UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
EASTERN PROFIT CORPORATION,
                            Plaintiff,

                                                                    18 civ 2185 (JGK)

        -against-

STRATEGIC VISION,
                            Defendant.
--------------------------------------------------------------X

## ORDER

A conference is scheduled for **Wednesday, September 12, 2018, at 4:30pm.**

**SO ORDERED.**

_____
                        **JOHN G. KOELTL**
               **UNITED STATES DISTRICT JUDGE**

Dated: New York, New York
       September 7, 2018

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 09/08/2018
```



# Phillips Lytle LLP

Via ECF                                                    September 6, 2018
Honorable John G. Koeltl
United States District Court
Southern District of New York
500 Pearl St., Courtroom 14A
New York, NY 10007-1312

Re:     Eastern Profit Corporation Limited v. Strategic Vision US, LLC,
        Civil Action No. 18-cv-2185

Dear Judge Koeltl:

We represent defendant, Strategic Vision US, LLC ("Strategic Vision"), in the above-
referenced matter.  On August 24, 2018, in accordance with Your Honor's Individual
Practices, we filed a letter requesting a pre-motion conference on Strategic Vision's
proposed motion for leave to file an amended answer and counterclaims, which would
add Guo Wengui as a counterclaim defendant (Dkt. No. 43).  Nearly two weeks have
elapsed and Plaintiff has not responded to our letter.

In light of Plaintiff's lack of opposition, we respectfully request that the Court waive the
pre-motion conference requirement or, alternatively, schedule a conference to discuss
Strategic Vision's proposed motion.

Respectfully,

Phillips Lytle LLP

By /s/ Heather H. Kidera

Heather H. Kidera

cc:     Counsel of Record (via ECF)

Doc #05-498976

HEATHER H. KIDERA

DIRECT 212 508 0479 HKIDERA@PHILLIPSLYTLE.COM

ATTORNEYS AT LAW

340 MADISON AVENUE 17TH FLOOR NEW YORK, NY 10173-1922 PHONE 212 759 4888 FAX 212 308 9079
NEW YORK: ALBANY, BUFFALO, CHAUTAUQUA, GARDEN CITY, NEW YORK, ROCHESTER | WASHINGTON, DC | CANADA: WATERLOO REGION | PHILLIPSLYTLE.COM

# ZEICHNER ELLMAN & KRAUSE LLP

1211 AVENUE OF THE AMERICAS

NEW YORK, NEW YORK 10036

ZACHARY GRENDI
(203) 489-1233
zgrendi@zeklaw.com

WWW.ZEKLAW.COM

September 6, 2018

Via ECF
Hon. Judge John. G. Koeltl
United States District Judge
S.D.N.Y.
500 Pearl St.
New York, NY 10007-1312

Re:     *Eastern Profit Corporation Limited v. Strategic Vision US LLC,*
        Civil Action No. 18-CV-2185

Dear Judge Koeltl,

We represent Eastern Profit Corporation Limited ("Eastern"), plaintiff in the above
referenced matter. As Strategic Vision US LLC ("Strategic Vision") indicated in its Letter
Motion to the Court dated August 24, 2018, Eastern does not consent to the proposed
amended answer and counterclaim. That said, Eastern has no objection to Strategic
Vision's August 24, 2018 Letter Motion for a conference to discuss the proposed amended
answer and counterclaim, and invites such a conference, be it by telephone or in-person.

Eastern respectfully requests that the Court not waive its pre-motion conference
requirement. Strategic Vision's request to add Guo Wengui as a party to this action raises
several issues, foremost of which would be Guo Wengui's right to respond the proposed
amended answer and counterclaim of his own accord. A conference would be a
productive forum for the parties and the Court to tackle the implications of Strategic
Vision's proposed amended answer and counterclaim.

Respectfully Submitted,

By:___/s/Zachary Grendi_____
Zachary Grendi, Esq.
Zeichner Ellman & Krause LLP
1211 Ave of the Americas
New York, NY 10036
Telephone: (203)489-1233
Facsimile: (203)862-9889

NEW YORK  |  CONNECTICUT  |  NEW JERSEY  |  ISRAEL  |  WASHINGTON D.C.



# Phillips Lytle LLP

<u>**Via ECF**</u>
Honorable John G. Koeltl                                                    August 24, 2018
United States District Court
Southern District of New York
50 Pearl St., Courtroom 14A
New York, NY 10007-1312

Re:    Eastern Profit Corporation Limited v. Strategic Vision US, LLC,
       Civil Action No. 18-cv-2185

Dear Judge Koeltl:

We represent defendant, Strategic Vision US, LLC ("Strategic Vision"), in the above-referenced matter.  Pursuant to Rule 2(B) of Your Honor's Individual Rules of Practice, Strategic Vision requests a pre-motion conference to discuss its proposed motion for leave to file an amended answer and counterclaims.  As explained below, Strategic Vision's proposed amended answer and counterclaims would add Guo Wengui a/k/a Miles Kwok ("Mr. Guo"), believed to be the principal of plaintiff Eastern Profit Corporation Limited ("Plaintiff"), as a counterclaim defendant.

## I.     Factual and Procedural Background

Plaintiff commenced this action, filed entirely under seal, on or about March 12, 2018.  Strategic Vision filed an answer and counterclaim on April 3, 2018, asserting one counterclaim for breach of contract relating to the outstanding amounts owed by Plaintiff under the parties' agreement.  Plaintiff filed its answer to the counterclaim on or about May 4, 2018.

