## ZEICHNER ELLMAN & KRAUSE LLP

1211 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036

ZACHARY GRENDI
(203) 489-1233
zgrendi@zeklaw.com

WWW.ZEKLAW.COM

January 8, 2019

**VIA ECF**
Judge John G. Koeltl
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Re:   *Eastern Profit Corporation Limited v. Strategic Vision US LLC,*
Civil Action No. 18-CV-2185.

Dear Judge Koeltl,

Plaintiff Eastern Profit Corporation Limited ("Eastern") hereby responds to Strategic Vision US LLC ("SV") letters dated January 7, 2019 and January 8, 2019.

First, with respect to SV's 11th hour request to adjourn the scheduling conference due to an unspecified "scheduling conflict," Eastern merely notes that Phillips Lytle LLP employs numerous attorneys in its New York and Garden City offices. Certainly one of those attorneys is (or can be familiarized with) the issues in play at tomorrow's conference. There being no good cause for an adjournment, the conference should proceed as scheduled.

Second, SV's blatant mischaracterization of the applicable Agreement must be squarely addressed. Through an abuse of the ellipse, SV's counsel has omitted key aspects of the relevant section of the Agreement concerning confidentiality on page 1 of the Agreement. Said section actually reads, in full:

> **Both parties agree that the nature of this contract, and work related to it, is highly confidential. Both parties are bound by the strictest secrecy not to disclose the existence of the contract, work relating to the contract, sources and methods used to execute the contract; and participants in formulating, supervising, or executing the contract's provisions, to any third party, except as required under United States law or the laws of the State of Nevada.**

ZEICHNER ELLMAN & KRAUSE LLP

January 8, 2019
Page 2

A copy of the Agreement is enclosed with this letter for the convenience of the Court and was filed as an exhibit by SV in its responsive pleading.  Dkt. No. 22-2.

SV's omission of the "**to any third party except as required under United States law or the laws of the State of Nevada**" ending of this paragraph via an ellipse is beyond the bounds of legitimate advocacy.  Eastern is not a third party – it's a one of the two parties to the Agreement.  Thus, this section does not apply to disclosures between Eastern and SV.  Moreover, the Agreement expressly states that disclosures of highly confidential information could be compelled as required by law, as in response to a subpoena or (as in this case) a discovery demand in civil litigation.  SV's assertion that "the parties understood that the sources and contractors used by Strategic Vision in connection with the Agreement could not, under any circumstances, be disclosed to anyone" is false in light of the plain terms of the Agreement.

Worse still, the parties agreed to custom tailored Stipulated Protective Order, Dkt. No. 40, which outlines detailed processes each party may use to protect non-parties with real confidentiality concerns.  SV can use these procedures to designate documents and information confidential, thus protecting legitimately confidential information from public disclosure.  The fact that the parties' protective order goes unmentioned in SV's January 8, 2019 letter is perplexing and notable.  And in the height of irony, it is SV that moved to unseal this case, ultimately exposing the identities of the parties and the Agreement to the public.[1]

SV's assertion that the such information is not "necessary" or relevant in this case is manifestly baseless.  The substance and timing of SV's performance (in reality non-performance) under the Agreement is the central issue in this case.  Indeed, SV's defenses and counterclaims are built around alleged actions and activities of its subcontractors.  Dkt. No 47 at ¶¶ 40, 60, 64, 67, 68, 69, 70.  SV cannot rely upon their subcontractor's alleged activities for SV's benefit, while simultaneously claiming that Eastern cannot explore those assertions or even know

---

[1] It should not go unnoticed that in moving to unseal this case, SV cited *Bernstein v. Berstein Litowitz Berger & Grossmann LLP*, NO. 14-CV-6867 (VEC), 2016 WL 1071107 (S.D.N.Y. Jan. 12, 2015), which held that the presumption of public access is outweighed by certain factors including the **privacy interests of those resisting disclosure**.  SV explicitly argued that "**none of the interests necessary to justify sealing exist.**" (*See* Dkt. No. 26, at pg. 4) (emphasis added).  Now, in an about-face, SV wants to claim that the Agreement requires the "utmost level of confidentiality, secrecy and compartmentalization."  Put differently, SV initially asked this Court to permit the entire world to have access to this litigation; but now, in the face of discovery demands asking how SV performed under a multi-million-dollar contract, SV claims it all must be kept secret because "the threat of harm to those hired by Strategic Vision … is very real."  SV simply cannot have it both ways.

Z E I C H N E R   E L L M A N   &   K R A U S E   LLP

January 8, 2019
Page 3

the identities of SV's subcontractors.  SV's insistence that Eastern is cynically trying to gain leverage over SV by seeking this discovery is nonsense – Eastern is merely trying to obtain critical relevant discovery to litigate its claims and defenses. Regardless, SV's January 8, 2019 letter fails to identify any statute or case law which supports its assertion of an undefined secrecy privilege.

