**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

**EASTERN PROFIT CORPORATION LIMITED,**

    **Plaintiff/Counterclaim Defendant,**

                               **Case No. 18-cv-2185**

    **v.**

**STRATEGIC VISION US, LLC,**

    **Defendant/Counterclaim Plaintiff.**

----------------------------------------------------------------------------------------------------------------------

**DEFENDANT STRATEGIC VISION US, LLC'S AMENDED ANSWER AND
COUNTERCLAIMS TO SECOND AMENDED COMPLAINT**

    Defendant Strategic Vision US, LLC ("Strategic Vision") states and alleges the

following for its Amended Answer and Counterclaims to the Second Amended Complaint

("Complaint") of Plaintiff Eastern Profit Corporation Limited ("Eastern Profit").  This

Amended Answer includes, verbatim, the Counterclaims previously filed by Strategic Vision

at ECF 114.  This Amended Answer is amended solely to assert additional defenses and

affirmative defenses to the Complaint.

## PARTIES

    1.      Strategic Vision is without knowledge or information sufficient to form a belief as

to the truth of the allegations in Paragraph 1 of the Complaint and therefore denies them for lack

of information. Strategic Vision reserves its right to conduct discovery regarding these

allegations.

    2.      Strategic Vision admits the allegations of Paragraph 2 of the Complaint.

## JURISDICTION AND VENUE

    3.      The allegations of Paragraph 3 of the Complaint comprise one or more legal

conclusions to which no response from Strategic Vision is required. To the extent an answer is

deemed required, Strategic Vision denies the application of any legal conclusions against its interests in this case. Further answering, Strategic Vision admits the jurisdictional facts stated in the Paragraph regarding the amount in controversy and citizenship of the parties.

4.      The allegations of Paragraph 4 of the Complaint comprise one or more legal conclusions to which no response from Strategic Vision is required. To the extent an answer is deemed required, Strategic Vision denies the application of any legal conclusions against its interests in this case. Strategic Vision denies the factual allegations of the Paragraph on which the legal conclusions rest except that Strategic Vision admits participating in discussions with Guo Wengui, a/k/a Miles Guo, a/k/a Miles Kwok ("Guo") at his home at 781 Fifth Avenue, New York, New York on matters related to the subject contract attached as Ex. A to the Complaint (the "Contract"). Further answering, Strategic Vision states that Paragraph 4 of the Complaint alleges that the Contract was negotiated in New York but Paragraph 8 of the Complaint contradicts that allegation in part.

5.      The allegations of Paragraph 5 of the Complaint comprise one or more legal conclusions to which no response from Strategic Vision is required. To the extent an answer is deemed required, Strategic Vision denies the application of any legal conclusions against its interests in this case. Strategic Vision denies the factual allegations of the Paragraph on which the legal conclusions rest except that Strategic Vision admits that some, but not all, negotiations regarding the Contract occurred in New York.

**FACTS COMMON TO ALL COUNTS**

6.      In response to the allegations of Paragraph 6 of the Complaint, Strategic Vision admits that Eastern Profit and Strategic Vision entered into a contract formally executed on or about January 6, 2018 and in place as of on or about December 29, 2017 (referred to above as the

"Contract"). Strategic Vision admits that a true and correct copy of the Contract is attached as Ex. A to the Complaint. Strategic Vision denies any characterizations or mischaracterizations of the Contract by Eastern Profit against Strategic Vision's interests in the case, and Strategic Vision refers to the Contract for the true and accurate statement of its terms. Strategic Vision states that, by an agreed amendment of the Contract, Strategic Vision's services under the Contract would commence no earlier than January 16, 2018.

7.      In response to the allegations of Paragraph 7 of the Complaint, Strategic Vision admits executing the Contract in Virginia on the date indicated.

8.      Strategic Vision admits the allegations of Paragraph 8 of the Complaint.

9.      Strategic Vision admits the allegations of Paragraph 9 of the Complaint.

10.     Strategic Vision admits the allegations of Paragraph 10 of the Complaint.

11.     Strategic Vision denies the allegations of Paragraph 11 of the Complaint except that Strategic Vision admits it made accurate and true representations to Eastern Profit regarding Strategic Vision's resources and experience in the course of confirming Strategic Vision's ability to satisfy Eastern Profit's description of its intended scope and plans for the investigative research to be conducted by Strategic Vision pursuant to the Contract.

12.     Strategic Vision denies the allegations of Paragraph 12 of the Complaint because they misrepresent the nature of its statements to Eastern Profit regarding Strategic Vision's experience and resources in the field of investigative research.

13.     Strategic Vision denies the allegations of Paragraph 13 of the Complaint because they misrepresent the nature of its statements to Eastern Profit regarding Strategic Vision's experience in the field of investigative research.

14.     Strategic Vision denies the allegations of Paragraph 14 of the Complaint because they misrepresent the nature of its statements to Eastern Profit regarding Strategic Vision's research experience.

15.     Strategic Vision denies the allegations of Paragraph 15 of the Complaint.

16.     In response to the allegations of Paragraph 16 of the Complaint, Strategic Vision states that it is without knowledge or information sufficient to form a belief as to the truth of them because they are based on a description of Eastern Profit's alleged state of mind when entering into the Contract. Strategic Vision states that the Contract terms included none of the alleged circumstances described in the Paragraph as within Eastern Profit's state of mind when entering into the Contract.

17.     In response to the allegations of the first sentence of Paragraph 17 of the Complaint, Strategic Vision admits that it received payment from Eastern Profit in the amount indicated in the sentence but denies all other allegations in the sentence. Strategic Vision denies the remaining allegations of the Paragraph, including because they misrepresent the terms of the Contract and misstate the legal effect of those terms in the circumstances of this case. Strategic Vision denies any characterizations or mischaracterizations of the Contract by Eastern Profit against Strategic Vision's interests in the case. Strategic Vision denies any construction of the Contract that would involve an obligation on the part of Strategic Vision to return the indicated funds to Eastern Profit.

18.     Strategic Vision denies the allegations of Paragraph 18 of the Complaint.

19.     Strategic Vision denies the allegations of Paragraph 19 of the Complaint but admits that Strategic Vision and Eastern Profit agreed that calculation of Eastern Profit's payments to Strategic Vision for Strategic Vision's work under the Contract would commence

on January 16, 2019. Further answering, Strategic Vision did work between January 6, 2019 and January 16, 2019, and did perform $250,000 worth of uncompensated work for Eastern Profit during that period.

20.     Strategic Vision denies the allegations of Paragraph 20 of the Complaint.

21.     Strategic Vision denies the allegations of Paragraph 21 of the Complaint, including without limitation the implied allegation that the Contract required Strategic Vision to have an "in-house" team perform the investigative research described in the Contract. Strategic Vision denies that the Contract required this, and denies making a representation to Eastern Profit at any time that an "in-house" team would perform investigative research under the Contract. Strategic Vision denies any characterizations or mischaracterizations of the Contract by Eastern Profit against Strategic Vision's interests in the case.

22.     In response to the allegations of the first sentence of Paragraph 22 of the Complaint, Strategic Vision admits that French Wallop is its CEO and that, during the relevant timeframe, Strategic Vision did not employ W-2 representatives, to the extent that Eastern Profit intends such as the meaning of "employee" as used in the Paragraph. Strategic Vision denies the remaining allegations of the Paragraph.

23.     Strategic Vision denies the allegations of Paragraph 23 of the Complaint. Strategic Vision specifically denies that the Contract required an "in-house" team to perform investigative research under the Contract, and Strategic Vision denies making a representation to Eastern Profit at any time that an "in-house" team would perform the investigative research. Strategic Vision denies any characterizations or mischaracterizations of the Contract by Eastern Profit against Strategic Vision's interests in the case.

24.     In response to the allegations of Paragraph 24 of the Complaint, Strategic Vision admits that, on or about the date indicated in the Paragraph, Strategic Vision delivered incomplete work product to Eastern Profit in the form of raw research data but this was in response to unreasonable pressure and impossible demands from Eastern Profit, through its representative (or, alternatively, its true principal) Guo in particular. Strategic Vision denies any other allegations of the Paragraph.

25.     Strategic Vision denies the allegations of Paragraph 25 of the Complaint.

26.     Strategic Vision denies the allegations of Paragraph 26 of the Complaint. Strategic Vision denies any characterizations or mischaracterizations of the Contract by Eastern Profit against Strategic Vision's interests in the case.

27.     Strategic Vision denies the allegations of Paragraph 27 of the Complaint. Strategic Vision denies any characterizations or mischaracterizations of the Contract by Eastern Profit against Strategic Vision's interests in the case.

28.     The allegations of Paragraph 28 of the Complaint are based on one or more written documents that speak for themselves and are the best evidence of their content and meaning. Strategic Vision denies any characterizations or mischaracterizations of the documents by Eastern Profit against Strategic Vision's interests in the case. Strategic Vision admits that Eastern Profit purported to terminate the Contract through correspondence from legal counsel on or about the date indicated in the Paragraph.

29.     The allegations of Paragraph 29 of the Complaint are based on one or more written documents, including the Contract, that speak for themselves and are the best evidence of their content and meaning. Strategic Vision denies any characterizations or mischaracterizations of the documents by Eastern Profit against Strategic Vision's interests in the case. Strategic

Vision denies that the Contract requires the return of the indicated sum in the circumstances present in this case.

## COUNT I: ALLEGED BREACH OF THE CONTRACT

30.     Strategic Vision repeats and realleges its responses to all prior Paragraphs of the Complaint as if fully set forth herein.

31.     The allegations of Paragraph 31 of the Complaint comprise one or more legal conclusions to which no response from Strategic Vision is required. To the extent an answer is deemed required, Strategic Vision denies the application of any legal conclusions against its interests in this case. Further answering, Strategic Vision admits the existence of the Contract and that it is valid and enforceable. Strategic Vision denies the allegation that it breached the Contract.

32.     The allegations of Paragraph 32 of the Complaint comprise one or more legal conclusions to which no response from Strategic Vision is required. To the extent an answer is deemed required, Strategic Vision denies the application of any legal conclusions against its interests in this case. Strategic Vision denies the allegation that it breached the Contract and denies the existence of the "actions and inactions" described in the Paragraph.

33.     The allegations of Paragraph 33 of the Complaint comprise one or more legal conclusions to which no response from Strategic Vision is required. To the extent an answer is deemed required, Strategic Vision denies the application of any legal conclusions against its interests in this case. Strategic Vision denies the allegation that it breached the Contract and denies the existence of damages incurred by Eastern Profit as alleged in the Paragraph.

## COUNT II: ALLEGED FRAUDULENT MISREPRESENTATION

34.     Strategic Vision repeats and realleges its responses to all prior Paragraphs of the Complaint as if fully set forth herein.

