

Edward D. Greim
Direct Dial: (816) 256-4144
edgreim@gravesgarrett.com

August 22, 2019

<u>VIA ECF</u>
Hon. Debra Freeman
Daniel Patrick Moynihan
United States Courthouse
Courtroom 17A
500 Pearl Street
New York, New York 10007

Re:  Eastern Profit Corp. Ltd. v. Strategic Vision US, LLC, 18-cv-2185 (JGK)-DCF

Dear Judge Freeman:

Yesterday evening, you asked the parties to confer regarding the question of ACA transfers out of Hong Kong at Guo Wengui's direction. We have conferred with opposing counsel and the parties' disagreement has not been resolved. As we stated on the call, we believe this is relevant for two distinct reasons, even though the last part of our discussion focused on just one of those reasons: that someone claiming to be a Chinese dissident would not send funds to, or keep funds in, Hong Kong, and then have those funds transferred abroad.

1. **Reason 1: Holding and transferring Hong Kong funds is inconsistent with someone who truly believes he is a dissident and in danger of monetary sanctions or punishment from Chinese authorities.**

Guo's counsel appeared to argue that United Kingdom-Chinese treaty obligations guarantee the rule of law in Hong Kong (this is commonly referred to as the "One Country, Two Systems" paradigm), and/or that they do not allow the enforcement of judgments in Hong Kong. Yet our argument is that in practice, Chinese authorities are able to exert control over institutions in what is now called the Hong Kong Special Autonomous Region, so that no person claiming dissident status would dare keep a store of funds in Hong Kong and enjoy the ability to openly disburse those funds for purportedly anti-Chinese causes in the U.S.

From 2006 to 2019, disputes related to the seizure of financial assets for parties liable in both Mainland China and Hong Kong were subject to the terms of a Choice of Court Agreement, whereby rulings on financial assets in one jurisdiction were enforceable by agreement and courtesy in another, and since 2019, this agreement of mutual enforceability has been strengthened beyond financial assets. https://www.lexology.com/library/detail.aspx?g=25cfd2ac-3821-433e-adb3-3eb492724111. We believe that, in essence, rulings in either Hong Kong or Mainland China are assumed to be enforceable in the other jurisdiction. Thus, Mainland China cannot directly freeze assets in Hong Kong, but we believe the work-around is not difficult. The Mainland government can obtain a judgment in Mainland courts freezing Chinese assets (as Guo claims has happened to him). It could then submit the judgment to a Hong Kong court to freeze Hong Kong assets.



The Hong Kong governmental apparatus is also subject to influence from Beijing. A group of electors picks the Chief Executive (currently, Carrie Lam) from a group of nominees acceptable to Beijing. The legislature (Legislative Council) has only a minority of democratically elected officials; the rest of the seats are from local business groups who many understand to take direction from Beijing. The Chief Executive makes judicial appointments. It is the widespread belief that Beijing is actually able to exert control over Hong Kong business and government that has driven mass protests over the last several years—most recently over a proposed extradition law that was proposed (formally, at least) by Hong Kong's own government.

This influence can take a variety of forms. Recently, for example, a Chinese billionaire, Xia Jianhua, who was abducted from the Four Seasons Hotel in Hong Kong, suffered the Mainland's seizure of his bank, Baoshang. The bank appears to be based in Inner Mongolia, but authorities were able to seize Jianhua in Hong Kong. *See* Attachment 1. Importantly, Hong Kong officials—including bankers, judges, and the like—who have a Hong Kong Special Administrative Region passport must also be citizens of the People's Republic of China, providing the Mainland with indirect leverage over the individuals who would be faced with either informal pressure to freeze or trace, or an attempt at a domesticated judgment to seize, Hong Kong assets.

Notably, ACA's director, who purportedly signed the "loan agreement" at issue, is one William Je. Yet Je is also apparently the Chairman of Macquarie Capital Equity Markets for Greater China—a position that we believe would require him to be on good terms with Chinese officials, and that from a dissident's perspective would subject him and Macquarie to an uncomfortable degree of pressure from the Mainland. See Attachment 2. If ACA does in fact make regular transfers out of Hong Kong at Guo's request and for Guo's projects, it strongly suggests that Guo's dissident status is not real.

Finally, Guo has claimed he has no assets, but we cannot find a statement in which Guo claims to be unable to move assets specifically from Hong Kong. (In fact, we cannot find a statement making reference to his having Hong Kong assets at all. Instead, Guo used ACA to move money to Hong Kong in advance of an attempted purchase of shares in a Mainland entity, as Strategic pleads at Paragraph 59 of its Counterclaim.)

In conclusion, no Chinese dissident would view Hong Kong as a safe haven for assets, let alone make transfers from Hong Kong banks for activities purportedly meant to undermine the Chinese regime. At the very least, such transfers would be known to Chinese authorities. It is for that very reason, as Strategic pled, that the parties had agreed not to use either a Mainland or Hong Kong bank or entity to wire funds to Strategic Vision. Dkt. 127, ¶¶ 21-22. That Guo did this via ACA and its Hong Kong bank surprised Strategic and caused it concern. We seek to show through discovery that this was not a one-time occurrence, but that ACA has transferred out other funds at Guo's request.

**Reason 2: Multiple ACA transfers on Guo's behalf and at Guo's direction would tend to show that the ACA transfer was not pursuant to any "loan" to Eastern Profit.**

Apart from Strategic's fraud claim, this discovery will aid its defense of Eastern Profit's claims for return of the funds. Eastern Profit seems to claim that ACA loaned it funds for "its" contract. But if ACA regularly makes payments at Guo's request to entities like Eastern Profit that perform his



projects, it would tend to show that this was simply ACA or Guo's money that is regularly put to use for such projects without the necessity of any loan. This would tend to show that the appearance of a "loan" was created later, perhaps even during the litigation, as a pretext to enable Eastern Profit to meet the "damages" element of its breach of contract claim. It is important to note that Eastern has already admitted that Guo "ordered" a wire from ACA, and Strategic has already pled that ACA sent at least one other wire for personal expenses of Guo, to pay a U.S. law firm. This discovery may be necessary in the event that no witness can testify to the circumstances of the "loan agreement."

Respectfully submitted,

Edward D. Greim

cc: Counsel of record via ECF