```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK


In re:                                 :
                                           Docket #1:18-CV-02185-
 EASTERN PROFIT CORPORATION LIMITED,   :  JGK-DCF

                    Plaintiff,         :

  - against -                          :

 STRATEGIC VISION US LLC,              : New York, New York
                                         August 21, 2019
                    Defendant.         :

                                         TELEPHONE CONFERENCE
------------------------------------ :


                       PROCEEDINGS BEFORE
              THE HONORABLE JUDGE DEBRA C. FREEMAN,
           UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:            ZEICHNER ELLMAN & KRAUSE, LLP
                          BY:  ZACHARY B. GRENDI, ESQ.
                          One Landmark Square, Suite 4th Floor
                          Stamford, Connecticut 06902
                          203-622-0900


For the Defendant,        GRAVES GARRETT, L.L.C.
Strategic Vision US:      BY:  EDWARD D. GREIM, ESQ.
                               JENNIFER DONNELLI, ESQ.
                          1100 Main Street - Suite 2700
                          Kansas City, Missouri 64105
                          816-256-4144




Transcription Service: Carole Ludwig, Transcription Services
                          141 East Third Street #3E
                          New York, New York 10009
                          Phone:  (212) 420-0771


Proceedings conducted telephonically and recorded by
electronic sound recording;
Transcript produced by transcription service
```

APPEARANCES - CONTINUED:

For Guo Wengui:              HODGSON RUSS LLP
                            BY:  ERIN N. TESKE, ESQ.
                                 MARK A. HARMON, ESQ.
                            605 Third Avenue, 23rd Floor
                            New York, New York 10158
                            646-218-7517

<u>**INDEX**</u>

<u>**E X A M I N A T I O N S**</u>

| <u>**Witness**</u> | <u>**Direct**</u> | <u>**Cross**</u> | <u>**Re-Direct**</u> | <u>**Re-Cross**</u> |
|---|---|---|---|---|

None

<u>**E X H I B I T S**</u>

| <u>**Exhibit Number**</u> | <u>**Description**</u> | <u>**ID**</u> | <u>**In**</u> | <u>**Voir Dire**</u> |
|---|---|---|---|---|

None

```
 1                        PROCEEDINGS               4

 2              HONORABLE DEBRA C. FREEMAN (THE COURT):   Good

 3   afternoon.  This is Judge Freeman.

 4              MR. ZACHARY GRENDI:  Good afternoon, Judge.

 5   (indiscernible).

 6              THE COURT:  All right, who --

 7              MS. ERIN TESKE:  Good afternoon, your Honor.

 8              THE COURT:  Good afternoon.  All right, who do I

 9   have for Eastern Profit?

10              MR. GRENDI:  Zachary Grendi of Zeichner Ellman &

11   Krause.

12              THE COURT:  Okay.  Hold on just one second.  Let

13   me just make sure I have -- okay, Mr. Grendi.

14              Who do I have for Strategic Vision?

15              MR. GREIM:  Your Honor, you have Eddie Greim.  And

16   with me is Jennifer Donnelli, who has moved for admission

17   pro hac vice.

18              THE COURT:  Okay.  You've already filed a motion

19   or you're seeking --

20              MR. GREIM:  Just a couple of days ago.  I don't

21   mean to -- I know our time is precious; we don't

22   necessarily have to do it right this second.  I just

23   thought I'd announce that she has filed it.

24              THE COURT:  Okay.  Who do I have for the

25   nonparties?
```

```
 1                         PROCEEDINGS                    5

 2              MS. TESKE:  Good afternoon, your Honor.  This

 3   Erin Teske.  And with me is Mark Harmon from Hodgson Russ

 4   on behalf of the nonparties, Guo Wengui, Karen Mastrollo, and

 5   Golden Springs, New York.

 6              THE COURT:  Okay, it's pronounced Gree, the

 7   individual's name?

 8              MS. TESKE:  Guo Wengui.

 9              THE COURT:  Oh, Guo Wengui.  How do you -- do you

10   refer to him as Mr. Guo or Mr. Wengui?

11              MS. TESKE:  I refer to him as Mr. Guo or Mr. Kwok,

12   which I understand is the Cantonese translation of "guo,"

13   which is his --

14              THE COURT:  Okay, and I have Mr. Harmon's name on

15   things.  How do you spell your last name?

16              MS. TESKE:  Teske.  It's T, as in Thomas; e-S, as

17   in Sam; k-e.

18              THE COURT:  I'm sorry.  T-e-s-k-e?

19              MS. TESKE:  That's right.

20              THE COURT:  Okay.  All right.  So is anybody else

21   on the call?

22              No.  Okay.

23              MR. GRENDI:  There shouldn't be, your Honor.

24              THE COURT:  Okay.  So just so you know, I have

25   recording equipment that would electronically record this
```

```
 1                        PROCEEDINGS                    6
 2  conference, which I'm doing so you can have a transcript if
 3  you want one.  Did I mention this when we were on the phone
 4  last time, that I had this capability?
 5            MR. GREIM:  No.  But we're glad you do, your Honor.
 6            THE COURT:  Okay.  So usually when I mention it for
 7  the first time, I also tell people that if you're not familiar
 8  with it and you want to obtain a transcript, the way you go
 9  about doing that is you go to the court's website and you look
10  at the top menu bar.  All the way over on the right side you
11  click on Trial Support.  And you go from there not to Court
12  Reporters and Transcripts and things, but to Courtroom
13  Technology, because this is the same technology that we have
14  in the courtrooms.  And that will take you to an explanation
15  of electronic court recordings or ECR, which is what this is,
16  and it will tell you how you can go about ordering a
17  transcript.
18            I know there is a protective order in this case, and
19  I know that some information is covered by it.  If anything is
20  said on this conference that anyone thinks falls within that
21  protective order and therefore should not be put on the
22  docket, if you order a copy of the transcript, please make
23  sure you alert whoever transcribes it to the fact that it
24  should be reviewed by the parties for any confidentiality
25  before it gets put on the docket, because if you order it,
```

```
 1                           PROCEEDINGS                    7
 2   whoever transcribes it will probably just upload it to the
 3   docket.  So just be aware of that.
 4           All right, so all that said, I have read what I have
 5   found to read.  I am missing one letter, which is the first
 6   letter that related to the 30(b)(6) deposition.  It was
 7   apparently dated back on August 6, I think.  You can kind of
 8   tell because other letters are responsive to it.  But I think
 9   that from reading the opposition's lengthy reply, you know,
10   further letters, I think I probably got the gist of what it
11   was.  But that one was apparently under seal, and we had tried
12   from my chambers to reach out and have somebody send us a
13   courtesy copy of it; but that we don't seem to have ever
14   gotten.
15           I do have two copies of Mr. Guo's deposition
16   transcript, one in rough-cut form and one seemingly not.  I
17   haven't looked at those because I haven't felt the need to
18   look specifically at the testimony at this point.  But I have
19   those, and I have a bunch of other letters.
20           So just going through it, I've carved this into
21   three issues:  one, the two nonparty depositions that were
22   subpoenaed to -- subpoenaed witnesses, which are scheduled
23   for, I gather, tomorrow and the next day; then I have the any
24   further 30(b)(6) deposition of Eastern Profit by some person,
25   whether it's Wang again or Mr. Guo or somebody else and the
```

```
 1                        PROCEEDINGS              8

 2   questions that are fair game for that if that happens; and

 3   then, finally, I have this one other person named Han someone.

 4   What is his last name again?  Well, the third --

 5           MR. GRENDI:  Chungauang, your Honor.

 6           THE COURT:  Correct.  That person.  -- and whether

 7   that person should be made to appear for deposition.  Right?

 8   That's how I'm carving up the issues.  Is that correct?  Am I

 9   missing something?

10           MR. GREIM:  Your Honor, this is Mr. Greim for

11   Strategic Vision.  We see it just a little differently.

12   Maybe we would add a -- maybe the easiest way to say this

13   is we would add a fourth issue, which is regardless of

14   whether Guo Wengui comes back as the 30(b)(6) deponent --

15   and it sounds like it's just not possible, that Eastern

16   Profit has said you cannot make him do that -- we think he

17   should come back to finish answering, you know, questions

18   that he has knowledge of anyway, even if it's not come back

19   as a 30(b)(6).  We were hoping we could do them both

20   together; but if we can't, why, then, that is -- there's

21   three letters that relate only to Guo and whether he should

22   come back.

23           THE COURT:  Well, look, when you have a 30(b)(6)

24   notice, the way that works is the entity gets to pick the

25   witness, so the party seeking the deposition doesn't get to
```

```
1                        PROCEEDINGS              9

2   do that.  That's just not how the rule works.  And so you

3   can't force -- even if Eastern were to say he could be our

4   witness, you can't tell them that he should be the witness

5   because it's not your prerogative to do.

6              And --

7              MR. GREIM:  Your Honor, we understand that.  Our

8   position was that we're so far down, we know who has the

9   knowledge.  But we also understand through this process

10  that they can't do it.  And so it is what it is.  We

11  understand; we mentioned in our last letter the structure

12  of the rule is not such that we choose the witness.  So

13  we're fully aware of that.

14             THE COURT:  So you're only looking for Mr. Guo to

15  come back to answer questions that you already put out

16  there but that he either refused to answer or was

17  instructed not to answer?

18             MR. GREIM:  That's right.  The only thing I would

19  say is so that we could use the day wisely -- I mean, I

20  didn't just ask every other -- you know, there were other

21  questions that -- where the line was drawn, but we

22  definitely want him prepped for that --

23             THE COURT:  Okay.

24             MR. GREIM:  -- and so that was one of our most

25  (indiscernible) to you.
```

```
 1                        PROCEEDINGS                10
 2             THE COURT:  Okay, so look, here is my overall
 3   general take of what I'm seeing in front of me, and then
 4   I'll get into specifics.  My overall take is that both
 5   sides -- now, you may have been negotiating since these
 6   letters, and you may have found some common ground in some
 7   areas that's better than what I've seen right out in the
 8   letters.  The last letter that I got suggested that
 9   progress had been made at least with respect to 30(b)(6)
10   topics but there was still a lot of (indiscernible).  But
11   what I was seeing, at least up until that point, was a lot
12   of overreaching by Strategic Vision with respect to the
13   scope of the request of discovery and a lot of obstruction
14   by Eastern Profit and by the nonparties with respect to
15   what was going to be allowed.
16             It seemed to me you were both wrong.  It seemed to
17   me that the scope was too broad.  But the fact that nothing
18   was being produced and that everything was being --
19   happened extremely narrowly by plaintiff and by the
20   nonparties was also improper.  So I think that there is
21   room on both sides to find a middle ground and to pursue
22   discovery that is in fact reasonably tailored to the claims
23   and defenses that have been asserted in the case and for
24   plaintiff and the nonparties to cooperate with that.  But I
25   do not plan to say yes, you get answers to all of the
```

```
 1                        PROCEEDINGS                  11
 2   questions and all of the types of questions and you get all
 3   of the types of documents that you've been requesting
 4   because I do consider the requests to be overbroad.  So
 5   that's my general take.
 6              I want to start by looking at the calendar because
 7   I know, from the prior conversations we had, that there was
 8   concern as expressed by counsel for Strategic Vision, in
 9   particular, about the deposition schedule and about the
10   overall discovery schedule and about making sure things
11   could get done.  And there was some concern about if
12   something didn't happen this week, what that would do to
13   the rest of the schedule and how things could get done by
14   the end deadline.  So I want to have an overall view of
15   what we have to work with here in terms of the schedule
16   because I am assuming that if you want these nonparty
17   depositions to go forward, you don't want them to go
18   forward without a stitch of paper in hand.  And so the odds
19   that you're going to get the documents produced, at least
20   some amount of documents produced prior to depositions
21   tomorrow and the next day, seems fairly slim.  I'm sure
22   you're going to want effort to be made to collect documents
23   that I find appropriate.  If they get moved because of
24   that -- assuming you don't want to go forward with the
25   depositions without the documents -- maybe you do, but
```

```
 1                          PROCEEDINGS                  12
 2   assuming you don't -- what can be accomplished in
 3   September, and to what extent would things have to then
 4   tick past September.  And have you been talking at all
 5   about a proposal that would involve potentially extending
 6   the deadline but getting things done in relatively short
 7   order?
 8              MR. GREIM:  Your Honor, this is Mr. Greim again.
 9   I'll keep doing that for the transcript --
10              THE COURT:  I appreciate that.  It's helpful.
11              MR. GREIM:  -- if it's recognizable.
12              THE COURT:  It's helpful for anybody transcribing
13   it, so I appreciate that.
14              MR. GREIM:  Okay.  You know, we actually -- we did
15   sort of expect these issues.  And the way our schedule
16   falls out, I think there's a solution.  The few witnesses
17   who are already noticed for Friday were Karin Maistrello
18   and Han Chunguang, and there are no documents associated
19   with Han Chunguang's deposition.  And counsel for
20   Maistrello says that she has no documents whatsoever.  So
21   happily, it works out to keep those depositions on Friday.
22              And now, Golden Spring we think does have
23   documents.
24              THE COURT:  Wait.  Hold on one second.
25              MR. GREIM:  And we've already called off --
```

```
 1                          PROCEEDINGS              13

 2              THE COURT:  Hold on one second.  Ms. Maistrello,

 3   I gather you've subpoenaed her both for her own individual

 4   testimony and also as a way to subpoena an entity that she

 5   was at the time, you thought, a director of; and then it

 6   turned out she wasn't?

 7              MR. GREIM:  Well, actually, your Honor, what

 8   happened, we know that she was a director of --

 9              THE COURT:  I read your letter.  I read your

10   letter.  So but that entity, you still don't have

11   anything, any agreement on whether the -- that's ACA,

12   right?

13              MR. GREIM:  Correct.

14              THE COURT:  Right.  You don't have any agreement

15   as to whether ACA should present a witness for testimony?

16              MR. GREIM:  Well, your Honor, we are afraid we

17   did not serve ACA because Maistrello's counsel is not

18   representing ACA, and they're telling us that in between

19   service and, you know, notice of service, she was removed

20   as a director.  So I --

21              THE COURT:  So ACA is floating out there as an

22   unserved entity, and there's no cooperation between

23   counsel who are on this call to work that one out?

24              MR. GREIM:  Correct.  And I'd only say -- I'm not

25   saying that opposing counsel is being uncooperative;
```

they're just not saying that they represent ACA.  We don't

know at this point who to talk to to even begin a

discussion with ACA.  It would have been Maistrello -- and

we hope to question her, I mean, to find out -- I mean,

I'm curious about whether she truly has been removed, who

did that and how it happened.  That will be interesting to

us.  But there just isn't someone sitting in that chair,

and so we're scrambling.  And I just thought, you know

what, let's focus on what we can get.  And if it turns out

that she was never gone or she wasn't validly removed,

why, then we can try to get ACA to --

THE COURT:  So she doesn't have documents as an

individual.  ACA might have documents.  But you don't have

a path right now to get those documents?

MR. GREIM:  Correct.  And maybe Mr. Harmon --

this is his -- he hasn't said anything yet; I've been

taking all the time -- maybe he wants to jump in on that.

THE COURT:  Well, before --

MS. TESKE:  We don't have much to say other than

we don't represent ACA.

THE COURT:  Do you know who does?

MS. TESKE:  I can't speak on its behalf; I don't

know who does.

MR. GRENDI:  Your Honor, this is Zach Grendi.  I

1
PROCEEDINGS                    15

2 don't represent ACA, either; and I don't know who does.

3              THE COURT:  All right.  And this person, other

4 person who's scheduled for Friday, is that the person I

5 said was the other individual where there was a dispute

6 about his deposition, or is that somebody else?

7              MR. GREIM:  No, you're exactly right, your Honor.

8 That's Han Chunguang.  And he would be -- he would go in

9 the afternoon, and Maistrello would go in the morning.  So

10 I'm already set.  I've got a spot and I've got tickets.

11 And I'm hoping to knock those out because I figure that

12 we'll come back for Golden Spring, if we can get there.

13 We'll be producing our own witness to have her testify on

14 the new parts of the counterclaims, on kind of a reopened

15 30(b)(6).  We've got other business to do in New York, but

16 I'm afraid that I can get nothing done this week.  I don't

17 know if --

18              THE COURT:  All right, so Ms. Maistrello, she is

19 saying she cannot be present on Friday, or she can be?

