

Edward D. Greim
Direct Dial: (816) 256-4144
edgreim@gravesgarrett.com

September 3, 2019

<u>VIA ECF</u>
Hon. Debra Freeman
Daniel Patrick Moynihan
United States Courthouse
Courtroom 17A
500 Pearl Street
New York, New York 10007

   Re:  *Eastern Profit Corp. Ltd. v. Strategic Vision US, LLC*, 18-cv-2185 (JGK)-DCF

Dear Judge Freeman:

   This letter supplements our previous showing on behalf of Defendant/Counterclaimant Strategic Vision US, LLC ("Strategic Vision"), which seeks to compel Guo Wengui to provide key deposition testimony regarding Strategic Vision's claims and defenses.

   You will recall that Guo is a critical fact witness, so much so that Plaintiff/Counterclaim Defendant Eastern Profit Corp. Ltd. has admitted in a pleading that "Eastern authorized Guo to communicate with Strategic Vision on Eastern's behalf concerning the [Research] Agreement [at issue in this case]" and that Guo's representations to, and interactions with, Strategic Vision concerning the Agreement are binding upon Eastern." (*See* ECF 142). However, at his August 2, 2019 deposition, Guo refused to provide testimony reflective of his close association with Eastern Profit. He avoided answering questions about which Eastern Profit's own description of him guaranteed he had knowledge. At the conclusion of an August 21, 2019, conference, you instructed Strategic Vision to file a letter listing the questions it had been unable to ask Mr. Guo and that were not established by the admissions in Eastern Profit's answer to the counterclaims. Through the detailed questions outlined below, we believe you will find that Strategic Vision has more than established the relevance of its questions to this critical fact witness.

   Many of these questions pertain to the falsity of Mr. Guo's statements to Strategic Vision about his status as a dissident (a foundational reason for Strategic Vision to enter into negotiations, let alone the Agreement itself) and the purpose for which he intended to use the fruits of Strategic Vision's research efforts. As Strategic Vision has already outlined, without obtaining relief under Fed. R. Civ. P. 26(c), Mr. Guo's counsel instructed the witness not to answer questions pertinent to Strategic Vision's fraud counterclaim because he viewed it as outside of discovery. This Court has already decided that the fraud counterclaim is appropriate for discovery, and Strategic Vision is well within its discovery rights to test the credibility of witnesses.



The succeeding sections group Strategic Vision's proposed questions into more specific categories, all of which either pertain to its fraud or breach of contract counterclaims.

I.   **Questions about Mr. Guo's communications and negotiations with officials of the Chinese Communist Party ("CCP") and People's Republic of China ("PRC") in the months before beginning his contract negotiations with Strategic Vision.**

   A.   Basis for questions

   Strategic Vision's Counterclaim alleges that Guo communicated and negotiated with CCP and PRC officials about ways in which he could advance the regime just a few months before meeting with Strategic Vision and discussing his plans as an alleged dissident to use its consulting services to undermine the regime. *See* Counterclaim, ¶¶ 61-64 (March 2017 recorded statement that Guo's "operation is on" and that dissidents are disloyal to China, followed by Guo litigation against at least one dissident mentioned in the recording); ¶¶ 73-74 (May 2017 meeting between Guo and visiting Chinese officials regarding his assets, family, and public statements); ¶¶ 75-77 (Guo August 26, 2017 letter to "Chairman Xi Jinping" promising to convert his "influence and resources" to "best serve Chairman Xi Jinping's China Dream," *i.e.*, Xi's plan for increased patriotism and for winning a global competition against the United States, and to "obey orders," including service as a "propagandist" for China).

   B.   Proposed questions

   1. Authentication of recordings of Mr. Guo's statements and conversations in March, May, and August of 2017. These were provided to Guo's counsel several days before the deposition along with a request that they be reviewed in advance so that authentication questions could be asked. The day before the deposition, Guo's counsel stated that Guo had not reviewed and would not review the recordings to authenticate the conversations. We would ask Guo to testify regarding these and other recordings or postings of or by Guo.

   2. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (Guo Tr. 26:7-24.) (Note: Strategic Vision has at least two of these recordings, has had them transcribed and translated, and has produced the statements and translations in discovery. Further, although Guo claimed ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ in other news outlets he has claimed, "There are more than 100 hours of conversation I have on tape," (*see* Ex. 1). Two years ago he shared with the Wall Street Journal "a partial audio recording Mr. Guo said he made of the May encounter and posted online in September." (see Ex. 2) Mr. Guo's ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ were not credible.



    3. ████████████████████████████████████████████████████
████████████████████████████████████████████ (*Id.*)

    4. Follow-up questions would focus on Guo's communications and negotiations with CCP or PRC officials. Strategic Vision believes these communications will show that Guo intended to use any "research" into regime-connected individuals to bolster his position with the CCP and ingratiate himself with Xi Jinping.

