

Edward D. Greim
Direct Dial: (816) 256-4144
edgreim@gravesgarrett.com

September 3, 2019

<u>VIA ECF</u>
Hon. Debra Freeman
Daniel Patrick Moynihan
United States Courthouse
Courtroom 17A
500 Pearl Street
New York, New York 10007

Re:  **Eastern Profit Corp. Ltd. v. Strategic Vision US, LLC, 18-cv-2185 (JGK)-DCF**

Dear Judge Freeman:

Pursuant to your instruction to counsel at the conclusion of the August 21, 2019 telephone conference in this matter, we write on behalf of Defendant/Counterclaimant Strategic Vision US, LLC ("Strategic Vision") to discuss the topics remaining in dispute concerning the continuation of the Fed. R. Civ. P. 30(b)(6) deposition of Plaintiff/Counterclaim Defendant Eastern Profit Corp. Ltd. ("Eastern Profit"). You may recall that counsel for Strategic Vision and Eastern Profit recently found agreement on a significant number of topics that are no longer in dispute and that Eastern Profit's designated witness has agreed to be prepared to testify to at the upcoming deposition. Those aside, Eastern Profit should prepare and furnish Fed. R. Civ. P. 30(b)(6) testimony on the following discrete topics:

1. **Topic: the individuals identified by Yvette Wang in her communications with Strategic Vision as having some role in the research agreement at issue, and the individuals who she claimed acted as "investors" in the contract. Wang tried to bargain and communicate with Strategic Vision by claiming she had spoken with, and was conveying the wishes of, other individuals aside from her "boss," Guo. She sometimes called these other people "investors." Who were they? What interest did they have in the contract? For what purpose did they back the contract—and did those purposes match Guo's representations to Strategic Vision about the objective of the contract? Did Eastern Profit disclose Strategic Vision's work to any person outside of EP, despite the confidentiality provision contained in the contract?**

In Eastern Profit's first Rule 30(b)(6) deposition, Strategic Vision tried to explore these topics. They are plainly relevant. Eastern Profit failed to assert any objection. It certainly failed to assert its **<u>only</u>** current objection: that answering this question will somehow endanger individuals in China, notwithstanding that the existing Protective Order would prohibit disclosures outside of the case.

The reason the questions must be asked again is that when they were asked the first time, Eastern Profit's witness, Yvette Wang, was utterly unprepared, gave seemingly



inconsistent responses, and generally did not know the answer to the questions. Yet she should have known—and likely did know—each answer from her own personal knowledge. For example, Wang was asked about an important communication with Strategic Vision representative French Wallop the night before the contract was signed, produced by Eastern in discovery and marked as Wang Exhibit 15. In that text, Wang stated: "There is of course no impasse here. I work with several people, M [Guo] is one of them, **saying for *this* project, he is not the only boss.**" (emphasis added). In contrast to its current position, Eastern Profit allowed its witness to be questioned about its agent's assertion that Guo was "not the only boss" for "this project," but Wang ████████████████████  The communication was specific to the contract here and Wang stated that she had more than one "boss" on the project, but her testimony was ███████████████████████



████████████████████████████████ It makes little sense given her explicit comment that "for this project, he is not the only boss." Who was the other boss, and what did he want out of the contract? Strategic Vision should have Eastern Profit's answer.

Moments later, Wang was again allowed to answer questions about ███████ ████████████████████████████████████████████ Eastern Profit made no objection and never even mentioned its current claim that, notwithstanding the Protective Order, Wang's answers would endanger lives in China. Instead, she was allowed to answer:







Wang's claimed lack of knowledge allowed Eastern Profit to limp through this first deposition, but given the sheer number of her contemporaneous references to others, it simply is not believable. In other messages to Strategic Vision *after* the contract was signed, Wang repeatedly refers to "the investors," that she "checked with them," and that they needed results. *See* SVUS00051 (Ex. 1). Separately, in communications with French Wallop just before the contract was signed, it now appears that Wang was distinguishing between her "boss" (i.e., Guo) and "hk" (using the parties' convention of using city code-names to refer to Guo and others, presumably someone in Hong Kong). *See* SVUS001869 (Ex. 2). Who were these people, if not Guo himself? Was Guo required to share research results with others in Hong Kong, Mainland China, or elsewhere, despite the strict confidentiality provision of the contract? And were the goals of these "investors" different from Guo's claimed goals?

