

**Graves Garrett** LLC

Edward D. Greim
Direct Dial: (816) 256-4144
edgreim@gravesgarrett.com

October 2, 2019

**VIA ECF**
Hon. Debra Freeman
Daniel Patrick Moynihan
United States Courthouse
Courtroom 17A
500 Pearl Street
New York, New York 10007

Re: Eastern Profit Corp. Ltd. v. Strategic Vision US, LLC, 18-cv-2185 (JGK)-DCF
Guo Wengui Testimony and Document Subpoena—Reply by Strategic Vision

Dear Judge Freeman:

On behalf of Defendant/Counterclaimant Strategic Vision US, LLC ("Strategic Vision"), please accept this reply in support of Strategic Vision's motions to (1) bring back Guo Wengui to answer questions about his dissident status and his true intentions regarding the Strategic Vision contract; and (2) compel Guo to produce a subset of documents Strategic originally subpoenaed.

Guo remains at the center of this case. It cannot be that Guo can avoid producing any documents or audio/video recordings—his current position—and also stand on his refusal to testify on the core issues in this case: whether he was truly a dissident, and whether he truly intended to use Strategic Vision's work under the contract to seek to undermine the Communist regime. In Guo's world, a fair deposition consists of him simply repeating his claim that he opposes the CCP. That having been done, the deposition is over: questions about facts that would undermine this claim—for example, his now-admitted negotiations with CCP officials, or his August 2017 letter pledging loyalty to Chairman Xi just weeks before being introduced to Strategic Vision—are "harassment" and should not be allowed by the Court.

1. **Guo's new "summary judgment" approach to discovery fails as a matter of procedure, law, and fact.** Perhaps finally realizing that he will have to reappear to answer at least some questions, Guo's September 25, 2019 response (ECF 159) tries a new tactic. Now, Guo tries to convert this discovery dispute over the scope of day two of his deposition into a one-sided summary judgment-type analysis of the (still incomplete) fact record on whether he is a dissident.

Not only is this improper under Rule 26, Guo tries to restrict his factual argument to a narrow subset of the available information. At the Court's September 18 conference, Strategic Vision had just begun to discuss its evidence when the conversation turned to recordings of Guo. Strategic Vision cited to this Court, and then produced on September 20, nine recording transcripts. The three key recordings are from March, May, and August 2017, several months before Eastern Profit entered the contract with Strategic Vision. Yet for reasons he does not explain, Guo asks the Court to essentially make a factual finding based exclusively on his May



2017 recordings, claiming that these prove that he is in fact a dissident. They certainly do not. In fact, they show the opposite, as is discussed in point 3 below, and as should already be clear from a complete reading.

But more fundamentally, the question in a discovery dispute, and in this discovery dispute, is not whether a single piece of evidence—say, the May 2017 transcript—proves or disproves that Guo is a dissident. That is a merits question unlikely to be resolved on a single piece of evidence, and should not be resolved now. The question under Rule 26(b) is whether the matters to be asked of Guo are "relevant to any party's claim or defense and proportional to the needs of the case."

2. **Guo has made important admissions that affect the question of relevance**. In a watershed event, after almost two months of letter-writing and shifting positions, Guo has finally admitted that he did meet privately in New York with a CCP delegation, not once but twice. Just as important, he finally admits that two of the nine recordings Strategic was forced to find on the internet (and which Strategic first presented to Guo's counsel in July 2019, asking for Guo's own, complete copies of the same)—are authentic.

Given these eleventh-hour admissions, Strategic's position is simple. *Asking Guo about his communications with the CCP would likely yield information on his relationship with the CCP*, a question that every party admits is at the center of this case. Information about Guo's relationship with the CCP is plainly "relevant."

