

Edward D. Greim
Direct Dial: (816) 256-4144
edgreim@gravesgarrett.com

October 16, 2019

<u>VIA ECF</u>
Hon. Debra Freeman
Daniel Patrick Moynihan
United States Courthouse
Courtroom 17A
500 Pearl Street
New York, New York 10007

Re:   Eastern Profit Corp. Ltd. v. Strategic Vision US, LLC, Case No. 18-cv-2185 (JGK)-DCF
      Golden Spring Subpoena

Dear Judge Freeman:

On behalf of Defendant/Counterclaimant Strategic Vision US, LLC ("Strategic Vision"), we write to request that Karen Maistrello ("Maistrello") be held in contempt pursuant to Fed. R. Civ. P. 45(g), which provides that "[t]he court for the district where compliance is required … may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it." In addition, the Court should grant Strategic Vision's October 4, 2019 request, ECF 166, for legal fees from Maistrello, and order the other remedial relief outlined below.

## Background

Maistrello has disobeyed this Court's September 18, 2019 order that she produce critical records about her decision to resign as a director of ACA Capital Group Limited ("ACA") less than 24 hours before she was served with a discovery subpoena to the entity. Maistrello has refused to produce the subject emails, which she described (and claimed to have found and to possess) in her August 23, 2019 deposition. She now claims through counsel that they are no longer in her "possession, custody, and control," or never existed in the first place. Her attorneys' recent representations about Maistrello's supposedly "refreshed recollection" contradict multiple portions of Maistrello's sworn testimony from August 23rd, when she was only a few weeks removed from the relevant events and she did not testify that her memory needed any refreshing. Indeed, she expressed no doubts about having searched for and found several emails, which were immediately requested on the record (and then many times thereafter). In short, Maistrello's "refreshed recollection" as conveyed by her counsel directly contradicts her sworn deposition testimony.

More fundamentally, the failure to produce the emails that initiated and ended the resignation communications (assuming against the record evidence and logic that there really are no emails—more on that below) means that one of two alternative things are true. First, the absence of emails may mean there were no *Maistrello* communications at all expressing her desire and decision to resign. The first existing email that we have seen has William Je, an apparent ACA insider, emailing

1



Maistrello that "as requested," he was sending her a "sample" resignation. (See Ex. A hereto)  In the only other existing email, Maistrello responds a mere 3 minutes later with a signed resignation. (See Ex. A hereto.)  Under this alternative, the reason Maistrello doesn't "have" the opening email (i.e. the request) is because *someone else, not Maistrello,* decided to have Maistrello resign, and contacted William Je, an ACA insider, to request that he send her a form resignation letter. Similarly, there is no "acceptance" email because,  after she had emailed it, ACA never accepted or processed her resignation. Second, and alternatively, these opening and closing communications between Maistrello and Je *did* occur, but they were in person or over the phone. Importantly, option "2" would contradict yet other sworn testimony of Maistrello that she had few meetings or calls with Je, that they were not recent, and that nothing of substance was ever discussed. (See Ex. B hereto, portions of Maistrello's deposition testimony, at 39:8-43:8, 27:3-30:18, 32:4-33:11, 37:13-19)  She would need to have utterly forgotten extremely consequential communications from just a few weeks before giving her testimony. Yet counsel now rather nonchalantly "testifies" for Maistrello that this is just what happened. Counsel's unsworn "replacement" testimony for Maistrello seems highly unlikely. Je is normally found in Hong Kong or London, and the witness had already testified that in-person and phone communications with him since she became a director were both rare and non-substantive. (See Ex. B at 39:8-43:8)  If Maistrello's story about the purported resignation has now changed, it calls into question whether Maistrello—still listed as a director in ACA's official Hong Kong records—effectively resigned at all. (See Ex. 6 to Maistrello Depo., attached here as Ex. C, showing Maistrello as director of ACA as of Aug. 2019)

