# EX. E

Atkinson-Baker, Inc.
www.depo.com

## Page 54

```
1    A.   I have not.                              12:51
2    Q.   So sitting here today, you can't tell
3  us anything about Eastern Profit; is that correct?
4    A.   That's correct.
5    Q.   You don't know what it does?
6    A.   I have no idea.
7    Q.   Did you realize that we're here in the
8  case of Eastern Profit versus Strategic Vision?
9         MS. TESKE:  Object to the form.
10        You can answer.
11   A.   Yes, I did.
12   Q.   So other than hearing that it's in the
13 title of the case, you've never heard of Eastern
14 Profit?
15   A.   I have not.                              12:51
16   Q.   Have you ever heard of Strategic
17 Vision?
18   A.   I have not.
19   Q.   And you understand it's in the title of
20 the case that we're here under, correct?
21   A.   That's correct.
22   Q.   So you've never spoken to Yvette Wang
23 about Strategic Vision?
24   A.   No, I have not.
25   Q.   You've never spoken to Yvette Wang
```

## Page 55

```
1  about Eastern Profit?                           12:52
2    A.   No, I have not.
3         (Whereupon, Maistrello Exhibit 3,
4  subpoena issued to ACA Capital Group Limited,
5  is marked for identification, as of this
6  date.)
7         (Whereupon, Maistrello Exhibit 4,
8  subpoena issued to Karin Maistrello, is marked
9  for identification, as of this date.)
10   Q.   I'm going to hand you what we're
11 marking as Exhibits 3 and 4.
12        Please take a look at Exhibit 3.
13   A.   Which one is that?
14        MR. GRENDI:  Which one is that,
15 they look the same.                              12:54
16        MR. GREIM:  They're not.  You'll
17 see it's a bit different.
18        MS. TESKE:  Which one is 3?
19        MR. GREIM:  Exhibit 3 is the ACA.
20        MS. TESKE:  Thank you.
21   Q.   So do you see that Exhibit 3 is a
22 subpoena to ACA Capital Group Limited?
23   A.   Mm-hmm, yes.
24   Q.   By the way, is ACA Capital Group
25 Limited the official name of the entity of which you
```

## Page 56

```
1  are a director?                                 12:54
2         MS. TESKE:  Object to the form.
3    A.   Can you please ask it again.
4    Q.   Is ACA Capital Group Limited the
5  official name of the entity of which you are a
6  director?
7         MS. TESKE:  Same objection.
8         You can answer.
9    A.   I am not sure.
10   Q.   So you'll see the first two pages are a
11 notice of subpoena.
12   A.   Mm-hmm.
13   Q.   If you turn to page 3, you'll see the
14 subpoena itself.  Do you see that?
15   A.   I do.                                    12:55
16        MS. TESKE:  Object to the form.
17        You can answer.
18   Q.   And do you see about a quarter of the
19 way down it says "To"?
20   A.   Yes.
21   Q.   Okay.  And what does it say on that
22 line, could you read that, please?
23   A.   "ACA Capital Group Limited to be served
24 to its director, Karin Maistrello 17 Gifford
25 Apartment 5F, Jersey City, New Jersey, 07304."
```

## Page 57

```
1    Q.   Is that your address?                    12:55
2    A.   It is.
3    Q.   And were you served with this subpoena
4  at that address?
5         MS. TESKE:  Object to the form.
6         You can answer.
7    A.   Yes.
8    Q.   What did you do after you were served
9  with this subpoena?
10        MS. TESKE:  Object if the form.
11        You can answer it.
12   A.   I gave it to our lawyer.
13   Q.   And was that Ms. Teske sitting here
14 next to you?
15   A.   It was not.                              12:56
16   Q.   Who was that?
17   A.   Daniel Podhaskie.
18   Q.   When you say "our lawyer," do you mean
19 Golden Spring's lawyer?
20   A.   Golden Spring's lawyer.
21   Q.   Now, don't -- I'm not going to ask you
22 for the content of your discussion.  My only question
23 is, did you ask Mr. Podhaskie for legal advice?
24   A.   I asked him --
25        MS. TESKE:  No.  Whoa, whoa, whoa,
```

