```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2

 3  ----------------------------------X
                                      :
 4  EASTERN PROFIT CORPORATION        :
       LIMITED,                       :
 5                                    : 18-CV-02185 (JGK)
                     Plaintiff,       :
 6              v.                    : September 18, 2019
                                      :
 7  STRATEGIC VISION US LLC,          : 500 Pearl Street
                                      : New York, New York
 8                   Defendant.       :
    ----------------------------------X
 9
            TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONE CONFERENCE
10             BEFORE THE HONORABLE DEBRA C. FREEMAN
                  UNITED STATES MAGISTRATE JUDGE
11

12  APPEARANCES:

13  For the Plaintiff:          ZACHARY GRENDI, ESQ.
                                Zeichner Ellman & Krause, LLP
14                              One Landmark Square
                                Stamford, Connecticut 06902
15
    For the Defendant:          EDWARD GREIM, ESQ.
16                              Graves Garrett LLC
                                1100 Main Street
17                              Kansas City, Missouri 64105

18                              ERIN TESKE, ESQ.
                                Hodgson Russ LLP
19                              605 Third Avenue
                                New York, New York 10158
20

21
    Court Transcriber:          SHARI RIEMER, CET-805
22                              TypeWrite Word Processing Service
                                211 N. Milton Road
23                              Saratoga Springs, New York 12866

24

25


    Proceedings recorded by electronic sound recording,
    transcript produced by transcription service
```

2

1    (CALL CUTS OUT WHEN ATTORNEYS/JUDGE SPEAK OVER EACH OTHER)

2              THE COURT:  This is Judge Freeman.

3              MR. GREIM:  Good afternoon.  You've got all three of

4    the attorneys here.  This is Eddie Greim for Strategic Vision,

5    defendant counterclaim plaintiff.  I'll let the other ones

6    introduce themselves.

7              MS. TESKE:  Good afternoon, Judge.  This is Erin

8    Teske from Hodgson Russ, and Mark Harmon may be joining me

9    although he's not here at the moment.

10             THE COURT:  And you're for?

11             MS. TESKE:  Representing the non party, Mr. Clark.

12             MR. GRENDI:  Zach Grendi for Eastern Profit,

13   Zeichner, Ellman & Krause.

14             THE COURT:  All right.  So the first order of

15   business seems to me is, Mr. Grendi, your status here and I

16   haven't seen a substitution.  I haven't seen a motion to

17   withdraw.  The whole idea was that I thought that was going to

18   happen prior to this call and we were going to have new

19   counsel on this call.  What's going on?

20             MR. GRENDI:  Yes, Your Honor.  I can only apologize

21   on behalf of my client.  It is my understanding, and I just

22   spoke to my client before the call, that another firm has been

23   selected.  The terms have been mentioned and negotiated as to

24   their arrangement, the financial side [inaudible] practice and

25   they will be executing something shortly [inaudible]

3

1   substituted on our behalf.

2          It's a matter that's out of my control but my

3   understanding is that it has been imminent [inaudible], Your

4   Honor.

5          THE COURT:  That's --

6          MR. GRENDI:  [Inaudible]

7          THE COURT:  That's what we thought last time and now

8   we have issues --

9          MR. GRENDI:  I know, Your Honor.

10         THE COURT:  -- that have been waiting to be resolved

11  and I don't know what to do with someone who says I don't have

12  authority to discuss these things or to represent the client

13  and you are nonetheless still counsel of record.  At some

14  point if there's no substitution, if you don't have authority

15  you're going to have to move for leave to withdraw.  That

16  would then trigger some actions by the court because if you've

17  got a corporate client, a corporate client can't proceed

18  without a lawyer.

19         MR. GRENDI:  I'm sorry.  Go ahead.  Obviously they

20  need representation.  That's why I understood that a new firm

21  is coming in.  What can I say, Your Honor?  I believe that

22  it's going to be any day now.  I've been monitoring the

23  situation and calling and trying to get information.

24         THE COURT:  Did you explain -- did you explain to

25  your client contact that there is a call today in which there

4

1   may be some issues raised in which it may have an interest and

2   that you are still its representative and may be called upon

3   to speak on its behalf?

4         MR. GRENDI:  I certainly explained to him that there

5   was a call today.  I do understand that my client has an

6   interest in this matter.  Obviously the third parties or non

7   parties are ably represented by counsel.  I don't think that

8   their position is too far afield from Eastern's position.  I'm

9   prepared to proceed, Your Honor.  What can I say?  I'm in a

10  difficult position and it should be resolved very much in the

11  near future and --

12        THE COURT:  I understand that you're in a difficult

13  position.  I just -- you haven't been relieved of counsel.  So

14  I understand that from where you sit it's a difficult position

15  but you are still counsel of record for this client at the

16  moment and unless we put this -- unless we put off these

17  issues to wait for a substitution which was supposedly

18  imminent before then you're kind of stuck with it I think.

