

Edward D. Greim
Direct Dial: (816) 256-4144
edgreim@gravesgarrett.com

November 19, 2019

<u>VIA ECF</u>
Hon. Debra Freeman
Daniel Patrick Moynihan
United States Courthouse
Courtroom 17A
500 Pearl Street
New York, New York 10007

    Re:    Eastern Profit Corp. Ltd. v. Strategic Vision US, LLC, Case No. 18-cv-2185 (JGK)-DCF
              Enforcement of Subpoena to Non-Party ACA Capital Group Limited

Dear Judge Freeman:

    Defendant/Counterclaimant Strategic Vision US, LLC ("Strategic Vision"), respectfully requests that non-party ACA Capital Group Limited ("ACA") be held in contempt pursuant to the federal non-party subpoena rule, Fed. R. Civ. P. 45(g), which provides that "[t]he court for the district where compliance is required … may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it." ACA should be ordered to appear for deposition forthwith, and the costs of this motion should be awarded to Strategic Vision.

    I.    Why ACA's Testimony Is Critical

    This Court is familiar with a key part of Strategic Vision's case: the fact that Guo Wengui has transferred, and received, large sums of money to and from Hong Kong undermines his claims that the supposed seizure of his assets in Mainland China is proof that he is, in fact, a dissident. In fending off requests for relevant discovery, Eastern Profit, Guo, and his family office, Golden Spring, have repeatedly taken the position that Strategic is wrong. They claim that it is entirely unremarkable for Guo and his entities to have ready access to Hong Kong money because Hong Kong is supposedly beyond the influence of the PRC and CCP. Eastern Profit and Guo's argument convinced this Court, at least provisionally. Thus, this Court cut off any discovery into ACA's transfers of funds, either at Guo's request or to his many entities, except for ACA's $1 million in wires to Strategic Vision.

    In the past few days, everything has changed. Perhaps calculating that the impending close of discovery meant that ACA was out of the woods, Eastern Profit and Golden Spring have now completely reversed their position. Eastern now claims that its own Hong Kong assets were frozen *precisely because of the CCP's ability to freeze the funds of its opponents in Hong Kong*. Further, Eastern Profit now claims the following: (1) the CCP's freezing of Eastern's Hong Kong assets starting in June 2017 is the reason why ACA wired funds to Strategic Vision in January 2018; (2) Yvette Wang asked Strategic Vision to wire the $1 million *back* to ACA *instead of* Eastern Profit because the CCP had frozen Eastern Profit's bank accounts; and (3) a purpose of the Research Agreement at issue in



this case was actually to target two senior CCP/PRC officials, cause their downfall, cause regime change, and thereby cause Hong Kong to unfreeze Eastern Profit's assets. None of this was previously disclosed. In fact, just two months ago, Eastern beat Strategic's motion to compel by representing to this Court that the freezing of its Hong Kong assets was irrelevant to this case; Eastern and Guo also maintained that the Mainland and CCP could not have frozen assets in Hong Kong in 2017 or 2018. Now, though, Eastern Profit claims the CCP *did* freeze its Hong Kong assets starting in 2017. Indeed, it claims that its assets cannot be unfrozen without regime change on the Mainland. Strangely, though, Eastern still refuses to explain why it has fallen victim to the Mainland's freezing of its Hong Kong assets. It refuses to explain its business or give even a generic description of what dissident activities it undertakes. It certainly has not explained why it was the official contracting party for an agreement negotiated by Guo and his assistant, Yvette Wang, and paid for by yet another entity tied to Guo. In reality, Eastern is simply a shell for Guo. Eastern now admits that Guo Wengui's daughter, Guo Mei, is the sole shareholder of the entity, and that her shares came from Han Chunguang, who several witnesses identify as Guo's servant and cook.

While the alleged inability to move money out of China has always been the centerpiece of Guo's assumed "dissident" identity, his representative has publicly stated that Guo has not taken money out of Hong Kong, either. As recently as the day after Strategic filed its counterclaims, on July 22, 2019, Daniel Podhaskie, who wears multiple hats as Guo's attorney and spokesman, Golden Spring's general counsel, and Eastern Profit's attending corporate representative at depositions in this case, told the same cover story to the Wall Street Journal, claiming that Guo "has never taken a penny out of China or Hong Kong since he began speaking out" against them.

Thanks to disclosures regarding Hong Kong-based ACA, we now know that this cover story is false.

