

Edward D. Greim
Direct Dial: (816) 256-4144
edgreim@gravesgarrett.com

November 25, 2019

**VIA ECF**
Hon. Debra Freeman
Daniel Patrick Moynihan
United States Courthouse
Courtroom 17A
500 Pearl Street
New York, New York 10007

    Re:    Eastern Profit Corp. Ltd. v. Strategic Vision US, LLC, Case No. 18-cv-2185 (JGK)-DCF
              Motion to Compel Disclosure against Strategic Vision US, LLC

Dear Judge Freeman:

       This responds to Eastern Profit's motion to compel Strategic Vision "to disclose to Eastern the identity of the natural person or persons that are paying Strategic Vision's attorneys' fees and legal expenses in this action," including through intermediaries. *See* ECF 200. Eastern Profit's motion should fail on any number of grounds. Most importantly, it misstates the law; seeks irrelevant information about the litigation motives of Strategic; is brought for the improper purpose of retaliating against Strategic and those who share its views on the danger Guo poses to the United States in its efforts against China; and would invade multiple legal privileges.

    1.  **Eastern Profit is wrong on the law.** Eastern fails to cite, let alone try to distinguish, numerous cases from this Circuit holding that the identity of third-party funders is an improper subject of discovery—especially where, as here, the claimed relevance is to explore the litigation motives of the party that needed funding. See, e.g., *Benitez v. Lopez,* 17-CV-3827-SJ-SJB, 2019 WL 1578167, at *1 (E.D.N.Y. March 14, 2019) ("As to the litigation funding documents, Defendants fail to establish that such discovery is 'relevant to any party's claims or defense.' " Also, "[t]he financial backing of a litigation funder is as irrelevant to credibility as the Plaintiff's personal financial wealth, credit history, or indebtedness. That a person has received litigation funding does not assist the factfinder in determining whether or not the witness is telling the truth."). *Kaplan v. S.A.C. Capital Advisors, L.P., S.A.C.*, No. 12-CV-9350 (VM)(KNF), 2015 WL 5730101, at *5 (S.D.N.Y. Sept. 10, 2015), aff'd, 141 F. Supp. 3d 246 (S.D.N.Y. 2015); *Mackenzie Architects, P.C. v. VLG Real Estates Developers, LLC*, No. 115CV1105TJMDJS, 2017 WL 4898743, at *3 (N.D.N.Y. Mar. 3, 2017) (denying the defendants' discovery request for records concerning the plaintiff's litigation funding, and criticizing the defendants' attempt to "travel down an unfruitful path in pursuit of 'litigation motivation'").[1]

---

[1] This is consistent with the overwhelming weight of authority from other jurisdictions. *In re Valsartan N-Nitrosodimethylamine (NDMA) Contamination Prod. Liab. Litig.,* No. CV 19-2875 (RBK/JS), 2019 WL 4485702, at



Skipping over the case law on relevance, Eastern relies entirely on three unreported cases in which courts found that no privilege applied to an already-identified funder, where (unlike here) the parties had already agreed that the underlying documents relating to the funder were relevant. Indeed, in Eastern's main authority, an order entered in *Cohen v. Cohen*, the sought-after communications contained statements by the plaintiff herself, and no party disputed that they were relevant. *Id.*, No 9 CIV. 10230 LAP, 2015 WL 4469704, at *5 (S.D.N.Y. June 29, 2015). What Eastern fails to tell this Court is that five months *after* entering this order, the court denied disclosure of any communications between the plaintiff and the relevant individual concerning "legal strategy unrelated to facts… possible settlement… and funding" because "they have no bearing on the facts of the case, Plaintiff's credibility… or other relevant evidence." *Id.* Plaintiff's two other cases appear only on LEXIS, were not provided by Eastern, and contain no detailed analysis of the relevance issue, privilege, or the facts of the case. As shown below, the work product and attorney-client privileges would apply in this context. In short, Eastern is wrong on the law.

