**Atkinson-Baker, Inc.**
www.depo.com

```
 2           IN THE UNITED STATES DISTRICT COURT

 3         FOR THE SOUTHERN DISTRICT OF NEW YORK

 4   ------------------------------------------X

 5   EASTERN PROFIT CORPORATION LIMITED,

 6                Plaintiff/COUNTER-CLAIM DEFENDANT,

 7               CASE NO.: 18-cv-2185(JGK)

 8        -against-

 9

10   STRATEGIC VISION US, LLC

11                Defendant/COUNTERCLAIM PLAINTIFF.

12   ------------------------------------------X

13              30(b)(6)DEPOSITION OF

14     GOLDEN SPRING BY AND THROUGH AMELIA COLUCCIO

15                NEW YORK, NEW YORK

16                November 12, 2019

17

18   ATKINSON-BAKER, INC.

19   (800)288-3376

20   www.Depo.com

21   REPORTED BY:  KIARA MILLER

22   FILE NO.: AD0B4E5

23

24

25
```

Atkinson-Baker, Inc.
www.depo.com

```
                                    A. COLUCCIO
 1   introduce themselves. After counsel
 2   has introduced themselves, the
 3   witness may be sworn in by the court
 4   reporter?
 5        MR. GREIM: This morning you
 6   have Eddy Greim and Jennifer
 7   Denalli. We are Counsel for Graves
 8   Garret for Strategic Vision, which
 9   is the defendant and counterclaim
10   plaintiff in this case.
11        MS. TESKE: And Erin Teske
12   with Hodgson Russ for Golden Spring
13   New York, the deponent.
14        MR. GREIM: And with us here
15   is Daniel Podhaskie, the corporate
16   rep for GSNY.
17
18   A M E L I A   C O L L U C I O, after having first
19   been duly sworn by a Notary Public of the State of
20   New York, was examined and testified as follows:
21        COURT REPORTER: Please state
22   your name for the record.
23        THE WITNESS: Amelia Coluccio.
24        COURT REPORTER: Please state
```
Page 6

```
                                    A. COLUCCIO
 1   your address for the record.
 2        THE WITNESS: 162 East 64th
 3   Street, New York 10065.
 4        (Whereupon, Notice of Deposition
 5        was marked as Golden Spring
 6        Exhibit 1 for identification as
 7        of this date.)
 8   BY MR. GREIM:
 9   Q    Ms. Coluccio, good morning?
10   A    Good morning.
11   Q    I put in front of you what we've
12   marked as Golden Spring Exhibit One. Have
13   you had a chance to review that?
14   A    No.
15   Q    Please take a look at it. And my
16   question to you is simply, have you seen
17   this document before?
18   A    I think I have.
19   Q    Do you recognize this as the
20   notice of deposition duces tecum under which
21   you're here today?
22        MS. TESKE: Object. You can
23        answer.
24   A    Yes.
```
Page 7

```
                                    A. COLUCCIO
 1   Q    And if you could, please turn to
 2   page three, which says Exhibit A at the top
 3   of it. You're there.
 4        Are these the topics on which
 5   you're prepared to testify today?
 6        MS. TESKE: Object to the
 7        form. You can answer.
 8   A    Yes.
 9   Q    And if you turn to the next page,
10   you'll see documents be produced pursuant to
11   rule 45. There's two items on that page.
12   A    I'm sorry, what's the question?
13   Q    Do you see two items on that page?
14   A    Yes.
15   Q    Did you bring any documents with
16   you today?
17   A    No.
18   Q    Have you seen this page four of
19   the subpoena before?
20   A    No. I don't think so.
21   Q    What is your position -- let me
22   ask you this, are you an employee of Golden
23   Spring?
24   A    Yes.
```
Page 8

```
                                    A. COLUCCIO
 1   Q    What is your position?
 2   A    Paralegal?
 3   Q    How long have you had that role?
 4   A    About seven months.
 5   Q    What are your duties?
 6   A    Mainly to help organize legal
 7   files and to coordinate with outside law
 8   firms.
 9   Q    Does that include this case?
10   A    Yes.
11   Q    What other cases do you work on?
12        MS. TESKE: Object. Don't
13        answer that.
14        MR. GREIM: Is that an
15        instruction not to answer?
16        MS. TESKE: Yes.
17   Q    How many other cares do you work
18   on as paralegal at Golden Spring?
19   A    To estimate maybe 20 to 30.
20   Q    Are those all cases in which
21   Golden Spring is a party?
22        MS. TESKE: Object. Don't
23        answer that.
24   Q    You work full-time?
```
Page 9

