

Edward D. Greim
Direct Dial: (816) 256-4144
edgreim@gravesgarrett.com

December 6, 2019

<u>VIA ECF</u>
Hon. Debra Freeman
Daniel Patrick Moynihan
United States Courthouse
Courtroom 17A
500 Pearl Street
New York, New York 10007

Re: **Eastern Profit Corp. Ltd. v. Strategic Vision US, LLC, 18-cv-2185 (JGK)-DLF/ Leave to Depose Non-Party Steven Bannon**

Dear Judge Freeman:

On behalf of Defendant/Counterclaimant Strategic Vision US, LLC ("Strategic Vision"), we respectfully request that the Court allow Strategic Vision leave to depose non-party Steven Bannon beyond the end of the discovery period, which closed for most purposes on November 29, 2019. Mr. Bannon is a critical fact witness whose testimony is relevant and proportionate to the needs of the case. Strategic Vision will be prejudiced without this discovery and Strategic Vision has been exceptionally diligent in trying to obtain it. As discussed in detail below, following notice to Plaintiff Eastern Profit Corp. Ltd. ("Eastern Profit") on <u>September 25, 2019</u> (over two months prior to the close of discovery), Strategic Vision began extensive, time-consuming, and costly efforts to personally serve Mr. Bannon with a Fed. R. Civ. P. 45 subpoena. After employing three separate process service companies and paying over $5,000 to them in fees, Mr. Bannon was eventually personally served with the subpoena outside his residence in Washington, D.C., on November 14, 2019. The subpoena did not request the production of documents, and Mr. Bannon had eight days' official notice (although, given Mr. Bannon's direct access to materials from this case through Guo Wengui, Strategic Vision believes Mr. Bannon knew of the subpoena shortly after September 25th). However, without obtaining any relief from a court, Mr. Bannon did not appear at the November 22, 2019 deposition—a date within the discovery period. A certification from the court reporter of the non-appearance was prepared.

Strategic Vision believes Mr. Bannon will in fact appear and, until the discovery conference on December 2nd, his deposition had been noticed for December 5th (a date given by Mr. Bannon's counsel). The deposition has now been cancelled following the Court's invitation to Strategic Vision to make the case, with notice to Mr. Bannon's counsel, that



this deposition should be taken just outside of the discovery period. Mr. Bannon will be the last witness in this case.

**Strategic Vision's Efforts to Serve Mr. Bannon Were Early and Extraordinary**

Strategic Vision's belief in Steve Bannon's role as a fact witness in this case has been evident since at least the filing of the August 8, 2019 answer by Strategic Vision to the amended complaint, ECF 127.  There, Mr. Bannon is described as deeply involved in Guo Wengui's introduction to the United States and knowledgeable of his activities there as a purported dissident allegedly fleeing the Chinese Communist Party.  *See* ECF 127, ¶¶ 7, 11, 15, 60, 79, 80-82, 84-85.  Mr. Bannon also is alleged to have direct knowledge of this litigation, which he tracks, and is described in Strategic Vision's claims as having personally undertaken efforts to thwart and intimidate the participation of one of Strategic Vision's representatives, Michael Waller, in discovery and the case as a whole.  *See* ECF 127, ¶ 84.

On September 25, 2019 (over two months prior to the close of discovery), Strategic Vision gave the notice required by Fed. R. Civ. P. 45(a)(4) to Eastern Profit that Mr. Bannon's deposition would be sought.  (See Ex. A hereto)  A copy of the subpoena to Mr. Bannon also was provided to Eastern Profit, indicating a deposition of Mr. Bannon on October 10, 2019.  (Ex. A)  Eastern Profit made no objection to the notice, subpoena, or deposition.

Efforts to serve Mr. Bannon were begun immediately through HPS Process Service and Investigations.  The first attempt was the same day as the notice.  However, despite attempts on September 25, 2019, September 26, 2019, and October 4, 2019, HPS was unsuccessful in reaching Mr. Bannon at his residence.  (See Ex. B hereto, an affidavit of non-service).  HPS was paid $175.00 for its efforts.  (See Ex. C hereto, billing invoice from HPS)

A private investigator was then hired.  She, too, visited Mr. Bannon's residence several times, where she had been informed of the make and model of his vehicle and found it to be present nearby.  The service attempts at the residence happened on October 13, 14, 19, and 25, 2019.  (See Ex. D invoice).  However, Mr. Bannon's "handlers," two young men who answered his doorbell, refused to allow the private investigator inside to serve Mr. Bannon and refused to take the papers on his behalf.

