```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2

 3   ----------------------------------------X
                                            :
 4   EASTERN PROFIT CORPORATION LIMITED,    : 18-CV-02185 (JGK)
                                            :
 5                    Plaintiff,            :
                                            :
 6              v.                          :
                                            : 500 Pearl Street
 7   STRATEGIC VISION US LLC, et al.,       : New York, New York
                                            :
 8                    Defendants.           : January 16, 2020
     ----------------------------------------X
 9
          TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONE CONFERENCE
10             BEFORE THE HONORABLE DEBRA C. FREEMAN
                  UNITED STATES MAGISTRATE JUDGE
11
     APPEARANCES:
12
     For the Plaintiff:        CHRISTOPHER B. CHUFF, ESQ.
13                             Pepper Hamilton LLP
                               Hercules Plaza
14                             1313 Market Street, Suite 5100
                               Wilmington, Delaware 19899
15
     For the Defendant:        EDWARD D. GREIM, ESQ.
16                             Graves Garrett, LLC
                               1100 Main Street, Suite 2700
17                             Kansas City, Missouri 64105

18   For Golden Spring:        MARK HARMON, ESQ.
                               Hodgson Russ, LLP (NYC)
19                             605 3rd Avenue, Suite 2300
                               New York, New York 10158
20
     For Kin Ming Je:          JEFFREY GAVENMAN, ESQ.
21                             Schulman Bhattacharya LLC
                               7500 Old Georgetown Road
22                             Bethesda, Maryland 20814

23
     Court Transcriber:        SHARI RIEMER, CET-805
24                             TypeWrite Word Processing Service
                               211 N. Milton Road
25                             Saratoga Springs, New York 12866


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service
```

2

1          THE COURT:  Hello, it's Judge Freeman.

2          MR. GREIM:  Judge Freeman, this is Mr. Greim.  We do

3   have all the parties on the line now.

4          THE COURT:  Oh, all the non-parties?

5          MR. GREIM:  Yes.  Both sets of non-parties who are,

6   you know, relevant to this call as well as opposing counsel

7   Eastern Profit.

8          THE COURT:  All right.  So let me just go down the

9   line.  Who do I have for Eastern Profit?

10          MR. CHUFF:  Chris Chuff, Your Honor, from Pepper

11   Hamilton.

12          THE COURT:  Okay.  And who do I have for Mr.

13   Guo and Golden Spring?

14          MR. HARMON:  This is Mark Harmon, Your Honor, for

15   Mr. Guo, Golden Spring, and Yvette Wong [Ph.].

16          THE COURT:  Okay.  And who do I have for Mr. Je?

17          MR. GAVENMAN:  This is Jeff Gavenman for Mr. Je.

18          THE COURT:  I'm sorry.  Tell me your name again.

19          MR. GAVENMAN:  Jeff Gavenman, G-A-V-E-N-M-A-N.

20          THE COURT:  Okay.  For those of you who may not have

21   been on prior calls with me, I do have recording capability

22   and I'm attempting to use it so you can have a record.  You

23   can get a transcript if you want.  But it is my desire to go

24   through all of the subpoenas that are out there and address

25   whether they should be responded to or not so that we can get

1    to the close of discovery in this case.

2              I am aware of six subpoenas.  Is that right, Mr.

3    Greim?  Are there six subpoenas?  I have an AT&T, I have four

4    for Google, and I have a GoDaddy.

5              MR. GREIM:  Your Honor, I believe that's right.

6    I've got them listed by the accounts we're seeking.

7              THE COURT:  Well, the two Google ones are YouTube

8    and two Google ones are Gmail.

9              MR. GREIM:  I believe that's right.

10             THE COURT:  Okay.  Well, let me start with the one

11   that is the easiest which is one of the Google Gmail subpoenas

12   where the date of the subpoena is November 26.  That would be

13   I think for -- involving Mr. Je.  That one seems to me to be

14   untimely as served just within three days of the close of

15   discovery with it not being reasonable time for compliance a

16   within discovery period.  Even if I'm not a stickler for it

17   has to be, you know, well in advance of that deadline, that

18   seems to me to be too close.  So that one just seems to  me to

19   be untimely.

20             The GoDaddy subpoena, I do not think I have a copy

21   of it so I don't know the date of the subpoena or the date

22   when compliance was sought.  Can you please tell me what the

23   date of that subpoena was and what its return date was?

24             MR. GREIM:  Yes, I believe we can.  It'll take just

25   a second here.  The date is November the 4th and October the

4

1   31st.

2           THE COURT:  I'm sorry.

3           MR. GREIM:  And --

4           THE COURT:  One sec.  October 31st is the date of

5   the subpoena and the compliance --

6           MR. GREIM:  Yes.

7           THE COURT:  And the compliance date was November 4?

8           MR. GREIM:  No, I'm sorry.  There were two different

9   subpoenas to GoDaddy.  One was October 31, and one was October

10  4th.

11          THE COURT:  October 4 or November 4?

12          MR. GREIM:  I'm sorry, I'm sorry.  November 4.

13  November 4.

14          THE COURT:  All right.

15          MR. GREIM:  So let me --

16          THE COURT:  I don't have -- I don't think I have

17  copies of any GoDaddys being -- in all of the voluminous

18  materials that have been submitted to this Court, there's like

19  huge stacks of material, I don't -- I was not able to find any

20  GoDaddy subpoenas much less more than one.  I wasn't -- I

21  didn't even know there were more than one.

22          MR. GREIM:  Okay.  Well, we do -- Your Honor, we do

23  have two of them.  They may be exhibited to -- we didn't

24  include them because the first filing on this was done by Ms.

25  Teske for Hodgson Russ.  And so there may be exhibits for that

5

1   filing.

2           THE COURT:  I don't believe --

3           MR. GREIM:  But we are running --

4           THE COURT:  I don't believe so.  I could be wrong

5   because we've looked at all of the exhibits.  But are these

6   two GoDaddy subpoenas looking for accounts for two different

7   individuals?  Is it one for Mr. Je and one for Mr. Guo?

