## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EASTERN PROFIT CORPORATION LIMITED )<br><br>Plaintiff, )<br><br>v. )<br><br>STRATEGIC VISION US, LLC )<br><br>Defendant. ) | Case No. 18-CV-2185 (LJL) |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF FACTS ................................................................................. 3

    A.   The Parties and Relevant Non-Parties .................................................... 3

    B.   The Negotiation of the Research Agreement .......................................... 5

    C.   The $1 Million Deposit and ACA Loan ................................................. 6

    D.   The Research Agreement ........................................................................ 7

    E.   The Attempted Performance ................................................................... 9

    F.   The Breach ............................................................................................. 11

III.   PROCEDURAL POSTURE .............................................................................. 12

IV.   ARGUMENT ..................................................................................................... 13

    A.   Standard of Review ................................................................................ 13

    B.   Summary Judgment Should be Granted Because the Research Agreement is Void as a Matter of Law ................................................... 14

        1.   The Research Agreement Violates Virginia Public Policy ..................... 14

        2.   The Research Agreement is Consequently Void ...................................... 19

    C.   Summary Judgment Should Be Granted On Strategic's Fraudulent Inducement Claim (Count II) ................................................................ 21

        1.   Strategic Cannot Prove Reasonable Reliance ........................................ 22

        2.   Strategic Cannot Prove Scienter/Intent to Defraud ............................... 27

        3.   Strategic Cannot Prove a Provably False Statement of Material Fact ........................................................................................................ 28

V.   CONCLUSION ................................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abbey v. 3F Therapeutics, Inc.*,
  2011 U.S. Dist. LEXIS 17299 (S.D.N.Y. Feb. 18, 2011)........................................................23

*AllGood Entm't, Inc. v. Dileo Entm't & Touring, Inc.*,
  726 F. Supp. 2d 307 (S.D.N.Y. 2010)...................................................................................18

*Allison v. Round Table Inv. Mgmt. Co., LP*,
  2010 U.S. Dist. LEXIS 113937 (S.D.N.Y. Oct. 21, 2010)....................................................26

*Alvarez v. Dekar Homes, Inc.*,
  22 Va. Cir. 88 (Va. Cir. Ct. 1990)........................................................................................26

*Baraliu v. Vinya Capital, L.P.*,
  2009 WL 959578 (S.D.N.Y. Mar. 31, 2009).........................................................................22

*Berkson v. Gogo LLC*,
  97 F. Supp. 3d 359 (E.D.N.Y. 2015)....................................................................................27

*Century Pacific, Inc. v. Hilton Hotels Corp.*,
  528 F. Supp. 2d 206 (S.D.N.Y. 2007), *aff'd*, 354 F. App'x 496 (2d Cir. 2009).....................20

*Cleveland v. Policy Mgmt. Sys. Corp.*,
  526 U.S. 795 (1999)..............................................................................................................14

*Creazioni Artistiche Musicali, S.r.l. v. Carlin Am., Inc.*,
  2016 U.S. Dist. LEXIS 180431 (S.D.N.Y. Dec. 30, 2016)...................................................18

*Cresswell v. Sullivan & Cromwell*,
  704 F. Supp. 392 (S.D.N.Y. 1989)........................................................................................22

*Elite Physician Servs., LLC v. Citicorp Payment Servs.*,
  2009 U.S. Dist. LEXIS 134966 (S.D.N.Y. Oct. 8, 2009).....................................................21

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
  343 F.3d 189 (2d Cir. 2003)............................................................................................22, 23

*In re Eugenia Vi Venture Hldgs., Ltd.*,
  649 F. Supp. 2d 105 (S.D.N.Y. 2008)..................................................................................23

*Fierro v. Gallucci*,
  2010 U.S. Dist. LEXIS 27664 (E.D.N.Y. Mar. 24, 2010)....................................................27

*Foremost Guar. Corp. v. Meritor Sav. Bank*,
  910 F.2d 118 (4th Cir. 1990)................................................................................................21

*Giannacopoulos v. Credit Suisse,*
  37 F. Supp. 2d 626 (S.D.N.Y. 1999)...................................................21, 22, 25

*Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC,*
  2005 U.S. Dist. LEXIS 32299 (S.D.N.Y. Dec. 8, 2005) .........................................20

*Kriegel v. Donelli,*
  2014 U.S. Dist. LEXIS 90086 (S.D.N.Y. June 30, 2014) ......................................21

*Lazard Freres & Co. v. Protective Life Ins. Co.,*
  108 F.3d 1531 (2d Cir. 1997)...........................................................................22

*Lehman Bros. Commer. Corp. v. Minmetals Int'l Non-Ferrous Metals Co.,*
  179 F. Supp. 2d 118 (S.D.N.Y. 2000)................................................................18

*Massie v. Dudley,*
  3 S.E.2d 176 (Va. 1939).................................................................................19

*In re Merrill Lynch Auction Rate Sec. Litig.,*
  851 F. Supp. 2d 512 (S.D.N.Y. 2012).............................................................23, 25

*Mizell v. Sara Lee Corp.,*
  2005 U.S. Dist. LEXIS 36988 (E.D. Va. June 9, 2005) .......................................21

*PHL Variable Ins. Co. v. Town of Oyster Bay,*
  2017 U.S. Dist. LEXIS 83262 (E.D.N.Y. May 30, 2017) ......................................22

*PNC Bank, Nat'l Assoc. v. Dominion Energy Mgmt.,*
  2018 U.S. Dist. LEXIS 62577 (E.D. Va. Apr. 11, 2018)........................................21

*Porto v. Guirgis,*
  659 F. Supp. 2d 597 (S.D.N.Y. 2009)............................................................13, 14

*Powell v. Nat'l Bd. of Med. Exam'rs,*
  364 F.3d 79 (2d Cir. 2004)..............................................................................14

*Powers v. British Vita,*
  57 F.3d 176 (2d Cir. 1995)..............................................................................26

*Reading & Language Learning Ctr. v. Sturgill,*
  94 Va. Cir. 94 (Va. Cir. Ct. 2016).....................................................................19

*Rella v. N. Atl. Marine Ltd.,*
  2004 U.S. Dist. LEXIS 11567 (S.D.N.Y. June 21, 2004) .....................................20

*Rosenberg v. Pillsbury Co.,*
  718 F. Supp. 1146 (S.D.N.Y. 1989)..................................................................20

*Schur v. Sprenkle*,
    84 Va. Cir. 418 (Va. Cir. Ct. 2012) ........................................................................23

*Stuart Lipsky, P.C. v. Price*,
    215 A.D.2d 102, 625 N.Y.S.2d 563 (1st Dept.1995) ................................................23

*In re UBS Auction Rate Sec. Litig.*,
    2010 U.S. Dist. LEXIS 59024 (S.D.N.Y. June 10, 2010) ........................................23

*Urban Protective Servs. v. Great Latin Rests., L.L.C.*,
    2007 Va. Cir. LEXIS 33 (Va. Cir. Ct. Mar. 5, 2007) ........................................19, 20

*White v. Potocska*,
    589 F. Supp. 2d 631 (E.D. Va. 2008) ...........................................20, 21, 22, 23

*Winn v. Aleda Constr. Co.*,
    315 S.E.2d 193 (Va. 1984) ........................................................................20

*Wolf v. Fannie Mae*,
    830 F. Supp. 2d 153 (W.D. Va. 2011) ..................................................................26

*Wyly v. CA, Inc.*,
    2009 U.S. Dist. LEXIS 90037 (E.D.N.Y. Sept. 2, 2009) ........................................26

*Xia Bi v. McAuliffe*,
    927 F.3d 177 (4th Cir. 2019) ..................................................................................23

*Ying Jing Gan v. City of New York*,
    996 F.2d 522 (2d Cir. 1993) ....................................................................................14

## STATUTES

*Va. Code Ann. §§ 9.1-138, 9.1-139* ..................................................................... 14-19

## I.      **INTRODUCTION**

This is a contract case.  Eastern Profit Corporation Limited ("Eastern") entered into a contract with Strategic Vision US, LLC ("Strategic") pursuant to which Strategic agreed to provide certain private investigation services to Eastern (the "Research Agreement" or "Agreement").   Under the terms of the contract, Strategic was to perform specified research services and provide detailed research reports per a deliverable schedule set forth in the Agreement.   Eastern agreed to pay for these deliverables per payment terms set forth in the Agreement, and Eastern agreed to, and did, provide Strategic with a $1 million deposit in anticipation of its services.

Strategic failed to provide any of the specified deliverables by the agreed delivery dates, so Eastern terminated the contract less than two months after it was executed.  Eastern filed this lawsuit seeking the return of its $1 million deposit, plus interest.

Strategic does not dispute its failure to supply the deliverables required by the Agreement; instead, it claims that Eastern fraudulently induced Strategic to enter the Agreement by orally misrepresenting the purpose for which Eastern requested the research.  Specifically, Strategic claims that Eastern orally represented that it was entering into the Research Agreement because it opposed the Chinese Communist Party (the "CCP") and was seeking information it could use to weaken the Chinese regime, when in fact, according to Strategic, the individual who negotiated the Agreement on behalf of Eastern—Guo Wengui—actually supports the CCP.

 Despite the obvious difficulties of proving up the elements of fraud with clear and convincing evidence under such a theory, Strategic used the articulation of the claim as a license to seek broad ranging and intrusive discovery ranging from subpoenas to cell phone carriers and ISP providers to mine data on the telephone usage and geographic locations of Eastern's employees and agents, to depositions not only of Eastern's employees and agents, but of third-

party journalists and even former White House strategist Steve Bannon.  In terms of its damages, Strategic claims it gets to keep the $1 million deposit, and "get[s] a little money back" on top.[1]

All of Strategic's discovery, and the related use of the Court's resources,[2] was for naught.  As an initial matter, summary judgment must be granted in Eastern's favor because the contract is void.  There is no dispute that Strategic, its sole principal, French Wallop ("Wallop"), and the person that Strategic partnered with to provide the investigatory services, Michael Waller ("Waller"), do not possess a license—anywhere in the United States or abroad—to provide such services.  Under Virginia law—which applies because the Research Agreement was negotiated, drafted, signed, and performed in Virginia—soliciting, contracting to provide, and/or actually providing private investigation services without having a license to do so is prohibited.  Any contract entered into in contravention with that prohibition is necessarily void, invalid, and unenforceable as a matter of Virginia law.  Because Strategic has *admitted* in this litigation that Strategic, Ms. Wallop, and Mr. Waller were not licensed to provide such services and because Strategic nevertheless solicited, contracted to provide, and did in fact provide private investigation services to Eastern in Virginia, the Research Agreement is necessarily void as a matter of law and the deposit paid to Strategic under the Research Agreement must be returned.

Because all of the claims in this action arise from the Research Agreement, a ruling by the Court that it is void would resolve this entire action.  Such a ruling would warrant the entering of a judgment in favor of Eastern on its declaratory judgment (Count III) and unjust

---

[1] *See* March 2, 2020 Hearing Tr. at 6-7.  Although its damages theory has changed over the course of the case and is hard to pin down, at least at one point Strategic sought as damages so-called out-of-pocket costs for things like a "coat" from "Bloomingdale's," a "laptop envelope," a "briefcase," personal "life insurance," and a trip that Ms. Wallop took with her son to Turks & Caicos.  Ex. G, Wallop II Tr. at 81:9-86:8, 97:5-99:2.

[2] Strategic filed numerous discovery letters in this action, most of which were directed at third parties.  *See e.g.*, Dkt. Nos. 131, 132, 140, 144, 148, 149, 152, 154, 155, 156, 163, 164, 165, 166, 171, 177, 180, 186, 187, 190, 197, 198, 201, 206, 210, 212, 219, 222, 228, 229, 234, 235, 238, 241, 255.

enrichment (Count IV) claims.  It would necessitate dismissal of Strategic's breach of contract (Count I) and fraudulent inducement (Count II) counterclaims because the Research Agreement that Strategic claims to have been breached and which Strategic claims to have been fraudulently induced to enter into will have been rendered completely void.  It also would moot Eastern's breach of contract (Count I) and fraudulent inducement claims (Count II).

Separate and apart from the foregoing, Strategic's far-flung and harassing fraud counterclaim makes no sense.  Strategic provides no explanation as to why Eastern would fraudulently induce the likes of Ms. Wallop and Mr. Waller to perform private investigation services for it, when, if there were any prohibitive ideological difference between Eastern and any service provider, it could just retain another—properly licensed—one.  More specifically, Strategic's fraud claim fails because Strategic is unable to prove the required elements of fraud as a matter of law, including reasonable reliance, intent to defraud, and the existence of a provably false statement of material fact.  Thus, even if the Research Agreement were not deemed void (which it must be under Virginia law), summary judgment on Strategic fraudulent inducement claim (Count IV) would still be warranted.

## II.    STATEMENT OF FACTS

### A.    The Parties and Relevant Non-Parties

Eastern is organized under the laws of Hong Kong and has a principal place of business in Hong Kong.[3]  Guo Wengui, also known as Mile Kwok ("Mr. Guo"), was and is an advisor to Eastern who acted on behalf of Eastern in connection with the negotiation of the

---

[3] Ex. A, Strategic's Amended Answer, Affirmative Defenses, and Counterclaims to Eastern's Second Amended Complaint (the "Answer") at 20 ¶ 3; Ex. B, Strategic's Objections and Responses to Eastern's First Requests for Admission ("Strategic's Admissions"); Ex. C, Eastern Answer to Strategic's Counterclaim at 1 ¶ 3; Ex D, Strategic's Responses and Objections to Eastern's First Interrogatories.

Research Agreement.[4]   Yvette Wang ("Ms. Wang") is an agent of Eastern Profit and was responsible for overseeing the investigation services that Strategic was to provide to Eastern.[5] Chunguang Han ("C. Han") is an agent of Eastern profit and was responsible for securing financing that Eastern needed to fund the deposit that was to be provided by Eastern to Strategic under the Research Agreement.[6]

Strategic is a limited liability company organized under the laws of Nevada.[7]   At least from September 1, 2017 and March 13, 2018 (the "Relevant Time Period"), Strategic's principal place of business was in Arlington, Virginia.[8]   In its own words, Strategic provides private "investigatory research" to clients within the United States in exchange for monetary compensation.[9]   During the Relevant Time Period, Ms. Wallop was Strategic's Chief Executive Officer and only member.[10]   Strategic had no employees, other than Ms. Wallop.[11]   Mr. Waller is a friend of Ms. Wallop who has partnered with Strategic on a number of investigations since 2016 or 2017.[12]   During the Relevant Time Frame, neither Strategic, nor Ms. Wallop, nor Mr. Waller

---

[4] Ex. A, Answer at 20-21 ¶¶ 3-4, 53 ¶ 108.

[5] Ex. A, Answer at 20-21 ¶¶ 3-4; *id.* at 25 ¶ 17; *id.* at 28 ¶ 23.

[6] Ex. E, Dep. Tr. of Chunguang Han dated November 11, 2019 ("C. Han. Tr.") at 12:20-23, 59:5-17.

[7] Ex. A, Answer at 1 ¶ 2.

[8] *Id.*; *see also* Ex. B, Strategic's Admissions ¶ 18.

[9] Ex. B, Answer at 10-11 ¶¶ 47-51; Ex. F, Wallop I Tr. at 17:15-18:12, 26:21-29:13.

[10] Ex. B, Answer ¶ 9; Ex. F, Dep. Tr. of French Wallop dated February 12, 2019 ("Wallop I Tr.") at 17:9-14; Ex. G, Dep. Tr. of French Wallop dated November 19, 2019 ("Wallop II Tr.") at 6:4-16.  Wallop resides at 1557 North 22nd Street, Arlington, Virginia 22209.  Ex. F, Wallop I Tr. at 9:1-4.

[11] Ex. F, Wallop I Tr. at 16:16-18:12.

[12] Ex. H, Deposition of Michael Waller dated February 8, 2019 ("Waller I Tr.") at 10:23-13:05; Ex. I, Dep. Tr. of Michael Waller dated November 19, 2019 ("Waller II Tr.") at 6:2-7:20; Ex. A, Answer at 3 ¶ 10.

was licensed as a private investigator under the laws of Virginia or any other state or jurisdiction within the United States or anywhere else.[13]

Bill Gertz ("Mr. Gertz") is a former reporter for the Washington Free Beacon and a current reporter for the Washington Times.[14]  Mr. Gertz is a mutual acquaintance of Mr. Guo and Ms. Wallop and Mr. Waller, and he was involved in bringing Eastern and Strategic together for the purposes of entering into the Research Agreement.[15]  Lianchao Han ("L. Han") is a mutual acquaintance of Mr. Guo and Ms. Wallop and Mr. Waller, and he was involved in bringing Eastern and Strategic together to enter into the Research Agreement.[16]

### B. The Negotiation of the Research Agreement

In late October or early November, Mr. Gertz and L. Han introduced Mr. Guo to Ms. Wallop and Mr. Waller of Strategic.[17]  From that introduction until the Research Agreement was signed, representatives of Eastern (Mr. Guo and Ms. Wang) conferred with representatives of Strategic (Ms. Wallop and Mr. Waller) regarding a variety of services that Strategic Vison purportedly could provide, including investigatory research into members of the CCP.[18]

Although the parties discussed a number of different services, they ultimately decided to proceed with the investigatory research only.[19]  The parties then began negotiating the

---

[13] Ex. A, Answer at 14 ¶¶ 88-102; Ex. F, Wallop I Tr. at 290:25:-292:2.

[14] Ex. J, Dep. Tr. of William Gertz dated October 15, 2019 ("Gertz Tr.") at 17:2-12.

[15] *Id.* at 64:19-76:19, 126:5-8-127:16; Ex. F, Wallop I Tr. at 31:23-34:19; Ex. H, Waller I Tr. at 116:10-117:9, 162:1-163-25.

[16] Ex. K, Dep. Tr. of Lianchao Han dated August 28, 2019 ("L. Han. Tr.") at 30:19-34:5, 38:20-14; Ex. F, Wallop I Tr. 34:20-35:1.

[17] Ex. F, Wallop I Tr. at 31:23-32:04, 33:15-21, 34:20-35:7; Waller I Tr. 23:23-25:22; *see also* Waller I Tr. at 116:8-117:9.

[18] Ex. F, Wallop I Tr. at 31:23-109:18; Ex. H, Waller I Tr. at 18:8-38:14.

[19] *Id.*

terms of what eventually would become the Research Agreement.[20]  A substantial portion of the negotiations regarding the terms of the Research Agreement occurred in Virginia.[21]  In December 2017, after negotiations matured, Ms. Wallop and Mr. Waller prepared the initial draft of the Research Agreement while at Ms. Wallop's home in Virginia.[22]

### C.   The $1 Million Deposit and ACA Loan

As part of contract negotiations, Ms. Wallop requested that Eastern provide a $1 million deposit under the Research Agreement.[23]  On December 29, 2017, to fund the deposit contemplated by the parties, Eastern borrowed $1 million from ACA Capital Group Limited ("ACA," and the loan from ACA to Eastern, the "ACA Loan").[24]  On January 2, 2018, as negotiations were wrapping up, but before the parties signed the Research Agreement, Eastern caused the $1 million deposit to be wired to Strategic through ACA.[25]  Strategic received the $1 million.[26]  Strategic understood that the $1 million payment from ACA was the deposit that the parties had previously discussed.[27]  Strategic has acknowledged that it accepted the $1 million deposit and purported to utilize it to cover the expenses associated with the investigation called for under the Research Agreement.[28]

---

[20] *Id.*

[21] Ex. A, Answer at 3 ¶ 8; Ex. B, Strategic's Admissions, ¶¶ 20-25.

[22] Ex. F, Wallop I Tr. at 108:5-109:18.

[23] *Id.* at 192:09-194:16.

[24] Ex. E, C. Han Tr. at 124:14-129:2; Ex. L, ACA Loan Agreement, EASTERN-000278.

[25] *Id.*; Ex. F, Wallop I Tr. at 192:09-194:16.

[26] Ex. A, Answer at 4 ¶ 17; Ex. F, Wallop I Tr. at 192:09-194:16; Ex. H, Waller I Tr. at 157:9-22; Ex. I, Waller II Tr. at 91:14-94:6.

[27] Ex. F, Wallop I Tr. 192:09-194:16; Ex. I, Waller II Tr. at 91:23-94:6

[28] Ex. A, Answer at 4 ¶ 17; *id.* at 28 ¶ 23; Ex. F, Wallop I Tr. at 246:16-247:23; Ex. H, Waller I Tr. at 157:9-22; Ex. I, Waller II Tr. at 66:10-16, 93:22-94:6.

D.      **The Research Agreement**

Eastern and Strategic entered into the Research Agreement on January 6, 2018.[29]
The parties executed the Research Agreement at Ms. Wallop's home in Virginia.[30]  Strategic did
not conduct any due diligence into Eastern or Mr. Guo—including into whether Mr. Guo was a
dissident or opposed the CCP—before signing the Research Agreement.[31]  Per Strategic, the
Research Agreement required it to "investigat[e]" certain individuals selected by Eastern.[32]
According to the Research Agreement's terms, Strategic was to provide Eastern "high quality
original research and prepare reports on subjects chosen at [Eastern's] discretion for the purposes
of detecting, stopping, and preventing crime or other harm to innocent people."[33]

More specifically, Strategic was required to provide Eastern with the following
three types of "Deliverables": "Financial Forensic Reports" "Current Tracking Reports," and
"Social Media Reports."[34]  Strategic was obligated to "provide the deliverables based on the best
practices and standards of the industry, comparable to other top firms with similar services,"
including by delivering reports "of very high quality, revealing the true, complete and full profile
of the subject."[35]  All of the deliverables were to be provided "by USB drive only"; oral reports
were insufficient.[36]

---

[29] Ex. A, Answer at 2 ¶¶ 6-7; Ex. I, Waller II Tr. at 89:21-90:16; Ex. M, Research Agreement.

[30] Ex. A, Answer at 2 ¶¶ 6-7; Ex. F, Wallop I Tr. at 126:3-14; Ex. I, Waller II Tr. at 89:21-90:16.

[31] Ex. A, Answer at 11 ¶¶ 47-54; Ex. F, Wallop I Tr. 59:2-61:13, 86:19-91:1, 171:21-173:24, *see also id.* at 12:5-21, 16:16-18:12, 26:22-27:2, 27:18-30:1; *see also* Ex. H, Waller I Tr. at 286:1-287:8.

[32] Ex. A, Answer at 11 ¶ 56 (admitting that Strategic agreed to perform "a private investigation" into various individuals identified by Eastern under the Research Agreement); Ex. I, Waller II Tr. at 96:5-98:7.

[33] Ex. M, Research Agreement at 1; Ex. A, Answer at 2 ¶ 6.

[34] *Id.*

[35] *Id.*

[36] *Id.*; Ex. F, Wallop I Tr. at 136:13-23, 203:23-204:9; Ex. I, Waller II Tr. at 96:5-98:7.

Financial Forensic Reports were to consist of "in-depth and detailed reports of existing and historical business and financial transactions, on subjects selected by [Eastern]."[37] For each subject, Strategic was to "produce progress reports on this financial forensic research each week in the first month, a preliminary report in the first month, and one comprehensive historical research report within 3 months . . . ."[38]  Current Tracking Reports were to consist of "detailed reports on movements of specified subjects by land, air, and sea."[39]  Strategic was to provide these reports on a weekly basis in the first month, and monthly thereafter.[40]  Social Media Reports were to consist of "in-depth and detailed reports on the social media usage" of the identified subjects.[41]  Strategic was obligated to provide these reports on a "weekly basis for the first month, and on monthly basis thereafter."[42]

Eastern agreed to pay Strategic $300,000 for each deliverable that Strategic completed in accordance with the terms of the Research Agreement; if no deliverables were provided, Eastern had no obligation to pay Strategic under the Research Agreement.[43]  The Research Agreement also required Eastern to provide a $1 million deposit.[44]  The deposit was to be treated by Strategic as a down payment to be credited on a prorated basis to fees earned by

---

[37] Ex. M, Research Agreement at 1-3; Ex. A, Answer at 2 ¶ 6.

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.*; Ex. G Wallop II Tr. at 35:5-36:5, 42:15-44:12, 47:6-11, 49:21-50:17 ("Q.  So the pricing was based per unit, correct?  A.  Yes."; "Q. . . . When you were in the meeting talking about this document, the idea was that pricing would be tied to units?  A.  My understanding, that's correct.").

[44] Ex. M, Research Agreement at 5; Ex. A, Answer at 2 ¶ 6.

Strategic during the last one and one-third months of the Research Agreement.[45]  The deposit was not meant to be a signing bonus.[46]  The parties agreed that "[Eastern] may direct other entities to pay [Strategic], and that such payments will be deemed satisfactory compensation by [Strategic]."[47]

The Research Agreement also authorized the parties to "terminate the contract with 30 days' written notice."[48]  Termination was permitted without a showing of cause.[49]  Strategic did not require Eastern to represent in the Research Agreement that Mr. Guo was a dissident who opposed the CCP or covenant that he would use the investigatory research against the CCP.[50]

E.       **The Attempted Performance**

On or about January 8, 2018, Eastern—through Ms. Wang—delivered a list of 15 individuals to Strategic—through Ms. Wallop—on a USB key (the "Subject List") that Eastern wanted investigated under the Research Agreement.[51]  All of the individuals on the Subject List were members of the CCP, many of them high ranking officials that comprised the key group in control of China's banking system.[52]

---

[45] Id.; Ex. A, Answer at 2, 4 ¶¶ 6, 17; Ex. I, Waller II Tr. at 91:23-94:6.

[46] Ex. A, Answer at 4 ¶ 17; Ex. I, Waller II Tr. at 91:23-94:6.

[47] Ex. M, Research Agreement at 5; Ex. A, Answer at 2 ¶ 6.

[48] Ex. M, Research Agreement at 5; Ex. A, Answer at 2 ¶ 6; Ex. I, Waller II Tr. at 90:17-91:8.

[49] Id.

[50] Ex. M, Research Agreement at 1-5; Ex. I, Waller II Tr. at 30:16-31:10.

[51] Ex. F, Wallop I Tr. at 174:04-175:02; 177:05-177:10; Ex. H, Waller I Tr. at 164:6-165:17; Ex. A, Answer at 13 ¶¶ 65, 66.

[52] Ex. K, L. Han. Tr. at 174:21-175:19.

Strategic then endeavored to conduct its investigation into the individuals on the Subject List.[53] Strategic decided to split the investigation into two parts, with Mr. Waller directing the part of the investigation that involved international contacts and Ms. Wallop handling the United States based part of the investigation.[54] A substantial portion of Strategic's investigation occurred in Virginia.[55] In fact, Strategic has admitted that it "coordinated its efforts to perform under the [Research Agreement] out of the Commonwealth of Virginia."[56] Ms. Wallop performed her portion of the investigation out of her home in Arlington, Virginia.[57] Mr. Waller and Ms. Wallop (on behalf of Strategic) met on an "almost daily" basis to "handle this investigation," at Ms. Wallop's home in Arlington, Virginia.[58] Ms. Wallop had in person meetings with, and made phone calls to persons in Virginia and Washington D.C. to verify and cross check the information provided in the Subject List.[59]

In addition to Ms. Wallop's and Mr. Waller's own investigation activities, Strategic also retained or attempted to retain independent contractors within the United States and outside the United States to assist with the investigation.[60] On a number of occasions throughout January, Ms. Wallop and Mr. Waller met with members of one of the investigative teams assembled by

---

[53] *See infra* at 10-11.

[54] Ex. F, Wallop I Tr. 177:20-178:17, 180:06-180:08.

[55] *See e.g.*, Ex. B, Strategic's Admissions ¶¶ 22, 26, 38, 39, 43, 44 (describing numerous meetings in Virginia regarding performance of Research Agreement).

[56] Ex. B, Strategic's Admissions ¶ 36.

[57] Ex. A, Answer ¶ 2.

[58] Ex. F, Wallop I Tr. 183:09-183:18; 8:02-8:03.

[59] Ex. A, Answer at 13 ¶¶ 71-72; Ex. F, Wallop I Tr. 180:6-184:24.

[60] Ex. A, Answer at 14 ¶ 86.

Strategic—referred to by Strategic as "Team 1"— in Ms. Wallop's home in Arlington, Virginia.[61] Ms. Wallop and Mr. Waller also met with the members of the other investigative team—referred to by Strategic as "Team 2—on at least two occasions.[62]

### F.   The Breach

The weekly deliverables called for under the Research Agreement were due by no later than mid-January 2018.[63]  Strategic did not meet the contractual deadline.[64]  Rather, Strategic delivered its first USB drive to Eastern pursuant to the Research Agreement on January 26, 2018.[65] That drive did not, however, comply with the terms of the Research Agreement.  Indeed, Strategic has admitted that the information contained on that drive was "of no use to Guo or Eastern Profit because it was nothing more than the researchers' own work to familiarize themselves with the fifteen subjects using open-source information."[66]  On January 30, 2018, Strategic delivered a second USB drive to Eastern Profit.[67]  That USB drive, like the first, failed to comply with the terms of the Research Agreement.  As admitted by Strategic, the drive contained "incomplete work product . . . in the form of raw research data" that was not "of any use" to Eastern.[68]  Strategic did not deliver any other USB drives to Eastern.[69]

---

[61] Ex. G, Wallop II Tr. at 6:19-13:9.

[62] *Id.* at 20:10-13, 23:20-26:10.

[63] Ex. M, Research Agreement at 1-3.

[64] *See infra* at 11-12.

[65] Ex. A Answer at 35 ¶ 45; Ex. H, Waller I Tr. at 201:10-202:13; Ex. G, Wallop II Tr. at 16:12-17; Ex. I, Waller II Tr. at 6:2-8, 112:7-114:10.

[66] Answer at A at 35 ¶ 45; Ex. I, Waller II Tr. at 6:2-8, 112:7-114:10.

[67] Answer at A at 28 ¶ 24; Ex. G, Wallop II Tr. at 16:12-17; Ex. H, Waller I Tr. at 211:3-215:16; Ex. I, Waller II Tr. at 115:9-116-17.

[68] *Id.*

[69] Ex I, Waller II Tr. at 114:23-115:8.

Consequently, Strategic failed to provide to Eastern any of the required deliverables.[70]  It never delivered any "financial forensic [h]istorical research" called for under the Research Agreement.[71]  It did not deliver to Eastern any "current tracking research" called for under the Research Agreement.[72]  It also failed to deliver to Eastern any "social media research" called for under the Research Agreement.[73]  In fact, Strategic has admitted that it "was unable to prepare *any* [of the] detailed reports" called for under the Research Agreement.[74]

As a result, on February 23, 2018, Eastern wrote to Strategic terminating the Research Agreement.[75]  In its letter, Eastern demanded that Strategic return the $1 million deposit.[76]  Strategic has refused to do so.[77]  Since termination, ACA has demanded repayment of the ACA Loan, and Eastern acknowledges that it remains obligated to repay the ACA Loan.[78]

## III.   PROCEDURAL POSTURE

Eastern brought suit against Strategic on March 12, 2018.[79]  Eastern primarily seeks to recover its $1 million deposit, plus pre- and post-judgment interest.  In Eastern's first count—breach of contract—Eastern alleges that Strategic breached the Research Agreement by failing to provide the research deliverables called for therein.  In its second count—fraudulent inducement—

---

[70] Ex I, Waller II Tr. at 6:2-8, 98:8-114:10; Ex. K, L. Han Tr. at 160:10-19, 264:9-265:20, 275:15-279:17.

[71] Ex I, Waller II Tr. at 6:2-8, 98:8-100:3.

[72] Ex I, Waller II Tr. at 6:2-8, 100:4-111:20.

[73] Ex I, Waller II Tr. at 6:2-8, 112:7-114:10.

[74] Ex D, Strategic's Responses and Objections to Eastern's First Interrogatories, Response to Interrogatory No. 8 (emphasis added).

[75] Ex A, Answer at 6 ¶ 28; Ex I, Waller II Tr. at 91:9-13; Ex. N, Termination Letter, EASTERN-000198.

[76] Answer at 6 ¶ 28; Ex. N, Termination Letter, EASTERN-000198.

[77] *Id.*

[78] *See* Ex. E, C. Han Tr. at 34:14-20, 38:18-40:17.

[79] *See* Dkt. No. 19.

Eastern claims that Strategic fraudulently induced it to enter into the Research Agreement by misrepresenting its research capabilities.  In its third count—declaratory judgment—Eastern seeks an order declaring the Research Agreement void as against public policy.  Eastern's fourth cause of action seeks recovery of the deposit paid to Strategic under an unjust enrichment theory.

Strategic asserts two counterclaims against Eastern.[80]   In Strategic's first counterclaim—breach of contract—Strategic claims that Eastern breached the Research Agreement by failing to pay the amounts allegedly owed for period of January 16, 2018 through March 21, 2018.  In Strategic's second counterclaim—fraudulent inducement—Strategic alleges that Mr. Guo, in negotiating the Research Agreement on behalf of Eastern, misrepresented that he "was a Chinese dissident," that "he opposed the [CCP]," and that "he was actively working to find and publicize research. . . that he would then use to weaken the Chinese regime . . . ."

## IV.    ARGUMENT

### A.    Standard of Review

The standard for granting summary judgment is well established.  *Porto v. Guirgis*, 659 F. Supp. 2d 597, 602 (S.D.N.Y. 2009).  Summary judgment is appropriate if the nonmoving party cannot prove an element that is essential to the non-moving party's case and on which it will bear the burden of proof at trial.  *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999); *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir. 2004).  If the moving party meets its initial burden of showing a lack of a material issue of fact, the burden shifts to the nonmoving party to come forward with "specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2); *Porto*, 659 F. Supp. at 603.  The nonmoving party must produce evidence and

---

[80] *See* Dkt. No. 127.

"may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993).

### B.  Summary Judgment Should be Granted Because the Research Agreement is Void as a Matter of Law

Summary judgment should be granted in favor of Eastern with respect to Eastern's declaratory judgment and unjust enrichment claims (Count III and IV of Eastern's Complaint) and Strategic's breach of contract claim and fraudulent inducement counterclaims (Count I and IV of Strategic's Counterclaims) because, as explained below, the Research Agreement is unlawful under Va. Code Ann. § 9.1-139 and is therefore void as a matter of law.

### 1.  The Research Agreement Violates Virginia Public Policy

Virginia statutory law strictly forbids persons from soliciting, contracting to provide, or providing private investigation services without a license:

> No person shall ***engage in the private security services business*** or ***solicit private security business*** in the Commonwealth ***without having obtained a license*** from the Department.  No person shall be issued a private security services business license until a compliance agent is designated in writing on forms provided by the Department. The compliance agent shall ensure the compliance of the private security services business with this article and shall meet the qualifications and perform the duties required by the regulations adopted by the Board.

Va. Code Ann. § 9.1-139.  "Private Security Services Business," as defined in the statute, includes *providing* or *undertaking to provide* private investigator services pursuant to a contract: "[A]ny person engaged in the business of providing, or who undertakes to provide, . . . private investigators . . . to another person under contract, express or implied.  Va. Code Ann. § 9.1-138.  Private investigators, in turn, are defined to include individuals who seek to "obtain information on (i) crimes or civil wrongs; (ii) the location, disposition, or recovery of stolen property; (iii) the cause

of accidents, fires, damages, or injuries to persons or to property; or (iv) evidence to be used before any court, board, officer, or investigative committee."  Va. Code Ann. § 9.1-138.

Read together, these statutory provisions and definitions prohibit persons from (i) soliciting private investigation business in Virginia without a license, (ii) contracting to provide private investigation services in Virginia without a license, and/or (iii) actually providing private investigation services in Virginia without a license.  Va. Code Ann. §§ 9.1-138, 9.1-139.

Here, Strategic admits that it, Ms. Wallop, and Mr. Waller are not and never have been licensed to provide private investigation services in Virginia or any other state or jurisdiction within the United States or abroad.[81]  Further, as explained below, it is indisputable that Strategic's conduct in connection with the Research Agreement falls within the confines of and therefore violates Va. Code Ann. § 9.1-139.

First, there can be no doubt that Strategic *contracted in Virginia to provide* private investigatory services.  The record evidence in this case, including admissions by Strategic, has conclusively established that:

- Eastern and Strategic, which was and is based in *Virginia*, entered into the Research Agreement on January 6, 2019 *in Virginia*[82];

- Strategic has admitted that the Research Agreement required Strategic to perform "a private investigation" into various individuals identified by Eastern[83]; and

---

[81] Ex. A, Answer at 14 ¶¶ 88-102; Ex. F, Wallop I Tr. at 290:25:-292:2.

[82] Ex. A, Answer at 2-3 ¶¶ 2, 7; *id.* at 28 ¶ 23; Ex. I, Waller II Tr. at 89:21-90:16; Ex. F, Wallop I Tr. at 126:3-14.

[83] Ex. A, Answer at 11 ¶ 56; *id.* at 8 ¶¶ 35-41 ("Strategic Vision admits making accurate and true representations to Eastern Profit regarding . . . Strategic Vision's ability to satisfy Eastern Profit's description of its intended scope and plans for the ***investigative research to be conducted by Strategic Vision pursuant to the Contract***") (emphasis added); *id.* at 29 ¶ 28 ("Immediately upon entering into the [Research Agreement], Strategic Vision [began] recruiting, vetting, engaging and marshaling the initial efforts of various ***investigators*** and analysts in the United States, Europe and the Middle East.") (emphasis added).  Indeed, both Waller and Wallop ***repeatedly*** referred to the services that they were to provide and attempted to provide to Eastern under the Research Agreement as an "***investigation***."  *See e.g.*, Ex. F, Wallop I Tr. at 17:9-18:12, 21:1-23:6, 51:14-17, 87:7-22, 127:14-128:23, 138:1-

-15-

- According to the very terms of the Research Agreement, Strategic contracted to provide Eastern with "high quality original research and . . . reports on subjects chosen at [Eastern's] discretion for the *purposes of detecting, stopping, and preventing crime or other harm to innocent people*."[84]

By way of specific example, in the course of her deposition testimony regarding the schedule of claimed out of pocket expenses Strategic was seeking to recover, Ms. Wallop testified as follows:

> Q: And then go down a few more lines.  There is a debit card purchase on March 13th.  What is the Grace Bay Club & Spa?
>
> A:  That was to investigate -- there were two Chinese individuals we were tracking in the Turks & Caicos.
>
> Q:  So that is an expenditure –
>
> A:  Yes.
>
> Q:  -- of $456 at a spa in Turks & Caicos?
>
> A:  It wasn't a spa, it was a hotel, a night, two nights.
>
> Q:  And your testimony is whom were you investigating?
>
> A:  Two Chinese characters that were on the list.
>
> Q:  And who was with you in Turks & Caicos?
>
> A:  My son was with me, but just we had separate rooms, so --
>
> Q:  But who -- you were there, were you meeting with investigators there?
>
> A:  No, I was investigating on my own.
>
> Q:  Why did you need to be in Turks & Caicos?

---

16,  151:22-152:13,  153:12-17,  169:5-170:3,  177:5-180:20  (Wallop describing her personal role in the "investigation"), 183:9-18, 257:2-10; Ex. G, Wallop II Tr. at 29:20-30:16, 89:17-93-11, 96:5-101:15; Ex. H, Waller I Tr. at 33:8-34:3, 195:15-17; Ex. I, Waller II Tr. at 57:12-16 ("***Q. . . . [S]o Strategic Vision did, in fact, set out to investigate a number of individuals on a list, right?  A.  Yes.***") (emphasis added).

[84] Ex. M, Research Agreement at 1 (emphasis added); *see also* Answer at 2 ¶ 6.

A:  Because that's where the two Chinese were those two nights.

Q:  And what did you do to investigate them?

A:  I suppose that when you are tracking somebody you are trying to gather intelligence, and that's what I was doing.

Q:  That's what I am asking you about.  Were you surveilling them?

A:  Yes, to some degree, yes.

Q:  And how did you go about that?

A:  As anybody that does this does, you watch them, you listen, you see what they are talking about, you take photographs of them, you put it back into the basket of information that we filling.[85]

Thus, not only has Strategic *conceded* that it contracted in Virginia to provide "a private investigation" to Eastern, the stated purpose of the Research Agreement also fits squarely within the statutory definition of private investigator services under Virginia law.  Indeed, Va. Code Ann. § 9.1-138 defines private investigation services to include efforts to "obtain information on . . . crimes or civil wrongs" and the stated purpose of the research within the Research Agreement is to "detect[], stop[], and prevent[] crime or other harm to innocent people."[86]  Thus, both party admissions regarding the services that were to be provided and the very terms of the Research Agreement confirm that Strategic, without question, contracted in Virginia to provide private investigatory services to Eastern.  Because it did so without a license, the Research Agreement violates Va. Code Ann. § 9.1-139.

The Research Agreement is illegal under Virginia law for another reason—not only did Strategic *contract to provide* private investigatory services in Virginia, it also *solicited* private investigatory business from Eastern in Virginia without a license.  Strategic has admitted that:

---

[85] Ex. G, Wallop II Tr. at 97:5-98:22.

[86] Ex. M, Research Agreement at 1 (emphasis added); *see also* Answer at 2 ¶ 6.

- It negotiated the Research Agreement, including the services that Strategic would provide to Eastern under the agreement, during several meetings between representatives of Eastern and Strategic *in Virginia*[87];

- Ms. Wallop and Mr. Waller, *while located in Virginia*, communicated with representatives of Eastern on numerous occasions to discuss the activities that Strategic was proposing to perform for Eastern under the Research Agreement, the proposed terms of the Research Agreement, and the finalized terms of the agreement[88]; and

- As negotiations matured, Ms. Wallop and Mr. Waller prepared the initial draft of the Research Agreement while at Ms. Wallop's home *in Virginia*.[89]

Put simply, Strategic *solicited* private investigation business from Eastern in Virginia without a license in contravention with Va. Code Ann. § 9.1-139.

Finally, the Research Agreement violates Virginia law for a third reason—Strategic *actually provided* investigatory services to Eastern pursuant to the Research Agreement in Virginia without a license. Discovery has revealed that:

- Strategic "coordinated its efforts to perform under the [Research Agreement] *out of the Commonwealth of Virginia*"[90];

- Mr. Waller and Ms. Wallop met on an almost daily basis to "handle this investigation" at Ms. Wallop's home *in Virginia*[91];

- Ms. Wallop had in person meetings with and made phone calls to persons *in Virginia* to verify and cross check the information provided in the Subject List[92];

---

[87] Ex. A, Answer at 3 ¶ 8.

[88] Ex. A, Answer at 3 ¶ 8; Ex. B, Strategic's Admissions ¶¶ 20-25; Ex. F, Wallop I Tr. 186:13-186:20.

[89] Ex. F, Wallop I Tr. at 108:5-109:18.

[90] Ex. B, Strategic's Admissions ¶ 36.

[91] Ex. F, Wallop I Tr. 183:09-183:18; 8:02-8:03. Strategic also admitted that Wallop and Waller met in person at least five times in Virginia after the Research Agreement was executed to discuss the Research Agreement and at least three times in Virginia after the Research Agreement was executed to discuss the progress of Strategic's work under the Research Agreement. Ex. B, Strategic's Admissions ¶¶ 38, 39, 43, 44.

[92] Ex. A, Answer at 12 ¶¶ 71-72; Ex. F, Wallop I Tr. 180:6-184:24.

- Ms. Wallop and Mr. Waller met with L. Han regarding the Research Agreement in Ms. Wallop's home *in Virginia* to discuss the investigation on at least two occasions[93];

- Ms. Wallop and Mr. Waller, while located *in Virginia*, communicated with Ms. Wang regarding the investigation after the Research Agreement was executed[94]; and

- Ms. Wallop and Mr. Waller met with members of one of the investigative teams assembled by Strategic—referred to by Strategic as "Team 1"—on a number of occasions in Ms. Wallop's home *in Virginia*.[95]

In short, the record, including Strategic's admissions and Ms. Wallop's and Mr. Waller's testimony, demonstrates that not only did Strategic contract to perform investigation services to Eastern in Virginia and solicit such business from Eastern in Virginia, it also actually performed such services for Eastern in Virginia without a license.  Thus, the Research Agreement is clearly illegal, *for three separate and independent reasons*, under Va. Code Ann. § 9.1-139.

## 2.      The Research Agreement is Consequently Void

Because it is unlawful, the Research Agreement is also void as a matter of Virginia contract law.[96]  Virginia law leaves no doubt that "[c]ontracts that violate Virginia public policy are void" as a matter of law.  *Reading & Language Learning Ctr. v. Sturgill*, 94 Va. Cir. 94, 106 (Va. Cir. Ct. 2016).  To be sure, "a contract made in violation of a statute is void, and there can be no recovery thereon, unless it is apparent from the statute that the legislature did not intend to make

---

[93] Ex. G, Wallop II Tr. at 20:14-21:4, 31-12-32:5.

[94] Ex. B, Strategic's Admissions ¶¶ 22, 26.

[95] Ex. G, Wallop II Tr. at 6:19-13:9; Ex. H, Waller I Tr. at 192:6-19.

[96] Virginia law applies to determine the validity of the Research Agreement because Strategic is based in Virginia (Ex. A, Answer at 1 ¶ 2), the parties' negotiated the agreement in Virginia (*id.* at 3 ¶ 8; Ex. B, Strategic's Admissions, ¶¶ 20-25), Strategic drafted the agreement in Virginia (Ex. F, Wallop I Tr. at 108:5-109:18), the parties signed the agreement in Virginia (Ex. A, Answer at 2-3, ¶¶ 6-7; *id.* at 28 ¶ 23), and Strategic performed the services called for by the agreement in Virginia (*supra* at 17-18).  *See e.g.*, Restatement (Second) of Conflicts § 188; *Creazioni Artistiche Musicali, S.r.l. v. Carlin Am., Inc.*, 2016 U.S. Dist. LEXIS 180431, at *10 (S.D.N.Y. Dec. 30, 2016) *AllGood Entm't, Inc. v. Dileo Entm't & Touring, Inc.*, 726 F. Supp. 2d 307, 317 (S.D.N.Y. 2010); *Lehman Bros. Commer. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 118, 146 (S.D.N.Y. 2000).

the contract void and unenforceable." *Massie v. Dudley*, 3 S.E.2d 176, 180 (Va. 1939).  With Va. Code Ann. § 9.1-13, the legislature clearly intended to make private investigation contracts void and unenforceable when the party doing the investigating does not have a license.  In fact, at least one Virginia court has explicitly held as much—applying Va. Code Ann. § 9.1-139 to void a contract for the provision of private security services where the party providing the services under the contract was not licensed.  *See Urban Protective Servs. v. Great Latin Rests., L.L.C.*, 2007 Va. Cir. LEXIS 33, at *5-8 (Va. Cir. Ct. Mar. 5, 2007).

In *Urban*, the Virginia Circuit Court declared an "express contract between the parties . . . void because the Plaintiff [Urban Protective Services] had not secured the requisite private security license before entering into a contract to provide private security services to the Defendant." *Id.* at *5.  The court made clear that "the contract between the parties was not merely invalid and unenforceable, but illegal and in contravention of public policy." *Id.* at *5-6. As a result, the court ruled that the plaintiff was not entitled to assert contractual or implied contractual claims pursuant to the private security contract and ordered the plaintiff to return the monies that defendant had paid to plaintiff pursuant to the contract. *Id.* at *8.

The *Urban* decision is directly on point here.  As in *Urban*, the Research Agreement between Eastern and Strategic is void because Strategic solicited, contracted to provide, and/or actually provided investigatory services in Virginia without a license in violation of positive Virginia law.  Thus, Strategic's breach of contract (Count I) and fraudulent inducement claims (Count II), which are premised upon the existence of the Research Agreement, should be dismissed in accordance with *Urban*.  Further, summary judgment on Eastern's declaratory judgment (Count III) and unjust enrichment (Count IV) claims should also be granted in Eastern's favor.[97]

---

[97] If the Research Agreement is void, then by definition, there is no justification under which Strategic may be permitted to keep the $1 million deposit and summary judgment must be granted in Eastern's favor on its unjust

### C.  Summary Judgment Should Be Granted On Strategic's Fraudulent Inducement Claim (Count II)

Summary Judgment should be granted in Eastern's favor on Strategic's fraudulent inducement Counterclaim because Strategic is unable, as a matter of law, to prove a number of the required elements.

"[A] claim of fraudulent inducement requires proof (1) that the defendants made a representation, (2) as to a material fact, (3) which was false, (4) and known to be false by the defendants, (5) that the representation was made for the purpose of inducing the other party to rely upon it, (6) that the other party rightfully did so rely, (7) in ignorance of its falsity, (8) to his injury."  *Internet Law Library, Inc. v. Southridge Capital Mgmt.*, LLC, 2005 U.S. Dist. LEXIS 32299, at *17 (S.D.N.Y. Dec. 8, 2005); *see also Winn v. Aleda Constr. Co.,* 315 S.E.2d 193, 195 (Va. 1984).[98]

"At summary judgment as well as at trial, a plaintiff must prove each element of fraudulent inducement by 'clear and convincing' evidence." *Century Pacific, Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 219 (S.D.N.Y. 2007), *aff'd*, 354 F. App'x 496 (2d Cir. 2009); *White v. Potocska*, 589 F. Supp. 2d 631, 640 (E.D. Va. 2008).  Strategic's fraud claim fails here because, in addition to other deficiencies, Strategic is unable to prove reasonable reliance, scienter, or the existence of a provably false statement of material fact as a matter of law.

---

enrichment claim.  *See e.g., Rella v. N. Atl. Marine Ltd.*, 2004 U.S. Dist. LEXIS 11567, at *18 (S.D.N.Y. June 21, 2004) ("Indeed, absent some contractual arrangement, if a purchase has been cancelled, the seller has no legitimate claim to a deposit, for without a pending purchase, the deposit can be deemed neither a down payment on the purchase price nor security to ensure performance by the buyer.").

[98] Given that the locus of the alleged fraud took place in Virginia (*i.e.*, Strategic's principal place of business), Virginia law likely applies to Strategic's fraud claim.  *Rosenberg v. Pillsbury Co.*, 718 F. Supp. 1146, 1150 (S.D.N.Y. 1989).  Because Virginia law regarding fraudulent inducement claims is consistent with New York law, Eastern cites to cases interpreting both Virginia and New York law.

### 1.      Strategic Cannot Prove Reasonable Reliance

Strategic cannot, as a matter of law, demonstrate reasonable reliance here because: (i) it did not conduct *any* diligence into the background of Eastern or Mr. Guo before entering into the Research Agreement; (ii) it did not seek to memorialize any of the alleged misstatements as representations, warranties, or covenants in the Research Agreement; and (iii) the so-called evidence that it now seeks to marshal in purported support of its fraud claim is publicly-available information that Strategic could have easily accessed before entering into the Research Agreement.

Reasonable reliance "is an essential element of fraudulent inducement." *Kriegel v. Donelli*, 2014 U.S. Dist. LEXIS 90086, at *34 (S.D.N.Y. June 30, 2014); *Mizell v. Sara Lee Corp.*, 2005 U.S. Dist. LEXIS 36988, at *17 (E.D. Va. June 9, 2005).  "Given that it is an indispensable element . . . , if a plaintiff cannot establish reasonable reliance, summary judgment is warranted." *Kriegel*, 2014 U.S. Dist. LEXIS 90086, at *37; *PNC Bank, Nat'l Assoc. v. Dominion Energy Mgmt.*, 2018 U.S. Dist. LEXIS 62577, at *48 (E.D. Va. Apr. 11, 2018).

"In situations where there is a written contract, . . . courts are typically reluctant to consider a plaintiff's reliance upon oral communications reasonable." *Elite Physician Servs., LLC v. Citicorp Payment Servs.*, 2009 U.S. Dist. LEXIS 134966, at *18 (S.D.N.Y. Oct. 8, 2009); *Foremost Guar. Corp. v. Meritor Sav. Bank*, 910 F.2d 118, 124 (4th Cir. 1990).  Further, it is well-settled that reliance is not reasonable where a plaintiff failed to use means available to it to verify alleged extra-contractual representations. *Elite Physician*, 2009 U.S. Dist. LEXIS 134966, at *18; *White*, 589 F. Supp. 2d at 650-51.

Indeed, "[a] party claiming fraudulent inducement . . . must show that he or she made an independent inquiry into the available information." *Giannacopoulos v. Credit Suisse*, 37 F. Supp. 2d 626, 632 (S.D.N.Y. 1999); *White*, 589 F. Supp. 2d at 650-51.  If a "plaintiff has the means available to it of knowing, by the exercise of ordinary intelligence, the truth or the real

quality of the subject of the representation, the plaintiff must make use of those means, or it will not be heard to complain that it was induced to enter into the transaction by misrepresentations[.]" *PHL Variable Ins. Co. v. Town of Oyster Bay*, 2017 U.S. Dist. LEXIS 83262, at *42-43 (E.D.N.Y. May 30, 2017); *Cresswell v. Sullivan & Cromwell*, 704 F. Supp. 392, 410 (S.D.N.Y. 1989); *White*, 589 F. Supp. 2d at 650 n.18.

"The touchstone of reasonableness is prudent investigation." *White*, 589 F. Supp. 2d at 650-51. Thus, "when a party has been 'put on notice of material facts which have not been documented and he nevertheless proceeds with the transaction without securing the available documentation or inserting appropriate language in the agreement for his protection . . . [that failure] renders reliance on the misrepresentation *unreasonable as a matter of law*." *Baraliu v. Vinya Capital, L.P.*, 2009 WL 959578, at *8 (S.D.N.Y. Mar. 31, 2009) (emphasis added).

Based upon these principles, courts applying both New York and Virginia law routinely dismiss or grant summary judgment as to fraud claims on reliance grounds where the claimant failed to conduct reasonable diligence into an alleged oral statement made during contract negotiations or seek to negotiate that statement into a formal representation, warranty, or covenant in the applicable agreement.[99]

---

[99] *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1543 (2d Cir. 1997) (granting summary judgment on fraud claim on reliance grounds because: "Where, as here, a party has been put on notice of the existence of material facts which have not been documented and he nevertheless proceeds with a transaction without securing the available documentation or inserting appropriate language in the agreement for his protection, he may truly be said to have willingly assumed the business risk that the facts may not be as represented. Succinctly put, a party will not be heard to complain that he has been defrauded when it is his own evident lack of due care which is responsible for his predicament."); *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 196 (2d Cir. 2003) ("[H]aving been told that NETV's largest investment was its $14 million purchase of an equity interest in Brightstreet, Emergent should have protected itself by insisting that this representation be included in the stock purchase agreement. . . . Emergent's failure to do so precludes as a matter of law a finding of reasonable reliance upon defendants' misrepresentations about Brightstreet."); *Giannacopoulos*, 37 F. Supp. 2d at 632 (granting summary judgment on fraud claim on reliance grounds because "plaintiff investigated any misrepresented facts insufficiently to prove justifiable reliance."); *Abbey v. 3F Therapeutics, Inc.*, 2011 U.S. Dist. LEXIS 17299, at *33 (S.D.N.Y. Feb. 18, 2011) (same); *In re Eugenia Vi Venture Hldgs., Ltd.*, 649 F. Supp. 2d 105, 119 (S.D.N.Y. 2008) (same); *see also In re Merrill Lynch Auction Rate Sec. Litig.*, 851 F. Supp. 2d 512, 537 (S.D.N.Y. 2012) (granting motion to dismiss fraud claim on reliance grounds because "Plaintiff's failure to avail itself of the public information made available is similarly

Such is the case here. Indeed, although Strategic conclusorily asserts that it relied upon Mr. Guo's alleged representations regarding his dissident status and his opposition to the CCP,[100] the discovery record belies Strategic's contention and precludes a finding of reasonable reliance. As an initial matter, Strategic's lack of reliance on Mr. Guo's alleged misrepresentations is evidenced by the fact that it did not seek to negotiate the alleged statements as formal representations, warranties, or covenants in the Research Agreement.[101] Strategic instead purports to rely upon oral statements allegedly made by Mr. Guo during contract negotiations that by their very nature cannot not be reasonably relied upon.[102]

Strategic has further demonstrated its lack of reliance on Mr. Guo's alleged representations by failing to even attempt to verify the accuracy of those alleged representations. Indeed, despite touting itself as a sophisticated investigatory firm with the ability to gain in depth and detailed information on research targets, Strategic did not conduct even the most cursory diligence into the background of Eastern or Mr. Guo, including into whether Mr. Guo was truly a dissident or opposed the CCP.[103] It did not know for what purpose Eastern was proposing to use the investigatory research and thought that Eastern might "run it both ways" (that is, both for and

---

unreasonable"); *In re UBS Auction Rate Sec. Litig.,* 2010 U.S. Dist. LEXIS 59024, at *74 (S.D.N.Y. June 10, 2010); *see also Stuart Lipsky, P.C. v. Price*, 215 A.D.2d 102, 625 N.Y.S.2d 563, 564 (1st Dept.1995) (rejecting fraud action by buyer of law practice claiming misrepresentations of practice's size and viability because buyer "had the means available to ascertain the truth [and] nevertheless chose to rely solely upon the alleged oral representations without any effort to verify that information via financial statements."); *see also Xia Bi v. McAuliffe*, 927 F.3d 177, 187 (4th Cir. 2019) (similar); *White*, 589 F. Supp. 2d at 650-51 (granting motion to dismiss on reasonable reliance grounds); *Schur v. Sprenkle*, 84 Va. Cir. 418, 419-20 (Va. Cir. Ct. 2012) (similar).

[100] Ex. A, Answer at 48 ¶ 87.

[101] Ex. M, Research Agreement; Ex. I, Waller II Tr. at 30:16-31:10.

[102] *See Emergent*, 343 F.3d at 196 ("[H]aving been told that NETV's largest investment was its $14 million purchase of an equity interest in Brightstreet, Emergent should have protected itself by insisting that this representation be included in the stock purchase agreement. . . . Emergent's failure to do so precludes as a matter of law a finding of reasonable reliance upon defendants' misrepresentations about Brightstreet.").

[103] Ex. A, Answer. at 11 ¶¶ 47-54; Ex. F, Wallop I Tr. 59:2-61:13, 86:19-91:1, 171:21-173:24, *see also id.* at 12:5-21, 16:16-18:12, 26:22-27:2, 27:18-30:1; *see also* Ex. H, Waller I Tr. at 286:1-287:8.

against the CCP).[104]  It "never [even] discussed what the research would be used for . . . with Mr. Guo or Ms. Wang or Mr. Han."[105]  In fact, Strategic waited until months *after* the Research Agreement was signed to even begin conducting diligence into Mr. Guo and Eastern.[106]

Instead of negotiating what Strategic now claims to be material representations into the Research Agreement or conducting diligence into those alleged representations before it signed the agreement, Strategic relied solely upon the recommendation of two third parties—Mr. Gertz and L. Han—in choosing to enter into the Research Agreement:

> Q.  Okay.  So you didn't do any work regarding Mr. Guo or his business prior to . . . the execution of the contract on or about January 6, 2018?
>
> A.  No.
>
> Q.  You didn't access your network to determine whether this was someone you wanted to do business with or not?
>
> A.  We had Bill Gertz, who was one of the finest intellects on Chinese corruption, and reporters, journalists, and also Lianchao, again, of the highest sterling standards.  When they asked us to look into it, that's what we did.  That was looking into putting together a program that would help somebody that we believed at the time was absolutely anti-communist.
>
> Q.  I see.  So you relied up -- let me put it this way.  Strategic Vision relied upon the recommendation of Bill Gertz and Lianchao Han in terms of deciding to do business with, or deciding to enter into the research agreement?
>
> A.  Correct.[107]

---

[104] Ex. F, Wallop I Tr. at 59:2-61:13.

[105] *Id.*

[106] Ex. F, Wallop I Tr. at 65:19-73:13 ("Q;  So you were checking references on Mr. Guo after the agreement was over with.  A: Yes.  We had trusted him up until that time."); Ex. G, Wallop II Tr. at 93:4-17.

[107] Ex. F, Wallop I Tr. at 90:4-91:1.

If Mr. Guo's representations were so important to Strategic, it would have done much more than take the recommendation of Mr. Gertz—a reporter who barely knew Mr. Guo— and L. Han—a recent acquaintance of both Mr. Guo's and Ms. Wallop's.  It would have at the very least sought to explore the veracity of Mr. Guo's alleged statements or seek to negotiate those alleged statements into formal representations or covenants in the Research Agreement. Consistent with the authorities cited in footnote 99, that Strategic did neither precludes it from demonstrating reasonable reliance as a matter of law.

Strategic's conclusory assertion of reasonable reliance rings especially hollow given that Strategic could have easily discovered through the use of basic internet searches the very information on which it now seeks to base its fraud claim.  As Strategic made clear during its Rule 30(b)(6) deposition, the supposed basis for Strategic's fraud claim comes *from publicly available information,* such as news articles and YouTube videos, that Strategic *could have easily accessed before entering into the Research Agreement*.[108]

Strategic's post-hoc attempt to rely on information that it could have and should have accessed before entering into the Research Agreement should not be countenanced.  Indeed, "[p]arties cannot demand judicial protection when they could have protected themselves with a reasonable inquiry into any misrepresented facts."  *Giannacopoulos,* 37 F. Supp. 2d 626 at 633; *see also In re Merrill Lynch*, 851 F. Supp. 2d at 537 (granting motion to dismiss fraud claim on reliance grounds because "Plaintiff's failure to avail itself of the public information made available is similarly unreasonable").  Strategic's failure to use the means readily-available to it to uncover the information on which it now seeks to base its fraud claim further forecloses any potential showing of reasonable reliance.

---

[108] Ex. I, Waller II Tr. at 11:11-23, 31:20-36:25, 52:3-20.

## 2.      Strategic Cannot Prove Scienter/Intent to Defraud

Strategic's fraud claim fails for another reason—Strategic cannot prove an intent to defraud.  "To adequately plead scienter, [Strategic] must show that [Mr. Guo on behalf of Eastern] intentionally misrepresented [his dissident status] in order to commit a fraud." *Allison v. Round Table Inv. Mgmt. Co., LP*, 2010 U.S. Dist. LEXIS 113937, at *9 (S.D.N.Y. Oct. 21, 2010) (*citing Wyly v. CA, Inc.*, 2009 U.S. Dist. LEXIS 90037, at *31 (E.D.N.Y. Sept. 2, 2009)); *Alvarez v. Dekar Homes, Inc.*, 22 Va. Cir. 88, 89 (Va. Cir. Ct. 1990)  "[Strategic] may either allege 'a motive for committing fraud and a clear opportunity for doing so,' or 'when the motive is not apparent,' 'identify[ ] circumstances indicating conscious behavior by [Eastern].'"  *Allison*, 2010 U.S. Dist. LEXIS 113937, at *9 (*quoting Powers v. British Vita*, 57 F.3d 176, 184 (2d Cir. 1995)); *Wolf v. Fannie Mae*, 830 F. Supp. 2d 153, 166 (W.D. Va. 2011).

Strategic has shown neither motive nor conscious behavior by Eastern or Mr. Guo. As an initial matter, there is no admissible evidence in the record suggesting that Mr. Guo intended to defraud Strategic about his dissident status or opposition to the CCP.  Nor has Strategic provided any explanation as to why Mr. Guo would have been motivated to defraud Strategic about his dissident status or opposition to the CCP, as he had absolutely nothing to gain from doing so.

Indeed, even if Mr. Guo were a member of the CCP (he is not), and even if Strategic would have turned down millions of dollars of prospective business because Mr. Guo was a member of the CCP, Eastern could have simply found another private investigation company to provide the services that it was seeking to obtain.  Eastern is the customer in this case.  The only party that had any motivation to lie is Strategic, as the provider of the services that Eastern was seeking to procure.  Because Strategic is unable to proffer any actual evidence of an intent to defraud or any motive that Mr. Guo would have had to lie, Strategic's fraudulent inducement claim fails as a matter of law.

-27-

### 3.     Strategic Cannot Prove a Provably False Statement of Material Fact

Finally, Strategic's fraud claim also fails because it is premised upon a statement that is neither provably false nor material.  Despite Strategic's black and white portrayal of the issue, the alleged misrepresentations that Mr. Guo is a "dissident" or "opposes the CCP" are plainly not factual statements capable of being proven trust or false.  As such the alleged representations cannot be the proper subject of a fraud claim. *Prosser & Keeton*, Law of Torts § 677 ("Many cases can be resolved by considering whether the defendant's statement would be reasonably understood to mean something that was provably true or false"); *Fierro v. Gallucci*, 2010 U.S. Dist. LEXIS 27664, at *47 n.30 (E.D.N.Y. Mar. 24, 2010) (dismissing fraud claim where claim was based upon alleged misrepresentations that were "not statements of fact capable of proof.").  In addition, such alleged representations are patently immaterial.  The material portions of a services arrangement, such as the Research Agreement, are the services to be provided and the amount being paid for those services.  *See Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 392 (E.D.N.Y. 2015).  The customer's political affiliations or leanings are not pertinent.  Summary judgment on Strategic's fraud claim should be granted for these reasons as well.

## V.     <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Eastern's Motion for Summary Judgment, enter judgment in Eastern's favor on Counts III and IV of Eastern's Second Amended Complaint and on Counts I and II of Strategic's Counterclaims, order Strategic to return the $1 million deposit paid to it pursuant to the Research Agreement, plus pre- and post-judgment interest, and grant Eastern such other relief that the Court deems appropriate.

Dated:  March 16, 2020

Respectfully submitted,

/s/ Francis J. Lawall

OF COUNSEL:

Francis J. Lawall (NY Bar ID No. FL1234)

Joanna J. Cline (*Pro Hac Vice*)
Christopher B. Chuff (*Pro Hac Vice*)
PEPPER HAMILTON LLP
1313 North Market Streets, Suite 5100
Wilmington, DE 19801
302.777.6500
302.421.8390 (facsimile)

PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103
215.981.4000
215.981.4750 (facsimile)

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

**EASTERN PROFIT CORPORATION LIMITED,**

    **Plaintiff/Counterclaim Defendant,**

                                        **Case No. 18-cv-2185**

    **v.**

**STRATEGIC VISION US, LLC,**

    **Defendant/Counterclaim Plaintiff.**

-----------------------------------------------------------------------------------------------------------------------

## DEFENDANT STRATEGIC VISION US, LLC'S AMENDED ANSWER AND COUNTERCLAIMS TO SECOND AMENDED COMPLAINT

    Defendant Strategic Vision US, LLC ("Strategic Vision") states and alleges the following for its Amended Answer and Counterclaims to the Second Amended Complaint ("Complaint") of Plaintiff Eastern Profit Corporation Limited ("Eastern Profit"). This Amended Answer includes, verbatim, the Counterclaims previously filed by Strategic Vision at ECF 114. This Amended Answer is amended solely to assert additional defenses and affirmative defenses to the Complaint.

## PARTIES

    1.    Strategic Vision is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1 of the Complaint and therefore denies them for lack of information. Strategic Vision reserves its right to conduct discovery regarding these allegations.

    2.    Strategic Vision admits the allegations of Paragraph 2 of the Complaint.

## JURISDICTION AND VENUE

    3.    The allegations of Paragraph 3 of the Complaint comprise one or more legal conclusions to which no response from Strategic Vision is required. To the extent an answer is

deemed required, Strategic Vision denies the application of any legal conclusions against its interests in this case. Further answering, Strategic Vision admits the jurisdictional facts stated in the Paragraph regarding the amount in controversy and citizenship of the parties.

4. The allegations of Paragraph 4 of the Complaint comprise one or more legal conclusions to which no response from Strategic Vision is required. To the extent an answer is deemed required, Strategic Vision denies the application of any legal conclusions against its interests in this case. Strategic Vision denies the factual allegations of the Paragraph on which the legal conclusions rest except that Strategic Vision admits participating in discussions with Guo Wengui, a/k/a Miles Guo, a/k/a Miles Kwok ("Guo") at his home at 781 Fifth Avenue, New York, New York on matters related to the subject contract attached as Ex. A to the Complaint (the "Contract"). Further answering, Strategic Vision states that Paragraph 4 of the Complaint alleges that the Contract was negotiated in New York but Paragraph 8 of the Complaint contradicts that allegation in part.

5. The allegations of Paragraph 5 of the Complaint comprise one or more legal conclusions to which no response from Strategic Vision is required. To the extent an answer is deemed required, Strategic Vision denies the application of any legal conclusions against its interests in this case. Strategic Vision denies the factual allegations of the Paragraph on which the legal conclusions rest except that Strategic Vision admits that some, but not all, negotiations regarding the Contract occurred in New York.

## FACTS COMMON TO ALL COUNTS

6. In response to the allegations of Paragraph 6 of the Complaint, Strategic Vision admits that Eastern Profit and Strategic Vision entered into a contract formally executed on or about January 6, 2018 and in place as of on or about December 29, 2017 (referred to above as the

"Contract"). Strategic Vision admits that a true and correct copy of the Contract is attached as Ex. A to the Complaint. Strategic Vision denies any characterizations or mischaracterizations of the Contract by Eastern Profit against Strategic Vision's interests in the case, and Strategic Vision refers to the Contract for the true and accurate statement of its terms. Strategic Vision states that, by an agreed amendment of the Contract, Strategic Vision's services under the Contract would commence no earlier than January 16, 2018.

7.      In response to the allegations of Paragraph 7 of the Complaint, Strategic Vision admits executing the Contract in Virginia on the date indicated.

8.      Strategic Vision admits the allegations of Paragraph 8 of the Complaint.

9.      Strategic Vision admits the allegations of Paragraph 9 of the Complaint.

10.      Strategic Vision admits the allegations of Paragraph 10 of the Complaint.

11.      Strategic Vision denies the allegations of Paragraph 11 of the Complaint except that Strategic Vision admits it made accurate and true representations to Eastern Profit regarding Strategic Vision's resources and experience in the course of confirming Strategic Vision's ability to satisfy Eastern Profit's description of its intended scope and plans for the investigative research to be conducted by Strategic Vision pursuant to the Contract.

12.      Strategic Vision denies the allegations of Paragraph 12 of the Complaint because they misrepresent the nature of its statements to Eastern Profit regarding Strategic Vision's experience and resources in the field of investigative research.

13.      Strategic Vision denies the allegations of Paragraph 13 of the Complaint because they misrepresent the nature of its statements to Eastern Profit regarding Strategic Vision's experience in the field of investigative research.

14.     Strategic Vision denies the allegations of Paragraph 14 of the Complaint because they misrepresent the nature of its statements to Eastern Profit regarding Strategic Vision's research experience.

15.     Strategic Vision denies the allegations of Paragraph 15 of the Complaint.

16.     In response to the allegations of Paragraph 16 of the Complaint, Strategic Vision states that it is without knowledge or information sufficient to form a belief as to the truth of them because they are based on a description of Eastern Profit's alleged state of mind when entering into the Contract. Strategic Vision states that the Contract terms included none of the alleged circumstances described in the Paragraph as within Eastern Profit's state of mind when entering into the Contract.

17.     In response to the allegations of the first sentence of Paragraph 17 of the Complaint, Strategic Vision admits that it received payment from Eastern Profit in the amount indicated in the sentence but denies all other allegations in the sentence. Strategic Vision denies the remaining allegations of the Paragraph, including because they misrepresent the terms of the Contract and misstate the legal effect of those terms in the circumstances of this case. Strategic Vision denies any characterizations or mischaracterizations of the Contract by Eastern Profit against Strategic Vision's interests in the case. Strategic Vision denies any construction of the Contract that would involve an obligation on the part of Strategic Vision to return the indicated funds to Eastern Profit.

18.     Strategic Vision denies the allegations of Paragraph 18 of the Complaint.

19.     Strategic Vision denies the allegations of Paragraph 19 of the Complaint but admits that Strategic Vision and Eastern Profit agreed that calculation of Eastern Profit's payments to Strategic Vision for Strategic Vision's work under the Contract would commence

on January 16, 2019. Further answering, Strategic Vision did work between January 6, 2019 and January 16, 2019, and did perform $250,000 worth of uncompensated work for Eastern Profit during that period.

20.     Strategic Vision denies the allegations of Paragraph 20 of the Complaint.

21.     Strategic Vision denies the allegations of Paragraph 21 of the Complaint, including without limitation the implied allegation that the Contract required Strategic Vision to have an "in-house" team perform the investigative research described in the Contract. Strategic Vision denies that the Contract required this, and denies making a representation to Eastern Profit at any time that an "in-house" team would perform investigative research under the Contract. Strategic Vision denies any characterizations or mischaracterizations of the Contract by Eastern Profit against Strategic Vision's interests in the case.

22.     In response to the allegations of the first sentence of Paragraph 22 of the Complaint, Strategic Vision admits that French Wallop is its CEO and that, during the relevant timeframe, Strategic Vision did not employ W-2 representatives, to the extent that Eastern Profit intends such as the meaning of "employee" as used in the Paragraph. Strategic Vision denies the remaining allegations of the Paragraph.

23.     Strategic Vision denies the allegations of Paragraph 23 of the Complaint. Strategic Vision specifically denies that the Contract required an "in-house" team to perform investigative research under the Contract, and Strategic Vision denies making a representation to Eastern Profit at any time that an "in-house" team would perform the investigative research. Strategic Vision denies any characterizations or mischaracterizations of the Contract by Eastern Profit against Strategic Vision's interests in the case.

24.     In response to the allegations of Paragraph 24 of the Complaint, Strategic Vision admits that, on or about the date indicated in the Paragraph, Strategic Vision delivered incomplete work product to Eastern Profit in the form of raw research data but this was in response to unreasonable pressure and impossible demands from Eastern Profit, through its representative (or, alternatively, its true principal) Guo in particular. Strategic Vision denies any other allegations of the Paragraph.

25.     Strategic Vision denies the allegations of Paragraph 25 of the Complaint.

26.     Strategic Vision denies the allegations of Paragraph 26 of the Complaint. Strategic Vision denies any characterizations or mischaracterizations of the Contract by Eastern Profit against Strategic Vision's interests in the case.

27.     Strategic Vision denies the allegations of Paragraph 27 of the Complaint. Strategic Vision denies any characterizations or mischaracterizations of the Contract by Eastern Profit against Strategic Vision's interests in the case.

28.     The allegations of Paragraph 28 of the Complaint are based on one or more written documents that speak for themselves and are the best evidence of their content and meaning. Strategic Vision denies any characterizations or mischaracterizations of the documents by Eastern Profit against Strategic Vision's interests in the case. Strategic Vision admits that Eastern Profit purported to terminate the Contract through correspondence from legal counsel on or about the date indicated in the Paragraph.

29.     The allegations of Paragraph 29 of the Complaint are based on one or more written documents, including the Contract, that speak for themselves and are the best evidence of their content and meaning. Strategic Vision denies any characterizations or mischaracterizations of the documents by Eastern Profit against Strategic Vision's interests in the case. Strategic

Vision denies that the Contract requires the return of the indicated sum in the circumstances present in this case.

## COUNT I: ALLEGED BREACH OF THE CONTRACT

30.    Strategic Vision repeats and realleges its responses to all prior Paragraphs of the Complaint as if fully set forth herein.

31.    The allegations of Paragraph 31 of the Complaint comprise one or more legal conclusions to which no response from Strategic Vision is required. To the extent an answer is deemed required, Strategic Vision denies the application of any legal conclusions against its interests in this case. Further answering, Strategic Vision admits the existence of the Contract and that it is valid and enforceable. Strategic Vision denies the allegation that it breached the Contract.

32.    The allegations of Paragraph 32 of the Complaint comprise one or more legal conclusions to which no response from Strategic Vision is required. To the extent an answer is deemed required, Strategic Vision denies the application of any legal conclusions against its interests in this case. Strategic Vision denies the allegation that it breached the Contract and denies the existence of the "actions and inactions" described in the Paragraph.

33.    The allegations of Paragraph 33 of the Complaint comprise one or more legal conclusions to which no response from Strategic Vision is required. To the extent an answer is deemed required, Strategic Vision denies the application of any legal conclusions against its interests in this case. Strategic Vision denies the allegation that it breached the Contract and denies the existence of damages incurred by Eastern Profit as alleged in the Paragraph.

## COUNT II: ALLEGED FRAUDULENT MISREPRESENTATION

34.     Strategic Vision repeats and realleges its responses to all prior Paragraphs of the Complaint as if fully set forth herein.

35.     Strategic Vision denies the allegations of Paragraph 35 of the Complaint, including its subparts. Strategic Vision admits making accurate and true representations to Eastern Profit regarding Strategic Vision's resources and experience in describing Strategic Vision's ability to satisfy Eastern Profit's description of its intended scope and plans for the investigative research to be conducted by Strategic Vision pursuant to the Contract. The Paragraph grossly misrepresents Strategic Vision's statements to Eastern Profit in this regard.

36.     Strategic Vision denies the allegations of Paragraph 36 of the Complaint. Strategic Vision admits making accurate and true representations to Eastern Profit regarding Strategic Vision's resources and experience in describing Strategic Vision's ability to satisfy Eastern Profit's description of its intended scope and plans for the investigative research to be conducted by Strategic Vision pursuant to the Contract. The Paragraph grossly misrepresents Strategic Vision's statements to Eastern Profit in this regard.

37.     Strategic Vision denies the allegations of Paragraph 37 of the Complaint. Strategic Vision admits making accurate and true representations to Eastern Profit regarding Strategic Vision's resources and experience in describing Strategic Vision's ability to satisfy Eastern Profit's description of its intended scope and plans for the investigative research to be conducted by Strategic Vision pursuant to the Contract. The Paragraph grossly misrepresents Strategic Vision's statements to Eastern Profit in this regard.

38.     Strategic Vision denies the allegations of Paragraph 38 of the Complaint. Strategic Vision admits making accurate and true representations to Eastern Profit regarding

Strategic Vision's resources and experience in describing Strategic Vision's ability to satisfy Eastern Profit's description of its intended scope and plans for the investigative research to be conducted by Strategic Vision pursuant to the Contract. The Paragraph grossly misrepresents Strategic Vision's statements to Eastern Profit in this regard.

39.     Strategic Vision denies the allegations of Paragraph 39 of the Complaint. Strategic Vision admits making accurate and true representations to Eastern Profit regarding Strategic Vision's resources and experience in describing Strategic Vision's ability to satisfy Eastern Profit's description of its intended scope and plans for the investigative research to be conducted by Strategic Vision pursuant to the Contract. The Paragraph grossly misrepresents Strategic Vision's statements to Eastern Profit in this regard.

40.     Strategic Vision denies the allegations of Paragraph 40 of the Complaint, and expressly denies making the representations indicated in the Paragraph.

41.     Strategic Vision denies the allegations of Paragraph 41 of the Complaint. Strategic Vision admits making accurate and true representations to Eastern Profit regarding Strategic Vision's resources and experience in describing Strategic Vision's ability to satisfy Eastern Profit's description of its intended scope and plans for the investigative research to be conducted by Strategic Vision pursuant to the Contract. Strategic Vision denies the implied allegation that the Contract required that Strategic Vision use an "in-house" investigative team to conduct investigative research under the Contract.

42.     In response to the allegations of Paragraph 42 of the Complaint, Strategic Vision denies that the Contract requires the return of the indicate sum in the circumstances present in this case. Strategic Vision denies any characterizations or mischaracterizations of the Contract by

Eastern Profit against Strategic Vision's interests in the case. Strategic Vision denies making any misrepresentation to Eastern Profit in connection with the Contract.

43.     Strategic Vision denies making any misrepresentation to Eastern Profit in connection with the Contract and therefore denies the allegations of Paragraph 43 of the Complaint.

44.     Strategic Vision denies making any misrepresentation to Eastern Profit in connection with the Contract and therefore denies the allegations of Paragraph 44 of the Complaint.

45.     Strategic Vision denies making any misrepresentation to Eastern Profit in connection with the Contract and therefore denies the allegations of Paragraph 45 of the Complaint. Strategic Vision denies that Eastern Profit has incurred any damages under the Contract as a result of any failure by Strategic Vision under the Contract.

## COUNT III: DECLARATORY JUDGMENT

46.     Strategic Vision repeats and realleges its responses to all prior Paragraphs of the Complaint as if fully set forth herein.

47.     Strategic Vision admits the allegations of Paragraph 47 of the Complaint and admits that it has provided services to clients outside of the United States.

48.     Strategic Vision admits the allegations of Paragraph 48 of the Complaint.

49.     Strategic Vision admits the allegations of Paragraph 49 of the Complaint.

50.     Strategic Vision admits the allegations of Paragraph 50 of the Complaint but denies that the activity described in the Paragraph occurs universally when Strategic Vision performs investigative research for its clients.

51.     Strategic Vision admits the allegations of Paragraph 51 of the Complaint.

52.     Strategic Vision admits the allegations of Paragraph 52 of the Complaint.

53.     Strategic Vision admits the allegations of Paragraph 53 of the Complaint.

54.     Strategic Vision denies the allegations of Paragraph 54 of the Complaint to the extent they imply that Strategic Vision guaranteed a certain result from its investigative research for Eastern Profit. Strategic Vision admits that its services could result in providing assistance for asset recovery efforts.

55.     Strategic Vision is without knowledge or information sufficient to form a belief as to the truth of the vague allegations in Paragraph 55 of the Complaint and therefore denies them for lack of information. Strategic Vision reserves its right to conduct discovery regarding these allegations.

56.     The allegations of Paragraph 56 of the Complaint are based on one or more written documents, namely the Contract, that speak for themselves and are the best evidence of their content and meaning. Strategic Vision denies any characterizations or mischaracterizations of the documents by Eastern Profit against Strategic Vision's interests in the case. Strategic Vision admits the general characterization of the Contract contained in this Paragraph.

57.     The allegations of Paragraph 57 of the Complaint are based on one or more written documents, namely the Contract, that speak for themselves and are the best evidence of their content and meaning. Strategic Vision denies any characterizations or mischaracterizations of the documents by Eastern Profit against Strategic Vision's interests in the case.

58.     The allegations of Paragraph 58 of the Complaint are based on one or more written documents, namely the Contract, that speak for themselves and are the best evidence of their content and meaning. Strategic Vision denies any characterizations or mischaracterizations of the documents by Eastern Profit against Strategic Vision's interests in the case.

59.     The allegations of Paragraph 59 of the Complaint are based on one or more written documents, namely the Contract, that speak for themselves and are the best evidence of their content and meaning. Strategic Vision denies any characterizations or mischaracterizations of the documents by Eastern Profit against Strategic Vision's interests in the case.

60.     The allegations of Paragraph 60 of the Complaint are based on one or more written documents, namely the Contract, that speak for themselves and are the best evidence of their content and meaning. Strategic Vision denies any characterizations or mischaracterizations of the documents by Eastern Profit against Strategic Vision's interests in the case.

61.     The allegations of Paragraph 61 of the Complaint are based on one or more written documents, namely the Contract, that speak for themselves and are the best evidence of their content and meaning. Strategic Vision denies any characterizations or mischaracterizations of the documents by Eastern Profit against Strategic Vision's interests in the case.

62.     The allegations of Paragraph 62 of the Complaint are based on one or more written documents, namely the Contract, that speak for themselves and are the best evidence of their content and meaning. Strategic Vision denies any characterizations or mischaracterizations of the documents by Eastern Profit against Strategic Vision's interests in the case.

63.     The allegations of Paragraph 63 of the Complaint are based on one or more written documents, namely the Contract, that speak for themselves and are the best evidence of their content and meaning. Strategic Vision denies any characterizations or mischaracterizations of the documents by Eastern Profit against Strategic Vision's interests in the case.

64.     The allegations of Paragraph 64 of the Complaint are based on one or more written documents, namely the Contract, that speak for themselves and are the best evidence of

their content and meaning. Strategic Vision denies any characterizations or mischaracterizations of the documents by Eastern Profit against Strategic Vision's interests in the case.

65.     Strategic Vision admits the allegations of Paragraph 65 of the Complaint.

66.     Strategic Vision admits the allegations of Paragraph 66 of the Complaint.

67.     Strategic Vision denies the allegations of Paragraph 67 of the Complaint.

68.     Strategic Vision denies the allegations of Paragraph 68 of the Complaint.

69.     Strategic Vision denies the allegations of Paragraph 69 of the Complaint.

70.     Strategic Vision admits the allegations of Paragraph 70 of the Complaint.

71.     Strategic Vision admits the allegations of Paragraph 71 of the Complaint.

72.     Strategic Vision admits the allegations of Paragraph 72 of the Complaint.

73.     Strategic Vision denies the allegations of Paragraph 73 of the Complaint.

74.     Strategic Vision denies the allegations of Paragraph 74 of the Complaint.

75.     Strategic Vision denies the allegations of Paragraph 75 of the Complaint.

76.     Strategic Vision denies the allegations of Paragraph 76 of the Complaint.

77.     Strategic Vision denies the allegations of Paragraph 77 of the Complaint.

78.     Strategic Vision denies the allegations of Paragraph 78 of the Complaint.

79.     Strategic Vision denies the allegations of Paragraph 79 of the Complaint.

80.     Strategic Vision denies the allegations of Paragraph 80 of the Complaint.

81.     Strategic Vision denies the allegations of Paragraph 81 of the Complaint.

82.     Strategic Vision denies the allegations of Paragraph 82 of the Complaint.

83.     Strategic Vision denies the allegations of Paragraph 83 of the Complaint.

84.     Strategic Vision denies the allegations of Paragraph 84 of the Complaint.

85.     Strategic Vision denies the allegations of Paragraph 85 of the Complaint.

86.     Strategic Vision admits the allegations of Paragraph 86 of the Complaint.

87.     Strategic Vision denies the allegations of Paragraph 87 of the Complaint.

88.     Strategic Vision admits the allegations of Paragraph 88 of the Complaint. Further answering, Strategic Vision denies that this circumstance creates legal liability for Strategic Vision or supports Eastern Profit's claim that the Contract is unenforceable.

89.     Strategic Vision admits the allegations of Paragraph 89 of the Complaint. Further answering, Strategic Vision denies that this circumstance creates legal liability for Strategic Vision or supports Eastern Profit's claim that the Contract is unenforceable.

90.     Strategic Vision admits the allegations of Paragraph 90 of the Complaint. Further answering, Strategic Vision denies that this circumstance creates legal liability for Strategic Vision or supports Eastern Profit's claim that the Contract is unenforceable.

91.     Strategic Vision admits the allegations of Paragraph 91 of the Complaint. Further answering, Strategic Vision denies that this circumstance creates legal liability for Strategic Vision or supports Eastern Profit's claim that the Contract is unenforceable.

92.     Strategic Vision admits the allegations of Paragraph 92 of the Complaint. Further answering, Strategic Vision denies that this circumstance creates legal liability for Strategic Vision or supports Eastern Profit's claim that the Contract is unenforceable.

93.     Strategic Vision admits the allegations of Paragraph 93 of the Complaint. Further answering, Strategic Vision denies that this circumstance creates legal liability for Strategic Vision or supports Eastern Profit's claim that the Contract is unenforceable.

94.     Strategic Vision admits the allegations of Paragraph 94 of the Complaint. Further answering, Strategic Vision denies that this circumstance creates legal liability for Strategic Vision or supports Eastern Profit's claim that the Contract is unenforceable.

95.     Strategic Vision admits the allegations of Paragraph 95 of the Complaint. Further answering, Strategic Vision denies that this circumstance creates legal liability for Strategic Vision or supports Eastern Profit's claim that the Contract is unenforceable.

96.     Strategic Vision admits the allegations of Paragraph 96 of the Complaint. Further answering, Strategic Vision denies that this circumstance creates legal liability for Strategic Vision or supports Eastern Profit's claim that the Contract is unenforceable.

97.     Strategic Vision admits the allegations of Paragraph 97 of the Complaint. Further answering, Strategic Vision denies that this circumstance creates legal liability for Strategic Vision or supports Eastern Profit's claim that the Contract is unenforceable.

98.     Strategic Vision admits the allegations of Paragraph 98 of the Complaint. Further answering, Strategic Vision denies that this circumstance creates legal liability for Strategic Vision or supports Eastern Profit's claim that the Contract is unenforceable.

99.     Strategic Vision admits the allegations of Paragraph 99 of the Complaint. Further answering, Strategic Vision denies that this circumstance creates legal liability for Strategic Vision or supports Eastern Profit's claim that the Contract is unenforceable.

100.    Strategic Vision admits the allegations of Paragraph 100 of the Complaint. Further answering, Strategic Vision denies that this circumstance creates legal liability for Strategic Vision or supports Eastern Profit's claim that the Contract is unenforceable.

101.    Strategic Vision admits the allegations of Paragraph 101 of the Complaint. Further answering, Strategic Vision denies that this circumstance creates legal liability for Strategic Vision or supports Eastern Profit's claim that the Contract is unenforceable.

102.    Strategic Vision admits the allegations of Paragraph 102 of the Complaint.
Further answering, Strategic Vision denies that this circumstance creates legal liability for
Strategic Vision or supports Eastern Profit's claim that the Contract is unenforceable.

103.    The allegations of Paragraph 103 of the Complaint comprise one or more legal
conclusions to which no response from Strategic Vision is required. To the extent an answer is
deemed required, Strategic Vision denies the application of any legal conclusions against its
interests in this case. Strategic Vision denies that the Contract is illegal or void on the basis
alleged in the Paragraph.

104.    The allegations of Paragraph 104 of the Complaint comprise one or more legal
conclusions to which no response from Strategic Vision is required. To the extent an answer is
deemed required, Strategic Vision denies the application of any legal conclusions against its
interests in this case. Strategic Vision denies that the Contract is illegal or void on the basis
alleged in the Paragraph.

105.    The allegations of Paragraph 105 of the Complaint comprise one or more legal
conclusions to which no response from Strategic Vision is required. To the extent an answer is
deemed required, Strategic Vision denies the application of any legal conclusions against its
interests in this case. Strategic Vision denies that the Contract is illegal or void on the basis
alleged in the Paragraph.

106.    The allegations of Paragraph 106 of the Complaint comprise one or more legal
conclusions to which no response from Strategic Vision is required. To the extent an answer is
deemed required, Strategic Vision denies the application of any legal conclusions against its
interests in this case. Strategic Vision denies that the Contract is illegal or void on the basis
alleged in the Paragraph.

107.　　Strategic Vision states that the allegations of Paragraph 107 of the Complaint are a description of the claim related to the allegation and, as such, no response from Strategic Vision is needed. To the extent an answer is required, Strategic Vision denies Eastern Profit's entitlement to the relief requested.

## COUNT IV: ALLEGED UNJUST ENRICHMENT

108.　　Strategic Vision repeats and realleges its responses to all prior Paragraphs of the Complaint as if fully set forth herein.

109.　　The allegations of Paragraph 109 of the Complaint comprise one or more legal conclusions to which no response from Strategic Vision is required. To the extent an answer is deemed required, Strategic Vision denies the application of any legal conclusions against its interests in this case. Strategic Vision denies that a benefit has been conferred on it by Eastern Profit under the Contract. Eastern Profit has breached the Contract, as alleged below, and Strategic Vision's performance under the Contract has not been fully compensated or satisfied under the circumstances that exist in this case.

110.　　The allegations of Paragraph 110 of the Complaint comprise one or more legal conclusions to which no response from Strategic Vision is required. To the extent an answer is deemed required, Strategic Vision denies the application of any legal conclusions against its interests in this case. Strategic Vision denies that a benefit has been conferred on it by Eastern Profit under the Contract. Eastern Profit has breached the Contract, as alleged below, and Strategic Vision's performance under the Contract has not been fully compensated or satisfied under the circumstances that exist in this case.

111.　　The allegations of Paragraph 111 of the Complaint comprise one or more legal conclusions to which no response from Strategic Vision is required. To the extent an answer is

deemed required, Strategic Vision denies the application of any legal conclusions against its interests in this case. Strategic Vision denies that a benefit has been conferred on it by Eastern Profit under the Contract. Eastern Profit has breached the Contract, as alleged below, and Strategic Vision's performance under the Contract has not been fully compensated or satisfied under the circumstances that exist in this case.

112.    The allegations of Paragraph 112 of the Complaint comprise one or more legal conclusions to which no response from Strategic Vision is required. To the extent an answer is deemed required, Strategic Vision denies the application of any legal conclusions against its interests in this case. Strategic Vision denies that a benefit has been conferred on it by Eastern Profit under the Contract. Eastern Profit has breached the Contract, as alleged below, and Strategic Vision's performance under the Contract has not been fully compensated or satisfied under the circumstances that exist in this case.

113.    The allegations of Paragraph 113 of the Complaint comprise one or more legal conclusions to which no response from Strategic Vision is required. To the extent an answer is deemed required, Strategic Vision denies the application of any legal conclusions against its interests in this case. Strategic Vision denies that a benefit has been conferred on it by Eastern Profit under the Contract. Eastern Profit has breached the Contract, as alleged below, and Strategic Vision's performance under the Contract has not been fully compensated or satisfied under the circumstances that exist in this case.

## AFFIRMATIVE AND OTHER DEFENSES

1.    The Complaint fails to state a claim on which relief can be granted.

2.    Strategic Vision's liability for Eastern Profit's claims, if any, is reduced or eliminated by the doctrines of estoppel, waiver, offset, set-off, breach of the implied duty of

good faith and fair dealing, failure to mitigate alleged damages, unclean hands, election of remedies, impossibility of performance and excuse on behalf of Strategic Vision for alleged non-performance, and frustration of purpose.

3.     The fraudulent misrepresentation allegations in the Complaint fail to satisfy the pleading requirements of Fed. R. Civ. P. 9 and the governing law.

4.     Eastern Profit is not entitled to recover on the Complaint, specifically the claim for alleged breach of contract, because it committed the first breach of the Contract and Strategic Vision did not breach the Contract.  Eastern Profit failed to abide by its duties, express and implied, under the Contract.

5.     Eastern Profit alleges in Paragraph 1 of the Complaint that it is organized under the laws of Hong Kong and has a principal place of business there.  Eastern Profit lacks capacity and standing and Strategic Vision otherwise has a defense to Eastern Profit's claims in the Complaint because, upon information and belief, Eastern Profit is and has been during the relevant timeframe purporting to do business regularly and systematically in New York and hold itself out as authorized to do business in New York but is not and has not been registered to do business in the State of New York as required by N.Y. Bus. Corp. §§ 1304, 1301 *et seq.*  Golden Spring (New York) Limited, which has been indicated by Eastern Profit to hold a power-of-attorney for Eastern Profit regarding this litigation, also, upon information and belief, has been regularly and systematically doing business in New York but is not registered to do business in New York and has not been so registered under N.Y. Bus. Corp. §§ 1304, 1301 *et seq.*

6.     Relief cannot be accorded herein in the absence of ACA Capital Group Limited as a party to the case.  ACA Capital Group Limited paid Strategic Vision the funds that Eastern Profit alleges to have paid as a deposit pursuant to the contract negotiated with Guo, and was also involved in an unsuccessful attempt to reverse transfer of the deposit to Strategic Vision's

account.  Eastern Vision lacks capacity and standing to seek the relief sought in the Complaint.

WHEREFORE, Defendant Strategic Vision US, LLC demands judgment (i) dismissing the Complaint or entering an order finding against Plaintiff and in favor of Defendant on the Complaint; (ii) granting the relief request in the Counterclaims; and (iii) granting such other and further relief as to the Court deems just, equitable and proper.

## COUNTERCLAIMS

Strategic Vision states and alleges the following for its Counterclaims against Eastern Profit.

## PARTIES, JURISDICTION, AND VENUE

1.      Strategic Vision is a limited liability company organized under the laws of the State of Nevada, with its principal place of business in Virginia.

2.      Strategic Vision is a consulting firm that performs research and analysis in the area of global competitive and political intelligence. It was established in 2005 by individuals who, as the result of decades of work in government and the private sector, developed significant connections in multiple U.S. presidential administrations, the U.S. Congress, the U.S. Department of Defense, the U.S. Department of Energy, and other government agencies in the U.S. and elsewhere. Strategic Vision's close working network of trusted resources extends to, among other places: Washington, D.C.; Houston, Texas; Calgary, Canada; London, England; Abu Dhabi, United Arab Emirates; and Singapore.

3.      Eastern Profit is organized under the laws of Hong Kong, has a principal place of business in Hong Kong, and purports to engage in business activities in the State of New York and elsewhere in the United States. Upon information and belief, Eastern Profit has little or no assets. After months of discussions between Strategic Vision and Guo Wengui (a/k/a Miles Kwok), after exchanging several drafts of the written Contract at issue in this case (which is

attached to the Complaint as Ex. A), and immediately before the Contract's execution, a

representative of Eastern Profit authorized by Guo to negotiate the final contract for him

identified Eastern Profit by name to Strategic Vision for the first time. That representative, Wang

Yangping, a/k/a Yvette Wang, indicated that Eastern Profit would be the corporate vehicle to

perform for Guo and receive Strategic Vision's performance under the Contract.

4.      At all times, Guo acted and made representations for Eastern Profit, and at no

time did Eastern Profit repudiate or fail to accept or adopt any action or representation by Guo or

any person acting under his express authority. At no time did Eastern Profit direct Strategic

Vision to communicate with it through any person other than Guo or one of his representatives,

or inform Strategic Vision that Guo or any person acting under Guo's authority could not bind

Eastern Profit. In fact, at all times Strategic Vision interacted on the Contract with three

individuals. These three were Guo, and two other individuals to whom Guo alternatively gave

authority: Wang and another individual identified more fully below, Lianchao Han. At all times,

Wang and Lianchao Han claimed to be acting under the authority and with the permission of

Guo.

5.      Eastern Profit contends in this case that its "principal" is Han Chunguang.

However, on information and belief, Han provides personal services, including cooking and

security services, to Guo Wengui. Further, Eastern Profit is listed in Hong Kong as having a sole

director, Guo Mei, who was appointed on June 27, 2017. Guo Mei is the daughter of Guo

Wengui. Guo is the actual person who controls and directs Eastern Profit.

6.      Eastern Profit is associated through Guo with non-party Golden Spring (New

York) Limited, a Delaware corporation having its principal place of business a few hundred feet

north of Guo's Fifth Avenue apartment. Golden Spring claims to be Eastern Profit's attorney-in-

fact for certain purposes, including this litigation. Golden Spring's CEO is Yvette Wang. Wang claims that Eastern Profit and the Guo family are both clients of Golden Spring, and has claimed that Golden Spring is a Guo family office. Wang purported to execute the Contract on Eastern Profit's behalf in the presence of Strategic Vision principal French Wallop, but Ms. Wallop—who does not read Chinese characters—did not notice that Wang actually wrote the "signature" of Han Chunguang.

7.    Eastern Profit claims that Guo ordered its first and only payment to Strategic Vision under the Contract—two successive $500,000 wires sent moments apart on January 2, 2018. Those wires actually came from another entity, non-party "ACA Capital Group Limited" ("ACA"), a Hong Kong-based entity. Eastern Profit claims that it entered into a loan agreement with ACA, signed by ACA director and longtime Guo associate William Je, a/k/a Yu Jianming, at around the time ACA wired the $1 million to Strategic Vision. Another ACA director, Karin Maistrello, is an Italian-Chinese translator who also served as notary public on many of Eastern Profit's filings in this case. On information and belief, Maistrello also works for Golden Spring (New York). Maistrello also acts as a co-host of Chinese-themed broadcasts alongside Guo and Stephen K. Bannon and Maistrello is President and Treasurer of the Rule of Law Society, which Guo founded and Bannon chairs.

8.    On July 25, 2017, Chinese business publication Caixin reported that Guo had "lost control" of ACA. Somehow, just over five months later, ACA made its $1 million in payments to Strategic Vision.

9.    In May 2019, a Hong Kong High Court reportedly entered an order freezing the assets of many of the above entities or persons, including Eastern Profit, Guo Wengui, Han Chunguang, Golden Spring (Hong Kong) Limited (an entity that wholly owns Golden Spring

(New York), and whose sole director since March 2014 has been registered in Hong Kong as

Guo Qiang, who is Guo Wengui's son), and a variety of other entities related to an organized

crime and money-laundering inquiry in which Guo Wengui is designated as "Respondent 1."

10.    Jurisdiction and venue are proper in this Court.

## FACTS COMMON TO ALL COUNTS

### Introduction

11.    Guo is a Chinese national who claims to hold 11 passports. He publicly presents

himself as a dissident who is opposed to China's Communist government and the Chinese

Communist Party ("CCP"). As shown in greater detail below, in 2017, Guo filed an application

for asylum in the United States based on alleged political persecution. Since 2017, he has

cultivated allies in conservative media, political, and policy circles, including Stephen K. Bannon

and reporter Bill Gertz, who are perceived as being China hawks—that is, supportive of taking a

stronger stand against Chinese human rights abuses, espionage, and assertions of offensive

military power. When Gertz and another Guo intermediary approached Strategic Vision in late

2017 to perform research and analytics on numerous Chinese nationals who were allegedly

linked to top Party officials—work that Guo himself soon presented as necessary for his struggle

against the evils of the Chinese Communist Party, in alignment with Strategic Vision's

worldview—this apparently heroic and outspoken dissident was a man with whom Strategic

Vision was proud to partner.

12.    But the real Guo was never a dissident. Just four months before directing Yvette

Wang to sign Eastern Profit's contract with Strategic Vision, in an August 26, 2017 signed

written statement that Guo later read aloud on video, Guo had professed his personal loyalty to

"Chairman Xi," the leader of the Chinese Communist Party and President of the People's

Republic of China. In that letter, Guo asked CCP leadership to convert his "influence and resources" to "best serve Chairman Xi Jinping's China Dream!" "Assign me tasks," Guo implored, and "provide me with detailed instruction with particular reference to public statements I may make to the media." Even earlier, in March 2017, Guo had secretly promised to become Beijing's dissident-hunter in the United States, bringing ruinous tort litigation against critics of the Communist regime. Even as he directed Eastern Profit to promise Strategic Vision that it was being engaged to "prevent crime or other harm to innocent people," Guo had begun to carry out his plan against Chinese dissidents in the United States.

13.     Guo's true intentions were always irreconcilable with the purpose and terms of the Contract, from day one of the negotiations through the final days of Strategic Vision's performance. As set forth in the Counterclaims below, Guo fraudulently represented the purpose to which he intended to put Strategic Vision's labors, causing it special damage, and, once Strategic Vision was hooked, it was inevitable that Guo's Eastern Profit entity would breach the Contract by endangering Strategic Vision and frustrating its performance.

**The Contract Negotiation**

14.     In or about December 2017, Guo was introduced to Strategic Vision by one of his associates, Mr. Lianchao Han. (Mr. Han will be referred to by his first name, "Lianchao," to differentiate him from purported Eastern Profit director Han Chunguang, whom Strategic Vision believes is unrelated). Lianchao and a reporter for the Washington Free Beacon, Bill Gertz, had first approached Strategic Vision on behalf of Guo. Both Lianchao and Gertz represented to Strategic Vision that Guo was a true dissident and that his sympathies were with those trying to undermine the Chinese Communist Party regime, bring democracy and freedom to China, and turn China from a strategic adversary to a friend of the United States. Lianchao and Gertz knew

French Wallop and Strategic Vision, and Michael Waller, who partnered with Strategic Vision.
Lianchao and Gertz knew that Wallop and Waller—and therefore Strategic Vision—would only
be receptive to a project that sought to undermine—and never support—the Communist Party.
Wallop and Waller had known Gertz for more than 30 years and had known Lianchao for many
years, and trusted their judgment. On information and belief, Guo knew this.

15.     By August 2017, Breitbart.com (the news outlet at that time controlled by Stephen
K. Bannon) had begun actively promoting Guo's cause. Bannon had led Breitbart prior to joining
the White House as Chief Strategist to President Donald Trump, and Bannon returned to lead
Breitbart after President Trump fired him on August 18, 2017. Six days later, on August 24,
2017, the first pro-Guo story appeared in Breitbart. By October 2017, Bannon himself had begun
to speak publicly on behalf of Guo. Through other connections, Guo even gained membership in
President Trump's Mar-a-Lago resort in Florida. These prominent connections with China hawks
such as Bannon, including the assurances of Lianchao and Gertz, persuaded Wallop and Waller
to journey to New York to meet with Guo.

16.     Guo received Strategic Vision's representatives at his $67 million apartment,
which occupies the entire 18th floor penthouse of the Sherry-Netherland on Fifth Avenue. Guo
represented to Strategic Vision that Lianchao and Yvette Wang each had authority to act for and
on behalf of Guo at various times. Lianchao and Wang also alternatively served as Guo's
interpreter, as Guo lacks a fluent command of the English language.

17.     Conversations between Strategic Vision and Guo concerning the purpose, scope
and methods for the Contract were alternatively facilitated by Lianchao and Wang.

18.     Guo represented to Strategic Vision that he was a dissident, and intended to find
damaging information on individuals with connections to Communist Party leadership,

particularly family members reputed to be running money laundering and other operations for them. He represented that he would then use this information to highlight corruption and misconduct at the highest levels. The entire Chinse political system is thoroughly corrupt; Guo's stated intent was to use his exposures of corruption to exploit and widen divisions within the CCP, and ultimately completely undermine CCP rule in China.

19.     During several conversations throughout December 2017, Strategic Vision informed Guo that (i) Strategic Vision's effectiveness would depend upon the quality of direction and information provided by Guo to Strategic Vision, (ii) Strategic Vision's work would be conducted in all respects consistent with the laws of the United States and Strategic Vision would not act on any requests of Guo that would require it to violate U.S. law, (iii) the work contemplated by Guo would require Strategic Vision to engage subcontractors in Strategic Vision's global network of intelligence professionals and analysts, and that organizing that network would take time and require advance startup funding, (iv) Strategic Vision's business processes and global relationship with independent researchers and analysts were Strategic Vision's proprietary and confidential business information, (v) the time within which results would be reported to Guo and the quality of those results could not be assured because of the claimed sensitive nature of the information sought by Guo, the time-consuming security measures that Guo required for retrieving the information from around the world, and the challenges and occasional impossibilities of retrieving certain information, (vi) the exchange of information between Strategic Vision and Guo would require extensive travel and time due to Guo's insistence that they take place only in person-to- person meetings, and (vii) Guo must not take any action or request any service that would compromise the security of Strategic Vision's principals or its independent contractors.

20.     As discussions between Strategic Vision and Guo progressed, they agreed to an initial scope of work and fee schedule. Without identifying any particular entity by name, Guo informed Strategic Vision that he would cause his Contract with Strategic Vision to be entered into with a corporate entity controlled by him that he would fund as necessary to pay for Strategic Vision's services. It was explicitly agreed that such entity would not be based out of the People's Republic of China or Hong Kong, as this would greatly increase the risk of detection by Guo's targets or their allies in the CCP or Chinese government.

21.     Strategic Vision and Guo had also repeatedly discussed implementing security measures in advance of wiring money, using a circuitous route to avoid Chinese government detection and resulting harassment of Strategic Vision or disruption of its work. Accordingly, Strategic Vision and Guo had agreed that Guo would use third-party companies, not based in Hong Kong or China, to send a $1,000,000 deposit prior to initiation of the Contract.

22.     On January 2, 2018, without notice to Strategic Vision and contrary to express instructions from Strategic Vision to Guo, an entity named "ACA Capital Group Limited" ("ACA") wired two separate payments of $500,000 each, totaling USD $1,000,000 (less wire fees), from Hong Kong to Strategic Vision's long-established bank account. This provided the Chinese Communist regime with a direct electronic payment trail to Strategic Vision. Sending two separate and nearly simultaneous wires in identical amounts also violated a basic security procedure, dangerously increasing the already-magnified risk of Chinese detection. Guo provided no information to Strategic Vision regarding ACA or the nature of its association with Guo or Eastern Profit, even after both wires were sent. Neither Guo nor anyone associated with his enterprise ever mentioned ACA's name to Strategic Vision. However, in this case, Eastern Profit has admitted that Guo ordered the wires to be sent on or about December 29, 2017.

Eastern Profit has also admitted that both Guo and Yvette Wang have "knowledge" of ACA's unsuccessful attempts to reverse those wires days after they were sent.

23.     On January 5, 2018, Wang traveled to the home of a principal of Strategic Vision in the State of Virginia and engaged in discussions concerning the services sought by Eastern Profit. In that same location on January 6, 2018, Wang, on behalf of Eastern Profit, executed the Contract, which French Wallop executed at the same time on behalf of Strategic Vision.

24.     Wang laughed or chuckled as she signed the Contract in Wallop's presence. Wallop did not understand at the time, and Wang did not disclose, that the Chinese characters Wang was signing (and initialing on each page) were not her name, but that of Han Chunguang, Guo's cook and security guard, whom Eastern Profit falsely claims is its principal.

25.     The Contract provided that Strategic Vision would be paid for specific periods of work, rather than for the quantity, content or data in its periodic reports. The Contract did not define the scope of the reports, and Guo would later insist that the reports should contain purely raw data and no analysis from Strategic Vision.

26.     In anticipation that circumstances might disrupt work flow, the Contract also included the following provision:

> **Irregular Circumstances.** Both parties understand that occasional unforeseen challenges may arise that will slow or block comprehensive research, and that there may be periods in which information is irregular, unavailable, or incomplete. [Strategic Vision] will endeavor to make research and reports as complete as possible in a timely scheduled manner.

### Contract Performance

27.     Strategic Vision performed in all respects as required by the Contract and in a manner exhibiting good faith and fair dealing towards Eastern Profit. Strategic Vision's work

under the Contract was in the form of providing services, not product. Strategic Vision performed all services possible under the Contract, given the circumstances.

28.     Immediately upon entering into the Contract, Strategic Vision commenced its work under the Contract by, among other activities, recruiting, vetting, engaging and marshaling the initial efforts of various investigators and analysts in the United States, Europe and the Middle East, identifying trusted Chinese/English translators who are not Chinese nationals and analyzing initial data provided by Guo, without compromising or endangering the parties to the Contract or their respective principals and agents.

29.     As detailed further below, conflicting instructions, inaccessible attempted communications and bizarre behaviors by Guo and Eastern Profit created "irregular circumstances" that hindered and delayed Strategic Vison's work. Guo's and Eastern Profit's conduct in this regard was intentional and in bad faith without regard to the adverse effect on Strategic Vision.

30.     To facilitate Strategic Vision's work, it was incumbent upon Guo and Eastern Profit to identify the subjects (referred to by Eastern Profit in the Contract as "fish") of its desired research and analysis. Despite agreeing that Guo and Eastern Profit would prioritize no more than 10 subjects in each phase of Strategic Vison's work, Guo provided to Strategic Vision a list of 92 potential subjects. To accommodate Guo's demands, Strategic Vision had agreed to increase the list to 15 individuals for the first month, at which point the list would drop back to 10 names for the same flat fee, and Strategic Vision never agreed to process a list of 92 names at a given time for the existing contract price.

31.     On January 6, 2018, immediately after signing the Contract, Wang delivered to Strategic Vision two flash drives that purportedly included information necessary to facilitate

Strategic Vision's work under the Contract. One appeared to be empty. Strategic Vision immediately discovered that the other flash drive was not only un-encrypted, but was unreadable and electronically contaminated with unusual and sophisticated malware that attacked recipient computers.

32.     Strategic Vision immediately took the contaminated flash drive to a cybersecurity expert, who reported that he had never seen such malware before. The malware originated from Eastern Profit's team. Strategic Vision then warned Eastern Profit that its systems had been breached and corrupted. Despite repeated requests from Strategic Vision, Eastern Profit failed to explain why it had delivered to Strategic Vision corrupted and potentially very harmful or malicious data files.

33.     To replace the malware-infected drives, Wang delivered three duplicate flash drives to Strategic Vision on January 8, 2018, during a meeting in New York City. Those three drives, which (like the first set of drives) were also cheap and unsecured, again purportedly contained data (the 15 priority names in a set of charts of 92 names overall) necessary to Strategic Vision's work under the Contract. A large part of such data (i.e., one of three flash drives) was also corrupted.

34.     At the time that the Contract was negotiated with Guo, Strategic Vision and Guo expressly agreed that they would not meet in person again, to prevent the Communist Chinese regime from observing their interactions. Guo told Strategic Vision that the Chinese government had him under constant electronic and human surveillance.

35.     Guo told Strategic Vision that the Chinese Embassy in Washington also had Strategic Vision and Wallop's residence under constant electronic and human surveillance; Wang even wrote the name, in English and Chinese characters, of the person the Embassy had

assigned. Guo and Eastern Profit, however, repeatedly summoned Strategic Vision's principals to New York for meetings at Guo's residence. Guo even invited them to future events aboard his yacht in Florida, despite Strategic Vision's cautionary warnings. Strategic Vision had no choice but to comply with Guo's requests for in-person meetings at his residence.

36. Strategic Vision's team, working in other countries, also found troubling breaches of security by Eastern Profit and Guo that frustrated and prevented Strategic Vision's performance. For example, the team found that other teams of researchers were simultaneously researching some of the same individuals and files that Guo, through Wang, had given to Strategic Vision. Previously, Guo had stated that he had three or four other teams of researchers he could use if Strategic Vision did not enter into the Contract; he had never stated that he would simultaneously have those teams surveil the same subjects as Strategic Vision, which created a security risk for all of the teams and made it much more likely they would be uncovered and subjected to defensive measures or counter-measures by the targets. Strategic Vision would never have agreed to expose its team to work under such circumstances.

37. Strategic Vision's team also found that Guo had posted on his publicly-available website the same initial informational page Strategic Vision had received for at least one of the fifteen initial targets, instantly identifying Guo as the client—a relationship that, for security reasons, is never compromised by disclosure to individual researchers operating under cover. Guo's online disclosure also made it more likely that individual subjects would know they were being researched—and by whom. This further placed Strategic Vision and its researchers at risk. Indeed, some individuals on Guo's initial list of 15 Chinese Communists appeared to have known in advance that they were objects of Guo's interest. Someone had taken precautions to

block research into some of the individuals' activities, and at least one of them appeared to have laid a computer trap for Strategic Vision.

38.     The above conduct by Guo and Eastern Profit, which they undertook intentionally and in bad faith toward Strategic Vision, caused some of Strategic Vision's team members to quit. The team in question, based abroad, was a network of people who worked with and trusted one another, and the loss of some team members became another work setback.

39.     In the preliminary phase of its work in connection with Eastern Profit's first 15 identified subjects, a second Strategic Vision team, based in the U.S., learned that all 15 of the individuals so identified by Eastern Profit had been designated by the U.S. government as "Records Protected" persons. "Records Protected" status, the team said, meant that information concerning the subjects' status and activities was not subject to disclosure under the methods that Strategic Vision's team was permitted to use. This team, consisting entirely of former government intelligence, Homeland Security, or law enforcement personnel, explained that "Records Protected" people were foreigners who were either assisting the U.S. government on law enforcement or national security cases, were under federal investigation for criminal activity, or were potentially to come under investigation. In practice, the purpose of the designation was to ensure that no one, including the individuals themselves, could learn information that would help them determine whether they were under investigation. Strategic Vision learned that attempting to research subjects known to be "Records Protected" could be a criminal activity, and so alerted Guo via Lianchao Han, the person Guo had at that time designated for communications regarding the Eastern Profit Contract. Strategic Vision asked for Guo's guidance, but Lianchao responded that Guo was extremely agitated and would not give the requested guidance. Strategic Vision chose to risk its $9 million annual contract with Guo's

Eastern Profit entity by operating strictly within the law, yet remained engaged with Lianchao to convince Guo to address the issue and perhaps offer a new list of individuals to research. Strategic Vision remained in contact with Lianchao until an attorney for Eastern Profit notified Strategic Vision that Eastern Profit was terminating the Contract.

40. When negotiating and executing the Contract, Strategic Vision was unaware and could not have been aware that the subjects were designated Records Protected because Eastern Profit did not indicate the Subjects until after the Contract was in place, and Strategic Vision had not heard of the "Records Protected" term before. Given Eastern Profit's assurances that the purpose of the Contract was to facilitate investigation of Communist Chinese individuals opposed to the United States, it was not foreseeable that Eastern Profit would provide a list of names that were Records Protected. It is appropriate to allocate the risk of the subjects being Records Protected on Eastern Profit, not Strategic Vision.

41. Communications among Eastern Profit and Strategic Vision were hindered by Guo's conflicting instructions, impossible demands, and failure to give guidance when requested. For example, after describing Lianchao Han and Yvette Wang as trusted business associates, Guo advised Strategic Vision to communicate only with Lianchao while negotiating the Contract, and once even banished Wang from the premises so that he could speak privately with Strategic Vision through Lianchao as the interpreter. Then, in the last days of December 2017 through January 2018, through the final negotiation of the Contract and the beginning of its performance, Guo instructed Strategic Vision to speak only with Wang. Later, he instructed Strategic Vision to communicate only with Lianchao. Shortly thereafter, in mid-January, Guo advised Strategic Vision through Wang to refrain from communicating with Lianchao because he was "not trustworthy" and to instead communicate with Wang. Oddly, Guo had advised Strategic

Vision in Wang's presence that Wang was a member of the Chinese Communist Party who also could not be trusted. Strategic Vision thought that Guo must have been joking at Wang's expense, but later independently verified that at least two of Wang's family members are in fact Chinese Communist police officials, and that Wang had been a CCP member since 1999.

42. Wang remained Strategic Vision's sole designated contact on the Contract until on or about February 2, 2018, at which point Wang herself relayed Guo's instruction that Lianchao should once again become the point of contact on Eastern Profit's Contract. Lianchao was Strategic Vision's point of contact for the remainder of February. This continued until approximately one week after Strategic Vision had requested guidance given the "Records Protected" issue, at which point Wang resurfaced to send Strategic Vision a termination letter. Given Guo's general lack of accessibility, his failure to ensure consistent, trusted channels of communication between Strategic Vision and Eastern Profit, his major security breaches, and his persistent failure or refusal to provide guidance when he was advised that pursuing the original 15 names would violate federal law, Guo and Eastern Profit hindered Strategic Vision's work under the Contract and breached Eastern Profit's covenants of good faith and fair dealing.

43. Within the first two weeks of what was to be a multi-faceted and complex year-long effort under the Contract, Strategic Vision verbally made progress reports to Guo about Strategic Vision's build-out of the first research team and implementation of the research project. At the end of this period, Strategic Vision also reported to Guo that Strategic Vision could not within the limits of U.S. law obtain certain information sought by Guo on his initial list of subjects within the limits that Guo suddenly had demanded.

44. With this news, Guo became enraged and demanded that Strategic Vision immediately deliver its raw intelligence results for his review. This was despite the fact that the

parties had understood that it would not be possible to instantaneously deliver large quantities
from a team abroad that had just begun operations.

45.      In response to Guo's demand, Strategic Vision explained that irregular
circumstances caused by Guo had precluded Strategic Vision from collecting and verifying data,
and that the small amount of raw data developed to that point was not in a comprehensible form
that would be of material use to Guo or Eastern Profit. In the face of Guo's intransigence,
however, Strategic Vision sent a partner to Europe, met the research team leader, returned to
New York, and hand delivered its raw data to Wang on January 26, 2018. Strategic Vision made
its delivery with the caveat that the information would be of no use to Guo or Eastern Profit
because it was nothing more than the researchers' own work to familiarize themselves with the
fifteen subjects using open-source information. Strategic Vision repeatedly told Guo and Eastern
Profit that it was practically and mathematically impossible for the researchers to work faster.

46.      Strategic Vision, Guo and Eastern Profit had agreed from the beginning of their
conversations and all understood that there would be unforeseen delays and difficulties in
procuring information on the challenging task desired by Guo and Eastern Profit. They agreed to
work cooperatively and in good faith when such delays arose. The Contract memorializes this
understanding. The parties expressly understood that there could be severe and unforeseen
delays, as well as times when no information could be discovered or reported at all. Eastern
Profit agreed in writing that such delays were foreseen and that the parties would work through
them in a fair fashion.

47.      Strategic Vision communicated to Guo and Eastern Profit each of the above
alleged irregular circumstances. Strategic Vision even offered not to charge Guo for the first 10
days of work to calm Guo and proceed with its performance, taking a loss of approximately

$250,000 in billable time for the period January 6 to January 16, 2018. Guo did agree, and temporarily calmed down. Yet while Guo and Eastern Profit acknowledged all of these problems, Guo and Eastern Profit did nothing to address them before unilaterally and without just cause terminating the Contract.

### Guo's Fraudulent Representations Regarding the Purpose of the Contract

48.     Eastern Profit's breaches of the Contract and frustration of Strategic Vision's performance are unsurprising in retrospect, because Guo never intended to use the fruits of Strategic Vision's research against the Chinese Communist Party. That is because Guo was not the dissident he claimed to be. Instead, Guo Wengui was, and is, a dissident-hunter, propagandist, and agent in the service of the People's Republic of China and the Chinese Communist Party.

49.     In the parties' December meetings at his apartment in New York City, Guo claimed to Strategic Vision that he had a long history of speaking out against the Chinese regime, and that he was now in America as a dissident and asylum-seeker. He claimed to want to use his country of refuge as a base to gather intelligence on high-ranking Communist officials and, through public criticisms of them, to give aid and comfort to opponents of the Chinese Communist regime both inside and outside China.

50.     Yet much of Guo's origin story is untrue.

51.     Guo claims, and claimed to Strategic Vision, that he was arrested and imprisoned in May 1989 during the Tiananmen Square massacre for providing money to help protesters. In fact, Guo lived and was arrested in Puyang, Henan province, 750 miles away from Beijing. The Tiananmen Square massacre did not occur until June 4, 1989, after Guo had already been imprisoned for running a fraudulent oil sales operation.

52.     Guo quickly built a fortune in China during the late 1990s and 2000s primarily through real estate speculation and investment. During that time, a Chinese citizen could enjoy a rapid increase in wealth only through the support, sponsorship, or protection of high-ranking individuals within the Chinese Communist Party.

53.     Guo's protector, beginning in about 2004, was Ma Jian, Vice Minister of the Ministry of State Security ("MSS") until Ma's arrest and expulsion from the Party in December 2014 after losing an intra-Party power struggle. The MSS is responsible for internal security, foreign intelligence, and political repression. One of Ma's duties was to run the MSS's No. 8 Bureau, which is in charge of counterintelligence against foreign targets, including diplomats, businessmen, and reporters. The MSS has a role not only in repressing domestic political dissent, but also in monitoring and suppressing activities overseas that are deemed to be subversive of the Chinese Communist Party. This includes overseas dissidents, who the CCP views as traitors to China.

54.     On information and belief, Guo was a "long-time employee of Vice Minister Ma Jian." On information and belief, Guo paid MSS officials and bought surveillance equipment for the MSS in exchange for favors. Guo was able to use his connection with Ma and the MSS against Guo's business rivals in China, while the MSS was able to use Guo's business empire against its own targets in China.

55.     Guo has claimed he was forced to leave China in late 2014 with the onset of official reprisals against members of Ma's faction of the CCP. CCP Chairman and Chinese President Xi Jinping had waged an anti-corruption campaign against members of the most ostentatiously corrupt CCP factions. Ma, in his MSS secret police capacity, had supposedly amassed evidence of corruption among Xi Jinping loyalists such as Wang Qishan, who was the

CCP's anti-corruption leader and member of the powerful Politburo Standing Committee. Wang Qishan purportedly struck first, charged Ma with corruption, and stripped Ma of his CCP membership. Only after Guo became a public figure in the United States in 2017 did authorities move to charge Ma, eventually claiming to put him on "trial" in 2018, whereupon he was reportedly found guilty and given a suspended death sentence.

56.     In Guo's telling, reprisals began against him following the fall of Ma, starting in January 2015. Thus, in a case filed by Guo and companies purportedly controlled by him on January 30, 2018 against a Chinese-American billionaire businessman with close ties to the Chinese regime (*Guo, Beijing Pangu, Beijing Zenith v. Bruno Wu*), the complaint states, "In total, approximately 27 employees of the Plaintiff Companies were arrested from January-to-May 2015." The complaint then notes that the assets of companies purportedly owned and controlled by Guo started suffering the seizure of assets "in or around late January and early February 2015" and that, as of a January 2018 filing, the businesses had "halted nearly all regular business operations."

57.     Following this narrative, in more than a dozen complaints and counterclaims in court litigation in the United States, Guo has consistently claimed that he came to the United States on precisely January 9, 2015. Numerous contemporaneous media accounts from January 2015, however, report that Guo was actually forced to return to China for interrogation on or around January 9, 2015. *Bloomberg News*' description of the incident in a story published January 25, 2015 was that "Miles Kwok, also known as Guo Wengui, was taken in by authorities." Guo claims, however, to have avoided the fate that befell others who were purportedly pursued in the aftermath of Ma's fall. Even though (as he claimed) 27 of his

employees and family were arrested and his assets were being seized, Guo was released from custody, and was even allowed to leave China and come to the United States.

58.     By March 2015, roughly a month after what Guo claimed was the starting point of China's seizure of billions of dollars of his assets, Guo had purchased his $68 million Sherry Netherland penthouse home in New York City. Money for the purchase of the unit was wired from the Hong Kong back account of Bravo Luck Limited on or around March 4, 2015. The sale was approved by the co-op board of directors on March 24, 2015, and the next day, March 25, the Chinese publication *Caixin* ran an excerpt of a 10,000-word profile, which ostensibly gave a comprehensive account of Guo's entire life story, his business history, and his purported credentials as a dissident. The full article ran two days later. It did not mention his January 9, 2015 detention or his highly improbable release, even as his employees and family members were purportedly being arrested and assets were purportedly being seized.

59.     Even if the Chinese government had actually been seizing Guo's assets by late January and early February 2015 and Guo had, despite that, somehow been able to wire over $60 million from Hong Kong to New York for the purchase of his Sherry-Netherland apartment in March 2015, Guo's subsequent actions shortly afterwards in 2015 further undercut his "dissident" narrative. In May 2015, Guo attempted to purchase a substantial portion of a multibillion-dollar private placement of H-shares (those available in the Hong Kong Stock Exchange) in Haitong Securities, with his efforts reportedly involving billions of U.S. dollars' worth of investment from ACA. According to Guo's own affidavit dated February 5, 2016 and filed in *Ace Decade Holding v. UBS* under Guo's Cantonese alias "Ho Wan Kwok," Guo transferred approximately $260 million in U.S. dollar-denominated assets in a New York bank account on May 13, 2015 to an account at China Minsheng Bank in Hong Kong, an institution

explicitly regulated and monitored by the very Chinese authorities who only three months earlier had supposedly seized most of Guo's assets. Shortly after transferring the funds to the Hong Kong-based bank, Guo reportedly purchased over USD $1 billion of H-shares in Haitong Securities, a high-profile action that would seem inexplicably reckless for someone who had just endured the supposed arrest of 27 of his employees and family members, never mind the purported seizure of most or perhaps all of his assets.

60.     Between the spring of 2015 and the January 2017 inauguration of President Trump, Guo made few public statements. In fact, he made no public statements as a dissident, and never criticized Xi Jinping. But newly-elected President Trump promised a harder line on China, visibly backed by advisers such as Stephen K. Bannon. From that time forward, Guo assumed a brash public personality, quickly constructing an active social media profile and attacking his perceived enemies with caustic rhetoric.

61.     On or about March 1, 2017, Guo arrived again in New York City on a tourist visa and, except for a trip to an unknown location between March 11 and April 10, 2017, he has since remained in the United States. In a March 5, 2017, audio recording which, upon information and belief, Guo himself made, Guo stated: "In New York City right now… My operation is on." He continued: "I have absolute confidence in General Secretary Xi," referring to the Chinese President by his official Communist Party title.

62.     Speaking of dissidents, Guo stated, "Our government spends too much budget every year… to let these bad guys go free." He continued, "They never say anything good about China. They attack our CPC [CCP] central leaders… they deserve to die! So these people, I must teach them a lesson." He offered, "I can take these bastards down and help our leaders to revenge." Guo made specific threats about two dissidents, referring to them by their pen names.

Of dissident journalist Wei Shi (whose real name is Weican "Watson" Meng), founder of Boxun.com, Guo stated, "Time to finish this bastard… I must end him." Guo expressed similar sentiments about Wei Shi's fellow dissident, known by the pen name Xi Nuo (and whose real name is Xianmin Xiong). Both dissidents write for Boxun.com.

63.     Contemporaneously with these statements, Guo began to harass Wei Shi and Xi Nuo by having them and their families followed throughout the Greater New York City area. Guo also threatened members of Wei Shi's family who were still living in China.

64.     Additionally, Guo began to file defamation lawsuits against targeted Chinese dissidents in various jurisdictions. As of the filing of this pleading, Guo had been embroiled in litigation with Wei Shi, Xi Nuo, and at least eleven other dissidents. After a July 2, 2019 trial in one of the dissident cases, Guo made a video threatening litigation against several others. In a July 12, 2019 video, on information and belief, Guo makes additional threats against individuals who oppose the Chinese Communist Party, pledging to swamp them in litigation for life.

65.     But Guo has also engaged himself in other kinds of litigation. A key part of Guo's "dissident" narrative has been high-profile lawsuits that appear to pit him against Chinese regime-connected entities, such as HNA Group and Soho China. In every instance to date, despite heated rhetoric in all directions found in court filings for those cases, the cases languish without significant discovery or other development, with voluntary dismissals being filed, regardless of whether Guo was the plaintiff or defendant. In *HNA Group v. Guo Wengui*, for example, the plaintiff—whom Guo had accused of being secretly owned and controlled in large part by Wang Qishan—noted in filing for voluntary dismissal in March 2019 that, despite the case being initiated over 20 months earlier, "little to no discovery has occurred." The suit brought by Chinese business publication *Caixin*—which has done more than any other media

outlet to establish Guo's supposed dissident bona fides—and its founder Hu Shuli had a similar

end result. In that case, the plaintiff—widely believed to have enjoyed relative independence by

the standards of mainland Chinese media because of the protection provided by Wang Qishan—

filed for voluntary dismissal in September 2018, two days before the first discovery deadline.

66.     Despite Guo's initial moves, most of his plan of retribution—which Guo had

seemingly disclosed to the CCP at least in March 2017—had yet to unfold during the remainder

of that year. Publicly, Guo began a media and Twitter campaign alleging official corruption in

China, attracting a following both within and outside China.

67.     In January 2017, Guo launched his public campaign. His chosen medium

consisted of at least two interviews with *Mingjing*, or Mirror Media, an online tabloid news

outlet, which continued to interview and promote Guo throughout 2017. Mingjing's founder, Ho

Pin, had sold his previous media outlet, *Duowei*, to a Hong Kong businessman friendly with the

Chinese government. And in the same year when it was providing a regular platform to Guo, a

supposed enemy of the Chinese regime, Mingjing received a "large investment" from the

People's Republic of China, according to a report released by Stanford University's Hoover

Institution in November 2018.

68.     Guo also began to grant interviews with conservative media figures such as Bill

Gertz of the Washington Times and Washington Free Beacon, burnishing Guo's image as a

dissident. The seminal story was an interview with Gertz which ran in the Free Beacon on July

11, 2017. Although these and other statements were and remain widely available to the public

through Gertz's article, Guo made similar statements to Strategic Vision several months later

after the parties were introduced by Gertz.

69.     In July 2017, for example, Guo told Gertz that he had been jailed for 22 months after taking part in the 1989 Tiananmen Square protests. As alleged in Paragraph 51, later research showed that Guo was actually arrested for a fraudulent oil scheme before the Tiananmen Square Massacre, 750 miles away from Tiananmen Square in Beijing.

70.     Gertz also reported in July 2017 that Guo had "broken with the regime," but only "several months ago," despite the fact that Guo had been detained, left China, moved to New York City and purchased his apartment over two years previously.

71.     Guo denied to Gertz that Guo was part of a Communist leadership faction in Beijing, claiming instead that he began speaking out as part of a long-planned effort to bring democratic reform to China. "What I want to do is the change the whole system," he claimed. "I want to change the Chinese government. Absolutely, the Chinese government is the mafia." Guo further claimed to have details of a massive Chinese espionage effort against the United States, stating that he learned about Chinese spy activities from his protector, Ma Jian, and Ji Shengde, the former People's Liberation Army intelligence chief. Yet Guo provided only general information, offering none of the alleged details he had claimed to have.

72.     Guo warned that the United States should take counter-measures, because "if we do not have the United States exercising some kind of control over the world system, the world will turn into a place where men eat men." Guo reiterated his purportedly strong beliefs: "I love my nation. I love my country, but I hate the Communist Party."

73.     Guo also claimed that Chinese officials had threatened him and his family, and that in a May 2017 meeting in his apartment, visiting high-ranking government intelligence (that is, MSS, the same entity in which Ma Jian had served as a leader) and Party Politburo officials

43

had promised to release $17 billion in frozen assets and not seek his arrest or prosecution if he remained silent.

74. Guo later admitted that he had agreed to not one but two meetings with the Chinese intelligence and security officials in May 2017. The second meeting came after the MSS and Politburo officials were confronted by FBI agents at Penn Station and told to leave the country, but then returned to New York City to visit Guo at his Sherry-Netherland penthouse a second time. Guo disclosed that his wife had treated the officials to homemade dumplings.

75. On August 26, 2017, just three months after his meeting with Chinese officials and several weeks after his apparently tell-all Gertz interview, Guo penned a letter to Chinese officials. The statement has been translated into English and entered into evidence in *Weican Meng v. Guo Wengui*, Case No. 159636/2017 (N.Y. Supreme Court, New York County).

76. In that letter, Guo professed his personal loyalty to "Chairman Xi," asking CCP leadership to convert his "influence and resources" to "best serve Chairman Xi Jinping's China Dream!" The China Dream was first enunciated by Chairman Xi Jinping in 2012 as a slogan to inspire the population to strengthen China's economy, military, and society in the service of greater socioeconomic progress inside China, and more aggressive foreign and military policy goals.

77. "Assign me tasks," Guo implored, and "provide me with detailed instruction with particular reference to public statements I may make to the media." Guo claimed that his statements in the United States, apparently including his statements to Gertz, were done "under coercion," and that even when "forced" to give an interview to American media, "I did not cross the red line." He promised, "I am doing the best I can under difficult circumstances to safeguard our nation's interests and image," and "I will continue not to cross the red line." Asking that

investigators cease efforts to "arrest and destroy" him, Guo promised to "completely obey orders given to me at their disposal—to serve Chairman Xi Jinping's agenda and that of our nation!" More specifically, Guo offered to be a "propagandist," using what he called "my own style of propaganda" outside of China, including in the United States.

78.     Eleven days after making this pledge, Guo applied for political asylum in the United States. That application gave Guo an anticipated two to three years of freedom while the claim was being processed.

79.     Just eight days before Guo made the statement, on August 18, 2017, Steve Bannon left the White House and would return within days to his former media outlet, Breitbart. Days later, favorable articles about Guo began to appear in Breitbart. Upon information and belief, Bannon was familiar with Guo's case from Bannon's time within the Trump administration, and was in contact with Guo either in person or through one or more interlocutors while Bannon worked in the White House.

80.     By October 2017, Bannon had begun appearing with Guo in public and on Guo's self-made YouTube videos. Guo continually pulled Bannon more closely in to his circle, eventually appointing Bannon as Chairman of his "Rule of Law Society," a New York-based, Delaware-incorporated not-for-profit entity that claims tax status as an I.R.C. Section 501(c)(4) social welfare organization.

81.     In mid-September 2017, Bannon made a sudden trip to Hong Kong, where a Chinese state-owned brokerage and investment group—the nation's largest—paid him to give what the Financial Times called a "closed door" speech. In that speech, his first after leaving the White House, Bannon praised Xi Jinping, stating that Xi is "just like President Trump." Bannon's praise for Xi contrasted with his statement to the New York Times, published several

days before, in which Bannon compared modern-day China under Xi to prewar 1930s Nazi

Germany. Bannon then continued to Beijing. There, he secretly met for 90 minutes with none

other than Wang Qishan, the official most often accused of corruption by Guo, and the one who

Guo blames for bringing down his protector, Ma Jian, in 2014, leading to Guo's departure from

China. On information and belief, Bannon's meeting with Wang Qishan was not for any official

purpose, and was therefore likely undertaken as a courier for Guo. On information and belief,

any meeting pertaining to Guo was likely for the purpose of receiving the "detailed instruction"

that Guo just a few weeks before had solicited from the Chinese Communist Party leadership so

that Guo could "serve Chairman Xi Jinping's agenda" as an agent in the United States.

82.      In the succeeding months, Guo continued his dissident-like statements, but it is

now apparent that he made no criticism of Xi Jinping. In a December 9, 2017 interview, just

weeks before slotting in Eastern Profit as Strategic Vision's contracting party, Guo called for

Chinese regime change and attacked the Communist Party, but praised Xi Jinping as "the most

human, most emotional person out of all the officials." On information and belief, Guo has never

issued a statement critical of Xi Jinping or revealed anything of legitimate intelligence value to

the United States, staying consistent with his pledge not to "cross the red line."

83.      Meanwhile, Guo and his close-knit circle have continued their campaign against

Chinese dissidents and their allies in the United States.

84.      In the spring of 2019, Guo shared with Steve Bannon the uncorrected and

unsigned deposition transcript of Michael Waller, conducted and transcribed for use only by

Eastern Profit in this case. Bannon remarked to individuals not connected with this litigation that

he had read the transcript. Specifically, Bannon approached Brian Kennedy and Frank Gaffney,

who are, respectively, the Chairman and Vice Chairman of the Committee on the Present

Danger-China ("CPDC"), a group founded in March 2019 to raise awareness of, and develop national security policies toward, the threat posed by China. Gaffney is also the Executive Chairman of the Center for Security Policy ("CSP"), which staffs and pays the expenses of CPDC and is also Waller's employer.

85.     To this point, Bannon and Waller had had a positive relationship, Bannon had invited Waller to his home for Bannon-sponsored events, and Bannon had never discussed Guo with Waller. Nonetheless, Bannon—himself a member of the CPDC—cited the instant litigation in pressuring Kennedy and Gaffney to remove Waller from the CPDC. They refused, whereupon Bannon threatened to use his influence to have Gaffney himself removed. Shortly before these events, board members of the Bannon-Guo Rule of Law Society had discussed possible ways to provide large amounts of funding to either the CSP or the ad-hoc CPDC itself through the Rule of Law operation, an organization reportedly funded and controlled by Guo. Waller therefore saw this as a Guo attempt to gain control of CPDC's operations. These efforts were rebuffed, as they were seen as indirect donations from Guo himself. On June 13, 2019, Bannon conveyed to Gaffney threats that Guo "has more money than God" and intends to file litigation against Waller personally. This threat is credible because it follows Guo's pattern of behavior with Chinese dissidents. Upon information and belief, Bannon acts as an agent of influence for Guo Wengui in the United States.

86.     In short, the sum of Guo's behavior, from his arrival in the United States in 2015 to his continuing cultivation of individuals such as Gertz and Bannon through 2019, show that he is not the dissident he has claimed to be. Rather, Guo Wengui acts as an agent of influence on behalf of Chinese Communist Party Chairman Xi Jinping and the Chinese MSS.

87.     Had Guo disclosed his true purpose in entering the Contract with Strategic Vision in December 2017 and January 2018—to bolster his position within the Chinese Communist Party and ingratiate himself with Xi Jinping—Strategic Vision never would have contracted with him, let alone desired to meet him in the first place.

88.     Strategic Vision has been damaged, among other ways, by the exposure of its capabilities and informational connections to a Chinese Communist agent; by the loss of other profitable opportunities that, unlike Guo's work, would not have compromised Strategic Vision's political principles and business purpose; and by the damage to its reputation caused by being associated with a person who is now increasingly recognized as a Chinese dissident-hunter, rather than a dissident.

## FIRST COUNTERCLAIM:
## BREACHES OF CONTRACT AND CONTRACTUAL COVENANTS

89.     Strategic Vision repeats and realleges all prior Paragraphs of its Counterclaim as if set forth fully herein.

90.     Eastern Profit and Strategic Vision are parties to the Contract, which was executed on January 6, 2018.

91.     By mutual agreement of the parties, the Contract was amended to include a start date of January 16, 2018.

92.     In entering into the Contract, the parties mutually covenanted to use good faith and fair dealing when undertaking their respective performances and any actions pursuant to the

a.      Contract. At a minimum, this included each party's covenant not to prevent or frustrate the performance of the counter-party or to take action that would deprive the counter-party from receiving the benefits of the Contract. These covenants included

without limitation: a. Eastern Profit agreed not to take actions that would endanger or expose Strategic Vision and its contractors;

b.      Eastern Profit agreed not to take actions during performance of the Contract that would, in turn, prevent Strategic Vision's performance or cause Strategic Vision to be unable to complete its responsibilities under the Contract as described therein; and

c.      Eastern Profit agreed to act in good faith towards Strategic Vision and not to take actions that would deprive Strategic Vision of the benefits its entry into the Contract provided.

93.    Strategic Vision performed under the Contract, including without limitation by rendering services to Eastern Profit as required by and within the meaning of the Contract. At all points, the actions Strategic Vision took pursuant to the Contract were consistent with the terms of the Contract and in good faith towards Eastern Profit. Strategic Vision at all points acted fairly towards Eastern Profit.

94.    Eastern Profit has breached the Contract, including without limitation by failing to pay to Strategic Vision the amount due upon Eastern Profit's termination of the Contract.

95.    Eastern Profit has breached its covenants of good faith and fair dealing under the Contract by taking actions that endangered Strategic Vision and its contractors, that prevented or frustrated Strategic Vision's performance, or that deprived Strategic Vision of the benefits of the Contract, in at least the following ways:

a.      Eastern Profit failed to adequately preserve confidentiality, exposing Strategic Vision and its contractors to reprisals from the Chinese, when it had two $500,000 wires sent from a Hong Kong bank, easily traceable by the Chinese, and rendered more

noticeable by the large, duplicate wires, directly to Strategic Vision instead of through intermediary institutions as the parties had discussed;

b.      Eastern Profit failed to protect Strategic Vision and its contractors from injury when it provided the initial list of 15 names on unencrypted flash drives that were immediately shown to be infected with exotic, sophisticated malware, and then, when it provided a second set of flash drives, produced a drive that once again contained malware. This was bound to damage Strategic Vision and its contractors, opening them up to surveillance or malicious attacks by third parties or state actors;

c.      Eastern Profit took actions to expose Strategic Vision and its team when, through Guo, it posted on internet sites associated with Guo some of the same initial dossier files it had given to Strategic Vision, so that any person who suspected they were being surveilled could quickly run internet searches to guess Strategic Vision's client and, through Guo's other security breaches, identify Strategic Vision itself;

d.      Eastern Profit took actions to frustrate Strategic Vision's performance when, as an entity or through Guo, it gave a similar list of investigative targets to other researchers, greatly increasing the risk that subjects would learn of electronic intrusions, and thereafter take defensive measures to shut down vulnerabilities or even retaliate against Strategic Vision;

e.      Eastern Profit took actions to frustrate Strategic Vision's performance when it supplied an initial list of 15 subjects, all of whom were identified as "Records Protected" within the United States, shutting off Strategic Vision's access to law enforcement and government records checks; when Strategic Vision reported this to Guo and asked for guidance and a different set of names, Guo refused to provide them.

f.      Eastern Profit took actions to frustrate Strategic Vision's performance when it demanded immediate invasive hacking of foreign subjects (a legal activity under the laws of applicable foreign states), a process which would trigger the subjects' defenses and render impossible the longer-term tracking and infiltration called for under the Contract.

96.     Strategic Vision has been damaged as a result of Eastern Profit's breaches of the Contract and of the covenants created by the Contract for Eastern Profit to perform.

97.     Pursuant to the Contract as amended by the parties, Eastern Profit agreed to pay to Strategic Vision a fee of $750,000 per month for Strategic Vision's work while under the Contract commencing, as amended, on January 16, 2018.

98.     The Contract provides that either party may terminate it upon "'30 days' written notice." As with all other terms of the Contract, Eastern Profit was to exercise this provision in good faith.

99.     By letter dated February 23, 2018, counsel for Eastern Profit provided notice of Eastern Profit's termination of the Contract "pursuant to the [Contract's] 'Duration' Section."

100.    Consequently, in bad faith, Eastern Profit terminated the Contract as of March 21, 2018. At the time of such termination, Eastern Profit was obligated to pay to Strategic Vision the amount of $1,596,774.25, computed as follows:

| Period | Number of Days | Per Diem | Total |
|--------|----------------|----------|-------|
| January 16-31 | 15 | $24,193.55 | $362,903.25 |
| February 1-28 | N/A | N/A | $750,000.00 |
| March 1-21 | 20 | $24,193.55 | $483,871.00 |
|  |  |  | $1,596,774.25 |

101.    Assuming that the ACA $1 million payment was made on Eastern Profit's behalf, the amount of $596,774.25 was due and payable from Eastern Profit to Strategic Vision as of March 21, 2018.

102.     Eastern Profit has breached the Contract by failing to pay to Strategic Vision $596,774.25 due upon Eastern Profit's termination of the Contract.

103.     Strategic Vision is entitled to judgment against Eastern Profit in the amount of $596,774.25, plus interest at the State of New York's statutory rate for the period March 21, 2018 through the date that judgment is filed.

104.     In addition, but for Eastern Profit's breaches, including without limitation Eastern Profit's various breaches of its covenants of good faith and fair dealing, Strategic Vision would have completed good faith research on subjects for a three-month period, receiving $750,000 per month from Eastern Profit. Strategic Vision has been damaged by Eastern Profit's deprivation of this opportunity through its wrongful termination of the Contract. Strategic Vision is entitled to the lost benefits of the Contract because it was prevented from performing during the period from March 21, 2018 (the end of the 30-day notice period) to April 16, 2018 (the end of the first three months under the Contract). The Parties had specifically negotiated a timeframe when they would evaluate how the Contract was being performed, and this was intended to reflect the bare minimum timeframe for Strategic Vision's services. The amount of damages—Strategic Vision's lost revenues minus its expenses for that final period—is approximately $100,000.

### SECOND COUNTERCLAIM: FRAUDULENT MISREPRESENTATION

105.     Strategic Vision repeats and realleges all prior Paragraphs of its Counterclaim as if set forth fully herein.

106.     Guo Wengui made misrepresentations of fact to Strategic Vision. These included, without limitation, the representations that Guo was a Chinese dissident; that he opposed the Chinese Communist Party, which controls the Chinese state; and that through the contract with Strategic Vision, he was actively working to find and publicize research regarding key Chinese

leaders that he would then use to weaken the Chinese regime and support a move to a more democratic and U.S.-friendly regime. Guo affirmatively represented that his desire was to advance, and not harm or impede, the interests of the United States.

107.    Guo made each of the misrepresentations in the meetings he held at his Fifth Avenue apartment in December 2017, which were attended by French Wallop and Mike Waller.

108.    Guo made each of these misrepresentations on behalf and for the benefit of Eastern Profit, an entity under his actual direction and control and which he directed to become a counter-party to Strategic Vision in the Contract he had negotiated and from which he intended to benefit. Alternatively, Eastern Profit authorized Guo's misrepresentations, or it ratified Guo's misrepresentations because, with knowledge of his misrepresentations, it accepted the benefits of those misrepresentations in the form of Strategic Vision's entry into and performance under the Contract.

109.    Guo's representations of fact to Strategic Vision were false. Guo is not a Chinese dissident, he is a supporter of the Chinese Communist Party, which controls the Chinese state. Guo is not actively working to find and publicize research regarding key Chinese leaders for the purpose of weakening the Chinese regime and supporting a move to a more democratic and U.S.-friendly regime, and he did not intend to use the Strategic Vision's work under the Contract for these or similar purposes.

110.    Guo's status, his views towards the Chinese Communist regime, and his reason for having Eastern Profit enter into the Contract were material facts collateral or extraneous to the Contract.

111.    Guo made the misrepresentations to Strategic Vision with the knowledge, at the time of the misrepresentations, that they were false.

112.     Guo made the misrepresentations to Strategic Vision with the intention to induce Strategic Vision to enter into the Contract.

113.     Strategic Vision justifiably, reasonably, and foreseeably relied on Guo's misrepresentations in deciding to enter into the Contract and perform under it with Eastern Profit as the counterparty. Strategic Vision had no way of knowing about Guo's clandestine statements and promises to Chinese Communist Party leadership and Chinese Ministry of State Security, and Guo had carefully cultivated a public persona as a dissident and a friend of China hawks in the U.S. conservative establishment, who in turn were known to and/or trusted by Strategic Vision.

114.     In performing under the Contract, Strategic Vision provided unique services and incurred significant expenses and financial outlay in reliance on Guo's promises.

115.     Strategic Vision would not have entered into the Contract but for Guo's representations regarding his status, his position toward the Chinese Communist regime, and his purpose for having Eastern Profit enter into the Contract. Accordingly, Strategic Vision has been harmed by its reasonable and foreseeable reliance on Guo's promise, which he has failed to fulfill.

116.     Eastern Profit is liable for the damages sustained by Strategic Vision as the result of its detrimental reliance on Guo's various promises that caused Strategic Vision to enter into and perform under the Contract. Strategic Vision's damages include those financial outlays it made in connection with the Contract, including without limitation costs incurred during negotiation of the Contract such as to prepare proposals for the Contract and related costs for time involved in Contract, costs to identify, recruit, and engage subcontractors to perform investigative work and translation services, costs for other expenditures for startup needs,

extensive travel and time expenses during Contract negotiation and performance that resulted

from Guo's insistence that certain information be conveyed only in person-to- person meetings,

costs to address the security breaches and other harms to Strategic Vision's principals and

independent contractors resulting from Eastern Profit's wrongdoing, and legal fees.

WHEREFORE, Defendant/Counterclaim Plaintiff Strategic Vision US, LLC seeks

judgment in its favor and against Plaintiff/Counterclaim Defendant Eastern Profit Corporation

Limited on the Counterclaims, for court costs, attorneys' fees, and any other relief the Court

deems just and appropriate.

Dated August 8, 2019

> Respectfully submitted,
>
> GRAVES GARRETT LLC
>
> *s/ Edward D. Greim*
> Edward D. Greim, #4240172
> 1100 Main Street, Suite 2700
> Kansas City, MO 64105
> Telephone: (816) 256-3181
> Fax: (816) 256-5958
> edgreim@gravesgarrett.com
> ATTORNEYS FOR
> DEFENDANT/COUNTERCLAIM PLAINTIFF

## CERTIFICATE OF SERVICE

This certifies that the foregoing was served via the Court's Electronic Case Filing System

on the date of filing, August 8, 2019, to all counsel of record.

> *s/ Edward D. Greim*
> Attorneys for Defendant/Counterclaim Plaintiff

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| _____ | ) | |
| EASTERN PROFIT CORPORATION | ) | |
| LIMITED | ) | |
|  | ) | Case No. 18-CV-2185 (JGK)(DCF) |
| Plaintiff, | ) | |
|  | ) | |
| v. | ) | |
|  | ) | |
| STRATEGIC VISION US, LLC | ) | |
|  | ) | |
| Defendant. | ) | |
| _____ | ) | |

**DEFENDANT/COUNTERCLAIMANT'S OBJECTIONS AND RESPONSES TO**
**PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSIONS**

Defendant/Counterclaimant Strategic Vision US, LLC ("Strategic Vision") objects and responds as follows to the First Requests for Admissions ("Requests") served by Plaintiff/Counterclaim Defendant Eastern Profit Corporation Limited ("Eastern Profit") pursuant to Fed. R. Civ. P. 36.

<u>Preliminary Statement Applicable to Responses to All Requests</u>

1.    Strategic Vision will respond to the Requests on the basis of the information available to Strategic Vision at the time of the responses. Further investigation may reveal additional documents and information affecting the responses to the Requests. Strategic Vision reserves the right to continue discovery and investigation into this matter and to present additional information discovered after the date of the responses.

2.    Strategic Vision objects to the Requests to the extent that answers to them involve information that is privileged and protected from discovery by any privilege, including without limitation the attorney-client privilege and/or the work product doctrine, the joint defense

1

privilege, or material prepared in anticipation of litigation. Strategic Vision reserves the right to withhold such documents from production.

3.     Strategic Vision objects to the Requests to the extent they seek information that Strategic Vision is unable to disclose based on its confidentiality and nondisclosure obligations to third parties that are not addressed by the Stipulated Protective Order Governing Designation and Disclosure of Confidential Information, ECF 40.

## REQUESTS

1.     Admit that the Contract was a written contract to perform private investigations into multiple individuals.

**RESPONSE:**  Strategic Vision denies this Request except to the extent that it asserts the Contract was a written contract.  Strategic Vision admits the Contract was a written contract. Further answering, Strategic Vision states that neither this Request nor the Requests as a whole define the term "private investigations" or place the term in the context of the law of any particular state.  In past submissions to the Court (ECF 117), Eastern Profit has expressed equivocation regarding what law should apply to answer the question Eastern Profit has attempted to raise concerning state private investigation licensure requirements that Eastern Profit contends apply to Strategic Vision under the Contract.  Strategic Vision denies that it performed any work under the Contract that was governed by the private investigator regulatory law of Virginia, New York, Nevada, or the District of Columbia.

2.     Admit that the handwritten items on SVUS000173 were made or written by Ms. Wallop.

**RESPONSE:**  Strategic Vision admits this Request.

3.      Admit that the handwritten items on SVUS000175 were made or written by Ms. Wallop.

**RESPONSE:**  Strategic Vision admits this Request.

4.      Admit that the handwritten items on SVUS000177 were made or written by Ms. Wallop.

**RESPONSE:**  Strategic Vision admits this Request.

5.      Admit that the handwritten items on SVUS000179 were made or written by Ms. Wallop.

**RESPONSE:**  Strategic Vision admits this Request.

6.      Admit that the handwritten items on SVUS000182 were made or written by Ms. Wallop.

**RESPONSE:**  Strategic Vision admits this Request.

7.      Admit that the handwritten items SVUS000183 were made or written by Ms. Wallop.

**RESPONSE:**  Strategic Vision admits this Request.

8.      Admit that the handwritten items SVUS000190 were made or written by Ms. Wallop.

**RESPONSE:**  Strategic Vision admits this Request.

9.      Admit that the handwritten items SVUS000254 were made or written by Ms. Wallop.

**RESPONSE:**  Strategic Vision admits this Request.

10.      Admit that the handwritten items SVUS000255 were made or written by Ms. Wallop.

**RESPONSE:** Strategic Vision admits this Request.

11.     Admit that, as part of SV's investigation into the research subjects, SV obtained information concerning the family tree of the research subject identified on SVUS000171.

**RESPONSE:** Strategic Vision denies this Request as worded. Strategic Vision did not itself "investigate" the indicated research subject. Strategic Vision admits receiving the indicated information from another source outside of Strategic Vision in the course of Strategic Vision providing advisory and research services under the Contract.

12.     Admit that, as part of SV's investigation into the research subjects, SV obtained information concerning the social security number of the research subject identified on SVUS000171.

**RESPONSE:** Strategic Vision denies this Request as worded. Strategic Vision did not itself "investigate" the indicated research subject. Strategic Vision admits receiving the indicated information from another source outside of Strategic Vision in the course of Strategic Vision providing advisory and research services under the Contract.

13.     Admit that, as part of SV's investigation into the research subjects, SV obtained information concerning the nickname of the individual identified on SVUS000177.

**RESPONSE:** Strategic Vision denies this Request as worded. Strategic Vision did not itself "investigate" the indicated research subject. Strategic Vision admits receiving the indicated information from another source outside of Strategic Vision in the course of Strategic Vision providing advisory and research services under the Contract.

14.     Admit that, as part of SV's investigation into the research subjects, SV obtained information concerning the location or "base" of a corporation highlighted on SVUS000179.

4

**RESPONSE:**  Strategic Vision denies this Request as worded.  Strategic Vision did not itself "investigate" the indicated research subject.  Strategic Vision admits receiving the indicated information from another source outside of Strategic Vision in the course of Strategic Vision providing advisory and research services under the Contract.

15.    Admit that, as part of SV's investigation into the research subjects, SV obtained information concerning the family tree of the research subject identified on SVUS000181.

**RESPONSE:**  Strategic Vision denies this Request as worded.  Strategic Vision did not itself "investigate" the indicated research subject.  Strategic Vision admits receiving the indicated information from another source outside of Strategic Vision in the course of Strategic Vision providing advisory and research services under the Contract.

16.    Admit that, as part of SV's investigation into the research subjects, SV obtained information concerning the residency history of the research subject identified on SVUS000183.

**RESPONSE:**  Strategic Vision denies this Request as worded.  Strategic Vision did not itself "investigate" the indicated research subject.  Strategic Vision admits receiving the indicated information from another source outside of Strategic Vision in the course of Strategic Vision providing advisory and research services under the Contract.

17.    Admit that, as part of SV's investigation into the research subjects, SV obtained information concerning an address used by the research subject identified on SVUS000254.

**RESPONSE:**  Strategic Vision denies this Request as worded.  Strategic Vision did not itself "investigate" the indicated research subject.  Strategic Vision admits receiving the indicated information from another source outside of Strategic Vision in the course of Strategic Vision providing advisory and research services under the Contract.

18.    Admit that SV's headquarters was located at Ms. Wallop's home in the Commonwealth of Virginia during the relevant time period.

**RESPONSE:**  Strategic Vision admits this Request.

19.    Admit that Ms. Wallop, while located in the Commonwealth of Virginia, communicated with Ms. Wang via Signal Messages concerning the proposed terms of the Contract before it was executed.

**RESPONSE:**  Strategic Vision admits this Request as to at least one communication described in the Request.

20.    Admit that Ms. Wallop, while located in the Commonwealth of Virginia, communicated with Ms. Wang via Signal Messages concerning the actual terms of the Contract.

**RESPONSE:**  Strategic Vision admits this Request as to at least one communication described in the Request.

21.    Admit that Ms. Wallop, while located in the Commonwealth of Virginia, communicated with Ms. Wang via Signal Messages concerning SV's activities to perform under the terms of the Contract.

**RESPONSE:**  Strategic Vision admits this Request as to at least one communication described in the Request.

22.    Admit that Ms. Wallop, while located in the Commonwealth of Virginia, communicated with Ms. Wang via Signal Messages concerning disputes between the parties concerning the Contract.

**RESPONSE:**  Strategic Vision admits this Request as to at least one communication described in the Request.

23.     Admit that Mr. Waller, while located in the Commonwealth of Virginia, communicated with Ms. Wang via Signal Messages concerning the proposed terms of the Contract before it was executed.

**RESPONSE:**  Strategic Vision admits this Request as to at least one communication described in the Request.

24.     Admit that Mr. Waller, while located in the Commonwealth of Virginia, communicated with Ms. Wang via Signal Messages concerning the actual terms of the Contract.

**RESPONSE:**  Strategic Vision admits this Request as to at least one communication described in the Request.

25.     Admit that Mr. Waller, while located in the Commonwealth of Virginia, communicated with Ms. Wang via Signal Messages concerning SV's activities to perform under the terms of the Contract.

**RESPONSE:**  Strategic Vision admits this Request as to at least one communication described in the Request.

26.     Admit that Mr. Waller, while located in the Commonwealth of Virginia, communicated with Ms. Wang via Signal Messages concerning disputes between the parties concerning the Contract.

**RESPONSE:**  Strategic Vision admits this Request as to at least one communication described in the Request.

27.     Admit that Ms. Wallop, using a phone located in the Commonwealth of Virginia, called contacts of hers within the United States Government in order to obtain the information concerning one or more of the research subjects.

**RESPONSE:** Strategic Vision denies that the Contract called for or that Strategic Vision otherwise performed an "investigation" to "obtain information" on the research subjects. Strategic Vision denies that Ms. Wallop used a phone located in the Commonwealth of Virginia for purposes of the Contract.

28.     Admit that Mr. Waller, using a phone located in the Commonwealth of Virginia, communicated with contacts of his within the United States business community in order to obtain the information concerning one or more of the research subjects.

**RESPONSE:** Strategic Vision denies that the Contract called for or that Strategic Vision otherwise performed an "investigation" to "obtain information" on the research subjects. Strategic Vision denies that Mr. Waller used a phone located in the Commonwealth of Virginia for purposes of the Contract.

29.     Admit that Ms. Wallop, using a computer located in the Commonwealth of Virginia, obtained information concerning one or more of the research subjects.

**RESPONSE:** Strategic Vision denies that the Contract called for or that Strategic Vision otherwise performed an "investigation" to "obtain information" on the research subjects. Strategic Vision denies that Ms. Wallop used a computer located in the Commonwealth of Virginia for purposes of the Contract other than to transfer data to Eastern Profit.

30.     Admit that Mr. Waller, using a computer located in the Commonwealth of Virginia, obtained information concerning one or more of the research subjects.

**RESPONSE:** Strategic Vision denies that the Contract called for or that Strategic Vision otherwise performed an "investigation" to "obtain information" on the research subjects. Strategic Vision denies that Mr. Waller used a computer located in the Commonwealth of Virginia for purposes of the Contract.

31.   Admit that Ms. Wallop, while located in the Commonwealth of Virginia, received investigatory research reports concerning the research subjects from independent contractors.

**RESPONSE:**  Strategic Vision denies this Request.

32.   Admit that SV has performed private investigations in the Commonwealth of Virginia.

**RESPONSE:**  Strategic Vision denies this Request.  Strategic Vision states that neither this Request nor the Requests as a whole define the term "private investigations" or place the term in the context of the law of any particular state.  In past submissions to the Court (ECF 117), Eastern Profit has expressed equivocation regarding what law should apply to answer the question Eastern Profit has attempted to raise concerning state private investigation licensure requirements that Eastern Profit contends apply to Strategic Vision under the Contract.  Strategic Vision denies that it performed any work under the Contract that was governed by the private investigator regulatory law of Virginia, New York, Nevada, or the District of Columbia.

33.   Admit that SV has performed private investigations in the State of New York.

**RESPONSE:**  Strategic Vision denies this Request.  Strategic Vision states that neither this Request nor the Requests as a whole define the term "private investigations" or place the term in the context of the law of any particular state.  In past submissions to the Court (ECF 117), Eastern Profit has expressed equivocation regarding what law should apply to answer the question Eastern Profit has attempted to raise concerning state private investigation licensure requirements that Eastern Profit contends apply to Strategic Vision under the Contract.  Strategic Vision denies that it performed any work under the Contract that was governed by the private investigator regulatory law of Virginia, New York, Nevada, or the District of Columbia.

34.   Admit that SV has performed private investigations in the District of Columbia.

**RESPONSE:**  Strategic Vision denies this Request.  Strategic Vision states that neither this Request nor the Requests as a whole define the term "private investigations" or place the term in the context of the law of any particular state.  In past submissions to the Court (ECF 117), Eastern Profit has expressed equivocation regarding what law should apply to answer the question Eastern Profit has attempted to raise concerning state private investigation licensure requirements that Eastern Profit contends apply to Strategic Vision under the Contract.  Strategic Vision denies that it performed any work under the Contract that was governed by the private investigator regulatory law of Virginia, New York, Nevada, or the District of Columbia.

35.    Admit that SV has performed private investigations in the State of Nevada.

**RESPONSE:**  Strategic Vision denies this Request.  Strategic Vision states that neither this Request nor the Requests as a whole define the term "private investigations" or place the term in the context of the law of any particular state.  In past submissions to the Court (ECF 117), Eastern Profit has expressed equivocation regarding what law should apply to answer the question Eastern Profit has attempted to raise concerning state private investigation licensure requirements that Eastern Profit contends apply to Strategic Vision under the Contract.  Strategic Vision denies that it performed any work under the Contract that was governed by the private investigator regulatory law of Virginia, New York, Nevada, or the District of Columbia.

36.    Admit that SV coordinated its efforts to perform under the Contract out of the Commonwealth of Virginia.

**RESPONSE:**  Strategic Vision admits this Request.

37.    Admit that SV performed investigatory activities pursuant to the Contract in the Commonwealth of Virginia.

**RESPONSE:**  Strategic Vision denies this Request.  Strategic Vision states that neither this Request nor the Requests as a whole define the term "private investigatory activities" or place the term in the context of the law of any particular state.  In past submissions to the Court (ECF 117), Eastern Profit has expressed equivocation regarding what law should apply to answer the question Eastern Profit has attempted to raise concerning state private investigation licensure requirements that Eastern Profit contends apply to Strategic Vision under the Contract.  Strategic Vision denies that it performed any work under the Contract that was governed by the private investigator regulatory law of Virginia, New York, Nevada, or the District of Columbia.

38.     Admit that Ms. Wallop and Mr. Waller met in person at least once in Virginia after the Contract was executed to discuss the Contract.

**RESPONSE:**  Strategic Vision admits this Request.

39.     Admit that Ms. Wallop and Mr. Waller met in person at least five times in Virginia after the Contract was executed to discuss the Contract.

**RESPONSE:**  Strategic Vision admits this Request.

40.     Admit that Ms. Wallop and Mr. Waller met in person at least ten times in Virginia after the Contract was executed to discuss the Contract.

**RESPONSE:**  Pursuant to Fed. R. Civ. P. 36(a)(4), Strategic Vision states that it has made reasonable inquiry and the information it knows or can readily obtain does not provide Strategic Vision with sufficient information to admit or deny this Request.

41.     Admit that Ms. Wallop and Mr. Waller met in person at least once in Virginia after the Contract was executed to discuss SV's investigation strategy for the Contract.

**RESPONSE:**  Strategic Vision denies this Request.  Ms. Wallop and Mr. Waller never met to discuss an "investigation strategy" regarding the Contract because Strategic Vision did not "investigate" under the Contract.

42.     Admit that Ms. Wallop and Mr. Waller met in person at least five times in Virginia after the Contract was executed to discuss SV's investigation strategy for the Contract.

**RESPONSE:**  Strategic Vision denies this Request.  Ms. Wallop and Mr. Waller never met to discuss an "investigation strategy" regarding the Contract because Strategic Vision did not "investigate" under the Contract.

43.     Admit that Ms. Wallop and Mr. Waller met in person at least ten times in Virginia after the Contract was executed to discuss SV's investigation strategy for the Contract.

**RESPONSE:**  Strategic Vision denies this Request.  Ms. Wallop and Mr. Waller never met to discuss an "investigation strategy" regarding the Contract because Strategic Vision did not "investigate" under the Contract.

44.     Admit that Ms. Wallop and Mr. Waller met in person at least once in Virginia after the Contract was executed to discuss the progress of SV's investigation concerning the Contract.

**RESPONSE:**  Strategic Vision denies this Request.  Ms. Wallop and Mr. Waller never met to discuss the progress of "Strategic Vision's investigation" regarding the Contract because Strategic Vision did not "investigate" under the Contract.  Further answering, Strategic Vision admits that Ms. Wallop and Mr. Waller met in person at least once in Virginia after the Contract was executed to discuss the progress of Strategic Vision's work under the Contract.

45.     Admit that Ms. Wallop and Mr. Waller met in person at least three times in Virginia after the Contract was executed to discuss the progress of SV's investigation concerning the Contract.

12

**RESPONSE:**  Strategic Vision denies this Request.  Ms. Wallop and Mr. Waller never met to discuss the progress of "Strategic Vision's investigation" regarding the Contract because Strategic Vision did not "investigate" under the Contract.  Further answering, Strategic Vision admits that Ms. Wallop and Mr. Waller met in person at least three times in Virginia after the Contract was executed to discuss the progress of Strategic Vision's work under the Contract.

46.    Admit that Ms. Wallop and Mr. Waller met in person at least five times in Virginia after the Contract was executed to discuss the progress of SV's investigation concerning the Contract.

**RESPONSE:**  Strategic Vision denies this Request.  Ms. Wallop and Mr. Waller never met to discuss the progress of "Strategic Vision's investigation" regarding the Contract because Strategic Vision did not "investigate" under the Contract.  Further answering and pursuant to Fed. R. Civ. P. 36(a)(4), Strategic Vision states that it has made reasonable inquiry and the information it knows or can readily obtain does not provide Strategic Vision with sufficient information to admit or deny whether Ms. Wallop and Mr. Waller met in person at least five times in Virginia after the Contract was executed to discuss the progress of Strategic Vision's work under the Contract.

47.    Admit that Ms. Wallop and Mr. Waller met in person at least ten times in Virginia after the Contract was executed to discuss the progress of SV's investigation concerning the Contract.

**RESPONSE:**  Strategic Vision denies this Request.  Ms. Wallop and Mr. Waller never met to discuss the progress of "Strategic Vision's investigation" regarding the Contract because Strategic Vision did not "investigate" under the Contract.  Further answering and pursuant to Fed. R. Civ. P. 36(a)(4), Strategic Vision states that it has made reasonable inquiry and the

information it knows or can readily obtain does not provide Strategic Vision with sufficient information to admit or deny whether Ms. Wallop and Mr. Waller met in person at least ten times in Virginia after the Contract was executed to discuss the progress of Strategic Vision's work under the Contract.

48.     Admit that SV paid Mr. Waller, or entities controlled by Mr. Waller, for Mr. Waller's services to SV concerning the Contract.

**RESPONSE:**  Strategic Vision admits that Mr. Waller received funds under the Contract that he disbursed under the Contract, including to others.

49.     Admit that SV received more money from Eastern than it paid to independent contractors for services concerning the Contract.

**RESPONSE:**  Strategic Vision admits this Request.


Dated September 16, 2019                   Respectfully submitted,

                                           GRAVES GARRETT LLC

                                           *s/ Edward D. Greim*
                                           Edward D. Greim, #4240172
                                           Jennifer Donnelli, Pro Hac Vice Application
                                           Granted
                                           1100 Main Street, Suite 2700
                                           Kansas City, MO 64105
                                           Telephone: (816) 256-3181
                                           Fax: (816) 256-5958
                                           edgreim@gravesgarrett.com
                                           jdonnelli@gravesgarrett.com
                                           ATTORNEYS FOR
                                           DEFENDANT/COUNTERCLAIM PLAINTIFF

14

## <u>CERTIFICATE OF SERVICE</u>

This certifies that on September 16, 2019, the foregoing was served via electronic mail to all counsel of record, including:

Zachary Grendi
Zeichner Ellman & Krause LLP
1 Landmark Square
4th Floor
Stamford, CT 06901
zgrendi@zeklaw.com

*s/ Edward D. Greim*
Attorneys for Defendant/Counterclaim Plaintiff

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EASTERN PROFIT CORPORATION
LIMITED,

     Plaintiff/Counterclaim Defendant,

     v.

STRATEGIC VISION US LLC,

     Defendant/Counterclaim Plaintiff.

Case No. 18-CV-2185 (JGK)-DCF

## EASTERN PROFIT CORPORATION'S ANSWER AND AFFIRMATIVE DEFENSES TO STRATEGIC VISION US LLC'S AMENDED COUNTERCLAIM

Pursuant to Fed. R. Civ. P. 8, Plaintiff/Counterclaim-Defendant Eastern Profit Corporation Limited ("Eastern") in answer to the numbered paragraphs set forth in the amended counterclaims filed by Defendant/Counterclaimant Strategic Vision US LLC ("Strategic Vision") on August 8, 2019 (Dkt. No. 127) (the "Counterclaim"), responds as follows:

1.     Eastern admits that public records show that Strategic Vision is organized under the laws of the State of Nevada, and that it has a principal place of business in Virginia.

2.     Eastern admits the allegations contained in the first sentence of Paragraph 2 of the Counterclaim. Eastern denies knowledge or information sufficient to form a belief as to the truth of the allegations concerning the second sentence of Paragraph 2 of the Counterclaim. Eastern denies knowledge or information sufficient to form a belief as to the truth of the allegations concerning the third sentence of Paragraph 2 of the Counterclaim.

3.     Eastern admits the allegations in the first sentence of Paragraph 3 of the Counterclaim, but denies that it purports to engage in business activities in the State of New York

and elsewhere in the United States.  Eastern denies the allegations in the second sentence of Paragraph 3 of the Counterclaim.  Eastern denies the allegations in the third sentence of Paragraph 3 of the Counterclaim, except admits that Strategic Vision and Eastern negotiated the agreement annexed to Plaintiff's Second Amended Complaint as Exhibit A (the "Agreement") in late 2017 and early 2018, admits that Guo Wengui participated in those discussions on Eastern's behalf, admits that the parties exchanged several drafts of the Agreement prior to execution, and admits that Eastern's name was included in the Agreement prior to its execution.  Eastern denies the allegations in the fourth sentence of Paragraph 3 of the Counterclaim and respectfully refers to the terms of the Agreement itself.

4.      Eastern denies the allegations in the first sentence of Paragraph 4 of the Counterclaim, which is unintelligibly broad and vague, but admits that Eastern authorized Guo to communicate with Strategic Vision on Eastern's behalf concerning the Agreement, that Guo's representations to, and interactions with, Strategic Vision concerning the Agreement are binding upon Eastern, and that Eastern has not repudiated any such representations or interactions.  Eastern denies the allegations in the second sentence of paragraph 4 of the Counterclaim.  Eastern denies the allegations in the third, fourth and fifth sentences of Paragraph 4 of the Counterclaim, except admits that substantive interactions concerning the Agreement prior to its termination consisted of interactions between French Wallop, J. Michael Waller, Guo Wengui, Lianchao Han, and Yvette Wang.

5.      Eastern admits that Han Chunguang is its "principal."   Eastern denies the allegations contained in the second sentence of paragraph 5 of the Counterclaim.  Eastern denies the allegations contained in the remaining sentences of paragraph 5 of the Counterclaim, which are vague, includes or is comprised of one or more legal conclusions to which no response is

required, except admits that the Companies Registry for the Government of the Hong Kong Special Administrative Region indicates that Eastern has one director named Guo Mei, who was appointed on June 27, 2017, admits that Guo Wengui has a daughter named Guo Mei.

6. Eastern denies the allegations contained in the first and second sentence of paragraph 6 of the Counterclaim, admits Guo's residence and the offices of Golden Spring (New York) Limited are both located in New York City and respectfully refers to the applicable power of attorney for its actual terms. Eastern denies the allegations contained in the third sentence of paragraph 6 of the Counterclaim except admits that Yvette Wang is the president of Golden Spring (New York) Limited. Eastern denies the allegations contained in the fourth sentence of paragraph 6 of the Counterclaim and respectfully refers to the deposition of Yvette Wang for Ms. Wang's actual testimony. Eastern denies the allegations contained in the fifth sentence of paragraph 6 of the Counterclaim but admits that Yvette Wang physically executed the Agreement on Eastern's behalf.

7. Eastern denies the allegations contained in the first sentence of paragraph 7 of the Counterclaim, but admits that Eastern Profit authorized two wires totaling $1,000,000 to be sent to Strategic Vision on or about January 2, 2018. Eastern denies the allegations contained in the second sentence of paragraph 7 of the Counterclaim, but admits that Eastern Profit authorized ACA to send two wires totaling $1,000,000 to be sent to Strategic Vision on or about January 2, 2018 on Eastern's behalf. Eastern admits the allegations contained in the third sentence of paragraph 7 of the Counterclaim, except denies knowledge or information sufficient to form a belief as to whether William Je, a/k/a Yu Jianming, is a "longtime Guo associate." Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in the fourth sentence of paragraph 7 of the Counterclaim, except admits that Karin Maistrello has notarized

documents executed by Eastern. Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in the fifth sentence of paragraph 7 of the Counterclaim. Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in the sixth sentence of paragraph 7 of the Counterclaim.

8.      Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 8 of the Counterclaim, except that it admits that ACA wired $1,000,000 to Strategic Vision for Eastern pursuant to the Agreement.

9.      The allegations contained in paragraph 9 of the Counterclaim are based on one or more written documents that speak for themselves and are the best evidence of their content and meaning. Eastern denies any characterizations or mischaracterizations of the documents by Strategic Vision against Eastern's interests in this case.

10.     Eastern admits the allegations contained in paragraph 10 of the Counterclaim.

11.     Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in the first sentence of paragraph 11 of the Counterclaim. Eastern admits the allegations contained in the second sentence of paragraph 11 of the Counterclaim. The allegations contained in sentence three of paragraph 11 of the Counterclaim are based on one or more written documents that speak for themselves and are the best evidence of their content and meaning. Eastern denies any characterizations or mischaracterizations of the documents by Strategic Vision against Eastern's interests in this case. Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in the fourth sentence of paragraph 11 of the Counterclaim. Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in the fifth sentence of paragraph 11 of the Counterclaim, which is largely unintelligible, except admits that Gertz and Lianchao Han introduced Eastern to Strategic Vision for the purpose of

4

having Strategic Vision conduct investigatory research into Chinese nationals linked to top Party officials.

12.      Eastern denies the allegations contained in the first sentence of paragraph 12 of the Counterclaim.  Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in the second sentence of paragraph 12 of the Counterclaim.  Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in the third sentence of paragraph 12 of the Counterclaim.  Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in the fourth sentence of paragraph 12 of the Counterclaim.  Eastern denies the allegations contained in the fifth sentence of paragraph 12 of the Counterclaim, except admits that both parties agreed, in the Agreement, that "[t]he Contractor will conduct high quality original research and prepare reports on subjects chosen at Client's discretion, for the purpose of detecting, stopping, and preventing crime or other harm to innocent people."

13.      Eastern denies the allegations contained in paragraph 13 of the Counterclaim.

14.      Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 14 of the Counterclaim.

15.      Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 15 of the Counterclaim.

16.      Eastern denies the allegations contained in paragraph 16 of the Counterclaim, except admits that there were meetings at Mr. Guo's apartment at the Sherry-Netherland and that Lianchao Han and Yvette Wang often acted as Guo's interpreter because he lacks fluent command of English.

17.     Eastern denies the allegations contained in paragraph 17 of the Counterclaim, except admits that Lianchao Han and Yvette Wang communicated with Strategic Vision concering the Agreement.

18.     Eastern admits the allegations contained in paragraph 18 of the Counterclaim.

19.     Eastern denies the allegations contained in paragraph 19 of the Counterclaim.

20.     Eastern denies the allegations contained in paragraph 20 of the Counterclaim, except admits that the parties initially discussed a scope of work and fee schedule.

21.     Eastern denies the allegations contained in paragraph 21 of the Counterclaim.

22.     Eastern denies the allegations contained in paragraph 22 of the Counterclaim, except admits that the wire payments from ACA (on behalf of Eastern Profit) were sent to Strategic Vision on or about January 2, 2018 and that Eastern unsuccessfully attempted to reverse said wires because they were mistakenly made prior to the execution of the Agreement.

23.     Eastern admits the allegations contained in paragraph 23 of the Counterclaim.

24.     Eastern denies the allegations contained in paragraph 24 of the Counterclaim.

25.     The allegations of Paragraph 25 of the Counterclaim are based on the Agreement, which is itself the best evidence of its content and meaning. Eastern denies any characterizations or mischaracterizations of the Agreement by Strategic Vision against Eastern's interests in the case.

26.     The allegations of Paragraph 26 of the Counterclaim are based on the Agreement, which is itself the best evidence of its content and meaning. Eastern denies any characterizations or mischaracterizations of the Agreement by Strategic Vision against Eastern's interests in the case.

27.     Eastern denies the allegations contained in paragraph 27 of the Counterclaim.

28. Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 28 of the Counterclaim.

29. Eastern denies the allegations contained in paragraph 29 of the Counterclaim.

30. The allegations of Paragraph 30 of the Counterclaim are based on the Agreement, which is itself the best evidence of its content and meaning. Eastern denies any characterizations or mischaracterizations of the Agreement by Strategic Vision against Eastern's interests in the case.

31. Eastern denies the allegations contained in paragraph 31 of the Counterclaim, except admits that on January 6, 2018, Yvette Wang delivered flash drives to French Wallop containing the names of the 15 individuals to be researched by Strategic Vision pursuant to the Agreement.

32. Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 32 of the Counterclaim, except it denies that the flash drives contained malware, but admits that Strategic Vision claimed that the flash drives contained malware.

33. Eastern denies the allegations contained in paragraph 33 of the Counterclaim except admits that on January 8, 2018, Yvette Wang delivered flash drives to French Wallop containing the names of the 15 individuals to be researched by Strategic Vision pursuant to the Agreement.

34. Eastern denies the allegations contained in paragraph 34 of the Counterclaim, except admits that Strategic Vision was informed that Guo was under surveillance by the Chinese government.

35. Eastern denies the allegations contained in paragraph 35 of the Counterclaim, except admits that the parties often met at Guo's New York apartment concerning the Agreement.

36.     Eastern denies the allegations contained in paragraph 36 of the Counterclaim.

37.     Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 37 of the Counterclaim.

38.     Eastern denies the allegations contained in paragraph 38 of the Counterclaim.

39.     Eastern denies the allegations contained in paragraph 39 of the Counterclaim, except admits that Strategic Vision claimed it could not perform the research contemplated by the Agreement because Strategic Vision claimed that the subjects of the investigation were "Records Protected."

40.     The allegations of Paragraph 40 of the Counterclaim comprise one or more legal conclusions to which no response from Eastern is required.  To the extent an answer is deemed required, Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 40 of the Counterclaim, except admits that Eastern had never heard of the alleged term "Records Protected" until Strategic Vision filed its first answer in this case.

41.     Eastern denies the allegations contained in paragraph 41 of the Counterclaim.

42.     The allegations of Paragraph 42 of the Counterclaim comprise one or more legal conclusions to which no response from Eastern is required.  To the extent an answer is deemed required, Eastern denies the allegations contained in Paragraph 42, and respectfully refers to the termination letter, which is the best evidence of its contents.  Eastern denies any characterizations or mischaracterizations of the termination letter by Strategic Vision against Eastern's interests in the case.

43.     Eastern denies the allegations contained in paragraph 43 of the Counterclaim.

44.      Eastern denies the allegations contained in paragraph 44 of the Counterclaim, except admits that it demanded the reports owed to it pursuant to the terms of the Agreement when Strategic Vision failed to perform.

45.      Eastern denies the allegations contained in paragraph 45 of the Counterclaim, except admits that Strategic Vision hand-delivered data to Eastern on or about January 26, 2018.

46.      The allegations of Paragraph 46 of the Counterclaim are based on the Agreement, which is itself the best evidence of its content and meaning.  Eastern denies any characterizations or mischaracterizations of the Agreement by Strategic Vision against Eastern's interests in the case.  To the extent a further answer is required, Eastern denies the allegations contained in Paragraph 46 of the Counterclaim.

47.      Eastern denies the allegations contained in paragraph 47 of the Counterclaim, except admits that Strategic Vision offered to delay the start of the Agreement due to its own internal problems.

48.      The allegations of Paragraph 48 of the Counterclaim comprise one or more legal conclusions to which no response from Eastern is required.  To the extent an answer is deemed required, Eastern denies the allegations contained in paragraph 48 of the Counterclaim.

49.      Eastern admits the allegations contained in paragraph 49 of the Counterclaim

50.      Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 50 of the Counterclaim.

51.      Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 51 of the Counterclaim.

52.      Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 52 of the Counterclaim.

53.     Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 53 of the Counterclaim.

54.     Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 54 of the Counterclaim.

55.     Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 55 of the Counterclaim.

56.     Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 56 of the Counterclaim.

57.     Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 57 of the Counterclaim.

58.     Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 58 of the Counterclaim.

59.     Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 59 of the Counterclaim.

60.     Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 60 of the Counterclaim.

61.     Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 61 of the Counterclaim.

62.     Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 62 of the Counterclaim.

63.     Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 63 of the Counterclaim.

64.     Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 64 of the Counterclaim.

65.     Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 65 of the Counterclaim.

66.     Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 66 of the Counterclaim.

67.     Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 67 of the Counterclaim.

68.     Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 68 of the Counterclaim.

69.     Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 69 of the Counterclaim.

70.     Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 70 of the Counterclaim.

71.     Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 71 of the Counterclaim.

72.     Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 72 of the Counterclaim.

73.     Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 73 of the Counterclaim.

74.     Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 74 of the Counterclaim.

75.     Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 75 of the Counterclaim.

76.     Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 76 of the Counterclaim.

77.     Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 77 of the Counterclaim.

78.     Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 78 of the Counterclaim.

79.     Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 79 of the Counterclaim.

80.     Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 80 of the Counterclaim.

81.     Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 81 of the Counterclaim.

82.     Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 82 of the Counterclaim.

83.     Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 83 of the Counterclaim.

84.     Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 84 of the Counterclaim.

85.     Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 85 of the Counterclaim.

86. Eastern denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 86 of the Counterclaim, except denies that Guo is an agent of influence on behalf of the Chinese Communist Party, Xi Jinping, and the Chinese MSS.

87. Eastern denies the allegations contained in paragraph 87 of the Counterclaim.

88. The allegations of Paragraph 88 of the Counterclaim comprise one or more legal conclusions to which no response from Eastern is required. To the extent an answer is deemed required, Eastern denies the allegations in Paragraph 88 of the Counterclaim.

89. Eastern hereby repeats and reasserts all prior answers to the Paragraphs of the Counterclaim as if set forth fully herein.

90. Eastern admits the allegations in Paragraph 90 of the Counterclaim.

91. Eastern admits the allegations in Paragraph 91 of the Counterclaim.

92. The allegations of Paragraph 88 of the Counterclaim comprise one or more legal conclusions to which no response from Eastern is required. To the extent an answer is deemed required, the allegations of Paragraph 88 of the Counterclaim are based on the Agreement, which is itself the best evidence of its content and meaning. Eastern denies any characterizations or mischaracterizations of the Agreement by Strategic Vision against Eastern's interests in the case.

93. Eastern denies the allegations in Paragraph 93 of the Counterclaim.

94. Eastern denies the allegations in Paragraph 94 of the Counterclaim.

95. The allegations of Paragraph 95 of the Counterclaim comprise one or more legal conclusions to which no response from Eastern is required. To the extent an answer is deemed required, Eastern denies the allegations in Paragraph 95 of the Counterclaim.

96.     The allegations of Paragraph 96 of the Counterclaim comprise one or more legal conclusions to which no response from Eastern is required.  To the extent an answer is deemed required, Eastern denies the allegations in Paragraph 96 of the Counterclaim.

97.     The allegations of Paragraph 97 of the Counterclaim are based on the Agreement, which is itself the best evidence of its content and meaning. Eastern denies any characterizations or mischaracterizations of the Agreement by Strategic Vision against Eastern's interests in the case.  Eastern does admit that the start date of the Agreement was amended to January 16, 2018.

98.     The allegations of Paragraph 98 of the Counterclaim are based on the Agreement, which is itself the best evidence of its content and meaning. Eastern denies any characterizations or mischaracterizations of the Agreement by Strategic Vision against Eastern's interests in the case.

99.     The allegations of Paragraph 99 of the Counterclaim are based on the Agreement and the termination letter, which are themselves the best evidence of their content and meaning. Eastern denies any characterizations or mischaracterizations of those documents by Strategic Vision against Eastern's interests in the case.

100.    The allegations of Paragraph 100 of the Counterclaim comprise one or more legal conclusions to which no response from Eastern is required.  To the extent an answer is deemed required, Eastern denies the allegations in Paragraph 100 of the Counterclaim.

101.    Eastern denies the allegations in Paragraph 101 of the Counterclaim.

102.    Eastern denies the allegations in Paragraph 102 of the Counterclaim.

103.    Eastern denies the allegations in Paragraph 103 of the Counterclaim.

104.    Eastern denies the allegations in Paragraph 104 of the Counterclaim and respectfully refers to the Agreement for its actual terms.

105.    Eastern hereby repeats and reasserts all prior answers to the Paragraphs of the Counterclaim as if set forth fully herein.

106.    Eastern denies the allegations in Paragraph 106 of the Counterclaim.

107.    Eastern denies the allegations in Paragraph 107 of the Counterclaim.

108.    Eastern denies the allegations in Paragraph 108 of the Counterclaim.

109.    Eastern denies the allegations in Paragraph 109 of the Counterclaim.

110.    Eastern denies the allegations in Paragraph 110 of the Counterclaim.

111.    Eastern denies the allegations in Paragraph 111 of the Counterclaim.

112.    Eastern denies the allegations in Paragraph 112 of the Counterclaim.

113.    Eastern denies the allegations in Paragraph 113 of the Counterclaim.

114.    Eastern denies the allegations in Paragraph 114 of the Counterclaim.

115.    Eastern denies the allegations in Paragraph 115 of the Counterclaim.

116.    Eastern denies the allegations in Paragraph 116 of the Counterclaim.

## ANSWER TO PRAYER FOR RELIEF

Plaintiff/Counterclaim-Defendant, Eastern, denies that Defendant/Counterclaim-Plaintiff, Strategic Vision, is entitled to the judgment and relief prayed for in its Prayer for Relief.

## GENERAL DENIAL

Eastern denies each and every factual allegation in the Counterclaim that is not specifically admitted or otherwise addressed in the preceding Paragraphs and demands strict proof thereof.

## AFFIRMATIVE DEFENSES

Plaintiff/Counterclaim-Defendant Eastern asserts the following affirmative defenses in response to Defendant/Counterclaimant Strategic Vision's Counterclaim.  Eastern reserves the right to add defenses that may be supported by the facts upon completion of discovery.

### First Affirmative Defense
(Failure to State a Claim)

Strategic Vision's Counterclaim fails to state a claim upon which relief can be granted.

### Second Affirmative Defense
(Fraudulent Misrepresentation)

Strategic Vision's Counterclaim is barred because Strategic Vision engaged in misrepresentations of facts, made promises without intent to perform, or concealed and suppressed material facts from Eastern, causing damage.

### Third Affirmative Defense
(Excuse)

Any alleged non-performance of the Agreement by Eastern, which Eastern denies, was excused by the prior breach by Strategic Vision.

### Fourth Affirmative Defense
(Void Against Public Policy Due to Illegality)

Strategic Vision's claims are barred because it was not a licensed private investigator under the laws of any U.S. state or jurisdiction during any relevant time period. As such, the Agreement is illegal and void as against public policy, and Strategic Vision is barred from enforcing the Agreement or asserting any claims arising from Strategic Vision's entry into the Agreement.

### Fifth Affirmative Defense
(Economic Loss Doctrine)

Strategic Vision's claims are barred by the economic loss doctrine.

### Sixth Affirmative Defense
(N.Y. Bus. Corp. §§ 1301, 1304, et. seq.)

Strategic Vision lacks capacity and standing to use Eastern because, upon information and belief, Strategic Vision is and has been during the relevant timeframe purporting to do business regularly and systematically in New York and hold itself out as authorized to do business in New

York but is not and has not been registered to do business in the State of New York as required by

N.Y. Bus. Corp. §§ 1301, 1304 et seq.

### Seventh Affirmative Defense
(Frustration of Purpose)

Strategic Vision's claims are barred by the doctrine of frustration of purpose.

### Eighth Affirmative Defense
(Equitable Estoppel)

Strategic Vision's claims are barred by the doctrine of equitable estoppel.

### Ninth Affirmative Defense
(Unclean Hands)

Strategic Vision's claims are barred by the doctrine of unclean hands.

### RELIEF REQUESTED

WHEREFORE, Eastern prays for the following relief:

    A. Dismissal of the Counterclaim with prejudice;

    B. An award to Eastern of its costs and reasonable attorneys' fees; and

    C. Such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Eastern hereby demands a trial by jury on the Counterclaims and defenses so triable.

EASTERN PROFIT CORPORATION LIMITED,
By its attorneys,

_____/s/Zachary Grendi_____
Zachary Grendi, Esq.
ZEICHNER ELLMAN & KRAUSE LLP
1 Landmark Square
4th Floor
Stamford, CT 06901
203-489-1233
zgrendi@zeklaw.com

**<u>Certificate of Service</u>**

I certify that this document was served via the Court's Electronic Case Filing System on the date of filing, August 21, 2019, to all counsel of record.

___/s/_Zachary Grendi_____
Zachary Grendi
*Attorney for Eastern Profit Corporation Limited*

# EXHIBIT D



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

EASTERN PROFIT CORPORATION LIMITED,

        Plaintiff-Counterclaim Defendant,

vs.

STRATEGIC VISION US, LLC,

        Defendant-Counterclaim Plaintiff,

vs.

GUO WENGUI a/k/a Miles Kwok,

        Counterclaim Defendant.

**STRATEGIC VISION'S
RESPONSE AND
OBJECTIONS TO
PLAINTIFF'S FIRST
SET OF
INTERROGATORIES**

Case No. 18-cv-2185

---

        Defendant-counterclaim plaintiff, Strategic Vision US, LLC ("Strategic

Vision"), by its attorneys, Phillips Lytle LLP, responds as follows to plaintiff-counterclaim

defendant, Eastern Profit Corporation Limited's ("Eastern"), First Set of Interrogatories to

Defendant Strategic Vision US, LLC, dated October 9, 2018 (the "Interrogatories").

### <u>GENERAL OBJECTIONS</u>

        In addition to any specific objections or limitations stated below, Strategic

Vision incorporates the following general objections and limitations into each of its

responses, whether or not these general objections and limitations are restated, in whole or

in part, in Strategic Vision's specific responses.

        1.    Strategic Vision objects to the Interrogatories to the extent they seek to

impose requirements that are inconsistent with or beyond the scope of those contemplated

by the Federal Rules of Civil Procedure and the Local Rules of this District, and to the

extent they seek information which is not relevant to any claim or defense in this action nor are proportional to the needs of the case.

2.     Strategic Vision objects to the Interrogatories to the extent they seek information protected from discovery by the attorney-client privilege, by the joint defense privilege, by the work product doctrine, as material prepared in anticipation of litigation, or by other doctrines, privileges, rules or laws.  Inadvertent disclosure of any document or information subject to any such privilege, doctrine, immunity or of any other ground for objecting to disclosure of such materials or information, shall not constitute a waiver of any such grounds for objection or of Strategic Vision's right to object to the use of such materials or information during any later proceeding or otherwise to seek the return of the materials or information.

3.     Strategic Vision objects to the Interrogatories to the extent they seek information that relates to proprietary or confidential business information, trade secrets, or competitively sensitive information, the discovery of which would be harmful to the business interest or privacy of Strategic Vision.

4.     Strategic Vision objects to the Interrogatories to the extent they seek information that Strategic Vision is unable to disclose based on its confidentiality and non-disclosure obligations to third parties.

5.     Strategic Vision objects to the Interrogatories to the extent they are overbroad, unduly vague and ambiguous, duplicative, or compound.

6.     Strategic Vision objects to the Interrogatories to the extent they seek information that is not within Strategic Vision's possession or control, not otherwise available to Strategic Vision or is in Plaintiff's possession or control.

7.      Strategic Vision objects to the Interrogatories to the extent they seek information in the possession of third parties or that is publicly available.

8.      The failure of Strategic Vision to make a specific objection to a particular interrogatory is not, and shall not be construed as, an admission that responsive information exists.

9.      By responding to the Interrogatories, Strategic Vision does not waive any objections based upon lack of authenticity, hearsay, or otherwise, and waives no evidentiary objection whatsoever as to the responses or information contained in or accompanying these responses.  In addition, Strategic Vision specifically reserves its right to challenge the competency, relevancy, materiality and admissibility of such information in any proceeding, hearing, motion or trial in this or any other action.

10.     Strategic Vision reserves its right to supplement, revise, correct, modify, clarify or complete its response at any time up to and including the time of trial.

11.     The General Objections set forth above are incorporated into the responses below and shall be deemed to be continuing although not specifically referred to in the responses.

## RESPONSES

**INTERROGATORY NO. 1:** Identify each person who answered, assisted in answering or preparing these interrogatories, excluding your attorneys.

**RESPONSE:** Subject to its General Objections, Strategic Vision responds as follows:  French Wallop and J. Michael Waller assisted in preparing these responses.

**INTERROGATORY NO. 2:** Identify the "principals" of SV referred to in paragraph 43 of SV's Amended Answer and Counterclaims.

**RESPONSE:** In addition to its General Objections, Strategic Vision objects to this Interrogatory because it seeks information not relevant to the claims or defenses in

- 3 -

this action nor proportional to the needs of the case.  Subject to this and its General

Objections, Strategic Vision responds as follows:  French Wallop is the principal of Strategic

Vision.

      **INTERROGATORY NO. 3:** Identify the persons which constitute SV's
"close working network of trusted resources" referenced in paragraph 43 of SV's Amended
Answer and Counterclaims.

      **RESPONSE:** In addition to its General Objections, Strategic Vision objects

to this Interrogatory because it is overly broad and unduly burdensome and seeks

information not relevant to the claims or defenses in this action nor proportional to the

needs of the case.  Strategic Vision's network encompasses many resources that have no

relation to the engagement that is the subject of this action.

      **INTERROGATORY NO. 4:** Identify each employee of SV who performed
research pursuant to the Contract.

      **RESPONSE:** In addition to its General Objections, Strategic Vision objects

to this Interrogatory because it is overly broad and unduly burdensome and seeks

information not relevant to the claims or defenses in this action nor proportional to the

needs of the case.  Subject to this and its General Objections, Strategic Vision responds as

follows:  Strategic Vision does not employ any W-2 employees.

      **INTERROGATORY NO. 5:** Identify the "various investigators and
analysts in the United States, Europe, and the Middle East" referenced in Paragraph 60 of
SV's Amended Answer and Counterclaims.

      **RESPONSE:** In addition to its General Objections, Strategic Vision objects

to this Interrogatory because it is overly broad and unduly burdensome and seeks

information not relevant to the claims or defenses in this action nor proportional to the

needs of the case. Subject to this and its General Objections, Strategic Vision responds as

follows:  Strategic Vision utilized a highly compartmentalized system for conducting

research in connection with the contract. This was done at Mr. Guo's insistence to protect
his identity and maintain total secrecy. As a result, Strategic Vision does not know the
identities of many of the investigators and analysts that were contacted regarding the
contract. For the remainder, Strategic Vision is unable to disclose their identities, as it
promised these investigators and analysts absolute confidentiality.

   **INTERROGATORY NO. 6:** Identify the "trusted Chinese/English
translators" referenced in Paragraph 60 of SV's Amended Answer and Counterclaims.

   **RESPONSE:** In addition to its General Objections, Strategic Vision objects
to this Interrogatory because it is overly broad and unduly burdensome and seeks
information not relevant to the claims or defenses in this action nor proportional to the
needs of the case. Subject to this and its General Objections, Strategic Vision responds as
follows: The trusted Chinese/English translators that Strategic Vision identified in
connection with its contract with Eastern are Lianchao Han and Yvette Wang a/k/a
Yanping Wang.

   **INTERROGATORY NO. 7:** Identify each independent contractor which
performed research for SV pursuant to the Contract.

   **RESPONSE:** In addition to its General Objections, Strategic Vision objects
to this Interrogatory because it is overly broad and unduly burdensome and seeks
information not relevant to the claims or defenses in this action nor proportional to the
needs of the case. Subject to this and its General Objections, Strategic Vision responds as
follows: Strategic Vision utilized a highly compartmentalized system for conducting
research in connection with the contract. This was done at Mr. Guo's insistence to protect
his identity and maintain total secrecy. As a result, Strategic Vision does not know the
identities of many of the independent contractors that performed research in connection

with the contract.  For the remainder, Strategic Vision is unable to provide their identities,

as it promised the independent contractors absolute confidentiality.

**INTERROGATORY NO. 8:**  Identify each person who prepared reports for
SV pursuant to the Contract.

**RESPONSE:**  In addition to its General Objections, Strategic Vision objects

to this Interrogatory because it is overly broad and unduly burdensome and seeks

information not relevant to the claims or defenses in this action nor proportional to the

needs of the case. Subject to this and its General Objections, Strategic Vision responds as

follows:  Because of Mr. Guo's erratic behavior and tortious interference, and because the

engagement had just begun, Strategic Vision was unable to prepare any detailed reports in

the short time before Eastern suddenly terminated the contract without notice and

commenced this action.

**INTERROGATORY NO. 9:**  Identify each and every category of damages
SV is seeking from Eastern, and set forth the specific amount claimed for each category, and
how such amount was calculated.

**RESPONSE:**  Subject to its General Objections, Strategic Vision responds as

follows:  Strategic Vision seeks, at minimum, $838,709.75 in damages, plus interest and

costs.  This amount corresponds to the amount owed by Eastern under the parties' contract,

less the $1 million deposit received by Strategic Vision (assuming it was made on Eastern's

behalf).  Strategic Vision reserves the right to amend this response as more information

becomes available.

**INTERROGATORY NO. 10:**  Identify the "cybersecurity expert"
referenced in Paragraph 64 of SV's Amended Answer and Counterclaims.

**RESPONSE:**  In addition to its General Objections, Strategic Vision objects

to this Interrogatory because it seeks information not relevant to the claims or defenses in

this action nor proportional to the needs of the case.  Subject to this and its General

Objections, Strategic Vision responds as follows:  Strategic Vision maintained total secrecy

in connection with the project, at Mr. Guo's insistence to protect his identity.  As a result,

Strategic Vision is unable to provide the identity of the cybersecurity expert who examined

the corrupted flash drives provided to Strategic Vision by Eastern, as Strategic Vision had

promised this individual absolutely confidentiality.

**INTERROGATORY NO. 11:**  Identify the "computer experts and
authorities in three countries" referenced in Paragraph 67 of SV's Amended Answer and
Counterclaims.

**RESPONSE:**  In addition to its General Objections, Strategic Vision objects

to this Interrogatory because it is overly broad and unduly burdensome and seeks

information not relevant to the claims or defenses in this action nor proportional to the

needs of the case. Subject to this and its General Objections, Strategic Vision responds as

follows:  Strategic Vision is unable to identify the experts who provided warnings regarding

the inadequate security of Mr. Guo's computer system due to its confidentiality obligations.

**INTERROGATORY NO. 12:**  Identify the persons who were "members of
Strategic Vision's team," referenced in the last sentence of Paragraph 67 of SV's Amended
Answer and Counterclaims, who allegedly "quit" due to the "potential danger" caused by
the allegedly "alarming breach of Mr. Guo's and Eastern's promise of security."

**RESPONSE:**  In addition to its General Objections, Strategic Vision objects

to this Interrogatory because it is overly broad and unduly burdensome and seeks

information not relevant to the claims or defenses in this action nor proportional to the

needs of the case.  Subject to this and its General Objections, Strategic Vision responds as

follows:  Strategic Vision utilized a highly compartmentalized system for conducting

research in connection with the contract.  This was done at Mr. Guo's insistence to protect

his identity and maintain total secrecy.  As a result, Strategic Vision does not know the

identities of the individuals who resigned from the Strategic Vision team as a result of Eastern's and Mr. Guo's security breaches.

Dated:   November 28, 2018          New York, New York

                                    PHILLIPS LYTLE LLP

                                    By   /s/ Heather K...

                                    David J. McNamara
                                    Heather H. Kidera
                                    Attorneys for Defendant-Counterclaim
                                    Plaintiff
                                    *Strategic Vision US LLC*
                                    340 Madison Avenue, 17th Floor
                                    New York, New York 10173
                                    Telephone No. (212) 759-4888
                                    dmcnamara@phillipslytle.com
                                    hkidera@phillipslytle.com

TO:   ZEICHNER ELLMAN & KRAUSE LLP
      Zachary Grendi, Esq.
      Attorneys for Plaintiff-Counterclaim Defendant
      *Eastern Profit Corporation Limited*
      35 Mason Street
      Greenwich, CT 06830

      HODGSON RUSS LLP
      Jillian M. Searles, Esq.
      Attorneys for Counterclaim Defendant
      *Guo Wengui a/k/a Miles Kwok*
      605 Third Avenue, Suite 2300
      New York, NY 10158

Doc #05-519160

- 8 -

<u>VERIFICATION</u>

STATE OF Washington          )
                             )  ss:
COUNTY OF District of Columbia )

French C. Wallp being duly sworn, deposes and says that I am

CEO          at Strategic Vision US, LLC.  I have read the foregoing response to

interrogatories and know the contents thereof, and the same are true to my knowledge,

information and belief.

Sworn to before me this
28th day of November, 2018.

Notary Public

# EXHIBIT E

1

2          IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF NEW YORK
3    ------------------------------------------X

4    EASTERN PROFIT CORPORATION LIMITED,

5          Plaintiff/Counterclaim Defendant,

6        -against-          Case No. 18-cv-2185 (JGK)

7    STRATEGIC VISION US, LLC,

8          Defendants/Counterclaim Plaintiff,

9               -against-

10   GUO WENGUI a/k/a MILES KWOK,

11                  Counterclaim Defendant.

12   ------------------------------------------X

13

14

15                  DEPOSITION OF

16                  HAN CHUNGUANG

17              New York, New York

18              November 11, 2019

19

20

21

22   ATKINSON-BAKER, INC.
     (800) 288-3376
23   Www.depo.com

24   REPORTED BY:  TERRI FUDENS

25   FILE NO:  AD0B4F6

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
EASTERN PROFIT CORPORATION LIMITED,
        Plaintiff/Counterclaim Defendant,
V.          Case # 18-cv-2185 (JGK)
STRATEGIC VISION US, LLC,
        Defendants/Counterclaim Plaintiff.
V.
GUO WENGUI a/k/a MILES KWOK,
        Counterclaim Defendant.
----------------------------------------X

        Deposition of HAN CHUNGUANG, a Non-Party
Witness, taken by the Defendant-Counterclaim
Plaintiff pursuant to Court Order held at 620
Eighth Avenue, New York, New York, commencing at
10:03 A.M., Monday, November 11, 2019, before
Terri Fudens, a Stenotype Reporter and Notary
Public of the State of New York.

Page 2

I N D E X
WITNESS:     EXAMINATION BY:      PAGES:
Han Chunguang
            Ms. Donnelli          5

E X H I B I T S
DEFENDANT'S:   DESCRIPTION:       PAGES:
30    Notice of Change of Company   106
      Secretary and Director
      (Appointment/Cessation) Bates
      stamped EASTERN-000400 to 402

31    A piece of yellow paper      109
      containing the witness' name
      handwritten three times

32    A two-page document titled    109
      Limited Power of Attorney
      Bates stamped EASTERN-000276
      and 277

33    A document titled Substitution 118
      of Counsel consisting of two
      pages

34    A document titled Research    119
      Agreement dated December 29,
      2017 Bates stamped
      EASTERN-000005 to 000009

35    A document titled Loan        124
      Agreement Bates stamped
      EASTERN-000278 to 280

36    A black and white photograph   153
      of five people

        * * * * *

Page 4

A P P E A R A N C E S :
PEPPER HAMILTON LLP
Attorneys for Plaintiff/Counterclaim
Defendant - Eastern Profit Corporation, Ltd.
    1313 North Market Street
    Suite 5100
    Wilmington, Delaware  19801

BY:  CHRIS CHUFF, ESQ.


GRAVES GARRETT LLC
Attorneys for Defendant/Counterclaim
Plaintiff - Strategic Vision US LLC
    1100 Main Street, Suite 2700
    Kansas City, Missouri  64105
    816.2563181
BY:  EDWARD D. GREIM, ESQ.
    edgreim@gravesgarrett.com

JENNIFER DONNELLI, ESQ.
    jdonnelli@gravesgarrett.com

GOLDEN SPRING (NEW YORK) LTD.
In-House Counsel for Golden Spring
    162 E. 64th Street
    New York, New York  10065
    917.941.9698
BY:  DANIEL PODHASKIE, ESQ.

ALSO PRESENT:
French Wallop
Michael Waller
Yvette Wang
Ann Chi Ho, Interpreter

Page 3

HAN CHUNGUANG
ANN CHI HO, the Interpreter, was duly sworn by
    Terri Fudens, a Notary Public of the
    State of New York, to accurately
    translate the following questions and
    answers to the best of her ability.
H A N   C H U N G U A N G, a Non-Party witness
    herein, having been first duly sworn
    by Terri Fudens, a Notary Public of
    the State of New York, was examined
    and testified as follows:
EXAMINATION BY
MS. DONNELLI:
    Q     Please state your name for the
record.
    A     Chunguang Han.  My last name is Han.
My first name is Chunguang.
        MR. CHUFF:  Chris Chuff for
    Eastern Profit Corporation Limited
    and the witness.
        MS. WANG:  Yvette Wang from
    Golden Spring, New York, Ltd.
        MR. PODHASKIE:  Daniel Podhaskie
    with Golden Spring, New York, Ltd.
        MS. DONNELLI:  Eddie Greim and

Page 5

2 (Pages 2 to 5)

Han Chunguang
November 11, 2019

HAN CHUNGUANG
1
2  keep my questions as focused on those
3  topics as I can.  But there's come
4  background that I think is necessary
5  to place this witness in the context
6  of these questions.  I will try to
7  keep it focused.  I do have some
8  background.
9        MR. CHUFF:  Why is where he was
10  born relevant to the contract claim?
11        MS. DONNELLI:  Well that's, I
12  think, in part to make the witness
13  sort of comfortable with getting to
14  know me and I'm getting to know him.
15        MR. CHUFF:  Okay.
16        MS. DONNELLI:  I will probably
17  have questions about his time here in
18  relation to the documents that he
19  signed.  So I want to kind of place
20  his local where he was at certain
21  times.
22        MS. WANG:  Can you please
23  translate, madam translator.
24        MS. CLINE:  Thank you.
25  Q    I believe the question was where were

Page 10

HAN CHUNGUANG
1
2  you born.
3  A    In China.
4  Q    Where in China?
5  A    Shandong.  S-H-A-N-D-O-N-G.
6  Q    What brought you to the United
7  States?
8        MR. CHUFF:  Objection.  I'm not
9  going to allow the witness to testify
10  about this.  The court has already
11  ordered that personal history and
12  reasons for coming to the United
13  States is clearly beyond the scope of
14  relevancy to these proceedings.  And
15  I'm not going to allow him to answer
16  without the court ordering us to do
17  so.
18        I direct you to Docket 189,
19  page 7 where it says personal history
20  and reasons for coming to the United
21  States, defendant has not
22  demonstrated the relevance of this
23  topic.
24        So we're not going to allow the
25  witness to answer any questions about

Page 11

HAN CHUNGUANG
1
2  this unless the court directs us to
3  do so.
4        MS. DONNELLI:  We'll withdraw
5  the question.
6        MR. CHUFF:  Thank you.
7  Q    When you were living in China, did
8  you begin working for Eastern Profit?
9  A    Okay.  When I was working for this
10  company, it was in 2017.  No.  No.  No.  It was in
11  2015 or 2016.  That's right.
12  Q    Were you living in the United States
13  in 2015 or 2016?
14  A    Not yet.  At the time I was in Hong
15  Kong.
16  Q    When did you begin living in the
17  United States?
18  A    In 20 -- I'm not sure, but I have
19  been here for several years already.
20  Q    Were you performing a role for
21  Eastern Profit while you were living in the United
22  States?
23  A    I am an agent for them.
24  Q    Were you an agent for Eastern Profit
25  while you have been living in the United States?

Page 12

HAN CHUNGUANG
1
2  A    Before June, 2017 I was a director of
3  this company.  However, in July that year, I
4  transferred it to -- Guo Mei ask me to be an agent
5  for this company after the transfer.
6  Q    Before June, 2017, were you living in
7  the United States?
8  A    I think so.
9  Q    Have you lived in the United States
10  since June of 2017 and nowhere else?
11  A    I am not sure, but I think I have
12  been moving around.
13  Q    Within the United States?
14  A    Yes.
15  Q    Have you been back to China since
16  June of 2017 for any extended period?
17        MR. CHUFF:  Objection to form.
18        Again, I'm going to cut this off
19        soon.  It's not relevant to the
20        issues that the court allowed your
21        side to proceed on.
22  A    No.
23  Q    Where do you currently live?
24  A    In United States.
25  Q    What city?

Page 13

4 (Pages 10 to 13)

HAN CHUNGUANG

1  specific.
2      Q    Have you ever discussed Eastern
3  Profit with Mr. Guo?
4      A    No.
5      Q    Does the address 162 East 64th
6  Street, New York City mean anything to you?
7      A    I have heard about it.
8      Q    What do you understand it to be?
9      A    I was in the lobby of this building
10 to meet Yvette and discussed about paying back a
11 loan.
12     Q    A loan to whom?
13     A    I borrowed money from William, and
14 William was asking me to pay him back.  That was
15 the matter I brought it up with Yvette in the
16 lobby of this building.
17     Q    Did you or Eastern Profit borrow the
18 money you're referring to?
19     A    The company did.
20     Q    How often do you meet with Mr. Guo
21 for him to mentor you and teach you how to do
22 things?
23         MR. CHUFF:  Objection.  For the
24     reasons I've already discussed, I

Page 34

HAN CHUNGUANG

1         instruct the witness not to answer
2     unless counsel can direct it to some
3     kind of relevance to Eastern Profit.
4      Q    Do you know who Guo Mei is?
5      A    Yes.
6      Q    Is Guo Mei Mr. Guo's daughter?
7      A    Yes.
8      Q    Does Guo Mei have a relationship with
9  Eastern Profit?
10     A    Guo Mei is a director of Eastern
11 Profit right now.
12     Q    Have you ever discussed Guo Mei's
13 role with Eastern Profit with Mr. Guo?
14     A    No.  I have never had such a
15 discussion with Mr. Guo.
16     Q    Do you have a job at this time?
17     A    Do I have a job right now?  Yes.
18     Q    Where are you employed?
19     A    I work for my own company.
20     Q    What is your company called?
21     A    Since this has nothing to do with
22 this case, I'm not going to answer this question.
23     Q    How long have you been employed by
24 your company?

Page 35

HAN CHUNGUANG

1      A    The business is a family trust.
2  Therefore, I would say I've been working for it
3  for a long time.
4      Q    Since you've been in the United
5  States?
6      A    Yes.
7      Q    Does it have any involvement with
8  Eastern Profit?
9      A    No.
10     Q    Is the name of the company Golden
11 Spring New York Limited?
12     A    I don't understand your question.
13 Can you rephrase your question?
14     Q    Does a company called Golden Spring
15 New York employ you?
16     A    No.
17     Q    Has that company ever employed you?
18     A    No.  But again, I'm not sure.  My
19 recollection is not clear.
20     Q    Has a company called Golden Spring
21 Hong Kong Limited ever employed you?
22     A    No.
23     Q    If I represented to you that Golden
24 Spring New York Limited employed Yvette Wang,

Page 36

HAN CHUNGUANG

1  would that refresh your recollection whether it
2  has employed you?
3      A    I did ask Yvette to do something for
4  me.  And she is or was involved with Golden Spring
5  New York.
6         THE INTERPRETER:  Interpreter
7     note in Chinese we don't have a
8     tense.  In China no present, or past,
9     or future times.
10     Q    When you met with Yvette Wang to
11 discuss a loan, was she there personally or for
12 Golden Spring New York?
13     A    She represented the company.
14     Q    Golden Spring New York?
15     A    Yes.
16     Q    Why would you be speaking with Golden
17 Spring New York about a loan?
18     A    It is not like I was speaking to
19 Golden Spring New York.  I was speaking
20 specifically to Yvette as far as what capacity
21 Yvette represented, it had nothing to do with me.
22     Q    Do you know who Yvette represented
23 during that meeting?
24     A    Which meeting again?

Page 37

10 (Pages 34 to 37)

Atkinson-Baker, Inc.
www.depo.com

HAN CHUNGUANG

1
2       Q      You testified about meeting Yvette
3  Wang in the lobby to discuss a loan.
4       A      What's your question?  I won't
5  qualify the discussion as a meeting.  I chatted
6  with her briefly.
7       Q      When you say briefly, how long was
8  it?
9       A      Around 20 minutes at the most.  20
10 some minutes.
11      Q      Was anyone else present besides you
12 and Yvette?
13      A      No.
14      Q      How did you know to meet with Yvette?
15      A      I don't understand her question.
16 What do you mean how did I know to meet with
17 Yvette?
18      Q      Why did you meet with Yvette rather
19 than Mr. Guo?
20      A      That day I went there to see Mr. Guo
21 who stayed there at the time.  I bumped into
22 Yvette in the lobby.  I brought up the subject
23 that William was asking me to pay back a loan, and
24 I chatted with her briefly.
25      Q      Why did you think that Yvette knew

Page 38

HAN CHUNGUANG

1  anything about the loan?
2
3       A      I don't understand your question.
4  What do you mean?
5       Q      You met with Yvette to discuss the
6  loan because you believed she knew about the loan;
7  correct?
8       A      I hired a company to investigate a
9  matter for me, and I asked Yvette to handle it for
10 me.  At the time I borrowed money from William to
11 hire this investigation company.  However, the
12 investigation didn't go anywhere.
13             William was asking me to pay back the
14 loan.  When I bumped into Yvette, I have to tell
15 Yvette what was going on.
16      Q      Why did you choose Yvette to tell
17 this to?
18      A      By the way, can I go to the bathroom
19 first.
20      Q      In a few minutes we will take a
21 break, but please answer the question.
22      A      Can you repeat your question?
23             (The requested portion of the
24             record was read back by the
25             reporter.)

Page 39

HAN CHUNGUANG

1
2       MS. WANG:  She just called me a
3  bitch just now.  She said that.  I
4  want it on the record.  I'm sorry.
5       MR. PODHASKIE:  I didn't hear.
6       MR. GREIM:  Let's stop and get
7  an answer to this question.
8       A      At the time when I hired an
9  investigation company, and Yvette told me I needed
10 money to hire the company, that was why I borrowed
11 from William.
12             When William ask me to return the
13 money, I had to bring it up with Yvette because
14 Yvette was telling me somehow we got misled.  And
15 I wanted her to know results of investigation we
16 received.  I have to know.  I have to tell Yvette
17 about it.
18      Q      I have one more question, and then we
19 can take a restroom break.  You have been
20 referring to William.  What is William's full
21 name?
22      A      William.
23      Q      Can you please spell that?
24      A      YU.  I think Y-U.
25      Q      Is William Yu the same person as

Page 40

HAN CHUNGUANG

1  William Je, J-E?
2
3       A      I have no idea.
4       Q      When you've been using the name
5  William today since we've been talking, have you
6  always been referring to William Yu?
7       A      Yes.  Yes, I think so.
8             MS. DONNELLI:  Thank you.  You
9  requested a bathroom break.  I would
10 like to break for no more than 10
11 minutes.
12             (At this time, a brief recess
13             was taken.)
14 CONTINUED EXAMINATION
15 BY MS. DONNELLI:
16      Q      We are here after taking a break.
17 Is Golden Spring New York's business
18 office located at 162 East 64th Street?
19      A      I don't know.
20      Q      Why were you able to meet Yvette Wong
21 in that building if that's not where Golden Spring
22 New York does its business?
23      A      I don't understand your question.
24      Q      You testified that you bumped into
25 Yvette in that building, and I'm asking what

Page 41

11 (Pages 38 to 41)

Han Chunguang
November 11, 2019

HAN CHUNGUANG

1
2    official address.
3        Q    Has that always been Eastern Profit's
4    business address?
5        MR. CHUFF:  Objection.
6    Foundation.
7        A    When you say that had this address
8    been the business address of Eastern Profit, what
9    do you mean by that?
10       Q    I understood you testified that
11   Eastern Profit had a business location.  Is that
12   true?
13       A    Yes.
14       Q    Where is Eastern Profit's business
15   location?
16       A    You asking me the company address;
17   right?  The company address was Bank of China
18   Building, 49th floor.
19       Q    Was that always Eastern Profit's
20   address since you purchased it?
21       A    Yes.
22       Q    Have you been there?
23       A    Yes, I did.
24       Q    When was that?
25       A    Wow.  It was several years ago.

Page 58

HAN CHUNGUANG

1
2    did not need anyone to select it for me.
3        Q    Did you sign any written document to
4    make yourself director of Eastern Profit?
5        A    Yes.
6        Q    Did you become a director of Eastern
7    Profit at the same time you purchased it?
8        A    Yes.
9        Q    What was the business of Eastern
10   Profit when you purchased it?
11       A    Investment.
12       Q    Did that purchase change over time?
13       A    No.  No.  It had not.
14       Q    Was the amount that Eastern Profit
15   invested the amount that you used to purchase
16   Eastern Profit in the first instance?
17            Where did the fund come from that
18   Eastern Profit used to make an investment?
19       A    For my family fund.
20       Q    Is that the family fund you work for
21   today?
22       A    Yes.
23       Q    Who at the family fund did you work
24   with to get the funds transferred so that Eastern
25   Profit could make investments?

Page 60

HAN CHUNGUANG

1
2        MR. CHUFF:  Objection to form.
3        A    This has nothing to do with this
4    case, and this question, it's very proven to my
5    privacy.  I don't want to answer it.
6        Q    To put it in a timeframe, you became
7    a director of Eastern Profit in 2014?
8        MR. CHUFF:  Objection to form.
9        A    That's correct.  When I purchased it
10   in 2014.
11       Q    What educational experience did you
12   have at that time to prepare you for the role of a
13   director of Eastern Profit?
14       MR. CHUFF:  Objection to form.
15       A    Is she asking me about my educational
16   background?
17       Q    Yes, but specifically to give you the
18   preparation that you needed to be a director of
19   Eastern Profit.
20       A    I went to two-year college.
21   Secondly, Mr. Guo has been teaching me a lot.
22       MS. WANG:  That was at least
23       three years, college.
24       THE INTERPRETER:  It's three
25       years in China.  The interpreter

Page 61

HAN CHUNGUANG

1
2        Q    How many times have you been to
3    Eastern Profit's office?
4        A    Several times.
5        Q    When you purchased Eastern Profit,
6    did it have any other owners?
7        A    No.  I was the only owner at the
8    time.
9        Q    Describe your role with Eastern
10   Profit other than that you owned it for a period
11   of time?
12       MR. PODHASKIE:  Objection.
13       Form.
14       A    Before I transferred the ownership to
15   Guo Mei, I was a director of the company.  After I
16   had it transferred to Guo Mei, she was the
17   director.  I became her agent.
18       Q    Is it true that you chose yourself to
19   be the director of Eastern Profit?
20       A    When you say I choose myself to be
21   director, I mean I don't really understand your
22   question, by the way.
23       Q    Did someone select you to be a
24   director of Eastern Profit?
25       A    I purchased it.  I was the boss.  I

Page 59

16 (Pages 58 to 61)

Han Chunguang
November 11, 2019

HAN CHUNGUANG

1
2      MS. DONNELLI:  How do you know
3  what he can and can't do?  That in
4  itself is an interesting question.
5  But the one that matters for now is
6  the last one I asked.
7      Can you repeat that to the
8  witness?
9      THE INTERPRETER:  (Complying)
10     MR. CHUFF:  I instruct the
11 witness not to answer it until
12 counsel tells him what he's looking
13 at.
14     MS. DONNELLI:  The witness is
15 going to heed your instruction?
16 A   Yes, I will listen to my attorney.
17     MS. DONNELLI:  So that we have a
18 clear record, the witness on
19 instruction of his counsel is
20 refusing to answer the question
21 whether his signature appears in
22 handwritten form on the last page of
23 Exhibit 34.
24     MR. CHUFF:  Because defendant's
25 counsel refuses to identify the

Page 122

HAN CHUNGUANG

1
2  document?
3      MR. CHUFF:  Objection.
4  Mischaracterizes the testimony.
5  A   Since you show me an English
6  document, which I cannot read, and then you ask me
7  whether my signature is on it, I think it is
8  normal in nature for me to ask what this document
9  is before I answer your question.  I have right to
10 know what this document, English document, is.
11 Q   Is today the first day you've seen
12 Exhibit 34?
13 A   Yes.
14     MS. DONNELLI:  We may come back
15 to Exhibit 34 in a moment.  For now I
16 will mark Exhibit 35.
17     (Defendant's Exhibit 35, a
18 document titled Loan Agreement Bates
19 stamped EASTERN-000278 to 280 marked
20 for Identification as of this date.)
21 Q   If we turn to the last page of
22 Exhibit 35.
23 A   Yes.  I'm looking at it.
24 Q   Thank you.  Do you see two
25 handwritten signatures on the last page of

Page 124

HAN CHUNGUANG

1
2      document for a non English-speaking
3      witness.
4  Q   I'm going to hand you Exhibit 31,
5  Mr. Han.  Do you need me to tell you what that
6  document is before you can recognize whether it's
7  the handwritten form of your signature?
8  A   Can you ask the interpreter to tell
9  me what this document is.
10 Q   Can you answer the question about
11 Exhibit 31, please?
12 A   Yes.  So what is your question
13 related to this document?
14 Q   Do you need me to tell you what
15 Exhibit 31 is before you can tell me if that's the
16 handwritten form of your name?
17 A   No, I don't.
18     MS. DONNELLI:  I would like to
19 look back at Exhibit 34.  So that I
20 have a clear understanding, is the
21 witness' testimony that the witness
22 cannot identify whether it is the
23 handwritten form of his name on
24 Exhibit 34, last page, unless I tell
25 him what the title is of the

Page 123

HAN CHUNGUANG

1
2  Exhibit 35?
3  A   Yes.
4  Q   Is one of them the handwritten form
5  of your name?
6      MR. CHUFF:  Same objection.
7  A   The one above is.
8  Q   Is that signature to the right of the
9  typewritten form of your name?
10 A   Yes.
11 Q   Did you place your signature on this
12 Exhibit 35?
13     MR. CHUFF:  Objection.  How can
14 he answer the question without
15 knowing what it is?
16 Q   Have you ever seen Exhibit 35 until
17 today?
18     MR. CHUFF:  Same objection.
19 A   Can I ask my interpreter what the
20 title of this document is?
21 Q   No.  Please answer the question
22 whether or not you have seen this two and a half
23 page document labeled Exhibit 35 before today.
24     MR. CHUFF:  Same objection.
25 A   Based upon my recollection, this was

Page 125

32 (Pages 122 to 125)

Atkinson-Baker, Inc.
www.depo.com

HAN CHUNGUANG
1
2  the loan agreement between William and I.
3      Q    Did Mr. Han, you place your signature
4  and handwriting on page 3 of this Exhibit 35.
5      A    Yes.
6      Q    When did you do that?
7      A    In 2018.  No.  I think at end of
8  2017.
9      Q    Which is your answer?
10          MR. CHUFF:  Objection.
11     A    What?
12     Q    Which is your answer?
13          MR. PODHASKIE:  Only if you
14          know.  Don't speculate.
15     A    The end of 2017.
16     Q    You said that William G's signature
17 is below yours?
18          MR. CHUFF:  Objection.
19          Mischaracterizes the testimony.
20     A    I don't understand your question.
21     Q    Does the signature of William G.
22 appear below your signature on Exhibit 35, page 3?
23     A    My signature is above his.
24     Q    When you placed your signature there or
25 Exhibit 35, was Mr. G's signature already there or

Page 126

HAN CHUNGUANG
1
2      A    In business meetings in Hong Kong I
3  met William, as a result of which we became good
4  friends.
5      Q    Was the meeting in Hong Kong about
6  Eastern Profit business?
7      A    No.
8      Q    Who does Mr. G work for?
9          MR. CHUFF:  Objection.  The
10          court already ruled that you cannot
11          ask about ACA's financial
12          information.
13          MS. DONNELLI:  Counsel, I think
14          you just hinted something to the
15          witness that was improper.  So why
16          don't you just object to form.
17          MR. WHO:
18          MR. PODHASKIE:  This whole thing
19          is improper.
20          MR. CHUFF:  No.  I'm instructing
21          him not to answer because it's beyond
22          the scope of what the court ordered.
23          MS. DONNELLI:  Then that is
24          probably better than instructing the
25          witness how to answer.

Page 128

HAN CHUNGUANG
1
2  not?
3          MR. CHUFF:  I'm sorry.  Go
4          ahead.
5      A    Both of us were in a hotel lobby when
6  I asked him for loan to pay for the investigation
7  company.  At the time I signed first, and then he
8  signed.
9      Q    So you both signed it the same day;
10 is that your testimony?
11     A    William and I signed on the same day.
12     Q    What was the name of the hotel?
13     A    Palace.  That's right.
14     Q    Was it here in New York City?
15     A    Yes.
16     Q    Does William G. live in New York
17 City?
18          MR. CHUFF:  Objection.  Beyond
19          the scope of the deposition.
20     A    I don't know.  I had no idea where he
21 lived.
22     Q    Was Exhibit 35 the first time you had
23 met William G. in person?
24     A    No.  I had met him before this.
25     Q    On what occasion?

Page 127

HAN CHUNGUANG
1
2          MR. CHUFF:  I did not --
3          MS. DONNELLI:  An Object.
4          MR. CHUFF:  If you would have
5          let me finish, I would have gotten
6          there.
7          MS. DONNELLI:  I don't know what
8          more information you might have
9          revealed.
10         Can you repeat the question.
11         (The requested portion of the
12         record was read back by the
13         reporter.)
14     A    I don't want to answer this question
15 because this has nothing to do with this case.
16     Q    When you signed this Exhibit 35, what
17 gave you reason to believe that William G. had
18 money to loan to Eastern Profit?
19     A    Because at the time I called him, I
20 said I had a project that would need $1 million.
21 I asked him if he could lend me the money.  He
22 thought about it and he said okay, because at the
23 time we were good friends.
24     Q    You testified that you asked Mr. G to
25 lend you the money.  Do you mean you, Mr. Han,

Page 129

33 (Pages 126 to 129)

Han Chunguang
November 11, 2019

# EXHIBIT F

```
 1   UNITED STATES DISTRICT COURT

 2   SOUTHERN DISTRICT OF NEW YORK

 3   ----------------------------------x

 4   EASTERN PROFIT CORPORATION LIMITED,

 5            Plaintiff-Counterclaim Defendant,

 6                             Case No.

 7      -against-              18-cv-2185 JGK

 8   STRATEGIC VISION US, LLC,

 9            Defendant-Counterclaim Plaintiff,

10   vs.

11   GUO WENGUI a/k/a, MILES KWOK,

12            Counterclaim Defendant.

13   ----------------------------------x

14

15

16            VIDEOTAPED DEPOSITION

17                  OF

18            FRENCH WALLOP

19          New York, New York

20        Tuesday, February 12, 2019

21

22

23

24

25
```

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

<table>
<tr><td colspan="2">Page 2</td></tr>
<tr><td>1</td><td></td></tr>
<tr><td>2</td><td></td></tr>
<tr><td>3</td><td></td></tr>
<tr><td>4</td><td></td></tr>
<tr><td>5</td><td></td></tr>
<tr><td>6</td><td>Tuesday, February 12, 2019</td></tr>
<tr><td>7</td><td>9:58 a.m.</td></tr>
<tr><td>8</td><td></td></tr>
<tr><td>9</td><td></td></tr>
<tr><td>10</td><td>Videotaped Deposition of FRENCH WALLOP, at</td></tr>
<tr><td>11</td><td>the offices of Zeichner, Ellman & Krause LLP,</td></tr>
<tr><td>12</td><td>1211 Avenue of the Americas, New York, New York,</td></tr>
<tr><td>13</td><td>before Roberta Caiola, a Shorthand Reporter and</td></tr>
<tr><td>14</td><td>Notary Public within and for the State of New</td></tr>
<tr><td>15</td><td>York.</td></tr>
<tr><td>16</td><td></td></tr>
<tr><td>17</td><td></td></tr>
<tr><td>18</td><td></td></tr>
<tr><td>19</td><td></td></tr>
<tr><td>20</td><td></td></tr>
<tr><td>21</td><td></td></tr>
<tr><td>22</td><td></td></tr>
<tr><td>23</td><td></td></tr>
<tr><td>24</td><td></td></tr>
<tr><td>25</td><td></td></tr>
</table>

Page 4

| | | |
|---|---|---|
| 1 | INDEX | |
| 2 | WITNESS:   FRENCH WALLOP | PAGE |
| 3 | BY:       MR. GRENDI | 8 |
| 4 | BY:       MS. TESKE | 292 |
| 5 | | |
| 6 | LIST OF EXHIBITS | |
| 7 | WALLOP        DESCRIPTION | PAGE |
| 8 | Exhibit 1   Notice of Deposition | 24 |
| 9 | Exhibit 2   Document Bates stamped | 27 |
| 10 | Eastern 000017 | |
| 11 | Exhibit 3   Document Bates stamped | 30 |
| 12 | SVUS000077 | |
| 13 | Exhibit 4   Document entitled | 41 |
| 14 | "Three-Year Timeline" Bates | |
| 15 | stamped SVUS000080 | |
| 16 | Exhibit 5   Handwritten document | 65 |
| 17 | Exhibit 6   Document entitled "Time to | 73 |
| 18 | Get Them Beginning the | |
| 19 | Psycho-Political Campaign | |
| 20 | For China" | |
| 21 | Exhibit 7   Document entitled "1:  Anita | 84 |
| 22 | Yiu Suen" | |
| 23 | Exhibit 8   Research Agreement, | 107 |
| 24 | January 1, 2018 | |
| 25 | | |

Page 3

<table>
<tr><td>1</td><td>A P P E A R A N C E S :</td></tr>
<tr><td>2</td><td></td></tr>
<tr><td>3</td><td>ZEICHNER, ELLMAN & KRAUSE LLP</td></tr>
<tr><td>4</td><td>Attorneys for Eastern Profit Corporation Limited</td></tr>
<tr><td>5</td><td>    1211 Avenue of the Americas</td></tr>
<tr><td>6</td><td>    New York, NY 10036</td></tr>
<tr><td>7</td><td>BY:  ZACHARY GRENDI, ESQ.</td></tr>
<tr><td>8</td><td>    zgrendi@zeklaw.com</td></tr>
<tr><td>9</td><td></td></tr>
<tr><td>10</td><td>HODGSON RUSS LLP</td></tr>
<tr><td>11</td><td>    Attorneys for Guo Wengui a/k/a, Miles Kwok</td></tr>
<tr><td>12</td><td>    605 Third Avenue, Suite 2300</td></tr>
<tr><td>13</td><td>    New York, New York 10158</td></tr>
<tr><td>14</td><td>BY:  ERIN N. TESKE, ESQ.</td></tr>
<tr><td>15</td><td></td></tr>
<tr><td>16</td><td>PHILLIPS LYTLE LLP</td></tr>
<tr><td>17</td><td>Attorneys for Strategic Vision US, LLC</td></tr>
<tr><td>18</td><td>    340 Madison Avenue</td></tr>
<tr><td>19</td><td>    New York, New York 10173-1922</td></tr>
<tr><td>20</td><td>BY:  JOSEPH B. SCHMIDT, ESQ.</td></tr>
<tr><td>21</td><td>    jschmit@phillipslytle.com</td></tr>
<tr><td>22</td><td></td></tr>
<tr><td>23</td><td>ALSO PRESENT:</td></tr>
<tr><td>24</td><td>YVETTE WANG (Morning session only)</td></tr>
<tr><td>25</td><td>JAYSUN LOUSHIN, The Videographer</td></tr>
</table>

Page 5

| | | |
|---|---|---|
| 1 | LIST OF EXHIBITS | |
| 2 | WALLOP        DESCRIPTION | PAGE |
| 3 | Exhibit 9   Research Agreement dated | 126 |
| 4 | December 29, 2017 | |
| 5 | Exhibit 10  Signal messages, Bates | 186 |
| 6 | stamped Eastern-0000201 | |
| 7 | Exhibit 11  Background Report on Qing | 226 |
| 8 | Yao | |
| 9 | Exhibit 12  Signal message thread | 228 |
| 10 | Exhibit 13  Letter dated February 23, | 241 |
| 11 | 2018 | |
| 12 | Exhibit 14  Document Bates stamped | 247 |
| 13 | SVUS000040 and SVUS000041 | |
| 14 | Exhibit 15  Document entitled "Line-Item | 251 |
| 15 | Budget 1 Month Projected | |
| 16 | Cost Analysis" Bates stamped | |
| 17 | SVUS260 | |
| 18 | Exhibit 16  Invoice from Allied Special | 254 |
| 19 | Operations Group, Bates | |
| 20 | stamped SVUS000262 | |
| 21 | Exhibit 17  Document Bates stamped | 257 |
| 22 | SVUS000272 to SVUS000277 | |
| 23 | Exhibit 18  Document entitled "Subject | 260 |
| 24 | Chart," Bates SVUS000278 | |
| 25 | | |

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 6

```
 1                    LIST OF EXHIBITS
 2   WALLOP           DESCRIPTION              PAGE
 3   Exhibit 19   Strategic Vision's Responses   262
 4                and Objections to
 5                Plaintiff's First Set of
 6                Interrogatories
 7   Exhibit 20   Strategic Vision's             271
 8                Supplemental and Amended
 9                Response and Objections to
10                Plaintiff's First Set of
11                Interrogatories
12   Exhibit 21   Amended Answer and             275
13                Counterclaims
14   (Exhibits retained by Counsel.)
15
16   (*r) DOCUMENTS REQUESTED:
17        Page: 118              11
          Page: 253              22
18        Page: 273              6
19
20
21
22
23
24
25
```

Page 7

```
 1        THE VIDEOGRAPHER:  Good morning.  This
 2   is the beginning of media 1 in the
 3   deposition of French Wallop, in the matter
 4   of Eastern Profit Corporation Limited versus
 5   Strategic Vision US, LLC.
 6        Today's date is February 12, 2019.  My
 7   name is Jaysun Loushin, I am the
 8   videographer, and the court reporter is
 9   Roberta Caiola.  We are here with Huseby
10   Global Litigation.
11        Counsel, please introduce yourself,
12   after which the court reporter will swear in
13   the witness.  The time on the monitor is
14   9:58.
15        MR. GRENDI:  Good morning.  I'm Zach
16   Grendi.  I'm counsel for Eastern Profit
17   Corporation.  My law firm is Zeichner,
18   Ellman & Krause.
19        MR. SCHMIDT:  Joe Schmidt from Phillips
20   Lytle, on behalf of Strategic Vision as well
21   as the witness, French Wallop.
22        MS. TESKE:  Erin Teske with Hodgson
23   Russ, on behalf of third-party defendant
24   Miles Kwok.
25
```

Page 8

```
 1   FRENCH WALLOP, called as a witness, having been
 2   first duly sworn by a Notary Public of the State
 3   of New York, testifies as follows:
 4   EXAMINATION BY
 5   MR. GRENDI:
 6        Q.    Good morning, Ms. Wallop.  I'm Zach
 7   Grendi, as you just heard, counsel for Eastern
 8   Profit.  I'm just going to be asking you some
 9   questions today.
10            Just for the courtesy of the court
11   reporter and the clarity of the record, I'm just
12   going to ask that, please wait until after I
13   finish asking a question to answer it.  Unlike in
14   normal conversation, in a deposition you need to
15   allow one person to stop talking and the other
16   person to start.
17            Also, shrugs and nods are things that
18   the court reporter can't take down, so I ask that
19   you please answer all questions verbally.  And if
20   you need a break, just let me know, let anyone
21   know, we can take one.  We're going to try to
22   move through this -- these materials as quickly
23   as possible, but breaks are allowed.
24        A.    Thank you.
25        Q.    What's your full legal name?
```

Page 9

```
 1        A.    French Carter Wallop.
 2        Q.    And where do you reside?
 3        A.    1557 North 22nd Street, Arlington,
 4   Virginia 22209.
 5        Q.    And --
 6        A.    And I also have a Wyoming address.
 7        Q.    Do you have a Las Vegas address?
 8        A.    Yes.
 9        Q.    Where is that?
10        A.    It's on Lakes Avenue.  It's -- it's
11   where we use as our agent for the LLC for
12   Strategic Vision.
13        Q.    So that's Strategic Vision's address --
14        A.    Yes.
15        Q.    -- in Las Vegas?
16        A.    Not personal.
17        Q.    Okay.  What's your educational
18   background?
19        Q.    Where would you want to start?
20        Q.    You can start in the beginning, but --
21        A.    Kindergarten?
22        Q.    -- no need to go into great depth.
23   Just an overview, if that's all right.
24        MR. SCHMIDT:  From college up.
25        A.    I went to a school in Switzerland for
```

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 10

1 four years.  And then I was at the Ecole
2 D'Interpretes in Geneva.  And then I came back to
3 Georgetown University and got my linguistic's
4 degree in simultaneous interpreting.
5      Q.    Anything else?
6      A.    I did -- I didn't finish, but I went to
7 SAIS, The School of Advanced International Study,
8 which is part of Johns Hopkins; so it doesn't
9 count as a degree, sadly.
10      Q.    What about your work experience, let's
11 just say the last 20 years or so?
12      A.    Oh, my goodness.
13      Q.    You don't have to say everything.  Just
14 an overview.
15      A.    Well, I've run two companies, and
16 plus -- and I sold them in 2000.  And then in
17 about 2005, I started up my Strategic Vision
18 group.
19      Q.    In 2005, starting Strategic Vision, is
20 that what you've been doing ever since?
21      A.    Yes.
22      Q.    Any other employment that you have or
23 businesses that you're running, other than
24 Strategic Vision?
25      A.    Yes.  I have another company that's

Page 11

1 called Regency Mayfair Worldwide, and that works
2 overseas on projects.
3      Q.    What kind of projects?
4      A.    Family office groups.
5      Q.    What do you mean by that?  What kind of
6 projects do you do for family office groups
7 through this Mayfair company?
8      A.    Investment -- investment advisory.
9      Q.    Okay.  So nothing to do with
10 investigatory research or things of that nature?
11      A.    No.
12      Q.    How do you know Michael Waller, or John
13 Michael Waller?
14      A.    Well, Mike Waller is the way we refer
15 to him, or Dr. Waller.  Gosh, I've known Mike for
16 many, many years.  I would say, certainly,
17 certainly 20.  And our paths have crossed many
18 times in Washington on both international affairs
19 and intelligence groups.
20      Q.    When did Mr. Waller -- well, I'll call
21 him Dr. Waller.
22      A.    Yes, he is Dr. Waller.
23      Q.    He didn't insist on it the last time,
24 but fair enough.  When did you start -- or when
25 did Strategic Vision start working with

Page 12

1 Dr. Waller?
2      A.    I would say in the last year and a
3 half.
4      Q.    And how did that come about?
5      A.    We had an -- I had an introduction by
6 Bill Gertz and Lianchao Han regarding this
7 particular client.  I'm not sure, by the way, how
8 to refer to this client.  We've referred to him
9 as Miles Guo, G-u-o.
10      Q.    Eastern Profit is fine.
11      MR. SCHMIDT:  Well, you know, you refer
12 to him however you think the client is.
13      A.    He has about six names, so I'm not sure
14 what goes into the record.
15      Q.    Whatever you know.
16      A.    We refer to him as Miles Guo.  But I
17 was referred to him by both Bill Gertz, the
18 Washington Times and the Free Beacon, and
19 Lianchao.  And I -- when they approached me,
20 that's when I decided Mike was one of the people
21 I really wanted to work with on this.
22      Q.    But I wanted to ask you.  Have you ever
23 worked with Dr. Waller on any investigatory
24 research before, as you said, you were introduced
25 to Mr. Guo?

Page 13

1      A.    No.  No.
2      Q.    Since you were introduced to Mr. Guo,
3 have you and Dr. Waller worked on any other
4 investigatory research together for another
5 client?  You don't have to name them.
6      A.    I can't name them.
7      Q.    No, I'm saying whether you have or have
8 not provided --
9      A.    Yes.
10      Q.    -- a service to another client?
11      A.    Yes, but -- yes.
12      Q.    Okay.  I didn't ask you to name the
13 client.
14      A.    Don't worry.
15      Q.    And how many other clients have you and
16 Dr. Waller worked on investigatory research for?
17      A.    I can't answer that.
18      Q.    So you're refusing to answer that
19 question?
20      MR. SCHMIDT:  No, no, I don't think
21      that's what she's saying.
22      MR. GRENDI:  Okay.
23      Q.    How many?
24      A.    Four.
25      MR. SCHMIDT:  Approximately?  Okay.

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 14

1      THE WITNESS:  Approximately, yeah.
2      MR. GRENDI:  I'm going to ask that you
3  not try to interrupt.
4      MR. SCHMIDT:  I'm trying to keep you
5  guys moving forward.
6      MR. GRENDI:  I appreciate that, but I'm
7  not trying to --
8      MR. SCHMIDT:  I think you knew what she
9  meant and kind of accused her of refusing to
10  answer.  I don't think that was appropriate,
11  so that's when I had to step in, okay?
12      MR. GRENDI:  I didn't think that that's
13  what I was doing.  I was --
14      MR. SCHMIDT:  Okay.  That's how it was
15  coming across on the record, so I clarified
16  it.
17      MR. GRENDI:  Okay.  Fair enough.
18      Q.   So you and Dr. Waller have worked on
19  approximately five different investigatory
20  research projects with Strategic Vision?
21      A.   Yes.
22      Q.   And none of them preceded your
23  introduction to Mr. Guo?
24      A.   No.
25      Q.   No, they did not precede --

Page 15

1      A.   No.
2      Q.   -- or --
3      A.   They did not.
4      Q.   Prior to working with Dr. Waller, did
5  you work with someone else in terms of
6  investigatory research for Strategic Vision?
7      A.   When?
8      Q.   Before you started working with
9  Dr. Waller, so let's say prior to a year and a
10  half ago.
11      A.   Yes.
12      Q.   And was it just one entity or several
13  entities?
14      A.   I can't remember.
15      Q.   Without going into any detail.  Was
16  that a similar arrangement to your arrangement
17  with Dr. Waller in terms of the provisioning of
18  investigatory research?
19      A.   No.
20      Q.   How was it different?
21      A.   I can't remember.
22      Q.   When did you stop working with someone
23  else on investigatory research prior to working
24  with Dr. Waller?
25      A.   That's an odd question.  I don't know

Page 16

1  how to answer it.
2      Q.   You don't understand the question?
3      A.   No, I don't understand the question.
4      Q.   Okay.  What I'm saying is, when did you
5  stop working with someone else in terms of
6  providing investigatory research?
7      A.   I didn't say I had stopped.
8      Q.   So you work with, concurrently, other
9  individuals who provide investigatory research
10  for Strategic Vision?
11      A.   From time to time.
12      Q.   Okay.  So you don't have an exclusive
13  relationship with Dr. Waller in terms of
14  investigatory research that he provides?
15      A.   No.
16      Q.   Okay.  You said that you founded
17  Strategic Vision in 2005?
18      A.   I think so.  I'd have to look.
19      Q.   Okay.  Was anyone else involved in the
20  company at the time?
21      A.   No.
22      Q.   So it's always been your company?
23      A.   Yes.
24      Q.   And you've never had any other
25  officers?

Page 17

1      A.   No.
2      Q.   Or directors?
3      A.   No.
4      Q.   Or unit holders?
5      A.   No.
6      Q.   Have there been any other principals of
7  Strategic Vision, other than you?
8      A.   No.
9      Q.   So what's your role in Strategic
10  Vision?
11      A.   I run certain advisory clients and work
12  with them as clients, private clients.
13      Q.   Do you have a title, like CEO?
14      A.   Yes, I think it's CEO.
15      Q.   So what services does Strategic Vision
16  provide to its clients?
17      A.   I've already answered that.
18      Q.   I don't think you have.
19      A.   I said advisory services.
20      Q.   What do you mean by advisory services?
21      A.   Advisory client services.
22      Q.   Does that include investigatory
23  research?
24      A.   Yes, in some cases.
25      Q.   What does that investigatory research

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 18

1  involve?
2       A.    Exactly as it says.  Each client is
3  different, isn't it?
4       Q.    Right.  What I'm asking is, what does
5  Strategic Vision's investigatory research
6  services entail?
7       A.    Every client is different.
8  Investigatory services is exactly that, depending
9  upon how you want to define investigations.
10      Q.    How does Strategic Vision provide that
11  service, what does it do?
12      A.    Investigate.
13      Q.    How?
14      A.    The usual ways.
15      Q.    What are the usual ways?
16      A.    I find it's a repetitive question.
17      Q.    I don't care if you find it a
18  repetitive question.  What I'm asking you to do
19  is answer my question.
20            I want to know how Strategic Vision
21  performs investigations?
22      A.    We look everybody up on Facebook.
23      Q.    That's it?
24      A.    Sure.  It's an idiotic question.
25            MR. SCHMIDT:  Don't comment.  Just

Page 19

1       answer the question.
2       Q.    Excuse me, ma'am, I'm just trying to
3  understand things.  And I think -- maybe you
4  don't understand how a deposition works, but I'm
5  just trying to understand basic information.  You
6  might think something is obvious or intuitive,
7  but the record doesn't know that and we don't
8  know that.  So I please ask you to cooperate.
9       A.    Of course.
10      Q.    So other than looking people up on
11  Facebook, how does Strategic Vision perform
12  investigations?
13      A.    We do investigative background work on
14  individuals that other clients are interested in
15  pursuing information on.
16      Q.    So that background work, does that
17  involve surveillance or electronic research; give
18  me a little detail on what it means to
19  investigate someone for background?
20      A.    Precisely.  Just as you said.
21      Q.    Does Strategic Vision do that
22  investigatory research itself?
23      A.    No.
24      Q.    So you never perform any research
25  yourself?

Page 20

1       A.    No.
2       Q.    Who does?
3       A.    Whomever we bring on board to do the
4  investigation.
5       Q.    So Strategic Vision hires independent
6  contractors?
7       A.    Our own team of people that we have
8  worked with off and on through the years, yes.
9       Q.    Do you or Strategic Vision provide any
10  input or edits to any of the reports?  I mean,
11  what does Strategic do in terms of --
12      A.    We review the reports.
13      Q.    Do you ever edit them?
14      A.    I wouldn't say edit them, no.
15      Q.    How does Strategic Vision contribute to
16  the end work product of an investigatory research
17  report?
18      A.    Well, when we get them, we look at them
19  and we read them, depending upon who the teams
20  are, and discuss them, and then produce them.
21  Sometimes they can be verbal, sometimes they can
22  be on flash drives.  It depends what the client
23  needs.
24      Q.    Does Strategic Vision -- well, let me
25  ask you this.  Strike that.

Page 21

1            Do you ever access a network of
2  individuals that you're familiar with to get
3  information for investigatory research?
4       A.    Sometimes.
5       Q.    And just, without naming any names,
6  describe what that entails?
7       A.    Experience.
8       Q.    Right.  Do you speak to individuals in
9  the intelligence community?
10      A.    Yes.
11      Q.    Politicians?
12      A.    Sometimes.
13      Q.    People in the business community?
14      A.    Yes.
15      Q.    And then you take that information and
16  perhaps include that in an investigatory research
17  report, or how does that work?
18      A.    It depends on the client.
19      Q.    Give me an example of a client where
20  you did access that network in order to
21  contribute?
22      A.    I can't do that precisely.
23      Q.    Not with any specificity?
24      A.    Just as I said.  We are very careful
25  about the investigations that we do, they're

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 22

1   private, and if they are what the client has
2   requested, that's what we do.
3           MR. SCHMIDT:  French, maybe you can
4       give a response to these questions just kind
5       of a 30,000-foot level in general of what
6       you do would, different ideas you've done
7       over the years, that might be helpful.
8           THE WITNESS:  Okay.
9           MR. SCHMIDT:  Like types of things
10      you've done to research people, that sort of
11      thing.
12      Q.     Please go ahead.
13          MR. SCHMIDT:  Yeah, go ahead.
14      A.     With what?
15      Q.     What he just asked.
16      A.     Go ahead, ask me the question again.
17      Q.     Can you please give an overview of the
18  types of research investigations that Strategic
19  Vision does and how they do them?
20      A.     We look at individual clients or groups
21  or companies or areas of interest on behalf of
22  our clients, whether it's international, whether
23  it's domestic.
24      Q.     And how many investigations over the
25  years has Strategic Vision handled?

Page 23

1       A.     Oh, my goodness, I have no idea.
2       Q.     Ballpark?
3       A.     I have no idea.
4       Q.     Fifty?
5       A.     No.  I would say probably, maybe 15,
6   20, something like that.
7       Q.     That's since 2005?
8       A.     It's probably more than that, but since
9   2005, yeah.
10      Q.     Okay.  And other than investigatory
11  services, what kind of services does Strategic
12  Vision provide?
13      A.     As I've said earlier, we work with
14  clients on advisory services for family offices.
15      Q.     That's part of Strategic Vision's
16  business?
17      A.     I've already stated that.
18      Q.     You mentioned another entity, that's
19  why I wasn't sure if you'd separated the two
20  entities or you --
21      A.     No, you were very sure.  You didn't --
22  that's not a fair statement.
23          MR. SCHMIDT:  Just answer the question,
24      French.
25          THE WITNESS:  Okay.

Page 24

1       Q.     And Strategic Vision doesn't have any
2   employees?
3       A.     No.
4           MR. GRENDI:  Let's do Exhibit 1 here.
5           (Wallop Exhibit 1, Notice of
6       Deposition, marked for identification.)
7       Q.     Ms. Wallop, do you recognize this
8   document?
9       A.     I'm sure it's in the file.  I don't
10  recognize it particularly.
11      Q.     If you turn to the third page there, do
12  you see that, Attachment A?
13      A.     Yes.
14      Q.     And just generally speaking, do you
15  understand that this is a 30(b)(6) deposition
16  notice?
17      A.     Yes.
18      Q.     And did you review this document prior
19  to today?
20      A.     Actually, I did not.
21      Q.     Did you prepare for this deposition in
22  any way?
23      A.     Of course.
24      Q.     You met with your attorneys?  And I'll
25  just caution you right away, don't tell me

Page 25

1   anything you said to your attorneys or your
2   attorneys said to you.
3       A.     Well, exactly, of course I discussed it
4   with my attorneys.
5       Q.     And did you meet and go over documents
6   in preparation for this deposition?
7           MR. SCHMIDT:  You can say yes or no.
8       A.     Yes.
9       Q.     How long did you do that for?
10      A.     Today, or ever, or?
11      Q.     All in, sure, all together.
12      A.     Sure.  I have no idea what the answer
13  would be.
14          MR. SCHMIDT:  Just do the best you can.
15      A.     Okay.  How about -- for today's
16  deposition?
17      Q.     Yes.
18      A.     Okay.  How about 3 hours, by telephone
19  or something.
20          MR. SCHMIDT:  We had met in person
21      before, you should tell him that.
22      A.     Oh, we had a coffee before, or I had a
23  coffee.
24      Q.     And you prepared with your attorney
25  here, Mr. Schmidt?

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 26

1   A.    Yes.
2   Q.    Did you go over any documents?
3   A.    No.
4        MR. SCHMIDT:  I think you should tell
5   him that, at the initial meeting we had, we
6   went over the --
7   A.    Oh, well, of course --
8        MR. SCHMIDT:  -- the documents.  That
9   counts as well.  You should --
10       THE WITNESS:  I thought he was talking
11  about the 30 minutes that we met for coffee
12  before we walked across the street.  So,
13  okay.
14       MR. SCHMIDT:  Fill out the record.
15       THE WITNESS:  So, all right.  Yeah, no,
16  obviously.
17  Q.    Let's clean that up, just so I
18  understand.  Did you go over documents in
19  preparation for this deposition?
20  A.    Yes.
21  Q.    Okay.  Let's go to the next document.
22  Just generally speaking, you understand that I'll
23  be asking questions addressed to Strategic
24  Vision.  In response to those, you'll be
25  answering on behalf of Strategic Vision; you

Page 27

1   understand that, right?
2   A.    Correct.
3        MR. GRENDI:  This is Exhibit 2.
4        (Wallop Exhibit 2, Document Bates
5        stamped Eastern 000017, marked for
6        identification.)
7   Q.    Ms. Wallop, I've handed you a document
8   that has the Bates number Eastern 17 in the
9   bottom right-hand corner of the first page, do
10  you see that?
11  A.    Correct.
12  Q.    Just so you -- for the clarity of the
13  record and for your own edification, sometimes
14  I'll be referring to documents by their Bates
15  number, just to be clear, and I just want to make
16  sure you know what a Bates number was.
17  A.    Thank you.
18  Q.    Do you recognize this document?
19  A.    It looks like a LinkedIn document or
20  print-off.
21  Q.    So did you create the content in this
22  document?
23  A.    Yes.
24  Q.    And did you ever give this information
25  to Mr. Guo or Yvette Wang or Michael -- or

Page 28

1   Dr. Waller -- or, I'm sorry, Lianchao Han?
2   A.    It's public.
3   Q.    I understand that.
4   A.    I have no idea whether they saw it or
5   not.
6   Q.    I'm asking whether you personally gave
7   it to them?
8   A.    I have no idea.
9        MR. SCHMIDT:  Do you remember giving it
10  to them?
11       THE WITNESS:  No.
12  Q.    Okay.  And it says here, "over a
13  40-year period, the principal has developed and
14  maintained connections with many U.S.
15  administrations, Congress, DOD, DOE and other
16  agencies."  Do you see that?
17  A.    Correct.
18  Q.    And that's your network of contacts
19  being referred to there?
20  A.    Correct.
21  Q.    And if you look a little further down
22  the page, it mentions strategic research, do you
23  see that?
24  A.    Yes.
25  Q.    Is that investigatory research; I mean,

Page 29

1   what does that mean?
2   A.    It can be.
3   Q.    What about competitive intelligence,
4   that's the last item there?
5   A.    Yes.  What about it?
6   Q.    Is that inclusive of investigatory
7   private research or investigations?
8   A.    In some cases, yes.
9   Q.    Is private investigations a specialty
10  of Strategic Vision or does it really provide a
11  broader suite of services?
12  A.    Broader suite, but it's inclusive of
13  that, if required.
14  Q.    Would you consider investigatory
15  research a core service of Strategic Vision?
16       MR. SCHMIDT:  Objection.  Go ahead.
17  A.    No.
18  Q.    So it's kind of like a side service
19  that Strategic Vision provides?
20       MR. SCHMIDT:  Same objection, but go
21  ahead.
22  A.    It depends on the client's request.
23  Q.    So sometimes it's the general focus of
24  Strategic Vision's service to a client and other
25  times it's not even part of the service?

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 30

1    A.    Correct.

2    Q.    Does Strategic Vision provide lobbying

3  services?

4    A.    Again, that depends on the client.  We

5  don't do it directly, but we will work with

6  people that are lobbyists.

7    Q.    So sometimes --

8    A.    Sometimes.

9    Q.    -- Strategic Vision provides lobbying

10  services?

11    A.    Sometimes, yes.

12          MR. GRENDI:  This is 3.

13          (Wallop Exhibit 3, Document Bates

14      stamped SVUS000077, marked for

15      identification.)

16    Q.    Ms. Wallop, do you recognize this

17  document?

18    A.    I do.

19    Q.    What is it?

20    A.    It is a preliminary sort of vision for

21  Miles Guo, for our first meeting, I believe, with

22  him, that both Mike Waller, Dr. Waller and I

23  worked on.

24    Q.    So the handwriting on the top right

25  corner, is that your handwriting?

Page 31

1    A.    Yes.

2    Q.    And when did you make that note, if you

3  recall?

4    A.    I'd have to -- to look on my paper

5  calendar.  I don't remember.

6    Q.    You have a paper calendar that you

7  keep?

8    A.    No.  I'd have to look -- I'd have to

9  look.  I remember it was sort of -- there was --

10  there was one meeting in early December, and I

11  don't have that with me.

12    Q.    Ms. Wallop, do you keep a calendar?

13    A.    No, I don't keep anything on -- I keep

14  notes, sticky notes, so.

15    Q.    You don't keep like a Google

16  calendar --

17    A.    No.

18    Q.    -- or electronic calendar?

19    A.    God, no.

20    Q.    You keep paper Post-it notes to track

21  your meetings and schedule?

22    A.    Yes.

23    Q.    How were you introduced to Mr. Guo?

24    A.    Through Bill Gertz and Lianchao Han.

25    Q.    And when did that come about?

Page 32

1    A.    I think sometime in late October or

2  early November.

3    Q.    Of what year?

4    A.    2017.

5    Q.    Do you recall if it was Mr. Gertz or

6  Mr. Han that called you, or how did that

7  interaction occur?

8    A.    That's a good question.  I think it was

9  Bill Gertz.  I think he may have called me.

10    Q.    And what did he tell you?

11    A.    He knew that I had been working in the

12  past for Taiwan and had been very active in

13  pro-democracy work, and I think he said at that

14  point he would like to have lunch with me, and,

15  possibly, Lianchao was at that first lunch.  I

16  think that was how it went.

17    Q.    Those were the three people who were

18  present at that lunch?

19    A.    Yes.  The three of us, yes.

20    Q.    And what was discussed there?

21    A.    He discussed Mr. Guo, and that he had

22  met with him, I guess, a number of times, I don't

23  know over what period of time, but that he

24  believed that he was looking for a group that

25  could help change his -- Mr. Guo -- Miles Guo's

Page 33

1  image in America.  He explained a little bit

2  about Miles Guo's issues, and we discussed at the

3  time how perhaps there might be a way of helping

4  him stay in the United States.

5    Q.    What were the issues that you just

6  mentioned?

7    A.    Pro-communist people that were

8  apparently after him.  There were many lawsuits

9  apparently that had been filed against Mr. Guo.

10  We didn't know anything about Mr. Guo, per se,

11  other than some of the media reports.

12          So Lianchao suggested that we meet with

13  him, and I said, well, I will -- I'll think about

14  it and get back to you.

15    Q.    And so, you said before that you knew

16  Mr. Gertz from years in politics or what's

17  your --

18    A.    He used to be, he still is, he's still

19  at the Washington Times, and he writes for the

20  Washington Times, and he's now with the

21  Washington -- Washington Times.

22          MR. SCHMIDT:  Times or Post?

23          THE WITNESS:  Washington Times.  Good

24      God, not the Washington Times.

25    Q.    It's a different -- it's a different

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 34

1  outfit.
2      A.    Yeah.  And the -- it's certainly
3  conservative, it was run under the time when
4  Arnaud de Borchgrave was the editor, along with
5  several other close friends, and he's now at the
6  Washington Free Beacon, I think, mostly.
7      Q.    Is that another right of center
8  publication?
9      A.    Um-hum.  I think I would call it a
10  center and conservative.  I wouldn't call it
11  right of center.
12      Q.    I was --
13      A.    I mean, really?
14      Q.    -- asking for your -- I was asking for
15  your understanding of it.
16      A.    Well, you've got my understanding of
17  it.
18      Q.    Thank you.
19      A.    You're welcome.
20      Q.    And how do you know Lianchao Han?
21      A.    Lianchao and I have crossed paths in
22  Washington off and on over the years, maybe
23  because of some of the Taiwan activities in
24  Washington.  But I've always sort of known him
25  and liked him.  I never worked with him.  But

Page 35

1  he's an excellent individual.
2      Q.    Did Strategic Vision pay any referral
3  fees or any other consideration to Mr. Han for
4  introducing Mr. Guo to you?
5      A.    Good Lord, no.
6      Q.    What about Mr. Gertz?
7      A.    Never.
8      Q.    Okay.  And going back to this first
9  meeting document.  Did you present this document
10  to Mr. Guo or was this just you and Mr. Waller's
11  notes?
12      A.    I know that we presented one that was
13  very similar to this, and I think a bit more --
14  it might have been a bit more extensive, but it
15  encapsulated.  We were probably trying to keep it
16  short and concise, but we did -- we did work on
17  this vision based upon what both Mr. Gertz and
18  Lianchao had told us about him and what his sort
19  of ambitions were for remaining in the United
20  States.
21      Q.    So did you and Dr. Waller create this
22  document after your meeting with Mr. Han and
23  Mr. Gertz?
24      A.    Yes.
25      Q.    And how did that collaboration come

Page 36

1  about?
2      A.    Well, I talked -- I mentioned to Bill,
3  I said, one of the people that I like a lot and
4  have worked with on a couple of things, but not
5  monetary, but just ideological, was Dr. Waller,
6  and I'd like to bring Dr. Waller in on this.  And
7  he said, wow, that would be phenomenal.  So, here
8  we are.
9      Q.    And did you speak to Mr. Guo before
10  putting this document together or was this just
11  based on your conversations with Mr. Han and
12  Mr. Gertz?
13      A.    I know that we had a preliminary one,
14  then we met with Mr. Guo, we did something
15  similar to this and gave it to him, I believe,
16  and -- and then we had, obviously, several other
17  meetings after that with Mr. Guo.
18      Q.    So, just speaking about this first
19  meeting.  Where did it occur?
20      A.    With Mr. Guo?
21      Q.    Yes.
22      A.    Okay.  In his apartment at the
23  Sherry-Netherland, his penthouse.
24      Q.    And when was that?
25      A.    I don't have a date on here, so I can't

Page 37

1  tell you.
2      Q.    From your memory.
3      A.    Well, it would have been in December at
4  some point.
5      Q.    December 2017?
6      A.    Yes, sorry.
7      Q.    That's okay.  What occurred at that
8  meeting?  What did you present and what did
9  Mr. Guo say?
10      A.    I believe Lianchao was also there -- I
11  know he was there, and Dr. Waller and I were
12  there, and we discussed his -- that is, Miles
13  Guo's life, his intentions, his questions about
14  investigative work; all of that was part of the
15  conversation.
16          He wanted to be -- he wanted to have a
17  presence in Washington, he wanted to buy real
18  estate in Washington, he wanted to buy a very
19  large bank building in Washington right across
20  from the White House, he wanted to buy a huge
21  house in Washington.  All of these things were
22  part of his sort of image building.
23      Q.    And those were his ideas?
24      A.    Yes.
25      Q.    But you hadn't met with Mr. Guo before

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

1  this meeting, right?
2      A.    No.  But the meeting went on for hours
3  and hours and hours.  You're asking what was the
4  content of the meeting.
5      Q.    Yes.
6      A.    Yes, that's what I'm saying.
7      Q.    So was this document written during the
8  meeting or before?
9      A.    I think this one may have been -- may
10  have been before, but -- yes, I think it was
11  before, because it doesn't mention the real
12  estate and so forth that he got into during the
13  meeting.  So this might have been sort of like
14  a -- it is sort of a vision paper, based on a
15  conversation with Mr. -- with Bill Gertz and with
16  Lianchao Han.
17      Q.    What do you recall saying about
18  Strategic Vision's capabilities and background?
19  Actually, let's just start with capabilities.
20          Do you recall presenting about what
21  Strategic Vision could do for Mr. Guo?
22      A.    We were talking ideologically mostly
23  about what could be done to help present his
24  views on communist China, on mainland China.  And
25  so we didn't get into specifics at the very

1  beginning.  We just started sort of having an
2  initial conversation about how -- how we felt he
3  could be represented in Washington and how we
4  could show his positive side.
5      Q.    And did you explain what Strategic
6  Vision does or how Strategic Vision could help
7  with that?
8      A.    Probably.
9      Q.    Do you recall what, if anything, you
10  said about that?
11      A.    Not precisely, no.  Generalities.  This
12  was someone we just met, and it is the custom in
13  Asia not to dive into a lot of details unless
14  you're asked.
15      Q.    So did Mr. Lianchao Han or Mr. Guo ask
16  about Strategic Vision's capabilities?
17      A.    Eventually.
18      Q.    But not at this meeting?
19      A.    Not entire -- I don't recall.
20      Q.    Okay.
21      A.    But they could have, but I don't
22  precisely recall.
23      Q.    Was investigatory research discussed in
24  any detail at this first meeting?
25      A.    It could have been.  It could have

1  been.
2      Q.    What do you remember about that?
3      A.    I remember that we discussed that Miles
4  Guo said that he had a number of people that he
5  wanted to know more about that were in mainland
6  China, but we didn't have any specifics at that
7  time what he was talking about.
8      Q.    Did Strategic Vision mention that it
9  could provide that information or that it had
10  that capability?
11      A.    I don't recall.  It could have.
12      Q.    Turning to the last page there, SV79.
13  It says, "Mr. G should maintain his statesmanlike
14  status by not engaging in everyday defense or
15  counterattack, and should leave it up to his own
16  surrogates."
17          Do you see that?
18      A.    Where is that?
19      Q.    It's the first sentence of the last
20  paragraph.
21      A.    Oh, the regime, yeah.  Okay.  "Those
22  surrogates will be in journalism, academia,
23  business, policy."  Yes, yes.  Okay.
24      Q.    Do you remember talking about that
25  subject at this meeting?

1      A.    Probably.
2      Q.    And what do you remember?
3      A.    I don't remember precisely.  It's over
4  a year ago.
5      Q.    And you don't remember what Mr. Guo
6  said about that, or anybody else?
7      A.    It was a general, initial conversation
8  with somebody that we did not know, and we were
9  asked to produce something that we felt could be
10  a good vision for him to consider, perhaps, yeah.
11          (Wallop Exhibit 4, Document entitled
12      "Three-Year Timeline" Bates stamped
13      SVUS000080, marked for identification.)
14      Q.    Do you recognize what's been marked as
15  Waller 4?
16      A.    Yes.
17      Q.    And what is this document?
18      A.    Wallop.
19      Q.    Oh, sorry, Wallop.  I apologize.  The
20  W. Wallop 4.
21      A.    Yes.
22      Q.    Did you create this document?
23      A.    Yes.  Mike and I did.
24      Q.    When was that?
25      A.    That was at the second meeting with

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 42

1   Miles Guo.
2        Q.     So you remember literally typing and
3   creating this document during the meeting?
4        A.     No.  Prior to the meeting.
5        Q.     Okay.  And when was this second
6   meeting?
7        A.     Again, I'd have to ask Mike.  I think
8   it was -- I know it was in December of 2017.
9        Q.     And who was present?
10       A.     Dr. Waller, Mike Waller, myself,
11  Lianchao, and, obviously, Miles Guo.
12       Q.     What was Lianchao's role in the
13  meeting; was he translating?
14       A.     Yes, mostly.  And explaining, walking
15  through some of the explanations, not only the
16  translation, but, again, we were having a
17  generalized conversation.
18       Q.     And just for the clarity of the record.
19  Mr. Han was translating for Mr. Guo?
20       A.     Yes.  Both ways.
21       Q.     Of course.
22       A.     Mr. Guo speaks very good English, so he
23  doesn't really need an interpreter, but it's
24  better to have one.
25       Q.     Did Mr. Han actually read this whole

Page 43

1   document to Mr. Guo and translate it for him; was
2   that part of the meeting?
3        A.     Yes.  I think we walked through each
4   one of these paragraphs, yes.
5        Q.     And going back to the prior document,
6   Exhibit 3.  Was the same process employed where
7   Mr. Han, to your understanding, was translating
8   the document for Mr. Guo?
9        A.     To my understanding, yes.
10       Q.     But, obviously, you don't speak
11  Mandarin, do you?
12       A.     A little bit.  Not as much as I'd like.
13       Q.     Fair enough.  But you're not fluent?
14       A.     No.
15       Q.     Okay.  And so, to the extent you
16  recall, what occurred at this second meeting?
17       A.     This was a broader timeline based on
18  the first meeting and the first vision paper that
19  we had in our discussion, and this gave sort of a
20  menu, so to speak, a la carte, or menu of ideas
21  as to how we could help Miles Guo, at his
22  request, to set up sort of a strategic plan for
23  him.
24       Q.     So what was his response to the
25  presentation that you made?

Page 44

1        A.     He liked it very much.
2        Q.     Does that include all of the items in
3   this timeline or was he more receptive to some
4   services than others?
5        A.     It was interesting.  He was very keen
6   on having a -- a big, a huge, large presence in
7   the way of a residence, and then also purchasing
8   the American Security and Trust building across
9   from the Treasury Department in Washington as an
10  office building for him.  He liked the idea of
11  the Washington-based educational and cultural
12  foundation, which we thought might be a good way
13  of exposing him to or introducing him to
14  Washington and the Hill, and working on a more
15  positive anti-communist role.
16       Q.     And in terms of this real estate
17  portion of it, acquiring what, a residence?
18       A.     Yes.
19       Q.     And also an office building, I guess,
20  for a foundation?
21       A.     Yes.  I just said that.
22       Q.     Yes.  I understand.  And so, is that a
23  service that Strategic Vision typically provides
24  for clients?
25       A.     Yes, sometimes.

Page 45

1        Q.     So Strategic Vision will help people
2   locate properties and acquire them?
3        A.     Correct.
4        Q.     Is that in the D.C. area or nationwide;
5   how does that work?
6        A.     Yes, both.  D.C. area, nationwide,
7   globally, whatever.
8        Q.     And how was that, let's just call it
9   real estate project, followed up on subsequently?
10       A.     Well, actually, Lianchao -- I picked up
11  Lianchao and Yvette at a hotel downtown off M
12  Street, because she wanted to see all of the
13  properties that we had in mind.  I think it must
14  have been obviously -- honestly I can't remember.
15  I think it was -- I think it was after this
16  second meeting, when she came to Washington, and
17  Lianchao lives in Washington, so we picked him
18  up, and I had a brochure, a set of brochures of
19  homes and the office building that we drove
20  around, because there are a lot of cameras in
21  Washington.
22              We put her in the back seat with
23  Lianchao.  I have a Jeep, so those windows happen
24  to have a, whatever it is, sun -- more blacked
25  out windows than the front two seats.

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 46

1    Q.    Tinted windows?
2    A.    Tinted, yes.  So we drove them around,
3    and I pointed out the homes.  I never made any
4    appointments to see the homes, because the last
5    thing we wanted to do was sort of bring Yvette or
6    anybody else in to see the homes.  We had the
7    brochures that had all of the interiors in the
8    homes, photographs, so she could easily see it.
9          We went around Kalorama, we went around
10   Georgetown, we went into what they call Spring
11   Valley.
12   Q.    And, Ms. Wang, was this the first time
13   you met her?
14   A.    No.  She was also in one of those
15   meetings, probably in the first meeting we had,
16   this one, sorry; whenever the first meeting was
17   with Guo, she was present.
18   Q.    So, I'm sorry, I just want to clarify
19   the record then.  Who was present at the first
20   meeting that you had with Mr. Guo?
21   A.    I think Yvette, Lianchao, Dr. Waller,
22   myself and Miles Guo.
23   Q.    Okay.  And when was this --
24   A.    Walkabout?
25   Q.    Yeah.  Little soldiering through the

Page 47

1    D.C. metro area?
2    A.    It was sometime in December.  It must
3    have been, you know, somewhere from the --
4    somewhere between the 10th and the 20th of
5    December of 2017.
6    Q.    And what did you understand that
7    Ms. Wang and Mr. Guo were doing with that trip?
8    What was their purpose in being there?
9    A.    She wanted to see the brochures that we
10   had, and I think I -- I can't remember, I think I
11   showed the Evermay property to Miles Guo during
12   that second meeting.  I happen to have a copy of
13   it with me.  I had to ask to get copies of the
14   other homes from Washington Fine Properties so
15   that I knew what he wanted as far as large
16   estates or large homes, and he wanted to have a
17   presence, he wanted to be close enough to Capitol
18   Hill.
19   Q.    And just going back.  You didn't show
20   them the interiors of the property because you
21   were concerned about surveillance or --
22   A.    Well, the way it works is, if it's in
23   Washington particularly, if you take an
24   individual in, you have to identify the
25   individual into multi-million-dollar, 10, 20, 30,

Page 48

1    $50 million homes.  You have to give a full
2    background.  I can say -- I can go in and look at
3    it, but when I bring somebody like Yvette, and
4    then I'd have to also identify Lianchao; it was
5    better just to drive around, take a look, decide
6    what sort of looked like something that both
7    Lianchao and Yvette thought might fit his
8    persona, and then go back and go and look at the
9    homes, if that's what he wanted to do.
10   Q.    Did anything come of that --
11   A.    No.
12   Q.    -- process?
13   A.    No.  And we did make a big foray into
14   trying to get the Riggs Bank building, which is
15   something that he wanted -- I'm sorry, excuse me,
16   the American Security and Trust building, which
17   is what he wanted, opposite the Treasury
18   Department.
19   Q.    And what was that effort, if you could
20   just generally describe that?
21   A.    Well, I called three or four people
22   that I think were private owners somehow through
23   a trust, and they told me repeatedly it wasn't
24   for sale.  And then I finally found out that of
25   course it was for sale at the right price.

Page 49

1    Q.    Sure.
2    A.    And we hadn't even gotten down that far
3    down the lane.  So I don't know what the number
4    would have been, but it was substantial, hundreds
5    of millions.
6    Q.    And you were -- so were those the only,
7    we'll call them sellers, you were in contact with
8    in connection with this real estate project?
9    A.    Well, on the office building, yes.
10   Q.    What about on residential properties?
11   A.    Well, with Evermay, I was in touch --
12   the previous owner of Evermay, sadly, who just
13   died in November this year, the previous owner
14   had been a childhood friend since I was 12, and
15   they had recently sold, probably five years prior
16   to this, they had recently sold Evermay to a
17   Japanese couple in the pharmaceutical business.
18         Fast forward, Japanese couple was
19   getting divorced.  Fast forward as well, the
20   previous owners of Evermay had a first right of
21   refusal; should they decide to buy the property
22   back from the Japanese couple, they could, in
23   their contract.
24         So I went to -- his name was Harry
25   Belin.  I went to Harry Belin and talked to him

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 50

1    about Evermay for Miles Guo, because it would
2    have been a perfect, perfect house for Miles.  He
3    could have incorporated his 501(c)(3) in that
4    house, because it was used as a 501(c)(3)
5    foundation by both Harry Belin and the Japanese
6    pharmaceutical couple.
7            Since there was no movement, we didn't
8    go any further on it, because Miles obviously
9    didn't -- I don't know.  I don't know what
10   happened.
11       Q.    You kind of anticipated my next
12   question.  When did this kind of process stop or
13   end?
14       A.    Miles was mostly really, really anxious
15   to move on the investigative side of the famous
16   file that you're aware of.
17       Q.    Sure.
18       A.    So, on the individuals.  I have no
19   idea -- he changes his mind all the time, so I
20   have no idea what his change of heart was on
21   that.
22       Q.    When did -- if you recall, when did the
23   conversation or negotiations pivot to this
24   investigatory research area?
25       A.    Probably during the second meeting.

Page 51

1    Mike has got a much better memory about these
2    things.
3        Q.    Do you recall how that occurred, was it
4    that Strategic Vision presented its investigatory
5    capabilities and Mr. Guo got excited or did he
6    ask about it; what occurred?
7        A.    We were -- again, we were speaking
8    about it in generalities.  It's not something you
9    boast about.  It's not something you discuss in a
10   way that is -- well, it's just not something you
11   boast about.  You can discuss it, you can discuss
12   the activities that can happen, and on a
13   hypothetical basis.
14       Q.    Did there come a time when Strategic
15   Vision offered to provide the sample
16   investigatory research on this --
17       A.    Yes.
18       Q.    -- vein of services?
19       A.    Yes, I believe there was.
20       Q.    When was that?
21       A.    I don't have the date.
22       Q.    Just generally, was it in this
23   December --
24       A.    It was in that December --
25       Q.    -- 2017 time frame?

Page 52

1        A.    That was in that December 2017 time,
2    yes.
3        Q.    What was -- was it research that was
4    offered or did Mr. Guo ask for that?
5        A.    I believe he gave us a name, and I
6    believe that we then had an exploratory peek into
7    what we could find initially.
8        Q.    So what was that exploratory research?
9    What was done by Strategic Vision?
10       A.    It was a -- it was done by our team, or
11   the initial team, before we even had a team, that
12   was contracted by us.  This was sort of a
13   freebie, to take a peek into this individual's
14   name, whatever, background.  And he gave us the
15   name.  I believe it was the number 1 name on the
16   folder that you have.
17       Q.    Is that Anita Suen?
18       A.    Yeah.
19       Q.    And that name was given to someone who
20   has been described by Strategic Vision as the
21   leader of Team 1?  Was that the --
22       A.    What?  I'm sorry, I don't understand
23   that question at all.
24       Q.    Maybe we'll get to it, we can define
25   it.  Let's just put it this way.  Who was that

Page 53

1    information regarding Anita Suen given to to do
2    the research?
3        A.    Mike.
4        Q.    Oh, okay.  Mike Waller?
5        A.    Yes.
6        Q.    Do you know what Mr. Waller did with
7    that information?
8        A.    Not precisely, no.
9        Q.    What understanding at all did you have
10   of what Mr. Waller would do with that
11   information?
12       A.    He was going to explore some of his
13   channels.
14       Q.    Do you know Dr. Waller's what you
15   describe as channels or --
16       A.    No, not all of them, no.
17       Q.    So you don't know all of the --
18       A.    We have channels.  We both have
19   channels.  I have channels, he has channels.
20       Q.    And do you deliberately keep your
21   channels confidential or secret from one another
22   for --
23       A.    Yes.
24       Q.    And why is that?
25       A.    For security.

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 54

1    Q.   So this freebie research report, was
2  that research completed, or conducted?
3    A.   It was conducted.  It wasn't completed
4  by any stretch.
5    Q.   Right.  And so what was -- was anything
6  presented back to Mr. Guo or Han or Ms. Wang?
7    A.   Yes.  I believe, yes, we did show --
8  again, Mr. Han, Mr. Guo, Miles Guo, and Mike and
9  myself were privy to whatever Mike had found.
10   Q.   So there was like a third meeting with
11 respect to this --
12   A.   Yes, somewhere.
13   Q.   -- pre-report?
14   A.   Yes.  In December of 2017.
15   Q.   Okay.  And where did that take place,
16 was it in New York?
17   A.   Yes.
18   Q.   What did Strategic Vision present as
19 this free report or free information?
20   A.   They -- I believe they had a -- Mike
21 had a screenshot of a couple of things that he
22 showed Miles Guo.
23   Q.   Was it information about accessing a
24 CITIC Bank account?
25   A.   I believe so, yes.  It wasn't

Page 55

1  accessing.  Please understand, there's a huge
2  difference.
3    Q.   Oh, please.  I want you to explain.
4  What was presented?  That's what I want to
5  understand.
6    A.   Yes.  There's a huge difference between
7  accessing.  It was not accessing.  It was what
8  they call peeking.  It was not invading into the
9  server.
10   Q.   Okay.
11   A.   Okay.
12   Q.   What does peeking mean?  I just want to
13 understand that clearly.
14   A.   To look over the wall.
15        THE WITNESS:  As I see, Yvette has
16   walked into the room.
17        MR. SCHMIDT:  The court reporter will
18   take down the appearance.  That's fine.
19        (Ms. Yvette Wang has joined the
20   deposition.)
21        THE WITNESS:  So, Yvette Wang has just
22   walked into the room.
23   A.   So, the peeking was a screenshot, I
24 believe, and I only saw it for a flash myself, of
25 a CITIC name and maybe an address or something.

Page 56

1  It wasn't very in depth.  I think it might have
2  had some numbers on it, it might have had some
3  account numbers on it or something like that.
4        But it was basically just to show how
5  some things could be retrieved.  We had to be
6  extremely careful.  These things were only
7  retrieved outside of The United States, and if
8  they were -- they were never retrieved inside The
9  United States.
10   Q.   And why was that?
11   A.   Because it's not really a terribly good
12 thing to do.
13   Q.   Is that because it's illegal or --
14   A.   It's probably illegal, yes.  So we
15 would never do anything illegal.
16        MR. SCHMIDT:  In The United States.
17        THE WITNESS:  In The United States.  Or
18   elsewhere, actually.
19   Q.   And did this presentation involve
20 showing that there was money in the bank account
21 or anything of that nature?
22   A.   I don't remember.  I saw it so quickly,
23 I -- because it was really Guo and either Yvette
24 or Lianchao looking at it.  I wasn't looking at
25 it.

Page 57

1    Q.   Had you looked at these screenshots or
2  information prior to the meeting?
3    A.   No, I don't believe I did.
4    Q.   Okay.
5    A.   Because, again, we compartmentalize
6  stuff.
7    Q.   So that was Dr. Waller's aspect of this
8  presentation, he handled that?
9    A.   I agree.
10   Q.   Did you tell Eastern or the people
11 present that you had enough information about
12 this person, Ms. Suen, to prove that she had
13 committed crimes?
14   A.   First of all, we had no idea who
15 Eastern was, so I don't know what you mean about
16 Eastern.
17   Q.   I'm obviously talking about Eastern
18 Profit.  Let's just put it this way --
19   A.   Yeah, but we're not here about Eastern
20 Profit, as you understand.  I never heard of
21 Eastern Profit until there was a contract.
22   Q.   Right.  Did you ever tell the people
23 present at this meeting that you had enough
24 information to prove that Ms. Suen had committed
25 crimes?

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 58

1    A.    I don't recall.  Mike would know the
2    answer to that.
3    Q.    Do you recall Mr. Waller talking about
4    crimes or anything like that at this meeting?
5    A.    I wouldn't call them crimes.  I think
6    they were asking for investigative background.
7    Miles Guo wanted to have as much information
8    on -- investigative background on a couple of
9    people, and I think she was the first and only
10   person he actually gave me -- gave us the name
11   about earlier, as a sort of trial.
12   Q.    And you understood that Strategic
13   Vision wouldn't be compensated for this --
14   A.    No.
15   Q.    -- project?
16   A.    Not -- well, we --
17   Q.    And what I mean by project is this
18   little presentation?
19   A.    No.  It was just to show them what we
20   had a certain capacity of being able to do.  It
21   was a limited capacity at that time.
22   Q.    Do you understand why the information
23   was requested, what the goal was?
24   A.    The goal was probably to sort of maybe
25   test some of the work that we could do

Page 59

1    compartmentally.
2    Q.    Let me just be a little more specific
3    then.  Did you understand what the end goal of
4    the research project as a whole was, what the
5    requesters of the information were trying to do?
6    A.    For the entire project?
7    Q.    Yes.  Why did they want this
8    investigatory research?
9    A.    Well, that's a really good question.
10   Q.    That's why I'm asking.  Do you know?
11   MR. SCHMIDT:  If you know or you don't.
12   A.    I don't know.
13   Q.    Okay.  You never discussed what the
14   research would be used for or anything like that
15   with Mr. Guo or Ms. Wang or Mr. Han?
16   A.    No.
17   Q.    Did you think that it was involved with
18   the political conversations you guys had had
19   concerning China, the communist party?
20   A.    Oh, I'm sure it had to do with the
21   communist party.  I mean, Yvette certainly was
22   part of the communist party, and her parents were
23   part of the communist party regime.  So, and she
24   was --
25   Q.    I didn't ask you about that at all.

Page 60

1    A.    But you're asking about the content of
2    the conversation and where it went and who was
3    involved and why --
4    Q.    Um-hum.
5    A.    -- right?
6    Q.    I'm asking whether or not you knew why
7    the research was requested.  That's what I'm
8    trying to understand.
9    A.    We have no idea what Yvette did with
10   it.  We have no idea what Guo did with it.  We
11   have no idea what happened to it.
12   Q.    So Strategic Vision didn't care what
13   the research was going to be used for one way or
14   another?
15   A.    We cared very much what it was going to
16   be used for.  We are very adamantly
17   anti-communist.
18   Q.    I see.
19   A.    We are very pro-democracy.  Both Mike
20   and I are adamantly pro-democracy.
21   Q.    So did you understand that the research
22   would be used to fight against the communist
23   party in China?
24   A.    Correct.  We thought.  We were not sure
25   what they were going to do with it.  Maybe he was

Page 61

1    going to run it both ways.  We don't know.
2    Q.    I'm only asking what you thought.
3    A.    Well, I just gave you my opinion.
4    Q.    Of course.  And so, did you understand
5    that the investigatory research that was
6    collected would ultimately be publicized?
7    A.    Probably, if we ended up with -- I
8    mean, that was up to Guo to decide what he was
9    going to do with it.  We certainly were not going
10   to publish it because we had strict
11   confidentiality agreements, but he didn't,
12   apparently, because he published a number of the
13   slides already on his sites.
14   Q.    Let's just talk about the
15   confidentiality agreement.  What do you mean by
16   that, when you said you had confidentiality
17   agreements?
18   A.    We had -- well, that was later in the
19   agreement itself.
20   Q.    Oh, that's what you're referring to.
21   Okay.
22   A.    Well, you know precisely what I'm
23   referring to.
24   MR. SCHMIDT:  Just answer the
25   questions.

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 62

1    Q.   I really don't.  I'm just trying to
2    be --
3         THE WITNESS:  I know, he knows what I'm
4    referring to.
5    Q.   I actually don't, so you'll have to
6    forgive me.  And so, what was the response to
7    this presentation of the CITIC, as you -- what
8    did you describe it as, the peering over the
9    wall?
10   A.   I'm sorry?
11   Q.   What was the response of Mr. Han or
12   Ms. Wang or Mr. Guo to your presentation?
13   A.   I suppose they were interested.  I
14   wasn't -- I wasn't that surprised that something
15   couldn't be brought up off the internet from some
16   of the investigators that Mike would have known
17   about.
18   Q.   So, in other words, you understood that
19   this was what Mike's team or contacts could
20   provide?
21   A.   Yes.
22   Q.   Did you feel that the recipients of
23   this information were impressed by it?
24   A.   I have no idea.
25   Q.   They didn't say anything like, wow,

Page 63

1    this is great or --
2    A.   I have no idea.
3    Q.   You mean you don't remember or you just
4    don't --
5    A.   I have no idea.
6    Q.   So you know the information was
7    presented, but you don't recall how it was
8    received?
9    A.   I'm sure it was favorable.
10        MR. GRENDI:  Let's take a little break
11        and we'll come back in five or 10 minutes.
12        THE VIDEOGRAPHER:  Going off the record
13        at 11:09.
14        (Whereupon, a short recess was taken.)
15        THE VIDEOGRAPHER:  We're now back on
16        the record at 11:21.
17   BY MR. GRENDI:
18   Q.   Just turning to SVUS84 of that exhibit,
19   that's the Bates number in the bottom right-hand
20   corner.
21   A.   Yes.  Yes, yes, yes.  So 84, okay.  83.
22   84, yes.
23        MR. SCHMIDT:  Final page.
24   Q.   You see where it says, "Total Social
25   Media Awareness," there's a bullet point for

Page 64

1    that?
2    A.   Yes.
3    Q.   Can you describe what this capability
4    is?  It says it was originally developed by the
5    U.S. military.
6    A.   Yes, this is one of the things that
7    Mike was aware of.
8    Q.   Are you aware of it, or you don't know
9    about this service?
10   A.   I'm aware of it, but he's more
11   experienced with it.
12   Q.   Well, let's -- what do you know about
13   it?
14   A.   Exactly what it says.  I mean, I'm
15   aware of it.  I don't know any more than -- than
16   that.  Mike is the one who is fully aware of it.
17   Q.   I appreciate that Mr. Waller might know
18   more about it than you, but I'm asking what you
19   know.
20   A.   I'm aware of what this paragraph says.
21   Q.   You don't know anything else about this
22   capability or what it is?
23   A.   I'm aware of the social media and text
24   messaging communications in multiple languages.
25   Q.   Okay.  But you don't provide this

Page 65

1    service, this isn't something that Strategic
2    Vision does itself?
3    A.   Only through our teams do we do this.
4    Q.   Okay.  Is this service part of
5    investigatory research or is it separate?
6    A.   It would probably be part of the full
7    package.  We were not sure what Miles Guo wanted,
8    so we tried to create a sort of a menu, as I
9    mentioned earlier.
10   Q.   So this document contains ideas for
11   Mr. Guo in terms of services that Strategic
12   Vision can provide?
13   A.   Correct.  Strategic Vision and its
14   team.
15        MR. GRENDI:  This is going to be Wallop
16        5.
17        (Wallop Exhibit 5, Handwritten
18        document, marked for identification.)
19   Q.   Looking at Wallop 5, is this your
20   handwriting here?
21   A.   It is.
22   Q.   And who are these individuals listed on
23   this document?
24   A.   Guo asked for some references of
25   individuals in the Middle East, and I wrote them

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 66

1  down.
2      Q.   By references, what -- does that mean
3  people who you've worked with or provided
4  services to; who are they?
5      A.   Both.
6      Q.   So Strategic Vision has provided
7  services to some of the people on this list?
8      A.   Some of the people, yes.
9      Q.   Which ones?
10      A.   I can't disclose that.
11      Q.   How many of them?
12      A.   I can't disclose that.
13      Q.   Were any of the services provided to
14  the people on this list investigatory research?
15      A.   Some.  He asked for both personal and
16  professional.  I just gave him a light list of
17  individuals that -- then there's a lot of Chinese
18  down here at the bottom, Chinese characters, so I
19  don't know what that's about.
20      Q.   I figured as much.  So these are just
21  individuals in the Middle East that are, as you
22  put it, references?
23      A.   Yes.
24      Q.   Did you --
25      A.   These were all UAE, as a matter of

Page 67

1  fact.  He asked specifically for UAE, so
2  that's -- these are all UAE.
3      Q.   What about references from people from
4  other countries, did you provide that information
5  to Mr. Guo?
6      A.   He did not ask.
7      Q.   Okay.  But you didn't provide that
8  information?
9      A.   He did not ask.
10      Q.   I didn't ask whether he asked.  I --
11      A.   No.
12      Q.   -- asked you whether --
13      A.   No.
14      Q.   -- you gave that information?
15      A.   No.
16      Q.   Okay.  So, in terms of Strategic
17  Vision's clients, only some of the people on the
18  list are people that you told Mr. Guo about being
19  Strategic Vision's clients, is that right?
20      A.   He asked for references, personal and
21  professional, in the UAE, and I gave him these
22  names.
23      Q.   And you never described any of
24  Strategic Vision's other clients to Mr. Guo?
25      A.   Certainly not.

Page 68

1      Q.   Why not?
2           MR. SCHMIDT:  Other clients beyond this
3      sheet?
4           MR. GRENDI:  Yeah.
5      A.   Because they're private clients.
6      Q.   Are the individuals on this list
7  private clients?
8      A.   Yes and no.
9      Q.   Why did you tell him about some of your
10  private clients on this document?
11      A.   He asked me -- I had permission from
12  these individuals to list them, if need be, with
13  somebody -- he went on and on about his
14  relationships in the UAE, and now -- now I
15  understand that he defrauded the UAE out of
16  $3 billion, particularly one of the families
17  that's listed on this page, I believe, and that's
18  public information.
19      Q.   Which one is that?
20      A.   The Al Nahyan family.  So, you know, it
21  was pretty cheeky to ask me for references in the
22  UAE, given his reputation in the UAE.
23      Q.   And this alleged fraud of people in the
24  UAE, when did you hear about that?
25      A.   It was all over the news media.  All

Page 69

1  you have to do is research it.
2      Q.   I was asking when you found out about
3  it?
4      A.   I don't remember.
5      Q.   Thank you.  Was it before or after you
6  gave this list to Mr. Guo, that you found out
7  that he was --
8      A.   After.
9      Q.   -- allegedly involved in fraud?
10      A.   After.
11      Q.   Okay.  And you don't have any personal
12  knowledge about Mr. Guo's relationships with
13  anyone in the United Arab Emirates, do you?
14      A.   I'm not going to answer that, because I
15  think it would be revealing confidential.
16           MR. SCHMIDT:  Do you have any personal
17      knowledge?
18           MR. GRENDI:  I'm just trying to know
19      why -- whether she knows about this alleged
20      fraud personally or whether she just read
21      about it in the media.
22           MR. SCHMIDT:  Why don't we ask that
23      question.  I think we've got to go slower
24      with these questions.  Why don't you answer
25      the question.  Do you have any information

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 70

1   about the fraud beyond --
2        THE WITNESS:  Yes.
3        MR. SCHMIDT:  -- what you read in the
4   media?
5        THE WITNESS:  Yes.
6        Q.   Okay.  And that's from who; how did you
7   hear about that?
8             You can look at me.  I'm asking you the
9   questions.
10       A.   Privileged -- privileged sources.
11       Q.   Okay.  So you're refusing to answer
12  that question based on privilege?
13       A.   Yes.
14       Q.   And what privilege is that?
15       MR. SCHMIDT:  Do you want to go talk
16  about it?
17       THE WITNESS:  Yes.
18       MR. SCHMIDT:  Why don't we go off the
19  record and see what's going on.
20       MR. GRENDI:  I'll tell you what, why
21  don't we just put a pin in it, and keep
22  going.
23       MR. SCHMIDT:  That's fine, too.  Okay,
24  we can do it at a break.
25       MS. TESKE:  Let's take a break for a

Page 71

1   quick second.
2        THE VIDEOGRAPHER:  Off the record at
3   11:29.
4        (Whereupon, a short recess was taken.)
5        THE VIDEOGRAPHER:  Back on the record
6   at 11:35.
7        MR. SCHMIDT:  We just stepped out to
8   discuss if there was any potential privilege
9   issue.  I think it's more of a
10  confidentiality issue.  She had actually
11  already revealed the answer to the question
12  in response to a prior question.  And I
13  think the question when we left was if she
14  knew anything beyond what she had read in
15  the public papers, and the answer was yes.
16  And I think your next question was, what.
17  And I think Ms. French is ready to respond
18  to that.
19       Q.   Go ahead.  How do you know something
20  beyond the public record about Mr. Guo allegedly
21  stealing $3-1/2 billion from the United Arab
22  Emirates?
23       A.   Based on conversations that I had with
24  members of the family with whom he allegedly
25  defrauded them of over $3 billion.

Page 72

1        Q.   And which family is that?
2        A.   The Al Nahyan family.
3        Q.   Is that on this list?  I'm sorry, I
4   have trouble reading your handwriting.
5        A.   Yes, it is.
6        Q.   That's the one, two, three, four --
7   fifth one from the top?
8        A.   Yes.
9        Q.   And what did they say to you about
10  that?
11       A.   When I mentioned his name, they said
12  that, yes, they were fully aware of him and that
13  it was not a pleasant experience.
14       Q.   Why were you talking to the Al Nahyan
15  family about Mr. Guo?
16       A.   Because Mr. Guo, I believe, had been
17  telling me with this document that he knew all of
18  these people, and I was checking on whether he
19  did know any of these people.  And so it came up
20  that he defrauded the UAE and the family of over
21  $3 billion, as you well know.
22       Q.   And you didn't agree to keep your
23  relationship with Mr. Guo confidential when you
24  were speaking with him?
25       A.   That had nothing to do with

Page 73

1   confidentiality.  He was the one that gave me --
2   he asked me for these references.  I wanted to
3   make sure we had a reference on him.  He said
4   that he worked very closely with the UAE, and it
5   turned out, I guess, he did.
6        Q.   When were these conversations you had
7   with the Al Nahyan family?
8        A.   Oh, probably in -- probably about six
9   months after the contract began.
10       Q.   So you were checking references on
11  Mr. Guo after the agreement was over with?
12       A.   Yes.  We had trusted him up until that
13  time.
14       Q.   Sure.
15       MR. SCHMIDT:  Let's not make any
16  commentary.
17       MR. GRENDI:  That's fine.
18       Q.   Let's go with the next exhibit.
19       (Wallop Exhibit 6, Document entitled
20  "Time to Get Them Beginning the
21  Psycho-Political Campaign For China", marked
22  for identification.)
23       Q.   Ms. Wallop, do you recognize this
24  document?
25       A.   Yes, this is one of Mike's documents.

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 74

```
1      Q.    It's called "Time to Get Them."
2            Do you know how that title was reached,
3  created?
4      A.    Yes, yes.
5      Q.    How's that?
6      A.    It came as a result of conversations
7  with Guo, Lianchao and Mike and myself regarding
8  the -- regarding the communists working within
9  The United States, from China DRC, as well as
10 elsewhere.
11     Q.    So in the chronology of meetings we've
12 been talking about, was this document created
13 before the first meeting, the second meeting, the
14 third meeting?  When did it --
15     A.    Oh, it had to have been after the
16 second or third meeting, because there's this
17 photograph of Anita here.
18     Q.    And that's on SVUS387?  If you look at
19 the bottom right-hand corner --
20     A.    Correct.
21     Q.    -- that's where those --
22     A.    Or maybe that's Yvette.  I'm not sure.
23 No, I think it is Anita.
24     Q.    Okay.  Was this a PowerPoint
25 presentation?
```

Page 75

```
1      A.    Yes.
2      Q.    And was it presented as a PowerPoint on
3  a computer or did you print it out?  How was
4  it --
5      A.    It might have been on a USB key.
6      Q.    And did you participate in creating
7  this document or did Mr. -- Dr. Waller create it
8  himself?
9      A.    Dr. Waller did much of it.  I worked
10 with him on some of it; not all of it, but some
11 of it.
12     Q.    So you made edits or --
13     A.    Yes.
14     Q.    And when was this presented to -- well,
15 let's start with striking that.
16           Who was this presented to?
17     A.    Well, this would have been presented to
18 Guo.
19     Q.    Anyone else?
20     A.    And probably Lianchao.  And, obviously,
21 myself.  I can't remember if Yvette was in there
22 or not.  He often didn't want her in the room,
23 so, who knows.
24     Q.    I understand.  But you don't recall
25 specifically who was in the room when this was
```

Page 76

```
1  presented?
2      A.    Well, it would have been one of the
3  four -- I mean all four of us.  It would have
4  been Lianchao, Guo, myself and Mike.
5      Q.    Okay.  Do you remember where that --
6      A.    And possibly Yvette.
7      Q.    Okay.
8      A.    I don't remember.
9      Q.    And do you remember where that was?
10     A.    In his flat, in his apartment at the
11 Sherry-Netherlands.
12     Q.    Okay.
13     A.    All meetings were there with him.
14     Q.    That's helpful.  So you never met with
15 Mr. Guo in Washington, D.C.?
16     A.    No.
17     Q.    Okay.  Let's look at 387.  It says,
18 "build and operate a secret system for
19 micro-targeted intelligence collection and
20 analysis."  Do you see that?
21     A.    Yes.
22     Q.    Is that a service that Strategic Vision
23 would provide or someone else?
24     A.    Through Mike and his teams, and some of
25 my people, yes.
```

Page 77

```
1      Q.    What do you mean by your people?
2      A.    Some of my channels, as we discussed
3  earlier.
4      Q.    I see.  So in terms of this service,
5  the game plan was for Dr. Waller to do most of
6  the research, is that fair to say, through his
7  channels?
8      A.    I would say it was equal.
9      Q.    Okay.
10     A.    It depends.  I mean, it depended on
11 which target we were working with.
12     Q.    So I have some understanding of what
13 Dr. Waller's process and capabilities were from
14 his deposition.  I want to know what -- what it
15 is that you personally would provide as a service
16 in connection with micro-targeted intelligence,
17 collection and analysis?
18     A.    It depended on which target and which
19 channels we both used collectively to bring the
20 information together on individuals or documents.
21     Q.    Right.  And I'm trying to understand
22 what --
23     A.    I don't --
24     Q.    -- process --
25     A.    I can't answer that.
```

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 78

1    Q.    Well, I didn't even ask a question.  So
2  I want you to just wait for me to ask, and then
3  you can answer.
4    A.    Go ahead.
5    Q.    Yes, thank you.  So I want to
6  understand what part of the process you would
7  participate in.  What would you do to help in the
8  collection process or accessing of the channels
9  process?
10    A.    Collection and gathering.  It was like
11  hunting and gathering.  We both did it.
12    Q.    And what would you do in connection
13  with this engagement?  What was it that you would
14  do?
15    A.    We would collect --
16    Q.    You.
17    A.    -- through my channels.
18    Q.    Right.
19    A.    Him through his channels.
20    Q.    And what channels did you access in
21  connection with this engagement?
22         MR. SCHMIDT:  Just to -- objection for
23    a second here.  This is a 30(b)(6).
24         THE WITNESS:  I don't understand the
25    question.

Page 79

1         MR. SCHMIDT:  So you're saying you as
2    Strategic Vision, or are you saying you
3    French Wallop?  How do you want to do it?
4         MR. GRENDI:  Let's do Strategic Vision.
5         MR. SCHMIDT:  Yeah.  I mean, that's
6    really the question here.
7         MR. GRENDI:  That's fine.
8         THE WITNESS:  Okay.
9    Q.    What did Strategic Vision do in terms
10  of collection and analysis?
11    A.    That's what we did, we did collection
12  and analysis.
13    Q.    So there's no more specificity --
14    A.    Through our own sources.
15    Q.    -- to it than that?  What does that
16  mean?
17    A.    How do you put a legal case together?
18  You have to start with bits and pieces.  So
19  that's what we were doing.  We were each
20  collecting bits and pieces to make the cases.
21    Q.    Let me ask it this way.  Did you ask
22  people in your network, do you know who Anita
23  Suen is?  What do you know about her?
24    A.    No.
25    Q.    So I'm trying to understand what it is

Page 80

1  you did, Strategic Vision, to collect
2  information?
3         MR. SCHMIDT:  Objection.  She's talked
4    about going out and getting Mike Waller and
5    putting that together --
6         MR. GRENDI:  I'm asking about anything
7    else.
8         MR. SCHMIDT:  Okay, anything else.
9    A.    Collecting teams.  Collecting teams.
10    Q.    Let's do it this way.  Setting aside
11  what Mr. Waller and his teams did.  Was there any
12  other teams accessed to provide information in
13  connection with this investigatory research?
14    A.    Yes.
15    Q.    And who were they?
16    A.    There were some from the U.K., there
17  were some from Israel, there were some from the
18  Middle East, there were some from our networks.
19    Q.    And now I'm talking about you
20  personally.
21    A.    Yes.
22    Q.    Are these people that you personally
23  contacted?
24    A.    Yes.
25    Q.    Okay.  That's all I'm trying to

Page 81

1  understand.  Without naming any names, would that
2  involve calling people on the phone or emailing
3  them?
4    A.    Rarely.  It's face-to-face.
5         MR. SCHMIDT:  Just listen to the
6    question.  Don't be distracted by the
7    document for now.
8    Q.    And so, in connection with the research
9  in this matter, how many face-to-face meetings
10  did you have with people in your contacts?  I'm
11  talking about you, Ms. Wallop.
12         MR. SCHMIDT:  Objection.
13    A.    I have no idea.  Many.
14    Q.    You said you rarely do telephone calls.
15  Did you do some in connection with this research
16  agreement?
17    A.    No.
18    Q.    What about internet research, did you
19  do any internet research in connection with this?
20         MR. SCHMIDT:  Objection.  Her
21    personally?
22    Q.    Strategic Vision.  Did Strategic Vision
23  do any internet research in connection with this
24  research?
25    A.    Lightly.  That was not our -- that was

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 82

1   not our way of doing it.
2        Q.    And what about you personally?
3        A.    No.
4        Q.    It says in this document that the first
5   ten targets are identified, do you see that?
6        A.    What page?
7        Q.    387.
8        A.    Yes.
9        Q.    What did you understand that to mean?
10       A.    Well, Guo gave us -- Miles Guo gave us
11  a large packet of names, and, in that -- in the
12  first ten, which they upped it to 15 in the first
13  month, but the first ten targets were identified,
14  and then they changed their mind and asked for 15
15  for the first month.  So that's -- those were his
16  targets.
17       Q.    So these ten targets, are those
18  referred to as fish in the signed research
19  agreement?
20       A.    Correct.
21       Q.    And it says, "monitor the ten targets
22  for several months to understand their habits,
23  patterns, personal and professional networks,
24  businesses and corruption."  Do you see that?
25       A.    Correct.

Page 83

1        Q.    Who would do that work of monitoring?
2        A.    Our team.
3        Q.    And by our team, what encompasses the
4   Strategic Vision team for this research
5   agreement?
6        MR. SCHMIDT:  Objection.  Go ahead.
7        A.    The particular team, we called it Team
8   1, and that's what they were assigned to do.
9        Q.    So Team 1 was assigned the monitoring
10  of the ten targets referred to here?
11       A.    Correct.
12       Q.    Okay.  And do you know the name of
13  anyone on Team 1?
14       A.    No.
15       Q.    Do you know the leader of Team 1, the
16  name of the leader of Team 1?
17       A.    I know his acronym.  I don't know his
18  name, his full name.  This was through Mike.
19       Q.    So you don't know the full name of the
20  leader of Team 1?
21       MR. SCHMIDT:  Yes or no, if you know.
22       Q.    I'm asking a yes or no.
23       A.    No.
24       Q.    So, specifically, do you know when the
25  first ten targets were identified?

Page 84

1        A.    When Guo threw that whole document down
2   on the coffee table in his apartment and he said,
3   these are the people I want investigated, these
4   are -- I said, where did this list come from?
5   And he said, I paid $250 million for this list.
6   I said, wow, okay.  So that's when I knew who the
7   first ten targets were.
8        MR. GRENDI:  Let's do Exhibit 7.
9        (Wallop Exhibit 7, Document entitled
10  "1:  Anita Yiu Suen", marked for
11  identification.)
12       Q.    Do you recognize what's been marked as
13  Wallop 7?
14       A.    Correct, I do.
15       Q.    And is this the document that you just
16  said Mr. Guo threw down on the table?
17       A.    It looks like it.
18       Q.    Okay.  So, to your recollection,
19  Mr. Guo threw a paper copy of this document onto
20  a table at some point during a meeting?
21       A.    No, on -- onto his coffee table in his
22  sun room, yes.
23       Q.    When was that?
24       A.    During the -- probably the second or
25  third meeting we had with him in New York, in

Page 85

1   December of 2017.
2        Q.    So did you keep that paper copy that
3   was thrown on the table?
4        A.    Well, I had this copy, I mean, the copy
5   of the copy.  I mean, the original that he gave
6   us.
7        Q.    I see.  So you retained a paper copy of
8   what's been marked as Wallop 7?
9        A.    That's correct.
10       Q.    And was that -- that was before the
11  contract was signed, right, the research
12  agreement that's the subject of this action?
13       A.    No.  I think we -- I saw the document,
14  but we didn't get the full document because of
15  the famous flash drives that were corrupted --
16       Q.    Right, but --
17       A.    -- by Yvette.
18       Q.    -- I just want to understand what
19  happened to the paper version that was --
20       A.    Oh, I didn't -- he didn't give that to
21  us at the time.  He kept his copy.
22       Q.    You didn't receive --
23       A.    No, no, no --
24       Q.    -- a paper copy from him?
25       A.    -- no, no, no.  He just showed it to

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 86

1   us.
2       Q.      I see.
3       A.      He threw his copy down on the table.
4       Q.      And this was at the second or third
5   meeting?
6       A.      Yeah.
7       Q.      Okay.
8       A.      Yes.
9       Q.      And you did not retain a copy from that
10  meeting?
11      A.      No.
12      Q.      And did you go through the paper copy
13  that was on the table?
14      A.      With him?
15      Q.      Yes.  Or on your own.
16      A.      Well, we glanced at it.  Mike was
17  there.  We glanced at it to try to get an idea as
18  to who it was, what it was.
19      Q.      We'll come back to this.  Going back to
20  Exhibit 6.  On 387, it says, "Document everything
21  as leverage to gain concessions, protect people,
22  use as political weapon, or as aid in criminal
23  prosecution and asset recovery."
24          Do you see that, it's the fourth or
25  fifth bullet down?

Page 87

1       A.      I don't have it.
2       Q.      Oh, I'm sorry.
3       A.      So, what page?
4       Q.      The same one we've been looking at,
5   387.
6       A.      So what would you like to look at?
7       Q.      Where it says, "Document everything as
8   leverage to gain concessions, protect people, use
9   as political weapon, or as aid in criminal
10  prosecution and asset recovery"?
11      A.      Correct.
12      Q.      What is the -- what was that about;
13  what does that mean in terms of the services to
14  be provided?
15      A.      This was what Mike was referring to
16  with regard to the Team 1.
17      Q.      So Team 1 was going to?
18      A.      Take a look at that, yes.
19      Q.      And what kind of leverage was sought?
20      A.      I guess, criminal leverage, depending
21  upon the individuals that we were investigating,
22  per Guo's instructions.
23      Q.      It also says "protect people."  What
24  was -- to your mind, what was the -- what was
25  that about?

Page 88

1       A.      I don't remember.  I don't know
2   precisely.
3       Q.      Okay.  And you don't remember
4   discussing whether -- what the political weapon
5   would be?
6       A.      Well, a political weapon, which is what
7   Guo wanted to use towards his investigation of
8   these individuals.  He was going to use it
9   against them, for whatever purpose.
10      Q.      But you don't know the purpose?
11      A.      Not entirely.
12      Q.      Okay.  A couple of bullets down it
13  says, "Break the Party's control of corrupt
14  information" -- or "corruption information" I
15  should say.  Do you see that?
16      A.      Yes.
17      Q.      What is "the Party's control"?  Which
18  party are we talking about there?
19      A.      Talking about the communist party.
20      Q.      And what control of corruption
21  information does the communist party have?
22      A.      Well, Guo had said that the CCP, or the
23  communist party of China, there was a great deal
24  of corruption within the leadership, and, as a
25  result of that, he wanted to find as much

Page 89

1   corruption as possible, and he wanted us to
2   investigate and retrieve that kind of corruption.
3   In other words, funds that would have been taken
4   out of the country illegally, cash payments, all
5   of these things that were part of that.
6       Q.      I understand.  And so going to the next
7   page, 388.  It says, "Reduce political threats to
8   yourself and your cause."
9           What did you understand is the
10  political threats to whoever yourself or your
11  cause is there?
12      A.      That was to Guo.
13      Q.      Okay.
14      A.      Political threats to Guo and Guo's
15  cause.
16      Q.      And what were those political threats?
17      A.      Well, he said that they were monetary
18  and political, and that many people were after
19  him either for monetary damages or corruption,
20  both by the Chinese officials as well as,
21  perhaps, his own corruption issues.  I don't
22  know.
23      Q.      Did you look into that at all in terms
24  of --
25      A.      This was a preliminary -- this was a

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 90

1  preliminary document that Mike had put together;
2  so, no, we were not under contract to look into
3  it.
4      Q.    Okay.  So you didn't do any work
5  regarding Mr. Guo or his business prior to --
6      A.    The contract?
7      Q.    -- the execution of the contract on or
8  about January 6, 2018?
9      A.    No.
10     Q.    You didn't access your network to
11 determine whether this was someone you wanted to
12 do business with or not?
13     A.    We had Bill Gertz, who was one of the
14 finest intellects on Chinese corruption, and
15 reporters, journalists, and also Lianchao, again,
16 of the highest sterling standards.  When they
17 asked us to look into it, that's what we did.
18 That was looking into putting together a program
19 that would help somebody that we believed at the
20 time was absolutely anti-communist.
21     Q.    I see.  So you relied up -- let me put
22 it this way.  Strategic Vision relied upon the
23 recommendation of Bill Gertz and Lianchao Han in
24 terms of deciding to do business with, or
25 deciding to enter into the research agreement?

Page 91

1      A.    Correct.
2      Q.    Let's just go to SVUS390.
3      A.    Um-hum.
4      Q.    It says, "Network With Russian
5  Opposition and Chinese Expats."  Do you see that?
6      A.    Correct.
7      Q.    Is this a service that you would
8  provide or Mr. Waller would provide?
9      A.    Both of us did.
10     Q.    Okay.  And why was Strategic Vision
11 recommending that Mr. Guo network with Russian
12 opposition and Chinese expats?
13     A.    Well, the photograph that you have
14 here, that's in this is Mikhail Khodorkovsky.
15 Okay?  Mikhail Khodorkovsky is a client of mine,
16 and he is an anti-Putin and pro-democracy leader,
17 opposition leader for Russia; so, therefore, we
18 felt that this might be a good person for Guo to
19 essentially team up with on certain ideological
20 issues.
21     Q.    And how would that synergy or
22 collaboration work?
23     A.    Through me.
24     Q.    Right.  But just a little more
25 specificity.  How would Mr. Guo, or whoever, team

Page 92

1  with Russian opposition and Chinese expats?
2      A.    Through me and certain ideas that we
3  had to combine our ideological belief in
4  democracy.
5      Q.    And -- right.  How would those ideas be
6  executed, what sort of --
7      A.    Through dialogue.
8      Q.    -- activities?
9      A.    Through dialogue.
10     Q.    And you also have links with Chinese
11 people inside Russia?
12     A.    We would have, yes.
13     Q.    That's you and Mr. Waller?
14     A.    Yes.
15     Q.    It says, "for propaganda and
16 organizational purposes."  Do you see that?
17     A.    Yes.
18     Q.    What would be the propaganda and
19 organizational purposes?
20     A.    Media and social media, probably.
21     Q.    So, in other words, messaging of
22 anti-communist, pro-democracy rhetoric?
23     A.    Correct.
24     Q.    Would the Russian opposition group be
25 involved in collecting investigatory research or

Page 93

1  is that a separate group?
2      A.    It would be separate.
3      Q.    Let's go to 394.  It says, "Target
4  Intelligence Capability:  Cost."
5          These costs here, are these prices that
6  Strategic Vision quoted?
7      A.    In a preliminary discussion, yes.
8      Q.    Okay.  So, initially, Strategic Vision
9  was offering $2,805,000 to have two teams monitor
10 one person?
11     A.    Yes.
12     Q.    And what would that monitoring entail,
13 just in terms of the types of surveillance or
14 investigatory work?
15     A.    It was hugely complex, and --
16         MR. SCHMIDT:  Keep going.
17     A.    It was hugely complex, and it had to do
18 with all the investigative tentacles that we
19 could reach within our channels.
20     Q.    So is that the full package of services
21 that Strategic Vision could provide in terms of
22 monitoring, that's like the full suite, call it
23 that?
24     A.    Except that he didn't accept it.
25     Q.    I understand that.  But was this --

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 94

1      A.      This was a preliminary overview of some
2  of the things that we would have done.
3      Q.      Right.  And it says, "above for 1, but
4  with only one team:  $2,380,000"?
5      A.      Correct.
6      Q.      So, just conceptually, what's the
7  difference between one team and two teams, in
8  terms of what a client would get?
9      A.      Because you obviously have to work with
10  both teams to define different sets of facts that
11  they are retrieving, and, out of those different
12  sets of facts, you compare the information on
13  both teams to see whether they are -- whether
14  they match or whether one is adding something
15  else to the -- to the individual that's being
16  monitored.
17           In other words, we're trying to combine
18  the information that we were retrieving so that
19  we would have one package, so to speak, for each
20  person, that would be better than just having one
21  team do it.
22      Q.      I see.  So the purpose of having two
23  teams in this context is to be able to
24  cross-check the teams against one another to see
25  if the information --

Page 95

1      A.      Yes.
2      Q.      -- they're finding is consistent?
3      A.      Yes, that's correct.
4      Q.      But both teams would be doing,
5  essentially, the same thing; is that fair to say?
6      A.      I don't think so.
7      Q.      Okay.  What would be the difference
8  between what Team 1 would do and what Team 2
9  would do in this context?
10      A.      It would depend upon the information
11  that we gave each team as to which one would do
12  which dimension of retrieval.  If you haven't
13  been in the game, you don't understand these
14  things, sorry.
15      Q.      That's what I'm trying to understand.
16      MR. SCHMIDT:  No comments.  Just answer
17  his questions to the best of your ability,
18  okay?
19      THE WITNESS:  I'm working on it.
20      MR. GRENDI:  Thank you, Joe.
21      Q.      And is there any other reason to set up
22  two teams, other than this cross-dimensional
23  referencing you've talked about?
24      A.      It just makes -- it makes better -- it
25  makes a better set of information so that you

Page 96

1  know that you're verifying.  Because one team
2  supposedly never knows about the other team.
3  They won't bump into each other.  So they're kept
4  completely separate.  So the information that we
5  were -- had expected to receive from the initial
6  dives into the first team, using just one team,
7  and then subsequently we -- we went on our own
8  dime to the second team.
9      Q.      Are you talking about research that was
10  actually performed or just conceptually how
11  Strategic Vision does things, as presented in
12  this -- what's this called -- in this document,
13  Exhibit 7?
14      A.      Would you repeat the question.
15      Q.      What I'm saying is, are you referring
16  to the Team 1 and Team 2 that were tasks in the
17  actual research agreement or what's being
18  described in this document?
19      A.      What we were -- it's a little bit of
20  both.
21      Q.      Okay.  And has Strategic Vision
22  previously employed dual teams to perform
23  investigatory research?
24      A.      Not at this depth, but, yes.
25      Q.      And did Strategic Vision sometimes only

Page 97

1  employ one team to do research like this in the
2  past?
3      A.      Yes.
4      Q.      Why does -- why does it cost roughly
5  $2.8 million to monitor one individual with two
6  teams?
7      A.      Based on what the client wanted.
8      Q.      No, I'm saying why does it cost that
9  much; where did you come up with the $2,805,000
10  cost?
11      MR. SCHMIDT:  Objection, but go ahead.
12      A.      That's an internal cost that Mike is
13  more aware of than I am.
14      Q.      I appreciate that Mike might know more
15  than you.  I'm just asking what you know.  What
16  does Strategic Vision know about the cost it
17  quoted to the individuals at this meeting?
18      A.      Because it depends upon the cost and
19  the risk and all of the dimensions that we have
20  to put together in order to retrieve the
21  information that the client was adamant about
22  having.
23      Q.      So part of the cost is the risk of
24  getting exposed or -- is that part of how the
25  cost is calculated?

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 98

1    A.    It is.  But it's expensive.
2    Q.    And what -- what about it is expensive?
3 Are the teams expensive to --
4    A.    The teams are very expensive.
5    Q.    Let's go to 395.  It says, "US-based
6 online army - Same group as those who helped win
7 Trump election."  Do you see that?
8    A.    Um-hum.  Yes.
9    Q.    Is that part of the investigatory
10 research or is that a different online group?
11    A.    This would be the U.S. side.
12    Q.    What is the U.S. side?  What does that
13 mean?
14    A.    It would be the U.S. basic
15 investigative dimension of social media and so
16 forth.
17    Q.    So one of the teams would be U.S. --
18    A.    Credit reports; whatever is publicly
19 and legally allowed in the United States for us
20 to do, yes.
21    Q.    I see.  So, in providing this
22 investigatory service, Strategic Vision divides
23 its team by where they're domiciled or headed?
24    A.    Who?
25    Q.    The team.  So, in other words, you have

Page 99

1 a U.S. team?
2    A.    Yes.
3    Q.    And you would also have a foreign team?
4    A.    Correct.
5    Q.    Okay.  Just for the benefit of the
6 record.  What's the purpose in separating the --
7 having a U.S.-based team and a foreign-based
8 team?
9    A.    Because we comply with U.S. law.
10    Q.    So, in other words, there's things that
11 the foreign teams can do that the U.S.-based
12 teams can't do?
13    A.    We understand that's correct, yes.
14    Q.    Okay.  If you go to 398?
15    A.    Okay.
16    Q.    You see it says "Russian networking
17 cost"?
18    A.    Yes.
19    Q.    And it says, "We will facilitate but
20 not manage or coordinate networking with Russian
21 opposition leaders and groups"?
22    A.    Yes.
23    Q.    The "we" there is Strategic Vision?
24    A.    Yes.
25    Q.    And how would that networking with

Page 100

1 Russian opposition leaders and groups work,
2 generally speaking?
3    A.    Our team would work with the opposition
4 groups I've already discussed.
5    Q.    Oh, from the prior slide?
6    A.    Yes.
7    Q.    The prior slide being SV390, the
8 picture of --
9    A.    Yes.
10    Q.    What would you exchange for support
11 with -- to Russian opposition groups?
12    A.    I don't understand that question.
13    Q.    It says in the document, "help fund
14 Russian opposition groups in Siberia, Far East,
15 Vladivostok in exchange for other support."
16    A.    Well, I think that's pretty clear.
17    Q.    Well, what would be exchanged?
18    A.    Information, pro-democracy.  We were
19 looking at pro-democracy issues and how to be
20 more proactive to help pro -- pro-democracy in
21 Russia, as well as in China.
22    Q.    So the concept was that Russian
23 opposition groups would exchange information with
24 this cause for their mutual benefit?
25    A.    Ostensibly.  But it wasn't something we

Page 101

1 had agreed to, no.
2    Q.    Oh, so this didn't end up being part of
3 the research agreement?
4    A.    This is not the contract.
5    Q.    I know that.  I'm asking whether this
6 service is part of the contract?
7    A.    This is not part of the contract.
8    Q.    Got it.
9    A.    If it had been, the cost would have
10 been mega amounts.
11    Q.    So this is an expensive service, this
12 Russian networking?
13    A.    Excuse me?
14    Q.    I said, so this Russian networking
15 service is an expensive service?
16    A.    This was a preliminary estimate on --
17 an overview of what we thought that we would like
18 to do for Mr. Guo.  Mr. Guo only wanted to do
19 investigations on these 15 people in the United
20 States and elsewhere, not on this entire thing
21 that you're looking at.
22    Q.    Got you.
23    A.    Okay?
24    Q.    Turning to SVUS402.  Do you see that?
25    A.    I do.

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 102

1    Q.    It says, "sign MOU."  That's a
2  memorandum of understanding?
3    A.    That's correct.
4    Q.    Is that how Strategic Vision normally
5  contracts with its clients?
6    A.    Again, this is a preliminary overview.
7  This was a discussion.  We were discussing it
8  openly in a little meeting that we were having
9  with Mr. Guo.  So this was just sort of a menu of
10  deciding what we would do and how we would
11  perform.
12    Q.    Does Strategic Vision normally sign
13  written agreements with its clients?
14    A.    Yes.
15    Q.    Does Strategic Vision have a standard
16  contract that it uses for its client engagements?
17    A.    No.
18    Q.    So you don't have a stock agreement
19  that you normally use when --
20    A.    No client's the same.
21    Q.    So, prior to signing the research
22  agreement, did you tell Mr. Guo that you had an
23  in-house team of investigators at Strategic
24  Vision?
25    A.    This is a fascinating misnomer.

Page 103

1    Q.    What -- what term is that that you're
2  calling --
3    A.    No.
4    Q.    -- a misnomer?
5    A.    No.
6          MR. SCHMIDT:  Just answer the question.
7    A.    No.
8          MR. SCHMIDT:  Let him follow -- he'll
9  follow up if he wants to follow up.
10    Q.    Okay.  So Strategic Vision does not
11  have an in-house team of investigators?
12    A.    No.
13    Q.    And you never told Mr. Guo that you had
14  20 employees, did you?
15    A.    I said that we worked with a team of
16  people.  I did not say that we had 20 employees.
17    Q.    Okay.  Did you ever tell him that you
18  had strong teams in Europe and the Middle East?
19    A.    Most likely, yes.
20    Q.    Again, this is all before signing the
21  research agreement, right?
22    A.    Yes.
23    Q.    And did you tell him you had
24  relationships with an Abu Dhabi princess?
25    A.    I said a -- no.

Page 104

1    Q.    What, if anything, did you tell Mr. Guo
2  about an Abu Dhabi princess?
3    A.    A Saudi -- it was not Abu Dhabi, it was
4  Saudi.
5    Q.    Okay.  What did you --
6    A.    To clarify, it's usual we have to
7  clarify.
8    Q.    Sure.  What did you tell Mr. Guo about
9  a Saudi princess?
10    A.    She was my roommate.
11    Q.    That was in college?
12    A.    No, in high school.
13    Q.    And is she a client of Strategic
14  Vision?
15    A.    No.
16    Q.    Okay.  Did you tell Mr. Guo that you
17  had, or that Strategic Vision had relationships
18  with clients in Saudi Arabia?
19    A.    Yes.
20    Q.    And in Iran?
21    A.    Many years ago, in Iran.
22    Q.    What about Turkey?
23    A.    Not a client.  A relationship.
24    Q.    And what about Qatar, did you tell him
25  you had clients in Qatar?

Page 105

1    A.    I did.  Past tense.  We don't work with
2  terrorists.
3    Q.    Okay.  What about Republican
4  politicians, did you ever tell Mr. Guo that you
5  worked for Republican politicians?
6    A.    Many.
7    Q.    So you told him you had -- that
8  Strategic Vision had worked for --
9          MR. SCHMIDT:  Just focus in on what you
10  told him.
11    A.    Yes.  I did, yes.
12    Q.    So you told Mr. Guo that you had
13  provided services to -- that Strategic Vision had
14  provided services to Republican --
15    A.    Personally.
16    Q.    -- politicians?
17    A.    Personally.  Not Strategic Vision.
18    Q.    Okay.  And what did that entail; that
19  was political campaigns or --
20    A.    Political campaigns.
21    Q.    And I'm going to guess those were
22  Republican --
23    A.    Republican.
24    Q.    -- politicians?
25    A.    Yes, presidential.

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 106

1    Q.    Which president, or nominee?
2    A.    Beginning -- it's okay, it's on the
3    record.  Beginning with the campaign for
4    President Reagan, President Bush, Dan Quayle,
5    obviously President Trump.
6    Q.    Did you tell Mr. Guo about all of these
7    or some of them?
8    A.    Yes.
9    Q.    Okay.
10   A.    He asked.
11   Q.    Did you tell him that you had influence
12   at the CIA?
13         MR. SCHMIDT:  Objection, but go ahead.
14   A.    I never would have used the word
15   influence.
16   Q.    How would you put it?
17   A.    Channels.
18   Q.    In other words, you have contacts at
19   the CIA?
20   A.    Yes.
21   Q.    And you could get information from them
22   that could be useful to a client from the CIA?
23   A.    No.  That's a trick question.
24   Q.    No, I'm not trying to trick you.  I
25   didn't -- if it came out that way, it wasn't my

Page 107

1    intent.
2    A.    Yeah, come on.
3    Q.    I'm trying to understand what your
4    channels to the CIA, what their use is?
5    A.    Information sources that are
6    unclassified.
7    Q.    And I would ask you the same question.
8    Did you tell him that you had contacts or
9    channels in the state department?
10   A.    Yes.
11   Q.    Did you ever tell him that you worked
12   for the CIA?
13   A.    Never.
14   Q.    Okay.  Did you ever tell him that
15   Mr. Waller worked for the CIA?
16   A.    Never.
17         MR. GRENDI:  Let's go to 8.
18         (Wallop Exhibit 8, Research Agreement,
19   January 1, 2018, marked for identification.)
20   Q.    This has been marked Wallop 8.  Do you
21   recognize this document at all?
22   A.    This was a draft document to -- to Guo
23   initially.
24   Q.    Who created it?
25   A.    I think Mike and I did.

Page 108

1    Q.    I'm just trying to --
2    A.    There were a lot of drafts running
3    around at the time, so, and the date is not
4    right.
5    Q.    When did you first start drafting an
6    agreement in connection with this case?
7    A.    When he asked us to, probably in --
8    around the 15th or so of December of 2017, after
9    several meetings.
10   Q.    Were there any other meetings, other
11   than the three we've talked about already, that
12   preceded this drafting?
13   A.    You know, you'd have to ask Mike.  I
14   don't think so, no.
15   Q.    When did you -- when did you do the
16   first draft?  Don't even worry about this
17   document.  I don't know if it is the first draft.
18   A.    When we had the vision documents, those
19   were sort of the beginning of the discussion.
20   This time to get them was also part of the vision
21   document that was on the flash drive, and it was
22   all in the conversation of trying to understand
23   what it was that Guo wanted.
24   Q.    So how did you go about doing the first
25   draft?  Did you and Mike sit down at a computer

Page 109

1    together, or what was the process?
2    A.    Yes.
3    Q.    Okay.  Where was that, at your home in
4    Virginia?
5    A.    Yes.
6    Q.    And you sat together and --
7    A.    Yes.
8    Q.    -- typed it out or --
9    A.    Sat together and discussed it and...
10   Q.    Did you -- was it handwritten notes
11   that you later had someone transcribe or did
12   you --
13   A.    No.
14   Q.    -- type it on the computer?
15   A.    No.  We just typed it up while we were
16   talking.
17   Q.    And did you do the typing or did he?
18   A.    He did the typing.
19   Q.    Okay.  And did you keep the original
20   draft that you created?
21   A.    I think this was the draft.  I don't
22   know.
23   Q.    Okay.  And do you recall giving Wallop
24   8 to Mr. Guo or Lianchao or Ms. Wang?
25   A.    I'm sure that we gave it to both of

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 110

1   them.  But we would have given it to them, we
2   would never have emailed it.
3        Q.    And why is that?
4        A.    Because of security and open internet.
5   We did everything very carefully, even before we
6   had a contract.
7        Q.    So even if it was like a Signal message
8   and end to end encrypted, you wouldn't send it?
9        A.    Well, Signal was different.  Signal was
10  a little different.
11       Q.    Why is that?
12       A.    Well, it's not as porous as a lot of
13  them are.
14       Q.    So you wouldn't have a problem sending
15  this agreement via Signal?
16       A.    I honestly can't remember.
17       Q.    No, I'm asking --
18       A.    I don't -- I normally would not have.
19       Q.    Okay.
20       A.    I personally would not have.
21       Q.    I see.
22       A.    I don't send anything, if I can help
23  it, on Signal or anything else.  I either
24  hand-deliver it or I USB it.
25       Q.    And when did you first give a draft to

Page 111

1   Mr. Guo or Lianchao Han or Yvette Wang?
2        A.    It would have been towards the middle
3   to end of December.  It was the middle of
4   December, I think initially, and then we kept
5   hammering it out, hammering it out, and hammering
6   it out until we had a final agreement which was
7   signed on the, whatever it was, the 6th of
8   January.
9        Q.    And without revealing any
10  communications, did Strategic Vision involve an
11  attorney in drafting this research agreement?
12       A.    No.  We just did it by trust.
13       Q.    I think you said it before, but
14  Strategic Vision has never used an agreement
15  similar to this to service another client?
16       A.    No.
17       Q.    And did you keep the drafts of this
18  research agreement that you -- the multiple
19  drafts you referenced before?
20       A.    What you see is what you have.
21       Q.    I know.  What I'm saying is, you had
22  referred to there were multiple drafts, correct?
23       A.    There were, but then -- you know, with
24  a draft, you go through, you delete it, you --
25  you create a better draft.  So I think this was

Page 112

1   sort of one of the final drafts.
2        Q.    I see.  But -- so there were other
3   drafts that you had that you deleted?
4        A.    Probably.
5        Q.    Okay.  And why is that, why don't you
6   keep the drafts of the agreements that you do in
7   connection with engaging a client?
8        A.    Because there are typos and there are
9   linguistic changes that need to be made in a
10  better -- in a better draft.  I don't understand
11  that.
12       Q.    I appreciate that one wouldn't be used
13  going forward.  I'm talking about the deletion
14  process.  Why is it that you would dispose of
15  them?
16       A.    Well, why would you keep --
17            MR. SCHMIDT:  Just answer the question.
18       A.    No.  I don't know the answer.
19       Q.    So you don't know whether you deleted
20  draft versions of the agreement or not?
21       A.    I produced everything that we have in
22  the way of whatever draft agreements.  I have
23  nothing else in the way of draft agreements.
24       Q.    So Strategic Vision has no other drafts
25  of the agreement?

Page 113

1        A.    Not that I'm aware of.
2        Q.    Okay.  It has a blank for contractor.
3   Any particular reason that --
4        A.    No.  That would have been Strategic
5   Vision and the client.
6        Q.    Did you consider using another entity
7   to be the contractor in connection with this
8   research?
9        A.    No.
10       Q.    What's Strategic Vision's financial
11  relationship with Mr. Waller in connection with
12  this research agreement?
13       A.    You mean how did we -- how did we --
14  how did we compensate him; is that what you're
15  asking?
16       Q.    If that's -- yeah, if that -- that's
17  certainly encompassed by what I just said.
18       A.    Otherwise, I don't understand the
19  question.
20       Q.    Sure.  What did -- how was Mr. Waller
21  paid for his services in connection with the
22  research agreement?
23       A.    By wire.
24       Q.    Okay.  And how was that calculated or
25  determined?

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 114

1      A.    We just had an agreement of trust
2  between us.
3      Q.    What were the terms of that agreement?
4      A.    Probably 50/50, plus expenses.
5      Q.    And I take it this wasn't a written
6  agreement?
7      A.    No.  We never needed one.
8      Q.    Right.  So when did you and -- well,
9  when did Strategic Vision and Mr. Waller come to
10  this 50/50 split agreement?
11      A.    Well, after we had the agreement
12  finally signed, it had been going off and on, off
13  and on during all of December, we didn't know
14  whether we had an agreement or not.  And then,
15  when Yvette turned up with the first set of flash
16  drives that were corrupted, so then I had come to
17  New York -- we didn't have an agreement, per se.
18  We had a signed agreement.  We had no funds at
19  the time, at the first -- at the tail end of
20  December, when we were still all talking after
21  Christmas.
22          And, finally, the funds turned up --
23  I'm trying to answer your question here.  When
24  the funds turned up in, like, the 2nd or 3rd of
25  January of 2018, we still didn't know whether

Page 115

1  that was even going to work, and then they turned
2  up from somebody we'd never heard of, and so
3  forth and so on.  So we had to sit down and
4  decide what was going to go for the teams that we
5  were going to use and how we were going to
6  allocate the expenses and so forth.
7      Q.    So when -- when was the point in time
8  when Strategic Vision and Mr. Waller decided how
9  they were going to, as you described it, split
10  the -- split it 50/50?
11      A.    Not until sometime in January.
12  Probably the end of January.
13      Q.    So, well after the contract had been
14  signed --
15      A.    Yes.
16      Q.    -- and the --
17      A.    We were trying to figure out what
18  things were going to cost.
19      Q.    You said before that Strategic Vision
20  had sent money to Mr. Waller, or Dr. Waller?
21      A.    When?
22      Q.    I'm asking.  That's what my question
23  is.
24      A.    No.  I mean...
25      Q.    You said there was a wire.  What was

Page 116

1  the wire that was sent?
2      A.    The wire was not sent until the middle
3  of January or so.
4      Q.    Okay.  And was that wire for splitting
5  the profits or for something else?
6      A.    It was for beginning to start paying
7  the team as well as beginning to pay Mike.
8      Q.    Oh, so it was both?
9      A.    Yeah.  There were two wires.  Maybe
10  there were three wires, yeah.
11      Q.    So how much was the wire for the team?
12  And I assume that means Team 1?
13      A.    The preliminary amount for Team 1 was
14  at least 300,000.
15      Q.    And how much of that, if there was a
16  second wire or the same wire, was for Dr. Waller?
17      A.    Then there was a separate wire for
18  about 200 for Dr. Waller.  It could have been
19  250, I have to look.  We haven't done our tax
20  thing yet on it.  But about 250.  And then there
21  was an additional amount for expenses.
22      Q.    How much was that expense amount wire,
23  if you recall?
24      A.    Well, I think -- we're talking about
25  travel, and -- because he had to do a lot of the

Page 117

1  face-to-face collection, and last minute, which
2  costs a lot more; probably between 25 and 50, I
3  can't remember, thousand.
4      Q.    And is that the full extent of the
5  amount of money that's been paid to Dr. Waller in
6  connection with the research agreement that's the
7  subject of this litigation?
8      A.    I think there was a bit more, maybe
9  another 50, and that was based on certain
10  invoices that he had for -- for things that he
11  was -- that we had to pay.
12      Q.    I see.  And so what about -- let's just
13  set aside Dr. Waller.  Were there any other costs
14  that Strategic Vision incurred in connection with
15  this research agreement that didn't go through
16  Dr. Waller or one of his entities?
17      A.    There were -- there was a lot of travel
18  expense for Strategic Vision, face-to-face time
19  with these individuals overseas that I had to do.
20  There was -- there were other entities that were
21  also contracted to retrieve information.
22      Q.    Let's go one at a time, I'm sorry to
23  hop in.  But what were your -- what were
24  Strategic Vision's kind of direct travel
25  expenses?

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 118

1    A.    Oh, I would say probably at least
2  50,000.
3    Q.    And does Strategic Vision have records
4  and bank statements that would memorialize or
5  otherwise reflect all these payments you're
6  talking about here today?
7    A.    We would be able to give you an idea as
8  to what the costs are, yes.
9    Q.    So those records do exist?
10   A.    The records, the receipts, yes.
11 (*r)    MR. GRENDI:  Joe, obviously we're going
12       to call for the production of those
13       documents, we'll obviously send you a
14       letter, but to put that on the record.
15   Q.    I'm sorry, you were saying after travel
16 expenses, there were other costs as well?
17   A.    Yes.
18   Q.    What were those?
19   A.    The hiring of individuals overseas to
20 retrieve certain information that was only --
21 only in the U.K. or in Switzerland or in the
22 Middle East.
23   Q.    Okay.  And these are -- this is
24 separate from Team 1?
25   A.    Yes.

Page 119

1    Q.    And what was the cost of, let's just
2  say, the team you used to get information out of
3  the U.K.?
4    A.    It was about 20,000 U.S. dollars.
5    Q.    Is that a group called Fletcher?
6    A.    That's correct.
7    Q.    Okay.  What about, you said that maybe
8  a team in Switzerland or somewhere else?
9    A.    Yes.
10   Q.    What was the cost of that other team?
11   A.    I'd have to look.  I can't remember.
12 But it was minimal.  I mean, it wasn't -- it
13 wasn't -- it's like maybe 8, $10,000, something
14 like that.
15   Q.    Right.
16   A.    Some of it had to be done in cash.
17   Q.    How much of it was done in cash?
18   A.    Maybe that amount.
19   Q.    Eight to 10,000?
20   A.    Eight to 10,000, perhaps.  I hate cash.
21   Q.    If you would take a moment, are there
22 any other costs that you can think of that
23 Strategic Vision incurred because of this
24 research agreement?
25   A.    Well, the usual costs, telephone,

Page 120

1  travel, time spent working on this, lots of
2  different meetings with different people to try
3  to collect data.
4    Q.    Did Strategic Vision ever turn away any
5  clients because of this engagement?
6    A.    Yes, we did.
7    Q.    When was that?
8    A.    It was probably in March.
9    Q.    Of what year?
10   A.    I'm sorry.
11   Q.    That's okay.
12   A.    2018.
13   Q.    Sure.  March of 2018.  And why did
14 Strategic Vision turn that client away?
15   A.    Because we were still working on this,
16 we believed.  It could have been February, too.
17 I'd have to ask Mike.
18   Q.    And what's the name of that potential
19 client?
20   A.    I can't tell you.
21   Q.    So you're refusing to tell me that
22 because?
23   A.    I can't tell you.
24   Q.    No, I'm asking why you're not telling
25 me?

Page 121

1    A.    It's confidential.
2         MR. SCHMIDT:  Can you describe in
3      general terms at all or?
4         THE WITNESS:  Obviously, I cannot.
5         MR. SCHMIDT:  Okay.
6         MR. GRENDI:  I mean, obviously, we
7      don't accept that assertion of
8      confidentiality here, and we'll deal with it
9      at a later date.
10   Q.    So why was it that this confidential
11 client couldn't be engaged?
12   A.    We had a lot on our plate.
13   Q.    And how much was this potential client
14 willing to engage Strategic Vision for?
15   A.    We hadn't gotten that far.
16   Q.    So you don't know whether the --
17   A.    No.
18   Q.    -- potential client was going to be a
19 valuable one or not?
20   A.    No, I don't know.  I'd have to -- I'd
21 have to talk to Mike about it.
22   Q.    Was it Mike's client or your client, or
23 Strategic Vision's client I should say?
24   A.    We would have shared the client.
25   Q.    Okay.  And just generally, can you

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 122

1   describe what the tenor of the conversation was
2   with this client as to why you couldn't provide
3   the service?
4       A.    We had a full plate.  We couldn't
5   handle it.
6       Q.    So the client reached out to you?
7       A.    Yes.
8       Q.    And you said, we can't do it, we're
9   full?
10      A.    We're full.
11      Q.    So Strategic Vision can only have a
12  limited amount of clients at a time?
13      A.    No.
14      Q.    What's full capacity for Strategic
15  Vision?  It sounds like one investigation,
16  investigatory research project is a full plate?
17      A.    No.
18      Q.    It's not?
19      A.    No.
20      Q.    Okay.  So, again I'll ask, why did you
21  turn them away if you could have done it then?
22      A.    We had a full plate.
23      Q.    So the research agreement that is the
24  subject of this case, that encompasses work that
25  maxes out Strategic Vision's capacity?

Page 123

1       A.    No.
2       Q.    Okay.  So then it's not a full plate?
3       A.    We were very busy doing many other
4   things, and so we could not take on an additional
5   client at the time, even though we wanted to.
6   But we'd also been served with some lawsuit on
7   the 23rd of February, which then, who knows.
8       Q.    So just to be clear.  So the client
9   that was turned away from Strategic Vision --
10      A.    Yes.
11      Q.    -- because of your full plate --
12      A.    Yes.
13      Q.    -- was after the February 23rd, 2018
14  letter?
15      A.    No.  As I said, it was either during
16  the middle of February, to the beginning of
17  March.  I can't remember exactly what the date
18  was.
19      Q.    Okay.
20      A.    Mike is the one that would know what
21  the date was.  I don't know the date.  But we had
22  hoped that the client would understand the
23  circumstances.
24      Q.    Did you go back to that client after
25  this agreement was terminated and say, we're

Page 124

1   free, we can do it?
2       A.    No, we did not.  And we had a full
3   plate, we should have.
4       Q.    Because of litigation?
5       A.    No.  We had a full plate.
6       Q.    So you got another client?  I'm asking
7   a question.
8       MR. SCHMIDT:  I mean, can you give him
9       just a little bit more about what the full
10      plate is, in addition to the lawsuit and
11      this contract.  I think that's fair.
12      A.    We had a full plate.  I can't give you
13  any more than that.
14      Q.    So you're refusing to answer that
15  question?  You're refusing to tell me whether
16  Strategic Vision had another client, and that's
17  why you couldn't do any more?
18      A.    We could have had another client.  We
19  did not -- we chose not to take the other client
20  because we had a full plate.  We didn't know what
21  this whole thing was all about.  So we just
22  didn't want to get into any more issues with a
23  client that was as complicated.
24      Q.    At the time the research agreement was
25  signed, January 6, 2018 --

Page 125

1       A.    Correct.
2       Q.    -- was Strategic Vision servicing any
3   other clients with investigatory research
4   services?
5       A.    No.
6       Q.    From the signing of the research
7   agreement, until February 23rd, 2018, did
8   Strategic Vision provide investigatory research
9   services to any other client?
10      A.    Not in that time frame, no.
11      Q.    Okay.  After February 23rd, 2018
12  through, let's say, the end of March 2018, did
13  Strategic Vision provide investigatory research
14  services to any other client?
15      A.    No.
16      MR. GRENDI:  How are people feeling
17      about lunch and taking that break?
18      MR. SCHMIDT:  At one o'clock, do you
19      want to do it?
20      MR. GRENDI:  Do you want to do
21      one o'clock?  I'm fine with that.  Is that
22      okay with you?
23      MS. TESKE:  Yes.
24      MR. SCHMIDT:  Is that good?
25      THE WITNESS:  That's fine.

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 126

1    MR. GRENDI:  So another 15 minutes.
2    Let's do Strategic Vision 9.
3         (Wallop Exhibit 9, Research Agreement
4    dated December 29, 2017, marked for
5    identification.)
6    Q.    Ms. Wallop, do you recognize this
7    document?
8    A.    I do.
9    Q.    That's your signature on the last page
10   there?
11   A.    It is.
12   Q.    Were you physically present when this
13   contract was executed?
14   A.    Yes.
15   Q.    And who else was there?
16   A.    Yvette Wang.
17   Q.    Anyone else?
18   A.    No.
19   Q.    Dr. Waller wasn't physically present?
20   A.    No.
21   Q.    Was he on a conference call or
22   telephoned in during the time that this agreement
23   was signed?
24   A.    No.
25   Q.    The agreement references the laws of

Page 127

1    the state of Nevada in that second paragraph, do
2    you see that?
3    A.    Correct.
4    Q.    Where did that come from?
5    A.    Because Strategic Vision is registered
6    in the state of Nevada.
7    Q.    So you put that in there because that's
8    where Strategic Vision is incorporated?
9    A.    Correct.
10   Q.    And there's some, I'll call it lingo or
11   jargon in this contract about fish, do you recall
12   that?
13   A.    Yes.
14   Q.    Where did the term fish come from?
15   A.    Guo was having a hard time
16   understanding how -- how we would select the --
17   the concept of investigation and the numbers, for
18   instance, per month.  The -- the whole file that
19   he showed us had -- the original file, whatever
20   exhibit that was, in fact, had at least 92 names
21   in it, which was reduced down to 30 names, which
22   was then reduced down to the ten names, but then
23   they switched and wanted to have 15 names in the
24   first month.
25        So, in order to give him an explanation

Page 128

1    as to how best to visualize, so to speak, the
2    whole concept of this agreement, we used an
3    example of like, it's like fish in a tank.  So if
4    you put the ten fish, or, as it turned out to be,
5    15 fish in the tank, and one of the fish --
6    forgive me -- died, but we didn't want to use the
7    word died, if one of the fish wasn't a useful
8    fish on the information that we were trying to
9    pull, we would take that fish out and put a new
10   fish, meaning a new name, into the tank, and we
11   would run the investigative background on that
12   new fish, as well as the other nine fish.
13        So, that's where the whole concept of
14   the fish tank came from.  He loved it.  He
15   couldn't wait to use it.  It was a big deal to
16   him.  So, fine, we kept talking about fish.  So,
17   for whatever reason, that's why it ended up in
18   this sort of contract agreement.
19        I realize that it's not the usual kind
20   of contract terminology that I would have used,
21   but he loved it, and so he used it, and so he
22   understood it, and that's why we moved forward
23   with it
24   Q.    I just want to know where the concept
25   came from.  Did he start using the term fish or

Page 129

1    did you; kind of like you saw a fish tank and you
2    said, well, it's just like if you took fish in
3    and out of a tank?
4    A.    Well, we were talking in hypotheticals.
5    He didn't understand how we would have to just
6    take different names out of different sort of
7    collection points --
8    Q.    I see.
9    A.    -- so we just used a really simple
10   analogy of a fish tank.  And you put the ten fish
11   in, as it turned out for the first month 15, and
12   then they -- you know, you pull one out if you
13   found that it wasn't going anywhere; in other
14   words, if it was a dead end.  A lot of these
15   Chinese names used fake names.  That's a whole
16   other thing we can get into.
17   Q.    Sure.  And has Strategic Vision ever
18   used this fish, or fish tank terminology --
19   A.    Never.
20   Q.    -- in connection with --
21        Just let me finish my question.
22   A.    Sorry.
23   Q.    -- with any other client?
24   A.    Never.
25   Q.    I take it from your expression that you

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 130

1   found it silly or ridiculous?
2       A.    I did, but it helped him understand the
3   concept.
4       Q.    It says here that, "Any and all
5   materials provided by the client, that's Eastern
6   Profit, to the contractor, that's Strategic
7   Vision, will be treated with absolute
8   confidentiality and will not be shared by the
9   contractor with any other entity."
10              Do you see that in the third paragraph
11  of this research agreement?
12      A.    Yes.
13      Q.    What -- how does that work with
14  Strategic Vision in terms of sharing information
15  with other entities?
16      A.    Well, we had to share it with the
17  teams, in other words, for them to be able to do
18  the research.
19      Q.    Does the contract discuss that at all?
20      A.    It's very clear.  You can't have an
21  agreement -- you can't do the research unless you
22  give it to the teams to do the research, right?
23      Q.    I just asked you if that was in the
24  agreement?
25      A.    Yes.

Page 131

1       Q.    Where?
2       A.    With any other entity.  "Will not be
3   shared by any other entity."  It's not an empty,
4   it was a team.  An entity would be the Washington
5   Post, or you, or a third or fourth party that has
6   nothing to do with this research agreement.
7       Q.    So I just want to understand that.  So
8   then, the contractor referred to in the contract
9   refers to more than just Strategic Vision?
10      A.    Our teams.
11      Q.    Okay.
12      A.    You understand the teams that we had to
13  use.
14      Q.    I'm just trying to understand what the
15  contract says.  Does the contract say anything
16  about teams?
17      A.    Well, if you're in the business, you
18  understand teams are teams, and you have to use a
19  team with a -- as a part of the contract.  He
20  knew perfectly well what that meant.
21      Q.    I just asked you whether the contract
22  said it, that's all.
23      A.    I'm not a lawyer.  It wasn't drawn up
24  by a lawyer.
25      Q.    It says, "The contractor will conduct

Page 132

1   high quality original research and prepare
2   reports on subjects chosen at the client's
3   discretion."
4               Do you see that in that following
5   sentence?
6       A.    Correct, yes.
7       Q.    What original research did Strategic
8   Vision do in connection with this contract?
9       A.    Based upon what we received, we then
10  started diving into pulling information.
11      Q.    When you say we, are you talking about
12  the entity Strategic Vision or other people, like
13  teams?
14      A.    Teams, and Mike and myself.
15      Q.    Was there anyone else that did the
16  research, other than those three entities that
17  you just referred to, yourself, Mr. Waller, or
18  Dr. Waller, and the teams?
19      A.    The groups in -- the individual ones in
20  both Europe and in the U.K.
21      Q.    Is that, you mean Fletcher --
22      A.    Yes.
23      Q.    -- and the other entity that you
24  referred to --
25      A.    Yes.

Page 133

1       Q.    -- I guess, in Switzerland?
2       A.    Yes.
3       Q.    It says, "The contractor will produce
4   complete research reports and provide all
5   supporting data as indicated below."  Do you see
6   that, two or three sentences down?
7       A.    Yes.
8       Q.    So was Strategic Vision going to
9   produce all the reports or were the teams going
10  to create some of them?
11      A.    The teams were going to develop them on
12  the flash drives.  We were not going to do any
13  written reports.
14      Q.    Why wouldn't you do any -- why wouldn't
15  Strategic Vision do any written reports?
16      A.    Because we were trying to keep it as
17  secure as possible.
18      Q.    But you understood that the other
19  teams -- strike that.  Let me start over.
20  Strategic Vision understood that its teams would
21  create written reports?
22              MR. SCHMIDT:  Objection.
23      A.    No.
24      Q.    No?
25      A.    No, it never says anything here about a

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

1  written report.
2       Q.   No, I know, I understand that.  I'm
3  trying to understand whether Strategic Vision
4  understood whether its teams or independent
5  contractors would produce written reports?
6       A.   We would not produce written reports,
7  or we had no intention of doing that.  This
8  was -- these were face-to-face meetings,
9  face-to-face information, USB flash drives.
10      Q.   Oh, I understand.
11      A.   It was --
12      Q.   Maybe we're having a semantic --
13      A.   It was Guo's -- sorry.  It was Guo's
14 insistence on the security measure.
15      Q.   I want to clarify something here.  Do
16 you understand written to mean just like
17 something written on a piece of paper as opposed
18 to electronic?
19           MR. SCHMIDT:  That's how I understood
20      it.
21      A.   Yes.
22           MR. SCHMIDT:  That's how the question
23      was.  You went from flash drives to USBs --
24           MR. GRENDI:  No, hold on.  Hold on.
25           MR. SCHMIDT:  -- into written reports.

1       So a written report is a written report.  It
2       has a standard connotation.  So you might
3       have to redo this.
4            MR. GRENDI:  Yeah, let's -- let's break
5       it out.  I didn't get it.  I always think of
6       writing as both.
7       Q.   So, including electronic documents, did
8  you understand that written materials would be
9  produced?
10      A.   No.
11      Q.   So you never -- Strategic Vision never
12 contemplated providing any written materials to
13 Eastern Profit?
14      A.   Correct.
15      Q.   So Strategic Vision understood
16 everything would be conveyed orally to the
17 client?
18      A.   Via flash drive.
19      Q.   So flash drive would be allowed.
20 That's -- I'm including a flash drive as a
21 writing.  In other words, if something is typed
22 or handwritten on a piece of paper, that's a
23 writing.  Can we agree on that?
24      A.   No.
25           MR. SCHMIDT:  I'm actually seriously

1       confused.  I don't know what you're asking.
2            MR. GRENDI:  All right.  I mean --
3            MR. SCHMIDT:  I think you got to back
4       way up and start this over.
5            MR. GRENDI:  Well, we're getting -- why
6       don't we do lunch.  We'll start over on
7       this.  It's no big deal.
8            THE VIDEOGRAPHER:  Off the record at
9       12:57.
10           (Whereupon, a short recess was taken.)
11           THE VIDEOGRAPHER:  Back on the record
12      at 1:01.
13      Q.   How did Strategic Vision intend to
14 deliver the reports described in this research
15 agreement?
16      A.   Directly to the designated driver, the
17 designated agent for Mr. Guo, who was either
18 going to be Lianchao, then it became Yvette, and
19 then it became Lianchao again.  So we would give
20 it to them or Guo directly on a USB key.
21      Q.   So there would be electronic documents
22 on a USB?
23      A.   Correct.
24      Q.   And would any of those documents be a
25 report in narrative form?

1       A.   I never saw them until later, until
2  after all of this started.  I never saw any of
3  the documentation.  Again, compartmentalizing.
4       Q.   Right.  So Strategic Vision never
5  reviewed any of the documents that were delivered
6  to either Lianchao Han or Yvette Wang under this
7  research agreement?
8            MR. SCHMIDT:  Objection.  Go ahead.
9       A.   No.
10      Q.   And I'll just ask about you personally.
11 You personally didn't review any of the documents
12 that were delivered to Lianchao Han or Yvette
13 Wang under this research agreement?
14      A.   No, because of the timing and the
15 logistics.
16      Q.   Okay.  What is financial forensic
17 historical research?
18      A.   What do you mean?
19      Q.   Well, it's described here in -- on
20 Eastern 5, on the first page there?
21      A.   Yes.
22      Q.   Have you used that term before in --
23      A.   Yes.
24      Q.   -- other research agreements?
25      A.   Yes.

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 138

1    Q.    And are these kind of standard terms or
2  items that would be included in financial
3  forensic historical research?
4    A.    It would be, particularly if you're
5  looking at information you're trying to get in
6  the way of money laundering or cash purchases;
7  for instance, there were cash purchases of
8  houses, cash purchases by these fish.  We were
9  tracking their individual financial spending
10 habits, how they could have a house, how they
11 could have a car, when they only had $2,500 in a
12 credit card limit.
13           I mean, there were multiple layers and
14 levels of investigation that go on into
15 financial, forensic accounting, or research in
16 this case.
17   Q.    This kind of list of different things
18 that could be researched, including statements,
19 capital sources, etc., do you see that list with
20 all those commas there?
21   A.    Yes.
22   Q.    Was that a list that you and Dr. Waller
23 put together in terms of Strategic Vision's
24 capabilities?
25   A.    What we would have been able to have

Page 139

1  researched -- there are two ways of looking at
2  it.  Stateside, what anybody can do that is into
3  this field.
4    Q.    Right.
5    A.    Versus what you can also do overseas,
6  and they're sort of two different rabbits here.
7    Q.    Does the agreement kind of break out
8  that difference in terms of U.S. versus foreign?
9    A.    Somewhere in here, I think it might
10 have.
11   Q.    Okay.  But just going back to this list
12 of different types of information on Eastern 5.
13 Do you recall you and Dr. Waller putting that
14 list together, or this --
15   A.    Yes, we did.  We talked about it, and
16 he wrote -- wrote it while we collaborated on it.
17   Q.    Do you remember any input from the
18 other side as to what the financial forensic
19 historical research should include?
20   A.    They wanted everything, everything we
21 could get our hands on.
22   Q.    I see.
23   A.    He was particularly -- Guo was
24 particularly insistent that we dive and dive
25 harder, and dive faster, and dive harder, almost

Page 140

1  to our detriment; we said, it was not legal to do
2  what he wanted to be done, so.
3    Q.    So in terms of the -- you understood
4  that the client wanted everything in terms of
5  financial forensic historical research?
6    A.    That's correct.
7    Q.    And then you kind of put together this
8  list here of everything you could think of that
9  you could access?
10   A.    We put together the list first.
11   Q.    Okay.
12   A.    And then he kept saying he wanted more
13 and more and more and more.
14   Q.    Oh, so do you recall adding, you know,
15 different items to this A tab, forensic
16 historical research, to include more items that
17 he was demanding?
18   A.    No.  He demanded it verbally.
19   Q.    Okay.
20   A.    I think it was around the 26th of
21 January, that, I do remember, where he was
22 insistent; I don't care what it takes, get it,
23 get it.  We said, you have to take your time.
24   Q.    And it talks about on the next page,
25 Eastern 6, progress reports.  It says,

Page 141

1  "contractor will produce a progress report on" --
2    A.    Where is this?
3    Q.    It's the, I guess, the first full
4  paragraph on Eastern 6.
5    A.    Oh, okay.
6    Q.    What is a progress report?
7    A.    Verbal conversations that we had with
8  him.
9    Q.    What would be in a verbal progress
10 report?
11   A.    Telling him what we were doing and how
12 we were trying to get the teams set up and done
13 in the first month.
14   Q.    Has Strategic Vision bargained for
15 progress reports in other agreements with other
16 clients?
17   A.    I don't understand the question.  Each
18 client is different and each agreement is
19 different, and so the terms are different.
20   Q.    So you've never -- strike that.  Has
21 Strategic Vision ever provided progress reports
22 to other clients in connection with investigatory
23 research?
24   A.    Usually we do it the same way, through
25 USB key or face-to-face.

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 142

1    Q.   Has the term progress report been used
2  by Strategic Vision in other contracts it has
3  with its clients?
4    A.   It depends on the terms of the
5  contract.
6    Q.   I'm asking if you recall?
7    A.   I don't recall.
8    Q.   So progress reports are not a standard
9  term that Strategic Vision uses in other research
10 agreements?
11       MR. SCHMIDT:  Objection.
12   A.   Progress reports have different
13 definitions depending upon the security and
14 the -- each individual client's situation.  They
15 are not all the same.
16   Q.   I understand.
17   A.   So they're not all the same.
18   Q.   Okay.
19   A.   A progress report -- if somebody wants
20 a progress report on how their cat is doing, we
21 can do a progress report on how the cat is, or
22 how a house is, or a real estate is.  But this is
23 highly confidential and a secure confidential
24 compartmentalization of information that was
25 vital to him, to Guo.

Page 143

1    Q.   What about preliminary reports?
2    A.   There is no terminology on here on
3  preliminary reports, other than face-to-face.
4  That's what we were relying on, was face-to-face.
5    Q.   If you look at the next sentence, it
6  says -- or, actually, the same sentence.  It
7  says, "the contractor will produce a progress
8  report on this financial, forensic research each
9  week in the first month."  Then it says, "one
10 preliminary report in the first month."
11   A.   Which we did.  We exceeded that.
12   Q.   Let me ask you this.  What does a
13 preliminary report include?
14   A.   Verbal report, face-to-face, which is
15 what we were doing when we had the meetings with
16 Guo in his apartment.
17   Q.   I think you're misunderstanding my
18 question.  I'm trying to understand what the
19 contents of a preliminary report would be, as
20 compared to a progress report?
21   A.   It would be a verbal report and
22 updating him on what the circumstances were and
23 what we were gathering and how we were gathering
24 it.  That's a preliminary report.
25   Q.   So there's really no difference between

Page 144

1  a progress report and a preliminary report?
2    A.   I have no idea how to answer that,
3  except that I'm trying to explain to you that it
4  is, in fact, a face-to-face conversation.  It is
5  not in writing.
6    Q.   I understand that.
7    A.   Okay.  So what's the problem on the
8  question?  I don't understand.
9    Q.   I want to understand what the
10 difference is between them.
11   A.   A written report and a verbal report?
12   Q.   Not a written report, no.  Let me ask
13 my question.  It says, a weekly progress
14 report --
15   A.   Yes.
16   Q.   -- and one preliminary report at the
17 end of the first month, or in the first month.
18   A.   All right.
19   Q.   And I want to know if, to Strategic
20 Vision, is there a difference between the
21 contents of a progress report and a preliminary
22 report.  I'm talking about contents, not delivery
23 method.
24   A.   Depending upon how much we've been able
25 to gather, the preliminary report is precisely

Page 145

1  that; that's just the beginning, that's like the
2  first paragraph in a novel.  The next
3  conversation, which is what happened, the next
4  conversation was an update on the material and
5  the information that we had already gathered.  So
6  it was all still verbal, face-to-face.  There is
7  no written report.
8    Q.   And what about a historical research
9  report, one comprehensive historical research
10 report; what were the contents --
11   A.   And that was --
12   Q.   -- whether it's conveyed orally or in
13 writing or electronically, what would the
14 contents of a comprehensive historical research
15 report be?
16   A.   That would have been the findings that
17 would have been coming from our teams, or team in
18 this case, which would have been the USB or flash
19 drive.
20   Q.   And what would typically be in a
21 comprehensive historical research report?  What
22 kind of level of information would be there?
23   A.   Since we were trying to get something
24 within ten days of the contract commencing, and
25 he was adamant about getting something

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 146

```
1   immediately, and we had to move teams, and Mike
2   had to go and see the teams two or three times in
3   order to get -- or meet with the team people two
4   or three times in order to get the flash drives,
5   it disrupted the process, and those teams were
6   doing a great deal of diving, and they did not
7   need to be disrupted.
8           So when we had the opportunity of
9   bringing information back, which is what Mike did
10  to Yvette several times, and we -- that was the
11  content, that was the first set of contents
12  within the first ten days of the contract.
13       Q.    Which delivery of the USB does
14  Strategic Vision consider to be the comprehensive
15  historical research report?
16       A.    Well, the beginning of it was the -- at
17  the tail end of January, I think, when Mike went
18  back and forth to -- twice, I think, to -- to
19  meet the team person.
20       Q.    So was that about on January 30, 2019?
21       A.    That's correct.  Not '19.  '18.
22       Q.    Oh, '18.  Thank you.  Appreciate that.
23  Was that a meeting where Dr. Waller delivered,
24  let's say, an 80-Gigabyte Flash Drive to Yvette
25  Wang at the Tracks Bar?
```

Page 147

```
1        A.    Well, at the train station.
2        Q.    The train station, sure.
3        A.    That's what I knew.  Yes.
4        Q.    But Strategic Vision had never even
5   reviewed --
6        A.    I never saw it.
7        Q.    -- that deliverable?
8        A.    Never saw it.  How could I see it?
9        Q.    And just looking at the next item,
10  "Current Tracking Research."
11       A.    Yes.
12       Q.    What kind of research is this?
13       A.    It's current tracking research.
14       Q.    What does it entail, though?  It's like
15  a -- is this --
16       A.    It's tracking individuals.  It's
17  tracking individuals that were the first ten on
18  the list, or the first 15 on the list that he
19  wanted us to track.
20       Q.    Is this akin to what, like, a private
21  investigator would do in terms of --
22       A.    Well, you know, you can look at
23  their -- their travel habits, you can look at
24  their travel bills, you can probably maybe or
25  maybe not get into some of their credit card
```

Page 148

```
1   activity with -- like American Express or
2   airlines.  It depends.  Names of carriers,
3   manifests, geo location, which is easy enough
4   to -- to get into if you have somebody's
5   telephone number.  Major events.  You can -- you
6   can -- you can do a lot that is -- that is
7   accessed remotely, as it says here.
8        Q.    And the reports for current tracking
9   research, is there any sort of meaningful
10  distinction between current tracking research
11  reports and financial, forensic, historical
12  research reports?
13       A.    It all would have been delivered, had
14  we had time to collect what we wanted to collect,
15  within the first USB keys.
16       Q.    Did Strategic Vision deliver any
17  current tracking research reports?
18       A.    I don't know what was on the reports.
19  I think the answer is yes.
20       Q.    But you never reviewed the reports?
21       A.    I did not, but I understand that the
22  answer is -- in some cases, actually, with the
23  Team 2 we did find stuff on tracking.
24       Q.    Okay.  We'll get to that.  What about
25  social media research; in terms of investigatory
```

Page 149

```
1   research, what's the distinction between current
2   tracking and social media?
3        A.    Social media is what's available online
4   that you can dive into and do a little bit more
5   in depth access into passwords and things like
6   that, that people like that, that do that sort of
7   thing understand how to get.
8        Q.    Is that hacking, password hacking?
9        A.    Overseas, it is known as hacking.  We
10  would not hack here.
11       Q.    But Strategic Vision would retain
12  independent contractors or other entities to do
13  hacking in other countries?
14       A.    Yes.  It's legal.
15       Q.    Which countries is it legal in, if you
16  know?
17       A.    I don't know all the countries.
18       Q.    What are some of them?
19       A.    Probably anywhere in Europe, probably
20  Russia, Eastern Europe, God knows Asia.
21            MR. SCHMIDT:  Don't speculate.  Just if
22       you know.
23       Q.    Did Strategic Vision retain anyone to
24  do this social media research in connection with
25  this research agreement?
```

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 150

1      A.    It was all done with Team 1.  Team 1
2  was doing it.
3      Q.    So Team 1 was assigned the A, B and C
4  described here on Eastern 5 and 6?
5      A.    They were assigned the entire menu.
6  That was their job.  Even though it was separated
7  out, they knew exactly what their mandate was.
8      Q.    And the social media research reports,
9  again, is there any distinction between how
10  they're created and the other reports,
11  conceptually?
12      A.    We didn't have time.  We -- what we
13  were pulling in ten days was remarkable.  Nobody
14  can pull it in ten days.  So you have a
15  three-month contract that you're signed on to,
16  and you believe that you've got three months to
17  pull the entire set of information retrieval
18  that's necessary, and you're given ten days,
19  while somebody's squawking about, oh, my, you
20  know, it -- it's not all there.
21           Well, it can't possibly be all there.
22  Nobody can have it there in ten days.  You can't
23  build a team, collect the beginnings of all of
24  these things, unless you want to be shut down
25  immediately.

Page 151

1      Q.    I just want to be clear, though.  Did
2  Strategic Vision deliver any social media
3  research reports?
4      A.    I'm sure we did, somewhere.
5      Q.    Did you verbally deliver a social media
6  research report to the client?
7      A.    I believe we did.
8      Q.    When would that have been?
9      A.    Sometime during -- between December and
10  January of 2017, '18.  They were verbally,
11  verbally.  And we may have had some
12  documentation.  I can't remember.
13      Q.    And what about current tracking
14  research, how was that conveyed to Ms. Wang or
15  Lianchao Han?
16      A.    Mike did it with the USB key.
17      Q.    And that was on January 30th of 2018?
18      A.    Yes.
19      Q.    Any other time?
20      A.    Yes, there was another USB key earlier,
21  I think.
22      Q.    It says on Eastern 7 that "all
23  deliverables shall be by USB drive only."
24      A.    Correct.
25      Q.    What does deliverables mean in that

Page 152

1  context?
2      A.    All the information we were mandated to
3  investigate.
4      Q.    And why USB only; was that a Strategic
5  Vision concept or Mr. Guo or someone else?
6      A.    It was Guo, as well as our own sense of
7  security on this investigation.  We were
8  investigating, according to Guo, a number of the
9  communist Chinese hierarchy leadership and their
10  children in the United States, and it was --
11  could have been life-threatening for all of us.
12  So it was only on USB key, and, hence, the
13  security issue.
14      Q.    Did Strategic Vision understand that
15  all the fish in Exhibit 7 were living in the U.S.
16  or had property in the U.S.?
17      A.    Some of -- no.  Some of them did and
18  some of them didn't.  I -- you know, you'd have
19  to go through them individually to see which ones
20  have what.
21      Q.    And so is that why Strategic Vision
22  needed a U.S. team, because there was
23  U.S.-located fish?
24      A.    There was U.S.-located information,
25  like fake passport numbers, fake Social Security

Page 153

1  numbers, fake names, Chinese, fake.  A lot of
2  fakes.
3      Q.    In the United States?
4      A.    In the United States.  On the list that
5  Guo gave us.
6      Q.    It says on Eastern 7 that, "the
7  contractor guarantees that all information
8  provided is genuine."  Do you see that?
9      A.    Yes.
10      Q.    It's in the criteria section.
11      A.    Sure.
12      Q.    How does Strategic Vision guarantee
13  that its information is genuine?
14      A.    Based upon the individuals from whom we
15  were retrieving the information, providing of
16  course we were given -- not given fake names and
17  fake passports and fake criteria to investigate.
18      Q.    I just want to understand Strategic
19  Vision's process, though.  How does it normally
20  go about guaranteeing the genuineness of the
21  information being provided to its clients?
22      A.    Because we trust our sources, and our
23  sources do not make up nonsense.
24      Q.    Does Strategic Vision ever do any
25  cross-checking or verification of the information

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 154

1  provided by its sources?
2      A.   That's part of the idea that we had
3  with having Team 1 and Team 2.
4      Q.   That's what you're talking about with
5  the -- how to get them document?
6      A.   Yeah.  It's cross-checking, it's making
7  sure, double verifying the same fact.  You have a
8  birthday over here and you have a birthday over
9  there.  They should be the same birthday.  If
10 they're not, there's something that we need to
11 look at on a secondary basis.
12      If you have a passport number over
13 here, a U.S. passport, a U.S. visa number over
14 here, and it doesn't match what we have within
15 the state department, there's an issue.  So we
16 have to then go down that rabbit hole.
17      Q.   And that's a synthesis or an analysis
18 process that Strategic Vision typically does with
19 the information it's getting from its sources?
20      A.   That's correct.
21      Q.   I see.  And that's how Strategic Vision
22 typically feels comfortable guaranteeing that all
23 the information is genuine?
24      A.   That's correct.
25      Q.   Did Strategic Vision have an

Page 155

1  opportunity to verify that the information being
2  provided was genuine in this instance?
3      A.   Yes and no.
4      Q.   Okay.  How does that work; which part
5  is yes and which part is no?
6      A.   Okay.  Of course.  Yes, we could verify
7  in many cases that the information was correct,
8  and then, if we found that it was incorrect, we
9  would have to, like, double-check it.
10      Q.   No, I'm asking about what happened in
11 this instance, with this research agreement.  Was
12 Strategic Vision able to determine that the
13 information being provided back to the client was
14 genuine?
15      A.   Yes.
16      MR. SCHMIDT:  Objection, but go ahead.
17      A.   Yes.
18      Q.   How did Strategic Vision do that?
19      A.   Because we compared apples and oranges
20 and made sure that they were one and the same, as
21 far as information that we were turning over
22 based on -- you have to understand, if we're told
23 your name is John Smith, and we're given
24 information on these documents from Guo that your
25 name is John Smith, with a photograph and all of

Page 156

1  your sort of date of birth, and we turn around
2  and we find out really your name is Joe Schmidt,
3  and you were born in a totally different place,
4  then we have to then rejig the entire system that
5  we're working with.
6      That's why it was extremely -- not
7  just -- it wasn't just frustrating, but it was an
8  extremely complex situation that you couldn't
9  just do like you're checking somebody's credit
10 report or Better Business Bureau thing.  You just
11 couldn't.
12      Q.   Well, just going back to Wallop 7.
13      A.   Whatever that is.
14      Q.   You're saying that -- that's the list
15 of fish?
16      A.   Yes.
17      Q.   You could take a look back at it if you
18 want, but I don't think it's necessary.
19      A.   No.  I sort of know these fish by now.
20      Q.   I was going to say, so how many of the
21 fish were -- was Strategic Vision provided with
22 correct information for?
23      A.   Well, I can tell you, you can see some
24 of my notes on here.  Some of these -- for
25 instance, on page 3, you have Anita.

Page 157

1      Q.   Yes.
2      A.   Her real mother is Mingduan Yao.  Her
3  adoptive parents, because that's done a lot in
4  this basket, are Frank Suen, and then -- then
5  the -- the mother -- sorry, the mother is
6  Mingduan Yao, and then the father of the sister,
7  Mingshan -- Mingshan Yao.  These are the real
8  parents of this girl, okay?  But, in certain
9  documentation, it's showing these people are
10 are, in fact, her mother and father (indicating).
11 They're not.  They're her adopt -- adoptive
12 parents.
13      Then if you go to here, if you go on to
14 page 4, and it shows 1990 as her, I guess, entry,
15 because I don't have the note on here; 1990 is
16 her -- maybe her entry into the United States
17 visa.  The Social Security number, if I recall
18 correctly, and this is only on recall --
19      Q.   Sure.
20      A.   -- was, in fact -- here we go, on page
21 5, it shows it, had the same Social Security
22 number as a woman named Eileen Rodriguez, at the
23 same address where this woman Anita was living.
24      So then again, this is just one tidbit
25 of one fish, or one person that you have to start

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 158

1  tracking, and you have to understand where the
2  pieces fit, or why.
3       Q.   And so just --
4       A.   If you go -- yeah.
5       Q.   On that fifth page, those are your
6  notes about --
7       A.   Yes.
8       Q.   -- Eileen Rodriguez?
9       A.   Yes.
10      Q.   And what does --
11      A.   It's the same Social Security number.
12      Q.   And what's the money down there?  It
13  looks like it says 2,000 and --
14      A.   No, no.  It's 2 million.  2.089.000.
15  That, I believe, was the address where she was
16  living, and it showed, if I recall correctly,
17  again, I can't remember because I don't have it
18  all in front of me, but she had sort of a credit
19  limit of $2,000 on a credit card, the only credit
20  card she had, and then the house that she was
21  living in somehow was bought in cash, but it
22  doesn't show who the owners were of that
23  residence.
24           And then you get all these -- you must
25  have had four or five Social Security numbers

Page 159

1  that were the same Social Security numbers for
2  the same person.
3       Q.   So just going back to my original
4  question, if you recall, how many of the
5  information about the -- well, strike that.
6       A.   There were a lot.  There were at least
7  three or four.
8       Q.   There were 15 fish, right?
9            MR. SCHMIDT:  Let him finish the
10  question.
11      Q.   Yeah, let me just finish the question.
12  Thanks.
13           There were 15 fish, correct?
14      A.   Yes, initially.
15      Q.   And how many of them had information
16  that, in Strategic Vision's knowledge, is false
17  or inaccurate?
18      A.   I would say maybe six or seven.  Maybe
19  more.
20      Q.   And the remainder had, let's call it
21  accurate information?
22      A.   I wouldn't call it accurate.  It had to
23  be double-checked.
24      Q.   Sure.
25      A.   So we found little things that were out

Page 160

1  of whack, like numbers, passport numbers or visa
2  numbers, or this one has an Australian
3  nationality, some of the ones that we were doing
4  in the U.K. had totally different names, but then
5  they actually did match up if you dug deeper.
6       Q.   Okay.  So some of them had -- you had
7  mentioned earlier had -- were completely fake,
8  they weren't --
9       A.   That's right.
10      Q.   -- real people?
11      A.   That's right.
12      Q.   How many of the 15 fish were, in
13  Strategic Vision's opinion or knowledge, fake?
14      A.   I would have to talk to Mike about
15  that, but I think we -- we came up with at least
16  five or six that were fake, or at least had a lot
17  of questions to be asked about them.  The names
18  did not match up with the names on the state
19  department visas or on -- within our channels.
20      Q.   In other words, there obviously was a
21  person who looked like that fish in the --
22      A.   That's right.
23      Q.   -- document?
24      A.   Yes.
25      Q.   But that the names and information

Page 161

1  being provided were for --
2       A.   Were fake.
3       Q.   Were fake?
4       A.   If -- if Guo was telling the truth
5  about saying he paid $250 million for this
6  information, then he totally got, excuse me,
7  screwed.  He got totally screwed.  Because the
8  information in here, just from what we were able
9  to surmise, was rubbish, and that's real -- the
10  real garbage.
11      Q.   Okay.  Let's go back to the research
12  agreement, that's Wallop 9.
13      A.   Yes, let's go.
14      Q.   And we'll -- I do want to check on
15  lunch.  I know it's 1:30 now.  Let me just go see
16  about that.  Let's go off the record for a
17  second.
18      A.   Do you want to finish this?
19      Q.   Well --
20      A.   I'd rather finish this.
21      Q.   Let's keep going, sure.  I'm sure
22  they'll knock when the time comes.
23      A.   I'm sure they will.
24      Q.   Let's talk about irregular
25  circumstances.  Do you see that paragraph?

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 162

1   A.   Yes.
2   Q.   Did you and Mr. Waller draft this
3   section?
4   A.   Dr. Waller, yes, we did.
5   Q.   And what was the intent or purpose
6   behind drafting this section?
7   A.   I wouldn't call it intent.  That's --
8   that's truly not fair.  It was a protective
9   element for life.  You can't always say that it's
10  going to be 100 percent of everything every
11  second of every day.  You cannot.  It's not
12  there, it's not gonna happen.
13       So irregular circumstances by us, and
14  including Guo, said that both parties understand
15  that occasional unforeseen challenges may arise
16  that will slow or block comprehensive research,
17  and that there may be periods in which
18  information is irregular, unavailable or
19  incomplete.
20       Perfect reference are some of these
21  names in here.  The contractor will endeavor to
22  make all research and reports as complete as
23  possible in a timely scheduled manner.  Which
24  does not mean ten days from the beginning of the
25  contract.

Page 163

1   Q.   Has Strategic Vision ever used a clause
2   that's substantially the same or similar to this
3   irregular circumstances clause in other
4   agreements?
5   A.   I'm sure there have been ones that have
6   been similar to it.  I mean, it's not unusual.
7   This is -- this is the form that is taken.
8   Q.   In terms of Strategic Vision's
9   experience in this field, was the research
10  bargained for in this research agreement, did it
11  encounter irregular circumstances or problems
12  from the outset?
13  A.   I would say when we started getting
14  into it, we found that there were irregularities.
15  That's not to say that we couldn't continue
16  digging to find the answer.  But we certainly
17  found irregularities when we were talking to Team
18  2 in Texas about these people.
19  Q.   Right.  So just in terms of, any
20  project has some problems, no investigatory
21  research project just goes off without a hitch,
22  correct?
23  A.   Correct.
24  Q.   So there's always some issues that
25  either slow down the research or make information

Page 164

1   unavailable for a time; is that fair to say?
2   A.   Which Guo understood completely.  At
3   least he said he did.
4   Q.   When did he tell you that?
5   A.   Several times.  I think it was probably
6   the middle of January when we met him, and then
7   on the 26th, even though he was upset we didn't
8   have everything by Chinese New Year, or some kind
9   of new criteria.
10  Q.   Did you understand that the research
11  was needed in a very tight schedule because of
12  the Chinese New Year?
13  A.   No.
14  Q.   When did you come to understand that?
15  A.   Later, when we realized that that
16  seemed to be his issue.
17  Q.   When did you first talk about getting
18  the information by Chinese New Year with Mr. Guo
19  or Yvette Wang --
20  A.   Never.
21  Q.   -- or Lianchao?
22  A.   Never.  Not until much later, I mean,
23  after the fact.
24  Q.   No, that's what I'm trying to find out
25  when --

Page 165

1   A.   Oh.
2   Q.   When that was.
3   A.   After the fact, so sometime in the
4   early part of February, I guess.  I think maybe
5   Lianchao sort of said that to us.
6   Q.   Okay.  But prior to the contract, there
7   was no discussion about --
8   A.   No.
9   Q.   -- Chinese New Year or anything like
10  that?
11  A.   No.
12  Q.   If irregular circumstances arise, does
13  the client have to pay for not receiving any
14  research?
15  A.   Of course.  It's the risk we both take.
16  Q.   And has that occurred in the past with
17  Strategic Vision's clients?
18  A.   Yes.
19  Q.   So even though Strategic Vision is
20  unable to provide, let's just say, any research
21  because of an irregular circumstance, the client
22  still has to pay the full price of the reports?
23  A.   It's our time that it takes to do what
24  we're doing.  We wouldn't find it out, would we,
25  unless we had done the investigation.  So it's

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 166

1  our time.
2      Q.    But if the compensation is monthly, and
3  time-based, essentially, is there any period
4  where irregular circumstances would result in a
5  pause of the client's obligation to make payment?
6          MR. SCHMIDT:  Objection.  It's been
7      answered, but go ahead.
8      A.    I'd like to ask any law firm.  Give me
9  a break.
10     Q.    Well, I'm asking you the question,
11 though, so, please.
12     A.    Well, you can ask the question, but I'm
13 telling you, it's just like a law firm, we
14 operate in the same way.
15         MR. SCHMIDT:  That's the answer.  You
16     got your answer.
17         MR. GRENDI:  I'm gonna just clean it
18     up.  Thank you.
19     Q.    So, in your mind, or in Strategic
20 Vision's understanding, it's compensated for the
21 time it spends trying to do research, not based
22 upon what's actually delivered?
23         MR. SCHMIDT:  Objection.
24     A.    Yes.
25     Q.    What's the cost of a report under this

Page 167

1  research agreement?
2      A.    Well, you have it here.  It's listed.
3  It's complex, depending upon the menu that he
4  chose to work with.
5      Q.    Are you looking on page -- well,
6  Eastern 8?
7          MR. SCHMIDT:  There's a knocking on the
8      door.
9          THE WITNESS:  Saved by your knock.
10         MR. GRENDI:  Let me see if that's it.
11     We'll go off.  I think it's about time.
12         THE VIDEOGRAPHER:  Off the record at
13     1:42.
14         (Whereupon a luncheon recess was
15     taken.)
16         THE VIDEOGRAPHER:  Back on the record
17     at 2:30.
18     Q.    Good afternoon.  Ms. Wallop, you still
19 understand that you're under oath?
20     A.    Yes.
21     Q.    On this Exhibit Number 9, on page
22 Eastern 9.
23     A.    Just a second.
24     Q.    I think it's right in front of you.
25     A.    Oh, okay.  Number 9, page 9, whatever

Page 168

1  it is.
2      Q.    Yeah, Eastern 9 is the Bates number.
3      A.    Okay, yes.
4      Q.    Do you see where it says, "It is
5  understood that client may direct entities
6  to pay the contractor"?  It's in the --
7      A.    Yes.
8      Q.    What was the purpose of this clause?
9      A.    Well, it was very simple, but,
10 apparently, Mr. Guo didn't understand how
11 important it was.
12     Q.    Well, why was this clause inserted into
13 the agreement; what was the meaning of it?
14     A.    Because we had told him that, and they
15 had told us that it was coming through a William
16 Wu in London from their account somewhere else in
17 the U.K. or Europe, and we had told them
18 explicitly that it should not come from Hong Kong
19 or an Asian account; and, guess what, it did, and
20 that was because of the mainland Chinese
21 intelligence services then finding out who Guo
22 and his people in Hong Kong were paying for this
23 kind of -- for a contract, let's just put it that
24 way.
25     Q.    So was the purpose of this clause to

Page 169

1  prevent the Chinese communist party from finding
2  out about this relationship?
3      A.    Yes, for our safety and the safety of
4  our -- our contractors or our teams.
5      Q.    Was it ever contemplated that the money
6  would come to an entity other than Strategic
7  Vision, to protect Strategic Vision's identity?
8      A.    Yes.  It was supposed to come from a
9  U.K. account to our account, from -- from him,
10 from Guo, through his money manager in the U.K.,
11 as we understood it.
12     Q.    When was that discussed?
13     A.    It was discussed when -- just before we
14 agreed to the contract, to the terms of the
15 contract, or the agreement.  We shouldn't call it
16 a contract, as it's an agreement.
17     Q.    And how did that issue come up; did you
18 bring it up or was it --
19     A.    Mike and I both raised it.
20     Q.    Okay.  And what was just the substance
21 of that discussion?
22     A.    The security fact that it was dangerous
23 for all of us to be connected with him based upon
24 the investigation that we would be doing, and if
25 that investigation of the mainland Chinese

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 170

1  hierarchy and their families was disclosed as a
2  result of the funding that he was doing to us
3  directly.
4       Q.    Did you ever consider, on the recipient
5  side, using another entity to receive the money,
6  other than Strategic Vision?
7       A.    No.  The agreement was with Strategic
8  Vision.  We had no idea who Eastern was.
9       Q.    Let me ask you about the next sentence
10  there.  It says, "all client payments must be
11  received by the contractor by wire transfer
12  within five business days of invoice," do you see
13  that?
14       A.    Yes.  Somewhere.
15       Q.    It's the last sentence in that
16  paragraph.
17       A.    Yes.
18       Q.    Did Strategic Vision issue any invoices
19  to Eastern?
20       A.    We were -- no.
21       Q.    So there was never a time when
22  Strategic Vision sent an invoice document saying
23  you owe this money to us, to Strategic -- or to
24  Eastern Profit, excuse me?
25       A.    That's when Lianchao was involved, and

Page 171

1  he explicitly told Guo that he did owe the
2  amount.  We never got paid for January, we never
3  got paid for February.  We had the agreement,
4  which outlined the terms.  We gave Guo the first
5  two weeks, essentially, free on our own ticket.
6  So from the 16th to the 26th was ten days that we
7  were into the contract.  So if you've taken it
8  from the 16th of January to the 16th of February,
9  that's when an invoice technically should have
10  gone out to him.  But we believed we were still
11  pulling information, and we wanted to be able to
12  have as much as possible for him, and, in the
13  meantime, he pulled his stunt with the lawsuit on
14  the 23rd.  And I was out of the country, so I
15  didn't know anything about it.
16       Q.    So Strategic Vision never sent Eastern
17  an invoice prior to February 23rd, 2018?
18       A.    We did not, but we should have.  In
19  hindsight, we thought that we were -- we thought
20  that we were being honest.
21       Q.    When was the first time Eastern Profit
22  Corporation was included in this contract, in a
23  draft of it I should say?
24       A.    It was never, until this particular
25  document, to my knowledge.

Page 172

1  was that on January 6th, the day it was
2  signed?
3       A.    I think so.
4       Q.    And how did that come up?
5       A.    Yvette said that was who was going to
6  be signing it.
7       Q.    What did you say in response to that,
8  if anything?
9       A.    I asked her, I said, who's Eastern
10  Profit?  She said, Mr. Guo's company, or some
11  such thing.
12       Q.    Then you checked where Eastern Profit
13  Corporation Limited was incorporated?
14       A.    If I recall, when we were in the
15  federal court, you didn't know where --
16       Q.    I'm asking you a question.
17       A.    No, I'm --
18       MR. SCHMIDT:  Just answer --
19       A.    I'm trying to answer it.  I don't know
20  because I couldn't find anything; when we went to
21  sort of look it up, there wasn't anything that we
22  could find in this country.
23       Q.    What I'm asking is, did you look up
24  Eastern Profit Corporation Limited on January 6,
25  2018, did you try to figure out where it was from

Page 173

1  then?
2       A.    No.
3       Q.    Did you know it was domiciled in China?
4       A.    I had no idea.  They certainly didn't
5  reveal that to us, as they should have.
6       Q.    Did you ask them where it was
7  domiciled?
8       A.    Yvette didn't know.
9       Q.    I'm asking if you asked?
10       A.    I asked Yvette.  She didn't know.
11       Q.    When was that?
12       A.    At the signing.  I said, what is this
13  Eastern Profit Corporation?
14       Q.    You asked, what is this Eastern Profit
15  Corporation?
16       A.    Yes.
17       Q.    And what did she say?
18       A.    She said, I don't know, it's something
19  that Mr. Guo has his own -- it's his own company.
20       Q.    And was there any followup to that or
21  was that the end --
22       A.    No.
23       Q.    -- of the discussion?
24       A.    That was the end of the discussion.
25       Q.    Okay.

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 174

1    A.    It was supposed to be funded.  The
2  entire contract was supposed to be funded.
3  Apparently, it wasn't.
4    Q.    Let's go back to Exhibit 7.  I think
5  previously you had mentioned that you saw this
6  Exhibit 7 when Mr. Guo put it on a table at a
7  meeting, is that right?
8    A.    I believe this is correct.
9    Q.    And when was the next time you saw this
10  information?
11    A.    When we actually printed it off from
12  the USB key.  After three different attempts of
13  corrupted USB keys from Yvette, we finally were
14  able to print it off ourselves onto a virgin
15  computer.
16    Q.    Okay.  When did -- when was the first
17  time you saw this information after the coffee
18  table viewing?
19    A.    When we printed it off after we got the
20  corrupted USB keys from Yvette.
21    Q.    What date was that?
22          MR. SCHMIDT:  What date?
23    A.    Oh, I'm sorry.  I guess it was about
24  the -- oh, God, about the -- oh, the 8th, the 8th
25  of January it would have been.  It would have

Page 175

1  been Monday, because I had to come up to New York
2  to get it.
3    Q.    So you didn't see the information in
4  Exhibit 7 on January 6, 2018 when it was -- the
5  contract was signed?
6    A.    No.
7    Q.    You didn't view it?
8    A.    I -- it wouldn't open, that was the
9  problem.  That's why I had to come to New York.
10  On the 6th, she gave us three keys, three USB
11  keys.  Two would not open.  The third one would
12  not open on my computer, and so that's when I
13  took it to my neighbor and he was kind enough to
14  put it into his computer, just to see if anything
15  would open.  All it was was complete corrupted
16  file, just nothing but Chinese characters all
17  over the place.  It had no -- nothing like this.
18  So we both starting pulling all of the wires out
19  of his computers and his hard drives and -- yeah,
20  and yanked the flash drive out and everything
21  else.  It was a nightmare.
22    Q.    And who's your neighbor?
23    A.    You have the letter.  His name is
24  Richard Shewell, S-h-e-w-e-l-l.
25    Q.    And What's Mr. Shewell's relationship

Page 176

1  to Strategic Vision?
2    A.    None, other than a friend who kindly
3  was trying to see if there was something the
4  matter with the flash drives, which clearly there
5  were.  So then I came to New York on Monday to
6  meet her, that is Yvette, at the Pierre, in the
7  lobby.  I brought another computer.  She brought
8  three flash drives.  One worked, and that was
9  this, this one; in other words, this file.  The
10  other two were corrupted.
11          I kept them, kept all of the flash
12  drives.  I took the one that was good, I brought
13  it back to Washington and put it into a virgin
14  computer, and then we printed this thing off.  A
15  virgin computer, for the benefit of the court, is
16  one that has no connection to the internet and/or
17  a printer that has any connection to an internet.
18  So it's like a dumb computer.
19    Q.    Does Strategic Vision have any kind of
20  confidentiality arrangement with Richard Shewell?
21    A.    No.
22    Q.    Is Richard Shewell a member of the team
23  or otherwise --
24    A.    No.
25    Q.    Let me just finish the question for the

Page 177

1  record.  Is Richard Shewell part of Strategic
2  Vision's team or teams that provide investigatory
3  research?
4    A.    No.
5    Q.    So once you've accessed this
6  information on January 8th, what did Strategic
7  Vision do next?
8    A.    On January 8th?
9    Q.    Yes.  Now that you have the list of
10  fish.
11    A.    So now that we've printed off this
12  file, then Mike came and we sat down and we
13  started talking about how we were going to --
14  where we could -- which certain things we could
15  put together and enter into our channels for
16  information.  And then we -- then he got in touch
17  with Team 1, that had been sort of sitting on
18  hold, and then -- then there were meetings with
19  Team 1 leader, and we began.
20    Q.    So just this initial process with
21  Dr. Waller, were you parsing to see who was going
22  to do what in terms of the investigation, is that
23  fair?
24    A.    Somewhat, yes.  It's a very complex
25  investigation.  It takes the U.S. side as well as

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

1  international side.  We had to divide up the
2  issues.
3       Q.     Were there aspects of the research that
4  he was going to handle and aspects that you were
5  going to handle, or Strategic Vision was going to
6  handle?
7       A.     I would say so, yes.
8       Q.     And what portion of the research was
9  assigned or delegated to Strategic Vision, or you
10 personally?
11      A.     The U.S. side, where we felt that we
12 could pull certain pieces of information legally
13 from U.S. channels, so we had to go through and
14 see who supposedly had a U.S. passport, U.S.
15 visas, or who had, you know, illegitimate
16 children born in the United States.  It was a --
17 it was big.  It was a big issue.
18      Q.     And what portion -- I take it Mr.
19 Waller was going to do the international portion?
20      A.     No, Dr. Waller.
21      Q.     I'm sorry.  I was calling him Mr.
22 Waller the whole last deposition, so correct me,
23 please, feel free.  Dr. Waller.
24             What was Dr. Waller assigned to in
25 terms of this division?

1       A.     He was assigned to work with Team 1 to
2  help pull the information with Team 1, because
3  there were a number of things that they had to
4  get into, but they could only do it from an
5  overseas location.
6       Q.     I see.  So none of the U.S.-based
7  investigatory research was handled by Team 1?
8       A.     No.  Well, no.  It was all done -- it
9  was done through the U.S. side.
10      Q.     And that was not Team 1?
11      A.     No, it's never been Team 1.
12      Q.     Got it.  I just want to be clear about
13 it.  The way you're saying no could be
14 interpreted multiple ways, so I just want to be
15 super clear.
16      A.     Not really.
17      Q.     Okay.
18             MR. SCHMIDT:  Just --
19             THE WITNESS:  I know.  It's silly.
20      Q.     You could just -- it's not.  It's a --
21 you have to understand, ma'am, it's a record that
22 we're trying to keep clear for the court, and I
23 just don't want there to be ambiguity.
24      A.     I wouldn't want any ambiguity for the
25 court.

1       Q.     Of course not.  Right.
2       A.     I want the court to be -- have a very
3  clear reading of what is being asked.
4       Q.     Me, too.
5       A.     Good.
6       Q.     And so then how did you -- were you
7  managing the U.S.-based process personally?
8       A.     Yes.  Um-hum.
9       Q.     So you've got the information on
10 January 8th.  What did you do in terms of that
11 process?  What was --
12      A.     Mike and I, as I said, divided up what
13 needed to be done.  I got in touch with my
14 channels, he got in touch with his channels.
15      Q.     Just without even saying who your
16 channels are or what they do, did you get in
17 touch with several people; how many people did
18 you get in touch with?
19      A.     I have no idea.  There were a number of
20 people.
21      Q.     And did you receive valuable
22 information from those people?
23      A.     Some, I did and some was -- was fake
24 information.  You have to understand that we were
25 given fake names and fake information to either

1  send us down rabbit holes for nothing, a waste of
2  time, or we could find legitimately that there
3  were some people that we could actually piece
4  together some of the tracking.  But their names
5  had been changed.  They kept changing their
6  names.
7       Q.     So when did you -- when did you first
8  find out that, in your understanding, some of the
9  names were fake; when did that happen?
10      A.     I would say probably within the
11 first -- probably within the first ten days.  And
12 we discussed that with Lianchao and we discussed
13 it with -- with Guo.
14      Q.     Okay.  How was -- was there a meeting
15 with Lianchao --
16      A.     Yes.
17      Q.     -- and Guo where that was discussed?
18      A.     Yes.
19      Q.     Where was that?
20      A.     In New York, at his apartment.  We
21 never met Guo outside of his apartment.  He never
22 left his apartment.
23      Q.     And when did that meeting occur?
24      A.     I guess it was, as I said, within the
25 ten days from the 8th, 9th, which was like a

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 182

1   Monday or a Tuesday, to about the 15th or so of
2   the month, 16th, something like that.
3       Q.   Was Ms. Wang there?
4       A.   Where?
5       Q.   At that meeting that you've just
6   described.
7       A.   Who knows.  He kept saying he didn't
8   trust her.
9       Q.   I'm asking whether you recall her being
10  present?
11      A.   No, I don't remember, because sometimes
12  she was in there and sometimes Lianchao was
13  there, so I don't remember.  He said he didn't
14  trust her, so a lot of times he sent her out.
15      Q.   In other words, she might have been in
16  the area, in the building that you were meeting
17  in, but he would say, leave the room?
18      A.   Yes.
19      Q.   And you would have the meeting without
20  her?
21      A.   Yes, that happened.
22      Q.   How many times did that --
23      A.   On several occasions.
24      Q.   And were you and Dr. Waller
25  coordinating and checking in on the research

Page 183

1   after this January 8th start date?
2       A.   Oh, yeah.  I mean, obviously, I
3   couldn't -- I could only do from my side what I
4   could do on retrievals.  What he was doing with
5   Team 1 was -- was totally different because it
6   was overseas, and so, therefore, he was
7   coordinating with the person on the overseas
8   retrieval, and I was not a party to that.
9       Q.   Right.  How did you check in with one
10  another?  Would you meet in --
11      A.   Daily.
12      Q.   -- D.C.?
13      A.   No, no, no, he would come to my home.
14  We never did anything on the telephone.
15      Q.   So after -- well, starting on
16  January 8th, you and Dr. Waller were meeting
17  almost daily to handle this investigation?
18      A.   I would say so, yes.
19      Q.   But of course you couldn't communicate
20  with him when he was flying to Europe or things
21  of that nature, correct?
22      A.   No.
23      Q.   Because you wouldn't.  Because, even
24  though you could communicate with him, for
25  security reasons, you would not do that?

Page 184

1       A.   That tended to be the case.  I mean, he
2   might say, I've landed, or he might say, I just
3   finished my meeting, or, I'm on the way back.
4   That's about the limit of it.
5       Q.   And would those be Signal messages or
6   some other communication means?
7       A.   Usually on Signal.
8       Q.   Did you keep your Signal messages with
9   Dr. Waller?
10      A.   I turned over everything I had to --
11  whatever is there to Joe.
12      Q.   Right.  I'm asking --
13      A.   To the law firm.
14      Q.   I'm asking if you -- did you delete
15  Signal messages you had with --
16      A.   Some I have.
17      Q.   -- Dr. Waller?
18      A.   I always do.  Because some I -- I don't
19  keep Sig -- all of my Signal messages.  That
20  means for everybody, not just for Guo.
21      Q.   I understand.  And why is it your
22  practice to delete messages like that?
23      A.   Because that's what it's set up for.
24  That's what Signal does.
25      Q.   Oh, there's like an automatic

Page 185

1   destruction policy?
2       A.   There's an automatic destruction thing,
3   It's 30 minutes or 30 whatever.  An hour.
4       Q.   Okay.  That's one of the features of
5   the application?
6       A.   Yes.
7       Q.   Did you ever ask Mr. Guo or Lianchao or
8   Yvette Wang how they got the information in
9   Exhibit 7?
10      A.   Yes, they told me.
11      Q.   What did they tell you?
12      A.   Guo said, this is the file, he slammed
13  down on the coffee table like that in front of me
14  in his apartment, in his sun room, and said, this
15  is what we need to investigate, these are the
16  people we need to look into, and, here, you can
17  look through the names.  And I said, wow.  He
18  said, I paid $250 million for this.  I said,
19  really.
20      Q.   I take it you didn't believe that
21  price?
22      A.   I found that extraordinary, given just
23  even the preliminary stuff that was on it.
24      Q.   And did he explain to you how the
25  information was obtained by him, other than

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 186

1  obviously paying for it, what means were
2  employed?
3      A.   He bribed people to get it, bribed
4  people to take photographs of passports, I guess.
5  I don't know.
6      Q.   Did he tell you that or is that your
7  assumption?
8      A.   He actually told me that.  I mean, he
9  said that in the meeting.  He said, yeah, I had
10  to bribe people to take pictures of passports.
11  Otherwise, I don't know where the other
12  information came from.
13      Q.   Let's go to the next document.
14          (Wallop Exhibit 10, Signal messages,
15      Bates stamped Eastern-0000201, marked for
16      identification.)
17      Q.   This has been marked Wallop 10.  Do you
18  recognize this Signal thread?
19      A.   Well, it looks like it's from me, and
20  probably to Yvette.
21      Q.   Did you ever exchange Signal messages
22  with Lianchao Han?
23      A.   I'm sure I have.  It may or may not
24  have had anything to do with this, the contract.
25      Q.   So you've worked with Mr. Han on other

Page 187

1  matters or --
2      A.   Well, we're pro-democracy, and he
3  represents a pro-democracy group in Washington;
4  and so, yes, there are issues that are going on
5  about the mainland that had nothing to do with
6  Guo.
7      Q.   Going to Eastern 203.
8      A.   Yes.
9      Q.   Do you see where it says, "yes let's
10  discuss now"?
11      A.   Yes.
12      Q.   And below that there's like a little
13  phone symbol, do you see that?
14      A.   Correct.
15      Q.   Do you recall speaking to Ms. Wang
16  about this agreement on or about December 28th?
17      A.   That would have been correct, because
18  that's when they sort of were changing the terms
19  of the contract from ten fish to 15 fish, and
20  that's what the 15 refers to in her...
21      Q.   And you had a phone conversation about
22  that?
23      A.   Yes, it's right here.  And then I put
24  it in -- or she put it in there, and then you'll
25  see the rest of it.

Page 188

1      Q.   Did you discuss any other terms at that
2  point, or was that just the focus, the number of
3  fish, during the first month?
4      A.   It was the number of fish for the first
5  month.
6      Q.   I'm asking from your memory --
7      A.   Yes.
8      Q.   -- do you recall discussing any other
9  terms of the agreement?
10      A.   No, we didn't change that term.  She
11  knew that, in the second month, it would be ten
12  fish.
13      Q.   And did you redraft or edit the
14  agreement based upon this discussion?
15      A.   Not that I recall, no.
16      Q.   Well, you did put in that there would
17  be 15 fish during the first month instead of
18  the --
19      A.   Yes, because we'd already -- when was
20  this?  This was 12/29.
21      Q.   28.
22      A.   12/28.  And I can't even remember on
23  the contract whether it's -- I don't know if we
24  even defined whether it was 15 in the first month
25  or not, but we went ahead and agreed to the 15;

Page 189

1  so, gave her five fish, basically.
2      Q.   Did you ever give her a copy of the
3  agreement for her to make edits?
4      A.   Yes.
5      Q.   When was that?
6      A.   Because when we talked about it, she
7  was talking to Guo all the time on the telephone,
8  and we made edits.  I remember when she was at
9  the house earlier that -- maybe during this time
10  frame, the 29th, or 28th or something.  "We are
11  looking at your changes and have made a combined
12  document based on our conversation yesterday and
13  our mutual agreement."  This was on the 29th.
14          So we made it at my house, and then we
15  agreed to it, and then I went and printed it off
16  from my printer.
17      Q.   Right.  What I'm asking is, did you --
18  you physically gave her a --
19      A.   Yeah.
20      Q.   -- a paper copy?
21      A.   Yes, we both did.  I mean, we both had
22  the same piece of paper that we were scratching
23  up and redoing.
24      Q.   I wasn't sure of that, that's why I'm
25  asking.  I don't know that.

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 190

1        So she left with a copy of the draft
2   agreement on or about --
3        A.   I believe so --
4        Q.   -- December 29th?
5        A.   -- yes.  It says here, "most easy
6   edits, no worries."
7        Q.   And that was your comment, correct?
8        A.   Yes.
9        Q.   Why did you think they were mostly easy
10  edits?
11       A.   Well, because she had -- she had made
12  the suggestion on the edits, so I made the
13  agreement to go ahead and make the little
14  changes, whatever they were.
15       Q.   And did you meet with Ms. Wang again on
16  or about December 30th?
17       A.   Honestly, I can't remember the 30th.  I
18  do remember the -- I guess it says -- see, here
19  it's the 5th.  I think it was the 5th that I met
20  her next.
21       Q.   Let me ask you this.  Do you recall a
22  meeting with Ms. Wang where you thought that she
23  was proposing major and unreasonable changes?
24       A.   Somewhere in that earlier part of that
25  conversation, and that's when we made the changes

Page 191

1   in the edits.  She then consulted with Guo.  Guo
2   agreed to them, there might have been something
3   he disagreed with, and then he disagreed with
4   her, and then we went back and re-did the edit
5   back to sort of what the original language must
6   have been in the final copy that she signed, and
7   he agreed to, on the telephone.
8        Q.   Was that on January 6th, on the actual
9   date of the signing?
10       A.   No, it was a little bit earlier.  I
11  think it goes back here to wherever we were
12  talking about mostly easy edits.
13       Q.   Okay.  Was Mr. Guo on the phone when
14  you and Ms. Wang signed the agreement?
15       A.   Yes, I think he was.  I think he was.
16  Because she sat on the sofa with me, and that's
17  where she was talking to somebody, so I -- in
18  Mandarin, so I presume that's who it was.
19       Q.   Okay.  So you didn't know who she was
20  talking to at that point, but --
21       A.   No, but she -- it was clear to me that
22  it was Guo.  She just sort of hung up, she said,
23  okay, fine, we all agree, everything is fine.
24       Q.   But he wasn't on speakerphone, so you
25  didn't hear his voice?

Page 192

1        A.   No.  It was Mandarin, so he was just
2   speaking to his employee, I guess.
3        Q.   But you -- sitting here today, you're
4   not certain that it was him?
5        A.   I could hear his voice, so it sounded
6   like him.
7        Q.   Turning to Eastern 206.
8        A.   Yes.
9        Q.   Do you see this message talking about
10  "unfortunately they could not stop the process
11  technically.  My Boss said he had already
12  contacted you about this fund...we were
13  discussing last week, as I advised you that our
14  people were ready to send you the deposit."  Do
15  you see that?
16       A.   I do.  I was very confused by that.
17       Q.   There's a PDF that was attached to this
18  document, do you see that?
19       A.   Yes.
20       Q.   Do you have any recollection as to what
21  was sent to you on or about January 2nd
22  concerning this deposit?
23       A.   This was, I believe, the copy of the
24  DBS wire.  I'm not sure, but I think it was.
25       Q.   And what was your response to receiving

Page 193

1   the wire?  Because, correct me if I'm wrong, but
2   the contract had not been signed as of
3   January 2nd, 2018, correct?
4        A.   Not by the 2nd, but we had agreed to
5   everything on the terms, even though she had to
6   come back from New York to sign the document; we
7   had agreed by telephone.
8        Q.   Were you surprised to receive the money
9   at that time?
10       A.   Not entirely.  But we -- we -- it came
11  from a source that we didn't know who it was.  It
12  came from ACA Capital or something.  We didn't
13  know who that was.
14       Q.   So how did you find out about that?
15  Did this message prompt you to check your account
16  or was it that you checked your account and said,
17  why is there a million dollars there?  What was
18  the process?
19       A.   It was very simple.  I got this
20  message --
21       Q.   I see.
22       A.   -- I checked the account.  Something
23  from ACA was there.  Said, my boss, meaning Guo,
24  said he had already contacted us about this fund.
25  We never got any contact from Guo.  Never  Never

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 194

1  received a phone call, never received a text,
2  nothing.  So I don't know what she's talking
3  about here.
4       "Our contract won't be changed if there
5  is a chance to work together.  Otherwise please
6  kindly return fund."  These people were like
7  ping-pong balls, okay?  You're just trying to do
8  what they're asking you to do, you get everything
9  in order to do it, and then they fool around with
10  this nonsense.
11       Q.   Did you consider sending the wire back
12  because you didn't have a signed contract or --
13       A.   No, because we already had agreed to
14  this verbally.  Both Guo and herself had agreed
15  to it.  And so she then comes down on the 5th,
16  and signs the thing on the 6th.
17       Q.   And so, going back to the 6th.  Were
18  there any changes made to the agreement at that
19  time?
20       A.   No, none.  The only change was that I
21  accepted the 15 fish instead of the ten, I mean,
22  verbally.  It was a verbal, honorable thing to
23  do.  And then here's my thing saying right what I
24  said on whatever it is, 208, as discussed with
25  the 15 fish.

Page 195

1       Q.   Did you tell Yvette that they shouldn't
2  have sent the wire from where they had?
3       A.   Well, I -- later on I did.  Lianchao
4  told her; like, what were you thinking?
5       Q.   So you had a conversation with Lianchao
6  about the wire --
7       A.   Later.
8       Q.   -- being done properly?
9       A.   Later, later.  Like, two weeks later.
10       Q.   And you understood that Lianchao had
11  conveyed that to --
12       A.   Yes.
13       Q.   -- Ms. Wang?
14       A.   Well, to Guo.  He played those two back
15  and forth.  He played Yvette against Lianchao,
16  Lianchao against Yvette.
17       Q.   Turning to Eastern 208.  It says, "We
18  hope you will have the docs as discussed for the
19  15 fish with you"?
20       A.   That's right.
21       Q.   And so what was -- was that the -- you
22  already understood what that was, that was --
23       A.   That was this.
24       Q.   -- Exhibit 7?
25       A.   Yes.  And that's when she arrived on

Page 196

1  the 5th and she had the bad flash drives, okay?
2  That's when I went to the next door neighbor,
3  just to stick it in to see if it was alive or
4  not.  He didn't see anything, because there was
5  nothing to see, and he couldn't have seen
6  anything even if he had.  So that's exactly what
7  happened.
8       Q.   Turning to Eastern 211.  You wrote,
9  "the agreement for 3 months is correct."  Do you
10  see that at the top of the page?
11       A.   Yes.
12       Q.   What did you mean by that?
13       A.   Because the contract was for three
14  months, was for 90 days.  January, we have
15  allowed 15 fish.  Ten fish each for February and
16  March; for some reason, that's sort of cut off.
17  Oh, here it is, March.  "We will determine the
18  subsequent monthly costs obviously by the next
19  set of numbers of fish in the tank."
20       Q.   So what would happen after 90 days?
21       A.   We were all going to regroup and figure
22  out how much -- how many of the fish had -- were
23  useful information for him and how many fish had
24  been tossed out, and then he was going to be
25  adding more fish.  He said up to 4,000 fish,

Page 197

1  total.
2       Q.   Would it have been possible to do
3  investigations on 4,000 fish?
4       A.   Not all at once, and he knew that.  He
5  agreed that would be ridiculous.  It was supposed
6  to be a three-year contract.
7       Q.   But it was a -- you're saying it was a
8  three-month contract?
9       A.   It was three months, to be done for a
10  year, if you look at the contract itself, and
11  then, after that time, it was a three-year
12  contract.  If you recall, on the last page of the
13  agreement, "duration of this contract shall be
14  enforced for three years from the date of
15  signing."  That's what we had initially planned
16  on.  We certainly had initially planned on the
17  first three months.
18       Q.   On Eastern 213, do you see where it
19  says, "can you please send the contract here?  I
20  get the right person to do.  Thank you"?
21       A.   That was weird.
22       Q.   What did you understand that request to
23  mean?
24       A.   Well, we certainly weren't going to
25  send it through any kind of email thing.  So she

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 198

1  had to sign it -- she had to come -- she signed
2  it on the 6th.  So she says, "please send the
3  contract here I get the right person to do."  I
4  don't know what that meant.  "There is of course
5  no impasse here.  I work with several people, M
6  is one of them saying for this project he is not
7  only boss."  Well, that was news to us.
8       Q.    I'm just asking about why you didn't
9  send the contract when it was requested there?
10      A.    Because we still didn't have -- oh,
11  dear lord.  We still didn't have the flash
12  drives.  This was the 5th.  We didn't get the
13  proper flash drives with the folder until the
14  8th, Monday the 8th.  So what could we do, except
15  take -- except have her sign the contract.  They
16  had already sent the money, we all had agreed to
17  the terms.  She needed to sign the contract.
18  Then I went to New York to get a flash drive
19  that, God willing, would work, out of the three.
20           And we tried to explain to them that
21  their systems were corrupted.  If she was
22  downloading, or he was downloading the stuff from
23  his own computer, he was getting -- he was being
24  hacked into by the Chinese himself.  Because you
25  can't make this stuff up on the -- on the

Page 199

1  corrupted files.
2       Q.    But before January 6th, you weren't
3  aware of any corruption or hacking issues, were
4  you?
5       A.    Yes, absolutely.
6       Q.    How were you supposedly aware of that?
7       A.    Well, because we had a corrupt -- when
8  we were even sitting there, I think at one point
9  Guo had a USB key and he was putting it into his
10  own computer, and it was acting up, and he took
11  it out and he said, I can't -- I can't do the
12  file here.
13      Q.    When was that?
14      A.    It was before -- this must have been
15  sometime in mid-Jan -- mid-December, whenever we
16  were up there meeting with him, he had an issue
17  with the computer.  And Mike told him, he said,
18  you know, you got -- you got issues here that
19  have nothing to do with us.
20      Q.    You wrote, "As you know, the agreement
21  can only be reviewed and cannot be sent by email
22  for the purpose of absolute security"?
23      A.    Correct.
24      Q.    It says, "Other than New York, L, M and
25  myself and you, we are the only ones privy to

Page 200

1  it."
2       A.    Correct.  And New York was equally
3  adamant about it.  That was Guo.
4       Q.    I was going to say, who's New York?
5       A.    That was Guo.
6       Q.    And L is Lianchao?
7       A.    Yes.
8       Q.    And who's M?
9       A.    Michael, Mike, Dr. Waller.
10      Q.    Turning to Eastern 19.  You wrote,
11  "Thank you.  I will look forward to seeing you
12  tomorrow here.  You can make whatever minor
13  changes here on my laptop and then print off two
14  copies"?
15      A.    Correct.  That meant print off two
16  copies of the agreement.
17      Q.    Right.  What were the changes or issues
18  that you were thinking of at that time?
19      A.    Whatever changes we made that were --
20  she would -- I mean, whatever was made was made,
21  and we agreed to in the document.  I don't
22  remember.  They were minor.
23      Q.    You said, "we've already lost a week"?
24      A.    That's right.
25      Q.    What did you mean by that?

Page 201

1       A.    If we didn't have this, we couldn't
2  start.  If we didn't have the entire file, we
3  couldn't start, could we?  Because we had no
4  information to go on.
5       Q.    Did you understand that time was an
6  important factor?
7            MR. SCHMIDT:  Objection.
8       A.    Of course it was an important factor.
9       Q.    Why was that?
10      A.    Because we were prepared to go, but,
11  due to their corrupt files, we couldn't start
12  until we got the full document that was not
13  corrupted.
14      Q.    Right.  But this is January 5th, right,
15  this email message or Signal message?
16      A.    Yes.
17      Q.    And so I'm just asking, you hadn't
18  seen -- or you hadn't received the files that had
19  any alleged issues with it in terms of --
20      A.    Yes.  She came on the 5th, she put the
21  files in, they didn't work, they were corrupted.
22  I then had to get on the train and come up here
23  on the Monday morning, the 8th, okay, to get the
24  USB file that was clean.  Out of the three, there
25  was only one that was clean.

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 202

```
1     Q.    I thought --
2     A.    So we couldn't start.
3     Q.    -- the agreement was signed on
4  January 6th, though?
5     A.    Yes, but we couldn't start until we had
6  clean files.  She thought she had clean files,
7  and she didn't have them on the 5th and 6th, did
8  she?
9     Q.    I don't understand how you thought you
10 lost a week, if you hadn't even signed an
11 agreement yet?
12    A.    Because the funds had been sent, right,
13 on the 29th, and let's call it the 2nd that we
14 had received them, and, in fact, they didn't
15 really get into our account until the 4th because
16 of the holiday weekend and so forth.  And then
17 Citibank called to say, are -- is this your --
18 are these -- you expecting this?  I said yes.  So
19 they were fine.  But they were not available --
20 there's something known as a federal reserve,
21 that stops large payments.  Anything over, like,
22 $300,000 gets flagged.  So we had to verify that
23 this was a contract.
24    Q.    Let's go to Eastern 223.  Do you
25 remember Ms. Wang sending you a Signal message
```

Page 203

```
1  asking to accommodate two small fish?
2     A.    Two more small fish.  So it would have
3  made 17 fish, okay?  No.  The answer was
4  absolutely no.
5     Q.    Well, let's just go one at a time.
6        MR. SCHMIDT:  Do you remember receiving
7     the message or --
8        THE WITNESS:  Yes.
9        MR. SCHMIDT:  -- or --
10       THE WITNESS:  Yes.
11       MR. SCHMIDT:  Okay.
12    Q.    Okay.  And what was your response?
13    A.    No.  Absolutely no.
14    Q.    And why did you have that firm
15 response?
16    A.    Because we've already given you five
17 extra fish, if you will read my response.
18    Q.    They did have to pay for those 15 fish,
19 though, right?
20    A.    Not really.
21    Q.    Okay.
22    A.    They didn't.  They were five free fish.
23    Q.    And they were entitled to all three
24 reports on those 15 fish?
25    A.    What reports?
```

Page 204

```
1     Q.    The financial, forensic research,
2  current tracking and social media?
3     A.    There were not reports, other than
4  flash drive information, which we've already
5  answered that.
6     Q.    Of course we have, yes, but they are
7  referred to as reports in the agreement, so
8  that's why I'm using that term.
9     A.    They're flash drives.
10    Q.    Okay.
11    A.    They're not written.
12    Q.    And the teams that are already
13 dispatched, how many teams were dispatched as of
14 January 9th?
15    A.    Well, One was in the process of
16 being -- Number One was being in the process of
17 being dispatched because it was an overseas
18 person that was -- that Mike had to coordinate
19 with, and we had to get -- we had to get numerous
20 computers and different kinds of phones and
21 burner phones and everything.  It's a huge
22 operation.
23    Q.    Were you involved at all in the
24 logistics of that operation?
25    A.    No.  Mike was.
```

Page 205

```
1     Q.    So he was involved in procuring the
2  phones and computers and things of that nature --
3     A.    No.
4     Q.    -- for Team 1?
5     A.    Team 1 did it.
6     Q.    Okay.  What other teams were dispatched
7  as of January 9th, other than Team 1?
8     A.    That was the only "team team" outside
9  of the United States.  I was collecting or I was
10 getting ready to begin to collect information
11 from my own channels, which was not labeled as a
12 team.
13    Q.    Right.  I'm just trying to understand
14 your message on Eastern 224.  At the end it says,
15 "Teams are already dispatched and beginning their
16 trip"?
17    A.    That meant Mike and the person that was
18 hiring the people to manage this particular
19 account.  It wasn't just one person with one
20 computer.  There were at least ten.
21    Q.    Ten individuals?
22    A.    Ten individuals.
23    Q.    On Team 1?
24    A.    On Team 1, at least.
25    Q.    And how did you know how many members
```

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 206

```
1   of Team 1 there were?
2       A.    Because I was told that by Mike.
3   That's all I know.  I don't know who they were, I
4   don't know their names.  I don't know anything
5   about it.  We compartmentalized it.
6       Q.    Right.  So you don't have any -- you
7   played no role in assembling Team 1 or managing
8   its actions?
9       A.    My expertise, young man, is --
10      Q.    I'm not that young, but go on.
11      A.    -- is 45 years of working in
12  specialized areas, and I understand how to
13  assemble the right people to do, God knows, the
14  right job.  And Mike was one of the people who
15  did dispatch and organize Team 1.
16      Q.    Right.  So you weren't involved with
17  managing or assembling --
18      A.    Not on a --
19      Q.    -- Team 1?
20      A.    -- day-to-day because we were
21  compartmentalizing it.
22      Q.    That's fine.  You can -- I'm just
23  asking for an answer.
24      A.    I'm giving you one.
25      Q.    Thank you.
```

Page 207

```
1       A.    You're welcome.
2       Q.    What was the issue that -- if we go to
3   Eastern 227, that caused a delay of eight days?
4       A.    Okay, you have to take a calendar out
5   and look at the calendar for January.  It's easy
6   to see.  The 8th, Monday the 8th was when we
7   finally got a decent copy of this, right
8   (indicating)?
9       Q.    Exhibit 7?
10      A.    Yes, Exhibit 7.
11      Q.    Sure.
12      A.    That week, Mike and the person from
13  Team 1 were coordinating how they were going to
14  get the -- the equipment together.  They had to
15  drive to three different countries to get the
16  information -- I mean, to get the equipment, so
17  they wouldn't be tracked.
18            The IP numbers and everything else
19  would not be tracked.  These would be, quote,
20  technically, virgin computers, virgin phones,
21  these would be burner phones.  All of these
22  communications had to be coordinated.  So from
23  the 8th of January to the 16th, I believe, makes
24  eight days.
25      Q.    And that's what I'm trying to
```

Page 208

```
1   understand.  What was it between the 8th and the
2   16th that caused a delay?
3       A.    Well, we didn't have the equipment to
4   begin to do what we said we wanted to be able to
5   do because of all of these weirdo delays with the
6   flash drives.
7       Q.    In other words --
8       A.    They were corrupted flash drives,
9   right?
10      Q.    In other words, you didn't have the
11  equipment to do the research on, let's just say,
12  January 1, you had to go and buy it --
13      A.    That's correct.
14      Q.    -- after the agreement was signed?
15      A.    That's correct.  And why would that be?
16      Q.    I'll be asking the questions.
17      A.    I know --
18            MR. SCHMIDT:  Don't ask questions.
19      A.    -- but, I mean, this is absurd.
20            MR. GRENDI:  Why don't we take a little
21  break.
22            THE WITNESS:  Yeah, I think we need a
23  little break.
24            MR. SCHMIDT:  That's fine.
25            THE WITNESS:  You just don't get it.
```

Page 209

```
1            THE VIDEOGRAPHER:  Off the record at
2   3:25.
3            (Whereupon, a short recess was taken.)
4            THE VIDEOGRAPHER:  Back on the record
5   at 3:32.
6       Q.    Still on Wallop 10, Bates number
7   Eastern 227.  Do you see where you wrote, "We
8   have some new exotic fish options to discuss
9   too"?
10      A.    Yes.
11      Q.    What did you mean by that?
12      A.    I think Mike and I had come up with
13  some information that would have been interesting
14  for Guo.
15      Q.    Why did you describe it as a fish
16  option?  What does that --
17      A.    I think exotic was the key word there,
18  because it was outside of the parameter.
19      Q.    What do you mean by parameter?  I just
20  want to understand --
21      A.    Outside of the -- the 15 fish.  It was
22  additional information that we thought he might
23  find useful.  It had nothing to do with the 15
24  fish.
25      Q.    What was that information?
```

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 210

```
1       A.    I can't remember right now.  I'm not
2  being -- trying to be avoiding you.  I just don't
3  remember.
4       Q.    That's okay.
5       A.    But he was happy with it, whatever it
6  was.
7       Q.    Oh, so you did describe it to him?
8       A.    Oh, yeah, I told him.  I just -- Mike
9  might remember what it was.
10      Q.    And it says here on the following page,
11 228, "We expect to have new fishing info for the
12 captain later next week"?
13      A.    Yes.  That would have been -- that
14 would have been the additional information over
15 and above the 15.
16      Q.    Oh, that's a reference to the exotic
17 fish option?
18      A.    Yeah.  It's in the same text.
19      Q.    There's a reference below to crispy
20 duck dumpling spinach?
21      A.    Yes.
22      Q.    Do you recall having a meal of that
23 nature with Mr. Guo?
24      A.    I do.
25      Q.    When was that?
```

Page 211

```
1       A.    In December or early January.
2       Q.    That was one of the first meetings?
3       A.    Yeah.  So it must have been December.
4  I just can't eat much, and sometimes they have
5  massive amounts.
6       Q.    You were just trying to kind of stave
7  off the embarrassment of having to turn down all
8  the stuff he was trying to give?
9       A.    Well, yes and yes.  He -- he was not
10 trying to give.  They often have lots and lots
11 and lots and lots of food at Chinese lunches, and
12 he's often -- he was often trying to give you
13 more food, and I can't eat that much.  So, I just
14 can't digest anything more than a little bit at a
15 time.
16      Q.    And turning to Eastern 230.  Do you see
17 where you wrote, "no.  We expect to have results
18 the following week due to the problems about
19 putting multiple fish in late."  Do you see that?
20      A.    Correct.
21      Q.    What were the problems due to putting
22 multiple fish in late?
23      A.    Well, when you add 33 percent more to
24 the -- to the equation, it -- it -- it bogs down
25 the ten research people we had working.  We had
```

Page 212

```
1  ten fish, we had ten people.
2       Q.    Was each team member assigned -- each
3  of the ten individuals on Team 1 assigned one
4  fish?
5       A.    I believe that was the case, but I do
6  not know because, again, I wasn't a party to it.
7  But that makes sense, doesn't it?
8       Q.    Were there any other problems, other
9  than just the -- the large volume of 15 fish as
10 opposed to ten?
11      MR. SCHMIDT:  Objection, but go ahead.
12      A.    The initial change at the last minute,
13 asking for 15 instead of ten, sort of gummed up
14 the works.  So, yes, and he actually understood
15 that when we finally got to talk to him about it.
16      Q.    I mean, at this time, did you
17 understand that the client wanted the information
18 on a very prompt basis?
19      A.    No.  There was no deadline given to us.
20      MR. SCHMIDT:  You answered.
21      THE WITNESS:  I'm sorry.
22      Q.    Let's go to Eastern 234.  This is a
23 message on January 17, 2018.  You said, "Please
24 inform New York re above, we expect to have a
25 fairly full net."  Do you see that comment?
```

Page 213

```
1       A.    Yes.
2       Q.    What did you mean by a fairly full net?
3       A.    We were told that we had some good,
4  useful information from Team 1, but then that was
5  told to Mike.
6       Q.    Did you have any reason to think there
7  would be a fairly full net based on the
8  information your contacts were bringing in?
9       A.    I didn't know.  I just -- I just
10 presumed that the -- I guess the word presumed is
11 the wrong word, but I believed that if they had
12 new information, that it was going to be useful,
13 and that he would be pleased with that.
14      Q.    So had you spoken to Dr. Waller at or
15 around this time about the progress of Team 1?
16      A.    I never saw -- you have to understand,
17 I never saw any of these USB keys or flash
18 drives, or the -- the data that was within them;
19 again, compartmentalizing.
20      Q.    I understand that.  What I was asking
21 was, did you talk to Dr. Waller about --
22      A.    No.
23      Q.    -- Team One's progress?
24      A.    No, no.
25      Q.    So this --
```

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 214

1    A.    Not in depth.
2    Q.    This comment about, we expect to have a
3 fairly full net, was just your assumption?
4    A.    Yes.
5    Q.    And at that time, you didn't know if
6 Team 1 was finding any information or good
7 information, or anything of that nature?
8    A.    We were told that they were finding
9 information.
10    Q.    So, again, how did you get that
11 information if you didn't get it from Dr. Waller?
12    A.    He told me, but I've said to you that I
13 only spoke a little bit to Michael.  I did not
14 know all of the details of that.  He said that he
15 believed he had some good information that was
16 going to make New York, New York, as we called
17 him, happy.
18    Q.    I got it.  Going to Eastern 235.  At
19 the bottom of the page you wrote, "We have to
20 finish shopping and we'll find a very nice
21 present for."  That's all it has there.
22          What did you mean by finish shopping,
23 if you recall?
24    A.    Well, we -- we're -- let's see.  This
25 was ten days into the contract, essentially.  We

Page 215

1 were working through weekends, so we were trying
2 to retrieve information, according to Mike, that
3 was -- that we felt that was going to be very
4 useful for him.  Again, I did not know what those
5 specifics were.
6    Q.    But the reference to shopping is the
7 collection of information?
8    A.    The collection, yes.
9    Q.    And a present would be, what, useful
10 information?
11    A.    Useful information.
12    Q.    And you said, "we'll be there on the
13 25th."  Was that for a meeting that you were
14 planning with Mr. Guo and Lianchao and Yvette?
15    A.    Yeah, it was the 25th or the 26th.  I
16 thought it was the 26th.
17    Q.    If you turn to Eastern 238.
18    A.    Yeah.
19    Q.    You see it says, "okay we'll do lunch
20 for the 26th"?
21    A.    Right.
22    Q.    And is that your recollection, that the
23 meeting was --
24    A.    Yes.
25    Q.    And what -- what happened at that

Page 216

1 meeting, if you recall?
2    A.    We had some information, and I can't
3 remember if Mike had gotten -- I don't think he'd
4 gotten the flash drive at that point, that
5 particular flash drive, but we were giving him a
6 verbal update on certain people within the --
7 within the file, Exhibit 7.
8    Q.    And you said before that you were
9 working around the clock?
10    A.    Yes.  They were.
11    Q.    But you weren't.  You mean the team was
12 or -- I just want to be precise here.
13    A.    Well, I'm human.  I don't work 24/7.
14    Q.    I didn't mean that, obviously.  But you
15 said you'd been working weekends on this; is that
16 fair to say?
17    A.    All of us were working, often.
18 Whenever we found a lead, we'd go after it.
19    Q.    And is that just standard procedure for
20 --
21    A.    Yes.
22    Q.    -- and engagement of this nature?
23    A.    Yes.
24          MR. SCHMIDT:  Just let him finish the
25    question.

Page 217

1          MR. GRENDI:  That's okay.
2    A.    Yes.
3    Q.    And does that schedule ever let up
4 during an engagement or is it just typical for
5 the beginning of an investigatory research
6 project?
7    A.    Well, something that was this intense,
8 where you had an increase -- mentally, you'd
9 already sort of planned out in the contract for
10 ten.  So you get a 33 percent increase.  So you
11 have to sort of shift the -- the process, adjust
12 the process so that you can continue to keep
13 going in.
14          Again, I have to tell you, repeatedly,
15 how many names were fake, how many -- how many
16 bits of information and addresses were fake, how
17 many rabbit holes these guys had to go down to --
18 to prove that there were not -- the information
19 that Guo had been given for $250 million, a lot
20 of it was rubbish.
21    Q.    Just going back to that meeting on the
22 26th of January.  Was any information presented
23 to the client?
24    A.    I think Mike did, yes, verbally.
25 Verbally.  We sat there and listened.

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 218

1     Q.    Did you personally make any
2  presentation about the research at that
3  January 26th meeting?
4     A.    I wouldn't call it a presentation.  We
5  had an open discussion about the -- the content
6  and the fact that we'd only been in it ten days,
7  and the complications arising from expecting --
8  or Guo expecting to have a full -- or a flash
9  drive in ten days was unreasonable.
10    Q.    So was it at that time when it occurred
11 to you that there was some immediacy to this
12 project?
13         MR. SCHMIDT:  Objection.
14    A.    Not more so than usual.  He never
15 mentioned any drop dead date or anything like
16 that.
17    Q.    But did you get the impression at that
18 January 26th meeting that Mr. Guo wanted the
19 information as soon as possible?
20    A.    He always wanted it as soon as
21 possible.
22    Q.    From the very beginning?
23    A.    From the very beginning.
24    Q.    And is that part of the reason why you
25 and your team were working around the clock or on

Page 219

1  weekends?
2     A.    Yes.  We wanted to make sure that the
3  client was happy and that we could find what we
4  needed to retrieve.
5     Q.    Was there any kind of internal
6  miscommunication at Strategic Vision that delayed
7  the progress of the investigation?
8         MR. SCHMIDT:  Objection.
9     A.    Not that I'm aware of.
10    Q.    You don't recall any problems or errors
11 that were made by Strategic Vision's team that
12 delayed the progress of the research?
13    A.    To my knowledge, we never made any
14 errors.  We were going out of our way not to make
15 errors, based on the fact that we had fake
16 information on a number of the files that we've
17 been given.
18    Q.    Did you ever tell Mr. Guo or Yvette
19 Wang or Lianchao Han that there was an internal
20 miscommunication that delayed the start of the
21 research?
22    A.    Not -- not to my recollection.  I mean,
23 we apologized that we hadn't been able to
24 retrieve it as quickly as he would have liked it,
25 but ten days is asking a lot.

Page 220

1     Q.    So why was it that you and Dr. Waller
2  were apologizing?
3     A.    Actually, Mike was the one who was
4  apologizing, and he was, I think -- I spent time
5  in Asia.  You -- you -- you don't allow your
6  Asian friends to lose face.  And so it was really
7  important for Mike and for me not to have him
8  lose face or be embarrassed by the fact that he
9  didn't have all the information, for whatever
10 reason, that he needed to have at that lunch, and
11 that's when -- that was on the 26th, the lunch,
12 when we discussed the delay.
13    Q.    Did you or Dr. Waller say to Mr. Guo,
14 what's the big hurry here?  What's the rush?
15    A.    I don't recall that.
16    Q.    You don't recall saying that?
17    A.    No, I don't recall either one of us
18 asking him.  He never told us why.
19    Q.    But you never asked?
20    A.    Well, the client was the one who should
21 have told us if there was a reason that we needed
22 to be -- to have something by X date.
23    Q.    And so going back to this apology.
24 What was offered, if anything, as an apology to
25 the present client?

Page 221

1     A.    To Guo, Mike just said, I'm really very
2  sorry, it is not our standard procedure to ever
3  have an unhappy client.  We certainly will do
4  everything we can to make sure that he -- that
5  you, you know, Miles, are happy with what we're
6  going to continue trying to retrieve.
7         And then Michael, again, explained to
8  him the layers of how these things are found.
9  You can't -- you can't bring up legitimate
10 information if you have been given fake names,
11 fake addresses, fake family relationships.  It's
12 like looking into a dark closet and there's
13 nothing there, because you can't identify
14 anything if you have no legitimate names to go
15 on.
16         The Chinese deliberately will change
17 the names of their daughters, cousins, uncles,
18 brothers; there's no Ancestry.com that you can go
19 to to figure it out.
20    Q.    And so, was it at this meeting that you
21 conveyed to Mr. Guo and Lianchao and -- well, I'm
22 sorry, who was present at this meeting?
23    A.    I think Lianchao was there.
24    Q.    Okay.
25    A.    No, no, no, I take it back.  I take it

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 222

1   back.  On the 26th, Yvette was there.  Yvette was
2   there, Mike and I were there, and -- and Guo was
3   there.
4        Q.    So was -- was it at this January 26th
5   meeting that you conveyed for the first time
6   that, hey, some of these names that you gave us,
7   they're fake people?
8        A.    No.
9        Q.    When was that?
10       A.    We had already told Lianchao and Yvette
11  that there were some fake names and fake leads in
12  here.
13       Q.    And when was that?
14       A.    Whenever we saw them.  And, you know,
15  since Lianchao lives in Washington, I was able to
16  tell him face-to-face, not on the telephone; we
17  had very limited, you know, whatever, Signal
18  messages or anything like that, so it was always
19  face-to-face.
20       Q.    And did Strategic Vision offer to give
21  ten days of --
22       A.    We did.
23       Q.    -- free service at that time?
24       A.    And we did.
25       Q.    And was that just a client relations

Page 223

1   offer --
2        A.    Yes.
3        Q.    -- it wasn't because there was any kind
4   of problem?
5        A.    I wouldn't call it a problem.  The
6   problem ended up here (indicating).  This was the
7   problem, with the initial Exhibit 7.  That was
8   the problem that -- that stymied us, plus their
9   asking for the additional five fish, which we
10  agreed to do to help them out.
11       Q.    So Strategic Vision didn't see anything
12  wrong with how it was conducting itself.  There
13  was a delay because of what you just said, some
14  of the names were fake?
15            MR. SCHMIDT:  Objection.
16       A.    Yes.
17       Q.    Was this discussion on January 26, 2018
18  the first oral report presented to Mr. Guo and
19  Yvette?
20       A.    No.
21       Q.    What was the previous?
22       A.    Somewhere around the 16th, or something
23  like that, the 15th, 16th.  I don't have a
24  calendar, so I don't know.
25       Q.    And who did you make that report to, if

Page 224

1   you were there?
2        A.    Guo, and probably Lian -- Lianchao, I
3   think, might have been there at that point.
4        Q.    Was Yvette there?
5        A.    I think that was one of the times he
6   sent her out of the room.  She was there, but he
7   sent her out.
8        Q.    What was the takeaway from the
9   January 26, 2018 report; what was going to happen
10  next?
11       A.    We were good.  And he said fine, just
12  keep digging.  I don't care what you have to do.
13  Go into every file you can find.  Be aggressive.
14  Don't hold back.
15            Mike explained to him that, you know,
16  there were certain parameters about what you
17  could go into legally, and that we were not
18  willing to do anything illegal, and we never
19  have, we were not going to start with him.
20            So, at the end of it, I had brought a
21  little present to give to Guo, my little personal
22  collection of small antique Buddhas, and I gave
23  it to -- I was giving it to him in the beginning,
24  the morning.  I said, this is something that I've
25  had for a long time, it means a lot to me, I'd

Page 225

1   like you to have it.  He refused to accept it.
2            And then he turned around to Mike and
3   gave Mike huge bear hugs, and then he gave me
4   close to a bear hug, but not quite; he gave Mike
5   a much bigger bear hug, slapped him on his back,
6   and said, you're my friend, I know we're going to
7   get this done, and everything is going to be
8   fine, and we just have to keep working on it, and
9   so forth.  So everything was fine when we left.
10       Q.    Did you understand that Mr. Guo wanted
11  information right away after that meeting?
12       A.    He never -- he always wanted
13  information right away, but he never had a
14  deadline, like, I have to have it by the 5th of
15  March or the 3rd of April, or whatever.  We
16  always felt pressured to get the information to
17  him.
18       Q.    So you don't recall Dr. Waller flying
19  off to Europe right after that meeting?
20       A.    Of course I do.  He went to get another
21  USB, another flash drive.
22       Q.    And why did he do that at that time?
23       A.    Because the client wanted to have the
24  latest, you know, chapter, I suppose.
25       Q.    So did Mr. Guo ask for a flash drive at

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 226

1  that January 26th meeting?
2      A.    He asked -- he said to Mike, I want you
3  to go get whatever it is, go get it and bring it
4  back.  Mike did that twice, at least.
5      Q.    And Mike did, in fact, fly off to
6  Europe --
7      A.    Yep.
8      Q.    -- right after that meeting?
9      A.    Yep.  Pretty much.
10          MR. GRENDI:  Let's go to 11.
11          (Wallop Exhibit 11, Background Report
12      on Qing Yao, marked for identification.)
13      Q.    Ms. Wallop, do you recognize this
14  document?
15      A.    Actually, I do not.  I have never seen
16  it until we did Yvette's, whatever it was,
17  deposition the other day.  I've never seen it.
18      Q.    Have you ever seen a report like it --
19      A.    No.
20      Q.    -- a background report like this?
21      A.    No.
22      Q.    Do you have any idea where this
23  document came from?
24      A.    I think it came from Mike and Team 1.
25  That was my understanding.

Page 227

1      Q.    But the first time you saw it was at
2  Ms. Wang's deposition?
3      A.    Yes.
4      Q.    Do you know if Dr. Waller delivered an
5  80-gigabyte flash drive to Yvette Wang on or
6  about January 30th?
7      A.    Yes, I do know.
8      Q.    How do you know about that?
9      A.    He told me.
10      Q.    And after that flash drive was
11  delivered, what happened?
12      A.    I don't know.  I know that he delivered
13  it to her in the train station.  He had literally
14  just come back from Ireland, having -- having
15  flown 24 hours round trip, I think.  And he -- he
16  also didn't know exactly what was on it.  So I
17  don't know what was on it because I never saw it.
18      Q.    What was the response to the
19  80-gigabyte flash drive from Mr. Guo?
20      A.    I don't know.
21      Q.    You never talked to him about it?
22      A.    No.
23      Q.    Did you ever talk to Dr. Waller about
24  the response to the 80-gigabyte flash drive?
25      A.    He -- he didn't meet Guo.  He met

Page 228

1  Yvette at the train station, as I understand it.
2  And then there was another guy from Guo's office
3  or something, who's yet to be identified.  But I
4  don't know who he was.
5      Q.    Did there ever come a point in time
6  when you talked to Dr. Waller about Mr. Guo or
7  Yvette being disappointed with the 80-gigabyte
8  flash drive, or USB drive?
9      A.    No.
10      Q.    You never discussed it?
11      A.    I never knew about it, because nobody
12  told me what was on the drive, so I didn't know
13  what was on the drive.  I think Mike had hoped
14  that there would probably be more on the drive,
15  but that's all I knew based upon what he told me.
16      Q.    When did you get the idea that Mr. Guo
17  was disappointed with the research?
18      A.    We never had any inkling until the
19  lawsuit was filed.
20          MR. GRENDI:  Let's do 12.
21          (Wallop Exhibit 12, Signal message
22      thread, marked for identification.)
23      A.    I might correct that, because my memory
24  is bad.  We did know from Lianchao that he was
25  not happy.

Page 229

1      Q.    When did --
2      A.    I would say somewhere in February,
3  early to mid-February.  I said, well, that's
4  silly, because we're -- we're knocking our brains
5  out.
6      Q.    Just turn to Eastern 225.  Or I'm
7  sorry, 255 of this document.
8          And is Pyratz a code name that
9  Dr. Waller would go by?
10      A.    Yeah, that's Mike's signal.
11      Q.    And do you see this message from Yvette
12  Waller on Eastern 255?
13      A.    You mean Yvette Wang.
14      Q.    Oh, jeez.  Thank you.  Yvette Wang, of
15  course.  Sorry.
16      A.    I don't know.  I never saw this.  This
17  is the first time I've seen it.  But he's very
18  good in explaining stuff.
19      Q.    Do you see Dr. Waller's response on
20  Eastern 257?
21      A.    Yes.  He was explaining whatever.
22      Q.    And so you and Dr. Waller never had any
23  discussions about this Signal exchange --
24      A.    No.
25      Q.    -- between Dr. Waller and Yvette Wang?

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 230

1     A.    No.
2     Q.    Let's go to Eastern 259.  Do you see
3  where Dr. Waller wrote, "our understanding was
4  that the first 90 days would be for starting up
5  and developing the data"?
6     A.    I see that.
7     Q.    Was that Strategic Vision's
8  understanding as well or just Dr. Waller's?
9     A.    No, it was our mutual understanding
10 between Guo and myself and Lianchao and Mike.
11    Q.    Do you see where it says, "We
12 did not understand that he expected actual data
13 in the first days or weeks"?
14    A.    Correct.
15    Q.    Again, you never talked to Dr. Waller
16 about this exchange after --
17    A.    Not about --
18    Q.    -- it happened on the --
19    A.    -- this exchange, no.
20    Q.    Did you ever discuss the substance of
21 this exchange, or something akin to it, about the
22 expectations of the client?
23    A.    Perhaps later that -- when we were
24 talking about what -- what we had been able to
25 retrieve so far, and how we had -- let me just

Page 231

1  read this.  How Mike had explained very
2  patiently, very calmly, very slowly, whether it
3  was with -- or through Lianchao or through
4  Yvette, how the process works.
5           So, if Guo wanted to speed up and get
6  everything really fast, then all the trap doors,
7  all the doors that we had been able to open
8  quietly, would be slammed shut.  If Guo would
9  just be patient and let us get into where we
10 needed to go quietly, he was going to get an
11 awful lot of information back.
12          The irony is, that had he just relaxed
13 and stayed on top of this, that is Guo, he would
14 have had a huge amount of information three
15 months a year in.  Huge.  We can't fix somebody's
16 perception of how this is done.  He was very
17 impatient.
18    Q.    When did you understand that Mr. Guo
19 was getting impatient?
20    A.    I guess around -- well, certainly on
21 the 26th, when we sort of had our lunch with him,
22 and then -- and then I think possibly through
23 Lianchao; because, as I told you, we never had
24 any direct contact with -- with Guo.  It was
25 always through Lianchao or Yvette.

Page 232

1     Q.    Right.
2     A.    Yvette was taken off the case in, as we
3  understand it, beginning the 1st of February.
4  And then she -- she sent us an email saying she
5  was no longer in it, that only to -- to
6  communicate with Lianchao.
7     Q.    Did Strategic Vision adjust its
8  research approach based upon this request for
9  more immediate results?
10    A.    No.  In fact, we actually increased the
11 pressure on Team 1, and then went and had a
12 long -- several meetings with potential Team 2,
13 and that's another side of it.
14    Q.    Is that a company that goes by the
15 acronym ASOG?
16    A.    Yes.  In Dallas.  Outside of Dallas.
17    Q.    And why was it that ASOG was contacted
18 in connection with this research agreement?
19    A.    Because we had the option of being able
20 to bring in whatever teams we felt were going to
21 be additionally viable, and also on the domestic
22 side of some of the things that we were bumping
23 into, or Mike and his team were bumping into on
24 the international side, which were not pretty.
25          So, we were given the names of the

Page 233

1  fellows who had been with NSA, DIA, whatever,
2  in -- in -- in Dallas, and we went and met with
3  them, and they told us -- they looked at -- we
4  only gave them like a couple of names, we never
5  gave them the whole file.
6           And they looked at it, and then we went
7  back about a week later maybe, it might even have
8  been ten days later, a week later, and they were
9  totally freaked out.  They said, you can't touch
10 any of these people or any of these names.  We
11 said, what are you talking about?
12          That's when they said, these are all
13 RPs.  We will all go to jail if you start fooling
14 around in their files.
15    Q.    So when did you first meet with ASOG,
16 that meeting in Dallas you just described?
17    A.    Yeah, it would have been the beginning
18 of February, I should think.  Again, Mike has the
19 date.
20    Q.    Is there any reason a second team
21 wasn't assembled at the outset of the agreement?
22    A.    We did -- because of the element of
23 retrieval we had to do outside of the United
24 States, because he wanted it so fast and so
25 quickly and intensely, that that was the fastest,

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 234

```
1   quickest way of getting into certain files had
2   they not all -- had some of them not been fake,
3   then we would have had no -- we wouldn't have
4   gone to the second -- second dimension.
5       Q.    And the decision to go with the second
6   team, was that Strategic Vision's --
7       A.    Mine --
8       Q.    -- decision or Dr. Waller's?
9       A.    Mine and Mike's, yeah.
10      Q.    Jointly?
11      A.    Jointly.
12      Q.    Okay.
13      A.    We both went down twice.
14      Q.    And you said RP.  What does RP mean?
15      A.    Restricted persons.
16      Q.    And in your career in this
17  investigatory field, have you encountered
18  restricted persons before or --
19      A.    Yes and no.  It's had different
20  acronyms.  Sometimes it's PP, protected persons.
21  Sometimes it's RP.  But it means that it is
22  either under a watch list by the U.S. Government
23  or it is a -- or, let's just say a certain agency
24  has tagged these individuals and is watching them
25  themselves.  So we cannot enter into those files
```

Page 235

```
1   at all in the U.S.
2       Q.    And these files you're talking about,
3   are these files government files or what kind of
4   files are they?
5       A.    Your Exhibit 7, these names, all of
6   these names.  We can't -- we don't know, because
7   we certainly were not peeking into those
8   government files.
9       Q.    Oh, they're government files you're
10  talking about?
11      A.    Yes.  These are U.S. intelligence
12  files.
13      Q.    I see.  And sometimes those files are
14  accessible, if they're not records protected --
15  or, I'm sorry, restricted persons?
16      A.    It just depends on the jurisdiction of
17  where you're looking into the file.  We would
18  never do anything that would be anti-U.S. law.
19  And he was asking us to continue doing that, Guo
20  was.
21      Q.    But just in terms of these people who
22  you -- ASOG told you were restricted persons.
23  There are some people, obviously, that are not
24  restricted persons, is that fair to say?
25      A.    I have no idea.  Because we didn't give
```

Page 236

```
1   them the whole file.  We only gave them like, I
2   don't know, maybe four or five names.
3       Q.    Okay.  But what I'm just trying to
4   understand is --
5       A.    And I --
6       Q.    -- and I know this sounds like a basic
7   question --
8       A.    Right.
9       Q.    -- and I apologize.  But are all people
10  restricted persons in intelligence files or
11  government files?
12      A.    No.
13      Q.    Okay.  So there are certain people --
14      A.    No, no, no, no, no.  These were tagged.
15      Q.    Specially tagged?
16      A.    These were tagged.  And I -- again, you
17  would have to ask Mike.  I don't know if it was
18  the whole file that was tagged or if it was just
19  four or five names they ran through the system.
20      Q.    I see.
21      A.    But they were all tagged; flagged,
22  tagged, whatever you want to call it.
23      Q.    So when did you convey to the client
24  that there was this restricted persons
25  designation on some of the fish?
```

Page 237

```
1       A.    We did that through Lianchao.
2       Q.    And when was that?
3       A.    Sometime in the middle of February, I
4   think, by the time we had gotten -- we had been
5   down to -- to Dallas.
6       Q.    And so you went to Dallas with
7   Dr. Waller?
8       A.    Twice.  Twice we went to see him.
9   Twice.  Or see them twice.  The irony was, we
10  then saw this group at a function in Washington,
11  at an intel or security defense function several
12  months later, and they said to us -- they said to
13  us, well, it's really weird, because they already
14  had figured out it was Guo that was the client.
15          We never told them who the client was.
16  So they told -- they -- they said, well, they
17  figured out it was Guo, and they said about a
18  week or so after we had been down there the
19  second time, that Guo had people go down to talk
20  to them.
21          And we never told anybody who they
22  were.  We didn't tell Lianchao who they were.  We
23  didn't tell anyone.  This was just between Mike
24  and me.  So that was very weird.
25      Q.    Do you think that was just a
```

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 238

1  coincidence or is that --
2      A.    I would find it an extraordinary
3  coincidence.  These guys are so deep-sixed that,
4  just even to physically find them is like
5  difficult.
6      Q.    So deep-sixed, you mean they're
7  inaccessible or --
8      A.    Inaccessible.
9      Q.    -- they keep a low profile?
10      A.    Yeah.  They had a very low profile and
11  they had a very low profile location.
12      Q.    And how is it that you knew about them,
13  ASOG?
14      A.    Through Mike and one of his people.
15      Q.    And so, did there come a time when ASOG
16  said, well, we can't do any research on this
17  because of this --
18      A.    That's right.
19      Q.    -- records protected status?
20      A.    Yes.  That's right.
21      Q.    I understand you're eager to move
22  forward, but, just for the court reporter, just
23  please wait for me to ask the question.
24          Could Strategic Vision still perform
25  some research, though, even though some of the

Page 239

1  individuals were designated as records protected,
2  or restricted persons, I'm sorry?
3      A.    We did not know at that point, and by
4  that time we got some kind of service for a
5  lawsuit.  And our teams, we had to let our teams
6  overseas know on the 23rd of February that they
7  had to stop.
8      Q.    I just want to ask this, though.  Could
9  Team 1 still do its job, even though ASOG found
10  that certain individuals were, as you described,
11  records protected?
12      A.    That's -- that's a question I'd have to
13  leave for a lawyer in the -- in the IC,
14  intelligence community, to answer.  We wouldn't
15  want to do anything that would be illegal.
16      Q.    So you didn't direct Team 1 to stop its
17  work when ASOG gave its report to you that people
18  were records protected?
19      A.    We did.  Mike did.  He did talk to
20  them.  And even though the -- he told them to
21  stop doing anything that looked like it was
22  peeking into something that they shouldn't be
23  looking into.
24          It's one thing to peek into somebody's
25  license, driver's license number, or their --

Page 240

1  their new address, or some sort of preliminary
2  stuff that was being brought up, but if you were
3  getting into deeper stuff, you couldn't touch it.
4  You shouldn't touch it.  And I'm sure he conveyed
5  that to the -- to the Team 1 leader.
6      Q.    So it's your understanding -- Strategic
7  Vision's understanding that Team One's work was
8  curtailed because of the discovery that certain
9  fish were restricted persons or records
10  protected?
11      A.    That's correct.
12      Q.    And that was on or about January 30th,
13  or whereabouts?
14      A.    No, no, no, no, no, no, no.  This was
15  way into the middle, the 15th to the 20th,
16  something in there, of February.
17      Q.    That's when ASOG conveyed to you
18  that --
19      A.    Yes.
20      Q.    -- you were -- okay.
21          So let's just get a clear record then.
22  When did ASOG tell you that certain people
23  were -- certain fish were records protected?
24      A.    At some point in Feb -- in the middle
25  of February 2018.

Page 241

1      Q.    And then is it your understanding that
2  Mike, very shortly thereafter, conveyed this
3  information to Team 1?
4      A.    That's correct.
5          MR. GRENDI:  Let's do Exhibit 13.
6          (Wallop Exhibit 13, Letter dated
7      February 23, 2018, marked for
8      identification.)
9      Q.    Do you recognize this document,
10  Ms. Wallop?
11      A.    Actually, I never saw the letter.  I
12  gather it was delivered to -- it says here it was
13  delivered to -- by hand delivery and electronic
14  mail to me, but I was out of the country, and
15  they had, in fact, sent it to the Nevada address.
16      Q.    The Nevada address, is that Strategic
17  Vision's?
18      A.    Strategic Vision's Nevada agent
19  address, yeah.
20      Q.    Does Strategic Vision have an office in
21  Nevada?
22      A.    We have an agent.
23      Q.    Do you have a physical --
24      A.    Yes, it's an address.
25      Q.    -- location that you can --

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 242

1    A.    Yes.  It's on all the documents
2  somewhere.
3    Q.    I'm asking if Strategic Vision has like
4  an office with --
5    A.    No.  It's an agent.  It's an LLC.
6  That's where they set them up.  Like Wyoming.
7    Q.    And what's in Wyoming, I'm sorry?
8    A.    LLCs.  There are a lot of LLCs and
9  corporate trusts and so forth set up in Wyoming,
10  as there are in Nevada.
11    Q.    Those are your corporate trusts and
12  LLCs?
13    A.    No.
14    Q.    I just want to clear it up.
15          You just mean it's a popular state for
16  incorporation?
17    A.    Correct.
18    Q.    Thank you.
19          So when did you first see this letter?
20    A.    Oh, when I probably returned from the
21  Middle East; I think it was probably, I don't
22  know, the first or second week of March.
23    Q.    Were you surprised by the letter?
24    A.    I thought it was idiotic, yes.
25    Q.    Why did you think it was idiotic?

Page 243

1    A.    Because we heard nothing from them.  We
2  were continuing to do the work.  And it was
3  silly.
4    Q.    What work was Strategic Vision doing
5  after January 30th that --
6    A.    All of February.  Or up until the 23rd
7  of February, to be precise.
8    Q.    And were there any meetings with
9  Lianchao Han and Mr. Guo after January 30, 2018?
10    A.    Not with us, no.
11    Q.    With whom, then?
12    A.    With Mike and myself, no.  With
13  Lianchao and Guo, possibly.  I don't know.
14    Q.    Let me ask this then.  Did you or
15  Dr. Waller meet with Lianchao after January 30,
16  2018 concerning this contract?
17    A.    That's a good question.  I doubt it,
18  because I didn't know that there was any issue
19  other than, you know, we were doing our best and
20  pedaling fast.
21    Q.    So Strategic Vision didn't deliver any
22  information to Lianchao, or certainly Yvette,
23  after January 30, 2018?
24    A.    We could have.  I'd have to ask Mike.
25    Q.    You didn't do it personally?

Page 244

1    A.    I personally did not, no.
2    Q.    Do you know if Dr. Waller did that
3  or --
4    A.    Well, he did on the 30th, obviously.
5    Q.    Right.  I'm talking about after the
6  30th.
7    A.    Okay.  Well, I don't know.  I don't
8  know.
9    Q.    Okay.  It says, "Eastern agreed to
10  delay the start of the contract by ten days from
11  January 6th to January 16th."  Do you see that on
12  the first page, Eastern 198?
13    A.    Yes.
14    Q.    Is that the ten-day grace period or
15  accommodation that you were talking about --
16    A.    Correct.
17    Q.    -- regarding the January --
18    A.    Yes.
19    Q.    -- 26, 2018 meeting?
20    A.    Yes.
21    Q.    Thank you.
22          Did Strategic Vision attempt to contact
23  Mr. Guo or Lianchao or Ms. Wang after receipt of
24  this letter?
25    A.    Well, Yvette had been taken off the

Page 245

1  case.  She was forbidden, apparently, to have
2  anything to do with it.  So the only two people
3  that would have been contactable would have been
4  Lianchao and I'm sure that -- again, I'm not sure
5  of the dates, but I'm sure -- and Lianchao
6  travels, too, so I'm not sure where he was in
7  February, but I'm sure that both Mike and I must
8  have had some conversation with him in February,
9  after this.
10    Q.    But you don't remember that, sitting
11  here today, what that conversation was like?
12    A.    No.  Well, I mean, we were very
13  surprised and very unhappy, and we'd been working
14  hard to -- to do what Guo wanted, so...
15    Q.    And did Lianchao say anything back to
16  you, or what was discussed?
17    A.    I think he said that, you know, Guo
18  gets upset all the time about a lot of things,
19  and so maybe we -- he could smooth it over and
20  calm him down and so forth.  And then we just, I
21  think, hoped that that would happen, and it
22  didn't.  So then the -- this thing was done, so
23  we just stopped.
24    Q.    You mean this lawsuit?
25    A.    Yes.

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 246

1    Q.    When did you instruct Mike, or anyone
2  else involved with the Strategic Vision team, to
3  just stop work on this project?
4          A.    After the 23rd of February.
5          Q.    You don't remember the exact date?
6          A.    No.  We had things in the hopper that
7  were being produced, but they -- we bought them,
8  so we had to pay for them, so when we got the
9  information, then we could produce it, but...
10         Q.    And did Dr. Waller fly to Europe to
11 tell the leader of Team 1 to stop work, or how
12 did that happen?
13         A.    I'm not sure.  You would have to ask
14 him how he did that.  He may have met with him
15 overseas.
16         Q.    Okay.  In connection with splitting the
17 profits from this engagement with Dr. Waller, do
18 you owe him money, or does Strategic Vision owe
19 him money I should say?
20         A.    First of all, there weren't profits.
21         Q.    Earlier we discussed your arrangement
22 with Dr. Waller to split the proceeds of this
23 engagement, correct?
24         A.    That's correct.
25         Q.    And has that splitting occurred, is

Page 247

1  what I should ask?
2          A.    Yes, because our time was valuable for
3  those two months, plus the people that we had
4  already contracted to pay for the research and so
5  forth.  We expected to have a three-month
6  contract at the very least, which were the terms
7  of the agreement, so...
8          Q.    And what I'm asking is, did you at some
9  point send Dr. Waller a wire or write him a check
10 for his half of this engagement?
11         A.    I already answered yes.
12         Q.    And that was -- was that $250,000 that
13 you referred to earlier?
14         A.    Yes.  More or less.  Plus expenses,
15 travel expenses and other expenses.
16         Q.    And there was another wire for about
17 $300,000 for Team 1, right?
18         A.    Yes, at least.
19         Q.    Okay.  So as far as you and Dr. Waller
20 are concerned, there's nothing left to split,
21 that's already been --
22         A.    Oh, that baby -- that train's long left
23 the station.
24               MR. GRENDI:  Let's go to 14.
25               (Wallop Exhibit 14, Document Bates

Page 248

1  stamped SVUS000040 and SVUS000041, marked
2  for identification.)
3          Q.    Just take a moment to take a look at
4  these two documents, SVUS40 and 41.
5          A.    Correct.
6          Q.    Do you recognize these documents?
7          A.    Yes, I do.
8          Q.    What are they?
9          A.    I think these were done by the -- I
10 can't remember if these were done by the ASOG
11 guys.  I think they were done by the ASOG guys,
12 because of the socials.  And they were -- Xi
13 Ping -- Xi Jinping, who is the premier of China,
14 and then his number 2, the next vice president of
15 the communist party in China.
16               And this is a -- this is a -- sort of a
17 geo -- geologic -- I mean, how would I put it?
18 It's sort of a graph of the connections between
19 certain families that were in the original
20 document that we were investigating.  So this was
21 like a -- not a flow chart; this was like a
22 genealogical -- I don't know what you want to
23 call it -- chart.
24         Q.    A family tree, is that what it is?
25         A.    It's sort of a family tree, yeah.  But

Page 249

1  it shows the relationships of many of these
2  people that were in our original document from
3  Guo.
4          Q.    Did you give this document to the
5  client?
6          A.    To the client?
7          Q.    Yeah, did you deliver this family tree?
8          A.    This is when we were told they were
9  RPs.
10         Q.    So you got this information on or about
11 February 15th?
12         A.    Yes.  Again, I would have to -- yes.
13         Q.    But you didn't give it to Lianchao?
14         A.    We never gave it to him.  We told
15 Lianchao.
16         Q.    What this family tree or --
17         A.    Yes.
18         Q.    -- chart includes?
19         A.    We told them that they were all RPs,
20 that the names that we had were RPs that we had
21 given in.  And, again, Mike would remember how
22 many of these we gave.
23         Q.    And just turning to the second page --
24         A.    Okay.
25         Q.    -- SVUS41?

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 250

1     A.     Correct.

2     Q.     Was this ever given to Lianchao Han?

3     A.     I believe it -- it could -- we may have

4  shown it to him, but, because of the security

5  concerns, given the RP status, we didn't probably

6  physically give it to him.  But we told him about

7  it, and we told him that there were these -- all

8  of these names at the top had -- were using

9  duplicate Social Security numbers.

10     Q.     I'm just a little confused here, so

11  please help me out.  But how did ASOG get this

12  information if the individuals were records

13  protected?

14     A.     Because they had -- oh, my goodness.

15  They had access to -- they work within the IC,

16  they work within the intelligence community, they

17  were DIA, NSA, D -- other --

18     Q.     DOJ?

19     A.     No.

20     Q.     Okay.  I was just trying.

21     A.     So they had access, and they had

22  incredible backgrounds and CVs.  So they had

23  access into pulling up these names.  And the more

24  the -- the more they -- they could do the

25  preliminary stuff, but the more they started to

Page 251

1  dig into the individuals, they found out that

2  they were RPs.

3     Q.     Oh, so it wasn't immediately apparent

4  to ASOG --

5     A.     It wasn't --

6     Q.     -- that they were RPs?

7     A.     It wasn't right away, no.

8     Q.     Ah, I see.  So they were able to find

9  some information?

10     A.     They found this information that they

11  shared with us, yes.

12     Q.     But at some point in their

13  investigation, they realized, oops, those are

14  RPs, we can't look anymore?

15     A.     That's correct.

16     Q.     Okay.  And ASOG did give some

17  information to Strategic Vision about these --

18  the information that they did find?

19     A.     Yes.

20     Q.     I see.

21          MR. GRENDI:  Let's go to 15.

22          (Wallop Exhibit 15, Document entitled

23          "Line-Item Budget 1 Month Projected Cost

24          Analysis" Bates stamped SVUS260, marked for

25          identification.)

Page 252

1     Q.     Ms. Wallop, have you ever seen what's

2  been marked as Wallop 15, Bates number SVUS260?

3     A.     Yes.

4     Q.     When did you see this?

5     A.     When we were billed for the wire for

6  the first month of Team 1.

7     Q.     And so, was this document given to

8  Dr. Waller when --

9     A.     Yes.

10     Q.     -- he was abroad?

11     A.     Yes.

12     Q.     And he brought it home?

13     A.     Yes.

14     Q.     Was there any negotiation of the prices

15  quoted or --

16     A.     I'm sure Mike did, but this was

17  dangerous stuff, so we did -- we did -- we agreed

18  to whatever the number is that I can't read at

19  the bottom here.

20     Q.     Yeah, it's a little bit of a fuzzy --

21     A.     Bad, bad.

22     Q.     -- photocopy there at the end, right?

23     A.     It was either 267 or 278 or something.

24     Q.     You're talking about the total direct

25  cost?

Page 253

1     A.     Yeah, um-hum, and I can't read that,

2  quite honestly.

3     Q.     Did Team 1 ever return any of the funds

4  that were sent to it --

5     A.     Why?

6     Q.     -- for this engagement?

7     A.     Why on earth could -- would they?

8          MR. SCHMIDT:  Just answer the question.

9     A.     No.

10     Q.     Is it fair to say there aren't any

11  refunds in this business?

12     A.     Certainly not.

13          MR. SCHMIDT:  You're learning that the

14  hard way.

15     Q.     I meant in connection with working with

16  secret teams like Team 1; is that fair to say?

17     A.     That's correct.

18     Q.     Fair enough.  And does Strategic Vision

19  have bank records reflecting sending funds to

20  Team 1?

21     A.     I'm sure we have a copy of a wire.

22  (*r)     MR. GRENDI:  We're going to call for

23          the production of that.  I'll follow up.

24          THE WITNESS:  That's fine.

25          MR. GRENDI:  Go to 16.

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 254

1        (Wallop Exhibit 16, Invoice from Allied
2    Special Operations Group, Bates stamped
3    SVUS000262, marked for identification.)
4        MR. SCHMIDT:  After this document, why
5    don't we take a two-minute break?
6        MR. GRENDI:  Yeah, sure.
7    Q.    So do you recognize this document, this
8    invoice from Allied Special Operations Group?
9    A.    Correct, ASOG.
10   Q.    And why was the invoice reduced from
11   over $100,000 to $5,000?
12   A.    Because they couldn't touch the -- they
13   couldn't go into the files that they had -- that
14   they had with the names; they could have gone to
15   prison, all right?  So they refunded us -- or
16   refunded is the wrong word.  I wish they had
17   refunded, but, no, they sent us a bill -- in
18   other words, so that you can see what this sort
19   of thing actually cost, this is what these things
20   cost, and this was only for a few names, and this
21   is only for one week.  So they -- you know, we
22   bit and screamed and hollered, and so they ended
23   up sending us the -- the bill for the 5,000.
24   5,412.50.
25   Q.    So, originally, ASOG was trying to get

Page 255

1    $105,000 from --
2    A.    It was 111,000.
3    Q.    Oh, I'm sorry.  Did I miss -- I thought
4    I -- no, that's fair.  Yeah, 111.
5    A.    $111,700.  That's what these people
6    charge.  Not these people, but the industry
7    charges.
8    Q.    And Strategic Vision kind of fought
9    back on that and said, well, you didn't really do
10   the work, so?
11   A.    No, we did not do that.
12   Q.    How did you negotiate with them over
13   the total amount owed?
14   A.    We explained to -- I mean, they
15   explained to us that they would have gone ahead
16   and done it and billed us for the 111,000,
17   without question.  Until they bumped into the
18   RPs.  When they bumped into the RPs, they said,
19   we can't do it.  You know, as American citizens,
20   neither can you.  So we didn't.
21   Q.    And because of that, they -- ASOG
22   determined that they should reduce the invoice to
23   just $5,000?
24   A.    They did.
25   Q.    I'm just confused, because you said you

Page 256

1    screamed and hollered, and that's why --
2    A.    Well, yeah, because normally we
3    understand -- look, again, a little bit in the IC
4    is that -- that, when you get into certain
5    records' protected arenas you cannot, you cannot
6    invade that space.
7        So while they were sniffing around the
8    edges of each one of these files, we said, you
9    know, between us, we can't touch it, so there
10   should be no bill.  So then that's when they sent
11   the $5,000 bill.
12   Q.    Because they had spent some time trying
13   to do this?
14   A.    They'd spent a week.  And the time --
15   the timing thing is there, the time -- whatever
16   it is.  Our rate, hours worked.  And those are
17   the initials of the people that worked there.
18       MR. GRENDI:  We can take that break
19   now, if you like.
20       THE VIDEOGRAPHER:  Off the record at
21   4:41.
22       (Whereupon, a short recess was taken.)
23       THE VIDEOGRAPHER:  Back on the record
24   at 4:48.
25       MR. GRENDI:  Let's do Exhibit 17 here.

Page 257

1    This will be Wallop 17.
2        (Wallop Exhibit 17, Document Bates
3    stamped SVUS000272 to SVUS000277, marked for
4    identification.)
5    Q.    Do you recognize this document,
6    Ms. Wallop?
7    A.    I do.
8    Q.    What is this?
9    A.    This was an investigation background on
10   a couple of people that are on the list.
11   Q.    Are they one of the 15 fish or are they
12   tertiary or --
13   A.    That's a good question.  I honestly
14   can't remember.  But they were of great interest
15   to -- I think they were part of the 15 fish.
16   They were a great interest to Guo.
17   Q.    And just going back to ASOG.  Has
18   Strategic Vision ever worked with ASOG before?
19   A.    I haven't, but I've worked on the IC
20   with a couple of people that have been involved
21   with ASOG.
22   Q.    And IC, does that mean intelligence
23   community?
24   A.    Yes.
25   Q.    And how did you work with members of

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 258

```
1   ASOG in the IC?
2        A.   They were not ASOG then.
3        Q.   Right.
4        A.   They were in the IC when I worked with
5   them.
6        Q.   And I take it you were in the
7   intelligence community as well?
8        A.   Let's just say I've been helpful.
9        Q.   And certain members of ASOG were in the
10  intelligence community when you were being
11  helpful?
12       A.   I believe that's true, yes.
13       Q.   Does that have anything to do with
14  Strategic Vision or is that just you personally,
15  before you started working at Strategic Vision?
16       A.   My whole life, beyond the age of 21.
17       Q.   And why did you task Fletcher with --
18  well, let me ask you this.  Strike all that.
19            Did you or Dr. Waller get in touch with
20  Fletcher?
21       A.   Because they were two very curious
22  people.
23       Q.   No, I'm saying did -- was it you
24  or Dr. --
25       A.   I did.
```

Page 259

```
1        Q.   You did?
2        A.   Yes.  That's my contact.
3        Q.   And Strategic Vision paid this invoice
4   to Fletcher?
5        A.   Correct.
6        Q.   When did Strategic Vision first request
7   this research from Fletcher?
8        A.   It would have been probably in
9   February; I'm not sure exactly, but probably at
10  the beginning of February of 2018.
11       Q.   And was this in response to a specific
12  request from the client or was it just an idea
13  that Strategic Vision had in terms of getting
14  more research?
15       A.   That's an odd question.
16       Q.   Let me ask it again then.
17       A.   That's an odd question.
18       Q.   Well, let me ask it again.
19       A.   You have a whole folder that we've been
20  dispatched to --
21            MR. SCHMIDT:  He's going to ask it
22       again.  Let him ask it --
23       A.   I know, for Heaven's sakes, come on.
24  Don't waste everybody's time.
25            So it was in the folder, it was part of
```

Page 260

```
1   our gathering technique to farm out between Mike
2   and myself who had the reach within a certain
3   dimension.  These guys were in the U.K., so my
4   relationships within the IC within the U.K. are
5   strong, so I went and had the conversation with
6   several people about some of these people,
7   including these two characters (indicating); and
8   they carry English passports, British passports.
9        Q.   Let's just look at 18, because I
10  believe this is the -- no, not 18, not this one.
11            MR. GRENDI:  This will be Wallop 18.
12            (Wallop Exhibit 18, Document entitled
13       "Subject Chart," Bates SVUS000278, marked
14       for identification.)
15       Q.   Do you recognize this document?
16       A.   I do.
17       Q.   And what is this?
18       A.   This has to do with, on our list
19  number, number 72 and 73 on Exhibit 7.
20       Q.   I see.  So these are -- those are
21  individuals identified on SVUS242 and 243?
22       A.   No, 73.  Page 73.
23       Q.   I know.  I'm talking about the Bates
24  number, if you don't mind.  I just want to be
25  clear.
```

Page 261

```
1        A.   Okay, they're Bates number 244 and 243,
2   correct.  Sorry.
3        Q.   I think you mean 242?
4        A.   244 and 243, that's what I mean.
5        Q.   Okay.
6        A.   I take it back.  I stand corrected.
7   242 and 243, sorry.
8        Q.   That's okay.
9        A.   You can't recognize some of these
10  passport pictures.
11       Q.   So is this the report that Fletcher put
12  together based upon the invoice we were just
13  looking at?
14       A.   That's correct.
15       Q.   And it says it's -- it's dated
16  March 21, 2018?
17       A.   Um-hum, that's right.
18       Q.   Is that when Strategic Vision received
19  this report?
20       A.   Yes, probably.
21       Q.   Okay.
22       A.   But I had been there the month -- a
23  month earlier to -- it takes -- it takes some
24  time to get this stuff.
25       Q.   So you had traveled to the United
```

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 262

1  Kingdom --
2      A.    Yes.
3      Q.    -- in February of 2018 to request this
4  report?
5      A.    Correct.
6      Q.    And it came back around March 2018, or
7  March 21, 2018?
8      A.    Correct.
9      Q.    And did Strategic Vision deliver this
10 report to the client?
11     A.    Well, we didn't get it until March
12 something, right?  So we were in the middle of a
13 sort of a lawsuit; so, no, we did not deliver it.
14     Q.    Did you edit that report at all after
15 receiving it, or provide any input to it?
16     A.    Never touched it.  Only paid it.
17     Q.    Did you ever review it?
18     A.    Yes, of course I read it.
19           MR. GRENDI:  19.
20           (Wallop Exhibit 19, Strategic Vision's
21     Responses and Objections to Plaintiff's
22     First Set of Interrogatories, marked for
23     identification.)
24     Q.    Ms. Wallop, do you recognize this
25 document?

Page 263

1      A.    Yes.
2      Q.    And what is this?
3      A.    Well, it looks like our general
4  objections, that is Strategic Vision's general
5  objections to Eastern Profit and Guo.
6      Q.    You understand that these are
7  interrogatories?
8      A.    Yes.
9      Q.    Okay.  And looking at interrogatory
10 number 6?
11     A.    Yes.
12     Q.    Strike that.
13           Did you aid in the preparation of these
14 interrogatory responses?
15     A.    Well, they're my lawyers, so they asked
16 me questions, so I answered --
17     Q.    Don't say what you said.  But you did
18 provide them with information?  I just don't want
19 you to reveal attorney/client communications.
20     A.    Yes.
21     Q.    And you provided them with information?
22     A.    Yes.  I signed it.
23           MR. SCHMIDT:  You verified it.
24           THE WITNESS:  Yes.
25     Q.    Going to interrogatory number 6.  It

Page 264

1  says, "The trusted Chinese/English translators
2  that Strategic Vision identified in connection
3  with its contract with Eastern are Lianchao Han
4  and Yvette Wang a/k/a Yanping Wang."
5           Were those the only translators that
6  Strategic Vision worked with in connection with
7  this --
8      A.    Yes.
9      Q.    -- contract?
10     A.    Yes.
11     Q.    So Strategic Vision did research in
12 Chinese on other individuals without other
13 translators?
14     A.    No.  We had Team 1, as we have
15 explained.  Team 1 had translators that were not
16 mainland Chinese.  They were translators in the
17 Chinese language, but were of another
18 nationality.
19     Q.    I see.
20     A.    And that was explicit because Guo did
21 not want any Chinese-speaking entities, other
22 than Lianchao and Yvette, I guess, working on any
23 of this.
24     Q.    Right.  But what I'm driving at here
25 is, there were translators on Team 1, correct?

Page 265

1      A.    Yes.  We had to get them through their
2  sources, probably about two or three weeks into
3  the thing, because they were coming up with stuff
4  that they didn't know what it was, and we were --
5  sorry -- we were turning over information.  But
6  we had to be able to dissect the information --
7      Q.    Sure.
8      A.    -- and interpret the information so
9  that we could turn it over.  Not just a bunch of
10 gobbledygook.
11     Q.    In other words, in order to do research
12 on Chinese documents, you kind of need to read --
13 be able to read --
14     A.    Yes.  That's right.
15     Q.    -- in Chinese or Mandarin?
16     A.    That's right.
17     Q.    Okay.  So Strategic Vision did use
18 translators other than Lianchao Han and Yvette
19 Wang in connection with this agreement?
20     A.    Yes, but I have no idea who they were.
21     Q.    Fair enough.
22           MR. SCHMIDT:  Just for clarity.  I'm
23     not sure what paragraph 60 days, sitting
24     here today, of the amended answer and
25     counterclaim.

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 266

1    MR. GRENDI:  Fair enough.
2    Q.    Let's do interrogatory number 8.  It
3  says here, "Because of Mr. Guo's erratic behavior
4  and tortious interference, and because the
5  engagement had just begun, Strategic Vision was
6  unable to prepare any detailed reports in the
7  short time before Eastern suddenly terminated the
8  contract without notice and commenced this
9  action."  Do you see that response?
10    A.    Yes.
11    Q.    What was the erratic behavior you're
12  talking about in that response?
13    A.    He's a very erratic, emotional, often
14  almost to the degree of being bipolar in his
15  responses to many conversations that we had in
16  his -- in his home.  And he was like a squash
17  ball; he was like bing, bing, bing, and you
18  couldn't keep -- you couldn't keep him focused on
19  any subject for very long.
20    Q.    And how did that prevent Strategic
21  Vision from preparing detailed reports?
22    A.    Because we were -- we were explaining
23  to him the process of how you get the deeper
24  volumes of information, versus his trying to just
25  get a quick fix.  And he -- it was hard for him

Page 267

1  to actually listen and understand how the process
2  actually works.  He was very erratic.
3    Q.    I'm sorry, I didn't hear that.
4    A.    He was very erratic.
5    Q.    Sitting here today, do you know who
6  prepared any of the reports that were delivered
7  to, or purportedly delivered to Eastern?
8    A.    There were no reports.  You keep
9  hammering on reports.  There were USB keys, flash
10  drives that were -- that was our process, which
11  he insisted on equally.  We had no written
12  reports; that he could put the thumb drive into
13  his computer and read whatever it was, okay?
14  Then he would take it out, presumably, God
15  forbid, I hope never downloaded it, take it out
16  and put it in his safe.  That was the process.
17    Q.    And of all of the USBs that were
18  delivered, who did those deliveries?  I just want
19  to understand.
20    A.    Mike.
21    Q.    So Mike -- Mike Waller delivered how
22  many USB reports?
23    A.    I believe there were at least two.
24  There could have been three.  And we had many
25  face-to-face conversations with Guo.  So he was

Page 268

1  informed completely all along the way, whenever
2  we met with him.
3    Q.    I'm just doing interrogatory number 12,
4  page 7 there.
5    MR. SCHMIDT:  12?
6    MR. GRENDI:  Interrogatory number 12,
7  yeah.
8    Q.    Actually, let's do 11.  I apologize.
9  Who are the computer experts and authorities in
10  three countries who provided warnings to
11  Strategic Vision concerning computer issues or
12  problems with Mr. Guo's --
13    A.    Well, you could start with The United
14  States, one of the countries.
15    Q.    I don't know if I understand that
16  response.  I was asking about computer experts.
17  You're saying authorities in The United States?
18    A.    Hello.  I don't know what to say.  I
19  mean, I don't understand the question.
20    MR. SCHMIDT:  Would it help if you look
21  at paragraph 67?  Do you have that?
22    MR. GRENDI:  I don't have it in front
23  of me.  Actually, I do have it.  I mean,
24  we're going to mark this as an exhibit, but
25  I'm happy to show it to the witness now, to

Page 269

1  deal with it that way.
2    A.    67.
3    Q.    So I guess the question is, can you
4  identify the computer experts and authorities in
5  three countries that you referred to in paragraph
6  67?
7    A.    I can tell you that ASOG was one of
8  them --
9    Q.    Okay.
10    A.    -- in Texas, and the others were in --
11  were overseas and part of Team 1.  They found
12  duplicate attempts to, and not at the same time,
13  because Team 1 was already working in this case,
14  long before Team 2 ever knew of it.
15    So Team 1 was the one that alerted us
16  to Guo's failings in -- in putting a number of
17  things himself online, like Anita.  He used the
18  same photograph of Anita in one of his -- in one
19  of his -- this thing here (indicating), in one of
20  his blogs.
21    Q.    And I'm just, for the record, what
22  document are you referring to?  It's obviously
23  Exhibit 7, but what page?
24    A.    It's page -- page 4 in doc -- in
25  Exhibit 7.

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 270

1    Q.    Okay.  And you don't know the
2  identities of any of the members of Team 1?
3    A.    No, none of them.
4    Q.    And interrogatory number 12, just below
5  that.
6    A.    Well, that happened both with -- with
7  Texas and with the overseas.
8    Q.    Okay.  So the ASOG team, why did they
9  quit?
10    A.    Because it was illegal for them to look
11  into records of RPs.  That's why we had one bill,
12  and then we had the little bill.
13    Q.    And so the -- the ASOG folks didn't
14  quit because they were concerned about security,
15  they were quitting because they couldn't do --
16  legally do the research, is that fair to say?
17    A.    Well, there's a lot of potential danger
18  in going to prison, so they decided that, really,
19  they were not going to risk anything that would
20  be -- and it says alarming breach of Guo's
21  security, because they also saw some of this
22  stuff that Guo had on his own blog that looked
23  like it was out of our own file.
24    Q.    So did you understand that ASOG quit
25  for both of those reasons, because --

Page 271

1    A.    You'd have to ask Mike.  Mike had a
2  better handle on that than I did.
3    Q.    How did you find out that the ASOG team
4  had quit, did Mike tell you about that?
5    A.    Mike told me.
6    Q.    You didn't directly communicate with --
7    A.    No.
8    Q.    -- ASOG about that?
9    A.    Uh-uh.
10          MR. GRENDI:  We're up to 20.
11          (Wallop Exhibit 20, Strategic Vision's
12       Supplemental and Amended Response and
13       Objections to Plaintiff's First Set of
14       Interrogatories, marked for identification.)
15    Q.    Ms. Wallop, do you recognize what's
16  been marked as Wallop 20?
17    A.    Yes.
18    Q.    Did you contribute to the answers
19  provided in this document?
20    A.    I did.
21    Q.    And you swore to their -- or verified
22  those answers?
23    A.    I did.
24    Q.    So, looking at interrogatory number 7,
25  the interrogatory asked for, "each independent

Page 272

1  contractor which performed research for Strategic
2  Vision pursuant to the contract."  Do you see
3  that?
4    A.    I do.
5    Q.    And is it fair to say that there's two
6  teams identified in the response?
7    A.    Yes.
8    Q.    And that's Team 1, which we've been
9  talking about was the Team 1 that was headed up by
10  Dr. Waller?
11    A.    Yes.
12    Q.    And ASOG, which is -- we've been
13  talking about in the last few questions?
14    A.    Correct.
15    Q.    But Strategic Vision did include some
16  other contractors in the research, correct?
17    A.    Yes, with individual -- how should I
18  put it -- individual names, not the whole file.
19    Q.    Is there any reason you didn't include
20  Fletcher?
21    A.    I forgot, actually.  I found it in the
22  file.
23    Q.    Is there anyone else that you forgot
24  about?
25    A.    There is one other in Switzerland, but

Page 273

1  it was not -- I'll have to see what I can find in
2  the way of any kind of paperwork.  I'll have
3  to -- I'll have to look for it, but I didn't find
4  it going through in the -- in the files that I
5  have.
6  (*r)       MR. GRENDI:  We'll call for the
7       production of documents concerning the
8       entity in Switzerland.
9    Q.    Do you know the name of that entity?
10    A.    No.
11    Q.    Was that an entity that was contracted
12  through --
13    A.    It was a dead end.  It was a dead end,
14  but I had to -- I had to pay for the time that it
15  took to find nothing.
16    Q.    And that was an entity that was
17  contacted through your channels?
18    A.    Yes.
19    Q.    And you did have to pay them money?
20    A.    I believe so.  It wasn't -- it wasn't
21  very much compared to what the normal charges
22  are.
23    Q.    Interrogatory 10, response refers to a
24  John Doe 1, do you see that?
25    A.    Yes.

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 274

1    Q.    And why is it that John Doe 1 was not
2    disclosed?
3    A.    Well, we did disclose it.  It is
4    disclosed.
5         MR. SCHMIDT:  Today, earlier today she
6    told you.
7    A.    Richard Shewell.
8    Q.    Oh, okay.  That's helpful.  Thank you.
9         Is Richard Shewell a cyber security
10   expert?  I thought he was just your neighbor?
11   A.    Neighbor.  But he spends a lot of time
12   in cyber security.
13   Q.    And where does he work?
14   A.    He works -- he's an independent
15   contractor.
16   Q.    Had he ever provided cyber security
17   advice or services to Strategic Vision before,
18   ever, put it that way?
19   A.    Never charged for it, no.
20   Q.    Okay.  How did you -- has Strategic
21   Vision ever brought work to Mr. Shewell?  I'm
22   sorry, how do you say his name?
23   A.    Shewell.
24   Q.    Shewell.
25   A.    I'm not sure.  Would you repeat the

Page 275

1    question?
2    Q.    Sure.
3    A.    It's odd.
4    Q.    Has Strategic Vision ever utilized
5    Mr. Shewell for any service?
6    A.    No.
7    Q.    Have you personally consulted
8    Mr. Shewell for your own computer issues or
9    things like that?
10   A.    Yes.
11   Q.    So that's your experience with
12   Mr. Shewell, it's just on a personal basis --
13   A.    Yes.
14   Q.    -- not involving Strategic Vision?
15   A.    Correct.
16        MR. GRENDI:  Let's do Document 21.
17        (Wallop Exhibit 21, Amended Answer and
18   Counterclaims, marked for identification.)
19   Q.    Ms. Wallop, do you recognize what's
20   been marked as Wallop 21?
21   A.    Yes, of course, I've seen it.
22   Q.    And what is this document?
23   A.    Amended answer and counterclaims to --
24   between Eastern Profit, Strategic Vision and
25   Miles Kwok, known as Guo Wengui.

Page 276

1    Q.    And just going to paragraph 54?
2    A.    Yes.
3    Q.    When did Mr. Guo allegedly promise that
4    he would adequately fund Eastern?
5    A.    From the very beginning, the first --
6    excuse me -- the first day that we met.  It was
7    not as -- with Eastern, it was personally.
8    Q.    And just please explain to me what he
9    said or --
10   A.    He said, I have millions and millions
11   of dollars.  I need to fund this, and I will do
12   it from my personal, I guess, wealth.
13   Q.    Then it says "adequately fund Eastern."
14   Where did Eastern come from in those
15   conversations?
16   A.    I have no idea where the Eastern part
17   came from, because we never knew about Eastern
18   until it turned up in the -- in the agreement.
19   Q.    So there was never a time when Mr. Guo
20   promised that he would adequately fund Eastern?
21   A.    He didn't adequately say Eastern, per
22   se.  If he's the contractor, if he's the person
23   we're contracting with, and he decides he's going
24   to use a shell company to fund us, and he tells
25   us that that funding will be there, we are then

Page 277

1    led to believe that that funding exists; and so,
2    therefore, we didn't know whether it was Eastern
3    or Mickey Mouse Club or whatever.
4    Q.    Did Mr. Guo ever say to you that he
5    would adequately fund the Eastern Profit
6    Corporation?
7    A.    Yes, he did.  But he didn't say Eastern
8    Profit.  He said, this project.
9    Q.    So he said, I'll fund this project?
10   A.    Yes, he did, numerous times.
11   Q.    But he did not say that he would
12   adequately fund Eastern?
13        MR. SCHMIDT:  Objection, she's answered
14   already.
15        MR. GRENDI:  That's okay.
16        You can answer it.
17   A.    Never heard of Eastern, as I said
18   before, until we got into the agreement.
19   Q.    Paragraph 60?
20   A.    60?
21   Q.    60, 6-0.
22   A.    Okay.
23   Q.    It says, "immediately upon entering
24   into the agreement, Strategic Vision commenced
25   its work under the agreement by and among other

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 278

1  activities recruiting, vetting, engaging and
2  marshaling the initial efforts of the various
3  investigators and analysts in The United States,
4  Europe and the Middle East."  Do you see that?
5       A.    I do.
6       Q.    Did Eastern ever engage any analysts in
7  the Middle East?
8       A.    Eastern?
9       Q.    Oh, I'm sorry, Strategic Vision.  Did
10 Strategic Vision ever engage any analysts in the
11 Middle East?
12      A.    It could have, and I wouldn't know.  It
13 could have been done through Team 1.
14      Q.    Wasn't Team 1 located in Europe?
15      A.    They were, but they could have -- they
16 all have links.
17      Q.    Okay.  Let me ask you this then.  So is
18 it your understanding that Team 1 could farm out
19 its responsibilities to other teams to help it
20 get information?
21      A.    It was all part of the team.
22      Q.    Right.  What I'm asking is, did Team 1
23 have subteams?
24      A.    No.  They would have had teams that --
25 well, if you call them subteams, they weren't.

Page 279

1  They were part of the original team.  And if they
2  used people in the Middle East or Europe or
3  wherever -- you know, the dark web has no
4  geographical location, so it could have been
5  anywhere that they were -- they were challenging
6  each other to find what they needed to find.
7  That's how it works.
8       Q.    But you understood Team 1 was located
9  in Europe, correct?
10      A.    Yes.
11      Q.    And Team 2 wasn't -- well, Team 2 was
12 ASOG, correct?
13      A.    Correct.
14      Q.    And Team 2 is located in The United
15 States?
16      A.    Correct.
17      Q.    And ASOG wasn't contacted until what
18 time?
19      A.    I answered that before.
20      Q.    Was that about February, middle --
21      A.    The beginning of February, and then
22 beginning to the 5th -- I don't know, 5th of
23 February.  I have to go back and look.
24      Q.    And what was the recruiting process?
25      A.    Mike and I were using our channels.

Page 280

1       Q.    And what vetting was done to select
2  the -- well, what vetting was done to select Team
3  1?
4       A.    Experience.
5       Q.    So just Dr. Waller's experience with
6  Team 1?
7       A.    Yes.
8       Q.    Let's look at paragraph 62.  Paragraph
9  62 says that, "Mr. Guo provided to Strategic
10 Vision a list of 92 potential subjects with no
11 prioritization."  Do you see that in the middle
12 of the paragraph there?
13      A.    I do.
14      Q.    And what list was that that had just 92
15 non-prioritized names?
16      A.    Exhibit 7.
17      Q.    So you didn't understand that there was
18 any priority to the 15 names that are in very
19 large font with numbers next to them?
20           MR. SCHMIDT:  Objection.  Go ahead.
21      A.    No, I would not -- I would not agree
22 with that.  We numbered them as to priority.
23      Q.    Well, you received the document with
24 the numbers next to -- let's just say, if you
25 look at the first page?

Page 281

1       A.    Yes.
2       Q.    It says Anita Suen --
3       A.    Yeah.
4       Q.    -- and it has a big 1 next to it?
5       A.    Yes.
6       Q.    It also has the types of reports, does
7  it not?
8       A.    Correct.
9       Q.    Did you not understand that that meant
10 that Anita Suen would be one of the fish?
11      A.    She was the first fish.
12      Q.    Right.
13      A.    She was the most important fish for
14 him.
15      Q.    Right.
16      A.    So the first, more or less, 15 in here
17 were the first -- were the first 15 fish that he
18 was talking about.
19      Q.    And there happens to be exactly 15
20 names with a number next to it and the number of
21 reports that were requested, and the types of
22 reports?
23      A.    Pretty much, yes.  You'd have to count
24 the names of the fish, yeah.  If you can see --
25 so you can't go by the page number, in other

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 282

1  words.  You have to go by the subject.  See,
2  like, here is the second fish (indicating).
3      Q.    Right.
4      A.    So the second fish is on page 11.
5      Q.    Right.
6      A.    Okay.  So you -- you'd have to go -- so
7  these 15 fish are in here at least -- at least 15
8  fish in here.
9      Q.    And you understood that those were
10 the -- or Strategic Vision understood that those
11 were the 15 fish that the research was supposed
12 to start on, correct?
13     A.    Yes.
14          MR. SCHMIDT:  Objection.
15     Q.    Do you still have the virgin laptop
16 that's described in paragraph 63?
17     A.    Yes.
18     Q.    And do you just have a ton of these
19 virgin laptops lying around, because of your --
20 Strategic Vision's work?
21     A.    On this specific issue, we had two
22 domestic ones, ones here, and then a battery of
23 ones overseas.
24     Q.    Could Strategic Vision get those
25 laptops if they request -- it requested them from

Page 283

1  Team 1?
2      A.    Never.  They've been destroyed.  They
3  were destroyed on purpose, because we would
4  destroy them every week so that there was no
5  tracing to the IP number.
6      Q.    So it's Strategic Vision's practice to
7  regularly destroy these laptops for security
8  purposes?
9      A.    Those particular ones, yes.  We did not
10 destroy the two that we had.
11     Q.    Paragraph 66, it says, "at the time the
12 agreement was negotiated with Mr. Guo, Strategic
13 Vision and Mr. Guo expressly agreed that they
14 would not meet in person again."  Do you see
15 that?
16     A.    Yes.
17     Q.    Was that maintained or followed?
18     A.    He kept insisting on wanting to meet
19 us, and we kept trying to explain to him that
20 every time we went in and out, we were being
21 photographed.  We didn't like that.  We did not
22 want to be identified with his programs.
23     Q.    And, by photographed, do you mean going
24 in and out of his apartment building?
25     A.    Yes.

Page 284

1      Q.    Who did you understand was doing that
2  surveillance, you mean the building security or
3  the --
4      A.    Oh, any number of people could easily
5  do the -- the security.  Mike's face is very
6  recognizable, people who knew who Mike was;
7  anybody in the Chinese communist party would have
8  made us, so...
9      Q.    I see.  But Strategic Vision did meet
10 with Mr. Guo repeatedly after the contract was
11 signed?
12     A.    We tried not to.
13          MR. SCHMIDT:  Objection.
14          THE WITNESS:  Oh, sorry.
15          MR. SCHMIDT:  It's okay.
16     A.    We tried not to.  We explained to him
17 after about maybe the fourth time that we just
18 couldn't do that anymore, it was just really
19 dangerous for him and dangerous for us.
20     Q.    Just so we're clear.  The last time you
21 personally met with Mr. Guo was -- was that
22 January 30th?
23     A.    That was the 26th.  No, it was the 26th
24 of January, because the 30th was when Mike met
25 with Yvette at Union Station.

Page 285

1      Q.    Got it.
2      A.    Or Penn Station.
3      Q.    When did Mr. Guo summon you to his
4  yacht in Florida?
5      A.    That must have been sometime -- it
6  might have been at the 26th meeting, January 26,
7  2017 -- 2018.
8      Q.    But I take it that yacht meeting never
9  happened?
10     A.    No.  We refused to go.  It was not
11 safe.
12     Q.    Let's go to paragraph 68.  It says
13 "Strategic Vision learned that most of the
14 individuals so identified by Eastern have been
15 designated by the U.S. Department of State under
16 the Obama administration as records protected
17 persons, meaning that information concerning
18 their status and activities was not subject to
19 disclosure under any circumstance."  Do you see
20 that?
21     A.    That's correct.
22     Q.    And did that in any way hinder Team
23 One's efforts, the records protected persons
24 designation?
25     A.    Actually, the curious thing is here, we

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 286

1  did not alert Eastern, we alerted Guo and we
2  alerted Lianchao, and -- and I believe that
3  Yvette was alerted -- no, I don't think -- Yvette
4  may not have been alerted because that was -- by
5  that time, it was in February.
6      Q.   It says most of the individuals.  Is
7  that most of the fish?
8      A.   Yes.
9      Q.   Is it fair to say that ASOG only looked
10 into five individuals on the list?
11     A.   I don't know how many they looked into.
12 Again, you would have to ask Mike.  They could
13 have looked into all of them.  I honestly don't
14 remember.
15     Q.   Let's look at paragraph 70.
16     A.   70?
17     Q.   7-0, yeah.
18     A.   Okay.
19     Q.   It says, "Strategic Vision verbally
20 reported to Mr. Guo and Eastern that Strategic
21 Vision could not within the limits of U.S. law
22 obtain the information sought by Eastern on its
23 initial list of subjects and that Strategic
24 Vision's work would be refocused upon others on
25 Eastern's list."

Page 287

1              Do you remember when you told
2  Mr. Guo --
3      A.   That must have --
4      Q.   -- this information?
5      A.   That must have been through Lianchao.
6  And you keep using the word Eastern.  It would
7  have been --
8      Q.   I was just reading the complaint.
9      A.   Yeah, but it's -- it's not Eastern.
10 It's Guo.  And I think it would have been -- that
11 would have been at the -- that would have been at
12 the -- at the January 26th lunch.
13     Q.   It says, "As a result, Mr. Guo became
14 enraged"?
15     A.   Yes.  He was -- I thought he was going
16 to jump on the table.
17     Q.   "And irrationally insisted that
18 Strategic Vision immediately deliver its work
19 product"?
20     A.   That's correct.  And continue to dive
21 into illegal areas.  And we said, we can't do
22 that.  That's when Mike apologized and said,
23 we're really sorry, but, you know, there are
24 certain things we can do, and we'll get, but
25 there are other things we can't do, and we --

Page 288

1  you'll be in bigger trouble than we will.
2  They'll send you back to China.
3      Q.   Going to paragraph 71.  It says:
4              "In the face of Eastern's insistence,
5  however, Strategic Vision hand-delivered its raw
6  data to Mr. Guo and Eastern on January 26, 2018,
7  with the caveat that it would be of no use to
8  Eastern until Strategic Vision had an opportunity
9  to analyze it and produce a formal report"?
10     A.   Yes, that's correct.  And formal report
11 would have meant, not just sort of a -- a file
12 that had been encrypted, but it also needed to
13 have Chinese translation, as I understood it, and
14 also needed to have -- and also needed -- there
15 are certain lines of code.
16             Look, I'm not a code expert, but there
17 are lines of code that people have to go through
18 and actually sort of translate into a language,
19 and he kept -- and it takes time to actually
20 translate that code.  You can't just stick it
21 into a machine and expect it to happen.
22             So we gave him the raw code, I believe,
23 on both the 26th and the 31st, or the 31st of
24 January, those two different USB keys.
25     Q.   Then it says, "until Strategic Vision

Page 289

1  had an opportunity to analyze it and produce a
2  formal report."  How would that work?
3      A.   Well, we needed to be able to take that
4  USB key back to the Team 1 to have them go
5  through and -- and configure however it was
6  supposed to be done.  And that was not -- that
7  was not my area, that was Mike's area, and Mike
8  can explain that really succinctly to you.
9      Q.   Paragraph 74.  There's a reference to a
10 wire reversal?
11     A.   Yes.
12     Q.   How did that attempted wire reversal
13 come to your attention?
14     A.   That was wild.  I got a call, like,
15 about the -- I have to see, I think it was around
16 the 12th or the 16th or something like that of
17 January 2018, and -- from Citibank wire
18 department saying that there'd been a request to
19 have 499,000 and some change reversed back to the
20 sender.  And I said, well, what are you talking
21 about?  She said, well, we've gotten a request.
22             So then I called one of my private
23 bankers at Citibank and I said, can this be done?
24 I've never heard of such a thing.  He said,
25 absolutely not, it can never be done.  Once the

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 290

1  money lands in the account, it's yours.  I said,
2  it's not mine.  I wish.  It belongs to the
3  company, and so, therefore, we've already started
4  wiring stuff out.  So that was going to be a huge
5  mess.  And we got absolutely zero notification
6  from Guo or Eastern, or whatever they're calling
7  themselves.
8        Q.    Do you know if that attempted wire
9  reversal was initiated before or after the
10  research agreement was signed?
11       A.    I have no idea.  I think it was after.
12       Q.    But sitting here today, you don't
13  know --
14       A.    It was after.  I think it was after.
15       Q.    Why do you think it was after?
16       A.    Because it was the following week --
17  we'd signed the thing on the 6th, and then I
18  think it was the following week that Citibank
19  called me.  So, as I said, it was probably like
20  the 12th or something like that, I -- I don't
21  remember.  I've got some note somewhere that says
22  when they called.
23       Q.    I just have a few more questions, and
24  then I'll turn it over to Ms. Teske.
25             Is Strategic Vision a licensed private

Page 291

1  investigator in any state?
2        A.    Never been.  Never.  We never portrayed
3  ourselves as that.
4        Q.    And are you a licensed -- personally, a
5  licensed private investigator in any state?
6        A.    I never portrayed myself as that.
7        Q.    And what about Dr. Waller, do you know
8  if he has a license for being a private
9  investigator?
10       A.    We never portrayed ourselves as that,
11  or himself as that.
12       Q.    Has Strategic Vision ever registered as
13  a foreign agent under the Foreign Agent
14  Registration Act?
15       A.    No, not recently, no.
16       Q.    Has it previously?
17       A.    No.  I think other -- other -- other
18  company names in the past, yes, but not -- not
19  Strategic Vision.
20       Q.    What about you personally, have you
21  ever registered as a foreign agent?
22       A.    No.
23       Q.    And do you know if Dr. Waller has?
24       A.    No.
25       Q.    You don't know, or you know that he is

Page 292

1  not registered?
2        A.    Both.
3        Q.    Okay.  And are you a licensed real
4  estate broker in the state of Virginia?
5        A.    I have been, in the District of
6  Columbia, but I no longer maintain the license,
7  but I have been.
8        Q.    When did you cease to have the license?
9        A.    Oh, gosh.  I got it for commercial real
10  estate reasons, so that I could sort of wade
11  through a lease, business office leases; so I
12  would say back in the '80s.
13       Q.    And you never had a license in Virginia
14  to be a real estate agent or broker?
15       A.    No, but I -- if you're trying to get to
16  the Evermay thing, that was a private transaction
17  that would have taken place.
18             MR. SCHMIDT:  Just answer the question.
19       A.    No.
20             MR. GRENDI:  Go ahead, Ms. Teske.  I'm
21  all set for now.  Thank you very much for
22  answering my questions today.
23  EXAMINATION BY
24  MS. TESKE:
25       Q.    Okay, Ms. Wallop, are you ready to

Page 293

1  continue?
2        A.    I am.  Not for long, but I will.
3             MR. SCHMIDT:  You don't need a break
4  right now?
5             THE WITNESS:  No.  I just need to tell
6  somebody where I am.
7             MS. TESKE:  And on the record, without
8  waiving any entitlement to render or issue a
9  notice of deposition, Ms. Wallop, I'm going
10  to do my best to wrap it up here today.
11            MR. SCHMIDT:  I would suggest that,
12  because we're going to probably oppose any
13  such notice.  But go ahead.
14            THE WITNESS:  Go ahead.
15       Q.    Good afternoon, Ms. Wallop.  I'm Erin
16  Teske.  I represent Mr. Kwok in this action.  I
17  just have a few follow-up questions.  I'll do my
18  best not to be redundant.  If you don't
19  understand any question I'm asking, please feel
20  free to let me know and I'll try to rephrase for
21  you.
22             I want to go back to your background a
23  little bit.  You had said, I believe -- and,
24  again, I'm trying to remember from earlier today,
25  so if I mischaracterize your testimony or your

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 294

1  beliefs at any point, please, again, tell me so
2  that that can be clear for the record.
3       I think you had said that, for
4  Strategic, you have -- about 15 to 20 clients
5  have engaged Strategic to do investigative
6  research for them, is that accurate?
7       A.   No, I did not say that.  What I said
8  was that I have had clients that have engaged us
9  to do specific advisory work.  It's not
10  investigative work.  That's very different.
11       Q.   Okay.  And I think, in connection with
12  that advisory work and those engagements, you
13  said that you tend to have written contracts with
14  those clients?
15       A.   Generally, yes.
16       Q.   Have any of those contracts been with
17  corporations?
18       A.   No.
19       Q.   Prior to your experience at -- prior to
20  your experience at Strategic, were you in the
21  business of providing services for individuals or
22  corporations?
23       A.   Yes.
24       Q.   And how were you in that business?
25            MR. SCHMIDT:  Objection.  But go ahead.

Page 295

1       A.   I really don't know how to answer that.
2  I worked with a group in London called Bell
3  Pottinger, and then I also, prior to that, I had
4  another firm of my own called Corporate
5  Consulting, and -- so that was many, many years
6  ago.
7       Q.   And in connection with your work at
8  Bell Pottinger, were you responsible for
9  negotiating or entering into contracts, service
10  contracts?
11       A.   I wouldn't call it service.  They're
12  client contracts.  It would be like a law firm
13  having a client come in and say, I'd like to have
14  you represent us.
15       Q.   And were you responsible for
16  negotiating and entering into those types of
17  contracts?
18       A.   Yes, in some cases, um-hum.
19       Q.   And were any of those contracts with
20  corporations?
21       A.   They were with clients of the firms,
22  yes.
23       Q.   How about your work as -- for Corporate
24  Consulting, were you responsible for negotiating
25  and entering into contracts with clients?

Page 296

1       A.   Yes.
2       Q.   And were any of those clients
3  corporations?
4       A.   Yes.
5       Q.   In any of those contracts, did you ever
6  obtain a personal guarantee?
7       A.   No.
8       Q.   You've said that you met with Mr. Guo
9  in person on three occasions.  I believe we've
10  identified -- just let me finish my question,
11  because I can see already you're skeptical as to
12  my question already.
13            But you've identified three occasions
14  that you've met with him in person prior to the
15  signing of the contract.  Is that -- are there
16  any other occasions on which you met with Mr. Guo
17  face-to-face prior to the signing of the
18  contract?
19       A.   I don't believe so.  They were always
20  in his apartment, and they were always there.
21  Then at one point he actually went downstairs,
22  and we had lunch at Cipriani at a little table,
23  so I don't know if you'd call that outside of the
24  apartment, but that was still in the
25  Sherry-Netherlands.

Page 297

1            So, no, I mean, the best of my ability,
2  I believe it's three.  It could have been four,
3  but I think it was three, only three.
4       Q.   How about on the telephone, did you
5  ever talk to Mr. Guo on the telephone?
6       A.   Not to my knowledge.
7       Q.   Did you ever communicate with Mr. Guo
8  via text message?
9       A.   Not to my knowledge.  It was always
10  done through Yvette.
11       Q.   Other than those three, possibly four
12  meetings with Mr. Guo face-to-face, did you have
13  any communication with Mr. Guo at all prior to
14  the signing of the contract?
15       A.   Well, there would have been either by
16  email, which we never did, because I didn't even
17  know what his email address was.  We had a -- he
18  gave me his Signal number.  I don't believe I
19  ever had any -- any communiqué with him because,
20  again, we were only going through Lianchao or
21  Yvette.  That's the way he wanted it and that's
22  the way we did it.
23       Q.   You've talked about this agreement --
24       A.   Um-hum.
25       Q.   -- and the secrecy that it was clouded

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 298

```
1    in for the protection of the parties, is that a
2    fair statement?
3         A.    That's a fair statement.
4         Q.    And you, being Strategic, took some
5    steps to maintain the identity of the parties, to
6    keep the identity of the parties secret, is that
7    fair?
8         A.    That's correct.
9         Q.    And is it -- is it one of Strategic's
10   business goals to protect the identities of its
11   clients, generally speaking?
12        A.    Yes, because it's generally a private
13   agreement or an arrangement between my clients
14   and myself.
15        Q.    And was this agreement different in
16   that regard in any way from your other clients;
17   was there a heightened degree of security or a
18   sense of keeping things -- keeping the names of
19   the parties confidential?
20        A.    Absolutely --
21             MR. SCHMIDT:   Objection.  But go ahead.
22             THE WITNESS:   Sorry.
23             MR. SCHMIDT:   No, that's fine.
24        A.    Absolutely.
25        Q.    When you learned that Eastern would be
```

Page 299

```
1    signing the contract on January 6th, the date
2    that you and Yvette executed the contract, did
3    you speak to Mr. Guo at any point thereafter,
4    prior to signing the contract but after learning
5    that Eastern would be the signatory?
6         A.    Gosh, I -- well, let me see.  So she
7    signed it on the -- the 6th of January.  Then we
8    saw him subsequently during January.  So I never
9    had any direct contact with him, it was only
10   through Yvette or Lianchao.  So I'm not sure if
11   that answers your question.
12        Q.    After finding out that Eastern would be
13   the counterparty to the contract --
14        A.    Right.
15        Q.    -- that's the subject of this
16   litigation, did you talk to Mr. Guo about also
17   signing the contract?
18        A.    He represented Eastern, and in all of
19   our conversations he was the only party with whom
20   I negotiated, and Mike negotiated the discussion
21   and the contract.
22        Q.    So after finding out that Eastern, not
23   Mr. Guo, would be the counterparty to the
24   contract, did you talk to Mr. Guo about also
25   signing the contract?
```

Page 300

```
1         A.    He represented -- Guo represented that
2    he was, in fact, the person that was going to
3    fund this.  So I presumed, when Yvette's sitting
4    next to me and having conversations with him,
5    along with -- along with all of the conversations
6    that we'd had in his apartment, that obviously
7    it's Guo with whom we are dealing.  So Guo equals
8    Eastern, one would presume.  Just saying.
9         Q.    Did you do any independent research to
10   determine whether or not that was -- that Guo
11   equaled Eastern?
12        A.    It's -- it's so redundant, but, no, we
13   didn't, because he said he was going to fund it,
14   whatever it was, and we did not know the name of
15   the entity that he was going to use.
16        Q.    When did he first tell you that it
17   would be an entity and not himself personally
18   that would be the counterparty to the contract?
19        A.    Because he said that he had accounts
20   everywhere and that it would probably be through
21   the U.K. office of William Wu or William Yu, or
22   whatever his name was, that was the -- his
23   financial person.
24        Q.    And when did you find that out; when
25   was the first time?
```

Page 301

```
1         A.    When did I find it out?  I mean, we
2    were discussing the payment process and how that
3    would work after looking at the -- we had the
4    vision paper, we had the -- the Word
5    presentation, we had done another sort of vision
6    paper; all of these were in different discussions
7    with him moving forward.
8             He then said, when we got to sort of
9    the third or fourth discussion of all of this,
10   that he wanted to fund it, and he explained that
11   he paid $250 million for that, and that he wanted
12   very much to make sure that, if this was done,
13   that we would have a long-term contract for at
14   least three years, and for possibly up to 4,000,
15   quote, fish, and he said that he would fund it,
16   so we presumed he would fund it.  We didn't know
17   whether he was Eastern or, as I say, the Mickey
18   Mouse Club.  We didn't know.  He never told us
19   who it was going to be.
20        Q.    But prior to signing the contract --
21        A.    Right.
22        Q.    -- you never asked Mr. Guo to sign it
23   himself?
24        A.    No, because he wouldn't.
25        Q.    Did you ever ask him?
```

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 302

1    A.   I think we did.
2    Q.   You did?
3    A.   I think Mike did.
4    Q.   When did you ask him?
5    A.   In the conversations, will you sign the
6   -- who will be signing the contract?  He said,
7   Yvette will be signing the contract.  And then,
8   when Lianchao was there, Lianchao will sign the
9   contract.  And then there was a conversation
10  about whether Lianchao should do it because he's
11  with an NGO.  And then, long story short, he
12  said, no, well, maybe we'll have Yvette sign it.
13  That was the last I heard of that.
14   Q.   Did you ask Mr. Guo to sign it?
15   A.   Did I personally?  Why -- why would I?
16   Q.   I'm having -- I feel like I've asked
17  the same question a couple of times and I keep --
18   A.   You have, and so I'm getting very
19  frustrated with the answer.
20   Q.   I need a yes or no.  Did you -- yes or
21  no question.  Did you ask Mr. Guo --
22   A.   I don't remember.
23   Q.   -- to sign the contract?
24   A.   I don't remember.  I --
25   Q.   Did you hear --

Page 303

1    A.   -- know we discussed it.
2    Q.   Did you hear Dr. Waller ask Mr. Guo to
3   sign the contract?
4    A.   I don't remember.  I don't think so.
5   But he said he was going to fund it, so we
6   presumed he was going to sign it.  There was
7   nobody else in the room.
8          MR. SCHMIDT:  That's fine.  There's no
9   question pending at this point.
10   Q.   And when you found out he wasn't going
11  to sign it, how long between finding out he
12  personally wasn't going to be signing it and you
13  signing the contract?
14         MR. SCHMIDT:  Objection.  But go ahead.
15   A.   That's the wildest question all day.
16   Q.   Okay, but it just requires an answer
17  nonetheless.
18   A.   It has absolutely no correlation with
19  the reality.
20   Q.   Your opinion on the correlation between
21  my question and this litigation is completely
22  irrelevant.  You're sitting there as the
23  deponent.  I've asked you a question.  Please
24  answer my question.
25   A.   Answer -- ask me again then.

Page 304

1    Q.   How long between the time that you
2   found out, on January 6th, that Mr. Guo was not
3   personally signing the contract and the time of
4   you physically signing the contract?
5          MR. SCHMIDT:  Objection.  But go ahead.
6    A.   I don't know.
7    Q.   Ballpark it for me.  More than an hour?
8    A.   I don't know.  It never came up.
9    Q.   You learned on January 6th for the
10  first time --
11   A.   I learned on January 6th that Yvette
12  was signing it.
13         MR. SCHMIDT:  Let her finish.
14   A.   I'm going to answer your question.
15         MS. TESKE:  I haven't finished the
16  question yet, Joe.
17         MR. SCHMIDT:  No, no.  Let her speak.
18         MS. TESKE:  I'd like to ask my
19  question.  There's no question pending.  I
20  don't know how she's speaking.  I just want
21  to finish asking my question.
22         MR. SCHMIDT:  She was going back to
23  your original question.  Let her speak.  Let
24  her finish.  Go ahead.
25   A.   Yvette sat on the sofa, she signed the

Page 305

1   contract, she had Guo on the phone, to the best
2   of my knowledge; it certainly sounded like him,
3   she was talking to him, so it sounded like his
4   voice on the other end of the phone.  Maybe it's
5   my imagination.  Maybe she had somebody else say,
6   let's just go ahead and sign the contract.  I
7   don't know.
8    Q.   Are you done?  Is that the end of your
9   answer?
10   A.   When you're polite, yes, that's the end
11  of my answer, my dear.
12         MR. SCHMIDT:  Just wait till -- wait
13  till.
14         THE WITNESS:  It's a long day.
15         MR. SCHMIDT:  Wait for the next
16  question.
17         THE WITNESS:  You haven't been sitting
18  in this chair.
19         MR. SCHMIDT:  Wait until the question.
20  There's no question.
21         THE WITNESS:  I'm waiting for it.
22         MR. SCHMIDT:  Go.
23   Q.   You found out on January 6th that
24  Eastern would be signing the contract.  You've
25  testified that you believe it was your

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 306

1  understanding at that time that Yvette was on the
2  telephone with Mr. Guo.
3          Did you ask Yvette to ask Mr. Guo if he
4  would personally sign the contract?
5      A.    No.
6      Q.    And how long was that meeting at which
7  you found out that Eastern would be signing, and
8  you and Yvette signed the contract?
9      A.    I have no idea.  It was during that
10  moment when she had the paperwork and we made the
11  changes, we agreed to the changes, she signed,
12  and then I signed, and it had Eastern on the top.
13  That's all I know.
14      Q.    All in all, two hours?
15      A.    Maybe.  Let's call it two hours, to
16  make you happy.
17      Q.    No, not -- I want the truth.  No answer
18  is going to make me happy.
19      A.    Two hours is fine with me.
20      Q.    I just want the truth.
21      A.    Two hours is fine.
22      Q.    Two hours?
23      A.    Sure.
24      Q.    And your understanding is that this
25  contract was the culmination of the conversations

Page 307

1  that you had had with Mr. Guo about the
2  investigative services that Strategic was going
3  to provide?
4      A.    He hired us, not Yvette.
5      Q.    So this contract was the culmination of
6  those conversations?
7      A.    Yes.
8          MS. TESKE:  Okay.  I have nothing
9  further.
10          MR. SCHMIDT:  I have no questions.
11  Thank you.
12          THE WITNESS:  Cheers.
13          MR. SCHMIDT:  Let him go off the
14  record.
15          THE VIDEOGRAPHER:  This concludes
16  today's deposition.  The time is 5:57.
17
18          (Whereupon, the within proceedings
19  concluded at 5:57 p.m., on the
20  12th day of February, 2019.)
21
22          *       *       *       *       *
23
24
25

Page 308

1          D E C L A R A T I O N
2
3      I hereby certify that having been first
4  duly sworn to testify to the truth, I gave the
5  above testimony.
6
7      I FURTHER CERTIFY that the foregoing
8  transcript is a true and correct transcript of
9  the testimony given by me at the time and place
10  specified hereinbefore.
11
12
13      _____
14          FRENCH WALLOP
15
16
17
18  Subscribed and sworn to before me
19
20  this _____ day of _____ 20___.
21
22
23  _____
24      NOTARY PUBLIC
25

Page 309

1          ERRATA SHEET
2
3  NAME OF CASE:  EASTERN PROFIT v STRATEGIC
4  DATE OF DEPOSITION:  Tuesday, February 12, 2019
5  NAME OF WITNESS:  FRENCH WALLOP
6  PAGE LINE  FROM              TO
7
8  ____|_____|_____|_____
9  ____|_____|_____|_____
10  ____|_____|_____|_____
11  ____|_____|_____|_____
12  ____|_____|_____|_____
13  ____|_____|_____|_____
14  ____|_____|_____|_____
15  ____|_____|_____|_____
16  ____|_____|_____|_____
17  ____|_____|_____|_____
18  ____|_____|_____|_____
19  ____|_____|_____|_____
20  ____|_____|_____|_____
21  ____|_____|_____|_____
22  ____|_____|_____|_____
23  ____|_____|_____|_____
24
25

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 310

```
 1              REPORTER'S CERTIFICATE

 2

 3   STATE OF NEW YORK   )

 4                       ) ss.

 5   COUNTY OF NEW YORK )

 6

 7         I, ROBERTA CAIOLA, a Shorthand Reporter

 8   and Notary Public within and for the State of New

 9   York, do hereby certify:

10         That FRENCH WALLOP, the witness whose

11   deposition is hereinbefore set forth, was duly

12   sworn by me and that such deposition is a true

13   record of the testimony given by such witness.

14         I further certify that I am not related

15   to any of the parties to this action by blood or

16   marriage and that I am in no way interested in

17   the outcome of this matter.

18         In witness whereof, I have hereunto set

19   my hand on this date, February 21, 2019.

20

21         [signature: Roberta Caiola]

22         _____

23              ROBERTA CAIOLA

24

25
```

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019                                          Index: $10,000..15

**$**

**$10,000**
 119:13

**$100,000**
 254:11

**$105,000**
 255:1

**$111,700**
 255:5

**$2,000**
 158:19

**$2,380,000**
 94:4

**$2,500**
 138:11

**$2,805,000**
 93:9 97:9

**$2.8**  97:5

**$250**  84:5
 161:5
 185:18
 217:19
 301:11

**$250,000**
 247:12

**$3**  68:16
 71:25
 72:21

**$3-1/2**  71:21

**$300,000**
 202:22
 247:17

**$5,000**
 254:11
 255:23
 256:11

**$50**  48:1

**\***

**\*r** 118:11
 253:22
 273:6

**0**

**000017**  27:5

**1**

**1**  7:2 24:4,
 5 52:15,21
 83:8,9,13,
 15,16,20
 84:10
 87:16,17
 94:3 95:8
 96:16
 107:19
 116:12,13
 118:24
 150:1,3
 154:3
 177:17,19
 179:1,2,7,
 10,11
 183:5
 205:4,5,7,
 23,24
 206:1,7,

15,19
 207:13
 208:12
 212:3
 213:4,15
 214:6
 226:24
 232:11
 239:9,16
 240:5
 241:3
 246:11
 247:17
 251:23
 252:6
 253:3,16,
 20 264:14,
 15,25
 269:11,13,
 15 270:2
 272:8
 273:24
 274:1
 278:13,14,
 18,22
 279:8
 280:3,6
 281:4
 283:1
 289:4

**10**  47:25
 63:11
 186:14,17
 209:6
 273:23

**10,000**
 119:19,20

**100**  162:10

**10th**  47:4

**11**  226:10,
 11 268:8
 282:4

**111**  255:4

**111,000**
 255:2,16

**11:09**  63:13

**11:21**  63:16

**11:29**  71:3

**11:35**  71:6

**12**  7:6
 49:14
 228:20,21
 268:3,5,6
 270:4

**12/28**  188:22

**12/29**  188:20

**12:57**  136:9

**12th**  289:16
 290:20
 307:20

**13**  241:5,6

**14**  247:24,
 25

**15**  23:5
 82:12,14
 101:19
 126:1
 127:23
 128:5

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019                                    Index: 1557..228

129:11
147:18
159:8,13
160:12
187:19,20
188:17,24,
25 194:21,
25 195:19
196:15
203:18,24
209:21,23
210:15
212:9,13
251:21,22
252:2
257:11,15
280:18
281:16,17,
19 282:7,
11 294:4

**1557**   9:3

**15th**   108:8
182:1
223:23
240:15
249:11

**16**   253:25
254:1

**16th**   171:6,
8 182:2
207:23
208:2
223:22,23
244:11
289:16

**17**   27:8

203:3
212:23
256:25
257:1,2

**18**   146:21,
22 151:10
260:9,10,
11,12

**19**   146:21
200:10
262:19,20

**198**   244:12

**1990**
157:14,15

**1:01**   136:12

**1:30**   161:15

**1:42**   167:13

**1st**   232:3

─────────
|    **2**   |
─────────

**2**   27:3,4
95:8 96:16
148:23
154:3
158:14
163:18
232:12
248:14
269:14
279:11,14

**2,000**   158:13

**2.089.000**
158:14

**20**   10:11
11:17 23:6
47:25
103:14,16
271:10,11,
16 294:4
308:20

**20,000**   119:4

**200**   116:18

**2000**   10:16

**2005**   10:17,
19 16:17
23:7,9

**2017**   32:4
37:5 42:8
47:5 51:25
52:1 54:14
85:1 108:8
126:4
151:10
285:7

**2018**   90:8
107:19
114:25
120:12,13
123:13
124:25
125:7,11,
12 151:17
171:17
172:25
175:4
193:3
212:23
223:17
224:9

240:25
241:7
243:9,16,
23 244:19
259:10
261:16
262:3,6,7
285:7
288:6
289:17

**2019**   7:6
146:20
307:20

**203**   187:7

**206**   192:7

**208**   194:24
195:17

**20th**   47:4
240:15

**21**   258:16
261:16
262:7
275:16,17,
20

**211**   196:8

**213**   197:18

**22209**   9:4

**223**   202:24

**224**   205:14

**225**   229:6

**227**   207:3
209:7

**228**   210:11

**22nd**  9:3

**23**  241:7

**230**  211:16

**234**  212:22

**235**  214:18

**238**  215:17

**23rd**  123:7,
13  125:7,
11  171:14,
17  239:6
243:6
246:4

**24**  227:15

**24/7**  216:13

**242**  261:3,7

**243**  260:21
261:1,4,7

**244**  261:1,4

**25**  117:2

**250**  116:19,
20

**255**  229:7,
12

**257**  229:20

**259**  230:2

**25th**
215:13,15

**26**  223:17
224:9
244:19
285:6
288:6

**267**  252:23

**26th**  140:20
164:7
171:6
215:15,16,
20  217:22
218:3,18
220:11
222:1,4
226:1
231:21
284:23
285:6
287:12
288:23

**278**  252:23

**28**  188:21

**28th**  187:16
189:10

**29**  126:4

**29th**
189:10,13
190:4
202:13

**2:30**  167:17

**2nd**  114:24
192:21
193:3,4
202:13

──────────
**3**
──────────

**3**  25:18
30:12,13
43:6

156:25
196:9

**30**  26:11
47:25
127:21
146:20
185:3
243:9,15,
23

**30(b)(6)**
24:15
78:23

**30,000-foot**
22:5

**300,000**
116:14

**30th**  151:17
190:16,17
227:6
240:12
243:5
244:4,6
284:22,24

**31st**  288:23

**33**  211:23
217:10

**387**  76:17
82:7  86:20
87:5

**388**  89:7

**394**  93:3

**395**  98:5

**398**  99:14

**3:25**  209:2

**3:32**  209:5

**3rd**  114:24
225:15

──────────
**4**
──────────

**4**  41:11,15,
20  157:14
269:24

**4,000**  196:25
197:3
301:14

**40-year**
28:13

**41**  248:4

**45**  206:11

**499,000**
289:19

**4:41**  256:21

**4:48**  256:24

**4th**  202:15

──────────
**5**
──────────

**5**  65:16,17,
19  137:20
139:12
150:4
157:21

**5,000**  254:23

**5,412.50**
254:24

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019                    Index: 50..absolutely

**50**   117:2,9

**50,000**   118:2

**50/50**   114:4,
 10  115:10

**501(c)(3)**
 50:3,4

**54**   276:1

**5:57**   307:16

**5:57 p.m**
 307:19

**5th**   190:19
 194:15
 196:1
 198:12
 201:14,20
 202:7
 225:14
 279:22

---
### 6

**6**   73:19
 86:20  90:8
 124:25
 140:25
 141:4
 150:4
 172:24
 175:4
 263:10,25

**6-0**   277:21

**60**   265:23
 277:19,20,
 21

**62**   280:8,9

**63**   282:16

**66**   283:11

**67**   268:21
 269:2,6

**68**   285:12

**6th**   111:7
 172:1
 175:10
 191:8
 194:16,17
 198:2
 199:2
 202:4,7
 244:11
 290:17
 299:1,7
 304:2,9,11
 305:23

---
### 7

**7**   84:8,9,13
 85:8  96:13
 151:22
 152:15
 153:6
 156:12
 174:4,6
 175:4
 185:9
 195:24
 207:9,10
 216:7
 223:7
 235:5

 260:19
 268:4
 269:23,25
 271:24
 280:16

**7-0**   286:17

**70**   286:15,
 16

**71**   288:3

**72**   260:19

**73**   260:19,
 22

**74**   289:9

---
### 8

**8**   107:17,
 18,20
 109:24
 119:13
 167:6
 266:2

**80-gigabyte**
 146:24
 227:5,19,
 24  228:7

**80s**   292:12

**83**   63:21

**84**   63:21,22

**8th**   174:24
 177:6,8
 180:10
 181:25
 183:1,16

 198:14
 201:23
 207:6,23
 208:1

---
### 9

**9**   126:2,3
 161:12
 167:21,22,
 25  168:2

**90**   196:14,
 20  230:4

**92**   127:20
 280:10,14

**9:58**   7:14

**9th**   181:25
 204:14
 205:7

---
### A

**a/k/a**   264:4

**ability**
 95:17
 297:1

**abroad**
 252:10

**absolute**
 130:7
 199:22

**absolutely**
 90:20
 199:5
 203:4,13

289:25
290:5
298:20,24
303:18

absurd
208:19

Abu   103:24
104:2,3

ACA   193:12,
23

academia
40:22

accept   93:24
121:7
225:1

accepted
194:21

access   21:1,
20  78:20
90:10
140:9
149:5
250:15,21,
23

accessed
80:12
148:7
177:5

accessible
235:14

accessing
54:23
55:1,7
78:8

accommodate
203:1

accommodation
244:15

account
54:24
56:3,20
168:16,19
169:9
193:15,16,
22  202:15
205:19
290:1

accounting
138:15

accounts
300:19

accurate
159:21,22
294:6

accused   14:9

acquire   45:2

acquiring
44:17

acronym
83:17
232:15

acronyms
234:20

Act   291:14

acting
199:10

action   85:12

266:9
293:16

actions
206:8

active   32:12

activities
34:23
51:12  92:8
278:1
285:18

activity
148:1

actual   96:17
191:8
230:12

adamant
97:21
145:25
200:3

adamantly
60:16,20

add   211:23

adding   94:14
140:14
196:25

addition
124:10

additional
116:21
123:4
209:22
210:14
223:9

additionally
232:21

address   9:6,
7,13  55:25
157:23
158:15
240:1
241:15,16,
19,24
297:17

addressed
26:23

addresses
217:16
221:11

adequately
276:4,13,
20,21
277:5,12

adjust
217:11
232:7

administration
285:16

administration
s   28:15

adopt   157:11

adoptive
157:3,11

Advanced
10:7

advice
274:17

advised

192:13

**advisory**
11:8
17:11,19,
20,21
23:14
294:9,12

**affairs**
11:18

**afternoon**
167:18
293:15

**age**  258:16

**agencies**
28:16

**agency**
234:23

**agent**  9:11
136:17
241:18,22
242:5
291:13,21
292:14

**aggressive**
224:13

**agree**  57:9
72:22
135:23
191:23
280:21

**agreed**  101:1
169:14
188:25
189:15

191:2,7
193:4,7
194:13,14
197:5
198:16
200:21
223:10
244:9
252:17
283:13
306:11

**agreement**
61:15,19
73:11
81:16
82:19 83:5
85:12
90:25
96:17
101:3
102:18,22
103:21
107:18
108:6
110:15
111:6,11,
14,18
112:20,25
113:12,22
114:1,3,6,
10,11,14,
17,18
117:6,15
119:24
122:23
123:25
124:24
125:7

126:3,22,
25 128:2,
18 130:11,
21,24
131:6
136:15
137:7,13
139:7
141:18
149:25
155:11
161:12
163:10
167:1
168:13
169:15,16
170:7
171:3
187:16
188:9,14
189:3,13
190:2,13
191:14
194:18
196:9
197:13
199:20
200:16
202:3,11
204:7
208:14
232:18
233:21
247:7
265:19
276:18
277:18,24,
25 283:12

290:10
297:23
298:13,15

**agreements**
61:11,17
102:13
112:6,22,
23 137:24
141:15
142:10
163:4

**ahead**  22:12,
13,16
29:16,21
71:19 78:4
83:6 97:11
106:13
137:8
155:16
166:7
188:25
190:13
212:11
255:15
280:20
292:20
293:13,14
294:25
298:21
303:14
304:5,24
305:6

**aid**  86:22
87:9
263:13

**airlines**
148:2

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019          Index: akin..appointments

**akin** 147:20
  230:21

**alarming**
  270:20

**alert** 286:1

**alerted**
  269:15
  286:1,2,3,
  4

**alive** 196:3

**alleged**
  68:23
  69:19
  201:19

**allegedly**
  69:9
  71:20,24
  276:3

**Allied**
  254:1,8

**allocate**
  115:6

**allowed** 8:23
  98:19
  135:19
  196:15

**ambiguity**
  179:23,24

**ambitions**
  35:19

**amended**
  265:24
  271:12
  275:17,23

**America** 33:1

**American**
  44:8 48:16
  148:1
  255:19

**amount**
  116:13,21,
  22 117:5
  119:18
  122:12
  171:2
  231:14
  255:13

**amounts**
  101:10
  211:5

**analogy**
  129:10

**analysis**
  76:20
  77:17
  79:10,12
  154:17
  251:24

**analysts**
  278:3,6,10

**analyze**
  288:9
  289:1

**Ancestry.com**
  221:18

**and/or**
  176:16

**Anita** 52:17

53:1
  74:17,23
  79:22
  84:10
  156:25
  157:23
  269:17,18
  281:2,10

**answering**
  26:25
  292:22

**answers**
  271:18,22
  299:11

**anti-communist**
  44:15
  60:17
  90:20
  92:22

**anti-putin**
  91:16

**anti-u.s.**
  235:18

**anticipated**
  50:11

**antique**
  224:22

**anxious**
  50:14

**anymore**
  251:14
  284:18

**apartment**
  36:22

**76:10 84:2**
  143:16
  181:20,21,
  22 185:14
  283:24
  296:20,24
  300:6

**apologize**
  41:19
  236:9
  268:8

**apologized**
  219:23
  287:22

**apologizing**
  220:2,4

**apology**
  220:23,24

**apparent**
  251:3

**apparently**
  33:8,9
  61:12
  168:10
  174:3
  245:1

**appearance**
  55:18

**apples**
  155:19

**application**
  185:5

**appointments**
  46:4

approach
  232:8

approached
  12:19

approximately
  13:25
  14:1,19

April  225:15

Arab  69:13
  71:21

Arabia
  104:18

area  45:4,6
  47:1 50:24
  182:16
  289:7

areas  22:21
  206:12
  287:21

arenas  256:5

arise  162:15
  165:12

arising
  218:7

Arlington
  9:3

army  98:6

Arnaud  34:4

arrangement
  15:16
  176:20
  246:21
  298:13

arrived
  195:25

Asia  39:13
  149:20
  220:5

Asian  168:19
  220:6

ASOG
  232:15,17
  233:15
  235:22
  238:13,15
  239:9,17
  240:17,22
  248:10,11
  250:11
  251:4,16
  254:9,25
  255:21
  257:17,18,
  21 258:1,
  2,9 269:7
  270:8,13,
  24 271:3,8
  272:12
  279:12,17
  286:9

aspect  57:7

aspects
  178:3,4

assemble
  206:13

assembled
  233:21

assembling

206:7,17

assertion
  121:7

asset  86:23
  87:10

assigned
  83:8,9
  150:3,5
  178:9,24
  179:1
  212:2,3

assume
  116:12

assumption
  186:7
  214:3

attached
  192:17

Attachment
  24:12

attempt
  244:22

attempted
  289:12
  290:8

attempts
  174:12
  269:12

attention
  289:13

attorney
  25:24
  111:11

attorney/
client
  263:19

attorneys
  24:24
  25:1,2,4

Australian
  160:2

authorities
  268:9,17
  269:4

automatic
  184:25
  185:2

Avenue  9:10

avoiding
  210:2

aware  50:16
  64:7,8,10,
  15,16,20,
  23 72:12
  97:13
  113:1
  199:3,6
  219:9

Awareness
  63:25

awful  231:11

───────
        B
───────

baby  247:22

back  10:2
  33:14 35:8
  43:5 45:22

47:19 48:8
49:22 54:6
63:11,15
71:5 86:19
123:24
136:3,11
139:11
146:9,18
155:13
156:12,17
159:3
161:11
167:16
174:4
176:13
184:3
191:4,5,11
193:6
194:11,17
195:14
209:4
217:21
220:23
221:25
222:1
224:14
225:5
226:4
227:14
231:11
233:7
245:15
255:9
256:23
257:17
261:6
262:6
279:23

288:2
289:4,19
292:12
293:22
304:22

**background**
9:18
19:13,16,
19 38:18
48:2 52:14
58:6,8
128:11
226:11,20
257:9
293:22

**backgrounds**
250:22

**bad**  196:1
228:24
252:21

**ball**  266:17

**Ballpark**
23:2 304:7

**balls**  194:7

**bank**  37:19
48:14
54:24
56:20
118:4
253:19

**bankers**
289:23

**Bar**  146:25

**bargained**

141:14
163:10

**based**  35:17
36:11
38:14
43:17
70:12
71:23 97:7
117:9
132:9
153:14
155:22
166:21
169:23
188:14
189:12
213:7
219:15
228:15
232:8
261:12

**basic**  19:5
98:14
236:6

**basically**
56:4 189:1

**basis**  51:13
154:11
212:18
275:12

**basket**  157:4

**Bates**  27:4,
8,14,16
30:13
41:12
63:19

168:2
186:15
209:6
247:25
251:24
252:2
254:2
257:2
260:13,23
261:1

**battery**
282:22

**Beacon**  12:18
34:6

**bear**  225:3,
4,5

**began**  73:9
177:19

**begin**  205:10
208:4

**beginning**
7:2 9:20
39:1 73:20
106:2,3
108:19
116:6,7
123:16
145:1
146:16
162:24
205:15
217:5
218:22,23
224:23
232:3
233:17

259:10
276:5
279:21,22

**beginnings**
150:23

**begun** 266:5

**behalf** 7:20,
23 22:21
26:25

**behavior**
266:3,11

**belief** 92:3

**beliefs**
294:1

**believed**
32:24
90:19
120:16
171:10
213:11
214:15

**Belin** 49:25
50:5

**Bell** 295:2,
8

**belongs**
290:2

**benefit** 99:5
100:24
176:15

**big** 44:6
48:13
128:15
136:7

178:17
220:14
281:4

**bigger** 225:5
288:1

**bill** 12:6,
17 31:24
32:9 36:2
38:15
90:13,23
254:17,23
256:10,11
270:11,12

**billed** 252:5
255:16

**billion**
68:16
71:21,25
72:21

**bills** 147:24

**bing** 266:17

**bipolar**
266:14

**birth** 156:1

**birthday**
154:8,9

**bit** 33:1
35:13,14
43:12
96:19
117:8
124:9
149:4
191:10

211:14
214:13
252:20
254:22
256:3
293:23

**bits** 79:18,
20 217:16

**blacked**
45:24

**blank** 113:2

**block** 162:16

**blog** 270:22

**blogs** 269:20

**board** 20:3

**boast** 51:9,
11

**bogs** 211:24

**Borchgrave**
34:4

**born** 156:3
178:16

**boss** 192:11
193:23
198:7

**bottom** 27:9
63:19
66:18
74:19
214:19
252:19

**bought**
158:21

246:7

**brains** 229:4

**breach**
270:20

**break** 8:20
63:10
70:24,25
88:13
125:17
135:4
139:7
166:9
208:21,23
254:5
256:18
293:3

**breaks** 8:23

**bribe** 186:10

**bribed** 186:3

**bring** 20:3
36:6 46:5
48:3 77:19
169:18
221:9
226:3
232:20

**bringing**
146:9
213:8

**British**
260:8

**broader**
29:11,12
43:17

brochure
  45:18

brochures
  45:18 46:7
  47:9

broker
  292:4,14

brothers
  221:18

brought
  62:15
  176:7,12
  224:20
  240:2
  252:12
  274:21

Buddhas
  224:22

Budget
  251:23

build  76:18
  150:23

building
  37:19,22
  44:8,10,19
  45:19
  48:14,16
  49:9
  182:16
  283:24
  284:2

bullet  63:25
  86:25

bullets

88:12

bump  96:3

bumped
  255:17,18

bumping
  232:22,23

bunch  265:9

Bureau
  156:10

burner
  204:21
  207:21

Bush  106:4

business
  21:13
  23:16
  40:23
  49:17
  90:5,12,24
  131:17
  156:10
  170:12
  253:11
  292:11
  294:21,24
  298:10

businesses
  10:23
  82:24

busy  123:3

buy  37:17,
  18,20
  49:21
  208:12

————————
      C
————————

Caiola  7:9

calculated
  97:25
  113:24

calendar
  31:5,6,12,
  16,18
  207:4,5
  223:24

call  11:20
  34:9,10
  45:8 46:10
  49:7 55:8
  58:5 93:22
  118:12
  126:21
  127:10
  159:20,22
  162:7
  169:15
  194:1
  202:13
  218:4
  223:5
  236:22
  248:23
  253:22
  273:6
  278:25
  289:14
  295:11
  296:23
  306:15

called  8:1

11:1 32:6,
9 48:21
74:1 83:7
96:12
119:5
202:17
214:16
289:22
290:19,22
295:2,4

calling  81:2
  103:2
  178:21
  290:6

calls  81:14

calm  245:20

calmly  231:2

cameras
  45:20

campaign
  73:21
  106:3

campaigns
  105:19,20

capabilities
  38:18,19
  39:16 51:5
  77:13
  138:24

capability
  40:10
  64:3,22
  93:4

capacity

58:20,21
122:14,25

capital
138:19
193:12

Capitol
47:17

captain
210:12

car 138:11

card 138:12
147:25
158:19,20

care 18:17
60:12
140:22
224:12

cared 60:15

career
234:16

careful
21:24 56:6

carefully
110:5

carriers
148:2

carry 260:8

carte 43:20

Carter 9:1

case 79:17
108:6
122:24
138:16

145:18
184:1
212:5
232:2
245:1
269:13

cases 17:24
29:8 79:20
148:22
155:7
295:18

cash 89:4
119:16,17,
20 138:6,
7,8 158:21

cat 142:20,
21

caused 207:3
208:2

caution
24:25

caveat 288:7

CCP 88:22

cease 292:8

center 34:7,
10,11

CEO 17:13,
14

certify
308:3,7

chair 305:18

challenges
162:15

challenging
279:5

chance 194:5

change 32:25
50:20
188:10
194:20
212:12
221:16
289:19

changed
82:14
181:5
194:4

changing
181:5
187:18

channels
53:13,15,
18,19,21
77:2,7,19
78:8,17,
19,20
93:19
106:17
107:4,9
160:19
177:15
178:13
180:14,16
205:11
273:17
279:25

chapter
225:24

characters
66:18
175:16
260:7

charge 255:6

charged
274:19

charges
255:7
273:21

chart
248:21,23
249:18
260:13

check 161:14
183:9
193:15
247:9

checked
172:12
193:16,22

checking
72:18
73:10
156:9
182:25

cheeky 68:21

Cheers
307:12

childhood
49:14

children
152:10
178:16

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019                    Index: China..client

China   38:24
40:6 59:19
60:23
73:21 74:9
88:23
100:21
173:3
248:13,15
288:2

Chinese
66:17,18
89:20
90:14
91:5,12
92:1,10
129:15
152:9
153:1
164:8,12,
18 165:9
168:20
169:1,25
175:16
198:24
211:11
221:16
264:12,16,
17 265:12,
15 284:7
288:13

Chinese-
speaking
264:21

Chinese/
english
264:1

chose   124:19

167:4

chosen   132:2

Christmas
114:21

chronology
74:11

CIA   106:12,
19,22
107:4,12,
15

Cipriani
296:22

circumstance
165:21
285:19

circumstances
123:23
143:22
161:25
162:13
163:3,11
165:12
166:4

Citibank
202:17
289:17,23
290:18

CITIC   54:24
55:25 62:7

citizens
255:19

clarified
14:15

clarify
46:18
104:6,7
134:15

clarity   8:11
27:12
42:18
265:22

clause
163:1,3
168:8,12,
25

clean   26:17
166:17
201:24,25
202:6

clear   27:15
100:16
123:8
130:20
151:1
179:12,15,
22 180:3
191:21
240:21
242:14
260:25
284:20
294:2

client   12:7,
8,12 13:5,
10,13
17:21
18:2,7
20:22
21:18,19

22:1 29:24
30:4 91:15
94:8 97:7,
21 102:16
104:13,23
106:22
111:15
112:7
113:5
120:14,19
121:11,13,
18,22,23,
24 122:2,6
123:5,8,
22,24
124:6,16,
18,19,23
125:9,14
129:23
130:5
135:17
140:4
141:18
151:6
155:13
165:13,21
168:5
170:10
212:17
217:23
219:3
220:20,25
221:3
222:25
225:23
230:22
236:23
237:14,15

249:5,6
259:12
262:10
295:12,13

client's
29:22
102:20
132:2
142:14
166:5

clients
13:15
17:11,12,
16  19:14
22:20,22
23:14
44:24
67:17,19,
24  68:2,5,
7,10
102:5,13
104:18,25
120:5
122:12
125:3
141:16,22
142:3
153:21
165:17
294:4,8,14
295:21,25
296:2
298:11,13,
16

clock  216:9
218:25

close  34:5
47:17
225:4

closely  73:4

closet
221:12

clouded
297:25

Club  277:3
301:18

code  229:8
288:15,16,
17,20,22

coffee
25:22,23
26:11
84:2,21
174:17
185:13

coincidence
238:1,3

collaborated
139:16

collaboration
35:25
91:22

collect
78:15  80:1
120:3
148:14
150:23
205:10

collected
61:6

collecting
79:20  80:9
92:25
205:9

collection
76:19
77:17
78:8,10
79:10,11
117:1
129:7
215:7,8
224:22

collectively
77:19

college  9:24
104:11

Columbia
292:6

combine  92:3
94:17

combined
189:11

comfortable
154:22

commas
138:20

commenced
266:8
277:24

commencing
145:24

comment
18:25

190:7
212:25
214:2

commentary
73:16

comments
95:16

commercial
292:9

committed
57:13,24

communicate
183:19,24
232:6
271:6
297:7

communication
184:6
297:13

communications
64:24
111:10
207:22
263:19

communiqué
297:19

communist
38:24
59:19,21,
22,23
60:22
88:19,21,
23  152:9
169:1
248:15

284:7

communists
  74:8

community
  21:9,13
  239:14
  250:16
  257:23
  258:7,10

companies
  10:15
  22:21

company
  10:25  11:7
  16:20,22
  172:10
  173:19
  232:14
  276:24
  290:3
  291:18

compare
  94:12

compared
  143:20
  155:19
  273:21

compartmentali
zation
  142:24

compartmentali
ze   57:5

compartmentali
zed   206:5

compartmentali
zing   137:3
  206:21
  213:19

compartmentall
y   59:1

compensate
  113:14

compensated
  58:13
  166:20

compensation
  166:2

competitive
  29:3

complaint
  287:8

complete
  133:4
  162:22
  175:15

completed
  54:2,3

completely
  96:4  160:7
  164:2
  268:1
  303:21

complex
  93:15,17
  156:8
  167:3
  177:24

complicated

124:23

complications
  218:7

comply   99:9

comprehensive
  145:9,14,
  21  146:14
  162:16

computer
  75:3
  108:25
  109:14
  174:15
  175:12,14
  176:7,14,
  15,18
  198:23
  199:10,17
  205:20
  267:13
  268:9,11,
  16  269:4
  275:8

computers
  175:19
  204:20
  205:2
  207:20

concept
  100:22
  127:17
  128:2,13,
  24  130:3
  152:5

conceptually
  94:6  96:10

150:11

concerned
  47:21
  247:20
  270:14

concerns
  250:5

concessions
  86:21  87:8

concise
  35:16

concluded
  307:19

concludes
  307:15

concurrently
  16:8

conduct
  131:25

conducted
  54:2,3

conducting
  223:12

conference
  126:21

confidential
  53:21
  69:15
  72:23
  121:1,10
  142:23
  298:19

confidentialit
y  61:11,15,
16  71:10
73:1 121:8
130:8
176:20

configure
289:5

confused
136:1
192:16
250:10
255:25

Congress
28:15

connected
169:23

connection
49:8  77:16
78:12,21
80:13
81:8,15,
19,23
108:6
112:7
113:7,11,
21  117:6,
14  129:20
132:8
141:22
149:24
176:16,17
232:18
246:16
253:15
264:2,6

265:19
294:11
295:7

connections
28:14
248:18

connotation
135:2

conservative
34:3,10

consideration
35:3

consistent
95:2

consulted
191:1
275:7

Consulting
295:5,24

contact   49:7
193:25
231:24
244:22
259:2
299:9

contactable
245:3

contacted
80:23
192:12
193:24
232:17
273:17
279:17

contacts
28:18
62:19
81:10
106:18
107:8
213:8

contemplated
135:12
169:5

content
27:21 38:4
60:1
146:11
218:5

contents
143:19
144:21,22
145:10,14
146:11

context
94:23 95:9
152:1

continue
163:15
217:12
221:6
235:19
287:20
293:1

continuing
243:2

contract
49:23
57:21 73:9

85:11
90:2,6,7
101:4,6,7
102:16
110:6
115:13
124:11
126:13
127:11
128:18,20
130:19
131:8,15,
19,21
132:8
142:5
145:24
146:12
150:15
162:25
165:6
168:23
169:14,15,
16 171:7,
22 174:2
175:5
186:24
187:19
188:23
193:2
194:4,12
196:13
197:6,8,
10,12,13,
19 198:3,
9,15,17
202:23
214:25
217:9

243:16
244:10
247:6
264:3,9
266:8
272:2
284:10
296:15,18
297:14
299:1,2,4,
13,17,21,
24,25
300:18
301:13,20
302:6,7,9,
23 303:3,
13 304:3,4
305:1,6,24
306:4,8,25
307:5

contracted
52:12
117:21
247:4
273:11

contracting
276:23

contractor
113:2,7
130:6,9
131:8,25
133:3
141:1
143:7
153:7
162:21
168:6

170:11
272:1
274:15
276:22

contractors
20:6 134:5
149:12
169:4
272:16

contracts
102:5
142:2
294:13,16
295:9,10,
12,17,19,
25 296:5

contribute
20:15
21:21
271:18

control
88:13,17,
20

conversation
8:14 37:15
38:15 39:2
41:7 42:17
50:23 60:2
108:22
122:1
144:4
145:3,4
187:21
189:12
190:25
195:5

245:8,11
260:5
302:9

conversations
36:11
59:18
71:23 73:6
74:6 141:7
266:15
267:25
276:15
299:19
300:4,5
302:5
306:25
307:6

convey
236:23

conveyed
135:16
145:12
151:14
195:11
221:21
222:5
240:4,17
241:2

cooperate
19:8

coordinate
99:20
204:18

coordinated
207:22

coordinating

182:25
183:7
207:13

copies  47:13
200:14,16

copy  47:12
84:19
85:2,4,5,
7,21,24
86:3,9,12
189:2,20
190:1
191:6
192:23
207:7
253:21

core  29:15

corner  27:9
30:25
63:20
74:19

corporate
242:9,11
295:4,23

Corporation
7:4,17
171:22
172:13,24
173:13,15
277:6

corporations
294:17,22
295:20
296:3

correct

27:2,11
28:17,20
30:1  45:3
60:24
65:13
74:20
82:20,25
83:11
84:14  85:9
87:11
91:1,6
92:23  94:5
95:3  99:4,
13  102:3
111:22
119:6
125:1
127:3,9
132:6
135:14
136:23
140:6
146:21
151:24
154:20,24
155:7
156:22
159:13
163:22,23
174:8
178:22
183:21
187:14,17
190:7
193:1,3
196:9
199:23
200:2,15

208:13,15
211:20
228:23
230:14
240:11
241:4
242:17
244:16
246:23,24
248:5
250:1
251:15
253:17
254:9
259:5
261:2,14
262:5,8
264:25
272:14,16
275:15
279:9,12,
13,16
281:8
282:12
285:21
287:20
288:10
298:8
308:8

corrected
261:6

correctly
157:18
158:16

correlation
303:18,20

corrupt
88:13
199:7
201:11

corrupted
85:15
114:16
174:13,20
175:15
176:10
198:21
199:1
201:13,21
208:8

corruption
82:24
88:14,20,
24  89:1,2,
19,21
90:14
199:3

cost  93:4
97:4,8,10,
12,16,18,
23,25
99:17
101:9
115:18
119:1,10
166:25
251:23
252:25
254:19,20

costs  93:5
117:2,13
118:8,16
119:22,25

196:18

counsel
7:11,16
8:7

count  10:9
281:23

counterattack
40:15

counterclaim
265:25

counterclaims
275:18,23

counterparty
299:13,23
300:18

countries
67:4
149:13,15,
17  207:15
268:10,14
269:5

country  89:4
171:14
172:22
241:14

counts   26:9

couple  36:4
49:17,18,
22  50:6
54:21  58:8
88:12
233:4
257:10,20
302:17

court  7:8,12
  8:10,18
  55:17
  172:15
  176:15
  179:22,25
  180:2
  238:22

courtesy
  8:10

cousins
  221:17

create  27:21
  35:21
  41:22 65:8
  75:7
  111:25
  133:10,21

created
  74:3,12
  107:24
  109:20
  150:10

creating
  42:3 75:6

credit  98:18
  138:12
  147:25
  156:9
  158:18,19

crimes
  57:13,25
  58:4,5

criminal
  86:22

87:9,20

crispy
  210:19

criteria
  153:10,17
  164:9

cross-check
  94:24

cross-checking
  153:25
  154:6

cross-
dimensional
  95:22

crossed
  11:17
  34:21

culmination
  306:25
  307:5

cultural
  44:11

curious
  258:21
  285:25

current
  147:10,13
  148:8,10,
  17 149:1
  151:13
  204:2

curtailed
  240:8

custom  39:12

cut   196:16

CVS   250:22

cyber  274:9,
  12,16

_____

_____
        D
_____

D'INTERPRETES
  10:2

D.C.  45:4,6
  47:1 76:15
  183:12

daily
  183:11,17

Dallas
  232:16
  233:2,16
  237:5,6

damages
  89:19

Dan   106:4

danger
  270:17

dangerous
  169:22
  252:17
  284:19

dark  221:12
  279:3

data  120:3
  133:5
  213:18
  230:5,12
  288:6

date  7:6
  36:25
  51:21
  108:3
  121:9
  123:17,21
  156:1
  174:21,22
  183:1
  191:9
  197:14
  218:15
  220:22
  233:19
  246:5
  299:1

dated  126:4
  241:6
  261:15

dates  245:5

daughters
  221:17

day  162:11
  172:1
  226:17
  276:6
  303:15
  305:14
  307:20
  308:20

day-to-day
  206:20

days  145:24
  146:12
  150:13,14,
  18,22

162:24
170:12
171:6
181:11,25
196:14,20
207:3,24
214:25
218:6,9
219:25
222:21
230:4,13
233:8
244:10
265:23

DBS  192:24

de  34:4

dead  129:14
218:15
273:13

deadline
212:19
225:14

deal  88:23
121:8
128:15
136:7
146:6
269:1

dealing
300:7

dear  198:11
305:11

December
31:10
37:3,5

42:8 47:2,
5 51:23,24
52:1 54:14
85:1 108:8
111:3,4
114:13,20
126:4
151:9
187:16
190:4,16
211:1,3

decent  207:7

decide  48:5
49:21 61:8
115:4

decided
12:20
115:8
270:18

decides
276:23

deciding
90:24,25
102:10

decision
234:5,8

deep-sixed
238:3,6

deeper  160:5
240:3
266:23

defendant
7:23

defense

40:14
237:11

define  18:9
52:24
94:10

defined
188:24

definitions
142:13

defrauded
68:15
71:25
72:20

degree  10:4,
9 266:14
298:17

delay  207:3
208:2
220:12
223:13
244:10

delayed
219:6,12,
20

delays  208:5

delegated
178:9

delete
111:24
184:14,22

deleted
112:3,19

deletion
112:13

deliberately
53:20
221:16

deliver
136:14
148:16
151:2,5
243:21
249:7
262:9,13
287:18

deliverable
147:7

deliverables
151:23,25

delivered
137:5,12
146:23
148:13
166:22
227:4,11,
12 241:12,
13 267:6,
7,18,21

deliveries
267:18

delivery
144:22
146:13
241:13

demanded
140:18

demanding
140:17

democracy

92:4

**department**
  44:9  48:18
  107:9
  154:15
  160:19
  285:15
  289:18

**depend**   95:10

**depended**
  77:10,18

**depending**
  18:8  20:19
  87:20
  142:13
  144:24
  167:3

**depends**
  20:22
  21:18
  29:22  30:4
  77:10
  97:18
  142:4
  148:2
  235:16

**deponent**
  303:23

**deposit**
  192:14,22

**deposition**
  7:3  8:14
  19:4  24:6,
  15,21
  25:6,16

26:19
55:20
77:14
178:22
226:17
227:2
293:9
307:16

**depth**   9:22
  56:1  96:24
  149:5
  214:1

**describe**
  21:6  48:20
  53:15  62:8
  64:3  121:2
  122:1
  209:15
  210:7

**designated**
  136:16,17
  239:1
  285:15

**designation**
  236:25
  285:24

**destroy**
  283:4,7,10

**destroyed**
  283:2,3

**destruction**
  185:1,2

**detail**   15:15
  19:18
  39:24

**detailed**
  266:6,21

**details**
  39:13
  214:14

**determine**
  90:11
  155:12
  196:17
  300:10

**determined**
  113:25
  255:22

**detriment**
  140:1

**develop**
  133:11

**developed**
  28:13  64:4

**developing**
  230:5

**Dhabi**   103:24
  104:2,3

**DIA**   233:1
  250:17

**dialogue**
  92:7,9

**died**   49:13
  128:6,7

**difference**
  55:2,6
  94:7  95:7
  139:8
  143:25

**detailed**
144:10,20

**difficult**
  238:5

**dig**   251:1

**digest**
  211:14

**digging**
  163:16
  224:12

**dime**   96:8

**dimension**
  95:12
  98:15
  234:4
  260:3

**dimensions**
  97:19

**direct**
  117:24
  168:5
  231:24
  239:16
  252:24
  299:9

**directly**
  30:5
  136:16,20
  170:3
  271:6

**directors**
  17:2

**disagreed**
  191:3

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019      Index: disappointed..document

disappointed
  228:7,17

disclose
  66:10,12
  274:3

disclosed
  170:1
  274:2,4

disclosure
  285:19

discovery
  240:8

discretion
  132:3

discuss
  20:20
  51:9,11
  71:8
  130:19
  187:10
  188:1
  209:8
  230:20

discussed
  25:3
  32:20,21
  33:2 37:12
  39:23 40:3
  59:13 77:2
  100:4
  109:9
  169:12,13
  181:12,17
  194:24
  195:18

220:12
228:10
245:16
246:21
303:1

discussing
  88:4 102:7
  188:8
  192:13
  301:2

discussion
  43:19 93:7
  102:7
  108:19
  165:7
  169:21
  173:23,24
  188:14
  218:5
  223:17
  299:20
  301:9

discussions
  229:23
  301:6

dispatch
  206:15

dispatched
  204:13,17
  205:6,15
  259:20

dispose
  112:14

disrupted
  146:5,7

dissect
  265:6

distinction
  148:10
  149:1
  150:9

distracted
  81:6

District
  292:5

dive  39:13
  139:24,25
  149:4
  287:20

dives  96:6

divide  178:1

divided
  180:12

divides
  98:22

diving
  132:10
  146:6

division
  178:25

divorced
  49:19

doc  269:24

docs  195:18

document
  24:8,18
  26:21
  27:4,7,18,

19,22
30:13,17
35:9,22
36:10 38:7
41:11,17,
22 42:3
43:1,5,8
65:10,18,
23 68:10
72:17
73:19,24
74:12 75:7
81:7 82:4
84:1,9,15,
19 85:13,
14 86:20
87:7 90:1
96:12,18
100:13
107:21,22
108:17,21
126:7
154:5
160:23
170:22
171:25
186:13
189:12
192:18
193:6
200:21
201:12
226:14,23
229:7
241:9
247:25
248:20
249:2,4

251:22
252:7
254:4,7
257:2,5
260:12,15
262:25
269:22
271:19
275:16,22
280:23

documentation
  137:3
  151:12
  157:9

documents
  25:5  26:2,
  8,18  27:14
  73:25
  77:20
  108:18
  118:13
  135:7
  136:21,24
  137:5,11
  155:24
  242:1
  248:4,6
  265:12
  273:7

DOD   28:15

Doe   28:15
  273:24
  274:1

DOJ   250:18

dollars
  119:4

193:17
276:11

domestic
  22:23
  232:21
  282:22

domiciled
  98:23
  173:3,7

door   167:8
  196:2

doors   231:6,
  7

double   154:7

double-check
  155:9

double-checked
  159:23

doubt   243:17

downloaded
  267:15

downloading
  198:22

downstairs
  296:21

downtown
  45:11

draft   107:22
  108:16,17,
  25  109:20,
  21  110:25
  111:24,25
  112:10,20,

22,23
162:2
171:23
190:1

drafting
  108:5,12
  111:11
  162:6

drafts   108:2
  111:17,19,
  22  112:1,
  3,6,24

drawn   131:23

DRC   74:9

drive   48:5
  108:21
  135:18,19,
  20  145:19
  146:24
  151:23
  175:20
  198:18
  204:4
  207:15
  216:4,5
  218:9
  225:21,25
  227:5,10,
  19,24
  228:8,12,
  13,14
  267:12

driver
  136:16

driver's

239:25

drives   20:22
  85:15
  114:16
  133:12
  134:9,23
  146:4
  175:19
  176:4,8,12
  196:1
  198:12,13
  204:9
  208:6,8
  213:18
  267:10

driving
  264:24

drop   218:15

drove   45:19
  46:2

dual   96:22

duck   210:20

due   201:11
  211:18,21

dug   160:5

duly   8:2
  308:4

dumb   176:18

dumpling
  210:20

duplicate
  250:9
  269:12

**duration**
  197:13

---

**E**

---

**eager**  238:21

**earlier**
  23:13
  58:11 65:9
  77:3
  151:20
  160:7
  189:9
  190:24
  191:10
  246:21
  247:13
  261:23
  274:5
  293:24

**early**  31:10
  32:2 165:4
  211:1
  229:3

**earth**  253:7

**easily**  46:8
  284:4

**East**  65:25
  66:21
  80:18
  100:14
  103:18
  118:22
  242:21
  278:4,7,11
  279:2

**Eastern**  7:4,
  16 8:7
  12:10
  27:5,8
  57:10,15,
  16,17,19,
  21 130:5
  135:13
  137:20
  139:12
  140:25
  141:4
  149:20
  150:4
  151:22
  153:6
  167:6,22
  168:2
  170:8,19,
  24 171:16,
  21 172:9,
  12,24
  173:13,14
  187:7
  192:7
  195:17
  196:8
  197:18
  200:10
  202:24
  205:14
  207:3
  209:7
  211:16
  212:22
  214:18
  215:17
  229:6,12,

  20 230:2
  244:9,12
  263:5
  264:3
  266:7
  267:7
  275:24
  276:4,7,
  13,14,16,
  17,20,21
  277:2,5,7,
  12,17
  278:6,8
  285:14
  286:1,20,
  22 287:6,9
  288:6,8
  290:6
  298:25
  299:5,12,
  18,22
  300:8,11
  301:17
  305:24
  306:7,12

**Eastern's**
  286:25
  288:4

**Eastern-
0000201**
  186:15

**easy**  148:3
  190:5,9
  191:12
  207:5

**eat**  211:4,
  13

**Ecole**  10:1

**edges**  256:8

**edification**
  27:13

**edit**  20:13,
  14 188:13
  191:4
  262:14

**editor**  34:4

**edits**  20:10
  75:12
  189:3,8
  190:6,10,
  12 191:1,
  12

**educational**
  9:17 44:11

**effort**  48:19

**efforts**
  278:2
  285:23

**Eileen**
  157:22
  158:8

**election**
  98:7

**electronic**
  19:17
  31:18
  134:18
  135:7
  136:21
  241:13

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019      Index: electronically..entitlement

electronically
  145:13

element
  162:9
  233:22

Ellman   7:18

email   197:25
  199:21
  201:15
  232:4
  297:16,17

emailed
  110:2

emailing
  81:2

embarrassed
  220:8

embarrassment
  211:7

Emirates
  69:13
  71:22

emotional
  266:13

employ   97:1

employed
  43:6 96:22
  186:2

employee
  192:2

employees
  24:2
  103:14,16

employment
  10:22

empty   131:3

encapsulated
  35:15

encompassed
  113:17

encompasses
  83:3
  122:24

encounter
  163:11

encountered
  234:17

encrypted
  110:8
  288:12

end   20:16
  50:13 59:3
  101:2
  110:8
  111:3
  114:19
  115:12
  125:12
  129:14
  144:17
  146:17
  173:21,24
  205:14
  224:20
  252:22
  273:13
  305:4,8,10

endeavor

  162:21

ended   61:7
  128:17
  223:6
  254:22

enforced
  197:14

engage
  121:14
  278:6,10

engaged
  121:11
  294:5,8

engagement
  78:13,21
  120:5
  216:22
  217:4
  246:17,23
  247:10
  253:6
  266:5

engagements
  102:16
  294:12

engaging
  40:14
  112:7
  278:1

English
  42:22
  260:8

enraged
  287:14

entail   18:6
  93:12
  105:18
  147:14

entails   21:6

enter   90:25
  177:15
  234:25

entering
  277:23
  295:9,16,
  25

entire   39:19
  59:6
  101:20
  150:5,17
  156:4
  174:2
  201:2

entities
  15:13
  23:20
  117:16,20
  130:15
  132:16
  149:12
  168:5
  264:21

entitled
  41:11
  73:19 84:9
  203:23
  251:22
  260:12

entitlement

293:8

**entity** 15:12
  23:18
  113:6
  130:9
  131:2,3,4
  132:12,23
  169:6
  170:5
  273:8,9,
  11,16
  300:15,17

**entry**
  157:14,16

**equal** 77:8

**equaled**
  300:11

**equally**
  200:2
  267:11

**equals** 300:7

**equation**
  211:24

**equipment**
  207:14,16
  208:3,11

**Erin** 7:22
  293:15

**erratic**
  266:3,11,
  13 267:2,4

**errors**
  219:10,14,
  15

**essentially**
  91:19 95:5
  166:3
  171:5
  214:25

**estate** 37:18
  38:12
  44:16 45:9
  49:8
  142:22
  292:4,10,
  14

**estates**
  47:16

**estimate**
  101:16

**Europe**
  103:18
  132:20
  149:19,20
  168:17
  183:20
  225:19
  226:6
  246:10
  278:4,14
  279:2,9

**events** 148:5

**Eventually**
  39:17

**Evermay**
  47:11
  49:11,12,
  16,20 50:1
  292:16

**everybody's**
  259:24

**everyday**
  40:14

**exact** 246:5

**EXAMINATION**
  8:4 292:23

**exceeded**
  143:11

**excellent**
  35:1

**exchange**
  100:10,15,
  23 186:21
  229:23
  230:16,19,
  21

**exchanged**
  100:17

**excited** 51:5

**exclusive**
  16:12

**excuse** 19:2
  48:15
  101:13
  161:6
  170:24
  276:6

**executed**
  92:6
  126:13
  299:2

**execution**
  90:7

**exhibit**
  24:4,5
  27:3,4
  30:13
  41:11 43:6
  63:18
  65:17
  73:18,19
  84:8,9
  86:20
  96:13
  107:18
  126:3
  127:20
  152:15
  167:21
  174:4,6
  175:4
  185:9
  186:14
  195:24
  207:9,10
  216:7
  223:7
  226:11
  228:21
  235:5
  241:5,6
  247:25
  251:22
  254:1
  256:25
  257:2
  260:12,19
  262:20
  268:24
  269:23,25
  271:11

275:17
280:16

**exist**  118:9

**exists**  277:1

**exotic**
209:8,17
210:16

**expats**  91:5,
12 92:1

**expect**
210:11
211:17
212:24
214:2
288:21

**expectations**
230:22

**expected**
96:5
230:12
247:5

**expecting**
202:18
218:7,8

**expense**
116:22
117:18

**expenses**
114:4
115:6
116:21
117:25
118:16
247:14,15

**expensive**
98:1,2,3,4
101:11,15

**experience**
10:10 21:7
72:13
163:9
275:11
280:4,5
294:19,20

**experienced**
64:11

**expert**
274:10
288:16

**expertise**
206:9

**experts**
268:9,16
269:4

**explain**  39:5
55:3 144:3
185:24
198:20
276:8
283:19
289:8

**explained**
33:1 221:7
224:15
231:1
255:14,15
264:15
284:16
301:10

**explaining**
42:14
229:18,21
266:22

**explanation**
127:25

**explanations**
42:15

**explicit**
264:20

**explicitly**
168:18
171:1

**exploratory**
52:6,8

**explore**
53:12

**exposed**
97:24

**exposing**
44:13

**Express**
148:1

**expression**
129:25

**expressly**
283:13

**extensive**
35:14

**extent**  43:15
117:4

**extra**  203:17

**extraordinary**
185:22
238:2

**extremely**
56:6
156:6,8

_____

F

**face**  220:6,
8 284:5
288:4

**face-to-face**
81:4,9
117:1,18
134:8,9
141:25
143:3,4,14
144:4
145:6
222:16,19
267:25
296:17
297:12

**Facebook**
18:22
19:11

**facilitate**
99:19

**fact**  67:1
127:20
144:4
154:7
157:10,20
164:23
165:3

169:22
202:14
218:6
219:15
220:8
226:5
232:10
241:15
300:2

**factor**
201:6,8

**facts**  94:10,
12

**failings**
269:16

**fair**  11:24
14:17
23:22
43:13  77:6
95:5
124:11
162:8
164:1
177:23
216:16
235:24
253:10,16,
18  255:4
265:21
266:1
270:16
272:5
286:9
298:2,3,7

**fairly**
212:25

213:2,7
214:3

**fake**  129:15
152:25
153:1,16,
17  160:7,
13,16
161:2,3
180:23,25
181:9
217:15,16
219:15
221:10,11
222:7,11
223:14
234:2

**fakes**  153:2

**false**  159:16

**familiar**
21:2

**families**
68:16
170:1
248:19

**family**  11:4,
6  23:14
68:20
71:24
72:1,2,15,
20  73:7
221:11
248:24,25
249:7,16

**famous**  50:15
85:15

**farm**  260:1
278:18

**fascinating**
102:25

**fast**  49:18,
19  231:6
233:24
243:20

**faster**
139:25

**fastest**
233:25

**father**
157:6,10

**favorable**
63:9

**features**
185:4

**Feb**  240:24

**February**  7:6
120:16
123:7,13,
16  125:7,
11  165:4
171:3,8,17
196:15
229:2
232:3
233:18
237:3
239:6
240:16,25
241:7
243:6,7
245:7,8

246:4
249:11
259:9,10
262:3
279:20,21,
23  286:5
307:20

**federal**
172:15
202:20

**feel**  62:22
178:23
293:19
302:16

**feeling**
125:16

**feels**  154:22

**fees**  35:3

**fellows**
233:1

**felt**  39:2
41:9  91:18
178:11
215:3
225:16
232:20

**field**  139:3
163:9
234:17

**Fifty**  23:4

**fight**  60:22

**figure**
115:17
172:25

196:21
221:19

**figured**
66:20
237:14,17

**file** 24:9
50:16
127:18,19
175:16
176:9
177:12
185:12
199:12
201:2,24
216:7
224:13
233:5
235:17
236:1,18
270:23
272:18,22
288:11

**filed** 33:9
228:19

**files** 199:1
201:11,18,
21 202:6
219:16
233:14
234:1,25
235:2,3,4,
8,9,12,13
236:10,11
254:13
256:8
273:4

**Fill** 26:14

**final** 63:23
111:6
112:1
191:6

**finally**
48:24
114:12,22
174:13
207:7
212:15

**financial**
113:10
137:16
138:2,9,15
139:18
140:5
143:8
148:11
204:1
300:23

**find** 18:16,
17 52:7
88:25
148:23
156:2
163:16
164:24
165:24
172:20,22
181:2,8
193:14
209:23
214:20
219:3
224:13
238:2,4

251:8,18
271:3
273:1,3,15
279:6
300:24
301:1

**finding** 95:2
168:21
169:1
214:6,8
299:12,22
303:11

**findings**
145:16

**fine** 12:10
47:14
55:18
70:23
73:17 79:7
125:21,25
128:16
191:23
202:19
206:22
208:24
224:11
225:8,9
253:24
298:23
303:8
306:19,21

**finest** 90:14

**finish** 8:13
10:6
129:21
159:9,11

161:18,20
176:25
214:20,22
216:24
296:10
304:13,21,
24

**finished**
184:3
304:15

**firm** 7:17
166:8,13
184:13
203:14
295:4,12

**firms** 295:21

**fish** 82:18
127:11,14
128:3,4,5,
7,8,9,10,
12,14,16,
25 129:1,
2,10,18
138:8
152:15,23
156:15,19,
21 157:25
159:8,13
160:12,21
177:10
187:19
188:3,4,
12,17
189:1
194:21,25
195:19
196:15,19,

22,23,25
197:3
203:1,2,3,
17,18,22,
24 209:8,
15,21,24
210:17
211:19,22
212:1,4,9
223:9
236:25
240:9,23
257:11,15
281:10,11,
13,17,24
282:2,4,7,
8,11 286:7
301:15

**fishing**
210:11

**fit** 48:7
158:2

**fix** 231:15
266:25

**flagged**
202:22
236:21

**flash** 20:22
55:24
85:15
108:21
114:15
133:12
134:9,23
135:18,19,
20 145:18

146:4,24
175:20
176:4,8,11
196:1
198:11,13,
18 204:4,9
208:6,8
213:17
216:4,5
218:8
225:21,25
227:5,10,
19,24
228:8
267:9

**flat** 76:10

**Fletcher**
119:5
132:21
258:17,20
259:4,7
261:11
272:20

**Florida**
285:4

**flow** 248:21

**flown** 227:15

**fluent** 43:13

**fly** 226:5
246:10

**flying**
183:20
225:18

**focus** 29:23
105:9

188:2

**focused**
266:18

**folder** 52:16
198:13
259:19,25

**folks** 270:13

**follow**
103:8,9
253:23

**follow-up**
293:17

**followup**
173:20

**font** 280:19

**food**
211:11,13

**fool** 194:9

**fooling**
233:13

**foray** 48:13

**forbid**
267:15

**forbidden**
245:1

**foregoing**
308:7

**foreign**
99:3,11
139:8
291:13,21

**foreign-based**

99:7

**forensic**
137:16
138:3,15
139:18
140:5,15
143:8
148:11
204:1

**forgive** 62:6
128:6

**forgot**
272:21,23

**form** 136:25
163:7

**formal**
288:9,10
289:2

**forward** 14:5
49:18,19
112:13
128:22
200:11
238:22
301:7

**fought** 255:8

**found** 48:24
54:9 69:2,
6 129:13
130:1
155:8
159:25
163:14,17
185:22
216:18

221:8
239:9
251:1,10
269:11
272:21
303:10
304:2
305:23
306:7

**foundation**
44:12,20
50:5

**founded**
16:16

**fourth** 86:24
131:5
284:17
301:9

**frame** 51:25
125:10
189:10

**Frank** 157:4

**fraud** 68:23
69:9,20
70:1

**freaked**
233:9

**free** 12:18
34:6 54:19
124:1
171:5
178:23
203:22
222:23
293:20

**freebie**
52:13 54:1

**French** 7:3,
21 8:1 9:1
22:3 23:24
71:17 79:3
308:14

**friend** 49:14
176:2
225:6

**friends** 34:5
220:6

**front** 45:25
158:18
167:24
185:13
268:22

**frustrated**
302:19

**frustrating**
156:7

**full** 8:25
48:1 65:6
83:18,19
85:14
93:20,22
117:4
122:4,9,
10,14,16,
22 123:2,
11 124:2,
5,9,12,20
141:3
165:22
201:12

212:25
213:2,7
214:3
218:8

**fully** 64:16
72:12

**function**
237:10,11

**fund** 100:13
193:24
194:6
276:4,11,
13,20,24
277:5,9,12
300:3,13
301:10,15,
16 303:5

**fund...we**
192:12

**funded**
174:1,2

**funding**
170:2
276:25
277:1

**funds** 89:3
114:18,22,
24 202:12
253:3,19

**fuzzy** 252:20

---

**G**

---

**G-U-O** 12:9

**gain** 86:21

87:8

**game** 77:5
95:13

**garbage**
161:10

**gather**
144:25
241:12

**gathered**
145:5

**gathering**
78:10,11
143:23
260:1

**gave** 28:6
36:15
43:19
52:5,14
58:10 61:3
66:16
67:14,21
69:6 73:1
82:10 85:5
95:11
109:25
153:5
171:4
175:10
189:1,18
222:6
224:22
225:3,4
233:4,5
236:1
239:17
249:14,22

288:22
297:18
308:4

genealogical
248:22

general  22:5
29:23 41:7
121:3
263:3,4

generalities
39:11 51:8

generalized
42:17

generally
24:14
26:22
48:20
51:22
100:2
121:25
294:15
298:11,12

Geneva  10:2

genuine
153:8,13
154:23
155:2,14

genuineness
153:20

geo  148:3
248:17

geographical
279:4

geologic

248:17

Georgetown
10:3 46:10

Gertz  12:6,
17 31:24
32:5,9
33:16
35:6,17,23
36:12
38:15
90:13,23

get all
158:24

girl  157:8

give  19:17
21:19
22:4,17
27:24 48:1
85:20
110:25
118:7
124:8,12
127:25
130:22
136:19
166:8
189:2
211:8,10,
12 222:20
224:21
235:25
249:4,13
250:6
251:16

giving  28:9
109:23

206:24
216:5
224:23

glanced
86:16,17

Global  7:10

globally
45:7

goal  58:23,
24 59:3

goals  298:10

gobbledygook
265:10

God  31:19
33:24
149:20
174:24
198:19
206:13
267:14

good  7:1,15
8:6 32:8
33:23 35:5
41:10
42:22
44:12
56:11 59:9
91:18
125:24
167:18
176:12
180:5
213:3
214:6,15
224:11

229:18
243:17
257:13
293:15

goodness
10:12 23:1
250:14

Google  31:15

gosh  11:15
292:9
299:6

government
234:22
235:3,8,9
236:11

grace  244:14

graph  248:18

great  9:22
63:1 88:23
146:6
257:14,16

Grendi  7:15,
16 8:5,7
13:22
14:2,6,12,
17 24:4
27:3 30:12
63:10,17
65:15 68:4
69:18
70:20
73:17
79:4,7
80:6 84:8
95:20

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019                      Index: group..Guo

107:17
118:11
121:6
125:16,20
126:1
134:24
135:4
136:2,5
166:17
167:10
208:20
217:1
226:10
228:20
241:5
247:24
251:21
253:22,25
254:6
256:18,25
260:11
262:19
266:1
268:6,22
271:10
273:6
275:16
277:15
292:20

**group**  10:18
32:24
92:24 93:1
98:6,10
119:5
187:3
237:10
254:2,8
295:2

**groups**  11:4,
6,19 22:20
99:21
100:1,4,
11,14,23
132:19

**guarantee**
153:12
296:6

**guaranteeing**
153:20
154:22

**guarantees**
153:7

**guess**  32:22
44:19 73:5
87:20
105:21
133:1
141:3
157:14
165:4
168:19
174:23
181:24
186:4
190:18
192:2
213:10
231:20
264:22
269:3
276:12

**gummed**
212:13

**Guo**  12:9,

16,25 13:2
14:23
27:25
30:21
31:23
32:21,25
33:9,10
35:4,10
36:9,14,
17,20
37:9,25
38:21
39:15 40:4
41:5 42:1,
11,19,22
43:1,8,21
46:17,20,
22 47:7,11
50:1 51:5
52:4 54:6,
8,22 56:23
58:7 59:15
60:10 61:8
62:12
65:7,11,24
67:5,18,24
69:6 71:20
72:15,16,
23 73:11
74:7 75:18
76:4,15
82:10
84:1,16,19
88:7,22
89:12,14
90:5
91:11,18,
25 101:18

102:9,22
103:13
104:1,8,16
105:4,12
106:6
107:22
108:23
109:24
111:1
127:15
136:17,20
139:23
142:25
143:16
152:5,6,8
153:5
155:24
161:4
162:14
164:2,18
168:10,21
169:10
171:1,4
173:19
174:6
181:13,17,
21 184:20
185:7,12
187:6
189:7
191:1,13,
22 193:23,
25 194:14
195:14
199:9
200:3,5
209:14
210:23

215:14
217:19
218:8,18
219:18
220:13
221:1,21
222:2
223:18
224:2,21
225:10,25
227:19,25
228:6,16
230:10
231:5,8,
13,18,24
235:19
237:14,17,
19 243:9,
13 244:23
245:14,17
249:3
257:16
263:5
264:20
267:25
270:22
275:25
276:3,19
277:4
280:9
283:12,13
284:10,21
285:3
286:1,20
287:2,10,
13 288:6
290:6
296:8,16

297:5,7,
12,13
299:3,16,
23,24
300:1,7,10
301:22
302:14,21
303:2
304:2
305:1
306:2,3
307:1

**Guo's**  32:25
33:2 37:13
69:12
87:22
89:14
134:13
172:10
228:2
266:3
268:12
269:16
270:20

**guy**  228:2

**guys**  14:5
59:18
217:17
238:3
248:11
260:3

——————
**H**
——————

**habits**  82:22
138:10
147:23

**hack**  149:10

**hacked**
198:24

**hacking**
149:8,9,13
199:3

**half**  12:3
15:10
247:10

**hammering**
111:5
267:9

**Han**  12:6
28:1 31:24
32:6 34:20
35:3,22
36:11
38:16
39:15
42:19,25
43:7 54:6,
8 59:15
62:11
90:23
111:1
137:6,12
151:15
186:22,25
219:19
243:9
250:2
264:3
265:18

**hand**  241:13

**hand-deliver**
110:24

**hand-delivered**
288:5

**handed**  27:7

**handle**  122:5
178:4,5,6
183:17
271:2

**handled**
22:25 57:8
179:7

**hands**  139:21

**handwriting**
30:24,25
65:20 72:4

**handwritten**
65:17
109:10
135:22

**happen**  45:23
47:12
51:12
162:12
181:9
196:20
224:9
245:21
246:12
288:21

**happened**
50:10
60:11
85:19
145:3
155:10
182:21

196:7
215:25
227:11
230:18
270:6
285:9

happy   210:5
214:17
219:3
221:5
228:25
268:25
306:16,18

hard   127:15
175:19
245:14
253:14
266:25

harder
139:25

Harry   49:24,
25  50:5

hate   119:20

he'll   103:8

headed   98:23
272:9

hear   68:24
70:7
191:25
192:5
267:3
302:25
303:2

heard   8:7
57:20

115:2
243:1
277:17
289:24
302:13

heart   50:20

Heaven's
259:23

heightened
298:17

helped   98:6
130:2

helpful   22:7
76:14
258:8,11
274:8

helping   33:3

hereinbefore
308:10

hey   222:6

hierarchy
152:9
170:1

high   104:12
132:1

highest
90:16

highly
142:23

Hill   44:14
47:18

hinder
285:22

hindsight
171:19

hired   307:4

hires   20:5

hiring
118:19
205:18

historical
137:17
138:3
139:19
140:5,16
145:8,9,
14,21
146:15
148:11

hitch   163:21

Hodgson   7:22

hold   134:24
177:18
224:14

holders   17:4

hole   154:16

holes   181:1
217:17

holiday
202:16

hollered
254:22
256:1

home   109:3
183:13
252:12

266:16

homes   45:19
46:3,4,6,8
47:14,16
48:1,9

honest
171:20

honestly
45:14
110:16
190:17
253:2
257:13
286:13

Hong
168:18,22

honorable
194:22

hop   117:23

hope   195:18
267:15

hoped   123:22
228:13
245:21

Hopkins   10:8

hopper   246:6

hotel   45:11

hour   185:3
304:7

hours   25:18
38:2,3
227:15
256:16

306:14,15,
19,21,22

**I**

**house**  37:20,
21 50:2,4
138:10
142:22
158:20
189:9,14

**houses**  138:8

**How's**  74:5

**hug**  225:4,5

**huge**  37:20
44:6 55:1,
6 204:21
225:3
231:14,15
290:4

**hugely**
93:15,17

**hugs**  225:3

**human**  216:13

**hundreds**
49:4

**hung**  191:22

**hunting**
78:11

**hurry**  220:14

**Huseby**  7:9

**hypothetical**
51:13

**hypotheticals**
129:4

**IC**  239:13
250:15
256:3
257:19,22
258:1,4
260:4

**idea**  23:1,3
25:12
28:4,8
44:10
50:19,20
57:14
60:9,10,11
62:24
63:2,5
81:13
86:17
118:7
144:2
154:2
170:8
173:4
180:19
226:22
228:16
235:25
259:12
265:20
276:16
290:11
306:9

**ideas**  22:6
37:23
43:20
65:10

92:2,5

**identification**
24:6 27:6
30:15
41:13
65:18
73:22
84:11
107:19
126:5
186:16
226:12
228:22
241:8
248:2
251:25
254:3
257:4
260:14
262:23
271:14
275:18

**identified**
82:5,13
83:25
228:3
260:21
264:2
272:6
283:22
285:14
296:10,13

**identify**
47:24 48:4
221:13
269:4

**identities**
270:2
298:10

**identity**
169:7
298:5,6

**ideological**
36:5 91:19
92:3

**ideologically**
38:22

**idiotic**
18:24
242:24,25

**illegal**
56:13,14,
15 224:18
239:15
270:10
287:21

**illegally**
89:4

**illegitimate**
178:15

**image**  33:1
37:22

**imagination**
305:5

**immediacy**
218:11

**immediately**
146:1
150:25
251:3

277:23
287:18

**impasse**
198:5

**impatient**
231:17,19

**important**
168:11
201:6,8
220:7
281:13

**impressed**
62:23

**impression**
218:17

**in-house**
102:23
103:11

**inaccessible**
238:7,8

**inaccurate**
159:17

**include**
17:22
21:16  44:2
139:19
140:16
143:13
272:15,19

**included**
138:2
171:22

**includes**
249:18

**including**
135:7,20
138:18
162:14
260:7

**inclusive**
29:6,12

**incomplete**
162:19

**incorporated**
50:3 127:8
172:13

**incorporation**
242:16

**incorrect**
155:8

**increase**
217:8,10

**increased**
232:10

**incredible**
250:22

**incurred**
117:14
119:23

**independent**
20:5 134:4
149:12
271:25
274:14
300:9

**indicating**
157:10
207:8

223:6
260:7
269:19
282:2

**individual**
22:20 35:1
47:24,25
94:15 97:5
132:19
138:9
142:14
272:17,18

**individual's**
52:13

**individually**
152:19

**individuals**
16:9 19:14
21:2,8
50:18
65:22,25
66:17,21
68:6,12
77:20
87:21 88:8
97:17
117:19
118:19
147:16,17
153:14
205:21,22
212:3
234:24
239:1,10
250:12
251:1
260:21

264:12
285:14
286:6,10
294:21

**industry**
255:6

**influence**
106:11,15

**info**  210:11

**inform**
212:24

**information**
19:5,15
21:3,15
27:24 40:9
53:1,7,11
54:19,23
57:2,11,24
58:7,22
59:5 62:23
63:6 67:4,
8,14 68:18
69:25
77:20
80:2,12
88:14,21
94:12,18,
25 95:10,
25 96:4
97:21
100:18,23
106:21
107:5
117:21
118:20
119:2

128:8
130:14
132:10
134:9
138:5
139:12
142:24
145:5,22
146:9
150:17
152:2,24
153:7,13,
15,21,25
154:19,23
155:1,7,
13,21,24
156:22
159:5,15,
21 160:25
161:6,8
162:18
163:25
164:18
171:11
174:10,17
175:3
177:6,16
178:12
179:2
180:9,22,
24,25
185:8,25
186:12
196:23
201:4
204:4
205:10
207:16

209:13,22,
25 210:14
212:17
213:4,8,12
214:6,7,9,
11,15
215:2,7,
10,11
216:2
217:16,18,
22 218:19
219:16
220:9
221:10
225:11,13,
16 231:11,
14 241:3
243:22
246:9
249:10
250:12
251:9,10,
17,18
263:18,21
265:5,6,8
266:24
278:20
285:17
286:22
287:4

**informed**
268:1

**initial**  26:5
39:2 41:7
52:11 96:5
177:20
212:12

223:7
278:2
286:23

**initially**
52:7 93:8
107:23
111:4
159:14
197:15,16

**initials**
256:17

**initiated**
290:9

**inkling**
228:18

**input**  20:10
139:17
262:15

**inserted**
168:12

**inside**  56:8
92:11

**insist**  11:23

**insisted**
267:11
287:17

**insistence**
134:14
288:4

**insistent**
139:24
140:22

**insisting**
283:18

**instance**
127:18
138:7
155:2,11
156:25

**instruct**
246:1

**instructions**
87:22

**intel**  237:11

**intellects**
90:14

**intelligence**
11:19 21:9
29:3 76:19
77:16 93:4
168:21
235:11
236:10
239:14
250:16
257:22
258:7,10

**intend**
136:13

**intense**
217:7

**intensely**
233:25

**intent**  107:1
162:5,7

**intention**
134:7

**intentions**

37:13

interaction
  32:7

interest
  22:21
  257:14,16

interested
  19:14
  62:13

interesting
  44:5
  209:13

interference
  266:4

interiors
  46:7  47:20

internal
  97:12
  219:5,19

international
  10:7  11:18
  22:22
  178:1,19
  232:24

internet
  62:15
  81:18,19,
  23  110:4
  176:16,17

interpret
  265:8

interpreted
  179:14

interpreter
  42:23

interpreting
  10:4

interrogatorie
  s   262:22
  263:7
  271:14

interrogatory
  263:9,14,
  25  266:2
  268:3,6
  270:4
  271:24,25
  273:23

interrupt
  14:3

introduce
  7:11

introduced
  12:24  13:2
  31:23

introducing
  35:4  44:13

introduction
  12:5  14:23

intuitive
  19:6

invade   256:6

invading
  55:8

investigate
  18:12
  19:19  89:2

152:3
153:17
185:15

investigated
  84:3

investigating
  87:21
  152:8
  248:20

investigation
  20:4  88:7
  122:15
  127:17
  138:14
  152:7
  165:25
  169:24,25
  177:22,25
  183:17
  219:7
  251:13
  257:9

investigations
  18:9,21
  19:12
  21:25
  22:18,24
  29:7,9
  101:19
  197:3

investigative
  19:13
  37:14
  50:15
  58:6,8
  93:18

98:15
128:11
294:5,10
307:2

investigator
  147:21
  291:1,5,9

investigators
  62:16
  102:23
  103:11
  278:3

investigatory
  11:10
  12:23
  13:4,16
  14:19
  15:6,18,23
  16:6,9,14
  17:22,25
  18:5,8
  19:22
  20:16
  21:3,16
  23:10
  28:25
  29:6,14
  39:23
  50:24
  51:4,16
  59:8  61:5
  65:5  66:14
  80:13
  92:25
  93:14
  96:23
  98:9,22

122:16
125:3,8,13
141:22
148:25
163:20
177:2
179:7
217:5
234:17

**investment**
11:8

**invoice**
170:12,22
171:9,17
254:1,8,10
255:22
259:3
261:12

**invoices**
117:10
170:18

**involve** 18:1
19:17
56:19 81:2
111:10

**involved**
16:19
59:17 60:3
69:9 92:25
170:25
204:23
205:1
206:16
246:2
257:20

**involving**

275:14

**IP** 207:18
283:5

**Iran**
104:20,21

**Ireland**
227:14

**irony** 231:12
237:9

**irrationally**
287:17

**irregular**
161:24
162:13,18
163:3,11
165:12,21
166:4

**irregularities**
163:14,17

**irrelevant**
303:22

**Israel** 80:17

**issue** 71:9,
10 152:13
154:15
164:16
169:17
170:18
178:17
199:16
207:2
243:18
282:21
293:8

**issues** 33:2,
5 89:21
91:20
100:19
124:22
163:24
178:2
187:4
199:3,18
200:17
201:19
268:11
275:8

**item** 29:4
147:9

**items** 44:2
138:2
140:15,16

_____

J
_____

**jail** 233:13

**January** 90:8
107:19
111:8
114:25
115:11,12
116:3
124:25
140:21
146:17,20
151:10,17
164:6
171:2,8
172:1,24
174:25
175:4

177:6,8
180:10
183:1,16
191:8
192:21
193:3
196:14
199:2
201:14
202:4
204:14
205:7
207:5,23
208:12
211:1
212:23
217:22
218:3,18
222:4
223:17
224:9
226:1
227:6
240:12
243:5,9,
15,23
244:11,17
284:22,24
285:6
287:12
288:6,24
289:17
299:1,7,8
304:2,9,11
305:23

**Japanese**
49:17,18,
22 50:5

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019                          Index: jargon..language

jargon
  127:11

---

**K**

---

Kalorama
  46:9

keen   44:5

keeping
  298:18

key  75:5
  136:20
  141:25
  151:16,20
  152:12
  174:12
  199:9
  209:17
  289:4

keys   148:15
  174:13,20
  175:10,11
  213:17
  267:9
  288:24

Khodorkovsky
  91:14,15

kind   11:3,5
  14:9 22:4
  23:11
  29:18
  50:11,12
  87:19 89:2
  117:24
  128:19
  129:1
  138:1,17
  139:7

Jaysun   7:7

Jeep  45:23

jeez  229:14

Jinping
  248:13

job  150:6
  206:14
  239:9

Joe  7:19
  95:20
  118:11
  156:2
  184:11
  304:16

John  11:12
  155:23,25
  273:24
  274:1

Johns  10:8

joined  55:19

Jointly
  234:10,11

journalism
  40:22

journalists
  90:15

jump  287:16

jurisdiction
  235:16

140:7
145:22
147:12
164:8
168:23
175:13
176:19
197:25
211:6
219:5
223:3
235:3
239:4
255:8
265:12
273:2

Kindergarten
  9:21

kindly   176:2
  194:6

kinds   204:20

Kingdom
  262:1

knew   14:8
  32:11
  33:15
  47:15 60:6
  71:14
  72:17 84:6
  131:20
  147:3
  150:7
  188:11
  197:4
  228:11,15
  238:12

269:14
276:17
284:6

knock   161:22
  167:9

knocking
  167:7
  229:4

knowledge
  69:12,17
  159:16
  160:13
  171:25
  219:13
  297:6,9
  305:2

Kong
  168:18,22

Krause   7:18

Kwok   7:24
  275:25
  293:16

---

**L**

---

la   43:20

labeled
  205:11

Lakes   9:10

landed   184:2

lands   290:1

lane   49:3

language
  191:5

264:17
288:18

**languages**
64:24

**laptop**
200:13
282:15

**laptops**
282:19,25
283:7

**large**  37:19
44:6
47:15,16
82:11
202:21
212:9
280:19

**Las**  9:7,15

**late**  32:1
211:19,22

**latest**
225:24

**laundering**
138:6

**law**  7:17
99:9
166:8,13
184:13
235:18
286:21
295:12

**laws**  126:25

**lawsuit**
123:6

124:10
171:13
228:19
239:5
245:24
262:13

**lawsuits**
33:8

**lawyer**
131:23,24
239:13

**lawyers**
263:15

**layers**
138:13
221:8

**lead**  216:18

**leader**  52:21
83:15,16,
20 91:16,
17 177:19
240:5
246:11

**leaders**
99:21
100:1

**leadership**
88:24
152:9

**leads**  222:11

**learned**
285:13
298:25
304:9,11

**learning**
253:13
299:4

**lease**  292:11

**leases**
292:11

**leave**  40:15
182:17
239:13

**led**  277:1

**left**  71:13
181:22
190:1
225:9
247:20,22

**legal**  8:25
79:17
140:1
149:14,15

**legally**
98:19
178:12
224:17
270:16

**legitimate**
221:9,14

**legitimately**
181:2

**letter**
118:14
123:14
175:23
241:6,11
242:19,23

244:24

**level**  22:5
145:22

**levels**
138:14

**leverage**
86:21
87:8,19,20

**Lian**  224:2

**Lianchao**
12:6,19
28:1 31:24
32:15
33:12
34:20,21
35:18
37:10
38:16
39:15
42:11
45:10,11,
17,23
46:21
48:4,7
56:24 74:7
75:20 76:4
90:15,23
109:24
111:1
136:18,19
137:6,12
151:15
164:21
165:5
170:25
181:12,15

182:12
185:7
186:22
195:3,5,
10,15,16
200:6
215:14
219:19
221:21,23
222:10,15
224:2
228:24
230:10
231:3,23,
25 232:6
237:1,22
243:9,13,
15,22
244:23
245:4,5,15
249:13,15
250:2
264:3,22
265:18
286:2
287:5
297:20
299:10
302:8,10

**Lianchao's**
42:12

**license**
239:25
291:8
292:6,8,13

**licensed**
290:25

291:4,5
292:3

**life** 37:13
162:9
258:16

**life-
threatening**
152:11

**light** 66:16

**Lightly**
81:25

**limit** 138:12
158:19
184:4

**limited** 7:4
58:21
122:12
172:13,24
222:17

**limits**
286:21

**Line-item**
251:23

**lines**
288:15,17

**lingo** 127:10

**linguistic**
112:9

**linguistic's**
10:3

**Linkedin**
27:19

**links** 92:10

278:16

**list** 66:7,
14,16
67:18
68:6,12
69:6 72:3
84:4,5
138:17,19,
22 139:11,
14 140:8,
10 147:18
153:4
156:14
177:9
234:22
257:10
260:18
280:10,14
286:10,23,
25

**listed** 65:22
68:17
167:2

**listen** 81:5
267:1

**listened**
217:25

**literally**
42:2
227:13

**litigation**
7:10 117:7
124:4
299:16
303:21

**lives** 45:17
222:15

**living**
152:15
157:23
158:16,21

**LLC** 7:5
9:11 242:5

**LLCS** 242:8,
12

**lobby** 176:7

**lobbying**
30:2,9

**lobbyists**
30:6

**locate** 45:2

**located**
278:14
279:8,14

**location**
148:3
179:5
238:11
241:25
279:4

**logistics**
137:15
204:24

**London**
168:16
295:2

**long** 25:9
224:25
232:12

247:22
266:19
269:14
293:2
302:11
303:11
304:1
305:14
306:6

**long-term**
301:13

**longer**  232:5
292:6

**looked**  48:6
57:1
160:21
233:3,6
239:21
270:22
286:9,11,
13

**lord**  35:5
198:11

**lose**  220:6,
8

**lost**  200:23
202:10

**lot**  36:3
39:13
45:20
66:17
108:2
110:12
116:25
117:2,17

121:12
129:14
148:6
153:1
157:3
159:6
160:16
182:14
217:19
219:25
224:25
231:11
242:8
245:18
270:17
274:11

**lots**  120:1
211:10,11

**Loushin**  7:7

**loved**
128:14,21

**low**  238:9,
10,11

**lunch**  32:14,
15,18
125:17
136:6
161:15
215:19
220:10,11
231:21
287:12
296:22

**luncheon**
167:14

**lunches**
211:11

**lying**  282:19

**Lytle**  7:20

────────────

**M**

────────────

**machine**
288:21

**made**  43:25
46:3  75:12
112:9
155:20
189:8,11,
14  190:11,
12,25
194:18
200:19,20
203:3
219:11,13
284:8
306:10

**mail**  241:14

**mainland**
38:24  40:5
168:20
169:25
187:5
264:16

**maintain**
40:13
292:6
298:5

**maintained**
28:14
283:17

**major**  148:5
190:23

**make**  27:15
31:2  48:13
73:3,15
79:20
153:23
162:22
163:25
166:5
189:3
190:13
198:25
200:12
214:16
218:1
219:2,14
221:4
223:25
301:12
306:16,18

**makes**  95:24,
25  207:23
212:7

**making**  154:6

**man**  206:9

**manage**  99:20
205:18

**manager**
169:10

**managing**
180:7
206:7,17

**Mandarin**
43:11

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019                    Index: mandate..meeting

191:18
192:1
265:15

**mandate**
150:7

**mandated**
152:2

**manifests**
148:3

**manner**
162:23

**March**  120:8,
13 123:17
125:12
196:16,17
225:15
242:22
261:16
262:6,7,11

**mark**  268:24

**marked**  24:6
27:5 30:14
41:13,14
65:18
73:21
84:10,12
85:8
107:19,20
126:4
186:15,17
226:12
228:22
241:7
248:1
251:24

252:2
254:3
257:3
260:13
262:22
271:14,16
275:18,20

**marshaling**
278:2

**massive**
211:5

**match**  94:14
154:14
160:5,18

**material**
145:4

**materials**
8:22 130:5
135:8,12

**matter**  7:3
66:25 81:9
176:4

**matters**
187:1

**maxes**  122:25

**Mayfair**
11:1,7

**meal**  210:22

**meaning**
128:10
168:13
193:23
285:17

**meaningful**
148:9

**means**  19:18
116:12
184:6,20
186:1
224:25
234:21

**meant**  14:9
131:20
198:4
200:15
205:17
253:15
281:9
288:11

**meantime**
171:13

**measure**
134:14

**media**  7:2
33:11
63:25
64:23
68:25
69:21 70:4
92:20
98:15
148:25
149:2,3,24
150:8
151:2,5
204:2

**meet**  25:5
33:12
146:3,19

176:6
183:10
190:15
227:25
233:15
243:15
283:14,18
284:9

**meeting**  26:5
30:21
31:10
35:9,22
36:19 37:8
38:1,2,4,
8,13
39:18,24
40:25
41:25
42:3,4,6,
13 43:2,
16,18
45:16
46:15,16,
20 47:12
50:25
54:10
57:2,23
58:4
74:13,14,
16 84:20,
25 86:5,10
97:17
102:8
146:23
174:7
181:14,23
182:5,16,
19 183:16

184:3
186:9
190:22
199:16
215:13,23
216:1
217:21
218:3,18
221:20,22
222:5
225:11,19
226:1,8
233:16
244:19
285:6,8
306:6

meetings
 31:21
 36:17
 46:15
 74:11
 76:13 81:9
 108:9,10
 120:2
 134:8
 143:15
 177:18
 211:2
 232:12
 243:8
 297:12

mega  101:10

member
 176:22
 212:2

members
 71:24

205:25
257:25
258:9
270:2

memorandum
 102:2

memorialize
 118:4

memory  37:2
 51:1 188:6
 228:23

mentally
 217:8

mention
 38:11 40:8

mentioned
 23:18 33:6
 36:2 65:9
 72:11
 160:7
 174:5
 218:15

mentions
 28:22

menu  43:20
 65:8 102:9
 150:5
 167:3

mess  290:5

message
 110:7
 192:9
 193:15,20
 201:15

202:25
203:7
205:14
212:23
228:21
229:11
297:8

messages
 184:5,8,
 15,19,22
 186:14,21
 222:18

messaging
 64:24
 92:21

met  24:24
 25:20
 26:11
 32:22
 36:14
 37:25
 39:12
 46:13
 76:14
 164:6
 181:21
 190:19
 227:25
 233:2
 246:14
 268:2
 276:6
 284:21,24
 296:8,14,
 16

method
 144:23

metro  47:1

Michael
 11:12,13
 27:25
 200:9
 214:13
 221:7

Mickey  277:3
 301:17

micro-targeted
 76:19
 77:16

mid-december
 199:15

mid-february
 229:3

mid-jan
 199:15

middle  65:25
 66:21
 80:18
 103:18
 111:2,3
 116:2
 118:22
 123:16
 164:6
 237:3
 240:15,24
 242:21
 262:12
 278:4,7,11
 279:2,20
 280:11

Mike  11:14,

15 12:20
30:22
41:23
42:7,10
51:1 53:3,
4 54:8,9,
20 58:1
60:19
62:16
64:7,16
74:7 76:4,
24 80:4
83:18
86:16
87:15 90:1
97:12,14
107:25
108:13,25
116:7
120:17
121:21
123:20
132:14
146:1,9,17
151:16
160:14
169:19
177:12
180:12
199:17
200:9
204:18,25
205:17
206:2,14
207:12
209:12
210:8
213:5

215:2
216:3
217:24
220:3,7
221:1
222:2
224:15
225:2,3,4
226:2,4,5,
24 228:13
230:10
231:1
232:23
233:18
236:17
237:23
238:14
239:19
241:2
243:12,24
245:7
246:1
249:21
252:16
260:1
267:20,21
271:1,4,5
279:25
284:6,24
286:12
287:22
289:7
299:20
302:3

**Mike's** 62:19
73:25
121:22
229:10

234:9
284:5
289:7

**Mikhail**
91:14,15

**Miles** 7:24
12:9,16
30:21
32:25 33:2
37:12 40:3
42:1,11
43:21
46:22
47:11
50:1,2,8,
14 54:8,22
58:7 65:7
82:10
221:5
275:25

**military**
64:5

**million** 48:1
84:5 97:5
158:14
161:5
185:18
193:17
217:19
301:11

**millions**
49:5
276:10

**mind** 45:13
50:19
82:14

87:24
166:19
260:24

**mine** 91:15
234:7,9
290:2

**Mingduan**
157:2,6

**Mingshan**
157:7

**minimal**
119:12

**minor**
200:12,22

**minute** 117:1
212:12

**minutes**
26:11
63:11
126:1
185:3

**mischaracteriz
e** 293:25

**miscommunicati
on** 219:6,20

**misnomer**
102:25
103:4

**misunderstandi
ng** 143:17

**moment**
119:21
248:3
306:10

Monday  175:1
  176:5
  182:1
  198:14
  201:23
  207:6
monetary
  36:5
  89:17,19
money  56:20
  115:20
  117:5
  138:6
  158:12
  169:5,10
  170:5,23
  193:8
  198:16
  246:18,19
  273:19
  290:1
monitor  7:13
  82:21 93:9
  97:5
monitored
  94:16
monitoring
  83:1,9
  93:12,22
month  82:13,
  15 127:18,
  24 129:11
  141:13
  143:9,10
  144:17
  182:2

188:3,5,
  11,17,24
  251:23
  252:6
  261:22,23
monthly
  166:2
  196:18
months  73:9
  82:22
  150:16
  196:9,14
  197:9,17
  231:15
  237:12
  247:3
morning  7:1,
  15 8:6
  201:23
  224:24
mother
  157:2,5,10
MOU  102:1
Mouse  277:3
  301:18
move  8:22
  50:15
  146:1
  238:21
moved  128:22
movement
  50:7
moving  14:5
  301:7

multi-million-
dollar  47:25
multiple
  64:24
  111:18,22
  138:13
  179:14
  211:19,22
mutual
  100:24
  189:13
  230:9

——————————
      N
——————————

Nahyan  68:20
  72:2,14
  73:7
named  157:22
names  12:13
  21:5 67:22
  81:1 82:11
  127:20,21,
  22,23
  129:6,15
  148:2
  153:1,16
  160:4,17,
  18,25
  162:21
  180:25
  181:4,6,9
  185:17
  206:4
  217:15
  221:10,14,
  17 222:6,

11  223:14
  232:25
  233:4,10
  235:5,6
  236:2,19
  249:20
  250:8,23
  254:14,20
  272:18
  280:15,18
  281:20,24
  291:18
  298:18
naming  21:5
  81:1
narrative
  136:25
nationality
  160:3
  264:18
nationwide
  45:4,6
nature  11:10
  56:21
  183:21
  205:2
  210:23
  214:7
  216:22
needed  114:7
  152:22
  164:11
  180:13
  198:17
  219:4
  220:10,21

231:10
279:6
288:12,14
289:3

**negotiate**
255:12

**negotiated**
283:12
299:20

**negotiating**
295:9,16,
24

**negotiation**
252:14

**negotiations**
50:23

**neighbor**
175:13,22
196:2
274:10,11

**net** 212:25
213:2,7
214:3

**network**
21:1,20
28:18
79:22
90:10
91:4,11

**networking**
99:16,20,
25 101:12,
14

**networks**

80:18
82:23

**Nevada**
127:1,6
241:15,16,
18,21
242:10

**news** 68:25
198:7

**NGO** 302:11

**nice** 214:20

**nightmare**
175:21

**nods** 8:17

**nominee**
106:1

**non-
prioritized**
280:15

**nonetheless**
303:17

**nonsense**
153:23
194:10

**normal** 8:14
273:21

**North** 9:3

**Notary** 8:2
308:24

**note** 31:2
157:15
290:21

**notes** 31:14,
20 35:11
109:10
156:24
158:6

**notice** 24:5,
16 266:8
293:9,13

**notification**
290:5

**November**
32:2 49:13

**NSA** 233:1
250:17

**number** 27:8,
15,16
32:22 40:4
49:3 52:15
61:12
63:19
148:5
152:8
154:12,13
157:17,22
158:11
167:21,25
168:2
179:3
180:19
188:2,4
204:16
209:6
219:16
239:25
248:14
252:2,18

260:19,24
261:1
263:10,25
266:2
268:3,6
269:16
270:4
271:24
281:20,25
283:5
284:4
297:18

**numbered**
280:22

**numbers**
56:2,3
127:17
152:25
153:1
158:25
159:1
160:1,2
196:19
207:18
250:9
280:19,24

**numerous**
204:19
277:10

---
**O**
---

**oath** 167:19

**Obama** 285:16

**objection**
29:16,20

78:22 80:3
81:12,20
83:6 97:11
106:13
133:22
137:8
142:11
155:16
166:6,23
201:7
212:11
218:13
219:8
223:15
277:13
280:20
282:14
284:13
294:25
298:21
303:14
304:5

objections
262:21
263:4,5
271:13

obligation
166:5

obtain
286:22
296:6

obtained
185:25

obvious  19:6

occasional
162:15

occasions
182:23
296:9,13,
16

occur  32:7
36:19
181:23

occurred
37:7 43:16
51:3,6
165:16
218:10
246:25

October  32:1

odd  15:25
259:15,17
275:3

offer  222:20
223:1

offered
51:15 52:4
220:24

offering
93:9

office  11:4,
6 44:10,19
45:19 49:9
228:2
241:20
242:4
292:11
300:21

officers
16:25

offices
23:14

officials
89:20

One's  213:23
240:7
285:23

online  98:6,
10 149:3
269:17

oops  251:13

open  110:4
175:8,11,
12,15
218:5
231:7

openly  102:8

operate
76:18
166:14

operation
204:22,24

Operations
254:2,8

opinion  61:3
160:13
303:20

opportunity
146:8
155:1
288:8
289:1

oppose
293:12

opposed
134:17
212:10

opposite
48:17

opposition
91:5,12,17
92:1,24
99:21
100:1,3,
11,14,23

option
209:16
210:17
232:19

options
209:8

oral  223:18

orally
135:16
145:12

oranges
155:19

order  21:20
97:20
127:25
146:3,4
194:9
265:11

organizational
92:16,19

organize
206:15

original

85:5
109:19
127:19
132:1,7
159:3
191:5
248:19
249:2
279:1
304:23

**originally**
64:4
254:25

**Ostensibly**
100:25

**outfit**  34:1

**outlined**
171:4

**outset**
163:12
233:21

**overseas**
11:2
117:19
118:19
139:5
149:9
179:5
183:6,7
204:17
239:6
246:15
269:11
270:7
282:23

**overview**
9:23 10:14
22:17 94:1
101:17
102:6

**owe**  170:23
171:1
246:18

**owed**  255:13

**owner**  49:12,
13

**owners**  48:22
49:20
158:22

————————
**P**
————————

**package**  65:7
93:20
94:19

**packet**  82:11

**paid**  84:5
113:21
117:5
161:5
171:2,3
185:18
259:3
262:16
301:11

**paper**  31:4,
6,20 38:14
43:18
84:19
85:2,7,19,
24 86:12

134:17
135:22
189:20,22
301:4,6

**papers**  71:15

**paperwork**
273:2
306:10

**paragraph**
40:20
64:20
127:1
130:10
141:4
145:2
161:25
170:16
265:23
268:21
269:5
276:1
277:19
280:8,12
282:16
283:11
285:12
286:15
288:3
289:9

**paragraphs**
43:4

**parameter**
209:18,19

**parameters**
224:16

**parents**
59:22
157:3,8,12

**parsing**
177:21

**part**  10:8
23:15
29:25
37:14,22
43:2
59:22,23
65:4,6
78:6 89:5
97:23,24
98:9
101:2,6,7
108:20
131:19
154:2
155:4,5
165:4
177:1
190:24
218:24
257:15
259:25
269:11
276:16
278:21
279:1

**participate**
75:6 78:7

**parties**
162:14
298:1,5,6,
19

party  59:19,
  21,22,23
  60:23
  88:18,19,
  21,23
  131:5
  169:1
  183:8
  212:6
  248:15
  284:7
  299:19

Party's
  88:13,17

passport
  152:25
  154:12,13
  160:1
  178:14
  261:10

passports
  153:17
  186:4,10
  260:8

password
  149:8

passwords
  149:5

past  32:12
  97:2 105:1
  165:16
  291:18

paths  11:17
  34:21

patient

231:9

patiently
  231:2

patterns
  82:23

pause  166:5

pay  35:2
  116:7
  117:11
  165:13,22
  168:6
  203:18
  246:8
  247:4
  273:14,19

paying  116:6
  168:22
  186:1

payment
  166:5
  301:2

payments
  89:4 118:5
  170:10
  202:21

PDF  192:17

pedaling
  243:20

peek  52:6,
  13 239:24

peeking
  55:8,12,23
  235:7
  239:22

peering  62:8

pending
  303:9
  304:19

Penn  285:2

penthouse
  36:23

people  12:20
  19:10 20:7
  21:13
  22:10 30:6
  32:17 33:7
  36:3 40:4
  45:1 48:21
  57:10,22
  58:9 66:3,
  7,8,14
  67:3,17,18
  68:23
  72:18,19
  76:25 77:1
  79:22
  80:22
  81:2,10
  84:3 86:21
  87:8,23
  89:18
  92:11
  101:19
  103:16
  120:2
  125:16
  132:12
  146:3
  149:6
  157:9
  160:10

163:18
168:22
180:17,20,
22 181:3
185:16
186:3,4,10
192:14
194:6
198:5
205:18
206:13,14
211:25
212:1
216:6
222:7
233:10
235:21,23
236:9,13
237:19
238:14
239:17
240:22
245:2
247:3
249:2
255:5,6
256:17
257:10,20
258:22
260:6
279:2
284:4,6
288:17

percent
  162:10
  211:23
  217:10

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019        Index: perception..ping-pong

perception
  231:16

perfect  50:2
  162:20

perfectly
  131:20

perform
  19:11,24
  96:22
  102:11
  238:24

performed
  96:10
  272:1

performs
  18:21

period  28:13
  32:23
  166:3
  244:14

periods
  162:17

permission
  68:11

person  8:15,
  16 25:20
  57:12
  58:10
  91:18
  93:10
  94:20
  146:19
  157:25
  159:2
  160:21

183:7
197:20
198:3
204:18
205:17,19
207:12
276:22
283:14
296:9,14
300:2,23

persona  48:8

personal
  9:16 66:15
  67:20
  69:11,16
  82:23
  224:21
  275:12
  276:12
  296:6

personally
  28:6 69:20
  77:15
  80:20,22
  81:21 82:2
  105:15,17
  110:20
  137:10,11
  178:10
  180:7
  218:1
  243:25
  244:1
  258:14
  275:7
  276:7
  284:21

291:4,20
300:17
302:15
303:12
304:3
306:4

persons
  234:15,18,
  20 235:15,
  22,24
  236:10,24
  239:2
  240:9
  285:17,23

pharmaceutical
  49:17 50:6

phenomenal
  36:7

Phillips
  7:19

phone  81:2
  187:13,21
  191:13
  194:1
  305:1,4

phones
  204:20,21
  205:2
  207:20,21

photocopy
  252:22

photograph
  74:17
  91:13
  155:25

269:18

photographed
  283:21,23

photographs
  46:8 186:4

physical
  241:23

physically
  126:12,19
  189:18
  238:4
  250:6
  304:4

picked
  45:10,17

picture
  100:8

pictures
  186:10
  261:10

piece  134:17
  135:22
  181:3
  189:22

pieces
  79:18,20
  158:2
  178:12

Pierre  176:6

pin  70:21

Ping  248:13

ping-pong
  194:7

pivot  50:23

place  54:15
  156:3
  175:17
  292:17
  308:9

Plaintiff's
  262:21
  271:13

plan  43:22
  77:5

planned
  197:15,16
  217:9

planning
  215:14

plate  121:12
  122:4,16,
  22 123:2,
  11 124:3,
  5,10,12,20

played
  195:14,15
  206:7

pleasant
  72:13

pleased
  213:13

point  32:14
  37:4 63:25
  84:20
  115:7
  188:2
  191:20

199:8
216:4
224:3
228:5
239:3
240:24
247:9
251:12
294:1
296:21
299:3
303:9

pointed  46:3

points  129:7

policy  40:23
  185:1

polite
  305:10

political
  59:18
  86:22 87:9
  88:4,6
  89:7,10,
  14,16,18
  105:19,20

politicians
  21:11
  105:4,5,
  16,24

politics
  33:16

popular
  242:15

porous
  110:12

portion
  44:17
  178:8,18,
  19

portrayed
  291:2,6,10

positive
  39:4 44:15

possibly
  32:15 76:6
  150:21
  231:22
  243:13
  297:11
  301:14

Post  33:22
  131:5

Post-it
  31:20

potential
  71:8
  120:18
  121:13,18
  232:12
  270:17
  280:10

Pottinger
  295:3,8

Powerpoint
  74:24 75:2

PP  234:20

practice
  184:22
  283:6

pre-report
  54:13

precede
  14:25

preceded
  14:22
  108:12

precise
  216:12
  243:7

precisely
  19:20
  21:22
  39:11,22
  41:3 53:8
  61:22 88:2
  144:25

preliminary
  30:20
  36:13
  89:25 90:1
  93:7 94:1
  101:16
  102:6
  116:13
  143:1,3,
  10,13,19,
  24 144:1,
  16,21,25
  185:23
  240:1
  250:25

premier
  248:13

preparation
  25:6 26:19

263:13

prepare
  24:21
  132:1
  266:6

prepared
  25:24
  201:10
  267:6

preparing
  266:21

presence
  37:17 44:6
  47:17

present
  32:18 35:9
  37:8 38:23
  42:9
  46:17,19
  54:18
  57:11,23
  126:12,19
  182:10
  214:21
  215:9
  220:25
  221:22
  224:21

presentation
  43:25
  56:19 57:8
  58:18
  62:7,12
  74:25
  218:2,4
  301:5

presented
  35:12 51:4
  54:6 55:4
  63:7 75:2,
  14,16,17
  76:1 96:11
  217:22
  223:18

presenting
  38:20

president
  106:1,4,5
  248:14

presidential
  105:25

pressure
  232:11

pressured
  225:16

presume
  191:18
  300:8

presumed
  213:10
  300:3
  301:16
  303:6

pretty  68:21
  100:16
  226:9
  232:24
  281:23

prevent
  169:1
  266:20

previous
  49:12,13,
  20 223:21

previously
  96:22
  174:5
  291:16

price  48:25
  165:22
  185:21

prices  93:5
  252:14

princess
  103:24
  104:2,9

principal
  28:13

principals
  17:6

print  75:3
  174:14
  200:13,15

print-off
  27:20

printed
  174:11,19
  176:14
  177:11
  189:15

printer
  176:17
  189:16

prior  15:4,
  9,23 24:18

42:4 43:5
49:15 57:2
71:12 90:5
100:5,7
102:21
165:6
171:17
294:19
295:3
296:14,17
297:13
299:4
301:20

prioritization
  280:11

priority
  280:18,22

prison
  254:15
  270:18

private
  17:12 22:1
  29:7,9
  48:22
  68:5,7,10
  147:20
  289:22
  290:25
  291:5,8
  292:16
  298:12

privilege
  70:12,14
  71:8

privileged
  70:10

privy  54:9
  199:25

pro   100:20

Pro-communist
  33:7

pro-democracy
  32:13
  60:19,20
  91:16
  92:22
  100:18,19,
  20 187:2,3

proactive
  100:20

problem
  110:14
  144:7
  175:9
  223:4,5,6,
  7,8

problems
  163:11,20
  211:18,21
  212:8
  219:10
  268:12

procedure
  216:19
  221:2

proceedings
  307:18

proceeds
  246:22

process   43:6

48:12
50:12
77:13,24
78:6,8,9
109:1
112:14
146:5
153:19
154:18
177:20
180:7,11
192:10
193:18
204:15,16
217:11,12
231:4
266:23
267:1,10,
16 279:24
301:2

procuring
  205:1

produce
  20:20 41:9
  133:3,9
  134:5,6
  141:1
  143:7
  246:9
  288:9
  289:1

produced
  112:21
  135:9
  246:7

product
  20:16

287:19

production
  118:12
  253:23
  273:7

professional
  66:16
  67:21
  82:23

profile
  238:9,10,
  11

Profit   7:4,
  16 8:8
  12:10
  57:18,20,
  21 130:6
  135:13
  170:24
  171:21
  172:10,12,
  24 173:13,
  14 263:5
  275:24
  277:5,8

profits
  116:5
  246:17,20

program
  90:18

programs
  283:22

progress
  140:25
  141:1,6,9,

15,21
142:1,8,
12,19,20,
21 143:7,
20 144:1,
13,21
213:15,23
219:7,12

project   45:9
  49:8
  58:15,17
  59:4,6
  122:16
  163:20,21
  198:6
  217:6
  218:12
  246:3
  277:8,9

Projected
  251:23

projects
  11:2,3,6
  14:20

promise
  276:3

promised
  276:20

prompt
  193:15
  212:18

propaganda
  92:15,18

proper
  198:13

properly
   195:8

properties
   45:2,13
   47:14
   49:10

property
   47:11,20
   49:21
   152:16

proposing
   190:23

prosecution
   86:23
   87:10

protect
   86:21
   87:8,23
   169:7
   298:10

protected
   234:20
   235:14
   238:19
   239:1,11,
   18 240:10,
   23 250:13
   256:5
   285:16,23

protection
   298:1

protective
   162:8

prove  57:12,
   24 217:18

provide  16:9
   17:16
   18:10 20:9
   23:12
   29:10 30:2
   40:9 51:15
   62:20
   64:25
   65:12
   67:4,7
   76:23
   77:15
   80:12 91:8
   93:21
   122:2
   125:8,13
   133:4
   165:20
   177:2
   262:15
   263:18
   307:3

provided
   13:8 66:3,
   6,13 87:14
   105:13,14
   130:5
   141:21
   153:8,21
   154:1
   155:2,13
   156:21
   161:1
   263:21
   268:10
   271:19
   274:16
   280:9

providing
   16:6 98:21
   135:12
   153:15
   294:21

provisioning
   15:17

Psycho-
political
   73:21

public  8:2
   28:2 68:18
   71:15,20
   308:24

publication
   34:8

publicized
   61:6

publicly
   98:18

publish
   61:10

published
   61:12

pull  128:9
   129:12
   150:14,17
   178:12
   179:2

pulled
   171:13

pulling
   132:10
   150:13

171:11
   175:18
   250:23

purchases
   138:6,7,8

purchasing
   44:7

purportedly
   267:7

purpose  47:8
   88:9,10
   94:22 99:6
   162:5
   168:8,25
   199:22
   283:3

purposes
   92:16,19
   283:8

pursuant
   272:2

pursuing
   19:15

put  45:22
   52:25
   57:18
   66:22
   70:21
   79:17
   90:1,21
   97:20
   106:16
   118:14
   127:7
   128:4,9

129:10
138:23
140:7,10
168:23
174:6
175:14
176:13
177:15
187:23,24
188:16
201:20
248:17
261:11
267:12,16
272:18
274:18

**putting**
36:10 80:5
90:18
139:13
199:9
211:19,21
269:16

**Pyratz** 229:8

───────────

**Q**

───────────

**Qatar**
104:24,25

**Qing** 226:12

**quality**
132:1

**Quayle** 106:4

**question**
8:13 13:19
15:25

16:2,3
18:16,18,
19,24 19:1
22:16
23:23 32:8
50:12
52:23 59:9
69:23,25
70:12
71:11,12,
13,16
78:1,25
79:6 81:6
96:14
100:12
103:6
106:23
107:7
112:17
113:19
114:23
115:22
124:7,15
129:21
134:22
141:17
143:18
144:8,13
159:4,10,
11 166:10,
12 172:16
176:25
216:25
236:7
238:23
239:12
243:17
253:8

255:17
257:13
259:15,17
268:19
269:3
275:1
292:18
293:19
296:10,12
299:11
302:17,21
303:9,15,
21,23,24
304:14,16,
19,21,23
305:16,19,
20

**questions**
8:9,19
22:4 26:23
37:13
61:25
69:24 70:9
95:17
160:17
208:16,18
263:16
272:13
290:23
292:22
293:17
307:10

**quick** 71:1
266:25

**quickest**
234:1

**quickly** 8:22
56:22
219:24
233:25

**quietly**
231:8,10

**quit** 270:9,
14,24
271:4

**quitting**
270:15

**quote** 207:19
301:15

**quoted** 93:6
97:17
252:15

───────────

**R**

───────────

**rabbit**
154:16
181:1
217:17

**rabbits**
139:6

**raised**
169:19

**ran** 236:19

**rarely** 81:4,
14

**rate** 256:16

**raw** 288:5,
22

**re-did** 191:4

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019          Index: reach..recollection

reach   93:19
  260:2

reached   74:2
  122:6

read   20:19
  42:25
  69:20  70:3
  71:14
  203:17
  231:1
  252:18
  253:1
  262:18
  265:12,13
  267:13

reading   72:4
  180:3
  287:8

ready   71:17
  192:14
  205:10
  292:25

Reagan   106:4

real   37:17
  38:11
  44:16  45:9
  49:8
  142:22
  157:2,7
  160:10
  161:9,10
  292:3,9,14

reality
  303:19

realize

128:19

realized
  164:15
  251:13

reason   95:21
  113:3
  128:17
  196:16
  213:6
  218:24
  220:10,21
  233:20
  272:19

reasons
  183:25
  270:25
  292:10

recall   31:3
  32:5
  38:17,20
  39:9,19,22
  40:11
  43:16
  50:22  51:3
  58:1,3
  63:7  75:24
  109:23
  116:23
  127:11
  139:13
  140:14
  142:6,7
  157:17,18
  158:16
  159:4
  172:14
  182:9

187:15
  188:8,15
  190:21
  197:12
  210:22
  214:23
  216:1
  219:10
  220:15,16,
  17  225:18

receipt
  244:23

receipts
  118:10

receive
  85:22  96:5
  170:5
  180:21
  193:8

received
  63:8  132:9
  170:11
  194:1
  201:18
  202:14
  261:18
  280:23

receiving
  165:13
  192:25
  203:6
  262:15

recently
  49:15,16
  291:15

receptive
  44:3

recess   63:14
  71:4
  136:10
  167:14
  209:3
  256:22

recipient
  170:4

recipients
  62:22

recognizable
  284:6

recognize
  24:7,10
  27:18
  30:16
  41:14
  73:23
  84:12
  107:21
  126:6
  186:18
  226:13
  241:9
  248:6
  254:7
  257:5
  260:15
  261:9
  262:24
  271:15
  275:19

recollection
  84:18

192:20
215:22
219:22

recommendation
90:23

recommending
91:11

record  8:11
12:14
14:15 19:7
26:14
27:13
42:18
46:19
63:12,16
70:19
71:2,5,20
99:6 106:3
118:14
136:8,11
161:16
167:12,16
177:1
179:21
209:1,4
240:21
256:20,23
269:21
293:7
294:2
307:14

records
118:3,9,10
235:14
238:19
239:1,11,
18 240:9,

23 250:12
253:19
270:11
285:16,23

records'
256:5

recovery
86:23
87:10

recruiting
278:1
279:24

redo  135:3

redoing
189:23

redraft
188:13

reduce  89:7
255:22

reduced
127:21,22
254:10

redundant
293:18
300:12

refer  11:14
12:8,11,16

reference
73:3
162:20
210:16,19
215:6
289:9

referenced
111:19

references
65:24
66:2,22
67:3,20
68:21
73:2,10
126:25

referencing
95:23

referral
35:2

referred
12:8,17
28:19
82:18
83:10
111:22
131:8
132:17,24
204:7
247:13
269:5

referring
27:14
61:20,23
62:4 87:15
96:15
269:22

refers  131:9
187:20
273:23

reflect
118:5

reflecting
253:19

refocused
286:24

refunded
254:15,16,
17

refunds
253:11

refusal
49:21

refused
225:1
285:10

refusing
13:18 14:9
70:11
120:21
124:14,15

regard  87:16
298:16

Regency  11:1

regime  40:21
59:23

registered
127:5
291:12,21
292:1

Registration
291:14

regroup
196:21

regularly

283:7

rejig   156:4

relations
  222:25

relationship
  16:13
  72:23
  104:23
  113:11
  169:2
  175:25

relationships
  68:14
  69:12
  103:24
  104:17
  221:11
  249:1
  260:4

relaxed
  231:12

relied
  90:21,22

relying
  143:4

remainder
  159:20

remaining
  35:19

remarkable
  150:13

remember
  15:14,21
  28:9 31:5,

9 40:2,3,
24 41:2,3,
5 42:2
45:14
47:10
56:22 63:3
69:4 75:21
76:5,8,9
88:1,3
110:16
117:3
119:11
123:17
139:17
140:21
151:12
158:17
182:11,13
188:22
189:8
190:17,18
200:22
202:25
203:6
210:1,3,9
216:3
245:10
246:5
248:10
249:21
257:14
286:14
287:1
290:21
293:24
302:22,24
303:4

remotely
  148:7

render   293:8

repeat   96:14
  274:25

repeatedly
  48:23
  217:14
  284:10

repetitive
  18:16,18

rephrase
  293:20

report   20:17
  21:17
  54:1,19
  134:1
  135:1
  136:25
  141:1,6,10
  142:1,19,
  20,21
  143:8,10,
  13,14,19,
  20,21,24
  144:1,11,
  12,14,16,
  21,22,25
  145:7,9,
  10,15,21
  146:15
  151:6
  156:10
  166:25
  223:18,25
  224:9

226:11,18,
20 239:17
261:11,19
262:4,10,
14 288:9,
10 289:2

reported
  286:20

reporter
  7:8,12
  8:11,18
  55:17
  238:22

reporters
  90:15

reports
  20:10,12
  33:11
  98:18
  132:2
  133:4,9,
  13,15,21
  134:5,6,25
  136:14
  140:25
  141:15,21
  142:8,12
  143:1,3
  148:8,11,
  12,17,18,
  20 150:8,
  10 151:3
  162:22
  165:22
  203:24,25
  204:3,7
  266:6,21

267:6,8,9,
12,22
281:6,21,
22

**represent**
293:16
295:14

**represented**
39:3
299:18
300:1

**represents**
187:3

**Republican**
105:3,5,
14,22,23

**reputation**
68:22

**request**
29:22
43:22
197:22
232:8
259:6,12
262:3
282:25
289:18,21

**requested**
22:2 58:23
60:7 198:9
281:21
282:25

**requesters**
59:5

**required**

29:13

**requires**
303:16

**research**
11:10
12:24
13:4,16
14:20
15:6,18,23
16:6,9,14
17:23,25
18:5
19:17,22,
24 20:16
21:3,16
22:10,18
28:22,25
29:7,15
39:23
50:24
51:16
52:3,8
53:2 54:1,
2 59:4,8,
14 60:7,
13,21 61:5
65:5 66:14
69:1 77:6
80:13
81:8,15,
18,19,23,
24 82:18
83:4 85:11
90:25
92:25
96:9,17,23
97:1 98:10

101:3
102:21
103:21
107:18
111:11,18
113:8,12,
22 117:6,
15 119:24
122:16,23
124:24
125:3,6,8,
13 126:3
130:11,18,
21,22
131:6
132:1,7,16
133:4
136:14
137:7,13,
17,24
138:3,15
139:19
140:5,16
141:23
142:9
143:8
145:8,9,
14,21
146:15
147:10,12,
13 148:9,
10,12,17,
25 149:1,
24,25
150:8
151:3,6,14
155:11
161:11

162:16,22
163:9,10,
21,25
164:10
165:14,20
166:21
167:1
177:3
178:3,8
179:7
182:25
204:1
208:11
211:25
217:5
218:2
219:12,21
228:17
232:8,18
238:16,25
247:4
259:7,14
264:11
265:11
270:16
272:1,16
282:11
290:10
294:6
300:9

**researched**
138:18
139:1

**reserve**
202:20

**reside**  9:2

**residence**
44:7,17
158:23

**residential**
49:10

**respect**
54:11

**respond**
71:17

**response**
22:4 26:24
43:24
62:6,11
71:12
172:7
192:25
203:12,15,
17 227:18,
24 229:19
259:11
266:9,12
268:16
271:12
272:6
273:23

**responses**
262:21
263:14
266:15

**responsibiliti
es** 278:19

**responsible**
295:8,15,
24

**rest** 187:25

**restricted**
234:15,18
235:15,22,
24 236:10,
24 239:2
240:9

**result** 74:6
88:25
166:4
170:2
287:13

**results**
211:17
232:9

**retain** 86:9
149:11,23

**retained**
85:7

**retrieval**
95:12
150:17
183:8
233:23

**retrievals**
183:4

**retrieve**
89:2 97:20
117:21
118:20
215:2
219:4,24
221:6
230:25

**retrieved**
56:5,7,8

**retrieving**
94:11,18
153:15

**return** 194:6
253:3

**returned**
242:20

**reveal** 173:5
263:19

**revealed**
71:11

**revealing**
69:15
111:9

**reversal**
289:10,12
290:9

**reversed**
289:19

**review** 20:12
24:18
137:11
262:17

**reviewed**
137:5
147:5
148:20
199:21

**rhetoric**
92:22

**Richard**
175:24
176:20,22
177:1

**274:7,9**

**ridiculous**
130:1
197:5

**Riggs** 48:14

**right-hand**
27:9 63:19
74:19

**risk** 97:19,
23 165:15
270:19

**Roberta** 7:9

**Rodriguez**
157:22
158:8

**role** 17:9
42:12
44:15
206:7

**room** 55:16,
22 75:22,
25 84:22
182:17
185:14
224:6
303:7

**roommate**
104:10

**roughly** 97:4

**round** 227:15

**RP** 234:14,
21 250:5

**RPS** 233:13

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019          Index: rubbish..screamed

249:9,19,
20 251:2,
6,14
255:18
270:11

**rubbish**
161:9
217:20

**run** 10:15
17:11 34:3
61:1
128:11

**running**
10:23
108:2

**rush** 220:14

**Russ** 7:23

**Russia** 91:17
92:11
100:21
149:20

**Russian**
91:4,11
92:1,24
99:16,20
100:1,11,
14,22
101:12,14

————————
————————
**S**

**S-H-E-W-E-L-L**
175:24

**sadly** 10:9
49:12

**safe** 267:16
285:11

**safety** 169:3

**SAIS** 10:7

**sakes** 259:23

**sale** 48:24,
25

**sample** 51:15

**sat** 109:6,9
177:12
191:16
217:25
304:25

**Saudi** 104:3,
4,9,18

**Saved** 167:9

**schedule**
31:21
164:11
217:3

**scheduled**
162:23

**Schmidt** 7:19
9:24 12:11
13:20,25
14:4,8,14
18:25
22:3,9,13
23:23
25:7,14,
20,25
26:4,8,14
28:9
29:16,20

33:22
55:17
56:16
59:11
61:24
63:23 68:2
69:16,22
70:3,15,
18,23 71:7
73:15
78:22
79:1,5
80:3,8
81:5,12,20
83:6,21
93:16
95:16
97:11
103:6,8
105:9
106:13
112:17
121:2,5
124:8
125:18,24
133:22
134:19,22,
25 135:25
136:3
137:8
142:11
149:21
155:16
156:2
159:9
166:6,15,
23 167:7
172:18

174:22
179:18
201:7
203:6,9,11
208:18,24
212:11,20
216:24
218:13
219:8
223:15
253:8,13
254:4
259:21
263:23
265:22
268:5,20
274:5
277:13
280:20
282:14
284:13,15
292:18
293:3,11
294:25
298:21,23
303:8,14
304:5,13,
17,22
305:12,15,
19,22
307:10,13

**school** 9:25
10:7
104:12

**scratching**
189:22

**screamed**

254:22
256:1

screenshot
54:21
55:23

screenshots
57:1

screwed
161:7

seat  45:22

seats  45:25

secondary
154:11

secrecy
297:25

secret  53:21
76:18
253:16
298:6

section
153:10
162:3,6

secure
133:17
142:23

security
44:8 48:16
53:25
110:4
134:14
142:13
152:7,13,
25 157:17,
21 158:11,

25 159:1
169:22
183:25
199:22
237:11
250:4,9
270:14,21
274:9,12,
16 283:7
284:2,5
298:17

select
127:16
280:1,2

sellers  49:7

semantic
134:12

send  110:8,
22 118:13
181:1
192:14
197:19,25
198:2,9
247:9
288:2

sender
289:20

sending
110:14
194:11
202:25
253:19
254:23

sense  152:6
212:7

298:18

sentence
40:19
132:5
143:5,6
170:9,15

sentences
133:6

separate
65:5 93:1,
2 96:4
116:17
118:24

separated
23:19
150:6

separating
99:6

served  123:6

server  55:9

service
13:10
18:11
29:15,18,
24,25
44:23 64:9
65:1,4
76:22
77:4,15
91:7 98:22
101:6,11,
15 111:15
122:3
222:23
239:4

275:5
295:9,11

services
17:15,19,
20,21
18:6,8
23:11,14
29:11
30:3,10
44:4 51:18
65:11
66:4,7,13
87:13
93:20
105:13,14
113:21
125:4,9,14
168:21
274:17
294:21
307:2

servicing
125:2

set  43:22
45:18
95:21,25
114:15
117:13
141:12
146:11
150:17
184:23
196:19
242:6,9
262:22
271:13
292:21

sets 94:10, 12

Setting 80:10

share 130:16

shared
121:24
130:8
131:3
251:11

sharing
130:14

sheet 68:3

shell 276:24

Sherry-netherland
36:23

Sherry-netherlands
76:11
296:25

Shewell
175:24
176:20,22
177:1
274:7,9, 21,23,24
275:5,8,12

Shewell's
175:25

shift 217:11

shopping
214:20,22
215:6

short 35:16
63:14 71:4
136:10
209:3
256:22
266:7
302:11

shortly
241:2

show 39:4
47:19 54:7
56:4 58:19
158:22
268:25

showed 47:11
54:22
85:25
127:19
158:16

showing
56:20
157:9

shown 250:4

shows
157:14,21
249:1

shrugs 8:17

shut 150:24
231:8

Siberia
100:14

side 29:18
39:4 50:15
98:11,12

139:18
170:5
177:25
178:1,11
179:9
183:3
232:13,22, 24

Sig 184:19

sign 102:1,
12 193:6
198:1,15,
17 301:22
302:5,8,
12,14,23
303:3,6,11
305:6
306:4

signal
110:7,9,
15,23
184:5,7,8,
15,19,24
186:14,18,
21 201:15
202:25
222:17
228:21
229:10,23
297:18

signatory
299:5

signature
126:9

signed 82:18
85:11

111:7
114:12,18
115:14
124:25
126:23
150:15
172:2
175:5
191:6,14
193:2
194:12
198:1
202:3,10
208:14
263:22
284:11
290:10,17
299:7
304:25
306:8,11,
12

signing
102:21
103:20
125:6
172:6
173:12
191:9
197:15
296:15,17
297:14
299:1,4,
17,25
301:20
302:6,7
303:12,13
304:3,4,12
305:24

306:7

signs  194:16

silly  130:1
179:19
229:4
243:3

similar
15:16
35:13
36:15
111:15
163:2,6

simple  129:9
168:9
193:19

simultaneous
10:4

sister  157:6

sit  108:25
115:3

sites  61:13

sitting
177:17
192:3
199:8
245:10
265:23
267:5
290:12
300:3
303:22
305:17

situation
142:14

156:8

skeptical
296:11

slammed
185:12
231:8

slapped
225:5

slide  100:5,
7

slides  61:13

slow  162:16
163:25

slower  69:23

slowly  231:2

small  203:1,
2 224:22

Smith
155:23,25

smooth
245:19

sniffing
256:7

social  63:24
64:23
92:20
98:15
148:25
149:2,3,24
150:8
151:2,5
152:25
157:17,21

158:11,25
159:1
204:2
250:9

socials
248:12

sofa  191:16
304:25

sold  10:16
49:15,16

soldiering
46:25

somebody's
148:4
150:19
156:9
231:15
239:24

sort  22:10
30:20 31:9
34:24
35:18
37:22
38:13,14
39:1
43:19,22
46:5 48:6
52:12
58:11,24
65:8 92:6
102:9
108:19
112:1
128:18
129:6
139:6

148:9
149:6
156:1,19
158:18
165:5
172:21
177:17
187:18
191:5,22
196:16
212:13
217:9,11
231:21
240:1
248:16,18,
25 254:18
262:13
288:11,18
292:10
301:5,8

sought  87:19
286:22

sounded
192:5
305:2,3

sounds
122:15
236:6

source
193:11

sources
70:10
79:14
107:5
138:19
153:22,23

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019                     Index: space..stated

154:1,19
265:2

space  256:6

speak  21:8
36:9
43:10,20
94:19
128:1
299:3
304:17,23

speakerphone
191:24

speaking
24:14
26:22
36:18 51:7
72:24
100:2
187:15
192:2
298:11
304:20

speaks  42:22

Special
254:2,8

specialized
206:12

Specially
236:15

specialty
29:9

specific
59:2
259:11

282:21
294:9

specifically
67:1 75:25
83:24

specificity
21:23
79:13
91:25

specifics
38:25 40:6
215:5

speculate
149:21

speed  231:5

spending
138:9

spends
166:21
274:11

spent  120:1
220:4
256:12,14

spinach
210:20

split  114:10
115:9,10
246:22
247:20

splitting
116:4
246:16,25

spoke  214:13

spoken
213:14

Spring  46:10

squash
266:16

squawking
150:19

stamped  27:5
30:14
41:12
186:15
248:1
251:24
254:2
257:3

stand  261:6

standard
102:15
135:2
138:1
142:8
216:19
221:2

standards
90:16

start  8:16
9:19,20
11:24,25
38:19
75:15
79:18
108:5
116:6
128:25
133:19

136:4,6
157:25
183:1
201:2,3,11
202:2,5
219:20
224:19
233:13
244:10
268:13
282:12

started
10:17 15:8
39:1
132:10
137:2
163:13
177:13
250:25
258:15
290:3

starting
10:19
175:18
183:15
230:4

state  8:2
107:9
127:1,6
154:15
160:18
242:15
285:15
291:1,5
292:4

stated  23:17

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC

French Wallop on 02/12/2019          Index: statement..strategic

| | | | |
|---|---|---|---|
| **statement** | **stave** 211:6 | 17:7,9,15 | 103:10 |
| 23:22 | | 18:5,10,20 | 104:13,17 |
| 298:2,3 | **stay** 33:4 | 19:11,21 | 105:8,13, |
| | **stayed** | 20:5,9,11, | 17 111:10, |
| **statements** | 231:13 | 15,24 | 14 112:24 |
| 118:4 | | 22:18,25 | 113:4,10 |
| 138:18 | **stealing** | 23:11,15 | 114:9 |
| | 71:21 | 24:1 | 115:8,19 |
| **States** 33:4 | | 26:23,25 | 117:14,18, |
| 35:20 | **step** 14:11 | 28:22 | 24 118:3 |
| 56:7,9,16, | **stepped** 71:7 | 29:10,15, | 119:23 |
| 17 74:9 | | 19,24 | 120:4,14 |
| 98:19 | **steps** 298:5 | 30:2,9 | 121:14,23 |
| 101:20 | **sterling** | 35:2 | 122:11,14, |
| 152:10 | 90:16 | 38:18,21 | 25 123:9 |
| 153:3,4 | **stick** 196:3 | 39:5,6,16 | 124:16 |
| 157:16 | 288:20 | 40:8 43:22 | 125:2,8,13 |
| 178:16 | | 44:23 45:1 | 126:2 |
| 205:9 | **sticky** 31:14 | 51:4,14 | 127:5,8 |
| 233:24 | **stock** 102:18 | 52:9,20 | 129:17 |
| 268:14,17 | **stop** 8:15 | 54:18 | 130:6,14 |
| 278:3 | 15:22 16:5 | 58:12 | 131:9 |
| 279:15 | 50:12 | 60:12 | 132:7,12 |
| | 192:10 | 65:1,11,13 | 133:8,15, |
| **Stateside** | 239:7,16, | 66:6 | 20 134:3 |
| 139:2 | 21 246:3, | 67:16,19, | 135:11,15 |
| | 11 | 24 76:22 | 136:13 |
| **statesmanlike** | | 79:2,4,9 | 137:4 |
| 40:13 | **stopped** 16:7 | 80:1 81:22 | 138:23 |
| | 245:23 | 83:4 90:22 | 141:14,21 |
| **station** | **stops** 202:21 | 91:10 | 142:2,9 |
| 147:1,2 | | 93:6,8,21 | 144:19 |
| 227:13 | **story** 302:11 | 96:11,21, | 146:14 |
| 228:1 | **strategic** | 25 97:16 | 147:4 |
| 247:23 | 7:5,20 | 98:22 | 148:16 |
| 284:25 | 9:12,13 | 99:23 | 149:11,23 |
| 285:2 | 10:17,19, | 102:4,12, | 151:2 |
| | 24 11:25 | 15,23 | 152:4,14, |
| **status** 40:14 | 14:20 15:6 | | |
| 238:19 | 16:10,17 | | |
| 250:5 | | | |
| 285:18 | | | |

21 153:12,
18,24
154:18,21,
25 155:12,
18 156:21
159:16
160:13
163:1,8
165:17,19
166:19
169:6,7
170:6,7,
18,22,23
171:16
176:1,19
177:1,6
178:5,9
219:6,11
222:20
223:11
230:7
232:7
234:6
238:24
240:6
241:16,18,
20 242:3
243:4,21
244:22
246:2,18
251:17
253:18
255:8
257:18
258:14,15
259:3,6,13
261:18
262:9,20

263:4
264:2,6,11
265:17
266:5,20
268:11
271:11
272:1,15
274:17,20
275:4,14,
24 277:24
278:9,10
280:9
282:10,20,
24 283:6,
12 284:9
285:13
286:19,20,
23 287:18
288:5,8,25
290:25
291:12,19
294:4,5,20
298:4
307:2

**Strategic's**
298:9

**street**    9:3
26:12
45:12

**stretch**    54:4

**strict**    61:10

**strike**    20:25
133:19
141:20
159:5
258:18

263:12

**striking**
75:15

**strong**
103:18
260:5

**Study**    10:7

**stuff**    57:6
148:23
185:23
198:22,25
211:8
229:18
240:2,3
250:25
252:17
261:24
265:3
270:22
290:4

**stunt**    171:13

**stymied**
223:8

**subject**
40:25
85:12
117:7
122:24
260:13
266:19
282:1
285:18
299:15

**subjects**
132:2

280:10
286:23

**Subscribed**
308:18

**subsequent**
196:18

**subsequently**
45:9  96:7
299:8

**substance**
169:20
230:20

**substantial**
49:4

**substantially**
163:2

**subteams**
278:23,25

**succinctly**
289:8

**suddenly**
266:7

**Suen**    52:17
53:1
57:12,24
79:23
84:10
157:4
281:2,10

**suggest**
293:11

**suggested**
33:12

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019                     Index: suggestion..talk

suggestion
  190:12

suite   29:11,
  12 93:22

summon   285:3

sun   45:24
  84:22
  185:14

super   179:15

Supplemental
  271:12

support
  100:10,15

supporting
  133:5

suppose
  62:13
  225:24

supposed
  169:8
  174:1,2
  197:5
  282:11
  289:6

supposedly
  96:2
  178:14
  199:6

surmise
  161:9

surprised
  62:14
  193:8
  242:23

surrogates
  40:16,22

surveillance
  19:17
  47:21
  93:13
  284:2

SV390   100:7

SV79   40:12

SVUS000040
  248:1

SVUS000041
  248:1

SVUS000077
  30:14

SVUS000080
  41:13

SVUS000262
  254:3

SVUS000272
  257:3

SVUS000277
  257:3

SVUS000278
  260:13

SVUS242
  260:21

SVUS260
  251:24
  252:2

SVUS387
  74:18

SVUS390   91:2

SVUS40   248:4

SVUS402
  101:24

SVUS41
  249:25

SVUS84   63:18

swear   7:12

switched
  127:23

Switzerland
  9:25
  118:21
  119:8
  133:1
  272:25
  273:8

swore   271:21

sworn   8:2
  308:4,18

symbol
  187:13

synergy
  91:21

synthesis
  154:17

system   76:18
  156:4
  236:19

systems
  198:21

T

tab   140:15

table   84:2,
  16,20,21
  85:3 86:3,
  13 174:6,
  18 185:13
  287:16
  296:22

tagged
  234:24
  236:14,15,
  16,18,21,
  22

tail   114:19
  146:17

Taiwan   32:12
  34:23

takeaway
  224:8

takes   140:22
  165:23
  177:25
  261:23
  288:19

taking
  125:17

talk   61:14
  70:15
  121:21
  160:14
  161:24
  164:17
  212:15

213:21
227:23
237:19
239:19
297:5
299:16,24

**talked**  36:2
49:25 80:3
95:23
108:11
139:15
189:6
227:21
228:6
230:15
297:23

**talking**  8:15
26:10
38:22
40:7,24
57:17 58:3
72:14
74:12
80:19
81:11
88:18,19
96:9
109:16
112:13
114:20
116:24
118:6
128:16
129:4
132:11
144:22
154:4

163:17
177:13
189:7
191:12,17,
20 192:9
194:2
230:24
233:11
235:2,10
244:5,15
252:24
260:23
266:12
272:9,13
281:18
289:20
305:3

**talks**  140:24

**tank**  128:3,
5,10,14
129:1,3,
10,18
196:19

**target**
77:11,18
93:3

**targets**
82:5,13,
16,17,21
83:10,25
84:7

**task**  258:17

**tasks**  96:16

**tax**  116:19

**team**  20:7

52:10,11,
21 62:19
65:14
83:2,3,4,
7,9,13,15,
16,20
87:16,17
91:19,25
94:4,7,21
95:8,11
96:1,2,6,
8,16 97:1
98:23,25
99:1,3,7,8
100:3
102:23
103:11,15
116:7,11,
12,13
118:24
119:2,8,10
131:4,19
145:17
146:3,19
148:23
150:1,3,23
152:22
154:3
163:17
176:22
177:2,17,
19 179:1,
2,7,10,11
183:5
205:4,5,7,
8,12,23,24
206:1,7,
15,19

207:13
212:2,3
213:4,15,
23 214:6
216:11
218:25
219:11
226:24
232:11,12,
23 233:20
234:6
239:9,16
240:5,7
241:3
246:2,11
247:17
252:6
253:3,16,
20 264:14,
15,25
269:11,13,
14,15
270:2,8
271:3
272:8,9
278:13,14,
18,21,22
279:1,8,
11,14
280:2,6
283:1
285:22
289:4

**teams**  20:19
65:3 76:24
80:9,11,12
93:9 94:7,
10,13,23,

24 95:4,22
96:22 97:6
98:3,4,17
99:11,12
103:18
115:4
130:17,22
131:10,12,
16,18
132:13,14,
18 133:9,
11,19,20
134:4
141:12
145:17
146:1,2,5
169:4
177:2
204:12,13
205:6,15
232:20
239:5
253:16
272:6
278:19,24

**technically**
171:9
192:11
207:20

**technique**
260:1

**telephone**
25:18
81:14
119:25
148:5
183:14

189:7
191:7
193:7
222:16
297:4,5
306:2

**telephoned**
126:22

**telling**
72:17
120:24
141:11
161:4
166:13

**tells** 276:24

**ten** 82:5,
12,13,17,
21 83:10,
25 84:7
127:22
128:4
129:10
145:24
146:12
147:17
150:13,14,
18,22
162:24
171:6
181:11,25
187:19
188:11
194:21
196:15
205:20,21,
22 211:25
212:1,3,

10,13
214:25
217:10
218:6,9
219:25
222:21
233:8
244:10

**ten-day**
244:14

**tend** 294:13

**tended** 184:1

**tenor** 122:1

**tense** 105:1

**tentacles**
93:18

**term** 103:1
127:14
128:25
137:22
142:1,9
188:10
204:8

**terminated**
123:25
266:7

**terminology**
128:20
129:18
143:2

**terms** 15:5,
17 16:5,13
20:11
44:16

65:11
67:16 77:4
79:9 87:13
89:23
90:24
93:13,21
94:8 114:3
121:3
130:14
138:1,23
139:8
140:3,4
141:19
142:4
147:21
148:25
163:8,19
169:14
171:4
177:22
178:25
180:10
187:18
188:1,9
193:5
198:17
201:19
235:21
247:6
259:13

**terribly**
56:11

**terrorists**
105:2

**tertiary**
257:12

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019                                Index: Teske..time

**Teske**  7:22
  70:25
  125:23
  290:24
  292:20,24
  293:7,16
  304:15,18
  307:8

**test**  58:25

**testified**
  305:25

**testifies**
  8:3

**testify**
  308:4

**testimony**
  293:25
  308:5,9

**Texas**  163:18
  269:10
  270:7

**text**  64:23
  194:1
  210:18
  297:8

**there'd**
  289:18

**thing**  22:11
  46:5 56:12
  95:5
  101:20
  116:20
  124:21
  129:16
  149:7

156:10
172:11
176:14
185:2
194:16,22,
23 197:25
239:24
245:22
254:19
256:15
265:3
269:19
285:25
289:24
290:17
292:16

**things**  8:17
  11:10 19:3
  22:9 36:4
  37:21 51:2
  54:21
  56:5,6
  64:6 89:5
  94:2 95:14
  96:11
  99:10
  115:18
  117:10
  123:4
  138:17
  149:5
  150:24
  159:25
  177:14
  179:3
  183:20
  205:2
  221:8

232:22
245:18
246:6
254:19
269:17
275:9
287:24,25
298:18

**thinking**
  195:4
  200:18

**third-party**
  7:23

**thought**
  26:10
  44:12 48:7
  60:24 61:2
  101:17
  171:19
  190:22
  202:1,6,9
  209:22
  215:16
  242:24
  255:3
  274:10
  287:15

**thousand**
  117:3

**thread**
  186:18
  228:22

**threats**
  89:7,10,
  14,16

**three-month**
  150:15
  197:8
  247:5

**three-year**
  41:12
  197:6,11

**threw**  84:1,
  16,19 86:3

**thrown**  85:3

**thumb**  267:12

**ticket**  171:5

**tidbit**
  157:24

**tight**  164:11

**till**
  305:12,13

**time**  7:13
  11:23
  16:11,20
  32:23 33:3
  34:3 40:7
  46:12
  50:19
  51:14,25
  52:1 58:21
  73:13,20
  74:1 85:21
  90:20
  108:3,20
  114:19
  115:7
  117:18,22
  120:1
  122:12

123:5
124:24
125:10
126:22
127:15
140:23
148:14
150:12
151:19
161:22
164:1
165:23
166:1,21
167:11
170:21
171:21
174:9,17
181:2
189:7,9
193:9
194:19
197:11
200:18
201:5
203:5
211:15
212:16
213:15
214:5
218:10
220:4
222:5,23
224:25
225:22
227:1
228:5
229:17
237:4,19

238:15
239:4
245:18
247:2
256:12,14,
15 259:24
261:24
266:7
269:12
273:14
274:11
276:19
279:18
283:11,20
284:17,20
286:5
288:19
300:25
304:1,3,10
306:1
307:16
308:9

**time-based**
166:3

**timeline**
41:12
43:17 44:3

**timely**
162:23

**times**  11:18
12:18
29:25
32:22
33:19,20,
21,22,23,
24 146:2,
4,10 164:5

182:14,22
224:5
277:10
302:17

**timing**
137:14
256:15

**Tinted**  46:1,
2

**title**  17:13
74:2

**today**  8:9
24:19
25:10
118:6
192:3
245:11
265:24
267:5
274:5
290:12
292:22
293:10,24

**today's**  7:6
25:15
307:16

**told**  35:18
48:23
67:18
103:13
105:7,10,
12 155:22
168:14,15,
17 171:1
185:10
186:8

195:4
199:17
206:2
210:8
213:3,5
214:8,12
220:18,21
222:10
227:9
228:12,15
231:23
233:3
235:22
237:15,16,
21 239:20
249:8,14,
19 250:6,7
271:5
274:6
287:1
301:18

**tomorrow**
200:12

**ton**  282:18

**top**  30:24
72:7
196:10
231:13
250:8
306:12

**tortious**
266:4

**tossed**
196:24

**total**  63:24
197:1

252:24
255:13

**totally**
156:3
160:4
161:6,7
183:5
233:9

**touch**  49:11
177:16
180:13,14,
17,18
233:9
240:3,4
254:12
256:9
258:19

**touched**
262:16

**tracing**
283:5

**track**  31:20
147:19

**tracked**
207:17,19

**tracking**
138:9
147:10,13,
16,17
148:8,10,
17,23
149:2
151:13
158:1
181:4

204:2

**Tracks**
146:25

**train**  147:1,
2 201:22
227:13
228:1

**train's**
247:22

**transaction**
292:16

**transcribe**
109:11

**transcript**
308:8

**transfer**
170:11

**translate**
43:1
288:18,20

**translating**
42:13,19
43:7

**translation**
42:16
288:13

**translators**
264:1,5,
13,15,16,
25 265:18

**trap**  231:6

**travel**
116:25

117:17,24
118:15
120:1
147:23,24
247:15

**traveled**
261:25

**travels**
245:6

**Treasury**
44:9 48:17

**treated**
130:7

**tree**
248:24,25
249:7,16

**trial**  58:11

**trick**
106:23,24

**trip**  47:7
205:16
227:15

**trouble**  72:4
288:1

**true**  258:12
308:8

**Trump**  98:7
106:5

**trust**  44:8
48:16,23
111:12
114:1
153:22
182:8,14

**trusted**
73:12
264:1

**trusts**
242:9,11

**truth**  161:4
306:17,20
308:4

**Tuesday**
182:1

**Turkey**
104:22

**turn**  24:11
120:4,14
122:21
156:1
211:7
215:17
229:6
265:9
290:24

**turned**  73:5
114:15,22,
24 115:1
123:9
128:4
129:11
184:10
225:2
276:18

**turning**
40:12
63:18
101:24
155:21

192:7
195:17
196:8
200:10
211:16
249:23
265:5

two-minute
254:5

type 109:14

typed 109:8,
15 135:21

types 22:9,
18 93:13
139:12
281:6,21
295:16

typical
217:4

typically
44:23
145:20
154:18,22

typing 42:2
109:17,18

typos 112:8

—————————
        U
—————————

U.K. 80:16
118:21
119:3
132:20
160:4
168:17

169:9,10
260:3,4
300:21

U.s. 28:14
64:5
98:11,12,
14,17
99:1,9
119:4
139:8
152:15,16,
22 154:13
177:25
178:11,13,
14 179:9
234:22
235:1,11
285:15
286:21

U.s.-based
99:7,11
179:6
180:7

U.s.-located
152:23,24

UAE 66:25
67:1,2,21
68:14,15,
22,24
72:20 73:4

Uh-uh 271:9

ultimately
61:6

um-hum 34:9
60:4 91:3

98:8 180:8
253:1
261:17
295:18
297:24

unable
165:20
266:6

unavailable
162:18
164:1

unclassified
107:6

uncles
221:17

understand
16:2,3
19:3,4,5
24:15
26:18,22
27:1 28:3
44:22 47:6
52:22
55:1,5,13
57:20
58:22 59:3
60:8,21
61:4 68:15
75:24
77:21
78:6,24
79:25 81:1
82:9,22
85:18
89:6,9
93:25

95:13,15
99:13
100:12
107:3
108:22
112:10
113:18
123:22
129:5
130:2
131:7,12,
14,18
134:2,3,
10,16
135:8
141:17
142:16
143:18
144:6,8,9
148:21
149:7
152:14
153:18
155:22
158:1
162:14
164:10,14
167:19
168:10
179:21
180:24
184:21
197:22
201:5
202:9
205:13
206:12
208:1

209:20
212:17
213:16,20
225:10
228:1
230:12
231:18
232:3
236:4
238:21
256:3
263:6
267:1,19
268:15,19
270:24
280:17
281:9
284:1
293:19

**understanding**
34:15,16
43:7,9
53:9 77:12
102:2
127:16
166:20
181:8
226:25
230:3,8,9
240:6,7
241:1
278:18
306:1,24

**understood**
58:12
62:18
128:22

133:18,20
134:4,19
135:15
140:3
164:2
168:5
169:11
195:10,22
212:14
279:8
282:9,10
288:13

**unforeseen**
162:15

**unhappy**
221:3
245:13

**Union**  284:25

**unit**  17:4

**United**  33:4
35:19
56:7,9,16,
17 69:13
71:21 74:9
98:19
101:19
152:10
153:3,4
157:16
178:16
205:9
233:23
261:25
268:13,17
278:3
279:14

**University**
10:3

**Unlike**   8:13

**unreasonable**
190:23
218:9

**unusual**
163:6

**update**   145:4
216:6

**updating**
143:22

**upped**   82:12

**upset**   164:7

**upset all**
245:18

**US-BASED**
98:5

**USB**   75:5
110:24
134:9
136:20,22
141:25
145:18
146:13
148:15
151:16,20,
23  152:4,
12 174:12,
13,20
175:10
199:9
201:24
213:17

225:21
228:8
267:9,22
288:24
289:4

**USBS**  134:23
267:17

**usual**  18:14,
15 104:6
119:25
128:19
218:14

**utilized**
275:4

---

**V**

---

**Valley**  46:11

**valuable**
121:19
180:21
247:2

**Vegas**  9:7,15

**vein**  51:18

**verbal**  20:21
141:7,9
143:14,21
144:11
145:6
194:22
216:6

**verbally**
8:19
140:18
151:5,10,

11 194:14,
22 217:24,
25 286:19

**verification**
153:25

**verified**
263:23
271:21

**verify**
155:1,6
202:22

**verifying**
96:1 154:7

**version**
85:19

**versions**
112:20

**versus**  7:4
139:5,8
266:24

**vetting**
278:1
280:1,2

**viable**
232:21

**vice**  248:14

**view**  175:7

**viewing**
174:18

**views**  38:24

**virgin**
174:14
176:13,15

207:20
282:15,19

**Virginia**  9:4
109:4
292:4,13

**visa**  154:13
157:17
160:1

**visas**  160:19
178:15

**vision**  7:5,
20 9:12
10:17,19,
24 11:25
14:20 15:6
16:10,17
17:7,10,15
18:10,20
19:11,21
20:5,9,15,
24 22:19,
25 23:12
24:1
26:24,25
29:10,15,
19 30:2,9,
20 35:2,17
38:14,21
39:6 40:8
41:10
43:18
44:23 45:1
51:4,15
52:9,20
54:18
58:13
60:12

65:2,12,13
66:6 76:22
79:2,4,9
80:1 81:22
83:4 90:22
91:10
93:6,8,21
96:11,21,
25 97:16
98:22
99:23
102:4,12,
15,24
103:10
104:14,17
105:8,13,
17 108:18,
20 111:10,
14 112:24
113:5
114:9
115:8,19
117:14,18
118:3
119:23
120:4,14
121:14
122:11,15
123:9
124:16
125:2,8,13
126:2
127:5,8
129:17
130:7,14
131:9
132:8,12
133:8,15,

20 134:3
135:11,15
136:13
137:4
141:14,21
142:2,9
144:20
146:14
147:4
148:16
149:11,23
151:2
152:5,14,
21 153:12,
24 154:18,
21,25
155:12,18
156:21
163:1
165:19
169:7
170:6,8,
18,22
171:16
176:1,19
177:7
178:5,9
219:6
222:20
223:11
232:7
238:24
241:20
242:3
243:4,21
244:22
246:2,18
251:17

253:18
255:8
257:18
258:14,15
259:3,6,13
261:18
262:9
264:2,6,11
265:17
266:5,21
268:11
272:2,15
274:17,21
275:4,14,
24 277:24
278:9,10
280:10
282:10,24
283:13
284:9
285:13
286:19,21
287:18
288:5,8,25
290:25
291:12,19
301:4,5

**Vision's**
9:13 18:5
23:15
29:24
38:18
39:16
67:17,19,
24 113:10
117:24
121:23
122:25

138:23
153:19
159:16
160:13
163:8
165:17
166:20
169:7
177:2
219:11
230:7
234:6
240:7
241:17,18
262:20
263:4
271:11
282:20
283:6
286:24

**visualize**
128:1

**vital** 142:25

**Vladivostok**
100:15

**voice** 191:25
192:5
305:4

**volume** 212:9

**volumes**
266:24

———————

**W**

———————

**wade** 292:10

**wait** 8:12
78:2
128:15
238:23
305:12,15,
19

**waiting**
305:21

**waiving**
293:8

**Walkabout**
46:24

**walked** 26:12
43:3
55:16,22

**walking**
42:14

**wall** 55:14
62:9

**Waller**
11:12,13,
14,15,20,
21,22
12:1,23
13:3,16
14:18
15:4,9,17,
24 16:13
28:1 30:22
35:21
36:5,6
37:11
41:15
42:10
46:21

53:4,6,10
58:3 64:17
75:7,9
77:5 80:4,
11 91:8
92:13
107:15
113:11,20
114:9
115:8,20
116:16,18
117:5,13,
16 126:19
132:17,18
138:22
139:13
146:23
162:2,4
177:21
178:19,20,
22,23,24
182:24
183:16
184:9,17
200:9
213:14,21
214:11
220:1,13
225:18
227:4,23
228:6
229:9,12,
22,25
230:3,15
237:7
243:15
244:2
246:10,17,

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC

22 247:9,
19 252:8
258:19
267:21
272:10
291:7,23
303:2

**Waller's**
35:10
53:14 57:7
77:13
229:19
230:8
234:8
280:5

**wallop** 7:3,
21 8:1,6
9:1 24:5,7
27:4,7
30:13,16
31:12
41:11,18,
19,20
65:15,17,
19 73:19,
23 79:3
81:11
84:9,13
85:8
107:18,20
109:23
126:3,6
156:12
161:12
167:18
186:14,17
209:6

226:11,13
228:21
241:6,10
247:25
251:22
252:1,2
254:1
257:1,2,6
260:11,12
262:20,24
271:11,15,
16 275:17,
19,20
292:25
293:9,15
308:14

**Wang** 27:25
46:12 47:7
54:6
55:19,21
59:15
62:12
109:24
111:1
126:16
137:6,13
146:25
151:14
164:19
182:3
185:8
187:15
190:15,22
191:14
195:13
202:25
219:19
227:5

229:13,14,
25 244:23
264:4
265:19

**Wang's** 227:2

**wanted**
12:21,22
37:16,17,
18,20 40:5
45:12 46:5
47:9,15,
16,17
48:9,15,17
58:7 65:7
73:2 88:7,
25 89:1
90:11 97:7
101:18
108:23
123:5
127:23
139:20
140:2,4,12
147:19
148:14
171:11
208:4
212:17
218:18,20
219:2
225:10,12,
23 231:5
233:24
245:14
297:21
301:10,11

**wanting**

283:18

**warnings**
268:10

**Washington**
11:18
12:18
33:19,20,
21,23,24
34:6,22,24
37:17,18,
19,21 39:3
44:9,14
45:16,17,
21 47:14,
23 76:15
131:4
176:13
187:3
222:15
237:10

**Washington-
based** 44:11

**waste** 181:1
259:24

**watch** 234:22

**watching**
234:24

**ways** 18:14,
15 42:20
61:1 139:1
179:14

**wealth**
276:12

**weapon** 86:22
87:9 88:4,

6

**web** 279:3

**week** 143:9
192:13
200:23
202:10
207:12
210:12
211:18
233:7,8
237:18
242:22
254:21
256:14
283:4
290:16,18

**weekend**
202:16

**weekends**
215:1
216:15
219:1

**weekly**
144:13

**weeks** 171:5
195:9
230:13
265:2

**weird** 197:21
237:13,24

**weirdo** 208:5

**Wengui**
275:25

**whack** 160:1

**whereabouts**
240:13

**White** 37:20

**Whomever**
20:3

**wild** 289:14

**wildest**
303:15

**William**
168:15
300:21

**win** 98:6

**windows**
45:23,25
46:1

**wire** 113:23
115:25
116:1,2,4,
11,16,17,
22 170:11
192:24
193:1
194:11
195:2,6
247:9,16
252:5
253:21
289:10,12,
17 290:8

**wires** 116:9,
10 175:18

**wiring** 290:4

**woman**
157:22,23

**word** 106:14
128:7
209:17
213:10,11
254:16
287:6
301:4

**words** 62:18
89:3 92:21
94:17
98:25
99:10
106:18
129:14
130:17
135:21
160:20
176:9
182:15
208:7,10
254:18
265:11
282:1

**work** 10:10
12:21 15:5
16:8 17:11
19:13,16
20:16
21:17
23:13 30:5
32:13
35:16
37:14 45:5
58:25 83:1
90:4 91:22
93:14 94:9
100:1,3

105:1
115:1
122:24
130:13
155:4
167:4
179:1
194:5
198:5,19
201:21
216:13
239:17
240:7
243:2,4
246:3,11
250:15,16
255:10
257:25
274:13,21
277:25
282:20
286:24
287:18
289:2
294:9,10,
12 295:7,
23 301:3

**worked** 12:23
13:3,16
14:18 20:8
30:23
34:25 36:4
66:3 73:4
75:9
103:15
105:5,8
107:11,15
176:8

186:25
256:16,17
257:18,19
258:4
264:6
295:2

**working**
11:25
15:4,8,22,
23 16:5
32:11
44:14 74:8
77:11
95:19
120:1,15
156:5
206:11
211:25
215:1
216:9,15,
17 218:25
225:8
245:13
253:15
258:15
264:22
269:13

**works** 11:1
19:4 47:22
212:14
231:4
267:2
274:14
279:7
**Worldwide**
11:1

**worries**
190:6

**worry** 13:14
108:16

**wow** 36:7
62:25 84:6
185:17

**wrap** 293:10

**write** 247:9

**writes** 33:19

**writing**
135:6,21,
23 144:5
145:13

**written** 38:7
102:13
114:5
133:13,15,
21 134:1,
5,6,16,17,
25 135:1,
8,12
144:11,12
145:7
204:11
267:11
294:13

**wrong** 193:1
213:11
223:12
254:16

**wrote** 65:25
139:16
196:8
199:20

200:10
209:7
211:17
214:19
230:3,11

**Wu** 168:16
300:21

**Wyoming** 9:6
242:6,7,9

────────────

**X**

**Xi** 248:12,
13

────────────

**Y**

**yacht** 285:4,
8

**yanked**
175:20

**Yanping**
264:4

**Yao** 157:2,
6,7 226:12

**year** 12:2
15:9 32:3
41:4 49:13
120:9
164:8,12,
18 165:9
197:10
231:15

**years** 10:1,
11 11:16
20:8 22:7,

25 33:16
34:22
49:15
104:21
197:14
206:11
295:5
301:14

**yesterday**
189:12

**Yiu** 84:10

**York** 8:3
54:16
84:25
114:17
175:1,9
176:5
181:20
193:6
198:18
199:24
200:2,4
212:24
214:16

**young** 206:9,
10

**Yu** 300:21

**Yvette** 27:25
45:11
46:5,21
48:3,7
55:15,19,
21 56:23
59:21 60:9
74:22
75:21 76:6

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019          Index: Yvette's..Zeichner

85:17
111:1
114:15
126:16
136:18
137:6,12
146:10,24
164:19
172:5
173:8,10
174:13,20
176:6
185:8
186:20
195:1,15,
16  215:14
219:18
222:1,10
223:19
224:4
227:5
228:1,7
229:11,13,
14,25
231:4,25
232:2
243:22
244:25
264:4,22
265:18
284:25
286:3
297:10,21
299:2,10
302:7,12
304:11,25
306:1,3,8
307:4

**Yvette's**
  226:16
  300:3

_____

**Z**
_____

**Zach**   7:15
  8:6

**Zeichner**
  7:17

# EXHIBIT G

Page 1

1

2   IN THE UNITED STATES DISTRICT COURT

3   FOR THE SOUTHERN DISTRICT OF NEW YORK

4   ----------------------------------------x

5   EASTERN PROFIT CORPORATON LIMITED,

6                   Plaintiff/Counterclaim Defendant,

7

8                       Case No.  18-cv-2185

9                   v.

10  STRATEGIC VISION US, LLC,

11                  Defendant/Counterclaim Plaintiff.

12  ----------------------------------------x

13                  1:47 p.m.
                    November 19, 2019

14
                    405 Lexington Avenue

15                  New York, New York

16

17          DEPOSITION of FRENCH WALLOP, testifying

18  under Rule 30(b)(6) on behalf of STRATEGIC VISION

19  US, LLC in the above entitled matter, pursuant to

20  Notice, before Stephen J. Moore, a Registered

21  Professional Reporter, Certified Realtime Reporter

22  and Notary Public of the State of New York.

23

24

25

Page 2

1
2 A P P E A R A N C E S:
3
4     GRAVES GARRETT LLC
5         Attorneys for Eastern Profit
6         Corporation Limited
7         1100 Main Street
8         Kansas City, Missouri  64105
9
10    BY:   EDWARD D. GREIM, ESQ.
11        and
12        JENNIFER DONNELLI, ESQ.
13
14    PEPPER HAMILSTON, LLP
15        Attorneys for Strategic Vision US,
16        LLC
17        1313 N. Market Street 5100
18        Wilmington, Delaware 19899
19
20    BY:   JOANNA CLINE, ESQ.
21
22 ALSON PRESENT:
23    MICHAEL WALLER
24    YVETTE WANG
25

Page 3

1
2 EXAMINATION BY              PAGE
3
4 MS. CLINE                    6
5
6       E X H I B I T
7
8 Exbt 111   Calendar pages produced by    6  21
9    Strategic Vision
10
11 Exbt 112   Document headed "Fish Tank   35  4
12    for 10 people only"
13
14 Exbt 113   Color table for              51  7
15    expenditures and payments to
16    Strategic Vision U.S. and wires
17    out to vendors
18
19 Exbt 114   Citibank Business            51  11
20    Strategic Vision U.S., LLC bank
21    statement from January 1, 2018
22    through January 31, 2019
23
24 Exbt 115   Bill from Fletcher           69  4
25

Page 4

1        FRENCH WALLOP
2        THE VIDEOGRAPHER:  Good
3 afternoon.  We are now recording and on
4 the record.  The time is 1:47 p.m., on
5 November 19, 2019.
6        This is video 1 in the deposition
7 of French Wallop taken by counsel for the
8 Plaintiff in the matter of Eastern Profit
9 Corporation, Limited, versus Strategic
10 Vision US, LLC, filed in the U.S. District
11 Court, Southern District of New York, case
12 number 18 CV 2185 JGK.
13        This deposition is being held at
14 405 Lexington Avenue, New York, New York.
15 My name is George Libbares.  The court
16 reporter is Stephen Moore, we are here for
17 Veritext New York.
18        Counsel will now state their
19 appearances and the court reporter will
20 administer the oath.
21        MS. CLINE:  Johanna Cline, Pepper
22 Hamilton, for Eastern Profit.
23        And again, just to clarify, this is
24 actually a deposition of Strategic Vision
25 a corporate designee deposition, and Ms.

Page 5

1        FRENCH WALLOP
2 Wallop is the second of their deponents
3 today.
4        MR. GREIM:  Eddie Greim and
5 Jennifer Donnelli for
6 Defendant/Counterclaim Plaintiff,
7 Strategic Vision.
8        And I agree with counsel's
9 clarification.
10        I would also state that we are here
11 today after having already taken a
12 30(b)(6) of Strategic Vision, we are here
13 on negotiated topics with counsel for
14 Eastern Profit.
15        They are limited to the, basically
16 topics that are stated in the notice,
17 which related to the new counterclaim that
18 was filed and various documents that were
19 referred to us after the first 30(b)(6).
20
21 F R E N C H      W A L L O P,   called as a
22    witness, having been first duly sworn by
23    the Notary Public, was examined and
24    testified as follows:
25 EXAMINATION BY

2 (Pages 2 - 5)

FRENCH WALLOP

1
2 MS. CLINE:
3
4       Q       Ms. Wallop, you're testifying
5 here today as a representative of Strategic
6 Vision, right?
7       A       I am.
8       Q       And you're authorized to testify
9 on behalf of Strategic Vision?
10      A       Correct.
11      Q       And you are the sole member of
12 the Strategic Vision, LLC, correct?
13      A       Yes.
14      Q       You've always been the sole
15 member of Strategic Vision, correct?
16      A       Yes.
17              MS. CLINE:  Can you mark this,
18      please.
19              (The above described document was
20      marked SV Exhibit 111 for identification
21      as of this date.)
22      Q       We have handed you what's been
23 marked as Exhibit 111.  And I can represent
24 that this is an excerpt from the calendar pages
25 or some calendar pages that Strategic Vision

FRENCH WALLOP

1
2 produced in this litigation.
3              And my first question for you is
4 whether these are pages from your calendar?
5       A       Yes.  They appear to be.
6       Q       Right, and you recognize the
7 handwriting on these pages as your handwriting?
8       A       I do.
9       Q       Could you just describe, please,
10 your practices with respect to your calendar
11 notations.  As a general matter --
12              MS. CLINE:  Let me try again.
13      Q       As a general matter, in the end
14 of 2017 and 2018, how did you use your calendar
15 on a daily basis?
16      A       I used it -- I don't use any
17 electronic calendars, because they are
18 hackable.  I use Post-Its, armed calendars,
19 which you can print off like this from Outlook
20 or whatever it is, and then I write in my
21 schedule.
22      Q       And is it a proactive exercise,
23 you calendar things that are coming up, or is
24 it retroactive, meaning you make entries about
25 things that have happened in the past?

FRENCH WALLOP

1
2       A       No, it's proactive, at the time.
3       Q       Prospective, I suppose?
4       A       Prospective, yes.
5       Q       Looking at these particular
6 pages with respect to November through February
7 of '18, sorry, November of 2017 through
8 February of 2018, did you, in fact, make these
9 entries on or about the corresponding dates in
10 the calendars?
11      A       Yes.  Generally, in other words,
12 if I was traveling, I would put London, and
13 then I would write an arrow through the dates
14 that I was going to be away on that day, and
15 then I would fill in appointments in those
16 countries or in that time frame.
17      Q       Is it fair to say that the
18 entries that appear on page 1 you physically
19 wrote in November, is that right?
20      A       Correct.
21      Q       And the entries that appear on
22 page 2, which is, I guess I will use the Bates
23 numbers, page 2103, you physically wrote those
24 in December of 2017?
25      A       Yes, that's right.

FRENCH WALLOP

1
2       Q       And with respect to page 2104,
3 you physically wrote those entries in January
4 of 2018?
5       A       Yes.
6       Q       And same question with respect
7 to page 2105.  Those entries you physically
8 wrote in February of 2018, is that correct?
9       A       Yes.
10      Q       So you didn't fill any of these
11 in at some point subsequent to February of
12 2018, did you?
13      A       No.
14              I may have copied something from
15 a Post-It note that I had on the calendar, but
16 no, this is an accurate reflection of my
17 calendar.
18      Q       So, let me just try again.
19              So, tell us, were there
20 instances in which you populated any of these
21 entries subsequent to February of 2018?
22      A       Not to my recollection, no;
23 other than the Post-It notes.  In other words,
24 I explained that I have Post-It notes that are
25 generally the size of this that I put down on

FRENCH WALLOP

1
2   the calendar as to what I'm doing, and then I
3   will put it onto the calendar if they occurred.
4        Q    And so when did you -- so when
5   did you transcribe any notes from Post-It notes
6   onto the actual calendar pages in Exhibit 111?
7        A    These were done at the time of
8   the month or the day of the year.  I mean,
9   there wasn't any change.
10       Q    Okay.  I am just trying to
11  understand what your practice is.
12            So, to the extent that some of
13  these entries were originally written on
14  Post-It notes and then transcribed onto the
15  calendar pages, did any of those transcriptions
16  take place subsequent to February 2018?
17       A    No.
18       Q    Did you consult with anybody
19  about what merits an entry on your calendar?
20       A    No.
21       Q    Turn, if you would, to January
22  2018.
23            On January 8 there is an entry
24  filled in which you have written, "Set up Team
25  1."  Do you see that?

FRENCH WALLOP

1
2        A    I don't see that.
3        Q    I misread the number.
4             On January 9th, 2018, there is
5   an entry that says, "Set up Team 1."  Do you
6   see that?
7        A    Yes.
8        Q    What does that mean?
9        A    That means that we were having
10  meetings with Team 1, and that was the
11  beginning of the setup.
12       Q    Who was doing the setting up on
13  behalf of Strategic Vision?
14       A    Mike Waller and myself.
15       Q    So was there, in fact, a setup
16  meeting with Team 1 on Tuesday, January 9th?
17       A    Well, if I put it here, that
18  would be the fact, yes.
19       Q    And so you were present for that
20  meeting?
21       A    Yes.
22       Q    And where was it?
23       A    I believe it was at my home.
24       Q    That's in Virginia, right?
25       A    Yes.

FRENCH WALLOP

1
2        Q    And so members of Team 1 were
3   present at your home on January 9th?
4        A    I believe so, I'm not 100
5   percent sure, because Mike was having
6   conversations with them as well.
7             So -- but I think that was the
8   case.
9        Q    Do you recall having met members
10  of Team 1?
11       A    Yes.
12       Q    And was that meeting at your
13  house?
14       A    Several times, but I can't be
15  specific on which date.
16       Q    So you personally met members of
17  Team 1 on more than one occasion?
18       A    Yes.
19       Q    And if you go forward a little
20  bit to January 11th, there is another entry
21  that says "Team 1 meeting."  Do you see that?
22       A    Yes.
23       Q    And was that a second meeting
24  involving Team 1?
25       A    Must have been, yes.

FRENCH WALLOP

1
2        Q    Does the fact that it is
3   included on your calendar mean you were there,
4   you were physically present?
5        A    Yes.
6        Q    And do you remember where that
7   meeting was?
8        A    Probably also in Virginia, if
9   the first one was.
10            I honestly don't remember.
11       Q    Drop down to January 25th.  It
12  says, "Team 1 work day."  Do you see that?
13       A    Yes.
14       Q    What does that mean?
15       A    That means one of the Team 1
16  members was in Washington.  It was a meeting.
17       Q    And the meeting involved you
18  personally?
19       A    Yes, and Mike Waller.
20       Q    And then, if you could just look
21  at January 26th, read your entry for us on that
22  day.
23       A    It says, "MW/FW, New York, 11:00
24  a.m."And then it says, underscored, then it
25  says, "Ten days after."

4 (Pages 10 - 13)

FRENCH WALLOP

2  Q    Okay.  What do those entries
3  mean?
4    A    Well, it's Mike Waller and
5  French Wallop in New York meeting Guo at 11:00
6  a.m., which was about ten days after the
7  contract was underway.
8         It was actually underway
9  earlier, but we gave him a leeway of ten days;
10  so that's why I have ten days after.
11  Q    Looking up, sort of directly up
12  in that column, on January 5th, there is an
13  entry there that says, "Contract signed."  Do
14  you see that?
15    A    Yes.
16  Q    So I am trying to understand,
17  what does your entry on the 26th above the "ten
18  days after," what does that correspond to?
19    A    Well, if you go back ten days,
20  that would get it to the 16th, right?
21         The 16th of January, and we had
22  said to Guo at that meeting that it would have
23  been -- we were giving him an additional ten
24  days like credit, because we were trying to get
25  the team set up and we didn't get the wires

FRENCH WALLOP

2  sort of into the account that we were using or
3  accessible until the -- truly until the 9th.
4         Because we didn't -- we didn't
5  have clean flash drives.  We had had bad flash
6  drives to begin with.
7         So when we got the clean flash
8  drive was when Mike and I got together with the
9  team members for Team 1 that week.
10         Because at that point the
11  money became hard that was in the account, and
12  then we could begin the setup of getting the
13  team started.
14         So that's what ten days
15  afterwards means; it was ten days after the
16  16th.
17         And Guo had said he was, you
18  know, demanded to have massive amounts of
19  information within ten days of setting up,
20  which was highly unreasonable.
21  Q    Could you just decipher for us
22  your entry on January 16th?
23    A    16th.
24         Wire out to Georgetown Research
25  for $200,000, and then I think another wire for

FRENCH WALLOP

2  $25,000.
3    Q    Then there is an EXP.  Does that
4  mean expenses?
5    A    Yes.  I'm sorry.
6    Q    So, the $25,000 wire to
7  Georgetown Research was for expenses?
8    A    It was.
9    Q    Was it you who was in charge of
10  setting up the wires?
11    A    Yes.
12    Q    Could you explain to us the
13  entry on January 31st?
14    A    Yeah, it was Michael Waller
15  returns with flash drive to Newark, and he had
16  done a 24 hour round trip to collect a flash
17  drive from his contact point in Europe.
18    Q    Why was that something important
19  enough to note on your calendar on January
20  31st?
21    A    Because it was important to show
22  the delivery of when we were complying with an
23  insistent Guo for information that he wanted to
24  have yesterday.
25    Q    And then if you go back up to

FRENCH WALLOP

2  January 6th, where you wrote -- sorry, January
3  5th, where you wrote "bad flash drives," do you
4  see that?
5    A    Yes, that's correct.
6    Q    And you made that entry, you
7  physically wrote that in your calendar on
8  January 5th?
9    A    Yes.
10    Q    Why was it important for you to
11  write that at that point in time?
12    A    Because we were supposed to be
13  under contract, we had all these verbal
14  agreements that had been bouncing back and
15  forth like ping-pong balls, and Yvette arrived
16  and she had bad flash drives.
17         We had signed the contract, and
18  then in order to download whatever it was that
19  she had on her USB keys, I did that, and
20  clearly it was a bad, bad flash drive.
21         And it -- we agreed that I would
22  have to come back to New York on, it must have
23  been on Sunday, I remember, yes, it was Sunday,
24  where I got the new flash drives.
25         There were three flash drives,

5 (Pages 14 - 17)

Page 18

FRENCH WALLOP

1
2 and out of those three, only one was good, the
3 other two were bad.  In other words, that means
4 there in malware in those flash drives.
5        It's a reason for part of the
6 delay.
7     Q    But you knew on January 5th that
8 it would be important to document that they
9 were bad?
10    A    Yes, absolutely.
11    Q    And what was the basis for that
12 knowledge?
13    A    Because if they are bad, you
14 need to make a note of that in your record, if
15 you're monitoring something like this in the
16 way of a project; perfectly reasonable.
17    Q    Can you turn to February,
18 please?
19    A    Yes, I have it.
20    Q    Just if you could just read the
21 entry on February 1st.
22    A    It says "Mars, Walmart."
23    Q    Does that have anything to do
24 with Eastern Profit?
25    A    It may have been a phone call I

Page 19

FRENCH WALLOP

1
2 had with some members of the Board.  No, it had
3 nothing to do with, probably should have been
4 deleted.
5     Q    I should say that the items that
6 have been redacted I gather have been redacted
7 for relevance?
8     A    Because they pertain to other
9 appointments or phone calls.  Have nothing to
10 do with Eastern Profit.
11    Q    On Groundhog Day there, what
12 does your entry there say?
13    A    "Dallas" and then "Possible Team
14 2."
15    Q    What did you mean by that?
16    A    Well, we decided we would go
17 down and see Team 2.
18    Q    Why does this --
19    A    I mean, we assumed that it was
20 going to be another team, because we were
21 concerned about what Team 1 was finding, and
22 Team 1 was finding all sorts of irregularities.
23        So we wanted to have a second
24 team to compare findings with.
25    Q    The entry says "POSS," is that

Page 20

FRENCH WALLOP

1
2 possibly?
3     A    Possible.
4     Q    Possible?
5     A    Possible Team 2.
6     Q    So Team 2 had not been hired at
7 this point?
8     A    No, I think we were just going
9 there.
10    Q    And did you and Mr. Waller in
11 fact go to Dallas to meet with Team 2?
12    A    Oh, yes, we did.  I'm just
13 looking, I think we went twice.  So yes.
14    Q    And then most of these are just
15 handwriting questions, February 5th, can you
16 tell us what that entry says?
17    A    Sorry, I can't --
18        That was a rigging group, if
19 that's the right thing -- no, sorry, that looks
20 like -- that was a meeting at 4:30 at my home
21 with Lianchao and Mike.
22    Q    What was the -- it says here,
23 does that mean it was at your home?
24    A    Yes.
25    Q    And what was the subject of that

Page 21

FRENCH WALLOP

1
2 meeting?
3     A    Well, it would have had to do
4 with the Guo contract.
5     Q    But just tell me as best you
6 can, who said what to whom at that meeting on
7 Monday, February 5th?
8     A    I have no recollection, other
9 than we were concerned that we were finding
10 issues with Guo's fake names and some of Guo's
11 fake information that he had given us out of
12 the 15 names that we had.
13        And we were concerned about
14 that, plus we also had inconsistencies with the
15 information that we had gotten on Yvette's
16 flash drives that we were using for Team 1.
17        And at that point we were
18 alerting us that there was a leak within the
19 Guo system, from Yvette's flash drives, and we
20 were very concerned as to what that was going
21 to do with something that we held as being
22 highly confidential and certainly of a concern.
23    Q    Did you share these concerns
24 with Mr. Han?
25    A    Yes.

6 (Pages 18 - 21)

Page 22

FRENCH WALLOP

1
2    Q    What was his response?
3    A    He was concerned, too.
4    Q    What did he say?
5    A    "I am concerned, too."
6         To the best of my recollection,
7    that would have been his normal response.
8    Q    Do you remember how long the
9    meeting was?
10   A    No, I think it was probably, it
11   might have been an hour, an hour and a half.
12   Q    Did you and Mr. Waller discuss
13   possible litigation with Mr. Guo at this
14   meeting?
15   A    What?
16   Q    Did you and Mr. Waller discuss
17   possible litigation with Mr. Guo or Eastern
18   Profit at this meeting?
19   A    Mr. Guo?  You mean Lianchao?
20        I'm sorry, I don't understand
21   your question.
22   Q    Just to make sure I'm tracking
23   the people present at this meeting on February
24   5th were you, Mike Waller and Lianchao Han?
25   A    That's correct.

Page 23

FRENCH WALLOP

1
2    Q    So I'm asking whether you and
3    Mr. Waller and Mr. Han discussed potential
4    litigation?
5    A    No.  There would have been no
6    reason to.
7    Q    Did you discuss whether
8    Strategic Vision would take any action with
9    respect to Mr. Guo's asylum application at that
10   meeting?
11   A    No.
12   Q    Did you decide on next steps to
13   take as a result of what you discussed on that
14   meeting?
15   A    Well, we were scrambling to try
16   to figure out who was telling us the truth.
17        We wanted to find out, comparing
18   the Dallas information, and I think I did go to
19   Dallas on the -- sorry, on the 2nd of February.
20        I think we went to Dallas on the
21   2nd of February, we had our preliminary
22   meeting, and then we flew down to Dallas on
23   the, looks like the 8th of February, to collect
24   whatever information they had been able to
25   retrieve in a week.

Page 24

FRENCH WALLOP

1
2    Q    And that meeting was on February
3    8th?
4    A    It looks like it, yes.
5    Q    And what happened at that
6    meeting with Team 2 on February 8th?
7    A    That was when we -- Adam Kraft
8    was there, Russell whatever his name was,
9    Ramsland or something, and then a fellow named
10   Lochnealy, plus the three analysts.
11        And we met with them to go
12   through some of the material that they showed
13   us in their files, and it was pretty thick.
14        At that point the -- I think it
15   was Russell Ramsland, we discussed the whole
16   process of what it was that we were retrieving
17   at that time.
18        They were the ones that said so,
19   it looks like Guo must be your client.
20        And we didn't admit to that, we
21   didn't say anything about it.  We said well, we
22   need to find out what you have retrieved on the
23   names we have given you.
24        And that is, first of all, they
25   sort of pushed a bill across the table to us

Page 25

FRENCH WALLOP

1
2    for $111,000 or $117,000 and we looked at it.
3         We hadn't said that we would
4    sign on until we had some real information, and
5    they said well, we have got the real
6    information about who he is and what he is, but
7    we will not be able to share it because ta da,
8    he is records protected.  These names are
9    records protected in the names that we had
10   given them.
11   Q    Was that the first time you had
12   heard of the concept of records protected?
13   A    Actually it is.  First time.
14   Q    And what did, what physically
15   did Team 2 show to you and Mr. Waller in that
16   meeting on February 8th?
17   A    They showed us some diagrams and
18   they showed us a few sort of, what I would call
19   a short version of some reports.
20        But those apparently had also
21   been retrieved on the internet that they
22   compiled, and were doing, almost similarly to
23   what we were trying to do elsewhere, was
24   gathering different pieces of information to
25   put together for the whole piece.

7 (Pages 22 - 25)

FRENCH WALLOP

2    So they had pulled together some
3 pieces, but the pieces that we already had, we
4 were planning to hire them as sort of Team 2,
5 so that we could compare the two sets of
6 retrievals on Guo's fish.
7    Q    Was Team 2 working on the same
8 fish that Team 1 was working on?
9    A    Yes, for certainly the first
10 five.
11    Q    Can you just read what the
12 February 9th entry says?
13    A    I had something at 9:30, and
14 then it got cancelled due to my flight to
15 Dallas.
16    So, I'm not sure.  I'm not sure
17 if we went down on the 8th or we went down on
18 the 9th, but it looks like we came back to D.C.
19 on the 10th.
20    Q    Did you have a meeting with --
21 so we talked about the meeting you had with Mr.
22 Han on February 5th.
23    A    Correct.
24    Q    Did you have a meeting with Mr.
25 Han in February subsequent to that day?

FRENCH WALLOP

2    A    I am looking.  I can't read my
3 own handwriting sometimes.
4    I did not, but I think that Mike
5 and Lianchao met on the 16th.  I was not
6 present.
7    Q    Okay, so just so the -- sorry to
8 ask you to do this, but just on February 16th,
9 what does that entry say?
10    A    It says "11:00 to 3:00, L and
11 M," then it looks like something "9:00 p.m." I
12 don't know what that is.
13    Q    How did you know that you
14 weren't at the meeting?
15    A    Because you can see here, I left
16 for London on the 18th, and I did not return
17 from London and Zurich until maybe the 1st of
18 March.
19    I don't know, because I don't
20 have March here, so I can't tell you.
21    Q    Just trying to follow, so the
22 entry for February 18th says "Depart LHR,"
23 right?
24    A    Yes.
25    Q    That's Heathrow?

FRENCH WALLOP

2    A    Yes.
3    That meant depart for LHR,
4 sorry.
5    Q    So I'm asking two days prior to
6 that, on February 16th, you said, "I think
7 there was a meeting with Lianchao and
8 Mr. Waller," right?
9    A    Yes.
10    It's such a bad copy, I can't
11 really tell where the lines went.
12    So, it looks like Lianchao and
13 Michael got together on the 16th.  I can't
14 remember if I was present or not.
15    Q    Would you have written it, would
16 it have been your practice to write it on your
17 calendar if you weren't going to be present?
18    A    Yes.  Regarding this project,
19 yes.
20    Q    Just why would you do that?
21    A    Why wouldn't I do it?
22    Because it pertained to sort of
23 a crisis situation with the information that
24 was -- that we were receiving back from now two
25 teams, and Lianchao was one of the people who

FRENCH WALLOP

2 had introduced us to Guo, along with Bill
3 Gertz.
4    Q    Skip ahead to February 25th.
5 That's the day you got home from London?
6    A    Yes.
7    Q    And did you meet with Mr. Waller
8 and Mr. Lianchao Han on that day?
9    A    Yes.
10    Q    Do you remember what happened on
11 that meeting?
12    A    I'm sure we were discussing the
13 project.
14    Q    Eastern Profit had terminated
15 the contract prior to then, correct?
16    A    I gather they had, but I was out
17 of the country, so I didn't -- I hadn't seen
18 anything about that.
19    I think Mike had told me.
20    Q    Were you out of the country on a
21 trip related to Eastern Profit?
22    A    Yes.
23    Q    And what were you doing?
24    A    Gathering intelligence.
25    Q    How did you go about that?

FRENCH WALLOP

2     A     Because I have a number of
3  people that would have helped me and did help
4  me in pulling information on Guo and on his
5  people, that he was asking for research on.
6     Q     You were pulling information on
7  Guo in the --
8     A     For Guo.
9     Q     For Guo.
10          Were those people part of Team
11  1?
12     A     No.
13     Q     Were they part of Team 2?
14     A     No.
15     Q     So, who were those people?
16     A     They were additional people.
17     Q     Did Strategic Vision pay for any
18  services of the people you are referring to?
19     A     I believe so, yes.
20     Q     Are you talking about Fletcher?
21     A     Yes.
22     Q     Did you meet with anyone else
23  other than Fletcher?
24     A     I did.
25     Q     Who else?

FRENCH WALLOP

2     A     That's sort of confidential.
3          MR. GREIM:  Let's keep it there
4     for now.  There is apparently an order
5     in this case.
6          I don't know if it covers this or
7     not, but if it doesn't, we will give the
8     answer.
9          Just if we could do it when we take
10     our next break.
11          MS. CLINE:  Okay.
12     Q     So you and Mr. Waller met with
13  Mr. Han on February 25th after Eastern Profit
14  had terminated the contract, right?
15     A     Yes.
16     Q     What did you all say to each
17  other?  First of all, was the meeting in
18  person?
19     A     Yes.
20     Q     And it was at your home in
21  Virginia?
22     A     Yes.
23     Q     What did you all say to each
24  other at that meeting?
25     A     I'm sure that Mike and Lianchao

FRENCH WALLOP

2  and I were trying to figure out how to handle
3  Guo, because of the fact that we were
4  delivering information and nothing seemed to
5  satisfy him.
6     Q     Did you and Mr. Waller and
7  Mr. Lianchao discuss litigation at that meeting
8  on February 25th?
9     A     No.
10     Q     Did you --
11     A     Never.
12     Q     Did you discuss whether
13  Strategic Vision would interfere with Mr. Guo's
14  asylum application at that meeting?
15     A     No.
16     Q     Did you ever have that
17  conversation with Mr. Han?
18     A     No.
19     Q     There is an entry on -- do you
20  happen to know whether February 2018 was a leap
21  year?
22          In other words, does that say
23  February 29?
24     A     It's 28th.
25          It just goes to 28.  If you look

FRENCH WALLOP

2  above, the calendar, it's 27/28, so there is no
3  29.
4     Q     What's -- so the last, just
5  humor me, the last column, the bottom column on
6  the page, right, starts with the 25th.
7          That's when you got home from
8  London?
9     A     Right.
10     Q     26th is blank, right?
11     A     Yes.
12     Q     27th you did something at 9:30,
13  but it's redacted, right?
14     A     Yes.
15     Q     28th you did something at 11:10,
16  but that's redacted, correct?
17     A     Correct.
18     Q     I am trying to figure out what
19  the entry is on what would be February 29th
20  there?
21     A     I can't really tell unless it
22  just says "depart 6:00 a.m."  So I don't know,
23  where is the rest of the calendar?
24          If you have the March calendar,
25  I can maybe piece it together.

FRENCH WALLOP

1
2      Q      Did you take any, putting aside
3  the calendar, do you remember whether you took
4  any business trips with respect to the Eastern
5  Profit matter subsequent to your trip to London
6  where you got home on February 25th?
7      A      Yes.
8      Q      And describe those.
9      A      Well, without a calendar, I
10 can't.
11     Q      You have no memory, you know you
12 went somewhere, but you just don't remember
13 what the nature of the trip was?
14     A      That's correct.  Unless I look
15 at the calendar I can be more explicit.
16     Q      Do you recall the purpose for
17 making a trip after the contract had been
18 terminated?
19     A      To continue gathering the
20 information that was sitting and available to
21 us to retrieve.
22            But these things had to be done
23 face-to-face, not by on the internet.
24            MS. CLINE:  Would you mark that,
25     please.

FRENCH WALLOP

1
2            (The above described document was
3      marked Exhibit SV 112 for identification,
4      as of this date.)
5      Q      All right.  We have handed you
6  what's been marked as Exhibit 112, and the
7  first question is just whether you can identify
8  the document for us, please?
9      A      I believe it was one of the
10 documents that we used to show, Strategic
11 Vision used to show Guo how we would operate
12 with each one -- with each specific fish in
13 a -- in a sort of graph, so that he could
14 understand it more clearly.
15     Q      Did you put Exhibit 112
16 together?
17     A      No, I did not.
18     Q      Do you know who did?
19     A      I believe Michael.  Michael and
20 I talked about it, and then he put it together.
21     Q      It was put together before the
22 contract was signed?
23     A      Yes.
24     Q      Did you use, did Strategic
25 Vision use Exhibit 8 in a meeting with Eastern

FRENCH WALLOP

1
2  Profit?
3      A      With Miles Guo, yes.  We didn't
4  know who Eastern Profit was until the contract
5  turned up.
6      Q      And what were the -- so did you
7  have communications with Mr. Guo about Exhibit
8  112?
9      A      Yes.
10     Q      Describe those, please.
11     A      Well, we walked him through it
12 based on the information that we had after we
13 finally got a clean flash drive from Yvette
14 Wang on how it would work.
15            Because obviously we didn't have
16 the 15 fish or the 10 fish names, so we could
17 break out how the tracking would work with each
18 one of these targets.
19            So we didn't have the names, in
20 other words, until we had gotten a clean flash
21 drive, which was not until, what did I say?
22 January 8th of 2018.
23     Q      Do you remember where you were
24 when Strategic Vision walked Mr. Guo through
25 Exhibit 112?

FRENCH WALLOP

1
2      A      I do not.
3      Q      Do you remember when the meeting
4  was?
5      A      Well, if we meet with Guo, it
6  would have been in his apartment.
7      Q      And --
8      A      And I'm not sure which meeting
9  it was, it might have been December.
10            Sorry.
11     Q      I was confused by your testimony
12 on this.
13     A      I'm confused actually right now.
14            I think -- I think in fact that
15 we did talk about it.  He had this big file of
16 names which he said he had paid $250 million
17 for, with all of these same names and
18 photographs and everything else that he showed
19 us early on.
20            Which, if I go back to my
21 calendar, I think that could have been either
22 the 4th of December or the -- sorry, or the
23 11th of December.
24            It looks like maybe the 11th of
25 December, because it shows I had put here

FRENCH WALLOP

1 Lianchao, Michael, myself, in New York, with
2 new targets.
3
4        So these may have been the new
5 targets that we were talking about, and Mike
6 may have, after that meeting, put together the
7 Power Point.
8        Yes, here it is, the Power Point
9 for the 21st of December, when we were back in
10 New York, and that's when I think these were
11 done.
12        I honestly cannot tell you which
13 meeting, but that makes sense that it would
14 have been on the 21st where we did a Power
15 Point.  I don't know.
16        You have to understand, Guo's --
17 Guo's intention initially with us was to buy
18 real estate in Washington and to buy a great
19 big office building across from the White House
20 and buy a great big mansion in Georgetown.
21 That was the initial.
22        MR. GREIM:  I would just instruct
23        the witness to make sure you answer
24        counsel's questions.
25        THE WITNESS:  Sorry, it's just I

FRENCH WALLOP

1
2 can't remember each meeting.
3        Thank you.
4        Q        So, do you think Exhibit 112 was
5 discussed at the meeting on December 21st where
6 the calendar entry says "Power Point"?
7        A        I believe so; and I think you
8 would have to ask Michael that question.
9        Q        Were there other meetings at
10 which Power Points were presented?
11        A        You would have to ask Michael
12 that question.
13        Q        Do you know what, on the entry
14 on December 21st says, I think it says,
15 RE/FNDA," do you see that?
16        A        Yes.
17        Q        What does that mean?
18        A        It means regarding foundation,
19 regarding a foundation, he was talking about
20 putting a foundation together.
21        Looks like Yvette was there,
22 too, I have a Y there.
23        Q        And your testimony is you put
24 that calendar entry on the calendar on December
25 21st?

FRENCH WALLOP

1
2        A        Yes.
3        Q        Why was it important to note
4 that he was talking about a foundation?
5        A        Because that was part of the
6 notes.  If you go back and look at Michael
7 Waller's notes, you will see they are far more
8 explicit than my notes in my calendar.
9        Q        It's all right.  I just have one
10 follow up on January 5th, if you go back to
11 that.
12        A        Yes.
13        Q        Says "bad flash drives."  Did
14 you discover on January 5th that you thought
15 they were bad?
16        A        Yes.
17        Q        How did you discover that?
18        A        Well, she was in my library, I
19 had an old laptop, I put them in -- I put them
20 in my laptop, I put one in my laptop, and it
21 just blew up the screen.
22        I was not happy about that, as
23 she well knows.
24        I said well there is something
25 either very much the matter with this flash

FRENCH WALLOP

1
2 drive, this USB, I want to have somebody check
3 it.
4        So I called a friend, a
5 neighbor, and asked him if he would mind
6 testing it in his one of his many computers, he
7 said sure, fine.
8        I left my son sitting in the
9 library with Yvette and I went to the
10 neighbor's and we put it in and it did the same
11 thing to three of his screens.
12        Q        And so this meeting on January
13 5th, when you put the flash drive into your
14 laptop and the screen blew up, was Yvette
15 present for that?
16        A        Yes, she was.  She saw it.
17        Q        She saw your screen?
18        A        Of course she saw it.
19        Q        Was your son present?
20        A        No, he was not, he was not part
21 of this.
22        Q        And then after that you asked
23 Eastern Profit to deliver a new flash drives,
24 and you got those on January 8th, is that
25 right?

11 (Pages 38 - 41)

FRENCH WALLOP

1
2     A     Yes, I came up to New York in a
3  snow storm and to the Pierre and met Yvette in
4  the Pierre lobby.
5     Q     Just, there is a New York on
6  January 8th, what's the abbreviation before
7  that?
8     A     Me, FW.
9     Q     You refer to yourself in the
10  third person?
11    A     Sometimes.  FW New York, you
12  will see on here.
13          MW, FW, you will see many things
14  MW, FW.
15    Q     So going back to Exhibit 112 --
16    A     Yes.
17    Q     -- just, fish means what?
18    A     It was the term we used to
19  identify and tag each person that was in -- on
20  the list of people that Guo wanted to have
21  researched.
22    Q     And what does unit mean?
23    A     23 units.  Well, it was a very
24  complex way we were trying to set it up, so
25  that we could put fish in and take fish out at

FRENCH WALLOP

1
2  the same time if they were not -- if the
3  information wasn't retrievable, if it wasn't
4  acceptable.
5          Either to Guo, in other words,
6  if it was just superficial information versus
7  really some good deep dives.
8     Q     So, in the first scenario in
9  Exhibit 112 --
10    A     Yes.
11    Q     -- it contemplates a flat number
12  of fish, but not always 30 units, right?
13    A     That's correct.  And I think
14  that the 30 units 10, 10, and 10 makes the 30,
15  right, for 10 fish?
16          So we were looking at each
17  individual cell to see which ones we could dive
18  for certain information on in each one of these
19  cells.
20          And some of the cells were not
21  relevant or were not -- the information was not
22  there because they were either fake or the
23  names were wrong or whatever.
24    Q     And in the scenario, in this
25  scenario on this first page, the Strategic

FRENCH WALLOP

1
2  Vision says, "The unpredictable work in
3  pricing."
4          Do you see that?
5     A     Yes.
6     Q     That's the pricing is
7  unpredictable because the number of units
8  wasn't steady, correct?
9     A     That's correct.
10    Q     So the pricing was based per
11  unit, correct?
12    A     Yes.
13    Q     And then, if you go to the
14  second page of the same exhibit, if there are
15  always 30 units, then the pricing is
16  predictable, right?
17    A     I guess so.
18          Again, this is a question for
19  Mike, because we tossed this thing back and
20  forth about ten times, discussing how the best
21  way would be for the tracking research to be
22  done.
23          That's a question also for him.
24    Q     I might have gotten that one
25  wrong.  I thought it was a question for you.

FRENCH WALLOP

1
2          MR. GREIM:  Actually, I will tell
3  you, we actually did say that this
4  document was for Ms. Wallop, but some of
5  the questions you are raising are going
6  back to contractual things that, as you
7  are asking the witness, she's saying
8  it's better for Mr. Waller.
9          So we did our best to try to find,
10  to try to divide these documents up and --
11         MS. CLINE:  Yeah, well, we will
12  see how it goes.  I would have asked him
13  about this had you designated it as
14  such.
15         MR. GREIM:  Well, all right, I
16  guess if we have exhausted this witness
17  and there are some questions about the
18  document itself that we still need, then
19  we have got him here.
20         We can, I hate to do this, but
21  maybe we can put him back on at the end to
22  ask whatever the questions are.
23         I just want to know what those are,
24  to be clear, what it is that Ms. Wallop
25  isn't able to say about the document

FRENCH WALLOP

1
2    itself.
3        I mean, because to be clear, we
4    have had a lot of testimony already on
5    what the fish were, what the contract
6    means, that was all in the first
7    deposition.
8        I understand this is to be about
9    this document --
10       MS. CLINE:  That's all I'm asking
11   about.
12       MR. GREIM:  We should look at the
13   transcript, because it occurs to me a
14   lot of the questions are moving into the
15   thing about fish and units and pricing,
16   which I understand it springs from
17   looking at the document, but those are
18   questions that actually have been asked
19   and answered a long time ago.
20       So I don't -- we don't need to have
21   a fight about it.  Let's just see what the
22   questions are about the document itself
23   that she can't answer, and if there are
24   some, we can put him on to answer those
25   questions.

FRENCH WALLOP

1
2        MS. CLINE:  Would you go back to
3    the last question I asked.
4        (The question requested was read
5        back by the reporter.)
6    Q    So, I'm asking you, when this
7    Power Point Exhibit 112 was
8    discussed with Mr. Guo, was there a
9    conversation around having pricing predictable
10   and tied to units?
11   A    I believe so, yes.
12   Q    Tell me what you remember about
13   that conversation.
14   A    We discussed -- he needed an
15   example as to how this would work.
16       So we chose the concept of fish
17   in an aquarium, and he understood that.
18       So that if we took -- we
19   initially were going to take 10 fish, that was
20   the deal, we would take 10 fish, the first
21   time, the first month, and then see where that
22   went.
23       If we took the first 10 fish and
24   we found that we, out of those 10, which they
25   then decided oh, no, we wouldn't to make it 15

FRENCH WALLOP

1
2    fish in the first month, which actually
3    unbalanced a lot of our programming as to how
4    we were going to process the 10 plus 5 fish,
5    making it 15 fish, it made us have to work 33
6    percent harder to pull up additional numbers
7    when we had only planned originally on the 10
8    based on the budget.
9        So our ability to walk him
10   through what we could pull within a certain
11   time frame, if we found that one or two of
12   these fish were dead, we would throw them out
13   of the tank and replace them with another fish,
14   so with another name, and then we would go to
15   work on those names to see how much we could
16   pull up on those names.
17       But it was -- when somebody
18   tells you they have got 4,000 names they want
19   investigated from the very beginning, we never
20   expected to be doing 4,000 names, we expected
21   to be able to work with about maybe 100 names
22   over the year, over the course of a year.
23       That's how we were sort of
24   trying to balance out the numbers of the people
25   that we were doing the research on based on

FRENCH WALLOP

1
2    what it was that he wanted in the way of
3    information back.
4        So again, it's really a much
5    better question for Mike.  He's the expert on
6    this sort of --
7    Q    I will ask him if you don't
8    know, but predictable pricing, that was
9    something Strategic Vision was interested in?
10   A    Yeah, whatever, yes, predictable
11   and unpredictable.
12   Q    Which?
13   A    Well, predictable pricing, if
14   that's what you're talking about, is that what
15   we are on, the 30 units?
16   Q    Yes.
17   A    Sorry.
18   Q    So, let me --
19   A    One is predictable and one is
20   unpredictable.
21   Q    Let me try it this way, and if
22   you don't know, we will ask Mr. Waller, but
23   scenario number one entails or would result in
24   unpredictable pricing, correct?
25   A    Correct.

13 (Pages 46 - 49)

FRENCH WALLOP

1
2      Q      Scenario number two would result
3  in predictable pricing, correct?
4      A      Correct.
5      Q      And Strategic Vision was
6  interested in predictable pricing?
7      A      Correct.
8      Q      In either scenario, the pricing
9  would be tied to the units?
10         MR. GREIM:  Objection, vague as
11  to time period.
12      Q      When this document -- when you
13  were in the meeting talking about this
14  document, the idea was that pricing would be
15  tied to units?
16      A      My understanding, that's
17  correct.
18         MS. CLINE:  Let's go off the
19  record.
20         THE VIDEOGRAPHER:  The time is
21  2:46.  We are off the record.
22         (At this point in the proceedings
23  there was a recess, after which the
24  deposition continued as follows:)
25         THE VIDEOGRAPHER:  The time is

FRENCH WALLOP

1
2  2:54 p.m.  We are back on the record.
3         MS. CLINE:  Could you please mark
4  this as the next exhibit.
5         (The above described document was
6  marked Exhibit SV 113 for identification
7  as of this date.)
8         MS. CLINE:  ,And 114 as well.
9         (The above described document was
10  marked Exhibit SV 114 for identification
11  as of this date.)
12      Q      Okay.  We have handed you what
13  have been marked as Exhibits 113 and 114, and
14  my first question is just to ask you to
15  identify them for the record.
16      A      Exhibit 113 is my color table
17  for expenditures and payments to Strategic
18  Vision U.S. which also shows wires out to
19  vendors.
20         And the other exhibit is,
21  Strategic Vision 114, which is a Citibank
22  Business Strategic Vision U.S., LLC bank
23  statement from January 1, 2018 through January
24  31, 2019.
25      Q      Do the -- does the color table

FRENCH WALLOP

1
2  on the first page of Exhibit 113 relate to
3  the -- correspond to the color coding in
4  Exhibit 114?
5      A      Yes, it does.
6      Q      You put these two exhibits
7  together?
8      A      I did.
9      Q      Tell us what was the purpose of
10  these exhibits?
11      A      Well, it was to show that was
12  allocated -- the green, which shows the
13  allocated amount to myself, since it's an LLC,
14  that's one and the same, Strategic Vision
15  business deductions and travel and research,
16  miscellaneous, is the yellow.
17         And then the wires out is orange
18  or red, looks like you've got here.
19      Q      Just say a bit more, if you
20  would, about what you mean by the FCW allotted
21  amounts.
22      A      Yes.
23      Q      So those are -- are those
24  personal expenditures?
25      A      They are not expenditures, they

FRENCH WALLOP

1
2  were -- Mike and I decided what we would -- how
3  we would divide the account based on our time
4  and -- being put into this project.
5         And so Mike got $250,000 wired
6  out and I got -- I left $250,000 in the
7  account, and I drew down on that amount, which
8  is how you will see that calculated in the
9  first green column, so to speak, throughout the
10  next 12 pages.
11      Q      So, you and Mr. Waller
12  individually each received $250,000 from the
13  Eastern Profit transaction?
14      A      Correct.
15      Q      And when did you decide, when
16  did Strategic Vision decide that each of you
17  would get $250,000?
18      A      Probably within the first --
19  after the contract was signed and we had sort
20  of begun to allocate some of the initial costs.
21         So I would say it would probably
22  be around the, I don't know, 10th -- 10th, 12th
23  of January 2018.
24      Q      And so in -- was that the
25  agreement -- you were here when Mr. Waller was

FRENCH WALLOP

1
2 testifying, right?
3     A     Yes.
4     Q     And he referred to an agreement
5 to split earnings.  Do you recall that
6 testimony?
7     A     Yes.  I wouldn't call it
8 earnings, but it depends upon how you define
9 it, I guess.
10          They were -- that was the amount
11 that we allocated to ourselves.
12     Q     What would you call it?  There
13 has been some prior testimony about splitting
14 of profits.  Is that more accurate?
15     A     These are not profits, this was
16 for our time allocated to this project and how
17 much time it would take between travel and
18 setting up the teams and so forth as to what
19 our costs would be.
20     Q     So, neither of you is an
21 employee of Strategic Vision, right?
22     A     That's correct.
23     Q     But the $250,000 apiece was
24 compensation?
25     A     Yes.

FRENCH WALLOP

1
2     Q     And did Strategic Vision then
3 issue a K-1?
4     A     No.
5     Q     Did Strategic Vision issue any
6 tax form to either of you in connection with
7 the $250,000?
8     A     No, because it's an LLC and he
9 was paid directly into Georgetown Research, and
10 I left the funds in the account and drew down
11 on what I would call my portion of those.
12     Q     When did Strategic Vision pay
13 Mr. Waller his $250,000?
14     A     Just looking at the January, it
15 looks like it was the 16th of January.
16          I'm sorry, I'm not sure, I take
17 that back.  It was either the 12th or the 16th;
18 I think it was the 12th of January.
19     Q     So the way, if I am following
20 correctly, the way that Strategic Vision made
21 the payment to Mr. Waller was that Strategic
22 Vision wired money to Georgetown Research and
23 then Mr. Waller withdrew it from Georgetown
24 Research?
25     A     Yes.

FRENCH WALLOP

1
2     Q     On the 16th your calendar entry
3 makes reference to a $200 --
4     A     $200,000.
5     Q     And then a $25,000 wire?
6     A     That's correct.
7     Q     Was there -- did there come a
8 time in which another $25,000 was wired?
9     A     I believe how it worked was that
10 I wired out on the 12th to Psyber Solutions
11 $200,000, on the 12th.
12          And if you look under that, it
13 says "Citibank setup for GRG," which is
14 Georgetown Research.
15          And then on the Monday, on the
16 Monday, the 16th, I wired out to GRG another
17 $200,000 plus $25,000 in expenses, and I think
18 that went to Team 1, and then Mike was going to
19 dispatch that or disburse that.
20          I may have gotten the two
21 accounts mixed up, but pretty much they are the
22 same amount, so --
23     Q     Now, I'm looking at your
24 calendar entry, so on the 12th, where it says
25 "wire out to," is that "PS, 200"?

FRENCH WALLOP

1
2     A     Psyber Solutions.  200.
3     Q     Is that a P?  I'm just asking a
4 handwriting question right now, is that a P and
5 S?
6     A     Yes, sorry.
7     Q     How does one spell Psyber?
8     A     P-s-y.
9          Well, and it's -- that's how he
10 spells it.
11     Q     And who is Psyber Solutions?
12     A     That's one of Michael's LLCs.
13     Q     And that one, Psyber Solutions,
14 is owned exclusively by Mr. Waller?
15     A     Yes.
16     Q     So, this is a general question,
17 so Strategic Vision made payment --
18          MS. CLINE:  Let me start over.
19     Q     I am trying to figure out to how
20 many of Mr. Waller's entities Strategic Vision
21 made payment to.
22          So, Strategic Vision made a
23 payment -- made payments to Georgetown
24 Research, is that right?
25     A     That's correct.

15 (Pages 54 - 57)

FRENCH WALLOP

1
2    Q     And that entity is jointly owned
3  by both of you?
4    A     It is, but it's really
5  Michael's.  I don't have any access to it or --
6  no.
7    Q     Do you have any ownership
8  interest in Georgetown Research?
9    A     No, no.  Not that I know of.
10    Q     From your perspective, it's 100
11  percent owned by Mr. Waller?
12    A     Yes.
13    Q     And Psyber Solutions is also 100
14  percent owned by Mr. Waller?
15    A     I believe so.  You would have to
16  ask him.
17    Q     What was the --
18        MS. CLINE:  Strike that, we will
19     get there in a second.
20    Q     Are you aware of any other LLCs
21  owned by Mr. Waller to which Strategic Vision
22  made payment?
23    A     No.
24    Q     So, if you could look, please,
25  at Exhibit 113, your color table.

FRENCH WALLOP

1
2    A     Um-hum.
3    Q     For now I'm just going to focus
4  on the red entries, the wires out.
5    A     Yes.
6    Q     So, if I am -- well, could you
7  tell me a little bit about how Exhibit 113 is
8  set up, what are the columns and how did you
9  organize this exhibit?
10    A     Well, I thought it was the
11  clearest way of being able to show as a direct
12  correlation to the actual bank statement.
13        So the whole full bank statement
14  was there for -- of Strategic Vision.
15        So I went through the bank
16  statement and highlighted all of the ones that
17  were what I call personal -- personal, and I
18  don't want to use the word expenses, because
19  they weren't, they were personal compensation,
20  which fell into the $250,000 that I had
21  allotted to myself, okay?
22        So I went through and I
23  highlighted all of those green ones, which were
24  part of that column.
25        In the yellow column were

FRENCH WALLOP

1
2  business expenses, and in the orange column,
3  those were the wires out to different entities,
4  relating obviously to the Team 1 and Team 2 and
5  so forth, or just Team 1.
6    Q     Were the business expenses in --
7  that are reflected in Exhibit 113, were those
8  solely related to the Eastern Profit matter?
9    A     Yes.
10        Well, yes, and business expenses
11  in running the business.  That would have
12  correlated with the expenses in order to
13  collect the information that we were looking
14  for, plus running the business.
15    Q     All right.  So let's go back now
16  and focus only on the color code red, the wires
17  out.
18    A     Okay.
19    Q     In Exhibit 113.
20    A     Yes.
21    Q     So, if I am following you, then,
22  what you did in Exhibit 113 with respect to the
23  column all the way on the right that is color
24  coded in red is just to record all of the wires
25  that were delineated in the bank statement

FRENCH WALLOP

1
2  that's Exhibit 114?
3    A     That's correct.
4    Q     So, starting with page the
5  second page of the exhibit, of Exhibit 113,
6  there are four wires that are mentioned there,
7  right?
8    A     That's correct.
9    Q     Okay.  The first one, does that
10  say "Hill invoice"?
11    A     Yes.
12    Q     What is Hill?
13    A     That is part of Team 1.
14    Q     So -- and then, if I can get you
15  to sort of simultaneously at Exhibit 114 as
16  well, if you turn to the second page of Exhibit
17  114.
18    A     Yes.
19    Q     The first red entry is a, or
20  entry highlighted in red is a $50,000 debit, is
21  that right?
22    A     That's correct.
23    Q     Does that correspond to the Hill
24  invoice recorded on Exhibit 113?
25    A     Yes.

16 (Pages 58 - 61)

FRENCH WALLOP

1
2     Q     And then the $200,000 entry on
3  Exhibit 113 says "Psyber Sol, that's also
4  reflected on page 2 of 114, correct?
5     A     Yes.
6     Q     And then there are two more red
7  highlights on page 2 of Exhibit 114, and those
8  are respectively a $25,000 wire to Georgetown
9  Research and a $200,000 wire to Georgetown
10  Research?
11     A     Yes.
12     Q     So Strategic Vision in early
13  January wired $425,000 to entities controlled
14  by Mr. Waller, is that right?
15     A     Yes, to pay vendors that we were
16  subcontracting to.
17        We were trying to keep this as,
18  despite the fact that we had gotten the wire
19  from ACA Hong Kong, which we asked not to have
20  it done that way, we were still trying to keep
21  this as compartmentalized as possible.
22     Q     Do you know, or does Strategic
23  Vision know --
24        MS. CLINE:  Strike that.
25     Q     Was it Psyber Sol or Georgetown

FRENCH WALLOP

1
2  Research or both through which Mr. Waller would
3  make payments to subcontractors?
4     A     I don't know, we would have to
5  ask him.  I believe -- I don't know.  I think
6  it's better for him to answer that.
7     Q     Well, do you know whether the
8  money that was wired to Psyber Sol, Mr. Waller
9  treated as part of his personal compensation?
10     A     No, I don't believe that -- I
11  think that was part of the overall invoice out
12  to Team 1.
13     Q     So you think Psyber Sol made
14  some payment to Team 1?
15     A     I think they made all of those
16  payments to Team 1.  In other words I think it
17  was $200,000, $250,000, yes, to Team 1.
18     Q     Then is it your understanding,
19  I'm trying to understand -- Mr. Waller and you
20  agreed that each of you would receive $250,000?
21     A     That's correct.
22     Q     And the way you received your
23  money was that it just -- you let it remain in
24  the Strategic Vision account and you used it
25  for personal expenditures, right?

FRENCH WALLOP

1
2     A     And I drew down on it, yes.
3     Q     How did Strategic Vision
4  distribute to Mr. Waller his $250,000?
5     A     Right here.
6     Q     To which one?
7     A     I'm not sure, that's why I am
8  saying you will have to just ask him which one.
9        I'm not privy to his invoices,
10  or, I know what he paid out, but I don't know
11  which account he paid it out from.
12        MR. GREIM:  Counsel, perhaps I
13     tried to draw too sharp of a line here,
14     but we will just simply -- we can put
15     him back on here and you can ask
16     whatever you need to about where those
17     wires went.
18        We will leave here with an answer
19     today.
20        MS. CLINE:  I appreciate it.
21     Q     Okay, let's just continue with
22  the, I am only interested in the wires column
23  on Exhibit 113.
24     A     Correct.
25     Q     So at the bottom of page 2, you

FRENCH WALLOP

1
2  just, as I understand it, you basically just
3  tally up all of the wires?
4     A     That's correct.
5     Q     Then go to the next page, if you
6  would, and again, focusing only on the wires
7  out column, can you describe what you have
8  recorded there?
9     A     There are no wires out for that
10  month or that -- yes, for that month.
11     Q     Okay.  And what's the arithmetic
12  at the top right-hand corner of the page there?
13     A     Essentially $475,000 from the
14  previous month wires out, and if you took the
15  $134,000 over on the left-hand column --
16     Q     Um-hum.
17     A     -- and also the business
18  expense, $5,800, you ended up showing a balance
19  or you ended up showing that it was $615,000
20  that had been essentially taken out of the
21  account in January, or not taken out, in my
22  case I left mine in.
23        So, it left a balance that we
24  were working with of $384,475.98.
25        Then if you go down the bottom

FRENCH WALLOP

1
2 of that column, it will show the $384,000 less
3 $9,090.66, where I had taken, again, I had
4 taken that out of my $250,000; if you look over
5 there on the left.
6     Q    Okay, let's keep going with the
7 wires out column.
8     A    Yeah, yeah, then the wires out,
9 then we get further on, in May, next set of
10 wires out.
11     Q    Yes, so until the beginning of
12 May the total amount of wires out was $475,000,
13 right?
14     A    That's correct, but did not
15 include my compensation.
16     Q    Okay.
17         And then what are the wires out
18 in May?
19     A    Wires out in May, $17,686.69,
20 and another one for $15,000.
21     Q    What are each of those, what is
22 the purpose?
23     A    The U.K. one was part of our
24 research in London for Fletcher, which you
25 have.

FRENCH WALLOP

1
2         Those are three of the fish, I
3 believe, two or three of the fish.
4     Q    Okay, Fletcher was a separate
5 entity that --
6     A    It wasn't Team 1, it wasn't Team
7 2, it was a separate entity.
8     Q    And what did they do?
9     A    They do investigative research?
10 Since the people were based in the U.K., we
11 wanted to see what they could pull up for -- on
12 them.
13     Q    And did Fletcher ever deliver a
14 work product to you?
15     A    Yes.
16     Q    What was that?
17     A    You have it.
18     Q    Could you describe it?
19     A    It was a report on the people
20 that were investigated, researched.
21     Q    And how when did they provide that
22 to you, to Strategic Vision?
23     A    So, they provided it in -- I
24 don't know when the bill came, but whenever the
25 bill came, I usually paid it pretty quickly.

FRENCH WALLOP

1
2         So I would have presumed they
3 provided it in May, because I saw them in
4 February to do the investigation on them.
5     Q    And when did Strategic Vision
6 retain Fletcher to --
7     A    In February, early February, I
8 think, mid-February.
9     Q    Then after Strategic Vision
10 received the termination notice from Eastern
11 Profit, did it take any means to cancel the
12 contract with --
13         MS. CLINE:  Well, strike that.
14     Q    Was there a contract between
15 Strategic Vision and Fletcher?
16     A    It was a verbal contract.
17     Q    And what were the terms of the
18 verbal contract?
19     A    He quoted me a price, he told me
20 what he thought he could get, and I agreed to
21 him, his price.
22     Q    After -- and was his price 3,000
23 pounds?
24     A    No, it was $17,000.
25         MS. CLINE:  Let's mark this.

FRENCH WALLOP

1
2         (The above described document was
3 marked Exhibit SV 115 for identification
4 as of this date.)
5     Q    So, could you identify Exhibit
6 115, please?
7     A    Exhibit 115 is a bill by
8 Fletcher for their research, and it is in the
9 amount of 13,000 pounds, which at the time
10 equaled $17,686.69.
11         It was paid on the 1st of May,
12 2018.
13     Q    And just to make sure I'm
14 understanding this correctly, in terms of the
15 breakdown of their invoice, 3,000 pounds was
16 for research and consultancy services, correct?
17     A    I don't know how they did their
18 invoices; we just agreed to the number.
19     Q    So you don't recall a specific
20 breakdown, you just agreed to --
21     A    I don't know how he does his
22 invoices.  When I saw the invoice it was the
23 number I had agreed to, and I keep my word,
24 so --
25     Q    When Strategic Vision received

18 (Pages 66 - 69)

FRENCH WALLOP

1   FRENCH WALLOP
2   the termination notice from Eastern Profit, did
3   it reach out to Fletcher and let it know about
4   the termination?
5       A   No, because it was already in
6   progress.
7       Q   Well --
8       A   In February.
9       Q   Some of the amounts paid to
10  Fletcher were for disbursements, including
11  travel, right?
12      A   I don't know, you will have to
13  ask them.
14      Q   Did you ever say, did Strategic
15  Vision ever have a conversation with Fletcher
16  to the effect that they shouldn't incur any
17  more fees because the contract had been
18  cancelled?
19      A   No.
20      Q   Why not?
21          MR. GREIM:  Objection,
22      foundation.
23          You can answer if you understand
24      the question.
25      A   I don't understand the question.

FRENCH WALLOP

1   FRENCH WALLOP
2   How about that?
3       Q   Who from Strategic Vision
4   reached the oral agreement with Fletcher?
5       A   I did.
6       Q   You did?
7       A   Yes.
8       Q   So perhaps you have a foundation
9   to answer the question.
10          So, then --
11      A   I love humor, it's so helpful.
12      Q   Why didn't Strategic Vision, and
13  specifically you, as the representative who
14  negotiated the arrangement, tell them to stop
15  incurring fees because the reason for the
16  arrangement you had made with them no longer
17  existed?
18          MR. GREIM:  Objection, compound
19      question, and foundation.
20      A   Because I had contracted them in
21  February, they were working on it.  I'm not
22  going to stop them.  Maybe the bill was going
23  to be a lot more.  Who knows?
24          But bottom line was I agreed to
25  this number, they did the research, they

FRENCH WALLOP

1   FRENCH WALLOP
2   produced the report.
3           And so if anybody was saying
4   that we were not producing reports, they did
5   not, again, know what they were talking about.
6           We were producing reports and we
7   were paying for reports.
8       Q   So Strategic Vision -- is there
9   any evidence that you are aware of that
10  Strategic Vision did anything to mitigate its
11  damages with respect to Fletcher?
12          MR. GREIM:  Objection, calls for
13      a legal conclusion, and foundation.
14      A   I have no way of understanding
15  how to answer that question.
16          MS. CLINE:  Can I just
17      understand, Eddie, the basis for the
18      foundation objection?
19          MR. GREIM:  Sure, I am happy.
20      It's a bit of an explanation, but
21      under the contract there is a 30 day
22      notice of termination.
23          So the notice of termination is
24      given, it must be given 30 days before the
25      end of the contract.

FRENCH WALLOP

1   FRENCH WALLOP
2           So in those 30 days, other work is
3   going to be done.
4           I mean, our theory, as you know, is
5   there is a set fee for certain periods,
6   and so it would not make any sense to call
7   and stop the work, you actually need
8   to finish the work over that time period.
9           So all of your questions assume
10  that it's a different situation, and you
11  haven't laid, the proper way to say it is
12  you haven't laid the foundation for the
13  work that you are trying to describe to
14  the witness.  So I am just preserving the
15  objection.
16          You can ask her facts, see what you
17  can get.  I will say we have moved a
18  little beyond understanding the document,
19  we are going back and circling through the
20  same topics from the first deposition.
21          But go ahead and do your best.
22          MS. CLINE:  Yes, she's the
23      damages witness, or at least she was,
24      and maybe only now she's the, partially
25      the damages witness.

19 (Pages 70 - 73)

FRENCH WALLOP

1
2      I'm just trying to understand why
3   there was money wired out to this
4   contractor in May for a contract that was
5   terminated in February, effective in
6   March, so.
7      Q    So my question to you as the
8   person who was the point of contact between
9   Strategic Vision and Fletcher is whether you
10  ever communicated with Fletcher after the
11  inception of your relationship with them to ask
12  them to stop incurring fees with respect to the
13  Eastern Profit research?
14     A    I did not, because I had
15  contracted with them in February to do the job,
16  and they did the job, and I didn't get noticed
17  on this lawsuit until sometime at the end of
18  February.
19         So, it was really clear that if
20  you ask somebody to do a transaction and do the
21  investigation and you owe them for that amount
22  of money, that you owe them for that amount of
23  money.
24         You don't just not pay them.
25     Q    What's the $15,000 wire in May

FRENCH WALLOP

1
2   to Georgetown Research, what is the purpose for
3   that?
4      A    I think that was to Michael, and
5   I think that was either for additional expenses
6   or, again, you will have to ask Michael, but I
7   think -- I think that's what it was.
8      Q    Turning to June --
9      A    Yes.
10     Q    -- what's that $50,000 wire?
11     A    That was to Oceanic, and that
12  was $50,000, and that was to Michael.  That was
13  part of his $250,000.
14         He had been paid $200,000 and he
15  was owed the additional $50,000.
16     Q    So, sorry, I am just trying to
17  find the -- what was the name of the entity,
18  Oceanic Advisors, do you remember?
19     A    I don't know.  I think so.
20     Q    But your understanding is the
21  wire sent in June of '18 was to an LLC
22  controlled by Mr. Waller?
23     A    Let me just take a look here.
24  Yes, I believe it was, I believe it was to
25  Oceanic.

FRENCH WALLOP

1
2      Q    And your understanding is that
3   was part of his personal compensation?
4      A    Yes, it was part of the
5   $250,000, the original $250,000.
6      Q    Would you turn to, in Exhibit
7   114, Bates page number 1924.
8      A    114?
9      Q    Yes, please, Bates 1924.
10     A    Sorry.  Yes, I have it.
11     Q    And there is a red highlight
12  that corresponds to the $50,000 wire we just
13  talked about, is that right?
14     A    That's correct.
15     Q    Do you know why Strategic Vision
16  redacted out the name of the recipient?
17     A    I don't.  Unless it was the
18  account number.
19     Q    Is there anywhere in Exhibit 113
20  where you total up all of the wires out?
21     A    That's a great question.
22         No, there isn't.
23         But it's pretty easy to do;
24  there are only about five or six wires out, so,
25  and they are all in round numbers.

FRENCH WALLOP

1
2      Q    So, approximately $490,000 of
3   the money was wired out to entities controlled
4   by Mr. Waller, is that accurate?
5      A    I think you would have to ask
6   Mr. Waller, Dr. Waller.  He was disbursing to
7   vendors.
8      Q    All right, let's look at the --
9   so, the green column?
10     A    Yes.
11     Q    Those are -- Strategic Vision
12  isn't claiming items that are in the green
13  column as business expenses in connection with
14  this litigation?
15     A    No.
16     Q    The yellow column is the one
17  that relates to Strategic Vision's business
18  expenses?
19     A    Correct.
20     Q    Sorry, bear with me, I lost my
21  place.
22         Turn, if you would, to the
23  second page of Exhibit 114.
24     A    Yes.
25     Q    Now we are focusing on yellow

20 (Pages 74 - 77)

FRENCH WALLOP

1
2  entries, Exhibit 114.
3      A     Yes.
4      Q     Several entries down there is
5  one for a debit of $2,000, it's an ACH debit.
6  Do you see that one?
7      A     Yes.
8      Q     January 10th?
9      A     Yes.
10     Q     And the memo line says it's for
11  payroll services.  Do you see that?
12     A     Yes.
13     Q     What were the payroll services
14  that Strategic Vision was --
15     A     It's actually a tax deduction, I
16  mean it's a set-aside for taxes every month.
17     Q     For whose taxes?
18     A     For the -- for the corporate
19  taxes or the business taxes, I guess.
20     Q     So, Strategic Vision?
21     A     Yes, Strategic Vision.
22     Q     Strategic Vision filed a tax
23  return?
24     A     Yes -- no, we did not.  It falls
25  under my own personal tax return.

FRENCH WALLOP

1
2      Q     So where did the -- every time
3  there is an entry for a $2,000 payroll --
4      A     That goes towards the taxes that
5  are paid in my tax return for this business
6  entity, for income, and it's a tiny -- this is,
7  $24,000 a year is nothing.
8      Q     So, let me just finish my
9  question, though.
10          So every time there is a $2,000
11  entry for payroll services, that's essentially
12  a payment to you for taxes?
13     A     Yes, it is.  Or a set-aside.  It
14  doesn't come to my account.
15     Q     Where does it go?
16     A     It goes into the ACH account.
17     Q     Where is that housed?
18     A     In my accountant's office.
19     Q     Did you -- did Strategic Vision
20  have an accountant?
21     A     No.
22     Q     Did you run your table by your
23  accountant?
24     A     No, I just asked him on the
25  telephone a couple of questions.

FRENCH WALLOP

1
2      Q     What did you ask him?
3      A     I asked him about business
4  expenses versus the personal.
5      Q     What did he say?
6      A     He said well, this is the best
7  way of sort of setting it out.  Unless you are
8  going to go through a sort of computer program,
9  it's just the easiest visual way for something
10  like this to be viewed by an attorney or a law
11  firm.
12     Q     Did you ask him whether the tax
13  set-aside to you every month is recordable as a
14  business expense?
15     A     No; I didn't ask.
16     Q     On the same page we were just
17  on, the second page of Exhibit 114, if you go
18  down actually on January 10th, there is another
19  entry for Hermes.  Do you see that?
20     A     Yes.
21     Q     That's a business expense?
22     A     Where is that?
23     Q     January 10, $1,315.
24     A     On the second page?
25     Q     So, just so we are clear, Bates

FRENCH WALLOP

1
2  1908.
3      A     1908.  Oh, yes, actually, I know
4  it doesn't look like it, but I went through
5  that with the green highlighter, you see it's
6  not -- it was yellow, then I made it green.
7      Q     So if you go --
8      A     It's hard to tell.
9      Q     Go to Exhibit 113, if you would,
10  second page of the Exhibit 113.
11     A     Okay.
12     Q     So, in the business expense
13  column there is a $1,315.
14     A     Yes.
15     Q     That corresponds to your Hermes
16  purchase, right?
17     A     Yes.  Actually, part of that
18  was -- part of that, I think, I thought I gave
19  something to Yvette, but I can't -- I don't
20  think I did.  I think I kept it because she was
21  so disagreeable.
22          So I think it was probably, it
23  should go back into my personal one, but you
24  see on my -- on my actual bank statement, I did
25  go over the green, I did go over the yellow

21 (Pages 78 - 81)

Page 82

FRENCH WALLOP

1
2 with green and it came out pale green, but I
3 didn't do it on my written one.
4         So that is a mistake on my part.
5 I thought I got that.
6         Q    Same page, so in Exhibit 113, if
7 you kind of scroll down with your finger toward
8 the bottom of the page, there is an entry for
9 $206.71.  Do you see that?
10       A    I see it here.
11       Q    And then if you track over to
12 the bank statements, there is a corresponding
13 entry to Tumi Stores?
14       A    Yes, that was for a briefcase.
15       Q    For whom?
16       A    Me.
17       Q    So in this case are you asking,
18 is Strategic Vision asking Eastern Profit to
19 pay for your briefcase?
20       A    It's a business expense.
21       Q    So the answer is yes?
22       A    Yes.
23       Q    So, in the bank statement,
24 Exhibit 114, turn, if you would, to page 1912.
25       A    Yes.

Page 83

FRENCH WALLOP

1
2       Q    Just bear with me a second.
3       The very last entry is another
4 entry to the Tumi Store, right?
5       A    Yes.
6       Q    $418.70?
7       A    Yes.
8       Q    And you've recorded that as a
9 business expense, right?
10      A    Yes.
11      Q    What was the nature of that
12 business expense?
13      A    I think one was a wallet and one
14 was a -- no, one was not a wallet.  It was a
15 laptop envelope, which was the cheaper one, and
16 then this was the briefcase.
17      Q    Turn the page in the bank
18 account, exhibit page 1913.
19      A    Yes.
20      Q    The very first entry, point of
21 service debit, Bloomy's, do you see that there?
22      A    Yes.
23      Q    What's Bloomy's?
24      A    Bloomingdale's.
25      Q    And there is a Bloomingdale's

Page 84

FRENCH WALLOP

1
2 debit over $1,500, right?
3       A    Yes.
4       Q    What's the business purpose of
5 the Bloomingdale's expense?
6       A    Probably a coat.
7       Q    A coat.  So your damages in this
8 case, Strategic Vision expects Eastern Profit
9 to pay for your coat?
10      A    It's not Eastern Profit, it's
11 ACA, right?  That's who paid for it, not -- we
12 need to straighten that out.
13          It is not Eastern Profit, it's
14 ACA who paid for it.  You want to get specific.
15      Q    Has Strategic Vision sued ACA to
16 get a return of its deposit?
17      A    Working on it.
18      Q    Currently do have a lawsuit
19 pending against ACA?
20      A    Not yet.
21      Q    But as damages in this case,
22 Strategic Vision is seeking a $1,500 expense
23 from Bloomingdale's for your coat, right?
24      A    For my coat -- I'm not seeking
25 damages, I'm showing expenses.  When you have

Page 85

FRENCH WALLOP

1
2 to get into the very cold winter and you have
3 to travel to cold places and you buy yourself a
4 coat or a suit, yes.
5          And business expenses are
6 allowed for clothing under IRS.
7       Q    Turn to page 1916 of the bank
8 account, Exhibit 114, please.
9       A    Yes.
10      Q    There is an entry toward,
11 actually the last entry on that page, it's for
12 $1,343.55.  Do you see that?
13      A    Yes, I do.
14      Q    And that is for life insurance,
15 is that right?
16      A    Yes, it is.
17      Q    That's a business expense as
18 well?
19      A    Yes.
20      Q    And how do you justify that as a
21 business expense?
22      A    Your insurance is not a business
23 expense?  My insurance is a business expense.
24 I can allocate whatever I wish to a business
25 expense as long as it's legal under the IRS

22 (Pages 82 - 85)

FRENCH WALLOP

1
2 regulations, and it is legal.
3    Q    Did you consult with your
4 accountant about the life insurance?
5    A    Always.
6    Q    With respect to this particular
7 entry did you?
8    A    Not specifically, no.
9    Q    So, you would agree that the
10 termination that Eastern Profit sent was
11 effective as of March 21st, 2018, correct?
12    A    No.
13    Q    When was the -- when was the
14 termination effective?
15    A    The termination was supposed to
16 have been for the three months.  The
17 termination was not given to us until sometime
18 in February, without knowledge and when -- and
19 I believe it was at the tail end of February.
20        I don't know what the exact date
21 was.
22    Q    Okay, and you understood there
23 was a 30 day termination?
24    A    I understand there is a 30 day
25 termination, and they should have taken it to

FRENCH WALLOP

1
2 the end of March or to the end of April, yes.
3    Q    Okay.  But even Strategic Vision
4 would concede that the contract by the end of
5 March was terminated, correct?
6        MR. GREIM:  Objection, calls for
7    a legal conclusion.
8    A    I don't know.  I rely on my
9 counsel's advice.
10    Q    As the representative of
11 Strategic Vision who's in charge of the damages
12 calculation, you don't know when the contract
13 was terminated?
14    A    I do know that they sent a
15 letter -- we actually didn't get a letter
16 stipulating a -- we just got a letter with a
17 lawsuit, not that it had been ended.
18        After multiple conversations
19 with Lianchao, who had multiple conversations
20 with Guo, he never said he was going to do it.
21 He said we were going to work
22 together to try to figure out how we could get
23 more information, which is exactly what we had
24 been doing all along.
25    Q    Let's go to page 1917 in Exhibit

FRENCH WALLOP

1
2 114.
3    A    Yes.
4    Q    So just that page there, every
5 line item in the bank statement is a business
6 expense, correct?
7    A    Yes.
8    Q    And what's the business
9 justification for those expenditures in April
10 of 2018?  What were you doing for Eastern
11 Profit at that point?
12    A    Many things.  We were continuing
13 to pull information.  We didn't believe that
14 Guo was going to keep up a lawsuit when we were
15 getting additional information bit by bit.
16    Q    So, Strategic Vision continued
17 to do work and incur expenses in April even
18 after the termination had taken effect,
19 correct?
20    A    I wouldn't agree with that.
21    Q    Well, is there a single
22 expenditure on page 1917 that you can explain
23 in connection with the work Strategic Vision
24 was doing for Eastern Profit?
25    A    Yes, all of it.

FRENCH WALLOP

1
2    Q    So let's focus on the second
3 entry, the ATM withdrawal, is it really in Abu
4 Dhabi?
5    A    If it says I'm in Abu Dhabi,
6 that's where I was, yes.
7    Q    Well, do you remember being in
8 Abu Dhabi in April of 2018?
9    A    Yes.
10    Q    And what was the purpose of this
11 ATM withdrawal that you made that you recorded
12 as a business expense?
13    A    Probably taxis.
14        In other words, it was an ATM
15 debit, to get cash to pay a taxi.  They don't
16 have taxis with credit cards, gizmos.
17    Q    Then there is -- so that was
18 on -- and what were you doing in Abu Dhabi as
19 that relates to Eastern Profit's business in
20 April of 2018?
21    A    Well, we were asked to come to
22 Abu Dhabi.
23    Q    By whom?
24    A    We were asked to come to Abu
25 Dhabi by somebody who had suggested we make a

23 (Pages 86 - 89)

FRENCH WALLOP

1
2  visit.
3      Q      By whom, who was that?
4      A      I can't remember his last name.
5      Q      It wasn't anyone on behalf of
6  Eastern Profit, right?
7      A      Could have been.
8      Q      It could have been?
9      A      Could have been.
10     Q      What's the basis for your
11  thinking that it could have been?
12     A      Well, we were looking into a lot
13  of potential fraud by Guo in Abu Dhabi.
14     Q      So, is your testimony that
15  someone from Eastern Profit could have asked
16  you to go to Abu Dhabi to look into fraud
17  relating to Mr. Guo?
18     A      You keep saying Eastern Profit.
19  It's ACA that sent the money, not Eastern
20  Profit.
21     Q      My question is trying to -- what
22  I'm driving at, I'm trying to understand the
23  nature of the -- of your reason for recording
24  your expenses in Abu Dhabi as business expenses
25  chargeable to Eastern Profit.

FRENCH WALLOP

1
2      A      I have no idea.
3      Q      Turn to page 1919.
4              Toward the bottom of the page
5  there are two business expenses or items you
6  have recorded in yellow, one for over $17,000
7  and one for $15,000.
8              Tell us what those are.
9      A      I think -- oh, that's easy,
10  $17,000 was for Fletcher and $15,000 was to
11  Mike's -- one of Mike's wires.
12     Q      Is there any reason those are
13  yellow and not red?
14     A      They were a business expense to
15  the company, right?
16             Let me just see, what month was
17  that, May?
18             Yeah, there actually should have
19  been -- they were on my sheet that way, but not
20  on this.
21             So I guess I was looking at it
22  as a business expense, but they are in my
23  actual accounting sheet.
24     Q      Turn to page 1920, please.
25             On May 11th there is an entry

FRENCH WALLOP

1
2  there for a debit, Capital One online payment.
3  Do you see that?
4      A      Yes.
5      Q      That's a credit card, I assume?
6      A      Yes.
7      Q      And the amount is $4,781.97,
8  right?
9      A      Yes.
10     Q      And what was the nature of those
11  expenses?
12     A      Probably the previous month
13  overseas in Abu Dhabi and in London.
14     Q      And how did those expenditures
15  in Abu Dhabi and London relate to Eastern
16  Profit?
17     A      We were still investigating his
18  fish, as well as some of the other work that
19  needed to be done on his case.
20     Q      Why were you still conducting
21  investigations in April and May?
22     A      We wanted to find out exactly
23  what was going on with him.
24     Q      Whom were you investigating in
25  April and May?

FRENCH WALLOP

1
2      A      A number of fish, including the
3  ones that Fletcher was investigating.
4      Q      Were you investigating Mr. Guo
5  in April?
6      A      Some of it, yes.
7      Q      So you are claiming as damages
8  in this litigation against Eastern Profit money
9  that you spent to investigate Mr. Guo?
10     A      Well, actually, again, it's ACA
11  that sent the money, not Mr. Guo, right?
12             MS. CLINE:  Can you read my
13         question back, please.
14             (The question requested was read
15         back by the reporter.)
16     Q      Is that right?
17     A      Yes.
18     Q      Is Strategic Vision compensating
19  you to testify today?
20     A      No.
21     Q      Is it compensating you for your
22  time?
23     A      No, sadly.
24     Q      Is anyone compensating you for
25  your time in connection with this litigation?

24 (Pages 90 - 93)

FRENCH WALLOP

1
2    A    No.
3    Q    Who paid for your travel
4 expenses to come to New York?
5    A    I did.
6    Q    Are you or Strategic Vision
7 being compensated or reimbursed in any way by
8 anyone for your expenses related to this
9 lawsuit?
10    A    No.
11        MS. CLINE:  All right, let's take
12    a break.
13        THE VIDEOGRAPHER:  The time is
14    3:51 p.m.  This is the end of video 1.
15    We are off the record.
16        (At this point in the proceedings
17    there was a recess, after which the
18    deposition continued as follows:)
19        THE VIDEOGRAPHER:  The time is
20    4:07 p.m.  We are on the record.  This
21    is video 2.
22    Q    I can't remember where we were,
23 but let's go to page 1920 of Exhibit 114.
24        MR. GREIM:  Counsel, I want to be
25    very clear about something.  I was

FRENCH WALLOP

1
2 listening to the last round of
3 questions, I was listening to the
4 witness' answers here.
5        And I did this once earlier today,
6 I will say this again on this point now.
7        It is not Strategic's position that
8 it is entitled to make a claim for any of
9 the yellow business costs on Exhibit 114
10 that were incurred after March 25th.
11        So I know, perhaps you're intending
12 to go further through the months here.
13 What the witness did was she went through
14 and divided this between personal and
15 business expenses for Strategic Vision.
16        The problem is that many of these
17 do not pertain to the Eastern Profit
18 contract, as I think is pretty clear.
19        And so I just want to state
20 Strategic Vision's position on the record
21 that its claim under the fraud claim for
22 recovery of its costs and a rescissionary
23 measure does not include recovery of
24 anything after March 25th.
25        MS. CLINE:  After March?

FRENCH WALLOP

1
2        MR. GREIM:  25th.
3        There are a few wires that were
4    made after March 25th that the witness
5    testified to, one to Mr. Waller and one to
6    Fletcher, that are part of the claim.
7        I'm talking about the yellow debit
8    column.
9        MS. CLINE:  Okay, bear with me a
10    minute, then.
11    Q    All right, let's turn to page
12 1915 of Exhibit 114.
13    A    Yes.
14    Q    There is a --
15        MS. CLINE:  Sorry, I've already
16    forgotten what date cutoff you just
17    said.
18        MR. GREIM:  March 25th.
19    Q    Okay, so let's start over.
20        So on page 1915 there is a -- on
21 March 1 there is a line item entry for ATM
22 withdrawal of $303.  That was cash, right?
23    A    It appears so, yes.
24    Q    And what was the business --
25 what did you do with the cash that was a

FRENCH WALLOP

1
2 business expense?
3    A    I have no idea.  It was a year
4 and a half ago, ATM machine.
5    Q    And then go down a few more
6 lines.  There is a debit card purchase on March
7 13th.  What is the Grace Bay Club & Spa?
8    A    That was to investigate -- there
9 were two Chinese individuals we were tracking
10 in the Turks & Cacos.
11    Q    So that is an expenditure --
12    A    Yes.
13    Q    -- of $456 at a spa in Turks &
14 Cacos?
15    A    It wasn't a spa, it was a hotel,
16 a night, two nights.
17    Q    And your testimony is whom were
18 you investigating?
19    A    Two Chinese characters that were
20 on the list.
21    Q    And who was with you in Turks &
22 Cacos?
23    A    My son was with me, but just we
24 had separate rooms, so --
25    Q    But who -- you were there, were

FRENCH WALLOP

1
2  you meeting with investigators there?
3      A     No, I was investigating on my
4  own.
5      Q     Why did you need to be in Turks
6  & Cacos?
7      A     Because that's where the two
8  Chinese were those two nights.
9      Q     And what did you do to
10  investigate them?
11     A     I suppose that when you are
12  tracking somebody you are trying to gather
13  intelligence, and that's what I was doing.
14     Q     That's what I am asking you
15  about.  Were you surveilling them?
16     A     Yes, to some degree, yes.
17     Q     And how did you go about that?
18     A     As anybody that does this does,
19  you watch them, you listen, you see what they
20  are talking about, you take photographs of
21  them, you put it back into the basket of
22  information that we filling.
23     Q     And are you trained in
24  surveillance?
25     A     I am not trained in

FRENCH WALLOP

1
2  surveillance, no.
3      Q     Did you conduct any other
4  surveillance yourself in connection with the
5  Eastern Profit contract?
6      A     Yes.
7      Q     Would you describe that?
8      A     I wouldn't know where to begin,
9  so.
10     Q     Other than at a hotel in Turks &
11  Cacos with your son --
12     A     Yes.
13     Q     -- what activities did you
14  undertake to engage in surveillance for Eastern
15  Profit?
16     A     In the U.K., in the Middle East
17  and in Switzerland.
18     Q     What did you do in the U.K.?
19     A     I think I've already mentioned
20  Fletcher and other people that I was talking
21  to.
22     Q     Well, Fletcher was a contractor
23  you hired, right?
24     A     Yes.
25     Q     Did you personally engage in any

FRENCH WALLOP

1
2  surveillance when you were in the U.K.?
3      A     I wouldn't call it surveillance,
4  no, but it was certainly collecting
5  information.
6      Q     How did you collect -- what was
7  the purpose for your trip to the U.K. other
8  than to meet with Fletcher?
9      A     There were multiple reasons.
10     Q     What were the other ones?
11     A     To comply with what our
12  so-called fake names that we were coming up
13  with, thanks to Guo and Yvette's incompetence,
14  we wanted to try to check out what was -- what
15  the truth was, who was who.
16           And that was happening as a
17  result of both Team 1 and Team 2, and we were
18  getting odds and ends of information to try to
19  determine which individuals were fake and which
20  ones weren't.
21     Q     How did you personally go about
22  getting odds and ends of information?
23     A     Oh, I'm not going into that, I'm
24  sorry.  I'm just not going into that.  We have
25  many contacts, a great network around the

FRENCH WALLOP

1
2  world.
3      Q     Did you personally engage in
4  surveillance when you were in the Middle East,
5  surveillance on behalf of Eastern Profit?
6      A     Surveillance is a wrong -- is a
7  ridiculous word.  It's not surveillance.
8      Q     So what did you do in the Middle
9  East?
10     A     You ask questions and you talk
11  to people and you burrow into getting answers
12  about people that are crooks and people that go
13  out of their way to lie and make up fake names,
14  putting us on a fake rabbit hunt to try to find
15  out things about people that don't exist.
16     Q     Did you personally engage in any
17  other information gathering on behalf of
18  Eastern Profit?
19     A     When?
20     Q     During the course of -- well,
21  from ever, let's start there.
22           I mean, you've told us about the
23  U.K. and the Middle East.  I am limiting it to
24  your personal activities, information
25  gathering, trying to understand the basis of

26 (Pages 98 - 101)

Page 102

FRENCH WALLOP

1   FRENCH WALLOP
2   your experience and expertise information
3   gathering and how you applied that here.
4       A    I don't understand the question.
5   Would you please repeat it?
6       Q    Yes.  So your testimony is that
7   when you were in Turks & Cacos you were
8   engaging in information gathering and
9   surveillance, I thought you said, and I am
10  trying to understand that was not my
11  understanding prior to today.
12      So I am trying to understand
13  what other information gathering you did on
14  behalf of Eastern Profit.
15      A    Because we were working with
16  certain team members and individuals that were
17  part of the overall team in collecting
18  information.
19      Q    When you say we, you mean you
20  and Mr. Waller?
21      A    No, myself and other people.
22      Q    Who else was with you?
23      A    I am not answering it.
24          MR. GREIM:  Well, I would say
25      that this witness is here to talk about

Page 103

1   FRENCH WALLOP
2   the damage calculation.
3       She -- the questions are
4       permissible I think to talk about what was
5       happening to incur that charge.
6       To talk about what other people are
7       there I think is beyond the scope.
8       Q    Let's look, for example, at
9   March 20th, the entry on page 1916.
10      A    Yes.
11      Q    There is a -- an entry for
12  $1,355.  Can you tell from the information here
13  what that purchase was for?
14      A    We have already said what that
15  purchase was for, it was for insurance.
16      Q    Sorry.  So there are two --
17  there is an entry at the bottom of the page
18  that says American General Life Insurance.
19      A    Yes.
20      Q    That's the one related to
21  insurance?
22      A    Yes.
23      Q    Then there is one up higher on
24  March 20th.
25      A    March 20th.

Page 104

FRENCH WALLOP

1   FRENCH WALLOP
2       That was British Airways.
3       Q    And so my question is what were
4   you doing, where did you go for the British
5   Airways?
6       A    London.
7       Q    Why were you in London in March
8   to do business for Eastern Profit?
9       A    Because we were trying to
10  salvage the mess that had been created by the
11  people that were working with Guo in the Sherry
12  Netherland, I guess, trying to clean up what we
13  were trying to gather as additional
14  intelligence.
15      Q    And what did you personally do
16  to clean up in London in March?
17      A    I met with a number of people
18  that were trying to be helpful.
19      Q    And who were those people?
20      A    I am not going to name them, I'm
21  sorry.
22      Q    I'm trying to understand the
23  justification for an expense of a trip to
24  London for which you are seeking damages in
25  this litigation, and are you refusing to answer

Page 105

1   FRENCH WALLOP
2   the question?
3       A    I am refusing to answer.
4       Q    Is your answer the same with
5   respect to all of the purchases on page 1916
6   through March 23rd?
7       A    These are all foreign expenses
8   for this project.
9       Q    Yes, and I am asking you to
10  describe the nature of the activities, the
11  business activities you were engaged in.
12      A    I've already answered that
13  question.
14      Q    I thought you were refusing to
15  answer the question?
16      A    Well, that's an answer.
17          MS. CLINE:  All right, I have no
18      further questions of this witness, but
19      we would like to recall Mr. Waller.
20          THE VIDEOGRAPHER:  The time is
21      4:20 p.m.  We are concluded and off the
22      record.
23
24
25

27 (Pages 102 - 105)

Page 106

```
1          C E R T I F I C A T E
2
3          I, the undersigned, a Certified
    Shorthand Reporter of the State of New
    York, do hereby certify:
4          That the foregoing proceedings were
    taken before me at the time and place
5    herein set forth; that any witnesses in
    the foregoing proceedings, prior to
6    testifying, were duly sworn; that a record
    of the proceedings was made by me using
7    machine shorthand which was thereafter
    transcribed under my direction;
8          That the foregoing transcript is a
    true record of the testimony given.
9          Further, that if the foregoing
    pertains to the original transcript of a
10   deposition in a federal case before
    completion of the proceedings, review of
11   the transcript [ ] was [x] was not
    requested.
12
           I further certify I am neither
13   financially interested in the action nor a
    relative or employee of any attorney or
14   party to this action.
           IN WITNESS WHEREOF, I have this
15   date subscribed my name.
16
17
18
19
20
           Stephen J. Moore
21         RPR, CRR
22
23
24
25
```

Page 107

```
1
2    DECLARATION UNDER PENALTY OF PERJURY
3         Case Name: EASTERN v. STRATEGIC
4         Date of Deposition: November 19,
5         2019
6
7         I, FRENCH WALLOP, hereby certify
8         Under penalty of perjury under the
9    laws of the State of New York that the
10   foregoing is true and correct.
11        Executed this _____ day of
12   _____, 2019, at
13        _____.
14
15
16   _____
17
18        FRENCH WALLOP
19
20
21
22
23
24
25
```

Page 108

```
1
2    DEPOSITION ERRATA SHEET
3    Case Name: EASTERN v. STRATEGIC.
4    Name of Witness: FRENCH WALLOP
5    Date of Deposition: November 19,
6    2019
7    Reason Codes:  1. To clarify the
8    record.
9    2. To conform to the facts.
10   3. To correct transcription errors.
11   Page _____ Line _____ Reason _____
     From _____ to _____
12   Page _____ Line _____ Reason _____
     From _____ to _____
13   Page _____ Line _____ Reason _____
     From _____ to _____
14   Page _____ Line _____ Reason _____
     From _____ to _____
15   Page _____ Line _____ Reason _____
     From _____ to _____
16   Page _____ Line _____ Reason _____
     From _____ to _____
17   Page _____ Line _____ Reason _____
     From _____ to _____
18   Page _____ Line _____ Reason _____
     From _____ to _____
19   Page _____ Line _____ Reason _____
     From _____ to _____
20   Page _____ Line _____ Reason _____
     From _____ to _____
21   Page _____ Line _____ Reason _____
     From _____ to _____
22   Page _____ Line _____ Reason _____
     From _____ to _____
23   Page _____ Line _____ Reason _____
     From _____ to _____
24   Page _____ Line _____ Reason _____
     From _____ to _____
25
```

Page 109

```
1
2    DEPOSITION ERRATA SHEET
3    Page _____ Line _____ Reason _____
     From _____ to _____
4    Page _____ Line _____ Reason _____
     From _____ to _____
5    Page _____ Line _____ Reason _____
     From _____ to _____
6    Page _____ Line _____ Reason _____
     From _____ to _____
7    Page _____ Line _____ Reason _____
     From _____ to _____
8    Page _____ Line _____ Reason _____
     From _____ to _____
9    Page _____ Line _____ Reason _____
     From _____ to _____
10   Page _____ Line _____ Reason _____
     From _____ to _____
11   Page _____ Line _____ Reason _____
     From _____ to _____
12   Page _____ Line _____ Reason _____
     From _____ to _____
13   Page _____ Line _____ Reason _____
     From _____ to _____
14   Page _____ Line _____ Reason _____
     From _____ to _____
15   Page _____ Line _____ Reason _____
     From _____ to _____
16   Page _____ Line _____ Reason _____
     From _____ to _____
17        Subject to the above
18   changes, I certify that the transcript is
19   true and correct
20        No changes have been
21   made. I certify that the transcript is
22   true and correct.
23
24   _____
25        FRENCH WALLOP
```

28 (Pages 106 - 109)

## &

**&** 97:7,10,13,21
    98:6 99:10 102:7

## 1

**1** 3:21 4:6 8:18
    10:25 11:5,10,16
    12:2,10,17,21,24
    13:12,15 15:9
    19:21,22 21:16
    26:8 30:11 51:23
    55:3 56:18 60:4,5
    61:13 63:12,14,16
    63:17 67:6 94:14
    96:21 100:17
    108:7
**1,315** 80:23 81:13
**1,343.55.** 85:12
**1,355** 103:12
**1,500** 84:2,22
**10** 3:12 36:16
    43:14,14,14,15
    47:19,20,23,24
    48:4,7 80:23
**100** 12:4 48:21
    58:10,13
**10th** 26:19 53:22
    53:22 78:8 80:18
**11** 3:19
**11/22/19** 106:16
**1100** 2:7
**111** 3:8 6:20,23
    10:6
**111,000** 25:2
**112** 3:11 35:3,6,15
    36:8,25 39:4
    42:15 43:9 47:7
**113** 3:14 51:6,13
    51:16 52:2 58:25
    59:7 60:7,19,22
    61:5,24 62:3

**64:23 76:19 81:9**
    81:10 82:6
**114** 3:19 51:8,10
    51:13,21 52:4
    61:2,15,17 62:4,7
    76:7,8 77:23 78:2
    80:17 82:24 85:8
    88:2 94:23 95:9
    96:12
**115** 3:24 69:3,6,7
**117,000** 25:2
**11:10** 33:15
**11th** 12:20 37:23
    37:24 91:25
**12** 53:10
**12th** 53:22 55:17
    55:18 56:10,11,24
**13,000** 69:9
**1313** 2:17
**134,000** 65:15
**13th** 97:7
**15** 21:12 36:16
    47:25 48:5
**15,000** 66:20 74:25
    91:7,10
**16th** 14:20,21
    15:16,22,23 27:5,8
    28:6,13 55:15,17
    62:16
**17,000** 68:24 91:6
    91:10
**17,686.69** 66:19
**17,686.69.** 69:10
**18** 1:8 4:12 8:7
    75:21
**18th** 27:16,22
**19** 1:13 4:5 107:4
    108:5
**1908** 81:2,3
**1912** 82:24

**1913** 83:18
**1915** 96:12,20
**1916** 85:7 103:9
    105:5
**1917** 87:25 88:22
**1919** 91:3
**1920** 91:24 94:23
**1924** 76:7,9
**19899** 2:18
**1:47** 1:13 4:4
**1st** 18:21 27:17
    69:11

## 2

**2** 8:22 19:14,17
    20:5,6,11 24:6
    25:15 26:4,7
    30:13 60:4 62:4,7
    64:25 67:7 94:21
    100:17 108:9
**2,000** 78:5 79:3,10
**200** 56:3,25 57:2
**200,000** 15:25 56:4
    56:11,17 62:2,9
    63:17 75:14
**2017** 7:14 8:7,24
**2018** 3:21 7:14 8:8
    9:4,8,12,21 10:16
    10:22 11:4 32:20
    36:22 51:23 53:23
    69:12 86:11 88:10
    89:8,20
**2019** 1:13 3:22 4:5
    51:24 107:5,12
    108:6
**206.71.** 82:9
**20932** 106:19
**20th** 103:9,24,25
**21** 3:8
**2103** 8:23
**2104** 9:2

**2105** 9:7
**2185** 1:8 4:12
**21st** 38:9,14 39:5
    39:14,25 86:11
**23** 42:23
**23rd** 105:6
**24** 16:16
**24,000** 79:7
**25,000** 16:2,6 56:5
    56:8,17 62:8
**250** 37:16
**250,000** 53:5,6,12
    53:17 54:23 55:7
    55:13 59:20 63:17
    63:20 64:4 66:4
    75:13 76:5,5
**25th** 13:11 29:4
    31:13 32:8 33:6
    34:6 95:10,24
    96:2,4,18
**26th** 13:21 14:17
    33:10
**27/28** 33:2
**27th** 33:12
**28** 32:25
**28th** 32:24 33:15
**29** 32:23 33:3
**29th** 33:19
**2:46** 50:21
**2:54** 51:2
**2nd** 23:19,21

## 3

**3** 108:10
**3,000** 68:22 69:15
**30** 1:18 5:12,19
    43:12,14,14 44:15
    49:15 72:21,24
    73:2 86:23,24
**303** 96:22
**31** 3:22 51:24

**31st** 16:13,20
**33** 48:5
**35** 3:11
**384,000** 66:2
**384,475.98.** 65:24
**3:00** 27:10
**3:51** 94:14

**4**

**4** 3:11,24
**4,000** 48:18,20
**4,781.97** 92:7
**405** 1:14 4:14
**418.70** 83:6
**425,000** 62:13
**456** 97:13
**475,000** 65:13
66:12
**490,000** 77:2
**4:07** 94:20
**4:20** 105:21
**4:30** 20:20
**4th** 37:22

**5**

**5** 48:4
**5,800** 65:18
**50,000** 61:20 75:10
75:12,15 76:12
**51** 3:14,19
**5100** 2:17
**5th** 14:12 17:3,8
18:7 20:15 21:7
22:24 26:22 40:10
40:14 41:13

**6**

**6** 1:18 3:4,8 5:12
5:19
**615,000** 65:19
**64105** 2:8
**69** 3:24

**6:00** 33:22
**6th** 17:2

**7**

**7** 3:14

**8**

**8** 10:23 35:25
**8th** 23:23 24:3,6
25:16 26:17 36:22
41:24 42:6

**9**

**9,090.66** 66:3
**9:00** 27:11
**9:30** 26:13 33:12
**9th** 11:4,16 12:3
15:3 26:12,18

**a**

**a.m.** 13:24 14:6
33:22
**abbreviation** 42:6
**ability** 48:9
**able** 23:24 25:7
45:25 48:21 59:11
**absolutely** 18:10
**abu** 89:3,5,8,18,22
89:24 90:13,16,24
92:13,15
**aca** 62:19 84:11,14
84:15,19 90:19
93:10
**acceptable** 43:4
**access** 58:5
**accessible** 15:3
**account** 15:2,11
53:3,7 55:10
63:24 64:11 65:21
76:18 79:14,16
83:18 85:8
**accountant** 79:20
79:23 86:4

**accountant's**
79:18
**accounting** 91:23
**accounts** 56:21
**accurate** 9:16
54:14 77:4
**ach** 78:5 79:16
**action** 23:8 106:13
106:14
**activities** 99:13
101:24 105:10,11
**actual** 10:6 59:12
81:24 91:23
**adam** 24:7
**additional** 14:23
30:16 48:6 75:5
75:15 88:15
104:13
**administer** 4:20
**admit** 24:20
**advice** 87:9
**advisors** 75:18
**afternoon** 4:3
**ago** 46:19 97:4
**agree** 5:8 86:9
88:20
**agreed** 17:21
63:20 68:20 69:18
69:20,23 71:24
**agreement** 53:25
54:4 71:4
**agreements** 17:14
**ahead** 29:4 73:21
**airways** 104:2,5
**alerting** 21:18
**allocate** 53:20
85:24
**allocated** 52:12,13
54:11,16
**allotted** 52:20
59:21

**allowed** 85:6
**alson** 2:22
**american** 103:18
**amount** 52:13
53:7 54:10 56:22
66:12 69:9 74:21
74:22 92:7
**amounts** 15:18
52:21 70:9
**analysts** 24:10
**answer** 31:8 38:23
46:23,24 63:6
64:18 70:23 71:9
72:15 82:21
104:25 105:3,4,15
105:16
**answered** 46:19
105:12
**answering** 102:23
**answers** 95:4
101:11
**anybody** 10:18
72:3 98:18
**apartment** 37:6
**apiece** 54:23
**apparently** 25:20
31:4
**appear** 7:5 8:18,21
**appearances** 4:19
**appears** 96:23
**application** 23:9
32:14
**applied** 102:3
**appointments**
8:15 19:9
**appreciate** 64:20
**approximately**
77:2
**april** 87:2 88:9,17
89:8,20 92:21,25
93:5

**aquarium** 47:17
**arithmetic** 65:11
**armed** 7:18
**arrangement**
 71:14,16
**arrived** 17:15
**arrow** 8:13
**aside** 34:2 78:16
 79:13 80:13
**asked** 41:5,22
 45:12 46:18 47:3
 62:19 79:24 80:3
 89:21,24 90:15
**asking** 23:2 28:5
 30:5 45:7 46:10
 47:6 57:3 82:17
 82:18 98:14 105:9
**assume** 73:9 92:5
**assumed** 19:19
**asylum** 23:9 32:14
**atm** 89:3,11,14
 96:21 97:4
**attorney** 80:10
 106:13
**attorneys** 2:5,15
**authorized** 6:8
**available** 34:20
**avenue** 1:14 4:14
**aware** 58:20 72:9

**b**

**b** 1:18 3:6 5:12,19
**back** 14:19 16:25
 17:14,22 26:18
 28:24 37:20 38:9
 40:6,10 42:15
 44:19 45:6,21
 47:2,5 49:3 51:2
 55:17 60:15 64:15
 73:19 81:23 93:13
 93:15 98:21

**bad** 15:5 17:3,16
 17:20,20 18:3,9,13
 28:10 40:13,15
**balance** 48:24
 65:18,23
**balls** 17:15
**bank** 3:20 51:22
 59:12,13,15 60:25
 81:24 82:12,23
 83:17 85:7 88:5
**based** 36:12 44:10
 48:8,25 53:3
 67:10
**basically** 5:15 65:2
**basis** 7:15 18:11
 72:17 90:10
 101:25
**basket** 98:21
**bates** 8:22 76:7,9
 80:25
**bay** 97:7
**bear** 77:20 83:2
 96:9
**beginning** 11:11
 48:19 66:11
**begun** 53:20
**behalf** 1:18 6:9
 11:13 90:5 101:5
 101:17 102:14
**believe** 11:23 12:4
 30:19 35:9,19
 39:7 47:11 56:9
 58:15 63:5,10
 67:3 75:24,24
 86:19 88:13
**best** 21:5 22:6
 44:20 45:9 73:21
 80:6
**better** 45:8 49:5
 63:6

**beyond** 73:18
 103:7
**big** 37:15 38:19,20
**bill** 3:24 24:25
 29:2 67:24,25
 69:7 71:22
**bit** 12:20 52:19
 59:7 72:20 88:15
 88:15
**blank** 33:10
**blew** 40:21 41:14
**bloomingdale's**
 83:24,25 84:5,23
**bloomy's** 83:21,23
**board** 19:2
**bottom** 33:5 64:25
 65:25 71:24 82:8
 91:4 103:17
**bouncing** 17:14
**break** 31:10 36:17
 94:12
**breakdown** 69:15
 69:20
**briefcase** 82:14,19
 83:16
**british** 104:2,4
**budget** 48:8
**building** 38:19
**burrow** 101:11
**business** 3:19 34:4
 51:22 52:15 60:2
 60:6,10,11,14
 65:17 77:13,17
 78:19 79:5 80:3
 80:14,21 81:12
 82:20 83:9,12
 84:4 85:5,17,21,22
 85:23,24 88:5,8
 89:12,19 90:24
 91:5,14,22 95:9,15
 96:24 97:2 104:8

 105:11
**buy** 38:17,18,20
 85:3

**c**

**c** 2:2 5:21 106:1,1
**cacos** 97:10,14,22
 98:6 99:11 102:7
**calculated** 53:8
**calculation** 87:12
 103:2
**calendar** 3:8 6:24
 6:25 7:4,10,14,23
 9:15,17 10:2,3,6
 10:15,19 13:3
 16:19 17:7 28:17
 33:2,23,24 34:3,9
 34:15 37:21 39:6
 39:24,24 40:8
 56:2,24
**calendars** 7:17,18
 8:10
**call** 18:25 25:18
 54:7,12 55:11
 59:17 73:6 100:3
**called** 5:21 41:4
 100:12
**calls** 19:9 72:12
 87:6
**cancel** 68:11
**cancelled** 26:14
 70:18
**capital** 92:2
**card** 92:5 97:6
**cards** 89:16
**case** 1:8 4:11 12:8
 31:5 65:22 82:17
 84:8,21 92:19
 106:10 107:3
 108:3
**cash** 89:15 96:22
 96:25

**cell** 43:17
**cells** 43:19,20
**certain** 43:18
  48:10 73:5 102:16
**certainly** 21:22
  26:9 100:4
**certified** 1:21
  106:2
**certify** 106:3,12
  107:7 109:18,21
**change** 10:9
**changes** 109:18,20
**characters** 97:19
**charge** 16:9 87:11
  103:5
**chargeable** 90:25
**cheaper** 83:15
**check** 41:2 100:14
**chinese** 97:9,19
  98:8
**chose** 47:16
**circling** 73:19
**citibank** 3:19
  51:21 56:13
**city** 2:8
**claim** 95:8,21,21
  96:6
**claiming** 77:12
  93:7
**clarification** 5:9
**clarify** 4:23 108:7
**clean** 15:5,7 36:13
  36:20 104:12,16
**clear** 45:24 46:3
  74:19 80:25 94:25
  95:18
**clearest** 59:11
**clearly** 17:20
  35:14
**client** 24:19

**cline** 2:20 3:4 4:21
  4:21 6:2,17 7:12
  31:11 34:24 45:11
  46:10 47:2 50:18
  51:3,8 57:18
  58:18 62:24 64:20
  68:13,25 72:16
  73:22 93:12 94:11
  95:25 96:9,15
  105:17
**clothing** 85:6
**club** 97:7
**coat** 84:6,7,9,23,24
  85:4
**code** 60:16
**coded** 60:24
**codes** 108:7
**coding** 52:3
**cold** 85:2,3
**collect** 16:16 23:23
  60:13 100:6
**collecting** 100:4
  102:17
**color** 3:14 51:16
  51:25 52:3 58:25
  60:16,23
**column** 14:12 33:5
  33:5 53:9 59:24
  59:25 60:2,23
  64:22 65:7,15
  66:2,7 77:9,13,16
  81:13 96:8
**columns** 59:8
**come** 17:22 56:7
  79:14 89:21,24
  94:4
**coming** 7:23
  100:12
**communicated**
  74:10

**communications**
  36:7
**company** 91:15
**compare** 19:24
  26:5
**comparing** 23:17
**compartmentali...**
  62:21
**compensated** 94:7
**compensating**
  93:18,21,24
**compensation**
  54:24 59:19 63:9
  66:15 76:3
**compiled** 25:22
**completion** 106:10
**complex** 42:24
**comply** 100:11
**complying** 16:22
**compound** 71:18
**computer** 80:8
**computers** 41:6
**concede** 87:4
**concept** 25:12
  47:16
**concern** 21:22
**concerned** 19:21
  21:9,13,20 22:3,5
**concerns** 21:23
**concluded** 105:21
**conclusion** 72:13
  87:7
**conduct** 99:3
**conducting** 92:20
**confidential** 21:22
  31:2
**conform** 108:9
**confused** 37:11,13
**connection** 55:6
  77:13 88:23 93:25
  99:4

**consult** 10:18 86:3
**consultancy** 69:16
**contact** 16:17 74:8
**contacts** 100:25
**contemplates**
  43:11
**continue** 34:19
  64:21
**continued** 50:24
  88:16 94:18
**continuing** 88:12
**contract** 14:7,13
  17:13,17 21:4
  29:15 31:14 34:17
  35:22 36:4 46:5
  53:19 68:12,14,16
  68:18 70:17 72:21
  72:25 74:4 87:4
  87:12 95:18 99:5
**contracted** 71:20
  74:15
**contractor** 74:4
  99:22
**contractual** 45:6
**controlled** 62:13
  75:22 77:3
**conversation**
  32:17 47:9,13
  70:15
**conversations**
  12:6 87:18,19
**copied** 9:14
**copy** 28:10
**corner** 65:12
**corporate** 4:25
  78:18
**corporation** 2:6
  4:9
**corporaton** 1:5
**correct** 6:10,12,15
  8:20 9:8 17:5

[correct - document]

22:25 26:23 29:15
33:16,17 34:14
43:13 44:8,9,11
49:24,25 50:3,4,7
50:17 53:14 54:22
56:6 57:25 61:3,8
61:22 62:4 63:21
64:24 65:4 66:14
69:16 76:14 77:19
86:11 87:5 88:6
88:19 107:10
108:10 109:19,22
**correctly**  55:20
69:14
**correlated**  60:12
**correlation**  59:12
**correspond**  14:18
52:3 61:23
**corresponding**  8:9
82:12
**corresponds**  76:12
81:15
**costs**  53:20 54:19
95:9,22
**counsel**  4:7,18
5:13 64:12 94:24
**counsel's**  5:8
38:24 87:9
**counterclaim**  1:6
1:11 5:6,17
**countries**  8:16
**country**  29:17,20
**couple**  79:25
**course**  41:18
48:22 101:20
**court**  1:2 4:11,15
4:19
**covers**  31:6
**created**  104:10
**credit**  14:24 89:16
92:5

**crisis**  28:23
**crooks**  101:12
**crr**  106:21
**currently**  84:18
**cutoff**  96:16
**cv**  1:8 4:12

### d

**d**  2:10
**d.c.**  26:18
**da**  25:7
**daily**  7:15
**dallas**  19:13 20:11
23:18,19,20,22
26:15
**damage**  103:2
**damages**  72:11
73:23,25 84:7,21
84:25 87:11 93:7
104:24
**date**  6:21 12:15
35:4 51:7,11 69:4
86:20 96:16
106:15 107:4
108:5
**dated**  106:16
**dates**  8:9,13
**day**  8:14 10:8
13:12,22 19:11
26:25 29:5,8
72:21 86:23,24
107:11
**days**  13:25 14:6,9
14:10,18,19,24
15:14,15,19 28:5
72:24 73:2
**dead**  48:12
**deal**  47:20
**debit**  61:20 78:5,5
83:21 84:2 89:15
92:2 96:7 97:6

**december**  8:24
37:9,22,23,25 38:9
39:5,14,24
**decide**  23:12 53:15
53:16
**decided**  19:16
47:25 53:2
**decipher**  15:21
**declaration**  107:2
**deduction**  78:15
**deductions**  52:15
**deep**  43:7
**defendant**  1:6,11
5:6
**define**  54:8
**degree**  98:16
**delaware**  2:18
**delay**  18:6
**deleted**  19:4
**delineated**  60:25
**deliver**  41:23
67:13
**delivering**  32:4
**delivery**  16:22
**demanded**  15:18
**depart**  27:22 28:3
33:22
**depends**  54:8
**deponents**  5:2
**deposit**  84:16
**deposition**  1:17
4:6,13,24,25 46:7
50:24 73:20 94:18
106:10 107:4
108:2,5 109:2
**describe**  7:9 34:8
36:10 65:7 67:18
73:13 99:7 105:10
**described**  6:19
35:2 51:5,9 69:2

**designated**  45:13
**designee**  4:25
**despite**  62:18
**determine**  100:19
**dhabi**  89:4,5,8,18
89:22,25 90:13,16
90:24 92:13,15
**diagrams**  25:17
**different**  25:24
60:3 73:10
**direct**  59:11
**direction**  106:7
**directly**  14:11
55:9
**disagreeable**
81:21
**disburse**  56:19
**disbursements**
70:10
**disbursing**  77:6
**discover**  40:14,17
**discuss**  22:12,16
23:7 32:7,12
**discussed**  23:3,13
24:15 39:5 47:8
47:14
**discussing**  29:12
44:20
**dispatch**  56:19
**distribute**  64:4
**district**  1:2,3 4:10
4:11
**dive**  43:17
**dives**  43:7
**divide**  45:10 53:3
**divided**  95:14
**document**  3:11
6:19 18:8 35:2,8
45:4,18,25 46:9,17
46:22 50:12,14
51:5,9 69:2 73:18

**documents** 5:18
35:10 45:10
**doing** 10:2 11:12
25:22 29:23 48:20
48:25 87:24 88:10
88:24 89:18 98:13
104:4
**donnelli** 2:12 5:5
**download** 17:18
**dr** 77:6
**draw** 64:13
**drew** 53:7 55:10
64:2
**drive** 15:8 16:15
16:17 17:20 36:13
36:21 41:2,13
**drives** 15:5,6 17:3
17:16,24,25 18:4
21:16,19 40:13
41:23
**driving** 90:22
**drop** 13:11
**due** 26:14
**duly** 5:22 106:6

**e**

**e** 2:2,2 3:6 5:21
106:1,1
**earlier** 14:9 95:5
**early** 37:19 62:12
68:7
**earnings** 54:5,8
**easiest** 80:9
**east** 99:16 101:4,9
101:23
**eastern** 1:5 2:5 4:8
4:22 5:14 18:24
19:10 22:17 29:14
29:21 31:13 34:4
35:25 36:4 41:23
53:13 60:8 68:10
70:2 74:13 82:18

84:8,10,13 86:10
88:10,24 89:19
90:6,15,18,19,25
92:15 93:8 95:17
99:5,14 101:5,18
102:14 104:8
107:3 108:3
**easy** 76:23 91:9
**eddie** 5:4 72:17
**edward** 2:10
**effect** 70:16 88:18
**effective** 74:5
86:11,14
**either** 37:21 40:25
43:5,22 50:8 55:6
55:17 75:5
**electronic** 7:17
**employee** 54:21
106:13
**ended** 65:18,19
87:17
**ends** 100:18,22
**engage** 99:14,25
101:3,16
**engaged** 105:11
**engaging** 102:8
**entails** 49:23
**entities** 57:20 60:3
62:13 77:3
**entitled** 1:19 95:8
**entity** 58:2 67:5,7
75:17 79:6
**entries** 7:24 8:9,18
8:21 9:3,7,21
10:13 14:2 59:4
78:2,4
**entry** 10:19,23
11:5 12:20 13:21
14:13,17 15:22
16:13 17:6 18:21
19:12,25 20:16

26:12 27:9,22
32:19 33:19 39:6
39:13,24 56:2,24
61:19,20 62:2
79:3,11 80:19
82:8,13 83:3,4,20
85:10,11 86:7
89:3 91:25 96:21
103:9,11,17
**envelope** 83:15
**equaled** 69:10
**errata** 108:2 109:2
**errors** 108:10
**esq** 2:10,12,20
**essentially** 65:13
65:20 79:11
**estate** 38:18
**europe** 16:17
**evidence** 72:9
**exact** 86:20
**exactly** 87:23
92:22
**examination** 3:2
5:25
**examined** 5:23
**example** 47:15
103:8
**exbt** 3:8,11,14,19
3:24
**excerpt** 6:24
**exclusively** 57:14
**executed** 107:11
**exercise** 7:22
**exhausted** 45:16
**exhibit** 6:20,23
10:6 35:3,6,15,25
36:7,25 39:4
42:15 43:9 44:14
47:7,7 51:4,6,10
51:16,20 52:2,4
58:25 59:7,9 60:7

60:19,22 61:2,5,5
61:15,16,24 62:3,7
64:23 69:3,5,7
76:6,19 77:23
78:2 80:17 81:9
81:10 82:6,24
83:18 85:8 87:25
94:23 95:9 96:12
**exhibits** 51:13
52:6,10
**exist** 101:15
**existed** 71:17
**exp** 16:3
**expected** 48:20,20
**expects** 84:8
**expenditure** 88:22
97:11
**expenditures** 3:15
51:17 52:24,25
63:25 88:9 92:14
**expense** 65:18
80:14,21 81:12
82:20 83:9,12
84:5,22 85:17,21
85:23,23,25 88:6
89:12 91:14,22
97:2 104:23
**expenses** 16:4,7
56:17 59:18 60:2
60:6,10,12 75:5
77:13,18 80:4
84:25 85:5 88:17
90:24,24 91:5
92:11 94:4,8
95:15 105:7
**experience** 102:2
**expert** 49:5
**expertise** 102:2
**explain** 16:12
88:22

**explained** 9:24
**explanation** 72:20
**explicit** 34:15 40:8
**extent** 10:12

**f**

**f** 5:21 106:1
**face** 34:23,23
**fact** 8:8 11:15,18
  13:2 20:11 32:3
  37:14 62:18
**facts** 73:16 108:9
**fair** 8:17
**fake** 21:10,11
  43:22 100:12,19
  101:13,14
**falls** 78:24
**far** 40:7
**fcw** 52:20
**february** 8:6,8 9:8
  9:11,21 10:16
  18:17,21 20:15
  21:7 22:23 23:19
  23:21,23 24:2,6
  25:16 26:12,22,25
  27:8,22 28:6 29:4
  31:13 32:8,20,23
  33:19 34:6 68:4,7
  68:7,8 70:8 71:21
  74:5,15,18 86:18
  86:19
**federal** 106:10
**fee** 73:5
**fees** 70:17 71:15
  74:12
**fell** 59:20
**fellow** 24:9
**fight** 46:21
**figure** 23:16 32:2
  33:18 57:19 87:22
**file** 37:15

**filed** 4:10 5:18
  78:22
**files** 24:13
**fill** 8:15 9:10
**filled** 10:24
**filling** 98:22
**finally** 36:13
**financially** 106:13
**find** 23:17 24:22
  45:9 75:17 92:22
  101:14
**finding** 19:21,22
  21:9
**findings** 19:24
**fine** 41:7
**finger** 82:7
**finish** 73:8 79:8
**firm** 80:11
**first** 5:19,22 7:3
  13:9 24:24 25:11
  25:13 26:9 31:17
  35:7 43:8,25 46:6
  47:20,21,23 48:2
  51:14 52:2 53:9
  53:18 61:9,19
  73:20 83:20
**fish** 3:11 26:6,8
  35:12 36:16,16
  42:17,25,25 43:12
  43:15 46:5,15
  47:16,19,20,23
  48:2,4,5,12,13
  67:2,3 92:18 93:2
**five** 26:10 76:24
**flash** 15:5,5,7
  16:15,16 17:3,16
  17:20,24,25 18:4
  21:16,19 36:13,20
  40:13,25 41:13,23
**flat** 43:11

**fletcher** 3:24
  30:20,23 66:24
  67:4,13 68:6,15
  69:8 70:3,10,15
  71:4 72:11 74:9
  74:10 91:10 93:3
  96:6 99:20,22
  100:8
**flew** 23:22
**flight** 26:14
**fnda** 39:15
**focus** 59:3 60:16
  89:2
**focusing** 65:6
  77:25
**follow** 27:21 40:10
**following** 55:19
  60:21
**follows** 5:24 50:24
  94:18
**foregoing** 106:4,5
  106:8,9 107:10
**foreign** 105:7
**forgotten** 96:16
**form** 55:6
**forth** 17:15 44:20
  54:18 60:5 106:5
**forward** 12:19
**found** 47:24 48:11
**foundation** 39:18
  39:19,20 40:4
  70:22 71:8,19
  72:13,18 73:12
**four** 61:6
**frame** 8:16 48:11
**fraud** 90:13,16
  95:21
**french** 1:17 4:1,7
  5:1 6:1 7:1 8:1 9:1
  10:1 11:1 12:1
  13:1 14:1,5 15:1

16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
107:7,18 108:4
109:25
**friend** 41:4
**full** 59:13
**funds** 55:10
**further** 66:9 95:12
  105:18 106:9,12
**fw** 13:23 42:8,11
  42:13,14

**g**

**garrett**  2:4
**gather**  19:6 29:16
  98:12 104:13
**gathering**  25:24
  29:24 34:19
  101:17,25 102:3,8
  102:13
**general**  7:11,13
  57:16 103:18
**generally**  8:11
  9:25
**george**  4:15
**georgetown**  15:24
  16:7 38:20 55:9
  55:22,23 56:14
  57:23 58:8 62:8,9
  62:25 75:2
**gertz**  29:3
**getting**  15:12
  88:15 100:18,22
  101:11
**give**  31:7
**given**  21:11 24:23
  25:10 72:24,24
  86:17 106:8
**giving**  14:23
**gizmos**  89:16
**go**  12:19 14:19
  16:25 19:16 20:11
  23:18 24:11 29:25
  37:20 40:6,10
  44:13 47:2 48:14
  50:18 60:15 65:5
  65:25 73:21 79:15
  80:8,17 81:7,9,23
  81:25,25 87:25
  90:16 94:23 95:12
  97:5 98:17 100:21
  101:12 104:4

**goes**  32:25 45:12
  79:4,16
**going**  8:14 19:20
  20:8 21:20 28:17
  42:15 45:5 47:19
  48:4 56:18 59:3
  66:6 71:22,22
  73:3,19 80:8
  87:20,21 88:14
  92:23 100:23,24
  104:20
**good**  4:2 18:2 43:7
**gotten**  21:15 36:20
  44:24 56:20 62:18
**grace**  97:7
**graph**  35:13
**graves**  2:4
**great**  38:18,20
  76:21 100:25
**green**  52:12 53:9
  59:23 77:9,12
  81:5,6,25 82:2,2
**greim**  2:10 5:4,4
  31:3 38:22 45:2
  45:15 46:12 50:10
  64:12 70:21 71:18
  72:12,19 87:6
  94:24 96:2,18
  102:24
**grg**  56:13,16
**groundhog**  19:11
**group**  20:18
**guess**  8:22 44:17
  45:16 54:9 78:19
  91:21 104:12
**guo**  14:5,22 15:17
  16:23 21:4,19
  22:13,17,19 24:19
  29:2 30:4,7,8,9
  32:3 35:11 36:3,7
  36:24 37:5 42:20

43:5 47:8 87:20
  88:14 90:13,17
  93:4,9,11 100:13
  104:11
**guo's**  21:10,10
  23:9 26:6 32:13
  38:16,17

**h**

**h**  3:6 5:21
**hackable**  7:18
**half**  22:11 97:4
**hamilston**  2:14
**hamilton**  4:22
**han**  21:24 22:24
  23:3 26:22,25
  29:8 31:13 32:17
**hand**  65:12,15
**handed**  6:22 35:5
  51:12
**handle**  32:2
**handwriting**  7:7,7
  20:15 27:3 57:4
**happen**  32:20
**happened**  7:25
  24:5 29:10
**happening**  100:16
  103:5
**happy**  40:22 72:19
**hard**  15:11 81:8
**harder**  48:6
**hate**  45:20
**headed**  3:11
**heard**  25:12
**heathrow**  27:25
**held**  4:13 21:21
**help**  30:3
**helped**  30:3
**helpful**  71:11
  104:18
**hermes**  80:19
  81:15

**higher**  103:23
**highlight**  76:11
**highlighted**  59:16
  59:23 61:20
**highlighter**  81:5
**highlights**  62:7
**highly**  15:20 21:22
**hill**  61:10,12,23
**hire**  26:4
**hired**  20:6 99:23
**home**  11:23 12:3
  20:20,23 29:5
  31:20 33:7 34:6
**honestly**  13:10
  38:12
**hong**  62:19
**hotel**  97:15 99:10
**hour**  16:16 22:11
  22:11
**house**  12:13 38:19
**housed**  79:17
**hum**  59:2 65:16
**humor**  33:5 71:11
**hunt**  101:14

**i**

**idea**  50:14 91:2
  97:3
**identification**  6:20
  35:3 51:6,10 69:3
**identify**  35:7
  42:19 51:15 69:5
**important**  16:18
  16:21 17:10 18:8
  40:3
**inception**  74:11
**include**  66:15
  95:23
**included**  13:3
**including**  70:10
  93:2

**income** 79:6
**incompetence** 100:13
**inconsistencies** 21:14
**incur** 70:16 88:17 103:5
**incurred** 95:10
**incurring** 71:15 74:12
**individual** 43:17
**individually** 53:12
**individuals** 97:9 100:19 102:16
**information** 15:19 16:23 21:11,15 23:18,24 25:4,6,24 28:23 30:4,6 32:4 34:20 36:12 43:3 43:6,18,21 49:3 60:13 87:23 88:13 88:15 98:22 100:5 100:18,22 101:17 101:24 102:2,8,13 102:18 103:12
**initial** 38:21 53:20
**initially** 38:17 47:19
**insistent** 16:23
**instances** 9:20
**instruct** 38:22
**insurance** 85:14 85:22,23 86:4 103:15,18,21
**intelligence** 29:24 98:13 104:14
**intending** 95:11
**intention** 38:17
**interest** 58:8
**interested** 49:9 50:6 64:22 106:13

**interfere** 32:13
**internet** 25:21 34:23
**introduced** 29:2
**investigate** 93:9 97:8 98:10
**investigated** 48:19 67:20
**investigating** 92:17,24 93:3,4 97:18 98:3
**investigation** 68:4 74:21
**investigations** 92:21
**investigative** 67:9
**investigators** 98:2
**invoice** 61:10,24 63:11 69:15,22
**invoices** 64:9 69:18,22
**involved** 13:17
**involving** 12:24
**irregularities** 19:22
**irs** 85:6,25
**issue** 55:3,5
**issues** 21:10
**item** 88:5 96:21
**items** 19:5 77:12 91:5

**j**

**j** 1:20 106:20
**january** 3:21,22 9:3 10:21,23 11:4 11:16 12:3,20 13:11,21 14:12,21 15:22 16:13,19 17:2,2,8 18:7 36:22 40:10,14 41:12,24 42:6

51:23,23 53:23 55:14,15,18 62:13 65:21 78:8 80:18 80:23
**jennifer** 2:12 5:5
**jgk** 4:12
**joanna** 2:20
**job** 74:15,16
**johanna** 4:21
**jointly** 58:2
**june** 75:8,21
**justification** 88:9 104:23
**justify** 85:20

**k**

**k** 55:3
**kansas** 2:8
**keep** 31:3 62:17,20 66:6 69:23 88:14 90:18
**kept** 81:20
**keys** 17:19
**kind** 82:7
**knew** 18:7
**know** 15:18 27:12 27:13,19 31:6 32:20 33:22 34:11 35:18 36:4 38:15 39:13 45:23 49:8 49:22 53:22 58:9 62:22,23 63:4,5,7 64:10,10 67:24 69:17,21 70:3,12 72:5 73:4 75:19 76:15 81:3 86:20 87:8,12,14 95:11 99:8
**knowledge** 18:12 86:18
**knows** 40:23 71:23

**kong** 62:19
**kraft** 24:7

**l**

**l** 5:21,21 27:10
**laid** 73:11,12
**laptop** 40:19,20,20 41:14 83:15
**law** 80:10
**laws** 107:9
**lawsuit** 74:17 84:18 87:17 88:14 94:9
**leak** 21:18
**leap** 32:20
**leave** 64:18
**leeway** 14:9
**left** 27:15 41:8 53:6 55:10 65:15 65:22,23 66:5
**legal** 72:13 85:25 86:2 87:7
**letter** 87:15,15,16
**lexington** 1:14 4:14
**lhr** 27:22 28:3
**lianchao** 20:21 22:19,24 27:5 28:7,12,25 29:8 31:25 32:7 38:2 87:19
**libbares** 4:15
**library** 40:18 41:9
**lie** 101:13
**life** 85:14 86:4 103:18
**limited** 1:5 2:6 4:9 5:15
**limiting** 101:23
**line** 64:13 71:24 78:10 88:5 96:21 108:11,12,13,14

**[line - moved]**                                                                 Page 10

108:15,16,17,18
108:19,20,21,22
108:23,24 109:3,4
109:5,6,7,8,9,10
109:11,12,13,14
109:15,16
**lines** 28:11 97:6
**list** 42:20 97:20
**listen** 98:19
**listening** 95:2,3
**litigation** 7:2
22:13,17 23:4
32:7 77:14 93:8
93:25 104:25
**little** 12:19 59:7
73:18
**llc** 1:10,19 2:4,16
3:20 4:10 6:12
51:22 52:13 55:8
75:21
**llcs** 57:12 58:20
**llp** 2:14
**lobby** 42:4
**lochnealy** 24:10
**london** 8:12 27:16
27:17 29:5 33:8
34:5 66:24 92:13
92:15 104:6,7,16
104:24
**long** 22:8 46:19
85:25
**longer** 71:16
**look** 13:20 32:25
34:14 40:6 46:12
56:12 58:24 66:4
75:23 77:8 81:4
90:16 103:8
**looked** 25:2
**looking** 8:5 14:11
20:13 27:2 43:16
46:17 55:14 56:23

60:13 90:12 91:21
**looks** 20:19 23:23
24:4,19 26:18
27:11 28:12 37:24
39:21 52:18 55:15
**lost** 77:20
**lot** 46:4,14 48:3
71:23 90:12
**love** 71:11

**m**

**m** 27:11
**machine** 97:4
106:7
**main** 2:7
**making** 34:17 48:5
**malware** 18:4
**mansion** 38:20
**march** 27:18,20
33:24 74:6 86:11
87:2,5 95:10,24,25
96:4,18,21 97:6
103:9,24,25 104:7
104:16 105:6
**mark** 6:17 34:24
51:3 68:25
**marked** 6:20,23
35:3,6 51:6,10,13
69:3
**market** 2:17
**mars** 18:22
**massive** 15:18
**material** 24:12
**matter** 1:19 4:8
7:11,13 34:5
40:25 60:8
**mean** 10:8 11:8
13:3,14 14:3 16:4
19:15,19 20:23
22:19 39:17 42:22
46:3 52:20 73:4
78:16 101:22

102:19
**meaning** 7:24
**means** 11:9 13:15
15:15 18:3 39:18
42:17 46:6 68:11
**meant** 28:3
**measure** 95:23
**meet** 20:11 29:7
30:22 37:5 100:8
**meeting** 11:16,20
12:12,21,23 13:7
13:16,17 14:5,22
20:20 21:2,6 22:9
22:14,18,23 23:10
23:14,22 24:2,6
25:16 26:20,21,24
27:14 28:7 29:11
31:17,24 32:7,14
35:25 37:3,8 38:6
38:13 39:2,5
41:12 50:13 98:2
**meetings** 11:10
39:9
**member** 6:11,15
**members** 12:2,9
12:16 13:16 15:9
19:2 102:16
**memo** 78:10
**memory** 34:11
**mentioned** 61:6
99:19
**merits** 10:19
**mess** 104:10
**met** 12:9,16 24:11
27:5 31:12 42:3
104:17
**michael** 2:23
16:14 28:13 35:19
35:19 38:2 39:8
39:11 40:6 75:4,6
75:12

**michael's** 57:12
58:5
**mid** 68:8
**middle** 99:16
101:4,8,23
**mike** 11:14 12:5
13:19 14:4 15:8
20:21 22:24 27:4
29:19 31:25 38:5
44:19 49:5 53:2,5
56:18
**mike's** 91:11,11
**miles** 36:3
**million** 37:16
**mind** 41:5
**mine** 65:22
**minute** 96:10
**miscellaneous**
52:16
**misread** 11:3
**missouri** 2:8
**mistake** 82:4
**mitigate** 72:10
**mixed** 56:21
**monday** 21:7
56:15,16
**money** 15:11
55:22 63:8,23
74:3,22,23 77:3
90:19 93:8,11
**monitoring** 18:15
**month** 10:8 47:21
48:2 65:10,10,14
78:16 80:13 91:16
92:12
**months** 86:16
95:12
**moore** 1:20 4:16
106:20
**moved** 73:17

**moving** 46:14
**multiple** 87:18,19
  100:9
**mw** 13:23 42:13
  42:14

**n**

**n** 2:2,17 5:21
**name** 4:15 24:8
  48:14 75:17 76:16
  90:4 104:20
  106:15 107:3
  108:3,4
**named** 24:9
**names** 21:10,12
  24:23 25:8,9
  36:16,19 37:16,17
  43:23 48:15,16,18
  48:20,21 100:12
  101:13
**nature** 34:13
  83:11 90:23 92:10
  105:10
**need** 18:14 24:22
  45:18 46:20 64:16
  73:7 84:12 98:5
**needed** 47:14
  92:19
**negotiated** 5:13
  71:14
**neighbor** 41:5
**neighbor's** 41:10
**neither** 54:20
  106:12
**netherland** 104:12
**network** 100:25
**never** 32:11 48:19
  87:20
**new** 1:3,15,15,22
  4:11,14,14,17 5:17
  13:23 14:5 17:22
  17:24 38:2,3,4,10

  41:23 42:2,5,11
  94:4 106:3 107:9
**newark** 16:15
**night** 97:16
**nights** 97:16 98:8
**normal** 22:7
**notary** 1:22 5:23
**notations** 7:11
**note** 9:15 16:19
  18:14 40:3
**notes** 9:23,24 10:5
  10:5,14 40:6,7,8
**notice** 1:20 5:16
  68:10 70:2 72:22
  72:23
**noticed** 74:16
**november** 1:13
  4:5 8:6,7,19 107:4
  108:5
**number** 4:12 11:3
  30:2 43:11 44:7
  49:23 50:2 69:18
  69:23 71:25 76:7
  76:18 93:2 104:17
**numbers** 8:23
  48:6,24 76:25

**o**

**o** 5:21
**oath** 4:20
**objection** 50:10
  70:21 71:18 72:12
  72:18 73:15 87:6
**obviously** 36:15
  60:4
**occasion** 12:17
**occurred** 10:3
**occurs** 46:13
**oceanic** 75:11,18
  75:25
**odds** 100:18,22

**office** 38:19 79:18
**oh** 20:12 47:25
  81:3 91:9 100:23
**okay** 10:10 14:2
  27:7 31:11 51:12
  59:21 60:18 61:9
  64:21 65:11 66:6
  66:16 67:4 81:11
  86:22 87:3 96:9
  96:19
**old** 40:19
**once** 95:5
**ones** 24:18 43:17
  59:16,23 93:3
  100:10,20
**online** 92:2
**operate** 35:11
**oral** 71:4
**orange** 52:17 60:2
**order** 17:18 31:4
  60:12
**organize** 59:9
**original** 76:5
  106:9
**originally** 10:13
  48:7
**outlook** 7:19
**overall** 63:11
  102:17
**overseas** 92:13
**owe** 74:21,22
**owed** 75:15
**owned** 57:14 58:2
  58:11,14,21
**ownership** 58:7

**p**

**p** 2:2,2 5:21 57:3,4
  57:8
**p.m.** 1:13 4:4
  27:11 51:2 94:14
  94:20 105:21

**page** 3:2 8:18,22
  8:23 9:2,7 33:6
  43:25 44:14 52:2
  61:4,5,16 62:4,7
  64:25 65:5,12
  76:7 77:23 80:16
  80:17,24 81:10
  82:6,8,24 83:17,18
  85:7,11 87:25
  88:4,22 91:3,4,24
  94:23 96:11,20
  103:9,17 105:5
  108:11,12,13,14
  108:15,16,17,18
  108:19,20,21,22
  108:23,24 109:3,4
  109:5,6,7,8,9,10
  109:11,12,13,14
  109:15,16
**pages** 3:8 6:24,25
  7:4,7 8:6 10:6,15
  53:10
**paid** 37:16 55:9
  64:10,11 67:25
  69:11 70:9 75:14
  79:5 84:11,14
  94:3
**pale** 82:2
**part** 18:5 30:10,13
  40:5 41:20 59:24
  61:13 63:9,11
  66:23 75:13 76:3
  76:4 81:17,18
  82:4 96:6 102:17
**partially** 73:24
**particular** 8:5
  86:6
**party** 106:14
**pay** 30:17 55:12
  62:15 74:24 82:19
  84:9 89:15

paying  72:7
payment  55:21
  57:17,21,23 58:22
  63:14 79:12 92:2
payments  3:15
  51:17 57:23 63:3
  63:16
payroll  78:11,13
  79:3,11
penalty  107:2,8
pending  84:19
people  3:12 22:23
  28:25 30:3,5,10,15
  30:16,18 42:20
  48:24 67:10,19
  99:20 101:11,12
  101:12,15 102:21
  103:6 104:11,17
  104:19
pepper  2:14 4:21
percent  12:5 48:6
  58:11,14
perfectly  18:16
period  50:11 73:8
periods  73:5
perjury  107:2,8
permissible  103:4
person  31:18
  42:10,19 74:8
personal  52:24
  59:17,17,19 63:9
  63:25 76:3 78:25
  80:4 81:23 95:14
  101:24
personally  12:16
  13:18 99:25
  100:21 101:3,16
  104:15
perspective  58:10
pertain  19:8 95:17

pertained  28:22
pertains  106:9
phone  18:25 19:9
photographs
  37:18 98:20
physically  8:18,23
  9:3,7 13:4 17:7
  25:14
piece  25:25 33:25
pieces  25:24 26:3
  26:3
pierre  42:3,4
ping  17:15
place  10:16 77:21
  106:4
places  85:3
plaintiff  1:6,11 4:8
  5:6
planned  48:7
planning  26:4
please  6:18 7:9
  18:18 34:25 35:8
  36:10 51:3 58:24
  69:6 76:9 85:8
  91:24 93:13 102:5
plus  21:14 24:10
  48:4 56:17 60:14
point  9:11 15:10
  16:17 17:11 20:7
  21:17 24:14 38:7
  38:8,15 39:6 47:7
  50:22 74:8 83:20
  88:11 94:16 95:6
points  39:10
pong  17:15
populated  9:20
portion  55:11
position  95:7,20
poss  19:25
possible  19:13
  20:3,4,5 22:13,17

62:21
possibly  20:2
post  7:18 9:15,23
  9:24 10:5,14
potential  23:3
  90:13
pounds  68:23 69:9
  69:15
power  38:7,8,14
  39:6,10 47:7
practice  10:11
  28:16
practices  7:10
predictable  44:16
  47:9 49:8,10,13,19
  50:3,6
preliminary  23:21
present  2:22 11:19
  12:3 13:4 22:23
  27:6 28:14,17
  41:15,19
presented  39:10
preserving  73:14
presumed  68:2
pretty  24:13 56:21
  67:25 76:23 95:18
previous  65:14
  92:12
price  68:19,21,22
pricing  44:3,6,10
  44:15 46:15 47:9
  49:8,13,24 50:3,6
  50:8,14
print  7:19
prior  28:5 29:15
  54:13 102:11
  106:5
privy  64:9
proactive  7:22 8:2
probably  13:8
  19:3 22:10 53:18

53:21 81:22 84:6
  89:13 92:12
problem  95:16
proceedings  50:22
  94:16 106:4,5,6,10
process  24:16 48:4
produced  3:8 7:2
  72:2
producing  72:4,6
product  67:14
professional  1:21
profit  1:5 2:5 4:8
  4:22 5:14 18:24
  19:10 22:18 29:14
  29:21 31:13 34:5
  36:2,4 41:23
  53:13 60:8 68:11
  70:2 74:13 82:18
  84:8,10,13 86:10
  88:11,24 90:6,15
  90:18,20,25 92:16
  93:8 95:17 99:5
  99:15 101:5,18
  102:14 104:8
profit's  89:19
profits  54:14,15
program  80:8
programming
  48:3
progress  70:6
project  18:16
  28:18 29:13 53:4
  54:16 105:8
proper  73:11
prospective  8:3,4
protected  25:8,9
  25:12
provide  67:21
provided  67:23
  68:3

**ps** 56:25
**psyber** 56:10 57:2
  57:7,11,13 58:13
  62:3,25 63:8,13
**public** 1:22 5:23
**pull** 48:6,10,16
  67:11 88:13
**pulled** 26:2
**pulling** 30:4,6
**purchase** 81:16
  97:6 103:13,15
**purchases** 105:5
**purpose** 34:16
  52:9 66:22 75:2
  84:4 89:10 100:7
**pursuant** 1:19
**pushed** 24:25
**put** 8:12 9:25 10:3
  11:17 25:25 35:15
  35:20,21 37:25
  38:6 39:23 40:19
  40:19,20 41:10,13
  42:25 45:21 46:24
  52:6 53:4 64:14
  98:21
**putting** 34:2 39:20
  101:14

**q**

**question** 7:3 9:6
  22:21 35:7 39:8
  39:12 44:18,23,25
  47:3,4 49:5 51:14
  57:4,16 70:24,25
  71:9,19 72:15
  74:7 76:21 79:9
  90:21 93:13,14
  102:4 104:3 105:2
  105:13,15
**questions** 20:15
  38:24 45:5,17,22
  46:14,18,22,25

73:9 79:25 95:3
  101:10 103:3
  105:18
**quickly** 67:25
**quoted** 68:19

**r**

**r** 2:2 5:21 106:1
**rabbit** 101:14
**raising** 45:5
**ramsland** 24:9,15
**reach** 70:3
**reached** 71:4
**read** 13:21 18:20
  26:11 27:2 47:4
  93:12,14
**real** 25:4,5 38:18
**really** 28:11 33:21
  43:7 49:4 58:4
  74:19 89:3
**realtime** 1:21
**reason** 18:5 23:6
  71:15 90:23 91:12
  108:7,11,12,13,14
  108:15,16,17,18
  108:19,20,21,22
  108:23,24 109:3,4
  109:5,6,7,8,9,10
  109:11,12,13,14
  109:15,16
**reasonable** 18:16
**reasons** 100:9
**recall** 12:9 34:16
  54:5 69:19 105:19
**receive** 63:20
**received** 53:12
  63:22 68:10 69:25
**receiving** 28:24
**recess** 50:23 94:17
**recipient** 76:16
**recognize** 7:6

**recollection** 9:22
  21:8 22:6
**record** 4:4 18:14
  50:19,21 51:2,15
  60:24 94:15,20
  95:20 105:22
  106:6,8 108:8
**recordable** 80:13
**recorded** 61:24
  65:8 83:8 89:11
  91:6
**recording** 4:3
  90:23
**records** 25:8,9,12
**recovery** 95:22,23
**red** 52:18 59:4
  60:16,24 61:19,20
  62:6 76:11 91:13
**redacted** 19:6,6
  33:13,16 76:16
**refer** 42:9
**reference** 56:3
**referred** 5:19 54:4
**referring** 30:18
**reflected** 60:7 62:4
**reflection** 9:16
**refusing** 104:25
  105:3,14
**regarding** 28:18
  39:18,19
**registered** 1:20
**regulations** 86:2
**reimbursed** 94:7
**relate** 52:2 92:15
**related** 5:17 29:21
  60:8 94:8 103:20
**relates** 77:17
  89:19
**relating** 60:4
  90:17

**relationship** 74:11
**relative** 106:13
**relevance** 19:7
**relevant** 43:21
**rely** 87:8
**remain** 63:23
**remember** 13:6,10
  17:23 22:8 28:14
  29:10 34:3,12
  36:23 37:3 39:2
  47:12 75:18 89:7
  90:4 94:22
**repeat** 102:5
**replace** 48:13
**report** 67:19 72:2
**reporter** 1:21,21
  4:16,19 47:5
  93:15 106:3
**reports** 25:19 72:4
  72:6,7
**represent** 6:23
**representative** 6:5
  71:13 87:10
**requested** 47:4
  93:14 106:11
**rescissionary**
  95:22
**research** 15:24
  16:7 30:5 44:21
  48:25 52:15 55:9
  55:22,24 56:14
  57:24 58:8 62:9
  62:10 63:2 66:24
  67:9 69:8,16
  71:25 74:13 75:2
**researched** 42:21
  67:20
**respect** 7:10 8:6
  9:2,6 23:9 34:4
  60:22 72:11 74:12
  86:6 105:5

**respectively** 62:8
**response** 22:2,7
**rest** 33:23
**result** 23:13 49:23
  50:2 100:17
**retain** 68:6
**retrievable** 43:3
**retrievals** 26:6
**retrieve** 23:25
  34:21
**retrieved** 24:22
  25:21
**retrieving** 24:16
**retroactive** 7:24
**return** 27:16
  78:23,25 79:5
  84:16
**returns** 16:15
**review** 106:10
**ridiculous** 101:7
**rigging** 20:18
**right** 6:6 7:6 8:19
  8:25 11:24 14:20
  20:19 27:23 28:8
  31:14 33:6,9,10,13
  35:5 37:13 40:9
  41:25 43:12,15
  44:16 45:15 54:2
  54:21 57:4,24
  60:15,23 61:7,21
  62:14 63:25 64:5
  65:12 66:13 70:11
  76:13 77:8 81:16
  83:4,9 84:2,11,23
  85:15 90:6 91:15
  92:8 93:11,16
  94:11 96:11,22
  99:23 105:17
**rooms** 97:24
**round** 16:16 76:25
  95:2

**rpr** 106:21
**rule** 1:18
**run** 79:22
**running** 60:11,14
**russell** 24:8,15

**s**

**s** 2:2 57:5,8
**sadly** 93:23
**salvage** 104:10
**satisfy** 32:5
**saw** 41:16,17,18
  68:3 69:22
**saying** 45:7 64:8
  72:3 90:18
**says** 11:5 12:21
  13:12,23,24,25
  14:13 18:22 19:25
  20:16,22 26:12
  27:10,22 33:22
  39:6,14,14 40:13
  44:2 56:13,24
  62:3 78:10 89:5
  103:18
**scenario** 43:8,24
  43:25 49:23 50:2
  50:8
**schedule** 7:21
**scope** 103:7
**scrambling** 23:15
**screen** 40:21 41:14
  41:17
**screens** 41:11
**scroll** 82:7
**second** 5:2 12:23
  19:23 44:14 58:19
  61:5,16 77:23
  80:17,24 81:10
  83:2 89:2
**see** 10:25 11:2,6
  12:21 13:12 14:14
  17:4 19:17 27:15

39:15 40:7 42:12
  42:13 43:17 44:4
  45:12 46:21 47:21
  48:15 53:8 67:11
  73:16 78:6,11
  80:19 81:5,24
  82:9,10 83:21
  85:12 91:16 92:3
  98:19
**seeking** 84:22,24
  104:24
**seen** 29:17
**sense** 38:13 73:6
**sent** 75:21 86:10
  87:14 90:19 93:11
**separate** 67:4,7
  97:24
**service** 83:21
**services** 30:18
  69:16 78:11,13
  79:11
**set** 10:24 11:5
  14:25 42:24 59:8
  66:9 73:5 78:16
  79:13 80:13 106:5
**sets** 26:5
**setting** 11:12
  15:19 16:10 54:18
  80:7
**setup** 11:11,15
  15:12 56:13
**share** 21:23 25:7
**sharp** 64:13
**sheet** 91:19,23
  108:2 109:2
**sherry** 104:11
**short** 25:19
**shorthand** 106:3,7
**show** 16:21 25:15
  35:10,11 52:11
  59:11 66:2

**showed** 24:12
  25:17,18 37:18
**showing** 65:18,19
  84:25
**shows** 37:25 51:18
  52:12
**sign** 25:4
**signature** 106:19
**signed** 14:13 17:17
  35:22 53:19
**similarly** 25:22
**simply** 64:14
**simultaneously**
  61:15
**single** 88:21
**sitting** 34:20 41:8
**situation** 28:23
  73:10
**six** 76:24
**size** 9:25
**skip** 29:4
**snow** 42:3
**sol** 62:3,25 63:8,13
**sole** 6:11,14
**solely** 60:8
**solutions** 56:10
  57:2,11,13 58:13
**somebody** 41:2
  48:17 74:20 89:25
  98:12
**son** 41:8,19 97:23
  99:11
**sorry** 8:7 16:5
  17:2 20:17,19
  22:20 23:19 27:7
  28:4 37:10,22
  38:25 49:17 55:16
  57:6 75:16 76:10
  77:20 96:15
  100:24 103:16
  104:21

sort 14:11 15:2
24:25 25:18 26:4
28:22 31:2 35:13
48:23 49:6 53:19
61:15 80:7,8
sorts 19:22
southern 1:3 4:11
spa 97:7,13,15
speak 53:9
specific 12:15
35:12 69:19 84:14
specifically 71:13
86:8
spell 57:7
spells 57:10
spent 93:9
split 54:5
splitting 54:13
springs 46:16
start 57:18 96:19
101:21
started 15:13
starting 61:4
starts 33:6
state 1:22 4:18
5:10 95:19 106:3
107:9
stated 5:16
statement 3:21
51:23 59:12,13,16
60:25 81:24 82:23
88:5
statements 82:12
states 1:2
steady 44:8
stephen 1:20 4:16
106:20
steps 23:12
stipulating 87:16
stop 71:14,22 73:7
74:12

store 83:4
stores 82:13
storm 42:3
straighten 84:12
strategic 1:10,18
2:15 3:9,16,20 4:9
4:24 5:7,12 6:5,9
6:12,15,25 11:13
23:8 30:17 32:13
35:10,24 36:24
43:25 49:9 50:5
51:17,21,22 52:14
53:16 54:21 55:2
55:5,12,20,21
57:17,20,22 58:21
59:14 62:12,22
63:24 64:3 67:22
68:5,9,15 69:25
70:14 71:3,12
72:8,10 74:9
76:15 77:11,17
78:14,20,21,22
79:19 82:18 84:8
84:15,22 87:3,11
88:16,23 93:18
94:6 95:15,20
107:3 108:3
strategic's 95:7
street 2:7,17
strike 58:18 62:24
68:13
subcontracting
62:16
subcontractors
63:3
subject 20:25
109:17
subscribed 106:15
subsequent 9:11
9:21 10:16 26:25
34:5

sued 84:15
suggested 89:25
suit 85:4
sunday 17:23,23
superficial 43:6
suppose 8:3 98:11
supposed 17:12
86:15
sure 12:5 22:22
26:16,16 29:12
31:25 37:8 38:23
41:7 55:16 64:7
69:13 72:19
surveillance 98:24
99:2,4,14 100:2,3
101:4,5,6,7 102:9
surveilling 98:15
sv 6:20 35:3 51:6
51:10 69:3
switzerland 99:17
sworn 5:22 106:6
system 21:19

**t**

t 3:6 106:1,1
ta 25:7
table 3:14 24:25
51:16,25 58:25
79:22
tag 42:19
tail 86:19
take 10:16 23:8,15
31:9 34:2 42:25
47:19,20 54:17
55:16 68:11 75:23
94:11 98:20
taken 4:7 5:11
65:20,21 66:3,4
86:25 88:18 106:4
talk 37:15 101:10
102:25 103:4,6

talked 26:21 35:20
76:13
talking 30:20 38:5
39:19 40:4 49:14
50:13 72:5 96:7
98:20 99:20
tally 65:3
tank 3:11 48:13
targets 36:18 38:3
38:5
tax 55:6 78:15,22
78:25 79:5 80:12
taxes 78:16,17,19
78:19 79:4,12
taxi 89:15
taxis 89:13,16
team 10:24 11:5
11:10,16 12:2,10
12:17,21,24 13:12
13:15 14:25 15:9
15:9,13 19:13,17
19:20,21,22,24
20:5,6,11 21:16
24:6 25:15 26:4,7
26:8 30:10,13
56:18 60:4,4,5
61:13 63:12,14,16
63:17 67:6,6
100:17,17 102:16
102:17
teams 28:25 54:18
telephone 79:25
tell 9:19 20:16
21:5 27:20 28:11
33:21 38:12 45:2
47:12 52:9 59:7
71:14 81:8 91:8
103:12
telling 23:16
tells 48:18

**ten** 13:25 14:6,9
14:10,17,19,23
15:14,15,19 44:20
**term** 42:18
**terminated** 29:14
31:14 34:18 74:5
87:5,13
**termination** 68:10
70:2,4 72:22,23
86:10,14,15,17,23
86:25 88:18
**terms** 68:17 69:14
**testified** 5:24 96:5
**testify** 6:8 93:19
**testifying** 1:17 6:4
54:2 106:6
**testimony** 37:11
39:23 46:4 54:6
54:13 90:14 97:17
102:6 106:8
**testing** 41:6
**thank** 39:3
**thanks** 100:13
**theory** 73:4
**thick** 24:13
**thing** 20:19 41:11
44:19 46:15
**things** 7:23,25
34:22 42:13 45:6
88:12 101:15
**think** 12:7 15:25
20:8,13 22:10
23:18,20 24:14
27:4 28:6 29:19
37:14,14,21 38:10
39:4,7,14 43:13
55:18 56:17 63:5
63:11,13,15,16
68:8 75:4,5,7,7,19
77:5 81:18,20,20
81:22 83:13 91:9

95:18 99:19 103:4
103:7
**thinking** 90:11
**third** 42:10
**thought** 40:14
44:25 59:10 68:20
81:18 82:5 102:9
105:14
**three** 17:25 18:2
24:10 41:11 67:2
67:3 86:16
**throw** 48:12
**tied** 47:10 50:9,15
**time** 4:4 8:2,16
10:7 17:11 24:17
25:11,13 43:2
46:19 47:21 48:11
50:11,20,25 53:3
54:16,17 56:8
69:9 73:8 79:2,10
93:22,25 94:13,19
105:20 106:4
**times** 12:14 44:20
**tiny** 79:6
**today** 5:3,11 6:5
64:19 93:19 95:5
102:11
**told** 29:19 68:19
101:22
**top** 65:12
**topics** 5:13,16
73:20
**tossed** 44:19
**total** 66:12 76:20
**track** 82:11
**tracking** 22:22
36:17 44:21 97:9
98:12
**trained** 98:23,25
**transaction** 53:13
74:20

**transcribe** 10:5
**transcribed** 10:14
106:7
**transcript** 46:13
106:8,9,11 109:18
109:21
**transcription**
108:10
**transcriptions**
10:15
**travel** 52:15 54:17
70:11 85:3 94:3
**traveling** 8:12
**treated** 63:9
**tried** 64:13
**trip** 16:16 29:21
34:5,13,17 100:7
104:23
**trips** 34:4
**true** 106:8 107:10
109:19,22
**truly** 15:3
**truth** 23:16 100:15
**try** 7:12 9:18
23:15 45:9,10
49:21 87:22
100:14,18 101:14
**trying** 10:10 14:16
14:24 25:23 27:21
32:2 33:18 42:24
48:24 57:19 62:17
62:20 63:19 73:13
74:2 75:16 90:21
90:22 98:12
101:25 102:10,12
104:9,12,13,18,22
**tuesday** 11:16
**tumi** 82:13 83:4
**turks** 97:10,13,21
98:5 99:10 102:7

**turn** 10:21 18:17
61:16 76:6 77:22
82:24 83:17 85:7
91:3,24 96:11
**turned** 36:5
**turning** 75:8
**twice** 20:13
**two** 18:3 26:5 28:5
28:24 48:11 50:2
52:6 56:20 62:6
67:3 91:5 97:9,16
97:19 98:7,8
103:16

**u**

**u.k.** 66:23 67:10
99:16,18 100:2,7
101:23
**u.s.** 3:16,20 4:10
51:18,22
**um** 59:2 65:16
**unbalanced** 48:3
**underscored**
13:24
**undersigned** 106:2
**understand** 10:11
14:16 22:20 35:14
38:16 46:8,16
63:19 65:2 70:23
70:25 72:17 74:2
86:24 90:22
101:25 102:4,10
102:12 104:22
**understanding**
50:16 63:18 69:14
72:14 73:18 75:20
76:2 102:11
**understood** 47:17
86:22
**undertake** 99:14
**underway** 14:7,8

**unit** 42:22 44:11
**united** 1:2
**units** 42:23 43:12
  43:14 44:7,15
  46:15 47:10 49:15
  50:9,15
**unpredictable**
  44:2,7 49:11,20,24
**unreasonable**
  15:20
**usb** 17:19 41:2
**use** 7:14,16,18
  8:22 35:24,25
  59:18
**usually** 67:25

**v**

**v** 1:9 107:3 108:3
**vague** 50:10
**various** 5:18
**vendors** 3:17
  51:19 62:15 77:7
**verbal** 17:13 68:16
  68:18
**veritext** 4:17
**version** 25:19
**versus** 4:9 43:6
  80:4
**video** 4:6 94:14,21
**videographer** 4:2
  50:20,25 94:13,19
  105:20
**viewed** 80:10
**virginia** 11:24
  13:8 31:21
**vision** 1:10,18 2:15
  3:9,16,20 4:10,24
  5:7,12 6:6,9,12,15
  6:25 11:13 23:8
  30:17 32:13 35:11
  35:25 36:24 44:2
  49:9 50:5 51:18

**51:21,22 52:14**
53:16 54:21 55:2
55:5,12,20,22
57:17,20,22 58:21
59:14 62:12,23
63:24 64:3 67:22
68:5,9,15 69:25
70:15 71:3,12
72:8,10 74:9
76:15 77:11 78:14
78:20,21,22 79:19
82:18 84:8,15,22
87:3,11 88:16,23
93:18 94:6 95:15
**vision's** 77:17
  95:20
**visit** 90:2
**visual** 80:9

**w**

**w** 5:21
**walk** 48:9
**walked** 36:11,24
**waller** 2:23 11:14
  13:19 14:4 16:14
  20:10 22:12,16,24
  23:3 25:15 28:8
  29:7 31:12 32:6
  45:8 49:22 53:11
  53:25 55:13,21,23
  57:14 58:11,14,21
  62:14 63:2,8,19
  64:4 75:22 77:4,6
  77:6 96:5 102:20
  105:19
**waller's** 40:7
  57:20
**wallet** 83:13,14
**wallop** 1:17 4:1,7
  5:1,2 6:1,4 7:1 8:1
  9:1 10:1 11:1 12:1
  13:1 14:1,5 15:1

**16:1 17:1 18:1**
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1,4
45:24 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
81:1 82:1 83:1
84:1 85:1 86:1
87:1 88:1 89:1
90:1 91:1 92:1
93:1 94:1 95:1
96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 107:7,18
108:4 109:25
**walmart** 18:22
**wang** 2:24 36:14
**want** 41:2 45:23
  48:18 59:18 84:14
  94:24 95:19
**wanted** 16:23
  19:23 23:17 42:20
  49:2 67:11 92:22
  100:14

**washington** 13:16
  38:18
**watch** 98:19
**way** 18:16 42:24
  44:21 49:2,21
  55:19,20 59:11
  60:23 62:20 63:22
  72:14 73:11 80:7
  80:9 91:19 94:7
  101:13
**week** 15:9 23:25
**went** 20:13 23:20
  26:17,17 28:11
  34:12 41:9 47:22
  56:18 59:15,22
  64:17 81:4 95:13
**whereof** 106:14
**white** 38:19
**wilmington** 2:18
**winter** 85:2
**wire** 15:24,25 16:6
  56:5,25 62:8,9,18
  74:25 75:10,21
  76:12
**wired** 53:5 55:22
  56:8,10,16 62:13
  63:8 74:3 77:3
**wires** 3:16 14:25
  16:10 51:18 52:17
  59:4 60:3,16,24
  61:6 64:17,22
  65:3,6,9,14 66:7,8
  66:10,12,17,19
  76:20,24 91:11
  96:3
**wish** 85:24
**withdrawal** 89:3
  89:11 96:22
**withdrew** 55:23
**witness** 5:22 38:23
  38:25 45:7,16

73:14,23,25 95:4
95:13 96:4 102:25
105:18 106:14
108:4
**witnesses**  106:5
**word**  59:18 69:23
101:7
**words**  8:11 9:23
18:3 32:22 36:20
43:5 63:16 89:14
**work**  13:12 36:14
36:17 44:2 47:15
48:5,15,21 67:14
73:2,7,8,13 87:21
88:17,23 92:18
**worked**  56:9
**working**  26:7,8
65:24 71:21 84:17
102:15 104:11
**world**  101:2
**write**  7:20 8:13
17:11 28:16
**written**  10:13,24
28:15 82:3
**wrong**  43:23 44:25
101:6
**wrote**  8:19,23 9:3
9:8 17:2,3,7

| x |
|---|

**x**  1:4,12 3:6
106:11

| y |
|---|

**y**  39:22 57:8
**yeah**  16:14 45:11
49:10 66:8,8
91:18
**year**  10:8 32:21
48:22,22 79:7
97:3

**yellow**  52:16 59:25
77:16,25 81:6,25
91:6,13 95:9 96:7
**yesterday**  16:24
**york**  1:3,15,15,22
4:11,14,14,17
13:23 14:5 17:22
38:2,10 42:2,5,11
94:4 106:3 107:9
**yvette**  2:24 17:15
36:13 39:21 41:9
41:14 42:3 81:19
**yvette's**  21:15,19
100:13

| z |
|---|

**zurich**  27:17

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# EXHIBIT H

```
 1   UNITED STATES DISTRICT COURT

 2   SOUTHERN DISTRICT OF NEW YORK

 3   ----------------------------------x

 4   EASTERN PROFIT CORPORATION LIMITED,

 5             Plaintiff-Counterclaim Defendant,

 6                                  Case No.

 7      -against-                 18-cv-2185

 8   STRATEGIC VISION US, LLC,

 9             Defendant-Counterclaim Plaintiff,

10    vs.

11   GUO WENGUI a/k/a, MILES KWOK,

12             Counterclaim Defendant.

13   ----------------------------------x

14

15

16            VIDEOTAPED DEPOSITION

17                   OF

18            J. MICHAEL WALLER

19            New York, New York

20         Friday, February 8, 2019

21

22

23

24

25
```

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

---

Page 2

```
 1
 2
 3
 4
 5
 6
 7                         Friday, February 8, 2019
 8                         10:00 a.m.
 9
10
11        Videotaped Deposition of J. MICHAEL WALLER,
12  held at the offices of Zeichner, Ellman & Krause
13  LLP, 1211 Avenue of the Americas, New York, New
14  York before Roberta Caiola, a Shorthand Reporter
15  and Notary Public within and for the State of New
16  York.
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1  A P P E A R A N C E S:
 2
 3  ZEICHNER, ELLMAN & KRAUSE LLP
 4  Attorneys for Eastern Profit Corporation Limited
 5       1211 Avenue of the Americas
 6       New York, NY 10036
 7  BY:  ZACHARY GRENDI, ESQ.
 8       zgrendi@zeklaw.com
 9
10  HODGSON RUSS LLP
11       Attorneys for Guo Wengui a/k/a, Miles Kwok
12       605 Third Avenue, Suite 2300
13       New York, New York 10158
14  BY:  ERIN N. TESKE, ESQ.
15
16  PHILLIPS LYTLE LLP
17  Attorneys for Strategic Vision US, LLC
18       340 Madison Avenue
19       New York, New York 10173-1922
20  BY:  JOSEPH B. SCHMIDT, ESQ.
21       jschmit@phillipslytle.com
22
23  ALSO PRESENT:
24  JAYSUN LOUSHIN, The Videographer
25
```

Page 4

```
 1                I N D E X
 2  WITNESS:  J. MICHAEL WALLER              PAGE
 3  BY:           MR. GRENDI                    8
 4  BY:           MS. TESKE                   281
 5  BY:           MR. GRENDI                  282
 6
 7            LIST OF EXHIBITS
 8  WALLER        DESCRIPTION                 PAGE
 9  Exhibit 1  Research Agreement              18
10             January 1, 2018
11  Exhibit 2  Research Agreement December     46
12             29, 2017
13  Exhibit 3  Handwritten document Bates     105
14             stamped Eastern 11
15  Exhibit 4  Document Bates stamped         113
16  Exhibit 5  Signal text message thread    116
17  Exhibit 6  Document entitled "Anita Yui  164
18             Suen"
19  Exhibit 7  Background Report on Qing      212
20             Yao
21  Exhibit 8  Letter dated February 23,      214
22             2018
23  Exhibit 9  Document Bates stamped         226
24             SVUS000077
25
```

Page 5

```
 1            LIST OF EXHIBITS
 2  WALLER        DESCRIPTION                 PAGE
 3  Exhibit 10 Document Bates stamped         229
 4             SVUS80
 5  Exhibit 11 Document entitled "Time to     233
 6             Get Them Beginning the
 7             Psycho-Political Campaign
 8             For China," Bates stamped SV
 9             385 to SV 402
10  Exhibit 12 Document Bates stamped         255
11             SVUS260
12  Exhibit 13 Document Bates stamped         259
13             SVUS00262
14  Exhibit 14 Document entitled "All         261
15             Source Intelligence
16             Collection Posture"
17  Exhibit 15 Subject Chart, Bates stamped  263
18             SVUS278
19  Exhibit 16 Document Bates stamped         267
20             SVUS267 and 268
21  Exhibit 17 Document Bates stamped         270
22             Eastern 250
23  Exhibit 18 Supplemental Interrogatories  282
24             submitted by Strategic
25             Vision
```

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 6

```
1              LIST OF EXHIBITS
2  WALLER        DESCRIPTION          PAGE
3  Exhibit 19  Amended Answer and      283
4              Counterclaims
5  (Exhibits retained by Counsel.)
6
   (*r) DOCUMENTS:
7
        Page:  20
8       Page:  22
        Page:  40
9       Page:  154
        Page:  169
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
1         THE VIDEOGRAPHER:  Good morning.  We
2  are now going on the record with the
3  deposition of Michael Waller in the matter
4  of Eastern Profit Corporation Limited versus
5  Strategic Vision US, LLC.  Today's date is
6  February 8th.  The time is 9:59.
7         I am the videographer, and the court
8  reporter is Roberta Caiola.  My name is
9  Jaysun Loushin from Huseby Global
10 Litigation.
11        Will counsel please introduce
12 themselves followed by the swearing in of
13 the witness.
14        MR. GRENDI:  Sure.  I'm Zach Grendi of
15 Zeichner, Ellman & Krause for the plaintiff,
16 Eastern Profit.
17        MR. SCHMIDT:  Hi.  I'm Joe Schmidt for
18 Strategic Vision and the witness.
19        MS. TESKE:  I'm Erin Teske with Hodgson
20 Russ, on behalf of Mr. Kwok.
21
22 J. MICHAEL WALLER, called as a witness, having
23 been first duly sworn by a Notary Public of the
24 State of New York, testifies as follows:
25
```

Page 8

```
1  EXAMINATION BY
2  MR. GRENDI:
3      Q.   Good morning, Mr. Waller.  My name is
4  Zach Grendi.  I represent the plaintiff in this
5  matter, Eastern Profit.
6           Have you ever taken a deposition
7  before, or given a deposition?
8      A.   Yes.
9      Q.   So I'm just going to go over a couple
10 of ground rules before we get started.  Please
11 wait until I finish asking a question to respond
12 to the question.  That way, the court reporter
13 can take down your testimony and my questions
14 accurately.  If we're talking over one another,
15 it's very hard for the court reporter.
16          If you need a break at any time, please
17 let us know and we can take one.  We're going to
18 try to get through as much of this as we can
19 today, and that's about it.
20          So please tell me your full legal name.
21 I know you go as J. Michael Waller.
22     A.   John Michael Waller.
23     Q.   That would be the name on your birth
24 certificate?
25     A.   Yes.
```

Page 9

```
1      Q.   What is your address?
2      A.   623 Lexington Place South -- Northeast,
3  Washington, D.C., 20002.
4      Q.   And just briefly, can you describe your
5  educational background?
6      A.   I have a bachelor's degree Phi Beta
7  Kappa from George Washington University, a
8  master's degree from Boston University, and a
9  Ph.D. from Boston University.
10     Q.   And after you graduated from school,
11 what is your work history, briefly?
12     A.   Work history is working with non-profit
13 research and policy groups principally in
14 Washington, D.C. and as the Annenberg Professor
15 of International Communication at the Institute
16 of World Politics, a grad school, and then in
17 private business.
18     Q.   Okay.  What are some of the private
19 business work experience that you've had?
20     A.   Business development and opposition
21 research.
22     Q.   Can you name any entities that you
23 provided that service to?  And by that, I mean --
24 I just want to be clear, not the client, the name
25 of the companies that you were working for doing
```

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 10

1  that work.
2           MR. SCHMIDT:  Your employer.
3           MR. GRENDI:  Employer, yeah.
4       A.  I do mean principally, principally as
5  my own contractor for myself through my company,
6  through Oceanic Advisors or Liberty Tree
7  Partners.
8       Q.  How do you know French Wallop?
9       A.  I met her about, first about 35 years
10 ago.  I had been a Senate staffer and her husband
11 was a U.S. senator.
12      Q.  Were you a staffer for Ms. Wallop's
13 husband?
14      A.  No.
15      Q.  Did you meet him through your work as a
16 staffer?
17      A.  The senator?
18      Q.  Yes.
19      A.  Yes.
20      Q.  Is that how you met French Wallop?
21      A.  I don't recall.  It could have been at
22 a reception or some other event.
23      Q.  When did you start working with
24 French Wallop in connection with
25 Strategic Vision?

Page 11

1       A.  2016, maybe 2017.
2       Q.  How did that come about?
3       A.  We had talked a lot about doing
4  different business projects.  We had worked
5  together during the Iraq War and the Afghanistan
6  War but never actually did contractual work.  It
7  was just mutual collaboration on work relating to
8  opposing jihadist movements, and then we
9  discussed ways to do business with a variety of
10 prospective clients in 2017.
11      Q.  You're saying 2017 now?
12      A.  2016-2017.  I feel more comfortable
13 saying early 2017.
14      Q.  Okay.  What was the nature of the work
15 you were doing with French Wallop before you
16 started talking about working with Strategic
17 Vision, the Iraq War and Afghanistan War?
18      A.  That was information opposition support
19 for the U.S. Special Operations Forces, or I'll
20 say U.S. Military in general.
21      Q.  So you were both providing that kind of
22 service to the U.S. Military?
23      A.  Yes, independently.  And we had -- when
24 she was working on another project, we had talked
25 about bringing me in, but we didn't.

Page 12

1       Q.  And so when did you do your first
2  project with Strategic Vision and French Wallop?
3           You said you started talking in early
4  2017.  When did you do your first project with
5  Strategic Vision?
6       A.  We had several going on at once at
7  about the same time, so I can't -- either late
8  2016 or early 2017.
9       Q.  So you jumped right in after discussing
10 with Ms. Wallop working together.  She said, "Can
11 you help on a couple of projects?"
12          Is that what happened?
13      A.  Yeah.  It's more of you get together
14 and you talk about ideas, and you brainstorm
15 about what kind of clients are out there or what
16 kind of work should be done or needs to be done,
17 and then where we would properly fit in and what
18 type of teams to build.
19      Q.  And so how many projects have you done
20 with Strategic Vision?
21      A.  None of it's written down, meaning we
22 don't have a contract, so we just work together
23 because we trust each other.  We have probably
24 two right now.
25      Q.  Just historically, how many different

Page 13

1  projects or clients have you serviced with
2  Strategic Vision?
3       A.  Probably two previous.  The ones we're
4  working on now are not yet clients.  We're just
5  working on building them as clients.
6       Q.  So you're not performing any service
7  for just Strategic Vision right now for any of
8  its clients?
9       A.  No.
10      Q.  And you're working on maybe doing two?
11      A.  Yes.
12      Q.  Other than the project that we're going
13 to discuss in this case with Eastern Profit, how
14 many other projects have you done for Strategic
15 Vision?
16      A.  Probably two.
17      Q.  That you actually performed work on?
18      A.  Yeah.
19      Q.  When was that?
20      A.  Let me correct my earlier statement.  I
21 think it was 2016 when I first did work with her.
22      Q.  That's fine.  So there were two other
23 projects that you performed for Strategic
24 Vision --
25      A.  Yes.

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 14

1    Q.    -- other than this one?
2    A.    Yes.
3    Q.    So three total that you've performed
4 work for Strategic Vision?
5    A.    This is the third one, yes.
6    Q.    And without identifying the name of any
7 of the clients or anything like that, what was
8 the substance of that kind of work, the other two
9 projects that you performed?
10    A.    Opposition research and political/
11 policy work, messaging.
12    Q.    What is the opposition research?  Can
13 you break that down a little bit and explain what
14 that means?
15    A.    Yeah, it's common in political
16 campaign-type work, but you can use it for really
17 anything where you want to research who your
18 opposition is, everything you can find out about
19 the opposition and use that for advancing your
20 political or policy purposes.
21    Q.    So was it investigation work?
22    A.    Yes.
23    Q.    What kind of investigation work?  Can
24 you describe it?
25    A.    Computer research, sort of academic

Page 15

1 research, good old-fashioned detective-type work.
2 The same way you would do a background
3 investigation.
4    Q.    And do you do that work personally?
5    A.    I do some of it personally, but I
6 arrange teams where it's beyond my expertise or
7 where the scope is too large.
8    Q.    So sometimes you'll perform the
9 investigatory research yourself if the resources
10 are available?
11    A.    Yes, or if my capabilities are there.
12 If they're beyond my capabilities, I'll hire out
13 the talent.
14    Q.    So you've done that for Strategic
15 Vision?
16    A.    Yes.
17    Q.    What if the research is beyond your
18 capabilities?
19    A.    You hire people who have those
20 capabilities.
21    Q.    You have contacts who can do that kind
22 of research when you can't do it?
23    A.    Yes.
24    Q.    Where is Strategic Vision located?
25    A.    At French Wallop's house.

Page 16

1    Q.    So it doesn't have a storefront or
2 office or anything like that?
3    A.    No.
4    Q.    Do you work in that office when you're
5 working on a project for Strategic Vision?
6    A.    No.  We'll meet at her house to talk,
7 that's all.
8    Q.    Just going back to your career.  How
9 many opposition research projects have you
10 performed in your career?
11    A.    More than a hundred.
12    Q.    Some of those are within the
13 United States?
14    A.    Both in the United States and abroad.
15    Q.    What's the split there, if you can
16 ballpark that?
17    A.    Roughly 50/50 either way.  I couldn't
18 quantify it.
19    Q.    So sometimes the subjects of an
20 investigation are in other countries and
21 sometimes they're in the United States?
22    A.    Yes.
23    Q.    Does French Wallop ever do this kind of
24 investigatory work, opposition research?
25    A.    She does, using different methods.

Page 17

1    Q.    So if you and French Wallop are working
2 on a project?  What's the division of labor?
3 What work would you do and what work would she
4 do?
5    A.    She normally does the networking in the
6 political or diplomatic or intelligence
7 communities through her personal networks.  Her
8 husband was on the Senate Intelligence Committee,
9 so she has connections going back longer than
10 I've known her.  She's maintained all those
11 contacts worldwide, and she's multilingual and
12 she's traveled very extensively.  So she'll use
13 those higher level contacts, and then I'll do the
14 more nuts-and-bolts work.
15    Q.    So in other words, Ms. Wallop might use
16 her network of contacts to get a certain amount
17 of information, investigatory research, and then
18 you might drill down on that data.
19        Is that fair to say?
20    A.    Yeah.  On occasion, yeah.
21    Q.    Let's look at a document here, and
22 we'll mark it as Waller 1.
23        MR. SCHMIDT:  Unless you just want to
24    continue numbering them.
25        MR. GRENDI:  I think I'm just going to

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 18

1   do them by name.  There's going to be some
2   overlap, so I don't want to mix and match.
3   I just want to keep them separate.  I have
4   to be careful not to give you the one that
5   I've marked up, so please bear with me.
6            (Waller Exhibit 1, Research Agreement
7   January 1, 2018, marked for identification.)
8            MS. TESKE:  Sorry, you said this is
9   Waller 1?
10           MR. GRENDI:  Yeah, this is Waller 1.
11      Q.    Mr. Waller, can you please just take a
12  moment to look at this document and let me know
13  when you're done reviewing it.  You don't have to
14  read every word.  Just familiarize yourself with
15  it.
16      A.    Okay.
17      Q.    Mr. Waller, do you recognize this
18  document?
19      A.    I recognize one with a different date
20  that's filled out.
21      Q.    Before today, you don't know if you've
22  ever seen this document?
23      A.    I'm not sure.  There are several
24  versions of it.
25      Q.    Let me ask you about that.  So does

Page 19

1   Strategic Vision have a standard research
2   agreement that it uses for its clients?
3       A.    I don't know.
4       Q.    Have you seen an agreement similar to
5   this in the past?
6       A.    No.  Well, apart from earlier drafts of
7   this one, no.
8       Q.    So you don't know, sitting here today,
9   whether Strategic Vision has a stock agreement
10  that it provides to its clients when there's a
11  project of this nature?
12      A.    I don't know.
13      Q.    So you don't know how long Strategic
14  Vision has used this document?
15      A.    I wrote the draft of this with Guo.
16      Q.    You wrote this document?
17           MR. SCHMIDT:  Just give me a chance to
18      object.
19           THE WITNESS:  Okay.
20           MR. SCHMIDT:  No, go ahead.  You're
21      good.
22      Q.    Did you write the original draft of
23  this research agreement?
24      A.    Not this draft, but I wrote drafts
25  leading up to what appears to be this draft.

Page 20

1   (*r)     MR. GRENDI:  Joe, I think we are going
2       to call for the production of any drafts
3       that weren't already produced.
4            MR. SCHMIDT:  All right.
5       Q.    So do you have those prior drafts in
6   your computer at home?
7       A.    I have one, I think, dated December 29,
8   2017.
9       Q.    Were there any drafts before
10  December 29, 2017?
11      A.    I don't know.  It was with Guo and
12  Lianchao Han and French Wallop, and then later on
13  with only French Wallop and Yvette Wang.
14      Q.    You said before that you worked on the
15  first draft of a document like this, is that
16  right?
17      A.    On initial drafts, but yes.
18      Q.    When did you do that initial draft?
19           MR. SCHMIDT:  Objection.
20           MR. GRENDI:  Is the witness going to
21      answer or are you saying he's not going to
22      answer?
23           MR. SCHMIDT:  It's a form objection.
24      You can answer.
25           THE WITNESS:  When there's an

Page 21

1   objection, am I bound to answer?
2            MR. SCHMIDT:  If I don't instruct you
3       not to answer, you can go ahead and answer.
4            THE WITNESS:  Repeat the question,
5       please.
6            MR. GRENDI:  Can you read it back,
7       please.
8            (Whereupon, the referred to question
9       was read back by the Reporter.)
10      A.    It's hard to say exactly because we
11  were developing the concept, developing the work
12  plan, developing the budgets, and so it would
13  have been depending on what an initial draft is,
14  in November or December of 2017, probably
15  December 2017.
16      Q.    Who did you work with on that draft,
17  the first draft?
18      A.    With Miles Kwok directly, with Lianchao
19  Han as the interpreter and facilitator, and with
20  French Wallop.
21      Q.    Where was that?  That sounds like it
22  was a meeting in person.
23      A.    Yes.  It was at Miles Kwok's residence
24  in New York City.
25      Q.    That was around, you're saying, early

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 22

December 2017?

2    A.    Roughly, yeah.  I'd have to go back and
3  check.  I can give you an absolute date.  We went
4  through ideas first, which wouldn't be a draft of
5  the contract, and then we did the draft of the
6  contract.  We did it directly at Kwok's
7  residence.
8    Q.    So did you handwrite it or did someone
9  else handwrite it or was there a computer
10  involved?  Can you just describe the writing
11  process?
12    A.    Yeah, I would have handwritten it
13  because we did not have computers in those
14  meetings.
15    Q.    So you took handwritten notes as to
16  what the provisions of the contract would be?
17    A.    Yes.
18    Q.    Did anyone else take notes like that?
19    A.    I don't recall.
20  (*r)    MR. GRENDI:  We would also call for the
21    production of those notes, Joe.
22    Q.    So please, if you would, describe what
23  was discussed at this meeting where the first
24  draft of the research agreement was memorialized
25  or discussed.

Page 23

1    A.    It was a lengthy meeting at his house.
2  It was split up by a sit-down in his living room
3  and then conversations in his dining room.  And
4  it was developed -- he told us what he wanted to
5  do.  We then said how we could meet that.  We
6  told him some of the things to do may not be
7  legal in the United States to do.  He was fine
8  with that.
9        Then we developed the scope, and then
10  from the scope developed a budget.  And I can't
11  recall specifically if we discussed the budget in
12  that first meeting or subsequently, and I did not
13  save a lot of the notes on purpose.
14    Q.    So you threw away the notes?
15    A.    Yeah.
16    Q.    When did you dispose of the notes?
17    A.    Ordinarily I destroyed my notes on
18  things where they have to be confidential, where
19  there's a high-risk environment, to protect the
20  client and to protect our own people, so I don't
21  remember when I would have done that.  It would
22  have been certainly before any dispute arose.
23    Q.    You mentioned what -- you said Mr. Guo
24  want.  Who are you talking about when you say
25  "Mr. Guo"?

Page 24

1    A.    He uses three names.  Miles Kwok, I
2  suppose, is the name he's using today for his
3  representation here.
4    Q.    Do you also know him as Guo Wengui?
5    A.    Yes.
6    Q.    You said there were three names.
7    A.    There was a third name that contained
8  the name "Guo."  I don't recall the exact part of
9  the name.
10    Q.    This meeting that you say occurred at
11  Mr. Guo's, you say, apartment --
12    A.    Yes, or whatever his unit is called.
13    Q.    -- in December of 2017, was that the
14  first time you had met him?
15    A.    Yes.
16    Q.    You described he told you what he
17  wanted.  What did he tell you he wanted?
18    A.    He wanted to do battle with the Chinese
19  Communist Party leadership.
20    Q.    Can you explain a little bit more about
21  what you thought he meant by that?
22    A.    Yes.  He wanted to exploit divisions
23  within the Communist Party leadership as
24  President Xi was consolidating power.  He wanted
25  to take advantage.  He wanted to exploit

Page 25

1  differences within the regime and within other
2  Chinese billionaires living both inside and
3  outside the People's Republic of China for the
4  purposes of disrupting the Xi government.  He
5  also wanted to expose the family networks of
6  certain of those Communist Party officials,
7  including what he described was their children
8  born out of wedlock who lived under different
9  names with relatives who managed the party
10  leaders' illegally gained funds and a range of
11  things related to that.  The bottom line was it
12  was for disruption of the Chinese Communist Party
13  leadership.
14    Q.    Was this the first time you had heard
15  about that being the supposed goal of this
16  research or request?
17    A.    Before I met him, I was told that he
18  was going to do this, and that's why I took an
19  interest in doing it.
20    Q.    Who told you about that interest?
21    A.    French Wallop told me and Lianchao Han
22  told me and Bill Gertz told me.
23    Q.    Let's just go one at a time.  Who is
24  the first one of those three people to tell you
25  or was it maybe one meeting?

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 26

1    A.    I believe it was French Wallop.
2    Q.    And then subsequent to that, you talked
3  to who about that?
4    A.    To Lianchao Han, L-i-a-n-c-h-a-o.  The
5  second name is H-a-n.
6    Q.    This is all before this December
7  meeting in Mr. Guo's apartment?
8    A.    Yes.
9    Q.    When did you talk to Bill Gertz?
10   A.    At about that same time.  Bill Gertz
11 had asked French Wallop if she could do this
12 work.  She said she would like to bring me in.
13 He thought it would be a great idea, in his
14 words, and Lianchao Han agreed.  And that's when
15 I was brought up to meet -- then I conferred with
16 Lianchao and was brought up to meet Guo.
17   Q.    So Mr. Guo apparently described what he
18 wanted to do, and then you said that Strategic
19 Vision -- let's strike that and start over.
20 Sorry.
21        So Mr. Guo told you what he wanted from
22 you and Ms. Wallop.  What did you tell him back
23 in terms of what Strategic Vision and you
24 yourself could provide as a service?
25   A.    First, I never spoke on behalf of

Page 27

1  Strategic Vision.
2    Q.    Okay.  Who were you speaking on behalf
3  of?
4    A.    On behalf of myself.
5    Q.    So you don't have an employment
6  agreement with Strategic Vision?
7    A.    No.
8    Q.    Did you explain to Mr. Guo and
9  Mr. Lianchao that you did not work for Strategic
10 Vision?
11   A.    Yes.
12   Q.    When was it?  Was that at this meeting
13 that you're talking about now?
14   A.    It was probably at the first meeting
15 with Guo.  I never implied anything that I worked
16 for Strategic Vision.
17   Q.    Did you explicitly say "I don't work
18 for Strategic Vision"?
19   A.    I don't recall if it was quite put that
20 way.  I would let Ms. Wallop answer that because
21 she was speaking for her company.  We presented
22 ourselves as a team, and we were specific that we
23 assemble teams on an as-needed basis to do this
24 type of research because there's no corporate
25 profile.  And that was essential for maintaining

Page 28

1  the client confidentiality and the
2  confidentiality of the work.
3    Q.    So you're saying at the outset here you
4  explained to Mr. Guo and Mr. Lianchao that
5  Strategic Vision and you personally are not
6  working together directly.  That you're, I guess,
7  an independent contractor?
8    A.    Yes, that would be accurate, as an
9  independent contractor.
10   Q.    And you explained that to Mr. Guo and
11 Mr. Lianchao?
12   A.    Yes.
13   Q.    Did they say anything when you
14 explained that?
15   A.    No.
16   Q.    Getting back to my original question,
17 what did you and Strategic Vision, through
18 Ms. Wallop, explain as a possible service that
19 could be provided to Eastern Profit?
20   A.    We could provide this opposition
21 research to Guo.  That we would set up the teams
22 to do the work.  That the work would have to be
23 done both in the United States and outside the
24 United States.  That we were starting up cold.
25 We never implied that we had a corporate entity

Page 29

1  with a staff and resources, that we would be
2  starting this up from scratch as we do with all
3  our projects.  So he was fine with that.
4    Q.    Did you or Ms. Wallop explain what
5  either your capabilities or Ms. Wallop's
6  capabilities were in terms of providing this
7  research?
8        MR. SCHMIDT:  Objection.  Go ahead.
9    Q.    Let me break it down, then.
10       Did you explain what you could provide
11 as a service in connection with this research?
12   A.    Yes.
13   Q.    And what did you explain to the parties
14 present?
15   A.    That I would assemble the research team
16 and supervise the research team.
17   Q.    That's the research team that would
18 perform investigatory research?
19   A.    Yes.
20   Q.    Did Ms. Wallop explain what Strategic
21 Vision could provide in connection with this
22 research?
23   A.    Yes.
24   Q.    What did she say, if you recall?
25   A.    I don't recall exactly.

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 30

1    Q.    What do you recall generally?
2    A.    That she could get the work done.
3    Q.    Were any other services described or
4  offered at this meeting, other than -- let's call
5  it investigatory research or, as you called it,
6  opposition research?
7    A.    Yes.  Guo had a big vision of things
8  that he wanted to do, and between Mrs. Wallop's
9  own research and connections and my own, we could
10  provide all of that or arrange for it to be
11  provided.
12    Q.    What were these other services?
13    A.    Guo was invested in purchasing real
14  estate in Washington, D.C. and in New York City
15  and Westchester County.  Mrs. Wallop had been
16  involved with high-end real estate in the past,
17  so she took that on.
18    Q.    So that was discussed at this meeting?
19    A.    I believe it was at that meeting.  If I
20  remember correctly, Lianchao first raised it with
21  us before we met Guo.
22    Q.    When you say "we," you mean you and
23  Ms. Wallop?
24    A.    Yes.
25    Q.    Now, at the time of this meeting in

Page 31

1  Mr. Guo's apartment, did you understand that
2  there had been prior meetings between either
3  Mr. Guo or Yvette Wang or Lianchao Han and
4  Strategic Vision?
5    A.    And Strategic Vision, no.
6    Q.    What about French Wallop?
7    A.    I don't know.  No, no.
8    MR. SCHMIDT:  No, you don't believe
9  they met before?
10    THE WITNESS:  I don't believe they met
11  before.
12    Q.    So you're not sure if French Wallop had
13  shown Mr. Guo or Yvette Wang real estate in the
14  Washington, D.C. area prior to this meeting?
15    A.    No, that was after the meeting.  There
16  was more that he asked us to do.
17    Q.    Such as?
18    A.    He wanted to set up a foundation, a
19  non-profit foundation for public policy relating
20  to China based in Washington, D.C.  He discussed
21  certain properties he wanted to buy in
22  Washington, D.C. to house that foundation, a
23  prestige property in Georgetown and a property
24  right across from the U.S. Treasury Department
25  overlooking the White House.

Page 32

1    He also wanted to set up a media
2  organization tentatively called Guo Media, and we
3  discussed various aspects of that.
4    Q.    Did Strategic Vision and Mr. Guo ever
5  agree to those other services?  Let's call them
6  non-investigatory services?
7    A.    I don't think it was contractual.  I
8  think it was just verbal.  Because I do know that
9  she took Yvette around to look at certain
10  properties in Washington, D.C.
11    Q.    But to your knowledge, there was never
12  any written agreement between Mr. Guo and
13  Strategic Vision concerning these other services?
14    A.    Not that I know of.
15    Q.    Going back to the terms of the research
16  agreement that you were drafting at this meeting.
17  To the extent you can recall, what were the basic
18  terms that were discussed that you wrote down or
19  remember?
20    MR. SCHMIDT:  Just objection, but go
21  ahead.
22    A.    Okay.  First I'd have to sort out one
23  meeting from the other and then what we discussed
24  before or after the meeting without Guo present,
25  so everything might not be completely accurate.

Page 33

1    MR. SCHMIDT:  Is the question just what
2  he drafted at that December meeting, the
3  notes he took?  That's the problem with the
4  question.
5    MR. GRENDI:  That's fair.
6    MR. SCHMIDT:  Maybe we can narrow it,
7  take it one bite at a time.
8    Q.    What were the notes that you took, to
9  the extent you recall, regarding this agreement
10  at the meeting at Mr. Guo's apartment that we've
11  been discussing?
12    A.    The general things that he wanted were
13  he wanted to investigate up to 4,000 individuals
14  in China or Chinese nationals living outside
15  China, and he wanted to start with ten.  He
16  described the types of research he wanted done.
17    Q.    Would that include financial forensic
18  research?
19    A.    Yes.
20    Q.    And would it include tracking research?
21    A.    Yes.
22    Q.    How about social media research?
23    A.    Yes.
24    Q.    So if you look at what we marked as
25  Waller 1, do items A, B and C describe the type

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 34

1  of services that Mr. Guo apparently asked for at
2  this meeting?
3      A.   Yes.
4      MR. SCHMIDT:  Objection.
5      Q.   What else was discussed at the meeting,
6  other than the 4,000 individuals starting with
7  ten, and the types of research?
8      A.   Guo had a three-year plan.  He wanted a
9  three-year contract to fulfill that plan.  He had
10 a larger plan of his own of which this was just
11 supposedly a small part.
12     Q.   Anything else you recall?
13     A.   He was extremely conscious of his own
14 personal security.  He expressed fear that he
15 would be murdered.  He expressed concern for his
16 property that was still in China, his overall
17 interest in China.  He expressed concern that
18 under no circumstances should our relationship
19 ever be divulged to anyone.
20          We discussed security measures we would
21 take, which were rather extraordinary because
22 they were meant to avoid detection by the Chinese
23 intelligence services called MSS, which is
24 extremely active in the United States.
25     Q.   That's MMS, you said?

Page 35

1      A.   MSS, Ministry of State Security.
2      Q.   Thanks.  Did Strategic Vision or you
3  offer any terms or conditions to providing this
4  service?
5      A.   In which way?
6      Q.   In other words, you've described what
7  apparently Mr. Guo had requested.  Was there
8  anything that Strategic Vision requested in
9  connection with this service?
10     A.   From him?
11     Q.   Just in connection with providing this
12 investigatory research.  For example, price?
13     A.   Yeah, of course.
14     MR. SCHMIDT:  Do you mean terms that
15     they wanted?
16     MR. GRENDI:  Exactly.
17     MR. SCHMIDT:  Terms of the contract,
18     did you make any requests at that meeting?
19     A.   Sure.  We -- and I don't know if it was
20 at that specific meeting or one subsequent to it,
21 but at the time of working out the contract,
22 let's say sometime in December of 2017.  And some
23 of it was directly with him and some of it was
24 indirectly through Lianchao, and I can't recall
25 necessarily which was which.

Page 36

1          One of the issues was a deposit of $1
2  million to finance the start-up of getting the
3  teams in order and getting all the pieces in
4  place.
5      Q.   Is $1 million the kind of starting
6  negotiating point that Strategic Vision had, or
7  did they demand a different sum?
8      A.   No, we had a larger sum for the work
9  involved, but we needed the funds to start up the
10 teams and to get all the pieces in place.  We
11 were very explicit that we were starting up cold.
12 We requested it first as a signing bonus.  He
13 disagreed.  He objected to that completely, so we
14 agreed on a deposit which would be credited to
15 the last month, roughly month and a third of the
16 contract, so he wouldn't pay us a final payment
17 at the end of year one.  We would just deduct
18 that.  We would just deduct the deposit as our
19 payment.
20     Q.   What about other payment terms?  Were
21 they discussed?
22     A.   Yes.  They were to be, specifically to
23 be circuitous payments so that the Chinese
24 intelligence authorities could not find that he
25 was making payments to any of us.

Page 37

1      Q.   But other than the deposit, was there
2  any other financial consideration discussed for
3  Strategic Vision's services, or your services?
4      A.   Yes.  There was a $750,000-a-month
5  flat-rate payment that was due at the end of the
6  pay period.
7      Q.   And that was discussed at this meeting?
8      A.   At one of those meetings.  I don't
9  recall specifically which.
10     Q.   I just want to go back to this meeting
11 in early December at Mr. Guo's apartment.  Were
12 there any other terms and conditions that
13 Strategic Vision wanted in connection with this
14 research agreement?
15     A.   Financial terms?
16     Q.   Any terms.
17     A.   Yes, we wanted to be paid obviously on
18 time, within five days of the end of the pay
19 period.  We would not issue a formal invoice to
20 avoid having any paperwork or paper trail
21 directly with him.  He would arrange for the
22 payments at the end of the month to be made
23 through a circuitous route for the purpose of
24 avoiding detection by the Chinese authorities.
25          If you want to be more specific, I can

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 38

1    address things more specifically, but offhand I
2    can't think of anything else.
3        Q.    Okay.  And in terms of negotiating
4    these terms for Strategic Vision, were you taking
5    a lead on that or was Ms. Wallop taking the lead
6    on that?
7            MR. SCHMIDT:  Objection.
8        A.    We teamed it.
9        Q.    Did you have --
10       A.    We worked with Lianchao as Guo's agent
11   or representative prior to this to determine the
12   scope.  Then when we met with Guo, he narrowed
13   the scope and then we came to the agreement for
14   750 a month.
15       Q.    What was your financial arrangement
16   with Strategic Vision in connection with this
17   research agreement?
18       A.    That French Wallop and I would split
19   the profits evenly.
20       Q.    Would it be you personally that would
21   split the profits evenly or one of your
22   companies?
23       A.    There were LLCs in my name, so it's
24   effectively me paid to one of my LLCs.
25       Q.    So your understanding through Strategic

Page 39

1    Vision was half of the money that comes in
2    through this research agreement would be paid
3    either to you or one of your LLCs?
4        A.    Half of the profits, yes.
5        Q.    Profits, okay.  So not just revenue.
6    Let's just say if the agreement was a million
7    dollars, you wouldn't get 500,000.  You would get
8    some smaller sum based on either overhead or
9    other costs?
10       A.    That's correct.
11       Q.    How did you plan on accounting for
12   that?
13       A.    Pardon.  There were also expenses paid
14   to one of my LLCs for the purpose of rerouting
15   this through a few channels to avoid detection by
16   the Chinese.
17       Q.    Which LLC was that?
18       A.    That was one that French and I both set
19   up called Georgetown Research LLC.
20       Q.    How much money was sent to Georgetown
21   Research LLC?
22       A.    I have the statements.  I'm guessing
23   $300,000, I'm guessing, but I can provide the
24   statements.
25       Q.    With respect to this agreement to split

Page 40

1    the profits, did you have a written agreement or
2    an oral agreement?
3        A.    Verbal agreement.
4        Q.    So there's no written agreement between
5    you and Ms. Wallop concerning how you or your
6    LLCs would be paid for your services in
7    connection with this research agreement?
8        A.    That's correct.
9        Q.    Other than the $300,000 payment, was
10   there any other payments from Strategic Vision to
11   you or one of your LLCs in connection with this
12   research agreement?
13       A.    Yeah.  I can provide those, the
14   documentation to that effect.
15   (*r)     MR. GRENDI:  Joe, I'm going to ask for
16       the production of Strategic Vision's records
17       with respect to these payments.
18           MR. SCHMIDT:  Okay.  I assume you're
19       going to follow up with a letter or
20       something detailing this, right?
21           MR. GRENDI:  Once we get the
22       transcript, we can do that.
23           MR. SCHMIDT:  Okay.  Because we
24       obviously owe you a letter from the last
25       deposition too.

Page 41

1            MR. GRENDI:  I understand.
2        Q.    You said you have records concerning
3    these transactions?
4        A.    The bank statements, yes.
5        Q.    Just ballpark, all in, do you know
6    about how much money was transferred from
7    Strategic Vision to you or your LLCs in
8    connection with this research agreement?
9        A.    I would say about that $300,000 figure
10   that I was referring to before was probably it,
11   but I would have to check, because the LLCs were
12   also used as a pass-through, by design.
13       Q.    Just in connection with this research
14   agreement, how many different LLCs were used?
15       A.    My own that I control?
16       Q.    Yes.
17       A.    Three.
18       Q.    What are those three?
19       A.    That would be Oceanic Advisors, Liberty
20   Tree Partners, although I don't recall if there
21   was a payment made to Liberty Tree, but that
22   would have been one, and then Georgetown Research
23   which was our joint LLC.
24       Q.    So why were these funds transferred to
25   your LLCs?

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 42

1    A.    So that we could make payments to start
2  team 1 and to cover all related expenses in
3  starting up this project.
4    Q.    So these payments were not for, as you
5  described it earlier, splitting the profits?
6    A.    That was part of the start-up.  We did
7  not deplete the funds.  There were funds left
8  over, but there were all kinds of costs involved
9  to start this up.  So anything involved in
10  starting up this project, we did through this
11  means.
12    Q.    I understand.  Correct me if I'm wrong.
13  The payments that were made to your three LLCs
14  were made in connection with you or your LLCs
15  retaining team 1?
16    A.    Yes.  To building and retaining team 1
17  and all of its equipment and all associated
18  expenses.
19    Q.    Did there come a time when you received
20  payment for splitting the profits?
21    A.    Yes.  I took some of the funds at that
22  same time to pay for my own expenses and my own
23  work, but it was not a splitting of the profits.
24    Q.    Right.  What I'm asking about is not
25  these payments that you just described.  What I'm

Page 43

1  asking about is was there ever another time when
2  you received money from Strategic Vision for
3  splitting the profits from this research
4  agreement?
5    A.    Yeah, during the first month of work.
6    Q.    How much was that payment for?
7    A.    I don't remember.  I have the records.
8    Q.    But you did -- you do recall receiving
9  a payment from Strategic Vision for splitting the
10  profits?
11    A.    To one of the LLCs.
12    Q.    Is that a "yes," though?
13    A.    "Splitting the profits" is the wrong
14  term.  It was for the first months of our own
15  compensation.  One of the issues was we wanted to
16  be paid one month in advance.  Guo objected.  We
17  still had to pay ourselves for that month's work.
18  I'm speaking for myself.  I'm not speaking for
19  Ms. Wallop or Strategic Vision.
20    Q.    I understand.  I just want to make the
21  record clear.  Did there ever come a time when
22  the profits from this research agreement were
23  split between you and Strategic Vision?
24    A.    Yes, but there are still funds left
25  that were not spent.  I don't have access to the

Page 44

1  Strategic Vision account, so I wouldn't know.  I
2  imagine there were some residual things, so the
3  profits were not fully -- to the extent there
4  were profits, they were not fully split.
5        We were cheated out of the first
6  month's work and the second month's work, and
7  then his failure to give 30-days' notice because
8  we were left in limbo.  So as far as we're
9  concerned, there were no profits because Miles
10  Kwok, or Guo cheated us out of our earnings.
11    Q.    So you don't expect to get any money
12  from French Wallop for any profit in connection
13  with this engagement?
14    A.    There's no profit if we were cheated.
15    Q.    I would appreciate it if you would just
16  answer the question directly.  Was there no
17  profit from this engagement for you or Strategic
18  Vision?
19    A.    You have to define "profit."  What were
20  our opportunity costs?  What were our losses from
21  doing work and preparing work for which
22  we were not compensated, or for not taking on
23  other jobs because we were working on Guo's work
24  for which he did not compensate us?  So it's an
25  academic question on what constitutes profit.

Page 45

1    Q.    Let me ask you this.  Do you expect
2  Strategic Vision to send you any payment in the
3  future in connection with, quote-unquote "profit"
4  from this engagement?
5    A.    If Guo pays what he owes yes, I do.  He
6  owes us $2 million in failure to pay and failure
7  to give notice that he was terminating the
8  contract in 30 days.  If and when he pays that,
9  yes, I expect to receive my share of the profit.
10  That's how we operate.
11    Q.    Let's just say the only money that
12  Strategic Vision has is the million dollars.  Is
13  there any profit to split?
14    A.    Not anymore, not with this legal case.
15    Q.    Did you and Strategic Vision ever
16  detail how profit would be defined, in terms of
17  splitting the profits from this engagement?
18    A.    In terms of dividing up the revenues
19  from this engagement, it would be a 50/50 split
20  after expenses.
21    Q.    Expenses, okay.  What expenses would
22  those be?
23    A.    The research teams, any travel, any
24  legal, any contractors, any equipment, any
25  leases, any security measures, anything related

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 46

1   to running the business.
2       Q.     And I guess legal fees --
3       A.     To executing this contract.
4       Q.     I would guess legal fees are apparently
5   a part of that?
6       A.     It's a part of running a business.
7       Q.     I'm asking about what you and --
8       A.     Legal fees are part of running a
9   business, yeah.  They happen to be, yeah.
10              MR. GRENDI:  Let's do number 2.
11              (Waller Exhibit 2, Research Agreement
12      December 29, 2017, marked for
13      identification.)
14      Q.     Mr. Waller, do you recognize this
15  document?
16      A.     Yes.
17      Q.     What is it?
18      A.     This is the research agreement that I
19  was referring to before dated December 29th.
20  It's the signed and initialed agreement between
21  French Wallop and Yvette Wang, who was working as
22  the agent of Miles Kwok, dated January 6, 2018.
23      Q.     So this is different from the draft
24  agreement I had showed you earlier, Exhibit 1?
25      A.     It's not the exact same agreement.

Page 47

1       Q.     So there was subsequent negotiation of
2   this agreement after the first draft that we've
3   showed you was drafted?
4       A.     This draft, this January 1st draft,
5   Exhibit Waller 1 is dated after the signed
6   agreement, Waller Exhibit 2, so I don't know what
7   you mean by "first draft."
8       Q.     But you don't know if Exhibit 1 was
9   drafted before or after the signed agreement?
10      A.     I don't know.  It would appear here you
11  fill in the blanks, and there are several blank
12  areas.  I have not read the text to compare the
13  text, but obviously the December 29th agreement
14  looks more complete than the one that's dated
15  January 1st.
16      Q.     Were you physically present when
17  Exhibit 2 was signed?
18      A.     No.
19      Q.     Were you telephonically involved or
20  telephonically present when this Exhibit 2 was
21  signed?
22      A.     No.  I was not present in any way,
23  shape or form, human or electronic.
24      Q.     Good to know.
25             Just looking at the agreement, the

Page 48

1   research subjects are referred to as "Fish."  Do
2   you see that on -- call it Eastern 7?  It's the
3   third page.
4       A.     Yes.
5       Q.     Where does that term "fish" come from?
6       A.     That was Guo's term.  It's admittedly a
7   very weird term to put in a contract.
8       Q.     You kind of anticipated my follow-up
9   question.  Have you ever done a contract that
10  referred to research subject as "fish"?
11      A.     No.
12      Q.     So this is the first one that you
13  ever --
14      A.     For fish?
15      Q.     Yes.
16      A.     Yes.  I mean, I wasn't going to deliver
17  him flounder as a deliverable, no.
18      Q.     Right.  And the contract refers to
19  "fish in the tank per year."  Do you see that?
20      A.     Yes.
21      Q.     What does the "tank" mean in that
22  context?
23      A.     This was a metaphor that Guo had in our
24  discussions with him about the number of people
25  to be researched at any given time and in the

Page 49

1   three categories outlined in the contract.  So if
2   you had ten individuals and three categories,
3   there would be 30 -- a set of 30.  But on
4   occasion, it would be impossible to research
5   certain of them, so you might only research eight
6   or he might want 12.
7              There would still be the same number of
8   deliverables, though, so it wouldn't be all three
9   items on all of them.  It might be only one or
10  two on some or there might be more people.  So
11  you have a, in his words, a water level in the
12  tank that is constant.
13      Q.     Would that also perhaps be referred to
14  as a "waterline"?  Have you ever heard that term
15  "waterline"?
16      A.     I don't know the difference.
17      Q.     So you and Ms. Wallop had never heard
18  of this kind of jargon in connection with the
19  investigatory research project?
20      A.     Never.  It was very strange.
21      Q.     Did you guys ever talk about how
22  strange you thought that was?
23      A.     Wouldn't you?  Yes.
24      Q.     What was the nature of that
25  conversation between you and Ms. Wallop about

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 50

1   these terms being strange?
2       A.    Any normal person would have a -- you
3   can imagine, if that was his way to quantify the
4   agreement and we put it down, then that was okay.
5   He was the client.  We all understood each other.
6   If you had a, let's say a body of ten names times
7   three issues per -- so that's 30 deliverables --
8   and you couldn't find information on five of
9   them, you go to the next five, but you're really
10  researching 15 people but not on every single
11  category.  So you would have 15 people for, say,
12  an average of two categories per for a total of
13  15, and that's what the fish would be.  Or the
14  subject would be the fish times three.
15      Q.    Let me ask you this, then.  What term
16  would you normally use in a research agreement
17  like this to describe what is referred to here as
18  the "fish" or the "tank" or the "waterline"?
19      A.    I would say "subject" or "individual"
20  or "target," something more...
21      Q.    And in other agreements you used those
22  terms, not fish?
23      A.    Never, no, no.  In my mind I thought it
24  was sort of just a Chinese way of illustrating
25  something and it was a cultural difference, and

Page 51

1   we went along, okay, if you want to call it
2   "fish," we'll call it "fish."
3       Q.    So you or Ms. Wallop didn't object to
4   this terminology?
5       A.    No.  If that's the way he understood
6   it, then that was fine with us.
7       Q.    In your view, is Strategic Vision very
8   experienced in providing the research
9   contemplated by this agreement?
10      A.    I don't know what Strategic Vision has
11  done in the past on this, but in terms of French
12  Wallop being able to deliver on her contacts in
13  the political and policy and diplomatic and
14  intelligence communities, absolutely, yes.  In
15  terms of my capabilities to be brought on as a
16  contractor with Strategic Vision for the
17  remainder of the deliverables, absolutely, yes.
18      Q.    Did you convey that confidence in
19  providing this sort of research to Mr. Guo or
20  Lianchao or Yvette Wang prior to the execution of
21  this agreement?
22      A.    Yes, we explained it explicitly.  In
23  fact, we were so detailed in explaining it, Guo
24  said, "I don't want to know it.  I don't want to
25  know it.  Just go do it."  He got impatient about

Page 52

1   it.  We tried to explain all the methodology to
2   him, and he didn't want to know the methodology.
3   He just wanted the product.
4           MR. GRENDI:  Do you need a break?
5           MR. SCHMIDT:  No.
6       Q.    You said before you've worked on two
7   similar projects with Strategic Vision?
8       A.    Not similar to this, but similar in
9   terms of opposition research or messaging.
10      Q.    So let's drill down on that.  Have you
11  ever performed investigatory research for
12  Strategic Vision that entailed what's described
13  in the research agreement as financial, forensic,
14  historical research?
15      A.    Not for Strategic Vision.  That's why
16  she brought me on board, to perform that type of
17  work.
18      Q.    What about for current tracking
19  research?  The same answer or different?
20      A.    Current tracking, no.  I had not done
21  that.  That's what we got the team members to do.
22      Q.    What about social media research?
23      A.    Yes.
24      Q.    Let's just talk about -- going to
25  Eastern 5 -- the financial, forensic historical

Page 53

1   research.  I'm sorry, the document is Eastern 5
2   on the bottom right corner there.  It's page 1.
3           When I'm referring to either "Eastern"
4   or "Strategic Vision" X number, I'm talking about
5   the Bates number that's in the right-hand corner
6   there, just so you can follow along.
7       A.    Okay.
8       Q.    Do you see financial, forensic
9   historical research there?
10      A.    Yes.
11      Q.    This description of it, was that
12  drafted in conjunction with a conversation you
13  had with plaintiff here?
14      A.    I would say conversations plural and
15  with Lianchao who was acting as his agent.
16      Q.    Who is Lianchao Han?
17      A.    Lianchao Han was a former Chinese
18  foreign ministry official who was a political
19  prisoner in China.  He spent four years doing
20  slave labor in the Gulag there, breaking rocks.
21          He became involved in the democracy
22  movement.  He was a Tiananmen Square student
23  protest organizer.  I first met him about 30
24  years ago.  I did not keep contact with him, but
25  we traveled in the same universe of people, so we

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 54

1  had a familiarity with each other and each
2  other's work.
3              He was working with Guo.  Guo was
4  trying to hire him.  He was not, to my knowledge,
5  paid by Guo and did not want to be, but he was
6  acting as Guo's agent to set up this arrangement
7  and to serve as Guo's interpreter.
8      Q.    Does Mr. Guo speak English well?
9      A.    He speaks it well but not fluent.  You
10  can have a conversation with him and he can read
11  it fine, but he cannot -- he would need
12  assistance of an interpreter.
13     Q.    So you've spoken to Mr. Guo in English
14  before?
15     A.    Yes.
16     Q.    But did you have any kind of difficulty
17  understanding what he was saying or struggle with
18  his English?
19     A.    Yeah, he would struggle with his
20  English, and that's why Lianchao or Yvette would
21  be present during the meetings.
22     Q.    So Lianchao and Yvette were
23  interpreters for Mr. Guo, as you understood it?
24     A.    In addition to serving as his agents to
25  work with us.

Page 55

1      Q.    Just going back to the financial,
2  forensic historical research, has Strategic
3  Vision provided that service in the past?
4      A.    I can't speak for Strategic Vision.
5      Q.    What about for you personally?
6      A.    Yes, as part of another -- as part of
7  other teams.
8      Q.    I just want to talk about the reports
9  referenced on the next page concerning financial,
10  forensic historical research.
11             Do you see the first full paragraph on
12  Eastern 6, "Contractor will produce a progress
13  report"?
14     A.    Yes.
15     Q.    What did you understand a progress
16  report would include or entail?
17     A.    The progress reports were to be on
18  roughly a weekly basis to let him know the
19  progress of how the project was going underway.
20  Initially, the progress reports were simply this
21  is the progress.  We're setting up the team.  We
22  got the funds moved.  We've recruited the right
23  people.  They're in place and so forth.
24             And then the -- so those were the
25  progress reports, and then the, quote, reports to

Page 56

1  be defined was never intended as a finished
2  analytical essay or bound type of report that one
3  would be accustomed to in a legal or business or
4  an academic environment.  It was simply raw data
5  passed on a USB thumb drive, a flash drive from
6  team 1 through me straight to Guo or his agent.
7              He did not want an analytical product
8  in terms of the short-term reports.
9      Q.    Does this research agreement define
10  what a progress report will have in it?
11     MR. SCHMIDT:  Objection.
12     A.    I mean, it says what it says, a
13  progress report.  I want to know the status.  How
14  are things?  Well, great.  Everybody's recruited.
15  They're in place.  They've begun working.  It
16  takes X number of days to do this, which we told
17  him in advance.  We told him something specific
18  would take six days to do.
19             By day 2, Guo was getting impatient.
20  So we were giving him the reports to let him know
21  how the team was coming together.  And then once
22  the team started digging up information -- it's
23  an extremely time-consuming task.  He knew that,
24  so we gave him the information on the sticks
25  right after he asked for it.

Page 57

1      Q.    Right.  I just want to understand.  Do
2  you recall a specific discussion with Mr. Guo or
3  Lianchao or Yvette regarding what would be in a
4  progress report prior to the execution of this
5  research agreement?
6      A.    Yeah, the progress report is simply
7  what's the status of the project.
8      Q.    That's not exactly what I asked.
9      A.    It would be a verbal -- it would be a
10  verbal status report and anything on a stick that
11  the researchers came up with in its raw form, not
12  in an analyzed synthesized form.
13     Q.    I think you're missing my question a
14  little bit, so let me just ask it again.
15             Do you recall telling Mr. Guo or
16  Yvette Wang or Mr. Lianchao what you understood
17  would be in a progress report?
18     A.    Yes.
19     Q.    When was that?
20     A.    That was in -- that was before the
21  contract in December, and it was after the
22  contract was signed.
23     Q.    Let's talk about before.  When was it
24  that you -- well, who did you tell about what a
25  progress report would entail before the contract

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 58

1   was signed?
2      A.   For the first part of it, for the setup
3   part of it, it was merely to tell him the status
4   of putting the team together.  It's a very
5   complicated task to do.  And because of his own
6   security requirements, which was that everything
7   be delivered on a USB port physically -- a USB
8   drive physically and not done online -- nothing
9   would be done over the internet -- that meant
10  physically traveling to a European country to
11  pick up the drive and then returning to New York
12  to deliver it to Guo or one of his agents.
13     Q.   Mr. Waller, I'm not trying to be
14  difficult here.  I'm trying to understand when
15  you were told -- or when you told, I'm sorry.
16  You said before you told either Mr. Guo or
17  Lianchao or Ms. Yvette Wang about what a weekly
18  progress report included.
19     A.   Right.
20     Q.   And I'm asking you, when did you do
21  that and who did you tell?
22     A.   It would have been in December at some
23  point prior to the contract.
24     Q.   Okay.
25     A.   But it was a casual, it was a casual

Page 59

1   thing.  We're going to give you a progress
2   report.  He was concerned that he was going to
3   get ripped off, so he wanted proof that he wasn't
4   getting ripped off.  So he wanted to know the
5   status of everything as we were putting
6   everything together.  That's fair enough.
7          So if he were to say -- or he did say
8   and through Lianchao and then through Yvette, --
9   although there was a difference between the
10  two -- what's the status of things.  So we would
11  tell him verbally the status of the situation.
12  Then that would get into the second type of
13  report, preliminary report which was on that USB
14  drive.
15     Q.   What did you describe would be in a
16  progress report to Mr. Guo or Lianchao or
17  Ms. Yvette prior to the execution of this
18  agreement?
19     A.   The status of the project as of that
20  day.
21     Q.   That's all?
22     A.   Yeah, very simple.
23     Q.   So you didn't describe it in any kind
24  of detail as to the progress report will have
25  these metrics?

Page 60

1      A.   Oh, no, it was never spelled out.
2      Q.   What about --
3      A.   Now, for a progress report versus
4   reports.  Those are two different things.
5      Q.   I understand.  I was going to ask you
6   next about what the financial, forensic research
7   preliminary report was.
8      A.   The preliminary report was the status
9   of how the research is going, how we set it up,
10  where we're digging, how we're digging, what we
11  were able to find, and what we were able to not
12  find.
13         One of the issues we anticipated -- and
14  it's addressed here in the contract two or three
15  times -- is there will be times where it's
16  impossible to find information or extremely
17  difficult or time-consuming.  It will take weeks
18  or months to find certain information, and this
19  was understood.
20         So we would report back to him.  In the
21  initial stage, we just started up this operation.
22  We don't have the -- there was never an
23  expectation that there would be all the
24  information in hand right away.  He developed
25  that expectation afterward when he was making

Page 61

1   demands.
2      Q.   Let me just hop in.
3          MR. SCHMIDT:  Are you finished?  Just
4      let him finish his answer and then you can
5      follow up.
6          Do you have anything further?
7      A.   Yes, he kept deviating in what he
8   wanted.  He never made it clear to us precisely
9   what he wanted.  He's an erratic personality
10  anyway, so we learned to expect that.
11     Q.   Mr. Waller, I just want you to answer
12  the question I'm asking you.
13     A.   Yes.
14     Q.   I just asked you before what would be
15  in a preliminary report.  That's what I'm trying
16  to get at here.
17     A.   Versus a progress report?
18     Q.   Yes.
19     A.   A preliminary report is simply what did
20  the research team dig up, the raw data that they
21  dug up on the USB port.  That is the, quote,
22  report.  No analytical product, no printed
23  product.  He didn't want paper.
24         A lot of the material was in Mandarin.
25  We did not have a team for that.  That was

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 62

1   stipulated also in the contract.  We ended up
2   needing one.  So it was just the raw data
3   regardless of how much or how little, as we were
4   building it up.
5       Q.    Before the contract was signed, do you
6   recall ever explaining what would be in a
7   preliminary report to Mr. Guo or Lianchao or
8   Yvette Wang?
9       A.    Yes.
10      Q.    When was that?
11      A.    Sometime in December.
12      Q.    And this was you personally?
13      A.    Yeah, yes, yes, because I was
14  supervising team 1.
15      Q.    Was there any disagreement about what a
16  preliminary report should be constituted by
17  between you and Mr. Guo or Waller -- sorry,
18  Mr. Guo, Lianchao or Yvette?
19      A.    Not prior to the contract.
20      Q.    So you didn't have a discussion about
21  what would be in a preliminary report?
22      A.    Yes.  Send what you have.  Send what
23  you come up with.
24      Q.    That was after the execution of the
25  agreement, right?

Page 63

1       A.    No, that was before.  The preliminary
2   report is send us what you found.  For better or
3   for worse, send it.  If it's a little or a lot,
4   send it.
5       Q.    So you and Eastern discussed that?
6       A.    Not Eastern.  With Guo.  I discussed it
7   directly with Guo and/or through Lianchao or
8   Yvette.
9       Q.    I just want to be clear.  You're saying
10  that was before the execution agreement?
11      A.    Yes.
12      Q.    Do you recall where that representation
13  or discussion occurred?
14      A.    That would have been with him directly
15  at his residence, with either -- French Wallop
16  was present whenever I was, and it would have
17  either been with Lianchao and/or Yvette.
18  Sometimes both were in the room.  Sometimes Kwok
19  dismissed Yvette because he didn't trust her.  So
20  on sensitive matters, he kept her out of a lot of
21  these things because he said he didn't trust her.
22      Q.    Mr. Waller, I'm just going to ask
23  again.  Please just answer the question.  You're
24  offering a lot of other information.  I know
25  you're trying to be helpful.

Page 64

1       A.    I am.
2       Q.    I appreciate that.
3       A.    You're trying to pin me down on
4   something I've already answered five times, which
5   is that the report is simply the data that we
6   got, for better or for worse, delivered on a USB
7   drive.  That's it; no more, no less.
8       Q.    What about the comprehensive historical
9   research report within three months?
10      A.    That would be all of the information
11  collected up to that period and collated.
12      Q.    And again, I want to ask about whether
13  you had a discussion about what would be in a
14  comprehensive historical research report prior to
15  the execution of this agreement.
16      Do you recall having that discussion?
17      A.    Yes, that was just delivering him the
18  raw data, but collated.  Let's say, for example,
19  we dig up a lot of information on various of the
20  individuals, but it's not collated.  We simply
21  collate it.  So in our first deliverable to him,
22  we had the electronic files for each of the 15
23  targets, or fish, so we were going to build out
24  from that.
25      Q.    So in your mind, I think you're talking

Page 65

1   about the January 30, 2018 delivery that you made
2   to Yvette Wang at Tracks Bar in New York City?
3       A.    Yes.
4       Q.    And you're saying that data --
5       A.    Repeat that because that would have
6   been the second deliverable.
7       Q.    You're saying that that was a -- what
8   kind of report was that?
9       A.    That was a USB drive with about 60 or
10  80,000 lines of code, of which about 16 lines of
11  code were useful.  I notified them in advance.  I
12  said to them, "No sense in going to Europe just
13  for that because only 16 lines are useful.  Let
14  us work those 16 lines."  They said, "No, we want
15  to have it anyway."  So I went over to Europe,
16  picked it up and brought it back.
17      Q.    In your mind, though, what kind of
18  report was that USB flash drive that you gave to
19  Yvette Wang on or about January 30, 2018?
20      A.    That was a report that we're referring
21  to right here.
22      Q.    Which one?  Is it a progress report?  A
23  preliminary report?  A comprehensive report?  A
24  research report?
25      A.    That would have been a preliminary

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 66

1  report.  That would have been one of the weekly
2  reports.
3      Q.    Have you ever provided reports of this
4  nature to other clients in this format of
5  progress report, preliminary report,
6  comprehensive historical research report?
7      A.    Progress reports, of course, yes.
8  Preliminary reports, of course, but in a
9  different way.  It was not just raw data.  It was
10 more defined.  Then the comprehensive historical
11 research report, analogous reports to this type
12 of wording, yes.  You can even say comprehensive
13 historical research report, yeah, that would be
14 fine.
15     Q.    So in your mind, is this kind of like a
16 standard industry practice in terms of providing
17 investigatory research?
18     A.    Yes.  Now, where it's tailored to the
19 client, you're going to deviate from the
20 standard, like using the word "fish."
21     Q.    What about the current tracking
22 research?  You see a little bit lower down there,
23 there's a discussion of producing monthly
24 reports?
25     A.    Yes.

Page 67

1      Q.    Except the first month where there will
2  be weekly reports?
3      A.    Right.
4      Q.    What was your understanding of what the
5  weekly reports would entail?
6      A.    First it would be a status report until
7  we were able to make the deep dives into the
8  research.
9      Q.    What about the monthly reports?
10     A.    That would basically be a compilation
11 of the weekly reports and then anything that was
12 integratable in its raw form, we would submit.
13     Q.    In terms of completing -- let's just
14 start with a weekly report.  How would that be
15 completed?  In other words, who does the work to
16 put together that report?
17     A.    Team 1.  Team 1 did the work because it
18 was simply raw data.  There was no analytical
19 product.
20     Q.    What was your role in connection with
21 any weekly reports?  What would you do?
22     A.    I was the one you would -- I was the
23 liaison with team 1.  I delivered Guo's
24 instructions to team 1.  I would get any
25 information back from them, and then I would

Page 68

1  physically go to Europe to pick up the drive and
2  then deliver it back to Guo or his agents.
3      Q.    Would you do any analytical work or
4  analysis of the report itself, or did you just,
5  as you described, just kind of pass it along?
6      A.    I simply acted as a pass-through for
7  delivering that.  We had envisioned doing -- in
8  terms of analytical work, if there was to be
9  paper as opposed to electronic information, I
10 would be collecting that and making sense of
11 that, but none of the computer work.
12     Q.    What about the preliminary reports?
13 Would you provide any analysis or use any of your
14 kind of experience in this field to create or
15 edit or do anything with those reports?
16     A.    We had talked about doing that.  Guo
17 specifically instructed us not to.
18     Q.    So again, you didn't edit or provide
19 any insight in terms of the data that you were
20 getting from team 1.  You just, again, passed it
21 along?
22     A.    Yes.  He didn't want it.  He just
23 wanted it passed straight to him.  Now --
24     Q.    Go ahead.
25     A.    Let me put a caveat on that.

Page 69

1      Q.    Sure.
2      A.    When we found a dead end or we found an
3  issue like bad names, names that were either not
4  real or spelled wrong or seemed to be the same
5  name among one or more different people, or two
6  or more different people, whether it's two people
7  with the same name or one person using two
8  persona, or if we found that some of the
9  information he gave us was false or inaccurate,
10 that's when I would get involved and deliver that
11 to him, as well as whatever information.
12         For example, he gave us copies of
13 passports of certain of the targets that he
14 wanted, and so we checked and found that some of
15 the passports were false.  So that was an
16 analytical piece of work that I did or had other
17 team members do apart from this.  I delivered
18 that separately, so that's apart from the raw
19 data.  We were trying to be as comprehensive as
20 we could for him.
21     Q.    So in other words, in terms of applying
22 your experience and background in this field,
23 that's where you would kind of participate in
24 focusing or refocusing one of these reports?
25     A.    Right.  Or if the team had said, we

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 70

1   found a lot of -- we were able to get information
2   on one of the individuals in Kwok's list -- there
3   were, if I recall correctly, about 92 names -- he
4   wanted the top 15 to research.
5           But he did say some of the people
6   further down in this chain might be of
7   importance.  If you find anything, let me know.
8   So we found, yeah, there's one guy, Frank Suen,
9   S-u-e-n, who was a particular -- became a
10  particular object of interest.  So I delivered
11  that news to Kwok, and said, "This is the kind of
12  information they got on him.  How do you want to
13  dig on him?  What else would you like to find?"
14          That was all verbal.  I delivered it.
15  So when you refer to "reports" in quotes, it was
16  verbal.  But in person, either to Kwok directly
17  or to one of his two agents.
18      Q.    So in terms of -- the reports didn't
19  have to be written?
20      A.    Correct.
21      Q.    What about your role in the
22  comprehensive historical research report?  What
23  would you do for one of those reports?  What
24  would you do?
25      A.    First of all, the contract didn't last

Page 71

1   three months for that to be produced.  The way in
2   working with any client is that things will adapt
3   and you find new problems or solutions or needs
4   or discoveries or whatever, opportunities, and
5   you think, how would you like this done.
6           So for the comprehensive historical
7   research report, it would be a summary of the raw
8   stuff that we got based on what the researchers
9   told us, but not a summary of the raw computer
10  data itself because Guo didn't want that
11  analyzed.  Meaning we were able to track targets
12  1, 2, 7, 8, 9 well, and we got this level of work
13  here.  Or we have some leads here, but it's going
14  to take longer than we expected.  Some of these
15  people are impossible to find.  Or this person
16  appears to be a false person.  So that would be a
17  comprehensive report.
18          For the point of doing the actual
19  research for the short-term, we would bring that
20  up if there was trouble right away, which we did.
21  But for a comprehensive one when we're getting a
22  bigger picture of the type of research we're
23  doing and the universe of people being
24  researched, we're finding oh, we might be going
25  after a false target here.  Let's go down after

Page 72

1   this one, or the team went and did on its own.
2           Because it would take at least five
3   days or a week traveling, stopping what they're
4   doing, traveling to a common point in Europe,
5   coming back here, delivering, and then consulting
6   with Guo and his agents, and then going back to
7   deliver the information to team 1.  That takes at
8   least a week just to deliver a message, round
9   trip.
10          So that would be immediate-term
11  reporting, say, weekly or monthly-type, quote,
12  reporting.  The comprehensive one is now we got a
13  big picture of it.  This is what we found.
14      Q.    So you would be, let's say,
15  synthesizing the research for one of these
16  comprehensive reports?
17      A.    Yeah, synthesizing what the team had
18  concluded or told me, but not synthesizing the
19  raw data that the teams came up with, yes.
20      Q.    Got it.  In terms of your relationship
21  with Strategic Vision, who was going to do
22  that -- let's call it -- report synthesis, or
23  that work?
24      A.    Generally me.  But what French Wallop
25  would do was she had her own contacts elsewhere

Page 73

1   throughout the U.S. government and other
2   governments.  So what we did for
3   comprehensiveness of the research and to
4   double-check to make sure that we were on the
5   right path or not, we would consult with members
6   of -- or people associated with intelligence
7   services of the U.S. and other countries.
8       Q.    I see.  So it was kind of two --
9       A.    She can speak more to that.  She had
10  most of those contacts.
11      Q.    It sounds to me like it's two methods
12  of acquiring information?
13      A.    More than two.
14      Q.    Well, let's call it two categories.
15  There is the -- I'll call it Mr. Waller category
16  doing the work that you just described, and then
17  Ms. Wallop would do her category of research
18  using her network of people in politics or
19  government to get information.  Is that fair to
20  say or do I have it wrong?
21      A.    In a law firm, you get defense
22  attorneys and litigators, so you have different
23  people with different skills, but they're in the
24  same general field.
25      Q.    Right.  They're collaborating, but they

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 74

1  kind of do different things?
2      A.    Right.
3      Q.    Got it.
4            MR. GRENDI:  Why don't we take a brief
5      break and come back in five minutes.
6            THE VIDEOGRAPHER:  Off the record at
7      11:28.
8            (Whereupon, a short recess was taken.)
9            THE VIDEOGRAPHER:  Back on the record
10     at 11:37.
11     Q.    Mr. Waller, just to remind you you're
12  still under oath here.
13     A.    Yes.
14     Q.    Have you ever met anyone who works for
15  Strategic Vision, other than Ms. Wallop?
16     A.    No.
17     Q.    Going back to this contract, Waller 2.
18  Can you turn to Eastern 5, which is the first
19  page.  Do you see where it says, "Any and all
20  materials provided by the client to the
21  contractor will be treated with absolute
22  confidentiality and will not be shared by the
23  contractor with any other entity"?
24     A.    Yes.
25     Q.    Do you recall drafting this provision

Page 75

1  into the agreement, or how it got in there?
2      A.    No.
3      Q.    Does Strategic Vision share the
4  information from the client with other entities?
5      A.    Only those who are part of the
6  contract, to execute the contract.
7      Q.    But there were entities other than
8  Eastern Profit and Strategic Vision that receive
9  the materials from the client, which is --
10     A.    The research orders, yes.
11     Q.    So those were other entities.  They're
12  not part of Strategic Vision?
13     A.    They're part of the Strategic Vision
14  team, so they would be included.
15     Q.    They're not actually the same entity as
16  Strategic Vision, legally speaking, right?
17           MR. SCHMIDT:  Objection.
18     Q.    If you know?
19     A.    They're part of the same team.
20     Q.    So in your mind, "team" is what the
21  contractor is defined by in this agreement?
22     A.    Yes.
23     Q.    So it says "Strategic Vision" up top
24  here as the contractor, correct?
25     A.    Yes.  I cannot speak for the signed

Page 76

1  nature of this contract because I am not, I am
2  not part of Strategic Vision.
3      Q.    Right.
4      A.    But having been part of putting the
5  arrangement together, there's a team that's the
6  entity.
7      Q.    So you understood that Strategic Vision
8  U.S. LLC also entailed whoever it is that they
9  subcontracted work to?
10           MR. SCHMIDT:  Objection.
11     A.    Not even Mrs. Wallop knows the
12  identities of many of the people on the team.
13  Not even I know some of them.  That's how tight
14  we kept it.  Guo gave us the research material
15  that, in order to execute the contract, we had to
16  provide to the people doing the research.
17     Q.    But you don't know who those people
18  are, the people doing the research?
19     A.    Not all of them.
20     Q.    Some of them?
21     A.    Some of them, yes.
22     Q.    And who were the people doing the
23  research that you know of?
24     A.    I cannot provide the identities of
25  team 1 for reasons that we explained before.

Page 77

1  Team 2, we --
2      Q.    Hold on.  I just want to maintain that
3  we don't think that that's -- this is a lawyer
4  part -- a legitimate objection.  But in light of
5  the procedural posture of our motion to compel
6  request, I'll allow it.
7            I'm sorry, continue with your answer.
8      A.    Team 2 was a company in Addison, Texas
9  called ASOG.  I believe it is American Special
10  Operations Group, or words to that effect, based
11  in Addison, Texas.  That was team 2.
12     Q.    Sitting here today, you refuse to tell
13  me who's on team 1?
14     A.    I decline to tell you.
15           MR. SCHMIDT:  Objection.  Just be
16     clear, with respect to team 1, do you
17     actually know the members or do you just
18     know the intermediary?
19     A.    I only know the team leader.
20           MR. SCHMIDT:  That's all what I wanted
21     to clarify for the record in case we do a
22     motion to compel later.
23     Q.    You know the leader of who team 1 is?
24     A.    Yes.
25     Q.    But sitting here today, you refuse to

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

---

Page 78

1  tell me that?
2      A.    Yes.
3      Q.    Why is it that you can't tell me who
4  the leader of team 1 is?
5      A.    Because the leader of team 1 lives in a
6  very high-risk area where there are a lot of very
7  bad actors who can cause physical harm, including
8  the worst kinds of violence you can imagine.
9      Q.    Did you promise the leader of team 1
10 not to disclose his identity?
11     A.    Yes.
12     Q.    Is that a promise that was made in
13 writing or orally?  How was it made?
14     A.    We do everything by handshake as much
15 as we can.  So that was literally a handshake
16 agreement.
17     Q.    That was an agreement between you and
18 the leader of team 1?
19     A.    Yes.
20     Q.    Does Strategic Vision know the name of
21 the leader of team 1?
22           MR. SCHMIDT:  Objection.
23     A.    You would have to ask Strategic Vision.
24     Q.    So you never talked to --
25     A.    I can't pretend to speak for Strategic

---

Page 79

1  Vision.  I'm not going to be put in that box.
2      Q.    I understand.  What I'm asking you,
3  though, is did you and Ms. Wallop ever talk about
4  who the leader of team 1 was?
5           MR. SCHMIDT:  You can answer whether
6      you had the conversation.
7      A.    Yes.
8      Q.    So she knows the name of the leader of
9  team 1?
10     A.    Yes.
11     Q.    Okay.  Let's go to Eastern 7.  It's the
12 third page of Waller 2.  In the criteria section,
13 do you see where it says, "The contractor
14 guarantees that all information provided is
15 genuine"?
16     A.    Yes.
17     Q.    What does that mean?
18     A.    It means that we're not going to make
19 up fake information in order to try to impress or
20 satisfy the client.  That everything we find is
21 legitimately -- legitimate facts that were
22 legitimately researched.
23     Q.    How do you know if the research is
24 genuine if you're not the one doing it?
25           MR. SCHMIDT:  Objection.

---

Page 80

1      A.    It's all based on trusting the team.
2      Q.    So you know that team 1 only provides
3  genuine information?
4      A.    They provide -- I know from the team 1
5  leader that all the information they dug up was
6  legitimate information that they did not
7  manufacture or fabricate.  It was just raw data.
8  As to the accuracy of the information they found,
9  that's different.
10           What we mean here by "genuine" is that
11 we did not create false or misleading
12 information.  In fact, we found that we had
13 informed the client of some false information
14 that we discovered.
15     Q.    Just going back to your answer there.
16 So you have a discussion or dialogue with the
17 leader of team 1 about the genuineness or quality
18 of the information that team 1 has found?
19     A.    Yes.
20     Q.    How was that conversation conducted?
21 Was it in person?
22     A.    Yes.
23     Q.    Ever over the phone?
24     A.    Never.
25     Q.    What about via secure text message

---

Page 81

1  service like Signal?
2      A.    We don't believe in secure text
3  messages, so the answer is no.
4      Q.    Fair enough.
5           So in your mind, Signal is not a secure
6  means of communication?
7      A.    I have no way of knowing, but we don't,
8  we don't -- we have our own methods of
9  communicating, but anything in detail is only
10 done in person.
11     Q.    Do you think a Signal message is more
12 secure than other forms of electronic
13 communication like just email?
14           MR. SCHMIDT:  Objection.
15     A.    Yes, absolutely.
16     Q.    Because you never emailed with Mr. Guo
17 or Lianchao or Yvette Wang concerning this
18 matter, have you?
19     A.    No, it was only by end-to-end
20 encryption that doesn't reside on a server.
21     Q.    Signal does that, is that right?  That
22 application?
23     A.    Yeah.
24     Q.    How do you know the deliverables are
25 provided with the best practice and standards of

---

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 82

1   the industry?
2       A.   I know.
3       Q.   The contractor is saying that it will
4   provide the deliverables based on the best
5   practices and standards in the industry, right?
6       A.   That's right, yes.
7       Q.   How would Strategic Vision know that?
8       A.   The first best standard is the security
9   part.  We exceed those best standards.  The
10  second part is the actual computer research,
11  which we know from the methods that they're
12  using, which are state-of-the-art methods.
13      Q.   Without divulging who you were working
14  for or when it was, have you ever done the actual
15  research that team 1 was dispatched to do in this
16  case?
17      A.   Not using the same methods.
18      Q.   Similar methods?
19      A.   It takes a certain skill set that I
20  don't have, but I have been present and
21  supervising in person when it was done in other
22  cases.
23      Q.   What skill set is that?
24      A.   Deep dive research.
25      Q.   Go ahead.

Page 83

1       A.   Just like in a law firm where you have
2   the attorney and you have a paralegal.  It
3   doesn't mean the paralegal is incompetent.  It's
4   just the person is not an attorney.  Or you have
5   the partner who might not have passed the bar but
6   owns the firm and can run the firm or manage the
7   firm, right.
8            So you have people with different skill
9   sets, but they all know each other and they all
10  work together, or they all at least trust each
11  other.  And so you have certain of them delegate
12  the work to others to do.
13      Q.   How long have you known the leader of
14  team 1?
15      A.   For about four or five years.
16      Q.   And you've done other work with that
17  individual concerning investigatory research?
18      A.   Yes.
19      Q.   Did you run into any issues with the
20  quality of that work?
21      A.   Never.
22      Q.   Have you ever known the members of any
23  of the teams that are led by the leader of
24  team 1?
25      A.   The individuals that he was

Page 84

1   supervising?
2       Q.   In any event, including in this
3   engagement.  I know you don't know, right?
4       A.   Right.
5       Q.   What about in other engagements?
6            MR. SCHMIDT:  Objection.  That's kind
7   of impossible to answer.
8       A.   On some things you can never know
9   everybody on the team.  It's not possible, if
10  something is outsourced or whatever.  Yeah, there
11  have been other times where I have -- this whole
12  profession involves an unusually high degree of
13  trust that no -- it has to be personal trust, and
14  you learn that by trial and error over a number
15  of years.
16           So you then learn to trust people who
17  do the work for you and produce that work.
18  Sometimes I have been part of the actual teams,
19  but for the sake of protecting the client's
20  identity and the existence of the work, we had
21  worked through cutouts, and that's been similar
22  with other projects.
23      Q.   Let's go to translation issue on
24  Eastern 6.  Starting on the bottom of the page,
25  it says, "When the contractor encounters

Page 85

1   information requiring translation, the contractor
2   will provide electronic copies of the material to
3   the client for the client to evaluate and
4   translate."  Do you see that?
5       A.   Yes.
6       Q.   How would that work?  I take it that
7   you don't speak Mandarin?
8       A.   No.
9       Q.   Does Ms. Wallop speak Mandarin?
10      A.   She understands some.
11      Q.   Can she read it?
12      A.   I don't know.
13      Q.   How did this agreement contemplate the
14  use of translators?
15      A.   We had said from the beginning that
16  we're going to need to have linguists doing the
17  original research.
18      Q.   The members of team 1?
19      A.   Yes.  And Guo said he didn't want that.
20  He would take care of all of the translations.
21  We then raised the issue well, these people are
22  going to dig up raw material in a language they
23  don't speak.
24      Q.   Right.
25      A.   How are they going to evaluate what

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 86

1   they have?  He says, "Just dig up the information
2   and send it to me and let me evaluate it."  So we
3   ended up saying we really need to have people who
4   get the language.  This was, I believe, through
5   Lianchao, who agreed.  So we retained two fluent,
6   say, diplomatic-quality Mandarin language
7   linguists who were not Chinese nationals to be
8   part of that team.
9       Q.    What was the concern about them being
10  Chinese nationals?
11      A.    In case they were agents of the
12  Communist party.  And Guo was pleased with that.
13      Q.    So who were the two individuals that
14  you retained to do this translation work?
15      A.    They were part of team 1.  I don't know
16  their identities.
17      Q.    So team 1 did have Mandarin-speaking
18  and Mandarin-reading members?
19      A.    Yes.  We added them on when we realized
20  we were going to need them.  And I believe
21  Lianchao said, "Yeah, go ahead and get them, as
22  long as they're not Chinese nationals, or don't
23  live in China."
24      Q.    So were you involved in the vetting
25  process for those individuals, or no?

Page 87

1       A.    No.
2       Q.    So did you understand that you weren't
3   really going to be able to read a lot of the data
4   that was part of this research?
5       A.    That was explicit.  A lot of it is just
6   code.
7           MR. GRENDI:  Do we have an issue?
8           THE VIDEOGRAPHER:  Move the mic up.
9           MR. GRENDI:  That's fine.  Just let us
10  know.
11          THE WITNESS:  How is it now?  Is this
12  good?
13          THE VIDEOGRAPHER:  It's just when your
14  hands are there.  I want you to be
15  comfortable.
16          THE WITNESS:  I'm in the hot seat.
17      Q.    Why was it that only USB drives would
18  be used for deliverables?
19      A.    Guo specified that.  He was insistent
20  on it.
21      Q.    Was there any pushback or discussion of
22  using USB drives for transmitting information?
23      A.    No, it made sense.  He didn't want
24  anything distributed electronically or on paper.
25      Q.    Did he explain why?

Page 88

1       A.    Yeah, the Chinese could intercept it.
2       Q.    Paper?
3       A.    No, paper is just too cumbersome.  And
4   you've got the digital forensics within the USB
5   drive so he could gauge what was in there.  But
6   you don't want printouts of computer code.  You
7   want to be able to exploit that code.  You can't
8   do that on paper.
9       Q.    So some of the raw data just in terms
10  of feasibility and practicality had to be
11  electronic?
12      A.    Yes.
13      Q.    In terms of transmitting it?
14      A.    Yes, and in delivering it to him.  He
15  simply specified no paper and nothing
16  electronically transmitted, so that was fair.
17  That was fine.
18      Q.    I want to talk about this irregular
19  circumstances clause.  Do you see that on page
20  Eastern 7?
21      A.    Yes.
22      Q.    Was this concept of irregular
23  circumstances discussed prior to the execution of
24  the agreement?
25      A.    Yes.

Page 89

1       Q.    Who came up with that clause or
2   insisted upon it?
3       A.    I drafted this section of it.
4       Q.    You personally?
5       A.    Yes.
6       Q.    What were you trying to convey when you
7   drafted this section?
8       A.    That there is no even flow of data.
9   That we're going to face challenges as in any
10  research project.  Like any legal case, you can't
11  state your case on the first month.  You have to
12  build the case over a period of time.  And
13  sometimes you're going to run into dead ends.
14  Sometimes you find false information.  Sometimes
15  you'll be spoofed by the other side.
16          There are risks of detection, the
17  countermeasures the other side takes.  There are
18  legal issues.  There are logistical issues given
19  the cumbersome physical nature of delivery of the
20  information by USB drive.  So we're just putting
21  this here that we both understand that it's not
22  all going to be a smooth delivery.
23      Q.    So does irregular circumstance in your
24  mind encompass items, only items that are out of
25  the control of the contractor or researching

**EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC**
J. Michael Waller on 02/08/2019

Page 90

1  party?

2          MR. SCHMIDT:  Objection.

3      Q.    Let me ask that again.  That's fair

4  enough.

5          If Strategic Vision makes a mistake or

6  fails to do its job for any reason, would that be

7  part of irregular circumstances?

8      A.    What do you mean by "failed to do its

9  job"?

10     Q.    Let me try it this way.

11     A.    If you get in an accident on the way to

12  work, are you failing to go to work?

13         MR. SCHMIDT:  Let him rephrase it.  You

14     said you don't understand it.  That's all

15     you have to do.

16     Q.    That's fine.

17         Does irregular circumstances only

18  include, let's just say, outside problems that

19  Strategic Vision would encounter?

20         MR. SCHMIDT:  Objection.  But go ahead

21     to the extent you can.

22     A.    Would you define "outside problem"?

23     Q.    Let's talk about -- you described it

24  earlier, third parties blocking the research or

25  there being dead ends.  Is that the full scope of

Page 91

1  irregular circumstances that you described

2  earlier?

3      A.    No, but it's indicative of an irregular

4  circumstance.

5      Q.    If irregular circumstances occur, does

6  the client still have to pay as though it's

7  getting full research?

8      A.    Yes.  It's right there in the contract.

9      Q.    Where does it say that under irregular

10  circumstances, the client still has to pay the

11  full price?

12     A.    It's right there in the price.  For

13  $750,000 a month, we're going to be doing the

14  following work, understanding that there will be

15  irregular circumstances that may prevent certain

16  of the work from being done at that point in

17  time.  This type of work is impossible to predict

18  when you're going after people who hide their

19  assets, who hide their activity, who operate

20  under false names, who have -- who use rigorous

21  security methods.  Or if there's a legal problem

22  and we discover hey, it's illegal to do this

23  thing that you want us to do, then that's going

24  to be a delay.  We have to figure out the right

25  way to do it.

Page 92

1      Q.    What if irregular circumstances just

2  totally prevented Strategic Vision from providing

3  any research reports?  Would the client still

4  have to pay?

5      A.    That's a hypothetical.  There's a

6  30-day clause to end the contract.

7      Q.    It's a hypothetical, and I'm asking you

8  to please answer the question.

9          What if irregular circumstances just

10  completely prevented Strategic Vision from

11  delivering any work?

12     A.    We go to the client and say it's not

13  possible to do.

14     Q.    And so they wouldn't -- the contract

15  would be over at that point?

16     A.    We would say, hopefully, we can't do it

17  this way.  Do you want to change the parameters?

18  Remember, there were 4,000 names he had, he

19  wanted.  So we can't do it on these 15.  Let's

20  try another group of 15 or it can't be done.

21          And we had suggested on one way to do

22  something, and he didn't want do it that way even

23  though it made sense to do it that way.  So you

24  try to find a way to get the job done, but if

25  ultimately you can't get the job done, then that

Page 93

1  becomes apparent after a lot of back-and-forth

2  with the client, just like any job.

3      Q.    Right, but just to be clear, if

4  irregular circumstances prevent the contractor

5  from delivering any reports, then does the client

6  have to pay anything?

7      A.    If you don't do the work, why should

8  the client pay if you don't do the work, right?

9      Q.    Right.

10     A.    But if you do do the work, then the

11  client pays, but there are going to be irregular

12  circumstances where the product is not going to

13  be what you want at a certain time, so we have to

14  get around that.  Or in the case of starting up,

15  it was explicitly understood from the start that

16  you're not going to get huge amounts of data

17  immediately.  You've gotta get the team to

18  understand the data first, and you gotta build

19  the channels for the data.

20     Q.    So long as Strategic Vision tries to

21  get the data, if irregular circumstances prevent

22  them from delivering any reports, that's good

23  enough.  They should still get paid?

24     A.    Well, no.  Let me give you an example.

25  There was around February -- between January 26th

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 94

1   and February 1st when the client was upset at the
2   way -- things weren't moving fast enough for him.
3   We were directed -- Yvette directed us in writing
4   to find another way of doing it.
5           So she was saying proceed with your
6   work. Just find another way to do it. That's
7   when we brought in team 2.
8       Q.   Okay.
9       A.   So that was an irregular circumstance.
10  Really it wasn't a delay on our part because we
11  were consistent with any research standard. We
12  were doing it as rapidly as humanly and
13  mathematically possible. It's just the client
14  objected because he thought it was a long delay.
15          If you recall in this, we prorated
16  things so that the first two weeks were not at
17  his expense. He agreed. So we had only been in
18  the contract effectively ten days, and he's
19  already objecting that we're not producing
20  monthly reports and everything else.
21      Q.   We'll get to that.
22      MR. SCHMIDT: Let him finish.
23      Q.   Go ahead.
24      A.   Because in order to satisfy him and
25  what he wanted, we offered to go ahead with a

Page 95

1   different team using different methodologies in
2   parallel with team 1, and that's when Yvette
3   instructed us on or about February 1st in a
4   Signal text to go ahead and use the -- start up
5   the other method.
6           So we were still doing the work, and we
7   were still finding a way to give him the
8   deliverables even though going with team 2 was
9   beyond what we had promised. So we were doing
10  extra work for him at this time.
11      Q.   In this contract is Strategic Vision
12  compensated on a per-report basis?
13      MR. SCHMIDT: Objection. Go ahead.
14      A.   It's a flat rate basis. It says "Up to
15  15." It doesn't say 15. It says "Up to 15."
16      Q.   Where are you looking, just so I know?
17      A.   The top of page 8. "The first month,
18  January, of this contract will include up to 15
19  fish for a total of 30 reports and will decrease
20  to ten fish, etc.," for February, for March and
21  for the duration of the contract. So this was
22  explicit. It's not all going to be complete on
23  the first month. Even digging into certain of
24  the names, we're just not going to have it in the
25  first month.

Page 96

1           And when we find that the -- as our
2   team 1 discovered and as Lianchao Han confirmed,
3   at least two and as possibly as many as four of
4   the 15 were not real people.
5       Q.   You're talking about the fish?
6       A.   Yes.
7       Q.   But the contract does say that the
8   comprehensive historical reports are 300,000 per
9   report?
10      MR. SCHMIDT: Objection.
11      MR. GRENDI: It says it on that page,
12  Eastern 8.
13      A.   Per year.
14      Q.   Yeah. And the tracking reports are --
15      A.   Look before that, please. "The flat
16  price structure is as follows." So whether it's
17  a small report or a large report, it's a flat
18  rate structure. And that is an annual number,
19  not a weekly or monthly number.
20      Q.   So in your mind, the report -- strike
21  that.
22          In your mind, the reports are not
23  broken down on a per-report basis cost?
24      A.   Correct.
25      Q.   So there's no charge in this agreement

Page 97

1   for what a weekly report is?
2       A.   That's the whole problem or the whole
3   issue with calling them "fish" and "keeping
4   things up at a water tank level." That was his
5   metaphor for explaining what he wanted at a
6   certain level. We went ahead with that as long
7   as you keep it up at that metaphorical waterline.
8   The actual details of the report are going to
9   vary. That's explicit in here in this contract.
10          We refer to the paragraph right above
11  flat price structure. We refer to each of these
12  as "We will measure each of the 30 reports as,
13  quote, 'report equivalents' in the event that it
14  is necessary to stop work prematurely on one fish
15  and replace it with a second fish. We will then
16  have the partial report on the terminated fish,"
17  etc.
18          So it's explicitly understood in this
19  contract that you're gonna be stop and go and
20  things are going to be incomplete, and then you
21  go on to the next one, but we'll still have that
22  same universe of individuals to be collecting
23  data on.
24      Q.   Just without identifying what you said
25  or who you said it to, did you consult a lawyer

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 98

1  in connection with drafting this agreement?
2      A.    The question answers itself.  No.
3      Q.    Why does it answer itself?
4      A.    It's not legalistic at all.  It's our
5  own wording.  It's more of like an MOU between
6  parties that was executed as a contract.  This is
7  the way we all understand this was going to work.
8  But it was signed as a contract.
9      Q.    What does "MOU" stand for?
10     A.    Memorandum of understanding or
11  statement of work, or whatever other word you
12  want to use.
13     Q.    Just going to Eastern 9, the last page
14  of this document.  Do you see where it says, "It
15  is understood that the client may direct other
16  entities to pay the contractor and that such
17  payments" --
18            (Court reporter interruption.)
19     Q.    -- "will be deemed satisfactory
20  compensation by the contractor."
21            Do you see that?
22     A.    Yes.
23     Q.    Why is this clause in the agreement?
24     A.    To be set up to conceal from the
25  Chinese authorities that Guo was funding this

Page 99

1  research.  So it was explicit that nothing from
2  any of his Hong Kong accounts straight to his
3  Strategic Vision account, but rather through a
4  circuitous route of various places in various
5  countries and various cutouts to conceal these
6  transfers from the Chinese intelligence service.
7      Q.    So it was understood that the client
8  would not directly pay the contractor because of
9  these security concerns?
10     A.    Right.  Well, the client would -- if
11  you think of it as a collaborative versus a legal
12  means, the client authorizes the payment to be
13  paid, or it instructs that the payment be paid,
14  and then it's done through a circuitous route.
15  So we understand that the funds have come on
16  Guo's instruction.  And then we let him know that
17  the funds have been received.  There were no
18  funds that were sent to Strategic Vision after
19  the execution of this contract.
20     Q.    Let me ask you this.  Do you know why
21  Eastern Profit is the client?
22     A.    No, we don't know why it's the client.
23     Q.    Well, how did it get into the contract?
24     A.    How did what get in?
25     Q.    Eastern Profit.

Page 100

1      A.    We never heard of Eastern Profit until
2  the day Yvette said it's gonna be Eastern Profit.
3      Q.    So that was January 6th?
4      A.    No, that was late December.
5      Q.    What did you say in response to Yvette
6  telling you that Eastern Profit was going to be
7  the counterparty to this research agreement?
8      A.    I was not there for the signing.
9      Q.    But this was not the signing?
10     A.    I had not heard of Eastern Profit.
11  There were several days in late December when it
12  was just Yvette and Ms. Wallop talking.
13     Q.    I see.  So you talked to Ms. Wallop
14  about how Eastern Profit got on the agreement?
15     A.    Yes.
16     Q.    But you don't know why yourself?
17     A.    No.  I would presume it's for the
18  reasons stated in the subsequent payments
19  portion, but I don't know that.  Because Eastern
20  Profit never paid us anything, and we never
21  received any money from any Guo entity after
22  execution of the contract.
23     Q.    It says here that "All client payments
24  must be received by the contractor by wire
25  transfer within five business days of invoice."

Page 101

1      A.    Right.
2      Q.    Do you know if Strategic Vision ever
3  sent any invoices to Eastern Profit?
4      A.    It was a verbal invoice.  There were
5  not to be written invoices.
6      Q.    Have you done verbal invoicing before?
7      A.    Yes.
8      Q.    It's a new one for me.  Can you just
9  describe how that works?
10     A.    If you want to keep something
11  untraceable, you don't leave a paper trail.  If
12  you don't leave a paper trail, you don't submit
13  invoices for those purposes, especially if the
14  purpose is to protect the client's identity from
15  one of the most notorious spy agencies in the
16  world who is out to get your client.  So you just
17  say, "Okay, it's the end of the pay date," and
18  then they will send the next one.
19            You're kind of smirking at that.
20     Q.    No, it's a new thing for me.
21     A.    It's normal in our area of work.
22     Q.    That's fine.
23     A.    As long as we comply with the IRS and
24  report our income, then that's fine.  We've done
25  work in other ways to protect our clients and

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 102

1   it's not in writing.
2       Q.    Sure.  Do you know if a verbal invoice
3   was issued in this case?
4       A.    Yes.
5       Q.    When was that?
6       A.    On or about February 16th.
7       Q.    That would have been the first?
8       A.    15th or 16th.  Yes.  It was supposed to
9   be on or about January 31st, but we had agreed on
10  the 26th.  I had offered, with Ms. Wallop's
11  concurrence, to write off the first two weeks of
12  work to satisfy Guo, because he was so agitated.
13  We wanted to keep the contract with him.  So we
14  would not have invoiced until -- we normally
15  would have on January 31st, but we did not until
16  roughly February 15th.
17          And that was to Lianchao Han because by
18  that time, Yvette had instructed us not to
19  communicate with her anymore, or that Guo had
20  said not to communicate with her anymore.
21      Q.    Was it you or Ms. Wallop who, I guess,
22  called Lianchao to verbally invoice?
23      A.    We would only speak in person.
24      Q.    So were you there when the verbal
25  invoice was issued?

Page 103

1       A.    Yeah.  It was more like -- verbal
2   invoice, in quotes, is, "Hey, Lianchao, it's time
3   to pay the first month's 750,000."
4       Q.    Now, did he say anything in response to
5   that?
6       A.    He said "Guo's really upset right now.
7   Let me work with him on it."  But there was never
8   any indication of termination.
9       Q.    Were any other verbal invoices issued?
10      A.    Well, no, because a week later we got
11  served.
12      Q.    So the answer is no?
13      A.    No, because a week later we got served.
14      Q.    You're saying if you hadn't been
15  served, you would have issued the invoice for the
16  next month?
17      A.    We would have still been working with
18  Lianchao had we been paid.  This is to have been
19  paid within five days; that would have been
20  February 20th.  We would have stopped work by
21  then because we did not get paid.  But we did not
22  stop work because Lianchao said he was trying to
23  work it out.
24      Q.    I see.
25      A.    He's speaking as the agent of Guo, so

Page 104

1   we were talking to Guo as far as we were
2   concerned.
3       Q.    Do you know if Lianchao works for
4   Eastern Profit?
5       A.    No.
6       Q.    Do you know one way or another whether
7   he does or does not or you just don't know?
8       A.    He told me Guo has offered to pay him
9   many times, and he was only doing it as a
10  volunteer because he had larger interests in
11  promoting the Chinese democracy movement.
12      Q.    Because of his own political feelings
13  and history?
14      A.    Yeah.  He said Guo was very mercurial,
15  doesn't keep his word and rips off his law firms
16  and clients and customers and fellow investors,
17  and so we should be -- we should be sure to have
18  our money in hand before we continue to work.
19      Q.    When did he tell you that?
20      A.    In December and in January and in
21  February.
22      Q.    Was that an in-person meeting?
23      A.    In person.  And the public record shows
24  that Guo rips off a lot of people.
25      Q.    That is your perception of it?

Page 105

1       A.    No, that's the news reports of it.
2       Q.    How did that come up?  Did Lianchao
3   raise that issue or did you ask him about that?
4       A.    I don't remember.
5       MR. GRENDI:  Why don't we go off the
6   record.
7       THE VIDEOGRAPHER:  Off the record at
8   12:14.
9       (Whereupon, a short recess was taken.)
10      THE VIDEOGRAPHER:  Back on the record
11  at 12:20.
12      MR. GRENDI:  This is Waller 3.
13      (Waller Exhibit 3, Handwritten document
14  Bates stamped Eastern 11, marked for
15  identification.)
16      Q.    Mr. Waller, do you recognize this
17  document?
18      A.    No.
19      Q.    You've never seen it before?
20      A.    No.
21      Q.    Do you recognize the handwriting on the
22  document?
23      A.    It appears to be French Wallop's
24  handwriting.
25      Q.    Do you know her handwriting pretty good

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 106

1  or well?
2      A.    Enough to tell that it appears to be
3  hers.
4      Q.    Do you recognize any of these names?
5      A.    They're mostly Arabic names.
6      Q.    Do you know if any of the individuals
7  on this list of names are clients of
8  Strategic Vision?
9      A.    No, I don't know.
10     Q.    So you've never provided services for
11 any of the individuals listed on this document?
12         MR. SCHMIDT:  Him being personally?
13         MR. GRENDI:  Yes.
14     A.    No.
15     Q.    Okay.  Did you ever talk to Mr. Guo or
16 Lianchao or Yvette Wang about people who are
17 clients of Strategic Vision?
18     A.    Present clients or past clients or
19 prospective clients?
20     Q.    Either.
21     A.    No.  Okay.  Repeat the question, then.
22     Q.    Sure.  Did you ever talk to Mr. Guo,
23 Lianchao or Yvette Wang about people who are
24 clients of Strategic Vision?
25     A.    No.

Page 107

1      Q.    You never told any of those three
2  people, We've done work for X, Y or Z?
3      A.    Yeah, that's why I asked what you mean
4  by "clients," whether it's present, past, or
5  prospective.
6      Q.    Let's go with present or past.
7      A.    No, I wouldn't know Strategic Vision's
8  previous clients.
9      Q.    But you did provide work for -- you
10 described before two clients of Strategic Vision?
11     A.    Yes, but none of them are on this list.
12     Q.    Right, but let me ask you this.  Did
13 you ever tell Mr. Guo, Yvette Wang or Lianchao
14 that you provided work for those two --
15     A.    Yes.
16     Q.    -- entities.  You did.
17           And did you describe the names of those
18 entities to --
19     A.    At least one of them.  I don't recall
20 the exact.
21     Q.    Which name is that?
22     A.    Mikhail Khodorkovsky.
23     Q.    Why don't we help the court reporter
24 out with that one?
25     A.    M-i-k-h-a-i-l.  Forgive me if this is

Page 108

1  not an entirely accurate spelling for the next
2  one.  I believe it's K-o-d-o-r-k-h-o-v-s-k-y.  It
3  might be K-h in the beginning, but I think it's
4  K.  It's K, yeah.
5      Q.    It's for the ease of my own butchering
6  of the Russian language, who is that individual?
7  I'll call him Mr. K?
8      A.    He is a Russian dissident.  He's exiled
9  in London.
10     Q.    You and Strategic Vision have provided
11 investigatory services for that individual?
12     A.    Messaging services.
13     Q.    Message services?
14     A.    Yes.
15     Q.    But not investigation research?
16     A.    I didn't.  I don't know if Strategic
17 Vision did.
18     Q.    Okay.  You said before there was
19 another client that was described to Lianchao,
20 Mr. Guo or Yvette Wang.
21           Do you recall that?
22     A.    I'm not sure.
23     Q.    Without divulging the name of that
24 client, what kind of client was it?
25     A.    I don't know if it was a client in fact

Page 109

1  or just somebody that Strategic Vision had worked
2  with before, so I don't know.  I'm not going to
3  state as a fact that it was a client, so I don't
4  know.
5      Q.    So that was before the contract was
6  signed, those discussions?
7      A.    I don't recall.
8      Q.    Did you ever tell Mr. Guo or Lianchao
9  that you were helping Russian opposition groups?
10     A.    Yes.
11     Q.    When was that?
12     A.    When was I helping them?
13     A.    No.  When did you tell them that you
14 were helping Russian opposition groups?
15     A.    Certainly before the contract and maybe
16 after the contract.
17     Q.    What did you tell them about that kind
18 of work that you were doing for Russian
19 opposition groups?
20     A.    Starting in -- it was -- how much
21 detail do you want?
22     Q.    You don't have to go crazy.  Just
23 generally.
24     A.    Starting in the late 1980s working with
25 anti-Soviet internal movements to help Ukraine,

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 110

1   Latvia, Lithuania, and Estonia secede from the
2   USSR.  And then with Russian internal opposition
3   groups opposed to the Russian -- the Soviet
4   Communist Party.  So they were tied --
5        MR. SCHMIDT:  Slow down.
6        A.    Tied to Boris Yeltsin from, like,
7   roughly '87, '88 up to '93, '94.
8        Q.    What about more recent work with
9   opposition groups and Putin regime?
10       A.    With Mikhail Khodorkovsky, who is one
11  of the lead opposition people against Putin.
12       Q.    So you told Mr. Guo about the services
13  that you provided to Mikhail Khodorkovsky?
14       A.    Not so much the services as opposed to
15  ideas, because one of our ideas was to unite
16  Chinese internal opposition with Russian
17  opposition and help bring -- this was on the
18  messaging part of the ideas, the brainstorming
19  with Guo.  We brainstormed a lot in December and
20  had wide-ranging discussions.  So in this case,
21  it was to work with Russian internal opposition
22  groups to bring things in and out of China over
23  the land border between Russia and China.
24       Q.    Did you tell them that you had
25  connections with the Abu Dhabi princess?

Page 111

1        A.    I didn't.
2        Q.    Did Ms. Wallop?
3        A.    Probably.
4        Q.    What about connections in Saudi Arabia?
5   Did you tout that as one of the resources that
6   you had?
7        A.    She has Saudi connections.
8        Q.    What about connections in Qatar,
9   Turkey, Iran?  Is that all Ms. Wallop?
10       A.    She has those connections.
11       Q.    So your connections are with the
12  Russian opposition groups?
13       A.    She has connections with them also and
14  with Khodorkovsky.
15       Q.    So you both provide services to these
16  Russian opposition groups?
17       A.    Yes.
18       Q.    Did you ever tell Mr. Guo that you had
19  20 or so projects going at a given time, research
20  projects?
21       A.    At the same time?
22       Q.    Yes.
23       A.    No.
24       Q.    Did Ms. Wallop while you were there
25  tell --

Page 112

1        A.    Not while I was there.
2        Q.    Did you ever tout connections to the
3   White House prior to the execution of the
4   contract?
5        A.    What do you mean by "tout"?
6        Q.    Like -- I won't say advertise, but just
7   explain in terms of the quality of your services
8   or Strategic Vision's services that you're
9   connected to the White House?
10       A.    Not so much in the services itself.
11  It's that I know people in the White House.
12       Q.    And you told Mr. Guo?
13       A.    Yes.
14       Q.    Did you tell them that you worked for
15  the Trump presidential campaign?
16       A.    No, I did not.  I did not work for the
17  campaign, and I didn't tell them I did.
18       Q.    Did Ms. Wallop?
19       A.    Not that I know of.  I would say I
20  don't know.
21       Q.    That's fine.
22            Did you tell Mr. Guo, Ms. Wang or
23  Lianchao that you worked with the CIA and
24  continue to work with the CIA in the Middle East?
25       A.    No.  I had helped the CIA in the past,

Page 113

1   but I never said I still work with them.
2        Q.    Do you still work with them?
3        A.    No.
4        MR. GRENDI:  Let's go to Waller 4.
5            (Waller Exhibit 4, Document Bates
6   stamped, marked for identification.)
7        Q.    Do you recognize this document?
8            I gave you the one with my marks on it.
9   Would you mind switching that?
10       A.    Sure.  I should take a look at your
11  marks.
12       Q.    That's okay.  There's nothing that good
13  there.
14       A.    It looks like my LinkedIn page, but I
15  don't see an indication that it's on LinkedIn.
16       Q.    Is this your background information?
17       A.    It appears to be.
18       Q.    Do you remember giving this information
19  to Mr. Guo?
20       A.    No.
21       Q.    Or Lianchao?
22       A.    Maybe Lianchao.
23       Q.    That would have been before this
24  contract was signed?
25       A.    Yes.

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 114

1    Q.    What does Georgetown Research do?
2    A.    It's an LLC that I set up with
3    French Wallop in the fall of 2017 to do joint
4    work, and then it became a vehicle for executing
5    this contract.
6    Q.    So Georgetown Research does
7    investigatory work?
8    A.    Yes.
9    Q.    That's in Washington, D.C., right?
10   A.    Yes.
11   Q.    Do you have an office or is that based
12   out of your home?
13   A.    No, it's just an LLC.
14   Q.    So there's no --
15   A.    No staff, no office, no physical
16   address.
17   Q.    And it's just you?
18   A.    Then.  Pardon, it's French Wallop and me
19   for this LLC.
20         MR. SCHMIDT:  For Georgetown.
21   A.    For Georgetown Research.
22   Q.    So you're both members of that LLC?
23   A.    Yes.
24   Q.    Got it.  Just in your bio it says that
25   you did special projects at Blackwater from 2007

Page 115

1    to 2009?
2    A.    Yes.
3    Q.    Is that company now known as -- I think
4    it's Academi?
5    A.    Academi.  A-c-a-d-e-m-i.  I don't know
6    if it's still by that name or not, but it became
7    that name.
8    Q.    Is this the Blackwater that used to be
9    run by a fellow named Erik Prince?
10         THE WITNESS:  Is this relevant?
11   A.    Yes.
12   Q.    You worked at Blackwater with
13   Erik Prince?
14   A.    Yes.
15   Q.    Did you mention that experience with
16   Blackwater prior to the execution of the contract
17   to Mr. Guo?
18   A.    I don't know.  I don't remember.
19   Q.    Just below that it says "Vice President
20   and American Foreign Policy Council"?
21   A.    Yeah.
22   Q.    Is this the work you were previously
23   describing concerning working with Russian
24   opposition groups?
25   A.    Yes.  It's part of it, yes.

Page 116

1    Q.    But you don't do that work anymore
2    through the American Foreign Policy Council?
3    A.    No.
4    Q.    I guess you're not with that outfit
5    anymore?
6    A.    Correct.
7          MR. GRENDI:  Let's do 5.
8          (Waller Exhibit 5, Signal text message
9    thread, marked for identification.)
10   Q.    Mr. Waller, do you recognize this
11   Signal thread?
12   A.    Let me take a look.  Yes.
13   Q.    Who is this correspondence between?
14   A.    Between Lianchao Han and myself.
15   Q.    I know you mentioned before, but how
16   long do you know Lianchao Han?
17   A.    I first met him in the '80s, but I've
18   then lost contact with him.  I've known him for
19   over 30 years but haven't worked with him closely
20   until this project.
21   Q.    How did you get in touch with him in
22   connection with this project?
23   A.    Through French Wallop.
24   Q.    So French Wallop reintroduced you to
25   Lianchao Han?

Page 117

1    A.    As I, as I understand it from her,
2    Bill Gertz was working with Lianchao Han and Guo,
3    and then Guo said he wanted to do this project
4    that we're discussing now.  Bill Gertz
5    contacted -- Bill Gertz is an intelligence and
6    defense reporter, and I've known him for 35
7    years.  So he talked to French about doing it.
8    She suggested bringing me in, and then through
9    that, I met Lianchao, re-met Lianchao.
10   Q.    So you weren't part of the -- let's
11   call it -- initial introduction of Bill Gertz and
12   Lianchao Han and Mr. Guo?
13   A.    No.
14   Q.    Does Lianchao Han have a relationship
15   with Strategic Vision?  Let's call it a financial
16   relationship.
17   A.    No, not that I know of.
18   Q.    Does he have a financial relationship
19   with you or any of your LLCs?
20   A.    No.
21   Q.    So he doesn't get any referral fees for
22   bringing work to you --
23   A.    No.
24   Q.    -- or Strategic Vision?
25   A.    No.

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 118

1    Q.    And I'll just be super clear, and
2  excuse the lawyer for being a little redundant.
3         Did Lianchao Han receive any
4  compensation for bringing Eastern Profit or
5  Mr. Guo to Strategic Vision?
6    A.    No.
7    Q.    I'll ask the same question for you or
8  your LLCs.  Did you ever pay Lianchao Han for
9  introducing you to Mr. Guo or Eastern Profit?
10   A.    No.
11   Q.    Let's turn to -- this is SVUS62, the
12  second page there.  Between the two text bubbles,
13  there's a lighter one and a darker one.  Which
14  one is you and which one is Lianchao Han?
15   A.    I'm the darker one.
16   Q.    And Lianchao Han is the lighter one?
17   A.    Yes.
18   Q.    Looking at this page, who is the friend
19  you could provide the menu for on December 18th?
20   A.    Guo.
21   Q.    That's Mr. Guo?
22   A.    Yes.
23   Q.    I'm turning to the next page.  This is
24  your message about Trump giving an excellent
25  speech today?

Page 119

1    A.    Yes.
2    Q.    And the response is "Yes, SB talked
3  about it here."  Do you see that?
4    A.    Yes.
5    Q.    Who is SB?
6    A.    I would presume it's Steve Bannon.
7    Q.    In the next message, Lianchao Han asks
8  you about "our friend from Tokyo."
9         Do you see that?
10   A.    Yes.
11   Q.    Who's your friend from Tokyo?
12   A.    He's not referring to my friend.  He's
13  referring to "our" as a generic "our."  It was a
14  Chinese individual from Tokyo whose name, whose
15  real name I never knew.
16   Q.    So not Mr. Guo?
17   A.    No.
18   Q.    This is some other individual?
19   A.    Some other person.
20   Q.    So does Lianchao Han introduce you to
21  other potential clients for the services that you
22  provide?
23   A.    No.
24   Q.    So he didn't ever introduce you to this
25  other Chinese individual?

Page 120

1    A.    He did.  Yeah, he did introduce me to
2  him.
3    Q.    But you didn't end up doing business
4  with him?
5    A.    No.
6    Q.    Turning to 64.  Do you see where it
7  says "New York friend wants to do it but asks for
8  more insurance"?
9    A.    Yes.
10   Q.    Who did you understand the New York
11  friend to be there?
12   A.    Guo.
13   Q.    What do you think Mr. Han meant by
14  "more insurance"?
15   A.    I think he meant assurance.  Assurances
16  that the job could be done.
17   Q.    I see.  So it's kind of just a phonetic
18  mistake in terms of the text message?
19   A.    Or whatever, yeah.
20   Q.    On the next page, do you see where you
21  wrote, "I don't think the New York guy is
22  serious"?
23   A.    Yes.
24   Q.    What did you mean by that?
25   A.    Guo kept waffling on what he wanted,

Page 121

1  and he was saying things that seemed conflicted.
2    Q.    What do you mean by that?
3    A.    He was waffling back and forth on
4  price, on scope, on what he wanted.  He wanted to
5  buy two Rockefeller properties, plus a $25
6  million house in Washington, D.C., and a building
7  across the street from the U.S. Treasury
8  Department with a line of view sight to the
9  White House, and set up all this research at the
10  same time.  It looked like he didn't seem serious
11  to me because he -- he seemed like he was a big
12  thinker, but it wasn't going to be.
13   Q.    So you didn't think that he was really
14  going to follow through with doing any of the
15  work that you guys were discussing at the time?
16   A.    I was apprehensive that he was going to
17  do any work with us.  Oh, and because the prices
18  that he was expecting to pay were nowhere near
19  what things were really going to cost.  That's
20  the next line.
21   Q.    Let me get there myself, if you don't
22  mind.  Lianchao Han's response was, "He wants do
23  it but wants to do it as cheap as possible."
24        Do you see that?
25   A.    Right.

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 122

1    Q.    What do you recall about him wanting to
2  do it for as cheap as possible?
3    A.    Well, you can't blame a businessman for
4  wanting to do something as cheap as possible.
5    Q.    Do you remember prices being discussed?
6    A.    Yeah, prices were discussed, and for
7  the scope that he wanted, it was just simply not
8  possible to do.
9    Q.    What did he propose?
10    A.    I don't recall precisely what it was.
11    Q.    But it was certainly less than whatever
12  ended up being in the contract?
13    A.    Right.
14    Q.    You wrote, "He will fail if he does it
15  on the cheap."  Do you see that?
16    A.    Yes.
17    Q.    Why did you think it would fail if it
18  was done on the cheap?
19    A.    You don't get the top-quality industry
20  standard people.
21    Q.    So in other words, you didn't think
22  that you would be able to hire a team that would
23  be of the sufficient quality to do the research
24  that was being asked for?
25    A.    No, not with the level of

Page 123

1  professionalism and security experience,
2  certainly not.
3    Q.    You don't have any recollection as to
4  what price he had wanted at that time, or asked
5  for at that time?
6    A.    If I remember correctly, he didn't say
7  the price he wanted.  He wanted us to give him a
8  price and then he kept saying no.
9    Q.    I see.  So you had offered some prices
10  and he just said absolutely not?
11    A.    Right.  That's part of the haggling.  I
12  don't recall him giving a price that he was
13  willing to pay, but we settled on the price
14  that's in the contract and adjusted the scope
15  accordingly.
16    Q.    In the same text bubble you wrote,
17  "Let's focus on the other guy."
18          Who's the "other guy"?
19    A.    I am not sure who it was.
20    Q.    Is it the same Chinese individual from
21  Tokyo that was discussed earlier in the thread?
22    A.    I don't know.  It could have been
23  Bannon.  I honestly don't know.
24    Q.    You and Lianchao were talking about
25  doing work for Steve Bannon at that time?

Page 124

1    A.    I know Bannon.
2    Q.    What work were you discussing in this
3  thread about Steve Bannon, other than he made a
4  speech?
5    A.    Steve has a lot of ideas to do a whole
6  lot of things, and one of them was to confront
7  the threat that China poses against the
8  United States.
9    Q.    Did you have a dialogue with
10  Steve Bannon about the research contemplated by
11  this agreement?
12    A.    No.
13    Q.    So you never spoke to Steve Bannon
14  about Mr. Guo or Eastern Profit?
15    A.    No, or anything China related, except
16  maybe the military problem as a policy matter,
17  but nothing to do with Guo or Lianchao.
18    Q.    Turning to the next page.  Do you see
19  where you wrote, "I trust your judgment.  I'm not
20  anxious to dialogue with him further"?
21    A.    Yes.
22    Q.    Who were you talking about there?
23    A.    About Guo.
24    Q.    Why weren't you anxious to keep talking
25  to him?

Page 125

1    A.    Because he kept coming back with
2  different things that he wanted do which didn't
3  tie into one another, and he didn't seem serious.
4    Q.    Do you have experience with people who
5  ask for your services, but that ultimately you
6  think are really not serious about it?
7    A.    Yeah.  When you're trying to have an
8  serious discussion and he brings out his jacket
9  after jacket of expensive baby alligator skin
10  jackets that were soaked in milk and tailored in
11  Ferrari colors, you think what are we doing here?
12    Q.    When did that occur?
13    A.    Sometime at his home in December.
14    Q.    So you went to a meeting to talk about
15  this contract in December?
16    A.    Yes.
17    Q.    And he instead was showing you clothes?
18    A.    Clothes.  This part was made in Italy
19  and this part in Hong Kong, and a Lego set of the
20  Tower Bridge in London and all kinds of stuff
21  that had nothing to do with anything, and then he
22  was being difficult on the things that we wanted
23  to talk about.  So I said, "I'm not anxious to
24  dialogue with him further."
25    Q.    I got it.

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 126

1       Do you see this message from Lianchao
2  Han on December 24, 2017 starting with "I talked
3  with him"?
4       A.   Um-hum.
5       Q.   What did you understand Lianchao Han to
6  be conveying in this message?
7       A.   Let me read the context.  So your
8  question?
9       Q.   Let me ask it this way.  The message
10  from Lianchao says, "If you fail to provide the
11  deliverables as defined in the scope, you should
12  return the deposit.  What do you think?"
13      A.   Right.
14      Q.   What did you understand that to mean?
15      A.   I spelled it out in the next, in my
16  response.  So we're dialoguing here.  We're not
17  defining things.  So my response explains -- my
18  response would answer your question, my written
19  response here.
20      Q.   Just looking at your response here, you
21  wrote, "That probably won't be possible in the
22  first 30 days because of the start-up work.  I
23  suggest a minimum of 90 days."  Do you see that?
24      A.   Yes.
25      Q.   Did you put anything in the contract

Page 127

1  that memorialized that it wouldn't be possible to
2  do any deliverables in the first 90 days?
3       A.   It's addressed in the contract, yes.
4       Q.   Where is that?
5       A.   Well, let's look.  I'm saying the
6  concerns are addressed in the contract.  It has
7  the -- it is understood that some of the reports
8  were produced on a regular schedule, meaning some
9  were not.  They'll be irregular.  There will
10  be -- then it's followed by the irregular
11  circumstances clause that we discussed.
12          And then there is the 90-day period
13  concerning the comprehensive reports which we
14  already discussed, the progress reports, then the
15  weekly reports, and then the 90-day reports.  So
16  we're setting up the -- this is the discussion
17  toward what ended up in the contract.
18      Q.   At this point, though, you were talking
19  about whether the deliverables meet the scope,
20  right?
21      A.   Yes.
22      Q.   What deliverables do you think would
23  meet the scope?  In other words, what's an
24  acceptable deliverable?
25      A.   He had asked for lots of data right

Page 128

1  away.  I said it's not possible.
2       Q.   That's what you're saying in here?
3  When did you tell him it wasn't possible?
4       A.   The whole time.  And Lianchao agreed
5  with it.  And he would have private meetings in
6  Mandarin with Guo about this.
7       Q.   So you were -- just so we're clear, you
8  were communicating with Mr. Guo through Lianchao?
9       A.   Yes.  Lianchao was explicitly acting as
10  Guo's agent in this correspondence.
11      Q.   And did you ever speak at least via
12  Signal message or other electronic means with
13  Mr. Guo?
14      A.   No.  Pardon me.  Not that I recall.  I
15  don't believe I did, but there might have been in
16  the initial stages.  I would have destroyed that
17  data.
18      Q.   Okay.  Below that it says, "I don't
19  know who will sign."  Do you see that?
20      A.   Yes.
21      Q.   Do you know what Lianchao was talking
22  about there?
23      A.   Who would sign the contract.
24      Q.   Why was that a question?
25      A.   It would have been a security question,

Page 129

1  meaning Guo would have a surrogate who we would
2  understand was signing on his behalf.
3       Q.   Did Strategic Vision think about having
4  a surrogate sign on its behalf for security
5  reasons?
6       A.   You have to ask Strategic Vision.  I
7  can't answer that.
8       Q.   You didn't talk to Ms. Wallop about
9  that?
10      A.   No.  She was going to sign it because
11  it was her company.
12      Q.   Below that it says, "He proposed you
13  and asked us if that would be acceptable to us.
14  All of us agreed, let's keep the agreement."
15          Do you see that?
16      A.   Yes.  Okay, this refreshes my memory.
17  There was a back-and-forth between whether
18  Lianchao or Yvette would be the signer.
19      Q.   And that was on or about December 24th?
20      A.   Yes, and just prior to it.
21      Q.   So there was a meeting before that?
22      A.   There was a back-and-forth with
23  Lianchao this whole time.  It just wasn't all in
24  writing.
25      Q.   Do you mean on the phone or in person?

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 130

1    A.    Never on the phone, always in person.
2    Q.    So regarding this agreement, you never
3  spoke to Lianchao on the phone?
4    A.    Correct.
5    Q.    What about Ms. Wang?  Did you ever
6  speak to her on the phone about this agreement?
7    A.    I think it was only by Signal.  Now,
8  let me correct myself.  We might have had some
9  brief talks on Signal audio.
10    Q.    Okay.
11    A.    But I wouldn't have a record of that.
12    Q.    I understand.
13    A.    Yes.  Here he says, "I don't know who
14  will sign," and I said "He," Guo, "proposed you,"
15  Lianchao, and asked -- because there was a
16  question of Yvette doing it, and because Guo told
17  us he didn't trust Yvette, and she's a member of
18  the Communist Party, and her parents are senior
19  people in the Chinese police, that obviously she
20  would be an unreliable person.  I could never
21  figure out why Guo would hire somebody like that,
22  but that's why I did not want her to be involved
23  in the signing of the contract.
24    Q.    When did Mr. Guo tell you that about
25  Yvette?

Page 131

1    A.    I heard about it secondhand because I
2  research my clients.  The judge asked me about my
3  client and I know what he does for his business,
4  as well as the people around him.  So I found out
5  that she was a Communist Party member which Guo
6  later confirmed at a lunch at his house after the
7  contract was executed.  And if I recall, Lianchao
8  said something to that same effect, but I don't
9  remember if it was before or after the contract
10  was executed.
11    Q.    But even after you knew that or heard
12  that, you still continued to work with Yvette
13  Wang, right?
14    A.    Yes.
15    Q.    Didn't it occur to you that that could
16  be a security risk for this project?
17    A.    Yes, and I told Guo that, and he
18  agreed.
19    Q.    Didn't you feel that that would
20  endanger you or your team leader or your team?
21    A.    Not if it was compartmented.  Not if
22  there was an anonymity, a barrier between Guo and
23  the team that wouldn't endanger them at all.  But
24  even Guo himself made his fortune through the
25  partnership with the number 2 official in the

Page 132

1  Chinese secret police, and he still was having
2  dialogue with the ministry of state security
3  officials, as he even told us.
4          So I don't know what his game was.  I
5  don't know what divisions he was working.  I
6  presumed he was working on divisions within the
7  Communist Party.  So if he trusted her after
8  saying he didn't trust her, then he's the client.
9  It's his prerogative.
10    Q.    So even though you found information
11  that you thought really endangered this
12  project, you still went ahead with it?
13          MR. SCHMIDT:  Objection.
14    A.    It didn't endanger the project.
15    Q.    You didn't feel that it did?
16    A.    No.
17    Q.    Let's go to SV69.  Do you see where you
18  wrote --
19    A.    Pardon me, I'm reading.
20    Q.    Go ahead.  Take a little bit of time.
21    A.    Just for the record, SV68 confirms what
22  I just told you.
23    Q.    Please wait for a pending question.
24    A.    69.
25    Q.    Do you see where he wrote -- or I'm

Page 133

1  sorry, do you see where you wrote, "If he changes
2  his mind on you, it indicates to me he doesn't
3  fully trust you.  Not a good thing"?
4    A.    Yes.
5    Q.    What did you mean by that?
6    A.    If Guo changes his mind on trusting the
7  person he said he trusted, then that's a bad
8  sign.
9    Q.    Do you know why Lianchao didn't end up
10  signing the contract?
11    A.    No.
12    Q.    Do you know if Mr. Guo stopped trusting
13  Lianchao for some reason?
14    A.    I don't know.  He seemed not to trust
15  anybody.  Toward February 1st, as Yvette had
16  noted, Guo had instructed that we only
17  communicate through Lianchao again.  So he
18  regained his trust.  But he never told us to stop
19  talking to Lianchao.
20    Q.    So through the life of the agreement,
21  you continued to communicate with Lianchao?
22    A.    Yes.
23    Q.    Even after Mr. Guo had instructed you
24  that you shouldn't, because in his mind, he
25  didn't want him to be involved in this anymore?

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 134

1    A.    He didn't say don't talk to -- Guo did
2  not say don't talk to Lianchao.  He just said
3  Yvette is going to be the principal point of
4  contact.
5    Q.    So you understood that, I guess, let's
6  say, after late December 2017 that there would be
7  two points of contact?
8    A.    Yes.  She would be the primary point of
9  contact on anything major, but because we had the
10 relationship with Lianchao and Lianchao still had
11 Guo's confidence, we would talk to Lianchao about
12 issues coming up with the project and how we
13 might best address them.  Yvette did not seem
14 to -- she was not able to answer those questions
15 for us.
16   Q.    In the response bubble to your last
17 bubble there, it says, "He has sensed my
18 disappointment with him."
19   A.    Yes.
20   Q.    Do you understand what Lianchao was
21 talking about there?
22   A.    That Guo has sensed Lianchao's
23 disappointment with Guo.
24   Q.    Right.  Did you understand what sense
25 of disappointment was being discussed?

Page 135

1    A.    No.  I think Lianchao is very direct
2  and methodical.  Guo is really not.
3    Q.    Why was it that you thought that
4  Lianchao was disappointed with Guo?
5    A.    Because Guo was exaggerating.  Guo was
6  being, again, bringing out his wardrobe to show
7  us, showing us his Lego set.
8    Q.    So Lianchao was at that meeting?
9    A.    Yes.
10   Q.    So after that meeting --
11   A.    Pardon me.  That may have been over the
12 course of two meetings.  I think the Tower Bridge
13 Lego set was at a second meeting.
14   Q.    But to your mind, Lianchao was
15 disappointed with Guo because of how he carried
16 himself at one or both of these meetings at his
17 apartment?
18   A.    Yes, and I believe other things
19 unrelated to our contract.
20   Q.    What were those other things?
21   A.    I don't know.
22   Q.    And Lianchao told you only through this
23 Signal message or did you have a discussion with
24 him about it?
25   A.    We had discussions about it.

Page 136

1    Q.    Can you just briefly describe what was
2  conveyed in those discussions?
3    A.    Similar to what was spelled out here.
4  There was a cause of frustration with Guo keeping
5  focus, Guo keeping a sensible scope of what he
6  wanted to do.  The difference between Guo being
7  unethical in his business practices, which is
8  another reason for a deposit, like a retainer,
9  but it was not a retainer.  Defending Guo when I
10 would say I've done research on him and found
11 that he's been involved in certain alleged
12 nefarious activities, what do you think about it.
13   Q.    So you raised those issues with
14 Lianchao?
15   A.    Yes.
16   Q.    What did he say?
17   A.    He said, "There's a lot there, John.
18 This is a complicated place.  You don't become a
19 billionaire in Communist China by playing by
20 American legal standards."
21   Q.    Let me just ask this.  Why do you think
22 Lianchao was interested at all in what Mr. Guo
23 was doing or trying to do through this contract
24 with Eastern Profit?
25   A.    Because Guo was in the United States

Page 137

1  under a form of sanctuary, he can't go back home
2  or he'll be arrested, so he's in opposition to
3  the Communist Party leadership.  That jived with
4  both Lianchao's and French Wallop's and my own
5  beliefs that the Communist government of China is
6  an evil regime, and if we can help fight it in
7  any way, great.  And if we can make a living
8  doing it, great.  And if we have a defector or a
9  deserter who's come to the United States to put
10 up funds to enable that, then this is a win-win
11 proposition.
12   Q.    So you and French Wallop and Mr. Guo
13 have kind of an ideological common purpose in
14 toppling the Communist regime in China?
15       MR. SCHMIDT:  Objection.  Go ahead.
16   A.    We thought we did.
17   Q.    At the time, let's say, December 2017?
18   A.    Right.  Later we began to suspect that
19 he was either a double agent or some other kind
20 of provocateur, but we could never prove it.
21   Q.    Just looking at the next text bubble,
22 who are Bernie and Judd?
23   A.    I don't remember Bernie.  Let me think
24 of Bernie.  Judd was former Senator Judd Gregg of
25 New Hampshire, G-r-e-g-g.

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 138

1    Q.    Judd Greg was a friend of Lianchao?
2    A.    Lianchao had worked for him for many
3  years.  I knew him and his dad before he even was
4  elected.
5    Q.    Just taking a moment.  Who is the other
6  friend of Lianchao named Bernie, if you know?
7    A.    Bernie Yoh, Y-o-h.
8    Q.    Who is that?
9    A.    He's deceased.  He was a -- he fought
10  the Japanese and Mao in the Japanese invasion of
11  China and the Chinese Civil War as a free China
12  fighter.
13    Q.    For Chiang Kai-shek?
14    A.    With Chiang Kai-shek, and then came to
15  the United States.  He mentored me when I was a
16  kid in college and he mentored Lianchao.  That's
17  one of our trust litmus tests.
18    Q.    I see.  So because you had people who
19  you both knew that both seemed to like you, you
20  figured Lianchao was someone you could trust?
21    A.    No, there are a lot of people who I
22  like who I don't trust, no, not at all.  Bernie
23  Yoh was a guerilla fighter in the most literal
24  sense, and in that kind of insurgency where you
25  don't have a commander in control, everything is

Page 139

1  based on trusting the guys that you're with.
2            He based his life in America the same
3  way.  Just because he liked you doesn't mean he
4  trusted you and vice versa.  But he's the type of
5  mentor -- I say that in the deepest sense of the
6  word -- that if he mentored me, he got to know me
7  very well.  I got to know him very well.  If he
8  mentored Lianchao, the same thing.  If you were
9  mentored by Bernie Yoh, then that's solid stuff.
10    Q.    I got you, okay.
11            Just turning to the next page, SV70.
12  Do you see where you wrote, "Any attempt to do
13  anything in court will expose everything, and
14  that isn't worth a lousy million dollars for
15  either party"?
16    A.    Yes.
17    Q.    What were you talking about there?
18    A.    Because in our verbal discussions,
19  Lianchao had related that Guo was very afraid of
20  being defrauded and was understandably nervous of
21  putting up a million dollars in advance that was
22  not in escrow.  So he's nervous about that.  So
23  we have the contract.  I didn't know what he
24  meant by what would protect him, which is why I'm
25  asking.

Page 140

1            I said if this ever goes to court, it's
2  going to expose the existence of the contract,
3  which was never supposed to be known.  We kept
4  our side of that bargain.  It would expose who
5  Guo is tracking and why.  It would exposure the
6  nature and extent of who he's following, and it
7  would completely upend the client's worth.  I
8  expressed doubt at this point that is it worth a
9  million dollars to him to risk everything he's
10  trying to do.
11    Q.    Why did you want Lianchao to sign
12  instead of someone else?
13    A.    Because I've known him for such a long
14  time and I trusted him, and he was not a member
15  of the Chinese Communist Party.
16    Q.    You're referring to Ms. Wang when you
17  say that, as someone who was a member of the
18  Chinese Communist Party?
19    A.    Yes.
20    Q.    Were any other alternatives provided?
21    A.    No.
22    Q.    Do you see where Lianchao wrote, "I
23  don't really care as long as we do it"?
24    A.    Yes.
25    Q.    Why did Lianchao care so much about

Page 141

1  this contract?
2    A.    He wanted to destabilize the Chinese
3  Communist Party.
4    Q.    He didn't really care about why or who
5  was going to do it.  He just wanted to hurt them?
6    A.    He just wanted it done.  It was a
7  natural synergy between someone who had the
8  motivation and the resources and the basic
9  information versus the people who could actually
10  do the work that would then provide the person
11  providing the funds with the means to make use of
12  that information over time.
13    Q.    Just looking at your response.  Why did
14  you say, "We must report to you and only you for
15  quality control"?
16    A.    Because of a trust issue.  Again, same
17  reason.  Lianchao understood exactly what we were
18  doing and how we were doing it.  Yvette did not
19  seem to know any of that.
20    Q.    Why did you think that Yvette didn't
21  know about any of that?
22    A.    She couldn't hold a real conversation
23  about what we were doing beyond interpreting.
24  She didn't know anything about opposition
25  research.  She didn't know -- she didn't seem to

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 142

1  know anything about computer research.  She would
2  keep saying -- using very oversimplified terms
3  that really made no sense.  "That's garbage.
4  That's garbage."
5       "Well, what do you mean by 'garbage'"?
6  Tell me specifically what's useful and what's
7  not.  She couldn't even say that to us.  She
8  couldn't convey anything necessary to conduct the
9  job.
10      Q.   Let's talk about when are these
11 conversations occurring that you're describing
12 here?  Was this before the contract or after?
13      A.   That was on both.  The judgment of the
14 information was after the contract, but she could
15 not hold a conversation about the types of work
16 involved prior to the contract.
17      Q.   Do you feel that she understood the
18 research agreement?
19      A.   Yes, her English was good enough.
20      Q.   Did she understand what was going to be
21 provided in terms of a service?
22           You're saying she didn't really
23 understand what the work was?
24      A.   Well, for the same reason anybody hires
25 an expert, right?  You depend on the expert to do

Page 143

1  it, but you would at least want to have a
2  conversation about the modalities with that
3  expert, and she didn't -- she wasn't up to having
4  that type of conversation.  Guo was, and she
5  interpreted for Guo.
6       Q.   I see.  Let's go to 72.  And just
7  before we talk about that.
8            When did Lianchao stop being your
9  primary point of contact?
10      A.   As I recall, it was the last few days
11 of December.
12      Q.   Okay.
13      A.   Roughly right after Christmas.
14      Q.   Before, you said he had gotten back
15 involved again later on.
16      A.   Yes.
17      Q.   When was that?
18      A.   When we were instructed to -- well, it
19 was various, because sometimes he would indicate
20 that Guo wanted to convey a message through him
21 verbally and not through Yvette, but in writing
22 it was on February 1st when Yvette instructed me
23 that she would no longer be the point of contact
24 and that I was to communicate only through
25 Lianchao.

Page 144

1       Q.   I see.  When was that again?
2       A.   I believe it was February 1, 2018.
3  It's in a Signal message.
4       Q.   Let's look at SV72.  Do you see where
5  you wrote, "If it is, my main concern is that you
6  remain as the filter to ensure quality control
7  and ensure that we can protect our sources and
8  methods and ensure that New York doesn't release
9  information prematurely and put the entire
10 project and our people in danger."
11      A.   Yes.
12      Q.   "New York" there refers to Mr. Guo?
13      A.   Yes.
14      Q.   Why were you concerned about him
15 releasing information prematurely?
16      A.   Because he would go back and forth on
17 us in terms of long-term research that he would
18 release over time, and therefore not jeopardize
19 the existence of the research itself.  And then
20 because he was so impulsive, he might release
21 information prematurely and then alert people we
22 were watching that we were watching them.
23      Q.   I think you've answered it to an
24 extent.  What would be a premature release of
25 information?

Page 145

1       A.   Let's say he releases information on
2  person X while we are still researching person X.
3  Once you know you're being followed -- once
4  person X knows he or she is being followed,
5  they're going to make it more difficult to put up
6  countermeasures or do whatever to prevent being
7  observed.  So we wanted to make sure that that
8  didn't happen so that we could continue to
9  execute on the project.
10      Q.   Did you understand that ultimately
11 information about the research subjects would be
12 released?
13      A.   Yes.
14      Q.   When did you come to that
15 understanding?
16      A.   That was explicit from the beginning.
17      Q.   Did Strategic Vision and Ms. Wallop
18 understand that too?
19      A.   Yes.
20      Q.   So the collateral damage you're talking
21 about there would be what?
22      A.   The collateral damage would be the
23 existence that we were invading the personal
24 information of senior members of the Chinese
25 Communist Party, the secret police, and their

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 146

1  family members.
2       Q.    And so you're talking about damage to
3  the investigation, not damage to anyone
4  personally or anything like that?
5       A.    People get pushed off buildings for
6  these things.
7       Q.    In this investigation?
8       A.    This type of work.
9       Q.    I see.
10      A.    Putin had two of my editorial board
11  members murdered for investigating his
12  corruption, so we're very wary of these types of
13  issues, as was Guo.  He's very afraid of being
14  pushed off his own balcony.
15      Q.    With respect to the members of your
16  team, I guess, that were, as you said, pushed off
17  a building, when did that occur?
18      A.    My team?  Galina Starovoitova.
19            (Court reporter interruption.)
20      A.    G-a-l-i-n-a, last name
21  S-t-a-r-o-v-o-i-t-o-v-a.  The other name is
22  worse.  And Yuri Shchekochikhin was poisoned.
23  She was murdered in '98, and he was within the
24  past -- I don't remember exactly the date.  There
25  were 11 Russians I knew that have been murdered

Page 147

1  for investigating Putin.
2       Q.    You also said in this blurb that "There
3  was a deep concern that New York did not want to
4  include her, but now wants her to be in charge."
5       A.    Yes.
6       Q.    What was that concern?  First of all,
7  I'm sorry, who is "her"?
8       A.    Yvette.
9       Q.    What was the concern that you were
10  talking about, the "deep concern" there?
11      A.    Let me read it.
12      Q.    Sure.
13      A.    Okay, so your question?
14      Q.    I'm sorry, my question was what was the
15  deep concern?
16      A.    My deep concern was that Guo was now
17  putting Yvette in charge when he said he didn't
18  trust her.
19      Q.    And that concerned you because why?
20      A.    Well, if the client doesn't trust his
21  own person and wants to put her in charge of the
22  project, that will complicate the project a lot.
23  And both French and I had a relation with
24  Lianchao where he was very easy to work with.  He
25  understood precisely what we were doing and what

Page 148

1  needed to be done.
2            He was in a way to not simply be a
3  cutout or a translator for Guo, but actually a
4  facilitator to iron things out, or to come up
5  with new ideas, or to persuade Guo, or to convey
6  Guo's concerns adequately to us.  So we were
7  losing that type of relationship with her as the
8  person in charge.  That was my concern.
9       Q.    Because you had never met her before
10  this engagement?
11      A.    Right, and she was a party member, and
12  her parents were -- her family is in the Chinese
13  enforcement unit.
14      Q.    Turning to the next page.  Do you see
15  where Lianchao wrote, "He wants me to work for
16  him exclusively, which I have to think about"?
17      A.    Yes.
18      Q.    What did you understand that to mean?
19      A.    Because for a while, even predating
20  this message, Guo had wanted to hire Lianchao on
21  salary or some other compensated basis to work
22  for him and only him.
23      Q.    And that didn't happen?
24      A.    Lianchao did not want to be dependent
25  on Guo.

Page 149

1       Q.    Was that the only reason that Lianchao
2  told you why he did not want to work for Mr. Guo?
3       A.    He just didn't want to be dependent on
4  Guo.  He would not take a salary from Guo.
5       Q.    And that's what I'm saying.  Is that
6  the only reason he told you he wouldn't take that
7  job?
8       A.    As far as I know.
9       Q.    Looking down the page on 73.  Do you
10  see where you mention that "We had agreed in
11  writing on December 12th"?
12      A.    Yes.
13      Q.    What was agreed upon in writing on
14  December 12th?
15      A.    If memory serves, that was the
16  preliminary terms of the draft contract.
17      Q.    So there was a writing on December 12th
18  that memorialized that?
19      A.    Judging by this, yes.
20      Q.    Do you know where that document is
21  today?
22      A.    No.  Again, I made a point to not save
23  unnecessary information.
24      Q.    I see.  So is it possible that there
25  was a December 12th draft agreement that you

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 150

1  disposed of?
2       A.    Not draft agreement, but draft terms.
3  But then you keep revising drafts and you throw
4  away the drafts you don't need.
5       Q.    By "throw away," what do you mean?
6  Like delete an electronic copy?
7       A.    Yeah, destroy electronic copies and
8  paper copies of printouts.
9       Q.    To your recollection, in connection
10 with this contract, what do you remember
11 disposing of or destroying?
12      A.    My habit is to dispose of anything
13 that's not needed to execute the project or to
14 retain it only for as long as necessary.  For
15 example, the Signal messages with Yvette, I saved
16 those because we were still working with her and
17 I would need to go back and refer, but then I
18 would periodically delete.  But once we got
19 served, I saved everything.
20      Q.    Let's just talk about that.  Did you
21 delete Signal messages that were part of this
22 research agreement?
23            MR. SCHMIDT:  Objection, but go ahead.
24      A.    I presume I did.
25      Q.    Who would those communications have

Page 151

1  been with?
2       A.    Anybody necessary to put the work
3  together or to execute the work.
4       Q.    So you might have deleted messages from
5  Yvette Wang?
6       A.    I might have, but whatever is on that
7  string.  If I have the whole string, I can tell
8  you.  I certainly deleted some messages, but not
9  pertaining to Yvette.  Meaning with team 1, for
10 example, I deleted everything.
11      Q.    I see.  So you did communicate with the
12 leader of team 1 via Signal?
13      A.    By coded messages within the encrypted
14 message and very vague, yes.
15      Q.    You don't have to tell me which
16 application you used, but you used some sort of
17 encrypted messaging service?
18      A.    We used multiple ones, yes.
19      Q.    But you disposed of those?
20      A.    Yes.
21      Q.    Just in terms of your practice, was it
22 your practice to delete them a day after you used
23 them or immediately?
24      A.    It depends.  Sometimes it's upon
25 reading.  Sometimes it would be within 48 hours

Page 152

1  or a week.  Sometimes not at all depending on the
2  need to refer back to what was corresponded.
3       Q.    Let's just talk about this blurb I
4  mentioned with December 12th.  It says, "Please
5  call F.  We agreed on the deposit.  That wasn't
6  the problem.  However, today Y came back with
7  major unreasonable changes to things that we had
8  agreed to in writing on December 12th."
9       A.    Yes.
10      Q.    What were the major changes that you
11 were talking about there?
12      A.    Let me look at this.
13            MR. GRENDI:  We'll do a hard stop at
14      1:30.  I don't know if I'm going to get
15      through this by then.
16      A.    I don't remember precisely what those
17 major unreasonable changes were, but they
18 involved pricing and the deposit.  Guo had
19 already agreed with Lianchao present to pricing
20 and the deposit.  She came back on her own --
21 "she" being Yvette came back on her own making
22 her own changes.  This was not to me, but to
23 French Wallop.
24      Q.    So you weren't present when Yvette
25 proposed these changes that were, to your

Page 153

1  description, major and unreasonable?
2       A.    I don't think I was.
3       Q.    French told you about that?
4       A.    If I recall correctly, yes.
5       Q.    Okay.  Do you know why -- I think you
6  later wrote, "She has no idea what she's talking
7  about"?  It's on the next page.
8       A.    Right.  This went on the top of 74?
9       Q.    Yeah.
10      A.    Yeah, she had no idea what she was
11 talking about.
12      Q.    And that was something French told you?
13      A.    Yes.
14      Q.    You weren't --
15      A.    Meaning Yvette, according to French,
16 has no idea what she, Yvette, is talking about.
17      Q.    I see.  So you weren't -- you didn't
18 hear Yvette talk about these things because you
19 weren't there or on the phone or anything like
20 that?
21      A.    I don't remember.  On thinking back.  I
22 think I might have been privy in New York on that
23 meeting with Guo, but I don't remember.
24      Q.    Just sitting here today, you don't
25 recall maybe hearing that or knowing what Yvette

Page 154

1    said that was described here as "major
2    unreasonable changes"?
3         A.    I don't remember what I heard firsthand
4    from Yvette versus what I heard secondhand from
5    French talking to Yvette.  I don't remember in
6    this particular issue.  Yvette had come back with
7    her own handwritten changes to the contract that
8    were objectionable.  I don't know where that
9    version of the contract is or if it exists or
10   what.
11        Q.    Describe how you know about those
12   handwritten notes on the contract.
13        A.    French showed me.
14        Q.    You saw the physical document?
15        A.    Yes.
16        Q.    And it's French's document, not your
17   document?
18        A.    Yes, correct.
19   (*r)    MR. GRENDI:  We will just put a pin in
20        that one.  If that document still exists, we
21        would like to have it produced.
22        Q.    Do you remember what was handwritten on
23   that document by Yvette?
24        A.    No.
25        Q.    Let me just ask you about one last

Page 155

1    thing with this thread here and I'll take lunch.
2    If you could go to 67 -- or 76.  Do you see that
3    blurb that you wrote on January 4th at 3:25 a.m.?
4         A.    That sounds like the right time.  Yes.
5         Q.    Who's Amir? -- and I'm going to butcher
6    this, the pronunciation.
7         A.    Fakhravar.
8         Q.    Who is Amir F?
9         A.    He is a leader of an Iranian opposition
10   student movement.
11        Q.    You said here, "I helped him establish
12   seven years ago"?
13        A.    Yes.
14        Q.    Was that work you did for your own
15   company or working for someone else?
16        A.    It was working for a non-profit and
17   working on my own, because it was the right thing
18   to do.
19        Q.    You said, "this will be good for
20   New York and your present guest to see.  It shows
21   in real life what our team can do."
22        A.    Yes.
23        Q.    What did you mean by that?
24        A.    We helped organize student protests
25   inside Iran and in other parts of the world and

Page 156

1    then had brought in various Iranian opposition
2    factions together to help them put aside their
3    differences and to set up the basis for a
4    government in exile or a government that could
5    take place once the present regime was toppled.
6         Q.    I see.  So the -- what your team can do
7    for that group, were you talking about
8    investigatory research or something else?
9         A.    No.  This is if and when Guo would
10   succeed in destabilizing the Chinese regime, we
11   could help with protest organizing, with helping
12   unarmed people develop defensive methods against
13   armed force and riot police and armored vehicles
14   and so forth.
15              Actually, certain design flaws in
16   Chinese-built armored vehicles that the Iranians
17   and others were using to help the civilian
18   protesters defend themselves, and then to get
19   organized into some sort of a provisional
20   government and set up an interim constitution
21   that they could agree on or something like that.
22        Q.    But this is not about investigatory
23   research?
24        A.    No, this was not part of the contract.
25   This was part of what was the larger vision.

Page 157

1              MR. GRENDI:  Let's break for lunch.
2         Thank you very much.
3              THE VIDEOGRAPHER:  Off the record at
4         1:28.
5              (Whereupon, a luncheon recess was taken
6         at 1:28 p.m.)
7              THE VIDEOGRAPHER:  Back on the record
8         at 2:15.
9         Q.    Hello again.  Mr. Waller, did there
10   come a time when Strategic Vision got a wire for
11   $1 million in connection with this research
12   assignment?
13        A.    It got two wires of just under half a
14   million dollars apiece from a Hong Kong company.
15        Q.    And when was that?
16        A.    I don't know the exact date.  It wasn't
17   my account, but I think it was January 2nd.
18        Q.    Of 2018?
19        A.    Yes.
20        Q.    Was that before or after the research
21   agreement was signed?
22        A.    Before.
23        Q.    How did you first hear about these --
24   I'll call them "one wire" if that's okay, the two
25   of them the same day?

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 158

1    A.    As long as it's clear that there are
2  two.
3        Q.    Let's call them "the two
4  half-million-dollar wires," how's that?
5        A.    Okay.
6        Q.    When did you first hear about the two
7  half-million-dollar wires?
8        A.    Right around the time French Wallop
9  realized that it had been deposited in her
10 account, in her company's account.
11       Q.    So January 2nd, January 3rd of 2018?
12       A.    Right.
13       Q.    What was your response or reaction to
14 hearing that news?
15       A.    I thought it was very curious because
16 we hadn't signed the contract yet.
17       Q.    Are there any issues about where the
18 money had come from or questions about where it
19 was from?
20       A.    Yes.  We were very upset that it had
21 come straight from a Hong Kong bank straight to
22 Strategic Vision's bank because that was not what
23 we had agreed with Guo.
24       Q.    What was that previous agreement you're
25 referring to?

Page 159

1        A.    That we would establish a circuitous
2  route through which to make payments in order to
3  avoid detection by the Chinese government.
4        Q.    And so what were the details of that
5  circuitous route?  What was contemplated or
6  discussed?
7        A.    Sending it through various accounts in
8  different countries where it would escape
9  detection from the Chinese.
10       Q.    Were any details of which entities
11 would be used to do that discussed?
12       A.    That had remained to be settled.
13       Q.    Okay.  When did you or Ms. Wallop plan
14 on having that conversation with the folks from
15 Eastern Profit?
16       A.    After signing the contract.
17       Q.    When did you discuss this circuitous
18 payment route idea with Mr. Guo or whoever?
19       A.    We discussed it on several occasions in
20 December, throughout December when we were going
21 over how we would do this, how we would arrange
22 payment and how we would keep security.  Guo
23 agreed, and we spoke about it in the presence of
24 Lianchao and Yvette both separately acting as
25 interpreters, and also in English with Guo, who

Page 160

1  speaks English.
2        Q.    When the wire came in, or the two
3  half-million-dollar wires came in, did you have a
4  discussion with Mr. Guo or Lianchao or Yvette
5  about this issue and the fact that a circuitous
6  payment route was not used?
7        A.    I believe I did with Lianchao right
8  away, as soon as I found out, and I know that
9  French Wallop certainly did with Yvette.
10       Q.    When did you speak to Lianchao about
11 that?  Was it January 3rd?
12       A.    I'm guessing.  I don't know, but it was
13 soon after.
14       Q.    Was that an in-person meeting or a
15 telephone call?
16       A.    They were never by telephone.  It was
17 in person.
18       Q.    So you met with him where?  In
19 Washington, D.C.?
20       A.    The D.C. area, greater D.C. area.
21       Q.    What did Lianchao say when you told him
22 this?  Did he know already?
23       A.    No.  He expressed surprise.
24       Q.    Did you have any doubt that the money
25 was from Eastern Profit when you received it?

Page 161

1        A.    Yes.
2        Q.    You had other clients that were maybe
3  going to send a million dollars?
4        A.    No, but somebody gets a million dollars
5  from a company they never heard of unrelated to
6  any contract that had been signed, it's rather
7  different.
8        Q.    But Yvette did eventually tell -- well,
9  strike that.
10       Did you ever hear that Yvette told
11 French Wallop the wire was from Eastern Profit?
12       A.    Never from Eastern Profit.
13       Q.    From anyone else?
14       A.    It would have -- we understood it to
15 have been authorized by Guo.  So we didn't say
16 hey, Eastern Profit, you haven't paid us.  Some
17 other company paid us, but we're not gonna -- we
18 presumed that it was from Guo.
19       Q.    I see.
20       A.    Eastern Profit is a fake entity.  We're
21 talking about Guo.  It's a cutout for Guo, so we
22 can dispense with that fiction.
23       Q.    We're not going to dispense with any
24 fiction.  There's no fiction here, but let's just
25 continue.

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 162

1        Did you ever discuss this research
2   assignment with Bill Gertz or William Gertz?
3        A.    Only at the beginning when he was
4   facilitating it.
5        Q.    Can you describe what that discussion
6   was and where that was?
7        A.    I don't recall.
8        Q.    Can you tell me when you talked to
9   Bill Gertz?
10       A.    Probably November, December of 2017.
11  It was pre-contract.
12       Q.    What was the nature of the discussion?
13  What was discussed?
14       A.    I thanked him for putting this
15  together.  I asked him if he wanted to be a part
16  of it.  He said no.
17       Q.    What do you mean by "be a part of it"?
18       A.    He's an investigative journalist, has
19  been for more than 30, 35 years ever since I've
20  known him, so I wondered if he wanted to be part
21  of it.  And since Guo trusted him, he would be an
22  ideal person to have on board.
23       Q.    In terms of an intermediary or someone
24  providing services?
25       A.    Providing services.  He has excellent

Page 163

1   contacts in the intelligence community.
2        Q.    I see.  That was the only time you ever
3   spoke to Bill Gertz about this matter?
4        A.    Yeah, as far as I can tell.  It might
5   have been a casual hey, things are still going.
6   It was nothing in any detail, not in violation of
7   any confidence.
8        Q.    I wasn't saying it was or wasn't.  I'm
9   just asking if you spoke to Bill Gertz about this
10  agreement or research agreement after your
11  initial meeting with him that you described from
12  November or December of 2017.
13       A.    I mean, we've been friends for a long
14  time, so more than a how's-it-going-type thing,
15  nothing of substance.
16       Q.    And you're still in touch with
17  Bill Gertz as friends or colleagues?
18       A.    Yeah.  I'm working with him and
19  Rich Higgins on another project.
20       Q.    Another investigation project?
21       A.    An information messaging project.
22       Q.    What do you mean by that?  Is that a
23  different service than investigatory research?
24       A.    Yeah, it's putting out a message as
25  opposed to investigating.

Page 164

1        Q.    So like social media or print
2   journalism, things like that?
3        A.    Yeah, public diplomacy, just messaging.
4        Q.    Let's go to the next exhibit.
5            MR. GRENDI:  Exhibit 6.
6            (Waller Exhibit 6, Document entitled
7   "Anita Yui Suen", marked for
8   identification.)
9            MR. GRENDI:  Joe, do you have any
10  objection to me giving this to co-counsel,
11  co-defendant.
12           MR. SCHMIDT:  No, that's fine.
13       Q.    Do you recognize this document?
14       A.    Yes.
15       Q.    Generally speaking, what is this?
16       A.    This is the document that Miles Kwok
17  provided for us for the research project.  This
18  is his list of targeted names.
19       Q.    Is this the list of fish that when
20  they're describing it?
21       A.    Yes.
22       Q.    When did you first see this document?
23       A.    As I recall, shortly after the contract
24  was executed, or signed.  It was shortly after it
25  was signed.

Page 165

1        Q.    Does January 8th or 9th sound right?
2        A.    Approximately.
3        Q.    How did you receive it?
4        A.    On a USB drive that Yvette had provided
5   to French Wallop.
6        Q.    So you received the USB drive with the
7   information in Exhibit 6 from French Wallop,
8   then?
9        A.    Yes.
10       Q.    Who had gotten the information from
11  Yvette Wang?
12       A.    Yvette had handed -- she had given
13  us -- or she had given French, rather, USB drives
14  that were corrupted.  So French had to go up to
15  New York to get uncorrupted versions of the drive
16  and then bring it down.  That's what was on this.
17  This document was on that drive.
18       Q.    Right.  So did you see this document
19  from the initial drive that was given to
20  French Wallop on January 6th or from, as you just
21  mentioned, drives that were given subsequently?
22       A.    As I recall, I did not see anything in
23  the corrupted drives.  This was the non-corrupted
24  drive a few days later.
25       Q.    Okay.  Do you recall when the

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 166

1  non-corrupted drives were given to Strategic
2  Vision?
3       A.    I can't say the day, but it was a few
4  days later.
5       Q.    A few days after what day?
6       A.    A few days after Strategic Vision
7  received the corrupted drives.
8       Q.    When was this?
9       A.    Sometime in the first week of January.
10      Q.    Do you know if it was January 6th, the
11  day that the contract was executed?
12      A.    I don't remember the exact date.
13      Q.    Okay.  And so once you got a
14  non-corrupted version, what did you do with this
15  document?
16      A.    We immediately gave that to the team 1
17  leader to start work.
18      Q.    Had you arranged in advance for the
19  team 1 leader to be kind of ready to do this
20  project?
21      A.    Yes.
22      Q.    When did you first talk to the team 1
23  leader about this project?
24      A.    In late November or early
25  December 2017.

Page 167

1       Q.    Is it fair to say as soon as you heard
2  about this engagement, you thought of the team 1
3  leader as the go-to guy?
4       A.    As one of the go-to guys.  So we had
5  him do a test which we presented to Guo.  He was
6  very satisfied with the results and wanted us to
7  continue.  That was in early December,
8  mid-December.
9       Q.    Let's talk about that test.  How did
10  that test come up?  Was that requested by Mr. Guo
11  or Ms. Wang or Lianchao?
12      A.    Guo requested it, with Lianchao being
13  present and French Wallop being present.  I don't
14  remember if Yvette was present.  I think she was
15  not present at that meeting.
16      Q.    What was the request?
17      A.    He wanted to hack into Anita Suen's
18  personal data, including the server of CITIC,
19  which is the Chinese state-owned -- I believe
20  CITIC is C-I-T-I-C, China International
21  Investment Corporation and Trade.  Her email
22  address was residing on the CITIC security
23  server, and Guo wanted to see if we could access
24  that server.
25      Q.    What did you say in response to that

Page 168

1  request?
2       A.    That it's not legal to do from the
3  United States, but we would see what we could do.
4  So we did a capabilities test to see if it was
5  possible and found that yes, it is possible or it
6  was possible.
7       Q.    You had mentioned before that the
8  team 1 leader was involved in this.  Did you
9  dispatch the team 1 leader to see if it was legal
10  to do in another country?
11      A.    Yes.
12      Q.    What did the team 1 leader tell you?
13      A.    Yes, it's legal.  He gave screenshots
14  of the inside of the CITIC security server
15  showing that indeed we had the capabilities to
16  break into the server.
17      Q.    Did you show these screenshots -- you
18  said you showed screenshots of this to Mr. Guo
19  and Lianchao Han?
20      A.    Yes.
21      Q.    When was that?
22      A.    Before the contract was executed, in
23  mid-December.
24      Q.    Where was that meeting?
25      A.    At Guo's residence.

Page 169

1       Q.    Did you present -- so there were
2  computer screenshots on a laptop that you
3  brought?
4       A.    He didn't want a laptop.  He didn't
5  want electronic.  That was on paper.
6       Q.    That was on paper?
7       A.    That was before he said he didn't want
8  anything on paper.  He had electronic security in
9  his residence, so we couldn't use computers.
10      Q.    Did you hand him this information in
11  paper for him to keep or did you just show it to
12  him?
13      A.    I don't recall if he kept it or not.
14      Q.    Do you still have a copy of that?
15      A.    Yes.
16  (*r)      MR. GRENDI:  I'm going to call for the
17       production of that document if it has not
18       already been produced, but we'll see.  We
19       got a lot of information recently.
20      Q.    Did you show Mr. Guo and Lianchao bank
21  account information for Anita Suen?
22      A.    No.
23      Q.    What information was on those
24  screenshots?  Can you describe those screenshots?
25      A.    Yes, it was a screenshot of the code,

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 170

```
1   of the server code showing that it was at the
2   doorstep of the server, so to speak.  It was not
3   a break-in of the server.  It was just to show
4   we're right at the front door and we can go in.
5       Q.    During this discussion, did you refer
6   to this server as like a wall that you could peer
7   over?
8       A.    It was some kind of metaphor.  We had
9   discussions about how to see the information, and
10  there were different ways to do it, and he just
11  wanted to brute force attack which is not a
12  feasible thing to do because that tells the
13  target that you're after them.  So there are
14  other ways to get access to it, and we described
15  to him those ways.
16      Q.    I just want to understand that a little
17  better.  So if you were to, as you described it,
18  break into the server, that would alert the
19  server host to the fact that there was a problem?
20      A.    Yes.
21      Q.    Why would that be problematic in terms
22  of doing investigatory research?
23      A.    That you couldn't see what's inside.
24      Q.    Because why?  I'm asking you to explain
25  this.  I understand that it's perhaps intuitive.
```

Page 171

```
1       A.    The server would put up its own
2   defenses to close down any access to it, or even
3   shut itself down, and that it would alert the
4   server administrator that there was an issue.
5       Q.    Did this information include anything
6   about there being a huge amount of illegal money
7   in the bank account that you were looking at?
8       A.    We weren't looking at a bank account.
9   Guo wanted us to look at bank accounts for
10  illegal money.
11      Q.    Was that research that Strategic Vision
12  was willing to do?
13      A.    We were willing to do it wherever it
14  was legal to do it.  Guo instructed us to break
15  into -- try to break into American bank accounts,
16  and we said no, that's a crime.  We advised him
17  of certain things he wanted to do, and we told
18  him these are crimes.  We're not going to do
19  them.  And he got very upset after earlier saying
20  he didn't want to break U.S. law.
21      Q.    How did he get upset?  Can you describe
22  that?  Was that during this meeting where you had
23  showed the server?
24      A.    I think it was a subsequent one.
25      Q.    I just want to stick with this meeting.
```

Page 172

```
1   You described kind of one screenshot.  How many
2   screenshots were there that you showed at this --
3       A.    Two or three.
4       Q.    So what were they one by one, if you
5   don't mind just kind of going through to the
6   extent that you remember?
7       A.    It's a shot of -- remember MS DOS?
8   Before Windows?
9       Q.    Sure.
10      A.    It looks kind of like that.
11      Q.    So it's like a command prompt?
12      A.    Yes.
13      Q.    What did that -- I guess that's one of
14  the screenshots, right?
15      A.    Yeah.  The other was related.  The
16  other one or two were related to that one.  They
17  all had that sort of --
18      Q.    DOS look?
19      A.    Yeah.
20      Q.    What would that information mean to a
21  layperson?  Did you explain what the screenshots
22  really meant?
23      A.    Yes.
24      Q.    Please explain to me what those
25  screenshots meant.
```

Page 173

```
1       A.    So we're right at the front door of
2   Anita Suen's CITIC security email account, but we
3   haven't opened the door.
4       Q.    Did you convey to Mr. Guo or Lianchao
5   that you could do that?
6       A.    Yes.
7       Q.    But you explained that you weren't
8   going to do that right now because it would
9   compromise the investigation in the future?
10      A.    Yes.
11      Q.    What was their reaction to this
12  presentation?
13      A.    That was fine.  That presentation was
14  what convinced Guo to proceed with the contract.
15      Q.    Did Strategic Vision subsequently
16  access that CITIC account?
17      A.    No.
18      Q.    And why not?
19      A.    As I recall, it was because Guo was
20  insisting on a brute force attack, and we were
21  telling him that's an unprofessional way to do
22  it.  It's going to defeat your purpose
23  completely, and they'll just throw up more
24  security and you'll never get what you want.
25  Allow us to do it by another means.
```

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 174

1    Q.    Did there come a time when he just
2   said, do it by brute force.  I don't care what it
3   takes.  Just access that account?
4    A.    Not on that one particularly, but on
5   another one, that's when we told him it was
6   illegal and he got angry.
7    Q.    So Strategic Vision never accessed
8   Anita Suen's CITIC account?
9    A.    No.  If I recall correctly, it was that
10  team 1 reported they went back to access it, and
11  there were other people trying to access that
12  same account.  Guo had said to us on two
13  occasions that he had three or four other teams.
14        Team 1 raised a red flag for me.  Then
15  when I met with the team 1 leader, he explained
16  it.  He said they stopped the activity because
17  they did not want to damage anything that Guo's
18  other teams might be doing.
19   Q.    Where was that meeting with the team 1
20  leader?
21   A.    In Europe.
22   Q.    In which part?
23   A.    It would be in Ireland.  No, pardon me.
24  That one was in the United States.
25   Q.    The team 1 leader was in the

Page 175

1   United States, and you met with him here?
2    A.    Yes, on that occasion.
3    Q.    How many times did you meet with the
4   team 1 leader?
5    A.    I may have to amend this statement
6   later when I see the written transcript because
7   I'm not exactly sure of certain dates.
8        MR. SCHMIDT:  Just do the best you can.
9   Don't speculate.
10       MR. GRENDI:  Yeah, sure.
11   Q.    How many times did you meet with the
12  team 1 leader in connection with this engagement?
13   A.    Maybe eight or ten times.
14   Q.    And some of those meetings were in the
15  United States?
16   A.    Yes.
17   Q.    And some of them were in Ireland?
18   A.    Ireland and Germany.
19   Q.    Anywhere else?
20   A.    No.
21   Q.    So when did those meetings begin?
22   A.    The U.S. ones or the foreign ones?
23   Q.    The first one, wherever it was?
24   A.    The U.S. ones were to arrange the
25  parameters of the -- set the parameters of what

Page 176

1   the job would be.  The European ones -- that was
2   before the contract.  The European ones were to
3   have him deliver the, quote, reports on the USB
4   drives after the contract was signed.
5    Q.    So those are the only two categories of
6   reasons to meet?
7    A.    Was to coordinate the scope of the
8   work, the nature of the work, the verification
9   that the work was being done, and then the work
10  product.
11   Q.    Just going back to this Exhibit 6.
12  What did you do with this information once you
13  got it?
14   A.    I gave it to team 1.
15   Q.    Where was that?
16   A.    That was by USB drive that I handed to
17  team 1 in Washington, D.C. or Arlington,
18  Virginia.
19   Q.    And then did you understand that team 1
20  was going to fly off to Europe to use the data?
21   A.    Yes, immediately.
22   Q.    What date was that?
23   A.    Within 24 hours of receiving the USB
24  drive.
25   Q.    So on or around January 9th,

Page 177

1   January 10th?
2    A.    Roughly.  It was very rapid.
3    Q.    Was the leader of team 1 like on
4   standby, kind of waiting to get the information
5   in the United States --
6    A.    Yes.
7    Q.    -- so that he could --
8    A.    Pardon me.  I didn't mean to intrude.
9        MR. SCHMIDT:  Let him finish the
10  question even if you know where it's going.
11       THE WITNESS:  Okay.
12   Q.    Looking at this document.  Did you
13  review it after receiving it to verify the
14  contents?
15   A.    Yes.  We printed it out to be able to
16  look at it, write it up, make sure we understood
17  what was in it, what things meant, what certain
18  of the relations were, and then to -- and what
19  certain of the documentation was that was
20  displayed in them.
21   Q.    So when you first reviewed it, did you
22  have any reason to think the information included
23  was inaccurate or wrong?
24   A.    No.
25   Q.    You kind of indicated earlier that you

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 178

1  thought some of the information was wrong.  Can
2  you please -- you don't have to say their names,
3  but just point to the numbered individuals where
4  you think that applies?
5        A.    I can't point to them off the top of my
6  head, but there were two data points here.  First
7  was from team 1 that said that they were -- they
8  found two and possibly three that were wrong.
9  And then Lianchao said that three and possibly
10 four were wrong.
11       Q.    So one of the issues you encountered
12 you're saying is that the information provided
13 was what, inaccurate?  Or what did the leader of
14 team 1 tell you?
15       A.    The leader of team 1 said that at least
16 one of the names was misspelled in Mandarin, and
17 since there were various transliterations of the
18 names in English, they needed the accurate
19 transliteration.  Then they suspected that others
20 were simply false people, false persona.
21       Q.    What do you mean by that?  That they
22 were not real people or they were fake documents?
23 What does that mean?
24       A.    Team 1 suspected that they were not
25 real people.  They were false identities for the

Page 179

1  purposes of laundering money or committing other
2  illegal activity.
3        Q.    In other words, if I remember from the
4  "Shawshank Redemption," it's a fake person.
5  Someone who doesn't even exist?
6        A.    Yeah, that's the way we understood it.
7        Q.    Were there any other issues with the
8  list of fish here?
9        A.    For team 1?
10       Q.    Yeah.
11       A.    We found that some of the documents
12 that are displayed here were themselves false.
13       Q.    What do you mean by that?  That they
14 were forgeries?
15       A.    Yes.  The Canadian passport of one of
16 the individuals was a forgery.
17       Q.    Anything else you can remember about
18 what you've described as fake documents?
19       A.    Not from team 1.  From team 2 we found
20 some more American passports that were forgeries.
21       Q.    Let's describe that.  Team 2 -- who ran
22 team 2?
23       A.    That was the ASOG, A-S-O-G, in Texas.
24       Q.    When did you give this information to
25 ASOG?

Page 180

1        A.    In the first week in February, right
2  after Yvette instructed us to find a different
3  means of getting data.
4        Q.    So what did they report to you was a
5  problem with the list of fish?
6        A.    They said there were many problems with
7  this list of fish.  First, that there were
8  several passports that were false, and they
9  suspected they had been forged from a Chinese
10 infiltration of a passport office in Texas.
11       They found -- the most important thing
12 they found was that all of the main 15 names had
13 been designated by federal authorities as records
14 protected, and that it was a crime to try to get
15 their records, because these individuals were
16 somehow either the subject of an active U.S.
17 criminal or counterintelligence investigation or
18 were Chinese nationals collaborating with the
19 U.S. authorities.
20       Q.    Okay.  So what does "records protected"
21 mean to you?
22       A.    The way we were told by the research
23 team was -- and by others when we looked at it, I
24 had not heard the term before -- that any records
25 pertaining -- any official records pertaining to

Page 181

1  those individuals were protected by the
2  U.S. government.  Meaning you could not go to,
3  say, the state of California contact to get their
4  driver's license number.  That would be a crime.
5        Q.    How would a person know that it was a
6  crime?
7        A.    You don't know unless you know whose
8  record is protected.
9        Q.    Right.
10       A.    We didn't know, so we had no idea.  So
11 we related this to Guo, hey, this is a crime to
12 do it.  Let's figure out something else or get
13 another list of fish.
14       Q.    I want to go back there.  You're saying
15 that these people have information that's in the
16 public domain that you could otherwise, if they
17 weren't records-protected, access?
18       A.    Or they're in the semipublic domain.
19       Q.    Okay.  Something that a regular
20 investigator could find if they use databases or
21 other sources to get that information?
22       A.    Right.  Some of these are protected,
23 meaning they're not officially accessible, but if
24 you have a contact in the system, you can ask
25 them and they'll run a check for you.  So you

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 182

1  can't necessarily mine the data by computer
2  yourself.
3      Q.   Right.  So how would a person know that
4  a particular individual was records-protected?
5      A.   That's where the ASOG group came in
6  because these were people who had U.S. government
7  clearances and who worked with people on the
8  inside, and as they were researching each
9  individual, they found each and every one was
10  records-protected.
11     Q.   So ASOG described this to you?
12     A.   Yes.
13     Q.   Did you hear this through French?
14     A.   French and I both went to the Dallas
15  area to meet with them twice.
16     Q.   Who was it at ASOG that told you this
17  information?
18     A.   It was a group.  It was the CEO Adam
19  Kraft, with a K, and it was the CFO who was
20  there, Russell -- his last name began with an
21  R -- and the investigators themselves, the actual
22  computer guys.
23     Q.   So they said we can't get information
24  about these 15 people in the United States
25  because they're records protected?

Page 183

1      A.   Yes.
2      Q.   Did the records protection prevent
3  Strategic Vision from getting information about
4  these individuals outside of the United States?
5      A.   Well, this was the question because the
6  ASOG people said they think that, judging by this
7  type of search, they think that Miles Kwok is a
8  double agent for the Chinese government, or is
9  representing a different faction of the Chinese
10  secret service, or is involved in criminal
11  activity, so it was a big red flag.
12          We went back to -- by this time -- this
13  was in February, so it was after Yvette had told
14  us to only communicate with Lianchao, and so we
15  told Lianchao then asked for guidance.
16     Q.   So you didn't find out about this
17  record protection issue until after you had
18  delivered the 80 gigabytes of data on about
19  January 30th?
20     A.   That's correct.
21     Q.   Can you just describe exactly what the
22  ASOG folks encountered that tipped them off about
23  this records protection issue?
24     A.   Yes.  That every single person on the
25  list, all 15 of them all had the same designation

Page 184

1  by the federal government.  So 100 percent of the
2  15 were records-protected.
3      Q.   So you're saying there's a database
4  where the federal government has a list of people
5  who are records-protected?
6      A.   I don't know how that works.  All I
7  know is that they would do research on, let's
8  say, person number 1 and come back with a reply
9  from someone in the federal system, this person's
10  records-protected.  Okay, how about person number
11  2?  The same thing, and so on.  So I don't know
12  if they did it by iteration or there's a
13  database.
14     Q.   Did ASOG give you any documentation
15  about this records-protected designation that
16  they told you about?
17     A.   No.
18     Q.   It was just conveyed orally that each
19  and every one of the people on this list is,
20  quote-unquote, "records-protected"?
21     A.   Yes.  These are vetted cleared people
22  with active security clearances, so I had no
23  reason to doubt them.
24     Q.   Cleared with whom?
25     A.   Whatever federal agencies that they

Page 185

1  either had worked with or were working with.
2      Q.   Was it your understanding that the
3  folks at ASOG worked for the federal government
4  directly?
5      A.   They had had -- so when you work for
6  the federal government and then you go into the
7  private sector, you can still have an active
8  clearance, so it was that type of a relationship
9  that they had.
10     Q.   So folks at ASOG were all in the
11  private sector now?
12     A.   Yes.
13     Q.   But they still had security clearance
14  with the federal government?
15     A.   That was my understanding, yes.
16     Q.   So they could see like classified
17  documents?
18     A.   Or they could talk to people who were
19  cleared.  It doesn't necessarily work that way,
20  but they could communicate with people in the
21  system who were cleared and say, hey, we want a
22  run on this person.  What do you have?  And that
23  person would come back and say sorry, that's an
24  RP, records protected.
25     Q.   So after you dispatched team 1 to

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 186

1  Europe, how did you monitor the research process,
2  if at all?
3      A.    I would meet with the team 1 leader
4  approximately every week during the beginning of
5  the contract.
6      Q.    Let's see if you remember.  What was
7  the first monitoring meeting you had with the
8  team 1 leader after the contract was signed?
9      A.    It was between January 17th and
10  January 20th, if I recall correct.
11      Q.    Just going back to this information in
12  Exhibit 6.  Was this more information than you
13  normally get when you start an investigation
14  project?
15      A.    This was very specific, and Guo
16  explained the meaning of it.  It was more in the
17  sense that Guo said he paid a quarter of a
18  billion dollars for this file that we have here
19  as Waller 6.  He paid $250 million, so he said.
20      Q.    Did you believe that statement?
21      A.    No.
22      Q.    You think maybe there was a translation
23  issue there?
24      A.    No, there was not.  I said, "Billion or
25  million?"  I couldn't believe it.  Guo insisted.

Page 187

1  Lianchao later said, "He likes to exaggerate."
2      Q.    The information in here includes dates
3  of birth --
4      A.    Right.
5      Q.    -- ID numbers, locations, passport
6  numbers, is that right?
7      A.    Yes.
8      Q.    Is that more information than Strategic
9  Vision or you usually start with when you begin
10  an investigation?
11      A.    I can't speak for Strategic Vision, but
12  speaking personally it depends on the case.  It
13  depends on the nature of the information that we
14  get.  Sometimes it's even more specific.
15      Q.    Is this sort of information helpful in
16  terms of jump-starting or accelerating an
17  investigation?
18          MR. SCHMIDT:  Objection.
19      A.    You can't start an investigation
20  without a starting point.  This was the starting
21  point.
22      Q.    I'm saying have you ever started an
23  investigation just with someone's name?
24      A.    You need more than just a name,
25  generally.

Page 188

1      Q.    What's kind of the bare minimum
2  starting point?
3      A.    Place of work or residence, nationality
4  even.
5      Q.    So there's more than that kind of
6  information in here, right?
7      A.    Yes.
8      Q.    But it's not the most information you
9  were ever given?
10      A.    Oh, no, I've had far more detailed
11  information.
12      Q.    Did you get any more information about
13  how Eastern Profit or Mr. Guo acquired this list
14  of names and information?
15      A.    Guo told us that he had it done
16  himself.  He commissioned it all himself through
17  years of work through other research companies
18  worldwide.
19      Q.    So peers or competitors of Strategic
20  Vision or yourself?
21      A.    Yeah, yeah.  But also my suspicion was
22  that he also got this information from the
23  Communist Chinese secret police because of the
24  nature of how some of it is so specific in China;
25  like passports, for example.

Page 189

1      Q.    Regarding the research, what was your
2  understanding of why Eastern and Mr. Guo or
3  whoever wanted this information?
4      A.    He wanted it to tear apart the Chinese
5  Communist Party leadership.
6      Q.    So was it your understanding that, once
7  he got the research information from Strategic
8  Vision or you, that he would then publicize or
9  otherwise disseminate that information?
10      A.    Yes.
11      Q.    I just want to look at Strategic Vision
12  175.
13          MR. SCHMIDT:  You have to look at the
14  lower right-hand corner.
15      A.    Okay.
16      Q.    It looks like there was a Post-it note
17  on this document.  Do you see that?
18      A.    Yes.
19      Q.    Whose handwriting is on that Post-it
20  note?
21      A.    It looks like French Wallop's
22  handwriting.
23      Q.    That's not your handwriting?
24      A.    No.  I have not seen this before.  I
25  have not seen the Post-it note before.

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 190

1    Q.    If you flip through the document, it
2  looks like there's handwritten notes kind of
3  interspersed throughout it?
4    A.    Yes.
5    Q.    And maybe items that are circled?
6    A.    Yes.
7    Q.    You didn't do any of those markings or
8  notes?
9    A.    No, I have not seen this before.
10   Q.    Let's look at 177.  Again, it looks
11  like there was a Post-it note or something
12  affixed on top of the document before it was
13  photocopied.  Do you see that?
14   A.    Yes.
15   Q.    Again, whose handwriting is that?
16   A.    It looks like French Wallop's
17  handwriting.
18   Q.    Did French tell you that she printed
19  out a copy of the list of fish and kind of put
20  notes and comments on it?
21   A.    Yes, yes.
22   Q.    She told you she did that or that's
23  what you think happened, I just want to be clear?
24   A.    I did it.  I printed them out
25  physically, one for her and one for me to work

Page 191

1  from.
2    Q.    I see.  Did you mark up and make
3  comments and notes on another version of this
4  document?
5    A.    No.
6    Q.    What did you do with your copy of it?
7    A.    I retained it.
8    Q.    You gave an electronic copy to team
9  leader 1?
10   A.    Yes.
11   Q.    And the folks at ASOG eventually?
12   A.    Yes.
13   Q.    Did you ever tell Mr. Guo that you like
14  him and trust him and think his work is great?
15   A.    I told him I liked him and I admired
16  his work.
17   Q.    When was that?
18   A.    I said -- we both said, let's build a
19  relationship of trust.  Neither one of us said we
20  trusted each other.
21   Q.    When was that discussion?
22   A.    I think it was the first time we met.
23  It was the time we met, actually.  Well, no, it
24  was not because he -- it was the first time we
25  met.  Words to that effect were said each of the

Page 192

1  times that we met in person.  The last time we
2  met it wasn't so trusting.
3    Q.    Cordial?
4    A.    But at the end, he gave me a huge hug
5  and said, "Let's work to trust each other."
6    Q.    So going back to your updates with the
7  leader of team 1.  What was the information you
8  got after the first update meeting with the
9  leader of team 1?
10   A.    So that was on a USB thumb drive, and
11  it consisted of files for most, if not all, of
12  the 15, quote, "fish."  It was the basic data
13  that the research team was using to orient
14  themselves to understand who they were
15  researching and some very preliminary
16  information.
17   Q.    Where was that meeting?  Where did that
18  take place, if you recall?
19   A.    I think it was Arlington, Virginia.
20   Q.    So the team leader had flown back after
21  going to Europe to update you on the research?
22   A.    Yes.
23   Q.    Was there any indication there was a
24  problem after that first meeting in terms of
25  getting the research done?

Page 193

1    A.    No.
2    Q.    Was there ever that internal
3  miscommunication that delayed the progress of the
4  investigation?
5        MR. SCHMIDT:  Objection.  You can go
6  ahead.
7    A.    There were several.
8    Q.    Let me break it down.  Was there ever
9  miscommunication between you and the leader of
10  team 1?
11   A.    No.
12   Q.    Was there ever a miscommunication
13  between you and French Wallop?
14       MR. SCHMIDT:  Objection.
15   A.    No, not that I can think of, no, no.
16   Q.    What did you do with the information
17  you received from the first -- let's call it --
18  follow-up meeting with the leader of team 1?  You
19  said you received a USB?
20   A.    Right, and we delivered it to Guo.
21   Q.    When was that delivery?
22   A.    Within a day or two of getting it, in
23  early January, mid-January.
24   Q.    Who did the delivery?
25   A.    The team 1 leader brought it to me, and

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 194

1  then if memory serves, I gave it to French, and I
2  don't remember whether I physically, I or French
3  physically gave it to Yvette.
4       Q.    So you don't know if the information
5  you received from the leader of team 1 in, as you
6  described it, early to mid-January was ever
7  actually conveyed to Yvette?
8       A.    Oh, yes, I did.
9       Q.    How do you know?
10      A.    Because Yvette came back and said,
11 "It's junk," and Guo actually complained about it
12 in person when we met him.
13      Q.    Between the execution of the contract
14 and when you were told that this information was
15 junk, how many meetings did you have with the
16 leader of team 1?
17      A.    It depends on when Guo said, "It's
18 junk," because he or Yvette said that
19 successively.
20      Q.    How about January 30th?  Between
21 January 6th and January 30, 2018, how many times
22 did you meet with the leader of team 1?
23      A.    Two or three.
24      Q.    Did you receive a USB drive from the
25 leader of team 1 at each of those meetings?

Page 195

1       A.    Yes.
2       Q.    So each time you met with him, you got
3  a USB?
4       A.    I got two drives from those two or
5  three meetings.
6       Q.    Okay.  Did the leader of team 1 tell
7  you there was any problem conducting the
8  research?
9       A.    No problems that were not standard.
10 Meaning you have -- it takes time to get into a
11 system and a minimum of six days for certain
12 procedures.  And we had told Guo this in the
13 beginning with the screenshot of that CITIC
14 server document.
15      Q.    So to your mind, this was a standard
16 investigation that was going as planned?
17      A.    Yes.
18      Q.    Did you ever tell Eastern or Mr. Guo or
19 Yvette that there were problems with the
20 investigation?
21      A.    No.  Challenges, but not problems.
22      Q.    What were the challenges?
23      A.    To explain to them why it takes so long
24 to get the data that they're requesting.  It
25 can't be turned around in days or even weeks.

Page 196

1  That was the purpose of the progress reports.
2       Q.    Do you think that Mr. Guo, Yvette, and
3  Lianchao had a misunderstanding about how easy it
4  would be to access the research information?
5       MR. SCHMIDT:  Objection.  You can
6  answer.
7       A.    I think in retrospect, Guo thought we
8  could simply pay off some crooked intelligence
9  officers here and get illegally obtained
10 information.
11      Q.    Why would he think that?  Why do you
12 think he thinks that?
13      A.    Because that's how you do it in China.
14 Second, it's physically impossible to -- even for
15 the NSA to dig out this information in the short
16 timeframe that Guo ended up seeking to expect.
17 It's mathematically impossible.
18      MS. TESKE:  Can we take a short break?
19      MR. GRENDI:  Let's take one.
20      THE VIDEOGRAPHER:  Off the record at
21 3:06.
22      (Whereupon, a short recess was taken.)
23      THE VIDEOGRAPHER:  We are now back on
24 the record at 3:16.
25      Q.    Did Strategic Vision ever deliver any

Page 197

1  reports under the agreement?
2       A.    Yes.
3       Q.    When was that?
4       A.    Every time we delivered a USB drive and
5  several times verbally.
6       Q.    Why don't you tell me about the times
7  that you believe you delivered a report to
8  Eastern?
9       MR. SCHMIDT:  Objection.
10      Q.    Let me put it this way.  Please tell me
11 about the first time you were present when a
12 report was delivered.
13      A.    I delivered them myself.
14      Q.    All the reports?
15      A.    Yes.
16      Q.    Okay.  When was the first report that
17 you delivered?
18      A.    The first were verbal progress reports
19 about the nature of the setup of the work,
20 immediately following signing of the contract.
21      Q.    So the first one, who did you convey
22 the report to?
23      A.    To -- that would have been to Yvette.
24      Q.    What was the date of that?
25      A.    I don't recall the date.

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 198

1    Q.    Roughly speaking?
2    A.    It was -- I don't recall the date.  It
3 was simply a status report on the progress, and
4 they were verbal.
5    Q.    Who else was present?
6    A.    French would have been present.
7    Q.    Anyone else?
8    A.    Not that I recall.
9    Q.    So it was you, French and Yvette --
10   A.    As I recall.
11   Q.    -- had a discussion that you think was
12 the first report?
13   A.    I know it was the first report.
14   Q.    Where did that occur?
15   A.    I don't remember.  It was -- I don't
16 recall.
17   Q.    What information was conveyed to
18 Yvette?
19   A.    The status of setting up team 1.
20   Q.    Anything else?
21   A.    No.
22   Q.    So it would have been after, let's say,
23 January 9th or 10th?
24   A.    Yeah, I would say the week, within that
25 week.

Page 199

1    Q.    Is there a date you could think of that
2 it was definitely before, had to have been before
3 X date?
4    A.    I can't give you a reasonable date.  It
5 was before -- well, no.  It was within a week of
6 signing the contract.
7    Q.    Was it in New York perhaps?
8    A.    I would have to check my travel
9 records.  I don't know where it was.  Or it could
10 have been simply -- I don't know.  I don't want
11 to say what it could have been.  I don't recall
12 the exact time.
13   Q.    Do you keep detailed travel records?
14   A.    Not detailed ones.
15   Q.    Do you keep travel records?
16   A.    Sometimes.
17   Q.    Like the flights that you take or maybe
18 when you take a train?
19   A.    Or sometimes I travel in ways that are
20 not traceable.  Remember, this is a contract.
21   Q.    Such as?
22   A.    You're trying to avoid the Chinese
23 intelligence service, so you're not going to keep
24 lawyerly notes of everything.
25   Q.    I wasn't expecting you to.  I'm just

Page 200

1 asking what you did or didn't do, that's all.
2         What about the second time you
3 delivered a report?  When was that?
4    A.    It was within, within a week of the
5 first one, approximately, and it was a very small
6 amount.
7    Q.    What, of data?
8    A.    Of data, yes.  So the verbal ones, and
9 there's constant verbal communication, but the
10 first report on a USB drive was roughly around
11 the 22nd, roughly.
12   Q.    I just want to break down what you mean
13 by "verbal."  Does a Signal message constitute in
14 your mind like a verbal report or do you mean
15 literally face-to-face?
16   A.    Face-to-face.  If it's done verbally on
17 Signal, that would count.  If it's simply how is
18 progress doing, here's what we're doing now.
19 This is the status report.
20        MR. SCHMIDT:  When you say "verbal,"
21   you mean an oral conversation as opposed to
22   a written or an electronic communication --
23   A.    That's correct.
24   Q.    -- right?
25        Were any of the reports a written

Page 201

1 Signal message?
2    A.    I don't recall.
3    Q.    But in your mind, it's possible that
4 you could have conveyed a status report via a
5 Signal message?
6    A.    It's possible.
7    Q.    But you don't recall if you did or
8 didn't do that?
9    A.    No.
10   Q.    I want to talk to you about a meeting
11 that I think occurred on January 26, 2018.  Did
12 there come a time when you met with French,
13 Yvette, and Mr. Guo at the Pierre on or about
14 January 26th?
15   A.    At the Pierre.
16   A.    I believe it's a hotel or apartment
17 complex.
18   A.    It was at Netherland's, something
19 Netherland's.
20   Q.    Sherry-Netherlands?
21   A.    Sherry-Netherlands.  That's where he
22 lived.  We met once in the first floor
23 restaurant.  That might have been the Pierre.  I
24 don't know if that's the name of it.
25   Q.    But you do recall a meeting on or about

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 202

1  January 26th?
2      A.    Yes.
3      Q.    Is that when you delivered this first
4  bit of USB data?
5      A.    Yes, I think.
6      Q.    Okay.  What was on that USB drive?
7      A.    It consisted of files containing most,
8  if not all, of the 15 main, quote, "fish," and
9  then some of the work, the demonstration of the
10  work that the researchers did so that they could
11  understand their targets, and then some very
12  basic interim electronic files that were attached
13  to them, that were attached to some of them.
14      Q.    Did you present the information on a
15  laptop or did you just hand over the disk and
16  say, here you go?
17      A.    I handed it over to him -- I think at
18  that point, I just handed it to him.
19      Q.    So there was no discussion about what
20  was actually there by looking at the data?
21      A.    Yes.  I said I mentioned in advance, and
22  then I explained it to Guo personally.
23      Q.    Was there ever a meeting where you
24  plugged a USB drive into a laptop to show Mr. Guo
25  or Yvette what research was being conducted?

Page 203

1      A.    The one I recall was at Penn Station at
2  a restaurant there on or around January 30th to
3  Yvette and a male companion of hers.
4      Q.    That's the only time you can remember
5  presenting information to Mr. Guo or Yvette on a
6  computer?
7      A.    That's the only one I recall because
8  he's very strict about computers in his
9  residence.
10      Q.    So going back to the meeting you were
11  just talking about.  On January 26, 2018, you
12  just kind of handed over a USB drive?
13      A.    I believe so.
14      Q.    Did Mr. Guo or Yvette put that into a
15  computer and look at it then?
16      A.    Actually, that was the one time when --
17  let me remember.  I'm not sure.
18      Q.    So you don't know if they reviewed the
19  data right then and there or if you guys left
20  after just handing over the disk?
21      A.    No, we stayed and we spent a few hours
22  with him.
23      Q.    Did you eat Chinese food at that
24  meeting?
25      A.    We always ate Chinese food with him.

Page 204

1      Q.    You recall eating a meal at that
2  meeting, though?
3      A.    Yes.
4      Q.    You said you met for about three hours?
5      A.    For a few hours.
6      Q.    A few hours, I'm sorry.
7            What was discussed?
8      A.    The --
9      Q.    I'm talking about the January 26, 2018
10  meeting.
11      A.    The nature of the information.  He
12  thought about it, then he got very upset when he
13  wasn't getting the quantity of information that
14  he wanted.  We explained to him again the
15  technology, the way we were -- the technical
16  means.  He didn't want to hear it.  He just said,
17  "I want it.  I want it now."
18      Q.    Do you recall Mr. Guo perhaps sitting
19  on a desk during this meeting or anything about
20  just the way the parties were situated as they
21  were discussing it?
22      A.    This was in his residence.  We would
23  sit in the living room.  He had his own chair,
24  and then we talked in the dining room over lunch.
25      Q.    When did he express what you described

Page 205

1  as disappointment and frustration?
2      A.    At that -- at that -- after being told
3  what was there.  And then he was quiet, and he
4  was very cordial, and then he exploded.
5      Q.    And what did he say when he, as you put
6  it, "he exploded"?
7      A.    He was attacking the integrity of the
8  project, questioning our motives, saying that
9  "This is all junk.  This is all garbage."  Then
10  he left the room, stomped around the house a
11  while, and then came back, and then sort of
12  stared me down.  Then I apologized to him for not
13  being able to produce the results, but this is
14  the way we did it.  This is the way we agreed to
15  do it, and this is the speed that I told you with
16  which we were going to get these results.  He was
17  still very angry, but he calmed down.
18      Q.    Did he explain to you --
19      A.    It was at that time --
20      Q.    Go ahead.
21      A.    No, please.
22      Q.    Did he explain to you why he wanted
23  information so promptly?
24      A.    No.
25      Q.    Did you ever come to understand why

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 206

1 there was a need for information promptly?
2    A.    No, because he would alternate between
3 saying he wanted this for a long-term political
4 attack and then he wanted it now.  We could never
5 reconcile that.
6    Q.    So after this confrontation, what
7 happened next during this meeting?
8    A.    During this meeting he was very
9 agitated, and after he calmed down, that's when
10 he saw us to his door, to the elevator and gave
11 me a big hug and said, "Let's just work this out
12 and work on it.  Let's work to trust each other."
13    Q.    Did you promise to deliver any
14 information subsequent to that meeting to placate
15 or otherwise please?
16    A.    Yes.  Well, first at that meeting, I
17 said, "Look, I know you're upset.  Why don't we
18 just write off the first two months of this and
19 have the contract start effectively on the 15th
20 of January?  That way, you don't" --
21    MR. SCHMIDT:  -- two --
22    MR. GRENDI:  Excuse me.  Don't
23    interrupt the witness during the middle of
24    testimony.
25    A.    So we essentially moved the start date

Page 207

1 to the 15th of January so that he wouldn't be
2 paying for the first two weeks.  He was satisfied
3 with that and grateful for it.
4    Q.    Why was it that you offered to give the
5 first two weeks for free?
6    A.    Because he was very agitated, and he
7 thought he was getting -- he was very agitated
8 and very angry, and he's a brand-new client that
9 we want to keep.  So you eat part of the cost to
10 keep the client.
11    Q.    So in your mind there wasn't any
12 problem with the start of the research or getting
13 it going that required you to write off two
14 weeks?
15    A.    No, there was no problem.
16    Q.    But the reason that you're saying is
17 that you wrote off that time is because the
18 client was upset?
19    A.    Yes.
20    Q.    Did he accept that offer?
21    A.    Yes.
22    Q.    He said, Okay.  All's well.  As long as
23 I get two weeks free, fine?
24    A.    Yes.
25    Q.    He said those words?

Page 208

1    A.    Words to that effect.
2    Q.    And Lianchao wasn't at that meeting,
3 right?
4    A.    No, just Yvette and French Wallop.
5    Q.    Do you know why Lianchao wasn't there?
6    A.    No.
7    Q.    Before you were saying that -- sorry.
8 Before you were saying you agreed to give him
9 data after this January 26th meeting?
10    I'm sorry, you have to answer verbally.
11    A.    I thought you were continuing the
12 question.
13    Q.    You were shaking your head, so I was
14 confused.
15    A.    Oh, it was sort of like go ahead.  So
16 what was the question?
17    Q.    The question is did you promise to give
18 Mr. Guo Eastern information after this
19 January 26, 2018 meeting?
20    A.    Yes.
21    Q.    What did you promise to give him?
22    A.    The next tranche of electronic
23 information via USB drive from team 1.
24    Q.    And did you understand that you were
25 going to give that information on kind of an

Page 209

1 accelerated basis?
2    A.    Yes.
3    Q.    Why is that?
4    A.    Because he was so impatient.
5    Q.    What did you tell him that information
6 would contain?
7    A.    I said, "It's not going to have a lot
8 of new material because it's still just starting
9 out."  He said, "I don't care.  I just want
10 whatever they have."
11    Q.    Why did you apologize to Mr. Guo at
12 this meeting?
13    A.    There is the Asian tradition of losing
14 face, and I didn't want him to feel like he was
15 losing face when I continued to tell him that his
16 demands were not possible, as we had already
17 discussed.
18    Q.    So you were just trying to placate him?
19    A.    Placate the client.
20    Q.    But you weren't actually sorry about
21 anything?
22    A.    I was sorry that he was disappointed,
23 yes.  I did not apologize for the work or the
24 quality of the work or the delays.  I apologized
25 for the fact that he was disappointed.

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 210

1    Q.    I understand.  Did you tell them that
2  you were going to fly to Europe to get the next
3  tranche of information?
4    A.    Yes.
5    Q.    And did you?
6    A.    Yes.
7    Q.    When was that?
8    A.    Within a couple of days.  I think it
9  was the 29th.
10   Q.    That you flew to Europe?
11   A.    Yes.
12   Q.    And then did you fly right back?
13   A.    Yes, the same day.
14   Q.    What country was that?
15   A.    I went to Ireland first, and then while
16  in Ireland, I booked a flight to Germany just so
17  that I would not have a preexisting flight to
18  Germany, to Frankfurt.  I met the contact in
19  Frankfurt.
20   Q.    Oh, i see.  So you flew to Ireland, and
21  then you booked a flight to Germany to meet the
22  leader of team 1?
23   A.    Yes.
24   Q.    That travel plan that you just
25  described is to avoid people knowing your

Page 211

1  itinerary?
2    A.    Right.
3    Q.    So then you met the leader of team 1 in
4  Germany on or about the 29th?
5    A.    I think it was the 30th.
6    Q.    Then you flew right back to the
7  United States?
8    A.    Yes.
9    Q.    What did you do next?
10   A.    Then I delivered the material to Yvette
11  at Penn Station.
12   Q.    Was that at Tracks Bar?
13   A.    Sounds right.
14   Q.    That was about 80 gigabytes of data or
15  thereabouts?
16   A.    Yes.
17   Q.    Did you even have a chance to review
18  that information?
19   A.    It was code.  I was told in advance
20  what it was.  Team 1 said it's only 80 gigs of
21  data of which 16 lines of code are important.  I
22  told this to Yvette before traveling.  She said,
23  "I don't care.  Bring it back anyway."
24   Q.    Just describe the meeting where you
25  handed the 80 gigabytes of data to Yvette.

Page 212

1    A.    I came in from Newark Airport by rail
2  to Penn Station, met her at that restaurant with
3  her male companion.  She and I sat next to each
4  other.  I used a virgin computer, meaning one
5  that had never been on the internet or had never
6  been used for anything besides my drives, and
7  scrolled through the information with her on the
8  screen.
9    Q.    This was in like the booth of the
10  restaurant?
11   A.    Yes.
12   Q.    What did you explain to her as you were
13  doing that?
14   A.    I said, "This is just as we reported.
15  There are 16 useful lines of code in here."
16        MR. GRENDI:  Let's do Exhibit 7.
17        (Waller Exhibit 7, Background Report on
18  Qing Yao, marked for identification.)
19   Q.    Just looking at the first page, do you
20  recognize this document?
21   A.    No.
22   Q.    Do you know whether or not this
23  information was in the 80 gigabytes of data?
24   A.    No.
25   Q.    And you never reviewed this report?

Page 213

1    A.    I'm not familiar with this report.  You
2  just said, "Look at the first page."
3    Q.    If you want to take a look through for
4  more to see if you know it, go ahead.
5    A.    I don't recognize this document.
6    Q.    So you don't know who created it?
7    A.    No.
8    Q.    Going back to that 80-gigabyte drive.
9  Did you on your flight back have a chance to
10  review it or look at any of the data?
11   A.    No.
12   Q.    Is that because you didn't have a
13  laptop with you?
14   A.    You don't -- computers on planes are
15  not secure.
16   Q.    And you didn't have any time in Germany
17  before your flight home to look at the data?
18   A.    No.  The team 1 leader explained to me
19  what the data contained.  If it's 80 gigabytes of
20  code and only 16 lines are useful, you only need
21  to know what's on those 16 lines.  Those 16 lines
22  were the email addresses and encrypted passwords
23  of several people on Guo's target list.
24   Q.    So the team had been able to obtain the
25  email address and passwords for some of the

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 214

1 members or some of the individuals listed in the
2 Exhibit 6?
3       A.   Yes.  The encrypted passwords, not the
4 passwords themselves.
5       Q.   What is the difference?
6       A.   It shows -- the encrypted password
7 shows the characters that aren't the characters
8 of the password.  So it's so-and-so@yahoo.com and
9 then a series of characters that are the
10 encrypted password.
11      Q.   What use is that information from an
12 investigation perspective?
13      A.   It gives you the email address and the
14 fact that there is a password that's decryptable.
15 It's within the code.  It's just a question of
16 mathematically decrypting it.
17      Q.   I see.  So the information provided
18 could show that there is a path to getting the
19 password of the individual fish?
20      A.   Yes.
21      Q.   And that through that, other
22 information could come?
23      A.   Yes.
24           MR. GRENDI:  Let's do 8.
25           (Waller Exhibit 8, Letter dated

Page 215

1           February 23, 2018, marked for
2           identification.)
3       Q.   Mr. Waller, do you recognize this
4 letter?
5       A.   Yes.
6       Q.   Just going back to the 80-gigabyte
7 drive we were talking about earlier.  Did you
8 give that information to Ms. Wallop before giving
9 it to Mrs. Wang?
10      A.   No.
11      Q.   So she never saw that information on
12 January 29th or January 30th?
13      A.   No.
14      Q.   Did there come a time when you reviewed
15 that information with Ms. Wallop?
16      A.   No.
17      Q.   Just turning back to 8 here.  When did
18 you first see this letter?
19      A.   On February 23, 2018.
20      Q.   How did you get it?
21      A.   I got it in a Signal text message from
22 Yvette.
23      Q.   Were you surprised by this letter?
24      A.   Yes.
25      Q.   Why is that?

Page 216

1       A.   Because we were working with Lianchao
2 to execute the contract and had not been in
3 contact at all with Yvette since February 1st
4 when she told us not to communicate with her, but
5 to communicate only with Lianchao.  So we had no
6 idea that anything representing a lawsuit was
7 ever under consideration.
8       Q.   After you started communicating
9 exclusively with Lianchao about this contract,
10 what other reports did you deliver?
11      A.   There was a third electronic thumb
12 drive and then verbal communication with
13 Lianchao.  By this time, Lianchao was saying that
14 Guo was very dissatisfied and for us to not
15 worry.  He's working on it.
16      Q.   I just want to understand the last
17 thing you said there.  Not to worry and you're
18 working on it, who are you talking about there?
19      A.   Lianchao said, "Guo is dissatisfied,
20 but no worries.  I'm working with him on it."  I,
21 Lianchao, am working with Guo on it.
22      Q.   What did the third USB drive that you
23 delivered contain?
24      A.   It contained more data, more extensive
25 data.

Page 217

1       Q.   How did you deliver that?
2       A.   By hand.
3       Q.   To whom?
4       A.   To Lianchao.
5       Q.   Did you ever discuss that third
6 delivery with Mr. Guo or anyone from Eastern?
7       A.   No, because Lianchao was Guo's agent
8 and our sole interlocutor.
9       Q.   At that time?
10      A.   Right.  Varying back and forth with
11 Yvette.  But per Yvette's February 1st
12 instruction she said New York -- or whatever
13 euphemism she used -- now wants you to talk only
14 to a euphemism for Lianchao.  That's in the
15 February 1st Signal communication.
16      Q.   So what was the response to this third
17 delivery you're describing?
18      A.   He just accepted it and said he would
19 relay it.
20      Q.   Did you get any feedback?
21      A.   No.
22      Q.   About when was that?
23      A.   I'm guessing roughly February 10th.
24      Q.   Were there any reports that you
25 delivered after February 10th?

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 218

1    A.    No.
2    Q.    When did team 1 --
3    A.    Pardon.  Correction.  No USB reports.
4    We had team 2 reports that we did provide after
5    February 10th.
6    Q.    Who were those provided to?
7    A.    They were provided to French Wallop and
8    me, and then we provided them to Lianchao.
9    Q.    What were the dates of those reports?
10   A.    Roughly within a few days after
11   February 10th.
12   Q.    These weren't USBs, he said, or they
13   were?  I'm sorry, I'm not clear.
14   A.    They were verbal because this was when
15   ASOG said we can't, we can't provide this
16   information because these are all restricted or
17   records-protected persons.
18   Q.    Was Mr. Guo present for you conveying
19   that information?
20   A.    No.
21   Q.    You just told it to Lianchao?
22   A.    Yes.
23   Q.    Was that via a Signal message or just
24   verbally?
25   A.    That was probably just verbally.  If

Page 219

1    it's a Signal message, it would be in that chain.
2    Q.    So you didn't delete any Signal
3    messages between you and Lianchao?
4    A.    I don't believe so.
5    Q.    When did you instruct team 1 and team 2
6    to stop working?
7    A.    Team 2 would not work for us.
8    Q.    When was that?
9    A.    That was when they gave us the
10   information about the RPs.  Now, they did provide
11   us other information which we relayed concerning
12   flights, travel of some of the individuals
13   involved, aircraft tail numbers, other personal
14   data which they showed visually and conveyed
15   verbally but did not physically give us.
16        They did provide a few pages of
17   information but not much.  They had a large file.
18   They presented us with a bill for $111,000 for
19   one week's research.  I said, "Well, if you're
20   not going to do the research, we're not going to
21   pay that bill if you're not going to hand over
22   the research."  So we paid them a very small
23   severance per their instruction that they did not
24   want to work with us.  They immediately suspected
25   that Guo was the client.

Page 220

1    Q.    How much did you pay to ASOG or did
2    Strategic Vision pay to ASOG?
3    A.    I believe $5,000.
4    Q.    So team 2, the all-in cost was $5,000?
5    A.    The final -- it was budgeted at
6    111,000.  They did not provide the information
7    because it was a crime, so they severed the
8    relationship with us.
9    Q.    I see.  When did they sever that
10   relationship?
11   A.    Around mid-February.
12   Q.    What about team 1?
13   A.    Team 1, when it was clear that there
14   was not going to be a payment coming from Guo, I
15   told them that I would appreciate them to work on
16   spec for those who would, but I warned them that
17   there may be a long delay in paying.  So parts of
18   team 1 continued working.
19   Q.    Did there ever come a time when you
20   heard that members of team 1 quit?
21   A.    Yes, they wanted to quit.
22   Q.    I just want to be precise, though.  Did
23   you ever hear that members of team 1 quit?
24   A.    I believe two quit.  The whole team
25   wanted to quit.

Page 221

1    Q.    I see.
2    A.    And then team 2 quit.
3    Q.    When did you find out that two members
4    of team 1 quit?
5    A.    Early on sometime in January.
6    Q.    I see.
7    A.    Sometime in the last two weeks of
8    January.
9    Q.    I take it the leader of team 1 told you
10   that information?
11   A.    Yes.
12   Q.    Did he tell you why they quit?
13   A.    Yes.
14   Q.    What was that?
15   A.    They thought that Miles Kwok was up to
16   organized criminal activity or was working for
17   the Chinese government.
18   Q.    Did you see any information to support
19   that conclusion or hypothesis?
20   A.    No.  That was just what they suspected,
21   and that's why they wanted to leave.  They also
22   complained -- the whole team complained that
23   Guo's security was deplorable because they could
24   see his fingerprints on the data that we provided
25   them, because he had put some of it up on his own

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 222

1   websites. He'd made it public. And because
2   there were other teams out there that were doing
3   the same research on the same targets, which they
4   suspected was part of his group.
5       Q.   But they don't have any way -- did they
6   have any way of knowing that it was definitely
7   Miles's other teams?
8       A.   No. It's just other people doing the
9   same work on the same targets at the same time.
10  Team 1 had asked if there were other teams, and I
11  said Guo had said that there were three or four
12  other teams.
13      Q.   So just when did team 1 finally stop
14  working?
15      A.   On February 23rd.
16      Q.   So as soon as you got this letter, you
17  told them that's it?
18      A.   "Stand down."
19      Q.   How much was paid to team 1?
20      A.   Between 250 and $300,000.
21      Q.   Was that money paid by one of your
22  LLCs?
23      A.   By I believe one of French's LLCs and
24  by one or two of my LLCs.
25      Q.   So you broke up the payments?

Page 223

1       A.   Yes.
2       Q.   And that was to evade detection by the
3   Chinese communists?
4       A.   Yes.
5       Q.   Are you aware of any other costs that
6   were incurred to put together the investigation
7   teams?
8       A.   We incurred our own expenses. We had
9   opportunity costs where we were not doing other
10  work.
11      Q.   Let's go one at a time. How much was
12  the cost of travel, items of that nature?
13      A.   Between French and me?
14      Q.   Yeah.
15      A.   Probably less than $50,000.
16  Approximately $50,000.
17      Q.   Any other hard costs where you actually
18  incurred an expense?
19      A.   Yeah. They were the ordinary expenses
20  of running something in the D.C. area, going to
21  meetings, talking to people, working through our
22  own networks to research, sure.
23      Q.   Right. But I mean something that was
24  actually an out-of-pocket cost?
25      A.   Yes.

Page 224

1       Q.   So you just mean like the travel and
2   meals associated that?
3       A.   No, we'd pay people to investigate. We
4   had other people looking. We wanted to verify
5   that what team 1 was telling us was true or
6   accurate.
7       Q.   So you had contacts and resources that
8   were verifying whether team 1 was doing its job?
9       A.   Verifying whether the techniques that
10  team 1 was using were indeed accurate, after Guo
11  was complaining that it was too slow.
12      Q.   And you were paying those other third
13  parties?
14      A.   Yes.
15      Q.   How much money were you talking about
16  paying to those people essentially verifying
17  team 1?
18      A.   In the low tens of thousands.
19      Q.   Who were those people?
20      A.   Anonymous hackers.
21      Q.   So if they're anonymous, how do you
22  know how to pay them?
23      A.   They set up a way to pay them.
24      Q.   What is that, like a crypto currency?
25      A.   Discreet ways of paying without a paper

Page 225

1   trail.
2       Q.   You're refusing to disclose how you pay
3   them?
4       A.   We paid them in crypto and in cash.
5       Q.   How much money are we talking about?
6       A.   Low tens.
7       Q.   So between 10 and 20?
8       A.   10 and 20, 10 and 25.
9       Q.   How many anonymous hackers did you pay
10  that money to?
11      A.   Two.
12      Q.   Two. Was one paid more than the other
13  or was it about down the line?
14      A.   I don't recall if one did more work.
15      Q.   Any other hard costs that were incurred
16  in connection with this engagement that you're
17  aware of?
18      A.   Of a major nature?
19      Q.   Yeah. If it's not material, I don't
20  need to know about a meal.
21      A.   No, I don't believe so.
22      Q.   I'll just give you a moment to think
23  about it, if there's anything else.
24      A.   I can't think of anything.
25      Q.   Okay.

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 226

```
1           MR. GRENDI:  Let's go to 9.
2           (Waller Exhibit 9, Document Bates
3    stamped SVUS000077, marked for
4    identification.)
5       Q.   Do you recognize this document?
6       A.   Yes.
7       Q.   Looking at that top right-hand corner,
8    there's some handwriting there.  Do you see that?
9       A.   Yes.
10      Q.   Is that your handwriting or someone
11   else's?
12      A.   No, it's someone else's.
13      Q.   Is it French's handwriting?
14      A.   It appears to be.
15      Q.   Did you draft this document?
16      A.   Yes.
17      Q.   Did you draft it alone or did you work
18   with French on it?
19      A.   I worked with French and Lianchao.
20      Q.   When was the first meeting with Guo?
21      A.   I want to say December 9th.  I'm not
22   certain.  I have the train receipt that would
23   mark that date.
24      Q.   Was Bill Gertz at that meeting?
25      A.   No.
```

Page 227

```
1       Q.   So who was there?
2       A.   It was French, Lianchao, Guo, and
3    myself.
4       Q.   Had you prepared this document in
5    advance of that meeting?
6       A.   Yes.
7       Q.   Where did you get the ideas for this
8    "Vision," as it's titled?
9       A.   Through my career of fighting
10   totalitarian dictatorships and helping defectors
11   or others to come up and be a spokesman for the
12   opposition.
13      Q.   Why did you think "Mr. G," as it's
14   titled in this document, would be interested in
15   this suite of services?
16      A.   This was based on our conversations
17   with Lianchao.
18      Q.   I see.  So had Lianchao described to
19   you what Mr. Guo was trying to do?
20      A.   Yes.
21      Q.   Based on those conversations, you
22   created this "Vision" document?
23      A.   Yes.
24      Q.   Is this sort of a Strategic Vision
25   playbook for waging a campaign to topple a, as
```

Page 228

```
1    you described it, "totalitarian regime"?
2       A.   It's not a Strategic Vision one; it's
3    my own.
4       Q.   It's your own?
5       A.   -yes.  And not a playbook; it was
6    designed custom to present to Guo.
7       Q.   So this is based on your analysis and
8    experience?
9       A.   Yeah.
10      Q.   This document?
11      A.   Yes.
12      Q.   What was Mrs. French's involvement with
13   creating this document, if any?
14      A.   Mrs. Wallop, she was part of the
15   discussions leading up to part of the
16   brainstorming with Lianchao to get the ideas
17   together to draw up this plan.
18      Q.   Were these your ideas as to what
19   Mr. Guo should do or did he tell you this is what
20   he wanted to do?
21      A.   He didn't tell us anything at that
22   time.  It was Lianchao who did.  So I combined
23   what he wanted with what I thought would best
24   suit his goals.
25      Q.   Did you give the document to Mr. Guo or
```

Page 229

```
1    Lianchao?
2       A.   Yes, to both of them.
3       Q.   You handed them a paper document?
4       A.   Yes.
5       Q.   But Mr. Guo didn't engage with
6    Strategic Vision or you to provide these
7    services, right?
8       A.   Not in a contractual way.
9       Q.   Let me ask you this.  Is there another
10   agreement between Mr. Guo -- strike that.
11           Did Strategic Vision and Mr. Guo come
12   to an agreement concerning the services in this
13   document?
14      A.   No, he decided just to go with the
15   opposition research.
16      Q.   So everything else in here was kind of
17   scrapped?
18      A.   Yes.
19      Q.   Do you know why Mr. Guo didn't engage
20   with Strategic Vision on these other items?
21      A.   No.
22           MR. GRENDI:  Let's do 10.
23           (Waller Exhibit 10, Document Bates
24   stamped SVUS80, marked for identification.)
25      Q.   Do you recognize this document?
```

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 230

1    A.    Yes.
2    Q.    This is the first document.  It's Bates
3  stamped SV80.
4          Did you draft this document as well?
5    A.    Yes.
6    Q.    What was this document drafted for?
7    A.    This was a follow onto the previous
8  document, Waller 9, after we met with -- after
9  the first meeting with Guo.  So we then took
10  what -- our takeaways from our discussion with
11  him for further ones with Lianchao, and then I
12  wrote this three-year timeline to show Guo on our
13  second meeting.
14    Q.    And when was that second meeting?
15    A.    Mid-December.
16    Q.    That was, again, with you, French,
17  Lianchao and Mr. Guo?
18    A.    Yes, at his residence.
19    Q.    In New York?
20    A.    Yes.
21    Q.    What was discussed at that meeting?
22    A.    All of these issues were, including
23  everything stated here and a proposal for him to
24  get the domain .China, so that he could build a
25  global media presence that the Chinese government

Page 231

1  couldn't interfere with.
2    Q.    How long was that meeting?
3    A.    Three or four hours.
4    Q.    What was the feedback you got from
5  this -- I take it it was a presentation based on
6  this document?
7    A.    Yes, we discussed this document.  Each
8  of us had a copy of it.  He had a copy of it.  We
9  discussed the whole thing.  He was going along
10  with it in English.  Then we discussed -- what
11  came out of this, he wanted to go ahead and
12  explore the real estate.  He did not engage so
13  much on the media part.  He was interested in
14  buying property.
15    Q.    Where would that property be?
16    A.    That was the Evermay mansion in
17  Georgetown.  That was the property across the
18  Treasury Department building in Washington, D.C.
19  We talked about him buying the Newseum,
20  N-e-w-s-e-u-m building in downtown Washington,
21  D.C., and the Rockefeller properties in New York
22  City and outside New York.
23    Q.    Did you participate in showing these
24  properties to Mr. Guo?
25    A.    No.

Page 232

1    Q.    Do you know who did?
2    A.    French did to Yvette.
3    Q.    I see.  When was that, if you know?
4    A.    Late December.  I believe it was late
5  December.  It was obviously subsequent to this
6  meeting.
7    Q.    So this was the first time there was a
8  discussion about purchasing a Washington property
9  in connection with building this Washington
10  presence?
11    A.    No, that came up at the first meeting.
12  This is the takeaway from the first meeting, this
13  document 10 and the presentation of the follow-on
14  proposal for the second meeting.
15    Q.    And it has cost estimates, things of
16  that nature?
17    A.    Yes.
18    Q.    Did you ever give a gift to Mr. Guo?
19    A.    Maybe a token gift.  I don't remember.
20    Q.    You don't recall trying to give Mr. Guo
21  a gift?
22    A.    No, I don't remember.  It was something
23  very minor, but I don't recall.
24    Q.    Do you customarily give gifts to
25  clients or potential clients?

Page 233

1    A.    It depends on the nature of the client
2  or the interest of the client.
3    Q.    So sometimes?
4    A.    A bottle of wine or something small
5  scale, yeah.
6    Q.    Okay.
7          MR. GRENDI:  Let's do 11.
8          (Waller Exhibit 11, Document entitled
9     "Time to Get Them Beginning the
10    Psycho-Political Campaign For China," Bates
11    stamped SV385 to SV402, marked for
12    identification.)
13         MR. GRENDI:  I think there's a little
14    bit of a copying issue here.  We can come
15    back to it if we need to.  It should be
16    SV385 to SV402.
17    Q.    Mr. Waller, do you recognize this
18  document?
19    A.    Yes.
20    Q.    What is it?
21    A.    It is a PowerPoint presentation to Guo
22  elaborating on the discussions that we had had
23  and showing a game plan that we were recommending
24  for him.
25    Q.    So is this created subsequently to the

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

| Page 234 |
|---|
1    previous two documents you were just showed?
2        A.    I believe I created it at the same time
3    with this.
4        Q.    That would be Exhibit 10?
5        A.    Yes, for the second meeting.
6        Q.    Did you present it at the second
7    meeting on like a computer?
8        A.    No.  He didn't allow computer
9    presentations.  It was just by hand.
10       Q.    So you printed this out?
11       A.    Yes, in a color paper copy.
12       Q.    So that was at that same second meeting
13   you described earlier?
14       A.    I believe so.
15       Q.    Turning to 387.  It says, "Build and
16   operate a secret system for micro-targeted
17   intelligence collection and analysis."
18             Do you see that?
19       A.    Yes.
20       Q.    What does that mean?
21       A.    That was the project about which this
22   whole suit is about.
23       Q.    That's a description of the research
24   that was memorialized in the research agreement?
25       A.    Yes.

| Page 235 |
|---|
1        Q.    It says, "The first ten targets are
2    identified."
3        A.    Yes.
4        Q.    What does that mean?
5        A.    He told us that he had ten targets he
6    wanted us to look at, and then gave us the name
7    of one to test earlier.
8        Q.    Who was that?
9        A.    That was Anita Suen.
10       Q.    Is that actually a picture of her on
11   the right?
12       A.    Yes.
13       Q.    And that test, was that test
14   demonstration before or after this meeting?
15       A.    I think it was before.
16       Q.    I see.  With respect to --
17       A.    Yes.  It was before because he provided
18   this picture for the presentation that we used.
19       Q.    What about the other nine targets?  Had
20   those been identified?
21       A.    I don't recall.  I think he hadn't
22   chosen which ones he wanted to prioritize, but I
23   don't recall.
24       Q.    You mentioned before that there were
25   like 92 non-prioritized names?

| Page 236 |
|---|
1        A.    Yes.
2        Q.    Is that correct?
3        A.    Yes.
4        Q.    Where are you getting that list of 92
5    from?
6        A.    From Exhibit 6.
7        Q.    Which part of that?
8        A.    Throughout the entire document you have
9    the main person, the numbered individual in large
10   letters, and then all the people associated with
11   that individual on these trees, and that's a
12   total of 92.
13       Q.    I see.  So if you counted up all the
14   individuals referenced in Exhibit 6, it's 92?
15       A.    Yes.
16       Q.    Exhibit 92 also -- excuse me --
17   Exhibit 6 also has 15 different named
18   individuals, correct?
19       A.    Yes.
20       Q.    And under those individuals' names
21   there's also the two reports that are requested,
22   two or three reports?
23       A.    Back on Exhibit 6?
24       Q.    Yes.
25       A.    Yes.

| Page 237 |
|---|
1        Q.    Sitting here today, are you telling me
2    that you didn't understand that the 15 numbered
3    names were the 15 fish being identified?
4        A.    Yes, but we didn't get this until after
5    the contract.  Really, this is three weeks before
6    we received this.
7        Q.    Right, but when did you receive a list
8    of 92 names?
9        A.    The day we received Exhibit 6.
10       Q.    Right, but you're indicating that you
11   didn't understand that they were prioritized in
12   any way.
13       A.    No, we understood fully that they were
14   prioritized.  But he also said you'll also find
15   people in here -- if you find data on some of
16   these other individuals, dig it out and let me
17   see it because they might replace one of the 15.
18       Q.    Right.  But in conducting the initial
19   research, you understood that the 15 fish were
20   the 15 names with numbers next to them on
21   Exhibit 6, right?
22       A.    Yes.
23       Q.    Going back to Exhibit 11.  It says,
24   "Document everything as leverage to gain
25   concessions, protect people, use as political

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 238

1   weapon or as aid in criminal prosecution and
2   asset recovery."
3           What do you mean by that?
4       A.   Those were memorializing Guo's -- the
5   end results that he wanted from this information.
6       Q.   What did you understand that to be?
7       A.   He said he had family still in China
8   who he wanted to get released.  He said he had
9   assets still in China that he wanted to -- that
10  had been confiscated that he wanted to recover,
11  and others that he wanted to prevent being
12  confiscated.
13      Q.   It also says "as aid in criminal
14  prosecution and asset recovery."
15      A.   Yes.
16      Q.   What does that mean in this context?
17      A.   The asset recovery part, I just
18  mentioned.
19      Q.   Oh, for recovery of his own assets?
20      A.   Of his own stolen assets.
21      Q.   I see.  Not the assets of others?
22      A.   No.
23      Q.   Continue.
24      A.   And then for criminal prosecution of
25  anybody of a criminal nature who is on the list.

Page 239

1       Q.   Criminal prosecution where?
2       A.   It was never specified.  It could be
3   London.  It could be United States.  He didn't
4   mean China.
5            Correction.  Also in China because he
6   had reasons for some of them who could be
7   prosecuted in China with the information that he
8   had.
9       Q.   In the next, I guess, little arrow or
10  bullet, it says, "Break the party's control of
11  corruption information."  What does that mean?
12      A.   The party keeps its control.  The
13  Chinese Communist Party keeps its control by --
14  it's sort of a symbiosis between the super rich
15  who got rich off the party, and then the
16  knowledge of their corrupt activities that the
17  party and the secret police have.
18      Q.   What does the "break the party's
19  control of corrupt information" mean?
20      A.   If you make the information public that
21  certain pillars of the Chinese government are
22  involved in corruption, right now it's only the
23  secret police that has that information, or the
24  Chinese authorities who have that information,
25  and they're using it for purposes of political

Page 240

1   control, to blackmail people to stay in line.
2   His desire was to break that monopoly and get it
3   out there so that everybody would know.
4       Q.   I understand.  And it says, "Burrow
5   into commercial and political networks for
6   business purposes."  What does that mean?
7       A.   Yes.  He had some business applications
8   that he wanted to use this information for in
9   China or Hong Kong.
10      Q.   Let's go to 388.  It says, "Aggressive
11  grassroots online social media/activist network
12  in the United States, to mobilize key support
13  base."
14      A.   Yes.
15      Q.   What does that mean?
16      A.   He had political threats to himself
17  through Americans who were tied in with the
18  Chinese government, who were putting pressure on
19  him to be deported back to China.  So we wanted
20  to reduce the effectiveness of that political
21  pressure by organizing other groups that would be
22  rallying to say this guy is leading the
23  opposition to China.  Don't deport him back to
24  Beijing.
25      Q.   What is this network?  Is it other

Page 241

1   companies or individuals?  Who's in the network?
2       A.   Main political activist networks and
3   online activists.
4       Q.   How many different entities are in that
5   network?  Ballpark?
6       A.   It's really hard to say because there
7   are networks of networks, so they're not
8   necessarily cohesive.  It's really impossible to
9   say.
10      Q.   These are all American-based entities?
11      A.   North American, U.S. and Canada.
12      Q.   Below that it says, "Primarily the
13  loose coalition that got Trump elected and to
14  which Trump communicates through his Tweets."
15      A.   Yes.
16      Q.   What does that mean?
17      A.   That's the online "MAGA" network of
18  supporters of Trump who hate the Chinese
19  government.
20      Q.   How did they get Trump elected?  I'm
21  just trying to understand that comment.
22      A.   They were credited with doing the --
23  Trump was running his campaign not through out of
24  his pocket so much as saying outrageous things
25  and using social media to get other people to

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 242

1  echo everything he said.  So we would want to use
2  that network, and that was credited with getting
3  him elected.
4      Q.    So this isn't a group of Russian
5  hackers that got Trump elected?
6      A.    No, no.
7      Q.    It also says, "Citizen-journalists who
8  break news, expose opponents, attack opponents,
9  discredit critics"?
10     A.    Right.
11     Q.    So that's a different part of this
12  network?
13     A.    Yes.
14     Q.    How would you access that network?
15     A.    I know them.
16     Q.    So you can get these journalists to
17  write positive things about Mr. Guo or attack the
18  communists?
19     A.    Or attack the people who wanted to get
20  him deported and say this person is doing it, but
21  this person also has money and is invested in
22  Chinese companies.  And there might be other
23  reasons that the Chinese regime uses to leverage
24  Americans to do their work for them, do their
25  work for it.

Page 243

1      Q.    So the previous group, that loose
2  coalition, is kind of just the broad MAGA group?
3      A.    Younger activists.
4      Q.    The second group is journalists for
5  hire essentially?
6      A.    Not really for hire so much as people
7  who want a good story.
8      Q.    I see.  Then it says, "Effective in
9  getting the President's attention and influencing
10  policy."  What does that mean?
11     A.    Well, the President is known for
12  following Twitter quite closely, and so he has
13  certain -- he follows a very small amount of
14  people, and he watches a certain network that's
15  in this building, so it's a question of getting
16  things on Fox and on Twitter.
17     Q.    I see.  And that gets the President's
18  eye on Mr. Guo in a positive light?
19     A.    Yes.
20     Q.    To prevent him from being deported?
21     A.    Yes.
22     Q.    Then it says, "Coordinate with the
23  above allied journalists in the U.S. and abroad
24  to remain on the information offensive."
25     A.    Yes.

Page 244

1      Q.    What do you mean by "information
2  offensive" there in italics?
3      A.    Yes.  Get off the defensive.  Change
4  his image from an eccentric, exiled
5  billionaire -- who can have sympathy for somebody
6  like that, right? -- to somebody who is trying to
7  do the right thing and bring democracy to China.
8      Q.    So this is kind of like a PR campaign
9  in a way that's being proposed?
10     A.    Yes.
11     Q.    Let's go to 390.  Who is the gentleman
12  pictured on the top right there?
13     A.    That is Mikhail Khodorkovsky.
14     Q.    That's the individual you mentioned
15  earlier today?
16     A.    Yes.  He's the Russian political
17  opposition leader who's exiled in London.
18     Q.    There's also a map here that's of the
19  Eurasian area with little numbers and
20  bull's-eyes.  Do you see that?
21     A.    Yes.
22     Q.    What do those little markers or
23  bull's-eyes represent?  There's numbers next to
24  them.
25     A.    Yes.  Those are locations in Russian

Page 245

1  where organized anti-Putin protests had just
2  taken place.
3      Q.    Let's just look at the one that's in
4  the Archangel region near Finland, the top left.
5  It says 100 to 150.  Do you see that?
6      A.    Yes.
7      Q.    What does that mean?
8      A.    That means that 100 to 150 people took
9  to the streets on that given day in the
10  nationwide-organized protests against Putin.
11     Q.    When was that protest?
12     A.    There were a few.  I don't recall.
13     Q.    It says below that, "Team with exiled
14  Russian opposition leaders and internal Russian
15  opposition activists."
16     A.    Yes.
17     Q.    What is the concept behind that idea?
18     A.    In this case it's a vision to transform
19  the whole Eurasian region into democratic
20  societies in Russia and China, and to use the
21  synergies of the China centric people with those
22  of the Russia centric people and have them work
23  together.
24     Q.    In other words, they're both oppressed
25  by horrible dictatorships.  They might as well be

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 246

1   on the same side?
2        A.    Right.
3        Q.    It says, "Link with Chinese people
4   inside of Russia including cross-border traders
5   for propaganda and organizational purposes."
6        A.    Yes.
7        Q.    What does that mean?
8        A.    There's a large Chinese population of
9   both permanent, semipermanent, and migratory
10  inside Russia, especially in central Russia and
11  the Russian Far East, and along the border area
12  illustrated on this chart on page 390.
13             The idea is you work with those
14  traders, Chinese traders who are in Russia, which
15  is freer than China in this regard, to have them
16  bring back pro-Guo, anti-regime material back
17  into China as part of their trading roots, and
18  the authorities don't bother them.
19             So this is just a new way -- as opposed
20  to flying into Beijing where you're going to get
21  caught.  You just do it through the trading
22  networks of Chinese nationals into Russia.
23        Q.    The idea would be to exploit the
24  commercial connection between China and Russia to
25  get information into China that's pro-Guo, so to

Page 247

1   speak?
2        A.    Or that suits what he wants to achieve,
3   yes.
4        Q.    Because it's typically difficult to
5   get -- let's call it -- controversial information
6   into China?
7        A.    Right.
8        Q.    Let's go to 394.  It says here for
9   single individual, regular monitoring with two
10  competitive teams, $2,805,000 per year, all costs
11  included.  Do you see that?
12        A.    Yes.
13        Q.    Was that like an initial price that was
14  quoted to Mr. Guo and Eastern?
15        A.    Yes.  Not Eastern, Mr. Guo.
16        Q.    It says above for one, but with one
17  team only $2,380,000.
18        A.    Yes.
19        Q.    Again, that was just an initial quote?
20        A.    Yes.
21        Q.    It says at the bottom, "This enterprise
22  can easily become a profit-making venture."
23        A.    Yes.
24        Q.    How is that?
25        A.    Mr. Guo is a man who likes to make a

Page 248

1   profit.  He had -- he's got his asset recovery
2   here.  He's getting leverage over bad actors in
3   China.  He can make a lot of money off this.  So
4   it's not simply a philanthropic or political
5   operation.  It could become advantageous to him
6   as a businessman.
7        Q.    In terms of recovering his own money?
8        A.    Yeah.
9        Q.    Is there any other way that it would
10  be?
11        A.    He spelled out some specific ways.
12  They were his ideas, not ours.  They were
13  itemized earlier in this exhibit.
14        Q.    Is that concerning exposing corruption
15  in China?
16        A.    Yes.
17        Q.    Let's go to 395.  It says, "U.S.-based
18  online army, same group as those who helped win
19  Trump election."  What does that mean?
20        A.    That was the online activists who I
21  referred to earlier.
22        Q.    It's the same group.  This is just a
23  kind of recitation of that?
24        A.    Yes.
25        Q.    It says, "Attack tactics include

Page 249

1   breaking news, creation & deployment of memes
2   (memetic warfare), defending friends, trolling
3   opponents, exposing and isolating opponents in
4   policy and media, swarming opponents."
5             Are these tactics that are issued to
6   this U.S.-based online army?
7        A.    That's what they practice already, so
8   we would hire them to carry them out.
9        Q.    In hiring them, you would just pay them
10  as you described earlier with anonymous hackers?
11        A.    No.  It's people who want to write
12  about it, want to develop those memes, want to
13  make a living doing this rather than have their
14  day job working at Walmart.
15        Q.    How are they paid, though?  I just want
16  to understand how they would make money.
17        A.    They would be paid either by check or
18  by cash through a series of LLCs.
19        Q.    I see.  Is it Strategic Vision that has
20  the connections to this online army or is it you
21  personally?
22        A.    Me personally.
23        Q.    Okay.  Just how would that normally
24  work?  You would contact one of these groups
25  online and send them a check if they agreed to

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 250

1   promote the content that you wanted?
2       A.    Yeah, or I know them personally.
3       Q.    How big is this online army that you're
4   able to access?
5       A.    It's 50 principal people with millions
6   of followers who add the volume and the mass to
7   the messages, so the re-tweeting and re-liking
8   and all that other stuff.
9       Q.    So what?  They, like, employ people who
10  have Twitter accounts to promote this content
11  or --
12      A.    Yes.
13      Q.    -- how does it work?
14      A.    Yeah, somebody is on Twitter, has a
15  certain following, has a certain stature in
16  whatever audience that you're looking at, and
17  then you pay them to do this type of work as part
18  of whatever else they're doing.
19      Q.    Do they typically disclose that they're
20  being paid to tweet about this subject?
21      A.    Some of them do.
22      Q.    But not all of them?
23      A.    I doubt it.
24      Q.    Let's go to 397.  I see here that
25  Hudson Institute and Atlas Foundation are

Page 251

1   circled?
2       A.    Um-hum.
3       Q.    Why is that?
4       A.    Because they are the smaller
5   foundations that are effective, despite their
6   small size.
7       Q.    I see.  So was this $11 million or so
8   price point being kind of promoted as you should
9   run an institution like these two?
10      A.    Yes.  It was in response to his request
11  for how much he was even thinking of pouring more
12  in.  And I said, "Pour too much in and people
13  aren't going to take it seriously."
14      Q.    In other words, it's counterproductive
15  to have an over-funded institution?
16      A.    It can be.
17      Q.    That's because people just think that
18  it's a mouthpiece for someone or?
19      A.    Oh, they know it's a mouthpiece anyway.
20  It's just an 800-pound gorilla as opposed to
21  somebody else who fits in with, you know, with
22  everyone else.
23      Q.    Let's go to 398.  It says, "Russia
24  Networking:  Cost."  "We will facilitate, but not
25  manage or coordinate networking with Russian

Page 252

1   opponent leaders and group.  Costs depends on
2   your discussions with them."
3           I'm trying to understand that.  What
4   does that mean?
5       A.    We had offered to introduce Guo to
6   Khodorkovsky and others.
7       Q.    So does this have anything do with the
8   actual research?  So it's not a Russian network
9   that would perform the investigatory research
10  that you would request for an agreement like
11  this?
12      A.    No.
13      Q.    There are these examples of Russia
14  beyond Putin, China beyond communism.
15          Do you see that?
16      A.    Yeah.
17      Q.    What are you talking about there?  What
18  is that?
19      A.    Well, the "Russian beyond Putin" refers
20  to Khodorkovsky's plan to envision a Russia
21  beyond Putin, because so many people sort of
22  believed that Putin is forever.  And there's
23  going to be an end to it, so the question is how
24  will there be an end to Putin's regime and then
25  what's going to replace it.

Page 253

1           So we had that vision.  Let's stop
2   obsessing about Putin and think about post-Putin
3   Russia.  The same as China.  Nearly everyone
4   seems to think that the Chinese Communist Party
5   is forever.  Our vision is to have a finite limit
6   to the party rule, and so think of the People's
7   Republic of China beyond the Chinese Communist
8   Party.
9       Q.    I understand.  Please turn to 401.  It
10  says, "Global electronic intelligence gathering
11  and synthesis capability through social media
12  monitoring."
13      A.    Yes.
14      Q.    Is that the investigatory research kind
15  of work?
16      A.    That's part of what we had proposed,
17  but we did not do this.
18      Q.    This is a different service?
19      A.    Yes.
20      Q.    How is this different?  I just want to
21  understand.  What's the distinction between this
22  global electronic intelligence gathering and what
23  the research agreement contemplated?
24      A.    This particular line item is to
25  collect, harvest data by electronic means through

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 254

1  monitoring social media and then zeroing in on
2  who -- as marketers do, for example.  And then
3  zero in on who are the opinion leaders who have
4  the interest in these subjects and then target
5  messaging to them, or collect information from
6  them.
7      Q.    Was it a way to get in contact with
8  like-minded people?  Is that what the goal is?
9      A.    Yes.  Like-minded people, regime
10  propagandists.  Guo supporters who have different
11  opinions of the regime or Guo opponents who have
12  different opinions of the regime.  So how do you
13  identify everyone and everything?  And then watch
14  what your adversaries are doing through social
15  media.
16      Q.    So this wasn't part of the research
17  agreement, though?
18      A.    No.
19      Q.    On then just on the last page of this
20  it says, "Begin work with Russian opposition."
21          Who would begin work with the Russian
22  opposition?
23      A.    French Wallop would have approached
24  Khodorkovsky, and if he agreed, fine.  If not, we
25  would go to other opposition figures and see if

Page 255

1  there was an interest.
2      Q.    That would be to what?  Coordinate with
3  Mr. Guo?
4      A.    Yes.
5          MR. GRENDI:  Let's do 12.
6          (Waller Exhibit 12, Document Bates
7          stamped SVUS260, marked for identification.)
8      Q.    Have you ever seen this document?
9      A.    Yes.
10      Q.    What is it?
11      A.    This is a proposed budget, monthly
12  budget by team 1, by the team 1 leader.
13      Q.    So the blacked-out portion of that,
14  that's some reference to the team 1 leader's
15  company?
16      A.    Yes.
17      Q.    The team 1 leader gave this to you?
18      A.    Yes.
19      Q.    It says, "1 Month Projected Cost
20  Analysis," right?
21      A.    Yes.
22      Q.    And is this just for the first month or
23  for kind of every month?
24      A.    No.  Some of these are start-up costs.
25  Although some of the things that look like

Page 256

1  start-up costs, they are for security measures.
2  You go through a lot of computers, let's say, so
3  you're buying computers very often, so they look
4  like start-up costs.
5      Q.    Right, but like a vehicle, for example,
6  is something you just buy once?
7      A.    That's correct.
8      Q.    So he would get $25,000 a month, a
9  program director?
10      A.    Yes.
11      Q.    And is this you understood the team
12  would be of this size, in terms of -- looking
13  just at item A, there is different types of
14  specialists and officers?
15      A.    This was the initial one.  It changed.
16  So this was his first cut.
17      Q.    What was the second cut or subsequent
18  cut?
19      A.    The subsequent cut where there would be
20  ten computer operators, ten computer researchers
21  and two linguists.
22      Q.    Just so we're clear, this is the group
23  that you paid 250 to $300,000?
24      A.    Yes.
25      Q.    But no more than that.  That was the

Page 257

1  full sum of money paid to team 1?
2      A.    If it was more, it wasn't significantly
3  more.
4      Q.    Okay.  So did you negotiate this budget
5  or is this just kind of an estimate?
6      A.    It was his first estimate, and then
7  when we looked at the scope, he said, "Oh, we
8  need to do adjustments."  So we got the
9  adjustments.
10      Q.    He needed more people is what you're
11  saying?
12      A.    He needed more computer people.
13      Q.    Okay.  Were there any other items that
14  changed?
15      A.    I don't know.
16      Q.    Did you haggle or negotiate with the
17  leader of team 1 about these costs?
18      A.    Not the costs so much as the people.
19  We need to have X number of people on X number of
20  machines to meet the capacity for this first part
21  of the contract.
22      Q.    So you just accepted whatever the cost
23  of these items were, but you were just concerned
24  about getting the work done?
25      A.    Correct.

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 258

1    Q.    Got it.
2          Did you give this to Ms. Wallop?
3    A.    Presumably, I don't recall.
4    Q.    You don't remember talking to her about
5    it?
6    A.    We talked about it.  I presume I gave
7    it to her, but I don't remember.
8    Q.    Did you ever get any money back from
9    team 1?
10   A.    No.
11   Q.    Did team 1 tell you that they were
12   disappointed or upset that the engagement ended
13   when it did?
14   A.    Yes.
15   Q.    What did they say?  Or what did he say,
16   I should say?
17   A.    He said that they liked the work.
18   Q.    Why is that?  Did he explain why?
19   A.    They liked the challenge.  They don't
20   like communists of any kind.  They don't like the
21   Chinese government.  They viewed it as the right
22   thing to do as opposed to just a job.
23   Q.    So ideologically, team 1 was on board
24   with this kind of work?
25   A.    All of our people were involved with

Page 259

1    this, yes, every last one.
2          MR. GRENDI:  Let's do 13.
3          (Waller Exhibit 13, Document Bates
4          stamped SVUS00262, marked for
5          identification.)
6    Q.    Do you recognize this document or
7    documents?
8    A.    Yes.
9    Q.    This is the business cards for ASOG?
10   A.    Yes.
11   Q.    Do you know why Adam Kraft has a little
12   "Ghost King" on his business card?  What does
13   that mean, if you know?
14   A.    I have no idea.  He was in the
15   military.
16   Q.    This invoice on the next page, SVUS263.
17   A.    Yes.
18   Q.    This is what you were talking about
19   before when you said that they invoiced you for
20   over a hundred thousand dollars, but they only
21   asked for $5,000 --
22   A.    Correct.
23   Q.    -- at the end of the day.
24         And that was the money that was paid
25   there to ASOG?

Page 260

1    A.    Yes.
2    Q.    So the SVUS265, I guess that's the
3    different associates who worked on this
4    engagement?
5    A.    Yes, on team 2.
6    Q.    Right.  This is the team you described
7    before that you said basically encountered only
8    records-protected information?
9    A.    Yes.
10   Q.    And ASOG was only doing work within the
11   United States for Strategic Vision, correct?
12   A.    Yes.
13   Q.    Why wasn't ASOG retained in the
14   beginning of this engagement?
15   A.    Because as Exhibit 11 indicates, we had
16   a proposal for two teams, two research teams.
17   Guo agreed to only fund enough for one research
18   team.  So we didn't use a second team because we
19   were setting up team 1.  We had not -- that was
20   not part of the arrangement.  So when Yvette
21   instructed on February 1st that we find other
22   means to do the work, that's when we engaged
23   team 2.
24   Q.    Was there any additional cost
25   contemplated by engaging team 2, at least with

Page 261

1    respect to Eastern's obligation?
2    A.    To Guo's obligation, yes.  We
3    anticipated paying something along these lines,
4    over $100,000 per tranche research per month,
5    even more.
6    Q.    But there wasn't any amendment to the
7    agreement with respect to this charge for Allied?
8    A.    No, we just wanted to keep the contract
9    that we had with Guo.
10   Q.    So Strategic Vision was offering this
11   ASOG service as a courtesy to try to save the
12   engagement?
13   A.    Not so much, well, courtesy, yeah,
14   courtesy to save the contract.  Yes, yes in
15   answer to your question.
16   Q.    Let's look at 14.
17         (Waller Exhibit 14, Document entitled
18         "All Source Intelligence Collection
19         Posture", marked for identification.)
20   Q.    Just looking at the first page which is
21   SV269, it says, "All Source Intelligence
22   Collection Posture."  What is this document?
23   A.    This is an ASOG document, part of their
24   team 2 -- part of their own promotional material.
25   Q.    So they gave this to you in connection

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 262

1   with the assembly of team 2 engagement?
2        A.    Yeah, it's like a handout.  It's a
3   standard handout.
4        Q.    Do you understand what these little
5   symbols, geometric shapes kind of scattered all
6   over the globe represent or mean?
7        A.    Yes.  It's better to see them in color.
8   The legend is here on the right, so the shapes
9   match up with Open Source Intelligence, which is
10  OSINT.  SIGINT, Signals Intelligence.  GEOINT,
11  Geospatial Intelligence, and Satellites.  MASINT,
12  which I don't know what it is, and HUMINT, which
13  is Human Intelligence.
14       Q.    So this document describes what
15  capabilities ASOG has in different parts of the
16  world?
17       A.    Yes.  And then the capable, and then
18  developing and limited circles.  The different
19  colored circles show the extent of their
20  capabilities at the time.
21       Q.    I see.  So it looks like -- maybe the
22  colors are throwing me off here but -- or lack of
23  colors, I should say -- but in North America,
24  ASOG has essentially full capability and in other
25  places of the world not so much?

Page 263

1        A.    Yes, that's the way it looks.
2        Q.    Is there any reason Strategic Vision
3   elected to go with team 1 out the box instead of
4   ASOG?
5        A.    We thought team 1 would be more
6   aggressive for what Guo wanted to build his -- to
7   build what he said he wanted to build, and it was
8   in a country where it was legal to do certain of
9   the things that were needed to build out those
10  capabilities.
11       Q.    Whereas ASOG is based in the
12  United States and perhaps is subject to more
13  restrictions?  Is that what your understanding
14  was?
15       A.    Yes.  And we also did not want to be
16  involved with U.S. intelligence services for our
17  data.  We wanted to have it as our own individual
18  people.
19             MR. GRENDI:  We're on 15.
20             (Waller Exhibit 15, Subject Chart,
21       Bates stamped SVUS278, marked for
22       identification.)
23       Q.    Turn to the second page, it says
24  "Background Report" and it has two individuals
25  names.

Page 264

1        Q.    Do you know what this document is?
2        A.    I don't recognize it.
3        Q.    You didn't draft it?
4        A.    Pardon me, no.  Let me read it.
5        Q.    Oh, sure.  You can read it, go ahead.
6        A.    Okay.
7        Q.    I was asking did you create this
8   document?
9        A.    No.
10       Q.    Do you know who did?
11       A.    I don't know the people who created it.
12  I do know that this was something that
13  French Wallop had commissioned in Europe in
14  February, early to mid-February.
15       Q.    So is this Strategic Vision work
16  product?
17       A.    No.  It's a research product that we
18  were to have brought to Guo as part of the
19  ongoing research, so it's just a different type
20  of research.
21       Q.    Right.  This is dated March 21, 2018,
22  correct?
23       A.    Yes.
24       Q.    So was this research that was
25  commissioned by Mr. Guo or Eastern?

Page 265

1        A.    No.  French Wallop commissioned this
2   research as part of the contract in February.  So
3   if it's dated in March, that's probably when it
4   was delivered.  I don't know.
5        Q.    And was this ever delivered to Mr. Guo
6   or Yvette or Lianchao?
7        A.    Anything after February 23rd we would
8   not have delivered once there was litigation.
9        Q.    So you're saying this is research that
10  was created for the contract at issue in this
11  case?
12       A.    Yes.
13       Q.    Are these two individuals named on this
14  background report listed as fish in Exhibit 6?
15       A.    I can check if you want me to leaf
16  through it.
17       Q.    Just if you know right now off the top
18  of your head?
19       A.    I don't know.  What I do know is the
20  reason they would be researched is because they
21  were objects of interest through Lianchao,
22  meaning Guo's objects of interest.
23       Q.    So do you know that these two
24  individuals were named as subjects who should be
25  researched?

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 266

1    A.    I believe I know.  I mean, I did not
2  commission this.
3    Q.    Right.
4    A.    But remember, the whole fish metaphor
5  where you can't find something on one, well,
6  let's find something on somebody else who is not
7  in the top 15.
8    Q.    I see.
9    A.    And so it would have been under those
10 circumstances.
11   Q.    So you didn't write this report.  Do
12 you know who did?
13   A.    No.  We were not to write analytical
14 reports at all.
15   Q.    So who would have?
16   A.    This was a British firm.
17   Q.    I see.  Was it called Fletcher?
18   A.    I don't know.
19   Q.    Do you know if French Wallop edited or
20 participated in creating this report?
21   A.    I believe she just commissioned the
22 report.
23   Q.    In other words, she just ordered it
24 from another IT?
25   A.    She said, "Pull out what you can on

Page 267

1  these individuals."
2    Q.    I see.
3          MR. GRENDI:  Let's go to 16.
4          (Waller Exhibit 16, Document Bates
5          stamped SVUS267 and 268, marked for
6          identification.)
7    Q.    Do you recognize SV267 or 268?
8    A.    Yes.
9    Q.    Let's start with 267.  What is this
10 document?
11   A.    This is a product from team 2 showing
12 that different individuals on Guo's list shared
13 the same Social Security number, and shared it
14 with others who are not on the list, including
15 people with non-Chinese names.
16   Q.    How is that possible?
17   A.    Fraud.
18   Q.    Did you present SVUS267 to Mr. Guo or
19 Lianchao or Yvette?
20   A.    To Lianchao.
21   Q.    When was that?
22   A.    This would have been delivered around
23 mid-February, after we were instructed to
24 communicate only with Lianchao.
25   Q.    Okay.  Turning to the next page, it

Page 268

1  says SVUS268.  What is this document?  It looks
2  like a family tree of sorts.
3    A.    Yes.  I'm not sure who originated this
4  document.  I think it was team 2.  On several
5  occasions we were trying to map out the
6  relationships because it's all families of
7  Chinese Communist Party leaders working through
8  mainly their out-of-wedlock children to move
9  money around.  This is trying to visualize who is
10 related to whom and how to help the researchers
11 target who they're going after and understand the
12 dynamics among them.
13   Q.    Is it fair to say this is team 2
14 foundational work?
15   A.    Yes.
16   Q.    Was this presented to Lianchao?
17   A.    Yes.
18   Q.    When was that?
19   A.    Probably the same day the Document 267
20 was.
21   Q.    For both of these documents, did you
22 ever get any feedback from Lianchao about what
23 Mr. Guo or anyone else thought about this
24 information?
25   A.    Yes.

Page 269

1    Q.    What was that?
2    A.    That Guo was very upset.
3    Q.    Was it explained to you why?
4    A.    He thinks it's junk.
5    Q.    You don't have any more information on
6  that?  Just that he said it was junk?
7    A.    That's the whole paradox here.  You
8  have a client who says it's junk, but won't say
9  what's wrong.
10   Q.    So you didn't understand why Mr. Guo or
11 anyone else would be disappointed with these
12 documents?
13   A.    No.  We thought he would be delighted
14 because you can bring a criminal case against all
15 of these people on the list in United States
16 courts for Social Security fraud and tax fraud;
17 valuable stuff.
18   Q.    What about the second document?  Is
19 there anything that you thought was actionable
20 about this information?
21   A.    No.  To my knowledge, this was just to
22 help the researchers understand the relationships
23 and the dynamics among the targets.
24   Q.    Going back to 267, about the Social
25 Security numbers.  Did you explain the criminal

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 270

1  exposure that the individuals listed on this
2  document would have to Lianchao?
3      A.    Yes.
4      Q.    What did he say?
5      A.    He seemed excited.
6      Q.    But I take it that you subsequently
7  heard that Mr. Guo or Eastern was disappointed
8  with this information?
9      A.    Yes.  He thought it was junk.
10         MR. GRENDI:  Let's take five, if that's
11     okay.  We're in the homestretch here, try to
12     get through these.  We can go off the
13     record, please.
14         THE VIDEOGRAPHER:  Off the record at
15     4:58.
16         (Whereupon, a short recess was taken.)
17         THE VIDEOGRAPHER:  Back on the record
18     at 5:07.
19         MR. GRENDI:  I'm going to do
20     Exhibit 17.
21         (Waller Exhibit 17, Document Bates
22     stamped Eastern 250, marked for
23     identification.)
24  BY MR. GRENDI:
25     Q.    Mr. Waller, do you recognize this

Page 271

1  document?  The first one is marked Eastern 250.
2      A.    I do not recognize this one, but I
3  recognize it as a version of one that I have.
4      Q.    Are you Pyratz, or do you go by that
5  code number?
6      A.    Pyratz.
7      Q.    Not spelled like pirates, like the
8  "Pirates of the Caribbean."
9      A.    It was taken.  Not rats, Pyratz.
10     Q.    Pyratz, sorry.
11         And is this your -- a Signal
12  conversation you had with Yvette Wang?
13     A.    It appears to be.  There are Chinese
14  characters, but I accept it as our
15  correspondence.
16     Q.    Why did you start messaging with Yvette
17  on or about January 29, 2018?
18     A.    Because Guo had instructed around the
19  26th that I communicate only with her.
20     Q.    So had you been communicating with
21  Lianchao prior to this date?
22     A.    Yes.  Let me correct that.  Let me
23  correct that.  At some time prior to this date.
24  This was in direct -- I had not been
25  communicating with her before just because I had

Page 272

1  not on this medium.  To answer your question, the
2  purpose of starting this conversation was to set
3  up a meeting after my return from Europe.
4      Q.    That was the meeting in Germany with
5  the leader of team 1?
6      A.    Yes.
7      Q.    Looking at Eastern 257, this is your
8  response to a rather long message from Ms. Wang.
9  Do you see your response there starting with
10  "Good to know"?
11     A.    Yes.
12     Q.    You wrote, "The reports are not actual,
13  but to show how the work is being executed."
14         Do you see that?
15     A.    Yes.
16     Q.    What do you mean by that?
17     A.    Because she kept complaining that
18  there's no actionable information in these
19  reports, and I had to explain yet again to her
20  that they're not supposed to be actionable.
21  These are the -- these are the preliminary
22  reports, and in this case, this was a progress
23  report to show how the work was being executed.
24     Q.    Turning to 259.  Eastern 259.  It says,
25  "There's a disconnect that needs to resolve.  Our

Page 273

1  understanding was that the first 90 days would be
2  for starting up and developing the data."
3         Do you see that?
4      A.    Correct.
5      Q.    What was your understanding about the
6  first 90 days of the research agreement?
7      A.    You're not going to get a substantial
8  data flow in large quantity until you set up the
9  operation.  We started cold.  We started cold in
10  January, mid-January, so it's going to take a
11  while.  And we explained this.  As one of the
12  earlier exhibits showed in our discussions prior
13  to the contract, it would take 90 days to gear up
14  to a full capacity, but we would start producing
15  information as we could right away.  And so I'm
16  talking to her about having to resolve this
17  disconnect because she did not understand this at
18  all.
19         Guo understood it perfectly and
20  Lianchao understood it perfectly.  So she's
21  coming back with these emphatic messages and
22  saying that -- showing her deep satisfaction, as
23  well as Guo's by this point, and I'm saying we
24  need to resolve this disconnect.
25     Q.    You mean dissatisfaction?

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 274

1     A.    Dissatisfaction.
2     Q.    Did you understand that at times,
3  Ms. Wang was just conveying translated messages
4  from Guo or Eastern or other people?
5     A.    She indicated that.  Yes, she indicated
6  that in a couple of her texts.
7     Q.    So you understood that it wasn't just
8  Yvette that was dissatisfied with what was being
9  provided by Strategic Vision?
10    A.    Yes.  Where she said she was quoting
11 from Guo, she said it and she was apologetic
12 about it in writing.
13    Q.    So your understanding was during the
14 first 90 days of the agreement, it would be okay
15 if no actionable material was delivered because
16 that was the start-up phase?
17    A.    That was never the intent, and that was
18 explicitly understood, yes.
19    Q.    Just turning to the next page, 260.  It
20 says "Had we understood this, we would have told
21 him that it is not how it works in our
22 experience."
23          What are you conveying in that
24 sentence?
25    A.    When we worked this out with him and

Page 275

1  Lianchao, with Guo and Lianchao, it was explicit
2  that the first data was not going to be
3  actionable.
4     Q.    For the first three months?
5     A.    Roughly, yes.  When Yvette took over,
6  she expressed a very different view, that it had
7  to be actionable.
8     Q.    That was before the contract was
9  signed, right, when Yvette took over?
10    A.    She took over it during the final
11 negotiation of the contract.
12    Q.    Right.  Okay.  It also says, "All my
13 team say that it is seldom practical or possible
14 to produce such rapid results, and that the best
15 way for the reasons I explained to you is to
16 cultivate the measures that I explained to you."
17          What did your teams tell you about the
18 practicality of producing actionable results?
19    A.    Given the amount of computing power
20 involved in the type of work Guo wanted done,
21 it's not possible to produce those immediate
22 results.  Not even an NSA, National Security
23 Agency, can do that.  It takes time to do.
24    Q.    Is this something you just kind of
25 intuitively knew or did your team actually tell

Page 276

1  you this is impossible?
2     A.    No, we knew beforehand.  Like anything,
3  it takes time to ramp up.  It takes time to build
4  a case.
5     Q.    I see.  Then on the next page, 261, it
6  says, "Checked with him, the quickest and most
7  efficient way is to use the ID information which
8  you were provided to dive."  Do you see that?
9     A.    Yes.
10    Q.    Do you know what Yvette was talking
11 about in that message?
12    A.    Yes, she was talking about Exhibit 6.
13    Q.    Right.  What did you understand her to
14 want Strategic Vision to do?
15    A.    To pull up large quantities of
16 actionable information immediately.  Where she's
17 talking about the social media stuff, we were
18 showing them how our team was trying to
19 understand their target.  It was not designed --
20 and we said this in the progress report.  It was
21 not designed to be part of the end product to
22 Guo.  It was just a progress report.
23    Q.    Then if you look at the following page,
24 262.  Is this at the time when you got in touch
25 with ASOG to create a second team?

Page 277

1     A.    Yes, roughly.
2     Q.    You said, "I will start a competing
3  team to verify."  Is that a reference to ASOG or
4  the individuals you talked about checking in on
5  team 1?
6     A.    Correct.  That is the start of team 2
7  right there.
8     Q.    That's team 2 you're talking about
9  there?
10    A.    Yes.
11    Q.    Is there any reference to -- did you
12 talk to Yvette or Lianchao or Mr. Guo about
13 verifying the work of team 1 that we discussed
14 earlier?
15    A.    Yeah.  I mentioned quality control and
16 to make sure that they were doing what we set
17 them to do.
18    Q.    Let's go to 264.
19    A.    If I may add, what they were asking is
20 far from best practices.  We were trying to suit
21 their needs by sticking to best practices.
22    Q.    Right.  You described how you don't get
23 the best data if you attack right away.  You
24 gotta build background information, right?
25    A.    Um-hum.

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 278

```
1      Q.    Is that a "yes"?
2            MR. SCHMIDT:  Out loud.
3      A.    Yes.
4      Q.    That's all right.  It happens.
5            Let's go back to 264, or forward to
6  264, sorry.  What did you mean by "I don't accept
7  the kindergarten comments"?
8      A.    Above she said, we are advised many
9  times -- "As we advised many times before, both
10 of us are college professors, not kindergarten
11 kids."  So I just said I don't accept that.
12     Q.    What did you understand her comment
13 about kindergarten kids to mean?
14     A.    It was a juvenile condescending
15 comment, so I was just pushing back.
16     Q.    Just going to the next page, 265.  At
17 the end you said, "This is a sophisticated group
18 that has ably dealt with hostile military
19 networks in combat environments.  They hit all
20 their targets.  I trust them."
21     Q.    Yes.
22     Q.    Who are you talking about there?
23     A.    Team 1.
24     Q.    How do you know that they've dealt with
25 hostile military networks in combat environments?
```

Page 279

```
1      A.    If I explain it I would have to
2  indicate who they are, and I cannot indicate who
3  they are.
4      Q.    So you're aware of -- let's just put it
5  this way.
6            Are you aware of the hostile military
7  network that they dealt with in a particular
8  combat environment?
9      A.    Yes.
10     Q.    But you don't want to reveal that
11 because you think that will reveal the identity
12 of team 1?
13     A.    Yes.
14     Q.    But you do know that team 1 has
15 experience in attacking a military network in a
16 combat environment?
17     A.    Yes.
18           MR. GRENDI:  We will set this aside for
19     our motion to compel issue if and when we
20     get to that.  We would obviously like to
21     know the identity of team 1.  We discussed
22     that before.
23     Q.    Just going to the next comment there.
24 It says, "The investors can pay your team without
25 contract."
```

Page 280

```
1      Q.    Do you see that?
2            It's not on the next page.  It's in the
3  bubble below.
4      A.    Yes.
5      Q.    Did you understand what Ms. Wang meant
6  by "investors"?
7      A.    No.  This was either the first or
8  second time she mentioned investors.  And the
9  first time I -- if this was not the first time, I
10 took it as a misstatement.  We'd never heard of
11 any investors before.
12     Q.    Right.  Did you ever discuss investors
13 with Mr. Guo?
14     A.    No.
15     Q.    Were you perplexed by this use of the
16 word "investors"?
17     A.    A lot of this perplexed me by this
18 time.
19     Q.    But this -- including the use of the
20 term "investors" there?
21     A.    Yes.
22           MR. GRENDI:  I'm going to call it for
23     now in terms of my examination.  If there's
24     a little time extra, I would like to come
25     back because I have a couple of other
```

Page 281

```
1  documents to go over.  But I want to make
2  sure that Ms. Teske has an opportunity to
3  examine.
4            MR. SCHMIDT:  Just to go on the record
5  here.  We're going to be closing in on
6  seven hours here, and so let's move it
7  along.  We've gone on to a lot of peripheral
8  issues.
9            We've gone over a lot of exhibits.  I
10 have not been interfering at all.  We have
11 not been late back from a break.  We have
12 had plenty of time, so let's just move
13 efficiently as we jump back and forth here.
14 We're getting near the end.
15 EXAMINATION BY
16 MS. TESKE:
17     Q.    Good afternoon, Mr. Waller.  My name is
18 Erin Teske, and I'm here today representing
19 Mr. Kwok, the third-party defendant in this
20 action.
21           Did you have any conversations with
22 Mr. Kwok that we have not discussed already
23 today?
24           MR. SCHMIDT:  Objection.  Do the best
25     you can.
```

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 282

1      A.    Not that I'm aware of.
2      Q.    Did you meet with him in person at any
3  point that we have not already discussed today?
4      A.    No.
5      Q.    Did you have any phone conversations
6  with him that we have not already discussed
7  today?
8      A.    No.
9      Q.    Any Signal conversations with him or
10 other text-like conversations that haven't been
11 produced?
12     A.    No.
13     MS. TESKE:  That's it.
14     MR. SCHMIDT:  Are you all done, Zach?
15     MR. GRENDI:  I mean, I think if I can
16     get a couple of questions in.  I know that
17     this is an intimidating stack of documents,
18     but there's not too much to it.
19     Let's do this as 18.
20     (Waller Exhibit 18, Supplemental
21     Interrogatories submitted by Strategic
22     Vision, marked for identification.)
23 (FURTHER) EXAMINATION
24 BY MR. GRENDI:
25     Q.    Mr. Waller, do you recognize this

Page 283

1  document?
2      MR. GRENDI:  I'll offer in the spirit
3      of efficiency that this is supplemental
4      interrogatories that were submitted by
5      Strategic Vision.
6      A.    Okay.
7      Q.    Did you participate in creating this
8  document?
9      A.    Yes.
10     Q.    It says in interrogatory number 2 that
11 the principals of SV, Strategic Vision, are --
12 French Wallop is the only principal.
13     Do you see where it says that on the
14 second page?
15     A.    Yes.
16     Q.    Is it your understanding that there are
17 no other members of Strategic Vision?
18     A.    Yes.
19     Q.    That she's the sole member of Strategic
20 Vision?
21     A.    Yes.
22     Q.    Let's take a look at the amended
23 counterclaim, and that will be our last document.
24     (Waller Exhibit 19, Amended Answer and
25     Counterclaims, marked for identification.)

Page 284

1      Q.    Let's go to paragraph 48.  Just off the
2  bat, do you recognize this document?
3      A.    I believe I do.
4      Q.    I'll offer that this is the Amended
5  Answer and Counterclaims that was filed by
6  Strategic Vision in this case.
7      Is that your understanding of what this
8  document is?
9      A.    Not having read through the whole
10 thing, yes.
11     Q.    Fair enough.  Going to paragraph 48,
12 there are a number of conversations that are
13 referred to.
14     Take a look at that paragraph and let
15 me know when you're done looking at it?
16     A.    Okay.
17     Q.    It says that Strategic Vision informed
18 Mr. Guo of the seven different items there.  Are
19 those representations that Strategic Vision made
20 or that you made?
21     A.    I as a contractor with Strategic
22 Vision, as part of the Strategic Vision team
23 made.
24     Q.    Okay.  So you were authorized by
25 Ms. Wallop to speak for Strategic Vision in

Page 285

1  connection with this engagement?
2      A.    Yes.
3      Q.    Going to paragraph 49.  It says that:
4      "Mr. Guo informed Strategic Vision that
5  he would cause his agreement with Strategic
6  Vision to be entered into with a corporate entity
7  controlled by him that he would fund as necessary
8  to pay for Strategic Vision's services."
9      Do you see that clause?
10     A.    Yes.
11     Q.    Do you recall hearing that alleged
12 representation or were you not present?
13     A.    I was there.
14     Q.    You were there?
15     A.    Yes.
16     Q.    When was that?
17     A.    That was at one of the December
18 meetings at his residence.
19     Q.    It says, "It was explicitly agreed such
20 entity would not be based in the People's
21 Republic of China or Hong Kong."
22     A.    Yes.
23     Q.    Was that also part of that
24 conversation?
25     A.    Yes.

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 286

1    Q.    Do you know where Eastern Profit
2  Corporation is based?
3    A.    No.
4    Q.    Did you ever check?
5    A.    We never heard of it before.
6    Q.    So you or Ms. Wallop never looked into
7  where Strategic Vision -- I'm sorry, strike that.
8         You or Ms. Wallop never looked into
9  where Eastern Profit was domiciled or
10 incorporated?
11   A.    Your client doesn't even know.
12   Q.    I'm asking you.
13   A.    I'm just saying neither of us know.
14 Fair is fair.
15   Q.    I'm asking if you know where it is
16 incorporated?
17   A.    No.
18   Q.    And you never checked that?
19         MR. SCHMIDT:  Are you going to let us
20   know, Zach?
21         MR. GRENDI:  I think it's in the answer
22   and counterclaim, so I don't think we need
23   to worry about that.
24   A.    The judge asked you.  Fair is fair.
25   Q.    It's in Hong Kong?

Page 287

1    A.    If you don't even know, I don't know.
2         MR. SCHMIDT:  That's enough.
3    Q.    Let's cool our nerves here.  We're
4  almost done.
5         All I'm saying is, did you check to see
6  where Eastern Profit Corporation was
7  incorporated?
8    A.    No.
9    Q.    Okay.  And did, to your knowledge,
10 Ms. Wallop check that either?
11   A.    I don't know.
12   Q.    Let's go to paragraph 67.  It says in
13 this paragraph that some of the individuals had
14 taken precautions to block research into their
15 activities, and at least one of them appeared to
16 have laid a trap for Strategic Vision.
17         Do you see that?  It's in the middle of
18 the paragraph.
19   A.    Yes.
20   Q.    Did you understand this information
21 from team 1 or how did you learn this?
22   A.    From team 1.
23   Q.    So team 1's leader told you that some
24 of the fish listed in Exhibit 6 had taken
25 precautions to block research?

Page 288

1    A.    Yes.
2    Q.    Did the leader of team 1 describe what
3  precautions?
4    A.    There were electronic precautions in
5  terms of changing passwords or changing behavior,
6  changing electronic behavior.
7    Q.    What about laying a trap?
8    A.    There was a concern, not confirmed,
9  that somebody might have known in advance that we
10 were going to be researching them and they may
11 have laid an electronic trap for such research.
12   Q.    Can you describe that electronic trap a
13 little bit more?
14         I just want to understand kind of
15 conceptually what that means?
16   A.    I can't do it in a technical sense, but
17 in a conceptual sense, it would be that they put
18 out bait for us to follow, so that then they
19 could confirm that they were indeed being
20 followed.
21   Q.    And again, that was the leader of
22 team 1 that told you that?
23   A.    Yes.
24   Q.    Did you ever hear about attempts to
25 reverse the payment that came to Strategic

Page 289

1  Vision?
2    A.    Yes.
3    Q.    When did you hear about that?
4    A.    On or about February -- on or about
5  January 8, 2018.
6    Q.    What did you hear?
7    A.    I heard from French Wallop that she got
8  a notice from her bank, from Strategic Vision's
9  bank that one of the wires had been -- the sender
10 of the wires had requested that one of them be
11 returned.
12   Q.    Does she know when that reversal
13 request was sent?
14   A.    I don't know.  I'm sure she has the
15 records, but I don't know.
16   Q.    So sitting here today, you don't know
17 if the reversal of the wire was attempted before
18 the contract was even signed?
19   A.    I don't know.
20         MR. GRENDI:  Thank you very much for
21   your time and patience today, Mr. Waller.
22         Any redirect there?
23         MR. SCHMIDT:  No questions.
24         MR. GRENDI:  Let's go off the record,
25   please.

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 290

```
1          THE VIDEOGRAPHER:  This concludes
2   today's deposition of Mr. Waller.  The time
3   is 5:35.  We are off the record.
4
5
6          (Whereupon, the within proceedings
7   concluded at 5:35 p.m., on the 8th day of
8   February, 2019.)
9
10         *       *       *       *       *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 291

```
1              D E C L A R A T I O N
2
3          I hereby certify that having been first
4   duly sworn to testify to the truth, I gave the
5   above testimony.
6
7          I FURTHER CERTIFY that the foregoing
8   transcript is a true and correct transcript of
9   the testimony given by me at the time and place
10  specified hereinbefore.
11
12
13          _____
14                 J. MICHAEL WALLER
15
16
17
18  Subscribed and sworn to before me
19
20  this _____ day of _____ 20___.
21
22
23  _____
24       NOTARY PUBLIC
25
```

Page 292

```
1                   ERRATA SHEET
2
3   NAME OF CASE:  EASTERN PROFIT v STRATEGIC
4   DATE OF DEPOSITION:  Friday, February 8, 2019
5   NAME OF WITNESS:  J. MICHAEL WALLER
6   PAGE LINE  FROM                 TO
7
8   ____|_____|_____|_____
9   ____|_____|_____|_____
10  ____|_____|_____|_____
11  ____|_____|_____|_____
12  ____|_____|_____|_____
13  ____|_____|_____|_____
14  ____|_____|_____|_____
15  ____|_____|_____|_____
16  ____|_____|_____|_____
17  ____|_____|_____|_____
18  ____|_____|_____|_____
19  ____|_____|_____|_____
20  ____|_____|_____|_____
21  ____|_____|_____|_____
22  ____|_____|_____|_____
23  ____|_____|_____|_____
24
25
```

Page 293

```
1                 REPORTER'S CERTIFICATE
2
3   STATE OF NEW YORK  )
4                     ) ss.
5   COUNTY OF NEW YORK )
6
7          I, ROBERTA CAIOLA, a Shorthand Reporter
8   and Notary Public within and for the State of New
9   York, do hereby certify:
10         That J. MICHAEL WALLER, the witness
11  whose deposition is hereinbefore set forth, was
12  duly sworn by me and that such deposition is a
13  true record of the testimony given by such
14  witness.
15         I further certify that I am not related
16  to any of the parties to this action by blood or
17  marriage and that I am in no way interested in
18  the outcome of this matter.
19         In witness whereof, I have hereunto set
20  my hand on this date, February 15, 2019.
21
22                 ROBERTA CAIOLA
23
24
25
```

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019
Index: $1..12th

**$**

**$1**   36:1,5
  157:11

**$100,000**
  261:4

**$11**   251:7

**$111,000**
  219:18

**$2**   45:6

**$2,380,000**
  247:17

**$2,805,000**
  247:10

**$25**   121:5

**$25,000**
  256:8

**$250**   186:19

**$300,000**
  39:23 40:9
  41:9
  222:20
  256:23

**$5,000**
  220:3,4
  259:21

**$50,000**
  223:15,16

**$750,000**
  91:13

**$750,000-a-
month**   37:4

**\***

**\*r**   20:1
  22:20
  40:15
  154:19
  169:16

**-**

**-yes**   228:5

**1**

**1**   17:22
  18:6,7,9,
  10 33:25
  42:2,15,16
  46:24
  47:5,8
  53:2 56:6
  62:14
  67:17,23,
  24 68:20
  71:12 72:7
  76:25
  77:13,16,
  23 78:4,5,
  9,18,21
  79:4,9
  80:2,4,17,
  18 82:15
  83:14,24
  85:18
  86:15,17
  95:2 96:2
  144:2
  151:9,12

  166:16,19,
  22 167:2
  168:8,9,12
  174:10,14,
  15,19,25
  175:4,12
  176:14,17,
  19 177:3
  178:7,14,
  15,24
  179:9,19
  184:8
  185:25
  186:3,8
  191:9
  192:7,9
  193:10,18,
  25 194:5,
  16,22,25
  195:6
  198:19
  208:23
  210:22
  211:3,20
  213:18
  218:2
  219:5
  220:12,13,
  18,20,23
  221:4,9
  222:10,13,
  19 224:5,
  8,10,17
  255:12,14,
  17,19
  257:1,17
  258:9,11,
  23 260:19

  263:3,5
  272:5
  277:5,13
  278:23
  279:12,14,
  21 287:21,
  22 288:2,
  22

**1's**   287:23

**10**   225:7,8
  229:22,23
  232:13
  234:4

**100**   184:1
  245:5,8

**10th**   177:1
  198:23
  217:23,25
  218:5,11

**11**   105:14
  146:25
  233:7,8
  237:23
  260:15

**111,000**
  220:6

**11:28**   74:7

**11:37**   74:10

**12**   49:6
  255:5,6

**12:14**   105:8

**12:20**   105:11

**12th**
  149:11,14,

17,25
152:4,8

**13**   259:2,3

**14**   261:16,
17

**15**   50:10,
11,13
64:22 70:4
92:19,20
95:15,18
96:4
180:12
182:24
183:25
184:2
192:12
202:8
236:17
237:2,3,
17,19,20
263:19,20
266:7

**150**   245:5,8

**15th**   102:8,
16 206:19
207:1

**16**   65:10,
13,14
211:21
212:15
213:20,21
267:3,4

**16th**   102:6,
8

**17**   270:20,

21

**175**   189:12

**177**   190:10

**17th**   186:9

**18**   282:19,
20

**18th**   118:19

**19**   283:24

**1980s**   109:24

**1:28**   157:4,
6

**1:30**   152:14

**1st**   47:4,15
94:1 95:3
133:15
143:22
216:3
217:11,15
260:21

―――――――
**2**
―――――――

**2**   46:10,11
47:6,17,20
56:19
71:12
74:17
77:1,8,11
79:12 94:7
95:8
131:25
179:19,21,
22 184:11
218:4
219:5,7

220:4
221:2
260:5,23,
25 261:24
262:1
267:11
268:4,13
277:6,8
283:10

**20**   111:19
225:7,8

**20002**   9:3

**2007**   114:25

**2009**   115:1

**2016**   11:1
12:8 13:21

**2016-2017**
11:12

**2017**   11:1,
10,11,13
12:4,8
20:8,10
21:14,15
22:1 24:13
35:22
46:12
114:3
126:2
134:6
137:17
162:10
163:12
166:25

**2018**   18:7
46:22

65:1,19
144:2
157:18
158:11
194:21
201:11
203:11
204:9
208:19
215:1,19
264:21
271:17
289:5

**2019**   290:8

**20th**   103:20
186:10

**21**   264:21

**22nd**   200:11

**23**   215:1,19

**23rd**   222:15
265:7

**24**   126:2
176:23

**24th**   129:19

**25**   225:8

**250**   222:20
256:23
270:22
271:1

**257**   272:7

**259**   272:24

**26**   201:11
203:11

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019                                    Index: 260..72

204:9
208:19

**260**   274:19

**261**   276:5

**262**   276:24

**264**   277:18
278:5,6

**265**   278:16

**267**   267:9
268:19
269:24

**268**   267:5,7

**26th**   93:25
102:10
201:14
202:1
208:9
271:19

**29**   20:7,10
46:12
271:17

**29th**   46:19
47:13
210:9
211:4
215:12

**2:15**   157:8

**2nd**   157:17
158:11

─────────────
          **3**
─────────────

**3**   105:12,13

**30**   45:8
49:3 50:7
53:23
65:1,19
95:19
97:12
116:19
126:22
162:19
194:21

**30-day**   92:6

**30-days'**
44:7

**300,000**   96:8

**30th**   183:19
194:20
203:2
211:5
215:12

**31st**   102:9,
15

**35**   10:9
117:6
162:19

**387**   234:15

**388**   240:10

**390**   244:11
246:12

**394**   247:8

**395**   248:17

**397**   250:24

**398**   251:23

**3:06**   196:21

**3:16**   196:24

**3:25**   155:3

**3rd**   158:11
160:11

─────────────
          **4**
─────────────

**4**   113:4,5

**4,000**   33:13
34:6 92:18

**401**   253:9

**48**   151:25
284:1,11

**49**   285:3

**4:58**   270:15

**4th**   155:3

─────────────
          **5**
─────────────

**5**   52:25
53:1 74:18
116:7,8

**50**   250:5

**50/50**   16:17
45:19

**500,000**   39:7

**5:07**   270:18

**5:35**   290:3

**5:35 p.m**
290:7

─────────────
          **6**
─────────────

**6**   46:22
55:12
84:24
164:5,6
165:7
176:11
186:12,19
214:2
236:6,14,
17,23
237:9,21
265:14
276:12
287:24

**60**   65:9

**623**   9:2

**64**   120:6

**67**   155:2
287:12

**69**   132:24

**6th**   100:3
165:20
166:10
194:21

─────────────
          **7**
─────────────

**7**   48:2
71:12
79:11
88:20
212:16,17

**72**   143:6

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019                    Index: 73..accurately

**73**   149:9

**74**   153:8

**750**   38:14

**750,000**
  103:3

**76**   155:2

---
**8**
---

**8**   71:12
  95:17
  96:12
  214:24,25
  215:17
  289:5

**80**   183:18
  211:14,20,
  25  212:23
  213:19

**80,000**   65:10

**80-gigabyte**
  213:8
  215:6

**800-pound**
  251:20

**80s**   116:17

**87**   110:7

**88**   110:7

**8th**   7:6
  165:1
  290:7

---
**9**
---

**9**   71:12
  98:13
  226:1,2
  230:8

**90**   126:23
  127:2
  273:1,6,13
  274:14

**90-day**
  127:12,15

**92**   70:3
  235:25
  236:4,12,
  14,16
  237:8

**93**   110:7

**94**   110:7

**98**   146:23

**9:59**   7:6

**9th**   165:1
  176:25
  198:23
  226:21

---
**A**
---

**A-C-A-D-E-M-I**
  115:5

**A-S-O-G**
  179:23

**a.m.**   155:3

**ably**   278:18

**abroad**   16:14
  243:23

**absolute**
  22:3  74:21

**absolutely**
  51:14,17
  81:15
  123:10

**Abu**   110:25

**Academi**
  115:4,5

**academic**
  14:25
  44:25  56:4

**accelerated**
  209:1

**accelerating**
  187:16

**accept**
  207:20
  271:14
  278:6,11

**acceptable**
  127:24
  129:13

**accepted**
  217:18
  257:22

**access**   43:25
  167:23
  170:14
  171:2
  173:16

  174:3,10,
  11  181:17
  196:4
  242:14
  250:4

**accessed**
  174:7

**accessible**
  181:23

**accident**
  90:11

**account**   44:1
  99:3
  157:17
  158:10
  169:21
  171:7,8
  173:2,16
  174:3,8,12

**accounting**
  39:11

**accounts**
  99:2  159:7
  171:9,15
  250:10

**accuracy**
  80:8

**accurate**
  28:8  32:25
  108:1
  178:18
  224:6,10

**accurately**
  8:14

accustomed
  56:3

achieve
  247:2

acquired
  188:13

acquiring
  73:12

acted  68:6

acting  53:15
  54:6 128:9
  159:24

action
  281:20

actionable
  269:19
  272:18,20
  274:15
  275:3,7,18
  276:16

active  34:24
  180:16
  184:22
  185:7

activist
  241:2

activists
  241:3
  243:3
  245:15
  248:20

activities
  136:12
  239:16

287:15

activity
  91:19
  174:16
  179:2
  183:11
  221:16

actors  78:7
  248:2

actual  71:18
  82:10,14
  84:18 97:8
  182:21
  252:8
  272:12

Adam  182:18
  259:11

adapt  71:2

add  250:6
  277:19

added  86:19

Addison
  77:8,11

addition
  54:24

additional
  260:24

address  9:1
  38:1
  114:16
  134:13
  167:22
  213:25
  214:13

addressed
  60:14
  127:3,6

addresses
  213:22

adequately
  148:6

adjusted
  123:14

adjustments
  257:8,9

administrator
  171:4

admired
  191:15

admittedly
  48:6

advance
  43:16
  56:17
  65:11
  139:21
  166:18
  202:21
  211:19
  227:5
  288:9

advancing
  14:19

advantage
  24:25

advantageous
  248:5

adversaries
  254:14

advertise
  112:6

advised
  171:16
  278:8,9

Advisors
  10:6 41:19

affixed
  190:12

Afghanistan
  11:5,17

afraid
  139:19
  146:13

afternoon
  281:17

afterward
  60:25

agencies
  101:15
  184:25

Agency
  275:23

agent  38:10
  46:22
  53:15 54:6
  56:6
  103:25
  128:10
  137:19
  183:8
  217:7

Case 1:18-cv-02185-LJL   Document 261   Filed 03/16/20   Page 438 of 645

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019      Index: agents..American-based

agents   54:24
  58:12 68:2
  70:17 72:6
  86:11

aggressive
  240:10
  263:6

agitated
  102:12
  206:9
  207:6,7

agree   32:5
  156:21

agreed   26:14
  36:14 86:5
  94:17
  102:9
  128:4
  129:14
  131:18
  149:10,13
  152:5,8,19
  158:23
  159:23
  205:14
  208:8
  249:25
  254:24
  260:17
  285:19

agreement
  18:6 19:2,
  4,9,23
  22:24 27:6
  32:12,16
  33:9 37:14

38:13,17
39:2,6,25
40:1,2,3,
4,7,12
41:8,14
43:4,22
46:11,18,
20,24,25
47:2,6,9,
13,25
50:4,16
51:9,21
52:13 56:9
57:5 59:18
62:25
63:10
64:15
75:1,21
78:16,17
85:13
88:24
96:25
98:1,23
100:7,14
124:11
129:14
130:2,6
133:20
142:18
149:25
150:2,22
157:21
158:24
163:10
197:1
229:10,12
234:24
252:10

253:23
254:17
261:7
273:6
274:14
285:5

agreements
  50:21

ahead   19:20
  21:3 29:8
  32:21
  68:24
  82:25
  86:21
  90:20
  94:23,25
  95:4,13
  97:6
  132:12,20
  137:15
  150:23
  193:6
  205:20
  208:15
  213:4
  231:11
  264:5

aid   238:1,
  13

aircraft
  219:13

Airport
  212:1

alert   144:21
  170:18
  171:3

All's   207:22

all-in   220:4

alleged
  136:11
  285:11

allied
  243:23
  261:7

alligator
  125:9

alternate
  206:2

alternatives
  140:20

amend   175:5

amended
  283:22,24
  284:4

amendment
  261:6

America
  139:2
  262:23

American
  77:9
  115:20
  116:2
  136:20
  171:15
  179:20
  241:11

American-based
  241:10

Case 1:18-cv-02185-LJL   Document 261   Filed 03/16/20   Page 439 of 645

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019          Index: Americans..armored

Americans
  240:17
  242:24

Amir  155:5,
  8

amount  17:16
  171:6
  200:6
  243:13
  275:19

amounts
  93:16

analogous
  66:11

analysis
  68:4,13
  228:7
  234:17
  255:20

analytical
  56:2,7
  61:22
  67:18
  68:3,8
  69:16
  266:13

analyzed
  57:12
  71:11

and/or  63:7,
  17

angry  174:6
  205:17
  207:8

Anita  164:7
  167:17
  169:21
  173:2
  174:8
  235:9

Annenberg
  9:14

annual  96:18

anonymity
  131:22

anonymous
  224:20,21
  225:9
  249:10

answers  98:2

anti-putin
  245:1

anti-regime
  246:16

anti-soviet
  109:25

anticipated
  48:8 60:13
  261:3

anxious
  124:20,24
  125:23

anymore
  45:14
  102:19,20
  116:1,5
  133:25

apartment
  24:11 26:7
  31:1 33:10
  37:11
  135:17
  201:16

apiece
  157:14

apologetic
  274:11

apologize
  209:11,23

apologized
  205:12
  209:24

apparent
  93:1

apparently
  26:17 34:1
  35:7 46:4

appeared
  287:15

appears
  19:25
  71:16
  105:23
  106:2
  113:17
  226:14
  271:13

application
  81:22
  151:16

applications
  156:1,16

  240:7

applies
  178:4

applying
  69:21

apprehensive
  121:16

approached
  254:23

approximately
  165:2
  186:4
  200:5
  223:16

Arabia  111:4

Arabic  106:5

Archangel
  245:4

area  31:14
  78:6
  101:21
  160:20
  182:15
  223:20
  244:19
  246:11

areas  47:12

Arlington
  176:17
  192:19

armed  156:13

armored
  156:13,16

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019                    Index: army..back

**army**  248:18
 249:6,20
 250:3

**arose**  23:22

**arrange**  15:6
 30:10
 37:21
 159:21
 175:24

**arranged**
 166:18

**arrangement**
 38:15 54:6
 76:5
 260:20

**arrested**
 137:2

**arrow**  239:9

**as-needed**
 27:23

**Asian**  209:13

**asks**  119:7
 120:7

**ASOG**  77:9
 179:23,25
 182:5,11,
 16 183:6,
 22 184:14
 185:3,10
 191:11
 218:15
 220:1,2
 259:9,25
 260:10,13

 261:11,23
 262:15,24
 263:4,11
 276:25
 277:3

**aspects**  32:3

**assemble**
 27:23
 29:15

**assembly**
 262:1

**asset**  238:2,
 14,17
 248:1

**assets**  91:19
 238:9,19,
 20,21

**assignment**
 157:12
 162:2

**assistance**
 54:12

**associates**
 260:3

**assume**  40:18

**assurance**
 120:15

**Assurances**
 120:15

**ate**  203:25

**Atlas**  250:25

**attached**
 202:12,13

**attack**
 170:11
 173:20
 206:4
 242:8,17,
 19 248:25
 277:23

**attacking**
 205:7
 279:15

**attempt**
 139:12

**attempted**
 289:17

**attempts**
 288:24

**attention**
 243:9

**attorney**
 83:2,4

**attorneys**
 73:22

**audience**
 250:16

**audio**  130:9

**authorities**
 36:24
 37:24
 98:25
 180:13,19
 239:24
 246:18

**authorized**
 161:15

 284:24

**authorizes**
 99:12

**average**
 50:12

**avoid**  34:22
 37:20
 39:15
 159:3
 199:22
 210:25

**avoiding**
 37:24

**aware**  223:5
 225:17
 279:4,6
 282:1

————————
         **B**
————————

**baby**  125:9

**bachelor's**
 9:6

**back**  16:8
 17:9 21:6,
 9 22:2
 26:22
 28:16
 32:15
 37:10 55:1
 60:20
 65:16
 67:25 68:2
 72:5,6
 74:5,9,17
 80:15

Case 1:18-cv-02185-LJL   Document 261   Filed 03/16/20   Page 441 of 645

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019    Index: back-and-forth..Beijing

105:10
121:3
125:1
137:1
143:14
144:16
150:17
152:2,6,
20,21
153:21
154:6
157:7
174:10
176:11
181:14
183:12
184:8
185:23
186:11
192:6,20
194:10
196:23
203:10
205:11
210:12
211:6,23
213:8,9
215:6,17
217:10
233:15
236:23
237:23
240:19,23
246:16
258:8
269:24
270:17
273:21

278:5,15
280:25
281:11,13

**back-and-forth**
93:1
129:17,22

**background**
9:5 15:2
69:22
113:16
212:17
263:24
265:14
277:24

**bad** 69:3
78:7 133:7
248:2

**bait** 288:18

**balcony**
146:14

**ballpark**
16:16 41:5
241:5

**bank** 41:4
158:21,22
169:20
171:7,8,9,
15 289:8,9

**Bannon** 119:6
123:23,25
124:1,3,
10,13

**bar** 65:2
83:5
211:12

**bare** 188:1

**bargain**
140:4

**barrier**
131:22

**base** 240:13

**based** 31:20
39:8 71:8
77:10 80:1
82:4
114:11
139:1,2
227:16,21
228:7
231:5
263:11
285:20
286:2

**basic** 32:17
141:8
192:12
202:12

**basically**
67:10
260:7

**basis** 27:23
55:18
95:12,14
96:23
148:21
156:3
209:1

**bat** 284:2

**Bates** 53:5
105:14

113:5
226:2
229:23
230:2
233:10
255:6
259:3
263:21
267:4
270:21

**battle** 24:18

**bear** 18:5

**began** 137:18
182:20

**begin** 175:21
187:9
254:20,21

**beginning**
85:15
108:3
145:16
162:3
186:4
195:13
233:9
260:14

**begun** 56:15

**behalf** 7:20
26:25
27:2,4
129:2,4

**behavior**
288:5,6

**Beijing**
240:24

246:20

**beliefs**
137:5

**believed**
252:22

**Bernie**
137:22,23,
24 138:6,
7,22 139:9

**Beta** 9:6

**big** 30:7
72:13
121:11
183:11
206:11
250:3

**bigger** 71:22

**bill** 25:22
26:9,10
117:2,4,5,
11 162:2,9
163:3,9,17
219:18,21
226:24

**billion**
186:18,24

**billionaire**
136:19
244:5

**billionaires**
25:2

**bio** 114:24

**birth** 8:23
187:3

**bit** 14:13
24:20
57:14
66:22
132:20
202:4
233:14
288:13

**bite** 33:7

**blacked-out**
255:13

**blackmail**
240:1

**Blackwater**
114:25
115:8,12,
16

**blame** 122:3

**blank** 47:11

**blanks** 47:11

**block**
287:14,25

**blocking**
90:24

**blurb** 147:2
152:3
155:3

**board** 52:16
146:10
162:22
258:23

**body** 50:6

**bonus** 36:12

**booked**
210:16,21

**booth** 212:9

**border**
110:23
246:11

**Boris** 110:6

**born** 25:8

**Boston** 9:8,9

**bother**
246:18

**bottle** 233:4

**bottom** 25:11
53:2 84:24
247:21

**bound** 21:1
56:2

**box** 79:1
263:3

**brainstorm**
12:14

**brainstormed**
110:19

**brainstorming**
110:18
228:16

**brand-new**
207:8

**break** 8:16
14:13 29:9
52:4 74:5
157:1
168:16

170:18
171:14,15,
20 193:8
196:18
200:12
239:10,18
240:2
242:8
281:11

**break-in**
170:3

**breaking**
53:20
249:1

**Bridge**
125:20
135:12

**briefly** 9:4,
11 136:1

**bring** 26:12
71:19
110:17,22
165:16
211:23
244:7
246:16
269:14

**bringing**
11:25
117:8,22
118:4
135:6

**brings** 125:8

**British**
266:16

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019                    Index: broad..capacity

broad   243:2

broke   222:25

broken   96:23

brought
  26:15,16
  51:15
  52:16
  65:16 94:7
  156:1
  169:3
  193:25
  264:18

brute   170:11
  173:20
  174:2

bubble
  123:16
  134:16,17
  137:21
  280:3

bubbles
  118:12

budget
  23:10,11
  255:11,12
  257:4

budgeted
  220:5

budgets
  21:12

build   12:18
  64:23
  89:12
  93:18

191:18
230:24
234:15
263:6,7,9
276:3
277:24

building
  13:5 42:16
  62:4 121:6
  146:17
  231:18,20
  232:9
  243:15

buildings
  146:5

bull's-eyes
  244:20,23

bullet
  239:10

Burrow   240:4

business
  9:17,19,20
  11:4,9
  46:1,6,9
  56:3
  100:25
  120:3
  131:3
  136:7
  240:6,7
  259:9,12

businessman
  122:3
  248:6

butcher

155:5

butchering
  108:5

buy   31:21
  121:5
  256:6

buying
  231:14,19
  256:3

─────────────

──────────────
          C
──────────────

C-I-T-I-C
  167:20

Caiola   7:8

California
  181:3

call   20:2
  22:20 30:4
  32:5 48:2
  51:1,2
  72:22
  73:14,15
  108:7
  117:11,15
  152:5
  157:24
  158:3
  160:15
  169:16
  193:17
  247:5
  280:22

called   7:22
  24:12 30:5
  32:2 34:23

39:19 77:9
102:22
266:17

calling   97:3

calmed
  205:17
  206:9

campaign
  112:15,17
  227:25
  233:10
  241:23
  244:8

campaign-type
  14:16

Canada
  241:11

Canadian
  179:15

capabilities
  15:11,12,
  18,20
  29:5,6
  51:15
  168:4,15
  262:15,20
  263:10

capability
  253:11
  262:24

capable
  262:17

capacity
  257:20

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019                    Index: card..China

273:14

card 259:12

cards 259:9

care 85:20
140:23,25
141:4
174:2
209:9
211:23

career 16:8,
10 227:9

careful 18:4

Caribbean
271:8

carried
135:15

carry 249:8

case 13:13
45:14
77:21
82:16
86:11
89:10,11,
12 93:14
102:3
110:20
187:12
245:18
265:11
269:14
272:22
276:4
284:6

cases 82:22

cash 225:4
249:18

casual 58:25
163:5

categories
49:1,2
50:12
73:14
176:5

category
50:11
73:15,17

caught
246:21

caveat 68:25

central
246:10

centric
245:21,22

CEO 182:18

certificate
8:24

CFO 182:19

chain 70:6
219:1

chair 204:23

challenge
258:19

challenges
89:9
195:21,22

chance 19:17
211:17

213:9

change 92:17
244:3

changed
256:15
257:14

changing
288:5,6

channels
39:15
93:19

characters
214:7,9
271:14

charge 96:25
147:4,17,
21 148:8
261:7

chart 246:12
263:20

cheap 121:23
122:2,4,
15,18

cheated
44:5,10,14

check 22:3
41:11
181:25
199:8
249:17,25
265:15
286:4
287:5,10

checked

69:14
276:6
286:18

checking
277:4

Chiang
138:13,14

children
25:7 268:8

China 25:3
31:20
33:14,15
34:16,17
53:19
86:23
110:22,23
124:7,15
136:19
137:5,14
138:11
167:20
188:24
196:13
230:24
233:10
238:7,9
239:4,5,7
240:9,19,
23 244:7
245:20,21
246:15,17,
24,25
247:6
248:3,15
252:14
253:3,7
285:21

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019          Index: Chinese..client

**Chinese**
  24:18
  25:2,12
  33:14
  34:22
  36:23
  37:24
  39:16
  50:24
  53:17
  86:7,10,22
  88:1 98:25
  99:6
  104:11
  110:16
  119:14,25
  123:20
  130:19
  132:1
  138:11
  140:15,18
  141:2
  145:24
  148:12
  156:10
  159:3,9
  167:19
  180:9,18
  183:8,9
  188:23
  189:4
  199:22
  203:23,25
  221:17
  223:3
  230:25
  239:13,21,
  24 240:18

  241:18
  242:22,23
  246:3,8,
  14,22
  253:4,7
  258:21
  268:7
  271:13

**Chinese-built**
  156:16

**chosen**
  235:22

**Christmas**
  143:13

**CIA**  112:23,
  24,25

**circled**
  190:5
  251:1

**circles**
  262:18,19

**circuitous**
  36:23
  37:23
  99:4,14
  159:1,5,17
  160:5

**circumstance**
  89:23 91:4
  94:9

**circumstances**
  34:18
  88:19,23
  90:7,17
  91:1,5,10,

  15 92:1,9
  93:4,12,21
  127:11
  266:10

**CITIC**
  167:18,20,
  22 168:14
  173:2,16
  174:8
  195:13

**Citizen-
journalists**
  242:7

**City**  21:24
  30:14 65:2
  231:22

**Civil**  138:11

**civilian**
  156:17

**clarify**
  77:21

**classified**
  185:16

**clause**  88:19
  89:1 92:6
  98:23
  127:11
  285:9

**clear**  9:24
  43:21 61:8
  63:9 77:16
  93:3 118:1
  128:7
  158:1
  190:23

  218:13
  220:13
  256:22

**clearance**
  185:8,13

**clearances**
  182:7
  184:22

**cleared**
  184:21,24
  185:19,21

**client**  9:24
  23:20 28:1
  50:5 66:19
  71:2 74:20
  75:4,9
  79:20
  80:13 85:3
  91:6,10
  92:3,12
  93:2,5,8,
  11 94:1,13
  98:15
  99:7,10,
  12,21,22
  100:23
  101:16
  108:19,24,
  25 109:3
  131:3
  132:8
  147:20
  207:8,10,
  18 209:19
  219:25
  233:1,2
  269:8

Case 1:18-cv-02185-LJL   Document 261   Filed 03/16/20   Page 446 of 645

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019     Index: client's..communicates

286:11

**client's**
84:19
101:14
140:7

**clients**
11:10
12:15
13:1,4,5,8
14:7 19:2,
10 66:4
101:25
104:16
106:7,17,
18,19,24
107:4,8,10
119:21
131:2
161:2
232:25

**close** 171:2

**closely**
116:19
243:12

**closing**
281:5

**clothes**
125:17,18

**co-counsel**
164:10

**co-defendant**
164:11

**coalition**
241:13
243:2

**code** 65:10,
11 87:6
88:6,7
169:25
170:1
211:19,21
212:15
213:20
214:15
271:5

**coded** 151:13

**cohesive**
241:8

**cold** 28:24
36:11
273:9

**collaborating**
73:25
180:18

**collaboration**
11:7

**collaborative**
99:11

**collate**
64:21

**collated**
64:11,18,
20

**collateral**
145:20,22

**colleagues**
163:17

**collect**
253:25

254:5

**collected**
64:11

**collecting**
68:10
97:22

**collection**
234:17
261:18,22

**college**
138:16
278:10

**color** 234:11
262:7

**colored**
262:19

**colors**
125:11
262:22,23

**combat**
278:19,25
279:8,16

**combined**
228:22

**comfortable**
11:12
87:15

**command**
172:11

**commander**
138:25

**comment**
241:21

278:12,15
279:23

**comments**
190:20
191:3
278:7

**commercial**
240:5
246:24

**commission**
266:2

**commissioned**
188:16
264:13,25
265:1
266:21

**Committee**
17:8

**committing**
179:1

**common** 14:15
72:4
137:13

**communicate**
102:19,20
133:17,21
143:24
151:11
183:14
185:20
216:4,5
267:24
271:19

**communicates**
241:14

communicating
81:9 128:8
216:8
271:20,25

communication
9:15 81:6,
13 200:9,
22 216:12
217:15

communications
150:25

communism
252:14

Communist
24:19,23
25:6,12
86:12
110:4
130:18
131:5
132:7
136:19
137:3,5,14
140:15,18
141:3
145:25
188:23
189:5
239:13
253:4,7
268:7

communists
223:3
242:18
258:20

communities

17:7 51:14

community
163:1

companies
9:25 38:22
188:17
241:1
242:22

companion
203:3
212:3

company 10:5
27:21 77:8
115:3
129:11
155:15
157:14
161:5,17
255:15

company's
158:10

compare
47:12

compartmented
131:21

compel 77:5,
22 279:19

compensate
44:24

compensated
44:22
95:12
148:21

compensation

43:15
98:20
118:4

competing
277:2

competitive
247:10

competitors
188:19

compilation
67:10

complained
194:11
221:22

complaining
224:11
272:17

complete
47:14
95:22

completed
67:15

completely
32:25
36:13
92:10
140:7
173:23

completing
67:13

complex
201:17

complicate
147:22

complicated
58:5
136:18

comply
101:23

comprehensive
64:8,14
65:23
66:6,10,12
69:19
70:22
71:6,17,21
72:12,16
96:8
127:13

comprehensiven
ess 73:3

compromise
173:9

computer
14:25 20:6
22:9 68:11
71:9 82:10
88:6 142:1
169:2
182:1,22
203:6,15
212:4
234:7,8
256:20
257:12

computers
22:13
169:9
203:8
213:14

256:2,3

computing
275:19

conceal
98:24 99:5

concept
21:11
88:22
245:17

conceptual
288:17

conceptually
288:15

concern
34:15,17
86:9 144:5
147:3,6,9,
10,15,16
148:8
288:8

concerned
44:9 59:2
104:2
144:14
147:19
257:23

concerns
99:9 127:6
148:6

concessions
237:25

concluded
72:18
290:7

concludes
290:1

conclusion
221:19

concurrence
102:11

condescending
278:14

conditions
35:3 37:12

conduct
142:8

conducted
80:20
202:25

conducting
195:7
237:18

conferred
26:15

confidence
51:18
134:11
163:7

confidential
23:18

confidentialit
y   28:1,2
74:22

confirm
288:19

confirmed
96:2 131:6

288:8

confirms
132:21

confiscated
238:10,12

conflicted
121:1

confront
124:6

confrontation
206:6

confused
208:14

conjunction
53:12

connected
112:9

connection
10:24
29:11,21
35:9,11
37:13
38:16
40:7,11
41:8,13
42:14
44:12 45:3
49:18
67:20 98:1
116:22
150:9
157:11
175:12
225:16
232:9

246:24
261:25
285:1

connections
17:9 30:9
110:25
111:4,7,8,
10,11,13
112:2
249:20

conscious
34:13

consideration
37:2 216:7

consisted
192:11
202:7

consistent
94:11

consolidating
24:24

constant
49:12
200:9

constitute
200:13

constituted
62:16

constitutes
44:25

constitution
156:20

consult   73:5
97:25

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019        Index: consulting..contractual

consulting
  72:5

contact
  53:24
  116:18
  134:4,7,9
  143:9,23
  181:3,24
  210:18
  216:3
  249:24
  254:7

contacted
  117:5

contacts
  15:21
  17:11,13,
  16 51:12
  72:25
  73:10
  163:1
  224:7

contained
  24:7
  213:19
  216:24

contemplate
  85:13

contemplated
  51:9
  124:10
  159:5
  253:23
  260:25

content

250:1,10

contents
  177:14

context
  48:22
  126:7
  238:16

continue
  17:24 77:7
  104:18
  112:24
  145:8
  161:25
  167:7
  238:23

continued
  131:12
  133:21
  209:15
  220:18

continuing
  208:11

contract
  12:22
  22:5,6,16
  34:9
  35:17,21
  36:16 45:8
  46:3 48:7,
  9,18 49:1
  57:21,22,
  25 58:23
  60:14
  62:1,5,19
  70:25
  74:17 75:6

76:1,15
  91:8 92:6,
  14 94:18
  95:11,18,
  21 96:7
  97:9,19
  98:6,8
  99:19,23
  100:22
  102:13
  109:5,15,
  16 112:4
  113:24
  114:5
  115:16
  122:12
  123:14
  125:15
  126:25
  127:3,6,17
  128:23
  130:23
  131:7,9
  133:10
  135:19
  136:23
  139:23
  140:2
  141:1
  142:12,14,
  16 149:16
  150:10
  154:7,9,12
  156:24
  158:16
  159:16
  161:6
  164:23

166:11
  168:22
  173:14
  176:2,4
  186:5,8
  194:13
  197:20
  199:6,20
  206:19
  216:2,9
  237:5
  257:21
  261:8,14
  265:2,10
  273:13
  275:8,11
  279:25
  289:18

contractor
  10:5 28:7,
  9 51:16
  55:12
  74:21,23
  75:21,24
  79:13 82:3
  84:25 85:1
  89:25 93:4
  98:16,20
  99:8
  100:24
  284:21

contractors
  45:24

contractual
  11:6 32:7
  229:8

control
  41:15
  89:25
  138:25
  141:15
  144:6
  239:10,12,
  13,19
  240:1
  277:15
controlled
  285:7
controversial
  247:5
conversation
  49:25
  53:12
  54:10 79:6
  80:20
  141:22
  142:15
  143:2,4
  159:14
  200:21
  271:12
  272:2
  285:24
conversations
  23:3 53:14
  142:11
  227:16,21
  281:21
  282:5,9,10
  284:12
convey  51:18
  89:6 142:8

143:20
148:5
173:4
197:21

conveyed
136:2
184:18
194:7
198:17
201:4
219:14

conveying
126:6
218:18
274:3,23

convinced
173:14

cool  287:3

coordinate
176:7
243:22
251:25
255:2

copies  69:12
85:2
150:7,8

copy  150:6
169:14
190:19
191:6,8
231:8
234:11

copying
233:14

cordial

192:3
205:4

corner  53:2,
5 189:14
226:7

corporate
27:24
28:25
285:6

Corporation
7:4 167:21
286:2
287:6

correct
13:20
39:10 40:8
42:12
70:20
75:24
96:24
116:6
130:4,8
154:18
183:20
186:10
200:23
236:2,18
256:7
257:25
259:22
260:11
264:22
271:22,23
273:4
277:6

Correction

218:3
239:5

correctly
30:20 70:3
123:6
153:4
174:9

corresponded
152:2

correspondence
116:13
128:10
271:15

corrupt
239:16,19

corrupted
165:14,23
166:7

corruption
146:12
239:11,22
248:14

cost  96:23
121:19
207:9
220:4
223:12,24
232:15
251:24
255:19
257:22
260:24

costs  39:9
42:8 44:20
223:5,9,17

225:15
247:10
252:1
255:24
256:1,4
257:17,18

Council
115:20
116:2

counsel   7:11

count   200:17

counted
236:13

counterclaim
283:23
286:22

Counterclaims
283:25
284:5

counterintelli
gence   180:17

countermeasure
s   89:17
145:6

counterparty
100:7

counterproduct
ive   251:14

countries
16:20 73:7
99:5 159:8

country
58:10
168:10

210:14
263:8

County   30:15

couple   8:9
12:11
210:8
274:6
280:25
282:16

court   7:7
8:12,15
98:18
107:23
139:13
140:1
146:19

courtesy
261:11,13,
14

courts
269:16

cover   42:2

crazy   109:22

create   68:14
80:11
264:7
276:25

created
213:6
227:22
233:25
234:2
264:11
265:10

creating
228:13
266:20
283:7

creation
249:1

credited
36:14
241:22
242:2

crime   171:16
180:14
181:4,6,11
220:7

crimes
171:18

criminal
180:17
183:10
221:16
238:1,13,
24,25
239:1
269:14,25

criteria
79:12

critics
242:9

crooked
196:8

cross-border
246:4

crypto
224:24

225:4

cultivate
275:16

cultural
50:25

cumbersome
88:3 89:19

curious
158:15

currency
224:24

current
52:18,20
66:21

custom   228:6

customarily
232:24

customers
104:16

cut   256:16,
17,18,19

cutout   148:3
161:21

cutouts
84:21 99:5

───────────

        D

───────────

D.C.   9:3,14
30:14
31:14,20,
22 32:10
114:9
121:6

160:19,20
176:17
223:20
231:18,21

**dad**   138:3

**Dallas**
  182:14

**damage**
  145:20,22
  146:2,3
  174:17

**danger**
  144:10

**darker**
  118:13,15

**data**   17:18
  56:4 61:20
  62:2 64:5,
  18 65:4
  66:9 67:18
  68:19
  69:19
  71:10
  72:19 80:7
  87:3 88:9
  89:8
  93:16,18,
  19,21
  97:23
  127:25
  128:17
  167:18
  176:20
  178:6
  180:3
  182:1

183:18
192:12
195:24
200:7,8
202:4,20
203:19
208:9
211:14,21,
25 212:23
213:10,17,
19 216:24,
25 219:14
221:24
237:15
253:25
263:17
273:2,8
275:2
277:23

**database**
  184:3,13

**databases**
  181:20

**date**   7:5
  18:19 22:3
  101:17
  146:24
  157:16
  166:12
  176:22
  197:24,25
  198:2
  199:1,3,4
  206:25
  226:23
  271:21,23

**dated**   20:7
  46:19,22
  47:5,14
  214:25
  264:21
  265:3

**dates**   175:7
  187:2
  218:9

**day**   56:19
  59:20
  100:2
  151:22
  157:25
  166:3,5,11
  193:22
  210:13
  237:9
  245:9
  249:14
  259:23
  268:19
  290:7

**days**   37:18
  45:8
  56:16,18
  72:3 94:18
  100:11,25
  103:19
  126:22,23
  127:2
  143:10
  165:24
  166:4,5,6
  195:11,25
  210:8
  218:10

273:1,6,13
274:14

**dead**   69:2
  89:13
  90:25

**dealt**
  278:18,24
  279:7

**deceased**
  138:9

**December**
  20:7,10
  21:14,15
  22:1 24:13
  26:6 33:2
  35:22
  37:11
  46:12,19
  47:13
  57:21
  58:22
  62:11
  100:4,11
  104:20
  110:19
  118:19
  125:13,15
  126:2
  129:19
  134:6
  137:17
  143:11
  149:11,14,
  17,25
  152:4,8
  159:20
  162:10

Case 1:18-cv-02185-LJL   Document 261   Filed 03/16/20   Page 453 of 645

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019          Index: decided..democratic

163:12
166:25
167:7
226:21
232:4,5
285:17

decided
229:14

decline
77:14

decrease
95:19

decryptable
214:14

decrypting
214:16

deduct
36:17,18

deemed   98:19

deep   67:7
82:24
147:3,10,
15,16
273:22

deepest
139:5

defeat
173:22

defector
137:8

defectors
227:10

defend

156:18

defendant
281:19

defending
136:9
249:2

defense
73:21
117:6

defenses
171:2

defensive
156:12
244:3

define   44:19
56:9 90:22

defined
45:16 56:1
66:10
75:21
126:11

defining
126:17

defrauded
139:20

degree   9:6,8
84:12

delay   91:24
94:10,14
220:17

delayed
193:3

delays

209:24

delegate
83:11

delete
150:6,18,
21 151:22
219:2

deleted
151:4,8,10

delighted
269:13

deliver
48:16
51:12
58:12
67:23 68:2
69:10
72:7,8
176:3
196:25
206:13
216:10
217:1

deliverable
48:17
64:21 65:6
127:24

deliverables
49:8 50:7
51:17
81:24 82:4
87:18 95:8
126:11
127:2,19,
22

delivered
58:7 64:6
69:17
70:10,14
183:18
193:20
197:4,7,
12,13,17
200:3
202:3
211:10
216:23
217:25
265:4,5,8
267:22
274:15

delivering
64:17 68:7
72:5 88:14
92:11
93:5,22

delivery
65:1
89:19,22
193:21,24
217:6,17

demand   36:7

demands   61:1
209:16

democracy
53:21
104:11
244:7

democratic
245:19

Case 1:18-cv-02185-LJL   Document 261   Filed 03/16/20   Page 454 of 645

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019      Index: demonstration..deviating

demonstration
  202:9
  235:14

Department
  31:24
  121:8
  231:18

depend
  142:25

dependent
  148:24
  149:3

depending
  21:13
  152:1

depends
  151:24
  187:12,13
  194:17
  233:1
  252:1

deplete   42:7

deplorable
  221:23

deployment
  249:1

deport
  240:23

deported
  240:19
  242:20
  243:20

deposit
  36:1,14,18

37:1
126:12
136:8
152:5,18,
20

deposited
  158:9

deposition
  7:3 8:6,7
  40:25
  290:2

describe   9:4
  14:24
  22:10,22
  33:25
  50:17
  59:15,23
  101:9
  107:17
  136:1
  154:11
  162:5
  169:24
  171:21
  179:21
  183:21
  211:24
  288:2,12

describes
  262:14

describing
  115:23
  142:11
  164:20
  217:17

description

53:11
153:1
234:23

deserter
  137:9

design   41:12
  156:15

designated
  180:13

designation
  183:25
  184:15

designed
  228:6
  276:19,21

desire   240:2

desk   204:19

destabilize
  141:2

destabilizing
  156:10

destroy
  150:7

destroyed
  23:17
  128:16

destroying
  150:11

detail   45:16
  59:24 81:9
  109:21
  163:6

detailed

51:23
188:10
199:13,14

detailing
  40:20

details   97:8
  159:4,10

detection
  34:22
  37:24
  39:15
  89:16
  159:3,9
  223:2

detective-type
  15:1

determine
  38:11

develop
  156:12
  249:12

developed
  23:4,9,10
  60:24

developing
  21:11,12
  262:18
  273:2

development
  9:20

deviate
  66:19

deviating
  61:7

Dhabi   110:25

dialogue
  80:16
  124:9,20
  125:24
  132:2

dialoguing
  126:16

dictatorships
  227:10
  245:25

difference
  49:16
  50:25 59:9
  136:6
  214:5

differences
  25:1 156:3

difficult
  58:14
  60:17
  125:22
  145:5
  247:4

difficulty
  54:16

dig   61:20
  64:19
  70:13
  85:22 86:1
  196:15
  237:16

digging
  56:22
  60:10

95:23

digital   88:4

dining   23:3
  204:24

diplomacy
  164:3

diplomatic
  17:6 51:13

diplomatic-
quality   86:6

direct   98:15
  135:1
  271:24

directed
  94:3

directly
  21:18 22:6
  28:6 35:23
  37:21
  44:16
  63:7,14
  70:16 99:8
  185:4

director
  256:9

disagreed
  36:13

disagreement
  62:15

disappointed
  135:4,15
  209:22,25
  258:12
  269:11

270:7

disappointment
  134:18,23,
  25 205:1

disclose
  78:10
  225:2
  250:19

disconnect
  272:25
  273:17,24

discover
  91:22

discovered
  80:14 96:2

discoveries
  71:4

discredit
  242:9

Discreet
  224:25

discuss
  13:13
  159:17
  162:1
  217:5
  280:12

discussed
  11:9
  22:23,25
  23:11
  30:18
  31:20
  32:3,18,23

34:5,20
36:21
37:2,7
63:5,6
88:23
122:5,6
123:21
127:11,14
134:25
159:6,11,
19 162:13
204:7
209:17
230:21
231:7,9,10
277:13
279:21
281:22
282:3,6

discussing
  12:9 33:11
  117:4
  121:15
  124:2
  204:21

discussion
  57:2 62:20
  63:13
  64:13,16
  66:23
  80:16
  87:21
  125:8
  127:16
  135:23
  160:4
  162:5,12

170:5
191:21
198:11
202:19
230:10
232:8

discussions
48:24
109:6
110:20
135:25
136:2
139:18
170:9
228:15
233:22
252:2
273:12

disk  202:15
203:20

dismissed
63:19

dispatch
168:9

dispatched
82:15
185:25

dispense
161:22,23

displayed
177:20
179:12

dispose
23:16
150:12

disposed
150:1
151:19

disposing
150:11

dispute
23:22

disrupting
25:4

disruption
25:12

dissatisfaction  273:25
274:1

dissatisfied
216:14,19
274:8

disseminate
189:9

dissident
108:8

distinction
253:21

distributed
87:24

dive  82:24
276:8

dives  67:7

dividing
45:18

division
17:2

divisions
24:22
132:5,6

divulged
34:19

divulging
82:13
108:23

document
17:21
18:12,18,
22 19:14,
16 20:15
46:15 53:1
98:14
105:13,17,
22 106:11
113:5,7
149:20
154:14,16,
17,20,23
164:6,13,
16,22
165:17,18
166:15
169:17
177:12
189:17
190:1,12
191:4
195:14
212:20
213:5
226:2,5,15
227:4,14,
22 228:10,
13,25

229:3,13,
23,25
230:2,4,6,
8 231:6,7
232:13
233:8,18
236:8
237:24
255:6,8
259:3,6
261:17,22,
23 262:14
264:1,8
267:4,10
268:1,4,19
269:18
270:2,21
271:1
283:1,8,23
284:2,8

documentation
40:14
177:19
184:14

documents
178:22
179:11,18
185:17
234:1
259:7
268:21
269:12
281:1
282:17

dollars  39:7
45:12
139:14,21

140:9
157:14
161:3,4
186:18
259:20

**domain**
 181:16,18
 230:24

**domiciled**
 286:9

**door**  170:4
 173:1,3
 206:10

**doorstep**
 170:2

**DOS**  172:7,
 18

**double**
 137:19
 183:8

**double-check**
 73:4

**doubt**  140:8
 160:24
 184:23
 250:23

**downtown**
 231:20

**draft**  19:15,
 22,24,25
 20:15,18
 21:13,16,
 17  22:4,5,
 24  46:23

47:2,4,7
149:16,25
150:2
226:15,17
230:4
264:3

**drafted**  33:2
 47:3,9
 53:12
 89:3,7
 230:6

**drafting**
 32:16
 74:25 98:1

**drafts**  19:6,
 24 20:2,5,
 9,17
 150:3,4

**draw**  228:17

**drill**  17:18
 52:10

**drive**  56:5
 58:8,11
 59:14 64:7
 65:9,18
 68:1 88:5
 89:20
 165:4,6,
 15,17,19,
 24 176:16,
 24 192:10
 194:24
 197:4
 200:10
 202:6,24
 203:12

208:23
213:8
215:7
216:12,22

**driver's**
 181:4

**drives**
 87:17,22
 165:13,21,
 23 166:1,7
 176:4
 195:4
 212:6

**due**  37:5

**dug**  61:21
 80:5

**duly**  7:23

**duration**
 95:21

**dynamics**
 268:12
 269:23

─────────────

E

─────────────

**earlier**
 13:20 19:6
 42:5 46:24
 90:24 91:2
 123:21
 171:19
 177:25
 215:7
 234:13
 235:7
 244:15

248:13,21
249:10
273:12
277:14

**early**  11:13
 12:3,8
 21:25
 37:11
 166:24
 167:7
 193:23
 194:6
 221:5
 264:14

**earnings**
 44:10

**ease**  108:5

**easily**
 247:22

**East**  112:24
 246:11

**Eastern**  7:4,
 16 8:5
 13:13
 28:19 48:2
 52:25
 53:1,3
 55:12
 63:5,6
 74:18 75:8
 79:11
 84:24
 88:20
 96:12
 98:13
 99:21,25

100:1,2,6,
10,14,19
101:3
104:4
105:14
118:4,9
124:14
136:24
159:15
160:25
161:11,12,
16,20
188:13
189:2
195:18
197:8
208:18
217:6
247:14,15
264:25
270:7,22
271:1
272:7,24
274:4
286:1,9
287:6

**Eastern's**
261:1

**easy**  147:24
196:3

**eat**  203:23
207:9

**eating**  204:1

**eccentric**
244:4

**echo**  242:1

**edit**  68:15,
18

**edited**
266:19

**editorial**
146:10

**educational**
9:5

**effect**  40:14
77:10
131:8
191:25
208:1

**effective**
243:8
251:5

**effectively**
38:24
94:18
206:19

**effectiveness**
240:20

**efficiency**
283:3

**efficient**
276:7

**efficiently**
281:13

**elaborating**
233:22

**elected**
138:4
241:13,20
242:3,5

263:3

**election**
248:19

**electronic**
47:23
64:22 68:9
81:12 85:2
88:11
128:12
150:6,7
169:5,8
191:8
200:22
202:12
208:22
216:11
253:10,22,
25  288:4,
6,11,12

**electronically**
87:24
88:16

**elevator**
206:10

**Ellman**  7:15

**else's**
226:11,12

**email**  81:13
167:21
173:2
213:22,25
214:13

**emailed**
81:16

**emphatic**

273:21

**employ**  250:9

**employer**
10:2,3

**employment**
27:5

**enable**
137:10

**encompass**
89:24

**encounter**
90:19

**encountered**
178:11
183:22
260:7

**encounters**
84:25

**encrypted**
151:13,17
213:22
214:3,6,10

**encryption**
81:20

**end**  36:17
37:5,18,22
69:2 92:6
101:17
120:3
133:9
192:4
238:5
252:23,24
259:23

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019          Index: end-to-end..Europe

276:21
278:17
281:14

**end-to-end**
81:19

**endanger**
131:20,23
132:14

**endangered**
132:11

**ended**   62:1
86:3
122:12
127:17
196:16
258:12

**ends**   89:13
90:25

**enforcement**
148:13

**engage**
229:5,19
231:12

**engaged**
260:22

**engagement**
44:13,17
45:4,17,19
84:3
148:10
167:2
175:12
225:16
258:12
260:4,14

261:12
262:1
285:1

**engagements**
84:5

**engaging**
260:25

**English**
54:8,13,
18,20
142:19
159:25
160:1
178:18
231:10

**ensure**
144:6,7,8

**entail**   55:16
57:25   67:5

**entailed**
52:12   76:8

**entered**
285:6

**enterprise**
247:21

**entire**   144:9
236:8

**entities**
9:22   75:4,
7,11   98:16
107:16,18
159:10
241:4,10

**entitled**

164:6
233:8
261:17

**entity**   28:25
74:23
75:15   76:6
100:21
161:20
285:6,20

**environment**
23:19   56:4
279:8,16

**environments**
278:19,25

**envision**
252:20

**envisioned**
68:7

**equipment**
42:17
45:24

**equivalents**
97:13

**Erik**   115:9,
13

**Erin**   7:19
281:18

**erratic**   61:9

**error**   84:14

**escape**   159:8

**escrow**
139:22

**essay**   56:2

**essential**
27:25

**essentially**
206:25
224:16
243:5
262:24

**establish**
155:11
159:1

**estate**
30:14,16
31:13
231:12

**estimate**
257:5,6

**estimates**
232:15

**Estonia**
110:1

**euphemism**
217:13,14

**Eurasian**
244:19
245:19

**Europe**
65:12,15
68:1   72:4
174:21
176:20
186:1
192:21
210:2,10
264:13
272:3

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC

| | | | |
|---|---|---|---|
| **European** | **examine** | 62:24 | 276:12 |
| 58:10 | 281:3 | 63:10 | 282:20 |
| 176:1,2 | | 64:15 | 283:24 |
| | **examples** | 88:23 | 287:24 |
| **evade**  223:2 | 252:13 | 99:19 | |
| | | 100:22 | **exhibits** |
| **evaluate** | **exceed**  82:9 | 112:3 | 273:12 |
| 85:3,25 | | 115:16 | 281:9 |
| 86:2 | **excellent** | 194:13 | |
| | 118:24 | | **exile**  156:4 |
| **evenly** | 162:25 | **exhibit**  18:6 | |
| 38:19,21 | | 46:11,24 | **exiled**  108:8 |
| | **excited** | 47:5,6,8, | 244:4,17 |
| **event**  10:22 | 270:5 | 17,20 | 245:13 |
| 84:2 97:13 | | 105:13 | |
| | **exclusively** | 113:5 | **exist**  179:5 |
| **eventually** | 148:16 | 116:8 | |
| 161:8 | 216:9 | 164:4,5,6 | **existence** |
| 191:11 | | 165:7 | 84:20 |
| | **excuse**  118:2 | 176:11 | 140:2 |
| **Evermay** | 206:22 | 186:12 | 144:19 |
| 231:16 | 236:16 | 212:16,17 | 145:23 |
| | | 214:2,25 | |
| **Everybody's** | **execute**  75:6 | 226:2 | **exists** |
| 56:14 | 76:15 | 229:23 | 154:9,20 |
| | 145:9 | 233:8 | |
| **evil**  137:6 | 150:13 | 234:4 | **expect**  44:11 |
| | 151:3 | 236:6,14, | 45:1,9 |
| **exact**  24:8 | 216:2 | 16,17,23 | 61:10 |
| 46:25 | | 237:9,21, | 196:16 |
| 107:20 | **executed** | 23 248:13 | |
| 157:16 | 98:6 | 255:6 | **expectation** |
| 166:12 | 131:7,10 | 259:3 | 60:23,25 |
| 199:12 | 164:24 | 260:15 | |
| | 166:11 | 261:17 | **expected** |
| **exaggerate** | 168:22 | 263:20 | 71:14 |
| 187:1 | 272:13,23 | 265:14 | |
| | | 267:4 | **expecting** |
| **exaggerating** | **executing** | 270:20,21 | 121:18 |
| 135:5 | 46:3 114:4 | | 199:25 |
| | | | |
| **examination** | **execution** | | **expense** |
| 8:1 280:23 | 51:20 57:4 | | 94:17 |
| 281:15 | 59:17 | | 223:18 |
| 282:23 | | | |

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019             Index: expenses..fact

expenses
  39:13
  42:2,18,22
  45:20,21
  223:8,19

expensive
  125:9

experience
  9:19 68:14
  69:22
  115:15
  123:1
  125:4
  228:8
  274:22
  279:15

experienced
  51:8

expert
  142:25
  143:3

expertise
  15:6

explain
  14:13
  24:20 27:8
  28:18
  29:4,10,
  13,20 52:1
  87:25
  112:7
  170:24
  172:21,24
  195:23
  205:18,22
  212:12

258:18
269:25
272:19
279:1

explained
  28:4,10,14
  51:22
  76:25
  173:7
  174:15
  186:16
  202:22
  204:14
  213:18
  269:3
  273:11
  275:15,16

explaining
  51:23 62:6
  97:5

explains
  126:17

explicit
  36:11 87:5
  95:22 97:9
  99:1
  145:16
  275:1

explicitly
  27:17
  51:22
  93:15
  97:18
  128:9
  274:18
  285:19

exploded
  205:4,6

exploit
  24:22,25
  88:7
  246:23

explore
  231:12

expose   25:5
  139:13
  140:2,4
  242:8

exposing
  248:14
  249:3

exposure
  140:5
  270:1

express
  204:25

expressed
  34:14,15,
  17 140:8
  160:23
  275:6

extensive
  216:24

extensively
  17:12

extent   32:17
  33:9 44:3
  90:21
  140:6
  144:24

172:6
262:19

extra   95:10
  280:24

extraordinary
  34:21

extremely
  34:13,24
  56:23
  60:16

eye   243:18

─────────

F

─────────

fabricate
  80:7

face   89:9
  209:14,15

face-to-face
  200:15,16

facilitate
  251:24

facilitating
  162:4

facilitator
  21:19
  148:4

fact   51:23
  80:12
  108:25
  109:3
  160:5
  170:19
  209:25
  214:14

Case 1:18-cv-02185-LJL   Document 261   Filed 03/16/20   Page 462 of 645

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019          Index: faction..financial

faction
  183:9

factions
  156:2

facts  79:21

fail
  122:14,17
  126:10

failed  90:8

failing
  90:12

fails  90:6

failure  44:7
  45:6

fair  17:19
  33:5 59:6
  73:19 81:4
  88:16 90:3
  167:1
  268:13
  284:11
  286:14,24

fake  79:19
  161:20
  178:22
  179:4,18

Fakhravar
  155:7

fall  114:3

false  69:9,
  15 71:16,
  25 80:11,
  13 89:14
  91:20

178:20,25
179:12
180:8

familiar
  213:1

familiarity
  54:1

familiarize
  18:14

families
  268:6

family  25:5
  146:1
  148:12
  238:7
  268:2

fast  94:2

fear  34:14

feasibility
  88:10

feasible
  170:12

February  7:6
  93:25 94:1
  95:3,20
  102:6,16
  103:20
  104:21
  133:15
  143:22
  144:2
  180:1
  183:13
  215:1,19

216:3
217:11,15,
23,25
218:5,11
222:15
260:21
264:14
265:2,7
289:4
290:8

federal
  180:13
  184:1,4,9,
  25 185:3,
  6,14

feedback
  217:20
  231:4
  268:22

feel  11:12
  131:19
  132:15
  142:17
  209:14

feelings
  104:12

fees  46:2,
  4,8 117:21

fellow
  104:16
  115:9

Ferrari
  125:11

fiction
  161:22,24

field  68:14
  69:22
  73:24

fight  137:6

fighter
  138:12,23

fighting
  227:9

figure  41:9
  91:24
  130:21
  181:12

figured
  138:20

figures
  254:25

file  186:18
  219:17

filed  284:5

files  64:22
  192:11
  202:7,12

fill  47:11

filled  18:20

filter  144:6

final  36:16
  220:5
  275:10

finally
  222:13

finance  36:2

financial

33:17
37:2,15
38:15
52:13,25
53:8 55:1,
9 60:6
117:15,18

find 14:18
36:24 50:8
60:11,12,
16,18
70:7,13
71:3,15
79:20
89:14
92:24
94:4,6
96:1 180:2
181:20
183:16
221:3
237:14,15
260:21
266:5,6

finding
71:24 95:7

fine 13:22
23:7 29:3
51:6 54:11
66:14 87:9
88:17
90:16
101:22,24
112:21
164:12
173:13
207:23

254:24

fingerprints
221:24

finish 8:11
61:4 94:22
177:9

finished
56:1 61:3

finite 253:5

Finland
245:4

firm 73:21
83:1,6,7
266:16

firms 104:15

firsthand
154:3

fish 48:1,
5,10,14,19
50:13,14,
18,22 51:2
64:23
66:20
95:19,20
96:5 97:3,
14,15,16
164:19
179:8
180:5,7
181:13
190:19
192:12
202:8
214:19
237:3,19

265:14
266:4
287:24

fit 12:17

fits 251:21

flag 174:14
183:11

flash 56:5
65:18

flat 95:14
96:15,17
97:11

flat-rate
37:5

flaws 156:15

Fletcher
266:17

flew
210:10,20
211:6

flight
210:16,17,
21 213:9,
17

flights
199:17
219:12

flip 190:1

floor 201:22

flounder
48:17

flow 89:8
273:8

flown 192:20

fluent 54:9
86:5

fly 176:20
210:2,12

flying
246:20

focus 123:17
136:5

focusing
69:24

folks 159:14
183:22
185:3,10
191:11

follow 40:19
53:6 61:5
121:14
230:7
288:18

follow-on
232:13

follow-up
48:8
193:18

followers
250:6

food
203:23,25

force 156:13
170:11
173:20
174:2

**Forces** 11:19

**foreign**
53:18
115:20
116:2
175:22

**forensic**
33:17
52:13,25
53:8 55:2,
10 60:6

**forensics**
88:4

**forever**
252:22
253:5

**forged** 180:9

**forgeries**
179:14,20

**forgery**
179:16

**Forgive**
107:25

**form** 20:23
47:23
57:11,12
67:12
137:1

**formal** 37:19

**format** 66:4

**forms** 81:12

**fortune**
131:24

**forward**
278:5

**fought** 138:9

**found** 63:2
69:2,8,14
70:1,8
72:13
80:8,12,18
131:4
132:10
136:10
160:8
168:5
178:8
179:11,19
180:11,12
182:9

**foundation**
31:18,19,
22 250:25

**foundational**
268:14

**foundations**
251:5

**Fox** 243:16

**Frank** 70:8

**Frankfurt**
210:18,19

**fraud** 267:17
269:16

**free** 138:11
207:5,23

**freer** 246:15

**French** 10:8,
20,24
11:15 12:2
15:25
16:23 17:1
20:12,13
21:20
25:21
26:1,11
31:6,12
38:18
39:18
44:12
46:21
51:11
63:15
72:24
105:23
114:3,18
116:23,24
117:7
137:4,12
147:23
152:23
153:3,12,
15 154:5,
13 158:8
160:9
161:11
165:5,7,
13,14,20
167:13
182:13,14
189:21
190:16,18
193:13
194:1,2
198:6,9

201:12
208:4
218:7
223:13
226:18,19
227:2
230:16
232:2
254:23
264:13
265:1
266:19
283:12
289:7

**French's**
154:16
222:23
226:13
228:12

**friend**
118:18
119:8,11,
12 120:7,
11 138:1,6

**friends**
163:13,17
249:2

**front** 170:4
173:1

**frustration**
136:4
205:1

**fulfill** 34:9

**full** 8:20
55:11

90:25
91:7,11
257:1
262:24
273:14

**fully** 44:3,4
133:3
237:13

**fund** 260:17
285:7

**funding**
98:25

**funds** 25:10
36:9 41:24
42:7,21
43:24
55:22
99:15,17,
18 137:10
141:11

**future** 45:3
173:9

———————
G
———————

**G-A-L-I-N-A**
146:20

**G-R-E-G-G**
137:25

**gain** 237:24

**gained** 25:10

**Galina**
146:18

**game** 132:4
233:23

**garbage**
142:3,4
205:9

**garbage'**
142:5

**gathering**
253:10,22

**gauge** 88:5

**gave** 56:24
65:18
69:9,12
76:14
113:8
166:16
168:13
176:14
191:8
192:4
194:1,3
206:10
219:9
235:6
255:17
258:6
261:25

**gear** 273:13

**general**
11:20
33:12
73:24

**generally**
30:1 72:24
109:23
164:15
187:25

**generic**
119:13

**gentleman**
244:11

**genuine**
79:15,24
80:3,10

**genuineness**
80:17

**GEOINT**
262:10

**geometric**
262:5

**George** 9:7

**Georgetown**
31:23
39:19,20
41:22
114:1,6,
20,21
231:17

**Geospatial**
262:11

**Germany**
175:18
210:16,18,
21 211:4
213:16
272:4

**Gertz** 25:22
26:9,10
117:2,4,5,
11 162:2,9
163:3,9,17

226:24

**get all**
36:10

**Ghost** 259:12

**gift**
232:18,19,
21

**gifts** 232:24

**gigabytes**
183:18
211:14,25
212:23
213:19

**gigs** 211:20

**give** 18:4
19:17 22:3
44:7 45:7
59:1 93:24
95:7 123:7
179:24
184:14
199:4
207:4
208:8,17,
21,25
215:8
219:15
225:22
228:25
232:18,20,
24 258:2

**giving** 56:20
113:18
118:24
123:12

164:10
215:8

global  7:9
230:25
253:10,22

globe  262:6

go-to  167:3,
4

goal  25:15
254:8

goals  228:24

good  7:1
8:3 15:1
19:21
47:24
87:12
93:22
105:25
113:12
133:3
142:19
155:19
243:7
272:10
281:17

gorilla
251:20

gotta  93:17,
18 277:24

government
25:4 73:1,
19 137:5
156:4,20
159:3
181:2

182:6
183:8
184:1,4
185:3,6,14
221:17
230:25
239:21
240:18
241:19
258:21

governments
73:2

grad  9:16

graduated
9:10

grassroots
240:11

grateful
207:3

great  26:13
56:14
137:7,8
191:14

greater
160:20

Greg  138:1

Gregg  137:24

Grendi  7:14
8:2,4 10:3
17:25
18:10
20:1,20
21:6 22:20
33:5 35:16

40:15,21
41:1 46:10
52:4 74:4
87:7,9
96:11
105:5,12
106:13
113:4
116:7
152:13
154:19
157:1
164:5,9
169:16
175:10
196:19
206:22
212:16
214:24
226:1
229:22
233:7,13
255:5
259:2
263:19
267:3
270:10,19,
24 279:18
280:22
282:15,24
283:2
286:21
289:20,24

ground  8:10

group  77:10
92:20
156:7

182:5,18
222:4
242:4
243:1,2,4
248:18,22
252:1
256:22
278:17

groups  9:13
109:9,14,
19 110:3,
9,22
111:12,16
115:24
240:21
249:24

guarantees
79:14

guerilla
138:23

guess  28:6
46:2,4
102:21
116:4
134:5
146:16
172:13
239:9
260:2

guessing
39:22,23
160:12
217:23

guest  155:20

guidance

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019          Index: Gulag..Guo's

183:15

**Gulag**  53:20

**Guo**  19:15
  20:11
  23:23,25
  24:4,8
  26:16,17,
  21 27:8,15
  28:4,10,21
  30:7,13,21
  31:3,13
  32:2,4,12,
  24 34:1,8
  35:7 38:12
  43:16
  44:10 45:5
  48:23
  51:19,23
  54:3,5,8,
  13,23
  56:6,19
  57:2,15
  58:12,16
  59:16
  62:7,17,18
  63:6,7
  68:2,16
  71:10 72:6
  76:14
  81:16
  85:19
  86:12
  87:19
  98:25
  100:21
  102:12,19
  103:25

104:1,8,
14,24
106:15,22
107:13
108:20
109:8
110:12,19
111:18
112:12,22
113:19
115:17
117:2,3,12
118:5,9,
20,21
119:16
120:12,25
124:14,17,
23 128:6,
8,13 129:1
130:14,16,
21,24
131:5,17,
22,24
133:6,12,
16,23
134:1,22,
23 135:2,
4,5,15
136:4,5,6,
9,22,25
137:12
139:19
140:5
143:4,5,20
144:12
146:13
147:16
148:3,5,

20,25
149:2,4
152:18
153:23
156:9
158:23
159:18,22,
25 160:4
161:15,18,
21 162:21
167:5,10,
12,23
168:18
169:20
171:9,14
173:4,14,
19 174:12
181:11
186:15,17,
25 188:13,
15 189:2
191:13
193:20
194:11,17
195:12,18
196:2,7,16
201:13
202:22,24
203:5,14
204:18
208:18
209:11
216:14,19,
21 217:6
218:18
219:25
220:14
222:11

224:10
226:20
227:2,19
228:6,19,
25 229:5,
10,11,19
230:9,12,
17 231:24
232:18,20
233:21
242:17
243:18
247:14,15,
25 252:5
254:10,11
255:3
260:17
261:9
263:6
264:18,25
265:5
267:18
268:23
269:2,10
270:7
271:18
273:19
274:4,11
275:1,20
276:22
277:12
280:13
284:18
285:4

**Guo's**  24:11
26:7 31:1
33:10
37:11

38:10
44:23 48:6
54:6,7
67:23
99:16
103:6
128:10
134:11
148:6
168:25
174:17
213:23
217:7
221:23
238:4
261:2
265:22
267:12
273:23

guy 70:8
120:21
123:17,18
167:3
240:22

guys 49:21
121:15
139:1
167:4
182:22
203:19

―――――――
H
―――――――

H-A-N 26:5

habit 150:12

hack 167:17

hackers
224:20
225:9
242:5
249:10

haggle
257:16

haggling
123:11

half 39:1,4
157:13

half-million-
dollar
158:4,7
160:3

Hampshire
137:25

Han 20:12
21:19
25:21
26:4,14
31:3
53:16,17
96:2
102:17
116:14,16,
25 117:2,
12,14
118:3,8,
14,16
119:7,20
120:13
126:2,5
168:19

Han's 121:22

hand 60:24
104:18
169:10
202:15
217:2
219:21
234:9

handed
165:12
176:16
202:17,18
203:12
211:25
229:3

handing
203:20

handout
262:2,3

hands 87:14

handshake
78:14,15

handwrite
22:8,9

handwriting
105:21,24,
25 189:19,
22,23
190:15,17
226:8,10,
13

handwritten
22:12,15
105:13
154:7,12,
22 190:2

happen 46:9
145:8
148:23

happened
12:12
190:23
206:7

hard 8:15
21:10
152:13
223:17
225:15
241:6

harm 78:7

harvest
253:25

hate 241:18

he'll 137:2

head 178:6
208:13
265:18

hear 153:18
157:23
158:6
161:10
182:13
204:16
220:23
288:24
289:3,6

heard 25:14
49:14,17
100:1,10
131:1,11
154:3,4

161:5
167:1
180:24
220:20
270:7
280:10
286:5
289:7

hearing
153:25
158:14
285:11

helped
112:25
155:11,24
248:18

helpful
63:25
187:15

helping
109:9,12,
14 156:11
227:10

hey  91:22
103:2
161:16
163:5
181:11
185:21

hide  91:18,
19

Higgins
163:19

high  84:12

high-end

30:16

high-risk
23:19 78:6

higher  17:13

hire  15:12,
19 54:4
122:22
130:21
148:20
243:5,6
249:8

hires  142:24

hiring  249:9

historical
52:14,25
53:9 55:2,
10 64:8,14
66:6,10,13
70:22 71:6
96:8

historically
12:25

history
9:11,12
104:13

hit  278:19

Hodgson  7:19

hold  77:2
141:22
142:15

home  20:6
114:12
125:13
137:1

213:17

homestretch
270:11

honestly
123:23

Hong  99:2
125:19
157:14
158:21
240:9
285:21
286:25

hop  61:2

horrible
245:25

host  170:19

hostile
278:18,25
279:6

hot  87:16

hotel  201:16

hours  151:25
176:23
203:21
204:4,5,6
231:3
281:6

house  15:25
16:6 23:1
31:22,25
112:3,9,11
121:6,9
131:6
205:10

how's  158:4

how's-it-
going-type
163:14

Hudson
250:25

hug  192:4
206:11

huge  93:16
171:6
192:4

human  47:23
262:13

humanly
94:12

HUMINT
262:12

hundred
16:11
259:20

hurt  141:5

husband
10:10,13
17:8

Huseby  7:9

hypothesis
221:19

hypothetical
92:5,7

_____

I

_____

ID  187:5
276:7

idea   26:13
  153:6,10,
  16  159:18
  181:10
  216:6
  245:17
  246:13,23
  259:14

ideal   162:22

ideas   12:14
  22:4
  110:15,18
  124:5
  148:5
  227:7
  228:16,18
  248:12

identification
  18:7  46:13
  105:15
  113:6
  116:9
  164:8
  212:18
  215:2
  226:4
  229:24
  233:12
  255:7
  259:5
  261:19
  263:22
  267:6
  270:23
  282:22
  283:25

identified
  235:2,20
  237:3

identify
  254:13

identifying
  14:6  97:24

identities
  76:12,24
  86:16
  178:25

identity
  78:10
  84:20
  101:14
  279:11,21

ideological
  137:13

ideologically
  258:23

illegal
  91:22
  171:6,10
  174:6
  179:2

illegally
  25:10
  196:9

illustrated
  246:12

illustrating
  50:24

image   244:4

imagine   44:2
  50:3  78:8

immediate-term
  72:10

immediately
  93:17
  151:23
  166:16
  176:21
  197:20
  219:24
  276:16

impatient
  51:25
  56:19
  209:4

implied
  27:15
  28:25

importance
  70:7

important
  180:11
  211:21

impossible
  49:4  60:16
  71:15  84:7
  91:17
  196:14,17
  241:8
  276:1

impress
  79:19

impulsive
  144:20

in-person
  104:22
  160:14

inaccurate
  69:9
  177:23
  178:13

include
  33:17,20
  55:16
  90:18
  95:18
  147:4
  171:5
  248:25

included
  58:18
  75:14
  177:22
  247:11

includes
  187:2

including
  25:7  78:7
  84:2
  167:18
  230:22
  246:4
  267:14
  280:19

income
  101:24

incompetent
  83:3

incomplete

97:20

incorporated
286:10,16
287:7

incurred
223:6,8,18
225:15

independent
28:7,9

independently
11:23

indicating
237:10

indication
103:8
113:15
192:23

indicative
91:3

indirectly
35:24

individual
50:19
83:17
108:6,11
119:14,18,
25 123:20
182:4,9
214:19
236:9,11
244:14
247:9
263:17

individuals

33:13 34:6
49:2 64:20
70:2 83:25
86:13,25
97:22
106:6,11
178:3
179:16
180:15
181:1
183:4
214:1
219:12
236:14,18
237:16
241:1
263:24
265:13,24
267:1,12
270:1
277:4
287:13

individuals'
236:20

industry
66:16
82:1,5
122:19

infiltration
180:10

influencing
243:9

information
11:18
17:17 50:8
56:22,24

60:16,18,
24 63:24
64:10,19
67:25 68:9
69:9,11
70:1,12
72:7
73:12,19
75:4
79:14,19
80:3,5,6,
8,12,13,18
85:1 86:1
87:22
89:14,20
113:16,18
132:10
141:9,12
142:14
144:9,15,
21,25
145:1,11,
24 149:23
163:21
165:7,10
169:10,19,
21,23
170:9
171:5
172:20
176:12
177:4,22
178:1,12
179:24
181:15,21
182:17,23
183:3
186:11,12

187:2,8,
13,15
188:6,8,
11,12,14,
22 189:3,
7,9 192:7,
16 193:16
194:4,14
196:4,10,
15 198:17
202:14
203:5
204:11,13
205:23
206:1,14
208:18,23,
25 209:5
210:3
211:18
212:7,23
214:11,17,
22 215:8,
11,15
218:16,19
219:10,11,
17 220:6
221:10,18
238:5
239:7,11,
19,20,23,
24 240:8
243:24
244:1
246:25
247:5
254:5
260:8
268:24

269:5,20
270:8
272:18
273:15
276:7,16
277:24
287:20

**informed**
80:13
202:21
284:17
285:4

**initial**
20:17,18
21:13
60:21
117:11
128:16
163:11
165:19
237:18
247:13,19
256:15

**initialed**
46:20

**Initially**
55:20

**inside**  25:2
155:25
168:14
170:23
182:8
246:4,10

**insight**
68:19

**insisted**
89:2
186:25

**insistent**
87:19

**insisting**
173:20

**Institute**
9:15
250:25

**institution**
251:9,15

**instruct**
21:2 219:5

**instructed**
68:17 95:3
102:18
133:16,23
143:18,22
171:14
180:2
260:21
267:23
271:18

**instruction**
99:16
217:12
219:23

**instructions**
67:24

**instructs**
99:13

**insurance**
120:8,14

**insurgency**
138:24

**integratable**
67:12

**integrity**
205:7

**intelligence**
17:6,8
34:23
36:24
51:14 73:6
99:6 117:5
163:1
196:8
199:23
234:17
253:10,22
261:18,21
262:9,10,
11,13
263:16

**intended**
56:1

**intent**
274:17

**intercept**
88:1

**interest**
25:19,20
34:17
70:10
233:2
254:4
255:1
265:21,22

**interested**
136:22
227:14
231:13

**interests**
104:10

**interfere**
231:1

**interfering**
281:10

**interim**
156:20
202:12

**interlocutor**
217:8

**intermediary**
77:18
162:23

**internal**
109:25
110:2,16,
21 193:2
245:14

**International**
9:15
167:20

**internet**
58:9 212:5

**interpreted**
143:5

**interpreter**
21:19
54:7,12

interpreters
  54:23
  159:25

interpreting
  141:23

interrogatorie
s  282:21
  283:4

interrogatory
  283:10

interrupt
  206:23

interruption
  98:18
  146:19

interspersed
  190:3

intimidating
  282:17

introduce
  7:11
  119:20,24
  120:1
  252:5

introducing
  118:9

introduction
  117:11

intrude
  177:8

intuitive
  170:25

intuitively

275:25

invading
  145:23

invasion
  138:10

invested
  30:13
  242:21

investigate
  33:13
  224:3

investigating
  146:11
  147:1
  163:25

investigation
  14:21,23
  15:3 16:20
  108:15
  146:3,7
  163:20
  173:9
  180:17
  186:13
  187:10,17,
  19,23
  193:4
  195:16,20
  214:12
  223:6

investigative
  162:18

investigator
  181:20

investigators

182:21

investigatory
  15:9 16:24
  17:17
  29:18 30:5
  35:12
  49:19
  52:11
  66:17
  83:17
  108:11
  114:7
  156:8,22
  163:23
  170:22
  252:9
  253:14

Investment
  167:21

investors
  104:16
  279:24
  280:6,8,
  11,12,16,
  20

invoice
  37:19
  100:25
  101:4
  102:2,22,
  25 103:2,
  15 259:16

invoiced
  102:14
  259:19

invoices

101:3,5,13
  103:9

invoicing
  101:6

involved
  22:10
  30:16 36:9
  42:8,9
  47:19
  53:21
  69:10
  86:24
  130:22
  133:25
  136:11
  142:16
  143:15
  152:18
  168:8
  183:10
  219:13
  239:22
  258:25
  263:16
  275:20

involvement
  228:12

involves
  84:12

Iran  111:9
  155:25

Iranian
  155:9
  156:1

Iranians
  156:16

**Iraq** 11:5, 17

**Ireland**
174:23
175:17,18
210:15,16, 20

**iron** 148:4

**irregular**
88:18,22
89:23
90:7,17
91:1,3,5, 9,15 92:1, 9 93:4,11, 21 94:9
127:9,10

**IRS** 101:23

**isolating**
249:3

**issue** 37:19
69:3 84:23
85:21 87:7
97:3 105:3
141:16
154:6
160:5
171:4
183:17,23
186:23
233:14
265:10
279:19

**issued**
102:3,25

103:9,15
249:5

**issues** 36:1
43:15 50:7
60:13
83:19
89:18
134:12
136:13
146:13
158:17
178:11
179:7
230:22
281:8

**italics**
244:2

**Italy** 125:18

**item** 253:24
256:13

**itemized**
248:13

**items** 33:25
49:9 89:24
190:5
223:12
229:20
257:13,23
284:18

**iteration**
184:12

**itinerary**
211:1

**J**

**jacket**
125:8,9

**jackets**
125:10

**January** 18:7
46:22
47:4,15
65:1,19
93:25
95:18
100:3
102:9,15
104:20
155:3
157:17
158:11
160:11
165:1,20
166:9,10
176:25
177:1
183:19
186:9,10
193:23
194:20,21
198:23
201:11,14
202:1
203:2,11
204:9
206:20
207:1
208:9,19
215:12
221:5,8

271:17
273:10
289:5

**Japanese**
138:10

**jargon** 49:18

**Jaysun** 7:9

**jeopardize**
144:18

**jihadist**
11:8

**jived** 137:3

**job** 90:6,9
92:24,25
93:2
120:16
142:9
149:7
176:1
224:8
249:14
258:22

**jobs** 44:23

**Joe** 7:17
20:1 22:21
40:15
164:9

**John** 8:22
136:17

**joint** 41:23
114:3

**journalism**
164:2

Case 1:18-cv-02185-LJL   Document 261   Filed 03/16/20   Page 475 of 645

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019Index: journalist..L-I-A-N-C-H-A-O

journalist
  162:18

journalists
  242:16
  243:4,23

Judd
  137:22,24
  138:1

judge  131:2
  286:24

judging
  149:19
  183:6

judgment
  124:19
  142:13

jump  281:13

jump-starting
  187:16

jumped  12:9

junk
  194:11,15,
  18 205:9
  269:4,6,8
  270:9

juvenile
  278:14

───────────

──────────
        K
──────────

K-H  108:3

K-O-D-O-R-K-H-
O-V-S-K-Y
  108:2

Kai-shek
  138:13,14

Kappa  9:7

keeping  97:3
  136:4,5

key  240:12

Khodorkovsky
  107:22
  110:10,13
  111:14
  244:13
  252:6
  254:24

Khodorkovsky's
  252:20

kid  138:16

kids
  278:11,13

kind  11:21
  12:15,16
  14:8,23
  15:21
  16:23 36:5
  48:8 49:18
  54:16
  59:23
  65:8,17
  66:15
  68:5,14
  69:23
  70:11 73:8
  74:1 84:6
  101:19
  108:24
  109:17

120:17
137:13,19
138:24
166:19
170:8
172:1,5,10
177:4,25
188:1,5
190:2,19
203:12
208:25
229:16
243:2
244:8
248:23
251:8
253:14
255:23
257:5
258:20,24
262:5
275:24
288:14

kindergarten
  278:7,10,
  13

kinds  42:8
  78:8
  125:20

King  259:12

knew  56:23
  119:15
  131:11
  138:3,19
  146:25
  275:25
  276:2

knowing  81:7
  153:25
  210:25
  222:6

knowledge
  32:11 54:4
  239:16
  269:21
  287:9

Kong  99:2
  125:19
  157:14
  158:21
  240:9
  285:21
  286:25

Kraft  182:19
  259:11

Krause  7:15

Kwok  7:20
  21:18 24:1
  44:10
  46:22
  63:18
  70:11,16
  164:16
  183:7
  221:15
  281:19,22

Kwok's  21:23
  22:6 70:2

──────────
        L
──────────

L-I-A-N-C-H-A-
O  26:4

labor  17:2
  53:20

lack  262:22

laid  287:16
  288:11

land  110:23

language
  85:22
  86:4,6
  108:6

laptop
  169:2,4
  202:15,24
  213:13

large  15:7
  96:17
  219:17
  236:9
  246:8
  273:8
  276:15

larger  34:10
  36:8
  104:10
  156:25

late  12:7
  100:4,11
  109:24
  134:6
  166:24
  232:4
  281:11

Latvia  110:1

laundering

179:1

law  73:21
  83:1
  104:15
  171:20

lawsuit
  216:6

lawyer  77:3
  97:25
  118:2

lawyerly
  199:24

laying  288:7

layperson
  172:21

lead  38:5
  110:11

leader
  77:19,23
  78:4,5,9,
  18,21
  79:4,8
  80:5,17
  83:13,23
  131:20
  151:12
  155:9
  166:17,19,
  23 167:3
  168:8,9,12
  174:15,20,
  25 175:4,
  12 177:3
  178:13,15
  186:3,8

191:9
192:7,9,20
193:9,18,
25 194:5,
16,22,25
195:6
210:22
211:3
213:18
221:9
244:17
255:12,17
257:17
272:5
287:23
288:2,21

leader's
  255:14

leaders
  245:14
  252:1
  254:3
  268:7

leaders'
  25:10

leadership
  24:19,23
  25:13
  137:3
  189:5

leading
  19:25
  228:15
  240:22

leads  71:13

leaf  265:15

learn  84:14,
  16 287:21

learned
  61:10

leases  45:25

leave
  101:11,12
  221:21

led  83:23

left  42:7
  43:24 44:8
  203:19
  205:10
  245:4

legal  8:20
  23:7
  45:14,24
  46:2,4,8
  56:3
  89:10,18
  91:21
  99:11
  136:20
  168:2,9,13
  171:14
  263:8

legalistic
  98:4

legally
  75:16

legend  262:8

legitimate
  77:4 79:21

80:6

**legitimately**
79:21,22

**Lego** 125:19
135:7,13

**lengthy** 23:1

**letter**
40:19,24
214:25
215:4,18,
23 222:16

**letters**
236:10

**level** 17:13
49:11
71:12
97:4,6
122:25

**leverage**
237:24
242:23
248:2

**Lexington**
9:2

**liaison**
67:23

**Lianchao**
20:12
21:18
25:21
26:4,14,16
27:9 28:4,
11 30:20
31:3 35:24

38:10
51:20
53:15,16,
17 54:20,
22 57:3,16
58:17
59:8,16
62:7,18
63:7,17
81:17
86:5,21
96:2
102:17,22
103:2,18,
22 104:3
105:2
106:16,23
107:13
108:19
109:8
112:23
113:21,22
116:14,16,
25 117:2,
9,12,14
118:3,8,
14,16
119:7,20
121:22
123:24
124:17
126:1,5,10
128:4,8,9,
21 129:18,
23 130:3,
15 131:7
133:9,13,
17,19,21

134:2,10,
11,20
135:1,4,8,
14,22
136:14,22
138:1,2,6,
16,20
139:8,19
140:11,22,
25 141:17
143:8,25
147:24
148:15,20,
24 149:1
152:19
159:24
160:4,7,
10,21
167:11,12
168:19
169:20
173:4
178:9
183:14,15
187:1
196:3
208:2,5
216:1,5,9,
13,19,21
217:4,7,14
218:8,21
219:3
226:19
227:2,17,
18 228:16,
22 229:1
230:11,17
265:6,21

267:19,20,
24 268:16,
22 270:2
271:21
273:20
275:1
277:12

**Lianchao's**
134:22
137:4

**Liberty** 10:6
41:19,21

**license**
181:4

**life** 133:20
139:2
155:21

**light** 77:4
243:18

**lighter**
118:13,16

**like-minded**
254:8,9

**likes** 187:1
247:25

**limbo** 44:8

**limit** 253:5

**limited** 7:4
262:18

**lines** 65:10,
13,14
211:21
212:15
213:20,21

261:3

**linguists**
85:16  86:7
256:21

**Link**  246:3

**Linkedin**
113:14,15

**list**  70:2
106:7
107:11
164:18,19
179:8
180:5,7
181:13
183:25
184:4,19
188:13
190:19
213:23
236:4
237:7
238:25
267:12,14
269:15

**listed**
106:11
214:1
265:14
270:1
287:24

**literal**
138:23

**literally**
78:15
200:15

**Lithuania**
110:1

**litigation**
7:10  265:8

**litigators**
73:22

**litmus**
138:17

**live**  86:23

**lived**  25:8
201:22

**lives**  78:5

**living**  23:2
25:2  33:14
137:7
204:23
249:13

**LLC**  7:5
39:17,19,
21  41:23
76:8
114:2,13,
19,22

**LLCS**  38:23,
24  39:3,14
40:6,11
41:7,11,
14,25
42:13,14
43:11
117:19
118:8
222:22,23,
24  249:18

**located**
15:24

**locations**
187:5
244:25

**logistical**
89:18

**London**  108:9
125:20
239:3
244:17

**long**  19:13
83:13
86:22
93:20
94:14  97:6
101:23
116:16
140:13,23
150:14
158:1
163:13
195:23
207:22
220:17
231:2
272:8

**long-term**
144:17
206:3

**longer**  17:9
71:14
143:23

**looked**
121:10
180:23

257:7
286:6,8

**loose**  241:13
243:1

**losing**  148:7
209:13,15

**losses**  44:20

**lost**  116:18

**lot**  11:3
23:13
61:24
63:3,20,24
64:19  70:1
78:6  87:3,
5  93:1
104:24
110:19
124:5,6
136:17
138:21
147:22
169:19
209:7
248:3
256:2
280:17
281:7,9

**lots**  127:25

**loud**  278:2

**Loushin**  7:9

**lousy**  139:14

**low**  224:18
225:6

**lower**  66:22

189:14

**lunch** 131:6
  155:1
  157:1
  204:24

**luncheon**
  157:5

─────────────

**M**
─────────────

**M-I-K-H-A-I-L**
  107:25

**machines**
  257:20

**made** 37:22
  41:21
  42:13,14
  61:8 65:1
  78:12,13
  87:23
  92:23
  124:3
  125:18
  131:24
  142:3
  149:22
  222:1
  284:19,20,
  23

**MAGA** 241:17
  243:2

**main** 144:5
  180:12
  202:8
  236:9
  241:2

**maintain**
  77:2

**maintained**
  17:10

**maintaining**
  27:25

**major** 134:9
  152:7,10,
  17 153:1
  154:1
  225:18

**make** 35:18
  42:1 43:20
  67:7 73:4
  79:18
  137:7
  141:11
  145:5,7
  159:2
  177:16
  191:2
  239:20
  247:25
  248:3
  249:13,16
  277:16
  281:1

**makes** 90:5

**making** 36:25
  60:25
  68:10
  152:21

**male** 203:3
  212:3

**man** 247:25

**manage** 83:6
  251:25

**managed** 25:9

**Mandarin**
  61:24
  85:7,9
  86:6 128:6
  178:16

**Mandarin-
reading**
  86:18

**Mandarin-
speaking**
  86:17

**mansion**
  231:16

**manufacture**
  80:7

**Mao** 138:10

**map** 244:18
  268:5

**March** 95:20
  264:21
  265:3

**mark** 17:22
  191:2
  226:23

**marked** 18:5,
  7 33:24
  46:12
  105:14
  113:6
  116:9
  164:7

212:18
  215:1
  226:3
  229:24
  233:11
  255:7
  259:4
  261:19
  263:21
  267:5
  270:22
  271:1
  282:22
  283:25

**markers**
  244:22

**marketers**
  254:2

**markings**
  190:7

**marks** 113:8,
  11

**MASINT**
  262:11

**mass** 250:6

**master's** 9:8

**match** 18:2
  262:9

**material**
  61:24
  76:14
  85:2,22
  209:8
  211:10
  225:19

246:16
261:24
274:15

**materials**
74:20 75:9

**mathematically**
94:13
196:17
214:16

**matter**  7:3
8:5 81:18
124:16
163:3

**matters**
63:20

**meal**  204:1
225:20

**meals**  224:2

**meaning**
12:21
71:11
127:8
129:1
151:9
153:15
181:2,23
186:16
195:10
212:4
265:22

**means**  14:14
42:11
79:18 81:6
99:12
128:12

141:11
173:25
180:3
204:16
245:8
253:25
260:22
288:15

**meant**  24:21
34:22 58:9
120:13,15
139:24
172:22,25
177:17
280:5

**measure**
97:12

**measures**
34:20
45:25
256:1
275:16

**media**  32:1,2
33:22
52:22
164:1
230:25
231:13
241:25
249:4
253:11
254:1,15
276:17

**media/activist**
240:11

**medium**  272:1

**meet**  10:15
16:6 23:5
26:15,16
127:19,23
175:3,11
176:6
182:15
186:3
194:22
210:21
257:20
282:2

**meeting**
21:22
22:23
23:1,12
24:10
25:25 26:7
27:12,14
30:4,18,
19,25
31:14,15
32:16,23,
24 33:2,10
34:2,5
35:18,20
37:7,10
104:22
125:14
129:21
135:8,10,
13 153:23
160:14
163:11
167:15
168:24
171:22,25
174:19

186:7
192:8,17,
24 193:18
201:10,25
202:23
203:10,24
204:2,10,
19 206:7,
8,14,16
208:2,9,19
209:12
211:24
226:20,24
227:5
230:9,13,
14,21
231:2
232:6,11,
12,14
234:5,7,12
235:14
272:3,4

**meetings**
22:14 31:2
37:8 54:21
128:5
135:12,16
175:14,21
194:15,25
195:5
223:21
285:18

**member**
130:17
131:5
140:14,17
148:11

283:19

**members**
52:21
69:17 73:5
77:17
83:22
85:18
86:18
114:22
145:24
146:1,11,
15 214:1
220:20,23
221:3
283:17

**memes** 249:1,
12

**memetic**
249:2

**Memorandum**
98:10

**memorialized**
22:24
127:1
149:18
234:24

**memorializing**
238:4

**memory**
129:16
149:15
194:1

**mention**
115:15
149:10

**mentioned**
23:23
116:15
152:4
165:21
168:7
235:24
238:18
244:14
277:15
280:8

**mentor** 139:5

**mentored**
138:15,16
139:6,8,9

**menu** 118:19

**mercurial**
104:14

**message** 72:8
80:25
81:11
108:13
116:8
118:24
119:7
120:18
126:1,6,9
128:12
135:23
143:20
144:3
148:20
151:14
163:24
200:13
201:1,5

215:21
218:23
219:1
272:8
276:11

**messages**
81:3
150:15,21
151:4,8,13
219:3
250:7
273:21
274:3

**messaging**
14:11 52:9
108:12
110:18
151:17
163:21
164:3
254:5
271:16

**met** 10:9,20
24:14
25:17
30:21
31:9,10
38:12
53:23
74:14
116:17
117:9
148:9
160:18
174:15
175:1
191:22,23,

25 192:1,2
194:12
195:2
201:12,22
204:4
210:18
211:3
212:2
230:8

**metaphor**
48:23 97:5
170:8
266:4

**metaphorical**
97:7

**method** 95:5

**methodical**
135:2

**methodologies**
95:1

**methodology**
52:1,2

**methods**
16:25
73:11 81:8
82:11,12,
17,18
91:21
144:8
156:12

**metrics**
59:25

**mic** 87:8

**Michael** 7:3,

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019         Index: micro-targeted..month

22 8:21,22

**micro-targeted**
234:16

**mid-december**
167:8
168:23
230:15

**mid-february**
220:11
264:14
267:23

**mid-january**
193:23
194:6
273:10

**middle**
112:24
206:23
287:17

**migratory**
246:9

**Mikhail**
107:22
110:10,13
244:13

**Miles** 21:18,
23 24:1
44:9 46:22
164:16
183:7
221:15

**Miles's**
222:7

**military**

11:20,22
124:16
259:15
278:18,25
279:6,15

**milk** 125:10

**million**
36:2,5
39:6 45:6,
12 121:6
139:14,21
140:9
157:11,14
161:3,4
186:19,25
251:7

**millions**
250:5

**mind** 50:23
64:25
65:17
66:15
75:20 81:5
89:24
96:20,22
113:9
121:22
133:2,6,24
135:14
172:5
195:15
200:14
201:3
207:11

**mine** 182:1

**minimum**

126:23
188:1
195:11

**ministry**
35:1 53:18
132:2

**minor** 232:23

**minutes** 74:5

**miscommunicati
on** 193:3,9,
12

**misleading**
80:11

**missing**
57:13

**misspelled**
178:16

**misstatement**
280:10

**mistake** 90:5
120:18

**misunderstandi
ng** 196:3

**mix** 18:2

**MMS** 34:25

**mobilize**
240:12

**modalities**
143:2

**moment** 18:12
138:5
225:22

**money** 39:1,
20 41:6
43:2 44:11
45:11
100:21
104:18
158:18
160:24
171:6,10
179:1
222:21
224:15
225:5,10
242:21
248:3,7
249:16
257:1
258:8
259:24
268:9

**monitor**
186:1

**monitoring**
186:7
247:9
253:12
254:1

**monopoly**
240:2

**month** 36:15
37:22
38:14
43:5,16
67:1 89:11
91:13
95:17,23,
25 103:16

Case 1:18-cv-02185-LJL   Document 261   Filed 03/16/20   Page 483 of 645

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019      Index: month's..Netherland's

255:19,22,
23 256:8
261:4

**month's**
43:17 44:6
103:3

**monthly**
66:23 67:9
94:20
96:19
255:11

**monthly-type**
72:11

**months** 43:14
60:18 64:9
71:1
206:18
275:4

**morning** 7:1
8:3

**motion** 77:5,
22 279:19

**motivation**
141:8

**motives**
205:8

**MOU** 98:5,9

**mouthpiece**
251:18,19

**move** 87:8
268:8
281:6,12

**moved** 55:22
206:25

**movement**
53:22
104:11
155:10

**movements**
11:8
109:25

**moving** 94:2

**MSS** 34:23
35:1

**multilingual**
17:11

**multiple**
151:18

**murdered**
34:15
146:11,23,
25

**mutual** 11:7

———————

**N**

———————

**N-E-W-S-E-U-M**
231:20

**named** 115:9
138:6
236:17
265:13,24

**names** 24:1,6
25:9 50:6
69:3 70:3
91:20
92:18
95:24
106:4,5,7

107:17
164:18
178:2,16,
18 180:12
188:14
235:25
236:20
237:3,8,20
263:25
267:15

**narrow** 33:6

**narrowed**
38:12

**National**
275:22

**nationality**
188:3

**nationals**
33:14
86:7,10,22
180:18
246:22

**nationwide-
organized**
245:10

**natural**
141:7

**nature** 11:14
19:11
49:24 66:4
76:1 89:19
140:6
162:12
176:8
187:13

188:24
197:19
204:11
223:12
225:18
232:16
233:1
238:25

**necessarily**
35:25
182:1
185:19
241:8

**needed** 36:9
148:1
150:13
178:18
257:10,12
263:9

**needing** 62:2

**nefarious**
136:12

**negotiate**
257:4,16

**negotiating**
36:6 38:3

**negotiation**
47:1
275:11

**nerves** 287:3

**nervous**
139:20,22

**Netherland's**
201:18,19

Case 1:18-cv-02185-LJL   Document 261   Filed 03/16/20   Page 484 of 645

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019      Index: network..objectionable

network
  17:16
  73:18
  240:11,25
  241:1,5,17
  242:2,12,
  14 243:14
  252:8
  279:7,15

networking
  17:5
  251:24,25

networks
  17:7 25:5
  223:22
  240:5
  241:2,7
  246:22
  278:19,25

Newark  212:1

news  70:11
  105:1
  158:14
  242:8
  249:1

Newseum
  231:19

non-chinese
  267:15

non-corrupted
  165:23
  166:1,14

non-
investigatory
  32:6

non-
prioritized
  235:25

non-profit
  9:12 31:19
  155:16

normal  50:2
  101:21

North  241:11
  262:23

Northeast
  9:2

Notary  7:23

note
  189:16,20,
  25 190:11

noted  133:16

notes  22:15,
  18,21
  23:13,14,
  16,17
  33:3,8
  154:12
  190:2,8,20
  191:3
  199:24

notice  44:7
  45:7 289:8

notified
  65:11

notorious
  101:15

November
  21:14

162:10
163:12
166:24

NSA  196:15
  275:22

number  46:10
  48:24 49:7
  53:4,5
  56:16
  84:14
  96:18,19
  131:25
  181:4
  184:8,10
  257:19
  267:13
  271:5
  283:10
  284:12

numbered
  178:3
  236:9
  237:2

numbering
  17:24

numbers
  187:5,6
  219:13
  237:20
  244:19,23
  269:25

nuts-and-bolts
  17:14

O

oath  74:12

object  19:18
  51:3 70:10

objected
  36:13
  43:16
  94:14

objecting
  94:19

objection
  20:19,23
  21:1 29:8
  32:20 34:4
  38:7 56:11
  75:17
  76:10
  77:4,15
  78:22
  79:25
  81:14 84:6
  90:2,20
  95:13
  96:10
  132:13
  137:15
  150:23
  164:10
  187:18
  193:5,14
  196:5
  197:9
  281:24

objectionable
  154:8

Case 1:18-cv-02185-LJL   Document 261   Filed 03/16/20   Page 485 of 645

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019          Index: objects..opposition

objects
  265:21,22

obligation
  261:1,2

observed
  145:7

obsessing
  253:2

obtain
  213:24

obtained
  196:9

occasion
  17:20 49:4
  175:2

occasions
  159:19
  174:13
  268:5

occur  91:5
  125:12
  131:15
  146:17
  198:14

occurred
  24:10
  63:13
  201:11

occurring
  142:11

Oceanic  10:6
  41:19

offensive
  243:24

244:2

offer  35:3
  207:20
  283:2
  284:4

offered  30:4
  94:25
  102:10
  104:8
  123:9
  207:4
  252:5

offering
  63:24
  261:10

offhand  38:1

office  16:2,
  4 114:11,
  15 180:10

officers
  196:9
  256:14

official
  53:18
  131:25
  180:25

officially
  181:23

officials
  25:6 132:3

old-fashioned
  15:1

ongoing
  264:19

online  58:8
  240:11
  241:3,17
  248:18,20
  249:6,20,
  25 250:3

Open  262:9

opened  173:3

operate
  45:10
  91:19
  234:16

operation
  60:21
  248:5
  273:9

Operations
  11:19
  77:10

operators
  256:20

opinion
  254:3

opinions
  254:11,12

opponent
  252:1

opponents
  242:8
  249:3,4
  254:11

opportunities
  71:4

opportunity
  44:20
  223:9
  281:2

opposed  68:9
  110:3,14
  163:25
  200:21
  246:19
  251:20
  258:22

opposing
  11:8

opposition
  9:20 11:18
  14:10,12,
  18,19
  16:9,24
  28:20 30:6
  52:9
  109:9,14,
  19 110:2,
  9,11,16,
  17,21
  111:12,16
  115:24
  137:2
  141:24
  155:9
  156:1
  227:12
  229:15
  240:23
  244:17
  245:14,15
  254:20,22,
  25

oppressed
   245:24

oral   40:2
   200:21

orally   78:13
   184:18

order   36:3
   76:15
   79:19
   94:24
   159:2

ordered
   266:23

orders   75:10

Ordinarily
   23:17

ordinary
   223:19

organization
   32:2

organizational
   246:5

organize
   155:24

organized
   156:19
   221:16
   245:1

organizer
   53:23

organizing
   156:11
   240:21

orient
   192:13

original
   19:22
   28:16
   85:17

originated
   268:3

OSINT   262:10

other's   54:2

out-of-pocket
   223:24

out-of-wedlock
   268:8

outfit   116:4

outlined
   49:1

outrageous
   241:24

outset   28:3

outsourced
   84:10

over-funded
   251:15

overhead
   39:8

overlap   18:2

overlooking
   31:25

oversimplified
   142:2

owe   40:24

owes   45:5,6

owns   83:6

_____

P
_____

p.m.   157:6

pages   219:16

paid   37:17
   38:24
   39:2,13
   40:6 43:16
   54:5 93:23
   99:13
   100:20
   103:18,19,
   21 161:16,
   17 186:17,
   19 219:22
   222:19,21
   225:4,12
   249:15,17
   250:20
   256:23
   257:1
   259:24

paper   37:20
   61:23 68:9
   87:24
   88:2,3,8,
   15 101:11,
   12 150:8
   169:5,6,8,
   11 224:25
   229:3
   234:11

paperwork

37:20

paradox
   269:7

paragraph
   55:11
   97:10
   284:1,11,
   14 285:3
   287:12,13,
   18

paralegal
   83:2,3

parallel
   95:2

parameters
   92:17
   175:25

pardon   39:13
   114:18
   128:14
   132:19
   135:11
   174:23
   177:8
   218:3
   264:4

parents
   130:18
   148:12

part   24:8
   34:11 42:6
   46:5,6,8
   55:6 58:2,
   3 75:5,12,
   13,19

76:2,4
77:4 82:9,
10 84:18
86:8,15
87:4 90:7
94:10
110:18
115:25
117:10
123:11
125:18,19
150:21
156:24,25
162:15,17,
20 174:22
207:9
222:4
228:14,15
231:13
236:7
238:17
242:11
246:17
250:17
253:16
254:16
257:20
260:20
261:23,24
264:18
265:2
276:21
284:22
285:23

**partial**
97:16

**participate**

69:23
231:23
283:7

**participated**
266:20

**parties**
29:13
90:24 98:6
204:20
224:13

**partner**   83:5

**Partners**
10:7 41:20

**partnership**
131:25

**parts**   155:25
220:17
262:15

**party**   24:19,
23 25:6,9,
12 86:12
90:1 110:4
130:18
131:5
132:7
137:3
139:15
140:15,18
141:3
145:25
148:11
189:5
239:12,13,
15,17
253:4,6,8

268:7

**party's**
239:10,18

**pass**   68:5

**pass-through**
41:12 68:6

**passed**   56:5
68:20,23
83:5

**passport**
179:15
180:10
187:5

**passports**
69:13,15
179:20
180:8
188:25

**password**
214:6,8,
10,14,19

**passwords**
213:22,25
214:3,4
288:5

**past**   19:5
30:16
51:11 55:3
106:18
107:4,6
112:25
146:24

**path**   73:5
214:18

**patience**
289:21

**pay**   36:16
37:6,18
42:22
43:17 45:6
91:6,10
92:4 93:6,
8 98:16
99:8
101:17
103:3
104:8
118:8
121:18
123:13
196:8
219:21
220:1,2
224:3,22,
23 225:2,9
249:9
250:17
279:24
285:8

**paying**   207:2
220:17
224:12,16,
25 261:3

**payment**
36:16,19,
20 37:5
40:9 41:21
42:20
43:6,9
45:2
99:12,13

159:18,22
160:6
220:14
288:25

**payments**
36:23,25
37:22
40:10,17
42:1,4,13,
25 98:17
100:18,23
159:2
222:25

**pays** 45:5,8
93:11

**peer** 170:6

**peers** 188:19

**pending**
132:23

**Penn** 203:1
211:11
212:2

**people** 15:19
23:20
25:24
48:24
49:10
50:10,11
53:25
55:23
69:5,6
70:5
71:15,23
73:6,18,23
76:12,16,

17,18,22
83:8 84:16
85:21 86:3
91:18 96:4
104:24
106:16,23
107:2
110:11
112:11
122:20
125:4
130:19
131:4
138:18,21
141:9
144:10,21
146:5
156:12
174:11
178:20,22,
25 181:15
182:6,7,24
183:6
184:4,19,
21 185:18,
20 210:25
213:23
222:8
223:21
224:3,4,
16,19
236:10
237:15,25
240:1
241:25
242:19
243:6,14
245:8,21,

22 246:3
249:11
250:5,9
251:12,17
252:21
254:8,9
257:10,12,
18,19
258:25
263:18
264:11
267:15
269:15
274:4

**People's**
25:3 253:6
285:20

**per-report**
95:12
96:23

**percent**
184:1

**perception**
104:25

**perfectly**
273:19,20

**perform** 15:8
29:18
52:16
252:9

**performed**
13:17,23
14:3,9
16:10
52:11

**performing**
13:6

**period** 37:6,
19 64:11
89:12
127:12

**periodically**
150:18

**peripheral**
281:7

**permanent**
246:9

**perplexed**
280:15,17

**person** 21:22
50:2 69:7
70:16
71:15,16
80:21
81:10
82:21 83:4
102:23
104:23
119:19
129:25
130:1,20
133:7
141:10
145:2,4
147:21
148:8
160:17
162:22
179:4
181:5
182:3

183:24
184:8,10
185:22,23
192:1
194:12
236:9
242:20,21
282:2

**person's**
184:9

**persona**  69:8
178:20

**personal**
17:7 34:14
84:13
145:23
167:18
219:13

**personality**
61:9

**personally**
15:4,5
28:5 38:20
55:5 62:12
89:4
106:12
146:4
187:12
202:22
249:21,22
250:2

**persons**
218:17

**perspective**
214:12

**persuade**
148:5

**pertaining**
151:9
180:25

**Ph.d.**  9:9

**phase**  274:16

**Phi**  9:6

**philanthropic**
248:4

**phone**  80:23
129:25
130:1,3,6
153:19
282:5

**phonetic**
120:17

**photocopied**
190:13

**physical**
78:7 89:19
114:15
154:14

**physically**
47:16
58:7,8,10
68:1
190:25
194:2,3
196:14
219:15

**pick**  58:11
68:1

**picked**  65:16

**picture**
71:22
72:13
235:10,18

**pictured**
244:12

**piece**  69:16

**pieces**  36:3,
10

**Pierre**
201:13,15,
23

**pillars**
239:21

**pin**  64:3
154:19

**pirates**
271:7,8

**placate**
206:14
209:18,19

**place**  9:2
36:4,10
55:23
56:15
136:18
156:5
188:3
192:18
245:2

**places**  99:4
262:25

**plaintiff**
7:15 8:4
53:13

**plan**  21:12
34:8,9,10
39:11
159:13
210:24
228:17
233:23
252:20

**planes**
213:14

**planned**
195:16

**playbook**
227:25
228:5

**playing**
136:19

**pleased**
86:12

**plenty**
281:12

**plugged**
202:24

**plural**  53:14

**pocket**
241:24

**point**  36:6
58:23
71:18 72:4
91:16
92:15

127:18
134:3,8
140:8
143:9,23
149:22
178:3,5
187:20,21
188:2
202:18
251:8
273:23
282:3

points  134:7
178:6

poisoned
146:22

police
130:19
132:1
145:25
156:13
188:23
239:17,23

policy  9:13
14:11,20
31:19
51:13
115:20
116:2
124:16
243:10
249:4

political
14:10,15,
20 17:6
51:13

53:18
104:12
206:3
237:25
239:25
240:5,16,
20 241:2
244:16
248:4

politics
9:16 73:18

population
246:8

port  58:7
61:21

portion
100:19
255:13

poses  124:7

positive
242:17
243:18

possibly
96:3
178:8,9

Post-it
189:16,19,
25 190:11

post-putin
253:2

posture  77:5
261:19,22

potential
119:21

232:25

Pour  251:12

pouring
251:11

power  24:24
275:19

Powerpoint
233:21

PR  244:8

practical
275:13

practicality
88:10
275:18

practice
66:16
81:25
151:21,22
249:7

practices
82:5 136:7
277:20,21

pre-contract
162:11

precautions
287:14,25
288:3,4

precise
220:22

precisely
61:8
122:10
147:25

152:16

predating
148:19

predict
91:17

preexisting
210:17

preliminary
59:13
60:7,8
61:15,19
62:7,16,21
63:1
65:23,25
66:5,8
68:12
149:16
192:15
272:21

premature
144:24

prematurely
97:14
144:9,15,
21

prepared
227:4

preparing
44:21

prerogative
132:9

presence
159:23
230:25

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019         Index: present..prisoner

232:10

present
  29:14
  32:24
  47:16,20,
  22 54:21
  63:16
  82:20
  106:18
  107:4,6
  152:19,24
  155:20
  156:5
  167:13,14,
  15 169:1
  197:11
  198:5,6
  202:14
  218:18
  228:6
  234:6
  267:18
  285:12

presentation
  173:12,13
  231:5
  232:13
  233:21
  235:18

presentations
  234:9

presented
  27:21
  167:5
  219:18
  268:16

presenting
  203:5

President
  24:24
  115:19
  243:11

President's
  243:9,17

presidential
  112:15

pressure
  240:18,21

prestige
  31:23

presume
  100:17
  119:6
  150:24
  258:6

presumed
  132:6
  161:18

pretend
  78:25

pretty
  105:25

prevent
  91:15
  93:4,21
  145:6
  183:2
  238:11
  243:20

prevented

92:2,10

previous
  13:3 107:8
  158:24
  230:7
  234:1
  243:1

previously
  115:22

price  35:12
  91:11,12
  96:16
  97:11
  121:4
  123:4,7,8,
  12,13
  247:13
  251:8

prices
  121:17
  122:5,6
  123:9

pricing
  152:18,19

Primarily
  241:12

primary
  134:8
  143:9

Prince
  115:9,13

princess
  110:25

principal

134:3
  250:5
  283:12

principally
  9:13 10:4

principals
  283:11

print  164:1

printed
  61:22
  177:15
  190:18,24
  234:10

printouts
  88:6 150:8

prior  20:5
  31:2,14
  38:11
  51:20 57:4
  58:23
  59:17
  62:19
  64:14
  88:23
  112:3
  115:16
  129:20
  142:16
  271:21,23
  273:12

prioritize
  235:22

prioritized
  237:11,14

prisoner

53:19

**private**
9:17,18
128:5
185:7,11

**privy**  153:22

**pro-guo**
246:16,25

**problem**  33:3
90:22
91:21 97:2
124:16
152:6
170:19
180:5
192:24
195:7
207:12,15

**problematic**
170:21

**problems**
71:3 90:18
180:6
195:9,19,
21

**procedural**
77:5

**procedures**
195:12

**proceed**  94:5
173:14

**proceedings**
290:6

**process**

22:11
86:25
186:1

**produce**
55:12
84:17
205:13
275:14,21

**produced**
20:3 71:1
127:8
154:21
169:18
282:11

**producing**
66:23
94:19
273:14
275:18

**product**  52:3
56:7
61:22,23
67:19
93:12
176:10
264:16,17
267:11
276:21

**production**
20:2 22:21
40:16
169:17

**profession**
84:12

**professionalis
m**  123:1

**Professor**
9:14

**professors**
278:10

**profile**
27:25

**profit**  7:4,
16 8:5
13:13
28:19
44:12,14,
17,19,25
45:3,9,13,
16 75:8
99:21,25
100:1,2,6,
10,14,20
101:3
104:4
118:4,9
124:14
136:24
159:15
160:25
161:11,12,
16,20
188:13
248:1
286:1,9
287:6

**profit-making**
247:22

**profits**
38:19,21

39:4,5
40:1 42:5,
20,23
43:3,10,
13,22
44:3,4,9
45:17

**program**
256:9

**progress**
55:12,15,
17,19,20,
21,25
56:10,13
57:4,6,17,
25 58:18
59:1,16,24
60:3 61:17
65:22
66:5,7
127:14
193:3
196:1
197:18
198:3
200:18
272:22
276:20,22

**project**
11:24
12:2,4
13:12 16:5
17:2 19:11
42:3,10
49:19
55:19 57:7
59:19

Case 1:18-cv-02185-LJL   Document 261   Filed 03/16/20   Page 493 of 645

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019          Index: Projected..provided

89:10
116:20,22
117:3
131:16
132:12,14
134:12
144:10
145:9
147:22
150:13
163:19,20,
21  164:17
166:20,23
186:14
205:8
234:21

**Projected**
255:19

**projects**
11:4
12:11,19
13:1,14,23
14:9  16:9
29:3  52:7
84:22
111:19,20
114:25

**promise**
78:9,12
206:13
208:17,21

**promised**
95:9

**promote**
250:1,10

**promoted**

251:8

**promoting**
104:11

**promotional**
261:24

**prompt**
172:11

**promptly**
205:23
206:1

**pronunciation**
155:6

**proof**   59:3

**propaganda**
246:5

**propagandists**
254:10

**properly**
12:17

**properties**
31:21
32:10
121:5
231:21,24

**property**
31:23
34:16
231:14,15,
17  232:8

**proposal**
230:23
232:14
260:16

**propose**
122:9

**proposed**
129:12
130:14
152:25
244:9
253:16
255:11

**proposition**
137:11

**prorated**
94:15

**prosecuted**
239:7

**prosecution**
238:1,14,
24  239:1

**prospective**
11:10
106:19
107:5

**protect**
23:19,20
101:14,25
139:24
144:7
237:25

**protected**
180:14,20
181:1,8,22
182:25
185:24

**protecting**
84:19

**protection**
183:2,17,
23

**protest**
53:23
156:11
245:11

**protesters**
156:18

**protests**
155:24
245:1,10

**prove**   137:20

**provide**
26:24
28:20
29:10,21
30:10
39:23
40:13
68:13,18
76:16,24
80:4  82:4
85:2  107:9
111:15
118:19
119:22
126:10
141:10
218:4,15
219:10,16
220:6
229:6

**provided**
9:23  28:19
30:11  55:3

66:3 74:20
79:14
81:25
106:10
107:14
108:10
110:13
140:20
142:21
164:17
165:4
178:12
214:17
218:6,7,8
221:24
235:17
274:9
276:8

**providing**
11:21 29:6
35:3,11
51:8,19
66:16 92:2
141:11
162:24,25

**provision**
74:25

**provisional**
156:19

**provisions**
22:16

**provocateur**
137:20

**Psycho-
political**
233:10

**public** 7:23
31:19
104:23
164:3
181:16
222:1
239:20

**publicize**
189:8

**pull** 266:25
276:15

**purchasing**
30:13
232:8

**purpose**
23:13
37:23
39:14
101:14
137:13
173:22
196:1
272:2

**purposes**
14:20 25:4
101:13
179:1
239:25
240:6
246:5

**pushback**
87:21

**pushed**
146:5,14,
16

**pushing**
278:15

**put** 27:19
48:7 50:4
67:16
68:25 79:1
126:25
137:9
144:9
145:5
147:21
151:2
154:19
156:2
171:1
190:19
197:10
203:14
205:5
221:25
223:6
279:4
288:17

**Putin** 110:9,
11 146:10
147:1
245:10
252:14,19,
21,22
253:2

**Putin's**
252:24

**putting** 58:4
59:5 76:4
89:20
139:21
147:17

162:14
163:24
240:18

**Pyratz**
271:4,6,9,
10

———————

**Q**
———————

**Qatar** 111:8

**Qing** 212:18

**quality**
80:17
83:20
112:7
122:23
141:15
144:6
209:24
277:15

**quantify**
16:18 50:3

**quantities**
276:15

**quantity**
204:13
273:8

**quarter**
186:17

**question**
8:11,12
21:4,8
28:16
33:1,4
44:16,25

Case 1:18-cv-02185-LJL   Document 261   Filed 03/16/20   Page 495 of 645

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019                    Index: questioning..recall

48:9 57:13
61:12
63:23 92:8
98:2
106:21
118:7
126:8,18
128:24,25
130:16
132:23
147:13,14
177:10
183:5
208:12,16,
17 214:15
243:15
252:23
261:15
272:1

**questioning**
205:8

**questions**
8:13
134:14
158:18
282:16
289:23

**quickest**
276:6

**quiet**  205:3

**quit**
220:20,21,
23,24,25
221:2,4,12

**quote**  55:25
61:21

72:11
97:13
176:3
192:12
202:8
247:19

**quote-unquote**
45:3
184:20

**quoted**
247:14

**quotes**  70:15
103:2

**quoting**
274:10

_____

**R**
_____

**rail**  212:1

**raise**  105:3

**raised**  30:20
85:21
136:13
174:14

**rallying**
240:22

**ramp**  276:3

**ran**  179:21

**range**  25:10

**rapid**  177:2
275:14

**rapidly**
94:12

**rate**  95:14
96:18

**rats**  271:9

**raw**  56:4
57:11
61:20 62:2
64:18 66:9
67:12,18
69:18
71:7,9
72:19 80:7
85:22 88:9

**re-liking**
250:7

**re-met**  117:9

**re-tweeting**
250:7

**reaction**
158:13
173:11

**read**  18:14
21:6,9
47:12
54:10
85:11 87:3
126:7
147:11
264:4,5
284:9

**reading**
132:19
151:25

**ready**  166:19

**real**  30:13,

16 31:13
69:4 96:4
119:15
141:22
155:21
178:22,25
231:12

**realized**
86:19
158:9

**reason**  90:6
133:13
136:8
141:17
142:24
149:1,6
177:22
184:23
207:16
263:2
265:20

**reasonable**
199:4

**reasons**
76:25
100:18
129:5
176:6
239:6
242:23
275:15

**recall**  10:21
22:19
23:11 24:8
27:19
29:24,25

Case 1:18-cv-02185-LJL   Document 261   Filed 03/16/20   Page 496 of 645

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019          Index: receipt..recruited

30:1 32:17
33:9 34:12
35:24 37:9
41:20 43:8
57:2,15
62:6 63:12
64:16 70:3
74:25
94:15
107:19
108:21
109:7
122:1,10
123:12
128:14
131:7
143:10
153:4,25
162:7
164:23
165:22,25
169:13
173:19
174:9
186:10
192:18
197:25
198:2,8,
10,16
199:11
201:2,7,25
203:1,7
204:1,18
225:14
232:20,23
235:21,23
245:12
258:3

285:11

**receipt**
226:22

**receive**  45:9
75:8 118:3
165:3
194:24
237:7

**received**
42:19 43:2
99:17
100:21,24
160:25
165:6
166:7
193:17,19
194:5
237:6,9

**receiving**
43:8
176:23
177:13

**recent**  110:8

**recently**
169:19

**reception**
10:22

**recess**  74:8
105:9
157:5
196:22
270:16

**recitation**
248:23

**recognize**
18:17,19
46:14
105:16,21
106:4
113:7
116:10
164:13
212:20
213:5
215:3
226:5
229:25
233:17
259:6
264:2
267:7
270:25
271:2,3
282:25
284:2

**recollection**
123:3
150:9

**recommending**
233:23

**reconcile**
206:5

**record**  7:2
43:21
74:6,9
77:21
104:23
105:6,7,10
130:11
132:21
157:3,7

181:8
183:17
196:20,24
270:13,14,
17 281:4
289:24
290:3

**records**
40:16 41:2
43:7
180:13,15,
20,24,25
182:25
183:2,23
185:24
199:9,13,
15 289:15

**records-
protected**
181:17
182:4,10
184:2,5,
10,15,20
218:17
260:8

**recover**
238:10

**recovering**
248:7

**recovery**
238:2,14,
17,19
248:1

**recruited**
55:22
56:14

red   174:14
  183:11

Redemption
  179:4

redirect
  289:22

reduce
  240:20

redundant
  118:2

refer   70:15
  97:10,11
  150:17
  152:2
  170:5

reference
  255:14
  277:3,11

referenced
  55:9
  236:14

referral
  117:21

referred
  21:8 48:1,
  10 49:13
  50:17
  248:21
  284:13

referring
  41:10
  46:19 53:3
  65:20
  119:12,13

140:16
158:25

refers   48:18
  144:12
  252:19

refocusing
  69:24

refreshes
  129:16

refuse
  77:12,25

refusing
  225:2

regained
  133:18

regard
  246:15

regime   25:1
  110:9
  137:6,14
  156:5,10
  228:1
  242:23
  252:24
  254:9,11,
  12

region
  245:4,19

regular
  127:8
  181:19
  247:9

reintroduced
  116:24

related
  25:11 42:2
  45:25
  124:15
  139:19
  172:15,16
  181:11
  268:10

relating
  11:7 31:19

relation
  147:23

relations
  177:18

relationship
  34:18
  72:20
  117:14,16,
  18 134:10
  148:7
  185:8
  191:19
  220:8,10

relationships
  268:6
  269:22

relatives
  25:9

relay   217:19

relayed
  219:11

release
  144:8,18,
  20,24

released
  145:12
  238:8

releases
  145:1

releasing
  144:15

relevant
  115:10

remain   144:6
  243:24

remainder
  51:17

remained
  159:12

remember
  23:21
  30:20
  32:19 43:7
  92:18
  105:4
  113:18
  115:18
  122:5
  123:6
  131:9
  137:23
  146:24
  150:10
  152:16
  153:21,23
  154:3,5,22
  166:12
  167:14
  172:6,7

179:3,17
186:6
194:2
198:15
199:20
203:4,17
232:19,22
258:4,7
266:4

remind   74:11

Repeat   21:4
65:5
106:21

rephrase
90:13

replace
97:15
237:17
252:25

reply   184:8

report
55:13,16
56:2,10,13
57:4,6,10,
17,25
58:18
59:2,13,
16,24
60:3,7,8,
20 61:15,
17,19,22
62:7,16,21
63:2 64:5,
9,14 65:8,
18,20,22,
23,24

66:1,5,6,
11,13
67:6,14,16
68:4 70:22
71:7,17
72:22
96:9,17,20
97:1,8,13,
16 101:24
141:14
180:4
197:7,12,
16,22
198:3,12,
13 200:3,
10,14,19
201:4
212:17,25
213:1
263:24
265:14
266:11,20,
22 272:23
276:20,22

reported
174:10
212:14

reporter   7:8
8:12,15
21:9 98:18
107:23
117:6
146:19

reporting
72:11,12

reports
55:8,17,

20,25
56:8,20
60:4 66:2,
3,7,8,11,
24 67:2,5,
9,11,21
68:12,15
69:24
70:15,18,
23 72:16
92:3 93:5,
22 94:20
95:19
96:8,14,22
97:12
105:1
127:7,13,
14,15
176:3
196:1
197:1,14,
18 200:25
216:10
217:24
218:3,4,9
236:21,22
266:14
272:12,19,
22

represent
8:4 244:23
262:6

representation
24:3 63:12
285:12

representations   284:19

representative
38:11

representing
183:9
216:6
281:18

Republic
25:3 253:7
285:21

request
25:16 77:6
167:16
168:1
251:10
252:10
289:13

requested
35:7,8
36:12
167:10,12
236:21
289:10

requesting
195:24

requests
35:18

required
207:13

requirements
58:6

requiring
85:1

rerouting
39:14

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019                    Index: research..respect

**research**
9:13,21
14:10,12,
17,25
15:1,9,17,
22 16:9,24
17:17 18:6
19:1,23
22:24
25:16
27:24
28:21
29:7,11,
15,16,17,
18,22
30:5,6,9
32:15
33:16,18,
20,22 34:7
35:12
37:14
38:17
39:2,19,21
40:7,12
41:8,13,22
43:3,22
45:23
46:11,18
48:1,10
49:4,5,19
50:16
51:8,19
52:9,11,
13,14,19,
22 53:1,9
55:2,10
56:9 57:5
60:6,9

61:20
64:9,14
65:24
66:6,11,
13,17,22
67:8 70:4,
22 71:7,
19,22
72:15
73:3,17
75:10
76:14,16,
18,23
79:23
82:10,15,
24 83:17
85:17 87:4
89:10
90:24 91:7
92:3 94:11
99:1 100:7
108:15
111:19
114:1,6,21
121:9
122:23
124:10
131:2
136:10
141:25
142:1,18
144:17,19
145:11
150:22
156:8,23
157:11,20
162:1
163:10,23

164:17
170:22
171:11
180:22
184:7
186:1
188:17
189:1,7
192:13,21,
25 195:8
196:4
202:25
207:12
219:19,20,
22 222:3
223:22
229:15
234:23,24
237:19
252:8,9
253:14,23
254:16
260:16,17
261:4
264:17,19,
20,24
265:2,9
273:6
287:14,25
288:11

**researched**
48:25
71:24
79:22
265:20,25

**researchers**
57:11 71:8

202:10
256:20
268:10
269:22

**researching**
50:10
89:25
145:2
182:8
192:15
288:10

**reside**  81:20

**residence**
21:23 22:7
63:15
168:25
169:9
188:3
203:9
204:22
230:18
285:18

**residing**
167:22

**residual**
44:2

**resolve**
272:25
273:16,24

**resources**
15:9 29:1
111:5
141:8
224:7

**respect**

39:25
40:17
77:16
146:15
235:16
261:1,7

**respond**  8:11

**response**
100:5
103:4
119:2
121:22
126:16,17,
18,19,20
134:16
141:13
158:13
167:25
217:16
251:10
272:8,9

**restaurant**
201:23
203:2
212:2,10

**restricted**
218:16

**restrictions**
263:13

**results**
167:6
205:13,16
238:5
275:14,18,
22

**retain**
150:14

**retained**
86:5,14
191:7
260:13

**retainer**
136:8,9

**retaining**
42:15,16

**retrospect**
196:7

**return**
126:12
272:3

**returned**
289:11

**returning**
58:11

**reveal**
279:10,11

**revenue**  39:5

**revenues**
45:18

**reversal**
289:12,17

**reverse**
288:25

**review**
177:13
211:17
213:10

**reviewed**

177:21
203:18
212:25
215:14

**reviewing**
18:13

**revising**
150:3

**rich**  163:19
239:14,15

**right-hand**
53:5
189:14
226:7

**rigorous**
91:20

**riot**  156:13

**ripped**  59:3,
4

**rips**
104:15,24

**risk**  131:16
140:9

**risks**  89:16

**Roberta**  7:8

**Rockefeller**
121:5
231:21

**rocks**  53:20

**role**  67:20
70:21

**room**  23:2,3
63:18

204:23,24
205:10

**roots**  246:17

**roughly**
16:17 22:2
36:15
55:18
102:16
110:7
143:13
177:2
198:1
200:10,11
217:23
218:10
275:5
277:1

**round**  72:8

**route**  37:23
99:4,14
159:2,5,18
160:6

**RP**  185:24

**RPS**  219:10

**rule**  253:6

**rules**  8:10

**run**  83:6,19
89:13
115:9
181:25
185:22
251:9

**running**
46:1,6,8

223:20
241:23

**Russ**   7:20

**Russell**
182:20

**Russia**
110:23
245:20,22
246:4,10,
14,22,24
251:23
252:13,20
253:3

**Russian**
108:6,8
109:9,14,
18  110:2,
3,16,21
111:12,16
115:23
242:4
244:16,25
245:14
246:11
251:25
252:8,19
254:20,21

**Russians**
146:25

――――――――
**S**
――――――――

**S-T-A-R-O-V-O-
I-T-O-V-A**
146:21

**S-U-E-N**   70:9

**sake**   84:19

**salary**
148:21
149:4

**sanctuary**
137:1

**sat**   212:3

**Satellites**
262:11

**satisfaction**
273:22

**satisfactory**
98:19

**satisfied**
167:6
207:2

**satisfy**
79:20
94:24
102:12

**Saudi**   111:4,
7

**save**   23:13
149:22
261:11,14

**saved**
150:15,19

**SB**   119:2,5

**scale**   233:5

**scattered**
262:5

**schedule**
127:8

**Schmidt**   7:17
10:2  17:23
19:17,20
20:4,19,23
21:2  29:8
31:8  32:20
33:1,6
34:4
35:14,17
38:7
40:18,23
52:5  56:11
61:3  75:17
76:10
77:15,20
78:22
79:5,25
81:14  84:6
90:2,13,20
94:22
95:13
96:10
106:12
110:5
114:20
132:13
137:15
150:23
164:12
175:8
177:9
187:18
189:13
193:5,14
196:5
197:9
200:20
206:21

**school**   9:10,
16

**scope**   15:7
23:9,10
38:12,13
90:25
121:4
122:7
123:14
126:11
127:19,23
136:5
176:7
257:7

**scrapped**
229:17

**scratch**   29:2

**screen**   212:8

**screenshot**
169:25
172:1
195:13

**screenshots**
168:13,17,
18  169:2,
24  172:2,
14,21,25

**scrolled**
212:7

search   183:7

seat   87:16

secede   110:1

secondhand
  131:1
  154:4

secret   132:1
  145:25
  183:10
  188:23
  234:16
  239:17,23

section
  79:12
  89:3,7

sector
  185:7,11

secure   80:25
  81:2,5,12
  213:15

security
  34:14,20
  35:1  45:25
  58:6  82:8
  91:21  99:9
  123:1
  128:25
  129:4
  131:16
  132:2
  159:22
  167:22
  168:14
  169:8
  173:2,24

184:22
185:13
221:23
256:1
267:13
269:16,25
275:22

seeking
  196:16

seldom
  275:13

semipermanent
  246:9

semipublic
  181:18

Senate   10:10
  17:8

senator
  10:11,17
  137:24

send   45:2
  62:22
  63:2,3,4
  86:2
  101:18
  161:3
  249:25

sender   289:9

Sending
  159:7

senior
  130:18
  145:24

sense   65:12

68:10
87:23
92:23
134:24
138:24
139:5
142:3
186:17
288:16,17

sensed
  134:17,22

sensitive
  63:20

sentence
  274:24

separate
  18:3

separately
  69:18
  159:24

series   214:9
  249:18

serve   54:7

served
  103:11,13,
  15  150:19

server   81:20
  167:18,23,
  24  168:14,
  16  170:1,
  2,3,6,18,
  19  171:1,
  4,23
  195:14

serves
  149:15
  194:1

service   9:23
  11:22  13:6
  26:24
  28:18
  29:11
  35:4,9
  55:3  81:1
  99:6
  142:21
  151:17
  163:23
  183:10
  199:23
  253:18
  261:11

serviced
  13:1

services
  30:3,12
  32:5,6,13
  34:1,23
  37:3  40:6
  73:7
  106:10
  108:11,12,
  13  110:12,
  14  111:15
  112:7,8,10
  119:21
  125:5
  162:24,25
  227:15
  229:7,12
  263:16

285:8

**serving**
  54:24

**set**  28:21
  31:18 32:1
  39:18 49:3
  54:6 60:9
  82:19,23
  98:24
  114:2
  121:9
  125:19
  135:7,13
  156:3,20
  175:25
  224:23
  272:2
  273:8
  277:16
  279:18

**sets**  83:9

**setting**
  55:21
  127:16
  198:19
  260:19

**settled**
  123:13
  159:12

**setup**  58:2
  197:19

**sever**  220:9

**severance**
  219:23

**severed**

220:7

**shaking**
  208:13

**shape**  47:23

**shapes**
  262:5,8

**share**  45:9
  75:3

**shared**  74:22
  267:12,13

**Shawshank**
  179:4

**Shchekochikhin**
  146:22

**she'll**  17:12

**Sherry-netherlands**
  201:20,21

**short**  74:8
  105:9
  196:15,18,
  22 270:16

**short-term**
  56:8 71:19

**shortly**
  164:23,24

**shot**  172:7

**show**  135:6
  168:17
  169:11,20
  170:3
  202:24
  214:18

230:12
262:19
272:13,23

**showed**  46:24
  47:3
  154:13
  168:18
  171:23
  172:2
  219:14
  234:1
  273:12

**showing**
  125:17
  135:7
  168:15
  170:1
  231:23
  233:23
  267:11
  273:22
  276:18

**shown**  31:13

**shows**  104:23
  155:20
  214:6,7

**shut**  171:3

**side**  89:15,
  17 140:4
  246:1

**sight**  121:8

**SIGINT**
  262:10

**sign**
  128:19,23

129:4,10
130:14
133:8
140:11

**Signal**  81:1,
  5,11,21
  95:4
  116:8,11
  128:12
  130:7,9
  135:23
  144:3
  150:15,21
  151:12
  200:13,17
  201:1,5
  215:21
  217:15
  218:23
  219:1,2
  271:11
  282:9

**Signals**
  262:10

**signed**  46:20
  47:5,9,17,
  21 57:22
  58:1 62:5
  75:25 98:8
  109:6
  113:24
  157:21
  158:16
  161:6
  164:24,25
  176:4
  186:8

275:9
289:18

**signer**
129:18

**significantly**
257:2

**signing**
36:12
100:8,9
129:2
130:23
133:10
159:16
197:20
199:6

**similar** 19:4
52:7,8
82:18
84:21
136:3

**simple** 59:22

**simply** 55:20
56:4 57:6
61:19
64:5,20
67:18 68:6
88:15
122:7
148:2
178:20
196:8
198:3
199:10
200:17
248:4

**single** 50:10
183:24
247:9

**sit** 204:23

**sit-down**
23:2

**sitting** 19:8
77:12,25
153:24
204:18
237:1
289:16

**situated**
204:20

**situation**
59:11

**size** 251:6
256:12

**skill** 82:19,
23 83:8

**skills** 73:23

**skin** 125:9

**slave** 53:20

**slow** 110:5
224:11

**small** 34:11
96:17
200:5
219:22
233:4
243:13
251:6

**smaller** 39:8

251:4

**smirking**
101:19

**smooth** 89:22

**so-and-so@
yahoo.com**
214:8

**soaked**
125:10

**social** 33:22
52:22
164:1
240:11
241:25
253:11
254:1,14
267:13
269:16,24
276:17

**societies**
245:20

**sole** 217:8
283:19

**solid** 139:9

**solutions**
71:3

**someone's**
187:23

**sophisticated**
278:17

**sort** 14:25
32:22
50:24
51:19

151:16
156:19
172:17
187:15
205:11
208:15
227:24
239:14
252:21

**sorts** 268:2

**sound** 165:1

**sounds** 21:21
73:11
155:4
211:13

**Source**
261:18,21
262:9

**sources**
144:7
181:21

**South** 9:2

**Soviet** 110:3

**speak** 54:8
55:4 73:9
75:25
78:25
85:7,9,23
102:23
128:11
130:6
160:10
170:2
187:11
247:1

284:25

**speaking**
27:2,21
43:18
75:16
103:25
164:15
187:12
198:1

**speaks**  54:9
160:1

**spec**  220:16

**special**
11:19 77:9
114:25

**specialists**
256:14

**specific**
27:22
35:20
37:25
56:17 57:2
186:15
187:14
188:24
248:11

**specifically**
23:11
36:22 37:9
38:1 68:17
142:6

**speculate**
175:9

**speech**
118:25

124:4

**speed**  205:15

**spelled**  60:1
69:4
126:15
136:3
248:11
271:7

**spelling**
108:1

**spent**  43:25
53:19
203:21

**spirit**  283:2

**split**  16:15
23:2
38:18,21
39:25
43:23 44:4
45:13,19

**splitting**
42:5,20,23
43:3,9,13
45:17

**spoke**  26:25
124:13
130:3
159:23
163:3,9

**spoken**  54:13

**spokesman**
227:11

**spoofed**
89:15

**spy**  101:15

**Square**  53:22

**stack**  282:17

**staff**  29:1
114:15

**staffer**
10:10,12,
16

**stage**  60:21

**stages**
128:16

**stamped**
105:14
113:6
226:3
229:24
230:3
233:11
255:7
259:4
263:21
267:5
270:22

**stand**  98:9
222:18

**standard**
19:1
66:16,20
82:8 94:11
122:20
195:9,15
262:3

**standards**
81:25

82:5,9
136:20

**standby**
177:4

**stared**
205:12

**Starovoitova**
146:18

**start**  10:23
26:19
33:15 36:9
42:1,9
67:14
93:15 95:4
166:17
186:13
187:9,19
206:19,25
207:12
267:9
271:16
273:14
277:2,6

**start-up**
36:2 42:6
126:22
255:24
256:1,4
274:16

**started**  8:10
11:16 12:3
56:22
60:21
187:22
216:8
273:9

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019          Index: starting..Strategic

**starting**
28:24 29:2
34:6 36:5,
11 42:3,10
84:24
93:14
109:20,24
126:2
187:20
188:2
209:8
272:2,9
273:2

**state**  7:24
35:1 89:11
109:3
132:2
181:3

**state-of-the-art**  82:12

**state-owned**
167:19

**stated**
100:18
230:23

**statement**
13:20
98:11
175:5
186:20

**statements**
39:22,24
41:4

**States**
16:13,14,
21 23:7

28:23,24
34:24
124:8
136:25
137:9
138:15
168:3
174:24
175:1,15
177:5
182:24
183:4
211:7
239:3
240:12
260:11
263:12
269:15

**Station**
203:1
211:11
212:2

**stature**
250:15

**status**  56:13
57:7,10
58:3 59:5,
10,11,19
60:8 67:6
198:3,19
200:19
201:4

**stay**  240:1

**stayed**
203:21

**Steve**  119:6

123:25
124:3,5,
10,13

**stick**  57:10
171:25

**sticking**
277:21

**sticks**  56:24

**stipulated**
62:1

**stock**  19:9

**stolen**
238:20

**stomped**
205:10

**stop**  97:14,
19 103:22
133:18
143:8
152:13
219:6
222:13
253:1

**stopped**
103:20
133:12
174:16

**stopping**
72:3

**storefront**
16:1

**story**  243:7

**straight**

56:6 68:23
99:2
158:21

**strange**
49:20,22
50:1

**Strategic**
7:5,18
10:25
11:16
12:2,5,20
13:2,7,14,
23 14:4
15:14,24
16:5 19:1,
9,13
26:18,23
27:1,6,9,
16,18
28:5,17
29:20
31:4,5
32:4,13
35:2,8
36:6 37:3,
13 38:4,
16,25
40:10,16
41:7 43:2,
9,19,23
44:1,17
45:2,12,15
51:7,10,16
52:7,12,15
53:4 55:2,
4 72:21
74:15

75:3,8,12,
13,16,23
76:2,7
78:20,23,
25  82:7
90:5,19
92:2,10
93:20
95:11
99:3,18
101:2
106:8,17,
24  107:7,
10  108:10,
16  109:1
112:8
117:15,24
118:5
129:3,6
145:17
157:10
158:22
166:1,6
171:11
173:15
174:7
183:3
187:8,11
188:19
189:7,11
196:25
220:2
227:24
228:2
229:6,11,
20  249:19
260:11
261:10

263:2
264:15
274:9
276:14
282:21
283:5,11,
17,19
284:6,17,
19,21,22,
25  285:4,
5,8  286:7
287:16
288:25
289:8

street   121:7

streets
245:9

strict   203:8

strike   26:19
96:20
161:9
229:10
286:7

string   151:7

structure
96:16,18
97:11

struggle
54:17,19

student
53:22
155:10,24

stuff   71:8
125:20
139:9

250:8
269:17
276:17

subcontracted
76:9

subject
48:10
50:14,19
180:16
250:20
263:12,20

subjects
16:19  48:1
145:11
254:4
265:24

submit   67:12
101:12

submitted
282:21
283:4

subsequent
26:2  35:20
47:1
100:18
171:24
206:14
232:5
256:17,19

subsequently
23:12
165:21
173:15
233:25
270:6

substance
14:8
163:15

substantial
273:7

succeed
156:10

successively
194:19

Suen   70:8
164:7
169:21
235:9

Suen's
167:17
173:2
174:8

sufficient
122:23

suggest
126:23

suggested
92:21
117:8

suit   228:24
234:22
277:20

suite   227:15

suits   247:2

sum   36:7,8
39:8  257:1

summary
71:7,9

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019                    Index: super..talk

**super** 118:1
 239:14

**supervise**
 29:16

**supervising**
 62:14
 82:21 84:1

**supplemental**
 282:20
 283:3

**support**
 11:18
 221:18
 240:12

**supporters**
 241:18
 254:10

**suppose** 24:2

**supposed**
 25:15
 102:8
 140:3
 272:20

**supposedly**
 34:11

**surprise**
 160:23

**surprised**
 215:23

**surrogate**
 129:1,4

**suspect**
 137:18

**suspected**
 178:19,24
 180:9
 219:24
 221:20
 222:4

**suspicion**
 188:21

**sv** 283:11

**SV267** 267:7

**SV269** 261:21

**SV385**
 233:11,16

**SV402**
 233:11,16

**SV68** 132:21

**SV69** 132:17

**SV70** 139:11

**SV72** 144:4

**SV80** 230:3

**SVUS000077**
 226:3

**SVUS00262**
 259:4

**SVUS260**
 255:7

**SVUS263**
 259:16

**SVUS265**
 260:2

**SVUS267**
 267:5,18

**SVUS268**
 268:1

**SVUS278**
 263:21

**SVUS62**
 118:11

**SVUS80**
 229:24

**swarming**
 249:4

**swearing**
 7:12

**switching**
 113:9

**sworn** 7:23

**symbiosis**
 239:14

**symbols**
 262:5

**sympathy**
 244:5

**synergies**
 245:21

**synergy**
 141:7

**synthesis**
 72:22
 253:11

**synthesized**
 57:12

**synthesizing**
 72:15,17,
 18

**system**
 181:24
 184:9
 185:21
 195:11
 234:16

--------

**T**

--------

**tactics**
 248:25
 249:5

**tail** 219:13

**tailored**
 66:18
 125:10

**takeaway**
 232:12

**takeaways**
 230:10

**takes** 56:16
 72:7 82:19
 89:17
 174:3
 195:10,23
 275:23
 276:3

**taking** 38:4,
 5 44:22
 138:5

**talent** 15:13

**talk** 12:14
 16:6 26:9
 49:21
 52:24 55:8

57:23 79:3
88:18
90:23
106:15,22
125:14,23
129:8
134:1,2,11
142:10
143:7
150:20
152:3
153:18
166:22
167:9
185:18
201:10
217:13
277:12

**talked**  11:3,
24 26:2
68:16
78:24
100:13
117:7
119:2
126:2
162:8
204:24
231:19
258:6
277:4

**talking**  8:14
11:16 12:3
23:24
27:13 53:4
64:25 96:5
100:12

104:1
123:24
124:22,24
127:18
128:21
133:19
134:21
139:17
145:20
146:2
147:10
152:11
153:6,11,
16 154:5
156:7
161:21
203:11
204:9
215:7
216:18
223:21
224:15
225:5
252:17
258:4
259:18
273:16
276:10,12,
17 277:8
278:22

**talks**  130:9

**tank**  48:19,
21 49:12
50:18 97:4

**target**  50:20
71:25
170:13

213:23
254:4
268:11
276:19

**targeted**
164:18

**targets**
64:23
69:13
71:11
202:11
222:3,9
235:1,5,19
269:23
278:20

**task**  56:23
58:5

**tax**  269:16

**team**  27:22
29:15,16,
17 42:2,
15,16
52:21
55:21
56:6,21,22
58:4
61:20,25
62:14
67:17,23,
24 68:20
69:17,25
72:1,7,17
75:14,19,
20 76:5,
12,25
77:1,8,11,

13,16,19,
23 78:4,5,
9,18,21
79:4,9
80:1,2,4,
17,18
82:15
83:14,24
84:9 85:18
86:8,15,17
93:17 94:7
95:1,2,8
96:2
122:22
131:20,23
146:16,18
151:9,12
155:21
156:6
166:16,19,
22 167:2
168:8,9,12
174:10,14,
15,19,25
175:4,12
176:14,17,
19 177:3
178:7,14,
15,24
179:9,19,
21,22
180:23
185:25
186:3,8
191:8
192:7,9,
13,20
193:10,18,

25 194:5,
16,22,25
195:6
198:19
208:23
210:22
211:3,20
213:18,24
218:2,4
219:5,7
220:4,12,
13,18,20,
23,24
221:2,4,9,
22 222:10,
13,19
224:5,8,
10,17
245:13
247:17
255:12,14,
17 256:11
257:1,17
258:9,11,
23 260:5,
6,18,19,
23,25
261:24
262:1
263:3,5
267:11
268:4,13
272:5
275:13,25
276:18,25
277:3,5,6,
8,13
278:23

279:12,14,
21,24
284:22
287:21,22,
23 288:2,
22

teamed   38:8

teams   12:18
15:6 27:23
28:21
36:3,10
45:23 55:7
72:19
83:23
84:18
174:13,18
222:2,7,
10,12
223:7
247:10
260:16
275:17

tear   189:4

technical
204:15
288:16

techniques
224:9

technology
204:15

telephone
160:15,16

telephonically
47:19,20

telling

57:15
100:6
173:21
224:5
237:1

tells   170:12

ten   33:15
34:7 49:2
50:6 94:18
95:20
175:13
235:1,5
256:20

tens   224:18
225:6

tentatively
32:2

term   43:14
48:5,6,7
49:14
50:15
180:24
280:20

terminated
97:16

terminating
45:7

termination
103:8

terminology
51:4

terms   26:23
29:6
32:15,18

35:3,14,17
36:20
37:12,15,
16 38:3,4
45:16,18
50:1,22
51:11,15
52:9 56:8
66:16
67:13
68:8,19
69:21
70:18
72:20
88:9,13
112:7
120:18
142:2,21
144:17
149:16
150:2
151:21
162:23
170:21
187:16
192:24
248:7
256:12
280:23
288:5

Teske   7:19
18:8
196:18
281:2,16,
18 282:13

test   167:5,
9,10 168:4

235:7,13

**testifies**
7:24

**testimony**
8:13
206:24

**tests** 138:17

**Texas** 77:8,
11 179:23
180:10

**text** 47:12,
13 80:25
81:2 95:4
116:8
118:12
120:18
123:16
137:21
215:21

**text-like**
282:10

**texts** 274:6

**thanked**
162:14

**thereabouts**
211:15

**thing** 59:1
91:23
101:20
133:3
139:8
155:1,17
163:14
170:12

180:11
184:11
216:17
231:9
244:7
258:22
284:10

**things** 23:6,
18 25:11
30:7 33:12
38:1 44:2
56:14
59:10 60:4
63:21 71:2
74:1 84:8
94:2,16
97:4,20
110:22
121:1,19
124:6
125:2,22
126:17
135:18,20
146:6
148:4
152:7
153:18
163:5
164:2
171:17
177:17
232:15
241:24
242:17
243:16
255:25
263:9

**thinker**
121:12

**thinking**
153:21
251:11

**thinks**
196:12
269:4

**third-party**
281:19

**thought**
24:21
26:13
49:22
50:23
94:14
132:11
135:3
137:16
158:15
167:2
178:1
196:7
204:12
207:7
208:11
221:15
228:23
263:5
268:23
269:13,19
270:9

**thousand**
259:20

**thousands**
224:18

**thread**
116:9,11
123:21
124:3
155:1

**threat** 124:7

**threats**
240:16

**three-year**
34:8,9
230:12

**threw** 23:14

**throw** 150:3,
5 173:23

**throwing**
262:22

**thumb** 56:5
192:10
216:11

**Tiananmen**
53:22

**tie** 125:3

**tied** 110:4,
6 240:17

**tight** 76:13

**time** 7:6
8:16 12:7
24:14
25:14,23
26:10
30:25 33:7
35:21
37:18
42:19,22

43:1,21
48:25
89:12
91:17
93:13
95:10
102:18
103:2
111:19,21
121:10,15
123:4,5,25
128:4
129:23
132:20
137:17
140:14
141:12
144:18
155:4
157:10
158:8
163:2,14
174:1
183:12
191:22,23,
24 192:1
195:2,10
197:4,11
199:12
200:2
201:12
203:4,16
205:19
207:17
213:16
215:14
216:13
217:9

220:19
222:9
223:11
228:22
232:7
233:9
234:2
262:20
271:23
275:23
276:3,24
280:8,9,
18,24
281:12
289:21
290:2

**time-consuming**
56:23
60:17

**timeframe**
196:16

**timeline**
230:12

**times** 50:6,
14 60:15
64:4 84:11
104:9
175:3,11,
13 192:1
194:21
197:5,6
274:2
278:9

**tipped**
183:22

**titled**

227:8,14

**today** 8:19
18:21 19:8
24:2
77:12,25
118:25
149:21
152:6
153:24
237:1
244:15
281:18,23
282:3,7
289:16,21

**today's** 7:5
290:2

**token** 232:19

**Tokyo** 119:8,
11,14
123:21

**told** 23:4,6
24:16
25:17,20,
21,22
26:21
56:16,17
58:15,16
71:9 72:18
104:8
107:1
110:12
112:12
130:16
131:17
132:3,22
133:18

135:22
149:2,6
153:3,12
160:21
161:10
171:17
174:5
180:22
182:16
183:13,15
184:16
188:15
190:22
191:15
194:14
195:12
205:2,15
211:19,22
216:4
218:21
220:15
221:9
222:17
235:5
274:20
287:23
288:22

**top** 70:4
75:23
95:17
153:8
178:5
190:12
226:7
244:12
245:4
265:17
266:7

Case 1:18-cv-02185-LJL   Document 261   Filed 03/16/20   Page 513 of 645

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019          Index: top-quality..trust

top-quality
  122:19

topple
  227:25

toppled
  156:5

toppling
  137:14

total  14:3
  50:12
  95:19
  236:12

totalitarian
  227:10
  228:1

totally  92:2

touch  116:21
  163:16
  276:24

tout  111:5
  112:2,5

Tower  125:20
  135:12

traceable
  199:20

track  71:11

tracking
  33:20
  52:18,20
  66:21
  96:14
  140:5

Tracks  65:2

211:12

Trade  167:21

traders
  246:4,14

trading
  246:17,21

tradition
  209:13

trail  37:20
  101:11,12
  225:1

train  199:18
  226:22

tranche
  208:22
  210:3
  261:4

transactions
  41:3

transcript
  40:22
  175:6

transfer
  100:25

transferred
  41:6,24

transfers
  99:6

transform
  245:18

translate
  85:4

translated
  274:3

translation
  84:23 85:1
  86:14
  186:22

translations
  85:20

translator
  148:3

translators
  85:14

transliteratio
n  178:19

transliteratio
ns  178:17

transmitted
  88:16

transmitting
  87:22
  88:13

trap  287:16
  288:7,11,
  12

travel  45:23
  199:8,13,
  15,19
  210:24
  219:12
  223:12
  224:1

traveled
  17:12
  53:25

traveling
  58:10
  72:3,4
  211:22

Treasury
  31:24
  121:7
  231:18

treated
  74:21

tree  10:6
  41:20,21
  268:2

trees  236:11

trial  84:14

trip  72:9

trolling
  249:2

trouble
  71:20

true  224:5

Trump  112:15
  118:24
  241:13,14,
  18,20,23
  242:5
  248:19

trust  12:23
  63:19,21
  83:10
  84:13,16
  124:19
  130:17
  132:8

Case 1:18-cv-02185-LJL   Document 261   Filed 03/16/20   Page 514 of 645

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019          Index: trusted..understand

133:3,14,
18 138:17,
20,22
141:16
147:18,20
191:14,19
192:5
206:12
278:20

**trusted**
132:7
133:7
139:4
140:14
162:21
191:20

**trusting**
80:1
133:6,12
139:1
192:2

**Turkey**  111:9

**turn**  74:18
118:11
253:9
263:23

**turned**
195:25

**turning**
118:23
120:6
124:18
139:11
148:14
215:17
234:15

267:25
272:24
274:19

**tweet**  250:20

**Tweets**
241:14

**Twitter**
243:12,16
250:10,14

**type**  12:18
27:24
33:25
52:16  56:2
59:12
66:11
71:22
91:17
139:4
143:4
146:8
148:7
183:7
185:8
250:17
264:19
275:20

**types**  33:16
34:7
142:15
146:12
256:13

**typically**
247:4
250:19

————————————
**U**
————————————

**U.S.**  10:11
11:19,20,
22 31:24
73:1,7
76:8 121:7
171:20
175:22,24
180:16,19
181:2
182:6
241:11
243:23
263:16

**U.s.-based**
248:17
249:6

**Ukraine**
109:25

**ultimately**
92:25
125:5
145:10

**Um-hum**  126:4
251:2
277:25

**unarmed**
156:12

**uncorrupted**
165:15

**understand**
31:1 41:1
42:12
43:20

55:15 57:1
58:14 60:5
79:2 87:2
89:21
90:14
93:18 98:7
99:15
117:1
120:10
126:5,14
129:2
130:12
134:20,24
142:20,23
145:10,18
148:18
170:16,25
176:19
192:14
202:11
205:25
208:24
210:1
216:16
237:2,11
238:6
240:4
241:21
249:16
252:3
253:9,21
262:4
268:11
269:10,22
273:17
274:2
276:13,19
278:12

Case 1:18-cv-02185-LJL   Document 261   Filed 03/16/20   Page 515 of 645

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019     Index: understandably..vehicles

280:5
287:20
288:14

**understandably**
139:20

**understanding**
38:25
54:17 67:4
91:14
98:10
145:15
185:2,15
189:2,6
263:13
273:1,5
274:13
283:16
284:7

**understands**
85:10

**understood**
50:5 51:5
54:23
57:16
60:19 76:7
93:15
97:18
98:15 99:7
127:7
134:5
141:17
142:17
147:25
161:14
177:16
179:6
237:13,19

256:11
273:19,20
274:7,18,
20

**underway**
55:19

**unethical**
136:7

**unit**   24:12
148:13

**unite**   110:15

**United**
16:13,14,
21 23:7
28:23,24
34:24
124:8
136:25
137:9
138:15
168:3
174:24
175:1,15
177:5
182:24
183:4
211:7
239:3
240:12
260:11
263:12
269:15

**universe**
53:25
71:23
97:22

**University**
9:7,8,9

**unnecessary**
149:23

**unprofessional**
173:21

**unreasonable**
152:7,17
153:1
154:2

**unrelated**
135:19
161:5

**unreliable**
130:20

**untraceable**
101:11

**unusually**
84:12

**update**
192:8,21

**updates**
192:6

**upend**   140:7

**upset**   94:1
103:6
158:20
171:19,21
204:12
206:17
207:18
258:12
269:2

**USB**   56:5
58:7 59:13
61:21 64:6
65:9,18
87:17,22
88:4 89:20
165:4,6,13
176:3,16,
23 192:10
193:19
194:24
195:3
197:4
200:10
202:4,6,24
203:12
208:23
216:22
218:3

**USBS**   218:12

**USSR**   110:2

---

**V**

---

**vague**   151:14

**valuable**
269:17

**variety**   11:9

**vary**   97:9

**Varying**
217:10

**vehicle**
114:4
256:5

**vehicles**

156:13,16

**venture**
247:22

**verbal**  32:8
40:3 57:9,
10 70:14,
16 101:4,6
102:2,24
103:1,9
139:18
197:18
198:4
200:8,9,
13,14,20
216:12
218:14

**verbally**
59:11
102:22
143:21
197:5
200:16
208:10
218:24,25
219:15

**verification**
176:8

**verify**
177:13
224:4
277:3

**verifying**
224:8,9,16
277:13

**versa**  139:4

**version**
154:9
166:14
191:3
271:3

**versions**
18:24
165:15

**versus**  7:4
60:3 61:17
99:11
141:9
154:4

**vetted**
184:21

**vetting**
86:24

**vice**  115:19
139:4

**view**  51:7
121:8
275:6

**viewed**
258:21

**violation**
163:6

**violence**
78:8

**virgin**  212:4

**Virginia**
176:18
192:19

**vision**  7:5,
18 10:25

11:17
12:2,5,20
13:2,7,15,
24 14:4
15:15,24
16:5 19:1,
9,14
26:19,23
27:1,6,10,
16,18
28:5,17
29:21 30:7
31:4,5
32:4,13
35:2,8
36:6 37:13
38:4,16
39:1 40:10
41:7 43:2,
9,19,23
44:1,18
45:2,12,15
51:7,10,16
52:7,12,15
53:4 55:3,
4 72:21
74:15
75:3,8,12,
13,16,23
76:2,7
78:20,23
79:1 82:7
90:5,19
92:2,10
93:20
95:11
99:3,18
101:2

106:8,17,
24 107:10
108:10,17
109:1
117:15,24
118:5
129:3,6
145:17
156:25
157:10
166:2,6
171:11
173:15
174:7
183:3
187:9,11
188:20
189:8,11
196:25
220:2
227:8,22,
24 228:2
229:6,11,
20 245:18
249:19
253:1,5
260:11
261:10
263:2
264:15
274:9
276:14
282:22
283:5,11,
17,20
284:6,17,
19,22,25
285:4,6

286:7
287:16
289:1

Vision's
  37:3 40:16
  107:7
  112:8
  158:22
  285:8
  289:8

visualize
  268:9

visually
  219:14

volume   250:6

volunteer
  104:10

_____

W

waffling
  120:25
  121:3

waging
  227:25

wait  8:11
  132:23

waiting
  177:4

wall  170:6

waller  7:3,
  22 8:3,21,
  22 17:22
  18:6,9,10,
  11,17

33:25
46:11,14
47:5,6
58:13
61:11
62:17
63:22
73:15
74:11,17
79:12
105:12,13,
16 113:4,5
116:8,10
157:9
164:6
186:19
212:17
214:25
215:3
226:2
229:23
230:8
233:8,17
255:6
259:3
261:17
263:20
267:4
270:21,25
281:17
282:20,25
283:24
289:21
290:2

Wallop  10:8,
  20,24
  11:15
  12:2,10

16:23
17:1,15
20:12,13
21:20
25:21
26:1,11,22
27:20
28:18
29:4,20
30:15,23
31:6,12
38:5,18
40:5 43:19
44:12
46:21
49:17,25
51:3,12
63:15
72:24
73:17
74:15
76:11 79:3
85:9
100:12,13
102:21
111:2,9,24
112:18
114:3,18
116:23,24
129:8
137:12
145:17
152:23
158:8
159:13
160:9
161:11
165:5,7,20

167:13
193:13
208:4
215:8,15
218:7
228:14
254:23
258:2
264:13
265:1
266:19
283:12
284:25
286:6,8
287:10
289:7

Wallop's
  10:12
  15:25 29:5
  30:8
  102:10
  105:23
  137:4
  189:21
  190:16

Walmart
  249:14

Wang   20:13
  31:3,13
  46:21
  51:20
  57:16
  58:17 62:8
  65:2,19
  81:17
  106:16,23
  107:13

Case 1:18-cv-02185-LJL   Document 261   Filed 03/16/20   Page 518 of 645

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019          Index: wanted..wide-ranging

108:20
112:22
130:5
131:13
140:16
151:5
165:11
167:11
215:9
271:12
272:8
274:3
280:5

**wanted** 23:4
24:17,18,
22,24,25
25:5
26:18,21
30:8
31:18,21
32:1
33:12,13,
15,16 34:8
35:15
37:13,17
43:15 52:3
59:3,4
61:8,9
68:23
69:14 70:4
77:20
92:19
94:25 97:5
102:13
117:3
120:25
121:4
122:7

123:4,7
125:2,22
136:6
141:2,5,6
143:20
145:7
148:20
162:15,20
167:6,17,
23 170:11
171:9,17
189:3,4
204:14
205:22
206:3,4
220:21,25
221:21
224:4
228:20,23
231:11
235:6,22
238:5,8,9,
10,11
240:8,19
242:19
250:1
261:8
263:6,7,17
275:20

**wanting**
122:1,4

**War** 11:5,6,
17 138:11

**wardrobe**
135:6

**warfare**
249:2

**warned**
220:16

**wary** 146:12

**Washington**
9:3,7,14
30:14
31:14,20,
22 32:10
114:9
121:6
160:19
176:17
231:18,20
232:8,9

**watch** 254:13

**watches**
243:14

**watching**
144:22

**water** 49:11
97:4

**waterline**
49:14,15
50:18 97:7

**ways** 11:9
101:25
170:10,14,
15 199:19
224:25
248:11

**weapon** 238:1

**websites**
222:1

**wedlock** 25:8

**week** 72:3,8
103:10,13
152:1
166:9
180:1
186:4
198:24,25
199:5
200:4

**week's**
219:19

**weekly** 55:18
58:17 66:1
67:2,5,11,
14,21
72:11
96:19 97:1
127:15

**weeks** 60:17
94:16
102:11
195:25
207:2,5,
14,23
221:7
237:5

**weird** 48:7

**Wengui** 24:4

**Westchester**
30:15

**White** 31:25
112:3,9,11
121:9

**wide-ranging**
110:20

**William**
162:2

**win**  248:18

**win-win**
137:10

**Windows**
172:8

**wine**  233:4

**wire**  100:24
157:10,24
160:2
161:11
289:17

**wires**  157:13
158:4,7
160:3
289:9,10

**wondered**
162:20

**word**  18:14
66:20
98:11
104:15
139:6
280:16

**wording**
66:12 98:5

**words**  17:15
26:14 35:6
49:11
67:15
69:21
77:10
122:21

127:23
179:3
191:25
207:25
208:1
245:24
251:14
266:23

**work**  9:11,
12,19
10:1,15
11:6,7,14
12:16,22
13:17,21
14:4,8,11,
16,21,23
15:1,4
16:4,24
17:3,14
21:11,16
26:12
27:9,17
28:2,22
30:2 36:8
42:23
43:5,17
44:6,21,23
52:17
54:2,25
65:14
67:15,17
68:3,8,11
69:16
71:12
72:23
73:16 76:9
83:10,12,
16,20

84:17,20
85:6 86:14
90:12
91:14,16,
17 92:11
93:7,8,10
94:6 95:6,
10 97:14
98:7,11
101:21,25
102:12
103:7,20,
22,23
104:18
107:2,9,14
109:18
110:8,21
112:16,24
113:1,2
114:4,7
115:22
116:1
117:22
121:15,17
123:25
124:2
126:22
131:12
141:10
142:15,23
146:8
147:24
148:15,21
149:2
151:2,3
155:14
166:17
176:8,9

185:5,19
188:3,17
190:25
191:14,16
192:5
197:19
202:9,10
206:11,12
209:23,24
219:7,24
220:15
222:9
223:10
225:14
226:17
242:24,25
245:22
246:13
249:24
250:13,17
253:15
254:20,21
257:24
258:17,24
260:10,22
264:15
268:14
272:13,23
275:20
277:13

**worked**  11:4
20:14
27:15
38:10 52:6
84:21
109:1
112:14,23
115:12

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019          Index: working..York

116:19
138:2
182:7
185:1,3
226:19
260:3
274:25

**working**
9:12,25
10:23
11:16,24
12:10
13:4,5,10
16:5 17:1
28:6 35:21
44:23
46:21 54:3
56:15 71:2
82:13
103:17
109:24
115:23
117:2
132:5,6
150:16
155:15,16,
17 163:18
185:1
216:1,15,
18,20,21
219:6
220:18
221:16
222:14
223:21
249:14
268:7

**works** 74:14
101:9
104:3
184:6
274:21

**world** 9:16
101:16
155:25
262:16,25

**worldwide**
17:11
188:18

**worries**
216:20

**worry**
216:15,17
286:23

**worse** 63:3
64:6
146:22

**worst** 78:8

**worth** 139:14
140:7,8

**write** 19:22
102:11
177:16
206:18
207:13
242:17
249:11
266:11,13

**writing**
22:10
78:13 94:3
102:1

129:24
143:21
149:11,13,
17 152:8
274:12

**written**
12:21
32:12
40:1,4
70:19
101:5
126:18
175:6
200:22,25

**wrong** 42:12
43:13 69:4
73:20
177:23
178:1,8,10
269:9

**wrote** 19:15,
16,24
32:18
120:21
122:14
123:16
124:19
126:21
132:18,25
133:1
139:12
140:22
144:5
148:15
153:6
155:3
207:17

230:12
272:12

————————

**X**
————————

**Xi** 24:24
25:4

————————

**Y**
————————

**Y-O-H** 138:7

**Yao** 212:18

**year** 36:17
48:19
96:13
247:10

**years** 10:9
53:19,24
83:15
84:15
116:19
117:7
138:3
155:12
162:19
188:17

**Yeltsin**
110:6

**Yoh** 138:7,
23 139:9

**York** 7:24
21:24
30:14
58:11 65:2
120:7,10,
21 144:8,

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019          Index: Younger..zeroing

12 147:3
153:22
155:20
165:15
199:7
217:12
230:19
231:21,22

**Younger**
243:3

**Yui**  164:7

**Yuri**  146:22

**Yvette**  20:13
31:3,13
32:9 46:21
51:20
54:20,22
57:3,16
58:17
59:8,17
62:8,18
63:8,17,19
65:2,19
81:17 94:3
95:2
100:2,5,12
102:18
106:16,23
107:13
108:20
129:18
130:16,17,
25 131:12
133:15
134:3,13
141:18,20
143:21,22

147:8,17
150:15
151:5,9
152:21,24
153:15,16,
18,25
154:4,5,6,
23 159:24
160:4,9
161:8,10
165:4,11,
12 167:14
180:2
183:13
194:3,7,
10,18
195:19
196:2
197:23
198:9,18
201:13
202:25
203:3,5,14
208:4
211:10,22,
25 215:22
216:3
217:11
232:2
260:20
265:6
267:19
271:12,16
274:8
275:5,9
276:10
277:12

**Yvette's**
217:11

___

**Z**

___

**Zach**  7:14
8:4 282:14
286:20

**Zeichner**
7:15

**zeroing**
254:1

# EXHIBIT I

Page 1

1

2   IN THE UNITED STATES DISTRICT COURT

3   FOR THE SOUTHERN DISTRICT OF NEW YORK

4   ----------------------------------------x

5   EASTERN PROFIT CORPORATON LIMITED,,

6                      Plaintiff/Counterclaim Defendant,

7

8                         Case No.  18-cv-2185

9                   v.

10   STRATEGIC VISION US, LLC,

11                      Defendant/Counterclaim Plaintiff.

12   ----------------------------------------x

13                      10:00 a.m.

                        November 19, 2019

14

                        405 Lexington Avenue

15                      New York, New York

16

17          DEPOSITION of JOHN MICHAEL WALLER,

18   testifying under Rule 30(b)(6) on behalf of

19   STRATEGIC VISION US, LLC in the above entitled

20   matter, pursuant to Notice, before Stephen J.

21   Moore, a Registered Professional Reporter,

22   Certified Realtime Reporter and Notary Public of

23   the State of New York.

24

25

Page 2

1
2 A P P E A R A N C E S :
3
4     GRAVES GARRETT LLC
5         Attorneys for Eastern Profit
6         Corporation Limited
7         1100 Main Street
8         Kansas City, Missouri  64105
9
10     BY:   EDWARD D. GREIM, ESQ.
11         and
12         JENNIFER DONNELLI, ESQ.
13
14     PEPPER HAMILTON, LLP
15         Attorneys for Strategic Vision US,
16         LLC
17         1313 N. Market Street 5100
18         Wilmington, Delaware 19899
19
20     BY:   JOANNA CLINE, ESQ.
21
22 ALSO PRESENT:
23     DANIEL PODHASKIE
24     YVETTE WANG
25

Page 4

1         MICHAEL WALLER
2         THE VIDEOGRAPHER:  Good morning.
3 We are recording and on the record at
4 9:09 a.m. on November 19, 2019.
5         Please note that the microphones
6 are sensitive and may pick up whispering,
7 private conversations and cellular
8 interference.
9         Please turn off all cell phones or
10 place them away from the microphones, as
11 they can interfere with the deposition
12 audio.
13         Recording will continue until all
14 parties agree to go off the record.
15         This is video 1 in the deposition
16 of Michael Waller, taken by counsel for
17 the Plaintiff, in the matter of Eastern
18 Profit Corporation, Limited, versus
19 Strategic Vision US, LLC, filed in the
20 U.S. District Court, Southern District of
21 New York, case number 18 CV 2185 JGP.
22         This deposition is being held at
23 405 Lexington Avenue, New York, New York.
24         My name is George Libbares the
25 court reporter is Stephen Moore and we are

Page 3

1
2 EXAMINATION BY                      PAGE
3 MS. CLINE                 5
4         E X H I B I T S
5 SV
6 EXBT 101 Strategic Vision's amended     11  14
7         Answer and counterclaims
8 EXBT 102 List of names          55  25
9 EXBT 103 Bank statement for         71   5
10         Georgetown Research for the
11         month of January, 2018
12 EXBT 104 Invoice from Team 1 leader     75  21
13         to Georgetown Research for
            $200,000
14 EXBT 105 Invoice from Allied Special     105   5
15         Operations Group from March
16         2018
17 EXBT 106 Handwritten notes         121  16
18 EXBT 107  Document Bates stamped SVUS    160  22
19         1961 through 65
20 EXBT 108 Document Bates stamped 1966     160  22
21         through 1971
22 EXBT 109 Document Bates stamped 1972     160  22
23         through 1975
24 EXBT 110 Document Bates stamped SVUS     164   8
25         1976 through 1990

Page 5

1         MICHAEL WALLER
2 here from Veritext New York.
3         Counsel will now state their
4 appearances and the court reporter will
5 administer the oath.
6         MS. CLINE:  This is Johanna
7 Cline, Pepper Hamilton for Eastern
8 Profit.
9         And just one clarification, today's
10 deposition is the deposition of Strategic
11 Vision, a 30(b)(6) deposition, and
12 Mr. Wallerer is Strategic Vision's first
13 deponent.
14         MR. GREIM:  Eddie Greim and
15 Jennifer dONNELLI, Graves Garrett LLC
16 for Strategic Vision.
17
18 J O H N     M I C H A E L     W A L L E R,
19 called as a witness, having been first
20 duly sworn by the Notary Public, was
21 examined and testified as follows:
22
23 EXAMINATION BY
24 MS. CLINE:
25

2 (Pages 2 - 5)

Page 6

MICHAEL WALLER

1
2     Q     Mr. Waller, you understand that
3 you are testifying today as a representative of
4 Strategic Vision?
5     A     Yes.
6     Q     And you're authorized to testify
7 on behalf of Strategic Vision?
8     A     Yes.
9     Q     How do you know?
10     A     Because the owner of the company
11 said so.
12     Q     And when did she say so?
13     A     As early as today, or as late as
14 today.
15     Q     So you weren't authorized until
16 today?
17     A     I'm authorized to appear here on
18 behalf of Strategic Vision when I was called, I
19 don't remember the date.
20     Q     And who called you?
21     A     French Wallop.
22     Q     Is there a written document
23 memorializing the authorization?
24     A     There was a message somewhere.
25 I don't have it handy.

Page 7

MICHAEL WALLER

1
2     Q     She sent you a text message?
3     A     I'm not sure how I got the
4 message to come here.
5     Q     Was there any -- well, Strategic
6 Vision is an LLC, right?
7     A     Yes.
8     Q     Are you a member of Strategic
9 Vision?
10     A     No.
11     Q     Do you have a title with
12 Strategic Vision?
13     A     No.
14     Q     Are you an employee of Strategic
15 Vision?
16     A     No.
17     Q     So you are not an employee, you
18 have no title, but your testimony is that you
19 are still authorized to act?
20     A     Yes.
21     Q     Have you ever seen the Strategic
22 Vision operating agreement?
23     A     With -- the one that's the
24 subject of the suit?
25     Q     No, sorry.

Page 8

MICHAEL WALLER

1
2     So Strategic Vision is an LLC.
3 So then presumably there is an operating
4 agreement that is the governing document of
5 that LLC entity.
6     Have you ever seen that?
7     A     No.
8     Q     Have you ever seen a written
9 consent or resolution authorizing your
10 testimony here today?
11     A     No.
12     Q     Have you ever seen any minutes
13 of Strategic Vision authorizing your testimony
14 here today?
15     A     No.
16     Q     So, should the absence of any
17 written authority or memorialization of your
18 authority lead us to conclude that you're not
19 authorized?
20     MR. GREIM:  Objection, calls for
21     a legal conclusion and for speculation.
22     A     I cannot give a legal
23 conclusion, respectfully.
24     Q     Strategic Vision is suing
25 Eastern Profit for fraud, you understand that?

Page 9

MICHAEL WALLER

1
2     A     Yes.
3     Q     Did you ever discuss that fraud
4 claim with anyone other than Ms. Wallop or your
5 counsel?
6     A     Yes.
7     Q     Tell me the first person with
8 whom you discussed that?
9     A     I don't know with whom I
10 discussed, I just know that I did.
11     Q     You can't tell me a single
12 person that you discussed the claim with?
13     A     Not -- not since -- since the
14 beginning, no.  I just know I got sued or the
15 company got sued, I am involved with it, and I
16 don't recall who I said it to.
17     Q     Okay, and --
18     A     It wasn't a material
19 conversation.
20     Q     Just to be clear, I'm speaking
21 specifically of Strategic Vision's fraud
22 counterclaim in this lawsuit.
23     So before that fraud
24 counterclaim was filed, did you speak with
25 anyone about the allegations in the fraud

3 (Pages 6 - 9)

MICHAEL WALLER

1
2  counterclaim other than Ms. Wallop and counsel?
3      A    Yes.
4      Q    With whom did you speak?
5      A    I don't remember.
6      Q    More than one person?
7      A    I would be speculating if I said
8  it.
9      Q    Well, let me put it this way
10 what did you do to verify the veracity of the
11 fraud allegations before --
12          MS. CLINE:  Strike that.
13     Q    What did Strategic Vision do to
14 verify the veracity of the fraud allegations
15 before the complaint was filed?
16          The counterclaim was filed --
17     A    As a -- as somebody with
18 Strategic Vision, I knew they were false
19 claims, so I knew firsthand.
20     Q    How did you know?
21     A    Because I had been a participant
22 in working with Strategic Vision.
23     Q    Who is Watson Meng?
24     A    He is a Chinese writer who
25 opposes the Communist Party.

MICHAEL WALLER

1
2      Q    You know Mr. Meng, right?
3      A    I have met him once.
4      Q    Did you talk to him about the
5  allegations in your fraud -- in Strategic
6  Vision's fraud counterclaim before the claim
7  was filed?
8      A    Not that I recall.
9          MS. CLINE:  Can we mark this as
10         101, please.
11         (The above described document was
12         marked SV Exhibit 101 for identification
13         as of this date.)
14     Q    So, we have handed you what's
15 been marked as Strategic Vision 101, do you
16 recognize this document?
17     A    I believe I do.
18     Q    It's Strategic Vision's amended
19 Answer and counterclaims in this case, right?
20     A    Yes.
21     Q    Did you review Exhibit 101
22 before it was filed?
23     A    Yes.
24     Q    Do you know whether anyone
25 verified, signed a written verification

MICHAEL WALLER

1
2  verifying the accuracy of these allegations?
3      A    I don't recall.
4      Q    Do you recall ever signing such
5  a verification?
6      A    No.
7      Q    Turn, if you would, to paragraph
8  62.
9          Just go ahead and take a moment
10 to read 62 and 63, if you would.
11         Can I just take a look at that
12 for a second.
13         So Mr. Podhaski points out that
14 there are multiple paragraphs 62 in this
15 document, so to clarify for the record, we are
16 going to talk about page 40, paragraph 62 which
17 leads on to page 41; apologies for that.
18     A    Yes.
19     Q    So, what factual research did
20 Strategic Vision do to verify the allegations
21 in paragraph 62 and 63?
22     A    63 also, let me read 63.
23         Paragraph 62 comes from an audio
24 recording of Guo Wengui speaking on March 5,
25 2017 about harassing anti-communist

MICHAEL WALLER

1
2  disdissidents in the United States.
3      Q    How about with respect to
4  paragraph 63?
5      A    These I got from written
6  statements by the two men whose pen names are
7  Wei Shi and Shi Wei.
8      Q    Wei Shi -- Wei Shi is Mr. Meng
9  about whom we were just speaking, is that
10 correct?
11     A    Yes.
12     Q    Okay, and how did you get a
13 written statement from Mr. Meng?
14     A    He is a publisher or an editor
15 of a website and he's got very extensive
16 writings on that website and he's very active
17 on social media.
18     Q    So the written statement upon
19 which you relied was published by Mr. Meng on
20 social media?
21     A    Or on his Boxun.com media
22 outlet, to my recollection.
23     Q    Boxun, that's B-o-x-u-n?
24     A    Yes.
25     Q    Did you and Mr. Meng exchange

4 (Pages 10 - 13)

Page 14

MICHAEL WALLER

1
2 any private communications regarding these
3 allegations?
4      A      Yes.
5      Q      Tell me about those
6 communications?
7      A      They were -- they were online
8 communications and I met him on one occasion.
9      Q      Tell me about what was the
10 nature of the online communications?
11      A      If I recall, the nature was
12 about his case.
13      Q      What do you mean by his case?
14      A      His case against Guo Wengui.
15      Q      What was his case against Guo
16 Wengui?
17      A      He and others are involved in
18 litigation either as Plaintiffs or Defendants
19 against Guo Wengui over allegations made
20 against one or the other.
21      Q      What was your role with respect
22 to Mr. Meng's case against Mr. Guo?
23      A      We just discussed the issues of
24 Guo Wengui in general.
25      Q      What issues in general did you

Page 15

MICHAEL WALLER

1
2 discuss?
3      A      If I recall it was a basic
4 discussion of how Guo came here as a dissident,
5 but really spends most of his legal energy
6 fighting Chinese dissidents and others who
7 oppose the Chinese government.
8      Q      Did Mr. Meng provide you with
9 any evidence of this notion that Mr. Guo spends
10 his energy fighting Chinese dissidents?
11      A      Did he physically provide me?
12      Q      Yes.
13      A      No, it's through my own research
14 that he developed a pattern and looking at his
15 case history, at Guo's case history.
16      Q      All I'm trying to get with this
17 line of questioning is figure out whether
18 Mr. Meng gave you any evidence regarding
19 Mr. Guo and whether or not he's a Chinese
20 dissident?
21           MR. GREIM:  Objection, vague.
22      A      Yes, if you could clarify.
23      Q      So, I'll just repeat the
24 question.
25           I'm trying to understand whether

Page 16

MICHAEL WALLER

1
2 Mr. Meng gave you any evidence that relates to
3 the subject of whether or not Mr. Guo is a
4 Chinese dissident?
5           MR. GREIM:  Objection, vague as
6      to evidence.
7      A      Right, do you mean physical
8 evidence or --
9      Q      Other than the written statement
10 that you mentioned that was published online,
11 did he provide you any evidence, written, oral
12 or otherwise, with respect to Mr. Guo's status
13 as a dissident?
14      A      Verbal.
15      Q      Verbal meaning oral?
16      A      Only verbal, yes.
17      Q      And when was that conversation?
18      A      Probably the spring of this
19 year, late spring, early summer of this year.
20      Q      So it was prior to the time
21 Strategic Vision filed it's amended
22 counterclaim, correct?
23      A      Yes.
24      Q      And where were you when you
25 spoke with him?

Page 17

MICHAEL WALLER

1
2      A      In Virginia.
3      Q      Were you and he face-to-face?
4      A      Yes.
5      Q      Where were you?
6      A      In Virginia.
7      Q      Where in Virginia?
8      A      I think Falls Church.
9      Q      At a restaurant?
10      A      I think so, yes.
11      Q      Do you remember the name of the
12 restaurant?
13      A      No.
14      Q      Do you know whether the written
15 statement that Mr. Meng published online was
16 produced in this litigation?
17      A      Produced in discovery?  I'm not
18 sure.
19      Q      Yes, that's my question.  Was it
20 produced in discovery?
21      A      I'm not sure.
22      Q      Were your text messages with
23 Mr. Meng produced in discovery in this case?
24      A      No.
25      Q      What did you do to search for

5 (Pages 14 - 17)

Page 18

MICHAEL WALLER
1
2 your text messages in this case?
3      A      They wouldn't have been -- they
4 wouldn't have been saved.
5      Q      Well, at the time Strategic
6 Vision filed this amended counterclaim the
7 litigation was already pending, right?
8      A      Yes.
9      Q      And Strategic Vision got a
10 litigation hold notice when the lawsuit was
11 filed, didn't it?
12      A      Let me correct myself, let me
13 correct what I just said.
14          I didn't speak to him
15 specifically about this case, I spoke to him
16 about his case.
17      Q      Okay, so let's just break that
18 down.
19          Did you have any conversations
20 or text messages or any communications with
21 Mr. Meng about the allegations that Strategic
22 Vision is making in this case?
23      A      Yes, but they were not about
24 Strategic Vision's allegations, per se, because
25 so many people have similar allegations.  I was

Page 19

MICHAEL WALLER
1
2 asking him about his case.
3      Q      Okay, so what I'm trying to do
4 is understand what evidence Strategic Vision
5 has of its fraud claim in this case.
6          So my question is with respect
7 to the communications that you had with
8 Mr. Meng, did you rely on any of those
9 communications -- did Strategic Vision rely on
10 any of those communications as the basis for
11 its fraud claim against Eastern Profit in this
12 case?
13      A      No.
14      Q      Who is -- I'm sorry, I don't
15 speak Mandarin, it is it Shi Wei?
16      A      Yes.
17      Q      Who is that?
18      A      He is another Defendant in
19 another Guo litigation, so he's a Chinese
20 democracy activist here in New York.
21      Q      And how do you know that the
22 allegations in paragraph 63 are true as to Mr.
23 Shi?
24      A      I follow the documents in his
25 case and they seem truthful and they matched

Page 20

MICHAEL WALLER
1
2 other information that I learned.
3      Q      Did you have any communications
4 with Mr. Shi about the allegations in this
5 case?
6      A      Not about this case, no.
7      Q      So then what is the basis, if
8 you didn't have any communications with
9 Mr. Meng or Mr. Shi about the allegations in
10 this case, what is Strategic Vision's basis for
11 the allegations made in paragraph 63?
12      A      Because their cases reflect the
13 same as the allegations that we make, they
14 provide supporting evidence to what we
15 understood independently.
16          MS. CLINE:  Would you read that
17      back, please.
18          (The answer requested was read back
19      by the reporter.)
20      Q      So, with respect to paragraph
21 63, your -- Strategic Vision's allegations are
22 based on nothing more than allegations made in
23 other lawsuits, is that correct?
24          MR. GREIM:  Objection,
25      argumentative, misstates the witness'

Page 21

MICHAEL WALLER
1
2 testimony.
3      A      I agree with what my counsel
4 said.
5      Q      You have to answer the question.
6      A      No, these were two sources out
7 of many that we are using to corroborate or
8 refute information to establish fact from
9 nonfact.
10      Q      Okay, so other than the
11 allegations in lawsuits involving Mr. Shi and
12 Mr. Guo, what evidence does Strategic Vision
13 have, written or otherwise, that supports the
14 allegations made in paragraph 63?
15      A      I use Mr. Guo's statements
16 himself where he was threatening or making
17 threats about both Mr. Shi and Mr. Guo --
18 pardon me, Mr. Meng and Mr. Guo.
19      Q      What statements are you
20 referring to with respect to alleged threats?
21      A      Mr. Guo made numerous statements
22 in audio or video recordings that were
23 published online, some of which he published
24 himself.
25      Q      Okay, published where?

6 (Pages 18 - 21)

MICHAEL WALLER

1
2    A    On YouTube or on Guo Media or
3 Voice of Guo.
4    Q    How about this allegation that
5 Mr. Guo had their families followed, what is
6 Strategic Vision's evidence for that
7 allegation?
8    A    Multi sourced statements by
9 various parties involved.
10    Q    By whom?
11    A    I don't recall the exact
12 individual's names, but they were -- one
13 doesn't make allegations based on a sole
14 source, unless you know that it's a primary
15 source.
16        In these two cases they were
17 also primary sources and they were both
18 different people in different cases in
19 different circumstances, so they corroborated
20 one another.
21    Q    Okay this is a federal lawsuit
22 in which you're accusing Mr. Guo and Eastern
23 Profit of committing fraud.
24        And I am asking you what's the
25 basis for this allegation in paragraph 63 that

MICHAEL WALLER

1
2 Mr. Guo had the families of Mr. Shi and
3 Mr. Meng followed.
4        MR. GREIM:  Objection,
5        argumentative, asked and answered.  The
6        witness is answering the question.
7    A    Let's start out with Mr. Guo's
8 statement of March 5, 2017 a recording of the
9 authenticity of which he did not refute, where
10 he said these men are bastards, they must die.
11        And then he announced in that
12 audio recording that he was going to spend his
13 resources harassing them.
14        He also made several other
15 recorded statements as recently as July 2019
16 saying that he would destroy their lives
17 through endless litigation.
18        That's harassment.
19        So I am using Mr. Guo's own
20 words through original recordings of his own
21 voice and original video showing him making
22 these statements as recently as last July.
23    Q    And is your sworn testimony that
24 Mr. Guo made statements to the effect that he
25 had their families followed throughout the

MICHAEL WALLER

1
2 greater New York City area?
3    A    That would be -- that would be
4 information based on what I got from those --
5 either of those witnesses.
6    Q    So, maybe I misunderstood.  I
7 thought you just told us that neither of these
8 gentlemen gave you any information relating to
9 the allegations in this lawsuit.
10        So let's --
11        MR. GREIM:  Objection, misstates
12        the witness' testimony.
13    Q    Well, the record is what it is,
14 but let me ask again.
15        Where did you get evidence to
16 support the notion that Mr. Guo had the
17 families of Mr. Shi and Mr. Meng followed
18 throughout the greater New York City area?
19    A    I got that from those two
20 witnesses and I combined those with Mr. Guo's
21 repeated statements that he would harass those
22 people until their lives were destroyed; and he
23 said that they must die.
24    Q    And the statement that you got
25 from Mr. Shi, sorry, Mr. Shi, what type of

MICHAEL WALLER

1
2 statement was that, written?
3    A    Those were his written
4 statements, his own writings.
5    Q    These are published statements
6 or text messages?
7    A    Yes, they were published
8 statements, public domain statements.
9    Q    And let's call him Mr. Meng.
10        With respect to Mr. Meng, the
11 statement that you got from him with respect to
12 the fact that his family was followed
13 throughout the greater New York City area,
14 where was that statement published?
15    A    I don't recall his exact
16 statement.
17        I don't recall the source for
18 it, correction.
19    Q    You never talked to any of the
20 family members of these two gentlemen to
21 confirm that they had been followed, right?
22    A    No.
23    Q    If you would turn to page 25 in
24 Exhibit 101.
25        I am going to direct your

7 (Pages 22 - 25)

MICHAEL WALLER

1
2 attention to paragraph 18, so go ahead and read
3 that.
4     A     Okay.
5     Q     All right, let's just start with
6 sort of the first part of the first sentence
7 which says, "Guo represented to Strategic
8 Vision that he was a dissident."
9           Do you see that?
10    A     Yes.
11    Q     Where was that representation
12 made?
13    A     At his home at Sherry
14 Netherland.
15    Q     Do you remember on what date?
16    A     On the first time November 21,
17 2017.
18    Q     Was it made more than one time,
19 that representation?
20    A     Yes.
21    Q     So the first time was what did
22 you say, I'm sorry?
23    A     November 21, 2017.
24    Q     When was the next time it was
25 made?

MICHAEL WALLER

1
2     A     Also at his residence a couple
3 of weeks later in December.
4     Q     Those were the only two times
5 they were made?
6     A     No, they were all four times I
7 met him.
8     Q     Did you meet him all four times
9 at the Sherry?
10    A     Yes.
11    Q     Let's start with the first one,
12 November 21, who else was present?
13    A     French Wallop was present.
14 Lianchao Han was present and Guo Wengui was
15 present; that was all.
16    Q     When you met him in December
17 of -- we are talking 2017, who was present?
18    A     In the first meeting was the
19 same group, it was French Wallop, Lianchao Han,
20 Guo Wengui and myself.
21    Q     The third meeting, do you
22 remember when that was?
23    A     That would have been later in
24 the month.
25    Q     Who was present there?

MICHAEL WALLER

1
2     A     And it was French Wallop, Guo
3 Wengui and the third time I met him regardless
4 of the date, and Yvette Wang.
5     Q     And there was a fourth time?
6     A     Yes; it was later, it was around
7 January 26, 2018.
8     Q     Who was there?
9     A     It was French Wallop, Guo Wengui
10 and Yvette Wang.
11    Q     Is it Strategic Vision's
12 position that that statement, that Mr. Guo was
13 a dissident is a statement that Strategic
14 Vision relied upon in entering into the
15 research agreement at issue in this case?
16    A     We based our decision to work
17 with him on his profession that he was a
18 Chinese dissident against the Communist Party.
19    Q     So, was the notion that he was a
20 Chinese dissident important to Strategic
21 Vision?
22    A     Yes.
23    Q     But that notion isn't captured
24 in the research agreement itself, is it?
25    A     Of course it is.

MICHAEL WALLER

1
2     Q     Actually this one is already
3 marked, we will just call it Han 11.
4           Is Han 11 the research agreement
5 that's at issue in this case?
6     A     It appears to be.
7     Q     Could you show me where in Han
8 11 there is a representation that Mr. Guo is a
9 dissident?
10    A     Mr. Guo is not named in this
11 agreement, but Strategic Vision negotiated this
12 agreement with him personally and he was
13 explicit about using this project to promote
14 his dissident activities against the Chinese
15 Communist Party.
16    Q     Yes.  So you told me a moment
17 ago, I asked you whether the notion that
18 Mr. Guo was a dissident was memorialized in the
19 agreement, and you said of course it is.
20          MR. GREIM:  Objection, misstates
21     the last question and the witness'
22     answer.
23    Q     My question is -- let me ask it
24 again, the record reflects what you actually
25 said.

8 (Pages 26 - 29)

MICHAEL WALLER

1         MICHAEL WALLER
2         Paragraph 18 of the Strategic
3 Vision's counterclaim says, "Guo represented to
4 Strategic Vision that he was a dissident."
5         You agree with me so far, right?
6     A    Yes.
7     Q    And you agree with me that the
8 concept of Mr. Guo being a dissident is
9 important to Strategic Vision, right?
10    A    Yes.
11    Q    And I'm asking you if it was so
12 important to Strategic Vision, why isn't it
13 encompassed in --
14        MS. CLINE:  Strike that, let me
15     ask a threshold question first.
16    Q    Is the notion that Mr. Guo is a
17 dissident memorialized in the research
18 agreement?
19        MR. GREIM:  Objection, calls for
20     a legal conclusion.  The agreement
21     speaks for itself.
22    Q    To your knowledge?
23    A    The agreement speaks for itself,
24 however in negotiating the agreement with
25 Mr. Guo, it was -- the express purpose of this

1         MICHAEL WALLER
2 project was to promote his dissident activity
3 in China against the Chinese Communist Party.
4 That was the purpose of the agreement.
5     Q    And is that express purpose, as
6 you call it, actually written in this agreement
7 anywhere?
8         MR. GREIM:  Same objection.
9     A    I do not see the word dissident
10 or Guo in this agreement.
11    Q    So, my question is if it was so
12 important to Strategic Vision that Mr. Guo is a
13 dissident, why didn't you insist upon it being
14 written down in the research agreement?
15    A    It was understood.
16        It was an explicit understanding
17 that we would have had no other reason to work
18 with him if he wasn't interested in ousting the
19 Chinese Communist Party.
20    Q    I gather Strategic Vision's
21 position in this case is that Mr. Guo is, in
22 fact, not a dissident, is that correct?
23    A    That's correct.
24    Q    And tell me what evidence you
25 have, written or otherwise, that Mr. Guo is not

1         MICHAEL WALLER
2 a dissident?
3     A    First, March 5, 2017 audio
4 recording of Guo Wengui announcing when he
5 arrived in New York, "My operation has begun."
6         And then announcing how he was
7 going to -- he was denouncing dissidents by
8 name, he was calling them, he was insulting
9 them, he was saying they deserved to die
10 because they were against the country of China.
11        The government of Xi Jingping
12 and what he called our party, meaning the
13 Communist Party.
14        That's not dissident talk.
15        In May of 2017, he met with
16 senior Chinese Communist Party and secret
17 police officials where he talked about a deal
18 that he had with them, to the point of even
19 saying that he wanted the secret police to take
20 his wife and children back to China and that
21 his niece should be executed if she was found
22 guilty of what she was being accused in court.
23        That is not a dissident's
24 activity.
25        And on August 26, 2017, Guo

1         MICHAEL WALLER
2 signed a lengthy letter to Communist Party
3 leader Xi Jingping professing his profound
4 subservience to Xi Jingping, offering to serve
5 as, in his words, a propagandist for Xi
6 Jingping, and setting up an agency relationship
7 with Xi Jingping in the United States.
8         That is not dissident activity.
9         In each of these statements made
10 in his words, which he either did not dispute
11 or he acknowledged, he referred to Xi Jingping
12 by his Communist Party title and not his state
13 title, which is also not a dissident activity.
14        He then embarked on a years'
15 long vexatious litigation campaign to harass
16 Chinese dissidents and democracy activists here
17 in the United States and people who supported
18 them.
19        That is not dissident activity.
20    Q    Just let me clarify a couple of
21 dates.
22        You mentioned an audio recording
23 that you said was March 5 of '17, is that
24 correct?
25    A    That's correct.

9 (Pages 30 - 33)

Page 34

MICHAEL WALLER

1
2    Q    And then the next thing you
3  mentioned was May of '17?
4    A    Yes.
5    Q    Then the third thing you
6  mentioned was August of 2017?
7    A    August 26th.
8    Q    Of 2017?
9    A    Yes.
10   Q    And the year's long vexatious
11 litigation campaign that you identify, when did
12 that start?
13   A    It began in 2017.
14   Q    Do you know when in 2017?
15   A    No.  Later 2017.
16        He followed up on his litigation
17 by suing the very people he had been denouncing
18 as people who must die the previous March 5th,
19 2017.
20   Q    And the audio recording was
21 published where?
22   A    It appeared on YouTube first.
23   Q    And the statement that was made
24 in May of 2017, where was that published?
25   A    It appeared on YouTube and later

Page 35

MICHAEL WALLER

1
2  Mr. Guo provided it to the Wall Street Journal.
3    Q    And then the statement that was
4  published in August of 2017, where was that
5  published?
6    A    That was -- that was -- there
7  were a couple, there was a video that was made
8  approximately on the 30th of August, 2017, on
9  Youtube, and then Mr. Guo made an interview
10 with a Chinese online news outlet that
11 translates to Mirror, roughly around the end of
12 August, early September 2017.
13   Q    Okay, other than those
14 recordings or statements that you just
15 mentioned and the litigation campaign as you
16 described it, does Strategic Vision have any
17 additional evidence in support of the notion
18 that Mr. Guo is not, in fact, a dissident?
19   A    Yes.
20   Q    Please describe it.
21   A    Mr. Guo made numerous public
22 statements that he published on Guo Media or
23 Voice of Guo announcing or pronouncing his
24 loyalty to Chinese communist party's leader Xi
25 Jingping and praising Xi Jingping as a gift

Page 36

MICHAEL WALLER

1
2  from God, as the greatest and most humane
3  leader of China and other effusive comments
4  about the Chinese Communist Party leader.
5    Q    Do you know when those
6  statements were published?
7    A    They were published throughout
8  that whole period, from the spring of 2017 up
9  until I believe as recently as September 2019.
10   Q    Any other evidence that Mr. Guo
11 is not, in fact, a dissident?
12   A    Yes.  He owes his entire
13 business success to the Chinese secret police
14 called MSS, ministry of state security.
15   Q    How do you know that?
16   A    Mr. Guo told this to the Voice
17 of America in an extensive interview in April
18 2017 and he told journalist Bill Gertz, who was
19 then with the Washington Free Beacon, in an
20 article published in July 2017, and other
21 statements.
22        He also told Mike Forsythe of
23 The New York Times.
24   Q    In 2017?
25   A    Yes.

Page 37

MICHAEL WALLER

1
2    Q    Any other evidence that Mr. Guo
3  was not, in fact, a dissident?
4    A    Yes, he continues as recently as
5  this year to show a profound affection and
6  respect for the former vice minister of state
7  security, his name is Ma Jian and he had made
8  his fortune under Ma Jian's sponsorship.
9        And worked with Ma Jian to wire
10 his real estate properties, including the
11 Pangzhou Plaza Hotel and retail complex, to
12 wire everything electronically so that the
13 secret police; could take compromising videos
14 of anybody who it wished to.
15        So he had in building his
16 fortune from his early beginnings with Ma Jian
17 at the provincial level all the way up to the
18 national level in Beijing, he relied on Ma Jian
19 as his patron and sponsor.
20   Q    And what's the basis of your
21 testimony regarding Mr. Jian?
22   A    These were Guo's own statements.
23   Q    The statements you have just
24 described?
25   A    Yes.

10 (Pages 34 - 37)

MICHAEL WALLER

1
2    Q    Any other evidence regarding the
3 notion that Mr. Guo is not, in fact, a
4 dissident?
5    A    Yes, unlike most dissidents from
6 communist countries who come to the United
7 States, Mr. Guo is not a defector, meaning he
8 did not turn against the system that he left.
9    Q    What's the basis for that
10 statement?
11    A    He was able to apply for a
12 defector Visa in 2017 when he sought a
13 permanent status in the United States.
14    He -- according to what he --
15 according to Mr. Guo as reported by Bill Gertz
16 he opted not to be a defector.
17    Q    And the basis for that testimony
18 is reporting done by Mr. Gertz?
19    A    As Guo -- yes, as Guo told him.
20    Q    I apologize again for my
21 inability to speak Mandarin, but are you
22 familiar with a gentleman whose name is first
23 name Xia, X-i-a, second name Yeliang,
24 Y-e-l-i-a-n-g?
25    A    Yes.

MICHAEL WALLER

1
2    Q    How do you pronounce that?
3    A    I am not Mandarin speaking
4 either, I X-i-a is pronounced Xia, or close
5 enough.
6    Q    And who is Mr. Xia?
7    A    She's a Defendant in one of
8 Guo's suits who's a critic of the Chinese
9 regime and of Guo.
10    Q    And you know Mr. Xia, right?
11    A    I met him once.
12    Q    Did you ever discuss with
13 Mr. Xia the subject of whether or not Mr. Guo
14 is a Chinese spy?
15    A    He told me that he contended
16 that Guo was a Chinese spy.
17    Q    Mr. Xia told you?
18    A    Yes.
19    Q    That Mr. Xia contended that Guo
20 was a spy?
21    A    Yes.
22    Q    And when did that conversation
23 take place?
24    A    Probably in June of this year.
25    Q    That was before -- was that --

MICHAEL WALLER

1
2 were your communications with Mr. Xia part of
3 the basis for Strategic Vision's fraud
4 allegations?
5    A    No.
6    Q    Did you and Mr. Xia exchange
7 text messages regarding --
8    MS. CLINE:  Strike that.
9    Q    Did you and Mr. Xia exchange any
10 written messages regarding Mr. Guo?
11    A    I don't recall.
12    Q    Are you aware of a lawsuit in
13 the Eastern District of Virginia in which
14 Mr. Guo sued Mr. Xia for defamation with regard
15 to the allegations regarding his being a spy?
16    A    Yes.
17    Q    And you are aware that Mr. Guo
18 won a jury verdict, correct?
19    A    He won parts of it on a jury
20 verdict.
21    Q    He won $100,000, right?
22    A    No, he had to also pay back, I
23 think, $20,000.
24    Q    He got a verdict in his favor of
25 $100,000?

MICHAEL WALLER

1
2    A    He got a partial verdict in his
3 favor, as far as I understand.
4    Q    So, the jury found that the
5 statement that Mr. Guo was a Chinese spy is
6 defamatory, right?
7    MR. GREIM:  Objection, calling
8    for this witness to speculate about what
9    a jury found in some other case.
10    It's beyond the scope of the notice
11    and it's calling for a legal conclusion.
12    A    I can't give a legal conclusion.
13    Q    Were you -- I'm just asking for
14 your understanding, not a legal conclusion.
15    MR. GREIM:  But his own personal
16    understanding of that case is not
17    relevant to anything in -- under the
18    notice.
19    I mean he said that we are not
20    relying upon that jury verdict for
21    anything in this case, so --
22    Q    No, I need an answer to my
23 question.  These allegations all go to
24 Mr. Guo's status as a dissident or not.
25    So, did you attend that trial by

11 (Pages 38 - 41)

MICHAEL WALLER

1
2 the way?
3     A     No.
4     Q     Were you involved in that trial
5 at all?
6     A     I was asked to be a witness in
7 that trial.
8     Q     Did you testify?
9     A     No.
10     Q     What were you asked to testify
11 about?
12     A     About my understanding of Guo as
13 a dissident.
14          MS. CLINE:  Sounds relevant to
15 me.
16     Q     Why did you not testify?
17          MR. GREIM:  Hold on, hold on,
18 wait a minute.
19          I'm going to object to being
20 outside the scope of the notice.  The
21 witness has said he was asked to testify
22 about his own personal understanding of
23 Guo as a dissident.
24          Strategic Vision was not asked to
25 testify in that case, and this is to --

MICHAEL WALLER

1
2 the purpose of this deposition is to
3 uncover the facts that Strategic Vision
4 has that form the basis of its pleading.
5          It's not to learn anything and
6 everything that Mr. Waller knows or about
7 his interaction with people in this other
8 case.
9          MS. CLINE:  Can you repeat my
10 question, please.
11          (The question requested was read
12 back by the reporter.)
13          MR. GREIM:  Okay, I'm going to
14 instruct the witness not to answer that
15 question.
16          This does not relate to Guo
17 Wengui's personal history, that's the
18 closest I can come here.
19          It does not relate to Strategic
20 Vision's contention under number 3, it
21 does not relate to the purported
22 misrepresentations Guo made to Strategic
23 Vision.
24          This person -- Mr. Waller's
25 individual decision on whether he did or

MICHAEL WALLER

1
2 did not testify is not within the topics
3 here.  He's not here to individually
4 testify.
5          MS. CLINE:  I just want to make a
6 record so we can take this to the court,
7 if need be.
8     Q     So you were asked to testify
9 regarding Mr. Guo's dissident status, correct?
10     A     I was asked to testify in my
11 individual capacity having nothing to do with
12 Strategic Vision.
13     Q     But you were asked to testify
14 about whether or not Mr. Guo was a dissident,
15 correct?
16     A     Actually my -- the -- it has
17 nothing to do with this case, so I cannot
18 answer that question, based on counsel
19 directing me not to answer.
20          MR. GREIM:  Let's see, here is
21 the thing, I think -- let's do this, the
22 question which is pending is whether
23 Mr. Waller was asked to testify about
24 Mr. Wengui's dissident status in another
25 case.

MICHAEL WALLER

1
2          Is that -- I think I understand
3 that.  I think if that is the question, I
4 would say we are beyond the scope, we are
5 beyond the scope of this notice.
6          This is not -- none of this is
7 information that is internal to Strategic
8 Vision, we are trying to, and some of
9 these questions understand Strategic
10 Vision's work product, we are right on the
11 edge of that, and I think -- and
12 Mr. Waller did not testify in the other
13 case, and so I think exploring these
14 communications is beyond the scope of the
15 notice.
16          So I will instruct the witness not
17 even to answer that question.
18          MS. CLINE:  Okay, so just so we
19 have it clear for the record, you are
20 instructing the witness not to testify
21 based on an argument that the question
22 is beyond the scope of this 30(b)(6) and
23 the question at issue is whether or not
24 Mr. Waller -- is Mr. Waller's -- the
25 request that Mr. Waller testify as to

12 (Pages 42 - 45)

MICHAEL WALLER
1
2  Mr. Guo's dissident status?
3       MR. GREIM:  Correct, it's whether
4  or not he was asked to do that, and I am
5  saying he cannot answer that question.
6       MS. CLINE:  There is no privilege
7  basis for your instruction not to
8  answer, right?
9       MR. GREIM:  It's just that we are
10  beyond the scope and we are starting to
11  harass Mr. Waller here.
12       We are not following the topics.
13  Q    And so your testimony, then, is
14  that Mr. Xia -- your conversations with Mr. Xia
15  did not in any way support the allegations
16  Strategic Vision made in this lawsuit, is that
17  correct?
18  A    I don't accept the premise of
19  your question.
20       It seems like a leading
21  question, I am -- it had nothing to do with the
22  Strategic Vision case.
23  Q    No, no, so --
24  A    So I am here as a Strategic
25  Vision witness, not as a personal witness.

MICHAEL WALLER
1
2  Q    Understood.
3  A    So I am not answering the
4  question.
5  Q    So where does Strategic Vision
6  get the information on which it based its
7  allegations of fraud in this case, from which
8  individuals?
9       Weren't you one of those
10  individuals?
11  A    Yes.
12  Q    So I am asking you to the extent
13  that you contributed to the allegation in
14  Strategic Vision's Complaint, what were the
15  sources of that information?
16       And specifically was Mr. Xia one
17  of the sources of that information?
18       MR. GREIM:  That is a fair
19  question that you can answer.
20  A    Okay, I used hundreds of
21  different sources to read, study, evaluate.
22       The ones I used to reach my
23  conclusions are much fewer, and I can't recall
24  which was which.
25       But Mr. Xia's information did

MICHAEL WALLER
1
2  not form a basis of my conclusions.
3  Q    And so my job is to try to
4  understand what the basis for your conclusions
5  were?
6  A    Okay, fine.
7  Q    And so you're saying, your sworn
8  testimony is that your -- the information that
9  you got from Mr. Xia did not in any way support
10  the allegations in this lawsuit?
11  A    I want to answer your question,
12  but I want to be clear.
13       Support the allegations, meaning
14  support them in a factual sense or support them
15  in a sense that I used those allegations in my
16  own conclusions?
17  Q    The latter.  I'm trying to
18  understand whether you learned anything from
19  Mr. Xia that served as the basis for Strategic
20  Vision's allegations in this lawsuit?
21  A    No.
22       MR. GREIM:  Just to also be very
23  clear, our position would be that if he
24  did, he could testify to that, but that
25  the questions regarding the testimony in

MICHAEL WALLER
1
2  court went even beyond that.
3  Q    Who is Lee Hong Kwon?
4  A    He is another Chinese democracy
5  activist.
6  Q    And you know him personally,
7  right?
8  A    I met him once.
9  Q    And did you meet him before
10  Strategic Vision filed it's counterclaim in
11  this lawsuit?
12  A    Yes.
13  Q    Did you have a conversation with
14  Mr. Lee about Mr. Guo?
15  A    Yes.
16  Q    What was the nature of your
17  conversation?
18  A    As it was with the others,
19  whether -- what his background was, his ties
20  with the Chinese secret police, his harassment
21  of Chinese dissidents, the fact that he sues
22  people who oppose the Chinese Communist Party
23  but doesn't sue people who help the Chinese
24  Communist Party.
25  Q    Where did you meet with Mr. Lee?

13 (Pages 46 - 49)

MICHAEL WALLER

1
2    A    In northern Virginia at a
3 restaurant.
4    Q    Do you remember the name of the
5 restaurant?
6    A    No.
7    Q    Do you remember the date?
8    A    I am guessing around June or
9 July of 2019.
10    Q    And did you and Mr. Lee exchange
11 any written messages about Mr. Guo?
12    A    We may have retweeted one
13 another.
14    Q    Other than retweeting, did you
15 and he -- did you and he exchange any private
16 messages about Mr. Guo?
17    A    Not to my recollection.
18    Q    And you're aware that Mr. Guo
19 sued Mr. Lee, correct?
20    A    Yes.
21    Q    Did you have any role in that
22 litigation?
23    A    No.
24    Q    Who is Robert Tucker?
25    A    There are several Robert

MICHAEL WALLER

1
2 Tuckers, one is a Sovietologist, one is a
3 security person who I believe was working for
4 Guo Wengui.
5    Q    Did the Mr. Tucker who you
6 believe to have worked for Mr. Guo Wengui, did
7 you have any conversations with him about the
8 allegations in this lawsuit?
9    A    No.
10    Q    Who is Endo Global?
11    A    I don't know.
12    Q    Enodo Global?
13    A    Enodo Global.
14    Q    Who is that?
15    A    That's a tech firm in Virginia.
16    Q    A tech firm that does what?
17    A    Social media network analysis.
18    Q    And do you have any
19 communications with Enodo Global about the
20 allegations in this lawsuit with anyone at
21 Enodo Global?
22    A    I don't recall ever having a
23 reason to, it has nothing to do with this case.
24    Q    Do you know the firm Arkin
25 Solbakken?

MICHAEL WALLER

1
2    A    No.
3    Q    So, just to kind of summarize or
4 you correct me if I am summarizing incorrectly,
5 could you tell me or confirm for me the names
6 of people from whom you got information that
7 helped form the basis for Strategic Vision's
8 allegations in this lawsuit?
9    A    First Guo Wengui himself,
10 Lianchao Han, L-i-a-n-c-h-a-o H-a-n, Yvette
11 Wang, and then a number of published --
12 published reports, public domain reports.
13    Q    What else or who else, I should
14 say?
15    A    A lot of court documents, I
16 can't recall precisely which ones they were,
17 but it was a great deal of material.
18        Really anything in the public
19 domain about Guo Wengui I probably either read
20 or was referred to.
21    Q    Okay, and how about things that
22 were not in the public domain, did you have any
23 private conversations with anyone other than
24 Mr. Guo, Mr. Han and Ms. Wang, that formed the
25 basis for Strategic Vision's allegations in

MICHAEL WALLER

1
2 this case?
3    A    It was principally my own
4 research, and then talking to other people who
5 had done their own research on Guo.  We already
6 discussed those names.
7    Q    And I just want to make sure I
8 have captured all of the names.
9        What I am trying to do is make a
10 list of every person with whom you had a
11 private conversation that helped inform
12 Strategic Vision's allegations.
13        So can you just give me a list
14 of those names, private conversations, other
15 than Mr. Guo, Mr. Han and Ms. Wang?
16    A    The names that you brought up
17 earlier, you can just tack those in.
18    Q    Let me just make sure we are on
19 the -- so that would be Mr. Meng, correct?
20    A    Yes.
21    Q    And Mr. Shi Wei?
22    A    Yes.
23    Q    And who else?
24    A    Mr. Lee, who you raised.
25    Q    And Mr. Xia?

14 (Pages 50 - 53)

Page 54

MICHAEL WALLER

1
2     A    Yes.
3          Doesn't mean I used the
4  information, but I spoke to them.
5     Q    So you did have communications
6  with Xia that formed the basis for Strategic
7  Vision's allegations in this case?
8     A    Yes, I evaluated all the cases,
9  read the cases, evaluated them and then came to
10  my own conclusions.
11     Q    I'm talking about private
12  communications that you had with Mr. Xia.
13     A    Yes, yes.
14     Q    And did you have any private
15  conversations with Mr. Xia that formed the
16  basis for your allegations in this case?
17     A    Mr. Xia's material did not form
18  the basis of allegations in this case.
19     Q    Anyone else other than Mr. Meng,
20  Mr. Shi, Mr. Lee?
21     A    Not to my recollection.
22     Q    Do you know who Richard Frankel
23  is?
24     A    No.
25     Q    A moment ago we went through

Page 55

MICHAEL WALLER

1
2  statements that Strategic Vision claims Mr. Guo
3  made regarding the fact that he was a
4  dissident, and I think you talked about four
5  different meetings; do you recall that?
6     A    Yes.
7     Q    Is your testimony that Mr. Guo
8  himself made these statements?
9     A    Yes.
10     Q    In which language?
11     A    In Mandarin and in English.  He
12  speaks better English than he let's on.
13     Q    So, my question is for -- on
14  each of those four occasions, it's your
15  testimony that he made the statement regarding
16  being a dissident in Mandarin and in English?
17     A    Yes, and if not using the word
18  dissident, saying he wants to destroy the
19  Communist Party of China.
20          MS. CLINE:  Let's mark this as
21  102, please.
22          (The above described document was
23          marked Exhibit SV 102 for identification
24          as of this date.)
25     Q    We have handed you a document

Page 56

MICHAEL WALLER

1
2  that's been marked as Exhibit 102, have you
3  ever seen it before?
4     A    No.
5     Q    Have you ever seen the names on
6  this list before?
7     A    Yes.
8     Q    Do you know whether all of these
9  individuals are members of the Chinese
10  Communist Party?
11     A    No.
12     Q    Do you know whether any of them
13  is?
14     A    Yes.
15     Q    Can you sort of identify, tell
16  us what you know about these people?
17     A    I would need a different
18  document to reference it.  It's a document
19  that's been produced before.
20          So I can't accurately tell you
21  who is who unless I refer to that document.
22     Q    So sitting here just based on
23  looking at their names, you can't say who's a
24  communist and who's not?
25     A    No, it would say on the

Page 57

MICHAEL WALLER

1
2  document.  I know one of them is the grandson
3  of a Chinese Communist Party leader, I know
4  another one is a supposedly illegitimate child
5  of Wang Qishan, W-a-n-g Q-u-i-s-h-a-n.
6          But offhand I can't say.
7          I know one of them Lee June Soon
8  is one of the Chinese Communist Party and MSS
9  officers who visited Guo in his home in May,
10  but other than that, I can't tell you offhand.
11     Q    Okay that's fair.
12          So put Exhibit 102 aside and
13  just -- so Strategic Vision did, in fact, set
14  out to investigate a number of individuals on a
15  list, right?
16     A    Yes.
17     Q    It was called fish in the
18  parlance of the research agreement, right?
19     A    Yes.
20     Q    How many fish were there, do you
21  recall, initially?
22     A    Initially there were these 15
23  names.
24     Q    Did you come to -- did Strategic
25  Vision come to a conclusion as to whether those

15 (Pages 54 - 57)

Page 58

MICHAEL WALLER

1
2 15 were all members of the Communist Party?
3     A    No.
4     Q    You don't know one way or the
5 other?
6     A    No.
7     Q    With respect to any of them?
8     A    We were not tasked to produce
9 analytical products.
10    Q    Did you come across any evidence
11 that suggested that those 15 individuals were
12 not members of the Chinese Communist Party?
13    A    It's hard to assess who's not,
14 so I can't answer that; no.
15    Q    Did you ever send a letter to
16 the United States Government claiming that
17 Mr. Guo was a Chinese spy?
18    MR. GREIM:  I'm going to object,
19 that is beyond the scope of the
20 deposition.
21    Again, whatever Mr. Waller and his
22 interactions with the United States
23 Government, is just beyond the scope of
24 this.
25    The question -- we are trying to

Page 59

MICHAEL WALLER

1
2 learn about Strategic Vision's contentions
3 about Guo Wengui not Mr. Waller's letters
4 to the U.S. Government.
5    MS. CLINE:  So I'm going to
6 repeat -- ask the court reporter to
7 repeat the question.
8    The allegations, if such a letter
9 were sent, the allegations in that letter,
10 presumably would be similar to the
11 allegations in the Complaint and
12 presumably the research would have been
13 duplicative, so it's fair game.
14    If you are going to instruct the
15 witness not to answer, we will make a
16 record so that we can take it up with the
17 court if appropriate.
18    So, I'm sorry, can you read it
19 back.
20    (The question requested was read
21 back by the reporter.) of the
22    MR. GREIM:  And based on all the
23 reasons that I articulated before,
24 including the fact that based on what
25 counsel said a moment ago I don't think

Page 60

MICHAEL WALLER

1
2 is relevant, I think there are too many
3 jumps, I will instruct the witness not
4 to answer that question.
5    MS. CLINE:  Just to be clear,
6 there is no privilege basis for your
7 instruction not to answer?
8    MR. GREIM:  Well, there would be
9 no -- well, I want to say this, I
10 actually -- I'm not prepared to waive a
11 privilege to the extent that any
12 confidentiality attaches to someone's
13 communications to the government in an
14 asylum case, I just don't know the
15 answer to that question.
16    We weren't prepared to talk about
17 it here today and I don't want to waive
18 it.
19    Q    Did you -- so, you agree with me
20 that Strategic Vision alleges in this case that
21 Mr. Guo is not a dissident, correct?
22    A    Correct.
23    Q    Did you have any communications
24 with the United States Government about whether
25 or not Mr. Guo is a dissident?

Page 61

MICHAEL WALLER

1
2    A    I've been directed not to answer
3 that question.
4    MR. GREIM:  And I will stay with
5 that same instruction.
6    MS. CLINE:  So let me be very
7 specific.  Prior to the filing of the
8 fraud counterclaim in this lawsuit, my
9 question is did you have any
10 communications with the United States
11 Government regarding whether Mr. Guo is
12 a dissident?
13    MR. GREIM:  And I will -- the
14 question is Mr. Waller individually --
15 well, I think I will -- I think I will
16 allow the question as to -- let me think
17 here for a minute here, Johanna.
18    No, I will instruct the witness not
19 to answer that question.
20    Again, if you want to understand
21 the information we have about Mr. Wengui,
22 which is what the attachment on the notice
23 asked for, we are here to provide that
24 information.
25    Our communications with the United

16 (Pages 58 - 61)

Page 62

MICHAEL WALLER

1
2   States Government, though, is beyond the
3   scope.
4       MS. CLINE:  All right just to be
5   clear, and we can fight about this
6   later, Strategic Vision got its
7   allegations from this human sitting
8   right here, Mr. Waller, and to instruct
9   him not to answer a question about his
10  communications regarding the allegations
11  is improper.
12      We will just make a record and we
13  can take it up with the court.
14      MR. GREIM:  Just to be very
15  clear, the instruction is his
16  communications to others about any
17  contentions he is making.
18      We agree that communications with
19  others by which he gathered information
20  can be proper, assuming it does not
21  intrude upon work product.
22  Q    Did the United States Government
23  ever confirm the allegation that Mr. Guo was
24  not a dissident?
25      MR. GREIM:  Objection assumes

Page 63

MICHAEL WALLER

1
2   facts not in evidence.
3   A    Did they confirm it to me or --
4   no.  I mean nothing.
5   Q    You have no evidence from the
6   United States Government confirming the
7   allegation that Mr. Guo is not a dissident,
8   correct?
9   A    Correct.
10  Q    Did the government provide any
11  information to you one way or the other with
12  respect to Mr. Guo's dissident status?
13  A    No.
14  Q    So, the contract that is at
15  issue in this lawsuit is a contract between
16  Strategic Vision and Eastern Profit, right?
17  A    Yes.
18  Q    When you testified in your
19  personal capacity, I think it was in February,
20  you testified that you and Ms. Wallop had an
21  oral agreement that you and she would split the
22  profits that came of the contract, is that
23  accurate?
24  A    To my recollection, yes.
25  Q    And is the statement accurate as

Page 64

MICHAEL WALLER

1
2   you sit here today that was your agreement?
3   A    Yes.
4   Q    Has Strategic Vision ever done a
5   calculation of what its profits were as --
6   stemming from the Eastern Profit contract?
7   A    I did not do it, but I
8   understand, yes that it was, but I did not do
9   it myself.
10  Q    Have you ever seen a calculation
11  of Strategic Vision's -- whether or not a
12  calculation that related to whether Strategic
13  Vision earned any profits from the Eastern
14  Profit contract?
15  A    Yes.
16  Q    Just ballpark, what's your
17  understanding of the amount of profit?
18  A    Pardon me, let me correct
19  myself.  I don't know that they would
20  constitute profits, but let's continue with the
21  questions.
22  Q    Okay, so let's just -- I don't
23  want to be confused about what I'm talking
24  about when I say profits, so can we just agree
25  that profits for purposes of this discussion

Page 65

MICHAEL WALLER

1
2   equal revenue minus expenses?
3   A    For a given period, yes.
4   Q    Fair.
5       Okay, so with that definition in
6   mind, did Strategic Vision earn any profit as a
7   result of the Eastern Profit contract?
8   A    It would be fair to say divided
9   earnings would be a proper way to define it.
10  Q    What do you mean by that?
11  A    So, our agreement was to split
12  earnings 50/50.
13  Q    Okay, and what -- sorry, I
14  didn't mean to cut you off.
15  A    So we did.
16  Q    And what do you mean by
17  earnings?
18  A    For whatever was paid, whatever
19  the residuals were, profit is a -- you're
20  asking me for a term that's it's more specific
21  than -- I mean I don't know the legal term
22  versus the human term difference, so let's just
23  say earnings from it.
24      Yeah, we split earnings from
25  that period.

17 (Pages 62 - 65)

Page 66

MICHAEL WALLER

1
2    Q    And the earnings, and I'm just
3 trying to use a word you're comfortable with,
4 so earnings, what does earnings mean?
5    A    Earnings would be weigh of the
6 grows versus what was paid out in expenses.
7    Q    So, to put it very simply, it
8 would be what came in minus what was paid out?
9    A    Yes.
10    Q    And did any -- what money came
11 into Strategic Vision in connection with this
12 contract?
13    A    There was a deposit of $1
14 million from ACA Capital, or almost $1 million
15 to ACA Capital -- from ACA Capital to Strategic
16 Vision.
17    Q    Any other money coming into
18 Strategic Vision with respect to this contract?
19    A    Not to my knowledge.
20    Q    And ballpark, how much money was
21 expended in costs by Strategic Vision with
22 respect to this contract?
23    A    That question would be best put
24 to my colleague, but I can tell you by negative
25 reasoning the -- my half of the residual was

Page 67

MICHAEL WALLER

1
2 about $250,000.
3    Q    So your half of the earnings was
4 $250,000?
5    A    Yes.
6    Q    Okay, so you're not here to
7 testify about specific expenditures that
8 Strategic Vision made, is that correct?
9    A    Right.
10    Q    What is Oceanic Advisors?
11    A    Oceanic Advisors was -- was a
12 sole member LLC that I had that's defunct.
13    Q    Did Oceanic Advisors have any
14 role in connection with the research agreement
15 at issue here?
16    A    No.
17    Q    Did Oceanic Advisors ever
18 receive any money from Strategic Vision?
19    A    No.
20    Q    What is Liberty Tree Partners?
21    A    That's another one member LLC
22 that I own.
23    Q    And did Liberty Tree Partners
24 have any role with respect to the research
25 agreement at issue here?

Page 68

MICHAEL WALLER

1
2    A    No.
3    Q    And did Liberty Tree Partners
4 ever receive any payment from Strategic Vision?
5    A    No.
6    Q    What is Georgetown Research?
7    A    Georgetown Research is the -- is
8 an LLC set up to administer this contract
9 that's at issue, meaning to sub out -- let me
10 rephrase that.
11    Oceanic Advisors was an LLC set
12 up for the purposes of administering things
13 through or from Strategic Vision for part of
14 the contract.
15    Q    I think you just misspoke, you
16 said Oceanic Advisors.
17    A    Pardon me, yes.  No, Georgetown
18 Research.
19    MS. CLINE:  So can you read back
20 his answer,
21    (The answer requested was read back
22    by the reporter.)
23    Q    So, fair to say that Georgetown
24 Research was the LLC set up to administer
25 things with respect to Strategic Vision and

Page 69

MICHAEL WALLER

1
2 this contract?
3    A    Yes, it was to administer
4 certain aspects of the contract.
5    Q    And which aspects were those?
6    A    They were -- first we did -- by
7 agreement with Mr. Guo we would use multiple
8 entities to -- for funding so that things would
9 be harder for the Chinese to trace.
10    So that was the primary reason
11 for setting up a company like that, and it was
12 mainly to serve as a payment mechanism or a
13 subcontracting mechanism.
14    Q    Any other aspects that were the
15 responsibility of Georgetown Research?
16    A    No.
17    Q    So when was Georgetown Research
18 established?
19    A    Late 2019 -- late 2017.
20    Q    Who are the members of -- it's
21 an LLC, correct?
22    A    Yes.
23    Q    Who are the members of
24 Georgetown Research?
25    A    French Wallop and myself.

18 (Pages 66 - 69)

MICHAEL WALLER

1
2      Q      50/50?
3      A      Yes.
4      Q      And there is a written operating
5 agreement, I assume?
6      A      No.
7      Q      It's registered to do business,
8 the LLC?
9      A      Yeah.
10     Q      And where is it registered?
11     A      I think it's Wyoming.
12     Q      Have there ever been any more
13 than two owners?
14     A      No.
15     Q      Georgetown Research did receive
16 payments from Strategic Vision, correct?
17     A      Yes.
18     Q      Can you just describe those
19 payments, very generally?
20     A      Sure, those were provided --
21 they were -- they were either payments to a
22 subcontractor who executed a lot of the work,
23 or to myself.
24          MS. CLINE:  Can you mark this as
25      103.

MICHAEL WALLER

1
2          (The above described document was
3      marked Exhibit SV 103 for identification
4      as of this date.)
5      Q      We have handed you what's been
6 marked as Exhibit 103, and I can represent for
7 the record that the highlight on the first page
8 is mine.
9          But other than that, do you
10 recognize Exhibit 103?
11     A      Yes.
12     Q      What is it?
13     A      It's a bank statement for
14 Georgetown Research from -- for the month of
15 January, 2018.
16     Q      And the first page of Exhibit
17 103 indicates that Georgetown Research received
18 two wire transfers from Strategic Vision, is
19 that correct?
20     A      Yes.
21     Q      And one of them was for $25,000
22 and the other one for $200,000, correct?
23     A      Yes.
24     Q      And then those were made on --
25 those transfers were made on January 16th,

MICHAEL WALLER

1
2 correct?
3      A      Yes.
4      Q      And on the same day there was a
5 withdrawal of $200,000, correct?
6      A      Yes.
7      Q      Do you know where that money
8 went?
9      A      Yes.
10     Q      First of all, was it a
11 withdrawal in cash?
12     A      No.
13     Q      Tell us about that withdrawal.
14     A      It was a -- it was either a bank
15 transfer or a wire.
16     Q      Where did that money go?
17     A      That went to the subcontractor
18 for Team 1.
19     Q      And how was the subcontractor
20 for Team 1 paid?
21     A      Through that payment directly to
22 an account that the Team 1 leader held.
23     Q      By wire transfer?
24     A      Either wire transfer or ACH.
25     Q      So it wasn't a physical -- it

MICHAEL WALLER

1
2 wasn't cash?
3      A      No, it was an electronic
4 payment.
5      Q      Can you turn to page 2 of
6 Exhibit 103, Bates stamped 1956.
7          Does the transaction receipt
8 that has something to do with the $200,000?
9      A      This is very faint.  I can't
10 read the -- I can't read this.
11     Q      Okay, can you see that there are
12 two references to two checking accounts there?
13          Are you able to make that out?
14     A      Yes.
15     Q      Do you know whose checking
16 accounts -- says withdrawal from checking then
17 deposit to checking, do you know whose deposits
18 those are?
19     A      I can't see the numbers.  If you
20 have a better copy I could tell you, on this
21 page?
22     Q      Correct?
23     A      Yes, I can't tell you.
24     Q      You would agree with me that
25 Georgetown Research's account ends in 034,

19 (Pages 70 - 73)

Page 74

MICHAEL WALLER

1
2  correct?
3      A    Yes.
4      Q    Do you have any idea whose
5  checking account ends in 001?
6      A    I believe this was Team 1
7  leader.
8          If page 1956 matches this, then
9  it would be Team 1 leader.
10     Q    Was the transfer made to an
11 individual or to an entity?
12     A    To an entity.
13     Q    And are you willing to testify
14 about the name of that entity?
15     A    That's protected under an
16 initial court order by Judge kettle.
17     Q    Do you know what Team 1 leader,
18 was there -- what were the terms under which
19 Team 1's leader was to receive $200,000?
20     A    That was to set up Team 1
21 outside the United States to do the work.
22     Q    And was there any itemization of
23 that $200,000?
24     A    No.
25     Q    So, you have no idea what that

Page 75

MICHAEL WALLER

1
2  $200,000 was spent on?
3      A    Yes, I do.
4      Q    Okay, what was it?
5      A    It was on computer gear and a
6  computer team.
7      Q    And did Strategic Vision ever
8  get invoices or receipts for either the
9  computer gear or the computer team?
10     A    We got an invoice.
11     Q    From whom?
12     A    Pardon me, Georgetown -- I don't
13 recall whether it was Strategic Vision or
14 Georgetown Research that got an invoice, but
15 one of the two got an invoice.
16         MS. CLINE:  Mark this as the next
17     exhibit, please.
18         (The above described document was
19     marked Exhibit SV 104 for identification
20     as of this date.)
21     A    Yes, this is the invoice.
22     Q    So, yes, so if you would just
23 describe for the record what Exhibit 104 is?
24     A    Exhibit 104 is an issue from
25 Team 1 leader to Georgetown Research for

Page 76

MICHAEL WALLER

1
2  $200,000.
3      Q    Okay, so in the redacted section
4  of text that's under the word invoice, is that
5  where Team 1's leader's name would appear?
6      A    I believe so, yes.
7      Q    Other than this, is there any
8  written evidence from Team 1 regarding that
9  payment of $200,000?
10     A    No, presumably illegible page
11 1956, but that would be all.
12     Q    Did Team 1 send you a receipt
13 after you paid the invoice that's number 104?
14     A    No.  Not to my recollection.
15     Q    Did you create Exhibit 104?
16     A    I provided the document.
17     Q    So you created the invoice, did
18 anyone at Team 1 ever touch Exhibit 104?
19     A    No.
20     Q    So you just created --
21     A    Touch the --
22     Q    So who created Exhibit 104?
23     A    Team 1 did.  I created the
24 exhibit in discovery, but Team 1 created the
25 document.

Page 77

MICHAEL WALLER

1
2          I mean this is Team 1's invoice
3  to Georgetown Research which I provided as
4  Georgetown Research, I provided in discovery.
5      Q    Okay, putting aside who produced
6  it in discovery, who physically typed this up?
7      A    Team 1.
8      Q    Okay, and so you received this
9  document that is Exhibit 104 from someone at
10 Team 1, correct?
11     A    Yes.
12     Q    Then just to close the loop, so
13 in connection with this invoice dated January
14 6, Georgetown Research made a wire transaction
15 on January 16th, is that right?
16     A    Yes.
17     Q    And then -- but you are not
18 aware of any receipt that Team 1 provided when
19 it received the funds, is that correct?
20     A    Correct.
21     Q    And you never got an itemization
22 from Team 1 as to how that $200,000 was spent,
23 correct?
24     A    Correct.
25     Q    To the best of your knowledge it

20 (Pages 74 - 77)

MICHAEL WALLER

1
2  was spent on computer gear, computer teams, but
3  you can't say anything more specific than that?
4      A    Correct.
5      Q    Was there an understanding
6  between Strategic Vision and Team 1 about
7  expenses beyond $200,000?
8      A    No, that was a flat rate payment
9  system that we had, and we structured
10  everything in a way to protect Mr. Guo from
11  being discovered by the Chinese.
12          So in our discussing the
13  contract, as we were arranging this with
14  Mr. Guo, we said that all invoicing would be
15  kept to a minimum and there would be as little
16  paperwork as possible in order to prevent the
17  Chinese government from finding out about this
18  activity.
19          So, likewise, we were not to
20  have invoiced either, there would just be
21  certain payments made verbally, through a
22  verbal arrangement.
23      Q    I'm sorry, there would be
24  payments made?
25      A    Right.

MICHAEL WALLER

1
2      Q    Through a verbal?
3      A    Right, so invoices would be
4  verbal.
5      Q    Invoices would be oral, you
6  mean, not written down?
7      A    Right.
8      Q    And how physically did Team 1
9  transmit this invoice to Georgetown Research?
10     A    By hand.
11     Q    And where did that take place?
12     A    Probably in Washington, D.C.
13     Q    Do you remember?
14     A    Not for facts.
15     Q    So you met face-to-face with the
16  leader of Team 1 in Washington, is that right?
17     A    Yes, in the D.C. area.
18     Q    What was the date on which you
19  and he met?
20     A    We met many times.
21          In terms of this contract, we
22  met many times between November and -- November
23  2017 and March 2018.
24     Q    Do you remember when he gave you
25  this invoice that's Exhibit 104?

MICHAEL WALLER

1
2      A    On or about January 6, 2018.
3      Q    Did Strategic Vision ask Team 1
4  to search its records for documents relevant to
5  this litigation?
6      A    Yes.
7      Q    And did they provide any?
8      A    There were no documents.
9      Q    Turn, if you would, in Exhibit
10  103 to Bates page 1957.
11          And this relates to -- it's a
12  bank account statement as of February 28th of
13  2018, correct?
14     A    Yes.
15     Q    There are two payments that are
16  American Express payments, do you see those?
17     A    Yes.
18     Q    Whose American Express is being
19  paid there?
20     A    That was my American Express.
21     Q    And then there is a wire
22  transfer to Allied Special Operations Group, do
23  you see that?
24     A    Yes.
25     Q    That's been referred to as Team

MICHAEL WALLER

1
2  2 in this litigation, is that correct?
3      A    Yes.
4      Q    And that was the entirety of the
5  payment to Team 2, correct?
6      A    Yes.
7      Q    So, in terms of outgoing funds
8  from Georgetown Research, we have a $200,000
9  deposit that goes to Team 1, correct?
10     A    Yes.
11     Q    And we have call it
12  approximately $3,000 in your American Express
13  payment, correct?
14     A    Yes.
15     Q    And then the transfer to Team 2
16  for approximately $5,400, right?
17     A    Yes.
18     Q    And then turn, if you would, to
19  the next page, to 1958, you see there are two
20  more American Express payments, right?
21     A    Yes.
22     Q    And those coordinate or
23  correspond to reimbursement invoices that you
24  submitted personally, correct?
25     A    Yes, I believe so.

21 (Pages 78 - 81)

MICHAEL WALLER

1
2  Q    Do you know why there are two
3  payments to American Express in the same month?
4  A    No.
5  Q    Was Georgetown research paying
6  anyone's American Express bill other than
7  yours?
8  A    No.
9  Q    All right, so then in March we
10 have approximately $8,000 in business expenses,
11 right?
12 A    Well, they were February, but
13 credited in March.
14 Q    Excuse me, fair, yes.
15      Turn the page to 1959, do you
16 see that?
17 A    Yes.
18 Q    There is one payment in April,
19 correct?
20 A    Yes.
21 Q    And that's made to your American
22 Express account?
23 A    Yes.
24 Q    And do those expenses tie out to
25 a reimbursement invoice, do you know?

MICHAEL WALLER

1
2  A    Probably, because it's an odd
3  number.
4  Q    But that's your American
5  Express?
6  A    Yes.
7  Q    The bill, correct?
8  A    Yes.
9  Q    And then turn to the last page,
10 if you would, which is a bank statement as of
11 May 31; do you see that?
12 A    Yes.
13 Q    And the first entry is a wire
14 transfer from Strategic Vision for $15,000; do
15 you see that?
16 A    Yes.
17 Q    Why was that transfer made?
18 A    I don't recall.
19 Q    Do you know whether that was
20 part of the $250,000 in earnings that you
21 received personally?
22 A    I don't recall.
23 Q    Do you recall when the research
24 agreement at issue here was terminated?
25 A    It would have been effective

MICHAEL WALLER

1
2  around March 25th of 2018.
3  Q    Right, so in light of that, do
4  you have any explanation for why there are
5  still being payments made in May to Georgetown
6  Research?
7  A    Because we ended up using
8  Georgetown Research for other purposes.
9  Q    When did that start taking
10 place?
11 A    After the termination of the
12 contract.
13 Q    When specifically?
14 A    Well, if you find the date of
15 the termination of the contract, you get the
16 date of the change.
17 Q    What were the purposes for which
18 you used it immediately after the contract
19 termination?
20 A    First there were still bills to
21 be paid, and second there was other business to
22 be done through things having nothing to do
23 with this contract.
24 Q    So, with respect to the
25 transaction listed in the May bank statement,

MICHAEL WALLER

1
2  we talked about the $15,000 credit and you
3  don't know why that was made, correct?
4  A    Correct.
5  Q    Then there is a payment to you,
6  the $15,000; do you see that?
7  A    Yes.
8  Q    I'm sorry if you answered this,
9  is that included in your $250,000, or no?
10 A    I would have to go back and
11 check, but I did say approximately $250,000.
12 Q    And then there is another AMEX
13 payment on May 7, do you see that?
14 A    Yes.
15 Q    And what business expenses could
16 be being paid on May 7th with respect to this
17 contract if it terminated effective in March?
18 A    I didn't say this was related to
19 the contract.
20 Q    Okay, so then you tell me then,
21 is this bill payment on May 7, is that not
22 related to this case, not related to Eastern
23 Profit?
24 A    I don't know, I don't believe
25 so.

22 (Pages 82 - 85)

MICHAEL WALLER

1
2     Q     Are any of these payments
3  subsequent to or on this May statement related
4  to the Eastern Profit agreement?
5     A     Something could have been a
6  residual dividing up of remainder funds, but I
7  don't have an accounting for it here.
8     Q     Sitting here you can't say one
9  way or the other?
10     A     Correct.
11     Q     Who is Psyber Solutions?
12     A     That's somebody whose business
13  was not related to the case.
14     Q     Then the wire to you on May
15  16th, does that relate to Eastern Profit at
16  all?
17     A     I don't recall sitting here.
18     MS. CLINE:  All right, let's take
19  a break.
20     THE VIDEOGRAPHER:  The time is
21  10:43 a.m., this is the end of video 1,
22  we are off the record.
23     (At this point in the proceedings
24  there was a recess, after which the
25  deposition continued as follows:)

MICHAEL WALLER

1
2     THE VIDEOGRAPHER:  The time is
3  11:08 a.m. we are back on the record.
4     This is video 2.
5     Q     So, Mr. Waller, I started by
6  asking you to confirm that you are -- to
7  confirm you are here as a representative of
8  Strategic Vision here today?
9     A     Correct.
10     Q     Is Strategic Vision compensating
11  you for your time here today?
12     A     No.
13     Q     Are they compensating you for
14  your testimony in any way?
15     A     No.
16     Q     Is anyone paying you for your
17  time here today?
18     A     No.
19     Q     Is anyone compensating you for
20  your role in this lawsuit?
21     A     No.
22     Q     Who paid your expenses to come
23  to New York today?
24     A     I did.
25     Q     Has anyone paid for any of

MICHAEL WALLER

1
2  your -- other than yourself, paid for your
3  travel expenses with respect to this
4  litigation?
5     A     No.
6     If I might complete an answer to
7  your question from before, regarding the
8  checking activity from May 1st in the Exhibit
9  SV 103, page 1960.
10     The $15,000 funds transfer was a
11  payment to me for work performed and then that
12  funds turn out the following day, was paid the
13  same payment to my personal account.
14     And then the funds transfer from
15  May 16th had nothing to do with this matter at
16  all.
17     Q     All right, can you just repeat
18  that?
19     So the -- sorry.
20     A     So the May 1st funds transfer
21  credit $15,000, that was payment to Strategic
22  Vision as a corporation, to me as an
23  individual.
24     Q     And is that --
25     A     For me as an individual.

MICHAEL WALLER

1
2     Q     Was that part of the $250,000 in
3  earnings?
4     A     I believe so.
5     Q     And then go ahead?
6     A     And then the May 2nd, funds turn
7  out, that wire to me, that's that same payment.
8     Q     Correct, so as I understand, the
9  money came in from Strategic Vision on May 1
10  and then out to you on May 2nd?
11     A     Correct.
12     And then the May 16th funds
13  transfer is something that has nothing to do
14  with this case at all, or it has nothing to do
15  with Strategic Vision.
16     Q     Okay, so turn, if you would, to
17  Han Exhibit 11, and we have already established
18  that's the research agreement that's in dispute
19  in this litigation, right?
20     A     Yes.
21     Q     The contract was signed on
22  behalf of Strategic Vision on January 6, 2018,
23  is that right?
24     A     Yes.
25     Q     And the contract was negotiated

23 (Pages 86 - 89)

MICHAEL WALLER

1
2  by Strategic Vision and Eastern Profit in part
3  in Ms. Wallop's home in Virginia, correct?
4      A    Most of it was negotiated with
5  Guo Wengui in his home in New York City.
6      Q    Didn't some of the negotiations
7  take place in Ms. Wallop's home in Virginia?
8      A    To my understanding, yes.
9      Q    And the contract was signed in
10 Ms. Wallop's home in Virginia, correct?
11     A    She signed it there with Yvette
12 Wang.
13     Q    Strategic Vision signed the
14 contract in Virginia?
15     A    With Yvette Wang in Virginia,
16 yes.
17     Q    Right above the signature page
18 there is a subheading called duration, do you
19 see that?
20     A    Yes.
21     Q    In the last sentence of that
22 paragraph says, "Either party may terminate the
23 contract with 30 days written notice."
24         Do you see that?
25     A    Yes.

MICHAEL WALLER

1
2      Q    That was your understanding of
3  the terms of the agreement, correct?
4      A    Yes.
5      Q    And there didn't need to be
6  cause to terminate, there didn't need to be a
7  reason to terminate, correct?
8      A    Yes; correct.
9      Q    Thank you.
10         And the contract was terminated
11 by Eastern Profit on or about February 23, is
12 that correct?
13     A    To my recollection, yes.
14     Q    I'm still looking on page 5 of
15 the agreement here, the parties agreed that --
16 it says, "The client will pay the contractor a
17 deposit of U.S. $1 million."
18         Do you see that?
19     A    Yes.
20     Q    And a deposit, in fact, was
21 paid, correct?
22     A    By ACA Capital, yes.
23     Q    And the parties -- with respect
24 to the deposit, the parties agreed that the
25 deposit would be credited on a prorated basis

MICHAEL WALLER

1
2  at the end of the contract, right?
3      A    Yes.
4         MR. GREIM:  Objection, calls for
5      a legal conclusion.
6      Q    That was your understanding?
7      A    I withdraw my legal conclusion.
8      Q    I'm not asking you -- you're a
9  business person, right?
10     A    Yes.
11     Q    I'm just asking you for your
12 understanding of the parties' terms.  You don't
13 have to have a JD to do that.
14         So your understanding was that
15 the deposit would be credited on a pro rata
16 basis to the end of the contract, correct?
17         MR. GREIM:  I just object once
18     again because this is for Strategic
19     Vision's vision's understanding and not
20     Mr. Waller's.
21     Q    Yeah, I'm asking for your
22 understanding.
23         You've no reason to disagree
24 with what I just said, correct?
25     A    I agree it says the deposit will

MICHAEL WALLER

1
2  be credited on a prorated basis to the final
3  one, one-third month's of the contract.
4      Q    And you understood that the
5  Strategic Vision understood that the $1 million
6  was a downpayment, not a signing fee, correct?
7      A    No, it was a deposit.
8      Q    So you did understand that it
9  was a downpayment, not a signing fee?
10     A    Correct.
11         MR. GREIM:  Objection, vague.
12     A    In our negotiations with Mr. Guo
13 on this contract, he did not like the idea of a
14 signing bonus or a deposit, so we settled
15 on -- pardon me, he didn't like the idea of a
16 signing bonus or an advance, so he chose to
17 call it a deposit, so we called it a deposit,
18 too.
19     Q    But you agree that it's not a
20 signing fee?
21     A    Correct.
22     Q    And you just testified, and I
23 think we saw, maybe we didn't yet, but the $1
24 million deposit came in through ACA Capital,
25 correct?

24 (Pages 90 - 93)

Page 94

MICHAEL WALLER

1
2      A    Yes.
3      Q    And Strategic Vision did not
4  return any portion of that deposit to ACA
5  Capital, did it?
6      A    Correct.  No, it did not.
7      Q    Turn, if you would again, you
8  might still be there, page 5 of the research
9  agreement.
10          Sort of in the middle of the
11  page there is a paragraph that starts with the
12  word subsequent, do you see that?
13     A    Yes.
14     Q    Then so there is a sentence that
15  starts with the word I will just read it all,
16  "subsequent payments will be made to the same
17  account unless mutually agreed otherwise in
18  writing."
19          Do you see that?
20     A    Yes.
21     Q    Then it says, "It is understood
22  that the client may direct other entities to
23  pay the contractor and that such payments will
24  be deemed satisfactory."
25          Do you see that?

Page 95

MICHAEL WALLER

1
2      A    Yes.
3      Q    Are you aware of any prohibition
4  in the contract that prohibited Eastern Profit
5  from making payments from entities other than
6  Eastern Profit?
7      A    It was explicit that they would
8  be all entities controlled by Guo Wengui, that
9  it was his money, and that he would -- he may
10  use various vehicles to conceal from the
11  Chinese government the fact that he was making
12  these payments.
13     Q    And there was no prohibition
14  that --
15          MS. CLINE:  Strike that.
16     Q    The parties -- there was no
17  prohibition in the contract preventing Eastern
18  Profit from making payment from an entity based
19  in Hong Kong, was there?
20     A    Let me review this.
21          In our negotiations with him, it
22  was explicit that there would never be a
23  payment straight from Hong Kong, because that
24  would violate basic operational security
25  compromising both Mr. Guo and all of us.

Page 96

MICHAEL WALLER

1
2      Q    But that never got memorialized
3  in the written contract, correct?
4      A    Correct.
5      Q    Just generally speaking, from a
6  business perspective of Strategic Vision, what
7  was -- what services was Strategic Vision
8  agreeing to provide to Eastern Profit under the
9  agreement?
10          MR. GREIM:  Objection, vague.
11          And one thing I'll say is this is
12     all material that was in the original
13     petition -- sorry, claim and counterclaim,
14     it was already covered in the 30(b)(6) of
15     Strategic Vision.
16          So none of this about the
17     statements of the services to be provided
18     is new, and that's what we are limiting
19     today to.
20          MS. CLINE:  The notice does call
21     for documents that were newly produced,
22     including a giant stack of handwritten
23     notes by Mr. Waller regarding the
24     negotiations of the contract.
25          So I'm entitled to ask him his

Page 97

MICHAEL WALLER

1
2  understanding of the contract.
3          If they are inconsistent with his
4  notes, then I will impeach him.
5          MR. GREIM:  Fair enough.  I agree
6  with that.
7          MS. CLINE:  Would you read back
8  the last question and answer.
9          (The portion of the record
10  requested was read back by the reporter.)
11     Q    Can you answer that question?
12     A    In summary, the agreements were
13  to dig up information on Chinese Communist
14  Party members and their family members and
15  their illegitimate children who would not
16  overtly be connected to them, who were running
17  or managing illegally gotten gains or money
18  stolen by the CCP officials for their own self
19  enrichment and any other kind of information
20  that would show their breaking Chinese law or
21  Communist Party "morality," anything that would
22  cause them to be shown to be breaking Chinese
23  law, American law and by extension discrediting
24  the party leadership.
25     Q    And there were certain reports

25 (Pages 94 - 97)

MICHAEL WALLER

1
2  or deliverables to be provided under the
3  contract, correct?
4      A      Yes.
5      Q      And the deliverables would be
6  delivered by USB only, correct?
7      A      Correct.
8      Q      Turn, if you would, to the first
9  page of Exhibit Han 11.
10          I direct your attention to the
11  bottom of the page, paragraph A.
12          There is a sub-bullet there that
13  says, "Financial forensic historical research."
14          Do you see that?
15      A      Yes.
16      Q      And that was one of the types of
17  deliverables to be provided, correct?
18      A      Yes.
19      Q      And specifically if you go to
20  the second line of that paragraph, it says,
21  "Research will consist of in-depth and detailed
22  reports of existing and historical business and
23  financial transactions."
24          Do you see that?
25      A      Yes.

MICHAEL WALLER

1
2      Q      Did Strategic Vision ever
3  produce such a deliverable?
4      A      Mr. Guo did not give us time.
5      Q      But just -- can you just answer
6  my question so the record is clear.
7          Did Strategic Vision ever
8  produce such a deliverable?
9      A      Mr. Guo made it impossible for
10  us to deliver that kind of material.
11      Q      So Strategic Vision did not
12  deliver that material, correct?
13      A      I already said my answer.
14      Q      I need an answer to the question
15  I understand.
16      A      I answered your question.
17      Q      I understand that you have
18  another argument, but I need an answer to the
19  question.
20          Did Strategic Vision ever
21  provide the in-depth and detailed reports of
22  existing and historical business and financial
23  transactions mentioned in the last paragraph of
24  page 1?
25      A      I will say again, Mr. Guo did

MICHAEL WALLER

1
2  not permit us to do that, so we did not deliver
3  them.
4      Q      If you turn the page and go to
5  section B, it says, "Current tracking
6  research."
7          Do you see that?
8      A      Yes.
9      Q      And it says, "Current tracking
10  research shall consist of, but not will be
11  limited to in depth and detailed reports on
12  movements of specified subjects by land, air
13  and sea."
14          Do you see that?
15      A      Yes.
16      Q      Did Strategic Vision deliver any
17  reports of that nature?
18      A      Yes.
19      Q      Describe that?
20      A      We found movements of specific
21  subjects by land and air, private and
22  commercial, addresses and lodging, means of
23  transportation, geolocation, and Mr. Guo
24  refused to accept that information.
25      Q      Did you attempt to provide that

MICHAEL WALLER

1
2  information to Mr. Guo?
3      A      Yes.
4      Q      By what means?
5      A      By -- through Lianchao Han in
6  February, the first or second week of February,
7  2018.
8      Q      Tell me about that.
9      A      This was work we had found
10  through Team 2.
11      Q      Team 2 is the ASOG team?
12      A      Yes.
13      Q      And what was the deliverable
14  that --
15          MS. CLINE:  Well, strike that.
16      Q      Tell me about what Team 2 found?
17      A      Well, first of all we had a
18  problem because there were questions about
19  whether the research methodology was legal.
20          We sought Mr. Guo's guidance on
21  that and he refused to give that guidance, so
22  we could not produce the data for him that had
23  been retrieved.
24          We could not provide him with
25  the data that had been retrieved because we

26 (Pages 98 - 101)

MICHAEL WALLER

1
2 were concerned about the legality of the way in
3 which it was collected.
4    Q    Did Strategic Vision then
5 receive from Team 2 a deliverable on a USB?
6    A    No, we received the deliverable
7 on paper in their offices.  They refused to
8 provide all of the data because of their
9 concerns about legality, but they gave us a
10 summary of it.
11        We went back to Mr. Guo through
12 Lianchao Han for guidance saying we found
13 information but we have hit an impasse, can you
14 give us guidance on what to do?
15        He refused to provide that
16 guidance.
17    Q    The -- so, ASOG gave you written
18 documentation?
19    A    He showed us.
20    Q    What did they show you?
21    A    It was a stack of about half an
22 inch thick or more, maybe three-quarters of an
23 inch thick of their actual documentation
24 concerning flights from Shanghai to Los Angeles
25 International Airport on private planes with

MICHAEL WALLER

1
2 the tail numbers that went to a private hangar
3 where U.S. Customs had no inspectors.
4        It had an airport in Wisconsin
5 where these planes would be parked.
6        It had names of individuals
7 doing transit on those and other aircraft,
8 these were private flights.
9        It had -- let me see, back on
10 this tracking research, it had significant
11 contacts of the subjects involved.
12        So it was a perfect set of
13 datapoints through which to begin a serious
14 deep dive, but we asked Mr. Guo for guidance
15 because we -- he refused to provide that
16 guidance, that's why we did not provide him the
17 data.
18    Q    So, Strategic Vision -- sorry,
19 ASOG showed you this information in hard copy
20 form?
21    A    Yes.
22    Q    And you didn't receive a
23 photocopy of that information?
24    A    No, they refused to provide it;
25 because of questions of legality.

MICHAEL WALLER

1
2    Q    And Strategic Vision subpoenaed
3 ASOG in this case, right?
4    A    Yes.
5    Q    And is there anything of the
6 sort of what you're describing produced by ASOG
7 in this case?
8        MR. GREIM:  Hold on, hold on.
9    Actually Eastern Profit subpoenaed ASOG,
10    Strategic Vision subpoenaed the person
11    named in ASOG's response to your client.
12    Q    Okay, so Strategic Vision
13 subpoenaed Adam Kraft?
14        MR. GREIM:  That's right.
15    Q    Is that your understanding?
16    A    I stand corrected from my
17 previous statement.  Yes, that is my
18 understanding.
19    Q    And did Mr. Kraft produce any
20 documents in response to the subpoena, to your
21 knowledge?
22    A    I don't know.
23        MR. GREIM:  I will take this one
24    just to be clear; he did not.
25        MS. CLINE:  Let's mark this one

MICHAEL WALLER

1
2 as the next up, please.
3        (The above described document was
4    marked Exhibit SV 105 for identification
5    as of this date.)
6    Q    Have you seen Exhibit number 105
7 before?
8    A    Yes.
9    Q    What is it?
10    A    This is an invoice from Allied
11 Special Operations Group, ASOG, from March 2018
12 for the work that we just discussed.
13    Q    Originally they were set to
14 invoice Strategic Vision over $100,000,
15 correct?
16    A    Correct.
17    Q    And then ultimately they only
18 invoiced Strategic Vision $5,400,
19 approximately?
20    A    Yes.
21    Q    You see on the page 2 of the
22 invoice there is an asterisk at the top next to
23 the words termination credit, do you see that?
24    A    Yes.
25    Q    It says see note below?

27 (Pages 102 - 105)

MICHAEL WALLER

1
2      A     Yes.
3      Q     Then at the bottom -- well, the
4  last text on the page there is a bullet that
5  says "termination credit," do you see that?
6      A     Yes.
7      Q     It says, "Client advised all
8  targets are RP by NCS."
9            Do you see that?
10     A     Yes.
11     Q     What does that mean?
12     A     This was the reason why they,
13  ASOG, did not provide us physical copies of the
14  data, because of questions of legality.
15           The targets that Mrs. Wang gave
16  us on behalf of Mr. Guo were -- which we
17  provided to ASOG, were designated as RP or
18  records protected.
19           And what ASOG told us is that RP
20  stands for -- as a designation for foreign
21  nationals whose files are protected by federal
22  authorities either because they are subject of
23  national security investigation,
24  counterterrorism investigation, criminal
25  investigation, or they may be subject to it, or

MICHAEL WALLER

1
2  conversely they may be collaborating with U.S.
3  authorities.
4            So they want to keep those
5  records private so that nobody finds out about
6  any of this until the government deems
7  necessary.
8            It was because of ASOG
9  discovering this RP designation that it was
10  unable to provide us with the data that it
11  provided.
12     Q     And do you know, did they tell
13  you what NCS means?
14     A     If I recall correctly it's
15  National Counterterrorism Service but I am not
16  sure.
17     Q     Did they provide a statutory
18  site about this restricted persons concept?
19     A     No.
20     Q     Had you ever heard it before?
21     A     No.
22     Q     The next line says, "ASOG
23  requests explanation by client.  No explanation
24  provided."
25           Do you see that?

MICHAEL WALLER

1
2      A     Yes.
3      Q     Do you know what that means?
4      A     Yes.
5      Q     Can you explain it?
6      A     Yes.  They wanted to know who we
7  were seeking this information for, and we
8  wouldn't tell them in order to protect our
9  agreement with Mr. Guo, and they immediately
10  suspected that it was Mr. Guo because of how
11  those names could be found open source linked
12  to his.
13           And we wouldn't acknowledge that
14  either, and then they suspected that this may
15  be a China's foreign counterintelligence
16  operation and that we were being used for those
17  purposes to assist the Chinese Secret Service
18  in finding information on that selective list
19  of people, meaning what did the U.S. Government
20  know or what was the status of the U.S.
21  criminal investigation of them.
22     Q     Can you just describe what you
23  mean by open source linked?
24     A     So, you go through social media
25  or any online media that's open source and you

MICHAEL WALLER

1
2  collect that on a very large scale, aggregate
3  it, then do your link analysis to find out what
4  some of the common names are.
5            And Guo had apparently denounced
6  a lot of these people in his videos or in his
7  public statements, and they -- leading these
8  analysts here immediately to assume that our
9  client was Guo.
10     Q     Does open source mean public?
11     A     Yes.
12     Q     How did ASOG deliver this
13  invoice that's Exhibit 105 to Strategic Vision?
14     A     I don't remember if it was by
15  hand or by e-mail, but -- I know it was by
16  e-mail, but I don't know if it was both.
17     Q     The documents that they showed
18  you, that was in Texas?
19     A     Yes.
20     Q     And who was present for that
21  meeting?
22     A     That was Adam Kraft who was the
23  CEO, that was the CFO, Russ, last name began
24  with R, I will remember it, and then the COO I
25  will recall his name, it's -- if I see their

28 (Pages 106 - 109)

Page 110

MICHAEL WALLER

1
2 website I can tell you who the names were.
3           And then there were three
4 analysts who I only knew by their first names.
5     Q     Was anyone there on behalf of
6 Strategic Vision other than yourself?
7     A     Yes, French Wallop was there.
8     Q     Was anyone else present other
9 than the three individuals you described?
10    A     No.
11    Q     And, I'm sorry, you may have
12 said this and I just didn't remember, where in
13 Texas was the meeting?
14    A     Addison, Texas, it was right
15 outside Dallas.
16    Q     At their offices?
17    A     Yes.
18    Q     Other than that -- so that
19 information never ended up on a USB drive that
20 was in your possession, correct?
21    A     No.
22    Q     And it certainly never made its
23 way to Eastern Profit, correct?
24    A     Correct.  We got into a big
25 argument with them about it, saying we were

Page 111

MICHAEL WALLER

1
2 ready to pay for it, she should have told us
3 this ahead of time, and this was causing
4 problems for us and for the client, and they
5 said this, if we give it to you, it's going to
6 break federal law, so no.
7           That's when we went back to
8 Mr. Guo for guidance through Lianchao Han about
9 what to do next.
10    Q     When you say we and they,
11 meaning Strategic Vision got into an argument
12 with ASOG?
13    A     Correct.
14    Q     So, other than the stack of hard
15 copy papers that you described that you saw but
16 didn't receive from ASOG, did Strategic Vision
17 compile any other tracking research consistent
18 with paragraph B on page 2 of the agreement?
19    A     No, that was our first crack at
20 the tracking research.
21    Q     And then -- just bear with me.
22    A     I might also add that it was a
23 problem on the legality side because while
24 Lianchao Han was scrupulous about obeying U.S.
25 law, Yvette Wang was not, and she even once

Page 112

MICHAEL WALLER

1
2 said I don't care if it's legal, just get it.
3           MS. CLINE:  Move to strike.
4     A     That is a completion of my
5 answer.  I ask that my comments be retained for
6 the record.
7     Q     If you drop down to paragraph C
8 on page 2 of the agreement, social media
9 research, do you see that subtitle?
10    A     Yes.
11    Q     It goes on to say, "Shall
12 consist of in-depth and detailed reports on the
13 social media usage and networks of specified
14 subjects and public figures."
15          Do you see that?
16    A     Yes.
17    Q     Did Strategic Vision ever
18 provide a deliverable that meets that
19 description?
20    A     Yes.
21    Q     Tell me about that.
22    A     It first obviously is to
23 research anything or anyone you need to do
24 basic research on it, so Team 1 did its own
25 initial research through open source or public

Page 113

MICHAEL WALLER

1
2 social media on certain of the targets on that
3 15 person list.
4           That was their own basic work.
5 So the only report, in quotes, that we provided
6 as a deliverable was showing how the research
7 team was setting up its methodology to collect
8 this data, but we did not -- that was the
9 extent of the report, it was just an initial
10 status report after the first week.
11    Q     Okay.
12    A     Or two.
13    Q     So there was a report on
14 methodology, correct?
15    A     Yes, but keep in mind our
16 reports were not supposed to be analytical,
17 they were supposed to be giving raw data.
18          But we wanted to demonstrate to
19 the client the methodology that was being used
20 so that the client would understand how the
21 work was being done.
22    Q     Okay, but was there a
23 deliverable provided that detailed the social
24 media usage and networks of the subjects?
25    A     No, only the methodology

29 (Pages 110 - 113)

Page 114

MICHAEL WALLER

1 deliverable that I just mentioned.
2     Q     Just to close the loop, that
3 methodology report was delivered how and when
4 and to whom?
5     A     It was delivered to Yvette Wang
6 by USB port and I was told, "This is all shit,
7 it's worthless.  Don't bother with this."
8     Q     And was this the delivery on
9 January of 26th?
10     A     It was said on two occasion.
11     Q     The delivery of the methodology
12 report with respect to social media research,
13 when was that made?
14     A     It was either January 26th, I
15 think it was -- I think it was January 26th.
16     Q     Was there more than one report
17 on social media methodology?
18     A     No, but I don't remember if it
19 was on -- if it was delivered on that day or at
20 a nearby day, I just want to be careful about
21 the date.
22     Q     And, in total, how many USB
23 drives did Strategic Vision deliver to Eastern
24 Profit?
25

Page 115

MICHAEL WALLER

1     A     Either two or three to Yvette
2 Wang.  I think it was two, but it might have
3 been three.
4     Q     So, one would be the social
5 media research methodology report you just
6 mentioned, correct?
7     A     Yes.
8     Q     And what was the nature of the
9 other USB deliverable?
10     A     It was raw code.
11     Q     When was that delivery made?
12     A     On or about the 30th of January
13 2018.
14     Q     And did the raw code relate
15 to --
16         MS. CLINE:  Sorry, let me strike
17     that.
18     Q     Turn back to page 1 of the
19 contract, if you would.
20     You see that there are the three
21 indented bullets, financial, forensic
22 historical research, current tracking research
23 and social media research; do you see that?
24     A     Yes.
25

Page 116

MICHAEL WALLER

1     Q     And the second USB that was all
2 code, does that relate to any of those three
3 subject matter areas?
4     A     It related to all three.
5     Let me say it potentially
6 related to all three.
7     Q     What do you mean by potentially?
8     A     It was still encrypted code and
9 Ms. Wang and Mr. Guo were insistent that we
10 deliver it regardless.
11     I said it hasn't been decrypted
12 yet, and they essentially said we don't care,
13 we want it anyway.
14     We said it won't be of any use
15 to you until it's decrypted.  So I went and
16 retrieved it anyway for them.
17     Q     I am just going to show you a
18 document, I'm not going to mark it yet because
19 I think I know what the answer to this question
20 is going to be.
21     Do you see this document, it has
22 a color code key at the top of it?
23     A     Yes.
24     Q     What's the Bates label on the
25

Page 117

MICHAEL WALLER

1 bottom of the page?
2     A     SVUS 001939.
3     Q     That's Ms. Wallop's document, is
4 that correct?
5     A     Yes.
6     Q     You are not here to testify
7 about that?
8     A     Correct.
9     Q     So turn back, if you would, to
10 the Strategic Vision's counterclaim.
11     And specifically page 31
12 paragraph 36?
13     A     Yes.
14     Q     All right, let's start with the
15 first sentence, says, "Strategic Vision's team
16 working in other countries also found troubling
17 breaches of security by Eastern Profit and Guo
18 that frustrated and prevented Strategic
19 Vision's performance."
20     Do you see that?
21     A     Yes.
22     Q     Which team is Strategic Vision
23 referring to there?
24     A     Team 1.

30 (Pages 114 - 117)

MICHAEL WALLER

1
2     Q     And what -- can you describe the
3  troubling breaches of security that are
4  alleged?
5     A     Yes.  One of them was that Guo
6  Wengui's name kept coming up in searches for
7  the names on the target list in a way that
8  appeared to be a pattern.
9          Meaning it gave away the
10 identity of the client, and we had stressed the
11 importance of protecting the client, and they
12 said there is too much out there where Guo has
13 already -- we know who your client is and he's
14 compromised those names already on his own, if
15 he wants to keep the list a secret.
16          Second one was it appeared that
17 there were other people out there who were
18 searching for the exact same obscure data at
19 about the same time.
20          And that two of the people on
21 the list appeared to know in advance that they
22 were being searched and had taken measures to
23 take down information available that we were --
24 had been tasked to search for.
25          And the Team 1 suspected that a

MICHAEL WALLER

1
2  trap had been laid for them, and they also
3  suspected that this was for illicit purposes.
4          So all of that was basic
5  troubling breaches of operational security.
6     Q     So let's break that down a
7  little bit.
8          When you -- let's specifically
9  talk about the breaches of security.
10         So what specifically was one of
11 the breaches of security?
12    A     So, Guo was publicly denouncing
13 the very people who -- some of the very people
14 who Team 1 had been tasked to dig up
15 information on.
16         Meaning that his name was being
17 connected with them, so that any work they were
18 doing, someone who is watching could presume
19 that they were working for Guo.
20         Guo was stressing the extreme
21 sensitivity of this information, and if any of
22 this was known, people would be killed, and
23 he's testified to this effect in this suit.
24         He had told us that at the same
25 time, so we were very alarmed that this was

MICHAEL WALLER

1
2  going to compromise our people who were doing
3  the work, as one example of a breach.
4          Meaning when you are doing
5  confidential investigative work, you don't
6  speak out loud with the names of the people you
7  are having investigated.
8     Q     And so that information that you
9  just described came from Team 1?
10    A     Yes.
11    Q     And there isn't any writing from
12 Team 1 to that effect yet?
13    A     Right, because Guo had
14 instructed us not to have electronic
15 communication.
16    Q     Any other examples of troubling
17 breaches of security?
18    A     Yes.
19         The computer researchers
20 themselves had detected that at least two of
21 the targets had taken down the very specific
22 information that these researchers had been
23 tasked to look for within hours, days or hours
24 of Team 1 doing this research, and they felt
25 that in their experience it was so unusual that

MICHAEL WALLER

1
2  somebody on Guo's team had compromised their
3  activities in their country where they were
4  doing the work.
5          This is -- this and other
6  examples are reflected in my notes.
7          Team 1 warned us that, "You have
8  an enemy in your own camp."  Meaning in the
9  client's camp.
10         So when you get these warnings
11 from seasoned professionals, you take them
12 seriously.
13         MS. CLINE:  Next exhibit, please.
14         (The above described document was
15     marked Exhibit SV 106 for identification
16     as of this date.)
17    Q     So we have handed you what's
18 been marked as Exhibit 106.
19         Are these your handwritten notes
20 to which you just referred?
21    A     Yes.
22    Q     So, just as a threshold matter,
23 can you kind of describe, like where did these
24 notes come from and what generally was your
25 notetaking practice?

31 (Pages 118 - 121)

MICHAEL WALLER

1
2     A     These are my handwritten notes,
3  the first page was from the first time we met
4  Guo when I did not use a notebook, most if not
5  all of the remainder were from my notebooks.
6     Q     Just meaning page 1 was sort of
7  a looseleaf?
8     A     Yes, it was the back of a page
9  of something else.
10     Q     Okay, and then the rest of
11  Exhibit 106 is a bound notebook?
12     A     Yes, I believe they were from
13  two notebooks.
14           No, this is just one.
15     Q     What is your note taking
16  practice, generally speaking?
17     A     In some meetings I don't take
18  notes at all, because people won't be as open
19  or they don't want them taken, or you just want
20  to keep things confidential.
21           In these types of meetings I
22  take notes which is a combination of what's
23  being said, what -- so it's not quite minutes,
24  but it's virtually minutes of the meeting, to
25  memorialize what was said at the meeting.

MICHAEL WALLER

1
2           It also has brainstorming in
3  there and then own ideas that I develop or
4  notes that I make to myself about later
5  follow-up.
6           So it's -- you won't see a
7  consistent method to all the notes.
8     Q     So I think you referred a moment
9  ago to notes that you took when you're meeting
10  with Team 1, is that correct?
11     A     The Team 1 leader.
12           No, no, I said it's reflected in
13  my notes what Team 1 had said, but I didn't
14  take notes. I don't recall that I took notes
15  with Team 1 leader.
16           We will probably explore that as
17  you question me.
18     Q     And I'll ask you to do a little
19  work here, could you find the notes to which
20  you were just referring in this packet?
21     A     Okay, there is another set of
22  notes that I provided in discovery that I don't
23  see here, so if -- there is an off chance it
24  could be in there.
25           Okay. Page 1788, it's

MICHAEL WALLER

1
2  underlined follow-up 1/25.
3           This is notes from a meeting
4  with team leader one, Team 1 leader and about a
5  little below, halfway down the capital letter
6  says security flaws.
7           So we were told Guo and Yvette
8  Wang both said these slides were extremely
9  secret, never to reveal anything.
10           Team 1 found the exact slide of
11  number one already online on something that
12  Guo's network of people had already posted in
13  public.
14     Q     So just when you say the exact
15  slide of number 1, you are referring to one
16  page in a hard copy document that Eastern
17  Profit provided to Strategic Vision?
18     A     In a -- one page in an
19  electronic document that Eastern Profit
20  provided to Strategic Vision.
21     Q     Okay.
22     A     Okay, that was slide number one.
23           "Information on number 2 on the
24  confidential slide was found on the same
25  website as they found information on number 1."

MICHAEL WALLER

1
2           So there was a breach somewhere
3  there.
4           And then it says "Team," meaning
5  Team 1, "knows that others are doing searches."
6  This was searches on the exact same people at
7  the exact same time.
8           He said, "Big risk of getting
9  caught," which means the team felt that even
10  though they had taken all the measures they
11  had, this was going to compromise them.
12           "Team hesitated because they
13  found other" word illegible "into e-mails and
14  accounts and they feared getting caught
15  therefore need more security or risk lock down.
16           "And we can screw it up for the
17  other team," meaning another team that we would
18  either hire or Guo had said he had three or
19  four other teams, so we told them to be
20  cautious because we didn't want Team 1 to be
21  compromising anything that Guo might have had
22  with any other teams that he might have hired.
23           He never told us if he actually
24  did hire them.
25           So the same slide, "raises

32 (Pages 122 - 125)

MICHAEL WALLER

1
2 alarms," so after "they", Team 1, "came to us
3 for guidance," and we go to M, which is Miles
4 Kwok or Wengui, "for guidance to provide it
5 back," so they were requesting guidance on
6 that.
7      Q     I was confused by your
8 testimony, did Mr. Guo ever represent to
9 Strategic Vision that he had hired other teams
10 to do similar research?
11     A     He said he had in the past, but
12 he said he had three or four other teams,
13 meaning at his disposal, but he didn't say one
14 way or another whether he had hired them at the
15 same time.
16     Q     So the only basis for the
17 allegation that there were other teams actively
18 researching the same targets is what you
19 learned from Team 1, isn't that correct?
20     A     Yes, so these were the people
21 actually doing the work, and they found someone
22 else out there is searching in the same
23 territory we were and we fear a security
24 breach.
25          I believe I have other notes on

MICHAEL WALLER

1
2 the other notebook which is not in this
3 exhibit.
4      Q     While we are on that page, there
5 is, sort of talking about page 1788, there is a
6 list of cities sort of on the right margin,
7 what do those represent?
8      A     Those are the codes where we
9 would say let's meet at a certain place,
10 because Mr. Guo insisted that all of the
11 exchanges of information be done in person by
12 USB drive and not online.
13          So, I would send a text, see you
14 at 17, with I would mean see you in Zurich, so
15 that was our code key.
16     Q     But this particular conversation
17 that was on January 25th was it -- was by
18 phone?
19     A     No, it was in person.
20     Q     You see right under your
21 follow-up 1/25 there is an asterisk, do you see
22 that?
23     A     Um-hum.
24     Q     It says, "Called for a status
25 report on all 30 pieces?"

MICHAEL WALLER

1
2      A     Yes.
3      Q     What does called mean?
4      A     That means the client had called
5 for a status report.  It doesn't mean telephone
6 call.
7      Q     So meaning Eastern Profit had
8 called you?
9      A     No, Mr. Guo had contacted us
10 through Yvette Wang.
11     Q     Called for, meaning requested?
12     A     Yes.  Ms. Wang contacted us to
13 get the latest status report.
14     Q     And what do you mean by all 30
15 pieces?
16     A     I would presume that meant a
17 reference to the fish.  So it's 30 in the
18 contract.
19     Q     Please turn to the next page, if
20 you would.
21     A     By the way, right below that it
22 says, "We can't do a hard start each month."
23          That referred to the -- what
24 amounted to tortious interference of stopping
25 Team 1 by having the leader travel abroad and

MICHAEL WALLER

1
2 then having me travel abroad to meet every few
3 days to exchange whatever partial data that
4 they were able to recover.
5          So this was impeding their
6 efforts.
7      Q     So what were the terms of the
8 contract between you and Team 1?
9      A     Strategic Vision and Team 1?
10     Q     Sorry, Strategic Vision and Team
11 1.
12     A     That the contract was to do the
13 deep dive research on -- for the first month on
14 all 15 of the -- all the main 15 names listed
15 on that 89 page document  and then from that
16 point on ten more names or ten names every
17 month, not 15.
18     Q     But what did the -- we saw an
19 invoice for $200,000 earlier, do you recall
20 that?
21     A     Yes.
22     Q     And what was supposed to have
23 been accomplished for that $200,000?
24     A     So that was the setup for the --
25 because we did not have, nor did we ever

MICHAEL WALLER

1
2 present the notion that we had an existing
3 office or set of offices for this, we would do
4 all our work setting out fresh teams, so there
5 is no continuity, and it avoids detection, so
6 we want to keep security for our clients.
7           In this case we would set up a
8 new team abroad, and that team needed new
9 computer equipment, so you want to make sure
10 there is no electronic ability to trace
11 anything that's being done, so you are buying
12 devices in cash in third countries to be
13 brought to another country where the team is
14 set up.
15           So it's all those start up
16 costs, related security costs, and then the
17 team members themselves.
18     Q     Did you -- did Strategic
19 Vision --
20           MS. CLINE:  So strike that.
21     Q     When we looked at the research
22 agreement between Eastern Profit and Strategic
23 Vision there was a concept of deliverables,
24 right?
25     A     Yes.

MICHAEL WALLER

1
2     Q     When Strategic Vision turned
3 around and contracted with Team 1, did it
4 import any concept of deliverables into the
5 contract between Team 1 and Strategic Vision?
6     A     Simply give us the raw data that
7 you have when requested.
8     Q     Did you provide Team 1 with a
9 copy of the Eastern Profit research agreement?
10     A     No.
11     Q     How did Team 1 know what the
12 subject matters were, what the deliverable
13 format was supposed to be?
14           How did they know those things?
15     A     We just provided Team 1 with the
16 list.
17           That's all the client requested,
18 he just said find out everything you can on
19 this list of 15 names.
20           The problem, of course, was
21 there is so much data to find and how do you
22 narrow it down?
23           And some of the data is either
24 security or illegal to obtain, and some of it
25 doesn't exist, and as Team 1 found out, two of

MICHAEL WALLER

1
2 the names were either misspelled and sent the
3 researchers in the wrong direction, or they
4 might not have been real names of real people
5 in the first place.
6           So you have to sift all that out
7 in the beginning and then narrow down what does
8 the client want, that's why the whole thing
9 always required client guidance.
10     Q     And did Strategic Vision give
11 Team 1 any guidance regarding financial,
12 forensic historical research, current tracking
13 research or social media research?
14     A     Yes.
15     Q     Tell us about that, what kind of
16 guidance did Strategic Vision give Team 1?
17     A     So first the team has to
18 familiarize themselves with the subject matter,
19 that meant for them to go through all open
20 source material so they could learn everything
21 they could so they would know where to look and
22 where not to look; that's standard for any
23 research project.
24           And then they would go for what
25 was easiest to retrieve, figure out what's

MICHAEL WALLER

1
2 easiest to get and then bring that data back,
3 and that's going to be mainly open source
4 material.
5           And then to go into the more
6 difficult parts, but first you have to
7 establish what you can find, the most easiest
8 way, and then go for the tougher stuff later.
9           But it's an iterative process
10 and you are constantly going back to the client
11 for guidance.
12           And it takes a while to start
13 up.
14           Did the pricing that Strategic
15 Vision established with Team 1, was it related
16 in any way to the pricing in the contract
17 between Eastern Profit and Strategic Vision?
18     A     It was a flat rate pricing for
19 Team 1.
20     Q     But was that flat rate in any
21 way tied to the Eastern Profit contract?
22           MR. GREIM:  Objection, vague.
23     A     I don't know what you mean by
24 tied.
25     Q     How did you come up with a flat

34 (Pages 130 - 133)

MICHAEL WALLER

1 rate of $200,000?
2      A     It was $250,000.
3      Q     How did you come up with that?
4      A     That's what they agreed to do it
5 for.
6      Q     But you didn't try to price it
7 out in comparison to what the price of the
8 contract with Eastern Profit was?
9           MR. GREIM:  Objection, vague.
10      A     No, because it wasn't just
11 for -- it just wasn't for that one team, there
12 were other elements of this project.
13      Q     So there was no -- there was no
14 deliverable based pricing with respect to Team
15 1, it was all a flat fee?
16      A     Yes.
17      Q     And other than Team 1 and Team
18 2, did Eastern -- did Strategic Vision have any
19 contracts with any other teams who were going
20 to perform the subject matter of the contract?
21      A     Just Team 1 and Team 2.  We
22 didn't have a contractual -- written
23 contractual relation with either, it was all
24 verbal.

MICHAEL WALLER

1
2      Q     But your testimony is that there
3 was a contract with each of them, right?
4      A     No, there were verbal agreements
5 with each of them.
6      Q     But an oral contract?  Are you
7 saying -- was there an oral?
8           MS. CLINE:  Strike that.
9      Q     There was an oral agreement
10 between Strategic Vision and Team 1, correct?
11      A     Correct.
12      Q     And the parties agreed orally
13 that the initial payment to Team 1 would be
14 $200,000, right?
15           Actually, can you pull out
16 Exhibit 104?
17      A     Okay.
18      Q     So was the flat fee between
19 Georgetown Research as the subcontractor for
20 Strategic Vision and Team 1 $200,000?
21      A     Yes, but I think the overall was
22 $250,000.
23      Q     So the total price of the
24 contract with team -- the agreement with Team 1
25 was going to be $250,000?

MICHAEL WALLER

1
2      A     Yes.
3           MR. GREIM:  Objection, vague as
4 to time period.
5      A     Say for that month, it was
6 month-to-month.
7      Q     What was -- so the first month
8 is $200,000, right?
9      A     No, that was paid out of that
10 pocket, but it was -- remember, we are setting
11 up something that the Chinese Government was
12 not supposed to detect, so it's not going to
13 have exact sums being transferred from point A
14 to point B at the same time, it's going to come
15 from different sources all for the same
16 purpose.
17           This is all to protect the
18 integrity of the project.
19      Q     Well, I thought you testified,
20 and correct me if I'm wrong, I thought you had
21 testified earlier that this $200,000 invoice
22 was paid with a $200,000 either a wire or an
23 ACH transaction?
24      A     That's correct.
25      Q     Correct?

MICHAEL WALLER

1
2      A     But that's not the only payment.
3      Q     Were there other payments made
4 to Team 1?
5      A     I believe from Strategic Vision
6 itself.
7      Q     And how much, do you know?
8      A     That's in the -- that's in the
9 financials that you just showed me that you
10 said you would discuss later.
11      Q     Ms. Wallop will testify to that?
12      A     I believe so.
13      Q     To your knowledge, did Team 1
14 ever make contact with any other teams who were
15 researching the same targets?
16      A     They did not.
17      Q     Turn, if you would, so now we
18 are on the Strategic Vision's counterclaim,
19 turn to page 36, and specifically paragraph 51.
20           I just direct your attention to
21 the first sentence of paragraph 51, and my
22 questions are going to be when did that
23 representation take place and who was present?
24      A     The whole sentence or part of
25 the sentence, there may be two --

35 (Pages 134 - 137)

MICHAEL WALLER

1
2   Q    Let's clean it up.
3   A    (Continuing) -- parts.
4   Q    Paragraph 51 states, "Guo claims
5  and claims to Strategic Vision that he was
6  arrested and imprisoned in May 1989 during the
7  TienanmenTienamen Square massacre for providing
8  money to help protesters."
9       Do you see that?
10  A    Yes.
11  Q    And my question, first question
12  is when was that representation made to
13  Strategic Vision?
14  A    He said that at his residence in
15  one of his meetings with us that Yvette Wang
16  interpreted for and then he commented it was
17  May 10th, which happened to be his birthday.
18  Q    So he made that --
19  A    He made that statement straight
20  to us.
21  Q    And he made it in Mandarin, then
22  it was translated?
23  A    Yes, but sometimes he would use
24  English to stress a point, or when Yvette
25  wasn't either in the room or translating the

MICHAEL WALLER

1
2  way he wanted to.
3   Q    Do you happen to remember which
4  of the four meetings you described before it
5  was in which that representation was made?
6   A    That would have probably been
7  the third meeting, the one before April --
8  pardon me, the one before January 26th.
9   Q    Turn to paragraph 52 on the next
10 page.
11      And the question is just what is
12 Strategic Vision's basis for these allegations?
13  A    This was all straight what Guo
14 had told us directly, personally and through
15 Lianchao Han and Yvette Wang and also press
16 reports, Wall Street Journal profiles, New York
17 Times profiles.
18  Q    Then drop down to paragraph 53,
19 paragraph 53 says, "Guo's protector, beginning
20 at about 2004, was Ma Jian, Vice Minister of
21 theMinistry of State Security.
22      "Until Ma's arrest and
23 expulstion from the Party in December 2014
24 after losing an intraparty power struggle."
25      Do you see that?

MICHAEL WALLER

1
2   A    Yes.
3   Q    What is Strategic Vision's basis
4  for that allegation?
5   A    Guo told this to us personally
6  himself; and it was widely recorded in the
7  press.
8       And I might add this intraparty
9  power struggle is important because that was
10 another clue that he was not a real dissident.
11      He had claimed to us that he
12 opposed the entire Communist Party, but as his
13 spokesman, Mr. Podhaskie told the Wall Street
14 Journal last July, it was only -- he was only
15 fighting a radical faction within the Communist
16 Party.
17      So that's not dissident
18 activity.
19  Q    How do you define dissident
20 activity?
21  A    You're opposing the ruling
22 party.
23      You're not picking a faction
24 fight within the party.
25      That means you are still a

MICHAEL WALLER

1
2  communist, that's not a dissident.
3   Q    So, with respect to the first
4  sentence of paragraph 53, when did Mr. Guo make
5  that representation to Strategic Vision?
6   A    On the first day we met him,
7  which would have been November 21, 2017.
8       He had already spoken about it
9  in his April 2017 Voice of America interview
10 and his July 2017 interview with Bill Gertz.
11  Q    How about just dropping down a
12 couple of sentences still in paragraph 53,
13 there is a sentence that starts, "One of Ma's
14 duties."
15      Do you see that?
16  A    Yes.
17  Q    "One of Ma's duties was to run
18 the MSS's Number 8 Bureau."
19      Do you see that?
20  A    Yes.
21  Q    What's the basis for Strategic
22 Vision's allegation there?
23  A    That comes from Guo himself as
24 related through Bill Gertz in the July 2018
25 Washington Free Beacon article.

36 (Pages 138 - 141)

MICHAEL WALLER

1
2     Q     And then drop down to the next
3  sentence, it says, "The MSS has a role not only
4  in repressing domestic political dissent, but
5  also in monitoring and suppressing activities
6  overseas that are deemed to be subversive of
7  the Chinese Communist Party."
8          Do you see that?
9     A     Yes.
10    Q     What is the basis of Strategic
11 Vision's allegations there?
12    A     That is from that same previous
13 source that I just told you, Guo telling Gertz,
14 but it's also through my own work.
15         I got my doctorate in studying
16 communist secret police systems and studied the
17 Soviet system, of which the Chinese system is a
18 Sinofide copy, so I understand through my own
19 professional work on how precisely how these
20 systems work and also how fortunes are made by
21 people who get under the wing of certain of
22 their officials.
23         The MSS learned a lot from the
24 KGB.
25    Q     Drop down to paragraph 54, first

MICHAEL WALLER

1
2  sentence, "On information and belief 'Guo was a
3  long time employee of Vice Minister Ma Jian.'"
4          Do you see that?
5     A     Yes.
6     Q     First of all, do you know why
7  Strategic Vision has that part of that sentence
8  in quotes there?
9     A     If it was in quotes it would
10 have been quoted from a public source.
11    Q     Do you know what the public
12 source is you are relying on there?
13    A     Probably the footnote was pulled
14 out, but I am surmising that it's also from
15 that same July 2017 Gertz article based on the
16 Guo interview.
17    Q     Okay, next sentence, "On
18 information and belief, Guo paid MSS officials
19 and bought surveillance equipment for the MSS
20 in exchange for favors."
21         What is Strategic Vision's basis
22 for that allegation?
23    A     Guo told that to Bill Gertz in
24 some of Gertz's writings and he told me
25 personally on November 21st, 2017.

MICHAEL WALLER

1
2     Q     Guo told you personally?
3     A     Yes, because I was interested
4  in -- I had commented to him how I had worked
5  on the Soviet side of things and saw how Soviet
6  entrepreneurs made their money through the KGB,
7  and he said yeah, he said -- and then he
8  described how he built the Penghzou Plaza
9  Hotel and how he blackmailed the vice mayor
10 of -- or extorted the vice mayor of Beijing by
11 having surreptitious sex videos made of him in
12 order to advance a property acquisition that
13 Guo had wanted or to recover property that the
14 Party had taken away from him.
15    Q     Just move to the last sentence
16 of paragraph 54, "Guo was able to use his
17 connection with Ma and the MSS against Guo's
18 business arrivals in Cline?"
19    A     Yes.
20    Q     "While the MSS was able to use
21 Guo's business empire against its own targets
22 in China?"
23    A     Yes.
24    Q     Same question, what's the basis
25 for that allegation.

MICHAEL WALLER

1
2     A     Same answer, Guo told Bill Gertz
3  who reported on it and Guo told me in at least
4  two discussions and then it was out there in
5  other open source journalistic accounts.
6     Q     So, did you have nonpublic
7  conversations with Mr. Gertz regarding Mr. Guo?
8     A     Only in the beginning when he
9  arranged for us to -- arranged for Strategic
10 Vision to do work for Mr. Guo.
11    Q     Okay, did any of your
12 conversations, private conversations with
13 Mr. Gertz form the basis for the allegations in
14 Strategic Vision's counterclaim?
15    A     No.
16         Bill Gertz and I both understand
17 that a lot of people can do really terrible
18 things, and then they see the light and then
19 they convert to the right cause.
20         As a dissident, for example, as
21 an opponent of the Communist Party, and you can
22 forgive the guy and work with the guy because
23 now you have a similar cause.
24         So he's using his contacts and
25 methodology against the Chinese regime, so we

37 (Pages 142 - 145)

MICHAEL WALLER

1
2 didn't see anything unusual in how he made his
3 fortune, how Guo made his fortune.
4          What was unusual was how Guo
5 kept those relationships.
6     Q    Did Strategic Vision consult
7 with Mr. Gertz at all regarding the allegations
8 in the fraud claim in Strategic Vision?
9     A    In which particular --
10         MS. CLINE:  Let me just strike
11 that and start again.
12     Q    Did Strategic Vision consult
13 with Mr. Gertz regarding its fraud counterclaim
14 against Eastern Profit?
15     A    Once I asked -- I asked Bill
16 Gertz to persuade Guo not to file suit because
17 it's just going to cause problems for
18 everybody.
19         Bill said he relayed that he
20 happened to agree, but nothing came of it, that
21 was the only discussion.
22     Q    So there were no discussions to
23 your knowledge between Strategic Vision and
24 Bill Gertz about Strategic Vision's fraud
25 claim?

MICHAEL WALLER

1
2     A    No.  Not that I recall.
3     Q    You testified earlier that you
4 had some private conversations with Mr. Watson
5 among about the allegations in Strategic
6 Vision's fraud counterclaim.
7          Who else was present at your
8 conversation with Mr. Meng?
9     A    I think I only had one
10 conversation with him, and then there were some
11 other Chinese people present, but I don't
12 remember their names.
13     Q    You don't know who they were?
14     A    I was introduced, but I didn't
15 retain their names.
16     Q    Was one of them Bruno Wu?
17     A    No.
18     Q    You would know it if he were
19 there?
20     A    Yes.
21     Q    You know Mr. Wu?
22     A    I have never met him.
23     Q    Have you had any communications
24 with Mr. Wu about the subject matter of
25 Strategic Vision's counterclaims?

MICHAEL WALLER

1
2     A    No.
3     Q    Is Mr. Wu funding this lawsuit
4 in any way, directly or indirectly?
5         MR. GREIM:  I'm going to object.
6     Who is funding this lawsuit is beyond
7     the scope of the notice.  It's
8     irrelevant to the case.  I instruct the
9     witness not to answer.
10     Q    Are you going to go by --
11     A    I won't answer that question.
12     Q    So you know the answer to the
13 question, you are just refusing to answer, is
14 that right?
15         MR. GREIM:  I will also instruct
16     the witness not to answer that question.
17     A    I won't answer that question.
18     Q    Strategic Vision in its prayer
19 for relief in this case is seeking attorneys'
20 fees, correct?
21         MR. GREIM:  I will answer that we
22     are not seeking attorneys' fees.
23         I am aware it's pled, but Strategic
24     Vision is not seeking attorneys' fees in
25     this case; that's a judicial admission.

MICHAEL WALLER

1
2         MS. CLINE:  You are going to
3     withdraw your claim for fees?
4         MR. GREIM:  I mean the fees are
5     listed in a catch-all in the wherefore
6     clause along with court cost and other
7     relief the court deems just and
8     appropriate.
9         And I will tell you that we have
10     asserted no cause of action under the law
11     that would allow us to recover attorneys'
12     fees, and we are not seeking them in this
13     case.
14     Q    Did you have a conversation with
15 Mr. Wu about whether Strategic Vision should
16 seek attorneys' fees in this case?
17         MS. CLINE:  It is not privileged.
18         MR. GREIM:  You can answer that
19     question.
20     A    No.
21     Q    Did you have any communications
22 with Mr. Wu on that subject?
23         THE WITNESS:  Counsel?
24         MR. GREIM:  I am going to go
25     ahead -- I allowed that one, I am not

Page 150

MICHAEL WALLER

1
2      going to allow any other questions about
3      the payment of attorneys' fees in this
4      case.  This is not within the scope of
5      the notice, nothing to do with the case.
6          Q      Did Mr. Wu introduce you to any
7      of the gentlemen who provided some of the
8      information which form the basis for Strategic
9      Vision's allegations in this case?
10         A      No.
11         Q      So Mr. Wu did not introduce you
12     to Mr. Meng?
13         A      No.
14         Q      Who did?
15         A      I think he asked me on Twitter
16     and we got together, it was direct.
17         Q      And who introduced to you Mr.
18     Shi Wei?
19             MR. GREIM:  I am just going to
20         say I think we are out again on the edge
21         of the notice here.
22             You want to understand the factual
23         basis for the allegations in the
24         Complaint, we have given you the sources,
25         now learning how Strategic Vision met

Page 151

MICHAEL WALLER

1
2      those sources is getting into our work
3      product, and it doesn't lead to any
4      admissible evidence.
5             It can't lead to any discovery of
6      admissible evidence.
7             And so I am going to say questions
8      about where information came from that's
9      in the Complaint is fair, but who
10     introduced Mr. Waller to an individual
11     person is not.
12         Q      Are you listening to your
13     counsel's advice not to answer the question?
14         A      I always want to take my
15     counsel's advice.
16         Q      You might not on this one.
17             When you had a conversation with
18     Mr. Shi Wei regarding the allegations in
19     Strategic Vision's counterclaim, who else was
20     present?
21         A      Shi Wei was pending for which
22     one?
23         Q      Turn to paragraph 62, page 41 of
24     the complaint or the counterclaim.
25         A      Okay.

Page 152

MICHAEL WALLER

1
2             Would you repeat the question?
3          Q      Yes, so when you had your
4      conversation with Mr. Shi Wei about the
5      allegations in Strategic Vision's counterclaim,
6      who else was present?
7          A      Just him.
8          Q      Do you know where he got his
9      information, the information on which Strategic
10     Vision relied in making its allegations?
11         A      First, Strategic Vision didn't
12     rely on him, we simply spoke to him and read a
13     lot of what he wrote, he's a prolific writer
14     and he had, if I recall correctly, had
15     gotten so far under Guo's skin and Guo was
16     calling him such terrible names and he was one
17     of the first two people, as with Wei Shi,
18     Watson Meng, they were the first two people Guo
19     threatened by name that we could find, so I
20     wanted to find them and I found them on
21     Twitter.
22         Q      What is Boxun.com?
23         A      That's a Chinese language news
24     site, opinion site, blog that's very popular
25     with both dissidents but it's also popular even

Page 153

MICHAEL WALLER

1
2      in China, and so it's a lot of commentary on --
3      independent commentary on China.
4          Q      Was that website, did Strategic
5      Vision use that website as a source for any of
6      the allegations in this Complaint?
7          A      I remember referring to it, it's
8      all in Mandarin and I don't speak or read
9      Mandarin, so it was very limited what utility
10     it could be, but I went through it just to see
11     who I was dealing with when I was talking to
12     different of the authors.
13         Q      Did you ever get anybody to
14     translate for you articles on Boxun so that you
15     could use them in connection with this
16     litigation?
17         A      I generally use machine
18     translation, three different kinds and sort of
19     averaged into each of the translations to
20     understand what was being written.
21         Q      And did you ever have any humans
22     translate anything on Boxun.com with you in
23     connection with this litigation?
24         A      No.
25         Q      Do you know who Jim Cisco is?

39 (Pages 150 - 153)

Page 154

MICHAEL WALLER

2  A   Yes.
3  Q   Who is he?
4  A   He's the CEO of Inodo, that has
5 nothing to do with this case.
6  Q   Did you have any conversations
7 with Mr. Cisco about whether or not Mr. Guo was
8 a dissident?
9  A   I can't remember why I ever
10 would have reason to.
11  Q   Do you remember one way or the
12 other whether you had any such conversations?
13  A   I have told a lot of people that
14 he's not a dissident, so I can't answer the
15 question, it would be speculation.
16      I will have to answer no with a
17 caveat that I really don't remember.
18  Q   Did you consult with
19 Mr. Cisco -- did Strategic Vision consult
20 Mr. Cisco about the allegations in the
21 Complaint?
22  A   No.
23  Q   I should say counterclaim.
24      In the conversation you had with
25 Mr. Meng, does he speak English?

Page 155

MICHAEL WALLER

2  A   A little bit.
3  Q   Did you have --
4  A   Watson Meng, pardon me, yes, he
5 does.
6  Q   So you didn't need a translator
7 for that conversation?
8  A   I don't think so.
9  Q   Same question as to Mr. Shi Wei,
10 did you need a translator for that one?
11  A   It was -- our discussion was
12 very brief and I don't remember if I needed
13 one.  I met with so many people I can't keep
14 track.
15  Q   With respect to each of those
16 two meetings, forgive me if I asked this
17 before, the meeting with Mr. Meng, I think you
18 said it was shortly before the counterclaim was
19 filed, is that right?
20  A   Yes.
21  Q   Do you remember any more details
22 about that meeting, where it was?
23  A   Northern Virginia.
24  Q   At a restaurant?
25  A   Yes.

Page 156

MICHAEL WALLER

2  Q   Do you remember which one?
3  A   No.
4  Q   And about how many people were
5 there with you?
6  A   Maybe two or three.
7  Q   And your testimony --
8  A   Again, it's a blur, I honestly
9 can't tell you precisely.
10  Q   Your testimony is as you sit
11 here you can't remember any of their names?
12  A   That's correct.
13  Q   Your meeting with Mr. Shi Wei?
14  A   I went to meet with him and
15 there were other people there, but I don't know
16 who they were.
17  Q   Did you bring anybody with you?
18  A   No.
19  Q   Did you take notes of that
20 meeting?
21  A   No.
22  Q   Did you take notes after the
23 meeting about the meeting?
24  A   No.
25  Q   And your meeting with Mr. Shi

Page 157

MICHAEL WALLER

2 Wei, was that also in northern Virginia?
3  A   Yes.
4  Q   Was that also slightly before
5 the counterclaim was filed?
6  A   Yes.
7  Q   And was that at a restaurant?
8  A   Yes.
9  Q   Which one?
10  A   I don't remember.
11  Q   How many people were there?
12  A   It would have been one or two
13 others, but I don't remember.  One or two or
14 more others; it was a small group.
15  Q   Did you invite any of those
16 people to attend the meeting?
17  A   No.
18  Q   And your testimony is you don't
19 remember any of them?
20  A   Yes.
21  Q   Did that meeting require a
22 translation?
23  A   If I remember correctly, he
24 spoke in English, other people chimed in
25 whether to clarify something or disagree with

Page 158

MICHAEL WALLER

1              MICHAEL WALLER
2  the use of a term.
3       So it wasn't an interpreter
4  based meeting.
5     Q    Was the purpose for the meeting
6  to garner support for the counterclaim?
7     A    No, it was to get to meet this
8  little Uber driver who this supposed
9  billionaire from China was so upset about and
10  said he wanted to have die, and finish him off,
11  literally, in the March 2017 audio.
12       That's why it was so interesting
13  to me, both of these two characters.
14       Guo Wengui tells someone my
15  operation is on, he's smashing these guys for
16  speaking out against the Chinese Communist
17  Party and Xi Jinping.  I want them to die.
18  They are bastards, I must finish them.
19       Then he proceeds to run this
20  litigation and smear campaign against them, so
21  of course I'm going to be interested in talking
22  to these guys.
23     Q    Okay, but part of the purpose of
24  the meeting was to supplement the allegations
25  of Strategic Vision's fraud claim, right?

Page 159

1              MICHAEL WALLER
2     A    No, it was to understand the
3  situation better.
4     Q    At the point in time you met
5  with them, you were intending to file a --
6  Strategic Vision was intending to file a fraud
7  counterclaim against Eastern Profit?
8       MR. GREIM:  I'm going to object
9     at this point.  Now we are getting into
10     work product and methods of gathering
11     evidence.
12       The witness is open to testify
13     everything he's learned from these
14     individuals, but what Strategic Vision's
15     intent was and at what time on the
16     counterclaim is not part of the notice and
17     it's work product and I will instruct you
18     not to answer that.
19     A    I won't answer that.
20     Q    Based on your counsel's
21  instruction?
22     A    Yes.
23       MS. CLINE:  All right, let's go
24     off the record.
25       THE VIDEOGRAPHER:  The time is

Page 160

1              MICHAEL WALLER
2  12:30 p.m.  This is the end of video 2.
3  We are off the record.
4       (At this point in the proceedings
5     there was a recess, after which the
6     deposition continued as follows:)
7       THE VIDEOGRAPHER:  The time is
8     1:22 p.m.
9       We are back on the record, this is
10     video 3.
11       MS. CLINE:  All right,
12     Mr. Waller, I'm going to hand you three
13     exhibits that have been marked 107, 108
14     and 109 and let me just describe them
15     for the record.
16       So, Exhibit 107 bears a Bates stamp
17     SVUS 1961 through 65, Exhibit 108 is 1966
18     through 1971 and Exhibit 109 is 1972
19     through 1975.
20       (The above described documents were
21     marked Exhibits SV 107 through 109, for
22     identification, as of this date.).
23     Q    First question, Mr. Waller, is
24  if you could just identify these documents for
25  us?

Page 161

1              MICHAEL WALLER
2     A    These documents are my
3  reimbursement invoices to Georgetown Research.
4     Q    So you put these documents
5  together, correct?
6     A    Yes.
7     Q    And starting with 107, just look
8  at the first page, so can you confirm that all
9  of these expenditures were incurred in
10  connection with the Eastern Profit matter?
11     A    Yes.
12     Q    There is a note there that you
13  made that the amount of $464.30 was refunded by
14  Delta, what did you mean by that?
15     A    That was a cancelled or a
16  changed flight, so they reminded it was
17  probably a nonrefundable ticket, so they issued
18  me credit or refunded it, I don't remember.
19     Q    Okay, then let's look at 108.
20     A    Yes.
21     Q    Same question, is it your
22  testimony that all of the expenses detailed on
23  Exhibit first page of 108 were incurred in
24  connection with the Eastern Profit matter?
25     A    Yes.

41 (Pages 158 - 161)

Page 162

MICHAEL WALLER

1
2     Q     And then look at 109, if you
3 would, the same question there, were all of the
4 expenses on the first page of Exhibit 109
5 incurred in connection with the Eastern Profit
6 matter?
7     A     Yes.
8     Q     In each case these expenses were
9 billed on your American Express card, is that
10 correct?
11     A     Yes.
12     Q     And then you had Georgetown
13 Research pay your AMEX bill directly, is that
14 correct?
15     A     Yes.
16     Q     Now, if you could sort of
17 simultaneously go back to Exhibit 103?
18     A     Okay.
19     Q     What I'm hoping to do is line up
20 the AMEX payments with the payments referenced
21 in Exhibit 103 with the invoices that you
22 submitted in Exhibits 107, 108 and 109.
23          So -- and I can help with some
24 of it, then I have a question for you with one
25 of them, so if you could turn to page -- in

Page 163

MICHAEL WALLER

1
2 Exhibit 103, turn to page 1958?
3     A     Okay.
4     Q     And at the bottom of the page
5 you see there is an AMEX payment of $1,053.79,
6 do you see that?
7     A     Yes.
8     Q     And does that payment correspond
9 with Exhibit 109?
10     A     Yes.
11     Q     All right, then the second bill
12 payment entry on Exhibit 103 page 1958 is an
13 AMEX payment for $6,890.06, do you see that?
14     A     Yes.
15     Q     Does that correspond with
16 Exhibit 108?
17     A     Yes.
18     Q     So then my question for you is
19 does the invoice reimbursement invoice number 1
20 that is Exhibit 107, is that reflected anywhere
21 in Exhibit 103?
22     A     Yeah, it could be the first two
23 items on February 9th, one for $211 and one for
24 $2,068.50 I'm not adding up the exact total but
25 it's a similar total.

Page 164

MICHAEL WALLER

1
2     Q     Do you know why it doesn't add
3 up exactly?
4     A     No, no.
5          MS. CLINE:  Would you mark this.
6          (The above described document was
7     marked Exhibit 110 for identification as
8     of this date.)
9     Q     So we have handed you an exhibit
10 that's been marked as Exhibit 110, we are in
11 the process of retrieving a paper clip for it.
12          But for the record, the Bates
13 stamp Bates range, thank you, is SVUS 1976
14 through 1990.
15          My first question for you
16 Mr. Waller is just whether you can identify the
17 document for us?
18     A     Looks like a list of receipts.
19     Q     Is Exhibit 110 something you put
20 together?
21     A     Yes.
22     Q     And what's the relationship, if
23 any, between Exhibit 110 and 107, 108, 109?
24     A     The relation?
25     Q     Yes.

Page 165

MICHAEL WALLER

1
2     A     I don't know, it's a list of --
3 it's a list of receipts.
4     Q     Just scanning the first page,
5 some of the -- some of the line items on page 1
6 of 110 are the same as some line items on
7 Exhibits 107 through 109, right?
8     A     Right.
9     Q     So, what was the purpose for
10 which you compiled Exhibit 110?
11     A     To create a logical list of
12 receipts.
13     Q     I mean is this totaling all of
14 your receipts?
15     A     I have no idea from just looking
16 at this.
17          You would have to add it up and
18 look, it's my own collection of receipts from
19 my own LLC.
20     Q     And did you use Exhibit 110 as
21 the basis for creating the reimbursement
22 invoices in 107, 108, 109?
23     A     Presumably.
24     Q     And sitting here you don't
25 remember?

42 (Pages 162 - 165)

MICHAEL WALLER

1
2      A    No, I get a bill, a pay the
3  bill.  If it's for one account to another, I
4  will just pay it, then I try to keep order for
5  tax purposes.
6      Q    Did Georgetown Research file tax
7  returns for the year 2018?
8      A    No.
9           It's attached to my Social
10 Security number, it's not an SPU.
11     Q    A pass-through?
12     A    Yes.
13     Q    Did you personally then claim
14 the expenses in 107 through 109 as business
15 expenses on your tax return?
16     A    I don't think my personal tax
17 returns have any relation to this case.
18     Q    I'm trying to understand whether
19 these are business expenses.
20          I asked whether Georgetown
21 Research submitted tax returns, your answer was
22 no.
23          So I'm asking whether there is
24 other evidence that you represented to the IRS
25 that these are business expenses.

MICHAEL WALLER

1
2           So my question is on your
3  personal tax returns, did you report these
4  expenses reflected in Exhibits 107 through 109
5  to the IRS?
6          MR. GREIM:  You know, I'm going
7  to object, I think the question here,
8  the legal question is Strategic Vision's
9  damages.
10         And amounts were paid downstream to
11 the individuals who were paid under the
12 contract.
13         I think drilling down into the
14 taxes of the individuals who draw from the
15 people at Strategic Vision were paid, I
16 think that's a bridge too far, because it
17 doesn't make it more or less likely that
18 Strategic Vision had certain costs that
19 are reimbursable under the fraud theory.
20         MS. CLINE:  Sure it does, I'm
21 just trying to establish whether these
22 are business expenses that -- whether
23 there is additional evidence that these
24 are business expenses that you felt
25 comfortable reporting to the IRS in

MICHAEL WALLER

1
2  addition, just like you felt comfortable
3  submitting them for reimbursement to
4  Georgetown Research which are part of
5  your damages claim in the case against
6  my client.
7           So I am going to repeat the
8  question.  If your counsel instructs you
9  not to answer, we will make yet another
10 record so that we have it and we can take
11 it up with the court as is appropriate.
12     Q    So my question is the business
13 expenses that are reflected in -- the expenses
14 that you say are business expenses that are
15 reflected in Exhibits 107, 108 and 109, did you
16 report them to the IRS in your own personal
17 income taxes as business expenses?
18         MR. GREIM:  We will instruct the
19 witness not to answer because
20 Mr. Waller's personal treatment of these
21 is no concern of Strategic Vision's and
22 it's irrelevant to this case.
23         MS. CLINE:  So you are
24 instructing him not to answer on
25 privileged -- on relevance grounds.

MICHAEL WALLER

1
2           I am asking about evidence relating
3  to the appropriateness of these claimed
4  damages.
5          MR. GREIM:  Yeah, and further
6  it's just harassment of Mr. Waller,
7  getting into his own personal tax
8  matters.
9           He was happy to testify as to what
10 the business expenses of Strategic Vision
11 are, he's here for that purpose, not to
12 talk about his own personal tax returns.
13         MS. CLINE:  Personal questions
14 are harassment.
15     Q    Do you know whether you sought
16 reimbursement --
17         MS. CLINE:  Strike that.
18     Q    Do you have any -- is Strategic
19 Vision claiming any business expenses incurred
20 by you other than those -- including by you,
21 Mr. Waller -- other than those tabulated in
22 Exhibits 107 to 109?
23     A    I can't speak for that, so I
24 can't answer your question.
25     Q    That's a question for Ms.

43 (Pages 166 - 169)

MICHAEL WALLER

1
2 Wallop?
3      A     Yes.
4      Q     I can't remember whether I asked
5 you this question before, so I'm going to ask
6 it again just to be sure.
7           Did you and Mr. Bruno Wu have
8 conversations, did you have any --
9           MS. CLINE:  Strike that, let me
10      start over.
11      Q     Did you have any communications
12 with Mr. Wu or any of his representatives or
13 affiliates about Strategic Vision's fraud
14 allegations in this case?
15      A     No.
16      Q     Did you and -- did you have any
17 communications of any nature about Mr. Wu or
18 any of his representatives regarding the
19 payment of attorneys' fees in this case?
20           MR. GREIM:  And we will instruct
21      the witness not to answer on the same
22      grounds that we outlined earlier.
23           MS. CLINE:  Okay, I just want to
24      make a record about what those grounds
25      are.

MICHAEL WALLER

1
2           We actually have case law that
3 confirms that the identity of a litigation
4 funder is not privileged Cohen v. Cohen
5 2015 U.S. District Lexus 21319, Alfata v.
6 Fen, 1994 U.S. District Lexus 11939.
7           I assume you are not making an
8 argument that it's a privilege assertion,
9 right?
10           MR. GREIM:  I am not waiving the
11      argument, but on independent grounds is
12      that it is not within the notice, it's
13      not the reason that we produced
14      witnesses for another 7 hours of
15      deposition, and it's harassment.
16           It's not relevant to the claims or
17      defenses in this case.
18           MS. CLINE:  So, you are
19      instructing the witness not to answer on
20      relevance grounds?
21           MR. GREIM:  And on harassment
22      grounds, and on the basis that we agreed
23      to do another 7 hours of 30(b)(6) based
24      solely on the topics on Attachment A and
25      the funder appears nowhere on here, it's

MICHAEL WALLER

1
2 completely irrelevant to this case.
3           MS. CLINE:  I mean we will make a
4 record of it later, there is New York
5 law regarding whether one can wander
6 outside the scope of a 30(b)(6) notice
7 and we can take that up with the court
8 later.
9           MR. GREIM:  We have been
10 consistently blocked from discovering
11 things that are actually relevant to the
12 case.
13           MS. CLINE:  We have objected to
14 your questions based when a court has
15 ruled, when a court -- when the court
16 has already ruled that the subject of
17 your questions are irrelevant, then we
18 have drawn a line.
19           But for something like this which
20 there has been no motion practice on it,
21 there is no ruling from the court as to
22 its relevance, we just -- we disagree.
23           MR. GREIM:  The problem is there
24 is an agreement among counsel about what
25 exactly could be inquired, that was the

MICHAEL WALLER

1
2 condition for us making the witness
3 available.
4           We did not make that agreement only
5 to come and have different topics be
6 brought.
7           MS. CLINE:  All right, so we will
8 just make a record for the court.
9           So from your perspective -- so I
10 actually have no further questions of you
11 at this time, subject to further
12 negotiation and dispute resolution with
13 your lawyers.
14           So thanks.
15           THE WITNESS:  Okay.
16           MR. GREIM:  Do you want to take a
17 short break?
18           MS. CLINE:  Do you have any
19 questions?
20           MR. GREIM:  I have no questions
21 for the witness.
22           MS. CLINE:  We can go off.
23           THE VIDEOGRAPHER:  The time is
24 1:39.
25           We are concluded and off the

44 (Pages 170 - 173)

Page 174

MICHAEL WALLER

1    MICHAEL WALLER
2    record.
3         (At this point in the proceedings
4    there was a recess, after which the
5    deposition continued as follows:)
6  J O H N    M I C H A E L    W A L L E R, recalled
7    as a witness, having been previously duly
8    sworn by the Notary Public, was further
9    examined and testified as follows:
10        THE VIDEOGRAPHER:  The time is
11   4:24 p.m. we are back on the record,
12   this is video 3B.
13
14  CONTINUED EXAMINATION BY
15  MS. CLINE:
16
17   Q    Okay, Mr. Waller, welcome back,
18  let's take a look at Exhibit 113, please.
19        I understand this isn't your
20  document, but I am going to use it to ask you
21  some questions.
22        So turn, if you would, to the
23  second page and on the right-hand side there is
24  a column that has a heading that says wires out
25  to GR -- second page, there you are.

Page 175

MICHAEL WALLER

1    MICHAEL WALLER
2    A    1940?
3    Q    Yes, sir.
4         You see at the top there is a
5    heading that says wires out to GR?
6    A    Yes.
7    Q    And is it your understanding
8    that the first wire amount of $50,000 went to
9    someone called or an entity called Hill?
10   A    Yes.
11   Q    And is that Team 1?
12   A    Yes.
13   Q    And then the second entry
14  reflects a $200,000 wire to Psyber Sol, what's
15  Psyber Sol?
16   A    Psyber Solutions is a cutout
17  LLC.
18   Q    Owned by whom?
19   A    Not by me, but I used it as a
20  cutout to pay -- to pay myself.
21   Q    What do you mean used it as a
22  cutout, I don't know what that means?
23   A    As a pass-through.
24   Q    And who is the owner of it?
25   A    That person is not part of this,

Page 176

MICHAEL WALLER

1    MICHAEL WALLER
2    but it answers your question about for whom the
3    money was -- that was money used to pay me.
4    This was an extra layer to protect Mr. Guo from
5    the Chinese tracking or to see where his money
6    was going.
7    Q    So the $200,000 came from
8    Strategic Vision, flowed through Psyber Sol and
9    just went to you personally?
10   A    Exactly.
11   Q    And that was part of your
12   $250,000 earnings or your personal allotment?
13   A    Yes.
14   Q    And on the same page there are
15   two entries with respect to wires to Georgetown
16   Research, do you see those?
17   A    Yes.
18   Q    What was the purpose of those
19   wires?
20   A    Those were for Team 1, the
21   200,000 one was for Team 1, the $25,000 one, if
22   I can look back to the bank account statement.
23   Q    Sure.
24   A    Exhibit 103, was to cover start
25   up costs for beginning the operation.

Page 177

MICHAEL WALLER

1    MICHAEL WALLER
2    Q    So, Team 1 in January received
3    both the $200,000 one and --
4         MS. CLINE:  Well, strike that, we
5         talked about this earlier but I have
6         lost track.
7    Q    The $200,000 that went to
8    Georgetown Research and then out to Team 1, how
9    was that transferred to Team 1?
10   A    Either wire or other electronic
11   transfer.
12   Q    Okay, so in January Team 1
13   received two transfers from Strategic Vision,
14   one for $50,000 and one for $200,000, is that
15   correct?
16   A    Yes.
17   Q    And are you aware of a written
18   invoice that related to the Hill payment?
19   A    No, that's the one that was paid
20   out of Strategic Vision?
21   Q    Yes.
22   A    No.
23   Q    So you have never seen an
24   invoice from Hill?
25   A    No.

45 (Pages 174 - 177)

MICHAEL WALLER

1
2      I verbally talked about it with
3  him and it was a verbal approval from my side
4  with Ms. Wallop.
5      Q      Did the $200,000 from Georgetown
6  Research also end up with Hill?
7      A      Yes.
8      Q      Is Hill Team 1?
9      A      He's the leader of Team 1.
10     Q      Then if you would go to page --
11 1945 in Exhibit 113.
12     A      Yes.
13     Q      Okay, so the first entry is one
14 for over $17,000.
15            Is it your understanding that
16 that wire went to Fletcher?
17     A      Yes.
18     Q      And then there is a second entry
19 for a wire for $15,000 to Georgetown Research,
20 right?
21     A      Yes.
22     Q      And what was the purpose of that
23 wire?
24     A      That is shown in Exhibit 103,
25 that was a payment to me, it shows it on page

MICHAEL WALLER

1
2  1960.
3      Q      So was that also part of your
4  $250,000 personal allotment?
5      A      Yes.  Well, when I said
6  approximate earlier in my testimony it was
7  approximate from January/February.
8      Q      And then back on page -- Exhibit
9  113, page 1946, there is an entry there that
10 says, "50,000" do you see that?
11     A      Yes.
12     Q      Then the initials OE, do you
13 know who that is?
14     A      Yes, and I was mistaken in my
15 earlier I don't know if it's testimony with you
16 or some other process about Oceanic Advisors,
17 it shouldn't be OE, it should be OA, that was
18 an LLC that I had and a bank account that I had
19 that I didn't use.
20            I had testified before that I
21 didn't have anything on that because I had
22 forgotten that was there.
23            I didn't remember I had used
24 that account, so that was what that was for,
25 that was payment to me from January/February.

MICHAEL WALLER

1
2      Q      What do you mean from
3  January/February?
4      A      From the work that I performed
5  in January and February of 2017.
6      Q      Okay, so you were getting paid
7  in June for work that you had done in
8  January/February?
9      A      Right.
10     Q      In June of 2018 did Strategic
11 Vision sort of do a -- renew its calculation of
12 profits or earnings that were to be split
13 between you and Ms. Wallop?
14     A      When I said there was residuals
15 I said I would -- I invoiced for a $50,000
16 residual.
17     Q      Well, let me go at it this way
18 there came a point in time at which Strategic
19 Vision decided that you and Ms. Wallop would
20 each get $250,000, correct?
21     A      Yes.
22     Q      Do you remember when that took
23 place?
24     A      That was in the initiation,
25 around the initiation of the contract.

MICHAEL WALLER

1
2      Q      Okay.  And then did there come a
3  time subsequently when Strategic Vision decided
4  that there was enough money for each of you to
5  get a little bit more?
6      A      Yes.
7      Q      And that happened in June?
8      A      That happened in -- no that
9  happened in late February.
10     Q      How much more did Strategic
11 Vision decide you would each get?
12     A      I didn't ask her what she got, I
13 just said I would take $50,000.
14            Maybe that extra $15, I don't
15 recall, but it was those two payments.
16     Q      Okay, so just so in terms of
17 money that went to you personally, there was a
18 $200,000 that went through Psyber Solutions,
19 right?
20     A      Yes.
21     Q      Then there was a $15,000 wire
22 that went to Georgetown Research, right?
23     A      Yes.
24     Q      And then there was a $50,000
25 wire that went to Oceanic advisors, correct?

46 (Pages 178 - 181)

Page 182

MICHAEL WALLER

1
2     A     Yes.
3     Q     Did any other money come from
4  Strategic Vision to you, either directly or
5  indirectly, but personally for a personal
6  payment?
7     A     No.
8     Q     So, the total amount of your
9  personal payment ended up being $275,000, is
10  that correct?
11     A     Is that how it adds up?
12     Q     Well, let's just do it again.
13           So there is $200,000 from Psyber
14  Solutions, right, $50,000 from Oceanic
15  advisors, so we are at $250,000, correct?
16     A     Yes.  $265, that sounds better.
17     Q     $265, is that consistent with
18  your recollection?
19     A     Right, that's why I had
20  corrected before when I said approximately
21  $250, that was the approximation.
22     Q     And do you know whether Ms.
23  Wallop -- do you know what her ultimate
24  personal allocation ended up being?
25     A     I do not.

Page 183

MICHAEL WALLER

1
2     Q     Did you ever audit the books of
3  Strategic Vision to see whether there, in fact,
4  had been even more money left over?
5     A     No.
6     Q     Okay, so just so we are clear,
7  we talked about I think there were three wires
8  to -- let me go through, hang on.
9           So I just want to total
10  everything up to make sure we are all on the
11  same page.
12           So there were three wires from
13  Strategic Vision to Georgetown Research total,
14  correct?
15     A     Yes.
16     Q     There was one wire from
17  Strategic Vision to Psyber Solutions, correct?
18     A     Yes.
19     Q     And there was another wire from
20  Strategic Vision to Oceanic Advisors, correct?
21     A     Yes.
22     Q     Other than those wires I just
23  mentioned, were there any other wires from
24  Strategic Vision to entities owned or
25  controlled by you?

Page 184

MICHAEL WALLER

1
2     A     No.
3     Q     And other than the $265,000 we
4  just discussed, did you personally take any
5  additional compensation from Strategic Vision?
6     A     No.
7     Q     And other than the wires and the
8  business expenses that are recorded on Exhibit
9  113, are you aware of any business expenditures
10  made by Strategic Vision in connection with the
11  Eastern Profit transaction?
12     A     No.
13           MS. CLINE:  I have no further
14  questions.
15           MR. GREIM:  We don't have any
16  questions for him either.
17           MS. CLINE:  We will just, for the
18  record, we have had a number of disputes
19  today, so we will circle back and meet
20  and confer about them and see if there
21  is any additional action to take with
22  the court or otherwise.
23           MR. GREIM:  Very well, and we
24  will read and sign, too.
25           MS. CLINE:  All right.  Thank

Page 185

MICHAEL WALLER

1
2  you.
3           THE VIDEOGRAPHER:  The time is
4  4:37 p.m.  We have concluded and are off
5  the record.

47 (Pages 182 - 185)

Page 186

```
1
2        C E R T I F I C A T E
3        I, the undersigned, a Certified
     Shorthand Reporter of the State of New
     York, do hereby certify:
4        That the foregoing proceedings were
5    taken before me at the time and place
     herein set forth; that any witnesses in
     the foregoing proceedings, prior to
6    testifying, were duly sworn; that a record
     of the proceedings was made by me using
7    machine shorthand which was thereafter
     transcribed under my direction;
8        That the foregoing transcript is a
     true record of the testimony given.
9        Further, that if the foregoing
     pertains to the original transcript of a
10   deposition in a federal case before
     completion of the proceedings, review of
11   the transcript [x ] was [ ] was not
     requested.
12
13       I further certify I am neither
     financially interested in the action nor a
     relative or employee of any attorney or
14   party to this action.
         IN WITNESS WHEREOF, I have this
15   date subscribed my name.
16       Dated: 12/4/19
17
18
19
20
21       Stephen J. Moore
22       RPR, CRR
23
24
25
```

Page 187

```
1
2    DECLARATION UNDER PENALTY OF PERJURY
3        Case Name: EASTERN v. STRATEGIC
4        Date of Deposition: November 19,
5    2019
6
7        I, MICHAEL WALLER, hereby certify
8        Under penalty of perjury under the
9    laws of the State of New York that the
10   foregoing is true and correct.
11       Executed this _____ day of
12   _____, 2019, at
13       _____.
14
15
16   _____
17
18   MICHAEL WALLER
19
20
21
22
23
24
25
```

Page 188

```
1
2        DEPOSITION ERRATA SHEET
3    Case Name: EASTERN v. STRATEGIC.
4    Name of Witness: MICHAEL WALLER
5    Date of Deposition: November 19,
6    2019
7    Reason Codes:  1. To clarify the
8    record.
9    2. To conform to the facts.
10   3. To correct transcription errors.
11   Page _____ Line _____ Reason _____
         From _____ to _____
12   Page _____ Line _____ Reason _____
         From _____ to _____
13   Page _____ Line _____ Reason _____
         From _____ to _____
14   Page _____ Line _____ Reason _____
         From _____ to _____
15   Page _____ Line _____ Reason _____
         From _____ to _____
16   Page _____ Line _____ Reason _____
         From _____ to _____
17   Page _____ Line _____ Reason _____
         From _____ to _____
18   Page _____ Line _____ Reason _____
         From _____ to _____
19   Page _____ Line _____ Reason _____
         From _____ to _____
20   Page _____ Line _____ Reason _____
         From _____ to _____
21   Page _____ Line _____ Reason _____
         From _____ to _____
22   Page _____ Line _____ Reason _____
         From _____ to _____
23   Page _____ Line _____ Reason _____
         From _____ to _____
24   Page _____ Line _____ Reason _____
         From _____ to _____
25
```

Page 189

```
1
2        DEPOSITION ERRATA SHEET
3    Page _____ Line _____ Reason _____
         From _____ to _____
4    Page _____ Line _____ Reason _____
         From _____ to _____
5    Page _____ Line _____ Reason _____
         From _____ to _____
6    Page _____ Line _____ Reason _____
         From _____ to _____
7    Page _____ Line _____ Reason _____
         From _____ to _____
8    Page _____ Line _____ Reason _____
         From _____ to _____
9    Page _____ Line _____ Reason _____
         From _____ to _____
10   Page _____ Line _____ Reason _____
         From _____ to _____
11   Page _____ Line _____ Reason _____
         From _____ to _____
12   Page _____ Line _____ Reason _____
         From _____ to _____
13   Page _____ Line _____ Reason _____
         From _____ to _____
14   Page _____ Line _____ Reason _____
         From _____ to _____
15   Page _____ Line _____ Reason _____
         From _____ to _____
16   Page _____ Line _____ Reason _____
         From _____ to _____
17       _____ Subject to the above
18   changes, I certify that the transcript is
19   true and correct
20       _____ No changes have been
21   made. I certify that the transcript  is
22   true and correct.
23
24   _____
25       MICHAEL WALLER
```

48 (Pages 186 - 189)

**[001 - 2017]**                                                    Page 1

## 0

**001**   74:5
**001939**   117:3
**034**   73:25

## 1

**1**   3:12 4:15 66:13
66:14 72:18,20,22
74:6,9,17,20 75:25
76:8,12,18,23,24
77:7,10,18,22 78:6
79:8,16 80:3 81:9
86:21 89:9 91:17
93:5,23 99:24
112:24 115:19
117:25 118:25
119:14 120:9,12
120:24 121:7
122:6 123:10,11
123:13,15 124:4
124:10,15,25
125:5,20 126:2,19
128:25 129:8,9,11
131:3,5,8,11,15,25
132:11,16 133:15
133:19 134:16,18
134:22 135:10,13
135:20,24 137:4
137:13 163:19
165:5 175:11
176:20,21 177:2,8
177:9,12 178:8,9
188:7
**1's**   74:19 76:5 77:2
**1,053.79**   163:5
**1/25**   124:2 127:21
**100,000**   40:21,25
105:14
**101**   3:6 11:10,12
11:15,21 25:24

**102**   3:8 55:21,23
56:2 57:12
**103**   3:9 70:25 71:3
71:6,10,17 73:6
80:10 88:9 162:17
162:21 163:2,12
163:21 176:24
178:24
**104**   3:12 75:19,23
75:24 76:13,15,18
76:22 77:9 79:25
135:16
**105**   3:14,14 105:4
105:6 109:13
**106**   3:17 121:15,18
122:11
**107**   3:18 160:13,16
160:21 161:7
162:22 163:20
164:23 165:7,22
166:14 167:4
168:15 169:22
**108**   3:20 160:13,17
161:19,23 162:22
163:16 164:23
165:22 168:15
**109**   3:22 160:14,18
160:21 162:2,4,22
163:9 164:23
165:7,22 166:14
167:4 168:15
169:22
**10:00**   1:13
**10:43**   86:21
**10th**   138:17
**11**   3:6 29:3,4,8
89:17 98:9
**110**   3:24 164:7,10
164:19,23 165:6
165:10,20

**1100**   2:7
**113**   174:18 178:11
179:9 184:9
**11939**   171:6
**11:08**   87:3
**12/4/19**   186:16
**121**   3:17
**12:30**   160:2
**1313**   2:17
**14**   3:6
**15**   57:22 58:2,11
113:3 129:14,14
129:17 131:19
181:14
**15,000**   83:14 85:2
85:6 88:10,21
178:19 181:21
**16**   3:17
**160**   3:18,20,22
**164**   3:24
**16th**   71:25 77:15
86:15 88:15 89:12
**17**   33:23 34:3
127:14
**17,000**   178:14
**1788**   123:25 127:5
**18**   1:8 4:21 26:2
30:2
**19**   1:13 4:4 187:4
188:5
**1940**   175:2
**1945**   178:11
**1946**   179:9
**1956**   73:6 74:8
76:11
**1957**   80:10
**1958**   81:19 163:2
163:12
**1959**   82:15
**1960**   88:9 179:2

**1961**   3:19 160:17
**1966**   3:20 160:17
**1971**   3:21 160:18
**1972**   3:22 160:18
**1975**   3:23 160:19
**1976**   3:25 164:13
**1989**   138:6
**19899**   2:18
**1990**   3:25 164:14
**1994**   171:6
**1:22**   160:8
**1:39**   173:24
**1st**   88:8,20

## 2

**2**   73:5 81:2,5,15
87:4 101:10,11,16
102:5 105:21
111:18 112:8
124:23 134:19,22
160:2 188:9
**2,068.50**   163:24
**20,000**   40:23
**200,000**   3:13 71:22
72:5 73:8 74:19
74:23 75:2 76:2,9
77:22 78:7 81:8
129:19,23 134:2
135:14,20 136:8
136:21,22 175:14
176:7,21 177:3,7
177:14 178:5
181:18 182:13
**2004**   139:20
**2014**   139:23
**2015**   171:5
**2017**   12:25 23:8
26:17,23 27:17
32:3,15,25 34:6,8
34:13,14,15,19,24
35:4,8,12 36:8,18
36:20,24 38:12

**[2017 - addison]**                                                   Page 2

69:19 79:23 141:7
141:9,10 143:15
143:25 158:11
180:5
**2018**   3:11,16 28:7
71:15 79:23 80:2
80:13 84:2 89:22
101:7 105:11
115:14 141:24
166:7 180:10
**2019**   1:13 4:4
23:15 36:9 50:9
69:19 187:5,12
188:6
**20932**   186:20
**21**   3:12 26:16,23
27:12 141:7
**211**   163:23
**21319**   171:5
**2185**   1:8 4:21
**21st**   143:25
**22**   3:18,20,22
**23**   91:11
**25**   3:8 25:23
**25,000**   71:21
176:21
**250**   182:21
**250,000**   67:2,4
83:20 85:9,11
89:2 134:3 135:22
135:25 176:12
179:4 180:20
182:15
**25th**   84:2 127:17
**26**   28:7 32:25
**265**   182:16,17
**265,000**   184:3
**26th**   34:7 114:10
114:15,16 139:8
**275,000**   182:9

**28th**   80:12
**2nd**   89:6,10

**3**

**3**   43:20 160:10
188:10
**3,000**   81:12
**30**   1:18 5:11 45:22
90:23 96:14
127:25 128:14,17
171:23 172:6
**30th**   35:8 115:13
**31**   83:11 117:12
**36**   117:13 137:19
**3b**   174:12

**4**

**40**   12:16
**405**   1:14 4:23
**41**   12:17 151:23
**464.30**   161:13
**4:24**   174:11
**4:37**   185:4

**5**

**5**   3:3,9,14 12:24
23:8 32:3 33:23
91:14 94:8
**5,400**   81:16 105:18
**50,000**   175:8
177:14 179:10
180:15 181:13,24
182:14
**50/50**   65:12 70:2
**51**   137:19,21 138:4
**5100**   2:17
**52**   139:9
**53**   139:18,19 141:4
141:12
**54**   142:25 144:16
**55**   3:8
**5th**   34:18

**6**

**6**   1:18 5:11 45:22
77:14 80:2 89:22
96:14 171:23
172:6
**6,890.06**   163:13
**62**   12:8,10,14,16
12:21,23 151:23
**63**   12:10,21,22,22
13:4 19:22 20:11
20:21 21:14 22:25
**64105**   2:8
**65**   3:19 160:17

**7**

**7**   85:13,21 171:14
171:23
**71**   3:9
**75**   3:12
**7th**   85:16

**8**

**8**   3:24 141:18
**8,000**   82:10
**89**   129:15

**9**

**9:09**   4:4
**9th**   163:23

**a**

**a.m.**   1:13 4:4
86:21 87:3
**ability**   130:10
**able**   38:11 73:13
129:4 144:16,20
**abroad**   128:25
129:2 130:8
**absence**   8:16
**aca**   66:14,15,15
91:22 93:24 94:4
**accept**   46:18
100:24

**accomplished**
129:23
**account**   72:22
73:25 74:5 80:12
82:22 88:13 94:17
166:3 176:22
179:18,24
**accounting**   86:7
**accounts**   73:12,16
125:14 145:5
**accuracy**   12:2
**accurate**   63:23,25
**accurately**   56:20
**accused**   32:22
**accusing**   22:22
**ach**   72:24 136:23
**acknowledge**
108:13
**acknowledged**
33:11
**acquisition**   144:12
**act**   7:19
**action**   149:10
184:21 186:13,14
**active**   13:16
**actively**   126:17
**activist**   19:20 49:5
**activists**   33:16
**activities**   29:14
121:3 142:5
**activity**   31:2 32:24
33:8,13,19 78:18
88:8 140:18,20
**actual**   102:23
**adam**   104:13
109:22
**add**   111:22 140:8
164:2 165:17
**adding**   163:24
**addison**   110:14

addition   168:2
additional   35:17
  167:23 184:5,21
addresses   100:22
adds   182:11
administer   5:5
  68:8,24 69:3
administering
  68:12
admissible   151:4,6
admission   148:25
advance   93:16
  118:21 144:12
advice   151:13,15
advised   106:7
advisors   67:10,11
  67:13,17 68:11,16
  179:16 181:25
  182:15 183:20
affection   37:5
affiliates   170:13
agency   33:6
aggregate   109:2
ago   29:17 54:25
  59:25 123:9
agree   4:14 21:3
  30:5,7 60:19
  62:18 64:24 73:24
  92:25 93:19 97:5
  146:20
agreed   91:15,24
  94:17 134:5
  135:12 171:22
agreeing   96:8
agreement   7:22
  8:4 28:15,24 29:4
  29:11,12,19 30:18
  30:20,23,24 31:4,6
  31:10,14 57:18
  63:21 64:2 65:11
  67:14,25 69:7

70:5 83:24 86:4
  89:18 91:3,15
  94:9 96:9 108:9
  111:18 112:8
  130:22 131:9
  135:9,24 172:24
  173:4
agreements   97:12
  135:4
ahead   12:9 26:2
  89:5 111:3 149:25
air   100:12,21
aircraft   103:7
airport   102:25
  103:4
alarmed   119:25
alarms   126:2
alfata   171:5
allegation   22:4,7
  22:25 47:13 62:23
  63:7 126:17 140:4
  141:22 143:22
  144:25
allegations   9:25
  10:11,14 11:5
  12:2,20 14:3,19
  18:21,24,25 19:22
  20:4,9,11,13,21,22
  21:11,14 22:13
  24:9 40:4,15
  41:23 46:15 47:7
  48:10,13,15,20
  51:8,20 52:8,25
  53:12 54:7,16,18
  59:8,9,11 62:7,10
  139:12 142:11
  145:13 146:7
  147:5 150:9,23
  151:18 152:5,10
  153:6 154:20
  158:24 170:14

alleged   21:20
  118:4
alleges   60:20
allied   3:14 80:22
  105:10
allocation   182:24
allotment   176:12
  179:4
allow   61:16
  149:11 150:2
allowed   149:25
amended   3:6
  11:18 16:21 18:6
america   36:17
  141:9
american   80:16,18
  80:20 81:12,20
  82:3,6,21 83:4
  97:23 162:9
amex   85:12
  162:13,20 163:5
  163:13
amount   64:17
  161:13 175:8
  182:8
amounted   128:24
amounts   167:10
analysis   51:17
  109:3
analysts   109:8
  110:4
analytical   58:9
  113:16
angeles   102:24
announced   23:11
announcing   32:4,6
  35:23
answer   3:7 11:19
  20:18 21:5 29:22
  41:22 43:14 44:18
  44:19 45:17 46:5

46:8 47:19 48:11
  58:14 59:15 60:4
  60:7,15 61:2,19
  62:9 68:20,21
  88:6 97:8,11 99:5
  99:13,14,18 112:5
  116:20 145:2
  148:9,11,12,13,16
  148:17,21 149:18
  151:13 154:14,16
  159:18,19 166:21
  168:9,19,24
  169:24 170:21
  171:19
answered   23:5
  85:8 99:16
answering   23:6
  47:3
answers   176:2
anti   12:25
anybody   37:14
  153:13 156:17
anyone's   82:6
anyway   116:14,17
apologies   12:17
apologize   38:20
apparently   109:5
appear   6:17 76:5
appearances   5:4
appeared   34:22,25
  118:8,16,21
appears   29:6
  171:25
apply   38:11
appropriate   59:17
  149:8 168:11
appropriateness
  169:3
approval   178:3
approximate
  179:6,7

**approximately**
35:8 81:12,16
82:10 85:11
105:19 182:20
**approximation**
182:21
**april** 36:17 82:18
139:7 141:9
**area** 24:2,18 25:13
79:17
**areas** 116:4
**argument** 45:21
99:18 110:25
111:11 171:8,11
**argumentative**
20:25 23:5
**arkin** 51:24
**arranged** 145:9,9
**arrangement**
78:22
**arranging** 78:13
**arrest** 139:22
**arrested** 138:6
**arrivals** 144:18
**arrived** 32:5
**article** 36:20
141:25 143:15
**articles** 153:14
**articulated** 59:23
**aside** 57:12 77:5
**asked** 23:5 29:17
42:6,10,21,24 44:8
44:10,13,23 46:4
61:23 103:14
146:15,15 150:15
155:16 166:20
170:4
**asking** 19:2 22:24
30:11 41:13 47:12
65:20 87:6 92:8
92:11,21 166:23

169:2
**asog** 101:11
102:17 103:19
104:3,6,9 105:11
106:13,17,19
107:8,22 109:12
111:12,16
**asog's** 104:11
**aspects** 69:4,5,14
**asserted** 149:10
**assertion** 171:8
**assess** 58:13
**assist** 108:17
**assume** 70:5 109:8
171:7
**assumes** 62:25
**assuming** 62:20
**asterisk** 105:22
127:21
**asylum** 60:14
**attached** 166:9
**attaches** 60:12
**attachment** 61:22
171:24
**attempt** 100:25
**attend** 41:25
157:16
**attention** 26:2
98:10 137:20
**attorney** 186:13
**attorneys** 2:5,15
148:19,22,24
149:11,16 150:3
170:19
**audio** 4:12 12:23
21:22 23:12 32:3
33:22 34:20
158:11
**audit** 183:2
**august** 32:25 34:6
34:7 35:4,8,12

**authenticity** 23:9
**authorities** 106:22
107:3
**authority** 8:17,18
**authorization** 6:23
**authorized** 6:6,15
6:17 7:19 8:19
**authorizing** 8:9,13
**authors** 153:12
**available** 118:23
173:3
**avenue** 1:14 4:23
**averaged** 153:19
**avoids** 130:5
**aware** 40:12,17
50:18 77:18 95:3
148:23 177:17
184:9

**b**

**b** 1:18 3:4 5:11
13:23 45:22 96:14
100:5 111:18
136:14 171:23
172:6
**back** 20:17,18
32:20 40:22 43:12
59:19,21 68:19,21
85:10 87:3 97:7
97:10 102:11
103:9 111:7
115:19 117:10
122:8 126:5 133:2
133:10 160:9
162:17 174:11,17
176:22 179:8
184:19
**background** 49:19
**ballpark** 64:16
66:20
**bank** 3:9 71:13
72:14 80:12 83:10

84:25 176:22
179:18
**based** 20:22 22:13
24:4 28:16 44:18
45:21 47:6 56:22
59:22,24 95:18
134:15 143:15
158:4 159:20
171:23 172:14
**basic** 15:3 95:24
112:24 113:4
119:4
**basis** 19:10 20:7
20:10 22:25 37:20
38:9,17 40:3 43:4
46:7 48:2,4,19
52:7,25 54:6,16,18
60:6 91:25 92:16
93:2 126:16
139:12 140:3
141:21 142:10
143:21 144:24
145:13 150:8,23
165:21 171:22
**bastards** 23:10
158:18
**bates** 3:18,20,22
3:24 73:6 80:10
116:25 160:16
164:12,13
**beacon** 36:19
141:25
**bear** 111:21
**bears** 160:16
**began** 34:13
109:23
**beginning** 9:14
132:7 139:19
145:8 176:25
**beginnings** 37:16

begun 32:5
behalf 1:18 6:7,18
  89:22 106:16
  110:5
beijing 37:18
  144:10
belief 143:2,18
believe 11:17 36:9
  51:3,6 74:6 76:6
  81:25 85:24 89:4
  122:12 126:25
  137:5,12
best 66:23 77:25
better 55:12 73:20
  159:3 182:16
beyond 41:10 45:4
  45:5,14,22 46:10
  49:2 58:19,23
  62:2 78:7 148:6
big 110:24 125:8
bill 36:18 38:15
  82:6 83:7 85:21
  141:10,24 143:23
  145:2,16 146:15
  146:19,24 162:13
  163:11 166:2,3
billed 162:9
billionaire 158:9
bills 84:20
birthday 138:17
bit 119:7 155:2
  181:5
blackmailed 144:9
blocked 172:10
blog 152:24
blur 156:8
bonus 93:14,16
books 183:2
bother 114:8
bottom 98:11
  106:3 117:2 163:4

bought 143:19
bound 122:11
boxun 13:23
  153:14
boxun.com 13:21
  152:22 153:22
brainstorming
  123:2
breach 120:3
  125:2 126:24
breaches 117:18
  118:3 119:5,9,11
  120:17
break 18:17 86:19
  111:6 119:6
  173:17
breaking 97:20,22
bridge 167:16
brief 155:12
bring 133:2
  156:17
brought 53:16
  130:13 173:6
bruno 147:16
  170:7
building 37:15
built 144:8
bullet 98:12 106:4
bullets 115:22
bureau 141:18
business 36:13
  70:7 82:10 84:21
  85:15 86:12 92:9
  96:6 98:22 99:22
  144:18,21 166:14
  166:19,25 167:22
  167:24 168:12,14
  168:17 169:10,19
  184:8,9
buying 130:11

c

c 2:2 5:18 52:10
  112:7 174:6 186:1
  186:1
calculation 64:5
  64:10,12 180:11
call 25:9 29:3 31:6
  81:11 93:17 96:20
  128:6
called 5:19 6:18,20
  32:12 36:14 57:17
  90:18 93:17
  127:24 128:3,4,8
  128:11 175:9,9
calling 32:8 41:7
  41:11 152:16
calls 8:20 30:19
  92:4
camp 121:8,9
campaign 33:15
  34:11 35:15
  158:20
cancelled 161:15
capacity 44:11
  63:19
capital 66:14,15
  66:15 91:22 93:24
  94:5 124:5
captured 28:23
  53:8
card 162:9
care 112:2 116:13
careful 114:21
case 1:8 4:21
  11:19 14:12,13,14
  14:15,22 15:15,15
  17:23 18:2,15,16
  18:22 19:2,5,12,25
  20:5,6,10 28:15
  29:5 31:21 41:9
  41:16,21 42:25

43:8 44:17,25
  45:13 46:22 47:7
  51:23 53:2 54:7
  54:16,18 60:14,20
  85:22 86:13 89:14
  104:3,7 130:7
  148:8,19,25
  149:13,16 150:4,5
  150:9 154:5 162:8
  166:17 168:5,22
  170:14,19 171:2
  171:17 172:2,12
  186:10 187:3
  188:3
cases 20:12 22:16
  22:18 54:8,9
cash 72:11 73:2
  130:12
catch 149:5
caught 125:9,14
cause 91:6 97:22
  145:19,23 146:17
  149:10
causing 111:3
cautious 125:20
caveat 154:17
ccp 97:18
cell 4:9
cellular 4:7
ceo 109:23 154:4
certain 69:4 78:21
  97:25 113:2 127:9
  142:21 167:18
certainly 110:22
certified 1:22
  186:2
certify 186:3,12
  187:7 189:18,21
cfo 109:23
chance 123:23

change   84:16
changed   161:16
changes   189:18,20
characters   158:13
check   85:11
checking   73:12,15
  73:16,17 74:5
  88:8
child   57:4
children   32:20
  97:15
chimed   157:24
china   31:3 32:10
  32:20 36:3 55:19
  144:22 153:2,3
  158:9
china's   108:15
chinese   10:24 15:6
  15:7,10,19 16:4
  19:19 28:18,20
  29:14 31:3,19
  32:16 33:16 35:10
  35:24 36:4,13
  39:8,14,16 41:5
  49:4,20,21,22,23
  56:9 57:3,8 58:12
  58:17 69:9 78:11
  78:17 95:11 97:13
  97:20,22 108:17
  136:11 142:7,17
  145:25 147:11
  152:23 158:16
  176:5
chose   93:16
church   17:8
circle   184:19
circumstances
  22:19
cisco   153:25 154:7
  154:19,20

cities   127:6
city   2:8 24:2,18
  25:13 90:5
claim   9:4,12 11:6
  19:5,11 96:13
  146:8,25 149:3
  158:25 166:13
  168:5
claimed   140:11
  169:3
claiming   58:16
  169:19
claims   10:19 55:2
  138:4,5 171:16
clarification   5:9
clarify   12:15
  15:22 33:20
  157:25 188:7
clause   149:6
clean   138:2
clear   9:20 45:19
  48:12,23 60:5
  62:5,15 99:6
  104:24 183:6
client   91:16 94:22
  104:11 106:7
  107:23 109:9
  111:4 113:19,20
  118:10,11,13
  128:4 131:17
  132:8,9 133:10
  168:6
client's   121:9
clients   130:6
cline   2:20 3:3 5:6
  5:7,24 10:12 11:9
  20:16 30:14 40:8
  42:14 43:9 44:5
  45:18 46:6 55:20
  59:5 60:5 61:6
  62:4 68:19 70:24

75:16 86:18 95:15
  96:20 97:7 101:15
  104:25 112:3
  115:17 121:13
  130:20 135:8
  144:18 146:10
  149:2,17 159:23
  160:11 164:5
  167:20 168:23
  169:13,17 170:9
  170:23 171:18
  172:3,13 173:7,18
  173:22 174:15
  177:4 184:13,17
  184:25
clip   164:11
close   39:4 77:12
  114:3
closest   43:18
clue   140:10
code   115:11,15
  116:3,9,23 127:15
codes   127:8 188:7
cohen   171:4,4
collaborating
  107:2
colleague   66:24
collect   109:2 113:7
collected   102:3
collection   165:18
color   116:23
column   174:24
combination
  122:22
combined   24:20
come   7:4 38:6
  43:18 57:24,25
  58:10 87:22
  121:24 133:25
  134:4 136:14
  173:5 181:2 182:3

comes   12:23
  141:23
comfortable   66:3
  167:25 168:2
coming   66:17
  118:6
commentary
  153:2,3
commented
  138:16 144:4
comments   36:3
  112:5
commercial
  100:22
committing   22:23
common   109:4
communication
  120:15
communications
  14:2,6,8,10 18:20
  19:7,9,10 20:3,8
  40:2 45:14 51:19
  54:5,12 60:13,23
  61:10,25 62:10,16
  62:18 147:23
  149:21 170:11,17
communist   10:25
  12:25 28:18 29:15
  31:3,19 32:13,16
  33:2,12 35:24
  36:4 38:6 49:22
  49:24 55:19 56:10
  56:24 57:3,8 58:2
  58:12 97:13,21
  140:12,15 141:2
  142:7,16 145:21
  158:16
company   6:10
  9:15 69:11
comparison   134:8

compensating
  87:10,13,19
compensation
  184:5
compile  111:17
compiled  165:10
complaint  10:15
  47:14 59:11
  150:24 151:9,24
  153:6 154:21
complete  88:6
completely  172:2
completion  112:4
  186:10
complex  37:11
compromise  120:2
  125:11
compromised
  118:14 121:2
compromising
  37:13 95:25
  125:21
computer  75:5,6,9
  75:9 78:2,2
  120:19 130:9
conceal  95:10
concept  30:8
  107:18 130:23
  131:4
concern  168:21
concerned  102:2
concerning  102:24
concerns  102:9
conclude  8:18
concluded  173:25
  185:4
conclusion  8:21,23
  30:20 41:11,12,14
  57:25 92:5,7
conclusions  47:23
  48:2,4,16 54:10

condition  173:2
confer  184:20
confidential  120:5
  122:20 124:24
confidentiality
  60:12
confirm  25:21
  52:5 62:23 63:3
  87:6,7 161:8
confirming  63:6
confirms  171:3
conform  188:9
confused  64:23
  126:7
connected  97:16
  119:17
connection  66:11
  67:14 77:13
  144:17 153:15,23
  161:10,24 162:5
  184:10
consent  8:9
consist  98:21
  100:10 112:12
consistent  111:17
  123:7 182:17
consistently
  172:10
constantly  133:10
constitute  64:20
consult  146:6,12
  154:18,19
contact  137:14
contacted  128:9
  128:12
contacts  103:11
  145:24
contended  39:15
  39:19
contention  43:20

contentions  59:2
  62:17
continue  4:13
  64:20
continued  86:25
  160:6 174:5,14
continues  37:4
continuing  138:3
continuity  130:5
contract  63:14,15
  63:22 64:6,14
  65:7 66:12,18,22
  68:8,14 69:2,4
  78:13 79:21 84:12
  84:15,18,23 85:17
  85:19 89:21,25
  90:9,14,23 91:10
  92:2,16 93:3,13
  95:4,17 96:3,24
  97:2 98:3 115:20
  128:18 129:8,12
  131:5 133:16,21
  134:9,21 135:3,6
  135:24 167:12
  180:25
contracted  131:3
contractor  91:16
  94:23
contracts  134:20
contractual
  134:23,24
contributed  47:13
controlled  95:8
  183:25
conversation  9:19
  16:17 39:22 49:13
  49:17 53:11
  127:16 147:8,10
  149:14 151:17
  152:4 154:24
  155:7

conversations  4:7
  18:19 46:14 51:7
  52:23 53:14 54:15
  145:7,12,12 147:4
  154:6,12 170:8
conversely  107:2
convert  145:19
coo  109:24
coordinate  81:22
copies  106:13
copy  73:20 103:19
  111:15 124:16
  131:9 142:18
corporation  2:6
  4:18 88:22
corporaton  1:5
correct  13:10
  16:22 18:12,13
  20:23 31:22,23
  33:24,25 40:18
  44:9,15 46:3,17
  50:19 52:4 53:19
  60:21,22 63:8,9
  64:18 67:8 69:21
  70:16 71:19,22
  72:2,5 73:22 74:2
  77:10,19,20,23,24
  78:4 80:13 81:2,5
  81:9,13,24 82:19
  83:7 85:3,4 86:10
  87:9 89:8,11 90:3
  90:10 91:3,7,8,12
  91:21 92:16,24
  93:6,10,21,25 94:6
  96:3,4 98:3,6,7,17
  99:12 105:15,16
  110:20,23,24
  111:13 113:14
  115:7 117:5,9
  123:10 126:19
  135:10,11 136:20

136:24,25 148:20
156:12 161:5
162:10,14 177:15
180:20 181:25
182:10,15 183:14
183:17,20 187:10
188:10 189:19,22
**corrected**   104:16
182:20
**correction**   25:18
**correctly**   107:14
152:14 157:23
**correspond**   81:23
163:8,15
**corroborate**   21:7
**corroborated**
22:19
**cost**   149:6
**costs**   66:21 130:16
130:16 167:18
176:25
**counsel**   4:16 5:3
9:5 10:2 21:3
44:18 59:25
149:23 168:8
172:24
**counsel's**   151:13
151:15 159:20
**counterclaim**   1:6
1:11 9:22,24 10:2
10:16 11:6 16:22
18:6 30:3 49:10
61:8 96:13 117:11
137:18 145:14
146:13 147:6
151:19,24 152:5
154:23 155:18
157:5 158:6 159:7
159:16
**counterclaims**   3:7
11:19 147:25

**counterintellige...**
108:15
**counterterrorism**
106:24 107:15
**countries**   38:6
117:17 130:12
**country**   32:10
121:3 130:13
**couple**   27:2 33:20
35:7 141:12
**course**   28:25
29:19 131:20
158:21
**court**   1:2 4:20,25
5:4 32:22 44:6
49:2 52:15 59:6
59:17 62:13 74:16
149:6,7 168:11
172:7,14,15,15,21
173:8 184:22
**cover**   176:24
**covered**   96:14
**crack**   111:19
**create**   76:15
165:11
**created**   76:17,20
76:22,23,24
**creating**   165:21
**credit**   85:2 88:21
105:23 106:5
161:18
**credited**   82:13
91:25 92:15 93:2
**criminal**   106:24
108:21
**critic**   39:8
**crr**   186:22
**current**   100:5,9
115:23 132:12
**customs**   103:3

**cut**   65:14
**cutout**   175:16,20
175:22
**cv**   1:8 4:21

**d**

**d**   2:10
**d.c.**   79:12,17
**dallas**   110:15
**damages**   167:9
168:5 169:4
**daniel**   2:23
**data**   101:22,25
102:8 103:17
106:14 107:10
113:8,17 118:18
129:3 131:6,21,23
133:2
**datapoints**   103:13
**date**   6:19 11:13
26:15 28:4 50:7
55:24 71:4 75:20
79:18 84:14,16
105:5 114:22
121:16 160:22
164:8 186:15
187:4 188:5
**dated**   77:13
186:16
**dates**   33:21
**day**   72:4 88:12
114:20,21 141:6
187:11
**days**   90:23 120:23
129:3
**deal**   32:17 52:17
**dealing**   153:11
**december**   27:3,16
139:23
**decide**   181:11
**decided**   180:19
181:3

**decision**   28:16
43:25
**declaration**   187:2
**decrypted**   116:12
116:16
**deemed**   94:24
142:6
**deems**   107:6 149:7
**deep**   103:14
129:13
**defamation**   40:14
**defamatory**   41:6
**defector**   38:7,12
38:16
**defendant**   1:6,11
19:18 39:7
**defendants**   14:18
**defenses**   171:17
**define**   65:9 140:19
**definition**   65:5
**defunct**   67:12
**delaware**   2:18
**deliver**   99:10,12
100:2,16 109:12
114:24 116:11
**deliverable**   99:3,8
101:13 102:5,6
112:18 113:6,23
114:2 115:10
131:12 134:15
**deliverables**   98:2
98:5,17 130:23
131:4
**delivered**   98:6
114:4,6,20
**delivery**   114:9,12
115:12
**delta**   161:14
**democracy**   19:20
33:16 49:4

demonstrate
113:18
denounced 109:5
denouncing 32:7
34:17 119:12
deponent 5:13
deposit 66:13
73:17 81:9 91:17
91:20,24,25 92:15
92:25 93:7,14,17
93:17,24 94:4
deposition 1:17
4:11,15,22 5:10,10
5:11 43:7 58:20
86:25 160:6
171:15 174:5
186:10 187:4
188:2,5 189:2
deposits 73:17
depth 98:21 99:21
100:11 112:12
describe 35:20
70:18 75:23
100:19 108:22
118:2 121:23
160:14
described 11:11
35:16 37:24 55:22
71:2 75:18 105:3
110:9 111:15
120:9 121:14
139:4 144:8
160:20 164:6
describing 104:6
description 112:19
deserved 32:9
designated 106:17
designation
106:20 107:9
destroy 23:16
55:18

destroyed 24:22
detailed 98:21
99:21 100:11
112:12 113:23
161:22
details 155:21
detect 136:12
detected 120:20
detection 130:5
develop 123:3
developed 15:14
devices 130:12
die 23:10 24:23
32:9 34:18 158:10
158:17
difference 65:22
different 22:18,18
22:19 47:21 55:5
56:17 136:15
153:12,18 173:5
difficult 133:6
dig 97:13 119:14
direct 25:25 94:22
98:10 137:20
150:16
directed 61:2
directing 44:19
direction 132:3
186:7
directly 72:21
139:14 148:4
162:13 182:4
disagree 92:23
157:25 172:22
discovered 78:11
discovering 107:9
172:10
discovery 17:17
17:20,23 76:24
77:4,6 123:22
151:5

discrediting 97:23
discuss 9:3 15:2
39:12 137:10
discussed 9:8,10
9:12 14:23 53:6
105:12 184:4
discussing 78:12
discussion 15:4
64:25 146:21
155:11
discussions 145:4
146:22
disdissidents 13:2
disposal 126:13
dispute 33:10
89:18 173:12
disputes 184:18
dissent 142:4
dissident 15:4,20
16:4,13 26:8
28:13,18,20 29:9
29:14,18 30:4,8,17
31:2,9,13,22 32:2
32:14 33:8,13,19
35:18 36:11 37:3
38:4 41:24 42:13
42:23 44:9,14,24
46:2 55:4,16,18
60:21,25 61:12
62:24 63:7,12
140:10,17,19
141:2 145:20
154:8,14
dissident's 32:23
dissidents 15:6,10
32:7 33:16 38:5
49:21 152:25
district 1:2,3 4:20
4:20 40:13 171:5
171:6

dive 103:14
129:13
divided 65:8
dividing 86:6
doctorate 142:15
document 3:18,20
3:22,24 6:22 8:4
11:11,16 12:15
55:22,25 56:18,18
56:21 57:2 71:2
75:18 76:16,25
77:9 105:3 116:19
116:22 117:4
121:14 124:16,19
129:15 164:6,17
174:20
documentation
102:18,23
documents 19:24
52:15 80:4,8
96:21 104:20
109:17 160:20,24
161:2,4
doing 103:7
119:18 120:2,4,24
121:4 125:5
126:21
domain 25:8 52:12
52:19,22
domestic 142:4
donnelli 2:12 5:15
downpayment
93:6,9
downstream
167:10
draw 167:14
drawn 172:18
drilling 167:13
drive 110:19
127:12

**driver** 158:8
**drives** 114:24
**drop** 112:7 139:18
  142:2,25
**dropping** 141:11
**duly** 5:20 174:7
  186:6
**duplicative** 59:13
**duration** 90:18
**duties** 141:14,17

**e**

**e** 2:2,2 3:4 5:18,18
  38:24 109:15,16
  125:13 174:6,6
  186:1,1
**earlier** 53:17
  129:19 136:21
  147:3 170:22
  177:5 179:6,15
**early** 6:13 16:19
  35:12 37:16
**earn** 65:6
**earned** 64:13
**earnings** 65:9,12
  65:17,23,24 66:2,4
  66:4,5 67:3 83:20
  89:3 176:12
  180:12
**easiest** 132:25
  133:2,7
**eastern** 1:5 2:5
  4:17 5:7 8:25
  19:11 22:22 40:13
  63:16 64:6,13
  65:7 85:22 86:4
  86:15 90:2 91:11
  95:4,6,17 96:8
  104:9 110:23
  114:24 117:18
  124:16,19 128:7
  130:22 131:9

133:17,21 134:9
134:19 146:14
159:7 161:10,24
162:5 184:11
187:3 188:3
**eddie** 5:14
**edge** 45:11 150:20
**editor** 13:14
**edward** 2:10
**effect** 23:24
  119:23 120:12
**effective** 83:25
  85:17
**efforts** 129:6
**effusive** 36:3
**either** 14:18 24:5
  33:10 39:4 52:19
  70:21 72:14,24
  75:8 78:20 90:22
  106:22 108:14
  114:15 115:2
  125:18 131:23
  132:2 134:24
  136:22 138:25
  177:10 182:4
  184:16
**electronic** 73:3
  120:14 124:19
  130:10 177:10
**electronically**
  37:12
**elements** 134:13
**embarked** 33:14
**empire** 144:21
**employee** 7:14,17
  143:3 186:13
**encompassed**
  30:13
**encrypted** 116:9
**ended** 84:7 110:19
  182:9,24

**endless** 23:17
**endo** 51:10
**ends** 73:25 74:5
**enemy** 121:8
**energy** 15:5,10
**english** 55:11,12
  55:16 138:24
  154:25 157:24
**enodo** 51:12,13,19
  51:21
**enrichment** 97:19
**entering** 28:14
**entire** 36:12
  140:12
**entirety** 81:4
**entities** 69:8 94:22
  95:5,8 183:24
**entitled** 1:19 96:25
**entity** 8:5 74:11,12
  74:14 95:18 175:9
**entrepreneurs**
  144:6
**entries** 176:15
**entry** 83:13
  163:12 175:13
  178:13,18 179:9
**equal** 65:2
**equipment** 130:9
  143:19
**errata** 188:2 189:2
**errors** 188:10
**esq** 2:10,12,20
**essentially** 116:13
**establish** 21:8
  133:7 167:21
**established** 69:18
  89:17 133:15
**estate** 37:10
**evaluate** 47:21
**evaluated** 54:8,9

**everybody** 146:18
**evidence** 15:9,18
  16:2,6,8,11 19:4
  20:14 21:12 22:6
  24:15 31:24 35:17
  36:10 37:2 38:2
  58:10 63:2,5 76:8
  151:4,6 159:11
  166:24 167:23
  169:2
**exact** 22:11 25:15
  118:18 124:10,14
  125:6,7 136:13
  163:24
**exactly** 164:3
  172:25 176:10
**examination** 3:2
  5:23 174:14
**examined** 5:21
  174:9
**example** 120:3
  145:20
**examples** 120:16
  121:6
**exbt** 3:6,8,9,12,14
  3:17,18,20,22,24
**exchange** 13:25
  40:6,9 50:10,15
  129:3 143:20
**exchanges** 127:11
**excuse** 82:14
**executed** 32:21
  70:22 187:11
**exhibit** 11:12,21
  25:24 55:23 56:2
  57:12 71:3,6,10,16
  73:6 75:17,19,23
  75:24 76:15,18,22
  76:24 77:9 79:25
  80:9 88:8 89:17
  98:9 105:4,6

109:13 121:13,15
121:18 122:11
127:3 135:16
160:16,17,18
161:23 162:4,17
162:21 163:2,9,12
163:16,20,21
164:7,9,10,19,23
165:10,20 174:18
176:24 178:11,24
179:8 184:8
**exhibits** 160:13,21
162:22 165:7
167:4 168:15
169:22
**exist** 131:25
**existing** 98:22
99:22 130:2
**expended** 66:21
**expenditures** 67:7
161:9 184:9
**expenses** 65:2 66:6
78:7 82:10,24
85:15 87:22 88:3
161:22 162:4,8
166:14,15,19,25
167:4,22,24
168:13,13,14,17
169:10,19 184:8
**experience** 120:25
**explain** 108:5
**explanation** 84:4
107:23,23
**explicit** 29:13
31:16 95:7,22
**explore** 123:16
**exploring** 45:13
**express** 30:25 31:5
80:16,18,20 81:12
81:20 82:3,6,22
83:5 162:9

**expulstion** 139:23
**extension** 97:23
**extensive** 13:15
36:17
**extent** 47:12 60:11
113:9
**extorted** 144:10
**extra** 176:4 181:14
**extreme** 119:20
**extremely** 124:8

**f**

**f** 186:1
**face** 17:3,3 79:15
79:15
**fact** 21:8 25:12
31:22 35:18 36:11
37:3 38:3 49:21
55:3 57:13 59:24
91:20 95:11 183:3
**faction** 140:15,23
**facts** 43:3 63:2
79:14 188:9
**factual** 12:19
48:14 150:22
**faint** 73:9
**fair** 47:18 57:11
59:13 65:4,8
68:23 82:14 97:5
151:9
**falls** 17:8
**false** 10:18
**familiar** 38:22
**familiarize** 132:18
**families** 22:5 23:2
23:25 24:17
**family** 25:12,20
97:14
**far** 30:5 41:3
152:15 167:16
**favor** 40:24 41:3

**favors** 143:20
**fear** 126:23
**feared** 125:14
**february** 63:19
80:12 82:12 91:11
101:6,6 163:23
179:7,25 180:3,5,8
181:9
**federal** 22:21
106:21 111:6
186:10
**fee** 93:6,9,20
134:16 135:18
**fees** 148:20,22,24
149:3,4,12,16
150:3 170:19
**felt** 120:24 125:9
167:24 168:2
**fen** 171:6
**fewer** 47:23
**fight** 62:5 140:24
**fighting** 15:6,10
140:15
**figure** 15:17
132:25
**figures** 112:14
**file** 146:16 159:5,6
166:6
**filed** 4:19 9:24
10:15,16 11:7,22
16:21 18:6,11
49:10 155:19
157:5
**files** 106:21
**filing** 61:7
**final** 93:2
**financial** 98:13,23
99:22 115:22
132:11
**financially** 186:13

**financials** 137:9
**find** 84:14 109:3
123:19 131:18,21
133:7 152:19,20
**finding** 78:17
108:18
**finds** 107:5
**fine** 48:6
**finish** 158:10,18
**firm** 51:15,16,24
**first** 5:12,19 9:7
26:6,6,16,21 27:11
27:18 30:15 32:3
34:22 38:22 52:9
69:6 71:7,16
72:10 83:13 84:20
98:8 101:6,17
110:4 111:19
112:22 113:10
117:16 122:3,3
129:13 132:5,17
133:6 136:7
137:21 138:11
141:3,6 142:25
143:6 152:11,17
152:18 160:23
161:8,23 162:4
163:22 164:15
165:4 175:8
178:13
**firsthand** 10:19
**fish** 57:17,20
128:17
**flat** 78:8 133:18,20
133:25 134:16
135:18
**flaws** 124:6
**fletcher** 178:16
**flight** 161:16
**flights** 102:24
103:8

**flowed** 176:8
**follow** 19:24 123:5
  124:2 127:21
**followed** 22:5 23:3
  23:25 24:17 25:12
  25:21 34:16
**following** 46:12
  88:12
**follows** 5:21 86:25
  160:6 174:5,9
**footnote** 143:13
**foregoing** 186:4,5
  186:8,9 187:10
**foreign** 106:20
  108:15
**forensic** 98:13
  115:22 132:12
**forgive** 145:22
  155:16
**forgotten** 179:22
**form** 43:4 48:2
  52:7 54:17 103:20
  145:13 150:8
**format** 131:13
**formed** 52:24 54:6
  54:15
**former** 37:6
**forsythe** 36:22
**forth** 186:5
**fortune** 37:8,16
  146:3,3
**fortunes** 142:20
**found** 32:21 41:4,9
  100:20 101:9,16
  102:12 108:11
  117:17 124:10,24
  124:25 125:13
  126:21 131:25
  152:20
**four** 27:6,8 55:4
  55:14 125:19

126:12 139:4
**fourth** 28:5
**frankel** 54:22
**fraud** 8:25 9:3,21
  9:23,25 10:11,14
  11:5,6 19:5,11
  22:23 40:3 47:7
  61:8 146:8,13,24
  147:6 158:25
  159:6 167:19
  170:13
**free** 36:19 141:25
**french** 6:21 27:13
  27:19 28:2,9
  69:25 110:7
**fresh** 130:4
**frustrated** 117:19
**funder** 171:4,25
**funding** 69:8
  148:3,6
**funds** 77:19 81:7
  86:6 88:10,12,14
  88:20 89:6,12
**further** 169:5
  173:10,11 174:8
  184:13 186:9,12

---

**g**

**g** 38:24 57:5
**gains** 97:17
**game** 59:13
**garner** 158:6
**garrett** 2:4 5:15
**gather** 31:20
**gathered** 62:19
**gathering** 159:10
**gear** 75:5,9 78:2
**general** 14:24,25
**generally** 70:19
  96:5 121:24
  122:16 153:17

**gentleman** 38:22
**gentlemen** 24:8
  25:20 150:7
**geolocation**
  100:23
**george** 4:24
**georgetown** 3:10
  3:12 68:6,7,17,23
  69:15,17,24 70:15
  71:14,17 73:25
  75:12,14,25 77:3,4
  77:14 79:9 81:8
  82:5 84:5,8
  135:19 161:3
  162:12 166:6,20
  168:4 176:15
  177:8 178:5,19
  181:22 183:13
**gertz** 36:18 38:15
  38:18 141:10,24
  142:13 143:15,23
  145:2,7,13,16
  146:7,13,16,24
**gertz's** 143:24
**getting** 125:8,14
  151:2 159:9 169:7
  180:6
**giant** 96:22
**gift** 35:25
**give** 8:22 41:12
  53:13 99:4 101:21
  102:14 111:5
  131:6 132:10,16
**given** 65:3 150:24
  186:8
**global** 51:10,12,13
  51:19,21
**go** 4:14 12:9 26:2
  41:23 72:16 85:10
  89:5 98:19 100:4
  108:24 126:3

132:19,24 133:5,8
  148:10 149:24
  159:23 162:17
  173:22 178:10
  180:17 183:8
**god** 36:2
**goes** 81:9 112:11
**going** 12:16 23:12
  25:25 32:7 42:19
  43:13 58:18 59:5
  59:14 111:5
  116:18,19,21
  120:2 125:11
  133:3,10 134:20
  135:25 136:12,14
  137:22 146:17
  148:5,10 149:2,24
  150:2,19 151:7
  158:21 159:8
  160:12 167:6
  168:7 170:5
  174:20 176:6
**good** 4:2
**gotten** 97:17
  152:15
**governing** 8:4
**government** 15:7
  32:11 58:16,23
  59:4 60:13,24
  61:11 62:2,22
  63:6,10 78:17
  95:11 107:6
  108:19 136:11
**gr** 174:25 175:5
**grandson** 57:2
**graves** 2:4 5:15
**great** 52:17
**greater** 24:2,18
  25:13
**greatest** 36:2

**greim** 2:10 5:14,14
8:20 15:21 16:5
20:24 23:4 24:11
29:20 30:19 31:8
41:7,15 42:17
43:13 44:20 46:3
46:9 47:18 48:22
58:18 59:22 60:8
61:4,13 62:14,25
92:4,17 93:11
96:10 97:5 104:8
104:14,23 133:22
134:10 136:3
148:5,15,21 149:4
149:18,24 150:19
159:8 167:6
168:18 169:5
170:20 171:10,21
172:9,23 173:16
173:20 184:15,23
**grounds** 168:25
170:22,24 171:11
171:20,22
**group** 3:15 27:19
80:22 105:11
157:14
**grows** 66:6
**guessing** 50:8
**guidance** 101:20
101:21 102:12,14
102:16 103:14,16
111:8 126:3,4,5
132:9,11,16
133:11
**guilty** 32:22
**guo** 12:24 14:14
14:15,19,22,24
15:4,9,19 16:3
19:19 21:12,17,18
21:21 22:2,3,5,22
23:2,24 24:16

26:7 27:14,20
28:2,9,12 29:8,10
29:18 30:3,8,16,25
31:10,12,21,25
32:4,25 35:2,9,18
35:21,22,23 36:10
36:16 37:2 38:3,7
38:15,19,19 39:9
39:13,16,19 40:10
40:14,17 41:5
42:12,23 43:16,22
44:14 49:14 50:11
50:16,18 51:4,6
52:9,19,24 53:5,15
55:2,7 57:9 58:17
59:3 60:21,25
61:11 62:23 63:7
69:7 78:10,14
90:5 93:12 95:8
95:25 99:4,9,25
100:23 101:2
102:11 103:14
106:16 108:9,10
109:5,9 111:8
116:10 117:18
118:5,12 119:12
119:19,20 120:13
122:4 124:7
125:18,21 126:8
127:10 128:9
138:4 139:13
140:5 141:4,23
142:13 143:2,16
143:18,23 144:2
144:13,16 145:2,3
145:7,10 146:3,4
146:16 152:15,18
154:7 158:14
176:4
**guo's** 15:15 16:12
21:15 23:7,19

24:20 37:22 39:8
41:24 44:9 46:2
63:12 101:20
121:2 124:12
139:19 144:17,21
152:15
**guy** 145:22,22
**guys** 158:15,22

## h

**h** 3:4 5:18,18
52:10,10 57:5
174:6,6
**half** 66:25 67:3
102:21
**halfway** 124:5
**hamilton** 2:14 5:7
**han** 27:14,19 29:3
29:4,7 52:10,24
53:15 89:17 98:9
101:5 102:12
111:8,24 139:15
**hand** 79:10 109:15
160:12 174:23
**handed** 11:14
55:25 71:5 121:17
164:9
**handwritten** 3:17
96:22 121:19
122:2
**handy** 6:25
**hang** 183:8
**hangar** 103:2
**happen** 139:3
**happened** 138:17
146:20 181:7,8,9
**happy** 169:9
**harass** 24:21
33:15 46:11
**harassing** 12:25
23:13

**harassment** 23:18
49:20 169:6,14
171:15,21
**hard** 58:13 103:19
111:14 124:16
128:22
**harder** 69:9
**heading** 174:24
175:5
**heard** 107:20
**held** 4:22 72:22
**help** 49:23 138:8
162:23
**helped** 52:7 53:11
**hesitated** 125:12
**highlight** 71:7
**hill** 175:9 177:18
177:24 178:6,8
**hire** 125:18,24
**hired** 125:22
126:9,14
**historical** 98:13,22
99:22 115:23
132:12
**history** 15:15,15
43:17
**hit** 102:13
**hold** 18:10 42:17
42:17 104:8,8
**home** 26:13 57:9
90:3,5,7,10
**honestly** 156:8
**hong** 49:3 95:19
95:23
**hoping** 162:19
**hotel** 37:11 144:9
**hours** 120:23,23
171:14,23
**hum** 127:23
**human** 62:7 65:22

humane  36:2
humans  153:21
hundreds  47:20

**i**

idea  74:4,25 93:13
  93:15 165:15
ideas  123:3
identification
  11:12 55:23 71:3
  75:19 105:4
  121:15 160:22
  164:7
identify  34:11
  56:15 160:24
  164:16
identity  118:10
  171:3
illegal  131:24
illegally  97:17
illegible  76:10
  125:13
illegitimate  57:4
  97:15
illicit  119:3
immediately  84:18
  108:9 109:8
impasse  102:13
impeach  97:4
impeding  129:5
import  131:4
importance
  118:11
important  28:20
  30:9,12 31:12
  140:9
impossible  99:9
imprisoned  138:6
improper  62:11
inability  38:21
inch  102:22,23

included  85:9
including  37:10
  59:24 96:22
  169:20
income  168:17
inconsistent  97:3
incorrectly  52:4
incurred  161:9,23
  162:5 169:19
indented  115:22
independent  153:3
  171:11
independently
  20:15
indicates  71:17
indirectly  148:4
  182:5
individual  43:25
  44:11 74:11 88:23
  88:25 151:10
individual's  22:12
individually  44:3
  61:14
individuals  47:8
  47:10 56:9 57:14
  58:11 103:6 110:9
  159:14 167:11,14
inform  53:11
information  20:2
  21:8 24:4,8 45:7
  47:6,15,17,25 48:8
  52:6 54:4 61:21
  61:24 62:19 63:11
  97:13,19 100:24
  101:2 102:13
  103:19,23 108:7
  108:18 110:19
  118:23 119:15,21
  120:8,22 124:23
  124:25 127:11
  143:2,18 150:8

151:8 152:9,9
initial  74:16
  112:25 113:9
  135:13
initially  57:21,22
initials  179:12
initiation  180:24
  180:25
inodo  154:4
inquired  172:25
insist  31:13
insisted  127:10
insistent  116:10
inspectors  103:3
instruct  43:14
  45:16 59:14 60:3
  61:18 62:8 148:8
  148:15 159:17
  168:18 170:20
instructed  120:14
instructing  45:20
  168:24 171:19
instruction  46:7
  60:7 61:5 62:15
  159:21
instructs  168:8
insulting  32:8
integrity  136:18
intending  159:5,6
intent  159:15
interaction  43:7
interactions  58:22
interested  31:18
  144:3 158:21
  186:13
interesting  158:12
interfere  4:11
interference  4:8
  128:24
internal  45:7

international
  102:25
interpreted
  138:16
interpreter  158:3
interview  35:9
  36:17 141:9,10
  143:16
intraparty  139:24
  140:8
introduce  150:6
  150:11
introduced  147:14
  150:17 151:10
intrude  62:21
investigate  57:14
investigated  120:7
investigation
  106:23,24,25
  108:21
investigative
  120:5
invite  157:15
invoice  3:12,14
  75:10,14,15,21
  76:4,13,17 77:2,13
  79:9,25 82:25
  105:10,14,22
  109:13 129:19
  136:21 163:19,19
  177:18,24
invoiced  78:20
  105:18 180:15
invoices  75:8 79:3
  79:5 81:23 161:3
  162:21 165:22
invoicing  78:14
involved  9:15
  14:17 22:9 42:4
  103:11

**involving** 21:11
**irrelevant** 148:8
  168:22 172:2,17
**irs** 166:24 167:5
  167:25 168:16
**issue** 28:15 29:5
  45:23 63:15 67:15
  67:25 68:9 75:24
  83:24
**issued** 161:17
**issues** 14:23,25
**itemization** 74:22
  77:21
**items** 163:23
  165:5,6
**iterative** 133:9

**j**

**j** 1:20 5:18 174:6
  186:21
**january** 3:11 28:7
  71:15,25 77:13,15
  80:2 89:22 114:10
  114:15,16 115:13
  127:17 139:8
  177:2,12 179:7,25
  180:3,5,8
**jd** 92:13
**jennifer** 2:12 5:15
**jgp** 4:21
**jian** 37:7,9,16,18
  37:21 139:20
  143:3
**jian's** 37:8
**jim** 153:25
**jingping** 32:11
  33:3,4,6,7,11
  35:25,25
**jinping** 158:17
**joanna** 2:20
**job** 48:3

**johanna** 5:6 61:17
**john** 1:17
**journal** 35:2
  139:16 140:14
**journalist** 36:18
**journalistic** 145:5
**judge** 74:16
**judicial** 148:25
**july** 23:15,22
  36:20 50:9 140:14
  141:10,24 143:15
**jumps** 60:3
**june** 39:24 50:8
  57:7 180:7,10
  181:7
**jury** 40:18,19 41:4
  41:9,20

**k**

**kansas** 2:8
**keep** 107:4 113:15
  118:15 122:20
  130:6 155:13
  166:4
**kept** 78:15 118:6
  146:5
**kettle** 74:16
**key** 116:23 127:15
**kgb** 142:24 144:6
**killed** 119:22
**kind** 52:3 97:19
  99:10 121:23
  132:15
**kinds** 153:18
**knew** 10:18,19
  110:4
**know** 6:9 9:9,10
  9:14 10:20 11:2
  11:24 17:14 19:21
  22:14 34:14 36:5
  36:15 39:10 49:6
  51:11,24 54:22

56:8,12,16 57:2,3
57:7 58:4 60:14
64:19 65:21 72:7
73:15,17 74:17
82:2,25 83:19
85:3,24 104:22
107:12 108:3,6,20
109:15,16 116:20
118:13,21 131:11
131:14 132:21
133:23 137:7
143:6,11 147:13
147:18,21 148:12
152:8 153:25
156:15 164:2
165:2 167:6
169:15 175:22
179:13,15 182:22
182:23
**knowledge** 30:22
  66:19 77:25
  104:21 137:13
  146:23
**known** 119:22
**knows** 43:6 125:5
**kong** 95:19,23
**kraft** 104:13,19
  109:22
**kwok** 126:4
**kwon** 49:3

**l**

**l** 5:18,18,18 38:24
  52:10 174:6,6,6
**label** 116:25
**laid** 119:2
**land** 100:12,21
**language** 55:10
  152:23
**large** 109:2
**late** 6:13 16:19
  69:19,19 181:9

**latest** 128:13
**law** 97:20,23,23
  111:6,25 149:10
  171:2 172:5
**laws** 187:9
**lawsuit** 9:22 18:10
  22:21 24:9 40:12
  46:16 48:10,20
  49:11 51:8,20
  52:8 61:8 63:15
  87:20 148:3,6
**lawsuits** 20:23
  21:11
**lawyers** 173:13
**layer** 176:4
**lead** 8:18 151:3,5
**leader** 3:12 33:3
  35:24 36:3,4 57:3
  72:22 74:7,9,17,19
  75:25 79:16
  123:11,15 124:4,4
  128:25 178:9
**leader's** 76:5
**leadership** 97:24
**leading** 46:20
  109:7
**leads** 12:17
**learn** 43:5 59:2
  132:20
**learned** 20:2 48:18
  126:19 142:23
  159:13
**learning** 150:25
**lee** 49:3,14,25
  50:10,19 53:24
  54:20 57:7
**left** 38:8 183:4
**legal** 8:21,22 15:5
  30:20 41:11,12,14
  65:21 92:5,7
  101:19 112:2

167:8
**legality**  102:2,9
  103:25 106:14
  111:23
**lengthy**  33:2
**letter**  33:2 58:15
  59:8,9 124:5
**letters**  59:3
**level**  37:17,18
**lexington**  1:14
  4:23
**lexus**  171:5,6
**lianchao**  27:14,19
  52:10 101:5
  102:12 111:8,24
  139:15
**libbares**  4:24
**liberty**  67:20,23
  68:3
**light**  84:3 145:18
**likewise**  78:19
**limited**  1:5 2:6
  4:18 100:11 153:9
**limiting**  96:18
**line**  15:17 98:20
  107:22 162:19
  165:5,6 172:18
  188:11,12,13,14
  188:15,16,17,18
  188:19,20,21,22
  188:23,24 189:3,4
  189:5,6,7,8,9,10
  189:11,12,13,14
  189:15,16
**link**  109:3
**linked**  108:11,23
**list**  3:8 53:10,13
  56:6 57:15 108:18
  113:3 118:7,15,21
  127:6 131:16,19
  164:18 165:2,3,11

**listed**  84:25
  129:14 149:5
**listening**  151:12
**literally**  158:11
**litigation**  14:18
  17:16 18:7,10
  19:19 23:17 33:15
  34:11,16 35:15
  50:22 80:5 81:2
  88:4 89:19 153:16
  153:23 158:20
  171:3
**little**  78:15 119:7
  123:18 124:5
  155:2 158:8 181:5
**lives**  23:16 24:22
**llc**  1:10,19 2:4,6
  4:19 5:15 7:6 8:2
  8:5 67:12,21 68:8
  68:11,24 69:21
  70:8 165:19
  175:17 179:18
**llp**  2:14
**lock**  125:15
**lodging**  100:22
**logical**  165:11
**long**  33:15 34:10
  143:3
**look**  12:11 120:23
  132:21,22 161:7
  161:19 162:2
  165:18 174:18
  176:22
**looked**  130:21
**looking**  15:14
  56:23 91:14
  165:15
**looks**  164:18
**loop**  77:12 114:3
**looseleaf**  122:7

**los**  102:24
**losing**  139:24
**lost**  177:6
**lot**  52:15 70:22
  109:6 142:23
  145:17 152:13
  153:2 154:13
**loud**  120:6
**loyalty**  35:24

## m

**m**  5:18 126:3
  174:6
**ma**  37:7,8,9,16,18
  139:20 143:3
  144:17
**ma's**  139:22
  141:13,17
**machine**  153:17
  186:7
**mail**  109:15,16
**mails**  125:13
**main**  2:7 129:14
**making**  18:22
  21:16 23:21 62:17
  95:5,11,18 152:10
  171:7 173:2
**managing**  97:17
**mandarin**  19:15
  38:21 39:3 55:11
  55:16 138:21
  153:8,9
**march**  3:15 12:24
  23:8 32:3 33:23
  34:18 79:23 82:9
  82:13 84:2 85:17
  105:11 158:11
**margin**  127:6
**mark**  11:9 55:20
  70:24 75:16
  104:25 116:19
  164:5

**marked**  11:12,15
  29:3 55:23 56:2
  71:3,6 75:19
  105:4 121:15,18
  160:13,21 164:7
  164:10
**market**  2:17
**massacre**  138:7
**matched**  19:25
**matches**  74:8
**material**  9:18
  52:17 54:17 96:12
  99:10,12 132:20
  133:4
**matter**  1:20 4:17
  88:15 116:4
  121:22 132:18
  134:21 147:24
  161:10,24 162:6
**matters**  131:12
  169:8
**mayor**  144:9,10
**mean**  14:13 16:7
  41:19 54:3 63:4
  65:10,14,16,21
  66:4 77:2 79:6
  106:11 108:23
  109:10 116:8
  127:14 128:3,5,14
  133:23 149:4
  161:14 165:13
  172:3 175:21
  180:2
**meaning**  16:15
  32:12 38:7 48:13
  68:9 108:19
  111:11 118:9
  119:16 120:4
  121:8 122:6 125:4
  125:17 126:13
  128:7,11

**means** 100:22
101:4 107:13
108:3 125:9 128:4
140:25 175:22
**meant** 128:16
132:19
**measures** 118:22
125:10
**mechanism** 69:12
69:13
**media** 13:17,20,21
22:2 35:22 51:17
108:24,25 112:8
112:13 113:2,24
114:13,18 115:6
115:24 132:13
**meet** 27:8 49:9,25
127:9 129:2
156:14 158:7
184:19
**meeting** 27:18,21
109:21 110:13
122:24,25 123:9
124:3 139:7
155:17,22 156:13
156:20,23,23,25
157:16,21 158:4,5
158:24
**meetings** 55:5
122:17,21 138:15
139:4 155:16
**meets** 112:18
**member** 7:8 67:12
67:21
**members** 25:20
56:9 58:2,12
69:20,23 97:14,14
130:17
**memorialization**
8:17

**memorialize**
122:25
**memorialized**
29:18 30:17 96:2
**memorializing**
6:23
**men** 13:6 23:10
**meng** 10:23 11:2
13:8,13,19,25 15:8
15:18 16:2 17:15
17:23 18:21 19:8
20:9 21:18 23:3
24:17 25:9,10
53:19 54:19 147:8
150:12 152:18
154:25 155:4,17
**meng's** 14:22
**mentioned** 16:10
33:22 34:3,6
35:15 99:23 114:2
115:7 183:23
**message** 6:24 7:2,4
**messages** 17:22
18:2,20 25:6 40:7
40:10 50:11,16
**met** 11:3 14:8 27:7
27:16 28:3 32:15
39:11 49:8 79:15
79:19,20,22 122:3
141:6 147:22
150:25 155:13
159:4
**method** 123:7
**methodology**
101:19 113:7,14
113:19,25 114:4
114:12,18 115:6
145:25
**methods** 159:10
**michael** 1:17 4:1
4:16 5:1 6:1 7:1

8:1 9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
81:1 82:1 83:1
84:1 85:1 86:1
87:1 88:1 89:1
90:1 91:1 92:1
93:1 94:1 95:1
96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1

132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
187:7,18 188:4
189:25
**microphones** 4:5
4:10
**middle** 94:10
**mike** 36:22
**miles** 126:3
**million** 66:14,14
91:17 93:5,24
**mind** 65:6 113:15
**mine** 71:8
**minimum** 78:15
**minister** 37:6
139:20 143:3
**ministry** 36:14
**minus** 65:2 66:8
**minute** 42:18
61:17
**minutes** 8:12
122:23,24
**mirror** 35:11
**misrepresentatio...**
43:22

**missouri** 2:8
**misspelled** 132:2
**misspoke** 68:15
**misstates** 20:25
24:11 29:20
**mistaken** 179:14
**misunderstood**
24:6
**moment** 12:9
29:16 54:25 59:25
123:8
**money** 66:10,17
66:20 67:18 72:7
72:16 89:9 95:9
97:17 138:8 144:6
176:3,3,5 181:4,17
182:3 183:4
**monitoring** 142:5
**month** 3:11 27:24
71:14 82:3 128:22
129:13,17 136:5,6
136:6,7
**month's** 93:3
**moore** 1:21 4:25
186:21
**morality** 97:21
**morning** 4:2
**motion** 172:20
**move** 112:3
144:15
**movements**
100:12,20
**mss** 36:14 57:8
142:3,23 143:18
143:19 144:17,20
**mss's** 141:18
**multi** 22:8
**multiple** 12:14
69:7
**mutually** 94:17

**n**

**n** 2:2,17 5:18
13:23 38:24 52:10
52:10 57:5,5
174:6
**name** 4:24 17:11
32:8 37:7 38:22
38:23,23 50:4
74:14 76:5 109:23
109:25 118:6
119:16 152:19
186:15 187:3
188:3,4
**named** 29:10
104:11
**names** 3:8 13:6
22:12 52:5 53:6,8
53:14,16 56:5,23
57:23 103:6
108:11 109:4
110:2,4 118:7,14
120:6 129:14,16
129:16 131:19
132:2,4 147:12,15
152:16 156:11
**narrow** 131:22
132:7
**national** 37:18
106:23 107:15
**nationals** 106:21
**nature** 14:10,11
49:16 100:17
115:9 170:17
**ncs** 106:8 107:13
**nearby** 114:21
**necessary** 107:7
**need** 41:22 44:7
56:17 91:5,6
99:14,18 112:23
125:15 155:6,10

**needed** 130:8
155:12
**negative** 66:24
**negotiated** 29:11
89:25 90:4
**negotiating** 30:24
**negotiation** 173:12
**negotiations** 90:6
93:12 95:21 96:24
**neither** 24:7
186:12
**netherland** 26:14
**network** 51:17
124:12
**networks** 112:13
113:24
**never** 25:19 77:21
95:22 96:2 110:19
110:22 124:9
125:23 147:22
177:23
**new** 1:3,15,15,23
4:21,23,23 5:2
19:20 24:2,18
25:13 32:5 36:23
87:23 90:5 96:18
130:8,8 139:16
172:4 186:3 187:9
**newly** 96:21
**news** 35:10 152:23
**niece** 32:21
**nonfact** 21:9
**nonpublic** 145:6
**nonrefundable**
161:17
**northern** 50:2
155:23 157:2
**notary** 1:22 5:20
174:8
**note** 4:5 105:25
122:15 161:12

**notebook** 122:4,11
127:2
**notebooks** 122:5
122:13
**notes** 3:17 96:23
97:4 121:6,19,24
122:2,18,22 123:4
123:7,9,13,14,14
123:19,22 124:3
126:25 156:19,22
**notetaking** 121:25
**notice** 1:20 18:10
41:10,18 42:20
45:5,15 61:22
90:23 96:20 148:7
150:5,21 159:16
171:12 172:6
**notion** 15:9 24:16
28:19,23 29:17
30:16 35:17 38:3
130:2
**november** 1:13
4:4 26:16,23
27:12 79:22,22
141:7 143:25
187:4 188:5
**number** 4:21
43:20 52:11 57:14
76:13 83:3 105:6
124:11,15,22,23
124:25 141:18
163:19 166:10
184:18
**numbers** 73:19
103:2
**numerous** 21:21
35:21

**o**

**o** 5:18 13:23 52:10
174:6

oa   179:17
oath   5:5
obeying   111:24
object   42:19 58:18
   92:17 148:5 159:8
   167:7
objected   172:13
objection   8:20
   15:21 16:5 20:24
   23:4 24:11 29:20
   30:19 31:8 41:7
   62:25 92:4 93:11
   96:10 133:22
   134:10 136:3
obscure   118:18
obtain   131:24
obviously   112:22
occasion   14:8
   114:11
occasions   55:14
oceanic   67:10,11
   67:13,17 68:11,16
   179:16 181:25
   182:14 183:20
odd   83:2
oe   179:12,17
offering   33:4
offhand   57:6,10
office   130:3
officers   57:9
offices   102:7
   110:16 130:3
officials   32:17
   97:18 142:22
   143:18
okay   9:17 13:12
   18:17 19:3 21:10
   21:25 22:21 26:4
   35:13 43:13 45:18
   47:20 48:6 52:21
   57:11 64:22 65:5

65:13 67:6 73:11
75:4 76:3 77:5,8
85:20 89:16
104:12 113:11,22
122:10 123:21,25
124:21,22 135:17
143:17 145:11
151:25 158:23
161:19 162:18
163:3 170:23
173:15 174:17
177:12 178:13
180:6 181:2,16
183:6
once   11:3 39:11
   49:8 92:17 111:25
   146:15
ones   47:22 52:16
online   14:7,10
   16:10 17:15 21:23
   35:10 108:25
   124:11 127:12
open   108:11,23,25
   109:10 112:25
   122:18 132:19
   133:3 145:5
   159:12
operating   7:22 8:3
   70:4
operation   32:5
   108:16 158:15
   176:25
operational   95:24
   119:5
operations   3:15
   80:22 105:11
opinion   152:24
opponent   145:21
oppose   15:7 49:22
opposed   140:12

opposes   10:25
opposing   140:21
opted   38:16
oral   16:11,15
   63:21 79:5 135:6
   135:7,9
orally   135:12
order   74:16 78:16
   108:8 144:12
   166:4
original   23:20,21
   96:12 186:9
originally   105:13
ousting   31:18
outgoing   81:7
outlet   13:22 35:10
outlined   170:22
outside   42:20
   74:21 110:15
   172:6
overall   135:21
overseas   142:6
overtly   97:16
owes   36:12
owned   175:18
   183:24
owner   6:10 175:24
owners   70:13

**p**

p   2:2,2
p.m.   160:2,8
   174:11 185:4
packet   123:20
page   3:2 12:16,17
   25:23 71:7,16
   73:5,21 74:8
   76:10 80:10 81:19
   82:15 83:9 88:9
   90:17 91:14 94:8
   94:11 98:9,11
   99:24 100:4

105:21 106:4
111:18 112:8
115:19 117:2,12
122:3,6,8 123:25
124:16,18 127:4,5
128:19 129:15
137:19 139:10
151:23 161:8,23
162:4,25 163:2,4
163:12 165:4,5
174:23,25 176:14
178:10,25 179:8,9
183:11 188:11,12
188:13,14,15,16
188:17,18,19,20
188:21,22,23,24
189:3,4,5,6,7,8,9
189:10,11,12,13
189:14,15,16
paid   65:18 66:6,8
   72:20 76:13 80:19
   84:21 85:16 87:22
   87:25 88:2,12
   91:21 136:9,22
   143:18 167:10,11
   167:15 177:19
   180:6
pangzhou   37:11
paper   102:7
   164:11
papers   111:15
paperwork   78:16
paragraph   12:7
   12:16,21,23 13:4
   19:22 20:11,20
   21:14 22:25 26:2
   30:2 90:22 94:11
   98:11,20 99:23
   111:18 112:7
   117:13 137:19,21
   138:4 139:9,18,19

141:4,12 142:25
144:16 151:23
**paragraphs** 12:14
**pardon** 21:18
64:18 68:17 75:12
93:15 139:8 155:4
**parked** 103:5
**parlance** 57:17
**part** 26:6 40:2
68:13 83:20 89:2
90:2 137:24 143:7
158:23 159:16
168:4 175:25
176:11 179:3
**partial** 41:2 129:3
**participant** 10:21
**particular** 127:16
146:9
**parties** 4:14 22:9
91:15,23,24 92:12
95:16 135:12
**partners** 67:20,23
68:3
**parts** 40:19 133:6
138:3
**party** 10:25 28:18
29:15 31:3,19
32:12,13,16 33:2
33:12 36:4 49:22
49:24 55:19 56:10
57:3,8 58:2,12
90:22 97:14,21,24
139:23 140:12,16
140:22,24 142:7
144:14 145:21
158:17 186:14
**party's** 35:24
**pass** 166:11
175:23
**patron** 37:19

**pattern** 15:14
118:8
**pay** 40:22 91:16
94:23 111:2
162:13 166:2,4
175:20,20 176:3
**paying** 82:5 87:16
**payment** 68:4
69:12 72:21 73:4
76:9 78:8 81:5,13
82:18 85:5,13,21
88:11,13,21 89:7
95:18,23 135:13
137:2 150:3 163:5
163:8,12,13
170:19 177:18
178:25 179:25
182:6,9
**payments** 70:16
70:19,21 78:21,24
80:15,16 81:20
82:3 84:5 86:2
94:16,23 95:5,12
137:3 162:20,20
181:15
**pen** 13:6
**penalty** 187:2,8
**pending** 18:7
44:22 151:21
**penghzhou** 144:8
**people** 18:25
22:18 24:22 33:17
34:17,18 43:7
49:22,23 52:6
53:4 56:16 108:19
109:6 118:17,20
119:13,13,22
120:2,6 122:18
124:12 125:6
126:20 132:4
142:21 145:17

147:11 152:17,18
154:13 155:13
156:4,15 157:11
157:16,24 167:15
**pepper** 2:14 5:7
**perfect** 103:12
**perform** 134:21
**performance**
117:20
**performed** 88:11
180:4
**period** 36:8 65:3
65:25 136:4
**perjury** 187:2,8
**permanent** 38:13
**permit** 100:2
**person** 9:7,12 10:6
43:24 51:3 53:10
92:9 104:10 113:3
127:11,19 151:11
175:25
**personal** 41:15
42:22 43:17 46:25
63:19 88:13
166:16 167:3
168:16,20 169:7
169:12,13 176:12
179:4 182:5,9,24
**personally** 29:12
49:6 81:24 83:21
139:14 140:5
143:25 144:2
166:13 176:9
181:17 182:5
184:4
**persons** 107:18
**perspective** 96:6
173:9
**persuade** 146:16
**pertains** 186:9

**petition** 96:13
**phone** 127:18
**phones** 4:9
**photocopy** 103:23
**physical** 16:7
72:25 106:13
**physically** 15:11
77:6 79:8
**pick** 4:6
**picking** 140:23
**pieces** 127:25
128:15
**place** 4:10 39:23
79:11 84:10 90:7
127:9 132:5
137:23 180:23
186:4
**plaintiff** 1:6,11
4:17
**plaintiffs** 14:18
**planes** 102:25
103:5
**plaza** 37:11 144:8
**pleading** 43:4
**please** 4:5,9 11:10
20:17 35:20 43:10
55:21 75:17 105:2
121:13 128:19
174:18
**pled** 148:23
**pocket** 136:10
**podhaski** 12:13
**podhaskie** 2:23
140:13
**point** 32:18 86:23
129:16 136:13,14
138:24 159:4,9
160:4 174:3
180:18
**points** 12:13

**police** 32:17,19
36:13 37:13 49:20
142:16
**political** 142:4
**popular** 152:24,25
**port** 114:7
**portion** 94:4 97:9
**position** 28:12
31:21 48:23
**possession** 110:20
**possible** 78:16
**posted** 124:12
**potentially** 116:6
116:8
**power** 139:24
140:9
**practice** 121:25
122:16 172:20
**praising** 35:25
**prayer** 148:18
**precisely** 52:16
142:19 156:9
**premise** 46:18
**prepared** 60:10,16
**present** 2:22 27:12
27:13,14,15,17,25
109:20 110:8
130:2 137:23
147:7,11 151:20
152:6
**press** 139:15 140:7
**presumably** 8:3
59:10,12 76:10
165:23
**presume** 119:18
128:16
**prevent** 78:16
**prevented** 117:19
**preventing** 95:17
**previous** 34:18
104:17 142:12

**previously** 174:7
**price** 134:7,8
135:23
**pricing** 133:14,16
133:18 134:15
**primary** 22:14,17
69:10
**principally** 53:3
**prior** 16:20 61:7
186:5
**private** 4:7 14:2
50:15 52:23 53:11
53:14 54:11,14
100:21 102:25
103:2,8 107:5
145:12 147:4
**privilege** 46:6 60:6
60:11 171:8
**privileged** 149:17
168:25 171:4
**pro** 92:15
**probably** 16:18
39:24 52:19 79:12
83:2 123:16 139:6
143:13 161:17
**problem** 101:18
111:23 131:20
172:23
**problems** 111:4
146:17
**proceedings** 86:23
160:4 174:3 186:4
186:5,6,10
**proceeds** 158:19
**process** 133:9
164:11 179:16
**produce** 58:8 99:3
99:8 101:22
104:19
**produced** 17:16
17:17,20,23 56:19

**77:5 96:21 104:6**
171:13
**product** 45:10
62:21 151:3
159:10,17
**products** 58:9
**professing** 33:3
**profession** 28:17
**professional** 1:21
142:19
**professionals**
121:11
**profiles** 139:16,17
**profit** 1:5 2:5 4:18
5:8 8:25 19:11
22:23 63:16 64:6
64:14,17 65:6,7,19
85:23 86:4,15
90:2 91:11 95:4,6
95:18 96:8 104:9
110:23 114:25
117:18 124:17,19
128:7 130:22
131:9 133:17,21
134:9 146:14
159:7 161:10,24
162:5 184:11
**profits** 63:22 64:5
64:13,20,24,25
180:12
**profound** 33:3
37:5
**prohibited** 95:4
**prohibition** 95:3
95:13,17
**project** 29:13 31:2
132:23 134:13
136:18
**prolific** 152:13
**promote** 29:13
31:2

**pronounce** 39:2
**pronounced** 39:4
**pronouncing**
35:23
**propagandist** 33:5
**proper** 62:20 65:9
**properties** 37:10
**property** 144:12
144:13
**prorated** 91:25
93:2
**protect** 78:10
108:8 136:17
176:4
**protected** 74:15
106:18,21
**protecting** 118:11
**protector** 139:19
**protesters** 138:8
**provide** 15:8,11
16:11 20:14 61:23
63:10 80:7 96:8
99:21 100:25
101:24 102:8,15
103:15,16,24
106:13 107:10,17
112:18 126:4
131:8
**provided** 35:2
70:20 76:16 77:3
77:4,18 96:17
98:2,17 106:17
107:11,24 113:5
113:23 123:22
124:17,20 131:15
150:7
**providing** 138:7
**provincial** 37:17
**psyber** 86:11
175:14,15,16
176:8 181:18

182:13 183:17
**public** 1:22 5:20
    25:8 35:21 52:12
    52:18,22 109:7,10
    112:14,25 124:13
    143:10,11 174:8
**publicly** 119:12
**published** 13:19
    16:10 17:15 21:23
    21:23,25 25:5,7,14
    34:21,24 35:4,5,22
    36:6,7,20 52:11,12
**publisher** 13:14
**pull** 135:15
**pulled** 143:13
**purported** 43:21
**purpose** 30:25
    31:4,5 43:2
    136:16 158:5,23
    165:9 169:11
    176:18 178:22
**purposes** 64:25
    68:12 84:8,17
    108:17 119:3
    166:5
**pursuant** 1:20
**put** 10:9 57:12
    66:7,23 161:4
    164:19
**putting** 77:5

**q**

**qishan** 57:5
**quarters** 102:22
**question** 15:24
    17:19 19:6 21:5
    23:6 29:21,23
    30:15 31:11 41:23
    43:10,11,15 44:18
    44:22 45:3,17,21
    45:23 46:5,19,21
    47:4,19 48:11

55:13 58:25 59:7
    59:20 60:4,15
    61:3,9,14,16,19
    62:9 66:23 88:7
    97:8,11 99:6,14,16
    99:19 116:20
    123:17 138:11,11
    139:11 144:24
    148:11,13,16,17
    149:19 151:13
    152:2 154:15
    155:9 160:23
    161:21 162:3,24
    163:18 164:15
    167:2,7,8 168:8,12
    169:24,25 170:5
    176:2
**questioning** 15:17
**questions** 45:9
    48:25 64:21
    101:18 103:25
    106:14 137:22
    150:2 151:7
    169:13 172:14,17
    173:10,19,20
    174:21 184:14,16
**quite** 122:23
**quoted** 143:10
**quotes** 113:5
    143:8,9

**r**

**r** 2:2 5:18 109:24
    174:6 186:1
**radical** 140:15
**raised** 53:24
**raises** 125:25
**range** 164:13
**rata** 92:15
**rate** 78:8 133:18
    133:20 134:2

**raw** 113:17 115:11
    115:15 131:6
**reach** 47:22
**read** 12:10,22
    20:16,18 26:2
    43:11 47:21 52:19
    54:9 59:18,20
    68:19,21 73:10,10
    94:15 97:7,10
    152:12 153:8
    184:24
**ready** 111:2
**real** 37:10 132:4,4
    140:10
**really** 15:5 52:18
    145:17 154:17
**realtime** 1:22
**reason** 31:17
    51:23 69:10 91:7
    92:23 106:12
    154:10 171:13
    188:7,11,12,13,14
    188:15,16,17,18
    188:19,20,21,22
    188:23,24 189:3,4
    189:5,6,7,8,9,10
    189:11,12,13,14
    189:15,16
**reasoning** 66:25
**reasons** 59:23
**recall** 9:16 11:8
    12:3,4 14:11 15:3
    22:11 25:15,17
    40:11 47:23 51:22
    52:16 55:5 57:21
    75:13 83:18,22,23
    86:17 107:14
    109:25 123:14
    129:19 147:2
    152:14 181:15

**recalled** 174:6
**receipt** 73:7 76:12
    77:18
**receipts** 75:8
    164:18 165:3,12
    165:14,18
**receive** 67:18 68:4
    70:15 74:19 102:5
    103:22 111:16
**received** 71:17
    77:8,19 83:21
    102:6 177:2,13
**recess** 86:24 160:5
    174:4
**recognize** 11:16
    71:10
**recollection** 13:22
    50:17 54:21 63:24
    76:14 91:13
    182:18
**record** 4:3,14
    12:15 24:13 29:24
    44:6 45:19 59:16
    62:12 71:7 75:23
    86:22 87:3 97:9
    99:6 112:6 159:24
    160:3,9,15 164:12
    168:10 170:24
    172:4 173:8 174:2
    174:11 184:18
    185:5 186:6,8
    188:8
**recorded** 23:15
    140:6 184:8
**recording** 4:3,13
    12:24 23:8,12
    32:4 33:22 34:20
**recordings** 21:22
    23:20 35:14
**records** 80:4
    106:18 107:5

recover 129:4
144:13 149:11
redacted 76:3
refer 56:21
reference 56:18
128:17
referenced 162:20
references 73:12
referred 33:11
52:20 80:25
121:20 123:8
128:23
referring 21:20
117:24 123:20
124:15 153:7
reflect 20:12
reflected 121:6
123:12 163:20
167:4 168:13,15
reflects 29:24
175:14
refunded 161:13
161:18
refused 100:24
101:21 102:7,15
103:15,24
refusing 148:13
refute 21:8 23:9
regard 40:14
regarding 14:2
15:18 37:21 38:2
40:7,10,15 44:9
48:25 55:3,15
61:11 62:10 76:8
88:7 96:23 132:11
145:7 146:7,13
151:18 170:18
172:5
regardless 28:3
116:11

regime 39:9
145:25
registered 1:21
70:7,10
reimbursable
167:19
reimbursement
81:23 82:25 161:3
163:19 165:21
168:3 169:16
relate 43:16,19,21
86:15 115:15
116:3
related 64:12
85:18,22,22 86:3
86:13 116:5,7
130:16 133:15
141:24 177:18
relates 16:2 80:11
relating 24:8
169:2
relation 134:24
164:24 166:17
relationship 33:6
164:22
relationships
146:5
relative 186:13
relayed 146:19
relevance 168:25
171:20 172:22
relevant 41:17
42:14 60:2 80:4
171:16 172:11
relied 13:19 28:14
37:18 152:10
relief 148:19 149:7
rely 19:8,9 152:12
relying 41:20
143:12

remainder 86:6
122:5
remember 6:19
10:5 17:11 26:15
27:22 50:4,7
79:13,24 109:14
109:24 110:12
114:19 136:10
139:3 147:12
153:7 154:9,11,17
155:12,21 156:2
156:11 157:10,13
157:19,23 161:18
165:25 170:4
179:23 180:22
reminded 161:16
renew 180:11
repeat 15:23 43:9
59:6,7 88:17
152:2 168:7
repeated 24:21
rephrase 68:10
report 113:5,9,10
113:13 114:4,13
114:17 115:6
127:25 128:5,13
167:3 168:16
reported 38:15
145:3
reporter 1:21,22
4:25 5:4 20:19
43:12 59:6,21
68:22 97:10 186:3
reporting 38:18
167:25
reports 52:12,12
97:25 98:22 99:21
100:11,17 112:12
113:16 139:16
represent 71:6
126:8 127:7

representation
26:11,19 29:8
137:23 138:12
139:5 141:5
representative 6:3
87:7
representatives
170:12,18
represented 26:7
30:3 166:24
repressing 142:4
request 45:25
requested 20:18
43:11 59:20 68:21
97:10 128:11
131:7,17 186:11
requesting 126:5
requests 107:23
require 157:21
required 132:9
research 3:10,12
12:19 15:13 28:15
28:24 29:4 30:17
31:14 53:4,5
57:18 59:12 67:14
67:24 68:6,7,18,24
69:15,17,24 70:15
71:14,17 75:14,25
77:3,4,14 79:9
81:8 82:5 83:23
84:6,8 89:18 94:8
98:13,21 100:6,10
101:19 103:10
111:17,20 112:9
112:23,24,25
113:6 114:13
115:6,23,23,24
120:24 126:10
129:13 130:21
131:9 132:12,13
132:13,23 135:19

161:3 162:13
166:6,21 168:4
176:16 177:8
178:6,19 181:22
183:13
**research's** 73:25
**researchers**
120:19,22 132:3
**researching**
126:18 137:15
**residence** 27:2
138:14
**residual** 66:25
86:6 180:16
**residuals** 65:19
180:14
**resolution** 8:9
173:12
**resources** 23:13
**respect** 13:3 14:21
16:12 19:6 20:20
21:20 25:10,11
37:6 58:7 63:12
66:18,22 67:24
68:25 84:24 85:16
88:3 91:23 114:13
134:15 141:3
155:15 176:15
**respectfully** 8:23
**response** 104:11
104:20
**responsibility**
69:15
**rest** 122:10
**restaurant** 17:9,12
50:3,5 155:24
157:7
**restricted** 107:18
**result** 65:7
**retail** 37:11

**retain** 147:15
**retained** 112:5
**retrieve** 132:25
**retrieved** 101:23
101:25 116:17
**retrieving** 164:11
**return** 94:4
166:15
**returns** 166:7,17
166:21 167:3
169:12
**retweeted** 50:12
**retweeting** 50:14
**reveal** 124:9
**revenue** 65:2
**review** 11:21
95:20 186:10
**richard** 54:22
**right** 7:6 11:2,19
16:7 18:7 25:21
26:5 30:5,9 39:10
40:21 41:6 45:10
46:8 49:7 57:15
57:18 62:4,8
63:16 67:9 77:15
78:25 79:3,7,16
81:16,20 82:9,11
84:3 86:18 88:17
89:19,23 90:17
92:2,9 104:3,14
110:14 117:15
120:13 127:6,20
128:21 130:24
135:3,14 136:8
145:19 148:14
155:19 158:25
159:23 160:11
163:11 165:7,8
171:9 173:7
174:23 178:20
180:9 181:19,22

182:14,19 184:25
**risk** 125:8,15
**robert** 50:24,25
**role** 14:21 50:21
67:14,24 87:20
142:3
**room** 138:25
**roughly** 35:11
**rp** 106:8,17,19
107:9
**rpr** 186:22
**rule** 1:18
**ruled** 172:15,16
**ruling** 140:21
172:21
**run** 141:17 158:19
**running** 97:16
**russ** 109:23

**s**

**s** 2:2 3:4 57:5
**satisfactory** 94:24
**saved** 18:4
**saw** 93:23 111:15
129:18 144:5
**saying** 23:16 32:9
32:19 46:5 48:7
55:18 102:12
110:25 135:7
**says** 26:7 30:3
73:16 90:22 91:16
92:25 94:21 98:13
98:20 100:5,9
105:25 106:5,7
107:22 117:16
124:6 125:4
127:24 128:22
139:19 142:3
174:24 175:5
179:10
**scale** 109:2

**scanning** 165:4
**scope** 41:10 42:20
45:4,5,14,22 46:10
58:19,23 62:3
148:7 150:4 172:6
**screw** 125:16
**scrupulous** 111:24
**se** 18:24
**sea** 100:13
**search** 17:25 80:4
118:24
**searched** 118:22
**searches** 118:6
125:5,6
**searching** 118:18
126:22
**seasoned** 121:11
**second** 12:12
38:23 84:21 98:20
101:6 116:2
118:16 163:11
174:23,25 175:13
178:18
**secret** 32:16,19
36:13 37:13 49:20
108:17 118:15
124:9 142:16
**section** 76:3 100:5
**security** 36:14
37:7 51:3 95:24
106:23 117:18
118:3 119:5,9,11
120:17 124:6
125:15 126:23
130:6,16 131:24
139:21 166:10
**see** 26:9 31:9
44:20 73:11,19
80:16,23 81:19
82:16 83:11,15
85:6,13 90:19,24

91:18 94:12,19,25
98:14,24 100:7,14
103:9 105:21,23
105:25 106:5,9
107:25 109:25
112:9,15 115:21
115:24 116:22
117:21 123:6,23
127:13,14,20,21
138:9 139:25
141:15,19 142:8
143:4 145:18
146:2 153:10
163:5,6,13 175:4
176:5,16 179:10
183:3 184:20
seek 149:16
seeking 108:7
148:19,22,24
149:12
seen 7:21 8:6,8,12
56:3,5 64:10
105:6 177:23
selective 108:18
self 97:18
send 58:15 76:12
127:13
senior 32:16
sense 48:14,15
sensitive 4:6
sensitivity 119:21
sent 7:2 59:9 132:2
sentence 26:6
90:21 94:14
117:16 137:21,24
137:25 141:4,13
142:3 143:2,7,17
144:15
sentences 141:12
september 35:12
36:9

serious 103:13
seriously 121:12
serve 33:4 69:12
served 48:19
service 107:15
108:17
services 96:7,17
set 57:13 68:8,11
68:24 74:20
103:12 105:13
123:21 130:3,7,14
186:5
setting 33:6 69:11
113:7 130:4
136:10
settled 93:14
setup 129:24
sex 144:11
shanghai 102:24
sheet 188:2 189:2
sherry 26:13 27:9
shi 13:7,7,8,8
19:15,23 20:4,9
21:11,17 23:2
24:17,25,25 53:21
54:20 150:18
151:18,21 152:4
152:17 155:9
156:13,25
shit 114:7
short 173:17
shorthand 186:3,7
shortly 155:18
show 29:7 37:5
97:20 102:20
116:18
showed 102:19
103:19 109:17
137:9
showing 23:21
113:6

shown 97:22
178:24
shows 178:25
side 111:23 144:5
174:23 178:3
sift 132:6
sign 184:24
signature 90:17
186:20
signed 11:25 33:2
89:21 90:9,11,13
significant 103:10
signing 12:4 93:6
93:9,14,16,20
similar 18:25
59:10 126:10
145:23 163:25
simply 66:7
113:17 131:6
152:12
simultaneously
162:17
single 9:11
sinofide 142:18
sir 175:3
sit 64:2 156:10
site 107:18 152:24
152:24
sitting 56:22 62:7
86:8,17 165:24
situation 159:3
skin 152:15
slide 124:10,15,22
124:24 125:25
slides 124:8
slightly 157:4
small 157:14
smashing 158:15
smear 158:20
social 13:17,20
51:17 108:24

112:8,13 113:2,23
114:13,18 115:5
115:24 132:13
166:9
sol 175:14,15
176:8
solbakken 51:25
sole 22:13 67:12
solely 171:24
solutions 86:11
175:16 181:18
182:14 183:17
somebody 10:17
86:12 121:2
someone's 60:12
soon 57:7
sorry 7:25 19:14
24:25 26:22 59:18
65:13 78:23 85:8
88:19 96:13
103:18 110:11
115:17 129:10
sort 26:6 56:15
94:10 104:6 122:6
127:5,6 153:18
162:16 180:11
sought 38:12
101:20 169:15
sounds 42:14
182:16
source 22:14,15
25:17 108:11,23
108:25 109:10
112:25 132:20
133:3 142:13
143:10,12 145:5
153:5
sourced 22:8
sources 21:6 22:17
47:15,17,21
136:15 150:24

151:2
**southern** 1:3 4:20
**soviet** 142:17
  144:5,5
**sovietologist** 51:2
**speak** 9:24 10:4
  18:14 19:15 38:21
  120:6 153:8
  154:25 169:23
**speaking** 9:20
  12:24 13:9 39:3
  96:5 122:16
  158:16
**speaks** 30:21,23
  55:12
**special** 3:14 80:22
  105:11
**specific** 61:7 65:20
  67:7 78:3 100:20
  120:21
**specifically** 9:21
  18:15 47:16 84:13
  98:19 117:12
  119:8,10 137:19
**specified** 100:12
  112:13
**speculate** 41:8
**speculating** 10:7
**speculation** 8:21
  154:15
**spend** 23:12
**spends** 15:5,9
**spent** 75:2 77:22
  78:2
**split** 63:21 65:11
  65:24 180:12
**spoke** 16:25 18:15
  54:4 152:12
  157:24
**spoken** 141:8

**spokesman** 140:13
**sponsor** 37:19
**sponsorship** 37:8
**spring** 16:18,19
  36:8
**spu** 166:10
**spy** 39:14,16,20
  40:15 41:5 58:17
**square** 138:7
**stack** 96:22 102:21
  111:14
**stamp** 160:16
  164:13
**stamped** 3:18,20
  3:22,24 73:6
**stand** 104:16
**standard** 132:22
**stands** 106:20
**start** 23:7 26:5
  27:11 34:12 84:9
  117:15 128:22
  130:15 133:12
  146:11 170:10
  176:24
**started** 87:5
**starting** 46:10
  161:7
**starts** 94:11,15
  141:13
**state** 1:23 5:3
  33:12 36:14 37:6
  139:21 186:3
  187:9
**statement** 3:9
  13:13,18 16:9
  17:15 23:8 24:24
  25:2,11,14,16
  28:12,13 34:23
  35:3 38:10 41:5
  55:15 63:25 71:13
  80:12 83:10 84:25

86:3 104:17
  138:19 176:22
**statements** 13:6
  21:15,19,21 22:8
  23:15,22,24 24:21
  25:4,5,8,8 33:9
  35:14,22 36:6,21
  37:22,23 55:2,8
  96:17 109:7
**states** 1:2 13:2
  33:7,17 38:7,13
  58:16,22 60:24
  61:10 62:2,22
  63:6 74:21 138:4
**status** 16:12 38:13
  41:24 44:9,24
  46:2 63:12 108:20
  113:10 127:24
  128:5,13
**statutory** 107:17
**stay** 61:4
**stemming** 64:6
**stephen** 1:20 4:25
  186:21
**stolen** 97:18
**stopping** 128:24
**straight** 95:23
  138:19 139:13
**strategic** 1:10,19
  2:15 3:6 4:19 5:10
  5:12,16 6:4,7,18
  7:5,8,12,14,21 8:2
  8:13,24 9:21
  10:13,18,22 11:5
  11:15,18 12:20
  16:21 18:5,9,21,24
  19:4,9 20:10,21
  21:12 22:6 26:7
  28:11,13,20 29:11
  30:2,4,9,12 31:12
  31:20 35:16 40:3

42:24 43:3,19,22
  44:12 45:7,9
  46:16,22,24 47:5
  47:14 48:19 49:10
  52:7,25 53:12
  54:6 55:2 57:13
  57:24 59:2 60:20
  62:6 63:16 64:4
  64:11,12 65:6
  66:11,15,18,21
  67:8,18 68:4,13,25
  70:16 71:18 75:7
  75:13 78:6 80:3
  83:14 87:8,10
  88:21 89:9,15,22
  90:2,13 92:18
  93:5 94:3 96:6,7
  96:15 99:2,7,11,20
  100:16 102:4
  103:18 104:2,10
  104:12 105:14,18
  109:13 110:6
  111:11,16 112:17
  114:24 117:11,16
  117:19,23 124:17
  124:20 126:9
  129:9,10 130:18
  130:22 131:2,5
  132:10,16 133:14
  133:17 134:19
  135:10,20 137:5
  137:18 138:5,13
  139:12 140:3
  141:5,21 142:10
  143:7,21 145:9,14
  146:6,8,12,23,24
  147:5,25 148:18
  148:23 149:15
  150:8,25 151:19
  152:5,9,11 153:4
  154:19 158:25

159:6,14 167:8,15
167:18 168:21
169:10,18 170:13
176:8 177:13,20
180:10,18 181:3
181:10 182:4
183:3,13,17,20,24
184:5,10 187:3
188:3
**street** 2:7,17 35:2
139:16 140:13
**stress** 138:24
**stressed** 118:10
**stressing** 119:20
**strike** 10:12 30:14
40:8 95:15 101:15
112:3 115:17
130:20 135:8
146:10 169:17
170:9 177:4
**structured** 78:9
**struggle** 139:24
140:9
**studied** 142:16
**study** 47:21
**studying** 142:15
**stuff** 133:8
**sub** 68:9 98:12
**subcontracting**
69:13
**subcontractor**
70:22 72:17,19
135:19
**subheading** 90:18
**subject** 7:24 16:3
39:13 106:22,25
116:4 131:12
132:18 134:21
147:24 149:22
172:16 173:11
189:17

**subjects** 100:12,21
103:11 112:14
113:24
**submitted** 81:24
162:22 166:21
**submitting** 168:3
**subpoena** 104:20
**subpoenaed** 104:2
104:9,10,13
**subscribed** 186:15
**subsequent** 86:3
94:12,16
**subsequently**
181:3
**subservience** 33:4
**subtitle** 112:9
**subversive** 142:6
**success** 36:13
**sue** 49:23
**sued** 9:14,15 40:14
50:19
**sues** 49:21
**suggested** 58:11
**suing** 8:24 34:17
**suit** 7:24 119:23
146:16
**suits** 39:8
**summarize** 52:3
**summarizing** 52:4
**summary** 97:12
102:10
**summer** 16:19
**sums** 136:13
**supplement**
158:24
**support** 24:16
35:17 46:15 48:9
48:13,14,14 158:6
**supported** 33:17
**supporting** 20:14

**supports** 21:13
**supposed** 113:16
113:17 129:22
131:13 136:12
158:8
**supposedly** 57:4
**suppressing** 142:5
**sure** 7:3 17:18,21
53:7,18 70:20
107:16 130:9
167:20 170:6
176:23 183:10
**surmising** 143:14
**surreptitious**
144:11
**surveillance**
143:19
**suspected** 108:10
108:14 118:25
119:3
**sv** 3:5 11:12 55:23
71:3 75:19 88:9
105:4 121:15
160:21
**svus** 3:18,24 117:3
160:17 164:13
**sworn** 5:20 23:23
48:7 174:8 186:6
**system** 38:8 78:9
142:17,17
**systems** 142:16,20

**t**

**t** 3:4 186:1,1
**tabulated** 169:21
**tack** 53:17
**tail** 103:2
**take** 12:9,11 32:19
37:13 39:23 44:6
59:16 62:13 79:11
86:18 90:7 104:23
118:23 121:11

122:17,22 123:14
137:23 151:14
156:19,22 168:10
172:7 173:16
174:18 181:13
184:4,21
**taken** 4:16 118:22
120:21 122:19
125:10 144:14
186:4
**takes** 133:12
**talk** 11:4 12:16
32:14 60:16 119:9
169:12
**talked** 25:19 32:17
55:4 85:2 177:5
178:2 183:7
**talking** 27:17 53:4
54:11 64:23 127:5
153:11 158:21
**target** 118:7
**targets** 106:8,15
113:2 120:21
126:18 137:15
144:21
**tasked** 58:8
118:24 119:14
120:23
**tax** 166:5,6,15,16
166:21 167:3
169:7,12
**taxes** 167:14
168:17
**team** 3:12 72:18
72:20,22 74:6,9,17
74:19,20 75:6,9,25
76:5,8,12,18,23,24
77:2,7,10,18,22
78:6 79:8,16 80:3
80:25 81:5,9,15
101:10,11,11,16

102:5 112:24
113:7 117:16,23
117:25 118:25
119:14 120:9,12
120:24 121:2,7
123:10,11,13,15
124:4,4,10 125:4,5
125:9,12,17,17,20
126:2,19 128:25
129:8,9,10 130:8,8
130:13,17 131:3,5
131:8,11,15,25
132:11,16,17
133:15,19 134:12
134:15,18,18,22
134:22 135:10,13
135:20,24,24
137:4,13 175:11
176:20,21 177:2,8
177:9,12 178:8,9
**teams** 78:2 125:19
125:22 126:9,12
126:17 130:4
134:20 137:14
**tech** 51:15,16
**telephone** 128:5
**tell** 9:7,11 14:5,9
31:24 52:5 56:15
56:20 57:10 66:24
72:13 73:20,23
85:20 101:8,16
107:12 108:8
110:2 112:21
132:15 149:9
156:9
**telling** 142:13
**tells** 158:14
**ten** 129:16,16
**term** 65:20,21,22
158:2

**terminate** 90:22
91:6,7
**terminated** 83:24
85:17 91:10
**termination** 84:11
84:15,19 105:23
106:5
**terms** 74:18 79:21
81:7 91:3 92:12
129:7 181:16
**terrible** 145:17
152:16
**territory** 126:23
**testified** 5:21
63:18,20 93:22
119:23 136:19,21
147:3 174:9
179:20
**testify** 6:6 42:8,10
42:16,21,25 44:2,4
44:8,10,13,23
45:12,20,25 48:24
67:7 74:13 117:7
137:11 159:12
169:9
**testifying** 1:18 6:3
186:6
**testimony** 7:18
8:10,13 21:2
23:23 24:12 37:21
38:17 46:13 48:8
48:25 55:7,15
87:14 126:8 135:2
156:7,10 157:18
161:22 179:6,15
186:8
**texas** 109:18
110:13,14
**text** 7:2 17:22 18:2
18:20 25:6 40:7
76:4 106:4 127:13

**thank** 91:9 164:13
184:25
**thanks** 173:14
**theministry**
139:21
**theory** 167:19
**thick** 102:22,23
**thing** 34:2,5 44:21
96:11 132:8
**things** 52:21 68:12
68:25 69:8 84:22
122:20 131:14
144:5 145:18
172:11
**think** 17:8,10
40:23 44:21 45:2
45:3,11,13 55:4
59:25 60:2 61:15
61:15,16 63:19
68:15 70:11 93:23
114:16,16 115:3
116:20 123:8
135:21 147:9
150:15,20 155:8
155:17 166:16
167:7,13,16 183:7
**third** 27:21 28:3
34:5 93:3 130:12
139:7
**thought** 24:7
136:19,20
**threatened** 152:19
**threatening** 21:16
**threats** 21:17,20
**three** 102:22 110:3
110:9 115:2,4,21
116:3,5,7 125:18
126:12 153:18
156:6 160:12
183:7,12

**threshold** 30:15
121:22
**ticket** 161:17
**tie** 82:24
**tied** 133:21,24
**tienanmentiena...**
138:7
**ties** 49:19
**time** 16:20 18:5
26:16,18,21,24
28:3,5 86:20 87:2
87:11,17 99:4
111:3 118:19
119:25 122:3
125:7 126:15
136:4,14 143:3
159:4,15,25 160:7
173:11,23 174:10
180:18 181:3
185:3 186:4
**times** 27:4,6,8
36:23 79:20,22
139:17
**title** 7:11,18 33:12
33:13
**today** 6:3,13,14,16
8:10,14 60:17
64:2 87:8,11,17,23
96:19 184:19
**today's** 5:9
**told** 24:7 29:16
36:16,18,22 38:19
39:15,17 106:19
111:2 114:7
119:24 124:7
125:19,23 139:14
140:5,13 142:13
143:23,24 144:2
145:2,3 154:13
**top** 105:22 116:23
175:4

**topics** 44:2 46:12
171:24 173:5
**tortious** 128:24
**total** 114:23
135:23 163:24,25
182:8 183:9,13
**totaling** 165:13
**touch** 76:18,21
**tougher** 133:8
**trace** 69:9 130:10
**track** 155:14
177:6
**tracking** 100:5,9
103:10 111:17,20
115:23 132:12
176:5
**transaction** 73:7
77:14 84:25
136:23 184:11
**transactions** 98:23
99:23
**transcribed** 186:7
**transcript** 186:8,9
186:11 189:18,21
**transcription**
188:10
**transfer** 72:15,23
72:24 74:10 80:22
81:15 83:14,17
88:10,14,20 89:13
177:11
**transferred**
136:13 177:9
**transfers** 71:18,25
177:13
**transit** 103:7
**translate** 153:14
153:22
**translated** 138:22
**translates** 35:11

**translating** 138:25
**translation** 153:18
157:22
**translations**
153:19
**translator** 155:6
155:10
**transmit** 79:9
**transportation**
100:23
**trap** 119:2
**travel** 88:3 128:25
129:2
**treatment** 168:20
**tree** 67:20,23 68:3
**trial** 41:25 42:4,7
**troubling** 117:17
118:3 119:5
120:16
**true** 19:22 186:8
187:10 189:19,22
**truthful** 19:25
**try** 48:3 134:7
166:4
**trying** 15:16,25
19:3 45:8 48:17
53:9 58:25 66:3
166:18 167:21
**tucker** 50:24 51:5
**tuckers** 51:2
**turn** 4:9 12:7
25:23 38:8 73:5
80:9 81:18 82:15
83:9 88:12 89:6
89:16 94:7 98:8
100:4 115:19
117:10 128:19
137:17,19 139:9
151:23 162:25
163:2 174:22

**turned** 131:2
**twitter** 150:15
152:21
**two** 13:6 21:6
22:16 24:19 25:20
27:4 70:13 71:18
73:12,12 75:18
80:15 81:19 82:2
113:12 114:11
115:2,3 118:20
120:20 122:13
131:25 137:25
145:4 152:17,18
155:16 156:6
157:12,13 158:13
163:22 176:15
177:13 181:15
**type** 24:25
**typed** 77:6
**types** 98:16 122:21

**u**

**u** 13:23 57:5
**u.s.** 4:20 59:4
91:17 103:3 107:2
108:19,20 111:24
171:5,6
**uber** 158:8
**ultimate** 182:23
**ultimately** 105:17
**um** 127:23
**unable** 107:10
**uncover** 43:3
**underlined** 124:2
**undersigned** 186:2
**understand** 6:2
8:25 15:25 19:4
41:3 45:2,9 48:4
48:18 61:20 64:8
89:8 93:8 99:15
99:17 113:20
142:18 145:16

150:22 153:20
159:2 166:18
174:19
**understanding**
31:16 41:14,16
42:12,22 64:17
78:5 90:8 91:2
92:6,12,14,19,22
97:2 104:15,18
175:7 178:15
**understood** 20:15
31:15 47:2 93:4,5
94:21
**united** 1:2 13:2
33:7,17 38:6,13
58:16,22 60:24
61:10,25 62:22
63:6 74:21
**unusual** 120:25
146:2,4
**upset** 158:9
**usage** 112:13
113:24
**usb** 98:6 102:5
110:19 114:7,23
115:10 116:2
127:12
**use** 21:15 66:3
69:7 95:10 116:15
122:4 138:23
144:16,20 153:5
153:15,17 158:2
165:20 174:20
179:19
**utility** 153:9

**v**

**v** 1:9 171:4,5
187:3 188:3
**vague** 15:21 16:5
93:11 96:10
133:22 134:10

136:3

**various** 22:9 95:10

**vehicles** 95:10

**veracity** 10:10,14

**verbal** 16:14,15,16
78:22 79:2,4
134:12 135:4
178:3

**verbally** 78:21
178:2

**verdict** 40:18,20
40:24 41:2,20

**verification** 11:25
12:5

**verified** 11:25

**verify** 10:10,14
12:20

**verifying** 12:2

**veritext** 5:2

**versus** 4:18 65:22
66:6

**vexatious** 33:15
34:10

**vice** 37:6 139:20
143:3 144:9,10

**video** 4:15 21:22
23:21 35:7 86:21
87:4 160:2,10
174:12

**videographer** 4:2
86:20 87:2 159:25
160:7 173:23
174:10 185:3

**videos** 37:13 109:6
144:11

**violate** 95:24

**virginia** 17:2,6,7
40:13 50:2 51:15
90:3,7,10,14,15
155:23 157:2

**virtually** 122:24

**visa** 38:12

**vision** 1:10,19 2:15
4:19 5:11,16 6:4,7
6:18 7:6,9,12,15
7:22 8:2,13,24
10:13,18,22 11:15
12:20 16:21 18:6
18:9,22 19:4,9
21:12 26:8 28:14
28:21 29:11 30:4
30:9,12 31:12
35:16 42:24 43:3
43:23 44:12 45:8
46:16,22,25 47:5
49:10 55:2 57:13
57:25 60:20 62:6
63:16 64:4,13
65:6 66:11,16,18
66:21 67:8,18
68:4,13,25 70:16
71:18 75:7,13
78:6 80:3 83:14
87:8,10 88:22
89:9,15,22 90:2,13
93:5 94:3 96:6,7
96:15 99:2,7,11,20
100:16 102:4
103:18 104:2,10
104:12 105:14,18
109:13 110:6
111:11,16 112:17
114:24 117:23
124:17,20 126:9
129:9,10 130:19
130:23 131:2,5
132:10,16 133:15
133:17 134:19
135:10,20 137:5
138:5,13 141:5
143:7 145:10

146:6,8,12,23
148:18,24 149:15
150:25 152:10,11
153:5 154:19
159:6 167:15,18
169:10,19 176:8
177:13,20 180:11
180:19 181:3,11
182:4 183:3,13,17
183:20,24 184:5
184:10

**vision's** 3:6 5:12
9:21 11:6,18
18:24 20:10,21
22:6 28:11 30:3
31:20 40:3 43:20
45:10 47:14 48:20
52:7,25 53:12
54:7 59:2 64:11
92:19,19 117:11
117:16,20 137:18
139:12 140:3
141:22 142:11
143:21 145:14
146:24 147:6,25
150:9 151:19
152:5 158:25
159:14 167:8
168:21 170:13

**visited** 57:9

**voice** 22:3 23:21
35:23 36:16 141:9

| **w** |
| --- |

**w** 5:18 57:5 174:6

**wait** 42:18

**waive** 60:10,17

**waiving** 171:10

**wall** 35:2 139:16
140:13

**waller** 1:17 4:1,16
5:1 6:1,2 7:1 8:1

9:1 10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1,6 44:1,23
45:1,12,24,25 46:1
46:11 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1,21 59:1 60:1
61:1,14 62:1,8
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
81:1 82:1 83:1
84:1 85:1 86:1
87:1,5 88:1 89:1
90:1 91:1 92:1
93:1 94:1 95:1
96:1,23 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1

129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1,10
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
160:12,23 161:1
162:1 163:1 164:1
164:16 165:1
166:1 167:1 168:1
169:1,6,21 170:1
171:1 172:1 173:1
174:1,17 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 187:7,18
188:4 189:25
**waller's** 43:24
45:24 59:3 92:20
168:20
**wallerer** 5:12
**wallop** 6:21 9:4
10:2 27:13,19
28:2,9 63:20
69:25 110:7
137:11 170:2
178:4 180:13,19
182:23
**wallop's** 90:3,7,10
117:4
**wander** 172:5
**wang** 2:24 28:4,10
52:11,24 53:15
57:5 90:12,15
106:15 111:25

114:6 115:3
116:10 124:8
128:10,12 138:15
139:15
**want** 44:5 48:11
48:12 53:7 60:9
60:17 61:20 64:23
107:4 114:21
116:14 122:19,19
125:20 130:6,9
132:8 150:22
151:14 158:17
170:23 173:16
183:9
**wanted** 32:19
108:6 113:18
139:2 144:13
152:20 158:10
**wants** 55:18
118:15
**warned** 121:7
**warnings** 121:10
**washington** 36:19
79:12,16 141:25
**watching** 119:18
**watson** 10:23
147:4 152:18
155:4
**way** 10:9 37:17
42:2 46:15 48:9
58:4 63:11 65:9
78:10 86:9 87:14
102:2 110:23
118:7 126:14
128:21 133:8,16
133:21 139:2
148:4 154:11
180:17
**website** 13:15,16
110:2 124:25
153:4,5

**week** 101:6 113:10
**weeks** 27:3
**wei** 13:7,7,8,8
19:15 53:21
150:18 151:18,21
152:4,17 155:9
156:13 157:2
**weigh** 66:5
**welcome** 174:17
**wengui** 12:24
14:14,16,19,24
27:14,20 28:3,9
32:4 51:4,6 52:9
52:19 59:3 61:21
90:5 95:8 126:4
158:14
**wengui's** 43:17
44:24 118:6
**went** 49:2 54:25
72:8,17 102:11
103:2 111:7
116:16 153:10
156:14 175:8
176:9 177:7
178:16 181:17,18
181:22,25
**wherefore** 149:5
**whereof** 186:14
**whispering** 4:6
**widely** 140:6
**wife** 32:20
**willing** 74:13
**wilmington** 2:18
**wing** 142:21
**wire** 37:9,12 71:18
72:15,23,24 77:14
80:21 83:13 86:14
89:7 136:22 175:8
175:14 177:3,10
178:16,19,23
181:21,25 183:16

183:19
**wires** 174:24
175:5 176:15,19
183:7,12,22,23
184:7
**wisconsin** 103:4
**wished** 37:14
**withdraw** 92:7
149:3
**withdrawal** 72:5
72:11,13 73:16
**witness** 5:19 20:25
23:6 24:12 29:21
41:8 42:6,21
43:14 45:16,20
46:25,25 59:15
60:3 61:18 148:9
148:16 149:23
159:12 168:19
170:21 171:19
173:2,15,21 174:7
186:14 188:4
**witnesses** 24:5,20
171:14 186:5
**won** 40:18,19,21
**word** 31:9 55:17
66:3 76:4 94:12
94:15 125:13
**words** 23:20 33:5
33:10 105:23
**work** 28:16 31:17
45:10 62:21 70:22
74:21 88:11 101:9
105:12 113:4,21
119:17 120:3,5
121:4 123:19
126:21 130:4
142:14,19,20
145:10,22 151:2
159:10,17 180:4,7

**worked** 37:9 51:6
  144:4
**working** 10:22
  51:3 117:17
  119:19
**worthless** 114:8
**writer** 10:24
  152:13
**writing** 94:18
  120:11
**writings** 13:16
  25:4 143:24
**written** 6:22 8:8
  8:17 11:25 13:5
  13:13,18 16:9,11
  17:14 21:13 25:2
  25:3 31:6,14,25
  40:10 50:11 70:4
  76:8 79:6 90:23
  96:3 102:17
  134:23 153:20
  177:17
**wrong** 132:3
  136:20
**wrote** 152:13
**wu** 147:16,21,24
  148:3 149:15,22
  150:6,11 170:7,12
  170:17
**wyoming** 70:11

### x

**x** 1:4,12 3:4 13:23
  38:23 39:4 186:11
**xi** 32:11 33:3,4,5,7
  33:11 35:24,25
  158:17
**xia** 38:23 39:4,6
  39:10,13,17,19
  40:2,6,9,14 46:14
  46:14 47:16 48:9
  48:19 53:25 54:6

54:12,15
**xia's** 47:25 54:17

### y

**y** 38:24
**yeah** 65:24 70:9
  92:21 144:7
  163:22 169:5
**year** 16:19,19 37:5
  39:24 166:7
**year's** 34:10
**years** 33:14
**yeliang** 38:23
**york** 1:3,15,15,23
  4:21,23,23 5:2
  19:20 24:2,18
  25:13 32:5 36:23
  87:23 90:5 139:16
  172:4 186:3 187:9
**youtube** 22:2
  34:22,25 35:9
**yvette** 2:24 28:4
  28:10 52:10 90:11
  90:15 111:25
  114:6 115:2 124:7
  128:10 138:15,24
  139:15

### z

**zurich** 127:14

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT J

```
 1              UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF NEW YORK

 3      _____

 4      Eastern Profit Corporation, )

 5                  Plaintiff,      )

 6      V.                          )    Civil Action No.

 7      Strategic Vision U.S, LLC,  )    1:18 CV 02185

 8      Defendant.                  )

 9      _____

10

11              C O N F I D E N T I A L

12

13

14         Videotaped Deposition of Bill Gertz

15              Tuesday, October 15, 2019

16

17
        ATKINSON-BAKER, INC.
18      (800) 288-3376
        www.depo.com
19      Reported by:  Jackie Smith

20      JOB: AD07998

21
```

**Atkinson-Baker, Inc.**
**www.depo.com**

1
2
3
4          Tuesday, October 15, 2019
5
6
7    Held at:  Law Offices of Kroph
8          1100 H Street NW, Suite 1220
9          Washington, D.C. 20005
10
11
12          Pursuant to Notice, before Jackie Smith,
13   Court Reporter and Notary.
14
15
16
17
18
19
20
21

Page 2

1          A P P E A R A N C E S (CONTINUED)
2    COUNSEL FOR THE WITNESS:
3          Sara Kropf, Esquire
4          Kroph Moseley PLLC
5          1100 H Street NW, Suite 1220
6          Washington, D.C. 20005
7          E Mail:  sara@kmlawfirm.com
8
9
10   ALSO PRESENT:
11          Jeffery Elam, Video Specialist
12          French Wallop
13          Michael Waller
14
15
16
17
18
19
20
21

Page 4

1          A P P E A R A N C E S
2    COUNSEL FOR THE PLAINTIFF:
3          Joanna J. Cline, Esquire
4          Pepper Hamilton LLP
5          3000 Two Logan Square
6          Philadelphia, Pennsylvania 19103 2799
7          E-Mail:  clinej@pepperlaw.com
8          (215)-981-4000
9
10   COUNSEL FOR THE DEFENDANT:
11          Lucinda H. Luetkemeyer, Esquire
12          Graves Garrett LLC
13          1100 Main Street, Suite 2700
14          Kansas City, Missouri 64105
15          E Mail:  lluetermeyer@gravesgarrett.com
16          (816) 256 3181
17
18
19
20
21

Page 3

1          C O N T E N T S
2    EXAMINATION OF BILL GERTZ:          PAGE
3    By Ms. Luetkemeyer                  08
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

Page 5

2 (Pages 2 to 5)

**Atkinson-Baker, Inc.**
**www.depo.com**

EXHIBITS

| No. | Description | Page |
|-----|-------------|------|
| 1 | E Mail, 11 11 17 | 10 |
| 2 | News Article | 61 |
| 3 | News Article | 83 |

Page 6

---

PROCEEDINGS

(12:03 p.m.)

THE VIDEOGRAPHER:  I am Jeffrey Elam, your videographer, and I represent Atkinson Baker, Incorporated in Glendale, California.

I am not financially interested in this action, nor am I related or employed of any attorney or any party.  The date is October 15, 2019.  The time is 12:03 p.m.

This deposition is being taking place at Kropf Moseley PLLC, 1100 H Street, Suite 1220, Washington, D.C.  The Case is filed in the United States District Court for the Southern District of New York, Case No. 18 CV 2185(K) excuse me, (JGK), entitled Eastern Profit Corporation, Limited versus Strategic Vision U.S., LLC.

The deponent is Bill Gertz.  This deposition is being taken on behalf of the defendant. Your court reporter is Jackie Smith from ELSS Executive Reporting.

Counsel will now please introduce

Page 7

---

themselves.  Counsel, please introduce yourselves

MS. KROPF:  I am Sara Kropf.  I represent the witness.

MS. LUETKEMEYER:  Lucinda Luetkemeyer on behalf of the defendant and counter claimant, Strategic Vision.

MS. CLINE:  Joanna Cline, Pepper Hamilton, on behalf of Eastern Profit.

THE VIDEOGRAPHER:  Will the court reporter please swear in the witness.

(Whereupon, witness was duly sworn.)

BY MS. LUETKEMEYER:

Q.  Good morning, Mr. Gertz.

A.  Good morning.

Q.  We met earlier.  I am Lucinda Luetkemeyer and I represent, Strategic Vision, the defendant in this action.  You are here today for your deposition.

Have you ever been deposed before?

A.  Yes.

Q.  And when was that?

Page 8

---

A.  Many years ago.

Q.  Do you remember what action it was in?

A.  I don't.

Q.  Okay.  So if you have been deposed before, it's fair to say that you understand what a deposition is?

A.  Yes.

Q.  You take an oath to tell the truth and you understand that's the whole truth to the full extent of your knowledge?

A.  Yes.

Q.  If you answer a question that I ask, I'm going to assume that you understood my question; is that fair?

A.  Okay.

Q.  And if you need clarification or if I speak too quickly, which sometimes I do, please just ask me to rephrase it and I will.

And I will also ask you to please give verbal answers like yes or no instead of um hum or uh

Page 9

---

3 (Pages 6 to 9)

**Bill Gertz - Confidential**
**October 15, 2019**

1 Ap, to communicate with Mr. Guo?
2      A.   No.
3      Q.   Okay.  Did you ever use What's Ap to
4 communicate with Ms. Wallop?
5      A.   No.
6      Q.   And do you have any hard copy
7 documents in your possession related to this matter?
8      A.   No.
9      Q.   Okay.  Any handwritten notes?
10      A.   No.
11      Q.   Okay.  I don't think I have any more
12 questions about this exhibit now, but we might come
13 back to it later, so feel free to keep it in front of
14 you.  Thank you.
15      Mr. Gertz, how did you prepare for today's
16 deposition?
17      A.   I just, basically, got ready to talk
18 about this case.
19      Q.   And did you meet with anyone to
20 prepare for today's deposition?
21      A.   No.

Page 14

1      Q.   Did you meet with your lawyer?
2      A.   Yes.
3      Q.   Okay.  Did you   I'm not going to
4 ask you about your communications with your lawyer
5 because those are privileged, but did you meet with
6 anyone other than your lawyer to talk about this
7 deposition?
8      A.   No.
9      Q.   Did you speak with Ling Cho Hann
10 (phonetic) about this deposition?
11      A.   No.
12      Q.   Did you speak with Mr. Guo about this
13 deposition?
14      A.   No.
15      Q.   And have you reviewed any other prior
16 depositions taken in this case?
17      A.   No.
18      Q.   Okay.  So you haven't seen French
19 Wallop's deposition, for example?
20      A.   No.
21      Q.   Okay.  Have you ever reviewed any of

Page 15

1 the pleadings in this case?
2      A.   No.
3      Q.   So you haven't seen the complaint or
4 the counterclaim?
5      A.   No.
6      Q.   Do you know, generally, what this
7 case is about?
8      A.   Vaguely.
9      Q.   And how do you have knowledge of
10 that?
11      A.   I think it was from some news reports
12 about a contract dispute.
13      Q.   Okay.  And that might have been the
14 news reports from earlier this summer?
15      A.   Yes.
16      Q.   Okay.  And did you show this document
17 that we discussed earlier, Exhibit 1, to anyone other
18 than your attorney before today?
19      A.   No.
20      Q.   Did anyone instruct you not to
21 provide documents responsive to our request?

Page 16

1      A.   No.
2      Q.   Let's start with going into your
3 background a little bit, your education and your
4 profession.  Can you just tell me a little bit about
5 you, and what you do, and how you arrived to your
6 position today?
7      A.   I am a journalist and author.  I work
8 for The Washington Times, and until recently, The
9 Washington Beacon.  I have written eight books.
10 I have -- I was educated at Washington College in
11 Chester Town, Maryland and also at George Washington
12 University in Washington, D.C.
13      Q.   And do you also occasionally do
14 speaking engagements?
15      A.   Yes.
16      Q.   And how often would you say you do
17 speaking engagements?
18      A.   Maybe once every two to three months.
19      Q.   Is that around the country or mostly
20 around here?
21      A.   It could be locally or it could be

Page 17

5 (Pages 14 to 17)

**Atkinson-Baker, Inc.**
**www.depo.com**

| | |
|---|---|
| 1 | Q. Had you interviewed Mr. Guo before |
| 2 | this article? |
| 3 | A. No. |
| 4 | Q. Had you met Mr. Guo before this |
| 5 | article? |
| 6 | A. No. |
| 7 | Q. And how soon after this article was |
| 8 | written did you meet with Mr. Guo? |
| 9 | A. Like I said, it was in the June or |
| 10 | July time frame. |
| 11 | Q. Do you believe this is the first |
| 12 | article you wrote about Mr. Guo? |
| 13 | A. I don't know. |
| 14 | Q. It's the earliest I found, so take |
| 15 | that for what you will. |
| 16 | In this article, Sasha Gong is quoted as a |
| 17 | source. Do you see that in the fourth paragraph? |
| 18 | A. Yes. |
| 19 | Q. What is this article about, |
| 20 | Mr. Gertz? |
| 21 | A. It's about an interview that was |

Page 62

| | |
|---|---|
| 1 | curtailed by the Voice Of America, and the suspension |
| 2 | of four VOA employees. |
| 3 | Q. Did you interview Sasha Gong for it? |
| 4 | A. Yes. |
| 5 | Q. Will you turn to the third page of |
| 6 | this Exhibit 2, please. It's the paragraph that |
| 7 | begins with, additionally. "Additionally, Guo's wife |
| 8 | and daughter currently have been allowed by Chinese |
| 9 | authorities to visit him in New York, but are required |
| 10 | to return to China for 20 days where they can be used |
| 11 | for political leverage against Mr. Guo." |
| 12 | Do you see that, Mr. Gertz? |
| 13 | A. At the top there, um hum. |
| 14 | Q. Now, if you didn't interview Mr. Guo |
| 15 | for that, do you remember where you learned that |
| 16 | information? |
| 17 | A. It was probably Sasha Gong. |
| 18 | Q. Okay. And then a few paragraphs |
| 19 | down, you say, Guo said -- if that was not from an |
| 20 | interview from Guo, would that also been from Sasha? |
| 21 | A. It would have been in a recent video. |

Page 63

| | |
|---|---|
| 1 | Q. And these are videos that Mr. Guo |
| 2 | would put on the Internet? |
| 3 | A. Yes. |
| 4 | Q. Just available for public viewing? |
| 5 | A. Yes. |
| 6 | Q. Okay. Did Sasha Gong introduce you |
| 7 | to Mr. Guo? |
| 8 | A. Yes. |
| 9 | Q. And when did that occur? |
| 10 | A. It would have been in the June to |
| 11 | July time frame, before I did the interview. I |
| 12 | contacted Sasha and said I would like to interview |
| 13 | Mr. Guo. |
| 14 | Q. Do you know how Sasha met Mr. Guo? |
| 15 | A. I do not. |
| 16 | Q. And did she agree to make the |
| 17 | introduction? |
| 18 | A. Yes. |
| 19 | Q. And when did you first meet him? |
| 20 | A. It was in the June or July time |
| 21 | frame. |

Page 64

| | |
|---|---|
| 1 | Q. And where did you meet? |
| 2 | A. In New York. |
| 3 | Q. At his apartment? |
| 4 | A. At a restaurant. |
| 5 | Q. And was Ms. Gong present? |
| 6 | A. No. |
| 7 | Q. Who was present for that meeting? |
| 8 | A. An interpreter and Evette Wong. |
| 9 | Q. Do you remember who the interpreter |
| 10 | was? |
| 11 | A. Yes. His name is Wui Chungua |
| 12 | (phonetic). |
| 13 | Q. And who was the other third person |
| 14 | you said? |
| 15 | A. Evette Wong. |
| 16 | Q. Who is Evette Wong? |
| 17 | A. She, I believe, is an assistant to |
| 18 | Mr. Guo. |
| 19 | Q. And who is her employer? |
| 20 | MS. CLINE: Objection, foundation. |
| 21 | THE WITNESS: I don't know. |

Page 65

17 (Pages 62 to 65)

**Bill Gertz - Confidential**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

BY MS. LUETKEMEYER:

Q.   And is that the first time you had met her?

A.   Yes.

Q.   And you said you met at a restaurant?

A.   Yes.

Q.   And how did that meeting go?

A.   It was an interview.

Q.   So it was an interview.  Was it on the record?

A.   Yes.

Q.   And do you remember about how long it lasted?

A.   Probably an hour.

Q.   And what was your first impression of Mr. Guo?

A.   I was amazed.  I felt that this is a person who is an amazing resource of inside information within the Chinese system.

I felt like he was, in a sense -- in my experience, I have covered intelligence defectors.

Page 66

And I believe that he was like a defector in the sense that he had access to inside information related to the Chinese Government, the Chinese Communist Party, and the Chinese Intelligence Services.

Q.   And did you believe that he would be a valuable source for you?

A.   Yes.

Q.   How long did that meeting last, or interview?

A.   About an hour.

Q.   And did you agree to meet again?

A.   I don't know.  I don't recall.

Q.   After that first meeting, did you begin to speak with Mr. Guo over the phone?

A.   After the first meeting, again, because I realized he was a valuable resource, I actually wanted to seek to do a book about him.

Q.   Already, after that first meeting?

A.   Yes.

Q.   Did he provide you with any documents

Page 67

in that first meeting?

A.   No.

Q.   And did you make up a proposal to Mr. Guo after the first meeting?

A.   Not after the first meeting.  I think it might have been several months later.

Q.   How frequently would you speak with Mr. Guo after that first meeting?

A.   After the first meeting, it was not frequently, yes.

Q.   And did he eventually become a source for you, subject of many of your articles and columns?

MS. CLINE:  Objection.

THE WITNESS:  Occasionally.  I interviewed him occasionally, and he was a source.

BY MS. LUETKEMEYER:

Q.   Did your opinions of Mr. Guo change over time?

A.   No.

Q.   Do you still believe today that same thing you believed whenever you left that first

Page 68

meeting?

A.   Yes.

Q.   And if you were to describe Mr. Guo to someone who had never heard of him, how would you describe him?

A.   A dissident, Chinese millionaire, who is working to bring about democracy and rule of law in China.

Q.   And what do you think his motivations are?

MS. CLINE:  Objection, foundation.

THE WITNESS:  I don't know his motivation, other than he has become a defector, former insider, who is now seeking to bring about democratic change.

BY MS. LUETKEMEYER:

Q.   And when you say bring about democratic change, can you expand on that a little bit, about his goals?

MS. CLINE:  Objection, foundation.

THE WITNESS:  He believes that the

Page 69

18 (Pages 66 to 69)

**Bill Gertz - Confidential**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

Communist Party of China is the source of the problem
of what I regard as the China threat today.
BY MS. LUETKEMEYER:
    Q.   When you say "the China threat," can
you explain that to me?
    A.   That's the title of my 2000 book.  In
China, they have something called the China threat
theory, which is the Chinese Government and
Intelligence Services use to monitor opposition to
China's development.
    So it's a play on the Chinese threat theory.
And it is, basically, the national security threats
from China which range from military, to political, to
intelligence, to economic, to financial.
    Q.   And do you believe Mr. Guo has value
in defeating the China threat?
    A.   Yes.
    Q.   In what way?
    A.   Because he is a former insider and
has access, he can provide valuable information that
could be used to help expose what I call the China

Page 70

threat.
    Q.   And when you first met Mr. Guo and he
told you his story, did you do any independent
reporting or verification on what he told you?
    A.   I did.  As much as I possibly could,
I read some of the stories about him in the Chinese
press or the press around the world, but there wasn't
a lot of information available on him.
    Q.   Mr. Gertz, do you speak Mandarin?
    A.   No.
    Q.   And so when you would meet with
Mr. Guo, was there always an interpreter present?
    A.   Not always, but many times.
    Q.   Does Mr. Guo speak English?
    A.   I'd say haltingly.
    Q.   Was it usually the same interpreter?
    A.   No.
    Q.   Who would interpret for him, if you
can remember any of their names?  You mentioned one
earlier.
    A.   Evette Wong, Ling Cho Hann were

Page 71

interpreters.
    Q.   So for many of your meetings with
Mr. Guo, was Ms. Wong present?
    A.   I would say occasionally.
    Q.   Did you ever meet with him one on
one, Mr. Guo?
    A.   Yes.
    Q.   And where would that occur?
    A.   In his apartment.
    Q.   And how frequently would you travel
to New York to meet with him?
    A.   I'd say once every two months.
    Q.   And would you describe your
relationship with Mr. Guo as a professional one?
    A.   I'd say it was a combination of both
a professional, as a source, as well as some
friendship.  In the news business, sources can be
friends.  It's not unusual.
    Q.   Would you socialize with him?
    A.   Would I socialize with him; what do
you mean by that?

Page 72

    Q.   Have you ever spent time with Mr. Guo
in a purely social capacity where he is not serving as
a source for you?
    A.   No.
    Q.   Have you ever been on his yacht?
    A.   Yes.
    Q.   How many times?
    A.   Once.
    Q.   And you said you have been in his
home in New York City?
    A.   Yes.
    Q.   Have you ever been in his home, not
to work on your book or the reporting, just to spend
some time together?
    A.   Well, like I said, I view him as a
valuable source of information.  So there is never a
time that I am not with him when I am not looking for
some inside information that could be produced as a
news story.
    Q.   Did you help Mr. Guo in his
application for asylum?

Page 73

19 (Pages 70 to 73)

**Bill Gertz - Confidential**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

| | |
|---|---|
| 1    A.   No. | 1    deal with.  And so I am aware of that, and I still |
| 2    Q.   But you are aware of that? | 2    regard him as a valuable resource. |
| 3    A.   Yes. | 3         Q.   Do you believe that Mr. Guo has that |
| 4    Q.   You never advised him on that | 4    kind of baggage? |
| 5    application? | 5         A.   I think all defectors have that |
| 6    A.   No. | 6    baggage, and I would say yes. |
| 7    Q.   You never consulted with him or his | 7         Q.   When you say baggage, what do you |
| 8    lawyers? | 8    mean by that? |
| 9    A.   No. | 9         A.   Whatever personality difficulties or |
| 10   Q.   Has he ever asked you for help | 10   adjustments to dealing with a new society.  He came |
| 11   applying for asylum? | 11   from a different system than is in the United States. |
| 12   A.   No. | 12        Q.   Did you think that Mr. Quo's main |
| 13   Q.   Wherever you would write articles or | 13   goal was to bring down the Chinese Communist Party? |
| 14   columns about Mr. Guo, would you ever show him a draft | 14        A.   Did I believe? |
| 15   before they were published? | 15        Q.   Did you and do you? |
| 16   A.   No. | 16        A.   I do. |
| 17   Q.   Would you ever show him quotes before | 17        Q.   And do you believe he is an opponent |
| 18   they were published, to make sure they were approved | 18   of Chairman Xi? |
| 19   or translated correctly? | 19        A.   Yes. |
| 20   A.   No. | 20        Q.   And have you personally ever heard |
| 21   Q.   And to your knowledge, did Mr. Guo | 21   Mr. Guo give an oath of loyalty to the Chinese |
| Page 74 | Page 76 |

| | |
|---|---|
| 1    read what you wrote about him? | 1    Community Party? |
| 2    A.   Yes. | 2         A.   No. |
| 3    Q.   Did he ever express an opinion about | 3         Q.   Have you ever heard a video of him |
| 4    your writing about him? | 4    doing that? |
| 5    A.   Yes. | 5         A.   No. |
| 6    Q.   And what he did he say? | 6         Q.   Have you ever heard an audio of him |
| 7    A.   If he liked a story, he would send me | 7    doing that? |
| 8    a text that he liked the story. | 8         A.   No. |
| 9    Q.   And if he didn't like the story? | 9         Q.   So it's fair to say you are unaware |
| 10   A.   I didn't hear anything. | 10   of any expressions of loyalty to Chairman Je? |
| 11   Q.   Were you certain that Mr. Guo was a | 11        A.   I would say that at the early stages |
| 12   dissident? | 12   of what he describes as whistle blowing or basically |
| 13   A.   Yes. | 13   exposing things, that I believe that perhaps he was |
| 14   Q.   And why is that? | 14   trying to hedge his bets. |
| 15   A.   I have had much experience dealing | 15        I can remember him kind of pulling his |
| 16   with defectors, from covering the intelligence beat. | 16   punches in criticizing Xi Jinping, while at the same |
| 17   And I can tell you that people who defect, as I | 17   time, criticizing what he regarded as large scale |
| 18   consider it, as he does, frequently come with baggage. | 18   corruption, but I never saw it as a kind of a loyalty |
| 19        They have usually had many types of | 19   or fidelity to Xi Jinping. |
| 20   different problems and things.  So often, dealing with | 20        Q.   And what did he tell you about his |
| 21   people from this situation are sometimes difficult to | 21   past? |
| Page 75 | Page 77 |

20 (Pages 74 to 77)

**Bill Gertz - Confidential**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

1    about that.
2        **Q.    You haven't seen the recording of**
3    **that, there is a video of that?**
4        A.    I have not.
5        **Q.    And when did you first meet French**
6    **Wallop?**
7        A.    It was, January, I believe, January
8    of 2017.
9        **Q.    French Wallop?**
10       A.    Yes.
11       **Q.    Okay.  And that's when you first met**
12   **her in your life?**
13       A.    Yes.
14       **Q.    Okay.  And when did you first meet**
15   **Mr.  Waller, Michael Waller, who is also here?**
16       A.    I have known Mike since, I believe,
17   he used to work at an affiliate publication of The
18   Washington Times many years ago.
19       **Q.    And what was your first impression of**
20   **Ms. Wallop?**
21       A.    Well, she said she knew my former

Page 126

1    editor, Oner Gaborkoff (phonetic), so I took that as
2    credit to her.
3        **Q.    And how would you describe your**
4    **relationship with Mr. Waller?**
5        A.    We were occasional friends when we
6    worked on a few policy oriented projects based on my
7    book, IWar, which called for reforming U.S. Government
8    information operations.
9        **Q.    What kinds of projects were those?**
10       A.    It was, basically, an idea to bring
11   about a better information capability for the U.S.
12   Government.  Right now, the Voice Of America is poorly
13   run.  We don't have the U.S. information agency that
14   we had during the Cold War.  And so my book, IWar,
15   recommends trying to revitalize some of those
16   functions.
17       **Q.    And how was Mr. Waller to help you in**
18   **that effort?**
19       A.    We sought to collaborate to present
20   these idea to get either Congress or the
21   administration to develop some type of reform

Page 127

1    programs.
2        **Q.    And do you remember about when that**
3    **was?**
4        A.    I do not, other than sometime between
5    2017 and 2018.
6        **Q.    Did you seek out Mr. Waller's help on**
7    **that effort?**
8        A.    I believe I did.
9        **Q.    And why him?**
10       A.    I believe that he has good skills at
11   doing information.
12            If I may explain, the reason that I tried to
13   contact or put French Wallop in touch with Mr. Guo is
14   that, again, because I saw him as an extremely
15   valuable resource, but also saw him as extremely
16   scattered in his presentation.
17            His presentations would be on video and they
18   would be talking about a wide variety of topics.  And
19   then in the middle of them, he would disclose really
20   valuable information about the inside workings of the
21   Chinese Government and Intelligence Service.  And I

Page 128

1    felt that he needed a strategic communications person.
2            And because French Wallop had contacted me
3    when she represented a dissident Russian billionaire
4    named Miguel Kortokofski, who I interviewed, she
5    arranged the interview, I felt that she could provide
6    strategic communication support to Guo, Mr. Guo.
7        **Q.    Did you understand Ms. Wallop to be**
8    **credible?**
9        A.    To be credible in what sense?
10       **Q.    A credible person you could recommend**
11   **for Mr. Guo to do business with?**
12       A.    I really didn't know her, I'll be
13   honest to say I really didn't know.  Like I said, I
14   was going on her reputation of having known Oner
15   Gaborkoff.
16       **Q.    Did you find her to be honest in her**
17   **dealings with you?**
18       A.    I guess I would say yes.
19       **Q.    Did you find her to be sincere?**
20       A.    Yes.
21       **Q.    And when did you first learn of the**

Page 129

33 (Pages 126 to 129)

**Bill Gertz - Confidential**
**October 15, 2019**

# EXHIBIT K

**Atkinson-Baker, Inc.**
**www.depo.com**

```
 1            ***** C O N F I D E N T I A L ****

 2            IN THE UNITED STATES DISTRICT COURT

 3            FOR THE SOUTHERN DISTRICT OF NEW YORK

 4                         - - -

 5   EASTERN PROFIT CORPORATION,          )
     LIMITED,                             )
 6                                        )
        Plaintiff/Counterclaim Defendant, )
 7                                        )
        v.                                )  Case No.
 8                                        )  18-cv-2185
     STRATEGIC VISION US, LLC,            )  (JGK)
 9                                        )
        Defendant/Counterclaim Plaintiff. )
10   -------------------------------------

11

12

13                   DEPOSITION OF

14                   LIANCHAO HAN

15                 WASHINGTON, D.C.

16                 AUGUST 28, 2019

17

18   ATKINSON-BAKER, INC.
     (800) 288-3376
19   www.depo.com

20   REPORTED BY:  CATHERINE B. CRUMP
     FILE NO. AD07997
21

22
```

**Lianchao Han - Confidential**
**August 28, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2       FOR THE SOUTHERN DISTRICT OF NEW YORK
 3                    - - -
 4   EASTERN PROFIT CORPORATION,      )
     LIMITED,                         )
 5                                    )
         Plaintiff/Counterclaim Defendant, )
 6                                    )
         v.              ) Case No.
 7                       ) 18-cv-2185
     STRATEGIC VISION US, LLC,    ) (JGK)
 8                                )
         Defendant/Counterclaim Plaintiff. )
 9   ------------------------------------
10
11
12        Video deposition of LIANCHAO HAN, taken on behalf
13   of Defendant/Counterclaim Plaintiff, at the law
14   offices of Foley & Lardner, LLP, 3000 K Street, N.W.,
15   Suite 600, Washington, D.C., commencing at 9:18 a.m.,
16   Wednesday, August 28, 2019, before Catherine B.
17   Crump, a Notary Public in and for the District of
18   Columbia.
19
20
21
22
```

Page 2

```
 1              I N D E X
 2   WITNESS:  Lianchao Han
 3   EXAMINATION            PAGE
 4     By Mr. Greim:         7, 285
 5     By Mr. Grendi:        261
 6   EXHIBITS
 7     NO.      DESCRIPTION         PAGE
 8   1 - August 28, 2019 Letter from Jeffrey
 9                                  14
10   2 - "Dissident Reveals Secret Chinese
11       Intelligence Plans Targeting U.S."   55
12   3 - You Tube Video Translation, April 29, 2017   74
13   4 - "China's Pursuit of Fugitive Businessman
14       Guo Wengui Kicks Off Manhattan Caper Worthy
15       of Spy Thriller"             88
16   5 - Certified Translation:  "A Proposal for a
17       Thorough and Comprehensive Solution
18       Regarding the Matters Involving Pangu
19       Bldg Investment and Other Concerning
20       Guo Wengui"                  99
21   6 - You Tube Video Translation,
22       January 18, 2018
```

Page 4

```
 1   A P P E A R A N C E S :
 2   FOR DEFENDANT/COUNTERCLAIM PLAINTIFF:
 3   GRAVES, GARRETT, LLC
     BY:  EDWARD D. GREIM, ESQ.
 4   1100 Main Street, Suite 2700
     Kansas City, Missouri  64105
 5   (816) 256-3181
     edgreim@gravesgarrett.com
 6
     ALSO PRESENT:
 7
     FRENCH WALLOP
 8   MICHAEL WALLER
 9   FOR PLAINTIFF/COUNTERCLAIM DEFENDANT:
10   ZEICHNER, ELLMAN & KRAUSE, LLP
     BY:  ZACHARY GRENDI, ESQ.
11   1 Landmark Square
     Fourth Floor
12   Stamford, Connecticut  06901
     zgrendi@zeklaw.com
13
     ALSO PRESENT:
14
     DANIEL PODHASKIE
15   YVETTE WANG
16   FOR THE WITNESS:
17   SCHULMAN, BHATTACHARYA
     BY:  JEFFREY S. GAVENMAN, ESQ.
18   The Clark Building
     7500 Old Georgetown Road
19   Suite 901
     Bethesda, Maryland  20814
20   (240) 356-8553
     jgavenman@schulmanbh.com
21
22   VIDEOGRAPHER:  Steven Jones
```

Page 3

```
 1   EXHIBIT NO.               PAGE
 2   7 - Thumb Drive           130
 3   8 - Proposal:  "Vision"   130
 4   9 - "Three-Year Timeline"    134
 5   10 - Text Messages        140
 6   11 - Research Agreement    222
 7   12 - "Chinese Tycoon Holed Up in Manhattan
 8        Hotel Is Accused of Spying for Beijing"   257
 9
10   [Han Exhibit Nos. 10 and 11 are designated
11   confidential.]
12
13   WANG EXHIBIT NO.           PAGE
14   5 - Text Messages          196
15   12 - Financial Forensic Research and
16        Tracking Research          170
17
18        [Wang Exhibit No. 12 is designated confidential.]
19
20
21
22
```

Page 5

2 (Pages 2 to 5)

**Atkinson-Baker, Inc.**
**www.depo.com**

| | |
|---|---|
| 1 | Q. What do you mean, "within the system"? |
| 2 | A. With the communist, work for the Chinese |
| 3 | Government. I didn't know the source, but I just |
| 4 | didn't remember if he said that in the meeting or |
| 5 | later, but that's my impression. |
| 6 | Q. Well, let me back up for a second. When |
| 7 | did you first remember meeting her? |
| 8 | A. Meeting Yvette? |
| 9 | Q. Um-hum. |
| 10 | A. I think maybe two years ago. |
| 11 | Q. Okay. So it would be late summer of |
| 12 | 2017? |
| 13 | A. It will be August or September. August, |
| 14 | most likely, yeah, August. |
| 15 | Q. How are you able to remember that time? |
| 16 | A. That was political asylum. Miles tried |
| 17 | to -- that's why we were introduced to him and he did |
| 18 | help him with his political asylum. Yeah. |
| 19 | Q. What I should have asked you in the very |
| 20 | beginning was when did you first meet Mr. Guo? |
| 21 | A. I think it's either July or August, |
| 22 | early August or, you know, late July of 2017. |

Page 30

| | |
|---|---|
| 1 | Q. And who introduced you? |
| 2 | A. His name is Jonathan Ho. The Chinese |
| 3 | name is Chen Jun. |
| 4 | Q. Is that the last name, H-O? |
| 5 | A. Correct. |
| 6 | Q. Jonathan Ho. Who is Jonathan Ho? |
| 7 | A. He is a longtime friend of mine. He |
| 8 | also used to be an activist, pro-democracy activist. |
| 9 | He's a friend with the late Nobel Peace Prize winner |
| 10 | Liu Xiaobo. |
| 11 | Q. So why did Mr. Ho introduce you to Mr. |
| 12 | Guo? |
| 13 | MR. GRENDI: Objection, form. |
| 14 | MR. GAVENMAN: Objection to form. |
| 15 | THE WITNESS: I think, at the time, they were |
| 16 | talking about the options, what to do, whether to |
| 17 | seek political asylum or other form of protection, |
| 18 | and he knows that, you know, I'm familiar with the |
| 19 | American legal system. So he brought me to discuss |
| 20 | those options with Miles. |
| 21 | BY MR. GREIM: |
| 22 | Q. And is it fair to say that you assisted |

Page 31

| | |
|---|---|
| 1 | him with his various efforts to obtain political |
| 2 | asylum from that point forward? |
| 3 | A. Correct. |
| 4 | Q. What was your initial impression of Mr. |
| 5 | Guo? |
| 6 | A. I think he's a genuine warm person. He |
| 7 | has a deep knowledge of how the communist system |
| 8 | works and he has a reason to expose the high-ranking |
| 9 | government officials that are corrupt and, also, he |
| 10 | has many defects of the people from the communist |
| 11 | system. |
| 12 | Q. What do you mean by that? |
| 13 | A. Like -- |
| 14 | MR. GRENDI: Objection to form. |
| 15 | THE WITNESS: He probably won't tell you |
| 16 | exactly what he thinks. Sometimes he exaggerates |
| 17 | what he's done and stuff like that. |
| 18 | BY MR. GREIM: |
| 19 | Q. So you met Ms. Wang, then, within about |
| 20 | a month or so of having met Mr. Guo himself? |
| 21 | A. Correct. |
| 22 | Q. Did your impression of Mr. Guo change |

Page 32

| | |
|---|---|
| 1 | over time? |
| 2 | A. No. |
| 3 | Q. Do you consider yourself to be a |
| 4 | personal friend of Mr. Guo? |
| 5 | A. That's a very -- |
| 6 | Q. Sorry. |
| 7 | A. -- difficult question. I think I |
| 8 | maintain a personal relationship with him and, also, |
| 9 | politically, I support his effort and I also have a |
| 10 | lot of reservation about him. |
| 11 | Q. What are those reservations? |
| 12 | A. He just brings troubles to me. You |
| 13 | know, I live a very simple straightforward life. |
| 14 | This is my first deposition, first -- you know, this, |
| 15 | it's not fun. |
| 16 | My focus is the big picture, how to change |
| 17 | China, how to promote democracy. I don't want to |
| 18 | sign on to derail from that goal. This definitely is |
| 19 | troublesome to me. |
| 20 | Q. Do you have any concern about whether |
| 21 | Guo is fully committed to overturning the Chinese |
| 22 | communist system? |

Page 33

9 (Pages 30 to 33)

**Atkinson-Baker, Inc.**
**www.depo.com**

| | |
|---|---|
| 1 | A.   Well, I think he's fully committed.  At |
| 2 | the same time, he also has his relatives, his |
| 3 | employees to be considered and his assets, although, |
| 4 | all of it has been confiscated.  So I understand his |
| 5 | position. |
| 6 | Q.   And would it surprise you if Mr. Guo, |
| 7 | for example, vacillates in wanting regime change |
| 8 | versus something less than that? |
| 9 | MR. GRENDI:  Object to the form. |
| 10 | MR. GAVENMAN:  Object to the form. |
| 11 | THE WITNESS:  Can you rephrase that? |
| 12 | BY MR. GREIM: |
| 13 | Q.   Sure.  Sure.  Would it surprise you that |
| 14 | Mr. Guo tries to bargain with Chinese officials? |
| 15 | MR. GRENDI:  Object to the form. |
| 16 | MR. GAVENMAN:  Objection to form. |
| 17 | THE WITNESS:  Frankly, I think it's possible, |
| 18 | but it's unlikely, highly unlikely.  It's too late |
| 19 | for that. |
| 20 | BY MR. GREIM: |
| 21 | Q.   What do you mean by it's too late for |
| 22 | that? |

Page 34

| | |
|---|---|
| 1 | MR. GRENDI:  Object to the form. |
| 2 | MR. GAVENMAN:  Objection to form. |
| 3 | THE WITNESS:  He's already put himself in the |
| 4 | position that he is the number one enemy of the |
| 5 | regime. |
| 6 | BY MR. GREIM: |
| 7 | Q.   When did he cross that line? |
| 8 | MR. GAVENMAN:  Objection to form. |
| 9 | MR. GRENDI:  Objection to the form. |
| 10 | THE WITNESS:  I don't know for sure.  My |
| 11 | speculation -- can I speculate? |
| 12 | MR. GAVENMAN:  You shouldn't speculate.  Only |
| 13 | speak to things that you know. |
| 14 | THE WITNESS:  All right.  But I think -- can |
| 15 | I just say, more likely, after he turned the MSS |
| 16 | Secretary of Discipline into FBI, they busted them at |
| 17 | La Guardia Airport and I think that's where he |
| 18 | crossed the line. |
| 19 | BY MR. GREIM: |
| 20 | Q.   Do you know whether he attempted to |
| 21 | negotiate with Chinese officials even after that |
| 22 | point? |

Page 35

| | |
|---|---|
| 1 | MR. GRENDI:  Object to the form. |
| 2 | THE WITNESS:  I didn't know. |
| 3 | BY MR. GREIM: |
| 4 | Q.   Do you know whether he is negotiating |
| 5 | with Chinese officials even today? |
| 6 | A.   I didn't know that either. |
| 7 | Q.   Let's shift gears for a moment here and |
| 8 | -- well, before we move on.  After you met Guo, Mr. |
| 9 | Guo -- |
| 10 | A.   Yeah. |
| 11 | Q.   -- did he introduce you to others |
| 12 | besides Yvette Wang over the next month or two? |
| 13 | A.   I met all his families, family members, |
| 14 | through him.  I met with Tony Blair.  I met -- who |
| 15 | else?  There were several other people that's |
| 16 | significant maybe. |
| 17 | Q.   Did he introduce you to someone named |
| 18 | Hansheng Wang? |
| 19 | A.   He never introduced me to Hansheng Wang. |
| 20 | Hansheng Wang, I know used to be his staff.  I got to |
| 21 | know him in that capacity. |
| 22 | Q.   What does Hansheng Wang do for Mr. Guo? |

Page 36

| | |
|---|---|
| 1 | MR. GRENDI:  Object to form. |
| 2 | MR. GAVENMAN:  Object to the form. |
| 3 | THE WITNESS:  If I saw him, he do -- he does |
| 4 | lots of different things, bodyguard, security.  He |
| 5 | also cooks.  What else he does?  Run errands, book |
| 6 | hotel rooms, you know. |
| 7 | BY MR. GREIM: |
| 8 | Q.   Does he run any companies? |
| 9 | A.   I have no knowledge. |
| 10 | Q.   Do you know if he's a principal of |
| 11 | Eastern Profit? |
| 12 | A.   I didn't know that. |
| 13 | Q.   Does he actually live in Mr. Guo's |
| 14 | apartment? |
| 15 | A.   I didn't know that either. |
| 16 | MR. GAVENMAN:  Objection to form. |
| 17 | MR. GRENDI:  Object to the form. |
| 18 | THE WITNESS:  I saw him all the time there, |
| 19 | but I didn't know he lived there. |
| 20 | BY MR. GREIM: |
| 21 | Q.   Which Guo family members were you |
| 22 | introduced to? |

Page 37

10 (Pages 34 to 37)

**Atkinson-Baker, Inc.**
**www.depo.com**

| | | |
|---|---|---|
| 1 | A.   I met his son, Wu Chun.  I met his | 10:01 |
| 2 | daughter, Wo Mei, his wife, Yu Chen Su. | 10:01 |
| 3 | **Q.   We'll get some of these names here on** | 10:01 |
| 4 | **the break.** | 10:01 |
| 5 | A.   Okay. | 10:01 |
| 6 | MR. GRENDI:  Eddie, I'm just going to jump in | 10:01 |
| 7 | here.  Are we going to get on topic here?  We're | 10:02 |
| 8 | talking about -- | 10:02 |
| 9 | MR. GREIM:  We are on topic. | 10:02 |
| 10 | MR. GRENDI:  Talking about Mr. Guo's family | 10:02 |
| 11 | and who Mr. Lianchao has met, this has nothing to do | 10:02 |
| 12 | with this dispute. | 10:02 |
| 13 | MR. GREIM:  Please don't disrupt the | 10:02 |
| 14 | deposition. | 10:02 |
| 15 | MR. GRENDI:  I'm not disrupting the | 10:02 |
| 16 | deposition.  I want to move it along and have it on | 10:02 |
| 17 | topic.  You know, we're discussing irrelevant stuff | 10:02 |
| 18 | right now, but please continue. | 10:02 |
| 19 | BY MR. GREIM: | 10:02 |
| 20 | **Q.   When was the first time that you met** | 10:02 |
| 21 | **French Wallop?** | 10:02 |
| 22 | A.   Let's see.  I would say September -- | 10:02 |

Page 38

| | | |
|---|---|---|
| 1 | October or September of 2017. | 10:02 |
| 2 | **Q.   Did you know her beforehand?** | 10:02 |
| 3 | A.   I didn't know her.  I know her -- I | 10:02 |
| 4 | worked with her husband many years ago.  So I had a | 10:02 |
| 5 | very good relationship with his office.  Naturally, I | 10:03 |
| 6 | know of her.  I didn't met her. | 10:03 |
| 7 | **Q.   Was this Senator Malcolm Wallop?** | 10:03 |
| 8 | A.   Correct. | 10:03 |
| 9 | **Q.   What about Mr. Waller?** | 10:03 |
| 10 | A.   That was the same time I met with | 10:03 |
| 11 | French. | 10:03 |
| 12 | **Q.   Did she you know of Mr. Waller before** | 10:03 |
| 13 | **the fall of 2017?** | 10:03 |
| 14 | A.   No. | 10:03 |
| 15 | **Q.   Let's talk a little bit about the** | 10:03 |
| 16 | **research project that's at issue here.  How is it** | 10:03 |
| 17 | **that -- well, let me ask you this:  Did there come a** | 10:03 |
| 18 | **time that you approached French Wallop about possible** | 10:03 |
| 19 | **work for Mr. Guo?** | 10:04 |
| 20 | A.   Say that again. | 10:04 |
| 21 | **Q.   Did there come a time when you** | 10:04 |
| 22 | **approached Ms. Wallop about possible work for Mr.** | 10:04 |

Page 39

| | | |
|---|---|---|
| 1 | Guo? | 10:04 |
| 2 | MR. GRENDI:  Object to the form. | 10:04 |
| 3 | THE WITNESS:  I didn't approach them. | 10:04 |
| 4 | BY MR. GREIM: | 10:04 |
| 5 | **Q.   Did Ms. Wallop approach you?** | 10:04 |
| 6 | A.   No.  That's not the case.  They were | 10:04 |
| 7 | introduced through Bill Gertz.  Bill Gertz called me | 10:04 |
| 8 | and said can you set up meeting with Miles; I want to | 10:04 |
| 9 | introduce Mike and French, Strategic Vision, to help | 10:04 |
| 10 | Miles.  So I set up meeting and we were introduced | 10:04 |
| 11 | that way. | 10:04 |
| 12 | **Q.   Okay.  Did you already know Mr. Gertz?** | 10:04 |
| 13 | A.   Yes. | 10:04 |
| 14 | **Q.   How long have you known him?** | 10:05 |
| 15 | A.   Thirty years. | 10:05 |
| 16 | **Q.   Now, did Mr. Gertz, then, already seem** | 10:05 |
| 17 | **to know or already seem to have a specific project in** | 10:05 |
| 18 | **mind for Mr. Guo?** | 10:05 |
| 19 | MR. GRENDI:  Objection. | 10:05 |
| 20 | MR. GAVENMAN:  Object to the form. | 10:05 |
| 21 | THE WITNESS:  Yes. | 10:05 |
| 22 | BY MR. GREIM: | 10:05 |

Page 40

| | | |
|---|---|---|
| 1 | **Q.   What was that?** | 10:05 |
| 2 | A.   I think that was the original proposal | 10:05 |
| 3 | French and Mike brought with them or maybe they first | 10:05 |
| 4 | gave it to me and I shared it with Miles to handle | 10:05 |
| 5 | his communication, pretty much. | 10:05 |
| 6 | **Q.   So when Mr. Gertz came to you --** | 10:05 |
| 7 | A.   Yes. | 10:05 |
| 8 | **Q.   -- and asked you to set up this** | 10:05 |
| 9 | **meeting --** | 10:05 |
| 10 | A.   Yes. | 10:05 |
| 11 | **Q.   -- did you understand that he had** | 10:05 |
| 12 | **already spoken to Ms. Wallop and Mr. Waller?** | 10:05 |
| 13 | A.   Absolutely. | 10:06 |
| 14 | MR. GRENDI:  Objection. | 10:06 |
| 15 | BY MR. GREIM: | 10:06 |
| 16 | **Q.   At that time, let's say when -- let me** | 10:06 |
| 17 | **strike that.** | 10:06 |
| 18 | **When Mr. Gertz first contacted you about** | 10:06 |
| 19 | **this --** | 10:06 |
| 20 | A.   Yeah. | 10:06 |
| 21 | **Q.   -- were you already aware that Mr. Guo** | 10:06 |
| 22 | **was looking for some type of research?** | 10:06 |

Page 41

11 (Pages 38 to 41)

**Lianchao Han - Confidential**
**August 28, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

| | |
|---|---|
| 1    Q.   Okay. Do you recall this conversation?    13:57 | my understanding is he doesn't want me to sign it.    13:59 |

1    **Q.   Okay. Do you recall this conversation?**     13:57
2    A.   Yes. Now, I remember, yes.     13:57
3    **Q.   And you recall that Ms. Wallop did not**     13:57
4   **want to agree to return of the deposit. Correct?**     13:57
5    A.   Um-hum.     13:57
6    **Q.   You also see she references that you,**     13:57
7   **yourself, would be on the hook, because as of this**     13:57
8   **time, she understood that you were going to sign the**     13:57
9   **contract. Do you see that part?**     13:57
10    MR. GRENDI: Objection.     13:57
11    THE WITNESS: "We will have entered -- which     13:57
12   part?     13:58
13    BY MR. GREIM:     13:58
14    **Q.   Really, it's sort of at the bottom of**     13:58
15   **1865 into 1866. Do you see it says -- at the very**     13:58
16   **bottom of 65, it says: "Since he wants you to sign."**     13:58
17    A.   Yeah.     13:58
18    **Q.   "And, therefore, be responsible for**     13:58
19   **payments, that is also very complex and unfair to**     13:58
20   **you."**     13:58
21    A.   Right. What's the question?     13:58
22    **Q.   Well, do you recall that at some point,**     13:58

Page 158

1    my understanding is he doesn't want me to sign it.     13:59
2    **Q.   Guo does not want you to sign it?**     13:59
3    A.   No. He does not.     13:59
4    **Q.   Let me back up for a second here before**     13:59
5   **we go further.**     13:59
6    A.   Yeah.     13:59
7    **Q.   We can stop looking at those texts for a**     13:59
8   **second.**     13:59
9    A.   That's okay.     13:59
10    **Q.   What was your role here? Did you see**     13:59
11   **yourself as an intermediary between the two sides or**     13:59
12   **as a representative of Guo?**     13:59
13    A.   I think I'm a person to facilitate this     13:59
14   project. I am friend on both sides. I have no     14:00
15   financial interest in there.     14:00
16    My entire thing is driven by the political     14:00
17   agenda. So I just want to get the things done, you     14:00
18   know, achieve what we said we're going to do. That's     14:00
19   it.     14:00
20    **Q.   By the way, during this period, did Guo**     14:00
21   **approach you and ask you to work for him full time?**     14:00
22    MR. GAVENMAN: Objection to form.     14:00

Page 160

1   **you were going to be the person to sign the**     13:58
2   **agreement?**     13:58
3    A.   It wasn't that clear at the time who's     13:58
4   going to sign, because, obviously, I didn't want to     13:58
5   get in the middle. That was my intention from the     13:58
6   very beginning.     13:58
7    **Q.   Well, where did the idea of you signing**     13:58
8   **come from? Was it suggested by someone?**     13:58
9    A.   I think French wants me to sign that as     13:58
10   go-between so I can communicate better with them and     13:58
11   with Miles. That's my recollection.     13:59
12    **Q.   Okay. Now, why wouldn't Guo just sign**     13:59
13   **it himself?**     13:59
14    A.   That, I don't know.     13:59
15    **Q.   Did Guo not want to sign it himself?**     13:59
16    MR. GAVENMAN: Objection.     13:59
17    MR. GRENDI: Objection.     13:59
18    THE WITNESS: I have no idea.     13:59
19    BY MR. GREIM:     13:59
20    **Q.   Well, did you discuss it with him?**     13:59
21    A.   No. We hadn't got -- you know, who is     13:59
22   going to sign, I think we have not got that far, but     13:59

Page 159

1    THE WITNESS: He did. I don't know when.     14:00
2    BY MR. GREIM:     14:00
3    **Q.   And what was your response?**     14:00
4    A.   I thought I said I have to think about     14:00
5   it, but it's probably, I think way before this,     14:00
6   before the project.     14:00
7    **Q.   You don't recall telling Mr. Waller or**     14:00
8   **Ms. Wallop right around the time of the project that**     14:01
9   **Mr. Guo had made the suggestion to you and you were**     14:01
10   **considering it?**     14:01
11    A.   I think --     14:01
12    MR. GAVENMAN: Objection to form.     14:01
13    THE WITNESS: I didn't remember if I     14:01
14   mentioned it. I probably did, but I didn't recall     14:01
15   the time and the contents -- the context.     14:01
16    BY MR. GREIM:     14:01
17    **Q.   Did there come a time when you**     14:01
18   **ultimately told Mr. Guo that you wouldn't do it?**     14:01
19    MR. GAVENMAN: Objection to form.     14:01
20    THE WITNESS: I never made a specific -- we     14:01
21   just leave it at that.     14:01
22    BY MR. GREIM:     14:01

Page 161

41 (Pages 158 to 161)

**Lianchao Han - Confidential**
**August 28, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

| | | |
|---|---|---|
| 1 | Q. Well, after this time, did he ever come | 14:01 |
| 2 | back to you again and say he would like you to work | 14:01 |
| 3 | for him exclusively? | 14:01 |
| 4 | A. What do you mean, after this? | 14:01 |
| 5 | Q. Well, let's say after December of 2017. | 14:01 |
| 6 | A. 2017? I think we haven't discussed | 14:01 |
| 7 | since. I didn't see anything at all. I didn't | 14:02 |
| 8 | respond, confirm or deny or reject. He never | 14:02 |
| 9 | mentioned it again. | 14:02 |
| 10 | Q. Do you remember a moment when Ms. Wallop | 14:02 |
| 11 | called you to come over to her apartment -- | 14:02 |
| 12 | A. Yes. | 14:02 |
| 13 | Q. -- late at night and look at something? | 14:02 |
| 14 | MR. GAVENMAN: Objection to form. | 14:02 |
| 15 | THE WITNESS: There is some time, I think she | 14:02 |
| 16 | called me to come to her house. | 14:02 |
| 17 | BY MR. GREIM: | 14:02 |
| 18 | Q. And what was the purpose of that visit? | 14:02 |
| 19 | MR. GAVENMAN: Objection to form. | 14:02 |
| 20 | THE WITNESS: I think -- I don't specifically | 14:02 |
| 21 | remember. It probably has to do with the project. | 14:02 |
| 22 | BY MR. GREIM: | 14:02 |

Page 162

| | | |
|---|---|---|
| 1 | Q. Did it have to do with something that | 14:02 |
| 2 | she said she could find, some research that she could | 14:02 |
| 3 | find? | 14:02 |
| 4 | A. Research she could find? | 14:02 |
| 5 | MR. GRENDI: Objection. | 14:02 |
| 6 | THE WITNESS: We had so many meetings in her | 14:02 |
| 7 | house. So I don't, you know, specifically recall. | 14:03 |
| 8 | You know, mostly, it relate to the research projects. | 14:03 |
| 9 | BY MR. GREIM: | 14:03 |
| 10 | Q. Okay. Do you recall her asking you to | 14:03 |
| 11 | come over so she can show you that she was able to | 14:03 |
| 12 | get into a certain bank account on her computer? | 14:03 |
| 13 | A. Yes. | 14:03 |
| 14 | MR. GAVENMAN: Objection. | 14:03 |
| 15 | BY MR. GREIM: | 14:03 |
| 16 | Q. All right. And did you come over and | 14:03 |
| 17 | view it? | 14:03 |
| 18 | A. Yes. | 14:03 |
| 19 | Q. What did you see? | 14:03 |
| 20 | A. I saw -- I think Mike showed me that, | 14:03 |
| 21 | not French, and, actually, it's a screen shot that | 14:03 |
| 22 | shows one of the Chinese Government high-ranking | 14:03 |

Page 163

| | | |
|---|---|---|
| 1 | officials, Wang Qishan, nephew -- not nephew -- | 14:03 |
| 2 | niece's E-mail account or bank account -- I forgot -- | 14:04 |
| 3 | something to that effect. Yeah. | 14:04 |
| 4 | Q. And did they represent to you that they | 14:04 |
| 5 | had done anything illegal? | 14:04 |
| 6 | A. Well, first of all, I cannot verify that | 14:04 |
| 7 | is the real bank account or information. I just saw | 14:04 |
| 8 | the screen shot and there's a -- you know, it showed | 14:04 |
| 9 | the person's name and stuff, and so I didn't, you | 14:04 |
| 10 | know, register anything of that thought. | 14:04 |
| 11 | Q. Sure. And my question is not what you | 14:04 |
| 12 | think determined. It's did they represent to you | 14:04 |
| 13 | that they had done anything illegal in pulling up the | 14:04 |
| 14 | information? | 14:04 |
| 15 | A. I didn't know, because we discussed | 14:04 |
| 16 | about how to do it legally, and I think this was | 14:05 |
| 17 | during the project formation of what we needed to be | 14:05 |
| 18 | done, how to not violate law in this country and go | 14:05 |
| 19 | outside of the country and do stuff that the other | 14:05 |
| 20 | country might be legally obtained, this information. | 14:05 |
| 21 | Q. What impact did that have on you when | 14:05 |
| 22 | you saw what they pulled up on the screen? | 14:05 |

Page 164

| | | |
|---|---|---|
| 1 | A. I first thought they have the ability, | 14:05 |
| 2 | the capacity, to dig into the information Miles is | 14:05 |
| 3 | looking for, I was looking for, and if it's, you | 14:05 |
| 4 | know, really real. So that was my first impression. | 14:05 |
| 5 | So I told Miles they have the capability to | 14:06 |
| 6 | get the information they needed. I mean we needed. | 14:06 |
| 7 | Yeah. | 14:06 |
| 8 | Q. Now, do you have any reason to think | 14:06 |
| 9 | that what they showed you wasn't real? | 14:06 |
| 10 | A. I don't, because it's hard -- with just | 14:06 |
| 11 | the one screen shot, it's very hard to say this is | 14:06 |
| 12 | the real thing. | 14:06 |
| 13 | Q. Do you remember anything else they told | 14:06 |
| 14 | you about the screen shot? | 14:06 |
| 15 | A. Yeah. They told me they have a team | 14:06 |
| 16 | that got into the system and the system, you know, we | 14:06 |
| 17 | have to be very careful with the team outside of this | 14:06 |
| 18 | country, and they want to be very careful and track | 14:06 |
| 19 | information, because they can have some trigger | 14:06 |
| 20 | mechanisms, a switch that can turn it off, and then | 14:07 |
| 21 | we should monitor the accounts rather than extract | 14:07 |
| 22 | the information. I think that's the only thing I | 14:07 |

Page 165

42 (Pages 162 to 165)

**Lianchao Han - Confidential**
**August 28, 2019**

| | |
|---|---|
| 1 | remember. 14:07 |
| 2 | Q.   Did they actually mention that to you 14:07 |
| 3 | repeatedly, that it was important to monitor rather 14:07 |
| 4 | than, simply, breaking into the accounts? 14:07 |
| 5 | MR. GRENDI:  Objection.  You can answer. 14:07 |
| 6 | THE WITNESS:  Yes. 14:07 |
| 7 | MR. GRENDI:  Sorry. 14:07 |
| 8 | THE WITNESS:  Yeah.  The emphasis was on that 14:07 |
| 9 | point. 14:07 |
| 10 | BY MR. GREIM: 14:07 |
| 11 | Q.   And was that your understanding of what 14:07 |
| 12 | they were supposed to be doing under the contract? 14:07 |
| 13 | MR. GAVENMAN:  Objection. 14:07 |
| 14 | MR. GRENDI:  Objection. 14:07 |
| 15 | THE WITNESS:  Under the contract, I think 14:07 |
| 16 | there's specifically -- it says specific information 14:07 |
| 17 | that, you know, they were looking for and they were 14:07 |
| 18 | supposed to deliver, and I think whether always 14:07 |
| 19 | monitor or not always monitor and extract at one 14:08 |
| 20 | time, there's no such specification, you know, 14:08 |
| 21 | specific provision in there. 14:08 |
| 22 | BY MR. GREIM: 14:08 |

Page 166

| | |
|---|---|
| 1 | Q.   So, however, your understanding is not 14:08 |
| 2 | that the contract required them to break into the 14:08 |
| 3 | accounts.  Correct? 14:08 |
| 4 | MR. GRENDI:  Objection. 14:08 |
| 5 | MR. GAVENMAN:  Objection. 14:08 |
| 6 | THE WITNESS:  Please rephrase. 14:08 |
| 7 | BY MR. GREIM: 14:08 |
| 8 | Q.   Sure.  Your understanding is not that 14:08 |
| 9 | the contract required them to break into these 14:08 |
| 10 | accounts, is it? 14:08 |
| 11 | MR. GRENDI:  Objection. 14:08 |
| 12 | MR. GAVENMAN:  Objection. 14:08 |
| 13 | THE WITNESS:  Not necessarily, but the 14:08 |
| 14 | discussion, during the discussion, the deliverables 14:08 |
| 15 | made it very clear that three types of -- three or 14:08 |
| 16 | four types information that the contract is going to 14:08 |
| 17 | require.  That is including the detailed information 14:08 |
| 18 | of financial statements, bank account, credit cards, 14:09 |
| 19 | all of that. 14:09 |
| 20 | BY MR. GREIM: 14:09 |
| 21 | Q.   Okay.  Did French and Mike tell you that 14:09 |
| 22 | all of the people working on the project would be 14:09 |

Page 167

| | |
|---|---|
| 1 | their own employees? 14:09 |
| 2 | MR. GAVENMAN:  Objection. 14:09 |
| 3 | THE WITNESS:  I think they didn't 14:09 |
| 4 | specifically say that's their employees.  They just 14:09 |
| 5 | hire contract people to do the work.  I think that's 14:09 |
| 6 | my recollection. 14:09 |
| 7 | BY MR. GREIM: 14:09 |
| 8 | Q.   Let's talk now about the 15 names.  We 14:09 |
| 9 | touched on this just a little bit earlier. 14:09 |
| 10 | A.   Yeah. 14:09 |
| 11 | Q.   Do you remember sitting with Mr. Guo -- 14:09 |
| 12 | A.   Yeah. 14:10 |
| 13 | Q.   -- and Ms. Wallop and Mr. Waller and 14:10 |
| 14 | walking through a packet of the 15 names? 14:10 |
| 15 | MR. GAVENMAN:  Objection. 14:10 |
| 16 | THE WITNESS:  I think, yeah.  I think -- I 14:10 |
| 17 | don't know if I were there or Yvette, because at the 14:10 |
| 18 | very beginning, maybe I was there.  We talked about a 14:10 |
| 19 | fish tank of things, and the names, maybe I learned 14:10 |
| 20 | later, because at one point, he didn't want me to get 14:10 |
| 21 | involved. 14:10 |
| 22 | So I didn't know the names at the time. 14:10 |

Page 168

| | |
|---|---|
| 1 | Basically, I'm saying I'm a little confused about 14:10 |
| 2 | whether I was present when the 15 names presented, 14:10 |
| 3 | but I learned later on.  At least I know who they 14:10 |
| 4 | are. 14:10 |
| 5 | BY MR. GREIM: 14:10 |
| 6 | Q.   All right.  By the way, when did -- when 14:10 |
| 7 | exactly did Yvette Wang get involved here? 14:11 |
| 8 | A.   So when they reached -- when we 14:11 |
| 9 | basically negotiated on the project, the contract was 14:11 |
| 10 | pretty done, like how much he's going to pay, who -- 14:11 |
| 11 | what the chunk, tranche of information they're going 14:11 |
| 12 | to provide, and then we solved the deposit issue. 14:11 |
| 13 | How we solved it, I didn't remember, and at the time, 14:11 |
| 14 | the basic foundation is done.  So he said, I don't 14:11 |
| 15 | want you to get involved; so you're out. 14:11 |
| 16 | I didn't know what was going on afterwards, 14:11 |
| 17 | how the contract restructured, because there were 14:11 |
| 18 | changes afterward.  So I have no idea. 14:11 |
| 19 | Q.   Do you recall that Mr. Guo walked away 14:11 |
| 20 | from the project, abandoned it, and a company called 14:12 |
| 21 | Eastern Profit came in to take his place? 14:12 |
| 22 | MR. GAVENMAN:  Objection. 14:12 |

Page 169

43 (Pages 166 to 169)

**Atkinson-Baker, Inc.**
**www.depo.com**

| | | |
|---|---|---|
| 1 | MR. GRENDI:  Objection. | 14:12 |
| 2 | THE WITNESS:  I didn't know it. | 14:12 |
| 3 | BY MR. GREIM: | 14:12 |
| 4 | Q.   Do you believe that happened? | 14:12 |
| 5 | MR. GAVENMAN:  Objection. | 14:12 |
| 6 | MR. GRENDI:  Objection. | 14:12 |
| 7 | THE WITNESS:  I didn't remember or recall how | 14:12 |
| 8 | he walked out.  At some point, he asked me, you know, | 14:12 |
| 9 | you need to step in to manage the project. | 14:12 |
| 10 | BY MR. GREIM: | 14:12 |
| 11 | Q.   So you were gone and then you were back? | 14:12 |
| 12 | A.   Yes. | 14:12 |
| 13 | [Wang Exhibit No. 12 was | 14:12 |
| 14 | identified for the record.] | 14:12 |
| 15 | BY MR. GREIM: | 14:12 |
| 16 | Q.   Okay.  Let's go to the names.  I'm going | 14:12 |
| 17 | to show what we've marked in another deposition as | 14:12 |
| 18 | Exhibit 12, and you'll see that this is Wang Exhibit | 14:12 |
| 19 | 12.  It starts at SVUS000171 and goes to 258, and if | 14:13 |
| 20 | you thumb through, you'll see it follows the same | 14:13 |
| 21 | format always.  There is a number with someone's | 14:13 |
| 22 | name, and then behind it is some information about | 14:13 |

Page 170

| | | |
|---|---|---|
| 1 | that person, and it goes on for several pages, and | 14:13 |
| 2 | then there is a second name and so on. | 14:13 |
| 3 | Take a second, if you could, just to study | 14:13 |
| 4 | this and then I'll ask you a few questions about it. | 14:13 |
| 5 | A.   Yeah.  I'm familiar with this. | 14:13 |
| 6 | Q.   Okay. | 14:13 |
| 7 | MR. GRENDI:  On the record, has Mr. Han | 14:13 |
| 8 | signed the addendum to the protective order? | 14:13 |
| 9 | MR. GREIM:  Oh, no.  He hasn't.  Okay.  Let's | 14:13 |
| 10 | cover this.  So we have a protective order in this | 14:13 |
| 11 | case, confidential order, and many of the documents | 14:13 |
| 12 | that we have here today are marked as confidential, | 14:14 |
| 13 | at least as of right now. | 14:14 |
| 14 | THE WITNESS:  Yeah. | 14:14 |
| 15 | MR. GREIM:  So we'll ask you, and I'll work | 14:14 |
| 16 | with your attorney on this, to sign an order agreeing | 14:14 |
| 17 | to be bound by the protective order in this case, | 14:14 |
| 18 | which means that you can take things here and, you | 14:14 |
| 19 | know, show them around, talk them outside.  Now, not | 14:14 |
| 20 | all of this is going to end up remaining | 14:14 |
| 21 | confidential, but until we've worked it out with the | 14:14 |
| 22 | judge, that's sort of our status quo. | 14:14 |

Page 171

| | | |
|---|---|---|
| 1 | MR. GAVENMAN:  Okay. | 14:14 |
| 2 | BY MR. GREIM: | 14:14 |
| 3 | Q.   All right.  So tell me what do you | 14:14 |
| 4 | recall about this document? | 14:14 |
| 5 | A.   I remember this is -- I don't remember I | 14:14 |
| 6 | saw this in my Miles' place.  Probably I saw it | 14:14 |
| 7 | through French, at French's house, but I'm not, you | 14:14 |
| 8 | know, a hundred percent sure. | 14:14 |
| 9 | Q.   Do you remember that this is a document | 14:14 |
| 10 | that Mr. Guo showed to Mr. Wallop and -- Mr. Waller | 14:15 |
| 11 | and Ms. Wallop? | 14:15 |
| 12 | A.   Most likely. | 14:15 |
| 13 | MR. GRENDI:  Objection. | 14:15 |
| 14 | MR. GAVENMAN:  Objection. | 14:15 |
| 15 | BY MR. GREIM: | 14:15 |
| 16 | Q.   And did you know that -- well, do you | 14:15 |
| 17 | know where these names came from? | 14:15 |
| 18 | MR. GAVENMAN:  Objection. | 14:15 |
| 19 | THE WITNESS:  I don't know where it comes | 14:15 |
| 20 | from, but I know this is probably what Miles wanted | 14:15 |
| 21 | them to look into. | 14:15 |
| 22 | BY MR. GREIM: | 14:15 |

Page 172

| | | |
|---|---|---|
| 1 | Q.   Did you discuss with Mr. Guo which names | 14:15 |
| 2 | would be good for the project? | 14:15 |
| 3 | A.   No, not at all.  This is entirely his. | 14:15 |
| 4 | Q.   Do you know who did? | 14:15 |
| 5 | A.   I have no idea. | 14:15 |
| 6 | Q.   Do you remember a meeting in Guo's | 14:15 |
| 7 | apartment where he had this stack of names and sort | 14:15 |
| 8 | of tossed it out on the table to Ms. Wallop and Mr. | 14:15 |
| 9 | Waller and said this cost him $250 million? | 14:15 |
| 10 | MR. GRENDI:  Objection. | 14:15 |
| 11 | MR. GAVENMAN:  Objection. | 14:15 |
| 12 | THE WITNESS:  I don't remember that.  I think | 14:15 |
| 13 | the $2 million, you know, that phrase, that, I | 14:16 |
| 14 | remember vaguely, yeah. | 14:16 |
| 15 | BY MR. GREIM: | 14:16 |
| 16 | Q.   Okay.  Let me -- that was a compound | 14:16 |
| 17 | question too.  So let me ask you do you remember Mr. | 14:16 |
| 18 | Guo claiming that this research had cost him, let's | 14:16 |
| 19 | say, over $200 million just to compile this? | 14:16 |
| 20 | A.   $200 million?  I don't remember $200 | 14:16 |
| 21 | million.  He exaggerates somewhat, like some certain | 14:16 |
| 22 | amount for this research. | 14:16 |

Page 173

44 (Pages 170 to 173)

| | |
|---|---|
| 1   Q.   Do you remember telling Ms. Wallop and | 14:16 |
| 2   Mr. Waller that the $200 hundred was probably an | 14:16 |
| 3   exaggeration? | 14:16 |
| 4   A.   I probably did. | 14:16 |
| 5   Q.   So did there come a time when you did | 14:16 |
| 6   study the names and information in this packet? | 14:16 |
| 7   A.   Yeah. | 14:16 |
| 8   Q.   When was that? | 14:16 |
| 9   A.   I don't recall the exact date. | 14:16 |
| 10  Q.   Do you remember why you would have | 14:16 |
| 11  looked through the names? | 14:16 |
| 12  A.   Why would he look? | 14:16 |
| 13  Q.   No.  Why you would have? | 14:17 |
| 14  MR. GAVENMAN:  Objection. | 14:17 |
| 15  THE WITNESS:  I think -- I don't remember | 14:17 |
| 16  exactly how when they first come out.  The first time | 14:17 |
| 17  I look at this name, I don't remember exactly, but I | 14:17 |
| 18  did see the list either in New York or in French's | 14:17 |
| 19  house, but I just don't remember exactly where. | 14:17 |
| 20  BY MR. GREIM: | 14:17 |
| 21  Q.   Okay.  Do you remember forming any -- | 14:17 |
| 22  let me just ask you this:  Do you remember having any | 14:17 |

Page 174

thoughts about whether some of these names would be 14:17
good subjects for research? 14:17
   A.   I think they're all good subjects for 14:17
research. 14:17
   Q.   Why is that? 14:17
   A.   Because this is the key group in the 14:17
control of China's bank system and investment. 14:17
   Q.   So do you know that that's what all 14:17
these names have in common? 14:18
   A.   Yes, except -- 14:18
MR. GAVENMAN:  Objection. 14:18
THE WITNESS:  -- there's -- huh? 14:18
MR. GAVENMAN:  Objection to form.  You can 14:18
answer. 14:18
THE WITNESS:  Except there's also like the 14:18
former party chief's grandson, but for Wang Qishan's 14:18
group, may of the names here that were in Wang 14:18
Qishan's group, I think they're all involved in 14:18
Chinese banging corruption. 14:18
BY MR. GREIM: 14:18
   Q.   What's the name?  Could you spell out 14:18
the name that you're telling us?  Wang? 14:18

Page 175

   A.   Wang Qishan, W-A-N-G, Q-I-S-H-A-N. 14:18
   Q.   This is the same person that Bannon had 14:18
met with.  Right? 14:18
   A.   Yes, and Mu Jen Ju is another person 14:18
that is a Chinese security chief.  He's also in here. 14:19
He persecuted Miles' family. 14:19
   Q.   Now, do you know whether Mr. Guo ended 14:19
up getting research on these individuals from some 14:19
other source other than Strategic Vision? 14:19
MR. GRENDI:  Objection. 14:19
MR. GAVENMAN:  Objection. 14:19
THE WITNESS:  That, I don't know. 14:19
BY MR. GREIM: 14:19
   Q.   Do you know whether he shared this 14:19
information with any of research group after 14:19
Strategic Vision? 14:19
   A.   I didn't know that either. 14:19
MR. GAVENMAN:  Objection. 14:19
BY MR. GREIM: 14:19
   Q.   Do you know whether he ever hired a 14:19
group called ASOG out of Texas? 14:19
   A.   ASOG?  No. 14:19

Page 176

   Q.   Do you know whether he hired an 14:19
individual named Adam Craft? 14:19
   A.   No. 14:19
   Q.   Does that name ring a bell to you? 14:19
   A.   Not at all. 14:19
   Q.   Does the name ASOG sound familiar to 14:19
you? 14:19
   A.   Not at all. 14:19
   Q.   So what did Mr. Guo tell you about this 14:20
list, if anything? 14:20
   A.   He didn't really discuss this list with 14:20
me at all, but when I saw it, I know what he's after. 14:20
   Q.   Is some of the same information that's 14:20
in this list already on the internet?  Have you seen 14:20
it on there? 14:20
MR. GRENDI:  Objection. 14:20
MR. GAVENMAN:  Objection. 14:20
THE WITNESS:  There might be some. 14:20
BY MR. GREIM: 14:20
   Q.   Do you have any understanding about who 14:20
actually paid Strategic Vision, if anyone, for the 14:20
work under this agreement? 14:20

Page 177

45 (Pages 174 to 177)

BY MR. GRENDI:                                              16:31

   Q.   Good afternoon.                               16:31

   A.   Good afternoon.                               16:31

   Q.   Mr. Han, my name is Zach Grendi.  I'm an     16:31

attorney for Eastern Profit Corporation, Limited.          16:31

Thank you for your patience in answering these             16:31

questions today and showing up here.                       16:31

   I just want to ask you about something you       16:31

talked about earlier, which was do you recall a time       16:31

when French Wallop ever threatened Guo Wengui if           16:31

there was any kind of lawsuit concerning this              16:31

research contract?                                         16:31

   MR. GREIM:  Objection, misstates the prior       16:31

testimony.                                                 16:31

   THE WITNESS:  I think there are lots of,          16:31

yeah, discussion about that.                               16:31

BY MR. GRENDI:                                             16:31

   Q.   What do you remember about that              16:31

discussion?                                                16:31

   A.   I think, if I recall, they are going to      16:31

give -- basically, fail if they are going to make a        16:32

huge noise, expose Miles and, you know, try to             16:32

Page 262

undermine his political asylum.                            16:32

   Q.   Who is they there?  Who are you talking      16:32

about?                                                     16:32

   A.   I think French and Mike.                     16:32

   Q.   So you were at a meeting when that           16:32

happened or you just heard about it?  How do you know      16:32

that that happened?                                        16:32

   A.   We had a meeting.  They mentioned to me      16:32

in my face, in my presence, they are going to make it      16:32

difficult for Miles.                                       16:32

   Q.   So, in other words, if this lawsuit was     16:32

brought, they were going to try to spike or otherwise      16:32

sabotage his political asylum case?                        16:32

   MR. GREIM:  Objection, leading.                  16:32

   MR. GRENDI:  I'm allowed to leading.  It's a     16:32

deposition.                                                16:32

   THE WITNESS:  Yes.                               16:32

BY MR. GRENDI:                                             16:32

   Q.   Okay.  Thank you.  What would happen to     16:32

Guo Wengui if he went back to China?                       16:33

   MR. GREIM:  Objection, calls for speculation.    16:33

   THE WITNESS:  They will definitely jail him      16:33

Page 263

and most likely kill him in prison.                        16:33

BY MR. GRENDI:                                             16:33

   Q.   And what would happen to you if you were    16:33

to go back to China?  Would that be the same result?      16:33

   MR. GREIM:  Same objection.                      16:33

   THE WITNESS:  Very likely.  I don't think        16:33

they may not kill me, maybe put me jail for sure.          16:33

BY MR. GRENDI:                                             16:33

   Q.   I think this was clear, but I just want     16:33

to confirm it.  You don't have any formal                  16:33

relationship with Mr. Wengui, do you?                      16:33

   A.   No.                                         16:33

   Q.   You don't work for him?                     16:33

   A.   No.                                         16:33

   Q.   You don't work for one of his companies?    16:33

   A.   Not at all.                                 16:33

   Q.   You haven't received any money from him?    16:33

   A.   No.                                         16:33

   Q.   Did French Wallop offer to give you         16:33

money for the fact that it got the deposit in              16:34

connection with this research agreement?                   16:34

   MR. GREIM:  Objection, vague.                    16:34

Page 264

   THE WITNESS:  She might implied.  She might      16:34

have implied.                                              16:34

BY MR. GRENDI:                                             16:34

   Q.   How did that happen?  How did she imply     16:34

that you might get money?                                  16:34

   A.   She said if you need some help for          16:34

certain things, you can come to me.                        16:34

   Q.   And you took that to mean that she was      16:34

offering you financial recompense for setting you up       16:34

with Eastern Profit?                                       16:34

   A.   Maybe.                                      16:34

   Q.   Setting her up with Eastern Profit?         16:34

   A.   Maybe.                                      16:34

   Q.   Maybe, okay.  Did you accept that offer?    16:34

   A.   No.                                         16:34

   Q.   Why not?                                    16:34

   A.   I think I have a pure political              16:34

motivation come to this -- to facilitate this              16:34

contract.  So I don't want that, you know, to              16:34

jeopardize my reputation, make things complicated.         16:34

   Q.   Do you think Strategic Vision has pure      16:34

political motivations in getting involved with this        16:35

Page 265

67 (Pages 262 to 265)

| | |
|---|---|
| 1 | matter? |
| 2 | MR. GREIM:  Objection, calls for speculation |
| 3 | and opinion and also vague. |
| 4 | THE WITNESS:  I think they have a good |
| 5 | intention at the beginning and want to do the right |
| 6 | thing, and yeah.  I have no doubt, otherwise, I |
| 7 | wouldn't introduce them to Miles. |
| 8 | BY MR. GRENDI: |
| 9 | Q.   Do you think they cared about the money? |
| 10 | A.   They do care about the money, but they |
| 11 | do also care about the political agenda. |
| 12 | Q.   What is Hansheng Wang look like? |
| 13 | A.   He's a very quiet guy, very reserved, |
| 14 | never participated in any of our meetings. |
| 15 | Q.   Have you ever talked to him? |
| 16 | A.   Occasionally. |
| 17 | Q.   If you recall, what did you talk to him |
| 18 | about? |
| 19 | A.   I think it's like what he -- where he |
| 20 | come from, where's his native province and what the |
| 21 | family were doing.  I think he just come from a poor |
| 22 | family, like a rural farmer, stuff like that. |

Page 266

| | |
|---|---|
| 1 | Q.   How many times have you met him? |
| 2 | A.   I don't know.  I don't remember exactly |
| 3 | how many times, but every time I've been to the |
| 4 | apartment, most of the time he's there. |
| 5 | Q.   Is he a dissident? |
| 6 | MR. GREIM:  Objection, calls for opinion. |
| 7 | THE WITNESS:  Well, no.  I think he is part |
| 8 | of, you know, Miles' team.  You know, you can't |
| 9 | escape that.  Everybody becomes a dissident now. |
| 10 | BY MR GRENDI |
| 11 | Q.   Anyone who does business with Miles |
| 12 | and -- |
| 13 | A.   Anyone associated with him, does |
| 14 | business with him, they will all become a dissident. |
| 15 | Q.   And they're putting their lives at risk |
| 16 | if they go back to China by doing so? |
| 17 | MR. GREIM:  Objection, calls for speculation. |
| 18 | THE WITNESS:  Absolutely. |
| 19 | BY MR. GREIM: |
| 20 | Q.   I'm sorry.  What was your -- |
| 21 | A.   Absolutely. |
| 22 | Q.   Okay.  Do you know if the CCP employees |

Page 267

| | |
|---|---|
| 1 | -- I'll call them fake dissidents, people are |
| 2 | pretending to be dissidents? |
| 3 | A.   Yes. |
| 4 | Q.   And what do those fake dissidents do? |
| 5 | What is their purpose? |
| 6 | A.   If we're talking about specifically |
| 7 | related to this project -- |
| 8 | Q.   Sure. |
| 9 | A.   They're a smear campaign against Miles |
| 10 | Kwok.  That was number one that those fake dissidents |
| 11 | are doing, and in addition to that, there are a lot |
| 12 | of people that Miles sued or countersued who are |
| 13 | involved in fake political asylum business and they |
| 14 | are to survive to make money, like fake persons. |
| 15 | We have evidence to show they made -- he |
| 16 | helped people to fabricate fake political asylum |
| 17 | cases, and there are many more.  Like another guy, a |
| 18 | lawyer, also does the same thing and then he's also |
| 19 | somehow connected with the MSS and the Chinese |
| 20 | Embassy. |
| 21 | There are so many of them.  You know, I think |
| 22 | you probably need to talk to the FBI to get this |

Page 268

| | |
|---|---|
| 1 | information. |
| 2 | Q.   So you believe the CCP is employing |
| 3 | hundreds of fake dissidents, if you know, however |
| 4 | many you think? |
| 5 | A.   I don't know how many.  I have no idea |
| 6 | how many, but in this particular case against Miles, |
| 7 | they hired very many to do their dirty work, |
| 8 | basically drag them into this lawsuit.  At the |
| 9 | beginning, I think lots of dissidents, whether fake |
| 10 | or real, they come to Miles and try to get support, |
| 11 | financial support, from him, and when that failed and |
| 12 | they started fighting over social media, criticized |
| 13 | Miles, and that caused them anger from Miles' side. |
| 14 | So he started suing them, and those dissidents or |
| 15 | activists, so called, they have now resources to do |
| 16 | this and then we saw the money transfer from the |
| 17 | Chinese Government.  They use one singular law firm |
| 18 | to do -- you know, didn't bother to change their |
| 19 | complaints, and then we have some evidence |
| 20 | independently -- it has nothing to do with Miles -- |
| 21 | we obtained from people that we know, showing that |
| 22 | they work closely with the Chinese consulate in New |

Page 269

68 (Pages 266 to 269)

**Atkinson-Baker, Inc.**
**www.depo.com**

| | | |
|---|---|---|
| 1 | York, the embassy here, and money their transferred | 16:40 |
| 2 | from different channels to pay for the legal bill. | 16:40 |
| 3 | Q.   Are you familiar with a website called | 16:40 |
| 4 | Boxun, B-O-X-U-N, I think? | 16:41 |
| 5 | A.   Yes. | 16:41 |
| 6 | Q.   And what does that website do? | 16:41 |
| 7 | A.   That website used to be a dissident | 16:41 |
| 8 | Chinese language dissident -- you know, it's like a | 16:41 |
| 9 | free press.  It's a free platform.  Everybody can put | 16:41 |
| 10 | their stuff in there, but mostly, it's the dissidents | 16:41 |
| 11 | who use that website to access information, post | 16:41 |
| 12 | their grievances or the articles they wrote. | 16:41 |
| 13 | Q.   So it's sort of open source; anyone can | 16:41 |
| 14 | post on it? | 16:41 |
| 15 | A.   Correct. | 16:41 |
| 16 | Q.   Have fake dissidents posted information | 16:41 |
| 17 | on that website? | 16:41 |
| 18 | A.   I'm sure there are many Chinese | 16:41 |
| 19 | Communists, you know, like sui jin.  The water army, | 16:41 |
| 20 | that's the term that posts stuff on that website as | 16:41 |
| 21 | well. | 16:41 |
| 22 | Q.   So you wouldn't necessarily trust | 16:41 |

Page 270

| | | |
|---|---|---|
| 1 | anything coming out of Boxun because fake dissidents | 16:41 |
| 2 | post information there? | 16:42 |
| 3 | A.   No.  It depends on the information. | 16:42 |
| 4 | Q.   Do you happen know where Exhibit 3 and | 16:42 |
| 5 | Exhibit 3 were posted, where they came from? | 16:42 |
| 6 | A.   No, I don't.  Which one? | 16:42 |
| 7 | Q.   Three. | 16:42 |
| 8 | A.   Okay.  Yeah. | 16:42 |
| 9 | Q.   Do you know if Boxun was the uploading | 16:42 |
| 10 | entity that put this video out there? | 16:42 |
| 11 | A.   I didn't know that. | 16:42 |
| 12 | Q.   Would you trust it if it came from | 16:42 |
| 13 | Boxun? | 16:42 |
| 14 | A.   It depends on the content.  I think it | 16:42 |
| 15 | depends on the information. | 16:42 |
| 16 | Q.   Well, let me ask you this. | 16:42 |
| 17 | A.   Not necessarily whether it showed on the | 16:42 |
| 18 | platform. | 16:42 |
| 19 | Q.   Have fake dissidents posted false | 16:42 |
| 20 | information about other dissidents to disrupt the -- | 16:42 |
| 21 | I'll call it the effort to damage the CCP? | 16:42 |
| 22 | A.   Yeah.  There are some. | 16:42 |

Page 271

| | | |
|---|---|---|
| 1 | Q.   Do they ever post fake images? | 16:43 |
| 2 | A.   Could be. | 16:43 |
| 3 | Q.   Fake videos? | 16:43 |
| 4 | A.   That, I'm not expert on that.  So I | 16:43 |
| 5 | can't tell. | 16:43 |
| 6 | Q.   Would it surprise you if they did? | 16:43 |
| 7 | A.   No.  I'm not surprised by that. | 16:43 |
| 8 | Q.   Are you aware that Google recently took | 16:43 |
| 9 | down a number of videos from its platform that were | 16:43 |
| 10 | posted by fake dissidents? | 16:43 |
| 11 | | 16:43 |
| 12 | Q.   Do you know if any of those videos were | 16:43 |
| 13 | critical of Miles Kwok or Guo Wengui? | 16:43 |
| 14 | A.   I don't know specific.  I suspect, yeah. | 16:43 |
| 15 | There might be some. | 16:43 |
| 16 | Q.   Because Guo Wengui is a real dissident. | 16:43 |
| 17 | Right? | 16:43 |
| 18 | A.   Guo Wengui, yes.  I would characterize | 16:43 |
| 19 | him as a real dissident. | 16:44 |
| 20 | Q.   And the CCP pretty desperate to get him | 16:44 |
| 21 | back to China and put him in jail? | 16:44 |
| 22 | A.   Correct. | 16:44 |

Page 272

| | | |
|---|---|---|
| 1 | Q.   In drafting the contract, was there a | 16:44 |
| 2 | concern about Mr. Wengui being identified in | 16:44 |
| 3 | connection with the research agreement? | 16:44 |
| 4 | A.   I think there was, if I recall | 16:44 |
| 5 | correctly. | 16:44 |
| 6 | Q.   I'll take you back to the contract.  Do | 16:44 |
| 7 | you remember if there was a specific schedule in that | 16:44 |
| 8 | agreement concerning when reports were to be | 16:44 |
| 9 | delivered? | 16:44 |
| 10 | A.   Yes.  There is. | 16:44 |
| 11 | Q.   Was it -- did it call for reports within | 16:44 |
| 12 | the first week, in the first month of the contract? | 16:45 |
| 13 | A.   Yeah.  I think there is a specific | 16:45 |
| 14 | requirement on the first week.  I think it's just | 16:45 |
| 15 | trying to show the progress, we're on the right | 16:45 |
| 16 | track. | 16:45 |
| 17 | Q.   Well, let's look at the agreement.  What | 16:45 |
| 18 | number is that?  It's number -- | 16:45 |
| 19 | MR. GAVENMAN:  Eleven. | 16:45 |
| 20 | MR. GRENDI:  Eleven. | 16:45 |
| 21 | MR. GREIM:  Let me just say while we're | 16:45 |
| 22 | pulling it up, the witness was instructed not to | 16:45 |

Page 273

69 (Pages 270 to 273)

**Lianchao Han - Confidential**
**August 28, 2019**

| | | |
|---|---|---|
| 1 | answer previously about the agreement on the ground | 16:45 |
| 2 | it was calling for a legal conclusion. So I would | 16:45 |
| 3 | hope we'd have consistence. | 16:45 |
| 4 | MR. GAVENMAN: It depends on what the | 16:45 |
| 5 | question is. | 16:45 |
| 6 | MR. GRENDI: I wasn't asking about a legal | 16:45 |
| 7 | opinion on it. | 16:45 |
| 8 | Oh, there's my copy. I'm sorry. | 16:45 |
| 9 | BY MR. GRENDI: | 16:45 |
| 10 | Q. Just looking at the second page, it says | 16:45 |
| 11 | the contractor will produce progress reports on this | 16:46 |
| 12 | -- | 16:46 |
| 13 | A. Where is that? | 16:46 |
| 14 | Q. Oh, I'm sorry. The first full paragraph | 16:46 |
| 15 | on the second page. | 16:46 |
| 16 | A. Okay. Okay. Yes. | 16:46 |
| 17 | Q. It says: "The contractor will produce a | 16:46 |
| 18 | progress report on this financial forensic research | 16:46 |
| 19 | each week in the first month, one preliminary report | 16:46 |
| 20 | in the first month and one comprehensive historical | 16:46 |
| 21 | research report within three months." | 16:46 |
| 22 | And then it goes on to talk about update | 16:46 |

Page 274

| | | |
|---|---|---|
| 1 | reports per individual subject to the client within a | 16:47 |
| 2 | specified timeframe as well as all relevant | 16:47 |
| 3 | supporting data." | 16:47 |
| 4 | Do you see that? | 16:47 |
| 5 | A. Yes. | 16:47 |
| 6 | Q. I'll ask you again did Strategic Vision | 16:47 |
| 7 | deliver weekly reports within the first month of the | 16:47 |
| 8 | agreement? | 16:47 |
| 9 | A. No. | 16:47 |
| 10 | Q. If you look further down the page, it | 16:47 |
| 11 | says: "The contractor will produce social media | 16:47 |
| 12 | research per individual subject to the client on a | 16:47 |
| 13 | weekly basis for the first month and on a monthly | 16:47 |
| 14 | basis thereafter except under circumstances that | 16:47 |
| 15 | require more frequent reporting, paren, weekly or | 16:47 |
| 16 | fortnightly, as the client directs or irregular | 16:48 |
| 17 | emergencies that the contractor may discover." | 16:48 |
| 18 | Do you see that? | 16:48 |
| 19 | A. Um-hum. | 16:48 |
| 20 | Q. Did Strategic Vision deliver weekly | 16:48 |
| 21 | reports during the first month of the agreement | 16:48 |
| 22 | concerning social media research? | 16:48 |

Page 276

| | | |
|---|---|---|
| 1 | reports. Do you see that section there? | 16:46 |
| 2 | A. Yes. | 16:46 |
| 3 | Q. Did Strategic Vision deliver financial | 16:46 |
| 4 | forensic research reports each week in the first | 16:46 |
| 5 | month? | 16:46 |
| 6 | MR. GREIM: Objection. Counsel has not | 16:46 |
| 7 | actually read the portion of the contract that he's | 16:46 |
| 8 | purporting to ask about. | 16:46 |
| 9 | MR. GRENDI: What are you talking about? | 16:46 |
| 10 | THE WITNESS: No. | 16:46 |
| 11 | MR. GRENDI: Would you like me to read the | 16:46 |
| 12 | full sentence, Mr. Greim? Is that what you're | 16:46 |
| 13 | getting at? | 16:46 |
| 14 | BY MR. GRENDI: | 16:46 |
| 15 | Q. Let me try it again. Looking at this | 16:46 |
| 16 | first full paragraph on the second page, it says: | 16:46 |
| 17 | "The contractor will produce a progress report on | 16:46 |
| 18 | this financial forensic research each week in the | 16:47 |
| 19 | first month, one preliminary report in the first | 16:47 |
| 20 | month, and one comprehensive historical research | 16:47 |
| 21 | report within three months and with update reports | 16:47 |
| 22 | sin each following month. The client may require | 16:47 |

Page 275

| | | |
|---|---|---|
| 1 | MR. GREIM: Objection, foundation. | 16:48 |
| 2 | THE WITNESS: No. | 16:48 |
| 3 | BY MR. GRENDI: | 16:48 |
| 4 | Q. And if you look in the middle of the | 16:48 |
| 5 | page there, again, we're on Eastern-000006, the | 16:48 |
| 6 | middle paragraph says: "The contractor will produce | 16:48 |
| 7 | concurrent tracking research per individual subject | 16:48 |
| 8 | to the client on a month basis except in the first | 16:48 |
| 9 | month that weekly reports shall be delivered and | 16:48 |
| 10 | under circumstances that require more frequent | 16:48 |
| 11 | reporting, paren, weekly or fortnightly, end paren, | 16:48 |
| 12 | as the client directs up to a six-month period." | 16:48 |
| 13 | Do you see that? | 16:48 |
| 14 | A. Yes. | 16:48 |
| 15 | Q. Did Strategic Vision deliver weekly | 16:49 |
| 16 | reports on tracking research per individual subject | 16:49 |
| 17 | during the first month of the agreement? | 16:49 |
| 18 | A. No. | 16:49 |
| 19 | Q. Okay. Did there come a time when | 16:49 |
| 20 | Strategic Vision delivered a 60-gigabyte hard drive | 16:49 |
| 21 | of data to Eastern Profit? | 16:49 |
| 22 | A. Yes. | 16:49 |

Page 277

70 (Pages 274 to 277)

**Atkinson-Baker, Inc.**
**www.depo.com**

| | | |
|---|---|---|
| 1 | Q.   And what was on that hard drive? | 16:49 |
| 2 | A.   It's lots of junk information. | 16:49 |
| 3 | Q.   Was any of that information the kind of | 16:49 |
| 4 | useful reporting that Eastern Profit would have | 16:49 |
| 5 | expected under this agreement? | 16:49 |
| 6 | MR. GREIM:  Objection, foundation, calls for | 16:49 |
| 7 | opinion. | 16:49 |
| 8 | THE WITNESS:  No. | 16:49 |
| 9 | BY MR. GRENDI: | 16:49 |
| 10 | Q.   Okay.  I believe you testified before | 16:49 |
| 11 | that you had heard that Team 2 found evidence of -- | 16:50 |
| 12 | strike that. | 16:50 |
| 13 | Did you ever hear that Team 2 of Strategic | 16:50 |
| 14 | Vision's team found evidence of Social Security | 16:50 |
| 15 | number fraud or human trafficking or customs fraud? | 16:50 |
| 16 | A.   Say that again. | 16:50 |
| 17 | Q.   Sorry.  Did there ever come a time when | 16:50 |
| 18 | you heard from Strategic Vision that its second team | 16:50 |
| 19 | -- they call it Team 2 -- had found evidence of | 16:50 |
| 20 | Social Security fraud, human trafficking, or customs | 16:50 |
| 21 | fraud concerning the subjects of the research | 16:50 |
| 22 | agreement? | 16:50 |

Page 278

| | | |
|---|---|---|
| 1 | A.   Is this relevant? | 16:51 |
| 2 | Q.   Well, that's what I'm going to get at | 16:51 |
| 3 | here, because my understanding would probably be that | 16:51 |
| 4 | you don't want to reveal the name of that entity. | 16:51 |
| 5 | A.   No. | 16:52 |
| 6 | Q.   Okay.  Is that because it's normally | 16:52 |
| 7 | confidential; you don't disclose the dealings of | 16:52 |
| 8 | private investigatory research clients that you're | 16:52 |
| 9 | working with with Strategic Vision? | 16:52 |
| 10 | A.   Correct. | 16:52 |
| 11 | MR. GRENDI:  So, Attorney Greim, we can talk | 16:52 |
| 12 | about whether you're going to try to use that in | 16:52 |
| 13 | damages and we can talk about who this client is and | 16:52 |
| 14 | find out information about it or you can -- we can | 16:52 |
| 15 | lay off on that and maybe talk to your client about | 16:52 |
| 16 | it. | 16:52 |
| 17 | MR. GREIM:  Yeah.  Let's just -- let's take | 16:52 |
| 18 | one minute. | 16:52 |
| 19 | MR. GRENDI:  Sure.  Off the record. | 16:52 |
| 20 | VIDEOGRAPHER:  Going off the record.  The | 16:52 |
| 21 | time is now 4:54 p.m. | 16:52 |
| 22 | [Mr. Greim confers with Ms. Wallop and Mr. | 16:52 |

Page 280

| | | |
|---|---|---|
| 1 | A.   Yes, but I don't hear the Team 2, that | 16:50 |
| 2 | term.  I was not familiar with the Team 2. | 16:50 |
| 3 | Q.   Let's just say Strategic Vision.  Did | 16:51 |
| 4 | Strategic Vision tell you it had found that kind of | 16:51 |
| 5 | information? | 16:51 |
| 6 | A.   Yes. | 16:51 |
| 7 | Q.   They did ever give you any documents to | 16:51 |
| 8 | prove that or show that that was the case? | 16:51 |
| 9 | A.   No. | 16:51 |
| 10 | Q.   No.  Okay.  And the whole point of this | 16:51 |
| 11 | agreement was to get that, like you said, the | 16:51 |
| 12 | concrete evidence that there was corruption in the | 16:51 |
| 13 | CCP.  Right? | 16:51 |
| 14 | A.   Correct. | 16:51 |
| 15 | Q.   But that was never delivered under this | 16:51 |
| 16 | agreement, was it? | 16:51 |
| 17 | A.   No. | 16:51 |
| 18 | Q.   I'll ask about this one, but I think | 16:51 |
| 19 | we're going to have to eventually go off the record | 16:51 |
| 20 | on it.  What is the name of project in Taiwan that | 16:51 |
| 21 | you were talking about with Attorney Greim just | 16:51 |
| 22 | before the break? | 16:51 |

Page 279

| | | |
|---|---|---|
| 1 | Waller.] | 16:54 |
| 2 | VIDEOGRAPHER:  We are back on the record. | 16:54 |
| 3 | The time is now 4:57 p.m. | 16:55 |
| 4 | BY MR. GRENDI: | 16:55 |
| 5 | Q.   So, Mr. Han, if you would please | 16:55 |
| 6 | identify the client or potential client from Taiwan | 16:55 |
| 7 | that you spoke of politically concerning a newspaper | 16:55 |
| 8 | article in "Politico". | 16:55 |
| 9 | A.   There is a -- I saw that article.  I | 16:55 |
| 10 | didn't know what it referred to.  They specifically | 16:55 |
| 11 | talked about the Taiwan project. | 16:55 |
| 12 | Q.   No, no.  I'm sorry.  You know what? | 16:55 |
| 13 | Let's strike that question.  I'll start over. | 16:55 |
| 14 | what is the name of the entity you and | 16:55 |
| 15 | Strategic Vision have been working on that comes from | 16:55 |
| 16 | Taiwan?  Who is that? | 16:55 |
| 17 | A.   There are several.  The Taiwan National | 16:55 |
| 18 | Security Council and Taiwan DPP, which is the ruling | 16:55 |
| 19 | party, and the embassy here. | 16:55 |
| 20 | Q.   And is Strategic Vision trying to | 16:55 |
| 21 | solicit business from those entities? | 16:55 |
| 22 | A.   Correct. | 16:56 |

Page 281

71 (Pages 278 to 281)

**Lianchao Han - Confidential**
**August 28, 2019**

# EXHIBIT L

# LOAN AGREEMENT



**THIS AGREEMENT** (this "Agreement") is made on the 29th December, 2017.

### BETWEEN

(1) **ACA Capital Group Limited** ("the Lender"), a limited company incorporated in Hong Kong with the Certificate of Incorporation Number of 188692, and

(2) **Eastern Profit Corporation Limited** ("the Borrower"), a limited company incorporated in Hong Kong with the Certificate of Incorporation Number of 1648534.

### WHEREAS

(1) The Lender has agreed to lend to the Borrower urgently subject to the terms of this Agreement.

### IT IS HEREBY AGREED:

**1.   DEFINITIONS AND INTERPRETATION**

(1) Definitions

In this Agreement unless the context otherwise requires:

"**Agreement**" means this Agreement as amended from time to time; and

"**Loan**" means the amount advanced to the Borrower pursuant to Clause 2 hereof.

**2.   THE LOAN**

The Lender agrees to lend to the Borrower by way of a loan in the amount of USD One Million (USD1,000,000) upon the terms and subject to the conditions of this Agreement. The term of the Loan commences from the date of the said amount being transferred to the Borrower until the Borrower repays the said amount together with interest (pursuant to Clause 3 hereof) in full.

The Lender fully understands and agrees that the Loan is un-collateralized.

The Lender agrees to wire transfer the said amount to the Borrower's designated bank as instructed by the Borrower.

**3.   INTEREST**

The Borrower agrees to pay 2% interest per month, compounded monthly or otherwise mutually agreed by the Lender and the Borrower in writing from time to time.

**4.   REPAYMENT**

The Borrower shall repay to the Lender at the end of the six-month period from the date of the said amount being transferred to the Borrower, in a form instructed by the Lender at the Lender's sole and absolute discretion of the loan amount plus the interest. The Borrower agreed to compensate the Lender for any loss or damages suffered by the Lender for any delay in repayment of the Loan.

1

5. **DOCUMENTATION**

The parties hereto jointly and severally acknowledge that this Agreement forms the entire agreement relating to the Loan. If there are any other terms relating to the Loan existing at the date hereof and not comprised in this Agreement, such terms shall be of no further force and effect. No amendment to this Agreement shall be of any effect unless it is in writing subscribed to by all the parties hereto.

6. **CONTINUING OBLIGATIONS AND TERMINATION**

(1) The obligations of the Borrower and the Lender hereunder shall be continuing obligations and shall be and remain fully effective until the repayment of the Loan in full in accordance with the provisions of this Agreement.

(2) Termination of this Agreement shall be without prejudice to the rights and claims of the Lender accrued or made at or prior to the date of termination.

7. **PARTIAL INVALIDITY**

The illegality, invalidity or unenforceability of any provision of this Agreement under the law of any jurisdiction shall not affect its legality, validity or enforceability under the law of any other jurisdiction nor the legality, validity or enforceability of any other provisions of this Agreement.

8. **CONFIDENTIALITY**

(1) The parties should not disclose to any third party any matters, confidential or secret information, financial status, and/or any other affairs which has been acquired in the course of this Agreement concerning the affairs of the respective parties.

(2) If the parties have not observed the above and caused losses to the other party, then the non-defaulting party shall have the right to terminate this Agreement immediately and/or to pursue by means of legal action, for damages or losses and other legal liabilities, towards the defaulting party.

9. **GOVERNING LAW AND JURISDICTION**

This Agreement shall be governed by and construed in accordance with the laws of the Hong Kong Special Administrative Region and each of the parties hereto irrevocably submits to the non-exclusive jurisdiction of the courts of the Hong Kong Special Administrative Region in relation to any disputes howsoever arising out of or in connection with this Agreement.

CONFIDENTIAL

EASTERN-000279

**IN WITNESS WHEREOF** the parties hereto have duly executed this Agreement the day and year first above written.

SIGNED for and on behalf of )
Eastern Profit Corporation Limited )
)
Chunguang Han )
Director )
)
)
)

SIGNED for and on behalf of )
ACA Capital Group Ltd. )
)
William Je )
Chief Executive )
)
)
)

3

CONFIDENTIAL

EASTERN-000280

# EXHIBIT M



## Research Agreement
December 29, 2017

This agreement is between Strategic Vision US LLC ("the Contractor"), and Eastern Profit Corporation Limited,("the Client"), for the purpose of providing business research, reporting, documentation, and other consulting services.

**Both parties agree that the nature of this contract, and work related to it, is highly confidential. Both parties are bound by the strictest secrecy not to disclose the existence of the contract, work relating to the contract, sources and methods used to execute the contract; and participants in formulating, supervising, or executing the contract's provisions, to any third party, except as required under United States law or the laws of the State of Nevada.**

To this effect, there will be single line communication between the Contractor and the Client. The individuals through which such communication will be made will be identified upon the initiation of this contract. Any and all materials provided by the Client to the Contractor will be treated with absolute confidentiality and will not be shared by the Contractor with any other entity.

The Contractor will conduct high quality original research and prepare reports on subjects chosen at the Client's discretion, for the purpose of detecting, stopping, and preventing crime or other harm to innocent people. The Client will provide the necessary basic information, and desired areas of focus, to the Contractor to research. The Contractor will produce complete reports and provide all supporting data as indicated below. The research and reports will be devoted to the following three subject categories:

A) **Financial forensic Historical research;**
B) **Current Tracking research;**
C) **Social media research.**

A) **Financial forensic Historical research** will consist of, but not be limited to, in-depth and detailed reports of existing and historical business and financial transactions, on subjects selected by the Client, and relations of the subject as identified by the Client. Business and financial transactions to be researched may include statements, capital sources, inflow and outflow information, bank receipts, financial instruments, financial products, statements of credit, precious metals transfers, commodity transfers, crypto currency exchange, stocks and other equities, business ownership, real property ownership, trusts, large

1
EASTERN-000005

amounts of spending, specific information to indicate the transaction participants, and other data required by the Client.

The Contractor will produce a progress report on this financial forensic research each week in the first month, one preliminary report in the first month, and one comprehensive historical research report within 3 months, and with update reports sin each following month; the Client may require, reports per individual subject to the Client within a specified timeframe, as well as all relevant supporting data.

B) **Current Tracking research** shall consist of, but not be limited to, in-depth and detailed reports on movements of specified subjects by land, air, and sea (private and commercial); schedules and itineraries, addresses and lodging, means of transportation, names of carriers, manifests, geolocation, major events and significant contacts the subjects involved, videos and audio that can be accessed remotely, and other data that may be of relevance to the overall research, such as past travel records that may significant to the research. This work shall consist only of primary source information, multimedia, and prepared reports.

The Contractor will produce concurrent tracking research per individual subject to the Client on a monthly basis, except in the first month that weekly reports shall be delivered and under circumstances that require more frequent reporting (weekly or fortnightly) as the Client directs, for up to a six-month period.

C) **Social media research** shall consist of, but not be limited to, in-depth and detailed reports on the social media usage and networks of specified subjects and public figures. Research shall include court records, criminal databases, sex offender and child abuse databases, information on subject's family, extramarital affairs, children born out of wedlock, passports and ID documents, assets, videos and audio, emails, websites, pornography and related media, comments on online media, social media (including Facebook, Twitter, Instagram, Snapchat, Wechat, and other sites as the Client may request), "dating" or sexual services apps, online classified ads or their equivalents, video or audio recordings, and other media.

The Contractor will produce social media research per individual subject to the Client on weekly basis for the first month, and on a monthly basis thereafter, except under circumstances that require more frequent reporting (weekly or fortnightly) as the Client directs, or irregular emergencies that the Contractor may discover.

**Information requiring translation.** When the Contractor encounters information requiring translation, the Contractor will provide electronic copies of the material to the Client for the Client to evaluate and translate. The Client may provide

2

EASTERN-000006

translations to the Contractor for the Contractor to include in analytical reports. The Contractor is not responsible for translations.

**Deliverables.** The deliverables under this contract will be comprehensive confidential reports to the client. It is understood that some of the reports will be produced on a regular schedule, and that others will be produced on an as-needed basis. (A) Financial Forensic historical research reports will be produced as specified above one time per subject, subject to occasional updating throughout the year. (B) Current Tracking reports for each subject will be produced monthly or more frequently as Client directs. (C) Social media reports for each subject will be produced monthly or more frequently as Client directs. All deliverables shall be by USB drive only.

**Irregular circumstances.** Both parties understand that occasional unforeseen challenges may arise that will slow or block comprehensive research, and that there may be periods in which information is irregular, unavailable, or incomplete. The Contractor will endeavor to make all research and reports as complete as possible in a timely scheduled manner.

**Criteria.** The Contractor shall provide the deliverables based on the best practices and standards of the industry, comparable to other top firms with similar services. It shall make most diligent efforts to ensure the services renders are of very high quality, revealing a true, complete and full profile of the subject. The Contractor guarantees that all information provided is genuine.

**Prices.** Preamble: The prices for each deliverable "A," "B," and "C" are $300,000. each, per subject (per "fish") per year, for a total of $900,000 per fish per year. The contract is for 10 fish in the tank per year, with each fish being the subject of an A, B, and C report, or a total of 30 reports per year (10 fish x 3 reports each = 30 jobs at any given time, or 30 reports per year).

It is understood that the Client may not wish for each of the 10 fish to be the subject of all three reports, and that the number of report work duties per month will vary. It is also understood that either the Client may find it necessary to remove certain fish from time to time, or the Contractor may find circumstances do not permit sufficient work to research a given fish.

Therefore, when a fish is removed from consideration, a new fish will be put in its place, by the Client, keeping the number of fish being monitored at any time at 10.

However, this solution does not provide for predictable budgeting or workloads. To ensure the maximum workload for predictability of the agreed price, we will measure the deliverables as 30 units per year (10 fish x 3 reports [A+B+C] each = 30 jobs/reports at any given time).

3

CONFIDENTIAL

EASTERN-000007

The first month (January) of this contract will include up to 15 fish for a total of 30 reports and will decrease to 10 fish for a total of 30 reports at the beginning of the second month (February) and for (March) and for the duration of this contract.

It is agreed by both Parties that for the first 3 months of this Agreement, January, February and March 2018, that the payment of $750,000. USD will be wired per our instructions to our US Bank account.

It is also agreed by both Parties that after the March reports and payments are made, that all involved Parties will meet to recap the accounting, prior to moving forward with the next quarter. We shall require that with any change to the numbers above 10 fish in the tank, that SVUS will reserve the right to renegotiate our financial Agreement.

The pricing for 30 units or deliverables per year remains a constant $9,000,000 per year, or $750,000 per month for 12 months. These units or deliverables may be mixed and matched as the Client requests. As one unit is deleted from one fish, an extra fish with the equivalent deliverable is added, as shown in the attached charts.

We will measure each of the 30 reports as "report-equivalents" in the event it is necessary to stop work prematurely on one fish, and replace it with a second fish. We then have the partial report on the terminated fish, and a new report for on the replacement fish for the duration of the contract. There is no extra startup charge for the replacement fish in the 12-month period.

The flat price structure is as follows:

A) Comprehensive historical reports: $300,000 per report (or report-equivalent) per year.
B) Tracking reports: $300,000 per report (or report-equivalent) per year.
C) Social media reports: $300,000 per report (or report-equivalent) per year.

Reports may be combined ("mixed and matched") in any combination of up to 30. They are not necessarily 10 of (A), 10 of (B), and 10 of (C); but could be, for example 14 of (A), 8 of (B), and 8 of (C), or whatever totals 30.

The total for 30 units x US$300,000 each is US$9,000,000 (nine million dollars) per year.

**Additional assignments.** Additional research consistent with the above may be added in annual blocks of 10 fish x 3 deliverables each, or 30 deliverables per year, as described above. The Client may direct the Contractor to conduct other research, not specified in this agreement, for an additional fee.

CONFIDENTIAL

EASTERN-000008

**Payment terms.** For the purposes of this contract, the year begins the day the contract is signed. Payment is to be made in regular monthly installments of US$750,000, at the end of each month.

The Client will pay the Contractor a deposit of US$1,000,000 (one million dollars) upon signing the contract. The deposit will be credited on a prorated basis to the final 1-1/3 (1.3) months of the contract. Payment is to be made by "same day value" wire transfer to Strategic Vision US, LLC, per the following instructions:

> **Citibank NV Account Wire Instructions**
> Signatory: French C. Wallop, CEO
> Account name: Strategic Vision US, LLC
> Routing # 322271724
> Account # 500371679
> SWIFT code: CITIUS33
> Branch address:
>     Citibank
>     The Lakes
>     8701 W. Sahara Ave.
>     Las Vegas, NV 89117 USA
> Branch telephone: +1-702-228-2501

Subsequent payments will be made to the same account, unless mutually agreed otherwise in writing. It is understood that the Client may direct other entities to pay the Contractor, and that such payments will be deemed satisfactory compensation by the Contractor. All Client payments must be received by the Contractor by wire transfer within 5 business days of invoice.

Both parties anticipate that this contract could expand to many more subjects of research. The Client has expressly stated that there could be as many as 4000 such 'fish in the tank'. Obviously, negotiations for the far larger range will be agreed upon in writing at a later date.

**Duration.** This contract shall be in force for three (3) years from the date of signing. Either party may terminate the contract with 30 days' written notice.

French C. Wallop, CEO
Strategic Vision US, LLC

Date: Jan 6. 2018                    Date: Jan. 6. 2018

CONFIDENTIAL                    EASTERN-000009

# EXHIBIT N



**FOLEY HOAG** LLP

Seaport West
155 Seaport Boulevard
Boston, MA 02210-2600

617.832.1000 main
617.832.7000 fax

Anthony D. Mirenda
617-832-1220 direct
ADM@foleyhoag.com

February 23, 2018

**Via Federal Express**

**CONFIDENTIAL**

EXHIBIT
Wallop
13
2-12-19

Ms. French C. Wallop, CEO
Strategic Vision US LLC
7260 W. Azure Drive, Suite 140-593
Las Vegas, NV 89130

     Re:   Contract with Eastern Profit Corporation Limited dated January 6, 2018

Dear Ms. Wallop:

     We have been engaged to represent Eastern Profit Corporation Limited ("Eastern") with regard to its Research Agreement contract with Strategic Vision US LLC ("Strategic Vision") dated January 6, 2018.

     As you are aware, Eastern has very serious concerns with Strategic Vision's wholly inadequate performance in the weeks since the contract was signed. In the contract, Strategic Vision promised that it would, among other things, conduct "high quality original research" and would provide detailed forensic financial reports, reports detailing tracking research, and reports detailing social media research concerning specific subjects as described therein. Per the contract, Strategic Vision was to deliver such reports concerning the specific subjects on a weekly basis over the course of the first month, and no less than on a monthly basis thereafter.

     Immediately after the contract was signed on January 6, problems concerning Strategic Vision's capabilities and competence began to surface. Because of what Strategic Vision described as "internal miscommunication" on the part of Strategic Vision's representatives, Eastern agreed to delay the start of the contract by 10 days, from January 6 to January 16. Even with this additional time, Strategic Vision failed to deliver its initial sets of weekly reports on time as required by the contract.

     Eventually, on January 30, Strategic Vision finally made its first delivery under the contract – an 80 GB dump of a combination of reports concerning particular subjects and

ATTORNEYS AT LAW          BOSTON | NEW YORK | PARIS | WASHINGTON | FOLEYHOAG.COM

CONFIDENTIAL

February 23, 2018
French C. Wallop
Page 2

raw research materials. This "delivery" was wholly inadequate for a host of reasons. First
and most fundamentally, while Eastern provided specific identifying information regarding
the particular subjects of the research, most of Strategic Vision's reports and research
materials concerned **different** subjects – not the particular ones specified by Eastern – and so
the information was entirely irrelevant. For example, Eastern provided detailed identifying
information concerning one particular subject, Chengjie LIU (including among other data his
date of birth and a photograph), but Strategic Vision provided a 121-page report on an
entirely different person, with a different date of birth and a different photograph – obviously
useless. As another example, Eastern provided detailed identifying information concerning
another particular subject, Qing YAO (including among other data his date of birth and a
photograph), but Strategic Vision provided a 52-page report on an entirely different person,
with a different date of birth and a different photograph – likewise obviously useless. The
remainder of the materials included similarly irrelevant and useless materials, or suffered
from other obvious flaws. This certainly does not represent anything close to "high quality
original research" on the specified subjects.

Since that first delivery, Strategic Vision has consistently failed to deliver the reports
required by the contract and has consistently failed to meet the schedule required there.
Eastern committed a substantial amount of resources in good faith, and paid $1 million in
advance as a deposit, based upon the representations and promises made by Strategic
Vision's representatives.

Regrettably, Eastern is compelled to conclude that Strategic Vision misrepresented
its capabilities to fraudulently induce Eastern to enter into the contract and pay the $1
million advance, and has breached its obligations under the contract. Therefore, Eastern is
entitled to terminate the contract immediately and to receive a full and complete refund of
the $1 million deposit. Strategic Vision should cease work immediately, and should
immediately return or destroy all materials and information provided by Eastern to Strategic
Vision. Eastern expects that Strategic Vision will refund the $1 million deposit immediately.
Please send the funds, via wire transfer, to:

| | |
|---|---|
| Beneficiary Bank Name: | DBS Bank Ltd |
| Beneficiary Bank Address: | 12 Marina Boulevard, DBS Asia Central, Marina Bay Financial Centre Tower 3, Singapore 018982 |
| Beneficiary Bank SWIFT: | DBSSSGSG |
| Beneficiary Account Name: | ACA Capital Group Limited |
| Beneficiary Account No.: | 0003-039595-01-1 |
| Immediate Bank Name: | JP Morgan Chase Bank, N.A. |
| Immediate Bank SWIFT: | CHASUS33 |

Finally, and without waiver of or prejudice to Eastern's rights to terminate the
contract immediately due to Strategic Vision's breach and to recover all legally available
remedies, please consider this letter as written notice of termination of the contract pursuant
to the contract's "Duration" section.

CONFIDENTIAL

February 23, 2018
French C. Wallop
Page 3

We trust that Strategic Vision will respond appropriately, terminate the contract and return the deposit, and that litigation will not be necessary.  However, should litigation become necessary, Eastern reserves all its rights to seek any and all remedies legally available to it, including recovery of all damages, costs, interest and attorney's fees.

Please contact me immediately to resolve this situation.  If we do not have a response by the close of business on February 27, 2018, Eastern will have no choice but to move forward to seek all legally available remedies.

Regards,

Anthony D. Mirenda

ADM/sml
Cc:    French C. Wallop, CEO (via Hand Delivery and Electronic Mail)
        Strategic Vision US LLC, 1557 22nd Street North, Arlington VA 22209

EASTERN-000200

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of March, 2020, a true and correct copy of the

foregoing *Plaintiff's Motion for Summary Judgment* was filed electronically.  Notice of this filing

will be sent to all registered parties by operation of the Court's electronic filing system.

Dated:  March 16, 2020

                                                                Respectfully submitted,

                                                                */s/ Francis J. Lawall*_____
OF COUNSEL:                                    Francis J. Lawall (NY Bar ID No. FL1234)
                                                                PEPPER HAMILTON LLP
Joanna J. Cline (Admitted *Pro Hac Vice*)    3000 Two Logan Square
Christopher B. Chuff (Admitted *Pro Hac*    Eighteenth and Arch Streets
*Vice*)                                              Philadelphia, PA  19103
PEPPER HAMILTON LLP                       215.981.4000
1313 North Market Streets, Suite 5100     215.981.4750 (facsimile)
Wilmington, DE  19801
302.777.6500
302.421.8390 (facsimile)