## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| _____ | ) |
| EASTERN PROFIT CORPORATION LIMITED | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | )   Case No. 18-CV-2185 (LJL) |
| STRATEGIC VISION US, LLC | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

### LOCAL RULE 56.1 STATEMENT

**A.      The Parties and Relevant Non-Parties**

1.      Through this action, Eastern Profit Corporation Limited ("Eastern") seeks to recover a $1 million deposit (the "Deposit"), plus pre- and post-judgment interest, paid to Strategic Vision US, LLC ("Strategic") pursuant to a contract under which Strategic agreed to provide certain private investigation services to Eastern (the "Research Agreement").[1]

2.      Eastern is organized under the laws of Hong Kong.[2]

3.      Eastern has its principal place of business in Hong Kong.[3]

4.      Guo Wengui ("Mr. Guo") is also known as Miles Kwok.[4]

---

[1] *See generally* Dkt. No. 93.

[2] Ex. A, Strategic's Amended Answer, Affirmative Defenses, and Counterclaims to Eastern's Second Amended Complaint (the "Answer") at 20 ¶ 3; Ex. B, Strategic's Objections and Responses to Eastern's First Requests for Admission ("Strategic's  Admissions"); Ex. C, Eastern Answer to Strategic's Counterclaim at 1 ¶ 3; Ex D, Strategic's Responses and Objections to Eastern's First Interrogatories.

[3] Ex. A, Answer at 20 ¶ 3; Ex. C, Eastern Answer to Strategic's Counterclaim at 1 ¶ 3.

[4] Ex. A, Answer at 20-21 ¶¶ 3-4, 53 ¶ 108.

5.      Mr. Guo was and is an outside advisor to Eastern.[5]

6.      Mr. Guo acted on behalf of Eastern in connection with the negotiation of the Research Agreement.[6]

7.      Yvette Wang ("Ms. Wang") was and is an agent of Eastern Profit.[7]

8.      Ms. Wang was responsible for overseeing the services that Strategic was to provide to Eastern under the Research Agreement.[8]

9.      Chunguang Han ("C. Han") was and is an agent of Eastern.[9]

10.     C. Han was responsible for securing financing that Eastern needed to fund the $1 million Deposit that was to be provided by Eastern to Strategic under the Research Agreement.[10]

11.     Strategic is a limited liability company organized under the laws of Nevada.[11]

12.     At least from September 1, 2017 and March 13, 2018 (the "Relevant Time Period"), Strategic's principal place of business was in Arlington, Virginia.[12]

---

[5] Ex. A, Answer at 20-21 ¶¶ 3-4, 53 ¶ 108.

[6] Ex. A, Answer at 20-21 ¶¶ 3-4, 53 ¶ 108.

[7] Ex. A, Answer at 20-21 ¶¶ 3-4; *id.* at 25 ¶ 17; *id.* at 28 ¶ 23.

[8] Ex. A, Answer at 20-21 ¶¶ 3-4; *id.* at 25 ¶ 17; *id.* at 28 ¶ 23.

[9] Ex. E, Dep. Tr. of Chunguang Han dated November 11, 2019 ("C. Han. Tr.") at 12:20-23, 59:5-17.

[10] Ex. E, C. Han Tr. at 12:20-23, 59:5-17.

[11] Ex. A, Answer at 1 ¶ 2.

[12] Ex. A, Answer at 1 ¶ 2; *see also* Ex. B, Strategic's Admissions ¶ 18.

13.     During the Relevant Time Period, French Wallop ("Wallop") was Strategic's Chief Executive Officer and only member.[13]

14.     Ms. Wallop resides at 1557 North 22nd Street, Arlington, Virginia 22209.[14]

15.     Among other services, Strategic is a sophisticated company that provides private "investigatory research" to clients within the United States in exchange for monetary compensation.[15]

16.     As part of its investigations, Strategic makes investigations into crimes and civil wrongs; the location, disposition, and recovery of stolen property; and the cause(s) of injuries to persons or to property.[16]

17.     As part of its investigations, Strategic makes investigations into the identities, habits, conduct, business, occupation, honesty, integrity, credibility, knowledge, trustworthiness, efficiency, loyalty, activity, movement, whereabouts, affiliations, associations, transactions, acts, reputation and character of individuals.[17]

18.     As part of Strategic's investigations, Strategic's CEO Ms. Wallop communicates with her network of contacts within the United States government and the United States business community in order to obtain the information concerning the subjects of Strategic's investigations.[18]

---

[13] Ex. A, Answer ¶ 9; Ex. F, Dep. Tr. of French Wallop, dated February 12, 2019 ("Wallop I Tr.") at 17:9-14; Ex. G, Dep. Tr. of French Wallop, dated November 19, 2019 ("Wallop II Tr.") at 6:4-16.

