**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| EASTERN PROFIT CORPORATION LIMITED, | ) | |
| | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | Case No. 18-cv-2185 |
| v. | ) | |
| | ) | |
| STRATEGIC VISION US, LLC, | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff. | ) | |
| _____ | ) | |

**DEFENDANT STRATEGIC VISION'S**
**MEMORANDUM OF LAW IN SUPPORT OF ITS**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iii

INTRODUCTION .................................................................................................................. 1

STATEMENT OF FACTS ..................................................................................................... 2

ARGUMENT .......................................................................................................................... 18

    I.     SUMMARY JUDGMENT STANDARD .......................................................... 18

    II.    EASTERN'S CONTRACT CLAIM (COUNT II) FAILS ................................ 19

          A.    Eastern cannot obtain restitution, its sole theory of damages ............. 19

               i.    Eastern conveyed no benefit to Strategic, and is not entitled to
                     the return of a $1 million deposit paid by another entity ............ 20

               ii.   Eastern is not entitled to restitutionary damages, as it does not
                     allege – and cannot prove – a total breach by Strategic ............ 22

          B.    Eastern frustrated and prevented performance by Strategic ............... 23

    III.   EASTERN'S CLAIM FOR FRAUDULENT
          MISREPRESENTATION (COUNT II) FAILS .............................................. 25

          A.    Eastern's Fraud claim fails because it duplicates its contract claim ..... 25

          B.    Eastern cannot show that Strategic made, or that it relied upon, false
               representations Strategic knew to be untrue .................................... 26

          C.    Eastern does not allege, and cannot show, special damages ............... 27

    IV.   EASTERN'S UNJUST ENRICHMENT CLAIM
          (COUNT IV) FAILS ......................................................................................... 28

          A.    Eastern cannot recover under an unjust enrichment theory ............... 28

          B.    Eastern cannot recover payments made under an
               enforceable contact ........................................................................... 29

    V.    EASTERN CANNOT MAINTAIN THIS ACTION BECAUSE
          IT IS NOT REGISTERED TO DO BUSINESS IN NEW YORK ............... 30

CONCLUSION ....................................................................................................................... 30

## TABLE OF AUTHORITIES

CASES                                                                          Page(s)

*Abdul v. Subbiah,*
    735 N.Y.S.2d 29 (N.Y.App.Div. 2001) ................................................................. 23

*American Capital Corp. v. F.D.I.C,*
    472 F.3d 859 (Fed. Cir. 2006) ............................................................................. 22

*In re Asia Global Crossing, Ltd.*
    404 B.R. 335 (S.D.N.Y. 2009) ............................................................................ 20

*Banco de La Republica de Columbia v. Bank of New York Mellon,*
    2013 WL 3871419 (S.D.N.Y. 2019) .................................................................... 26

*Bausch & Lomb, Inc. v. Bressler,*
    977 F.3d 720 (2d Cir. 1995) .......................................................................... 21, 22

*Bayerische Landesbank v. Nebraska Investment Finance Authority,*
    2017 WL 752192 (S.D.N.Y. 2017) ..................................................................... 29

*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,*
    98 F.3d 13 (2d Cir. 1996) ................................................................................... 26

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ........................................................................................... 19

*City of Yonkers v. Otis Elevator Co.,*
    844 F.2d 42 (2d Cir. 1988) ................................................................................. 29

*Credit Lyonnais Securities (USA) Inc. v. Alcantara,*
    183 F.3d 151 (2d Cir. 1999) ............................................................................... 20

*Direction Assocs., Inc. v. Programming & Systems, Inc.,*
    412 F.Supp. 714 (S.D.N.Y. 1976) ...................................................................... 23

*Deutsch v. JP Morgan Chase & Co.,*
    2019 WL 4805698 (S.D.N.Y. 2019) .................................................................. 26

*Eternity Glob. Master Fund Ltd. v. Moran Guar. Tr. Co. of N.Y.,*
    375 F.3d 168 (2d Cir. 2004) .......................................................................... 19, 25

*Farash v. Sykes Datatronics, Inc.,*
    59 N.Y.2d 500 (1983) ........................................................................................ 21

*Farrell Heating, Plumbing, Air Conditioning Contractors, Inc. v. Facilities Dev. and Improvement Corp.*,
    414 N.Y.S.2d 767 (N.Y. 3d Dep't 1979) .................................................................... 24

*Ferguson v. Lion Holding, Inc.*,
    478 F.Supp.2d 455 (S.D.N.Y. 2007) ......................................................................... 24

*Gerosa v. Savasta & Co.*,
    329 F.3d 317 (2d Cir. 2003) ...................................................................................... 21

*Granite Partners, L.P. v. Bear, Stearns & Co.*,
    17 F.Supp.2d 275 (S.D.N.Y. 1998) ........................................................................... 30

*Invacare Corp. v. John Nageldinger & Son, Inc.*,
    576 F.Supp. 1542 (E.D. N.Y. 1984) .......................................................................... 30

*Ixe Banco, S.A. v. MBNA American Bank, N.A.*,
    2009 WL 3124219 (S.D.N.Y. 2009) ......................................................................... 24

*Kaye v. Grossman*,
    202 F.3d 611 (2d Cir. 2000) ...................................................................................... 28

*LNC Invs., Inc. v. First Fideltiy Bank, N.A. New Jersey*,
    173 F.3d 454 (2d Cir. 1999) ................................................................................ 19, 20

*Mazzei v. Money Store*,
    308 F.R.D. 92 (S.D.N.Y. 2015) ................................................................................. 23

*Old Stone Corp. v. U.S.*
    450 F.3d 1360 (Fed. Cir. 2006) ................................................................................ 22

*Pickering V. American Express Travel Related Services Co., Inc.*,
    1999 WL 1225246 (S.D.N.Y. 1999) ......................................................................... 29

*Powell v. Nat'l Bd. of Med. Exam'rs*,
    364 F.3d 79 (2d Cir. 2004) ........................................................................................ 19

*Pransky v. Eisner*,
    2011 WL 4753455 (E.D.N.Y. 2011) .................................................................... 20, 21

*Puebla Palomo v. DeMai*,
    403 F.Supp.3d 42 (N.D.N.Y. 2019) .......................................................................... 23

*R. B. Ventures, Ltd. v. Shane*,
    112 F.3d 54 (2d Cir. 1997) ........................................................................................ 29

*Rocanova v. Equitable Life Assurance Soc'y,*
   634 N.E.2d 940 (1994) .................................................................................... 26

*Rothstein v. Auto Club South,*
   2019 WL 5722215 (S.D.N.Y. 2019) ............................................................... 29

*Russian Standard Vodka (USA), Inc. v. Allied Domecq Spirits & Wine USA, Inc.,*
   523 F.Supp.2d 376 (S.D.N.Y. 2007) .............................................................. 28

*Schuler-Haas Elec. Corp. v. Wager Constr. Corp.,*
   A.D.2d 707 (4th Dep't 1977) ........................................................................... 21

*Stardial Communications Corp. v. Turner Construction Co.,*
   305 A.D.2d 126 (N.Y. 1st Dep't 2003) ............................................................ 24

*Summit Properties Intern., LLC v. Ladies Professional Golf Ass'n,*
   2010 WL 4983176 (S.D.N.Y. 2010) ............................................................... 22

*Taizhou Zhongneng Imp. & Exp. Co. v. Koutsobinas,*
   F. App'x 54 (2d Cir. 2013) .............................................................................. 26

*Tesoro Petroleum Corp. v. Holborn Oil Co. Ltd.,*
   484 N.Y.S.2d 834 (N.Y. 1st Dep't 1985) .................................................. 26, 27

*VariBlend Dual Dispensing Systems LLC v. Crystal International (Group) Inc.,*
   2019 WL 4805771 (S.D.N.Y. 2019) ............................................................... 28

*Virgilio v. Ryland Group, Inc.,*
   680 F.3d 1329 (11th Cir. 2012) ...................................................................... 29

*Virgilia Flores, S.A. v. Jerome Radelman, Inc.,*
   567 F.Supp. 577 (E.D. N.Y 1982) .................................................................. 30

*Vtech Holdings Ltd. v. Lucent Techs., Inc.,*
   172 F.Supp.2d 435 (S.D.N.Y. 2001) .............................................................. 27

*Warren V. John Wiley & Sons,*
   No. 12-cv-5070, 2013 U.S. Dist. Lexis 93040 (S.D.N.Y. July 2, 2013) ......... 28

*Wiener v. Lazard Freres & Co.,*
   A.D.2d 114 (NY 1st Dep't 1998) ..................................................................... 21

*Williams Erectors of Suffolk County v. Mulach Steel Corp.,*
   684 F. Supp. 357 (E.D.N.Y. 1988) .................................................................. 30

*World of Boxing LLC v. King,*
    56 F.Supp.3d 507 (S.D.N.Y. 2014) ............................................................................. 24

*Young v. Rosenberg,*
    2017 WL 3267769 (S.D.N.Y. 2017) ............................................................................. 21

**STATUTES**

N.Y. Bus. Corp. § 1312(a)-(b) ............................................................................................. 30

**RULES**

Fed. R. Civ. P. 56(c) ......................................................................................................... 19

**OTHER AUTHORITIES**

22A N.Y. Jur. 2d Contracts § 410 ....................................................................................... 24

Restatement (Second) of Contracts § 370 (1981) ................................................................ 21

Restatement (Second) of Contracts § 373 (1979) ................................................................ 23

**INTRODUCTION**

Defendant Strategic Vision LP ("Strategic") submits this brief in support of its motion for summary judgment against Plaintiff Eastern Profit ("Eastern") on Eastern's Count I for breach of contract, Count II for fraudulent misrepresentation, and Count IV for unjust enrichment seeking restitution in the amount of the $1 million deposit paid by non-party ACA Capital Ltd. ("ACA").

