IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| EASTERN PROFIT CORPORATION LIMITED, | ) ) ) | |
| Plaintiff/Counterclaim Defendant, | ) ) | Case No. 18-cv-2185 |
| v. | ) ) | |
| STRATEGIC VISION US, LLC, | ) ) | |
| Defendant/Counterclaim Plaintiff. | ) ) | |

## DEFENDANT STRATEGIC VISION'S LOCAL RULE 56.1 STATEMENT

**Defendant Strategic Vision US, LLC, its Representative French Wallop, and Guo Wengui, Representative of Plaintiff Eastern Profit Corporation Limited**

1.     **Strategic Vision US, LLC ("Strategic Vision") is a single-member limited liability company ("LLC") registered and in good standing with the Nevada Secretary of State.** Nev. Sec. of State Bus. Reg. ("S.V. Reg."), Ex. A (Ex. A to Dkt. 264, Request for Judicial Notice ("RJN")), ¶ 1; Feb. 12, 2019 F. "Wallop Depo.," Ex. B, 8:6-9, 8:25-9:16, 127:4-6. **Strategic Vision is operated by French Wallop, who has had a home in Washington, D.C. for many years.** S.V. Reg., Ex. A; March 12, 2020 F. Wallop Aff., Ex. C, ¶¶ 1-2; Dkt. 93, p. 1, ¶ 2; Dkt. 127, p. 1, ¶ 2. **French was married to Senator Malcolm Wallop, who represented Wyoming from 1977 to 1994.** Wallop Aff., Ex. C, ¶¶ 1-2.

2.     **Her interest in politics, work in international affairs, and decades in Washington allowed French to cultivate extensive relationships in several U.S. presidential administrations, Congress, the Departments of Defense and Energy, and other government agencies.** Dkt. 127, p. 20, ¶¶ 1-2; Dkt. 142, p. 1, ¶ 2; Wallop Depo., Ex. B, 10:19-11:19, 28:12-

20, 28:21-30:1. **This led to consulting work for prominent clients.**[1] Dkt. 93, p. 3, ¶ 14; Jan.

31, 2019 Yvette "Wang Depo. 1," Ex. D, 194:20-198:7; Wallop Depo., Ex. B, 28:12-30:1,

104:16-106:20. **She grew significant connections overseas, consulting for clients in Canada,**

**England, the United Arab Emirates, and Singapore.** *Id.*; Dkt. 127, p. 20, ¶ 2.

3. **In 2005, French formed Strategic Vision as a consulting firm for research**

**and analysis of political intelligence.** Wallop Depo., Ex. B, 10:10-21, 16:16-17:8, 28:12-30:1;

Dkt. 127, p. 20, ¶¶ 1-2; Dkt. 142, p. 1, ¶ 2; S.V. Reg., Ex. A. **Its clients are typically diplomats**

**or political figures.** Wallop Depo., Ex. B, 28:12-30:1, 17:9-21:7; Dkt. 93, p. 3, ¶ 14; Wang

Depo. 1, Ex. D, 194:20-198:7; Dkt. 127, p. 20, ¶ 2. **Strategic's principal place of business has**

**always been French's Virginia residence.** Dkt. 127, p. 20, ¶ 1; Dkt. 142, p. 1, ¶ 1; Wallop

Depo., Ex. B, 8:25-9:4; S.V. Reg., Ex. A. **Strategic has never had employees.** Wallop Depo.,

Ex. B, 24:1-3.

4. **In about November 2017, Strategic Vision received a new client referral from**

**French's longtime acquaintances Dr. Lianchao Han and William Gertz, both prominent**

**Washington figures.** Wallop Depo., Ex. B, 11:24-12:21, 89:9-91:1, 31:23-35:7. **Dr. Han**

**immigrated to the United States from China, and worked in the U.S. Senate for several**

**years (including for the late Senator Wallop) on matters relating to China.** RJN, Dkt. 264, ¶

2; Wallop Aff., Ex. C, ¶¶ 2-3. **After the Tiananmen Square Massacre in 1989, Dr. Han**

**helped found the Independent Federation of Chinese Students and Scholars.** RJN, Dkt. 264,

¶ 2. **William "Bill" Gertz is an investigative reporter and columnist** who had already written

several articles on Guo and China, the author of several books about national security (during

---

[1]     Eastern Profit has alleged in its fraud claim that Strategic Vision misrepresented French's work as involving Republican politicians, a Middle East prince, and an opposition leader in China (Dkt. 93, p. 3, ¶ 14), but testified that it believed French had in fact worked for Republican politicians, a Middle East prince, and an opposition leader in China: **"…I believe they are true…"** Wang Depo. 1, Ex. D, 194:20-198:7.

this lawsuit, he wrote a book on Guo and China)**., and a national speaker on these topics.**
Wallop Depo., Ex. B, 12:16-21, 33:15-21; Oct. 15, 2019 William "Gertz Depo.," Ex. E, 17:2-24:21, 25:18-21.

5.      **The prospective new client was Guo Wengui (a/k/a Miles Kwok), who Dr.**
**Han and Gertz stated was a wealthy businessman who had moved to the U.S. to escape**
**political persecution in China and who had recently purchased the penthouse at the**
**Sherry-Netherland Hotel in New York City.**  Wallop Depo., Ex. B, 36:18-23, 89:9-91:1,
169:20-170:3; Aug. 2, 2019 "Guo Depo. 1", Ex. F, 104:12-105:11, 103:4-23; Nov. 11, 2019
"Chunguang [Han] Depo.," Ex. G, 5:14-17, 25:19-24, 92:10-93:25.  **According to Dr. Han and**
**Gertz, Guo had developed several broad goals involving the Chinese government beneficial**
**to the people of China.**  Wallop Depo., Ex. B, 88:3-89:5; Guo Depo. 1, Ex. F, 45:3-46:16; Aug.
28, 2019 "Lianchao [Han] Depo.," Ex. H, 53:13-20; Gertz Depo., Ex. E, 60:16-20, 64:16-65:2,
66:15-67:5, 69:3-8, 69:17-70:1, 128:6-129:6, 131:1-14.  **In September 2017, just before being**
**introduced to French Wallop, Guo had filed an application for asylum in the United States.**
Guo Depo. 1, Ex. F, 9:16-21; Lianchao Depo., Ex. H, 30:11-31:20.

