# Exhibit A

## ENTITY INFORMATION

### ENTITY INFORMATION

**Entity Name:**

STRATEGIC VISION US LLC

**Entity Number:**

E0310312011-9

**Entity Type:**

Domestic Limited-Liability Company (86)

**Entity Status:**

Active

**Formation Date:**

05/31/2011

**NV Business ID:**

NV20111365694

**Termination Date:**

Perpetual

**Annual Report Due Date:**

5/31/2020

**Series LLC:**

☐

**Restricted LLC:**

☐

### REGISTERED AGENT INFORMATION

**Name of Individual or Legal Entity:**

GG INTERNATIONAL

**Status:**

Active

**CRA Agent Entity Type:**

CRA - OTHER

**Registered Agent Type:**

Commercial Registered Agent

**NV Business ID:**

NV20101304611

**Office or Position:**

**Jurisdiction:**

NEVADA

**Street Address:**

500 N. Rainbow Ste. 300, Las Vegas, NV, 89107, USA

**Mailing Address:**

6210 N Jones Blvd. Ste.# 751986, Las Vegas, NV, 89136, USA

**Individual with Authority to Act:**

Lura Barua

**Fictitious Website or Domain Name:**

---

**OFFICER INFORMATION**

☐ **VIEW HISTORICAL DATA**

| Title | Name | Address | Last Updated | Status |
|-------|------|---------|--------------|--------|
| Manager | FRENCH C WALLOP | 7260 W. AZURE DR SUITE 140-593, LAS VEGAS, NV, 89130, USA | 05/13/2019 | Active |

**Page 1 of 1, records 1 to 1 of 1**

Filing History　　　Name History　　　Mergers/Conversions

Return to Search　　　Return to Results

# Exhibit B

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

```
 1   UNITED STATES DISTRICT COURT

 2   SOUTHERN DISTRICT OF NEW YORK

 3   ----------------------------------x

 4   EASTERN PROFIT CORPORATION LIMITED,

 5              Plaintiff-Counterclaim Defendant,

 6                                  Case No.

 7      -against-                   18-cv-2185 JGK

 8   STRATEGIC VISION US, LLC,

 9              Defendant-Counterclaim Plaintiff,

10   vs.

11   GUO WENGUI a/k/a, MILES KWOK,

12              Counterclaim Defendant.

13   ----------------------------------x

14

15

16              VIDEOTAPED DEPOSITION

17                     OF

18               FRENCH WALLOP

19            New York, New York

20          Tuesday, February 12, 2019

21

22

23

24

25
```

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 6

```
 1              LIST OF EXHIBITS
 2   WALLOP           DESCRIPTION           PAGE
 3   Exhibit 19  Strategic Vision's Responses   262
 4               and Objections to
 5               Plaintiff's First Set of
 6               Interrogatories
 7   Exhibit 20  Strategic Vision's            271
 8               Supplemental and Amended
 9               Response and Objections to
10               Plaintiff's First Set of
11               Interrogatories
12   Exhibit 21  Amended Answer and            275
13               Counterclaims
14   (Exhibits retained by Counsel.)
15
16   (*r) DOCUMENTS REQUESTED:
17        Page: 118           11
          Page: 253           22
18        Page: 273            6
19
20
21
22
23
24
25
```

Page 7

```
 1        THE VIDEOGRAPHER:  Good morning.  This
 2   is the beginning of media 1 in the
 3   deposition of French Wallop, in the matter
 4   of Eastern Profit Corporation Limited versus
 5   Strategic Vision US, LLC.
 6        Today's date is February 12, 2019.  My
 7   name is Jaysun Loushin, I am the
 8   videographer, and the court reporter is
 9   Roberta Caiola.  We are here with Huseby
10   Global Litigation.
11        Counsel, please introduce yourself,
12   after which the court reporter will swear in
13   the witness.  The time on the monitor is
14   9:58.
15        MR. GRENDI:  Good morning.  I'm Zach
16   Grendi.  I'm counsel for Eastern Profit
17   Corporation.  My law firm is Zeichner,
18   Ellman & Krause.
19        MR. SCHMIDT:  Joe Schmidt from Phillips
20   Lytle, on behalf of Strategic Vision as well
21   as the witness, French Wallop.
22        MS. TESKE:  Erin Teske with Hodgson
23   Russ, on behalf of third-party defendant
24   Miles Kwok.
25
```

Page 8

```
 1   FRENCH WALLOP, called as a witness, having been
 2   first duly sworn by a Notary Public of the State
 3   of New York, testifies as follows:
 4   EXAMINATION BY
 5   MR. GRENDI:
 6        Q.    Good morning, Ms. Wallop.  I'm Zach
 7   Grendi, as you just heard, counsel for Eastern
 8   Profit.  I'm just going to be asking you some
 9   questions today.
10             Just for the courtesy of the court
11   reporter and the clarity of the record, I'm just
12   going to ask that, please wait until after I
13   finish asking a question to answer it.  Unlike in
14   normal conversation, in a deposition you need to
15   allow one person to stop talking and the other
16   person to start.
17             Also, shrugs and nods are things that
18   the court reporter can't take down, so I ask that
19   you please answer all questions verbally.  And if
20   you need a break, just let me know, let anyone
21   know, we can take one.  We're going to try to
22   move through this -- these materials as quickly
23   as possible, but breaks are allowed.
24        A.    Thank you.
25        Q.    What's your full legal name?
```

Page 9

```
 1        A.    French Carter Wallop.
 2        Q.    And where do you reside?
 3        A.    1557 North 22nd Street, Arlington,
 4   Virginia 22209.
 5        Q.    And --
 6        A.    And I also have a Wyoming address.
 7        Q.    Do you have a Las Vegas address?
 8        A.    Yes.
 9        Q.    Where is that?
10        A.    It's on Lakes Avenue.  It's -- it's
11   where we use as our agent for the LLC for
12   Strategic Vision.
13        Q.    So that's Strategic Vision's address --
14        A.    Yes.
15        Q.    -- in Las Vegas?
16        A.    Not personal.
17        Q.    Okay.  What's your educational
18   background?
19        Q.    Where would you want to start?
20        Q.    You can start in the beginning, but --
21        A.    Kindergarten?
22        Q.    -- no need to go into great depth.
23   Just an overview, if that's all right.
24        MR. SCHMIDT:  From college up.
25        A.    I went to a school in Switzerland for
```

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 10

1   four years.  And then I was at the Ecole
2   D'Interpretes in Geneva.  And then I came back to
3   Georgetown University and got my linguistic's
4   degree in simultaneous interpreting.
5       Q.    Anything else?
6       A.    I did -- I didn't finish, but I went to
7   SAIS, The School of Advanced International Study,
8   which is part of Johns Hopkins; so it doesn't
9   count as a degree, sadly.
10      Q.    What about your work experience, let's
11  just say the last 20 years or so?
12      A.    Oh, my goodness.
13      Q.    You don't have to say everything.  Just
14  an overview.
15      A.    Well, I've run two companies, and
16  plus -- and I sold them in 2000.  And then in
17  about 2005, I started up my Strategic Vision
18  group.
19      Q.    In 2005, starting Strategic Vision, is
20  that what you've been doing ever since?
21      A.    Yes.
22      Q.    Any other employment that you have or
23  businesses that you're running, other than
24  Strategic Vision?
25      A.    Yes.  I have another company that's

Page 11

1   called Regency Mayfair Worldwide, and that works
2   overseas on projects.
3       Q.    What kind of projects?
4       A.    Family office groups.
5       Q.    What do you mean by that?  What kind of
6   projects do you do for family office groups
7   through this Mayfair company?
8       A.    Investment -- investment advisory.
9       Q.    Okay.  So nothing to do with
10  investigatory research or things of that nature?
11      A.    No.
12      Q.    How do you know Michael Waller, or John
13  Michael Waller?
14      A.    Well, Mike Waller is the way we refer
15  to him, or Dr. Waller.  Gosh, I've known Mike for
16  many, many years.  I would say, certainly,
17  certainly 20.  And our paths have crossed many
18  times in Washington on both international affairs
19  and intelligence groups.
20      Q.    When did Mr. Waller -- well, I'll call
21  him Dr. Waller.
22      A.    Yes, he is Dr. Waller.
23      Q.    He didn't insist on it the last time,
24  but fair enough.  When did you start -- or when
25  did Strategic Vision start working with

Page 12

1   Dr. Waller?
2       A.    I would say in the last year and a
3   half.
4       Q.    And how did that come about?
5       A.    We had an -- I had an introduction by
6   Bill Gertz and Lianchao Han regarding this
7   particular client.  I'm not sure, by the way, how
8   to refer to this client.  We've referred to him
9   as Miles Guo, G-u-o.
10      Q.    Eastern Profit is fine.
11          MR. SCHMIDT:  Well, you know, you refer
12      to him however you think the client is.
13      A.    He has about six names, so I'm not sure
14  what goes into the record.
15      Q.    Whatever you know.
16      A.    We refer to him as Miles Guo.  But I
17  was referred to him by both Bill Gertz, the
18  Washington Times and the Free Beacon, and
19  Lianchao.  And I -- when they approached me,
20  that's when I decided Mike was one of the people
21  I really wanted to work with on this.
22      Q.    But I wanted to ask you.  Have you ever
23  worked with Dr. Waller on any investigatory
24  research before, as you said, you were introduced
25  to Mr. Guo?

Page 13

1       A.    No.  No.
2       Q.    Since you were introduced to Mr. Guo,
3   have you and Dr. Waller worked on any other
4   investigatory research together for another
5   client?  You don't have to name them.
6       A.    I can't name them.
7       Q.    No, I'm saying whether you have or have
8   not provided --
9       A.    Yes.
10      Q.    -- a service to another client?
11      A.    Yes, but -- yes.
12      Q.    Okay.  I didn't ask you to name the
13  client.
14      A.    Don't worry.
15      Q.    And how many other clients have you and
16  Dr. Waller worked on investigatory research for?
17      A.    I can't answer that.
18      Q.    So you're refusing to answer that
19  question?
20          MR. SCHMIDT:  No, no, I don't think
21      that's what she's saying.
22          MR. GRENDI:  Okay.
23      Q.    How many?
24      A.    Four.
25          MR. SCHMIDT:  Approximately?  Okay.

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 14

1     THE WITNESS:  Approximately, yeah.
2     MR. GRENDI:  I'm going to ask that you
3  not try to interrupt.
4     MR. SCHMIDT:  I'm trying to keep you
5  guys moving forward.
6     MR. GRENDI:  I appreciate that, but I'm
7  not trying to --
8     MR. SCHMIDT:  I think you knew what she
9  meant and kind of accused her of refusing to
10  answer.  I don't think that was appropriate,
11  so that's when I had to step in, okay?
12     MR. GRENDI:  I didn't think that that's
13  what I was doing.  I was --
14     MR. SCHMIDT:  Okay.  That's how it was
15  coming across on the record, so I clarified
16  it.
17     MR. GRENDI:  Okay.  Fair enough.
18     Q.    So you and Dr. Waller have worked on
19  approximately five different investigatory
20  research projects with Strategic Vision?
21     A.    Yes.
22     Q.    And none of them preceded your
23  introduction to Mr. Guo?
24     A.    No.
25     Q.    No, they did not precede --

Page 15

1     A.    No.
2     Q.    -- or --
3     A.    They did not.
4     Q.    Prior to working with Dr. Waller, did
5  you work with someone else in terms of
6  investigatory research for Strategic Vision?
7     A.    When?
8     Q.    Before you started working with
9  Dr. Waller, so let's say prior to a year and a
10  half ago.
11     A.    Yes.
12     Q.    And was it just one entity or several
13  entities?
14     A.    I can't remember.
15     Q.    Without going into any detail.  Was
16  that a similar arrangement to your arrangement
17  with Dr. Waller in terms of the provisioning of
18  investigatory research?
19     A.    No.
20     Q.    How was it different?
21     A.    I can't remember.
22     Q.    When did you stop working with someone
23  else on investigatory research prior to working
24  with Dr. Waller?
25     A.    That's an odd question.  I don't know

Page 16

1  how to answer it.
2     Q.    You don't understand the question?
3     A.    No, I don't understand the question.
4     Q.    Okay.  What I'm saying is, when did you
5  stop working with someone else in terms of
6  providing investigatory research?
7     A.    I didn't say I had stopped.
8     Q.    So you work with, concurrently, other
9  individuals who provide investigatory research
10  for Strategic Vision?
11     A.    From time to time.
12     Q.    Okay.  So you don't have an exclusive
13  relationship with Dr. Waller in terms of
14  investigatory research that he provides?
15     A.    No.
16     Q.    Okay.  You said that you founded
17  Strategic Vision in 2005?
18     A.    I think so.  I'd have to look.
19     Q.    Okay.  Was anyone else involved in the
20  company at the time?
21     A.    No.
22     Q.    So it's always been your company?
23     A.    Yes.
24     Q.    And you've never had any other
25  officers?

Page 17

1     A.    No.
2     Q.    Or directors?
3     A.    No.
4     Q.    Or unit holders?
5     A.    No.
6     Q.    Have there been any other principals of
7  Strategic Vision, other than you?
8     A.    No.
9     Q.    So what's your role in Strategic
10  Vision?
11     A.    I run certain advisory clients and work
12  with them as clients, private clients.
13     Q.    Do you have a title, like CEO?
14     A.    Yes, I think it's CEO.
15     Q.    So what services does Strategic Vision
16  provide to its clients?
17     A.    I've already answered that.
18     Q.    I don't think you have.
19     A.    I said advisory services.
20     Q.    What do you mean by advisory services?
21     A.    Advisory client services.
22     Q.    Does that include investigatory
23  research?
24     A.    Yes, in some cases.
25     Q.    What does that investigatory research

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 18

1  involve?
2      A.   Exactly as it says.  Each client is
3  different, isn't it?
4      Q.   Right.  What I'm asking is, what does
5  Strategic Vision's investigatory research
6  services entail?
7      A.   Every client is different.
8  Investigatory services is exactly that, depending
9  upon how you want to define investigations.
10     Q.   How does Strategic Vision provide that
11  service, what does it do?
12     A.   Investigate.
13     Q.   How?
14     A.   The usual ways.
15     Q.   What are the usual ways?
16     A.   I find it's a repetitive question.
17     Q.   I don't care if you find it a
18  repetitive question.  What I'm asking you to do
19  is answer my question.
20          I want to know how Strategic Vision
21  performs investigations?
22     A.   We look everybody up on Facebook.
23     Q.   That's it?
24     A.   Sure.  It's an idiotic question.
25          MR. SCHMIDT:  Don't comment.  Just

Page 19

1       answer the question.
2      Q.   Excuse me, ma'am, I'm just trying to
3  understand things.  And I think -- maybe you
4  don't understand how a deposition works, but I'm
5  just trying to understand basic information.  You
6  might think something is obvious or intuitive,
7  but the record doesn't know that and we don't
8  know that.  So I please ask you to cooperate.
9      A.   Of course.
10     Q.   So other than looking people up on
11  Facebook, how does Strategic Vision perform
12  investigations?
13     A.   We do investigative background work on
14  individuals that other clients are interested in
15  pursuing information on.
16     Q.   So that background work, does that
17  involve surveillance or electronic research; give
18  me a little detail on what it means to
19  investigate someone for background?
20     A.   Precisely.  Just as you said.
21     Q.   Does Strategic Vision do that
22  investigatory research itself?
23     A.   No.
24     Q.   So you never perform any research
25  yourself?

Page 20

1      A.   No.
2      Q.   Who does?
3      A.   Whomever we bring on board to do the
4  investigation.
5      Q.   So Strategic Vision hires independent
6  contractors?
7      A.   Our own team of people that we have
8  worked with off and on through the years, yes.
9      Q.   Do you or Strategic Vision provide any
10  input or edits to any of the reports?  I mean,
11  what does Strategic do in terms of --
12     A.   We review the reports.
13     Q.   Do you ever edit them?
14     A.   I wouldn't say edit them, no.
15     Q.   How does Strategic Vision contribute to
16  the end work product of an investigatory research
17  report?
18     A.   Well, when we get them, we look at them
19  and we read them, depending upon who the teams
20  are, and discuss them, and then produce them.
21  Sometimes they can be verbal, sometimes they can
22  be on flash drives.  It depends what the client
23  needs.
24     Q.   Does Strategic Vision -- well, let me
25  ask you this.  Strike that.

Page 21

1          Do you ever access a network of
2  individuals that you're familiar with to get
3  information for investigatory research?
4      A.   Sometimes.
5      Q.   And just, without naming any names,
6  describe what that entails?
7      A.   Experience.
8      Q.   Right.  Do you speak to individuals in
9  the intelligence community?
10     A.   Yes.
11     Q.   Politicians?
12     A.   Sometimes.
13     Q.   People in the business community?
14     A.   Yes.
15     Q.   And then you take that information and
16  perhaps include that in an investigatory research
17  report, or how does that work?
18     A.   It depends on the client.
19     Q.   Give me an example of a client where
20  you did access that network in order to
21  contribute?
22     A.   I can't do that precisely.
23     Q.   Not with any specificity?
24     A.   Just as I said.  We are very careful
25  about the investigations that we do, they're

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 22

1    private, and if they are what the client has
2    requested, that's what we do.
3             MR. SCHMIDT:  French, maybe you can
4        give a response to these questions just kind
5        of a 30,000-foot level in general of what
6        you do would, different ideas you've done
7        over the years, that might be helpful.
8             THE WITNESS:  Okay.
9             MR. SCHMIDT:  Like types of things
10       you've done to research people, that sort of
11       thing.
12       Q.    Please go ahead.
13            MR. SCHMIDT:  Yeah, go ahead.
14       A.    With what?
15       Q.    What he just asked.
16       A.    Go ahead, ask me the question again.
17       Q.    Can you please give an overview of the
18   types of research investigations that Strategic
19   Vision does and how they do them?
20       A.    We look at individual clients or groups
21   or companies or areas of interest on behalf of
22   our clients, whether it's international, whether
23   it's domestic.
24       Q.    And how many investigations over the
25   years has Strategic Vision handled?

Page 23

1    A.    Oh, my goodness, I have no idea.
2    Q.    Ballpark?
3    A.    I have no idea.
4    Q.    Fifty?
5    A.    No.  I would say probably, maybe 15,
6    20, something like that.
7    Q.    That's since 2005?
8    A.    It's probably more than that, but since
9    2005, yeah.
10   Q.    Okay.  And other than investigatory
11   services, what kind of services does Strategic
12   Vision provide?
13   A.    As I've said earlier, we work with
14   clients on advisory services for family offices.
15   Q.    That's part of Strategic Vision's
16   business?
17   A.    I've already stated that.
18   Q.    You mentioned another entity, that's
19   why I wasn't sure if you'd separated the two
20   entities or you --
21   A.    No, you were very sure.  You didn't --
22   that's not a fair statement.
23            MR. SCHMIDT:  Just answer the question,
24       French.
25            THE WITNESS:  Okay.

Page 24

1    Q.    And Strategic Vision doesn't have any
2    employees?
3    A.    No.
4             MR. GRENDI:  Let's do Exhibit 1 here.
5             (Wallop Exhibit 1, Notice of
6        Deposition, marked for identification.)
7    Q.    Ms. Wallop, do you recognize this
8    document?
9    A.    I'm sure it's in the file.  I don't
10   recognize it particularly.
11   Q.    If you turn to the third page there, do
12   you see that, Attachment A?
13   A.    Yes.
14   Q.    And just generally speaking, do you
15   understand that this is a 30(b)(6) deposition
16   notice?
17   A.    Yes.
18   Q.    And did you review this document prior
19   to today?
20   A.    Actually, I did not.
21   Q.    Did you prepare for this deposition in
22   any way?
23   A.    Of course.
24   Q.    You met with your attorneys?  And I'll
25   just caution you right away, don't tell me

Page 25

1    anything you said to your attorneys or your
2    attorneys said to you.
3    A.    Well, exactly, of course I discussed it
4    with my attorneys.
5    Q.    And did you meet and go over documents
6    in preparation for this deposition?
7             MR. SCHMIDT:  You can say yes or no.
8    A.    Yes.
9    Q.    How long did you do that for?
10   A.    Today, or ever, or?
11   Q.    All in, sure, all together.
12   A.    Sure.  I have no idea what the answer
13   would be.
14            MR. SCHMIDT:  Just do the best you can.
15   A.    Okay.  How about -- for today's
16   deposition?
17   Q.    Yes.
18   A.    Okay.  How about 3 hours, by telephone
19   or something.
20            MR. SCHMIDT:  We had met in person
21       before, you should tell him that.
22   A.    Oh, we had a coffee before, or I had a
23   coffee.
24   Q.    And you prepared with your attorney
25   here, Mr. Schmidt?

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 26

1   A.   Yes.
2   Q.   Did you go over any documents?
3   A.   No.
4        MR. SCHMIDT:  I think you should tell
5   him that, at the initial meeting we had, we
6   went over the --
7   A.   Oh, well, of course --
8        MR. SCHMIDT:  -- the documents.  That
9   counts as well.  You should --
10       THE WITNESS:  I thought he was talking
11  about the 30 minutes that we met for coffee
12  before we walked across the street.  So,
13  okay.
14       MR. SCHMIDT:  Fill out the record.
15       THE WITNESS:  So, all right.  Yeah, no,
16  obviously.
17  Q.   Let's clean that up, just so I
18  understand.  Did you go over documents in
19  preparation for this deposition?
20  A.   Yes.
21  Q.   Okay.  Let's go to the next document.
22  Just generally speaking, you understand that I'll
23  be asking questions addressed to Strategic
24  Vision.  In response to those, you'll be
25  answering on behalf of Strategic Vision; you

Page 27

1   understand that, right?
2   A.   Correct.
3        MR. GRENDI:  This is Exhibit 2.
4        (Wallop Exhibit 2, Document Bates
5        stamped Eastern 000017, marked for
6        identification.)
7   Q.   Ms. Wallop, I've handed you a document
8   that has the Bates number Eastern 17 in the
9   bottom right-hand corner of the first page, do
10  you see that?
11  A.   Correct.
12  Q.   Just so you -- for the clarity of the
13  record and for your own edification, sometimes
14  I'll be referring to documents by their Bates
15  number, just to be clear, and I just want to make
16  sure you know what a Bates number was.
17  A.   Thank you.
18  Q.   Do you recognize this document?
19  A.   It looks like a LinkedIn document or
20  print-off.
21  Q.   So did you create the content in this
22  document?
23  A.   Yes.
24  Q.   And did you ever give this information
25  to Mr. Guo or Yvette Wang or Michael -- or

Page 28

1   Dr. Waller -- or, I'm sorry, Lianchao Han?
2   A.   It's public.
3   Q.   I understand that.
4   A.   I have no idea whether they saw it or
5   not.
6   Q.   I'm asking whether you personally gave
7   it to them?
8   A.   I have no idea.
9        MR. SCHMIDT:  Do you remember giving it
10  to them?
11       THE WITNESS:  No.
12  Q.   Okay.  And it says here, "over a
13  40-year period, the principal has developed and
14  maintained connections with many U.S.
15  administrations, Congress, DOD, DOE and other
16  agencies."  Do you see that?
17  A.   Correct.
18  Q.   And that's your network of contacts
19  being referred to there?
20  A.   Correct.
21  Q.   And if you look a little further down
22  the page, it mentions strategic research, do you
23  see that?
24  A.   Yes.
25  Q.   Is that investigatory research; I mean,

Page 29

1   what does that mean?
2   A.   It can be.
3   Q.   What about competitive intelligence,
4   that's the last item there?
5   A.   Yes.  What about it?
6   Q.   Is that inclusive of investigatory
7   private research or investigations?
8   A.   In some cases, yes.
9   Q.   Is private investigations a specialty
10  of Strategic Vision or does it really provide a
11  broader suite of services?
12  A.   Broader suite, but it's inclusive of
13  that, if required.
14  Q.   Would you consider investigatory
15  research a core service of Strategic Vision?
16       MR. SCHMIDT:  Objection.  Go ahead.
17  A.   No.
18  Q.   So it's kind of like a side service
19  that Strategic Vision provides?
20       MR. SCHMIDT:  Same objection, but go
21  ahead.
22  A.   It depends on the client's request.
23  Q.   So sometimes it's the general focus of
24  Strategic Vision's service to a client and other
25  times it's not even part of the service?

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 30

1   A.   Correct.
2   Q.   Does Strategic Vision provide lobbying
3 services?
4   A.   Again, that depends on the client.  We
5 don't do it directly, but we will work with
6 people that are lobbyists.
7   Q.   So sometimes --
8   A.   Sometimes.
9   Q.   -- Strategic Vision provides lobbying
10 services?
11   A.   Sometimes, yes.
12        MR. GRENDI:  This is 3.
13        (Wallop Exhibit 3, Document Bates
14   stamped SVUS000077, marked for
15   identification.)
16   Q.   Ms. Wallop, do you recognize this
17 document?
18   A.   I do.
19   Q.   What is it?
20   A.   It is a preliminary sort of vision for
21 Miles Guo, for our first meeting, I believe, with
22 him, that both Mike Waller, Dr. Waller and I
23 worked on.
24   Q.   So the handwriting on the top right
25 corner, is that your handwriting?

Page 31

1   A.   Yes.
2   Q.   And when did you make that note, if you
3 recall?
4   A.   I'd have to -- to look on my paper
5 calendar.  I don't remember.
6   Q.   You have a paper calendar that you
7 keep?
8   A.   No.  I'd have to look -- I'd have to
9 look.  I remember it was sort of -- there was --
10 there was one meeting in early December, and I
11 don't have that with me.
12   Q.   Ms. Wallop, do you keep a calendar?
13   A.   No, I don't keep anything on -- I keep
14 notes, sticky notes, so.
15   Q.   You don't keep like a Google
16 calendar --
17   A.   No.
18   Q.   -- or electronic calendar?
19   A.   God, no.
20   Q.   You keep paper Post-it notes to track
21 your meetings and schedule?
22   A.   Yes.
23   Q.   How were you introduced to Mr. Guo?
24   A.   Through Bill Gertz and Lianchao Han.
25   Q.   And when did that come about?

Page 32

1   A.   I think sometime in late October or
2 early November.
3   Q.   Of what year?
4   A.   2017.
5   Q.   Do you recall if it was Mr. Gertz or
6 Mr. Han that called you, or how did that
7 interaction occur?
8   A.   That's a good question.  I think it was
9 Bill Gertz.  I think he may have called me.
10   Q.   And what did he tell you?
11   A.   He knew that I had been working in the
12 past for Taiwan and had been very active in
13 pro-democracy work, and I think he said at that
14 point he would like to have lunch with me, and,
15 possibly, Lianchao was at that first lunch.  I
16 think that was how it went.
17   Q.   Those were the three people who were
18 present at that lunch?
19   A.   Yes.  The three of us, yes.
20   Q.   And what was discussed there?
21   A.   He discussed Mr. Guo, and that he had
22 met with him, I guess, a number of times, I don't
23 know over what period of time, but that he
24 believed that he was looking for a group that
25 could help change his -- Mr. Guo -- Miles Guo's

Page 33

1 image in America.  He explained a little bit
2 about Miles Guo's issues, and we discussed at the
3 time how perhaps there might be a way of helping
4 him stay in the United States.
5   Q.   What were the issues that you just
6 mentioned?
7   A.   Pro-communist people that were
8 apparently after him.  There were many lawsuits
9 apparently that had been filed against Mr. Guo.
10 We didn't know anything about Mr. Guo, per se,
11 other than some of the media reports.
12        So Lianchao suggested that we meet with
13 him, and I said, well, I will -- I'll think about
14 it and get back to you.
15   Q.   And so, you said before that you knew
16 Mr. Gertz from years in politics or what's
17 your --
18   A.   He used to be, he still is, he's still
19 at the Washington Times, and he writes for the
20 Washington Times, and he's now with the
21 Washington -- Washington Times.
22        MR. SCHMIDT:  Times or Post?
23        THE WITNESS:  Washington Times.  Good
24   God, not the Washington Times.
25   Q.   It's a different -- it's a different

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 34

1  outfit.
2      A.    Yeah.  And the -- it's certainly
3  conservative, it was run under the time when
4  Arnaud de Borchgrave was the editor, along with
5  several other close friends, and he's now at the
6  Washington Free Beacon, I think, mostly.
7      Q.    Is that another right of center
8  publication?
9      A.    Um-hum.  I think I would call it a
10  center and conservative.  I wouldn't call it
11  right of center.
12     Q.    I was --
13     A.    I mean, really?
14     Q.    -- asking for your -- I was asking for
15  your understanding of it.
16     A.    Well, you've got my understanding of
17  it.
18     Q.    Thank you.
19     A.    You're welcome.
20     Q.    And how do you know Lianchao Han?
21     A.    Lianchao and I have crossed paths in
22  Washington off and on over the years, maybe
23  because of some of the Taiwan activities in
24  Washington.  But I've always sort of known him
25  and liked him.  I never worked with him.  But

Page 35

1  he's an excellent individual.
2      Q.    Did Strategic Vision pay any referral
3  fees or any other consideration to Mr. Han for
4  introducing Mr. Guo to you?
5      A.    Good Lord, no.
6      Q.    What about Mr. Gertz?
7      A.    Never.
8      Q.    Okay.  And going back to this first
9  meeting document.  Did you present this document
10  to Mr. Guo or was this just you and Mr. Waller's
11  notes?
12     A.    I know that we presented one that was
13  very similar to this, and I think a bit more --
14  it might have been a bit more extensive, but it
15  encapsulated.  We were probably trying to keep it
16  short and concise, but we did -- we did work on
17  this vision based upon what both Mr. Gertz and
18  Lianchao had told us about him and what his sort
19  of ambitions were for remaining in the United
20  States.
21     Q.    So did you and Dr. Waller create this
22  document after your meeting with Mr. Han and
23  Mr. Gertz?
24     A.    Yes.
25     Q.    And how did that collaboration come

Page 36

1  about?
2      A.    Well, I talked -- I mentioned to Bill,
3  I said, one of the people that I like a lot and
4  have worked with on a couple of things, but not
5  monetary, but just ideological, was Dr. Waller,
6  and I'd like to bring Dr. Waller in on this.  And
7  he said, wow, that would be phenomenal.  So, here
8  we are.
9      Q.    And did you speak to Mr. Guo before
10  putting this document together or was this just
11  based on your conversations with Mr. Han and
12  Mr. Gertz?
13     A.    I know that we had a preliminary one,
14  then we met with Mr. Guo, we did something
15  similar to this and gave it to him, I believe,
16  and -- and then we had, obviously, several other
17  meetings after that with Mr. Guo.
18     Q.    So, just speaking about this first
19  meeting.  Where did it occur?
20     A.    With Mr. Guo?
21     Q.    Yes.
22     A.    Okay.  In his apartment at the
23  Sherry-Netherland, his penthouse.
24     Q.    And when was that?
25     A.    I don't have a date on here, so I can't

Page 37

1  tell you.
2      Q.    From your memory.
3      A.    Well, it would have been in December at
4  some point.
5      Q.    December 2017?
6      A.    Yes, sorry.
7      Q.    That's okay.  What occurred at that
8  meeting?  What did you present and what did
9  Mr. Guo say?
10     A.    I believe Lianchao was also there -- I
11  know he was there, and Dr. Waller and I were
12  there, and we discussed his -- that is, Miles
13  Guo's life, his intentions, his questions about
14  investigative work; all of that was part of the
15  conversation.
16        He wanted to be -- he wanted to have a
17  presence in Washington, he wanted to buy real
18  estate in Washington, he wanted to buy a very
19  large bank building in Washington right across
20  from the White House, he wanted to buy a huge
21  house in Washington.  All of these things were
22  part of his sort of image building.
23     Q.    And those were his ideas?
24     A.    Yes.
25     Q.    But you hadn't met with Mr. Guo before

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 38

1  this meeting, right?
2       A.    No.  But the meeting went on for hours
3  and hours and hours.  You're asking what was the
4  content of the meeting.
5       Q.    Yes.
6       A.    Yes, that's what I'm saying.
7       Q.    So was this document written during the
8  meeting or before?
9       A.    I think this one may have been -- may
10 have been before, but -- yes, I think it was
11 before, because it doesn't mention the real
12 estate and so forth that he got into during the
13 meeting.  So this might have been sort of like
14 a -- it is sort of a vision paper, based on a
15 conversation with Mr. -- with Bill Gertz and with
16 Lianchao Han.
17      Q.    What do you recall saying about
18 Strategic Vision's capabilities and background?
19 Actually, let's just start with capabilities.
20            Do you recall presenting about what
21 Strategic Vision could do for Mr. Guo?
22      A.    We were talking ideologically mostly
23 about what could be done to help present his
24 views on communist China, on mainland China.  And
25 so we didn't get into specifics at the very

Page 39

1  beginning.  We just started sort of having an
2  initial conversation about how -- how we felt he
3  could be represented in Washington and how we
4  could show his positive side.
5       Q.    And did you explain what Strategic
6  Vision does or how Strategic Vision could help
7  with that?
8       A.    Probably.
9       Q.    Do you recall what, if anything, you
10 said about that?
11      A.    Not precisely, no.  Generalities.  This
12 was someone we just met, and it is the custom in
13 Asia not to dive into a lot of details unless
14 you're asked.
15      Q.    So did Mr. Lianchao Han or Mr. Guo ask
16 about Strategic Vision's capabilities?
17      A.    Eventually.
18      Q.    But not at this meeting?
19      A.    Not entire -- I don't recall.
20      Q.    Okay.
21      A.    But they could have, but I don't
22 precisely recall.
23      Q.    Was investigatory research discussed in
24 any detail at this first meeting?
25      A.    It could have been.  It could have

Page 40

1  been.
2       Q.    What do you remember about that?
3       A.    I remember that we discussed that Miles
4  Guo said that he had a number of people that he
5  wanted to know more about that were in mainland
6  China, but we didn't have any specifics at that
7  time what he was talking about.
8       Q.    Did Strategic Vision mention that it
9  could provide that information or that it had
10 that capability?
11      A.    I don't recall.  It could have.
12      Q.    Turning to the last page there, SV79.
13 It says, "Mr. G should maintain his statesmanlike
14 status by not engaging in everyday defense or
15 counterattack, and should leave it up to his own
16 surrogates."
17            Do you see that?
18      A.    Where is that?
19      Q.    It's the first sentence of the last
20 paragraph.
21      A.    Oh, the regime, yeah.  Okay.  "Those
22 surrogates will be in journalism, academia,
23 business, policy."  Yes, yes.  Okay.
24      Q.    Do you remember talking about that
25 subject at this meeting?

Page 41

1       A.    Probably.
2       Q.    And what do you remember?
3       A.    I don't remember precisely.  It's over
4  a year ago.
5       Q.    And you don't remember what Mr. Guo
6  said about that, or anybody else?
7       A.    It was a general, initial conversation
8  with somebody that we did not know, and we were
9  asked to produce something that we felt could be
10 a good vision for him to consider, perhaps, yeah.
11           (Wallop Exhibit 4, Document entitled
12      "Three-Year Timeline" Bates stamped
13      SVUS000080, marked for identification.)
14      Q.    Do you recognize what's been marked as
15 Waller 4?
16      A.    Yes.
17      Q.    And what is this document?
18      A.    Wallop.
19      Q.    Oh, sorry, Wallop.  I apologize.  The
20 W. Wallop 4.
21      A.    Yes.
22      Q.    Did you create this document?
23      A.    Yes.  Mike and I did.
24      Q.    When was that?
25      A.    That was at the second meeting with

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 42

1   Miles Guo.
2       Q.      So you remember literally typing and
3   creating this document during the meeting?
4       A.      No.  Prior to the meeting.
5       Q.      Okay.  And when was this second
6   meeting?
7       A.      Again, I'd have to ask Mike.  I think
8   it was -- I know it was in December of 2017.
9       Q.      And who was present?
10      A.      Dr. Waller, Mike Waller, myself,
11  Lianchao, and, obviously, Miles Guo.
12      Q.      What was Lianchao's role in the
13  meeting; was he translating?
14      A.      Yes, mostly.  And explaining, walking
15  through some of the explanations, not only the
16  translation, but, again, we were having a
17  generalized conversation.
18      Q.      And just for the clarity of the record.
19  Mr. Han was translating for Mr. Guo?
20      A.      Yes.  Both ways.
21      Q.      Of course.
22      A.      Mr. Guo speaks very good English, so he
23  doesn't really need an interpreter, but it's
24  better to have one.
25      Q.      Did Mr. Han actually read this whole

Page 43

1   document to Mr. Guo and translate it for him; was
2   that part of the meeting?
3       A.      Yes.  I think we walked through each
4   one of these paragraphs, yes.
5       Q.      And going back to the prior document,
6   Exhibit 3.  Was the same process employed where
7   Mr. Han, to your understanding, was translating
8   the document for Mr. Guo?
9       A.      To my understanding, yes.
10      Q.      But, obviously, you don't speak
11  Mandarin, do you?
12      A.      A little bit.  Not as much as I'd like.
13      Q.      Fair enough.  But you're not fluent?
14      A.      No.
15      Q.      Okay.  And so, to the extent you
16  recall, what occurred at this second meeting?
17      A.      This was a broader timeline based on
18  the first meeting and the first vision paper that
19  we had in our discussion, and this gave sort of a
20  menu, so to speak, a la carte, or menu of ideas
21  as to how we could help Miles Guo, at his
22  request, to set up sort of a strategic plan for
23  him.
24      Q.      So what was his response to the
25  presentation that you made?

Page 44

1       A.      He liked it very much.
2       Q.      Does that include all of the items in
3   this timeline or was he more receptive to some
4   services than others?
5       A.      It was interesting.  He was very keen
6   on having a -- a big, a huge, large presence in
7   the way of a residence, and then also purchasing
8   the American Security and Trust building across
9   from the Treasury Department in Washington as an
10  office building for him.  He liked the idea of
11  the Washington-based educational and cultural
12  foundation, which we thought might be a good way
13  of exposing him to or introducing him to
14  Washington and the Hill, and working on a more
15  positive anti-communist role.
16      Q.      And in terms of this real estate
17  portion of it, acquiring what, a residence?
18      A.      Yes.
19      Q.      And also an office building, I guess,
20  for a foundation?
21      A.      Yes.  I just said that.
22      Q.      Yes.  I understand.  And so, is that a
23  service that Strategic Vision typically provides
24  for clients?
25      A.      Yes, sometimes.

Page 45

1       Q.      So Strategic Vision will help people
2   locate properties and acquire them?
3       A.      Correct.
4       Q.      Is that in the D.C. area or nationwide;
5   how does that work?
6       A.      Yes, both.  D.C. area, nationwide,
7   globally, whatever.
8       Q.      And how was that, let's just call it
9   real estate project, followed up on subsequently?
10      A.      Well, actually, Lianchao -- I picked up
11  Lianchao and Yvette at a hotel downtown off M
12  Street, because she wanted to see all of the
13  properties that we had in mind.  I think it must
14  have been obviously -- honestly I can't remember.
15  I think it was -- I think it was after this
16  second meeting, that she came to Washington, and
17  Lianchao lives in Washington, so we picked him
18  up, and I had a brochure, a set of brochures of
19  homes and the office building that we drove
20  around, because there are a lot of cameras in
21  Washington.
22          We put her in the back seat with
23  Lianchao.  I have a Jeep, so those windows happen
24  to have a, whatever it is, sun -- more blacked
25  out windows than the front two seats.

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 50

1 about Evermay for Miles Guo, because it would
2 have been a perfect, perfect house for Miles.  He
3 could have incorporated his 501(c)(3) in that
4 house, because it was used as a 501(c)(3)
5 foundation by both Harry Belin and the Japanese
6 pharmaceutical couple.
7           Since there was no movement, we didn't
8 go any further on it, because Miles obviously
9 didn't -- I don't know.  I don't know what
10 happened.
11      Q.    You kind of anticipated my next
12 question.  When did this kind of process stop or
13 end?
14      A.    Miles was mostly really, really anxious
15 to move on the investigative side of the famous
16 file that you're aware of.
17      Q.    Sure.
18      A.    So, on the individuals.  I have no
19 idea -- he changes his mind all the time, so I
20 have no idea what his change of heart was on
21 that.
22      Q.    When did -- if you recall, when did the
23 conversation or negotiations pivot to this
24 investigatory research area?
25      A.    Probably during the second meeting.

Page 51

1 Mike has got a much better memory about these
2 things.
3      Q.    Do you recall how that occurred, was it
4 that Strategic Vision presented its investigatory
5 capabilities and Mr. Guo got excited or did he
6 ask about it; what occurred?
7      A.    We were -- again, we were speaking
8 about it in generalities.  It's not something you
9 boast about.  It's not something you discuss in a
10 way that is -- well, it's just not something you
11 boast about.  You can discuss it, you can discuss
12 the activities that can happen, and on a
13 hypothetical basis.
14      Q.    Did there come a time when Strategic
15 Vision offered to provide the sample
16 investigatory research on this --
17      A.    Yes.
18      Q.    -- vein of services?
19      A.    Yes, I believe there was.
20      Q.    When was that?
21      A.    I don't have the date.
22      Q.    Just generally, was it in this
23 December --
24      A.    It was in that December --
25      Q.    -- 2017 time frame?

Page 52

1      A.    That was in that December 2017 time,
2 yes.
3      Q.    What was -- was it research that was
4 offered or did Mr. Guo ask for that?
5      A.    I believe he gave us a name, and I
6 believe that we then had an exploratory peek into
7 what we could find initially.
8      Q.    So what was that exploratory research?
9 What was done by Strategic Vision?
10      A.    It was a -- it was done by our team, or
11 the initial team, before we even had a team, that
12 was contracted by us.  This was sort of a
13 freebie, to take a peek into this individual's
14 name, whatever, background.  And he gave us the
15 name.  I believe it was the number 1 name on the
16 folder that you have.
17      Q.    Is that Anita Suen?
18      A.    Yeah.
19      Q.    And that name was given to someone who
20 has been described by Strategic Vision as the
21 leader of Team 1?  Was that the --
22      A.    What?  I'm sorry, I don't understand
23 that question at all.
24      Q.    Maybe we'll get to it, we can define
25 it.  Let's just put it this way.  Who was that

Page 53

1 information regarding Anita Suen given to to do
2 the research?
3      A.    Mike.
4      Q.    Oh, okay.  Mike Waller?
5      A.    Yes.
6      Q.    Do you know what Mr. Waller did with
7 that information?
8      A.    Not precisely, no.
9      Q.    What understanding at all did you have
10 of what Mr. Waller would do with that
11 information?
12      A.    He was going to explore some of his
13 channels.
14      Q.    Do you know Dr. Waller's what you
15 describe as channels or --
16      A.    No, not all of them, no.
17      Q.    So you don't know all of the --
18      A.    We have channels.  We both have
19 channels.  I have channels, he has channels.
20      Q.    And do you deliberately keep your
21 channels confidential or secret from one another
22 for --
23      A.    Yes.
24      Q.    And why is that?
25      A.    For security.

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 70

1     about the fraud beyond --
2            THE WITNESS:  Yes.
3            MR. SCHMIDT:  -- what you read in the
4     media?
5            THE WITNESS:  Yes.
6       Q.   Okay.  And that's from who; how did you
7     hear about that?
8            You can look at me.  I'm asking you the
9     questions.
10      A.    Privileged -- privileged sources.
11      Q.    Okay.  So you're refusing to answer
12    that question based on privilege?
13      A.    Yes.
14      Q.    And what privilege is that?
15           MR. SCHMIDT:  Do you want to go talk
16    about it?
17           THE WITNESS:  Yes.
18           MR. SCHMIDT:  Why don't we go off the
19    record and see what's going on.
20           MR. GRENDI:  I'll tell you what, why
21    don't we just put a pin in it, and keep
22    going.
23           MR. SCHMIDT:  That's fine, too.  Okay,
24    we can do it at a break.
25           MS. TESKE:  Let's take a break for a

Page 71

1     quick second.
2            THE VIDEOGRAPHER:  Off the record at
3     11:29.
4            (Whereupon, a short recess was taken.)
5            THE VIDEOGRAPHER:  Back on the record
6     at 11:35.
7            MR. SCHMIDT:  We just stepped out to
8     discuss if there was any potential privilege
9     issue.  I think it's more of a
10    confidentiality issue.  She had actually
11    already revealed the answer to the question
12    in response to a prior question.  And I
13    think the question when we left was if she
14    knew anything beyond what she had read in
15    the public papers, and the answer was yes.
16    And I think your next question was, what.
17    And I think Ms. French is ready to respond
18    to that.
19      Q.    Go ahead.  How do you know something
20    beyond the public record about Mr. Guo allegedly
21    stealing $3-1/2 billion from the United Arab
22    Emirates?
23      A.    Based on conversations that I had with
24    members of the family with whom he allegedly
25    defrauded them of over $3 billion.

Page 72

1       Q.    And which family is that?
2       A.    The Al Nahyan family.
3       Q.    Is that on this list?  I'm sorry, I
4     have trouble reading your handwriting.
5       A.    Yes, it is.
6       Q.    That's the one, two, three, four --
7     fifth one from the top?
8       A.    Yes.
9       Q.    And what did they say to you about
10    that?
11      A.    When I mentioned his name, they said
12    that, yes, they were fully aware of him and that
13    it was not a pleasant experience.
14      Q.    Why were you talking to the Al Nahyan
15    family about Mr. Guo?
16      A.    Because Mr. Guo, I believe, had been
17    telling me with this document that he knew all of
18    these people, and I was checking on whether he
19    did know any of these people.  And so it came up
20    that he defrauded the UAE and the family of over
21    $3 billion, as you well know.
22      Q.    And you didn't agree to keep your
23    relationship with Mr. Guo confidential when you
24    were speaking with him?
25      A.    That had nothing to do with

Page 73

1     confidentiality.  He was the one that gave me --
2     he asked me for these references.  I wanted to
3     make sure we had a reference on him.  He said
4     that he worked very closely with the UAE, and it
5     turned out, I guess, he did.
6       Q.    When were these conversations you had
7     with the Al Nahyan family?
8       A.    Oh, probably in -- probably about six
9     months after the contract began.
10      Q.    So you were checking references on
11    Mr. Guo after the agreement was over with?
12      A.    Yes.  We had trusted him up until that
13    time.
14      Q.    Sure.
15           MR. SCHMIDT:  Let's not make any
16    commentary.
17           MR. GRENDI:  That's fine.
18      Q.    Let's go with the next exhibit.
19           (Wallop Exhibit 6, Document entitled
20           "Time to Get Them Beginning the
21           Psycho-Political Campaign For China", marked
22           for identification.)
23      Q.    Ms. Wallop, do you recognize this
24    document?
25      A.    Yes, this is one of Mike's documents.

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 74

1      Q.     It's called "Time to Get Them."
2             Do you know how that title was reached,
3  created?
4      A.     Yes, yes.
5      Q.     How's that?
6      A.     It came as a result of conversations
7  with Guo, Lianchao and Mike and myself regarding
8  the -- regarding the communists working within
9  The United States, from China DRC, as well as
10  elsewhere.
11      Q.     So in the chronology of meetings we've
12  been talking about, was this document created
13  before the first meeting, the second meeting, the
14  third meeting?  When did it --
15      A.     Oh, it had to have been after the
16  second or third meeting, because there's this
17  photograph of Anita here.
18      Q.     And that's on SVUS387?  If you look at
19  the bottom right-hand corner --
20      A.     Correct.
21      Q.     -- that's where those --
22      A.     Or maybe that's Yvette.  I'm not sure.
23  No, I think it is Anita.
24      Q.     Okay.  Was this a PowerPoint
25  presentation?

Page 75

1      A.     Yes.
2      Q.     And was it presented as a PowerPoint on
3  a computer or did you print it out?  How was
4  it --
5      A.     It might have been on a USB key.
6      Q.     And did you participate in creating
7  this document or did Mr. -- Dr. Waller create it
8  himself?
9      A.     Dr. Waller did much of it.  I worked
10  with him on some of it; not all of it, but some
11  of it.
12      Q.     So you made edits or --
13      A.     Yes.
14      Q.     And when was this presented to -- well,
15  let's start with striking that.
16             Who was this presented to?
17      A.     Well, this would have been presented to
18  Guo.
19      Q.     Anyone else?
20      A.     And probably Lianchao.  And, obviously,
21  myself.  I can't remember if Yvette was in there
22  or not.  He often didn't want her in the room,
23  so, who knows.
24      Q.     I understand.  But you don't recall
25  specifically who was in the room when this was

Page 76

1  presented?
2      A.     Well, it would have been one of the
3  four -- I mean all four of us.  It would have
4  been Lianchao, Guo, myself and Mike.
5      Q.     Okay.  Do you remember where that --
6      A.     And possibly Yvette.
7      Q.     Okay.
8      A.     I don't remember.
9      Q.     And do you remember where that was?
10      A.     In his flat, in his apartment at the
11  Sherry-Netherlands.
12      Q.     Okay.
13      A.     All meetings were there with him.
14      Q.     That's helpful.  So you never met with
15  Mr. Guo in Washington, D.C.?
16      A.     No.
17      Q.     Okay.  Let's look at 387.  It says,
18  "build and operate a secret system for
19  micro-targeted intelligence collection and
20  analysis."  Do you see that?
21      A.     Yes.
22      Q.     Is that a service that Strategic Vision
23  would provide or someone else?
24      A.     Through Mike and his teams, and some of
25  my people, yes.

Page 77

1      Q.     What do you mean by your people?
2      A.     Some of my channels, as we discussed
3  earlier.
4      Q.     I see.  So in terms of this service,
5  the game plan was for Dr. Waller to do most of
6  the research, is that fair to say, through his
7  channels?
8      A.     I would say it was equal.
9      Q.     Okay.
10      A.     It depends.  I mean, it depended on
11  which target we were working with.
12      Q.     So I have some understanding of what
13  Dr. Waller's process and capabilities were from
14  his deposition.  I want to know what -- what it
15  is that you personally would provide as a service
16  in connection with micro-targeted intelligence,
17  collection and analysis?
18      A.     It depended on which target and which
19  channels we both used collectively to bring the
20  information together on individuals or documents.
21      Q.     Right.  And I'm trying to understand
22  what --
23      A.     I don't --
24      Q.     -- process --
25      A.     I can't answer that.

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 78

```
1     Q.   Well, I didn't even ask a question.  So
2  I want you to just wait for me to ask, and then
3  you can answer.
4     A.   Go ahead.
5     Q.   Yes, thank you.  So I want to
6  understand what part of the process you would
7  participate in.  What would you do to help in the
8  collection process or accessing of the channels
9  process?
10    A.   Collection and gathering.  It was like
11 hunting and gathering.  We both did it.
12    Q.   And what would you do in connection
13 with this engagement?  What was it that you would
14 do?
15    A.   We would collect --
16    Q.   You.
17    A.   -- through my channels.
18    Q.   Right.
19    A.   Him through his channels.
20    Q.   And what channels did you access in
21 connection with this engagement?
22         MR. SCHMIDT:  Just to -- objection for
23    a second here.  This is a 30(b)(6).
24         THE WITNESS:  I don't understand the
25    question.
```

Page 79

```
1          MR. SCHMIDT:  So you're saying you as
2     Strategic Vision, or are you saying you
3     French Wallop?  How do you want to do it?
4          MR. GRENDI:  Let's do Strategic Vision.
5          MR. SCHMIDT:  Yeah.  I mean, that's
6     really the question here.
7          MR. GRENDI:  That's fine.
8          THE WITNESS:  Okay.
9     Q.   What did Strategic Vision do in terms
10 of collection and analysis?
11    A.   That's what we did, we did collection
12 and analysis.
13    Q.   So there's no more specificity --
14    A.   Through our own sources.
15    Q.   -- to it than that?  What does that
16 mean?
17    A.   How do you put a legal case together?
18 You have to start with bits and pieces.  So
19 that's what we were doing.  We were each
20 collecting bits and pieces to make the cases.
21    Q.   Let me ask it this way.  Did you ask
22 people in your network, do you know who Anita
23 Suen is?  What do you know about her?
24    A.   No.
25    Q.   So I'm trying to understand what it is
```

Page 80

```
1  you did, Strategic Vision, to collect
2  information?
3          MR. SCHMIDT:  Objection.  She's talked
4     about going out and getting Mike Waller and
5     putting that together --
6          MR. GRENDI:  I'm asking about anything
7     else.
8          MR. SCHMIDT:  Okay, anything else.
9     A.   Collecting teams.  Collecting teams.
10    Q.   Let's do it this way.  Setting aside
11 what Mr. Waller and his teams did.  Was there any
12 other teams accessed to provide information in
13 connection with this investigatory research?
14    A.   Yes.
15    Q.   And who were they?
16    A.   There were some from the U.K., there
17 were some from Israel, there were some from the
18 Middle East, there were some from our networks.
19    Q.   And now I'm talking about you
20 personally.
21    A.   Yes.
22    Q.   Are these people that you personally
23 contacted?
24    A.   Yes.
25    Q.   Okay.  That's all I'm trying to
```

Page 81

```
1  understand.  Without naming any names, would that
2  involve calling people on the phone or emailing
3  them?
4     A.   Rarely.  It's face-to-face.
5          MR. SCHMIDT:  Just listen to the
6     question.  Don't be distracted by the
7     document for now.
8     Q.   And so, in connection with the research
9  in this matter, how many face-to-face meetings
10 did you have with people in your contacts?  I'm
11 talking about you, Ms. Wallop.
12         MR. SCHMIDT:  Objection.
13    A.   I have no idea.  Many.
14    Q.   You said you rarely do telephone calls.
15 Did you do some in connection with this research
16 agreement?
17    A.   No.
18    Q.   What about internet research, did you
19 do any internet research in connection with this?
20         MR. SCHMIDT:  Objection.  Her
21    personally?
22    Q.   Strategic Vision.  Did Strategic Vision
23 do any internet research in connection with this
24 research?
25    A.   Lightly.  That was not our -- that was
```

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 82

1   not our way of doing it.
2       Q.    And what about you personally?
3       A.    No.
4       Q.    It says in this document that the first
5   ten targets are identified, do you see that?
6       A.    What page?
7       Q.    387.
8       A.    Yes.
9       Q.    What did you understand that to mean?
10      A.    Well, Guo gave us -- Miles Guo gave us
11  a large packet of names, and, in that -- in the
12  first ten, which they upped it to 15 in the first
13  month, but the first ten targets were identified,
14  and then they changed their mind and asked for 15
15  for the first month.  So that's -- those were his
16  targets.
17      Q.    So these ten targets, are those
18  referred to as fish in the signed research
19  agreement?
20      A.    Correct.
21      Q.    And it says, "monitor the ten targets
22  for several months to understand their habits,
23  patterns, personal and professional networks,
24  businesses and corruption."  Do you see that?
25      A.    Correct.

Page 83

1       Q.    Who would do that work of monitoring?
2       A.    Our team.
3       Q.    And by our team, what encompasses the
4   Strategic Vision team for this research
5   agreement?
6       MR. SCHMIDT:  Objection.  Go ahead.
7       A.    The particular team, we called it Team
8   1, and that's what they were assigned to do.
9       Q.    So Team 1 was assigned the monitoring
10  of the ten targets referred to here?
11      A.    Correct.
12      Q.    Okay.  And do you know the name of
13  anyone on Team 1?
14      A.    No.
15      Q.    Do you know the leader of Team 1, the
16  name of the leader of Team 1?
17      A.    I know his acronym.  I don't know his
18  name, his full name.  This was through Mike.
19      Q.    So you don't know the full name of the
20  leader of Team 1?
21      MR. SCHMIDT:  Yes or no, if you know.
22      Q.    I'm asking a yes or no.
23      A.    No.
24      Q.    So, specifically, do you know when the
25  first ten targets were identified?

Page 84

1       A.    When Guo threw that whole document down
2   on the coffee table in his apartment and he said,
3   these are the people I want investigated, these
4   are -- I said, where did this list come from?
5   And he said, I paid $250 million for this list.
6   I said, wow, okay.  So that's when I knew who the
7   first ten targets were.
8       MR. GRENDI:  Let's do Exhibit 7.
9       (Wallop Exhibit 7, Document entitled
10  "1:  Anita Yiu Suen", marked for
11  identification.)
12      Q.    Do you recognize what's been marked as
13  Wallop 7?
14      A.    Correct, I do.
15      Q.    And is this the document that you just
16  said Mr. Guo threw down on the table?
17      A.    It looks like it.
18      Q.    Okay.  So, to your recollection,
19  Mr. Guo threw a paper copy of this document onto
20  a table at some point during a meeting?
21      A.    No, on -- onto his coffee table in his
22  sun room, yes.
23      Q.    When was that?
24      A.    During the -- probably the second or
25  third meeting we had with him in New York, in

Page 85

1   December of 2017.
2       Q.    So did you keep that paper copy that
3   was thrown on the table?
4       A.    Well, I had this copy, I mean, the copy
5   of the copy.  I mean, the original that he gave
6   us.
7       Q.    I see.  So you retained a paper copy of
8   what's been marked as Wallop 7?
9       A.    That's correct.
10      Q.    And was that -- that was before the
11  contract was signed, right, the research
12  agreement that's the subject of this action?
13      A.    No.  I think we -- I saw the document,
14  but we didn't get the full document because of
15  the famous flash drives that were corrupted --
16      Q.    Right, but --
17      A.    -- by Yvette.
18      Q.    -- I just want to understand what
19  happened to the paper version that was --
20      A.    Oh, I didn't -- he didn't give that to
21  us at the time.  He kept his copy.
22      Q.    You didn't receive --
23      A.    No, no, no --
24      Q.    -- a paper copy from him?
25      A.    -- no, no, no.  He just showed it to

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 86

```
 1   us.
 2       Q.     I see.
 3       A.     He threw his copy down on the table.
 4       Q.     And this was at the second or third
 5   meeting?
 6       A.     Yeah.
 7       Q.     Okay.
 8       A.     Yes.
 9       Q.     And you did not retain a copy from that
10   meeting?
11       A.     No.
12       Q.     And did you go through the paper copy
13   that was on the table?
14       A.     With him?
15       Q.     Yes.  Or on your own.
16       A.     Well, we glanced at it.  Mike was
17   there.  We glanced at it to try to get an idea as
18   to who it was, what it was.
19       Q.     We'll come back to this.  Going back to
20   Exhibit 6.  On 387, it says, "Document everything
21   as leverage to gain concessions, protect people,
22   use as political weapon, or as aid in criminal
23   prosecution and asset recovery."
24              Do you see that, it's the fourth or
25   fifth bullet down?
```

Page 87

```
 1       A.     I don't have it.
 2       Q.     Oh, I'm sorry.
 3       A.     So, what page?
 4       Q.     The same one we've been looking at,
 5   387.
 6       A.     So what would you like to look at?
 7       Q.     Where it says, "Document everything as
 8   leverage to gain concessions, protect people, use
 9   as political weapon, or as aid in criminal
10   prosecution and asset recovery"?
11       A.     Correct.
12       Q.     What is the -- what was that about;
13   what does that mean in terms of the services to
14   be provided?
15       A.     This was what Mike was referring to
16   with regard to the Team 1.
17       Q.     So Team 1 was going to?
18       A.     Take a look at that, yes.
19       Q.     And what kind of leverage was sought?
20       A.     I guess, criminal leverage, depending
21   upon the individuals that we were investigating,
22   per Guo's instructions.
23       Q.     It also says "protect people."  What
24   was -- to your mind, what was the -- what was
25   that about?
```

Page 88

```
 1       A.     I don't remember.  I don't know
 2   precisely.
 3       Q.     Okay.  And you don't remember
 4   discussing whether -- what the political weapon
 5   would be?
 6       A.     Well, a political weapon, which is what
 7   Guo wanted to use towards his investigation of
 8   these individuals.  He was going to use it
 9   against them, for whatever purpose.
10       Q.     But you don't know the purpose?
11       A.     Not entirely.
12       Q.     Okay.  A couple of bullets down it
13   says, "Break the Party's control of corrupt
14   information" -- or "corruption information" I
15   should say.  Do you see that?
16       A.     Yes.
17       Q.     What is "the Party's control"?  Which
18   party are we talking about there?
19       A.     Talking about the communist party.
20       Q.     And what control of corruption
21   information does the communist party have?
22       A.     Well, Guo had said that the CCP, or the
23   communist party of China, there was a great deal
24   of corruption within the leadership, and, as a
25   result of that, he wanted to find as much
```

Page 89

```
 1   corruption as possible, and he wanted us to
 2   investigate and retrieve that kind of corruption.
 3   In other words, funds that would have been taken
 4   out of the country illegally, cash payments, all
 5   of these things that were part of that.
 6       Q.     I understand.  And so going to the next
 7   page, 388.  It says, "Reduce political threats to
 8   yourself and your cause."
 9              What did you understand is the
10   political threats to whoever yourself or your
11   cause is there?
12       A.     That was to Guo.
13       Q.     Okay.
14       A.     Political threats to Guo and Guo's
15   cause.
16       Q.     And what were those political threats?
17       A.     Well, he said that they were monetary
18   and political, and that many people were after
19   him either for monetary damages or corruption,
20   both by the Chinese officials as well as,
21   perhaps, his own corruption issues.  I don't
22   know.
23       Q.     Did you look into that at all in terms
24   of --
25       A.     This was a preliminary -- this was a
```

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 90

1  preliminary document that Mike had put together;
2  so, no, we were not under contract to look into
3  it.
4        Q.    Okay.  So you didn't do any work
5  regarding Mr. Guo or his business prior to --
6        A.    The contract?
7        Q.    -- the execution of the contract on or
8  about January 6, 2018?
9        A.    No.
10       Q.    You didn't access your network to
11  determine whether this was someone you wanted to
12  do business with or not?
13       A.    We had Bill Gertz, who was one of the
14  finest intellects on Chinese corruption, and
15  reporters, journalists, and also Lianchao, again,
16  of the highest sterling standards.  When they
17  asked us to look into it, that's what we did.
18  That was looking into putting together a program
19  that would help somebody that we believed at the
20  time was absolutely anti-communist.
21       Q.    I see.  So you relied up -- let me put
22  it this way.  Strategic Vision relied upon the
23  recommendation of Bill Gertz and Lianchao Han in
24  terms of deciding to do business with, or
25  deciding to enter into the research agreement?

Page 91

1        A.    Correct.
2        Q.    Let's just go to SVUS390.
3        A.    Um-hum.
4        Q.    It says, "Network With Russian
5  Opposition and Chinese Expats."  Do you see that?
6        A.    Correct.
7        Q.    Is this a service that you would
8  provide or Mr. Waller would provide?
9        A.    Both of us did.
10       Q.    Okay.  Why was Strategic Vision
11  recommending that Mr. Guo network with Russian
12  opposition and Chinese expats?
13       A.    Well, the photograph that you have
14  here, that's in this is Mikhail Khodorkovsky.
15  Okay?  Mikhail Khodorkovsky is a client of mine,
16  and he is an anti-Putin and pro-democracy leader,
17  opposition leader for Russia; so, therefore, we
18  felt that this might be a good person for Guo to
19  essentially team up with on certain ideological
20  issues.
21       Q.    And how would that synergy or
22  collaboration work?
23       A.    Through me.
24       Q.    Right.  But just a little more
25  specificity.  How would Mr. Guo, or whoever, team

Page 92

1  with Russian opposition and Chinese expats?
2        A.    Through me and certain ideas that we
3  had to combine our ideological belief in
4  democracy.
5        Q.    And -- right.  How would those ideas be
6  executed, what sort of --
7        A.    Through dialogue.
8        Q.    -- activities?
9        A.    Through dialogue.
10       Q.    And you also have links with Chinese
11  people inside Russia?
12       A.    We would have, yes.
13       Q.    That's you and Mr. Waller?
14       A.    Yes.
15       Q.    It says, "for propaganda and
16  organizational purposes."  Do you see that?
17       A.    Yes.
18       Q.    What would be the propaganda and
19  organizational purposes?
20       A.    Media and social media, probably.
21       Q.    So, in other words, messaging of
22  anti-communist, pro-democracy rhetoric?
23       A.    Correct.
24       Q.    Would the Russian opposition group be
25  involved in collecting investigatory research or

Page 93

1  is that a separate group?
2        A.    It would be separate.
3        Q.    Let's go to 394.  It says, "Target
4  Intelligence Capability:  Cost."
5        These costs here, are these prices that
6  Strategic Vision quoted?
7        A.    In a preliminary discussion, yes.
8        Q.    Okay.  So, initially, Strategic Vision
9  was offering $2,805,000 to have two teams monitor
10  one person?
11       A.    Yes.
12       Q.    And what would that monitoring entail,
13  just in terms of the types of surveillance or
14  investigatory work?
15       A.    It was hugely complex, and --
16       MR. SCHMIDT:  Keep going.
17       A.    It was hugely complex, and it had to do
18  with all the investigative tentacles that we
19  could reach within our channels.
20       Q.    So is that the full package of services
21  that Strategic Vision could provide in terms of
22  monitoring, that's like the full suite, call it
23  that?
24       A.    Except that he didn't accept it.
25       Q.    I understand that.  But was this --

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 102

1    Q.    It says, "sign MOU."  That's a
2  memorandum of understanding?
3    A.    That's correct.
4    Q.    Is that how Strategic Vision normally
5  contracts with its clients?
6    A.    Again, this is a preliminary overview.
7  This was a discussion.  We were discussing it
8  openly in a little meeting that we were having
9  with Mr. Guo.  So this was just sort of a menu of
10 deciding what we would do and how we would
11 perform.
12   Q.    Does Strategic Vision normally sign
13 written agreements with its clients?
14   A.    Yes.
15   Q.    Does Strategic Vision have a standard
16 contract that it uses for its client engagements?
17   A.    No.
18   Q.    So you don't have a stock agreement
19 that you normally use when --
20   A.    No client's the same.
21   Q.    So, prior to signing the research
22 agreement, did you tell Mr. Guo that you had an
23 in-house team of investigators at Strategic
24 Vision?
25   A.    This is a fascinating misnomer.

Page 103

1    Q.    What -- what term is that that you're
2  calling --
3    A.    No.
4    Q.    -- a misnomer?
5    A.    No.
6          MR. SCHMIDT:  Just answer the question.
7    A.    No.
8          MR. SCHMIDT:  Let him follow -- he'll
9  follow up if he wants to follow up.
10   Q.    Okay.  So Strategic Vision does not
11 have an in-house team of investigators?
12   A.    No.
13   Q.    And you never told Mr. Guo that you had
14 20 employees, did you?
15   A.    I said that we worked with a team of
16 people.  I did not say that we had 20 employees.
17   Q.    Okay.  Did you ever tell him that you
18 had strong teams in Europe and the Middle East?
19   A.    Most likely, yes.
20   Q.    Again, this is all before signing the
21 research agreement, right?
22   A.    Yes.
23   Q.    And did you tell him you had
24 relationships with an Abu Dhabi princess?
25   A.    I said a -- no.

Page 104

1    Q.    What, if anything, did you tell Mr. Guo
2  about an Abu Dhabi princess?
3    A.    A Saudi -- it was not Abu Dhabi, it was
4  Saudi.
5    Q.    Okay.  What did you --
6    A.    To clarify, it's usual we have to
7  clarify.
8    Q.    Sure.  What did you tell Mr. Guo about
9  a Saudi princess?
10   A.    She was my roommate.
11   Q.    That was in college?
12   A.    No, in high school.
13   Q.    And is she a client of Strategic
14 Vision?
15   A.    No.
16   Q.    Okay.  Did you tell Mr. Guo that you
17 had, or that Strategic Vision had relationships
18 with clients in Saudi Arabia?
19   A.    Yes.
20   Q.    And in Iran?
21   A.    Many years ago, in Iran.
22   Q.    What about Turkey?
23   A.    Not a client.  A relationship.
24   Q.    And what about Qatar, did you tell him
25 you had clients in Qatar?

Page 105

1    A.    I did.  Past tense.  We don't work with
2  terrorists.
3    Q.    Okay.  What about Republican
4  politicians, did you ever tell Mr. Guo that you
5  worked for Republican politicians?
6    A.    Many.
7    Q.    So you told him you had -- that
8  Strategic Vision had worked for --
9          MR. SCHMIDT:  Just focus in on what you
10 told him.
11   A.    Yes.  I did, yes.
12   Q.    So you told Mr. Guo that you had
13 provided services to -- that Strategic Vision had
14 provided services to Republican --
15   A.    Personally.
16   Q.    -- politicians?
17   A.    Personally.  Not Strategic Vision.
18   Q.    Okay.  And what did that entail; that
19 was political campaigns or --
20   A.    Political campaigns.
21   Q.    And I'm going to guess those were
22 Republican --
23   A.    Republican.
24   Q.    -- politicians?
25   A.    Yes, presidential.

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 106

1      Q.     Which president, or nominee?
2      A.     Beginning -- it's okay, it's on the
3   record.  Beginning with the campaign for
4   President Reagan, President Bush, Dan Quayle,
5   obviously President Trump.
6      Q.     Did you tell Mr. Guo about all of these
7   or some of them?
8      A.     Yes.
9      Q.     Okay.
10     A.     He asked.
11     Q.     Did you tell him that you had influence
12  at the CIA?
13            MR. SCHMIDT:  Objection, but go ahead.
14     A.     I never would have used the word
15  influence.
16     Q.     How would you put it?
17     A.     Channels.
18     Q.     In other words, you have contacts at
19  the CIA?
20     A.     Yes.
21     Q.     And you could get information from them
22  that could be useful to a client from the CIA?
23     A.     No.  That's a trick question.
24     Q.     No, I'm not trying to trick you.  I
25  didn't -- if it came out that way, it wasn't my

Page 107

1   intent.
2      A.     Yeah, come on.
3      Q.     I'm trying to understand what your
4   channels to the CIA, what their use is?
5      A.     Information sources that are
6   unclassified.
7      Q.     And I would ask you the same question.
8   Did you tell him that you had contacts or
9   channels in the state department?
10     A.     Yes.
11     Q.     Did you ever tell him that you worked
12  for the CIA?
13     A.     Never.
14     Q.     Okay.  Did you ever tell him that
15  Mr. Waller worked for the CIA?
16     A.     Never.
17            MR. GRENDI:  Let's go to 8.
18            (Wallop Exhibit 8, Research Agreement,
19     January 1, 2018, marked for identification.)
20     Q.     This has been marked Wallop 8.  Do you
21  recognize this document at all?
22     A.     This was a draft document to -- to Guo
23  initially.
24     Q.     Who created it?
25     A.     I think Mike and I did.

Page 108

1      Q.     I'm just trying to --
2      A.     There were a lot of drafts running
3   around at the time, so, and the date is not
4   right.
5      Q.     When did you first start drafting an
6   agreement in connection with this case?
7      A.     When he asked us to, probably in --
8   around the 15th or so of December of 2017, after
9   several meetings.
10     Q.     Were there any other meetings, other
11  than the three we've talked about already, that
12  preceded this drafting?
13     A.     You know, you'd have to ask Mike.  I
14  don't think so, no.
15     Q.     When did you -- when did you do the
16  first draft?  Don't even worry about this
17  document.  I don't know if it is the first draft.
18     A.     When we had the vision documents, those
19  were sort of the beginning of the discussion.
20  This time to get them was also part of the vision
21  document that was on the flash drive, and it was
22  all in the conversation of trying to understand
23  what it was that Guo wanted.
24     Q.     So how did you go about doing the first
25  draft?  Did you and Mike sit down at a computer

Page 109

1   together, or what was the process?
2      A.     Yes.
3      Q.     Okay.  Where was that, at your home in
4   Virginia?
5      A.     Yes.
6      Q.     And you sat together and --
7      A.     Yes.
8      Q.     -- typed it out or --
9      A.     Sat together and discussed it and...
10     Q.     Did you -- was it handwritten notes
11  that you later had someone transcribe or did
12  you --
13     A.     No.
14     Q.     -- type it on the computer?
15     A.     No.  We just typed it up while we were
16  talking.
17     Q.     And did you do the typing or did he?
18     A.     He did the typing.
19     Q.     Okay.  And did you keep the original
20  draft that you created?
21     A.     I think this was the draft.  I don't
22  know.
23     Q.     Okay.  And do you recall giving Wallop
24  8 to Mr. Guo or Lianchao or Ms. Wang?
25     A.     I'm sure that we gave it to both of

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 114

1      A.    We just had an agreement of trust
2  between us.
3      Q.    What were the terms of that agreement?
4      A.    Probably 50/50, plus expenses.
5      Q.    And I take it this wasn't a written
6  agreement?
7      A.    No.  We never needed one.
8      Q.    Right.  So when did you and -- well,
9  when did Strategic Vision and Mr. Waller come to
10  this 50/50 split agreement?
11      A.    Well, after we had the agreement
12  finally signed, it had been going off and on, off
13  and on during all of December, we didn't know
14  whether we had an agreement or not.  And then,
15  when Yvette turned up with the first set of flash
16  drives that were corrupted, so then I had come to
17  New York -- we didn't have an agreement, per se.
18  We had a signed agreement.  We had no funds at
19  the time, at the first -- at the tail end of
20  December, when we were still all talking after
21  Christmas.
22          And, finally, the funds turned up --
23  I'm trying to answer your question here.  When
24  the funds turned up in, like, the 2nd or 3rd of
25  January of 2018, we still didn't know whether

Page 115

1  that was even going to work, and then they turned
2  up from somebody we'd never heard of, and so
3  forth and so on.  So we had to sit down and
4  decide what was going to go for the teams that we
5  were going to use and how we were going to
6  allocate the expenses and so forth.
7      Q.    So when -- when was the point in time
8  when Strategic Vision and Mr. Waller decided how
9  they were going to, as you described it, split
10  the -- split it 50/50?
11      A.    Not until sometime in January.
12  Probably the end of January.
13      Q.    So, well after the contract had been
14  signed --
15      A.    Yes.
16      Q.    -- and the --
17      A.    We were trying to figure out what
18  things were going to cost.
19      Q.    You said before that Strategic Vision
20  had sent money to Mr. Waller, or Dr. Waller?
21      A.    When?
22      Q.    I'm asking.  That's what my question
23  is.
24      A.    No.  I mean...
25      Q.    You said there was a wire.  What was

Page 116

1  the wire that was sent?
2      A.    The wire was not sent until the middle
3  of January or so.
4      Q.    Okay.  And was that wire for splitting
5  the profits or for something else?
6      A.    It was for beginning to start paying
7  the team as well as beginning to pay Mike.
8      Q.    Oh, so it was both?
9      A.    Yeah.  There were two wires.  Maybe
10  there were three wires, yeah.
11      Q.    So how much was the wire for the team?
12  And I assume that means Team 1?
13      A.    The preliminary amount for Team 1 was
14  at least 300,000.
15      Q.    And how much of that, if there was a
16  second wire or the same wire, was for Dr. Waller?
17      A.    Then there was a separate wire for
18  about 200 for Dr. Waller.  It could have been
19  250, I have to look.  We haven't done our tax
20  thing yet on it.  But about 250.  And then there
21  was an additional amount for expenses.
22      Q.    How much was that expense amount wire,
23  if you recall?
24      A.    Well, I think -- we're talking about
25  travel, and -- because he had to do a lot of the

Page 117

1  face-to-face collection, and last minute, which
2  costs a lot more; probably between 25 and 50, I
3  can't remember, thousand.
4      Q.    And is that the full extent of the
5  amount of money that's been paid to Dr. Waller in
6  connection with the research agreement that's the
7  subject of this litigation?
8      A.    I think there was a bit more, maybe
9  another 50, and that was based on certain
10  invoices that he had for -- for things that he
11  was -- that we had to pay.
12      Q.    I see.  And so what about -- let's just
13  set aside Dr. Waller.  Were there any other costs
14  that Strategic Vision incurred in connection with
15  this research agreement that didn't go through
16  Dr. Waller or one of his entities?
17      A.    There were -- there was a lot of travel
18  expense for Strategic Vision, face-to-face time
19  with these individuals overseas that I had to do.
20  There was -- there were other entities that were
21  also contracted to retrieve information.
22      Q.    Let's go one at a time, I'm sorry to
23  hop in.  But what were your -- what were
24  Strategic Vision's kind of direct travel
25  expenses?

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 118

1     A.    Oh, I would say probably at least
2  50,000.
3     Q.    And does Strategic Vision have records
4  and bank statements that would memorialize or
5  otherwise reflect all these payments you're
6  talking about here today?
7     A.    We would be able to give you an idea as
8  to what the costs are, yes.
9     Q.    So those records do exist?
10    A.    The records, the receipts, yes.
11  (*r)    MR. GRENDI:  Joe, obviously we're going
12        to call for the production of those
13        documents, we'll obviously send you a
14        letter, but to put that on the record.
15    Q.    I'm sorry, you were saying after travel
16  expenses, there were other costs as well?
17    A.    Yes.
18    Q.    What were those?
19    A.    The hiring of individuals overseas to
20  retrieve certain information that was only --
21  only in the U.K. or in Switzerland or in the
22  Middle East.
23    Q.    Okay.  And these are -- this is
24  separate from Team 1?
25    A.    Yes.

Page 119

1     Q.    And what was the cost of, let's just
2  say, the team you used to get information out of
3  the U.K.?
4     A.    It was about 20,000 U.S. dollars.
5     Q.    Is that a group called Fletcher?
6     A.    That's correct.
7     Q.    Okay.  What about, you said that maybe
8  a team in Switzerland or somewhere else?
9     A.    Yes.
10    Q.    What was the cost of that other team?
11    A.    I'd have to look.  I can't remember.
12  But it was minimal.  I mean, it wasn't -- it
13  wasn't -- it's like maybe 8, $10,000, something
14  like that.
15    Q.    Right.
16    A.    Some of it had to be done in cash.
17    Q.    How much of it was done in cash?
18    A.    Maybe that amount.
19    Q.    Eight to 10,000?
20    A.    Eight to 10,000, perhaps.  I hate cash.
21    Q.    If you would take a moment, are there
22  any other costs that you can think of that
23  Strategic Vision incurred because of this
24  research agreement?
25    A.    Well, the usual costs, telephone,

Page 120

1  travel, time spent working on this, lots of
2  different meetings with different people to try
3  to collect data.
4     Q.    Did Strategic Vision ever turn away any
5  clients because of this engagement?
6     A.    Yes, we did.
7     Q.    When was that?
8     A.    It was probably in March.
9     Q.    Of what year?
10    A.    I'm sorry.
11    Q.    That's okay.
12    A.    2018.
13    Q.    Sure.  March of 2018.  And why did
14  Strategic Vision turn that client away?
15    A.    Because we were still working on this,
16  we believed.  It could have been February, too.
17  I'd have to ask Mike.
18    Q.    And what's the name of that potential
19  client?
20    A.    I can't tell you.
21    Q.    So you're refusing to tell me that
22  because?
23    A.    I can't tell you.
24    Q.    No, I'm asking why you're not telling
25  me?

Page 121

1     A.    It's confidential.
2         MR. SCHMIDT:  Can you describe in
3     general terms at all or?
4         THE WITNESS:  Obviously, I cannot.
5         MR. SCHMIDT:  Okay.
6         MR. GRENDI:  I mean, obviously, we
7     don't accept that assertion of
8     confidentiality here, and we'll deal with it
9     at a later date.
10    Q.    So why was it that this confidential
11  client couldn't be engaged?
12    A.    We had a lot on our plate.
13    Q.    And how much was this potential client
14  willing to engage Strategic Vision for?
15    A.    We hadn't gotten that far.
16    Q.    So you don't know whether the --
17    A.    No.
18    Q.    -- potential client was going to be a
19  valuable one or not?
20    A.    No, I don't know.  I'd have to -- I'd
21  have to talk to Mike about it.
22    Q.    Was it Mike's client or your client, or
23  Strategic Vision's client I should say?
24    A.    We would have shared the client.
25    Q.    Okay.  And just generally, can you

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 130

1   found it silly or ridiculous?
2        A.   I did, but it helped him understand the
3   concept.
4        Q.   It says here that, "Any and all
5   materials provided by the client, that's Eastern
6   Profit, to the contractor, that's Strategic
7   Vision, will be treated with absolute
8   confidentiality and will not be shared by the
9   contractor with any other entity."
10            Do you see that in the third paragraph
11  of this research agreement?
12       A.   Yes.
13       Q.   What -- how does that work with
14  Strategic Vision in terms of sharing information
15  with other entities?
16       A.   Well, we had to share it with the
17  teams, in other words, for them to be able to do
18  the research.
19       Q.   Does the contract discuss that at all?
20       A.   It's very clear.  You can't have an
21  agreement -- you can't do the research unless you
22  give it to the teams to do the research, right?
23       Q.   I just asked you if that was in the
24  agreement?
25       A.   Yes.

Page 131

1        Q.   Where?
2        A.   With any other entity.  "Will not be
3   shared by any other entity."  It's not an empty,
4   it was a team.  An entity would be the Washington
5   Post, or you, or a third or fourth party that has
6   nothing to do with this research agreement.
7        Q.   So I just want to understand that.  So
8   then, the contractor referred to in the contract
9   refers to more than just Strategic Vision?
10       A.   Our teams.
11       Q.   Okay.
12       A.   You understand the teams that we had to
13  use.
14       Q.   I'm just trying to understand what the
15  contract says.  Does the contract say anything
16  about teams?
17       A.   Well, if you're in the business, you
18  understand teams are teams, and you have to use a
19  team with a -- as a part of the contract.  He
20  knew perfectly well what that meant.
21       Q.   I just asked you whether the contract
22  said it, that's all.
23       A.   I'm not a lawyer.  It wasn't drawn up
24  by a lawyer.
25       Q.   It says, "The contractor will conduct

Page 132

1   high quality original research and prepare
2   reports on subjects chosen at the client's
3   discretion."
4            Do you see that in that following
5   sentence?
6        A.   Correct, yes.
7        Q.   What original research did Strategic
8   Vision do in connection with this contract?
9        A.   Based upon what we received, we then
10  started diving into pulling information.
11       Q.   When you say we, are you talking about
12  the entity Strategic Vision or other people, like
13  teams?
14       A.   Teams, and Mike and myself.
15       Q.   Was there anyone else that did the
16  research, other than those three entities that
17  you just referred to, yourself, Mr. Waller, or
18  Dr. Waller, and the teams?
19       A.   The groups in -- the individual ones in
20  both Europe and in the U.K.
21       Q.   Is that, you mean Fletcher --
22       A.   Yes.
23       Q.   -- and the other entity that you
24  referred to --
25       A.   Yes.

Page 133

1        Q.   -- I guess, in Switzerland?
2        A.   Yes.
3        Q.   It says, "The contractor will produce
4   complete research reports and provide all
5   supporting data as indicated below."  Do you see
6   that, two or three sentences down?
7        A.   Yes.
8        Q.   So was Strategic Vision going to
9   produce all the reports or were the teams going
10  to create some of them?
11       A.   The teams were going to develop them on
12  the flash drives.  We were not going to do any
13  written reports.
14       Q.   Why wouldn't you do any -- why wouldn't
15  Strategic Vision do any written reports?
16       A.   Because we were trying to keep it as
17  secure as possible.
18       Q.   But you understood that the other
19  teams -- strike that.  Let me start over.
20  Strategic Vision understood that its teams would
21  create written reports?
22       MR. SCHMIDT:  Objection.
23       A.   No.
24       Q.   No?
25       A.   No, it never says anything here about a

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 134

1  written report.
2      Q.   No, I know, I understand that.  I'm
3  trying to understand whether Strategic Vision
4  understood whether its teams or independent
5  contractors would produce written reports?
6      A.   We would not produce written reports,
7  or we had no intention of doing that.  This
8  was -- these were face-to-face meetings,
9  face-to-face information, USB flash drives.
10     Q.   Oh, I understand.
11     A.   It was --
12     Q.   Maybe we're having a semantic --
13     A.   It was Guo's -- sorry.  It was Guo's
14 insistence on the security measure.
15     Q.   I want to clarify something here.  Do
16 you understand written to mean just like
17 something written on a piece of paper as opposed
18 to electronic?
19          MR. SCHMIDT:  That's how I understood
20     it.
21     A.   Yes.
22          MR. SCHMIDT:  That's how the question
23     was.  You went from flash drives to USBs --
24          MR. GRENDI:  No, hold on.  Hold on.
25          MR. SCHMIDT:  -- into written reports.

Page 135

1      So a written report is a written report.  It
2      has a standard connotation.  So you might
3      have to redo this.
4          MR. GRENDI:  Yeah, let's -- let's break
5      it out.  I didn't get it.  I always think of
6      writing as both.
7      Q.   So, including electronic documents, did
8  you understand that written materials would be
9  produced?
10     A.   No.
11     Q.   So you never -- Strategic Vision never
12 contemplated providing any written materials to
13 Eastern Profit?
14     A.   Correct.
15     Q.   So Strategic Vision understood
16 everything would be conveyed orally to the
17 client?
18     A.   Via flash drive.
19     Q.   So flash drive would be allowed.
20 That's -- I'm including a flash drive as a
21 writing.  In other words, if something is typed
22 or handwritten on a piece of paper, that's a
23 writing.  Can we agree on that?
24     A.   No.
25          MR. SCHMIDT:  I'm actually seriously

Page 136

1  confused.  I don't know what you're asking.
2          MR. GRENDI:  All right.  I mean --
3          MR. SCHMIDT:  I think you got to back
4      way up and start this over.
5          MR. GRENDI:  Well, we're getting -- why
6      don't we do lunch.  We'll start over on
7      this.  It's no big deal.
8          THE VIDEOGRAPHER:  Off the record at
9      12:57.
10         (Whereupon, a short recess was taken.)
11         THE VIDEOGRAPHER:  Back on the record
12     at 1:01.
13     Q.   How did Strategic Vision intend to
14 deliver the reports described in this research
15 agreement?
16     A.   Directly to the designated driver, the
17 designated agent for Mr. Guo, who was either
18 going to be Lianchao, then it became Yvette, and
19 then it became Lianchao again.  So we would give
20 it to them or Guo directly on a USB key.
21     Q.   So there would be electronic documents
22 on a USB?
23     A.   Correct.
24     Q.   And would any of those documents be a
25 report in narrative form?

Page 137

1      A.   I never saw them until later, until
2  after all of this started.  I never saw any of
3  the documentation.  Again, compartmentalizing.
4      Q.   Right.  So Strategic Vision never
5  reviewed any of the documents that were delivered
6  to either Lianchao Han or Yvette Wang under this
7  research agreement?
8          MR. SCHMIDT:  Objection.  Go ahead.
9      A.   No.
10     Q.   And I'll just ask about you personally.
11 You personally didn't review any of the documents
12 that were delivered to Lianchao Han or Yvette
13 Wang under this research agreement?
14     A.   No, because of the timing and the
15 logistics.
16     Q.   Okay.  What is financial forensic
17 historical research?
18     A.   What do you mean?
19     Q.   Well, it's described here in -- on
20 Eastern 5, on the first page there?
21     A.   Yes.
22     Q.   Have you used that term before in --
23     A.   Yes.
24     Q.   -- other research agreements?
25     A.   Yes.

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 138

1    Q.    And are these kind of standard terms or
2    items that would be included in financial
3    forensic historical research?
4    A.    It would be, particularly if you're
5    looking at information you're trying to get in
6    the way of money laundering or cash purchases;
7    for instance, there were cash purchases of
8    houses, cash purchases by these fish.  We were
9    tracking their individual financial spending
10   habits, how they could have a house, how they
11   could have a car, when they only had $2,500 in a
12   credit card limit.
13         I mean, there were multiple layers and
14   levels of investigation that go on into
15   financial, forensic accounting, or research in
16   this case.
17   Q.    This kind of list of different things
18   that could be researched, including statements,
19   capital sources, etc., do you see that list with
20   all those commas there?
21   A.    Yes.
22   Q.    Was that a list that you and Dr. Waller
23   put together in terms of Strategic Vision's
24   capabilities?
25   A.    What we would have been able to have

Page 139

1    researched -- there are two ways of looking at
2    it.  Stateside, what anybody can do that is into
3    this field.
4    Q.    Right.
5    A.    Versus what you can also do overseas,
6    and they're sort of two different rabbits here.
7    Q.    Does the agreement kind of break out
8    that difference in terms of U.S. versus foreign?
9    A.    Somewhere in here, I think it might
10   have.
11   Q.    Okay.  But just going back to this list
12   of different types of information on Eastern 5.
13   Do you recall you and Dr. Waller putting that
14   list together, or this --
15   A.    Yes, we did.  We talked about it, and
16   he wrote -- wrote it while we collaborated on it.
17   Q.    Do you remember any input from the
18   other side as to what the financial forensic
19   historical research should include?
20   A.    They wanted everything, everything we
21   could get our hands on.
22   Q.    I see.
23   A.    He was particularly -- Guo was
24   particularly insistent that we dive and dive
25   harder, and dive faster, and dive harder, almost

Page 140

1    to our detriment; we said, it was not legal to do
2    what he wanted to be done, so.
3    Q.    So in terms of the -- you understood
4    that the client wanted everything in terms of
5    financial forensic historical research?
6    A.    That's correct.
7    Q.    And then you kind of put together this
8    list here of everything you could think of that
9    you could access?
10   A.    We put together the list first.
11   Q.    Okay.
12   A.    And then he kept saying he wanted more
13   and more and more and more.
14   Q.    Oh, so do you recall adding, you know,
15   different items to this A tab, forensic
16   historical research, to include more items that
17   he was demanding?
18   A.    No.  He demanded it verbally.
19   Q.    Okay.
20   A.    I think it was around the 26th of
21   January, that, I do remember, where he was
22   insistent; I don't care what it takes, get it,
23   get it.  We said, you have to take your time.
24   Q.    And it talks about on the next page,
25   Eastern 6, progress reports.  It says,

Page 141

1    "contractor will produce a progress report on" --
2    A.    Where is this?
3    Q.    It's the, I guess, the first full
4    paragraph on Eastern 6.
5    A.    Oh, okay.
6    Q.    What is a progress report?
7    A.    Verbal conversations that we had with
8    him.
9    Q.    What would be in a verbal progress
10   report?
11   A.    Telling him what we were doing and how
12   we were trying to get the teams set up and done
13   in the first month.
14   Q.    Has Strategic Vision bargained for
15   progress reports in other agreements with other
16   clients?
17   A.    I don't understand the question.  Each
18   client is different and each agreement is
19   different, and so the terms are different.
20   Q.    So you've never -- strike that.  Has
21   Strategic Vision ever provided progress reports
22   to other clients in connection with investigatory
23   research?
24   A.    Usually we do it the same way, through
25   USB key or face-to-face.

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 150

1    A.    It was all done with Team 1.  Team 1
2  was doing it.
3    Q.    So Team 1 was assigned the A, B and C
4  described here on Eastern 5 and 6?
5    A.    They were assigned the entire menu.
6  That was their job.  Even though it was separated
7  out, they knew exactly what their mandate was.
8    Q.    And the social media research reports,
9  again, is there any distinction between how
10  they're created and the other reports,
11  conceptually?
12    A.    We didn't have time.  We -- what we
13  were pulling in ten days was remarkable.  Nobody
14  can pull it in ten days.  So you have a
15  three-month contract that you're signed on to,
16  and you believe that you've got three months to
17  pull the entire set of information retrieval
18  that's necessary, and you're given ten days,
19  while somebody's squawking about, oh, my, you
20  know, it -- it's not all there.
21         Well, it can't possibly be all there.
22  Nobody can have it there in ten days.  You can't
23  build a team, collect the beginnings of all of
24  these things, unless you want to be shut down
25  immediately.

Page 151

1    Q.    I just want to be clear, though.  Did
2  Strategic Vision deliver any social media
3  research reports?
4    A.    I'm sure we did, somewhere.
5    Q.    Did you verbally deliver a social media
6  research report to the client?
7    A.    I believe we did.
8    Q.    When would that have been?
9    A.    Sometime during -- between December and
10  January of 2017, '18.  They were verbally,
11  verbally.  And we may have had some
12  documentation.  I can't remember.
13    Q.    And what about current tracking
14  research, how was that conveyed to Ms. Wang or
15  Lianchao Han?
16    A.    Mike did it with the USB key.
17    Q.    And that was on January 30th of 2018?
18    A.    Yes.
19    Q.    Any other time?
20    A.    Yes, there was another USB key earlier,
21  I think.
22    Q.    It says on Eastern 7 that "all
23  deliverables shall be by USB drive only."
24    A.    Correct.
25    Q.    What does deliverables mean in that

Page 152

1  context?
2    A.    All the information we were mandated to
3  investigate.
4    Q.    And why USB only; was that a Strategic
5  Vision concept or Mr. Guo or someone else?
6    A.    It was Guo, as well as our own sense of
7  security on this investigation.  We were
8  investigating, according to Guo, a number of the
9  communist Chinese hierarchy leadership and their
10  children in the United States, and it was --
11  could have been life-threatening for all of us.
12  So it was only on USB key, and, hence, the
13  security issue.
14    Q.    Did Strategic Vision understand that
15  all the fish in Exhibit 7 were living in the U.S.
16  or had property in the U.S.?
17    A.    Some of -- no.  Some of them did and
18  some of them didn't.  I -- you know, you'd have
19  to go through them individually to see which ones
20  have what.
21    Q.    And so is that why Strategic Vision
22  needed a U.S. team, because there was
23  U.S.-located fish?
24    A.    There was U.S.-located information,
25  like fake passport numbers, fake Social Security

Page 153

1  numbers, fake names, Chinese, fake.  A lot of
2  fakes.
3    Q.    In the United States?
4    A.    In the United States.  On the list that
5  Guo gave us.
6    Q.    It says on Eastern 7 that, "the
7  contractor guarantees that all information
8  provided is genuine."  Do you see that?
9    A.    Yes.
10    Q.    It's in the criteria section.
11    A.    Sure.
12    Q.    How does Strategic Vision guarantee
13  that its information is genuine?
14    A.    Based upon the individuals from whom we
15  were retrieving the information, providing of
16  course we were given -- not given fake names and
17  fake passports and fake criteria to investigate.
18    Q.    I just want to understand Strategic
19  Vision's process, though.  How does it normally
20  go about guaranteeing the genuineness of the
21  information being provided to its clients?
22    A.    Because we trust our sources, and our
23  sources do not make up nonsense.
24    Q.    Does Strategic Vision ever do any
25  cross-checking or verification of the information

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 154

1   provided by its sources?
2       A.    That's part of the idea that we had
3   with having Team 1 and Team 2.
4       Q.    That's what you're talking about with
5   the -- how to get them document?
6       A.    Yeah.  It's cross-checking, it's making
7   sure, double verifying the same fact.  You have a
8   birthday over here and you have a birthday over
9   there.  They should be the same birthday.  If
10  they're not, there's something that we need to
11  look at on a secondary basis.
12           If you have a passport number over
13  here, a U.S. passport, a U.S. visa number over
14  here, and it doesn't match what we have within
15  the state department, there's an issue.  So we
16  have to then go down that rabbit hole.
17      Q.    And that's a synthesis or an analysis
18  process that Strategic Vision typically does with
19  the information it's getting from its sources?
20      A.    That's correct.
21      Q.    I see.  And that's how Strategic Vision
22  typically feels comfortable guaranteeing that all
23  the information is genuine?
24      A.    That's correct.
25      Q.    Did Strategic Vision have an

Page 155

1   opportunity to verify that the information being
2   provided was genuine in this instance?
3       A.    Yes and no.
4       Q.    Okay.  How does that work; which part
5   is yes and which part is no?
6       A.    Of course.  Yes, we could verify
7   in many cases that the information was correct,
8   and then, if we found that it was incorrect, we
9   would have to, like, double-check it.
10      Q.    No, I'm asking about what happened in
11  this instance, with this research agreement.  Was
12  Strategic Vision able to determine that the
13  information being provided back to the client was
14  genuine?
15      A.    Yes.
16           MR. SCHMIDT:  Objection, but go ahead.
17      A.    Yes.
18      Q.    How did Strategic Vision do that?
19      A.    Because we compared apples and oranges
20  and made sure that they were one and the same, as
21  far as information that we were turning over
22  based on -- you have to understand, if we're told
23  your name is John Smith, and we're given
24  information on these documents from Guo that your
25  name is John Smith, with a photograph and all of

Page 156

1   your sort of date of birth, and we turn around
2   and we find out really your name is Joe Schmidt,
3   and you were born in a totally different place,
4   then we have to then rejig the entire system that
5   we're working with.
6           That's why it was extremely -- not
7   just -- it wasn't just frustrating, but it was an
8   extremely complex situation that you couldn't
9   just do like you're checking somebody's credit
10  report or Better Business Bureau thing.  You just
11  couldn't.
12      Q.    Well, just going back to Wallop 7.
13      A.    Whatever that is.
14      Q.    You're saying that -- that's the list
15  of fish?
16      A.    Yes.
17      Q.    You could take a look back at it if you
18  want, but I don't think it's necessary.
19      A.    No.  I sort of know these fish by now.
20      Q.    I was going to say, so how many of the
21  fish were -- was Strategic Vision provided with
22  correct information for?
23      A.    Well, I can tell you, you can see some
24  of my notes on here.  Some of these -- for
25  instance, on page 3, you have Anita.

Page 157

1       Q.    Yes.
2       A.    Her real mother is Mingduan Yao.  Her
3   adoptive parents, because that's done a lot in
4   this basket, are Frank Suen, and then -- then
5   the -- the mother -- sorry, the mother is
6   Mingduan Yao, and then the father of the sister,
7   Mingshan -- Mingshan Yao.  These are the real
8   parents of this girl, okay?  But, in certain
9   documentation, it's showing that these people
10  are, in fact, her mother and father (indicating).
11  They're not.  They're her adopt -- adoptive
12  parents.
13           Then if you go to here, if you go on to
14  page 4, and it shows 1990 as her, I guess, entry,
15  because I don't have the note on here; 1990 is
16  her -- maybe her entry into the United States
17  visa.  The Social Security number, if I recall
18  correctly, and this is only on recall --
19      Q.    Sure.
20      A.    -- was, in fact -- here we go, on page
21  5, it shows it, had the same Social Security
22  number as a woman named Eileen Rodriguez, at the
23  same address where this woman Anita was living.
24           So then again, this is just one tidbit
25  of one fish, or one person that you have to start

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 166

1 our time.
2 Q.  But if the compensation is monthly, and
3 time-based, essentially, is there any period
4 where irregular circumstances would result in a
5 pause of the client's obligation to make payment?
6 MR. SCHMIDT:  Objection.  It's been
7 answered, but go ahead.
8 A.  I'd like to ask any law firm.  Give me
9 a break.
10 Q.  Well, I'm asking you the question,
11 though, so, please.
12 A.  Well, you can ask the question, but I'm
13 telling you, it's just like a law firm, we
14 operate in the same way.
15 MR. SCHMIDT:  That's the answer.  You
16 got your answer.
17 MR. GRENDI:  I'm gonna just clean it
18 up.  Thank you.
19 Q.  So, in your mind, or in Strategic
20 Vision's understanding, it's compensated for the
21 time it spends trying to do research, not based
22 upon what's actually delivered?
23 MR. SCHMIDT:  Objection.
24 A.  Yes.
25 Q.  What's the cost of a report under this

Page 167

1 research agreement?
2 A.  Well, you have it here.  It's listed.
3 It's complex, depending upon the menu that he
4 chose to work with.
5 Q.  Are you looking on page -- well,
6 Eastern 8?
7 MR. SCHMIDT:  There's a knocking on the
8 door.
9 THE WITNESS:  Saved by your knock.
10 MR. GRENDI:  Let me see if that's it.
11 We'll go off.  I think it's about time.
12 THE VIDEOGRAPHER:  Off the record at
13 1:42.
14 (Whereupon a luncheon recess was
15 taken.)
16 THE VIDEOGRAPHER:  Back on the record
17 at 2:30.
18 Q.  Good afternoon.  Ms. Wallop, you still
19 understand that you're under oath?
20 A.  Yes.
21 Q.  On this Exhibit Number 9, on page
22 Eastern 9.
23 A.  Just a second.
24 Q.  I think it's right in front of you.
25 A.  Oh, okay.  Number 9, page 9, whatever

Page 168

1 it is.
2 Q.  Yeah, Eastern 9 is the Bates number.
3 A.  Okay, yes.
4 Q.  Do you see where it says, "It is
5 understood that client may direct other entities
6 to pay the contractor"?  It's in the --
7 A.  Yes.
8 Q.  What was the purpose of this clause?
9 A.  Well, it was very simple, but,
10 apparently, Mr. Guo didn't understand how
11 important it was.
12 Q.  Well, why was this clause inserted into
13 the agreement; what was the meaning of it?
14 A.  Because we had told him that, and they
15 had told us that it was coming through a William
16 Wu in London from their account somewhere else in
17 the U.K. or Europe, and we had told them
18 explicitly that it should not come from Hong Kong
19 or an Asian account; and, guess what, it did, and
20 that was because of the mainland Chinese
21 intelligence services then finding out who Guo
22 and his people in Hong Kong were paying for this
23 kind of -- for a contract, let's just put it that
24 way.
25 Q.  So was the purpose of this clause to

Page 169

1 prevent the Chinese communist party from finding
2 out about this relationship?
3 A.  Yes, for our safety and the safety of
4 our -- our contractors or our teams.
5 Q.  Was it ever contemplated that the money
6 would come to an entity other than Strategic
7 Vision, to protect Strategic Vision's identity?
8 A.  Yes.  It was supposed to come from a
9 U.K. account to our account, from -- from him,
10 from Guo, through his money manager in the U.K.,
11 as we understood it.
12 Q.  When was that discussed?
13 A.  It was discussed when -- just before we
14 agreed to the contract, to the terms of the
15 contract, or the agreement.  We shouldn't call it
16 a contract, as it's an agreement.
17 Q.  And how did that issue come up; did you
18 bring it up or was it --
19 A.  Mike and I both raised it.
20 Q.  Okay.  And what was just the substance
21 of that discussion?
22 A.  The security fact that it was dangerous
23 for all of us to be connected with him based upon
24 the investigation that we would be doing, and if
25 that investigation of the mainland Chinese

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 170

1  hierarchy and their families was disclosed as a
2  result of the funding that he was doing to us
3  directly.
4      Q.    Did you ever consider, on the recipient
5  side, using another entity to receive the money,
6  other than Strategic Vision?
7      A.    No.  The agreement was with Strategic
8  Vision.  We had no idea who Eastern was.
9      Q.    Let me ask you about the next sentence
10 there.  It says, "all client payments must be
11 received by the contractor by wire transfer
12 within five business days of invoice," do you see
13 that?
14     A.    Yes.  Somewhere.
15     Q.    It's the last sentence in that
16 paragraph.
17     A.    Yes.
18     Q.    Did Strategic Vision issue any invoices
19 to Eastern?
20     A.    We were -- no.
21     Q.    So there was never a time when
22 Strategic Vision sent an invoice document saying
23 you owe this money to us, to Strategic -- or to
24 Eastern Profit, excuse me?
25     A.    That's when Lianchao was involved, and

Page 171

1  he explicitly told Guo that he did owe the
2  amount.  We never got paid for January, we never
3  got paid for February.  We had the agreement,
4  which outlined the terms.  We gave Guo the first
5  two weeks, essentially, free on our own ticket.
6  So from the 16th to the 26th was ten days that we
7  were into the contract.  So if you've taken it
8  from the 16th of January to the 16th of February,
9  that's when an invoice technically should have
10 gone out to him.  But we believed we were still
11 pulling information, and we wanted to be able to
12 have as much as possible for him, and, in the
13 meantime, he pulled his stunt with the lawsuit on
14 the 23rd.  And I was out of the country, so I
15 didn't know anything about it.
16     Q.    So Strategic Vision never sent Eastern
17 an invoice prior to February 23rd, 2018?
18     A.    We did not, but we should have.  In
19 hindsight, we thought that we were -- we thought
20 that we were being honest.
21     Q.    When was the first time Eastern Profit
22 Corporation was included in this contract, in a
23 draft of it I should say?
24     A.    It was never, until this particular
25 document, to my knowledge.

Page 172

1  Q.    Was that on January 6th, the day it was
2  signed?
3      A.    I think so.
4      Q.    And how did that come up?
5      A.    Yvette said that was who was going to
6  be signing it.
7      Q.    What did you say in response to that,
8  if anything?
9      A.    I asked her, I said, who's Eastern
10 Profit?  She said, Mr. Guo's company, or some
11 such thing.
12     Q.    Then you checked where Eastern Profit
13 Corporation Limited was incorporated?
14     A.    If I recall, when we were in the
15 federal court, you didn't know where --
16     Q.    I'm asking you a question.
17     A.    No, I'm --
18          MR. SCHMIDT:  Just answer --
19     A.    I'm trying to answer it.  I don't know
20 because I couldn't find anything; when we went to
21 sort of look it up, there wasn't anything that we
22 could find in this country.
23     Q.    What I'm asking is, did you look up
24 Eastern Profit Corporation Limited on January 6,
25 2018, did you try to figure out where it was from

Page 173

1  then?
2      A.    No.
3      Q.    Did you know it was domiciled in China?
4      A.    I had no idea.  They certainly didn't
5  reveal that to us, as they should have.
6      Q.    Did you ask them where it was
7  domiciled?
8      A.    Yvette didn't know.
9      Q.    I'm asking if you asked?
10     A.    I asked Yvette.  She didn't know.
11     Q.    When was that?
12     A.    At the signing.  I said, what is this
13 Eastern Profit Corporation?
14     Q.    You asked, what is this Eastern Profit
15 Corporation?
16     A.    Yes.
17     Q.    And what did she say?
18     A.    She said, I don't know, it's something
19 that Mr. Guo has his own -- it's his own company.
20     Q.    And was there any followup to that or
21 was that the end --
22     A.    No.
23     Q.    -- of the discussion?
24     A.    That was the end of the discussion.
25     Q.    Okay.

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 174

1    A.    It was supposed to be funded.  The
2  entire contract was supposed to be funded.
3  Apparently, it wasn't.
4    Q.    Let's go back to Exhibit 7.  I think
5  previously you had mentioned that you saw this
6  Exhibit 7 when Mr. Guo put it on a table at a
7  meeting, is that right?
8    A.    I believe this is correct.
9    Q.    And when was the next time you saw this
10 information?
11   A.    When we actually printed it off from
12 the USB key.  After three different attempts of
13 corrupted USB keys from Yvette, we finally were
14 able to print it off ourselves onto a virgin
15 computer.
16   Q.    Okay.  When did -- when was the first
17 time you saw this information after the coffee
18 table viewing?
19   A.    When we printed it off after we got the
20 corrupted USB keys from Yvette.
21   Q.    What date was that?
22      MR. SCHMIDT:  What date?
23   A.    Oh, I'm sorry.  I guess it was about
24 the -- oh, God, about the -- oh, the 8th, the 8th
25 of January it would have been.  It would have

Page 175

1  been Monday, because I had to come up to New York
2  to get it.
3    Q.    So you didn't see the information in
4  Exhibit 7 on January 6, 2018 when it was -- the
5  contract was signed?
6    A.    No.
7    Q.    You didn't view it?
8    A.    I -- it wouldn't open, that was the
9  problem.  That's why I had to come to New York.
10 On the 6th, she gave us three keys, three USB
11 keys.  Two would not open.  The third one would
12 not open on my computer, and so that's when I
13 took it to my neighbor and he was kind enough to
14 put it into his computer, just to see if anything
15 would open.  All it was was complete corrupted
16 file, just nothing but Chinese characters all
17 over the place.  It had no -- nothing like this.
18 So we both starting pulling all of the wires out
19 of his computers and his hard drives and -- yeah,
20 and yanked the flash drive out and everything
21 else.  It was a nightmare.
22   Q.    And who's your neighbor?
23   A.    You have the letter.  His name is
24 Richard Shewell, S-h-e-w-e-l-l.
25   Q.    And What's Mr. Shewell's relationship

Page 176

1  to Strategic Vision?
2    A.    None, other than a friend who kindly
3  was trying to see if there was something the
4  matter with the flash drives, which clearly there
5  were.  So then I came to New York on Monday to
6  meet her, that is Yvette, at the Pierre, in the
7  lobby.  I brought another computer.  She brought
8  three flash drives.  One worked, and that was
9  this, this one; in other words, this file.  The
10 other two were corrupted.
11      I kept them, kept all of the flash
12 drives.  I took the one that was good, I brought
13 it back to Washington and put it into a virgin
14 computer, and then we printed this thing off.  A
15 virgin computer, for the benefit of the court, is
16 one that has no connection to the internet and/or
17 a printer that has any connection to an internet.
18 So it's like a dumb computer.
19   Q.    Does Strategic Vision have any kind of
20 confidentiality arrangement with Richard Shewell?
21   A.    No.
22   Q.    Is Richard Shewell a member of the team
23 or otherwise --
24   A.    No.
25   Q.    Let me just finish the question for the

Page 177

1  record.  Is Richard Shewell part of Strategic
2  Vision's team or teams that provide investigatory
3  research?
4    A.    No.
5    Q.    So once you've accessed this
6  information on January 8th, what did Strategic
7  Vision do next?
8    A.    On January 8th?
9    Q.    Yes.  Now that you have the list of
10 fish.
11   A.    So now that we've printed off this
12 file, then Mike came and we sat down and we
13 started talking about how we were going to --
14 where we could -- which certain things we could
15 put together and enter into our channels for
16 information.  And then we -- then he got in touch
17 with Team 1, that had been sort of sitting on
18 hold, and then -- then there were meetings with
19 Team 1 leader, and we began.
20   Q.    So just this initial process with
21 Dr. Waller, were you parsing to see who was going
22 to do what in terms of the investigation, is that
23 fair?
24   A.    Somewhat, yes.  It's a very complex
25 investigation.  It takes the U.S. side as well as

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 190

1        So she left with a copy of the draft
2   agreement on or about --
3        A.   I believe so --
4        Q.   -- December 29th?
5        A.   -- yes.  It says here, "most easy
6   edits, no worries."
7        Q.   And that was your comment, correct?
8        A.   Yes.
9        Q.   Why did you think they were mostly easy
10  edits?
11       A.   Well, because she had -- she had made
12  the suggestion on the edits, so I made the
13  agreement to go ahead and make the little
14  changes, whatever they were.
15       Q.   And did you meet with Ms. Wang again on
16  or about December 30th?
17       A.   Honestly, I can't remember the 30th.  I
18  do remember the -- I guess it says -- see, here
19  it's the 5th.  I think it was the 5th that I met
20  her next.
21       Q.   Let me ask you this.  Do you recall a
22  meeting with Ms. Wang where you thought that she
23  was proposing major and unreasonable changes?
24       A.   Somewhere in that earlier part of that
25  conversation, and that's when we made the changes

Page 191

1   in the edits.  She then consulted with Guo.  Guo
2   agreed to them, there might have been something
3   he disagreed with, and then he disagreed with
4   her, and then we went back and re-did the edit
5   back to sort of what the original language must
6   have been in the final copy that she signed, and
7   he agreed to, on the telephone.
8        Q.   Was that on January 6th, on the actual
9   date of the signing?
10       A.   No, it was a little bit earlier.  I
11  think it goes back here to wherever we were
12  talking about mostly easy edits.
13       Q.   Okay.  Was Mr. Guo on the phone when
14  you and Ms. Wang signed the agreement?
15       A.   Yes, I think he was.  I think he was.
16  Because she sat on the sofa with me, and that's
17  where she was talking to somebody, so I -- in
18  Mandarin, so I presume that's who it was.
19       Q.   Okay.  So you didn't know who she was
20  talking to at that point, but --
21       A.   No, but she -- it was clear to me that
22  it was Guo.  She just sort of hung up, she said,
23  okay, fine, we all agree, everything is fine.
24       Q.   But he wasn't on speakerphone, so you
25  didn't hear his voice?

Page 192

1        A.   No.  It was Mandarin, so he was just
2   speaking to his employee, I guess.
3        Q.   But you -- sitting here today, you're
4   not certain that it was him?
5        A.   I could hear his voice, so it sounded
6   like him.
7        Q.   Turning to Eastern 206.
8        A.   Yes.
9        Q.   Do you see this message talking about
10  "unfortunately they could not stop the process
11  technically.  My Boss said he had already
12  contacted you about this fund...we were
13  discussing last week, as I advised you that our
14  people were ready to send you the deposit."  Do
15  you see that?
16       A.   I do.  I was very confused by that.
17       Q.   There's a PDF that was attached to this
18  document, do you see that?
19       A.   Yes.
20       Q.   Do you have any recollection as to what
21  was sent to you on or about January 2nd
22  concerning this deposit?
23       A.   This was, I believe, the copy of the
24  DBS wire.  I'm not sure, but I think it was.
25       Q.   And what was your response to receiving

Page 193

1   the wire?  Because, correct me if I'm wrong, but
2   the contract had not been signed as of
3   January 2nd, 2018, correct?
4        A.   Not by the 2nd, but we had agreed to
5   everything on the terms, even though she had to
6   come back from New York to sign the document; we
7   had agreed by telephone.
8        Q.   Were you surprised to receive the money
9   at that time?
10       A.   Not entirely.  But we -- we -- it came
11  from a source that we didn't know who it was.  It
12  came from ACA Capital or something.  We didn't
13  know who that was.
14       Q.   So how did you find out about that?
15  Did this message prompt you to check your account
16  or was it that you checked your account and said,
17  why is there a million dollars there?  What was
18  the process?
19       A.   It was very simple.  I got this
20  message --
21       Q.   I see.
22       A.   -- I checked the account.  Something
23  from ACA was there.  Said, my boss, meaning Guo,
24  said he had already contacted us about this fund.
25  We never got any contact from Guo.  Never  Never

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 194

1    received a phone call, never received a text,
2    nothing.  So I don't know what she's talking
3    about here.
4         "Our contract won't be changed if there
5    is a chance to work together.  Otherwise please
6    kindly return fund."  These people were like
7    ping-pong balls, okay?  You're just trying to do
8    what they're asking you to do, you get everything
9    in order to do it, and then they fool around with
10   this nonsense.
11        Q.    Did you consider sending the wire back
12   because you didn't have a signed contract or --
13        A.    No, because we already had agreed to
14   this verbally.  Both Guo and herself had agreed
15   to it.  And so she then comes down on the 5th,
16   and signs the thing on the 6th.
17        Q.    And so, going back to the 6th.  Were
18   there any changes made to the agreement at that
19   time?
20        A.    No, none.  The only change was that I
21   accepted the 15 fish instead of the ten, I mean,
22   verbally.  It was a verbal, honorable thing to
23   do.  And then here's my thing saying right what I
24   said on whatever it is, 208, as discussed with
25   the 15 fish.

Page 195

1         Q.    Did you tell Yvette that they shouldn't
2    have sent the wire from where they had?
3         A.    Well, I -- later on I did.  Lianchao
4    told her; like, what were you thinking?
5         Q.    So you had a conversation with Lianchao
6    about the wire --
7         A.    Later.
8         Q.    -- being done properly?
9         A.    Later, later.  Like, two weeks later.
10        Q.    And you understood that Lianchao had
11   conveyed that to --
12        A.    Yes.
13        Q.    -- Ms. Wang?
14        A.    Well, to Guo.  He played those two back
15   and forth.  He played Yvette against Lianchao,
16   Lianchao against Yvette.
17        Q.    Turning to Eastern 208.  It says, "We
18   hope you will have the docs as discussed for the
19   15 fish with you"?
20        A.    That's right.
21        Q.    And so what was -- was that the -- you
22   already understood what that was, that was --
23        A.    That was this.
24        Q.    -- Exhibit 7?
25        A.    Yes.  And that's when she arrived on

Page 196

1    the 5th and she had the bad flash drives, okay?
2    That's when I went to the next door neighbor,
3    just to stick it in to see if it was alive or
4    not.  He didn't see anything, because there was
5    nothing to see, and he couldn't have seen
6    anything even if he had.  So that's exactly what
7    happened.
8         Q.    Turning to Eastern 211.  You wrote,
9    "the agreement for 3 months is correct."  Do you
10   see that at the top of the page?
11        A.    Yes.
12        Q.    What did you mean by that?
13        A.    Because the contract was for three
14   months, was for 90 days.  January, we have
15   allowed 15 fish.  Ten fish each for February and
16   March; for some reason, that's sort of cut off.
17   Oh, here it is, March.  "We will determine the
18   subsequent monthly costs obviously by the next
19   set of numbers of fish in the tank."
20        Q.    So what would happen after 90 days?
21        A.    We were all going to regroup and figure
22   out how much -- how many of the fish had -- were
23   useful information for him and how many fish had
24   been tossed out, and then he was going to be
25   adding more fish.  He said up to 4,000 fish,

Page 197

1    total.
2         Q.    Would it have been possible to do
3    investigations on 4,000 fish?
4         A.    Not all at once, and he knew that.  He
5    agreed that would be ridiculous.  It was supposed
6    to be a three-year contract.
7         Q.    But it was a -- you're saying it was a
8    three-month contract?
9         A.    It was three months, to be done for a
10   year, if you look at the contract itself, and
11   then, after that time, it was a three-year
12   contract.  If you recall, on the last page of the
13   agreement, "duration of this contract shall be
14   enforced for three years from the date of
15   signing."  That's what we had initially planned
16   on.  We certainly had initially planned on the
17   first three months.
18        Q.    On Eastern 213, do you see where it
19   says, "can you please send the contract here?  I
20   get the right person to do.  Thank you"?
21        A.    That was weird.
22        Q.    What did you understand that request to
23   mean?
24        A.    Well, we certainly weren't going to
25   send it through any kind of email thing.  So she

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 198

1  had to sign it -- she had to come -- she signed
2  it on the 6th.  So she says, "please send the
3  contract here I get the right person to do."  I
4  don't know what that meant.  "There is of course
5  no impasse here.  I work with several people, M
6  is one of them saying for this project he is not
7  only boss."  Well, that was news to us.
8      Q.    I'm just asking about why you didn't
9  send the contract when it was requested there?
10     A.    Because we still didn't have -- oh,
11 dear lord.  We still didn't have the flash
12 drives.  This was the 5th.  We didn't get the
13 proper flash drives with the folder until the
14 8th, Monday the 8th.  So what could we do, except
15 take -- except have her sign the contract.  They
16 had already sent the money, we all had agreed to
17 the terms.  She needed to sign the contract.
18 Then I went to New York to get a flash drive
19 that, God willing, would work, out of the three.
20          And we tried to explain to them that
21 their systems were corrupted.  If she was
22 downloading, or he was downloading the stuff from
23 his own computer, he was getting -- he was being
24 hacked into by the Chinese himself.  Because you
25 can't make this stuff up on the -- on the

Page 199

1  corrupted files.
2      Q.    But before January 6th, you weren't
3  aware of any corruption or hacking issues, were
4  you?
5      A.    Yes, absolutely.
6      Q.    How were you supposedly aware of that?
7      A.    Well, because we had a corrupt -- when
8  we were even sitting there, I think at one point
9  Guo had a USB key and he was putting it into his
10 own computer, and it was acting up, and he took
11 it out and he said, I can't -- I can't do the
12 file here.
13     Q.    When was that?
14     A.    It was before -- this must have been
15 sometime in mid-Jan -- mid-December, whenever we
16 were up there meeting with him, he had an issue
17 with the computer.  And Mike told him, he said,
18 you know, you got -- you got issues here that
19 have nothing to do with us.
20     Q.    You wrote, "As you know, the agreement
21 can only be reviewed and cannot be sent by email
22 for the purpose of absolute security"?
23     A.    Correct.
24     Q.    It says, "Other than New York, L, M and
25 myself and you, we are the only ones privy to

Page 200

1  it."
2      A.    Correct.  And New York was equally
3  adamant about it.  That was Guo.
4      Q.    I was going to say, who's New York?
5      A.    That was Guo.
6      Q.    And L is Lianchao?
7      A.    Yes.
8      Q.    And who's M?
9      A.    Michael, Mike, Dr. Waller.
10     Q.    Turning to Eastern 19.  You wrote,
11 "Thank you.  I will look forward to seeing you
12 tomorrow here.  You can make whatever minor
13 changes here on my laptop and then print off two
14 copies"?
15     A.    Correct.  That meant print off two
16 copies of the agreement.
17     Q.    Right.  What were the changes or issues
18 that you were thinking of at that time?
19     A.    Whatever changes we made that were --
20 she would -- I mean, whatever was made was made,
21 and we agreed to in the document.  I don't
22 remember.  They were minor.
23     Q.    You said, "we've already lost a week"?
24     A.    That's right.
25     Q.    What did you mean by that?

Page 201

1      A.    If we didn't have this, we couldn't
2  start.  If we didn't have the entire file, we
3  couldn't start, could we?  Because we had no
4  information to go on.
5      Q.    Did you understand that time was an
6  important factor?
7          MR. SCHMIDT:  Objection.
8      A.    Of course it was an important factor.
9      Q.    Why was that?
10     A.    Because we were prepared to go, but,
11 due to their corrupt files, we couldn't start
12 until we got the full document that was not
13 corrupted.
14     Q.    Right.  But this is January 5th, right,
15 this email message or Signal message?
16     A.    Yes.
17     Q.    And so I'm just asking, you hadn't
18 seen -- or you hadn't received the files that had
19 any alleged issues with it in terms of --
20     A.    Yes.  She came on the 5th, she put the
21 files in, they didn't work, they were corrupted.
22 I then had to get on the train and come up here
23 on the Monday morning, the 8th, okay, to get the
24 USB file that was clean.  Out of the three, there
25 was only one that was clean.

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 202

1    Q.    I thought --
2    A.    So we couldn't start.
3    Q.    -- the agreement was signed on
4  January 6th, though?
5    A.    Yes, but we couldn't start until we had
6  clean files.  She thought she had clean files,
7  and she didn't have them on the 5th and 6th, did
8  she?
9    Q.    I don't understand how you thought you
10  lost a week, if you hadn't even signed an
11  agreement yet?
12    A.    Because the funds had been sent, right,
13  on the 29th, and let's call it the 2nd that we
14  had received them, and, in fact, they didn't
15  really get into our account until the 4th because
16  of the holiday weekend and so forth.  And then
17  Citibank called to say, are -- is this your --
18  are these -- you expecting this?  I said yes.  So
19  they were fine.  But they were not available --
20  there's something known as a federal reserve,
21  that stops large payments.  Anything over, like,
22  $300,000 gets flagged.  So we had to verify that
23  this was a contract.
24    Q.    Let's go to Eastern 223.  Do you
25  remember Ms. Wang sending you a Signal message

Page 203

1  asking to accommodate two small fish?
2    A.    Two more small fish.  So it would have
3  made 17 fish, okay?  No.  The answer was
4  absolutely no.
5    Q.    Well, let's just go one at a time.
6        MR. SCHMIDT:  Do you remember receiving
7    the message or --
8        THE WITNESS:  Yes.
9        MR. SCHMIDT:  -- or --
10        THE WITNESS:  Yes.
11        MR. SCHMIDT:  Okay.
12    Q.    Okay.  And what was your response?
13    A.    No.  Absolutely no.
14    Q.    And why did you have that firm
15  response?
16    A.    Because we've already given you five
17  extra fish, if you will read my response.
18    Q.    They did have to pay for those 15 fish,
19  though, right?
20    A.    Not really.
21    Q.    Okay.
22    A.    They didn't.  They were five free fish.
23    Q.    And they were entitled to all three
24  reports on those 15 fish?
25    A.    What reports?

Page 204

1    Q.    The financial, forensic research,
2  current tracking and social media?
3    A.    There were not reports, other than
4  flash drive information, which we've already
5  answered that.
6    Q.    Of course we have, yes, but they are
7  referred to as reports in the agreement, so
8  that's why I'm using that term.
9    A.    They're flash drives.
10    Q.    Okay.
11    A.    They're not written.
12    Q.    And the teams that are already
13  dispatched, how many teams were dispatched as of
14  January 9th?
15    A.    Well, One was in the process of
16  being -- Number One was being in the process of
17  being dispatched because it was an overseas
18  person that was -- that Mike had to coordinate
19  with, and we had to get -- we had to get numerous
20  computers and different kinds of phones and
21  burner phones and everything.  It's a huge
22  operation.
23    Q.    Were you involved at all in the
24  logistics of that operation?
25    A.    No.  Mike was.

Page 205

1    Q.    So he was involved in procuring the
2  phones and computers and things of that nature --
3    A.    No.
4    Q.    -- for Team 1?
5    A.    Team 1 did it.
6    Q.    Okay.  What other teams were dispatched
7  as of January 9th, other than Team 1?
8    A.    That was the only "team team" outside
9  of the United States.  I was collecting or I was
10  getting ready to begin to collect information
11  from my own channels, which was not labeled as a
12  team.
13    Q.    Right.  I'm just trying to understand
14  your message on Eastern 224.  At the end it says,
15  "Teams are already dispatched and beginning their
16  trip"?
17    A.    That meant Mike and the person that was
18  hiring the people to manage this particular
19  account.  It wasn't just one person with one
20  computer.  There were at least ten.
21    Q.    Ten individuals?
22    A.    Ten individuals.
23    Q.    On Team 1?
24    A.    On Team 1, at least.
25    Q.    And how did you know how many members

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 206

1  of Team 1 there were?
2      A.    Because I was told that by Mike.
3  That's all I know.  I don't know who they were, I
4  don't know their names.  I don't know anything
5  about it.  We compartmentalized it.
6      Q.    Right.  So you don't have any -- you
7  played no role in assembling Team 1 or managing
8  its actions?
9      A.    My expertise, young man, is --
10      Q.    I'm not that young, but go on.
11      A.    -- is 45 years of working in
12  specialized areas, and I understand how to
13  assemble the right people to do, God knows, the
14  right job.  And Mike was one of the people who
15  did dispatch and organize Team 1.
16      Q.    Right.  So you weren't involved with
17  managing or assembling --
18      A.    Not on a --
19      Q.    -- Team 1?
20      A.    -- day-to-day because we were
21  compartmentalizing it.
22      Q.    That's fine.  You can -- I'm just
23  asking for an answer.
24      A.    I'm giving you one.
25      Q.    Thank you.

Page 207

1      A.    You're welcome.
2      Q.    What was the issue that -- if we go to
3  Eastern 227, that caused a delay of eight days?
4      A.    Okay, you have to take a calendar out
5  and look at the calendar for January.  It's easy
6  to see.  The 8th, Monday the 8th was when we
7  finally got a decent copy of this, right
8  (indicating)?
9      Q.    Exhibit 7?
10      A.    Yes, Exhibit 7.
11      Q.    Sure.
12      A.    That week, Mike and the person from
13  Team 1 were coordinating how they were going to
14  get the -- the equipment together.  They had to
15  drive to three different countries to get the
16  information -- I mean, to get the equipment, so
17  they wouldn't be tracked.
18          The IP numbers and everything else
19  would not be tracked.  These would be, quote,
20  technically, virgin computers, virgin phones,
21  these would be burner phones.  All of these
22  communications had to be coordinated.  So from
23  the 8th of January to the 16th, I believe, makes
24  eight days.
25      Q.    And that's what I'm trying to

Page 208

1  understand.  What was it between the 8th and the
2  16th that caused a delay?
3      A.    Well, we didn't have the equipment to
4  begin to do what we said we wanted to be able to
5  do because of all of these weirdo delays with the
6  flash drives.
7      Q.    In other words --
8      A.    They were corrupted flash drives,
9  right?
10      Q.    In other words, you didn't have the
11  equipment to do the research on, let's just say,
12  January 1, you had to go and buy it --
13      A.    That's correct.
14      Q.    -- after the agreement was signed?
15      A.    That's correct.  And why would that be?
16      Q.    I'll be asking the questions.
17      A.    I know --
18          MR. SCHMIDT:  Don't ask questions.
19      A.    -- but, I mean, this is absurd.
20          MR. GRENDI:  Why don't we take a little
21  break.
22          THE WITNESS:  Yeah, I think we need a
23  little break.
24          MR. SCHMIDT:  That's fine.
25          THE WITNESS:  You just don't get it.

Page 209

1          THE VIDEOGRAPHER:  Off the record at
2  3:25.
3          (Whereupon, a short recess was taken.)
4          THE VIDEOGRAPHER:  Back on the record
5  at 3:32.
6      Q.    Still on Wallop 10, Bates number
7  Eastern 227.  Do you see where you wrote, "We
8  have some new exotic fish options to discuss
9  too"?
10      A.    Yes.
11      Q.    What did you mean by that?
12      A.    I think Mike and I had come up with
13  some information that would have been interesting
14  for Guo.
15      Q.    Why did you describe it as a fish
16  option?  What does that --
17      A.    I think exotic was the key word there,
18  because it was outside of the parameter.
19      Q.    What do you mean by parameter?  I just
20  want to understand --
21      A.    Outside of the -- the 15 fish.  It was
22  additional information that we thought he might
23  find useful.  It had nothing to do with the 15
24  fish.
25      Q.    What was that information?

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 230

1      A.    No.
2      Q.    Let's go to Eastern 259.  Do you see
3  where Dr. Waller wrote, "our understanding was
4  that the first 90 days would be for starting up
5  and developing the data"?
6      A.    I see that.
7      Q.    Was that Strategic Vision's
8  understanding as well or just Dr. Waller's?
9      A.    No, it was our mutual understanding
10 between Guo and myself and Lianchao and Mike.
11     Q.    Do you see where it says, "We
12 did not understand that he expected actual data
13 in the first days or weeks"?
14     A.    Correct.
15     Q.    Again, you never talked to Dr. Waller
16 about this exchange after --
17     A.    Not about --
18     Q.    -- it happened on the --
19     A.    -- this exchange, no.
20     Q.    Did you ever discuss the substance of
21 this exchange, or something akin to it, about the
22 expectations of the client?
23     A.    Perhaps later that -- when we were
24 talking about what -- what we had been able to
25 retrieve so far, and how we had -- let me just

Page 231

1  read this.  How Mike had explained very
2  patiently, very calmly, very slowly, whether it
3  was with -- or through Lianchao or through
4  Yvette, how the process works.
5          So, if Guo wanted to speed up and get
6  everything really fast, then all the trap doors,
7  all the doors that we had been able to open
8  quietly, would be slammed shut.  If Guo would
9  just be patient and let us get into where we
10 needed to go quietly, he was going to get an
11 awful lot of information back.
12          The irony is, that had he just relaxed
13 and stayed on top of this, that is Guo, he would
14 have had a huge amount of information three
15 months a year in.  Huge.  We can't fix somebody's
16 perception of how this is done.  He was very
17 impatient.
18     Q.    When did you understand that Mr. Guo
19 was getting impatient?
20     A.    I guess around -- well, certainly on
21 the 26th, when we sort of had our lunch with him,
22 and then -- and then I think possibly through
23 Lianchao; because, as I told you, we never had
24 any direct contact with -- with Guo.  It was
25 always through Lianchao or Yvette.

Page 232

1      Q.    Right.
2      A.    Yvette was taken off the case in, as we
3  understand it, beginning the 1st of February.
4  And then she -- she sent us an email saying she
5  was no longer in it, that only to -- to
6  communicate with Lianchao.
7      Q.    Did Strategic Vision adjust its
8  research approach based upon this request for
9  more immediate results?
10     A.    No.  In fact, we actually increased the
11 pressure on Team 1, and then went and had a
12 long -- several meetings with potential Team 2,
13 and that's another side of it.
14     Q.    Is that a company that goes by the
15 acronym ASOG?
16     A.    Yes.  In Dallas.  Outside of Dallas.
17     Q.    And why was it that ASOG was contacted
18 in connection with this research agreement?
19     A.    Because we had the option of being able
20 to bring in whatever teams we felt were going to
21 be additionally viable, and also on the domestic
22 side of some of the things that we were bumping
23 into, or Mike and his team were bumping into on
24 the international side, which were not pretty.
25          So, we were given the names of the

Page 233

1  fellows who had been with NSA, DIA, whatever,
2  in -- in -- in Dallas, and we went and met with
3  them, and they told us -- they looked at -- we
4  only gave them like a couple of names, we never
5  gave them the whole file.
6          And they looked at it, and then we went
7  back about a week later maybe, it might even have
8  been ten days later, a week later, and they were
9  totally freaked out.  They said, you can't touch
10 any of these people or any of these names.  We
11 said, what are you talking about?
12          That's when they said, these are all
13 RPs.  We will all go to jail if you start fooling
14 around in their files.
15     Q.    So when did you first meet with ASOG,
16 that meeting in Dallas you just described?
17     A.    Yeah, it would have been the beginning
18 of February, I should think.  Again, Mike has the
19 date.
20     Q.    Is there any reason a second team
21 wasn't assembled at the outset of the agreement?
22     A.    We did -- because of the element of
23 retrieval we had to do outside of the United
24 States, because he wanted it so fast and so
25 quickly and intensely, that that was the fastest,

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 234

1  quickest way of getting into certain files had
2  they not all -- had some of them not been fake,
3  then we would have had no -- we wouldn't have
4  gone to the second -- second dimension.
5      Q.    And the decision to go with the second
6  team, was that Strategic Vision's --
7      A.    Mine --
8      Q.    -- decision or Dr. Waller's?
9      A.    Mine and Mike's, yeah.
10     Q.    Jointly?
11     A.    Jointly.
12     Q.    Okay.
13     A.    We both went down twice.
14     Q.    And you said RP.  What does RP mean?
15     A.    Restricted persons.
16     Q.    And in your career in this
17  investigatory field, have you encountered
18  restricted persons before or --
19     A.    Yes and no.  It's had different
20  acronyms.  Sometimes it's PP, protected persons.
21  Sometimes it's RP.  But it means that it is
22  either under a watch list by the U.S. Government
23  or it is a -- or, let's just say a certain agency
24  has tagged these individuals and is watching them
25  themselves.  So we cannot enter into those files

Page 235

1  at all in the U.S.
2      Q.    And these files you're talking about,
3  are these files government files or what kind of
4  files are they?
5      A.    Your Exhibit 7, these names, all of
6  these names.  We can't -- we don't know, because
7  we certainly were not peeking into those
8  government files.
9      Q.    Oh, they're government files you're
10  talking about?
11     A.    Yes.  These are U.S. intelligence
12  files.
13     Q.    I see.  And sometimes those files are
14  accessible, if they're not records protected --
15  or, I'm sorry, restricted persons?
16     A.    It just depends on the jurisdiction of
17  where you're looking into the file.  We would
18  never do anything that would be anti-U.S. law.
19  And he was asking us to continue doing that, Guo
20  was.
21     Q.    But just in terms of these people who
22  you -- ASOG told you were restricted persons.
23  There are some people, obviously, that are not
24  restricted persons, is that fair to say?
25     A.    I have no idea.  Because we didn't give

Page 236

1  them the whole file.  We only gave them like, I
2  don't know, maybe four or five names.
3      Q.    Okay.  But what I'm just trying to
4  understand is --
5      A.    And I --
6      Q.    -- and I know this sounds like a basic
7  question --
8      A.    Right.
9      Q.    -- and I apologize.  But are all people
10  restricted persons in intelligence files or
11  government files?
12     A.    No.
13     Q.    Okay.  So there are certain people --
14     A.    No, no, no, no, no.  These were tagged.
15     Q.    Specially tagged?
16     A.    These were tagged.  And I -- again, you
17  would have to ask Mike.  I don't know if it was
18  the whole file that was tagged or if it was just
19  four or five names they ran through the system.
20     Q.    I see.
21     A.    But they were all tagged; flagged,
22  tagged, whatever you want to call it.
23     Q.    So when did you convey to the client
24  that there was this restricted persons
25  designation on some of the fish?

Page 237

1      A.    We did that through Lianchao.
2      Q.    And when was that?
3      A.    Sometime in the middle of February, I
4  think, by the time we had gotten -- we had been
5  down to -- to Dallas.
6      Q.    And so you went to Dallas with
7  Dr. Waller?
8      A.    Twice.  Twice we went to see him.
9  Twice.  Or see them twice.  The irony was, we
10  then saw this group at a function in Washington,
11  at an intel or security defense function several
12  months later, and they said to us -- they said to
13  us, well, it's really weird, because they already
14  had figured out it was Guo that was the client.
15        We never told them who the client was.
16  So they told -- they -- they said, well, they
17  figured out it was Guo, and they said about a
18  week or so after we had been down there the
19  second time, that Guo had people go down to talk
20  to them.
21        And we never told anybody who they
22  were.  We didn't tell Lianchao who they were.  We
23  didn't tell anyone.  This was just between Mike
24  and me.  So that was very weird.
25     Q.    Do you think that was just a

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 238

1    coincidence or is that --
2        A.    I would find it an extraordinary
3    coincidence.  These guys are so deep-sixed that,
4    just even to physically find them is like
5    difficult.
6        Q.    So deep-sixed, you mean they're
7    inaccessible or --
8        A.    Inaccessible.
9        Q.    -- they keep a low profile?
10       A.    Yeah.  They had a very low profile and
11   they had a very low profile location.
12       Q.    And how is it that you knew about them,
13   ASOG?
14       A.    Through Mike and one of his people.
15       Q.    And so, did there come a time when ASOG
16   said, well, we can't do any research on this
17   because of this --
18       A.    That's right.
19       Q.    -- records protected status?
20       A.    Yes.  That's right.
21       Q.    I understand you're eager to move
22   forward, but, just for the court reporter, just
23   please wait for me to ask the question.
24             Could Strategic Vision still perform
25   some research, though, even though some of the

Page 239

1    individuals were designated as records protected,
2    or restricted persons, I'm sorry?
3        A.    We did not know at that point, and by
4    that time we got some kind of service for a
5    lawsuit.  And our teams, we had to let our teams
6    overseas know on the 23rd of February that they
7    had to stop.
8        Q.    I just want to ask this, though.  Could
9    Team 1 still do its job, even though ASOG found
10   that certain individuals were, as you described,
11   records protected?
12       A.    That's -- that's a question I'd have to
13   leave for a lawyer in the -- in the IC,
14   intelligence community, to answer.  We wouldn't
15   want to do anything that would be illegal.
16       Q.    So you didn't direct Team 1 to stop its
17   work when ASOG gave its report to you that people
18   were records protected?
19       A.    We did.  Mike did.  He did talk to
20   them.  And even though the -- he told them to
21   stop doing anything that looked like it was
22   peeking into something that they shouldn't be
23   looking into.
24             It's one thing to peek into somebody's
25   license, driver's license number, or their --

Page 240

1    their new address, or some sort of preliminary
2    stuff that was being brought up, but if you were
3    getting into deeper stuff, you couldn't touch it.
4    You shouldn't touch it.  And I'm sure he conveyed
5    that to the -- to the Team 1 leader.
6        Q.    So it's your understanding -- Strategic
7    Vision's understanding that Team One's work was
8    curtailed because of the discovery that certain
9    fish were restricted persons or records
10   protected?
11       A.    That's correct.
12       Q.    And that was on or about January 30th,
13   or whereabouts?
14       A.    No, no, no, no, no, no, no.  This was
15   way into the middle, the 15th to the 20th,
16   something in there, of February.
17       Q.    That's when ASOG conveyed to you
18   that --
19       A.    Yes.
20       Q.    -- you were -- okay.
21             So let's just get a clear record then.
22   When did ASOG tell you that certain people
23   were -- certain fish were records protected?
24       A.    At some point in Feb -- in the middle
25   of February 2018.

Page 241

1        Q.    And then is it your understanding that
2    Mike, very shortly thereafter, conveyed this
3    information to Team 1?
4        A.    That's correct.
5             MR. GRENDI:  Let's do Exhibit 13.
6             (Wallop Exhibit 13, Letter dated
7        February 23, 2018, marked for
8        identification.)
9        Q.    Do you recognize this document,
10   Ms. Wallop?
11       A.    Actually, I never saw the letter.  I
12   gather it is delivered to -- it says here it was
13   delivered to -- by hand delivery and electronic
14   mail to me, but I was out of the country, and
15   they had, in fact, sent it to the Nevada address.
16       Q.    The Nevada address, is that Strategic
17   Vision's?
18       A.    Strategic Vision's Nevada agent
19   address, yeah.
20       Q.    Does Strategic Vision have an office in
21   Nevada?
22       A.    We have an agent.
23       Q.    Do you have a physical --
24       A.    Yes, it's an address.
25       Q.    -- location that you can --

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 242

1    A.    Yes.  It's on all the documents
2  somewhere.
3    Q.    I'm asking if Strategic Vision has like
4  an office with --
5    A.    No.  It's an agent.  It's an LLC.
6  That's where they set them up.  Like Wyoming.
7    Q.    And what's in Wyoming, I'm sorry?
8    A.    LLCs.  There are a lot of LLCs and
9  corporate trusts and so forth set up in Wyoming,
10  as there are in Nevada.
11    Q.    Those are your corporate trusts and
12  LLCs?
13    A.    No.
14    Q.    I just want to clear it up.
15          You just mean it's a popular state for
16  incorporation?
17    A.    Correct.
18    Q.    Thank you.
19          So when did you first see this letter?
20    A.    Oh, when I probably returned from the
21  Middle East; I think it was probably, I don't
22  know, the first or second week of March.
23    Q.    Were you surprised by the letter?
24    A.    I thought it was idiotic, yes.
25    Q.    Why did you think it was idiotic?

Page 243

1    A.    Because we heard nothing from them.  We
2  were continuing to do the work.  And it was
3  silly.
4    Q.    What work was Strategic Vision doing
5  after January 30th that --
6    A.    All of February.  Or up until the 23rd
7  of February, to be precise.
8    Q.    And were there any meetings with
9  Lianchao Han and Mr. Guo after January 30, 2018?
10    A.    Not with us, no.
11    Q.    With whom, then?
12    A.    With Mike and myself, no.  With
13  Lianchao and Guo, possibly.  I don't know.
14    Q.    Let me ask this then.  Did you or
15  Dr. Waller meet with Lianchao after January 30,
16  2018 concerning this contract?
17    A.    That's a good question.  I doubt it,
18  because I didn't know that there was any issue
19  other than, you know, we were doing our best and
20  pedaling fast.
21    Q.    So Strategic Vision didn't deliver any
22  information to Lianchao, or certainly Yvette,
23  after January 30, 2018?
24    A.    We could have.  I'd have to ask Mike.
25    Q.    You didn't do it personally?

Page 244

1    A.    I personally did not, no.
2    Q.    Do you know if Dr. Waller did that
3  or --
4    A.    Well, he did on the 30th, obviously.
5    Q.    Right.  I'm talking about after the
6  30th.
7    A.    Okay.  Well, I don't know.  I don't
8  know.
9    Q.    Okay.  It says, "Eastern agreed to
10  delay the start of the contract by ten days from
11  January 6th to January 16th."  Do you see that on
12  the first page, Eastern 198?
13    A.    Yes.
14    Q.    Is that the ten-day grace period or
15  accommodation that you were talking about --
16    A.    Correct.
17    Q.    -- regarding the January --
18    A.    Yes.
19    Q.    -- 26, 2018 meeting?
20    A.    Yes.
21    Q.    Thank you.
22          Did Strategic Vision attempt to contact
23  Mr. Guo or Lianchao or Ms. Wang after receipt of
24  this letter?
25    A.    Well, Yvette had been taken off the

Page 245

1  case.  She was forbidden, apparently, to have
2  anything to do with it.  So the only two people
3  that would have been contactable would have been
4  Lianchao and I'm sure that -- again, I'm not sure
5  of the dates, but I'm sure -- and Lianchao
6  travels, too, so I'm not sure where he was in
7  February, but I'm sure that both Mike and I must
8  have had some conversation with him in February,
9  after this.
10    Q.    But you don't remember that, sitting
11  here today, what that conversation was like?
12    A.    No.  Well, I mean, we were very
13  surprised and very unhappy, and we'd been working
14  hard to -- to do what Guo wanted, so...
15    Q.    And did Lianchao say anything back to
16  you, or what was discussed?
17    A.    I think he said that, you know, Guo
18  gets upset all the time about a lot of things,
19  and so maybe we -- he could smooth it over and
20  calm him down and so forth.  And then we just, I
21  think, hoped that that would happen, and it
22  didn't.  So then the -- this thing was done, so
23  we just stopped.
24    Q.    You mean this lawsuit?
25    A.    Yes.

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 246

```
1       Q.    When did you instruct Mike, or anyone
2   else involved with the Strategic Vision team, to
3   just stop work on this project?
4       A.    After the 23rd of February.
5       Q.    You don't remember the exact date?
6       A.    No.  We had things in the hopper that
7   were being produced, but they -- we bought them,
8   so we had to pay for them, so when we got the
9   information, then we could produce it, but...
10      Q.    And did Dr. Waller fly to Europe to
11  tell the leader of Team 1 to stop work, or how
12  did that happen?
13      A.    I'm not sure.  You would have to ask
14  him how he did that.  He may have met with him
15  overseas.
16      Q.    Okay.  In connection with splitting the
17  profits from this engagement with Dr. Waller, do
18  you owe him money, or does Strategic Vision owe
19  him money I should say?
20      A.    First of all, there weren't profits.
21      Q.    Earlier we discussed your arrangement
22  with Dr. Waller to split the proceeds of this
23  engagement, correct?
24      A.    That's correct.
25      Q.    And has that splitting occurred, is
```

Page 247

```
1   what I should ask?
2       A.    Yes, because our time was valuable for
3   those two months, plus the people that we had
4   already contracted to pay for the research and so
5   forth.  We expected to have a three-month
6   contract at the very least, which were the terms
7   of the agreement, so...
8       Q.    And what I'm asking is, did you at some
9   point send Dr. Waller a wire or write him a check
10  for his half of this engagement?
11      A.    I already answered yes.
12      Q.    And that was -- was that $250,000 that
13  you referred to earlier?
14      A.    Yes.  More or less.  Plus expenses,
15  travel expenses and other expenses.
16      Q.    And there was another wire for about
17  $300,000 for Team 1, right?
18      A.    Yes, at least.
19      Q.    Okay.  So as far as you and Dr. Waller
20  are concerned, there's nothing left to split,
21  that's already been --
22      A.    Oh, that baby -- that train's long left
23  the station.
24      MR. GRENDI:  Let's go to 14.
25      (Wallop Exhibit 14, Document Bates
```

Page 248

```
1   stamped SVUS000040 and SVUS000041, marked
2   for identification.)
3       Q.    Just take a moment to take a look at
4   these two documents, SVUS40 and 41.
5       A.    Correct.
6       Q.    Do you recognize these documents?
7       A.    Yes, I do.
8       Q.    What are they?
9       A.    I think these were done by the -- I
10  can't remember if these were done by the ASOG
11  guys.  I think they were done by the ASOG guys,
12  because of the socials.  And they were -- Xi
13  Ping -- Xi Jinping, who is the premier of China,
14  and then his number 2, the next vice president of
15  the communist party in China.
16          And this is a -- this is a -- sort of a
17  geo -- geologic -- I mean, how would I put it?
18  It's sort of a graph of the connections between
19  certain families that were in the original
20  document that we were investigating.  So this was
21  like a -- not a flow chart; this was like a
22  genealogical -- I don't know what you want to
23  call it -- chart.
24      Q.    A family tree, is that what it is?
25      A.    It's sort of a family tree, yeah.  But
```

Page 249

```
1   it shows the relationships of many of these
2   people that were in our original document from
3   Guo.
4       Q.    Did you give this document to the
5   client?
6       A.    To the client?
7       Q.    Yeah, did you deliver this family tree?
8       A.    This is when we were told they were
9   RPs.
10      Q.    So you got this information on or about
11  February 15th?
12      A.    Yes.  Again, I would have to -- yes.
13      Q.    But you didn't give it to Lianchao?
14      A.    We never gave it to him.  We told
15  Lianchao.
16      Q.    What this family tree or --
17      A.    Yes.
18      Q.    -- chart includes?
19      A.    We told them that they were all RPs,
20  that the names that we had were RPs that we had
21  given in.  And, again, Mike would remember how
22  many of these we gave.
23      Q.    And just turning to the second page --
24      A.    Okay.
25      Q.    -- SVUS41?
```

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 278

1  activities recruiting, vetting, engaging and
2  marshaling the initial efforts of the various
3  investigators and analysts in The United States,
4  Europe and the Middle East."  Do you see that?
5      A.    I do.
6      Q.    Did Eastern ever engage any analysts in
7  the Middle East?
8      A.    Eastern?
9      Q.    Oh, I'm sorry, Strategic Vision.  Did
10  Strategic Vision ever engage any analysts in the
11  Middle East?
12      A.    It could have, and I wouldn't know.  It
13  could have been done through Team 1.
14      Q.    Wasn't Team 1 located in Europe?
15      A.    They were, but they could have -- they
16  all have links.
17      Q.    Okay.  Let me ask you this then.  So is
18  it your understanding that Team 1 could farm out
19  its responsibilities to other teams to help it
20  get information?
21      A.    It was all part of the team.
22      Q.    Right.  What I'm asking is, did Team 1
23  have subteams?
24      A.    No.  They would have had teams that --
25  well, if you call them subteams, they weren't.

Page 279

1  They were part of the original team.  And if they
2  used people in the Middle East or Europe or
3  wherever -- you know, the dark web has no
4  geographical location, so it could have been
5  anywhere that they were -- they were challenging
6  each other to find what they needed to find.
7  That's how it works.
8      Q.    But you understood Team 1 was located
9  in Europe, correct?
10      A.    Yes.
11      Q.    And Team 2 wasn't -- well, Team 2 was
12  ASOG, correct?
13      A.    Correct.
14      Q.    And Team 2 is located in The United
15  States?
16      A.    Correct.
17      Q.    And ASOG wasn't contacted until what
18  time?
19      A.    I answered that before.
20      Q.    Was that about February, middle --
21      A.    The beginning of February, and then
22  beginning to the 5th -- I don't know, 5th of
23  February.  I have to go back and look.
24      Q.    And what was the recruiting process?
25      A.    Mike and I were using our channels.

Page 280

1      Q.    And what vetting was done to select
2  the -- well, what vetting was done to select Team
3  1?
4      A.    Experience.
5      Q.    So just Dr. Waller's experience with
6  Team 1?
7      A.    Yes.
8      Q.    Let's look at paragraph 62.  Paragraph
9  62 says that, "Mr. Guo provided to Strategic
10  Vision a list of 92 potential subjects with no
11  prioritization."  Do you see that in the middle
12  of the paragraph there?
13      A.    I do.
14      Q.    And what list was that that had just 92
15  non-prioritized names?
16      A.    Exhibit 7.
17      Q.    So you didn't understand that there was
18  any priority to the 15 names that are in very
19  large font with numbers next to them?
20          MR. SCHMIDT:  Objection.  Go ahead.
21      A.    No, I would not -- I would not agree
22  with that.  We numbered them as to priority.
23      Q.    Well, you received the document with
24  the numbers next to -- let's just say, if you
25  look at the first page?

Page 281

1      A.    Yes.
2      Q.    It says Anita Suen --
3      A.    Yeah.
4      Q.    -- and it has a big 1 next to it?
5      A.    Yes.
6      Q.    It also has the types of reports, does
7  it not?
8      A.    Correct.
9      Q.    Did you not understand that that meant
10  that Anita Suen would be one of the fish?
11      A.    She was the first fish.
12      Q.    Right.
13      A.    She was the most important fish for
14  him.
15      Q.    Right.
16      A.    So the first, more or less, 15 in here
17  were the first -- were the first 15 fish that he
18  was talking about.
19      Q.    And there happens to be exactly 15
20  names with a number next to it and the number of
21  reports that were requested, and the types of
22  reports?
23      A.    Pretty much, yes.  You'd have to count
24  the names of the fish, yeah.  If you can see --
25  so you can't go by the page number, in other

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 282

1   words.  You have to go by the subject.  See,
2   like, here is the second fish (indicating).
3        Q.    Right.
4        A.    So the second fish is on page 11.
5        Q.    Right.
6        A.    Okay.  So you -- you'd have to go -- so
7   these 15 fish are in here at least -- at least 15
8   fish in here.
9        Q.    And you understood that those were
10  the -- or Strategic Vision understood that those
11  were the 15 fish that the research was supposed
12  to start on, correct?
13       A.    Yes.
14             MR. SCHMIDT:  Objection.
15       Q.    Do you still have the virgin laptop
16  that's described in paragraph 63?
17       A.    Yes.
18       Q.    And do you just have a ton of these
19  virgin laptops lying around, because of your --
20  Strategic Vision's work?
21       A.    On this specific issue, we had two
22  domestic ones, ones here, and then a battery of
23  ones overseas.
24       Q.    Could Strategic Vision get those
25  laptops if they request -- it requested them from

Page 283

1   Team 1?
2        A.    Never.  They've been destroyed.  They
3   were destroyed on purpose, because we would
4   destroy them every week so that there was no
5   tracing to the IP number.
6        Q.    So it's Strategic Vision's practice to
7   regularly destroy these laptops for security
8   purposes?
9        A.    Those particular ones, yes.  We did not
10  destroy the two that we had.
11       Q.    Paragraph 66, it says, "at the time the
12  agreement was negotiated with Mr. Guo, Strategic
13  Vision and Mr. Guo expressly agreed that they
14  would not meet in person again."  Do you see
15  that?
16       A.    Yes.
17       Q.    Was that maintained or followed?
18       A.    He kept insisting on wanting to meet
19  us, and we kept trying to explain to him that
20  every time we went in and out, we were being
21  photographed.  We didn't like that.  We did not
22  want to be identified with his programs.
23       Q.    And, by photographed, do you mean going
24  in and out of his apartment building?
25       A.    Yes.

Page 284

1        Q.    Who did you understand was doing that
2   surveillance, you mean the building security or
3   the --
4        A.    Oh, any number of people could easily
5   do the -- the security.  Mike's face is very
6   recognizable, people who knew who Mike was;
7   anybody in the Chinese communist party would have
8   made us, so...
9        Q.    I see.  But Strategic Vision did meet
10  with Mr. Guo repeatedly after the contract was
11  signed?
12       A.    We tried not to.
13             MR. SCHMIDT:  Objection.
14             THE WITNESS:  Oh, sorry.
15             MR. SCHMIDT:  It's okay.
16       A.    We tried not to.  We explained to him
17  after about maybe the fourth time that we just
18  couldn't do that anymore, it was just really
19  dangerous for him and dangerous for us.
20       Q.    Just so we're clear.  The last time you
21  personally met with Mr. Guo was -- was that
22  January 30th?
23       A.    That was the 26th.  No, it was the 26th
24  of January, because the 30th was when Mike met
25  with Yvette at Union Station.

Page 285

1        Q.    Got it.
2        A.    Or Penn Station.
3        Q.    When did Mr. Guo summon you to his
4   yacht in Florida?
5        A.    That must have been sometime -- it
6   might have been at the 26th meeting, January 26,
7   2017 -- 2018.
8        Q.    But I take it that yacht meeting never
9   happened?
10       A.    No.  We refused to go.  It was not
11  safe.
12       Q.    Let's go to paragraph 68.  It says
13  "Strategic Vision learned that most of the
14  individuals so identified by Eastern have been
15  designated by the U.S. Department of State under
16  the Obama administration as records protected
17  persons, meaning that information concerning
18  their status and activities was not subject to
19  disclosure under any circumstance."  Do you see
20  that?
21       A.    That's correct.
22       Q.    And did that in any way hinder Team
23  One's efforts, the records protected persons
24  designation?
25       A.    Actually, the curious thing is here, we

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 286

1  did not alert Eastern, we alerted Guo and we
2  alerted Lianchao, and -- and I believe that
3  Yvette was alerted -- no, I don't think -- Yvette
4  may not have been alerted because that was -- by
5  that time, it was in February.
6      Q.   It says most of the individuals.  Is
7  that most of the fish?
8      A.   Yes.
9      Q.   Is it fair to say that ASOG only looked
10  into five individuals on the list?
11      A.   I don't know how many they looked into.
12  Again, you would have to ask Mike.  They could
13  have looked into all of them.  I honestly don't
14  remember.
15      Q.   Let's look at paragraph 70.
16      A.   70?
17      Q.   7-0, yeah.
18      A.   Okay.
19      Q.   It says, "Strategic Vision verbally
20  reported to Mr. Guo and Eastern that Strategic
21  Vision could not within the limits of U.S. law
22  obtain the information sought by Eastern on its
23  initial list of subjects and that Strategic
24  Vision's work would be refocused upon others on
25  Eastern's list."

Page 287

1           Do you remember when you told
2  Mr. Guo --
3      A.   That must have --
4      Q.   -- this information?
5      A.   That must have been through Lianchao.
6  And you keep using the word Eastern.  It would
7  have been --
8      Q.   I was just reading the complaint.
9      A.   Yeah, but it's -- it's not Eastern.
10  It's Guo.  And I think it would have been -- that
11  would have been at the -- that would have been at
12  the -- at the January 26th lunch.
13      Q.   It says, "As a result, Mr. Guo became
14  enraged"?
15      A.   Yes.  He was -- I thought he was going
16  to jump on the table.
17      Q.   "And irrationally insisted that
18  Strategic Vision immediately deliver its work
19  product"?
20      A.   That's correct.  And continue to dive
21  into illegal areas.  And we said, we can't do
22  that.  That's when Mike apologized and said,
23  we're really sorry, but, you know, there are
24  certain things we can do, and we'll get, but
25  there are other things we can't do, and we --

Page 288

1  you'll be in bigger trouble than we will.
2  They'll send you back to China.
3      Q.   Going to paragraph 71.  It says:
4           "In the face of Eastern's insistence,
5  however, Strategic Vision hand-delivered its raw
6  data to Mr. Guo and Eastern on January 26, 2018,
7  with the caveat that it would be of no use to
8  Eastern until Strategic Vision had an opportunity
9  to analyze it and produce a formal report"?
10      A.   Yes, that's correct.  And formal report
11  would have meant, not just sort of a -- a file
12  that had been encrypted, but it also needed to
13  have Chinese translation, as I understood it, and
14  also needed to have -- and also needed -- there
15  are certain lines of code.
16           Look, I'm not a code expert, but there
17  are lines of code that people have to go through
18  and actually sort of translate into a language,
19  and he kept -- and it takes time to actually
20  translate that code.  You can't just stick it
21  into a machine and expect it to happen.
22           So we gave him the raw code, I believe,
23  on both the 26th and the 31st, or the 31st of
24  January, those two different USB keys.
25      Q.   Then it says, "until Strategic Vision

Page 289

1  had an opportunity to analyze it and produce a
2  formal report."  How would that work?
3      A.   Well, we needed to be able to take that
4  USB key back to the Team 1 to have them go
5  through and -- and configure however it was
6  supposed to be done.  And that was not -- that
7  was not my area, that was Mike's area, and Mike
8  can explain that really succinctly to you.
9      Q.   Paragraph 74.  There's a reference to a
10  wire reversal?
11      A.   Yes.
12      Q.   How did that attempted wire reversal
13  come to your attention?
14      A.   That was wild.  I got a call, like,
15  about the -- I have to see, I think it was around
16  the 12th or the 16th or something like that of
17  January 2018, and -- from Citibank wire
18  department saying that there'd been a request to
19  have 499,000 and some change reversed back to the
20  sender.  And I said, well, what are you talking
21  about?  She said, well, we've gotten a request.
22           So then I called one of my private
23  bankers at Citibank and I said, can this be done?
24  I've never heard of such a thing.  He said,
25  absolutely not, it can never be done.  Once the

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 298

1  in for the protection of the parties, is that a
2  fair statement?
3      A.    That's a fair statement.
4      Q.    And you, being Strategic, took some
5  steps to maintain the identity of the parties, to
6  keep the identity of the parties secret, is that
7  fair?
8      A.    That's correct.
9      Q.    And is it -- is it one of Strategic's
10 business goals to protect the identities of its
11 clients, generally speaking?
12     A.    Yes, because it's generally a private
13 agreement or an arrangement between my clients
14 and myself.
15     Q.    And was this agreement different in
16 that regard in any way from your other clients;
17 was there a heightened degree of security or a
18 sense of keeping things -- keeping the names of
19 the parties confidential?
20     A.    Absolutely --
21     MR. SCHMIDT:  Objection.  But go ahead.
22     THE WITNESS:  Sorry.
23     MR. SCHMIDT:  No, that's fine.
24     A.    Absolutely.
25     Q.    When you learned that Eastern would be

Page 299

1  signing the contract on January 6th, the date
2  that you and Yvette executed the contract, did
3  you speak to Mr. Guo at any point thereafter,
4  prior to signing the contract but after learning
5  that Eastern would be the signatory?
6      A.    Gosh, I -- well, let me see.  So she
7  signed it on the -- the 6th of January.  Then we
8  saw him subsequently during January.  So I never
9  had any direct contact with him, it was only
10 through Yvette or Lianchao.  So I'm not sure if
11 that answers your question.
12     Q.    After finding out that Eastern would be
13 the counterparty to the contract --
14     A.    Right.
15     Q.    -- that's the subject of this
16 litigation, did you talk to Mr. Guo about also
17 signing the contract?
18     A.    He represented Eastern, and in all of
19 our conversations he was the only party with whom
20 I negotiated, and Mike negotiated the discussion
21 and the contract.
22     Q.    So after finding out that Eastern, not
23 Mr. Guo, would be the counterparty to the
24 contract, did you talk to Mr. Guo about also
25 signing the contract?

Page 300

1      A.    He represented -- Guo represented that
2  he was, in fact, the person that was going to
3  fund this.  So I presumed, when Yvette's sitting
4  next to me and having conversations with him,
5  along with -- along with all of the conversations
6  that we'd had in his apartment, that obviously
7  it's Guo with whom we are dealing.  So Guo equals
8  Eastern, one would presume.  Just saying.
9      Q.    Did you do any independent research to
10 determine whether or not that was -- that Guo
11 equaled Eastern?
12     A.    It's -- it's so redundant, but, no, we
13 didn't, because he said he was going to fund it,
14 whatever it was, and we did not know the name of
15 the entity that he was going to use.
16     Q.    When did he first tell you that it
17 would be an entity and not himself personally
18 that would be the counterparty to the contract?
19     A.    Because he said that he had accounts
20 everywhere and that it would probably be through
21 the U.K. office of William Wu or William Yu, or
22 whatever his name was, that was the -- his
23 financial person.
24     Q.    And when did you find that out; when
25 was the first time?

Page 301

1      A.    When did I find it out?  I mean, we
2  were discussing the payment process and how that
3  would work after looking at the -- we had the
4  vision paper, we had the -- the Word
5  presentation, we had done another sort of vision
6  paper; all of these were in different discussions
7  with him moving forward.
8          He then said, when we got to sort of
9  the third or fourth discussion of all of this,
10 that he wanted to fund it, and he explained that
11 he paid $250 million for that, and that he wanted
12 very much to make sure that, if this was done,
13 that we would have a long-term contract for at
14 least three years, and for possibly up to 4,000,
15 quote, fish, and he said that he would fund it,
16 so we presumed he would fund it.  We didn't know
17 whether he was Eastern or, as I say, the Mickey
18 Mouse Club.  We didn't know.  He never told us
19 who it was going to be.
20     Q.    But prior to signing the contract --
21     A.    Right.
22     Q.    -- you never asked Mr. Guo to sign it
23 himself?
24     A.    No, because he wouldn't.
25     Q.    Did you ever ask him?

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 306

1  understanding at that time that Yvette was on the
2  telephone with Mr. Guo.
3        Did you ask Yvette to ask Mr. Guo if he
4  would personally sign the contract?
5     A.   No.
6     Q.   And how long was that meeting at which
7  you found out that Eastern would be signing, and
8  you and Yvette signed the contract?
9     A.   I have no idea.  It was during that
10 moment when she had the paperwork and we made the
11 changes, we agreed to the changes, she signed,
12 and then I signed, and it had Eastern on the top.
13 That's all I know.
14    Q.   All in all, two hours?
15    A.   Maybe.  Let's call it two hours, to
16 make you happy.
17    Q.   No, not -- I want the truth.  No answer
18 is going to make me happy.
19    A.   Two hours is fine with me.
20    Q.   I just want the truth.
21    A.   Two hours is fine.
22    Q.   Two hours?
23    A.   Sure.
24    Q.   And your understanding is that this
25 contract was the culmination of the conversations

Page 307

1  that you had had with Mr. Guo about the
2  investigative services that Strategic was going
3  to provide?
4     A.   He hired us, not Yvette.
5     Q.   So this contract was the culmination of
6  those conversations?
7     A.   Yes.
8        MS. TESKE:  Okay.  I have nothing
9  further.
10       MR. SCHMIDT:  I have no questions.
11 Thank you.
12       THE WITNESS:  Cheers.
13       MR. SCHMIDT:  Let him go off the
14 record.
15       THE VIDEOGRAPHER:  This concludes
16 today's deposition.  The time is 5:57.
17
18       (Whereupon, the within proceedings
19 concluded at 5:57 p.m., on the
20 12th day of February, 2019.)
21
22       *      *      *      *      *
23
24
25

Page 308

1            D E C L A R A T I O N
2
3        I hereby certify that having been first
4  duly sworn to testify to the truth, I gave the
5  above testimony.
6
7        I FURTHER CERTIFY that the foregoing
8  transcript is a true and correct transcript of
9  the testimony given by me at the time and place
10 specified hereinbefore.
11
12
13       _____
14            FRENCH WALLOP
15
16
17
18 Subscribed and sworn to before me
19
20 this _____ day of _____ 20___.
21
22
23 _____
24    NOTARY PUBLIC
25

Page 309

1            ERRATA SHEET
2
3  NAME OF CASE:  EASTERN PROFIT v STRATEGIC
4  DATE OF DEPOSITION:  Tuesday, February 12, 2019
5  NAME OF WITNESS:  FRENCH WALLOP
6  PAGE LINE   FROM                   TO
7
8  ____|_____|_____|_____
9  ____|_____|_____|_____
10 ____|_____|_____|_____
11 ____|_____|_____|_____
12 ____|_____|_____|_____
13 ____|_____|_____|_____
14 ____|_____|_____|_____
15 ____|_____|_____|_____
16 ____|_____|_____|_____
17 ____|_____|_____|_____
18 ____|_____|_____|_____
19 ____|_____|_____|_____
20 ____|_____|_____|_____
21 ____|_____|_____|_____
22 ____|_____|_____|_____
23 ____|_____|_____|_____
24
25

# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

EASTERN PROFIT CORPORATION LIMITED,

    **Plaintiff/Counterclaim Defendant,**

                                              **Case No. 18-cv-2185**

    **v.**

**STRATEGIC VISION US, LLC,**

    **Defendant/Counterclaim Plaintiff.**

-------------------------------------------------------------------------------------------------------------

## AFFIDAVIT

French Wallop, having been duly sworn, states and affirms the following, about which she has personal knowledge and to which she would testify if called on in Court.

1.      I am the founding and sole member of Strategic Vision US, LLC ("Strategic Vision"). Strategic Vision is a limited liability company registered in the State of Nevada, and I am its manager. Strategic Vision is in good standing with the State of Nevada. Strategic Vision's mailing address is 7260 W. Azure Dr., Ste. 140-593, Las Vegas, NV, 89130, but I primarily receive communications about and engage in business matters for Strategic Vision at my home, located at 1557 North 22nd Street, Arlington, Va. 22209.

2.      I have lived in the Washington, D.C. area (and in Wyoming) for decades. For many of my years in Washington, I was married to Senator Malcolm Wallop, who represented Wyoming from 1977 to 1994. Malcolm died in 2011.

3.      While in the Senate, Senator Wallop worked with Lianchao Han, who emigrated from China and is a prominent voice on matters of U.S. human rights policy toward China. I have known Lianchao for many years on a professional and personal level.

4.      Strategic Vision entered into a Research Agreement with Eastern Profit Corp. Ltd. ("Eastern Profit") that was signed by both sides at my home in Virginia on January 6, 2018. When I was first approached about the engagement, I had serious concerns about the safety of who would be involved because the project would create support for the criticism of the Chinese government and members of the Chinese Communist Party. In negotiating the Agreement, I made it a point to have protections for the safety and well-being of the parties and the people who would do research under the Agreement. These precautions included various ways to ensure the project would be kept strictly confidential.

5.      My concerns about the project were based on Guo's claims to me that he was an opponent of the Chinese regime. After the project began, Guo told me that the Chinese Embassy in Washington was surveilling my home and Guo gave me a name, in English and Chinese, of who at the Embassy was tracking me. Guo also told me that I had a neighbor who was a member of the Chinese Communist Party.

6.      As shown in the Agreement, the confidentiality of the project meant that Eastern Profit would not share the results of Strategic Vision's work with any other party. I eventually came to understand that Eastern Profit had disclosed Strategic Vision's existence and work to an entity called ACA Capital Group Limited ("ACA"). No one associated with Eastern Profit (including Guo Wengui) ever asked for Strategic Vision's permission to disclose its existence and work to ACA, and Eastern Profit never informed Strategic Vision about anything to do with ACA.

7.      Eastern Profit has taken the position in this lawsuit that it had a loan agreement with ACA that concerned the Research Agreement. If this is true, Strategic Vision did not know it until this lawsuit was in its second year. The only contact that Strategic Vision had with ACA

regarding the Research Agreement came from two wire transfers that Strategic Vision received in early January 2018 from ACA as the sender.  Neither Eastern Profit nor ACA informed Strategic Vision that these wires would be arriving from ACA, what they were for, or that ACA had tried to retract the wires shortly after they were sent.  ACA has never made demand on Strategic Vision to return the wires or for anything else pertaining to the Agreement.

8.      As the project was nearing its end, Strategic Vision arranged for a Texas-based company (Allied Special Operations Group—ASOG) to conduct research under the Agreement. ASOG informed Strategic Vision that the individuals being looked at, who had been designated by Mr. Guo and Eastern Profit as subjects for research, were "Records Protected."  This meant that the names could not be searched in federal databases typically used for work of this sort. Strategic Vision was not given the names of research subjects prior to entering the Agreement with Eastern Profit, and, prior to the notification from ASOG, I was unaware of this designation and how it would impact a project like this.

9.      Deciding who would be the subject of the research was entirely under the control of Eastern Profit per the Agreement.  Even though Eastern Profit had identified many more names than the 15 that ASOG reviewed and found to be Records Protected, when the Records Protected issue surfaced, Eastern Profit did not respond to our requests through its designated intermediary, Lianchao Han, to provide substitute names not subject to this designation.

10.     When Eastern Profit terminated the Research Agreement on or about February 23, 2018, among other problems, Strategic Vision could only continue work for 30 more days and its opportunity to work through the contract's look-back or "recap" date of April 16, 2018 was cut short.  This early termination of work caused Strategic Vision to lose at least $100,000 in revenues.

FURTHER AFFIANT SAYETH NAUGHT.

_French Wallop_
French Wallop

STATE OF _Virginia_ )
) ss
COUNTY OF _Arlington_ )

On this _12_ day of March, 2020, before me personally appeared French Wallop, to me known to be the person described herein, who executed the foregoing instrument and acknowledged she executed said instrument as her knowing and free act and deed.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal in _3/12/20_ , the day and year last above written.

> FATEMA SHAKHAWAT
> Notary Public
> Commonwealth of Virginia
> Registration No. 7506523
> My Commission Expires Jun 30, 2020

[notary seal]

_Fatema S._
Notary Public

My commission expires: _06/30/2020_

4

# Exhibit D

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------x
EASTERN PROFIT CORPORATION LIMITED,

          Plaintiff-Counterclaim Defendant,

                 - against -

STRATEGIC VISION US, LLC,

          Defendant-Counterclaim Plaintiff,

                 - against -

GUO WENGUI a/k/a MILES KWOK,

                 Counterclaim Defendant.
-------------------------------------x

                    340 Madison Avenue
                    New York, New York

                    January 31, 2019
                    9:40 a.m.




          EXAMINATION BEFORE TRIAL of YVETTE

WANG, a 30(b)(6) Witness on behalf of EASTERN

PROFIT CORPORATION LIMITED, the

Plaintiff-Counterclaim Defendant herein, taken

by the Defendant-Counterclaim Plaintiff,

pursuant to Court Order, held at the

above-mentioned time and place, before Michelle

Lemberger, a Notary Public of the State of New

York.

Page 2

1
2  A P P E A R A N C E S :
3
   ZEICHNER ELLMAN & KRAUSE, LLP
4  Attorneys for Plaintiff-Counterclaim Defendant
       35 Mason Street
5      Greenwich, Connecticut 06830
   BY:  ZACHARY GRENDI, ESQ.
6
7
   PHILLIPS LYTLE, LLP
8  Attorneys for Defendant-Counterclaim Plaintiff
       340 Madison Avenue, 17th Floor
9      New York, New York 10173
   BY:  JOSEPH SCHMIT, ESQ.
10
       jschmit@phillipslytle.com
11
       HEATHER KIDERA, ESQ.
12
13
14 HODGSON RUSS, LLP
15 Attorneys for Counterclaim Defendant
       605 Third Avenue, Suite 2300
16     New York, New York 10158
   BY:  ERIN N. TESKE, ESQ.
17
18
   ALSO PRESENT:
19
       French Wallop
20
       Sophia Xie - Mandarin interpreter
21                    (sitting in)
22        *    *    *    *    *
23
24
25

Page 3

1
2        S T I P U L A T I O N S
3
4       IT IS HEREBY STIPULATED AND AGREED by
5  and between the attorneys for the respective
6  parties herein, that filing, sealing and
7  certification be and the same are hereby
8  waived.
9       IT IS FURTHER STIPULATED AND AGREED
10 that all objections, except as to the form of
11 the question shall be reserved to the time of
12 the trial.
13      IT IS FURTHER STIPULATED AND AGREED
14 that the within deposition may be signed and
15 sworn to before any officer authorized to
16 administer an oath, with the same force and
17 effect as if signed and sworn to before the
18 Court and that a copy of this examination
19 shall be furnished without charge to the
20 attorney representing the witness testifying
21 herein.
22
23
24
25

Page 4

1
2  Y V E T T E   W A N G, having been first duly
3        sworn by a Notary Public of the State
4        of New York, was examined and
5        testified as follows:
6  BY THE REPORTER:
7      Q.  Please state your name for the
8  record.
9      A.  Yvette Wang.
10     Q.  What is your present address?
11     A.  150 East 57th Street, Apartment 22D,
12 New York, New York 10022.
13 EXAMINATION BY
14 MR. SCHMIT:
15     Q.  Good morning.  Could you please
16 state your name for the record?
17     A.  Yvette Wang.
18     Q.  Ms. Wang, my name is Joe Schmit.  We
19 met a moment ago.  I represent defendant and
20 counterclaim plaintiff in this, Strategic
21 Vision U.S. LLC.
22         You're here this morning for your
23 deposition.  Do you recognize that?
24     A.  Yes.
25     Q.  You're here specifically as a

Page 5

1                Yvette Wang
2  30(b)(6) representative for plaintiff in this
3  action, Eastern Profit Corporation Limited;
4  is that right?
5      A.  Yes.
6      Q.  Has your attorney explained to you
7  what that means, being a 30(b)(6)
8  representative?
9      A.  Yes.
10     Q.  I'm going to ask you a series of
11 questions.  All I ask is that you give me
12 complete and truthful answers; is that all
13 right?
14     A.  Will do.
15     Q.  The most important thing in my book
16 is that you understand the question.
17     A.  Yes.
18     Q.  If at any time you don't understand
19 the question I am asking, just let me know,
20 okay?
21     A.  Yes.
22     Q.  I will do my best to meet your
23 concern.  Okay?
24     A.  Yes, thank you.
25     Q.  There's one thing.  There was a

Page 6

Yvette Wang

1
2    little bit of a miscommunication.  We do have
3    a Mandarin interpreter in the room, but my
4    understanding is you don't need an
5    interpreter?
6        A.  Thank you.
7        Q.  Is that correct?
8        A.  I will try my best, it's correct.
9        Q.  Okay.  If during the morning there
10   comes a time, because for whatever set of
11   reasons you want to change your mind, just
12   let me know.  Okay?
13       A.  Sure, thank you.
14           MR. GRENDI:  Just before we get
15       into it, I just want to put an
16       objection on the record.  I think
17       just for clarity and consistency down
18       the road because I don't want to be
19       interrupting you all the time, but to
20       the extent that you're asking
21       questions that are part of the topics
22       encompassed in the 30(b)(6)
23       attachment, obviously the witness
24       will be answering for the
25       corporation.  To the extent there are

Page 7

Yvette Wang

1
2       questions being asked outside of
3       that, the witness will not be
4       answering for the corporation, will
5       be answering based on her own
6       knowledge.  And I may pop in with
7       that every now and then.
8    BY MR. SCHMIT:
9        Q.  Ms. Wang, I'm going to ask you from
10   time to time how you know the answer and just
11   let me know if you've been educated and
12   provided the answer or if it is from your
13   personal knowledge; is that okay?
14       A.  Okay.
15           MR. SCHMIT:  Let's have this
16       marked as Exhibit 1.  If at any time
17       you need a break, just let us know,
18       okay.
19           THE WITNESS:  Sure, thank you.
20           (Whereupon, at this time, the
21       reporter marked the above-mentioned
22       notice of deposition as Wang Exhibit
23       1 for identification.)
24   BY MR. SCHMIT:
25       Q.  Ms. Wang, I'm going to hand you

Page 8

Yvette Wang

1
2    what's been marked for your deposition as
3    Exhibit 1.
4        A.  Thank you.
5        Q.  It is Strategic Vision's notice of
6    30(b)(6) deposition to plaintiff.
7            Do you have that in front of you?
8        A.  Yes.
9        Q.  Have you seen it before?
10       A.  Yes, I did.
11       Q.  If you can turn to the last page,
12   those are the list of topics that have been
13   identified.
14           Do you see that?
15       A.  Yes.
16       Q.  Have you reviewed those topics
17   before?
18       A.  Yes.
19       Q.  Are there any topics there that
20   you're not prepared to testify concerning
21   today?
22       A.  No.  All of them, I'm ready to
23   answer the question.
24       Q.  Eastern Profit Corporation Limited,
25   are you familiar with that entity?

Page 9

Yvette Wang

1
2        A.  Not too much.
3        Q.  To what extent are you familiar with
4    that entity?
5        A.  No.
6        Q.  You said not too much?
7        A.  Yes.
8        Q.  How are you, if at all, affiliated
9    with Eastern Profit Corporation Limited?
10       A.  I was told this is another party,
11   but I don't know this company at all before
12   this project.
13       Q.  You referred to you were told this
14   is another party.  What do you mean by that?
15       A.  Miles, that is the person who
16   involved in this project as well, and he told
17   me this is another party of the contract.
18       Q.  Miles, who are you referring to?
19       A.  Miles Kwok.
20       Q.  Is he known by any other names?
21       A.  Kwok Ho Wan, I think.
22       Q.  Could you spell that?
23       A.  K-W-O-K, H-O, W-A-N.
24       Q.  How about Guo?
25       A.  Yes.

Page 10

1                    Yvette Wang
2        Q.  How do you spell that?
3        A.  G-U-O.
4        Q.  And is that his first name often?
5        A.  Last name, family name.
6        Q.  So sometimes people refer to him as
7   Mr. Guo?
8        A.  Yes.
9        Q.  If I say Mr. Guo, you'll know who
10   I'm referring to?
11       A.  Yes.
12       Q.  If I say Eastern Profit, will you
13   know that I'm referring to Eastern Profit
14   Corporation Limited?
15       A.  Yes.
16       Q.  So is it Mr. Guo who introduced you
17   to Eastern Profit?
18       A.  Yes.
19       Q.  When did that happen?
20       A.  In December 2017.  No, the contract
21   was signed 2018, right before this contract
22   was signed.
23       Q.  I'll represent to you the contract
24   was signed on January 6, 2018; does that
25   sound about right?

Page 11

1                    Yvette Wang
2        A.  2018.  That's right, December 2017.
3        Q.  So shortly before January you would
4   have been introduced to Eastern Profit?
5        A.  Yes.
6        Q.  What did Mr. Guo tell you about
7   Eastern Profit when he introduced you to that
8   company?
9        A.  He told me this is another party of
10   this contract, and then he gave me the name.
11   And that's it.
12       Q.  When you say "another party of the
13   contract," what are you referring to?
14       A.  Another party.  The client of this
15   contract.
16            MR. SCHMIT:  Just so the record
17       is clear, could I have this marked as
18       Exhibit 2?
19            (Whereupon, at this time, the
20       reporter marked the above-mentioned
21       research agreement as Wang Exhibit 2
22       for identification.)
23   BY MR. SCHMIT:
24       Q.  I'm going to hand you what's been
25   marked as Exhibit 2.

Page 12

1                    Yvette Wang
2        Do you recognize that document?
3        A.  Yes.
4        Q.  What is it?
5        A.  It's the contract signed between
6   Eastern Profit and Strategic Vision.
7        Q.  And in your answers up until now,
8   you've been saying the other party to the
9   contract.  You're referring to the contract
10   that I just marked as Exhibit 2?
11       A.  Correct.
12            MR. GRENDI:  Objection to the
13       form.
14            You can answer.
15       Q.  When Mr. Guo introduced you to
16   Eastern Profit, did he hand you the contract?
17       A.  I don't understand what you mean,
18   hand me the contract?
19       Q.  How did he say -- what did he say
20   when you first heard the words Eastern Profit
21   or first heard of the entity?
22       A.  I remember that happened before I
23   went to Virginia to discuss about this
24   contract.  By then I was request to negotiate
25   this contract.  Then I ask who is the client.

Page 13

1                    Yvette Wang
2   Then I had that, this name.
3        Q.  So you were negotiating the contract
4   on behalf of Mr. Guo initially?
5            MR. GRENDI:  Objection of the
6       form.
7            You can answer.
8        A.  I will listen to my lawyer.
9            MR. GRENDI:  I said you can
10       answer.
11       Q.  No, no, you can answer.  Unless he
12   tells you not to answer, you have to answer.
13   Objections are just for the record.
14       A.  Okay.  Correct.
15       Q.  And then at some point Mr. Guo said,
16   The actual entity that's going to enter the
17   contract is Eastern Profit, right?
18       A.  Correct.
19       Q.  So initially, when you were
20   negotiating in Virginia, you were speaking on
21   behalf of Mr. Guo; is that a fair statement?
22            MR. GRENDI:  Objection, you can
23       answer.
24            MS. TESKE:  Objection.
25       A.  Correct.

Page 14

1                  Yvette Wang
2        Q.  And then at some point prior to
3   execution, he said the party we're going to
4   put in the contract is Eastern Profit, right?
5            MR. GRENDI:  Objection.
6            You can answer.
7        A.  I don't remember that.
8        Q.  So what did he finally tell you when
9   he introduced you to Eastern Profit?
10       A.  Because I am a project manager.  I
11  have to have enough information for a
12  project.  So I request the necessary
13  information to finish this contract.  Then he
14  gave me this name.
15       Q.  What information did you request of
16  Mr. Guo in order to finish this project?
17       A.  At least who is the client or who is
18  the vendor.
19       Q.  So when you asked him who the client
20  or the vendor was, he said Eastern Profit; is
21  that fair?
22       A.  Correct.
23       Q.  What did he tell you about Eastern
24  Profit at that time?
25       A.  I don't remember.

Page 15

1                  Yvette Wang
2        Q.  Did you ask anything?
3        A.  No.
4        Q.  Up until that point, had you ever
5   heard of Eastern Profit before?
6        A.  I don't remember I heard about that.
7        Q.  Sitting here today, you think that
8   may have been the first time you ever heard
9   of Eastern Profit?
10       A.  You mean by then?
11           MR. GRENDI:  Objection to the
12       form.
13           You can answer, go ahead.
14       A.  You mean by this time, December
15  2017?
16       Q.  Yes.
17       A.  Yes.
18       Q.  So as far as you can recall, that's
19  the first time you ever heard of Eastern
20  Profit?
21       A.  Correct.
22       Q.  Did Mr. Guo tell you anything about
23  Eastern Profit?
24       A.  I don't remember.
25       Q.  What does Eastern Profit do?

Page 16

1                  Yvette Wang
2            MR. GRENDI:  I'll just remind
3       everyone of the objection as to the
4       topics that the witness has been
5       prepared to testify about, and this
6       outside the topics.  But you can go
7       ahead and answer.
8            MR. SCHMIT:  This is well
9       within the topics, but you stated
10      your objection.
11       Q.  What does Eastern Profit do?
12       A.  I do not know.
13       Q.  Does Eastern Profit have a board of
14  directors?
15       A.  I don't know.
16       Q.  Are you employed by Eastern Profit?
17       A.  No, I'm not.
18       Q.  Are you an officer or director of
19  Eastern Profit?
20       A.  I am not.
21       Q.  Have you ever met anybody or spoken
22  on the phone with anybody who is employed by
23  Eastern Profit?
24       A.  No, I didn't.
25       Q.  Have you ever met anybody or spoken

Page 17

1                  Yvette Wang
2   on the phone with anybody that you understood
3   to be an officer or director of Eastern
4   Profit?
5        A.  No, I didn't.
6        Q.  Since you executed the contract on
7   behalf of Eastern Profit, has anybody told
8   you anything about what Eastern Profit does?
9        A.  You mean business?
10       Q.  Anything.  However you want to
11  characterize it.
12       A.  If I recall a little bit, I'm not
13  sure, Mr. Guo said Eastern Profit is a kind
14  of, like, investment company.  But I didn't
15  ask further what is that.
16       Q.  Do you know where Eastern Profit is
17  based?
18       A.  Hong Kong.
19       Q.  Does it have an office there?
20       A.  I don't know.
21       Q.  Again, do you know if there are any
22  employees in Hong Kong?
23       A.  Eastern Profit employee?
24       Q.  Yes.
25       A.  No, I didn't.

Page 22

Yvette Wang

1
2  Springs, correct?
3      A.  Yes.
4      Q.  Are there other employees?
5          MR. GRENDI:  Objection.  You
6   can answer.
7      A.  In New York?
8      Q.  In New York.
9      A.  I don't answer this.  But because,
10  you know, I try to save everyone's time, so,
11  yes, they do have employees here.
12     Q.  Where is it?  Is there an office?
13     A.  Yes.
14     Q.  Where is the office located?
15     A.  800 Fifth Avenue.
16     Q.  How many employees are there for
17  this entity?
18     A.  12 now, I think, 12.
19     Q.  Does Mr. Guo work for this entity?
20     A.  No.
21     Q.  Why did Golden Springs verify the
22  interrogatories in this case?
23         MR. GRENDI:  Objection.
24         You can answer.
25     A.  I don't understand your question.

Page 23

Yvette Wang

1
2      Q.  Why did --
3          MR. SCHMIT:  Let's have this
4   marked as Exhibit 3.
5          (Whereupon, at this time, the
6   reporter marked the above-mentioned
7   responses and objections to
8   interrogatories as Wang Exhibit 3 for
9   identification.)
10 BY MR. SCHMIT:
11     Q.  I'm handing you what's been marked
12  for your deposition as Exhibit 3.
13     A.  Thank you.
14     Q.  Do you recognize that document?
15     A.  Yes.
16     Q.  Turn to the second to last page.  Do
17  you see that, the verification?
18     A.  Yes.
19     Q.  Is that your signature there?
20     A.  Yes.
21     Q.  And it says, Yvette Wang, President,
22  do you see that?
23     A.  Yes.
24     Q.  And then up above it says Golden
25  Spring New York LTD.  I assume your title is

Page 24

Yvette Wang

1
2  president with Golden Spring LTD, right?
3      A.  You're right.
4      Q.  Why did you verify the
5   interrogatories in this fashion?
6          MR. GRENDI:  I'm just going to
7   object to the form, and -- well,
8   if -- go ahead and answer if you can.
9      A.  Because I was project manager of
10  this contract (indicating).
11     Q.  And does Golden Spring LTD have any
12  contractual relationships with Eastern
13  Profit?
14     A.  No.
15         MR. GRENDI:  Objection.  I
16  mean, I think that needs to be
17  clarified and I think there's a
18  document that will clarify that.
19         Can we go off the record
20  briefly?
21         MR. SCHMIT:  Yes, sure, why
22  not?
23         MR. GRENDI:  Do you want to
24  step outside?
25         MR. SCHMIT:  You want to talk

Page 25

Yvette Wang

1
2  with me?
3          MR. GRENDI:  With you, yes.
4          (Whereupon, a brief recess was
5   taken.)
6          MR. GRENDI:  Just in the
7   interest of clarifying the record, as
8   I think there is just an error there,
9   there is a relationship between
10  Golden Spring and Eastern Profit
11  Corporation, there's a limited power
12  of attorney.  That document, we're
13  happy to produce that to clarify this
14  issue.  But I think the answer that
15  there's no relationship between
16  Eastern Profit and Golden Spring was,
17  obviously, just kind of a mistake
18  made by a witness that's not an
19  attorney.
20         So we will produce that
21  document shortly.  I don't have it on
22  me.
23 BY MR. SCHMIT:
24     Q.  Ms. Wang, have you seen this power
25  of attorney document?

Page 26

1                  Yvette Wang
2       A.  Yes.
3       Q.  Do you recall who signed it on
4   behalf of Eastern Profit?
5       A.  I don't remember that.  It's a long
6   time ago.  If you have it -- I don't
7   remember.
8           MR. GRENDI:  I believe the
9       document will clarify that.
10          MR. SCHMIT:  Can you help, for
11      the record, and say who executed it?
12          MR. GRENDI:  I know him as
13      Hank.  His full name is -- it's in
14      the interrogatory responses.  Let me
15      see, I want to make sure I get it
16      right for the record.  C-H-U-N-G,
17      U-A-N-G, H-A-N.  That's my
18      recollection.
19  BY MR. SCHMIT:
20      Q.  If you can turn to Exhibit 3, second
21  page, do you see the second interrogatory,
22  number 2?
23      A.  Yes.
24      Q.  It says identify the principals of
25  Eastern.

Page 27

1                  Yvette Wang
2       Do you see that?
3       A.  Yes.
4       Q.  And then that's Mr. Han, your
5   attorney just spelled into the record, right?
6           MR. GRENDI:  Objection, but,
7       yes, go ahead.
8       A.  Yes.
9       Q.  Is that the only principal of
10  Eastern that you're aware of?
11      A.  From here, yes.
12      Q.  Are you aware of any other
13  principals of Eastern Profit?
14      A.  No.
15      Q.  Have you ever met Mr. Han?
16      A.  We met before.
17      Q.  Where does he reside?
18      A.  Sorry?
19      Q.  Where does he live?  Where does he
20  reside?
21      A.  I don't know.
22      Q.  Where did you meet him?
23      A.  New York.
24      Q.  Do you know if he resides in the
25  States, the United States?

Page 28

1                  Yvette Wang
2       A.  I didn't ask.
3       Q.  Did he explain to you what his
4   relationship with Eastern Profit was?
5       A.  He didn't explain.
6       Q.  Do you have any idea why he would
7   execute a power of attorney for Eastern
8   Profit?
9       A.  Because we provide service, Golden
10  Spring.
11      Q.  Service to who?
12      A.  Service to the client.
13      Q.  Who is the client?
14      A.  Eastern Profit.
15      Q.  Does Eastern Profit provide Golden
16  Spring with any compensation?
17      A.  Not now, not yet.
18      Q.  When you say "not now," will they at
19  some time in the future or have they at some
20  time in the past?
21          MR. GRENDI:  Objection of form.
22          You can answer.
23      A.  No.
24      Q.  And what did you mean by not now?
25          MR. GRENDI:  Objection.

Page 29

1                  Yvette Wang
2       You can answer.
3       Q.  You can answer.
4       A.  Oh.
5           MR. GRENDI:  You can answer,
6       I'm sorry.
7       Q.  Yes.  He's just making an objection
8   for the record.  It's for him and I to work
9   out later, if necessary.
10      A.  Okay.  Because Golden Spring didn't
11  sign any contract with Eastern.  So I don't
12  know there is any payment or any, like,
13  payment, yeah.
14      Q.  Does Eastern Profit have a bank
15  account anywhere?
16      A.  I don't know.
17      Q.  Why did Eastern Profit enter into
18  this contract?
19      A.  I don't know.
20      Q.  But Mr. Guo told you Eastern Profit
21  was going to be the client that should be put
22  in the contract, right?
23      A.  Correct.  Mr. Guo said he is the
24  advisor and consultant to Eastern.  So that's
25  why he communicated and told me Eastern

Page 30

1                  Yvette Wang
2    should be in this contract.
3        Q.  Did he say what he was advising or
4    consulting Eastern Profit on?
5        A.  He didn't say that clearly, but I
6    remember he mentioned about, like, strategy
7    or some investments, something like that.
8        Q.  Tell me, when did he give this
9    explanation?
10       A.  I don't remember that clearly.
11   Should be in December or January, right
12   before or after this contract signed.
13       Q.  What was the purpose of the
14   contract?
15       A.  Investigation service.
16       Q.  Investigation of what?
17       A.  Information.
18       Q.  What kind of information?
19       A.  Let me review the contract again.
20            (Witness peruses document.)
21       Q.  You can't answer that question
22   without looking at the contract?
23       A.  I can.
24       Q.  I mean, you're welcome to look at
25   it, but what was being investigated pursuant

Page 31

1                  Yvette Wang
2    to the contract?
3        A.  Financial, forensic, historical
4    research, current tracking research, social
5    media research.
6        Q.  Of what?
7        A.  Of what?  I don't understand your
8    question.
9        Q.  I mean, those are general areas, but
10   what's being researched?  Buildings, people,
11   plants, animals?  What's being researched?
12       A.  People.
13       Q.  How were the people identified that
14   were going to be researched?
15            MR. GRENDI:  Objection.  I just
16       want to hop in here.  We may be,
17       obviously, designating portions of
18       this deposition confidential.  I just
19       want to put that on the record,
20       something I should have said at the
21       outset, and obviously applies
22       retroactively to the beginning.
23            Go ahead and answer.
24       A.  The people they are Strategic Vision
25   called them fish, F-I-S-H.

Page 32

1                  Yvette Wang
2        Q.  You use that term as well, correct?
3        A.  Yes.  That is Strategic Vision
4    request me to use.
5        Q.  What did you understand fish to
6    mean?
7        A.  Target people, human beings.
8        Q.  But Strategic Vision wasn't
9    identifying anybody to be researched, that
10   was Eastern Profit, right?
11       A.  Correct.
12       Q.  So who was Eastern Profit
13   identifying to be researched and why?
14       A.  Some individual who are highly
15   corrupted, Chinese people.
16       Q.  Corrupted in whose view?
17            MR. GRENDI:  Objection.
18            You can answer.
19       A.  I don't understand your question.
20       Q.  What do you mean by corrupted?
21       A.  Corrupted, they are Chinese high
22   level official, or some of them they are high
23   level and some of them are official,
24   government official, and their family.  They
25   are suspected to have huge illegal criminal

Page 33

1                  Yvette Wang
2    assets in other country, which they steal
3    from Chinese government and Chinese people.
4        Q.  And when you say "other country,"
5    what are you referring to?
6        A.  Other country means outside of the
7    Mainland of China.
8        Q.  And these people, were they -- are
9    they members of the Communist party?
10       A.  Some of them, they are.
11       Q.  And who identified these people?
12            MR. GRENDI:  Objection.
13            You can answer.
14       A.  Mr. Guo.
15       Q.  And from where did Mr. Guo get his
16   information?
17       A.  I don't know.
18       Q.  You never asked?
19       A.  No.
20       Q.  Did he ever say why certain
21   individuals were being identified?
22       A.  I didn't ask.  But if you want, you
23   can follow his social media.  He talks a lot
24   in there.
25       Q.  About what he's doing and why he's

Page 34

1                    Yvette Wang
2    doing it?
3         A.  Yes.
4         Q.  What is your understanding, though,
5    of what he is doing and why he's researching
6    these people?
7              MR. GRENDI:  Objection.
8              You can answer.
9         A.  I don't understand.  What is your
10   question?
11        Q.  Well, what is your understanding?
12        A.  My understanding?
13        Q.  Of why he's investigating these
14   people.
15        A.  Oh, okay.  He needs the information
16   about these people to whistle blow and
17   disclosure their crime.  So Chinese
18   government, and even other countries'
19   authorities, they can take action to this
20   corrupted criminal, Chinese official.
21        Q.  So your understanding was the
22   research would be reported back to China?
23        A.  I don't know that.
24        Q.  How was he going to do what you just
25   said?

Page 35

1                    Yvette Wang
2         A.  What is your question?
3         Q.  How was Mr. Guo going to help report
4    or whistle blow on these individuals?
5              MR. GRENDI:  Objection.
6              You can answer.
7         A.  I didn't ask.  And I don't know.
8    But from what he has done on his media, his
9    social media, and he probably, I mean,
10   explained to the public, I don't know, this
11   is all my guess.
12             MS. TESKE:  Can I add my
13        objection to that question?  Thank
14        you.
15        Q.  Who besides you assisted on this
16   project for Mr. Guo?
17             MS. TESKE:  Objection.
18             MR. GRENDI:  Objection.  You
19        can answer.
20        A.  I heard there's a gentleman called
21   Mr. Han Lianchao, H-A-N, L-I-A-N-C-H-A-O.
22        Q.  Did you work with anybody else on
23   this project other than Mr. Guo?
24             MR. GRENDI:  Objection.  You
25        can answer.

Page 36

1                    Yvette Wang
2         A.  No.
3         Q.  Was anybody else from Golden Springs
4    involved in this project?
5              MR. GRENDI:  Objection.  You
6         can answer.
7         A.  No.
8         Q.  How did Eastern Profit identify
9    these individuals?
10        A.  I don't know.
11        Q.  You never asked?
12        A.  No.
13        Q.  Mr. Guo never said, This is where we
14   got this list of corrupt people?
15        A.  No.
16        Q.  Is Mr. Guo a member of the Communist
17   Party?
18        A.  No.
19             MR. GRENDI:  Objection.  You
20        can answer.
21             MS. TESKE:  Objection.
22        A.  No.  I'm allowed to answer that.
23        Q.  Are you a member of the Communist
24   Party?
25        A.  I was before.

Page 37

1                    Yvette Wang
2         Q.  When did your affiliation with the
3    Communist Party end?
4              MR. GRENDI:  Objection.  You
5         can answer.
6         A.  Five years ago, about.  Five or six,
7    yes.
8         Q.  Do you know why Mr. Guo cares if
9    these individuals are committing crimes
10   against the Chinese government?
11             MR. GRENDI:  Objection.  You
12        can answer.
13        A.  It's a big question, but I love to
14   answer.  And if you follow all the media,
15   including New York Times, Washington Post,
16   Wall Street Journal, all of this, big media
17   internationally, and his own social media,
18   you will have the answer.
19        Q.  How about you provide me with your
20   answer?
21        A.  Because he spoke out on behalf of a
22   Chinese outrage, common people, about the
23   corruption of Chinese certain high official.
24   There's no rule of law and democracy in
25   Mainland of China.  And Chinese outrage

Page 38

```
1                    Yvette Wang
2    people, they deserve, and they urgently,
3    hungrily need that.
4           So he believed what he has been
5    doing until now, since two years ago, is for
6    justice and for rule of law, democracy of
7    China.
8    Q.  You keep saying certain high
9    official.  Is there a particular individual
10   you're referring to?
11          MR. GRENDI:  Objection.  I just
12      want to again --
13   A.  I would love to answer.
14   Q.  You could answer.
15          MR. GRENDI:  I wasn't going to
16      say that you can't.  Do we want to
17      put the names of individuals that are
18      going to be potentially more targets
19      of this research contract on the
20      record?
21          MR. SCHMIT:  Well, I just want
22      to make sure.
23   Q.  You're saying one high official, you
24   keep saying, in your answer.  Are you
25   referring -- how about a yes or no?  Are you
```

Page 39

```
1                    Yvette Wang
2    referring to a particular individual?
3           MR. GRENDI:  Objection to the
4       form.
5           You can answer.
6    A.  From New York Times and Washington
7    Post, Wall Street Journal reported about Mr.
8    Guo, I know he whistle blow a lot about
9    Chinese vice president, somehow, yes.  If you
10   read article, you can have answer.
11   Q.  But is that who you were referring
12   to?
13   A.  I don't understand your question.
14   Q.  In your answer, you keep saying
15   singular, high official.
16   A.  Singular?
17   Q.  I just want to make sure.
18   A.  Maybe my English too broken.  I
19   didn't say singular.  What do you mean
20   singular?
21   Q.  As in one person as opposed to many,
22   as opposed to plural?
23   A.  Many, many, yes.
24   Q.  So when you say "high official,"
25   you're referring to the people being
```

Page 40

```
1                    Yvette Wang
2    identified to be investigated, right?
3    A.  Yes.
4           MR. GRENDI:  Objection.  You
5       can answer.
6    Q.  The entity ACA Capital Group
7    Limited, are you familiar with that?
8    A.  I heard this name.
9    Q.  How did you hear this name?
10   A.  From this project.
11   Q.  In what context did the name come
12   up?
13   A.  I don't have that.
14   Q.  Well, how did you hear about it in
15   connection with this project?
16   A.  After that one million was wired to
17   Strategic Vision without contract signed, I
18   heard ACA trying to fix this mistake.  And
19   then this name came to me.
20   Q.  Prior to them wiring a million
21   dollars to Strategic Vision, you had never
22   heard of ACA Capital?
23   A.  No, I didn't.
24   Q.  Do you know why they wired a million
25   dollars to Strategic Vision?
```

Page 41

```
1                    Yvette Wang
2    A.  I don't know, but with this contract
3    that's supposed to be the deposit to this
4    contract.
5    Q.  But why did ACA Capital Limited send
6    the money?
7           MR. GRENDI:  Objection, you can
8       answer.
9    Q.  As opposed to, say, Eastern Profit?
10          MR. GRENDI:  Objection.  You
11      can answer.
12          MR. SCHMIT:  What is the
13      objection on that one?  I'm being
14      pretty liberal about not getting into
15      this debate, but there have been a
16      lot of objections that are
17      questionable, to say the least.
18          MR. GRENDI:  There is a lack of
19      clarity in the form.
20          MR. SCHMIT:  There is?  What is
21      it?  I'd like to meet it.
22          MR. GRENDI:  I mean, I think
23      you're indicating that -- well, you
24      know what --
25          MR. SCHMIT:  I asked why?
```

Page 42

Yvette Wang

1
2     MR. GRENDI:  I mean, what, as
3  to --
4     MR. SCHMIT:  It's kind of a
5  standard question.
6     MR. GRENDI:  You want me to
7  explain why your question is a little
8  bit incomplete?  I don't want to --
9     MR. SCHMIT:  No, if there's a
10 form and I can clarify it somehow for
11 you or the witness, I'd like to do
12 so.
13    MR. GRENDI:  Well, I'll allow
14 it to go forward, but I just think
15 it's not necessarily an accurate
16 reflection of what's going on here.
17 But go ahead.
18    MR. SCHMIT:  Can you read the
19 question for the witness?
20 (Whereupon, at this time, the requested
21 portion was read by the reporter.)
22 A.  Why?  Right?
23 Q.  Yes.
24 A.  From my understanding, that was the
25 deposit to this research equipment.  Before

Page 43

Yvette Wang

1
2  the research equipment was officially signed,
3  and that was a kind of mistake, shouldn't
4  happen.  Because there was even not a
5  contract at all by then.
6  Q.  You mean a contract hasn't been
7  executed at all by then?
8  A.  Signed, executed, correct.
9  Q.  Right.  Because the wire from ACA
10 Capital came a few days before January 6th,
11 right?
12 A.  January 6th, correct.
13 Q.  Which is the day the contract was
14 actually executed, right?
15 A.  You are right.
16 Q.  But I'm going to go back to my
17 question.
18    Why did ACA Capital Limited send
19 money that you're saying is pursuant to a
20 contract that ACA Capital Limited never
21 signed, ever?
22 A.  So you are asking why, right?
23 Q.  Why.
24 A.  I heard there is a loan between
25 Eastern Profit and ACA.

Page 44

Yvette Wang

1
2  Q.  A loan?
3  A.  Yes.
4  Q.  Who told you about this loan?
5  A.  Both Mr. Guo.  And if I remember
6  correctly, Mr. Han.
7  Q.  What is the loan?
8  A.  I don't know.
9  Q.  But Eastern Profit had loaned money
10 to ACA Capital?
11 A.  Borrow money from ACA Capital.
12 Q.  How much did they borrow?
13 A.  I don't know.
14 Q.  Was the idea that Eastern Profit was
15 going to have to pay this million dollars
16 back to ACA Capital?
17 A.  They called this is a loan,
18 officially there should be a payback, in my
19 understanding.
20 Q.  In other words, at some point ACA
21 Capital is going to want that million dollars
22 back from Eastern Profit?
23 A.  You are right.
24 Q.  Why did ACA Capital agree to provide
25 the funds to Eastern Profit?

Page 45

Yvette Wang

1
2  A.  There was a loan.
3  Q.  But why did they agree to enter into
4  the loan for this contract?
5  A.  I don't know.
6  Q.  You don't know why they didn't?
7  A.  No.
8  Q.  Is there documentation to support
9  this loan?
10 A.  I requested there should be some
11 documents.
12 Q.  Have you ever seen the documents
13 supporting this loan?
14 A.  I didn't see that.
15 Q.  You did not see it?
16 A.  No.
17    MR. SCHMIT:  Obviously, if
18 there's any documents supporting this
19 loan, we'd ask that they be produced.
20    MR. GRENDI:  Request noted.
21 Q.  What is ACA Capital Limited?
22 A.  I heard it's a fund management
23 company, assets management company, something
24 like that.
25 Q.  Where is it located?

Page 46

Yvette Wang

1
2      A.  I heard it's located in Hong Kong.
3      Q.  Have you ever spoken with anybody
4  from ACA Capital Limited?
5      A.  No.
6      Q.  Does Golden Springs do business with
7  ACA Capital Limited?
8          MR. GRENDI:  Objection.  You
9      can answer.
10     A.  No.
11     Q.  Is Mr. Guo affiliated with ACA
12 Capital Limited at all?
13     A.  I don't know.
14     Q.  Has there been any communications
15 with ACA Capital Limited since this lawsuit
16 began?
17     A.  You mean the communication between
18 who and who?
19     Q.  Eastern Profit and ACA Capital
20 Limited.
21     A.  I don't know.
22     Q.  Nobody has informed you of any?
23     A.  No.
24     Q.  You don't know if ACA Capital has
25 inquired about where the million dollars is

Page 47

Yvette Wang

1
2  or anything along those lines?
3      A.  They didn't tell me, but I heard
4  from Mr. Guo that there was a loan, and they
5  are asking the money back.  But, obviously,
6  that conversation might happen in Hong Kong,
7  which I was not involved.
8      Q.  But Mr. Guo informed you that they
9  are probably asking for the money back?
10     A.  Correct.
11     Q.  Do you know what the terms of the
12 loan were?
13     A.  I don't know.
14     Q.  Are they asking for the money back
15 because the term -- the contract was
16 terminated?
17     A.  Obviously --
18         MR. GRENDI:  Objection of form.
19         You can answer.
20     A.  Obviously, correct.  Because this
21 contract produced nothing.
22     Q.  By the way, is that why ACA Capital
23 Limited is asking for the money back, do you
24 know that?
25         MR. GRENDI:  Objection to the

Page 48

Yvette Wang

1
2      form.
3          You can answer.
4      A.  I don't know.
5      Q.  Does Golden Springs work for any --
6  do any work for any clients unaffiliated with
7  Mr. Guo?
8      A.  I don't understand your question.
9  What is your question?
10     Q.  Are there any clients other than
11 companies that Mr. Guo brings to Golden
12 Springs that Golden Springs does work for?
13         MR. GRENDI:  Objection.  I just
14     want to clarify, which Golden Spring?
15         MR. SCHMIT:  New York Golden
16     Spring, that the witness is an
17     employee of.
18     A.  So you're asking Golden Spring's
19 clients?
20     Q.  Yes.
21     A.  I cannot disclosure that.  But you
22 ask, is there any clients of Golden Spring
23 who was or were introduced by Mr. Guo?
24     Q.  No, that were not.  I mean, are all
25 the clients brought to your Golden Spring by

Page 49

Yvette Wang

1
2  Mr. Guo?
3      A.  Oh, is there any --
4          MR. GRENDI:  Objection.
5      A.  Is there any other client, right?
6  Brought by Mr. Guo to Golden Spring,
7  introduced, you mean, right?
8      Q.  Why don't you answer that question,
9  we'll start there.
10         MR. GRENDI:  Objection.
11     Q.  Just a yes or no.
12         MR. GRENDI:  I don't understand
13     this question.
14         MR. SCHMIT:  She's asking me --
15     she's got a question in mind.  She
16     can answer it and we will get beyond
17     it.
18     A.  Sorry, I don't mean to be rude, but
19 I need to know the question.
20     Q.  Okay.  Your company, Golden Springs
21 does work for clients, right?
22     A.  Correct.
23     Q.  You've referred to Golden Springs as
24 a family office, correct?
25     A.  Correct.

Page 50

Yvette Wang

1
2    Q.  Are any of Golden Springs' clients
3  from a source other than Mr. Guo?
4         MR. GRENDI:  Objection.  This
5         has no relevance to this.
6         MR. SCHMIT:  It does.  They
7         signed the interrogatories and we're
8         not getting much information on
9         anything else.  I have to try to work
10        through these issues and find out
11        what's going on here.
12        MR. GRENDI:  You're asking
13        about clients other than the parties
14        that are involved in this action.
15        MR. SCHMIT:  I haven't asked
16        for the identification.
17    Q.  I want to know, is Golden Springs
18  Mr. Guo's family office?
19    A.  No.
20    Q.  Then are there other clients for
21  Golden Springs that are introduced by
22  individuals or come from sources other than
23  Mr. Guo?
24    A.  Yes, we do have.
25    Q.  Now, the family that you work for is

Page 51

Yvette Wang

1
2  located in Mainland China?
3    A.  And Hong Kong.
4    Q.  And it is a single family?
5    A.  Not only one family.
6         MR. SCHMIT:  Can I get this
7         marked as Exhibit 4?
8         (Whereupon, at this time, the
9         reporter marked the above-mentioned
10        research agreement as Wang Exhibit 4
11        for identification.)
12  BY MR. SCHMIT:
13    Q.  I'm going to hand you what's been
14  marked as Exhibit 4.  It's entitled research
15  agreement, January 1, 2018.  And it's Eastern
16  1 through Eastern 4.
17    Do you have that in front of you?
18    A.  Yes.
19    Q.  Have you ever seen this document
20  before?
21    A.  Yes.
22    Q.  Who produced -- I mean, not --
23  Eastern indicates you guys produced it in
24  this litigation.  But do you know who drafted
25  or generated this document?

Page 52

Yvette Wang

1
2    A.  I heard this was drafted by
3  Strategic Vision.
4    Q.  Now, you heard that; who did you
5  hear that from?
6    A.  Mr. Guo.
7    Q.  Did Mr. Guo hand it to you and say,
8  This is a draft prepared by Strategic Vision?
9    A.  Yes.
10    Q.  What did he say about it, anything
11  in particular?
12    A.  He said he wants me to review and to
13  finish this contract.
14    Q.  And did you do that?
15    A.  Yes.
16    Q.  During the review process, did you
17  have conversations with Mr. Guo?
18    A.  I did.
19    Q.  Generally speaking, what were the
20  tenure of these conversations as you drafted
21  the -- as you filled in and finished the
22  contract?
23    A.  Sorry, can I ask you, what is your
24  question?
25    Q.  Just tell me about the conversations

Page 53

Yvette Wang

1
2  you had with Mr. Guo as you filled in and
3  finished the contract.
4    A.  He asked me to review the contract,
5  and he mentioned about, like, the deposit,
6  like price and he explained his request to
7  me, asking me to check whether that is
8  already included in the contract.
9    Q.  Whether the deposit and price were
10  included?
11    A.  The terms, including the deposit,
12  payment, whether they are correct, whether
13  they are included in the contract.
14    Q.  Now, how would you know whether they
15  were correct or not?  Did he tell you what
16  they should be?
17    A.  Yes.
18    Q.  And did you conclude they were
19  correct or were they included in the
20  contract?
21    A.  I reviewed and something was not the
22  same with what he told me.  So I explained to
23  him and he asked me to finish the review and
24  try to revise it.
25    Q.  And what was that issue?

Page 54

Yvette Wang

A. I don't remember that clearly. It's about Strategic Vision called a waterline. Mr. Guo, he doesn't like that. And in his understanding, that should not be a waterline, which is defined by Strategic Vision.

Q. And what was your understanding of what was meant by waterline?

A. Strategic Vision, Ms. Wallop told me and that is a waterline in the tank which can keep the project and team, her team, working and produce the reports. By short term, waterline means money. And Strategic Vision, I mean, Ms. Wallop requested a certain amount of money paid, which maintain her team and her research.

But the argument is, Mr. Guo, he would like to keep, we call it a la carte. Like, I need how many reports, I pay how many reports. If I don't need that amount of reports, and we should not go the waterline. The waterline is a, if I may describe it as a lock-in price or lock-in money, which no matter how many reports the client request,

Page 55

Yvette Wang

and we have to pay that, which in Mr. Guo, his understanding, is not fair and not practical.

Q. Now, the waterline, is this a reference -- does this have anything to do with the million dollar deposit?

A. No. One million dollar deposit has nothing to do with waterline. Waterline is Ms. Wallop and Strategic Vision requested the client of this contract to pay $750,000 per month, no matter how many reports the client requested or Strategic Vision provided. That money must be paid.

And the explanation and the reason Ms. Wallop explained to me many, many times, hours, said that waterline permit her to keep her team in our country or other district to investigate. And that is her common standard, in her business, and in her called this, industry, which in my understanding is her investigation industry and the business.

And she repeatedly told me that is already very nice and reasonable waterline to Miles Guo, and that is mandatory to this

Page 56

Yvette Wang

project. So we spent hours, hours, hours to negotiate about this waterline.

Q. And the negotiations, what did they lead to? What was the final agreement in your view?

A. We had, I remember, we had totally three meetings. And by the end, compromised.

Q. How did you compromise? Is it reflected in the final agreement?

A. Correct.

Q. Why don't you pull out the final agreement and show me where that compromise is reflected? It's Exhibit 2.

A. So you want me to explain what is compromise?

Q. Well, I asked you whether the compromise -- you said there was a compromise. And I asked you if it was in the final agreement. I believe you said yes?

A. Yes, I said that.

Q. Now you've got the final agreement in front of you and I would like you to point out where it is reflected.

(Witness peruses document.)

Page 57

Yvette Wang

A. Yes, it's on page 4. If you see second paragraph, it is agreed by both parties that for the first three months of this agreement, January, February and March 2018, that the payment of 750,000 U.S. dollars will be wired per our instruction to our U.S. bank account. And after that there is a recap term. What is the recap? Oh, yes. It is also agreed by both parties that after the March reports and the payments are made, that all involved parties will meet to recap the accounting.

Q. What does that mean in your view? What is your understanding of that term?

A. That means in the very beginning, Strategic Vision, I mean, Mrs. Wallop requested $750,000 per month for 12 months. And, obviously, the client, I mean, Mr. Guo, they don't like that, and they didn't agree.

Q. They did or did not agree?

A. They did not. So the compromise here is that recap. Finally, Mrs. Wallop advised or stressed it for the first three months, please pay 750,000 per month. And

Page 58

Yvette Wang

1       Yvette Wang
2   after the first three months, by the end of
3   March, let's recap.  See, so you guys still
4   pay me 750,000 or there's a lower or higher,
5   she called, waterline.
6       Q.  So the agreement for the first three
7   months it was going to be 750,000 for
8   January, 750,000 for February and 750,000 for
9   March, right?
10      A.  Correct.
11          MR. GRENDI:  Objection.  You
12       can answer.
13      A.  Waterline.
14      Q.  Were those amounts ever paid?
15      A.  No.
16      Q.  That was 750,000 per month, not
17   total, right?
18      A.  Correct.
19      Q.  How about the -- what is your
20   understanding of the fourth paragraph down?
21   The pricing for 30-year units or deliverables
22   per year remains a constant $9 million per
23   year or 750,000 per month for 12 months?
24      A.  You are pointing the correct point.
25   This is Mrs. Wallop called waterline, which

Page 59

Yvette Wang

1       Yvette Wang
2   she is able to maintain her investigation
3   team waterlined.  And she said that is
4   mandatory.  That is if you want this project,
5   you have to pay minimum to keep waterline.
6       Q.  In other words, that in part
7   encompassed what it was going to cost
8   Strategic Vision to keep teams out in the
9   field and available in order to do the work
10   for Eastern Profit, right?
11      A.  Based on her explanation, she said,
12   yes, that is professional and that is a
13   mandatory request.
14      Q.  And that ended up in the final
15   contract?
16      A.  Correct.
17      Q.  Whose initials are on the bottom
18   right corner of Exhibit 2?  There seem to be
19   initials on each page.  Whose are those?
20      A.  That is mine.
21      Q.  So is F.C.W., Ms. Wallop's?
22      A.  Yes.
23      Q.  And then the other initial is yours?
24      A.  Correct.
25      Q.  And then on page 5, production

Page 60

Yvette Wang

1       Yvette Wang
2   number Eastern 9, that is your signature
3   there, right, on the right-hand side?
4       A.  Correct.
5       Q.  So that was one issue, the waterline
6   we will call it, that Mr. Guo raised with
7   you.
8           Did he raise any other issues when
9   he saw the draft or the incomplete draft?
10      A.  She asked me to check about the
11   deliverable of reports.  In my understanding,
12   when she asked me to check, he was already
13   told by Strategic Vision, I mean Mrs. Wallop,
14   how many reports, how frequency the reports
15   will be provided.
16          So Mr. Guo asked me, because he
17   doesn't read English at all.  So he ask me to
18   check whether that reports deliverable
19   schedule is included in here as his
20   understanding.
21      Q.  Was it?
22      A.  Yes.  Close, almost.
23      Q.  Did you make or request any changes
24   based on what Mr. Guo said?
25      A.  I didn't.

Page 61

Yvette Wang

1       Yvette Wang
2       Q.  Was a translation of this document
3   ever provided to Mr. Guo?
4       A.  I orally translated for him.
5       Q.  And he speaks Mandarin?
6       A.  Correct.
7       Q.  So you read line by line and got his
8   okay to the final agreement, right?
9       A.  Correct.
10      Q.  Okay.  What other issues?  There is
11   deliverables, waterline; any other issues
12   that Mr. Guo raised with you?
13          MR. GRENDI:  Objection of form.
14          You can answer.
15      A.  No.  That is the main two parts.
16   Yes.
17      Q.  What about the deposit?  Did he
18   raise any issues with respect to the deposit?
19      A.  Oh, you reminded me.  Because I
20   remember clearly when I went through this
21   draft with Mr. Guo, I pointed out, I said
22   that one million deposit in advance is a lot.
23   Because I am a project manager, so I feel I
24   should remind him, this is a huge amount of
25   money to pay as a deposit.

Page 62

1                    Yvette Wang
2           And I remember Mr. Guo said,
3    Mrs. Wallop and Mike, they are respectful
4    people.  And I trust them.  They are
5    reliable.  And before they even ask three
6    million as a deposit in this contract, now
7    they reduced by one million, and let's just
8    keep that.  I remember that conversation.
9        Q.  So ultimately you agreed to the
10   million dollar deposit, correct?
11       A.  That's right.  As a project manager,
12   you know, I pointed out my concern, if he
13   insisted then I just let it go.
14       Q.  Did you guys ever discuss any
15   mechanism by which you might be able to get
16   that million dollar deposit back if something
17   wasn't done or things didn't work out under
18   the contract?
19       A.  You mean when I was discussing with
20   Mr. Guo?
21       Q.  Or that you heard of or had been
22   educated about.
23       A.  No, I don't remember that clearly.
24       Q.  Do you remember it at all?
25       A.  No.

Page 63

1                    Yvette Wang
2        Q.  Now, ultimately, you're saying ACA
3    Capital Limited made the million dollar
4    deposit?
5        A.  Correct.
6            MR. GRENDI:  Objection of form.
7            You can answer.
8        Q.  On whose orders did they do that?
9        A.  I'm sorry, what is your question?
10       Q.  On whose orders did they do that?
11   Why did they do that?
12       A.  I was not involved in that
13   instruction communication.  But I guess it's
14   only my guess, between Eastern and ACA.
15       Q.  Eastern and who?
16       A.  ACA Capital.
17       Q.  Who on behalf of Eastern would
18   have --
19           MS. TESKE:  Objection.
20       A.  Obviously, Mr. Han, from the paper.
21       Q.  Do you know that or have you seen
22   anything that would suggest he gave the order
23   to wire the million dollar deposit?
24       A.  No.  I was not involved in that
25   process.

Page 64

1                    Yvette Wang
2        Q.  Did you ever discuss it with Mr.
3    Guo?
4        A.  About what?
5        Q.  The deposit being made.
6        A.  Oh, Mr. Guo send me the receipt, the
7    wire transfer receipt.  And then told me to
8    send a text message to Mrs. Wallop about this
9    one million deposit paid.
10       Q.  And what did -- what was your
11   reaction to getting this receipt, this one
12   million dollar receipt?
13       A.  I was shocked.
14       Q.  Why were you shocked?
15       A.  Because there was even no contract
16   executed and signed.  And the money was
17   already paid.  And in my understanding, this
18   is a huge, huge, mistake.  Accident.
19       Q.  So who did you talk to about that?
20       A.  I texted Mrs. Wallop.
21       Q.  And what did you tell Mrs. Wallop?
22       A.  If you have my Signal message with
23   her, I remember I texted her.  I said, This
24   deposit was already wired to you, even
25   without the contract signed.  And kind of

Page 65

1                    Yvette Wang
2    like shows the seriousness.  And if you would
3    like to continue to do this project, and we
4    will stay -- we will stay with our terms
5    which is our negotiation.  I was very insist,
6    if you do not agree, kindly, please, return
7    the one million deposit back, and sorry for
8    the inconvenience.  You have my Signal
9    message.  I remember that.
10       Q.  And when you say the contract as
11   agreed, in other words, no more changes to
12   the contract, we need to sign it as is; is
13   that fair?
14       A.  Correct.  Sign my version.
15       Q.  Okay.  And, ultimately, when you say
16   your version, the one that was existing at
17   the time the million dollars was paid, right?
18       A.  Correct.
19       Q.  Were any changes requested or made
20   to that contract?
21           MR. GRENDI:  Objection.  You
22       can answer.
23       A.  You mean when?
24       Q.  After the million dollars showed up,
25   did Ms. Wallop or anybody else on behalf of

Page 66

Yvette Wang

1    Strategic Vision request any changes?
2            MR. GRENDI:  Objection.  You
3        can answer.
4        A.  They obviously requested and they
5    did, because the version by that wire
6    transfer was made, my version was different
7    from the final version.  This is from
8    Mrs. Wallop, this version (indicating).
9    There was -- there is some difference in
10   there still.
11       Q.  So changes made after the wire was
12   received?
13       A.  Correct.
14       Q.  What changes were those?
15       A.  That first three months waterline
16   must be paid after that recap.  That is the
17   main change.
18       Q.  That's a change you requested,
19   though, right?
20       A.  No.  That was not a change I
21   requested.  Before that, I request a la
22   carte.  Like how many reports, the client
23   buy, pay how much.  There's no waterline.
24       Q.  When did you have that conversation

*(line numbers 1–25 on Page 66; line 25 shown as "When did you have that conversation")*

Page 67

Yvette Wang

1    with Ms. Wallop?
2        A.  The date is -- contract was signed
3    January 6th; that is one week before that
4    date.  It's very end of December, beginning
5    of January.
6        Q.  Any other changes?
7        A.  No.  Mainly that is the most heavily
8    biggest argument.
9        Q.  Had Ms. Wallop told you that's how
10   it had to be prior to the wire being
11   received?
12           MR. GRENDI:  Objection.  You
13       can answer.
14       A.  Sorry, what is your question?
15       Q.  Did this waterline concept, you had
16   discussed it with Ms. Wallop prior to the
17   wire being received or is this a conversation
18   you guys had after ACA Capital sent the
19   money?
20       A.  Oh, the waterline conversation
21   happened from the first second, from the very
22   beginning.  And let me make it precise.  Even
23   before the one million wired, I mean, from
24   the very beginning, when I was discussing

Page 68

Yvette Wang

1    with her directly.
2        Q.  And Ms. Wallop said from the
3    beginning that with respect -- there has to
4    be this waterline concept?
5        A.  Correct.
6        Q.  And you conveyed that to Mr. Guo?
7        A.  I post a request and message to Mr.
8    Guo.  I told him this is what they call
9    waterline, they must have.
10       Q.  And when would you have given that
11   message to Mr. Guo?
12       A.  You mean when, right?
13       Q.  When, yes.
14       A.  From my first meeting with
15   Mr. Wallop about this project.
16       Q.  About when was that?
17       A.  Sorry, what is the question?
18       Q.  About when was that?
19       A.  What time, right?
20       Q.  Yes.
21       A.  By the very end of December 2017.  I
22   don't remember that date.
23       Q.  So it was December 2017 Ms. Wallop
24   by then had said, Look, there has to be a

Page 69

Yvette Wang

1    waterline.  And you told Mr. Guo this is the
2    position Strategic Vision is taking; is that
3    fair?
4        A.  That is fair.  I remember my first
5    meeting with Ms. Wallop about this project
6    was in the very end of December, in
7    Mrs. Wallop's house in Virginia.  That was
8    our first meeting.  And the waterline problem
9    happened from that moment.
10       Q.  When did you see this final version
11   of the draft, the final agreement for
12   execution?
13       A.  The final version of this contract,
14   the first time I saw was on January 6th, the
15   date which was -- this was signed.
16       Q.  What was your reaction to it?  Who
17   was at that meeting?  Was anybody present?
18       A.  Only Mrs. Wallop and me.
19       Q.  Where did that take place?
20       A.  Ms. Wallop's house, in Virginia
21   home.
22       Q.  And what did you tell Ms. Wallop
23   after you looked at the contract?
24       A.  I remember I went through the

Page 70

                          Yvette Wang
1
2   contract.  Then I saw that recap after first
3   three months.
4       Q.  And the recap was part of what you
5   had requested, right?
6       A.  No.
7       Q.  Not at all?
8       A.  Not as -- that is not my request at
9   all.  That is Ms. Wallop.  She stressed it,
10  and she put in the draft.  And in my
11  understanding, that was a compromise.  Like,
12  okay, now, let's recap by the end of three
13  months about the waterline.  At least give a
14  chance to recap, instead of request you must
15  pay for all the 12 months, right?  To me,
16  that is a little bit better.  So I feel that
17  is a compromise.
18      Q.  Before signing it, did you pick up
19  the phone and call anybody?
20      A.  I called Mr. Guo.
21      Q.  What did you tell Mr. Guo about that
22  agreement?
23      A.  I told him, I said, This is still
24  not my contract.  Not my version.  And I
25  translated to him briefly about the recap,

Page 71

                          Yvette Wang
1
2   that part.
3       Q.  And what did he say?
4       A.  He said, you just go ahead to sign
5   it.  And we need this project started.
6       Q.  Are there any other provisions you
7   went over with Mr. Guo on the phone?
8       A.  I emphasized again to him about the
9   report delivery schedule, which is weekly
10  report in the first month, and then there
11  should be a preliminary report for the first
12  month, and then after first month, there
13  should be at least a monthly report every
14  month.  And some of the research, the reports
15  will be based on the request from the client.
16  So that's the two main point I emphasized
17  again to him.
18      Q.  Why did you emphasize the report
19  issue to Mr. Guo?
20      A.  Because that was in the first
21  discussion when I saw this project with Mr.
22  Guo.  And -- yeah, that's the two points he
23  really cares about.
24      Q.  The report and what it was going to
25  cost?

Page 72

                          Yvette Wang
1
2       A.  Yes.
3       Q.  What did he say in regards to the
4   reports?
5       A.  You mean --
6       Q.  The language, when you told him over
7   the phone, Remember, look, these are the
8   reports, this is when it is going to come in,
9   what was his reaction?
10      A.  You mean by 1/6?
11      Q.  Yes.  As I understand you're having
12  a telephone conversation with him on January
13  6th?
14      A.  You're right.
15      Q.  What did he say about the reports?
16      A.  He said confirmed, okay.
17      Q.  The word "report" appears several
18  times in the agreement.  What is your
19  understanding of the word report?
20      A.  You mean my understanding, personal?
21      Q.  Well, why don't we start with yours
22  and if you have reason to think it's
23  different than Eastern, you can let me know.
24      A.  In my understanding, the report, as
25  the, I mean, project manager, if I may call

Page 73

                          Yvette Wang
1
2   myself, a little bit, and the report should
3   be in black and white.  It's solid, reliable,
4   and there is value.  And I mean, valuable
5   information in the deliverable, which we call
6   the report, and which should be delivered
7   without delay based on the report deliverable
8   schedule of this contract signed to the
9   client.  I mean, as a project manager, that
10  is my understanding.  First the quality,
11  second the timeline.
12      Quality means you cannot deliver
13  garbage or advertisement or Wikipedia or even
14  Russian language stuff.  Because that is not
15  valuable and they are garbage, nonsense.
16      Second, timeline.  And you should
17  deliver the report based on the contract
18  signed in here, which agreed by both sides.
19  That is the weekly report, for the first
20  month, and monthly report for the following
21  month, which never happened.
22      Q.  What is a progress report, if you
23  look on page 2?  What is a progress report?
24      A.  Which paragraph are you referring
25  to?

Page 74

Yvette Wang

1
2     Q.  The contractor will produce a
3  progress report.  What is -- compared to a
4  general report, what is a progress report?
5          (Witness peruses document.)
6     A.  Progress reports includes, in my
7  understanding, again, as a project manager,
8  first that should include what is happening.
9  What is the team.  What is your mechanism.
10  And the second mainly that is, I mean, the
11  first part should be like 30 percent or 20
12  percent of the whole progress report.  And
13  the rest of the 80 or 70 percent of progress
14  report, that should be valuable.  Valuable
15  means that, okay, there are information in
16  there, valuable, instead of having zero
17  valuable information and only garbage.
18     Q.  Well, what's a preliminary report as
19  opposed to an overall report, a progress
20  report?
21     A.  The preliminary report, in the first
22  month, in my understanding, that should be a
23  conclusion report or January, big report for
24  the first month.  Why the first month need
25  preliminary report, because that was the

Page 75

Yvette Wang

1
2  beginning of this project.
3          So you may include who is your team,
4  who is your team member, who is your project
5  manager, what is your strategy or what is
6  your mechanism or working.  That's why that
7  happened in the first month.
8          Why there is no preliminary report
9  in the second and third month, the reason is
10  the first month needs all of that
11  information.  Not only the valuable
12  information which they worked, but also their
13  general and detailed information of their
14  investigation team, their work mechanism, at
15  least who is the project manager or how they
16  work.  Fair enough?
17     Q.  What about comprehensive historical
18  research report?  Does that differ any from
19  kind of this overall report concept or
20  progress report or preliminary report?
21     A.  Comprehensive historical research
22  report within three months, in my
23  understanding --
24     Q.  This is your understanding as a
25  project manager?

Page 76

Yvette Wang

1
2     A.  Correct.  I am sorry about that.
3     Q.  That's all right.
4     A.  So comprehensive, within three
5  months, which is a bigger report than the
6  report of first month and the second month
7  and third month.  That should be a kind of
8  like all together, like summarize.  And then
9  they have all the information, I mean,
10  valuable information in there.  They have
11  their whole team reported in here.  And then
12  they may decide, because there is a recap,
13  they may decide by the end of third month,
14  how they will proceed for the next three
15  quarter of that year, that is my
16  understanding.
17     Q.  When you say this is your
18  understanding as a project manager, how did
19  you gain this understanding of these terms?
20     A.  How did I get this?
21     Q.  Yes.
22     A.  From my work experience.
23     Q.  And what kind of work experience was
24  that and for who?
25     A.  For who or from who?

Page 77

Yvette Wang

1
2     Q.  However -- your work experience.
3  You said you gained this from your work
4  experience.  Have you done investigative
5  contracts before?
6     A.  Oh, that is better understanding for
7  me.
8          I'm a project manager and I work for
9  many different projects.  I don't mean
10  investigation project.  For example, I build
11  house, right?  I'm managing like the media
12  project.  This is a common knowledge and
13  common sense as a project manager.
14     Q.  Well, putting aside -- have you ever
15  been a project manager on a, you know,
16  confidential research of individuals?
17     A.  Sorry, can you repeat your question?
18     Q.  Have you ever been a project manager
19  for any contract remotely close to the one we
20  have marked as Exhibit 2?
21          MR. GRENDI:  Objection.  You
22     can answer.
23     A.  I believe this is new to me.  So
24  that's why I was educated, educated by
25  Strategic Vision and Ms. Wallop, saying,

Page 78

Yvette Wang

1            Yvette Wang
2   Yvette, you are new to this kind of industry,
3   I remember that clearly, and she said, we
4   never communicate by e-mail and all the
5   reports and deliverable we must hand over
6   face to face.  No e-mail, no phone call.
7            That's why, for example, like your
8   project, Mike, another associate of Ms.
9   Wallop, will fly himself to other country,
10  including Swiss, Switzerland, or other
11  countries in Asia, to face to face meet their
12  project manager and engineer, to receive
13  their deliverable.
14            So I'm talking about my experience
15  to be educated by a professional people in
16  this so-called industry.  So to answer your
17  question as this kind of project to me is new
18  and fresh, and I was educated a lot.
19       Q.  Did you discuss with either Mr. Guo
20  or Mr. Han what they expected the reports to
21  be prior to execution?
22       A.  They expected the reports or
23  information are valuable.
24       Q.  But did they talk in terms of the
25  form and how they would be delivered,

Page 79

Yvette Wang

1   anything along those lines?
2        A.  The form?  I don't understand your
3   question.
4        Q.  Flash drive, in person, e-mail; how
5   was it supposed to be delivered based on your
6   conversations with Mr. Guo and Mr. Han?
7        A.  Oh, basically, the first time I was
8   told how the deliverable or report should be
9   transported was, I heard it from Ms. Wallop.
10  And she clearly told me that, no e-mail, no
11  phone call.
12       Q.  No written report?
13       A.  No written report.
14       Q.  No memo, no memorandum?
15            MR. GRENDI:  Objection.
16       Q.  You weren't expecting a memo to be
17  delivered?
18       A.  What do you mean memo?
19       Q.  A written memorandum.
20       A.  Are we talking about the --
21       Q.  The report.
22       A.  Are we talking about the information
23  in a report?  I'm confused by you.
24       Q.  The reports.  We're talking about

Page 80

Yvette Wang

1   the definition of the report in the
2   agreement.  Did Ms. Wallop ever suggest she
3   was going to write a written report out in
4   any way, shape or form?
5        A.  She said the report should be
6   delivered by flash drive.
7        Q.  By who?
8        A.  Flash drive.  USB key, thumb drive.
9        Q.  And what was your -- did she ever
10  discuss what was going to be on the flash
11  drive or USB key?
12       A.  You mean when?
13       Q.  What.  What was going to be on it?
14       A.  Oh, the report.
15       Q.  Did she ever get into detail of what
16  the form and substance of the report was
17  going to be?
18       A.  I remember she mentioned that will
19  be the valuable information, because she
20  presented herself and her team as the best in
21  this industry.  So she guaranteed again and
22  again the information we will receive, they
23  are valuable and they are in compliance with
24  Mr. Guo's request.

Page 81

Yvette Wang

1        Q.  Okay.  We will get to the definition
2   of valuable.  But I just want to be clear.
3   Now we're going to deliver flash drives in
4   person for these reports, right?
5        A.  Correct.
6        Q.  Did you have an understanding of
7   what was going to be on the flash drive, not
8   just valuable information, but as far as form
9   or substance, letters, memorandums,
10  handwritten notes?
11       A.  Oh, okay.
12       Q.  Recorded conversations, what was
13  going to be on there?
14       A.  That is very helpful.  In my
15  understanding, based on our discussion about
16  the contract, based on --
17       Q.  In discussion with who, if I can
18  just ask you?
19            MR. GRENDI:  Objection.  You
20       should let the witness answer, and I
21       think it's probably getting difficult
22       for the court reporter to keep up.
23            MR. SCHMIT:  We're doing fine
24       here.

Page 82

1                  Yvette Wang
2      Q. Go ahead.
3      A. Where should I start?
4      Q. Go ahead.  Do you need it read back
5  here?
6      A. Based on my discussion with Ms.
7  Wallop, based on my discussion with Mr. Guo,
8  that the report could possibly include, like,
9  financial, like -- because I remember Ms.
10 Wallop described their capability about their
11 technology to the bank system.
12         For example, before a contract
13 signed, she went to New York, met with Mr.
14 Guo, and she described their capability, said
15 they already in a certain bank system.
16         I'm talking about Ms. Wallop, her
17 team.  They were in, entered into a certain
18 bank's system.  And she said her people tried
19 to climb on the wall and they did that, and
20 they saw the bank information in there.  And
21 they are huge money.
22         And then Ms. Wallop even asked Mr.
23 Guo, do you want that money?  Give me your
24 bank account so we can move the money.  And
25 Mr. Guo refused immediately.  So based on my

Page 83

1                  Yvette Wang
2  understanding that the report should include
3  the information or related information about
4  financial, which are not our request, which
5  should be legal, because Mr. Guo told Ms.
6  Wallop clearly, you are doing something
7  illegal.  And I am not stealing money, and I
8  don't need the money.
9      Q. We will get back to that.  Again, I
10 just want to finish one line of questioning
11 before we go down that road.
12         The report, though, on the flash
13 drive, Excel spread sheets, any
14 representation that you would be supplied
15 with Excel spreadsheets?
16     A. You mean the final report?
17     Q. Anything.  Any report.  The flash
18 drive you would receive.  I want to know
19 physically, when you plugged it in and you
20 looked at the screen, what did Eastern Profit
21 understand would pop up?
22     A. This could be like Excel, like Word,
23 or PDF or video.  Whatever the format.
24     Q. Was there a specific agreement as to
25 the format of the information?

Page 84

1                  Yvette Wang
2      A. Agreement of format?  It could be
3  any format, in my understanding.  But the
4  information Eastern requested is illegal and
5  is checkable from resources or database.
6      Q. You use the term throughout this
7  time --
8         MR. GRENDI:  Why don't we take
9      a break at this time?  I know you're
10     about to ask a question.
11         MR. SCHMIT:  Why don't I just
12     ask and then we will take a break.
13     Q. You used the term several times the
14 information must be valuable.  What did you
15 mean by that?  What was your understanding of
16 that?
17     A. Valuable, in my understanding, that
18 should be helpful to the client, as a project
19 manager.
20     Q. Did you ever discuss -- you keep
21 saying "as a project manager."  I want to get
22 back to that before we break because that's
23 important to this whole line of questioning.
24         Did Mr. Guo ever explain to you what
25 he thought was going to be valuable?

Page 85

1                  Yvette Wang
2      A. At least they are real.
3      Q. No, no, did Mr. Guo ever exchange --
4      A. Yes, he told me.
5      Q. What did he --
6      A. They should be real.  They should be
7  real message.
8      Q. What does "real" mean?  What do you
9  mean by real?
10     A. Real means that it's true fact, real
11 message.  Instead of -- let me give you
12 another example, maybe that will be helpful.
13     Q. You answered my question though.
14         Did you ever talk to Ms. Wallop
15 about what Eastern Profit considered was
16 valuable?  Did you ever go, Ms. Wallop, this
17 is what we're looking for, this is what we
18 want?
19     A. We did.  If you review the contract
20 signed, which is your Exhibit number 2, you
21 can see clearly reports A, B, C, the details.
22 That should be information.
23     Q. But we already covered that there
24 was no exact agreement as to format, right?
25     A. Format you mean Excel, Word, PDF,

Page 86

Yvette Wang

1 Power Point?

2    Q.  Yes.  What was going to be on the

3 flash drive.

4        MR. GRENDI:  I want to hop in

5    here.  We requested a break, I know

6    you are continuing down this line of

7    questioning and you're obviously

8    entitled to.  But can we have a

9    break, please?

10        MR. SCHMIT:  Sure.  Take a

11    break.

12        THE WITNESS:  Thank you.

13        (Whereupon, a brief recess was

14    taken.)

15 BY MR. SCHMIT:

16    Q.  We were talking before the break,

17 Ms. Wang, about what would be considered,

18 quote unquote, valuable information.

19        Did you ever discuss that with Ms.

20 Wallop or Mike Waller, the other individual

21 you've mentioned?

22    A.  About what?

23    Q.  About what you considered to be

24 valuable or under the contract.

Page 87

Yvette Wang

1    A.  The valuable, the first thing they

2 should be truth, they should be true --

3    Q.  No, no, did you discuss it?

4    A.  Discuss it?

5    Q.  Did you discuss your definition of

6 valuable with either Ms. Wallop or Mr.

7 Waller?

8    A.  I didn't.

9    Q.  Do you know of anybody on behalf of

10 Eastern Profit that did?

11    A.  I believe Mr. Guo discussed it with

12 them.

13    Q.  Why do you believe that?

14    A.  Why I believe that?  Because after

15 the discussion, I guess, again, they come up

16 this definition (indicating).  So I read this

17 and I understand --

18    Q.  What are you pointing to?

19    A.  The page one until page two with all

20 the definitions regarding A, B, and C

21 research.

22    Q.  I don't understand what's in the

23 contract, though.  Were you aware of any

24 discussions Mr. Guo had with Ms. Wallop or

Page 88

Yvette Wang

1 Mr. Waller about what the definition of what

2 you said is, quote unquote, valuable would

3 be?

4        MR. GRENDI:  Objection.  You

5    can answer.

6    A.  Can you repeat your question?

7        MR. SCHMIT:  Can you read it

8    back?

9    (Whereupon, at this time, the requested

10 portion was read by the reporter.)

11    A.  Sorry, I still -- I don't quite

12 understand your question.  So you're talking

13 about, am I aware Mr. Guo discussed with Ms.

14 Wallop and Mike about the valuable, the

15 definition of valuable?

16    Q.  What he would consider valuable

17 under the contract.

18    A.  I believe I did.

19    Q.  You believe you did with who?

20    A.  Mr. Guo discussed it with them.

21    Q.  Okay.  And why do you believe that?

22    A.  Because Mr. Guo requested their

23 things or they offered their things.  I mean,

24 this is the proof, this is the agreement.

Page 89

Yvette Wang

1    Q.  I mean, were you present for any

2 conversations about, you know, Gee, Ms.

3 Wallop, this is what I would consider

4 valuable, this is what I'm looking for?

5    A.  Thank you.  That is more easier for

6 me.  No, I didn't.  And I was absent in the

7 very beginning of this project.  So in the

8 very beginning, which means before I started

9 to be involved in this project, and Mr. Guo

10 and Ms. Wallop and Mike and Mr. Han, you

11 know, Mr. Han Lianchao, we say L.C. in all

12 the correspondence, they discussed about

13 those things, I believe.

14    Q.  Why do you believe that?

15    A.  Because come out with this

16 (indicating).  Otherwise where are they come

17 from?

18    Q.  Are you aware of any specific

19 conversations along those lines, though?

20    A.  I don't understand.  Am I aware of

21 any conversation?

22    Q.  Yes.

23    A.  Yes.

24    Q.  Which ones?  When did they take

Page 106

Yvette Wang

1  years?
2          MS. TESKE:  Same objection.
3          MR. GRENDI:  Same objection.
4      A.  I don't know.
5      Q.  Do you have any idea?
6      A.  I don't think that long, I mean, my
7  guess.
8      Q.  You've met Mr. Han, right?
9      A.  Yes, I did.
10     Q.  When did you first meet him?
11     A.  In New York.
12     Q.  What time?  When?
13     A.  Late October, November of 2017.
14     Q.  Who introduced you?
15     A.  He was in Mr. Guo's apartment and I
16 went there and Mr. Guo introduced him to me.
17     Q.  What is your understanding of why he
18 was with Mr. Guo that day?
19     A.  My understanding, he's a friend of
20 him, otherwise why at his home, right?
21     Q.  What did Mr. Guo tell you about Mr.
22 Han during the introduction?
23     A.  He said Mr. Han is from Washington
24 D.C.  And he is a real fighter for Chinese

Page 107

Yvette Wang

1  rules of law and democracy as well and a very
2  good man.
3      Q.  Do you know, is Mr. Han originally
4  from Washington D.C.?
5      A.  Originally you mean what?
6      Q.  Like where was he born?
7      A.  Oh, he was born in Mainland of
8  China.  He told me.
9      Q.  Did he know Mr. Guo over in China?
10     A.  I don't know.  But I don't believe
11 so.  Looks like not, my guess, again.
12     Q.  Just one more question about the --
13 this has nothing do with this exhibit, but
14 about the million dollars deposit that ACA
15 Capital sent, right, they tried to claw it
16 back, right?
17     A.  To get it back?
18     Q.  Yes.
19     A.  Yes.  Sorry my language.
20     Q.  That's fine.  Who told them that
21 they should try to pull it back?
22     A.  I don't know.
23     Q.  Did you go -- when you found out
24 about the deposit, how did you find out about

Page 108

Yvette Wang

1  it?
2      A.  Mr. Guo sent me --
3          MR. GRENDI:  Objection.  You
4      can answer.
5      A.  Mr. Guo sent me the wire receipt,
6  which I told you.
7      Q.  Did you talk with anybody from ACA
8  Capital about it?
9      A.  No, in my memory, no, no.
10     Q.  Did Mr. Guo -- did you tell Mr. Guo,
11 We've got to get this money back, this is
12 crazy?
13     A.  No, I didn't tell him.  I mean, why
14 should I tell him?
15     Q.  Do you know what ACA Capital was
16 told?
17         MR. GRENDI:  Objection.  You
18     can answer.
19     A.  I don't know.  I don't know that.
20     Q.  Do you know if it was specifically
21 told that you have to pull this back because
22 no contract has been signed yet?
23     A.  You mean I was told, right?
24     Q.  No, no.  ACA Capital, they're the

Page 109

Yvette Wang

1  ones that were trying to claw the money back?
2      A.  Oh.
3      Q.  Do you know specifically what
4  instruction they were given or why they were
5  doing it?
6      A.  I don't know that part.  I don't
7  know.
8      Q.  Mr. Guo never shared that
9  information with you?
10         MS. TESKE:  Objection.
11         MR. GRENDI:  Objection.
12     Q.  Let's go back to Exhibit 5 here.  If
13 you would turn to production number 65.
14         (Witness peruses document.)
15     Q.  It says at the top, it says, Okay,
16 thanks, I don't think the New York guy is
17 serious.
18         Is it your understanding New York
19 guy is a reference to Mr. Guo?
20     A.  Correct.  That is my understanding,
21 yes.
22     Q.  Okay.  Do you know who this -- who
23 wrote that?
24     A.  I don't know.

Page 134

Yvette Wang

1    Miles Kwok is the biggest dissident of
2    Chinese government.  And she doesn't want to
3    get together with those group of people.  I
4    mean, Miles Kwok's group of people.  And then
5    I don't think that fear or that experience is
6    related to this project.
7         Let me tell you why.  Because when
8    this project show up in front of me, my first
9    reaction is, okay, what is job of this lady?
10   And later on, with more meetings together
11   with them, I was educated, Ms. Wallop and
12   Mike, they are super very much experienced in
13   investigation and research, which they
14   described themselves in front of me.  And
15   from those meetings, I feel no fear, they
16   have no fear at all to, like, Miles Guo or
17   me.  So it's totally separated.
18        Q.  Why was the agreement, if you look
19   at Exhibit 2, it says here both parties agree
20   that the nature of this contract and work
21   related to it is highly confidential.
22        A.  Yes, I saw this.
23        Q.  What is your understanding of that
24   phrase?
25

Page 135

Yvette Wang

1         A.  Highly confidential, both parties,
2    what is my understanding?  My understanding
3    is that all the information related to this
4    project or this contract, should be kept
5    confidential.
6         Q.  And at whose request was that?
7         A.  I believe, this is my guess, again,
8    because when I have the draft, it's -- if my
9    memory works well, it's already there.  So my
10   guess is, this is a request from both sides.
11        Q.  And do you know why both sides
12   wanted it that way?
13        A.  I don't know, but I feel this is a
14   common sense.
15        MR. SCHMIT:  If I can have this
16        marked as Exhibit 6.
17            (Whereupon, at this time, the
18        reporter marked the above-mentioned
19        three-page letter as Wang Exhibit 6
20        for identification.)
21   BY MR. SCHMIT:
22        Q.  Ms. Wang, I'm going to hand you
23   what's been marked as deposition Exhibit 6.
24        A.  Thank you.
25

Page 136

Yvette Wang

1         Q.  It's a three-page letter, dated
2    February 23rd, 2018.
3         Do you have that in front of you?
4         A.  Yes.
5         Q.  Have you ever seen this before?
6         A.  Yes, I did.
7         Q.  Did you look at it, just a yes or no
8    to this, did you look at it in draft form?
9         A.  I'm sorry, what is your question?
10        Q.  Did you see it in draft form?
11        A.  Draft form meaning?
12        Q.  Prior to being executed.
13        A.  Yes, I did, I did.
14        Q.  Did you provide any input into it?
15        A.  Yes, I did.
16        Q.  Who else would have provided input
17   into this letter?
18        A.  Who else provided information to
19   this, right?
20        Q.  Yes.
21        MR. GRENDI:  Objection.  You
22        can answer.
23        A.  Mr. Guo.
24        Q.  Anybody else?
25

Page 137

Yvette Wang

1         A.  My lawyer.
2         Q.  And just, if -- when you say my
3    lawyer, who are you referring to?
4         A.  Foley Hoag, H-O-A-G, people.
5         Q.  Did they represent Eastern Profit in
6    connection with the negotiation of the
7    agreement as well?
8         A.  One of their partner, they did.
9         Q.  Who was that?
10        A.  Gare, G-A-R-E, Smith.
11        Q.  So Mr. Smith would have looked at
12   the agreement that we've marked as Exhibit 2
13   prior to Eastern Profit executing it?
14        MR. GRENDI:  Objection.  You
15        can answer.
16        A.  Far before this version.  You know
17   what I mean?
18        Q.  No, I don't.
19        A.  Okay.  So the very, very, very
20   beginning, when I first time visited Ms.
21   Wallop to discuss about this contract.
22        Q.  Was there a draft on the table or
23   did you discuss concepts?
24        A.  I asked him to --
25

Page 138

1                    Yvette Wang
2            MR. GRENDI:  Objection, stop,
3       hold on.  I don't want you to
4       reveal --
5            MR. SCHMIT:  Just yes or no,
6       sorry.
7            MR. GRENDI:  I just want to
8       instruct the witness on this.
9            Don't reveal any conversations
10      you had with any lawyers.
11           THE WITNESS:  Okay.
12           MR. GRENDI:  Why don't we just
13      roll that back and you can ask yes or
14      no, please?
15           MR. SCHMIT:  Can you just
16      repeat it?
17  (Whereupon, at this time, the requested
18  portion was read by the reporter.)
19      A.  Yes.
20      Q.  And was Ms. Wallop present for this
21  meeting?
22      A.  No.
23      Q.  Who else -- was anybody else in the
24  room when you discussed this?
25      A.  No.

Page 139

1                    Yvette Wang
2       Q.  Was Mr. Guo or anybody on the phone?
3       A.  No.
4       Q.  If you look at -- it's the third
5   paragraph of the letter.  It says, Eastern
6   agreed to delay the start of the contract by
7   ten days from January 6th to January 16th.
8   Do you see that?
9       A.  Yes.
10      Q.  And January 6th is the day the
11  contract was executed, right?
12      A.  Correct.
13      Q.  Is that true?
14      A.  Correct, that was -- that is true.
15      Q.  Why was that done?
16      A.  You mean the delay?
17      Q.  Yes.
18      A.  Oh, that was on January 26th.  The
19  last meeting was Wallop, Mike, Guo and me
20  together at New York.  By that meeting, Mike
21  and Ms. Wallop finally presented their report
22  to Mr. Guo and me, which they already delayed
23  about like three weeks -- three weeks.
24      Q.  I'm sorry, what day was this
25  meeting?

Page 140

1                    Yvette Wang
2       A.  January 26th.  And by that meeting,
3   Mike and Ms. Wallop apologized many times to
4   Mr. Guo and me, saying they had internal
5   communication problem, misunderstanding
6   between Mike and their project manager about
7   the report, and about the delay.  So they
8   officially apologized many, many times.
9       Q.  At that meeting?
10      A.  Yes.  And then they offered to Mr.
11  Guo and me, saying that because of our
12  mistake and our internal communication
13  problem with my project manager, and we offer
14  this ten days to you.  So that was the ten
15  days came from.
16      Q.  And simply that would mean less
17  would be due under the contract?
18           MR. GRENDI:  Objection.  You
19      can answer.
20      A.  Sorry, I don't understand.
21      Q.  That would mean less money would be
22  due under the contract, right?
23           MR. GRENDI:  Same objection, go
24      ahead.
25      A.  In my understanding, that means the

Page 141

1                    Yvette Wang
2   date we paid.  I mean, the one month we paid
3   should start from January 16th instead of
4   January 6th.
5       Q.  And what was the purpose of this
6   letter that we've marked as Exhibit 6?
7       A.  The purpose was to terminate,
8   officially terminate the contract, and to
9   advise Strategic Vision return the deposit,
10  otherwise Eastern is going to take legal
11  action.
12      Q.  So this was the official termination
13  notice of the agreement, right?
14           MR. GRENDI:  Objection.  You
15      can answer.
16      A.  Correct.
17      Q.  Why did Eastern Profit believe it
18  was entitled to receive the million dollar
19  deposit back?
20           MR. GRENDI:  Objection.  You
21      can answer.
22           MR. SCHMIT:  What could
23      possibly be the objection to that
24      question?
25           MR. GRENDI:  Go ahead.

Page 154

1                    Yvette Wang
2   time that Eastern Profit needed that
3   information at that time?
4       A.  I'm sorry, I don't understand your
5   question.
6       Q.  Did Eastern Profit miss anything or
7   breach a contract or not be able to do
8   anything because it didn't have the
9   information on the 26th or whatever the
10  subsequent date is?
11          MR. GRENDI:  Objection.  You
12      can answer.
13      A.  I don't remember clearly.  But I did
14  remember like Mr. Guo, he was waiting for
15  that information for his plan.
16      Q.  Why was he waiting for that
17  information?
18      A.  Why?
19      Q.  Yes.
20      A.  Because he needs that information.
21      Q.  To do what?
22      A.  To do his tech now, Chinese
23  Communist party work.
24          MS. TESKE:  Objection.
25      A.  He has been doing for last two,

Page 155

1                    Yvette Wang
2   three years.
3       Q.  How is he going to use that
4   information in order to do that?
5           MS. TESKE:  Object.
6           MR. GRENDI:  Objection.
7       A.  I don't know.
8       Q.  You never asked?
9       A.  No.
10          MR. SCHMIT:  Why don't we break
11      for lunch now?
12          (Whereupon, a luncheon recess
13      was taken.)
14  BY MR. SCHMIT:
15      Q.  Welcome back, Ms. Wang.
16      A.  Thank you.
17      Q.  Just remember you're still under
18  oath.
19      A.  Yes.
20      Q.  After the termination letter that we
21  looked at a short while ago was sent, what,
22  if anything, did Eastern Profit do to carry
23  on the prong as we've referred to it as?
24      A.  Ask Foley Hoag to follow up.
25      Q.  That's not what I'm asking.  Did the

Page 156

1                    Yvette Wang
2   research continue, did you have somebody else
3   continue to research individuals?
4       A.  I have no idea.  I don't know.
5       Q.  You've not been involved in any
6   research or investigation projects since
7   Foley Hoag sent this letter?
8       A.  Correct.
9       Q.  Do you know who Rich Higgens is?
10      A.  Rich?
11      Q.  Rich Higgens?
12      A.  Sorry, who is this person?
13      Q.  That's the question.  Do you know
14  who that person is, Rich Higgens?
15      A.  Rich Higgens, sounds -- the name is
16  familiar.  Is it the guy with DOJ?  Is that
17  the guy?  No, I don't know.
18      Q.  Who were you thinking of just now?
19      A.  Because there was a newspaper talk,
20  there is a DOJ employee was sued before,
21  maybe I was wrong.  Something similar like
22  that one.
23          MR. GRENDI:  Can you give me a
24      spelling on Higgens?
25          MR. SCHMIT:  H-I-G-G-E-N-S.  It

Page 157

1                    Yvette Wang
2       might be I-N-S, I'm not sure.
3       Q.  You don't recognize that name?  As
4   far as you know, Eastern Profit doesn't work
5   with him?
6       A.  No.
7       Q.  Has Eastern Profit done anything to
8   retain some other firm or individual to do
9   the research it wanted strategic alliance to
10  do -- or Strategic Vision, excuse me?
11      A.  I don't know.
12      Q.  Not to your knowledge?
13      A.  Not with my knowledge.
14      Q.  Do you know who William Yu, Y-U, is?
15      A.  No, I don't know.
16      Q.  You never met anybody by that name?
17      A.  William Yu, no, never.
18      Q.  To your knowledge, is Mr. Guo
19  carrying on the work we've been discussing in
20  any way, shape or form since Strategic Vision
21  was terminated?
22          MR. GRENDI:  Objection.  You
23      can answer.
24      A.  I don't know.
25      Q.  You have not been involved?

Page 158

```
1                    Yvette Wang
2      A.  No.
3            MS. TESKE:  Same objection.
4            MR. SCHMIT:  Let's mark this as
5      Exhibit 7.
6            (Whereupon, at this time, the
7      reporter marked the above-mentioned
8      bank document as Wang Exhibit 7 for
9      identification.)
10 BY MR. SCHMIT:
11     Q.  I'm handing you what's been marked
12 for your deposition as Exhibit 7.  Do you
13 have that in front of you?
14     A.  Yes.
15     Q.  It's got the production numbers in
16 the lower right-hand corner of Eastern, a
17 bunch of zeros, 21 through 22.
18         Do you see that?
19     A.  Yes.
20     Q.  Do you recognize this document?
21     A.  Yes.
22     Q.  What is it?
23     A.  It's bank document.
24     Q.  Do you know what it is conveying or
25 signifying?
```

Page 159

```
1                    Yvette Wang
2      A.  This shows a transaction with
3  beneficiary name, Strategic Vision.
4      Q.  Have you ever seen this document
5  before?
6            (Witness peruses document.)
7      A.  Yes, I did.
8      Q.  What is it?
9      A.  Huh?
10     Q.  What is it?
11     A.  It's a bank proof document.
12     Q.  Proving what?
13     A.  Proving looks like a wire transfer
14 to Strategic Vision.  Happened on January 2,
15 2018.
16     Q.  Who is sending the wire?
17     A.  ACA Capital Group Limited.
18     Q.  And do you know why ACA Capital
19 Group Limited is sending a wire to Strategic
20 Vision?
21     A.  From this project, that this should
22 be the deposit.  Because the time match,
23 looks like.
24            MR. SCHMIT:  Can we just have
25     this marked as 8, please.
```

Page 160

```
1                    Yvette Wang
2            (Whereupon, at this time, the
3      reporter marked the above-mentioned
4      corporate telegraphic transfer
5      cancellation amendment request as
6      Wang Exhibit 8 for identification.)
7  BY MR. SCHMIT:
8      Q.  I'm going to hand you what's been
9  marked for your deposition, ma'am, as Exhibit
10 8.
11     A.  Thank you.
12     Q.  Eastern 279 to 280.
13     A.  Yes.
14     Q.  Have you ever seen this before?
15     A.  Yes.
16     Q.  What is it?
17     A.  It's a corporate telegraphic
18 transfer cancellation amendment request.
19     Q.  Who is making the request?
20     A.  Looks like ACA Capital Group
21 Limited.
22     Q.  And, again, do you know why they're
23 making this request?
24     A.  I guess from the date, it looks like
25 they tried to cancel the wire.
```

Page 161

```
1                    Yvette Wang
2      Q.  To your knowledge, did anybody from
3  Eastern Profit or anyone for that matter,
4  tell Strategic Vision, Hey, we're going to
5  try to cancel the wire we sent?
6      A.  I have no knowledge about that.
7      Q.  You didn't do it?
8      A.  No, I didn't.
9      Q.  And again, you weren't involved in
10 any conversations regarding why the wire was
11 canceled?
12     A.  I'm sorry, what is the question?
13     Q.  You weren't involved in any
14 conversations concerning why the wire was
15 canceled; is that a correct statement?
16     A.  I was not involved in any
17 conversation of that.
18     Q.  And looking at this doesn't refresh
19 your recollection of anything?
20     A.  No, no.
21            MR. SCHMIT:  Mark this as 9,
22     please.
23            (Whereupon, at this time, the
24     reporter marked the above-mentioned
25     e-mail chain as Wang Exhibit 9 for
```

Page 178

Yvette Wang

1   Guo.  I told him, this is still not my
2   contract, but I can see there's recap here,
3   right, this is new, and then what do you want
4   me to do.  And then he said, Then just sign
5   it.  Then I sign it.
6       Q.  Just yes or no to this.  Was
7   Mr. Smith involved at this stage of the
8   proceedings, Gare Smith who you identified
9   earlier?
10      A.  I know Gare Smith; you mean
11  preceding these proceeding?
12      Q.  No.  During these negotiations
13  you're talking?
14      A.  With Ms. Wallop, right?
15      Q.  Was Gare Smith?
16      A.  Yes.
17      Q.  Was he involved in any of these
18  meetings or looking at the drafts or helping
19  you out in any fashion?
20      A.  No.
21      Q.  When was the last time you would
22  have spoken or conferred with him?
23      A.  I don't remember that clearly.
24  Sometime late December.  I don't remember

Page 179

Yvette Wang

1   that clearly.
2       Q.  But at some point he looked at a
3   draft and you discussed it with him?  Don't
4   tell me what you discussed.
5       A.  Yes.
6       Q.  If you could just look at the
7   fraudulent misrepresentation count there.
8   Page 6.
9           (Witness peruses document.)
10      A.  Yes.
11      Q.  It says there, if you look at
12  paragraph 32, Prior to entering into the
13  contract representatives for Strategic Vision
14  made the following representations to
15  Eastern.
16          Do you see that?
17      A.  Yes.
18      Q.  Who were the representatives of
19  Strategic Vision referring to?
20      A.  Ms. French Wallop and Mr. J. Michael
21  Waller.
22      Q.  Now, you know, it says, A, Strategic
23  Vision had a highly skilled in-house team of
24  investigators ready to conduct the detailed

Page 180

Yvette Wang

1   research Eastern required during a short
2   timeframe.
3           Do you see that?
4       A.  Yes.
5       Q.  When did they -- is that a
6   representation that was made to you?
7       A.  Made to me?
8       Q.  Yes.
9       A.  I don't understand the question.
10  Made to me with what?
11      Q.  Did somebody say that to you?
12      A.  Yes.
13      Q.  Who said that?
14      A.  Strategic Vision.
15      Q.  Who is Strategic Vision?
16      A.  Ms. French Wallop and Mr. J. Michael
17  Waller.
18      Q.  Who said those words, though; who
19  made those representations to you?
20      A.  Both of them.
21      Q.  On separate occasions, at the same
22  time?
23      A.  At the same time.  At the same time.
24      Q.  When was that made?

Page 181

Yvette Wang

1       A.  Well, a couple of times.
2       Q.  When was the first time that
3   representation was made?
4       A.  I remember the first time should
5   be -- first time which I was there is like
6   mid December, something like that, almost
7   every, each meeting about this project, and
8   the Strategic Vision that two person, and
9   they always repeatedly, repeatedly tell or
10  told Mr. Guo and me, they are this, very
11  capable, very experienced.
12      Q.  The best?
13      A.  Yes.  The best in the industry.
14      Q.  Specifically, with respect to, A,
15  highly skilled in-house team of
16  investigators.
17          Do you see that?
18      A.  Yes.
19      Q.  What words did they use to convey
20  that?
21      A.  What words?  They said they have
22  project manager, they have different team in
23  different kind of, like, country, and they
24  have quite a lot of significant clients who

Page 182

Yvette Wang

1
2  they served and they named them as a
3  reference.  But they refused to tell us,
4  like, what position in their team, like those
5  kind of details.
6      Q.  So they identified clients for you?
7      A.  Yes.
8      Q.  Who were the clients they
9  identified?
10     A.  Some Russian official, Middle
11 Eastern royal family people.  I believe you
12 have the names.  Handwriting by Ms. Wallop,
13 yeah.
14     Q.  Did you attempt to contact them or
15 verify those stories at all?
16     A.  No, I didn't, personally, I didn't.
17     Q.  Did Mr. Guo?
18     A.  I don't know.
19     Q.  Did anybody else, as far as you
20 know?
21     A.  No idea.
22     Q.  Did you and Mr. Guo or anybody else
23 ever talk about these clients and the work
24 Strategic Vision had done for them or
25 anything along those lines?

Page 183

Yvette Wang

1
2      A.  Personally, I didn't.
3      Q.  Did you ever ask Mr. Waller or Ms.
4  Wallop, you know, more about their team or
5  how they would do it or what they wanted to
6  do?
7      A.  We mentioned, we asked, yes.
8      Q.  What did they say?
9      A.  They refused to tell too much
10 details.  They just say they are very
11 capable.  And they use for the clients, and
12 they are experienced, but I don't know who
13 they are or where are they.
14     Q.  But they told you they weren't going
15 to tell you, right?  I mean, you asked and
16 they said, We're not going to reveal that
17 information?
18         MR. GRENDI:  Objection.  You
19     can answer.
20     A.  We did not ask the name.  And they
21 didn't disclosure too much details.
22     Q.  Did you ask them for more detail?
23     A.  I don't remember that.  I don't
24 remember that part.
25     Q.  Did they specifically say in-house?

Page 184

Yvette Wang

1
2  When you use the term in-house, is that a
3  word that came out of Ms. Wallop's or Mr.
4  Waller's mouth?
5      A.  I believe this is described their
6  project manager.
7      Q.  It says here, they said highly
8  skilled in-house team.  I'm just wondering,
9  did they ever actually use the term in-house?
10 Did you ever discuss with them what they
11 meant by in-house?
12     A.  The in-house means their people.
13 They always called them our people.
14     Q.  So they said -- that's what I'm
15 trying to get.  I want to know what they
16 said.  Did they say our people?
17     A.  Yes.  So in my understanding, okay,
18 your people, it's your team.  And it should
19 be in-house, not you --
20     Q.  Well, did they ever say in-house,
21 though?  That's the question.
22     A.  They said my people, our people.
23     Q.  Our people, my people?
24     A.  Yes.
25     Q.  Something along those lines but

Page 185

Yvette Wang

1
2  never used the words in-house?
3      A.  I don't remember that.
4      Q.  How about, B, why don't you read
5  that to yourself.
6         (Witness peruses document.)
7      A.  Yes.
8      Q.  Did a representation about former
9  intelligence officers, was that ever
10 discussed in your presence?
11     A.  You mean, is there any formal
12 intelligence officer shows in front of me?
13     Q.  No, no.  You had discussions, I
14 assume, it says Strategic Vision here in the
15 complaint.  This is the complaint filed by
16 Eastern Profit.
17     A.  Oh, okay.
18     Q.  Did somebody from Strategic Vision
19 ever specifically say they had a former
20 intelligence officer or anything like that?
21     A.  Yes, they did.
22     Q.  And when would those representations
23 have been made?
24     A.  Many times.  Almost every -- each of
25 the meetings about this project.

Page 186

Yvette Wang

1
2     Q.  Did you ask them what they meant by
3  that?
4     A.  What is your question?
5     Q.  Did you ask them what they meant by
6  a former intelligence officer?
7     A.  What does that mean?
8     Q.  Did you ask them what they meant
9  when they said former intelligence officer?
10    A.  We ask, like who they are, what did
11 they work for, like for previous -- like
12 their employer or their experience.  And
13 basically we didn't ask too much, but we did
14 ask.  Mainly they, I mean, Ms. Wallop and
15 Mike, they voluntarily kept talking with us.
16 Keep introducing us many, many times.  And
17 even I can feel clearly by the end of some
18 meeting, we start to lose our patience, like,
19 let's stop education, let's talk about the
20 contract and project.
21    Q.  So at a certain point you got sick
22 of hearing about their capabilities and what
23 they can do?
24    A.  What is the question?
25          MR. GRENDI:  Objection.

Page 187

Yvette Wang

1
2     Q.  At a certain point you got tired of
3  hearing about their capabilities and what
4  they can do?
5     A.  Yes.  Because they are repeating so
6  many, many times.
7     Q.  And you just said, Let's get to the
8  contract and let's negotiate it?
9     A.  No.  We said, Let's just see what we
10 can do together, not specifically which
11 contract or which investigation.
12    Q.  At the end of the day, was it really
13 important to you whether there was a former
14 intelligence officer involved or not?
15    A.  That is their team.  And we have no
16 control about that team.
17    Q.  What did you -- the capabilities of
18 conducting sophisticated financial tracking,
19 do you remember many conversations about
20 that?
21    A.  Yes.
22    Q.  What was said about that?
23    A.  Like they said they are capable of
24 climb the wall and watch the thing right
25 there.  Like, sounds like they are breaking

Page 188

Yvette Wang

1  something.
2     Q.  Breaking something?
3     A.  They described that.  Yes.
4     Q.  When you look at sophisticated
5  financial tracking, what would your
6  expectation be?
7     A.  Legal.
8     Q.  Legal versus nonlegal?
9     A.  Yes.  Because what they said to us
10 is not legal.  It's common sense, we don't
11 need that.
12    Q.  What did they say to you?
13    A.  They said climb the wall and see the
14 assets.  So in our understanding, it's not
15 legal.
16    Q.  So at that point you didn't really
17 rely on that, in fact, you told them, We
18 don't want that; is that a stair statement?
19          MR. GRENDI:  Objection.
20 Objection.
21          You can answer.
22    A.  What is your question?
23    Q.  At that point, when you heard that
24 from Ms. Wallop or Mr. Waller, you said, No,

Page 189

Yvette Wang

1
2  we don't want that?
3     A.  Correct, correct.
4     Q.  You don't have to do that, right?
5     A.  Correct.
6          MR. GRENDI:  Objection.  I'm
7     just going to advise you to please
8     not raise your voice at the witness.
9     I think -- I know you're trying to
10    get information.
11         MR. SCHMIT:  I'm not raising my
12    voice at all.  I think the record
13    will reflect --
14         MR. GRENDI:  Well, I think --
15         MR. SCHMIT:  It's been going a
16    little clearer now that we're getting
17    a better understanding, but I don't
18    think I've been raising my voice at
19    all.
20         THE WITNESS:  By the way, I
21    don't like people have their cell
22    phone in front of me like this.  It
23    just makes me uncomfortable.  So that
24    will slow down my answer to you.  I'm
25    just trying to help here.

Page 194

Yvette Wang

1  it afterwards?
2      A.  He said, No, no, no, no.
3      Q.  Wasn't it Mr. Guo that asked whether
4  you could access money from banks of these
5  people you were identifying?
6          MS. TESKE:  Object.
7      A.  What is your question?
8      Q.  Didn't Mr. Guo ask representatives
9  from Strategic Vision whether they could
10 access money from the bank accounts of the
11 people that were being identified by Eastern
12 Profit?
13         MS. TESKE:  Object.
14         MR. GRENDI:  Same objection.
15     A.  I don't remember that.
16     Q.  You don't remember that happening at
17 all?
18     A.  No.
19     Q.  Let's go on to page 7.  C there,
20 they had represented other sophisticated
21 clients in the past, including Republican
22 politicians, a Middle Eastern prince, and a
23 leader of the Russian Opposition Party.  Do
24 you see that?
25

Page 195

Yvette Wang

1
2      A.  Yes.
3      Q.  And that -- when was that
4  representation made?
5      A.  I forget the time.  In one of the
6  meetings about this project.
7      Q.  And did you follow up with any of
8  these individuals to even verify that they
9  were clients?
10     A.  Follow up?  You mean?
11     Q.  Call them, e-mail them, text them?
12     A.  I didn't.
13     Q.  Did anybody at your direction?
14     A.  From me, I didn't.
15     Q.  Do you know of it being done at all?
16     A.  I have no idea.
17     Q.  Do you have any reason to believe
18 that this is not a true statement, that they
19 represented sophisticated clients in the
20 past?  What about that --
21     A.  Personally, I believe that is true.
22     Q.  You do believe that is a true
23 statement?
24     A.  Yes.
25     Q.  Okay.

Page 196

Yvette Wang

1
2      A.  Because otherwise why did Ms. Wallop
3  handwrite all the client's name?  I mean,
4  some of the very important client's name in
5  Miles Guo's handbook -- notebook.
6      Q.  You have no reason to believe that
7  it wasn't true, right?
8          MR. GRENDI:  Objection.  You
9      can answer.
10     A.  Personally, I believe it's true.
11     Q.  And do you believe some of those
12 clients might have included Republican
13 politicians?
14     A.  I don't know about that.
15     Q.  Do you have any reason to believe
16 they didn't?
17     A.  I have no knowledge about that.
18     Q.  Do you know whether Ms. Wallop is a
19 Republican or a Democrat?
20     A.  It's not my business.  I never know
21 about that.
22     Q.  How about Middle Eastern princes?
23     A.  Yes.
24     Q.  Any reason to think the clients in
25 the past didn't include a Middle Eastern

Page 197

Yvette Wang

1
2  prince?
3      A.  It should be on the handwriting,
4  some of them.
5      Q.  You believed it to be true?
6      A.  I believe the handwriting, it's
7  true.
8      Q.  And do you have any reason to
9  believe that what was written on that sheet
10 of paper, napkin whatever you're describing
11 wasn't true?
12     A.  Which paper?
13     Q.  Wherever the prince's name was
14 written down.  My question is, do you have
15 any reason to believe that that prince was
16 not a former client of Strategic Vision or
17 Ms. Wallop or Mr. Waller?
18     A.  After I saw Ms. Wallop, her
19 handwriting on Mr. Guo's notebook, I believe
20 they are true.
21     Q.  And a leader of the Russian
22 Opposition Party, do you have any reason to
23 believe that Strategic Vision didn't
24 represent a leader of the Russian Opposition
25 Party?

Page 198

Yvette Wang

1
2      A.  Same answer.
3      Q.  You believed them to be true?
4      A.  Yes.
5      Q.  Have you discovered anything since
6   then to in any way make you question it?
7      A.  Same answer like before, no.
8      Q.  Paragraph 34, it says here,
9   Strategic Vision also told Eastern that
10  Eastern's one million dollar deposit would be
11  used as a deposit against the last payments
12  owed by Eastern at the end of the contract.
13  Paragraph, upon information and belief
14  Strategic Vision also knew this statement to
15  be false.
16          Why was that statement false?
17      A.  I don't understand this statement.
18  Can you please help me?
19      Q.  It's Eastern Profit's complaint.
20  That's the one million dollar deposit under
21  the agreement.
22      A.  That's right, this is drafted by
23  lawyer.  English is not my first language,
24  sorry about that.  I'm trying to understand.
25      Q.  Was that representation ever made to

Page 199

Yvette Wang

1
2   you?
3          (Witness peruses document.)
4      A.  From the contract side --
5      Q.  So you're referring back to the
6   contract that's been marked.  What exhibit is
7   that for the record?
8      A.  Your Exhibit number 2.
9      Q.  Okay.
10     A.  Page number 5.  The client will pay
11  the contractor a deposit of U.S. dollar one
12  million upon signing the contract.  The
13  deposit will be credited on a prorated basis
14  to the final one to one-third month of the
15  contract.
16          In my understanding, this one
17  million should not be used against the last
18  payment.
19     Q.  Should not be used?
20     A.  Correct.
21     Q.  What should have happened with the
22  one million dollar deposit upon --
23     A.  This is, in my understanding, an
24  evergreen deposit, which means that one
25  million just stay there as one million.  And

Page 200

Yvette Wang

1
2   they, Strategic Vision is going to issue
3   invoice every month and the client is just to
4   pay the invoice.
5      Q.  So it would stand out there, and the
6   client, you would still owe the monthly fees?
7          MR. GRENDI:  Objection.  You
8       could answer.
9      Q.  That's what evergreen means, right?
10     A.  Correct, yes.
11     Q.  In other words, to give you an
12  example, you paid a million dollars and you
13  get that bill for $750,000.  If the million
14  dollars is an evergreen deposit, or in our
15  business a retainer, you still have to pay
16  that $750,000, right?
17     A.  That is evergreen, you are right.
18  Pay month by month and this deposit stay
19  there.
20     Q.  What happens to that evergreen
21  deposit at the end of the contract?
22     A.  They didn't say clearly in the
23  contract, which means Strategic Vision should
24  return that deposit after this project is
25  terminated.

Page 201

Yvette Wang

1
2      Q.  Well, it says here, the deposit will
3   be credited on a prorated basis to the final
4   one and one-third months of the contract.  Do
5   you see that?
6      A.  Yes.
7      Q.  What is your understanding of that?
8      A.  Can I say, I don't understand what
9   is prorated basis?  I don't understand this.
10     Q.  You don't know what prorated -- you
11  don't have a view as to what prorated basis
12  means?
13     A.  I'm not quite familiar with that.
14     Q.  What language of this contract would
15  say that Strategic Vision should just return
16  the million dollars at the end of the
17  contract?
18     A.  They didn't clearly say that
19  sentence in the contract.
20     Q.  It's not in there, right?
21     A.  Correct.
22     Q.  When was the final day of the
23  contract?
24          MR. GRENDI:  Objection.  You
25       can answer.

Page 262

Yvette Wang

1                    Yvette Wang
2  Profit?
3       A.  I didn't go that detail.
4       Q.  Did he seem to know anything about
5  the deposition, that it was occurring or
6  otherwise?
7            MS. TESKE:  Objection.
8            MR. GRENDI:  Objection.
9       A.  I didn't -- no.
10      Q.  Does Eastern Profit have any assets
11 whatsoever as far as you know?
12      A.  No idea.
13      Q.  Does it have a relationship with a
14 bank?  Does it have any loans or anything
15 like that?
16           MR. GRENDI:  Objection.  You
17      can answer.
18      A.  No idea about their loan with bank.
19           MR. SCHMIT:  Why don't we take
20      five minutes?
21           MR. GRENDI:  I was just going
22      to say that.
23           (Whereupon, a brief recess was
24      taken.)
25           MR. SCHMIT:  Mark this as

Page 263

1                    Yvette Wang
2       Exhibit 21.
3            (Whereupon, at this time, the
4       reporter marked the above-mentioned
5       screen shot of text messages as Wang
6       Exhibit 21 for identification.)
7  BY MR. SCHMIT:
8       Q.  I'm going to hand you what's been
9  marked as Exhibit 21.
10      A.  Thank you.
11      Q.  It is a two-page text message, 259
12 through 260.  Do you have that in front of
13 you?
14      A.  Yes.
15      Q.  If you can just read the message and
16 let me know when you're finished.
17           (Witness peruses document.)
18      A.  Yes, I finished.
19      Q.  Did you receive this text message?
20      A.  Yes.
21      Q.  Did you ever discuss these issues
22 with Mr. Waller?
23      A.  I believe no.
24      Q.  Did you ever discuss them with Mr.
25 Guo?

Page 264

1                    Yvette Wang
2       A.  I mentioned this message to him.
3       Q.  And what was his reaction?
4       A.  He said they are making excuse and
5  it doesn't make any sense.
6       Q.  Why did he think it didn't make any
7  sense?
8            MS. TESKE:  Object.
9       A.  I believe the two pages here, the
10 main spirit or the main contact with never
11 included in the contract, which is signed on
12 January 6th.
13      Q.  I'm sorry, what's not included?
14      A.  The content of here.
15      Q.  Did Mr. Guo ever discuss that based
16 on his experience this isn't how it worked or
17 Mr. Waller had it all wrong?
18      A.  He didn't mention that to me.
19      Q.  In this context, was Mr. Guo getting
20 more and more agitated?
21      A.  What do you mean agitated?
22      Q.  Angry, frustrated.
23           MS. TESKE:  Object.
24      A.  Oh, yes.
25      Q.  And in this time, did he ever say

Page 265

1                    Yvette Wang
2  why he needed this information so
3  immediately?
4            MR. GRENDI:  Objection.
5       A.  No, he didn't mention that.  He said
6  that before already.
7       Q.  He said what before?
8            (Witness peruses document.)
9       Q.  Are you looking for a particular
10 message?
11      A.  Yes.  There was a timeline in my
12 text message.  On your Exhibit number 18,
13 page 233, conveyed to him, this is my
14 message, on January 16, to French Wallop, I
15 said, Convey to him, he advised that if you
16 could make it he needs to see the report
17 before January 25th.  And he has some plan
18 from January 6th, which will need your input.
19      Q.  But did he ever tell -- as far as
20 you know, did he ever tell you, let's start
21 there, what the plan was?  That was the
22 question.
23           MR. GRENDI:  Objection.  We've
24      been over this a couple of times now,
25      but go ahead.

Page 278

```
 1
 2              I N D E X
 3  EXAMINATION BY                    PAGE
 4  Mr. Schmit                        4
 5
                E X H I B I T S
 6
 7
    WANG        DESCRIPTION           PAGE
 8
      1    Notice of deposition        7
 9
      2    Research agreement         11
10
      3    Responses and objections
11         to interrogatories        23
12    4    Research agreement         51
13    5    Screen shot of text messages  103
14    6    Three-page letter         135
15    7    Bank document             158
16    8    Corporate telegraphic transfer
           cancellation amendment
17         request                   160
18    9    E-mail chain              161
19   10    Handwritten document      164
20   11    Complaint                 167
21   12    Name list                 212
22   13    Background report         216
23   14    Background report         219
24   15    Screen shot of text messages  224
25   16    Screen shot of text messages  230
```

Page 279

```
 1
 2
           (Exhibits cont.)
 3
 4
    WANG        DESCRIPTION           PAGE
 5
     17    Screen shot of text messages   234
 6
     18    Screen shot of text messages   240
 7
     19    Screen shot of text messages   244
 8
     20    Screen shot of text messages   254
 9
     21    Screen shot of text messages   263
10
     22    Screen shot of text messages   272
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 280

```
 1
 2  DOCUMENTS AND/OR
    INFORMATION REQUESTED        PAGE LINE
 3
    Documents supporting loan       45   17
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 281

```
 1
 2              C E R T I F I C A T E
 3       I, MICHELLE LEMBERGER, a shorthand
 4  reporter and Notary Public within and for
 5  the State of New York, do hereby certify:
 6       That the witness(es) whose testimony
 7  is hereinbefore set forth was duly sworn by
 8  me, and the foregoing transcript is a true
 9  record of the testimony given by such
10  witness(es).
11       I further certify that I am not
12  related to any of the parties to this
13  action by blood or marriage, and that I am
14  in no way interested in the outcome
15  of this matter.
16
17
18
19
              MICHELLE LEMBERGER
20
21
22
23
24
25
```

Page 282

1

2          DEPOSITION ERRATA SHEET

3   Case Caption:  Eastern Profit Corp v.

4   Strategic Vision LLP

5

6       DECLARATION UNDER PENALTY OF PERJURY

7          I declare under penalty of perjury

8   that I have read the entire transcript of my

9   Deposition taken in the captioned matter or

10  the same has been read to me, and the same is

11  true and accurate, save and except for changes

12  and/or corrections, if any, as indicated by me

13  on the DEPOSITION ERRATA SHEET hereof, with

14  the understanding that I offer these changes

15  as if still under oath.

16

17       _____

18          YVETTE WANG

19

20  Subscribed and sworn to on the _____ day of

21  _____, 2019, before me,

22  _____

23  Notary Public,

24  in and for the State of _____

25

Page 283

1

2          DEPOSITION ERRATA SHEET

3   Page No. _____ Line No. _____ Change to: _____

4   _____

5   Reason for change: _____

6   Page No. _____ Line No. _____ Change to: _____

7   _____

8   Reason for change: _____

9   Page No. _____ Line No. _____ Change to: _____

10  _____

11  Reason for change: _____

12  Page No. _____ Line No. _____ Change to: _____

13  _____

14  Reason for change: _____

15  Page No. _____ Line No. _____ Change to: _____

16  _____

17  Reason for change: _____

18  Page No. _____ Line No. _____ Change to: _____

19  _____

20  Reason for change: _____

21  Page No. _____ Line No. _____ Change to: _____

22  _____

23  Reason for change: _____

24  SIGNATURE:_____DATE:_____

25          YVETTE WANG

# Exhibit E

**Atkinson-Baker, Inc.**
**www.depo.com**

```
1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF NEW YORK

3    _____

4    Eastern Profit Corporation, )

5              Plaintiff,        )

6    V.                          )    Civil Action No.

7    Strategic Vision U.S, LLC,  )    1:18 CV 02185

8    Defendant.                  )

9    _____

10

11        C O N F I D E N T I A L

12

13

14       Videotaped Deposition of Bill Gertz

15           Tuesday, October 15, 2019

16

17   ATKINSON-BAKER, INC.
     COURT REPORTERS
18   (800) 288-3376
     www.depo.com
19   Reported by:  Jackie Smith

20

21
```

Page 1

**Bill Gertz**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

| | |
|---|---|
| 1 Ap, to communicate with Mr. Guo? | 1 the pleadings in this case? |
| 2     A.  No. | 2     A.  No. |
| 3     Q.  Okay.  Did you ever use What's Ap to | 3     Q.  So you haven't seen the complaint or |
| 4 communicate with Ms. Wallop? | 4 the counterclaim? |
| 5     A.  No. | 5     A.  No. |
| 6     Q.  And do you have any hard copy | 6     Q.  Do you know, generally, what this |
| 7 documents in your possession related to this matter? | 7 case is about? |
| 8     A.  No. | 8     A.  Vaguely. |
| 9     Q.  Okay.  Any handwritten notes? | 9     Q.  And how do you have knowledge of |
| 10     A.  No. | 10 that? |
| 11     Q.  I don't think I have any more | 11     A.  I think it was from some news reports |
| 12 questions about this exhibit now, but we might come | 12 about a contract dispute. |
| 13 back to it later, so feel free to keep it in front of | 13     Q.  Okay.  And that might have been the |
| 14 you.  Thank you. | 14 news reports from earlier this summer? |
| 15     Mr. Gertz, how did you prepare for today's | 15     A.  Yes. |
| 16 deposition? | 16     Q.  Okay.  And did you show this document |
| 17     A.  I just, basically, got ready to talk | 17 that we discussed earlier, Exhibit 1, to anyone other |
| 18 about this case. | 18 than your attorney before today? |
| 19     Q.  And did you meet with anyone to | 19     A.  No. |
| 20 prepare for today's deposition? | 20     Q.  Did anyone instruct you not to |
| 21     A.  No. | 21 provide documents responsive to our request? |
| Page 14 | Page 16 |
| 1     Q.  Did you meet with your lawyer? | 1     A.  No. |
| 2     A.  Yes. | 2     Q.  Let's start with going into your |
| 3     Q.  Okay.  Did you   I'm not going to | 3 background a little bit, your education and your |
| 4 ask you about your communications with your lawyer | 4 profession.  Can you just tell me a little bit about |
| 5 because those are privileged, but did you meet with | 5 you, and what you do, and how you arrived to your |
| 6 anyone other than your lawyer to talk about this | 6 position today? |
| 7 deposition? | 7     A.  I am a journalist and author.  I work |
| 8     A.  No. | 8 for The Washington Times, and until recently, The |
| 9     Q.  Did you speak with Ling Cho Hann | 9 Washington Beacon.  I have written eight books. |
| 10 (phonetic) about this deposition? | 10 I have -- I was educated at Washington College in |
| 11     A.  No. | 11 Chester Town, Maryland and also at George Washington |
| 12     Q.  Did you speak with Mr. Guo about this | 12 University in Washington, D.C. |
| 13 deposition? | 13     Q.  And do you also occasionally do |
| 14     A.  No. | 14 speaking engagements? |
| 15     Q.  And have you reviewed any other prior | 15     A.  Yes. |
| 16 depositions taken in this case? | 16     Q.  And how often would you say you do |
| 17     A.  No. | 17 speaking engagements? |
| 18     Q.  Okay.  So you haven't seen French | 18     A.  Maybe once every two to three months. |
| 19 Wallop's deposition, for example? | 19     Q.  Is that around the country or mostly |
| 20     A.  No. | 20 around here? |
| 21     Q.  Okay.  Have you ever reviewed any of | 21     A.  It could be locally or it could be |
| Page 15 | Page 17 |

5 (Pages 14 to 17)

**Bill Gertz**
**October 15, 2019**

| | |
|---|---|
| 1 around the country. | 1 promotion of radio and television. |

around the country.

Q.   And do you have a company that arranging those for you or do you have an LLC that you do speaking engagements through?

A.   No.

Q.   Just available to book you through your website?

A.   Yes.

Q.   So if someone wanted to book you to do a speech at a college or university, how would they get in touch with you?

A.   Probably through phone.

Q.   Do you have a book agent?

A.   Yes.

Q.   And who is your agent?

A.   Joseph Valerie.

Q.   And what company does he work for?

A.   He passed away recently, last year.

Q.   Oh, sorry.  Okay.  Do you have anyone new that you work with?

A.   No.

Page 18

promotion of radio and television.

Q.   And when did your appearances on radio and TV begin?

A.   That would probably be around September 3rd, after that.

Q.   And are they ongoing, those appearances?

A.   Yes.

Q.   When is the last one that you had?

A.   I think I was on the Adam Carolla Podcast last week.

Q.   That must have been interesting.  And you were Fox News last week as well, correct?

A.   I think I was on Lou Dobbs, yes.

Q.   Okay.  We have talked a little bit about being an author and a journalist.  What's your main focus of writing?

A.   I write about defense and national security affairs.

Q.   And has that always been the case since you began journalism?

Page 20

Q.   That's who you worked with on your most recent book?

A.   Yes.

Q.   And tell me about your most recent book?

A.   My most recent book is called Deceiving The Sky.

Q.   And what's it about?

A.   It's about China.  It is basically, in the year 2000, I wrote a book called The China Threat.  And this book was initially, the working title was The China Threat 2.0, to look at all of the various things that have happened related to China since 2000.

Q.   And when did Deceiving The Sky come out?

A.   It was published in September, early September of this year.

Q.   And did you go on a book tour?

A.   It's not really a tour in the sense of a tour.  It's more or less a promotional -- a

Page 19

A.   Yes.

Q.   And you have written eight books.  We have talked about two of them.  Generally, what are the other six about?

A.   They are about -- one was about the Clinton Administration's national security policies.  One was about arms proliferation.  Another was about the intelligence failures related to 911.  The China Threat was one.  One was called IWar, which was war and peace in the information age.

Q.   And since 2017, which is the operative time for this dispute, which entities have paid you money?  We discussed the Free Beacon, The Times.

Q.   What other sources of income have you had?

A.   In what sense?

Q.   Anyone who pays you, that hits your bank account.  So who have your employers been?

A.   My employer has been The Washington Times and The Washington Free Beacon.  The most recent book was published by Encounter Books.

Page 21

6 (Pages 18 to 21)

**Bill Gertz**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

1      Q.   And when do you speaking engagements,
2   do you receive a fee or honoraria for those?
3      A.   Sometimes.
4      Q.   And that's just paid to you directly?
5      A.   Yes.
6      Q.   And you receive royalties for your
7   books?
8      A.   Yes.
9      Q.   And that's through Encounter, the
10  publisher?
11     A.   It will be, yes.  I have not received
12  royalties.
13     Q.   And wherever you published this book
14  with Encounter, what is your contract with them?
15     A.   In what sense?
16     Q.   What are the royalties and what are
17  the terms of payment?
18     A.   I don't know all of it, but it's
19  basically after the first number of copies that are
20  sold, you get 15 percent, and after that, a certain
21  number, it's 12 percent, and then I think it's 10

Page 22

1   percent of the sales of the book.
2      Q.   Do you get more money if the book
3   does better in sales, such as like bestseller list or
4   anything like that?
5      A.   No.
6      Q.   Okay.  And when did you sign the
7   contract for the most recent Encounter book deal for
8   Deceiving The Sky?
9      A.   I think it was the August time frame.
10     Q.   And did you receive a lump many sum
11  at the beginning for publishing that book?
12     A.   No.
13     Q.   Do you know about when your first
14  payment would come in from them?
15     A.   I'm not sure of the terms, but I
16  think it would be six -- six months or so.
17     Q.   From publication?
18     A.   From publication, or maybe a year.
19     Q.   And based on your prior seven books,
20  about how much do you expect to make from your most
21  recent book, Deceiving The Sky?

Page 23

1      A.   It's hard to say.  I couldn't say.  I
2   don't know.
3      Q.   Well, what's your best guess?
4      A.   I'd rather not guess.
5      Q.   Do you think it would be over
6   $100,000?
7      A.   It could be.
8      Q.   How much did you make on your last
9   book?
10     A.   I made around that amount.
11     Q.   Okay.  And the six books before that,
12  was it about that amount as well?
13     A.   I really can't remember.
14     Q.   Is it safe to say possibly in the six
15  figures, but that that amount could change, based on
16  sales?
17     A.   I really don't remember.  I really
18  don't have a clear recollection.
19     Q.   Do you have a contract in writing
20  with Encounter for this most recent book deal?
21     A.   Yes.

Page 24

1      Q.   And your former agent negotiated that
2   for you?
3      A.   No, he didn't.
4      Q.   You negotiated that on your own?
5      A.   Yes.
6      Q.   Who did you negotiate with at
7   Encounter?
8      A.   Roger Kimble.
9      Q.   And what's his position?
10     A.   I believe he is the publisher.
11     Q.   And was Encounter paid by anyone to
12  publish your book?
13     A.   Not that I know of.
14     Q.   Okay.  Would they have disclosed that
15  to you, do you believe, if they had received payment
16  from a third party?
17     A.   Yes.
18     Q.   And you said you have worked for both
19  The Washington Times and the Free Beacon at the same
20  time, is that correct?
21     A.   Yes.

Page 25

7 (Pages 22 to 25)

**Bill Gertz**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

1     A.   No.

2         Q.   Are you aware that he did so?

3     A.   I don't know.

4         Q.   Did he call you after he had spoke

5  with them on Sunday?

6     A.   No.

7         Q.   Did he speak with you after he spoke

8  with them on Sunday?

9     A.   No.

10        Q.   So after Mr. Hann called you and

11  asked if you needed any help, did you send him any

12  communication in writing?

13    A.   No.

14        Q.   You just told him verbally that you

15  did not need any help?

16    A.   That's right.

17        Q.   Do you know why he would call you?

18    A.   He's a friend, and I think he was

19  concerned about my situation.

20        Q.   And you remain friends?

21    A.   Yes.

Page 58

1         Q.   Have you spoken with Mr. Hann about

2  this case, Ling Cho Hann, about this case?

3     A.   No.

4         Q.   So when he called you on Sunday

5  asking if you need any help, was that needing any help

6  with respect to your deposition today?

7     A.   No.

8         Q.   What did he mean by help?

9     A.   He just wanted to know if he could do

10  anything to help.  He said he felt bad that I was in

11  this position that I was in.

12        Q.   And what did you tell him?

13    A.   I said, "I'm fine.  I have a lawyer.

14  I don't need any help."

15        Q.   And did Mr. Hann share with you his

16  thoughts on this lawsuit?

17    A.   No.

18        Q.   Did he tell you that he had been

19  deposed?

20    A.   I don't recall.  I don't think that

21  came up.

Page 59

1         Q.   Were you aware that he had been

2  deposed in this lawsuit?

3     A.   Yes.

4         Q.   But you have not reviewed his

5  deposition?

6     A.   No.

7         Q.   What's Mr. Ling Cho's relationship

8  with Mr. Guo?

9         MS. CLINE:  Objection, foundation.

10        THE WITNESS:  I don't know.  I know that

11  he served as a translator in some of the meetings that

12  I had with Mr. Guo.

13  BY MS. LUETKEMEYER:

14        Q.   And those would have been in 2017?

15    A.   Probably 2017 and 2018.

16        Q.   Let's go back to the very beginning

17  of when you first met Guo Wengui.  When was that, to

18  the best of your recollection?

19    A.   It would have been either June or

20  July of 2017.

21        Q.   Okay.  Do you remember writing an

Page 60

1  article for The Free Beacon in May of 2017 about

2  Mr. Guo?

3     A.   I do not.

4         - - - -

5     (Exhibit No. 2 marked for identification.)

6         - - - -

7         Q.   Let me mark it so we can talk about

8  it.  I'm going to hand you, Mr. Gertz, what's been

9  marked as Exhibit No. 2 and I'm going to give a copy

10  to your Counsel as well.  This has a marking.

11        Sir, if you can take a minute and look at

12  that.  It's been marked as Exhibit 2, and the headline

13  is, "China Intervenes to Block Businessman From

14  Revealing Spying Secrets on VOA."

15        MS. CLINE:  Do you have another copy, by

16  any chance?

17        MS. LUETKEMEYER:  I'm sorry.  I don't,

18  but I can give you mine in just a second.  I'm sorry.

19        Q.   Sir, this article was published on

20  May 3, 2017.  Do you see that?

21    A.   Yes.

Page 61

16 (Pages 58 to 61)

**Atkinson-Baker, Inc.**
**www.depo.com**

1    Q.   Had you interviewed Mr. Guo before
2  this article?
3    A.   No.
4    Q.   Had you met Mr. Guo before this
5  article?
6    A.   No.
7    Q.   And how soon after this article was
8  written did you meet with Mr. Guo?
9    A.   Like I said, it was in the June or
10  July time frame.
11    Q.   Do you believe this is the first
12  article you wrote about Mr. Guo?
13    A.   I don't know.
14    Q.   It's the earliest I found, so take
15  that for what you will.
16    In this article, Sasha Gong is quoted as a
17  source.  Do you see that in the fourth paragraph?
18    A.   Yes.
19    Q.   What is this article about,
20  Mr. Gertz?
21    A.   It's about an interview that was

Page 62

1  curtailed by the Voice Of America, and the suspension
2  of four VOA employees.
3    Q.   Did you interview Sasha Gong for it?
4    A.   Yes.
5    Q.   Will you turn to the third page of
6  this Exhibit 2, please.  It's the paragraph that
7  begins with, additionally.  "Additionally, Guo's wife
8  and daughter currently have been allowed by Chinese
9  authorities to visit him in New York, but are required
10  to return to China for 20 days where they can be used
11  for political leverage against Mr. Guo."
12  Do you see that, Mr. Gertz?
13    A.   At the top there, um hum.
14    Q.   Now, if you didn't interview Mr. Guo
15  for that, do you remember where you learned that
16  information?
17    A.   It was probably Sasha Gong.
18    Q.   Okay.  And then a few paragraphs
19  down, you say, Guo said -- if that was not from an
20  interview from Guo, would that also been from Sasha?
21    A.   It would have been in a recent video.

Page 63

1    Q.   And these are videos that Mr. Guo
2  would put on the Internet?
3    A.   Yes.
4    Q.   Just available for public viewing?
5    A.   Yes.
6    Q.   Okay.  Did Sasha Gong introduce you
7  to Mr. Guo?
8    A.   Yes.
9    Q.   And when did that occur?
10    A.   It would have been in the June to
11  July time frame, before I did the interview.  I
12  contacted Sasha and said I would like to interview
13  Mr. Guo.
14    Q.   Do you know how Sasha met Mr. Guo?
15    A.   I do not.
16    Q.   And did she agree to make the
17  introduction?
18    A.   Yes.
19    Q.   And when did you first meet him?
20    A.   It was in the June or July time
21  frame.

Page 64

1    Q.   And where did you meet?
2    A.   In New York.
3    Q.   At his apartment?
4    A.   At a restaurant.
5    Q.   And was Ms. Gong present?
6    A.   No.
7    Q.   Who was present for that meeting?
8    A.   An interpreter and Evette Wong.
9    Q.   Do you remember who the interpreter
10  was?
11    A.   Yes.  His name is Wui Chungua
12  (phonetic).
13    Q.   And who was the other third person
14  you said?
15    A.   Evette Wong.
16    Q.   Who is Evette Wong?
17    A.   She, I believe, is an assistant to
18  Mr. Guo.
19    Q.   And who is her employer?
20    MS. CLINE:  Objection, foundation.
21    THE WITNESS:  I don't know.

Page 65

17 (Pages 62 to 65)

**Bill Gertz**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

BY MS. LUETKEMEYER:

Q.   And is that the first time you had met her?

A.   Yes.

Q.   And you said you met at a restaurant?

A.   Yes.

Q.   And how did that meeting go?

A.   It was an interview.

Q.   So it was an interview. Was it on the record?

A.   Yes.

Q.   And do you remember about how long it lasted?

A.   Probably an hour.

Q.   And what was your first impression of Mr. Guo?

A.   I was amazed. I felt that this is a person who is an amazing resource of inside information within the Chinese system.

I felt like he was, in a sense -- in my experience, I have covered intelligence defectors.

Page 66

And I believe that he was like a defector in the sense that he had access to inside information related to the Chinese Government, the Chinese Communist Party, and the Chinese Intelligence Services.

Q.   And did you believe that he would be a valuable source for you?

A.   Yes.

Q.   How long did that meeting last, or interview?

A.   About an hour.

Q.   And did you agree to meet again?

A.   I don't know. I don't recall.

Q.   After that first meeting, did you begin to speak with Mr. Guo over the phone?

A.   After the first meeting, again, because I realized he was a valuable resource, I actually wanted to seek to do a book about him.

Q.   Already, after that first meeting?

A.   Yes.

Q.   Did he provide you with any documents

Page 67

in that first meeting?

A.   No.

Q.   And did you make up a proposal to Mr. Guo after that first meeting?

A.   Not after the first meeting. I think it might have been several months later.

Q.   How frequently would you speak with Mr. Guo after that first meeting?

A.   After the first meeting, it was not frequently, yes.

Q.   And did he eventually become a source for you, subject of many of your articles and columns?

MS. CLINE: Objection.

THE WITNESS: Occasionally. I interviewed him occasionally, and he was a source.

BY MS. LUETKEMEYER:

Q.   Did your opinions of Mr. Guo change over time?

A.   No.

Q.   Do you still believe today that same thing you believed whenever you left that first

Page 68

meeting?

A.   Yes.

Q.   And if you were to describe Mr. Guo to someone who had never heard of him, how would you describe him?

A.   A dissident, Chinese millionaire, who is working to bring about democracy and rule of law in China.

Q.   And what do you think his motivations are?

MS. CLINE: Objection, foundation.

THE WITNESS: I don't know his motivation, other than he has become a defector, former insider, who is now seeking to bring about democratic change.

BY MS. LUETKEMEYER:

Q.   And when you say bring about democratic change, can you expand on that a little bit, about his goals?

MS. CLINE: Objection, foundation.

THE WITNESS: He believes that the

Page 69

18 (Pages 66 to 69)

**Bill Gertz**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

1  Communist Party of China is the source of the problem
2  of what I regard as the China threat today.
3  BY MS. LUETKEMEYER:
4      Q.   When you say "the China threat," can
5  you explain that to me?
6      A.   That's the title of my 2000 book.  In
7  China, they have something called the China threat
8  theory, which is the Chinese Government and
9  Intelligence Services use to monitor opposition to
10 China's development.
11     So it's a play on the Chinese threat theory.
12 And it is, basically, the national security threats
13 from China which range from military, to political, to
14 intelligence, to economic, to financial.
15     Q.   And do you believe Mr. Guo has value
16 in defeating the China threat?
17     A.   Yes.
18     Q.   In what way?
19     A.   Because he is a former insider and
20 has access, he can provide valuable information that
21 could be used to help expose what I call the China

Page 70

1  interpreters.
2      Q.   So for many of your meetings with
3  Mr. Guo, was Ms. Wong present?
4      A.   I would say occasionally.
5      Q.   Did you ever meet with him one on
6  one, Mr. Guo?
7      A.   Yes.
8      Q.   And where would that occur?
9      A.   In his apartment.
10     Q.   And how frequently would you travel
11 to New York to meet with him?
12     A.   I'd say once every two months.
13     Q.   And would you describe your
14 relationship with Mr. Guo as a professional one?
15     A.   I'd say it was a combination of both
16 a professional, as a source, as well as some
17 friendship.  In the news business, sources can be
18 friends.  It's not unusual.
19     Q.   Would you socialize with him?
20     A.   Would I socialize with him; what do
21 you mean by that?

Page 72

1  threat.
2      Q.   And when you first met Mr. Guo and he
3  told you his story, did you do any independent
4  reporting or verification on what he told you?
5      A.   I did.  As much as I possibly could,
6  I read some of the stories about him in the Chinese
7  press or the press around the world, but there wasn't
8  a lot of information available on him.
9      Q.   Mr. Gertz, do you speak Mandarin?
10     A.   No.
11     Q.   And so when you would meet with
12 Mr. Guo, was there always an interpreter present?
13     A.   Not always, but many times.
14     Q.   Does Mr. Guo speak English?
15     A.   I'd say haltingly.
16     Q.   Was it usually the same interpreter?
17     A.   No.
18     Q.   Who would interpret for him, if you
19 can remember any of their names?  You mentioned one
20 earlier.
21     A.   Evette Wong, Ling Cho Hann were

Page 71

1      Q.   Have you ever spent time with Mr. Guo
2  in a purely social capacity where he is not serving as
3  a source for you?
4      A.   No.
5      Q.   Have you ever been on his yacht?
6      A.   Yes.
7      Q.   How many times?
8      A.   Once.
9      Q.   And you said you have been in his
10 home in New York City?
11     A.   Yes.
12     Q.   Have you ever been in his home, not
13 to work on your book or the reporting, just to spend
14 some time together?
15     A.   Well, like I said, I view him as a
16 valuable source of information.  So there is never a
17 time that I am not with him when I am not looking for
18 some inside information that could be produced as a
19 news story.
20     Q.   Did you help Mr. Guo in his
21 application for asylum?

Page 73

19 (Pages 70 to 73)

**Atkinson-Baker, Inc.**
**www.depo.com**

1 about that.

2 　　Q.　You haven't seen the recording of

3 that, there is a video of that?

4 　　A.　I have not.

5 　　Q.　And when did you first meet French

6 Wallop?

7 　　A.　It was, January, I believe, January

8 of 2017.

9 　　Q.　French Wallop?

10 　　A.　Yes.

11 　　Q.　Okay.  And that's when you first met

12 her in your life?

13 　　A.　Yes.

14 　　Q.　Okay.  And when did you first meet

15 Mr.  Waller, Michael Waller, who is also here?

16 　　A.　I have known Mike since, I believe,

17 he used to work at an affiliate publication of The

18 Washington Times many years ago.

19 　　Q.　And what was your first impression of

20 Ms. Wallop?

21 　　A.　Well, she said she knew my former

Page 126

1 editor, Oner Gaborkoff (phonetic), so I took that as

2 credit to her.

3 　　Q.　And how would you describe your

4 relationship with Mr. Waller?

5 　　A.　We were occasional friends when we

6 worked on a few policy oriented projects based on my

7 book, IWar, which called for reforming U.S. Government

8 information operations.

9 　　Q.　What kinds of projects were those?

10 　　A.　It was, basically, an idea to bring

11 about a better information capability for the U.S.

12 Government.  Right now, the Voice Of America is poorly

13 run.  We don't have the U.S. information agency that

14 we had during the Cold War.  And so my book, IWar,

15 recommends trying to revitalize some of those

16 functions.

17 　　Q.　And how was Mr. Waller to help you in

18 that effort?

19 　　A.　We sought to collaborate to present

20 these idea to get either Congress or the

21 administration to develop some type of reform

Page 127

1 programs.

2 　　Q.　And do you remember about when that

3 was?

4 　　A.　I do not, other than sometime between

5 2017 and 2018.

6 　　Q.　Did you seek out Mr. Waller's help on

7 that effort?

8 　　A.　I believe I did.

9 　　Q.　And why him?

10 　　A.　I believe that he has good skills at

11 doing information.

12 　　　　If I may explain, the reason that I tried to

13 contact or put French Wallop in touch with Mr. Guo is

14 that, again, because I saw him as an extremely

15 valuable resource, I also saw him as extremely

16 scattered in his presentation.

17 　　　　His presentations would be on video and they

18 would be talking about a wide variety of topics.  And

19 then in the middle of them, he would disclose really

20 valuable information about the inside workings of the

21 Chinese Government and Intelligence Service.  And I

Page 128

1 felt that he needed a strategic communications person.

2 　　　　And because French Wallop had contacted me

3 when she represented a dissident Russian billionaire

4 named Miguel Kortokofski, who I interviewed, she

5 arranged the interview, I felt that she could provide

6 strategic communication support to Guo, Mr. Guo.

7 　　Q.　Did you understand Ms. Wallop to be

8 credible?

9 　　A.　To be credible in what sense?

10 　　Q.　A credible person you could recommend

11 for Mr. Guo to do business with?

12 　　A.　I really didn't know her, I'll be

13 honest to say I really didn't know.  Like I said, I

14 was going on her reputation of having known Oner

15 Gaborkoff.

16 　　Q.　Did you find her to be honest in her

17 dealings with you?

18 　　A.　I guess I would say yes.

19 　　Q.　Did you find her to be sincere?

20 　　A.　Yes.

21 　　Q.　And when did you first learn of the

Page 129

33 (Pages 126 to 129)

**Atkinson-Baker, Inc.**
**www.depo.com**

| | |
|---|---|
| 1  firm, Strategic Vision? | 1  associates? |
| 2      A.   I can't recall, but it would have to | 2      A.   I didn't learn it until the first |
| 3  have been based on news reports of this matter. | 3  meeting with French on the subject. |
| 4      Q.   Okay.  So when you introduced Mr. Guo | 4      Q.   Do you find Mr. Waller to be |
| 5  to French and Mike? | 5  credible? |
| 6      A.   I didn't. | 6      A.   Yes. |
| 7      Q.   You didn't introduce them? | 7      Q.   Do you find him to be honest? |
| 8      A.   No.  I introduced them to Ling Cho | 8      A.   Yes. |
| 9  Hann and Evette Wong, and then they made the | 9      Q.   Do you find him to be sincere? |
| 10  introduction to Guo.  My job was simply to make the | 10      A.   Yes. |
| 11  connection, and then that was it. | 11      Q.   Do you remember the first time you |
| 12      Q.   Okay.  So when you introduced them to | 12  introduced to Ms. Wallop and Mr. Waller to Ling Cho? |
| 13  Ling Cho Hann and Ms. Wong, you weren't aware that | 13      A.   I don't not remember the exact day or |
| 14  Ms. Wallop's firm was called Strategic Vision? | 14  circumstances. |
| 15      A.   Correct. | 15      Q.   Do you know if it was an in person |
| 16      Q.   You learned that later, the formal | 16  meeting? |
| 17  name of the firm? | 17      A.   I think it may have been a phone |
| 18      A.   Yes. | 18  connection given, the connection, and that they would |
| 19      Q.   Did you learn that once the lawsuit | 19  connect them, but I honestly do not remember. |
| 20  was filed? | 20      Q.   And you have described the purpose of |
| 21      A.   I can't remember when. | 21  that introduction being for strategic communication |
| Page 130 | Page 132 |

| | |
|---|---|
| 1      Q.   Okay.  But as far as you were | 1  assistance to Mr. Guo? |
| 2  concerned, you were making an introduction of an | 2      A.   Yes.  Again, I viewed Mr. Guo as |
| 3  individual? | 3  having lots of various resources, but I really felt |
| 4      A.   Yes. | 4  that what he lacked was someone that could provide him |
| 5      Q.   Or was it two individuals, Mr. Waller | 5  with the ability to project, in a coherent and |
| 6  also? | 6  effective way, his message, which I think is an |
| 7      A.   Well, initially when I met French, | 7  important message. |
| 8  she brought Mike in.  And that was her decision, so I | 8      Q.   And did you tell him that you |
| 9  had no objection to it. | 9  believed he lacked that ability? |
| 10      So, again, I was -- my objective was to try | 10      A.   I can't recall.  I may have, but I |
| 11  and get Mr. Guo to focus his message so that it could | 11  can't recall a specific conversation about that, but I |
| 12  be a more effective tool, and that I would benefit | 12  think that was the whole purpose of my contacting |
| 13  from that by getting information and news stories from | 13  French Wallop. |
| 14  that. | 14      Q.   And did he ask you to help him find |
| 15      Q.   And you had already known Mr. Waller | 15  someone to aid him in communication? |
| 16  for years? | 16      A.   No. |
| 17      A.   Yes. | 17      Q.   Do you remember if you spoke with |
| 18      Q.   Did her bringing Mr. Waller in give | 18  Mr. Guo before or after you first brought up the idea |
| 19  you confidence? | 19  to Ms. Wallop? |
| 20      A.   I had no objection to it. | 20      A.   I may have raised the question.  I |
| 21      Q.   Did you know that they were business | 21  may have told him that I had worked with French Wallop |
| Page 131 | Page 133 |

34 (Pages 130 to 133)

**Atkinson-Baker, Inc.**
**www.depo.com**

1  in the Miguel Kortokofski issue, which was early
2  there, and I said that I felt that if she could do for
3  Miguel Kortokofski what she would do for Mr. Guo, that
4  it would be beneficial to him.
5      Q.   Did you understand that her services
6  would include research?
7      A.   No.
8      Q.   Did Mr. Guo ever discuss with you his
9  goal of hiring someone to conduct research?
10         MS. CLINE:  Objection to form.
11         THE WITNESS:  No.
12  BY MS. LUETKEMEYER:
13      Q.   Did you negotiate any compensation
14  for your introduction?
15      A.   No.  I think, at one point, there was
16  a suggestion that I would get a finder's fee.  And my
17  suggestion was, no, I am not interested in that, but
18  if the collaboration may have involved some important
19  information that could be useful to me as a reporter,
20  that I would be welcome, I would welcome information
21  that would be useful for news reporting.

Page 134

1      Q.   So your arrangement was that the
2  fruits of the labor, if any, would flow to you
3  exclusively as a reporter?
4      A.   No.
5      Q.   Just that you would have access to
6  that information?
7      A.   No.  It was, again, that I felt that
8  if he had all of this valuable information and if it
9  were packaged properly, it could be made public.
10         So that rather than giving an hour and a
11  half video, that he could talk about whatever, his
12  personal food or his exercises, but then he could
13  focus more on the substance of what he wanted to
14  reveal.
15      Q.   So your view is Ms. Wallop and
16  Mr. Waller would help him with information he already
17  had, packaging his story and his information?
18      A.   Correct.
19      Q.   Were you surprised -- would you be
20  surprised to learn that he wanted them to conduct
21  research on third parties?

Page 135

1      A.   Yes.
2      Q.   Was that ever part of your
3  discussions with him?
4      A.   No.
5      Q.   Was that ever part of your
6  discussions with Ms. Wallop?
7      A.   No.
8      Q.   What about with Mr. Waller?
9      A.   No.
10      Q.   Others in this case have testified
11  that Mr. Guo communicated with them using What's Ap.
12  Have you ever spoken with him or communicated with him
13  using What's Ap?
14      A.   No.
15      Q.   You said, previously, it was just
16  Signal?
17      A.   Correct.
18      Q.   Do you recall who it was who
19  suggested you be given a finder's fee for the
20  introduction?
21      A.   It may have been French, but it was

Page 136

1  more of a suggestion rather than anything.
2  Again, I said that I wasn't interested in any fee, but
3  that I was more interested in getting the message out
4  and getting information.
5      Q.   Do you remember what you told Ling
6  Cho Hann about the purpose of the first meeting with
7  Ms. Wallop and Mr. Waller?
8      A.   To my recollection, it was what I had
9  said, was we have seen from Mr. Guo a very powerful
10  message, but, again, somewhat disjointed in its
11  presentation, and that it was my hope that having a
12  strategic communications professional or
13  professionals, that it would help him to present his
14  information in a much more powerful way.
15      Q.   Did Ling Cho Hann agree?
16      A.   I think he did.
17      Q.   Did he ever mention to you that
18  Mr. Guo needed research help?
19      A.   He did not.
20      Q.   Did Ms. Wong ever mention to you that
21  Mr. Guo was looking for a research firm?

Page 137

35 (Pages 134 to 137)

**Bill Gertz**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

1    A.   No.

2    Q.   **Did you have any concerns introducing**

3 **Ms. Wallop and Mr. Waller to Mr. Guo?**

4    A.   No.

5    Q.   **Do you believe that, as originally**

6 **conceived, the project would be benefiting him**

7 **personally?**

8    MS. CLINE:  Objection to form.

9    THE WITNESS:  What project?

10 BY MS. LUETKEMEYER:

11    Q.   **The project of hiring Ms. Wallop and**

12 **Mr. Waller, do you believe that was to be conveyed to**

13 **Mr. Guo as a personal benefit?**

14    A.   I don't know.

15    Q.   **Did you envision that their efforts**

16 **would help him obtain asylum?**

17    A.   I don't know.

18    Q.   **Do you recall Mr. Guo ever discussing**

19 **with you if Ms. Wallop could be helpful in him seeking**

20 **asylum?**

21    A.   I don't recall.

Page 138

1    Q.   **Do you recall ever having a**

2 **discussion about Ms. Wallop and Mr. Waller's work**

3 **being made public?**

4    A.   I do not.

5    Q.   **Did you ever see the contract?**

6    A.   No.

7    Q.   **When you had meetings with -- first**

8 **of all, let's go back.  Your very first meeting with**

9 **Mr. Guo and Ms. Wallop and Mr. Waller, were you all**

10 **physically in the same space?**

11    A.   I never met together with Ms. Wallop,

12 Mr. Waller, and Mr. Guo.

13    Q.   **Okay.  So you made the introduction**

14 **to Ling Cho Hann and Evette Wong, and then meetings**

15 **occurred after that?**

16    A.   Yes.

17    Q.   **Okay.  Were you ever on any phone**

18 **calls with Mr. Guo, and Ms. Wallop, and Mr. Waller?**

19    A.   No.

20    Q.   **As he began negotiations and**

21 **discussions with them, did he update you on the**

Page 139

1 **progress of those?**

2    A.   No.

3    Q.   **Did he ever report to you about how**

4 **the partnership was going?**

5    A.   No.  I think, at one point, he asked

6 me if he should do this contract.  And, again, I had

7 no knowledge about the contract.  I believed that it

8 was a strategic communications vehicle.

9    And he asked me if he should do the

10 contract.  And my response to him was, I would do it

11 maybe month to month or three months as a trial period

12 to see how it goes.

13    Q.   **Did he show it to you when he asked**

14 **you about it, did he send you a copy of what was**

15 **proposed?**

16    A.   No.

17    Q.   **Did he tell you how much the contract**

18 **cost?**

19    A.   I don't believe so.

20    Q.   **Have you since learned the value of**

21 **the contract?**

Page 140

1    A.   Yes.

2    Q.   **And how did you learn that?**

3    A.   I can't remember.

4    Q.   **And what's your understanding of the**

5 **value of the contract?**

6    A.   I think it's about a million dollars.

7    Q.   **And do you understand what the work**

8 **is to be performed on the contract?**

9    A.   No.

10    Q.   **And when you first decided to**

11 **introduce Ms. Wallop and Mr. Waller to Ling Cho Hann**

12 **and Ms. Wong, or subsequent introduction to Mr. Guo,**

13 **was there a time line or deadline in place by Mr. Guo?**

14    A.   Not that I know of.

15    Q.   **And you didn't have any deadline in**

16 **mind, in particular?**

17    A.   Not   I had no knowledge of that.

18    Q.   **Was time of the essence?**

19    MS. CLINE:  Objection to form.

20    THE WITNESS:  I have no idea.

21 BY MS. LUETKEMEYER:

Page 141

36 (Pages 138 to 141)

**Atkinson-Baker, Inc.**
**www.depo.com**

```
 1          THE VIDEOGRAPHER:  We are going off the
 2   record at 2:53 p.m., and this concludes today's
 3   testimony of Bill Gertz.  The total number of media
 4   units used was two.
 5          (The deposition concluded at 2:53 p.m.)
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
```

Page 186

```
 1          CERTIFICATION OF NOTARY
 2          I, Jackie Smith, the officer before whom the
 3   foregoing deposition was taken, do hereby certify that
 4   witness whose testimony appears in the foregoing
 5   deposition was duly sworn by me; that the testimony of
 6   said witness was taken by me stenographically and
 7   thereafter reduced to typewriting; that said
 8   deposition is a true record of the testimony given by
 9   said witness; that I am neither counsel for, related
10   to, or employed by any of the parties to the action in
11   which this deposition is taken; and further, that I am
12   not a relative or employee of any attorney  employed
13   by the parties thereto, nor financially or otherwise
14   interested in the outcome of the action.
15          _____
16          Jackie Smith
17          Notary Public
18   My Commission Expires: 3-30-2020
19
20
21
```

Page 187

48 (Pages 186 to 187)

**Bill Gertz**
**October 15, 2019**

# Exhibit F

```
1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE SOUTHERN DISTRICT OF NEW YORK

3    -----------------------------------------x

4    Eastern Profit CORPORATION LIMITED,

5                        Plaintiff,

6         -against-              Case No. 18-cv-2185(JGK)

7    Strategic Vision US, LLC,

8                        Defendant.

9    -----------------------------------------x

10                            August 2, 2019

11                            9:51 a.m.

12

13       Deposition of GUO WENGUI, held at the offices of Hodgson

14   Russ, 605 Third Avenue, Suite 2300, New York, New York,

15   pursuant to Notice, before Renate Reid, Registered Professional

16   Reporter and Notary Public of the State of New York.

17

18

19

20

21

22

23

24

25
```

**Atkinson-Baker, Inc.**
**www.depo.com**

Guo Wengui

1    Guo Wengui
2        A.  No.
3        Q.  What is your current residential
4    address?
5        A.  I cannot really say it in English, so          09:55
6    it's Sidney Hotel, 781 Fifth Avenue.
7        MR. HARMON:  It's Sherry.
8        A.  Sherry.
9        MR. HARMON:  S-h-e-r-r-y.
10       A.  Sherry Hotel.                                  09:56
11   BY MR. GREIM:
12       Q.  Mr. Guo, can you please tell us all the
13   legal names that you have used anywhere in the
14   world.
15       MR. HARMON:  Object to the form of the             09:56
16   question.
17       A.  I don't understand the question.
18       MR. HARMON:  Just a clarification.
19   When I object to the form of the question, do you
20   translate my objection for the witness?                09:56
21       MR. GREIM:  I think he -- I think he
22   should.
23       MR. HARMON:  Yes.
24       MR. GREIM:  Yeah.
25       MR. HARMON:  I -- I think he has to,              09:56

                                              Page 6

1    Guo Wengui
2    but I want to make sure that he is.
3    BY MR. GREIM:
4        Q.  Mr. Guo, what is your legal name?
5        MR. HARMON:  Object to the form of the             09:56
6    question.
7        A.  So I don't need to answer this
8    question?
9        MR. HARMON:  You do.
10       A.  Haoyun Guo.                                    09:57
11       MR. GREIM:  Could you spell that for
12   the record, Mr. Translator?
13       INTERPRETER:  H-a-o-y-u-n -- that's
14   first name; last name is G-u-o.
15   BY MR. GREIM:                                          09:57
16       Q.  Do you also go by Guo Wengui?
17       A.  Yes.
18       Q.  What other names do you go by?
19       A.  Miles Kwok, my English name.
20       Q.  What else?                                     09:58
21       A.  No, not that I can recall.
22       Q.  When and where were you born?
23       A.  I was born on May 10, 1968.  I was born
24   in China.
25       Q.  Where in China?                                09:58

                                              Page 7

1    Guo Wengui
2        A.  So you mean which province and which
3    city?
4        Q.  Yes.
5        A.  Shandong province.                             09:58
6        Q.  In what city?
7        A.  Liaocheng City.
8        Q.  In what countries do you hold
9    citizenship?
10       A.  My citizenship is Hong Kong.                   09:59
11       Q.  For what countries do you hold
12   passports?
13       A.  Hong Kong.
14       Q.  Where else?
15       A.  You mean at present, currently?               09:59
16       Q.  Yes.
17       A.  Hong Kong passport.
18       Q.  In the last five years, for what
19   countries have you held active passports?
20       A.  Abu Dhabi, Malatu (phonetic).                 10:00
21       Q.  Have you claimed to hold 11 passports
22   within the last three years? (DIR)
23       MR. HARMON:  Don't answer the question.
24   Next question, please.
25       MR. GREIM:  We need an answer to that             10:01

                                              Page 8

1    Guo Wengui
2    question.
3        MR. HARMON:  He's not answering the
4    question.
5    Next question.                                         10:01
6        MR. GREIM:  On what basis, Counsel?
7        MR. HARMON:  It has nothing to do with
8    the lawsuit.  It's personally harassing of him.
9    He's here as a nonparty witness.  He's not
10   answering the question.                                10:01
11       If you have other questions for him,
12   please go ahead.
13       MR. GREIM:  We'll just mark this part
14   of the transcript.
15   BY MR. GREIM:                                          10:01
16       Q.  What is your current legal status in
17   the United States?
18       A.  Political asylum.
19       Q.  You mean you're claiming political
20   asylum?                                                10:01
21       A.  I'm in the process of application.
22       Q.  When is the last time that you left
23   this country? (DIR)
24       MR. HARMON:  Okay.  We're not answering
25   the question.                                          10:01

                                              Page 9

                                     3 (Pages 6 to 9)

**Guo Wengui**
**August 2, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

---

Guo Wengui

BY MR. GREIM:

Q. Let me ask you this question: Where did you obtain the 15 names that you or Mrs. Wang gave to Strategic Vision to research? 10:57

A. First of all, I need to tell you, I did not provide even one name.

Q. Do you know who provided the 15 names to French Waller and Mike Wallop -- French Wallop and Mike Waller? 10:57

A. Yvette.

Q. Did you tell French Wallop and Mike Waller that you had paid over $200 million for those names?

INTERPRETER: You would pay, right? 10:58 Not pay, but you would pay?

MR. GREIM: You had paid.

INTERPRETER: You had paid.

CHECK INTERPRETER: Counsel, did you say 200 million? 10:58

INTERPRETER: 200 million.

A. It's a big lie. Never. It's a big, super lie.

BY MR. GREIM:

Q. Do you know how the 15 names were 10:58

*Page 38*

---

obtained?

A. No.

Q. Who chose the 15 names?

A. I don't know. 10:58

Q. Do you know whether Yvette Wang chose the 15 names?

A. I don't know.

Q. What did you intend to do with the research that Strategic Vision was going to 10:59 provide?

MR. HARMON: Object to the form of the question.

MR. GRENDI: Object to form.

A. The simple reason is, we want to 10:59 eliminate the Chinese Communist Party. We try to overthrow the Chinese Communist Party, to bring rule of law to China, to let the West know the scenes committed by the Chinese Communist Party.

BY MR. GREIM: 11:00

Q. My question was more specific. What did you intend to do with the research that Strategic Vision uncovered regarding the 15 names?

MR. GRENDI: Object to the form. 11:00

*Page 39*

---

Guo Wengui

MR. HARMON: Object to the form of the question.

A. So we're going to send these reports to the U.S. courts so that people who got persecuted 11:01 would know the truth.

BY MR. GREIM:

Q. Mr. Guo, is -- do you know where Eastern Profit obtained the 15 names?

A. No, I don't. 11:02

Q. Did you approve the use -- strike that. Did you approve the 15 names before they were provided to Strategic Vision?

MR. GRENDI: Object to the form.

A. No. 11:02

BY MR. GREIM:

Q. Did you review the results of Strategic Vision's research?

A. They never produced a report. All lies, zero. So all I got was a USB drive with 11:02 Facebook posts and rumors gathered from the Internet. It's all lies. So I don't consider whatever they gather from Facebook can constitute as report. So, as a result, I never received a report. Very low, very despicable liars. 11:03

*Page 40*

---

Guo Wengui

Q. Did you receive information on the same 15 individuals from anyone else in 2018? (DIR)

MR. HARMON: Direct the witness not to answer. 11:04

A. I refuse to answer this question.

BY MR. GREIM:

Q. Did Eastern Profit receive information regarding the 15 individuals from any other source in 2018? 11:04

A. I don't know.

Q. Did Eastern Profit receive any information on the 15 individuals in 2017?

A. I don't know.

Q. Why did you expect to receive useful 11:05 results regarding these 15 individuals?

MR. HARMON: Object to the form of the question.

MR. GRENDI: Object to the form of the 11:05 question.

INTERPRETER: Can you say that again, the question?

BY MR. GREIM:

Q. Why did you expect to receive useful 11:05 results with respect to these 15 individuals?

*Page 41*

---

11 (Pages 38 to 41)

**Guo Wengui**
**August 2, 2019**

Guo Wengui

1  INTERPRETER:  So let me translate this
2  question.
3      A.  So those two individuals claimed that
4  they used to work for CIA, Pentagon, and FBI; and    11:06
5  then they had, like, a lot of experience over the
6  past many, many years.  And they also boasted that
7  they have a 24-hour working team based in the
8  Middle East and Europe.  And the lady claimed that
9  she is so good at doing her job, and the gentleman    11:07
10 also claimed that he is very good at doing the
11 job.  And they gave me a very, you know,
12 convincing lying pitch about, you know, their
13 ability.  And, also, not to mention, you know, Han
14 Lianchao, my contact, my liaison at the time --    11:07
15 these two individuals even showed my liaison, Han
16 Lianchao, on their computers, you know, that, oh,
17 we have discovered money laundering evidence that
18 amounted to tens of -- of billions of dollars and
19 hundreds of billions of dollars.  And, also, Wang    11:07
20 Qishan's daughter had a, you know, deposit -- lot
21 of deposits with China Centric.
22     CHECK INTERPRETER:  CITIC Bank.
23     A.  Citibank, in China.
24     CHECK INTERPRETER:  CITIC.    11:07

Page 42

Guo Wengui

1      A.  CITIC.
2      INTERPRETER:  CITIC, C-I-T-I-C.
3      A.  CITIC Bank, in China.  So it was a very
4  convincing pitch.    11:07
5      CHECK INTERPRETER:  And also, the
6  witness also mentioned that if you don't sign the
7  contract, you will not be able to obtain those
8  information.
9      INTERPRETER:  I did not hear that part.    11:08
10     CHECK INTERPRETER:  (Speaking Chinese
11 to witness.)
12     A.  So, yes, they prodded me to sign
13 agreement as soon as possible so that they can
14 give me the information about the goddaughter of    11:08
15 Wang Qishan, her deposit in China CITIC, billions
16 and billions of dollars.  And, also, my liaison --
17 Han Lianchao, even made a personal loan guarantee
18 in order to sign the contract.
19     So I'm not finished yet.    11:09
20     I remember one night, late at night, this
21 lady make emergency call, made a very urgent call
22 to Han Lianchao asking Han Lianchao to come over
23 to her apartment to show her something on the
24 computer screen that says, you know, the    11:09

Page 43

Guo Wengui

1  goddaughter of Wang Qishan had billions and
2  hundreds of billions of deposits in China CITIC.
3  And because of that, you know, Han Lianchao even
4  gave a personal guarantee that, okay, I actually    11:10
5  saw this information with my own eyes.  However,
6  we did not even -- we did not sign a contract even
7  after that.
8      And later on, Mr. Han Lianchao got
9  summoned -- got asked by this lady again to come    11:10
10 to apartment, also late at night, to look at the
11 information again, to be given another pitch
12 showing that, you know, tens of billions of
13 dollars and hundreds of billions of dollars of
14 deposits, you know, information in that regard.    11:10
15 And we did not sign a contract.
16     And so, with all those movements and
17 activities, we were prodded to sign a contract as
18 soon as possible.  They say that once we sign the
19 contract, they will be able to release that    11:10
20 information to us.  So, apparently, we got
21 tricked, and we got tricked.  And Han Lianchao, as
22 a liaison in the middle, also got tricked.
23 BY MR. GREIM:
24     Q.  Here is my question:  What is it --    11:11

Page 44

**Guo Wengui**

1  start again.
2      **What was it about the 15 names that led**
3  **you to believe that Strategic Vision's research**
4  **would be useful to you in your goal of eliminating**    11:11
5  **the Chinese Communist Party?**
6      MR. HARMON:  Object to the form of the
7  question.
8      MR. GRENDI:  Object to form.
9      A.  So the reason being, some of these    11:11
10 names -- first of all, I don't know -- so I don't
11 know all the names, but I do know -- I did know
12 some of the names among the 15 names.  Some names
13 included, for example, the goddaughter of Wang
14 Qishan, about -- you know, about her putting aside    11:13
15 tens of billions of dollars and hundreds of
16 billions of dollars in bank accounts.  If we are
17 able to disclose that information to the public,
18 that would be great.  And, also, they boasted that
19 they had information, secret informations, about,    11:14
20 you know, a police -- Chinese police department
21 intelligence head, intelligence head, about his
22 corruption information.
23     So back then, we felt like, if -- with
24 possession of those information, we are able to    11:14

Page 45

**Atkinson-Baker, Inc.**
**www.depo.com**

| | |
|---|---|
| Guo Wengui | Guo Wengui |

Guo Wengui

1
2  release those information to the U.S. government
3  to help save millions of peoples who got falsely
4  persecuted in China, even hundreds of millions of
5  people who got persecuted in China.  And because    11:14
6  of this lying pitch, we lost a wonderful
7  opportunity to rescue all these millions and tens
8  of millions of people who got thrown into jail for
9  no reason.
10        So, essentially, these two people, these    11:14
11  two individuals, took advantage of our sense of
12  urgency to rescue millions, tens of millions of
13  people, from the prison, and they used those
14  people as bait to try to get us into sign the
15  contracts.  And those two people -- those two    11:14
16  individuals are really despicable and very low.
17        CHECK INTERPRETER:  The check
18  interpreter wanted to raise one question with the
19  actual interpreter to see whether he can agree to
20  that.  I don't believe that the witness said, "I    11:15
21  know some of the names amongst those 15 names."  I
22  think that he said, I don't know those 15 names,
23  but I know the names of just Wang Qishan
24  goddaughter, Wang Qishan head of the intelligence.
25  So if I -- those are the people that -- you know,    11:15

Page 46

Guo Wengui

1
2  something like that.  I don't think that he said,
3  actually, I know the names among the 15 names.
4  Did you hear that?
5        INTERPRETER:  I think I heard that.    11:15
6  And -- so what's the procedure?
7        MR. GREIM:  Why don't we do this:  Let
8  me just ask the witness that as a separate
9  question, and we'll get an answer.  And we'll ask
10  only that question and ask for -- just for an    11:15
11  answer to that part, so that -- and it's hard to
12  translate, you know, paragraphs and paragraphs at
13  a time.
14  BY MR. GREIM:
15        Q.  So here's my question.    11:16
16        MR. HARMON:  Translate that first, and
17  then ask the question.
18        MR. GREIM:  Okay.
19        VIDEOGRAPHER:  Counsel --
20        MR. GREIM:  Okay.  Let's --    11:16
21        VIDEOGRAPHER:  -- you have two minutes.
22        MR. GREIM:  Let's do that.  Let's
23  translate it and get an answer.
24  BY MR. GREIM:
25        Q.  So here's my question:  Did you know    11:16

Page 47

**Guo Wengui**

1
2  **some of the 15 names before they were given to**
3  **Strategic Vision?**
4        A.  Yes.
5        MR. GREIM:  I also want to be clear    11:17
6  about something in the translation just now.  A
7  comment by the witness was -- in the transcript
8  appears as "lying pitch," referring to someone.
9  BY MR. GREIM:
10        Q.  Was that actually "lying bitch"?    11:17
11        A.  No.
12        INTERPRETER:  No, he did not use that.
13        A.  I'm not as despicable as the other
14  party.  I did not use "bitch."  "Pitch," I said.
15        VIDEOGRAPHER:  The time is    11:18
16  approximately 11:17 a.m., Friday, August 2, 2019.
17  This is the end of media number 1 of the
18  videotaped deposition of Mr. Guo Wengui.  We are
19  off the record.
20        (Recess taken.)    11:18
21        VIDEOGRAPHER:  The time is
22  approximately 11:36 a.m., Friday, August 2, 2019.
23  This is media number 2 of the videotaped
24  deposition of Mr. Guo Wengui.  We are back on the
25  record.    11:37

Page 48

Guo Wengui

1
2  CONTINUED EXAMINATION
3  BY MR. GREIM:
4        Q.  Mr. Guo, I want to follow up on a few
5  **questions from before our break.**    11:37
6        **I believe I heard you say that Lianchao**
7  **Han had extended a personal loan guarantee; is**
8  **that correct?**
9        MR. HARMON:  Object to the form of the    11:37
10  question.
11        MR. GRENDI:  Object to the form of the
12  question.
13        A.  I think the lawyer is trying to bait
14  me.
15        CHECK INTERPRETER:  No.  I think he    11:38
16  said "cited me wrongly."
17        A.  Cite me wrongly.
18        What I said was, Mr. Han Lianchao told me
19  that, "I saw the information with my own eyes, and
20  I can personally guarantee that they have the    11:38
21  ability to perform the job."
22        So no money was involved.
23  BY MR. GREIM:
24        Q.  And does all of the information you
25  **have about Ms. Wallop's interaction with Lianchao**    11:38

Page 49

13 (Pages 46 to 49)

**Guo Wengui**
**August 2, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

Guo Wengui

should research on.  However, all this
information, so far, information that we have
covered so far, is easily available online.
BY MR. GREIM:                                        02:16
    Q.  My question -- and I understand, sir.
    My question is whether you made the
recommendation for this name.
        MR. GRENDI:  Objection.
    A.  This one, I don't remember.                  02:16
BY MR. GREIM:
    Q.  Is it possible that you did, though,
and you just can't remember?
        MR. HARMON:  Object to the form of the
question.                                            02:16
    A.  I don't answer any question that's
uncertain or regarding possibility.
        CHECK INTERPRETER:  Or "if."
BY MR. GREIM:
    Q.  Can you say definitively that you did     02:17
not make this recommendation?
    A.  I don't remember.
    Q.  Please turn to page 39.  And I'm now
going to ask you about pages 39 to 41.  Page 39
has number 6.                                        02:17

Page 102

Guo Wengui

    And what name, sir, do you see there?
    A.  Sun Lijun.
    Q.  Who is that person?
    A.  So she's the number 2 head of the         02:18
intelligence agency in China.  She did a lot of --
she persecuted a lot of innocent people in Tibet
and in Xinjiang (phonetic).  And also, a lot of my
family members were arrested by her.  And also,
currently, he's in Hong Kong to persecute         02:18
additional people, and he's also pursuing me in
the U.S.  He's currently the vice minister of
China's public safety.
    Q.  What do you mean when you say he is
pursuing you in the U.S.?                          02:18
    A.  New York Times actually wrote an
article about him being in the U.S.
    Q.  I see.
    So are you saying that he came to the
U.S. to pursue you?                                02:19
    A.  Yes.
    Q.  When?
    A.  2017.
    Q.  Did you recommend this name to Yvette
Wang?                                              02:19

Page 103

Guo Wengui

    A.  A hundred percent, I made that
recommendation.
    Q.  And did you expect that research into
this person would aide you in the objective that  02:19
you testified to earlier today?
        MR. GRENDI:  Object to the form.
        MR. HARMON:  Object to the form of the
question.
    A.  Yes.                                        02:20
BY MR. GREIM:
    Q.  And would you have any objection to the
public disclosure in this litigation of pages 39
through 41?
    A.  I'm currently only on page 39.  I          02:20
haven't reviewed the other pages yet.
    Q.  Please review the other pages.
    A.  Thank you.  Thank you for allowing me.
(Witness reviews document.)
    Q.  Now I will repeat my question.             02:21
    Do you have any objection to the public
disclosure in this litigation of pages 39 through
41?
    A.  I object 100 percent.  If you
include -- if you disclose this information to the  02:21

Page 104

Guo Wengui

public, hundreds of millions of people will get
killed because of this, including -- you know, the
family members of Wong Yen Ping have been killed,
and a lot of other investigators who are engaged  02:22
in investigating matters in this regard will get
killed.  So if they get killed, the blood will be
on you, including me personally, including my
family members in the U.S., and also family
members of Wong Yen Ping and Wong Yen Ping        02:22
herself.  All of us will be under threat.
    Q.  What other investigators are
investigating number 6, Sun Lijun?
    A.  I don't know.  But it's just -- I
assume that -- I mean, I assume that a lot of     02:22
people are also engaged in trying to figure out
his dealings.  Those people, they will be
threatened as well.
    So that's why I'm saying your clients,
you know, they've been using, you know, this name  02:23
as a bait, use this name as a bait, keep telling
me, can we publicly disclose this name, publicly
disclose this information?  If we do that, a lot
of people in the U.S. will get harmed and a lot of
people in China will get killed.  And your clients  02:23

Page 105

27 (Pages 102 to 105)

**Guo Wengui**
**August 2, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

| | |
|---|---|
| 1         Guo Wengui | 1      A C K N O W L E D G E M E N T |

1         Guo Wengui
2 but, you know, for the solemn nature of -- you are
3 being irresponsible.  After seven hours of
4 questioning; and then, all of a sudden, you threw
5 out this piece of translation, which has not yet    07:01
6 been verified.
7        CHECK INTERPRETER:  I heard, you know,
8 a response, many times I have not been
9 interviewed.
10 BY MR. GREIM:                 07:01
11    **Q.  Has Eastern Profit --**
12        MR. HARMON:  I thought you get one more
13 question.
14        MR. GREIM:  Yeah, I know.  Actually,
15 this is for the last question.            07:01
16 BY MR. GREIM:
17    **Q.  Has Eastern Profit ever asked you to be**
18 **its witness?**
19      A.  I'm not going to answer your question,
20 this question, because, earlier, you told me that    07:02
21 the previous question was already the last
22 question.  And I respect you as a lawyer; I
23 respect the dignity of the legal profession.  And
24 as a witness, I take this matter very seriously.
25 And I hope that you will honor your statement.  We    07:02

Page 230

1         Guo Wengui
2 all heard that the previous question was the last
3 question, and I'm not going to answer your
4 question.  And you --
5    **Q.  Well, thank you.**             07:02
6        MR. GREIM:  We intend to hold this
7 deposition open.  I understand we're going to have
8 an objection, probably, from the other parties.
9 But we believe that Eastern Profit has not
10 properly given us 30(b)(6) witnesses that can tell    07:02
11 us anything about the entity, and we have many
12 more questions of Mr. Guo that he was blocked from
13 answering.  And so we'll hold it open for those
14 purposes.
15        MR. HARMON:  Thank you for your time.    07:04
16        VIDEOGRAPHER:  The time is
17 approximately 7:03 p.m., Friday, August 2, 2019.
18 This is the end of media number 5 and completes
19 the videotaped deposition of Mr. Guo Wengui.
20      We're off the record.            07:04
21
22      (Time noted: 7:03 p.m.)
23
24
25

Page 231

1      A C K N O W L E D G E M E N T
2
3      I, GUO WENGUI, do hereby acknowledge I have
4 read and examined the foregoing pages of testimony,
5 and the same is a true, correct and complete
6 transcription of the testimony given by me, and any
7 changes or corrections, if any, appear in the
8 attached errata sheet signed by me.
9
10
11
12      _____   _____
13      Date        GUO WENGUI
14
15
16
17
18
19
20
21
22
23
24
25

Page 232

1     CERTIFICATE OF NOTARY PUBLIC
2     I, RENATE REID, the officer before whom the
3 foregoing deposition was taken, do hereby certify
4 that the witness, GUO WENGUI, whose testimony appears
5 in the foregoing deposition, was duly sworn by me;
6 that the testimony of said witness was taken by me in
7 stenotype and thereafter reduced to typewriting under
8 my direction; that said deposition is a true record
9 of the testimony given by said witness;
10     That I am neither counsel for, related to,
11 nor employed by and of the parties to the action in
12 which this deposition was taken; and, further, that I
13 am not a relative or employee of any counsel or
14 attorney employed by the parties hereto, nor
15 financially or otherwise interested in the outcome of
16 this action. The witness will sign.
17     IN WITNESS WHEREOF, I have hereunto set
18 my hand this 15th day of August, 2019.
19
20
21
22     RENATE REID
23     Notary Public in and for
24     The State of New York
25

Page 233

59 (Pages 230 to 233)

**Guo Wengui**
**August 2, 2019**

# Exhibit G

Atkinson-Baker, Inc.
www.depo.com

```
1

2          IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF NEW YORK
3    -------------------------------------------X

4    EASTERN PROFIT CORPORATION LIMITED,

5          Plaintiff/Counterclaim Defendant,

6        -against-         Case No. 18-cv-2185 (JGK)

7    STRATEGIC VISION US, LLC,

8          Defendants/Counterclaim Plaintiff,

9                -against-

10   GUO WENGUI a/k/a MILES KWOK,

11                  Counterclaim Defendant.

12   -------------------------------------------X

13

14

15                    DEPOSITION OF

16                    HAN CHUNGUANG

17               New York, New York

18               November 11, 2019

19

20

21

22   ATKINSON-BAKER, INC.
     (800) 288-3376
23   Www.depo.com

24   REPORTED BY:   TERRI FUDENS

25   FILE NO:   AD0B4F6
```

Han Chunguang
November 11, 2019

Atkinson-Baker, Inc.
www.depo.com

**Page 2**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
EASTERN PROFIT CORPORATION LIMITED,
        Plaintiff/Counterclaim Defendant,
V.          Case # 18-cv-2185 (JGK)
STRATEGIC VISION US, LLC,
        Defendants/Counterclaim Plaintiff.
V.
GUO WENGUI a/k/a MILES KWOK,
        Counterclaim Defendant.
----------------------------------------X

        Deposition of HAN CHUNGUANG, a Non-Party
Witness, taken by the Defendant-Counterclaim
Plaintiff pursuant to Court Order held at 620
Eighth Avenue, New York, New York, commencing at
10:03 A.M., Monday, November 11, 2019, before
Terri Fudens, a Stenotype Reporter and Notary
Public of the State of New York.

**Page 4**

I N D E X
WITNESS:      EXAMINATION BY:      PAGES:
Han Chunguang
        Ms. Donnelli             5

E X H I B I T S
DEFENDANT'S:   DESCRIPTION:        PAGES:
30    Notice of Change of Company   106
      Secretary and Director
      (Appointment/Cessation) Bates
      stamped EASTERN-000400 to 402

31    A piece of yellow paper       109
      containing the witness' name
      handwritten three times

32    A two-page document titled    109
      Limited Power of Attorney
      Bates stamped EASTERN-000276
      and 277

33    A document titled Substitution  118
      of Counsel consisting of two
      pages

34    A document titled Research    119
      Agreement dated December 29,
      2017 Bates stamped
      EASTERN-000005 to 000009

35    A document titled Loan        124
      Agreement Bates stamped
      EASTERN-000278 to 280

36    A black and white photograph  153
      of five people

            *  *  *  *  *

**Page 3**

A P P E A R A N C E S :
    PEPPER HAMILTON LLP
    Attorneys for Plaintiff/Counterclaim
    Defendant - Eastern Profit Corporation, Ltd.
        1313 North Market Street
        Suite 5100
        Wilmington, Delaware  19801

    BY:  CHRIS CHUFF, ESQ.


    GRAVES GARRETT LLC
    Attorneys for Defendant/Counterclaim
    Plaintiff - Strategic Vision US LLC
        1100 Main Street, Suite 2700
        Kansas City, Missouri  64105
        816.2563181
    BY:  EDWARD D. GREIM, ESQ.
        edgreim@gravesgarrett.com

    JENNIFER DONNELLI, ESQ.
        jdonnelli@gravesgarrett.com

    GOLDEN SPRING (NEW YORK) LTD.
    In-House Counsel for Golden Spring
        162 E. 64th Street
        New York, New York  10065
        917.941.9698
    BY:  DANIEL PODHASKIE, ESQ.

ALSO PRESENT:
    French Wallop
    Michael Waller
    Yvette Wang
    Ann Chi Ho, Interpreter

**Page 5**

        HAN CHUNGUANG
ANN CHI HO, the Interpreter, was duly sworn by
    Terri Fudens, a Notary Public of the
    State of New York, to accurately
    translate the following questions and
    answers to the best of her ability.
H A N   C H U N G U A N G, a Non-Party witness
    herein, having been first duly sworn
    by Terri Fudens, a Notary Public of
    the State of New York, was examined
    and testified as follows:
EXAMINATION BY
MS. DONNELLI:
    Q    Please state your name for the
record.
    A    Chunguang Han.  My last name is Han.
My first name is Chunguang.
        MR. CHUFF:  Chris Chuff for
    Eastern Profit Corporation Limited
    and the witness.
        MS. WANG:  Yvette Wang from
    Golden Spring, New York, Ltd.
        MR. PODHASKIE:  Daniel Podhaskie
    with Golden Spring, New York, Ltd.
        MS. DONNELLI:  Eddie Greim and

2 (Pages 2 to 5)

Han Chunguang
November 11, 2019

HAN CHUNGUANG

1  keep my questions as focused on those
2  topics as I can.  But there's come
3  background that I think is necessary
4  to place this witness in the context
5  of these questions.  I will try to
6  keep it focused.  I do have some
7  background.
8      MR. CHUFF:  Why is where he was
9  born relevant to the contract claim?
10      MS. DONNELLI:  Well that's, I
11  think, in part to make the witness
12  sort of comfortable with getting to
13  know me and I'm getting to know him.
14      MR. CHUFF:  Okay.
15      MS. DONNELLI:  I will probably
16  have questions about his time here in
17  relation to the documents that he
18  signed.  So I want to kind of place
19  his local where he was at certain
20  times.
21      MS. WANG:  Can you please
22  translate, madam translator.
23      MS. CLINE:  Thank you.
24   Q    I believe the question was where were

HAN CHUNGUANG

1  you born.
2   A    In China.
3   Q    Where in China?
4   A    Shandong.  S-H-A-N-D-O-N-G.
5   Q    What brought you to the United
6  States?
7      MR. CHUFF:  Objection.  I'm not
8  going to allow the witness to testify
9  about this.  The court has already
10  ordered that personal history and
11  reasons for coming to the United
12  States is clearly beyond the scope of
13  relevancy to these proceedings.  And
14  I'm not going to allow him to answer
15  without the court ordering us to do
16  so.
17      I direct you to Docket 189,
18  page 7 where it says personal history
19  and reasons for coming to the United
20  States, defendant has not
21  demonstrated the relevance of this
22  topic.
23      So we're not going to allow the
24  witness to answer any questions about

HAN CHUNGUANG

1  this unless the court directs us to
2  do so.
3      MS. DONNELLI:  We'll withdraw
4  the question.
5      MR. CHUFF:  Thank you.
6   Q    When you were living in China, did
7  you begin working for Eastern Profit?
8   A    Okay.  When I was working for this
9  company, it was in 2017.  No.  No.  No.  It was in
10  2015 or 2016.  That's right.
11   Q    Were you living in the United States
12  in 2015 or 2016?
13   A    Not yet.  At the time I was in Hong
14  Kong.
15   Q    When did you begin living in the
16  United States?
17   A    In 20 -- I'm not sure, but I have
18  been here for several years already.
19   Q    Were you performing a role for
20  Eastern Profit while you were living in the United
21  States?
22   A    I am an agent for them.
23   Q    Were you an agent for Eastern Profit
24  while you have been living in the United States?

HAN CHUNGUANG

1   A    Before June, 2017 I was a director of
2  this company.  However, in July that year, I
3  transferred it to -- Guo Mei ask me to be an agent
4  for this company after the transfer.
5   Q    Before June, 2017, were you living in
6  the United States?
7   A    I think so.
8   Q    Have you lived in the United States
9  since June of 2017 and nowhere else?
10   A    I am not sure, but I think I have
11  been moving around.
12   Q    Within the United States?
13   A    Yes.
14   Q    Have you been back to China since
15  June of 2017 for any extended period?
16      MR. CHUFF:  Objection to form.
17      Again, I'm going to cut this off
18      soon.  It's not relevant to the
19      issues that the court allowed your
20      side to proceed on.
21   A    No.
22   Q    Where do you currently live?
23   A    In United States.
24   Q    What city?

Han Chunguang
November 11, 2019

HAN CHUNGUANG

1
2  A    New York.
3  Q    What street?
4        MR. CHUFF:  Objection.
5  Relevance and that's beyond the scope
6  of what the court allowed.
7        MS. DONNELLI:  The court didn't
8  make an order about this witness.
9  The court made an order about
10 Mr. Guo.
11       Besides, at the most recent
12 deposition, which was of Eastern
13 Profit, the litigant, we heard
14 testimony that this witness has
15 involvement with Eastern Profit,
16 significant involvement.  So I'm
17 exploring where he was located.
18       MR. CHUFF:  You have the city.
19 Why do you need the street address?
20       MS. DONNELLI:  I routinely ask
21 witnesses what their street address
22 is.
23       MR. CHUFF:  I just don't see how
24 it's relevant.
25       MS. DONNELLI:  If you're going

Page 14

HAN CHUNGUANG

1
2  it to you.  But the court was very
3  clear that he had limited involvement
4  in issues in this case and has to be
5  focused on the power of attorney, the
6  ACA loan and the Strategic Vision
7  Research Agreement.
8        MS. DONNELLI:  And that was an
9  order entered upon a representation
10 by your side of things about what
11 this witness knew.  And at our last
12 deposition, which I know you didn't
13 attend --
14       MR. CHUFF:  But I read.
15       MS. DONNELLI:  -- but you read,
16 you will agree that there was
17 testimony that this witness had
18 significant involvement with Eastern
19 Profit.
20       MR. CHUFF:  I would not agree
21 that there was any testimony that he
22 had significant involvement.  Again,
23 I don't think his street address is
24 relevant.
25       MS. DONNELLI:  The testimony is

Page 16

HAN CHUNGUANG

1
2  to instruct him not to answer, that's
3  one thing.  But I caution you that
4  that's a very common question to ask
5  of a witness.
6        MR. CHUFF:  We've agreed to
7  produce him at trial already.  So you
8  don't need to serve him with
9  anything.  It's beyond the scope.
10       MS. DONNELLI:  I'm trying to
11 understand the context of where he's
12 doing his work for this entity and to
13 be able to understand where he lives.
14 The time frame in question is
15 important.
16       MR. CHUFF:  I agree.  And that's
17 why I let you get to New York City,
18 because I understand the relevance of
19 that.  But if I don't understand the
20 relevance of the street name, we're
21 not going to allow it unless the
22 court orders us to.
23       And just to correct one thing,
24 there is an oral order about
25 Mr. Han's deposition, and I can read

Page 15

HAN CHUNGUANG

1
2  he was the boss of Eastern Profit.
3  So anyway, I think it's relevant to
4  understand where this witness resides
5  so that we can see where he is at in
6  relation to entities that have an
7  association with Eastern Profit.
8        MR. CHUFF:  Until you've
9  achieved that, I'm not going to allow
10 him to answer about his street
11 address.
12       MS. DONNELLI:  You're not going
13 to allow him to answer his street
14 address?
15       MR. CHUFF:  Not without the
16 court directing me to do so.
17       MS. DONNELLI:  You're going to
18 instruct the witness not to answer.
19 I just want the record to be clear.
20       MR. CHUFF:  Yes.
21 Q    Since June of 2017, have you been
22 living in the same location?
23 A    I don't think I have moved.
24 Q    You have been living in the same
25 location here in New York since June of 2017;

Page 17

5 (Pages 14 to 17)

Han Chunguang
November 11, 2019

HAN CHUNGUANG

1
2      correct?
3          A      I have stayed in New York.
4              MS. DONNELLI:  Can you repeat
5          the question to the witness and ask
6          him to answer the question?
7              (Interpret complying)
8              MR. CHUFF:  Objection to form.
9          A      Yes.
10         Q      Do you own the place where you live,
11     or do you rent the place where you live?
12             MR. CHUFF:  Objection.  Form.
13         A      Rent.
14         Q      Does anyone live there with you
15     today?
16             MR. CHUFF:  Objection.  Again,
17         this is way beyond the scope of what
18         the court agreed that this witness
19         could be produced to testify about.
20             So unless the court changes its
21         order by a request from you, I'm not
22         going to allow him to testify about
23         this stuff.
24             MS. DONNELLI:  As you know, the
25         court is closed today.  We're going

Page 18

HAN CHUNGUANG

1
2          to have to do the best we can to make
3          our respective positions for today,
4          but we're not going to have a court
5          order today.
6              MR. CHUFF:  Then he's not going
7          to testify about this today.
8              MS. DONNELLI:  We'll preserve
9          that and bring it up with the court
10         as is appropriate.
11         Q      Are you married?
12             MR. CHUFF:  I'm sorry.  I want
13         to read something into the transcript
14         given that we're not going to see the
15         court today.
16             This is the August 24, 2019
17         transcript.  The dispute for contacts
18         was whether Mr. Han could be or would
19         even be produced as a witness.  And
20         this is what the court ruled:
21             This is not a case where
22         Mr. Chunguang is accused of
23         wrongdoing personally.  It's a case
24         where Eastern is accused of wrong
25         doing.  And the question is whether

Page 19

HAN CHUNGUANG

1
2          he knows anything about those
3          allegations.  Maybe he knows
4          something that relates to a defense
5          on the claim as opposed to the
6          counterclaim; right?  But it's not to
7          go off on just, you know, satisfying
8          Mr. Greim's curiosity about, you
9          know, what he might know about
10         anything and everything in the
11         universe that relates to Mr. Guo or
12         the universe that relates to
13         Mr. Chunguang, or the universe that
14         relates to Miss Wang.
15             This is, you know, the request
16         that I've seen.  I'm just going to
17         say it as clear as I can, Mr. Greim,
18         they are overbroad.  You've got
19         claims.  You have to be able to
20         articulate why something is relevant
21         to a claim.  You have --
22             MS. DONNELLI:  Counsel, I
23         recognize you want to make a record,
24         but you're taking up a lot of time to
25         do that.  And I think you're

Page 20

HAN CHUNGUANG

1
2          borderline on obstructing this
3          deposition.
4              So I ask that you keep your
5          objections to nonspeaking objections
6          for the record and that we move on.
7              MR. CHUFF:  Right.
8              So you've disputed what the
9          ruling is then, and I wanted to make
10         that clear on the record.  From now
11         on I won't reread it, but I just
12         wanted to make that clear.
13             MS. DONNELLI:  Thank you.
14         Q      Does the address 781 Fifth Avenue,
15     Suite 1801, New York City mean anything to you?
16         A      Nothing.
17         Q      Have you ever lived at that address?
18             MR. PODHASKIE:  Objection.  Move
19         on, counsel.  I just read into the
20         record that it has to be relevant to
21         the claim.
22             MS. DONNELLI:  It is relevant
23         and I'll tell you why it's relevant.
24         Because we've connected that address
25         with a key fact witness, and we

Page 21

6 (Pages 18 to 21)

Atkinson-Baker, Inc.
www.depo.com

HAN CHUNGUANG

1    believe this witness has a
2    relationship with that witness.  So I
3    ask if the witness will answer the
4    question.
5         MR. CHUFF:  I'm instructing him
6    not to answer.  This is not relevant
7    to any of the issues, and the court
8    has been very clear that this has to
9    be a very narrow deposition with his
10   involvement with the issues in this
11   case.  And this has nothing to do
12   with the contracts at issue.
13        MS. DONNELLI:  You haven't even
14   let me establish where it might go.
15   You're just instructing the witness
16   not to answer.
17        MR. CHUFF:  Explain it to me,
18   because I'm not seeing the relevance.
19        MS. DONNELLI:  Because we
20   believe that that is an address
21   connected with Guo Wengui, and we
22   think that this witness has a
23   relationship with Guo Wengui that is
24   deeper than perhaps your objections

Page 22

HAN CHUNGUANG

1    are intended to convey.
2         So you're not even letting me
3    get into anything, and you're
4    instructing a witness not to answer,
5    a fact witness not to answer.  And
6    that, I believe, is a dangerous
7    ground.
8         MR. CHUFF:  How is that relevant
9    whether the contract been breached?
10        MS. DONNELLI:  I just explained
11   it.  The context of this witness'
12   involvement with these contracts with
13   the people these contracts involved
14   is important.  You're not even
15   letting me go anywhere.
16        MR. CHUFF:  The contracts, I
17   agree with you.  But that's not what
18   you're asking.
19        MS. DONNELLI:  All right.
20        MR. CHUFF:  I'll only add one
21   sentence.  This is what the Judge
22   said:  This deposition is not to go
23   off on just, you know, satisfying
24   Mr. Greim's curiosity about, you

Page 23

HAN CHUNGUANG

1    know, what he might know about
2    anything and everything in the
3    universe that relates to --
4         MS. DONNELLI:  Counsel, you just
5    read that again for a second time.
6    You're obstructing this deposition.
7         MR. CHUFF:  That's exactly what
8    you're doing.  I'm not wasting my
9    time.
10        MS. DONNELLI:  You read that
11   twice and I asked you to not obstruct
12   the deposition.  I'm surprised that
13   you are frankly, but you are.
14        MR. CHUFF:  I'm surprised that
15   after I read it the first time you're
16   still asking these questions.
17        MS. DONNELLI:  Let's just move
18   on.
19   Q    Do you know a Guo Wengui?
20   A    Yes.
21   Q    How do you know that name?
22   A    In 2009 I went to visit Mr. Guo
23   Wengui not Guo Pangu because of his
24   representation.

Page 24

HAN CHUNGUANG

1    Because of my adoration for him, I
2    learned investment architecture, art and
3    everything else from him, Pangu.
4    Q    Was Mr. Guo your mentor?
5    A    Yes.  A mentor.
6    Q    What is the nature of your
7    relationship with Mr. Guo while you've been living
8    in the United States?
9    A    Our relationship after all is about
10   my learning from him, my learning about investment
11   and how to do things from him.
12   Q    Is it your testimony that you have
13   never been in the Sherry Netherland building here
14   in New York City?
15        MR. CHUFF:  Objection.
16   Mischaracterizes testimony.
17   A    I don't understand your question.
18   Q    Have you ever been in the Sherry
19   Netherland building here in New York City?
20   A    Yes.
21   Q    For what reason?
22   A    Because Mr. Guo was there.  I went to
23   learn from him about -- just about everything.
24   Q    Have you lived in the Sherry

Page 25

7 (Pages 22 to 25)

Han Chunguang
November 11, 2019

Atkinson-Baker, Inc.
www.depo.com

HAN CHUNGUANG

1
2   specific.
3        Q    Have you ever discussed Eastern
4   Profit with Mr. Guo?
5        A    No.
6        Q    Does the address 162 East 64th
7   Street, New York City mean anything to you?
8        A    I have heard about it.
9        Q    What do you understand it to be?
10       A    I was in the lobby of this building
11  to meet Yvette and discussed about paying back a
12  loan.
13       Q    A loan to whom?
14       A    I borrowed money from William, and
15  William was asking me to pay him back.  That was
16  the matter I brought it up with Yvette in the
17  lobby of this building.
18       Q    Did you or Eastern Profit borrow the
19  money you're referring to?
20       A    The company did.
21       Q    How often do you meet with Mr. Guo
22  for him to mentor you and teach you how to do
23  things?
24            MR. CHUFF:  Objection.  For the
25       reasons I've already discussed, I

Page 34

HAN CHUNGUANG

1
2            instruct the witness not to answer
3            unless counsel can direct it to some
4            kind of relevance to Eastern Profit.
5        Q    Do you know who Guo Mei is?
6        A    Yes.
7        Q    Is Guo Mei Mr. Guo's daughter?
8        A    Yes.
9        Q    Does Guo Mei have a relationship with
10  Eastern Profit?
11       A    Guo Mei is a director of Eastern
12  Profit right now.
13       Q    Have you ever discussed Guo Mei's
14  role with Eastern Profit with Mr. Guo?
15       A    No.  I have never had such a
16  discussion with Mr. Guo.
17       Q    Do you have a job at this time?
18       A    Do I have a job right now?  Yes.
19       Q    Where are you employed?
20       A    I work for my own company.
21       Q    What is your company called?
22       A    Since this has nothing to do with
23  this case, I'm not going to answer this question.
24       Q    How long have you been employed by
25  your company?

Page 35

HAN CHUNGUANG

1
2        A    The business is a family trust.
3   Therefore, I would say I've been working for it
4   for a long time.
5        Q    Since you've been in the United
6   States?
7        A    Yes.
8        Q    Does it have any involvement with
9   Eastern Profit?
10       A    No.
11       Q    Is the name of the company Golden
12  Spring New York Limited?
13       A    I don't understand your question.
14  Can you rephrase your question?
15       Q    Does a company called Golden Spring
16  New York employ you?
17       A    No.
18       Q    Has that company ever employed you?
19       A    No.  But again, I'm not sure.  My
20  recollection is not clear.
21       Q    Has a company called Golden Spring
22  Hong Kong Limited ever employed you?
23       A    No.
24       Q    If I represented to you that Golden
25  Spring New York Limited employed Yvette Wang,

Page 36

HAN CHUNGUANG

1
2   would that refresh your recollection whether it
3   has employed you?
4        A    I did ask Yvette to do something for
5   me.  And she is or was involved with Golden Spring
6   New York.
7            THE INTERPRETER:  Interpreter
8            note in Chinese we don't have a
9            tense.  In China no present, or past,
10           or future things.
11       Q    When you met with Yvette Wang to
12  discuss a loan, was she there personally or for
13  Golden Spring New York?
14       A    She represented the company.
15       Q    Golden Spring New York?
16       A    Yes.
17       Q    Why would you be speaking with Golden
18  Spring New York about a loan?
19       A    It is not like I was speaking to
20  Golden Spring New York.  I was speaking
21  specifically to Yvette as far as what capacity
22  Yvette represented, it had nothing to do with me.
23       Q    Do you know who Yvette represented
24  during that meeting?
25       A    Which meeting again?

Page 37

10 (Pages 34 to 37)

Atkinson-Baker, Inc.
www.depo.com

HAN CHUNGUANG

1
2    Q    You testified about meeting Yvette
3  Wang in the lobby to discuss a loan.
4    A    What's your question?  I won't
5  qualify the discussion as a meeting.  I chatted
6  with her briefly.
7    Q    When you say briefly, how long was
8  it?
9    A    Around 20 minutes at the most.  20
10  some minutes.
11    Q    Was anyone else present besides you
12  and Yvette?
13    A    No.
14    Q    How did you know to meet with Yvette?
15    A    I don't understand her question.
16  What do you mean how did I know to meet with
17  Yvette?
18    Q    Why did you meet with Yvette rather
19  than Mr. Guo?
20    A    That day I went there to see Mr. Guo
21  who stayed there at the time.  I bumped into
22  Yvette in the lobby.  I brought up the subject
23  that William was asking me to pay back a loan, and
24  I chatted with her briefly.
25    Q    Why did you think that Yvette knew

Page 38

HAN CHUNGUANG

1
2    MS. WANG:  She just called me a
3  bitch just now.  She said that.  I
4  want it on the record.  I'm sorry.
5    MR. PODHASKIE:  I didn't hear.
6    MR. GREIM:  Let's stop and get
7  an answer to this question.
8    A    At the time when I hired an
9  investigation company, and Yvette told me I needed
10  money to hire the company, that was why I borrowed
11  from William.
12    When William ask me to return the
13  money, I had to bring it up with Yvette because
14  Yvette was telling me somehow we got misled.  And
15  I wanted her to know results of investigation we
16  received.  I have to know.  I have to tell Yvette
17  about it.
18    Q    I have one more question, and then we
19  can take a restroom break.  You have been
20  referring to William.  What is William's full
21  name?
22    A    William.
23    Q    Can you please spell that?
24    A    YU.  I think Y-U.
25    Q    Is William Yu the same person as

Page 40

HAN CHUNGUANG

1
2  anything about the loan?
3    A    I don't understand your question.
4  What do you mean?
5    Q    You met with Yvette to discuss the
6  loan because you believed she knew about the loan;
7  correct?
8    A    I hired a company to investigate a
9  matter for me, and I asked Yvette to handle it for
10  me.  At the time I borrowed money from William to
11  hire this investigation company.  However, the
12  investigation didn't go anywhere.
13    William was asking me to pay back the
14  loan.  When I bumped into Yvette, I have to tell
15  Yvette what was going on.
16    Q    Why did you choose Yvette to tell
17  this to?
18    A    By the way, can I go to the bathroom
19  first.
20    Q    In a few minutes we will take a
21  break, but please answer the question.
22    A    Can you repeat your question?
23    (The requested portion of the
24    record was read back by the
25    reporter.)

Page 39

HAN CHUNGUANG

1
2  William Je, J-E?
3    A    I have no idea.
4    Q    When you've been using the name
5  William today since we've been talking, have you
6  always been referring to William Yu?
7    A    Yes.  Yes, I think so.
8    MS. DONNELLI:  Thank you.  You
9  requested a bathroom break.  I would
10  like to break for no more than 10
11  minutes.
12    (At this time, a brief recess
13    was taken.)
14  CONTINUED EXAMINATION
15  BY MS. DONNELLI:
16    Q    We are here after taking a break.
17  Is Golden Spring New York's business
18  office located at 162 East 64th Street?
19    A    I don't know.
20    Q    Why were you able to meet Yvette Wong
21  in that building if that's not where Golden Spring
22  New York does its business?
23    A    I don't understand your question.
24    Q    You testified that you bumped into
25  Yvette in that building, and I'm asking what

Page 41

11 (Pages 38 to 41)

Han Chunguang
November 11, 2019

HAN CHUNGUANG

1
2  caused her to be in that building.
3      A    I don't know.  You have to ask her.
4  It happened that I bumped into her that day, and I
5  talked to her about this matter.  That was it.
6  You have to ask her why.
7      Q    Where is your place of work located?
8      A    My place of work?
9      Q    Yes.
10     A    I'm not at liberty to disclose that
11  here.
12     Q    Is your place of work 162 East 64th
13  Street?
14     A    No.
15     Q    Why are you not at liberty to
16  disclose your place of work?
17          MR. CHUFF:  Objection.  Form.
18     A    What I'm concerned is that once my
19  information is revealed, the communist party will
20  also learn about it too.
21     Q    Is your place of work the same place
22  of work of the family trust?
23     A    Your question is rather vague.  I
24  don't know how to answer your question.
25          MS. DONNELLI:  Can you read the

Page 42

HAN CHUNGUANG

1
2          question back.
3              (The requested portion of the
4          record was read back by the
5          reporter.)
6      A    In terms of her question, I don't
7  know how to answer it.
8      Q    When you performed things for Eastern
9  Profit, did you do that at 162 East 64th Street?
10     A    No.
11     Q    Where were you located when you
12  performed the things you did for Eastern Profit?
13     A    The headquarter of this company was
14  in Hong Kong.  However, I could choose anywhere I
15  wanted to work for this company.  I was quite
16  free.
17     Q    Where did you choose to do your work
18  for Eastern Profit?
19     A    When I took over this company, I was
20  in Hong Kong.
21     Q    Did you perform any work for Eastern
22  Profit anywhere other than Hong Kong?
23     A    In New York, I asked Yvette to do
24  thing for me on behalf of this company.
25     Q    When you say "this company," you mean

Page 43

HAN CHUNGUANG

1
2  Eastern Profit?
3      A    Yes.  I got permission from Guo Mei,
4  and I authorized Yvette to handle this particular
5  matter for me, which was a matter of hiring and
6  investigation company.
7      Q    Is that the only involvement that
8  Yvette had with Eastern Profit?
9      A    I'm so sorry.  Can you repeat your
10  question.
11          (The requested portion of the
12          record was read back by the
13          reporter.)
14     A    In terms of all matters related to
15  the investigation company, I gave my authorization
16  to Yvette so that she could act on my behalf.
17     Q    Did Yvette do anything for Eastern
18  Profit other than related to the investigation
19  company?
20     A    No.  No, because this company of mine
21  was frozen in Hong Kong and that was all I asked
22  her to do for me.
23     Q    Going back to this meeting that you
24  had with Yvette at 162 East 64th Street, when did
25  it occur?

Page 44

HAN CHUNGUANG

1
2      A    Several months ago, I think.
3      Q    In the year 2019?
4      A    Yes.
5      Q    Other than that meeting, did you ever
6  speak with or communicate with Yvette about the
7  loan?
8      A    I don't remember.
9      Q    The work that you currently do for
10  the family trust, is that the type of work you did
11  for Eastern Profit?
12     A    Again, since your question is related
13  to what my family trust is doing, I am not at
14  liberty to answer your question here.
15     Q    Why not?
16     A    Again, I'm concerned about my safety.
17  If I reveal too much information about myself, the
18  communist party eventually will also learn about
19  it too.
20     Q    You called this your, Y-O-U-R, family
21  trust.  Is it the Han Family Trust that you work
22  for?
23     A    My answer will be the same as what I
24  have given to you, to your previous answer -- to
25  your previous question.

Page 45

12 (Pages 42 to 45)

HAN CHUNGUANG

1
2     Q     You testified that you had to get
3  permission from Guo Mei to authorize Yvette to do
4  things for Eastern Profit.
5          MR. CHUFF:  Objection to form.
6     Q     Why did Guo Mei not simply go
7  directly to Yvette rather than through you?
8     A     Guo Mei was very busy.  Guo Mei gave
9  me the authorization to handle things for her, and
10 then I give the authorization to Yvette to do
11 things for me.  It was very logic.  This was the
12 way I did my business.
13    Q     Was any of the instruction that
14 Mr. Guo gave you about investments helpful to you
15 in your role with Eastern Profit?
16         MR. CHUFF:  Objection.  Form.
17    A     Yes.  He has been teaching me a lot.
18 He has given me knowledge.  And whatever I learn
19 from him I'll apply it to the rest of my life to
20 apply it to my company, to apply it to my business
21 model.
22    Q     Why did you not apply it to Eastern
23 Profit and instead got Yvette involved?
24         MR. PODHASKIE:  Objection to
25    form.

Page 46

HAN CHUNGUANG

1
2     A     Firstly, my English is not great.  I
3  need someone in New York to help me.  Therefore, I
4  authorize Yvette to handle things for me.  It was
5  as simple as that.
6     Q     When you say handle, I understood you
7  to mean that Yvette had your full authority.  Do
8  you mean something less than that?
9     A     I got full authorization to Yvette to
10 handle the matters was this liar company.
11    Q     You testified that Guo Mei authorized
12 you.  Was that authorization in writing?
13    A     What do you mean, written
14 authorization?
15    Q     Yes.
16    A     No.  Orally.
17    Q     Where was Guo Mei located when she
18 gave you the permission to authorize Yvette to
19 undertake things that we've discussed?
20         MR. CHUFF:  Objection.  Form.
21         THE INTERPRETER:  The
22         interpreter needs clarification from
23         the witness to repeat last sentence
24         because the interpreter did not hear
25         it clearly.

Page 47

HAN CHUNGUANG

1
2     A     I think she was in New York, but I'm
3  not sure.  Basically I had a phone conversation
4  with her, or I had phone conversations with her.
5  I was not sure where she was.
6          THE INTERPRETER:  Interpreter
7          note in Chinese we don't have a
8          singular or plurals.  Therefore the
9          interpreter does not know how many
10         phone conversation had with Miss Guo.
11    Q     When were the phone conversations?
12    A     In 2017.  Also in 2018.  There were
13 phone conversations in recent years.
14    Q     Can you be more specific as far as
15 even a month in those years?
16    A     Again, I don't remember the
17 specifics.  But I do remember in last few years I
18 spoke with her over the phone.
19    Q     Were you working for the family trust
20 when you spoke with Guo Mei about this?
21    A     Yes.  Continually.
22    Q     Why did you not choose someone from
23 the family trust to help you rather than choosing
24 Yvette?
25    A     This was due to a business

Page 48

HAN CHUNGUANG

1
2  consideration.
3     Q     Which was what?
4     A     This is rather personal.  I don't
5  think I should tell you my business' strategies
6  was.  I don't think I want to review it here.
7     Q     Did you have personal interests in
8  Eastern Profit?
9          MR. CHUFF:  Objection.  Form.
10    A     When you say personal interest, what
11 do you mean by that?
12    Q     I was trying to understand your
13 answer, why something on a personal level affected
14 your decision for Eastern Profit.
15    A     I still don't understand your
16 question.  What do you mean that my personal way
17 of thinking affected my involvement with the
18 company?
19    Q     We will get to that more later.
20         Does the address 800 Fifth Avenue,
21 Suite 21F mean anything to you?
22    A     No.
23    Q     We've been speaking about an entity
24 called Eastern Profit; true?
25    A     Yes.

Page 49

13 (Pages 46 to 49)

HAN CHUNGUANG

1
2     Q    What is the full name of that entity?
3     A    Eastern Profit.
4     Q    Do you know that entity to have any
5  other names?
6     A    I'm not sure.
7     Q    Your understanding is that the
8  entity's name is Eastern Profit; correct?
9     A    Yes.
10    Q    No other words in its name; correct?
11    A    No.
12    Q    When was Eastern Profit formed?
13    A    I acquired it somewhere around the
14  end of 2014.  I purchased it for someone, but I
15  didn't know whether the company had another name
16  or not before my purchase of it.
17    Q    When was your purchase of Eastern
18  Profit?
19    A    I think the end of 2014.
20    Q    Had you had any involvement with
21  Eastern Profit prior to the end of 2014?
22    A    No.
23    Q    Who did you acquire it from?
24    A    From a friend of mine.
25    Q    What was the name of the friend?

Page 50

HAN CHUNGUANG

1
2  did everything in a legal sense?
3        MR. CHUFF:  Objection.  Form.
4     A    Yes.  When I purchased this company
5  for my friend, I was going to use it to do
6  investment business.  Of course I wanted to do it
7  right.  I wanted to do it legally.  I wanted to do
8  it in sound business.
9     Q    What review or research did you do
10  before purchasing Eastern Profit to assure
11  yourself that it had, in fact, done things
12  legally?
13    A    I was to acquire this company.  I did
14  some analysis and performance evaluation.  I did
15  it also based upon my experience.  By the way, it
16  was a company legally listed.  Why would it not do
17  things legally?
18    Q    Did Mr. Guo provide you guidance or
19  advice when you were reviewing Eastern Profit to
20  purchase it?
21    A    No, not anything specific.
22    Q    Did you inform Mr. Guo that you were
23  intending to purchase Eastern Profit before you
24  purchased it?
25    A    No.

Page 52

HAN CHUNGUANG

1
2     A    The last name Xu, X-U.  Z-H-A-O,
3  H-U-I, X-U.
4        THE INTERPRETER:  The
5        interpreter is spelling, which may
6        not be the official spilling.
7        MS. DONNELLI:  Thank you.
8     Q    Why did you purchase Eastern Profit?
9     A    At the time I had just got to Hong
10  Kong.  I wanted to open the international market.
11  Therefore, I acquired this company.  I wanted to
12  use this company to do some investments.
13    Q    Investments in what industry?
14    A    Everything, as long as they were
15  legal and could be profitable.
16    Q    Why did you choose to purchase
17  Eastern Profit rather than another company?
18    A    Because I knew this friend of mine.
19  I knew about him and I kind of knew his business.
20        And this company was just a regular
21  company who did everything legally right.  But the
22  decision was based upon logic and no more business
23  consideration.
24    Q    What research did you do, if any,
25  before purchasing Eastern Profit to know that it

Page 51

HAN CHUNGUANG

1
2     Q    Did Mr. Guo provide you the
3  compensation needed to purchase Eastern Profit?
4     A    No.
5     Q    When you were performing your
6  analysis and evaluation, did you review any
7  written materials from Eastern Profit?
8     A    At the time in Hong Kong I had an
9  agent.  I had this agent of mine to do all the
10  things for me.
11    Q    What was the name of the agent?
12    A    Natasha.
13        THE INTERPRETER:  Interpreter
14        note interpreter earlier
15        misinterpreted the person's gender.
16        Obviously right now we know the
17        gender is a woman.  The reason it's
18        not in Chinese, we don't have a
19        gender.
20    Q    What was Natasha's last name?
21    A    Natasha's last name is Q-U, which may
22  not be the official last name.  I don't know how
23  to spell it.  I only know she called herself
24  Natasha.  It's an English name, Natasha.
25    Q    What was Natasha's Chinese name?

Page 53

14 (Pages 50 to 53)

Atkinson-Baker, Inc.
www.depo.com

HAN CHUNGUANG

1
2      A   I don't know.
3      Q   Who did Natasha work for?
4      A   What do you mean by that?
5      Q   Natasha performed a service for you.
6  Who did she work for?
7      A   I didn't know what company she was
8  working for. However, I knew him. I trusted him.
9  In Hong Kong I gave her the authorization to
10  handle my stuff for me in Hong Kong.
11     Q   Did she report to you about her
12  review of Eastern Profit before you purchased it?
13     A   I think so. But to tell you the
14  truth, I don't remember because it was a long time
15  ago. I would say that I trusted her. In Chinese,
16  trust is everything.
17         Since I trusted her, I gave her full
18  authorization to handle matters for me in Hong
19  Kong.
20     Q   Did you put that authorization in
21  writing?
22     A   Yes.
23     Q   What had Natasha done to earn your
24  trust?
25     A   I met her. Also I met her in social

Page 54

HAN CHUNGUANG

1
2  settings. From what I learned about her, I felt
3  that she was someone that I could trust.
4      Q   You testified that you purchased
5  Eastern Profit to make investments. Once you
6  purchased Eastern Profit, did it make any
7  investments?
8      A   Yes, some.
9      Q   What were they?
10     A   I'm not at the liberty to reveal the
11  information here since that question is related to
12  my business secret.
13     Q   Can you describe your business secret
14  without revealing it?
15     A   Stocks.
16     Q   The investment was in stocks?
17         MR. CHUFF: Objection to the
18         form.
19     A   No. I invested in stocks.
20     Q   Did you invest Eastern Profit
21  resources in stock?
22     A   Yes.
23     Q   Isn't that public information?
24         MR. CHUFF: Objection. Form.
25     A   Yes. However, here I don't want to

Page 55

HAN CHUNGUANG

1
2  talk about that.
3      Q   We'll talk about that later.
4         How much did you pay for Eastern
5  Profit?
6      A   1,000 Hong Kong currency. 1,000 HK
7  currency.
8      Q   Was that worth around 200 U.S.
9  dollars?
10     A   I don't know about exchange rate back
11  then. This number is what I can remember right
12  now. All the details about the purchase of the
13  company was handled by Natasha. I didn't know
14  most of the details.
15     Q   What was Eastern Profit's
16  capitalization?
17         MR. CHUFF: Objection. The
18         court has already said that the
19         financial identity of Eastern Profit
20         is off limits. Docket entry 189,
21         page 4. To the extent the defendant
22         seeks to further -- inquire further
23         regarding plaintiff's financial
24         situation is a request for a leave to
25         do so. Denied again for failure to

Page 56

HAN CHUNGUANG

1
2  establish relevance.
3      Q   Do you know the answer to my
4  question?
5      A   I don't understand to answer the
6  question.
7      Q   You don't want to say whether you
8  know the answer?
9      A   I just trying to tell you that I
10  don't want to answer it. I don't want to answer
11  any question related to this.
12     Q   Describe what a capitalization is for
13  a business like Eastern Profit.
14         MR. PODHASKIE: Objection.
15         Vague.
16     A   It's difficult for me to say.
17     Q   Where was Eastern Profit formed?
18     A   In Hong Kong.
19     Q   Does Eastern Profit have a business
20  address?
21     A   Yes.
22     Q   What is it?
23     A   Bank of China's building, 49th floor.
24         THE INTERPRETER: Interpreter is
25         translation, which may not be the

Page 57

15 (Pages 54 to 57)

Han Chunguang
November 11, 2019

HAN CHUNGUANG

1  official address.
2       Q    Has that always been Eastern Profit's
3  business address?
4            MR. CHUFF:  Objection.
5       Foundation.
6       A    When you say that had this address
7  been the business address of Eastern Profit, what
8  do you mean by that?
9       Q    I understood you testified that
10  Eastern Profit had a business location.  Is that
11  true?
12      A    Yes.
13      Q    Where is Eastern Profit's business
14  location?
15      A    You asking me the company address;
16  right?  The company address was Bank of China
17  Building, 49th floor.
18      Q    Was that always Eastern Profit's
19  address since you purchased it?
20      A    Yes.
21      Q    Have you been there?
22      A    Yes, I did.
23      Q    When was that?
24      A    Wow.  It was several years ago.

Page 58

HAN CHUNGUANG

1  did not need anyone to select it for me.
2       Q    Did you sign any written document to
3  make yourself director of Eastern Profit?
4       A    Yes.
5       Q    Did you become a director of Eastern
6  Profit at the same time you purchased it?
7       A    Yes.
8       Q    What was the business of Eastern
9  Profit when you purchased it?
10      A    Investment.
11      Q    Did that purchase change over time?
12      A    No.  No.  It had not.
13      Q    Was the amount that Eastern Profit
14  invested the amount that you used to purchase
15  Eastern Profit in the first instance?
16           Where did the fund come from that
17  Eastern Profit used to make an investment?
18      A    For my family fund.
19      Q    Is that the family fund you work for
20  today?
21      A    Yes.
22      Q    Who at the family fund did you work
23  with to get the funds transferred so that Eastern
24  Profit could make investments?

Page 60

HAN CHUNGUANG

1       Q    How many times have you been to
2  Eastern Profit's office?
3       A    Several times.
4       Q    When you purchased Eastern Profit,
5  did it have any other owners?
6       A    No.  I was the only owner at the
7  time.
8       Q    Describe your role with Eastern
9  Profit other than that you owned it for a period
10  of time?
11           MR. PODHASKIE:  Objection.
12      Form.
13      A    Before I transferred the ownership to
14  Guo Mei, I was a director of the company.  After I
15  had it transferred to Guo Mei, she was the
16  director.  I became her agent.
17      Q    Is it true that you chose yourself to
18  be the director of Eastern Profit?
19      A    When you say I choose myself to be
20  director, I mean I don't really understand your
21  question, by the way.
22      Q    Did someone select you to be a
23  director of Eastern Profit?
24      A    I purchased it.  I was the boss.  I

Page 59

HAN CHUNGUANG

1            MR. CHUFF:  Objection to form.
2       A    This has nothing to do with this
3  case, and this question, it's very proven to my
4  privacy.  I don't want to answer it.
5       Q    To put it in a timeframe, you became
6  a director of Eastern Profit in 2014?
7            MR. CHUFF:  Objection to form.
8       A    That's correct.  When I purchased it
9  in 2014.
10      Q    What educational experience did you
11  have at that time to prepare you for the role of a
12  director of Eastern Profit?
13           MR. CHUFF:  Objection to form.
14      A    Is she asking me about my educational
15  background?
16      Q    Yes, but specifically to give you the
17  preparation that you needed to be a director of
18  Eastern Profit.
19      A    I went to two-year college.
20  Secondly, Mr. Guo has been teaching me a lot.
21           MS. WANG:  That was at least
22      three years, college.
23           THE INTERPRETER:  It's three
24      years in China.  The interpreter

Page 61

16 (Pages 58 to 61)

HAN CHUNGUANG

1
2      Q    That is not the question.
3         The question is what, besides the
4   education you described, prepared you to be a
5   director of Eastern Profit?
6      A    I purchased it and I became the
7   director of the company.
8      Q    So nothing other than the education
9   you described prepared you to be a director of
10  Eastern Profit?
11         MR. CHUFF:  Objection.  Asked
12      and answered.  Mischaracterizes the
13      testimony.
14      A    Let me put it this way.  My own
15  experience, Mr. Guo's teaching, myself learning
16  and what I have been learning from my family trust
17  or family fund, all this prepared me for it and
18  also prepared me for the future.  It doesn't mean
19  that I only learned things through a formal
20  education.
21      Q    Did you review any written materials
22  about Eastern Profit when you became its director?
23         MR. CHUFF:  Objection to form.
24      A    I don't remember.  In terms of all
25  the documents related to the company, they were

Page 66

HAN CHUNGUANG

1
2   Hong Kong.
3      Q    Regarding Eastern Profit; correct?
4      A    Yes.
5      Q    Were you living in Hong Kong at the
6   time?
7      A    Yes.  When I purchased Eastern
8   Profit, I lived in Hong Kong.
9      Q    What education did Natasha have that
10  allowed her to serve this role?
11         MR. CHUFF:  Objection.  This is
12      completely beyond the scope.  I let
13      this go long enough.  He's not --
14         MS. DONNELLI:  Are you
15      testifying for the witness?
16         MR. CHUFF:  I'm explaining why
17      this line of questioning has to stop.
18         MS. DONNELLI:  Why don't you
19      just object to it rather than coach
20      him?
21         MR. CHUFF:  I want to explain my
22      basis.  I'm not coaching him because
23      he's not going to answer it.
24         This is not a case where he's
25      being sued for managing Eastern

Page 68

HAN CHUNGUANG

1
2   handled by Natasha, whom I trusted very much.
3      Q    When Natasha was doing this role,
4   where was she employed?
5         MR. CHUFF:  Objection.  Asked
6      and answered.
7      A    I don't know whom she was working for
8   at the time.
9      Q    Was she employed by Eastern Profit?
10      A    She was an agent authorized by me.
11      Q    An agent authorized for Eastern
12  Profit?
13      A    No.  She was the agent authorized by
14  me.  At the time I was the boss of Eastern Profit,
15  I authorized Natasha to handle a lot of stuff in
16  Hong Kong for me.
17      Q    Was she an employee of Eastern
18  Profit?
19         MR. CHUFF:  Objection.  Asked
20      and answered.
21      A    An employee?  You can say that.
22      Q    How long was she employed by Eastern
23  Profit?
24      A    I think about two years.  I'm only
25  talking about she was handling matters for me in

Page 67

HAN CHUNGUANG

1
2   Profit a certain way.  This is about
3   a contract between an entity and
4   another entity.
5         MS. DONNELLI:  Why don't you
6      just say I'm going to instruct him
7      not to answer.  It will save a lot of
8      time, and it won't coach the witness.
9         MR. CHUFF:  He's not answering.
10      Q    Is Natasha's name spelled Q-U, first
11  name, last name G-U.  Last name is Q-U.  First
12  name G-U-O-J-I-A-O?
13      A    I don't know this name.  I only know
14  the person I knew whose name was Natasha.
15      Q    Have you personally seen the written
16  records of Eastern Profit's business dealings?
17         MR. CHUFF:  Objection.  Vague.
18      A    I think so, yes.
19      Q    When was that?
20         MR. CHUFF:  Objection.  Vague.
21      A    I think several years ago.
22      Q    What was the purpose of your review?
23      A    When I purchase it, I of course
24  looked into the document.  I have to know what I
25  was purchasing.  Once I took over the company, I

Page 69

18 (Pages 66 to 69)

Atkinson-Baker, Inc.
www.depo.com

HAN CHUNGUANG
1
2  gave them to Natasha.  I also gave her the CO and
3  stuff so that she could handle stuff for me in
4  Hong Kong.
5      Q    When you were serving as a director
6  of Eastern Profit, were there any other directors
7  besides yourself?
8      A    When I was the director of the
9  company, no one else was.
10      Q    When you were director of Eastern
11  Profit, was it successful?
12      A    Was this successful company?  How are
13  you going to define whether a company is
14  successful or not?  Please teach me.
15      Q    Were you pleased with the performance
16  of Eastern Profit when you were the director of
17  it?
18          MR. CHUFF:  Objection.
19  Relevance.
20      A    It was okay.
21      Q    Did Eastern Profit have any debts
22  when you were a director?
23          MR. CHUFF:  Objection.  The
24      court already ruled on this.  There's
25      to be no questioning about the

Page 70

HAN CHUNGUANG
1
2      A    What do you mean by that?
3      Q    You've testified that Eastern
4  Profit's assets were frozen.  How did you come to
5  know that?
6      A    Natasha told me.
7      Q    So the freezing, excuse me, of the
8  assets took place in the two years that Natasha
9  did services for Eastern Profit?
10      A    I don't remember.  It was a long time
11  ago.
12      Q    After the assets of Eastern Profit
13  were frozen, was it able to conduct any business?
14      A    Natasha could.  Just one second.
15          THE INTERPRETER:  Can you repeat
16      your question?  I wanted to have your
17      question read back.  I want to know
18      your question.
19          (The requested portion of the
20      record was read back by the
21      reporter.)
22      A    After the asset was frozen, the
23  company didn't do any business.
24      Q    What, as a director of Eastern
25  Profit, did you do to challenge the order freezing

Page 72

HAN CHUNGUANG
1
2  independent financial identity of
3  Eastern Profit.  That's Docket 189,
4  page 4.  There's only one debt that's
5  relevant to this case.
6      Q    Who took over from Natasha after she
7  left?
8      A    No one else by the time the company
9  was frozen.
10      Q    What caused the company to have its
11  assets frozen?
12      A    Actually, I wanted to know the answer
13  of your question.  I want to know why the police
14  took control of my company, and my assets was
15  frozen, and the police took my people away.
16          I really want to know the answer to
17  your question.
18      Q    Was there anything you did as a
19  director of Eastern Profit that caused that to
20  happen?
21          MR. CHUFF:  Objection.
22      A    No.  I have not done anything illegal
23  as a director.
24      Q    How did you come to know that Eastern
25  Profit's assets were frozen?

Page 71

HAN CHUNGUANG
1
2  Eastern Profit's assets?
3          MR. CHUFF:  Objection.  Form.
4          THE INTERPRETER:  Interpreter
5      needs clarification from the witness.
6      A    At the end of 2017 Yvette told me
7  there was this company that was very good at the
8  investigation, and the company was able to find
9  out the government's corruption in China.  This
10  would help me to have my assets un-freezed.
11          When Yvette told me and say to me it
12  was a great idea, I mention it to Guo Mei, and
13  then I authorized Yvette to handle this matter for
14  me.
15      Q    Were you still a director of Eastern
16  Profit when that took place?
17      A    Guo Mei was the director at the time.
18  Why I was the agent.
19      Q    Was the freezing of the assets of
20  Eastern Profit while you were a director of
21  Eastern Profit?
22      A    When the assets was frozen, no, I was
23  not.
24      Q    So the freezing of the assets took
25  place after you were no longer director of Eastern

Page 73

19 (Pages 70 to 73)

Han Chunguang
November 11, 2019

HAN CHUNGUANG

Profit?

A    That's correct.  I was an agent.

Q    How long had it been since you were a director of Eastern Profit when the freezing of the assets happened?

MR. CHUFF:  Objection to form.

A    How long?  Again, I don't remember the specific, but I think about two years.

Q    So two years passed after you left being a director of Eastern Profit and when the assets of the company were frozen?

MR. CHUFF:  Objection to form.

A    Can you repeat your question?

Q    How much time passed after you stopped being a director of Eastern Profit and when the assets were frozen?

A    I don't remember.

Q    Who ordered the freezing of Eastern Profit's assets?

MR. PODHASKIE:  Objection. Form.

A    I didn't know who ordered it.  I really wanted to know the answer to your question. I think it was an order from the communist party

Page 74

HAN CHUNGUANG

in China.

Q    You don't know why the assets were frozen or what reason was given?

MR. CHUFF:  Objection. Foundation.

A    No, I don't.

Q    You mentioned that transaction was done by Eastern Profit with an investigation company.

Do you remember your testimony?

THE INTERPRETER:  Can I have the question read back?

(The requested portion of the record was read back by the reporter.)

MR. PODHASKIE:  Objection. Form.

A    Yes.

Q    Was the purpose of the investigation to allow Eastern Profit to have its assets unfrozen?

A    That was a part of it.

Q    What was the other part?

A    Number 1, to hire this investigation

Page 75

HAN CHUNGUANG

company to find out the Chinese government's corruptions.  Number 2, to help me unfreeze my assets.  Number 3 to have my company back to normal.

Q    Did anyone replace Natasha after she stopped doing work for Eastern Profit?

MR. CHUFF:  Objection.  Asked and answered.  Relevance.

A    No.

MS. DONNELLI:  We'll make this the last couple of questions before our break.

Q    Prior to the time that Eastern Profit's assets were frozen, did Eastern Profit operate a private equity fund?

MR. CHUFF:  Objection.  This goes to the independent financial control and identity of Eastern Profit, and the court has already ruled this is not a permissible scope of questioning.

MS. DONNELLI:  Are you instructing the witness not to answer?

Page 76

HAN CHUNGUANG

MR. CHUFF:  Yes.

Q    When you were a director of Eastern Profit, did it have any clients?

MR. CHUFF:  Same objection.  It goes to independent financial identity, and the court has already ruled on this.

Q    Which family trust did Eastern Profit give the money with which it was making investments?

MR. CHUFF:  Same objection.

Q    Did you receive compensation as a director of Eastern Profit?

A    When I was the director of the company?

Q    Yes.

MR. PODHASKIE:  Objection. Makes no sense.  He's the owner, but I will let him answer.

MS. DONNELLI:  Please don't testify for the witness, counsel.

A    I think so.

Q    What was it?

A    Are you talking about the revenue in

Page 77

20 (Pages 74 to 77)

Han Chunguang
November 11, 2019

HAN CHUNGUANG

1
2  my company?
3        Q    Any kind of compensation.
4             MR. CHUFF:  Objection.
5        Misleading.
6        A    Since I don't feel that this question
7  has anything to do with this case, this is about
8  the finance of the company.  I'm not going to
9  answer it.
10       Q    Was the reason that you stopped being
11 a director of Eastern Profit because you weren't
12 being paid for your work?
13            MR. CHUFF:  Objection.  Vague.
14       Confusing and misleading.
15       A    Again, this has nothing do with this
16 case.  I'm not going to answer it.
17       Q    Did you receive any compensation or
18 payments as an agent of Eastern Profit?
19       A    I believe so.  I believe when the
20 company's asset is unfreeze one day, I will
21 receive some compensation, because this is normal
22 business model where I believe I will receive some
23 compensation one day.
24       Q    Before Eastern Profit's assets were
25 frozen, did you receive any compensation?

Page 78

HAN CHUNGUANG

1
2             MR. CHUFF:  As an agent or a
3        director?
4        Q    Either in your capacity as an agent
5  or a director?
6             MR. CHUFF:  Objection.
7        Compound.  And to the extent it's
8        asking for compensation as an owner
9        is misleading.
10       A    When you say about compensation, can
11 you be more specific, because I really don't
12 understand the word compensation.
13       Q    It means wages, salary, money for any
14 reason.
15       A    When I was a director, when I was a
16 boss, of course I received some money.  Because I
17 was making money or cost, I reaped the benefits.
18       Q    At Eastern Profit is there a
19 difference between a principal and a director
20 role?
21       A    Between principal and the director?
22       Q    Yes.
23       A    Right now Guo Mei is the director of
24 the company while I am her agent.  When I'm
25 handling her stuff for her out of respect, I will

Page 79

HAN CHUNGUANG

1
2  ask her for opinion.  Just part of a business
3  routine.
4        Q    Have you ever been a principal of
5  Eastern Profit?
6             MR. CHUFF:  Objection.  Asked
7        and answered.
8        A    When are you talking about?
9        Q    Any time since 2014 to the present.
10            MR. CHUFF:  Same objection.
11       A    I am always acting on behalf of
12 Eastern Profit.
13       Q    Has he ever held the title principal
14 of Eastern Profit?  Have you?
15            MR. CHUFF:  Same objection.
16       A    I don't really understand your
17 question.  All I can say to you is that before I
18 transfer it, my company to her, I was the
19 director.  After I transfer my company to her, I
20 was the agent.  That is it.
21       Q    Do you receive compensation from
22 Golden Spring, New York?
23       A    No.
24       Q    Have you ever?
25       A    No.

Page 80

HAN CHUNGUANG

1
2             MS. DONNELLI:  We'll take a
3        break.
4             (At this time, a brief recess
5        was taken.)
6             (Time noted: 12:54 p.m.)
7             (After a luncheon recess was
8        taken, the following was had:)
9             (Time noted:  1:48 p.m.)
10
11      A F T E R N O O N   S E S S I O N
12 CONTINUED EXAMINATION
13 BY MS. DONNELLI:
14       Q    We're here after a break.
15       Would you say that --
16            MR. CHUFF:  Could I just make
17       one thing on the record.
18            So we've been going for two and
19       a half hours now, and virtually none
20       of the questioning has been within
21       the scope of what the court ordered
22       Mr. Han to appear for.
23            If it continues, we reserve our
24       rights to seek fees from the court
25       after this deposition.

Page 81

21 (Pages 78 to 81)

Han Chunguang
November 11, 2019

HAN CHUNGUANG

1  
2      Q    Would you say, Mr. Han, that you were  
3  very careful in your role as a director of Eastern  
4  Profit?  
5      A    What do you mean by that?  
6      Q    You wanted everything done right as a  
7  director of Eastern Profit; correct?  
8      A    Yes.  
9      Q    You wouldn't have signed something  
10  for Eastern Profit unless you were a director of  
11  it; right?  
12          MR. CHUFF:  Objection.  
13      Misleading.  Mischaracterizes  
14      testimony.  
15      A    I don't understand your question.  
16  What do you mean by that?  
17      Q    You wouldn't have signed something  
18  for Eastern Profit unless you were a director of  
19  Eastern Profit; right?  
20          MR. CHUFF:  Same objection.  
21      A    When I was an agent for a company, I  
22  had also signed some documents.  
23      Q    Is one of Eastern Profit's  
24  investments cars?  
25          MR. CHUFF:  Objection.  This is  

Page 82

HAN CHUNGUANG

1  
2      A    I don't think Eastern Profit had ever  
3  invested in car.  But the company owned cars.  
4      Q    How many cars did the company own  
5  when Mr. Han was a director?  
6          MR. CHUFF:  Objection.  This is  
7      all irrelevant.  
8      A    Several.  
9      Q    Have you ever attended a director's  
10  meeting for Eastern Profit?  
11          MR. CHUFF:  Objection.  This  
12      goes into the financial independence  
13      of Eastern Profit, and the court  
14      already ruled on this.  You're not  
15      permitted to ask questions about it.  
16      Q    You testified that you put a  
17  signature on documents as an agent for Eastern  
18  Profit.  In connection with that, did you ever  
19  attend any meeting giving you authority to do  
20  that?  
21      A    What kind of meeting?  
22      Q    Any kind of meeting in which,  
23  Mr. Han, you were given authority to make your  
24  signature on behalf of Eastern Profit?  
25          MR. CHUFF:  Objection.  Asked  

Page 84

HAN CHUNGUANG

1  
2  beyond the scope of the court order  
3  Mr. Han is here for.  
4          MS. DONNELLI:  Are you  
5      instructing the witness not to answer  
6      that?  It comes directly from  
7      Miss Wang's testimony for Eastern  
8      Profit within the last couple of  
9      weeks.  
10          MR. CHUFF:  It's beyond the  
11      scope of what the court ordered for  
12      Mr. Han.  
13          MS. DONNELLI:  So are you  
14      instructing the witness not to  
15      answer?  
16          MR. CHUFF:  You can ask your  
17      question.  
18          MS. DONNELLI:  Okay.  Can you  
19      read it back?   Thank you.  
20          (The requested portion of the  
21      record was read back by the  
22      reporter.)  
23      A    What cars?  
24      Q    Any kind of investment in cars,  
25  vehicles.  

Page 83

HAN CHUNGUANG

1  
2  and answered.  
3      A    In New York I authorized Yvette to  
4  handle the affairs for me here.  
5      Q    What kind of reporting did Yvette do  
6  to you after you authorized her?  
7      A    Yvette --  
8          MR. CHUFF:  Objection.  Form.  
9      A    Not much reporting from her because I  
10  trust her very much in the same position against  
11  communist party in China.  
12          I have full confidence in her to  
13  handle the affair for me.  There's not much  
14  reporting required from her.  Of course  
15  occasionally we talked a little bit about it.  
16      Q    Did you authorize Yvette to handle  
17  all the affairs of eastern profit or just the one  
18  involving the investigative project?  
19      A    Everything.  
20      Q    For the everything, did you ever  
21  authorize Yvette to approve an invoice for Eastern  
22  Profit?  
23          MR. CHUFF:  Objection.  Assuming  
24      facts.  
25      A    When I'm talking about my  

Page 85

22 (Pages 82 to 85)

Atkinson-Baker, Inc.
www.depo.com

HAN CHUNGUANG
1
2    authorization to Yvette, I'm actually talking
3    about everything related to the hired
4    investigation company.
5        Q    I thought your testimony was that you
6    authorized a Yvette to handle all of the affairs
7    of Eastern Profit?
8        A    No.  Thing related to this matter.
9        Q    What do you mean by "this matter"?
10       A    To hire this investigation company
11   and also to handle everything related to the hired
12   investigation company.
13       Q    Was there anything else that you
14   authorized Yvette to handle for Eastern Profit?
15       A    Only for this investigation and
16   everything related to it.
17       Q    Did you get permission from Guo Mei
18   to authorize Yvette?
19           MR. CHUFF:  Objection.  Asked
20           and answered.
21       A    I did not have to have permission for
22   Guo Mei.  However, I did report it to her.  I did
23   speak to her about it.
24       Q    Were you the person who chose Yvette
25   for her role versus someone else?

Page 86

HAN CHUNGUANG
1
2        Q    Was that because the assets of
3    Eastern Profit were frozen?
4        A    Yes.
5        Q    What volume of assets of Eastern
6    Profit were frozen?
7            MR. CHUFF:  Objection.  Vague as
8            to what volume means.
9        A    Are you asking me to give you a
10   number or what?
11       Q    More of a category.  Was it all of
12   Eastern Profit's assets that were frozen, a
13   portion of them, something less than all?
14       A    My company account or accounts was --
15   all were freezed.
16           THE INTERPRETER:  Again in
17           Chinese there's no singular or
18           plural.
19       Q    In total or just in part?
20       A    All.
21       Q    You testified that the reason that
22   Eastern Profit got involved with the investigative
23   company was to unfreeze Eastern Profit's assets.
24       Do you remember that testimony?
25           MR. PODHASKIE:  Objection.

Page 88

HAN CHUNGUANG
1
2    Mischaracterizes the testimony.
3        A    Yes, I did.
4        Q    Was that project successful to
5    unfreeze Eastern Profit's assets?
6        A    Up to now, no.  It's not successful.
7        Q    Eastern Profit's assets remain frozen
8    today; is that true?
9        A    Yes.
10       Q    Do you know how long that the
11   investigative company was allowed to do its work?
12       A    When Yvette talked to me at the time,
13   she said it would only take several months and we
14   will see the result of it.
15       Q    When Eastern Profit didn't see the
16   result of it, did it hire any other company to do
17   the investigation?
18           MR. CHUFF:  Objection.  Are you
19           asking of the same targets, that's
20           strategic vision?
21           MS. DONNELLI:  Counsel, please
22           don't testify for the witness.  You
23           made an objection to form.  Let us go
24           on.
25           MR. CHUFF:  I'm just trying to

Page 89

HAN CHUNGUANG
1
2        A    Yes.
3        Q    In connection with Yvette's work, did
4    she have control over Eastern Profit's bank
5    accounts?
6            MR. CHUFF:  Objection.  It's
7            beyond the scope of what the court
8            allowed Mr. Han to testify about.
9        A    I don't want to answer this question.
10       Q    Are you instructing the witness not
11   to answer the question?  It relates specifically
12   to the work that Yvette did in relation to Eastern
13   Profit and the investigative project?
14           MR. CHUFF:  Can you explain that
15           to me?  I don't see how it does.
16           MS. DONNELLI:  In connection
17           with that work I've asked did Yvette
18           have control over Eastern Profit's
19           bank accounts in connection with that
20           work.
21           MR. CHUFF:  You didn't use that
22           last phrase.
23       Q    In relation to the investigative
24   project.
25       A    She couldn't.

Page 87

23 (Pages 86 to 89)

Han Chunguang
November 11, 2019

HAN CHUNGUANG

1  help you.
2      MS. DONNELLI:  I don't think
3  you're trying to help.
4      MR. CHUFF:  I am because the
5  court said you're allowed to ask
6  about the subjects that were part of
7  the Strategic Vision contract and not
8  other subjects.
9      So if you want to ask about
10  those subjects, it's permissible.
11  Otherwise it's not.
12  Q    Regarding any of the work that
13  Eastern Profit hired the investigative company to
14  do, once that unfreezing of assets didn't happen,
15  did Eastern Profit hire any other company for the
16  purpose of unfreezing the assets through
17  investigative work?
18  A    This has nothing to do as it is.
19  Q    Please answer the question.
20  A    I don't want to answer.
21      MR. CHUFF:  You can answer, if
22  you know.
23  A    Are you asking if Eastern Profit
24  hires another investigative company to do the same

Page 90

HAN CHUNGUANG

1  job.
2  Q    Yes.  After the first investigative
3  company is no longer doing the project.
4  A    I'm not sure.
5  Q    Your testimony is that you're not
6  aware of any other company that came in after to
7  do the same work; true?
8  A    Yes.
9  Q    When Eastern Profit was entering into
10  the project with the investigation company, did
11  Eastern Profit pass a resolution to allow that
12  transaction?
13  A    I authorized Yvette to take care of
14  this business, and Yvette had my full
15  authorization to take care of things like this.
16  Q    Was a resolution signed by you
17  allowing Yvette to do this?
18  A    I don't really understand what you
19  mean by resolution.
20  Q    Do you know what the term resolution
21  means in the context of a private company?
22  A    Yes, I do.
23  Q    Did Eastern Profit's company bylaws
24  require a resolution before Yvette was permitted

Page 91

HAN CHUNGUANG

1  to enter into an arrangement with the
2  investigative company?
3      MR. PODHASKIE:  Objection.
4  Beyond the scope of the court's
5  order.
6  A    No.  I give the full authorization to
7  Yvette.  It was not necessary to require a
8  resolution.
9      Okay.  Let me tell you why I give
10  Yvette full authorization over this matter.  The
11  reason was that Miss Guo was against communist
12  party in China.  I followed Mr. Guo's example.  I
13  was also strongly against the communist party in
14  China wands that was why the Chinese government
15  freeze my asset.
16      And when Yvette told me about this
17  wonderful company that would be able to expose the
18  Chinese government's corruption and it will give
19  me an opportunity to get my asset back.  She also
20  assured me that in U.S., this could be done
21  legally, and I thought that this was wonderful
22  idea.  I get gave her my full authorization to
23  handle this matters.
24      Like Miss Guo, we were all against

Page 92

HAN CHUNGUANG

1  the communist parties in China.  I gave her my
2  full authorization to take charge of this matter.
3  Q    What is located at the Tai Yau
4  building located at 181 Johnston Road, Wanchai,
5  W-A-N-C-H-A-I, Hong Kong, if you know?
6      MR. CHUFF:  Objection.  Beyond
7  the scope of the court's order.
8  A    This has nothing to do with this
9  case.  I am not at liberty to answer this
10  question.
11  Q    How do you know that the Chinese
12  communist party was involved in the freezing of
13  Eastern Profit's assets?
14  A    Can you repeat your question?
15      (Interpreter complying)
16  A    Mr. Guo was in stanch option to
17  Chinese communist party.  I followed his example,
18  and as a result of my position, my family was
19  persecuted by the Chinese communist party, and
20  then my accounts in Hong Kong were frozen, and my
21  workers were taken away by the police.
22      Who else -- did they have such kind
23  of power to take away my people without leaving a
24  trace.  It was only the communist party in China.

Page 93

24 (Pages 90 to 93)

Han Chunguang
November 11, 2019

Atkinson-Baker, Inc.
www.depo.com

HAN CHUNGUANG

1
2     Q     When did you resign as a director?
3     A     On June 27, 2017 the company was
4 transferred to Guo Mei, and Guo Mei asked me to
5 continue to handle the company's affairs as an
6 agent for her.
7           MS. DONNELLI:  Can you read the
8           question, because the witness did not
9           accept it.
10          (The requested portion of the
11          record was read back by the
12          reporter.)
13    A     June 27, 2017.
14    Q     Why did you resign as a director of
15 Eastern Profit?
16    A     This was one of my business'
17 strategies which has nothing to do with this case.
18 I'm not going to answer it.
19          MS. DONNELLI:  We'll need to ask
20          the witness to answer the question.
21          MR. CHUFF:  Objection.
22          Argumentative.  Asked and answered.
23    A     I don't want to answer this question,
24 and I insist that I not answer this question.
25    Q     Do you have the answer to the

Page 102

HAN CHUNGUANG

1
2 her.  All this was not contradictory to each
3 other.
4     Q     What do you mean by contradictory to
5 each other?
6           MR. CHUFF:  Objection.
7     A     She asked me to be her agent, to take
8 care of the affairs for her, and we were good
9 friends.  And I say okay.  Fine.  I will do so.
10          I became an agent of the company.
11 That was it.
12    Q     So Guo Mei asked you to resign from
13 your directorship of Eastern Profit?
14          MR. CHUFF:  Objection.  Assumes
15          facts.  Mischaracterizes testimony.
16    A     No.
17    Q     How did you come to know that Guo Mei
18 had a plan that required you to resign as director
19 from Eastern Profit?
20          MR. CHUFF:  Objection.  Assumes
21          facts.  Mischaracterizes the
22          testimony.  Beyond the scope of what
23          the court ordered him to testify to.
24    A     She told me she wanted to purchase my
25 company to get into movie business.  Then it's

Page 104

HAN CHUNGUANG

1
2 question in your mind?
3     A     What answer?
4     Q     If the answer to the question is you
5 don't know why you resigned from the company,
6 that's one thing.  But if the witness has the
7 answer in his mind, he needs to give it in
8 response to the question.
9           MR. CHUFF:  Objection.  I
10          disagree.  It's clearly beyond the
11          scope of what the court ordered.
12    A     I am not going to answer this
13 question.
14    Q     Explain why you resigned as director
15 of Eastern Profit that remained as you are
16 testifying in a role allowing you to be involved
17 with Eastern Profit?
18          MR. CHUFF:  Objection.  Asked
19          and answered.
20    A     This was a business strategy of mine.
21 And when I transferred the company to Guo Mei, Guo
22 Mei had some intention to how to use this company.
23 She had her idea what she was going
24 to do about it.  And then she asked me to be an
25 agent for this company to handle the affairs for

Page 103

HAN CHUNGUANG

1
2 long.  Then she asked me to stay on to help her
3 out as an agent.
4     Q     Wasn't it Mr. Guo's wish for his
5 daughter to purchase Eastern Profit from you?
6           MR. CHUFF:  Objection.  Beyond
7           the scope.
8     A     I don't know.
9     Q     Did you resign from Eastern Profit
10 because you needed someone to buy the stock from
11 you, you were short on money?
12          MR. CHUFF:  Objection.  This is
13          way beyond the scope that the court
14          allowed this witness to appear, and
15          the topic then, the court allowed
16          them to testify to.
17          MS. DONNELLI:  I'm about to hand
18          the witness a document that was
19          produced by Eastern Profit.  I think
20          it is relevant.  Why else would it
21          have been produced?
22          MR. CHUFF:  Whether he needs the
23          money is in a document?  I doubt the
24          MS. DONNELLI:  We're marking
25          this as Exhibit 30.

Page 105

27 (Pages 102 to 105)

Han Chunguang
November 11, 2019

Atkinson-Baker, Inc.
www.depo.com

HAN CHUNGUANG

1
2          (Defendant's Exhibit 30, Notice
3     of Change of Company Secretary and
4     Director (Appointment/Cessation)
5     Bates stamped EASTERN-000400 to 402
6     marked for Identification as of this
7     date.)
8          MS. DONNELLI:  This is the first
9     exhibit we've used.
10     Q     Mr. Han, if you turn to the third
11 page of the document.  At the bottom of the
12 document do you see your name typewritten?
13     A     Yes.
14     Q     Is that the handwritten form of your
15 name above it?
16     A     Yes.
17     Q     Did you place your name on this
18 document?
19     A     Yes.
20     Q     Did you place your name on this
21 document on June 27, 2017?
22     A     Yes.
23     Q     The second page of the document, on
24 the box that is numbered 17, the second 17 at the
25 bottom --

Page 106

HAN CHUNGUANG

1
2     A     Yes.
3     Q     -- who has signed there?
4          MR. CHUFF:  Objection.
5     Foundation.
6     A     Guo Mei's signature.
7     Q     Did Guo Mei ask you to sign this
8 Exhibit 30?
9          MR. CHUFF:  Objection.  This is
10     treading into what the court has said
11     counsel may not ask about which is
12     the sale of Eastern Profit from
13     Mr. Han to Guo Mei.  It's docket
14     entry 189, pages 3 and 4.  It was on
15     the relevance grounds.
16     Q     Mr. Han, is Exhibit 30 the official
17 record of your resignation as a director of
18 Eastern Profit?
19          THE INTERPRETER:  The witness
20     wants the interpreter to retranslate
21     the question.  Interpreter will do
22     so.
23          (Interpreter complying)
24     A     Yes.
25          MS. DONNELLI:  Do we want to

Page 107

HAN CHUNGUANG

1
2 take a break?
3          MR. CHUFF:  If it's okay with
4     you, yes.
5          MS. DONNELLI:  Let's take a
6     break at the witness' request for,
7     say, 10 minutes.
8          (At this time, a brief recess
9     was taken.)
10 CONTINUED EXAMINATION
11 BY MS. DONNELLI:
12     Q     We're back on the record.
13          MR. CHUFF:  We've gone another
14     hour and still haven't hit the topics
15     that the court Mr. Han to testify to.
16     We're reserving the right to seek
17     fees for this waste of time.
18     Q     I'm going to hand you, Mr. Han, a
19 piece of paper.  I have written three lines, and
20 I've asked for you to write your name, hand write
21 your name on those three lines.
22          I'm going to hand you a document that
23 we're going to mark.  By the way, that is
24 Exhibit 31, this piece of paper.  The three places
25 that the witness has written his name is 31.

Page 108

HAN CHUNGUANG

1
2          (Defendant's Exhibit 31, a
3     piece of yellow paper containing the
4     witness' name handwritten three times
5     marked for Identification as of this
6     date.)
7          MR. CHUFF:  Will that be going
8     to the reporter?
9          MS. DONNELLI:  Yes.  The
10     reporter is going to keep the
11     exhibits.
12          We're going to mark as
13     Exhibit 32 a document.  It already
14     has an exhibit label as Guo.
15          (Defendant's Exhibit 32, a
16     two-page document titled Limited
17     Power of Attorney Bates stamped
18     EASTERN-000276 and 277 marked for
19     Identification as of this date.)
20     Q     What is the title of this document,
21 Mr. Han?
22     A     Can you translate it for me.
23          MS. DONNELLI:  Can you translate
24     the title of the document for him?
25     A     I understand.

Page 109

28 (Pages 106 to 109)

Han Chunguang
November 11, 2019

HAN CHUNGUANG
1
2      Q     All right.  The second page, is that
3   your handwritten name above the words Chunguang
4   Han?
5      A     Yes.
6      Q     Did you place your handwritten
7   signature there?
8      A     Yes.
9      Q     Was this on behalf of Eastern Profit?
10      A     Yes.
11      Q     What was the purpose of this
12   document?
13      A     This was a Power of Attorney that I
14   gave Yvette the authority to handle the
15   investigation company's matter.
16      Q     When did you sign this?
17      A     Last year, 2018.
18      Q     Who asked you to sign this on behalf
19   of Eastern Profit?
20      A     I don't understand your question.
21          (The requested portion of the
22          record was read back by the
23          reporter.)
24          MR. CHUFF:  Objection.  Assumes
25   facts.

Page 110

HAN CHUNGUANG
1
2      A     Yvette told me at the time we were
3   lied to, we were deceased, and we might have to
4   file a lawsuit against the other parties.
5          One day last year Yvette called me
6   saying that she had this document for me to sign
7   to authorize her to handle all these matters.  I
8   said okay.  And then I went to Yvette's, yes,
9   Yvette's office to sign this document.
10      Q     Where was Yvette's office located?
11          MR. CHUFF:  Objection.  Asked
12          and answered.
13      A     800 Fifth Avenue.
14      Q     So you did not prepare this document
15   yourself?
16      A     No, I did not.
17      Q     Why did Guo Mei not sign this
18   document?
19      A     Because Guo Mei gave me the
20   authorization to handle the matters, and I gave
21   the authorization to Yvette to handle the matters.
22   And Yvette would report to me.
23      Q     So we have two authorizations, one
24   from Guo Mei to you and one from you to Yvette;
25   correct?

Page 111

HAN CHUNGUANG
1
2          MR. PODHASKIE:  Objection.
3   Asked and answered.
4          THE INTERPRETER:  Interpreter
5          needs the witness to repeat one
6          portion of answer.
7          (Witness complying)
8      A     Guo Mei gave me authorization to
9   agent, and then I gave the authorization to Yvette
10   to handle the matters.
11      Q     Was Yvette an agent also?
12      A     Yes.  After I gave her the
13   authorization, she handled the matters, all the
14   matters on my behalf.
15      Q     Were the authorizations done at the
16   same time?
17          MR. CHUFF:  Objection.  Asked
18          and answered.
19      A     After June 27, 2017 when I
20   transferred my company to Guo Mei, Guo Mei
21   authorized me to be her agent.  And then not long
22   after that, I authorized Yvette to handle the
23   matter for me.
24      Q     Was the authorization from Guo Mei to
25   you put in writing?

Page 112

HAN CHUNGUANG
1
2          MR. CHUFF:  Objection.  Asked
3   and answered.
4      A     No.  Orally only.
5      Q     Was your authorization to Yvette put
6   in writing?
7      A     Here.
8      Q     I'm sorry.  It's Exhibit 32?
9      A     Yes.
10      Q     At the time that you signed
11   Exhibit 32, you were no longer a director of
12   Eastern Profit; correct?
13          MR. CHUFF:  Objection.  Asked
14          and answered.
15      A     That's correct.
16      Q     As a director of Eastern Profit, you
17   never allowed it to enter into a transaction
18   without signing a contract; correct?
19      A     I don't understand your question.
20      Q     When you were a director of Eastern
21   Profit, did it enter into any transaction without
22   signing a written document?
23          MR. CHUFF:  Objection.  Form.
24      A     I don't understand your question.
25   What do you mean by transaction without contract.

Page 113

29 (Pages 110 to 113)

HAN CHUNGUANG

1  personally or something else?
2     A    On behalf of Eastern Profit.
3     Q    We see from the first page of
4  Exhibit 35 that it's dated December 29, 2017.
5     Do you see that on the first line?
6     MR. CHUFF:  Objection.
7     A    Yes.
8     Q    By December, 2017, you hadn't been a
9  director of Eastern Profit for several months;
10  correct?
11     A    Yes, that's correct.
12     Q    So why did you believe you were in a
13  position to ask to borrow money for Eastern Profit
14  at that time?
15     MR. CHUFF:  Objection.  Asked
16     and answered.
17     MS. DONNELLI:  Counsel, we
18     haven't even gotten into this
19     document.  How it could be asked and
20     answered, I believe it couldn't have
21     been.
22     MR. CHUFF:  He testified to
23     his --
24     MS. DONNELLI:  Please stop

Page 130

---

HAN CHUNGUANG

1  testifying for the witness.
2     MR. CHUFF:  You're trying to
3     confuse the witness.  He testified to
4     his authority earlier.  That's all I
5     will say.
6     MS. DONNELLI:  Oh, because
7     you've answered the question for him,
8     so you can just stop; is that it?
9     Please stop instructing this witness
10     how to answer.
11     MR. CHUFF:  You need to stop
12     trying to confusion the witness.
13     MS. DONNELLI:  Can you read the
14     question back, please.
15     (The requested portion of the
16     record was read back by the
17     reporter.)
18     A    Yes.  As I have previously testified
19  numerous times, Guo Mei authorized me as her agent
20  to handle matters on behalf of Eastern Profit.
21     Q    How did you know that Eastern Profit
22  needed to borrow money as this Exhibit 35 shows?
23     A    Because Natasha at the time told me
24  the company assets were frozen.  And at the time

Page 131

---

HAN CHUNGUANG

1  the payment was going to come from the company
2  itself since the asset was freezed.  I instead
3  borrowed money from him.
4     Q    I thought you testified that Natasha
5  stopped working for Eastern Profit in 2016, two
6  years after you became director.
7     MR. CHUFF:  Objection.
8     Mischaracterizes the testimony.
9     A    Who are you talking about?
10     Q    The person who the witness, Mr. Han,
11  talked about.  Mr. Han, I believe you testified
12  that Natasha worked for Eastern Profit for two
13  years.
14     Did I remember that correctly?
15     A    I think you misunderstood my answer.
16  Previously when I say that she had worked for the
17  company for two years, I thought I was trying to
18  tell you she worked for a company during the two
19  years I was the director.
20     But after that, she still helped out
21  with the company's affairs.
22     Q    Mr. Han, weren't you a director of
23  Eastern Profit for three years, not two?
24     A    I don't remember exactly how long.

Page 132

---

HAN CHUNGUANG

1  It was more than two years.
2     Q    I thought you also testified,
3  Mr. Han, that Natasha was a person who was taken
4  by the Chinese communist party?
5     A    Yes.
6     Q    So how was Natasha able to inform you
7  in December of 2017 that Eastern Profit needed to
8  borrow money?
9     A    I don't think she was taken away in
10  2017.  I think she was taken by the police last
11  year in 2018.
12     Q    How many times did you meet with
13  Mr. G in person about this loan agreement?
14     A    I think two or three times.
15     Q    Was that before or after the meeting
16  in the hotel lobby?
17     A    I think before.
18     Q    Mr. G brought this loan agreement
19  with him to meet you in the hotel lobby; correct?
20     A    Before this, we talked about a loan
21  over the phone, and then William drafted the
22  document.  At the end, he brought it to the hotel
23  lobby, to which both of us signed.
24     Q    You were the one then who negotiated

Page 133

34 (Pages 130 to 133)

Han Chunguang
November 11, 2019

Atkinson-Baker, Inc.
www.depo.com

HAN CHUNGUANG

1
2  the terms of the loan on behalf of Eastern Profit;
3  correct?
4           MR. CHUFF:  Objection.
5       Mischaracterizes the testimony.
6       A    Yes.  William and I talked over the
7  phone about the interest payment of 2 percent and
8  about a half year and stuff like that.
9       Q    How about the amount of the loan, did
10 you negotiate that?
11      A    A million dollars.
12           THE INTERPRETER:  Interpreter
13      need to clear it with the witness.
14      A    Yes, U.S.D.
15      Q    When Mr. G handed you this document,
16 did you say to him wait, I can't sign this because
17 I'm no longer a director of Eastern Profit?
18           MR. CHUFF:  Objection.
19      Misleading.
20      A    No, I did not.
21      Q    Did you keep a copy of this loan
22 agreement after you signed it that day in the
23 hotel lobby with Mr. G?
24      A    No.
25      Q    Why not?

Page 134

HAN CHUNGUANG

1       A    There was no reason why.
2       Q    Mr. Han, you signed this document on
3  behalf of Eastern Profit; correct?
4       A    Yes.
5       Q    Was any other representative of
6  Eastern Profit with you at the meeting in the
7  hotel lobby where you signed this loan agreement?
8       A    No.
9       Q    Did you have any certainty that
10 Eastern Profit, for which you've testified you
11 were an agent, was going to even get a copy of
12 this loan agreement if you didn't leave that
13 meeting with a copy of it?
14           MR. CHUFF:  Objection to form.
15      A    After the assets of Eastern Profit
16 was freezed, this was the only one loan I made was
17 such a huge amount.  Of course I remembered.  Once
18 the asset is un-freezed, I would tell the fiscal
19 about it.  He had money, the one handle the money.
20      Q    What does the term fiscal mean in
21 relation to Eastern Profit?
22      A    What I mean is that the time I
23 borrowed this money on behalf of the company, of
24 course eventually the loan has to be paid.  And I

Page 135

HAN CHUNGUANG

1  would tell the fiscal department about this loan.
2       Q    The fiscal department at Eastern
3  Profit or somewhere else?
4       A    Of course Eastern Profit.
5       Q    Did you explore what the terms would
6  be for Eastern Profit if it borrowed the money
7  from someone other than Mr. G?
8       A    No.
9       Q    Why not?
10      A    There was no reason why.  Besides, if
11 you look at these tons, they were acquired no more
12 in terms of Hong Kong needs market.  As a matter
13 of fact, if you compare the terms to other loans,
14 they were quite reasonable.
15      Q    But Mr. Han, did you compare the
16 terms of any other possible loan before signing
17 this document?
18      A    No.
19      Q    Is it your testimony that you and
20 Mr. G placed your respective signatures on this
21 document on December 29, 2017?
22           MR. CHUFF:  Objection.  Asked
23      and answered.
24      A    Yes.

Page 136

HAN CHUNGUANG

1       Q    When you met with Mr. G to sign this
2  loan agreement, did you have anything to eat or
3  drink with him?
4       A    No.
5           MR. CHUFF:  Counsel, whenever
6      you get to a natural spot, can we
7      take a 5 or 10-minute break.
8           MS. DONNELLI:  Okay.
9           MR. CHUFF:  It doesn't have to
10     be right now.  Just whenever you get
11     there.
12           MS. DONNELLI:  Thank you.
13      Q    What is the status of this loan as we
14 sit here today?
15      A    The money is still owed.
16      Q    Has Eastern Profit made any payment
17 on this loan?
18      A    No, because the asset continues being
19 freezed.
20           MS. DONNELLI:  The witness'
21     counsel has asked for break.  We'll
22     take a short 10-minute break.
23           (At this time, a brief recess
24     was taken.)

Page 137

35 (Pages 134 to 137)

Atkinson-Baker, Inc.
www.depo.com

HAN CHUNGUANG

1                 HAN CHUNGUANG
2   Yvette told you that you needed to get money and
3   when you actually got the money from William G?
4       A   Several days.
5       Q   Was it less than a month?
6           MR. CHUFF:  Objection.  Asked
7   and answered.
8       A   Again, I don't remember, but I think
9   it was a month, several days later.
10      Q   What collateral did Eastern Profit
11   give for the loan?
12          MR. PODHASKIE:  Objection.
13          MR. CHUFF:  Objection.  Assumes
14   facts.
15      A   When you say collateral, what do you
16   mean?
17       Q   Security for the repayment of the
18   loan.
19      A   Number 1, the guarantee was that when
20   the assets company was un-freezed as a result of
21   the investigation, I will return him the money and
22   pay him back the loan.
23          Secondly, we were good friends.  We
24   had enough trust.
25      Q   If you had enough trust, why isn't

Page 146

1                 HAN CHUNGUANG
2      A   No.
3      Q   Do you know who Lianchao Han is?
4   L-I-A-N-C-H-A-O H-A-N.
5      A   Can you just repeat it again.
6      Q   Lianchao Han.
7      A   The way you read it, I don't think
8   so.  You're not telling me.  I don't know this
9   person the way you read it.  The way you spell it,
10   L-I-A-N-C-H-A-O.  Lianchao, I don't know this
11   person.
12      Q   Do you know someone with a name
13   similar to that?
14          MR. CHUFF:  Objection to form.
15      A   Again, I don't have any impression of
16   this name.
17      Q   This morning I introduced you to
18   French Wallop who is sitting to my left.
19      A   Mm-hmm.
20      Q   Have you ever seen Miss Wallop before
21   today?
22      A   No.  I don't have a memory of it.
23      Q   Did you ever prepare a meal for
24   Miss Wallop and in Mr. Guo's apartment?
25          MR. PODHASKIE:  Objection.  I

Page 148

1                 HAN CHUNGUANG
2   Yvette dealing with William G now instead of you?
3          MR. CHUFF:  Objection.  Form.
4      A   There was no why.  I give Yvette the
5   full authority to take care of this matter, and
6   she took care of this matter for me.  That was it.
7      Q   Do you know the individual name Je
8   Kin Ming?  J-E  K-I-N  M-I-N-G.
9      A   No.
10      Q   Do you ever exchange E-mails with
11   William G?
12      A   No.
13      Q   You've never received an E-mail from
14   William G?
15      A   No.
16      Q   Have you ever met Karen Maistrello?
17          MR. CHUFF:  Objection to form.
18      A   I don't have impression of her.
19      Q   You've never met Karen Maistrello?
20          MR. CHUFF:  Objection.
21          Mischaracterizes the testimony.
22      A   When you just bring this name up, I
23   don't have any impression of it.
24      Q   What about if the first name is
25   Karen?

Page 147

1                 HAN CHUNGUANG
2   don't understand scope.
3      A   Why would I prepare a meal for her,
4   especially I am not even a chef.
5      Q   So it's a yes or no question.  Please
6   answer it.
7      A   No.
8          MR. CHUFF:  Objection.
9      Q   I introduced you this morning to
10   Mr. Michael Waller, who is sitting to the left of
11   me.
12          Mr. Waller, have you ever seen
13   Mr. Waller before today?
14      A   Again, I don't have any impression of
15   him.
16      Q   Were you present when the terms of
17   the investigation contract between Eastern Profit
18   and the investigation company were negotiated?
19          MR. PODHASKIE:  Objection.
20          Asked and answered.
21      A   No.
22      Q   Did you have any role in the
23   negotiation of the contract between Eastern Profit
24   and the investigative company?
25          MR. CHUFF:  Same objection.

Page 149

38 (Pages 146 to 149)

Han Chunguang
November 11, 2019

```
 1
 2              A C K N O W L E D G M E N T
 3
 4   STATE OF NEW YORK     )
 5                   ss:
 6   COUNTY OF _____  )
 7
 8       I, Han Chunguang, hereby certify that I
 9   have read the transcript of my testimony taken
10   under oath in my deposition of November 11, 2019;
11   that the transcript is a true and complete record
12   of my testimony, and that the answers on the
13   record as given by me are true and correct.
14
15
16       _____
17              HAN CHUNGUANG
18
19
20   Subscribed and sworn to before me
21   This      day of        2019
22   _____
23       (NOTARY PUBLIC)
24
25
```

Page 158

```
 2
 3              C E R T I F I C A T E
 4
 5       I, Terri Fudens, a stenotype reporter
 6   and Notary Public within and for the State of New
 7   York, do hereby certify:
 8           That the witness whose testimony is
 9   hereinbefore set forth was duly sworn by me and
10   that such testimony is a true record of the
11   testimony given by such witness.
12           I further certify that I am not related
13   to any of the parties by blood or marriage, and
14   that I am in no way interested in the outcome of
15   this matter.
16           IN WITNESS WHEREOF, I have hereunto set
17   my hand.
18   Signature Requested
19
20
21       _____
22              Terri Fudens
23
24
25
```

Page 159

41 (Pages 158 to 159)

Han Chunguang
November 11, 2019

# Exhibit H

**Atkinson-Baker, Inc.**
**www.depo.com**

```
 1            ***** C O N F I D E N T I A L ****

 2            IN THE UNITED STATES DISTRICT COURT

 3           FOR THE SOUTHERN DISTRICT OF NEW YORK

 4                       -  -  -

 5   EASTERN PROFIT CORPORATION,        )
     LIMITED,                           )
 6                                      )
        Plaintiff/Counterclaim Defendant, )
 7                                      )
        v.                             )  Case No.
 8                                      )  18-cv-2185
     STRATEGIC VISION US, LLC,          )  (JGK)
 9                                      )
        Defendant/Counterclaim Plaintiff. )
10   -------------------------------------

11

12

13                    DEPOSITION OF

14                    LIANCHAO HAN

15                   WASHINGTON, D.C.

16                  AUGUST 28, 2019

17

18   ATKINSON-BAKER, INC.
     (800) 288-3376
19   www.depo.com

20   REPORTED BY:  CATHERINE B. CRUMP
     FILE NO. AD07997
21

22
```

**Atkinson-Baker, Inc.**
**www.depo.com**

| | |
|---|---|
| 1 | Q.   After you came to the U.S., maybe if you |
| 2 | just could walk us through your career since you've |
| 3 | been here. |
| 4 | A.   I went to a year of law school and I |
| 5 | didn't quite -- I finished a program, but when the |
| 6 | Tieneman Square massacre occurred and I become a |
| 7 | student leader in this country, we organized protests |
| 8 | against China's crackdown, and about 300 universities |
| 9 | in this country, the Chinese student scholars formed |
| 10 | a group that elected me as their first vice |
| 11 | president.  So we carried out the pro-democracy |
| 12 | protest of, you know, Chinese students in this |
| 13 | country and, also, we prepared ourself for to |
| 14 | practice democracy and to learn how democracy works |
| 15 | here and, meanwhile, we lobby U.S. Congress, U.S. |
| 16 | Government, for a tougher human rights policy against |
| 17 | China. |
| 18 |      So after, I did that work in Washington, D.C. |
| 19 | for about a year and I worked in the U.S. Senate for |
| 20 | about 12 years.  I worked for three different |
| 21 | Senators, served as a staff attorney, staff |
| 22 | legislative counsel, and policy director.  After |

Page 10

| | |
|---|---|
| 1 | that, I went back to finish my Ph.D., and after |
| 2 | Ph.D., I went back to community college to study |
| 3 | science and went to John Hopkins to get another |
| 4 | master's degree in biotechnology, and when Liu |
| 5 | Xiaobo, we promoted Liu Xiaobo to get the Nobel Peace |
| 6 | Prize, and after that, I feel that we want to |
| 7 | organize to run Liu Xiaobo. |
| 8 |      So I joined a human rights group called |
| 9 | Citizens for Initiative for China and I served as the |
| 10 | vice president of the group until now.  I'm still the |
| 11 | vice president of the group.  So we basically lobby |
| 12 | Congress, educate American general public about China |
| 13 | and about, you know, for improved democracy for human |
| 14 | rights. |
| 15 | Q.   Now, is it true -- I mentioned earlier |
| 16 | that you're an attorney.  You're a patent attorney; |
| 17 | is that right? |
| 18 | A.   Correct. |
| 19 | Q.   Do you have any patents? |
| 20 | A.   I didn't myself.  I didn't get a chance |
| 21 | to file. |
| 22 | Q.   Okay.  Okay.  Is it also fair to say |

Page 11

| | |
|---|---|
| 1 | that you are a speaker and writer about U.S.-Chinese |
| 2 | relations? |
| 3 | A.   Correct. |
| 4 | Q.   And you follow domestic politics in |
| 5 | China as well? |
| 6 | A.   Correct. |
| 7 | Q.   If I were to ask you what Chairman -- |
| 8 | well, let me back up for a second. |
| 9 |      Who is the president of China? |
| 10 | A.   Xi Jinping. |
| 11 | Q.   Is he also the chairman of the Chinese |
| 12 | Communist Party? |
| 13 | A.   Yes. |
| 14 | Q.   Have you heard of a program of his |
| 15 | called China Dream? |
| 16 | A.   Yes. |
| 17 | Q.   What is that? |
| 18 | A.   It is his idea.  It's rhetoric about |
| 19 | rejuvenating the nationalism of China.  That's |
| 20 | basically what it is. |
| 21 | Q.   Okay.  And what does rejuvenating of the |
| 22 | nationalism of China entail, more specifically? |

Page 12

| | |
|---|---|
| 1 | A.   More specifically -- |
| 2 | MR. GAVENMAN:  Objection to form. |
| 3 | THE WITNESS:  Huh? |
| 4 | MR. GAVENMAN:  I said objection to form. |
| 5 | THE WITNESS:  It's, basically, you know, make |
| 6 | China the greatest country in the world. |
| 7 | BY MR. GREIM: |
| 8 | Q.   Does that entail competition with the |
| 9 | United States? |
| 10 | A.   Absolutely. |
| 11 | Q.   Does it involve undermining United |
| 12 | States' interests? |
| 13 | A.   Of course. |
| 14 | Q.   Now, I take it, based on the background |
| 15 | that you've just given us, that one of your goals is |
| 16 | not to advance President Xi's goals.  Am I right |
| 17 | about that? |
| 18 | MR. GRENDI:  Object to the form. |
| 19 | THE WITNESS:  Yes. |
| 20 | MR. GREIM:  Okay.  Brief interlude:  I want |
| 21 | to mark as Exhibit 1 a production I received from |
| 22 | your counsel in the wee hours. |

Page 13

4 (Pages 10 to 13)

**Lianchao Han - Confidential**
**August 28, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

**Page 18**

1    introduced Mike and French to Miles. Miles feel like

2    he is cheated by them. So when I learned the

3    supporters are about to attack me personally, I sent

4    him a message and I said how can you, you know, let

5    your supporters do this to me.

6         So he called me back and discussed and we

7    argued, you know, for quite a while and then, you

8    know, just ended that. He kept asking me who gave

9    you that information, who tell you that my supporters

10   are going to attack you personally. I said I won't

11   be able to tell you that, and he pressured me many,

12   many times. I refused to tell him.

13        So when it ended, that's the only time we

14   discussed this, and a few times when I was in his

15   office, he mentioned about it as well, but we

16   obviously have different views about our perception.

17        Q.   The longer discussion that you just

18   testified to --

19        A.   Yeah.

20        Q.   -- was this after the lawsuit was filed?

21        A.   I don't know when this lawsuit was

22   filed. So I have no idea if it was before or after.

**Page 19**

1         Q.   Okay. Was it after the -- do you

2    recall, at some point, there was a letter terminating

3    the contract from the Foley, Hogue law firm?

4         A.   I didn't.

5         Q.   No? Do you recall if it was soon after

6    the work on the project started -- stopped?

7         A.   That, I don't specifically remember. I

8    think it must be a while after it stopped.

9         Q.   Did Mr. Guo deny to you that he had

10   supporters who were going to attack you?

11        A.   He didn't deny it.

12        Q.   What do you mean when you say that

13   supporters of Guo were going to personally attack

14   you?

15        A.   At one point, I think Miles made a video

16   to see. I assured him four times a hundred percent

17   Mike and French are going to deliver what he's asking

18   for, which I did, and then the supporters say, you

19   know, I must be in the scam to cheat him, so asking

20   him when should we attack Lianchao Han.

21        Q.   Were these supporters online supporters?

22        A.   I think they were through a private chat

**Page 20**

1    platform.

2         Q.   Have you received any sort of threats

3    from Yvette Wang or Mr. Podhaskie, sitting here today

4    on behalf of Golden Spring?

5         A.   No.

6         MR. GRENDI:  Objection to form.

7    BY MR. GREIM:

8         Q.   Let me ask you have you had any

9    communications with Mr. Podhaskie here before today?

10        A.   I did.

11        Q.   What were those communications?

12        A.   Mostly focused on the case against Clark

13   Hill. He asked me -- he's bothering me, actually,

14   about, you know, the case and I have been giving my

15   accounts five, six times to different lawyers. I

16   just got really tired of that. He pressured me for

17   giving more. So that's why we were back and forth

18   about it.

19        Q.   I'm sorry. What was the Clark Hill

20   case?

21        A.   Clark Hill case is Miles is suing them,

22   is about maybe suing them for his political asylum,

**Page 21**

1    and Clark Hill was representing him originally to do

2    the political asylum case and then right after, you

3    know, they file the application, the Chinese cyber

4    attacked, basically hijacked the entire firm and

5    forced the Clark Hill to drop representation of him.

6         As a result, Miles' application was exposed

7    because Chinese hackers got the information and

8    posted online, which is damaging to his personal

9    safety.

10        Q.   Now let me ask you when were your

11   interactions with Mr. Podhaskie about that matter?

12        A.   I would say I don't know when he was

13   hired. I think it's back and forth probably through

14   maybe over half a year, maybe eight months. I don't

15   remember specifically.

16        Q.   Half a year or eight months ago?

17        A.   Yes. Eight months ago, maybe a year

18   ago.

19        Q.   And we're about to move on. I just want

20   to make sure I understand this.

21        A.   Yeah.

22        Q.   How is it that you would have

**Atkinson-Baker, Inc.**
**www.depo.com**

| | | |
|---|---|---|
| 1 | Q.   What do you mean, "within the system"? | 09:49 |
| 2 | A.   With the communist, work for the Chinese | 09:49 |
| 3 | Government.  I didn't know the source, but I just | 09:49 |
| 4 | didn't remember if he said that in the meeting or | 09:49 |
| 5 | later, but that's my impression. | 09:49 |
| 6 | Q.   Well, let me back up for a second.  When | 09:49 |
| 7 | did you first remember meeting her? | 09:49 |
| 8 | A.   Meeting Yvette? | 09:50 |
| 9 | Q.   Um-hum. | 09:50 |
| 10 | A.   I think maybe two years ago. | 09:50 |
| 11 | Q.   Okay.  So it would be late summer of | 09:50 |
| 12 | 2017? | 09:50 |
| 13 | A.   It will be August or September.  August, | 09:50 |
| 14 | most likely, yeah, August. | 09:50 |
| 15 | Q.   How are you able to remember that time? | 09:50 |
| 16 | A.   That was political asylum.  Miles tried | 09:50 |
| 17 | to -- that's why we were introduced to him and he did | 09:50 |
| 18 | help him with his political asylum.  Yeah. | 09:50 |
| 19 | Q.   What I should have asked you in the very | 09:50 |
| 20 | beginning was when did you first meet Mr. Guo? | 09:50 |
| 21 | A.   I think it's either July or August, | 09:50 |
| 22 | early August or, you know, late July of 2017. | 09:50 |

Page 30

| | | |
|---|---|---|
| 1 | Q.   And who introduced you? | 09:50 |
| 2 | A.   His name is Jonathan Ho.  The Chinese | 09:51 |
| 3 | name is Chen Jun. | 09:51 |
| 4 | Q.   Is that the last name, H-O? | 09:51 |
| 5 | A.   Correct. | 09:51 |
| 6 | Q.   Jonathan Ho.  Who is Jonathan Ho? | 09:51 |
| 7 | A.   He is a longtime friend of mine.  He | 09:51 |
| 8 | also used to be an activist, pro-democracy activist. | 09:51 |
| 9 | He's a friend with the late Nobel Peace Prize winner | 09:51 |
| 10 | Liu Xiaobo. | 09:51 |
| 11 | Q.   So why did Mr. Ho introduce you to Mr. | 09:51 |
| 12 | Guo? | 09:51 |
| 13 | MR. GRENDI:  Objection, form. | 09:51 |
| 14 | MR. GAVENMAN:  Objection to form. | 09:51 |
| 15 | THE WITNESS:  I think, at the time, they were | 09:52 |
| 16 | talking about the options, what to do, whether to | 09:52 |
| 17 | seek political asylum or other form of protection, | 09:52 |
| 18 | and he knows that, you know, I'm familiar with the | 09:52 |
| 19 | American legal system.  So he brought me to discuss | 09:52 |
| 20 | those options with Miles. | 09:52 |
| 21 | BY MR. GREIM: | 09:52 |
| 22 | Q.   And is it fair to say that you assisted | 09:52 |

Page 31

| | | |
|---|---|---|
| 1 | him with his various efforts to obtain political | 09:52 |
| 2 | asylum from that point forward? | 09:52 |
| 3 | A.   Correct. | 09:52 |
| 4 | Q.   What was your initial impression of Mr. | 09:52 |
| 5 | Guo? | 09:52 |
| 6 | A.   I think he's a genuine warm person.  He | 09:52 |
| 7 | has a deep knowledge of how the communist system | 09:53 |
| 8 | works and he has a reason to expose the high-ranking | 09:53 |
| 9 | government officials that are corrupt and, also, he | 09:53 |
| 10 | has many defects of the people from the communist | 09:53 |
| 11 | system. | 09:53 |
| 12 | Q.   What do you mean by that? | 09:53 |
| 13 | A.   Like -- | 09:53 |
| 14 | MR. GRENDI:  Objection to form. | 09:53 |
| 15 | THE WITNESS:  He probably won't tell you | 09:53 |
| 16 | exactly what he thinks.  Sometimes he exaggerates | 09:53 |
| 17 | what he's done and stuff like that. | 09:53 |
| 18 | BY MR. GREIM: | 09:53 |
| 19 | Q.   So you met Ms. Wang, then, within about | 09:53 |
| 20 | a month or so of having met Mr. Guo himself? | 09:54 |
| 21 | A.   Correct. | 09:54 |
| 22 | Q.   Did your impression of Mr. Guo change | 09:54 |

Page 32

| | | |
|---|---|---|
| 1 | over time? | 09:54 |
| 2 | A.   No. | 09:54 |
| 3 | Q.   Do you consider yourself to be a | 09:54 |
| 4 | personal friend of Mr. Guo? | 09:54 |
| 5 | A.   That's a very -- | 09:54 |
| 6 | Q.   Sorry. | 09:54 |
| 7 | A.   -- difficult question.  I think I | 09:54 |
| 8 | maintain a personal relationship with him and, also, | 09:54 |
| 9 | politically, I support his effort and I also have a | 09:55 |
| 10 | lot of reservation about him. | 09:55 |
| 11 | Q.   What are those reservations? | 09:55 |
| 12 | A.   He just brings troubles to me.  You | 09:55 |
| 13 | know, I live a very simple straightforward life. | 09:55 |
| 14 | This is my first deposition, first -- you know, this, | 09:55 |
| 15 | it's not fun. | 09:55 |
| 16 | My focus is the big picture, how to change | 09:55 |
| 17 | China, how to promote democracy.  I don't want to | 09:55 |
| 18 | sign on to derail from that goal.  This definitely is | 09:55 |
| 19 | troublesome to me. | 09:55 |
| 20 | Q.   Do you have any concern about whether | 09:55 |
| 21 | Guo is fully committed to overturning the Chinese | 09:56 |
| 22 | communist system? | 09:56 |

Page 33

9 (Pages 30 to 33)

**Atkinson-Baker, Inc.**
**www.depo.com**

| | | |
|---|---|---|
| 1 | A.   Well, I think he's fully committed.  At | 09:56 |
| 2 | the same time, he also has his relatives, his | 09:56 |
| 3 | employees to be considered and his assets, although, | 09:56 |
| 4 | all of it has been confiscated.  So I understand his | 09:56 |
| 5 | position. | 09:56 |
| 6 | Q.   And would it surprise you if Mr. Guo, | 09:56 |
| 7 | for example, vacillates in wanting regime change | 09:56 |
| 8 | versus something less than that? | 09:56 |
| 9 | MR. GRENDI:  Object to the form. | 09:57 |
| 10 | MR. GAVENMAN:  Object to the form. | 09:57 |
| 11 | THE WITNESS:  Can you rephrase that? | 09:57 |
| 12 | BY MR. GREIM: | 09:57 |
| 13 | Q.   Sure.  Sure.  Would it surprise you that | 09:57 |
| 14 | Mr. Guo tries to bargain with Chinese officials? | 09:57 |
| 15 | MR. GRENDI:  Object to the form. | 09:57 |
| 16 | MR. GAVENMAN:  Objection to form. | 09:57 |
| 17 | THE WITNESS:  Frankly, I think it's possible, | 09:57 |
| 18 | but it's unlikely, highly unlikely.  It's too late | 09:57 |
| 19 | for that. | 09:57 |
| 20 | BY MR. GREIM: | 09:57 |
| 21 | Q.   What do you mean by it's too late for | 09:57 |
| 22 | that? | 09:57 |

Page 34

| | | |
|---|---|---|
| 1 | MR. GRENDI:  Object to the form. | 09:57 |
| 2 | MR. GAVENMAN:  Objection to form. | 09:57 |
| 3 | THE WITNESS:  He's already put himself in the | 09:57 |
| 4 | position that he is the number one enemy of the | 09:57 |
| 5 | regime. | 09:57 |
| 6 | BY MR. GREIM: | 09:57 |
| 7 | Q.   When did he cross that line? | 09:57 |
| 8 | MR. GAVENMAN:  Objection to form. | 09:58 |
| 9 | MR. GRENDI:  Objection to form. | 09:58 |
| 10 | THE WITNESS:  I don't know for sure.  My | 09:58 |
| 11 | speculation -- can I speculate? | 09:58 |
| 12 | MR. GAVENMAN:  You shouldn't speculate.  Only | 09:58 |
| 13 | speak to things that you know. | 09:58 |
| 14 | THE WITNESS:  All right.  But I think -- can | 09:58 |
| 15 | I just say, more likely, after he turned the MSS | 09:58 |
| 16 | Secretary of Discipline into FBI, they busted them at | 09:58 |
| 17 | La Guardia Airport and I think that's where he | 09:58 |
| 18 | crossed the line. | 09:58 |
| 19 | BY MR. GREIM: | 09:58 |
| 20 | Q.   Do you know whether he attempted to | 09:58 |
| 21 | negotiate with Chinese officials even after that | 09:58 |
| 22 | point? | 09:58 |

Page 35

| | | |
|---|---|---|
| 1 | MR. GRENDI:  Object to the form. | 09:58 |
| 2 | THE WITNESS:  I didn't know. | 09:58 |
| 3 | BY MR. GREIM: | 09:58 |
| 4 | Q.   Do you know whether he is negotiating | 09:58 |
| 5 | with Chinese officials even today? | 09:59 |
| 6 | A.   I didn't know that either. | 09:59 |
| 7 | Q.   Let's shift gears for a moment here and | 09:59 |
| 8 | -- well, before we move on.  After you met Guo, Mr. | 09:59 |
| 9 | Guo -- | 09:59 |
| 10 | A.   Yeah. | 09:59 |
| 11 | Q.   -- did he introduce you to others | 09:59 |
| 12 | besides Yvette Wang over the next month or two? | 09:59 |
| 13 | A.   I met all his families, family members, | 09:59 |
| 14 | through him.  I met with Tony Blair.  I met -- who | 09:59 |
| 15 | else?  There were several other people that's | 09:59 |
| 16 | significant maybe. | 09:59 |
| 17 | Q.   Did he introduce you to someone named | 10:00 |
| 18 | Hansheng Wang? | 10:00 |
| 19 | A.   He never introduced me to Hansheng Wang. | 10:00 |
| 20 | Hansheng Wang, I know used to be his staff.  I got to | 10:00 |
| 21 | know him in that capacity. | 10:00 |
| 22 | Q.   What does Hansheng Wang do for Mr. Guo? | 10:00 |

Page 36

| | | |
|---|---|---|
| 1 | MR. GRENDI:  Object to form. | 10:00 |
| 2 | MR. GAVENMAN:  Object to the form. | 10:00 |
| 3 | THE WITNESS:  If I saw him, he do -- he does | 10:00 |
| 4 | lots of different things, bodyguard, security.  He | 10:00 |
| 5 | also cooks.  What else he does?  Run errands, book | 10:00 |
| 6 | hotel rooms, you know. | 10:00 |
| 7 | BY MR. GREIM: | 10:00 |
| 8 | Q.   Does he run any companies? | 10:00 |
| 9 | A.   I have no knowledge. | 10:00 |
| 10 | Q.   Do you know if he's a principal of | 10:00 |
| 11 | Eastern Profit? | 10:01 |
| 12 | A.   I didn't know that. | 10:01 |
| 13 | Q.   Does he actually live in Mr. Guo's | 10:01 |
| 14 | apartment? | 10:01 |
| 15 | A.   I didn't know that either. | 10:01 |
| 16 | MR. GAVENMAN:  Objection to form. | 10:01 |
| 17 | MR. GRENDI:  Object to the form. | 10:01 |
| 18 | THE WITNESS:  I saw him all the time there, | 10:01 |
| 19 | but I didn't know he lived there. | 10:01 |
| 20 | BY MR. GREIM: | 10:01 |
| 21 | Q.   Which Guo family members were you | 10:01 |
| 22 | introduced to? | 10:01 |

Page 37

10 (Pages 34 to 37)

**Lianchao Han - Confidential**
**August 28, 2019**

| | |
|---|---|
| 1 | A.  I met his son, Wu Chun.  I met his | 10:01 |
| 2 | daughter, Wo Mei, his wife, Yu Chen Su. | 10:01 |
| 3 | **Q.  We'll get some of these names here on** | 10:01 |
| 4 | **the break.** | 10:01 |
| 5 | A.  Okay. | 10:01 |
| 6 | MR. GRENDI:  Eddie, I'm just going to jump in | 10:01 |
| 7 | here.  Are we going to get on topic here?  We're | 10:02 |
| 8 | talking about -- | 10:02 |
| 9 | MR. GREIM:  We are on topic. | 10:02 |
| 10 | MR. GRENDI:  Talking about Mr. Guo's family | 10:02 |
| 11 | and who Mr. Lianchao has met, this has nothing to do | 10:02 |
| 12 | with this dispute. | 10:02 |
| 13 | MR. GREIM:  Please don't disrupt the | 10:02 |
| 14 | deposition. | 10:02 |
| 15 | MR. GRENDI:  I'm not disrupting the | 10:02 |
| 16 | deposition.  I want to move it along and have it on | 10:02 |
| 17 | topic.  You know, we're discussing irrelevant stuff | 10:02 |
| 18 | right now, but please continue. | 10:02 |
| 19 | BY MR. GREIM: | 10:02 |
| 20 | **Q.  When was the first time that you met** | 10:02 |
| 21 | **French Wallop?** | 10:02 |
| 22 | A.  Let's see.  I would say September -- | 10:02 |

Page 38

| | |
|---|---|
| 1 | October or September of 2017. | 10:02 |
| 2 | **Q.  Did you know her beforehand?** | 10:02 |
| 3 | A.  I didn't know her.  I know her -- I | 10:02 |
| 4 | worked with her husband many years ago.  So I had a | 10:02 |
| 5 | very good relationship with his office.  Naturally, I | 10:03 |
| 6 | know of her.  I didn't met her. | 10:03 |
| 7 | **Q.  Was this Senator Malcolm Wallop?** | 10:03 |
| 8 | A.  Correct. | 10:03 |
| 9 | **Q.  What about Mr. Waller?** | 10:03 |
| 10 | A.  That was the same time I met with | 10:03 |
| 11 | French. | 10:03 |
| 12 | **Q.  Did she you know of Mr. Waller before** | 10:03 |
| 13 | **the fall of 2017?** | 10:03 |
| 14 | A.  No. | 10:03 |
| 15 | **Q.  Let's talk a little bit about the** | 10:03 |
| 16 | **research project that's at issue here.  How is it** | 10:03 |
| 17 | **that -- well, let me ask you this:  Did there come a** | 10:03 |
| 18 | **time that you approached French Wallop about possible** | 10:03 |
| 19 | **work for Mr. Guo?** | 10:04 |
| 20 | A.  Say that again. | 10:04 |
| 21 | **Q.  Did there come a time when you** | 10:04 |
| 22 | **approached Ms. Wallop about possible work for Mr.** | 10:04 |

Page 39

| | |
|---|---|
| 1 | Guo? | 10:04 |
| 2 | MR. GRENDI:  Object to the form. | 10:04 |
| 3 | THE WITNESS:  I didn't approach them. | 10:04 |
| 4 | BY MR. GREIM: | 10:04 |
| 5 | **Q.  Did Ms. Wallop approach you?** | 10:04 |
| 6 | A.  No.  That's not the case.  They were | 10:04 |
| 7 | introduced through Bill Gertz.  Bill Gertz called me | 10:04 |
| 8 | and said can you set up meeting with Miles; I want to | 10:04 |
| 9 | introduce Mike and French, Strategic Vision, to help | 10:04 |
| 10 | Miles.  So I set up meeting and we were introduced | 10:04 |
| 11 | that way. | 10:04 |
| 12 | **Q.  Okay.  Did you already know Mr. Gertz?** | 10:04 |
| 13 | A.  Yes. | 10:04 |
| 14 | **Q.  How long have you known him?** | 10:05 |
| 15 | A.  Thirty years. | 10:05 |
| 16 | **Q.  Now, did Mr. Gertz, then, already seem** | 10:05 |
| 17 | **to know or already seem to have a specific project in** | 10:05 |
| 18 | **mind for Mr. Guo?** | 10:05 |
| 19 | MR. GRENDI:  Objection. | 10:05 |
| 20 | MR. GAVENMAN:  Object to the form. | 10:05 |
| 21 | THE WITNESS:  Yes. | 10:05 |
| 22 | BY MR. GREIM: | 10:05 |

Page 40

| | |
|---|---|
| 1 | **Q.  What was that?** | 10:05 |
| 2 | A.  I think that was the original proposal | 10:05 |
| 3 | French and Mike brought with them or maybe they first | 10:05 |
| 4 | gave it to me and I shared it with Miles to handle | 10:05 |
| 5 | his communication, pretty much. | 10:05 |
| 6 | **Q.  So when Mr. Gertz came to you --** | 10:05 |
| 7 | A.  Yes. | 10:05 |
| 8 | **Q.  -- and asked you to set up this** | 10:05 |
| 9 | **meeting --** | 10:05 |
| 10 | A.  Yes. | 10:05 |
| 11 | **Q.  -- did you understand that he had** | 10:05 |
| 12 | **already spoken to Ms. Wallop and Mr. Waller?** | 10:05 |
| 13 | A.  Absolutely. | 10:06 |
| 14 | MR. GRENDI:  Objection. | 10:06 |
| 15 | BY MR. GREIM: | 10:06 |
| 16 | **Q.  At that time, let's say when -- let me** | 10:06 |
| 17 | **strike that.** | 10:06 |
| 18 | **When Mr. Gertz first contacted you about** | 10:06 |
| 19 | **this --** | 10:06 |
| 20 | A.  Yeah. | 10:06 |
| 21 | **Q.  -- were you already aware that Mr. Guo** | 10:06 |
| 22 | **was looking for some type of research?** | 10:06 |

Page 41

11 (Pages 38 to 41)

**Lianchao Han - Confidential**
**August 28, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

| | |
|---|---|
| 1 | **Q.   Have you been paid by the Rule of Law** `10:30` |
| 2 | **Foundation?** `10:30` |
| 3 | A.   No. `10:30` |
| 4 | **Q.   Okay.  Then here's what I'll do.  I'm** `10:30` |
| 5 | **not -- I don't believe a privilege will apply to** `10:30` |
| 6 | **shield his disclosures to you about his past from** `10:30` |
| 7 | **discovery, but what I'm going to do is just simply** `10:30` |
| 8 | **ask you about your knowledge.  Okay?** `10:30` |
| 9 | **And what we'll try to do is not put it -- we** `10:30` |
| 10 | **will try not to ask about conversations that you had** `10:30` |
| 11 | **with him while his asylum counsel were present.** `10:30` |
| 12 | **Okay?** `10:30` |
| 13 | A.   [Gestures.] `10:30` |
| 14 | **Q.   Okay.** `10:30` |
| 15 | MR. GAVENMAN:  Let me caution you.  To the `10:30` |
| 16 | extent you learned anything in the course of those `10:31` |
| 17 | discussions, you shouldn't disclose that either. `10:31` |
| 18 | THE WITNESS:  Correct. `10:31` |
| 19 | BY MR. GREIM: `10:31` |
| 20 | **Q.   So did you understand that Mr. Guo** `10:31` |
| 21 | **became a dissident during the Tieneman Square** `10:31` |
| 22 | **demonstrations and massacre?** `10:31` |

Page 50

| | |
|---|---|
| 1 | A.   Say that again. `10:31` |
| 2 | **Q.   Well, let me ask you a different** `10:31` |
| 3 | **question, because that's -- did you understand that** `10:31` |
| 4 | **Mr. Guo participated in the Tieneman Square** `10:31` |
| 5 | **demonstrations and massacre?** `10:31` |
| 6 | MR. GRENDI:  Object to the form. `10:31` |
| 7 | MR. GAVENMAN:  Objection. `10:31` |
| 8 | THE WITNESS:  Understand? `10:31` |
| 9 | BY MR. GREIM: `10:31` |
| 10 | **Q.   Yes.  Did you believe?** `10:31` |
| 11 | MR. GRENDI:  Objection. `10:31` |
| 12 | MR. GRENDI:  Objection.  This is pretty far `10:31` |
| 13 | afield from what Mr. Han is here to testify about. `10:31` |
| 14 | I'm not sure how this is a good use of your time, but `10:31` |
| 15 | you can keep going. `10:31` |
| 16 | THE WITNESS:  That discussion is with his `10:32` |
| 17 | counsel. `10:32` |
| 18 | MR. GAVENMAN:  So objection, privilege.  I `10:32` |
| 19 | instruct you not to answer. `10:32` |
| 20 | THE WITNESS:  Right. `10:32` |
| 21 | BY MR. GREIM: `10:32` |
| 22 | **Q.   Do you know why Mr. Guo left China?** `10:32` |

Page 51

| | |
|---|---|
| 1 | MR. GAVENMAN:  Objection to form. `10:32` |
| 2 | MR. GRENDI:  Objection. `10:32` |
| 3 | THE WITNESS:  A lot of that discussion, you `10:32` |
| 4 | know, this is all from the meeting. `10:32` |
| 5 | MR. GAVENMAN:  So I'm going to instruct you `10:32` |
| 6 | not to answer, attorney-client privilege. `10:32` |
| 7 | THE WITNESS:  Yeah. `10:32` |
| 8 | BY MR. GREIM: `10:32` |
| 9 | **Q.   Did Mr. Guo make representations to** `10:32` |
| 10 | **French Wallop or Mike Waller about his past?** `10:32` |
| 11 | MR. GAVENMAN:  Objection to form, foundation. `10:33` |
| 12 | THE WITNESS:  During the meeting with them? `10:33` |
| 13 | BY MR. GREIM: `10:33` |
| 14 | **Q.   Yes.** `10:33` |
| 15 | A.   I didn't remember exactly what he said `10:33` |
| 16 | to them.  I think that maybe there is some `10:33` |
| 17 | discussion. `10:33` |
| 18 | **Q.   Did Mr. Guo participate in the Tieneman** `10:33` |
| 19 | **Square protest?** `10:33` |
| 20 | A.   During the time of that meeting? `10:33` |
| 21 | MR. GAVENMAN:  Asked and answered. `10:33` |
| 22 | MR. GRENDI:  Objection. `10:33` |

Page 52

| | |
|---|---|
| 1 | MR. GAVENMAN:  We've established that there `10:33` |
| 2 | is privilege attached to that answer.  So I instruct `10:33` |
| 3 | you not to answer as well. `10:33` |
| 4 | BY MR. GREIM: `10:33` |
| 5 | **Q.   What do you remember about what Mr. Guo** `10:33` |
| 6 | **said about himself to Ms. Wallop and Mr. Waller?** `10:34` |
| 7 | A.   I don't remember much. `10:34` |
| 8 | **Q.   What do you remember though?** `10:34` |
| 9 | A.   I remember specifically what was `10:34` |
| 10 | discussed about the proposal, you know, what to do `10:34` |
| 11 | about what information is required and the back and `10:34` |
| 12 | forth. `10:34` |
| 13 | **Q.   What did Mr. Guo say he wanted to do** `10:34` |
| 14 | **with the research?** `10:34` |
| 15 | A.   He wanted -- `10:34` |
| 16 | MR. GAVENMAN:  Objection. `10:34` |
| 17 | MR. GRENDI:  Objection to form. `10:34` |
| 18 | THE WITNESS:  He wanted to expose the `10:34` |
| 19 | corruption of the highest-ranking members of the `10:34` |
| 20 | Communist Party. `10:34` |
| 21 | BY MR. GREIM: `10:34` |
| 22 | **Q.   Did he say how he wanted to do that?** `10:34` |

Page 53

14 (Pages 50 to 53)

**Atkinson-Baker, Inc.**
**www.depo.com**

| | Page 182 | |
|---|---|---|
| 1 | and about the Chinese Government -- | 14:25 |
| 2 | A.   Right. | 14:25 |
| 3 | Q.   -- do you agree that it would be prudent | 14:25 |
| 4 | not to use a Chinese entity or a Chinese bank to pay | 14:25 |
| 5 | Strategic Vision under the contract? | 14:25 |
| 6 | MR. GRENDI:  Objection. | 14:25 |
| 7 | MR. GAVENMAN:  Objection. | 14:25 |
| 8 | THE WITNESS:  I didn't -- I -- from the very | 14:25 |
| 9 | beginning, we want to keep this highly confidential. | 14:25 |
| 10 | Everything we do has to be, you know, like very | 14:25 |
| 11 | cautious, and whether I made that specific | 14:25 |
| 12 | suggestion, I don't remember, but if I did, it must | 14:25 |
| 13 | be based on that principle. | 14:25 |
| 14 | BY MR. GREIM: | 14:25 |
| 15 | Q.   And that would be common sense, wouldn't | 14:25 |
| 16 | it? | 14:25 |
| 17 | MR. GRENDI:  Objection. | 14:25 |
| 18 | MR. GAVENMAN:  Objection. | 14:25 |
| 19 | THE WITNESS:  It is not necessarily Chinese | 14:25 |
| 20 | company.  I think it's how confidential, how | 14:25 |
| 21 | trustworthy they are, not the entities, from where. | 14:25 |
| 22 | It's the discrete nature of the entity that matters. | 14:26 |

Page 182

| | Page 183 | |
|---|---|---|
| 1 | BY MR. GREIM: | 14:26 |
| 2 | Q.   Well, what about the ability of Chinese | 14:26 |
| 3 | officials to follow the wire from, you know, a | 14:26 |
| 4 | Chinese account directly to Strategic Vision? | 14:26 |
| 5 | MR. GRENDI:  Objection. | 14:26 |
| 6 | MR. GAVENMAN:  Objection. | 14:26 |
| 7 | THE WITNESS:  Well, yeah.  It's definitely | 14:26 |
| 8 | easier to track if it's a Chinese company based in | 14:26 |
| 9 | China. | 14:26 |
| 10 | BY MR. GREIM: | 14:26 |
| 11 | Q.   What about an entity based in Hong Kong? | 14:26 |
| 12 | MR. GAVENMAN:  Objection to form. | 14:26 |
| 13 | MR. GRENDI:  Objection. | 14:26 |
| 14 | MR. GAVENMAN:  I'm not sure what that | 14:26 |
| 15 | question even is.  Can you rephrase that question? | 14:26 |
| 16 | THE WITNESS:  Yes. | 14:27 |
| 17 | BY MR. GREIM: | 14:27 |
| 18 | Q.   Did you understand it? | 14:27 |
| 19 | A.   Maybe you can rephrase. | 14:27 |
| 20 | Q.   Is it also easier to track if the money | 14:27 |
| 21 | comes from an entity based in Hong Kong? | 14:27 |
| 22 | MR. GRENDI:  Objection. | 14:27 |

Page 183

| | Page 184 | |
|---|---|---|
| 1 | MR. GAVENMAN:  Objection. | 14:27 |
| 2 | THE WITNESS:  It's possible, yes.  Hong Kong | 14:27 |
| 3 | has a different system, but China has a lot of | 14:27 |
| 4 | difference there. | 14:27 |
| 5 | BY MR. GREIM: | 14:27 |
| 6 | Q.   When did you first hear of the entity | 14:27 |
| 7 | called Eastern Profit? | 14:27 |
| 8 | A.   I don't think I ever heard that term | 14:27 |
| 9 | until this case, you know, showed up. | 14:27 |
| 10 | Q.   Did you know that Mr. Guo's daughter is | 14:27 |
| 11 | the sole shareholder and director of Eastern Profit? | 14:27 |
| 12 | MR. GRENDI:  Objection. | 14:27 |
| 13 | MR. GAVENMAN:  Objection. | 14:27 |
| 14 | THE WITNESS:  No. | 14:27 |
| 15 | BY MR. GREIM: | 14:27 |
| 16 | Q.   Do you know whether Mr. Guo typically | 14:27 |
| 17 | has his children hold companies that he uses for his | 14:27 |
| 18 | projects? | 14:27 |
| 19 | A.   I didn't. | 14:28 |
| 20 | MR. GRENDI:  Objection. | 14:28 |
| 21 | MR. GAVENMAN:  Objection. | 14:28 |
| 22 | THE WITNESS:  I didn't know. | 14:28 |

Page 184

| | Page 185 | |
|---|---|---|
| 1 | BY MR. GREIM: | 14:28 |
| 2 | Q.   Did you always understand that | 14:28 |
| 3 | regardless of who signed the contract that that | 14:28 |
| 4 | person or entity would be reporting to Mr. Guo? | 14:28 |
| 5 | MR. GRENDI:  Objection. | 14:28 |
| 6 | MR. GAVENMAN:  Objection to form. | 14:28 |
| 7 | THE WITNESS:  Yes. | 14:28 |
| 8 | BY MR. GREIM: | 14:28 |
| 9 | Q.   Have you ever heard that Hansheng Wang | 14:28 |
| 10 | was actually in charge of Eastern Profit? | 14:28 |
| 11 | A.   I didn't know that.  I thought you said | 14:28 |
| 12 | his daughter. | 14:28 |
| 13 | Q.   Would it surprise to hear that in this | 14:28 |
| 14 | case, Eastern Profit claims that its principal is | 14:28 |
| 15 | Hansheng Wang? | 14:28 |
| 16 | MR. GAVENMAN:  Objection, form. | 14:28 |
| 17 | THE WITNESS:  I have no idea. | 14:28 |
| 18 | BY MR. GREIM: | 14:28 |
| 19 | Q.   Did you ever talk to Hansheng Wang about | 14:28 |
| 20 | this project at all? | 14:29 |
| 21 | A.   No. | 14:29 |
| 22 | Q.   Would it surprise if Hansheng Wang was | 14:29 |

Page 185

47 (Pages 182 to 185)

**Lianchao Han - Confidential**
**August 28, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

| | |
|---|---|

1 recall specifically.  There are some glitches, you 15:34
2 know, like something going.  I also remember French 15:34
3 told me in the middle, you know, the wire transfer 15:34
4 and Miles tried to stop the second payment. 15:34
5 Q.  I'm going to be -- make sure I'm a clear 15:34
6 on a couple of questions about representations.  I 15:34
7 know we covered these much earlier today, but I want 15:34
8 to make sure I've got them. 15:34
9 A.  Yeah. 15:34
10 Q.  Did Guo represent to Strategic Vision 15:34
11 that he was a dissident? 15:34
12 MR. GAVENMAN:  Objection, form. 15:34
13 MR. GRENDI:  Objection to form. 15:34
14 THE WITNESS:  I don't think he specifically 15:34
15 said he's a dissident, but I think he made his 15:35
16 intention clear to them that he's anti-CCP.  This is 15:35
17 the agenda.  The reason we're doing this is to 15:35
18 disrupt the regime. 15:35
19 BY MR. GREIM: 15:35
20 Q.  And when you say disrupt the regime, 15:35
21 what do you mean by that? 15:35
22 A.  Just expose them to corruption, to the 15:35

Page 226

1 scandals so that people will see the nature of the 15:35
2 Communist regime and even disturb internal power 15:35
3 struggle among the leaders. 15:35
4 Q.  Did he say it was his goal to actually 15:35
5 overthrow the Communist Part? 15:35
6 MR. GAVENMAN:  Objection to form. 15:35
7 MR. GRENDI:  Objection to form. 15:35
8 THE WITNESS:  That, I didn't remember 15:35
9 specifically.  I think Miles has been involved from 15:36
10 the original -- you know, the beginning of the 19 -- 15:36
11 2017 to this later stage. 15:36
12 Until now, there's an evolution going on with 15:36
13 him.  He's political agenda are slight different in 15:36
14 each stage. 15:36
15 BY MR. GREIM: 15:36
16 Q.  What do you mean by that? 15:36
17 A.  From the very beginning, you know, I 15:36
18 think he is trying to protect his family, his 15:36
19 employees, and his assets, his own life, and revenge. 15:36
20 That's the goals, three goals, he proposed, and that 15:36
21 later evolved into anti-CCP, but still support CGP. 15:36
22 Now he's moved along that line to overthrow the CCP 15:37

Page 227

1 and Rule of Law and perfectly, he mentioned many 15:37
2 times to me that he strongly opposed to CGP's 15:37
3 dictatorship. 15:37
4 Q.  When did he move from second to the 15:37
5 third phase, overthrow CCP? 15:37
6 MR. GRENDI:  Objection to form. 15:37
7 MR. GAVENMAN:  Objection to form. 15:37
8 THE WITNESS:  I don't remember specifically. 15:37
9 We can go back and look at the timeline, but I don't 15:37
10 remember. 15:37
11 BY MR. GREIM: 15:37
12 Q.  Did you observe the information that was 15:37
13 loaded onto hard drives given by Yvette Wang to 15:38
14 French Wallop? 15:38
15 MR. GAVENMAN:  Objection to form. 15:38
16 MR. GRENDI:  Objection to form. 15:38
17 THE WITNESS:  I think it might be -- Mike 15:38
18 shoot me.  I don't specifically remember.  Maybe I 15:38
19 recall that, but it's all junk, full of junk.  I was 15:38
20 disappointed with that.  I expressed my 15:38
21 disappointment to Mike.  It doesn't advance our 15:38
22 agenda.  It doesn't help the deliverables. 15:38

Page 228

1 Yes.  I think I saw it. 15:38
2 BY MR. GREIM: 15:38
3 Q.  I'm sorry.  My question was different 15:38
4 though. 15:38
5 A.  Okay.  Sorry. 15:38
6 Q.  My question was whether you saw the hard 15:38
7 drives that Yvette Wang gave to French Wallop with 15:38
8 the initial information to begin the research? 15:38
9 A.  Oh, no.  Maybe -- 15:38
10 MR. GRENDI:  Objection to the form. 15:38
11 MR. GAVENMAN:  Objection to form. 15:38
12 THE WITNESS:  Maybe French shoot me, but 15:38
13 French mentioned that when he installed, there some 15:38
14 weird stuff going on. 15:39
15 BY MR. GREIM: 15:39
16 Q.  Did you -- do you remember hearing that 15:39
17 there was Malware in the drives? 15:39
18 A.  That's what French told me. 15:39
19 MR. GAVENMAN:  Objection to form. 15:39
20 THE WITNESS:  I have not -- yeah. 15:39
21 BY MR. GREIM: 15:39
22 Q.  Did you realize that that required 15:39

Page 229

58 (Pages 226 to 229)

**Lianchao Han - Confidential**
**August 28, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

| | Page 278 | |
|---|---|---|
| 1 | Q.   And what was on that hard drive? | 16:49 |
| 2 | A.   It's lots of junk information. | 16:49 |
| 3 | Q.   Was any of that information the kind of | 16:49 |
| 4 | useful reporting that Eastern Profit would have | 16:49 |
| 5 | expected under this agreement? | 16:49 |
| 6 | MR. GREIM:  Objection, foundation, calls for | 16:49 |
| 7 | opinion. | 16:49 |
| 8 | THE WITNESS:  No. | 16:49 |
| 9 | BY MR. GRENDI: | 16:49 |
| 10 | Q.   Okay.  I believe you testified before | 16:49 |
| 11 | that you had heard that Team 2 found evidence of -- | 16:50 |
| 12 | strike that. | 16:50 |
| 13 | Did you ever hear that Team 2 of Strategic | 16:50 |
| 14 | Vision's team found evidence of Social Security | 16:50 |
| 15 | number fraud or human trafficking or customs fraud? | 16:50 |
| 16 | A.   Say that again. | 16:50 |
| 17 | Q.   Sorry.  Did there ever come a time when | 16:50 |
| 18 | you heard from Strategic Vision that its second team | 16:50 |
| 19 | -- they call it Team 2 -- had found evidence of | 16:50 |
| 20 | Social Security fraud, human trafficking, or customs | 16:50 |
| 21 | fraud concerning the subjects of the research | 16:50 |
| 22 | agreement? | 16:50 |

Page 278

| | Page 279 | |
|---|---|---|
| 1 | A.   Yes, but I don't hear the Team 2, that | 16:50 |
| 2 | term.  I was not familiar with the Team 2. | 16:50 |
| 3 | Q.   Let's just say Strategic Vision.  Did | 16:51 |
| 4 | Strategic Vision tell you it had found that kind of | 16:51 |
| 5 | information? | 16:51 |
| 6 | A.   Yes. | 16:51 |
| 7 | Q.   They did ever give you any documents to | 16:51 |
| 8 | prove that or show that that was the case? | 16:51 |
| 9 | A.   No. | 16:51 |
| 10 | Q.   No.  Okay.  And the whole point of this | 16:51 |
| 11 | agreement was to get that, like you said, the | 16:51 |
| 12 | concrete evidence that there was corruption in the | 16:51 |
| 13 | CCP.  Right? | 16:51 |
| 14 | A.   Correct. | 16:51 |
| 15 | Q.   But that was never delivered under this | 16:51 |
| 16 | agreement, was it? | 16:51 |
| 17 | A.   No. | 16:51 |
| 18 | Q.   I'll ask about this one, but I think | 16:51 |
| 19 | we're going to have to eventually go off the record | 16:51 |
| 20 | on it.  What is the name of project in Taiwan that | 16:51 |
| 21 | you were talking about with Attorney Greim just | 16:51 |
| 22 | before the break? | 16:51 |

Page 279

| | Page 280 | |
|---|---|---|
| 1 | A.   Is this relevant? | 16:51 |
| 2 | Q.   Well, that's what I'm going to get at | 16:51 |
| 3 | here, because my understanding would be that | 16:51 |
| 4 | you don't want to reveal the name of that entity. | 16:51 |
| 5 | A.   No. | 16:52 |
| 6 | Q.   Okay.  Is that because it's normally | 16:52 |
| 7 | confidential; you don't disclose the dealings of | 16:52 |
| 8 | private investigatory research clients that you're | 16:52 |
| 9 | working with with Strategic Vision? | 16:52 |
| 10 | A.   Correct. | 16:52 |
| 11 | MR. GRENDI:  So, Attorney Greim, we can talk | 16:52 |
| 12 | about whether you're going to try to use that in | 16:52 |
| 13 | damages and we can talk about who this client is and | 16:52 |
| 14 | find out information about it or you can -- we can | 16:52 |
| 15 | lay off on that and maybe talk to your client about | 16:52 |
| 16 | it. | 16:52 |
| 17 | MR. GREIM:  Yeah.  Let's just -- let's take | 16:52 |
| 18 | one minute. | 16:52 |
| 19 | MR. GRENDI:  Sure.  Off the record. | 16:52 |
| 20 | VIDEOGRAPHER:  Going off the record.  The | 16:52 |
| 21 | time is now 4:54 p.m. | 16:52 |
| 22 | [Mr. Greim confers with Ms. Wallop and Mr. | 16:52 |

Page 280

| | Page 281 | |
|---|---|---|
| 1 | Waller.] | 16:54 |
| 2 | VIDEOGRAPHER:  We are back on the record. | 16:54 |
| 3 | The time is now 4:57 p.m. | 16:55 |
| 4 | BY MR. GRENDI: | 16:55 |
| 5 | Q.   So, Mr. Han, if you would please | 16:55 |
| 6 | identify the client or potential client from Taiwan | 16:55 |
| 7 | that you spoke of politically concerning a newspaper | 16:55 |
| 8 | article in "Politico". | 16:55 |
| 9 | A.   There is a -- I saw that article.  I | 16:55 |
| 10 | didn't know what it referred to.  They specifically | 16:55 |
| 11 | talked about the Taiwan project. | 16:55 |
| 12 | Q.   No, no.  I'm sorry.  You know what? | 16:55 |
| 13 | Let's strike that question.  I'll start over. | 16:55 |
| 14 | what is the name of the entity you and | 16:55 |
| 15 | Strategic Vision have been working on that comes from | 16:55 |
| 16 | Taiwan?  Who is that? | 16:55 |
| 17 | A.   There are several.  The Taiwan National | 16:55 |
| 18 | Security Council and Taiwan DPP, which is the ruling | 16:55 |
| 19 | party, and the embassy here. | 16:55 |
| 20 | Q.   And is Strategic Vision trying to | 16:55 |
| 21 | solicit business from those entities? | 16:55 |
| 22 | A.   Correct. | 16:56 |

Page 281

71 (Pages 278 to 281)

**Lianchao Han - Confidential**
**August 28, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

| | | |
|---|---|---|
| 1 | MR. GRENDI:  Thank you. | 17:09 |
| 2 | MR. GREIM:  Thank you. | 17:09 |
| 3 | VIDEOGRAPHER:  This concludes today's video | 17:09 |
| 4 | deposition of Lianchao Han.  This is Disk 3 of 3, | 17:09 |
| 5 | going off the record.  The time is 5:11 p.m. | 17:09 |
| 6 | [Whereupon, at 5:11 p.m., the deposition | |
| 7 | concluded.] | |
| 8 | [Signature not waived.] | |

Page 294

CERTIFICATE OF NOTARY PUBLIC

1  
2    I, CATHERINE B. CRUMP, the officer before  
3  whom the foregoing deposition was taken, do hereby  
4  testify that the witness whose testimony appears in  
5  the foregoing deposition was duly sworn by me; that  
6  the testimony of said witness was taken by me  
7  stenographically and thereafter reduced to  
8  typewriting under my direction; that said deposition  
9  is a true record of the testimony given by said  
10  witness; that I am neither counsel for, related to,  
11  nor employed by any of the parties to the action in  
12  which this deposition was taken; and further, that I  
13  am not a relative or employee of any attorney or  
14  counsel employed by the parties hereto nor  
15  financially or otherwise interested in the outcome of  
16  the action.  
17    _____  
18  **Signature        CATHERINE B. CRUMP  
19  Requested**        Notary Public in and for the  
20              District of Columbia  
21  My Commission Expires:  October 31, 2022

Page 296

CERTIFICATE OF DEPONENT

1  
2  
3    I have read the foregoing 294 pages which  
4  contain the correct transcript of the answers made by  
5  me to the questions therein recorded.  
6  
7  
8    _____  
9    Lianchao Han  
10  
11    - - -  
12  
13  Subscribed and sworn to before me this  
14  _____ day of _____, 2019.  
15  
16  
17  
18    _____  
19  
20    Notary Public in and for  
21  
22  My Commission Expires:

Page 295

**Lianchao Han - Confidential**
**August 28, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

```
 1

 2            IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF NEW YORK
 3   ----------------------------------------X

 4   EASTERN PROFIT CORPORATION LIMITED,

 5        Plaintiff/Counterclaim Defendant,

 6             -against-                    Case No.
                                           18-cv-2185 (JGK)
 7   STRATEGIC VISION US, LLC,

 8        Defendants/Counterclaim Plaintiff,

 9             -against-

10   GUO WENGUI a/k/a MILES KWOK,

11                  Counterclaim Defendant.

12   ----------------------------------------X

13

14

15            VIDEOTAPED DEPOSITION OF

16                 YVETTE WANG

17             New York, New York

18             October 30, 2019

19

20

21   ATKINSON-BAKER, INC.
     COURT REPORTERS
22   (800) 288-3376
     Www.depo.com
23
     REPORTED BY:   TERRI FUDENS
24
     FILE NO:   ADOABD6A
25
```

**Atkinson-Baker, Inc.**
**www.depo.com**

YVETTE WANG

1
2       A       Just my lawyer, I believe.
3       Q       So only with Miss Cline?
4       A       Yes.
5       Q       Now did you speak with any nonlawyers
6   in preparation for your testimony today?
7       A       For today?
8       Q       Mm-hmm.
9       A       No, I didn't.
10      Q       Did you speak with any representative
11  of Eastern Profit other than Miss Cline in
12  preparation for your deposition today?
13              MS. CLINE:  Objection to form.
14      A       I briefly ask some question.
15      Q       Okay.  Of whom?
16      A       The director and a representative of
17  Eastern Profit.
18      Q       Okay.  Are those two different people
19  or the same person?
20      A       Two different people.
21      Q       Who is the director of Eastern Profit
22  that you spoke with?
23      A       Mei Guo.  M-E-I G-U-O.
24      Q       Okay.  And who is the representative
25  that you spoke with?

Page 22

YVETTE WANG

1
2       A       Mr. Han, H-A-N.
3       Q       Is this Mr. Han Chunguang.
4       A       Correct.
5       Q       C-H-U-N-G-U-A-N-G; right?
6       A       C-H-U-N-G-U-A-N-G, yes.
7       Q       Does he sometimes go by Hank Han?
8       A       I don't know his English name.
9   You're talking about his English name?
10      Q       Yes.  You never heard him called Hank
11  before?
12      A       I don't know that name.
13      Q       When did you speak with Mei Guo?
14      A       I don't remember clearly.  Like a
15  couple of month ago.
16      Q       Was it in preparation for this
17  deposition?
18      A       I believe not because this deposition
19  was just ordered like a couple of days ago.  How I
20  can prepare this deposition, it involves like a
21  couple of month.
22      Q       What did you speak with Mei Guo
23  about?
24      A       I don't remember clearly.
25      Q       Who is she?

Page 23

YVETTE WANG

1
2       A       A business woman.
3       Q       She's Guo Wengui's daughter; correct?
4       A       Correct.
5       Q       And she is the sole director of
6   Eastern Profit; is that correct?
7       A       Correct.
8       Q       Why did you -- well, let me ask you
9   this.
10              Did you speak to her in person or
11  over the phone?
12      A       I don't remember clearly.  Should be
13  like in person, yeah.
14      Q       And is it your testimony that you do
15  not remember what you spoke to her about?
16      A       Is there any problem?  Like a couple
17  of months ago if you ask me specific question, I
18  may be able to recall my memory about that
19  conversation because we met and we talk a lot.  I
20  don't know which is the answer you ask.
21      Q       Okay.  So it was a long conversation
22  with Mei Guo?
23              MS. CLINE:  Objection to form.
24      A       I don't remember.
25      Q       I'm trying to understand, you said

Page 24

YVETTE WANG

1
2   you met and you talked a lot.  What did you talk
3   about?
4       A       I don't understand your question.
5       Q       Did you talk a lot with Mei Guo when
6   you spoke with her a few months ago?
7       A       I don't understand your question.
8       Q       Where were you when you spoke with
9   Mei Guo in person a couple of months ago?
10      A       In New York.
11      Q       Where in New York?
12      A       A restaurant.
13      Q       Okay.  Who else was with you?
14      A       Just myself and her.
15      Q       Had you met her before?
16      A       Yes.
17      Q       Was this a social meeting or a
18  business meeting?
19              MS. CLINE:  Objection to form.
20      A       What is your definition?  What is
21  social meeting?  What is business meeting?
22      Q       What was the purpose of your meeting?
23      A       I don't understand your question.
24      Q       Why did you meet with her?
25      A       To ask her what is about Eastern

Page 25

7 (Pages 22 to 25)

**30(b)(6) Yvette Wang**
**October 30, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

YVETTE WANG

1
2  Profit.
3      Q    Okay.  So the purpose of the meeting
4  was to ask her about Eastern Profit?
5      A    Kind of.
6      Q    Okay.  Well what was the other
7  purpose of the meeting?
8      A    Chat about the Chinese Communist
9  Party took more action mainland of China to
10 persecute my colleagues or my friends.
11     Q    Who requested the meeting?
12     A    Myself.
13     Q    Why did you want to talk to her about
14 the persecution of your colleagues on the
15 mainland?
16     A    Chat.  Just chat.
17     Q    So during this chat, you also talked
18 to her about Eastern Profit?
19     A    Correct.
20     Q    But at that time, as you said
21 earlier, you did not know that this continuation
22 deposition would be ordered?
23     A    What's your question?
24     Q    But at that time, as you testified
25 earlier, you did not know that the continue

Page 26

YVETTE WANG

1
2  deposition would be ordered; did you?
3              MS. CLINE:  Objection to form.
4      A    Should I know by then what will
5  happen after like a couple of month?  Fair; right?
6      Q    Right.  So the answer is no?
7      A    Correct.
8      Q    So why did you want to talk to her
9  about Eastern Profit during this restaurant
10 meeting?
11     A    Because Eastern Profit signed a
12 Limited Power of Attorney authorize Golden Spring
13 to handle this case.
14     Q    So were you reporting on the progress
15 of the case?
16     A    What do you mean report?
17     Q    Tell.  Were you telling her about the
18 progress of the case?
19     A    I told her.
20     Q    Okay.  And what did you tell her?
21     A    I told her Eastern Profit was
22 cheated.  And Eastern Profit right now is in a
23 lawsuit.  I probably need to know more, know more
24 about Eastern Profit so I can help to deal with
25 this litigation.

Page 27

YVETTE WANG

1
2      Q    What was her response?
3      A    She was upset and she said she didn't
4  know anything about this.  And she ask me to
5  handle everything.
6      Q    Okay.  How did you respond to her
7  request?
8      A    I said -- I don't remember the clear
9  precise quote, but I told her okay.  I have been
10 already dealing with this group of liars, and this
11 case, I will handle this for you.  You don't need
12 to worry because you don't know anything about
13 this at all.
14     Q    How did you know that she didn't know
15 anything about this at all?
16     A    I don't understand your question.
17     Q    How did you know that Guo Mei did not
18 know anything about this at all?
19     A    Oh.  That is my guess because I ask
20 her:  Did you hear or heard about these two liars,
21 French Wallop and Michael Waller?  She said I
22 don't know.
23     Q    Was this after Strategic Vision had
24 filed its counterclaim in this case?
25     A    When did you file counterclaim?

Page 28

YVETTE WANG

1
2      Q    July 23rd.
3      A    Which year?
4      Q    2019.
5      A    Oh.  I don't remember that.  It's in
6  summer, but I don't remember which month.  It's
7  before you or after you.  I don't remember that.
8      Q    What else did you discuss about
9  Eastern Profit?
10     A    I ask like I remember the general,
11 like basic information about Eastern Profit.
12     Q    What did she tell you?
13     A    The bank.  The first thing she told
14 me Eastern Profit bank accounts was frozen in Hong
15 Kong.
16     Q    Okay.  What else?
17     A    Eastern Profit is a Hong Kong
18 company.
19     Q    I think you knew that at your first
20 deposition.  Do you remember that?
21     A    I don't remember that.
22     Q    What else did she tell you?
23     A    Before the bank accounts like was
24 frozen, Eastern -- I don't remember that clearly.
25          Kind of she told me Eastern has

Page 29

8 (Pages 26 to 29)

**30(b)(6) Yvette Wang**
**October 30, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

YVETTE WANG

1
2      office in Hong Kong.  And Eastern Profit, they
3      have assets, yeah, because I was asking her about
4      the general, like basic information about this
5      company.
6          Q      Right.
7          A      So she told me these things.
8          Q      Do you remember anything else she
9      told you?
10                 MS. CLINE:  I'm just going to
11             object to the line of inquiry.  There
12             is a narrow set of topics on which we
13             agreed and the court issued an order
14             that don't include, for example,
15             whether or not Eastern Profit has any
16             independent financial identities.
17                 I'm not sure why we're delving
18             into every piece of every
19             conversation she had with Guo Mei,
20             and I think we should move on and get
21             to the substance of the deposition as
22             agreed upon.
23                 MR. GREIM:  It's the only
24             natural person we've heard about, so
25             we're finally getting some relevant

Page 30

YVETTE WANG

1
2      testimony.  But I think we exhausted
3             the witness on this.
4          Q      I do have a question.  Did Guo Mei
5      mention to you Han Chung Uang?
6          A      Yes.
7          Q      What did she say?
8          A      I don't remember the precise quotes
9      again.  Kind of like she told me Mr. Han, she
10     trusted her -- trusted him, and he was running
11     Eastern before.
12                 And Mei Guo, she has no problem or
13     issue with him, and having him still running
14     something on behalf of Eastern Profit.
15         Q      Did she say whether he actually still
16     was running something on Eastern Profit?
17         A      Sorry.  What's your question?
18         Q      Did she say whether he actually still
19     was running something on behalf of Eastern Profit?
20         A      You mean he; right?
21         Q      Right.
22         A      You're asking what time period?
23         Q      I'm trying to understand what she
24     told you.
25         A      Of course.

Page 31

YVETTE WANG

1
2          Q      So did she tell you during this
3      discussion that Hank, as you said, or Han Chung
4      Uang, was still running Eastern Profit at that
5      time?
6          A      In my understanding, yes.
7          Q      Did she tell you what he does for
8      Eastern Profit?
9          A      Not too much, because she expressed
10     like as a normal business if the bank account was
11     frozen or is frozen, what kind of business you can
12     continue.
13                 But she emphasized Mr. Han as still
14     helping her to like manage the cars and -- yeah,
15     the cars.  Basically the assets of Eastern Profit.
16         Q      Did you say cars as in automobiles?
17         A      Yeah.  Driving car.
18         Q      Well, what else did she say about
19     Mr. Han?
20         A      Still I remember back to our like CCP
21     persecution chat.  Mr. Han has his family member
22     mainland of China also.  So they are threatened
23     and even arrested, integrated by Chinese Communist
24     Party also.
25         * Q      Did you tell Mei Guo that you're

Page 32

YVETTE WANG

1
2      member of the Chinese Communist Party?
3                 MS. CLINE:  Objection.  This is
4             a deposition in her corporate
5             capacity.  This is not about Miss
6             Wong personally, and we really need
7             to move on and get to the substance
8             as to our agreement and the court's
9             order.
10                 MR. GREIM:  Okay.  That's the
11             last question, and we'll move on to
12             your other prep for this deposition.
13                 MS. CLINE:  No.  I object to the
14             question as beyond the scope.
15                 MR. GREIM:  Well, the witness
16             opened the door by talking about this
17             persecution of Mr. Han.
18                 MS. CLINE:  No.  No.  No.  I
19             object.  We can call the court on
20             this one if you want to, and we can
21             make a list of everybody, and we're
22             going to call the court.
23                 You're asking her about
24             questions in her personal capacity,
25             and that's not why she's here.

Page 33

**30(b)(6) Yvette Wang**
**October 30, 2019**

YVETTE WANG

1
2      MR. GREIM:  We will just simply
3   mark that and keep going.
4      **Q    Okay.  You said you also talked to**
5   **Mr. Han Chung Uang who you characterized as a**
6   **representative of Eastern Profit.**
7         **When did you talk to Han Chung Uang**
8   **in preparation for this case?  Let me give you a**
9   **different question.**
10        **When did you talk with Mr. Han Chung**
11  **Uang in preparation for this deposition?**
12     A   Again, this deposition was ordered
13  like two, three ago.  How I can prepare something
14  which by then was not expected to happen with a
15  precise date?
16        My answer is I didn't talk to Mr. Han
17  right before this deposition was ordered.
18     **Q    Okay.  Fair enough.  I will ask you a**
19  **question that covers a little bit more.**
20        **I would like to know whether you have**
21  **gained information from talking to Han Chung Uang**
22  **that you will use to answer the questions today?**
23     A   Obtained?
24     **Q    Obtained.**
25     A   Yes, I did.

Page 34

YVETTE WANG

1
2      **Q    So when -- when were the**
3   **conversations that you had with Mr. Han Chung Uang**
4   **about Eastern Profit since your last deposition?**
5      A   When?  Since my last deposition.  My
6   last deposition is January of this year; right?
7         Yeah, the conversation for sure
8   happened in this year, yeah.
9      **Q    Okay.  So we know you did not talk to**
10  **him before your last deposition.  So my question**
11  **is that was January 31st, 2019.  When have you**
12  **talked to him since then to gain information about**
13  **Eastern Profit?**
14     A   A couple of months ago.
15     **Q    A couple of months ago?**
16     A   Yes.
17     **Q    Was that the only time you talked to**
18  **Mr. Chung Uang to gain information about Eastern**
19  **Profit?**
20     A   You mean after my first deposition?
21     **Q    Correct.**
22     A   Correct.
23     **Q    Was the conversation with Mr. Chung**
24  **Uang before or after your conversation with Mei**
25  **Guo?**

Page 35

YVETTE WANG

1
2      A   Should be after, yeah.
3      **Q    Why do you say that?**
4      A   Because was Mei Guo, as I said, in
5   summer, yeah.  With Mr. Han should be like end of
6   the summer.
7      **Q    Where did you meet with Mr. Han?**
8      A   I met him in the lobby of my office.
9      **Q    This is the 162 East 64th Street?**
10     A   Yes.
11     **Q    How long was your conversation with**
12  **him?**
13     A   Not very long.  Like 20, 30 minutes.
14     **Q    So did you talk right there in the**
15  **lobby of Golden Spring?**
16     A   The lobby?  I don't mean like a
17  public everyone goes in and out.  Yeah.  There is
18  a conference room in the lobby.
19     **Q    What did you ask Mr. Han?**
20     A   He asked me.
21     **Q    He asked you questions?**
22     A   Yeah.
23     **Q    What did he ask you?**
24     A   He told me he was chased by the
25  lender for the one minute.

Page 36

YVETTE WANG

1
2      **Q    For the what?**
3      A   One million.
4         MS. CLINE:  One million.
5      A   U.S. dollars.
6      **Q    I see.**
7      A   He told me he doesn't speak too much
8   English, and he asked me to handle this.
9      **Q    What do you mean the lender of the**
10  **$1 million?  What are you referring to?**
11     A   I don't remember precisely his quote.
12  He said kind of like as per the loan agreement,
13  Eastern should pay back the 1 million loan.
14        And he was not sure, and he doesn't
15  know about the litigation, so he ask me to
16  continue, help and handle completely.
17     **Q    Did Mr. Chung Uang say that someone**
18  **else told him that Eastern Profit should pay back**
19  **the million dollars, or did he tell you that**
20  **Eastern Profit should pay back the $1 million?**
21     A   He told me Eastern Profit borrowed
22  this 1 million, and now Eastern is unable to pay
23  back that.  He was chased.
24     **Q    Did he tell you who Eastern Profit**
25  **borrowed the money from?**

Page 37

10 (Pages 34 to 37)

**Atkinson-Baker, Inc.**
**www.depo.com**

YVETTE WANG

1
2    A    ACA.
3    Q    ACA?
4    A    ACA.
5    Q    Did he tell you that someone, a
6  person actually chased him around New York City
7  for the money?  I'm trying to understand what you
8  mean by chased?  What do you mean by chased?
9         MS. CLINE:  Objection to form.
10    Q    What do you mean by chased?
11    A    What do you mean by chased?  What do
12  you mean by chased, like a stalk.
13    Q    Did he explain to you what he meant
14  by chased?  Is that the word he used?
15    A    He speaks Mandarin, Chinese.
16    Q    True.  Okay.  What did he tell you
17  about the efforts of ACA to recover the
18  $1 million?
19    A    Oh, okay.  He mentioned to me he was
20  like called.  Called.  Called by a phone call.
21    Q    Called?
22    A    Yeah.  And, yeah, like called like a
23  couple of times he said.
24    Q    Did he say when he received the phone
25  calls?

Page 38

YVETTE WANG

1
2         MS. CLINE:  Same objection.
3    A    What is your question?
4    Q    Is dealing with ACA on behalf of
5  Eastern Profit regarding the $1 million loan part
6  of GSNY's duties under the limited Power of
7  Attorney?  I'm asking you for your understanding
8  as Eastern Profit.
9         MS. CLINE:  Objection to form.
10    A    I don't know what you mean dealing
11  with.
12    Q    Communicating with ACA.
13    A    When?  From when to when?
14    Q    Today.
15    A    He didn't clearly say that in our
16  conversation, but my understanding should be yes.
17    Q    So Eastern Profit believes that it is
18  authorized to deal with -- I'm sorry.  Eastern
19  Profit believes that Golden Spring is authorized
20  to deal directly with ACA on repayment of the
21  loan?
22         MS. CLINE:  Objection to the
23         form.  We may be going beyond the
24         scope.  It's not a memory test.  If
25         you have a question about the POA,

Page 40

YVETTE WANG

1
2    A    I guess -- I couldn't guess, of
3  course.  Before he talk to me.
4    Q    Were they recent or they happened a
5  long time ago?
6         MS. CLINE:  Objection to form.
7    A    I didn't ask him, but he was saying
8  that he wanted me to continue handle all of this.
9    Q    What did he mean by all of this?
10         MS. CLINE:  Objection.
11         Foundation.
12    Q    What did you understand that he meant
13  when he said continue to handle all of this?
14    A    You're asking my understanding?
15    Q    Yes.
16    A    My understanding is we were
17  authorized by a limited POA to deal with the
18  contract until now including litigation, including
19  like now I sit in front of you to be questioned.
20    Q    Is dealing with ACA on the loan part
21  of the Limited Power of Attorney?
22         MS. CLINE:  Objection to the
23         form.
24    Q    Is that covered within the limited
25  Power of Attorney?

Page 39

YVETTE WANG

1
2  you can put it in front of her and
3  ask her.
4    Q    What's the question?
5    Q    Would you need to see the Power of
6  Attorney to answer that question?
7    A    Yeah.  That would be yes.
8    Q    Okay.  Let's do that.
9         (Guo Exhibit 2, Limited Power of
10         Attorney Bates stamped Eastern-000276
11         and 277 previously marked for
12         Identification as of this date.)
13         I'm going to hand you what we marked
14  as Guo Exhibit 2.  We're not going to remark this.
15  I'm just going to hand you what we marked as Guo
16  Exhibit 2.  Please give one to your attorney.  And
17  you'll see it already says Guo Exhibit 2, and it's
18  Bates labeled 276 -- Eastern 276 to Eastern 277.
19         Do you recognize this document?
20    A    Yes.
21    Q    Is this the Limited Power of Attorney
22  that Eastern Profit granted to Golden Spring, New
23  York?
24    A    Yes.
25    Q    And is the negotiation of -- we'll

Page 41

11 (Pages 38 to 41)

**30(b)(6) Yvette Wang**
**October 30, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

YVETTE WANG

1
2  start with -- I'm going to break this apart.
3  Okay?
4          I'm going to ask you about the loan
5  that Eastern Profit claims it has with ACA.  Okay?
6  My first question is is negotiation of that loan
7  between Eastern Profit and ACA one of the powers
8  that Eastern Profit granted Golden Spring under
9  this Power of Attorney?
10             MS. CLINE:  You're asking her to
11         read the document?
12     Q    I'm asking for Eastern Profit's
13  testimony.  If you want to look at the document if
14  that would help, that's fine.  If you think you
15  personally know it, that's fine too.
16             MS. CLINE:  This deposition is
17         not about her personal knowledge.
18     A    Can I read this?
19     Q    Go ahead.
20     A    (Reading)  What's your question?
21     Q    I'll have the court reporter just
22  read it back.
23             (The requested portion of the
24         record was read back by the
25         reporter.)

Page 42

YVETTE WANG

1
2             MS. CLINE:  I'm going to repeat
3         my objection to form.  You're asking
4         the witness to interpret a document
5         that speaks for itself and we can all
6         read.
7     A    This limited Power of Attorney in my
8  understanding is talking about Eastern Profit's
9  Corporation Limited authorized Golden Spring New
10  York Limited to deal with the contract with
11  Strategic Vision.
12     Q    There's no reference to ACA in here,
13  is there?
14     A    I didn't see that name on these two
15  pages.
16     Q    So let me ask you this.  Separate and
17  apart from this Limited Power of Attorney, has
18  Eastern Profit asked Golden Spring New York to
19  deal with ACA regarding the purported Eastern
20  Profit ACA loan?
21     A    What do you mean purported?
22     Q    The loan.
23     A    Okay.
24     Q    Has Eastern Profit -- I'll repeat the
25  question.

Page 43

YVETTE WANG

1
2          Has Eastern Profit asked Golden
3  Spring New York to deal on Eastern Profit's behalf
4  with ACA regarding the loan?
5     A    You asked about when?
6     Q    As of now.
7     A    In my conversation with Mr. Han, he
8  mentioned to me or he asked me can you please
9  explain what is happening to ACA about this loan,
10  because I was or I am chased to ask before pay
11  back.  I don't know how to explain to ACA.
12     Q    How did you respond him?
13     A    I said okay.
14     Q    Was this the first time Mr. Chunguang
15  had told you that ACA was trying to recover this
16  million dollar payment?
17     A    I don't remember clearly, but yes.
18     Q    Before your conversation with
19  Mr. Chunguang, had you heard from anyone, from any
20  other source, that ACA was trying to recover the
21  million dollar payment?
22     A    What's your question?
23     Q    Before this conversation with
24  Mr. Chunguang, had you heard from anyone, from any
25  other source that ACA was trying to recover the

Page 44

YVETTE WANG

1
2  million dollar payment?
3     A    Yes, I did.
4     Q    From where?
5     A    I remember ACA mentioned this to me
6  also.
7     Q    When was that?
8     A    Kind of like by the -- long time ago.
9  By the end of or fall of 2018.
10     Q    Who is the person from ACA who
11  contacted you?
12     A    William.
13     Q    William who?
14     A    William Yu.
15     Q    How do you spell that in English?
16     A    William?
17     Q    No.  Yu.
18     A    Y-U.
19     Q    Is William Yu also sometimes called
20  William Je, J-E?
21     A    I don't know his other name.
22     Q    Does he also go by Je Kin Ming, J-E
23  K-I-N  M-I-N-G?
24     A    I just know his name is William.
25     Q    Did William reach out to you by phone

Page 45

12 (Pages 42 to 45)

**30(b)(6) Yvette Wang**
**October 30, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

YVETTE WANG

or E-mail?

A    In the fall of 2018, like last year, a year ago, I believe I met him in the restaurant again.

Q    **And he mentioned it over lunch or dinner?**

A    Dinner?

Q    **Yes, over dinner?**

A    Yes, dinner.

Q    **Who else was present, if anyone?**

A    Just me and him.

Q    **What did he say?**

A    About what?

Q    **About the million dollar loan.**

A    I don't remember precisely what he said.  Kind of he asked, I heard you are cheated, and then I briefly told her.

Q    **Told him?**

A    Yeah, told him.  Yeah.  We were cheated by two liars.

Q    **So did he demand repayment of the million dollars from Eastern Profit?**

A    You mean in our dinner?

Q    **Yes.**

Page 46

---

YVETTE WANG

A    He mentioned that.  Kind of a -- he said we are expecting the result, but you are cheated.  And the loan agreement, the loan kind of like need to be pay back.

Q    **What result did he say he was expecting?**

MS. CLINE:  Objection to form.

A    Generally they corrupted Chinese official information.

Q    **So William Je said he expected that information?**

MS. CLINE:  Objection to form.

A    Correct.

Q    **Did you tell him that, in fact, you were cheated?**

MS. CLINE:  Objection to form.

A    Yes.

Q    **And who is the "you" who was cheated?**

A    Myself.

Q    **"You," Yang Ping Wang?  (Phonetic)**

A    When I say I was cheated, I mean I should say Eastern, because -- if you're asking about contract.  But I was authorized by Eastern. So if I say I, I mean Eastern.

Page 47

---

YVETTE WANG

Q    **Did you tell him at the dinner that you met Eastern?**

A    What's the question?

MS. CLINE:  Objection to form.

Q    **Did you tell him at the dinner that when you said that you were cheated, you actually meant Eastern?**

MS. CLINE:  Objection to form.

A    You mean I mean Eastern or I said Eastern?  What is the question?

Q    **Did you tell Mr. Je or Mr. Yu that Eastern was the one that was cheated?**

MS. CLINE:  Objection to form.

A    I didn't pronounce Eastern is worse, but I said I was cheated.  We were cheated.  Which if you want to understand who they are, we or I, in my understanding they are the Eastern people, not including myself.

Q    **Who else?**

A    Who else?

MS. CLINE:  Objection to form.

A    Oh, yeah.  I forgot this one.  Miles, M-I-L-E-S.

Q    **This is Guo Wengui?**

Page 48

---

YVETTE WANG

A    Correct.

Q    **Okay.  Who else?**

A    Man Cho Han.

Q    **Who else?**

A    Who do you want else?

Q    **Who were the people?  You said the Eastern people were cheated.  I'm asking who are those Eastern people that you are referring to?**
**You mentioned Guo, you mentioned Lianchao.**

A    You cannot define my term by yourself, okay.  I say Eastern people.  I don't mean Eastern's employee, or Eastern's director or Eastern's like whatever.

I mean the people on Eastern's side who are authorized, who is designated, and who has the same goal to take down Chinese Communist Party.

That is my definition about Eastern people.

Q    **Very good.  We'll come back to that. That's a separate section.  So let me bring us back to the outline here so I cover everything.**
**Before we leave this discussion with**

Page 49

13 (Pages 46 to 49)

**30(b)(6) Yvette Wang**
**October 30, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

YVETTE WANG

1
2  William Yu, did you commit to him that Eastern
3  Profit would pay him back the million dollars?
4        MS. CLINE:  Objection to form.
5     A   What do you mean committed?
6     Q   Tell.
7     A   In my understanding, this is a low
8  agreement between lender and a borrower.  And the
9  borrower should pay back the money, which means
10 Eastern should pay back.
11    Q   My question is what you told him
12 though.  Not how you characterize this, but my
13 question is:  What did you tell Mr. Yu?
14    A   I prefer not to use told.  I agreed.
15    Q   So you -- so Mr. Yu told you that he
16 expected Eastern Profit to pay a million dollars
17 to ACA.  You told him that you agreed?
18    A   With interest.
19    Q   With interest?
20    A   Yeah.
21    Q   Did you have authority to tell Mr. Yu
22 that on behalf of Eastern?
23        MS. CLINE:  Objection to form.
24    A   Authority?  What do you mean
25 authority?

Page 50

YVETTE WANG

1
2     Q   Well, had Eastern given you authority
3  to deal with ACA regarding the loan?
4        MS. CLINE:  Objection to form.
5     A   Deal with ACA about the loan?  It's
6  too general.  I couldn't understand your question.
7     Q   Well, we just looked at the limited
8  Power of Attorney.  It's not in there; is it?
9        MS. CLINE:  Objection to form.
10    A   What is not there?
11    Q   Your authority to deal with ACA
12 regarding its purported loan to Eastern Profit is
13 not set forth in the Power of Attorney; is it?  We
14 just looked at it.
15        MS. CLINE:  Objection.  You're
16        mischaracterizing the document and
17        her testimony, and I think you're
18        trying to confuse the witness.  She's
19        here as a representative of Eastern
20        Profit.  Later you can ask her about
21        the role of Golden Spring.
22    Q   I'm asking for Eastern Profit's
23 understanding about what power you had to deal
24 with ACA regarding the loan.
25        So when you were speaking with

Page 51

YVETTE WANG

1
2  Mr. Yu, had Eastern Profit given you authority to
3  deal with Mr. Yu about repayment of the loan?
4        MS. CLINE:  Objection to form.
5     A   When William mentioned to me I will
6  have to ask the loan to be asked.  I have to ask
7  the loan to be fully paid back with interest.  I
8  said yes.  I agree with you.  I didn't say there
9  is any reason.  You couldn't.
10    Q   My question to you --
11    A   That was my conversation with William
12 about this loan.
13    Q   Okay.  My question now to you is
14 Eastern Profit is -- were you acting as Eastern
15 Profit's agent in having that discussion with
16 William Yu about the loan?
17    A   You mean before my dinner with
18 William?
19    Q   During your dinner with William, were
20 you acting as Eastern Profits' agent in saying
21 yes, I agree with you that the loan should be
22 repaid, or you're just expressing your own
23 personal opinion?
24    A   Oh.  It's much easier to understand
25 now.  I would express my personal opinion and

Page 52

YVETTE WANG

1
2  Eastern's also.
3     Q   So why are you able to say that you
4  were expressing Eastern's opinion?
5        MS. CLINE:  Objection to form.
6     A   You're asking my personal
7  understanding; right?
8     Q   No.  I'm asking why is -- Eastern is
9  sitting here today telling me that when you told
10 William Yu yes, I agree with you, that you were
11 speaking on behalf of it.  And I'm saying on what
12 basis.  How or why did Eastern give you authority
13 to speak on its behalf with William Yu?
14        MS. CLINE:  Objection to form.
15    A   I still don't quite understand your
16 question.
17    Q   Okay.  We'll break it down.  We'll
18 break it down.
19        Did someone from Eastern tell you
20 that you should deal with William Yu regarding the
21 purported ACA to Eastern Profit loan?
22    A   By that dinner, I don't remember
23 clearly.  I don't remember clearly.  I was talking
24 with William.  Again, I was thinking that I have
25 this case in my hands.  And this is a -- sounds

Page 53

14 (Pages 50 to 53)

**30(b)(6) Yvette Wang**
**October 30, 2019**

YVETTE WANG

```
1              YVETTE WANG
2    like in my understanding a no more business loan
3    agreement, and people should pay back.
4         Q    Now do you recall on January 31, 2019
5    at your first deposition you testified that you
6    had not seen the loan agreement.
7              Do you recall that?
8              MS. CLINE:  Objection.  If you
9         want to ask her about her testimony,
10        you can show her the transcript.
11        Q    I'm happy to show you the transcript.
12   Do you want to look at it?
13        Let me do this.  Do you recall
14   offhand whether you had seen the loan agreement
15   yet when you gave your first deposition in this
16   case?
17        A    You're asking when I was deposed for
18   the first time, by then did I ever see with my own
19   eyes the loan agreement or not?
20        Q    Right.
21        A    I heard --
22        Q    Right.
23        A    -- the loan agreement.
24        Q    So as of January, 2019, you had heard
25   there was a loan agreement.  You had not yet seen
```

Page 54

```
1              YVETTE WANG
2         A    Oh.  In my dinner --
3         Q    Yes.
4         A    -- with William?
5         Q    Yes.
6         A    I told him Eastern should pay back.
7         Q    Did Eastern have an understanding how
8    it was going to pay back the loan?
9         A    By this lawsuit.  That's why Eastern
10   sued, to get this 1 million back, because
11   Eastern's bank account was frozen.
12        Q    It wasn't frozen yet at that time in
13   the fall of 2018?
14             MS. CLINE:  Objection to form.
15        A    Eastern's bank account was frozen
16   around June of 2018, yes.
17        Q    Although that was after the lawsuit
18   was filed, wasn't it?  The lawsuit was filed in
19   March of 2018; isn't that right?
20             MS. CLINE:  Objection again.
21        This is a memory test.
22        A    Oh, yeah.  This is a memory test.  My
23   mistake.
24             You're confusing me with all these
25   dates back and forward, Eddie.
```

Page 56

```
1              YVETTE WANG
2    it?
3         A    Correct.
4         Q    So this discussion with Mr. Yu
5    happened in the fall of 2018.  You just testified
6    several months before your deposition.  So when
7    you were speaking with Mr. Yu, you had not yet
8    seen the loan agreement; correct?
9         A    I did not see physically the hard
10   copy paper in front of me was my personal
11   knowledge.  I was testifying my gained knowledge
12   or obtained knowledge.
13        Q    When did you first hear that there
14   was a loan between ACA and EP, Eastern Profit.
15        A    2018.
16        Q    Was it before the dinner with Mr. Yu?
17        A    I don't remember that.
18        Q    Do you think maybe you learned of the
19   loan agreement from Mr. Yu?
20        A    Possibly.  I don't remember that
21   clearly.
22        Q    Did you tell Mr. Yu how Eastern
23   Profit intended to repay the loan?
24        A    Intend?  What do you mean intend?
25        Q    Planned.
```

Page 55

```
1              YVETTE WANG
2         So correction.  Eastern's bank
3    account was frozen.  When is it this contract was
4    signed with SV's contract.
5         Q    It's dated -- it was signed
6    January 6, 2018.
7         A    January, 2018.  Eastern's bank
8    account was frozen in June of 2017.  This is the
9    correct answer.
10             MS. CLINE:  Can we take a break
11        pretty soon.  We've being going for
12        over an hour.
13             MR. GREIM:  Yes.  Good point.
14        I'm going to finish up with this.
15        I'm thinking the same thing because
16        I'm running low.
17        Q    Let me go back to your discussion
18   with Mr. Chunguang.
19             Who did he say was calling him from
20   ACA?
21             MS. CLINE:  Objection to form.
22        A    What was the question?
23        Q    You said that Mr. Chunguang told you
24   somebody was chasing him about the million dollar
25   loan.
```

Page 57

15 (Pages 54 to 57)

**Atkinson-Baker, Inc.**
**www.depo.com**

YVETTE WANG

1
2      A    Correct.
3      Q    I gather that somebody was not
4  actually following him around the streets for
5  collection.  I gather that you mean somebody was
6  contacting him; correct?
7      A    Correct.
8      Q    And who was the person who was
9  contacting him?
10         MS. CLINE:  Objection.
11     Q    Who did he say?
12         MS. CLINE:  Objection to form.
13     A    You're asking the name; right?
14     A    Yes.  Yes.
15     A    William.
16     Q    Did he say whether William -- this is
17  the same William Yu, or the same William Yu that
18  you mentioned before?
19     A    Correct.
20     Q    Did he say how William Yu was
21  contacting him?
22     A    What was the question?
23     Q    Did he say how William Yu was
24  contacting him?
25     A    You mean by what kind of a

Page 58

YVETTE WANG

1
2      Q    Yes I am, actually.
3      A    Wow. Year?
4      Q    Something he said gave you the
5  impression that the calls had been happening for
6  about a year?
7      A    Yes.
8      Q    But you can't remember the exact
9  words he used?
10     A    If you want me to translate, because
11  he speaks Mandarin, he used long time, always some
12  words like that.
13     Q    Did he know William Je by the way;
14  was William Je known to him?
15         MS. CLINE:  Objection.
16         Foundation.
17         This is beyond the scope of a
18  30(b)(6) of Eastern Profit.
19     Q    It's important to understand whether
20  the Eastern Profit purported representative
21  dealing with ACA on repayment of the loan, whether
22  they're known to each other or not.
23         Did you get the understanding from
24  talking to Mr. Han that he was already familiar
25  with William Yu?

Page 60

YVETTE WANG

1
2  communication tool; right?
3      Q    Yes.  Yes.
4      A    He said phone call.
5      Q    Did he say how many phone calls?
6      A    A couple of.
7      Q    And your testimony is he did not say
8  when he had received these phone calls?
9         MS. CLINE:  Objection to form.
10     A    You're asking did he tell me on which
11  dates he was caught?
12     Q    Just generally when.  If he gave you
13  dates, great.
14     A    Which unfortunately he didn't give me
15  the dates.
16     Q    Did he tell you it was recent?
17         MS. CLINE:  Objection to form.
18     A    Not only recent.  Yeah.  He said --
19  he told me he was called or he was chased for long
20  time.
21     Q    Just a few more questions, and then
22  we will take a break here.
23         What do you mean for a long time?
24     A    You're asking my personal
25  understanding?

Page 59

YVETTE WANG

1
2         MS. CLINE:  Again, this is a
3  corporate designee deposition of
4  Eastern Profit.  You subpoenaed
5  everyone whose name has ever been
6  mentioned in this case.  You can ask
7  more appropriate people those types
8  of questions.
9         MR. GREIM:  Okay.  I'll just ask
10  Eastern Profit.
11     Q    Was William Yu familiar with -- I'm
12  sorry.  Was Mr. Han familiar with William Yu?
13         MS. CLINE:  Objection.
14         Foundation.
15     A    I don't remember my filling, that
16  conversation.  Eddie is asking my personal
17  filling.
18     Q    Well I'm not asking -- I'm asking --
19  forget about your feelings.  Sorry.  It sounds
20  terrible.
21     A    I'm fine.
22     Q    I'm asking Eastern Profit whether the
23  person it claims is its principal is familiar with
24  William Yu.
25         MS. CLINE:  Objection.

Page 61

16 (Pages 58 to 61)

**30(b)(6) Yvette Wang**
**October 30, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

YVETTE WANG

1  Foundation.
2  You're going to depose Mr. Han.
3  You can ask him a question directly.
4  MR. GREIM:  Okay.  If this
5  representative doesn't know that,
6  that's okay.
7  **Q    But if Eastern Profit knows the**
8  **answer, I would like to know the answer.**
9  A    I cannot talk on behalf of any
10  individual.  His or her personal knows someone or
11  don't know someone, familiar with someone or not
12  familiar with someone.
13  MR. GREIM:  All right.  Let's
14  take a break.  Let's take a 10-minute
15  break, if that's okay.
16  Does that make sense?
17  THE VIDEOGRAPHER:  The time is
18  11:36 a.m., Wednesday, October 30,
19  2019.  This is the end of media
20  number one of the videotaped
21  deposition of Miss Yvette Wang.
22  We are off the record.
23  (At this time, a brief recess
24  was taken.)

Page 62

YVETTE WANG

1  THE VIDEOGRAPHER:  The time is
2  11:51 a.m., Wednesday, October 30,
3  2019.  This is media number 2 of the
4  videotaped deposition of this event.
5  We're back on the record.
6  CONTINUED EXAMINATION
7  BY MR. GREIM:
8  **Q    Okay.  I want to clear up a few**
9  **things from our last round of questions, and then**
10  **we'll move on to a new topic.  Okay?**
11  A    (Nodding)
12  **Q    In your conversation with Guo Mei,**
13  **did she ask you to handle Eastern Profit's**
14  **interactions with ACA regarding the million dollar**
15  **loan?**
16  A    You mean our dinner?
17  **Q    Yes.**
18  A    She didn't specifically say the
19  details, but basically she said, "I don't know any
20  of this.  Please handle all of this."
21  **Q    So is it Eastern Profit's position**
22  **that -- let me back up.**
23  **Is it Eastern Profit's position that**
24  **you are to handle negotiations or discussions with**

Page 63

YVETTE WANG

1  **ACA regarding the million dollar loan?**
2  MS. CLINE:  Objection to form.
3  A    In my understanding from the moment I
4  knew the loan, I should help Eastern to handle
5  everything.
6  **Q    From the first time you learned of**
7  **the loan, you believed it was your responsibility**
8  **to handle issues regarding the loan?**
9  MS. CLINE:  Objection to form.
10  A    Yes.
11  **Q    And you first learned of the loan**
12  **sometime in 2018; right?**
13  A    Yes.
14  **Q    Possibly you learned of it for the**
15  **first time in your dinner with William Yu?**
16  MS. CLINE:  Asked and answered.
17  A    I believe you asked this question
18  already.  The answer is possibly.
19  **Q    So what has Eastern done, or what has**
20  **Eastern told you to make you believe that you have**
21  **authority on its behalf to deal with ACA regarding**
22  **the loan?**
23  MS. CLINE:  Objection to form.
24  She's already testified about her

Page 64

YVETTE WANG

1  responsibilities.
2  A    I will repeat my answer again.
3  Both Mr. Han and Miss Mei Guo told me
4  can you please handle everything, because we do
5  not know the details.
6  **Q    But those two conversations happened**
7  **in the summer and the late summer of 2019; right?**
8  MS. CLINE:  Objection to form.
9  A    Yes.
10  **Q    So how did you get authority from**
11  **Eastern Profit before that time to deal with ACA**
12  **regarding the loan?**
13  A    What's your question?
14  **Q    How did you get authority from**
15  **Eastern Profit before your discussions with Guo**
16  **Mei and Han Chunguang to deal with ACA regarding**
17  **the loan?**
18  A    What I say before this conversation?
19  **Q    For example your fall, 2018 dinner**
20  **meeting with William Yu.**
21  A    In my understanding, that was a
22  dinner.  It's not specifically about anything.
23  **Q    Well, you testified earlier that when**
24  **you said yes, I agree, that you were speaking on**

Page 65

17 (Pages 62 to 65)

**30(b)(6) Yvette Wang**
**October 30, 2019**

YVETTE WANG

1
2   MS. CLINE:  Objection.  Eddie,
3   you're taking that Power of Attorney,
4   which has to do the authority granted
5   to Golden Spring, and you're using it
6   to misdirect the question to this
7   witness who is sitting on behalf of
8   Eastern Profit.
9       So the Power of Attorney has to
10  do with Golden Spring.  You can ask
11  about that later with respect to
12  Golden Spring's authority.
13      She's already answered your
14  question about her role at Eastern
15  Profit multiple times now.
16  MR. GREIM:  I'm asking for the
17  basis of it, and I would ask for the
18  speaking objections to stop.
19  **Q   So here's my question.  I'm going to**
20  **ask it a third time.  I haven't heard an answer**
21  **yet.**
22      **Is there any document that granted**
23  **you authority to deal with William Yu on behalf of**
24  **Eastern Profit relating to the ACA loan before**
25  **your fall, 2018 dinner with William Yu?**

Page 70

YVETTE WANG

1
2   words we said in that dinner to help you in here.
3   Okay?  William mentioned to me I heard you guys
4   were cheated by liars, which means I will have to
5   ask the loan to be paid back with interest.  I
6   remember I said yes, sadly, we were cheated, and
7   I'm sorry about that.
8       And I agree with you, since you guys
9   have a law agreement, the borrower should pay you
10  back, and we are in litigation right now trying to
11  get that 1 million U.S. dollars from the liars
12  back.
13      Hopefully we can get the justice, and
14  that 1 million U.S. dollars can be returned back
15  to Eastern Profits with even any damage.  So
16  Eastern, as you said, you told me borrower can pay
17  you back.
18  **Q   Okay.  My question --**
19  A   That is precisely a hundred percent.
20  No.  Too much hundred percent.  99 percent of
21  words we used in a conversation.
22  **Q   That was not my question.**
23      **My question is:  Was there anyone**
24  **from Eastern Profit who told you that you had**
25  **authority to deal with William Yu on its behalf**

Page 72

YVETTE WANG

1
2   A   I don't remember that.
3   **Q   Okay did someone from Eastern Profit**
4   **tell you, before the fall, 2018 meeting, that you**
5   **had authority to deal with William Yu on behalf of**
6   **Eastern Profit relating to the ACU loan?**
7   MS. CLINE:  Objection to form.
8   A   What's the question?
9   **Q   Did someone from Eastern Profit tell**
10  **you before your 2018 dinner meeting with William**
11  **Yu that you had authority to deal with him on**
12  **Eastern Profit's behalf regarding the ACA loan?**
13  MS. CLINE:  Objection to form.
14  A   I don't remember that.
15  **Q   So why do you believe that you did**
16  **have authority to deal with Mr. Yu then?**
17  MS. CLINE:  Asked and answered.
18  A   Did I believe?  You're confusing me.
19  **Q   On what basis does Eastern Profit**
20  **claim that you had authority to deal with William**
21  **Yu regarding the ACA loan at the fall, 2018**
22  **meeting?**
23  A   Eddie, I will repeat my reply for the
24  fourth time for you.
25      I tried to recall every inch of the

Page 71

YVETTE WANG

1
2   before you had that meeting?  It's a yes or no.
3   Someone did or someone didn't.
4   MS. CLINE:  Is not necessarily.
5   Objection to form.  Asked and
6   answered.
7   A   I don't remember that.
8   **Q   Now had the contract not terminated,**
9   **how was Eastern Profit ever going to pay ACA back?**
10  A   What's the question?
11  **Q   If the contract had not been**
12  **terminated and Strategic Vision had given Eastern**
13  **Profit what it wanted, how was is it ever going to**
14  **repay the loan to ACA, or even make interest**
15  **payments?**
16  A   If they're not liars, we were not
17  cheated, they're professional qualified
18  investigation company.  You're talking about if
19  that is the scenario.
20  **Q   How is Eastern Profit going to repay**
21  **Strategic or ACA?**
22  A   Which means if this contract with
23  Strategic Vision, let's say, let's imagine work
24  out, right, succeed by the end; right?  Okay.
25      Eastern Profit has bank account.  And

Page 73

19 (Pages 70 to 73)

**30(b)(6) Yvette Wang**
**October 30, 2019**

YVETTE WANG

1  
2 I heard there are assets. The bank account was
3 frozen by Chinese Communist Party in Hong Kong.
4 By Eastern believes if the corrupted CCP are taken
5 down, they are -- there are assets. Nobody can
6 take them.
7        So the bank account will be unfrozen,
8 and Eastern will back to their normal business.
9    Q    Which is what?
10    A    I heard again -- this is my obtain
11 knowledge, like investment.
12    Q    You said that at your first
13 deposition. What about investment management?
14    A    What do you mean investment
15 management?
16    Q    Well I'm just trying to ask you, what
17 do you mean investment? What is that? I don't
18 understand what you mean by that.
19    A    It could be like the investment on
20 the cars, which they already have right now, in
21 any profitable investment.
22        What's your question? Sorry.
23    Q    Are they a car dealership?
24        MS. CLINE: Objection to form.
25    Q    You say investment in cars. They

Page 74

YVETTE WANG

1  
2 You're asking her the nature of
3 Eastern Profit's business. Fine.
4 But beyond that, getting into the
5 nature of investments and so forth I
6 think goes beyond the appropriate
7 scope. Again, I know the judge gave
8 you seven hours. But we can get to
9 the topics we agreed upon and are
10 covered by the court's order, that
11 would be the goal of this deposition.
12    Q    What more do you know about Eastern
13 Profit's business?
14    A    Eastern is registered in 2011.
15    Q    Right.
16    A    In Hong Kong. They are operating
17 from 2011 until they're their bank account was
18 frozen.
19    Q    You said their business is
20 investments, which was your answer in the last
21 deposition, and also that they own cars.
22        Now is this part of their business?
23 Do they buy and sell cars, or do they just happen
24 to own a company car?
25        MS. CLINE: Again, objection.

Page 76

YVETTE WANG

1  
2 invest in antique cars?
3    A    I didn't say that.
4    Q    Okay. How does one invest in cars?
5        MS. CLINE: Objection.
6    Q    I just want to understand. I don't
7 think we have to go far into this. I truly don't
8 understand the investment business in cars. What
9 do you know about this?
10        MS. CLINE: Objection to form
11 and mischaracterizes the testimony.
12    Q    Tell me where I'm wrong. So far we
13 know that they own cars and that they do
14 investments.
15        What more can you tell me about the
16 business of Eastern Profit?
17        MS. CLINE: I'm going to lodge
18 another objection having now brought
19 up the opinion which says beyond the
20 scope of this testimony is whether
21 plaintiff has any independent
22 financial identity.
23        MR. GREIM: I'm not asking that.
24 I'm asking what it does.
25        MS. CLINE: Let me finish.

Page 75

YVETTE WANG

1  
2 Beyond the scope.
3    Q    In other words, is this just as an
4 asset that they happened to have, in which case I
5 don't care about it whatsoever, or is it their
6 business to own cars, to invest, buy and sell
7 cars?
8    A    I believe their investment is not
9 only buy and sell cars.
10    Q    Okay. Is that one of the
11 investments? Do they make investments in cars?
12    A    Sorry. What's the question?
13    Q    Do they make investments in cars?
14        MS. CLINE: Objection to form.
15    A    They own cars. It could come from
16 investment.
17    Q    Let me ask it this way.
18        Do they own a fleet of cars, or do
19 they have a few company cars?
20        MS. CLINE: Objection to form.
21    A    There's no difference in my
22 understanding.
23    Q    Do they have one or two cars, or do
24 they have many cars that they have bought as an
25 investment?

Page 77

20 (Pages 74 to 77)

YVETTE WANG

MS. CLINE:  Objection.  Again, she's sitting here in her capacity as a representative of 30(b)(6) -- a 30(b)(6) representative for Eastern Profit.

You have yet to ask a single question about the contract that is the subject of this lawsuit.

Now you're again asking questions about Mr. Je and ACA, which is specifically not within the scope of this deposition.

So if we can just get to what we're actually litigating, that would be amazing.

Q   Did you ask Mr. Je about whether he signed this purported loan agreement from ACA to Eastern Profit?

MS. CLINE:  Objection to form.

A   He told me he signed.

Q   When did he tell you that?

A   I don't remember that.

Q   Was it in 2019?

A   I believe it was in 2018.  The

Page 110

YVETTE WANG

dinner, that should be the first time he clearly told me, yes.

Q   So how did this come up that he signed it?  Did you ask him or did he just volunteer that information?

A   He told me.

MS. CLINE:  Objection to form.

A   He told me we sign a loan agreement. We had a loan agreement.

Q   So he told you two things.  One, that there was a loan agreement, and two, that he had been the signer on behalf of the ACA?

MS. CLINE:  Objection to form.

A   You remember my first deposition in January, 2019, I said I even didn't hear about ACA company.  My dinner with William was by light 2018, that dinner.  William just told me they sign a loan agreement.  He didn't even mention to me what company.

Q   What company he signed on behalf of?

A   Yes.

Q   Did you understand that it was ACA, or did you think it was maybe a different company?

A   When I saw this loan agreement and

Page 111

YVETTE WANG

understand he's talking about ACA.

Q   But you didn't see this loan agreement until sometime in 2019 when Mr. Grendi gave it to you; correct?

A   I don't remember the time.  Again, I told you I don't remember first time agreement.

Q   You testified at your deposition that you had asked for a copy of the loan agreement and hadn't gotten one.

Do you remember that?

MS. CLINE:  Objection to form. Again if you want to show her testimony.

MR. GREIM:  We will.

Q   Turn to page 45, please.  Are you there?

A   45, yes.

Q   You see line 8 there is a question from the lawyer.  He says:  Is there documentation to support this loan?  Answer:  I requested there should be some documents.  Question:  Have you ever seen the documents supporting this loan answer?  Answer:  I didn't see that.  Question: You did not see it?  Answer:  No.

Page 112

YVETTE WANG

Did I read that correctly?

A   Yes.

Q   Now do you recall testifying at your deposition that you had not seen a copy of the loan agreement?

MS. CLINE:  Objection to the form.

A   And you're helping yourself to answer your own question.  By January, my first deposition, I testify I didn't see the law agreement which you're helping yourself.  I saw this law agreement after my first deposition.

Q   Good.  And so -- but you cannot tell us today what that was.  Was it soon after the deposition, was it recently before Mr. Grendi left the case?

A   I don't remember.

MS. CLINE:  Objection to form.

A   I don't remember that.

Q   Once you got the loan document, did you question Mr. Han Chunguang about it?

A   Question?

Q   Did you ask him questions about the document?

Page 113

29 (Pages 110 to 113)

**30(b)(6) Yvette Wang**
**October 30, 2019**

YVETTE WANG

1          YVETTE WANG
2     **Q   What, if any, was Guo Wengui's**
3   **involvement in the discussion of the loan,**
4   **negotiation of the loan?**
5     A   I'm not quite clear about his role in
6   this discussion.
7     **Q   Well, was he acting as Eastern**
8   **Profits' agent in connection with the loan**
9   **negotiation?**
10    A   Correct.
11    **Q   Was he acting as Eastern Profit's**
12   **agent -- let me strike that.**
13       **Has he been the acting as Eastern**
14   **Profit's agent in connection with discussions with**
15   **ACA regarding payment or a collection of the loan?**
16    A   I heard William mention to be paid
17   back to Mr. Guo also.
18    **Q   Where did you hear that?**
19    A   From William.
20    **Q   When did he tell you this?**
21    A   I forgot the precise words, but my
22   impression is he's chasing everyone he can chase.
23    **Q   My question was when did William Je**
24   **mention to you that he had talked to Guo about**
25   **paying back the loan?**

Page 126

1          YVETTE WANG
2    A   Should be quite a long time. 2018.
3    **Q   Is this in the 2018 dinner?**
4    A   Yes. In a dinner he mentioned to me
5   also, yeah.
6    **Q   In a dinner or the dinner that we**
7   **discussed earlier?**
8    A   I believe we were talking about their
9   dinner. I'm ready to tell you where is the
10   restaurant.
11    **Q   Where is the restaurant?**
12    A   Avra.
13    **Q   Spell that for the record.**
14    A   A-V-R-A. It's a great seafood
15   restaurant.
16    **Q   Well, other than Guo and other than**
17   **Han Chunguang, who else was involved in**
18   **negotiation of the ACA Eastern Profit loan?**
19    A   Mei is aware of this loan also.
20    **Q   Well, you say she is aware. My**
21   **question is who was involved in the negotiation of**
22   **the loan?**
23    A   Oh. Negotiation. William, Mr. Han.
24   Yeah.
25    **Q   You said Mr. Guo also acted as the**

Page 127

1          YVETTE WANG
2   **agent of Eastern Profit with respect to the loan?**
3    A   I said Mr. Guo acted as an agent on
4   behalf of Eastern Profit to talk with Strategic
5   Vision and Waller and wallop. W-A-L-L-E-R and
6   W-A-L-L-O-P.
7    **Q   I'm sorry. My question is about the**
8   **loan, not about the discussions with Strategic**
9   **Vision. I will be very clear.**
10      **In fact, let me take a second.**
11      **Does Mr. Guo have any E-mails or**
12   **texts that he sent to Mr. Ye or anyone else on**
13   **Eastern Profit's behalf in connection with the**
14   **loan?**
15    A   I don't believe so.
16    **Q   Did Eastern Profit check for those**
17   **E-mails or texts before the deposition today?**
18      MS. CLINE: Again, that was not
19   a subject of the depo notice.
20      If you know the answer, you may
21   respond.
22    A   I asked about the loan agreement. I
23   was advised they were our discussion.
24      So I didn't change further and say
25   let me search your E-mail or search your texts,

Page 128

1          YVETTE WANG
2   because I believe I was told the truth.
3    **Q   Did you ask Mr. Guo that question?**
4    A   I didn't ask him. I don't remember
5   that.
6    **Q   Now the research agreement called for**
7   **a fee of $750,000 a month; is that right?**
8      MS. CLINE: Objection to form.
9    A   $750,000, U.S. dollars, based on
10   their weekly reports and general monthly reports.
11   Without seeing or received the reports, $750,000
12   U.S. dollars should not be paid.
13    **Q   What steps, if any, did Eastern**
14   **Profit take to raise the money for the first**
15   **$750,000 payment to Strategic Vision?**
16      MS. CLINE: Objection to form.
17    A   Sorry. What's the question? Raised
18   the money?
19    **Q   Sure.**
20    A   What's the question?
21    **Q   What steps, if any, did Eastern**
22   **Profit take to raise the money for the first**
23   **$750,000 payment to Strategic Vision?**
24      MS. CLINE: So hold your answer
25   for a minute. Again, the Judge has

Page 129

33 (Pages 126 to 129)

**Atkinson-Baker, Inc.**
**www.depo.com**

| | |
|---|---|
| **YVETTE WANG** | YVETTE WANG |

**Page 138**

1          **YVETTE WANG**
2    the very back.
3        A    Which page?
4        Q    Page 3.  Was Chu -- do you see
5    Chunguang Han's signature?  Do you see it?
6        A    I see a signature behind Chunguang
7    Han's name.
8        Q    Is that his signature?
9            MS. CLINE:  Objection.
10    Foundation.
11        A    This is accurate, as you said, true
12    loan agreement.  Of course this is his signature.
13    What do you mean, like someone made up?  I don't
14    understand your question.
15        Q    I'm asking Eastern Profit if this is
16    really its director's signature.
17        A    I'm telling you this is a true loan
18    agreement.  So the signature on this loan
19    agreement, the signature are accurate and true.
20        Q    And how do you know that this is a
21    true loan agreement; did someone tell you this?
22            MS. CLINE:  Objection.  Asked
23        and answered.  You're badgering the
24        witness.  You asked her about the
25        signature.  She answered the

**Page 139**

1          YVETTE WANG
2        question.
3        Q    Other than Mr. Grendi, has anyone
4    else told you this is Mr. Chunguang Han's
5    signature?
6            MS. CLINE:  Objection to form.
7        Mischaracterizes testimony.
8        Q    Did you sign Chunguang Han's
9    signature on the research agreement in this case?
10        A    Pardon?
11        Q    Did you sign Chunguang Han's
12    signature on the research agreement at issue in
13    this case?
14        A    How I can sign his signature?
15        Q    Do you sign his name to the research
16    agreement in this case?
17        A    You're confusing me.  Which
18    agreement?
19        Q    The research agreement at issue in
20    this case.
21        A    That is a signature I was authorized
22    to sign.
23        Q    So you were authorized to write his
24    name on that document?
25        A    I don't believe that's his name.

**Page 140**

1          YVETTE WANG
2        Q    Whose name is it?
3        A    It's a signature.
4        Q    Of who?
5        A    It could be a (inaudible) or any
6    symbolic.
7        Q    Let's go ahead and get it out.  We
8    have it.
9        A    Let's get it.
10            (Wang Exhibit 2, Research
11            Agreement dated December 29, 2017
12            Bates stamped Eastern-000005 to
13            Eastern 000009 previously marked for
14            Identification as of this date.)
15        Q    I'm going to show you what we marked
16    in your first deposition as Wong 2.
17        Do you recognize this document?  The
18    question pending is whether you recognize the
19    document.
20        A    I'm preparing to answer your
21    question.
22        Q    Just making sure.
23        A    Yes.
24        Q    What is it?
25        A    It's called a Research Agreement.

**Page 141**

1          YVETTE WANG
2        Q    It's an agreement that you signed in
3    French Wallop's presence; isn't it?
4        A    Yes.
5        Q    And whose name did you sign?
6        A    I didn't.  I did not mean to sign
7    anyone's name here.
8        Q    Did you sign any name?
9        A    Are you Chinese Mandarin,
10    linguistics?  Do you read Mandarin?
11        Q    Answer the question.  Whose name did
12    you sign?
13        A    I didn't sign anyone's name.  This is
14    a signature.
15        Q    What does it read?
16        A    It's simple.
17        Q    So this is not a name?  I'm
18    indicating the Chinese handwriting on page 3.
19            MS. CLINE:  Objection to form.
20        A    It could be a name.
21        Q    What is it?  Whose name is this?
22        A    I am authorized to sign this contract
23    on behalf of Eastern Profit Limited.  I sign here.
24    This is my signature on behalf of Eastern Profit
25    Limited.

36 (Pages 138 to 141)

**30(b)(6) Yvette Wang**
**October 30, 2019**

YVETTE WANG

2  Q   Fair enough.
3  A   I can say this is my name.  I can say
4  this is in my English name or Chinese name, and
5  this is my authorized signature here.
6  (Indicating)
7  Q   My question is whose name is it?
8  A   Nobody's name.
9  Q   So a Mandarin speaker would look at
10  this and say this is just squiggly lines, it's no
11  one's name.  Does it make out a name?
12  A   I don't know think any Mandarin say
13  this name.
14  Q   This is Han Chunguang's name; isn't
15  it?
16  A   I didn't say that.
17  Q   I'm asking you.  Is this Han
18  Chunguang's name?
19  A   I didn't say that.  I don't think it
20  is.
21  Q   Okay.  So your testimony under oath
22  is that you did not sign Han Chunguang's name?
23  A   Correct.
24  Q   You signed -- did you sign any name?
25      MS. CLINE:  Objection.  Asked

Page 142

YVETTE WANG

2  Q   What date was that signed?
3  A   You mean as Power of Attorney?
4  Q   Yes.
5      MS. CLINE:  Just to be clear, is
6  your line of inquiry -- this is the
7  Eastern Profit 30(b)(6).  Your line
8  of inquiry, am I correct, relates to
9  your authority on behalf of Eastern
10  Profit.
11      MR. GREIM:  Correct.
12  A   What's your question?
13  Q   When was the limited Power of
14  Attorney signed?
15  A   You went me to read this; right?
16  Q   Just answer the question.
17  A   I need to know the question.  What
18  was the question?
19  Q   The question is:  When was the
20  limited Power of Attorney signed?  When was it
21  signed?
22  A   August 30, 2018.
23  Q   Right.  So my question is how did you
24  get your authority; was it orally, or was it in
25  writing, on or before January 6, 2018 to affix

Page 144

YVETTE WANG

2  and answered.
3  A   I repeat again.  I didn't mean to be
4  anyone's name.  I was authorized to sign on
5  Eastern Profits, and I just sign that.
6  Q   Who authorized you to sign this
7  agreement on behalf of Eastern Profit?
8  A   Eastern Profit.
9  Q   Who?
10  A   Is both May, M-E-I, and Mr. Han.
11  Q   So Guo Mei and Mr. Han authorized you
12  sometime before January 6th or on January 6th to
13  sign something on this line?
14      MS. CLINE:  Objection to form.
15  A   They authorized me to handle this
16  research project with everything this project
17  needs Eastern to do.
18  Q   How did they authorize you to handle
19  this project on or before January 6th?
20      MS. CLINE:  Objection.  Asked
21  and answered.
22  A   How?
23  Q   By what method did they give this
24  authorization to you?
25  A   You have a limited Power of Attorney.

Page 143

YVETTE WANG

2  something to exhibit number 2, the research
3  screen?
4  A   You should ask me these questions
5  from the very beginning.  I will give you what you
6  need to know and what you want to know.
7  Q   Great.  I can't wait to hear it.
8      MS. CLINE:  I object.  Please
9  don't stare her down.  You can ask a
10  question, and she can answer it.  The
11  stipulation is the stares we can do
12  without.
13      MR. GREIM:  Okay.  But she's
14  making a funny face at me.  That's
15  okay.
16  Q   I would just like to know the answer
17  to the question.
18  How did you get the authority to sign
19  Exhibit 2?
20      MS. CLINE:  When you say
21  Exhibit 2, you mean --
22      MR. GREIM:  The research
23  agreement.
24      MS. CLINE:  -- Wang Exhibit 2.
25  You have two exhibits with the

Page 145

37 (Pages 142 to 145)

30(b)(6) Yvette Wang
October 30, 2019

**Atkinson-Baker, Inc.**
**www.depo.com**

| | |
|---|---|
| YVETTE WANG | YVETTE WANG |

YVETTE WANG

1  YVETTE WANG
2  number 2 on them.
3  THE WITNESS:  Can I answer?
4  MS. CLINE:  Yes.
5  A   I was authorized both by orally and
6  Power of Attorney.
7  Q   What was the first word?
8  A   Orally.  O-R-A-L-L-Y.
9  Q   So is there another Power of Attorney
10 that predates Guo Exhibit 2?
11 MS. CLINE:  Again, the questions
12 that have to do with Golden Spring
13 and Golden Spring's authority are for
14 a separate deposition.
15 MR. GREIM:  I agree.
16 MS. CLINE:  Right now we're
17 talking about Eastern Profit.
18 MR. GREIM:  Yup.  That's exactly
19 right.
20 Q   So the question is -- first of all,
21 Exhibit 2, Wang Exhibit 2, the Research Agreement
22 was signed by Eastern Profit; right?
23 A   Correct.
24 Q   So you've just testified that you
25 received the authority to sign by Eastern Profit

Page 146

YVETTE WANG

1  YVETTE WANG
2  MS. CLINE:  Objection to form.
3  Mischaracterizes the document.
4  THE WITNESS:  Should I answer?
5  MS. CLINE:  You can answer.
6  A   I don't remember the dates.  80
7  percent.  Again, she doesn't want me to guess.
8  I sign this research agreement based
9  on a firm, confirmative, very firm, F-I-R-M, oral
10 authorization.
11 Q   From who?
12 A   From Mr. Han.
13 Q   When did he give you the oral
14 authorization to sign the research agreement?
15 A   December, 2017.
16 Q   Okay.  When in December of 2017?  A
17 lot of negotiations in that month.
18 When in December of 2017 did Mr. Han
19 give you this authority?
20 A   I don't remember the dates, but it
21 was before we entered into this research
22 agreement.
23 Q   So did you discuss with Mr. Han the
24 terms of the research agreement?
25 A   Nope.

Page 148

YVETTE WANG

1  YVETTE WANG
2  from two different sources, orally and by limited
3  Power of Attorney.
4  So my first question is what is the
5  limited Power of Attorney that authorized you to
6  sign the research agreement for Eastern Profit?
7  MS. CLINE:  Objection to form.
8  A   I have to correct my linguistic or
9  your understanding.  I told you orally or Power of
10 Attorney.
11 Q   Okay.  So is it your testimony that
12 there is a Power of Attorney that granted you the
13 authority to sign Wang Exhibit 2, or are you
14 saying there is no limited Power of Attorney?
15 Which one is it?
16 A   I repeat again.  I was authorized by
17 eastern both orally and Power of Attorney.
18 Q   I see.  And so we just looked at one
19 Power of Attorney, but it mentions Golden Spring,
20 and it's from later in the year.
21 MS. CLINE:  Objection to form.
22 Q   So my question is is there some other
23 Power of Attorney that I haven't seen yet that
24 gave you the authority to sign the research
25 agreement on behalf of Eastern Property?

Page 147

YVETTE WANG

1  YVETTE WANG
2  Q   Did you translate it for him?
3  A   He didn't ask.  I don't remember I
4  offered.
5  Q   Did you talk to Mr. Chunguang about
6  the deal with Strategic Vision?
7  A   Yes, I did.
8  Q   Did he give you approval that he
9  agreed with the deal?
10 A   He authorized me to deal with this
11 deal.  But he is aware we're trying to disclosure
12 the Chinese corrupted official by investigation.
13 And he is on same page with us, which means he
14 agree with what we are doing.
15 Q   So how did you know that that was the
16 purpose of the research agreement?
17 MS. CLINE:  I'm sorry.  I was
18 coughing.  Can I hear that back.
19 (The requested portion of the
20 record was read back by the
21 reporter.)
22 MS. CLINE:  Objection to form.
23 A   How did I know?  I don't remember
24 that clearly, but I heard -- this is about Chinese
25 corrupted official.  They're illegal like

Page 149

38 (Pages 146 to 149)

**30(b)(6) Yvette Wang**
**October 30, 2019**

YVETTE WANG

2 investigation from Miles and from Wallop, Waller.
3 Both.
4        I don't remember like which dates,
5 the precise language, but Miles is looking for
6 some professional company, and Waller, Wallop
7 represented themselves, the best research company,
8 professional qualified who can help our research.
9 So I got to know about this research from there.
10       Q    Why did you -- what made you
11 understand that Mr. Han was the person to go to
12 for authority to sign the research agreement?
13       MS. CLINE:  Objection to form.
14       A    What's the question?
15       Q    How did you come to understand that
16 Mr. Han was the person for you to go to to seek
17 authority to sign the research agreement?
18       MS. CLINE:  Objection to form.
19       A    Because Waller and Wallop, obviously
20 they did not want Mile's name on any of the
21 contracts.
22       Q    I'm sorry?
23       A    I didn't finish.
24       Q    Okay.  Go ahead.
25       A    And Miles, he expressed okay.  Let's

Page 150

---

YVETTE WANG

2 look for someone who can be on this contract
3 pursuing the same goal with us.  I didn't finish.
4       Q    Okay.  Keep going.
5       A    So I start to look for, and I asked
6 Mr. Han.  He was onboard.  That's it.
7       Q    Okay.  But my question unfortunately
8 was:  How did you know that Mr. Han was the right
9 person to speak with to obtain Eastern Profit's
10 authority?
11       MS. CLINE:  Objection to form.
12       A    Okay.  I'm still confused by you.
13       Q    We know that at some point you
14 identified Eastern Profit.  We know that.
15       A    Mm-hmm.
16       Q    You had to go to a real person though
17 to speak on behalf of Eastern Profit to give you
18 authority; right?
19       MS. CLINE:  Objection to the
20       form.
21       A    Continue.
22       Q    You agree with me so far; right?
23       A    I heard you so far.
24       Q    Okay.  Fine.  My question is why did
25 you go to Mr. Han?  Why not some other person?

Page 151

---

YVETTE WANG

2 **How did you know Mr. Han was the person to go to**
3 **to get authority from Eastern Profit?**
4       MS. CLINE:  Objection to form.
5       A    I started to ask and look for someone
6 as I just said.  It was Mr. Han.  He mentioned to
7 me Eastern Profit could be on the contract.
8       Q    This is Chunguang Han?
9       A    Mr. Han.
10       Q    Han Chunguang; right?
11       A    Correct.  He gave me Eastern Profit's
12 name.
13       Q    So the person who suggested Eastern
14 Profit to take Mr. Guo's place was Han Chunguang?
15       MS. CLINE:  Objection to form.
16       A    What do you mean take Mr. Guo's
17 place?
18       Q    Who was the first person who
19 mentioned Eastern Profit to you?
20       A    I don't remember clearly.  It could
21 be either Mr. Han or Mr. Guo, but I don't remember
22 that clearly.
23       Q    You remember testifying at your first
24 deposition it was Mr. Guo?
25       A    You want me to read the page?  Which

Page 152

---

YVETTE WANG

2 page?
3       Q    Before we go back and do this, why
4 don't we do it the right way.  I'm just going to
5 ask you.  You remember testifying before that you
6 first heard the words Eastern Profit from Mr. Guo?
7       A    You're asking me is that my testimony
8 in my first deposition?
9       Q    Yes.  Yes.
10       MS. CLINE:  He's asking whether
11       you remember.
12       A    I don't remember that.
13       Q    All right.  Look at page 12, please,
14 of your transcript.
15       A    12, right.
16       Q    Yes.  Let's look at page 10.  Even
17 better, it's all over these pages.
18       Let's start on 10.  Why don't you
19 just take a look at pages 10 through 13.  Just
20 take a second to read through.
21       A    From page 10 to 13?
22       Q    Yes, to the correct answer at the
23 bottom of 13.  You can go to the bottom of 13.
24       Are you finished?
25       A    Yes.

Page 153

30(b)(6) Yvette Wang
October 30, 2019

**Atkinson-Baker, Inc.**
**www.depo.com**

YVETTE WANG

Q    Okay.  Now do you recall now that you testified that Mr. Guo introduced you to Eastern Profit?

MS. CLINE:  Objection to form.

A    Now I do.

Q    All right.  I don't want to get you too far down the road with Han Chunguang, because I remember his testimony.

So how is it then that you learned that Han Chunguang had anything to do with Eastern Profit?

A    What's the question?

Q    How did you learn that Han Chunguang had anything to do with Eastern Profit?

A    How did I learn?

Q    Mm-hmm.

A    That was I asked him there's a project in here, kind of like are you interested.  And then he told me Eastern Profit probably could join this project.

Q    Han Chunguang said this to you?

A    I don't remember the precise words quote, okay.  That is my impression.  I was asking him, and then he agree with our big goal, to take

Page 154

YVETTE WANG

A    Should I continue?

Q    Go ahead.  I'm sorry.  I thought you were done.

A    He told me Eastern Profit could be onboard.  I can go ahead to sign a contract.

Q    Did he explain to you what his relationship with Eastern Profit was?

A    I forgot the precise words he told me, but he expressed he was or he is running Eastern Profits, and he told me Eastern Profits will be on the same side with our big anti-CCP, Chinese Communist Party.

Q    Did Mr. Han tell you what his duties and responsibilities were?

A    He was running.  My impression is he was running.

Q    Who told you he was the, quote, principal of Eastern?

MS. CLINE:  Objection to form.

A    Called principal.

Q    Who told you that he was the principal of Eastern?

MS. CLINE:  Objection to form.

A    That is my understanding, he's the

Page 156

YVETTE WANG

down CCB.  And he said kind of like it's a great job.  Let's do it.

Q    Who told you that Han Chunguang had any authority to act on behalf of Eastern Profit?

MS. CLINE:  Objection to form.

A    You mean when?

Q    No.  Who.  Who told you that Han Chunguang had any authority to act on behalf of Eastern Profit?

A    Mei told me.

Q    When did she tell you that?

A    I forgot the precise time.  It should be sometime in 2018.

Q    Okay.  But back in December of 2017, all right --

A    Yes.

Q    -- when you testified that Han Chunguang gave you authority to sign the research agreement on behalf of Eastern Profit, who told you that Han Chunguang had any authority to speak on behalf of Eastern Profit?

MS. CLINE:  Objection to form.

A    He told me.

Q    He told you?

Page 155

YVETTE WANG

principal.

Q    And who told you that?

A    Mr. Han expressed Eastern could be onboard and he runs eastern.  So I recognize him.  He is a principal.

And later on Mei confirmed her authorization to Mr. Han also which double confirm my recognition to Mr. Han as the principal of Eastern Profit.

Q    Do you remember testifying at your deposition in January that you didn't know what Mr. Han's duties and responsibilities were, and it was Mr. Guo who told you he was the principal of Eastern?

MS. CLINE:  Objection to form.

A    Which page?

Q    Page 97.  You can start up on 96 if you want to.  The person starts asking about Chunguang Han at line 13.

All right Miss Wang, do you see that the questioner asked you at the bottom of 96, he says, line 18:  What is his exact position Eastern?

You answer:  He is the President of

Page 157

**Atkinson-Baker, Inc.**
**www.depo.com**

YVETTE WANG

1  YVETTE WANG
2  before and after those couple of days.  I don't
3  have the precise dates.
4      Q    You first learned of Eastern Profit's
5  existence just before going down to Virginia to
6  sign the contract with Miss Wallop; isn't that
7  right?
8          MS. CLINE:  Objection to form.
9      A    That's correct.
10         (Wang Exhibit 4, a document
11          titled Research Agreement dated
12          January 1, 2018 and Bates stamped
13          Eastern-000001 to Eastern-000004
14          previously marked for Identification
15          as of this date.)
16     Q    I'm going to hand you what we marked
17  in the original deposition as Exhibit 4.  I'm
18  giving you another copy for your attorney.
19         This is Wong Exhibit 4, Eastern Bates
20  numbers 1 through 4.  This is a document that you,
21  or that Eastern produced to us in this case.  And
22  if you want, you can compare it.  Maybe it will be
23  helpful to compare it to the actual research
24  agreement which is Exhibit -- Wang Exhibit 2.
25         You'll see they're not the same

Page 162

1  YVETTE WANG
2      Q    Do you recall this being -- first of
3  all, the agreement wasn't signed on January 1; was
4  it?
5      A    You're right.
6      Q    And do you recall this being a draft
7  of the agreement, at least a draft, maybe not the
8  only draft, as of January 1, 2018?
9          MS. CLINE:  Exhibit 41.
10         MR. GREIM:  Yes, Exhibit 4.
11     A    It has been almost 20 months.  I
12  don't remember clearly what was the negotiation,
13  but since this is Eastern, we produce this.  I
14  have to say yes.
15     Q    And do you recall that at this time I
16  won't -- I don't want to characterize this the
17  wrong way, but do you agree that at this time
18  Eastern Profit had not been identified yet as the
19  entity that would be entering the contract?
20         MS. CLINE:  At which time?
21         MR. GREIM:  As of January 1,
22  2018.
23     A    You are asking me by January 1, 2018,
24  Eastern Profit was not recognized?
25     Q    Right.

Page 164

1  YVETTE WANG
2  document; are they?
3      A    You're right.
4      Q    Wang Exhibit 4 doesn't have
5  signatures on it; right?
6      A    Correct.
7      Q    It doesn't have the same payment
8  terms.  The amount is only $250,000.  If you look
9  on page 4 of Wang Exhibit 4, do you see that?
10     A    I'm reading this.  You want me just
11  to read this paragraph; right?
12     Q    Yeah.  My only question is I just
13  wanted you to look at the payment terms paragraph.
14  And I'm just asking you to see that this is only
15  $250,000 a month in this draft; is that right?
16     A    Correct.
17     Q    And strategic was demanding a much
18  higher amount, which it ultimately got, $750,000 a
19  month; isn't that right?
20         MS. CLINE:  Objection to form.
21     A    Correct.
22     Q    If you go to the front of Wong
23  Exhibit 4, you see the date typed up in the top is
24  January 1, 2018?
25     A    Yes.

Page 163

1  YVETTE WANG
2      A    No.  I don't agree with you.
3      Q    Okay.  Okay.
4          So when was Eastern Profit first
5  identified as the contracting party for we'll call
6  it your side of the contract?
7      A    Was identified?  You mean confirmed
8  or found; right?
9      Q    Sure.
10     A    I don't remember that clearly, but I
11  started to talk to Hank kind of like November
12  earliest, November, December of 2017.
13     Q    But you testified that you didn't
14  learn the name of Eastern Profit until just before
15  going down to Virginia to negotiate with French
16  Wallop.  So how could Eastern Profit have been
17  identified back in November of 2017?
18         MS. CLINE:  Objection to form.
19         Mischaracterizes testimony.
20     A    Why before?  Like two hours right
21  before I came down to Virginia?  I'm talking about
22  like a month or two month.  Less than two month.
23  I don't think that is a long time.  I can still
24  quote that as right before.
25     Q    Is it your testimony that you first

Page 165

42 (Pages 162 to 165)

**30(b)(6) Yvette Wang**
**October 30, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

---

YVETTE WANG
1
2  learned that Eastern Profit would be the
3  contracting party in November of 2017?
4      A   I don't remember that clearly, but
5  it's for sure the latest is November -- no,
6  December or even November, late November of 2017.
7      Q   Mr. Chunguang Han is not a director
8  of Eastern Profit, is he?
9      A   You're asking about now?
10     Q   Right.
11     A   He is not.
12     Q   Between September, 2017 and March,
13  2018 he was not a director of Eastern Profit, was
14  he?
15     A   Between September of 2017 until when?
16     Q   March, 2018 he was not a director,
17  was he?
18     A   He was not.
19     Q   Is there any document appointing
20  Mr. Han as any sort of an officer or
21  representative of Eastern Profit for the period
22  September, 2017 to March, 2018?
23     A   He is authorized.
24     Q   My question is is there a document
25  giving him that authority?

Page 166

---

YVETTE WANG
1
2  me also, but I don't remember that clearly.
3      Q   Okay.  So other than a recollection
4  that at some point Mr. Han and Miss Mei told you
5  that he had authority to act for Eastern Profit
6  between September, 2017 and March, 2018, can
7  Eastern Profit point to any other documents
8  reflecting that he had that role?
9      A   I didn't ask.
10     Q   Do they exist?  Do the documents
11  exist?
12     A   I did not ask.
13         MR. GREIM:  Why don't we take a
14     short break.  Let's take a
15     five-minute break.
16         THE VIDEOGRAPHER:  The time is
17     3:25 p.m., Wednesday, October 30,
18     2019.
19         This is the end of media number
20     3 of the videotaped deposition of
21     Yvette Wang.
22         We're off the record.
23         (At this time, a brief recess
24     was taken.)
25         THE VIDEOGRAPHER:  The time is

Page 168

---

YVETTE WANG
1
2      A   I didn't remember I saw that document
3  paper, no.
4      Q   Why do you believe he is authorized?
5  Let's stick to the period of September of 2017 to
6  March, 2018.
7         Why does Eastern Profit say he's
8  authorized to act during that period?
9      A   September, 2017 until March, 2018;
10  right?
11         I don't remember the precise words.
12  My impression is I was told he was the director.
13  He is still running the company authorized by the
14  director.
15         And then later on Mei confirmed
16  Mr. Han made the correct representation about
17  himself and his wife.
18     Q   Okay.  So who is the person that told
19  you that he had been given authority to act on
20  behalf of Eastern Profit between September, 2017
21  and March, 2018?
22         MS. CLINE:  Objection to form.
23     Asked and answered.
24     A   Mr. Han, he expressed it to me.  I
25  don't remember clearly.  Miss Mei mentioned it to

Page 167

---

YVETTE WANG
1
2  3:39 p.m., Wednesday, October 30,
3  2019.  This is media number 4 of the
4  videotaped deposition of Miss Yvette
5  Wang.  We're back on the record.
6  CONTINUED EXAMINATION
7  BY MR. GREIM:
8      Q   All right, Miss Wang.  Welcome back.
9  Based on your most recent testimony,
10  it sounds like there are two individuals who we
11  can say had knowledge of the negotiation of the
12  contract between Eastern Profit and Strategic
13  Division, Guo Mei and Han Chunguang.  Is that
14  correct?
15         MS. CLINE:  Objection.
16     Q   Let me strike that.
17     A   Too long a question.  I going to
18  forget.
19     Q   Is it fair to say that Han Chunguang
20  and Guo Mei had knowledge of Eastern Profit's
21  negotiation of the contract with Eastern -- with
22  Strategic Vision?
23     A   You're talking about this research
24  agreement; right?
25     Q   I am.

Page 169

---

43 (Pages 166 to 169)

YVETTE WANG

1
2    A    They don't have the details like in
3 terms of this contract.  But they know or they
4 knew we hired a so-called professional
5 investigation company which really Shell Company
6 and liars.
7    **Q    But if I understand you correctly,**
8 **you have now testified that Han Chunguang knew of**
9 **the agreement before it was signed, approved of**
10 **its purpose, and authorized you to sign it?**
11        MS. CLINE:  Objection to form.
12    **Q    Is that correct?**
13    A    Mr. Han did not get that deeply
14 involved.
15    **Q    However, it is true, isn't it, that**
16 **you told Han Chunguang about the contract, you**
17 **told him about the goals of the contract, and you**
18 **asked for his authority to sign it.**
19        **That is your testimony today; isn't**
20 **it?**
21        MS. CLINE:  Objection to form.
22    A    I told him we found a research
23 company.  Miles was meeting with their
24 representatives.  They seem like qualified and
25 professional by them.  Most likely we can contract

Page 170

YVETTE WANG

1
2    **Q    Very good.  Please take a look at**
3 what we marked in your other deposition as Wang
4 Exhibit 3.
5        (Wang Exhibit 3, a document
6        titled Plaintiff Eastern Profit
7        Corporation Limited's Responses and
8        Objections to Defendant Strategic
9        Vision US, LLC's First Set of
10        Interrogatories previously marked for
11        Identification as of this date.)
12    **Q    Do you recognize these as Eastern**
13 **Profit Limited's responses and objections to**
14 **Strategic Vision's first set of interrogatories?**
15        **You'll see that the second to last**
16 **page you have signed it, and Karen Maistrello**
17 **notarized your signature on December 20, 2018.**
18    A    You want me to read through all the
19 pages?
20    **Q    No.  I'm just asking do you remember**
21 **verifying the interrogatory responses on behalf of**
22 **Eastern Profit in this case.  That's you, isn't**
23 **it?  You signed this?**
24    A    Correct.
25    **Q    Then if you go to page 1 -- I'm**

Page 172

YVETTE WANG

1
2 them, start research.
3    **Q    And before January 6, he told you**
4 **that you can sign the agreement; is that right?**
5    A    After I told him that, he said please
6 go ahead.  You are the miles.  We believe you
7 guys.  Go ahead with this company.
8    **Q    And your testimony also is that the**
9 **reason you believed you had authority or -- I'm**
10 **sorry.  Let me strike that.**
11        **The reason you believe that Han had**
12 **authority to give you that approval, is that Han**
13 **told you he had the authority and Guo Mei may told**
14 **you he had the authority before you signed the**
15 **contract; is that right?**
16        MS. CLINE:  Objection to form.
17    A    Before I sign a contract I was
18 authorized to proceed and execute with this
19 contract.  I was told I'm authorized to sign it.
20    **Q    My question though is who told you**
21 **that Han Chunguang  could give you the authority**
22 **to sign the contract?  Who told you Han Chunguang**
23 **had the authority on behalf of Eastern Profit?**
24        MS. CLINE:  Objection to form.
25    A    Both Mr. Han and Miss Mei.

Page 171

YVETTE WANG

1
2 sorry, page 2, question 1, you see the very first
3 thing says:  Identify all persons with whom
4 Eastern consulted who answering these
5 interrogatories or who were otherwise involved in
6 any way in answering these interrogatories?
7        Do you see that question?  Then in
8 response, first Eastern objects, and then the
9 second sentence you see where it says subject to
10 Eastern's objection, Yvette Wong and Guo Wengui
11 were consulted with answering these
12 interrogatories.
13        **Did I read that right?**
14    A    Yes.
15    **Q    In fact you did consult with Guo**
16 **Wengui when answering these interrogatories;**
17 **didn't you?**
18        MS. CLINE:  Objection to form.
19    A    I don't remember.  This is the
20 conversation my lawyer worked with.
21    **Q    Then let's turn to -- well, let me**
22 **ask you:  Did you provide any input into these**
23 **interrogatory responses?**
24        MS. CLINE:  That's a yes or no
25        question.

Page 173

44 (Pages 170 to 173)

**Atkinson-Baker, Inc.**
**www.depo.com**

YVETTE WANG

1

2     A    I reply you before, I believe, but I
3  can repeat again.  I put together name list.  I
4  took advice from Mr. Guo.  I put together name
5  list based on Internet whistle blow information.
6  And I'm aware, like some of the bad guy, they go
7  after Mr. Han and Miss Mei family in China.
8         So if you won't say anyone put
9  together so that is my name list, I can tell you
10 maximal there's people.
11        Q    Now originally there were to be 10
12 names, and 5 were added; is that correct?
13        A    You're asking about negotiation of
14 the contract terms?
15        Q    Yes, I am.
16        A    Kind of like, yes.
17        Q    What was the reason that five
18 additional names were added?  Let me ask you this.
19             Did those five additional names have
20 anything in common?
21        A    What do you mean in common?
22        Q    Well, for example did the same person
23 recommend all five of the additional names?
24        A    The only thing --
25             MS. CLINE:  Objection to form.

Page 194

YVETTE WANG

1

2             Sorry.  Go ahead.
3        A    The only thing in common is five
4  names, and 10 name, 15 name, they're all corrupted
5  Chinese Communist Party official, or their family,
6  or their like kids.  I don't know that words.
7  Private case.  And that is the only thing they're
8  in common.
9        Q    Other than with ACA, is there any
10 other -- and I guess Mr. Guo, was there any other
11 person with whom Eastern Profit intended to share
12 the research results?
13        A    What's the question?
14        Q    Other than ACA and Mr. Guo, was there
15 any other person with whom Eastern Profit intended
16 to share the research results?
17             MS. CLINE:  Objection to form.
18        A    Eastern, of course, is happy to share
19 the results.  It was all Chinese people who are
20 pursuing the rule of law and democracy of China.
21        Q    Did Eastern Profit engage anyone to
22 research any of these 15 names, anyone other than
23 Strategic Vision to research the 15 names?
24        A    To best of my knowledge, no.
25        Q    Okay.  Now I want to ask you more

Page 195

YVETTE WANG

1

2  than just to the best of your knowledge.  I'm
3  asking Eastern Profit.
4             Did it engage anyone to research --
5  anyone else other than Strategic Vision to
6  research any of these 15 names?
7        A    Nope.
8        Q    What was the -- let me strike that.
9             What was Eastern's plan for
10 publicizing and using the information that
11 Strategic Vision was supposed to obtain?
12        A    Of course to send this criminal
13 person or criminal Chinese Communist Party
14 officials into jail and to -- including Eastern
15 Profit, the company, they're assets back.
16        Q    So Eastern Profit believed that the
17 public outcry resulting from publicity would cause
18 its assets to be unfrozen in Hong Kong?
19             MS. CLINE:  Objection to form.
20        A    There are some words I don't
21 understand in my sentence.  Archive, what is
22 that?  What's your question?
23        Q    So Eastern Profit believed that the
24 public outcry --
25        A    Wait a second.  Public outcry, what's

Page 196

YVETTE WANG

1

2  this?
3        Q    You never heard outcry?  Let me
4  choose a different word?
5        A    Sorry.  Foreigner here.
6             MS. CLINE:  No need for
7  commentary.
8             MR. GREIM:  No one says she's a
9  foreigner here.  I don't understand
10 the reason for the comment.
11             MS. CLINE:  She's not a native
12 English speaking person.
13             MR. GREIM:  I'm trying to ask a
14 question, please.
15        Q    So Eastern Profits?
16             MR. GREIM:  Please stop
17 interrupting.  Finally.
18        Q    So Eastern Profit's plan was that the
19 public reaction to it's publicizing this
20 information would cause it's assets to be unfrozen
21 in Hong Kong?
22             MS. CLINE:  Objection to form.
23        A    Eastern Profits believes to
24 disclosure this corrupted Chinese official, bring
25 the justice to Chinese people, and itself also.

Page 197

50 (Pages 194 to 197)

**Atkinson-Baker, Inc.**
**www.depo.com**

YVETTE WANG

1  YVETTE WANG
2       We'll be able to help all the Chinese
3  people and itself, including I'm frozen, Eastern
4  itself assets and back to normal business, which
5  Eastern was conducting before their bank accounts
6  was frozen.
7       **Q   So I just want to understand this.**
8  **This is the first time we're hearing about Eastern**
9  **Profit wanting to unfreeze its assets.**
10      **Did Eastern Profit believe that it**
11 **would put its own prosecutors in jail in Hong**
12 **Kong?  Let me ask you this.**
13      **What was Eastern Profit's specific**
14 **plan to use the research in Hong Kong?**
15          MS. CLINE:  Objection.  It's
16      Beyond the scope of your topics.
17 **Q   Well, the very first topic is why did**
18 **Eastern Profit enter into the contract.  Question**
19 **number 1.  That's what we're trying to find out.**
20      **We just learned it's to unfreeze its**
21 **assets.  So I would like to know about the**
22 **specifics of this.**
23      **How specifically did Eastern Profit**
24 **believe it was going to be able to use the**
25 **research results to unfreeze it's Hong Kong**

Page 198

1  YVETTE WANG
2  appearing on the list is why did EP
3  enter into the contract.  The second
4  sentence is:  What circumstances led
5  EP to seek research.
6          MR. PODHASKIE:  Join.  I'm --
7          MR. GREIM:  Please do not enter
8      into the record.
9          MS. CLINE:  Which is the letter
10     you're referring to?
11         MR. GREIM:  I'll just give you
12     a copy.  This is my E-mail to you of
13     October 3rd, 2019.  I attached a word
14     document.  You can pass it over to
15     your attorney.
16         Let's go off the record.
17         MS. CLINE:  No.  Let's keep
18     going.
19         MR. GREIM:  We're using up time
20     now.  I think it's a spurious
21     objection.
22         THE VIDEOGRAPHER:  Off the
23     record.
24         MS. CLINE:  On the record.
25 **Q   So the question is:  What was Eastern**

Page 200

1       YVETTE WANG
2  **assets?**
3          MS. CLINE:  What was the
4      number 1 that you were just referring
5      to?
6          MR. GREIM:  I'm referring you to
7      the long list, item 1, very first
8      question sent to you on August 13.
9          MS. CLINE:  You're not referring
10     to the deposition notice; right?
11         MR. GREIM:  No.  Within the
12     deposition notice it's under research
13     agreement including negotiations
14     concerning the same.
15         Question 1:  Why did EP enter
16     into the contract?
17         MS. CLINE:  I mean the notice
18     topic is the research agreement and
19     negotiations.  I will give you a
20     little leeway.
21         MR. GREIM:  We're in between
22     counsel, which is supposed to be
23     honored by the court's order, which I
24     sent to you October 3rd is this list.
25         And the very first question

Page 199

1       YVETTE WANG
2  **Profit's specific plan to use the research to free**
3  **up its Hong Kong assets?**
4          MS. CLINE:  You're representing
5      that that question isn't on here?
6          MR. GREIM:  No.  It's the first
7      two questions.
8  **Q   Why did Eastern Profit enter into the**
9  **contract?  You just learned for the first time**
10 **that it's to free up some frozen Hong Kong.**
11     **I'm trying to learn about the**
12 **specific plan that Eastern Profit had.**
13         MS. CLINE:  You're
14     mischaracterizing her testimony.  If
15     you want to know why did Eastern
16     Profit enter into the contract, you
17     can ask her that question again.
18         You're twisting --
19         MR. GREIM:  I'm not limited to
20     using the exact words on that
21     document.  I'm following up on the
22     witness' questioning, and I'm being
23     obstructed.
24         I would like to get an answer to
25     the question.

Page 201

51 (Pages 198 to 201)

**30(b)(6) Yvette Wang**
**October 30, 2019**

YVETTE WANG
1
2    Q    What was Eastern Profit's specific
3  plan to use the research results to unfreeze its
4  Hong Kong assets?
5          MS. CLINE:  Objection to form.
6          Mischaracterizes testimony and beyond
7          the scope of counsel's agreement
8          regarding the scope of the
9          deposition.
10         You can answer.
11    A    I'm happy to tell you.  I remember on
12  my name list there are two person.  One is called
13  M-E-N-G, J-I-A-N, Z-H-U.  He was the hat or steel
14  head of entire China, police, court, persecutor.
15  Almost -- most of the law enforcement.  He's the
16  head of that.  The most powerful person.  One of
17  the most powerful person in China.
18    Q    And so you hoped --
19    A    Let me finish.
20    Q    You paused for so long, I thought you
21  were done.
22    A    I'm trying to help you.
23    Q    I'm sorry.  Keep going.
24    A    I told you I have language barrier.
25  You have to allow me finish.

Page 202

YVETTE WANG
1
2    Q    I thought you were finished with the
3  sentence when a few second ticked by.  Go on
4  ahead.
5    A    So clearly of Eastern's previous
6  directors, current directors, they were all
7  persecuted by this corrupted Chinese official.
8          So Eastern would like to disclosure
9  this corrupted Chinese official.  His legal
10  assets, his crimes, et cetera to bring the justice
11  to China.
12         And it should be a natural
13  understanding to Eastern and all the Chinese
14  people who are persecuted by this bad official.
15         If this official is completely
16  removed, sent to jail, and they will be able to
17  get their justice back including -- you know the
18  relationship between Hong Kong and Beijing; right?
19  You don't need me to explain that.  That will
20  naturally bring justice to Hong Kong for Eastern
21  Profit to release his assets which are illegally
22  frozen.
23    Q    In Hong Kong?
24    A    Correct.
25    Q    And this Mr. Meng is a CCP or, I'm

Page 203

YVETTE WANG
1
2  sorry, PRC official?
3    A    He is Chinese Communist Party
4  official, yes.
5    Q    So that's one person.  You said there
6  was a second person.  Who was that?
7    A    The second person is Sun Li Jum.
8  S-U-N, L-I, J-U-M.
9    Q    Okay.  Go ahead.
10    A    I finished.
11    Q    I'm sorry.  That time you were done.
12  Okay.
13         What was the plan with respect to
14  him?  How was that going to unfreeze the assets?
15    A    A similar plan.
16    Q    Anyone else in your list of 15 names
17  that were going to help unfreeze the Eastern
18  Profit assets in Hong Kong?
19          MS. CLINE:  Objection to form.
20    A    Everyone.
21    Q    Okay.  How were ACA assets able to
22  flow out of Hong Kong?
23          MS. CLINE:  Objection.  Beyond
24          the scope.
25          MR. GREIM:  Let's take a short

Page 204

YVETTE WANG
1
2  break.
3          THE VIDEOGRAPHER:  The time is
4  4:39 p.m., Wednesday, October 30,
5  2019.  This is the end of Media 4 in
6  the deposition of Yvette Wang.
7  We're off the record.
8          (At this time, a brief recess
9  was taken.)
10          THE VIDEOGRAPHER:  The time is
11  4:56 p.m., Wednesday, October 30,
12  2019.
13          This is media number 5 of the
14  videotaped deposition of Missy Wong.
15  We're back on the record.
16  EXAMINATION CONTINUED
17  BY MR. GREIM:
18    Q    Miss Wong, we're going to jump around
19  a little bit between some different topics and try
20  to wrap up today.
21          My first question is earlier we
22  talked about the Power of Attorney by which
23  Eastern Profit granted to Gold Spring, New York.
24          My question for you is who on behalf
25  of Eastern Profit  authorized Han Chunguang to

Page 205

52 (Pages 202 to 205)

YVETTE WANG
2 sign that Power of Attorney?
3          MS. CLINE:  Objection.  I'm not
4 sure that's within the scope.
5          If you know the answer, you can
6 answer.
7     A   I have, I believe, Miss Mei.  M-E-I.
8     Q   Were any lenders, other than ACA,
9 approached by Eastern Profit for purposes of this
10 contract?
11          MS. CLINE:  Again, objection.
12 Beyond the scope.
13     A   I didn't hear about that.
14     Q   In other words, did ACA try to find a
15 competitive -- find competitive loan terms?
16     A   Find competitive loan terms?
17     Q   Right.  In other words, did it see if
18 it could find cheaper financing from somebody
19 other than ACA?
20     A   You're asking do I know or not?
21     Q   My question is did Eastern Profit try
22 to shop for the best loan terms it could?
23     A   I didn't hear about this.
24     Q   Does Eastern Profit have any plan to
25 repay the loan other than getting its assets

Page 206

YVETTE WANG
2 unfrozen in Hong Kong?
3          MS. CLINE:  Objection to form.
4     Q   What do you mean other than assets?
5     Q   Let me go back.
6          So let's suppose that Strategic
7 Vision -- I asked a question, not the same
8 question, but a similar one earlier.
9          Let's suppose Strategic Vision had
10 given Eastern Profit all of the research it wanted
11 for an entire year, for the entire term of the
12 contract.  Let's say that it happened.
13          Did Eastern Profit have any plan to
14 repay ACA's loan other than by effecting political
15 change in China?
16          MS. CLINE:  Objection to form.
17 Hypothetical.
18          You can answer, if you can.
19     A   It's hard to understand your
20 question.  Still I don't quite understand your
21 question.  You mean F, Strategic Vision, they
22 are -- which they are not, they are qualified to
23 deliver the reports which agreed in the contract,
24 which means the contract happened.  I mean with
25 merits or with facts happened.

Page 207

YVETTE WANG
2          So besides Eastern is looking for
3 release their bank accounts from Hong Kong to pay
4 back the loan, is there any other way Eastern
5 planned to pay back?
6     Q   Correct.
7     A   Okay.  I didn't discuss that yet, but
8 I heard kind of like William would be happy to
9 contribute this fund into the entire taking down
10 Chinese Communist Party campaign.  But I don't
11 have too much details.
12     Q   So had the research been successful,
13 Mr. Yu would have been happy to write off the
14 loan?
15          MS. CLINE:  Objection to form.
16     A   Possible.
17     Q   Did Eastern Profit intend to keep
18 borrowing from ACA for the rest of the contract?
19          MS. CLINE:  Objection to the
20          form.
21     A   I think I replied to your question.
22 Still the same answer.  Possible.
23     Q   Did Eastern Profit hire T and M
24 Security to research these names, any of these 15
25 names?

Page 208

YVETTE WANG
2     A   No.
3     Q   Did it hire Robert Tucker or Dunkin
4 Levitt to research any of these 15 names?
5     A   No.
6     Q   Did Eastern Profit expend any money
7 in coming up with its list of 15 names?
8     A   I don't understand the question.
9 Sorry.
10     Q   Did Eastern Profit -- so you've
11 testified that you and Mr. Guo came up with a list
12 of 15 names, and that you considered various
13 factors.
14          My question to you is did Eastern
15 Profit spend any money in developing its list of
16 15 names?
17          MS. CLINE:  Objection to form.
18     A   Spend any money in developing my name
19 at least; right?
20     Q   Correct.
21     A   If you are talking about Eastern's
22 assets were frozen, they could not continue their
23 normal business.  The damage should be count as
24 cost to spend.
25     Q   I'm sorry.  My question was did

Page 209

**30(b)(6) Yvette Wang**
**October 30, 2019**

YVETTE WANG

1
2  Eastern Profit spend money in developing the list
3  of 15 names?
4         MS. CLINE:  Objection to form.
5     A    I don't know, but I will say no.
6     Q    Did Eastern Profit spend any money to
7  develop the supporting materials it provided to
8  Strategic Vision along with the 15 names?
9         MS. CLINE:  Objection to form.
10    A    The 15 names, they are public,
11 international.  No, international information.
12 Why Eastern Profits should spend money to the
13 American names, should spend money to build the
14 list.
15    Q    That's my question to you.  Did it?
16    A    I believe I reply to your question
17 with my question.
18    Q    But I would like an answer.
19        MS. CLINE:  Asked and answered.
20    A    No.  It's public Internet
21 information.  Let me repeat again.  Everyone has
22 access.
23    Q    Was Eastern Profit aware that Guo had
24 hired researchers to investigate the same 15 names
25 that Strategic Vision was researching?

Page 210

YVETTE WANG

1
2         MS. CLINE:  Objection to form.
3         Assumes facts not in evidence.
4     A    No.
5     Q    By the way, some of the accompanying
6  information in the 15 names that Eastern Profit
7  gave to Strategic Vision included birthdays,
8  passport numbers, Social Security numbers.
9         Is it your testimony that all that
10 information was already on the Internet?
11    A    Correct.  You can try.
12    Q    You recall an attempt to retract the
13 two $500,000 wires that ACA sent to Strategic
14 Vision?
15    A    How much money?
16    Q    Two $500,000 wires for a total of
17 $1 million.
18        Do you recall an attempt to retract
19 those wires?
20    A    $250,000.
21    Q    No.  Two $500,000 wires.
22    A    Oh.  Two half million; right?
23    Q    Correct?
24    A    Yes, I remember it.
25    Q    And do you recall asking French

Page 211

YVETTE WANG

1
2  Wallop to have Strategic Vision send the money
3  back to ACA?
4     A    Yes.  I asked Wallop.
5     Q    Why did you ask her to send the money
6  back to ACA instead of to Eastern Profit?
7         MS. CLINE:  Objection.  To the
8         extent all this stuff was asked in
9         the first deposition, and now we're
10        reinventing wheels again.
11        You can answer.
12    A    Eastern Profits bank account is
13 frozen.  How can Eastern be able to receive
14 refund, return, let's say.  Sorry about my
15 language.  Return of money.
16    Q    What is the latest conversation
17 you've had with ACA or William Je about the
18 million dollars?
19        MS. CLINE:  Objection.  Asked
20        and answered.
21    A    Latest conversation, you mean the
22 last conversation today?
23    Q    The most recent, yes.
24    A    Last month.
25    Q    Okay.

Page 212

YVETTE WANG

1
2     A    Or yeah, like a month ago or a month
3  and a half, yeah.
4     Q    Have you spoken with anyone other
5  than William Je at ACA about the loan?
6     A    Nope.
7     Q    A few of the people we've been
8  talking about today here, for one, William Je,
9  where does he reside?
10        MS. CLINE:  Objection.  Again,
11        this is a 30(b)(6) of the Eastern
12        Profit designee.  We specifically had
13        an agreement that we would not go
14        into ACA, it's corporate structure or
15        anything like that, and you know it.
16        This is way outside the scope of our
17        agreement.
18        MR. GREIM:  It sounds like he is
19        a witness.  And if you want to
20        instruct the witness not to answer
21        because it's outside the scope of the
22        agreement, so be it.  I can't make --
23        MS. CLINE:  He's outside the
24        scope.
25    Q    What about Guo Mei, is she in the

Page 213

54 (Pages 210 to 213)

ACKNOWLEDGMENT

STATE OF NEW YORK     )
                    ss:
COUNTY OF _____ )

     I, Yvette Wang, hereby certify that I have
read the transcript of my testimony taken under
oath in my deposition of October 30, 2019; that
the transcript is a true and complete record of my
testimony, and that the answers on the record as
given by me are true and correct.


     _____
          YVETTE WANG


Subscribed and sworn to before me
This      day of            2019
_____
     (NOTARY PUBLIC)

Page 226

CERTIFICATE

     I, Terri Fudens, a stenotype reporter
and Notary Public within and for the State of New
York, do hereby certify:
     That the witness whose testimony is
hereinbefore set forth was duly sworn by me and
that such testimony is a true record of the
testimony given by such witness.
     I further certify that I am not related
to any of the parties by blood or marriage, and
that I am in no way interested in the outcome of
this matter.
     IN WITNESS WHEREOF, I have hereunto set
my hand.


     _____
          Terri Fudens

Page 227

58 (Pages 226 to 227)

# Exhibit J



## Research Agreement
December 29, 2017

This agreement is between Strategic Vision US LLC ("the Contractor"), and Eastern Profit Corporation Limited,("the Client"), for the purpose of providing business research, reporting, documentation, and other consulting services.

**Both parties agree that the nature of this contract, and work related to it, is highly confidential. Both parties are bound by the strictest secrecy not to disclose the existence of the contract, work relating to the contract, sources and methods used to execute the contract; and participants in formulating, supervising, or executing the contract's provisions, to any third party, except as required under United States law or the laws of the State of Nevada.**

To this effect, there will be single line communication between the Contractor and the Client. The individuals through which such communication will be made will be identified upon the initiation of this contract. Any and all materials provided by the Client to the Contractor will be treated with absolute confidentiality and will not be shared by the Contractor with any other entity.

The Contractor will conduct high quality original research and prepare reports on subjects chosen at the Client's discretion, for the purpose of detecting, stopping, and preventing crime or other harm to innocent people. The Client will provide the necessary basic information, and desired areas of focus, to the Contractor to research. The Contractor will produce complete reports and provide all supporting data as indicated below. The research and reports will be devoted to the following three subject categories:

A) **Financial forensic Historical research;**
B) **Current Tracking research;**
C) **Social media research.**

A) **Financial forensic Historical research** will consist of, but not be limited to, in-depth and detailed reports of existing and historical business and financial transactions, on subjects selected by the Client, and relations of the subject as identified by the Client. Business and financial transactions to be researched may include statements, capital sources, inflow and outflow information, bank receipts, financial instruments, financial products, statements of credit, precious metals transfers, commodity transfers, crypto currency exchange, stocks and other equities, business ownership, real property ownership, trusts, large

1

EASTERN-000005

amounts of spending, specific information to indicate the transaction participants, and other data required by the Client.

The Contractor will produce a progress report on this financial forensic research each week in the first month, one preliminary report in the first month, and one comprehensive historical research report within 3 months, and with update reports sin each following month; the Client may require, reports per individual subject to the Client within a specified timeframe, as well as all relevant supporting data.

**B) Current Tracking research** shall consist of, but not be limited to, in-depth and detailed reports on movements of specified subjects by land, air, and sea (private and commercial); schedules and itineraries, addresses and lodging, means of transportation, names of carriers, manifests, geolocation, major events and significant contacts the subjects involved, videos and audio that can be accessed remotely, and other data that may be of relevance to the overall research, such as past travel records that may significant to the research. This work shall consist only of primary source information, multimedia, and prepared reports.

The Contractor will produce concurrent tracking research per individual subject to the Client on a monthly basis, except in the first month that weekly reports shall be delivered and under circumstances that require more frequent reporting (weekly or fortnightly) as the Client directs, for up to a six-month period.

**C)  Social media research** shall consist of, but not be limited to, in-depth and detailed reports on the social media usage and networks of specified subjects and public figures. Research shall include court records, criminal databases, sex offender and child abuse databases, information on subject's family, extramarital affairs, children born out of wedlock, passports and ID documents, assets, videos and audio, emails, websites, pornography and related media, comments on online media, social media (including Facebook, Twitter, Instagram, Snapchat, Wechat, and other sites as the Client may request), "dating" or sexual services apps, online classified ads or their equivalents, video or audio recordings, and other media.

The Contractor will produce social media research per individual subject to the Client on weekly basis for the first month, and on a monthly basis thereafter, except under circumstances that require more frequent reporting (weekly or fortnightly) as the Client directs, or irregular emergencies that the Contractor may discover.

**Information requiring translation.** When the Contractor encounters information requiring translation, the Contractor will provide electronic copies of the material to the Client for the Client to evaluate and translate. The Client may provide

2

translations to the Contractor for the Contractor to include in analytical reports. The Contractor is not responsible for translations.

**Deliverables**. The deliverables under this contract will be comprehensive confidential reports to the client. It is understood that some of the reports will be produced on a regular schedule, and that others will be produced on an as-needed basis. (A) Financial Forensic historical research reports will be produced as specified above one time per subject, subject to occasional updating throughout the year. (B) Current Tracking reports for each subject will be produced monthly or more frequently as Client directs. (C) Social media reports for each subject will be produced monthly or more frequently as Client directs. All deliverables shall be by USB drive only.

**Irregular circumstances**. Both parties understand that occasional unforeseen challenges may arise that will slow or block comprehensive research, and that there may be periods in which information is irregular, unavailable, or incomplete. The Contractor will endeavor to make all research and reports as complete as possible in a timely scheduled manner.

**Criteria**. The Contractor shall provide the deliverables based on the best practices and standards of the industry, comparable to other top firms with similar services. It shall make most diligent efforts to ensure the services renders are of very high quality, revealing a true, complete and full profile of the subject. The Contractor guarantees that all information provided is genuine.

**Prices.** Preamble: The prices for each deliverable "A," "B," and "C" are $300,000. each, per subject (per "fish") per year, for a total of $900,000 per fish per year. The contract is for 10 fish in the tank per year, with each fish being the subject of an A, B, and C report, or a total of 30 reports per year (10 fish x 3 reports each = 30 jobs at any given time, or 30 reports per year).

It is understood that the Client may not wish for each of the 10 fish to be the subject of all three reports, and that the number of report work duties per month will vary. It is also understood that either the Client may find it necessary to remove certain fish from time to time, or the Contractor may find circumstances do not permit sufficient work to research a given fish.

Therefore, when a fish is removed from consideration, a new fish will be put in its place, by the Client, keeping the number of fish being monitored at any time at 10.

However, this solution does not provide for predictable budgeting or workloads. To ensure the maximum workload for predictability of the agreed price, we will measure the deliverables as 30 units per year (10 fish x 3 reports [A+B+C] each = 30 jobs/reports at any given time).

3

The first month  (January) of this contract will include up to 15 fish for a total of 30 reports and will decrease to 10 fish for a total of 30 reports at the beginning of the second month (February) and for (March) and for the duration of this contract.

It is agreed by both Parties that for the first 3 months of this Agreement, January, February and March 2018, that the payment of $750,000. USD will be wired per our instructions to our US Bank account.

It is also agreed by both Parties that after the March reports and payments are made, that all involved Parties will meet to recap the accounting, prior to moving forward with the next quarter. We shall require that with any change to the numbers above 10 fish in the tank, that SVUS will reserve the right to renegotiate our financial Agreement.

The pricing for 30 units or deliverables per year remains a constant $9,000,000 per year, or $750,000 per month for 12 months. These units or deliverables may be mixed and matched as the Client requests. As one unit is deleted from one fish, an extra fish with the equivalent deliverable is added, as shown in the attached charts.

We will measure each of the 30 reports as "report-equivalents" in the event it is necessary to stop work prematurely on one fish, and replace it with a second fish. We then have the partial report on the terminated fish, and a new report for on the replacement fish for the duration of the contract. There is no extra startup charge for the replacement fish in the 12-month period.

The flat price structure is as follows:

A) Comprehensive historical reports: $300,000 per report (or report-equivalent) per year.
B) Tracking reports: $300,000 per report (or report-equivalent) per year.
C) Social media reports: $300,000 per report (or report-equivalent) per year.

Reports may be combined ("mixed and matched") in any combination of up to 30. They are not necessarily 10 of (A), 10 of (B), and 10 of (C); but could be, for example 14 of (A), 8 of (B), and 8 of (C), or whatever totals 30.

The total for 30 units x US$300,000 each is US$9,000,000 (nine million dollars) per year.

**Additional assignments**. Additional research consistent with the above may be added in annual blocks of 10 fish x 3 deliverables each, or 30 deliverables per year, as described above. The Client may direct the Contractor to conduct other research, not specified in this agreement, for an additional fee.

4

CONFIDENTIAL

EASTERN-000008

**Payment terms**. For the purposes of this contract, the year begins the day the contract is signed. Payment is to be made in regular monthly installments of US$750,000, at the end of each month.

The Client will pay the Contractor a deposit of US$1,000,000 (one million dollars) upon signing the contract. The deposit will be credited on a prorated basis to the final 1-1/3 (1.3) months of the contract. Payment is to be made by "same day value" wire transfer to Strategic Vision US, LLC, per the following instructions:

> **Citibank NV Account Wire Instructions**
> Signatory: French C. Wallop, CEO
> Account name: Strategic Vision US, LLC
> Routing # 322271724
> Account # 500371679
> SWIFT code: CITIUS33
> Branch address:
>> Citibank
>> The Lakes
>> 8701 W. Sahara Ave.
>> Las Vegas, NV  89117  USA
> Branch telephone: +1-702-228-2501

Subsequent payments will be made to the same account, unless mutually agreed otherwise in writing. It is understood that the Client may direct other entities to pay the Contractor, and that such payments will be deemed satisfactory compensation by the Contractor. All Client payments must be received by the Contractor by wire transfer within 5 business days of invoice.

Both parties anticipate that this contract could expand to many more subjects of research. The Client has expressly stated that there could be as many as 4000 such 'fish in the tank'. Obviously, negotiations for the far larger range will be agreed upon in writing at a later date.

**Duration**. This contract shall be in force for three (3) years from the date of signing. Either party may terminate the contract with 30 days' written notice.

French C. Wallop, CEO
Strategic Vision US, LLC

Date: _June 6, 2018_

Date: _Jun. 6. 2018_

CONFIDENTIAL

EASTERN-000009

# Exhibit K

Page 1

1

2    IN THE UNITED STATES DISTRICT COURT

3    FOR THE SOUTHERN DISTRICT OF NEW YORK

4    ----------------------------------------x

5    EASTERN PROFIT CORPORATON LIMITED,,

6                   Plaintiff/Counterclaim Defendant,

7

8                      Case No.  18-cv-2185

9              v.

10   STRATEGIC VISION US, LLC,

11                   Defendant/Counterclaim Plaintiff.

12   ----------------------------------------x

13                   10:00 a.m.

                     November 19, 2019

14

                     405 Lexington Avenue

15                   New York, New York

16

17        DEPOSITION of JOHN MICHAEL WALLER,

18   testifying under Rule 30(b)(6) on behalf of

19   STRATEGIC VISION US, LLC in the above entitled

20   matter, pursuant to Notice, before Stephen J.

21   Moore, a Registered Professional Reporter,

22   Certified Realtime Reporter and Notary Public of

23   the State of New York.

24

25

MICHAEL WALLER

1
2     Q     50/50?
3     A     Yes.
4     Q     And there is a written operating
5 agreement, I assume?
6     A     No.
7     Q     It's registered to do business,
8 the LLC?
9     A     Yeah.
10     Q     And where is it registered?
11     A     I think it's Wyoming.
12     Q     Have there ever been any more
13 than two owners?
14     A     No.
15     Q     Georgetown Research did receive
16 payments from Strategic Vision, correct?
17     A     Yes.
18     Q     Can you just describe those
19 payments, very generally?
20     A     Sure, those were provided --
21 they were -- they were either payments to a
22 subcontractor who executed a lot of the work,
23 or to myself.
24          MS. CLINE:  Can you mark this as
25     103.

MICHAEL WALLER

1
2          (The above described document was
3     marked Exhibit SV 103 for identification
4     as of this date.)
5     Q     We have handed you what's been
6 marked as Exhibit 103, and I can represent for
7 the record that the highlight on the first page
8 is mine.
9          But other than that, do you
10 recognize Exhibit 103?
11     A     Yes.
12     Q     What is it?
13     A     It's a bank statement for
14 Georgetown Research from -- for the month of
15 January, 2018.
16     Q     And the first page of Exhibit
17 103 indicates that Georgetown Research received
18 two wire transfers from Strategic Vision, is
19 that correct?
20     A     Yes.
21     Q     And one of them was for $25,000
22 and the other one for $200,000, correct?
23     A     Yes.
24     Q     And then those were made on --
25 those transfers were made on January 16th,

MICHAEL WALLER

1
2 correct?
3     A     Yes.
4     Q     And on the same day there was a
5 withdrawal of $200,000, correct?
6     A     Yes.
7     Q     Do you know where that money
8 went?
9     A     Yes.
10     Q     First of all, was it a
11 withdrawal in cash?
12     A     No.
13     Q     Tell us about that withdrawal.
14     A     It was a -- it was either a bank
15 transfer or a wire.
16     Q     Where did that money go?
17     A     That went to the subcontractor
18 for Team 1.
19     Q     And how was the subcontractor
20 for Team 1 paid?
21     A     Through that payment directly to
22 an account that the Team 1 leader held.
23     Q     By wire transfer?
24     A     Either wire transfer or ACH.
25     Q     So it wasn't a physical -- it

MICHAEL WALLER

1
2 wasn't cash?
3     A     No, it was an electronic
4 payment.
5     Q     Can you turn to page 2 of
6 Exhibit 103, Bates stamped 1956.
7          Does the transaction receipt
8 that has something to do with the $200,000?
9     A     This is very faint.  I can't
10 read the -- I can't read this.
11     Q     Okay, can you see that there are
12 two references to two checking accounts there?
13          Are you able to make that out?
14     A     Yes.
15     Q     Do you know whose checking
16 accounts -- says withdrawal from checking then
17 deposit to checking, do you know whose deposits
18 those are?
19     A     I can't see the numbers.  If you
20 have a better copy I could tell you, on this
21 page?
22     Q     Correct?
23     A     Yes, I can't tell you.
24     Q     You would agree with me that
25 Georgetown Research's account ends in 034,

MICHAEL WALLER

1
2 correct?
3     A     Yes.
4     Q     Do you have any idea whose
5 checking account ends in 001?
6     A     I believe this was Team 1
7 leader.
8           If page 1956 matches this, then
9 it would be Team 1 leader.
10    Q     Was the transfer made to an
11 individual or to an entity?
12    A     To an entity.
13    Q     And are you willing to testify
14 about the name of that entity?
15    A     That's protected under an
16 initial court order by Judge kettle.
17    Q     Do you know what Team 1 leader,
18 was there -- what were the terms under which
19 Team 1's leader was to receive $200,000?
20    A     That was to set up Team 1
21 outside the United States to do the work.
22    Q     And was there any itemization of
23 that $200,000?
24    A     No.
25    Q     So, you have no idea what that

MICHAEL WALLER

1
2 $200,000 was spent on?
3     A     Yes, I do.
4     Q     Okay, what was it?
5     A     It was on computer gear and a
6 computer team.
7     Q     And did Strategic Vision ever
8 get invoices or receipts for either the
9 computer gear or the computer team?
10    A     We got an invoice.
11    Q     From whom?
12    A     Pardon me, Georgetown -- I don't
13 recall whether it was Strategic Vision or
14 Georgetown Research that got an invoice, but
15 one of the two got an invoice.
16          MS. CLINE:  Mark this as the next
17    exhibit, please.
18          (The above described document was
19    marked Exhibit SV 104 for identification
20    as of this date.)
21    A     Yes, this is the invoice.
22    Q     So, yes, so if you would just
23 describe for the record what Exhibit 104 is?
24    A     Exhibit 104 is an issue from
25 Team 1 leader to Georgetown Research for

MICHAEL WALLER

1
2 $200,000.
3     Q     Okay, so in the redacted section
4 of text that's under the word invoice, is that
5 where Team 1's leader's name would appear?
6     A     I believe so, yes.
7     Q     Other than this, is there any
8 written evidence from Team 1 regarding that
9 payment of $200,000?
10    A     No, presumably illegible page
11 1956, but that would be all.
12    Q     Did Team 1 send you a receipt
13 after you paid the invoice that's number 104?
14    A     No.  Not to my recollection.
15    Q     Did you create Exhibit 104?
16    A     I provided the document.
17    Q     So you created the invoice, did
18 anyone at Team 1 ever touch Exhibit 104?
19    A     No.
20    Q     So you just created --
21    A     Touch the --
22    Q     So who created Exhibit 104?
23    A     Team 1 did.  I created the
24 exhibit in discovery, but Team 1 created the
25 document.

MICHAEL WALLER

1
2           I mean this is Team 1's invoice
3 to Georgetown Research which I provided as
4 Georgetown Research, I provided in discovery.
5     Q     Okay, putting aside who produced
6 it in discovery, who physically typed this up?
7     A     Team 1.
8     Q     Okay, and so you received this
9 document that is Exhibit 104 from someone at
10 Team 1, correct?
11    A     Yes.
12    Q     Then just to close the loop, so
13 in connection with this invoice dated January
14 6, Georgetown Research made a wire transaction
15 on January 16th, is that right?
16    A     Yes.
17    Q     And then -- but you are not
18 aware of any receipt that Team 1 provided when
19 it received the funds, is that correct?
20    A     Correct.
21    Q     And you never got an itemization
22 from Team 1 as to how that $200,000 was spent,
23 correct?
24    A     Correct.
25    Q     To the best of your knowledge it

MICHAEL WALLER

1
2 was spent on computer gear, computer teams, but
3 you can't say anything more specific than that?
4     A     Correct.
5     Q     Was there an understanding
6 between Strategic Vision and Team 1 about
7 expenses beyond $200,000?
8     A     No, that was a flat rate payment
9 system that we had, and we structured
10 everything in a way to protect Mr. Guo from
11 being discovered by the Chinese.
12         So in our discussing the
13 contract, as we were arranging this with
14 Mr. Guo, we said that all invoicing would be
15 kept to a minimum and there would be as little
16 paperwork as possible in order to prevent the
17 Chinese government from finding out about this
18 activity.
19         So, likewise, we were not to
20 have invoiced either, there would just be
21 certain payments made verbally, through a
22 verbal arrangement.
23     Q     I'm sorry, there would be
24 payments made?
25     A     Right.

MICHAEL WALLER

1
2     Q     Through a verbal?
3     A     Right, so invoices would be
4 verbal.
5     Q     Invoices would be oral, you
6 mean, not written down?
7     A     Right.
8     Q     And how physically did Team 1
9 transmit this invoice to Georgetown Research?
10    A     By hand.
11    Q     And where did that take place?
12    A     Probably in Washington, D.C.
13    Q     Do you remember?
14    A     Not for facts.
15    Q     So you met face-to-face with the
16 leader of Team 1 in Washington, is that right?
17    A     Yes, in the D.C. area.
18    Q     What was the date on which you
19 and he met?
20    A     We met many times.
21        In terms of this contract, we
22 met many times between November and -- November
23 2017 and March 2018.
24    Q     Do you remember when he gave you
25 this invoice that's Exhibit 104?

MICHAEL WALLER

1
2     A     On or about January 6, 2018.
3     Q     Did Strategic Vision ask Team 1
4 to search its records for documents relevant to
5 this litigation?
6     A     Yes.
7     Q     And did they provide any?
8     A     There were no documents.
9     Q     Turn, if you would, in Exhibit
10 103 to Bates page 1957.
11        And this relates to -- it's a
12 bank account statement as of February 28th of
13 2018, correct?
14    A     Yes.
15    Q     There are two payments that are
16 American Express payments, do you see those?
17    A     Yes.
18    Q     Whose American Express is being
19 paid there?
20    A     That was my American Express.
21    Q     And then there is a wire
22 transfer to Allied Special Operations Group, do
23 you see that?
24    A     Yes.
25    Q     That's been referred to as Team

MICHAEL WALLER

1
2 2 in this litigation, is that correct?
3     A     Yes.
4     Q     And that was the entirety of the
5 payment to Team 2, correct?
6     A     Yes.
7     Q     So, in terms of outgoing funds
8 from Georgetown Research, we have a $200,000
9 deposit that goes to Team 1, correct?
10    A     Yes.
11    Q     And we have call it
12 approximately $3,000 in your American Express
13 payment, correct?
14    A     Yes.
15    Q     And then the transfer to Team 2
16 for approximately $5,400, right?
17    A     Yes.
18    Q     And then turn, if you would, to
19 the next page, to 1958, you see there are two
20 more American Express payments, right?
21    A     Yes.
22    Q     And those coordinate or
23 correspond to reimbursement invoices that you
24 submitted personally, correct?
25    A     Yes, I believe so.

21 (Pages 78 - 81)

MICHAEL WALLER

2    Q    Do you know why there are two
3 payments to American Express in the same month?
4    A    No.
5    Q    Was Georgetown research paying
6 anyone's American Express bill other than
7 yours?
8    A    No.
9    Q    All right, so then in March we
10 have approximately $8,000 in business expenses,
11 right?
12    A    Well, they were February, but
13 credited in March.
14    Q    Excuse me, fair, yes.
15        Turn the page to 1959, do you
16 see that?
17    A    Yes.
18    Q    There is one payment in April,
19 correct?
20    A    Yes.
21    Q    And that's made to your American
22 Express account?
23    A    Yes.
24    Q    And do those expenses tie out to
25 a reimbursement invoice, do you know?

MICHAEL WALLER

2    A    Probably, because it's an odd
3 number.
4    Q    But that's your American
5 Express?
6    A    Yes.
7    Q    The bill, correct?
8    A    Yes.
9    Q    And then turn to the last page,
10 if you would, which is a bank statement as of
11 May 31; do you see that?
12    A    Yes.
13    Q    And the first entry is a wire
14 transfer from Strategic Vision for $15,000; do
15 you see that?
16    A    Yes.
17    Q    Why was that transfer made?
18    A    I don't recall.
19    Q    Do you know whether that was
20 part of the $250,000 in earnings that you
21 received personally?
22    A    I don't recall.
23    Q    Do you recall when the research
24 agreement at issue here was terminated?
25    A    It would have been effective

MICHAEL WALLER

2 around March 25th of 2018.
3    Q    Right, so in light of that, do
4 you have any explanation for why there are
5 still being payments made in May to Georgetown
6 Research?
7    A    Because we ended up using
8 Georgetown Research for other purposes.
9    Q    When did that start taking
10 place?
11    A    After the termination of the
12 contract.
13    Q    When specifically?
14    A    Well, if you find the date of
15 the termination of the contract, you get the
16 date of the change.
17    Q    What were the purposes for which
18 you used it immediately after the contract
19 termination?
20    A    First there were still bills to
21 be paid, and second there was other business to
22 be done through things having nothing to do
23 with this contract.
24    Q    So, with respect to the
25 transaction listed in the May bank statement,

MICHAEL WALLER

2 we talked about the $15,000 credit and you
3 don't know why that was made, correct?
4    A    Correct.
5    Q    Then there is a payment to you,
6 the $15,000; do you see that?
7    A    Yes.
8    Q    I'm sorry if you answered this,
9 is that included in your $250,000, or no?
10    A    I would have to go back and
11 check, but I did say approximately $250,000.
12    Q    And then there is another AMEX
13 payment on May 7, do you see that?
14    A    Yes.
15    Q    And what business expenses could
16 be being paid on May 7th with respect to this
17 contract if it terminated effective in March?
18    A    I didn't say this was related to
19 the contract.
20    Q    Okay, so then you tell me then,
21 is this bill payment on May 7, is that not
22 related to this case, not related to Eastern
23 Profit?
24    A    I don't know, I don't believe
25 so.

22 (Pages 82 - 85)

MICHAEL WALLER

1
2      A     Yes.
3      Q     And Strategic Vision did not
4  return any portion of that deposit to ACA
5  Capital, did it?
6      A     Correct.  No, it did not.
7      Q     Turn, if you would again, you
8  might still be there, page 5 of the research
9  agreement.
10          Sort of in the middle of the
11  page there is a paragraph that starts with the
12  word subsequent, do you see that?
13     A     Yes.
14     Q     Then so there is a sentence that
15  starts with the word I will just read it all,
16  "subsequent payments will be made to the same
17  account unless mutually agreed otherwise in
18  writing."
19          Do you see that?
20     A     Yes.
21     Q     Then it says, "It is understood
22  that the client may direct other entities to
23  pay the contractor and that such payments will
24  be deemed satisfactory."
25          Do you see that?

MICHAEL WALLER

1
2      A     Yes.
3      Q     Are you aware of any prohibition
4  in the contract that prohibited Eastern Profit
5  from making payments from entities other than
6  Eastern Profit?
7      A     It was explicit that they would
8  be all entities controlled by Guo Wengui, that
9  it was his money, and that he would -- he may
10  use various vehicles to conceal from the
11  Chinese government the fact that he was making
12  these payments.
13     Q     And there was no prohibition
14  that --
15          MS. CLINE:  Strike that.
16     Q     The parties -- there was no
17  prohibition in the contract preventing Eastern
18  Profit from making payment from an entity based
19  in Hong Kong, was there?
20     A     Let me review this.
21          In our negotiations with him, it
22  was explicit that there would never be a
23  payment straight from Hong Kong, because that
24  would violate basic operational security
25  compromising both Mr. Guo and all of us.

MICHAEL WALLER

1
2      Q     But that never got memorialized
3  in the written contract, correct?
4      A     Correct.
5      Q     Just generally speaking, from a
6  business perspective of Strategic Vision, what
7  was -- what services was Strategic Vision
8  agreeing to provide to Eastern Profit under the
9  agreement?
10          MR. GREIM:  Objection, vague.
11          And one thing I'll say is this is
12  all material that was in the original
13  petition -- sorry, claim and counterclaim,
14  it was already covered in the 30(b)(6) of
15  Strategic Vision.
16          So none of this about the
17  statements of the services to be provided
18  is new, and that's what we are limiting
19  today to.
20          MS. CLINE:  The notice does call
21  for documents that were newly produced,
22  including a giant stack of handwritten
23  notes by Mr. Waller regarding the
24  negotiations of the contract.
25          So I'm entitled to ask him his

MICHAEL WALLER

1
2  understanding of the contract.
3          If they are inconsistent with his
4  notes, then I will impeach him.
5          MR. GREIM:  Fair enough.  I agree
6  with that.
7          MS. CLINE:  Would you read back
8  the last question and answer.
9          (The portion of the record
10  requested was read back by the reporter.)
11     Q     Can you answer that question?
12     A     In summary, the agreements were
13  to dig up information on Chinese Communist
14  Party members and their family members and
15  their illegitimate children who would not
16  overtly be connected to them, who were running
17  or managing illegally gotten gains or money
18  stolen by the CCP officials for their own self
19  enrichment and any other kind of information
20  that would show their breaking Chinese law or
21  Communist Party "morality," anything that would
22  cause them to be shown to be breaking Chinese
23  law, American law and by extension discrediting
24  the party leadership.
25     Q     And there were certain reports

25 (Pages 94 - 97)

MICHAEL WALLER

1
2  or deliverables to be provided under the
3  contract, correct?
4      A    Yes.
5      Q    And the deliverables would be
6  delivered by USB only, correct?
7      A    Correct.
8      Q    Turn, if you would, to the first
9  page of Exhibit Han 11.
10         I direct your attention to the
11  bottom of the page, paragraph A.
12         There is a sub-bullet there that
13  says, "Financial forensic historical research."
14         Do you see that?
15     A    Yes.
16     Q    And that was one of the types of
17  deliverables to be provided, correct?
18     A    Yes.
19     Q    And specifically if you go to
20  the second line of that paragraph, it says,
21  "Research will consist of in-depth and detailed
22  reports of existing and historical business and
23  financial transactions."
24         Do you see that?
25     A    Yes.

MICHAEL WALLER

1
2      Q    Did Strategic Vision ever
3  produce such a deliverable?
4      A    Mr. Guo did not give us time.
5      Q    But just -- can you just answer
6  my question so the record is clear.
7         Did Strategic Vision ever
8  produce such a deliverable?
9      A    Mr. Guo made it impossible for
10  us to deliver that kind of material.
11     Q    So Strategic Vision did not
12  deliver that material, correct?
13     A    I already said my answer.
14     Q    I need an answer to the question
15  I understand.
16     A    I answered your question.
17     Q    I understand that you have
18  another argument, but I need an answer to the
19  question.
20         Did Strategic Vision ever
21  provide the in-depth and detailed reports of
22  existing and historical business and financial
23  transactions mentioned in the last paragraph of
24  page 1?
25     A    I will say again, Mr. Guo did

MICHAEL WALLER

1
2  not permit us to do that, so we did not deliver
3  them.
4      Q    If you turn the page and go to
5  section B, it says, "Current tracking
6  research."
7         Do you see that?
8      A    Yes.
9      Q    And it says, "Current tracking
10  research shall consist of, but not will be
11  limited to in depth and detailed reports on
12  movements of specified subjects by land, air
13  and sea."
14         Do you see that?
15     A    Yes.
16     Q    Did Strategic Vision deliver any
17  reports of that nature?
18     A    Yes.
19     Q    Describe that?
20     A    We found movements of specific
21  subjects by land and air, private and
22  commercial, addresses and lodging, means of
23  transportation, geolocation, and Mr. Guo
24  refused to accept that information.
25     Q    Did you attempt to provide that

MICHAEL WALLER

1
2  information to Mr. Guo?
3      A    Yes.
4      Q    By what means?
5      A    By -- through Lianchao Han in
6  February, the first or second week of February,
7  2018.
8      Q    Tell me about that.
9      A    This was work we had found
10  through Team 2.
11     Q    Team 2 is the ASOG team?
12     A    Yes.
13     Q    And what was the deliverable
14  that --
15         MS. CLINE:  Well, strike that.
16     Q    Tell me about what Team 2 found?
17     A    Well, first of all we had a
18  problem because there were questions about
19  whether the research methodology was legal.
20         We sought Mr. Guo's guidance on
21  that and he refused to give that guidance, so
22  we could not produce the data for him that had
23  been retrieved.
24         We could not provide him with
25  the data that had been retrieved because we

26 (Pages 98 - 101)

MICHAEL WALLER

1            MICHAEL WALLER
2   were concerned about the legality of the way in
3   which it was collected.
4       Q    Did Strategic Vision then
5   receive from Team 2 a deliverable on a USB?
6       A    No, we received the deliverable
7   on paper in their offices.  They refused to
8   provide all of the data because of their
9   concerns about legality, but they gave us a
10  summary of it.
11           We went back to Mr. Guo through
12  Lianchao Han for guidance saying we found
13  information but we have hit an impasse, can you
14  give us guidance on what to do?
15           He refused to provide that
16  guidance.
17      Q    The -- so, ASOG gave you written
18  documentation?
19      A    He showed us.
20      Q    What did they show you?
21      A    It was a stack of about half an
22  inch thick or more, maybe three-quarters of an
23  inch thick of their actual documentation
24  concerning flights from Shanghai to Los Angeles
25  International Airport on private planes with

1            MICHAEL WALLER
2   the tail numbers that went to a private hangar
3   where U.S. Customs had no inspectors.
4            It had an airport in Wisconsin
5   where these planes would be parked.
6            It had names of individuals
7   doing transit on those and other aircraft,
8   these were private flights.
9            It had -- let me see, back on
10  this tracking research, it had significant
11  contacts of the subjects involved.
12           So it was a perfect set of
13  datapoints through which to begin a serious
14  deep dive, but we asked Mr. Guo for guidance
15  because we -- he refused to provide that
16  guidance, that's why we did not provide him the
17  data.
18      Q    So, Strategic Vision -- sorry,
19  ASOG showed you this information in hard copy
20  form?
21      A    Yes.
22      Q    And you didn't receive a
23  photocopy of that information?
24      A    No, they refused to provide it;
25  because of questions of legality.

1            MICHAEL WALLER
2       Q    And Strategic Vision subpoenaed
3   ASOG in this case, right?
4       A    Yes.
5       Q    And is there anything of the
6   sort of what you're describing produced by ASOG
7   in this case?
8            MR. GREIM:  Hold on, hold on.
9       Actually Eastern Profit subpoenaed ASOG,
10      Strategic Vision subpoenaed the person
11      named in ASOG's response to your client.
12      Q    Okay, so Strategic Vision
13  subpoenaed Adam Kraft?
14           MR. GREIM:  That's right.
15      Q    Is that your understanding?
16      A    I stand corrected from my
17  previous statement.  Yes, that is my
18  understanding.
19      Q    And did Mr. Kraft produce any
20  documents in response to the subpoena, to your
21  knowledge?
22      A    I don't know.
23           MR. GREIM:  I will take this one
24      just to be clear; he did not.
25           MS. CLINE:  Let's mark this one

1            MICHAEL WALLER
2   as the next up, please.
3            (The above described document was
4       marked Exhibit SV 105 for identification
5       as of this date.)
6       Q    Have you seen Exhibit number 105
7   before?
8       A    Yes.
9       Q    What is it?
10      A    This is an invoice from Allied
11  Special Operations Group, ASOG, from March 2018
12  for the work that we just discussed.
13      Q    Originally they were set to
14  invoice Strategic Vision over $100,000,
15  correct?
16      A    Correct.
17      Q    And then ultimately they only
18  invoiced Strategic Vision $5,400,
19  approximately?
20      A    Yes.
21      Q    You see on the page 2 of the
22  invoice there is an asterisk at the top next to
23  the words termination credit, do you see that?
24      A    Yes.
25      Q    It says see note below?

27 (Pages 102 - 105)

MICHAEL WALLER

1
2     A     Yes.
3     Q     Then at the bottom -- well, the
4  last text on the page there is a bullet that
5  says "termination credit," do you see that?
6     A     Yes.
7     Q     It says, "Client advised all
8  targets are RP by NCS."
9            Do you see that?
10    A     Yes.
11    Q     What does that mean?
12    A     This was the reason why they,
13  ASOG, did not provide us physical copies of the
14  data, because of questions of legality.
15           The targets that Mrs. Wang gave
16  us on behalf of Mr. Guo were -- which we
17  provided to ASOG, were designated as RP or
18  records protected.
19           And what ASOG told us is that RP
20  stands for -- as a designation for foreign
21  nationals whose files are protected by federal
22  authorities either because they are subject of
23  national security investigation,
24  counterterrorism investigation, criminal
25  investigation, or they may be subject to it, or

MICHAEL WALLER

1
2  conversely they may be collaborating with U.S.
3  authorities.
4            So they want to keep those
5  records private so that nobody finds out about
6  any of this until the government deems
7  necessary.
8            It was because of ASOG
9  discovering this RP designation that it was
10  unable to provide us with the data that it
11  provided.
12    Q     And do you know, did they tell
13  you what NCS means?
14    A     If I recall correctly it's
15  National Counterterrorism Service but I am not
16  sure.
17    Q     Did they provide a statutory
18  site about this restricted persons concept?
19    A     No.
20    Q     Had you ever heard it before?
21    A     No.
22    Q     The next line says, "ASOG
23  requests explanation by client.  No explanation
24  provided."
25           Do you see that?

MICHAEL WALLER

1
2     A     Yes.
3     Q     Do you know what that means?
4     A     Yes.
5     Q     Can you explain it?
6     A     Yes.  They wanted to know who we
7  were seeking this information for, and we
8  wouldn't tell them in order to protect our
9  agreement with Mr. Guo, and they immediately
10  suspected that it was Mr. Guo because of how
11  those names could be found open source linked
12  to his.
13           And we wouldn't acknowledge that
14  either, and then they suspected that this may
15  be a China's foreign counterintelligence
16  operation and that we were being used for those
17  purposes to assist the Chinese Secret Service
18  in finding information on that selective list
19  of people, meaning what did the U.S. Government
20  know or what was the status of the U.S.
21  criminal investigation of them.
22    Q     Can you just describe what you
23  mean by open source linked?
24    A     So, you go through social media
25  or any online media that's open source and you

MICHAEL WALLER

1
2  collect that on a very large scale, aggregate
3  it, then do your link analysis to find out what
4  some of the common names are.
5            And Guo had apparently denounced
6  a lot of these people in his videos or in his
7  public statements, and they -- leading those
8  analysts here immediately to assume that our
9  client was Guo.
10    Q     Does open source mean public?
11    A     Yes.
12    Q     How did ASOG deliver this
13  invoice that's Exhibit 105 to Strategic Vision?
14    A     I don't remember if it was by
15  hand or by e-mail, but -- I know it was by
16  e-mail, but I don't know if it was both.
17    Q     The documents that they showed
18  you, that was in Texas?
19    A     Yes.
20    Q     And who was present for that
21  meeting?
22    A     That was Adam Kraft who was the
23  CEO, that was the CFO, Russ, last name began
24  with R, I will remember it, and then the COO I
25  will recall his name, it's -- if I see their

28 (Pages 106 - 109)

Page 110

MICHAEL WALLER

1    website I can tell you who the names were.
2    And then there were three
3    analysts who I only knew by their first names.
4
5    Q    Was anyone there on behalf of
6    Strategic Vision other than yourself?
7    A    Yes, French Wallop was there.
8    Q    Was anyone else present other
9    than the three individuals you described?
10    A    No.
11    Q    And, I'm sorry, you may have
12    said this and I just didn't remember, where in
13    Texas was the meeting?
14    A    Addison, Texas, it was right
15    outside Dallas.
16    Q    At their offices?
17    A    Yes.
18    Q    Other than that -- so that
19    information never ended up on a USB drive that
20    was in your possession, correct?
21    A    No.
22    Q    And it certainly never made its
23    way to Eastern Profit, correct?
24    A    Correct.  We got into a big
25    argument with them about it, saying we were

Page 111

MICHAEL WALLER

1
2    ready to pay for it, she should have told us
3    this ahead of time, and this was causing
4    problems for us and for the client, and they
5    said this, if we give it to you, it's going to
6    break federal law, so no.
7    That's when we went back to
8    Mr. Guo for guidance through Lianchao Han about
9    what to do next.
10    Q    When you say we and they,
11    meaning Strategic Vision got into an argument
12    with ASOG?
13    A    Correct.
14    Q    So, other than the stack of hard
15    copy papers that you described that you saw but
16    didn't receive from ASOG, did Strategic Vision
17    compile any other tracking research consistent
18    with paragraph B on page 2 of the agreement?
19    A    No, that was our first crack at
20    the tracking research.
21    Q    And then -- just bear with me.
22    A    I might also add that it was a
23    problem on the legality side because while
24    Lianchao Han was scrupulous about obeying U.S.
25    law, Yvette Wang was not, and she even once

Page 112

MICHAEL WALLER

1
2    said I don't care if it's legal, just get it.
3    MS. CLINE:  Move to strike.
4    A    That is a completion of my
5    answer.  I ask that my comments be retained for
6    the record.
7    Q    If you drop down to paragraph C
8    on page 2 of the agreement, social media
9    research, do you see that subtitle?
10    A    Yes.
11    Q    It goes on to say, "Shall
12    consist of in-depth and detailed reports on the
13    social media usage and networks of specified
14    subjects and public figures."
15    Do you see that?
16    A    Yes.
17    Q    Did Strategic Vision ever
18    provide a deliverable that meets that
19    description?
20    A    Yes.
21    Q    Tell me about that.
22    A    It first obviously is to
23    research anything or anyone you need to do
24    basic research on it, so Team 1 did its own
25    initial research through open source or public

Page 113

MICHAEL WALLER

1
2    social media on certain of the targets on that
3    15 person list.
4    That was their own basic work.
5    So the only report, in quotes, that we provided
6    as a deliverable was showing how the research
7    team was setting up its methodology to collect
8    this data, but we did not -- that was the
9    extent of the report, it was just an initial
10    status report after the first week.
11    Q    Okay.
12    A    Or two.
13    Q    So there was a report on
14    methodology, correct?
15    A    Yes, but keep in mind our
16    reports were not supposed to be analytical,
17    they were supposed to be showing raw data.
18    But we wanted to demonstrate to
19    the client the methodology that was being used
20    so that the client would understand how the
21    work was being done.
22    Q    Okay, but was there a
23    deliverable provided that detailed the social
24    media usage and networks of the subjects?
25    A    No, only the methodology

29 (Pages 110 - 113)

MICHAEL WALLER

1    deliverable that I just mentioned.
2        Q    Just to close the loop, that
3    methodology report was delivered how and when
4    and to whom?
5        A    It was delivered to Yvette Wang
6    by USB port and I was told, "This is all shit,
7    it's worthless.  Don't bother with this."
8        Q    And was this the delivery on
9    January of 26th?
10       A    It was said on two occasion.
11       Q    The delivery of the methodology
12   report with respect to social media research,
13   when was that made?
14       A    It was either January 26th, I
15   think it was -- I think it was January 26th.
16       Q    Was there more than one report
17   on social media methodology?
18       A    No, but I don't remember if it
19   was on -- if it was delivered on that day or at
20   a nearby day, I just want to be careful about
21   the date.
22       Q    And, in total, how many USB
23   drives did Strategic Vision deliver to Eastern
24   Profit?
25

MICHAEL WALLER

1        A    Either two or three to Yvette
2    Wang.  I think it was two, but it might have
3    been three.
4        Q    So, one would be the social
5    media research methodology report you just
6    mentioned, correct?
7        A    Yes.
8        Q    And what was the nature of the
9    other USB deliverable?
10       A    It was raw code.
11       Q    When was that delivery made?
12       A    On or about the 30th of January
13   2018.
14       Q    And did the raw code relate
15   to --
16           MS. CLINE:  Sorry, let me strike
17       that.
18       Q    Turn back to page 1 of the
19   contract, if you would.
20           You see that there are the three
21   indented bullets, financial, forensic
22   historical research, current tracking research
23   and social media research; do you see that?
24       A    Yes.
25

MICHAEL WALLER

1        Q    And the second USB that was all
2    code, does that relate to any of those three
3    subject matter areas?
4        A    It related to all three.
5            Let me say it potentially
6    related to all three.
7        Q    What do you mean by potentially?
8        A    It was still encrypted code and
9    Ms. Wang and Mr. Guo were insistent that we
10   deliver it regardless.
11           I said it hasn't been decrypted
12   yet, and they essentially said we don't care,
13   we want it anyway.
14           We said it won't be of any use
15   to you until it's decrypted.  So I went and
16   retrieved it anyway for them.
17       Q    I am just going to show you a
18   document, I'm not going to mark it yet because
19   I think I know what the answer to this question
20   is going to be.
21           Do you see this document, it has
22   a color code key at the top of it?
23       A    Yes.
24       Q    What's the Bates label on the
25

MICHAEL WALLER

1    bottom of the page?
2        A    SVUS 001939.
3        Q    That's Ms. Wallop's document, is
4    that correct?
5        A    Yes.
6        Q    You are not here to testify
7    about that?
8        A    Correct.
9        Q    So turn back, if you would, to
10   the Strategic Vision's counterclaim.
11           And specifically page 31
12   paragraph 36?
13       A    Yes.
14       Q    All right, let's start with the
15   first sentence, says, "Strategic Vision's team
16   working in other countries also found troubling
17   breaches of security by Eastern Profit and Guo
18   that frustrated and prevented Strategic
19   Vision's performance."
20           Do you see that?
21       A    Yes.
22       Q    Which team is Strategic Vision
23   referring to there?
24       A    Team 1.

30 (Pages 114 - 117)

MICHAEL WALLER

1 alarms," so after "they", Team 1, "came to us
2 for guidance," and we go to M, which is Miles
3 Kwok or Wengui, "for guidance to provide it
4 back," so they were requesting guidance on
5 that.
6
7        Q    I was confused by your
8 testimony, did Mr. Guo ever represent to
9 Strategic Vision that he had hired other teams
10 to do similar research?
11       A    He said he had in the past, but
12 he said he had three or four other teams,
13 meaning at his disposal, but he didn't say one
14 way or another whether he had hired them at the
15 same time.
16       Q    So the only basis for the
17 allegation that there were other teams actively
18 researching the same targets is what you
19 learned from Team 1, isn't that correct?
20       A    Yes, so these were the people
21 actually doing the work, and they found someone
22 else out there is searching in the same
23 territory we were and we fear a security
24 breach.
25             I believe I have other notes on

MICHAEL WALLER

1
2 the other notebook which is not in this
3 exhibit.
4        Q    While we are on that page, there
5 is, sort of talking about page 1788, there is a
6 list of cities sort of on the right margin,
7 what do those represent?
8        A    Those are the codes where we
9 would say let's meet at a certain place,
10 because Mr. Guo insisted that all of the
11 exchanges of information be done in person by
12 USB drive and not online.
13             So, I would send a text, see you
14 at 17, with I would mean see you in Zurich, so
15 that was our code key.
16       Q    But this particular conversation
17 that was on January 25th was it -- was by
18 phone?
19       A    No, it was in person.
20       Q    You see right under your
21 follow-up 1/25 there is an asterisk, do you see
22 that?
23       A    Um-hum.
24       Q    It says, "Called for a status
25 report on all 30 pieces?"

MICHAEL WALLER

1
2        A    Yes.
3        Q    What does called mean?
4        A    That means the client had called
5 for a status report.  It doesn't mean telephone
6 call.
7        Q    So meaning Eastern Profit had
8 called you?
9        A    No, Mr. Guo had contacted us
10 through Yvette Wang.
11       Q    Called for, meaning requested?
12       A    Yes.  Ms. Wang contacted us to
13 get the latest status report.
14       Q    And what do you mean by all 30
15 pieces?
16       A    I would presume that meant a
17 reference to the fish.  So it's 30 in the
18 contract.
19       Q    Please turn to the next page, if
20 you would.
21       A    By the way, right below that it
22 says, "We can't do a hard start each month."
23             That referred to the -- what
24 amounted to tortious interference of stopping
25 Team 1 by having the leader travel abroad and

MICHAEL WALLER

1
2 then having me travel abroad to meet every few
3 days to exchange whatever partial data that
4 they were able to recover.
5             So this was impeding their
6 efforts.
7        Q    So what were the terms of the
8 contract between you and Team 1?
9        A    Strategic Vision and Team 1?
10       Q    Sorry, Strategic Vision and Team
11 1.
12       A    That the contract was to do the
13 deep dive research on -- for the first month on
14 all 15 of the -- all the main 15 names listed
15 on that 89 page document  and then from that
16 point on ten more names or ten names every
17 month, not 15.
18       Q    But what did the -- we saw an
19 invoice for $200,000 earlier, do you recall
20 that?
21       A    Yes.
22       Q    And what was supposed to have
23 been accomplished for that $200,000?
24       A    So that was the setup for the --
25 because we did not have, nor did we ever

MICHAEL WALLER

1
2 present the notion that we had an existing
3 office or set of offices for this, we would do
4 all our work setting out fresh teams, so there
5 is no continuity, and it avoids detection, so
6 we want to keep security for our clients.
7          In this case we would set up a
8 new team abroad, and that team needed new
9 computer equipment, so you want to make sure
10 there is no electronic ability to trace
11 anything that's being done, so you are buying
12 devices in cash in third countries to be
13 brought to another country where the team is
14 set up.
15          So it's all those start up
16 costs, related security costs, and then the
17 team members themselves.
18     Q    Did you -- did Strategic
19 Vision --
20          MS. CLINE:  So strike that.
21     Q    When we looked at the research
22 agreement between Eastern Profit and Strategic
23 Vision there was a concept of deliverables,
24 right?
25     A    Yes.

MICHAEL WALLER

1
2     Q    When Strategic Vision turned
3 around and contracted with Team 1, did it
4 import any concept of deliverables into the
5 contract between Team 1 and Strategic Vision?
6     A    Simply give us the raw data that
7 you have when requested.
8     Q    Did you provide Team 1 with a
9 copy of the Eastern Profit research agreement?
10    A    No.
11    Q    How did Team 1 know what the
12 subject matters were, what the deliverable
13 format was supposed to be?
14          How did they know those things?
15    A    We just provided Team 1 with the
16 list.
17          That's all the client requested,
18 he just said find out everything you can on
19 this list of 15 names.
20          The problem, of course, was
21 there is so much data to find and how do you
22 narrow it down?
23          And some of the data is either
24 security or illegal to obtain, and some of it
25 doesn't exist, and as Team 1 found out, two of

MICHAEL WALLER

1
2 the names were either misspelled and sent the
3 researchers in the wrong direction, or they
4 might not have been real names of real people
5 in the first place.
6          So you have to sift all that out
7 in the beginning and then narrow down what does
8 the client want, that's why the whole thing
9 always required client guidance.
10    Q    And did Strategic Vision give
11 Team 1 any guidance regarding financial,
12 forensic historical research, current tracking
13 research or social media research?
14    A    Yes.
15    Q    Tell us about that, what kind of
16 guidance did Strategic Vision give Team 1?
17    A    So first the team has to
18 familiarize themselves with the subject matter,
19 that meant for them to go through all open
20 source material so they could learn everything
21 they could so they would know where to look and
22 where not to look; that's standard for any
23 research project.
24          And then they would go for what
25 was easiest to retrieve, figure out what's

MICHAEL WALLER

1
2 easiest to get and then bring that data back,
3 and that's going to be mainly open source
4 material.
5          And then to go into the more
6 difficult parts, but first you have to
7 establish what you can find, the most easiest
8 way, and then go for the tougher stuff later.
9          But it's an iterative process
10 and you are constantly going back to the client
11 for guidance.
12          And it takes a while to start
13 up.
14    Q    Did the pricing that Strategic
15 Vision established with Team 1, was it related
16 in any way to the pricing in the contract
17 between Eastern Profit and Strategic Vision?
18    A    It was a flat rate pricing for
19 Team 1.
20    Q    But was that flat rate in any
21 way tied to the Eastern Profit contract?
22          MR. GREIM:  Objection, vague.
23    A    I don't know what you mean by
24 tied.
25    Q    How did you come up with a flat

34 (Pages 130 - 133)

Page 186

```
1        C E R T I F I C A T E
2
3        I, the undersigned, a Certified
         Shorthand Reporter of the State of New
         York, do hereby certify:
4        That the foregoing proceedings were
         taken before me at the time and place
5        herein set forth; that any witnesses in
         the foregoing proceedings, prior to
6        testifying, were duly sworn; that a record
         of the proceedings was made by me using
7        machine shorthand which was thereafter
         transcribed under my direction;
8        That the foregoing transcript is a
         true record of the testimony given.
9        Further, that if the foregoing
         pertains to the original transcript of a
10       deposition in a federal case before
         completion of the proceedings, review of
11       the transcript [x ] was [ ] was not
         requested.
12
13       I further certify I am neither
         financially interested in the action nor a
         relative or employee of any attorney or
14       party to this action.
         IN WITNESS WHEREOF, I have this
15       date subscribed my name.
16       Dated: 12/4/19
17
18
19
20
21
         Stephen J. Moore
22       RPR, CRR
23
24
25
```

Page 187

```
1
2    DECLARATION UNDER PENALTY OF PERJURY
3        Case Name: EASTERN v. STRATEGIC
4        Date of Deposition: November 19,
5        2019
6
7        I, MICHAEL WALLER, hereby certify
8        Under penalty of perjury under the
9    laws of the State of New York that the
10   foregoing is true and correct.
11       Executed this _____ day of
12       _____, 2019, at
13       _____.
14
15
16   _____
17
18       MICHAEL WALLER
19
20
21
22
23
24
25
```

Page 188

```
1
2        DEPOSITION ERRATA SHEET
3        Case Name: EASTERN v. STRATEGIC.
4        Name of Witness: MICHAEL WALLER
5        Date of Deposition: November 19,
6        2019
7        Reason Codes:  1. To clarify the
8        record.
9        2. To conform to the facts.
10       3. To correct transcription errors.
11   Page _____ Line _____ Reason _____
         From _____ to _____
12   Page _____ Line _____ Reason _____
         From _____ to _____
13   Page _____ Line _____ Reason _____
         From _____ to _____
14   Page _____ Line _____ Reason _____
         From _____ to _____
15   Page _____ Line _____ Reason _____
         From _____ to _____
16   Page _____ Line _____ Reason _____
         From _____ to _____
17   Page _____ Line _____ Reason _____
         From _____ to _____
18   Page _____ Line _____ Reason _____
         From _____ to _____
19   Page _____ Line _____ Reason _____
         From _____ to _____
20   Page _____ Line _____ Reason _____
         From _____ to _____
21   Page _____ Line _____ Reason _____
         From _____ to _____
22   Page _____ Line _____ Reason _____
         From _____ to _____
23   Page _____ Line _____ Reason _____
         From _____ to _____
24   Page _____ Line _____ Reason _____
         From _____ to _____
25
```

Page 189

```
1
2        DEPOSITION ERRATA SHEET
3    Page _____ Line _____ Reason _____
         From _____ to _____
4    Page _____ Line _____ Reason _____
         From _____ to _____
5    Page _____ Line _____ Reason _____
         From _____ to _____
6    Page _____ Line _____ Reason _____
         From _____ to _____
7    Page _____ Line _____ Reason _____
         From _____ to _____
8    Page _____ Line _____ Reason _____
         From _____ to _____
9    Page _____ Line _____ Reason _____
         From _____ to _____
10   Page _____ Line _____ Reason _____
         From _____ to _____
11   Page _____ Line _____ Reason _____
         From _____ to _____
12   Page _____ Line _____ Reason _____
         From _____ to _____
13   Page _____ Line _____ Reason _____
         From _____ to _____
14   Page _____ Line _____ Reason _____
         From _____ to _____
15   Page _____ Line _____ Reason _____
         From _____ to _____
16   Page _____ Line _____ Reason _____
         From _____ to _____
17       Subject to the above
18   changes, I certify that the transcript is
19   true and correct
20       No changes have been
21   made. I certify that the transcript is
22   true and correct.
23
24   _____
25       MICHAEL WALLER
```

48 (Pages 186 - 189)

# Exhibit L

```
 1   UNITED STATES DISTRICT COURT

 2   SOUTHERN DISTRICT OF NEW YORK

 3   ----------------------------------x

 4   EASTERN PROFIT CORPORATION LIMITED,

 5            Plaintiff-Counterclaim Defendant,

 6                                  Case No.

 7      -against-                   18-cv-2185

 8   STRATEGIC VISION US, LLC,

 9            Defendant-Counterclaim Plaintiff,

10    vs.

11   GUO WENGUI a/k/a, MILES KWOK,

12            Counterclaim Defendant.

13   ----------------------------------x

14

15

16            VIDEOTAPED DEPOSITION

17                   OF

18            J. MICHAEL WALLER

19            New York, New York

20         Friday, February 8, 2019

21

22

23

24

25
```

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 10

1   that work.
2                MR. SCHMIDT:  Your employer.
3                MR. GRENDI:  Employer, yeah.
4        A.   I do mean principally, principally as
5   my own contractor for myself through my company,
6   through Oceanic Advisors or Liberty Tree
7   Partners.
8        Q.   How do you know French Wallop?
9        A.   I met her about, first about 35 years
10  ago.  I had been a Senate staffer and her husband
11  was a U.S. senator.
12       Q.   Were you a staffer for Ms. Wallop's
13  husband?
14       A.   No.
15       Q.   Did you meet him through your work as a
16  staffer?
17       A.   The senator?
18       Q.   Yes.
19       A.   Yes.
20       Q.   Is that how you met French Wallop?
21       A.   I don't recall.  It could have been at
22  a reception or some other event.
23       Q.   When did you start working with
24  French Wallop in connection with
25  Strategic Vision?

Page 11

1        A.   2016, maybe 2017.
2        Q.   How did that come about?
3        A.   We had talked a lot about doing
4   different business projects.  We had worked
5   together during the Iraq War and the Afghanistan
6   War but never actually did contractual work.  It
7   was just mutual collaboration on work relating to
8   opposing jihadist movements, and then we
9   discussed ways to do business with a variety of
10  prospective clients in 2017.
11       Q.   You're saying 2017 now?
12       A.   2016-2017.  I feel more comfortable
13  saying early 2017.
14       Q.   Okay.  What was the nature of the work
15  you were doing with French Wallop before you
16  started talking about working with Strategic
17  Vision, the Iraq War and Afghanistan War?
18       A.   That was information opposition support
19  for the U.S. Special Operations Forces, or I'll
20  say U.S. Military in general.
21       Q.   So you were both providing that kind of
22  service to the U.S. Military?
23       A.   Yes, independently.  And we had -- when
24  she was working on another project, we had talked
25  about bringing me in, but we didn't.

Page 12

1        Q.   And so when did you do your first
2   project with Strategic Vision and French Wallop?
3             You said you started talking in early
4   2017.  When did you do your first project with
5   Strategic Vision?
6        A.   We had several going on at once at
7   about the same time, so I can't -- either late
8   2016 or early 2017.
9        Q.   So you jumped right in after discussing
10  with Ms. Wallop working together.  She said, "Can
11  you help on a couple of projects?"
12            Is that what happened?
13       A.   Yeah.  It's more of you get together
14  and you talk about ideas, and you brainstorm
15  about what kind of clients are out there or what
16  kind of work should be done or needs to be done,
17  and then where we would properly fit in and what
18  type of teams to build.
19       Q.   And so how many projects have you done
20  with Strategic Vision?
21       A.   None of it's written down, meaning we
22  don't have a contract, so we just work together
23  because we trust each other.  We have probably
24  two right now.
25       Q.   Just historically, how many different

Page 13

1   projects or clients have you serviced with
2   Strategic Vision?
3        A.   Probably two previous.  The ones we're
4   working on now are not yet clients.  We're just
5   working on building them as clients.
6        Q.   So you're not performing any service
7   for just Strategic Vision right now for any of
8   its clients?
9        A.   No.
10       Q.   And you're working on maybe doing two?
11       A.   Yes.
12       Q.   Other than the project that we're going
13  to discuss in this case with Eastern Profit, how
14  many other projects have you done for Strategic
15  Vision?
16       A.   Probably two.
17       Q.   That you actually performed work on?
18       A.   Yeah.
19       Q.   When was that?
20       A.   Let me correct my earlier statement.  I
21  think it was 2016 when I first did work with her.
22       Q.   That's fine.  So there were two other
23  projects that you performed for Strategic
24  Vision --
25       A.   Yes.

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 26

```
1      A.    I believe it was French Wallop.
2      Q.    And then subsequent to that, you talked
3  to who about that?
4      A.    To Lianchao Han, L-i-a-n-c-h-a-o.  The
5  second name is H-a-n.
6      Q.    This is all before this December
7  meeting in Mr. Guo's apartment?
8      A.    Yes.
9      Q.    When did you talk to Bill Gertz?
10     A.    At about that same time.  Bill Gertz
11  had asked French Wallop if she could do this
12  work.  She said she would like to bring me in.
13  He thought it would be a great idea, in his
14  words, and Lianchao Han agreed.  And that's when
15  I was brought up to meet -- then I conferred with
16  Lianchao and was brought up to meet Guo.
17     Q.    So Mr. Guo apparently described what he
18  wanted to do, and then you said that Strategic
19  Vision -- let's strike that and start over.
20  Sorry.
21        So Mr. Guo told you what he wanted from
22  you and Ms. Wallop.  What did you tell him back
23  in terms of what Strategic Vision and you
24  yourself could provide as a service?
25     A.    First, I never spoke on behalf of
```

Page 27

```
1  Strategic Vision.
2      Q.    Okay.  Who were you speaking on behalf
3  of?
4      A.    On behalf of myself.
5      Q.    So you don't have an employment
6  agreement with Strategic Vision?
7      A.    No.
8      Q.    Did you explain to Mr. Guo and
9  Mr. Lianchao that you did not work for Strategic
10  Vision?
11     A.    Yes.
12     Q.    When was it?  Was that at this meeting
13  that you're talking about now?
14     A.    It was probably at the first meeting
15  with Guo.  I never implied anything that I worked
16  for Strategic Vision.
17     Q.    Did you explicitly say "I don't work
18  for Strategic Vision"?
19     A.    I don't recall if it was quite put that
20  way.  I would let Ms. Wallop answer that because
21  she was speaking for her company.  We presented
22  ourselves as a team, and we were specific that we
23  assemble teams on an as-needed basis to do this
24  type of research because there's no corporate
25  profile.  And that was essential for maintaining
```

Page 28

```
1  the client confidentiality and the
2  confidentiality of the work.
3      Q.    So you're saying at the outset here you
4  explained to Mr. Guo and Mr. Lianchao that
5  Strategic Vision and you personally are not
6  working together directly.  That you're, I guess,
7  an independent contractor?
8      A.    Yes, that would be accurate, as an
9  independent contractor.
10     Q.    And you explained that to Mr. Guo and
11  Mr. Lianchao?
12     A.    Yes.
13     Q.    Did they say anything when you
14  explained that?
15     A.    No.
16     Q.    Getting back to my original question,
17  what did you and Strategic Vision, through
18  Ms. Wallop, explain as a possible service that
19  could be provided to Eastern Profit?
20     A.    We could provide this opposition
21  research to Guo.  That we would set up the teams
22  to do the work.  That the work would have to be
23  done both in the United States and outside the
24  United States.  That we were starting up cold.
25  We never implied that we had a corporate entity
```

Page 29

```
1  with a staff and resources, that we would be
2  starting this up from scratch as we do with all
3  our projects.  So he was fine with that.
4      Q.    Did you or Ms. Wallop explain what
5  either your capabilities or Ms. Wallop's
6  capabilities were in terms of providing this
7  research?
8          MR. SCHMIDT:  Objection.  Go ahead.
9      Q.    Let me break it down, then.
10         Did you explain what you could provide
11  as a service in connection with this research?
12     A.    Yes.
13     Q.    And what did you explain to the parties
14  present?
15     A.    That I would assemble the research team
16  and supervise the research team.
17     Q.    That's the research team that would
18  perform investigatory research?
19     A.    Yes.
20     Q.    Did Ms. Wallop explain what Strategic
21  Vision could provide in connection with this
22  research?
23     A.    Yes.
24     Q.    What did she say, if you recall?
25     A.    I don't recall exactly.
```

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 38

1   address things more specifically, but offhand I
2   can't think of anything else.
3        Q.   Okay.  And in terms of negotiating
4   these terms for Strategic Vision, were you taking
5   a lead on that or was Ms. Wallop taking the lead
6   on that?
7            MR. SCHMIDT:  Objection.
8        A.   We teamed it.
9        Q.   Did you have --
10       A.   We worked with Lianchao as Guo's agent
11  or representative prior to this to determine the
12  scope.  Then when we met with Guo, he narrowed
13  the scope and then we came to the agreement for
14  750 a month.
15       Q.   What was your financial arrangement
16  with Strategic Vision in connection with this
17  research agreement?
18       A.   That French Wallop and I would split
19  the profits evenly.
20       Q.   Would it be you personally that would
21  split the profits evenly or one of your
22  companies?
23       A.   There were LLCs in my name, so it's
24  effectively me paid to one of my LLCs.
25       Q.   So your understanding through Strategic

Page 39

1   Vision was half of the money that comes in
2   through this research agreement would be paid
3   either to you or one of your LLCs?
4        A.   Half of the profits, yes.
5        Q.   Profits, okay.  So not just revenue.
6   Let's just say if the agreement was a million
7   dollars, you wouldn't get 500,000.  You would get
8   some smaller sum based on either overhead or
9   other costs?
10       A.   That's correct.
11       Q.   How did you plan on accounting for
12  that?
13       A.   Pardon.  There were also expenses paid
14  to one of my LLCs for the purpose of rerouting
15  this through a few channels to avoid detection by
16  the Chinese.
17       Q.   Which LLC was that?
18       A.   That was one that French and I both set
19  up called Georgetown Research LLC.
20       Q.   How much money was sent to Georgetown
21  Research LLC?
22       A.   I have the statements.  I'm guessing
23  $300,000, I'm guessing, but I can provide the
24  statements.
25       Q.   With respect to this agreement to split

Page 40

1   the profits, did you have a written agreement or
2   an oral agreement?
3        A.   Verbal agreement.
4        Q.   So there's no written agreement between
5   you and Ms. Wallop concerning how you or your
6   LLCs would be paid for your services in
7   connection with this research agreement?
8        A.   That's correct.
9        Q.   Other than the $300,000 payment, was
10  there any other payments from Strategic Vision to
11  you or one of your LLCs in connection with this
12  research agreement?
13       A.   Yeah.  I can provide those, the
14  documentation to that effect.
15  (*r)     MR. GRENDI:  Joe, I'm going to ask for
16       the production of Strategic Vision's records
17       with respect to these payments.
18           MR. SCHMIDT:  Okay.  I assume you're
19       going to follow up with a letter or
20       something detailing this, right?
21           MR. GRENDI:  Once we get the
22       transcript, we can do that.
23           MR. SCHMIDT:  Okay.  Because we
24       obviously owe you a letter from the last
25       deposition too.

Page 41

1            MR. GRENDI:  I understand.
2        Q.   You said you have records concerning
3   these transactions?
4        A.   The bank statements, yes.
5        Q.   Just ballpark, all in, do you know
6   about how much money was transferred from
7   Strategic Vision to you or your LLCs in
8   connection with this research agreement?
9        A.   I would say about that $300,000 figure
10  that I was referring to before was probably it,
11  but I would have to check, because the LLCs were
12  also used as a pass-through, by design.
13       Q.   Just in connection with this research
14  agreement, how many different LLCs were used?
15       A.   My own that I control?
16       Q.   Yes.
17       A.   Three.
18       Q.   What are those three?
19       A.   That would be Oceanic Advisors, Liberty
20  Tree Partners, although I don't recall if there
21  was a payment made to Liberty Tree, but that
22  would have been one, and then Georgetown Research
23  which was our joint LLC.
24       Q.   So why were these funds transferred to
25  your LLCs?

**EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC**
J. Michael Waller on 02/08/2019

Page 42

1    A.    So that we could make payments to start
2  team 1 and to cover all related expenses in
3  starting up this project.
4    Q.    So these payments were not for, as you
5  described it earlier, splitting the profits?
6    A.    That was part of the start-up.  We did
7  not deplete the funds.  There were funds left
8  over, but there were all kinds of costs involved
9  to start this up.  So anything involved in
10  starting up this project, we did through this
11  means.
12    Q.    I understand.  Correct me if I'm wrong.
13  The payments that were made to your three LLCs
14  were made in connection with you or your LLCs
15  retaining team 1?
16    A.    Yes.  To building and retaining team 1
17  and all of its equipment and all associated
18  expenses.
19    Q.    Did there come a time when you received
20  payment for splitting the profits?
21    A.    Yes.  I took some of the funds at that
22  same time to pay for my own expenses and my own
23  work, but it was not a splitting of the profits.
24    Q.    Right.  What I'm asking about is not
25  these payments that you just described.  What I'm

Page 43

1  asking about is was there ever another time when
2  you received money from Strategic Vision for
3  splitting the profits from this research
4  agreement?
5    A.    Yeah, during the first month of work.
6    Q.    How much was that payment for?
7    A.    I don't remember.  I have the records.
8    Q.    But you did -- you do recall receiving
9  a payment from Strategic Vision for splitting the
10  profits?
11    A.    To one of the LLCs.
12    Q.    Is that a "yes," though?
13    A.    "Splitting the profits" is the wrong
14  term.  It was for the first months of our own
15  compensation.  One of the issues was we wanted to
16  be paid one month in advance.  Guo objected.  We
17  still had to pay ourselves for that month's work.
18  I'm speaking for myself.  I'm not speaking for
19  Ms. Wallop or Strategic Vision.
20    Q.    I understand.  I just want to make the
21  record clear.  Did there ever come a time when
22  the profits from this research agreement were
23  split between you and Strategic Vision?
24    A.    Yes, but there are still funds left
25  that were not spent.  I don't have access to the

Page 44

1  Strategic Vision account, so I wouldn't know.  I
2  imagine there were some residual things, so the
3  profits were not fully -- to the extent there
4  were profits, they were not fully split.
5    We were cheated out of the first
6  month's work and the second month's work, and
7  then his failure to give 30-days' notice because
8  we were left in limbo.  So as far as we're
9  concerned, there were no profits because Miles
10  Kwok, or Guo cheated us out of our earnings.
11    Q.    So you don't expect to get any money
12  from French Wallop for any profit in connection
13  with this engagement?
14    A.    There's no profit if we were cheated.
15    Q.    I would appreciate it if you would just
16  answer the question directly.  Was there no
17  profit from this engagement for you or Strategic
18  Vision?
19    A.    You have to define "profit."  What were
20  our opportunity costs?  What were our losses from
21  doing work and preparing work for which
22  we were not compensated, or for not taking on
23  other jobs because we were working on Guo's work
24  for which he did not compensate us?  So it's an
25  academic question on what constitutes profit.

Page 45

1    Q.    Let me ask you this.  Do you expect
2  Strategic Vision to send you any payment in the
3  future in connection with, quote-unquote "profit"
4  from this engagement?
5    A.    If Guo pays what he owes yes, I do.  He
6  owes us $2 million in failure to pay and failure
7  to give notice that he was terminating the
8  contract in 30 days.  If and when he pays that,
9  yes, I expect to receive my share of the profit.
10  That's how we operate.
11    Q.    Let's just say the only money that
12  Strategic Vision has is the million dollars.  Is
13  there any profit to split?
14    A.    Not anymore, not with this legal case.
15    Q.    Did you and Strategic Vision ever
16  detail how profit would be defined, in terms of
17  splitting the profits from this engagement?
18    A.    In terms of dividing up the revenues
19  from this engagement, it would be a 50/50 split
20  after expenses.
21    Q.    Expenses, okay.  What expenses would
22  those be?
23    A.    The research teams, any travel, any
24  legal, any contractors, any equipment, any
25  leases, any security measures, anything related

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 54

1   had a familiarity with each other and each
2   other's work.
3          He was working with Guo.  Guo was
4   trying to hire him.  He was not, to my knowledge,
5   paid by Guo and did not want to be, but he was
6   acting as Guo's agent to set up this arrangement
7   and to serve as Guo's interpreter.
8      Q.    Does Mr. Guo speak English well?
9      A.    He speaks it well but not fluent.  You
10  can have a conversation with him and he can read
11  it fine, but he cannot -- he would need
12  assistance of an interpreter.
13     Q.    So you've spoken to Mr. Guo in English
14  before?
15     A.    Yes.
16     Q.    But did you have any kind of difficulty
17  understanding what he was saying or struggle with
18  his English?
19     A.    Yeah, he would struggle with his
20  English, and that's why Lianchao or Yvette would
21  be present during the meetings.
22     Q.    So Lianchao and Yvette were
23  interpreters for Mr. Guo, as you understood it?
24     A.    In addition to serving as his agents to
25  work with us.

Page 55

1      Q.    Just going back to the financial,
2   forensic historical research, has Strategic
3   Vision provided that service in the past?
4      A.    I can't speak for Strategic Vision.
5      Q.    What about for you personally?
6      A.    Yes, as part of another -- as part of
7   other teams.
8      Q.    I just want to talk about the reports
9   referenced on the next page concerning financial,
10  forensic historical research.
11         Do you see the first full paragraph on
12  Eastern 6, "Contractor will produce a progress
13  report"?
14     A.    Yes.
15     Q.    What did you understand a progress
16  report would include or entail?
17     A.    The progress reports were to be on
18  roughly a weekly basis to let him know the
19  progress of how the project was going underway.
20  Initially, the progress reports were simply this
21  is the progress.  We're setting up the team.  We
22  got the funds moved.  We've recruited the right
23  people.  They're in place and so forth.
24         And then the -- so those were the
25  progress reports, and then the, quote, reports to

Page 56

1   be defined was never intended as a finished
2   analytical essay or bound type of report that one
3   would be accustomed to in a legal or business or
4   an academic environment.  It was simply raw data
5   passed on a USB thumb drive, a flash drive from
6   team 1 through me straight to Guo or his agent.
7          He did not want an analytical product
8   in terms of the short-term reports.
9      Q.    Does this research agreement define
10  what a progress report will have in it?
11         MR. SCHMIDT:  Objection.
12     A.    I mean, it says what it says, a
13  progress report.  I want to know the status.  How
14  are things?  Well, great.  Everybody's recruited.
15  They're in place.  They've begun working.  It
16  takes X number of days to do this, which we told
17  him in advance.  We told him something specific
18  would take six days to do.
19         By day 2, Guo was getting impatient.
20  So we were giving him the reports to let him know
21  how the team was coming together.  And then once
22  the team started digging up information -- it's
23  an extremely time-consuming task.  He knew that,
24  so we gave him the information on the sticks
25  right after he asked for it.

Page 57

1      Q.    Right.  I just want to understand.  Do
2   you recall a specific discussion with Mr. Guo or
3   Lianchao or Yvette regarding what would be in a
4   progress report prior to the execution of this
5   research agreement?
6      A.    Yeah, the progress report is simply
7   what's the status of the project.
8      Q.    That's not exactly what I asked.
9      A.    It would be a verbal -- it would be a
10  verbal status report and anything on a stick that
11  the researchers came up with in its raw form, not
12  in an analyzed synthesized form.
13     Q.    I think you're missing my question a
14  little bit, so let me just ask it again.
15         Do you recall telling Mr. Guo or
16  Yvette Wang or Mr. Lianchao what you understood
17  would be in a progress report?
18     A.    Yes.
19     Q.    When was that?
20     A.    That was in -- that was before the
21  contract in December, and it was after the
22  contract was signed.
23     Q.    Let's talk about before.  When was it
24  that you -- well, who did you tell about what a
25  progress report would entail before the contract

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 66

1  report.  That would have been one of the weekly
2  reports.
3      Q.    Have you ever provided reports of this
4  nature to other clients in this format of
5  progress report, preliminary report,
6  comprehensive historical research report?
7      A.    Progress reports, of course, yes.
8  Preliminary reports, of course, but in a
9  different way.  It was not just raw data.  It was
10  more defined.  Then the comprehensive historical
11  research report, analogous reports to this type
12  of wording, yes.  You can even say comprehensive
13  historical research report, yeah, that would be
14  fine.
15      Q.    So in your mind, is this kind of like a
16  standard industry practice in terms of providing
17  investigatory research?
18      A.    Yes.  Now, where it's tailored to the
19  client, you're going to deviate from the
20  standard, like using the word "fish."
21      Q.    What about the current tracking
22  research?  You see a little bit lower down there,
23  there's a discussion of producing monthly
24  reports?
25      A.    Yes.

Page 67

1      Q.    Except the first month where there will
2  be weekly reports?
3      A.    Right.
4      Q.    What was your understanding of what the
5  weekly reports would entail?
6      A.    First it would be a status report until
7  we were able to make the deep dives into the
8  research.
9      Q.    What about the monthly reports?
10      A.    That would basically be a compilation
11  of the weekly reports and then anything that was
12  integratable in its raw form, we would submit.
13      Q.    In terms of completing -- let's just
14  start with a weekly report.  How would that be
15  completed?  In other words, who does the work to
16  put together that report?
17      A.    Team 1.  Team 1 did the work because it
18  was simply raw data.  There was no analytical
19  product.
20      Q.    What was your role in connection with
21  any weekly reports?  What would you do?
22      A.    I was the one you would -- I was the
23  liaison with team 1.  I would deliver Guo's
24  instructions to team 1.  I would get any
25  information back from them, and then I would

Page 68

1  physically go to Europe to pick up the drive and
2  then deliver it back to Guo or his agents.
3      Q.    Would you do any analytical work or
4  analysis of the report itself, or did you just,
5  as you described, just kind of pass it along?
6      A.    I simply acted as a pass-through for
7  delivering that.  We had envisioned doing -- in
8  terms of analytical work, if there was to be
9  paper as opposed to electronic information, I
10  would be collecting that and making sense of
11  that, but none of the computer work.
12      Q.    What about the preliminary reports?
13  Would you provide any analysis or use any of your
14  kind of experience in this field to create or
15  edit or do anything with those reports?
16      A.    We had talked about doing that.  Guo
17  specifically instructed us not to.
18      Q.    So again, you didn't edit or provide
19  any insight in terms of the data that you were
20  getting from team 1.  You just, again, passed it
21  along?
22      A.    Yes.  He didn't want it.  He just
23  wanted it passed straight to him.  Now --
24      Q.    Go ahead.
25      A.    Let me put a caveat on that.

Page 69

1      Q.    Sure.
2      A.    When we found a dead end or we found an
3  issue like bad names, names that were either not
4  real or spelled wrong or seemed to be the same
5  name among one or more different people, or two
6  or more different people, whether it's two people
7  with the same name or one person using two
8  persona, or if we found that some of the
9  information he gave us was false or inaccurate,
10  that's when I would get involved and deliver that
11  to him, as well as whatever information.
12          For example, he gave us copies of
13  passports of certain of the targets that he
14  wanted, and so we checked and found that some of
15  the passports were false.  So that was an
16  analytical piece of work that I did or had other
17  team members do apart from this.  I delivered
18  that separately, so that's apart from the raw
19  data.  We were trying to be as comprehensive as
20  we could for him.
21      Q.    So in other words, in terms of applying
22  your experience and background in this field,
23  that's where you would kind of participate in
24  focusing or refocusing one of these reports?
25      A.    Right.  Or if the team had said, we

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 74

1 kind of do different things?
2      A.    Right.
3      Q.    Got it.
4            MR. GRENDI:  Why don't we take a brief
5 break and come back in five minutes.
6            THE VIDEOGRAPHER:  Off the record at
7 11:28.
8            (Whereupon, a short recess was taken.)
9            THE VIDEOGRAPHER:  Back on the record
10 at 11:37.
11     Q.    Mr. Waller, just to remind you you're
12 still under oath here.
13     A.    Yes.
14     Q.    Have you ever met anyone who works for
15 Strategic Vision, other than Ms. Wallop?
16     A.    No.
17     Q.    Going back to this contract, Waller 2.
18 Can you turn to Eastern 5, which is the first
19 page.  Do you see where it says, "Any and all
20 materials provided by the client to the
21 contractor will be treated with absolute
22 confidentiality and will not be shared by the
23 contractor with any other entity"?
24     A.    Yes.
25     Q.    Do you recall drafting this provision

Page 75

1 into the agreement, or how it got in there?
2      A.    No.
3      Q.    Does Strategic Vision share the
4 information from the client with other entities?
5      A.    Only those who are part of the
6 contract, to execute the contract.
7      Q.    But there were entities other than
8 Eastern Profit and Strategic Vision that receive
9 the materials from the client, which is --
10     A.    The research orders, yes.
11     Q.    So those were other entities.  They're
12 not part of Strategic Vision?
13     A.    They're part of the Strategic Vision
14 team, so they would be included.
15     Q.    They're not actually the same entity as
16 Strategic Vision, legally speaking, right?
17           MR. SCHMIDT:  Objection.
18     Q.    If you know?
19     A.    They're part of the same team.
20     Q.    So in your mind, "team" is what the
21 contractor is defined by in this agreement?
22     A.    Yes.
23     Q.    So it says "Strategic Vision" up top
24 here as the contractor, correct?
25     A.    Yes.  I cannot speak for the signed

Page 76

1 nature of this contract because I am not, I am
2 not part of Strategic Vision.
3      Q.    Right.
4      A.    But having been part of putting the
5 arrangement together, there's a team that's the
6 entity.
7      Q.    So you understood that Strategic Vision
8 U.S. LLC also entailed whoever it is that they
9 subcontracted work to?
10           MR. SCHMIDT:  Objection.
11     A.    Not even Mrs. Wallop knows the
12 identities of many of the people on the team.
13 Not even I know some of them.  That's how tight
14 we kept it.  Guo gave us the research material
15 that, in order to execute the contract, we had to
16 provide to the people doing the research.
17     Q.    But you don't know who those people
18 are, the people doing the research?
19     A.    Not all of them.
20     Q.    Some of them?
21     A.    Some of them, yes.
22     Q.    And who were the people doing the
23 research that you know of?
24     A.    I cannot provide the identities of
25 team 1 for reasons that we explained before.

Page 77

1 Team 2, we --
2      Q.    Hold on.  I just want to maintain that
3 we don't think that that's -- this is a lawyer
4 part -- a legitimate objection.  But in light of
5 the procedural posture of our motion to compel
6 request, I'll allow it.
7            I'm sorry, continue with your answer.
8      A.    Team 2 was a company in Addison, Texas
9 called ASOG.  I believe it is American Special
10 Operations Group, or words to that effect, based
11 in Addison, Texas.  That was team 2.
12     Q.    Sitting here today, you refuse to tell
13 me who's on team 1?
14     A.    I decline to tell you.
15           MR. SCHMIDT:  Objection.  Just be
16 clear, with respect to team 1, do you
17 actually know the members or do you just
18 know the intermediary?
19     A.    I only know the team leader.
20           MR. SCHMIDT:  That's all what I wanted
21 to clarify for the record in case we do a
22 motion to compel later.
23     Q.    You know the leader of who team 1 is?
24     A.    Yes.
25     Q.    But sitting here today, you refuse to

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 78

1 tell me that?

2    A.    Yes.

3    Q.    Why is it that you can't tell me who
4 the leader of team 1 is?

5    A.    Because the leader of team 1 lives in a
6 very high-risk area where there are a lot of very
7 bad actors who can cause physical harm, including
8 the worst kinds of violence you can imagine.

9    Q.    Did you promise the leader of team 1
10 not to disclose his identity?

11    A.    Yes.

12    Q.    Is that a promise that was made in
13 writing or orally?  How was it made?

14    A.    We do everything by handshake as much
15 as we can.  So that was literally a handshake
16 agreement.

17    Q.    That was an agreement between you and
18 the leader of team 1?

19    A.    Yes.

20    Q.    Does Strategic Vision know the name of
21 the leader of team 1?

22          MR. SCHMIDT:  Objection.

23    A.    You would have to ask Strategic Vision.

24    Q.    So you never talked to --

25    A.    I can't pretend to speak for Strategic

Page 79

1 Vision.  I'm not going to be put in that box.

2    Q.    I understand.  What I'm asking you,
3 though, is did you and Ms. Wallop ever talk about
4 who the leader of team 1 was?

5          MR. SCHMIDT:  You can answer whether
6     you had the conversation.

7    A.    Yes.

8    Q.    So she knows the name of the leader of
9 team 1?

10    A.    Yes.

11    Q.    Okay.  Let's go to Eastern 7.  It's the
12 third page of Waller 2.  In the criteria section,
13 do you see where it says, "The contractor
14 guarantees that all information provided is
15 genuine"?

16    A.    Yes.

17    Q.    What does that mean?

18    A.    It means that we're not going to make
19 up fake information in order to try to impress or
20 satisfy the client.  That everything we find is
21 legitimately -- legitimate facts that were
22 legitimately researched.

23    Q.    How do you know if the research is
24 genuine if you're not the one doing it?

25          MR. SCHMIDT:  Objection.

Page 80

1    A.    It's all based on trusting the team.

2    Q.    So you know that team 1 only provides
3 genuine information?

4    A.    They provide -- I know from the team 1
5 leader that all the information they dug up was
6 legitimate information that they did not
7 manufacture or fabricate.  It was just raw data.
8 As to the accuracy of the information they found,
9 that's different.

10          What we mean here by "genuine" is that
11 we did not create false or misleading
12 information.  In fact, we found that we had
13 informed the client of some false information
14 that we discovered.

15    Q.    Just going back to your answer there.
16 So you have a discussion or dialogue with the
17 leader of team 1 about the genuineness or quality
18 of the information that team 1 has found?

19    A.    Yes.

20    Q.    How was that conversation conducted?
21 Was it in person?

22    A.    Yes.

23    Q.    Ever over the phone?

24    A.    Never.

25    Q.    What about via secure text message

Page 81

1 service like Signal?

2    A.    We don't believe in secure text
3 messages, so the answer is no.

4    Q.    Fair enough.

5          So in your mind, Signal is not a secure
6 means of communication?

7    A.    I have no way of knowing, but we don't,
8 we don't -- we have our own methods of
9 communicating, but anything in detail is only
10 done in person.

11    Q.    Do you think a Signal message is more
12 secure than other forms of electronic
13 communication like just email?

14          MR. SCHMIDT:  Objection.

15    A.    Yes, absolutely.

16    Q.    Because you never emailed with Mr. Guo
17 or Lianchao or Yvette Wang concerning this
18 matter, have you?

19    A.    No, it was only by end-to-end
20 encryption that doesn't reside on a server.

21    Q.    Signal does that, is that right?  That
22 application?

23    A.    Yeah.

24    Q.    How do you know the deliverables are
25 provided with the best practice and standards of

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 82

1 the industry?
2       A.      I know.
3       Q.      The contractor is saying that it will
4 provide the deliverables based on the best
5 practices and standards in the industry, right?
6       A.      That's right, yes.
7       Q.      How would Strategic Vision know that?
8       A.      The first best standard is the security
9 part.  We exceed those best standards.  The
10 second part is the actual computer research,
11 which we know from the methods that they're
12 using, which are state-of-the-art methods.
13      Q.      Without divulging who you were working
14 for or when it was, have you ever done the actual
15 research that team 1 was dispatched to do in this
16 case?
17      A.      Not using the same methods.
18      Q.      Similar methods?
19      A.      It takes a certain skill set that I
20 don't have, but I have been present and
21 supervising in person when it was done in other
22 cases.
23      Q.      What skill set is that?
24      A.      Deep dive research.
25      Q.      Go ahead.

Page 83

1       A.      Just like in a law firm where you have
2 the attorney and you have a paralegal.  It
3 doesn't mean the paralegal is incompetent.  It's
4 just the person is not an attorney.  Or you have
5 the partner who might not have passed the bar but
6 owns the firm and can run the firm or manage the
7 firm, right.
8               So you have people with different skill
9 sets, but they all know each other and they all
10 work together, or they all at least trust each
11 other.  And so you have certain of them delegate
12 the work to others to do.
13      Q.      How long have you known the leader of
14 team 1?
15      A.      For about four or five years.
16      Q.      And you've done other work with that
17 individual concerning investigatory research?
18      A.      Yes.
19      Q.      Did you run into any issues with the
20 quality of that work?
21      A.      Never.
22      Q.      Have you ever known the members of any
23 of the teams that are led by the leader of
24 team 1?
25      A.      The individuals that he was

Page 84

1 supervising?
2       Q.      In any event, including in this
3 engagement.  I know you don't know, right?
4       A.      Right.
5       Q.      What about in other engagements?
6               MR. SCHMIDT:  Objection.  That's kind
7       of impossible to answer.
8       A.      On some things you can never know
9 everybody on the team.  It's not possible, if
10 something is outsourced or whatever.  Yeah, there
11 have been other times where I have -- this whole
12 profession involves an unusually high degree of
13 trust that no -- it has to be personal trust, and
14 you learn that by trial and error over a number
15 of years.
16              So you then learn to trust people who
17 do the work for you and produce that work.
18 Sometimes I have been part of the actual teams,
19 but for the sake of protecting the client's
20 identity and the existence of the work, we had
21 worked through cutouts, and that's been similar
22 with other projects.
23      Q.      Let's go to translation issue on
24 Eastern 6.  Starting on the bottom of the page,
25 it says, "When the contractor encounters

Page 85

1 information requiring translation, the contractor
2 will provide electronic copies of the material to
3 the client for the client to evaluate and
4 translate."  Do you see that?
5       A.      Yes.
6       Q.      How would that work?  I take it that
7 you don't speak Mandarin?
8       A.      No.
9       Q.      Does Ms. Wallop speak Mandarin?
10      A.      She understands some.
11      Q.      Can she read it?
12      A.      I don't know.
13      Q.      How did this agreement contemplate the
14 use of translators?
15      A.      We had said from the beginning that
16 we're going to need to have linguists doing the
17 original research.
18      Q.      The members of team 1?
19      A.      Yes.  And Guo said he didn't want that.
20 He would take care of all of the translations.
21 We then raised the issue well, these people are
22 going to dig up raw material in a language they
23 don't speak.
24      Q.      Right.
25      A.      How are they going to evaluate what

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 86

1   they have?  He says, "Just dig up the information
2   and send it to me and let me evaluate it."  So we
3   ended up saying we really need to have people who
4   get the language.  This was, I believe, through
5   Lianchao, who agreed.  So we retained two fluent,
6   say, diplomatic-quality Mandarin language
7   linguists who were not Chinese nationals to be
8   part of that team.
9       Q.    What was the concern about them being
10  Chinese nationals?
11      A.    In case they were agents of the
12  Communist party.  And Guo was pleased with that.
13      Q.    So who were the two individuals that
14  you retained to do this translation work?
15      A.    They were part of team 1.  I don't know
16  their identities.
17      Q.    So team 1 did have Mandarin-speaking
18  and Mandarin-reading members?
19      A.    Yes.  We added them on when we realized
20  we were going to need them.  And I believe
21  Lianchao said, "Yeah, go ahead and get them, as
22  long as they're not Chinese nationals, or don't
23  live in China."
24      Q.    So were you involved in the vetting
25  process for those individuals, or no?

Page 87

1       A.    No.
2       Q.    So did you understand that you weren't
3   really going to be able to read a lot of the data
4   that was part of this research?
5       A.    That was explicit.  A lot of it is just
6   code.
7           MR. GRENDI:  Do we have an issue?
8           THE VIDEOGRAPHER:  Move the mic up.
9           MR. GRENDI:  That's fine.  Just let us
10  know.
11          THE WITNESS:  How is it now?  Is this
12  good?
13          THE VIDEOGRAPHER:  It's just when your
14  hands are there.  I want you to be
15  comfortable.
16          THE WITNESS:  I'm in the hot seat.
17      Q.    Why was it that only USB drives would
18  be used for deliverables?
19      A.    Guo specified that.  He was insistent
20  on it.
21      Q.    Was there any pushback or discussion of
22  using USB drives for transmitting information?
23      A.    No, it made sense.  He didn't want
24  anything distributed electronically or on paper.
25      Q.    Did he explain why?

Page 88

1       A.    Yeah, the Chinese could intercept it.
2       Q.    Paper?
3       A.    No, paper is just too cumbersome.  And
4   you've got the digital forensics within the USB
5   drive so he could gauge what was in there.  But
6   you don't want printouts of computer code.  You
7   want to be able to exploit that code.  You can't
8   do that on paper.
9       Q.    So some of the raw data just in terms
10  of feasibility and practicality had to be
11  electronic?
12      A.    Yes.
13      Q.    In terms of transmitting it?
14      A.    Yes, and in delivering it to him.  He
15  simply specified no paper and nothing
16  electronically transmitted, so that was fair.
17  That was fine.
18      Q.    I want to talk about this irregular
19  circumstances clause.  Do you see that on page
20  Eastern 7?
21      A.    Yes.
22      Q.    Was this concept of irregular
23  circumstances discussed prior to the execution of
24  the agreement?
25      A.    Yes.

Page 89

1       Q.    Who came up with that clause or
2   insisted upon it?
3       A.    I drafted this section of it.
4       Q.    You personally?
5       A.    Yes.
6       Q.    What were you trying to convey when you
7   drafted this section?
8       A.    That there is no even flow of data.
9   That we're going to face challenges as in any
10  research project.  Like any legal case, you can't
11  state your case on the first month.  You have to
12  build the case over a period of time.  And
13  sometimes you're going to run into dead ends.
14  Sometimes you find false information.  Sometimes
15  you'll be spoofed by the other side.
16          There are risks of detection, the
17  countermeasures the other side takes.  There are
18  legal issues.  There are logistical issues given
19  the cumbersome physical nature of delivery of the
20  information by USB drive.  So we're just putting
21  this here that we both understand that it's not
22  all going to be a smooth delivery.
23      Q.    So does irregular circumstance in your
24  mind encompass items, only items that are out of
25  the control of the contractor or researching

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 90

1  party?

2          MR. SCHMIDT:  Objection.

3      Q.    Let me ask that again.  That's fair

4  enough.

5          If Strategic Vision makes a mistake or

6  fails to do its job for any reason, would that be

7  part of irregular circumstances?

8      A.    What do you mean by "failed to do its

9  job"?

10     Q.    Let me try it this way.

11     A.    If you get in an accident on the way to

12  work, are you failing to go to work?

13          MR. SCHMIDT:  Let him rephrase it.  You

14      said you don't understand it.  That's all

15      you have to do.

16     Q.    That's fine.

17          Does irregular circumstances only

18  include, let's just say, outside problems that

19  Strategic Vision would encounter?

20          MR. SCHMIDT:  Objection.  But go ahead

21      to the extent you can.

22     A.    Would you define "outside problem"?

23     Q.    Let's talk about -- you described it

24  earlier, third parties blocking the research or

25  there being dead ends.  Is that the full scope of

Page 91

1  irregular circumstances that you described

2  earlier?

3      A.    No, but it's indicative of an irregular

4  circumstance.

5      Q.    If irregular circumstances occur, does

6  the client still have to pay as though it's

7  getting full research?

8      A.    Yes.  It's right there in the contract.

9      Q.    Where does it say that under irregular

10  circumstances, the client still has to pay the

11  full price?

12     A.    It's right there in the price.  For

13  $750,000 a month, we're going to be doing the

14  following work, understanding that there will be

15  irregular circumstances that may prevent certain

16  of the work from being done at that point in

17  time.  This type of work is impossible to predict

18  when you're going after people who hide their

19  assets, who hide their activity, who have -- who use

20  under false names, who have -- who use rigorous

21  security methods.  Or if there's a legal problem

22  and we discover hey, it's illegal to do this

23  thing that you want us to do, then that's going

24  to be a delay.  We have to figure out the right

25  way to do it.

Page 92

1      Q.    What if irregular circumstances just

2  totally prevented Strategic Vision from providing

3  any research reports?  Would the client still

4  have to pay?

5      A.    That's a hypothetical.  There's a

6  30-day clause to end the contract.

7      Q.    It's a hypothetical, and I'm asking you

8  to please answer the question.

9          What if irregular circumstances just

10  completely prevented Strategic Vision from

11  delivering any work?

12     A.    We go to the client and say it's not

13  possible to do.

14     Q.    And so they wouldn't -- the contract

15  would be over at that point?

16     A.    We would say, hopefully, we can't do it

17  this way.  Do you want to change the parameters?

18  Remember, there were 4,000 names he had, he

19  wanted.  So we can't do it on these 15.  Let's

20  try another group of 15 or it can't be done.

21          And we had suggested on one way to do

22  something, and he didn't want do it that way even

23  though it made sense to do it that way.  So you

24  try to find a way to get the job done, but if

25  ultimately you can't get the job done, then that

Page 93

1  becomes apparent after a lot of back-and-forth

2  with the client, just like any job.

3      Q.    Right, but just to be clear, if

4  irregular circumstances prevent the contractor

5  from delivering any reports, then does the client

6  have to pay anything?

7      A.    If you don't do the work, why should

8  the client pay if you don't do the work, right?

9      Q.    Right.

10     A.    But if you do do the work, then the

11  client pays, but there are going to be irregular

12  circumstances where the product is not going to

13  be what you want at a certain time, so we have to

14  get around that.  Or in the case of starting up,

15  it was explicitly understood from the start that

16  you're not going to get huge amounts of data

17  immediately.  You've gotta get the team to

18  understand the data first, and you gotta build

19  the channels for the data.

20     Q.    So long as Strategic Vision tries to

21  get the data, if irregular circumstances prevent

22  them from delivering any reports, that's good

23  enough.  They should still get paid?

24     A.    Well, no.  Let me give you an example.

25  There was around February -- between January 26th

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 94

1  and February 1st when the client was upset at the
2  way -- things weren't moving fast enough for him.
3  We were directed -- Yvette directed us in writing
4  to find another way of doing it.
5       So she was saying proceed with your
6  work. Just find another way to do it. That's
7  when we brought in team 2.
8  Q.   Okay.
9  A.   So that was an irregular circumstance.
10  Really it wasn't a delay on our part because we
11  were consistent with any research standard. We
12  were doing it as rapidly as humanly and
13  mathematically possible. It's just the client
14  objected because he thought it was a long delay.
15       If you recall in this, we prorated
16  things so that the first two weeks were not at
17  his expense. He agreed. So we had only been in
18  the contract effectively ten days, and he's
19  already objecting that we're not producing
20  monthly reports and everything else.
21  Q.   We'll get to that.
22       MR. SCHMIDT:  Let him finish.
23  Q.   Go ahead.
24  A.   Because in order to satisfy him and
25  what he wanted, we offered to go ahead with a

Page 95

1  different team using different methodologies in
2  parallel with team 1, and that's when Yvette
3  instructed us on or about February 1st in a
4  Signal text to go ahead and use the -- start up
5  the other method.
6       So we were still doing the work, and we
7  were still finding a way to give him the
8  deliverables even though going with team 2 was
9  beyond what we had promised. So we were doing
10  extra work for him at this time.
11  Q.   In this contract is Strategic Vision
12  compensated on a per-report basis?
13       MR. SCHMIDT:  Objection. Go ahead.
14  A.   It's a flat rate basis. It says "Up to
15  15." It doesn't say 15. It says "Up to 15."
16  Q.   Where are you looking, just so I know?
17  A.   The top of page 8. "The first month,
18  January, of this contract will include up to 15
19  fish for a total of 30 reports and will decrease
20  to ten fish, etc.," for February, for March and
21  for the duration of the contract. So this was
22  explicit. It's not all going to be complete on
23  the first month. Even digging into certain of
24  the names, we're just not going to have it in the
25  first month.

Page 96

1       And when we find that the -- as our
2  team 1 discovered and as Lianchao Han confirmed,
3  at least two and as possibly as many as four of
4  the 15 were not real people.
5  Q.   You're talking about the fish?
6  A.   Yes.
7  Q.   But the contract does say that the
8  comprehensive historical reports are 300,000 per
9  report?
10       MR. SCHMIDT:  Objection.
11       MR. GRENDI:  It says it on that page,
12  Eastern 8.
13  A.   Per year.
14  Q.   Yeah. And the tracking reports are --
15  A.   Look before that, please. "The flat
16  price structure is as follows." So whether it's
17  a small report or a large report, it's a flat
18  rate structure. And that is an annual number,
19  not a weekly or monthly number.
20  Q.   So in your mind, the report -- strike
21  that.
22       In your mind, the reports are not
23  broken down on a per-report basis cost?
24  A.   Correct.
25  Q.   So there's no charge in this agreement

Page 97

1  for what a weekly report is?
2  A.   That's the whole problem or the whole
3  issue with calling them "fish" and "keeping
4  things up at a water tank level." That was his
5  metaphor for explaining what he wanted at a
6  certain level. We went ahead with that as long
7  as you keep it up at that metaphorical waterline.
8  The actual details of the report are going to
9  vary. That's explicit in here in this contract.
10       We refer to the paragraph right above
11  flat price structure. We refer to each of these
12  as "We will measure each of the 30 reports as,
13  quote, 'report equivalents' in the event that it
14  is necessary to stop work prematurely on one fish
15  and replace it with a second fish. We will then
16  have the partial report on the terminated fish,"
17  etc.
18       So it's explicitly understood in this
19  contract that you're gonna be stop and go and
20  things are going to be incomplete, and then you
21  go on to the next one, but we'll still have that
22  same universe of individuals to be collecting
23  data on.
24  Q.   Just without identifying what you said
25  or who you said it to, did you consult a lawyer

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 98

1   in connection with drafting this agreement?
2       A.   The question answers itself.  No.
3       Q.   Why does it answer itself?
4       A.   It's not legalistic at all.  It's our
5   own wording.  It's more of like an MOU between
6   parties that was executed as a contract.  This is
7   the way we all understand this was going to work.
8   But it was signed as a contract.
9       Q.   What does "MOU" stand for?
10      A.   Memorandum of understanding or
11  statement of work, or whatever other word you
12  want to use.
13      Q.   Just going to Eastern 9, the last page
14  of this document.  Do you see where it says, "It
15  is understood that the client may direct other
16  entities to pay the contractor and that such
17  payments" --
18           (Court reporter interruption.)
19      Q.   -- "will be deemed satisfactory
20  compensation by the contractor."
21           Do you see that?
22      A.   Yes.
23      Q.   Why is this clause in the agreement?
24      A.   To be set up to conceal from the
25  Chinese authorities that Guo was funding this

Page 99

1   research.  So it was explicit that nothing from
2   any of his Hong Kong accounts straight to his
3   Strategic Vision account, but rather through a
4   circuitous route of various places in various
5   countries and various cutouts to conceal these
6   transfers from the Chinese intelligence service.
7       Q.   So it was understood that the client
8   would not directly pay the contractor because of
9   these security concerns?
10      A.   Right.  Well, the client would -- if
11  you think of it as a collaborative versus a legal
12  means, the client authorizes the payment to be
13  paid, or it instructs that the payment be paid,
14  and then it's done through a circuitous route.
15  So we understand that the funds have come on
16  Guo's instruction.  And then we let him know that
17  the funds have been received.  There were no
18  funds that were sent to Strategic Vision after
19  the execution of this contract.
20      Q.   Let me ask you this.  Do you know why
21  Eastern Profit is the client?
22      A.   No, we don't know why it's the client.
23      Q.   Well, how did it get into the contract?
24      A.   How did what get in?
25      Q.   Eastern Profit.

Page 100

1       A.   We never heard of Eastern Profit until
2   the day Yvette said it's gonna be Eastern Profit.
3       Q.   So that was January 6th?
4       A.   No, that was late December.
5       Q.   What did you say in response to Yvette
6   telling you that Eastern Profit was going to be
7   the counterparty to this research agreement?
8       A.   I was not there for the signing.
9       Q.   But this was not the signing?
10      A.   I had not heard of Eastern Profit.
11  There were several days in late December when it
12  was just Yvette and Ms. Wallop talking.
13      Q.   I see.  So you talked to Ms. Wallop
14  about how Eastern Profit got on the agreement?
15      A.   Yes.
16      Q.   But you don't know why yourself?
17      A.   No.  I would presume it's for the
18  reasons stated in the subsequent payments
19  portion, but I don't know that.  Because Eastern
20  Profit never paid us anything, and we never
21  received any money from any Guo entity after
22  execution of the contract.
23      Q.   It says here that "All client payments
24  must be received by the contractor by wire
25  transfer within five business days of invoice."

Page 101

1       A.   Right.
2       Q.   Do you know if Strategic Vision ever
3   sent any invoices to Eastern Profit?
4       A.   It was a verbal invoice.  There were
5   not to be written invoices.
6       Q.   Have you done verbal invoicing before?
7       A.   Yes.
8       Q.   It's a new one for me.  Can you just
9   describe how that works?
10      A.   If you want to keep something
11  untraceable, you don't leave a paper trail.  If
12  you don't leave a paper trail, you don't submit
13  invoices for those purposes, especially if the
14  purpose is to protect the client's identity from
15  one of the most notorious spy agencies in the
16  world who is out to get your client.  So you just
17  say, "Okay, it's the end of the pay date," and
18  then they will send the next one.
19           You're kind of smirking at that.
20      Q.   No, it's a new thing for me.
21      A.   It's normal in our area of work.
22      Q.   That's fine.
23      A.   As long as we comply with the IRS and
24  report our income, then that's fine.  We've done
25  work in other ways to protect our clients and

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 102

1  it's not in writing.
2      Q.   Sure.  Do you know if a verbal invoice
3  was issued in this case?
4      A.   Yes.
5      Q.   When was that?
6      A.   On or about February 16th.
7      Q.   That would have been the first?
8      A.   15th or 16th.  Yes.  It was supposed to
9  be on or about January 31st, but we had agreed on
10  the 26th.  I had offered, with Ms. Wallop's
11  concurrence, to write off the first two weeks of
12  work to satisfy Guo, because he was so agitated.
13  We wanted to keep the contract with him.  So we
14  would not have invoiced until -- we normally
15  would have on January 31st, but we did not until
16  roughly February 15th.
17          And that was to Lianchao Han because by
18  that time, Yvette had instructed us not to
19  communicate with her anymore, or that Guo had
20  said not to communicate with her anymore.
21      Q.   Was it you or Ms. Wallop who, I guess,
22  called Lianchao to verbally invoice?
23      A.   We would only speak in person.
24      Q.   So were you there when the verbal
25  invoice was issued?

Page 103

1      A.   Yeah.  It was more like -- verbal
2  invoice, in quotes, is, "Hey, Lianchao, it's time
3  to pay the first month's 750,000."
4      Q.   Now, did he say anything in response to
5  that?
6      A.   He said "Guo's really upset right now.
7  Let me work with him on it."  But there was never
8  any indication of termination.
9      Q.   Were any other verbal invoices issued?
10      A.   Well, no, because a week later we got
11  served.
12      Q.   So the answer is no?
13      A.   No, because a week later we got served.
14      Q.   You're saying if you hadn't been
15  served, you would have issued the invoice for the
16  next month?
17      A.   We would have still been working with
18  Lianchao had we been paid.  This is to have been
19  paid within five days; that would have been
20  February 20th.  We would have stopped work by
21  then because we did not get paid.  But we did not
22  stop work because Lianchao said he was trying to
23  work it out.
24      Q.   I see.
25      A.   He's speaking as the agent of Guo, so

Page 104

1  we were talking to Guo as far as we were
2  concerned.
3      Q.   Do you know if Lianchao works for
4  Eastern Profit?
5      A.   No.
6      Q.   Do you know one way or another whether
7  he does or does not or you just don't know?
8      A.   He told me Guo has offered to pay him
9  many times, and he was only doing it as a
10  volunteer because he had larger interests in
11  promoting the Chinese democracy movement.
12      Q.   Because of his own political feelings
13  and history?
14      A.   Yeah.  He said Guo was very mercurial,
15  doesn't keep his word and rips off his law firms
16  and clients and customers and fellow investors,
17  and so we should be -- we should be sure to have
18  our money in hand before we continue to work.
19      Q.   When did he tell you that?
20      A.   In December and in January and in
21  February.
22      Q.   Was that an in-person meeting?
23      A.   In person.  And the public record shows
24  that Guo rips off a lot of people.
25      Q.   That is your perception of it?

Page 105

1      A.   No, that's the news reports of it.
2      Q.   How did that come up?  Did Lianchao
3  raise that issue or did you ask him about that?
4      A.   I don't remember.
5          MR. GRENDI:  Why don't we go off the
6      record.
7          THE VIDEOGRAPHER:  Off the record at
8      12:14.
9          (Whereupon, a short recess was taken.)
10          THE VIDEOGRAPHER:  Back on the record
11      at 12:20.
12          MR. GRENDI:  This is Waller 3.
13          (Waller Exhibit 3, Handwritten document
14      Bates stamped Eastern 11, marked for
15      identification.)
16      Q.   Mr. Waller, do you recognize this
17  document?
18      A.   No.
19      Q.   You've never seen it before?
20      A.   No.
21      Q.   Do you recognize the handwriting on the
22  document?
23      A.   It appears to be French Wallop's
24  handwriting.
25      Q.   Do you know her handwriting pretty good

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 106

```
 1  or well?
 2      A.    Enough to tell that it appears to be
 3  hers.
 4      Q.    Do you recognize any of these names?
 5      A.    They're mostly Arabic names.
 6      Q.    Do you know if any of the individuals
 7  on this list of names are clients of
 8  Strategic Vision?
 9      A.    No, I don't know.
10      Q.    So you've never provided services for
11  any of the individuals listed on this document?
12          MR. SCHMIDT:  Him being personally?
13          MR. GRENDI:  Yes.
14      A.    No.
15      Q.    Okay.  Did you ever talk to Mr. Guo or
16  Lianchao or Yvette Wang about people who are
17  clients of Strategic Vision?
18      A.    Present clients or past clients or
19  prospective clients?
20      Q.    Either.
21      A.    No.  Okay.  Repeat the question, then.
22      Q.    Sure.  Did you ever talk to Mr. Guo,
23  Lianchao or Yvette Wang about people who are
24  clients of Strategic Vision?
25      A.    No.
```

Page 107

```
 1      Q.    You never told any of those three
 2  people, We've done work for X, Y or Z?
 3      A.    Yeah, that's why I asked what you mean
 4  by "clients," whether it's present, past, or
 5  prospective.
 6      Q.    Let's go with present or past.
 7      A.    No, I wouldn't know Strategic Vision's
 8  previous clients.
 9      Q.    But you did provide work for -- you
10  described before two clients of Strategic Vision?
11      A.    Yes, but none of them are on this list.
12      Q.    Right, but let me ask you this.  Did
13  you ever tell Mr. Guo, Yvette Wang or Lianchao
14  that you provided work for those two --
15      A.    Yes.
16      Q.    -- entities.  You did.
17          And did you describe the names of those
18  entities to --
19      A.    At least one of them.  I don't recall
20  the exact.
21      Q.    Which name is that?
22      A.    Mikhail Khodorkovsky.
23      Q.    Why don't we help the court reporter
24  out with that one?
25      A.    M-i-k-h-a-i-l.  Forgive me if this is
```

Page 108

```
 1  not an entirely accurate spelling for the next
 2  one.  I believe it's K-o-d-o-r-k-h-o-v-s-k-y.  It
 3  might be K-h in the beginning, but I think it's
 4  K.  It's K, yeah.
 5      Q.    It's for the ease of my own butchering
 6  of the Russian language, who is that individual?
 7  I'll call him Mr. K?
 8      A.    He is a Russian dissident.  He's exiled
 9  in London.
10      Q.    You and Strategic Vision have provided
11  investigatory services for that individual?
12      A.    Messaging services.
13      Q.    Message services?
14      A.    Yes.
15      Q.    But not investigation research?
16      A.    I didn't.  I don't know if Strategic
17  Vision did.
18      Q.    Okay.  You said before there was
19  another client that was described to Lianchao,
20  Mr. Guo or Yvette Wang.
21          Do you recall that?
22      A.    I'm not sure.
23      Q.    Without divulging the name of that
24  client, what kind of client was it?
25      A.    I don't know if it was a client in fact
```

Page 109

```
 1  or just somebody that Strategic Vision had worked
 2  with before, so I don't know.  I'm not going to
 3  state as a fact that it was a client, so I don't
 4  know.
 5      Q.    So that was before the contract was
 6  signed, those discussions?
 7      A.    I don't recall.
 8      Q.    Did you ever tell Mr. Guo or Lianchao
 9  that you were helping Russian opposition groups?
10      A.    Yes.
11      Q.    When was that?
12      A.    When was I helping them?
13      Q.    No.  When did you tell them that you
14  were helping Russian opposition groups?
15      A.    Certainly before the contract and maybe
16  after the contract.
17      Q.    What did you tell them about that kind
18  of work that you were doing for Russian
19  opposition groups?
20      A.    Starting in -- it was -- how much
21  detail do you want?
22      Q.    You don't have to go crazy.  Just
23  generally.
24      A.    Starting in the late 1980s working with
25  anti-Soviet internal movements to help Ukraine,
```

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

1   Latvia, Lithuania, and Estonia secede from the
2   USSR. And then with Russian internal opposition
3   groups opposed to the Russian -- the Soviet
4   Communist Party. So they were tied --
5        MR. SCHMIDT: Slow down.
6        A.   Tied to Boris Yeltsin from, like,
7   roughly '87, '88 up to '93, '94.
8        Q.   What about more recent work with
9   opposition groups and Putin regime?
10       A.   With Mikhail Khodorkovsky, who is one
11  of the lead opposition people against Putin.
12       Q.   So you told Mr. Guo about the services
13  that you provided to Mikhail Khodorkovsky?
14       A.   Not so much the services as opposed to
15  ideas, because one of our ideas was to unite
16  Chinese internal opposition with Russian
17  opposition and help bring -- this was on the
18  messaging part of the ideas, the brainstorming
19  with Guo. We brainstormed a lot in December and
20  had wide-ranging discussions. So in this case,
21  it was to work with Russian internal opposition
22  groups to bring things in and out of China over
23  the land border between Russia and China.
24       Q.   Did you tell them that you had
25  connections with the Abu Dhabi princess?

1        A.   I didn't.
2        Q.   Did Ms. Wallop?
3        A.   Probably.
4        Q.   What about connections in Saudi Arabia?
5   Did you tout that as one of the resources that
6   you had?
7        A.   She has Saudi connections.
8        Q.   What about connections in Qatar,
9   Turkey, Iran? Is that all Ms. Wallop?
10       A.   She has those connections.
11       Q.   So your connections are with the
12  Russian opposition groups?
13       A.   She has connections with them also and
14  with Khodorkovsky.
15       Q.   So you both provide services to these
16  Russian opposition groups?
17       A.   Yes.
18       Q.   Did you ever tell Mr. Guo that you had
19  20 or so projects going at a given time, research
20  projects?
21       A.   At the same time?
22       Q.   Yes.
23       A.   No.
24       Q.   Did Ms. Wallop while you were there
25  tell --

1        A.   Not while I was there.
2        Q.   Did you ever tout connections to the
3   White House prior to the execution of the
4   contract?
5        A.   What do you mean by "tout"?
6        Q.   Like -- I won't say advertise, but just
7   explain in terms of the quality of your services
8   or Strategic Vision's services that you're
9   connected to the White House?
10       A.   Not so much in the services itself.
11  It's that I know people in the White House.
12       Q.   And you told Mr. Guo?
13       A.   Yes.
14       Q.   Did you tell them that you worked for
15  the Trump presidential campaign?
16       A.   No, I did not. I did not work for the
17  campaign, and I didn't tell them I did.
18       Q.   Did Ms. Wallop?
19       A.   Not that I know of. I would say I
20  don't know.
21       Q.   That's fine.
22            Did you tell Mr. Guo, Ms. Wang or
23  Lianchao that you worked with the CIA and
24  continue to work with the CIA in the Middle East?
25       A.   No. I had helped the CIA in the past,

1   but I never said I still work with them.
2        Q.   Do you still work with them?
3        A.   No.
4            MR. GRENDI: Let's go to Waller 4.
5            (Waller Exhibit 4, Document Bates
6        stamped, marked for identification.)
7        Q.   Do you recognize this document?
8            I gave you the one with my marks on it.
9   Would you mind switching that?
10       A.   Sure. I should take a look at your
11  marks.
12       Q.   That's okay. There's nothing that good
13  there.
14       A.   It looks like my LinkedIn page, but I
15  don't see an indication that it's on LinkedIn.
16       Q.   Is this your background information?
17       A.   It appears to be.
18       Q.   Do you remember giving this information
19  to Mr. Guo?
20       A.   No.
21       Q.   Or Lianchao?
22       A.   Maybe Lianchao.
23       Q.   That would have been before this
24  contract was signed?
25       A.   Yes.

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 114

1      Q.    What does Georgetown Research do?
2      A.    It's an LLC that I set up with
3   French Wallop in the fall of 2017 to do joint
4   work, and then it became a vehicle for executing
5   this contract.
6      Q.    So Georgetown Research does
7   investigatory work?
8      A.    Yes.
9      Q.    That's in Washington, D.C., right?
10     A.    Yes.
11     Q.    Do you have an office or is that based
12  out of your home?
13     A.    No, it's just an LLC.
14     Q.    So there's no --
15     A.    No staff, no office, no physical
16  address.
17     Q.    And it's just you?
18     A.    Yes.  Pardon, it's French Wallop and me
19  for this LLC.
20           MR. SCHMIDT:  For Georgetown.
21     A.    For Georgetown Research.
22     Q.    So you're both members of that LLC?
23     A.    Yes.
24     Q.    Got it.  Just in your bio it says that
25  you did special projects at Blackwater from 2007

Page 115

1   to 2009?
2      A.    Yes.
3      Q.    Is that company now known as -- I think
4   it's Academi?
5      A.    Academi.  A-c-a-d-e-m-i.  I don't know
6   if it's still by that name or not, but it became
7   that name.
8      Q.    Is this the Blackwater that used to be
9   run by a fellow named Erik Prince?
10           THE WITNESS:  Is this relevant?
11     A.    Yes.
12     Q.    You worked at Blackwater with
13  Erik Prince?
14     A.    Yes.
15     Q.    Did you mention that experience with
16  Blackwater prior to the execution of the contract
17  to Mr. Guo?
18     A.    I don't know.  I don't remember.
19     Q.    Just below that it says "Vice President
20  and American Foreign Policy Council"?
21     A.    Yeah.
22     Q.    Is this the work you were previously
23  describing concerning working with Russian
24  opposition groups?
25     A.    Yes.  It's part of it, yes.

Page 116

1      Q.    But you don't do that work anymore
2   through the American Foreign Policy Council?
3      A.    No.
4      Q.    I guess you're not with that outfit
5   anymore?
6      A.    Correct.
7           MR. GRENDI:  Let's do 5.
8           (Waller Exhibit 5, Signal text message
9       thread, marked for identification.)
10     Q.    Mr. Waller, do you recognize this
11  Signal thread?
12     A.    Let me take a look.  Yes.
13     Q.    Who is this correspondence between?
14     A.    Between Lianchao Han and myself.
15     Q.    I know you mentioned before, but how
16  long do you know Lianchao Han?
17     A.    I first met him in the '80s, but I've
18  then lost contact with him.  I've known him for
19  over 30 years but haven't worked with him closely
20  until this project.
21     Q.    How did you get in touch with him in
22  connection with this project?
23     A.    Through French Wallop.
24     Q.    So French Wallop reintroduced you to
25  Lianchao Han?

Page 117

1      A.    As I, as I understand it from her,
2   Bill Gertz was working with Lianchao Han and Guo,
3   and then Guo said he wanted to do this project
4   that we're discussing now.  Bill Gertz
5   contacted -- Bill Gertz is an intelligence and
6   defense reporter, and I've known him for 35
7   years.  So he talked to French about doing it.
8   She suggested bringing me in, and then through
9   that, I met Lianchao, re-met Lianchao.
10     Q.    So you weren't part of the -- let's
11  call it -- initial introduction of Bill Gertz and
12  Lianchao Han and Mr. Guo?
13     A.    No.
14     Q.    Does Lianchao Han have a relationship
15  with Strategic Vision?  Let's call it a financial
16  relationship.
17     A.    No, not that I know of.
18     Q.    Does he have a financial relationship
19  with you or any of your LLCs?
20     A.    No.
21     Q.    So he doesn't get any referral fees for
22  bringing work to you --
23     A.    No.
24     Q.    -- or Strategic Vision?
25     A.    No.

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 118

1    Q.    And I'll just be super clear, and
2    excuse the lawyer for being a little redundant.
3          Did Lianchao Han receive any
4    compensation for bringing Eastern Profit or
5    Mr. Guo to Strategic Vision?
6    A.    No.
7    Q.    I'll ask the same question for you or
8    your LLCs.  Did you ever pay Lianchao Han for
9    introducing you to Mr. Guo or Eastern Profit?
10   A.    No.
11   Q.    Let's turn to -- this is SVUS62, the
12   second page there.  Between the two text bubbles,
13   there's a lighter one and a darker one.  Which
14   one is you and which one is Lianchao Han?
15   A.    I'm the darker one.
16   Q.    And Lianchao Han is the lighter one?
17   A.    Yes.
18   Q.    Looking at this page, who is the friend
19   you could provide the menu for on December 18th?
20   A.    Guo.
21   Q.    That's Mr. Guo?
22   A.    Yes.
23   Q.    I'm turning to the next page.  This is
24   your message about Trump giving an excellent
25   speech today?

Page 119

1    A.    Yes.
2    Q.    And the response is "Yes, SB talked
3    about it here."  Do you see that?
4    A.    Yes.
5    Q.    Who is SB?
6    A.    I would presume it's Steve Bannon.
7    Q.    In the next message, Lianchao Han asks
8    you about "our friend from Tokyo."
9          Do you see that?
10   A.    Yes.
11   Q.    Who's your friend from Tokyo?
12   A.    He's not referring to my friend.  He's
13   referring to "our" as a generic "our."  It was a
14   Chinese individual from Tokyo whose name, whose
15   real name I never knew.
16   Q.    So not Mr. Guo?
17   A.    No.
18   Q.    This is some other individual?
19   A.    Some other person.
20   Q.    So does Lianchao Han introduce you to
21   other potential clients for the services that you
22   provide?
23   A.    No.
24   Q.    So he didn't ever introduce you to this
25   other Chinese individual?

Page 120

1    A.    He did.  Yeah, he did introduce me to
2    him.
3    Q.    But you didn't end up doing business
4    with him?
5    A.    No.
6    Q.    Turning to 64.  Do you see where it
7    says "New York friend wants to do it but asks for
8    more insurance"?
9    A.    Yes.
10   Q.    Who did you understand the New York
11   friend to be there?
12   A.    Guo.
13   Q.    What do you think Mr. Han meant by
14   "more insurance"?
15   A.    I think he meant assurance.  Assurances
16   that the job could be done.
17   Q.    I see.  So it's kind of just a phonetic
18   mistake in terms of the text message?
19   A.    Or whatever, yeah.
20   Q.    On the next page, do you see where you
21   wrote, "I don't think the New York guy is
22   serious"?
23   A.    Yes.
24   Q.    What did you mean by that?
25   A.    Guo kept waffling on what he wanted,

Page 121

1    and he was saying things that seemed conflicted.
2    Q.    What do you mean by that?
3    A.    He was waffling back and forth on
4    price, on scope, on what he wanted.  He wanted to
5    buy two Rockefeller properties, plus a $25
6    million house in Washington, D.C., and a building
7    across the street from the U.S. Treasury
8    Department with a line of view sight to the
9    White House, and set up all this research at the
10   same time.  It looked like he didn't seem serious
11   to me because he -- he seemed like he was a big
12   thinker, but it wasn't going to be.
13   Q.    So you didn't think that he was really
14   going to follow through with doing any of the
15   work that you guys were discussing at the time?
16   A.    I was apprehensive that he was going to
17   do any work with us.  Oh, and because the prices
18   that he was expecting to pay were nowhere near
19   what things were really going to cost.  That's
20   the next line.
21   Q.    Let me get there myself, if you don't
22   mind.  Lianchao Han's response was, "He wants do
23   it but wants to do it as cheap as possible."
24         Do you see that?
25   A.    Right.

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 290

1    THE VIDEOGRAPHER:  This concludes
2    today's deposition of Mr. Waller.  The time
3    is 5:35.  We are off the record.
4
5
6    (Whereupon, the within proceedings
7    concluded at 5:35 p.m., on the 8th day of
8    February, 2019.)
9
10    *    *    *    *    *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 291

1    D E C L A R A T I O N
2
3    I hereby certify that having been first
4    duly sworn to testify to the truth, I gave the
5    above testimony.
6
7    I FURTHER CERTIFY that the foregoing
8    transcript is a true and correct transcript of
9    the testimony given by me at the time and place
10    specified hereinbefore.
11
12
13    _____
14    J. MICHAEL WALLER
15
16
17
18    Subscribed and sworn to before me
19
20    this _____ day of _____ 20___.
21
22
23    _____
24    NOTARY PUBLIC
25

Page 292

1    ERRATA SHEET
2
3    NAME OF CASE:  EASTERN PROFIT v STRATEGIC
4    DATE OF DEPOSITION:  Friday, February 8, 2019
5    NAME OF WITNESS:  J. MICHAEL WALLER
6    PAGE LINE   FROM                TO
7
8    ____|_____|_____|_____
9    ____|_____|_____|_____
10    ____|_____|_____|_____
11    ____|_____|_____|_____
12    ____|_____|_____|_____
13    ____|_____|_____|_____
14    ____|_____|_____|_____
15    ____|_____|_____|_____
16    ____|_____|_____|_____
17    ____|_____|_____|_____
18    ____|_____|_____|_____
19    ____|_____|_____|_____
20    ____|_____|_____|_____
21    ____|_____|_____|_____
22    ____|_____|_____|_____
23    ____|_____|_____|_____
24
25

Page 293

1    REPORTER'S CERTIFICATE
2
3    STATE OF NEW YORK  )
4                       ) ss.
5    COUNTY OF NEW YORK )
6
7    I, ROBERTA CAIOLA, a Shorthand Reporter
8    and Notary Public within and for the State of New
9    York, do hereby certify:
10    That J. MICHAEL WALLER, the witness
11    whose deposition is hereinbefore set forth, was
12    duly sworn by me and that such deposition is a
13    true record of the testimony given by such
14    witness.
15    I further certify that I am not related
16    to any of the parties to this action by blood or
17    marriage and that I am in no way interested in
18    the outcome of this matter.
19    In witness whereof, I have hereunto set
20    my hand on this date, February 15, 2019.
21                    _Roberta Caiola_
22                    ROBERTA CAIOLA
23
24
25

# Exhibit M

**UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF NEW YORK**

---

EASTERN PROFIT CORPORATION
LIMITED

      Plaintiff,

v.

STRATEGIC VISION US, LLC

      Defendant.

---

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 18-CV-2185 (JGK)



EXHIBIT

Wang
3   mc
1-31-19

**PLAINTIFF EASTERN PROFIT CORPORATION LIMITED'S REPONSES**
**AND OBJECTIONS TO DEFENDANT STRATEGIC VISION US, LLC'S FIRST**
**SET OF INTERROGATORIES**

   Eastern Profit Corporation Limited ("Eastern") by its attorneys, Zeichner Ellman

& Krause, LLP, responds as follows to Strategic Vision US, LLC's ("SV") First Set of

Interrogatories to Eastern, dated November 13, 2018 (the "Interrogatories").

<u>**OBJECTIONS TO SV'S INSTRUCTIONS**</u>

   A.  Eastern objects to SV's Instructions to the extent that they seek to impose

obligations beyond those imposed by the Federal Rules of Civil Procedure and the Local

Rules of the Southern District of New York.

## SPECIFIC RESPONSES TO SV'S FIRST SET OF INTERROGATORIES

1.     Identify all persons with whom Eastern consulted when answering these Interrogatories, or who were otherwise involved in any way in answering these Interrogatories.

**Response:**    Pursuant to Local Rule 33.3, Eastern objects to this interrogatory to the extent it seeks information beyond the identification of witnesses with knowledge of information relevant to the subject matter of this litigation. Subject to Eastern's objection, Yvette Wang and Guo Wengui were consulted when answering these Interrogatories.

2.     Identify the principals of Eastern.

**Response:**         Chunguang Han is the principal of Eastern.

3.     Identify the principals of ACA Capital Group Limited.

**Response:**         Pursuant to Local Rule 33.3, Eastern objects to this interrogatory because it seeks information beyond the identification of witnesses with knowledge of information relevant to the subject matter of this litigation.

4.     Identify who directed the wires on or about December 29, 2017 in the total amount of $1 million be sent to Strategic Vision.

**Response:**         Eastern objects to this interrogatory because the term "directed" is vague, ambiguous and unclear in this context. Notwithstanding the forgoing objection, Guo Wengui, on behalf of Eastern, ordered wires totaling $1 million to be sent to Strategic Vision on or about December 29, 2017.

5.      Identify each person with knowledge of the Agreement, including the negotiation of same.

**Response**:     Pursuant to Local Rule 33.3, Eastern objects to this interrogatory to the extent it seeks information beyond the identification of witnesses with knowledge of information relevant to the subject matter of this litigation.  Subject to Eastern's objection, French Wallop, J. Michael Waller, Yvette Wang, Lianchao Han, Guo Wengui, and Gare Smith have knowledge of the Agreement, including the negotiation of same.

6.      Identify each person who participated in the "meetings between representatives of Eastern and Strategic Vision," as alleged in paragraph 8 of the Complaint.

**Response**: Pursuant to Local Rule 33.3, Eastern objects to this interrogatory to the extent it seeks information beyond the identification of witnesses with knowledge of information relevant to the subject matter of this litigation.  Subject to Eastern's objection, William Gertz, French Wallop, J. Michael Waller, Yvette Wang, Lianchao Han, and Guo Wengui participated in one or more meetings between representatives of Eastern and Strategic Vision.

7.      Identify each person with knowledge of Strategic Vision's misrepresentations of its "capabilities, resources, expertise and prior experiences," as alleged in paragraph 16.

**Response**:     Pursuant to Local Rule 33.3, Eastern objects to this interrogatory to the extent it seeks information beyond the identification of witnesses with knowledge of information relevant to the subject matter of this litigation.  Eastern further objects to this

3

interrogatory, because it is ambiguous and vague due the fact that it does not identify which document's paragraph 16 is being referenced.

8. Identify each person with knowledge of Strategic Vision's failure to deliver its initial set of weekly reports on time, as alleged in paragraph 18 of the Complaint.

**Response**: Pursuant to Local Rule 33.3, Eastern objects to this interrogatory to the extent it seeks information beyond the identification of witnesses with knowledge of information relevant to the subject matter of this litigation. Subject to Eastern's objection, French Wallop, J. Michael Waller, Yvette Wang, Lianchao Han, and Guo Wengui have knowledge of Strategic Vision's failure to deliver its initial set of weekly reports on time.

9. Identify each person with knowledge of the first delivery under the Agreement, including all reports and raw research materials, as alleged in paragraph 20 of the Complaint.

**Response**: Pursuant to Local Rule 33.3, Eastern objects to this interrogatory to the extent it seeks information beyond the identification of witnesses with knowledge of information relevant to the subject matter of this litigation. Subject to Eastern's objection, French Wallop, J. Michael Waller, Yvette Wang, Lianchao Han, and Guo Wengui have knowledge of the first delivery of information Strategic Vision made on or about January 30, 2018.

10.    Identify each person with knowledge of the information provided by Eastern to Strategic Vision under the Agreement, including the flash drives delivered to Strategic Vision.

**Response**: Pursuant to Local Rule 33.3, Eastern objects to this interrogatory to the extent it seeks information beyond the identification of witnesses with knowledge of information relevant to the subject matter of this litigation.  Subject to Eastern's objection, French Wallop, J. Michael Waller, Yvette Wang, Lianchao Han, and Guo Wengui have knowledge of the information provided by Eastern to Strategic Vision under the Agreement, including the flash drives delivered to Strategic Vision.

11.    Identify each person with knowledge of Strategic Vision's failure to deliver reports and meet the schedule under the Agreement, as alleged in paragraph 23 of the Complaint.

**Response**:  Pursuant to Local Rule 33.3, Eastern objects to this interrogatory to the extent it seeks information beyond the identification of witnesses with knowledge of information relevant to the subject matter of this litigation. Subject to Eastern's objection, French Wallop, J. Michael Waller, Yvette Wang, Lianchao Han, and Guo Wengui have knowledge of Strategic Vision's failure to deliver reports and meet the schedule under the Agreement.

12.    Identify each person with knowledge of Eastern's demand for return of the $1 million deposit, as alleged in paragraph 24 of the Complaint.

**Response**: Pursuant to Local Rule 33.3, Eastern objects to this interrogatory to the extent it seeks information beyond the identification of witnesses with knowledge of information

5

relevant to the subject matter of this litigation. Subject to Eastern's objection, French Wallop, J. Michael Waller, Yvette Wang, Lianchao Han, Guo Wengui, Gare Smith, and Anthony D. Mirenda, and Peter Sullivan, have knowledge of Eastern's demand for return of the $1 million deposit.

13.     Identify each person with knowledge of Eastern and/or ACA Capital Group Limited's attempt to reverse the wires of the $1 million deposit, or otherwise have the payment returned by non-voluntarily means.

**Response**:  Pursuant to Local Rule 33.3, Eastern objects to this interrogatory to the extent it seeks information beyond the identification of witnesses with knowledge of information relevant to the subject matter of this litigation. Subject to Eastern's objection, Yvette Wang and Guo Wengui have knowledge of attempts to reverse the wires of the $1 million deposit.

14.     Identify each person on the initial list of 15 subjects contained on the flash drive delivered by Ms. Y to Strategic Vision, as alleged in paragraph 63 of the Answer.

**Response:**  Pursuant to Local Rule 33.3, Eastern objects to this interrogatory because it seeks information beyond the identification of witnesses with knowledge of information relevant to the subject matter of this litigation.

15.     Identify each person with whom you have consulted as an expert or whom you expect to call as an expert witness at the trial of this action. For each such person, identify:

a.              the person's name, address, and telephone number;

b.              an explanation of the subject matter on which the person is expected to testify;

c.              the substance of the facts and opinions, as well as the basis for each opinion, to which each person is expected to testify;

d.              the educational background, training, and experience that you contend qualifies each person as an expert; and

e.              each person's field(s) of expertise.

**Response:** Pursuant to Local Rule 33.3, Eastern objects to this interrogatory because it seeks information beyond the identification of witnesses with knowledge of information relevant to the subject matter of this litigation.   Eastern further objects to this interrogatory because it is premature.

16.       Provide an itemized statement of your alleged damages.

**Response:** Eastern's damages in this case are as follows:

$1,000,000 for the $1,000,000 paid to Strategic Vision as a deposit under the Agreement, plus reasonable attorneys' fees which shall be determined at the time of trial, the costs associated with this action, pre-judgement interest at the legal rate of interest.

17.       Identify the name and address of each person that you know or claim has knowledge of the allegations in the Complaint, including the damages alleged in the Complaint.

**Response:** Pursuant to Local Rule 33.3, Eastern objects to this interrogatory to the extent it seeks information beyond the identification of witnesses with knowledge of information relevant to the subject matter of this litigation. Subject to Eastern's objection, French Wallop, J. Michael Waller, Yvette Wang, Lianchao Han, Guo Wengui, Gare Smith, Peter Sullivan, and Anthony D. Mirenda have knowledge of the allegations in the Complaint.

18.     Identify all documents, witnesses, evidence, materials and testimony not previously identified in your answers to these interrogatories, and upon which the allegations in the Complaint are based, or upon which you relied in preparing the answers to these interrogatories, or will rely in proving your contentions or in responding to any of Strategic Vision's counterclaims, allegations, denials and defenses at the trial of this action.

**Response:** Eastern objects to this interrogatory because (1) it calls for the disclosure of documents and information not permitted by Local Rule 33.3, (2) it is compound, vague and unintelligibly muddled, (3) is an impractical and unduly burdensome means of obtaining the information sought, and (4) calls for the disclosure of trial witnesses and evidence prematurely under the Federal Rules of Civil Procedure.   Subject to Eastern's objections, William Gertz, French Wallop, J. Michael Waller, Yvette Wang, Lianchao Han, Guo Wengui, Gare Smith, Peter Sullivan and Anthony D. Mirenda have knowledge of the subject matter of this action.

**AS TO THE OBJECTIONS:**

Dated:   New York, New York
         December 20, 2018

ZEICHNER ELLMAN & KRAUSE LLP

By:___/s/_____
Zachary B. Grendi, Esq.
*Attorneys for Plaintiff*
1211 Avenue of the Americas
New York, New York  10036
(212) 223-0400
zgrendi@zeklaw.com

## VERIFICATION

  I, Yvette Wang, state that I have read the foregoing responses; that the responses were prepared with the assistance of counsel; that the responses are, subject to inadvertent and undiscovered errors, based on and therefore necessarily limited by the records and information I have reviewed, or by my personal knowledge of certain facts were so stated, and by information thus far discovered in preparing these responses.

  I reserve the right to make any changes in the responses if it appears at any time that material omissions or errors have been made therein or that more accurate information is available.

  Subject to these limitations, I state, under the pains and penalties of perjury, that the responses are true to the best of by knowledge, information and belief.

Date Executed: ___12 | 20 | 2018_____

Golden Spring (New York) Ltd.
As attorney in fact for
Eastern Profit Corporation Limited

Signature: _____
Name: Yvette Wang
Title: President

Sworn to before me this
20 day of December 2018

_____
Notary Public

**KARIN MAISTRELLO**
NOTARY PUBLIC STATE OF NEW YORK
Registration No. 01MA6376654
Qualified in NY County
Commision expires June, 18 2022

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, of the law offices of Zeichner Ellman & Krause LLP, attorneys for Eastern Profit Corporation Limited, do hereby certify that that I have served all parties of record with copies of the below listed documents by U.S. Mail on this December 31, 2018:

Documents:
- Eastern Profit Corporation Limited's Responses and Objections to Strategic Vision US, LLC's First Set of Interrogatories

_____/s/_____
Zachary Grendi

# Exhibit N

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

EASTERN PROFIT CORPORATION
LIMITED,

   *Plaintiff/Counterclaim Defendant,*

   **v.**

STRATEGIC VISION US, LLC,

   *Defendant/Counterclaim Plaintiff.*

Case No. 18-cv-2185 (JGK)-DCF

## PLAINTIFF'S RESPONSES AND OBJECTIONS TO DEFENDANT'S CIVIL RULE 26.1 DEMAND

Plaintiff/Counterclaim Defendant Eastern Profit Corporation Limited ("Eastern Profit") hereby responds to Defendant/Counterclaimant Strategic Vision US, LLC ("Strategic Vision"), pursuant to Local Civ. R. 26.1 as follows:

1.  The identity of all partners or members of Eastern Profit as of the date of this Demand.

**RESPONSE:** Eastern Profit objects to this request because it calls for the furnishing of information pursuant to Local Civil Rule 26.1(b), which applies to partnerships, limited liability partnerships, limited liability companies, or other unincorporated associations. Eastern Profit is a Private Limited Company registered under the laws of the Hong Kong Special Administrative Region of the People's Republic of China. As such, Eastern Profit has shareholders, not partners or members as described in Local Rule 26.1(b). As such, Eastern Profit Corporation Limited is subject to the disclosures of Local Rule 26.1(c), not Local Rule 26.1(b).

Accordingly, Eastern Profit hereby furnishes or discloses that it was registered in the Hong Kong Special Administrative Region of the People's Republic of China, has its principal place of business in the Hong Kong Special Administrative Region of the People's Republic of China. Eastern Profit is a citizen of the Hong Kong Special Administrative Region of the People's Republic of China for purposes of 28 U.S.C. § 1332.

2.    The residence and domicile of each partner or member of Eastern Profit as of the date of this Demand.

**RESPONSE:**  Eastern Profit objects to this request because it calls for the furnishing of information pursuant to Local Civil Rule 26.1(b), which applies to partnerships, limited liability partnerships, limited liability companies, or other unincorporated associations. Eastern Profit is a Private Limited Company registered under the laws of the Hong Kong Special Administrative Region of the People's Republic of China. As such, Eastern Profit has shareholders, not partners or members as described in Local Rule 26.1(b). As such, Eastern Profit Corporation Limited is subject to the disclosures of Local Rule 26.1(c), not Local Rule 26.1(b).

Accordingly, Eastern Profit hereby furnishes or discloses that it was registered in the Hong Kong Special Administrative Region of the People's Republic of China, has its principal place of business in the Hong Kong Special Administrative Region of the People's Republic of China. Eastern Profit is a citizen of the Hong Kong Special Administrative Region of the People's Republic of China for purposes of 28 U.S.C. § 1332.

3.      The state or other jurisdiction where Eastern Profit was formed.

**RESPONSE:**  Eastern Profit was registered in the Hong Kong Special Administrative Region of the People's Republic of China.

4.      If one or more of Eastern Profit's claims in the Second Amended Complaint has been assigned, identify each original owner of each claim and identify any assignee of any claim.

**RESPONSE:**  None of the claims in the Second Amended Complaint has been assigned.

Dated August 20, 2019

**AS TO THE OBJECTIONS**

> EASTERN PROFIT CORPORATION LIMITED,
> By its attorneys,
>
> _____/s/Zachary Grendi_____
> Zachary Grendi, Esq.
> ZEICHNER ELLMAN & KRAUSE LLP
> 1 Landmark Square
> 4th Floor
> Stamford, CT 06901
> 203-489-1233
> zgrendi@zeklaw.com

## **VERIFICATION**

I, Yvette Wang, state that I have read the foregoing responses; that the responses were prepared with the assistance of counsel; that the responses are, subject to inadvertent and undiscovered errors, based on and therefore necessarily limited by the records and information I have reviewed, or by my personal knowledge of certain facts were so stated, and by information thus far discovered in preparing these responses.

I reserve the right to make any changes in the responses if it appears at any time that material omissions or errors have been made therein or that more accurate information is available.

Subject to these limitations, I state, under the pains and penalties of perjury, that the responses are true to the best of my knowledge, information and belief.

Date Executed: ___8/20/2019___

Golden Spring (New York) Ltd.

As attorney in fact for

Eastern Profit Corporation Limited

Signature: _____

Name: Yvette Wang

Title: President

Sworn to before me this

20th day of August 2019

_____

Notary Public

JENNIFER MERCURIO
Notary Public, State of New York
Reg. No. 02ME6394573
Qualified in Putnam County
Commission Expires July 8, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2019, the foregoing was emailed and served via U.S.

Mail, first-class postage prepaid, to the following:

Edward D. Greim, #4240172
1100 Main Street, Suite 2700
Kansas City, MO 64105
Telephone: (816) 256-3181
Fax: (816) 256-5958
edgreim@gravesgarrett.com

/s/Zachary Grendi
Zachary Grendi

# Exhibit O





## LIMITED POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that Eastern Profit Corporation Limited, a Hong Kong corporation, and having its usual place of business at Rooms 805-806 8th Floor, Tai Yau Building, 181 Johnston Road, Wanchai, Hong Kong ("Eastern") hereby constitutes and appoints Golden Spring (New York) Limited ("Golden Spring"), a Delaware corporation, having its usual place of business at 800 5th Avenue, Ste 21F New York, NY 10065 as Eastern's true and lawful Attorney-in-Fact, in the Eastern's name, place and stead and for Eastern's benefit, in connection with Eastern's interactions, negotiations, contract and/or any litigation with Strategic Vision US, LLC ("SV"), solely for the purpose of performing such acts and executing such documents in the name of Eastern necessary and appropriate to effectuate the following enumerated transactions.

This Appointment shall apply only to the following enumerated transactions and nothing herein or in the Agreement shall be construed to the contrary:

1. Negotiating a contract between Eastern and SV;

2. Executing a contract between Eastern and SV;

3. The full enforcement and preservation of Eastern's rights under any contract between Eastern and SV, including but not limited to prosecuting and/or defending any and all claims concerning the relationship between Eastern and SV, including, but not limited to, any and all of the following acts:

   a. Retaining counsel to prosecute and/or defend any claims and/or litigation arising out of any relationship between Eastern and SV;
   b. Executing affidavits and pleadings on behalf of Eastern in any litigation between Eastern and SV;
   c. Resolving and/or settling any dispute(s) between Eastern and SV via execution of settlement agreement(s);

The undersigned gives said Attorney-in-Fact full power and authority to execute such instruments and to do and perform all and every act and thing necessary and proper to carry into effect the power or powers granted by or under this Limited Power of Attorney as fully as the undersigned might or could do, and hereby does ratify and confirm to all that said Attorney-in-Fact shall be effective as of October 1, 2017.

This appointment is to be construed and interpreted as a limited power of attorney. The enumeration of specific items, rights, acts or powers herein is not intended to, nor does it give rise to, and it is not to be construed as a general power of attorney. This Limited Power of Attorney is entered into and shall be

CONFIDENTIAL

EASTERN-000276

governed by the laws of the State of New York, without regard to conflicts of law principles of such state.

Third parties without actual notice may rely upon the exercise of the power granted under this Limited Power of Attorney; and may be satisfied that this Limited Power of Attorney shall continue in full force and effect and has not been revoked unless an instrument of revocation has been made in writing by the undersigned.

IN WITNESS WHEREOF, Eastern Profit Corporation Limited, has caused its corporate seal to be hereto affixed and these presents to be signed and acknowledged in its name and behalf by a duly elected and authorized signatory this _30 n_ day of August, 2018

Eastern Profit Corporation Limited

By: _____

Name: Chunguang Han

Title: DIRECTOR _____

STATE OF NEW YORK )
                                     ) ss:
COUNTY OF New York )

On the _30 n_ day of August, 2018, before me, the undersigned, personally appeared Chunguang Han, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

KARIN MAISTRELLO
NOTARY PUBLIC STATE OF NEW YORK
Registration No. 01MA6176654
Qualified in NY County
Commission expires June, 18 2022

CONFIDENTIAL                    EASTERN-000277

# Exhibit P

**Atkinson-Baker, Inc.**
www.depo.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
EASTERN PROFIT CORPORATION LIMITED,
          Plaintiff/COUNTER-CLAIM DEFENDANT,
              CASE NO.: 18-cv-2185(JGK)
          -against-

STRATEGIC VISION US, LLC
          Defendant/COUNTERCLAIM PLAINTIFF.
-------------------------------------------------------X

Deposition of AMELIA COLLUCIO, taken on behalf of
defendant/counterclaimant, at 620 Eighth Avenue,
27th Floor, New York, New York, commencing at 9:18
a.m., Tuesday, November 12, 2019, before Kiara
Miller.

Page 2

APPEARANCES:

          GRAVES GARRETT, LLC
          Attorneys for Plaintiff
          1100 Main Street, Suite 2700
          Kansas City, Missouri 64105

          BY:  EDWARD D. GREIM, ESQ.


          HODGSON, RUSS
          Attorneys for Defendant
          605 Third Avenue, Suite 2300
          New York, New York 10158

          BY:  ERIN N. TESKE, ESQ.

ALSO PRESENT:
          JENNIFER DONNELLI
          DANIEL PODHASKIE

Page 3

FEDERAL STIPULATION

          IT IS HEREBY STIPULATED AND AGREED by
and between the counsel for the respective
parties hereto, that the filing, sealing, and
certification of the within deposition shall be
and the same are hereby waived;
          IT IS FURTHER STIPULATED AND AGREED
that all objections, except as to the form of
the question shall be reserved to the time of
trial.
          IT IS FURTHER STIPULATED AND AGREED
that the within deposition may be signed before
any notary public with the same force and
effect as if signed and sworn to before this
court.

Page 4

          VIDEOGRAPHER:  Good morning, I
am Thomas Del Vecchio, your
videographer. I am present on
behalf of Atkinson-Baker in
Glendale, California. I am not
financially interested in this
action, nor am I a relative or
employee of any attorneys or any of
the parties.
          Today's date Tuesday, November
12, 2019.  The time is 9:18 a.m.
This deposition is taking place at
the offices of Pepper Hamilton, 620
8th Avenue, New York, New York.  The
case number is 18-CV-2185, entitled
Eastern Profit versus Strategic
Vision.
          The deponent today is
Ms. Amelia Coluccio.  This
deposition is being taken on behalf
of the defendant/counterclaimant.
The court reporter today is Kiara
Miller from Atkinson Baker.
          Counsel will now please

Page 5

2 (Pages 2 to 5)

**30(b)(6): Amelia Coluccio**
**November 12, 2019**

# Exhibit Q

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

EASTERN PROFIT CORPORATION
LIMITED,

               Plaintiff,

             vs.

STRATEGIC VISION US LLC,

              Defendant.

-------------------------------------------------------X

: Docket No.: 18 cv 2185

: **SUBSTITUTION OF COUNSEL**



**DEFENDANT'S EXHIBIT**
33
11/11/19

    **IT IS HEREBY CONSENTED** that COHEN & HOWARD LLP be substituted as

attorney of record for Plaintiff EASTERN PROFIT CORPORATION LIMITED, in the above-

captioned action in place and stead of FOLEY HOAG LLP as of the date hereof.

Dated: May 30, 2018
      New York, NY

Respectfully,

Peter A. Sullivan, Esq.
FOLEY HOAG LLP
1540 Broadway, 23rd Floor
New York, NY 10036
psullivan@foleyhoag.com
646-927-5500 tel
646-927-5599 fax

*Outgoing Attorneys for Plaintiff*
*EASTERN PROFIT CORPORATION LIMITED*

Respectfully,

Aaron A. Mitchell, Esq.
COHEN & HOWARD LLP
766 Shrewsbury Avenue, Suite 200
Tinton Falls, NJ 07724
amitchell@cohenandhoward.com
732-747-5202 tel
732-747-5259 fax

*Incoming Attorneys for Plaintiff*
*EASTERN PROFIT CORPORATION LIMITED*

Acknowledged and Consented hereto,

Chunguang Han,
Member Eastern Profit Corporation Limited

-1-

So Ordered:

_____

Honorable John G. Koeltl, U.S.D.J.

# Exhibit R

存案 Filed



更改公司秘書及董事通知書(委任／停任)
**Notice of Change of Company Secretary and Director (Appointment／Cessation)**

公司註冊處
Companies Registry

表格
Form **ND2A**

公司編號 Company Number

1648534


DEFENDANT'S EXHIBIT
30
11/11/19

註 Note

**1 公司名稱 Company Name**

**EASTERN PROFIT CORPORATION LIMITED**
東利興業有限公司

**2 公司秘書／董事的停任 Cessation to Act as Company Secretary／Director**
(如超過一名公司秘書／董事停任，請用續頁 A 填報 Use Continuation Sheet A if more than 1 company secretary／director ceased to act)

**A. 現時在公司註冊處登記的詳情 Particulars Currently Registered with the Companies Registry**
請在適用的空格內加上 ✓ 號 Please tick the relevant box(es)

⑦ 身分
Capacity

☐ 公司秘書 Company Secretary  ☑ 董事 Director  ☐ 候補董事 Alternate Director

代替 Alternate to

(Nil)

公司秘書／董事的詳情(自然人) **Particulars of Company Secretary／Director (Natural Person)**

| 中文姓名 Name in Chinese | | 韓春光 |
|---|---|---|
| 英文姓名 Name in English | 姓氏 Surname | Han |
| | 名字 Other Names | Chunguang |

⑧ 身分證明
Identification

(Nil)
香港身分證號碼
Hong Kong Identity Card Number

(Nil)
護照號碼
Passport Number

**或 OR**

⑨ 公司秘書／董事的詳情(法人團體) **Particulars of Company Secretary／Director (Body Corporate)**
中文及英文名稱 Chinese and English Names

(Nil)

**B. 停任詳情 Details of Cessation**

停任原因
**Reason for Cessation**

☑ 辭職／其他 Resignation／Others  ☐ 去世 Deceased

⑩ 停任日期
Date of Cessation

| 27 | 06 | 2017 |
|---|---|---|
| 日 DD | 月 MM | 年 YYYY |

⑪ 上述董事或候補董事在停任日期後，是否仍然擔任這公司的候補董事或董事職位？
Will this director or alternate director continue to hold office as alternate director or director in this company after the date of cessation?

☐ 是 Yes
☑ 否 No

④ **提交人資料 Presenter's Reference**
姓名 Name:
地址 Address:

電話 Tel:
電郵 Email:
檔號 Reference:

請勿填寫本欄 **For Official Use**

CR
收件日期 RECEIVED
2 7 JUN 2017
文件管理組
Document Management Section

22401474897  1648534
ND2A
27/06/2017

指明編號 1/2014 (2014 年 3 月) Specification No. 1/2014 (March 2014)

CSA by P & L Associates

EASTERN-000400

表格 **ND2A**
Form

公司編號 **Company Number**

1648534

**3  委任公司秘書／董事(自然人) Appointment of Company Secretary／Director (Natural Person)**
(如委任超過一名自然人為公司秘書／董事，請用續頁 B 填報 Use Continuation Sheet B if more than 1 natural person is appointed as company secretary／director)
*請在適用的空格內加上 ✓ 號 Please tick the relevant box(es)*

| 身分 Capacity | 公司秘書 Company Secretary ☐ | 董事 Director ☑ | 候補董事 Alternate Director ☐ | 代替 Alternate to |
|---|---|---|---|---|
| | | | | (Nil) |

| 中文姓名 Name in Chinese | | 郭美 |
|---|---|---|
| 英文姓名 Name in English | 姓氏 Surname | Guo |
| | 名字 Other Names | Mei |
| 前用姓名 Previous Names | 中文 Chinese | (Nil) |
| | 英文 English | (Nil) |
| 別名 Alias | 中文 Chinese | (Nil) |
| | 英文 English | (Nil) |

| 地址 Address | Majestic View Manor |
|---|---|
| | 20 South Bay Road |
| | |
| 國家／地區 Country／Region | Hong Kong |

| 電郵地址 Email Address | (Nil) |
|---|---|

**身分證明 Identification**

(a) 香港身分證號碼
Hong Kong Identity Card Number

| | R | 6 | 4 | 2 | 5 | 9 | 1 | (6) |
|---|---|---|---|---|---|---|---|---|

(b) 護照 Passport  簽發國家 Issuing Country  (Nil)

號碼 Number  (Nil)

委任日期 Date of Appointment   27 日DD   06 月MM   2017 年YYYY

上述董事或候補董事在獲得這次委任時，是否已經是這公司的現任候補董事或董事？
Is this director or alternate director already an existing alternate director or director in this company at the time of this appointment?    是 Yes ☐    否 No ☑

| 提示 Advisory Note | 所有公司董事均應閱讀公司註冊處編製的《董事責任指引》，並熟悉該指引所概述的董事一般責任。All directors of the company are advised to read 'A Guide on Directors' Duties' published by the Companies Registry and acquaint themselves with the general duties of directors outlined in the Guide. |
|---|---|

**出任董事職位同意書 Consent to Act as Director**  * 請刪去不適用的者 Delete whichever does not apply

本人同意擔任本公司的 董事／候補董事*，並確認本人已年滿 18 歲。
I consent to act as Director／~~Alternate Director~~* of this company and confirm that I have attained the age of 18 years.

簽署 Signed : Guo Mei

第二頁 Page 2

*CSA by P & L Associates*

EASTERN-000401

表格　**ND2A**
Form

公司編號 Company Number

1648534

**4  委任公司秘書／董事 (法人團體) Appointment of Company Secretary／Director (Body Corporate)**
*(如委任超過一個法人團體為公司秘書／董事，請用組頁 C 填寫 Use Continuation Sheet C if more than 1 body corporate is appointed as company secretary／director)*
*請在適用的空格內加上 ✓ 號 Please tick the relevant box(es)*

⑱ 身分　　　☐ 公司秘書　　☐ 董事　　　☐ 候補董事　　代替 Alternate to
Capacity　　　Company　　　Director　　　Alternate
　　　　　　　Secretary　　　　　　　　　Director

⑲ 中文名稱
Name in Chinese　　　　　　　　　　(Blank Section)

⑲ 英文名稱
Name in English

⑳ 地址
Address

　　　　　國家／地區
　　　　　Country／Region

㉑ 電郵地址
Email Address

公司編號 Company Number
*(只適用於在香港註冊的法人團體)*
*(Only applicable to body corporate registered in Hong Kong)*

委任日期 Date of Appointment

　　　　　　　　　　日 DD　　　月 MM　　　年 YYYY

㉒ 上述董事或候補董事在獲授過這次委任時，是否已經是該公司的現任候補董事或董事？　　☐ 是 Yes
Is this director or alternate director already an existing alternate director or director in this
company at the time of this appointment ?　　　　　　　　　　　　　　　　　　　☐ 否 No

㉓ 提示　　　所有公司董事均獲勸諭閱讀公司註冊處編製的《董事責任指引》，並熟悉該指引所概述的董事一般責任。
Advisory Note　All directors of the company are advised to read 'A Guide on Directors' Duties' published by the
　　　　　　　Companies Registry and acquaint themselves with the general duties of directors outlined in the Guide.

㉓ **出任董事職位同意書 Consent to Act as Director**
本人謹代表上述公司確認，上述公司同意擔任公司的董事／候補董事＊。
I, acting on behalf of the above named company, confirm that the above company consents to act as
Director／Alternate Director＊ of this company.

簽署 Signed　　:

　　　　　　董事(法人團體)的董事／公司秘書／獲授權人士＊
　　　　　Director／Company Secretary／Authorized Person of the Director (Body Corporate)＊

本通知書包括下列續頁 This Notice includes the following Continuation Sheet(s)

| 續頁 Continuation Sheet(s) | A | B | C |
|---|---|---|---|
| 頁數 Number of pages | 0 | 0 | 0 |

㉔ **5　確認(適用的話) Confirmation (If applicable)**
名列本通知書內的每一名獲委任為公司秘書的自然人通常居於香港。
Each natural person appointed as company secretary and named in this Notice ordinarily resides in Hong Kong.

⑥ 簽署 Signed　　:　　　*Han Chunguang* [signature]

姓名 Name　　：　　Han Chunguang　　　　　　日期 Date　：　**2 7 JUN 2017**

　　　　　　董事 Director／~~公司秘書 Company Secretary~~ ＊　　　　　　日 DD／月 MM／年 YYYY

＊請刪去不適用者 Delete whichever does not apply

第三頁 Page 3

指明編號 1/2014 (2014 年 3 月) Specification No. 1/2014 (March 2014)

CSA by P & L Associates

# Exhibit S



**FOLEY HOAG** LLP

Seaport West
155 Seaport Boulevard
Boston, MA 02210-2600

617.832.1000 main
617.832.7000 fax

Anthony D. Mirenda
617-832-1220 direct
ADM@foleyhoag.com

February 23, 2018

<u>**Via Federal Express**</u>

**CONFIDENTIAL**



Ms. French C. Wallop, CEO
Strategic Vision US LLC
7260 W. Azure Drive, Suite 140-593
Las Vegas, NV  89130

> Re:   <u>Contract with Eastern Profit Corporation Limited dated January 6, 2018</u>

Dear Ms. Wallop:

We have been engaged to represent Eastern Profit Corporation Limited ("Eastern")
with regard to its Research Agreement contract with Strategic Vision US LLC ("Strategic
Vision") dated January 6, 2018.

As you are aware, Eastern has very serious concerns with Strategic Vision's wholly
inadequate performance in the weeks since the contract was signed.  In the contract,
Strategic Vision promised that it would, among other things, conduct "high quality original
research" and would provide detailed forensic financial reports, reports detailing tracking
research, and reports detailing social media research concerning specific subjects as
described therein.  Per the contract, Strategic Vision was to deliver such reports concerning
the specific subjects on a weekly basis over the course of the first month, and no less than on
a monthly basis thereafter.

Immediately after the contract was signed on January 6, problems concerning
Strategic Vision's capabilities and competence began to surface.  Because of what Strategic
Vision described as "internal miscommunication" on the part of Strategic Vision's
representatives, Eastern agreed to delay the start of the contract by 10 days, from January 6
to January 16.  Even with this additional time, Strategic Vision failed to deliver its initial sets
of weekly reports on time as required by the contract.

Eventually, on January 30, Strategic Vision finally made its first delivery under the
contract – an 80 GB dump of a combination of reports concerning particular subjects and

CONFIDENTIAL

February 23, 2018
French C. Wallop
Page 2

raw research materials. This "delivery" was wholly inadequate for a host of reasons. First and most fundamentally, while Eastern provided specific identifying information regarding the particular subjects of the research, most of Strategic Vision's reports and research materials concerned **different** subjects – not the particular ones specified by Eastern – and so the information was entirely irrelevant. For example, Eastern provided detailed identifying information concerning one particular subject, Chengjie LIU (including among other data his date of birth and a photograph), but Strategic Vision provided a 121-page report on an entirely different person, with a different date of birth and a different photograph – obviously useless. As another example, Eastern provided detailed identifying information concerning another particular subject, Qing YAO (including among other data his date of birth and a photograph), but Strategic Vision provided a 52-page report on an entirely different person, with a different date of birth and a different photograph – likewise obviously useless. The remainder of the materials included similarly irrelevant and useless materials, or suffered from other obvious flaws. This certainly does not represent anything close to "high quality original research" on the specified subjects.

Since that first delivery, Strategic Vision has consistently failed to deliver the reports required by the contract and has consistently failed to meet the schedule required there. Eastern committed a substantial amount of resources in good faith, and paid $1 million in advance as a deposit, based upon the representations and promises made by Strategic Vision's representatives.

Regrettably, Eastern is compelled to conclude that Strategic Vision misrepresented its capabilities to fraudulently induce Eastern to enter into the contract and pay the $1 million advance, and has breached its obligations under the contract. Therefore, Eastern is entitled to terminate the contract immediately and to receive a full and complete refund of the $1 million deposit. Strategic Vision should cease work immediately, and should immediately return or destroy all materials and information provided by Eastern to Strategic Vision. Eastern expects that Strategic Vision will refund the $1 million deposit immediately. Please send the funds, via wire transfer, to:

| | |
|---|---|
| Beneficiary Bank Name: | DBS Bank Ltd |
| Beneficiary Bank Address: | 12 Marina Boulevard, DBS Asia Central, Marina Bay Financial Centre Tower 3, Singapore 018982 |
| Beneficiary Bank SWIFT: | DBSSSGSG |
| Beneficiary Account Name: | ACA Capital Group Limited |
| Beneficiary Account No.: | 0003-039595-01-1 |
| Immediate Bank Name: | JP Morgan Chase Bank, N.A. |
| Immediate Bank SWIFT: | CHASUS33 |

Finally, and without waiver of or prejudice to Eastern's rights to terminate the contract immediately due to Strategic Vision's breach and to recover all legally available remedies, please consider this letter as written notice of termination of the contract pursuant to the contract's "Duration" section.

EASTERN-000199

CONFIDENTIAL

February 23, 2018
French C. Wallop
Page 3

We trust that Strategic Vision will respond appropriately, terminate the contract and return the deposit, and that litigation will not be necessary. However, should litigation become necessary, Eastern reserves all its rights to seek any and all remedies legally available to it, including recovery of all damages, costs, interest and attorney's fees.

Please contact me immediately to resolve this situation. If we do not have a response by the close of business on February 27, 2018, Eastern will have no choice but to move forward to seek all legally available remedies.

Regards,

Anthony D. Mirenda

ADM/sml
Cc:    French C. Wallop, CEO (via Hand Delivery and Electronic Mail)
       Strategic Vision US LLC, 1557 22nd Street North, Arlington VA 22209

# Exhibit T

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

EASTERN PROFIT CORPORATION  )
LIMITED,                     )
                             )
    **Plaintiff/Counterclaim Defendant,**  )
                             )    **Case No. 18-cv-2185 (JGK)-DCF**
    **v.**                     )
                             )
STRATEGIC VISION US, LLC,    )
                             )
    **Defendant/Counterclaim Plaintiff.**  )

## PLAINTIFF/COUNTERCLAIM DEFENDANT'S RESPONSES AND OBJECTIONS TO DEFENDANT/COUNTERCLAIM PLAINTIFF'S THIRD SET OF INTERROGATORIES

_____

Eastern Profit Corporation Limited ("Eastern") by its attorneys, Zeichner Ellman & Krause, LLP, responds as follows to Strategic Vision US, LLC's ("SV") Third Set of Interrogatories to Eastern, dated August 28, 2019 (the "Interrogatories").

## OBJECTIONS TO SV'S INSTRUCTIONS

A.    Eastern objects to SV's Instructions to the extent that they seek to impose obligations beyond those imposed by the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Southern District of New York.

## **Interrogatories**

1.      Describe the association, involvement, and influence of William Je (a/k/a Yu Jianming) in or on the affairs and business of Eastern Profit during the timeframe of January 1, 2017 to January 1, 2019, including without limitation whether William Je was involved in (a) the approval of the wire transfers totaling $1 million from ACA Capital Group Limited to Strategic Vision described in the Second Amended Complaint and, if so, the nature of that involvement; (b) the attempted retraction of those wires by ACA Capital Group Limited and, if so, the nature of that involvement; (c) the decision by Eastern Profit to terminate the Contract with Strategic Vision described in the Second Amended Complaint and, if so, the nature of that involvement; and (d) Eastern Profit's decision to sue Strategic Vision in this matter and, if so, the nature of that involvement.

**RESPONSE:**  Eastern objects to this interrogatory because it seeks information beyond the scope of Local Rule 33.3.  Eastern further objects to this interrogatory because it is vague, unduly burdensome, and because there are more practical methods of obtaining the information sought.  Eastern Profit further objects to this interrogatory because it is irrelevant to claims and defenses at issue in this action and is not proportional to the needs of the case.

Subject to Eastern's objections, Eastern hereby answers this interrogatory as follows: William Je was not involved in Eastern's decision to terminate the Contract due to Strategic Vision's multiple material breaches or Eastern's decision to sue Strategic Vision.

2.      Describe the role, association, and involvement of William Je in the affairs and business of ACA Capital Group Limited during the timeframe of January 1, 2017 to March 1, 2018, such that William Je would be involved in the transfer of wires totaling $1 million from ACA

Capital Group Limited to Strategic Vision as alleged in the Second Amended Complaint.

**RESPONSE:**  Eastern objects to this interrogatory because it seeks information beyond the scope of Local Rule 33.3.  Eastern further objects to this interrogatory because it is vague, unduly burdensome, and because there are more practical methods of obtaining the information sought.  Eastern Profit further objects to this interrogatory because it is irrelevant to claims and defenses at issue in this action and is not proportional to the needs of the case.

Subject to its Objections, Eastern believes that William Je was the Chief Executive Officer of ACA Capital Group Limited on or about December 29, 2017.

3.      Describe the association or relationship between Eastern Profit, including without limitation any of its representatives such as Guo Weingui, and Celestial Tide Holdings.

**RESPONSE:**  Eastern objects to this interrogatory because it seeks information beyond the scope of Local Rule 33.3.  Eastern further objects to this interrogatory because it is vague and unduly burdensome.  Eastern Profit further objects to this interrogatory because it is irrelevant to claims and defenses at issue in this action and is not proportional to the needs of the case.

4.      Describe the association or relationship between Golden Spring (New York) Limited, including without limitation any of its representatives, and Celestial Tide Holdings.

**RESPONSE:**  Eastern objects to this interrogatory because it seeks information beyond the scope of Local Rule 33.3.  Eastern further objects to this interrogatory because it is vague and unduly burdensome.  Eastern Profit further objects to this interrogatory because it is irrelevant to claims and defenses at issue in this action and is not proportional to the needs of

the case.

5.      Identify the assets of Eastern Profit as of the following dates:  December 1, 2017,

February 23, 2018, December 31, 2018, January 1, 2019, and July 31, 2019.

**RESPONSE:**  Eastern objects to this interrogatory because it seeks information beyond the

scope of Local Rule 33.3.  Eastern further objects to this interrogatory because it is vague and

unduly burdensome.  Eastern Profit further objects to this interrogatory because it is

irrelevant to claims and defenses at issue in this action and is not proportional to the needs of

the case.


**AS TO THE OBJECTIONS:**


Dated:      New York, New York
            September 27, 2019

                              _____/s/Zachary Grendi_____
                                    Zachary Grendi
                                    Zeichner Ellman & Krause LLP
                                    1 Landmark Square
                                    4th Floor
                                    Stamford, CT 06901
                                    zgrendi@zeklaw.com

4

## **<u>VERIFICATION</u>**

I, Yvette Wang, state that I have read the foregoing responses; that the responses were prepared with the assistance of counsel; that the responses are, subject to inadvertent and undiscovered errors, based on and therefore necessarily limited by the records and information I have reviewed, or by my personal knowledge of certain facts were so stated, and by information thus far discovered in preparing these responses.

I reserve the right to make any changes in the responses if it appears at any time that material omissions or errors have been made therein or that more accurate information is available.

Subject to these limitations, I state, under the pains and penalties of perjury, that the responses are true to the best of by knowledge, information and belief.

Date Executed: _____

Golden Spring (New York) Ltd.

As attorney in fact for

Eastern Profit Corporation Limited

Signature:_____

Name: Yvette Wang

Title:  President

Sworn to before me this

____ day of December 2018

_____

Notary Public

## **CERTIFICATE OF SERVICE**

I, the undersigned, of the law offices of Zeichner Ellman & Krause LLP, attorneys for Eastern Profit Corporation Limited, do hereby certify that that I have served all parties of record with copies of the below listed documents by U.S. Mail on this September 27, 2019:

Documents:

- Eastern Profit Corporation Limited's Responses and Objections to Strategic Vision US, LLC's Third Set of Interrogatories

/s/Zachary Grendi
Zachary Grendi

# Exhibit U

 **DBS**

## Outgoing Telegraphic Transfer

ACA CAPITAL GROUP LIMITED-███████████-USD

### Transaction Advice/s

| | | | |
|---|---|---|---|
| Date | : 02-Jan-2018 | Customer Reference | : ███████████ |
| Transaction Reference | : ███████████ | | |
| Beneficiary Name | : STRATEGIC VISION US, LLC | Beneficiary Bank SWIFT/ BIC | : CITIUS33XXX |
| Beneficiary Account | : ███████ | | |
| Beneficiary Bank | : CITIBANK N.A. | | |

### Transaction Details

| Principal | | Remittance Amount | Exchange Rate | | Transaction Amount | Account Number |
|---|---|---|---|---|---|---|
| | USD | 500,000.00 | | USD | 500,000.00 | ████████ |
| OT - Commission in lieu | | | | USD | 74.52 | ████████ |
| OT - Handling Commission | | | | USD | 74.52 | ████████ |
| OT - Cable | | | | USD | 14.90 | ████████ |

### Transaction Trail

| SWIFT gpi Transaction Status | SWIFT gpi Tracking Number | Elapse Time |
|---|---|---|
| | ████████████ | |

| 1 | Originating Bank → |
|---|---|
| **DBSSSGSG** | |
| **Release date and time** 02 Jan 2018 11:59hr | |
| **Amount remitted** USD 500,000.00 | |

EXHIBIT
Wang
7 mL
1-31-19

 **DBS**

**Outgoing Telegraphic Transfer**

SWIFT MT103

2018-01-02 12:00:04.114

MT S103 SINGLE CUSTOMER CREDIT TRANSFER

```
BASIC HEADER              ███████████████
APPLICATION HEADER        ███████████████
USER HEADER               SERVICE CODE    103:
                          BANK. PRIORITY  113:NORQ
                          MSG USER REF.   108:
                          VALIDATION      119:
SENDER'S REF.             ████████████████
TIME INDICATION           13C:CODE/        /TIME    SIGN OFFSET
BANK OPERATION CODE       23B:CRED
INSTRUCTION CODE          23E:
TRANS. TYPE CODE          26T:
SETTLEMENT AMOUNT         32A:DATE180102CURRENCYUSDAMOUNT500000
INSTRUCTED AMOUNT         33B:          CUR/CODEUSDAMOUNT500000
EXCHANGE RATE             36 :
ORDERING CUSTOMER         50K:
                          ACA CAPITAL GROUP LIMITED
                          49TH FLOOR, BANK OF CHINA TOWER 1
                          GARDEN ROAD CENTRAL, HONG KONG

SENDING INSTITUTION       51A:

ORDERING INST.            52 :



SENDER'S CORR.            53 :



RECEIVER'S CORR.          54 :



THIRD REIMBURS.INST.      55 :



INTERMEDIARY              56 :



ACCOUNT WITH INST.        57A://█████████
                          ███████████

BENEFICIARY CUSTOMER      59 :████████████
                          STRATEGIC VISION US, LLC


REMITTANCE INFO.          70 :



DETAILS OF CHARGES        71A:SHA
SENDER'S CHARGES          71F:CURRENCYUSDAMOUNT163.94
RECEIVER'S CHARGES        71G:CURRENCY    AMOUNT
SEND. TO REC. INFO.       72 :



REGULATORY REPORT         77B:
```

# Exhibit V

## CORPORATE TELEGRAPHIC TRANSFER TRACER / CANCELLATION / AMENDMENT REQUEST

| Your Particulars | |
|---|---|
| Company Name ...ACA CAPITAL GROUP LIMITED......... | **EXHIBIT** Wang 8 mc 1-31-19 |
| Debit Account Number ... ▓▓▓▓▓▓▓▓▓ | |
| Contact No. --- ▓▓▓▓▓▓ | |

### TT Details

Please send a tracer for the following transaction, details are as follows :

TT Reference No. -- ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Date of Transaction..... 2 Jan 2018

Currency & Amount...... USD 500,000 -

Reason for Request :

☐ Beneficiary claims non-receipt of funds.

☐ Amendment of TT details* : ....................................

.................................................................

.................................................................

☑ Cancellation of payment.

☐ Others (please specify) : ....................................

.................................................................

*Note: Currency and Amount cannot be amended. For such cases, request for Cancellation of payment and submit a new payment request

### Charges Details

Payment of handling charge and any agent charges that may arise from the above request is as follows :

☑ Debit our account No.   ..▓▓▓▓▓▓▓▓▓▓▓▓▓...........................

### Terms and Conditions of Request

I/We acknowledge that this request will be processed same business day only if the application is submitted before the cut-off times stipulated from time to time failing which request will be processed on the next business day. We acknowledge that my request for cancellation of payment will be made only when you are in possession of the funds in respect of the above telegraphic transfer payment. This is subject to the beneficiary and/or his bank agreeing to my/our request for cancellation and returning the funds to you. I/We agree that you will have no responsibility or liability towards me/us if the beneficiary fails to return the funds to you.

I/We agree that any refund is to be made at the prevailing buying rate and less your charges if any.

_____     3 Jan 2018
Authorised Signature(s) with Company Stamp (if applicable)     Date

### For Bank Use

Special Instruction from Branch .................................................................

☐ Faxed original TT application form to Payment Operations (REM).

Name & Signature ..............................................  Branch ..............................................

Specimen No..............................................  Contact No ..............................................

### Customer Information

Completed form signed by the Authorised Signatory/ies should be submitted to DBS via any of the following channels:
(1) Original copy at any DBS/POSB Branches
(2) Scanned as PDF and send via IDEAL™ Secured Mailbox to the recipient group 'SG TT-Amendments/Cancel Requests'

DBS BANK LTD
Co. Reg. No. 196800306E

REM-03(11/2015)

**CORPORATE TELEGRAPHIC TRANSFER TRACER / CANCELLATION / AMENDMENT REQUEST**

| Your Particulars |
|---|

Company Name ___ A.CA  CAPITAL  GROUP  LIMITED

Debit Account Number -- ██████████████████

Contact No. ---- ████████████████

| TT Details |
|---|

Please send a tracer for the following transaction, details are as follows :

TT Reference No. ████████████████████

Date of Transaction ___ 3  Jan  2018

Currency & Amount ___ USD  500,000

Reason for Request :

☐ Beneficiary claims non-receipt of funds.

☐ Amendment of TT details* :

_____

_____

☑ Cancellation of payment.

☐ Others (please specify) :

*Note; Currency and Amount cannot be amended. For such cases, request for Cancellation of payment and submit a new payment request

| Charges Details |
|---|

Payment of handling charge and any agent charges that may arise from the above request is as follows :

☑ Debit our account No. ██████████████████

| Terms and Conditions of Request |
|---|

I/We acknowledge that this request will be processed same business day only if the application is submitted before the cut-off times stipulated from time to time failing which request will be processed on the next business day. We acknowledge that my request for cancellation of payment will be made only when you are in possession of the funds in respect of the above telegraphic transfer payment. This is subject to the beneficiary and/or his bank agreeing to my/our request for cancellation and returning the funds to you. I/We agree that you will have no responsibility or liability towards me/us if the beneficiary fails to return the funds to you.

I/We agree that any refund is to be made at the prevailing buying rate and less your charges if any.

_____          3 Jan 2018
Authorised Signature(s) with Company Stamp (if applicable)          Date

| For Bank Use |
|---|

Special Instruction from Branch --------------------------------------------------------------

☐ Faxed original TT application form to Payment Operations (REM).

Name & Signature --------------------------------   Branch ----------------------------

Specimen No.--------------------------------------   Contact No -----------------------

| Customer Information |
|---|

Completed form signed by the Authorised Signatory/ies should be submitted to DBS via any of the following channels:
(1) Original copy at any DBS/POSB Branches
(2) Scanned as PDF and send via IDEAL™ Secured Mailbox to the recipient group 'SG TT-Amendments/Cancel Requests'

DBS BANK LTD                                                          REM-03(11/2015)
Co. Reg. No. 196800306E

# Exhibit W

Atkinson-Baker, Inc.
www.depo.com

```
1            IN THE UNITED STATES DISTRICT COURT

2         FOR THE SOUTHERN DISTRICT OF NEW YORK

3    -------------------------------------x

4    EASTERN PROFIT CORPORATION LIMITED,

5         Plaintiff/Counterclaim Defendant,     Case No.

6         -against-                       18-cv-2185

7    STRATEGIC VISION US, LLC,                  (JGK)

8         Defendant/Counterclaim plaintiff.

9    ----------------------------------x

10

11

12

13                  Karin MAISTRELLO

14                NEW YORK, NEW YORK

15                AUGUST 23, 2019

16

17

18   ATKINSON-BAKER, INC.

19   (800) 288-3376

20   www.depo.com

21
     REPORTED BY:  KATHLEEN T. KEILTY
22                 C.S.R. NO. 000755

23   FILE NO.:    AD0867C

24

25
```

Atkinson-Baker, Inc.
www.depo.com

| | |
|---|---|
| 1    the defense that you're trying to raise    12:12 | 1      Q.   Tell me what you remember Mr. Je saying   12:16 |

the defense that you're trying to raise here.

---

**Page 26** (left column)

1    the defense that you're trying to raise    12:12
2    here.
3        MR. GREIM:  And, your Honor, just
4    to be clear, we're going to ask about her
5    resignation as well, the thing that makes
6    ACA not reachable.
7        MS. TESKE:  And I have no
8    objection to this.
9        MR. GREIM:  Okay.
10        THE COURT:  All right, good.
11        MR. GREIM:  All right.
12        THE COURT:  Carry on, then.
13        MR. GREIM:  Thank you.
14        MS. TESKE:  Thank you.
15        MR. GRENDI:  Thank you, your    12:13
16    Honor.
17        THE COURT:  You're welcome.
18        (Whereupon, the teleconference
19    with the Hon. Debra Freeman concludes.)
20        THE VIDEOGRAPHER:  We are back on
21    the record at 12:13 p.m.
22        (Whereupon, the record is read as
23    follows:
24        "Question:  How is it that you came to
25    meet Mrs. Wang?")

Page 26

---

**Page 27** (bottom left column)

1        A.   I met her for the first time at a job    12:14
2    interview and that's how we met.
3        Q.   Now, you said you met William Je
4    several times before becoming a director.
5        A.   That's correct.
6        Q.   Did you understand when you were
7    meeting him what his role was with ACA?
8        A.   We never spoke about ACA before.
9        Q.   But I presume that you did speak about
10    ACA when he offered you a directorship; is that
11    right?
12        A.   Briefly.
13        Q.   And was that discussion in person or
14    over the phone?
15        A.   In person.    12:15
16        Q.   Where did that happen?
17        A.   That happened at our office.
18        Q.   I'm sorry.  Who's office?
19        A.   Golden Spring New York's office.
20        Q.   Your testimony is that it was
21    several months -- well, actually let me ask you.
22        When -- how long before January 1st,
23    2019 did that discussion happen?
24        MR. GRENDI:  Object to the form.
25        A.   Probably a month before.

Page 27

---

**Page 28** (top right column)

1        Q.   Tell me what you remember Mr. Je saying    12:16
2    to you about the offer.
3        A.   We didn't speak much.  He just told me
4    that he was interested in some business in the US,
5    and he asked whether I wanted to join.
6        Q.   What did he say the business was?
7        A.   Fund investment.
8        Q.   Now did you have a background in fund
9    investment?
10        A.   I do not.
11        Q.   Did you have any questions for Mr. Je
12    about what this role would entail?
13        A.   No.
14        Q.   Why not?
15        A.   I trusted his judgment.    12:16
16        Q.   Why did you trust his judgment?
17        MS. TESKE:  Object to the form.
18        You can answer.  You can answer.
19        A.   I trust him, therefore, I trust his
20    judgment.
21        Q.   Okay.  I guess let me rephrase it.
22        What is it about him that made you
23    trust his judgement.
24        MS. TESKE:  Object to the form.
25        You can answer.

Page 28

---

**Page 29** (bottom right column)

1        A.   He was introduced to me by someone I    12:17
2    trust and that's how it works for me, the person who
3    introduced us trusted him and I got to trust him.
4        Q.   So did you tell him yes on the spot?
5        A.   I did.
6        Q.   Did you ask him what your duties would
7    be?
8        A.   Briefly.
9        Q.   What did he say?
10        A.   Again, he was interested in some
11    business in the US and was asking if I could help
12    find some investors.
13        Q.   Okay.
14        A.   Some --
15        Q.   Go ahead.    12:17
16        A.   I'm sorry.  Some projects to invest in.
17        Q.   So if I understand correctly, he told
18    you that your duties would be finding projects for
19    ACA to invest in?
20        MS. TESKE:  Object to the form.
21        You can answer.
22        A.   Yes.
23        Q.   Did he say -- did he tell you what
24    sorts of projects ACA invested in?
25        A.   No, he did not.

Page 29

---

8 (Pages 26 to 29)

Karin Maistrello
August 23, 2019

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|

1      Q.    So, like, for example, construction          12:18
2  projects, renovation projects, did he give you any
3  kind of detail what he meant by projects?
4      A.    Again, no, he did not.
5      Q.    Is ACA a hedge fund?
6      A.    I do not know.
7      Q.    Did Mr. Je tell you who you would be
8  reporting to, if anyone, as a director?
9      A.    No, he didn't.
10     Q.    Did he tell you who else was involved
11 with the company?
12     A.    No, he did not.
13     Q.    Did he tell you if there were any other
14 directors?
15     A.    No, he did not.                              12:19
16     Q.    Did he tell you whether he was a
17 director?
18     A.    No, he did not.
19     Q.    Did you have any concerns about working
20 for ACA?
21     A.    No.
22          MS. TESKE:  Object to the form.
23          You can answer.
24     A.    No.
25     Q.    When was the first time you heard of

Page 30

1  ACA?                                                   12:19
2      A.    When he asked me to become director.
3      Q.    Did you do any research to learn more
4  about what ACA was?
5      A.    I did not.
6      Q.    At any time after your discussion with
7  Mr. Je, did you do any research to determine what ACA
8  was?
9      A.    No, I did not.
10     Q.    Did you understand what jurisdiction
11 ACA was registered in?
12          MS. TESKE:  Object to the form of
13     the question.
14          You can answer.
15     A.    I don't answer it -- I'm sorry.  I        12:20
16 didn't understand the question.
17     Q.    Did Mr. Je tell you where ACA was
18 registered?
19     A.    No.
20     Q.    Did he tell you what country or state
21 had jurisdiction over ACA and its directors?
22          MS. TESKE:  Object to the form --
23          MR. GRENDI:  Object to the form.
24          MS. TESKE:  -- of the question.
25     A.    No.

Page 31

1      Q.    Did he refer you to any attorney to          12:20
2  advise you on that question?
3      A.    No.
4      Q.    Okay.  Let's talk about your time with
5  ACA.  First of all, as director, did you have an
6  office somewhere?
7      A.    No, I did not.
8      Q.    Did ACA have an office in the United
9  States anywhere?
10     A.    I do not know.
11     Q.    Between the time of your appointment
12 and the time that you are saying that you resigned,
13 did you do any work as a director of ACA?
14     A.    No, I didn't.
15     Q.    Did you find any projects for Mr. Je?        12:21
16     A.    No, I didn't.
17     Q.    Did you try to find projects for
18 Mr. Je?
19     A.    No, I didn't.
20     Q.    Did Mr. Je ever ask you why you were
21 not finding projects?
22     A.    No.
23     Q.    Did you ever talk to Mr. Je about your
24 role with ACA after that conversation?
25          MR. GRENDI:  Object to the form.

Page 32

1          MS. TESKE:  Object to the form.                12:22
2          You can answer.
3      A.    No.
4      Q.    Let's be clear.  There was an
5  objection.  I'm going to make sure that this is clear
6  for the record.
7          So is it your testimony that after the
8  in-person meeting where Mr. Je offered the
9  directorship to you, you never spoke with Mr. Je
10 again about your work as an ACA director?
11     A.    That's correct.
12     Q.    Okay.  I'm going to broaden the
13 question now.
14          After the discussion with Mr. Je where
15 he made the offer to you, did you ever discuss your   12:22
16 work as an ACA director with any other person?
17     A.    No, I didn't.
18     Q.    Did you ever discuss it with Yvette
19 Wang?
20     A.    I did not.
21     Q.    Were you ever paid for your work as a
22 director?
23     A.    No.
24     Q.    Did you sign any document appointing
25 you as a director?

Page 33

9 (Pages 30 to 33)

Karin Maistrello
August 23, 2019

Atkinson-Baker, Inc.
www.depo.com

| | |
|---|---|
| 1    A.    I have not.                                    12:51 | 1    are a director?                                     12:54 |
| 2    Q.    So sitting here today, you can't tell | 2          MS. TESKE:  Object to the form. |
| 3    us anything about Eastern Profit; is that correct? | 3    Q.    Can you please ask it again. |
| 4    A.    That's correct. | 4    Q.    Is ACA Capital Group Limited the |
| 5    Q.    You don't know what it does? | 5    official name of the entity of which you are a |
| 6    A.    I have no idea. | 6    director? |
| 7    Q.    Did you realize that we're here in the | 7          MS. TESKE:  Same objection. |
| 8    case of Eastern Profit versus Strategic Vision? | 8          You can answer. |
| 9          MS. TESKE:  Object to the form. | 9    A.    I am not sure. |
| 10          You can answer. | 10    Q.    So you'll see the first two pages are a |
| 11    A.    Yes, I did. | 11    notice of subpoena. |
| 12    Q.    So other than hearing that it's in the | 12    A.    Mm-hmm. |
| 13    title of the case, you've never heard of Eastern | 13    Q.    If you turn to page 3, you'll see the |
| 14    Profit? | 14    subpoena itself.  Do you see that? |
| 15    A.    I have not.                                    12:51 | 15    A.    I do.                                          12:55 |
| 16    Q.    Have you ever heard of Strategic | 16          MS. TESKE:  Object to the form. |
| 17    Vision? | 17          You can answer. |
| 18    A.    I have not. | 18    Q.    And do you see about a quarter of the |
| 19    Q.    And you understand it's in the title of | 19    way down it says "To"? |
| 20    the case that we're here under, correct? | 20    A.    Yes. |
| 21    A.    That's correct. | 21    Q.    Okay.  And what does it say on that |
| 22    Q.    So you've never spoken to Yvette Wang | 22    line, could you read that, please? |
| 23    about Strategic Vision? | 23    A.    "ACA Capital Group Limited to be served |
| 24    A.    No, I have not. | 24    to its director, Karin Maistrello 17 Gifford |
| 25    Q.    You've never spoken to Yvette Wang | 25    Apartment 5F, Jersey City, New Jersey, 07304." |
| Page 54 | Page 56 |

| | |
|---|---|
| 1    about Eastern Profit?                               12:52 | 1    Q.    Is that your address?                          12:55 |
| 2    A.    No, I have not. | 2    A.    It is. |
| 3          (Whereupon, Maistrello Exhibit 3, | 3    Q.    And were you served with this subpoena |
| 4    subpoena issued to ACA Capital Group Limited, | 4    at that address? |
| 5    is marked for identification, as of this | 5          MS. TESKE:  Object to the form. |
| 6    date.) | 6          You can answer. |
| 7          (Whereupon, Maistrello Exhibit 4, | 7    A.    Yes. |
| 8    subpoena issued to Karin Maistrello, is marked | 8    Q.    What did you do after you were served |
| 9    for identification, as of this date.) | 9    with this subpoena? |
| 10    Q.    I'm going to hand you what we're | 10          MS. TESKE:  Object if the form. |
| 11    marking as Exhibits 3 and 4. | 11          You can answer it. |
| 12          Please take a look at Exhibit 3. | 12    A.    I gave it to our lawyer. |
| 13    A.    Which one is that? | 13    Q.    And was that Ms. Teske sitting here |
| 14          MR. GRENDI:  Which one is that, | 14    next to you? |
| 15    they look the same.                               12:54 | 15    A.    It was not.                                    12:56 |
| 16          MR. GREIM:  They're not.  You'll | 16    Q.    Who was that? |
| 17    see it's a bit different. | 17    A.    Daniel Podhaskie. |
| 18          MS. TESKE:  Which one is 3? | 18    Q.    When you say "our lawyer," do you mean |
| 19          MR. GREIM:  Exhibit 3 is the ACA. | 19    Golden Spring's lawyer? |
| 20          MS. TESKE:  Thank you. | 20    A.    Golden Spring's lawyer. |
| 21    Q.    So do you see that Exhibit 3 is a | 21    Q.    Now, don't -- I'm not going to ask you |
| 22    subpoena to ACA Capital Group Limited? | 22    for the content of your discussion.  My only question |
| 23    A.    Mm-hmm, yes. | 23    is, did you ask Mr. Podhaskie for legal advice? |
| 24    Q.    By the way, is ACA Capital Group | 24    A.    I asked him -- |
| 25    Limited the official name of the entity of which you | 25          MS. TESKE:  No.  Whoa, whoa, whoa, |
| Page 55 | Page 57 |

15 (Pages 54 to 57)

Karin Maistrello
August 23, 2019

Atkinson-Baker, Inc.
www.depo.com

| | |
|---|---|
| 1 | MR. GREIM:  In 2019. |
| 2 | MS. TESKE:  Relating to her |
| 3 | services? |
| 4 | MR. GREIM:  Relating to personal |
| 5 | services. |
| 6 | MS. TESKE:  Personal services? |
| 7 | MR. GREIM:  Services, any |
| 8 | services. |
| 9 | MS. TESKE:  Provided to ACA. |
| 10 | MR. GREIM:  Well, first provided |
| 11 | to ACA. |
| 12 | MS. TESKE:  Maybe rephrase the |
| 13 | question. |
| 14 | MR. GREIM:  Yeah, I'm sorry. |
| 15 | MR. GRENDI:  That's a bad one. |
| 16 | MR. GREIM:  I'm sorry.  I'm |
| 17 | thinking about -- I'm trying to cut out |
| 18 | arts and crafts or, you know, artwork or |
| 19 | something, tangible things. |
| 20 | Let me go back, okay, and make it |
| 21 | clear. |
| 22 | BY MR. GREIM: |
| 23 | Q.   In 2019, have you received payment for |
| 24 | any services other than your salary as a director of |
| 25 | ACA? |

Page 102

| | |
|---|---|
| 1 | MS. TESKE:  Object to the form. |
| 2 | You can answer the question. |
| 3 | Q.   I'm sorry.  Other than your salary as |
| 4 | an employee of Golden Spring? |
| 5 | MS. TESKE:  Object to the form. |
| 6 | But you can answer the question. |
| 7 | A.   No, I did not. |
| 8 | MR. GREIM:  Okay.  Well, I want to |
| 9 | stand on the questions I asked about the |
| 10 | discussion with Mr. Podhaskie.  I think |
| 11 | I've asked every possible question that |
| 12 | can be asked about that question, and I |
| 13 | want to hold open the deposition for that |
| 14 | purpose only. |
| 15 | I will say that for efficiency |
| 16 | sake, if there is a way to get the |
| 17 | information we need from ACA without |
| 18 | going into that, then we will try.  We |
| 19 | will try.  But if we can't, we'll want to |
| 20 | return to this topic and we'll just raise |
| 21 | it with the judge.  And so I've got |
| 22 | nothing else. |
| 23 | MS. TESKE:  Thank you. |
| 24 | MR. GRENDI:  Thank you very much. |
| 25 | MR. GREIM:  Thank you, Ms. Maistrello. |

Page 103

| | |
|---|---|
| 1 | THE WITNESS:  Thank you. |
| 2 | MS. TESKE:  Thank you, |
| 3 | Ms. Maistrello. |
| 4 | THE VIDEOGRAPHER:  This will |
| 5 | conclude Video No. 2 and end the |
| 6 | deposition of Karin Maistrello.  We are |
| 7 | off the record at 2:15 p.m., August 23rd, |
| 8 | 2019. |
| 9 | (Time noted:  2:15 p.m.) |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Page 104

| | |
|---|---|
| 1 | ACKNOWLEDGMENT |
| 2 | |
| 3 | STATE OF NEW YORK      ) |
| 4 | )  ss.: |
| | COUNTY OF _____  ) |
| 5 | |
| 6 | I, KARIN MAISTRELLO, hereby |
| 7 | certify that I have read the transcript |
| 8 | of my testimony taken under oath, on the |
| 9 | 23rd day of August, 2019; that the |
| 10 | transcript, except as noted in any |
| 11 | attached errata sheet(s), is a true |
| 12 | record of my testimony. |
| 13 | |
| 14 | _____ |
| | KARIN MAISTRELLO |
| 15 | Subscribed and sworn to before me |
| 16 | this ____ day of _____, 20____. |
| 17 | |
| 18 | |
| 19 | _____ |
| | Notary Public |
| 20 | |
| 21 | My Commission expires the |
| 22 | ____ day of _____, 20____. |
| 23 | |
| 24 | |
| 25 | |

Page 105

27 (Pages 102 to 105)

Atkinson-Baker, Inc.
www.depo.com

```
1                 CERTIFICATE
2
   STATE OF NEW YORK      )
3                        ) ss.:
   COUNTY OF WESTCHESTER  )
4
5          I, KATHLEEN T. KEILTY, a Certified
6     Shorthand Reporter and Notary Public within
7     and for the State of New York, do hereby
8     certify:
9          That KARIN MAISTRELLO, the witness whose
10    testimony is hereinbefore set forth, was duly
11    sworn/affirmed by me before testifying and
12    that the foregoing transcript is a true record
13    of said testimony.
14         I further certify that I am not related
15    to any of the parties to this action by blood
16    or marriage, and that I am in no way
17    interested in the outcome of this matter.
18         IN WITNESS WHEREOF, I have hereunto set
19    my hand this 4th day of September, 2019.
20
21         _____
           KATHLEEN T. KEILTY, C.S.R.
22         License No. 000755
23
24
25
```
                                              Page 106

```
1                 ERRATA SHEET
              Page ____ of _____
2
       I, KARIN MAISTRELLO, wish to make the following
3   changes to the foregoing transcript of my testimony
    taken on the 23rd day of August 2019, for the reasons
4   cited below:
5   PG-LN    CHANGE FRM/TO        REASON
6   _____  _____   _____
7   _____  _____   _____
8   _____  _____   _____
9   _____  _____   _____
10  _____  _____   _____
11  _____  _____   _____
12  _____  _____   _____
13  _____  _____   _____
14  _____  _____   _____
15  _____  _____   _____
16  _____  _____   _____
17
         _____
18             KARIN MAISTRELLO
19
20  Subscribed and sworn to before me
21  this _____ day of _____, 20_____.
22
    _____
23       NOTARY PUBLIC
24  My Commission expires the _____ day
25  of _____, 20_____.
```
                                              Page 107

28 (Pages 106 to 107)

Karin Maistrello
August 23, 2019

# Exhibit X

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EASTERN PROFIT CORPORATION LIMITED, | ) ) ) |
| Plaintiff/Counterclaim Defendant, | ) ) |
| v. | ) ) |
| STRATEGIC VISION US, LLC, | ) ) ) |
| Defendant/Counterclaim Plaintiff. | ) ) ) |

Case No. 18-cv-2185 (JGK)

## NOTICE OF SUBPOENA TO NON-PARTY
## FOR DEPOSITION TESTIMONY AND PRODUCTION OF DOCUMENTS

PLEASE TAKE NOTICE that the Defendant/Counterclaim Plaintiff shall cause the

attached subpoena, directed to non-party ACA Capital Group Limited, to be served through its

director Karin Maistrello after service of this notice.

Dated July 24, 2019

Respectfully submitted,

GRAVES GARRETT LLC

*s/ Edward D. Greim*
Edward D. Greim, #4240172
1100 Main Street, Suite 2700
Kansas City, MO 64105
Telephone: (816) 256-3181
Fax: (816) 256-5958
edgreim@gravesgarrett.com
ATTORNEYS FOR
DEFENDANT/COUNTERCLAIM PLAINTIFF



Pltf 3
EXHIBIT Maistrello
DATE
Kathleen T. Keilty, CSR

1

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2019, the foregoing was emailed and mailed by First Class U.S. Mail to the following parties:

> Zachary Grendi
> Zeichner Ellman & Krause LLP
> 35 Mason Street
> Greenwich, CT 06830
> zgrendi@zeklaw.com

*s/ Edward D. Greim*
Attorneys for Defendant/Counterclaim Plaintiff

AO 88A  (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Southern District of New York

| | | |
|---|---|---|
| Eastern Profit Corporation Limited | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   1:18-cv-02185-JGK |
| Strategic Vision US LLC | ) | |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:  ACA Capital Group Limited, to be served through its director Karin Maistrello
17 Gifford Avenue, Apt. 5F, Jersey City, NJ 07304
*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:
See Attached Exhibit A.

| Place:  Bryan Cave Leighton Paisner, 1290 Avenue of the Americas, New York, New York | Date and Time: 08/23/2019 9:00 am |
|---|---|

The deposition will be recorded by this method:   stenographic and video recording

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: See Attached Exhibit A. Notwithstanding the foregoing instructions, you may produce the materials requested within Exhibit A electronically or by mail no later than August 22, 2019 by making arrangements with counsel for the Defendant/Counterclaim Plaintiff, Edward Greim, whose contact information is set forth below.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   07/24/2019

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | s/Edward D. Greim |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Strategic Vision
, who issues or requests this subpoena, are:

Edward Greim, 1100 Main Street, Kansas City, MO, 64105, EDGreim@gravesgarrett.com, (816) 256-4144

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  1:18-cv-02185-JGK

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

◻ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

◻ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ 51.70 _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ ____ 0.00 ____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

*Eastern Profit Corporation, Ltd. v. Strategic Vision US, LLC,* 1:18-cv-02185-JGK (S.D.N.Y.)

Strategic Vision's Subpoena to ACA Capital Group Limited

## **EXHIBIT A**

### Documents to be produced pursuant to Fed. R. Civ. P. 45

1. Any and all documents reflecting the ownership, management, governance, and structure of ACA, between November 1, 2014, and July 1, 2019.
2. Any and all documents relating to a communication between ACA and any other party regarding the negotiation, extension, servicing, or collection of a loan from ACA to Eastern Profit Corp., Ltd., between January 1, 2017, and July 1, 2019.
3. Any and all documents relating to a communication between ACA and any party regarding ACA's transfer of funds to, or attempted retrieval of funds from, Strategic Vision, between December 2017 and January 2018.
4. Any and all financial statements or tax returns reflecting the income, expenses, assets, or liabilities of ACA, between November 1, 2014 and July 1, 2019.
5. Any and all documents relating to communications between ACA and any of its agents (including but not limited to Karin Maistrello or William Je), on the one hand, and on the other hand, Guo Wengui, between November 1, 2014 and July 1, 2019.
6. Any and all documents regarding transfers of funds between ACA and any person or entity working directly or indirectly on behalf of Guo Wengui, Eastern Profit, or Golden Spring (New York), including but not limited to law firms, investigative or research firms, intelligence firms, security firms, or other professional service providers between January 1, 2015, and July 1, 2019.
7. Any and all documents regarding transfers of funds from ACA to any other person or entity at the suggestion, request, or direction of Guo Wengui, Eastern Profit, or Golden Spring (New York) or any person working on behalf of the foregoing, between November 1, 2014 and July 1, 2019.

### Topics of testimony pursuant to Fed. R. Civ. P. 30(b)(6)

1. The documents requested above, including their authentication, preparation, or contents.
2. The ownership, management, governance, and structure of ACA between November 1, 2014 and July 1, 2019.
3. The identification of all parents of ACA, subsidiaries of ACA, joint ventures of ACA, or entities in which ACA held shares, membership interests, or voting rights, between November 1, 2014 and July 1, 2019.
4. ACA's line of business.
5. ACA's relationship and business dealings with Guo Wengui, Eastern Profit Corp., Golden Spring (New York), or any other entity controlled in whole or in part by Guo Wengui, between November 1, 2014 and July 1, 2019.

6. ACA's income, expenses, assets, and liabilities between November 1, 2014 and July 1, 2019.

7. ACA's transfers of funds to entities (including but not limited to Strategic Vision) at Guo's instruction or direction, or for the benefit of Guo or his entities, between November 1, 2014 and July 1, 2019.

8. The background, qualifications, appointment or hiring, and duties of William Je, Karin Maistrello, and the other directors, managers, or officers of ACA.

9. The location of ACA's business records and assets.

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
    (i) is a party or a party's officer; or
    (ii) is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
  (A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  (B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
  (A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  (B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***

  (A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    (i) fails to allow a reasonable time to comply;
    (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
    (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    (iv) subjects a person to undue burden.
  (B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    (i) disclosing a trade secret or other confidential research, development, or commercial information; or
    (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  (C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  (A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  (B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  (C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  (D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
  (A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    (i) expressly make the claim; and
    (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  (B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# Exhibit Y



# INVOICE

Michael Waller
Georgetown Research, LLC
PO Box 28171
Washington, DC 20038

Date: 1/6/18
Invoice Number: 20180108
Terms:  Due upon receipt.

| Description | | Fee |
|---|---|---|
| One (1) month consulting for strategic research and business development in █████ including startup costs. | | $  200,000 |
| | Subtotal | $  200,000 |
| | Total | $  200,000 |

Thank you for your business. It is a pleasure to work with you on your project.

Payment may be made by bank wire transfer to:

Citi Bank
2101 L Street NW
Washington, DC 20037

Account # █████
Routing  #  254070116



EXHIBIT

SV 104

11/19/19

PENGAD 800-631-6989

CONFIDENTIAL_SVUS001955