IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| EASTERN PROFIT CORPORATION LIMITED, | ) ) ) | |
| Plaintiff/Counterclaim Defendant, | ) ) | Case No. 18-cv-2185 |
| v. | ) ) | |
| STRATEGIC VISION US, LLC, | ) ) | |
| Defendant/Counterclaim Plaintiff. | ) ) ) | |

**PLAINTIFF'S RESPONSE TO
DEFENDANT'S LOCAL RULE 56.1 STATEMENT**

Pursuant to Local Rule 56.1(b), Plaintiff Eastern Profit Corporation Limited ("Eastern") hereby respectfully submits its response to the purported factual averments set forth in Defendant Strategic Vision US, LLC's ("Strategic") Local Rule 56.1 Statement submitted pursuant to Local Rule 56.1(a). Eastern's responds to Strategic's Rule 56.1 Statement without waiver of its objection that many of the facts put forth by Strategic are not material to any of the issues raised in its Motion for Summary Judgment.

**RESPONSES**

1.      **Strategic Vision US, LLC ("Strategic Vision") is a single-member limited liability company ("LLC") registered and in good standing with the Nevada Secretary of State.** Nev. Sec. of State Bus. Reg. ("S.V. Reg."), Ex. A (Ex. A to Dkt. 264, Request for Judicial Notice ("RJN")), ¶ 1; Feb. 12, 2019 F. "Wallop Depo.," Ex. B, 8:6-9, 8:25-9:16, 127:4-6. **Strategic Vision is operated by French Wallop, who has had a home in Washington, D.C. for many years.** S.V. Reg., Ex. A; March 12, 2020 F. Wallop Aff., Ex. C, ¶¶ 1-2; Dkt. 93, p. 1, ¶ 2; Dkt. 127, p. 1, ¶ 2. **French was married to Senator Malcolm Wallop, who represented Wyoming from 1977 to 1994.** Wallop Aff., Ex. C, ¶¶ 1-2.

**RESPONSE:**  Admitted, except that Strategic Vision's principle place of business is not and never was in Washington. D.C.  Indeed, Ms. Wallop's home and Strategic's principal place of business was in Arlington, Virginia.  Ex. A, Answer at 1 ¶ 2; Ex. B, Strategic's Admissions ¶ 18.[1]

2.      **Her interest in politics, work in international affairs, and decades in Washington allowed French to cultivate extensive relationships in several U.S. presidential administrations, Congress, the Departments of Defense and Energy, and other government agencies.**  Dkt. 127, p. 20, ¶¶ 1-2; Dkt. 142, p. 1, ¶ 2; Wallop Depo., Ex. B, 10:19-11:19, 28:12-20, 28:21-30:1.  **This led to consulting work for prominent clients.**  Dkt. 93, p. 3, ¶ 14; Jan. 31, 2019 Yvette "Wang Depo. 1," Ex. D, 194:20-198:7; Wallop Depo., Ex. B, 28:12-30:1, 104:16-106:20.  **She grew significant connections overseas, consulting for clients in Canada, England, the United Arab Emirates, and Singapore.**  *Id*.; Dkt. 127, p. 20, ¶ 2.

**RESPONSE:**  Objection.  This fact is not material to any of the issues raised in Strategic's Motion for Summary Judgment motion and should not be deemed admitted.  To the extent an answer is required, denied because Ms. Wallop's alleged relationships do not qualify her to perform the work contemplated by the contract, including the necessity of being licensed to provide such services.   Ex. A, Answer at 14 ¶¶ 88-102 (admitting that Strategic Vision, Ms. Wallop, and Mr. Waller were not licensed to conduct private investigation); Ex. F, Wallop I Tr. at 290:25:-292:2 (same).

3.      **In 2005, French formed Strategic Vision as a consulting firm for research and analysis of political intelligence.**  Wallop Depo., Ex. B, 10:10-21, 16:16-17:8, 28:12-30:1; Dkt.

---

[1] Eastern's exhibit citations herein refer to the exhibits attached to Eastern's Memorandum of Law in support of its Motion for Summary Judgment.  *See* Dkt. No. 261.

127, p. 20, ¶¶ 1-2; Dkt. 142, p. 1, ¶ 2; S.V. Reg., Ex. A.  **Its clients are typically diplomats or political figures.**  Wallop Depo., Ex. B, 28:12-30:1, 17:9-21:7; Dkt. 93, p. 3, ¶ 14; Wang Depo. 1, Ex. D, 194:20-198:7; Dkt. 127, p. 20, ¶ 2.  **Strategic's principal place of business has always been French's Virginia residence.**  Dkt. 127, p. 20, ¶ 1; Dkt. 142, p. 1, ¶ 1; Wallop Depo., Ex. B, 8:25-9:4; S.V. Reg., Ex. A.  **Strategic has never had employees.**  Wallop Depo., Ex. B, 24:1-3.

> **RESPONSE:**  As to the first two sentences, objection.  These facts are not material to any of the issues raised in Strategic's Motion for Summary Judgment motion and should not be deemed admitted.  To the extent an answer to the first two sentences is required, denied because Ms. Wallop's alleged relationships do not qualify her to perform the work contemplated by the contract, including the necessity of being licensed to provide such services.  Ex. A, Answer at 14 ¶¶ 88-102 (admitting that Strategic Vision, Ms. Wallop, and Mr. Waller were not licensed to conduct private investigation); Ex. F, Wallop I Tr. at 290:25:-292:2 (same) and 29 (conceding that "investigatory research" is not a core service of Strategic Vision).

> As to the third and fourth sentences, admitted.  Eastern further responds, however, that French Wallop's residence, and therefore Strategic's principal place of business, was and is in Arlington, Virginia.  Ex. A, Answer at 1 ¶ 2; Ex. B, Strategic's Admissions ¶ 18.  Eastern further responds that French Wallop was Strategic's only principal/employee.  Ex. B, Answer ¶ 9; Ex. F, Wallop I Tr. at 17:9-14; Ex. G, Wallop II Tr. at 6:4-16; *see also* Ex. F, Wallop I Tr. at 9:1-4.

4.  **In about November 2017, Strategic Vision received a new client referral from French's longtime acquaintances Dr. Lianchao Han and William Gertz, both prominent Washington figures.**  Wallop Depo., Ex. B, 11:24-12:21, 89:9-91:1, 31:23-35:7.  **Dr. Han immigrated to the United States from China, and worked in the U.S. Senate for several years**

(including for the late Senator Wallop) on matters relating to China.  RJN, Dkt. 264, ¶ 2; Wallop Aff., Ex. C, ¶¶ 2-3.  **After the Tiananmen Square Massacre in 1989, Dr. Han helped found the Independent Federation of Chinese Students and Scholars.**  RJN, Dkt. 264, ¶ 2. **William "Bill" Gertz is an investigative reporter and columnist** who had already written several articles on Guo and China, the author of several books about national security (during this lawsuit, he wrote a book on Guo and China)**., and a national speaker on these topics.**  Wallop Depo., Ex. B, 12:16-21, 33:15-21; Oct. 15, 2019 William "Gertz Depo.," Ex. E, 17:2-24:21, 25:18-21.

RESPONSE:  Admitted.  Eastern further responds that Bill Gertz is a former reporter for the Washington Free Beacon and a current reporter for the Washington Times, is a mutual acquaintance of Mr. Guo and Ms. Wallop and Mr. Waller, and was involved in bringing Eastern and Strategic together for the purposes of entering into the Research Agreement.  Ex. J, Gertz Tr. at 17:2-12, 64:19-76:19, 126:5-8-127:16; Ex. F, Wallop I Tr. at 31:23-34:19; Ex. H, Waller I Tr. at 116:10-117:9, 162:1-163-25.  Eastern responds further that L. Han is a mutual acquaintance of Mr. Guo and Ms. Wallop and Mr. Waller, and he was involved in bringing Eastern and Strategic together to enter into the Research Agreement.  Ex. K, Dep. Tr. L. Han. Tr. at 30:19-34:5, 38:20-14; Ex. F, Wallop I Tr. 34:20-35:1.

5.     **The prospective new client was Guo Wengui (a/k/a Miles Kwok), who Dr. Han and Gertz stated was a wealthy businessman who had moved to the U.S. to escape political persecution in China and who had recently purchased the penthouse at the Sherry-Netherland Hotel in New York City.**  Wallop Depo., Ex. B, 36:18-23, 89:9-91:1, 169:20-170:3; Aug. 2, 2019 "Guo Depo. 1", Ex. F, 104:12-105:11, 103:4-23; Nov. 11, 2019 "Chunguang [Han] Depo.," Ex. G, 5:14-17, 25:19-24, 92:10-93:25.  **According to Dr. Han and Gertz, Guo had**

developed several broad goals involving the Chinese government beneficial to the people of China.  Wallop Depo., Ex. B, 88:3-89:5; Guo Depo. 1, Ex. F, 45:3-46:16; Aug. 28, 2019 "Lianchao [Han] Depo.," Ex. H, 53:13-20; Gertz Depo., Ex. E, 60:16-20, 64:16-65:2, 66:15-67:5, 69:3-8, 69:17-70:1, 128:6-129:6, 131:1-14.  **In September 2017, just before being introduced to French Wallop, Guo had filed an application for asylum in the United States.**  Guo Depo. 1, Ex. F, 9:16-21; Lianchao Depo., Ex. H, 30:11-31:20.

RESPONSE:  Admitted.

6.     **Initially, Guo looked to Strategic Vision for public relations and communications advice regarding his integration into the U.S., such as where to buy residential and business property in Washington, D.C. to achieve a high profile presence there and what personal and business associations to make to advance his goals involving China.**  Wallop Depo., Ex. B, 32:17-38:4, 41:11-42:11, 43:15-45:25, 87:23-89:5; Gertz Depo., Ex. E, 137:5-16.  **This early, *gratis* advice did not give rise to the claims here.**

RESPONSE:  Denied, except Eastern admits that from the parties' introduction through the signing of the Research Agreement, representatives of Eastern (Mr. Guo and Ms. Wang) conferred with representatives of Strategic (Ms. Wallop and Mr. Waller) regarding a variety of services that Strategic Vison purportedly could provide, including investigatory research.  Ex. F, Wallop I Tr. at 31:23-109:18; Ex. H, Waller I Tr. at 18:8-38:14.  Eastern further responds that L. Han's and Gertz's testimony make clear that it was Strategic Vision that was pitching its services to Mr. Guo, not the other way around.  L. Han Tr. at 39:15-41:13; Gertz Tr. at 130: 4-11, 132:23 - 134:4.

7.     **Ultimately, Strategic Vision was asked to contribute to Guo's integration efforts by conducting research to expose corruption within the Chinese Communist Party**

**("CCP"), which Guo would then use to undermine the Chinese regime in China.** Guo Depo. 1, Ex. F, 45:3-46:16; Wallop Depo., Ex. B, 88:3-89:22; Oct. 30, 2019 Eastern Profit Fed. R. Civ. P. 30(b)(6) "Wang Depo. 2," Ex. I, 197:18-208:22, 202:2-204:20, 149:5-150:9. **Specifically, research was needed to examine questionable interactions between CCP members and Chinese nationals living in the United States and abroad.** *Id.*; Lianchao Depo., Ex. H, 279:10-14. **Although Strategic Vision did not receive any specific names to research until after entering into a contract, Guo believed there was a large number of corrupt CCP officials and that, by exposing them, he could achieve the long-term objective of breaking CCP's control over China, creating a regime change that would turn China from a strategic adversary to a friend of the United States and pave the way for democracy and freedom for the people of China.** Guo Depo. 1, Ex. F, 39:9-19, 45:3-46:16; Wang Depo. 2, Ex. I, 49:7-21, 202:2-204:20, 149:5-150:9; Wallop Depo., Ex. B, 88:3-89:22; Lianchao Depo., Ex. H, 226:10-18. **Guo claimed that he needed Strategic Vision to advise him on the political weaknesses of CCP members in high government positions.** *Id.*

        **RESPONSE:** Admitted that exposing CCP corruption was Eastern's intention in contracting for the research, but denied that Eastern represented that purpose to Strategic prior to entering into the contract. Strategic has failed to cite any evidence as required under Local Rule 56.1(d) that Eastern or anyone on behalf of Eastern, including Mr. Guo, represented to Strategic the purpose for which Eastern was planning on using the investigatory research. In fact, Ms. Wallop admitted that Strategic did not know for what purpose Eastern was proposing to use the investigatory research and thought that Eastern might "run it both ways" (that is, both for and against the CCP), and that Strategic "never [even] discussed what the research would be used for . . . with Mr. Guo or Ms. Wang or Mr. Han." Ex. F, Wallop I Tr. at 59:2-61:13.

