**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **EASTERN PROFIT CORPORATION LIMITED,** | ) | |
| | ) | |
| | ) | |
|     **Plaintiff/Counterclaim Defendant,** | ) | |
| | ) | **Case No. 18-cv-2185** |
|     **v.** | ) | |
| | ) | |
| **STRATEGIC VISION US, LLC,** | ) | |
| | ) | |
|     **Defendant/Counterclaim Plaintiff.** | ) | |
| _____ | ) | |

**DEFENDANT STRATEGIC VISION'S CONSOLIDATED MEMORANDUM OF
LAW IN OPPOSITION TO EASTERN'S MOTION FOR SUMMARY JUDGMENT
AND IN SUPPORT OF ITS CROSS-MOTION AGAINST EASTERN**

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iii

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ................................................................................................. 2

> I.     SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR
> OF STRATEGIC ON EASTERN'S CLAIM FOR DECLARATORY
> JUDGMENT THAT THE RESEARCH AGREEMENT IS VOID ............. 16
>
>> A.    Contracts are Presumed Valid and Are Only Void on Public
>> Policy Grounds Where Illegality is "Clear and Certain" ................ 16
>>
>> B.    Virginia's Private Security Services Statute is Inapplicable ......... 17
>>
>> C.    Even if the Virginia Statute Applies, the Contract is Not Void ....... 21
>>
>> D.    If the Contract is Void, Eastern Cannot Recover Restitution ......... 22
>
> II.    STRATEGIC'S FRAUD CLAIM IS FOR THE JURY ..................... 24
>
>> A.    Strategic Reasonably Relied on Guo and His Associates ............ 24
>>
>> B.    Strategic Has Alleged Sufficient Facts to Show Scienter ............ 26
>>
>> C.    Guo's Statements Are False, and Provably So ..................... 27

CONCLUSION ............................................................................................................ 30

# TABLE OF AUTHORITIES

**CASES**                                                                                           **Page(s)**

*Abu Dhabi Commercial Bank. v. Morgan Stanley & Co. Inc.,*
    651 F.Supp.2d 155 (S.D.N.Y. 2009) ................................................................. 26

*Abu Dhabi Comm. Bank v. Morgan Stanley & Co. Inc.,*
    888 F.Supp.2d 478 (S.D.N.Y. 2012) ................................................................. 25

*Am.-LaFrance & Foamite Indus. v. Arlington Cty.,*
    169 Va. 1, 1, 192 S.E. 758 (Va. 1937) ............................................................. 23

*Brass v. Am. Film Technologies, Inc.,*
    987 F.2d 142 (2d Cir. 1993) ............................................................................. 27

*Broadview Chem. Corp. v. Loctite Corp,*
    417 F.2d 998 (2d Cir. 1969) ............................................................................. 16

*In re Brooklyn Navy Yard Asbestos Litig.,*
    971 F.2d 831 (2d Cir. 1992) ............................................................................. 17

*Center v. Sturgill,*
    2016 WL 10880215 (Va. Cir. Ct. August 4, 2016) ........................................... 17

*Cosmas v. Hassett,*
    886 F.2d. 8 (3d Cir. 1989) ................................................................................ 26

*Cullwell v. Huff,*
    50 Va. Cir. 180, 1999 WL 33722325 (Va. Cir. Ct. 1999) ............................ 22-24

*Dervin Corp. v. Banco Bilbao Vizcaya Argentaria, S.A.,*
    2004 WL 1933621 (S.D.N.Y. August 30, 2004) ............................................. 17

*Estes Express Lines, Inc. v. Chopper Express, Inc.,*
    273 Va. 358 (Va. 2007) .................................................................................... 17

*In re General Motors LLC Ignition Switch Litig.,*
    407 F. Supp.3d 212 (S.D.N.Y. 2019) ............................................................... 17

*HIS Acquis. XV, Inc. v. Kings Harbor Care Ctr.,*
    1999 WL 223152 (S.D.N.Y. April 16, 1999) .................................................. 21

*Joe O'Brien Investigations, Inc. v. Zorn,*
    263 A.D.2d 182 (3d Dep't N.Y. 1999) ............................................................. 22

*Lehman v. Lehman,*
    38 Va. App. 598, 567 S.E.2d 571 (Va. App. 2002) .................................................17

*Magnaleasing, Inc. v. Staten Island Mall,*
    563 F.2d 567 (2d Cir. 1977) ....................................................................................27

*Newman v. Light,*
    152 Va. 760 (1929) ..................................................................................................23

*Niemeyer v. Wright,*
    75 Va. 239 (Va. 1881) .............................................................................................21

*Northern Shipping Funds I, L.L.C. v. Icon Capital Corp.,*
    998 F.Supp.2d 301 (S.D.N.Y. 2014) .......................................................................25

*Rella v. N. Atl. Marine,*
    2004 WL 1418021 (S.D.N.Y. June 23, 2004) .........................................................23

*Shaarei Arazim of Monsey v. Horowitz,*
    2013 WL 3305770 (S.D.N.Y. June 24, 2013) .........................................................25

*Siben V. American Airlines, Inc.,*
    913 F.Supp. 271 (S.D.N.Y. 1996) ...........................................................................26

*STMicroelectronics, N.V. v. Credit Suisse Securities (USA) LLC,*
    648 F.3d 68 (2d Cir. 2011) ......................................................................................25

*Taylor Thiemann & Aitken v. Hayes,*
    418 S.E.2d 897 (Va. 1992) ......................................................................................22

*U.S. v. Com. of Va.,*
    972 F. Supp. 1008 (E.D. Va. 1997) .........................................................................18

*Urban Protective Servs. v. Great Latin Rests., LLC,*
    2007 WL 1660374 (Va. Cir. Ct. Mar. 5, 2007) ......................................................20

*Virginia Public Service Co. v. Steindler,*
    166 Va. 686 (1936) ..................................................................................................23

*Vtech Holdings, Ltd. v. Pricewaterhouse Coorpers, LLP,*
    348 F.Supp.2d 255 (S.D.N.Y. 2004) .......................................................................27

*Wallihan v. Hughes,*
    196 Va. 117 (1954) ..................................................................................................17

*Watters & Martin v. Homes Corp.*,
    136 Va. 114 (1923) ................................................................................ 21, 22

*Woods v. Maytag Co.*,
    2010 WL 4314313 (E.D.N.Y. Nov. 2, 2010) .................................................. 27

*Zysk v. Zysk*,
    239 Va. 32, 34, 404 S.E.2d 721 (1990) ...................................................... 24

## STATUTES

VA. CODE ANN. § 9 ............................................................................................ 18

VA. CODE ANN. § 9.1-138 ............................................................................ 19, 24

VA. CODE ANN. § 9.1-139(A) ............................................................................ 24

VA. CODE ANN. § 9.1-140 .................................................................................. 21

VA. CODE ANN. § 9.1-147 ............................................................................ 19, 22

VA. CODE ANN. § 9.1-150 ............................................................................ 19, 22

## INTRODUCTION

Guo Wengui deceived Strategic Vision. He lied about his identity as a dissident and his supposed plan to publicize Strategic's research, disrupting and eventually ousting the Chinese Communist Party, or CCP. Guo was artful. A Chinese intelligence veteran, he quickly gained access to—and, alarmingly, the loyalty and services of—the country's top China Hawk, Stephen K. Bannon. Along the way, he sold his story, in succession, to Voice of America director and dissident Sasha Gong, Washington journalist Bill Gertz, and Dr. Lianchao Han, a lawyer, former Senate staffer, and longtime dissident. These individuals brought Strategic to Guo.

Now, Gong has revealed Guo's admissions to her. Guo's Chinese recordings—unknown even to Gertz and Han—have been authenticated and translated. Discovery has shown how Guo funded Strategic's contract through ACA and William Je, who have deep Mainland ties. Je funds Guo's U.S. operations from Hong Kong even though Guo claims his "celebrity dissident" status, and CCP control of Hong Kong, make this impossible. A tight circle of New York, Hong Kong, and Mainland workers run Guo's network. Guo has used this backing to inflict real damage, turning people like Bannon to his own purposes, attacking China hawks and dissidents, and litigating scores of lawsuits—all while failing to reveal truly damaging details about the CCP.

In this case, Guo continues this strategy: he attacks Strategic and its witnesses from behind the veil of Eastern Profit, the shell entity he inserted into Strategic's contract. As shown in Strategic's last brief, Eastern had only $80,000 in a frozen Hong Kong bank account, farmed out all of its work to Guo's family office, promised to give Strategic's research to Guo and ACA, and contributed absolutely nothing to the $750,000/month agreement. This Court should deny Eastern's Motion for Summary Judgment: it should allow Strategic's contract and fraud counterclaims to reach a jury and should decline to declare that Strategic's research to advance

1

Guo's political program was a Virginia "private investigation." Instead, it should grant Strategic's Cross-Motion (incorporated herein) for judgment against Eastern on its declaratory judgment and unjust enrichment claims. The end result should be that Guo and ACA, having decided to hide behind the shell of Eastern, fail to reap the windfall of a "return" of $1 million.