Strategic Vision also filed a motion to unseal the case on April 3, 2018.  The parties were attempting to resolve the motion to unseal through a stipulated protective order.  During the course of negotiations on the protective order, Plaintiff retained new counsel on or about May 30, 2018.  Then, on July 25, 2018, we received notification that Plaintiff was once again retaining new counsel.  The case was unsealed by this Court on August 9, 2018 (ECF No. 15).

On August 7, 2018, counsel appeared for a conference before the Court.  At that time, the Court set a scheduling order, which includes August 24, 2018 as the deadline to add parties.  On August 20, 2018, we provided Plaintiff's counsel with a copy of the

ATTORNEYS AT LAW
_____

340 MADISON AVENUE  17TH FLOOR  NEW YORK, NY 10173-1922  PHONE 212 759 4888  FAX 212 308 9079
NEW YORK: ALBANY, BUFFALO, CHAUTAUQUA, GARDEN CITY, NEW YORK, ROCHESTER  |  WASHINGTON, DC  |  CANADA: WATERLOO REGION  |  PHILLIPSLYTLE.COM

Honorable John G. Koeltl                                      August 24, 2018
Page 2

proposed amended answer and counterclaims and requested Plaintiff's consent to
Strategic Vision's motion to amend.  On August 22, 2018, counsel for Plaintiff advised
that Plaintiff did not consent to the amended answer and counterclaims.

## II.   Strategic Vision's Proposed Motion

Rule 15 of the Federal Rules of Civil Procedure provides that leave to amend should be
"freely" given "when justice so requires."  The rule in the Second Circuit is "to allow a
party to amend its pleadings in the absence of a showing by the non-movant of
prejudice or bad faith."  *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993).

Here, Strategic Vision seeks leave to file an amended answer and counterclaims, which
would add Mr. Guo as a counterclaim defendant and assert claims against him, for
breach of contract, promissory estoppel and tortious interference.  A copy of the
proposed answer and counterclaims is attached as Exhibit A.  The case is in its early
stage (discovery has not yet begun) and Plaintiff's legal representation appears to have
just recently been sorted out.  Plaintiff will not be prejudiced by the addition of Mr. Guo
at this point.  Accordingly, Strategic Vision should be granted leave to file an amended
answer and counterclaims.

In light of the above, Strategic Vision respectfully requests the opportunity to discuss its
proposed motion to amend with the Court at a pre-motion conference.

Respectfully,

Phillips Lytle LLP

By   *David McNamara*

David J. McNamara

cc:  Counsel of Record (by ECF)

Doc #05-498497

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

EASTERN PROFIT CORPORATION LIMITED,

                    Plaintiff-Counterclaim Defendant,

vs.

STRATEGIC VISION US, LLC,

                    Defendant-Counterclaim Plaintiff,

vs.

GUO WENGUI a/k/a Miles Kwok,

                    Counterclaim Defendant.

**AMENDED ANSWER AND COUNTERCLAIMS**

Case No. 18-cv-2185

---

        Defendant, Strategic Vision US, LLC ("Strategic Vision") for its amended answer and counterclaims to plaintiff, Eastern Profit Corporation Limited's ("Eastern") complaint:

        1.     Lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 1.

        2.     Admits the allegations in paragraph 2, except denies that Strategic Vision's principal place of business is located at 7260 West Azure Drive, Suite 140-593, Las Vegas, Nevada.

        3.     Admits the allegations in paragraph 3.

        4.     Denies the allegations in paragraph 4, except admits that Strategic Vision participated in discussions in New York with Guo Wengui, a/k/a Miles Guo, a/k/a Miles Kwok ("Mr. Guo") on matters related to the subject contract.

5.      Admits the allegations in paragraph 5.

6.      In answer to paragraph 6, admits that Eastern and Strategic Vision entered into a contract executed on January 6, 2018 and dated as of December 29, 2017, ("Contract"), and refers to the Contract for a true and accurate statement of its terms.

7.      In answer to paragraph 7, refers to the Contract for a true and accurate statement of its terms.

8.      Admits the allegations in paragraph 8.

9.      Denies the allegations in paragraph 9.

10.     Denies the allegations in paragraph 10.

11.     Denies the allegations in paragraph 11.

12.     Denies the allegations in paragraph 12.

13.     Denies the allegations in paragraph 13.

14.     Denies the allegations in paragraph 14.

15.     Denies the allegations in paragraph 15.

16.     Denies the allegations in paragraph 16.

17.     Denies the allegations in paragraph 17, except admits that Strategic Vision and Mr. Guo mutually agreed that Strategic Vision's services under the Contract would be deemed to commence as of January 16.

18.     Denies the allegations in paragraph 18.

19.     Denies the allegations in paragraph 19.

20.     Denies the allegations in paragraph 20, except admits that upon Mr. Guo's unreasonable insistence, Strategic Vision delivered certain raw research and data to Eastern on January 30, 2018.

- 2 -

21.     Denies the allegations in paragraph 21.

22.     Denies the allegations in paragraph 22.

23.     Denies the allegations in paragraph 23.

24.     Denies the allegations in paragraph 24, except admits that Strategic Vision received a letter from Eastern's law firm purporting to terminate the Agreement.