SV's objections to Eastern's discovery requests are meritless and SV should be compelled to produce the information sought.

Respectfully submitted,

Zachary Grendi, Esq.

## Research Agreement
December 29, 2017

This agreement is between Strategic Vision US LLC ("the Contractor"), and Eastern Profit Corporation Limited ("the Client"), for the purpose of providing business research, reporting, documentation, and other consulting services.

**Both parties agree that the nature of this contract, and work related to it, is highly confidential. Both parties are bound by the strictest secrecy not to disclose the existence of the contract, work relating to the contract, sources and methods used to execute the contract; and participants in formulating, supervising, or executing the contract's provisions, to any third party, except as required under United States law or the laws of the State of Nevada.**

To this effect, there will be single line communication between the Contractor and the Client. The individuals through which such communication will be made will be identified upon the initiation of this contract. Any and all materials provided by the Client to the Contractor will be treated with absolute confidentiality and will not be shared by the Contractor with any other entity.

The Contractor will conduct high quality original research and prepare reports on subjects chosen at the Client's discretion, for the purpose of detecting, stopping, and preventing crime or other harm to innocent people. The Client will provide the necessary basic information, and desired areas of focus, to the Contractor to research. The Contractor will produce complete reports and provide all supporting data as indicated below. The research and reports will be devoted to the following three subject categories:

A) **Financial forensic Historical research;**
B) **Current Tracking research;**
C) **Social media research.**

A) **Financial forensic Historical research** will consist of, but not be limited to, in-depth and detailed reports of existing and historical business and financial transactions, on subjects selected by the Client, and relations of the subject as identified by the Client. Business and financial transactions to be researched may include statements, capital sources, inflow and outflow information, bank receipts, financial instruments, financial products, statements of credit, precious metals transfers, commodity transfers, crypto currency exchange, stocks and other equities, business ownership, real property ownership, trusts, large

1

amounts of spending, specific information to indicate the transaction participants, and other data required by the Client.

The Contractor will produce a progress report on this financial forensic research each week in the first month, one preliminary report in the first month, and one comprehensive historical research report within 3 months, and with update reports sin each following month; the Client may require, reports per individual subject to the Client within a specified timeframe, as well as all relevant supporting data.

**B) Current Tracking research** shall consist of, but not be limited to, in-depth and detailed reports on movements of specified subjects by land, air, and sea (private and commercial); schedules and itineraries, addresses and lodging, means of transportation, names of carriers, manifests, geolocation, major events and significant contacts the subjects involved, videos and audio that can be accessed remotely, and other data that may be of relevance to the overall research, such as past travel records that may significant to the research. This work shall consist only of primary source information, multimedia, and prepared reports.

The Contractor will produce concurrent tracking research per individual subject to the Client on a monthly basis, except in the first month that weekly reports shall be delivered and under circumstances that require more frequent reporting (weekly or fortnightly) as the Client directs, for up to a six-month period.

**C) Social media research** shall consist of, but not be limited to, in-depth and detailed reports on the social media usage and networks of specified subjects and public figures. Research shall include court records, criminal databases, sex offender and child abuse databases, information on subject's family, extramarital affairs, children born out of wedlock, passports and ID documents, assets, videos and audio, emails, websites, pornography and related media, comments on online media, social media (including Facebook, Twitter, Instagram, Snapchat, Wechat, and other sites as the Client may request), "dating" or sexual services apps, online classified ads or their equivalents, video or audio recordings, and other media.

The Contractor will produce social media research per individual subject to the Client on weekly basis for the first month, and on a monthly basis thereafter, except under circumstances that require more frequent reporting (weekly or fortnightly) as the Client directs, or irregular emergencies that the Contractor may discover.

**Information requiring translation.** When the Contractor encounters information requiring translation, the Contractor will provide electronic copies of the material to the Client for the Client to evaluate and translate. The Client may provide

2

translations to the Contractor for the Contractor to include in analytical reports. The Contractor is not responsible for translations.

**Deliverables.** The deliverables under this contract will be comprehensive confidential reports to the client. It is understood that some of the reports will be produced on a regular schedule, and that others will be produced on an as-needed basis. (A) Financial Forensic historical research reports will be produced as specified above one time per subject, subject to occasional updating throughout the year. (B) Current Tracking reports for each subject will be produced monthly or more frequently as Client directs. (C) Social media reports for each subject will be produced monthly or more frequently as Client directs. All deliverables shall be by USB drive only.

**Irregular circumstances.** Both parties understand that occasional unforeseen challenges may arise that will slow or block comprehensive research, and that there may be periods in which information is irregular, unavailable, or incomplete. The Contractor will endeavor to make all research and reports as complete as possible in a timely scheduled manner.