35.     Strategic Vision denies the allegations of Paragraph 35 of the Complaint, including its subparts. Strategic Vision admits making accurate and true representations to Eastern Profit regarding Strategic Vision's resources and experience in describing Strategic Vision's ability to satisfy Eastern Profit's description of its intended scope and plans for the investigative research to be conducted by Strategic Vision pursuant to the Contract. The Paragraph grossly misrepresents Strategic Vision's statements to Eastern Profit in this regard.

36.     Strategic Vision denies the allegations of Paragraph 36 of the Complaint. Strategic Vision admits making accurate and true representations to Eastern Profit regarding Strategic Vision's resources and experience in describing Strategic Vision's ability to satisfy Eastern Profit's description of its intended scope and plans for the investigative research to be conducted by Strategic Vision pursuant to the Contract. The Paragraph grossly misrepresents Strategic Vision's statements to Eastern Profit in this regard.

37.     Strategic Vision denies the allegations of Paragraph 37 of the Complaint. Strategic Vision admits making accurate and true representations to Eastern Profit regarding Strategic Vision's resources and experience in describing Strategic Vision's ability to satisfy Eastern Profit's description of its intended scope and plans for the investigative research to be conducted by Strategic Vision pursuant to the Contract. The Paragraph grossly misrepresents Strategic Vision's statements to Eastern Profit in this regard.

38.     Strategic Vision denies the allegations of Paragraph 38 of the Complaint. Strategic Vision admits making accurate and true representations to Eastern Profit regarding

Strategic Vision's resources and experience in describing Strategic Vision's ability to satisfy Eastern Profit's description of its intended scope and plans for the investigative research to be conducted by Strategic Vision pursuant to the Contract. The Paragraph grossly misrepresents Strategic Vision's statements to Eastern Profit in this regard.

39.     Strategic Vision denies the allegations of Paragraph 39 of the Complaint. Strategic Vision admits making accurate and true representations to Eastern Profit regarding Strategic Vision's resources and experience in describing Strategic Vision's ability to satisfy Eastern Profit's description of its intended scope and plans for the investigative research to be conducted by Strategic Vision pursuant to the Contract. The Paragraph grossly misrepresents Strategic Vision's statements to Eastern Profit in this regard.

40.     Strategic Vision denies the allegations of Paragraph 40 of the Complaint, and expressly denies making the representations indicated in the Paragraph.

41.     Strategic Vision denies the allegations of Paragraph 41 of the Complaint. Strategic Vision admits making accurate and true representations to Eastern Profit regarding Strategic Vision's resources and experience in describing Strategic Vision's ability to satisfy Eastern Profit's description of its intended scope and plans for the investigative research to be conducted by Strategic Vision pursuant to the Contract. Strategic Vision denies the implied allegation that the Contract required that Strategic Vision use an "in-house" investigative team to conduct investigative research under the Contract.

42.     In response to the allegations of Paragraph 42 of the Complaint, Strategic Vision denies that the Contract requires the return of the indicate sum in the circumstances present in this case. Strategic Vision denies any characterizations or mischaracterizations of the Contract by

Eastern Profit against Strategic Vision's interests in the case. Strategic Vision denies making any misrepresentation to Eastern Profit in connection with the Contract.

43.     Strategic Vision denies making any misrepresentation to Eastern Profit in connection with the Contract and therefore denies the allegations of Paragraph 43 of the Complaint.

44.     Strategic Vision denies making any misrepresentation to Eastern Profit in connection with the Contract and therefore denies the allegations of Paragraph 44 of the Complaint.

45.     Strategic Vision denies making any misrepresentation to Eastern Profit in connection with the Contract and therefore denies the allegations of Paragraph 45 of the Complaint. Strategic Vision denies that Eastern Profit has incurred any damages under the Contract as a result of any failure by Strategic Vision under the Contract.

## COUNT III: DECLARATORY JUDGMENT

46.     Strategic Vision repeats and realleges its responses to all prior Paragraphs of the Complaint as if fully set forth herein.

47.     Strategic Vision admits the allegations of Paragraph 47 of the Complaint and admits that it has provided services to clients outside of the United States.

48.     Strategic Vision admits the allegations of Paragraph 48 of the Complaint.

49.     Strategic Vision admits the allegations of Paragraph 49 of the Complaint.

50.     Strategic Vision admits the allegations of Paragraph 50 of the Complaint but denies that the activity described in the Paragraph occurs universally when Strategic Vision performs investigative research for its clients.

51.     Strategic Vision admits the allegations of Paragraph 51 of the Complaint.

52.     Strategic Vision admits the allegations of Paragraph 52 of the Complaint.

53.     Strategic Vision admits the allegations of Paragraph 53 of the Complaint.

54.     Strategic Vision denies the allegations of Paragraph 54 of the Complaint to the extent they imply that Strategic Vision guaranteed a certain result from its investigative research for Eastern Profit. Strategic Vision admits that its services could result in providing assistance for asset recovery efforts.

55.     Strategic Vision is without knowledge or information sufficient to form a belief as to the truth of the vague allegations in Paragraph 55 of the Complaint and therefore denies them for lack of information. Strategic Vision reserves its right to conduct discovery regarding these allegations.

56.     The allegations of Paragraph 56 of the Complaint are based on one or more written documents, namely the Contract, that speak for themselves and are the best evidence of their content and meaning. Strategic Vision denies any characterizations or mischaracterizations of the documents by Eastern Profit against Strategic Vision's interests in the case. Strategic Vision admits the general characterization of the Contract contained in this Paragraph.

57.     The allegations of Paragraph 57 of the Complaint are based on one or more written documents, namely the Contract, that speak for themselves and are the best evidence of their content and meaning. Strategic Vision denies any characterizations or mischaracterizations of the documents by Eastern Profit against Strategic Vision's interests in the case.

58.     The allegations of Paragraph 58 of the Complaint are based on one or more written documents, namely the Contract, that speak for themselves and are the best evidence of their content and meaning. Strategic Vision denies any characterizations or mischaracterizations of the documents by Eastern Profit against Strategic Vision's interests in the case.

59.     The allegations of Paragraph 59 of the Complaint are based on one or more written documents, namely the Contract, that speak for themselves and are the best evidence of their content and meaning. Strategic Vision denies any characterizations or mischaracterizations of the documents by Eastern Profit against Strategic Vision's interests in the case.

60.     The allegations of Paragraph 60 of the Complaint are based on one or more written documents, namely the Contract, that speak for themselves and are the best evidence of their content and meaning. Strategic Vision denies any characterizations or mischaracterizations of the documents by Eastern Profit against Strategic Vision's interests in the case.

61.     The allegations of Paragraph 61 of the Complaint are based on one or more written documents, namely the Contract, that speak for themselves and are the best evidence of their content and meaning. Strategic Vision denies any characterizations or mischaracterizations of the documents by Eastern Profit against Strategic Vision's interests in the case.

62.     The allegations of Paragraph 62 of the Complaint are based on one or more written documents, namely the Contract, that speak for themselves and are the best evidence of their content and meaning. Strategic Vision denies any characterizations or mischaracterizations of the documents by Eastern Profit against Strategic Vision's interests in the case.

63.     The allegations of Paragraph 63 of the Complaint are based on one or more written documents, namely the Contract, that speak for themselves and are the best evidence of their content and meaning. Strategic Vision denies any characterizations or mischaracterizations of the documents by Eastern Profit against Strategic Vision's interests in the case.

64.     The allegations of Paragraph 64 of the Complaint are based on one or more written documents, namely the Contract, that speak for themselves and are the best evidence of

their content and meaning. Strategic Vision denies any characterizations or mischaracterizations

of the documents by Eastern Profit against Strategic Vision's interests in the case.

65.     Strategic Vision admits the allegations of Paragraph 65 of the Complaint.

66.     Strategic Vision admits the allegations of Paragraph 66 of the Complaint.

67.     Strategic Vision denies the allegations of Paragraph 67 of the Complaint.

68.     Strategic Vision denies the allegations of Paragraph 68 of the Complaint.

69.     Strategic Vision denies the allegations of Paragraph 69 of the Complaint.

70.     Strategic Vision admits the allegations of Paragraph 70 of the Complaint.

71.     Strategic Vision admits the allegations of Paragraph 71 of the Complaint.

72.     Strategic Vision admits the allegations of Paragraph 72 of the Complaint.

73.     Strategic Vision denies the allegations of Paragraph 73 of the Complaint.

74.     Strategic Vision denies the allegations of Paragraph 74 of the Complaint.

75.     Strategic Vision denies the allegations of Paragraph 75 of the Complaint.

76.     Strategic Vision denies the allegations of Paragraph 76 of the Complaint.

77.     Strategic Vision denies the allegations of Paragraph 77 of the Complaint.

78.     Strategic Vision denies the allegations of Paragraph 78 of the Complaint.

79.     Strategic Vision denies the allegations of Paragraph 79 of the Complaint.

80.     Strategic Vision denies the allegations of Paragraph 80 of the Complaint.

81.     Strategic Vision denies the allegations of Paragraph 81 of the Complaint.

82.     Strategic Vision denies the allegations of Paragraph 82 of the Complaint.

83.     Strategic Vision denies the allegations of Paragraph 83 of the Complaint.

84.     Strategic Vision denies the allegations of Paragraph 84 of the Complaint.

85.     Strategic Vision denies the allegations of Paragraph 85 of the Complaint.

86.     Strategic Vision admits the allegations of Paragraph 86 of the Complaint.

87.     Strategic Vision denies the allegations of Paragraph 87 of the Complaint.

88.     Strategic Vision admits the allegations of Paragraph 88 of the Complaint. Further answering, Strategic Vision denies that this circumstance creates legal liability for Strategic Vision or supports Eastern Profit's claim that the Contract is unenforceable.

89.     Strategic Vision admits the allegations of Paragraph 89 of the Complaint. Further answering, Strategic Vision denies that this circumstance creates legal liability for Strategic Vision or supports Eastern Profit's claim that the Contract is unenforceable.

90.     Strategic Vision admits the allegations of Paragraph 90 of the Complaint. Further answering, Strategic Vision denies that this circumstance creates legal liability for Strategic Vision or supports Eastern Profit's claim that the Contract is unenforceable.

91.     Strategic Vision admits the allegations of Paragraph 91 of the Complaint. Further answering, Strategic Vision denies that this circumstance creates legal liability for Strategic Vision or supports Eastern Profit's claim that the Contract is unenforceable.

92.     Strategic Vision admits the allegations of Paragraph 92 of the Complaint. Further answering, Strategic Vision denies that this circumstance creates legal liability for Strategic Vision or supports Eastern Profit's claim that the Contract is unenforceable.

93.     Strategic Vision admits the allegations of Paragraph 93 of the Complaint. Further answering, Strategic Vision denies that this circumstance creates legal liability for Strategic Vision or supports Eastern Profit's claim that the Contract is unenforceable.