20              MS. TESKE:  Your Honor, she can be present on

21 Friday.  We have objected to producing her on the grounds

22 that she did not have any relevant information.  And we

23 have not heard articulated a basis for, existing basis for

24 deposing her.  But we have, you know, received

25 confirmation that, in the event she's instructed to

```
 1                        PROCEEDINGS                    16
 2   appear, she's available on Friday morning.
 3            THE COURT:  Well, she at least had a connection
 4   with ACA, right?  And so -- and ACA seems to have a
 5   connection to -- at least a defense has been asserted in
 6   this case, as I understand it -- as I --
 7            MS. TESKE:  Your Honor, the connection is
 8   tenuous, at best.  They made a payment which was on behalf
 9   of Eastern which was accepted and not (indiscernible).
10            THE COURT:  Right.  Isn't there a defense that
11   maybe that money was not really Eastern's money, and so
12   Eastern has a claim to get this money back and maybe it
13   wasn't its money in the first place; and somebody said,
14   well, it was a loan; and then there was a question about
15   the loan documentation and some questions about was this
16   really a bona fide loan and that sort of thing?
17            MS. TESKE:  Your Honor, I don't know that there
18   is or can be any dispute that the payment wasn't made on
19   Eastern's behalf under the contract.  It was accepted by
20   Strategic, and services were performed under the contract
21   on the basis the party received that payment.  I'm not
22   sure the relevance of the fact that it came from ACA on
23   Eastern's behalf or whether there's a --
24            MR. GRENDI:  Your Honor, this is Attorney Grendi.
25   I would just echo that sentiment and just add that, you
```

```
 1                    PROCEEDINGS                17
 2  know, Strategic Vision doesn't have standing to challenge
 3  the relationship between ACA and Eastern.  The payment was
 4  made for Eastern.  We've provided the loan documents.
 5  That's -- you know, to hear a comment about the
 6  overbreadth of Strategic Vision's inquiry there, they're
 7  seeking to go always to the next level and always to look
 8  past whatever's in front of them to try to find out more
 9  and more about anything related to Mr. Guo.
10            MR. GREIM:  Your Honor, this is Mr. Greim.  I
11  mean, this is -- to us this is an issue that we would raise
12  on summary judgment because, you know, damages, whether
13  they go breach of contract, whether they go illegal
14  contract plus restitution, the element that they've got to
15  prove is that they paid $1 million and, you know, didn't
16  get their money's worth; or, you know, under restitution,
17  they gave us $1 million under an illegal contract, they
18  want it back.
19            Look, we believe that ACA is just a kitty of money
20  for Mr. Guo and that it -- they probably don't usually even
21  sign contracts for things and that actually the money was
22  just sent from ACA, they -- you know, we'll be interested
23  to learn more about this document.  The person who signed
24  it is Han Chunguang; yet, his signature on another document
25  wasn't made by him, the actual agreement.  So, I mean, we
```

```
 1                          PROCEEDINGS                    18
 2   think this has to be explored and we have to be able to
 3   present this.  I mean, I don't know how to say it, but this
 4   is essential discovery for us.
 5               THE COURT:  Well, let me ask a question.  So
 6   let's say you have two contracting parties and one is
 7   supposed to pay the other money under the contract.  And
 8   the money comes in from a source that is truly separate and
 9   apart and is not the party that was supposed to pay the
10   money.  But the money under the contract was paid; it just
11   came in from some other source.  And it was accepted and
12   put toward the contract.  Legally what's the ramification
13   of the fact that it came from a different source?  Because
14   if you're able to prove that --
15               MR. GREIM:  It's money --
16               THE COURT:  -- if you're able to prove that it
17   wasn't Eastern but was really a different entity, ACA, so
18   what?  Where does that get you?
19               MR. GREIM:  Well, your Honor, I think where that
20   gets us is you remember there's that extra element of
21   breach of contract, which it seems like it's sort of a --
22   it's not doing any work in the analysis; it's the element
23   of --
24               THE COURT:  I'm sorry, who breached what contract?
25   I mean, sorry, which party breached are you talking about
```

1                        PROCEEDINGS                    19

2     here?

3              MR. GREIM:  Well, I'm just saying in general when

4     there's a breach of contract.  But here I'm talking about

5     their breach of contract, Eastern Profit's claim against

6     Strategic Vision --

7              THE COURT:  Okay, well, their breach of contract

8     was not from having the money come from some other source,

9     was it -- or was it?  Is that your theory?

10             MR. GREIM:  Well, our theory is that -- is that

11    really this was Guo and sort of Eastern Profit at the last

12    minute and that $1 million came to us from ACA.  Our theory

13    is that it's not Eastern Profit's money -- and here's the

14    key, your Honor --

15             THE COURT:  Okay, so let's say it's not Eastern

16    Profit's money.  Let's say you're able to establish that it

17    is not Eastern Profit's money.  Let's say it's money from

18    Mr. Guo.  Let's say it's money from a separate company,

19    ACA.  Let's say it's money that's, you know, fell from the

20    moon into somebody's hands, and somebody said let's just

21    give it to you.  All right?  So legally, so what?  So if

22    Eastern was supposed to give you money and you got money

23    and it came from another source but it was on behalf of

24    Eastern and you took it, so what difference does it make in

25    terms of whether they breached the contract?  The money

1                                   PROCEEDINGS                          20

2    came to you.

3              MR. GREIM:  But, your Honor, that's what I saying.

4    And so here's the answer.  There's two elements.  One

5    element is breach, but the second element is damages.  It's

6    actually a required element of a breach-of-contract claim.

7    And our damages, you have to argue, you know, what are you

8    out here?  What are you out?  And if you look at the

9    pleading here, they say what they are out is the million

10   dollars that they paid -- okay? -- that they want back.

11   And so if they never paid the money, what would happen is

12   you might be able to establish part one of a breach-of-

13   contract claim; you might be able to establish breach.  But

14   there would be no way to award a judgment for X amount of

15   money to Eastern Profit because it can't establish damages

16   for --

17             THE COURT:  Okay.  So on Eastern's side and for

18   Ms. Maistrello in the same line of inquiry here, what is

19   the answer to that?:  Why would her testimony not be

20   relevant on the question of whether Eastern itself suffered

21   damages?

22             MS. TESKE:  Your Honor, I guess I'm confused as

23   to whether Mr. Greim is suggesting Strategic would just be

24   able to then keep that money because it sounds if he had

25   breached the contract and accepted that money to perform

```
 1
 2    services, is found not to have performed those services and
 3    then to keep it, just receive that (indiscernible).
 4         THE COURT:  Well, I think what he's saying is --
 5    and I mean, maybe there's research to be done on it -- it
 6    sounds like what he's saying is that it's the plaintiff's
 7    burden to prove both a breach of a contract and that the
 8    plaintiff itself suffered damages as a result.  And if
 9    plaintiff is in no worse position than it was when it
10    started because somebody else passed on the money, then
11    perhaps it's not going to be able to establish that it was
12    damaged.  And I don't know if that's true or not.
13         MS. TESKE:  Your Honor -- and, Zach, correct me
14    if I'm wrong -- but there's a loan document that has been
15    provided that speaks that ACA provided these funds on
16    behalf of Eastern.  And I have not heard a good-faith basis
17    for believing that that loan is anything but legitimate.
18         THE COURT:  Well, let's say for a moment that
19    there was in fact a legitimate loan, okay?  So Mr. Greim --
20    am I pronouncing your name right? -- is it Greim?
21         MR. GREIM:  You are.  You are.  That's --
22         THE COURT:  No, no, I know someone with the same
23    name, and it's pronounced "greem," so I just wanted to make
24    sure.
25         So what is the response?  What is the response
```

```
 1                            PROCEEDINGS                  22
 2   there?  What if it's a legit loan document, why does that
 3   matter or not matter?
 4             MR. GREIM:  Well, your Honor, it would be one
 5   thing if -- I think my answer is that it's going to matter
 6   because it would be one thing if I, you know -- maybe I've
 7   got no money, but I love this opportunity; I go borrow the
 8   money from someone.  And instead of making the proceeds
 9   available to me -- we're in a big hurry -- they just send
10   it onto somebody else?  So now in my books I'm going to
11   carry this liability.  I've got a liability of $1 million
12   that I've got to pay back to so-and-so.  And they're going
13   to be looking to me to pay that back.  And so that would be
14   a different matter, I mean.
15             But in this case there's lots of reason to have
16   real doubt about this loan document.  Remember that at the
17   very first 30(b)(6), this loan just sort of -- this
18   testimony just kind of appeared out of the blue.  It had
19   not been provided at the start of the case under Rule 26;
20   it wasn't provided in the production.  And then Eastern
21   Profit's own witness said, Oh, I asked -- and she didn't
22   say who, which would be interesting -- but I asked to see
23   the agreement, and they wouldn't let me see.  And then it
24   just was produced later on, you know, probably a few weeks
25   later in the case.  And so, you know, we tried to ask her
```

```
 1                        PROCEEDINGS                    23
 2   about it, and she was blank on this.
 3            So I think it's very interesting it's also dated
 4   December 29.  It's at a time, I think, before we knew that
 5   there was going to be $1 million.  And it's signed by
 6   somebody, by one party who we're not able to get to and who
 7   probably, we just suspect, doesn't actually have a
 8   connection to Eastern Profit; but we want to establish that
 9   through his deposition.
10            There's all kinds of reasons.  We don't think
11   there's been interest payments on this.  We think that this
12   was come up with after the fact when they realized they had
13   a problem here.
14            MR. GRENDI:  Your Honor, this is Attorney Grendi.
15   I think this just goes to a fundamental standing issue,
16   that Strategic Vision came in on the one hand, kept the $1
17   million understanding that it came from ACA and
18   understanding at the time that Eastern was providing it
19   through ACA.  And the parties had discussed using an
20   intermediary to do that because of the confidential nature
21   of the contract.  But, in any event, if we have, for
22   example, a breach-of-contract case between the buyer and
23   the seller of a home, the seller doesn't get to say to the
24   buyer, "You paid me with money from Wells Fargo.  That
25   doesn't count."  I mean, it's just -- there's no standing
```

```
 1                          PROCEEDINGS                    24
 2   to that restricting of the money to say, "You aren't
 3   damaged because it didn't come directly from you."  Well,
 4   it happens all the time in just garden-variety breach-of-
 5   contract cases in, you know, a real estate market.  This
 6   argument that somehow Eastern's money doesn't count, I just
 7   don't think it carries water, and I think we've clarified
 8   that there's just, again, no standing, no basis for
 9   Strategic Vision to go on a fishing expedition about
10   everything related to that loan to try to find out more
11   about the Guo universe.
12               MR. GREIM:  Your Honor, this is Mr. Greim.  I
13   guess my question is going to be how is this loan document
14   ever going to be authenticated?  I mean, let's -- just the
15   point of that after Bayer, you know, I mean, I don't --
16               THE COURT:  Well, all right, here's what I think.
17   What I think is that some basic questioning regarding the
18   relationship between ACA and Eastern Profit and the nature
19   of this loan is -- it may be a bit of a search, but I could
20   see that as relevant to a defense, whether it's a good one
21   or a bad one.  It hasn't been litigated yet; and as there's
22   no court ruling that it is -- that there's no standing to
23   assert it, that it is a losing defense, that may be
24   ultimately on a motion that's where it will come out.
25               But when I look at the document requests that were
```

 1
 2  made to Ms. Maistrello, whether on her behalf or trying to
 3  get documents from ACA -- but I'm assuming you're trying to
 4  get at the same kind of information from her even if she
 5  appears individually to ask you what she knows about these
 6  things.  You start going, Mr. Greim, far beyond was this a
 7  bona fide loan and, you know, is it really the payment
 8  where they would have any loss, Eastern Profit would have
 9  any loss on its -- in order to put damages on this breach-
10  of-contract claim, you're asking for all of ACA's financial
11  information; all of its income and expenses, assets and
12  liabilities; you're asking for information about all
13  communication between ACA and a whole bunch of others for a
14  four-year period and all kinds of transfers of funds
15  with -- between anybody and for anybody for all types of
16  work or purposes for a period of years and everything about
17  this company, ACA, and what it does and who it is and who
18  it works with and so on and so forth.  And although I can
19  kind of see where you're going with the loan as in, all
20  right, in this dispute there was money paid that is at
21  issue that's being sought back and you have an argument
22  that you think is colorable that perhaps there wasn't a
23  loss by Eastern Profit, which Eastern will obviously
24  dispute vigorously, I at least can see, you know, how that
25  relates to a defense that you're trying to raise.  A lot of

PROCEEDINGS                    26

the rest of this I do not see as being fair game in

discovery in this case.

         Here's how I'm seeing what you're trying to do.

You have most of the discovery that you are seeking that is

in dispute.  You seem to be hooking into your fraud claim.

The fraud claim seems to be that Mr. Guo, who was the first

person who negotiated this deal and you understood the deal

would be with him and he'd fill in the name of a corporate

entity and that corporate entity happened to be Eastern.

But Mr. Guo, in inducing your company, Strategic Vision, to

do this deal, made representations about who he was and why

he wanted the research he wanted.  And you later came to

believe -- "you" meaning, you know, Strategic Vision --

came to believe that Mr. Guo was not who he said he was and

in fact had different motives, and it was, you know, such

that you would never have wanted to enter into the deal in

the first place.  And in order to try to prove that what he

said to Strategic Vision's representatives during that

initial negotiation was actually false and misleading, you

want to try to prove what the truth really is, which is who

Mr. Guo really is, what Mr. Guo is really up to, that he's

not truly a dissident or acting on behalf of dissidents and

so on.

         Now, how you go about proving that seems to me

where you are going off in all kinds of directions to try

to learn everything there is to learn about Mr. Guo, any

company he may have had his hands on or been affiliated

with in any way, every activity he's been in for some

number of years, every activity these other companies have

been involved with for some number of years, flows of money

here and there and everywhere, people who've been involved

here, there and everywhere, other lawsuits, other people's

stories, etc., etc., etc.  And I understand that it may be

a tricky business to try to establish that he was not who

he said he was and was not after what he said he was after,

but when I say that the discovery is overreaching, there

has to be some limits on this that get it focused on what

the particular representations were in the particular time

frame with regard to something that has some nexus to this

case and the claims; it's not, okay, now we're going to

basically engage in scorched earth research on Mr. Guo in

every possible avenue we can find to turn up anything and

everything we can find about anyone who's been associated

with him or any company that's been associated with him and

follow each of those leads into the ground.

          So if I allow the deposition of Ms. Maistrello to

go forward with respect to this stated loan, which you

might say is a purported loan, but we'll just call it

```
 1                        PROCEEDINGS                28
 2   "loan," and the payment that was made and where it came
 3   from, I would allow some questioning of her regarding the
 4   connection between ACA and Eastern, you know, what the loan
 5   connection was, information about the documentation if
 6   she's familiar with it, you know, information to go toward
 7   whether it was a bona fide loan.  So if you wanted to ask,
 8   you know, were there terms, if the terms involved interest,
 9   if in fact been paid, what do you know about that, but a
10   whole host of this other stuff, which is what I expect
11   would take you the rest of, you know, the seven hours, I
12   have some serious doubts about.  And so, you know, and that
13   carries through with respect to sort of the rest of the
14   discovery that is being sought from ACA: should you be able
15   to find it, Golden Spring; Mr. Guo; and so on.  That's a
16   speech on my part, but that's what I'm seeing.
17            MR. GREIM:  Your Honor, thank you.  I mean, what
18   you're explaining is exactly the struggle that we had as
19   we -- you always have to decide, you know, I think this is
20   actually the theory that fits this case that most fits what
21   my client felt, but I know I've got three months of
22   discovery, you know.  And so it's -- all those
23   considerations that you just mentioned went into the mix
24   here.
25            The other issue is we obviously can't prove, we
```

```
 1                         PROCEEDINGS                    29
 2   can't begin to prove everything that he has done.  And some
 3   of this is really kind of more relevant for some of the
 4   other witnesses that we might get to here in a second --
 5   there are other discovery.  But I agree with you what
 6   you've just hit on is really the underlying kind of issue
 7   that we're trying to grapple with here.
 8             But I will say that, you know, certain -- what
 9   we've tried to do is keep it to five or six depositions and
10   to choose the entities that seem to both touch upon this
11   specific contract but also play an important role in what
12   Guo Wengui is doing.  And so, for example, ACA is not just
13   sort of a one-time player that came out of the blue to fund
14   $1 million here.  And you saw -- we had some other
15   allegations -- it's all in the letters; I won't repeat it
16   all -- but we think that -- you know, we think one of the
17   ways to establish this, without going into all the ways we
18   could establish it, is the fact that he's been able to
19   transfer so much money, still, back and forth from the U.S.
20   to China or Hong Kong when you would think, according to
21   his allegations, he's not actually able to do that anymore.
22   And one of the ways he has done that is actually through
23   ACA and then its -- it has a parent entity, as well.
24             And so we think that's where this money actually
25   is and that this $1 million that is paid here at Guo's
```

PROCEEDINGS                    30

1

2    direction is just an example of the way that he used this

3    ACA.  And, you know, we realize we've got limited

4    resources -- everybody does -- we don't want go crazy.  I

5    mean, there were many other entities connected to Guo we

6    could ask about, and we're not; we're keeping it basically

7    to ACA and then Golden Spring, which we think is, you know,

8    employs maybe about ten people in New York, and it's the

9    same kind of cast of characters who get used in all these

10   different things.  Maistrello's one; Yvette Wang is sort of

11   a leader; and Han Chunguang has a role but a more minor

12   role.