## II. Questions about Mr. Guo's past in China and the reasons for his coming to the United States.

### A. Basis for questions.

Strategic Vision alleges that to support his factual claims in the public and to Strategic Vision about being a dissident, Guo has told a specific story about the basis for his animus against the regime and his reasons for leaving China. Strategic alleges that those claims are false. *See generally* Strategic Vision's Answer and Counterclaims to Second Amended Complaint (Dkt. 114) ("Counterclaim"), ¶¶ 48-61. Strategic Vision has alleged and is entitled to discovery concerning the particularly pertinent excerpts below, among others.

> 49. In the parties' December meetings at his apartment in New York City, Guo claimed to Strategic Vision that he had a long history of speaking out against the Chinese regime, and that he was now in America as a dissident and asylum-seeker. He claimed to want to use his country of refuge as a base to gather intelligence on high-ranking Communist officials and, through public criticisms of them, to give aid and comfort to opponents of the Chinese Communist regime both inside and outside China.
>
> 50. Yet much of Guo's origin story is untrue.
>
> 51. Guo claims, and claimed to Strategic Vision, that he was arrested and imprisoned in May 1989 during the Tiananmen Square massacre for providing money to help protesters. In fact, Guo lived and was arrested in Puyang, Henan province, 750 miles away from Beijing. The Tiananmen Square massacre did not occur until June 4, 1989, after Guo had already been imprisoned for running a fraudulent oil sales operation.
>
> 55. Guo has claimed he was forced to leave China in late 2014 with the onset of official reprisals against members of Ma's faction of the CCP. CCP Chairman and Chinese President Xi Jinping had waged an anti-corruption campaign against members of the most ostentatiously corrupt CCP factions. Ma, in his MSS secret police capacity, had supposedly amassed evidence of corruption among Xi Jinping loyalists such as Wang Qishan, who was the CCP's anti-corruption leader and member of the powerful Politburo Standing Committee. Wang Qishan purportedly struck first, charged Ma with corruption, and stripped Ma of his CCP membership. Only after Guo became a public figure in the



United States in 2017 did authorities move to charge Ma, eventually claiming to put him on "trial" in 2018, whereupon he was reportedly found guilty and given a suspended death sentence.

56. In Guo's telling, reprisals began against him following the fall of Ma, starting in January 2015. Thus, in a case filed by Guo and companies purportedly controlled by him on January 30, 2018 against a Chinese-American billionaire businessman with close ties to the Chinese regime (*Guo, Beijing Pangu, Beijing Zenith v. Bruno Wu*), the complaint states, "In total, approximately 27 employees of the Plaintiff Companies were arrested from January-to-May 2015." The complaint then notes that the assets of companies purportedly owned and controlled by Guo started suffering the seizure of assets "in or around late January and early February 2015" and that, as of a January 2018 filing, the businesses had "halted nearly all regular business operations."

57. Following this narrative, in more than a dozen complaints and counterclaims in court litigation in the United States, Guo has consistently claimed that he came to the United States on precisely January 9, 2015. Numerous contemporaneous media accounts from January 2015, however, report that Guo was actually forced to return to China for interrogation on or around January 9, 2015. *Bloomberg News*' description of the incident in a story published January 25, 2015 was that "Miles Kwok, also known as Guo Wengui, was taken in by authorities." Guo claims, however, to have avoided the fate that befell others who were purportedly pursued in the aftermath of Ma's fall. Even though (as he claimed) 27 of his employees and family were arrested and his assets were being seized, Guo was released from custody, and was even allowed to leave China and come to the United States.

58. By March 2015, roughly a month after what Guo claimed was the starting point of China's seizure of billions of dollars of his assets, Guo had purchased his $68 million Sherry Netherland penthouse home in New York City. Money for the purchase of the unit was wired from the Hong Kong back account of Bravo Luck Limited on or around March 4, 2015. The sale was approved by the co-op board of directors on March 24, 2015, and the next day, March 25, the Chinese publication *Caixin* ran an excerpt of a 10,000-word profile, which ostensibly gave a comprehensive account of Guo's entire life story, his business history, and his purported credentials as a dissident. The full article ran two days later. It did not mention his January 9, 2015 detention or his highly improbable release, even as his employees and family members were purportedly being arrested and assets were purportedly being seized.

### B. Proposed questions

1. ███████████████████████████████████████████ (Guo Tr. 9:22-25)
2. ███████████████████████████████████████████ (Guo Tr. 10:6-9)



3. Further questioning would establish when Guo left China and came to the U.S., any visits to the Mainland or Hong Kong, whether Guo's travel was restricted or monitored by the CCP there, and the reason for those trips.
4. ███████████████████████████████████████ (Guo Tr. 10:22-11:9).
5. Further questioning would establish the true reason and timing for his alleged arrest in conjunction with the Tiananmen Square Massacre.
6. Further questioning would establish whether he was in fact detained on or about January 9, 2015, the day he says he came to the United States, and whether he was then released, and why and under what conditions.