The answers to these questions go to the heart of the fraud claim. If others—"investors" or otherwise—had the right to see or use Strategic Vision's research, or if Guo was actually beholden to some other person or group who actually funded the agreement, then Guo's and Eastern Profit's representations regarding Guo's limited and targeted use of the research (and plan to "fill in" a corporate entity rather than his name as the contract signor) were false. Strategic Vision will never learn the answer to these questions, however, if Eastern Profit can refuse to explain its own documents and communications to Strategic Vision based on a murky objection—advanced without support, and asserted only after the questions were already asked once without objection—that the answers will somehow seep through the Protective Order to endanger Chinese dissidents.

Eastern Profit should have to explain who, if not Guo, was pressing for results on the research, and what their interests in the research were. This time, Ms. Wang should not be able to stand on a lack of knowledge about her own communications to Strategic Vision.



2. **Topic: who worked for Golden Spring and how were they paid? Did Eastern Profit, Guo, or any other person pay Golden Spring for its work? What families does Golden Spring work for now? In the past? What kind of work does it do?**

Several months into this litigation, Eastern Profit seems to have suddenly appointed Golden Spring as its "attorney-in-fact." The appointment covers not only the conduct of the litigation, including discovery (which the Court noted was unusual), but also appears to have been retroactive to events that had happened months earlier: the negotiation and performance of the contract itself.

Strangely, neither Golden Spring nor its involvement was ever mentioned to Strategic Vision during the negotiation or performance of the agreement. Why? And why was Golden Spring's role as agent for Eastern Profit not disclosed to Strategic Vision initially under Rule 26, or before Eastern Profit's first attempt at a deposition, almost a year into the case?

Strategic Vision believes that Guo founded Golden Spring New York when he first came to the United States in 2015. Wang, his longtime assistant, was made Golden Spring's CEO, and Golden Spring became the nerve center of all of Guo's projects. If Golden Spring actually had access to Strategic Vision's work product, it may well have been the means by which outside entities and interests—with purposes sharply at odds with Guo's representations to Strategic Vision—would have accessed and used the research.

Of more immediate import, Golden Spring's general counsel, Daniel Podhaskie, has now begun to attend depositions in this case over Strategic Vision's objection, apparently serving as a secondary corporate representative to Yvette Wang, who herself seems to double as both an Eastern Profit and Golden Spring representative. Karin Maistrello, the ACA director (and herself a Golden Spring employee) who purports to have resigned her directorship less than 24 hours before she was served with an ACA subpoena, admitted that ██████████████████████ ██████████████████████████████████████████████████ Maistrello's purported resignation is the reason ACA claims to be absent from this jurisdiction. Podhaskie has also had contact with counsel for another non-party witness, Lianchao Han, who was hired just before Han's deposition. Podhaskie also issued a long statement to several media outlets, including the Wall Street Journal and Miami Herald, making various factual allegations about the case, and for purposes of those statements held himself out as Guo Wengui's personal attorney. Guo's litigation counsel, Hodgson Russ, also represents both Golden Spring and Maistrello. No one, however, seems to know who represents ACA.  In short, it should be possible to explore basic facts about an entity that was retroactively granted a power of attorney to oversee the contract at issue in this case, and that essentially coordinates this litigation for both Guo and Eastern Profit.

Finally, it is important to note the connection between this topic and another issue before the Court. Golden Spring failed to produce a witness or any documents for its Rule 30(b)(6) deposition, noticed for August 22, 2019. The scope of the Golden Spring deposition was the subject of a Strategic Vision letter-motion on which the Court has not yet ruled, but the fact that a witness for Golden Spring would appear has never been in dispute. Since the conference, Golden Spring



has continued to actively assist Eastern Profit in this case, but it has declined repeated invitations to confer and provide make-up dates for its witness, or to provide any requested documents—even where no objections have been raised. Strategic Vision believes that the witness for Golden Spring will be the same as the witness as Eastern Profit: Yvette Wang, who claims to be Golden Spring's CEO. Although everything known to Golden Spring should also be known to Eastern Profit by virtue of the entities' power of attorney relationship, Strategic respectfully submits that Topic 2 would be particularly appropriate for Ms. Wang when testifying in her capacity as Golden Spring's witness.

3. **Topic: What were Eastern Profit's communications with ACA or any person who controls ACA about the loan, or about repayment? Is Eastern Profit making its interest payments? With what assets?**

Strategic Vision's theory is that the so-called Eastern Profit-ACA loan is not real. Neither person who purported to sign the loan document, which was produced only <u>after</u> Eastern Profit's first Rule 30(b)(6) deposition, has stepped forward to submit to questions about its authenticity, negotiation or substance. If the terms of the loan are not being followed and payment is not being made, it further supports the theory that the loan was concocted, perhaps after questions began to be asked at Eastern Profit's first deposition, as a means to allow Eastern Profit to sue in breach of contract to recover "its" $1 million.  The topic forms one of Strategic Vision's defenses.