Further, Guo should be asked about the remaining recordings and any others that he personally or through his media outlet, Guo Media, has released or placed into circulation. Neither this Court nor Strategic Vision should have to accept counsel's implication—which, interestingly, stops well short of a denial—that the other recordings are *not* authentic.[1] Are they or aren't they? After all, Lianchao Han, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

---

[1] Instead, Guo cites three online articles as proof that he has been the subject of a "massive disinformation campaign by the CCP in an effort to smear his reputation." Response, p.1, fn 1. Even if a party's citation of news articles were sufficient proof to cut off discovery about relevant topics, these articles cannot pass muster. None of them have anything to do with Guo. Instead, the first two articles suggest that China employs tactics to coopt and disrupt the dissident movement in the United States—not unlike the plan Guo announced in the March 2017 recording, in which he criticizes two Chinese immigrants by claiming they "attack our CCP leaders," and "must be punished." *See* Chambers Copy of Transcripts Discussed in 9/18/19 Conference, pages SVUS1314-1315; *see also* https://www.nytimes.com/2019/04/05/world/canada/sheng-xue-chinese-activist-smear-campaign.html; https://cpj.org/blog/2016/03/chinas-overseas-critics-under-pressure-from-smear-.php. The third article is even further afield. It describes the creation of fake Youtube and Twitter supporters of anti-Hong Kong, and pro-Mainland views in connection with the recent pro-democracy protests. https://www.npr.org/2019/08/20/752668835/how-china-uses-twitter-and-facebook-to-share-disinformation-about-hong-kong. That has nothing to do with any of the voice recordings Strategic Vision has found, which are believed to be of Guo giving statements or participating in interviews. Despite claiming that he is a victim of disinformation, Guo doesn't cite a single example of a "false recording" of him.

2 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *See, e.g.,* Lianchao Han Dep. Tr. 60:9-61:22.



This is why we have depositions, and questions about these recordings should have been answered by Guo under oath back on August 2, 2019, after Guo's counsel had had the links to each recording for several days in advance of the deposition.

**3. The recordings Strategic Vision has so far uncovered show that Guo had a plan to help senior CCP leadership in the U.S., had a close relationship with senior CCP leadership, and ultimately pledged his loyalty to Xi Jinping just weeks before meeting with Strategic Vision to discuss a possible engagement.**

Guo's first recording is from March 2017 (Video 1, published April 29, 2017). In it, Guo reports to an unknown listener that he is back in New York. "The operation is on now. I have absolute faith in General Secretary Xi." SVUS1314. Guo next criticizes one reporter, Xi Nuo, because he "attack[s] our CCP leaders" and "wrote a book about leaders' private affairs." SVUS1315. For this, he says, "these people must be punished;" indeed, "they are the modern traitors of the Chinese nation" and "deserve to die." *Id*. He proposes his own plan of action: "Just wait and see. I can take these bastards down and help our leaders to [get] revenge." *Id*. Guo concludes by saying that he plans to "make some contributions and establish merit first" before going back to China. *Id*.

This is utterly inconsistent with the "testimony" Guo's counsel tries to create for him in the Response, which studiously avoids even mentioning the March recording. Indeed, the March recording shows that Guo hoped to be of use to "our CCP leaders" while Guo was living in the U.S., and that he viewed his own mission as helping those CCP leaders to take "revenge" on certain Chinese who were criticizing them from the U.S. Guo should certainly answer questions about this recording and the plans he discusses, particularly since Guo was embroiled in litigation with Xi Nuo and others soon after this recording was made.

At around the same time in 2017, in recordings he wanted to make public within the Chinese community and within the higher echelons of Mainland leadership, Guo tried to straddle the line: effusively praising "President Xi," against all common sense and against the great weight of the dissident community, claiming he was a budding champion of "freedom and democracy." *See* SVUS001318-1319 (2017 recordings from before the October 2017 19th National Congress). These are not the words of a pro-democracy crusader; it is a message from a man who is ready to deal—and likely already dealing—with the regime.

Perhaps that is why, around the same time (May 24 and 26, 2017), Guo hosted Liu Yanping, among other Politburo and PRC officials, in his New York apartment.

---

[3] *See*



██████████████████████████████████████████████, but even those are telling and show how Guo began to negotiate with CCP leaders on personal matters.[4]

The opening portion of the first transcript shows that Guo was intertwined with the Ministry of State Security (the "MSS," or China's CIA)—and was not, as he now claims, a private businessman who suffered abuse from high-ranking officials after becoming a dissident. For several of his key assets, he actually seems to have shared control with the state or with senior leaders, or served as their proxy. *See* SVUS001363 (1:30-2:00, with Liu offering Guo the part of several properties "that is legal," and the state taking the part of other key properties because, as Guo says, "You are the actual controller. You can get back the assets that belong to you.").