There is one other development. Maistrello's production last week, on Monday, October 7, shows that Maistrello was communicating with William Je from her email account at Golden Spring (New York) Limited ("GSNY")—not from Google, as Maistrello's counsel represented during at least one of the parties' meet-and-confer discussions about this issue and apparently believed even after making last week's production. (See Ex. D, Oct. 7th correspondence from Maistrello's counsel and the production)  This is not surprising, since it is GSNY's General Counsel (and also Guo Wengui's attorney) Daniel Podhaskie who first approached Maistrello to tell her she would be served with the subpoenas, and to tell her "something about ACA" that caused her to resign. (See Ex. E, Maistrello testimony, at 57:3-60:11,[1] 61:13-73:19)  Perhaps Maistrello and Je connected shortly after Podhaskie warned Maistrello about the subpoenas. At any rate, GSNY is the attorney-in-fact for a litigant in this case; it actually controls Eastern Profit's litigation of the case and should have all of the duties of a litigant. The same counsel represent GSNY and Maistrello. Thus, GSNY should have preserved—and should still be preserving—those emails. That duty arose no later than the dispute over Maistrello's resignation and service on August 14, and certainly by her August 23 deposition. Fed. R. Civ. P. 37(e).

Given GSNY's control of Maistrello and discovery, it should never have fallen to Maistrello to look through her own emails herself. Now, GSNY/Maistrello's counsel will not say when Maistrello went back to her email to re-locate the emails to which she had originally testified; how she searched; or when and how the relevant emails were delivered to counsel. And GSNY flatly refuses to search its own servers for the emails, which Maistrello sent and received from her GSNY account while at work. (See Ex. F, Oct. 11, 2019 communications from Maistrello's counsel)

---

[1]    "Q. What did you do after you were served with this subpoena?  MS. TESKE: Object if the form.  You can answer it.  A. I gave it to our lawyer.  Q. Who was that?  A. Daniel Podhaskie."



If the documents will not be produced by Maistrello and GSNY will not assist, this Court should order the responsive information to be produced through alternative means, as follows:

1. Directing GSNY to search its own email server and produce any remnants of the emails and attachments in native format (since Maistrello was emailing Je about her resignation from her GSNY account during work hours), as well as any other emails from other GSNY employees or representatives regarding the ACA subpoenas and her resignation;

2. Directing Maistrello to reappear for deposition on (i) the question of her communications since July 23, 2019 with William Je and any GSNY employee, including but not limited to Guo and GSNY in-house Daniel Podhaskie, about the subpoenas, ACA, her directorship and resignation, and her email records; and (ii) her pre- and post-deposition email searches; and

3. Directing Daniel Podhaskie to appear and testify regarding his communications with any other person regarding the ACA subpoena and Maistrello resignation, pursuant to Rule 45(e)(1)(D) ("The court may specify conditions for the discovery.").

## Argument

### I.     Maistrello testified on August 23 that the July 26 emails existed.

As the Court will recall, Maistrello's resignation occurred in the short, 72-hour window between the service of the notice of the ACA subpoena to counsel for Eastern Profit (the subpoena to be served, as indicated in the notice, on Maistrello as ACA's director) and personal delivery of the subpoena to Maistrello. Through counsel, Maistrello has contended that at the time she was served with the ACA subpoena, she was no longer a director of the entity (having resigned just hours before) and therefore could not validly accept service for ACA.[2]  Unable to identify any other ACA representatives within the subpoena power of the Court, Strategic Vision could not obtain discovery from ACA—it has evaded discovery[3]—even though: (i) ACA is the entity that wired Strategic Vision $1 million purportedly to make Eastern Profit's contractual deposit; (ii) the loan "document" memorializing the ACA-Eastern Profit loan was produced late in discovery in questionable circumstances; (iii) Eastern Profit's corporate representative could not testify about the loan; and (iv) the loan document bears the signature of a person who is Guo's cook and bodyguard.

Strategic Vision was troubled by the timing of Maistrello's resignation because of its appearance of bad faith and its adverse effect on Strategic Vision's discovery efforts. Given the unusual circumstances surrounding the resignation, the Court agreed with Strategic Vision that Maistrello

---

[2]      Maistrello's counsel, Hodgson Russ, argued in an August 9, 2019 objection letter (Ex. G hereto) that Maistrello could not accept service of a subpoena on ACA because she was no longer a director of the organization. In the same letter, Hodgson Russ also indicated Maistrello would not appear to give testimony in her personal capacity, despite effective service of a subpoena on her personally.  The Court overruled that position, and Maistrello was deposed on August 23, 2019.

[3]      Maistrello's counsel, who also represents Guo and Golden Spring, recently illustrated how ACA is outside of the reach of discovery in this case: "We do not represent ACA.  We will not waste any more time running down answers to assuage your curiosity."  (See Ex. F, Oct. 11th communications)



should be deposed, including about the circumstances of her resignation, overruling Maistrello's objections against the deposition and the production of certain documents described in the subpoena.