15 (Pages 54 to 57)

Atkinson-Baker, Inc.
www.depo.com

## Page 58

```
 1    whoa.                                    12:56
 2         MR. GRENDI: Object. Yes or no, yeah.
 3    Q.   Yes or no. It's a yes or no answer.
 4         MS. TESKE: If you thought you
 5    were seeking legal advice, say yes. If
 6    not, you can say no.
 7    A.   Then no.
 8    Q.   All right. Then what did you discuss
 9    with him?
10    A.   I asked him what should I do with
11    these.
12    Q.   And what did he say?
13         MS. TESKE: No, no, no, no, no.
14         MR. GRENDI: Yeah.
15         MS. TESKE: That sounds like --     12:57
16         MR. GRENDI: Misunderstanding.
17         MS. TESKE: No. That's sounds
18    like a misunderstanding, so I'm going to
19    direct the witness not to answer.
20         MR. GREIM: Okay.
21    Q.   What did you do with these after you
22    showed them to Mr. Podhaskie?
23    A.   Nothing.
24    Q.   I'm sorry. Did you give them to him or
25    did you keep them?
```

## Page 59

```
 1    A.   I gave them to him.                 12:57
 2    Q.   Did you keep a copy for yourself?
 3    A.   I did not.
 4    Q.   And just to be clear, let's also take a
 5    look at Exhibit 4. Do you recognize Exhibit 4?
 6    A.   I do not.
 7    Q.   Okay. You'll see that under where it
 8    says, "Please take notice," do you see that it says
 9    that "The defendant/counterclaim plaintiff shall
10    cause the attached subpoena directed to nonparty
11    Karin Maistrello to be served after service of this
12    notice." Do you see that?
13    A.   Yes, I do.
14    Q.   And then if you turn two pages, you see
15    a subpoena?                              12:58
16         MS. TESKE: Object to the form.
17    A.   Yes.
18    Q.   And do you see the "To" line?
19    A.   I see it.
20    Q.   Could you read who that's to?
21    A.   "Karin Maistrello, 17 Gifford Avenue,
22    Apartment 5F, Jersey City, New Jersey, 07304."
23    Q.   Is this the subpoena that did you
24    received?
25         MS. TESKE: Objection to form.
```

## Page 60

```
 1         You can answer.                     12:58
 2    A.   Yes. I believe so.
 3    Q.   So do you recall receiving two
 4    subpoenas, one for you, Karin Maistrello and the
 5    other for ACA to be served on you?
 6         MS. TESKE: Object to the form.
 7         You can answer.
 8    A.   Yes.
 9    Q.   And when you said that you gave them to
10    Mr. Podhaskie. Did you give him both subpoenas?
11    A.   Yes.
12    Q.   And you didn't keep a copy of either
13    subpoena, correct?
14    A.   Correct.
15    Q.   Did you -- you'll see that on the back  12:59
16    of the one that's addressed to you, this is
17    Exhibit 4, if you look, there's an Exhibit A. Do you
18    see it lists about eight different document items?
19    A.   Yes.
20    Q.   Did you take any steps to search for
21    these documents?
22         MS. TESKE: Object to the form.
23         You can answer.
24    A.   No.
25    Q.   Let me ask you this. When was the
```

## Page 61

```
 1    first time that you saw Exhibits 3 and 4.    01:00
 2         MS. TESKE: Object to the form.
 3    A.   I don't know. To be honest, when I
 4    received this, I didn't read them.
 5    Q.   Did you read them before you gave them
 6    to Mr. Podhaskie?
 7    A.   I did not.
 8    Q.   Had you seen Exhibits 3 and 4 before
 9    the time you were served with process at your house?
10         MS. TESKE: Object to the form.
11         You can answer.
12    A.   No.
13    Q.   Why did you choose to resign?
14         Well, let me strike that.
15         Why did you resign on July 26th, 2019?   01:01
16    A.   I heard from Daniel that something was
17    going on with ACA, something I --
18         MS. TESKE: Whoa, whoa, whoa,
19    whoa, whoa, whoa, whoa, whoa.
20         MR. GRENDI: Yeah.
21         MS. TESKE: Conversations between
22    you and Daniel are privileged and you are
23    directed not to answer with respect to
24    those conversations.
25         MR. GREIM: I would say this, if
```