19        MR. GRENDI:  I understand, Your Honor, and --

20        THE COURT:  I said last time that I didn't want to

21  discuss extensions of deadlines without having new counsel at

22  the table for that because I don't want to keep changing

23  dates.  Has new counsel surfaced at all even informally to

24  speak with opposing counsel about scheduling?

25        MR. GREIM:  Your Honor, this is Mr. Greim.  We've

5

1  heard from nobody other than Mr. Grendi and we just check with

2  him every couple of days to see what the status is.

3          THE COURT:  Okay.

4          MR. GRENDI:  Your Honor, I think at least clarify

5  that it is not -- I know there is a firm.  Its name is Pepper

6  Hamilton.  Like I said, my understanding is they're on the

7  cusp of being retained and substituting --

8          THE COURT:  Well, they're not going to get a longer

9  extension of time because they're waiting longer to show their

10  faces.  I mean --

11          MR. GRENDI:  I don't think, Your Honor, that that's

12  the intention or what they are trying to do here.  I really do

13  think it's just -- it has to do with their relationship with

14  my client and how they're hammering that out.  Again, I don't

15  know much about those things but I don't think the goal is to

16  buy more time by waiting to substitute.

17          Now, certainly --

18          THE COURT:  Whether it's the goal or not --

19          MR. GRENDI:  -- [inaudible] after this call.

20          THE COURT:  Whether it's the goal or not they should

21  be aware that there may be a consequence.  They may end up

22  with less time to get up to speed if they get into the case

23  later because if they had the opportunity to get in, if

24  they've been talking to the client, if they've had a chance to

25  be reviewing paper and all of that it may fall on deaf ears if

6

1   they come in and say they want a lengthy extension.  So please

2   pass that word along.

3           MR. GRENDI:  Thank you, Your Honor.

4           THE COURT:  Pass that word along that if they don't

5   come in soon what they're doing is they're sacrificing their -

6   - or potentially sacrificing their own getting up to speed

7   time once they're officially in the case because I'm assuming

8   they can start getting up to speed now.  They're in active

9   talks with the client.  They can be looking at files.  So I'm

10   not going to be too sympathetic if they say we don't know

11   anything yet.  So please pass that along.

12           MR. GRENDI:  I will convey that very --

13           THE COURT:  Maybe that will help -- maybe that will

14   help goose everybody to make this happen already.

15           So I also have these issues regarding third party

16   discovery.  There's a fair amount that's been said on this

17   subject in correspondence to me.  It seems to boil down to the

18   questions of should Mr. Guo come back for another day of

19   deposition in light of his having been instructed to or

20   refusing to answer a number of questions, are those questions

21   the sort of thing that are appropriate within the scope of

22   relevant discovery, should he have been answering these kind

23   of questions and appropriate follow up from them.  Those seem

24   to fall into certain categories, not all of which I can quite

25   get my arms around in terms of why it's relevant what we're

7

1  talking about exactly.

2         But I think there's probably enough to have him come

3  back but I'm fairly suspicious about a number of these

4  categories in terms of whether they've been shown to really

5  have bearing on a claim or defense that's been raised in the

6  case.  But why don't we take them in turn first with respect

7  to Mr. Guo's communications or negotiations with the Chinese

8  government.

9         It sounds like defendant is only looking for a

10 fairly narrow period of time before or during contract

11 negotiations.  Is that right?

12         MR. GREIM:  Your Honor, that's right.  We're looking

13 for -- what we've alleged are the things that we already have

14 found recordings about.  The first one is in March and then it

15 continues on through August and then from that point the

16 recordings stop but obviously we don't -- there could have

17 been other communications and just some questions about what

18 the communications hare been and when and how frequent.  We

19 may actually learn there's others.

20         THE COURT:  So where do these recordings come from?

21 How do you have these recordings?

22         MR. GREIM:  [Inaudible]  Your Honor, we found them

23 on YouTube.

24         THE COURT:  And these are recordings that seem to

25 show sympathy to the Chinese government?

8

1          MR. GREIM:  Yes.  I mean certainly more than

2    sympathy.  I'll tell you -- I'm just going to -- I wanted to

3    mention this before.  I'm having the same issue that we might

4    have had on the last call.  I'm just -- I can hear what you're

5    saying but I'm missing little parts of words here and there.

6    I just wanted to mention it.

7          But to go to your question yes, I mean the March

8    27th team call which we talked about in our counterclaim Guo

9    said he's back in New York.  The operation is one.  Then he

10   proceeds to criticize dissidents as being unpatriotic and says

11   he completely supports [inaudible].  So that's the March.

12         The May -- we have two different clicks and they are

13   communications with a high ranking CCP official.  He was

14   actually with Guo in his apartment in New York at the time and

15   we have transcribed those and translated them and sent them to

16   the other side.

17         Back in July, Your Honor, I sent these clips to

18   opposing counsel and said hey, rather than play these whole

19   things at a deposition I just want to send it to you now, just

20   let you know that we would like to ask your client to

21   authenticate these.  So they've got those and now we've

22   produced our transcription.