The first data point comes from Guo himself. In a declaration[1] filed in unrelated litigation just one day after his attorney Podhaskie's statement, on July 23, 2019, Guo admitted that China Golden Spring Hong Kong (an entity Guo says is "owned and operated by my family," and which is the parent of witness Golden Spring New York) received over $7 million in "consulting" fees from ACA Investment Management Limited, another Hong Kong entity, during the relevant period in this case: January 2017 to February 2018. Lest there be any doubt, Guo further admits that at least $500,000 of this amount came directly to him in the form of a "distribution." And this was not for some sort of secretive, dissident-related work. Rather, Guo was paid to help ACA invest "in the greater China region," specifically because of his "ability to make introductions to numerous business executives in China and Hong Kong." Guo now admits that he was going to make these introductions to key business leaders in China and Hong Kong from January 2017 onward, including figures on the Mainland. This was at the very same time he was telling Western media, Strategic Vision, and anyone else who would listen that he was China's "number one dissident."

ACA's transfer to Guo through his Golden Spring entity is far from the only ACA outflow to aid Guo. In the course of extensive open source research and discovery in this case, in fact, we have yet to identify significant expenses actually covered by Guo or one of his companies from 2017 onward. Guo and his representatives claim this is because their assets have been frozen by the CCP. Curiously,

---

[1] *See* Exhibit A.



though, despite ACA's public and open association with Guo (even covered in the local Chinese media), it has somehow completely escaped China's purported crackdown, and seems to have been a major cash source for Guo and his projects. During 2017 and 2018 alone:

- ACA wired $100,000 to a key witness in this case for work on a publication that praised Guo under terms the witness had communicated to Guo. Significantly, William Je and the witness understood that ACA was a foreign "sovereign wealth fund," that is, a fund controlled by a foreign state. (The witness claims that these were the only funds paid to him by an entity affiliated with Guo.)
- ACA wired $1 million to Williams & Connolly, Guo's asylum lawyers.
- ACA made two wires totaling $1 million to Strategic Vision.
- ACA paid Guo's China Golden Spring entity over $7 million for Guo's introduction of ACA to "numerous business executives in Hong Kong and China," and Guo received $500,000 of those funds.
- In the fall of 2017, when Guo's public relations campaign was in full swing, the person who controls ACA, William Je, provided a letter of credit to Guo to enable him to buy high-end property in the District of Columbia.

In fact, testimony will show that the man who controls ACA, William Je, was Guo's "money man" during the period at issue here. Further, other evidence will show that Je has long been closely tied to Mainland China, most recently serving on a so-called "patriotic group" of the type that the CCP uses to exert political influence in Hong Kong.

Finally, all of these entities—ACA, both Golden Spring entities, and Eastern Profit, whom Golden Spring (New York) "serves" and controls in this litigation—are intertwined.

- At least two related ACA entities controlled entirely by Je in Hong Kong have twice shared the exact same office as (a) Eastern Profit and (b) China Golden Spring (Hong Kong), which Guo has admitted is owned and controlled by his family and makes distributions to him. China Golden Spring, of course, controls Golden Spring (New York), and Yanping Wang, Guo's assistant and "President" of Golden Spring (New York), claims to take direction from China Golden Spring. The first of these two shared addresses is a suite in the Bank of China Tower; the second is the Guo family's multimillion-dollar waterfront residence.
- Fiona Yu, who served as corporate secretary for both ACA entities, also served as the "Authorized Representative" for the U.S. LLC set up to hold Guo's Sherry Netherland apartment—just a month after ACA wired the $1 million to Strategic Vision.
- Two months later, William Je, who runs ACA, set up two New York entities based in an expensive residential space at 800 Fifth Avenue, Unit 21F. That is the same address shared by any number of Guo entities, including Golden Spring (New York), Saraca Media Group (which uses the trade name Guo Media), and the Rule of Law non-profit entities.
- The same Buffalo law firm that incorporated William Je's entities in 2018 and later submitted subsequent filings in 2019, Hodgson Russ, also filed the corporate paperwork for the Guo entities. That firm represents Guo and GSNY in this case (although it has



> repeatedly denied that it represents ACA, and for that reason will not confer regarding any ACA-related motion).
> - Finally, there is the relationship that forms the basis of this motion: a new GSNY employee was assigned to be ACA's only natural-person director.

At trial, Strategic Vision will show that the inference is clear: Guo claims that his assets are all frozen due to his dissident status, but in fact, he has ready access to funds from the various, closely related ACA entities, a closely affiliated Hong Kong entity that, through William Je, is under the sway of the CCP. In the U.S., Guo and his publicity and litigation operation—through the shell entity of his choice—spend and dispense ACA's money.