2. **Eastern Profit's theory of relevance—that it needs to identify any funder so that it can discover the motivation for Strategic's litigation strategy, which will then provide a window back in time to Strategic's reliance on Guo's claims about himself—is illogical and is never sanctioned by courts.** Eastern would have this Court allow it (and to be fair, also Strategic) discovery into the motivation of each respective opponent in litigating various claims and defenses—effecting a separate litigation *within* the litigation *about* the litigation. *See Mackenzie Architects, P.C.*, 2017 WL 4898743, at *3 (criticizing the defendants' attempt to "travel down an unfruitful path in pursuit of 'litigation motivation'"); *Benitez*, 2019 WL 1578167 at *2 (rejecting claim that litigation funding information was "required to discern the motives for Plaintiff's suit and for the litigation funding," and holding that "no reasonable understanding of Rule 26 would permit discovery of the minimally probative information Defendants seek.")

Eastern believes that, by learning whether Strategic has an outside funder and then learning that funder's identity, it can explain Strategic's motivation for vigorously seeking discovery of its defenses and fraud counterclaim. Eastern's theory is apparently that only the Chinese Communist Party would work so hard to litigate against Guo, since he is so obviously a dissident. If Strategic is willing to accept funding from any source to defend itself against Guo, Eastern's theory goes, that source is likely the CCP; and if that is true, then Strategic must also feel comfortable sidling up to the CCP today; and if that is true, Strategic must also not have really cared about Guo's dissident status when negotiating with him in 2017.

---

*3 (D.N.J. Sept. 18, 2019) ("The Court agrees with the plethora of authority that holds that discovery directed to a plaintiff's litigation funding is irrelevant.") *MLC Intellectual Property LLC v. Micron Technology, Inc.*, Case No. 14-cv-3657-SI, 2019 WL 118595, at *2 (N.D. Cal. Jan. 7, 2019) (denying litigation funding discovery and stating, "[t]he Court concludes that [defendant] is not entitled to the discovery it seeks because it is not relevant.") *Yousefi v. Delta Electric Motors, Inc.*, No. 13-CV-1632 RSL, 2015 WL 11217257, at *2 (W.D. Wash. May 11, 2015) ("[w]hether plaintiff is funding this litigation through savings, insurance proceeds, a kickstarter campaign, or contributions from [a] union is not relevant to any claim or defense at issue.").
!
!



This "motivation" theory is outlandish on its face; were it even necessary, Strategic would testify that it never has and never would take compensation from the CCP or PRC or any CCP or PRC intermediary. But that should not be necessary: Eastern's theory is logically flawed because it is ultimately circular and requires one to first accept all of Guo's arguments on the merits.

First, note that the theory is only valid if the Court sanctions discovery into Strategic Vision's motivations for litigating in the way it has: precisely the area that court after court says is outside the permissible scope of discovery. What would such discovery look like? Consider Strategic Vision's contract and fraud theories, that ACA and William Je are under the sway of the Mainland (the PRC and CCP), that they are allowed to move money freely from Hong Kong while Guo and Eastern Profit claim the Mainland is able to block dissidents (including themselves) from doing so; and that ACA and Je serve as the moneymen for Guo's activities through a variety of controlled and shell entities in the United States—including on this contract and a variety of other projects. That necessarily includes this litigation. Recall that Eastern now claims all of its assets, in Hong Kong, are frozen precisely because of the CCP's influence in Hong Kong, and that GSNY is actually providing all of the business and legal work at issue in this case free of charge—or until the CCP releases Eastern's Hong Kong assets. Thus, under Eastern's theory, Strategic can discover various facts that go directly to the motivation of Guo to have various counsel litigate this case so that his connection to the Mainland is not discovered:

- The payor of Hodgson Russ on all of its litigation for Guo and GSNY, including in this case, and the ultimate source of that funding;
- The payor of all of Eastern Profit's legal bills, and the ultimate source of that funding;
- The reason for the 3-week delay in Pepper Hamilton coming into this case after Eastern's prior counsel suddenly lost authority to act, and the ensuing several week delay while the firm familiarized itself with the file and party discovery ground to a halt. Was this nearly 2-month delay, which pushed most discovery into November and thereby served Guo's interest, coordinated with Golden Spring, Guo, and ACA/Je?
- The reason for various attempts by counsel working for Guo, GSNY, and other affiliated entities to contact subpoenaed witnesses, including whether they paid for their counsel or attempted to procure their non-attendance at duly-noticed depositions.