3 (Pages 6 to 9)

30(b)(6): Amelia Coluccio
November 12, 2019

Atkinson-Baker, Inc.
www.depo.com

**Page 18**

A. COLUCCIO
This is irrelevant. Get to the point.
Q   You can answer.
A   So are you asking specifically about this case?
Q   Sure. I'll start with this case.
A   I don't think I've done any scheduling directly relating to him for this case.
Q   Do you know who does?
    MS. TESKE: Objection to the form. of the question.
    Go ahead.
A   I think Yvette would deal with scheduling.
Q   Did you review any documents in preparation for your testimony today?
A   No.
Q   Not even with counsel?
A   No.
Q   How about the Golden Spring New York's corporate filings, did you review those?
A   No.

**Page 19**

A. COLUCCIO
Q   Did you have any role in keeping those updated?
A   The filings in this case?
Q   No.
    Let me ask you, are you aware whether Golden Spring New York is registered to do business in New York?
A   Yes.
Q   Do you know how one goes about doing that?
A   I don't know the details.
Q   Have you had any involvement with Golden Spring New York's filings, corporate filings in New York?
A   No.
Q   Have you ever reviewed those filings?
A   I don't think so.
Q   Does Golden Spring New York have any offices other than 162 East 64 Street?
A   No.
Q   Does it have any employees who work remotely, not in the 162 East 64 Street office?

**Page 20**

A. COLUCCIO
A   Not that I know of.
Q   Does Yvette Wang work in that office?
A   She is there. I know she works in that office, yeah.
Q   Did any other entities have offices at 162 East 64 Street?
    MS. TESKE: Object to the form of the question.
    We are so widely off of what is relevant in this case. This is a complete waste of time. I will give you a little more leeway, then I'm going to start directing her not to answer so that we can get to the point of the deposition and topics directed by the Court.
A   A law firm that we work with sometimes works out of that office, but I don't know if that's officially their business address.
Q   Any other entities?
A   Not that I know of.
Q   Who are the other officers of

**Page 21**

A. COLUCCIO
Golden Spring, other than Yvette Wang?
A   Guo Qiang is a director.
Q   Who is he?
A   I know that he's a --
    MS. TESKE: Object to the form.
A   -- director of Golden Spring.
Q   Is he's Guo Wengui's son?
A   I think so.
Q   Have you ever met Guo Qiang?
A   I think so.
Q   Where did you meet him?
A   He came to our office once.
Q   When was that?
A   I don't remember exactly. Maybe last month.
Q   Did you ask to meet with him to prepare for your deposition today?
A   No.
Q   Do you know whether Guo Qiang gives direction to Yvette Wang as president?
    MS. TESKE: Object to the form of the question.
    You can answer, if you know.

**Page 22**

```
 1            A. COLUCCIO
 2     A   No.
 3     Q   Do you know whether Yvette Wang
 4  gives direction to Guo Qiang?
 5     A   No.
 6     Q   What are his duties as director of
 7  Golden Spring?
 8     A   I don't know.
 9     Q   What are Yvette Wang's duties as
10  president of Golden Spring?
11     A   I don't know.
12     Q   Did you ask her?
13     A   No.
14     Q   I've got to ask you, when did you
15  meet with Ms. Wang to prepare for your
16  deposition today?
17     A   Yesterday.
18     Q   When?
19     A   About 4 p.m.
20     Q   Was that meeting here at this
21  office?
22     A   Yes.
23     Q   I didn't see you.  We were taking
24  depositions here yesterday.
25         How long did you meet with her?
```

**Page 23**

```
 1            A. COLUCCIO
 2     A   Probably about maybe an hour.
 3     Q   Who else was present -- well, was
 4  anyone else present for that meeting?
 5     A   Yes.
 6     Q   Who was that?
 7     A   Erin Teske and Mark Harmon.
 8     Q   How Mr. Podhaskie.
 9     A   He came in at the end.  I think we
10  might have been pretty much done talking at
11  that point.
12     Q   All right.  Did you have any other
13  meetings with Ms. Wang to prepare for your
14  testimony today?
15     A   No.
16     Q   Did you have any other meetings
17  with Ms. Teske or Mr. Harmon to prepare for
18  your testimony today?
19     A   No.
20     Q   Did you ever have any other
21  meeting with Mr. Podhaskie to prepare for
22  your testimony today?
23     A   No.
24     Q   When did you learn that you would
25  be a 30B6 witness?
```