The private investigator followed her visits to the Bannon residence by making arrangements to attend an event on November 7th in New York City where Mr. Bannon was scheduled to be a speaker.  Erik Prince and Tony Shaffer also were speakers—a gala hosted by the New York Young Republican Club.  (Ex. F, event notice, Ex. D, invoice)  The investigator attempted to purchase a ticket to the event but was placed on the waiting list.



She nevertheless travelled to New York (Strategic Vision paying the cost, see Ex. E, travel receipts), and surveilled the event location for some time but could not, however, reach Mr. Bannon to serve him with the subpoena.  The private investigator was paid $4,817.61 for her services, which were over the course of several weeks.  (Ex. D)

Finally, Same Day Process Service, 1413 K. Street, NW 7th Floor, Washington, DC 20005, was hired in early November, and a new notice of subpoena was served on Eastern Profit for a deposition on November 22nd.  (Ex. G, notice of subpoena)  This was still within the discovery period.  As with the first Bannon notice, Eastern Profit did not object to the notice, subpoena, or deposition.

On November 8, 2019, a SDPS server travelled to the Roger Stone trial taking place at the federal courthouse in Washington, D.C.  Media coverage indicated that Mr. Bannon was a witness for the prosecution, and social media published real-time updates on Mr. Bannon's testimony as he gave it.  The process server was kept aware of the updates through the SDPS administrative office.  He was not allowed, per Court rules, to enter the courtroom to serve Mr. Bannon but waited outside the only door he believed could be used by Mr. Bannon to exit.  However, it is believed Mr. Bannon used a private exit, and the server did not reach Mr. Bannon that day.  SDPS then visited Mr. Bannon's residence on November 8th but could not reach him there.

Success was finally had on November 14, 2019, when Mr. Bannon was found to exit his townhouse and was personally served with the subpoena while standing on the sidewalk/ outside steps to the townhouse.  Mr. Bannon interacted with two SDPS process servers, and each signed affidavits of personal service on him.  The affidavits were promptly filed with the Court and served on Eastern Profit. (ECF 196, Affidavits of Service)  SDPS was paid over $1,000 for its efforts.  (Ex. H, invoice)

Mr. Bannon does not contest service of the subpoena.

### Mr. Bannon Does Not Appear for his November 22nd Deposition

Mr. Bannon's deposition was noticed for November 22nd, within the discovery period. After service on November 14th, Mr. Bannon had counsel contact Strategic Vision on November 18th, evidencing that Mr. Bannon took near-immediate steps to provide the subpoena to counsel.  On the call, Mr. Bannon's counsel generally inquired why Strategic Vision believed Mr. Bannon had relevant information, and Strategic Vision's counsel described his anticipated testimony.  In the call, Mr. Bannon's counsel gave no notice that he would not appear on November 22nd or that he planned to seek court relief from the subpoena.  In fact, to this day, Mr. Bannon has not sought court relief from the subpoena. Under the law, the deadline for him to do so was prior to November 22nd; Mr. Bannon needed a court order to not appear on that date.  *Solargen Elec. Motor Car. Corp. v.*



*American Motors Corp.*, 506 F. Supp. 546, 552 (N.D. N.Y. 1981) ("A *deponent* [] may seek a protective order from the court … *The burden then rests upon the objecting witness* to set forth grounds for the issuance of a protective order, such as the existence of a privilege.") (emphasis added).  His options did not include serving an objection to the subpoena (which he did not do) or filing a motion requesting relief (which he did not do) without it being ruled on before the deposition.

From November 18th to November 21st, Mr. Bannon made no filing in any court and his counsel did not contact Strategic Vision.  On the afternoon of November 21st, as Strategic Vision's counsel was preparing to leave for the airport to fly to Washington, D.C., for the deposition the next morning, Mr. Bannon's counsel called.  For the first time, she indicated that Mr. Bannon "may" be on an overseas trip and "may" not be able to appear the next day.  However, counsel did not indicate that Mr. Bannon actually was unavailable to appear for the deposition the next day.  While Mr. Bannon's counsel indicated that December 5th was a better date and would give Mr. Bannon more time to prepare for the deposition, she likewise did not indicate that there actually was insufficient time to prepare him to appear the next day.  (See Ex. I, November 21st communication: "We are happy to discuss the conditions for a potential deposition of Mr. Bannon on December 5.").