8           MR. GREIM:  No.  I'll tell you exactly.  So let's

9   start with the October 31 subpoena, Your Honor.  That one

10  requested registration information for four domains.  The

11  first is guo.media.  The second is goldenspringgroup.com.  The

12  third is acacapital.com.  And the fourth is rolfoundation.org.

13          THE COURT:  And what was the second one?

14          MR. GREIM:  Goldenspringgroup.com

15          THE COURT:  No, no, no.  The second subpoena.

16          MR. GREIM:  Oh, I'm sorry.  Okay.  Second is

17  November 4th and that request also registration information

18  for four domains: ruleoflawsociety.org,

19  ruleoflawfoundation.info, saracamediagroup.com, and

20  saracamedia.com.

21          THE COURT:  And when you say registration

22  information, what information in particular are you looking

23  for?

24          MR. GREIM:  It would be the person who set it up.

25  It would be the recovery number, it would be the IP address

6

1  from which it was started, and then I believe it would be the

2  IP information from which it was accessed.  But let me just

3  tell you -- so let me go into the documents to be produced to

4  make sure I didn't miss something here just now.  I've got one

5  of them pulled up.

6          So it's documents sufficient to show identifying

7  information for the person or persons who registered the

8  domain name, including names, company names, addresses, phone

9  numbers, and e-mail addresses.  That's number one.  Number two

10 reports or other information associated with the domain names

11 including underlying registrant data if it was shared with law

12 enforcement or government bodies --

13          THE COURT:  I'm sorry.  If it was --

14          MR. GREIM:  -- [inaudible].

15          THE COURT:  If it was shared, what does that mean?

16 You want to know the answer of whether it was shared or you

17 only want it if it was shared?

18          MR. GREIM:  We want it if it was shared.

19          THE COURT:  And if it was not shared then you don't

20 want the information?

21          MR. GREIM:  Correct because they wouldn't have

22 generated that report.  In other words, we want reports that

23 were shared.  I mean there wouldn't be such a thing as a

24 report that wasn't shared.

25          THE COURT:  So you want reports?  And what would

7

1   these reports have?

2           MR. GREIM:  They would have registrant data.  They

3   would have information about who had registered, from where

4   they had registered, and I think from where they have

5   accessed.  But I'm not entirely sure exactly everything that's

6   in that report.  I simply know that, and I think this is

7   right, that there are no such documents to be produced.  In

8   other words, there's no -- that [inaudible] --

9           THE COURT:  GoDaddy has told you for all eight of

10  these domains there are no reports?

11          MR. GREIM:  Let me -- okay, no, actually we don't

12  know that.  We don't know that, Your Honor.

13          THE COURT:  So what were you talking about?

14          MR. GREIM:  It's possible.

15          THE COURT:  What were you talking about, somebody

16  told you there are no reports on some account somewhere?

17          MR. GREIM:  No, no.  I just misunderstood.  I'm

18  trying to -- I have a lot of stuff here.  I just

19  misremembered.  I checked with a colleague here and I was

20  wrong about that.

21          THE COURT:  Okay.

22          MR. GREIM:  Okay.  So that was two.

23          THE COURT:  All right.  And I'm assuming the other

24  GoDaddy subpoena asking -- is there more information you're

25  asking for besides who registered --

8

1          MR. GREIM:  Yeah.

2          THE COURT:  What else are you asking for?

3          MR. GREIM:  Yes.  I'll just quickly run through so

4  we've got a record here: all documents including but not

5  limited to any reports of abuse related to suspected or actual

6  violations by domain names and policies in the service

7  agreement.  And then I'll just go -- this is going to take a

8  while so I'll just --

9          THE COURT:  What is the relevance of all of this?

10          MR. GREIM:  Well, Your Honor, what we're trying to

11  get is we're trying to find out who actually set up and

12  maintained these accounts and which is important.  I mean no -

13  -

14          THE COURT:  Okay.  Who set up and maintained an

15  account is not this whole long list of everything you're

16  reading to me.  Who set up and maintained the account is who

17  set up and maintained the account.

18          MR. GREIM:  Right.  But, Your Honor, we tried to use

19  a technical form here.  And I mean we could have said that --

20          THE COURT:  What does that mean?  What does --

21          MR. GREIM:  -- [indiscernible] have a long

22  discussion with GoDaddy about --

23          THE COURT:  Wait a minute.  I'm sorry.

24          MR. GREIM:  -- what kind of records they keep.

25          THE COURT:  I'm sorry.

1       MR. GREIM:  [Inaudible].

2       THE COURT:  Mr. Greim, reports of abuse related to

3  suspected violations is not a technical form that GoDaddy

4  would need to understand that what you're looking for is who

5  set up the account.  Who set up the account is in plain

6  English --

7       MR. GREIM:  Your Honor --

8       THE COURT:  -- who set up the account, who's the

9  registrant.

10      MR. GREIM:  Well, I mean if this will be a reason --

11  I mean what I'm willing to do is say this, we want to know who

12  set up and maintained the account and then here's the other

13  piece I didn't have a chance to get to.  We want to know from

14  what IP -- you know, what IP addresses are they using to do

15  this.

16      THE COURT:  Right.  But didn't you tell me long ago

17  and repeatedly that you are not looking for geographical

18  location information and didn't we have a conversation and we

19  talked about the fact that the IP address information can be

20  used to identify geographic location and that that was not

21  something you were interested in?  And if that is not what

22  you're interested in, why are you interested in the IP

23  addresses?

24      MR. GREIM:  But, Your Honor, there's two different

25  things.  My understanding is geographical tracking information

1   is something very specific.  I don't actually know what's

2   included in that, I'll just tell you, but it's with

3   something's been communicated to every single one of these

4   recipients that we are not trying to get.  But the

5   conversation we had before, Your Honor, is that we are seeking

6   IP information because that at least tells you the general

7   location.  Like, for example, was somebody -- was an

8   authorized user for Guo.media accessing Guo.media from

9   mainland China.  I mean and, frankly, we have found some

10  interesting information on that point with some other

11  subpoenas that we have here.