[14] Ex. F, Wallop I Tr. at 9:1-4.

[15] Ex. A, Answer ¶¶ 47-51; Ex. F, Wallop I Tr. at 17:15-18:12, 26:21-29:13.

[16] Ex. A, Answer ¶ 48.

[17] Ex. A, Answer ¶ 49.

[18] Ex. A, Answer ¶ 50.

19.     Since it was founded, Strategic has conducted at least five private investigations for its clients.[19]

20.     Strategic had no employees, other than Ms. Wallop.[20]

21.     J. Michael Waller ("Waller") is a friend of Ms. Wallop who has partnered with Strategic on a number of investigations since 2016 or 2017.[21]

22.     During the Relevant Time Frame, Strategic was not licensed as a private investigator under the laws of Virginia or any other state or jurisdiction within the United States.[22]

23.     During the Relevant Time Frame, Ms. Wallop was not licensed as a private investigator under the laws of Virginia or any other state or jurisdiction within the United States.[23]

24.     During the Relevant Time Frame, Mr. Waller was not licensed as a private investigator under the laws of Virginia or any other state or jurisdiction within the United States.[24]

25.     Bill Gertz ("Mr. Gertz") is a former reporter of The Washington Free Beacon and a current reporter of The Washington Times.[25]

---

[19] Ex. A, Answer ¶ 51.

[20] Ex. F, Wallop I Tr. at 16:16-18:12.

[21] Ex. H, Deposition of Michael Waller dated February 8, 2019 ("Waller I Tr.") at 10:23-13:05; Ex. I, Dep. Tr. of Michael Waller dated November 19, 2019 ("Waller Tr. II") at 6:2-7:20; Ex. A, Answer at 3 ¶ 10.

[22] Ex. A, Answer at 14 ¶¶ 88-102; Ex. F, Wallop I Tr. at 290:25:-292:2.

[23] Ex. A, Answer at 14 ¶¶ 88-102; Ex. F, Wallop I Tr. at 290:25:-292:2.

[24] Ex. A, Answer at 14 ¶¶ 88-102; Ex. F, Wallop I Tr. at 290:25:-292:2.

[25] Ex. J, Dep. Tr. of William Gertz dated October 15, 2019 ("Gertz Tr.") at 17:2-12.

26.     Mr. Gertz is a mutual acquaintance of Mr. Guo and Ms. Wallop and J. Mr. Waller.[26]

27.     Mr. Gertz was involved in bringing Eastern and Strategic together for the purposes of entering into the Research Agreement.[27]

28.     Lianchao Han ("L. Han") is a mutual acquaintance of Mr. Guo and Ms. Wallop and Mr. Waller.[28]

29.     L. Han was involved in bringing Eastern and Strategic together for the purposes of entering into the Research Agreement.[29]

**B.      The Negotiation of the Research Agreement**

30.     In late October or early November, Mr. Gertz and L. Han introduced Mr. Guo to Ms. Wallop and Mr. Waller of Strategic.[30]

31.     From the date of that introduction until the Research Agreement was signed, representatives of Eastern (Mr. Guo and Ms. Wang) conferred with representatives of Strategic (Ms. Wallop and Mr. Waller) to discuss a variety of services that Strategic Vison purportedly could provide, including investigatory research into certain people who supported the Chinese Communist Party ("CCP").[31]

---

[26] Gertz Tr. at 64:19-76:19, 126:5-8-127:16; Ex. F, Wallop I Tr. at 31:23-34:19; Ex. H, Waller I Tr. at 116:10-117:9, 162:1-163-25.

[27] Gertz Tr. at 64:19-76:19, 126:5-8-127:16; Ex. F, Wallop I Tr. at 31:23-34:19; Ex. H, Waller I Tr. at 116:10-117:9, 162:1-163-25.

[28] Ex. K, Dep. Tr. of Lianchao Han dated August 28, 2019 ("L. Han. Tr.") at 30:19-34:5, 38:20-14; Ex. F, Wallop I Tr. 34:20-35:1.

[29] Ex. K, L. Han Tr. at 30:19-34:5, 38:20-14; Ex. F, Wallop I Tr. 34:20-35:1.

[30] Ex. F, Wallop I Tr. at 31:23-32:04, 33:15-21, 34:20-35:7; Waller I Tr. 23:23-25:22; *see also* Waller I Tr. at 116:8-117:9.