Eastern should lose each of these claims for the same basic reason: at bottom, it was just another thinly-capitalized shell controlled by the family and assistants of Chinese businessman Guo Wengui. Eastern had nothing to give to the parties' Research Agreement. It gave nothing. And it lost nothing when, contrary to the Agreement's terms, it issued a no-notice termination after just five weeks of performance, demanding "return" of $1 million that was paid to Strategic by a third party, ACA. We now know Eastern could never have paid this deposit or any of the $750,000 monthly installments to Strategic (or repaid them to ACA, if ACA had "loaned" it all to Eastern). Why? Eastern's tiny assets (about $80,000) were frozen in Hong Kong long before Strategic ever met Guo. Late in discovery, Eastern claimed it contracted with Strategic because it hoped the research would trigger a chain reaction, toppling the CCP on the Mainland and later, unfreezing Eastern's paltry Hong Kong bank account so that it could pay for all of the research. But if this ever made sense, Eastern never gave Strategic replacement "subjects" when the research ran into early difficulty; quickly ended the contract; and never hired new researchers or resuscitated its bizarre plan. What is going on? Simply this: ACA and Guo—those who actually meant to use Strategic's research, and who paid it $1 million—want the $1 million back, but have elected to hide behind Eastern. That calculation leaves them with a shell of a litigant that cannot satisfy the elements of claims for restitution or "special damages" for fraud. ACA and Guo fled from discovery and from this Court. They may recalculate, but the correct answer now, on these pleadings and facts, is judgment against Eastern.

## STATEMENT OF FACTS

Strategic Vision US, LLC is a single-member limited liability company ("LLC") registered and in good standing with the Nevada Secretary of State.[1] Strategic Vision is operated by French Wallop,[2] who was married to Senator Malcolm Wallop, who represented Wyoming from 1977 to 1994.[3] French's interest in politics, work in international affairs, and decades in Washington created extensive relationships for her in several U.S. presidential administrations, Congress, the Departments of Defense and Energy, and other government agencies.[4] This involved consulting work for prominent clients.[5] She also grew significant connections overseas, consulting for clients in Canada, England, the United Arab Emirates, and Singapore.[6]

In 2005, French formed Strategic Vision as a consulting firm for research and analysis of political intelligence.[7] Its clients are typically diplomats or political figures.[8] Strategic's principal place of business has always been French's Virginia residence;[9] it has never had employees.[10]

In about November 2017, Strategic Vision received a new client referral from French's longtime acquaintances Dr. Lianchao Han and William Gertz, both prominent Washington figures.[11] Dr. Han immigrated to the United States from China, and worked in the U.S. Senate for several years (including for the late Senator Wallop) on matters relating to China.[12] William

---

[1] All exhibit references are to the Exhibits attached to Strategic Vision's L.R. 56.1 Statement, filed with this brief. Nev. Sec. of State Bus. Reg. ("S.V. Reg."), Ex. A (Ex. A to Dkt. 264, Request for Judicial Notice ("RJN")), ¶ 1; Feb. 12, 2019 F. "Wallop Depo.," Ex. B, 8:6-9, 8:25-9:16, 127:4-6.

[2] S.V. Reg., Ex. A; March 12, 2020 F. Wallop Aff., Ex. C, ¶¶ 1-2; Dkt. 93, p. 1, ¶ 2; Dkt. 127, p. 1, ¶ 2.

[3] Wallop Aff., Ex. C, ¶¶ 1-2.

[4] Dkt. 127, p. 20, ¶¶ 1-2; Dkt. 142, p. 1, ¶ 2; Wallop Depo., Ex. B, 10:19-11:19, 28:12-20, 28:21-30:1.

[5] Dkt. 93, p. 3, ¶ 14; Jan. 31, 2019 Yvette "Wang Depo. 1," Ex. D, 194:20-198:7; Wallop Depo., Ex. B, 28:12-30:1, 104:16-106:20.

[6] Id.; Dkt. 127, p. 20, ¶ 2.

[7] Wallop Depo., Ex. B, 10:10-21, 16:16-17:8, 28:12-30:1; Dkt. 127, p. 20, ¶¶1-2; Dkt. 142, p. 1, ¶2; SV Reg., Ex. A.

[8] Wallop Depo., Ex. B, 28:12-30:1, 17:9-21:7; Dkt. 93, p. 3, ¶ 14; Wang Depo. 1, Ex. D, 194:20-198:7; Dkt. 127, p. 20, ¶ 2.

[9] Dkt. 127, p. 20, ¶ 1; Dkt. 142, p. 1, ¶ 1; Wallop Depo., Ex. B, 8:25-9:4; S.V. Reg., Ex. A.

[10] Wallop Depo., Ex. B 24:1-3.

[11] Wallop Depo., Ex. B, 11:24-12:21, 89:9-91:1, 31:23-35:7.

[12] RJN, Dkt. 264, ¶ 2; Wallop Aff., Ex. C, ¶¶ 2-3.

"Bill" Gertz is an investigative reporter and columnist who had already written several articles on Guo and China, the author of several books about national security (during this lawsuit, he wrote a book on Guo and China), and a national speaker on these topics.[13]

The prospective new client was Guo Wengui (a/k/a Miles Kwok), who Dr. Han and Gertz stated was a wealthy businessman who had moved to the U.S. to escape political persecution in China and who had recently purchased the penthouse at the Sherry-Netherland Hotel in New York City.[14] According to Dr. Han and Gertz, Guo had developed broad goals involving the Chinese government beneficial to the people of China.[15] In September 2017, just before being introduced to French Wallop, Guo had filed an application for asylum in the United States.[16]

Initially, Guo looked to Strategic Vision for public relations and communications advice regarding his integration into the U.S., such as where to buy residential and business property in Washington, D.C., to achieve a high-profile presence there, and what associations to make to advance his goals involving China.[17] This early, *gratis* advice did not give rise to the claims here.

Ultimately, Strategic Vision was asked to contribute to Guo's integration efforts by conducting research to expose corruption within the Chinese Communist Party ("CCP"), which Guo would then use to undermine the Chinese regime in China.[18] Specifically, research was needed to examine questionable interactions between CCP members and Chinese nationals living in the United States and abroad.[19] Although Strategic Vision did not receive any specific names to research until after entering into a contract, Guo believed there was a large number of corrupt

---

[13] Wallop Depo., Ex. B, 12:16-21, 33:15-21; Oct. 15, 2019 William "Gertz Depo.," Ex. E, 17:2-24:21, 25:18-21.
[14] Wallop Depo., Ex. B, 36:18-23, 89:9-91:1, 169:20-170:3; Aug. 2, 2019 "Guo Depo. 1", Ex. F, 104:12-105:11, 103:4-23; Nov. 11, 2019 "Chunguang [Han] Depo.," Ex. G, 5:14-17, 25:19-24, 92:10-93:25.
[15] Wallop Depo., Ex. B, 88:3-89:5; Guo Depo. 1, Ex. F, 45:3-46:16; Aug. 28, 2019 "Lianchao [Han] Depo.," Ex. H, 53:13-20; Gertz Dep., Ex. E, 60:16-20, 64:16-65:2, 66:15-67:5, 69:3-8, 69:17-70:1, 128:6-129:6, 131:1-14.
[16] Guo Depo. 1, Ex. F, 9:16-21; Lianchao Depo., Ex. H, 30:11-31:20.
[17] Wallop Depo., Ex. B, 32:17-38:4, 41:11-42:11, 43:15-45:25, 87:23-89:5; Gertz Depo., Ex. E, 137:5-16.
[18] Guo Depo. 1, Ex. F, 45:3-46:16; Wallop Depo., Ex. B, 88:3-89:22; Oct. 30, 2019 Eastern Profit Fed. R. Civ. P. 30(b)(6) "Wang Depo. 2," Ex. I, 197:18-208:22, 202:2-204:20, 149:5-150:9.
[19] *Id.*; Lianchao Depo., Ex. H, 279:10-14.

CCP officials and that, by exposing them, he could achieve the long-term objective of breaking CCP's control over China, creating a regime change that would turn China from a strategic adversary to a friend of the United States and pave the way for democracy and freedom for the people of China.[20] Guo claimed that he needed Strategic Vision to advise him on the political weaknesses of CCP members in high government positions. *Id.*

Strategic Vision agreed to consider the project, but requested certain conditions. First, based on Guo's warnings, French was concerned that any association between Strategic and Guo could lead to surveillance by the Chinese government, reprisals, and even physical danger.[21] Later, Guo claimed that the Chinese Embassy was surveilling French's residence, writing down the name, in English and Chinese characters, of the person he claimed the Embassy had assigned.[22] The parties therefore agreed to secrecy measures, such as circuitous payment routes, and later agreed in their written contract "that the Client may direct other entities to pay the Contractor, and that such payments will be deemed satisfactory compensation by the Contractor."[23] For other reasons, as it turned out, no funds ever passed through Eastern's hands.[24]

In addition, the parties would exchange reports and identification of research subjects only through in-person contact at secure locations, and this would require extensive travel and other time-consuming personal effort by Strategic Vision.[25] Guo likewise was expected to refrain from conduct that would compromise the security of Strategic Vision's work.[26] The parties'

---

[20] Guo Depo. 1, Ex. F, 39:9-19, 45:3-46:16; Wang Depo. 2, Ex. I, 49:7-21, 202:2-204:20, 149:5-150:9; Wallop Depo., Ex. B, 88:3-89:22; Lianchao Depo., Ex. H, 226:10-18.
[21] Wallop Depo., Ex. B, 168:4-170:3, 298:15-20; Wallop Aff., Ex. C, ¶¶ 4-5; Guo Depo. 1, Ex. F, 45:3-46:16; Lianchao Depo., Ex. H, 12:9-13:13.
[22] Wallop Aff., Ex. C, ¶¶ 4-5.
[23] Wang Depo. 1, Ex. D, 11:19-12:11; Ex. 2 to Wang Depo. 1, p. 5; Wallop Depo., Ex. B, 168:4-170:3; Nov. 19, 2019 Strategic Vision Fed. R. Civ. P. 30(b)(6) Depo. ("S.V. Depo."), Ex. K, 95:16-25; Wallop Aff., Ex. C, ¶ 4.
[24] Wang Depo. 1, Ex. D, 203:11-15.
[25] Ex. J, Ex. 2 to Wang Depo. 1, p. 1; Wallop Depo., Ex. B, 136:13-20; S.V. Depo., Ex. K, 127:4-15; Feb. 8, 2019 "Waller Depo.,", Ex. L, 67:9-68:2.
[26] Wallop Depo., Ex. B, 283:11-285:11.

contract required "the strictest secrecy[,] not to disclose the existence of the contract, work relating to the contract, sources and methods used to execute the contract and participants in formulating supervising or executing the contract's provisions, to any third party…"[27]