        <u>**Events Leading to the Contract in Dispute and How it was Negotiated**</u>

6.      **Initially, Guo looked to Strategic Vision for public relations and**
**communications advice regarding his integration into the U.S., such as where to buy**
**residential and business property in Washington, D.C. to achieve a high profile presence**
**there and what personal and business associations to make to advance his goals involving**
**China.**  Wallop Depo., Ex. B, 32:17-38:4, 41:11-42:11, 43:15-45:25, 87:23-89:5; Gertz Depo.,
Ex. E, 137:5-16.  **This early, *gratis* advice did not give rise to the claims here.**

7.      **Ultimately, Strategic Vision was asked to contribute to Guo's integration efforts by conducting research to expose corruption within the Chinese Communist Party ("CCP"), which Guo would then use to undermine the Chinese regime in China.**  Guo Depo. 1, Ex. F, 45:3-46:16; Wallop Depo., Ex. B, 88:3-89:22; Oct. 30, 2019 Eastern Profit Fed. R. Civ. P. 30(b)(6) "Wang Depo. 2," Ex. I, 197:18-208:22, 202:2-204:20, 149:5-150:9. **Specifically, research was needed to examine questionable interactions between CCP members and Chinese nationals living in the United States and abroad.**  *Id.*; Lianchao Depo., Ex. H, 279:10-14.  **Although Strategic Vision did not receive any specific names to research until after entering into a contract, Guo believed there was a large number of corrupt CCP officials and that, by exposing them, he could achieve the long-term objective of breaking CCP's control over China, creating a regime change that would turn China from a strategic adversary to a friend of the United States and pave the way for democracy and freedom for the people of China.**  Guo Depo. 1, Ex. F, 39:9-19, 45:3-46:16; Wang Depo. 2, Ex. I, 49:7-21, 202:2-204:20, 149:5-150:9; Wallop Depo., Ex. B, 88:3-89:22; Lianchao Depo., Ex. H, 226:10-18.  **Guo claimed that he needed Strategic Vision to advise him on the political weaknesses of CCP members in high government positions.**  *Id.*

8.      **Strategic Vision agreed to consider the project but requested certain conditions.  First, based on Guo's warnings, French was concerned that any association between Strategic Vision and Guo could lead to surveillance by the Chinese government, reprisals, and even physical danger.**  Wallop Depo., Ex. B, 168:4-170:3, 298:15-20; Wallop Aff., Ex. C, ¶¶ 4-5; Guo Depo. 1, Ex. F, 45:3-46:16; Lianchao Depo., Ex. H, 12:9-13:13.  **Later, after Strategic Vision began work, Guo claimed that the Chinese Embassy in Washington**

was surveilling French's residence, writing down the name, in English and Chinese characters, of the person he claimed the Embassy had assigned.  Wallop Aff., Ex. C, ¶¶ 4-5.

9.      **The parties therefore agreed to secrecy measures, such as circuitous payment routes, and later agreed in their written contract "that the Client may direct other entities to pay the Contractor, and that such payments will be deemed satisfactory compensation by the Contractor."**  Wang Depo. 1, Ex. D, 11:19-12:11; R. Agreement Ex. J, (Ex. 2 to Wang Depo 1.), p. 5; Wallop Depo., Ex. B, 168:4-170:3; Nov. 19, 2019 Strategic Vision Fed. R. Civ. P. 30(b)(6) Depo. ("S.V. Depo."), Ex. K, 95:16-25; Wallop Aff., Ex. C, ¶ 4.  **For other reasons, as it turned out, no funds ever passed through Eastern's hands.** Wang Depo. 1, Ex. D, 203:11-15.

10.      **In addition, the parties would exchange reports and identification of research subjects only through in-person contact at secure locations, and this would require extensive travel and other time-consuming personal effort by Strategic Vision.**  R. Agreement Ex. J, p. 1; Wang Depo. 1, Ex. D, 77:18-78:18; Wallop Depo., Ex. B, 136:13-20; S.V. Depo., Ex. K, 127:4-15; Feb. 8, 2019 Michael "Waller Depo.", Ex. L, 67:9-68:2.  **Guo likewise was expected to refrain from any conduct that would compromise the security of Strategic Vision's work.**  Wallop Depo., Ex. B, 283:11-285:11.  **The parties' contract required "the strictest secrecy[,] not to disclose the existence of the contract, work relating to the contract, sources and methods used to execute the contract and participants in formulating supervising or executing the contract's provisions, to any third party…"**  R. Agreement Ex. J, p. 1.

11.      **Second, Strategic Vision would engage subcontractors (intelligence analysts in the U.S. and overseas, which Strategic Vision described as a "team" and not its own**

employees) to perform the research that Strategic Vision would then incorporate into political advice for Guo.  Wallop Depo., Ex. B, 17:9-21:7, 80:10-24, 82:21-83:23, 79:9-20, 138:17-139:6; Wang Depo. 1, Ex. D, 179:23-186:20; S.V. Depo., Ex. K, 129:22-130:17, 132:15-133:13.

      12.     **Strategic Vision itself would not conduct the research:**

**Q.    Does Strategic Vision do that investigatory research itself?**
**A.    No.**
**Q.    So you never perform any research yourself?**
**A.    No.**
**Q.    Who does?**
**A.    Whomever we bring on board to do the investigation.**
**Q.    So Strategic Vision hires independent contractors?**
**A.    Our own team of people that we have worked with off and on through the years, yes.**

Wallop Depo., Ex. B, 19:21-20:8 and 79:9-20, 80:10-24, 82:21-83:23, 153:12-154:24, 130:4-131:13.  **Notifying this network and organizing its work would take time and advance startup funding.**  *Id*. and 247:16-18; S.V. Depo., Ex. K 129:22-130:17, 131:11-133:13.

      13.     **Guo would not be allowed to contact the network because Strategic Vision's relationships and approach to the research were confidential and proprietary, and Strategic Vision declined to reveal the names or titles of any team members.**  Wallop Depo., Ex. B, 82:21-83:23, 53:14-25 (French did not even know Mike Waller's contacts and vice versa); S.V. Depo., Ex. K, 129:22-130:14; Waller Depo., Ex. B, 74:14-77:1.  **Eastern Profit admitted in testimony that Strategic Vision never represented that it had in-house employees or particular categories of associates.**  Wang Depo. 1, Ex. D, 179:23-186:20 (and 184:25-185:3: "Q. Something along those lines but never used the words in-house? A.  I don't remember that.").