8.      **Strategic Vision agreed to consider the project but requested certain conditions.  First, based on Guo's warnings, French was concerned that any association between Strategic Vision and Guo could lead to surveillance by the Chinese government, reprisals, and even physical danger.**  Wallop Depo., Ex. B, 168:4-170:3, 298:15-20; Wallop Aff., Ex. C, ¶¶ 4-5; Guo Depo. 1, Ex. F, 45:3-46:16; Lianchao Depo., Ex. H, 12:9-13:13.  **Later, after Strategic Vision began work, Guo claimed that the Chinese Embassy in Washington was surveilling French's residence, writing down the name, in English and Chinese characters, of the person he claimed the Embassy had assigned.**  Wallop Aff., Ex. C, ¶¶ 4-5.

   **RESPONSE:**  Denied.  The Research Agreement does not contain any of the conditions Strategic claims it does.  *See generally,* Ex. M, Research Agreement.

9.      **The parties therefore agreed to secrecy measures, such as circuitous payment routes, and later agreed in their written contract "that the Client may direct other entities to pay the Contractor, and that such payments will be deemed satisfactory compensation by the Contractor."**  Wang Depo. 1, Ex. D, 11:19-12:11; R. Agreement Ex. J, (Ex. 2 to Wang Depo 1.), p. 5; Wallop Depo., Ex. B, 168:4-170:3; Nov. 19, 2019 Strategic Vision Fed. R. Civ. P. 30(b)(6) Depo. ("S.V. Depo."), Ex. K, 95:16-25; Wallop Aff., Ex. C, ¶ 4.  **For other reasons, as it turned out, no funds ever passed through Eastern's hands.**  Wang Depo. 1, Ex. D, 203:11-15.

   **RESPONSE:**  Denied.  The Research Agreement does not require Eastern to use a "circuitous payment route"; instead, the provision is permissive and allows Eastern to pay Strategic through other entities, but does not require it to do so— "the Client ***may*** direct other entities to pay the Contractor, and that such payments ***will be deemed satisfactory compensation*** by the Contractor."  Ex. M, Research Agreement at 5.

10.     **In addition, the parties would exchange reports and identification of research subjects only through in-person contact at secure locations, and this would require extensive travel and other time-consuming personal effort by Strategic Vision.**  R. Agreement Ex. J, p. 1; Wang Depo. 1, Ex. D, 77:18-78:18; Wallop Depo., Ex. B, 136:13-20; S.V. Depo., Ex. K, 127:4-15; Feb. 8, 2019 Michael "Waller Depo.", Ex. L, 67:9-68:2.  **Guo likewise was expected to refrain from any conduct that would compromise the security of Strategic Vision's work.**  Wallop Depo., Ex. B, 283:11-285:11.  **The parties' contract required "the strictest secrecy[,] not to disclose the existence of the contract, work relating to the contract, sources and methods used to execute the contract and participants in formulating supervising or executing the contract's provisions, to any third party…"** R. Agreement Ex. J, p. 1.

        **RESPONSE:**   As to the first and second sentences, denied.  The Research Agreement does not contain any of the measures that Strategic claims that it does in those sentences.  *See generally,* Ex. M, Research Agreement.  Regarding the exchange of reports, the Research Agreement required only that the deliverables be provided "by USB drive only."  *Id.*  In fact, Strategic's course of conduct makes clear that absolute secrecy was never its concern. Ex. F, Wallop II Tr. at 40:9-41:11 (testifying that she shared flash drives provided by Eastern to her neighbor).   As to the third sentence, admitted.

11.     **Second, Strategic Vision would engage subcontractors (intelligence analysts in the U.S. and overseas, which Strategic Vision described as a "team" and not its own employees) to perform the research that Strategic Vision would then incorporate into political advice for Guo.**  Wallop Depo., Ex. B, 17:9-21:7, 80:10-24, 82:21-83:23, 79:9-20, 138:17-139:6; Wang Depo. 1, Ex. D, 179:23-186:20; S.V. Depo., Ex. K, 129:22-130:17, 132:15-133:13.

**RESPONSE:**  Objection.  Strategic has not provided any admissible evidence that such subcontractors were ever retained by Strategic.  To the extent an answer is required, denied. The Research Agreement does not mention anything about Strategic hiring subcontractors or providing political advice to Mr. Guo.  *See generally,* Ex. M, Research Agreement.

12.     **Strategic Vision itself would not conduct the research:**

**Q.     Does Strategic Vision do that investigatory research itself?**
**A.     No.**
**Q.     So you never perform any research yourself?**
**A.     No.**
**Q.     Who does?**
**A.     Whomever we bring on board to do the investigation.**
**Q.     So Strategic Vision hires independent contractors?**
**A.     Our own team of people that we have worked with off and on through the years, yes.**

Wallop Depo., Ex. B, 19:21-20:8 and 79:9-20, 80:10-24, 82:21-83:23, 153:12-154:24, 130:4-131:13.  **Notifying this network and organizing its work would take time and advance startup funding.**  *Id*. and 247:16-18; S.V. Depo., Ex. K 129:22-130:17, 131:11-133:13.

**RESPONSE:**  Denied.  As to the first sentence, Ms. Wallop and Mr. Waller admitted multiple times that they both conducted investigative activities for Eastern on behalf of Strategic.  *See e.g.*, Ex. F, Wallop I Tr. at 17:9-18-12, 21:1-23:6, 51:14-17, 87:7-22, 127:14-128:23, 138:1-16, 151:22-152:13, 153:12-17, 169:5-170:3, 177:5-180:20 (Wallop describing her personal role in the "investigation"), 183:9-18, 257:2-10; Ex. G, Wallop II Tr. at 29:20-30:16, 89:17-93-11, 96:5-101:15; Ex. H, Waller I Tr. at 33:8-34:3, 195:15-17; Ex. I, Waller II Tr. at 57:12-16 ("Q. . . . [S]o Strategic Vision did, in fact, set out to investigate a number of individuals on a list, right?  A.  Yes.") (emphasis added).  For instance, Ms. Wallop testified that she personally tracked two individuals on the Subject List:

Q: And then go down a few more lines.  There is a debit card
purchase on March 13th.  What is the Grace Bay Club & Spa?

A:  That was to investigate -- there were two Chinese individuals we were tracking in the Turks & Caicos.

Q:  So that is an expenditure –

A:  Yes.

Q:  -- of $456 at a spa in Turks & Caicos?

A:  It wasn't a spa, it was a hotel, a night, two nights.

Q:  And your testimony is whom were you investigating?

A:  Two Chinese characters that were on the list.

Q:  And who was with you in Turks & Caicos?

A:  My son was with me, but just we had separate rooms, so --

Q:  But who -- you were there, were you meeting with investigators there?

A:  No, I was investigating on my own.

Q:  Why did you need to be in Turks & Caicos?

A:  Because that's where the two Chinese were those two nights.

Q:  And what did you do to investigate them?

A:  I suppose that when you are tracking somebody you are trying to gather intelligence, and that's what I was doing.

Q:  That's what I am asking you about.  Were you surveilling them?

A:  Yes, to some degree, yes.

Q:  And how did you go about that?

A:  As anybody that does this does, you watch them, you listen, you see what they are talking about, you take photographs of them, you put it back into the basket of information that we filling.

Ex. G, Wallop II Tr. at 97:5-98:22.

As to the second sentence, performance under the Research Agreement was to begin immediately; the parties did not negotiate for and the agreement did not provide for ramp up time.  *See generally* Ex. M, Research Agreement.

13.   **Guo would not be allowed to contact the network because Strategic Vision's relationships and approach to the research were confidential and proprietary, and Strategic Vision declined to reveal the names or titles of any team members.**  Wallop Depo., Ex. B, 82:21-83:23, 53:14-25 (French did not even know Mike Waller's contacts and vice versa); S.V. Depo., Ex. K, 129:22-130:14; Waller Depo., Ex. B, 74:14-77:1.  **Eastern Profit admitted in testimony that Strategic Vision never represented that it had in-house employees or particular categories of associates.**  Wang Depo. 1, Ex. D, 179:23-186:20 (and 184:25-185:3: "Q. Something along those lines but never used the words in-house? A.  I don't remember that.").

RESPONSE:   Denied.  As to the first sentence, there is no provision within the Research Agreement that prohibited Mr. Guo from contacting the "network" or otherwise knowing the members of Strategic's "team."  *See generally* Ex. M, Research Agreement.  As to the second sentence, the record demonstrates that Strategic misrepresented that it had the expertise and qualifications to perform the Research Agreement, including that it was licensed to perform a private investigation. Dkt. No. 93 ¶¶ 35-39 (summarizing fraud allegations); Ex. O, Deposition Transcript of Guo Wengui dated August 2, 2019 ("Guo I Tr.") at 150:7-151:5 (testifying that Strategic Vision misrepresented its qualifications, including that it was licensed to perform private investigation, and that Eastern relied on those qualification to its detriment); Ex. A, Answer at 14 ¶¶ 88-102 (admitting that Strategic Vision, Ms. Wallop, and Mr. Waller were not licensed to conduct private investigation); Ex. F, Wallop I Tr. at 290:25:-292:2 (same).

14.     **To help set up and monitor the network and prepare its eventual advice to Guo, Strategic Vision would partner with Mike Waller, who was introduced to Guo during contract negotiations.**  Wallop Depo., Ex. B, 35:25-37:22, 11:12-13:1; Gertz Depo., Ex. E, 131:1-20.  **Dr. Waller, a Ph.D. in international security affairs, is an expert in strategic communications, with a focus on intelligence, political warfare, public diplomacy, and terrorism avoidance.**  RJN, Dkt. 264, ¶ 4.  **Dr. Waller is not a member or employee of Strategic Vision but was invited to work on the project by French, who he has known professionally for many years.**  Wallop Depo., Ex. B, 11:12-12:9, 24:1-3, 16:12-17:8; Waller Depo., Ex. L, 10:8-11:25.

        **RESPONSE:**  Admitted as to the first and third sentences.  As to second sentence, denied.  Strategic has not substantiated Mr. Waller's communications, including its contention that he is an expert on intelligence.  Ex. A, Answer at 14 ¶¶ 88-102 (admitting that Strategic Vision, Ms. Wallop, and Mr. Waller were not licensed to conduct private investigation); Ex. F, Wallop I Tr. at 290:25:-292:2 (same).

15.     **Third, given the uncertainties attendant to researching a large group of foreign subjects, Strategic only could approximate the time required to prepare a report on a given person, and could not guarantee a particular result at a particular time. Thus, the contract later allowed for adjustments for "irregular circumstances": "[b]oth parties understand that occasional unforeseen challenges may arise that will slow or block comprehensive research, and that there may be periods in which information is irregular, unavailable, or incomplete.  The Contractor will endeavor to make all research and reports as complete as possible in a timely scheduled manner."**  R. Agreement, Ex. J, p. 3.