## STATEMENT OF FACTS

In November 2017, Defendant Strategic Vision US, LLC ("Strategic"), was contacted by two respected members of the U.S. China hawk community in Washington, D.C., Dr. Lianchao Han and William Gertz.[1] They wanted Strategic's principal, French Wallop, to meet Guo Wengui.[2] Ms. Wallop was married to U.S. Senator Malcolm Wallop (who represented Wyoming for 17 years),[3] and had developed expertise in political consulting and communications during her years in Washington.[4] She knew Lianchao from his work in Sen. Wallop's office as an advisor on U.S.-China relations with specific knowledge on the CCP.[5] Lianchao had lately developed close ties with Guo, supposedly a wealthy Chinese dissident now living in the U.S.[6] who had introduced Lianchao to such prominent political figures as Tony Blair.[7] Gertz had worked with Wallop before[8] and is an author covering defense and national security affairs over his lengthy entire career; has written eight books, including two on China and his most recent (*Deceiving the Sky*); and also speaks around the country and appears on national news

---

[1] All exhibit references are to the Exhibits attached to Strategic Vision's L.R. 56.1 Statement ("SOF"), filed with this brief. Wallop 1 Tr., Ex. FF, 11:24-12:21, 31:23-35:7, 89:9-91:1; Lianchao Tr., Ex. BB, 44:17-46:2; Gertz Tr., Ex. QQ, 48:9-15, 128:6-134:21, 138:2-4.
[2] Wallop Aff., Ex. C, ¶¶ 1-2; Dkt. 93, p. 1, ¶ 2; Dkt. 127, p. 1, ¶ 2; Wallop 1 Tr., Ex. FF, 11:24-12:21, 31:23-35:7, 89:9-91:1; Lianchao Tr., Ex. BB, 44:17-46:2; Gertz Tr., Ex. QQ, 48:9-15, 128:6-134:21, 138:2-4.
[3] Wallop Aff., Ex. C, ¶¶ 1-2.
[4] Dkt. 127, p. 20, ¶¶ 1-2; Dkt. 142, p. 1, ¶ 2; Wallop 1 Tr., Ex. FF, 10:19-11:19, 28:12-20, 28:21-30:1; Dkt. 93, p. 3, ¶ 14; Wang 1 Tr., Ex. CC, 194:20-198:7; Wallop 1 Tr., Ex. FF, 28:12-30:1, 104:16-106:20, 10:10-21, 16:16-17:8; Dkt. 127, p. 20, ¶¶ 1-2; Dkt. 142, p. 1, ¶ 2.
[5] Lianchao Tr., Ex. BB, 43:1-46:2, 38:20-39:6; Wallop Aff., Ex. C, ¶¶ 2-3.
[6] Lianchao Tr., Ex. BB, 46:17-47:9.
[7] Lianchao Tr., Ex. BB, 30:19-32:11, 36:8-16, 46:17-47:9.
[8] Gertz Tr., Ex. QQ, 129:2-6.

programs.[9] Like Lianchao, Gertz had developed a friendship and professional relationship with Guo after having been introduced to him by Sasha Gong, a prominent Chinese dissident based in the U.S.,[10] in June 2017.[11] Gong was director of the Chinese branch of the U.S. government's Voice of America media operation, which seeks to spread the word about democracy within China through Chinese language broadcasts.[12]

According to Lianchao and Gertz, Guo supposedly whistle-blew on abuses by the CCP and had recently come to the U.S. to advance several noteworthy policy goals to help the Chinese people.[13] Discovery later showed that Lianchao, a researcher, analyst, and lawyer, had been advising Guo on his asylum case; in order to sustain his momentum, Lianchao had advised, Guo needed to gather and publish research against "high-ranking government officials" similar to what Lianchao had already performed through two nonprofit think tanks.[14] Lianchao believed that to "continue to disrupt the Communist regime," Guo needed "sustainable, fact-based, evidence-based disclosure of Chinese corruption."[15] For his part, Gertz was concerned with messaging, seeing a need to "focus [Guo's] message so that it could be a more effective tool."[16]

Guo had other provenance: his friendship with Stephen K. Bannon, a prominent political commentator who until August 2017 was chief advisor to President Donald Trump. Strategic then believed Bannon wanted to "confront the threat that China poses against the United States"[17] and had no reason to think that Bannon would associate himself with a false Chinese dissident.

[9] Gertz Tr., Ex. QQ, 20:15-21:1, 17:2-24:21, 25:18-21; Wallop 1 Tr., Ex. FF, 12:16-21, 33:15-21.
[10] Gong Tr., Ex. PP, 15:17-19:23.
[11] Gertz Tr., Ex. QQ, 64:6-65:8; 72:13-73:19; Guo 1 Tr., Ex. AA, 58:6-13;
[12] Gong Tr., Ex. PP, 20:9-22:13, 29:20-32:11; 35:9-37:15, 39:12-40:15, 41:2-11.
[13] Wallop 1 Tr., Ex. FF, 88:3-89:5; Guo 1 Tr., Ex. AA, 45:3-46:16; Lianchao Tr., Ex. BB, 53:13-20; Gertz Tr., Ex. QQ, 60:16-20, 64:16-65:2, 66:15-67:5, 69:3-8, 69:17-70:1, 128:6-129:6, 131:1-14.
[14] Lianchao Tr., Ex. BB, 43:1-46:2, 126:22-128:9; 137:20-139:20.
[15] Lianchao Tr., Ex. BB, 138:12-139:15.
[16] Gertz Tr., Ex. QQ, 131:1-132:13.
[17] Waller 2 Tr., Ex. ZZZ, 123:24-124:8.

Through a series of discussions, Guo and Strategic moved from focusing purely on Guo's messaging to a project suggested by Lianchao Han that would research CCP officials; Guo would then use the research for his publicity campaign, aiding his asylum case and undermining the regime.[18] Guo told Strategic that, as a longtime CCP opponent,[19] he believed exposing corruption could break its control, triggering regime change, turning China from a U.S. foe to a friend, and bringing democracy and freedom to the Chinese people.[20] Guo wanted to sow disruption and oust the CCP,[21] he said, by publicizing Strategic's research about officials' corruption.[22][23] Guo had no other avenue to get the research, as his use of other firms had ended.[24]

The parties drafted the Research Agreement.[25] Its express purpose was "business research" and "consulting," but later, it referred to "preventing crime or other harm to innocent people,"[26] Guo's preferred slogan for his push for regime change by exposing CCP "corruption," which he viewed as crimes against the Chinese people, democracy, and the rule of law.[27] Strategic received no specific name to research until the contract was signed[28] because Guo's plan was a wholesale political attack, not research on an actual crime or specific victim.[29] From negotiation through performance, Strategic believed its client was Guo and that Guo, shepherded

---

[18] Guo 1 Tr., Ex. AA, 45:3-46:16; Wallop 1 Tr., Ex. FF, 88:3-89:22; Wang 2 Tr., Ex. II, 197:18-208:22, 202:2-204:20, 149:5-150:9.

[19] Wang 1 Tr., Ex. CC, 32:5-35:11, 37:8-38:7, Lianchao Tr., Ex. BB, 53:13-54:5, 138:12-139:15, 173:1-175:7.

[20] Guo 1 Tr., Ex. AA, 39:9-19, 45:3-46:16; Wang 2 Tr., Ex. II, 49:7-21, 202:2-204:20, 149:5-150:9; Wallop 1 Tr., Ex. FF, 88:3-89:22; Lianchao Tr., Ex. BB, 226:10-18.

[21] Guo 1 Tr., Ex. AA, 45:3-46:9, 206:25-207:7.

[22] Lianchao Tr., Ex. BB, 173:1-175:7, 279:10-14.

[23] Guo 1 Tr., Ex. AA, 45:3-46:9, 206:25-207:7; Wallop 1 Tr., Ex. FF, 84:15-89:5; Wang Tr. 2, Ex. II, 49:25-50:10, 53:19-54:3, 56:7-11, 57:5-9, 110:17-112:2.

[24] Wallop 1 Tr., Ex. FF, 159:8-161:10; Lianchao Tr., Ex. BB, 247:11-250:5.

[25] Ex. J, R. Agreement, p. 1; Wallop Aff., Ex. C, ¶ 4; Wang 1 Tr., Ex. CC, 264:9-12, 26:24-27:23, 59:17-60:4 (Ex. 2, p. 5, Eastern 9); Wang 2 Tr., Ex. II, 140:15-144:22, 27:8-13, 147:4-17, 149: 5-14, 145:18-146:8, 148:18-149:14, 154:7-156:13.

[26] Ex. J, R. Agreement, p. 1.

[27] Guo 1 Tr., Ex. AA, 39:9-19, 45:3-46:16; Wang 2 Tr., Ex. II, 49:7-21, 202:2-204:20, 149:5-150:9; Wallop 1 Tr., Ex. FF, 88:3-89:22; Lianchao Tr., Ex. BB, 226:10-18.

[28] *Id.*

[29] Guo 1 Tr., Ex. AA, 39:9-19, 45:3-46:16; Wang 2 Tr., Ex. II, 49:7-21, 202:2-204:20, 149:5-150:9.

by Gertz and Lianchao, would use the research for his political objectives.[30] The development of the identities and background research on the 15 initial subjects had been provided by Guo at his own cost[31] through the work of other firms that were no longer serving him.[32] All work involved in negotiating the contract, monitoring performance, and prosecuting this lawsuit—even producing documents and serving as a corporate witness—was performed by Golden Spring New York (Limited) ("GSNY"), which in turn takes direction from Guo's family office, China Golden Spring.[33] The Agreement itself provided for payment from some entity other than the signer, but that was to avoid CCP detection of Guo's involvement.[34]

Strategic's counter-party, inserted at the last minute by Guo through his project manager, Yvette Wang, was Eastern Profit Corp., Ltd.[35] Before signing, Wang read the contract to Guo over the phone line-by-line to get his approval.[36] Eastern is a private limited company registered under the laws of the Hong Kong Special Administrative Region of the People's Republic of China.[37] Guo relied mainly on Lianchao for the project, but Lianchao had never heard of Eastern until the lawsuit was filed.[38]

Even though the Agreement committed Eastern to advance $1 million and pay $750,000 per month for 3 years, Eastern actually had no accessible money. Eastern's only asset, a Hong Kong bank account which held $80,000, had been frozen, which Eastern claims was due to influence by the

---

[30] Waller 1 Tr., Ex. Z, 226:1-253:8; Lianchao Tr., Ex. BB, 246:6-17; Plt's First Interrog. Resp. Ex. M, p. 2, No. 4; Dkt. 93, pp. 3-4, ¶ 17; Wallop Aff., Ex. C, ¶¶ 6-7.