25.     Denies the allegations in paragraph 25 insofar as they can be construed to allege an obligation on the part of Strategic Vision to return funds to Eastern.

26.     Denies the allegations in paragraph 26.

27.     In answer to paragraph 27, repeats and realleges the responses in paragraph 1 through 26 above.

28.     Admits the allegations in paragraph 28.

29.     Denies the allegations in paragraph 29.

30.     Denies the allegations in paragraph 30.

31.     In answer to paragraph 31, repeats and realleges the responses in paragraphs 1 through 30 above.

32.     Denies the allegations in paragraph 32.

33.     Denies the allegations in paragraph 33.

34.     Denies the allegations in paragraph 34.

35.     Denies the allegations in paragraph 35.

36.     Denies the allegations in paragraph 36.

37.     Denies the allegations in paragraph 37, except admits the allegations in the first sentence of paragraph 37 and denies the remaining allegations therein.

FIRST DEFENSE

38.     The complaint fails to state a claim upon which relief can be granted.

SECOND DEFENSE

39.     Relief cannot be accorded the parties of this action in the absence of
ACA Capital Group Limited, which is the party that paid to Strategic Visions the funds that
Eastern alleges to have paid as a deposit pursuant to the contract negotiated with Mr. Guo.

THIRD DEFENSE

40.     Eastern is estopped from asserting the claim for breach of the Contract
because, as alleged in Strategic Vision's counterclaims below, it hindered Strategic Vision's
performance and purported to terminate the Agreement precipitously and without cause.

FOURTH DEFENSE

41.     Eastern has failed to plead fraud and misrepresentation with
particularity as required by Rule 9 of the Federal Rules of Civil Procedure.

COUNTERCLAIMS

Strategic Vision, for its counterclaims against Eastern, alleges upon
information and belief.

PARTIES

42.     Strategic Vision is organized under the laws of the State of Nevada,
with its principal place of business in Nevada.

43.     Strategic Vision is a consulting firm that performs research and
analysis in the area of global competitive and political intelligence.  It was established in
2010 by principals who, as the result of decades of work in government and the private
sector, developed vast connections in multiple U.S. presidential administrations, both
houses of the U.S. Congress, the U.S. Department of Defense, the U.S. Department of

- 4 -

Energy, and many other government agencies in the U.S. and elsewhere. Strategic Vision's close working network of trusted resources extends to, among other places: Washington, D.C.; Houston, Texas; Calgary, Canada; London, England; Abu Dhabi, Sydney, Australia; and Singapore.

44.     Eastern is organized under the laws of Hong Kong, has a principal place of business in Hong Kong and engages in business activities in the State of New York and elsewhere in the United States.

45.     Eastern's principal is believed to be counterclaim-defendant Guo Wengui a/k/a Miles Kwok ("Mr. Guo"), a Chinese national who sought out Strategic Vision to perform research and analytics on numerous Chinese Nationals whom Mr. Guo and his undisclosed Chinese associates suspected to be engaged in activities in the United States and elsewhere that are inconsistent with their standing in the Chinese Communist Party and/or the laws of the United States. Attached as Exhibit A is an article published on October 3, 2017 by "The Real Deal - - -New York City Real Estate News" regarding Mr. Guo and his "anti-communist rhetoric" and activities.

A.     THE AGREEMENT

46.     In or about December 2017, Mr. Guo was introduced to Strategic Vision by one of his associates, Mr. Lianchao Han ("Mr. Lianchao"). Mr. Guo represented to Strategic Vision that Mr. Lianchao and Ms. Yvette Wang a/k/a/ Yanping Wang ("Ms. Y") each had authority to act for and on behalf of Mr. Guo. Ms. Y also served as Mr. Guo's interpreter, as Mr. Guo lacks a fluent command of the English language.

47.     Conversations between Strategic Vision and Mr. Guo concerning the scope and methods of Strategic Vision's work were facilitated by Mr. Lianchao and Ms. Y.

- 5 -

48.     During several conversations throughout December 2017, Strategic Vision informed Mr. Guo that (i) Strategic Vision's effectiveness would depend upon the quality of direction and information provided by Mr. Guo to Strategic Vision, (ii) Strategic Vision's work would be conducted in all respects consistent with the laws of the United States and it would not act on any requests of Mr. Guo that would require Strategic Vision to violate U.S. law, (iii) the work contemplated by Mr. Guo would require Strategic to engage subcontractors in Strategic Vision's global network of investigative professionals and analysts, (iv) Strategic Vision's business processes and global network of investigators and analysts were Strategic Vision's proprietary and confidential business information, (v) the time within which results would be reported to Mr. Guo and the quality of those results could not be assured because of the claimed sensitive nature of the information sought by Mr. Guo, (vi) the exchange of information between Strategic Vision and Mr. Guo could only take place in person-to-person meetings, and (vii) Mr. Guo must not take any action or request any service that would compromise the security of Strategic Vision's principals or its independent contractors.

49.     As discussions between Strategic Vision and Mr. Guo progressed, they agreed to an initial scope of work and fee schedule. Without identifying any particular entity by name, Mr. Guo informed Strategic Vision that he would cause his agreement with Strategic Vision to be entered into with a corporate entity controlled by him that he would fund as necessary to pay for Strategic Vision's services.

50.     Upon information and belief, Mr. Guo is the principal of Eastern.

51.     Upon information and belief, Eastern has little to no assets and is undercapitalized, and is unable to pay the amounts owed under the Agreement.