**Criteria.** The Contractor shall provide the deliverables based on the best practices and standards of the industry, comparable to other top firms with similar services. It shall make most diligent efforts to ensure the services renders are of very high quality, revealing a true, complete and full profile of the subject. The Contractor guarantees that all information provided is genuine.

**Prices.** Preamble: The prices for each deliverable "A," "B," and "C" are $300,000. each, per subject (per "fish") per year, for a total of $900,000 per fish per year. The contract is for 10 fish in the tank per year, with each fish being the subject of an A, B, and C report, or a total of 30 reports per year (10 fish x 3 reports each = 30 jobs at any given time, or 30 reports per year).

It is understood that the Client may not wish for each of the 10 fish to be the subject of all three reports, and that the number of report work duties per month will vary. It is also understood that either the Client may find it necessary to remove certain fish from time to time, or the Contractor may find circumstances do not permit sufficient work to research a given fish.

Therefore, when a fish is removed from consideration, a new fish will be put in its place, by the Client, keeping the number of fish being monitored at any time at 10.

However, this solution does not provide for predictable budgeting or workloads. To ensure the maximum workload for predictability of the agreed price, we will measure the deliverables as 30 units per year (10 fish x 3 reports [A+B+C] each = 30 jobs/reports at any given time).

The first month  (January) of this contract will include up to 15 fish for a total of 30 reports and will decrease to 10 fish for a total of 30 reports at the beginning of the second month (February) and for (March) and for the duration of this contract.

It is agreed by both Parties that for the first 3 months of this Agreement, January, February and March 2018, that the payment of $750,000. USD will be wired per our instructions to our US Bank account.

It is also agreed by both Parties that after the March reports and payments are made, that all involved Parties will meet to recap the accounting, prior to moving forward with the next quarter. We shall require that with any change to the numbers above 10 fish in the tank, that SVUS will reserve the right to renegotiate our financial Agreement.

The pricing for 30 units or deliverables per year remains a constant $9,000,000 per year, or $750,000 per month for 12 months. These units or deliverables may be mixed and matched as the Client requests. As one unit is deleted from one fish, an extra fish with the equivalent deliverable is added, as shown in the attached charts.

We will measure each of the 30 reports as "report-equivalents" in the event it is necessary to stop work prematurely on one fish, and replace it with a second fish. We then have the partial report on the terminated fish, and a new report for on the replacement fish for the duration of the contract. There is no extra startup charge for the replacement fish in the 12-month period.

The flat price structure is as follows:

A) Comprehensive historical reports: $300,000 per report (or report-equivalent) per year.
B) Tracking reports: $300,000 per report (or report-equivalent) per year.
C) Social media reports: $300,000 per report (or report-equivalent) per year.

Reports may be combined ("mixed and matched") in any combination of up to 30. They are not necessarily 10 of (A), 10 of (B), and 10 of (C); but could be, for example 14 of (A), 8 of (B), and 8 of (C), or whatever totals 30.

The total for 30 units x US$300,000 each is US$9,000,000 (nine million dollars) per year.

**Additional assignments.** Additional research consistent with the above may be added in annual blocks of 10 fish x 3 deliverables each, or 30 deliverables per year, as described above. The Client may direct the Contractor to conduct other research, not specified in this agreement, for an additional fee.

4

**Payment terms.** For the purposes of this contract, the year begins the day the contract is signed. Payment is to be made in regular monthly installments of US$750,000, at the end of each month.

The Client will pay the Contractor a deposit of US$1,000,000 (one million dollars) upon signing the contract. The deposit will be credited on a prorated basis to the final 1-1/3 (1.3) months of the contract. Payment is to be made by "same day value" wire transfer to Strategic Vision US, LLC, per the following instructions:

> **Citibank NV Account Wire Instructions**
> Signatory: French C. Wallop, CEO
> Account name: Strategic Vision US, LLC
> Routing # 322271724
> Account # 500371679
> SWIFT code: CITIUS33
> Branch address:
>     Citibank
>     The Lakes
>     8701 W. Sahara Ave.
>     Las Vegas, NV 89117 USA
> Branch telephone: +1-702-228-2501

Subsequent payments will be made to the same account, unless mutually agreed otherwise in writing. It is understood that the Client may direct other entities to pay the Contractor, and that such payments will be deemed satisfactory compensation by the Contractor. All Client payments must be received by the Contractor by wire transfer within 5 business days of invoice.

Both parties anticipate that this contract could expand to many more subjects of research. The Client has expressly stated that there could be as many as 4000 such 'fish in the tank'. Obviously, negotiations for the far larger range will be agreed upon in writing at a later date.

**Duration.** This contract shall be in force for three (3) years from the date of signing. Either party may terminate the contract with 30 days' written notice.

French C. Wallop, CEO
Strategic Vision US, LLC

Date: Jan 6, 2018

Date: Jan 6, 2018

5