94.     Strategic Vision admits the allegations of Paragraph 94 of the Complaint. Further answering, Strategic Vision denies that this circumstance creates legal liability for Strategic Vision or supports Eastern Profit's claim that the Contract is unenforceable.

95.     Strategic Vision admits the allegations of Paragraph 95 of the Complaint. Further answering, Strategic Vision denies that this circumstance creates legal liability for Strategic Vision or supports Eastern Profit's claim that the Contract is unenforceable.

96.     Strategic Vision admits the allegations of Paragraph 96 of the Complaint. Further answering, Strategic Vision denies that this circumstance creates legal liability for Strategic Vision or supports Eastern Profit's claim that the Contract is unenforceable.

97.     Strategic Vision admits the allegations of Paragraph 97 of the Complaint. Further answering, Strategic Vision denies that this circumstance creates legal liability for Strategic Vision or supports Eastern Profit's claim that the Contract is unenforceable.

98.     Strategic Vision admits the allegations of Paragraph 98 of the Complaint. Further answering, Strategic Vision denies that this circumstance creates legal liability for Strategic Vision or supports Eastern Profit's claim that the Contract is unenforceable.

99.     Strategic Vision admits the allegations of Paragraph 99 of the Complaint. Further answering, Strategic Vision denies that this circumstance creates legal liability for Strategic Vision or supports Eastern Profit's claim that the Contract is unenforceable.

100.    Strategic Vision admits the allegations of Paragraph 100 of the Complaint. Further answering, Strategic Vision denies that this circumstance creates legal liability for Strategic Vision or supports Eastern Profit's claim that the Contract is unenforceable.

101.    Strategic Vision admits the allegations of Paragraph 101 of the Complaint. Further answering, Strategic Vision denies that this circumstance creates legal liability for Strategic Vision or supports Eastern Profit's claim that the Contract is unenforceable.

102.     Strategic Vision admits the allegations of Paragraph 102 of the Complaint. Further answering, Strategic Vision denies that this circumstance creates legal liability for Strategic Vision or supports Eastern Profit's claim that the Contract is unenforceable.

103.     The allegations of Paragraph 103 of the Complaint comprise one or more legal conclusions to which no response from Strategic Vision is required. To the extent an answer is deemed required, Strategic Vision denies the application of any legal conclusions against its interests in this case. Strategic Vision denies that the Contract is illegal or void on the basis alleged in the Paragraph.

104.     The allegations of Paragraph 104 of the Complaint comprise one or more legal conclusions to which no response from Strategic Vision is required. To the extent an answer is deemed required, Strategic Vision denies the application of any legal conclusions against its interests in this case. Strategic Vision denies that the Contract is illegal or void on the basis alleged in the Paragraph.

105.     The allegations of Paragraph 105 of the Complaint comprise one or more legal conclusions to which no response from Strategic Vision is required. To the extent an answer is deemed required, Strategic Vision denies the application of any legal conclusions against its interests in this case. Strategic Vision denies that the Contract is illegal or void on the basis alleged in the Paragraph.

106.     The allegations of Paragraph 106 of the Complaint comprise one or more legal conclusions to which no response from Strategic Vision is required. To the extent an answer is deemed required, Strategic Vision denies the application of any legal conclusions against its interests in this case. Strategic Vision denies that the Contract is illegal or void on the basis alleged in the Paragraph.

107.    Strategic Vision states that the allegations of Paragraph 107 of the Complaint are a description of the claim related to the allegation and, as such, no response from Strategic Vision is needed. To the extent an answer is required, Strategic Vision denies Eastern Profit's entitlement to the relief requested.

### COUNT IV: ALLEGED UNJUST ENRICHMENT

108.    Strategic Vision repeats and realleges its responses to all prior Paragraphs of the Complaint as if fully set forth herein.

109.    The allegations of Paragraph 109 of the Complaint comprise one or more legal conclusions to which no response from Strategic Vision is required. To the extent an answer is deemed required, Strategic Vision denies the application of any legal conclusions against its interests in this case. Strategic Vision denies that a benefit has been conferred on it by Eastern Profit under the Contract. Eastern Profit has breached the Contract, as alleged below, and Strategic Vision's performance under the Contract has not been fully compensated or satisfied under the circumstances that exist in this case.

110.    The allegations of Paragraph 110 of the Complaint comprise one or more legal conclusions to which no response from Strategic Vision is required. To the extent an answer is deemed required, Strategic Vision denies the application of any legal conclusions against its interests in this case. Strategic Vision denies that a benefit has been conferred on it by Eastern Profit under the Contract. Eastern Profit has breached the Contract, as alleged below, and Strategic Vision's performance under the Contract has not been fully compensated or satisfied under the circumstances that exist in this case.

111.    The allegations of Paragraph 111 of the Complaint comprise one or more legal conclusions to which no response from Strategic Vision is required. To the extent an answer is

deemed required, Strategic Vision denies the application of any legal conclusions against its interests in this case. Strategic Vision denies that a benefit has been conferred on it by Eastern Profit under the Contract. Eastern Profit has breached the Contract, as alleged below, and Strategic Vision's performance under the Contract has not been fully compensated or satisfied under the circumstances that exist in this case.

112.    The allegations of Paragraph 112 of the Complaint comprise one or more legal conclusions to which no response from Strategic Vision is required. To the extent an answer is deemed required, Strategic Vision denies the application of any legal conclusions against its interests in this case. Strategic Vision denies that a benefit has been conferred on it by Eastern Profit under the Contract. Eastern Profit has breached the Contract, as alleged below, and Strategic Vision's performance under the Contract has not been fully compensated or satisfied under the circumstances that exist in this case.

113.    The allegations of Paragraph 113 of the Complaint comprise one or more legal conclusions to which no response from Strategic Vision is required. To the extent an answer is deemed required, Strategic Vision denies the application of any legal conclusions against its interests in this case. Strategic Vision denies that a benefit has been conferred on it by Eastern Profit under the Contract. Eastern Profit has breached the Contract, as alleged below, and Strategic Vision's performance under the Contract has not been fully compensated or satisfied under the circumstances that exist in this case.

## **AFFIRMATIVE AND OTHER DEFENSES**

1.    The Complaint fails to state a claim on which relief can be granted.

2.    Strategic Vision's liability for Eastern Profit's claims, if any, is reduced or eliminated by the doctrines of estoppel, waiver, offset, set-off, breach of the implied duty of

good faith and fair dealing, failure to mitigate alleged damages, unclean hands, election of remedies, impossibility of performance and excuse on behalf of Strategic Vision for alleged non-performance, and frustration of purpose.

3.     The fraudulent misrepresentation allegations in the Complaint fail to satisfy the pleading requirements of Fed. R. Civ. P. 9 and the governing law.

4.     Eastern Profit is not entitled to recover on the Complaint, specifically the claim for alleged breach of contract, because it committed the first breach of the Contract and Strategic Vision did not breach the Contract.  Eastern Profit failed to abide by its duties, express and implied, under the Contract.

5.     Eastern Profit alleges in Paragraph 1 of the Complaint that it is organized under the laws of Hong Kong and has a principal place of business there.  Eastern Profit lacks capacity and standing and Strategic Vision otherwise has a defense to Eastern Profit's claims in the Complaint because, upon information and belief, Eastern Profit is and has been during the relevant timeframe purporting to do business regularly and systematically in New York and hold itself out as authorized to do business in New York but is not and has not been registered to do business in the State of New York as required by N.Y. Bus. Corp. §§ 1304, 1301 *et seq.*  Golden Spring (New York) Limited, which has been indicated by Eastern Profit to hold a power-of-attorney for Eastern Profit regarding this litigation, also, upon information and belief, has been regularly and systematically doing business in New York but is not registered to do business in New York and has not been so registered under N.Y. Bus. Corp. §§ 1304, 1301 *et seq.*

6.     Relief cannot be accorded herein in the absence of ACA Capital Group Limited as a party to the case.  ACA Capital Group Limited paid Strategic Vision the funds that Eastern Profit alleges to have paid as a deposit pursuant to the contract negotiated with Guo, and was also involved in an unsuccessful attempt to reverse transfer of the deposit to Strategic Vision's

account.  Eastern Vision lacks capacity and standing to seek the relief sought in the Complaint.

WHEREFORE, Defendant Strategic Vision US, LLC demands judgment (i) dismissing the Complaint or entering an order finding against Plaintiff and in favor of Defendant on the Complaint; (ii) granting the relief request in the Counterclaims; and (iii) granting such other and further relief as to the Court deems just, equitable and proper.

## COUNTERCLAIMS

Strategic Vision states and alleges the following for its Counterclaims against Eastern Profit.

## PARTIES, JURISDICTION, AND VENUE

1.      Strategic Vision is a limited liability company organized under the laws of the State of Nevada, with its principal place of business in Virginia.

2.      Strategic Vision is a consulting firm that performs research and analysis in the area of global competitive and political intelligence. It was established in 2005 by individuals who, as the result of decades of work in government and the private sector, developed significant connections in multiple U.S. presidential administrations, the U.S. Congress, the U.S. Department of Defense, the U.S. Department of Energy, and other government agencies in the U.S. and elsewhere. Strategic Vision's close working network of trusted resources extends to, among other places: Washington, D.C.; Houston, Texas; Calgary, Canada; London, England; Abu Dhabi, United Arab Emirates; and Singapore.

3.      Eastern Profit is organized under the laws of Hong Kong, has a principal place of business in Hong Kong, and purports to engage in business activities in the State of New York and elsewhere in the United States. Upon information and belief, Eastern Profit has little or no assets. After months of discussions between Strategic Vision and Guo Wengui (a/k/a Miles Kwok), after exchanging several drafts of the written Contract at issue in this case (which is

attached to the Complaint as Ex. A), and immediately before the Contract's execution, a representative of Eastern Profit authorized by Guo to negotiate the final contract for him identified Eastern Profit by name to Strategic Vision for the first time. That representative, Wang Yangping, a/k/a Yvette Wang, indicated that Eastern Profit would be the corporate vehicle to perform for Guo and receive Strategic Vision's performance under the Contract.

4.      At all times, Guo acted and made representations for Eastern Profit, and at no time did Eastern Profit repudiate or fail to accept or adopt any action or representation by Guo or any person acting under his express authority. At no time did Eastern Profit direct Strategic Vision to communicate with it through any person other than Guo or one of his representatives, or inform Strategic Vision that Guo or any person acting under Guo's authority could not bind Eastern Profit. In fact, at all times Strategic Vision interacted on the Contract with three individuals. These three were Guo, and two other individuals to whom Guo alternatively gave authority: Wang and another individual identified more fully below, Lianchao Han. At all times, Wang and Lianchao Han claimed to be acting under the authority and with the permission of Guo.