13           So we tried to find where his overall story

14   overlaps with what happened in this case, and that's why

15   we're doing it.  And that's the best I can say here.  We

16   think, though, that we'll be able to show that ACA

17   basically has his money and that it just spends his money

18   when he asks it to.

19           MS. TESKE:  Your Honor, I don't understand the

20   relevance of that at all to this case.  And, frankly --

21           THE COURT:  Well, okay, all right.  So on that

22   point, here's what I'm understanding -- but, again,

23   somebody correct me if I'm wrong -- so Strategic Vision has

24   a fraud counterclaim.  And the fraud counterclaim is that

25   Mr. Guo made statements that were false or misleading that

|  |  |
|---|---|
| 1 | PROCEEDINGS                              31 |

```
 2  induced Strategic Vision to enter into a contract.  I'm
 3  assuming you're claiming you were damaged somehow by
 4  entering into the contract.  I know that you were paid $1
 5  million and haven't returned it.  I don't know if there was
 6  more money you say you should have been paid or if you're
 7  claiming some other kind of harm; but, in any event, I
 8  assume there's some claim there of damage.  And --
 9           MR. GREIM:  Yes.
10           THE COURT:  -- you have -- you claim that there
11  were false and misleading statements made by Mr. Guo.  And
12  the defendant in this case is now Eastern.  So the
13  statements by Mr. Guo, in order to get the fraud to
14  Eastern, Mr. Guo's statements have to be binding on
15  Eastern.  So Mr. Guo, then, has to be the voice of Eastern;
16  he has to be the principal, he has to be controlling, and
17  he had to do something in order to have this statements
18  Eastern's fraud.  Otherwise, it's just Mr. Guo's fraud, and
19  Mr. Guo is not the named defendant.  So in order to get
20  Mr. Guo's statements to be Eastern's statements, you have
21  to find that Mr. Guo was controlling Eastern.  And if you
22  can't get that he was directly controlling Eastern, even
23  though you think he was, then you're trying to get that he
24  was controlling ACA, which in turn was controlling Eastern
25  or was paying its money for it or something.  It's a little
```

```
 1                        PROCEEDINGS                    32
 2   bit convoluted, but I gather what you're trying to show is
 3   that Mr. Guo was controlling both Eastern and ACA, maybe
 4   one through the other in some way, or maybe through Golden
 5   Spring.  But somehow you're trying to get Mr. Guo's
 6   statements to be the statements of the plaintiff, is that
 7   right?
 8             MR. GREIM:  Your Honor, that is right.  My only
 9   thing I would say is I don't know that ACA is being used to
10   control Eastern.  I don't think he needs ACA to control
11   Eastern.  I think --
12             THE COURT:  Okay, so, then, why do -- then why do
13   we care if Mr. Guo is controlling ACA?
14             MR. GREIM:  Because then we can show that ACA
15   simply exists -- in other words, it gives us an independent
16   reason that ACA would wire us money.  It's not because ACA
17   decided to become a lender and go into commercial lending,
18   and here we go, they thought Eastern Profit was such a good
19   credit risk, they've written a loan.  Instead, ACA just
20   makes payments that Mr. Guo directs.  And it's when they
21   realized that they wanted to file a lawsuit or that people
22   were asking about, hey, you know, what's the provenance of
23   this $1 million that they said, Oh, well, we need to say
24   that was a loan, you know, loan agreement.
25             THE COURT:  Right.  So what difference does it
```

1                          PROCEEDINGS                    33

2  make -- so let's say I allow you to depose Ms. Maistrello

3  and ACA if you can find them and ask questions about the

4  relationship between ACA and Eastern, the particular loan

5  in question and whether it was a bona fide loan and, you

6  know, and whose money it was and why it was whoever's

7  money it was, why do you need to go beyond that and get at

8  questions about whether ACA is, you know, a pocketbook for

9  Mr. Guo?  So what?

10          MR. GREIM:  Because -- I'm sorry, your Honor,

11  it's because what may happen is Maistrello may say, you

12  know, "They call me a director, but I don't really do

13  anything; it's really all somebody in Hong Kong."  I don't

14  know what she'll say.  But I think it helps us to -- I

15  mean, at least circumstantial evidence here that this $1

16  million is not really, you know, part of a loan when ACA

17  has shown -- if we look and see that the only money it

18  pays out is for expenses that Mr. Guo has or wants or

19  directs and that there are no -- you know, none of those

20  involve loans; and, you know, and then we further can find

21  nothing to authenticate this document to show that this

22  person signed it, to show that this person signed it, to

23  show that it was negotiated.  I think we have now made our

24  showing that this is a sham, it's not a loan.

25          THE COURT:  Why would you need evidence

| | PROCEEDINGS                                    34 |
|---|---|

1  regarding other activities of ACA, transfers of money from

2  China or Hong Kong?  Why would you need all of the rest of

3  what you're looking for with respect to ACA other than

4  just testing whether this was a bona fide loan?

5

6          MR. GREIM:  Well, because, your Honor, I think

7  that's the way that we do it.  I think that's the way we

8  show.  So just going through our numbered list I've pulled

9  up here, you know, a few of these actually go to if ACA

10 just, you know, they use to hold Guo's money, to transfer

11 money back and forth in a way that he's supposedly not

12 able to do.  That goes to our, you know, "He's not really

13 a dissident" claim.

14         But separately, every other request we have

15 depends -- it's all predicated on ACA transferring money

16 on behalf of Guo, Eastern Profit or Golden Spring.  And

17 that is -- and we added Golden Spring just in case Yvette

18 Wang is the one making the request and she says, "Hey, I'm

19 with Golden Spring."  But everything else is tied -- it's

20 not all about ACA; I mean, if ACA is really a billion-

21 dollar company that does stuff all over the world and

22 really has no connection, then the answer to a lot of

23 these questions would be nothing.  You don't have any

24 documents reflecting or relating to work for Guo Wengui,

25 you know, Golden Spring, Steve Bannon, Eastern Profit.  We

```
 1                           PROCEEDINGS                    35

 2   have one; it's $1 million that we sent out.  Okay.

 3            MS. TESKE:  Your Honor, what have not heard

 4   articulated any basis for the connection or exploring the

 5   connection between ACA and Mr. Guo.  But I actually wanted

 6   to take a step back, your Honor, because there has never

 7   been any dispute by Eastern Profit that Mr. Guo in

 8   whatever conversations he would have been in connection

 9   with the formulation of this contract was not acting on

10   behalf of Eastern Profit.  And, in fact, their answer to

11   Eastern just filed admits that Guo participated in the

12   discussion on behalf of Eastern Profit as those

13   discussions related to the contract.  That issue is not

14   even in dispute, and --

15            THE COURT:  I'm sorry.  I'm sorry.

16            MS. TESKE:  -- he's asking for a fishing --

17            THE COURT:  Hold on a second.  You are willing

18   to stipulate on behalf of Eastern that any statements --

19            MS. TESKE:  I --

20            THE COURT:  Hold on a second.  -- that any

21   statements made by Mr. Guo in connection with discussing a

22   potential contract, negotiating the contract, entering

23   into the contract in the first instance, that any

24   statements made by Mr. Guo are statements of Eastern and

25   can be held against Eastern.  So if they were false or
```

```
 1                        PROCEEDINGS                36
 2   misleading, then Eastern was making statements that were
 3   false and misleading?
 4            MR. GREIM:  Your Honor --
 5            MS. TESKE:  I'm not Eastern's counsel.  I'm just
 6   reading an answer that was filed --
 7            THE COURT:  I'm sorry?
 8            MR. GRENDI:  Your Honor, this is Zach Grendi for
 9   Eastern Profit.  It's absolutely verified that Mr. Wengui
10   was acting with Eastern's agent in negotiating this
11   contract and was lead -- you know, a mouthpiece for Eastern
12   in terms of the interaction.  That's how Strategic Vision
13   and Eastern really interacted.  Mr. Chunguang that they're
14   trying to depose on Friday, he had nothing to do with those
15   interface or phone-related interactions --
16            THE COURT:  Well, let's hold him off for -- hold
17   off on him for a second, because we're getting off track.
18   I'll get back to him.
19            So you are willing to stipulate that any
20   statements made by Mr. Guo, whatever they might be proven
21   to be, were statements made by him as an agent for Eastern
22   Profit and bind Eastern Profit to the extent that if they
23   were false or misleading and if they were used to
24   fraudulently induce the contract, then Eastern is on the
25   hook for that; you're not going to say, "Hey, he was a
```

1                           PROCEEDINGS                    37

2   nonparty, those are his statements, those weren't our

3   statements, you don't have a fraud claim against us,"

4   because if that's true, if you take that issue out of the

5   case, then that takes away the need for that piece of

6   discovery.  But if you come back later and you say, "No,

7   no, no, that wasn't us; that was Mr. Guo," then Mr. Greim

8   will be unfairly deprived of that discovery.

9           MR. GRENDI:  Your Honor, I'm sorry I've jumped in.

10  I misinterpreted some of your policies that you -- your

11  comments.  It's absolutely accurate to say yes, Mr. Guo was

12  speaking for Eastern in that particular context, not

13  everything that Mr. Guo ever said is binding on Eastern;

14  but as it relates to the negotiations, the private

15  investigatory research contract, yes, Mr. Guo was speaking

16  for Eastern, and they're going to be stuck with what he

17  said to Strategic Vision concerning that.

18          THE COURT:  Well, Mr. Greim, if they make that

19  clear enough for you -- I mean, obviously, it will be on

20  the transcript of this call if you have a transcript

21  made -- to make that clear enough for you, you can forgo

22  some discovery that's designed to try to show that Mr. Guo

23  was speaking for Eastern with respect to any statements

24  that you're claiming were false or misleading.  And that

25  takes that issue out, and that takes that need for that

1                        PROCEEDINGS                    38

2    discovery out of the picture.

3         MS. TESKE:  I just wanted to further put this

4    claim into perspective, your Honor.  The representations

5    that are being referenced by Strategic are actually in the

6    con -- the contract speaks to what the purpose of the

7    contract is expressly.  And so whatever representations

8    they're claiming relate to the purpose of the contract, the

9    contract speaks for itself.  It actually said that, "The

10   contractor will conduct high-quality original research and

11   prepare reports on subjects chosen at the client's

12   discretion for the purpose of detecting, stopping and

13   preventing crime or other harms" (indiscernible) people.

14        So to the extent we're talking about what

15   representations were made concerning the purpose of the

16   contract, this is all just a smokescreen for some publicity

17   campaign that they're trying to conduct against Mr. Kwok.

18   The contract speaks for itself.  This is a breach-of-

19   contract claim.

20        And, furthermore, to say that they want to pursue

21   this fraudulent misrepresentation claim and rescind the

22   contract seems really disingenuous to me considering they

23   would then have to return the $1 million that they profited

24   and prove up on a *quantum meruit* basis the services they

25   provided over a 28-day period.

```
 1                        PROCEEDINGS                    39
 2              THE COURT:  Well, what is Eastern's -- not
 3    Eastern -- what is Strategic's claim for damages?
 4              MR. GREIM:  It's -- let me see, I'm going to read
 5    directly from our counterclaim here, just to be clear.  I
 6    think that Ms. Teske -- I was getting ready to answer a
 7    question.  I believe that was Ms. Teske speaking on behalf
 8    of Mr. Guo.  Okay, let me get to your damages point.  First
 9    of all, we -- okay, I'm sorry, I'm at paragraph 116 of our
10    complaint.  So we would go back to all the costs that we
11    made in connection with negotiating the contract; preparing
12    proposals for it; costs to identify, recruit, engage
13    subcontractors; perform work; costs for startup needs; time
14    and travel expenses; costs to address security breaches and
15    other harms --
16              THE COURT:  I'm sorry, this is after you --
17              MR. GREIM:  -- whole list of things.
18              THE COURT:  -- this is after you entered into the
19    contract or before?
20              MR. GREIM:  No, what we're saying is, you know, if
21    you put us back in the position we would have been in had
22    there not been the contract, we're going through all the
23    expenses that we incurred.  But there's more beyond that.
24              THE COURT:  Wait, but you didn't answer my
25    question.  Were those expenses incurred before the contract
```

```
 1                          PROCEEDINGS              40
 2   was entered into or after?
 3            MR. GREIM:  Well, they're both before and after.
 4   Some were during the negotiation, after representations but
 5   before signing the contract.
 6            THE COURT:  So you're claiming you were
 7   fraudulently induced to incur certain expenses before the
 8   contract was entered into?
 9            MR. GREIM:  You're right.  Your Honor, there were
10   two -- there are kind of two or three buckets.  The first
11   bucket -- and this is getting a little beyond the pleading,
12   but it's how I'm working it out here for -- getting ready
13   for motions.  The first bucket would be Guo making
14   representations to us about himself that were false and
15   getting us to spend probably a month preparing different
16   proposals with him.  The second -- and that was all before
17   the contract was signed on January 6.  So we --
18            THE COURT:  Okay, so your claim --
19            MR. GREIM:  -- were already --
20            THE COURT:  Okay, hold on a second.  So you
21   don't have a breach-of-contract claim with respect to that
22   because there's no contract.  So you have a fraud claim
23   that you were fraudulently induced to do -- to prepare
24   these proposals, is that right?
25            MR. GREIM:  Right.  Well, among other things,
```

```
 1                          PROCEEDINGS              41
 2   right, to take about a month to negotiate with him,
 3   prepare different proposals.  It ended up resulting in the
 4   contract, which was a narrower set --
 5             THE COURT:  Okay, so it's not -- the claim is
 6   not that Strategic was fraudulently induced to enter into
 7   a contract; it's that it was fraudulently induced to do a
 8   bunch of work, some of which hap -- and a bunch of money,
 9   some of which happened before the contract was entered
10   into and some of which happened later; and all of this
11   amounted to more than $1 million worth of work, I gather?
12             MR. GREIM:  Well, your Honor, I can't say I'm
13   total with that.  But there are some other elements,
14   though.  The second bucket of things would be the cost in
15   performing the contract; all these people had to be paid
16   money.  And the third thing we said is just the cost of
17   having our capabilities exposed to Guo and the
18   reputational damage of, you know, having been seen to work
19   with Guo, you know, now that I think the perception of him
20   today is different than the perception of him when we
21   entered the contract.  So those are all the things we're
22   claiming as damages.  And we've actually got an upcoming
23   30(b)(6) on that.
24             THE COURT:  Okay.  So when you add up all of
25   these items, you're saying that through this negotiation,
```

1                                PROCEEDINGS                    42

2   preparing of proposals, entering into the contract, doing

3   work for however many days it was, all of that damaged you

4   by more than the $1 million that you got so that you have

5   a net loss; is that right?

6            MR. GREIM:  Well, yes, your Honor, I would say we

7   do have more than a $1 million loss.  But I would also say

8   this.  We are not concluding that the $1 million goes to

9   Eastern Profit; in other words, that Eastern Profit gets a

10  credit for $1 million that came from somewhere else.  That

11  issue moves separately --

12           THE COURT:  Right.  But, so -- fine -- so your

13  client got an amount of money in the door, wherever it

14  came from -- so the $1 million.  Now let's say you're

15  damaged by having to have engaged in work that was $1.2

16  million and you're saying you're damaged by $1.2 million?

17  You're not saying, "We know we've got $1 million in, so

18  we're really out of pocket two bucks"?  You're still

19  saying you get the 1.2 million because you don't think

20  that they get any credit for the money that you pocketed?