(Guo Tr. 185:10-22) Note: Mr. Guo was allowed to answer █████████████████████████████████████████████

  b. ███████████████████ (*Id.*)
8. Guo was allowed to testify and deny ████████████████████████████████████████████████████████████████████ (Guo Tr. 193:3-194:12).
  a. ██████████████████████ (*Id.*)
9. Strategic Vision would question Mr. Guo about how and why he was able to transfer in excess of $60 million to the United States for the Sherry-Netherland purchase in March 2015, after his assets were already being seized; and how and why he believed he could send funds later in 2015 to China Minsheng Bank in Hong Kong for the purchase, through ACA Capital Group Limited, of a Mainland-controlled entity, Haitong Securities. Counterclaim, ¶¶ 58-59.
10. ████████████████████████████████████ (Guo Tr. 223:9-22). Note: Mr. Guo had refused even to answer whether ████████████████████████████████████████████████████████████████████████ Guo Tr. 220-223. Mr. Podhaskie did make several statements to media outlets identifying himself as Mr. Guo's lawyer, in which he claimed that Mr. Guo had not moved a penny out of Hong Kong or China since he had begun speaking out against the CCP.



### III. Questions about other research Mr. Guo obtained, funded, or controlled that was similar in nature to the research for which he (using Eastern Profit) retained Strategic Vision.

#### A. Basis for questions

These questions would provide essential discovery for Strategic Vision's contract and fraud claims. For its fraud claim, Strategic Vision has alleged that Guo never intended to actually use the research to publicize corruption within the CCP or PRC, and as evidence of Guo's plan and intent, Strategic Vision believes it can show that no Guo entity—including Eastern—ever actually received or used the research that Strategic Vision was supposed to obtain. Further, Strategic Vision believes it can show that Guo himself has never publicized the results of similar research—against the 15-person tranche of initial subjects or any associated people—or used that information ███████████████████████████████ ████████████████████████████████████████████████ Guo Tr. 45:3-48:4.

Second, on its breach of contract counterclaim, Strategic Vision alleges that Eastern Profit breached its duty of good faith and fair dealing, frustrating Strategic Vision's performance, by having other teams simultaneously research the same targets. If anyone knows the answer, it should be Guo. *See* Counterclaim, ¶ 36:

> 36. Strategic Vision's team, working in other countries, also found troubling breaches of security by Eastern Profit and Guo that frustrated and prevented Strategic Vision's performance. For example, the team found that other teams of researchers were simultaneously researching some of the same individuals and files that Guo, through Wang, had given to Strategic Vision. Previously, Guo had stated that he had three or four other teams of researchers he could use if Strategic Vision did not enter into the Contract; he had never stated that he would simultaneously have those teams surveil the same subjects as Strategic Vision, which created a security risk for all of the teams and made it much more likely they would be uncovered and subjected to defensive measures or counter-measures by the targets. Strategic Vision would never have agreed to expose its team to work under such circumstances.

#### B. Proposed questions

1. ████████████████████████████████████████████████████
████████████████████████████████████████████████ (Guo Tr. 35:11-16)
2. ████████████████████████████████████████████████
████████████████████████ (Guo Tr. 36:5-37:25)





[redacted]

IV.   Relationships with or payments to key witnesses

A.   Basis for questions

Strategic Vision believes it is important to know whether two key witnesses—Bill Gertz and Lianchao Han, the individuals who introduced Strategic Vision to Guo and his network, including Eastern Profit—have a personal interest in Mr. Guo's background story being true, or in otherwise supporting Eastern Profit's position in this case. It is typical to test witnesses' credibility by determining whether they are receiving compensation or things of value from other parties or key witnesses, and to understand whether they have other mutual interests that could affect the truth of their testimony. Mr. Guo has refused to answer most of these questions.

B.   Proposed questions

[redacted]

Finally, Guo's arguments to limit discovery based on his supposed separation from Eastern Profit should no longer have force. Despite Guo's [redacted], Eastern Profit has admitted that Guo was its "agent" concerning the Agreement at issue. Additionally, new evidence has come to light that should dissolve any artificial barrier between Eastern and Guo. First, Eastern now seems to admit that Guo's daughter, Guo Mei, is the sole director of Eastern. See Answer, Dkt. 142, ¶5. A Hong Kong record search shows that for the relevant period, she has owned all of its shares. Those



shares were transferred to her before the events that took place in this case. Tellingly, the prior holder of the shares, and prior sole director, was none other than Chunguang Han. Lianchao Han, a confidant of Guo (and no relation to Chunguang) testified that, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

No person, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ has ever testified that Eastern Profit actually performs any business activity, and no actual employee or officer of Eastern Profit has ever been identified. In short, it seems highly likely that Guo simply keeps Eastern Profit on the shelf and under his control through surrogates. Guo should not be able to continue to hide behind Eastern Profit when it is clear that it is he, and he alone, who has the information necessary to complete discovery in this case.

The deposition should now be completed, and this time, Guo should truthfully provide his personal knowledge without further instructions to refuse to answer.

Respectfully submitted,

*Edward Greim*

Edward D. Greim

cc: Counsel of record via ECF