Further, this Court has already ruled that ACA, a non-party, could itself be asked these questions. With Karin Maistrello's purported "resignation," ACA now claims to be beyond the reach of this Court. Surely Eastern Profit, the named plaintiff, should be required to answer questions that would either prove or disprove the existence of the loan that forms the basis of its damage claim.

4. **Topic: The corporate history of Eastern Profit (formed no earlier than 2011) and its directors. Does Eastern Profit have any business?**

At issue is whether Strategic Vision can ask about any corporate actions by Eastern Profit before September 1, 2017 or after March 21, 2018, although Eastern Profit would allow "reasonable foundation" questions to go earlier. Strategic Vision is willing to accept these constraints for purposes of the Rule 30(b)(6) deposition so long as (1) Strategic Vision can ask about the circumstances under which Han Chunguang, Guo's cook and bodyguard, transferred sole control of Eastern Profit to Guo Mei, Guo Wengui's daughter, in 2017; and (2) Eastern Profit is precluded from mounting any claim or defense based on actions it took before or after these dates.

5. **Topic: Does Eastern Profit have any assets, liabilities, or income? Bank or financial accounts? Loans with a bank? Where?**

Eastern Profit is seeking a money judgment for $1 million in damages—the money it claims to have given to Strategic Vision. Strategic Vision believes the purported loan between ACA and



Eastern Profit is a sham transaction intended to give the appearance that Eastern Profit itself was responsible for the initial payment to Strategic Vision. An answer to these basic questions about the state of Eastern's finances may well show that Eastern Profit has no business, assets, or liabilities, no bank account, and has no financial records at all, let alone records of the purported loan. Strategic Vision is willing to limit its questions to the period between January 2015 (close to the time when Guo allegedly came to the United States) and the present.

**6.  Topic: Whether Guo, his son and/or daughter, and Han Chunguang are engaged in a Hong Kong money laundering conspiracy using Eastern Profit.**

If Guo, Guo's children, and Han Chunguang are using Eastern Profit to launder money, it may be that the ACA money used to pay Strategic Vision was never intended to be an asset of Eastern Profit or to be transferred directly to that entity. Instead, Guo may have hoped that a sudden dispute and lawsuit (which was filed only weeks after performance began on a year-long contract) would become a means for moving $1 million from ACA, through Strategic Vision, and finally, in the form of a judgment, to Eastern Profit. It may well be that Eastern Profit does not engage in *bona fide* commercial transactions at all, and that Eastern Profit is liable to no one for "recovering" a $1 million ACA "loan." In that case, Eastern Profit cannot claim return of the $1 million as damages. Nonetheless, Strategic Vision recognizes that the Court has already stated that it did not see the relevance of this topic. Because little time is left for discovery, Strategic is willing to forego discovery of this topic by means of the Eastern Profit Rule 30(b)(6) deposition.

**7.  Topic: When has Guo advised Eastern Profit and acted on its behalf?**

Eastern Profit objects that these questions should only relate to the contract at hand, while Strategic Vision would like to ask not only about the contract at hand, but also about similar research projects (into the 15 named subjects or other individuals) in which Guo has advised Eastern Profit. This is relevant for at least two reasons.

First, one of Strategic Vision's defenses and counterclaims is that Eastern Profit frustrated Strategic Vision's performance by employing other researchers to investigate the same subjects, which created unwelcome activity regarding the subjects that infringed on the availability of information about them. As with the contract at issue here, Guo would likely have been involved, even if Guo claims he merely acted as Eastern's agent or advisor. Answers to these questions may reveal that Guo used Eastern for a parallel project, causing parallel teams of investigators to alert the targets Strategic was investigating and delaying or frustrating Strategic's performance.

Second, Guo's work with Eastern Profit on other research projects may show that the parol evidence Eastern Profit has tried to inject about what sorts of reports were required under the contract were inconsistent with what Guo expected and obtained in his other work. Because of the scope and relevance of this topic, Strategic is willing to limit the relevant time period from January 2015 to the present, which is the only time period in which Guo would conceivably have been using Eastern for other projects.



## Conclusion

We recognize that the above matters remain open to further guidance from the Court, but do seek to apprise the Court of Strategic Vision's efforts over the last several weeks, unfortunately without out success, to obtain a date for this deposition. Regardless of the specific dates when Eastern Profit's witness can be made available, only a few weeks remain for discovery. Strategic Vision is willing and able to join a call with the Court at its earliest convenience to receive its ruling on these remaining questions.

Respectfully submitted,

Edward D. Greim

cc: Counsel of record via ECF