Further demonstrating his connection to the MSS, Guo takes credit for an apparent joint operation with the MSS and its Vice Minister Ma Jian, suggesting that it was he and Ma who obtained custody of Chen Weili, the son of a prominent party boss who was later prosecuted, from Malaysia. SVUS1364-1365. The turn against the Chen family came about as Guo's faction of the CCP, under then-President Hu Jintao, gained power in 2008.[5]

Further, Guo's response to the bribery charges is revealing because, far from the full-throated denial portrayed in his counsel's letter to this Court, Guo's actual words indicate the extent of Guo's ties to Ma Jian, the MSS, and others. Guo begins by stating, "I will take my own responsibilities. I know what I did, I won't try to get away by denying what I have done." SVUS001369. After making initial general denials (SVUS001369-70), Guo then tries to argue that his work was for the MSS and on behalf of the "nation," and that if anyone received "bribes," it was the nation. *Id.* Guo then seems to admit to transactions in which officials purchased properties from him and then sold them back for a profit. *Id.* at 1371-1372. His rhetorical questions suggest his relationship with the CCP and PRC: "Is this illegal? Is it not possible to have any trade of power and money?" *Id.* Guo, a party insider with close connections to the MSS, is reminding Liu that he was doing the same thing as other insiders.

In the remainder of the first recording, the terms of the potential deal are murky, but it seems to involve a promise to record a statement. SVUS1374-1376. It is important here to remember that the recordings Guo released to the Journal were "partial audio recordings." *Id.* Indeed, even those recordings were likely more substantial than what Strategic found on the internet, as Guo gave the Journal access to "audio *and video recordings* he made of some conversations," and Strategic can find no video recordings. *Id.* Guo now attempts to argue that the audio clips show he is a dissident, but refuses to produce the remainder or to answer questions about his many incongruous comments. The full recordings should be released, and Guo should answer questions about the full extent of his negotiations and communications with CCP officials.

---

[4] *See* https://www.wsj.com/articles/chinas-hunt-for-guo-wengui-a-fugitive-businessman-kicks-off-manhattan-caper-worthy-of-spy-thriller-1508717977 (cited in Guo's Response).

[5] http://www.asianews.it/news-en/Son-of-former-Shanghai-party-boss-Chen-Liangyu-sentenced-to-jail-12920.html



In the next recording (starting at SVUS1377), perhaps occurring after the initial recording, Liu again talks with Guo, this time, perhaps, by phone, but we cannot know the circumstances without Guo's testimony. Strikingly, he shares details about the movement of senior Chinese officials in the U.S. *Id.* at 1377-1378. He also reports that Guo had said Ma Jian (a Vice Minister in the MSS) "worked for [Guo]," and repeatedly expresses the belief that Guo had already made unspecified "contributions to the country." SVUS1378 at 3:30-4:00.

And it is here that Guo claims to be in a power struggle with Wang Qishan and Meng Jianzhu. The key point of contention is whether Guo will disclose the supposed "secrets" of Wang and Meng; it first appears that if he does not, his family will be allowed to travel freely. SVUS1385-86. Further, Guo makes clear that his criticism of Wang and Meng stems from his supposed feud with them and their attacks on his family. SVUS1386 (17:00); SVUS1387 (17:30-18:00, stating that if Wang and Meng retain positions after the upcoming Congress, "it's impossible that they will let me off."). On the flip side, if Wang and Meng are not retained at the Congress, Guo is willing to "definitely announce that I'm not against the party, President Xi, the state and the nation," or the "Communist Party." He will then, he says, return to a "normal life." *Id.* For Guo, as seen above and as alleged in Strategic Vision's Counterclaim, that had meant cooperation with the MSS while using the MSS to make money in his business.

It bears repeating that Guo's criticisms of Wang and Meng are not for corruption, as his counsel claims. Instead, they are apparently bitter complaints about what Guo claims is Wang's investigation of him, SVUS1390 (24:30), and Meng's "slandering" Guo in the Middle East. SVUS001391 (25:30). The same is true for Fu Zhenghua, who allegedly threatened Guo's family. SVUS001410. If Guo's statements are to be believed, he is describing an internal fight within the regime over money and power. But again, without questioning him, we cannot get the answers.