At the August 23rd deposition, Maistrello testified to having personally searched for relevant emails, and that she had located and reviewed (1) her initial email to William Je (an ACA insider) to the effect that she wanted to resign, and (2) Je's supposed confirmation that he had accepted her resignation:

> 9 Now, is it your testimony that *Mr. Je*
> *10 responded and said that he accepted it?*
> *11 A. Yes.*
> *12 Q. Okay. Did you bring that email with*
> *13 you?*
> *14 A. I did not.*
> 15 Q. Okay. When did he -- *I'd ask you to*
> *16 produce that afterwards.*
> *17 A. Mm-hmm.*
> 18 Q. When did he send that to you?
> 19 A. I believe right afterwards.
> 20 Q. Did you understand that he was
> 21 expecting your email?
> 22 A. Yes.
> 23 Q. How did you understand that he was
> 24 expecting your email?
> *25 A. Before this email, I wrote an email*
> *1 saying that I would like to resign, so he was*
> *2 definitely expecting it.*
> 3 Q. When did you write that email?
> 4 A. On the same day, so July 26th.
> 5 Q. Okay. At what time?
> 6 A. I don't remember.
> *7 Q. Do you have a copy of that email still?*
> *8 A. I do.*
> *9 Q. I would like to ask that you produce*
> *10 that.*

(See Ex. H, portions of the Maistrello testimony, at 45:9-46:15)

## II.   Difficulty in obtaining the documents and enforcing this Court's prior order

Despite this clear testimony that the emails existed, Maistrello has never to this day produced emails matching this description. After numerous attempts to informally resolve the issue failed, the Court gave each side the opportunity to argue their positions, on Sept. 18th, and then ordered Maistrello to produce the emails reflecting her decision to resign from her directorship of ACA on the eve of the service of the subpoena to ACA. The discovery conference



ended with the order that Maistrello immediately produce the materials, even if not in native format. There was no confusion on what should be produced, and Maistrello's counsel never voiced a hint of concern that the materials did not, in fact, exist.

Even after that direct order on September 18th, however, Strategic Vision had to remind Maistrello's counsel about the emails—multiple times—to no avail. Maistrello's counsel did not even acknowledge these reminders, let alone comply with them (or the Court's order). On October 4th, Strategic Vision finally wrote the Court, surprised that the Court's order was being openly defied. Then, and only then, on October 7th, after the September 18th order of the Court and after an October 4th letter by Strategic Vision alerting the Court to Maistrello's defiance of that order, Maistrello produced four pages of information. None were the emails she had described on August 23rd.

The absurdity of this situation cannot be overstated. To get to this point, which still does not involve production of the subject emails, Strategic Vision:

- Requested the emails during Maistrello's deposition;
- Wrote Maistrello's counsel the same day as the deposition to describe the emails;[4]
- Repeatedly contacted Maistrello's counsel about the emails (see Ex. I);
- Wrote discovery letters to the Court about the emails;
- Argued in the September 18th discovery conference;
- Received the Court's order directing immediate production of the emails;
- Repeatedly reminded Maistrello's counsel of the need to comply with the order;
- Wrote the Court on Oct. 4th about Maistrello's defiance of the order; and
- Communicated repeatedly with Maistrello's counsel by telephone and written communication about the inadequate Oct. 7th production.

## III.   When, if Ever, Did the Emails Fall Out of Maistrello's "Possession, Custody, and Control?"

Despite the myriad of contacts by Strategic Vision from August 23 to October 7th, and the September 18th discovery conference itself, Maistrello's counsel never took the position she is now taking—that Maistrello no longer has (or perhaps never had?) possession of the emails:[5] "Ms. Maistrello has searched her emails and produced all emails responsive to your request"; she has produced everything in her "possession, custody, and control."

It defies rational belief that this is the case. If it were true, why did Maistrello's counsel not simply disclose that important information at any one of the earlier points when this issue was addressed? There were half a dozen chances for Maistrello to set the record straight that she was the

---

[4]      "Erin:  This will confirm that we are asking Ms. Maistrello to produce **the entire set of communications with Mr. Je (or anyone else, if undisclosed) regarding her purported resignation** or about her deposition today. We would like the emails and docs (including the Word doc that the witness testified Je had drafted) in native format. Thank you."  (emphasis added)

[5]      Maistrello's counsel refused to describe when Maistrello had conducted this search, except to say the obvious (that it was after the deposition), or details of how the search was conducted.  (See Ex. F, communications from Maistrello's counsel)



wrong source to produce the emails. As just one example, it was with less than candor that Maistrello's counsel participated in the September 18th conference, which was predicated on the existence of the emails. The Court wasted time and resources considering and then ordering production from a person who now says she cannot make the production. Why has Maistrello never moved to set aside the Court's order or for relief from it on the basis that it is impossible to comply with? Maistrello and her counsel have repeatedly led the Court and Strategic Vision along a wrong path by failing to disclose their position that the emails are no longer (or never were?) available from Maistrello.