16 (Pages 58 to 61)

Karin Maistrello
August 23, 2019

Atkinson-Baker, Inc.
www.depo.com

**Page 62**

```
 1     Mr. Podhaskie is giving legal advice,         01:01
 2   it's one thing. If Mr. Podhaskie is
 3   telling her that a subpoena is coming,
 4   that is entirely another thing.
 5     Q.  So I'm going to ask you --
 6         MS. TESKE: No. Well -- okay.
 7   You --
 8         MR. GREIM: I'll make my record --
 9         MS. TESKE: That's fine.
10         MR. GREIM: -- and you can listen
11   and you can...
12     Q.  So we'll take this in steps, okay?
13         MS. TESKE: Don't answer the
14   question.
15     Q.  Did Mr. Podhaskie -- I'm going to ask  01:01
16   you about things that Podhaskie told you, not about
17   advice he gave you, okay? There's a difference.
18         What did Mr. Podhaskie tell you was
19   going on with ACA?
20         MS. TESKE: Object to the form of
21   the question. Direct the witness not to
22   answer.
23         I need -- if you can be really
24   specific in what you're asking.
25         MR. GREIM: Okay.
```

**Page 63**

```
 1         MS. TESKE: And she can tell me      01:02
 2   and I can decide whether or not that's an
 3   attorney-client privileged communication.
 4         MR. GREIM: We'll see. We'll find
 5   a way.
 6     Q.  Let's be very careful here, okay. I
 7   don't want you to waive any privilege.
 8         When can was the discussion with
 9   Mr. Podhaskie that you were starting to tell us
10   about?
11     A.  I don't remember.
12     Q.  Was it on July 26th?
13     A.  I don't remember.
14     Q.  Was it on July 25th?
15     A.  I do not remember.                   01:02
16     Q.  Does Mr. Podhaskie -- did you
17   understand Mr. Podhaskie to be counsel to ACA?
18         MS. TESKE: Object to the form.
19         You can answer.
20     A.  No.
21     Q.  Did you ever ask Mr. Podhaskie for
22   legal advice relating to ACA?
23         MS. TESKE: Object to the form.
24         You can answer.
25     A.  No.
```

**Page 64**

```
 1     Q.  Did Mr. Podhaskie ever give you advice  01:03
 2   relating to ACA?
 3         MS. TESKE: Object to the form.
 4         You can answer.
 5     A.  No.
 6     Q.  What did Mr. Podhaskie tell you was
 7   going on with ACA?
 8         MS. TESKE: Object to the form.
 9         Direct you not to answer.
10         I need to know more about the
11   context in which this communication
12   happened before she can answer that
13   question.
14         MR. GREIM: Okay. We'll keep
15   going. We'll see, we'll pick around the    01:03
16   edges here.
17     Q.  Just go slowly, give your counsel a
18   chance to object if she wants to, okay?
19         Did Mr. Podhaskie -- when you spoke
20   with Mr. Podhaskie, was it over the phone or in
21   person?
22         MS. TESKE: You can answer.
23     A.  In person.
24     Q.  Where did the conversation take place?
25         MS. TESKE: You can answer.
```