23         We recently found a third clip by the way of a

24   meeting.  There were a couple of different --

25         THE COURT:  Wait.  Hang on a second.

9

1          MR. GREIM:  -- [inaudible] same kind of [inaudible]

2    May of 2017.

3          THE COURT:  These were audio -- hold on a second.

4    These are audio recordings that were on YouTube and that were

5    not in English.  Is that right?

6          MR. GREIM:  That's right.  They're not in English.

7          THE COURT:  And they're audio -- there's audio that

8    you found on YouTube that's in -- is it Mandarin?  What's the

9    language?

10         MR. GREIM:  It is.

11         THE COURT:  It's in Mandarin, okay.

12         MR. GREIM:  So I'm told.

13         THE COURT:  So this has been now translated by

14   somebody who I assume is a certified translator and you

15   provided transcripts of audio recordings you found on YouTube

16   that you think were recorded by Mr. Gro himself.

17         MR. GREIM:  That's what we believe although my

18   questions about that -- that's where I begin to get some push

19   back.  We've also alleged that --

20         MS. TESKE:  Wait, sorry.  Eddie, are you saying that

21   you provided us with transcriptions of the recordings?

22         MR. GREIM:  I produced them in discovery.  I guess

23   it's possible that my discovery -- yes, I have not given the

24   transcriptions to -- I don't believe.  I'm looking over -- we

25   did not produce them to non parties but they were produced in

1  discovery quite some time ago and the links themselves was

2  sent to Guo's counsel back in July.

3          MS. TESKE:  We don't have those transcriptions.

4          MR. GREIM:  Okay.  I'm happy to -- I'm a little

5  surprised but I guess I can understand.  We just produced them

6  in discovery and we wouldn't have produced discovery to Guo

7  but I have no objection to doing it and I'm surprised --

8          MS. TESKE:  You just said you sent them to us so I

9  just want to make sure we're all being clear on the call.

10         MR. GREIM:  No, I don't think -- okay.  Well, I

11 apologize for any misunderstanding there but anyway we

12 produced them in discovery and I tried to ask Mr. Guo about

13 recordings.  I tried to lay the groundwork for his ability to

14 record conversations that happened in his apartment because

15 other conversations have come out as well.  We know that he

16 installed some microphones.  I think he said others were

17 already there.  We got a dispute about whether he actually can

18 or cannot access those.

19         So that's one reason why I asked him to bring to his

20 deposition [inaudible] subpoena because at the time it seemed

21 like we were able to cooperate in that way.  Any recordings he

22 had that were relevant to the case and -- so I think there may

23 well be the actual Guo recording version of these.  That's

24 probably longer.  We let *The Wall Street Journal* listen to

25 some of these.  *The Wall Street Journal* did an article about

1  them and the reporter say they were granted access to these
2  and Guo says he has other excerpts.
3        So we'd like to see them.  He's trying to negotiate
4  what he can say and not say, travel arrangements for his
5  family, you know, fines or penalties he may have to pay,
6  property he can keep.  These are seemingly relatively cordial
7  discussions.  So he's negotiating with him and then --
8        MS. TESKE:  Your Honor, I have -- can I just -- I
9  have to say that the portrayal of this conversation that is
10 being provided by Mr. Greim is night and day from the
11 portrayal that the *Washington Street* -- *The Wall Street*
12 *Journal* gave in its article about this.  What *The Wall Street*
13 *Journal* said after listening to the recordings was that the
14 CCP arrived at Mr. Guo's house and demanded that he stop doing
15 what he's doing in the U.S. and stop speaking out about the
16 CCP and that he return to China and that if he behaved well
17 that China will release his assets and not harm is family and
18 that he can return to China safely.
19       Then they left and then they returned back to his
20 apartment a second time and *The Wall Street Journal* said
21 that -- that Mr. Guo called the FBI to alert the FBI that they
22 would be returning and to please tell them to meet.
23       So the portrayal that Mr. Greim is giving is so
24 drastically different than what is actually in those
25 recordings.  This is why I have suspicions about everything

12

1  that comes out of Mr. Greim's mouth.

2          MR. GREIM:  Well, Your Honor, I guess I can say

3  this.  I don't know what portions of the transcripts *The Wall*

4  *Street Journal* listened to.  I really don't.  But I've read

5  the transcripts of these and I have for as long as I could

6  tried to listen to the tone of voice of these individuals as

7  they speak.

8          The other thing is, *The Wall Street Journal* reported

9  on probably what Guo told them about this.  There are other

10  circumstances that we've alleged in our complaint about this.

11  The point is I don't -- we are trying to -- we are trying to

12  get these authenticated and actually get the full recordings.

13  They clearly go to the question -- I mean if they are what Ms.

14  Teske represents and what she's saying *The Wall Street Journal*

15  reported then great.  Then that's what they establish but I

16  don't have to rove that they already show he's not a dissident

17  before I get to see the tapes.