Why is this even possible? Why has the CCP omitted ACA from what Eastern Profit now says was the CCP's campaign of asset freezes for over a dozen Hong Kong entities because they were affiliated with Guo (either directly, or indirectly through his children or Han Chunguang)? ACA should explain. Regardless, we now know that ACA is a gaping exception to Guo's and Eastern Profit's newly stated claims that their dissident status caused the CCP to block transfers to them from Hong Kong going back to at least 2017.

It is time, therefore, for ACA to appear and testify. That is possible and should occur now, because, as shown below, ACA director Karin Maistrello was validly served in New Jersey. GSNY and Je's hurried email exchanges were ineffective in eliminating Maistrello's authority to receive process as the only natural-person director of ACA.

### ACA Was Effectively Commanded to Appear for Deposition and Produce Records

On July 27th, after giving advance notice to Eastern Profit that ACA would be served with a Rule 45 subpoena via Maistrello as its director, Strategic Vision delivered a subpoena that was accepted by Maistrello. (Ex. B, the return of service) There is no dispute that Maistrello accepted service of the ACA subpoena. The ACA subpoena commanded appearance by ACA at an August 23rd deposition. ACA also was commanded to produce certain records requested by the subpoena.

Serving Maistrello with the ACA subpoena complied with New York personal service requirements for a corporation, which require personal delivery to an officer, director, managing or general agent, or cashier or assistant cashier or to any other agent authorized by appointment or by law to receive service for the organization. N.Y. Civ.Prac.L. § 311(a)(1). However, Maistrello's counsel contended in an August 9th objection letter that Maistrello could not have accepted service of the ACA subpoena because she was no longer a director of ACA when delivery was had on her. "Ms. Maistrello is no longer, and was not at the time she received a subpoena to ACA … a director of ACA. Thus, she cannot accept service of the ACA Subpoena."

Hodgson later wrote "[w]e do not represent ACA. We will not waste any more time running down answers to assuage your curiosity," but nonetheless engaged in advocacy relating to *ACA's* interests in the subpoena to *ACA*. Regardless, because it is unable to identify any other ACA representatives within the subpoena power of the Court, Strategic Vision believed it could not obtain discovery from ACA and did not try to enforce the subpoena.



Strategic Vision's reliance on Hodgson's statement that Maistrello could not accept service of the ACA subpoena because she was no longer a director was understandable but ultimately discovered to be misplaced. Some months later, in early October, Maistrello's resignation as an ACA director was unable to be confirmed in documentary evidence, discussed more below. Strategic Vision has now learned that, under the ordinances governing ACA (a Hong Kong entity), Maistrello was authorized to accept service of a subpoena even if she had not been a director of ACA on the acceptance date (which she was).

ACA is registered with the Companies Registry, the Government of the Hong Kong Special Administrative Region, as a "private company limited by shares." (Ex. C) As such, ACA is governed by CAP 622 (Companies Ordinance), which applies to, among other entities, a "limited" company, meaning that "it is a <u>company</u> limited by <u>shares</u> []." (Ex. D, CAP 622, Pt. 1, Div. 3, Sub. 1, § 7. *See also* Pt. 1, Div. 5, § 17 (Application of this Ordinance)[2]  As a "private company," ACA must have at least 1 director, namely a natural person. (Ex. D, Pt. 10, Div. 1, Sub. 1, §§ 454, 457)

Resignation of a director is governed by an ordinance entitled "Removal and Resignation of Directors." It provides, among other things, that the company's articles or specific agreement govern but, in their absence, a director can resign at any time. Here, an ACA director resignation exists close in time (dated December 14, 2018) to Maistrello's alleged resignation (i.e. the event causing Maistrello to pick up the directorship). In that filing, the resigning director indicated that ACA's articles required the director to give written notice to ACA of a resignation. (Ex. E, resignation record.) But as shown below, there is no documentary evidence that ACA received Maistrello's resignation.

Entirely independent of this requirement, the Ordinance also provides that the act of a director is valid despite the "fact that it is afterwards discovered … (c) that the person had ceased to hold office as a <u>director</u>." (Ex. D with emphasis added, Pt. 10, Div. 1, Sub. 2, § 461 (Validity of acts of <u>director</u>) ((1) The acts of a person acting as a <u>director</u> are valid despite the fact that it is afterwards discovered —(a) that there was a defect in the appointment of the person as a <u>director</u>; … (c) that the person had ceased to hold office as a <u>director</u>; [])).