Second, Eastern's argument depends on the self-serving and circular assumption that no person would litigate vigorously against Guo except for the CCP—thus, Eastern's suspicion is justified by the very diligence of Strategic in uncovering Guo's network and its ties back to ACA. But there is a much more likely reason for Strategic (and other of Guo's targets, who are mostly pro se and cannot afford to mount serious resistance) to take a stand. As Strategic Vision pled, and as the discovery in this case is showing, Guo has very deliberately cut a path of destruction through the Chinese dissident community. He claims to have amassed a fund of over $100 million specifically for litigation (although there is no evidence that these funds are anywhere within the U.S.). As Strategic pled and a witness will testify, that program of litigation and threats of physical and financial injury have chilled real dissidents—most of whom do not have Guo's apparent access to vast financial resources—and monopolized the movement in the United States.

Meanwhile, and of even greater concern from a national security perspective, Guo has used his access to cash from Chinese sources to make payments to key individuals and institutions who



are recognized as China hawks, including several witnesses in this case. Not unlike his tear through the Chinese dissident community, Guo is attempting to corner the market on the U.S. foreign policy establishment. It should come as no surprise, then, that many in the U.S. foreign policy community who are China hawks and who may have initially welcomed Guo as a potential asset are now alarmed by him. It should be no wonder that Strategic Vision and others believe it is time that someone stood up to Guo.

Still, these matters—who is motivated to oppose Guo in this litigation and why, and who is funding Guo's litigation team and why—are irrelevant and beyond the scope of this case. What is being litigated here is the alleged fraud and breach of contract that occurred in 2017 and early 2018. To litigate the question of why Strategic has vigorously litigated the case, or of why Guo's team has marched in lockstep in obstructing discovery at every turn, will ultimately assist no one. Such "litigation about litigation" is utterly beyond the scope of discovery.

3. **Eastern Profit's motion is brought not because it truly believes this firm or Strategic Vision are being paid by the CCP, but because Guo wants to identify and harass anyone who opposes him.** It is instructive that Eastern Profit's professed basis for seeking this discovery shifted within a matter of days. At Strategic's Rule 30(b)(6) deposition last week, Eastern initially argued that the identity of a Strategic Vision litigation funder would be relevant because Strategic's prayer for relief (like Eastern's) asks for attorneys' fees, even though neither party has actually pled any theory that would allow for them to be recovered. To clear up any confusion, Strategic Vision immediately stipulated on the record that it was not in fact seeking fees. And of course, even if the parties were seeking fees, the identity of a third-party funder would be irrelevant.

Now, Eastern has shifted to citing a "suspicion," not facts, that this law firm and Strategic Vision are being paid by the CCP (or some CCP intermediary). Tellingly, Eastern is silent on its factual basis. It refuses to say what—if not Strategic's attempts to gain discovery into Guo and his funding sources—supports its hunch. It is not even clear that Eastern actually holds a good-faith belief. Its deposition questions to Strategic Vision about litigation funding focused on a man named Bruno Wu, with whom Guo appears to have been in litigation for some time—although Strategic questions whether Wu and Guo are truly in opposition. Strategic did testify that it had never had contact with Wu, or any of his representatives, about its allegations in the case— questions that were allowed based on the theory that Eastern could discover the factual basis and support for Strategic's allegations. Given the lack of communications with Wu, the basis of Eastern's claimed "suspicion" about CCP funding seems to be nil. Now, it seeks to cast about to find any information on whether Strategic even has a third-party funder, and if so, who.

Strategic reasonably fears that Eastern's last-minute gambit is solely to aid Guo in his well-documented harassment campaign—whether through litigation, threats of sanctions, or actual threats of physical injury. Strategic's counterclaim pleads that Guo has embarked upon just such a campaign. Indeed, well before Strategic filed its counterclaim, Guo had already conveyed a threat through Stephen Bannon to personally ruin J. Michael Waller, who helped run Strategic's work on this contract, through litigation. As Strategic has pled, Bannon gained access to Waller's confidential deposition transcript from Guo's team. Bannon then told Waller's superiors that Guo had "more money than God," and tried to convince them to remove Waller from the Committee on the Present Danger: China. Guo delivered on that threat when he sued Waller personally, French



Wallop personally, Strategic Vision, its counsel personally, and various media entities for defamation for $50 million, relying in large part on the counterclaim itself. And of course, Guo has repeatedly threatened to retaliate against dissidents, including at least one witness in this case, and has threatened violence against any who oppose him. If there is any third-party funder, the disclosure to Guo will almost certainly mean—at a minimum—that this person will be added to Guo's litigation target-list. Without doubt, Guo's defamation case will be amended to include the alleged funder. If Guo is allowed to continue these tactics in case after case, then eventually, public discussion of his bona fides will come to a halt.