**Page 24**

```
 1            A. COLUCCIO
 2     A   It was I believe either Wednesday
 3  or Thursday of last week.
 4     Q   Who told you?
 5         MS. TESKE:  Objection to the
 6  form of the question.
 7         You can answer.
 8     A   Dan.
 9     Q   Other than the hour-long meeting
10  last night, is there anything else you did
11  to prepare yourself since Wednesday or
12  Thursday for your deposition today?
13     A   Last night I just kind of reviewed
14  information on my own.
15     Q   After the meeting?
16     A   Yeah.
17     Q   What did you review?
18     A   Just my notes from the meeting.
19     Q   Did these notes consist of things
20  that counsel told you to say today?
21     A   No.
22         MS. TESKE:  Object to the form
23  of the question.
24     Q   Did the notes consist of basic
25  information about Golden Spring?
```

**Page 25**

```
 1            A. COLUCCIO
 2         MS. TESKE:  Object to the form
 3  of the question.
 4         You can answer.
 5     A   Yes.
 6     Q   Do you have the notes with you
 7  today?
 8     A   No.
 9     Q   How many pages of notes?  Were
10  they handwritten notes?
11     A   No.
12     Q   Are they notes that you took?
13     A   Yes.
14     Q   Did you type them up while during
15  the meeting?
16     A   Yes.
17     Q   How many pages of notes did you
18  type up?
19     A   I believe.
20         MS. TESKE:  Object to the form
21  of the question.
22     A   I believe just one.
23     Q   Are you relying on those notes for
24  your testimony today?
25         MS. TESKE:  Object to the form
```

Atkinson-Baker, Inc.
www.depo.com

## Page 50

A. COLUCCIO

positions, whether Eastern Profit, Guo Wengui, or any other person paid Golden Spring for its work, what families Golden Spring does work for now or in the past, what kind of work Golden Spring does, Golden Spring's ownership and organizational structure", and decided to the Court's order.  Docket 189, page three, note one and page ten.

So my question is, and I think I'm entitled to know -- let's keep it to the timeframe, okay.

So after January 1 2017 --

MS. TESKE: Which is when the contract was executed in this case.

MR. GREIM: Wrong. No. Please don't interrupt, okay.

**Q   After January 1, 2017, what work did Golden Spring do for Eastern Profit?**

MS. TESKE: I'm telling the witness not to answer because your topics are limited by the Court's orders, which has specifically tailored that to as it concerns the

## Page 51

A. COLUCCIO

contract.

MR. GREIM: We'll just mark this and we'll come back to it. I think that's incorrect.

MS. TESKE: I can read you the Court's order right now, which actually says, "defendant may ask Golden Springs witness about its dealings with the plaintiff, that would be Eastern, during the specified period, but so as to keep the deposition focused on issues relevant to the party's claims and defenses, only in so far as those dealings relate to the negotiations, execution or performance of the contract at issue."

**Q   Let me ask you this, before Golden Spring began to work with Eastern Profit on -- well, let me back up.**

**When did Golden Spring begin to work for Eastern Profit on --**

MS. TESKE: Object --

**Q   -- on this matter?**

## Page 52

A. COLUCCIO

MS. TESKE: On this matter.

A   At the end of 2017.

**Q   When did at the end of 2017?**

A   I don't know, exactly.

**Q   What did Yvette tell you?**

A   About how they started to work together?

**Q   No, about when.**

A   Oh, just end of 2017.

**Q   Is it in December of 2017?**

A   I didn't get a specific month.

**Q   I guess you didn't get a time within December 2017, correct?**

A   Correct.

**Q   How do you know that the end of 2017 is an accurate answer to my question?**

MS. TESKE: Asked and answered.

You can answer again.

A   From my conversation with Yvette.

**Q   Have you looked for any written documentation of the Golden Spring Eastern Profit relationship related to this**

## Page 53

A. COLUCCIO

contract?

A   No.

**Q   Do you know whether one exist?**

A   No.

**Q   What were the terms of Golden Spring's work for Eastern Profit regarding this contract?**

A   Eastern Profit gave Yvette, told Yvette that Eastern Profit would enter into the contract.

**Q   Okay.  I better be a little more clear.  Well, actually let's go with that, then we'll come back to the question I asked you.  Okay?**

A   Okay.

**Q   When did Eastern Profit tell Yvette that it would enter into the research agreement in this case?**

A   At the end of 2017.

**Q   When at the end of 2017?**

A   That's just at the end of 2017. That's all I know.