During the call, Strategic Vision offered to reach this Court by telephone to address the issue of when the deposition would occur. Mr. Bannon's counsel declined to immediately make the call, but asked to first confer with her client and another lawyer at her firm. Strategic Vision's counsel advised that he would wait for a return call in the next hour and ten minutes and was ready to call the Court, but that after this point, he would have to leave the office for his late-afternoon flight to Washington, D.C., for the deposition. Strategic Vision stated that, absent an agreement to call the Court to seek a date outside of the discovery period, the noticed deposition would go forward.

Mr. Bannon's counsel did not call back as requested. Instead, long after Strategic Vision's counsel had left for the airport and minutes before boarding the flight, Strategic Vision's counsel received an email from Mr. Bannon's counsel stating that he would not be appearing.  (Ex. I)  Despite that counsel had already conferred twice that week, this was Mr. Bannon's first notice that he objected to the date and that he would not appear the following day. Strategic Vision objected to the discourtesy of the late notice but, to mitigate expenses, did not board the flight. On November 22nd, a telephonic record was made of Mr. Bannon's non-appearance. In order to avoid further delay, Strategic Vision's counsel informed Mr. Bannon's counsel that the deposition would be re-noticed for his proposed December 5th date.

In recognition of the date falling shortly after the November 29th close of discovery, by letter motion to the Court on November 27, 2019 (ECF 210, pp. 5-6), Strategic Vision



**Graves Garrett** LLC

requested leave to conduct the Bannon deposition on December 5, 2019. Again, this was a date first suggested by Mr. Bannon's counsel. (Ex. I)  No party objected to that request. However, on December 2, 2019, the Court denied that request without prejudice to Strategic Vision making a full showing, with notice to Mr. Bannon's counsel, demonstrating the efforts that Strategic Vision undertook to take his deposition within the discovery period.

Strategic Vision has made Mr. Bannon's counsel aware of the need to include her in a future conference with the Court.  She has requested a copy of the conference transcript and Strategic Vision has requested that it be prepared.

**Mr. Bannon is a Critical Fact Witness**
**Concerning Guo Wengui's Status and Activities During the Relevant Period**

As the Court explained during the December 2nd discovery conference, Strategic Vision should be allowed to develop the evidence it believes is needed to prove its affirmative claims and its defenses to the claims of Plaintiff Eastern Profit Corp. Ltd. ("Eastern Profit").  Whether Strategic Vision ultimately can make its case is for later, but the development of evidence now should not be hindered if the discovery is relevant and proportionate to the needs of the case.

Mr. Bannon's testimony is both relevant and proportionate to the needs of the case. Witnesses have testified that Mr. Bannon's relationship with Guo Wengui gave Guo an aura of credibility that directly resulted in Strategic Vision's decision to enter a contract with Eastern Profit, the Guo-controlled entity that Golden Spring (New York) Limited's Yvette Wang chose as the "contracting party" for the Research Agreement at issue after Guo told Strategic Vision that he would have a business entity sign the contract. Further, discovery is proper into Mr. Bannon's trip to meet with two high-ranking Chinese and Emirati officials known to Guo, and with whom Guo would have had an urgent need to communicate in the fall of 2017, shortly after Guo made a written pledge to Chinese leaders and shortly before he engaged with Strategic Vision.

Mr. Bannon has deep knowledge of Mr. Guo's activities in the U.S. beginning in the summer of 2017. Mr. Bannon was reportedly involved in White House discussions in the summer of 2017 about whether Mr. Guo should be deported to China. In August 2017, days after Mr. Bannon left the White House and returned to Breitbart.com, the outlet began actively promoting Guo's cause. In mid-September 2017, Mr. Bannon (now, as a private citizen) travelled to Hong Kong, where a Chinese state-owned brokerage and investment group—the nation's largest—paid him to give what the Financial Times called a "closed



door" speech.  In that speech, Mr. Bannon praised Xi Jinping, stating that Xi is "just like President Trump."[1]  From there, Mr. Bannon traveled to Beijing to visit for 3 hours with none other than Wang Qishan, the senior CCP and PRC official Guo was contemporaneously claiming was his arch-enemy. The trip was arranged by John Thornton, a former U.S. investment banker close to the Chinese leadership who knows Bannon[2] and who at least one witness has testified knows Guo.

The Wang meeting is important, because it came just a few weeks after Guo wrote to top Chinese officials pledging his loyalty, promising to speak on behalf of China's interests in the U.S. without "crossing the red line," and asking for "detailed instructions." Wang Qishan, who Guo claims is his arch-enemy, was already a member of the standing committee of the Politburo and soon to be the number 2 official in China; he would certainly have been in a position to approve and convey the regime's response to Guo's letter. But despite many requests in this case, there is little evidence regarding what the response was, who gave it, and when it was conveyed.