12          And so that's what we're trying to find.  It's not

13  -- I mean I understand the issue with geographical tracking

14  location where --

15          THE COURT:  I'm sorry.  Did these other subpoenas

16  involve these same non-parties who are on the call and do they

17  know about the information that was obtained?

18          MR. GREIM:  Yes.  Guo -- there is one subpoena to

19  Cloudflare that involves Guo Media.  Now many many questions

20  many many times counsel for Guo and Golden Spring have told us

21  over and over again they do not represent Guo Media.  And Guo

22  claims, in fact, not to own or even know who owns Guo Media,

23  although we think the evidence will be overwhelming that

24  that's not correct.

25          But nonetheless, we did find information on Guo

11

1  Media from our Cloudflare subpoena.  And in fact, we found --

2  let me go to -- I've got a little --

3        THE COURT:  Okay.  Don't forget we're focused on the

4  claims and defenses raised in the litigation in front of me.

5  Guo --

6        MR. GREIM:  Correct.

7        THE COURT:  Guo is not even a party.  Guo Media is

8  not a party.  You know, in order for you to make these

9  connections that Mr. Guo on behalf of Eastern Profit

10  fraudulently induced Strategic Vision to enter into a contract

11  the idea that Guo Media was accessed from China, for example,

12  you're going to have to put those pieces together.  And as

13  I've questioned you many times, just finding something

14  interesting is not the test for discovery, okay?  So you're

15  looking --

16        MR. GREIM:  [Indiscernible].

17        THE COURT:  You're looking for a tremendous amount

18  of information from a tremendous number of suppliers including

19  information that would enable you to find geographic location

20  even though you said you don't want geographic tracking data,

21  but what you're looking for is the same thing through these IP

22  addresses as far as I can tell which is where were people at

23  the time that they did certain things at certain times.

24  Otherwise, I don't know why you would care about the IP

25  addresses.  So --

1          MR. GREIM:   [Inaudible].

2          THE COURT:   Okay.  So I understand that you might

3    want to understand who was behind a YouTube account where you

4    found something posted that you thought was relevant.   Even

5    for authentication purposes, I understand that.   But you're

6    looking for a tremendous amount of material, billing records,

7    all kinds of other kinds of records and whether you've made it

8    clear to providers you're not looking for tracking

9    information, the subpoenas all contain that information.

10          So you're going to have to make a showing to me that

11   this connects to your counterclaim in some kind of coherent

12   way where it outweighs the breadth of these subpoenas and, you

13   know, makes sense at this stage of the game.  And don't forget

14   we're supposed to be doing last bits of finishing up loose

15   ends of discovery where you had thought it really wouldn't be

16   very much and we'd kind of be at the end of the road, right.

17   So this is not a whole new -- it's not supposed to be a whole

18   new trek with whole new large volumes of material leading to

19   who knows what, okay?

20          Let me hear from --

21          MR. GREIM:  Your Honor, I understand all of that.  I

22   mean and I agree with -- we're on the same page with all of

23   that.  I mean these went out the door in, as I said, October

24   31 and November 4th.  And let me make that connection.  Let me

25   make the connection.

13

1          So Guo -- you know, obviously, as you said, he is no

2    longer a party in this case.  He did not choose to replead an

3    alter ego theory.  Nonetheless, it is his statements about

4    himself that matter for the Eastern Profit's fraud claim.

5    That's been admitted in this case.  And so then the question

6    is, well, what are the -- you know, what things prove or

7    disprove, make it more or less likely that Guo is a dissident

8    and we talked about different ways of proving that.  One area

9    has been, you know, flows of money.  And, frankly, some of

10   those flows of money also are really for breach of contract

11   claim that this supposed loan that they're basing their, you

12   know, restitution claim on we're saying is the sham

13   transaction because it's really just one entity.  But I won't

14   go into that.

15          THE COURT:  Her to the subpoenas.

16          MR. GREIM:  You've probably heard it like 20 times

17   from me.  So let me go back.

18          THE COURT:  Get to the subpoenas.

19          MR. GREIM:  Okay.  So, what we know is that there

20   are a few websites out there, a couple I -- you know, let me

21   be specific -- a couple of YouTube channels that supposedly,

22   you know find secret things about Guo or they alter things and

23   they are sources that are controlled by the Chinese party.

24   That's at least the allegation.

25          As we said in our letter, those are Guo's supposed

14

1   tormentors.  And so I know I'm shifting from GoDaddy for a

2   second here, but it's necessary to understand this whole

3   thing.  And so a couple of the YouTube channels that we are

4   trying to unmask to see who's actually running those and who's

5   the registrant for those --

6             THE COURT:  Let me interrupt you, okay.

7             MR. GREIM:  Thank you.

8             THE COURT:  I already said I understand if you might

9   want to -- that you might want to know who's registered or has

10  uploaded information to YouTube sites where that information

11  is something that you want to use in this case even just for

12  authentication purposes.  I understand that.  What I said I

13  don't understand is why you are looking for information far

14  beyond who the registrant is of those YouTube sites with all

15  of these subpoenas and why all of this other information

16  you're seeking is relevant to your -- relevant to claims to

17  defenses or counterclaims and not disproportionate.

18            MR. GREIM:  Okay.  Okay.  So let me -- well, I

19  understand that, but it's important to understand at the

20  outset that we've got -- that we hope to get data from these

21  other two websites that I can't -- I'm sure no one here is

22  claiming that they represent, okay.  But we expect to get that

23  from these subpoenas.

24            And so the first thing I would say is it will be --

25  we believe there is an excellent chance that the registration

1  information and the IP addresses being used to load data onto

2  those may well match up with the domains that are controlled

3  by Guo which would -- you know, we were to prove that, we

4  would now be able to see that the supposed tormentors that Guo

5  has never himself tried to unmask any of his lawsuits actually

6  share administrators and accessors with his own websites.  But

7  that's not all.  I mean that would be -- I would like to be

8  able to show that.  I can't t ell you that we already know

9  we'll be able to show that.  So let me go further.