[31] Ex. F, Wallop I Tr. at 31:23-109:18; Ex. H, Waller I Tr. at 18:8-38:14.

32.     One such meeting took place in the middle of December 2017 and was attended by Mr. Guo, L. Han, Ms. Wallop and Mr. Waller.[32]

33.     At the meeting described in the preceding paragraph, Ms. Wallop and Mr. Waller presented Mr. Guo and L. Han with a paper document entitled "Time to Get Them: Beginning the Psycho-Political Campaign for China" (hereinafter "Time to Get Them").[33]

34.     Time to Get Them described Strategic's capabilities concerning "Targeted Intelligence Collection and Analysis."[34]

35.     Targeted Intelligence Collection and Analysis contemplated that Strategic would "build and operate a secret system for micro-targeted intelligence collection and analysis."[35]

36.     The parties ultimately decided to proceed with the investigatory research only.[36]

37.     The parties then began negotiating the terms of what eventually would become the Research Agreement.[37]

38.     A significant portion of the negotiations regarding the terms of the Research Agreement occurred in Virginia.[38]

---

[32] Ex. H, Waller I Tr. 230:14-230:20; 233:07-234:14; Ex. F, Wallop I Tr. 73:18-74:17; 76:09-76:16.

[33] Ex. H, Waller I Tr. 230:14-230:20; 233:07-234:14; Ex. F, Wallop I Tr. 73:18-74:17; 76:09-76:16.

[34] Ex. H, Waller I Tr. 234:15-234:25; SVUS000387.

[35] Ex. H, Waller I Tr. 234:15-234:25; SVUS000387.

[36] Ex. F, Wallop I Tr. at 31:23-109:18; Ex. H, Waller I Tr. at 18:8-38:14.

[37] Ex. F, Wallop I Tr. at 31:23-109:18; Ex. H, Waller I Tr. at 18:8-38:14.

[38] Ex. A, Answer at 3 ¶ 8; Ex. B, Strategic's Admissions, ¶¶ 20-25.

39.     Ms. Wallop and Mr. Waller, while located in the Commonwealth of Virginia, communicated with Ms. Wang concerning the activities Strategic was to perform under the Research Agreement.[39]

40.     Ms. Wallop and Mr. Waller, while located in the Commonwealth of Virginia, communicated with Ms. Wang concerning the proposed terms of the Research Agreement before it was executed.[40]

41.     Ms. Wallop and Mr. Waller, while located in the Commonwealth of Virginia, communicated with Ms. Wang concerning the actual terms of the Research Agreement.[41]

42.     For instance, from December 2017 through January 6, 2018, Ms. Wallop communicated from the Commonwealth of Virginia to Ms. Wang via Signal messages to negotiate the pricing structure of the contemplated research and the number of individuals to be researched.[42]

43.     In or around December 2017, Ms. Wallop and Mr. Waller prepared the initial draft of the Research Agreement while at Ms. Wallop's home in Virginia.[43]

---

[39] Ex. B, Strategic's Admissions, ¶¶ 21, 25.

[40] Ex. B, Strategic's Admissions, ¶¶ 19, 23.

[41] Ex. B, Strategic's Admissions, ¶¶ 20, 24.

[42] Ex. F, Wallop I Tr. 186:13-186:20.

[43] Ex. F, Wallop I Tr. at 108:5-109:18.

### C.     The $1 Million Deposit and ACA Loan

44.     As part of contract negotiations, Ms. Wallop requested that Eastern provide a $1 million Deposit under the Research Agreement.[44]

45.     On December 29, 2017, to fund the Deposit contemplated by the parties, Eastern borrowed $1 million from ACA Capital Group Limited ("ACA," and the loan from ACA to Eastern, the "ACA Loan").[45]

46.     On January 2, 2018, Eastern caused the $1 million Deposit to be wired to Strategic through ACA.[46]

47.     Strategic received the $1 million.[47]

48.     Strategic understood that the $1 million payment from ACA was the Deposit that the parties had previously discussed.[48]

49.     Strategic has acknowledged that it accepted the $1 million deposit and purported to utilize it to cover the expenses associated with the investigation called for under the Research Agreement.[49]

---

[44] Ex. F, Wallop I Tr. at 192:09-194:16.

[45] Ex. E, C. Han Tr. at 124:14-129:2; Ex. L, ACA Loan Agreement, EASTERN-000278.

[46] Ex. E, C. Han Tr. at 124:14-129:2; Ex. F, Wallop I Tr. at 192:09-194:16.