Second, Strategic Vision would engage subcontractors (intelligence analysts in the U.S. and overseas, which Strategic Vision described as a "team" rather than its own employees) to perform the research that Strategic Vision would then incorporate into political advice for Guo.[28] Strategic Vision itself would not conduct the research.[29] Notifying this network and organizing its work would take time and advance startup funding.[30] Guo would not be allowed to contact the network because Strategic Vision's relationships and approach to the research were proprietary, and Strategic Vision declined to reveal the names or titles of any team members.[31] Eastern Profit has admitted that Strategic Vision never represented that it had in-house employees or particular categories of associates.[32] To help set up and monitor the network and prepare its eventual advice to Guo, Strategic Vision would partner with Mike Waller, who was introduced to Guo during contract negotiations.[33] Dr. Waller, a Ph.D. in international security affairs, is an expert in strategic communications.[34] Dr. Waller was invited to work on the project by French, who he has known professionally for many years.[35]

Third, given the uncertainties attendant to researching a large group of foreign subjects, Strategic only could approximate the time required to prepare a report on a given person, and

---

[27] Ex. J, Ex. 2 to Wang Depo. 1, p. 1.
[28] Wallop Depo., Ex. B, 17:9-21:7, 80:10-24, 82:21-83:23, 79:9-20, 138:17-139:6; Wang Depo. 1, Ex. D, 179:23-186:20; S.V. Depo., Ex. K, 129:22-130:17, 132:15-133:13.
[29] Wallop Depo., Ex. B, 19:21-20:8 and 79:9-20, 80:10-24, 82:21-83:23, 153:12-154:24, 130:4-131:13.
[30] *Id*. and 247:16-18; S.V. Depo., Ex. K, 129:22-130:17, 131:11-133:13.
[31] Wallop Depo., Ex. B, 82:21-83:23, 53:14-25 (French did not even know Mike Waller's contacts and vice versa); S.V. Depo., Ex. K, 129:22-130:14; Waller Depo., Ex. L, 74:14-77:1.
[32] Wang Depo. 1, Ex. D, 179:23-186:20 (and 184:25-185:3: "Q. Something along those lines but never used the words in-house? A.  I don't remember that.").
[33] Wallop Depo., Ex. B, 35:25-37:22, 11:12-13:1; Gertz Depo., Ex. E, 131:1-20.
[34] RJN, Dkt. 264, ¶ 4.
[35] Wallop Depo., Ex. B, 11:12-12:9, 24:1-3, 16:12-17:8; Waller Depo, Ex. L, 10:8-11:25.

could not guarantee a particular result at a particular time. Thus, the contract later allowed for adjustments for "irregular circumstances": "[b]oth parties understand that occasional unforeseen challenges may arise that will slow or block comprehensive research, and that there may be periods in which information is irregular, unavailable, or incomplete. The Contractor will endeavor to make all research and reports as complete as possible in a timely scheduled manner."[36] Finally, because Strategic Vision would need clear direction from Guo as to the individuals about whom research was needed, Guo would be expected to communicate with Strategic Vision as necessary for its work.[37]

After discussing these concerns, Guo pressed ahead with the project, and the parties negotiated the Research Agreement, detailing the services Strategic Vision would provide.[38] Over the course of approximately one month, several drafts of the Agreement were exchanged between Guo and his representatives (in New York) and French and Waller (in Virginia).[39] Guo authorized two representatives to speak with Strategic Vision: Lianchao (who knew both Guo and French) and Wang Yangping, a/k/a Yvette Wang.[40]

In negotiations, the parties agreed to Guo's request that an entity, not Guo himself, would enter into the contract with Strategic Vision.[41] That entity, Eastern Profit, was revealed by Guo just before the contract was signed.[42] It is a private limited company registered under the laws of the Hong Kong Special Administrative Region of the PRC.[43] It has never been registered in New York.[44]

---

[36] R. Agreement (Ex. 2 to Wang Depo. 1), Ex. J, p. 3.
[37] R. Agreement (Ex. 2 to Wang Depo. 1), Ex. J, at p. 1.
[38] R. Agreement (Ex. 2 to Wang Depo. 1), Ex. J; Wallop Depo., Ex. B, 126:3-18; Wallop Aff., Ex. C, ¶ 4.
[39] Wang Depo. 1, Ex. D, 59:17-60:4.
[40] Plff's First Interr. Resp., Ex. M, p. 3, No. 5; Wallop Dep., Ex. B, 199:20-200:9; Wang Depo. 1, Ex. D, 59:17-60:4.
[41] Wallop Depo., Ex. B, 299:22-300:8 ("Obviously it's Guo with whom we are dealing. So Guo equals Eastern, one would presume."); Lianchao Depo., Ex. H, 185:2-7; S.V. Depo., Ex. K, 95:3-12.
[42] Wang Dep.1, Ex. D, 8:24-11:15, 14:2-25; Wang Dep.2, Ex. I, 162:4-9, 150:10-151:6; Wallop, Ex. B, 306:6-307:7.
[43] Eastern Profit's C.R. 26.1 Demand, Ex. N, at p. 2, No. 2, p. 3, Nos. 3-4; Wang Depo. 2, Ex. I, 22:10-23:6, 23:25-25:16, 25:24-26:5, 27:8-13, 29:16-18, 29:22-30:5, 76:12-18.
[44] Eastern Profit's C.R. 26.1 Demand, Ex. N, p. 2, No. 2, p. 3, Nos. 3-4; RJN, Dkt. 264, ¶ 3.

In negotiating the Agreement, Strategic Vision dealt with Guo, and only knew of Guo and the two individuals he had designated to negotiate on his behalf, Lianchao and Wang.[45] At the time, Guo represented that Wang and Lianchao answered to him; in this litigation, Eastern Profit claims that Guo was orally appointed as its agent, and that Wang worked for Eastern because Eastern had orally hired Golden Spring (New York) Ltd. ("GSNY"), an entity controlled Guo's family office, to assist it regarding the Agreement.[46] Eastern has never repudiated any representation made by Guo (or Lianchao or Wang) concerning the Agreement.[47] GSNY participates in discovery; its counsel, Daniel Podhaskie (also Guo's), attends depositions.[48]

The Agreement was ultimately signed at French's home in Virginia on January 6, 2018.[49] Wang claimed authority to sign, admitted she did sign, but claimed she never actually wrote her own signature.[50] Eastern later claimed Chunguang Han had been orally given authority to hire GSNY, Wang's official employer, by Guo Mei, who is Guo's daughter and the only director, shareholder, or natural person officially associated with Eastern.[51] Both Wang and Han were New York residents at all relevant times.[52] (Eastern Profit claims that, in 2019, both Guo Mei and Chunguang gave additional verbal authority to Wang in New York that allowed her to represent Eastern's interests in communicating with a third party regarding payments received by

---

[45] Dkt. 142, p. 2, No. 4; Plt's First Interrog. Resp., Ex. M, p. 3, No. 6; Wang Depo. 2, Ex. I, 169:19-171:7.

[46] POA, Ex. O (Chunguang Ex. 32); Chunguang Depo., Ex. G, 109:15-110:17, 111:14-112:23; Wang Depo. 1, Ex. D, 28:6-17; Wang Depo. 2, Ex. I, 144:19-22, 205:21-206:7, 169:19-171:7.

[47] Dkt. 142, p. 2, ¶ 4 ("Eastern authorized Guo to communicate with Strategic Vision on Eastern's behalf concerning the Agreement, Guo's representations to, and interactions with, Strategic Vision concerning the Agreement are binding upon Eastern, and Eastern has not repudiated any such representations or interactions.").

[48] Ex. P; Lianchao Depo., Ex. H, 20:8-21:9.

[49] R. Agreement, Ex. J, p. 5; Wallop Aff., Ex. C, ¶ 4; Wang Depo. 1, Ex. D, 264:9-12.

[50] Wang Depo. 1, Ex. D, 26:24-27:23, 59:17-60:4 (Ex. 2, p. 5, Eastern 9); Wang Depo. 2, Ex. I, 140:15-144:22, 27:8-13, 147:4-17, 149: 5-14, 145:18-146:8, 148:18-149:14, 154:7-156:13.

[51] Chunguang Depo., Ex. G, 5:14-17; Wang Depo. 2, Ex. I, 22:13-23:7, 140:15-144:22, 27:8-13, 147:4-17, 149: 5-14, 145:18-146:8, 148:18-149:14, 154:7-156:13, 166:7-18.

[52] Chunguang Depo., Ex. G, 13:6-14:2; 17:21-18:3; Wang Depo. 1, Ex. D, 4:11-12, 26:24-27:23.

Strategic Vision under the Agreement.[53]) At any rate, Wang signed the Agreement only after Guo approved its final terms for Eastern, which Wang read him over the phone line-by-line.[54]

Of Strategic, the Agreement required "business research, reporting, documentation, and other consulting services" that would be documented in periodic "comprehensive confidential reports" with supporting data provided on a timetable set out in the Agreement.[55] Guo represented to Strategic in negotiations, and the Agreement recited, that Guo planned to use its analysis for "detecting, stopping, and preventing crime or other harm" to the people of China in order to force a regime change that would implement the rule of law and democracy.[56] Further, Strategic Vision would be paid for specific periods of work rather than for its periodic reports.[57] Wang had asked for an alternative *a la carte*, report-for-payment structure, but that was not included in the final Agreement, which instead adopted a "waterline" structure which would pay Strategic Vision a set fee per month.[58] Strategic was guaranteed a bare minimum of work, from the Agreement's start (January 16, 2018)[59] through a period of three months (April 16, 2018).[60] When that guaranteed period ended, "after the March reports and payments are made, [] all involved Parties will meet to recap the accounting…"[61] The Research Agreement had a term of three years.[62] Each party had a right to terminate the Agreement on "30 days' written notice."[63]

---

[53] *Id.*
[54] Wang Depo. 1, Ex. D, 61:2-9.
[55] R. Agreement, Ex. J (Ex. 2 to Wang Depo. 1), pp. 1, 3; Wang Depo. 1, Ex. D, 11:19-12:11.
[56] *Id.*; Guo Depo. 1, Ex. F, 45:3-46:16; Wang Depo. 1, Ex. D, 33:8-14 (Guo identified research subjects), 32:5-35:11, 37:8-38:7.
[57] R. Agreement (Ex. 2 to Wang Depo. 1), Ex. J, p. 4; Wang Depo. 1, Ex. D, 56:12-59:16.
[58] Wang Depo. 1, Ex. D, 66:12-67:9.
[59] The parties mutually agreed to extend the start date of the Agreement from January 6, 2018 to January 16, 2018. Wang Depo. 1, Ex. D, 139:4-17; Ex. S (Ex. 6 to Wang Depo. 1), p. 1; Dkt. 93, p. 4, ¶ 19.
[60] R. Agreement, Ex. J, pp. 3-4.
[61] Wang Depo. 1, Ex. D, 56:22-58:5, R. Agreement, Ex. J, p. 4; Wallop Depo., Ex. B, 246:25-247:7.
[62] R. Agreement, Ex. J, p. 5.
[63] *Id.*; Ex. J and Ex. 6 to Wang Depo. 1; Wang Depo. 1, Ex. D, 135:18-136:7.