14.    **To help set up and monitor the network and prepare its eventual advice to Guo, Strategic Vision would partner with Mike Waller, who was introduced to Guo during contract negotiations.**  Wallop Depo., Ex. B, 35:25-37:22, 11:12-13:1; Gertz Depo., Ex. E, 131:1-20.  **Dr. Waller, a Ph.D. in international security affairs, is an expert in strategic communications, with a focus on intelligence, political warfare, public diplomacy, and terrorism avoidance.**  RJN, Dkt. 264, ¶ 4.  **Dr. Waller is not a member or employee of Strategic Vision but was invited to work on the project by French, who he has known professionally for many years.**  Wallop Depo., Ex. B, 11:12-12:9, 24:1-3, 16:12-17:8; Waller Depo., Ex. L, 10:8-11:25.

15.    **Third, given the uncertainties attendant to researching a large group of foreign subjects, Strategic only could approximate the time required to prepare a report on a given person, and could not guarantee a particular result at a particular time. Thus, the contract later allowed for adjustments for "irregular circumstances": "[b]oth parties understand that occasional unforeseen challenges may arise that will slow or block comprehensive research, and that there may be periods in which information is irregular, unavailable, or incomplete.  The Contractor will endeavor to make all research and reports as complete as possible in a timely scheduled manner."**  R. Agreement, Ex. J, p. 3.

16.    **Finally, because Strategic Vision would need clear direction from Guo as to the individuals about whom research was needed and any other issues that developed during the project, Guo would be expected to communicate with Strategic Vision as necessary for its work.**  R. Agreement, Ex. J, at p. 1.

17.    **After discussing these concerns, Guo pressed ahead with the project, and the parties negotiated the Research Agreement, detailing the services Strategic Vision would**

**provide.**  R. Agreement, Ex. J; Wallop Depo., Ex. B, 126:3-18; Wallop Aff., Ex. C, ¶ 4.  **Over the course of approximately one month, several drafts of the Agreement were exchanged between Guo and his representatives (in New York) and French and Waller (in Virginia).**  Wang Depo. 1, Ex. D, 59:17-60:4.  **Guo authorized two representatives to speak with Strategic Vision:  Lianchao (who knew both Guo and French) and Wang Yangping, a/k/a Yvette Wang, who French first met through Guo.**  Plt's First Interrog. Resp., Ex. M, p. 3, No. 5; Wallop Depo., Ex. B, 199:20-200:9; Wang Depo. 1, Ex. D, 59:17-60:4.

<u>**Eastern Profit and Strategic Vision Enter into their Contract**</u>

18.     **During negotiations, the parties agreed to Guo's request that a separate entity, and not Guo himself, would enter into the Agreement with Strategic Vision.**  Wallop Depo., Ex. B, 299:22-300:8 ("Obviously it's Guo with whom we are dealing. So Guo equals Eastern, one would presume."); Lianchao Depo., Ex. H, 185:2-7; S.V. Depo., Ex. K, 95:3-12. **That entity, Plaintiff Eastern Profit Corporation Limited ("Eastern Profit"), was revealed by Guo just shortly before the contract was signed.**  Wang Depo. 1, Ex. D, 8:24-11:15, 14:2-25; Wang Depo. 2, Ex. I, 162:4-9, 150:10-151:6; Wallop Depo., Ex. B, 306:6-307:7.  **It is a private limited company registered under the laws of the Hong Kong Special Administrative Region of the People's Republic of China.**  Eastern Profit's C.R. 26.1 Demand, Ex. N, at p. 2, No. 2, p. 3, Nos. 3-4; Wang Depo. 2, Ex. I, 22:10-23:6, 23:25-25:16, 25:24-26:5, 27:8-13, 29:16-18, 29:22-30:5, 76:12-18.  **Eastern Profit has not been registered to do business in the State of New York.** Eastern Profit's C.R. 26.1 Demand, Ex. N, p. 2, No. 2, p. 3, Nos. 3-4; RJN, Dkt. 264, ¶ 3.

19.     **In negotiating the Agreement, Strategic Vision dealt with Guo, and only knew of Guo and the two individuals he had designated to negotiate on his behalf, Lianchao and Wang.**  Dkt. 142, p. 2, No. 4; Plt's First Interrog. Rep., Ex. M, p. 3, No. 6; Wang

Depo. 2, Ex. I, 169:19-171:7.  **At the time, Guo represented that Wang and Lianchao answered to him; in this litigation, Eastern Profit claims that Guo was orally appointed as its agent, and that Wang worked for Eastern Profit because Eastern Profit had orally hired GSNY, an entity controlled Guo's family office, to assist it regarding the Agreement.** POA,[2] Ex. O (Chunguang Ex. 32); Chunguang Depo., Ex. G, 109:15-110:17, 111:14-112:23; Wang Depo. 1, Ex. D, 28:6-17; Wang Depo. 2, Ex. I, 144:19-22, 205:21-206:7, 169:19-171:7. **At no point has Eastern Profit repudiated any representation made by Guo (himself or through Lianchao and Wang) concerning the Agreement.**  Dkt. 142, p. 2, ¶ 4 ("Eastern authorized Guo to communicate with Strategic Vision on Eastern's behalf concerning the Agreement, Guo's representations to, and interactions with, Strategic Vision concerning the Agreement are binding upon Eastern, and Eastern has not repudiated any such representations or interactions.").

20.     **The Agreement was ultimately signed at French's home in Virginia on January 6, 2018.**  R. Agreement, Ex. J, p. 5; Wallop Aff., Ex. C, ¶ 4; Wang Depo. 1, Ex. D, 264:9-12.  **Wang claimed authority to sign, admitted she did sign, but claimed she never actually wrote her own signature.**  Wang Depo. 1, Ex. D, 26:24-27:23, 59:17-60:4 (Ex. 2, p. 5, Eastern 9); Wang Depo. 2, Ex. I, 140:15-144:22, 27:8-13, 147:4-17, 149: 5-14, 145:18-146:8, 148:18-149:14, 154:7-156:13.  **Eastern later claimed Chunguang Han had been orally given authority to hire Golden Spring (New York) Limited ("GSNY"), Wang's official employer, by Guo Mei, who is Guo's daughter and the only director, shareholder, or natural person**

---

[2]     **Eastern Profit claims it has executed a power-of-attorney that permits GSNY to verify Eastern Profit's interrogatory responses as "Golden Spring (New York) Ltd. as attorney in fact for Eastern Profit Corporation Limited."**  Wang Depo. 1, Ex. D, 23:3-26:2.  **The verification was signed by Yvette Wang, whose signature was notarized by Karin Maistrello.**  Plt's First Interrog. Resp., Ex. M, p. 10.  **Wang also gave two depositions as the Fed. R. Civ. P. 30(b)(6) representative of Eastern Profit.**  Exs. D and I.  **Golden Spring's in-house counsel, Daniel Podhaskie (also counsel for Guo), attended numerous depositions, and his legal assistant (Amanda Coluccio) was presented in an attempt to give corporate representative testimony for GSNY.**  Ex. P; Lianchao Depo., Ex. H, 20:8-21:9.