**RESPONSE:**  As to the first sentence, Eastern denies the sentence as stated and refers to the terms of the Research Agreement itself, in which Strategic agreed to a very specific deliverable schedule.  Eastern further responds that the parties agreed in the Research Agreement that Eastern would not be obligated to pay Strategic unless it successfully provided each deliverable called for in the terms of the Research Agreement; if no deliverables were provided, Eastern had no obligation to pay Strategic under the Research Agreement.  Ex. M, Research Agreement at 1-3; Ex. A, Answer at 2 ¶ 6; Ex. G Wallop II Tr. at 35:5-36:5, 42:15-44:12, 47:6-11, 49:21-50:17 ("Q.  So the pricing was based per unit, correct?  A.  Yes."; "Q. . . . When you were in the meeting talking about this document, the idea was that pricing would be tied to units?  A. My understanding, that's correct.").

As to the second sentence, admitted that the Research Agreement contains an irregular circumstances clause, but denied that it authorizes any "adjustments" to be made to the contract.  *See generally* Ex. M, Research Agreement.

16.    **Finally, because Strategic Vision would need clear direction from Guo as to the individuals about whom research was needed and any other issues that developed during the project, Guo would be expected to communicate with Strategic Vision as necessary for its work.**  R. Agreement, Ex. J, at p. 1.

**RESPONSE:**  Denied.  The Research Agreement required Eastern to provide only the "necessary basic information, and desired areas of focus, to [Strategic] to research."  *See generally* Ex. M, Research Agreement.  As specified in the Research Agreement, Eastern was to provide this information, not Guo.

17.    **After discussing these concerns, Guo pressed ahead with the project, and the parties negotiated the Research Agreement, detailing the services Strategic Vision would**

**provide.**  R. Agreement, Ex. J; Wallop Depo., Ex. B, 126:3-18; Wallop Aff., Ex. C, ¶ 4.  **Over the course of approximately one month, several drafts of the Agreement were exchanged between Guo and his representatives (in New York) and French and Waller (in Virginia).**  Wang Depo. 1, Ex. D, 59:17-60:4.  **Guo authorized two representatives to speak with Strategic Vision:  Lianchao (who knew both Guo and French) and Wang Yangping, a/k/a Yvette Wang, who French first met through Guo.**  Plt's First Interrog. Resp., Ex. M, p. 3, No. 5; Wallop Depo., Ex. B, 199:20-200:9; Wang Depo. 1, Ex. D, 59:17-60:4.

      **RESPONSE:**  As to the first sentence, denied, except that it is admitted that Eastern, not Guo, and Strategic agreed to proceed with the investigation and that the parties negotiated and agreed to the Research Agreement to memorialize the terms and conditions of the parties' arrangement.  *See generally* Ex. M, Research Agreement.

      As to the second sentences, denied.  The parties negotiated the agreement in Virginia (*id.* at 3 ¶ 8; Ex. B, Strategic's Admissions, ¶¶ 20-25), Strategic drafted the agreement in Virginia (Ex. F, Wallop I Tr. at 108:5-109:18), and the parties signed the agreement in Virginia (Ex. A, Answer at 2-3, ¶¶ 6-7; *id.* at 28 ¶ 23).

      As to the third sentence, admitted.

    18.    **During negotiations, the parties agreed to Guo's request that a separate entity, and not Guo himself, would enter into the Agreement with Strategic Vision.**  Wallop Depo., Ex. B, 299:22-300:8 ("Obviously it's Guo with whom we are dealing. So Guo equals Eastern, one would presume."); Lianchao Depo., Ex. H, 185:2-7; S.V. Depo., Ex. K, 95:3-12.  **That entity, Plaintiff Eastern Profit Corporation Limited ("Eastern Profit"), was revealed by Guo just shortly before the contract was signed.**  Wang Depo. 1, Ex. D, 8:24-11:15, 14:2-25; Wang Depo. 2, Ex. I, 162:4-9, 150:10-151:6; Wallop Depo., Ex. B, 306:6-307:7.  **It is a private limited company**

**registered under the laws of the Hong Kong Special Administrative Region of the People's Republic of China.** Eastern Profit's C.R. 26.1 Demand, Ex. N, at p. 2, No. 2, p. 3, Nos. 3-4; Wang Depo. 2, Ex. I, 22:10-23:6, 23:25-25:16, 25:24-26:5, 27:8-13, 29:16-18, 29:22-30:5, 76:12-18.   **Eastern Profit has not been registered to do business in the State of New York.** Eastern Profit's C.R. 26.1 Demand, Ex. N, p. 2, No. 2, p. 3, Nos. 3-4; RJN, Dkt. 264, ¶ 3.

> **RESPONSE:**   Admitted, except that the evidence that Strategic cites makes clear that Ms. Wang revealed that Eastern was the entity that would be the "Client" in the Research Agreement.

19.   **In negotiating the Agreement, Strategic Vision dealt with Guo, and only knew of Guo and the two individuals he had designated to negotiate on his behalf, Lianchao and Wang.** Dkt. 142, p. 2, No. 4; Plt's First Interrog. Rep., Ex. M, p. 3, No. 6; Wang Depo. 2, Ex. I, 169:19-171:7.   **At the time, Guo represented that Wang and Lianchao answered to him; in this litigation, Eastern Profit claims that Guo was orally appointed as its agent, and that Wang worked for Eastern Profit because Eastern Profit had orally hired GSNY, an entity controlled Guo's family office, to assist it regarding the Agreement.** POA, Ex. O (Chunguang Ex. 32); Chunguang Depo., Ex. G, 109:15-110:17, 111:14-112:23; Wang Depo. 1, Ex. D, 28:6-17; Wang Depo. 2, Ex. I, 144:19-22, 205:21-206:7, 169:19-171:7.   **At no point has Eastern Profit repudiated any representation made by Guo (himself or through Lianchao and Wang) concerning the Agreement.** Dkt. 142, p. 2, ¶ 4 ("Eastern authorized Guo to communicate with Strategic Vision on Eastern's behalf concerning the Agreement, Guo's representations to, and interactions with, Strategic Vision concerning the Agreement are binding upon Eastern, and Eastern has not repudiated any such representations or interactions.").

**RESPONSE**:  As to the first sentence, denied except it is admitted that Mr. Guo and Ms. Wang were involved with negotiating the Research Agreement on behalf of Eastern, and that L. Han was involved with introducing Mr. Guo with Ms. Wallop and Mr. Waller.  Wang I Tr. at 13:3-14, 51:22 -53:13; Wang II Tr. at 127:25-128:6, 176:10-178:9; L. Han Tr. at 179:2-13; 188:13-17; Ex. F, Wallop I Tr. at 31:23-32:04, 33:15-21, 34:20-35:7; Waller I Tr. 23:23-25:22; *see also* Waller I Tr. at 116:8-117:9.

As to the second sentence, denied to the extent that it says Guo represented that Wang and L. Han answered to him.  Strategic has not cited any evidence in support of that contention as required by Local Rule 56.1(d).  In fact, Ms. Wang and L. Han testified that they did not answer to Guo.  Wang I Tr. at 20:6-14; L.Han at 210:16–211:2.  The second sentence is otherwise admitted.

As to the third sentence, admitted.

20.    **The Agreement was ultimately signed at French's home in Virginia on January 6, 2018.**  R. Agreement, Ex. J, p. 5; Wallop Aff., Ex. C, ¶ 4; Wang Depo. 1, Ex. D, 264:9-12.  **Wang claimed authority to sign, admitted she did sign, but claimed she never actually wrote her own signature.**  Wang Depo. 1, Ex. D, 26:24-27:23, 59:17-60:4 (Ex. 2, p. 5, Eastern 9); Wang Depo. 2, Ex. I, 140:15-144:22, 27:8-13, 147:4-17, 149: 5-14, 145:18-146:8, 148:18-149:14, 154:7-156:13.  **Eastern later claimed Chunguang Han had been orally given authority to hire Golden Spring (New York) Limited ("GSNY"), Wang's official employer, by Guo Mei, who is Guo's daughter and the only director, shareholder, or natural person officially associated with Eastern.**  Chunguang Depo., Ex. G, 5:14-17; Wang Depo. 2, Ex. I, 22:13-23:7, 140:15-144:22, 27:8-13, 147:4-17, 149: 5-14, 145:18-146:8, 148:18-149:14, 154:7-156:13, 166:7-

18.  **Both Wang and Han were New York residents at all relevant times.**  Chunguang Depo.,
Ex. G, 13:6-14:2; 17:21-18:3; Wang Depo. 1, Ex. D, 4:11-12, 26:24-27:23.

    **RESPONSE**:  Admitted.

    21.    **Later, after the Research Agreement was executed, this lawsuit was filed, and
discovery was underway, Eastern claimed that two other individuals were involved in the
project:  Chunguang Han (an assistant of Guo who, in litigation, Eastern  has claimed is its
"principal") and Guo Mei (Guo's daughter and the sole director, shareholder, or natural
person formally associated with Eastern  from June 27, 2017 through today).**  Plt's First Interr.
Resp., Ex. M, at p. 2, No. 2 ("Chunguang Han is the principal of Eastern."); Ex. Q (Chunguang
Depo. Ex. 33); Lianchao Depo., Ex. H, 36:11-38:4; Ex. R (Chunguang Depo. Ex. 30), p. 2 (Eastern
401); Wang Depo. 2, Ex. I, 25:8-28:13, 45:25-47:25, 63:22-64:14, 126:2-17; Chunguang Depo.,
Ex. G, 34:6-17; 38:18-39:15, 106:2-107:24.  **Eastern Profit claims that Guo Mei orally gave
Chunguang Han authority to manage Eastern Profit's affairs, which included his hiring of
Golden Spring (New York) Limited ("GSNY"), Wang's official employer and a wholly-
owned subsidiary of Guo's family office, China Golden Spring (Hong Kong).**  Wang Depo. 2,
Ex. I, 25:5-44:17.  **Eastern Profit claims that, in 2019, both Guo Mei and Chunguang gave
additional verbal authority to Wang in New York that allowed her to represent Eastern
Profit's interests in communicating with a third party regarding payments received by
Strategic Vision under the Agreement, discussed below.**  *Id*.  **Both Wang and Han were
residents of New York at all relevant times.**  Chunguang Depo., Ex. G, 13:6-14:2; 17:21-18:3;
Wang Depo. 1, Ex. D, 4:11-12, 26:24-27:23; Wang Depo. 2, Ex. I, 25:5-44:17.

    **RESPONSE**:  As to the first sentence: denied with respect to the prefatory language
that precedes the colon because Strategic could have ascertained Guo Mei's and C. Han's

ownership and prior ownership, respectively, of Eastern before the Research Agreement was signed simply by accessing Eastern's governance documents, which are publicly-available, but Strategic chose not to do so, Wallop I Tr. at, 90:4 -91:1; admitted that C. Han is an agent of Eastern; denied that C. Han is Mr. Guo's assistant, C. Han at 152:6-24; admitted that Guo Mei is Mr. Guo's daughter and the sole director, shareholder, or natural person formally associated with Eastern from June 27, 2017 through today.

As to the second, third, and fourth sentences, admitted.

22.     **Wang signed the Research Agreement only after Guo approved its final terms for Eastern Profit, which Wang read him over the phone line-by-line.**  Wang Depo. 1, Ex. D, 61:2-9.

RESPONSE: Denied as stated.  Guo I Tr. at 71:7-8, 204:15-25.

23.     **Of Strategic Vision, the Agreement required "business research, reporting, documentation, and other consulting services" that would be documented in periodic "comprehensive confidential reports" with supporting data provided on a timetable set out in the Agreement.**  R. Agreement, Ex. J, pp. 1, 3; Wang Depo. 1, Ex. D, 11:19-12:11.  **The three areas of analysis (all labeled "research") were "financial forensic historical research; current tracking research; and social media research."**  R. Agreement, Ex. J, pp. 1-2.  **Guo represented to Strategic Vision in negotiations, and the Agreement recited, that Guo planned to use Strategic Vision's analysis for "detecting, stopping, and preventing crime or other harm"** (*Id.*) **to the people of China in order to force a regime change that would implement the rule of law and democracy.**  Guo Depo. 1, Ex. F, 45:3-46:16; Wang Depo. 1, Ex. D, 33:8-14 (Guo identified research subjects), 32:5-35:11, 37:8-38:7.