[31] Wang 2 Tr., Ex. II, 209:25-210:5; Wallop 1 Tr., Ex. FF, 83:24-84:7, 185:7-186:12, Lianchao Tr., Ex. BB, 173:6-174:4; Waller 1 Tr., Ex. Z, 186:11-188:7.

[32] Lianchao Tr., Ex. BB, 247:11-250:5.

[33] Wang 1 Tr., Ex. CC, 23:3-29:13, 18:14-20:21; Coluccio Tr., Ex. OO, 171:2-172:13, 186:15-19, 122:15-123:3.

[34] Wang 1 Tr., Ex. CC, 11:19-12:11; R. Agreement, Ex. J, p. 5; Wallop 1 Tr., Ex. FF, 168:4-170:3; Waller 2 Tr., Ex. ZZZ, 95:16-25; Wallop Aff., Ex. C, ¶ 4.

[35] Wang 1 Tr., Ex. CC, 8:24-11:15, 14:2-25; Wang 2 Tr., Ex. II, 162:4-9, 150:10-151:6; Wallop 1 Tr., Ex. FF, 306:6-307:7.

[36] Wang 1 Tr., Ex. CC, 61:2-9.

[37] Eastern Profit's C.R. 26.1 Demand, Ex. RRRR, at p. 2, No. 2, p. 3, Nos. 3-4; Wang 2 Tr., Ex. II, 22:10-23:6, 23:25-25:16, 25:24-26:5, 27:8-13, 29:16-18, 29:22-30:5, 76:12-18.

[38] Lianchao Tr., Ex. BB, 84:6-9.

5

Chinese government and CCP.[39] Eastern had no plan for raising the $27 million required under the Agreement.[40] Late in discovery, though, Eastern described what it claimed was its own purportedly independent motivation (never before revealed) for entering the Agreement:[41] it planned to publicly expose corrupt officials, cause the CCP's downfall on the Mainland, and then, apparently by ripple effects emanating from Mainland control of Hong Kong, cause the $80,000 in its frozen bank account to be released.[42] Thus, Eastern said it planned to spend $750,000 per month,[43] over three years, to cause world-historical change—all in order to unfreeze its $80,000 Hong Kong account.[44]

In fact, Eastern's plan was to provide Strategic's reports to others, including ACA and Guo, for consideration: ACA indicated that its $1 million "loan" would be forgiven if Eastern's research proved successful,[45] and Guo had already given ample consideration for his use of Eastern's research, via his provision of the initial 15 names and background and the staffing of Eastern's contract work by GSNY.[46] Eastern, then, had nothing to provide to the Agreement; it could only pass the research to Guo and ACA, who provided the manpower, names, and funding.

No funds in fact ever passed through Eastern's hands.[47] The only payment ever made was a $1 million deposit received by Strategic[48] from non-party ACA. In litigation, Eastern claimed this was a loan. Yet there is reason to doubt a loan was truly made, beginning with irregularities

---

[39] Wang 2 Tr., Ex. II, 73:8-74:8; 196:9-15; 197:18-198:6; 202:2-204:20; 207:13-208:16; Chunguang Tr., Ex. KK, 87:3-88:20; Dkt. 203-2 (Eastern's only asset—a Hong Kong bank account—is frozen); Dkt. 264, ¶ 5.
[40] Wang 2 Tr., Ex. II, 73:8-74:8; 196:9-15; 197:18-198:6; 202:2-204:20; 207:13-208:16; Chunguang Tr., Ex. KK, 87:3-88:20
[41] Wang 2 Tr., Ex. II, 73:8-74:8; 196:9-15; 197:18-198:6; 202:2-204:20; 207:13-208:16.
[42] Wang 2 Tr., Ex. II, 208:17-22.
[43] R. Agreement, Ex. J, pp. 1, 5
[44] Wang 2 Tr., Ex. II, 208:17-22; Dkt. 203-2 (amount frozen in Eastern's Hong Kong bank account was the equivalent of about $80,000); Dkt. 264, ¶ 5.
[45] Wang 2 Tr., Ex. II, 71:19-72:17.
[46] Wang 2 Tr., Ex. II, 209:25-210:5; Wallop 1 Tr., Ex. FF, 83:24-84:7, 185:7-186:12, Lianchao Tr., Ex. BB, 173:6-174:4; Waller 1 Tr., Ex. Z, 186:11-188:7 (provision of names); Wang 1 Tr., Ex. CC, 23:3-29:13, 18:14-20:21; Coluccio Tr., Ex. OO, 171:2-172:13, 186:15-19, 122:15-123:3 (GSNY work)
[47] Wang 1 Tr., Ex. CC, 203:11-15.
[48] Ex.  U; Wang 1 Tr., Ex. CC, 158:6-9, 158:20-159:23, 161:2-17; Dkt. 127, p. 22, ¶ 7; Dkt. 142, p. 3, ¶ 7.

in the loan document itself. Eastern's agent, Chunguang Han, supposedly signed as "Director," but was not.[49] He had long before resigned, having sold Eastern to Guo Wengui's daughter, Guo Mei, back in June of 2017, just before Eastern's assets were seized.[50] The real (and sole) director at the time of the purported loan was Guo Mei, Guo Wengui's daughter.[51] Chunguang admitted Guo's daughter had bought Eastern from him, but claimed she wanted to use Eastern to go into the movie business, and for that reason had orally asked him to be Eastern's "agent."[52]

Guo's confidants, including Lianchao Han, easily recognized Chunguang as Guo's cook, bodyguard, and errand boy,[53] who was usually in Guo's New York apartment.[54] Yet Chunguang refused to explain his line or place of work or presence in Guo's building; he denied ever having worked for Guo and instead claimed he started his own investment business after having been tutored by Guo, his "mentor" and "idol," in art, architecture, and investing.[55] Guo admitted Chunguang is in his building almost every day, but refused to say why,[56] and laughed when asked whether Chunguang attended meetings between Guo and Strategic.[57] (He did not.)

The timing of the supposed "loan" talks does not match with the last-minute insertion of Eastern as the signatory to the Agreement. The loan was supposedly signed on Friday, December 29, 2017, a date ACA's Je happened to be in New York City and also the last business day before ACA sent its Tuesday, January 2, 2018 wires to Strategic.[58] Yet Chunguang testified that even after Yvette Wang approached him and he supposedly agreed to have Eastern sign the

---

[49] Chunguang Tr., Ex. KK 59:60:8, 70:5-9, 102:2-18 (discussing resignation); Ex. LL (Chunguang Tr. Ex. 35, EASTERN-000278-80, loan document).
[50] *Id*. (resignation), 87:3-88:20; Dkt. 203-2 (asset seizure).
[51] *Id*.
[52] Chunguang Tr., Ex. KK, 101:17-105:3 (date of sale June 27, 2017), Ex. J, p. 5; Wallop Aff., Ex. C, ¶ 4; Wang 1 Tr., Ex. CC, 264:9-12.
[53] Lianchao Tr., Ex. BB, 36:17-37:12; Gong Tr., Ex. PP, 36:9-22; 116:24-118:11.
[54] Lianchao Tr., Ex. BB, 266:12-277:4.
[55] Chunguang Tr., Ex. KK, 24:20-34:2; 35:17-36:4; 42:7-11.
[56] Guo 1 Tr., Ex. AA, 114:9-117:6; 195:23-197:24.
[57] Guo 1 Tr., Ex. AA, 158:5-15.
[58] Ex. U; Wang 1 Tr., Ex. CC, 158:6-9, 158:20-159:23, 161:2-17; Dkt. 127, p. 22, ¶ 7; Dkt. 142, p. 3, ¶ 7.

Agreement,[59] a step he says he could only take after he received authority from Guo Mei (Guo's daughter),[60] it required "two or three" in-person meetings, as well as at least one phone call, before the loan could be signed in-person on December 29.[61] Wang's approach to Chunguang supposedly triggered all of Chunguang's work, but she did not herself learn Eastern's identity until just before her first trip to Virginia (to see Ms. Wallop for execution of the contract) on December 29th, and the draft Guo gave her to review did not even contain Eastern's name.[62]

Eastern did not keep any copy of the loan agreement after it was signed; Chunguang tried to explain by claiming he only intended to tell Eastern's "fiscal department" (though it had no employees left) about the loan at some future point after Eastern's assets were unfrozen and the loan could be repaid.[63] The loan was not produced before Eastern's first Rule 30(b)(6) deposition on Jan. 31, 2019 and, ten months later, Eastern's corporate representative (Wang) still could not say <u>where</u> Eastern had obtained the loan document to produce in the case; she was allowed to say only that she saw it for the first time in prior litigation counsel's "file."[64]

Additionally, the purported loan covered only the $1 million deposit on a contract that required payments of $750,000 per month beginning January 2018.[65] Eastern had made no arrangements to borrow any of the other payments[66] and had "no idea" how it would fund the rest of the Agreement,[67] which had a term of three years.[68] The purported loan bore interest at 2% per month, compounding monthly.[69] It was repayable in full, with interest, in just six

---

[59] Chunguang Tr., Ex. KK, 39:5-40:11.
[60] *Id.*, 72:24-73:13.
[61] *Id.*, 133:13-24.
[62] Wang 1 Tr., Ex. CC, 51:6-52:18; Ex. CC (Wang 1 Tr. Ex. 4).
[63] Chunguang Tr., Ex. KK, 134:21-136:5.
[64] Wang 2 Tr., Ex. II, 97:20-102:8.
[65] Ex. J (R. Agreement), p. 5.
[66] Wang 2 Tr., Ex. II, 208:17-22.
[67] *Id.,* 258:21-259:13.
[68] Ex. J (R. Agreement), p. 5 ("Duration").
[69] Ex. KK (Chunguang Tr. Ex. 35).

months.[70] Yet Eastern had committed itself to an Agreement that would take three years and $27 million to finish,[71] and its only plan for generating cash was for Strategic to find damaging research on CCP leaders; then for Guo (or someone) to effectively publicize the research; for this to trigger regime change in China; and for this regime change to cause Hong Kong authorities to unfreeze Eastern's account.[72] That account, however, held only about $80,000, just a fraction of the deposit, let alone the contractually-required payment for a single month of work.[73]

Despite the fact that the loan had been due for payment in full on June 29, 2018,[74] Eastern testified it had had no contact with ACA about repayment when its deposition was taken on January 31, 2019, almost a year after Eastern sued Strategic.[75] Eastern's 30(b)(6) witness, the so-called "project manager," claimed she had never seen a loan document and had never spoken with anyone from ACA.[76] Only after Strategic questioned the loan in this litigation did Eastern use its second deposition to claim that ACA had begun to "chase" Chunguang to collect.[77]

Eastern's supposedly independent motivation and plan to attack the CCP is not the only factual question in this case. Strategic also claims, and would show a jury, that Guo falsely claimed he was a dissident who planned to use Strategic's research to undermine the CCP.