- 6 -

52.     Upon information and belief, Eastern is under the complete dominion and control of Mr. Guo.

53.     Upon information and belief, Eastern has failed to abide by corporate formalities.

54.     Strategic Vision reasonably and foreseeably relied on Mr. Guo's promise in determining to enter the Agreement with Eastern as the counterparty.  Strategic Vision would not have entered into the Agreement but for Mr. Guo's promise that he would adequately fund Eastern.

55.     On January 2, 2018, without notice to Strategic Vision and contrary to express instructions from Strategic Vision to Mr. Guo, an entity named "ACA Capital Group Limited" ("ACA") wired USD $1,000,000 (less wire fees) to Strategic Vision's long established bank account (the "ACA Payment").  Mr. Guo provided no information to Strategic Vision regarding ACA or the nature of its association with Mr. Guo or Eastern, if any.

56.     Strategic Vision and Mr. Guo had repeatedly discussed implementing security measures in advance of wiring money to protect Strategic Vision from harassment from Communist Chinese authorities.  Contrary to those discussions, the ACA Payment was sent directly from Hong Kong to Strategic Vision, providing Chinese Communists with a direct electronic payment trail.

57.     On January 5, 2018, Ms. Y traveled to the home of a principal of Strategic Vision in the State of Virginia and engaged in discussions concerning the services sought by Eastern.  In that same location on January 6, 2018, Ms. Y, on behalf of Eastern,

executed a certain "Research Agreement" which was also executed at that time by Strategic

Vision (the "Agreement"). A copy of the Agreement is attached as Exhibit B.

58.   The Agreement includes the following provision:

Irregular Circumstances. Both parties understand that occasional
unforeseen challenges may arise that will slow or block comprehensive
research, and that there may be periods in which information is irregular,
unavailable, or incomplete. [Strategic Vision] will endeavor to make research
and reports as complete as possible in a timely scheduled manner.

B.   STRATEGIC VISION'S PERFORMANCE UNDER THE
AGREEMENT

59.   Strategic Vision performed in all respects as required by the

Agreement.

60.   Immediately, upon entering into the Agreement, Strategic Vision

commenced its work under the Agreement by, among other activities, engaging and

marshaling the initial efforts of various investigators and analysts in the United States,

Europe and the Middle East, identifying trusted Chinese/ English translators who are not

Chinese nationals and analyzing initial data provided by Mr. Guo.

61.   As detailed further below, Mr. Guo's and Eastern's conflicting

instructions, inaccessible attempted communications and bizarre behaviors created

"irregular circumstances" that hindered and delayed Strategic Vison's work. Ms. Guo's

conduct in this regard was intentional.

62.   To facilitate Strategic Vision's work, it was incumbent upon Mr. Guo

and Eastern to identify the subjects ( referred to by Eastern in the Agreement as "fish") of its

desired research and analysis. Despite agreeing that Mr. Guo and Eastern would prioritize

no more than 10 subjects in each phase of Strategic Vison's work, Mr. Guo provided to

- 8 -

Strategic Vision a list of 92 potential subjects with no prioritization. Mr. Guo and Eastern then delayed in prioritizing their list of subjects, thus hindering Strategic Vision's work.

63.     On January 6, 2018, Eastern delivered to Strategic Vision a flash drive that purportedly included information necessary to facilitate Strategic Vision's work under the Agreement. Using industry best practices, Strategic Vision procured and used a virgin lap top in an attempt to access the data purportedly included on Eastern's flash drive. In doing so, Strategic Vision discovered that Eastern had provided to Strategic Vision an un-encrypted, unreadable, and electronically contaminated flash drive that contained unusual and sophisticated malware that attacked recipient computers.

64.     Strategic Vision took Eastern's flash drive to a cybersecurity expert who reported that he had never seen such malware before. The malware originated from Eastern's team. Strategic Vision then warned Eastern that its systems had been breached and corrupted. Despite repeated requests from Strategic Vision, Eastern failed to explain why it had delivered to Strategic Vision corrupted and potentially very harmful or malicious data files.

65.     During a meeting in New York City on January 8, Ms. Y delivered another flash drive to Strategic Vision which again purportedly included data necessary to Strategic Vision's work under the agreement. A large part of such data (i.e. one of three flash drives) was also corrupted.

66.     At the time that the Agreement was negotiated with Mr. Guo, Strategic Vision and Mr. Guo expressly agreed that they would not meet in person again, to prevent the Communist Chinese regime from observing their interactions. Mr. Guo and Eastern, however, repeatedly summoned Strategic Vision's principals to New York for

- 9 -

meetings and Mr. Guo invited them to future events aboard his yacht in Florida, despite Strategic Vision's cautionary warnings.

67.     Based on information received from Eastern that was used in Strategic Vision's investigatory work, Strategic Vision received warnings from computer experts and authorities in three countries that Eastern's systems were infiltrated and compromised, and that individual Chinese Communists had known in advance that they were objects of Eastern's interest.  Some of those individuals had taken precautions to block research into their activities, and at least one of them appeared to have laid a trap for Strategic Vision. This alarming breach of Mr. Guo's and Eastern's promise of security put members of Strategic Vision's team in potential danger, and caused some to quit.