5.      Eastern Profit contends in this case that its "principal" is Han Chunguang. However, on information and belief, Han provides personal services, including cooking and security services, to Guo Wengui. Further, Eastern Profit is listed in Hong Kong as having a sole director, Guo Mei, who was appointed on June 27, 2017. Guo Mei is the daughter of Guo Wengui. Guo is the actual person who controls and directs Eastern Profit.

6.      Eastern Profit is associated through Guo with non-party Golden Spring (New York) Limited, a Delaware corporation having its principal place of business a few hundred feet north of Guo's Fifth Avenue apartment. Golden Spring claims to be Eastern Profit's attorney-in-

fact for certain purposes, including this litigation. Golden Spring's CEO is Yvette Wang. Wang claims that Eastern Profit and the Guo family are both clients of Golden Spring, and has claimed that Golden Spring is a Guo family office. Wang purported to execute the Contract on Eastern Profit's behalf in the presence of Strategic Vision principal French Wallop, but Ms. Wallop—who does not read Chinese characters—did not notice that Wang actually wrote the "signature" of Han Chunguang.

7.      Eastern Profit claims that Guo ordered its first and only payment to Strategic Vision under the Contract—two successive $500,000 wires sent moments apart on January 2, 2018. Those wires actually came from another entity, non-party "ACA Capital Group Limited" ("ACA"), a Hong Kong-based entity. Eastern Profit claims that it entered into a loan agreement with ACA, signed by ACA director and longtime Guo associate William Je, a/k/a Yu Jianming, at around the time ACA wired the $1 million to Strategic Vision. Another ACA director, Karin Maistrello, is an Italian-Chinese translator who also served as notary public on many of Eastern Profit's filings in this case. On information and belief, Maistrello also works for Golden Spring (New York). Maistrello also acts as a co-host of Chinese-themed broadcasts alongside Guo and Stephen K. Bannon and Maistrello is President and Treasurer of the Rule of Law Society, which Guo founded and Bannon chairs.

8.      On July 25, 2017, Chinese business publication Caixin reported that Guo had "lost control" of ACA. Somehow, just over five months later, ACA made its $1 million in payments to Strategic Vision.

9.      In May 2019, a Hong Kong High Court reportedly entered an order freezing the assets of many of the above entities or persons, including Eastern Profit, Guo Wengui, Han Chunguang, Golden Spring (Hong Kong) Limited (an entity that wholly owns Golden Spring

(New York), and whose sole director since March 2014 has been registered in Hong Kong as Guo Qiang, who is Guo Wengui's son), and a variety of other entities related to an organized crime and money-laundering inquiry in which Guo Wengui is designated as "Respondent 1."

10.     Jurisdiction and venue are proper in this Court.

## FACTS COMMON TO ALL COUNTS

### Introduction

11.     Guo is a Chinese national who claims to hold 11 passports. He publicly presents himself as a dissident who is opposed to China's Communist government and the Chinese Communist Party ("CCP"). As shown in greater detail below, in 2017, Guo filed an application for asylum in the United States based on alleged political persecution. Since 2017, he has cultivated allies in conservative media, political, and policy circles, including Stephen K. Bannon and reporter Bill Gertz, who are perceived as being China hawks—that is, supportive of taking a stronger stand against Chinese human rights abuses, espionage, and assertions of offensive military power. When Gertz and another Guo intermediary approached Strategic Vision in late 2017 to perform research and analytics on numerous Chinese nationals who were allegedly linked to top Party officials—work that Guo himself soon presented as necessary for his struggle against the evils of the Chinese Communist Party, in alignment with Strategic Vision's worldview—this apparently heroic and outspoken dissident was a man with whom Strategic Vision was proud to partner.

12.     But the real Guo was never a dissident. Just four months before directing Yvette Wang to sign Eastern Profit's contract with Strategic Vision, in an August 26, 2017 signed written statement that Guo later read aloud on video, Guo had professed his personal loyalty to "Chairman Xi," the leader of the Chinese Communist Party and President of the People's

Republic of China. In that letter, Guo asked CCP leadership to convert his "influence and resources" to "best serve Chairman Xi Jinping's China Dream!" "Assign me tasks," Guo implored, and "provide me with detailed instruction with particular reference to public statements I may make to the media." Even earlier, in March 2017, Guo had secretly promised to become Beijing's dissident-hunter in the United States, bringing ruinous tort litigation against critics of the Communist regime. Even as he directed Eastern Profit to promise Strategic Vision that it was being engaged to "prevent crime or other harm to innocent people," Guo had begun to carry out his plan against Chinese dissidents in the United States.

13.      Guo's true intentions were always irreconcilable with the purpose and terms of the Contract, from day one of the negotiations through the final days of Strategic Vision's performance. As set forth in the Counterclaims below, Guo fraudulently represented the purpose to which he intended to put Strategic Vision's labors, causing it special damage, and, once Strategic Vision was hooked, it was inevitable that Guo's Eastern Profit entity would breach the Contract by endangering Strategic Vision and frustrating its performance.

**The Contract Negotiation**

14.      In or about December 2017, Guo was introduced to Strategic Vision by one of his associates, Mr. Lianchao Han. (Mr. Han will be referred to by his first name, "Lianchao," to differentiate him from purported Eastern Profit director Han Chunguang, whom Strategic Vision believes is unrelated). Lianchao and a reporter for the Washington Free Beacon, Bill Gertz, had first approached Strategic Vision on behalf of Guo. Both Lianchao and Gertz represented to Strategic Vision that Guo was a true dissident and that his sympathies were with those trying to undermine the Chinese Communist Party regime, bring democracy and freedom to China, and turn China from a strategic adversary to a friend of the United States. Lianchao and Gertz knew

French Wallop and Strategic Vision, and Michael Waller, who partnered with Strategic Vision. Lianchao and Gertz knew that Wallop and Waller—and therefore Strategic Vision—would only be receptive to a project that sought to undermine—and never support—the Communist Party. Wallop and Waller had known Gertz for more than 30 years and had known Lianchao for many years, and trusted their judgment. On information and belief, Guo knew this.

15.     By August 2017, Breitbart.com (the news outlet at that time controlled by Stephen K. Bannon) had begun actively promoting Guo's cause. Bannon had led Breitbart prior to joining the White House as Chief Strategist to President Donald Trump, and Bannon returned to lead Breitbart after President Trump fired him on August 18, 2017. Six days later, on August 24, 2017, the first pro-Guo story appeared in Breitbart. By October 2017, Bannon himself had begun to speak publicly on behalf of Guo. Through other connections, Guo even gained membership in President Trump's Mar-a-Lago resort in Florida. These prominent connections with China hawks such as Bannon, including the assurances of Lianchao and Gertz, persuaded Wallop and Waller to journey to New York to meet with Guo.

16.     Guo received Strategic Vision's representatives at his $67 million apartment, which occupies the entire 18th floor penthouse of the Sherry-Netherland on Fifth Avenue. Guo represented to Strategic Vision that Lianchao and Yvette Wang each had authority to act for and on behalf of Guo at various times. Lianchao and Wang also alternatively served as Guo's interpreter, as Guo lacks a fluent command of the English language.

17.     Conversations between Strategic Vision and Guo concerning the purpose, scope and methods for the Contract were alternatively facilitated by Lianchao and Wang.

18.     Guo represented to Strategic Vision that he was a dissident, and intended to find damaging information on individuals with connections to Communist Party leadership,

particularly family members reputed to be running money laundering and other operations for them. He represented that he would then use this information to highlight corruption and misconduct at the highest levels. The entire Chinse political system is thoroughly corrupt; Guo's stated intent was to use his exposures of corruption to exploit and widen divisions within the CCP, and ultimately completely undermine CCP rule in China.

19.     During several conversations throughout December 2017, Strategic Vision informed Guo that (i) Strategic Vision's effectiveness would depend upon the quality of direction and information provided by Guo to Strategic Vision, (ii) Strategic Vision's work would be conducted in all respects consistent with the laws of the United States and Strategic Vision would not act on any requests of Guo that would require it to violate U.S. law, (iii) the work contemplated by Guo would require Strategic Vision to engage subcontractors in Strategic Vision's global network of intelligence professionals and analysts, and that organizing that network would take time and require advance startup funding, (iv) Strategic Vision's business processes and global relationship with independent researchers and analysts were Strategic Vision's proprietary and confidential business information, (v) the time within which results would be reported to Guo and the quality of those results could not be assured because of the claimed sensitive nature of the information sought by Guo, the time-consuming security measures that Guo required for retrieving the information from around the world, and the challenges and occasional impossibilities of retrieving certain information, (vi) the exchange of information between Strategic Vision and Guo would require extensive travel and time due to Guo's insistence that they take place only in person-to- person meetings, and (vii) Guo must not take any action or request any service that would compromise the security of Strategic Vision's principals or its independent contractors.

20.     As discussions between Strategic Vision and Guo progressed, they agreed to an initial scope of work and fee schedule. Without identifying any particular entity by name, Guo informed Strategic Vision that he would cause his Contract with Strategic Vision to be entered into with a corporate entity controlled by him that he would fund as necessary to pay for Strategic Vision's services. It was explicitly agreed that such entity would not be based out of the People's Republic of China or Hong Kong, as this would greatly increase the risk of detection by Guo's targets or their allies in the CCP or Chinese government.

21.     Strategic Vision and Guo had also repeatedly discussed implementing security measures in advance of wiring money, using a circuitous route to avoid Chinese government detection and resulting harassment of Strategic Vision or disruption of its work. Accordingly, Strategic Vision and Guo had agreed that Guo would use third-party companies, not based in Hong Kong or China, to send a $1,000,000 deposit prior to initiation of the Contract.

22.     On January 2, 2018, without notice to Strategic Vision and contrary to express instructions from Strategic Vision to Guo, an entity named "ACA Capital Group Limited" ("ACA") wired two separate payments of $500,000 each, totaling USD $1,000,000 (less wire fees), from Hong Kong to Strategic Vision's long-established bank account. This provided the Chinese Communist regime with a direct electronic payment trail to Strategic Vision. Sending two separate and nearly simultaneous wires in identical amounts also violated a basic security procedure, dangerously increasing the already-magnified risk of Chinese detection. Guo provided no information to Strategic Vision regarding ACA or the nature of its association with Guo or Eastern Profit, even after both wires were sent. Neither Guo nor anyone associated with his enterprise ever mentioned ACA's name to Strategic Vision. However, in this case, Eastern Profit has admitted that Guo ordered the wires to be sent on or about December 29, 2017.

Eastern Profit has also admitted that both Guo and Yvette Wang have "knowledge" of ACA's unsuccessful attempts to reverse those wires days after they were sent.

23.     On January 5, 2018, Wang traveled to the home of a principal of Strategic Vision in the State of Virginia and engaged in discussions concerning the services sought by Eastern Profit. In that same location on January 6, 2018, Wang, on behalf of Eastern Profit, executed the Contract, which French Wallop executed at the same time on behalf of Strategic Vision.