21           MR. GREIM:  Well, your Honor, I guess the question

22  is whether they get a claim for the offset, and I've

23  just -- this is an issue we're going to have to address in

24  our briefing.  I have to tell you I'm not prepared to --

25           THE COURT:  Okay, I'm just trying to understand

```
 1                        PROCEEDINGS              43
 2   what the claim is, what's relevant to the claim, what the
 3   scope of discovery should be.  And I've been scratching my
 4   head since I've been reading these papers, just wondering
 5   what exactly Strategic's damages are because I didn't see
 6   anything in these papers.  And I didn't go back and go
 7   through the pleadings, I confess; but trying to understand
 8   from this, you know, where the harm falls.  You know,
 9   reputational harm, okay, maybe there's some reputational
10   harm that can be established, but -- okay; and cost of
11   preparing proposals, if you were misled in doing that,
12   okay, I guess you've got an argument there and so on.  But
13   I'm just wondering.
14               So going back to this, going back to -- we're
15   going to try to knock one of these off at a time --
16   Ms. Maistrello.  I've already said that I can see my way
17   clear to letting you have a deposition of Ms. Maistrello
18   or requiring her to appear and asking her about this loan
19   to try to determine if it's a bona fide loan.  But the
20   list of document requests that I have directed to
21   Ms. Maistrello, which I assume is a guide to the kinds of
22   questions you'd be asking her, still do go well beyond
23   that.  And I am having trouble understanding, in light of
24   what Eastern has represented, why this is something that
25   is needed in discovery, reasonably needed in discovery or,
```

1                              PROCEEDINGS                  44

2   you know, is we're supposed to try to rein it in to be

3   tailored to the needs of the case, why it's not

4   disproportionate to those needs.

5           The one thing I've heard you say that I'm sort

6   of puzzling over is you would -- it would potentially help

7   you prove that Mr. Guo was not really a dissident if he

8   was able to move money freely.  And if he moved money

9   freely through ACA, if Mr. Guo used ACA for his own

10  purposes to be able to move his money that would otherwise

11  you would have expected have been frozen, then that would

12  show that the government was aware of him, they didn't

13  treat him as a dissident because they're letting him move

14  money.  But it wouldn't be ACA moving money.  ACA is not

15  Mr. Guo, unless you're able to prove there's some alter-

16  ego there.  It would be Mr. Guo's money that ACA was

17  helping Mr. Guo move or was moving for him, right?  So

18  that may be an area of inquiry, just is this person aware

19  of and are there documents in ACA -- should you ever get

20  to ACA -- that show that ACA was using some way to move

21  Mr. Guo's money out of Hong Kong or I don't know if he had

22  money in China or somehow move money in or out of I'm

23  going to assume it's Hong Kong.  Was it Hong Kong or was

24  it Hong Kong and China or was it China?

25          MR. GREIM:  No, it's Hong Kong, your Honor.

```
 1                         PROCEEDINGS                45
 2              THE COURT:  Hong Kong.  Okay.  That ACA was being
 3    used by Mr. Guo to help facilitate his movement of his own
 4    money out of Hong Kong or into Hong Kong.  And -- okay,
 5    but that's still much more narrow than what you have here.
 6    Like, you have information you want regarding money being
 7    spent by Mr. Guo or by Eastern or by Golden Spring or by
 8    ACA to other -- to law firms, to other research firms
 9    seemingly looking for work that is competitive to the work
10    that was contemplated in this case.  You have extremely
11    broadly worded document requests, so I assume you're
12    intending to go off in similarly broad areas in
13    questioning this witness.  And I'm really having trouble
14    seeing how that could be appropriate.
15              MR. GREIM:  Your Honor, I think you're looking at
16    No. 6.
17              THE COURT:  I'm looking at one through eight as
18    a whole.  I mean, I looked at six just now, but I mean
19    No. 4, for example, that's basically any financial
20    information about ACA.  But, no, I don't see any reason
21    why it would be a yes.  Communications between ACA and any
22    of its agents for four years, no.  Why?  I mean, where
23    does that -- you're way overbroad for the needs of this
24    case.  It's really disproportionate unless you have some
25    specific hook where you can say this will, you know,
```

```
 1                         PROCEEDINGS                46
 2   constitute evidence that this person was lying.  And this
 3   is just way broad, you know, for that.
 4            MR. GREIM:  I'm sorry, your Honor, if I could --
 5   this is Mr. Greim again -- No. 5, for example -- and,
 6   really, I see what you're saying on No. 4, I hear what
 7   you're saying, I think we can scrap No. 4.  I'm willing --
 8   I mean, we're here to get through these and make some
 9   progress -- we can scrap No. 4.  And, at any rate, I don't
10   think Maistrello herself will probably have those, anyway.
11            But if you look at five through eight, like, on
12   No. 5, your Honor, we're not saying communications between
13   ACA and any of its agents -- there's a parenthetical in
14   there which makes it a little hard to read -- but we're
15   saying any of its agents, on the one hand, and on the other
16   hand, Guo.  So we want Guo-to-ACA communications.  No. 6 --
17            THE COURT:  That's overly broad.  It's overly
18   broad.  Here's what I'm going to allow -- okay?  I'm going
19   to allow you to depose Ms. Maistrello.  If she's available
20   Friday, great; get it done on Friday.  I'll allow you to
21   depose her about the relationship between ACA and Eastern,
22   about this loan document, about, you know, questions that
23   go to whether it was a bona fide loan.  I'll also allow you
24   to ask her, if she has knowledge of it, whether Mr. Guo was
25   using ACA in some manner to move money in or out of Hong
```

```
 1                         PROCEEDINGS              47
```

Kong, because you said that would go toward indicating that

he's not a dissident, if he could move money in or out of

Hong Kong.  So far that's all I got, but I'm --

            MS. TESKE:  I'm --

            THE COURT:  So far that's all I've got that I'm

seeing the connection to on any of the claims or defenses

that have been raised here.

            MS. TESKE:  Your Honor, can I get some

clarification on how it shows that Mr. Guo is not a

dissident of Hong Kong simply if he is exchanging -- money

is going between him and a Hong Kong entity?

            THE COURT:  Well, defendant has said --

            MS. TESKE:  Because I --

            THE COURT:  -- Eastern has -- Eastern is making

the argument that if you are known to the Chinese

government to be a dissident, your money is going to be

frozen, and you're not going to be allowed to move it

freely in or out of either China or Hong Kong -- at least

that's what I'm understanding.  So if he was able to move

his money --

            MS. TESKE:  He has --

            THE COURT:  This is the argument that I'm

hearing.

            MS. TESKE:  I know.  But I'm -- your Honor,

1                           PROCEEDINGS                    48

2    there's no -- China cannot stop a Hong Kong entity from

3    transferring money to Mr. Kwok.  And there's been no

4    indication that that's true.

5              THE COURT:  I'm sorry, say that again, please?

6              MS. TESKE:  And there's been no --

7              THE COURT:  I'm sorry --

8              MS. TESKE:  -- for even making that --

9              THE COURT:  I'm sorry, say that again, please?

10             MS. TESKE:  The Chinese government cannot

11   prevent a Hong Kong entity from transferring out money to

12   Mr. Kwok or anyone else.  Only Hong Kong can do that.  And

13   there's been no even good-faith basis for suggesting that

14   that's the case.

15             THE COURT:  All right, Mr. Greim --

16             MS. TESKE:  And he was only actually --

17             THE COURT:  Mr.  Greim -- Mr. Greim -- hold on a

18   second.

19             Mr. Greim, what is your basis for saying that if

20   Mr. Guo -- I'm going to call him that just because that's

21   how I see his name here -- if Mr. Guo was known to the

22   Chinese government to be a dissident, he would not be able

23   to transfer money out of Hong Kong?

24             MR. GREIM:  Your Honor, we understand from

25   Mr. Guo's own statements that he's not able to get his

```
 1                          PROCEEDINGS                    49
 2   money out, that because his assets have been frozen
 3   because of his dissident status.
 4            THE COURT:  I'm sorry, he testified to --
 5            MS. TESKE:  I have --
 6            THE COURT:  -- he testified to that in his
 7   deposition; he said he can't get his money out of Hong
 8   Kong?
 9            MR. GREIM:  No, your Honor, he hasn't testified.
10   We weren't able to ask that question in the deposition.
11            THE COURT:  I'm sorry, he made a public statement
12   that he can't get his money out of Hong Kong because he's
13   a dissident?
14            MR. GREIM:  Your Honor, that's our understanding.
15   I can -- I can go in -- we have a series of articles that
16   we've cited in our complaint.  And what we have argued is
17   that the fact that he is able to move --
18            THE COURT:  Okay, what was he quoted as saying
19   where about whether he could not get his money out of Hong
20   Kong?
21            MR. GREIM:  Your Honor, I actually -- I have to
22   tell you I'm not prepared to tell you right now.  I could
23   go through -- but I actually can't answer that on the spot
24   here.
25            THE COURT:  Well, isn't this sort of central to
```

```
 1                        PROCEEDINGS                    50
 2  your theory as to why his movement of his money is
 3  relevant because he said he can't do this?  So if he said
 4  he can't do this, are you sure that he said he can't move
 5  money out of Hong Kong as opposed to he can't move money
 6  out of China?
 7            MR. GREIM:  Your Honor, all I can say is I've got
 8  to go back and find it.  I just -- that's what I have in
 9  my head; that's why we're asking for it.  But I just, I
10  don't have it.  I don't have it in front of me here.  I
11  would be happy to sup --
12            MS. TESKE:  And how is any of this --
13            MR. GREIM:  -- supplement that --
14            MS. TESKE:  -- relevant to the false
15  representations that he made to Strategic?
16            THE COURT:  Hold on, please --
17            MR. GREIM:  Your Honor --
18            THE COURT:  Hold on.  Okay?  I see a claim for
19  fraud that statements that were made on behalf of Eastern
20  were false or misleading, and those statements were in
21  essence that Mr. Guo was a dissident working to -- I may
22  have this somewhat wrong -- but root out, expose
23  something, corruption within the Communist party in China
24  and the Chinese government and that the work that he
25  was -- according to Strategic -- the work he was asking
```

```
 1                        PROCEEDINGS                   51
 2  them to do would be toward that end and toward that goal
 3  because this is what he himself was and believed.
 4            Now, if the defendant has a claim that that was
 5  false and misleading and that in fact he was not a
 6  dissident and in fact was a propagandist for the Chinese
 7  government or some-such, then they need to be able through
 8  discovery to pin down some of what they think they have
 9  found through evidence to try to demonstrate that that was
10  false.  They have -- so far I have heard that one way that
11  you demonstrate that that's false is the statements that
12  Mr. Guo has made that his money was frozen because he's a
13  dissident was not actually true and he was able to move
14  money.  If in fact he made a statement that his money in
15  Hong Kong was frozen and he couldn't move it because he
16  was a dissident and in fact he was moving money and was
17  doing so through ACA, then arguably this would be
18  circumstantial evidence that he was not what he said he
19  was.  Now, that's -- it's a little bit beyond what you
20  would think of as the scope of a commercial dispute
21  between parties, but how you go about proving that
22  somebody was not a dissident as you said he was I think is
23  a tricky business.  So it's the one concrete thing so
24  far --
25            MS. TESKE:  Your Honor --
```

| 1 | PROCEEDINGS                          52 |

2              THE COURT:  -- it's the one concrete thing so

3    far that I have heard.  If there in fact are no statements

4    by Mr. Guo that he ever had any difficulty transferring

5    money out of Hong Kong and never said he did and that as a

6    dissident it wouldn't matter one wit if, you know, that he

7    would still be fully able to move money in and out of Hong

8    Kong, then that seems to me evaporates, and then we don't

9    go that route.  But I had thought that there was

10   something, and maybe I'm wrong.

11             MR. GREIM:  Your Honor --

12             MS. TESKE:  Your Honor, it is a very serious

13   accusation to say that a person seeking political asylum

14   in the United States is actually a propagandist for the

15   Chinese Communist party, and I have not heard any good-

16   faith basis for making that allegation.  All we have --

17             THE COURT:  But that's the allegation in the

18   counter -- that's the allegation -- that is the

19   counterclaim, right?  I mean, it may be that there's no

20   good-faith --

21             MS. TESKE:  But there's no good-faith basis for

22   making it, and we have -- we have statements --

23             THE COURT:  Wait, wait, wait, wait.

24             MS. TESKE:  -- that --

25             THE COURT:  Wait a minute.

```
 1                        PROCEEDINGS                 53
 2          MS. TESKE:  -- purpose is to --
 3          THE COURT:  Wait a minute.  Wait a minute.
 4  Maybe there is a counterclaim that's been asserted in bad
 5  faith.  Maybe no reasonable inquiry was made.  Maybe it's
 6  a Rule 11 violation.  But right now I'm charged with
 7  making sure the parties have discovery that is tailored to
 8  the claims and defenses raised in the case.  So there may
 9  be a bad-faith counterclaim, but it's not been dismissed;
10  it's in the case.  This is my understanding as to what it
11  is.  Am I wrong as to what it is?
12          MS. TESKE:  Your Honor, we are nonparties of the
13  case and not in a position to be making a motion to
14  dismiss this claim, but I am saying that in light of the
15  fact that discovery has to be proportional to the needs of
16  the case and in light of the fact that this is a nonparty
17  seeking political asylum in the United States and in light
18  of the fact that we have not heard any good-faith basis
19  for requesting this discovery other than just the beliefs
20  of Strategic, that we need to be very careful about what
21  we're allowing here because especially in light of the
22  fact that Mr. Greim has said to the media that the whole
23  point of this litigation is to hold Mr. Guo personally
24  accountable for these actions and that his client has been
25  spreading all of these claims, using these pleadings, as a
```

```
 1                          PROCEEDINGS                    54
```

2  basis for spreading all of these claims all over the media

3  and engaging in a smear campaign.

4            THE COURT:  Okay.  Let me try to -- let me put

5  it --

6            MR. GREIM:  Your Honor --

7            THE COURT:  All right, let me put this a

8  different way.  Okay?

9            MR. GREIM:  Your Honor --

10            THE COURT:  I cannot in discovery decide the

11  merits of a claim that's been raised in the case.  It may

12  be meritless and it may be asserted in bad faith, but I

13  cannot decide that in a discovery context.  Okay?  In

14  discovery context I've got a party --

15            MR. GREIM:  Your Honor --

16            THE COURT:  -- I've got a party that's asserted

17  this fraud claim.  And the whole fraud claim is that they

18  were mostly false statements, and the false statements

19  have to do, I gather, with who Mr. Guo said he was.

20            MR. GRENDI:  Your Honor, this is Zach Grendi for

21  Eastern Profit.  I just want to make an undisputed set of

22  facts clear here that really, I think, put the spotlight

23  on why this line of -- this whole theory of why Guo's not

24  a dissident and he's transferring money out of China and

25  this and that.  It's undisputed by the parties that the

PROCEEDINGS                    55

1
2   money from ACA came from Hong Kong before the contract was
3   signed.  And so this whole idea that Strategic Vision
4   would never do business with someone who wasn't a real
5   dissident because real dissidents can't transfer money out
6   of Hong Kong is completely contradicted by the fact that
7   Strategic Vision accepted money from Hong Kong prior to
8   the execution of the contract and when the parties then
9   talked about it, they said oh, let's sign the deal --
10              THE COURT:  All right, I'm sorry --
11              MR. GRENDI:  -- and they then turned around and
12   signed the contract.
13              THE COURT:  I'm sorry, was this Mr. Guo's money
14   that you say was transferred out of Hong Kong?
15              MR. GRENDI:  No, your Honor, this is money from
16   Eastern Profit.  But, obviously, the parties know that
17   this is a contract being signed by Eastern Profit for
18   intelligence work into dissidents -- or, I'm sorry, into
19   the Communist Party by dissidents.  They can't make the
20   claim that these funds -- getting money from Hong Kong
21   from someone associated with Mr. Guo, like Eastern Profit
22   is obviously working with Mr. Guo, that the money comes
23   from Hong Kong, they think that that's a big red flag.
24   And, yet, they're moving forward.  It doesn't make any
25   sense.  And they're just trying to engage in this

collateral discovery because they're trying to turn the

case into a trial about who Mr. Guo is as opposed to what

this contract's about.

THE COURT:  Okay.  Hold on, please.  Okay?  Let

me back up.  There is a fraud claim.  You have to have

discovery on fraud claims.  You can, you know, you can --

I understand a nonparty is a nonparty and doesn't have a

lot of tools available to it, but Eastern does.  And

there's this claim in the case -- right?  I can't say

because somebody is telling me it's a bad-faith claim and

was asserted without reasonable investigation, reasonable

inquiry by counsel, that there should be no discovery on

it.  We can't take that.  We can't have a case where a

claim is brought, an opposing party or nonparty says it's

brought in bad faith and without support; therefore,

Judge, you shouldn't let anybody have discovery on it.