With respect to his family, Guo is willing to go quite far for a supposed dissident, sending his own wife and children back to China and "using" them in order to prove that the CCP is a "reliable party." SVUS001388. And indeed, his warm relationship with Liu (SVUS001397) and previous deals with Liu (SVUS001396, agreeing by July 1 to say he did not oppose the Communist Party, and SVUS1399, talking only about certain officials) seem to have yielded benefits for Guo. (SVUS1398-1399).

Could this continue? Guo first seems to suggest that no further bargain could be reached, because he would "have to face proceedings" for certain "cases" in China. SVUS001403 (45:00). Then, Guo makes a four-part proposal, and promises not to make more comments on Wang and Meng. SVUS1404-1409. Contrary to his counsel's current claim, Guo admits he broke the law, but claims to not be "guilty," presumably in the moral sense or perhaps under a claim that he lacked criminal intent. *Id.* Finally, perhaps knowing that he might release at least this part of the recording or allow Liu to share it with senior CCP and MSS officials, Guo tries to couch the bargain and his agreement to redirect publicity as support for President Xi's anti-corruption effort. SVUS1413. Speaking of a final conference he had hoped to hold in August, Guo promises to share the content first with the CCP, *via* Liu, and notes: "I might [have been] a bit extreme before. I can adjust the content. I felt I had to do it or I'd lose face, things would bet complicated." SVUS001414.



For the rest of the conversation, Guo and Liu are comfortable enough that Liu shares with Guo the identity of a group of individuals he says are "against President Xi" and are "plotting to betray the party." SVUS001415. Guo promises not to invite one of them to the press conference. *Id.* Liu and Guo then discuss a series of compromising facts Liu claims to have uncovered about various high-ranking officials. SVUS001416-18. The two then come to agreement that China would be "destroyed" without President Xi, and Guo declares, "I strongly support President Xi." SVUS1425. Guo even promises to wait until his own issues are resolved to make complaints against his supposed arch-nemesis Wang internally, within China, and even then, only after Liu gives him approval to "take measures as you like." SVUS001426-1427. The two agree that this is the patriotic path. *Id.*

Shortly afterward, presumably following further discussions of this nature that may well have been recorded, Guo signed a letter pledging loyalty to Chairman Xi. *See* SVUS001320-1330 (recording of Mingjing "Mirror" TV—a Chinese-language television station—interview in which Guo authenticates and attempts to explain the letter, dated August 26, 2017.) In the letter, addressed to "The Honorable Leader(s)" but intended for Xi Jinping and Meng Jianzhu, Guo refers to his meeting with Liu Yanping and makes the following statements:[6]

- "I understand and accept all of your directives and requirements leading to settling the matter." (p.1)
- "In order to carry out your instruction better, I pray that you clarify what Wengui [is] not allowed to speak out and what Wengui [is] not permitted to do." (p.1)
- That his ability to live in the United States is based on certain "conditions," and that to act consistently with those conditions, "I am now doing things not out of my own volition and talking things that I do not really mean… My public exposures of information was done under coercion, my choice to perform publicity was not voluntary… This is the main reason why my family and I have received top class special protection and have been able to survive. As soon as I commit stop revealing information in two months, such… agreement will definitely be rescinded… I will definitely have to try to leave this country…" (p.1-2)
- "You and I will have more convenient ways to communicate with each other when I am there in the U.K." (p.2)
- "Yet I still kept faith in you and in the organization so I did not cross the red line when I was forced to give out for interviews." (p.2)
- Guo says it was a serious matter to "freeze several Hong Kong accounts" of one Qu Guojiao and asks that the accounts be unfrozen. (p.2-3).
- "I will put our national interest first and I am willing to devote my life to protecting our nation's interests, to defend Chairman Xi Jinping's value as our nation's Core Faith and make ultimate dedication of myself to safeguard Chairman Xi Jinping!"(p.3)

---

[6] [redacted] *Id.*



- "Can you consider to convert Wengui's influence and resources momentarily into best serving Chairman Xi Jinping's China Dream?" (p.3)
- "Assign me tasks to accomplish in furtherance of our national interests initiative and engage in Chairman Xi Jinping's global strategy, so that I can redeem myself by my good service, demonstrating my patriotism and loyalty to Chairman Xi Jinping!" (p.4)

Guo's interview is an attempt to explain each of these points, adding some gloss that is not in the letter.[7] His interview does, however, make clear that he had other conversations, including with Vice Minister of the Department of Public Security Sun Lijun, in between the May meeting and August letter. *See* SVUS001327 (17:00-17:30). It is unclear what conversations happened after the August letter.