Yet this is only the first problem. Consider Maistrello's new "testimony" through counsel: "Maistrello's refreshed recollection and understanding having conducted a search for additional emails is that communications with Mr. Je, if any, concerning her resignation, other than those provided to you, took place in person or over the phone." If Maistrello testified falsely about the existence of the emails (*i.e.*, they were never sent), *it does not necessarily follow* that the initial outreach regarding Maistrello's desire to resign, and the book-ending acceptance of her resignation by ACA, occurred in-person or via phone. As an initial matter, why the uncertainty for such a substantial and recent communication with a man who is normally in Hong Kong or London? If in-person, why were there any emails at all? Alternatively, why did the parties abruptly switch to oral communication if the purpose was to document a resignation?

More fundamentally, as noted above, the "switched to verbal" version of events would also contradict Maistrello's other testimony that her phone and in-person contacts with Je were limited and of no substance. (See Ex. B at 39:8-43:8, 42:7-9)  Maistrello didn't remember these alleged meetings "or" phone conversations that had occurred just a few weeks previously.

For all of these reasons, an entirely different explanation is just as likely as—if not more likely than—the story in counsel's letter. Someone else emailed or contacted William Je to prepare Maistrello's resignation. (Indeed, Maistrello's counsel tries to cover this possibility, using the formulation, "[additional] communications with Mr. Je, *if any...*") (emphasis added). Recall that it was GSNY's counsel, Daniel Podhaskie, who came to Maistrello at the GSNY office to warn her about the subpoenas and tell her there was something bad coming—the witness would not say what—about ACA. (See Ex. E)  Further, in the earlier of the two produced emails, Je does not tell Maistrello that he is providing a sample resignation at "her" request; he simply says, "as requested." (See Ex. A) Next, with respect to the missing "acceptance" email, why should we conclude from the absence of an email that Je called Maistrello from wherever in the world he was at 3:30 PM ET to orally convey his acceptance? What if he didn't respond at all? Perhaps her resignation was never accepted, which would explain why ACA's official records in Hong Kong still show Maistrello as a director. (See Ex. C, Ex. 6 to Maistrello Depo.)

To be sure, it is far from clear that the emails do not, in fact, exist. Only Maistrello is reported to have searched for them; counsel will provide no explanation of when or how the search was conducted; and GSNY won't search its own server, which held the emails.  (See Ex. F)  But if indeed it is true that they don't exist, then any number of questions naturally arise. Maistrello should testify under oath— we should not have to accept counsel's carefully-constructed and non-committal "testimonial revisions"



by letter. Either way, Maistrello is in contempt of Court for not producing the emails and for belatedly claiming that they may never have existed, and should be so designated by the Court.

## IV.    Maistrello Alludes to the Purpose of the Resignation as to Avoid a Deposition

As explained above, the trouble began with Maistrello's abrupt resignation after she learned of the subpoenas. The following excerpt from Maistrello's testimony supports the idea that Maistrello resigned for the strategic purpose of trying to protect herself from something happening to ACA but that, ultimately, Maistrello "was here" for the deposition despite her resignation:

Q. And so, my question is, why did you
18 think that resigning as a director of ACA would
19 accomplish that goal?
20 MS. TESKE: Object to the form.
21 You can answer.
22 A. Let's put it this way. You are part of
23 a company or you work in a store. There are things
24 in the store that you don't want to get involved
25 with. You resign. You're not part of it any more.
1 Q. What are the things that you don't want
2 to be involved in?
3 MS. TESKE: Object to the form.
4 You can answer.
5 A. I don't know.
6 Q. But whatever they were, they were
7 serious enough for you to resign from ACA?
8 MS. TESKE: Object to the form.
9 You can answer.
10 MR. GRENDI: Object to the form.
11 A. I don't know.
12 Q. You just testified a second ago that
13 you trusted Mr. Je because you shared a mission of
14 making China a better place, right?
15 A. That's correct.
16 Q. And is that the mission you thought ACA
17 had?
18 A. No. I trust him as a person as I know
19 that he shares the same idea about the Communist
20 Party and how bad they are. I am not talking about
21 ACA or any other thing. I was talking specifically
22 about him as a person.
23 Q. So what is the thing you were trying to
24 keep from getting involved in by resigning as a
25 director?
1 MS. TESKE: Object to the form.
2 You can answer.