**Page 65**

```
 1     A.  At our office.                       01:04
 2     Q.  What time of day was it?
 3     A.  I don't remember.
 4     Q.  Who else was present?
 5     A.  Just the two of us.
 6     Q.  Was Yvette Wang present?
 7     A.  She was not.
 8     Q.  Without getting into any legal
 9   advice, did Mr. Podhaskie tell you that he had spoken
10   with William Je?
11         MS. TESKE: Object to the form of
12   the question and direct the witness not
13   to answer.
14     Q.  Did Mr. Podhaskie -- okay.
15         Let me ask you this. At the end of   01:05
16   the conversation, did you tell Mr. Podhaskie that you
17   were going to resign as an ACA director?
18         MS. TESKE: Object to the form of
19   the question and direct the witness not
20   to answer.
21         MR. GREIM: The problem is that's
22   a yes or no answer.
23         MS. TESKE: But it's a yes or no
24   answer about what she told her company's
25   lawyer in a conversation where it was
```

17 (Pages 62 to 65)

Karin Maistrello
August 23, 2019

Atkinson-Baker, Inc.
www.depo.com

**Page 66**

just the two of them about an issue in which she may very well have been seeking legal advice whether or not, you know, she understands the scope of that or not, and she's a Golden Spring employee who went to the only attorney she knows, Golden Spring's attorney, to talk about a legal document and you want to inquire about those conversations. And I just can't give you a lot of leeway there.

MR. GREIM: But the problem is, though, that it's incumbent upon the attorney -- not every lawyer-client discussion is protected by the privilege, and if she's coming to him as the ACA director and he's not counsel for ACA --

MS. TESKE: It doesn't matter.

MR. GREIM: -- it's incumbent upon him to say I'm counsel for Golden Spring. But we don't need to do this on the record. I understand your objection.

Q. Let me ask you this. Did Mr. Podhaskie initiate the conversation or did you?

MS. TESKE: Object to the form. You can answer.

**Page 67**

A. I'm not clear about what conversation we're talking about.

Q. Okay. You began to tell us a few minutes ago that you heard from Daniel something was going on with ACA. That's the conversation I'm talking about.

So my question to you is, did you initiate that conversation or did Mr. Podhaskie?

MS. TESKE: Okay. Object and direct the witness not to answer, and I don't know that if that specific conversation was a follow-up on a previous conversation that they had, and I do not know enough to allow the witness -- again, we are talking about a Golden Spring's employee who went to the only attorney she knows, her Golden Spring's attorney, to talk about something related to a legal case or a legal document. I'm not going to allow the witness --

MR. GREIM: Actually, that was not the witness's testimony, but I will ask you that now.

Q. Did you go to Mr. Podhaskie to ask him

**Page 68**

about a legal document?

MS. TESKE: She's already testified that she did. She already testified that she brought these documents to him. I'm not going to allow the witness to divulge infor- --

MR. GREIM: That was the difficult conversation. That's the question. That's the key. That's when she handed him the documents. This conversation happened earlier, that's what I'm asking about.

Q. And so my --

MS. TESKE: We don't --

Q. My question is, in the conversation where you said you heard from Daniel something was going on with ACA -- let me ask you. That was not the conversation where you gave him these documents, was it?

A. It was not.

Q. So in the conversation where Daniel said something was going on with ACA, did you come -- did you start that conversation with Podhaskie and come to ask him a question or did Podhaskie come to you?

**Page 69**

MS. TESKE: Okay. Object. Direct the witness not to answer.

The only way I am going to get comfortable with the witness answering these questions is if I know more about what those conversations entailed, and I don't -- and that conversation can't happen on the record.

MR. GREIM: Okay.

MS. TESKE: I need to step out with the witness so I can understand the full scope of what is going on so I can --

MR. GREIM: Okay. Let's go ahead. Let's all refresh in our minds. You know what? Actually we will come back to it. We'll do that at the end with a bunch of other stuff. Okay, let's put a place mark on this and we'll come back to it.

BY MR. GREIM:

Q. But let me come back to my question, though, because I don't -- I think you began to answer it talking about this discussion, so now I'm just going to ask you, why did you decide to resign as a director of ACA on July 26th?