18          MS. TESKE:  But you have to have some good faith

19  basis for believing that all of the facts that are supporting

20  Mr. Guo's status as a dissident, he's reporting the fact that

21  this is what the recordings say are not true.

22          MR. GREIM:  Well --

23          THE COURT:  Wait a minute.  I didn't -- hold on a

24  minute.  I didn't follow that.  Say that again.  I lost those

25  on the negatives and the positive on that sentence.

1          MS. TESKE:  Yeah, yeah, yeah.  Sorry, Your Honor.

2   We need some good faith basis for inquiring into the

3   recordings and if -- all of the publicly available information

4   states that the recordings do nothing but support Mr. Guo's

5   status as a dissident you have to have some good faith basis

6   for looking into this.  Otherwise you could look into

7   absolutely everything and not just here.

8          I mean I'm sorry but listening to the tone of

9   somebody speaking in Mandarin is -- and deciding that it's too

10  familiar or too friendly is such a stretch.

11         MR. GREIM:  Your Honor, I've got a transcription of

12  these two things.

13         THE COURT:  So tell me -- tell me what's in the

14  transcription.  What is -- what is said that is suspicious to

15  you?

16         MR. GREIM:  Frankly, Your Honor, it's going to take

17  me a second.  I don't have it in front of me.  For use in

18  discovery I've got them on my system here.  But what he's

19  generally doing is telling the -- I forget the name of the

20  official here.

21         You know what, before I start guessing at it, if --

22  if the Court actually wants to read the transcript and that's

23  going to become the basis of the ruling if you can give me a

24  little time maybe while we -- while I give you the rest of my

25  [inaudible], just give me a second --

1          THE COURT:  Let's do this.  Let's adjourn this call

2   for a minute or two.  Maybe more than a minute or two.  Find

3   it.  Produce a copy to Mr. Guo's counsel so they know what

4   you're talking about and then I have another call at 3:30.  So

5   as long as you call me back no later than a quarter to three

6   because I don't know if I'm going to need 45 minutes with you

7   but I certainly hope it's not more than that.  Give me a call

8   back.  All right?

9          MR. GREIM:  Your Honor, I do have one other -- we

10  have a couple of other issues on the call.

11         THE COURT:  I thought the main issue was whether Mr.

12  Guo's deposition should be continued and if so what kind of

13  questions are going to be fair game or categories of

14  questioning.

15         MR. GREIM:  That is the main question.  There are

16  two other questions.  One is going --

17         THE COURT:  Wait, wait, wait.  Wait a minute.  If

18  you are talking simultaneously I'm not going to be able to

19  hear either of you nor if this conference is ever transcribed

20  will it come out making sense.

21         MR. GREIM:  Okay.  Your Honor, I'm sorry.  If

22  somebody else is talking I guess maybe my own phone blocks it

23  out.  But Golden Spring is one outstanding issue.  And then

24  the final issue is these ACA Mistrello documents.  That's --

25  parties are also represented by Ms. Teske.  We let Golden

15

1   Spring on our last call back on August 21 -- 21st.  The

2   Mistrello document issue is new and it arose at the Mistrello

3   deposition.  I was hoping we could cover those issues here

4   today as well.  So I was just going to suggest that I could

5   maybe have somebody going to get those and even emailing them

6   and we might use a small window of time here just to switch

7   and change gears.  But we don't have to.  It was just a

8   suggestion.

9          THE COURT:  What is the issue about Mistrello

10  documents?

11         MR. GREIM:  Your Honor, you might recall that we

12  deposed Karen Mistrello for a short amount of time.  It's been

13  now several weeks ago.  I'd ask that she bring in native

14  format through her counsel, Erin Teske, any kind of

15  resignation that she supposedly sent in right before being

16  served as [inaudible] director.  The witness did bring a

17  printout of an electronically mailed resignation prior to the

18  deposition.  We marked it, brought an email that transmitted

19  it, printed off, and then we learned that there was an email

20  that responded to it allegedly and said this is accepted and

21  we heard that there were some emails before that that -- in

22  which she suggested resigning or said something about

23  resigning and then there was a back and forth at William Gee,

24  the man who seems to be affiliated with ACA.

25         So at the deposition I said I'd like to ask that

1    these be produced.  The parties have a dispute about whether

2    the witness did or have the authority to agree to make sure I

3    got those after the deposition and we dispute whether -- maybe

4    I understood Ms. Teske to say that email her and I would get

5    them.  I think her position is she said email me and then

6    we'll talk about it and it's -- the point is I'd like to get

7    those other resignation materials because I have severe doubts

8    about this resignation happened right before she was served

9    with process.

10        MS. TESKE:  Your Honor, I don't have Mistrello's

11   deposition transcript yet although Eddie, if you can get me a

12   copy I would appreciate it.  It's my understanding -- I just

13   remember Ms. Mistrello testifying that there was an email in

14   [inaudible] saying something along the lines of accepted.  I

15   don't remember a reference to any other email communication

16   that wasn't provided.  That email I'm happy to provide.