Regardless whether she had effectively resigned as director, Maistrello's admitted act of accepting the ACA subpoena is valid service on ACA.

### ACA Has No Evidence that Maistrello's Resignation was Effectively Accepted

Maistrello testified that she sent a resignation to ACA representative William Je. She also testified that Je's acceptance of it for ACA was confirmed in an email back to her from Je. However, ACA has no written proof of the acceptance of her resignation, and has not produced evidence that Je

---

[2]  Application to existing company (1) This Ordinance applies to an existing company, in the same manner as if—… (b) in the case of a limited company other than a company limited by guarantee, the company had been formed and registered under this Ordinance as a company limited by shares…). *See also* Pt. 1, Div. 3, Sub. 2, § 11 ("a company is a private company if—(a) its articles—(i) restrict a member's right to transfer shares;(ii) limit the number of members to 50; and (iii) prohibit any invitation to the public to subscribe for any shares or debentures of the company; and (b) it is not a company limited by guarantee."



(who as not himself a director or officer of ACA) was authorized to accept such resignation. Without such proof, ACA cannot establish that Maistrello was not a director of ACA on the day she was served, July 27th.

The Court will recall a dizzying series of events spanning several weeks and regarding supposed documentary evidence of Maistrello's resignation. First, Maistrello testified under oath that she had a resignation acceptance email from Je. Second, the parties discussed the email with the Court and submitted briefing on the email. Third, the Court ordered the email produced. Fourth, the email was not produced and Strategic Vision sought relief from the Court. Then, and only then, did Maistrello's counsel (Hodgson) advise that the email never existed in the first place: "Maistrello's refreshed recollection and understanding having conducted a search for additional emails is that communications with Mr. Je, if any, concerning her resignation, other than those provided to you, took place in person or over the phone." In a separate statement only to Strategic Vision, Hodgson wrote "Ms. Maistrello has searched her emails and produced all emails responsive to your request"; she has produced everything in her "possession, custody, and control."

No email from William Je accepting Maistrello's resignation for ACA exists according to Maistrello, the person who allegedly resigned and allegedly received confirmation of ACA's receipt of her resignation. Likewise, no proof has been produced that Je was authorized by ACA's business organization papers to accept such an event. In short, ACA cannot prove Maistrello was not a director at the time she accepted delivery of the ACA subpoena on July 27th. And again, even if Maistrello and her counsel reverse course yet again and suddenly "find" such evidence, it no longer matters. Under Hong Kong's ordinances, the act of a director is valid despite the "fact that it is afterwards discovered … (c) that the person had ceased to hold office as a director."

### Relief Requested

ACA is in contempt of a validly-served Rule 45 subpoena for testimony and documents. They are important to the case and should be produced. Under Fed. R. Civ. P. 45(e)(1)(D), "[t]he court may specify conditions for the discovery." The Court should enter an order enforcing the subpoena for ACA to appear to give testimony and produce the requested documents, to which no objection was timely made, on a date to be set by Strategic Vision's counsel once the ruling has been issued. Strategic Vision concurrently requests leave of Court to conduct ACA's deposition after the November 29, 2019 close of discovery, if necessary. This is the type of carve-out from the discovery deadline that the Court approved during a discovery conference on November 8, 2019 regarding the Guo deposition.

At this stage, Strategic Vision proposes to make the following inquiry of ACA (testimony and documents):

1. The foundation, ownership, structure, funding, and governance of all related ACA entities, including the tenure and duties of William Je.
2. The various, related ACA entities' relationship and communications with Eastern Profit, the Golden Spring entities, Guo Wengui, the PRC, and CCP.
3. ACA's interest in the Research Agreement at issue in this case, including its plans to receive or use the fruits of the research.



4. ACA Capital's wiring of $1 million to Strategic Vision, and any loan, communications (oral, written, or electronic, including metadata), or understanding between ACA and either Eastern Profit, the Golden Spring entities, or Guo Wengui regarding the wire. This includes the negotiation, drafting, emailing, signing, custody, and maintenance of the purported loan document, as well as any attempts to collect the principal and interest.
5. The various, related ACA entities' transmittal of any funds from Hong Kong or Mainland China for the benefit of Guo Wengui, Eastern Profit, the Golden Spring entities, Saraca Media Group, the Rule of Law nonprofits, or any other entity acting under the control or direction of Guo, his children, his family, Han Chunguang, Yvette Wang, or any other agent or employee of Guo's from December 2014 to the present.

Thank you for your continued attention to these discovery issues.

Respectfully submitted,

Edward D. Greim
Attorney for Defendant/Counterclaimant