4. **Eastern's requested disclosure would invade both legal and First Amendment privileges that would exist between Strategic and any third-party funder.** First, many courts have recognized that the work product doctrine and attorney-client privilege protect communications between a party and a third-party funder. *See, e.g., In re International Oil Trading Company, LLC*, 548 B.R. 825, 835 (Bankr. S.D. Fla. 2016) ("without litigation funders, parties owed money, or otherwise stymied by deep-pocketed judgment debtors, might have reduced or no ability to pursue their claims. Litigation funders may be essential to the provision of legal advice in such cases. Absent the ability to communicate with funders without waiving privilege, potential plaintiffs … might be handcuffed …"); *Charge Injection Techs. v. E.I. Dupont De Nemours & Co.*, Del. Super., 2015 WL 1540520, *4-5 (Mar. 31, 2015) (litigation financier communications are protected by privilege and work product and that the funding agreement was protected work product). In fact:

> The work product doctrine exists to preserve and promote the adversarial system of litigation and prevent a party from free-riding on his opponent's efforts. In those instances where a claim cannot proceed without third-party financing, one element of preparing a client's case for trial will be securing the requisite funding, which probably will require discussions of a case's merits in an effort to convince the third party to supply the needed funds. No persuasive reason has been advanced in this case why litigants should lose work product protection simply because they lack the financial means to press their claims on their own dime. Allowing work product protection for documents and communications relating to third-party funding places those parties that require outside funding on the same footing as those who do not and maintains a level playing field among adversaries in litigation. Thus, even though claim funding is the business of financing lawsuits, which means the Discovery Documents serve a business purpose, those documents simultaneously also are litigation documents and work product protection is appropriate.

*Carlyle Inv. Mgmt. L.L.C. v. Moonmouth Co. S.A.,* No. CV 7841-VCP, 2015 WL 778846, at *9 (Del. Ch. Feb. 24, 2015).

Further, the First Amendment protects the identity of, and confidential discussions with, a funder who shares a political association with a litigant where that association would be chilled by compelled disclosure and the threat of resulting harassment. *See NAACP v. Alabama*, 357 U.S. 449, 460 (1953); *NAACP v. Button*, 371 U.S. 415, 433 (1963); *Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1355 (2d Cir. 1989). As discussed above, there are many supporters of a robust stand against China who are alarmed not only by Guo's campaign of harassment against dissidents, but



also by his efforts to encroach upon and corner the significant element of the U.S. foreign policy establishment that has been trying to sound the alarm about the threat posed by China. Such individuals are natural supporters of Strategic Vision. Guo has access to substantial reserves of foreign money—which William Je and at least one witness who received some of this funding understood was a "sovereign wealth fund"—which he has frequently leveraged for his own purposes within the United States, including on the contract at issue. Further, not even Guo would dispute that he has worked for years with China's Ministry of State Security, and had—and may still have—access to private electronic surveillance resources in other countries. These are formidable resources. Further, they have been put to use against United States citizens and residents. One need only consult Guo's history of litigating at least two dozen lawsuits in his short time in the U.S., his many threats conveyed via the internet, and his campaign to sever the relationship between Mr. Waller and his political associates at the Committee on the Present Danger: China. Together, the threat of continuing retribution and harassment is more than enough to chill any third-party funder of ordinary fortitude from continuing to engage in political association with Strategic Vision. The First Amendment would protect against the compelled disclosure of the identity of any funder for Strategic's efforts in this case.[2]

In conclusion, Eastern knows that law and logic are against it. Its eleventh-hour effort to compel disclosure of the identity of any third-party funder and political supporter of Strategic Vision was brought for an improper purpose and should be rejected.

Respectfully submitted,

*[signature]*

Edward D. Greim
Attorneys for Defendant/Counterclaimant

---

[2] For present purposes, Strategic is not disclosing whether or not it has a third-party funder. Were the Court to deem this information relevant and reopen discovery for both sides to apply this principle, Strategic would support a claim of legal and First Amendment privileges with the required factual showing and, with the Court's permission, *in camera*.