**Q   Who from Eastern Profit told Yvette that it would enter into this**

Atkinson-Baker, Inc.
www.depo.com

**Page 58**

A. COLUCCIO

A  Yes. I think so.
Q  Okay. And I think you testified earlier that Golden Spring understood Mr. Han to be at that time still the director of Eastern Profit, right?
A  Yeah, I think so.
Q  Let me ask you this, why did Golden Spring approach Mr. Han?
A  To see if he knew of any company that could enter into this research agreement.
Q  Why did Golden Spring believe Mr. Han would be a fruitful source of a potential candidate companies for the agreement?
A  I don't know.
Q  Well, what did Golden Spring know about Mr. Han when it approached him?
A  I'm not sure.
Q  Who knows the answer to that question?
    MS. TESKE: Object to the form.
    You can answer.

**Page 59**

A. COLUCCIO

A  I guess Yvette would.
Q  Did Golden Spring tell Mr. Han that the negotiations were supposed to be confidential?
    MS. TESKE: Object to the form of the question.
    You can answer.
A  I don't know.
Q  Did Golden Spring tell Mr. Han that Ms. Wang had promised Strategic Vision that the only people involved with the contract would be Lianchao Han, Yvette Wang, Mr. Guo and Strategic Vision?
A  I don't know.
Q  Who knows the answer to that question?
A  I don't know.
Q  I guess your testimony is the only person who dealt with Eastern Profit for Golden Spring was Yvette?
A  Correct.
Q  So if anyone knows it would have to be Yvette, right?
    MS. TESKE: Object to the form

**Page 60**

A. COLUCCIO

of the question.
A  Maybe.
Q  Well, let's keep moving ahead.
    Oh, by the way, did Golden Spring New York know whether Guo Mai (phonetic) had any role with Eastern Profit when it approached Mr. Han?
    MS. TESKE: Object to the form of the question.
    You can answer, if you know.
A  I don't know.
Q  Did Guo Mai have any role with Eastern Profit when Golden Spring approached Mr. Han?
    MS. TESKE: Object to the form of the question. This is way beyond the scope.
    If you have any idea, you can answer.
A  I don't know.
Q  What was discussed in that first exchange between Ms. Wang and Mr. Han?
A  Yvette told Mr. Han about the research that Golden Spring was looking to

**Page 61**

A. COLUCCIO

do, and Mr. Han advised that Eastern Profit could enter into the contract.
Q  Well, what was Golden Spring's understanding about the research that it was looking to do when it approached Mr. Han?
A  It was looking to do research on the CCP.
Q  For what reason?
A  I'm not sure.
Q  Well, did Golden Spring have some reason for wanting to do research into the CCP?
A  I'm not sure.
Q  If Golden Spring wanted to do this research, why did it approach anyone else? Why didn't it just do the research itself?
A  Well, they wanted to hire an investigation company.
Q  Right.
A  To do the research.
Q  So why didn't Golden Spring just hire the investigation company? Why did they try to find someone else to hire the investigation company?

16 (Pages 58 to 61)

30(b)(6): Amelia Coluccio
November 12, 2019

A. COLUCCIO

A   Golden Spring wasn't in a position to enter into a contract as a party.
Q   Why not?
A   I don't know.
Q   How do you know that they weren't in a position to enter into a contract as a party?
A   From my conversation with Yvette.
Q   This is from last night?
A   Yeah.
Q   So she didn't tell you why they weren't in a position to enter into a contract as a party?
A   No.
Q   Golden Spring is licensed to do business in New York, right?
A   Yes.
Q   They're registered here as a foreign corporation?
A   Golden Spring is registered in the US.
Q   Right.
    Let me back up. You know, when you say a corporation is registered as a

Page 62

A. COLUCCIO

foreign corporation, do you understand that means that they are actually formed under the law of another state and they're registered to do business in another state they're called a foreign corporation, right? Not foreign as in from outside the US, but foreign as in formed under the laws from another state, do you understand that?
A   Okay.
Q   Under the laws of what other state is Golden Spring New York formed?
A   I thought it was under New York.
Q   Okay. Do you know the answer to that question?
        MS. TESKE: Asked and answered.
A   (No verbal response given.)
Q   Do you know the answer to that question?
        MS. TESKE: Asked and answered.
Q   You can answer it?
A   Well, I just told you what I thought.