There is reason to believe that Bannon knows. Another witness has testified that Mr. Bannon discussed his Wang Qishan meeting with Mr. Guo in early October 2017. Although Mr. Bannon has publicly stated that the meeting was to discuss "economic nationalism," a colleague of his has testified in this case that Mr. Bannon would not explain to the witness what was actually discussed, and that this refusal to provide details was unusual for Mr. Bannon.

Mr. Bannon departed Beijing for Abu Dhabi in the United Arab Emirates for a visit with Crown Prince Mohammed bin Zayed. In 2015, Guo had convinced the royal family to invest $3 billion in ACA Capital under a failed scheme to invest in a Mainland-based entity. Mr. Bannon would have remembered discussions a few months earlier in the White House involving a purported effort to extradite Mr. Guo to the UAE, which would then exchange Guo with the Chinese in return for a payment. In short, it is reasonable to believe that Bannon's trip involved communications with Mr. Wang and UAE leadership on behalf of Guo, since (i) Guo had much to discuss with each party and (ii) we know that Bannon reported on his trip to Guo shortly after it was completed.

---

[1] Mr. Bannon's praise for Xi markedly contrasted with his statement to the New York Times, published several days before, in which he compared modern-day China under Xi to prewar 1930s Nazi Germany.

[2] https://www.nytimes.com/2017/09/22/us/politics/bannon-china-abu-dhabi.html



Mr. Bannon's relationship with Guo only deepened after this trip. By October 2017, Mr. Bannon himself had begun to speak publicly on behalf of Guo, and soon began to appear in videos and pictures with him—some of which can only be described as strange. Mr. Bannon has since been drawn tightly into Guo's circle, and reports surfaced just weeks ago that he is being paid no less than $1 million per year by Saraca Media Group, a Guo-controlled entity that uses the name "Guo Media." (Guo denies owning or knowing who owns the entity, but Strategic Vision will show that Guo Media is Guo's main propaganda arm in the U.S.) Further, as Strategic Vision has alleged, Mr. Bannon has served as an ally of Guo in his campaign to infiltrate the conservative "China hawk" establishment and marginalize any individuals who are concerned with Guo. As Strategic Vision has alleged, this has included Mr. Bannon's direct conveyance of Guo's threats against J. Michael Waller, a Strategic Vision agent and key witness in this case. (ECF 127, ¶ 84)  Mr. Bannon made his threats to Mr. Waller's colleagues at the Committee on the Present Danger: China, who separately employ Mr. Waller in a foreign policy-focused nonprofit. Mr. Bannon told Mr. Waller's colleagues that Mr. Waller should be removed from the Committee, and said that Guo, who had "more money than God," would personally sue Mr. Waller (a threat that soon thereafter materialized in the form of a $50 million defamation claim). Mr. Bannon also told Mr. Waller's employers that he had somehow accessed and read Mr. Waller's confidential deposition in this case—access that could only have come from Guo. In short, Mr. Bannon is so close to Guo that he is apparently privy to, and has his authority to release and share, sensitive material from this case that is confidential by order of this Court.

Mr. Bannon, then, is expected to have information on: (1) Guo's contacts with Chinese officials in the fall of 2017 (when Mr. Bannon traveled to Beijing to meet with Guo's main alleged adversary, Wang Qishan); (2) Guo's campaign in the U.S. to influence the dissident and "China hawk" foreign policy establishment; and (3) the source of payments used to fund Guo's U.S. influence operations from overseas, including payments Mr. Bannon himself has received. This last topic has been addressed extensively with the Court, including in the context of Strategic Vision's failed effort to obtain testimony and documents from ACA Capital.

In closing, we would note that the other party to the case, Eastern Profit Corp. Ltd., has expressed no opposition to the limited reopening of discovery to conduct the deposition of Steve Bannon. Eastern Profit also did not object to any of the Bannon-deposition-related notices and events.  The information sought is uniquely in the possession of Mr. Bannon and could not be obtained from other witnesses. The Bannon deposition is a critical closure of discovery that Strategic Vision has obtained only with great effort and expense, and is necessary to prepare for trial or summary disposition.



We appreciate the Court's attention to this important matter.

Respectfully submitted,

Edward D. Greim

Counsel for Defendant/Counterclaim Plaintiff
Strategic Vision US, LLC

cc:    Counsel of record via ECF
       Counsel for Steven Bannon, Allison McGuire and Alex Spiro, via electronic mail

8