10         THE COURT:  So you want to be able to show -- you

11  are hoping that you will be able to show that an IP address

12  that didn't access, meaning view a website but an IP address

13  associated with the registrant of a website --

14         MR. GREIM:  Yes.

15         THE COURT:  -- is the same IP address associated

16  with the registrant of another website, one being Guo-friendly

17  and one supposedly not being Guo-friendly?

18         MR. GREIM:  Correct.  That's piece A, part A.  But

19  the other piece of this, as we've already found on our

20  Cloudflare subpoena is that Guo Media has what's called for

21  the lack of a better word sort of a super administrator.  So

22  there are different accounts that you can see on there that

23  are the, quote, administrator of that account.  And the other

24  thing you can see is where are they sending invoices for that

25  account.

1          So for Guo Media, at least the one that is covered

2   by Cloudflare, we can see that the IP address for the

3   administrator of that actually is at China Golden Spring.  So

4   that's the first interesting point.  Remember we talked about

5   China Golden Spring back when we were trying to get to ACA and

6   William Je and just couldn't find any way to find an agent or

7   even somebody who would say they'd represent these folks.  So

8   remember China Golden Spring is the kind of mother ship that

9   is the family office for Guo based in Hong Kong.  That's who

10  Yvette Wong says she got instructions from on the Eastern

11  Profit contract.

12          So we now learned that the IP administrator at China

13  Golden Spring is the person who created the Cloudflare account

14  for Guo Media.  So right there we can see that this is not

15  just some independent entity that Guo knows nothing about.  It

16  doesn't definitively prove things, but that's not our standard

17  for discovery.  Okay, so that's point one.

18          Then we can see that they are sending all of their

19  invoices all the way through mid-August of 2018 to Golden

20  Spring Hong Kong when supposedly these assets in Hong Kong are

21  frozen, they're being -- at least being sent to Hong Kong

22  Golden Spring.  This is for Guo Media, supposedly a U.S.

23  entity that is just interested in Guo.  Next, we see that

24  there is a super administrator and there is a lead user for

25  that account.  And that's the person who kind of controls

17

1   access and privileges for all other people.  That person works

2   at a Hong Kong-based marketing company which itself does

3   substantial business on the mainland.

4           Then we see that -- let's see, I'm sorry, I'm just

5   going through my notes here -- that the super administrator

6   uses IP addresses in the U.S. and Hong Kong.  And, finally,

7   several other users, and this is maybe the most important

8   point, of Guo Media -- this is not people who just happen to

9   click on it to see what's on there, these are actual people

10  who are authorized to run Guo Media -- are actually based not

11  only in Hong Kong but they're also in mainland China.

12          THE COURT:  I'm sorry.  In your understanding, what

13  is Guo Media and what is its relevance to the case?

14          MR. GREIM:  Guo Media is sort of the messaging arm

15  for Guo.  Now, again, I will acknowledge Guo at his deposition

16  denied it.  He denied --

17          THE COURT:  And you believe that that is the case

18  because even though he denied it, you believe that for some

19  other reason?

20          MR. GREIM:  Well, I mean for starters it's called

21  Guo Media, and if you just look at the content, it largely

22  consists of his own YouTube videos.  But of course it's hard

23  to authenticate when he claims that, you know, it's some other

24  entity that somehow gets his stuff and he's not sure.  And I

25  will also say the president of Guo Media's no other than Han

18

1   Chunguang, the man who's also the president supposedly or at

2   least the person who controls Eastern Profit in our case.

3           But, nonetheless, we also saw that the person who

4   actually set up Guo Media, that's one of the points I

5   mentioned earlier, the IP address for that IP -- is for the IP

6   administrator at China Golden Spring which is in Hong Kong.

7   So I mean, yes, he has denied it.  We don't think that denial

8   is credible.  I mean he's denied even knowing who owns Guo

9   Media.  It just seems hard to believe that somebody who's so

10  diligently sort of polices speech about himself would really

11  know nothing about who owns Guo Media, but you know that's

12  what he said.

13          Nonetheless, it should never be the case that Guo

14  Media who has actually set up and run with his own China

15  Golden Spring people had people in the mainland who have

16  authority to run the website.  That should not -- if his

17  family members have been arrested, if he can't go there

18  himself, I he's a dissident, how can it possibly be that

19  people on the mainland are running Guo Media?  And so that's a

20  sample of what we got from the Cloudflare subpoena.

21          So that's a second reason why it is very

22  interesting.  You know, we're not getting people's internal

23  communications.  We're just finding the sort of nuts and bolts

24  data that cannot lie.  I mean who set this up, from where are

25  they accessing it, the people that actually have authority to

19

1   access that website, and, you know, is it all the same group

2   of people?

3              THE COURT:  You have quite a number of accounts that

4   you're looking for.  I mean just with the GoDaddy you've

5   identified I think it was eight separate accounts.  So they're

6   not all Mr. Guo's, they're not all Guo Media.

7              MR. GREIM:  Correct, but there are --

8              THE COURT:  And with each one that is going to

9   require another explanation as to why you're going after some

10  other entity's account information.

11             MR. GREIM:  Well, the other entities, though, are --

12  so I had mentioned two that were Saraca.  Saraca Media -- Guo

13  Media is a DBA for Saraca Media Group.  And so that's three of

14  the eight, actually, that are Guo Media.  Saraca Media Group

15  is the entity that we know, for example, that Mr. Bannon

16  entered into a deal with and that probably is the entity that

17  paid him to make these appearances with Guo.  So that's three

18  of our eight.  We have Golden Spring Group itself which is,

19  you know, in this very case the agent of Eastern Profit.  They

20  were appointed to litigate this case for Eastern Profit, so

21  they're very much a part of this case.  They're Guo's family

22  office as we learned in our deposition of Golden Spring.

23             ACA Capital we know why they're relevant.  That is

24  the William Je entity that we believe is funding this

25  operation.  And, finally, we've got the Rule of Law entities.