[47] Ex. A, Answer at 4 ¶ 17; Ex. F, Wallop I Tr. at 192:09-194:16; Ex. H, Waller I Tr. at 157:9-22; Ex. I, Waller II Tr. at 91:14-94:6.

[48] Ex. F, Wallop I Tr. 192:09-194:16; Ex. I, Waller II Tr. at 91:23-94:6

[49] Ex. A, Answer at 4 ¶ 17; Ex. F, Wallop I Tr. at 246:16-247:23; Ex. H, Waller I Tr. at 157:9-22; Ex. I, Waller II Tr. at 66:10-16, 93:22-94:6.

> **D.    The Research Agreement**

50.    Eastern and Strategic entered into the Research Agreement on January 6, 2018.[50]

51.    The parties executed the Research Agreement at Ms. Wallop's home in Virginia.[51]

52.    Ms. Wallop signed the Research Agreement on behalf of Strategic in Virginia.[52]

53.    Per Strategic, the Research Agreement required it to "investigat[e]" certain individuals chosen by Eastern.[53]

54.    According to the Research Agreement's terms, Strategic was to provide Eastern "high quality original research and prepare reports on subjects chosen at [Eastern's] discretion for the purposes of detecting, stopping, and preventing crime or other harm to innocent people."[54]

55.    Strategic was obligated to "provide the deliverables based on the best practices and standards of the industry, comparable to other top firms with similar services," including by delivering reports "of very high quality, revealing the true, complete and full profile of the subject."[55]

---

[50] Ex. A, Answer at 2 ¶¶ 6-7; Ex. I, Waller II Tr. at 89:21-90:16; Ex. M, Research Agreement.

[51] Ex. A, Answer at 2 ¶¶ 6-7; Ex. F, Wallop I Tr. at 126:3-14; Ex. I, Waller II Tr. at 89:21-90:16.

[52] Ex. A, Answer ¶ 7; Ex. F, Wallop I Tr. at 126:3-14.

[53] Ex. A, Answer at 11 ¶ 56; Ex. I, Waller II Tr. at 96:5-98:7.

[54] Ex. M, Research Agreement at 1-5; Ex. A, Answer at 2 ¶ 6.

[55] Ex. M, Research Agreement at 1-5; Ex. A, Answer at 2 ¶ 6.

56.     The Agreement states: "[Eastern] will provide the necessary basic information, and desired area of focus, to [Strategic] to research.  [Strategic] will produce complete reports and provide all supporting data as indicated below."[56]

57.     The three types of research Strategic agreed to perform in the Agreement were "Financial forensic Historical research, Current Tracking research, and Social Media Research."[57]

58.     The Agreement describes Financial forensic Historical research as: "in-depth and detailed reports of existing and historical business and financial transactions, on subjects selected by [Eastern], and relations of the subject as identified by [Eastern].  Business and financial transactions to be researched may include statements, capital sources, inflow and outflow information, bank receipts, financial instruments, financial products, statements of credit, precious metals transfers, crypto currency exchange, stocks and other equities, business ownership, real property ownership, trusts, large amounts of spending, specific information to indicate the transaction participants, and other data required by [Eastern]."[58]

59.     The Agreement describes Current Tracking research as: "in-depth and detailed reports on movements of specified subjects by land, air, and sea (private and commercial); schedules and itineraries, addresses and lodging, means of transportation, names of carriers, manifests, geolocation, major events and significant contacts the subject involved, video

---

[56] Ex. M, Research Agreement at 1-5; Ex. A, Answer at 2 ¶ 6.

[57] Ex. M, Research Agreement at 1-5; Ex. A, Answer at 2 ¶ 6.

[58] Ex. M, Research Agreement at 1-5; Ex. A, Answer at 2 ¶ 6.

and audio that can be accessed remotely, and other data that may be of relevance to the overall research, such as past travel records that may significant to research."[59]

60.     The Agreement describes Social media research as: "in-depth and detailed reports on the social media usage and networks of specified subjects and public figures. Research shall include court records, criminal databases, sex offender and child abuse databases, information on subject's family, extramarital affairs, children born out of wedlock, passports and ID documents, assets, videos and audio, emails, websites, pornography and related media, comments on online media, social media (including Facebook, Twitter, Instagram, Snapchat, Wechat, and other sites as [Eastern] may request), "dating" or sexual services apps, online classified ads or their equivalents, video or audio recordings, and other media."[60]

61.     The Agreement provides that the research called for under the Agreement were to be delivered to Eastern by USB drive only.[61]

62.     Strategic was entitled to payment under the Research Agreement only if it provided the research called for under the Research Agreement; the potential amount owed to Strategic under the Research Agreement was tied to each deliverable, report, or unit of research delivered.[62]

63.     The Agreement states that "[Eastern] will pay [Strategic] a deposit of US$1,000,000 (one million dollars) upon signing the contract."[63]

---

[59] Ex. M, Research Agreement at 1-5; Ex. A, Answer at 2 ¶ 6.