Of Eastern Profit, the Agreement required "the necessary basic information, and desired areas of focus, to the Contractor to research" and payment for Strategic Vision's services.[64] The payment structure required "for the first 3 months of this Agreement, January, February and March 2018, [] the payment of $750,000. USD will be wired per our instructions to our US Bank account."[65] The Agreement also required "a deposit of US $1,000,000 [] upon signing the contract.[66] "The deposit will be credited on a prorated basis to the final 1-1/3 (1.3) months of the contract."[67] Eastern Profit testified that the deposit was an "evergreen deposit," which "means that one million just stay there as one million. And they, Strategic Vision is going to issue invoice every month and the client is just to pay the invoice."[68]

Although unknown to Strategic Vision until discovery in this case, Eastern Profit had no ability to make the $1 million initial payment or pay monthly invoices.[69] Late in discovery, Eastern claimed its assets were all in Hong Kong and had been frozen there due to influence by the Chinese government and CCP prior to the contract; it presented evidence to the Court that those assets were only about $550,000 HK, or roughly $80,000.[70] Eastern had no expectation this would change, absent a regime change triggered by the fruits of the Research Agreement.[71]

Also unknown to Strategic Vision, Eastern Profit had promised another entity, non-party ACA Capital Group Limited ("ACA"), a private company registered under the laws of the Hong Kong Special Administrative Region of the People's Republic of China, that it would be given the

---

[64] R. Agreement (Ex. 2 to Wang Depo. 1), Ex. J, pp. 1, 3-4.
[65] *Id.*, p. 4.
[66] *Id.*, p. 5.
[67] *Id.*
[68] Wang Depo. 1, Ex. D, 199:5-200:19.
[69] Wang Depo. 2, Ex. I, 73:20-74:8, 197:18-198:6, 202:2-204:20.
[70] *Id.*; RJN, Dkt. 264, ¶ 5; Dkt. 203-2, Oct. 18, 2018, p. 14/27 for Respondent 16 (Dkt. 203, p. 2: "The assets of Mr. Guo and Eastern Profit that have been frozen in Hong Kong were frozen, not by the CCP or Mainland China, but by ***the High Court of Hong Kong***. *See* Exhibit B." Ex. B (pp. 3, 14, Respondent 16: H.K. Ct. Order); Chunguang Depo., Ex. G, 44:17-22, 70:10-72:6, 74:19-75:1, 88:2-89:9, 131:22-132:4, 146:10-24.
[71] Wang Depo. 2, Ex. I, 202:2-203:24.

results of Strategic Vision's work.[72] Eastern claims the $1 million ACA transferred to Strategic on January 2, 2018 was the result of a purported loan between ACA and Eastern only intended to be paid back, with 2% monthly interest, *after* Guo used Strategic's research to trigger regime change in China and (apparently by these means) unfreeze Eastern's Hong Kong bank account.[73] ACA head William Je (a/k/a Yu Jianming)[74] even indicated that ACA might forgive the alleged "loan" if the Agreement bore fruit.[75] Neither Guo nor any other Eastern representative disclosed ACA's name to Strategic, disclosed the existence of the "loan," or sought permission from Strategic to allow its strictly confidential work product to be given to a third party for that party's use.[76] Strategic did not know the identity of ACA or its representatives and, when Eastern turned out to have no assets, had no means of recourse against ACA for payment or anything else regarding the Research Agreement. ACA was to be the ultimate recipient of Strategic Vision's work under the Agreement, even though ACA is not the plaintiff and Eastern Profit has not assigned its claims in this case.[77] The only authority Eastern Profit has granted anyone regarding the Agreement is a power-of-attorney in favor of Guo's entity, GSNY—not ACA.[78]

---

[72] Wang Depo. 2, Ex. I, 46:22-47:14, 49:25-50:10, 53:19-54:3, 56:7-11, 57:5-9, 110:17-112:2; Wallop Depo., Ex. B, ¶¶.

[73] Wang Depo. 2, Ex. I, 49:25-50:10, 53:19-54:3, 56:7-11, 57:5-9, 110:17-112:2; Dkt. 203-2; Chunguang Depo., Ex. G, 72:24-73:14.

[74] It was William Je who was representing ACA's interests in communicating with Eastern Profit about the Research Agreement. Wang Depo. 2, Ex. I, 57:23-58:19, 53:19-54:3.

[75] Wang Depo. 2, Ex. I, 208:2-16, 46:22-47:14, 44:10-47:14, 197:18-198:6, 202:2-204:20, 73:20-74:8; Plt's Third Interrog. Resp., Ex. T, p. 3, No. 2.

[76] Wallop Aff., Ex. C, ¶¶ 4, 6; R. Agreement (Ex. 2 to Wang Depo. 1), Ex. J, p. 1 ("Both parties agree that the nature of this contract, and the work related to it, is highly confidential.  Both parties are bound by the strictest secrecy not to disclose … to any third party."); Wang Depo. 1, Ex. D, 134:19-135:15 ("My understanding is that all the information related to this project or this contract, should be kept confidential").

[77] Ex. N (Eastern Profit's C.R. 26.1 Demand), p. 3, No. 4; Wang Depo. 2, Ex. I, 208:2-16 and 197:18-198:6, 202:2-204:20, 73:20-74:8.

[78] Wang Depo. 2, Ex. I, 205:21-206:7; Ex. O (Chunguang Ex. 32); Chunguang Depo., Ex. G, 109:15-19, 110:2-17.

As noted above, on or about January 2, 2018, at its Las Vegas, Nevada, bank, Strategic received two $500,000 wire transfers.[79] These were from an ACA bank account in Hong Kong.[80] Strategic had agreed with Guo to avoid a direct payment route from Eastern to Strategic (the Agreement provided "that the Client may direct other entities to pay the Contractor, and that such payments will be deemed satisfactory compensation by the Contractor").[81] The wires, however, compromised whatever secrecy this routing might have achieved by being sent simultaneously from Hong Kong (the very location where Eastern now claims it assets had just been frozen under CCP influence), in the same sizable amounts, and to the same U.S. recipient.[82]

Discovery later revealed that, several days after sending them, ACA asked its bank to reverse the wires.[83] The transfers already having been completed, ACA's request was declined.[84] ACA did not inform Strategic Vision of this attempt, has never made demand on Strategic for return of the funds, and has never communicated to Strategic about the Research Agreement or any other matter.[85] Nevertheless, Eastern Profit claims that its damages are "$1,000,000 for the $1,000,000 paid to Strategic Vision as a deposit under the Agreement."[86]

Attempts to involve ACA in discovery were unsuccessful. ACA's sole director (Karin Maistrello, a U.S.-based employee of GSNY) accepted hand delivery of a Fed. R. Civ. P. 45 deposition

---

[79] Ex. U (Wang Depo. 1 Ex. 7); Wang Depo. 1, Ex. D, 158:6-9, 158:20-159:23, 161:2-17; Dkt. 127, p. 22, ¶ 7; Dkt. 142, p. 3, ¶ 7.
[80] *Id.* Although Strategic Vision did not know of ACA, Strategic Vision assumed the wires had sent at Guo's order under the Agreement, which is what Eastern Profit now contends. Plt's First Interrog. Resp. Ex. M, p. 2, No. 4 ("Guo Wengui, on behalf of Eastern, ordered wires totaling $1 million to be sent to Strategic Vision on or about December 29, 2017."); Dkt. 93, pp. 3-4, ¶ 17; Wallop Aff., Ex. C, ¶¶ 6-7.
[81] R. Agreement (Ex. 2 to Wang Depo. 1), Ex. J, p. 5.
[82] Ex. U (Wang Depo. 1 Ex. 7).
[83] Wang Depo. 1, Ex. D, 107:13-20, 160:2-161:17; Ex. V (Ex. 8 to Wang Depo. 1); Plt's First Interrog. Resp. Ex. M, p. 6, No. 13.
[84] *Id.*
[85] Wallop Aff., Ex. C, ¶ 7; Wang Depo. 1, Ex. D, 161:2-17; Wallop Depo., Ex. B, 192:20-194:16; Plt's Third Interrog. Resp., Ex. T, p. 2, No. 1.
[86] Plt's First Interrog. Resp., Ex. M, p. 16, No. 7.

subpoena directed to ACA but then, through counsel she shared with Guo and with his entity, GSNY,[87] took the position that the service was ineffective on ACA because she had resigned as a director within 48 hours after Strategic Vision had given the required pre-service notice to Eastern Profit.[88]  Maistrello testified that she resigned her directorship after learning from Daniel Podhaskie, counsel GSNY (her employer and Eastern Profit's agent for purposes of this litigation), that she was about to be served with a subpoena in her capacity as an ACA director.[89] Eastern Profit likewise opposed discovery into ACA, calling it "entirely collateral to the claims and defenses at issue in this litigation …."[90] Guo, through the same counsel as GSNY and Maistrello, opposed discovery into ACA, claiming it was "an attempt to harass and provoke" him and that "Strategic should not be entitled to such overreaching discovery from multiple non-parties."[91]

The Research Agreement was signed January 6, 2018 (Wallop Aff., Ex. C, ¶ 4) but the effective date was January 16, 2018.[92] In early January 2018, Waller travelled to Europe and the Middle East and engaged independent research contractors, including trusted Chinese/English translators and a team-lead there.[93] This effort cost at least $200,000, done on an expedited basis.[94] Before the contractors could start work, however, Eastern Profit had to identify the subjects to be researched.[95] Instead, Eastern provided unencrypted (and thus vulnerable) flash