**officially associated with Eastern.**  Chunguang Depo., Ex. G, 5:14-17; Wang Depo. 2, Ex. I, 22:13-23:7, 140:15-144:22, 27:8-13, 147:4-17, 149: 5-14, 145:18-146:8, 148:18-149:14, 154:7-156:13, 166:7-18.  **Both Wang and Han were New York residents at all relevant times.**  Chunguang Depo., Ex. G, 13:6-14:2; 17:21-18:3; Wang Depo. 1, Ex. D, 4:11-12, 26:24-27:23.

21.     **Later, after the Research Agreement was executed, this lawsuit was filed, and discovery was underway, Eastern claimed that two other individuals were involved in the project:  Chunguang Han (an assistant of Guo who, in litigation, Eastern  has claimed is its "principal") and Guo Mei (Guo's daughter and the sole director, shareholder, or natural person formally associated with Eastern  from June 27, 2017 through today).**  Plt's First Interr. Resp., Ex. M, at p. 2, No. 2 ("Chunguang Han is the principal of Eastern."); Ex. Q (Chunguang Depo. Ex. 33); Lianchao Depo., Ex. H, 36:11-38:4; Ex. R (Chunguang Depo. Ex. 30), p. 2 (Eastern 401); Wang Depo. 2, Ex. I, 25:8-28:13, 45:25-47:25, 63:22-64:14, 126:2-17; Chunguang Depo., Ex. G, 34:6-17; 38:18-39:15, 106:2-107:24.  **Eastern Profit claims that Guo Mei orally gave Chunguang Han authority to manage Eastern Profit's affairs, which included his hiring of Golden Spring (New York) Limited ("GSNY"), Wang's official employer and a wholly-owned subsidiary of Guo's family office, China Golden Spring (Hong Kong).**  Wang Depo. 2, Ex. I, 25:5-44:17.  **Eastern Profit claims that, in 2019, both Guo Mei and Chunguang gave additional verbal authority to Wang in New York that allowed her to represent Eastern Profit's interests in communicating with a third party regarding payments received by Strategic Vision under the Agreement, discussed below.**  *Id*.  **Both Wang and Han were residents of New York at all relevant times.**  Chunguang Depo., Ex. G, 13:6-14:2; 17:21-18:3; Wang Depo. 1, Ex. D, 4:11-12, 26:24-27:23; Wang Depo. 2, Ex. I, 25:5-44:17.

22.     **Wang signed the Research Agreement only after Guo approved its final terms for Eastern Profit, which Wang read him over the phone line-by-line.**  Wang Depo. 1, Ex. D, 61:2-9.

### The Parties' Respective Obligations Under the Contract

23.     **Of Strategic Vision, the Agreement required "business research, reporting, documentation, and other consulting services" that would be documented in periodic "comprehensive confidential reports" with supporting data provided on a timetable set out in the Agreement.**  R. Agreement, Ex. J, pp. 1, 3; Wang Depo. 1, Ex. D, 11:19-12:11.  **The three areas of analysis (all labeled "research") were "financial forensic historical research; current tracking research; and social media research."**  R. Agreement, Ex. J, pp. 1-2.  **Guo represented to Strategic Vision in negotiations, and the Agreement recited, that Guo planned to use Strategic Vision's analysis for "detecting, stopping, and preventing crime or other harm"** (*Id.*) **to the people of China in order to force a regime change that would implement the rule of law and democracy.**  Guo Depo. 1, Ex. F, 45:3-46:16; Wang Depo. 1, Ex. D, 33:8-14 (Guo identified research subjects), 32:5-35:11, 37:8-38:7.

24.     **Under the Agreement, Strategic Vision would be paid for specific periods of work rather than for its periodic reports.**  R. Agreement, Ex. J, p. 4; Wang Depo. 1, Ex. D, 56:12-59:16.  **Wang had asked for an alternative a la carte, report-for-payment structure, but that was not included in the final Agreement, which instead adopted a "waterline" structure which would pay Strategic Vision a set fee per month.**  Wang Depo. 1, Ex. D, 66:12-67:9.  **Strategic Vision was guaranteed a bare minimum of work, from the**

Agreement's start (January 16, 2018)[3] through a period of three months (April 16, 2018). R. Agreement, Ex. J, pp. 3-4. **When that guaranteed period ended, "after the March reports and payments are made, [] all involved Parties will meet to recap the accounting…"** Wang Depo. 1, Ex. D, 56:22-58:5, R. Agreement, Ex. J, p. 4; Wallop Depo., Ex. B, 246:25-247:7. **The Research Agreement had a term of three years.** R. Agreement, Ex. J, p. 5. **Each party had a right to terminate the Agreement on "30 days' written notice."** *Id.*; Ex. J and Ex. S, Ex. 6 to Wang Depo. 1; Wang Depo. 1, Ex. D, 135:18-136:7.

25.     **Of Eastern Profit, the Agreement required "the necessary basic information, and desired areas of focus, to the Contractor to research" and payment for Strategic Vision's services.** R. Agreement, Ex. J, pp. 1, 3-4. **The payment structure required "for the first 3 months of this Agreement, January, February and March 2018, [] the payment of $750,000. USD will be wired per our instructions to our US Bank account."** *Id.*, p. 4. **The Agreement also required "a deposit of US $1,000,000 [] upon signing the contract.** *Id.*, p. 5. **"The deposit will be credited on a prorated basis to the final 1-1/3 (1.3) months of the contract."** *Id.*

26.     **Wang, for Eastern Profit, testified that the deposit was an "evergreen deposit," which "means that one million just stay there as one million.  And they, Strategic Vision is going to issue invoice every month and the client is just to pay the invoice."** Wang Depo. 1, Ex. D, 199:5-200:19.