**RESPONSE**: As to the first sentence, admitted that this was one of the many obligations that Strategic undertook in the Research Agreement, and Eastern refers to the Research Agreement for a complete and accurate description of Strategic's obligations under that agreement. *See generally* Ex. M, Research Agreement.

As to the second sentence, admitted that Strategic was required to provide Eastern with the following three types of "Deliverables": "Financial Forensic Reports" "Current Tracking Reports," and "Social Media Reports," that Strategic was obligated to "provide the deliverables based on the best practices and standards of the industry, comparable to other top firms with similar services," including by delivering reports "of very high quality, revealing the true, complete and full profile of the subject," and that all of the deliverables were to be provided "by USB drive only." Ex. M, Research Agreement; Ex. A, Answer at 2 ¶ 6. Eastern refers to the Research Agreement for a complete and accurate description of Strategic's obligations under that agreement. *See generally* Ex. M, Research Agreement.

As to the third sentence, admitted that the Research Agreement provides that the purpose of Strategic's investigatory research is "detecting, stopping, and preventing crime or other harm." Eastern refers to the Research Agreement for a complete and accurate description of Strategic's obligations under the agreement. *See generally* Ex. M, Research Agreement. The remainder of the third sentence is denied. Strategic has failed to cite any evidence as required under Local Rule 56.1(d) that Eastern or anyone on behalf of Eastern, including Mr. Guo, represented the purpose for which Eastern was planning on using the investigatory research. In fact, Ms. Wallop admitted that Strategic did not know for what purpose Eastern was proposing to use the investigatory research and thought that Eastern might "run it both ways" (that is, both for

and against the CCP), and that Strategic "never [even] discussed what the research would be used for . . . with Mr. Guo or Ms. Wang or Mr. Han."  Ex. F, Wallop I Tr. at 59:2-61:13.

24.     **Under the Agreement, Strategic Vision would be paid for specific periods of work rather than for its periodic reports.**  R. Agreement, Ex. J, p. 4; Wang Depo. 1, Ex. D, 56:12-59:16.  **Wang had asked for an alternative a la carte, report-for-payment structure, but that was not included in the final Agreement, which instead adopted a "waterline" structure which would pay Strategic Vision a set fee per month.**  Wang Depo. 1, Ex. D, 66:12-67:9.  **Strategic Vision was guaranteed a bare minimum of work, from the Agreement's start (January 16, 2018) through a period of three months (April 16, 2018).**  R. Agreement, Ex. J, pp. 3-4.  **When that guaranteed period ended, "after the March reports and payments are made, [] all involved Parties will meet to recap the accounting…"**  Wang Depo. 1, Ex. D, 56:22-58:5, R. Agreement, Ex. J, p. 4; Wallop Depo., Ex. B, 246:25-247:7.  **The Research Agreement had a term of three years.**  R. Agreement, Ex. J, p. 5.  **Each party had a right to terminate the Agreement on "30 days' written notice."**  *Id.*; Ex. J and Ex. S, Ex. 6 to Wang Depo. 1; Wang Depo. 1, Ex. D, 135:18-136:7.

**RESPONSE**:  As to the first four sentences, denied. The Research Agreement, as well as Ms. Wallop's own testimony, makes very clear that Eastern was obligated to pay Strategic only if its performed its obligations and provided the "deliverables" called for under the contract. Ex. M, Research Agreement at 1-4 ("The prices for *each deliverable* . . . are $300,000; "The pricing for *30 units or deliverables* per year remains a constant $9,000,000 per year, or $750,000 per month for 12 months."); Ex. A, Answer at 2 ¶ 6; Ex. G Wallop II Tr. at 35:5-36:5, 42:15-44:12, 47:6-11, 49:21-50:17 ("Q.  So the pricing was based per unit, correct?  A.  Yes."; "Q. . . . When you were in the meeting talking about this document, the idea was that pricing would be tied to

units?  A.  My understanding, that's correct.").   Strategic also misrepresents Ms. Wang's testimony and the Research Agreement.  As stated in both the cited testimony and the bottom of page 3 of the Research Agreement, the "waterline" concept meant only that Eastern agreed to maintain at least 10 subjects to be investigated for a total of 30 units or deliverables at all times and that if a subject was "removed from consideration" a new subject would "be put in its place."  *See* Ex. M, Research Agreement at 3.  Finally, the Research Agreement does not provide for any "guaranteed" period for the reasons set forth above in this response and because the agreement allowed for termination without cause by providing 30 days' notice.  *See* Ex. M, Research Agreement.

As to the fifth and sixth sentences admitted.

By way of further response, Eastern refers to the Research Agreement for a complete and accurate description of Strategic's obligations under that agreement.  *See generally* Ex. M, Research Agreement.

25.    **Of Eastern Profit, the Agreement required "the necessary basic information, and desired areas of focus, to the Contractor to research" and payment for Strategic Vision's services.**  R. Agreement, Ex. J, pp. 1, 3-4**.  The payment structure required "for the first 3 months of this Agreement, January, February and March 2018, [] the payment of $750,000. USD will be wired per our instructions to our US Bank account."**  *Id*., p. 4.  **The Agreement also required "a deposit of US $1,000,000 [] upon signing the contract.**  *Id*., p. 5.  **"The deposit will be credited on a prorated basis to the final 1-1/3 (1.3) months of the contract."**  *Id*.

**RESPONSE**:  As to the first and second sentences, admitted except that payment for Strategic's services were only due and owing if Strategic delivered the deliverables called for under the contract.  *See* Response to ¶ 24.

As to the third and fourth sentences, admitted.  Eastern further responds, however, that the deposit was not meant to be a signing bonus and that the parties agreed that "[Eastern] may direct other entities to pay [Strategic], and that such payments will be deemed satisfactory compensation by [Strategic]."   Ex. M, Research Agreement at 5; Ex. A, Answer at 2 ¶ 6; Ex. A, Answer at 4 ¶ 17; Ex. I, Waller II Tr. at 91:23-94:6.

By way of further response, Eastern refers to the Research Agreement for a complete and accurate description of Strategic's obligations under that agreement.  *See generally* Ex. M, Research Agreement.

26.     **Wang, for Eastern Profit, testified that the deposit was an "evergreen deposit," which "means that one million just stay there as one million.  And they, Strategic Vision is going to issue invoice every month and the client is just to pay the invoice."**  Wang Depo. 1, Ex. D, 199:5-200:19.

**RESPONSE**: Admitted, except that payment for Strategic's services was only due and owing if Strategic delivered the deliverables called for under the contract and that the deposit was required to be returned if Strategic did not perform its obligations.  *See* Response to ¶ 24.  *See also* Wang I Tr. at 129: 6-12 ("Q.  Now the research agreement called for a fee of $750,000 a month; is that right?  A.  $750,000, U.S. dollars, based on their weekly reports and general monthly reports.  Without seeing or received the reports, $750,000 U.S. dollars should not be paid.").  Eastern further responds that the deposit was not meant to be a signing bonus and that the parties agreed that "[Eastern] may direct other entities to pay [Strategic], and that such payments will be deemed satisfactory compensation by [Strategic]."   Ex. M, Research Agreement at 5; Ex. A, Answer at 2 ¶ 6; Ex. A, Answer at 4 ¶ 17; Ex. I, Waller II Tr. at 91:23-94:6.  By way of further

response, Eastern refers to the Research Agreement for a complete and accurate description of Strategic's obligations under that agreement.   *See generally* Ex. M, Research Agreement.

27.   **Although unknown to Strategic Vision until discovery in this case, Eastern Profit had no ability to make the $1 million initial payment or pay monthly invoices.**   Wang Depo. 2, Ex. I, 7320-74:8, 197:18-198:6, 202:2-204:20.   **Late in discovery, Eastern Profit claimed its assets were all in Hong Kong and had been frozen there due to influence by the Chinese government and CCP prior to the Research Agreement and showing that those assets were only about $550,000 HK, or roughly $80,000.**   *Id.*; RJN, Dkt. 264, ¶ 5; Dkt. 203-2, Oct. 18, 2018, p. 14/27 for Respondent 16 (Dkt. 203, p. 2:   "The assets of Mr. Guo and Eastern Profit that have been frozen in Hong Kong were frozen, not by the CCP or Mainland China, but by *the High Court of Hong Kong*. *See* Exhibit B."   Ex. B (pp. 3, 14, Respondent 16:   H.K. Ct. Order); Chunguang Depo., Ex. G, 44:17-22, 70:10-72:6, 74:19-75:1, 88:2-89:9, 131:22-132:4, 146:10-24.   **Eastern Profit had no expectation that this would change, absent a regime change triggered by the fruits of the Research Agreement.**   Wang Depo. 2, Ex. I, 202:2-203:24.

**RESPONSE**: Objection.   Irrelevant and prejudicial.   To the extent a response is required, denied.   As part of contract negotiations, Ms. Wallop requested that Eastern provide a $1 million deposit under the Research Agreement.   Ex. F, Wallop I Tr. at 192:09-194:16.   On December 29, 2017, to fund the deposit contemplated by the parties, Eastern borrowed $1 million from ACA (*i.e.*, the ACA Loan).   Ex. E, C. Han Tr. at 124:14-129:2; Ex. L, ACA Loan Agreement, EASTERN-000278.   On January 2, 2018, as negotiations were wrapping up, but before the parties signed the Research Agreement, Eastern caused the $1 million deposit to be wired to Strategic through ACA.   *Id.*; Ex. F, Wallop I Tr. at 192:09-194:16.   Strategic received the $1 million.   Ex. A, Answer at 4 ¶ 17; Ex. F, Wallop I Tr. at 192:09-194:16; Ex. H, Waller I Tr. at 157:9-22; Ex. I,

Waller II Tr. at 91:14-94:6.  Strategic understood that the $1 million payment from ACA was the deposit that the parties had previously discussed.  Ex. F, Wallop I Tr. 192:09-194:16; Ex. I, Waller II Tr. at 91:23-94:6.  Strategic has acknowledged that it accepted the $1 million deposit and purported to utilize it to cover the expenses associated with the investigation called for under the Research Agreement.  Ex. A, Answer at 4 ¶ 17; *id.* at 28 ¶ 23; Ex. F, Wallop I Tr. at 246:16-247:23; Ex. H, Waller I Tr. at 157:9-22; Ex. I, Waller II Tr. at 66:10-16, 93:22-94:6.

28.    **Also unknown to Strategic Vision, Eastern Profit had promised another entity, non-party ACA Capital Group Limited ("ACA"), a private company registered under the laws of the Hong Kong Special Administrative Region of the People's Republic of China, that it would be given the results of Strategic Vision's work.**  Wang Depo. 2, Ex. I, 46:22-47:14, 49:25-50:10, 53:19-54:3, 56:7-11, 57:5-9, 110:17-112:2; Wallop Depo., Ex. B, Dkt. 203-2, Oct. 18, 2018. **Eastern claims the $1 million ACA transferred to Strategic on January 2, 2018 was the result of a purported loan between ACA and Eastern only intended to be paid back, with 2% monthly interest, *after* Guo used Strategic's research to trigger regime change in China and (apparently by these means) unfreeze Eastern's Hong Kong bank account.**  Wang Depo. 2, Ex. I, 49:25-50:10, 53:19-54:3, 56:7-11, 57:5-9, 110:17-112:2; Dkt. 203-2; Chunguang Depo., Ex. G, 72:24-73:14.  **ACA head William Je (a/k/a Yu Jianming)[2] even indicated that ACA might forgive the purported "loan" if the Research Agreement bore fruit:**

> **A Okay. I didn't discuss that yet, but I heard kind of like William would be happy to contribute this fund into the entire taking down Chinese Communist Party campaign. But I don't have too much details.**
> **Q So had the research been successful, Mr. Yu would have been happy to write off the loan?**
> **Ms. Cline: Objection to form.**
> **Possible.**

---

[2]    **It was William Je who was representing ACA's interests in communicating with Eastern Profit about the Research Agreement.** Wang Depo. 2, Ex. I, 57:23-58:19, 53:19-54:3.