In his August 2, 2019, deposition, Guo testified that Sasha Gong (discussed above) was his "friend" who had introduced him to Washington Free Beacon journalist Bill Gertz.[78] Gong testified regarding Guo's dissident status. Beginning in April 2017 and continuing through 2018,

---

[70] *Id.*
[71] Ex. J (R. Agreement), p. 5 ("Duration").
[72] Wang 2 Tr., Ex. II, 73:8-74:8; 196:9-15; 197:18-198:6; 202:2-204:20; 207:13-208:16; Chunguang Tr., Ex. KK, 87:3-88:20.
[73] Dkt. 203-2 (Eastern's only asset—a Hong Kong bank account—is frozen); Dkt. 264, ¶ 5.
[74] Ex. LL, Chunguang Tr. Ex. 35.
[75] Wang 1 Tr., Ex. CC, 45:8-46:23.
[76] *Id.*
[77] Wang 2 Tr., Ex. II, 35:2-39:8.
[78] Guo 1 Tr., Ex. AA, 58:6-13.

Gong interviewed Guo several times, both off the record and live on-air.[79] Starting with the first interview, Gong also visited Guo at his Sherry-Netherland apartment in New York City several times and met Guo's retinue, including Wang and Chunguang Han.[80] Throughout 2017, Gong continued to speak with Guo, who made claims about his longtime CCP involvement.[81]  Later, Gong was served as an initial director of the Rule of Law Society,[82] an entity founded by Guo and Steve Bannon supposedly to "whistleblow" and fight for Chinese democracy.[83]  So trusted was Gong that in the spring of 2019, Guo gave her a "thick" copy of his court file in this case.[84]

Guo claimed to Gong, and has also publicly claimed, that he was arrested for his support of the 1989 Tiananmen Square movement.[85] But Guo also told Gong that, after a time in Hong Kong following Tiananmen Square, he came back to the Mainland, where he built real estate, made many high-ranking friends, and became one of the major players in China's intelligence community.[86] Guo was one of only three people who could visit Hu Jintao, the former general secretary of the CCP (predecessor to Xi Jinping) without an appointment.[87] He used this access to battle with the former Vice Mayor of Beijing by allying with Ma Jian, a senior official in the Chinese Ministry of State Security (the "MSS," or China's CIA).[88] Guo admitted to Gong that he became very close with Ma Jian.[89] His close friend, he said, was Zhang Yue, known to have

---

[79] Gong Tr., Ex. PP, 29:20-32:11; 35:9-37:15.
[80] Gong Tr., Ex. PP, 35:9-37:15 (first interview); 41:2-20.
[81] Gong Tr., Ex. PP, 46:4-48:12; 58:21-59:12.
[82] Gong Tr., Ex. PP, 177:8-23.
[83] Gong Tr., Ex. PP, 23:7-24:15.
[84] Gong Tr., Ex. PP, 48:16-49:13.
[85] Gong Tr., Ex. PP, 59:2-12.
[86] Gong Tr., Ex. PP, 61:24-62:9.
[87] Gong Tr., Ex. PP, 68:21-69:10.
[88] *Id.*, 64:21-68:6.
[89] *Id.*, 66:10-67:8.

played a major role in suppressing the democracy movement after Tiananmen Square, although Guo never discussed this.[90] Guo would not reveal to Gong what Zhang Yue's function was.[91]

Guo further admitted other work for the MSS, including visiting the Dalai Lama, for which he allegedly received a medal.[92] In 2018, Guo admitted to Gong that he had participated in government meetings with senior CCP officials in Zhongnanhai.[93] Guo claimed to Gong that he had left China because his patron, Ma Jian, the Deputy Minister of State Security, told him he would be caught up in the anti-corruption campaign.[94] Guo told Gertz that the MSS is not only responsible for repressing domestic political dissent, it is also responsible for monitoring and suppressing overseas activities that are deemed subversive of the CCP.[95]

Once in the U.S., Guo continued to cut business deals,[96] admitting to Gong that he maintains connections with senior Chinese leaders.[97] Gong's interviews of Guo, starting April 17, 2017, coupled with China's issuance of an Interpol notice and purported complaints to Voice of America, lent him credibility he had not yet enjoyed.[98] But in 2017, Guo admitted he believed Xi Jinping was a good leader; Guo's only goal was "to target the corrupt ones" in the CCP.[99]

Starting no later than March 2017, just months before he met Strategic, Guo secretly spoke with CCP officials, pledging loyalty and discussing the content of his media campaign. In a March recording, Guo reported in Mandarin to an unknown listener that he was back in New York: "The operation is on now. I have absolute faith in General Secretary Xi." Guo criticized a reporter, Xi Nuo, because he "attack[s] our CCP leaders" and "wrote a book about leaders'

---

[90] Gong Tr., Ex. PP, 62:6-63:20.
[91] *Id.*, 64:10-20.
[92] Gong Tr., Ex. PP, 70:17-71:4.
[93] Gong Tr., Ex. PP, 216:7-25.
[94] Gong Tr., Ex. PP, 74:22-75:17.
[95] Waller 2 Tr., Ex. ZZZ, 142:2-24.
[96] Gong Tr., Ex. PP, 75:18-76:2.
[97] Gong Tr., Ex. PP, 131:12- 132:15.
[98] Gong Tr., Ex. PP, 184:10-185:5.
[99] Gong Tr., Ex. PP, 76:3-77:13.

private affairs." For this, he says, "these people must be punished"; indeed, "they are the modern traitors of the Chinese nation" and "deserve to die." Guo proposes his own plan of action: "Just wait and see. I can take these bastards down and help our leaders to [get] revenge."[100]

In late May 2017, Guo hosted Liu Yanping, among other Politburo and PRC officials, in his apartment.[101] The recordings show Guo was not, as he now claims, a private businessman who suffered abuse after becoming a dissident; instead, he was intertwined with the MSS, for as Guo tells Liu, "You are the actual controller. You can get back the assets that belong to you."[102] Guo took credit for a joint operation with the MSS, arguing that his work was for the MSS and on behalf of the "nation." Guo even suggests sending his own wife and children back to China, "using" them to prove that the CCP is a "reliable party." Guo finally declares, "I strongly support President Xi."[103] Guo promised to wait until his own issues were resolved to make complaints against his supposed arch-nemesis Wang internally, within China, and even then, only after Liu gave him approval to "take measures as you like" agreeing that this was the patriotic path.[104]

Soon after, Guo signed a letter for Chairman Xi Jinping pledging loyalty to him:[105]

    i.  "I understand and accept all of your directives and requirements leading to settling the matter." (p. 1)

    ii.  "In order to carry out your instruction better, I pray that you clarify what Wengui [is] not allowed to speak out and what Wengui [is] not permitted to do." (p. 1)

    iii.  That his ability to live in the United States is based on certain "conditions," and that to act consistently with those conditions, "I am now doing things not out of my own volition and talking things that I do not really mean… My public exposures of information was done under coercion, my choice to perform publicity was not voluntary… This is the main reason why my family and I have received top class special

---

[100] Gong Tr., Ex. PP, 159:16-162:18 (authenticating Guo's voice); Lianchao Tr., Ex. BB, 74:9-80:16 (same, and agreeing Chinese transcription was accurate); Ex. WW (referencing SVUS1314, et seq. (cert. English translation)).

[101] Ex. YY.

[102] Ex. WW (SVUS001363: 1:30-2:00).

[103] Ex. WW (SVUS1425).

[104] Ex. WW (SVUS001426-1427).