68.     Eastern's confusing and contradictory instructions regarding the number and identity of the subjects of Strategic Vision's work resulted in a list of fifteen names, contrary to the parties' agreement that Strategic Vision would work on ten subjects in each phase of its work.  In the preliminary phase of its work in connection with Eastern's first identified subjects, Strategic Vision learned that most of the individuals so identified by Eastern had been designated by the U.S. Department of State under the Obama administration as "Records Protected" persons, meaning that information concerning their status and activities was not subject to disclosure under any circumstances.  Strategic Vision learned that attempting to research subjects known to be "Records Protected" could be a criminal activity, and so alerted Eastern.

69.     Communications among Eastern and Strategic Vision were hindered by Mr. Guo's conflicting instructions.  After describing Mr. Lianchao and Ms. Y as trusted business associates, Mr. Guo shortly thereafter advised Strategic Vision to refrain from

- 10 -

communicating with Mr. Lianchao because he was not trustworthy and to communicate with Ms. Y., who Mr. Guo oddly advised was a member of the Chinese Communist Party who also could not be trusted. During negotiations for what became the Agreement, r. Guo once banished Ms. Y from the premises so that Strategic Vision could speak privately with Mr. Guo, with Mr. Lianchao serving as interpreter. Strategic Vision independently learned that Ms. Y's husband and other close family members are Communist Chinese police or authorities. Given Mr. Guo's general lack of accessibility, his failure to ensure trusted channels of communication between Strategic Vision and Eastern hindered Strategic Vision's work under the Agreement.

70.     Within the first weeks of what was to be a multi-faceted and complex year-long effort under the Agreement, Strategic Vision verbally reported to Guo and Eastern that Strategic Vision could not within the limits of U.S. law obtain the information sought by Eastern on its initial list of subjects and that Strategic Vision's work would be refocused on others on Eastern's list. As a result, Mr. Guo became enraged and irrationally insisted that Strategic Vison immediately deliver its work product for his and Eastern's review.

71.     In response to Mr. Guo's demand, Strategic Vision explained that the "irregular circumstances" caused by Eastern precluded Strategic Vision from collecting and analyzing collected data and that the raw data developed to that point was not in a comprehensible form that would be of material use to Eastern. In the face of Eastern's insistence, however, Strategic Vision hand delivered its raw data to Mr. Guo and Eastern on January 26, 2018 with the caveat that it would be of no use to eastern until Strategic Vision had an opportunity to analyze it and produce a formal report.

72.     Strategic Vision communicated to Eastern each of the above alleged irregular circumstances. While Eastern acknowledged the problems, it did nothing to address them.

73.     Strategic Vision, Mr. Guo and Eastern had agreed from the beginning of their conversations and both understood that there would be unforeseen delays and difficulties in procuring information on the challenging task desired by Mr. Guo and Eastern. They agreed to work cooperatively when such delays arose. An entire section of the Agreement memorializes this understanding and agreement. The parties expressly understood that there could be severe and unforeseen delays, as well as times when no information could be discovered or reported at all. Eastern agreed in writing that such delays were foreseen and that the parties would work through them.

74.     Eastern surreptitiously and illegally attempted to reverse the ACA Payment by communicating directly with Strategic Vision's bank during the time period when Strategic Vision was rendering services to Eastern and before Eastern was finding ways to execute Eastern's project in compliance with U.S. law, Eastern was working behind Strategic Vision's back to deprive it of payment for its services.

<u>FIRST COUNTERCLAIM</u>
(Breach of Contract--Eastern and Mr. Guo)

75.     Strategic Vision repeats and realleges paragraphs 1 through 74 above.

76.     Pursuant to the Agreement, Eastern agreed to pay to Strategic Vision a fee of $750,000 per month for Strategic Vision's work while under the Agreement commencing on January 6, 2018.

77.     Strategic Vision rendered services to Eastern as required by the Agreement.

- 12 -

78.   The Agreement provides that either party may terminate it upon "'30 days' written notice."

79.   By letter dated February 23, 2018, counsel for Eastern provided notice of Eastern's termination of the Agreement "pursuant to the [Agreement's] 'Duration' Section."

80.   Consequently, the Agreement was terminated as of March 21, 2018. At the time of such termination, Eastern was obligated to pay to Strategic Vision the amount of $1,838,709.75, computed as follows:

| Period | Number of Days | Per Diem | Total |
|---|---|---|---|
| January 6-31 | 25 | $24,193.55 | $604,838.75 |
| February 1-28 | N/A | N/A | $750,000.00 |
| March 1-21 | 20 | $24,193.55 | $483,871.00 |
| | | | $1,838,709.75 |

81.   Assuming that the ACA payment was made on Eastern's behalf, the amount of $838,709.75 was due and payable from Eastern to Strategic Vision as of March 21, 2018.

82.   Eastern has breached the Agreement by failing to pay to Strategic Vision $838,709.75 due upon Eastern's termination of the Agreement.

83.   Eastern is under the complete dominion and control of Mr. Guo.  Mr. Guo has exercised control over Eastern to withhold payment to Strategic Vision of the amounts owed under the Agreement, resulting in an injury to Strategic Vision.

84.   In addition, Eastern has little to no assets and is undercapitalized, and is unable to pay the amounts owed under the Agreement.

85.   Eastern is the alter ego of Mr. Guo.  Accordingly, Mr. Guo is liable for the amounts owed by Eastern under the Agreement.

- 13 -

86.     Strategic Vision is entitled to judgment against Eastern and Mr. Guo in the amount of $838,709.75, plus interest at the State of New York's statutory rate for the period March 21, 2018 through the date that judgment is filed.