24.     Wang laughed or chuckled as she signed the Contract in Wallop's presence. Wallop did not understand at the time, and Wang did not disclose, that the Chinese characters Wang was signing (and initialing on each page) were not her name, but that of Han Chunguang, Guo's cook and security guard, whom Eastern Profit falsely claims is its principal.

25.     The Contract provided that Strategic Vision would be paid for specific periods of work, rather than for the quantity, content or data in its periodic reports. The Contract did not define the scope of the reports, and Guo would later insist that the reports should contain purely raw data and no analysis from Strategic Vision.

26.     In anticipation that circumstances might disrupt work flow, the Contract also included the following provision:

> **Irregular Circumstances.** Both parties understand that occasional unforeseen challenges may arise that will slow or block comprehensive research, and that there may be periods in which information is irregular, unavailable, or incomplete. [Strategic Vision] will endeavor to make research and reports as complete as possible in a timely scheduled manner.

### Contract Performance

27.     Strategic Vision performed in all respects as required by the Contract and in a manner exhibiting good faith and fair dealing towards Eastern Profit. Strategic Vision's work

under the Contract was in the form of providing services, not product. Strategic Vision performed all services possible under the Contract, given the circumstances.

28.     Immediately upon entering into the Contract, Strategic Vision commenced its work under the Contract by, among other activities, recruiting, vetting, engaging and marshaling the initial efforts of various investigators and analysts in the United States, Europe and the Middle East, identifying trusted Chinese/English translators who are not Chinese nationals and analyzing initial data provided by Guo, without compromising or endangering the parties to the Contract or their respective principals and agents.

29.     As detailed further below, conflicting instructions, inaccessible attempted communications and bizarre behaviors by Guo and Eastern Profit created "irregular circumstances" that hindered and delayed Strategic Vison's work. Guo's and Eastern Profit's conduct in this regard was intentional and in bad faith without regard to the adverse effect on Strategic Vision.

30.     To facilitate Strategic Vision's work, it was incumbent upon Guo and Eastern Profit to identify the subjects (referred to by Eastern Profit in the Contract as "fish") of its desired research and analysis. Despite agreeing that Guo and Eastern Profit would prioritize no more than 10 subjects in each phase of Strategic Vison's work, Guo provided to Strategic Vision a list of 92 potential subjects. To accommodate Guo's demands, Strategic Vision had agreed to increase the list to 15 individuals for the first month, at which point the list would drop back to 10 names for the same flat fee, and Strategic Vision never agreed to process a list of 92 names at a given time for the existing contract price.

31.     On January 6, 2018, immediately after signing the Contract, Wang delivered to Strategic Vision two flash drives that purportedly included information necessary to facilitate

Strategic Vision's work under the Contract. One appeared to be empty. Strategic Vision immediately discovered that the other flash drive was not only un-encrypted, but was unreadable and electronically contaminated with unusual and sophisticated malware that attacked recipient computers.

32.     Strategic Vision immediately took the contaminated flash drive to a cybersecurity expert, who reported that he had never seen such malware before. The malware originated from Eastern Profit's team. Strategic Vision then warned Eastern Profit that its systems had been breached and corrupted. Despite repeated requests from Strategic Vision, Eastern Profit failed to explain why it had delivered to Strategic Vision corrupted and potentially very harmful or malicious data files.

33.     To replace the malware-infected drives, Wang delivered three duplicate flash drives to Strategic Vision on January 8, 2018, during a meeting in New York City. Those three drives, which (like the first set of drives) were also cheap and unsecured, again purportedly contained data (the 15 priority names in a set of charts of 92 names overall) necessary to Strategic Vision's work under the Contract. A large part of such data (i.e., one of three flash drives) was also corrupted.

34.     At the time that the Contract was negotiated with Guo, Strategic Vision and Guo expressly agreed that they would not meet in person again, to prevent the Communist Chinese regime from observing their interactions. Guo told Strategic Vision that the Chinese government had him under constant electronic and human surveillance.

35.     Guo told Strategic Vision that the Chinese Embassy in Washington also had Strategic Vision and Wallop's residence under constant electronic and human surveillance; Wang even wrote the name, in English and Chinese characters, of the person the Embassy had

assigned. Guo and Eastern Profit, however, repeatedly summoned Strategic Vision's principals to New York for meetings at Guo's residence. Guo even invited them to future events aboard his yacht in Florida, despite Strategic Vision's cautionary warnings. Strategic Vision had no choice but to comply with Guo's requests for in-person meetings at his residence.

36.     Strategic Vision's team, working in other countries, also found troubling breaches of security by Eastern Profit and Guo that frustrated and prevented Strategic Vision's performance. For example, the team found that other teams of researchers were simultaneously researching some of the same individuals and files that Guo, through Wang, had given to Strategic Vision. Previously, Guo had stated that he had three or four other teams of researchers he could use if Strategic Vision did not enter into the Contract; he had never stated that he would simultaneously have those teams surveil the same subjects as Strategic Vision, which created a security risk for all of the teams and made it much more likely they would be uncovered and subjected to defensive measures or counter-measures by the targets. Strategic Vision would never have agreed to expose its team to work under such circumstances.

37.     Strategic Vision's team also found that Guo had posted on his publicly-available website the same initial informational page Strategic Vision had received for at least one of the fifteen initial targets, instantly identifying Guo as the client—a relationship that, for security reasons, is never compromised by disclosure to individual researchers operating under cover. Guo's online disclosure also made it more likely that individual subjects would know they were being researched—and by whom. This further placed Strategic Vision and its researchers at risk. Indeed, some individuals on Guo's initial list of 15 Chinese Communists appeared to have known in advance that they were objects of Guo's interest. Someone had taken precautions to

block research into some of the individuals' activities, and at least one of them appeared to have

laid a computer trap for Strategic Vision.

38.     The above conduct by Guo and Eastern Profit, which they undertook intentionally

and in bad faith toward Strategic Vision, caused some of Strategic Vision's team members to

quit. The team in question, based abroad, was a network of people who worked with and trusted

one another, and the loss of some team members became another work setback.

39.     In the preliminary phase of its work in connection with Eastern Profit's first 15

identified subjects, a second Strategic Vision team, based in the U.S., learned that all 15 of the

individuals so identified by Eastern Profit had been designated by the U.S. government as

"Records Protected" persons. "Records Protected" status, the team said, meant that information

concerning the subjects' status and activities was not subject to disclosure under the methods that

Strategic Vision's team was permitted to use. This team, consisting entirely of former

government intelligence, Homeland Security, or law enforcement personnel, explained that

"Records Protected" people were foreigners who were either assisting the U.S. government on

law enforcement or national security cases, were under federal investigation for criminal activity,

or were potentially to come under investigation. In practice, the purpose of the designation was

to ensure that no one, including the individuals themselves, could learn information that would

help them determine whether they were under investigation. Strategic Vision learned that

attempting to research subjects known to be "Records Protected" could be a criminal activity,

and so alerted Guo via Lianchao Han, the person Guo had at that time designated for

communications regarding the Eastern Profit Contract. Strategic Vision asked for Guo's

guidance, but Lianchao responded that Guo was extremely agitated and would not give the

requested guidance. Strategic Vision chose to risk its $9 million annual contract with Guo's

Eastern Profit entity by operating strictly within the law, yet remained engaged with Lianchao to convince Guo to address the issue and perhaps offer a new list of individuals to research. Strategic Vision remained in contact with Lianchao until an attorney for Eastern Profit notified Strategic Vision that Eastern Profit was terminating the Contract.

40.     When negotiating and executing the Contract, Strategic Vision was unaware and could not have been aware that the subjects were designated Records Protected because Eastern Profit did not indicate the Subjects until after the Contract was in place, and Strategic Vision had not heard of the "Records Protected" term before. Given Eastern Profit's assurances that the purpose of the Contract was to facilitate investigation of Communist Chinese individuals opposed to the United States, it was not foreseeable that Eastern Profit would provide a list of names that were Records Protected. It is appropriate to allocate the risk of the subjects being Records Protected on Eastern Profit, not Strategic Vision.

41.     Communications among Eastern Profit and Strategic Vision were hindered by Guo's conflicting instructions, impossible demands, and failure to give guidance when requested. For example, after describing Lianchao Han and Yvette Wang as trusted business associates, Guo advised Strategic Vision to communicate only with Lianchao while negotiating the Contract, and once even banished Wang from the premises so that he could speak privately with Strategic Vision through Lianchao as the interpreter. Then, in the last days of December 2017 through January 2018, through the final negotiation of the Contract and the beginning of its performance, Guo instructed Strategic Vision to speak only with Wang. Later, he instructed Strategic Vision to communicate only with Lianchao. Shortly thereafter, in mid-January, Guo advised Strategic Vision through Wang to refrain from communicating with Lianchao because he was "not trustworthy" and to instead communicate with Wang. Oddly, Guo had advised Strategic

Vision in Wang's presence that Wang was a member of the Chinese Communist Party who also could not be trusted. Strategic Vision thought that Guo must have been joking at Wang's expense, but later independently verified that at least two of Wang's family members are in fact Chinese Communist police officials, and that Wang had been a CCP member since 1999.

42.     Wang remained Strategic Vision's sole designated contact on the Contract until on or about February 2, 2018, at which point Wang herself relayed Guo's instruction that Lianchao should once again become the point of contact on Eastern Profit's Contract. Lianchao was Strategic Vision's point of contact for the remainder of February. This continued until approximately one week after Strategic Vision had requested guidance given the "Records Protected" issue, at which point Wang resurfaced to send Strategic Vision a termination letter. Given Guo's general lack of accessibility, his failure to ensure consistent, trusted channels of communication between Strategic Vision and Eastern Profit, his major security breaches, and his persistent failure or refusal to provide guidance when he was advised that pursuing the original 15 names would violate federal law, Guo and Eastern Profit hindered Strategic Vision's work under the Contract and breached Eastern Profit's covenants of good faith and fair dealing.

43.     Within the first two weeks of what was to be a multi-faceted and complex year-long effort under the Contract, Strategic Vision verbally made progress reports to Guo about Strategic Vision's build-out of the first research team and implementation of the research project. At the end of this period, Strategic Vision also reported to Guo that Strategic Vision could not within the limits of U.S. law obtain certain information sought by Guo on his initial list of subjects within the limits that Guo suddenly had demanded.

44.     With this news, Guo became enraged and demanded that Strategic Vision immediately deliver its raw intelligence results for his review. This was despite the fact that the

parties had understood that it would not be possible to instantaneously deliver large quantities from a team abroad that had just begun operations.