How is that a workable system?  There's a claim in the

case; you get discovery unless and until the claim is

dismissed or there's some sort of injunctive relief or

something else that's extraordinary.  Right?  In the

ordinary course of the claim there's discovery.  The claim

is that Mr. Guo, speaking on behalf of Eastern, lied.

Maybe he lied and maybe he didn't lie.  Maybe he's seeking

asylum because he's a dissident, and maybe it's all a

1                              PROCEEDINGS                    57

2   sham.  I don't know.  I have no idea.  Okay?  But that's

3   the claim in the case.

4              So discovery is proportionate to the claim.  If

5   there is a statement by Mr. Guo out there that his money

6   is tied up in Hong Kong because he's a dissident; and if

7   in fact he's moving money through ACA and there's some

8   basic information about that that can be gotten, then

9   maybe it would go toward showing he's not who he says he

10  is.  If he never made a statement that his money's frozen,

11  that would be a false assumption and he never made it and

12  it's just a complete leap by Strategic, then, okay, that

13  undermines the argument Strategic is trying to make that

14  this would help show he's not who he said.  Okay?

15             So we've got to go back to was there in fact a

16  statement by Mr. Guo in the media, somewhere, that his

17  money in Hong Kong was tied up.  If there was such a

18  statement, I would allow some reasonable questioning to

19  Maistrello of do you know of Mr. Guo getting any money out

20  of Hong Kong through ACA.  I'm not talking about hours of

21  questioning; I'm just talking about something pretty basic

22  on that subject.  But if there's no core underlying

23  foundation for it because he never in fact said what

24  Mr. Greim says Mr. Guo said and in fact there was never a

25  question of whether he could get money out of Hong Kong

1                          PROCEEDINGS                    58

2    and in fact he can get money out of Hong Kong and maybe

3    he's willing to stipulate or submit an affidavit that says

4    yes, I could get money out of Hong Kong, then maybe that

5    issue goes away too.

6              MS. TESKE:  How is any of this related to the

7    fraudulent inducement to enter into a contract?  This is

8    such a thinly-veiled attempt to interfere with Mr. Guo's

9    political asylum, and I think that we need to, you know,

10   keep in mind that the discovery rules, you know, have to

11   be proportional to the needs of the case --

12             THE COURT:  Have you heard nothing that I have

13   said?

14             MS. TESKE:  -- and I think --

15             THE COURT:  Have you heard nothing that I have

16   said?  Have you heard nothing that I have said?

17             MS. TESKE:  (Indiscernible).

18             THE COURT:  I have said the discovery requests

19   are overbroad.  I have said they need to be proportionate

20   to the needs of the case.  I've also said there is a fraud

21   claim in this case.  The fraud claim is that Mr. Guo on

22   behalf of Eastern made statements that according to

23   Strategic were false and misleading, and those statements

24   had to do with his status as a dissident.  Defendants want

25   to go and try to prove that those were in fact false.  If

```
 1                        PROCEEDINGS                    59
 2   they don't have a shred of anything to base it on, that
 3   will in turn limit the discovery to keep it proportional.
 4   But if they in fact have a statement from Mr. Guo, as they
 5   say they do, although I haven't heard what it is yet, that
 6   his money was tied up because he's a dissident and in fact
 7   the evidence shows otherwise, then it's relevant to
 8   proving that the statement was false and misleading.
 9   That's not that complex.  But I don't know whether there
10   really is an underlying statement because Mr. Greim has
11   said, "I don't know where it is.  I have to find it for
12   you, Judge."  So go find it for me.  If it's not there,
13   you don't get that discovery.  If it is there --
14            MR. GREIM:  Your Honor, I don't think there's an
15   allegation in the counterclaim, which I was just looking
16   at today, that Mr. Guo represented to Strategic Vision
17   that he could not move money out of Hong Kong.
18            THE COURT:  No.  The representation, as I
19   understand -- the representation as I understand it was
20   that he was a dissident.  Okay?  That was the
21   representation.  And he wanted to work on behalf of
22   dissidents against the Chinese government.  So if that's
23   the representation, then the question is if the allegation
24   is that that was false and misleading, the question is how
25   you go about finding evidence that that's false and
```

1                              PROCEEDINGS                    60

2   misleading.  You can't just do it as a pure fishing

3   expedition; you have to have something that roots it where

4   you have some basis to say this is why we believe that

5   this exists and would show that that's a lie.  If there is

6   a statement A, a statement by Mr. Guo that his money is

7   tied up because of his dissident status, including his

8   money in Hong Kong; and, B, if there's some evidence that

9   Mr. Guo was able to use ACA to move money -- and the

10  allegation here is a little bit thin, but the suggestion

11  is that ACA provided $1 million at Mr. Guo's request and

12  that it may have been Mr. Guo's money because Mr. Guo was

13  the one who wanted this project funded, and the money

14  magically came from ACA with a loan document that Mr. Guo

15  said that -- was it Mr. Guo who said or Ms. Wang or

16  somebody said they hadn't even been able to see and it had

17  some questionable origins -- you know, there's at least

18  some nexus there as opposed to a lot of this other stuff

19  that Mr. Greim is seeking where I am inclined to say no.

20            So, Mr. Greim, you have to find for me what the

21  hook is here, and I have to be satisfied it is a

22  legitimate hook.  If it is, I'll allow you to go down that

23  path at least somewhat.  If there isn't, then I'm going to

24  say no.

25            MR. GREIM:  Your Honor, I haven't spoken for a

2   while.  I've been listening, but I've also been scrolling

3   through my counterclaim, which doesn't have all the

4   information we have, but it's what I can easily get to

5   sitting in my little paddle station here for our phone

6   call.  And paragraph 59 of the counterclaim lays out a

7   transaction that's even more complicated than we got into

8   here because it just was beginning to be too much so I

9   tried to summarize it.  But essentially what we've said is

10  that he shouldn't be able to move money even from Hong

11  Kong.  Earlier I said there was a public statement -- I

12  was trying to remember back to our counterclaim -- that

13  there was a public statement cited in our counterclaim

14  that he could not move money out of Hong Kong.  And I

15  don't see that we pled that here.  I'm not saying he

16  hasn't said that.  He's said his assets are frozen.  But

17  there's a specific part -- and, again, I'll reference it

18  for the record here -- and I'm not limiting myself; I'm

19  just saying paragraph 59 of the counterclaim lays out how

20  after Guo left China, supposedly fled China because of the

21  crackdown involving his sort of mentor there, he came to

22  the United States.  He then tried to do a securities

23  purchase of Haitong Securities, and ACA was actually the

24  investment vehicle for doing that.  I think it involved

25  some heir money, as well, but that's not pled here.  He

```
 1                          PROCEEDINGS              62
 2   then -- he had money transferred from New York back over
 3   to China Minsheng Bank in Hong Kong, which he tried to
 4   kind of show you it's a few degrees removed from ACA.
 5   That money they got combined, and then the investment
 6   ended up failing.  But we've pled that he should not have
 7   been able to have sent $260 million to China Minsheng Bank
 8   in Hong Kong to make an investment when Chinese
 9   authorities, who would have controlled that, had just
10   seized most of his assets.
11              So I can give you more that enabled me to
12   develop the idea about the influence the Chinese
13   authorities have over Hong Kong banks and whether they're
14   actually able to seize and block transfers of funds there
15   if that is a condition precedent to getting this
16   Maistrello discovery.  We believe that it's true.  I hear
17   that --
18              THE COURT:  What's the --
19              MR. GREIM:  -- they claim it's not.
20              THE COURT:  What's the date of the counterclaim?
21              MR. GREIM:  July 19, 2019, 114.
22              THE COURT:  I'm sorry, Docket 114?
23              MR. GREIM:  Right.  This is on page 38,
24   paragraph --
25              MR. GRENDI:  I believe that's your old
```

```
 1                          PROCEEDINGS                  63
 2   counterclaim, Attorney Greim.  I think they're identical.
 3              MR. GREIM:  Yes, good point.  We did file an
 4   amendment to change a few (indiscernible), but this part
 5   stayed the same.  If you go there, you'll find it, your
 6   Honor.
 7              THE COURT:  I'm sorry, this is the correct
 8   operative pleading or it is not, that I'm looking at?
 9              MR. GREIM:  Well, there is a later one, but this
10   part didn't change.  We added two affirmative defenses.
11   So I'm sorry, I should really give you the most recent
12   one.  And I'm just about to do that.  It is Document 127.
13              THE COURT:  Hold on, please.  I'm just going to
14   pull it up.
15              MR. GREIM:  I was in a hurry to pull it up, and I
16   accidentally pulled up my old one.
17              And I believe it's probably still page 38.
18              THE COURT:   Paragraph 59?  Page 39.
19              MR. GREIM:  Oh, you're right.  Okay.
20              THE COURT:  "Even if the Chinese" -- "Even if
21   the Chinese" -- I'm going to read paragraph 59.  " Even if
22   the Chinese government had actually been seizing Guo's
23   assets by late January and early February 2015 and Guo
24   had, despite that, somehow been able to wire over $60
25   million from Hong Kong to New York for the purchase of his
```

PROCEEDINGS                    64

Sherry-Netherland apartment in March 2015, Guo's
subsequent actions shortly afterwards in 2015 further
undercut his 'dissident' narrative. In May 2015, Guo
attempted to purchase a substantial portion of a
multibillion-dollar private placement of H-shares (those
available in the Hong Kong Stock Exchange) in Haitong
Securities, with his efforts reportedly involving billions
of U.S. dollars' worth of investment from ACA. According
to Guo's own affidavit dated February 5, 2016 and filed in
Ace Decade Holding v. UBS under Guo's Cantonese alias "Ho
Wan Kwok," Guo transferred approximately $260 million in
U.S. dollar-denominated assets in a New York bank account
on May 13, 2015 to an account at China Minsheng Bank in
Hong Kong, an institution explicitly regulated and
monitored by the very Chinese authorities who only three
months earlier had supposedly seized most of Guo's assets.
Shortly after transferring the funds to the Hong Kong-
based bank, Guo reportedly purchased over USD $1 billion
of H-shares in Haitong Securities, a high-profile action
that would seem inexplicably reckless for someone who had
just endured the supposed arrest of 27 of his employees
and family members, never mind the purported seizure of
most or perhaps all of his assets."

          MS. TESKE:  Your Honor, I just want to make the

```
 1                        PROCEEDINGS                    65
 2   point that I think that all of the allegations that are
 3   with respect to money moving in and out were with Hong
 4   Kong or Hong Kong-based entities.  And the Chinese
 5   government does not have the authority to restrict that.
 6            MR. GREIM:  And, your Honor, we think they do.
 7            MS. TESKE:  And that's actually the point --
 8            THE COURT:  Yes, but I --
 9            MS. TESKE:  -- of the demonstrations in Hong
10   Kong right now.
11            MR. GREIM:  Actually, I thought that was about
12   extradition, but I -- your Honor, I --
13            MS. TESKE:  Because the Chinese government
14   doesn't have the right to extradite anybody in Hong Kong,
15   and they're trying to.
16            THE COURT:  I don't -- I would --
17            MS. TESKE:  (Indiscernible)
18            MR. GREIM:  Your Honor, we will agree to limit
19   Maistrello -- this is Mr. Greim -- to the items that you
20   mentioned before -- because I know we've got other people
21   to cover here.  It's -- I wrote this down -- it's showing
22   that ACA was used to move Guo's money in and out of Hong
23   Kong; and also, ACA's relationship with EP -- I guess
24   Eastern Profit -- it's what I wrote; and the, you know,
25   provenance of the loan.  And we won't -- we will not go
```

```
 1                        PROCEEDINGS              66
 2   into other issues.  And I don't know if any documents will
 3   be produced, but that's all we would expect.
 4            THE COURT:  All right, I just -- I want to make
 5   it clear for this record that I have no idea whether China
 6   has any ability to seize assets held in Hong Kong at any
 7   financial institution or other.  I just don't know.  Okay?
 8   And it may be that they don't have that authority.  And it
 9   may be that Mr. Guo's counsel can provide some information
10   to Mr. Greim that shows that in fact they can't do that
11   and in fact there's no -- there was never a claim that
12   they did seize his assets in Hong Kong.
13            But, on the other hand, Mr. Greim, I'm expecting
14   that if you're going to go into this area, you have some
15   statement by Mr. Guo that his monies in Hong Kong were not
16   available to him as a dissident, if he had money in Hong
17   Kong.  You said you did; you said he said that.  You said
18   that's the reason you think that this would belie what he
19   himself has said.  It's not in your pleading.
20            MR. GREIM:  Your Honor, I'm sorry, I want to be
21   clear on that, though, because I was trying to remember --
22   I didn't have my pleading pulled up, and so I used the
23   long interlude to look in there.  But I'm trying to go off
24   my memory.  I want to be very, very clear here.  Mr. Guo
25   has said that all or most of his assets are frozen.  We
```

```
 1                    PROCEEDINGS              67
 2  have also alleged that he should not be able to move money
 3  in and out of Hong Kong.  I can't -- I want to be clear,
 4  so I don't want to be -- I don't want it to be said I
 5  misrepresented something to you.  I want to be very, very
 6  clear.  I don't know that I have a statement -- I might
 7  have a statement, but I don't know that I have a statement
 8  from Guo that he can't move his Hong Kong assets out.  For
 9  all I know, Guo might have said, "I can move my Hong Kong
10  assets, and that explains why I'm able to do it."  But, in
11  fact, he should not be able to do it.  And I want to just
12  be clear the basis of our theory is that he should not be
13  able to move the assets in and out of there.  And I was
14  doing my best to try to remember --
15          THE COURT:  Do you have some support for that?
16          MR. GREIM:  Um --
17          THE COURT:  Assuming Mr. Guo did not himself
18  make that statement, assuming he did not himself say, "I
19  cannot move assets out of Hong Kong"; that, at most, he
20  said, "I can't move assets out of China," if he said
21  anything, right?  Assuming he didn't say it himself, do
22  you have any authority for the proposition that if you've
23  got a dissident with money in Hong Kong, the Chinese
24  government will be able to freeze that money and keep it
25  from being transferred?  Is that actually a thing?
```

```
 1                        PROCEEDINGS                    68
 2            MR. GREIM:  I could have that, but I just -- what
 3   I'm telling you right now is that I went to consult my --
 4   the counterclaim itself, which just has --
 5            THE COURT:  I understand that.  I understand
 6   that.  But when you say it's your belief that he shouldn't
 7   be able to do that, whether it's in your counterclaim or
 8   not, what is the basis of your belief that he should not
 9   be able to do that?  Because counsel on the other side or
10   for Mr. Guo is saying China can't freeze assets in Hong
11   Kong, they can't do that, that's not a thing.  And you
12   seem to believe it is a thing.
13            MR. GREIM:  Right.
14            THE COURT:  Do you have some basis for believing
15   it's a thing?
16            MR. GREIM:  Well, I guess I would say that I
17   don't know what basis they have for saying they can't do
18   it, but I will do this.  I will get that -- that did not
19   come out of the blue; that was a basis -- that was one of
20   the bases for our theory.
21            MS. TESKE:  Your Honor --
22            MR. GREIM:  So I will -- I can't recite it to you
23   here.  I was just frantically hoping I actually could, but
24   I can't.  But I will endeavor to do that.
25            THE COURT:  All right.  Fine.  So I'll tell you
```

```
 1                        PROCEEDINGS                   69
 2   what --
 3           MS. TESKE:  Your Honor, just to clarify, our
 4   basis -- our basis for our belief is the treaty between
 5   Britain and China.
 6           THE COURT:  I thought there was a lot of talk
 7   these days in the news about China sort of thumbing its
 8   nose at Britain and that treaty and saying, "We don't have
 9   to pay attention to that anymore."  I mean, I don't know,
10   that's just from watching news about demonstrations in
11   Hong Kong.
12           MR. MARK HARMON:  Right.  Your Honor, this is
13   Mark Harmon, and I can -- I hope to clarify that for you.
14   So what happened is that the Hong Kong government tried to
15   enact a change in its law to permit the extradition of
16   Hong Kong residents to China, that -- not that China was
17   making Hong Kong do it, but that Hong Kong was voluntarily
18   trying to get that accomplished.  And that's what caused
19   the uproar by the residents of Hong Kong and ultimately
20   led to the withdrawal of that proposed legislative change.
21           And so this all stems from the treaty that
22   Britain and China entered into when Britain returned the
23   territory of Hong Kong to China and it became for 50 years
24   a special purpose territory because of its financial
25   strength and the role that it played in the financial
```

```
 1                        PROCEEDINGS                    70
 2   markets of not only China but Western Europe and the
 3   United States.
 4            So the notion that China can reach into Hong
 5   Kong and seize money is just wrong.  Mr. Guo's assets in
 6   China were frozen by China, and years later -- and
 7   recently Hong Kong imposed a separate freeze on Mr. Guo's
 8   assets.  But that was after -- after -- the transaction by
 9   which the $1 million was provided by ACA to Strategic
10   Vision.
11            MR. GREIM:  Well, your Honor -- this is
12   Mr. Greim -- all I'm going to say is that I'm willing to
13   provide that authority.  And if there's no basis to think
14   that dissidents have, you know, a danger, should not be
15   able to send money to and from Hong Kong, then I would
16   agree that that basis for getting that kind of discovery
17   from ACA or I guess really from Maistrello, because he
18   said she knows it, would be gone.  But I --
19            THE COURT:  Okay, so here's what we're going to
20   do.  Here's what we're going to do, because we're going to
21   move along, all right?  You have Maistrello for a
22   deposition on Friday.  Tomorrow is Thursday.  You either
23   agree between you, between and among you -- I think the
24   most relevant players here are Maistrello's counsel, Guo's
25   counsel and Strategic's counsel, I mean, because it seems
```