We do know, however, that Guo's emissaries reached out to Strategic Vision in October and that initial meetings with Guo happened in late November—six to twelve weeks after this letter was signed. How did the contract Guo negotiated with Strategic Vision advance the "tasks" Guo asked CCP officials to "assign" him in the late August letter? Did Guo report on the Strategic Vision contract to Liu, Sun Lijun, or any of the other officials with which he had contact as recently as late August? How was Guo able to order $1 million in funds from ACA to Strategic given the concerns he expressed on Mirror TV about his Hong Kong assets being frozen?

Worse than leading their own witness during direct examination, Guo's counsel is presenting their own arguments (often without citation) in an effort to avoid Guo himself completing his deposition and answering these questions. It is time to hear from Guo.

4. **The three other topics Strategic Vision outlined in its September 3 and September 17, 2019 letters (ECF 148 and 154) are also relevant, and Guo utterly fails to answer Strategic Vision's arguments regarding the relevance of four categories of his documents.** The testimonial topics include the following:

> Topic II: Questions about Guo's past in China and his reasons for coming to the U.S.
> Topic III: Questions about other research Guo obtained, funded, or controlled that was similar in nature to the research for which he (through Eastern Profit) retained Strategic Vision.
> Topic IV: Relationships with or payments to key witnesses. This includes Bill Gertz and Lianchao Han.

The **documents** have now been limited to include the following:

1. Video and audio recordings relevant to this case (*see* ECF 155, p.2)

---

[7] Importantly, Guo also tells Chinese-language viewers that during his negotiations with Beijing, certain of his entities' Hong Kong accounts were frozen—acts which he attributes to Beijing. SVUS1328-1329. Guo also claims that his intent was to "help the country to realize freedom" and "democracy," concepts noticeably absent from his lengthy letter. SVUS1329-1330.



2. Documents pertaining to installation, maintenance, preservation, destruction, loss, custody, or right to access the recordings (*id.* at p. 3)
3. Video, audio, or text postings or broadcasts on the internet/social media by Guo, Guo Media, or any other entity owned by him, relevant to this case (id. at p. 4)
4. Documents reflecting communications between Guo and others relevant to this case (id.).

These materials should be produced in advance of his deposition, which should occur in October.

5. **Guo's asylum application is irrelevant to the scope of discovery.** Finally, Guo suggests for the first time that his asylum application is still pending, and that this Court should weigh this as a consideration regarding the allowable scope of discovery. Guo's legal status is not a proper basis for limiting discovery under Rule 26. If Guo's asylum application is indeed still pending, we can only assume it is being considered on its merits by officials with substantial expertise who have access to far more information than Strategic Vision could ever obtain. They have access to Guo himself and to all of the information Strategic Vision has found in the public domain—some of it, like his August 2017 pledge of loyalty to Xi Jinping, placed there by Guo himself. The progress of the asylum proceeding is known only to Guo. Whenever it concludes, this case can have no effect on that proceeding, and vice versa. Still, if Guo has relevant information that he believes would damage his asylum case, the remedy is to invoke the confidentiality provisions of the protective order and then later, in an orderly fashion, to obtain a judicial determination about whether it may be kept confidential under the relevant body of law, which balances the risk of injury to the disclosing party against citizens' First Amendment and common law rights to the courts.

The remedy is not to recklessly accuse Strategic Vision of trying to "harm" Guo's application, and then use that charge to stop discovery. Indeed, it is highly improper for Guo or any other asylum applicant to seek some sort of quasi-immunity from United States courts, particularly when Guo caused Eastern Profit to file this lawsuit in the first place. This Court should disregard Guo's "asylum" argument and focus instead on the merits of the parties' positions under Rule 26.

We look forward to receiving the Court's decision on these matters.

Respectfully submitted,

*[signature]*

Edward D. Greim

cc: Counsel of record via ECF