1100 Main Street, Suite 2700   Kansas City, MO 64105   ph 816.256.3181   www.gravesgarrett.com



3 A. I don't know. I don't know
4 specifically what's going on here with these -- with
5 any company. I just feel that I don't want to be
6 involved in something that does not belong to me.
7 Q. What did you learn that made you decide
8 that you did not want to be involved in ACA as of
9 July 26th?
10 MS. TESKE: Object to the form.
11 You can answer.
12 A. Really nothing.
13 Q. Was it something Mr. Podhaskie told
14 you?
15 MS. TESKE: Object to the form,
16 and -- object to the form.
17 You can answer without giving away
18 any substance of communications.
19 A. Yes.
20 Q. So it's something Mr. Podhaskie told
21 you but you can't tell us what that thing is; is that
22 your testimony today?
23 MS. TESKE: Because I'm directing
24 her not to.
        25 MR. GREIM: Well, okay. So you're
1 directing her not to tell me what the
2 thing ACA was involved in that she wanted
3 to get out of.
4 MS. TESKE: I am directing her not
5 to discuss her communications with Dan
6 Podhaskie with you.
7 MR. GREIM: Okay. That's -- okay,
        8 fair enough.
Q. *Let me ask you this. Has your*
10 *resignation been effective in keeping you from being*
11 *involved in that thing that you did not want to be*
12 *involved in?*
13 MS. TESKE: Object to the form.
14 MR. GRENDI: Object to the form.
15 *A. I don't know. Meaning, I'm here*
16 *wasting my time about something I have no idea what*
17 *it is about, so I don't know.*

(See Ex. J, portions of the Maistrello testimony)

Despite several instructions not to answer, and a seeming loss of memory about the ACA "thing" she had just recently resigned to avoid, Maistrello's testimony strongly suggests that the subpoena

8



triggered her resignation. In her discussions with GSNY counsel (Mr. Podhaskie) and perhaps others who disclosed to her that she would soon be served, Maistrello likely received the misimpression that she could avoid being "here" (that is, at the deposition) by resigning as a director of ACA. To Maistrello's evident frustration, it didn't work, because she still was deposed. Her testimony is as close as a carefully-instructed witness, subject to multiple instructions not to answer, can come to that admission.

Given the fact that Maistrello's resignation was prompted by Podhaskie's approach to her after he learned ACA would be served through her, GSNY's search of its own email servers for the missing emails, including any other emails discussing the ACA subpoena and Maistrello's resignation, will likely yield responsive information. Further, Mr. Podhaskie himself should provide a complete recounting under oath of his and his coworkers' actions once they learned that service on Maistrello was imminent.

Conclusion

This combination of conduct before and after Maistrello's deposition, not only by Maistrello herself but also by GSNY and others, supports sanctions under Rule 45. Strategic Vision seeks an order awarding the following relief:

1.  Directing Golden Spring (New York) ("GSNY") to search its own email server and produce any remnants of the emails and attachments in native format (since Maistrello was emailing Je about her resignation from her GSNY account during work hours), as well as any other emails from other GSNY employees regarding the ACA subpoenas and her resignation;

2.  Directing Maistrello to reappear for deposition, which was held open (Ex. H, p. 103) on (i) the question of her communications since July 23, 2019 with William Je and any GSNY employee, including but not limited to Guo and GSNY in-house Daniel Podhaskie, about the subpoenas, ACA, her directorship and resignation, and her email records; and (ii) her pre- and post-deposition email searches; and

3.  Directing Daniel Podhaskie to appear and testify regarding his communications with any other person regarding the ACA subpoena and Maistrello resignation, pursuant to Rule 45(e)(1)(D) ("The court may specify conditions for the discovery.").

Strategic Vision also seeks its fees and costs in (1) attempting to obtain the Maistrello emails; and (2) seeking relief from the Court.

Respectfully submitted,

Edward D. Greim
Attorneys for Defendant/Counterclaimant