18 (Pages 66 to 69)

Karin Maistrello
August 23, 2019

Atkinson-Baker, Inc.
www.depo.com

**Page 70**

```
 1         MS. TESKE: And I'm going to              01:09
 2    caution you not to reveal any
 3    communications that you had with
 4    Mr. Podhaskie.
 5         A.   Can you repeat your question, please.
 6         Q.   Why did you decide to resign as an ACA
 7    director on July 26th?
 8         A.   I did not want to get involved in
 9    things that I'm not involved with.
10         Q.   What are those things?
11         A.   To be honest, I don't know.
12         Q.   Is it -- are you referring to this
13    case?
14         A.   I don't know anything about this case.
15    To be honest, I don't even know why I'm here. The  01:10
16    reason why I worked for this company, why I trust
17    William is because we share a mission. That's what
18    makes me trust him and that's probably why he trusts
19    me.
20              Anything else, what he does, who he is,
21    his family, I don't know. I don't care. We're
22    trying to work to make China a better place and
23    that's all that matters.
24         Q.   Why did you think that resigning from
25    ACA as a director would keep you from getting
```

**Page 71**

```
 1    involved in things that you don't want to be involved  01:11
 2    in?
 3         MS. TESKE: Object to the form.
 4         You can answer.
 5         A.   Can you repeat your question, please.
 6         MR. GREIM: I'll have the court
 7    reporter do that.
 8         (Whereupon, the record is read.)
 9         A.   I'm not sure I understand the question.
10         Q.   You told me a few minutes ago that you
11    resigned from ACA because you did not want to get
12    involved in things that you don't want to be involved
13    in. Do you remember that testimony?
14         MS. TESKE: Object to the form.
15         You can answer.                          01:11
16         A.   Yes.
17         Q.   And so, my question is, why did you
18    think that resigning as a director of ACA would
19    accomplish that goal?
20         MS. TESKE: Object to the form.
21         You can answer.
22         A.   Let's put it this way. You are part of
23    a company or you work in a store. There are things
24    in the store that you don't want to get involved
25    with. You resign. You're not part of it any more.
```

**Page 72**

```
 1         Q.   What are the things that you don't want  01:12
 2    to be involved in?
 3         MS. TESKE: Object to the form.
 4         You can answer.
 5         A.   I don't know.
 6         Q.   But whatever they were, they were
 7    serious enough for you to resign from ACA?
 8         MS. TESKE: Object to the form.
 9         You can answer.
10         MR. GRENDI: Object to the form.
11         A.   I don't know.
12         Q.   You just testified a second ago that
13    you trusted Mr. Je because you shared a mission of
14    making China a better place, right?
15         A.   That's correct.                      01:13
16         Q.   And is that the mission you thought ACA
17    had?
18         A.   No. I trust him as a person as I know
19    that he shares the same idea about the Communist
20    Party and how bad they are. I am not talking about
21    ACA or any other thing. I was talking specifically
22    about him as a person.
23         Q.   So what is the thing you were trying to
24    keep from getting involved in by resigning as a
25    director?
```

**Page 73**

```
 1         MS. TESKE: Object to the form.          01:13
 2         You can answer.
 3         A.   I don't know. I don't know
 4    specifically what's going on here with these -- with
 5    any company. I just feel that I don't want to be
 6    involved in something that does not belong to me.
 7         Q.   What did you learn that made you decide
 8    that you did not want to be involved in ACA as of
 9    July 26th?
10         MS. TESKE: Object to the form.
11         You can answer.
12         A.   Really nothing.
13         Q.   Was it something Mr. Podhaskie told
14    you?
15         MS. TESKE: Object to the form,          01:14
16    and -- object to the form.
17         You can answer without giving away
18    any substance of communications.
19         A.   Yes.
20         Q.   So it's something Mr. Podhaskie told
21    you but you can't tell us what that thing is; is that
22    your testimony today?
23         MS. TESKE: Because I'm directing
24    her not to.
25         MR. GREIM: Well, okay. So you're
```

19 (Pages 70 to 73)

Karin Maistrello
August 23, 2019