17        The email that we did provide has a date stamp on it

18   and I don't know what else is being requested.

19        MR. GREIM:  Your Honor, I followed up immediately

20   after deposition and I can't believe -- I've pasted the

21   section.  We talked about it.  I can't believe that Ms.

22   Mistrello's counsel doesn't have the transcript.  If not we'll

23   make sure we get at least a draft we have over.

24        But look, I don't want to make this too messy.  I

25   just thought I should have the communications that were the

17

1   resignation and I was told basically no --

2          THE COURT:  Have you conferred fully pointing out

3   the section in the deposition, pointing out the documents

4   you're talking about --

5          MR. GREIM:  Yes.

6          THE COURT:  -- and --

7          MS. TESKE:  No.

8          MR. GREIM:  Your Honor, we -- we have conferred

9   fully on this matter.  I asked several -- over a two week

10  period I asked repeatedly for these.  At the end of two weeks

11  I was told no, we never agreed to do this.  We then conferred

12  on the telephone about it.  We exchanged a section of the

13  transcript.  I am willing to agree that I was only told to

14  send an email to opposing counsel.

15         THE COURT:  I'm sorry.  You exchanged a section of

16  the transcript?  What does that mean?

17         MR. GREIM:  The section in the transcript where I

18  asked can I please -- can I please have these other emails

19  that weren't produced.  And frankly I left that day thinking

20  okay, I'll send an email.  I'll just remind opposing counsel

21  that this is what we're asking for and I thought I would get

22  them and two weeks into it after I emailed about I'd say three

23  times with no response I get a response saying we never agreed

24  to do this and I said well, let's talk about it and we did

25  talk about it.

1          Look, I'm not going to stand on -- I don't want to

2    get into a fight about whether I misunderstood, maybe inviting

3    me to email, it might just be inviting me to talk about it

4    offline.  That's fine.  That's fair.  My [inaudible] point is

5    though that the witness can't just produce a printout of the

6    resignation itself and not be communications on either side of

7    it and I did ask for them in native format.  So you can see

8    that they really send an email then.  I think it's a pretty

9    simple request.  It's not burdensome.  I've been told

10   unequivocally no.  It sounds like I just heard yes on part of

11   it which comes as a shock.

12          MS. TESKE:  I will produce an email where he

13   responds accepted if that is a request that is now being

14   asked.  I don't recall that specific request in the

15   transcript.  What I said that he did not produce are the

16   native files because the emails were Bates stamped and she's a

17   non party that had absolutely nothing of substance to say it

18   was relevant to this case.

19          MR. GREIM:  Your Honor, I've got to tell you.  This

20   -- there's no question that this was asked for.  I was told

21   unequivocally no on the phone.  I asked for native files

22   because there were -- there were emails -- the witness

23   testified on either side of this resignation that she sent.

24   It sounds to me like there might be a total of two or three

25   additional emails and I simply want them in native format.  I

19

1   don't -- a link, you can even send me a disk.  I mean I really

2   thought I would get them the next day.  I don't know.  I don't

3   know what really --

4           THE COURT:  What is the information -- what is the

5   information you want to be able to see by having it in native

6   format?

7           MR. GREIM:  I want to be able to see when the emails

8   were actually sent.

9           THE COURT:  Don't emails when they're printed out

10  have the -- generally have a time on them?

11          MR. GREIM:  Well, they do but the reason parties

12  produce things in native format is that frankly that's not

13  always what the original emails said and especially here where

14  she's emailing --

15          THE COURT:  Listen, listen, listen.  I said this

16  last time.  I'm going to say it again.  You seem to be

17  operating from the point of view of I have a lot of suspicions

18  about everything.  I'm just a very suspicious person and

19  everything that I see makes me wonder if there's something

20  else and makes me think there's something under the surface

21  that I'm not seeing and I have to keep digging because I am

22  really suspicious.  Okay.  You have an issue of timing.  But

23  you have a non party.  You get the emails.

24          I'm going to tell counsel for the witness if there

25  are a string of emails that relate to the resignation, if

20

1   there's any back and forth about it at all, if it goes back in

2   time where it was being considered at an earlier time which it

3   sorts of [inaudible] suspicion anyway, produce more than just

4   the one -- the one resignation letter.  Produce the emails and

5   on the emails that are produced in whatever format they're

6   produced whether they're in paper format or electronic format

7   make sure they show the times and dates, dates and times when

8   they were sent.

9           I'm not going to assume that the documents have been

10  doctored and that the dates and times are not really when they

11  were sent.  Get that produced in some kind of form that shows

12  date and time.  All right?  Let's move on.

13          MS. TESKE:  Okay.

14          MR. GREIM:  Your Honor, that just leaves Golden

15  Spring and Guo and maybe this is now a good -- maybe we should

16  go ahead and take our short break and we'll --

17          THE COURT:  Take the break because with respect to

18  Mr. Guo you've got a number of categories of topics.  One of

19  them has to do clearly with these recordings and I'm hearing a

20  flat out contradiction as to the content of the recordings of

21  which you are aware and if you're relying on the content to

22  open the door to these kinds of questions I should at least

23  give the other side an opportunity to tell me whether you're

24  accurately or not accurately conveying what the content it.