Page 63

A. COLUCCIO

Q   Okay, okay. Do you know of any reason why Golden Spring could not just enter into the contract itself?
A   No.
Q   Well, we'll do the best we can here. We'll keep forging ahead.
    Did Mr. Han tell Golden Spring whether it was going to be able to actually pay for the research work under this contract?
        MS. TESKE: Object to the form.
        You can answer.
A   Pay for the research work. I don't know.
Q   Did Mr. Han tell Golden Spring whether Eastern Profit could pay Golden Spring for its work?
A   Yes.
Q   What did he say?
A   He said that -- I'm sorry. He said Golden Spring New York would be compensated by Eastern Profit if the agreement was successful.

Page 64

A. COLUCCIO

Q   Did he say this right away in the first discussion or was this in a later discussion?
A   I'm not sure.
Q   Did it take sometime for Eastern Profit and Golden Spring to make their deal about Golden Spring working for Eastern Profit here?
        MS. TESKE: Objection to the form of the question.
        You can answer?
A   I'm not sure.
Q   Did it take a couple of days to negotiate the terms out?
A   I don't know how long it took.
Q   So you don't know other than the end of 2017 when this first approach from Ms. Wang to Mr. Han took place and you don't know how many days it took or if it even took multiple days to hammer out the Eastern Profit Golden Spring agreement, correct?
        MS. TESKE: Object to the form of the question.
        You can answer.

Page 65

Atkinson-Baker, Inc.
www.depo.com

A. COLUCCIO

A   Correct.
Q   Who knows the answer to those questions?
A   I would think Yvette would know.
Q   Did you ask her last night?
A   (No verbal response.)
Q   And you haven't looked for any writing that reflects the terms of this agreement?
   MS. TESKE: Object to the form of the question.
   You can answer.
A   Correct.
Q   Why did Golden Spring agree -- well, let me go back.
   You said Mr. Han told Golden Spring it would be compensated if the agreement was successful; what did it mean for the agreement to be successful?
A   I'm not sure.
Q   Does Golden Spring know?
A   I don't know.
Q   I mean was success defined as regime change in China? Was it defined as

Page 66

A. COLUCCIO

some of Guo's assets get unfrozen; what was the definition?
A   I don't know.
Q   Does Golden Spring know?
A   I don't know.
Q   Let's turn to the other half of the agreement. How much would Golden Spring be compensated if the agreement was successful?
A   I don't think that was decided on.
Q   How do you know that?
A   From my conversation with Yvette.
Q   So did Yvette tell you the amount of the compensation wasn't decided on?
A   Correct.
Q   By the way in this discussion with Yvette, did you have a chance to ask her question or did she just kind of march through the points with you?
A   I might have asked her, what, a couple of questions.
Q   Do you remember any question that you asked her?
A   Right now, I can't.

Page 67

A. COLUCCIO

Q   As we're going if you remember something you're telling me was a question you asked her, please let me know. If you can remember, okay?
A   Okay.
Q   And you were typing up notes as Ms. Wang was talking with you; was that right?
A   Yes.
   MR. GREIM: I'm going to call for production of those notes.
   MS. TESKE: We will object.
Q   Okay. What about there's one more piece of this I didn't ask you about.
   What was the timeline discussed? In other words, at what point was Golden Spring going to look back and Eastern Profit going to look back and say, all right, we either are successful or we're not; was that one of the things that was part of the agreement?
A   I don't know.
   MS. TESKE: Object to the form of that.

Page 68

A. COLUCCIO

Q   Is this the typical for Golden Spring not to have written agreements with its clients?
   MS. TESKE: Object to the scope.
   If you know the answer to that, go ahead.
A   I don't know.
Q   Does Golden Spring know the answer to that question?
A   I don't know.
Q   Does Golden Spring have written agreements with any of its client?
   MS. TESKE: Object to the scope of that question.
   And you don't have to the answer that.
Q   You're going to abide by counsel's instruction?
A   Yes.
Q   Were the terms of Golden Spring's deal with Eastern Profit atypical for Golden Spring?
A   I don't know.

Page 69

18 (Pages 66 to 69)

30(b)(6): Amelia Coluccio
November 12, 2019

**Page 70**

A. COLUCCIO

Q  Does Golden Spring have any experience doing research work for clients?
   MS. TESKE: Object to the scope of that question.
   But you can answer, if you know.
A  Not that I know of.
Q  So what investigation did Golden Spring do of Eastern Profit before deciding whether it wanted to go forward with this deal with Eastern Profit?
A  I don't know.
Q  Did it conduct any due diligence of Eastern Profit?
A  I don't know.
Q  Did it determine what Eastern Profit's line of business was?
A  I don't know.
Q  Did it determine who controlled Eastern Profit?
   MS. TESKE: Objection to the form of the question.
   The witness has already testified that it had a preexisting