1   Those are the non-profit arms that Guo has set up to, as he

2   says, expose corruption.  And we had a witness who had just

3   resigned from Rule of Law Society, the twin of Rule of Law

4   Foundation who told us about how that entity operates and, you

5   know, essentially that's the entity that Guo said he would

6   fund with $100 million and that would speak out, essentially

7   do the publicizing work that I think Guo thought he would do

8   with Strategic Vision.

9            So we know that he has something that many many

10  shale companies that do many things.  It shows the circle of

11  entities that are most likely to, you know, have people who

12  are accessing it now and that are tied to the facts of our

13  case.

14           THE COURT:  Who --

15           MR. GREIM:  And I would also point out that nobody

16  represents, nobody on this call represents any of these

17  entities.  I mean the objections are coming from people who

18  don't represent any of these groups.

19           THE COURT:  Well, for me to hear objections, the

20  first thing that I need to determine is standing.  And so if

21  there is personal information, private information for any of

22  the individuals or entities represented on this call by

23  counsel where you think that the subpoenas would divulge that

24  sort of information where your clients have interest, then

25  I'll find that there's standing to challenge them.

21

1          If you don't speak for the entities, if the

2     individuals do not have a personal interest, for example, if

3     counsel for Mr. Guo says Mr. Guo is not in fact affiliated

4     with Guo Media and knows nothing about Guo Media and what they

5     do and who runs it, then presumably the registrant information

6     and so on and so forth would not be Mr. Guo's information,

7     would not have an impact on Mr. Guo, and there would be no

8     standing to challenge that.  So the first thing I need to

9     understand for each of these subpoenas is who actually has

10    standing to challenge them who has made an objection.

11         So can I run down those subpoenas and -- or maybe

12    I'll start with counsel and tell me which subpoenas are you

13    challenging and are there any that you're not?  So starting

14    with Mr. Harmon, which ones are you challenging and which ones

15    are you not?

16         MR. HARMON:  Thank you.  I want to get to your

17    question, Your Honor, but I want to, if I may, just start off

18    with a general statement of my disquiet that what's been going

19    on here is that Mr. Greim on behalf of Strategic Vision has

20    been issuing subpoenas for vast amounts of information that I

21    think is clearly beyond the scope of anything to which he'd be

22    entitled to which he needs relating to any person or entity

23    that Strategic Vision thinks may have some relationship to Mr.

24    Guo.  And that in some instances such as the GoDaddy

25    subpoenas, we haven't seen them.  If we hadn't serendipitously

1   found out that GoDaddy was going to comply and objected, then

2   all of the information that you pointed out is beyond the pail

3   for production would already have been provided to Strategic

4   Vision including regarding Golden Spring which is a client of

5   ours.

6          No, I do not represent ACA.  I do not represent Guo

7   Wengui.  I have not appeared on behalf on Saraca.  Those are

8   not entities for which I speak.  But it's very discomforting

9   to think that Strategic Vision has been using the umbrella of

10  this action to send out subpoenas for all of this personal

11  information, all of this tracking information, all of this IP

12  address information that we've discussed and using it for that

13  purpose because they believe they have an excellent chance and

14  hope of showing something.  And in the meantime based upon

15  believing that they have an excellent chance, they're amassing

16  all of this personal information in a case in which they have

17  made it clear from the outset that their goal is to hold Mr.

18  Guo accountable [inaudible].

19         THE COURT:  All right.  Can I interrupt you?  I have

20  a need to parse this, okay.  I can no longer deal with broad

21  statements.  I need to parse it.  So the first thing I'm going

22  to do is say this.  If it's a subpoena for Mr. Guo's records,

23  if it's a subpoena for Golden Spring's records or for Yvette

24  Wong's records, someone you represent, okay, and if you can

25  maintain that there -- and if you maintain that there is a

1  privacy interest in the records being sought, then I will find

2  that you have standing to challenge those particular

3  subpoenas.  If it's a subpoena for the records of an entity

4  like ACA or like Guo Media or some other entity and you cannot

5  tell me that any of your clients, including Mr. Guo, have a

6  persona interest in that material, then you -- somebody else

7  might have standing to challenge it but you would not and,

8  therefore, I can't hear your objections.

9          There is a separate issue as to whether people who

10  have potential interest in the subpoenaed information have

11  been notified of the subpoena so they have an opportunity to

12  raise objections.  What's already done is done.  The only

13  thing that I can say there is that it might make sense for Mr.

14  Greim to inform counsel on this call as to what other

15  subpoenas have been served or have been responded to, are out

16  there where no objection has been made so that if anybody here

17  would have standing to object, they can still move to have the

18  information, you know, returned or destroyed or stricken or

19  something.

20          But with respect to the ones I know about, I have an

21  AT&T subpoena; I have two Google subpoenas regarding YouTube,

22  one from YouTube accounts, one from October 31 and one from

23  November 4; I've got two directed to Gmail, one from November

24  4 and one from November 26; and I have two GoDaddy subpoenas

25  that have been discussed.  So the first thing I need to

24

1  understand, Mr. Harmon, is which of those do you have standing

2  to challenge on behalf of your clients and whose information

3  is it that's at issue so that I can understand the basis of

4  the standing?

5         MR. HARMON:   Thank you.   I appreciate that and I

6  appreciate your letting me go off a little bit before that.   I

7  do want to say that I suspect that if Rule of Law and Saraca

8  knew that their information was being requested like this,

9  they would have objected, but I don't know how they could have

10 known that these subpoenas were issued because we have never

11 seen the GoDaddy subpoenas and now I'm hearing that at least

12 some of the information sought on the GoDaddy subpoenas

13 relates to Golden Spring New York which is a client of mine

14 and on behalf of which we object.

15        That would also be true with regard to the Google

16 accounts for e-mails of Mr. Guo and Yvette Wong.   The AT&T

17 subpoenas that involve phone numbers for Yvette Wong had

18 Golden Spring employees and Mr. Guo.   I understand that the T-

19 Mobile subpoenas has already been complied with,

20 notwithstanding out initial original objections.   And I

21 understand that a subpoena to LinkedIn for personal

22 information regarding Karin Maistrello to which we objected

23 and it has been withdrawn.