[60] Ex. M, Research Agreement at 1-5; Ex. A, Answer at 2 ¶ 6.

[61] Ex. M, Research Agreement at 1-5; Ex. A, Answer at 2 ¶ 6.

[62] Ex. M, Research Agreement at 1-5; Ex. A, Answer at 2 ¶ 6; Ex. G Wallop II Tr. at 35:5-36:5, 42:15-44:12, 47:6-11, 49:21-50:17.

[63] Ex. M, Research Agreement at 1-5; Ex. A, Answer at 2 ¶ 6.

64.     The Deposit was to be treated by Strategic as a down payment to be credited on a prorated basis to fees earned by Strategic during the last one and one-third months of the Research Agreement.[64]

65.     The Deposit was not meant to be a signing bonus.[65]

66.     The Agreement states that "It is understood that [Eastern] may direct other entities to pay [Strategic], and that such payments will be deemed satisfactory compensation by [Strategic]."[66]

67.     The Research Agreement authorized the parties to "terminate the contract with 30 days' written notice."[67]

68.     Termination was permitted without a showing of cause.[68]

69.     The termination provision in the Research Agreement allowed for termination without cause so long as 30 day's written notice was provided.[69]

70.     Strategic did not require Eastern to represent in the Research Agreement that Mr. Guo was a dissident who opposed the CCP.[70]

71.     Strategic did not require Eastern to covenant in the Research Agreement that Eastern would use the investigatory research against the CCP.[71]

---

[64] Ex. M, Research Agreement at 1-5; Ex. A, Answer at 2, 4 ¶¶ 6, 17; Ex. I, Waller II Tr. at 91:23-94:6.

[65] Ex. M, Research Agreement at 1-5; Ex. A, Answer at 4 ¶ 17; Ex. I, Waller Tr. II at 91:23-94:6.

[66] Ex. M, Research Agreement at 1-5; Ex. A, Answer at 2 ¶ 6.

[67] Ex. M, Research Agreement at 1-5; Ex. A, Answer at 2 ¶ 6.

[68] Ex. M, Research Agreement at 1-5; Ex. A, Answer at 2 ¶ 6.

[69] Ex. M, Research Agreement at 1-5; Ex. A, Answer at 2 ¶ 6.

[70] Ex. M, Research Agreement at 1-5; Ex. I, Waller II Tr. at 30:16-31:10.

[71] Ex. M, Research Agreement at 1-5; Ex. I, Waller II Tr. at 30:16-31:10.

72.     Strategic did not conduct diligence into the background of Eastern or Mr. Guo, including into whether Mr. Guo was truly a dissident or opposed the CCP, before signing the Research Agreement.[72]

73.     Ms. Wallop testified that she "never discussed what the research would be used for . . . with Mr. Guo or Ms. Wang or Mr. Han."[73]

74.     Ms. Wallop testified that Strategic did not know for what purpose Eastern was proposing to use the investigatory research and thought that Eastern might "run it both ways."[74]

75.     Strategic waited until after the Research Agreement was signed to begin investigating Mr. Guo's background.[75]

76.     Evidence that Strategic is relying upon to show that Mr. Guo misrepresented his status as a Chinese dissident and opposition to the CCP comes from publicly available sources, such as news articles (including in the Wall Street Journal) and YouTube videos, that existed in the public forum before the parties signed the Research Agreement.[76]

77.     Strategic relied upon the recommendation of Mr. Gertz and L. Han in choosing to enter into the Research Agreement.[77]

78.     Ms. Wallop testified as follows:

---

[72] Ex. A, Answer. at 11 ¶¶ 47-54; Ex. F, Wallop I Tr. 59:2-61:13, 86:19-91:1, 171:21-173:24, *see also id.* at 12:5-21, 16:16-18:12, 26:22-27:2, 27:18-30:1; *see also* Ex. H, Waller I Tr. at 286:1-287:8.

[73] Ex. F, Wallop I Tr. at 59:2-61:13.

[74] Ex. F, Wallop I Tr. at 59:2-61:13.