---

[87] Dkt. 213, 4:5-10, Dkt. 195.
[88] Aug. 23, 2019 "Maistrello Depo.," Ex. W, 27:9-25, 28:1-29:5, 30:1-32:10; Ex. 6 to Maistr. Dep.; Dkt. 177-Exs. 3, 1.
[89] Maistrello Depo., Ex. W, 55:12-57:20 ("Q. What did you do after you were served with this subpoena? MS. TESKE: Object if the form. You can answer it. A. I gave it to our lawyer. Q. Who was that? A. Daniel Podhaskie.") and Ex. X (Ex. 3 to Maistrello Depo.).
[90] Dkt. 203, p. 2.
[91] Dkt. 158, p. 1, opposing discovery into GSNY, Dkt. 195; Dkt. 150, p. 2
[92] Wang Depo. 1, Ex. D, 139:4-17; Ex. S (Ex. 6 to Wang Depo. 1), p. 1 ("Eastern agreed to delay the start of the contract by 10 days, from January 6 to January 16."); Dkt. 93, p. 4, ¶ 19.
[93] Wallop Depo., Ex. B, 115:7-118:10, 82:21-83:23, 130:4-131:13, 71:5-73:4, 74:17-76:6, 77:25-79:23; Waller Depo., Ex. L, 74:14-77:1, 29:10-19, 41:5-42:18.
[94] Id.; S.V. Depo., Ex. K, 72:4-73:2, 74:10-76:6; S. V. Depo Ex. 104 (Ex. Y).
[95] R. Agreement (Ex. 2 to Wang Depo. 1), Ex. J, p. 1; Wallop Depo., Ex. B, 3:24-84:7, 85:10-86:11; S.V. Depo., Ex. K, 131:1-132:9, 132:15-133:11.

drives infected with malware that attacked the computer used to open it.[96] The flash drives were inoperable and Eastern did not fully correct the problem when Wang delivered three more flash drives to Strategic, also unencrypted.[97] One flash drive was working and safe, and it contained 92 names.[98] The number of initial subjects was increased by agreement to 15 from 10.[99]

Later, in February, Strategic made arrangements with Allied Special Operations Group ("ASOG"), based in Texas, to research the 15 subjects being examined overseas.[100] ASOG determined the subjects were designated by the U.S. government as "Records Protected"— information concerning the subjects' status and activities was not accessible through traditional, legal means.[101] The purpose of the designation was to ensure that no one, including the individuals themselves, could learn information that would help them determine they were under investigation.[102] According to ASOG, trying to research subjects known to be "Records Protected" could be a criminal activity.[103] ASOG's conviction was so strong that it withdrew a bill to Strategic for $111,700.[104] ASOG instead received $5,412 for finding the "Records Protected" designation.[105]

Strategic Vision did not receive any subject names before entering the Agreement and had no way of anticipating that the third parties conducting the research would encounter this circumstance.[106] Strategic had never before heard of the designation.[107] Nevertheless, Guo

---

[96] Wallop Depo., Ex. B, 174:9-176:18, 198:11-199:1, 200:10-202:2, 207:25-208:13, 114:3-115:6, 85:10-17, 114:8-115:6.
[97] *Id.*
[98] *Id.* and 127:14-128:23.
[99] S.V. Depo., Ex. K, 129:7-17, 82:4-20; Wallop Depo., Ex. B, 281:19-282:13.
[100] Wallop Depo., Ex. B, 232:7-234:13; Wallop Aff., Ex. C, ¶ 8; S.V. Depo., Ex. K, 100:16-102:16.
[101] Wallop Depo., Ex. B, 232:7-238:20, 239:16-241:4, 285:12-288:24; SV Depo., Ex. K, 100:16-103:25, 105:6-108:21.
[102] S.V. Depo., Ex. K, 106:15-107:7.
[103] *Id.*; S.V. Depo., Ex. K, 100:16-102:16, 106:15-108:21.
[104] S.V. Depo., Ex. K, 105:6-20, 106:15-108:21; Ex. 105 to S.V. Depo., Ex. K.
[105] *Id.*; S.V. Depo., Ex. K, 109:12-110:17, 81:15-17.
[106] Wallop Depo., Ex. B, 83:24-84:7, 85:10-86:11, 174:4-8, 175:3-176:18.
[107] Wallop Aff., Ex. C, ¶¶ 8.

angrily refused to discuss the "Records Protected" problem when Strategic notified him.[108] He demanded that Strategic turn over all work done by its contractors, despite many protests by Strategic that it was impossible for the researchers to work faster and have final reports ready in a matter of days.[109] The Agreement did not require, and no party could physically provide, immediate results; what Guo now demanded on a rush basis was contrary to the Agreement.[110]

Attempting to keep the project alive, Waller nevertheless made immediate travel plans and flew overseas, met with the research team leader, and returned to New York.[111] On or about January 26th or 30th, 2018, less than two weeks after Strategic Vision began its work under the Agreement, Waller delivered to Wang an initial tranche of raw data.[112] Strategic repeatedly cautioned it would be of no independent use to Guo because it was simply the researchers' own work to familiarize themselves with the initial subjects using open-source information.[113]

Even though Strategic, through Waller, had made extraordinary efforts to accommodate Guo's unreasonable demands under the contract, Eastern would not provide any guidance about the "Records Protected" designation and what it meant for the future of the research on the first 15 subject names.[114] Nor did Eastern simply move its focus from the initial 15 subject to another 15 within the 92 subject names on the flash drives delivered by Eastern back on January 8, 2018.

Although the Agreement provided for a look-back after three months to compare the deliverables with the amounts paid, and also provided for termination on "'30 days' written notice," Eastern Profit terminated the Agreement only 5 weeks after the January 16, 2018 start

[108] Wallop Depo., Ex. B, 139:17-140:23, 285:12-288:24, 136:13-20; S.V. Depo., Ex. K, 100:16-102:16.
[109] Wallop Depo., Ex. B, 230:2-232:13, 285:12-288:24, 139:17-140:23; S.V. Depo., Ex. K, 112:11-116:17, 127:24-129:6; Waller Depo., Ex. L, 56:19-25, 93:20-95:10.
[110] Wang Depo. 1, Ex. D, 154:6-23; Ex. J (Ex. 2 to Wang Depo. 1); Gertz Depo., Ex. E, 141:4-17.
[111] SV Depo., Ex. K, 127:24-129:6.
[112] SV Depo., Ex. K, 112:11-116:17, 127:24-129:6; Wallop Depo., Ex. B, 243:14-244:4, 285:12-288:24, 136:13-15.
[113] SV Depo, Ex. K, 112:11-116:17 ("That was their own basic work. So the only report, in quotes, that we provided as a deliverable was showing how the research team was setting up its methodology to collect this data");127:24-129:6.
[114] S.V. Depo., Ex. K, 101:11-103:25, 105:21-107:11.

date, claiming it was effective immediately.[115] Eastern's February 23, 2018, termination letter also demanded "a full and complete refund of the $1 million deposit."[116] The Agreement contained no provision for return of the monthly fee or deposit if Eastern was dissatisfied with Strategic's work and, in fact, required Eastern to make a monthly $750,000 payment, starting in January.[117] Neither Eastern nor ACA ever made even that first monthly $750,000 payment.[118] Eastern admitted nothing in the contract required Strategic to return the $1 million at the end of the contract, nor had Strategic made such a representation to Eastern.[119] Regardless, Eastern's counsel demanded Strategic "return" the $1 million (*via* wire to ACA, not Eastern).[120] Strategic did not comply.[121]

The Agreement guaranteed Strategic Vision a period of time to provide its services that ran from the agreed start date of the arrangement (January 16, 2018)[122] to 30 days after the February 23, 2018 termination,[123] and Eastern's no-notice termination meant that Strategic Vision lost the opportunity to make $1,596,774.25.[124] Not only did Eastern Profit fail to pay even the first monthly payment, its February 23, 2018 termination prevented Strategic Vision from performing through the contractually-guaranteed look-back period scheduled for April 16, 2018, resulting in a loss of at least $100,000 in profits for the roughly three-week period between March 21 and April 16.[125]

---

[115] Ex. J (Ex. 2 to Wang Depo. 1).

[116] Wang Depo. 1, Ex. D, 135:16-141:16; Ex. S (Ex. 6 Wang Depo. I), p. 1; Wallop Depo., Ex. B, 241:6-8, 242:19-243:3; Wang Depo. 2, Ex. I, 211:12-212:15.

[117] Ex. J (Ex. 2 to Wang Depo. 1).

[118] Wang Depo. 1, Ex. D, 58:6-18.

[119] Wang Depo. 1, Ex. D, 198: 8-201:14-21.

[120] Ex. S (Ex. 6 to Wang Depo.1), p. 2 ("Beneficiary Acct. Name:  ACA Capital Group Limited").

[121] Dkt. 93, p. 5, ¶ 29.

[122] Wang Depo. 1, Ex. D, 139:4-17; Ex. S (Ex. 6 to Wang Depo. 1), p. 1 ("Eastern agreed to delay the start of the contract by 10 days, from January 6 to January 16."); Dkt. 93, p. 4, ¶ 19.

[123] Wang Depo. 1, Ex. D, 135:16-141:16; Ex. S (Ex. 6 Wang Depo. 1), p. 1.

[124] R. Agreement (Ex. 2 to Wang Depo. 1), Ex. J, pp.3-4; Wallop Depo., Ex. B, 246:25-247:7.

[125] Wallop Aff., Ex. C, ¶ 10; Ex. S (Ex. 6 to Wang Depo. 1); R. Agreement (Wang Depo. 1 Ex. 2), Ex. J, pp.3-4.

While Eastern's Complaint claims special fraud damages—"los[ing] three months" of investigation time and to need to "find another" investigator (Dkt. 93, ¶ 45)—it was unwilling or unable to testify that it ever made such efforts.[126]  Indeed, as outlined below, discovery showed that Eastern is scarcely a real entity, and that its only business takes place through members of Guo's network of family and assistants in New York, where it is not registered to do business.