27.     **Although unknown to Strategic Vision until discovery in this case, Eastern Profit had no ability to make the $1 million initial payment or pay monthly invoices.** Wang Depo. 2, Ex. I, 7320-74:8, 197:18-198:6, 202:2-204:20. **Late in discovery, Eastern Profit**

---

[3]     **The parties mutually agreed to extend the start date of the Agreement from January 6, 2018 to January 16, 2018.** Wang Depo. 1, Ex. D, 139:4-17; Ex. S (Ex. 6 to Wang Depo. 1), p. 1 ("Eastern agreed to delay the start of the contract by 10 days, from January 6 to January 16."); Dkt. 93, p. 4, ¶ 19.

claimed its assets were all in Hong Kong and had been frozen there due to influence by the Chinese government and CCP prior to the Research Agreement and showing that those assets were only about $550,000 HK, or roughly $80,000. *Id*.; RJN, Dkt. 264, ¶ 5; Dkt. 203-2, Oct. 18, 2018, p. 14/27 for Respondent 16 (Dkt. 203, p. 2: "The assets of Mr. Guo and Eastern Profit that have been frozen in Hong Kong were frozen, not by the CCP or Mainland China, but by *the High Court of Hong Kong*. *See* Exhibit B." Ex. B (pp. 3, 14, Respondent 16:  H.K. Ct. Order); Chunguang Depo., Ex. G, 44:17-22, 70:10-72:6, 74:19-75:1, 88:2-89:9, 131:22-132:4, 146:10-24.  **Eastern Profit had no expectation that this would change, absent a regime change triggered by the fruits of the Research Agreement.**  Wang Depo. 2, Ex. I, 202:2-203:24.

28.    **Also unknown to Strategic Vision, Eastern Profit had promised another entity, non-party ACA Capital Group Limited ("ACA"), a private company registered under the laws of the Hong Kong Special Administrative Region of the People's Republic of China, that it would be given the results of Strategic Vision's work.**  Wang Depo. 2, Ex. I, 46:22-47:14, 49:25-50:10, 53:19-54:3, 56:7-11, 57:5-9, 110:17-112:2; Wallop Depo., Ex. B, Dkt. 203-2, Oct. 18, 2018.  **Eastern claims the $1 million ACA transferred to Strategic on January 2, 2018 was the result of a purported loan between ACA and Eastern only intended to be paid back, with 2% monthly interest,** *after* **Guo used Strategic's research to trigger regime change in China and (apparently by these means) unfreeze Eastern's Hong Kong bank account.**  Wang Depo. 2, Ex. I, 49:25-50:10, 53:19-54:3, 56:7-11, 57:5-9, 110:17-112:2; Dkt. 203-2; Chunguang Depo., Ex. G, 72:24-73:14.  **ACA head William Je (a/k/a Yu Jianming)[4]**

---

[4]    **It was William Je who was representing ACA's interests in communicating with Eastern Profit about the Research Agreement.**  Wang Depo. 2, Ex. I, 57:23-58:19, 53:19-54:3.

**even indicated that ACA might forgive the purported "loan" if the Research Agreement**

**bore fruit:**

> **A Okay. I didn't discuss that yet, but I heard kind of like William would be**
> **happy to contribute this fund into the entire taking down Chinese**
> **Communist Party campaign. But I don't have too much details.**
> **Q So had the research been successful, Mr. Yu would have been happy to write off**
> **the loan?**
> **Ms. Cline: Objection to form.**
> **Possible.**

Wang Depo. 2, Ex. I, 208:2-16, 46:22-47:14, 44:10-47:14, 197:18-198:6, 202:2-204:20, 73:20-

74:8; Plt's Third Interrog. Resp., Ex. T, p. 3, No. 2.

29.     **Neither Guo nor any other Eastern Profit representative disclosed ACA's**

**name to Strategic Vision, disclosed the existence of the "loan," or sought permission from**

**Strategic Vision to allow its strictly confidential work product to be given to a third party**

**for that party's use.**  Wallop Aff., Ex. C, ¶¶ 4, 6; R. Agreement, Ex. J, p. 1 ("Both parties agree

that the nature of this contract, and the work related to it, is highly confidential.  Both parties are

bound by the strictest secrecy not to disclose … to any third party."); Wang Depo. 1, Ex. D,

134:19-135:15 ("My understanding is that all the information related to this project or this

contract, should be kept confidential").

30.     **Strategic Vision thus did not know the identity of ACA or its representatives**

**and, when Eastern Profit turned out to have no assets, had no means of recourse against**

**ACA for payment or anything else regarding the Research Agreement.  ACA was to be the**

**ultimate recipient of Strategic Vision's work under the Agreement, even though ACA is not**

**the plaintiff and Eastern Profit has not assigned its claims in this case.**  Ex. N (Eastern

Profit's C.R. 26.1 Demand), p. 3, No. 4; Wang Depo. 2, Ex. I, 208:2-16 and 197:18-198:6, 202:2-

204:20, 73:20-74:8.  **The only authority Eastern Profit has granted anyone regarding the**

Agreement is a power-of-attorney in favor of Guo's entity, GSNY, not ACA.  Wang Depo. 2, Ex. I, 205:21-206:7; Ex. O (Chunguang Ex. 32); Chunguang Depo., Ex. G, 109:15-19, 110:2-17.

**Strategic Vision Receives Payments from Non-Party ACA**

31.    **On or about January 2, 2018, at its bank in Las Vegas, Nevada, Strategic Vision received two successive $500,000 wire transfers.**  Ex. U (Wang Depo. 1 Ex. 7); Wang Depo. 1, Ex. D, 158:6-9, 158:20-159:23, 161:2-17; Dkt. 127, p. 22, ¶ 7; Dkt. 142, p. 3, ¶ 7. **These were from an ACA bank account in Hong Kong.**  *Id.*  **Although Strategic Vision did not know of ACA, Strategic Vision assumed the wires had sent at Guo's order under the Agreement, which is what Eastern Profit now contends.**  Plt's First Interrog. Resp. Ex. M, p. 2, No. 4 ("Guo Wengui, on behalf of Eastern, ordered wires totaling $1 million to be sent to Strategic Vision on or about December 29, 2017."); Dkt. 93, pp. 3-4, ¶ 17; Wallop Aff., Ex. C, ¶¶ 6-7.  **Strategic Vision had agreed with Guo to avoid a direct payment route from Eastern Profit to Strategic Vision (the Agreement provided "that the Client may direct other entities to pay the Contractor, and that such payments will be deemed satisfactory compensation by the Contractor").** R. Agreement, Ex. J, p. 5.  **No funds ever passed through Eastern's hands.** Wang Depo. 1, Ex. D, 203:11-15.

32.    **The wires, however, compromised whatever secrecy this routing might have achieved by being sent simultaneously from Hong Kong (the very location where Eastern now claims it assets had just been frozen under CCP influence), in the same sizable amounts, and to the same U.S. recipient.**  Ex. U (Wang Depo. 1 Ex. 7).