Wang Depo. 2, Ex. I, 208:2-16, 46:22-47:14, 44:10-47:14, 197:18-198:6, 202:2-204:20, 73:20-74:8; Plt's Third Interrog. Resp., Ex. T, p. 3, No. 2.

    **RESPONSE**: Objection.  Irrelevant, prejudicial, hearsay, and lacks foundation.  To the extent a response is required, denied.  As part of contract negotiations, Ms. Wallop requested that Eastern provide a $1 million deposit under the Research Agreement.  Ex. F, Wallop I Tr. at 192:09-194:16.  On December 29, 2017, to fund the deposit contemplated by the parties, Eastern borrowed $1 million from ACA (*i.e.*, the ACA Loan).  Ex. E, C. Han Tr. at 124:14-129:2; Ex. L, ACA Loan Agreement, EASTERN-000278.  On January 2, 2018, as negotiations were wrapping up, but before the parties signed the Research Agreement, Eastern caused the $1 million deposit to be wired to Strategic through ACA.  *Id.*; Ex. F, Wallop I Tr. at 192:09-194:16.  Strategic received the $1 million.  Ex. A, Answer at 4 ¶ 17; Ex. F, Wallop I Tr. at 192:09-194:16; Ex. H, Waller I Tr. at 157:9-22; Ex. I, Waller II Tr. at 91:14-94:6.  Strategic understood that the $1 million payment from ACA was the deposit that the parties had previously discussed.  Ex. F, Wallop I Tr. 192:09-194:16; Ex. I, Waller II Tr. at 91:23-94:6.  Strategic has acknowledged that it accepted the $1 million deposit and purported to utilize it to cover the expenses associated with the investigation called for under the Research Agreement.  Ex. A, Answer at 4 ¶ 17; *id.* at 28 ¶ 23; Ex. F, Wallop I Tr. at 246:16-247:23; Ex. H, Waller I Tr. at 157:9-22; Ex. I, Waller II Tr. at 66:10-16, 93:22-94:6.

    29. **Neither Guo nor any other Eastern Profit representative disclosed ACA's name to Strategic Vision, disclosed the existence of the "loan," or sought permission from Strategic Vision to allow its strictly confidential work product to be given to a third party for that party's use.**  Wallop Aff., Ex. C, ¶¶ 4, 6; R. Agreement, Ex. J, p. 1 ("Both parties agree that the nature of this contract, and the work related to it, is highly confidential.  Both parties are

bound by the strictest secrecy not to disclose … to any third party."); Wang Depo. 1, Ex. D, 134:19-135:15 ("My understanding is that all the information related to this project or this contract, should be kept confidential").

> **RESPONSE**: Denied.   ACA wired Strategic $1 million *before* the Research Agreement was even signed.  Ex. A, Answer at 4 ¶ 17; Ex. F, Wallop I Tr. at 192:09-194:16; Ex. H, Waller I Tr. at 157:9-22; Ex. I, Waller II Tr. at 91:14-94:6.  If Strategic was concerned about ACA's involvement, it could have returned the money and called off the agreement; instead, Strategic did not raise any concerns about ACA and accepted the $1 million that ACA sent to Strategic on Eastern's behalf.  Ex. A, Answer at 4 ¶ 17; *id.* at 28 ¶ 23; Ex. F, Wallop I Tr. at 246:16-247:23; Ex. H, Waller I Tr. at 157:9-22; Ex. I, Waller II Tr. at 66:10-16, 93:22-94:6.   In fact, Strategic's course of conduct makes clear that absolute confidentiality was never its concern. Ex. F, Wallop II Tr. at 40:9-41:11 (testifying that she shared flash drives provided by Eastern to her neighbor).

30.     **Strategic Vision thus did not know the identity of ACA or its representatives and, when Eastern Profit turned out to have no assets, had no means of recourse against ACA for payment or anything else regarding the Research Agreement.  ACA was to be the ultimate recipient of Strategic Vision's work under the Agreement, even though ACA is not the plaintiff and Eastern Profit has not assigned its claims in this case.**  Ex. N (Eastern Profit's C.R. 26.1 Demand), p. 3, No. 4; Wang Depo. 2, Ex. I, 208:2-16 and 197:18-198:6, 202:2-204:20, 73:20-74:8.  **The only authority Eastern Profit has granted anyone regarding the Agreement is a power-of-attorney in favor of Guo's entity, GSNY, not ACA.**  Wang Depo. 2, Ex. I, 205:21-206:7; Ex. O (Chunguang Ex. 32); Chunguang Depo., Ex. G, 109:15-19, 110:2-17.

**RESPONSE**: Objection. Irrelevant.  To the extent an answer is required, denied. ACA wired Strategic $1 million *before* the Research Agreement was even signed.  Ex. A, Answer at 4 ¶ 17; Ex. F, Wallop I Tr. at 192:09-194:16; Ex. H, Waller I Tr. at 157:9-22; Ex. I, Waller II Tr. at 91:14-94:6.  If Strategic was concerned about ACA's involvement, it could have returned the money and called of the agreement; instead, Strategic did not raise any concerns about ACA and accepted the $1 million that ACA sent to Strategic on Eastern's behalf.  Ex. A, Answer at 4 ¶ 17; *id.* at 28 ¶ 23; Ex. F, Wallop I Tr. at 246:16-247:23; Ex. H, Waller I Tr. at 157:9-22; Ex. I, Waller II Tr. at 66:10-16, 93:22-94:6.  The purpose of the research was to undermine the CCP, not provide it to ACA.  Guo Depo. 1, Ex. F, 39:9-19, 45:3-46:16

31.    **On or about January 2, 2018, at its bank in Las Vegas, Nevada, Strategic Vision received two successive $500,000 wire transfers.**  Ex. U (Wang Depo. 1 Ex. 7); Wang Depo. 1, Ex. D, 158:6-9, 158:20-159:23, 161:2-17; Dkt. 127, p. 22, ¶ 7; Dkt. 142, p. 3, ¶ 7.  **These were from an ACA bank account in Hong Kong.** *Id.*  **Although Strategic Vision did not know of ACA, Strategic Vision assumed the wires had sent at Guo's order under the Agreement, which is what Eastern Profit now contends.**  Plt's First Interrog. Resp. Ex. M, p. 2, No. 4 ("Guo Wengui, on behalf of Eastern, ordered wires totaling $1 million to be sent to Strategic Vision on or about December 29, 2017."); Dkt. 93, pp. 3-4, ¶ 17; Wallop Aff., Ex. C, ¶¶ 6-7.  **Strategic Vision had agreed with Guo to avoid a direct payment route from Eastern Profit to Strategic Vision (the Agreement provided "that the Client may direct other entities to pay the Contractor, and that such payments will be deemed satisfactory compensation by the Contractor").** R. Agreement, Ex. J, p. 5.  **No funds ever passed through Eastern's hands.** Wang Depo. 1, Ex. D, 203:11-15.

**RESPONSE**: Admitted, except that the Research Agreement does not require Eastern to "avoid a direct payment route"; instead, the provision is permissive and allows Eastern to pay Strategic through other entities, but does not require it— "the Client *may* direct other entities to pay the Contractor, and that such payments *will be deemed satisfactory compensation* by the Contractor."  Ex. M, Research Agreement at 5.

32.  **The wires, however, compromised whatever secrecy this routing might have achieved by being sent simultaneously from Hong Kong (the very location where Eastern now claims it assets had just been frozen under CCP influence), in the same sizable amounts, and to the same U.S. recipient.**  Ex. U (Wang Depo. 1 Ex. 7).

**RESPONSE**: Admitted that ACA wired the funds to Strategic from Hong Kong, but denied that the Research Agreement prohibited Eastern from wiring any payments called for under the Research Agreement from Hong Kong.  There is no such provision in the Research Agreement; instead, the only relevant provision is permissive and allows Eastern to pay Strategic through other entities, but does not require it— "the Client *may* direct other entities to pay the Contractor, and that such payments *will be deemed satisfactory compensation* by the Contractor." Ex. M, Research Agreement at 5.

33.  **Discovery later revealed that, several days after sending them, ACA asked its bank to reverse the wires.**  Wang Depo. 1, Ex. D, 107:13-20, 160:2-161:17; Ex. V (Wang Depo. 1 Ex. 8); Plt's First Interrog. Resp. Ex. M, p. 6, No. 13.  **The transfers already having been completed, ACA's request was declined.**  *Id.*  **ACA did not inform Strategic Vision of this attempt, has never made demand on Strategic Vision for return of the funds, and has never communicated to Strategic Vision about the Research Agreement or any other matter.** Wallop Aff., Ex. C, ¶ 7; Wang Depo. 1, Ex. D, 161:2-17; Wallop Depo., Ex. B, 192:20-194:16;

-28-

Plt's Third Interrog. Resp., Ex. T, p. 2, No. 1. **Nevertheless, Eastern Profit claims that its damages are "$1,000,000 for the $1,000,000 paid to Strategic Vision as a deposit under the Agreement."** Plt's First Interrog. Resp., Ex. M, p. 16, No. 7.

      **RESPONSE**: Admitted.  Eastern responds further as follows:  Eastern directed ACA to reverse the wires because ACA unintentionally wired the $1 million deposit to Strategic before the Research Agreement was signed.  The deposit was paid by ACA on Eastern's behalf, as explicitly allowed for under the Agreement.  Ex. M, Research Agreement at 5 ("[Eastern] may direct other entities to pay [Strategic], and that such payments will be deemed satisfactory compensation by [Strategic].").  Indeed, as part of contract negotiations, Ms. Wallop requested that Eastern provide a $1 million deposit under the Research Agreement.  Ex. F, Wallop I Tr. at 108:5-109:18, 192:09-194:16.  On December 29, 2017, to fund the deposit contemplated by the parties, Eastern borrowed $1 million from ACA Capital Group Limited.  Ex. E, C. Han Tr. at 124:14-129:2; Ex. L, ACA Loan Agreement, EASTERN-000278.  On January 2, 2018, as negotiations were wrapping up, but before the parties signed the Research Agreement, Eastern caused the $1 million deposit to be wired to Strategic through ACA. *Id.*; Ex. F, Wallop I Tr. at 192:09-194:16.   Strategic received the $1 million.  Ex. A, Answer at 4 ¶ 17; Ex. F, Wallop I Tr. at 192:09-194:16; Ex. H, Waller I Tr. at 157:9-22; Ex. I, Waller II Tr. at 91:14-94:6.  Strategic understood that the $1 million payment from ACA was the deposit that the parties had previously discussed.  Ex. F, Wallop I Tr. 192:09-194:16; Ex. I, Waller II Tr. at 91:23-94:6.  Strategic has acknowledged that it accepted the $1 million deposit and purported to utilize it to cover the expenses associated with the investigation called for under the Research Agreement.  Ex. A, Answer at 4 ¶ 17; id. at 28 ¶ 23; Ex. F, Wallop I Tr. at 246:16-247:23; Ex. H, Waller I Tr. at 157:9-22; Ex. I, Waller II Tr. at 66:10-16, 93:22-94:6.