[105] Ex. WW (SVUS001320-1330 (recording of Mingjing "Mirror" TV—a Chinese-language television station— interview in which Guo authenticates and attempts to explain the letter, dated August 26, 2017)

protection and have been able to survive. As soon as I commit stop revealing information in two months, such… agreement will definitely be rescinded… I will definitely have to try to leave this country…" (pp. 1-2)

iv. "You and I will have more convenient ways to communicate with each other when I am there in the U.K." (p. 2)

v. "Yet I still kept faith in you and in the organization so I did not cross the red line when I was forced to give out for interviews." (p. 2)

vi. "I will put our national interest first and I am willing to devote my life to protecting our nation's interests, to defend Chairman Xi Jinping's value as our nation's Core Faith and make ultimate dedication of myself to safeguard Chairman Xi Jinping!" (p .3)

vii. "Can you consider to convert Wengui's influence and resources momentarily into best serving Chairman Xi Jinping's China Dream?" (3)

viii. "Assign me tasks to accomplish in furtherance of our national interests initiative and engage in Chairman Xi Jinping's global strategy, so that I can redeem myself by my good service, demonstrating my patriotism and loyalty to Chairman Xi Jinping!" (4)

Xi Jinping's "China Dream" is his program to make China the greatest country in the world, which entails competition with, and undermining, the United States.[106] On August 31, 2017, Guo tried to explain the letter in an interview by a Chinese-language media outlet in New York.[107] He revealed that he had other conversations, including with Vice Minister of the Department of Public Security Sun Lijun, in between the May meeting and August letter.[108] Guo also told Chinese-language viewers that during his negotiations with Beijing, certain of his entities' Hong Kong accounts were frozen—acts which he attributed to Beijing.[109] Guo also claimed to viewers that his intent in writing the letter was to "help the country to realize freedom" and "democracy," even though those concepts do not appear in his letter.[110]

Guo's Mirror Media interview was not the only time Guo has claimed that he has not moved money from Hong Kong or the Mainland since he began speaking out as a dissident.[111]

---

[106] Lianchao Tr., Ex. BB, 12:9-13:13.
[107] Ex. ZZ (Chen Aff.).
[108] Ex. WW (SVUS001327 (17:00-17:30))
[109] Ex. WW (SVUS1328-1329).
[110] Ex. WW (SVUS1328-1330).
[111] Ex. YY.

Through shared counsel, Guo and GSNY told this Court that Strategic "concedes" that "Mr. Guo… has been speaking out publicly against China for several years and, as a result, his assets in both China and Hong Kong have been seized…" Dkt. 136, p. 6. Eastern, too, claims the CCP dissident crackdown caused its only asset, in Hong Kong, to be frozen in June 2017. Dkt. 203, 2.

In fact, Guo has been able to openly direct and receive money for his U.S. operations from ACA,[112] a Hong Kong entity controlled by a man named William Je.[113] Strategic was not the only recipient; ACA funds much of Guo's U.S. operation, including a payment to Gertz as an "advance" on his book about Guo and China[114] and a $1 million retainer to a law firm for Guo's asylum case.[115] Introducing William Je to Sasha Gong, Guo said, "He's the money man."[116]

In this case, Guo claimed Je is such a well-known dissident that Hong Kong police and government harassment caused Je's hospitalization from stress.[117] But in reality, Je holds a seat on the Chongqing Chinese People's Political Consultative Conference, a Party-approved honor, and serves on a so-called Hong Kong "patriotic" group known for advancing Beijing's interest in Hong Kong;[118] Je has even named a Mainland resident as ACA's sole director. Perhaps not surprisingly, then, Guo claims in another case that ACA paid $7 million per year to his "family office," China Golden Spring (Hong Kong) between January 2017 and February 2018, precisely during the time that Guo and Je were supposed to be in danger from China (and Guo's Hong Kong operations should have halted altogether), because "I had the ability to make introductions

---

[112] Ex. M (Pltf. Interrogatory Response No. 4 (admitting that Guo "ordered" ACA to wire $1 million to Strategic Vision on or about December 29, 2017, although claiming this was "on behalf of" Eastern Profit)). (Under oath, Guo denied "ordering" ACA's release of the funds or to know how Eastern came up with the $1 million deposit, directly contradicting Eastern's sworn interrogatory response. Guo 1 Tr., Ex. AA, 182:13-183:6).

[113] Wang 2 Tr., Ex. II, 46:22-47:14, 49:25-50:10, 53:19-54:3, 56:7-11, 57:5-9, 110:17-112:2; Dkt. 203-2

[114] Gertz Tr., Ex. QQ, 28:15-30:3.

[115] Ex. AAA (https://freebeacon.com/national-security/fbi-eyes-china-posting-hacked-documents-chinese-dissident/)

[116] Gong Tr., Ex. PP, 78:18-80:7

[117] Guo 2 Tr., Ex. XX, 320:8-321:23.

[118] Ex. LLL (Je LinkedIn); Dkt. 203-1; Ex. BBBB (J. Ju Dec.), Ex. C (SVUS002486); Dkt. 203-1 (attachment signed July 26, 2019 naming ACA sole director).

to numerous business executives in China and Hong Kong."[119] Guo's network, in fact, is intertwined with Je, both in the US and Hong Kong,[120] far beyond ACA's funding of Eastern's deposit, Je's weigh-in on whether to litigate this case,[121] and ACA's expectation of receiving Strategic's research and potentially forgiving the "loan".

Finally, Guo insisted that Strategic not use any Mandarin translators with Chinese ties, and Sasha Gong confirmed that it is extremely dangerous (and thus very unlikely) for dissidents to keep electronic communications with the Mainland.[122] Guo also claimed to have lost his assets and employees in Hong Kong.[123] Yet the web presence of Guo's network of U.S. publicity-generating entities (including Saraca Media Group and its Guo Media/G News operations, and YouTube channels for Voice of Guo Media and "Guo Wengui") have troubling Mainland and Hong Kong ties; records show many of their administrators are using Mainland IP addresses, email addresses and recovery phone numbers, long after Guo supposedly became China's number one dissident, losing his assets and employees in Hong Kong and the Mainland.[124]

Guo now makes public attacks on the CCP, but his operations in the U.S. have damaged the China Hawk community.[125] He has engaged in dozens of lawsuits, attacks dissidents such as Sasha Gong, associated himself with Stephen K. Bannon and used Bannon to threaten Strategic Vision agent Michael Waller, and attempted to influence groups such as the Committee on the

---

[119] Ex. BBB, July 23, 2019, Aff. Guo Wengui, *Guo Wengui v. Hongkuan Li*, Case No. PWG 18-259 (U.S. Dist. Ct. D. Md.) Dkt No. 20-4 (Dkt. No. 197-1 in this case).
[120] Exs. DDD, EEE, FFF.
[121] Lianchao Tr., Ex. BB, 23:17-25:9.
[122] Waller 1 Tr., Ex. Z, 85:13-86:23; Gong Tr., Ex. PP, 159:1-9.
[123] Dkt. 203, p. 2; Ex. WW; J. Ju Aff., Recording 4 (p. 24-25, Guo at 19:30-20:30).
[124] Ex. SSS, TTT, UUU, VVV, WWW, XXX, YYY; Ex. GGG, HHHH, IIII; Ex. KKKK, PPPP, QQQQ.
[125] Gong Tr., Ex. PP, 142:24-145:16; Ex. QQQ ("G News" article).

Present Danger: China.[126] Neither Guo nor Eastern would identify any other research into the 15 individuals subject to Strategic's contract, and no expose has followed.[127]

## I.   SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF STRATEGIC ON EASTERN'S CLAIM FOR DECLARATORY JUDGMENT THAT THE RESEARCH AGREEMENT IS VOID

Eastern seeks a declaratory judgment[128] that the parties' agreement is void as a matter of law, relying on an inapplicable Virginia public safety statute and a single trial court decision relating to an unlicensed rent-a-cop business. The Court should decline to find the contract void as a matter of Virginia public policy. To start, Virginia courts presume contracts valid; their aversion to holding contracts unenforceable as against public policy means that, at minimum, their illegality must be clear and certain. Here, the Virginia licensing requirement is inapplicable to the purported effort by Guo Wengui and his network to achieve regime change in China. But even if Strategic were required to be licensed and thus subject to the statute's penalties, the legislature left no indication that it intended to void contracts. And finally, even if Virginia public policy clearly demands a voided contract, Eastern cannot get the windfall of $1 million in "restitution," both (i) because Eastern never gave (and never had the funds to give) the deposit, and (ii) because Eastern, *in pari delicto*, also meant to disseminate the research for consideration.

### A.  Contracts are Presumed Valid and Are Only Void on Public Policy Grounds Where Illegality is "Clear and Certain"

Eastern claims "Virginia law leaves *no doubt* that '[c]ontracts that violate Virginia public policy are void' as a matter of law." Dkt. No. 261 at 19, *quoting Reading and Language Learning Center v. Sturgill*, 2016 WL 10880215, at *10 (Va. Cir. Ct. 2016) (emphasis added).

---

[126] Gong Tr., Ex. PP, 132:23-133:14; 134:2-138:11; 138:9-19. Ex. OOOO (Waller Dec.), at ¶¶ 2-3.

[127] Gong Tr., Ex. PP, 180:8-25; 182:15-183:16; Chunguang Tr., Ex. KK, 91:3-9, 78:17-23; Lianchao Tr., Ex. BB, 237:10-238:6; Wang 2 Tr., Ex. II, 195:21-196:7.

[128] Such relief is appropriate "when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and ... when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Broadview Chem. Corp. v. Loctite Corp.*, 417 F.2d 998, 1001 (2d Cir.1969).

But Eastern omits the crucial remainder of the trial court's holding, that "courts are averse to holding contracts unenforceable on the ground of public policy unless their illegality is clear and certain. Thus, the presumption is against finding contracts void on public policy grounds." *Id.* (*quoting Estes Express Lines, Inc. v. Chopper Express, Inc*., 273 Va. 358, 364 (Va. 2007) and *Lehman v. Lehman*, 38 Va. App. 598, 604 (Va. App. 2002)). This principle is well established in Virginia. *See Wallihan v. Hughes*, 196 Va. 117, 125 (1954). This Court too has noted that "forfeitures by operation of law are disfavored, particularly where the defaulting party seeks to raise illegality as 'a sword for personal gain rather than a shield for the public good.'" *Dervin Corp. v. Banco Bilbao Vizcaya Argentaria*, S.A., 2004 WL 1933621, at *4 (S.D.N.Y. 2004).