## SECOND COUNTERCLAIM
(Promissory Estoppel--Mr. Guo)

87.     Strategic Vision repeats and realleges paragraphs 1 through 86 above.

88.     The Agreement was negotiated entirely between representatives of Strategic Vision and Mr. Guo, or his agents at his specific instruction.  During the negotiations, Mr. Guo promised Strategic Vision that he would adequately fund Eastern such that it could meet its financial obligations under the Agreement.

89.     Strategic Vision reasonably and foreseeably relied on Mr. Guo's promise in determining to enter the Agreement with Eastern as the counterparty.   In performing under the Agreement, Strategic Vision provided unique services and incurred significant expenses in reliance on Mr. Guo's promise.

90.     Eastern has little to no assets and is undercapitalized, and is unable to pay the amounts owed under the Agreement.

91.     Strategic Vision would not have entered into the Agreement but for Mr. Guo's promise that he would adequately fund Eastern.  Accordingly, Strategic Vision has been harmed by its reasonable and foreseeable reliance on Mr. Guo's promise, which he has failed to fulfill.

92.     Mr. Guo is liable for the damages sustained by Strategic Vision as the result of its detrimental reliance on his promise in connection with the Agreement.

- 14 -

93.     Strategic Vision is entitled to judgment against Mr. Guo in the amount of $838,709.75, plus interest at the State of New York's statutory rate for the period March 21, 2018 through the date that judgment is filed.

### THIRD COUNTERCLAIM
(Tortious Interference--Mr. Guo)

94.     Strategic Vision repeats and realleges paragraphs 1 through 93 above.

95.     Mr. Guo had knowledge of the Agreement, as principal of Eastern and its primary point of contact.

96.     Mr. Guo intentionally engaged in a pattern of irrational conduct with respect to the Agreement, including providing conflicting instructions to Strategic Vision and attempting communications that were inaccessible.  Mr. Guo's conduct hindered Strategic Vision's ability to continue performing under the Agreement.

97.     Mr. Guo intentionally interfered with the Agreement by his irrational conduct and expectations that were inconsistent with the terms of the Agreement.

98.     Strategic Vision has been damaged by Mr. Guo's conduct, in an amount to be determined at trial.

WHEREFORE, the Defendant demands judgment (i) dismissing plaintiff's complaint; (ii) granting the relief request in the counterclaims; and (iii) granting such other and further relief as to the Court deems just, equitable and proper.

Dated:   August __, 2018          PHILLIPS LYTLE LLP
         New York, New York

                                  By _____
                                         David J. McNamara
                                         Heather H. Kidera
                                  Attorneys for Defendant-Respondent
                                  Strategic Vision US LLC
                                  125 Main Street
                                  Buffalo, New York 14203-2887

- 15 -

Telephone No. (716) 847-8400
dmcnamara@phillipslytle.com
hkidera@phillipslytle.com

Doc # 05-498173

- 16 -

# EXHIBIT A

**Case 1:18-cv-02185-LJL   Document 46   Filed 09/08/18   Page 24 of 31**

Case 1:18-cv-02185-JGK   Document 43-1   Filed 08/24/18   Page 19 of 26
Guo Wengui | Sherry-Netherland | Miles Kwok                                         Page 1 of 2

Sections **THE REAL DEAL THE REAL DEAL**
NEW YORK REAL ESTATE NEWS        NEW YORK CITY REAL ESTATE NEWS

## Fugitive Chinese billionaire speaks out from his hideout in the Sherry-Netherland

*Guo Wengui has set aside $150M war chest and plans to step up anti-government rhetoric*

October 03, 2017 10:25AM



*The penthouse at the Sherry-Netherland hotel and Chinese billionaire Guo Wengui (Credit: Twitter)*

Chinese billionaire Guo Wengui, who's been living in self-imposed exile at the Sherry-Netherland, is ready to take on his enemies. And there are many.

Guo, who has accused government and business figures of corruption via social media, has amassed a $150 million war chest that he said will cover his legal fees and other expenses as he seeks asylum in the U.S. and steps up anti-Communist rhetoric. "Nothing can stop me," he told the Wall Street Journal. "The U.S. is the last land of justice."

Guo, also known as Miles Kwok, made his fortune in real estate before fleeing China in 2015. That year, he picked up a sprawling co-op at the Sherry-Netherland co-op for $70 million. The apartment, pieced together out of smaller apartments over the years, has seven bedrooms and 2,000 square feet of terrace space. Last year, he listed it for $78 million with Brown Harris Stevens' Kathy Sloane, who brought Guo to the co-op two years ago.

Sign up for China Watch for weekly emails on Chinese real estate investments.

But a Hong Kong hedge fund moved to block the sale of Guo's apartment, arguing that he'd likely move the proceeds out of the U.S. to avoid repaying his debts. The unit is currently off the market.

Guo's allegations are hard to corroborate — even seemingly small details such as his age. But his accusations could upset China's planned leadership transition this month.

Last month, Guo said he would seek asylum in the U.S. since his accusations have made him a political target in China.