45.     In response to Guo's demand, Strategic Vision explained that irregular circumstances caused by Guo had precluded Strategic Vision from collecting and verifying data, and that the small amount of raw data developed to that point was not in a comprehensible form that would be of material use to Guo or Eastern Profit. In the face of Guo's intransigence, however, Strategic Vision sent a partner to Europe, met the research team leader, returned to New York, and hand delivered its raw data to Wang on January 26, 2018. Strategic Vision made its delivery with the caveat that the information would be of no use to Guo or Eastern Profit because it was nothing more than the researchers' own work to familiarize themselves with the fifteen subjects using open-source information. Strategic Vision repeatedly told Guo and Eastern Profit that it was practically and mathematically impossible for the researchers to work faster.

46.     Strategic Vision, Guo and Eastern Profit had agreed from the beginning of their conversations and all understood that there would be unforeseen delays and difficulties in procuring information on the challenging task desired by Guo and Eastern Profit. They agreed to work cooperatively and in good faith when such delays arose. The Contract memorializes this understanding. The parties expressly understood that there could be severe and unforeseen delays, as well as times when no information could be discovered or reported at all. Eastern Profit agreed in writing that such delays were foreseen and that the parties would work through them in a fair fashion.

47.     Strategic Vision communicated to Guo and Eastern Profit each of the above alleged irregular circumstances. Strategic Vision even offered not to charge Guo for the first 10 days of work to calm Guo and proceed with its performance, taking a loss of approximately

$250,000 in billable time for the period January 6 to January 16, 2018. Guo did agree, and temporarily calmed down. Yet while Guo and Eastern Profit acknowledged all of these problems, Guo and Eastern Profit did nothing to address them before unilaterally and without just cause terminating the Contract.

### Guo's Fraudulent Representations Regarding the Purpose of the Contract

48.     Eastern Profit's breaches of the Contract and frustration of Strategic Vision's performance are unsurprising in retrospect, because Guo never intended to use the fruits of Strategic Vision's research against the Chinese Communist Party. That is because Guo was not the dissident he claimed to be. Instead, Guo Wengui was, and is, a dissident-hunter, propagandist, and agent in the service of the People's Republic of China and the Chinese Communist Party.

49.     In the parties' December meetings at his apartment in New York City, Guo claimed to Strategic Vision that he had a long history of speaking out against the Chinese regime, and that he was now in America as a dissident and asylum-seeker. He claimed to want to use his country of refuge as a base to gather intelligence on high-ranking Communist officials and, through public criticisms of them, to give aid and comfort to opponents of the Chinese Communist regime both inside and outside China.

50.     Yet much of Guo's origin story is untrue.

51.     Guo claims, and claimed to Strategic Vision, that he was arrested and imprisoned in May 1989 during the Tiananmen Square massacre for providing money to help protesters. In fact, Guo lived and was arrested in Puyang, Henan province, 750 miles away from Beijing. The Tiananmen Square massacre did not occur until June 4, 1989, after Guo had already been imprisoned for running a fraudulent oil sales operation.

52.     Guo quickly built a fortune in China during the late 1990s and 2000s primarily through real estate speculation and investment. During that time, a Chinese citizen could enjoy a rapid increase in wealth only through the support, sponsorship, or protection of high-ranking individuals within the Chinese Communist Party.

53.     Guo's protector, beginning in about 2004, was Ma Jian, Vice Minister of the Ministry of State Security ("MSS") until Ma's arrest and expulsion from the Party in December 2014 after losing an intra-Party power struggle. The MSS is responsible for internal security, foreign intelligence, and political repression. One of Ma's duties was to run the MSS's No. 8 Bureau, which is in charge of counterintelligence against foreign targets, including diplomats, businessmen, and reporters. The MSS has a role not only in repressing domestic political dissent, but also in monitoring and suppressing activities overseas that are deemed to be subversive of the Chinese Communist Party. This includes overseas dissidents, who the CCP views as traitors to China.

54.     On information and belief, Guo was a "long-time employee of Vice Minister Ma Jian." On information and belief, Guo paid MSS officials and bought surveillance equipment for the MSS in exchange for favors. Guo was able to use his connection with Ma and the MSS against Guo's business rivals in China, while the MSS was able to use Guo's business empire against its own targets in China.

55.     Guo has claimed he was forced to leave China in late 2014 with the onset of official reprisals against members of Ma's faction of the CCP. CCP Chairman and Chinese President Xi Jinping had waged an anti-corruption campaign against members of the most ostentatiously corrupt CCP factions. Ma, in his MSS secret police capacity, had supposedly amassed evidence of corruption among Xi Jinping loyalists such as Wang Qishan, who was the

CCP's anti-corruption leader and member of the powerful Politburo Standing Committee. Wang Qishan purportedly struck first, charged Ma with corruption, and stripped Ma of his CCP membership. Only after Guo became a public figure in the United States in 2017 did authorities move to charge Ma, eventually claiming to put him on "trial" in 2018, whereupon he was reportedly found guilty and given a suspended death sentence.

56.     In Guo's telling, reprisals began against him following the fall of Ma, starting in January 2015. Thus, in a case filed by Guo and companies purportedly controlled by him on January 30, 2018 against a Chinese-American billionaire businessman with close ties to the Chinese regime (*Guo, Beijing Pangu, Beijing Zenith v. Bruno Wu*), the complaint states, "In total, approximately 27 employees of the Plaintiff Companies were arrested from January-to-May 2015." The complaint then notes that the assets of companies purportedly owned and controlled by Guo started suffering the seizure of assets "in or around late January and early February 2015" and that, as of a January 2018 filing, the businesses had "halted nearly all regular business operations."

57.     Following this narrative, in more than a dozen complaints and counterclaims in court litigation in the United States, Guo has consistently claimed that he came to the United States on precisely January 9, 2015. Numerous contemporaneous media accounts from January 2015, however, report that Guo was actually forced to return to China for interrogation on or around January 9, 2015. *Bloomberg News*' description of the incident in a story published January 25, 2015 was that "Miles Kwok, also known as Guo Wengui, was taken in by authorities." Guo claims, however, to have avoided the fate that befell others who were purportedly pursued in the aftermath of Ma's fall. Even though (as he claimed) 27 of his

employees and family were arrested and his assets were being seized, Guo was released from custody, and was even allowed to leave China and come to the United States.

58. By March 2015, roughly a month after what Guo claimed was the starting point of China's seizure of billions of dollars of his assets, Guo had purchased his $68 million Sherry Netherland penthouse home in New York City. Money for the purchase of the unit was wired from the Hong Kong back account of Bravo Luck Limited on or around March 4, 2015. The sale was approved by the co-op board of directors on March 24, 2015, and the next day, March 25, the Chinese publication *Caixin* ran an excerpt of a 10,000-word profile, which ostensibly gave a comprehensive account of Guo's entire life story, his business history, and his purported credentials as a dissident. The full article ran two days later. It did not mention his January 9, 2015 detention or his highly improbable release, even as his employees and family members were purportedly being arrested and assets were purportedly being seized.

59. Even if the Chinese government had actually been seizing Guo's assets by late January and early February 2015 and Guo had, despite that, somehow been able to wire over $60 million from Hong Kong to New York for the purchase of his Sherry-Netherland apartment in March 2015, Guo's subsequent actions shortly afterwards in 2015 further undercut his "dissident" narrative. In May 2015, Guo attempted to purchase a substantial portion of a multibillion-dollar private placement of H-shares (those available in the Hong Kong Stock Exchange) in Haitong Securities, with his efforts reportedly involving billions of U.S. dollars' worth of investment from ACA. According to Guo's own affidavit dated February 5, 2016 and filed in *Ace Decade Holding v. UBS* under Guo's Cantonese alias "Ho Wan Kwok," Guo transferred approximately $260 million in U.S. dollar-denominated assets in a New York bank account on May 13, 2015 to an account at China Minsheng Bank in Hong Kong, an institution

explicitly regulated and monitored by the very Chinese authorities who only three months earlier had supposedly seized most of Guo's assets. Shortly after transferring the funds to the Hong Kong-based bank, Guo reportedly purchased over USD $1 billion of H-shares in Haitong Securities, a high-profile action that would seem inexplicably reckless for someone who had just endured the supposed arrest of 27 of his employees and family members, never mind the purported seizure of most or perhaps all of his assets.

60.     Between the spring of 2015 and the January 2017 inauguration of President Trump, Guo made few public statements. In fact, he made no public statements as a dissident, and never criticized Xi Jinping. But newly-elected President Trump promised a harder line on China, visibly backed by advisers such as Stephen K. Bannon. From that time forward, Guo assumed a brash public personality, quickly constructing an active social media profile and attacking his perceived enemies with caustic rhetoric.

61.     On or about March 1, 2017, Guo arrived again in New York City on a tourist visa and, except for a trip to an unknown location between March 11 and April 10, 2017, he has since remained in the United States. In a March 5, 2017, audio recording which, upon information and belief, Guo himself made, Guo stated: "In New York City right now… My operation is on." He continued: "I have absolute confidence in General Secretary Xi," referring to the Chinese President by his official Communist Party title.

62.     Speaking of dissidents, Guo stated, "Our government spends too much budget every year… to let these bad guys go free." He continued, "They never say anything good about China. They attack our CPC [CCP] central leaders… they deserve to die! So these people, I must teach them a lesson." He offered, "I can take these bastards down and help our leaders to revenge." Guo made specific threats about two dissidents, referring to them by their pen names.

Of dissident journalist Wei Shi (whose real name is Weican "Watson" Meng), founder of Boxun.com, Guo stated, "Time to finish this bastard… I must end him." Guo expressed similar sentiments about Wei Shi's fellow dissident, known by the pen name Xi Nuo (and whose real name is Xianmin Xiong). Both dissidents write for Boxun.com.

63.   Contemporaneously with these statements, Guo began to harass Wei Shi and Xi Nuo by having them and their families followed throughout the Greater New York City area. Guo also threatened members of Wei Shi's family who were still living in China.

64.   Additionally, Guo began to file defamation lawsuits against targeted Chinese dissidents in various jurisdictions. As of the filing of this pleading, Guo had been embroiled in litigation with Wei Shi, Xi Nuo, and at least eleven other dissidents. After a July 2, 2019 trial in one of the dissident cases, Guo made a video threatening litigation against several others. In a July 12, 2019 video, on information and belief, Guo makes additional threats against individuals who oppose the Chinese Communist Party, pledging to swamp them in litigation for life.