| | PROCEEDINGS 71 |
|---|---|
| 1 | |
| 2 | to me that it's the witness -- Mr. Guo is the one who has |
| 3 | the personal interest and Strategic, if you agree among |
| 4 | you that something is on the table or off the table for |
| 5 | the deposition, fine.  For that matter, you can agree to |
| 6 | whatever you want is on the table or off the table for the |
| 7 | deposition.  If you're all in accord, I don't care; go do |
| 8 | your thing.  If you cannot agree, then by the middle of |
| 9 | the day tomorrow, you know, get me what you've got, and I |
| 10 | will reserve ruling on this piece until I see what you've |
| 11 | got.  In the meantime, I'll allow questioning about the |
| 12 | relationship between ACA and Eastern, about the bona fides |
| 13 | of this loan -- and there was something else that I had |
| 14 | said.  What else did I say? |
| 15 | MR. GREIM:  Yes, your Honor, I believe it was the |
| 16 | relationship between ACA and Eastern was point one; point |
| 17 | two was the bona fides of the loan. |
| 18 | THE COURT:  Right.  The relationship between ACA |
| 19 | and Eastern, and the bona fides of the loan.  All right? |
| 20 | So you can ask that.  It ought to be a short deposition. |
| 21 | And if you can agree on anything else, fine.  And on this |
| 22 | one point about whether Guo used ACA to move money in or |
| 23 | out of Hong Kong, you see what you come up with.  And if |
| 24 | you can't resolve it between you based on what you're |
| 25 | showing each other, then I'll look at it tomorrow.  I will |

PROCEEDINGS                    72

1

2   tell you if there is a statement by Guo at a relevant

3   point in time that he was unable to move money out of Hong

4   Kong, that would lead me to think that it's more fair

5   game.  If there is, you know, a treaty with evidence that

6   China is upholding it and nothing much to the contrary out

7   there in reliable reports, then I'm more inclined to say

8   that's all you've got on that.

9           With respect to the other individual whom you

10  want to depose on Friday, I understand that counsel for

11  the witness is saying he doesn't know anything about

12  anything, and his lack of knowledge is a fair reason to

13  leave him out of the mix for discovery.  But I also

14  understand from Mr. Greim that his name, this witness's

15  name appears on three separate documents that all have

16  some bearing on this case; one, the contract itself, which

17  is clearly at issue in the case; two, the loan documents,

18  which I gather may have some relevance to a defense in

19  this case; and, three, was -- I don't remember, but it was

20  something else.

21          MR. GRENDI:  Your Honor, this is Zach Grendi for

22  Eastern.  I think two of the documents were clearly signed

23  by Chunguang, and that's the power of attorney from

24  Eastern to --

25          THE COURT:  Oh, right, that was the third one.

```
 1                         PROCEEDINGS              73
 2              MR. GRENDI:  -- Golden Spring, and the other
 3    being the loan, which we've been talking about.  But the
 4    contract itself was not signed by Mr. Chunguang.
 5    Everybody here knows that.  The person who physically
 6    signed it was Yvette Wang.  She did it in the presence of
 7    Strategic Vision's principal in her home in Virginia.
 8    There's a dispute as to what she signed, but there's no
 9    question that it was Yvette Wang signing the contract and
10    not Mr. Chunguang.  He wasn't --
11              THE COURT:  Right.  But did she sign his name?
12              MR. GRENDI:  I don't believe so, your Honor.
13    There's a dispute over that in terms of the handwriting
14    and what it means.  They're in Chinese characters, which I
15    don't think anyone assembled here can read.  The claim
16    from Strategic Vision is that it is Mr. Chunguang's name.
17    When we were at the deposition of Mr. Guo that topic came
18    up, and even the translator who was working for Strategic
19    Vision could not confirm or otherwise even read the
20    language.  But the point is that the person physically
21    signing the agreement was Ms. Wang.  And Mr. Chunguang was
22    not present for that moment --
23              THE COURT:  So Ms. Wang was deposed?
24              MR. GRENDI:  Correct.
25              THE COURT:  And Ms. Wang said it was her own
```

```
 1                      PROCEEDINGS              74
 2   name on there, or did she sign for him?
 3            MR. GRENDI:  I don't believe she was asked that,
 4   your Honor.  I don't believe that was asked.  But the
 5   issue of what the signature on the agreement actually
 6   means in Chinese characters only came up recently in this
 7   litigation.  The first set of attorneys that Strategic
 8   Vision was using did not raise that.  So I'm sitting here
 9   today and trying to remember a deposition from January.  I
10   don't believe that that even --
11            THE COURT:  You don't think that she was asked,
12   "Is this your name on it?"
13            MR. GRENDI:  I don't remember, your Honor.  I
14   don't think so.  I think they asked her if she signed, and
15   she said yes.  I don't remember if they said, "Is this
16   your name?"
17            MR. GREIM:  Your Honor, regardless, you know,
18   there's a line that says Han Chunguang.  And so the
19   question seems to be -- I don't understand how this is
20   (indiscernible) but I also don't understand Chinese
21   characters.  So far we can't -- for some reason we believe
22   that she did sign his name.  The point is it was supposed
23   to be his to sign.  Maybe she wrote her name in there, but
24   we believe she wrote his name.
25            THE COURT:  Wait.  For some reason you believe
```

```
 1                        PROCEEDINGS                75
 2   that it was his name?  What do you mean "for some reason"
 3   you believe?
 4        MR. GREIM:  Well, because, your Honor, this is
 5   another example of I've just looked at too many things in
 6   this case.  I can't remember exactly what Wang said on
 7   this, but I -- I've got a reason to think that.  I can't
 8   remember -- I'm trying to get a note -- let's see.  Let's
 9   see, we do have -- okay, I think -- do we have this --
10   okay, we think we have testimony that Guo told Yvette Wang
11   to use Chunguang Han's name.  But I just -- I don't --
12   your Honor, the point is this is the only natural person
13   who's ever been identified as somebody with Eastern
14   Profit.  It's not a sprawling company.  If there's
15   something to know about Eastern Profit, if he doesn't
16   know, then I think we have to question whether it's just a
17   shell entity.
18        The other thing is we only have Han Chunguang's
19   name.  It's not on any document as being -- there's not
20   some sort of organizational document that identifies him.
21   Yvette Wang told us at her deposition that the only reason
22   he was identified as the principal of Eastern Profit is
23   that Guo told her to do it.  So, I mean, I would like to
24   know who this guy is and what he really does.  I'd like to
25   know whether this --
```

```
 1                         PROCEEDINGS                      76
 2              THE COURT:  Well, who he is and what he really
 3   does doesn't sound like it's necessarily relevant to your
 4   claims or expenses, but if his name is on two documents
 5   that you believe have some relevance and might be on a
 6   third, although there may be a dispute as to what it says,
 7   then I don't see why you can't put those three documents
 8   in front of him and ask him questions about the documents
 9   that either have his name or might have his name.  And if
10   he says, "This is not my name; I didn't sign it.  Ms. Wang
11   signed it, and it says Ms. Wang on it.  It doesn't say my
12   name.  You can't read; I can," you know, you're not going
13   to get very far with that document.  But you might learn
14   something about the -- you might learn something about
15   either the loan or the involvement of -- I'm not sure why
16   we have relevance to the involvement of --
17              MR. GREIM:  Your Honor, I would just --
18              THE COURT:  -- what is the name of the company?
19              MR. GREIM:  Golden Spring.
20              THE COURT:  I'm drawing a blank on the name of
21   this other entity.
22              MR. GREIM:  Well, the other entity is --
23              THE COURT:  Golden --
24              MR. GREIM:  -- Golden Spring.
25              THE COURT:  Golden Spring.  Right.  I mean --
```

```
 1                        PROCEEDINGS              77
 2          MR. GREIM:  You know, why he'd be comfortable
 3    doing it, what is Golden Spring, who approached him to do
 4    this, did he have authority even to enter into this, did
 5    he have authority to enter into the loan, did he actually
 6    sign --
 7          THE COURT:  Wait, wait, wait, wait.  You're
 8    (indiscernible) questions.  You can ask -- you can, like,
 9    fill a full page of questions that are curiosity matters
10    for you that you'd kind of love to know the answer to.
11    That doesn't mean it's relevant and discoverable.  So, you
12    know, whether he had authority for a power of attorney is
13    relevant to what point -- is relevant to what defense?
14    You know, I've already said you can --
15          MR. GRENDI:  It's not relevant, your Honor.  It's
16    not relevant --
17          THE COURT:  -- I've already -- I tend to agree.
18    Whether he has knowledge about the loan, which I've
19    already said you can ask some questions about, at least
20    some limited ones.  Okay.  I think his name is on things
21    as a principal of this company.  You've had a 30(b)(6)
22    witness who seemed not to know much of anything about the
23    company she was a 30(b)(6) witness for, like whether it
24    even had employees or officers or directors and if so, who
25    they were.  Okay, that's a defendant; you can ask some
```

1                        PROCEEDINGS              78

2  questions of somebody who maybe knows something.  But

3  this, you know, a lot of the questions that you would love

4  to know the answer to, that's great; but that's not the

5  test for whether it's discoverable.

6            MR. GREIM:  Well, your Honor, I'd have to concede

7  that --

8            MR. GRENDI:  Your Honor, this is Zach Grendi.  I

9  just want to clarify here that we're talking about an

10  individual who it's undisputed he had no contact with

11  French Wallop, who's the person who runs Strategic Vision,

12  or this individual, Michael Waller, who kind of does work

13  for Strategic Vision and is loosely associated with.

14  Those are the two people that Strategic has used to

15  communicate with Eastern about this case.  And there's no

16  dispute that Mr. Chunguang never spoke to them.  So he's

17  got nothing to offer about misrepresentations or, you

18  know, the contract negotiations, I mean, you know, the

19  guts of this actual case.

20            And the only documents that were seemingly --

21  well, there was two documents.  There's a power of

22  attorney that gives Golden Spring the right to act on

23  Eastern's behalf in connection with this matter, which I

24  think, you know, it doesn't really have any connection to

25  whether there's a viable claim or defense.  It's just,

1                           PROCEEDINGS                    79

2     again, Mr. Greim's interest in knowing about all things

3     Guo.   And then we have this loan document.

4              And just to dovetail with the 30(b)(6), you

5     know, we're certainly comfortable asking or answering

6     additional questions about that loan document at that

7     30(b)(6), which we're working on scheduling and Mr. Greim

8     had just sent me a message about early September, either

9     the 4th or the 5th, and I think we can do the 5th.   I'm

10    still working to pin that down.   But he's literally asking

11    for, at this point, a deposition about -- for

12    Mr. Chunguang, to ask him about one loan document, when in

13    a couple of weeks we'll have a 30(b)(6) answering those

14    questions about the loan document.   And if he's going

15    forward on Friday with Ms. Maistrello, he'll get

16    information about it from that end.   We're talking about

17    deposing an individual who, again, knows (indiscernible)

18    about the case, about potentially one document.   And that

19    to me just seems like it's really overkill and

20    overreaching, especially just in terms of talking to the

21    parties, Mr. Chunguang doesn't speak English fluently, so

22    we'd have to have a translator.   I'm just putting it out

23    there that there's definitely a more efficient way to get

24    this tiny piece of testimony about this one loan rather

25    than deposing Mr. Chunguang.

1                          PROCEEDINGS                    80

2               MR. GREIM:  Your Honor, this is Mr. Greim.  I

3     mean, we don't know what Maistrello's going to say about

4     this.  I mean, I don't know that we'll get an answer.  And

5     one reason for our frustration is we had a 30(b)(6) with

6     this Golden Spring person who apparently was appointed to

7     do the work for Eastern Profit.  You know, she didn't find

8     very much.  She didn't even talk to Guo to prepare for the

9     deposition.

10              I mean, I -- here's the other thing I'm worried

11    about.  I just read the answer that was filed about 90

12    minutes before this conference that Guo's counsel seemed

13    to be pretty well versed on.  I'm still reading through

14    it.  But one thing I see is that Eastern Profit admits

15    that Guo made certain representations to us.  But then on

16    the question of whether those were true or not, while we

17    have allegations about that, Eastern Profit doesn't have

18    any information.  And here's what interests me, your

19    Honor.  Here's what interests me.  Eastern Profit has

20    appointed Golden Spring to answer discovery for it in this

21    case, among other things.  Well, your Honor, we think

22    Golden Spring is actually under the control of Guo.  We

23    think that its controller is Guo's son.  Now, how is it

24    that Eastern Profit doesn't have enough information to

25    answer any of those things in this case when it's got

```
 1                          PROCEEDINGS                    81
 2   Guo's people, we think, running the litigation for it,
 3   running its efforts?  I would like to know something about
 4   why Golden Spring was put in to stand in place of Eastern
 5   Profit here and who's in charge of the ship.  I mean, how
 6   do they not have information about the truth or falsity of
 7   Guo's statements?
 8            THE COURT:  I've kind of lost you.
 9            MR. GREIM:  When she's supposedly --
10            THE COURT:  I've kind of lost you.  We're
11   talking about Han Chunguang, okay?
12            MR. GREIM:  Right.
13            THE COURT:  Okay.  In the letter that I have
14   from Mr. Greim dated August 19 -- one of the letters -- I
15   think there may have been more than one -- or maybe not.
16   August 19 -- I'm not sure if it's -- it's Docket 134, I
17   think.  In that letter, on the last page there's a section
18   about Mr. Chunguang.  And it says that Eastern Profit
19   provided interrogatory responses that indicated that
20   Mr. Chunguang is its principal.  Okay?  Now, I don't know
21   what that means, if there's more than one principal, if
22   there's only one principal, if he's -- you know, if he is
23   *the* principal actor in that company.  But it's a party,
24   and this is the principal of the party -- again, I don't
25   know if it's *the* principal or *a* principal.  But let's say
```

```
1                         PROCEEDINGS                    82
2   for a moment it's the principal of a party and this person
3   named might appear on the contract as signed by Wang,
4   although I'm not sure where exactly that came from.  But
5   certainly does appear on the loan document, which I'm
6   allowing some questions on and also appears on a power of
7   attorney that allows another entity to provide discovery
8   responses on behalf of Eastern, which is, to put it
9   mildly, a little bit odd.  Why would a party designate
10  another party to provide discovery response?  Because the
11  discovery responses are not adequate or are sanctionable?
12  I mean, it's the party that's at risk; you can't delegate
13  that away.  And the party has to cooperate and the party
14  has to sign things and so on and so forth.  So I don't
15  understand what Golden Spring is.  It's not an attorney;
16  it's a company.  I don't understand how you designate a
17  company to answer your discovery for you.  But he seems to
18  know something about that --
19            MR. GREIM:  Your Honor --
20            THE COURT:  I don't quite -- I just don't quite
21  get that.  It doesn't necessarily mean that lots of
22  questions about that are now fair game for discovery
23  because they may not be relevant to claims or defenses.
24  But his name, Mr. Chunguang's name, appears on things that
25  bear relation to this case, and so it's hard to fathom how
```

```
 1                        PROCEEDINGS                    83
 2   he knows absolutely nothing about it and about the issues
 3   that are central to the case.
 4           So --
 5           MR. GREIM:  Yes, your Honor, I would just say the
 6   power of attorney, this is an arrangement that I think a
 7   contract that maybe people here might be familiar with is
 8   mortgage servicing trusts often use a power of attorney.
 9   It's for the convenience of having another entity handle
10   something.  It's completely above board and commonplace.
11   It may be not something that's typically found in
12   commercial litigation in this context, but it's certainly
13   normal in other contexts.  And it's really, again --
14           THE COURT:  I'm sorry, it's normal -- it --
15   right.  So what is Golden Spring?  What kind of company is
16   it?  What does it do?
17           MR. GREIM:  Your Honor, I'm not representing
18   Golden Spring.  I'll certainly defer to their counsel, but
19   they're an entity based in New York.  Our understanding is
20   Yvette Wang works there, so she's the person who did sign
21   the agreement and is knowledgeable about the negotiations
22   on a personal basis.  So there's a convenience factor
23   there just in terms of utilizing Golden Spring to handle
24   things that, again, Mr. Chunguang and Eastern and entered
25   into this agreement when he was relying on other agents,
```

1                          PROCEEDINGS                    84

2   other people to do the groundwork in connection with the

3   research agreement.  And it's perfectly normal and

4   appropriate for them to enter into this sort of power of

5   attorney, including to allow them to handle --

6              THE COURT:  Did Eastern do anything on its own

7   behalf?  Did Eastern want research to be done?  Did

8   Eastern put forward money?  Did Eastern negotiate?  Did

9   Eastern as an entity do anything on its own behalf, or did

10  it act solely through others, whether initially through

11  Mr. Guo and then through ACA and then through Golden

12  Spring?  Did it ever act on its own in any way?

13             MR. GRENDI:  I think it certainly did, your

14  Honor.  And I think it's a basic framework to understand

15  the relationships is that both Eastern and Guo are what's

16  called -- also are dissident or at least contra

17  (indiscernible) also dissident, also someone who has -- is

18  not happy with the Communist Party in China and has been

19  subject to its persecution.  So, you know, there's a

20  working relationship was there.  Obviously, Mr. Guo is

21  more active in the negotiation part.  Eastern's handling

22  the contracting part and money part, series of loans that

23  we've been discussing.  So they're involved, but their

24  involvement is largely hands off as to large parts of it.