25          So I'll wait for a call back.

1          MR. GREIM:  Okay, Your Honor.

2          THE COURT:  Thank you all.

3                    [Off the record.]

4          THE COURT:  Hello again.  It's Judge Freeman.  Do I

5    have everyone on the call I had before?

6          MR. GREIM:  I believe so.  This is Mr. Greim.

7          MR. GRENDI:  Mr. Grendi.

8          MS. TESKE:  Erin Teske's on the line.

9          THE COURT:  So what have you learned?

10         MR. GREIM:  Well, Your Honor, I hadn't read this

11   transcript for quite some time.  So I finally stopped.  I've

12   got about 20 references I could run through that show Mr. Guo

13   and Mr. Lui Yan Pen [Ph.] negotiating Guo's property.  We've

14   got references to prior discussions in which Guo made promises

15   about which officials he would talk to.  We've got Guo making

16   promises about what he'll say and ultimately saying he

17   supports President Xi.  So we could go line by line but I --

18   we've got I mean over two hours worth transcribed here of

19   discussions with Lui Yan Pen.  Guo tells Lui that he is

20   telling the Americans about their movements.  Lui reports on

21   plans that the delegation had for meeting with President

22   Trump.  Not this delegation but a forthcoming delegation.

23         These are very high level officials and they're

24   exchanging very sensitive information.  If this isn't relevant

25   to showing that Mr. Guo is working with the officials, with

1 the Chinese CCP officials and PRC and not a dissident then I

2 don't know what else is.  I'm curious -- I'd like to get the

3 full recording if this isn't it.

4       MS. TESKE:  Your Honor, I still haven't heard any

5 statement.  I don't even know what to say to that because I

6 still am not sure what Mr. Greim is referring to.  If he could

7 pick out statements in the recordings -- could I also say that

8 irrespective of what we say on this call I really think Your

9 Honor should read the transcription because it's a little bit

10 difficult to pick out pieces of this that's being discussed

11 between two people who have a much broader understanding of

12 what's happening when it's being translated from Mandarin to

13 English and you really get the feel for the conversation when

14 you read it as a whole.

15       MR. GREIM:  Your Honor, we have no objection to

16 that.  In fact, there's the March 17 call I spoke about.

17 That's transcribed here.  Then a follow up to these meetings

18 in August in which Guo goes on a TV program to talk about his

19 letter pledging support for President Xi.

20       THE COURT:  Why don't you read me an excerpt in

21 particular and point out to opposing counsel, which is non

22 party counsel, what page and line you're at?

23       MR. GREIM:  Okay.

24       MS. TESKE:  And maybe we should start with the May

25 2017 recordings because those are the only ones that our

1  client has been able to authenticate and all of the other -- I

2  have no idea where they came from.

3         MR. GREIM:  Okay.  Your Honor, that's the first time

4  I've heard that he has even viewed them or authenticated them.

5  We'd ask --

6         MS. TESKE:  I told you the last time we spoke that I

7  was going to get back to you and have him do that and I just

8  found that out.  So I'm not trying to spring it on you but I'm

9  just -- I'm trying to speed up the conversation.

10        MR. GREIM:  Okay.  Well, I'm just going to start

11  from the top.  I guess I quit -- I was in a hurry.  I quit

12  taking notes at some point.

13        THE COURT:  I'm sorry.  You're starting from the top

14  of what?

15        MR. GREIM:  Okay.  We're going to start -- this is

16  Exhibit -- video.  This is Video No. 8 and in this exhibit

17  that we produced -- I'm trying to think -- I don't -- I'm

18  sorry.

19        MR. GRENDI:  I don't know where you're looking.

20        MR. GREIM:  I'll give you the time stamps.  You have

21  to flip back to where Video 8 begins and it's -- I will

22  represent to you that these transcriptions are the vast bulk

23  of what we have.  It says published October 19th and it's got

24  -- the best I can say it looks like it's on -- I can't see my

25  [inaudible].  I'm sorry.  I'll just have to let you scroll to

24

1    it.  Do you see where I'm talking about?

2            MS. TESKE:  Your Honor, I know you said you had a

3    call in 13 minutes.  Can I suggest that we adjourn this for a

4    time after we have all had a chance to read this and digest

5    the transcripts?  Because I really think that pitching pieces

6    of this out and talking about them in a vacuum is not the

7    right way to go about this.

8            MR. GREIM:  I would even say a little further.  I

9    think the sum is greater -- the whole is greater than the sum

10   of its parts.  I mean I've written down a long series of pages

11   of minute markers in each of these two videos.  But I mean we

12   disclosed these a long time ago.  We pled them in our

13   counter --

14           MS. TESKE:  Not to us you didn't, Eddie.  Not to us

15   you didn't.