**Page 71**

A. COLUCCIO

relationship with Eastern Profit.
   But you can answer.
   MR. GREIM: We don't need to testify for the witness. Let's just see, let's see what Golden Spring says.
Q  Did Golden Spring know who controlled Eastern Profit?
A  I think so. I don't know.
Q  Why do you say you think so?
A  Because they already had a business relationship with Eastern Profit, so I would think that they would know.
Q  I mean was it even a major business relationship?
   MS. TESKE: Object to the scope.
   You don't have to answer that.
Q  Was it a contract of some kind?
   MS. TESKE: You don't have to answer that.
Q  So why do you think that this prior business relationship was sufficient for Golden Spring to have known who

**Page 72**

A. COLUCCIO

controlled Eastern Profit?
   MS. TESKE: Object to the scope.
   You can answer, if you know.
A  I was just thinking that if two companies have a relationship, they have an idea of the officers of each company.
Q  Do you know that?
A  No.
Q  And do you -- you're going to be told not to answer, but do you actually know what that relationship is?
   MS. TESKE: Direct not to answer.
Q  Do you yourself know what the relationship was?
   I'm not going to ask what it was. I want to know whether this witness even knows what the relationship was.
   MS. TESKE: I'm going to direct you not answer because she's testifying in her corporate capacity and her personal knowledge is irrelevant.

**Page 73**

A. COLUCCIO

Q  Did Yvette Wang just tell you to say that there was a prior relationship?
   MS. TESKE: Object to the form of the question.
A  She didn't tell me to say it, but she told, from my conversation with her, she said that there was a preexisting relationship.
Q  And without disclosing what it was, did she tell you what the relationship was?
A  No.
Q  Did you ask her?
A  No.
Q  Now, both Eastern Profit and Golden Spring New York are controlled by Guo Wengui; Is that correct?
   MS. TESKE: Object to the form of the question.
   Do not answer it.
Q  They have common ownership?
   MS. TESKE: Object to the form of the question.
   Do not answer it.

### Page 74

A. COLUCCIO

Q Was it an arm's length negotiation between Yvette Wang and Han Chunguang?

MS. TESKE: Object to the --
I'm sorry.
Say your question again.

Q Was it an arm's length negotiation between Yvette Wang and Han Chunguang?

MS. TESKE: What negotiation?
MR. GREIM: Over the terms of Golden Spring's deal with Eastern Profit.

A I don't understand the question.

Q Okay. Have you ever heard of the term arm's length negotiation, have you ever heard that before?

A No.

Q Let me ask you this then -- so you never heard that -- each side fully controls its own position and there's no common control of the two different sides.

So my question is, in this negotiation about the terms under which Golden Spring would work for Eastern Profit, was each side fully in control of its own

### Page 75

A. COLUCCIO

position in that negotiation?

MS. TESKE: Object to the scope.
And in so far as she is here to testify as to GSNY, not Eastern, but you can answer to the best of your ability.

A From what I understand there was, there had already been a limited power of attorney in place for Golden Spring to act as Eastern Profit's limited power of attorney.

So Mr. Han basically told Yvette that she could go forward on behalf of Eastern Profit because there was that limited power of attorney.

Q So even before Golden Spring approached Eastern Profit about the research agreement, Golden Spring already held a limited power of attorney on behalf of Eastern Profit?

A Yes.

Q Okay. What was the scope of that authority?

### Page 76

A. COLUCCIO

A Just all I know was that it was Golden Spring could act as limited power of attorney for Eastern Profit.

Q In what matters?

A I don't, I'm not sure.

Q Was this in writing?

A Yes.

MR. GREIM: I call for the production of this other limited power of attorney.

MS. TESKE: I don't know that there is an other limited power of attorney.

MR. GREIM: Well, I've got the best they can give me.

MS. TESKE: And if there is and it concerns something other than this contract, then it's not relevant to this case.

MR. GREIM: Apparently it affected the negotiation between the two.

MS. TESKE: I didn't hear that out of her.

### Page 77

A. COLUCCIO

Q Have you ever seen it?

A No.

Q Who told you it existed?

A Yvette.

Q When?

A Yesterday.

Q Did you ask to see it?

A No.

Q Well, since GSNY already had this limited power of attorney, why did they even go to Mr. an Chin Gwan and ask for permission for Eastern Profit to enter into the research agreement?

MS. TESKE: Object to the form of the question.

A I don't know.

Q So did the limited power of attorney not already give Golden Spring authority to just put Eastern Profit's name on the agreement?