24        I hope that I've covered all the subpoenas.   If I

25 haven't --

1          THE COURT:  Well, let's start with the --

2          MR. HARMON:  I also -- I'd like to question the

3    statement that Mr. Guo denied knowing or using Guo Media.  I

4    think he denied knowing who owns it.  But I do not believe

5    that Mr. Guo's testimony has been that he has no idea what Guo

6    Media is or doesn't use it to post videos.  So if one of the

7    bases of relevance here is that Mr. Guo has denied any

8    knowledge of Guo Media, I hadn't prepared for that so I don't

9    think that's been raised before this call.  But I don't

10   believe that to be accurate.

11         THE COURT:  Well, I will say that a lot of the

12   arguments being made by Mr. Greim are not ones that we saw in

13   the papers that were submitted.  So, you know, there was some

14   information about wanting to show that sites were accessed

15   from mainland China, but we didn't --

16         MR. HARMON:  Your Honor, that's a subpoena that we

17   had no knowledge of before this phone call.

18         THE COURT:  Which one, I'm sorry?

19         MR. HARMON:  We did not know that they obtained

20   information, do not know what information they obtained or the

21   accuracy of the representations regarding that information.

22   I'm just completely in the dark about that.

23         MR. GREIM:  Your Honor, this is Mr. Greim, if I

24   could quickly respond on this information, this thing about

25   notice.  First of all, we understand that both Google and

1    GoDaddy notified these account holders when they send out the

2    -- when they received the subpoenas.  And, number two, of

3    course, we are sending notice of all of these to our opposing

4    counsel Eastern Profit and remember, Your Honor, Eastern

5    Profit here -- I mean there is an attorney in the slot of

6    Eastern Profit that is our friends at Pepper Hamilton and

7    before that Mr. Grendi.  Those attorneys though remember have

8    -- Eastern Profit has appointed Golden Spring for purposes of

9    actually running this litigation.  And so the context there is

10   Golden Spring.

11          Remember when we gave notice of trying to serve

12   Karin Maistrello who -- you know, that went only to Eastern

13   Profit and yet Ms. Maistrello resigned within about 24 hours

14   of that notice.  I don't need to go into that whole issue

15   again, but I think it -- I mean, frankly, I'm not sure how --

16   it's --

17          THE COURT:  Counsel?

18          MR. GREIM:  [inaudible].

19          THE COURT:  Counsel, I have another conference in

20   another case at 12 o'clock.

21          MR. GREIM:  Okay.  I'll stop.

22          THE COURT:  Thank you.  I would like to -- it sounds

23   to me like this should boil down to the following information,

24   okay.  It should boil down to for various accounts that have

25   been identified, assuming there's a plausible argument of

1  relevance regarding the entity whose account it is, it should

2  boil down to who's the registrant of the account and what is

3  the technical information associated with the registrant,

4  meaning what is the registrant's stated contact information.

5  You know, in other words, this is the account information as

6  the subscriber or as the registrant.  This is the account

7  information I am providing.  I am providing this -- I don't

8  know if they provide an IP address or if they provide an e-

9  mail or they provided something, a name, a contact, something

10  -- with the information they provide so it can be matched up

11  to say, oh look, these accounts have a common registrant,

12  these accounts were set up through a common IP address, these

13  accounts are linked not, you know, overtly but if you look

14  behind the scenes you can see that whoever set it up, you

15  know, and is in charge of the account is connected to somebody

16  else who's in charge of another account.

17          Beyond that, I don't really hear a very strong

18  argument for, you know, why the other kinds of information is

19  relevant.  When you're talking about billing records, if you

20  have basic account registrant information, presumably that

21  basic account registrant information says I'm the registrant,

22  if there's a bill, you send it to me.  You don't need copies

23  of the bills, you don't need copies of where they go.  You

24  have that basic information as to who stands behind the

25  account.  And it sounds like that's the core of what's being

1   looked for here.

2          The idea of how many times account were accessed by

3   people and whether there are reports about these accounts that

4   are generated and so one and so forth I think is going beyond

5   the core information.  But I will say, Mr. Greim, when you say

6   I'm looking for registration information and that's really all

7   I'm looking for and then you go on with the details of what

8   that could include and you start talking about reports of

9   abuse and things like this, you know, you're going well beyond

10  registration information, who is it and were the accounts

11  associated with the registrant that they provide to Google

12  when they set up the account.

13         Now, assuming I limit these subpoenas to that, who

14  is the registrant, what are the account that are provided by

15  the registrant as their contact info for Google, for AT&T,

16  whatever, when they set it up, not all the many phone numbers,

17  not all the many locations, but just what is the information

18  provided by the registrant as part of the registration, which

19  may or may not provide an IP address.  I'm not quite sure if

20  that does, but perhaps that IP address for the registrant

21  through which the account was registered.

22         For the counsel who are on the phone representing

23  non-parties and I haven't heard anything, Mr. Gavenman yet, I

24  apologize for that, what is your response to that if I were to

25  so limit these subpoenas?

1          MR. GAVENMAN:  This is Mr. Gavenman.  I'll speak

2    first if you don't mind.  So the only one that I'm here to

3    quash is the e-mail about Mr. Je's personal e-mail account.

4    My understanding at the beginning of the call is that you were

5    quashing that in its entirety because of timeliness.  Is that

6    fair?

7          THE COURT:  Well, there were -- no -- yes on that.

8    On the GoDaddy -- I'm sorry, on the Google subpoena or Gmail

9    that was dated November 26th, I'm quashing that in its

10   entirety as untimely.  But Mr. Je I thought was a targeted

11   individual on one of these GoDaddy subpoenas, although perhaps

12   not based on what Mr. Greim has now said.  I had thought from

13   the information that we were given that he was somehow

14   connected to one of those.