[75] Ex. F, Wallop I Tr. at 65:19-73:13; Ex. G, Wallop II Tr. at 93:4-17.

[76] Ex. I, Waller II Tr. at 11:11-23, 31:20-36:25, 52:3-20.

[77] Ex. F, Wallop I Tr. at 90:4-91:1.

- Q.  Okay.  So you didn't do any work regarding Mr. Guo or his business prior to . . . the execution of the contract on or about January 6, 2018?

- A.  No.

- Q.  You didn't access your network to determine whether this was someone you wanted to do business with or not?

- A.  We had Bill Gertz, who was one of the finest intellects on Chinese corruption, and reporters, journalists, and also Lianchao, again, of the highest sterling standards.  When they asked us to look into it, that's what we did.  That was looking into putting together a program that would help somebody that we believed at the time was absolutely anti-communist.

- Q.  I see.  So you relied up -- let me put it this way.  Strategic Vision relied upon the recommendation of Bill Gertz and Lianchao Han in terms of deciding to do business with, or deciding to enter into the research agreement?

- A.  Correct.[78]

E.    **The Attempted Performance**

79.    On or about January 8, 2018, Eastern—through Ms. Wang—delivered a list of 15 individuals to Strategic—through Ms. Wallop—on a USB key (the "Subject List") that Eastern wanted investigated under the Research Agreement.[79]

80.    All of the individuals on the Subject List were members of the CCP.[80]

81.    Many of the individuals on the Subject List were high ranking officials that comprised the key group in control of China's banking system.[81]

---

[78] Ex. F, Wallop I Tr. at 90:4-91:1.

[79] Ex. F, Wallop I Tr. at 174:04-175:02; 177:05-177:10; Ex. H, Waller I Tr. at 164:6-165:17; Ex. A, Answer at 13 ¶¶ 65, 66.

[80] Ex. K, L. Han. Tr. at 174:21-175:19.

[81] Ex. K, L. Han. Tr. at 174:21-175:19.

82.     Strategic decided to split the investigation into two parts, with Mr. Waller directing the part of the investigation that involved international contacts and Ms. Wallop handling the United States based part of the investigation.[82]

83.     The activities that comprised Strategic's investigation occurred in or were directed from Virginia.[83]

84.     Strategic has admitted that it "coordinated its efforts to perform under the [Research Agreement] out of the Commonwealth of Virginia."[84]

85.     Ms. Wallop performed her portion of the investigation out of her home in Arlington, Virginia.[85]

86.     Mr. Waller and Ms. Wallop (on behalf of Strategic) met on an "almost daily" basis to "handle this investigation," at Ms. Wallop's home in Arlington, Virginia.[86]

87.     Ms. Wallop had in person meetings with, and made phone calls to persons in Virginia and Washington D.C. to verify and cross check the information provided in the Subject List.[87]

---

[82] Ex. F, Wallop I Tr. 177:20-178:17, 180:06-180:08.

[83] *See e.g.*, Ex. B, Strategic's Admissions ¶¶ 22, 26, 38, 39, 43, 44.

[84] Ex. B, Strategic's Admissions ¶ 36.

[85] Ex. A, Answer ¶ 2.

[86] Ex. F, Wallop I Tr. 183:09-183:18; 8:02-8:03.

[87] Ex. A, Answer at 13 ¶¶ 71-72; Ex. F, Wallop I Tr. 180:6-184:24.

88.     Strategic has admitted that Ms. Wallop and Mr. Waller met in person at least five times in Virginia after the Research Agreement was executed to discuss the Research Agreement.[88]

89.     Strategic has admitted that Ms. Wallop and Mr. Waller met in person at least three times in Virginia after the Research Agreement was executed to discuss the progress of Strategic's work under the Research Agreement.[89]

90.     Strategic has admitted that both Ms. Wallop and Mr. Waller, while located in the Commonwealth of Virginia, communicated with Ms. Wang concerning disputes regarding performance of the Research Agreement.[90]

91.     After receiving the Subject List, Strategic printed a paper copy of the Subject List and began strategizing how to collect information and perform the investigation.[91]

92.     Upon receipt of the Subject List, Strategic began verifying and cross checking the information provided in the Subject List.[92]

93.     After receiving the Subject List, Ms. Wallop (on behalf of Strategic) began searching for legal channels within the United States to see "who supposedly had a U.S. passport, U.S. visas, or who had, you know, illegitimate children born in the United States."[93]

---

[88] Ex. B, Strategic's Admissions ¶¶ 38, 39.