Chunguang Han claims to have bought all of Eastern Profit for $1,000 HK in late 2014.[127]  He became and remained the sole director of Eastern until he transferred ownership to Guo Mei (Guo Wengui's daughter)[128] on June 28, 2017.[129] Han says that during his directorship and while he was in Hong Kong, he trusted a Chinese woman, known only as Natasha Qu (he testified he never knew her "official" last or Chinese name), to run whatever it is that Eastern did.[130] Han did not know who she was working for when he turned over Eastern's operations to her.[131] In June 2017, Eastern's only asset—its Hong Kong bank account—was frozen.[132] Natasha reported this to Han (*id*. at 72:3-12), left, and no one replaced her in Hong Kong.[133]

By about this point, Han was in New York; he says has been there since at least June of 2017.[134] Han claims that, once in New York, he was orally authorized by its new director, Guo Mei (Guo Wengui's daughter), to act as Eastern Profit's agent.[135] Han, in turn, says he orally authorized Wang to handle everything related to investigating Chinese officials.[136] The purpose of that investigation, Han says, was to "expose the Chinese government's corruption and it will

---

[126] Wang Depo. 1, Ex. D, 155:24-156:4, 157:7-13, 157:18-24.
[127] Chunguang Depo., Ex. G, 50:17-22, 56:4-14.
[128] Chunguang Depo., Ex. G, 35:5-12.
[129] *Id*. at 59:5-60:8, 70:5-9, 102:2-18.
[130] Chunguang Depo., Ex. G, 53:20-55:3.
[131] *Id*. at 66:21-68:8.
[132] Chunguang Depo., Ex. G, 87:3-88:20; Dkt. 203-2.
[133] Chunguang Depo., Ex. G, 71:6-9.
[134] Chunguang Depo., Ex. G, 13:6-14:2; 17:21-18:3; Wang Depo. 1, Ex. D, 26:24-27:23.
[135] Chunguang Depo., Ex. G, 43:11-44:22; 47:11-16; 102:2-104:11.
[136] *Id*. at 46:2-12; 84:22-86:16.

give me an opportunity to get my asset back."[137] Han gave Wang "full authorization" for the work, understanding the contract would be in the U.S.[138] Starting in 2017, from New York, Han—still, supposedly, as Eastern Profit's orally-appointed agent—reported back to Guo Mei.[139]

Eastern has no remaining Hong Kong business. Its address had been the 49th Floor of the Bank of China Tower in Hong Kong.[140] Han Chunguang was last there "several years ago."[141] Eastern's only claimed business anywhere in the world since the asset freeze is in New York: Han's alleged delegation of authority to Yvette Wang, GSNY, and Guo to research Chinese officials.[142] Han continued to work on Eastern Profit's business in New York after making what he testified was his oral delegation of authority to Wang to use research to recover Eastern's allegedly frozen assets. In December 2017, Han claims to have met with William Je in New York several times to negotiate and execute a "loan" for $1 million.[143] In 2018, Han conferred with Wang at her office at 800 Fifth Avenue and signed a Power of Authority authorizing the company of which Wang is the CEO, GSNY, to continue to handle the research into Chinese officials, including any related litigation (*i.e.*, this very case).[144]

Wang also claims she was responsible for dealing with Eastern's purported New York-executed loan after having first learned of it in 2018;[145] she claims she met with ACA representative William Je in New York in 2018 to discuss Eastern Profit-ACA business.[146] Han met Wang at 162 E. 64th Street in New York City, GSNY's current address and also the office of

---

[137] *Id*. at 91:24-92:3.
[138] *Id*. at 92:17-24.
[139] *Id*. at 47:17-48:18.
[140] Chunguang Depo., Ex. G, 58:14-59:4.
[141] *Id*.
[142] *Id*. at 43:21-44:22.
[143] Chunguang Depo., Ex. G, 133:13-134:8.
[144] *Id*., 109:12-111:22 and Ex. O (Chunguang Ex. 32).
[145] Wang Depo. 2, Ex. I, 63:22-64:14.
[146] Wang Depo. 2 Ex. I, 45:25-47:25.

Guo, to discuss the purported "loan" ACA made to Eastern Profit.[147] Finally, Eastern testified that Guo (who has remained in New York) also served as Eastern's agent in connection with the loan from ACA, and also conferred with Je about the loan.[148] Eastern also admits that Guo, again, in New York, acted as its representative in negotiating the contract.[149] Continuing into 2019, Eastern continued to operate out of New York; Wang (Eastern's agent) met with Eastern's sole director, Guo Mei (Guo's daughter), in New York to confer regarding the investigation.[150]

In the end, this three-year contract, which Guo claimed he would use to advance his purported goal of toppling the CCP regime in China to the benefit of the Chinese people, was terminated by Eastern after just five weeks.[151] As shown above, Eastern apparently abandoned any effort to renew the investigation or unfreeze its assets; Eastern never had the assets to pay even a tiny portion of the Agreement, even if the research had led to the toppling of the CCP and this had later caused the "unfreezing" of Eastern's small Hong Kong bank account; Eastern frustrated Strategic's performance by failing to provide new research subjects after the first 15 proved impossible; and finally, discovery showed that Eastern's only remaining operations have involved Guo's cohorts in New York, even though Eastern never even registered to do business there. It is this entity, then, that seeks the intervention of this Court, through Counts I, II, and IV of this lawsuit, to obtain a "return" *to it* of ACA's $1 million payment to Strategic. As shown in the legal argument below, Eastern cannot prevail.

## ARGUMENT

## I.   SUMMARY JUDGMENT STANDARD

---

[147] Chunguang Depo., Ex. G, 34:6-17; 38:18-39:15.
[148] Wang Depo. 2, Ex. I, 126:2-17.
[149] Dkt. 142, p. 2, ¶¶ 3-4; Dkt. 127, pp. 20-21, ¶¶ 3-4.
[150] Wang Depo. 2, Ex. I, 25:8-28:13.
[151] R. Agreement, Ex. J, p. 5; Ex. S (Ex. 6 to Wang Depo. 1), p. 1; Guo Depo. 1, Ex. F, 45:3-46:16; Wallop Depo., Ex. B, 88:3-89:22; Wang Depo. 2, Ex. I, 197:18-208:22, 202:2-204:20, 149:5-150:9.

Summary judgment is appropriate where there is no genuine issue of material fact and on the undisputed facts the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). If the non-moving party cannot prove an element essential to its case and on which it bears the burden of proof, summary judgment must be granted. *See Celotex Corp. v. Catrett*, 477 U.S. at 317, 322 (1986); *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir. 2004).

## II.   EASTERN'S CONTRACT CLAIM (COUNT II) FAILS

Under New York law, a plaintiff claiming a breach of contract must show "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004). Damages are an essential element. *LNC Invs., Inc. v. First Fidelity Bank, N.A. New Jersey*, 173 F.3d 454, 465 (2d Cir. 1999) ("Under New York law ... '[t]he failure to prove damages is ... fatal to [a] plaintiff's breach of contract cause of action." (quotation marks omitted)).

Both parties admit they entered into a contract,[152] but Eastern cannot prove the other three elements of its claim. Eastern cannot prove its sole theory of damages—restitution— because Eastern never conferred a benefit on Strategic and therefore is not entitled to "return" of the $1 million paid by another entity, ACA. Further, any failure by Strategic to perform was excused due to frustration of purpose: as a matter of law, Eastern itself breached the contract by failing to perform and frustrating Strategic's performance.

### A.  Eastern cannot obtain restitution, its sole theory of damages

---

[152] Eastern admits there "is a valid and enforceable Contract between Eastern and Strategic Vision." Dkt. 93, Second Am. Complt., ¶ 31. Eastern's request for a declaratory judgment that the contract is void as against public policy, will be discussed in detail in Strategic's forthcoming opposition to Eastern's motion for summary judgment on its Count III.

In order to prove a breach of contract claim, a plaintiff must prove its damages. *See LNC Invs.*, 173 F.3d at 465. The court may not accept a plaintiff's damage allegations as true, but rather must make an independent determination of the appropriate relief to be awarded. *Pransky v. Eisner*, 2011 WL 4753455, at *3 (E.D.N.Y. 2011), (*citing Credit Lyonnais Securities (USA), Inc. v. Alcantara,* 183 F.3d 151, 154–55 (2d Cir. 1999)).

Eastern claims its damages are "$1,000,000 for the $1,000,000 paid to Strategic Vision as a deposit under the agreement."[153] The $1 million represents restitutionary damages, rather than expectation or reliance damages, as it is the total amount paid as the deposit for the research agreement. Yet non-party ACA, not Eastern, paid Strategic.[154] At the time of payment, Strategic did not know that ACA existed, nor that ACA expected to access Strategic's research.[155] No funds ever passed through Eastern's hands.[156] Indeed, even had the parties completed performance, Eastern never had the assets to pay $1 million back to ACA (if ACA's wire to Strategic is viewed as a "loan" to Eastern), nor did it have the assets to make the additional $750,000 monthly payments required by the Agreement.[157] Eastern's paltry assets were (and are) frozen in Hong Kong, which Eastern claims is a result of a CCP crackdown on dissidents.[158]

### i.   Eastern conveyed no benefit on Strategic, and is not entitled to the return of a $1 million deposit paid by another entity

The goal of restitutionary damages is "to restore the nonbreaching party to as good a position as the one she occupied before the contract was made, without attempting to compensate her for consequential harms." *In re Asia Global Crossing, Ltd*., 404 B.R. 335, 341 (S.D.N.Y. 2009). *The party claiming restitution* must have conveyed a benefit on the defendant. *See*

---

[153] Plt's First Interrog. Resp., Ex. M, p. 16, No. 7.
[154] Ex. U; Wang Depo. 1, Ex. D, 158:6-9, 158:20-159:23, 161:2-17; Dkt. 127, p. 22, ¶ 7; Dkt. 142, p. 3, ¶ 7.
[155] Ex. N, p. 3, No. 4; Wang Depo. 2, Ex. I, 208:2-16 and 197:18-198:6, 202:2-204:20, 73:20-74:8.
[156]  Wang Depo. 1, Ex. D, 203:11-15.
[157] Wang Depo. 2, Ex. I, 7320-74:8; 197:18-198:6, 202:2-204:20; Dkt. 203-2, Oct. 18, 2018; Chunguang Depo., Ex. G, 44:17-22, 70:10-72:6, 74:19-75:1, 88:2-89:9, 131:22-132:4, 146:10-24.
[158] *Id.*

Restatement (Second) of Contracts § 370 (restitution is "available to a party only to the extent that *he* has conferred a benefit on the other party") (emphasis added); *id*. cmt. a ("benefit must have been conferred *by the party* claiming restitution") (emphasis added); *Gerosa v. Savasta & Co.*, 329 F.3d 317, 321 (2d Cir. 2003) ("[T]o make out a claim for restitution, a plaintiff must show that the defendant has unjustly received *from the plaintiff* a benefit...." (emphasis added). New York law is clear: a party that "has not conferred a benefit may not obtain restitution." *Farash v. Sykes Datatronics, Inc.*, 59 N.Y.2d 500, 504 (1983) (*citing* Restatement (Second) Contracts § 370 cmt. a); *see also Schuler-Haas Elec. Corp. v. Wager Constr. Corp.*, 57 A.D.2d 707, 70708 (4th Dep't 1977) ("A benefit must have passed *from plaintiff to defendant* for which the plaintiff should be compensated in equity and good conscience.") (emphasis added).