33.    **Discovery later revealed that, several days after sending them, ACA asked its bank to reverse the wires.**  Wang Depo. 1, Ex. D, 107:13-20, 160:2-161:17; Ex. V (Wang Depo. 1 Ex. 8); Plt's First Interrog. Resp. Ex. M, p. 6, No. 13.  **The transfers already having**

been completed, ACA's request was declined.  *Id.*  **ACA did not inform Strategic Vision of this attempt, has never made demand on Strategic Vision for return of the funds, and has never communicated to Strategic Vision about the Research Agreement or any other matter.**  Wallop Aff., Ex. C, ¶ 7; Wang Depo. 1, Ex. D, 161:2-17; Wallop Depo., Ex. B, 192:20-194:16; Plt's Third Interrog. Resp., Ex. T, p. 2, No. 1.  **Nevertheless, Eastern Profit claims that its damages are "$1,000,000 for the $1,000,000 paid to Strategic Vision as a deposit under the Agreement."**  Plt's First Interrog. Resp., Ex. M, p. 16, No. 7.

34.   **Attempts to involve ACA in discovery were unsuccessful.  ACA's sole director (Karin Maistrello, a U.S.-based employee of GSNY) accepted hand delivery of a Fed. R. Civ. P. 45 deposition subpoena directed to ACA but then, through counsel she shared with Guo and with his entity, GSNY (Dkt. 213, 4:5-10, Dkt. 195), took the position that the service was ineffective on ACA because she had resigned as a director within 48 hours after Strategic Vision had given the required pre-service notice of intent to Eastern Profit.**  Aug. 23, 2019 "Maistrello Depo.," Ex. W, 27:9-25, 28:1-29:5, 30:1-32:10; Ex. 6 to Maistrello Depo.; Dkt. 177-Exs. 3, 1.  **Maistrello testified that she resigned her directorship after learning from Daniel Podhaskie, counsel GSNY (her employer and Eastern Profit's agent for purposes of this litigation), that she was about to be served with a subpoena in her capacity as an ACA director.**  Maistrello Depo., Ex. W, 55:12-57:20 ("Q. What did you do after you were served with this subpoena? MS. TESKE: Object if the form. You can answer it. A. I gave it to our lawyer. Q. Who was that? A. Daniel Podhaskie.") and Ex. X (Maistrello Depo Ex. 3).

35.   **Eastern Profit also opposed discovery into ACA, calling it "entirely collateral to the claims and defenses at issue in this litigation …."  (Dkt. 203, p. 2)  Guo, through the same counsel as GSNY and Maistrello (Dkt. 158, p. 1, opposing discovery into GSNY, Dkt.**

195), opposed discovery into ACA, claiming it was "an attempt to harass and provoke" him and that "Strategic should not be entitled to such overreaching discovery from multiple non-parties." (Dkt. 150, p. 2)  Counsel for ACA never appeared in the case.

**Strategic Vision's Efforts Under the Research Agreement**

36.    **The Research Agreement was signed January 6, 2018 (Wallop Aff., Ex. C, ¶ 4) but the effective date was January 16, 2018.**  Wang Depo. 1, Ex. D, 139:4-17; Ex. S (Ex. 6 to Wang Depo. 1), p. 1 ("Eastern agreed to delay the start of the contract by 10 days, from January 6 to January 16."); Dkt. 93, p. 4, ¶ 19.  **In early January 2018, Waller travelled to Europe and the Middle East and engaged independent research contractors, including trusted Chinese/English translators and a team lead there.**  Wallop Depo., Ex. B, 115:7-118:10, 82:21-83:23, 130:4-131:13, 71:5-73:4, 74:17-76:6, 77:25-79:23; Waller Depo., Ex. L, 74:14-77:1, 29:10-19, 41:5-42:18.  **This effort cost at least $200,000, done on an expedited basis.**  *Id.*; S.V. Depo., Ex. K, 72:4-73:2, 74:10-76:6; S.V. Depo. Ex. 104 (Ex. Y).

37.    **Before the contractors could begin their work, Eastern Profit had to identify the subjects to be researched.**  R. Agreement, Ex. J, p. 1; Wallop Depo., Ex. B, 83:24-84:7, 85:10-86:11; S.V. Depo., Ex. K, 131:1-132:9, 132:15-133:11.  **Instead, Eastern Profit provided unencrypted (and thus vulnerable) flash drives infected with malware that attacked the computer used to open it.**  Wallop Depo., Ex. B, 174:9-176:18, 198:11-199:1, 200:10-202:2, 207:25-208:13, 114:3-115:6, 85:10-17, 114:8-115:6.  **The flash drives were inoperable and Eastern Profit did not fully correct the problem when Wang delivered three more flash drives to Strategic Vision, also unencrypted.**  *Id.*  **One flash drive was working and safe, and it contained 92 names.**  *Id.* and 127:14-128:23. **The number of initial subjects**

**was increased by agreement to 15 from 10.** S.V. Depo., Ex. K, 129:7-17, 82:4-20, Wallop

Depo., Ex. B, 281:19-282:13.

38. **Later, in February, Strategic Vision made arrangements with Allied Special Operations Group ("ASOG"), based in Texas, to research the 15 subjects being examined overseas.** Wallop Depo., Ex. B, 232:7-234:13; Wallop Aff., Ex. C, ¶ 8; S.V. Depo., Ex. K, 100:16-102:16.

39. **ASOG determined that the subjects were designated by the U.S. government as "Records Protected"—information concerning the subjects' status and activities was not accessible through legal means.** Wallop Depo., Ex. B, 232:7-238:20, 239:16-241:4, 285:12-288:24; S.V. Depo., Ex. K, 100:16-103:25, 105:6-108:21. **The purpose of the designation was to ensure that no one, including the individuals themselves, could learn information that would help them determine they were under investigation.** S.V. Depo., Ex. K, 106:15-107:7. **According to ASOG, trying to research subjects known to be "Records Protected" could be a criminal activity.** *Id.*; S.V. Depo., Ex. K, 100:16-102:16, 106:15-108:21.

40. **ASOG's conviction was so strong that it withdrew a bill to Strategic Vision for $111,700.** S.V. Depo., Ex. K, 105:6-20, 106:15-108:21; Ex. 105 to S.V. Depo., Ex. K. **ASOG instead received $5,412 for finding the "Records Protected" designation.** *Id.*; S.V. Depo., Ex. K, 109:12-110:17, 81:15-17.

41. **Strategic Vision did not receive any subject names before entering the Agreement and had no way of anticipating that the third parties conducting the research would encounter this circumstance.** Wallop Depo., Ex. B, 83:24-84:7, 85:10-86:11, 174:4-8, 175:3-176:18. **Prior to this, Strategic Vision had not heard of the designation.** Wallop Aff., Ex. C, ¶¶ 8.