34.      **Attempts to involve ACA in discovery were unsuccessful.  ACA's sole director (Karin Maistrello, a U.S.-based employee of GSNY) accepted hand delivery of a Fed. R. Civ. P. 45 deposition subpoena directed to ACA but then, through counsel she shared with Guo and with his entity, GSNY (Dkt. 213, 4:5-10, Dkt. 195), took the position that the service was ineffective on ACA because she had resigned as a director within 48 hours after Strategic Vision had given the required pre-service notice of intent to Eastern Profit.**  Aug. 23, 2019 "Maistrello Depo.," Ex. W, 27:9-25, 28:1-29:5, 30:1-32:10; Ex. 6 to Maistrello Depo.; Dkt. 177-Exs. 3, 1.  **Maistrello testified that she resigned her directorship after learning from Daniel Podhaskie, counsel GSNY (her employer and Eastern Profit's agent for purposes of this litigation), that she was about to be served with a subpoena in her capacity as an ACA director.**  Maistrello Depo., Ex. W, 55:12-57:20 ("Q. What did you do after you were served with this subpoena? MS. TESKE: Object if the form. You can answer it. A. I gave it to our lawyer. Q. Who was that? A. Daniel Podhaskie.") and Ex. X (Maistrello Depo Ex. 3).

**RESPONSE**:  Objection.  Counsel's attempts at discovery are not material facts pertinent to resolution of this matter, including at the summary judgment stage.

35.      **Eastern Profit also opposed discovery into ACA, calling it "entirely collateral to the claims and defenses at issue in this litigation …."  (Dkt. 203, p. 2)  Guo, through the same counsel as GSNY and Maistrello (Dkt. 158, p. 1, opposing discovery into GSNY, Dkt. 195), opposed discovery into ACA, claiming it was "an attempt to harass and provoke" him and that "Strategic should not be entitled to such overreaching discovery from multiple non-parties." (Dkt. 150, p. 2)  Counsel for ACA never appeared in the case.**

**RESPONSE**:  Objection.  Counsel's attempts at discovery are not material facts pertinent to resolution of this matter, including at the summary judgment stage.

36.     **The Research Agreement was signed January 6, 2018 (Wallop Aff., Ex. C, ¶ 4)**
**but the effective date was January 16, 2018.**  Wang Depo. 1, Ex. D, 139:4-17; Ex. S (Ex. 6 to
Wang Depo. 1), p. 1 ("Eastern agreed to delay the start of the contract by 10 days, from January 6
to January 16."); Dkt. 93, p. 4, ¶ 19.  **In early January 2018, Waller travelled to Europe and**
**the Middle East and engaged independent research contractors, including trusted**
**Chinese/English translators and a team lead there.**  Wallop Depo., Ex. B, 115:7-118:10, 82:21-
83:23, 130:4-131:13, 71:5-73:4, 74:17-76:6, 77:25-79:23; Waller Depo., Ex. L, 74:14-77:1, 29:10-
19, 41:5-42:18.  **This effort cost at least $200,000, done on an expedited basis.**  *Id.*; S.V. Depo.,
Ex. K, 72:4-73:2, 74:10-76:6; S.V. Depo. Ex. 104 (Ex. Y).

        **RESPONSE**: As to the first sentence, admitted.  Eastern further responds that the
parties signed the agreement in Virginia (Ex. A, Answer at 2-3, ¶¶ 6-7; id. at 28 ¶ 23).  As to
second and third sentences, denied.  Strategic has not provided documentary evidence to support
its self-serving testimony.

37.     **Before the contractors could begin their work, Eastern Profit had to identify**
**the subjects to be researched.**  R. Agreement, Ex. J, p. 1; Wallop Depo., Ex. B, 83:24-84:7,
85:10-86:11; S.V. Depo., Ex. K, 131:1-132:9, 132:15-133:11.  **Instead, Eastern Profit provided**
**unencrypted (and thus vulnerable) flash drives infected with malware that attacked the**
**computer used to open it.**  Wallop Depo., Ex. B, 174:9-176:18, 198:11-199:1, 200:10-202:2,
207:25-208:13, 114:3-115:6, 85:10-17, 114:8-115:6.  **The flash drives were inoperable and**
**Eastern Profit did not fully correct the problem when Wang delivered three more flash**
**drives to Strategic Vision, also unencrypted.**  *Id.*  **One flash drive was working and safe, and**
**it contained 92 names.**  *Id.* and 127:14-128:23. **The number of initial subjects was increased**

**by agreement to 15 from 10.**  S.V. Depo., Ex. K, 129:7-17, 82:4-20, Wallop Depo., Ex. B, 281:19-282:13.

      **RESPONSE**:  Strategic denies it ever agreed to the hiring of subcontractors.  *See* Ex. M, Research Agreement.  The second and third sentences are also denied.  Wang I Tr. at 236-240.  The remainder of the paragraph is admitted.

      38.    **Later, in February, Strategic Vision made arrangements with Allied Special Operations Group ("ASOG"), based in Texas, to research the 15 subjects being examined overseas.**  Wallop Depo., Ex. B, 232:7-234:13; Wallop Aff., Ex. C, ¶ 8; S.V. Depo., Ex. K, 100:16-102:16.

      **RESPONSE**:  Denied.  There is no admissible evidence of a contract between Strategic and ASOG, or that ASOG performed any work for Strategic.

      39.    **ASOG determined that the subjects were designated by the U.S. government as "Records Protected"—information concerning the subjects' status and activities was not accessible through legal means.**  Wallop Depo., Ex. B, 232:7-238:20, 239:16-241:4, 285:12-288:24; S.V. Depo., Ex. K, 100:16-103:25, 105:6-108:21.  **The purpose of the designation was to ensure that no one, including the individuals themselves, could learn information that would help them determine they were under investigation.**  S.V. Depo., Ex. K, 106:15-107:7.  **According to ASOG, trying to research subjects known to be "Records Protected" could be a criminal activity.**  *Id.*; S.V. Depo., Ex. K, 100:16-102:16, 106:15-108:21.

      **RESPONSE**:  Objection. Strategic has not provided any admissible evidence in support of this factual averment as required by Local Rule 56.1(d).  Strategic has not cited any admissible evidence demonstrating that certain of the individuals on the Subject List were allegedly designated by the federal government as "records protected," substantiating what the so-

called "records protected" designation even means, or why that purported "records protected" designation precludes an investigation into the individuals subject to that designation. Eastern was not able to cite any statutory authority defining the concept of "records protected" or its implications. Even if Eastern had come up with such substantiation, it is at best a partial excuse—relating only to four or five individuals on the Subject List—for its failed performance; to be sure, Strategic has not cited to any admissible evidence to the contrary.

Instead, Strategic relies solely upon inadmissible hearsay. In an effort to show that certain of the individuals on the Subject List were "records protected," whatever that might mean, Strategic points to deposition testimony of Ms. Wallop and Mr. Waller , in which they claim that members of a Texas-based investigation group called Allied Special Operations Group ("ASOG") told them that certain individuals on the Subject List were "records protected." *See* Dkt. No. 266 at 13. Strategic does not cite to any deposition testimony by the ASOG members (because there is none) or submit an affidavit from those members. Having failed to obtain discovery from Strategic's own subcontractors, Strategic cannot now utilize inadmissible hearsay statements attributed to those subcontractors to prove a claim that Eastern somehow frustrated Strategic's performance.

40.     **ASOG's conviction was so strong that it withdrew a bill to Strategic Vision for $111,700.** S.V. Depo., Ex. K, 105:6-20, 106:15-108:21; Ex. 105 to S.V. Depo., Ex. K. **ASOG instead received $5,412 for finding the "Records Protected" designation.** *Id.*; S.V. Depo., Ex. K, 109:12-110:17, 81:15-17.

RESPONSE:  Objection.  See Response to ¶ 39.  By way of further response, there is no foundation for any testimony from Strategic Vision as to what ASOG's conviction may have

been or why it billed the amounts it allegedly did, and any such testimony would be hearsay in any event.

41.   **Strategic Vision did not receive any subject names before entering the Agreement and had no way of anticipating that the third parties conducting the research would encounter this circumstance.**   Wallop Depo., Ex. B, 83:24-84:7, 85:10-86:11, 174:4-8, 175:3-176:18.   **Prior to this, Strategic Vision had not heard of the designation.**   Wallop Aff., Ex. C, ¶¶ 8.

**RESPONSE**:   Objection.  See Response to ¶ 39.   To the extent an answer is required, denied.  If Strategic was licensed to provide the services it agreed to provide and had the expertise it claims it has, and if "records protected" stats were a term of art in the private investigation/intelligence field, Strategic would have known about the so-called "records protected" designation.

42.   **Nevertheless, Guo angrily refused to discuss the "Records Protected" problem when Strategic Vision notified him.**   Wallop Depo., Ex. B, 139:17-140:23, 285:12-288:24, 136:13-20; S.V. Depo., Ex. K, 100:16-102:16.   **He then demanded that Strategic Vision turn over all work done by its contractors, despite many protests by Strategic Vision that it was impossible for the researchers to work faster and have final reports ready in a matter of days.**   Wallop Depo., Ex. B, 230:2-232:13, 285:12-288:24, 139:17-140:23; S.V. Depo., Ex. K, 112:11-116:17, 127:24-129:6; Waller Depo., Ex. L, 56:19-25, 93:20-95:10.   **The Agreement did not require, and no party could physically provide, immediate results; what Guo now inexplicably demanded on a rush basis was contrary to the Agreement.**   Wang Depo. 1, Ex. D, 154:6-23; R. Agreement, Ex. J; Gertz Depo., Ex. E, 141:4-17.

**RESPONSE**: Objection. See Response to ¶ 39.  Denied.  The weekly deliverables called for under the Research Agreement were due by no later than mid-January 2018.  Ex. M, Research Agreement at 1-3.  Strategic did not meet the contractual deadline.  Rather, Strategic delivered its first USB drive to Eastern pursuant to the Research Agreement on January 26, 2018.  Ex. A Answer at 35 ¶ 45; Ex. H, Waller I Tr. at 201:10-202:13; Ex. G, Wallop II Tr. at 16:12-17; Ex. I, Waller II Tr. at 6:2-8, 112:7-114:10.  That drive did not, however, comply with the terms of the Research Agreement; indeed, Strategic has admitted that the information contained on that drive was "of no use to Guo or Eastern Profit because it was nothing more than the researchers' own work to familiarize themselves with the fifteen subjects using open-source information."  Answer at A at 35 ¶ 45; Ex. I, Waller II Tr. at 6:2-8, 112:7-114:10.  On January 30, 2018, Strategic delivered a second USB drive to Eastern Profit.  Answer at A at 28 ¶ 24; Ex. G, Wallop II Tr. at 16:12-17; Ex. H, Waller I Tr. at 211:3-215:16; Ex. I, Waller II Tr. at 115:9-116:17.  That USB drive, like the first, failed to comply with the terms of the Research Agreement; as admitted by Strategic, the drive contained "incomplete work product . . . in the form of raw research data" that was not "of any use" to Eastern.  Ex I, Waller II Tr. at 114:23-115:8.  Strategic did not deliver any other USB drives to Eastern.   Consequently, Strategic failed to provide to Eastern any of the required deliverables.  Ex I, Waller II Tr. at 6:2-8, 98:8-114:10; Ex. K, L. Han Tr. at 160:10-19, 264:9-265:20, 275:15-279:17.   It never delivered any "financial forensic [h]istorical research" called for under the Research Agreement.  Ex I, Waller II Tr. at 6:2-8, 98:8-100:3.  It did not deliver to Eastern any "current tracking research" called for under the Research Agreement.  Ex I, Waller II Tr. at 6:2-8, 100:4-111:20.  It also failed to deliver to Eastern any "social media research" called for under the Research Agreement.   Ex I, Waller II Tr. at 6:2-8, 112:7-114:10.  In fact, Strategic has admitted that it "was unable to prepare any [of the] detailed reports" called for under

the Research Agreement.    Ex D, Strategic's Responses and Objections to Eastern's First Interrogatories, Response to Interrogatory No. 8 (emphasis added).  As a result, on February 23, 2018, Eastern wrote to Strategic terminating the Research Agreement.  Ex A, Answer at 6 ¶ 28; Ex I, Waller II Tr. at 91:9-13; Ex. N, Termination Letter, EASTERN-000198.  In its letter, Eastern demanded that Strategic return the $1 million deposit.  Ex. A, Answer at 6 ¶ 28; Ex. N, Termination Letter, EASTERN-000198.    Strategic has refused to do so.  *Id.*

43.    **Attempting to keep the project alive, Waller nevertheless made immediate travel plans and flew overseas, met with the research team leader, and returned to New York.**  S.V. Depo., Ex. K, 127:24-129:6.  **On or about January 26th or 30th, 2018, less than two weeks after Strategic Vision began its work under the Agreement, Waller delivered to Wang an initial tranche of raw data.**  S.V. Depo., Ex. K, 112:11-116:17, 127:24-129:6; Wallop Depo., Ex. B, 243:14-244:4, 285:12-288:24, 136:13-15.  **Strategic Vision repeatedly cautioned it would be of no independent use to Guo because it was simply the researchers' own work to familiarize themselves with the initial subjects using open-source information.**  S.V. Depo., Ex. K, 112:11-116:17 ("That was their own basic work.  So the only report, in quotes, that we provided as a deliverable was showing how the research team was setting up its methodology to collect this data") and 127:24-129:6.