The Virginia Supreme Court has never voided a contract made in violation of the private security services licensing law. When confronted with an issue of ambiguous or unsettled state law, a federal court "must do its best to guess how the state court of last resort would decide the issue." *In re Brooklyn Navy Yard Asbestos Litig*., 971 F.2d 831, 850 (2d Cir. 1992). A federal court is not bound by lower state court opinions; it instead considers "the statutory language, pertinent legislative history, the statutory scheme set in historical context, how the statute can be woven into the state law with the least distortion of the total fabric, state decisional law, and federal cases which construe the state statute." *In re General Motors LLC Ignition Switch Litig.*, 407 F.Supp.3d 212, 220 (S.D.N.Y. 2019) (citations omitted). As shown below, this Court should not find that Virginia's law applies to this international political opposition project; and even if it did apply, Virginia's Supreme Court would not void the contract, awarding Eastern a windfall.

### B.  Virginia's Private Security Services Statute Is Inapplicable

Eastern urges this Court to adopt a sweeping view of what the Virginia Supreme Court would consider "private investigation" under its "private security services" statute: requiring

licensure for all who (as the Research Agreement here provides) perform "business research, reporting, documentation, and other consulting services." Dkt. 93-1. The Agreement's later reference to "preventing crime or other harm to innocent people" only seems to conflict with the earlier, "business research" provision: it is simply Guo Wengui's preferred slogan for his supposed political push to oust the CCP by using "media" to publicize officials' "corruption," crimes "against the Chinese people," democracy, and the "rule of law."[129] Not once—in initial talks or years later, in litigation—did Guo or Eastern identify an actual crime, victim (beyond "hundreds of millions" of "Chinese people"), or specific plan to use the research for any case. *Id.* From start to finish, this was a political and publicity, not quasi-law enforcement, program. *Id.* Virginia's statute does not clearly demonstrate an intent to prohibit a contract between sophisticated private parties designed to further personal political goals, rather than to assist a particular crime or tort victim in adjudicating a specific crime or civil wrong.

Virginia imposes "training, registration, and licensing requirements for the private security services industry…to 'secure the public safety and welfare against incompetent, unqualified, unscrupulous, or unfit persons engaging in the activities of private security services businesses.'" *U.S. v. Com. of Va.*, 972 F.Supp. 1008, 1010 (E.D.Va. 1997) (discussing Va. Code Ann. § 9). The statute regulates several private security occupations through the state Criminal Justice Services Board, including alarm respondents, locksmiths, armored car personnel, central

---

[129] SOF ¶1 (research was to "overthrow the Communist Party"); ¶2 (Lianchao Han, adviser to Guo on his pending asylum application, told him he needed to "sustain" "whistleblower" image by making new "fact-based" disclosure on CCP "corruption" similar to research Lianchao had just done); ¶3 (Eastern referred questioner to newspapers and Guo's social media; Lianchao, who conceived of, negotiated, and managed project, answered, "how he's going to do it, I don't think he has an idea."); ¶4 (Guo refused to answer how he intended to use research to overthrow the CCP, but said that research was part of his goal); ¶5 (Guo now says research would show "hundreds of billions" of dollars in bank accounts, would be given to the U.S. government, and save "hundreds of millions" of falsely persecuted Chinese people, including "tens of millions" jailed for no reason); ¶ 6 (in 2019, Eastern still didn't know Guo's plans for the research aside from Guo's social media remarks; Guo doesn't recall discussing with anyone else his supposed plan to bring Strategic's research to US courts "as a group" by suing "whoever commits a crime"; research would be shared with "people of China" through "media").

station dispatchers, and armed security officers, among others,[130] and imposes penalties for those

who fail to comply with the statute or Board regulations. *See* Va. Code Ann. § 9.1-138; 9.1-147,

9.1-150. With certain exceptions, the law defines a "private investigator" as anyone who, among

other things, seeks to "obtain information on crimes or civil wrongs." Va. Code Ann. § 9.1-138.

There is a clear continuity between all of these professions: they are performing tasks parallel to,

or even in place of, law enforcement. The only profession that does not deal with physical

security is the one at issue here, but even then, its potential overbreadth is statutorily cabined by

being limited to a specific goal: obtaining information on crimes or civil wrongs.

That was not the purpose of the Research Agreement. Guo intended to use the research to

undermine the CCP through a publicity campaign while his asylum application was pending—

not to prosecute some specific criminal charge.[131] Where Guo refers to crimes, he does so in the

vague sense of crimes against "the Chinese people:" crimes against good governance, the rule of

law, and democracy, but not any sort of plausible prosecution.[132] Guo's goal here was publicity.

Eastern Profit, the party Guo inserted into the Agreement, testified to equally murky

plans: it would spend millions over three years to publicly expose corrupt officials, cause the

downfall of the CCP on the Mainland, and then, through the Mainland's control of Hong Kong,

cause the $80,000 or so in its frozen bank account to be released.[133] For such sweeping political

---

[130] The statute also covers: electronic security sales representatives, electronic security technicians, electronic security technician's assistants, personal protection specialists, private investigators, security canine handlers, detector canine handlers, unarmed security officers, and armed security officers. Va. Code Ann. § 9.1-138. 3.
[131] SOF ¶ 2 (Lianchao Han, adviser to Guo on his pending asylum application, told him he needed to "sustain" "whistleblower" image by making new "fact-based" disclosure on CCP "corruption" similar to research Lianchao had just done); ¶3 (Eastern referred questioner to newspapers and Guo's social media; Lianchao, who conceived of, negotiated, and managed project, answered, "how he's going to do it, I don't think he has an idea."); ¶4 (Guo refused to answer how he intended to use research to overthrow the CCP, but said that research was part of his goal)
[132] SOF ¶ 5 (Guo now says research would show "hundreds of billions" of dollars in bank accounts, would be given to the US government, and save "hundreds of millions" of falsely persecuted Chinese people, including "tens of millions" jailed for no reason); ¶ 6 (in 2019, Eastern still didn't know Guo's plans for the research aside from Guo's social media remarks; Guo doesn't recall sharing his supposed plan to bring Strategic's research to US courts "as a group" by suing "whoever commits a crime"; research would be shared with "people of China" through "media").
[133] SOF ¶¶ 16-20.

purposes, one does not turn to Virginia's directory of licensed rent-a-cops and private eyes, and there is not a single Virginia case holding that Virginia public policy says otherwise.

Eastern asks this Court, however, to find that this is the "clear and certain" policy of Virginia. If so, the consequences will be significant and, for many public policy for-profit and nonprofits based in Virginia, completely unexpected. Government licensing and training will be mandated, and contracts thrown into doubt, for all who are paid to provide information on "crimes or civil wrongs," including reporters, authors, think tanks, historians, genealogists, political activists, and even business consultants, none of whom are covered by Virginia's statutory exceptions. This cannot be. No case supports the view that Virginia would require a party to obtain a state license to conduct research into figurative "crimes" or "wrongs" to further political and public policy goals abroad, much less that Virginia would void a contract between private parties where, as noted above, there was no particular victim or specific crime or civil wrong to be investigated.[134] Nor has the Virginia legislature endorsed such an expansive view of what constitutes private investigation: the statute lists 31 exceptions to the definition of "private investigator," at least one of which, if Eastern's reading is correct, expressly covers a third of the work outlined in Strategic's contract (describing "social media research"). Dkt. 93-1; Va. Code Ann. § 9.1-140 (29) (exemption for reviewing, analyzing digital information and electronic data).

---

[134] The only case cited by Eastern did not involve "private investigators," but rather, "private security services." There, an unlicensed rent-a-cop company could not recover under a quasi-contract theory for its services in guarding a restaurant. *Urban Protective Servs. v. Great Latin Rests., LLC*, 2007 WL 1660374 (Va. Cir. Ct. Mar. 5, 2007). But the unreported trial court decision does not actually cite or discuss any Virginia authority on the threshold question of what types of statutory violations render a contract void; it dealt with the follow-up question—not presented here—of whether *quantum meruit* can require payment after the contract has already been found void. Apparently, a separate trial judge issued an order voiding the contract, but its analysis (if any) is unknown and not cited by Eastern. If any Virginia court has ever undertaken such an analysis of any part of the private security statute, it is not to be found in the decision Eastern cites, and Strategic cannot find it. Beyond this, Strategic's contract for political research did not implicate rent-a-cops or public safety at all, let alone other quasi-law enforcement activities.

Eastern's sweeping reading, then, is anything but "clear and certain." Strategic was not a "private investigator" which the Virginia Supreme Court would hold must have been licensed by the Criminal Justice Services Board. Its Research Agreement was "for the purpose of providing business research, reporting, documentation, and other consulting services" intended, as shown above, to advance Guo's supposed political agenda in China (and perhaps Eastern's similar plan) and, relatedly, Guo's asylum-related publicity push. Dkt. 93-1. The statute does not apply.

### C. Even If the Virginia Statute Applies, the Contract Is Not Void

"Allowing parties to avoid their contractual obligations is especially inappropriate where there are regulatory sanctions and statutory penalties in place to redress violations of the law." *IHS Acquis. XV, Inc. v. Kings Harbor Care Ctr*., 1999 WL 223152 *3 (S.D.N.Y. April 16, 1999).

> [T]he enforceability of contracts that do not adhere to all regulations and statutes is a complicated issue that involves a multi-factor analysis [including] whether the statute in question is malum prohibitum or malum in se; what the underlying purpose of the statute is and for whose benefit it was passed…; whether the statute contains a criminal penalty or other sanction for violation of the law; whether the legislature envisioned that the contract would be null as a result of a violation of the statute; whether voiding the contract is out of proportion with the requirements of public policy; and whether the illegality defense is being used as a 'sword for personal gain' or a 'shield for the public good.'

*Id*. (internal citations omitted).