https://therealdeal.com/2017/10/03/fugitive-chinese-property-billionaire-speaks-out-from-hi...   4/3/2018

Case 1:18-cv-02185-LJL   Document 46   Filed 09/08/18   Page 25 of 31
Case 1:18-cv-02185-JGK   Document 43-1   Filed 08/24/18   Page 20 of 26
Page 2 of 2
Guo Wengui | Sherry-Netherland | Miles Kwok

In recent weeks, his critics have shut down one of his Facebook accounts and interfered with his video broadcasts. "China is at a very dangerous crossroads now," said Guo, who was set to speak Wednesday at the Hudson Institute, a Washington-based think tank.

The Journal described a man who appears quite comfortable at the Sherry-Netherland pad and in the claims he's making. "Sipping tea in a long black Chinese gown next to a fireplace in his apartment adorned with a Lego brick model of the London bridge, he challenged his detractors to produce evidence that he is wrong," the paper wrote.

Chinese officials have dismissed Guo's claims, and there is a warrant for his arrest. Several subordinates have been detained, and in August, government officials told the Associated Press that it was investigating Guo in 19 criminal cases involving bribery, kidnapping, fraud, money laundering and rape. HNA Group — which Guo has accused of having ties to the Communist Party — has filed a defamation suit against him. A Chinese woman who worked as his personal assistant accused him of rape, according to a suit filed in New York. [WSJ] —— E.B. Solomont

Tags: Residential Real Estate, Sherry Netherland

Share                    Tweet                    Share

The BEST Price for
Unlimited
Now with hulu
Sprint                                    Switch now

# EXHIBIT B

## Research Agreement
December 29, 2017

This agreement is between Strategic Vision US LLC ("the Contractor"), and Eastern Profit Corporation Limited,("the Client"), for the purpose of providing business research, reporting, documentation, and other consulting services.

Both parties agree that the nature of this contract, and work related to it, is highly confidential. Both parties are bound by the strictest secrecy not to disclose the existence of the contract, work relating to the contract, sources and methods used to execute the contract; and participants in formulating, supervising, or executing the contract's provisions, to any third party, except as required under United States law or the laws of the State of Nevada.

To this effect, there will be single line communication between the Contractor and the Client. The individuals through which such communication will be made will be identified upon the initiation of this contract. Any and all materials provided by the Client to the Contractor will be treated with absolute confidentiality and will not be shared by the Contractor with any other entity.

The Contractor will conduct high quality original research and prepare reports on subjects chosen at the Client's discretion, for the purpose of detecting, stopping, and preventing crime or other harm to innocent people. The Client will provide the necessary basic information, and desired areas of focus, to the Contractor to research. The Contractor will produce complete reports and provide all supporting data as indicated below. The research and reports will be devoted to the following three subject categories:

    A) **Financial forensic Historical research;**
    B) **Current Tracking research;**
    C) **Social media research.**

A) **Financial forensic Historical research** will consist of, but not be limited to, in-depth and detailed reports of existing and historical business and financial transactions, on subjects selected by the Client, and relations of the subject as identified by the Client. Business and financial transactions to be researched may include statements, capital sources, inflow and outflow information, bank receipts, financial instruments, financial products, statements of credit, precious metals transfers, commodity transfers, crypto currency exchange, stocks and other equities, business ownership, real property ownership, trusts, large

1

amounts of spending, specific information to indicate the transaction participants, and other data required by the Client.

The Contractor will produce a progress report on this financial forensic research each week in the first month, one preliminary report in the first month, and one comprehensive historical research report within 3 months, and with update reports sin each following month; the Client may require, reports per individual subject to the Client within a specified timeframe, as well as all relevant supporting data.

B) **Current Tracking research** shall consist of, but not be limited to, in-depth and detailed reports on movements of specified subjects by land, air, and sea (private and commercial); schedules and itineraries, addresses and lodging, means of transportation, names of carriers, manifests, geolocation, major events and significant contacts the subjects involved, videos and audio that can be accessed remotely, and other data that may be of relevance to the overall research, such as past travel records that may be significant to the research. This work shall consist only of primary source information, multimedia, and prepared reports.

The Contractor will produce concurrent tracking research per individual subject to the Client on a monthly basis, except in the first month that weekly reports shall be delivered and under circumstances that require more frequent reporting (weekly or fortnightly) as the Client directs, for up to a six-month period.

C) **Social media research** shall consist of, but not be limited to, in-depth and detailed reports on the social media usage and networks of specified subjects and public figures. Research shall include court records, criminal databases, sex offender and child abuse databases, information on subject's family, extramarital affairs, children born out of wedlock, passports and ID documents, assets, videos and audio, emails, websites, pornography and related media, comments on online media, social media (including Facebook, Twitter, Instagram, Snapchat, Wechat, and other sites as the Client may request), "dating" or sexual services apps, online classified ads or their equivalents, video or audio recordings, and other media.

The Contractor will produce social media research per individual subject to the Client on weekly basis for the first month, and on a monthly basis thereafter, except under circumstances that require more frequent reporting (weekly or fortnightly) as the Client directs, or irregular emergencies that the Contractor may discover.

**Information requiring translation.** When the Contractor encounters information requiring translation, the Contractor will provide electronic copies of the material to the Client for the Client to evaluate and translate. The Client may provide

2

translations to the Contractor for the Contractor to include in analytical reports. The Contractor is not responsible for translations.

**Deliverables.** The deliverables under this contract will be comprehensive confidential reports to the client. It is understood that some of the reports will be produced on a regular schedule, and that others will be produced on an as-needed basis. (A) Financial Forensic historical research reports will be produced as specified above one time per subject, subject to occasional updating throughout the year. (B) Current Tracking reports for each subject will be produced monthly or more frequently as Client directs. (C) Social media reports for each subject will be produced monthly or more frequently as Client directs. All deliverables shall be by USB drive only.