65.   But Guo has also engaged himself in other kinds of litigation. A key part of Guo's "dissident" narrative has been high-profile lawsuits that appear to pit him against Chinese regime-connected entities, such as HNA Group and Soho China. In every instance to date, despite heated rhetoric in all directions found in court filings for those cases, the cases languish without significant discovery or other development, with voluntary dismissals being filed, regardless of whether Guo was the plaintiff or defendant. In *HNA Group v. Guo Wengui*, for example, the plaintiff—whom Guo had accused of being secretly owned and controlled in large part by Wang Qishan—noted in filing for voluntary dismissal in March 2019 that, despite the case being initiated over 20 months earlier, "little to no discovery has occurred." The suit brought by Chinese business publication *Caixin*—which has done more than any other media

41

outlet to establish Guo's supposed dissident bona fides—and its founder Hu Shuli had a similar end result. In that case, the plaintiff—widely believed to have enjoyed relative independence by the standards of mainland Chinese media because of the protection provided by Wang Qishan—filed for voluntary dismissal in September 2018, two days before the first discovery deadline.

66.     Despite Guo's initial moves, most of his plan of retribution—which Guo had seemingly disclosed to the CCP at least in March 2017—had yet to unfold during the remainder of that year. Publicly, Guo began a media and Twitter campaign alleging official corruption in China, attracting a following both within and outside China.

67.     In January 2017, Guo launched his public campaign. His chosen medium consisted of at least two interviews with *Mingjing*, or Mirror Media, an online tabloid news outlet, which continued to interview and promote Guo throughout 2017. Mingjing's founder, Ho Pin, had sold his previous media outlet, *Duowei*, to a Hong Kong businessman friendly with the Chinese government. And in the same year when it was providing a regular platform to Guo, a supposed enemy of the Chinese regime, Mingjing received a "large investment" from the People's Republic of China, according to a report released by Stanford University's Hoover Institution in November 2018.

68.     Guo also began to grant interviews with conservative media figures such as Bill Gertz of the Washington Times and Washington Free Beacon, burnishing Guo's image as a dissident. The seminal story was an interview with Gertz which ran in the Free Beacon on July 11, 2017. Although these and other statements were and remain widely available to the public through Gertz's article, Guo made similar statements to Strategic Vision several months later after the parties were introduced by Gertz.

69.     In July 2017, for example, Guo told Gertz that he had been jailed for 22 months after taking part in the 1989 Tiananmen Square protests. As alleged in Paragraph 51, later research showed that Guo was actually arrested for a fraudulent oil scheme before the Tiananmen Square Massacre, 750 miles away from Tiananmen Square in Beijing.

70.     Gertz also reported in July 2017 that Guo had "broken with the regime," but only "several months ago," despite the fact that Guo had been detained, left China, moved to New York City and purchased his apartment over two years previously.

71.     Guo denied to Gertz that Guo was part of a Communist leadership faction in Beijing, claiming instead that he began speaking out as part of a long-planned effort to bring democratic reform to China. "What I want to do is the change the whole system," he claimed. "I want to change the Chinese government. Absolutely, the Chinese government is the mafia." Guo further claimed to have details of a massive Chinese espionage effort against the United States, stating that he learned about Chinese spy activities from his protector, Ma Jian, and Ji Shengde, the former People's Liberation Army intelligence chief. Yet Guo provided only general information, offering none of the alleged details he had claimed to have.

72.     Guo warned that the United States should take counter-measures, because "if we do not have the United States exercising some kind of control over the world system, the world will turn into a place where men eat men." Guo reiterated his purportedly strong beliefs: "I love my nation. I love my country, but I hate the Communist Party."

73.     Guo also claimed that Chinese officials had threatened him and his family, and that in a May 2017 meeting in his apartment, visiting high-ranking government intelligence (that is, MSS, the same entity in which Ma Jian had served as a leader) and Party Politburo officials

had promised to release $17 billion in frozen assets and not seek his arrest or prosecution if he remained silent.

74.     Guo later admitted that he had agreed to not one but two meetings with the Chinese intelligence and security officials in May 2017. The second meeting came after the MSS and Politburo officials were confronted by FBI agents at Penn Station and told to leave the country, but then returned to New York City to visit Guo at his Sherry-Netherland penthouse a second time. Guo disclosed that his wife had treated the officials to homemade dumplings.

75.     On August 26, 2017, just three months after his meeting with Chinese officials and several weeks after his apparently tell-all Gertz interview, Guo penned a letter to Chinese officials. The statement has been translated into English and entered into evidence in *Weican Meng v. Guo Wengui*, Case No. 159636/2017 (N.Y. Supreme Court, New York County).

76.     In that letter, Guo professed his personal loyalty to "Chairman Xi," asking CCP leadership to convert his "influence and resources" to "best serve Chairman Xi Jinping's China Dream!" The China Dream was first enunciated by Chairman Xi Jinping in 2012 as a slogan to inspire the population to strengthen China's economy, military, and society in the service of greater socioeconomic progress inside China, and more aggressive foreign and military policy goals.

77.     "Assign me tasks," Guo implored, and "provide me with detailed instruction with particular reference to public statements I may make to the media." Guo claimed that his statements in the United States, apparently including his statements to Gertz, were done "under coercion," and that even when "forced" to give an interview to American media, "I did not cross the red line." He promised, "I am doing the best I can under difficult circumstances to safeguard our nation's interests and image," and "I will continue not to cross the red line." Asking that

investigators cease efforts to "arrest and destroy" him, Guo promised to "completely obey orders given to me at their disposal—to serve Chairman Xi Jinping's agenda and that of our nation!" More specifically, Guo offered to be a "propagandist," using what he called "my own style of propaganda" outside of China, including in the United States.

78.     Eleven days after making this pledge, Guo applied for political asylum in the United States. That application gave Guo an anticipated two to three years of freedom while the claim was being processed.

79.     Just eight days before Guo made the statement, on August 18, 2017, Steve Bannon left the White House and would return within days to his former media outlet, Breitbart. Days later, favorable articles about Guo began to appear in Breitbart. Upon information and belief, Bannon was familiar with Guo's case from Bannon's time within the Trump administration, and was in contact with Guo either in person or through one or more interlocutors while Bannon worked in the White House.

80.     By October 2017, Bannon had begun appearing with Guo in public and on Guo's self-made YouTube videos. Guo continually pulled Bannon more closely in to his circle, eventually appointing Bannon as Chairman of his "Rule of Law Society," a New York-based, Delaware-incorporated not-for-profit entity that claims tax status as an I.R.C. Section 501(c)(4) social welfare organization.

81.     In mid-September 2017, Bannon made a sudden trip to Hong Kong, where a Chinese state-owned brokerage and investment group—the nation's largest—paid him to give what the Financial Times called a "closed door" speech. In that speech, his first after leaving the White House, Bannon praised Xi Jinping, stating that Xi is "just like President Trump." Bannon's praise for Xi contrasted with his statement to the New York Times, published several

days before, in which Bannon compared modern-day China under Xi to prewar 1930s Nazi Germany. Bannon then continued to Beijing. There, he secretly met for 90 minutes with none other than Wang Qishan, the official most often accused of corruption by Guo, and the one who Guo blames for bringing down his protector, Ma Jian, in 2014, leading to Guo's departure from China. On information and belief, Bannon's meeting with Wang Qishan was not for any official purpose, and was therefore likely undertaken as a courier for Guo. On information and belief, any meeting pertaining to Guo was likely for the purpose of receiving the "detailed instruction" that Guo just a few weeks before had solicited from the Chinese Communist Party leadership so that Guo could "serve Chairman Xi Jinping's agenda" as an agent in the United States.

82.     In the succeeding months, Guo continued his dissident-like statements, but it is now apparent that he made no criticism of Xi Jinping. In a December 9, 2017 interview, just weeks before slotting in Eastern Profit as Strategic Vision's contracting party, Guo called for Chinese regime change and attacked the Communist Party, but praised Xi Jinping as "the most human, most emotional person out of all the officials." On information and belief, Guo has never issued a statement critical of Xi Jinping or revealed anything of legitimate intelligence value to the United States, staying consistent with his pledge not to "cross the red line."

83.     Meanwhile, Guo and his close-knit circle have continued their campaign against Chinese dissidents and their allies in the United States.

84.     In the spring of 2019, Guo shared with Steve Bannon the uncorrected and unsigned deposition transcript of Michael Waller, conducted and transcribed for use only by Eastern Profit in this case. Bannon remarked to individuals not connected with this litigation that he had read the transcript. Specifically, Bannon approached Brian Kennedy and Frank Gaffney, who are, respectively, the Chairman and Vice Chairman of the Committee on the Present

Danger-China ("CPDC"), a group founded in March 2019 to raise awareness of, and develop national security policies toward, the threat posed by China. Gaffney is also the Executive Chairman of the Center for Security Policy ("CSP"), which staffs and pays the expenses of CPDC and is also Waller's employer.

85.     To this point, Bannon and Waller had had a positive relationship, Bannon had invited Waller to his home for Bannon-sponsored events, and Bannon had never discussed Guo with Waller. Nonetheless, Bannon—himself a member of the CPDC—cited the instant litigation in pressuring Kennedy and Gaffney to remove Waller from the CPDC. They refused, whereupon Bannon threatened to use his influence to have Gaffney himself removed. Shortly before these events, board members of the Bannon-Guo Rule of Law Society had discussed possible ways to provide large amounts of funding to either the CSP or the ad-hoc CPDC itself through the Rule of Law operation, an organization reportedly funded and controlled by Guo. Waller therefore saw this as a Guo attempt to gain control of CPDC's operations. These efforts were rebuffed, as they were seen as indirect donations from Guo himself. On June 13, 2019, Bannon conveyed to Gaffney threats that Guo "has more money than God" and intends to file litigation against Waller personally. This threat is credible because it follows Guo's pattern of behavior with Chinese dissidents. Upon information and belief, Bannon acts as an agent of influence for Guo Wengui in the United States.

86.     In short, the sum of Guo's behavior, from his arrival in the United States in 2015 to his continuing cultivation of individuals such as Gertz and Bannon through 2019, show that he is not the dissident he has claimed to be. Rather, Guo Wengui acts as an agent of influence on behalf of Chinese Communist Party Chairman Xi Jinping and the Chinese MSS.

87.     Had Guo disclosed his true purpose in entering the Contract with Strategic Vision in December 2017 and January 2018—to bolster his position within the Chinese Communist Party and ingratiate himself with Xi Jinping—Strategic Vision never would have contracted with him, let alone desired to meet him in the first place.

88.     Strategic Vision has been damaged, among other ways, by the exposure of its capabilities and informational connections to a Chinese Communist agent; by the loss of other profitable opportunities that, unlike Guo's work, would not have compromised Strategic Vision's political principles and business purpose; and by the damage to its reputation caused by being associated with a person who is now increasingly recognized as a Chinese dissident-hunter, rather than a dissident.