25  But that's not inappropriate.  They're using agents to

```
 1                        PROCEEDINGS              85
 2   talk to Strategic Vision and particularly in the context
 3   of a contract where confidentiality and concerns about
 4   security are paramount, that's not unusual.
 5            THE COURT:  All right.  So if Eastern --
 6            MR. GREIM:  This is Mr. Greim --
 7            THE COURT:  Hold on a second.  If Eastern Profit
 8   did anything on its own behalf, if it had its own interest
 9   in this contract, if it, you know, if it was giving
10   something and wanted to get something on its own behalf,
11   then if Mr. Chunguang is the principal of Eastern, he
12   would presumably know what that was that Eastern wanted
13   and was offering and was doing on its own behalf, unless
14   there is another principal of the company who would know
15   what Eastern was doing on its own behalf.  You know, if
16   Eastern acted solely through others and Mr. Chunguang's
17   role was to sign away this piece or that piece to
18   different players or entities in, you know, handling this
19   aspect of things or that aspect of things and it didn't
20   really do anything on its own, still -- somebody still had
21   to be making the decisions within the company that this is
22   how to do things and why.  I mean, defendants seem to
23   believe -- and, again, I don't know if there's a good-
24   faith basis for it, but seem to believe that Eastern
25   Profit is really a shell; it doesn't really have employees
```

```
 1                          PROCEEDINGS              86
 2   and directors and officers and whatever and just was sort
 3   of created to stip into this contract, but it was really
 4   Mr. Guo's project.  But I don't understand how
 5   Mr. Chunguang would fit into that if that were the case.
 6              MR. GRENDI:  Your Honor, I would just say
 7   Eastern's been around for well more -- I think it's 2011 is
 8   when it was incorporated.  Or, I don't know, actually, I
 9   think registered it (indiscernible) by using Hong Kong.  So
10   the idea that it was created just for this litigation and
11   is just a nothing entity, it's been around for quite some
12   time.
13              But be that as it may, I do understand your
14   Honor's position as to obviously someone at Eastern knows
15   something about this case.  That's only fair.
16              THE COURT:  Though Ms. Wang didn't seem to know
17   much about Eastern, right?  Ms. Wang, when she testified,
18   from what I was reading, she didn't even know if there were
19   employees or officers or directors or anything about
20   Eastern, didn't know anything about its records, didn't
21   know anything much and said you have to ask them.  That's
22   the section that Mr. Greim quoted to me.  I don't know what
23   else she said in her lengthy deposition.  So if she didn't
24   know anything about the company, maybe Mr. Chunguang has
25   more knowledge if he's principal of the company.
```

```
 1                        PROCEEDINGS              87

 2              MR. GRENDI:  I would just say this, your Honor.  I

 3  think there's maybe two things going on there.  I mean,

 4  first of all, I just want to say Ms. Wang was very prepared

 5  and was fulsome and gave complete answers as to what she

 6  knew about with respect to the contract negotiations and

 7  things that she participated in in terms of, again, the

 8  nuts and bolts of how these parties actually interacted.

 9              But I think perhaps she misunderstood or didn't

10  really understand how a 30(b)(6) works in terms of what she

11  knows versus what she's supposed to have known for a

12  30(b)(6), and I did prepare her as much as I could.  I

13  don't know how that didn't come through.  But, be that as

14  it may, again, we were -- and we can kind of -- at some

15  point we'll obviously transition to talking about the

16  30(b)(6) -- but she will be fully prepared and ready to

17  discuss the topics at a second go-around, which, again,

18  we've been offering for a long time.  And I know that

19  there's been a number of comments about how late in the

20  game that we are with this, but after Ms. Wang's first

21  deposition in January 31 this year, I got a follow-up

22  letter from Eastern's first set of counsel pretty early on

23  that they were looking for a follow-up deposition, and we

24  readily agreed to that back in February, so --

25              THE COURT:  Okay, so that will happen.
```

1                          PROCEEDINGS                    88

2            MR. GREIM:  Correct.

3            THE COURT:  So that will happen, and that will

4    address some of those issues.

5            So we still have Mr. Chunguang, whose name is at

6    least on the loan document.  And maybe if you learn more

7    about the loans from Ms. Maistrello, you don't need

8    Mr. Chunguang.  What do you need from him that you think

9    would be unique to him that would not be duplicative of

10   somebody else?

11           MR. GREIM:  Your Honor, here's our problem.  And

12   Mr. Grendi I think just admitted now.  Eastern Profit did

13   its work through the various people that it's saying are

14   agents.  That seems to be how it does things; or at least

15   in retrospect, to pursue the case; that's the argument

16   being made.  Okay, fine.  You know, so these people become

17   third-party witnesses, some of them.  We just go to those

18   people and get the information from them.

19           But the problem is the two people who have got to

20   be at the center of this were Guo and Yvette Wang.  And

21   both of them said they don't know what Eastern's business

22   is.  I mean, to me, that makes me feel like the people that

23   certainly know, you know, why this is inserted into the

24   contract, why was this entity chosen, you know, whatever,

25   what's the background; they don't know what the business

```
 1                        PROCEEDINGS                89
 2   is.  And so here's the one person, the only person who has
 3   been admitted to be something with Eastern, who actually
 4   appeared on these agreements.  We finally have a chance to
 5   actually hear from that person, not the person who
 6   supposedly has been, you know, investigated, prepared and
 7   did whatever, we actually get a real person.  And, I mean,
 8   your Honor, I want to ask about the loan agreements, but I
 9   want to ask a little bit about this entity, you know.  For
10   example, "Did anyone ever tell you that you're the
11   principal of Eastern?"  You know, "Did you sign something?
12   Did you just learn this, you know, right before the
13   interrogatories were filed?"  I mean, I think I want to
14   pull on the string a little bit of who Han Chunguang is.
15   We believe he's somebody who works for Guo, and he was a
16   convenient person to say he was the principal of Eastern.
17   I don't know that, but I've got to be able to sit down with
18   a real live breathing person who is supposed to be actually
19   a principal of Eastern.
20           THE COURT:  All right, look, I think that when
21   people are choosing who they want to depose in a case,
22   deposing the person who's identified in interrogatory
23   responses as a principal of the party is reasonable.  What
24   the questions are that Mr. Greim plans to ask, I don't
25   know; maybe not so much so, depending upon how far off on
```

```
 1                        PROCEEDINGS                 90
 2   tangents you go.  Okay?  This is not a case where
 3   Mr. Chunguang is accused of wrongdoing personally.  It's a
 4   case where Eastern is accused of wrongdoing, and the
 5   question is whether he knows anything about those
 6   allegations.  Maybe he knows something about something that
 7   relates to a defense on the claim, as opposed to the
 8   counterclaim.  Right?  But it's not to go off on just, you
 9   know, satisfying Mr. Greim's curiosity about, you know,
10   what he might know about anything and everything in the
11   universe that relates to Mr. Guo or in the universe that
12   relates to Mr. Chunguang or in the universe that relates to
13   Ms. Wang or that relates to Golden Spring.
14              This is, you know, the requests that I have seen,
15   I'm going to just say it, you know, as clearly as I can,
16   Mr. Greim.  They are overbroad.  And what you seem to be
17   doing is saying, "Gee, I wonder if I turn over this rock; I
18   wonder if I turn over that little stone; I wonder if
19   there's something here; I wonder if there's something
20   there; I wonder if there's some path I can follow where I
21   might find something that smells funny which might get me
22   to do something -- I don't even know what yet, but I'll
23   figure it out later."  That's not what discovery is.
24   You've got claims; you have to be able to articulate why
25   something is relevant to a claim.  You've got defenses or
```

```
 1                       PROCEEDINGS                91
 2   somebody else has a defense; you've got to be able to
 3   articulate why it's relevant to that.  If you can't
 4   articulate clearly why it's relevant to something that's
 5   been pleaded in this case, then you don't get it.  Okay?
 6   And you've got to pull it way back from what you've got.
 7   And on defendant's and the nonparties' side, I mean, I
 8   think you should be able to get Mr. Chunguang as a witness.
 9   It's just a question of where that testimony goes.  And if
10   he says a lot of "I don't know it" -- if he has a lot of "I
11   don't know" responses, so be it, a lot of "I don't know
12   responses."  But use the chance to sit him down and ask him
13   about things relative to the claims.
14             MR. GRENDI:  Your Honor, we've only -- we're
15   starting him at 1:00 o'clock.  And --
16             MR. GREIM:  (indiscernible)
17             MR. GRENDI:  -- Kansas City.  And so I --
18             MR. GREIM:  We are not going to go over the map of
19   the world with him and learn about his likes and dislikes
20   and whatever else.  You know --
21             THE COURT:  I certainly hope not.  I will tell
22   you --
23             MR. GRENDI:  Your Honor, I just want to --
24             THE COURT:  I will tell you that on --
25             MR. GRENDI:  -- I just want to make it clear.
```

```
 1                          PROCEEDINGS                    92
 2              THE COURT:  Go ahead.
 3              MR. GRENDI:  I'm sorry, your Honor.  I just want
 4    to make it clear, and it's only because I just got this
 5    information prior to our call, but Mr. Chunguang is not
 6    available on Friday.  And I'm working on getting an
 7    alternative date for him.  It just seems, as the Court has
 8    strongly indicated here that it is going to permit his
 9    deposition to go forward, I am working on another date.
10    But he is not available on Friday.
11              THE COURT:  All right, look, I can't make the
12    person magically appear.  I mean, I could order him to
13    appear, but that doesn't necessarily mean it's going to
14    work.  And I'd rather, with nonparties -- well, let me
15    see, he's a party -- he might be a party witness,
16    actually.
17              MR. GREIM:  Your Honor, I just wanted to say --
18              THE COURT:  So look --
19              MR. GREIM:  -- this is Mr. Greim -- I'm sorry --
20    it's easy to interrupt somebody on the phone, and I'm
21    afraid I just did it.  Did I interrupt your Honor?
22              THE COURT:  It's okay.
23              MR. GREIM:  Okay.  Well, I just want to say I
24    laid out the witnesses we wanted to -- in early July I
25    laid out the witnesses we wanted.  I asked --
```

```
 1                          PROCEEDINGS              93
 2            THE COURT:  Okay, we're going to move on.  We're
 3  going to move on.
 4            Okay, I am going to allow a negotiated and
 5  reasonable extension of the discovery deadline to make
 6  sure that things get done.  Not the 12th of never.  Judge
 7  Koetl, as you pointed out, allowed more discovery, being
 8  nice to new counsel after -- they're already the third
 9  counsel in the case.  This is not meant to drag on
10  forever.  But I know that the end of August is difficult.
11  I know you had tried to get these depositions when you
12  did.  I know you've got other things coming up on another
13  trip.  I'm going to allow you to work together.  And if
14  you need a little cushion of time to get things done, I
15  will give it to you.  Okay?  Figure it out.  Don't ask me
16  for a month-to-month.  Ask me for a little cushion and
17  give me a concrete schedule, a concrete plan of when the
18  things will happen within that time so I know it's not
19  just some open-ended extension but it's one that really
20  will cover what you need to get, though.  Okay?
21            MR. GRENDI:  Okay.  We will, your Honor.
22            THE COURT:  Okay, now, the 30(b)(6) stuff.
23  You've been talking -- wait, hold on.  We don't know about
24  ACA, so it's off the table for now.  We don't know if
25  they're ever going to get properly served.  I'm not in a
```

```
 1                         PROCEEDINGS                    94

 2   position to make a finding of bad faith by ACA in

 3   terminating a director; that's just not something I could

 4   possibly do based on what I have in front of me.

 5             So you have Maistrello's deposition will happen;

 6   it will be narrow.  Mr. Chunguang's deposition will

 7   happen, although not Friday.  You'll work out a date.  And

 8   it will also be focused -- okay?  If you're in the middle

 9   of the deposition and there's a series of questions that

10   somebody thinks is improper and there's going to be an

11   application to come back and have the person show up for

12   another deposition day, I'd rather you try to call me and

13   get a ruling at the time so that we don't have this

14   stretch on forever.  Because I don't really expect to have

15   witnesses coming back and back; I'd rather just resolve

16   the issue.  And I'll tell you now if you do call me and

17   you reach me and it's a focused question where I can see

18   the connection to a claim or a defense, I'll allow it.

19   And if I can't really see the connection and it seems to

20   be fishing in the sense that discovery should not be, as

21   opposed to the sense that it always is to some extent, but

22   in the sense where it really should not be, I'm going to

23   say no.  So make sure you're on, you know, on solid ground

24   with your questions and your objections before you call

25   me.  But feel free to try.  Okay?
```

```
 1                        PROCEEDINGS                95
 2            I will tell you that for this Friday in the
 3   morning I'm going to be on the bench quite a lot because I
 4   have -- or I'm going to be on the phone quite a lot
 5   because I have conferences 10:00, 10:30, 11:00, 11:30, and
 6   12:00, and then a settlement conference at 2:00.  But if
 7   there's something that's pressing, tell somebody in
 8   chambers to pass me a note, and I will try to find a break
 9   and get back to you if I can.  All right?
10            Okay, so that covers Maistrello; that covers
11   Chunguang; that covers ACA, which we can't do anything
12   about for now.  We are left with the 30(b)(6) questions
13   that you can't agree on.  You're going to have Ms. Wang or
14   somebody back; you're going to have her better prepared.
15   And you have seven or so categories of topics or questions
16   that you are still disputing, is that right?
17            MR. GREIM:  That's right, your Honor.
18            MR. GRENDI:  That's correct, your Honor.
19            THE COURT:  What else do I have still out there,
20   as my ear gets tired on this call?  What else do I have
21   out there besides that?
22            MR. GREIM:  Your Honor, we have the return of
23   Guo.
24            THE COURT:  Oh, right.  It sounds like a movie
25   or something.  The return of Guo.
```

```
 1                        PROCEEDINGS                    96
 2             Yes, I mean, I saw examples of the questions
 3   that Mr. Guo's counsel -- I think it was Mr. Guo's
 4   counsel; maybe it was the agent's counsel -- thought were
 5   inappropriate and properly objected to.  I probably agree
 6   with some and probably disagree with some.  I do not, for
 7   the life of me, see the relevance of some of these
 8   questions.  On the other hand, I suspect that some of the
 9   questions relate -- I'm not sure about this -- but suspect
10   some of them relate to representations that were made by
11   Mr. Guo about his status and his views of China.  For
12   example, the question, "Do you want to eliminate one-party
13   rule in China?" maybe he said something along those lines.
14   I mean, I don't know what his representations all were,
15   but if he was saying these are my goals, this is what I
16   want to do, I could see that maybe he said some things
17   like this.  And going over what the representations were
18   or things around those representations I think might be
19   fair.  But, on the other hand, without somebody explaining
20   it to me, like, "Do you have a UK resident visa?" why is
21   that relevant to something?  Why does that help show
22   whether he was or was not a dissident, for example?
23             MR. GREIM:  Your Honor, I don't know if anybody
24   else senses and can pick this up, but I hear a lot of
25   cutting out and fading a little bit.  Can anybody else
```

```
 1                         PROCEEDINGS              97
 2   pick that up?
 3            THE COURT:  Were you not able to hear me?
 4            MR. GRENDI:  I can't seem to --
 5            THE COURT:  Were you not able to hear me?
 6            MR. GREIM:  I started to hear about every third
 7   word, and it got quieter.
 8            THE COURT:  I'm most sorry about that.
 9            MR. GREIM:  That's okay.  That's okay.  I mean, I
10   know we've been going for a few hours.  I think the
11   question -- I think you mentioned something about a UK
12   resident visa.
13            THE COURT:  Well, it's just that there are a
14   bunch of questions that were in Mr. Harmon's letter dated
15   August 19 -- it was docket -- no, it was August 16.  I'm
16   sorry, it was attached to the August 19 letter. It might
17   have been part of Docket 135.  But, anyway, there are a
18   bunch of questions set out here that were objected to and
19   which Mr. Harmon was saying were appropriate questions
20   because they were either harassing or they were improper
21   or they were going to irrelevant testimony or so on.  And
22   I'm looking at these bullet-pointed lists of
23   questions -- I'm sure those are not all of the questions
24   that were objected to or that are at issue, but I was just
25   saying I could see that some of them maybe have some
```

1

2  bearing to the representations that Strategic Vision says

3  were made and some I don't know, like, you know -- well,

4  here's something that was an interesting question in light

5  of what you were talking about before.  "In May 2019, did

6  the Hong Kong high court enter an order freezing your

7  assets?"  So that came, I gather, after these events?