16           MR. GREIM:  Okay.  So maybe that's the best way to

17   go, Your Honor, but I would also point out that it's not just

18   these two.  I would almost say we should maybe just produce

19   the entire affidavit of the translator into everything that

20   she transcribed because those are also at issue to the other

21   points.  I'm happy to just submit it to the Court.

22           THE COURT:  What are we talking about --

23           MS. TESKE:  [Inaudible] that they haven't been

24   authenticated and they were pulled off of YouTube.

25           THE COURT:  Well, that's fine.  He can use it at

1  deposition to try to authenticate them.  That's a legitimate

2  use of a deposition.  If you have something that's not

3  authenticated to try to make it authenticated.

4           MS. TESKE:  [Inaudible] taken those efforts.

5           THE COURT:  But if Mr. Guo cannot authenticate it

6  then he can't and if he can then he can.  But in terms -- how

7  voluminous is this material that you're now talking about

8  sending to me?

9           MR. GREIM:  Ha ha ha.  Good question.  Most of it is

10  the transcription of these two meetings with these officials.

11          THE COURT:  So it's approximately how many pages?

12          MR. GREIM:  Okay.  [Inaudible]

13          MR. GRENDI:  It's over 100 pages.

14          MS. TESKE:  No, not the March 2017 [inaudible].

15  Those are -- I don't know.  Fifteen pages?

16          MR. GRENDI:  Well, my window [inaudible] page, Your

17  Honor.

18          MS. TESKE:  It's also not full pages.  I mean it's

19  put up in a column.  It has all the Chinese stuff, Mandarin

20  stuff on one side and [inaudible] narrow columns.

21          MR. GREIM:  We think it's 136 pages, Your Honor.

22  Then the relevant section is going to probably be about 70 of

23  those.

24          THE COURT:  This seems to me to be an important

25  issue with respect to this deposition.  Is that fair?  There

26

1  are a bunch of issues but this seems to me to be maybe the

2  biggest --

3         MR. GREIM:  Your Honor, this is the number one

4  thing.  If we can't ask them about this -- to us it's number

5  one.

6         THE COURT:  All right.  Send it to me.  Make sure

7  everybody's got the same thing.  Try to have Bates numbers so

8  that everybody can be on the same page if the pages aren't

9  otherwise numbered so that if we're talking about it in a

10  follow up call everybody can be looking at the same thing.

11         MR. GREIM:  We will do that.  Your Honor, would you

12  like to receive this in some better way than what we've been

13  doing?  Would an email work or --

14         THE COURT:  If you send me an email of 136 pages

15  then I've got to print out 136 pages.

16         MR. GREIM:  Okay.

17         THE COURT:  I would rather not have to do that.

18         MR. GREIM:  Fair enough.  I get it.  We'll overnight

19  it.  Maybe --

20         THE COURT:  Having it bound in some sort of way

21  would be useful but I was sent a copy of the Guo deposition.

22  It was just a whole stack of loose paper with a large rubber

23  band which is not that helpful.

24         MR. GREIM:  Okay.

25         THE COURT:  I don't have binding capability here.

27

1       MR. GREIM:  Your Honor, I'm sorry about that.

2       THE COURT:  I don't know -- I don't mind if it's in

3  big print like a deposition transcript.  I don't mind

4  something like a miniscript.  We sometimes copy things four

5  per page to make it less voluminous.  As long as it's legible

6  I don't care.

7       THE WITNESS:  Would you like front and back?

8       THE COURT:  I'm not as crazy about front and back

9  because when somebody goes to make copies very often you get

10  pages 1, 3, 5 and 7 but I don't mind -- I don't mind any way

11  that is easy to read and that everybody -- if everybody else

12  has a copy of the same thing if we're talking about it it's

13  not hard to figure out what page we're on.

14       MR. GREIM:  Okay.  We'll -- it's in sort of chart

15  format.  It's got time stamps, speaker's initials.

16       THE COURT:  You figure it out.  You figure out the

17  best format for getting it produced to me and everybody else.

18  I gather what I'm looking at is to see is this -- does this

19  look like or could this arguably be what defendant's counsel

20  says it is and thus fair game for questioning even in an

21  attempt to authenticate it.

22       Again, I pointed out last time that it is a

23  difficult task to try to prove somebody is not really a

24  dissident as he said he was.  How do you go about doing that?

25  I understand you need a little leeway to be able to do that

1  but you can't be off here and there and everywhere without

2  some grounding.

3          So I'll look at it and we'll reconvene.  I'm not

4  sure exactly when.  We'll figure something out.  Do you want

5  to try to find a date and time for reconvening purposes?

6          MR. GREIM:  Yes.  We'll work on it, Your Honor.  We

7  won't use your time right before your next call to do that but

8  we'll huddle and we'll talk to your staff about when you got

9  time.