MS. TESKE: Object to the form of the question.

A I don't know.

Q Who knows the answer?

Atkinson-Baker, Inc.
www.depo.com

### Page 78

A. COLUCCIO

A   I don't know for sure.
Q   Did Golden Spring come up with a budget for how much it would cost to work on this project for Eastern Profit?
A   I don't know.
Q   Has Golden Spring been paid for its work on behalf of Eastern Profit?
A   No.
Q   Does Golden Spring New York have any clients who pay it for work on projects?
   MS. TESKE: Object.
   Don't answer that.
Q   Is it typical -- well, let me ask you this.
   How many hours has Golden Spring put into this Eastern Profit negotiation, performance, everything that's covered under its work for Eastern Profit, how many hours has Golden Spring put into it?
A   I don't know.
Q   Hundred hours?
A   I don't know.
Q   A thousand?
A   I don't know.

### Page 79

A. COLUCCIO

Q   Who are the different staff at Golden Spring who work on the Eastern Profit project?
   MS. TESKE: Object to the form. Asked and answered.
   You can answer.
A   Just Yvette.
Q   Mr. Podhaskie too though, right?
A   I'm sorry. The Eastern Profit project?
Q   Yeah. Let's go back.
   Is that unclear to you?
A   Yes.
Q   Let's go from the negotiation of the contract through the performance through everything else that is under the limited power of attorney.
   And so my question is who works on those things? So far we got Yvette and my next question is, is that Mr. Podhaskie as well?
A   Not that I know of.
Q   Other than his time spent in this litigation itself?

### Page 80

A. COLUCCIO

A   Right.
Q   And I suppose you spent sometime on it too?
A   On this litigation matter?
Q   Yes.
A   In an administrative sense, yes.
Q   What about the Han Chunguang, does he spend time on this?
A   I --
   MS. TESKE: Object to the form of the question.
   You can answer.
A   I don't know.
Q   Is he a Golden Spring employee?
A   No.
Q   Does he work in a Golden Spring office?
   MS. TESKE: Object to the form of the question.
A   No.
Q   You seem uncertain about that?
A   I've seen him at the office, but I don't think he works out of the office.
Q   Where does he work?

### Page 81

A. COLUCCIO

A   I don't --
   MS. TESKE: Object.
   You don't have to answer that.
Q   I'm sorry, what were you about to say?
   MS. TESKE: I'm directing her not to answer. It's way beyond the scope.
Q   Does he have a Golden Spring email address?
A   Not that I know of.
   VIDEOGRAPHER: Counselor.
Q   Why did Eastern Profit tell Golden Spring it would enter into the contract?
A   Because, well I know that Mr. Han was being persecuted by the CCP and was interested in doing research on them, and Eastern was in a position to enter into the contract.
Q   What do you mean it was in a position to be able to enter into the contract?
A   It was able to.
Q   That's literally what Mr. Han told

**Page 82**

A. COLUCCIO
Ms. Wang?
   MS. TESKE: Object to the form of the question.
   You can answer.
A  From what I understand.
Q  Well, does Golden Spring actually know that what Mr. Han said is true, that he's being persecuted by the CCP?
   MS. TESKE: Object to the form of the question.
   You can answer.
A  I don't know.
Q  Did Golden Spring make any efforts to see whether Mr. Han's story was correct?
A  I don't know.
Q  Who would know the answer to that question?
A  I think maybe Yvette would.
Q  Did Mr. Han tell Golden Spring what the persecution consisted of?
A  I don't know.
Q  Did Mr. Han tell Golden Spring why he thought entering into this research agreement would ease the persecution?

**Page 83**

A. COLUCCIO
A  I don't --
   MS. TESKE: Object to the form of the question.
   You can answer.
A  I don't know.
Q  Did Mr. Han tell Golden Spring what its goals were, what Eastern Profit's goals were in entering into the research agreement?
A  I don't know.
Q  Did Mr. Han give Golden Spring New York any parameters in terms of how much it was willing to spend on the research agreement?
A  I don't know.
Q  Mr. Han tell Golden Spring whether Eastern Profit itself could even afford to pay for research?
   MS. TESKE: Object to the form.
   You can answer.
A  I'm not sure. I just know that they, that he said that Golden Spring would be compensated by Eastern Profit if the