15         ME. GAVENMAN:  Well, that's what brings me to my

16   next point is my understanding is there's a host of subpoenas

17   sent out on the 26th of November but had been targeting my

18   client in sort of [indiscernible] ways and asked Mr. Greim

19   about these other kinds of subpoenas.  He only sent me the one

20   directed at Mr. Je's Gmail.

21         I think there may have been something to LinkedIn,

22   in fact I'm fairly certain there are as referenced in one of

23   the letters from Mr. Greim, Twitter, other things that were,

24   you know, targeting Mr. Je but not, you know, in a direct way.

25   But I think those were also not on November 26.  And so to the

1    extent we can just resolve this by perhaps issuing a

2    protective order saying that all of those subpoenas, various

3    subpoenas issued on November 26th are untimely and Strategic

4    Vision cannot seek to enforce those, I think that would clear

5    everything up.  I don't believe there's anything issued before

6    November 26th that my client is, you know, trying to

7    challenge.

8            THE COURT:  Well, that I'm happy to do because

9    subpoenas issued on November 26th, Mr. Greim, I would consider

10   untimely.  And even if you've already received information,

11   you know, I don't know that you gave the non-parties fair

12   opportunity to respond since they don't even seem to know

13   about them and you shouldn't have been going off issuing

14   subpoenas November 26th.

15           MR. GREIM:  Your Honor, the portions though who are

16   going to be complying with those subpoenas are not objecting

17   that they only had, you know, X number of days.

18           THE COURT:  I am still in charge of supervising

19   discovery in this case and I'm still in charge of setting

20   discovery limits in terms of time frame.  And you knew the

21   discovery deadline wasn't November 29th and subpoenas served

22   November 26th are untimely.  And whether they object or not,

23   it's still within the authority of the Court to enforce

24   compliance with scheduling set by the Court for discovery.

25   Discovery includes party and non-party discovery.  They are

31

1   untimely.  Understood?

2          MR. GAVENMAN:  Your Honor, this is Mr. Gavenman

3   again.  I did bring this up to Mr. Greim before filing our

4   motion to quash and asked him to withdraw the subpoenas to Mr.

5   Je on that basis, on a number of bases but one of them being

6   it was untimely and he refused.

7          THE COURT:  Okay.  Let's move on.  Any subpoenas

8   served November 26th --

9          MR. GAVENMAN:  [Indiscernible] attorney's fees, Your

10  Honor.

11         THE COURT:  Any subpoenas --

12         MR. GAVENMAN:  I request for attorney's fees.

13         THE COURT:  Any subpoenas served November 26th I'm

14  considering untimely.  Mr. Greim, they are untimely.  They are

15  considered quashed whether the motions were made or not

16  because the Court has the inherent authority to supervise its

17  own discovery schedule and enforce it.  All right?  And --

18         MR. GAVENMAN:  Could I just renew my request for

19  attorney's fees on that basis?

20         THE COURT:  I'm denying all requests for sanctions.

21         MR. GAVENMAN:  Okay.

22         THE COURT:  But I am directing Mr. Greim to

23  withdrawn any subpoenas that are still out there that were

24  served on or after November 26th.  I don't know if there were

25  any served on November 25 or November 24, but you know you're

32

1   on notice, Mr. Greim, you have to act in good faith here.   And

2   if you know that there were some that were served, you know,

3   less than ten days before the close of discovery which would

4   be under any measure, you know, reasonable and sort of minimum

5   under most circumstances or reasonable notice to a non-party,

6   you know, you're cutting it too close and I consider those

7   untimely.

8          MR. GREIM:   Very well, Your Honor.   We will notify

9   those who received subpoenas regardless of whether they have

10  counsel that those are all withdrawn.

11         THE COURT:   Okay.   And if you already got material

12  on any of those, you know, you need to treat those as, you

13  know, invalid subpoenas through which you obtained the

14  information.   All right?

15         Let's talk about the other ones, though.   With

16  respect to the other ones served October 31 -- October 22,

17  October 31, and November 4, those seems to be the operative

18  dates, I'd like to hear from Mr. Harmon or anybody else who

19  wants to be heard including, Mr. Gavenman, if you want to be

20  heard on any of those with respect to your response if I were

21  to allow the subpoenas to go forward but limit them to the

22  registrant information that I described, who registered it and

23  what account information they provided in connection with the

24  registration for contact, for billing, and if there is an IP

25  address through which the registration is made, the IP address

33

1   from which the registration is made.

2           MR. HARMON:  Thank you, Your Honor.  This is Mark

3   Harmon.  I would have no objection to that if I would request

4   that I impose on the Court the compliance was sent initially

5   to the Court to ensure that inadvertently none of these

6   responding parties provided the scope and breadth of the

7   information that was requested in the subpoenas so that we can

8   be sure that the response is limited to what Your Honor is

9   proposing.  And I'd also like to know whether in addition to

10  any of these subpoenas other subpoenas have been served

11  respecting information any of the parties I -- non-parties I

12  represent so that we can ensure that there are not other

13  subpoenas out there that wouldn't be covered by this ruling.

14          THE COURT:  Well, I don't really want to undertake

15  to -- I don't really want to volunteer to review the documents

16  that come in by way of subpoenas.  But I will do the

17  following: one, to the extent there are any other subpoenas

18  out there that have not been specifically objected to by

19  counsel on this call because, Mr. Greim, you seem to think

20  everything is connected and everything goes back to Mr. Guo

21  and we have Mr. Guo's counsel.