[89] Ex. B, Strategic's Admissions, ¶¶ 43, 44.

[90] Ex. B, Strategic's Admissions ¶¶ 22, 26.

[91] Ex. F, Wallop I Tr. at 131:25-133:2, 177:11-177:24

[92] Ex. A, Answer ¶ 70.

[93] Ex. F, Wallop I Tr. 177:05-178:17.

94.     After receiving the Subject List, Ms. Wallop (on behalf of Strategic) began communicating with numerous individuals in her contact network to verify and cross check the information provided in the Subject List; some of these communications occurred in Virginia and Washington, D.C.[94]

95.     After receiving the Subject List, Ms. Wallop (on behalf of Strategic) had in person meetings with, and made phone calls to, persons in Virginia and Washington D.C., to verify and cross check the information provided in the Subject List.[95]

96.     Ms. Wallop uncovered that some of the names on the Subject List were fake, while other names of the Subject List were correct.[96]

97.     Ms. Wallop (on behalf of Strategic) took handwritten notes on her print out of the Subject List.[97]

98.     Ms. Wallop's notes on the Subject List demonstrate that she: 1) verified the identities and relationships of subjects' families; 2) had discovered that one subject was using the same social security number as another person; 3) the nickname of one subject; and 4) the address history of one subject.[98]

---

[94] Ex. A, Answer ¶ 71; Ex. F, Wallop I Tr. 180:6-184:24.

[95] Ex. A, Answer ¶ 72.

[96] Ex. F, Wallop I Tr. 180:21-181:06.

[97] Ex. F, Wallop I Tr. at 84:08-84:14; 156:23-158:09; Waller I Tr. at 189:11-190:21.

[98] Ex. F, Wallop I Tr. 84:08-84:14; 156:23-160:13; SVUS-000173, SVUS-000175, SVUS-000177, SVUS-000183, SVUS-00090, SVUS-000254.

99.     After receipt of the Subject List, Strategic also retained or attempted to retain independent contractors to perform private investigatory research into the 15 individuals identified in the Subject List. [99]

100.     Throughout January, Ms. Wallop and Mr. Waller met with members of one of the investigative teams assembled by Strategic—referred to by Strategic as "Team 1"—on a number of occasions in Ms. Wallop's home in Arlington, Virginia. [100]

101.     Ms. Wallop met with the members of Team 1 on January 9, 2018 at her home in Virginia.[101]

102.     Ms. Wallop met with the members of Team 1 on January 11, 2018 at her home in Virginia.[102]

103.     Ms. Wallop met with members of Team 1 on January 25, 2018 in Washington D.C.[103]

104.     Ms. Wallop and Mr. Waller also met with the members of the other investigative team—referred to by Strategic as "Team 2—on at least two occasions. [104]

105.     The weekly deliverables called for under the Research Agreement were due by no later than mid-January 2018.[105]

---

[99] Ex. A, Answer at 14 ¶ 86.

[100] Ex. G, Wallop II Tr. at 6:19-13:9.

[101] Ex. G, Wallop II Tr. at 11:4-12:18.

[102] Ex. G, Wallop II Tr. at 12:19-13:9.

[103] Ex. G, Wallop II Tr. at 13:11-19.

[104] Ex. G, Wallop II Tr. at 20:10-13, 23:20-26:10.

[105] Ex. M, Research Agreement at 1-3.

106.    Strategic delivered its first USB drive to Eastern pursuant to the Research Agreement on January 26, 2018.[106]

107.    Strategic has admitted that the information contained on the USB drive delivered to Eastern on January 26, 2018 was "of no use to Mr. Guo or Eastern Profit because it was nothing more than the researchers' own work to familiarize themselves with the fifteen subjects using open-source information."[107]

108.    On January 30, 2018, Strategic delivered a second USB drive to Eastern Profit.[108]

109.    The USB drive delivered to Eastern on January 30, 2018 was not "of any use" to Eastern.[109]

110.    The USB drive delivered to Eastern on January 30, 2018 contained "incomplete work product . . . in the form of raw research data."[110]

111.    Strategic did not deliver any other USB drives to Eastern.[111]

---

[106] Ex. A, Answer at 35 ¶ 45; Ex. H, Waller I Tr. at 201:10-202:13; Ex. G, Wallop II Tr. at 16:12-17; Ex. I, Waller II Tr. at 6:2-8, 112:7-114:10.

[107] Answer at A at 35 ¶ 45; Ex. I, Waller II Tr. at 6:2-8, 112:7-114:10.