If a plaintiff seeks restitution of benefits that the plaintiff never bestowed, such a claim must be dismissed. *See Wiener v. Lazard Freres & Co.,* 241 A.D.2d 114, 117-21 (NY 1st Dep't 1998) (distinguishing between benefits conferred by plaintiff and those conferred by third party). Benefits conferred by a third party "cannot be said to be benefits bestowed on defendants... to which plaintiffs were entitled." *Id.* at 121 (affirming dismissal of claim seeking restitution). A party claiming restitution damages must base its claim solely upon the amount it paid to the other party. *Young v. Rosenberg*, 2017 WL 3267769, at *2 (S.D.N.Y. 2017), *quoting Bausch & Lomb, Inc. v. Bressler*, 977 F.3d 720, 730 (2d Cir. 1995) ("restitution looks to the reasonable value of any benefit conferred upon the defendant *by the plaintiff*") (emphasis added); *see also Pransky*, 2011 WL 4753455, at *3 (plaintiffs in a total breach situation were entitled to recover restitution from defendant for "all of the money *they conveyed* to him") (emphasis added). Where a party claiming restitution did not confer a benefit to the other party, its claim for restitution damages

fails. *Id.*[159] "A party may recover damages as restitution to the extent *that party* has conferred a benefit on the breaching party." *Old Stone Corp. v. U.S.*, 450 F.3d 1360, 1371 (Fed. Cir. 2006) (emphasis added).

Eastern is not entitled to restitutionary damages: it conferred no benefit on Strategic; never itself paid even a nominal amount to Strategic; and never *could have* paid Strategic, re-paid ACA, or paid anyone else with the paltry sum (around $80,000)[160] that authorities froze in Eastern's Hong Kong account even before the contract was negotiated. Indeed, Eastern admits this sum would only have been released if research into CCP leaders had yielded good results, its publication had caused regime change, and this in turn had caused its assets to be unfrozen.[161] Yet after terminating the Agreement only five weeks in, back in February 2018, Eastern has never even tried to hire another entity to take over for Strategic and follow through on its purported plan to recover the $80,000 that sits frozen in Hong Kong.[162] Even if Eastern's story is true, it is not entitled to the windfall of a "return" of the $1 million non-party ACA sent to Strategic. Far from restoring Eastern's pre-contract position, awarding it ACA's $1 million would place Eastern in a far better position than it enjoyed in January 2018. "An award of restitution cannot provide a windfall to the non-breaching party." *American Capital Corp. v. F.D.I.C*, 472 F.3d 859, 870 (Fed. Cir. 2006).

### ii. Eastern is not entitled to restitutionary damages, as it does not allege—and cannot prove—a total breach by Strategic

---

[159] In addition to the requirement that a plaintiff seeking restitution have conveyed a benefit on the defendant, any counter-performance by the defendant destroys a claim for restitution. *Bausch & Lomb*, 977 F.2d at 729. Where a plaintiff "has not alleged that it actually paid any amount…" to the defendant, and where it has received a counter-performance by the defendant, a "claim for restitution damages is completely offset by the counter-performance it has received, and it can therefore recover nothing under a restitution theory of damages." *Summit Properties Intern., LLC v. Ladies Professional Golf Ass'n*, 2010 WL 4983179, at *4, n.4 (S.D.N.Y. 2010).

[160] Wang Depo. 2, Ex. I, 7320-74:8, 197:18-198:6, 202:2-204:20; Dkt. 203-2, Oct. 18, 2018; Chunguang Depo., Ex. G, 44:17-22, 70:10-72:6, 74:19-75:1, 88:2-89:9, 131:22-132:4, 146:10-24.

[161] Wang Depo. 2, Ex. I, 202:2-203:24.

[162] Wang Depo. 1, Ex. D, 155:24-156:4, 157:7-13, 157:18-24.

In addition to the requirement that the party seeking restitution have conferred a benefit on the defendant, restitution is only available if the plaintiff can prove the defendant is liable for repudiation or a total breach. Restatement (Second) of Contracts § 373 (1979), *see also Abdul v. Subbiah*, 735 N.Y.S.2d 29, 30 (N.Y.App.Div. 2001) (awarding restitution for total breach of contract by non-performance); *Direction Assocs., Inc. v. Programming & Sys., Inc.,* 412 F.Supp. 714, 719 (S.D.N.Y. 1976) (denying restitution damages where there was no total breach of contract)."[N]ot every minor breach entitles the other party to demand all its money back." *Puebla Palomo v. DeMaio*, 403 F.Supp.3d 42, 71–72 (N.D.N.Y. 2019). And "restitution [damages are] available only if the breach gives rise to a claim for damages for total breach and not merely to a claim for damages for partial breach." *Mazzei v. Money Store*, 308 F.R.D. 92, 105 (S.D.N.Y. 2015).

Eastern cannot show a total breach by Strategic. It is undisputed that Strategic performed tasks pursuant to the contract, including conducting research, providing data, and making extraordinary efforts to draft and deliver reports to Eastern, all before Eastern terminated the contract without having rendered any of the required monthly payments.[163] Without proof of a total breach, Eastern cannot recover on the restitutionary theory it pled.

### B.  Eastern frustrated and prevented performance by Strategic

Eastern frustrated Strategic's performance when it refused to provide replacement subjects for research after Strategic told Eastern that the first 15 subjects identified by Eastern held "Records Protected" status and thus could not be investigated.[164]

---

[163] Wallop Depo., Ex. B, 115:7-118:10, 82:21-83:23, 130:4-131:13, 71:5-73:4, 74:17-76:6, 77:25-79:23; 136:13-15; 230:2-232:13, 241:6-8, 242:19-243:3; 285:12-288:24, 139:17-140:23; Waller Depo., Ex. L, 74:14-77:1, 29:10-19, 41:5-42:18; 56:19-25, 93:20-95:10; S.V. Depo., Ex. K, 112:11-116:17, 127:24-129:6; Wang Depo. 1, Ex. D, 135:16-141:16; 211:12-212:15; Ex. S (Ex. 6 Wang Depo. 1), p. 1.
[164] Wallop Depo., Ex. B, 139:17-140:23, 285:12-288:24, 136:13-20; S.V. Depo., Ex. K, 100:16-1103:25, 105:21-107:11; Wang Depo. 1, Ex. D, 154:6-23; R. Agreement, Ex. J; Gertz Depo., Ex. E, 141:4-17.

"There is an implied condition of every contract that one party will not prevent performance by the other." 22A N.Y. Jur. 2d Contracts § 410; *see also Ferguson v. Lion Holding, Inc*., 478 F. Supp. 2d 455, 469–70 (S.D.N.Y. 2007). "Conduct of a party to a contract which frustrates and prevents performance by the other party" constitutes a breach on the part of the former and "excuses performance by the latter." 22A N.Y. Jur. 2d Contracts § 410. Under New York law, one who frustrates another's performance may not hold the frustrated party in breach of contract. *Stardial Communications Corp. v. Turner Construction Co*., 305 A.D.2d 126, 757 N.Y.S.2d 749 (N.Y. 1st Dep't 2003).

A party need not prove the other actually prevented the condition precedent from occurring so long as it can show that the other party's behavior substantially hindered performance. *Ixe Banco, S.A. v. MBNA America Bank, N.A*., 2009 WL 3124219, at *5 (S.D.N.Y. 2009); *see also Farrell Heating, Plumbing, Air Conditioning Contractors, Inc. v. Facilities Dev. and Improvement Corp*., 414 N.Y.S.2d 767, 770 (N.Y. 3d Dep't 1979) (a party who "greatly disrupts and frustrates" the other's performance breaches the underlying agreement). This approach is consistent with the doctrine's foundation in the covenant of good faith and fair dealing implied in every contract and this Court's prior observation that "[n]ot only do parties have an obligation not to prevent the occurrence of a condition, each party also has an affirmative obligation to help facilitate the other's performance." *Ixe Banco, S.A. v. MBNA America Bank, N.A*., 2009 WL 3124219, at *5 (S.D.N.Y. 2009).

A breach can be excused—and liability extinguished—if the breaching party can show that performance was impossible on account of a "supervening event" whose "non-occurrence of that event [was] a 'basic assumption' on which both parties made the contract." *World of Boxing LLC v. King*, 56 F.Supp.3d 507, 512 (S.D.N.Y. 2014).

24

Impossibility excuses non-performance if the "unanticipated event could not have been foreseen or guarded against in the contract." *King*, 56 F.Supp.3d at 512.

Eastern prevented and substantially hindered Strategic's performance when it refused to provide additional subjects for research under the contract after it learned that the initial 15 subjects identified by Eastern held "Records Protected" status.[165] Strategic could not provide research on those subjects due to their classification.[166] The parties could not have anticipated that Strategic would be prevented from completing its research on the first 15 subjects, and Eastern frustrated Strategic's earnest attempts to provide research on replacement subjects.[167] Faced with an unforeseen event and refusing to accommodate Strategic to allow it to provide other performance, Eastern cannot now hold Strategic in breach of contract.

## III.   EASTERN'S CLAIM FOR FRAUDULENT MISREPRESENTATION (COUNT II) FAILS

### A.  Eastern's fraud claim fails because it duplicates its contract claim

Eastern's Count II claims that to induce the contract, Strategic fraudulently represented its capabilities, in-house expertise, and intent to perform (Dkt. 93, Second Am. Complt., ¶¶ 35-39) and that Eastern suffered "substantial damages," in an amount to be determined later, by losing "three months" that it "could have spent working with another investigative company." *Id.*, ¶ 45.

A plaintiff claiming fraudulent misrepresentation must show by clear and convincing evidence that "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Eternity Global Master Fund Ltd. v.*

---

[165] S.V. Depo., Ex. K, 101:11-103:25, 105:21-107:11.
[166] S.V. Depo., Ex. K, 105:6-20, 106:15-108:21; Ex. 105 to S.V. Depo.
[167] S.V. Depo., Ex. K, 101:11-103:25, 105:21-107:11.

*Morgan Guar. Trust Co. of New York*, 375 F.3d 168, 186–87 (2d Cir. 2004). A fraud claim that is duplicative of a breach of contract claim must be dismissed. *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 19–20 (2d Cir.1996) ("intentionally-false statements ... indicating [an] intent to perform under the contract [are] not sufficient to support a claim of fraud under New York law."). A claim for fraudulent misrepresentation cannot arise out of the same facts that support an alleged breach of contract. *Taizhou Zhongneng Imp. & Exp. Co. v. Koutsobinas*, 509 F. App'x 54, 57 (2d Cir. 2013).