42.     **Nevertheless, Guo angrily refused to discuss the "Records Protected"
problem when Strategic Vision notified him.**   Wallop Depo., Ex. B, 139:17-140:23, 285:12-
288:24, 136:13-20; S.V. Depo., Ex. K, 100:16-102:16.  **He then demanded that Strategic
Vision turn over all work done by its contractors, despite many protests by Strategic Vision
that it was impossible for the researchers to work faster and have final reports ready in a
matter of days.**  Wallop Depo., Ex. B, 230:2-232:13, 285:12-288:24, 139:17-140:23; S.V.
Depo., Ex. K, 112:11-116:17, 127:24-129:6; Waller Depo., Ex. L, 56:19-25, 93:20-95:10.  **The
Agreement did not require, and no party could physically provide, immediate results; what
Guo now inexplicably demanded on a rush basis was contrary to the Agreement.**  Wang
Depo. 1, Ex. D, 154:6-23; R. Agreement, Ex. J; Gertz Depo., Ex. E, 141:4-17.

43.     **Attempting to keep the project alive, Waller nevertheless made immediate
travel plans and flew overseas, met with the research team leader, and returned to New
York.**  S.V. Depo., Ex. K, 127:24-129:6.  **On or about January 26th or 30th, 2018, less than
two weeks after Strategic Vision began its work under the Agreement, Waller delivered to
Wang an initial tranche of raw data.**  S.V. Depo., Ex. K, 112:11-116:17, 127:24-129:6;
Wallop Depo., Ex. B, 243:14-244:4, 285:12-288:24, 136:13-15.  **Strategic Vision repeatedly
cautioned it would be of no independent use to Guo because it was simply the researchers'
own work to familiarize themselves with the initial subjects using open-source information.**
S.V. Depo., Ex. K, 112:11-116:17 ("That was their own basic work.  So the only report, in
quotes, that we provided as a deliverable was showing how the research team was setting up its
methodology to collect this data") and 127:24-129:6.

44.     **Even though Strategic Vision, through Waller, had made extraordinary
efforts to accommodate Guo's unreasonable demands under the contract, Eastern Profit**

**would not provide any guidance about the "Records Protected" designation and what it meant for the future of the research on the first 15 subject names.** S.V. Depo., Ex. K, 101:11-103:25, 105:21-107:11. **Nor did Eastern Profit simply move its focus from the initial 15 subject to another 15 within the 92 subject names on the flash drives delivered by Eastern Profit back on January 8, 2018.**

<u>**Eastern Profit Terminates the Agreement Less than Two Months After it is Signed**</u>

45. **Although the Agreement provided for a look-back after three months to compare the deliverables with the amounts paid, and also provided for "'30 days' written notice," Eastern Profit terminated the Agreement only 5 weeks after the January 16, 2018 start date, claiming it was effective immediately.** R. Agreement, Ex. J. **Eastern's February 23, 2018, termination letter also demanded "a full and complete refund of the $1 million deposit."** Wang Depo. 1, Ex. D, 135:16-141:16; Ex. S (Ex. 6 Wang Depo. 1), p. 1; Wallop Depo., Ex. B, 241:6-8, 242:19-243:3; Wang Depo. 2, Ex. I, 211:12-212:15. **The Agreement contained no provision for return of the monthly fee or deposit if Eastern Profit was dissatisfied with Strategic Vision's work and, in fact, required Eastern Profit to make a monthly $750,000 payment, starting in January.** R. Agreement, Ex. J. **Neither Eastern nor ACA ever made even that first monthly $750,000 payment.** Wang Depo. 1, Ex. D, 58:6-18. Eastern admitted nothing in the contract required Strategic to return the $1 million at the end of the contract, nor had Strategic made such a representation to Eastern Profit**.** Wang Depo. 1, Ex. D, 198: 8-201:14-21. **Regardless, Eastern Profit's counsel** demanded Strategic "return" the $1 million (*via* wire to ACA, not Eastern)**. .** Ex. S (Ex. 6 to Wang Depo. 1), p. 2 ("Beneficiary Acct. Name:  ACA Capital Group Limited"). **Strategic Vision did not comply.** Dkt. 93, p. 5, ¶ 29.

46.     **The Agreement guaranteed Strategic Vision a period of time to provide its services that ran from the agreed start date of the arrangement (January 16, 2018)[5] (to 30 days after the February 23, 2018 termination,[6] and Eastern's no-notice termination meant that Strategic Vision lost the opportunity to make $1,596,774.25.**  R. Agreement, Ex. J, pp.3-4; Wallop Depo., Ex. B, 246:25-247:7.

| Period | Number of Days | Per Diem | Total |
|--------|----------------|----------|-------|
| **January 16-31** | **15** | **$24,193.55** | **$362,903.25** |
| **February 1-28** | **N/A** | **N/A** | **$750,000.00** |
| **March 1-21** | **20** | **$24,193.55** | **$483,871.00** |
| | | | **$1,596,774.25** |

47.     **Not only did Eastern Profit fail to pay these amounts, its February 23, 2018 termination prevented Strategic Vision from performing through the contractually-guaranteed look-back period scheduled for April 16, 2018, resulting in a loss of at least $100,000 in profits for the roughly three-week period between March 21 and April 16.** Wallop Aff., Ex. C, ¶ 10; Ex. S (Ex. 6 to Wang Depo. 1); R. Agreement, Ex. J, pp.3-4.

48.     **While Eastern's Complaint claims special fraud damages—"los[ing] three months" of investigation time and to need to "find another" investigator (Dkt. 93, ¶ 45)—it was unwilling or unable to testify that it ever undertook such efforts.**  Wang Depo. 1, Ex. D, 155:24-156:4, 157:7-13, 157:18-24.

49.     **In the end, this three-year contract, intended to advance Guo's purported goal of helping to topple the CCP regime in China to the benefit of the Chinese people, lasted just five weeks.**  R. Agreement, Ex. J, p. 5; Ex. S (Ex. 6 to Wang Depo. 1), p. 1; Guo

---

[5]      Wang Depo. 1, Ex. D, 139:4-17; Ex. S (Ex. 6 to Wang Depo. 1), p. 1 ("Eastern agreed to delay the start of the contract by 10 days, from January 6 to January 16."); Dkt. 93, p. 4, ¶ 19.

[6]      Wang Depo. 1, Ex. D, 135:16-141:16; Ex. S (Ex. 6 Wang Depo. 1), p. 1.