RESPONSE:  Eastern has no basis to refute Waller's contention that he flew overseas, met with someone, and returned to New York, but lacks knowledge as to precisely why he did that or the identity of the person he allegedly met (Waller has refused to provide such information, Waller II Tr. at 74-75)  Eastern responds further that Strategic was required under the terms of the Research Agreement to begin providing the deliverables called for under the Research

Agreement by no later than mid-January 2018.  Ex. M, Research Agreement at 1-3.   As set forth in the prior response, Strategic failed to meet that deadline.

44.     **Even though Strategic Vision, through Waller, had made extraordinary efforts to accommodate Guo's unreasonable demands under the contract, Eastern Profit would not provide any guidance about the "Records Protected" designation and what it meant for the future of the research on the first 15 subject names.**  S.V. Depo., Ex. K, 101:11-103:25, 105:21-107:11.  **Nor did Eastern Profit simply move its focus from the initial 15 subject to another 15 within the 92 subject names on the flash drives delivered by Eastern Profit back on January 8, 2018.**

**RESPONSE**:  Objection. *See* Response to ¶ 39.

45.     **Although the Agreement provided for a look-back after three months to compare the deliverables with the amounts paid, and also provided for "'30 days' written notice," Eastern Profit terminated the Agreement only 5 weeks after the January 16, 2018 start date, claiming it was effective immediately.**  R. Agreement, Ex. J.  **Eastern's February 23, 2018, termination letter also demanded "a full and complete refund of the $1 million deposit."**  Wang Depo. 1, Ex. D, 135:16-141:16; Ex. S (Ex. 6 Wang Depo. 1), p. 1; Wallop Depo., Ex. B, 241:6-8, 242:19-243:3; Wang Depo. 2, Ex. I, 211:12-212:15.  **The Agreement contained no provision for return of the monthly fee or deposit if Eastern Profit was dissatisfied with Strategic Vision's work and, in fact, required Eastern Profit to make a monthly $750,000 payment, starting in January.**  R. Agreement, Ex. J.  **Neither Eastern nor ACA ever made even that first monthly $750,000 payment.**  Wang Depo. 1, Ex. D, 58:6-18.  Eastern admitted nothing in the contract required Strategic to return the $1 million at the end of the contract, nor had Strategic made such a representation to Eastern Profit**.** Wang Depo. 1, Ex. D, 198: 8-201:14-

21. **Regardless, Eastern Profit's counsel demanded Strategic "return" the $1 million (*via* wire to ACA, not Eastern).** Ex. S (Ex. 6 to Wang Depo. 1), p. 2 ("Beneficiary Acct. Name:  ACA Capital Group Limited").  **Strategic Vision did not comply.**  Dkt. 93, p. 5, ¶ 29.

> **RESPONSE**:   As to the first sentence: denied that the Research Agreement provided for any "look-back" period, Ex. M, Research Agreement; admitted that the Research Agreement provided for termination upon 30-days written notice; and admitted that Eastern terminated the Research Agreement on February 23, 2018, Ex A, Answer at 6 ¶ 28; Ex I, Waller II Tr. at 91:9-13; Ex. N, Termination Letter, EASTERN-000198.

> As to the second sentence, admitted.

> As to the third sentence, denied.  The Research Agreement explicitly states that "[t]he deposit will be credited on a prorated basis to the final 1-1/3 (1.3) months of the contract" and was not meant to be a signing bonus.   Ex. M, Research Agreement at 5; Ex. A, Answer at 2 ¶ 6; Ex. A, Answer at 4 ¶ 17; Ex. I, Waller II Tr. at 91:23-94:6.   Thus, if Strategic failed to provide the deliverables under the Research Agreement, which it did, the deposit was to be returned to Eastern.  Ex. M, Research Agreement at 5; Ex. A, Answer at 2 ¶ 6; Ex. A, Answer at 4 ¶ 17; Ex. I, Waller II Tr. at 91:23-94:6.

> As to the fourth sentence, admitted that Eastern did not pay or direct any other entity to pay Strategic any other monies because payment was only required under the Research Agreement if Strategic properly performed its obligations thereunder, which Strategic failed to do. Objection. *See* Response to ¶ 42.

> As to the fifth and sixth sentences, admitted.

46.   **The Agreement guaranteed Strategic Vision a period of time to provide its services that ran from the agreed start date of the arrangement (January 16, 2018) (to 30**

**days after the February 23, 2018 termination, and Eastern's no-notice termination meant that Strategic Vision lost the opportunity to make $1,596,774.25.** R. Agreement, Ex. J, pp.3-4; Wallop Depo., Ex. B, 246:25-247:7.

| Period | Number of Days | Per Diem | Total |
|---|---|---|---|
| **January 16-31** | **15** | **$24,193.55** | **$362,903.25** |
| **February 1-28** | **N/A** | **N/A** | **$750,000.00** |
| **March 1-21** | **20** | **$24,193.55** | **$483,871.00** |
| | | | **$1,596,774.25** |

        **RESPONSE**:  Objection.  Calls for legal conclusion.  To the extent an answer is required, denied.  As specified in the Research Agreement, Eastern agreed to pay Strategic for each deliverable that Strategic completed in accordance with the terms of the Research Agreement; if no deliverables were provided, Eastern had no obligation to pay Strategic under the Research Agreement.  *See* Response to ¶ 42.

        47.     **Not only did Eastern Profit fail to pay these amounts, its February 23, 2018 termination prevented Strategic Vision from performing through the contractually-guaranteed look-back period scheduled for April 16, 2018, resulting in a loss of at least $100,000 in profits for the roughly three-week period between March 21 and April 16.**  Wallop Aff., Ex. C, ¶ 10; Ex. S (Ex. 6 to Wang Depo. 1); R. Agreement, Ex. J, pp.3-4.

        **RESPONSE**:  Denied.  As specified in the Research Agreement, Eastern only agreed to Eastern agreed to pay Strategic for each deliverable that Strategic completed in accordance with the terms of the Research Agreement; if no deliverables were provided, Eastern had no obligation to pay Strategic under the Research Agreement.  *See* Response to ¶ 42.  By way of further response, Eastern has provided no evidence substantiating its claim for $100,000 in lost profits.

48.     **While Eastern's Complaint claims special fraud damages—"los[ing] three months" of investigation time and to need to "find another" investigator (Dkt. 93, ¶ 45)—it was unwilling or unable to testify that it ever undertook such efforts.**  Wang Depo. 1, Ex. D, 155:24-156:4, 157:7-13, 157:18-24.

   **RESPONSE**:  Denied.  Strategic Vision itself claims that Eastern hired other researchers.  Waller II Tr. at 118:16-119:3.

49.     **In the end, this three-year contract, intended to advance Guo's purported goal of helping to topple the CCP regime in China to the benefit of the Chinese people, lasted just five weeks.**  R. Agreement, Ex. J, p. 5; Ex. S (Ex. 6 to Wang Depo. 1), p. 1; Guo Depo. 1, Ex. F, 45:3-46:16; Wallop Depo., Ex. B, 88:3-89:22; Wang Depo. 2, Ex. I, 197:18-208:22, 202:2-204:20, 149:5-150:9.

   **RESPONSE**:  Admitted that Eastern terminated the Research Agreement because Strategic failed to perform its obligations thereunder.  *See* Response to ¶ 42.

50.     **Chunguang Han claims to have purchased all of Eastern Profit for $1,000 HK in late 2014.**  Chunguang Depo., Ex. G, 50:17-22, 56:4-14.  **He became and remained the sole director of Eastern Profit until he transferred ownership to Guo Mei (Guo Wengui's daughter**, Chunguang Depo., Ex. G, 35:5-12) **on June 28, 2017.**  *Id*. at 59:5-60:8, 70:5-9, 102:2-18.

   **RESPONSE**:  Admitted.

51.     **Han claims that during his directorship and while he was in Hong Kong, he trusted a Chinese woman, known only as Natasha Qu (he testified that he never knew her "official" last name or Chinese name), to run whatever it is that Eastern Profit did.**

Chunguang Depo., Ex. G, 53:20-55:3.  **Han did not know who she was working for at the time he turned over Eastern's operations to her.**  *Id*. at 66:21-68:8.

    **RESPONSE**:  As to the first sentence, admitted.  As to the second sentence, denied that C. Han "turned over Eastern's operations" to Natasha Qu.  Rather the cited testimony makes clear that Natasha Qu merely assisted C. Han.  C. Han. Tr. at 67:9-16 ("At the time I was the boss of Eastern Profit, I authorized Natasha to handle a lot of stuff in Hong Kong for me.").

    52.    **In June of 2017, Eastern Profit's only asset—its Hong Kong bank account— was frozen.**  Chunguang Depo., Ex. G, 87:3-88:20; Dkt. 203-2.  **Natasha reported this to Han** (*Id*. at 72:3-12), **left, and no one replaced her in Hong Kong.**  Chunguang Depo., Ex. G, 71:6-9.

    **RESPONSE**:  Objection.  Irrelevant, prejudicial.  To the extent an answer is required, denied as the cited testimony makes clear that by that point C. Han sold his interest in Eastern to Guo Mei and was no longer the owner and director of Eastern Profit.

    53.    **By about this point, Han was in New York; he says has been there since at least June of 2017.**  Chunguang Depo., Ex. G, 13:6-14:2; 17:21-18:3; Wang Depo. 1, Ex. D, 26:24-27:23.

    **RESPONSE**:  Admitted, except the cited testimony also makes clear that by that point C. Han sold his interest in Eastern to Guo Mei and was no longer the owner and director of Eastern Profit.

    54.    **Han claims that, once in New York, he was orally authorized by its new director, Guo Mei (Guo Wengui's daughter), to act as Eastern Profit's agent.**  Chunguang Depo., Ex. G, 43:11-44:22; 47:11-16; 102:2-104:11.  **Han, in turn, says he orally authorized Wang to handle everything related to an investigation of Chinese officials.**  *Id*. at 46:2-12; 84:22-86:16. **The purpose of that investigation, Han says, was to "expose the Chinese**

government's corruption and it will give me an opportunity to get my asset back." *Id*. at 91:24-92:3.  **Han gave Wang "full authorization" for the work, understanding that the contract would be in the U.S.**  *Id*. at 92:17-24.  **Starting in 2017, from New York, Han— still, purportedly, as Eastern Profit's orally-appointed agent—reported back to Guo Mei.**  *Id*. at 47:17-48:18.