Virginia law is clear: failure to obtain a license, permit, or certificate does not invalidate every contract as contrary to public policy. *See Niemeyer v. Wright*, 75 Va. 239, 244 (Va. 1881) (holding that where "[a] statute containing a prohibition and a penalty, makes the act which it punishes unlawful ... it does not follow that the unlawfulness of the act was meant by the Legislature to avoid a contract made in contravention of it"); *Watters & Martin v. Homes Corp*., 136 Va. 114, 127-128 (1923) (enforcing a contract that violated the state's "blue sky laws" where the "real purpose of the act," which provided for criminal penalties, was to regulate the

21

profession of security sales and "prevent unfairness, imposition, and fraud"). Nothing in the licensure provision states that the provision of research services out of compliance with the statute shall render a contract void. Rather, the private security services licensing statute provides specific penalties for those who fail to comply with its terms. *See* Va. Code Ann. § 9.1-147, 9.1-150 (setting out penalties). As in *Watters*, the statute's purpose is to regulate various professions and penalize violators, not to void private contracts. Therefore, the licensing statute is merely a penal statute which was not intended to affect the validity of contracts. That a contract is malum prohibitum (contrary to a statute) alone is an insufficient basis upon which to find a public policy violation. *See Cullwell v. Huff,* 50 Va. Cir. 180, 1999 WL 33722325, at *9 (Va. Cir. Ct. 1999).

A contract is enforceable despite a statutory violation if it appears the legislature did not intend to render a contract in violation of the statute void, but rather intended that the violation be subject to the penalties provided in the statute. *See Taylor Thiemann & Aitken v. Hayes*, 418 S.E.2d 897, 899 (Va. 1992). In a similar New York case involving a private investigator contract, the Appellate Division refused to invalidate a private investigator's contract despite a "malum prohibitum" statutory violation. *Joe O'Brien Investigations. Inc. v. Zorn*, 263 A.D.2d 812, 814 (3d Dep't 1999). The Court enforced the contract, noting that "[i]f a statute or regulation "does not provide expressly that its violation will deprive the parties of their right to sue on the contract, and the denial of relief is wholly out of proportion to the requirements of public policy or appropriate individual punishment, the right to recover will not be denied."

### D.  Even If The Contract is Void, Eastern Cannot Recover Restitution

Eastern cites no authority for its contention that a void Agreement entitles it to gain the windfall of non-party ACA's $1 million deposit.[135] First, as discussed at length in Strategic's

---

[135] In a footnote, Eastern cites one case in support of awarding it restitution of $1 million, but that case provides no help. Dkt. 261, n. 97. It did not involve an illegal or void contract, but instead whether a yacht seller could retain a

prior motion, Eastern is not entitled to restitution, as its paltry Hong Kong assets were hopelessly frozen and it did not confer (and could never have conferred) any benefit on Strategic.[136]

Second, Eastern is barred from restitution due to its own unclean hands and the principle of *in pari delicto.* "It is an elementary principle of law that he who comes into a court of equity must come with clean hands." *Newman v. Light,* 152 Va. 760, 771 (1929). The clean hands doctrine is a two-way street, as "equity does not look solely at the rights of one party and ignore those of the other." *Virginia Public Service Co. v. Steindler*, 166 Va. 686, 698 (1936). Eastern was not an "innocent party" that the Virginia statute was designed to protect; indeed, if the contract is void due to Strategic's failure to register before providing research on potential crimes or civil wrongs to a third party for consideration, Eastern is *in pari delicto.*

Virginia courts will neither enforce performance nor afford equitable relief where the "objects sought to be achieved" by the plaintiff were also illegal. *Cullwell*, 50 Va. Cir. 180; *see also Am.-LaFrance & Foamite Indus. v. Arlington Cty*., 169 Va. 1, 1, 192 S.E. 758 (1937). By Eastern's own reading of the Virginia statute, if Strategic is a "private investigator," Eastern itself is subject to licensure and therefore in violation. Why? Eastern always intended to provide Strategic's reports to "investors," including ACA Capital and Guo, for consideration: Guo had already paid for and contributed the first 15 names and research, and ACA indicated its $1 million "loan" would be forgiven if Eastern's research proved successful.[137] Eastern was clearly

---

deposit after a cancelled purchase. *Rella v. N. Atl. Marine*, 2004 WL 1418021, at *4 (S.D.N.Y. June 23, 2004). Here, Eastern seeks a court order intervening in the status quo, compelling Strategic to pay Eastern funds far in excess of Eastern's net worth, and deposited with Strategic by another party, ACA, that chooses to remain absent.
[136] SOF ¶ 17-18 (Eastern wanted to publicize Strategic's research to cause regime change on the Mainland, which it believed would then cause its sole asset, a Hong Kong bank account, to be released due to CCP influence in Hong Kong); ¶ 20 (Eastern's frozen account held only about $80,000); ¶19 (Eastern had "no idea" how it would put together the "big budget" of several million dollars over three years called for under the Research Agreement); ¶ 21-22 (all of the performance required of Eastern under the Agreement was done for free by others).
[137] SOF ¶¶ 10-11 (Guo spent money to compile the initial 15 names and associated dossiers, gave these to Eastern, and in return expected to receive Eastern's research for his own use); SOF ¶ 12 (ACA expected Eastern to give it Strategic's research); SOF ¶¶ 13-14 (ACA discussed forgiving the "loan" if Strategic's research succeeded, and

a conduit for the "private investigator" services to reach other hands, as a successful contract over three years would have cost $7 million—far more than the $80,000 or so Eastern allegedly had frozen and was trying to "recover."[138] If Eastern itself was "undertaking to provide private investigators to another person under an express or implied contract," and Eastern is right that these services are covered, then Eastern is itself an unlicensed "private security services business" under Va. Code Ann. § 9.1-138, violating § 9.1-139(A). Because Eastern intended to act as an unlicensed private securities services business, Eastern and Strategic had shared purposes and the parties share the same "degree of guilt." When parties to an illegal contract are *in pari delicto* ("in equal fault") and "one of them has performed the illegal agreement in whole or in part, he cannot recover from the other party that which he has parted with under the contract. The law simply leaves the litigants in the plight in which they have seen fit to place themselves[.]" *Cullwell*, 1999 WL 33722325, *9. Public policy supports this view: allowing recovery here would incent sophisticated but unlicensed parties like Guo and Eastern to hire investigators and then reap a windfall: the "return" of another party's deposit that dwarfs the sum the named parties were allegedly using the contract to unfreeze.[139]

## II.   STRATEGIC'S FRAUD CLAIM IS FOR THE JURY

### A.  Strategic Reasonably Relied on Guo and His Associates

Whether reliance was reasonable is a fact question for the jury: "an evaluation of the reasonable-reliance element should involve many factors to consider and balance, no single one

---

ACA supposedly asked Eastern to repay the "loan" because the contract had been unsuccessful); SOF ¶ 15 (Wang repeatedly told Strategic that "investors" were "spending money" and wouldn't continue without successful results).

[138] SOF ¶ 31 (contract called for payments of $750,000 per month over 3 years, Eastern Profit had "no idea" how it would pay, and plan for unfreezing assets required giving research results to Guo in exchange for his assistance in performing the contract so that publicity could be generated and assets unfrozen).

[139] Eastern may argue that denying relief in this case will tempt unlicensed parties to enter into illegal contracts in the future. But that argument ignores that fact that parties who fail to obtain licensure are subject to criminal penalties.  As the Virginia Supreme Court held in a leading *in pari delicto* case, "the public interest is protected sufficiently by criminal sanctions and does not require that the [plaintiff] receive compensation." *Zysk v. Zysk*, 239 Va. 32, 34, 404 S.E.2d 721, 722 (1990) (internal citations omitted).

of which is dispositive. Accordingly, reasonable reliance is often a question of fact for the jury rather than a question of law for the court." *Abu Dhabi Comm. Bank v. Morgan Stanley & Co. Inc.*, 888 F.Supp.2d 478, 484–85 (S.D.N.Y. 2012) (internal quotations omitted); *see also STMicroelectronics, N.V. v. Credit Suisse Securities (USA) LLC*, 648 F.3d 68, 81 (2d Cir. 2011).

Strategic has offered sufficient evidence from which a jury could infer that Strategic reasonably relied on Guo and Eastern's statements that Guo was a dissident and planned to use the research to undermine the CCP. Under these facts, the fraud claim is best left for a jury.[140] *See Northern Shipping Funds I, L.L.C. v. Icon Capital Corp.*, 998 F.Supp.2d 301, 321–22 (S.D.N.Y. 2014) (denying summary judgment where plaintiff "offered sufficient evidence from which a reasonable jury could infer that [defendant] made representations it knew to be false and omitted key facts"); *see also Shaarei Arazim of Monsey v. Horowitz*, 2013 WL 3305770, at *6 (S.D.N.Y. 2013) (given "the fact-specific nature of the reasonable-reliance inquiry, the Court finds defendants are not entitled to summary judgment on this element of plaintiff's claim.")

Here, Guo used Bill Gertz and Lianchao Han, two long-respected China Hawks who publicly pledged their reputations to back Guo, vouching for him with Strategic.[141] Gertz and Han's reputations depended on their ability to accurately sift and analyze copious material, much in Chinese and from Guo himself, and publicly vouch that Guo was really a dissident committed to bringing down the CCP.[142] And by late 2017, Guo had political and financial ties with a man then perceived as the nation's foremost critic of China, Steve Bannon.[143] Strategic was justified in relying on Guo; were he a fraud, it could ruin the careers of all of these public figures.

---

[140] Eastern contends a party must memorialize in the contract itself the key points on which it relies (Guo's status, fruits of the contract), but this cannot be. Under that view, a party could never sue for fraud in the inducement.

[141] SOF ¶¶ 33-36.

[142] SOF ¶¶ 36-38.

[143] SOF ¶¶ 40-41.