**Irregular circumstances.** Both parties understand that occasional unforeseen challenges may arise that will slow or block comprehensive research, and that there may be periods in which information is irregular, unavailable, or incomplete. The Contractor will endeavor to make all research and reports as complete as possible in a timely scheduled manner.

**Criteria.** The Contractor shall provide the deliverables based on the best practices and standards of the industry, comparable to other top firms with similar services. It shall make most diligent efforts to ensure the services renders are of very high quality, revealing a true, complete and full profile of the subject. The Contractor guarantees that all information provided is genuine.

**Prices.** Preamble: The prices for each deliverable "A," "B," and "C" are $300,000. each, per subject (per "fish") per year, for a total of $900,000 per fish per year. The contract is for 10 fish in the tank per year, with each fish being the subject of an A, B, and C report, or a total of 30 reports per year (10 fish x 3 reports each = 30 jobs at any given time, or 30 reports per year).

It is understood that the Client may not wish for each of the 10 fish to be the subject of all three reports, and that the number of report work duties per month will vary. It is also understood that either the Client may find it necessary to remove certain fish from time to time, or the Contractor may find circumstances do not permit sufficient work to research a given fish.

Therefore, when a fish is removed from consideration, a new fish will be put in its place, by the Client, keeping the number of fish being monitored at any time at 10.

However, this solution does not provide for predictable budgeting or workloads. To ensure the maximum workload for predictability of the agreed price, we will measure the deliverables as 30 units per year (10 fish x 3 reports [A+B+C] each = 30 jobs/reports at any given time).

3

The first month  (January) of this contract will include up to 15 fish for a total of
30 reports and will decrease to 10 fish for a total of 30 reports at the beginning of
the second month (February) and for (March) and for the duration of this
contract.

It is agreed by both Parties that for the first 3 months of this Agreement, January,
February and March 2018, that the payment of $750,000. USD will be wired per
our instructions to our US Bank account.

It is also agreed by both Parties that after the March reports and payments are
made, that all involved Parties will meet to recap the accounting, prior to moving
forward with the next quarter. We shall require that with any change to the
numbers above 10 fish in the tank, that SVUS will reserve the right to renegotiate
our financial Agreement.

The pricing for 30 units or deliverables per year remains a constant $9,000,000
per year, or $750,000 per month for 12 months. These units or deliverables may
be mixed and matched as the Client requests. As one unit is deleted from one
fish, an extra fish with the equivalent deliverable is added, as shown in the
attached charts.

We will measure each of the 30 reports as "report-equivalents" in the event it is
necessary to stop work prematurely on one fish, and replace it with a second
fish. We then have the partial report on the terminated fish, and a new report for
on the replacement fish for the duration of the contract. There is no extra startup
charge for the replacement fish in the 12-month period.

The flat price structure is as follows:

A) Comprehensive historical reports: $300,000 per report (or report-
   equivalent) per year.
B) Tracking reports: $300,000 per report (or report-equivalent) per year.
C) Social media reports: $300,000 per report (or report-equivalent) per year.

Reports may be combined ("mixed and matched") in any combination of up to 30.
They are not necessarily 10 of (A), 10 of (B), and 10 of (C); but could be, for
example 14 of (A), 8 of (B), and 8 of (C), or whatever totals 30.

The total for 30 units x US$300,000 each is US$9,000,000 (nine million dollars)
per year.

**Additional assignments.** Additional research consistent with the above may be
added in annual blocks of 10 fish x 3 deliverables each, or 30 deliverables per
year, as described above. The Client may direct the Contractor to conduct other
research, not specified in this agreement, for an additional fee.

4

**Payment terms.** For the purposes of this contract, the year begins the day the contract is signed. Payment is to be made in regular monthly installments of US$750,000, at the end of each month.

The Client will pay the Contractor a deposit of US$1,000,000 (one million dollars) upon signing the contract. The deposit will be credited on a prorated basis to the final 1-1/3 (1.3) months of the contract. Payment is to be made by "same day value" wire transfer to Strategic Vision US, LLC, per the following instructions:

> **Citibank NV Account Wire Instructions**
> Signatory: French C. Wallop, CEO
> Account name: Strategic Vision US, LLC
> Routing # 322271724
> Account # 500371679
> SWIFT code: CITIUS33
> Branch address:
>    Citibank
>    The Lakes
>    8701 W. Sahara Ave.
>    Las Vegas, NV  89117  USA
> Branch telephone: +1-702-228-2501

Subsequent payments will be made to the same account, unless mutually agreed otherwise in writing. It is understood that the Client may direct other entities to pay the Contractor, and that such payments will be deemed satisfactory compensation by the Contractor. All Client payments must be received by the Contractor by wire transfer within 5 business days of invoice.

Both parties anticipate that this contract could expand to many more subjects of research. The Client has expressly stated that there could be as many as 4000 such 'fish in the tank'. Obviously, negotiations for the far larger range will be agreed upon in writing at a later date.

**Duration.** This contract shall be in force for three (3) years from the date of signing. Either party may terminate the contract with 30 days' written notice.

French C. Wallop, CEO
Strategic Vision US, LLC

Date: Jan 6, 2018               Date: Jan 6, 2018

5