**FIRST COUNTERCLAIM:**
**BREACHES OF CONTRACT AND CONTRACTUAL COVENANTS**

89.     Strategic Vision repeats and realleges all prior Paragraphs of its Counterclaim as if set forth fully herein.

90.     Eastern Profit and Strategic Vision are parties to the Contract, which was executed on January 6, 2018.

91.     By mutual agreement of the parties, the Contract was amended to include a start date of January 16, 2018.

92.     In entering into the Contract, the parties mutually covenanted to use good faith and fair dealing when undertaking their respective performances and any actions pursuant to the

a.      Contract. At a minimum, this included each party's covenant not to prevent or frustrate the performance of the counter-party or to take action that would deprive the counter-party from receiving the benefits of the Contract. These covenants included

without limitation: a. Eastern Profit agreed not to take actions that would endanger or expose Strategic Vision and its contractors;

b.      Eastern Profit agreed not to take actions during performance of the Contract that would, in turn, prevent Strategic Vision's performance or cause Strategic Vision to be unable to complete its responsibilities under the Contract as described therein; and

c.      Eastern Profit agreed to act in good faith towards Strategic Vision and not to take actions that would deprive Strategic Vision of the benefits its entry into the Contract provided.

93.    Strategic Vision performed under the Contract, including without limitation by rendering services to Eastern Profit as required by and within the meaning of the Contract. At all points, the actions Strategic Vision took pursuant to the Contract were consistent with the terms of the Contract and in good faith towards Eastern Profit. Strategic Vision at all points acted fairly towards Eastern Profit.

94.    Eastern Profit has breached the Contract, including without limitation by failing to pay to Strategic Vision the amount due upon Eastern Profit's termination of the Contract.

95.    Eastern Profit has breached its covenants of good faith and fair dealing under the Contract by taking actions that endangered Strategic Vision and its contractors, that prevented or frustrated Strategic Vision's performance, or that deprived Strategic Vision of the benefits of the Contract, in at least the following ways:

a.      Eastern Profit failed to adequately preserve confidentiality, exposing Strategic Vision and its contractors to reprisals from the Chinese, when it had two $500,000 wires sent from a Hong Kong bank, easily traceable by the Chinese, and rendered more

noticeable by the large, duplicate wires, directly to Strategic Vision instead of through intermediary institutions as the parties had discussed;

b.      Eastern Profit failed to protect Strategic Vision and its contractors from injury when it provided the initial list of 15 names on unencrypted flash drives that were immediately shown to be infected with exotic, sophisticated malware, and then, when it provided a second set of flash drives, produced a drive that once again contained malware. This was bound to damage Strategic Vision and its contractors, opening them up to surveillance or malicious attacks by third parties or state actors;

c.      Eastern Profit took actions to expose Strategic Vision and its team when, through Guo, it posted on internet sites associated with Guo some of the same initial dossier files it had given to Strategic Vision, so that any person who suspected they were being surveilled could quickly run internet searches to guess Strategic Vision's client and, through Guo's other security breaches, identify Strategic Vision itself;

d.      Eastern Profit took actions to frustrate Strategic Vision's performance when, as an entity or through Guo, it gave a similar list of investigative targets to other researchers, greatly increasing the risk that subjects would learn of electronic intrusions, and thereafter take defensive measures to shut down vulnerabilities or even retaliate against Strategic Vision;

e.      Eastern Profit took actions to frustrate Strategic Vision's performance when it supplied an initial list of 15 subjects, all of whom were identified as "Records Protected" within the United States, shutting off Strategic Vision's access to law enforcement and government records checks; when Strategic Vision reported this to Guo and asked for guidance and a different set of names, Guo refused to provide them.

f.      Eastern Profit took actions to frustrate Strategic Vision's performance when it demanded immediate invasive hacking of foreign subjects (a legal activity under the laws of applicable foreign states), a process which would trigger the subjects' defenses and render impossible the longer-term tracking and infiltration called for under the Contract.

96.     Strategic Vision has been damaged as a result of Eastern Profit's breaches of the Contract and of the covenants created by the Contract for Eastern Profit to perform.

97.     Pursuant to the Contract as amended by the parties, Eastern Profit agreed to pay to Strategic Vision a fee of $750,000 per month for Strategic Vision's work while under the Contract commencing, as amended, on January 16, 2018.

98.     The Contract provides that either party may terminate it upon "'30 days' written notice." As with all other terms of the Contract, Eastern Profit was to exercise this provision in good faith.

99.     By letter dated February 23, 2018, counsel for Eastern Profit provided notice of Eastern Profit's termination of the Contract "pursuant to the [Contract's] 'Duration' Section."

100.    Consequently, in bad faith, Eastern Profit terminated the Contract as of March 21, 2018. At the time of such termination, Eastern Profit was obligated to pay to Strategic Vision the amount of $1,596,774.25, computed as follows:

| Period | Number of Days | Per Diem | Total |
|--------|----------------|----------|-------|
| January 16-31 | 15 | $24,193.55 | $362,903.25 |
| February 1-28 | N/A | N/A | $750,000.00 |
| March 1-21 | 20 | $24,193.55 | $483,871.00 |
| | | | $1,596,774.25 |

101.    Assuming that the ACA $1 million payment was made on Eastern Profit's behalf, the amount of $596,774.25 was due and payable from Eastern Profit to Strategic Vision as of March 21, 2018.

102.    Eastern Profit has breached the Contract by failing to pay to Strategic Vision $596,774.25 due upon Eastern Profit's termination of the Contract.

103.    Strategic Vision is entitled to judgment against Eastern Profit in the amount of $596,774.25, plus interest at the State of New York's statutory rate for the period March 21, 2018 through the date that judgment is filed.

104.    In addition, but for Eastern Profit's breaches, including without limitation Eastern Profit's various breaches of its covenants of good faith and fair dealing, Strategic Vision would have completed good faith research on subjects for a three-month period, receiving $750,000 per month from Eastern Profit. Strategic Vision has been damaged by Eastern Profit's deprivation of this opportunity through its wrongful termination of the Contract. Strategic Vision is entitled to the lost benefits of the Contract because it was prevented from performing during the period from March 21, 2018 (the end of the 30-day notice period) to April 16, 2018 (the end of the first three months under the Contract). The Parties had specifically negotiated a timeframe when they would evaluate how the Contract was being performed, and this was intended to reflect the bare minimum timeframe for Strategic Vision's services. The amount of damages—Strategic Vision's lost revenues minus its expenses for that final period—is approximately $100,000.

## SECOND COUNTERCLAIM: FRAUDULENT MISREPRESENTATION

105.    Strategic Vision repeats and realleges all prior Paragraphs of its Counterclaim as if set forth fully herein.

106.    Guo Wengui made misrepresentations of fact to Strategic Vision. These included, without limitation, the representations that Guo was a Chinese dissident; that he opposed the Chinese Communist Party, which controls the Chinese state; and that through the contract with Strategic Vision, he was actively working to find and publicize research regarding key Chinese

leaders that he would then use to weaken the Chinese regime and support a move to a more democratic and U.S.-friendly regime. Guo affirmatively represented that his desire was to advance, and not harm or impede, the interests of the United States.

107.    Guo made each of the misrepresentations in the meetings he held at his Fifth Avenue apartment in December 2017, which were attended by French Wallop and Mike Waller.

108.    Guo made each of these misrepresentations on behalf and for the benefit of Eastern Profit, an entity under his actual direction and control and which he directed to become a counter-party to Strategic Vision in the Contract he had negotiated and from which he intended to benefit. Alternatively, Eastern Profit authorized Guo's misrepresentations, or it ratified Guo's misrepresentations because, with knowledge of his misrepresentations, it accepted the benefits of those misrepresentations in the form of Strategic Vision's entry into and performance under the Contract.

109.    Guo's representations of fact to Strategic Vision were false. Guo is not a Chinese dissident, he is a supporter of the Chinese Communist Party, which controls the Chinese state. Guo is not actively working to find and publicize research regarding key Chinese leaders for the purpose of weakening the Chinese regime and supporting a move to a more democratic and U.S.-friendly regime, and he did not intend to use the Strategic Vision's work under the Contract for these or similar purposes.

110.    Guo's status, his views towards the Chinese Communist regime, and his reason for having Eastern Profit enter into the Contract were material facts collateral or extraneous to the Contract.

111.    Guo made the misrepresentations to Strategic Vision with the knowledge, at the time of the misrepresentations, that they were false.

112.    Guo made the misrepresentations to Strategic Vision with the intention to induce Strategic Vision to enter into the Contract.

113.    Strategic Vision justifiably, reasonably, and foreseeably relied on Guo's misrepresentations in deciding to enter into the Contract and perform under it with Eastern Profit as the counterparty. Strategic Vision had no way of knowing about Guo's clandestine statements and promises to Chinese Communist Party leadership and Chinese Ministry of State Security, and Guo had carefully cultivated a public persona as a dissident and a friend of China hawks in the U.S. conservative establishment, who in turn were known to and/or trusted by Strategic Vision.

114.    In performing under the Contract, Strategic Vision provided unique services and incurred significant expenses and financial outlay in reliance on Guo's promises.

115.    Strategic Vision would not have entered into the Contract but for Guo's representations regarding his status, his position toward the Chinese Communist regime, and his purpose for having Eastern Profit enter into the Contract. Accordingly, Strategic Vision has been harmed by its reasonable and foreseeable reliance on Guo's promise, which he has failed to fulfill.

116.    Eastern Profit is liable for the damages sustained by Strategic Vision as the result of its detrimental reliance on Guo's various promises that caused Strategic Vision to enter into and perform under the Contract. Strategic Vision's damages include those financial outlays it made in connection with the Contract, including without limitation costs incurred during negotiation of the Contract such as to prepare proposals for the Contract and related costs for time involved in Contract, costs to identify, recruit, and engage subcontractors to perform investigative work and translation services, costs for other expenditures for startup needs,

extensive travel and time expenses during Contract negotiation and performance that resulted from Guo's insistence that certain information be conveyed only in person-to- person meetings, costs to address the security breaches and other harms to Strategic Vision's principals and independent contractors resulting from Eastern Profit's wrongdoing, and legal fees.

WHEREFORE, Defendant/Counterclaim Plaintiff Strategic Vision US, LLC seeks judgment in its favor and against Plaintiff/Counterclaim Defendant Eastern Profit Corporation Limited on the Counterclaims, for court costs, attorneys' fees, and any other relief the Court deems just and appropriate.

Dated August 8, 2019

Respectfully submitted,

GRAVES GARRETT LLC

*s/ Edward D. Greim*
Edward D. Greim, #4240172
1100 Main Street, Suite 2700
Kansas City, MO 64105
Telephone: (816) 256-3181
Fax: (816) 256-5958
edgreim@gravesgarrett.com
ATTORNEYS FOR
DEFENDANT/COUNTERCLAIM PLAINTIFF

## CERTIFICATE OF SERVICE

This certifies that the foregoing was served via the Court's Electronic Case Filing System on the date of filing, August 8, 2019, to all counsel of record.

*s/ Edward D. Greim*
Attorneys for Defendant/Counterclaim Plaintiff