8          MR. GREIM:  Correct, your Honor.  That question

9  pertains to allegations that Mr. Guo, Han Chunguang,

10  Golden Spring, Hong Kong Limited, which owns the Golden

11  Spring entity in this case, and Eastern Profit were

12  accused of a money-laundering scheme.  And, of course,

13  we're not trying to put in character evidence or something

14  here, but we are interested in the fact that Hong Kong

15  authorities seemed to think that these entities are part

16  of a joint operation.  I mean, if that's true, then it

17  would tend to show that Mr. Guo controls Eastern Profit,

18  you know, along with these other individuals named.  I

19  think --

20          THE COURT:  That's really -- that's really

21  reaching.  That's really reaching.  I mean, you have to

22  look at the questions.  I'm going to send you back to the

23  drawing board on this.  You've heard what I've had to say

24  in general terms that you've got an awful lot in here

25  overall that's overbroad and overreaching and is not

1
2  demonstrated to me to be proportionate to the needs of

3  this case.  Right?  You're going to have to go back over

4  that transcript of Mr. Guo's deposition to figure out what

5  you really feel you  still need answers on and what lines

6  of questioning you still want to pursue.  And you're going

7  to have to make your case to me before I say he comes

8  back.

9          There may be some things that if you explain

10  them to me, I'll say, okay, I see that.  I see it's a

11  reasonably tight mix of -- to something that was an

12  alleged misrepresentation or that would really help you

13  demonstrate dissident or lack of dissident status.  But a

14  lot of these, honestly, it's just like tell me everything

15  I can possibly learn and let's see what comes up and then

16  what I can do with it and what kind of creative argument I

17  can make with it.  And I'm not going to go there.

18          So you go back and you take a good look.  And,

19  you know, you don't have to have Mr. Guo come back

20  tomorrow.  And before I say yes, you're going to have to

21  lay out for me, you know, what you still need and why you

22  really still need it.

23          MR. GREIM:  Okay, we'll do that, your Honor.  I

24  mean, our number one thing is whether his daughter is

25  actually the sole director of Eastern Profit.  And the

```
 1                         PROCEEDINGS                 100
 2   refusal there was based on -- I was asked to make a
 3   promise of confidentiality myself instead of going by the
 4   protective order.  I mean, that would be an important way
 5   to show they controlled Eastern Profit.  But we will --
 6   what we'll do is we'll give you a list.  I mean, we try to
 7   talk in terms of subject matter, but --
 8             THE COURT:  Well, you can give me the particular
 9   questions that were objected to.  You can tell me the
10   particular reasons why those questions would have called
11   for relevant and discoverable information.  And, you know,
12   if you got cut off and it was as line that you wanted to
13   pursue some, I understand that.  That's what happens in
14   depositions.  And so you can say that we wanted to pursue
15   this a little bit further, and I'll understand that.  But
16   the questions that have been singled out for me by
17   Mr. Harmon, I must say they sound interesting.  But
18   interesting is not the test.  Okay?  What --
19             MR. GREIM:  Okay, your Honor, we'll do that.  I
20   mean, I recognize what you're saying, and it's an
21   important -- it's an important part of the case, whether
22   he does or does not come back, for both sides.  And if you
23   believe that the letters that we've given you don't lay
24   that out, we'll go back and take another shot at it.
25             THE COURT:  Right.  But I'm telling you
```

```
 1                            PROCEEDINGS                 101
 2   specifically how to do it.  What you do is you go back to
 3   transcript, you tell me where your priorities are of what
 4   the questions are that you feel you deserved answers to
 5   and were not properly objected to that he should be called
 6   back to answer, and you explain to me what claim or
 7   defense it's relevant to and how it's anchored to
 8   something and that's non-speculative, non just curiosity,
 9   not just, "Gee, I'll turn over a stone and just take a
10   peek under it or fish in the pond and see what comes up."
11   Right?  There's going to be something beyond that that
12   tells me okay.  Just like this business with the moving
13   money, there's got to be something that you actually have
14   a grounded basis for before I say, "Okay, moving money,
15   that's interesting."  Right?  You've got to have something
16   that is more grounded than that.  Right?  So if it's
17   connected to --
18            MR. GREIM:  We will work on it.  We'll get it to
19   you quickly.
20            THE COURT:  That's fine.  And then, of course,
21   Mr. Harmon or whomever it is who wants to respond to it,
22   you respond and you can work between you as you have
23   before, between and among you, for a briefing schedule on
24   that, for letters.
25            So moving to the 30(b)(6), which is now
```

```
 1                        PROCEEDINGS                  102
 2   apparently agreed, so I have this list of eight
 3   collections of questions.  One is -- one has to do with
 4   assets in Hong Kong being frozen, but that was relating to
 5   this money-laundering conspiracy.  And I do think that's
 6   pretty far afield.  Okay?  I mean, what you've just
 7   explained to me right now just seems, you know, I mean,
 8   six degrees of separation; you can make anything relevant
 9   if you tie enough things together.  But we need a little
10   bit of -- we need something a little bit more direct than,
11   you know, if this and this, and if this is true in this
12   other case and this money-laundering conspiracy, which
13   is -- you know, that's a whole large bucket of worms to
14   bring into this case, which is not a money-laundering
15   conspiracy case.
16              MR. GREIM:  Right.  I understand, your Honor.
17   And maybe I didn't articulate it very well -- I probably
18   didn't -- I'm starting to kind of lose some of my focus --
19              THE COURT:  As are we all, I'm sure.
20              MR. GREIM:  I'm sure it's worse for you.
21              But I'll say this.  I mean, it's not the fact
22   that there -- see, we don't care that they've labeled the
23   allegations money laundering or whatever.  You know, what
24   we care about is if you're going to make that allegation,
25   you're arguing that the individual is controlling the
```

```
 1                          PROCEEDINGS                    103
 2   entity.
 3             THE COURT:  If who is going to make that
 4   allegation?  Who is making that allegation?
 5             MR. GREIM:  The authorities in Hong Kong in a
 6   Hong Kong high court proceeding --
 7             THE COURT:  Okay, so I have to decide whether
 8   the -- or somebody here in this court is going to have to
 9   decide whether allegations made by the Hong Kong
10   government or prosecutors in Hong Kong are valid because
11   only if they're valid would they tend to show that there
12   is a conspiracy which would tend to show if the elements
13   are similar to U.S. law -- and who knows if they are --
14   that there was an agreement between one or more persons to
15   engage in money laundering?  We're not talking RICO here,
16   where there's an enterprise that someone's controlling;
17   we're talking conspiracy.  So there's an agreement between
18   somebody and somebody else -- and we don't even know whom
19   exactly -- to engage in money-laundering conduct, and this
20   would tend to show that Guo was in charge of Eastern?
21             MR. GREIM:  Yes.
22             THE COURT:  No.
23             MR. GREIM:  That's what we want to do, but --
24             THE COURT:  Yes, that's a no.
25             MR. GREIM:  -- your Honor, look, I can clearly
```

1

2   see the direction of this.  I mean, we'll just directly

3   ask Guo about his control of Eastern, and we don't have

4   to, you know, trace --

5           THE COURT:  But I also would like to bring you

6   back to the point that we covered probably two hours ago,

7   which is that Eastern is willing to confirm and in fact

8   said it on the record here that the statements made by Guo

9   were binding on Eastern in terms of the representations

10  made, that they would not try to argue that he was not

11  acting on behalf of Eastern in making those statements.

12  So while you still need to try to discover whether Guo was

13  controlling Eastern is a little bit beyond me.  You

14  already have the one thing you said you needed, which is

15  to tie his statements to the party, to the defendant.

16          MR. GREIM:  Sure.  And, your Honor, I understand.

17  I mean, first of all, this pleading got filed about 90

18  minutes before our call.  I was --

19          THE COURT:  Okay.  So if you want, go back and

20  work on this further, too, then, because I am not going to

21  bless lines of questioning where the only -- the only

22  answer I get is, "Well, we need to show that he controlled

23  Eastern."

24          "Why do you need to show that he controlled

25  Eastern?"

1

2          "We need to show it so we can show that his

3   statements" (indiscernible) "Eastern."  You already have

4   that; therefore, you don't need anything further.

5          So if that's your whole round-about route to get

6   to that, you don't even need that.

7          MR. GREIM:  I agree, your Honor.  I mean, I --

8          THE COURT:  Okay.  So drop that one.  And have

9   these further conversations.  And I will tell you that

10  questions about whether Eastern or Golden Spring or

11  whatever entity it is has assets or liabilities or income

12  or whatever, why do we care?  You have to ask yourself

13  that question.  The judge is going to say why is that

14  relevant, to what is that relevant; not just, well, to the

15  subject matter of the case.  That's the old standard that

16  went out in maybe the year 2001 or something.  The

17  question is, is it relevant to a claim or a sense in the

18  case.  And I've got to say the direction of the federal

19  rules over the time that I've been on the bench has been

20  moving more and more for reining people in.  The whole

21  proportionality analysis, we always made that, anyway, but

22  now it's explicit in the rules.  So, you know, it's got to

23  be relevant to a claim, it's got to be relevant to a

24  defense, and it's got to be one or the other, and it's got

25  to be proportional.  And if you just say, "Well, but this

```
 1                        PROCEEDINGS              106
 2  is the party, and we should know if they're a shell; we
 3  should know who it's owners are; we should know what other
 4  business it has, or we should know --"  Why?  Why is that
 5  relevant to the claim?  There are contract claims; there
 6  are fraud claims.  If they're not relevant to a contract
 7  claim, a fraud claim or a defense to one of those claims,
 8  the answer's going to be no.  So go back again to the
 9  drawing board on this, too, and see if you can get this
10  further narrowed.  I'm going to say no to a fair amount, I
11  suspect.
12          MR. GREIM:  Your Honor, there was a second half
13  of that that I wanted to point out.  So -- and I know in
14  our letters -- I thought we would never get to this point
15  of them adopting these representations.  And, actually, I
16  was concerned that what I read in the answer didn't cover
17  this.  But we'll see.  If they'll stipulate, then
18  wonderful, because we've saved a bunch of money here.
19  However, the other side of this that bothers me is when
20  Eastern Profit says yes, these representations are binding
21  on us, but then they say, oh, but we have no knowledge --
22  we have no knowledge of whether these things that Guo said
23  that we fully stand behind, they bind us, are true, which
24  is what they also say in their answer.
25              So I would say well, wait a minute, if he's
```

1

2   really one with you on this, then, you know, you need to

3   get his information from him and tell us whether, you

4   know, he -- whether paragraph 75 is correct or not, did

5   this really happen.  I mean, then we won't be deposing

6   Guo.

7            MR. GRENDI:  Your Honor, this is Zach Grendi for

8   Eastern.  I think we kind of touched on, in looking at

9   that paragraph about the Haitong Securities in 2015, the

10  allegations in that counterclaim are basically everything

11  that Guo allegedly did or did not do since 1989, or at

12  least a lot in between 1989 and today.  And so the

13  expectation that Eastern has to know everything about Guo

14  is -- that's where I think we have a disconnect.  And it's

15  perfectly reasonable for Eastern to say it doesn't know

16  those things.

17           And in terms of what he specifically said at the

18  particular times, Eastern wasn't there.  He was speaking

19  for Eastern, but there's no, you know, evidence other than

20  what these people remember happening.  So it's a little

21  unfair for Attorney Greim to just say you have to know

22  everything that Guo ever did and everything he ever said

23  because you're adopting what he said in connection with

24  this context.

25           THE COURT:  Okay.  We're going to end this call

```
 1                          PROCEEDINGS                    108
 2   because it's two and a half hours or something like that,
 3   and it's enough for anybody.  It's going to be a fatter
 4   transcript than the deposition, so -- well, probably not,
 5   but it will be way too much.
 6            Go back and talk about it some more.  I do not
 7   understand even the potential relevance of some of the
 8   questions I see here, and I am inclined to say no on a lot
 9   of this, if not all of it.  I'm not sure because I haven't
10   picked through it.  But whether Eastern gave reports to
11   investors, I don't see the relevance.  Whether disclosed
12   Strategic's work to people outside of Eastern, someone's
13   going to have to explain the relevance of that one to me.
14   You're going to have to lay it out for me if you cannot
15   agree because honestly I do not see where these are going.
16   And the purpose of discovery is to let you get what's
17   reasonably necessary to prove your counterclaims or prove
18   your defenses or challenge the claims or defenses against
19   you -- challenge the claims against you and support your
20   own defenses.  But it's not just to go look here and look
21   there and look everywhere for all kinds of things that are
22   intriguing and paint a much larger picture of the world
23   than would ever be usable in this case by any, you know,
24   any logical expectation as to how this case ought to go.
25            So go -- you know, you get a further 30(b)(6)
```

```
 1                        PROCEEDINGS                   109
 2   day, that's already agreed.  You'll pick a day on the
 3   calendar, you'll talk about scheduling; and if you need a
 4   little smidgeon more time, you'll let me know, and I'll
 5   grant it.  And you'll go back and talk a little further
 6   about these things, but I think mostly this is going to be
 7   strategic, going back over the things that it said it
 8   can't live without and deciding those things that it
 9   probably can live without because the judge is probably
10   not going to give it to you.  And then on the things that
11   you really feel you can't live without and where you
12   really can make the good strong argument as to how it's
13   relevant and discoverable, you'll make those arguments to
14   me if you cannot reach agreement.  Okay?
15             MR. GRENDI:  Very good, your Honor.
16             MR. GREIM:  Your marching orders are pretty
17   clear, your Honor.  Thank you.
18             THE COURT:  Glad to hear it.  And sorry this
19   went so long.  Take care, everybody.
20             MS. TESKE:  Thank you, your Honor.
21             THE COURT:  You're welcome.
22             (Whereupon, the matter is adjourned.)
23
24
25
```

1                                                              110

2

3                        C E R T I F I C A T E

4

5              I, Carole Ludwig, certify that the foregoing

6    transcript of proceedings in the case of Eastern Profit

7    Corporation Limited v. Strategic Vision US LLC, Docket #18-

8    cv-02185-JGK-DCF, was prepared using digital transcription

9    software and is a true and accurate record of the

10   proceedings.

11

12

13

14   Signature_____
                            *Carole Ludwig*

15                      Carole Ludwig

16   Date:    August 26, 2019

17

18

19

20

21

22

23

24

25