10          The only other thing I'd say is we --

11          THE COURT:  Just bear in mind my calendar is

12  extremely full and I -- including with trials coming up.  So

13  it's going to be difficult to find a slot of time.

14          MR. GREIM:  We'll be -- the only thing I'd say, Your

15  Honor, is we cannot get dates -- we know the issue with Mr.

16  Grendi but with Ms. Teske's firm they represent Golden Spring

17  and Guo.  [Inaudible] just get dates, placeholder in the

18  calendar knowing that Golden Spring is going to have a

19  witness.  Guo will --

20          THE COURT:  What is the issue -- what is the -- what

21  is the issue on which you needed me for Golden Spring?

22          MR. GREIM:  Well, right now they agreed to produce

23  two categories of documents.  We got a dispute over some

24  others and we got a dispute over the 30(b)(6) topics for

25  Golden Spring.  We discussed it.  We have an impasse and we

29

1   need a decision on what we can ask Golden Spring about.

2            THE COURT:  I'm not even sure that was in the

3   papers --

4            MR. GREIM:  [Inaudible] the party that actually --

5            THE COURT:  I know who it is.  I don't know that

6   you've given me in all of your various letters that you've

7   given me that dispute.

8            MR. GREIM:  Your Honor, we did.  We didn't do it in

9   the last call though.  Remember, we spent a long time on ACA

10  Mistrello.  So we worked with the other side -- with Attorney

11  Teske.  We narrowed our request.  We still have a dispute and

12  we just -- we need some decision.  We think --

13           THE COURT:  So is -- you've worked since the last

14  call or before the last --

15           MR. GREIM:  Yes.

16           THE COURT:  Do I have the update as to where things

17  stand?

18           MS. TESKE:  No, Your Honor.  We have not written

19  letters to you on the Golden Spring issue.

20           THE COURT:  I'm not going to really want more

21  letters but I don't want to read an old letter and be behind

22  the times.

23           MR. GREIM:  Your Honor, we'll send you a short --

24  maybe we can knock out in the next call.  We'll send you a

25  letter that lines up where the parties are and the issues are

30

1  all the same you've seen with the other folks.  We just want

2  Golden Spring bound to the same extent as Eastern Profit

3  because it's the same person.

4          THE COURT:  Are you available on September 24, and

5  can you get yourself ready by then?

6          MR. GREIM:  I want to immediately say yes.  I'm just

7  quickly making sure here.  Tuesday -- yes.

8          MS. TESKE:  I'm sorry, Your Honor.  I am not

9  available on the 24th.

10          THE COURT:  Afternoon of the -- it's already the

11  18th.  I really --  I'm booked up solid on the 26th, 27th and

12  I start a trial on October 1.  Then we're talking about the

13  middle of -- I'm sorry.

14          MS. TESKE:  [Inaudible] the 30th.

15          THE COURT:  That's Rosh Hashanah.

16          MS. TESKE:  I'm sorry.

17          THE COURT:  I just don't have anything on the 26th

18  or 27th and then like I said I'm on trial.  I can have a short

19  call but I can't have an extended call.  That trial is going

20  to go through at least the 10th, maybe the 11th.  I'm not

21  sure.  So I could talk to you again October 17 at eleven.  I

22  just don't have slots.

23          MR. GREIM:  Your Honor, could we --

24          MR. GRENDI:  [Inaudible] I don't have any time at

25  all [inaudible].

31

1          MR. GREIM:  Your Honor, what if we just submit

2   our --

3          THE COURT:  I'll just do it on paper.  I'll just do

4   it on paper.  Everybody submit anything you haven't submitted

5   yet including these transcripts, these transcriptions --

6          MR. GREIM:  Your Honor, maybe I could ask.  What's

7   opposing counsel's conflict on the 24th?

8          MS. TESKE:  I have an out of office deposition.

9          THE COURT:  Get everything to me on paper.  Work out

10  a schedule for it and I'll just do it on paper.  If I really

11  feel I need to talk to you again we'll figure something out.

12  We'll get in touch with you.

13         MR. GREIM:  Your Honor, could we get agreement to

14  get dates on any of these depositions just to put it in the

15  calendar?

16         THE COURT:  Why have there not been dates put on the

17  calendar?

18         MR. GREIM:  We have been asking for over a --

19         THE COURT:  I understand you've been asking.  On the

20  other side, why are there no dates yet, just as hold dates?

21         MS. TESKE:  Your Honor, we dispute a date will be

22  necessary for Mr. Guo and --

23         THE COURT:  Find a hold date.  If it's not necessary

24  it won't happen.

25         MS. TESKE:  Okay.

32

1          THE COURT:  Thank you all.

2          MR. GRENDI:  Thank you, Your Honor.

3          MR. GRENDI:  Thank you, Your Honor.

4                          * * * * *

33

1     I certify that the foregoing is a court transcript from

2 an electronic sound recording of the proceedings in the above-

3 entitled matter.

4

5                              *Shari Riemer*
_____

6                              Shari Riemer, CET-805

7 Dated:  October 17, 2019