**Page 84**

A. COLUCCIO
agreement was successful.
Q  Okay. My question is a little bit different though.
   My question is, did Eastern Profit tell Golden Spring how Eastern Profit intended to pay for the research itself?
A  I don't know.
Q  Well, did a time come when Golden Spring learned that Eastern Profit couldn't pay anyone anything?
   MS. TESKE: Object to the form of the question.
A  I don't know.
Q  Who knows the answer to that question?
A  I don't know.
Q  Is it unusual for Golden Spring to work for free?
   MS. TESKE: Object to the form of the question.
   You can answer.
A  I don't know.
Q  Did Golden Spring already know that Eastern Profit's assets were frozen at

**Page 85**

A. COLUCCIO
the time it entered, it began its discussions with Eastern Profit?
   MS. TESKE: Object to the form of the question.
   You can answer.
A  I don't know.
Q  Did Golden Spring come up with any backup plan to be paid if it did all this work for Eastern Profit and the contract -- and it was owed money?
A  I don't know.
Q  Who did Ms. Wang report to with respect to her work on the project?
A  She didn't report to anyone.
Q  How do you know that?
A  From my conversations with her.
Q  Did she refer to Guo Wengui as her boss?
A  No.
Q  How do you know?
A  She told me.
Q  So she specifically told you last night that she never referred to Guo Wengui as her boss?

**Page 66**

```
 1              A. COLUCCIO
 2    A   Correct.
 3    Q   Who knows the answer to those
 4  questions?
 5    A   I would think Yvette would know.
 6    Q   Did you ask her last night?
 7    A   (No verbal response.)
 8    Q   And you haven't looked for any
 9  writing that reflects the terms of this
10  agreement?
11        MS. TESKE:  Object to the form
12    of the question.
13        You can answer.
14    A   Correct.
15    Q   Why did Golden Spring agree --
16  well, let me go back.
17        You said Mr. Han told Golden
18  Spring it would be compensated if the
19  agreement was successful; what did it mean
20  for the agreement to be successful?
21    A   I'm not sure.
22    Q   Does Golden Spring know?
23    A   I don't know.
24    Q   I mean was success defined as
25  regime change in China?  Was it defined as
```

**Page 67**

```
 1              A. COLUCCIO
 2  some of Guo's assets get unfrozen; what was
 3  the definition?
 4    A   I don't know.
 5    Q   Does Golden Spring know?
 6    A   I don't know.
 7    Q   Let's turn to the other half of
 8  the agreement.  How much would Golden Spring
 9  be compensated if the agreement was
10  successful?
11    A   I don't think that was decided on.
12    Q   How do you know that?
13    A   From my conversation with Yvette.
14    Q   So did Yvette tell you the amount
15  of the compensation wasn't decided on?
16    A   Correct.
17    Q   By the way in this discussion with
18  Yvette, did you have a chance to ask her
19  question or did she just kind of march
20  through the points with you?
21    A   I might have asked her, what, a
22  couple of questions.
23    Q   Do you remember any question that
24  you asked her?
25    A   Right now, I can't.
```

**Page 68**

```
 1              A. COLUCCIO
 2    Q   As we're going if you remember
 3  something you're telling me was a question
 4  you asked her, please let me know.  If you
 5  can remember, okay?
 6    A   Okay.
 7    Q   And you were typing up notes as
 8  Ms. Wang was talking with you; was that
 9  right?
10    A   Yes.
11        MR. GREIM:  I'm going to call
12    for production of those notes.
13        MS. TESKE:  We will object.
14    Q   Okay.  What about there's one more
15  piece of this I didn't ask you about.
16        What was the timeline discussed?
17  In other words, at what point was Golden
18  Spring going to look back and Eastern Profit
19  going to look back and say, all right, we
20  either are successful or we're not; was that
21  one of the things that was part of the
22  agreement?
23    A   I don't know.
24        MS. TESKE:  Object to the form
25    of that.
```

**Page 69**

```
 1              A. COLUCCIO
 2    Q   Is this the typical for Golden
 3  Spring not to have written agreements with
 4  its clients?
 5        MS. TESKE:  Object to the
 6    scope.
 7        If you know the answer to
 8    that, go ahead.
 9    A   I don't know.
10    Q   Does Golden Spring know the answer
11  to that question?
12    A   I don't know.
13    Q   Does Golden Spring have written
14  agreements with any of its client?
15        MS. TESKE:  Object to the
16    scope of that question.
17        And you don't have to the
18    answer that.
19    Q   You're going to abide by counsel's
20  instruction?
21    A   Yes.
22    Q   Were the terms of Golden Spring's
23  deal with Eastern Profit atypical for Golden
24  Spring?
25    A   I don't know.
```

18 (Pages 66 to 69)

30(b)(6): Amelia Coluccio
November 12, 2019