22          So any subpoena you served you think has some

23  connection to Mr. Guo, I'm going to ask you please to notify

24  Mr. Harmon of -- and for that matter Mr. Gavenman because if

25  it doesn't go back to Mr. Guo, you seem to think it goes to

1  Mr. Je or Golden Spring or some related entity that we have
2  counsel for -- notify them of the other subpoenas that have
3  been served and whether they've been responded to or they've
4  not been responded to or they've been withdrawn because there
5  may be other ones that do implicate their clients' interests
6  and they just did not know about.
7       Number two, I'm going to limit the subpoenas as I
8  described.  I'm going to write out an order, it might be a
9  text order, that so specifies the information for clarity's
10  sake.  I don't really know how IP addresses fit into
11  registration information, but it seems to me that the
12  providers might know the IP address associated with the
13  formation of the account and that I would allow.
14       And you are an officer of the Court, and you are
15  duty-bound to make sure that what happens is now in compliance
16  with the Court's order.  And if you get in additional
17  information, you're duty-bound to say something about it and
18  not just say, oh great, I got in additional information even
19  though I didn't ask for it.  You know, your obligation is to
20  make sure the providers understand the limits, send them a
21  copy of my order.  It may, you know, behoove you to be in
22  touch with counsel for both Eastern Profit and for the non-
23  parties who are on this call and let them know what comes in
24  in response to the subpoenas.  All right?
25       MR. HARMON:  Your Honor, can I -- I'm sorry to

1  interrupt.  Can I ask that the order require that any

2  responsive documents be sent to us as well directly so that we

3  have them in real time?  I'm concerned about inadvertent

4  disclosure because of the scope of these subpoenas is so

5  broad.

6          THE COURT:  I understand.  Mr. Greim, do you have an

7  objection to sharing the information that comes in or making

8  it available for inspection by counsel who are on this call?

9          MR. GREIM:  Your Honor, I don't have an objection.

10 I don't think it'll be voluminous.  We have a protective order

11 in this case anyway that -- I mean I suppose if it's actually

12 their information and I mean I was --

13         THE COURT:  I'm going to instruct that if

14 information comes in pursuant to any subpoenas that you have

15 served that in any way relate to Mr. Guo or Golden  Spring or

16 ACA or Je or any of these related people and entities, in your

17 way are related, that you let counsel on this call know that

18 you've subpoenaed someone, know that what's come in, and make

19 the documents available to them for inspection if not

20 providing copies directly, all right?

21         MR. GREIM:  Your Honor, that's understood.  I want

22 to point out one thing, though.  The -- you might remember

23 what I told you about the Cloudflare discovery.  The most

24 important evidence there, you know, because sometimes there

25 are administrators set up for these accounts and then we see

1  where -- you know, from where those administrators are

2  accessing the account.

3          THE COURT:  I'm saying no to that and I have my 12

4  o'clock call coming in.  I have ruled as to the scope of the

5  subpoenas that I will allow.  As for anything else that has

6  already come in, you're going to share the info.  And if there

7  is an objection to the use of something that has come in and

8  counsel on this call want to object to the use of that

9  information, you can let me know.

10         MR. GREIM:  Your Honor, the only thing left is AT&T

11  though.

12         THE COURT:  I'm going to say no with respect to all

13  of these call logs and SMS records and everything.  I'm not

14  sure what these phone numbers are and what you're looking for,

15  but this seems to me to be -- you know, looking for

16  everybody's phone records seems to me overbroad.

17         MR. GREIM:  Your Honor, we have told our opponents

18  that we are willing to limit this to international calls.

19  That is how we know that William Je and others are contacting

20  the mainland.  So we would propose limiting it as to only

21  that, and AT&T actually has a report they can issue that's

22  only the international lines.

23         THE COURT:  I'm sorry.  So what is exactly the limit

24  because you're seeking a lot of information in there.  What

25  exactly are the limits to what you are seeking?  You want any

1  report of international calls made to or from these numbers --

2          MR. GREIM:  That is correct, Your Honor.

3          THE COURT:  -- for some period of time?

4          MR. GREIM:  I'm sorry.

5          MR. HARMON:  Mr. Guo has family in China.  He grew

6  up in China.  Of course he's going to be making phone calls to

7  China.  What difference does it make if he's calling his

8  family and why should they have information about calls,

9  private personal calls he makes to his family?  I think that's

10 going to be instructive of what -- of anything having to do

11 with  the claim of fraud in this case.  That's why we haven't

12 agreed to that.  It doesn't go to prove anything --

13         THE COURT:  All right.  Mr. Greim, Mr. Guo concedes

14 that he makes calls into and out of Mainland China.  He

15 disagrees as to why.  He says he has family.  What will a call

16 tell you, the fact that a call was made internationally, what

17 will it tell you if he is already conceding he has family in

18 China and speaks to them?

19         MR. GREIM:  Okay.  Well, this is -- I mean, Your

20 Honor, we've been relying on testimony that dissidents do not

21 dare to make calls over lines like this that can be openly

22 monitored.

23         THE COURT:  Did Mr. Guo say he did not make phones

24 calls on these lines to anyone in China because he's a

25 dissident, it would be dangerous to do so and you want to try

38

1   to prove him wrong?  Is that what happened?

2          MR. HARMON:  No, he did not say that.  No, he did

3   not testify to that, Your Honor.

4          MR. GREIM:  No, I'm saying somebody -- I'm saying

5   another witness has testified to that.

6          THE COURT:  Well, did you ask Mr. Guo about whether

7   he made calls to China and if so, what numbers he used,

8   whether they were protected lines?

9          MR. HARMON:  No, he did not ask those questions.

10  [Indiscernible] deposition.

11         MR. GREIM:  I was just trying to answer your

12  question, Your Honor.  I'm sorry.

13         THE COURT:  Mr. Greim, did you make any inquiry of

14  Mr. Guo about his practice with respect to making calls to

15  China or receiving calls from China?

16         MR. GREIM:  [Inaudible].

17         THE COURT:  Anything at all?  All right.  And you go

18  in the first instance to the person you have in front of you

19  for deposition, and you don't start prying into their phone

20  records separate and apart.  It's a non-party.  In light of

21  the fact that counsel to Mr. Guo says that he does make calls

22  into China and receives calls from China, I don't see the

23  relevance.  That subpoena is quashed, and I have to take my

24  next call.  And I think we're at the end of this.  Thank you

25  all.

39

1          MR. HARMON:   Thank you, Your Honor.

2                          *  *  *  *  *  *

40

1        I certify that the foregoing is a court transcript from

2   an electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5                               _Shari Riemer_____

6                               Shari Riemer, CET-805

7   Dated:   January 20, 2020