[108] Answer at A at 28 ¶ 24; Ex. G, Wallop II Tr. at 16:12-17; Ex. H, Waller I Tr. at 211:3-215:16; Ex. I, Waller II Tr. at 115:9-116-17.

[109] Answer at A at 28 ¶ 24; Ex. G, Wallop II Tr. at 16:12-17; Ex. H, Waller I Tr. at 211:3-215:16; Ex. I, Waller II Tr. at 115:9-116-17.

[110] Answer at A at 28 ¶ 24; Ex. G, Wallop II Tr. at 16:12-17; Ex. H, Waller I Tr. at 211:3-215:16; Ex. I, Waller II Tr. at 115:9-116-17.

[111] Ex I, Waller II Tr. at 114:23-115:8.

112.     On February 5, 2018, Ms. Wallop met with Mr. Waller and L. Han regarding the Research Agreement in Ms. Wallop's home in Virginia to discuss the investigation.[112]

113.     Strategic never delivered to Eastern any "financial forensic [h]istorical research" called for under the Research Agreement.[113]

114.     Strategic never delivered to Eastern any "current tracking research" called for under the Research Agreement.[114]

115.     Strategic never delivered to Eastern any "social media research" called for under the Research Agreement.[115]

116.     Strategic has admitted that it "was unable to prepare any detailed reports."[116]

117.     On February 23, 2018, Eastern wrote to Strategic terminating the Research Agreement.[117]

118.     In the termination letter, Eastern demanded that Strategic return the $1 million deposit.[118]

---

[112] Ex. G, Wallop II Tr. at 20:14-21:4

[113]  Ex I, Waller II Tr. at 6:2-8, 98:8-100:3.

[114] Ex I, Waller II Tr. at 6:2-8, 100:4-111:20.

[115] Ex I, Waller II Tr. at 6:2-8, 112:7-114:10.

[116] Ex D, Strategic's Responses and Objections to Eastern's First Interrogatories, Response to Interrogatory No. 8 (emphasis added).

[117] Ex A, Answer at 6 ¶ 28; Ex I, Waller II Tr. at 91:9-13; Ex. N, Termination Letter, EASTERN-000198.

[118] Ex. A, Answer at 6 ¶ 28; Ex. N, Termination Letter, EASTERN-000198.

119.     Strategic has refused to return the $1 million deposit.[119]

120.     Ms. Wallop and Mr. Waller met with L. Han on February 25, 2018 in Ms. Wallop's home in Virginia to discuss, among other things, Eastern's termination of the Research Agreement.[120]

121.     Since termination, ACA has demanded repayment of the ACA Loan, and Eastern acknowledges that it remains obligated to repay the ACA Loan.[121]

Dated:  March 16, 2020

Respectfully submitted,

*/s/ Francis J. Lawall*

Francis J. Lawall (NY Bar ID No. FL1234)

OF COUNSEL:

PEPPER HAMILTON LLP
3000 Two Logan Square

Joanna J. Cline (Admitted *Pro Hac Vice*)
Christopher B. Chuff (Admitted *Pro Hac Vice*)
PEPPER HAMILTON LLP
1313 North Market Streets, Suite 5100
Wilmington, DE  19801
302.777.6500
302.421.8390 (facsimile)

Eighteenth and Arch Streets
Philadelphia, PA  19103
215.981.4000
215.981.4750 (facsimile)

---

[119] Ex. A, Answer at 6 ¶ 28; Ex. N, Termination Letter, EASTERN-000198.

[120] Ex. G, Wallop II Tr. at 31-12-32:5.

[121] *See* Ex. E, C. Han Tr. at 34:14-20, 38:18-40:17.

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of March, 2020, a true and correct copy of the foregoing *Local Rule 56.1 Statement* was filed electronically.  Notice of this filing will be sent to all registered parties by operation of the Court's electronic filing system.

Dated:  March 16, 2020

                                              Respectfully submitted,


OF COUNSEL:                                   */s/ Francis J. Lawall*
                                              Francis J. Lawall (NY Bar ID No. FL1234)
                                              PEPPER HAMILTON LLP
Joanna J. Cline (Admitted *Pro Hac Vice*)     3000 Two Logan Square
Christopher B. Chuff (Admitted *Pro Hac       Eighteenth and Arch Streets
Vice*)                                        Philadelphia, PA  19103
PEPPER HAMILTON LLP                           215.981.4000
1313 North Market Streets, Suite 5100         215.981.4750 (facsimile)
Wilmington, DE  19801
302.777.6500
302.421.8390 (facsimile)