"A failure to perform promises of future acts is merely a breach of contract to be enforced by an action on the contract. A cause of action for fraud does not arise when the only fraud charged relates to a breach of contract." *Tesoro Petroleum Corp. v Holborn Oil Co. Ltd*., 484 N.Y.S.2d 834, 835 (N.Y. 1st Dep't 1985) (dismissing fraud claim where "plaintiff did not allege that defendants breached any duty owed to plaintiff separate and apart from the contractual duty when they misrepresented their intent to perform"). "[A] contract action cannot be converted to one for fraud merely by alleging that the contracting party did not intend to meet its contractual obligations," *Rocanova v. Equitable Life Assurance Soc'y*, 634 N.E.2d 940, 944 (1994).

Where, as here, adjudicating the fraud claim "necessarily requires the same proof as the breach of contract claim," summary judgment should be granted. *Banco de La Republica de Colombia v. Bank of New York Mellon*, 2013 WL 3871419, at *10 (S.D.N.Y. 2013). A tort claim "may not be plead in the alternative alongside a claim that the defendant breached an enforceable contract." *Deutsch v. JPMorgan Chase & Co*., 2019 WL 4805689, at *10 (S.D.N.Y. 2019).

**B.  Eastern cannot show that Strategic made, or that Eastern relied upon, false representations Strategic knew to be untrue**

Eastern claims Strategic made fraudulent statements about its expertise, capability, and intent to perform under the contract:[168] that it would use an "in-house team" of investigators; that the "in-house" team was capable of sophisticated financial tracking; and that it had represented other sophisticated clients in the past.[169] Eastern also claims Strategic said the $1 million deposit would offset Eastern's last payments,[170] though the contract itself does not say this.[171]

Eastern cannot establish falsity or fraudulent intent. First, Eastern admits Strategic's alleged statements were not false.[172] What Strategic said about itself was true.[173] Second, Eastern admits that the "false representations" about in-house employees were neither made nor relied upon,[174] and that Strategic never made representations (separate and apart from the contract itself) about the intended use of the deposit.[175] Because Eastern's Count II is really a claim that Strategic "did not intend to perform" on the contract, it "fails to state a claim for fraud" and must be "dismissed as duplicative under New York law." *VTech Holdings Ltd. v. Lucent Techs., Inc.*, 172 F. Supp. 2d 435, 439 (S.D.N.Y. 2001).

### C.  Eastern does not allege, and cannot show, special damages

Dismissal of a duplicative fraud action is particularly appropriate where a plaintiff fails to allege "special damages" that cannot be recovered under the contract measure of damages. *Tesoro,* 484 N.Y.S.2d at 835. Where a plaintiff has not "claimed any special damages proximately caused by the false representation, not recoverable under the contract measure of damages, …[the fraud claim] was redundant and should have been dismissed." *Id.* at 835. For the

---

[168] Dkt. 93, ¶¶ 35-39.
[169] Dkt. 93, ¶ 35(a)-(c).
[170] Dkt. 93, ¶ 42.
[171] R. Agreement, Ex. J.
[172] Wang Depo. 1, Ex. D, 194:20-198:7. (Eastern testified Strategic's representations about prior clients were true.)
[173] Wallop Depo., Ex. B, 17:9-21:7, 79:9-20, 80:10-24, 82:21-83:23, 138:17-139:6; Wang Depo. 1, Ex. D, 179:23-186:20; S.V. Depo., Ex. K, 129:22-130:17, 132:15-133:13; Wang Depo. 1, Ex. D, 179:23-186:20.
[174]  Wang Depo. 1, Ex. D, 179:23-186:20.
[175] *Id*; Wang Depo. 1, Ex. D, 198: 8-201:14-21. Eastern cannot bring a fraud claim for issues not collateral to the contract.

same reason Eastern cannot show damages on its contract claim, it cannot show them here. *See*, *e.g.*,*VariBlend Dual Dispensing Systems LLC v. Crystal International (Group) Inc*., No. 18 Civ. 10758 (ER), 2019 WL 4805771, at *21–22 (S.D.N.Y. 2019); *Warren v. John Wiley & Sons*, No. 12-cv-5070, 2013 U.S. Dist. Lexis 93040, at *30-31 (S.D.N.Y. July 2, 2013) ("a failure of proof on direct out-of-pocket losses will subject a fraud claim to dismissal"). Further, while Eastern's Second Amended Complaint alleged damages from "los[ing] three months" of investigation time and the need to "find another" investigator (Dkt. 93, ¶ 45), Eastern was unwilling or unable to testify that it ever undertook such efforts.[176] Eastern's Count II fails.

## IV.    EASTERN'S UNJUST ENRICHMENT CLAIM (COUNT IV) FAILS

### A.  Eastern cannot recover under an unjust enrichment theory

Eastern's Count IV, under an unjust enrichment theory, seeks restitution of the "benefit" of the $1 million deposit payment made by ACA to Strategic. Eastern claims as an alternative to its breach of contract count that the contract is illegal,[177] such that Eastern should recover the $1 million *paid by ACA* under the theory of unjust enrichment. This claim also fails.

To state a claim for unjust enrichment under New York law, a plaintiff must allege: "(1) *the plaintiff* conferred a benefit upon defendants, (2) that the defendants will obtain the conferred benefit without adequately compensating plaintiff, and (3) 'equity and good conscience' require restitution." *Russian Standard Vodka (USA), Inc. v. Allied Domecq Spirits & Wine USA, Inc.*, 523 F.Supp.2d 376, 385 (S.D.N.Y. 2007) (emphasis added) *(citing Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)). In *Russian Standard*, this Court dismissed an unjust enrichment claim where the plaintiffs "have not alleged a benefit that *they* have conferred upon defendants, as required for an unjust enrichment claim under New York law." 523 F.Supp.2d at 386 (emphasis

---

[176] Wang Depo. 1, Ex. D, 155:24-156:4, 157:7-13, 157:18-24
[177] Strategic will separately argue in its forthcoming filing, by motion and cross-motion, that the first element of Eastern's count for unjust enrichment—that the contract was illegal (pled by Eastern in Count III)—fails.

added). This Court recently dismissed an unjust enrichment claim where the plaintiff conferred no benefit on the defendant. *Rothstein v. Auto Club South*, 2019 WL 5722215, at *12 (S.D.N.Y. 2019) (*citing Virgilio v. Ryland Group, Inc*., 680 F.3d 1329 (11th Cir. 2012)).

Eastern conferred no benefit on Strategic, which is a threshold requirement for a plaintiff to recover on unjust enrichment. *See Rothstein*, 2019 WL 5722215, at *12. In contrast, as shown in Section II, *supra*, it was non-party ACA—not Eastern—that paid Strategic the $1 million. This claim fails for the same reasons Eastern cannot recover restitutionary damages under its breach of contract claim: Eastern's receipt of the payment made to Strategic by another would be a windfall. Because Eastern did not confer a benefit on Strategic, this count must be dismissed.

### B.  Eastern cannot recover payments made under an enforceable contract

Unjust enrichment damages are reserved for circumstances where a contract does not exist in fact. *Pickering v. American Express Travel Related Services Co., Inc.,* 1999 WL 1225246, at *4 (S.D.N.Y. 1999) ("Unjust enrichment is a quasi-contractual theory for restitution that implies a contract in circumstances where one does not exist in fact."); *see also City of Yonkers v. Otis Elevator Co.,* 844 F.2d 42, 48 (2d Cir. 1988) (under New York law, quasi-contractual relief "unavailable where an express contract covers the subject matter"). Eastern's claim for unjust enrichment cannot survive because it alleges an enforceable agreement.[178] !

There can be no unjust enrichment claim when there is an express contract between the parties. *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 60 (2d Cir. 1997). As this Court has held, a claim of unjust enrichment fails where "the parties have an enforceable contract that governs this dispute." *Bayerische Landesbank v. Nebraska Investment Finance Authority*, 2017 WL 752192, at *7 (S.D.N.Y. 2017). Here, the existence of a contract "bars any attempt by [the plaintiff] to

---

[178] Eastern admits this. Dkt. 93, Second Am. Complt., ¶ 31 ("The Contract is a valid and enforceable Contract between Eastern and Strategic Vision.").

assert a claim for unjust enrichment regarding payments made pursuant to that contract." *Granite Partners, L.P. v. Bear, Stearns & Co.,* 17 F. Supp. 2d 275, 312 (S.D.N.Y. 1998) ("[P]ayments made pursuant to the express terms of a contract cannot be recovered via unjust enrichment.").

## V.   EASTERN CANNOT MAINTAIN THIS ACTION BECAUSE IT IS NOT REGISTERED TO DO BUSINESS IN NEW YORK

The Court should dismiss Eastern's claims because it lacks standing. Eastern is not and has not been registered to do business in New York, though it has during the relevant timeframe purported to do business and held itself out as authorized to do business in New York.[179] As a foreign corporation doing business in New York, Eastern cannot maintain an action until it is authorized to do business here. N.Y. Bus. Corp. §1312(a)-(b); *Virgilio Flores, S.A. v. Jerome Radelman, Inc*., 567 F.Supp. 577, 579 (E.D.N.Y. 1982) (an unregistered corporation doing business in New York cannot sue in a federal court action based on diversity); *Invacare Corp. v. John Nageldinger & Son, Inc.*, 576 F. Supp. 1542, 1543 (E.D.N.Y. 1984) ("If a corporation is doing business within the meaning of section 1312(a) it is precluded from maintaining an action not only in the State courts of New York but also in the Federal courts.").[180]

## CONCLUSION

For the foregoing reasons, Defendant Strategic Vision respectfully requests that this Court enter judgment as a matter of law in its favor on Eastern's Counts I, II, and IV.

---

[179] Chunguang Depo., Ex. G, 109:12-111:22 and Ex. O (Chunguang Ex. 32); Wang Depo. 2, Ex. I, 25:8-28:13.
[180] Strategic, as a Nevada corporation doing business in New York, is not prevented from counterclaiming or defending. *See Williams Erectors of Suffolk County v. Mulach Steel Corp*., 684 F.Supp. 357, 358 (E.D.N.Y. 1988).

Dated March 16, 2020

Respectfully submitted,

GRAVES GARRETT LLC

*s/ Edward D. Greim*
Edward D. Greim, #4240172
1100 Main Street, Suite 2700
Kansas City, MO 64105
Telephone: (816) 256-3181
Fax: (816) 256-5958
edgreim@gravesgarrett.com
ATTORNEYS FOR
DEFENDANT/COUNTERCLAIM PLAINTIFF

## CERTIFICATE OF SERVICE

This certifies that, on March 16, 2020, the foregoing was served on all counsel of record via the Court's Electronic Case Filing System.

*s/ Edward D. Greim*
Attorneys for Defendant/Counterclaim Plaintiff