Depo. 1, Ex. F, 45:3-46:16; Wallop Depo., Ex. B, 88:3-89:22; Wang Depo. 2, Ex. I, 197:18-208:22, 202:2-204:20, 149:5-150:9.

### Eastern Profit's Only Business Is in New York, But it Has Not Registered Here

50.      **Chunguang Han claims to have purchased all of Eastern Profit for $1,000 HK in late 2014.**  Chunguang Depo., Ex. G, 50:17-22, 56:4-14.  **He became and remained the sole director of Eastern Profit until he transferred ownership to Guo Mei (Guo Wengui's daughter**, Chunguang Depo., Ex. G, 35:5-12) **on June 28, 2017.**  *Id*. at 59:5-60:8, 70:5-9, 102:2-18.

51.      **Han claims that during his directorship and while he was in Hong Kong, he trusted a Chinese woman, known only as Natasha Qu (he testified that he never knew her "official" last name or Chinese name), to run whatever it is that Eastern Profit did.**  Chunguang Depo., Ex. G, 53:20-55:3.  **Han did not know who she was working for at the time he turned over Eastern's operations to her.**  *Id*. at 66:21-68:8.

52.      **In June of 2017, Eastern Profit's only asset—its Hong Kong bank account—was frozen.**  Chunguang Depo., Ex. G, 87:3-88:20; Dkt. 203-2.  **Natasha reported this to Han** (*Id*. at 72:3-12), **left, and no one replaced her in Hong Kong.**  Chunguang Depo., Ex. G, 71:6-9.

53.      **By about this point, Han was in New York; he says has been there since at least June of 2017.**  Chunguang Depo., Ex. G, 13:6-14:2; 17:21-18:3; Wang Depo. 1, Ex. D, 26:24-27:23.

54.      **Han claims that, once in New York, he was orally authorized by its new director, Guo Mei (Guo Wengui's daughter), to act as Eastern Profit's agent.**  Chunguang Depo., Ex. G, 43:11-44:22; 47:11-16; 102:2-104:11.  **Han, in turn, says he orally authorized**

Wang to handle everything related to an investigation of Chinese officials. *Id*. at 46:2-12; 84:22-86:16. **The purpose of that investigation, Han says, was to "expose the Chinese government's corruption and it will give me an opportunity to get my asset back."** *Id*. at 91:24-92:3. **Han gave Wang "full authorization" for the work, understanding that the contract would be in the U.S.** *Id*. at 92:17-24. **Starting in 2017, from New York, Han— still, purportedly, as Eastern Profit's orally-appointed agent—reported back to Guo Mei.** *Id*. at 47:17-48:18.

55.    **Eastern has no remaining Hong Kong business.  Its address had been the 49th Floor of the Bank of China Tower in Hong Kong.**  Chunguang Depo., Ex. G, 58:14-59:4. **Han Chunguang was last there "several years ago."** *Id*.  **Eastern Profit's only claimed business anywhere in the world since the asset freeze is in New York: Han's alleged delegation of authority to Yvette Wang, GSNY, and Guo to research Chinese officials.** *Id*. at 43:21-44:22.

56.    **Han claims to have been compensated for his work for Eastern Profit before he left Hong Kong, and "believe[s] when the company's asset is unfreeze one day, I will receive some compensation" for his work for Eastern Profit in New York.**  Chunguang Depo., Ex. G, 78:17-23.

57.    **Han continued to work on Eastern Profit's business in New York after making what he testified was his oral delegation of authority to Wang to use research to recover Eastern Profit's allegedly frozen assets.  In December 2017, Han claims to have met with William Je in New York several times to negotiate and execute a "loan" for $1 million.**  Chunguang Depo., Ex. G, 133:13-134:8.  **In 2018, Han conferred with Wang at her office at 800 Fifth Avenue and signed a Power of Authority authorizing the company of which**

Wang is the CEO, GSNY, to continue to handle the research into Chinese officials, including any related litigation, (*i.e.*, this very case).  *Id.*, 109:12-111:22 and Ex. O (Chunguang Ex. 32).

58.    **Wang also claims she was responsible for dealing with Eastern Profit's purported New York-executed loan after having first learned of it in 2018** (Wang Depo. 2, Ex. I, 63:22-64:14); **she claims she met with ACA representative William Je in New York in 2018 to discuss Eastern Profit-ACA business.**  Wang Depo. 2 Ex. I, 45:25-47:25.  **Han met again with Wang at 162 E. 64th Street in New York City, GSNY's current address and also the office of Guo, to discuss the purported "loan" ACA made to Eastern Profit.**  Chunguang Depo., Ex. G, 34:6-17; 38:18-39:15.  **Finally, Eastern Profit testified that Guo (who has remained in New York) also served as Eastern Profit's agent in connection with the loan from ACA, and also conferred with Je about the loan.**  Wang Depo. 2, Ex. I, 126:2-17. **Eastern Profit also admits that Guo, again, in New York, acted as its representative in negotiating the contract.**  Dkt. 142, p. 2, ¶¶ 3-4; Dkt. 127, pp. 20-21, ¶¶ 3-4.

59.    **Continuing into 2019, Eastern Profit continued to operate out of New York. Wang (Eastern Profit's agent) met with Eastern Profit's sole director, Guo Mei (Guo's daughter), in New York to confer regarding the investigation.**  Wang Depo. 2, Ex. I, 25:8-28:13.

60.    **In the end, this three-year contract, which Guo claimed he would use to advance his purported goal of toppling the CCP regime in China to the benefit of the Chinese people, was terminated by Eastern after just five weeks.** R. Agreement, Ex. J, p. 5; Ex. S (Ex. 6 to Wang Depo. 1), p. 1; Guo Depo. 1, Ex. F, 45:3-46:16; Wallop Depo., Ex. B, 88:3-89:22; Wang Depo. 2, Ex. I, 197:18-208:22, 202:2-204:20, 149:5-150:9.

Dated March 16, 2020

Respectfully submitted,

GRAVES GARRETT LLC

*s/ Edward D. Greim*
Edward D. Greim, #4240172
1100 Main Street, Suite 2700
Kansas City, MO 64105
Telephone: (816) 256-3181
Fax: (816) 256-5958
edgreim@gravesgarrett.com
ATTORNEYS FOR
DEFENDANT/COUNTERCLAIM PLAINTIFF

## CERTIFICATE OF SERVICE

This certifies that, on March 16, 2020, the foregoing was served on all counsel of record via the Court's Electronic Case Filing System.

*s/ Edward D. Greim*
Attorneys for Defendant/Counterclaim Plaintiff