RESPONSE:  Admitted.

55.     **Eastern has no remaining Hong Kong business.  Its address had been the 49th Floor of the Bank of China Tower in Hong Kong.**  Chunguang Depo., Ex. G, 58:14-59:4.  **Han Chunguang was last there "several years ago."**  *Id*.  **Eastern Profit's only claimed business anywhere in the world since the asset freeze is in New York: Han's alleged delegation of authority to Yvette Wang, GSNY, and Guo to research Chinese officials.**  *Id*. at 43:21-44:22.

RESPONSE:  Objection.  Calls for legal conclusion.  To the extent an answer is required, denied.  Strategic has not asserted any facts suggesting that Eastern conducted business in New York.  Strategic claims that Eastern must register to do business in New York because (i) some of the negotiations regarding the Research Agreement occurred in New York, (ii) C. Han signed the ACA Loan Agreement in New York, and (iii) C. Han signed the Power of Attorney authorizing GSNY to handle this litigation for Eastern in New York. Dkt. No. 266 at 16-18.  These contacts are precisely the type of "casual" or "occasional" interactions that do not constitute doing business in New York, and they certainly do not rise to the level of the "systematic and continuous" activity necessary to be deemed doing business in New York.  That is so, especially when one considers the facts Strategic omitted from its discussion, including (i) the fact that the Research Agreement—a contract between a Hong Kong company (Eastern) and a Nevada limited liability company based in Virginia (Strategic)—was drafted, signed, and principally negotiated in

Virginia, (ii) the fact that the ACA Loan Agreement is between two Hong Kong companies (Eastern and ACA), governed by Hong Kong law, and contains a Hong Kong forum-selection clause, and (iii) the fact that the Power of Attorney was entered into with GSNY, a company that is duly-authorized to operate in New York. Ex. A, Answer at 1-3, 28 ¶¶ 2, 6-8, 23; Ex. B, Strategic's Admissions, ¶¶ 20-25; Ex. F, Wallop I Tr. at 108:5-109:18; Ex. L, ACA Loan Agreement, EASTERN-000278; Exhibit O to Strategic's Memorandum (Dkt. No. 266).  In short, Eastern does not conduct business in New York.

56.    **Han claims to have been compensated for his work for Eastern Profit before he left Hong Kong, and "believe[s] when the company's asset is unfreeze one day, I will receive some compensation" for his work for Eastern Profit in New York.** Chunguang Depo., Ex. G, 78:17-23.

RESPONSE:   Denied.   The cited testimony does not support Strategic's contention.  C. Han did not testify that he conducted any business on behalf of Eastern in New York, let alone that he will be paid for any actions he took in New York.  Strategic has therefore failed to cite any evidence in support of the factual averment in paragraph 56 as required under Local Rule 56.1(d).

57.    **Han continued to work on Eastern Profit's business in New York after making what he testified was his oral delegation of authority to Wang to use research to recover Eastern Profit's allegedly frozen assets.  In December 2017, Han claims to have met with William Je in New York several times to negotiate and execute a "loan" for $1 million.** Chunguang Depo., Ex. G, 133:13-134:8.  **In 2018, Han conferred with Wang at her office at 800 Fifth Avenue and signed a Power of Authority authorizing the company of which Wang**

-43-

**is the CEO, GSNY, to continue to handle the research into Chinese officials, including any related litigation, (*i.e.*, this very case).** *Id.*, 109:12-111:22 and Ex. O (Chunguang Ex. 32).

        **RESPONSE**: Denied. The cited testimony does not support Strategic's contention. C. Han did not testify that he conducted any business on behalf of Eastern in New York. Strategic has therefore failed to cite any evidence in support of the factual averment in paragraph 56 as required under Local Rule 56.1(d). In fact the ACA Loan Agreement referenced in paragraph 56 is a loan agreement between two Hong Kong companies, is governed by "the laws of the Hong Kong Special Administrative Region" and the parties thereunder agreed to submit to the "non-exclusive jurisdiction of the courts of the Hong Kong Special Administrative Region in relation to any disputes . . . arising out of or in connection with [the ACA Loan Agreement]."

        58.    **Wang also claims she was responsible for dealing with Eastern Profit's purported New York-executed loan after having first learned of it in 2018** (Wang Depo. 2, Ex. I, 63:22-64:14); **she claims she met with ACA representative William Je in New York in 2018 to discuss Eastern Profit-ACA business.** Wang Depo. 2 Ex. I, 45:25-47:25. **Han met again with Wang at 162 E. 64th Street in New York City, GSNY's current address and also the office of Guo, to discuss the purported "loan" ACA made to Eastern Profit.** Chunguang Depo., Ex. G, 34:6-17; 38:18-39:15. **Finally, Eastern Profit testified that Guo (who has remained in New York) also served as Eastern Profit's agent in connection with the loan from ACA, and also conferred with Je about the loan.** Wang Depo. 2, Ex. I, 126:2-17. **Eastern Profit also admits that Guo, again, in New York, acted as its representative in negotiating the contract.** Dkt. 142, p. 2, ¶¶ 3-4; Dkt. 127, pp. 20-21, ¶¶ 3-4.

        **RESPONSE**: Admitted.

59. **Continuing into 2019, Eastern Profit continued to operate out of New York. Wang (Eastern Profit's agent) met with Eastern Profit's sole director, Guo Mei (Guo's daughter), in New York to confer regarding the investigation.** Wang Depo. 2, Ex. I, 25:8-28:13.

RESPONSE: Denied on the basis that Eastern cites no evidence suggesting that Eastern "operates" out of New York. At all times, Eastern remained a Honk Kong company with its principal place of business in Hong Kong. Ex. A, Strategic's Answer at 20 ¶ 3; Ex. B, Strategic's Admissions; Ex. C, Eastern Answer to Strategic's Counterclaim at 1 ¶ 3; Ex D, Strategic's Responses and Objections to Eastern's First Interrogatories.

60. **In the end, this three-year contract, which Guo claimed he would use to advance his purported goal of toppling the CCP regime in China to the benefit of the Chinese people, was terminated by Eastern after just five weeks.** R. Agreement, Ex. J, p. 5; Ex. S (Ex. 6 to Wang Depo. 1), p. 1; Guo Depo. 1, Ex. F, 45:3-46:16; Wallop Depo., Ex. B, 88:3-89:22; Wang Depo. 2, Ex. I, 197:18-208:22, 202:2-204:20, 149:5-150:9.

RESPONSE: Admitted only that Eastern terminated the Research Agreement because Strategic failed to perform its obligations thereunder. As specified in the Research Agreement, Eastern only agreed to pay Strategic for each deliverable that Strategic completed in accordance with the terms of the Research Agreement; if no deliverables were provided, Eastern had no obligation to pay Strategic under the Research Agreement. Ex. M, Research Agreement at 1-3; Ex. A, Answer at 2 ¶ 6; Ex. G Wallop II Tr. at 35:5-36:5, 42:15-44:12, 47:6-11, 49:21-50:17 ("Q. So the pricing was based per unit, correct? A. Yes."; "Q. . . . When you were in the meeting talking about this document, the idea was that pricing would be tied to units? A. My understanding, that's correct."). As it has admitted, Strategic failed to provide any deliverables.

The weekly deliverables called for under the Research Agreement were due by no later than mid-January 2018.  Ex. M, Research Agreement at 1-3.   Strategic did not meet the contractual deadline.   Rather, Strategic delivered its first USB drive to Eastern pursuant to the Research Agreement on January 26, 2018.   Ex. A Answer at 35 ¶ 45; Ex. H, Waller I Tr. at 201:10-202:13; Ex. G, Wallop II Tr. at 16:12-17; Ex. I, Waller II Tr. at 6:2-8, 112:7-114:10.   That drive did not, however, comply with the terms of the Research Agreement; indeed, Strategic has admitted that the information contained on that drive was "of no use to Guo or Eastern Profit because it was nothing more than the researchers' own work to familiarize themselves with the fifteen subjects using open-source information."  Answer at A at 35 ¶ 45; Ex. I, Waller II Tr. at 6:2-8, 112:7-114:10.   On January 30, 2018, Strategic delivered a second USB drive to Eastern Profit.   Answer at A at 28 ¶ 24; Ex. G, Wallop II Tr. at 16:12-17; Ex. H, Waller I Tr. at 211:3-215:16; Ex. I, Waller II Tr. at 115:9-116-17.   That USB drive, like the first, failed to comply with the terms of the Research Agreement; as admitted by Strategic, the drive contained "incomplete work product . . . in the form of raw research data" that was not "of any use" to Eastern.   Ex I, Waller II Tr. at 114:23-115:8.   Strategic did not deliver any other USB drives to Eastern.    Consequently, Strategic failed to provide to Eastern any of the required deliverables.   Ex I, Waller II Tr. at 6:2-8, 98:8-114:10; Ex. K, L. Han Tr. at 160:10-19, 264:9-265:20, 275:15-279:17.    It never delivered any "financial forensic [h]istorical research" called for under the Research Agreement.   Ex I, Waller II Tr. at 6:2-8, 98:8-100:3.  It did not deliver to Eastern any "current tracking research" called for under the Research Agreement.   Ex I, Waller II Tr. at 6:2-8, 100:4-111:20.   It also failed to deliver to Eastern any "social media research" called for under the Research Agreement.    Ex I, Waller II Tr. at 6:2-8, 112:7-114:10.   In fact, Strategic has admitted that it "was unable to prepare any [of the] detailed reports" called for under the Research Agreement.   Ex D, Strategic's Responses and Objections

to Eastern's First Interrogatories, Response to Interrogatory No. 8 (emphasis added).  As a result,

on February 23, 2018, Eastern wrote to Strategic terminating the Research Agreement.  Ex A,

Answer at 6 ¶ 28; Ex I, Waller II Tr. at 91:9-13; Ex. N, Termination Letter, EASTERN-000198.

In its letter, Eastern demanded that Strategic return the $1 million deposit.  Ex. A, Answer at 6 ¶

28; Ex. N, Termination Letter, EASTERN-000198.    Strategic has refused to do so.  *Id.*

## ADDITIONAL FACTS

In addition to the facts set out in each of the foregoing responses, Eastern hereby

incorporates each and every factual averment set forth in the Local Rule 56.1 Statement that it

submitted in connect with its Motion for Summary Judgment as if set forth fully and completely

herein.  *See* Dkt. No. 262.

Dated:  April 6, 2020

Respectfully submitted,

*/s/ Francis J. Lawall*

OF COUNSEL:                          Francis J. Lawall (NY Bar ID No. FL1234)
                                     PEPPER HAMILTON LLP
Joanna J. Cline (*Pro Hac Vice*)     3000 Two Logan Square
Christopher B. Chuff (*Pro Hac Vice*) Eighteenth and Arch Streets
PEPPER HAMILTON LLP                  Philadelphia, PA 19103
1313 North Market Streets, Suite 5100 215.981.4000
Wilmington, DE 19801                 215.981.4750 (facsimile)
302.777.6500
302.421.8390 (facsimile)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 6th day of April 2020, a true and correct copy of the

foregoing *Plaintiff's Response to Defendant's Local Rule 56.1 Statement* was filed electronically.

Notice of this filing will be sent to all registered parties by operation of the Court's electronic filing

system.

Dated:  April 6, 2020

Respectfully submitted,

*/s/ Francis J. Lawall*

OF COUNSEL:

Joanna J. Cline (Admitted *Pro Hac Vice*)
Christopher B. Chuff (Admitted *Pro Hac Vice*)
PEPPER HAMILTON LLP
1313 North Market Streets, Suite 5100
Wilmington, DE  19801
302.777.6500
302.421.8390 (facsimile)

Francis J. Lawall (NY Bar ID No. FL1234)
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA  19103
215.981.4000
215.981.4750 (facsimile)