## B.  Strategic Has Alleged Sufficient Facts to Show Scienter

Eastern complains that Strategic cannot prove scienter because it "has shown neither motive nor conscious behavior by Eastern or Mr. Guo." Dkt. 261 at 27.  But that is not the only way to show scienter. "To satisfy the scienter requirement, a plaintiff need not allege facts which show the defendant had a motive for committing fraud, as long as the plaintiff ... adequately identifies the circumstances indicating conscious behavior by the defendants." *Siben v. American Airlines, Inc*., 913 F.Supp. 271, 278 (S.D.N.Y. 1996) (*citing Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989)). "The requisite strong inference as to fraudulent intent may be established by factual allegations which show whether Defendants had both motive and opportunity to commit fraud or which constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* (internal citations omitted). Under New York law, a plaintiff may either plead motive and opportunity to commit fraud or show strong circumstantial evidence of conscious misbehavior or recklessness. *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc*., 651 F.Supp.2d 155, 171 (S.D.N.Y. 2009). As this Court has held, "adequately pleading motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged, while adequately pleading opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged." *Id*. at 171.

Here, Guo admitted he had used other firms to generate the dossier data on the first 15 names he provided to Strategic and had lost the use of another firm, T&M Security;[144] that he was being told by Lianchao Han, who was also advising him on his asylum application, that he needed to be able to publicize more information to sustain his image as a whistle-blower about

---

[144] SOF ¶¶ 43-45.

CCP corruption;[145] and that Eastern and Guo have been unable to show they ever found a back-up for Strategic.[146] Guo's motive? He knew he needed Strategic, and he needed it to believe him.

### C. Guo's Statements Are False, and Provably So

Strategic has alleged, and would prove to the jury, that Guo's representations about his status are false. Fraud requires a statement capable of being proven true or false, and statements of opinion may be fraudulent where the speaker omits key information. *Magnaleasing, Inc. v. Staten Island Mall*, 563 F.2d 567, 569 (2d Cir. 1977) ("It is a hornbook principle, however, that statements of opinion may constitute actionable fraud where a present intent to deceive exists.")

Regardless of whether Guo's statements about his status and intent to undermine the CCP were opinions or fact, Strategic can show they were made with the intent to deceive, rendering them fraudulent. *See Brass v. Am. Film Technologies, Inc*., 987 F.2d 142, 150 (2d Cir. 1993) (New York recognizes a duty to disclose "where the party has made a partial or ambiguous statement" and "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge."); *Woods v. Maytag Co*., No. 10-CV-0559, 2010 WL 4314313 at *10 (E.D.N.Y. Nov. 2, 2010) ("[O]nce a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth.") (*quoting Brass*, 987 F.2d 142, 150); *VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP*, 348 F. Sup. 2d 255, 272 (S.D.N.Y. 2004) ("that aspects of [defendant's] representation ... were literally accurate [] does not preclude the possibility that [defendant] consciously could have misled [plaintiff] with its statement.").

Guo's own admissions to his friend, Sasha Gong,[147] show he worked for, not against, the CCP in China. He worked hand-in-glove with Ministry of State Security official Ma Jian, pulling

---

[145] SOF ¶ 2.
[146] SOF ¶ 46.

off a Malaysian kidnapping, earning a CCP medal for work with the Dalai Lama, enjoying special access to the home of the last CCP General Secretary, and nourishing a close friendship with a key official who persecuted Tiananmen protesters.[148] Even Guo admits he left China not as a dissident, but because of "anti-corruption" efforts against his MSS ally, Ma Jian.[149]

Guo claims his dissident status suddenly caused the CCP to freeze his Mainland and Hong Kong assets, making it impossible to move money.[150] Yet just months before meeting Strategic, in March 2017, Guo spoke to an unknown person praising the CCP, castigating other Chinese in the U.S. for criticizing "our leaders" and threatening revenge, and promising that he was back in New York, so his "operation" was "on."[151] Guo claims to have been threatened and nearly kidnapped by a Chinese delegation that illegally visited him for lunch several times in his New York apartment, but a recording (even the only surviving part, which Guo chose to disseminate) shows a negotiation and Guo's promise to coordinate his public messaging.[152] In an August 27, 2017 letter to President Xi and senior leaders, Guo points out he never crossed "the red line," claims he is "talking things I do not really mean" to stay in the U.S., and promises to propagandize in the U.S. and to advance the "Chinese Dream," Xi's plan for world dominance at American expense.[153] In a Mandarin broadcast, Guo covered the letter point-by-point while it was displayed; Guo allies and the broadcaster authenticated it, but Guo now calls it a fake.[154]

Further, discovery showed that Guo is in fact able to move money from Hong Kong using the very entity, ACA, that paid Eastern's deposit.[155] Guo publicly claims that his frozen Hong

---

[147] SOF ¶ 49.
[148] SOF ¶¶ 55-61.
[149] SOF ¶ 61.
[150] SOF ¶¶ 80, 81, 122.
[151] SOF ¶ 66.
[152] SOF ¶¶ 68-73.
[153] SOF ¶¶ 74-75.
[154] SOF ¶¶ 77-80.
[155] SOF ¶ 82.

Kong assets prove the CCP's hostility, but ACA, led by Guo's longtime associate,[156] William Je, funds much of Guo's U.S. operation. That has at the very least included a payment to Bill Gertz as an "advance" on his book about Guo and China, as well as a $1 million retainer to a law firm for Guo's asylum case.[157] Guo himself introduced Je as his "money man," and Guo's network assumed the same.[158] Guo swore in federal court that ACA paid his family office, China Golden Spring Group, $7 million per year and that he took a draw from this payment.[159] Further, ACA/Je are intertwined with Guo's network not only regarding Strategic's agreement and the litigation of this case,[160] but on all Guo's Hong Kong and US operations.[161] Although Guo and his associates are quick to volunteer that Je is a dissident,[162] the facts show otherwise: he is on the Chongqing Chinese People's Political Consultative Conference, a Party-approved honor, and serves on a so-called Hong Kong "patriotic" group known for advancing Beijing's interest in Hong Kong.[163] As Strategic will show at trial, there is absolutely no way Guo can function without the CCP's consent when the Hong Kong financial gatekeeper for his U.S. operations is a man like Je.

Finally, Guo insisted that Strategic not use any Mandarin translators with Chinese ties, and Sasha Gong confirmed that it is extremely dangerous for dissidents to keep electronic communications with the Mainland.[164] Guo also claimed to have lost his assets and employees in Hong Kong.[165] Yet the web presence of Guo's network of U.S. publicity-generating entities (including Saraca Media Group and its Guo Media/G News operations, and the Voice of Guo

---

[156] SOF ¶ 83.

[157] SOF ¶¶ 91-92, 94-96 (Gertz received $100,000 from ACA as a no-interest "advance" on a book about China and Guo that dwarfed the amount he received from the actual publisher); ¶ 97 (Gertz reported that ACA, "Guo's company," sent $1 million to the firm as a retainer to represent Guo).

[158] SOF ¶ 84; ¶ 85 (William Je "may pay" Guo's pledge of $100 million to the Rule of Law); ¶ 86 (Je manages Guo's money and provided Guo a letter of credit for DC real estate purchase).

[159] SOF ¶¶ 88-90.

[160] SOF ¶¶ 98-99.

[161] SOF ¶¶ 100-104.

[162] SOF ¶ 105.

[163] SOF ¶¶ 106-111.

[164] SOF ¶ 113.

[165] SOF ¶ 122.

YouTube channel) have troubling ties to Hong Kong or the Mainland; in many cases, account records show that they were set up or maintained by individuals with Chinese email addresses and recovery phone numbers long after Guo supposedly became China's number one dissident, losing his assets and employees in Hong Kong and the Mainland.[166]

Guo can point to recent vitriolic anti-CCP rhetoric, largely during the course of this case, but in fact, his operations in the U.S. have damaged the China Hawk community.[167] He is engaged in scores of lawsuits, has attacked dissidents such as Sasha Gong, associated himself with Stephen K. Bannon and used Bannon to threaten Strategic Vision agent Michael Waller, and attempted to influence groups such as the Committee on the Present Danger: China.[168] Neither Guo nor Eastern would identify any other research into the 15 individuals subject to Strategic's contract, and no expose has followed.[169] A jury will find that Guo and Eastern were not who they said they were, and never intended to use Strategic's research to attack the CCP.

Rather than walking away from this failed scheme, Guo and his network—which somehow has sufficient funding to litigate scores of lawsuits in U.S. courts—insist on hiding behind their shell company, Eastern Profit, to pry ACA's $1 million from Strategic. Rather than admitting the truth, they have concocted an unbelievable story about Guo, Eastern, and a plan to "borrow" and spend millions in order to achieve quick regime change in Mainland and thereby cause Hong Kong to release Eastern's long-frozen $80,000. It is time for the charade to end.

## CONCLUSION

For Eastern's Motion should be denied, and Strategic's earlier Motion and current Cross-Motion for judgment against Eastern on its Counts III and IV should be granted.

---

[166] SOF ¶¶ 120, 121 ¶ 123 ; ¶ 124.
[167] SOF ¶ 125.
[168] SOF ¶¶ 126-127.
[169] SOF ¶ 46.

Dated April 6, 2020

Respectfully submitted,

GRAVES GARRETT LLC

*s/ Edward D. Greim*
Edward D. Greim, #4240172
1100 Main Street, Suite 2700
Kansas City, MO 64105
Telephone: (816) 256-3181
Fax: (816) 256-5958
edgreim@gravesgarrett.com
ATTORNEYS FOR
DEFENDANT/COUNTERCLAIM PLAINTIFF

## CERTIFICATE OF SERVICE

This certifies that, on April 6, 2020, the foregoing was served on all counsel of record via the Court's Electronic Case Filing System.

*s/ Edward D. Greim*
Attorneys for Defendant/Counterclaim Plaintiff

31