**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **EASTERN PROFIT CORPORATION LIMITED,** ) | |
| ) | |
| **Plaintiff/Counterclaim Defendant,** ) | |
| ) | **Case No. 18-cv-2185** |
| **v.** ) | |
| ) | |
| **STRATEGIC VISION US, LLC,** ) | |
| ) | |
| **Defendant/Counterclaim Plaintiff.** ) | |

**DEFENDANT STRATEGIC VISION US, LLC'S CONSOLIDATED (1) L.R. 56.1(b) STATEMENT OF ADDITIONAL MATERIAL FACTS CONCERNING PLAINTIFF'S STATEMENT OF FACTS, DKT. 262; (2) L.R. 56.1(a) STATEMENT OF MATERIAL FACTS ON DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT;[1] AND (3) L.R. 56.1(b) RESPONSE TO PLAINTIFF'S STATEMENT OF FACTS, DKT. 262**

A.     The Research Agreement Was Drafted to Further Guo's Personal Political Goals, Not to Assist Any Particular Victim in Adjudicating a Specific Crime or Civil Wrong

1.     Guo claimed he intended to use Strategic Vision's research for his own publicity program of attacking senior CCP leadership, thereby pressuring the CCP, leading to its downfall, and promoting the "rule of law" and "democracy" in China.  Feb. 8, 2019 J. Michael "Waller 1" Tr., Ex. Z, 24:16-25:13 ("He wanted to do battle with the Chinese Communist Party leadership."); 34:5-11 ("Guo had a three-year plan. He wanted a three-year contract to fulfill that plan.").[2]  Guo intended to make political use of Strategic Vision's work:

> Q. What did you intend to do with the research that Strategic Vision was going to provide?
> MR. HARMON: Object to the form of the question.

---

[1]     The facts outlined in Sections (A)-(C) herein, Paragraphs 1-32, support Strategic's Cross-Motion for Summary Judgment. All additional material facts are made in support of Strategic's Opposition to Eastern's Motion for Summary Judgment and are L.R. 56.1(b) additional material facts.

[2]     *See* Ex. 1, Demonstrative Exhibit/Roster of Entities, Constituents, and Individuals.

> MR. GRENDI: Object to form.
> A. The simple reason is, we want to
> eliminate the Chinese Communist Party. We try to
> overthrow the Chinese Communist Party, to bring
> rule of law to China, to let the West know the
> scenes committed by the Chinese Communist Party.

Aug. 2, 2019 "Guo [Wengui] 1" Tr., Ex. AA, 39:9-19 (underling added).

2.     Guo's advisers suggested he publicize new information about senior CCP officials

in order to maintain his publicity campaign. Lianchao Han testified that the idea for research into

Chinese political officials was his own. Aug. 28, 2019 Lianchao Han Tr., Ex. BB, 126:22-128:9;

137:20-139:20. Lianchao was at that time already advising Guo on his asylum application (*Id*.,

46:17-47:9) and, among other things, on how to remain a resident of the United States. *Id*.,

130:14-132:10.  Lianchao also was advising Guo on how to "sustain" his image as a

"whistleblower."  *Id*., 46:17-47:9. Before conceiving of Strategic's research project, Lianchao

was already advising Guo that, in order to sustain his momentum of criticism against the CCP, he

needed to gather and publish the type of research against "high-ranking government officials"

similar to what Lianchao had already performed through two nonprofit "thinktank" entities. *Id*.,

43:1-46:2. Lianchao believed that to "continue to disrupt the Communist regime," Guo needed

"sustainable, fact-based, evidence-based disclosure of Chinese corruption," and told Guo that

"once we have solid evidence, we can expose them." *Id*., 138:12-139:15.

3.     Guo's and Eastern's claims that they would use the research to expose "crimes"

against the Chinese people or government were rhetorical references to exposing public

corruption rather than a specific plan to use the research in connection with adjudicating specific

crimes against particular victims, as Eastern's corporate representative admitted:

> Q.  Do you know why Mr. Guo cares if these individuals are committing
> crimes against the Chinese government?
> MR. GRENDI:  Objection.  You can answer.

> A.  It's a big question, but I love to answer.  And if you follow all the media, including New York Times, Washington Post, Wall Street Journal, all of this, big media internationally, and his own social media, you will have the answer.
> Q.  How about you provide me with your answer?
> A.  Because he spoke out on behalf of a Chinese outrage, common people, about the corruption of Chinese certain high official. There's no rule of law and democracy in Mainland of China.  And Chinese outrage people, they deserve, and they urgently, hungrily need that. So he believed what he has been doing until now, since two years ago, is for justice and for rule of law, democracy of China.

Jan. 31, 2019 Yvette "Wang 1" Tr., Ex. CC, 37:8-38:7 (underling added); Lianchao Tr., Ex. BB, 53:13-54:5 (Guo said he wanted to expose the corruption of high-ranking CCP members, but "[h]ow he's going to do it, I don't think he has an idea.").

4.      Guo testified that the Strategic Vision research was to advance his alleged political goals:  Q. Do you want to undermine the current leadership of the People's Republic of China?  A. I'm not just trying to undermine the government; I'm trying to eliminate the current government, to -- I'm trying to eliminate the party, Chinese Communist Party, to bring rule of law and freedom to China.  Guo 1 Tr., Ex. AA, 33:6-12 (emphasis added).  Guo further testified:

> Q. Mr. Guo -- Mr. Guo, how do you intend accomplish the goal that you just described to us? (DIR)
> MR. HARMON: Direct the witness not to answer.
> A: I'm not answering this question.
> BY MR. GREIM:
> Q. Was your work with Strategic Vision intended to accomplish the goal that you just described to us?
> A. Yes.
> Q. Is that what you told French Wallop and Mike Waller?
> A. Yes.
> Q. When did you tell them that?
> A. Between -- I don't recall the exact dates, but it's probably between November 2017 and February 2018, when we signed the contract.

Guo 1 Tr., Ex. AA, 35:12-36:4 (underlining added).

5.      When pressed for details, Guo claimed that he planned to use information on the

first 15 names to expose "hundreds of billions of dollars" in bank accounts and "help save

millions of people" or "hundreds of millions of people who got falsely persecuted in China,"

and/or "rescue tens of millions of people from the prison":

> Q. What did you intend to do with the research that Strategic Vision was going to
> provide?
> MR. HARMON: Object to the form of the question.
> MR. GRENDI: Object to form.
> A. The simple reason is, we want to eliminate the Chinese Communist Party. We try to
> overthrow the Chinese Communist Party, to bring rule of law to China, to let the West
> know the scenes committed by the Chinese Communist Party.
> Q. My question was more specific. What did you intend to do with the research that
> Strategic Vision uncovered regarding the 15 names?
> MR. GRENDI: Object to the form.
> MR. HARMON: Object to the form of the question.
> A. So we're going to send these reports to the U.S. courts so that people who got
> persecuted would know the truth.

Guo 1 Tr., Ex. AA, 39:9-40:6 (underlying added).

> Q. What was it about the 15 names that led you to believe that Strategic Vision's
> research would be useful to you in your goal of eliminating the Chinese
> Communist Party?
> MR. HARMON: Object to the form of the question.
> MR. GRENDI: Object to form.
> A. So the reason being, some of these names -- first of all, I don't know -- so I
> don't know all the names, but I do know -- I did know some of the names among
> the 15 names. Some names included, for example, the goddaughter of Wang
> Qishan, about -- you know, about her putting aside tens of billions of dollars and
> hundreds of billions of dollars in bank accounts. If we are able to disclose that
> information to the public, that would be great. And, also, they boasted that they
> had information, secret informations, about, you know, a police -- Chinese police
> department intelligence head, intelligence head, about his corruption information.
> So back then, we felt like, if – with possession of those information, we are able
> to release those information to the U.S. government to help save millions of
> peoples who got falsely persecuted in China, even hundreds of millions of people
> who got persecuted in China. And because of this lying pitch, we lost a wonderful
> opportunity to rescue all these millions and tens of millions of people who got
> thrown into jail for no reason. So, essentially, these two people, these two
> individuals, took advantage of our sense of urgency to rescue millions, tens of
> millions of people, from the prison, and they used those people as bait to try to get

us into sign the contracts. And those two people -- those two individuals are really despicable and very low.

Guo 1 Tr., Ex. AA, 45:3-46:16 (underlining added).

6.    Guo had no plan to use any of the information to address a specific crime by a specific person in a specific judicial proceeding as opposed to using the information as a weapon against the CCP as a regime. Wang (as Guo's "project manager") knew Guo had identified the subjects for research but, even a year after the contract with Strategic was negotiated, still only knew Guo's reasoning and plans based on Guo's social media posts. Wang 1 Tr., Ex. CC, 32:12-35:11; Lianchao Tr., Ex. BB, 53:13-54:5 (Guo said he wanted to expose the corruption of high-ranking CCP members, but "[h]ow he's going to do it, I don't think he has an idea."). When pressed to provide details, Guo testified:

> Q. What did you expect Strategic Vision's Guo Wengui weekly report to include?
> A. Including corruption of the Chinese Communist Party, their overseas spy network, their money-laundering evidence, as well as evidence regarding them stealing money from the Chinese people.
> Q. Did you expect Strategic Vision to provide you raw data only or analysis of the data?
> MR. GRENDI: Object to the form.
> A. Raw data, only raw data.
> BY MR. GREIM:
> Q. Why?
> A. Because we could use the raw data as evidence when we bring it to the court, a U.S. court.
> Q. Who is going to bring the evidence to a U.S. court?
> A. Of course, people like us, who share the same goal of overthrowing the Chinese Communist Party in the U.S. We, as a group.
> Q. Well, what -- did you discuss this plan with other people?
> A. I don't remember.
> Q. Well, were you planning on sharing the research with anyone else?
> A. The U.S. government and the people of China.
> Q. How did you plan to share the information with the people of China?
> A. To release them to the media; to release the information to the media.
> Q. How did you intend to get the information to the U.S. government?
> A. Based on the legal procedures of the U.S.
> Q. Do you plan to file a lawsuit with the information?
> A. To answer your question, the plan is to file a lawsuit.

Q. Who are you going to sue?
A. Whoever commits a crime and we have the evidence.

Guo 1 Tr., Ex. AA, 206:25-208:19 (underlining added).

7.      During negotiation and performance of the Research Agreement, the only person

or entity that Guo or his associates claimed would be using Strategic's research was Guo himself,

even if someone else signed the contract opposite Strategic. Waller 1 Tr., Ex. Z, 226:1-253:8.

8.      As a corollary to this, it was expected that it would be Guo who would pay for

Strategic's work. Nov. 19, 2019 J. Michael "Waller 2" Tr., Ex. ZZZ, 95:3-12 (underlining added)

("It was explicit that they would be all entities controlled by Guo Wengui, that it was his money,

and that he would—he may use various vehicles to conceal from the Chinese government the

fact that he was making these payments."); Lianchao Tr., Ex. BB, 246:6-17.

9.      After performance had begun in January 2018, Wang was told by Guo, and then

conveyed to Waller, that "big budget is ready for this long-term project" and that the "investors"

could pay Waller's team even without a contract. Wang 1 Tr., Ex. CC, 258:5-259:13.  At all

times, Guo and his associates assumed that some other person or entity rather than Guo would

sign the written contract *as a stand-in for Guo*. Lianchao Tr., Ex. BB, 273:1-5 (In drafting the

Research Agreement, for security reasons, there was a concern about Guo being identified as a

party.); Ex. DD (Wang 1 Tr. Ex. 5, SVUS00067-70: Lianchao-Waller Dec. 24-25, 2017 text

exchange, in which Lianchao says "I don't know who will sign" and Waller reports that Guo had

already proposed and the parties had agreed that Lianchao sign); Ex. EE (Wang 1 Tr. Ex. 16,

EASTERN-00217-219:  Wang-Wallop January 5, 2018 text exchange, in which Wang says, "So

I'm the person to sign this contract tomorrow" and confirms that "NY" (that is, Guo) had

instructed her that "this contract and all the communications…are exclusively between NY, you,

M [Michael Waller] and me—four of us.").

6

B.      Eastern had Agreed to Furnish Strategic's Research to Others.

10.      To the extent Eastern is contending that it operates as a distinct entity outside of Guo's control, Eastern admitted that Guo provided it the initial fifteen subject names for Strategic to research and background information for research.  Feb. 12, 2019 French "Wallop 1" Tr., Ex. FF, 83:24-84:7, 185:7-186:12, Lianchao Tr., Ex. BB,173:6-174:4. Eastern was to give Guo the research results for Guo's own personal use, purportedly to "whistle blow" and publicly attack the CCP (Wallop 1 Tr., Ex. FF, 32:5-35:11, 37:8-38:7). These initial names and background information had value: Guo represented to Strategic that he had spent a substantial sum to compile the information associated with each name.  Waller 1 Tr., Ex. Z, 186:11-188:7; Wallop 1 Tr., Ex. FF, 83:24-84:7, 185:7-186:12, Lianchao Tr., Ex. BB, 173:6-174:4 (Lianchao remembers that Guo claimed to Strategic that he had paid some amount of money to come up with the initial research included with the list of names, but believed Guo may have exaggerated regarding the amount he had spent).

11.      To the extent Eastern is contending that it operates as a distinct entity outside of Guo's control, Eastern at all times intended, and the parties agreed, that Guo would receive and use the research that Strategic would provide, which was a continuation of the work Guo claimed he already had paid for. Wallop 1 Tr., Ex. FF, 83:24-84:7, 185:7-186:12, Lianchao Tr., Ex. BB, 173:6-174:4; Waller 1 Tr., Ex. Z, 186:11-188:7; Wang 1 Tr., Ex. CC, 32:5-35:11, 37:8-38:7 (Eastern admits Guo was the person who was going to use the research), 102:21-103:7 (Wang reported back solely to Guo on Strategic's performance), 263:8-268:12, 37:8-38:7 (Guo supposedly cares about this misconduct because he wants to promote democracy and the rule of law in China); Exs. GG and HH (Wang 1 Tr. Exs. 18 and 21 (The urgent need for information by January 26, 2018 was Guo's, but he never told Wang why he needed it so quickly; Wang also

authenticates text messages showing Guo needed reports for his own purposes)); Guo 1 Tr., Ex. AA, 213:6-214:3 (Wang reported to Guo on Strategic's delivery of a thumb drive, and because it didn't contain the "evidence" he had wanted, agreed with her that Strategic should be sued).

12.     To the extent Eastern is contending that it operates as a distinct entity outside of Guo's control, it also had promised to share the information from the Research Agreement with non-party ACA Capital Group Limited ("ACA," the entity that actually paid Strategic the $1 million deposit under the contract, and which Eastern claims "lent" it the $1 million): in a late 2018 dinner meeting, William Je reminded Wang that he had expected information from the Research Agreement regarding corrupted Chinese officials. Wang 1 Tr., Ex. CC, 44:1-47:14, 158:6-9, 158:20-159:23, 161:2-17; Ex. U, Dkt. 267-1 (Wang 1 Tr. Ex. 7); Dkt. 127, p. 22, ¶ 7; Dkt. 142, p. 3, ¶ 7. Wang reports to Je on the progress of this case. Oct. 30, 2019 Yvette "Wang 2" Tr., Ex. II, 224:6-17.

13.     Had the research been successful but Eastern still not regained access to its bank accounts, Eastern testified that ACA may have been willing to write off the purported loan altogether. Wang 2 Tr., Ex. II, 206:24-208:16.

14.     Consistent with ACA's possible intention to forgive the loan in exchange for successful research, Eastern twice testified that ACA told Eastern that *because* Eastern's contract with Strategic did not yield results, Eastern would have to repay the loan with interest:

> Q. On what basis does Eastern Profit claim that you had authority to deal with
> William Yu regarding the ACA loan at the fall, 2018 meeting?
> A. Eddie, I will repeat my reply for the fourth time for you. I tried to recall every
> inch of the words we said in that dinner to help you in here. Okay? William
> mentioned to me I heard you guys were cheated by liars, which means I will have
> to ask the loan to be paid back with interest. I remember I said yes, sadly, we were
> cheated, and I'm sorry about that. And I agree with you, since you guys have a
> law agreement, the borrower should pay you back, and we are in litigation right
> now trying to get that 1 million U.S. dollars from the liars back. Hopefully we can
> get the justice, and that 1 million U.S. dollars can be returned back to Eastern

Profits with even any damage. So Eastern, as you said, you told me borrower can
pay you back.

Wang 2 Tr., Ex. II, 71:19-72:17 (underlying added).

Q. Are they asking for the money back because the term—the contract was terminated?
A. Obviously--
Mr. GRENDI: Objection of form. You can answer.
A. Obviously, correct. Because this contract produced nothing.

Wang 1 Tr., Ex. CC, 47:14-21.

15.     During performance of the Research Agreement in January 2018, Wang had

discussed with Strategic a group of "investors" who were allegedly backing the project in

association with Guo. Wang 1 Tr., Ex. CC, 258:5-259:13; Ex. JJ (Wang 1 Tr. Ex. 20). At its

deposition, Eastern testified that these "investors" were "the people who are the real fighter for

rule of law and democracy in China." Wang 1 Tr., Ex. CC, 258:5-259:13.  In her texts to

Strategic, Wang said "the investors would not continue to spend money on the things they don't

need, for instance, the things of today [January 26, 2018]. Checked with them, we have 20 days

to update them 2-3 times hopefully, with the financial and tracking results agreed in contract…

Without the above, the investors could not move to second month with us, and hard to do future

with us, I'm afraid." Ex. JJ (Wang 1 Tr. Ex. 20).

16.     During its second corporate deposition, ordered by the Court just before the close

of discovery after Eastern did not seriously dispute that it had failed to produce a knowledgeable

witness at its first deposition (Dkt. 189, p. 5), Eastern (testifying again through Wang) for the

first time claimed that it had also intended to put Strategic's research to its own use. Wang 2 Tr.,

Ex. II, 73:8-74:8; 196:9-15; 197:18-198:6; 202:2-204:20; 207:13-208:16.

17.     Specifically, Eastern claimed it wanted to use Strategic's research to unfreeze its

only asset, a Hong Kong bank account that it claimed had been frozen by Hong Kong

authorities acting under the influence of the CCP. Wang 2 Tr., Ex. II, 73:8-74:8; 196:9-15; 197:18-198:6; 202:2-204:20; 207:13-208:16; Nov. 11, 2019 "Chunguang [Han]" Tr., Ex. KK, 87:3-88:20; Dkt. 203-2 (Eastern's only asset—a Hong Kong bank account—is frozen).

18.     Eastern claimed it intended to use Strategic's research to criticize CCP leaders, which would then achieve regime change on the Mainland, which Eastern claimed would then cause CCP-influenced Hong Kong authorities to unfreeze Eastern's bank account. Wang 2 Tr., Ex. II, 73:8-74:8; 196:9-15; 197:18-198:6; 202:2-204:20; 207:13-208:16. Eastern could not explain exactly how this plan would unfold but was confident that its bank account would be unfrozen. *Id*.

19.     Wang had told Strategic in January 2018 that "as you know, big budget is ready for this long term project. The investors can even pay your team without contract." Wang 1 Tr., Ex. CC, 258:5-259:13; Ex. JJ (Wang 1 Tr. Ex. 20). But even with the benefit of hindsight, Wang for Eastern answered, "I have no idea" when asked how it had planned to put this budget together. Wang 1 Tr., Ex. CC, 258:21-259:13.

20.     According to Eastern, it had been willing to "borrow" millions of dollars to pay for research to unfreeze an account that held only about $80,000. Wang 2 Tr., Ex. II, 208:17-22 (Eastern "possibly" intended to keep "borrowing" from ACA for the rest of the contract because the extent that ACA paid was limited to the contractual deposit); Dkt. 203-2 (the amount frozen in Eastern Profit's Hong Kong bank account was HK $578,399.78, the equivalent of about USD $80,000); Dkt. 264, ¶ 5. *See also* Ex. NN (https://www.bloomberg.com/quote/USDHKD:CUR (published market report showing historical 5-year exchange rate as between 7.75 and 7.85 HKD to one U.S. dollar)).

C.      Eastern Did Not and Could Not Have Provided Anything Meaningful of its Own that
        Was of Value to the Research Agreement.

21.     The development of identities and background research on the 15 initial subjects was provided by Guo at his own cost, and not paid for by Eastern.  Wang 2 Tr., Ex. II, 209:25-210:5; Wallop 1 Tr., Ex. FF, 83:24-84:7, 185:7-186:12, Lianchao Tr., Ex. BB, 173:6-174:4; Waller 1 Tr., Ex. Z, 186:11-188:7.

22.     All of the work involved in negotiating the Research Agreement, monitoring performance, and prosecuting the lawsuit—even producing documents and serving as a corporate witness—was performed on behalf of Eastern for free by an entity called Golden Spring New York (Limited) ("GSNY"), which in turn takes direction from Guo's family office, China Golden Spring. Ex. M (Plt's First Interrog. Resp.), also Dkt. 267-1, p. 2, No. 4; Wang 1 Tr., Ex. CC, 23:3-29:13 (Eastern's interrogatory responses are signed by Yvette Wang as President of GSNY because GSNY "provide[s] service" to Eastern Profit as its attorney-in-fact); 18:14-20:21 (Wang, Eastern Profit's 30(b)(6) witness, claims GSNY is a "family office" and that she takes direction from China Golden Spring in Hong Kong, but refuses to name the family or individuals involved); Nov. 12, 2019 A. "Coluccio Tr.," Ex. OO, 171:2-172:13 (GSNY is Guo's family office), 186:15-19 (GSNY takes direction from Guo), 122:15-123:3 (GSNY is wholly owned by China Golden Spring).

23.     The only payment that was ever made to Strategic—a deposit that was an order of magnitude greater than Eastern's only asset, a frozen Hong Kong bank account holding only about $80,000, came from an entity called ACA. Wang 1 Tr., Ex. CC, 158:6-9, 158:20-159:23, 161:2-17; Dkt. 127, p. 22, ¶ 7; Dkt. 142, p. 3, ¶ 7; Dkt. 203-2; Dkt. 264, ¶ 5.

24.     In negotiations, the parties understood that Guo was funding Strategic's research. Lianchao Tr., Ex. BB, 246:6-17; Ex. M (Plt's First Interrog. Resp.), Dkt. 267-1, p. 2, No. 4; Dkt.

93, pp. 3-4, ¶ 17; Wallop Aff., Ex. C (Dkt. 267-1), ¶¶ 6-7. In the Research Agreement, it was

agreed that payment would come from some entity other than the signer. Ex. J (Dkt. 267-1), p. 5.

During performance in January 2018, Wang conveyed to Strategic that "big budget is ready for

this long-term project," and that the "investors" could pay Waller's team even without a contract.

Wang 1 Tr., Ex. CC, 258:5-259:13.

25.     During the litigation, Eastern for the first time claimed that it had in fact paid

Strategic itself by virtue of having received a loan from another entity, ACA, that exactly

matched ACA's payment of a deposit to Strategic. Wang 2 Tr., Ex. II, 49:25-50:10, 53:19-54:3,

56:7-11, 57:5-9, 110:17-112:2; Dkt. 203-2; Chunguang Tr., Ex. KK, 72:24-73:14.

26.     There is reason to doubt that a loan was truly made, beginning with irregularities

in the loan document itself. The man who signed the loan for Eastern, purportedly (on the

signature line) as a "Director," was not in fact its director. Chunguang Tr., Ex. KK, 59:60:8,

70:5-9, 102:2-18 (discussing resignation); Ex. LL (Chunguang Tr. Ex. 35, EASTERN-000278-

80, loan document).  Chunguang had long before resigned as a director, having transferred

Eastern to Guo Wengui's daughter, Guo Mei, back in June of 2017, just before all of Eastern's

assets were seized. Chunguang Tr., Ex. KK, 59:60:8, 70:5-9, 102:2-18 (resignation), 87:3-88:20;

Dkt. 203-2 (asset seizure). The real director at the time of the purported loan, Eastern's sole

director, was Guo Mei, Guo Wengui's daughter. *Id*. Chunguang admitted Guo Mei had

purchased Eastern from him six months before the Research Agreement was negotiated, but

testified that Guo's daughter had made the purchase in order to go into the movie business, and

had orally asked him to be Eastern's agent.  Chunguang Tr., Ex. KK, 101:17-105:3 (date of sale

June 27, <u>2017</u>), Ex. J (Dkt. 267-1), p. 5 (Agreement signed January 6, <u>2018</u>); Wallop Aff., Ex. C

(Dkt. 267-1), ¶ 4; Wang 1 Tr., Ex. CC, 264:9-12.

27.     Other Guo confidants, including Lianchao Han, who negotiated the Research

Agreement, easily recognized Chunguang as a cook, bodyguard, and errand boy for Guo.

Lianchao Tr., Ex. BB, 36:17-37:12; Nov. 26, 2019 Sasha "Gong Tr.," Ex. PP, 36:9-22; 116:24-

118:11.  Lianchao testified that Chunguang was usually in Guo's New York apartment when he

visited Guo. Lianchao Tr., Ex. BB, 266:12-277:4. Yet, Chunguang refused to provide details on

his line of work, place of work, or reason for his presence in Guo's building; he denied ever

having worked for Guo and instead claimed to have begun running his own investment business

after having been tutored by Guo, his "mentor" and "idol," in the niceties of art, architecture, and

investing. (Chunguang Tr., Ex. KK, 24:20-34:2; 35:17-36:4; 42:7-11). Guo admitted Chunguang

is in his building almost every day, but refused to say why or to know why (Guo 1 Tr., Ex. AA,

114:9-117:6; 195:23-197:24), and laughed when asked whether Chunguang attended meetings

between Guo and Strategic (*Id*., 158:5-15). Of course, he did not. *See* Eastern's Rule 56.01

Statement, Dkt. 262, and Strategic's Responses to same, below, SOF 30-32.

28.     Additionally, the timing of the purported "loan" negotiation does not match with

the last-minute insertion of Eastern as the signatory to the Research Agreement. The loan was

purportedly signed on Friday, December 29, 2017, a date ACA "Chief Executive" William Je (a

non-resident of the U.S. who could not be found to testify as a witness) happened to be in New

York City—the last business day before the Tuesday, January 2, 2018 wires were sent from

ACA to Strategic. Ex. U (Dkt. 267-1) (Wang 1 Tr. Ex. 7); Wang 1 Tr., Ex. CC, 158:6-9, 158:20-

159:23, 161:2-17; Dkt. 127, p. 22, ¶ 7; Dkt. 142, p. 3, ¶ 7. Yet, Chunguang testified that even

after Yvette Wang approached him and he supposedly agreed to have Eastern sign the Research

Agreement (Chunguang Tr., Ex. KK, 39:5-40:11), a step he says he could only take after he

received authority from Guo Mei (Guo's daughter) to do the project (*Id*., 72:24-73:13), it

13

required "two or three" in-person meetings, as well as at least one phone call, before the loan could be signed in-person on December 29.  *Id*., 133:13-24. Again, Wang's approaching Chunguang is what supposedly triggered all of Chunguang's work in this regard, but she did not herself learn the identity of Eastern until just before her first, December 29, 2017 trip out of town to Virginia, and the draft Guo gave her to review did not even contain Eastern's name. Wang 1 Tr., Ex. CC, 51:6-52:18; Ex. AAAA (Wang 1 Tr. Ex. 4).

29.     Eastern did not keep any copy of the loan agreement after it was signed, and Chunguang tried to explain by claiming he only intended to tell Eastern's "fiscal department" (though it had no employees left) about the loan at some future point after Eastern's assets were unfrozen and the loan could be repaid (Chunguang Tr., Ex. KK, 134:21-136:5). The loan was not produced before Eastern's first Rule 30(b)(6) deposition on Jan. 31, 2019 and, ten months later, Eastern's corporate representative (Wang) still could not say <u>where</u> Eastern had obtained the loan document to produce in the case; she was allowed to say only that she saw it for the first time in prior litigation counsel's "file." Wang 2 Tr., Ex. II, 97:20-102:8.

30.     Chunguang's signature appears to have been falsely signed on at least two other documents involved in this case—the <u>Research Agreement</u> itself (Lianchao Tr., Ex. BB, 222:7-223:8, identifying Chunguang's name on Research Agreement that was signed by Wang in French Wallop's presence in Virginia (Wang 2 Tr., Ex. II, 141:15-143:5, admitting she did not sign her own name, but denying she signed Chunguang's and claiming she signed "nobody's name"), and a <u>Substitution of Counsel</u> filed in this Court (Chunguang Tr., Ex. KK,118:9-119:8; Ex. Q (Dkt. 267-1) (Ex. 33 to Chunguang Tr.)—without his knowledge or agreement.

31.     Additionally, the purported loan covered only the $1 million deposit on a contract that required payments of $750,000 per month beginning January 2018. Ex. J (Dkt. 267-1), p. 5.

Eastern had made no arrangements to borrow any of the other payments (Wang 2 Tr., Ex. II, 208:17-22) and had "no idea" how it would fund the rest of the Agreement (Wang 1 Tr., Ex. CC, 258:21-259:13, 262:10-18), which had a term of three years. Ex. J (Dkt. 267-1), p. 5 ("Duration").  The purported loan bore interest at 2% per month, compounding monthly.  Ex. LL (Chunguang Tr. Ex. 35).  It was repayable in full, with interest, in just six months.  *Id.* Yet Eastern had committed itself to a Research Agreement that would take three years to complete Ex. J (Dkt. 267-1), p. 5 ("Duration")), and Eastern's only plan for generating cash was for Strategic to find damaging research on CCP leaders; for Guo or someone else to effectively publicize the research; for regime change in China to occur; and for this regime change to cause Hong Kong authorities to unfreeze Eastern's account. Wang 2 Tr., Ex. II, 73:8-74:8; 196:9-15; 197:18-198:6; 202:2-204:20; 207:13-208:16; Chunguang Tr., Ex. KK, 87:3-88:20. That account, however, held only about $80,000, just a fraction of the deposit and nothing for the contractually-required payment for a single month of work. Dkt. 203-2 (Eastern's only asset—a Hong Kong bank account—is frozen); Dkt. 264, ¶ 5.

32.    Despite the fact that the loan had been due for payment in full on June 29, 2018 per its terms (Ex. LL, Chunguang Tr. Ex. 35), Eastern testified it had had no contact with ACA about repayment as of the date its initial deposition was taken on January 31, 2019, almost a year after Eastern had sued Strategic. Wang 1 Tr., Ex. CC, 45:8-46:23. Indeed, Eastern's corporate witness, the so-called "project manager," claimed she had never seen a loan document and had never spoken with anyone from ACA. *Id*. Only after Strategic questioned the genuineness of the loan in this litigation did Eastern use its second corporate deposition on Oct. 30, 2019 to claim that William Je, the chief executive of ACA, had begun to "chase" Chunguang in New York City to collect. Wang 2 Tr., Ex. II, 35:2-39:8. These meetings supposedly took place in the late

summer of 2019. *Id*. Eastern's corporate representative also claimed to remember that in the fall of 2018, William Je (on behalf of ACA) had met her for dinner at a New York City restaurant to discuss the Research Agreement and loan. *Id*., 44:1-47:14.

    D.   It was Reasonable for Strategic to Rely on Guo's Statements—They Came After Guo <u>was Introduced by Trustworthy Sources</u>.

33.     Guo did not contact Strategic without an introduction first. Guo arranged for two people who were acquainted with French Wallop (Dr. Lianchao Han ("Lianchao") and William Gertz ("Gertz")) to make arrangements for Guo to be introduced to Strategic. Wallop 1 Tr., Ex. FF, 11:24-12:21, 31:23-35:7, 89:9-91:1; Lianchao Tr., Ex. BB, 44:17-46:2; Oct. 15, 2019 William "Gertz Tr.," Ex. QQ, 48:9-15, 128:6-134:21, 138:2-4. This was in or around November 2017. *Id*.

34.     Lianchao, who immigrated to the United States from China, worked in the U.S. Senate for several years, including for the late Senator Wallop, to whom French was married at the time. Wallop Aff., Ex. C, Dkt. 267-1, ¶¶ 2-3. Lianchao came to know French from his close relationship with the Senator's office. *Id*.; Lianchao Tr., Ex. BB, 38:20-39:6. Lianchao also had known Guo for some time, had assisted Guo on such critical matters as his application for asylum in the U.S. (including through Lianchao's work with two Washington defense policy thinktanks), and, through Guo, has met such prominent political figures as Tony Blair. *Id*., 30:19-32:11, 36:8-16, 46:17-47:9.

35.     Gertz has covered defense and national security affairs for his entire career (Gertz Tr., Ex. QQ, 20:15-21:1); has written eight books, including two on China and his most recent (*Deceiving the Sky*); and also speaks around the country and appears on national news programs. *Id*., 17:2-24:21, 25:18-21; Wallop 1 Tr., Ex. FF, 12:16-21, 33:15-21. Gertz developed a deep involvement with Guo, through both a friendship and professional relationship after having been

16

introduced to Guo by Sasha Gong between June and July 2017. Gertz Tr., Ex. QQ, 64:6-65:8; 72:13-73:19.

36.    Gertz believed that Guo was a "valuable resource" with a "powerful message" but lacked effective communication skills and thus needed strategic communications advice from French. Gertz Tr., Ex. QQ, 128:12-133:7, 137:5-14. Gertz wanted Lianchao to introduce her to Guo so that Wallop could get Guo to "focus his message so that it could be a more effective tool," which would benefit Gertz as a reporter by giving him "information and news stories." *Id*., 131:1-132:13. According to Lianchao and Gertz, Guo's message was based on several broad and noteworthy policy goals involving the Chinese government beneficial to the people of China. Wallop 1 Tr., Ex. FF, 88:3-89:5, 31:23-35:7; Guo 1 Tr., Ex. AA, 45:3-46:16; Lianchao Tr., Ex. BB, 53:13-20; Gertz Tr., Ex. QQ, 60:16-20, 64:16-65:2, 66:15-67:5, 69:3-8, 69:17-70:1, 128:6-129:6, 131:1-132:19.

37.    Lianchao agreed to make the introduction and was already advising Guo that he needed to undertake research against "high-ranking government officials" to sustain his momentum. Lianchao Tr., Ex. BB, 43:1-46:2.

38.    That Gertz was so deeply involved with Guo was significant especially to Waller, who had known Gertz and periodically worked with him over the course of a 35-year period. Gertz Tr., Ex. QQ, 126:14-128:8; Waller 1 Tr., Ex. Z, 116:24-117:9.

39.    That Guo was a person of significant financial means was clear to Wallop when she gave public relations and communications advice to help his integration into the U.S., such as where to buy real estate in Washington, D.C. to achieve a high profile presence there. One of Guo's desires was to "buy a very large bank building in Washington right across from the White House … buy a huge house in Washington. All of these things were part of his sort of image

building."  Wallop 1 Tr., Ex. FF, 32:17-38:4, 41:11-42:11, 43:15-45:25, 87:23-89:5; Gertz Tr.,

Ex. QQ, 137:5-16.

40.     It was also significant to Strategic that Guo had formed a close relationship with

Stephen K. Bannon ("Bannon"), the former senior advisor to President Trump who Strategic

believed wanted to "confront the threat that China poses against the United States." Waller 2 Tr.,

Ex. ZZZ, 123:24-124:8 (referencing texts between Lianchao and Waller regarding Bannon).

41.     Strategic Vision has long known about Mr. Bannon's purported connections to

Mr. Guo. Their collaboration has been the subject of widespread press coverage going back to

2017. *See e.g.*, Ex. RR (Tom Phillips, "Guo Wengui, the Maverick Chinese Billionaire Who

Threatens to Crash Xi's Party," The Guardian (Oct. 15, 2017),

https://www.theguardian.com/world/2017/oct/16/guo-wengui-themaverick-chinese-billionaire-

who-threatens-to-crash-xis-party); Ex. SS (Cezary Podkul and Brian Spegele, "Steve Bannon,

Chinese Critic Create Fund to Investigate Beijing," Wall St. Journal (Nov. 20, 2018),

https://www.wsj.com/articles/bannon-chinese-critic-create-fund-to-investigate-beijing-

1542759820); Ex. TT (David Barboza, "Steve Bannon and a Fugitive Billionaire Target a

Common Enemy:China," N.Y. Times (Dec. 4, 2018),

https://www.nytimes.com/2018/12/04/business/stephenbannon-guo-wengui-china.html).

42.     Bannon resisted discovery in this case.  Dkt. 216, p.2 (letter of Bannon counsel

opposing motion to extend discovery to depose Bannon).

E.   <u>Guo Had Reason to Need Strategic's Services Because He Had No Other Avenue</u>.

43.     When Guo selected the subjects for research under the Research Agreement,

including the first 15 names (Guo 1 Tr., Ex. AA, 39:9-40:6; Wallop 1 Tr., Ex. FF, 129:7-17,

281:19-282:13), he was continuing something he had begun earlier with a different research

company—research that created a "big file of names" that Guo claimed to Strategic had cost $250 million.  Nov. 19, 2019 French "Wallop 2" Tr., Ex. UU, 37:14-19, Wallop 1 Tr., Ex. FF, 84:8-86:18, 159:8-161:10, 185:7-186:12, 217:3-20; Lianchao Tr., Ex. BB, 173:1-175:7; Waller 1 Tr., Ex. Z, 186:11-187:21.

44.     According to Guo, he had failed to receive what he needed from the earlier work:

> Guo said, this is the file, he slammed down on the coffee table like that in front of me in his apartment, in his sun room, and said, this is what we need to investigate, these are the people we need to look into, and, here, you can look through the names.· And I said, wow.· He said, I paid $250 million for this.· I said, really.

Wallop 1 Tr., Ex. UU, 185:12-19 (underlining added) and Lianchao Tr., Ex. BB, 173:1-175:7.

45.     Strategic believed the earlier work Guo had received was "rubbish" and of no value.  Wallop 1 Tr., Ex. FF, 159:8-161:10.  Guo's earlier "security service" had stopped work for Guo when he terminated its services.  Lianchao Tr., Ex. BB, 247:11-250:5. Guo had worked with T&M Security to install cameras in his apartment, but they no longer work for him. Guo 1 Tr., Ex. AA, 18:8-13, 21:3-15.

46.     The sophisticated research and consulting being provided by Strategic through its team of "top-quality industry standard people" (Waller 1 Tr., Ex. Z, 122:1-123:15) was not something Guo was able to receive from other sources (even Lianchao ultimately declined when Guo wanted to hire him, Lianchao Tr., Ex. BB, 218:11-219:2) and Guo needed Strategic to agree to the project. *Id.*, 173:1-175:7. Lianchao, who conceived of the project in the first place and advises Guo, is not aware that, after Strategic was terminated, Guo ever got information on the 15 individuals and using it to expose CCP leaders. *Id.*, 237:10-238:6. Eastern did not retain anyone else to research the 15 names. Wang 2 Tr., Ex. II, 195:21-196:7.

F.  Guo Made False Statements About his Opposition to the CCP and Desire to Use Strategic's Work to Undermine the CCP and Bring About Regime Change.

47.    Guo made representations about himself in his discussions with Strategic.  These included that he was a longtime opponent of CCP (Wang 1 Tr., Ex. CC, 32:5-35:11, 37:8-38:7, Lianchao Tr., Ex. BB, 53:13-54:5, 138:12-139:15, 173:1-175:7), that Guo desired to undermine, sow disruption, and bring about regime's downfall (Guo 1 Tr., Ex. AA, 45:3-46:9, 206:25-207:7), that he would accomplish this through publicizing research about regime's corruption (Lianchao Tr., Ex. BB, 173:1-175:7, 279:10-14), and that this was dependent on the work by Strategic.  Guo 1 Tr., Ex. AA, 45:3-46:9, 206:25-207:7; Wallop 1 Tr., Ex. FF, 84:15-89:5; Wang Tr. 2, Ex. II, 49:25-50:10, 53:19-54:3, 56:7-11, 57:5-9, 110:17-112:2.

48.    Wallop understood from Guo during a meeting to discuss Strategic's work that: "Well, Guo had said that the CCP, or the communist party of China, there was a great deal of corruption within the leadership, and, as a result of that, he wanted to find as much corruption as possible, and he wanted us to investigate and retrieve that kind of corruption.  In other words, funds that would have been taken out of the country illegally, cash payments, all of these things that were part of that."  Wallop 1 Tr., Ex. FF, 84:22-89:5 (underlining added).

G.  Guo's Representations Were False.

49.    In his August 2, 2019, deposition, Guo testified that Sasha Gong ("Gong") was his "friend" who had introduced him to Washington Free Beacon journalist Bill Gertz. Guo 1 Tr., Ex. AA, 58:6-13.

50.    Labeled and tracked as a counter-revolutionary in her youth, Gong immigrated to the U.S. in 1987.  Gong Tr., Ex. PP, 9:11-15:16. In the U.S., Gong became a member of the Chinese dissident community, earning a doctorate at Harvard and teaching, writing books, and even running for a seat in the Virginia House of Delegates. *Id*., 15:17-19:23. In 2011, Gong

became the director of the Chinese branch of the United States government's Voice of America

media operation. *Id.*, 20:9-22:13, 29:20-32:11; 35:9-37:15, 39:12-40:15, 41:2-11.  In this role,

she oversaw over 100 employees; it was her job to spread the word about democracy within

China through Chinese language broadcasts and also to expand the size of the audience, which

she accomplished. *Id*. Gong is also a member of the Committee on the Present Danger: China.

*Id.*, 22:18-23:6.

51.      Beginning in April 2017 and continuing through 2018, Gong interviewed Guo

several times, both off the record and live on-air. Gong Tr., Ex. PP, 29:20-32:11; 35:9-37:15.

52.      Starting with the first interview, Gong also visited Guo at his Sherry-Netherland

apartment in New York City several times and met Guo's retinue, including Wang and

Chunguang Han.  Gong Tr., Ex. PP, 35:9-37:15 (first interview); 41:2-20. Gong introduced Guo

to several reporters (*Id*.) and advised him on a new media arm he wanted to start. *Id.*, 42:6-43:11,

79:3-21.

53.      Throughout 2017, Gong continued to speak with Guo, who made claims about his

background and involvement in Chinese affairs. Gong Tr., Ex. PP, 46:4-48:12; 58:21-59:12.

54.      Later, Gong was invited to serve as an initial director of the Rule of Law Society

(Gong Tr., Ex. PP, 177:8-23), an entity founded by Guo and Steve Bannon purportedly to

"whistle blow" and fight for democracy in China; the homepage on its website, rolsociety.org,

states that its vision is to "expose corruption, obstruction, illegality, brutality, false

imprisonment, excessive sentencing, harassment, and inhumanity pervasive in the political, legal,

business and financial systems of China" and that is mission is to "permit the people of China to

live under a national system based on the rule of law, independent of the political system of the

People's Republic of China." (quoted from rolsociety.org). Gong served from its formal

organization in July 2019 until September 2019. Gong Tr., Ex. PP, 23:7-24:15. Finally, in late

May or early June 2019, Guo gave Gong for her review a "thick" copy of his court file in this

case. *Id.*, 48:16-49:13.

55.      Guo's own statements from the 2017-2018 time period show that he began his

career in, and continued to be part of, the Communist Chinese regime and wanted to continue to

bargain within it rather than cause its downfall.  Guo claimed in conversation with Gong in 2017

or 2018, and has also publicly claimed, that he was arrested for his support of the 1989

Tiananmen Square movement. Gong Tr., Ex. PP, 59:2-12.

56.      But Guo also told Gong that, after a time in Hong Kong subsequent to Tiananmen

Square, he came back to Mainland China, where he built real estate, made many high-ranking

friends, and became one of the major players in the Chinese intelligence community. Gong Tr.,

Ex. PP, 61:24-62:9.

57.      Guo also told Gong that he was one of only three people who could visit Hu

Jintao, the former general secretary of the CCP (and  immediate predecessor to Xi Jinping)

without an appointment. Gong Tr., Ex. PP, 68:21-69:10. He used this access to do battle with the

former Vice Mayor of Beijing by allying with Ma Jian, a senior official in the Chinese Ministry

of State Security (the "MSS," or China's CIA).  *Id.*, 64:21-68:6.  Guo admitted to Gong that he

became very close friends with Ma Jian. *Id.*, 66:10-67:8.

58.      Guo admitted to Gong that his close friend was Zhang Yue, who was known to

have played a major role in suppressing the democracy movement after Tiananmen Square,

although Guo never discussed this. Gong Tr., Ex. PP, 62:6-63:20. When questioned, Guo would

not provide Gong details on what Zhang Yue's function was. *Id.*, 64:10-20.

59.    Guo admitted to Gong that he did other work for the MSS, including visiting the Dalai Lama, for which he supposedly received a medal. Gong Tr., Ex. PP, 70:17-71:4.

60.    In 2018, Guo admitted to Gong that he had participated in government meetings with senior CCP officials in Zhongnanhai. Gong Tr., Ex. PP, 216:7-25.

61.    Guo claimed to Gong that he had left China because his patron, Ma Jian, the Deputy Minister of State Security, told him he would be caught up in the anti-corruption campaign. Gong Tr., Ex. PP, 74:22-75:17. Guo told Gertz that the MSS is not only responsible for repressing domestic political dissent, it is also responsible for monitoring and suppressing overseas activities that are deemed subversive of the CCP. Waller 2 Tr., Ex. ZZZ, 142:2-24.

62.    Guo admitted to Gong that, once in the U.S., he continued to make business deals. Gong Tr., Ex. PP, 75:18-76:2.

63.    Guo admitted to Gong that he maintains connections with senior Chinese leaders. Gong Tr., Ex. PP, 131:12- 132:15.

64.    In 2017, Guo admitted to Gong that he believed Xi Jinping was a good leader, and his only goal was "to target the corrupt ones" in the CCP. Gong Tr., Ex. PP, 76:3-77:13.

65.    Gong's public interviewing of Guo, beginning April 17, 2017, coupled with China's issuance of an Interpol notice and purported complaints to Voice of America, lent him credibility he had not to that point enjoyed. Gong Tr., Ex. PP, 184:10-185:5.  In fact, during 2017, in the months before meeting with Strategic, Guo engaged in numerous communications with CCP officials in which he pledged loyalty to the CCP and, later, seemingly tried to bargain regarding the extent of his public communications. (*See* Facts 67 through 82, below)

66.    In March 2017 (Video 1, published April 29, 2017), Guo reported in Mandarin to an unknown listener that he is back in New York: "The operation is on now. I have absolute faith

in General Secretary Xi." Gong Tr., Ex. PP, 159:16-162:18 (authenticating Guo's voice);

Lianchao Tr., Ex. BB, 74:9-80:16 (same, and also agreeing that Chinese transcription was

accurate); J. Ju Aff., Ex. BBBB, ¶¶ 1-8, 14 and Ex. B (referencing SVUS1314 (certified English

translation)). Guo next criticizes one reporter, Xi Nuo, because he "attack[s] our CCP leaders"

and "wrote a book about leaders' private affairs." *Id*. (J. Ju Aff.), ¶ 14, p.2, Ex. B (SVUS1315).

For this, he says, "these people must be punished"; indeed, "they are the modern traitors of the

Chinese nation" and "deserve to die." *Id.* Guo proposes his own plan of action: "Just wait and

see. I can take these bastards down and help our leaders to [get] revenge." *Id*. Guo concludes by

saying that he plans to "make some contributions and establish merit first" before going back to

China. *Id*. Guo claimed he "did not know" whether the recording was authentic. Dec. 4, 2019

"Guo 2" Tr., Ex. XX, 250:22-253:15.

      67.     On May 24 and 26, 2017, Guo hosted Liu Yanping, among other Politburo and

PRC officials, in his New York apartment (Ex. YY, https://www.wsj.com/articles/chinas-hunt-

for-guo-wengui-a-fugitive-businessman-kicks-off-manhattan-caper-worthy-of-spy-thriller-

1508717977) and cited by Guo as "publicly available information" supporting his theory at Dkt.

153, p. 5). The public has only the specific parts of those conversations that Guo chose to release

to the media (most notably, the Wall Street Journal) several months after the fact. Guo 2 Tr., Ex.

XX, 271:2-274:2; 275:15-276:23 (Guo made video recordings but can't recall where they are;

Guo doesn't know where video or audio recordings are but claimed to have posted all of them on

the internet). *Id*., 287:12-280:25 (authenticating video 8 as Guo's recording of a meeting with

Liu); *Id*., 282:23-286:23; 288:2-5 (authenticating video 9 as a recording of a May 24, 2017

meeting between Guo and Liu in his apartment); 288:15-24 (other recordings might exist, but

Guo made no search for them).

68.     The recordings show that Guo was intertwined with the MSS and was not, as he
now claims, a private businessman who suffered abuse from high-ranking officials after
becoming a dissident. Ex. WW (J. Ju Aff.), ¶ 14, Ex. B (SVUS001363:  1:30-2:00), with Liu
offering Guo the part of several properties "that is legal," and the state taking the part of other
key properties because, as Guo says, "You are the actual controller. You can get back the assets
that belong to you.").

69.     For several of his key assets, he actually shared control with the state or with
senior leaders, or served as their proxy.  Ex. WW (J. Ju Aff.), ¶ 14, Ex. B (SVUS001363).

70.     Further demonstrating his connection to the MSS, Guo took credit for an apparent
joint operation with the MSS and its Vice Minister Ma Jian. Ex. WW (J. Ju Aff.), ¶ 14, Ex. B
(SVUS1364-1365). Guo argued that his work was for the MSS and on behalf of the "nation," and
that if anyone received "bribes," it was the nation. *Id*. (SVUS001369-70).

71.     In the next recording (Video 9), perhaps occurring after the initial recording, Liu
again talked with Guo. Liu also reported that Guo had said Ma Jian (a Vice Minister in the MSS)
"worked for [Guo]," and repeatedly expressed the belief that Guo had already made unspecified
"contributions to the country." Ex. WW (J. Ju Aff.), ¶ 14, Ex. B (SVUS1378 at 3:30-4:00).

72.     With respect to his family, Guo was willing to send his own wife and children
back to China, "using" them in order to prove that the CCP is a "reliable party."  Ex. WW (J. Ju
Aff.), ¶ 14, Ex. B (SVUS001388). Guo's relationship with Liu (*Id*., Ex. B, SVUS001397) and
previous deals with Liu (*Id*., Ex. B, SVUS001396, agreeing by July 1 to say he did not oppose
the Communist Party, and SVUS1399, talking only about certain officials (Secs. Meng and
Wang)) yielded benefits for Guo. *Id*., Ex. B (SVUS1398-1399).

73.     After a long talk, Guo declared, "I strongly support President Xi."  Ex. WW (J. Ju

Aff.), ¶ 14, Ex. B (SVUS1425). Guo promised to wait until his own issues were resolved to

make complaints against his supposed arch-nemesis Wang internally, within China, and even

then, only after Liu gave him approval to "take measures as you like." *Id*., Ex. B (SVUS001426-

1427). The two agreed that this was the patriotic path. *Id*.

74.     Shortly afterward, presumably following further discussions of this nature that

may have been recorded, Guo signed a letter pledging loyalty to Chairman Xi. Ex. W (J. Ju Aff.),

¶ 14, Ex. B (SVUS001320-1330 recording of Mingjing "Mirror" TV—a Chinese-language

Internet-streaming television outlet—interview in which Guo authenticates and attempts to

explain the letter, dated August 26, 2017)) In the letter, addressed to "The Honorable Leader(s)"

but intended for Xi Jinping and Meng Jianzhu, Guo refers to his previous meeting with Liu

Yanping and makes the following statements:

    i.   "I understand and accept all of your directives and requirements leading to

        settling the matter." (p. 1)

    ii.   "In order to carry out your instruction better, I pray that you clarify what

        Wengui [is] not allowed to speak out and what Wengui [is] not permitted

        to do." (p. 1)

    iii.  That his ability to live in the United States is based on certain

        "conditions," and that to act consistently with those conditions, "I am now

        doing things not out of my own volition and talking things that I do not

        really mean… My public exposures of information was done under

        coercion, my choice to perform publicity was not voluntary… This is the

        main reason why my family and I have received top class special

26

protection and have been able to survive. As soon as I commit stop revealing information in two months, such… agreement will definitely be rescinded… I will definitely have to try to leave this country…" (pp. 1-2)

iv. "You and I will have more convenient ways to communicate with each other when I am there in the U.K." (p. 2)

v. "Yet I still kept faith in you and in the organization so I did not cross the red line when I was forced to give out for interviews." (p. 2)

vi. Guo says it was a serious matter to "freeze several Hong Kong accounts" of one <u>Qu Guojiao</u> and asks that the accounts be unfrozen. (pp. 2-3).

vii. "I will put our national interest first and I am willing to devote my life to protecting our nation's interests, to defend Chairman Xi Jinping's value as our nation's Core Faith and make ultimate dedication of myself to safeguard Chairman Xi Jinping!" (p .3)

viii. "Can you consider to convert Wengui's influence and resources momentarily into best serving Chairman Xi Jinping's China Dream?" (p. 3)

ix. "Assign me tasks to accomplish in furtherance of our national interests initiative and engage in Chairman Xi Jinping's global strategy, so that I can redeem myself by my good service, demonstrating my patriotism and loyalty to Chairman Xi Jinping!" (p. 4)

Ex. WW (J. Ju Aff.), ¶ 14, Ex. B.

75.     Xi Jinping's "China Dream" is his program to make China the greatest country in the world, which entails competition with the United States and undermining the United States. Lianchao Tr., Ex. BB, 12:9-13:13.

76.     Qu Guojiao is the Chinese name of the person, Natasha Qu, Chunguang Han claimed was a friend who had managed Eastern Profit's affairs in Hong Kong. Chunguang Tr., Ex. KK, 52:9-54:21.  Qu was named with Chunguang and Guo in the Hong Kong court order freezing multiple accounts, including Eastern Profit, China Golden Spring, and a host of other Guo entities. Dkt. 203-2.

77.     On August 31, 2017, Guo was interviewed by Chen Xiaoping on Mirror Media (Mingjing in Mandarin), a Chinese-language media outlet in New York. Ex. ZZ (Dec. 12, 2019 Chen Aff.). The interview was livestreamed and is available on YouTube at https://www.youtube.com/watch?v=Mo3-1YvQBt4. The interview has been transcribed in Mandarin and translated into English at Ex. WW, J. Ju Aff., ¶ 14, Ex. B, p. 16 (SVUS 1320-1330). After being compelled to reappear for a second day of deposition, Guo identified himself and his interviewer in a still image of the video, but claimed he could not remember the interview. Guo 2 Tr., Ex. XX, 297:15-303:21. Lianchao, Guo's associate (discussed above), saw the video of the Mirror Media interview and, although he had not seen it before, authenticated Guo's voice. Lianchao Tr., Ex. BB, 99:6-118:7.

78.     Lianchao was also shown the original text of a letter Guo claimed to have written, which was displayed on the broadcast in Chinese, and compared it to a certified translation by Chunguang Chen already filed in another of Guo's litigations. Lianchao Tr., Ex. BB, 99:6-118:7. Lianchao was asked to examine this translation, and although he disagreed with some of the

28

translator's word choice, Lianchao's own suggested translations do not materially diverge from the certified translation. *Id*.

79.     In the August 31, 2017, Mirror Media interview with Chen, Guo tried to explain his letter. Guo revealed that he had other conversations, including with Vice Minister of the Department of Public Security Sun Lijun, in between the May meeting and August letter. Ex. WW (J. Ju Aff.), ¶ 14, Ex. B (SVUS001327 (17:00-17:30)).

80.     Guo also told Chinese-language viewers that during his negotiations with Beijing, certain of his entities' Hong Kong accounts were frozen—acts which he attributed to Beijing. Ex. Ex. WW (J. Ju Aff.), ¶ 14, Ex. B (SVUS1328-1329). Guo also claimed to viewers that his intent in writing the letter was to "help the country to realize freedom" and "democracy," even though those concepts do not appear in his letter. *Id*., Ex. B (SVUS1329-1330).

81.     Guo's Mirror Media interview was not the only time Guo has claimed that he has not moved money from Hong Kong or the Mainland since he began speaking out as a dissident. Ex. YY (W.S.J. "China's Pursuit of Fugitive Businessman Guo Wengui Kicks Off Manhattan Caperworthy Spy Thriller). Through their shared counsel, Guo and GSNY represented to this Court that Strategic "concedes" that "Mr. Guo… has been speaking out publicly against China for several years and, as a result, his assets in both China and Hong Kong have been seized…" Dkt. 136, p. 6. Likewise, Eastern has claimed that a Mainland crackdown on dissidents has affected it and caused its only asset, in Hong Kong, to be frozen in June 2017. Dkt. 203 (underlining added, p. 2 ("The assets of Mr. Guo and Eastern Profit that have been frozen in Hong Kong were frozen, not by the CCP or Mainland China, but by *the High Court of Hong Kong*. *See* Exhibit B." Ex. B (pp. 3, 14, Respondent 16: H.K. Ct. Order)).

82.     In fact, Guo has been able to openly direct and receive money for his U.S. operations from ACA. Ex. M (Dkt 267-1) (Pltf. Interrogatory Response No. 4 (admitting that Guo "ordered" ACA to wire $1 million to Strategic Vision on or about December 29, 2017, although claiming this was "on behalf of" Eastern Profit)). (Under oath, Guo denied "ordering" ACA's release of the funds or to know how Eastern came up with the $1 million deposit, directly contradicting Eastern's sworn interrogatory response. Guo 1 Tr., Ex. AA, 182:13-183:6).

83.     ACA is a Hong Kong entity controlled by a man named William Je. Wang 2 Tr., Ex. II, 46:22-47:14, 49:25-50:10, 53:19-54:3, 56:7-11, 57:5-9, 110:17-112:2; Dkt. 203-2.  Guo initially tried to characterize Je as a former "friend" (albeit one who had just spoken with him a few weeks before his first deposition) who had "worked together" with him "on anti-Chinese Communist Party." Guo 1 Tr., Ex. AA, 92:18-93:19. Guo later admitted that Je is a longtime friend, that Je manages ACA, that he sees Je several times a year, and that he had last seen Je in New York shortly before the deposition, in the fall of 2019. *Id*., 184:22-25, 184:15-21; Guo 2 Tr., Ex. XX, 317:20-22, 318:11-19.

84.     When Guo introduced William Je to Sasha Gong, Guo said, "He's the money man." Gong Tr., Ex. PP, 78:18-80:7. The occasion was a November 20, 2018 luncheon at Guo's Sherry-Netherland apartment; Wang invited Gong on behalf of Guo, and Lianchao, Stephen K. Bannon ("Bannon"), Gertz, William Je, and Guo all attended; Gong and Je spoke in Cantonese. *Id*.

85.     Four days later, at a lunch with Lianchao and Bannon, Gong expressed her doubts to the two that Guo would pay the $100 million he had pledged to a new nonprofit entity, the Rule of Law Foundation, that Guo had just announced at a joint press conference with Bannon in

New York City. Lianchao remarked, "William Je is quite [an] honest person, and ask him, he may pay." Gong Tr., Ex. PP, 81:1-13.

86.     Lianchao testified that Je manages Guo's money. Lianchao Tr., Ex. BB, 26:4-6. When Guo needed a letter of credit to purchase D.C. real estate in the fall of 2017, it was provided by Je. *Id.*, 26:4-27:11. Lianchao testified that Guo "hired" Je, who had been at the Australian firm Macquarie Capital, to work at ACA. *Id.* In fact, Je had been the head of Greater China at the giant Australia-based financial services firm Macquarie Capital. *Id.*; Ex. LLL (LinkedIn, 1st entry under "Experience").

87.     Another Guo confidant who acted for him regarding the Research Agreement with Strategic also characterized ACA as owned by Guo: in a September 26, 2017 *Free Beacon* article, Gertz referred to ACA as "Guo's company."  Ex. AAA (https://freebeacon.com/national-security/fbi-eyes-china-posting-hacked-documents-chinese-dissident/).

88.     Guo has recently admitted that ACA has paid him, although he claims it is through an alleged $7 million-per-year "consulting agreement" with China Golden Spring Group (Hong Kong), Ltd. ("China Golden Spring"), which Guo admits is "owned and operated by my family." Ex. NNNN, July 23, 2019, Aff. Guo Wengui, *Guo Wengui v. Hongkuan Li*, Case No. PWG 18-259 (U.S. Dist. Ct. D. Md.) Dkt No. 20-4 (Dkt. No. 197-1 in this case).

89.     This particular ACA-Golden Spring contract was allegedly in force from January 2017 to February 2018, when it was supposedly terminated by ACA. Ex. NNNN (G. Wengui Aff., ¶ 2). Guo says that under the contract, he was paid because "I had the ability to make introductions to numerous business executives in China and Hong Kong":

2.      China Golden Spring Group (Hong Kong) Ltd. ("China Golden Spring"), a Hong Kong company owned and operated by my family, entered into a consulting agreement with ACA Investment Management Limited ("ACA") in January 2017 (the "Consulting Agreement"). ACA is an investment management company that manages capital for world renowned institutional investors. ACA's focus is on capital investment opportunities in Asia, especially in the greater China region.  China Golden Spring was hired because of my reputation in the Asian business community; my knowledge and expertise of doing business throughout the world, but in particular China and Hong Kong; and because I had the ability to make introductions to numerous business executives in China and Hong Kong.

*Id.*

90.     Further, Guo claims that ACA terminated the contract with China Golden Spring in February 2018 not because either he or William Je could no longer do business in China due to their supposed dissident status, but because of allegedly defamatory internet posts by U.S. resident Hongkuan Li, which accused Guo of "extreme and improper conduct." Ex. NNNN, p. 2. Indeed, Guo refuses to reveal the name of the ACA contact who told him of ACA's decision, claiming that it is that revelation that will cause the CCP to retaliate against ACA. *Id.* Guo's admission reveals that ACA and Guo kept substantial business on the Mainland long after Guo says he became the regime's top enemy, had to flee, and had all of his assets seized. Not addressed by Guo in his declaration is how funds were transmitted from ACA to China Golden Spring or from China Golden Spring to him after the June 2017 freezing of the assets and bank accounts of over a dozen entities related to Guo, including China Golden Spring. *See* Dkt. 203-2.

91.     In April 2018, two months after ACA allegedly terminated its contract with China Golden Spring, and three months after ACA wired $1 million to Strategic, ACA (supposedly at

the direction of William Je) also wired $100,000 to Bill Gertz, who had introduced Strategic to Guo's network.  Gertz Tr., Ex. QQ, 31:5-17.

92.     Gertz is a longtime *Washington Times* reporter and friend of Guo's (Gertz Tr., Ex. QQ, 72:13-73:11) who wrote a series of flattering articles about Guo to help establish his supposed bona fides in 2017 and 2018 as a "dissident."

93.     At his deposition, Gertz admitted that he had actually undertaken very little investigation into Guo. Gertz Tr., Ex. QQ, 178:6-14 (Gertz has never asked Guo about his actual birth date or early years in China); 86:3-87:20 (never asked details about Chinese officials' visits to his Sherry-Netherland apartment in May 2018); 87:20-88:4 (has never heard of Guo's statements expressing absolute faith in General Secretary Xi).

94.     Gertz testified that he approached Guo for $100,000 as an "advance" on Gertz's expected royalties from a book deal with a small publisher. Gertz Tr., Ex. QQ, 28:15-30:3.

95.     Meanwhile, Gertz testified that Je "advanced" the $100,000 on the same terms that Gertz proposed to Guo. There was and is no interest or timetable for repayment. Gertz Tr., Ex. QQ, 34:1-18; 153:15-154:10; 155:18-156:4. There has been no discussion of whether the "advance" must be repaid at all. *Id.*, 156:5-13.

96.     Gertz was dismissed from the *Washington Free Beacon* after it learned that Gertz had taken $100,000 from Je. Documents showed that the funds had come from ACA, which Je told Gertz was a "sovereign wealth fund." Gertz Tr., Ex. QQ, 146:16-147:15; 151:8-152:16.

97.     In a September 29, 2017 *Free Beacon* article, Gertz freely identifies ACA as "Guo's company" and reports on a document indicating it had wired $1 million to Williams & Connolly, the law firm that reportedly took over Guo's asylum case. Ex. AAA (referenced in SOF 87).

98.     Je and ACA were also involved in Strategic Vision's matter. Guo's shell entity, Eastern Profit, claimed that it intended to share the results of Strategic's confidential research with ACA and William Je. Wang 2 Tr., Ex. II, 45:22-46:25, 47:6-14.

99.     William Je also advised Guo, along with a tight circle of other confidants to Guo consisting of Lianchao and Victor Cerda (Guo's immigration lawyer), on whether to sue Strategic for breach of contract. Lianchao Tr., Ex. BB, 23:17-25:9. Other Eastern witnesses claimed that Je was an arms-length creditor who had loaned Eastern the "deposit" for the contract. Wang 2 Tr., Ex. II, 35:2-39:8, Chunguang Tr., Ex. KK, 140:12-141:5. If Je truly was an arms-length creditor, he would have had an incentive for Guo to sue in order to protect the principal on his uncollateralized loan—yet Je warned Guo *not* to sue Strategic for the return of the $1 million. Lianchao Tr., Ex. BB, 23:17-25:9.

100.    Aside from ACA's funding of Guo's activities during a time when Guo's Hong Kong and Mainland assets were supposedly frozen due to his dissident status, Guo's and William Je's operations have been inseparable. (*See* SOF 101, 104-05, below)

101.    Hong Kong requires companies like ACA to have at least one natural person director. Dkt. 197-4 (CAP 622 Companies Ordinance, § 454: "Private company required to have at least one director."). A new, 29-year-old employee of Guo's family office, GSNY, and recent arrival in the U.S., met Je through her work at GSNY and was assigned by Je to be ACA's only natural-person director in December 2018; she joined ACA the next month. Aug. 23, 2019 Karen "Maistrello Tr.," Ex. CCC, 9:18-14:25. That person, Karin Maistrello, was told by Je that ACA intended to search for U.S. investors for projects, and that she was intended to develop investors for these projects. *Id*., 29:6-25. Over a seven-month period on the job, Maistrello never learned what ACA did or what her specific duties would be, undertook no actions whatsoever as a

director, and had no communications with any other agent of ACA about ACA. *Id.*, 30:1-33:11.

She met Je in person at least twice and her new directorship never came up. *Id.*, 47:15-22.

102.     Maistrello abruptly resigned on July 25, 2019, and two months later at deposition (Ex. CCC), claimed she could not remember exactly why. The day before Maistrello resigned, Eastern had received notice from Strategic under Fed. R. Civ. P. 45 that Maistrello would be served with a subpoena for testimony and documents in her capacity as the sole natural-person director of ACA. Maistrello was tipped off by Daniel Podhaskie, the General Counsel of GSNY who also serves as Guo's attorney and spokesperson. Although her litigation counsel (also Guo's and GSNY's counsel) interposed privilege objections, Maistrello testified that Podhaskie approached her, told her she was being subpoenaed, and said "something about ACA" that caused her to resign her directorship. Maistrello Tr., Ex. CCC, 57:3-60:11,1 61:13-73:19.

103.     William Je replaced Maistrello with Chen Qiaoling, a woman living on the Mainland in the "P.R. China."  Dkt. 203-1 (Eastern Profit opposition to Strategic's motion to reopen discovery into ACA, attaching what Eastern represented was an Aug. 22, 2019 Hong Kong Change of Director form signed on July 26, 2019 by William Je on behalf of Celestial Tide Limited, the sole official owner of ACA).

104.     At least two related ACA entities controlled entirely by Je in Hong Kong (ACA Capital Management Ltd. and ACA Financial) have twice shared the exact same office as (a) Eastern Profit and (b) China Golden Spring (Hong Kong), which is owned and controlled by Guo's family and makes distributions to him.  Coluccio Tr., Ex. OO, 186:15-19 (GSNY takes direction from Guo), 122:15-123:3 (GSNY is wholly owned by China Golden Spring), 171:2-172:13 (GSNY is Guo's family office), 186:15-19 (GSNY takes direction from Guo), 122:15-123:3 (GSNY is wholly owned by China Golden Spring); Guo 1 Tr., Ex. AA, 84:1-19

(discussing GSNY's relationship with the Guo family). China Golden Spring controls GSNY, and Wang, Guo's assistant and "President" of GSNY, claims to take direction from China Golden Spring. Wang 1 Tr., Ex. CC, 23:3-29:13, 18:14-20:21.

a. The first of these two shared addresses is Suite 49F in the Bank of China Tower in Hong Kong; the second is the Guo family's multimillion-dollar waterfront residence.  Exs. UUU (Eastern filings, at p. SVUS002171, showing Eastern's address already at Suite 49F at Bank of China Tower, and at p. SVUS002178, showing that Eastern shareholder who soon thereafter sold to Chunguang Han in 2014 was at 18 South Bay Road); Ex. EEE at p. 1 of the 2016 Annual Report (Eastern-000382), showing Eastern's address became 49F, Bank of China Tower; Ex. EEE, the 2017 Annual Report, showing Chunguang with an address of Suite 49F, Bank of China Tower (Eastern-000399), sold Eastern to Guo's daughter, Guo Mei (Eastern-000399), residing at 20 South Bay Road, in June 2017 Eastern-000399; EX. EEE, p. SVUS0002316, showing Eastern's address changing to 20 South Bay Road and at Ex. EEE, p. SVUS002308, showing Guo Mei still residing at 20 South Bay Road; Ex. DDD (ACA filings, at SVUS001601 and SVUS001610, showing that ACA Capital Group Limited's offices were at 49F, Bank of China Tower, from at least 2016-2018; and filings for ACA Hong Kong Investment Holdings Group, Ltd., in the 2015 and 2016 filings, at pp. 1, 8, showing offices at 49F, Bank of China Tower, and Guo's son, Guo Qiang, residing at 20 South Bay); Ex. FFF (China Golden Spring Group (Hong Kong) filings, at p. 3 of Articles of Incorporation, showing sole shareholder in 2014 as Guo's son, Guo Qiang, at 20 South Bay Road; at p. 41 of Change of Address

36

form, that address was changed to 49F, Bank of China Tower, on October 25, 2016; on p. 1 of 2017 Annual Report, that official address remained at 49F, Bank of China Tower; and on p. 4 of 2018 Annual Report, that although official address was changed, Guo Qiang's residential address remained 20 South Bay Road).

b. At least by October 6, 2017, Guo had publicly claimed that China operates its overseas spy network not simply out of state-owned buildings, but specifically *only* those owned by Bank of China as overseas bases of operation for China's spies. Ex. GGG (https://www.rfa.org/english/news/china/spies-10062017115749.html (Radio Free Asia article reporting Washington, DC, press conference in which Guo made the claims)). Yet Guo's family office, his Eastern Profit shell company, and ACA are all listed as operating out of the Bank of China Tower in Hong Kong, long after he claimed his family members and employees were arrested en masse. See exhibits and pages cited in paragraph 104a.

c. Fiona Yu, who served as corporate secretary for both ACA entities, also served as the "Authorized Representative" for the U.S. LLC set up to hold Guo's Sherry Netherland apartment—just a month after ACA wired the $1 million to Strategic Vision. Ex. HHH (SVUS002404-16, p. 8, filed 2-20-18 by Yu Fiona Ka Wing). *See also* SOF 28, 82, 12 above.

d. Two months later, William Je set up two New York entities based in an expensive residential space at 800 Fifth Avenue, Unit 21F. That is the same address shared by any number of Guo entities, including GSNY, Saraca Media Group (which uses the trade name Guo Media), and the Rule of Law non-profit entities. Exs. III,

HHH, KKK (SVUS002436-39, SVUS002440-43, SVUS002425-29, signed by William Je)

e.  Hodgson Russ, the same Buffalo law firm that incorporated William Je's entities in 2018 (Ex. KKK, SVUS002425-29, SV002323-26) and later submitted subsequent filings in 2019 (Ex. MM, SVUS002444-49), also filed the corporate paperwork for the Guo entities (Ex. IIII, SVUS0002436-39, SVUS002440-43). That firm represents Guo and GSNY in this case (although it has repeatedly denied that it represents ACA). Dkt. 158 ("On behalf of non-party Golden Spring (New York) Limited ("GSNY")…"), Dkt. 159 ("On behalf of non-party Guo Wengui ("Guo")...").

105.   Guo and his associates volunteer that they put absolute faith in Je because he, like Guo, is a dissident. *See, e.g.*, Guo 1 Tr., Ex. AA, 92:18-93:8; Maistrello Tr., Ex. CCC, 27-29. Guo says he cannot remember how he and Je first met, but claims that William Je is such a well-known dissident, he receives daily phone call death threats, his mother was threatened by the Hong Kong police, his "people" were taken by the government, and Je had to be hospitalized because of the resulting stress. Guo 2 Tr., Ex. XX, 320:8-321:23.  However, Je maintains close ties to the Mainland and CCP, both through ACA's apparent ongoing activities there (SOF 28, 32, 83-84, 97, 12, 82, 28, above), and through his various offices as reported in various directories.  *See* SOF 119, below.

106.   Before Je was hired by Guo to manage ACA, he held an important position at Macquarie Capital (Hong Kong) Co., Ltd., as "Chairman of the Greater China Capital Market," which included coverage of both Hong Kong and the Mainland. Ex. LLL (1st entry under "Experience").

107.     From at least January 19, 2015[i] through at least May 24, 2017, [ii] Je was a member of the Chongqing CPPCC (Chinese People's Political Consultative Conference), referring to the city of Chongqing. Ex. LLL (LinkedIn).

108.     According to the announcement accompanying the newest directory of CPPCC members, the CPPCC is China's top advisory body, and consists of either CCP members or non-CCP members who are nominated by the CCP and "had gone through meticulous examinations in terms of their political stance, integrity of character and public image." Ex. MMM (http://www.cppcc.gov.cn/zxww/2018/02/26/ARTI1519615396504299.shtml)

109.     From at least May 20, 2013 (J. Ju Dec., Ex. BBBB, at Ex. C (SV002486), Ex. D (SVUS002487-88), Ex. E (SVUS002489-96)), through the present (*Id.*, Ex. E (at SVUS002491, photo), Je has been one of about 40 "members" of the Hong Kong Chongqing Friendship Federation (HKQCFF).  J. Ju Dec., Ex. BBBB, Exs. C-E.  He has been listed prominently on the front page of this group's website (J. Ju Dec., Ex. BBBB, Exs. C, D, E, (SVUS002491, photo), F (SVUS0002500:  "Founded in 2008, the Chongqing Fed. H.K….", SVUS002501 ("Founding Vice President:  … Yu Jianming…").  Je is listed as Vice President of the Federation.  J. Ju Dec., Ex. BBBB, Ex. F (SVUS002501).

110.     The HKQCKK "About" page includes the following text (originally in Chinese) (emphasis added):

> This association was established in 2008 and is one of the influential <u>patriotic groups</u> in Hong Kong. Since its inception, the Association has been adhering to the tenet of "Serving <u>the Country</u>, Serving Hong Kong, Serving <u>Chongqing</u>, and Serving Committee Members." It has united the people of Chongqing Municipality in Hong Kong, the <u>members of the Chongqing Municipal Committee of the CPPCC</u>.

J. Ju Dec., Ex. BBBB, at Ex. C (translating http://www.hkcqff.org/sh/about.php).

111.    Hong Kong "Patriotic Groups" are supported or sponsored by the Chinese government or the Communist Party. Ex. NNN (underlining added) (China's *Global Times* Aug. 9, 2019:  "As Hong Kong's <u>patriotic groups</u> bravely stands out <u>with the support of central government</u>, conspiracy will be smashed, turmoil will be ended and rioters will be punished by law."); Ex. OOO (Andrew Higgins, *New York Times*, "From the Shadows, China's Communist Party Mobilizes Against Protests":  "Many nominally independent "patriotic" groups in Hong Kong, for instance, are regarded with suspicion and thought of as front organizations that take orders from Beijing."); Ex. PPP (Chinadaily.com.cn ("Finally, the <u>patriotic groups who love Hong Kong should act to nip the violence</u> in the bud.") (underlining added).

112.    It cannot be disputed that the political situation in Hong Kong involves support or outright sponsorship of "Patriotic Groups" by the Chinese government or the Communist Party. Ex. CCCC (https://www.reuters.com/article/us-hongkong-politics/hong-kong-leader-demands-end-of-independence-talk-warns-ties-with-beijing-at-risk-idUSKCN1BU0GY); Ex. PPP (http://www.chinadaily.com.cn/hkedition/2019-08/09/content_37500135.htm); Ex. DDDD (https://qz.com/883640/beijing-wants-to-crush-youth-activists-in-taiwan-and-hong-kong-trying-to-band-together/); Ex. NNN (http://www.globaltimes.cn/content/1160904.shtml); Ex. EEEE (https://www.scmp.com/news/hong-kong/education-community/article/1829077/police-use-pepper-spray-hong-kong-protesters).

113.    Guo's media and social media operation also has close ties to the Mainland, with many administrators for his websites and social media accounts actually having operated from the Mainland. *See* SOFs 115, 119-20 below.

114.    Guo insisted that none of the Mandarin translators from Team I (the first research team hired by Strategic Vision in January 2018) should be Chinese nationals or live in China,

purportedly for concern that they might be CCP agents. Waller 1 Tr., Ex. Z, 85:13-86:23. Gong, herself a dissident, testified that it would be unusual and unsafe for U.S. dissidents to have contact over open phone lines with the Mainland.  Gong Tr., Ex. PP, 159:1-9.

115.     Now, Guo's primary vehicle for spreading his message and for extending his political influence (such as by hiring Bannon), Saraca Media Group (a Delaware corporation d/b/a Guo Media), appears to have administrators in Mainland China. *See* below at SOFs 123, 115-16, 120-21.

116.     Guo Media is Guo's primary media platform. Gertz Tr., Ex. QQ, 163:6-18, 163:20-21 (Guo Media is the platform for Guo to get his message out); Lianchao Tr., Ex. BB, 133:22-134:7 (Guo Media is Guo's media platform); Gong Tr., Ex. PP, 109:15-20 (Guo Media is Guo's personal social media platform).

117.     Chunguang Han (Chunguang, described above), the man who acts as Guo's own personal servant (Lianchao Tr., Ex. BB, 36:17-37:6) and who is also claimed to be the "principal" of Eastern, another shell company controlled by Guo's daughter, holds himself out as the president of Saraca. Ex. MM (SVUS0002444-49, 2445). Maistrello, an employee of Guo's entity, GSNY (Lianchao Tr., Ex. BB, 252:11-253:9), and a former director of ACA, also works as an assistant for Guo Media. Gertz Tr., Ex. QQ, 172:15-20. Guo Media is set up in the same 6-story residential apartment as Guo's office. Gong Tr., Ex. PP, 119:6-120:25.

118.     Guo Media's "news" page, G News (https://gnews.org/), includes tabs for commentary and YouTube videos by two individuals: Guo himself and Bannon. It includes banners soliciting charitable contributions to the Rule of Law Society and Rule of Law Foundation, two entities controlled by Guo, and also includes screenshots from the videotaped testimony of French Wallop and Michael Waller made in this case, as well as purported

41

summaries of later testimony and document productions that were made only to Eastern Profit. Ex. QQQ (https://gnews.org/ ("The True Story Behind Strategic Vision US, LLC," posted December 10, 2019).

119.    Guo's spokesperson and attorney, Daniel Podkhaskie, admits in a widely-circulated Axios report that Bannon was hired to work for Guo Media and to assist G News for at least $1 million per year, but denied that Guo "has a financial stake in" Saraca. Ex. RRR (https://www.axios.com/steve-bannon-contract-chinese-billionaire-guo-media-fa6bc244-6d7a-4a53-9f03-1296d4fae5aa.html). *See also* Dkt. 216 (letter of Bannon counsel to the Court opposing motion to extend discovery to depose Bannon, but admitting to Bannon's "collaboration" with Guo (p.2) and "professional connection to Mr. Guo" (p.7)).

120.    Guo Media's domain (guo.media) was registered and is controlled by the same tight circle of staff in New York and Hong Kong (as well as one person in Mainland China) who also set up the domains for the Rule of Law Foundation (rolfoundation.org and ruleoflawfoundation.info); Golden Spring Group (goldenspringgroup.com); Saraca Media Group (saracamedia.com); Rule of Law Society (rolsociety.org). *See* SOFs 121-24 below. Both of the Rule of Law entities were formed by Guo: the Rule of Law Society, an IRC Section 501(c)(4) entity of which Bannon is Chairman, and the Rule of Law Foundation, an IRC Section 501(c)(3) entity. Gong Tr., Ex. PP, 23:7-24:15. Both shared an office in a 6-story Upper East Side building with Guo Media and Guo himself. *Id*., 119:6-121:3. Maistrello, one of Guo's GSNY employees, is also President of the Rule of Law of Society. *Id*., 126:18-127:5.

121.    Saraca Media Group's domain, saracamedia.com, was registered October 4, 2019, in Guangxi Provice, Mainland China.[3] Saraca Media Group, in turn, is associated with the

---

[3] Ex. SSS (GoDaddy Response 2, GD000001-5).

"Shopper ID," or customer ID, of ███████ for several other Guo-related domains. The natural person associated with Saraca and the Shopper ID is ████████ at her GSNY email address ██████@gsnyus.com) and the current street address of GSNY, which is 162 E. 64th Street, NY, NY.[4] Ms. Marin's Saraca/GSNY coworker, ████████ ██@gsnyus.com) was the billing and shipping contact for ruleoflawfoundation.info and rolsociety.org at the prior business address of Saraca and GSNY, 800 Fifth Avenue, Suite 21F, NY, NY,[5] as was Ms. ██████ colleague ███████.[6] ████████ was actually the registrant and administrative contact for both domains from 2018 through at least January 24, 2019, when both were transitioned to an intermediary masking company, "Domains by Proxy."[7] Again, the same Shopper ID, including ████████ at Saraca Media through her GSNY email and physical business address, is also tied to Guo Media's domain, guo.media, created November 12, 2017;[8] rolfoundation.org, created Jan. 22, 2019, by █████ at Saraca/GSNY;[9] and goldenspringgroup.com, created Dec. 4, 2019 and with billing to ███████ in Hong Kong with a Hong Kong phone number and the address ████████@goldenspringgroup.com.[10]

122. The use of the same set of individuals in Hong Kong and New York to run the Guo network's accounts is consistent with Yvette Wang's testimony that as President of GSNY, she takes direction from China Golden Spring Group, Hong Kong Ltd.[11] But Eastern Profit claims that its assets were frozen by the Hong Kong High Court as of June 2017, and the order it admits is evidence of the seizure (Dkt. 203-2, p. 3, listing Eastern Profit) also lists frozen assets

---

[4] Ex. TTT (GoDaddy Response 2, GD000006); Ex. WWW (GoDaddy Response 1, GD000001).
[5] Wang 1 Tr., Ex. CC, 22:12-18.
[6] Ex. UUU (GoDaddy Response 2, GD000015-18).
[7] Ex. VVV (GoDaddy Response 2, GD00008-10, 12-14).
[8] Ex. WWW (GoDaddy Response 1, GD000001-2).
[9] Ex. XXX (GoDaddy Response 1, GD000007).
[10] Exs. VVV, UUU (GoDaddy Response 1, GD000008-9, 15).
[11] Wang 1 Tr., Ex. CC, 20:6-14.

for several other Guo entities. These include China Golden Spring Group (Hong Kong) Limited (*Id*., pp. 4, 16, "Respondent 22"), the entity that Yvette Wang says gave her direction on the Strategic contract (Wang 1 Tr., Ex. CC, 20:6-14) and that employed Donald Chan, who was the billing contact on the GoldenSpringGroup.com domain registered through GoDaddy in 2019. They also include Rosy Acme Ventures Limited (Dkt. 203-2, pp. 4 and 16, "Respondent 23"), an entity which Guo admitted in an interview was being used to pay his employees through China Construction Bank. Ex. WW (J. Ju Aff., Recording 4 (pp. 24-25, Guo at 19:30-20:30 claiming that he asked CCP officials to resolve his Hong Kong "thing," that they had frozen his Hong Kong assets, and that a China Construction Bank account with $8M HK used to pay staff "salary" was frozen, which can only refer to the Rosy Acme account with $8.6M HK purportedly frozen)). Thus, Guo has claimed not only that his Hong Kong assets were frozen by the CCP, but that his operations have been shut down there.

123.     Yet Guo Media's Cloudflare account shows that programmers physically based in the Mainland have open access to its name servers, which direct end Internet users who enter one of Guo's domain names to the computer servers hosting the corresponding Guo-controlled website.  The Cloudflare account was created by someone based in Hong Kong on November 19, 2017 who was working for China Golden Spring Group (likely Donald Chan, or Chan Ka On; *see* Basic Billing Info Excel spreadsheet, Ex. FFFF, showing Chan; his IP address, and his Hong Kong address; see also Billing Profile Details sheet, Ex. GGGG, (p. 2), showing Chan's Hong Kong physical address and his email itadman@goldenspringgroup.com, as well as the IP address he used on Nov. 19, 2017), which was Guo's family office (SOF 22 above), and whose assets were supposedly frozen along with Eastern Profit's in an "anti-dissident" crackdown no later than June 2017 (SOF 122 above).  Second, Cloudflare continued sending its invoices to China

Golden Spring's Hong Kong office, at Bank of China Tower, 49F, 1 Garden Road, for most of

2018, long after China Golden Spring's assets were allegedly frozen; then sent the same invoices

to Golden Spring (New York) at 800 Fifth Avenue, 21F, New York, New York and then to

Saraca Media Group (which also managed the domain for the Rule of Law Foundation starting in

Feb. 2019) at exactly the same address. *See* Ex. HHHH, Billing Statement in Combined Files

Doc; pages 1-9 on Hong Kong; 10-16 on GSNY; 17-20 on Saraca. Cloudflare's records show

that at least four administrators accessing the name servers for the various Guo-affiliated

domains did so using IP addresses that were physically based in Hong Kong, and another three

administrators used IPs based inside Mainland China. *See* Ex. IIII, Excerpts of Cloudflare Audit

Log for Guo.Media (paired with Whois IP Address Location Reports for the following

Guo.Media users: (User 11240210, used IP Address 43.225.106.61 on 11/8/18, in Hong Kong;

User 8468394 (Chan), used the following IP Addresses on the following dates, IP 61.93.141 on

11/19/2017 in Hong Kong, IP 45.112.205.91 on 1/31/2018 from Hong Kong, and IP

59.149.73.54 on 2/8/2018 in Hong Kong; User 11298209, used IP 123.146.04 on 11/14/2018

from Mainland China; User 9040756 used IP 223.197.179.236 on 2/11/2018 in Hong Kong; and

User 10508322 used IP 120.230.160.99 on 10/27/2019 from Mainland China.)

124.    A similar pattern emerges with respect to Guo's various social media accounts on

YouTube. Guo's four Voice of Guo Media channels, Guo's own official "Guo Wengui" channel,

and one for the Rule of Law Foundation—are linked to from each other's official YouTube

"home" page, presenting them to the public as one cohesive, intertwined network.  *See* Voice of

Guo YouTube English channel, linking to Guo Wengui, Rule of Law Foundation, and three

related Voice of Guo channels:

https://www.youtube.com/channel/UCbujLoHxA16TveAXWGx2xSg. Ex. JJJJ. Discovery

produced by Google about the IT administrators who manage and update five of those channels

(this excludes Guo's own "official site"—for which YouTube did not produce a list of "owners"

or managers) reflects a backend technical team that is every bit as interconnected: each of the

accounts, four Voice of Guo and one Rule of Law Foundation, shares administrators in common

with at least two other channels. *See* Ex. KKKK (Compilation of Google Account Manager

Identities for the following five channels: Voice of Guo English Channel, English-channel-2289;

Voice of Guo Media Channel 1, guo-you-zhi-she-7603; Rule of Law Foundation Channel,

rolfoundation-f-7672; Voice of Guo Media Channel 2, zhan-you-zhi-sh-2451; and Voice of Guo

Media Channel 3, zhan-you-zhi-sh-7983). Further, Voice of Guo YouTube Channels 1-3 have

administrators with direct links to Mainland China that existed *after* Guo launched his

"dissident" persona in January 2017, and administrators for the other two channels work

alongside the Mainland-based administrators in their capacity as "managers" for one or more of

the other three YouTube channels.  *See* Ex. PPPP.  First, all three Voice of Guo Media YouTube

accounts (Channels 1-3, as noted in the last citation) were set up with the "manager" as the

Gmail address of 654505105@gmail.com; that Gmail address was itself set up on August 21,

2018—long after Guo claimed to be a dissident and to have had his Mainland/Hong Kong

operations shuttered—**using a "recovery email" address that is Chinese**:

654505105@qq.com,[1] **and a recovery phone number that is also Chinese**:

8613422475313.[2] Second, yet another Voice of Guo Media account manager (for Channel 2,

noted in the last citation) set up the Gmail address yanzhonghuashu1974@gmail.com on March

3, 2018, again, using a "recovery email address **that is Chinese**: 550369674@qq.com. On Voice

---

[1] The "qq.com" domain is operated by Tencent, a Chinese company based in Guangdong Province.
https://www.whois.com/whois/qq.com
[2] The country code for Mainland China is "86."

of Guo Media YouTube Channels 2 and 3, alternate emails for the July 9, 2015 (after Guo left China) nangongsnow@gmail address for manager "Snow Nangong" **are both Chinese**: 88951176@qq.com and 303014030@qq.com. Finally, a manager for Voice of Guo Channel 1 set up xiaoxiyou1@gmail.com on August 11, 2018, using a recovery number, 8618918215947, **that, again is Chinese**. *See* Ex. QQQQ.

125.     Using the credibility lent to him by well-known individuals such as Gertz, Lianchao Han, Bannon, Guo has disrupted the China Hawk community in the United States by attacking and attempting to silence independent dissident voices (Gong Tr., Ex. PP, 142:24-145:16), as well as others in the policy community who feel that the United States should take the threat of China seriously.  *See, e.g.,* Ex. QQQ (https://gnews.org/ (page 1, linking to one story attacking Waller and his employer (the Center for Security Policy) a conservative institute focused on the China threat; and another story attacking a Chinese pastor and dissident based in Texas).

126.     The Committee on the Present Danger: China, is a group concerned with the China threat of which Bannon and Gong were founding members, and of which J. Michael Waller is also a member. Gong Tr., Ex. PP, 132:23-133:14. Members of the CPDC expressed concern to Gong about Guo, and in response, Gong tried to share her concerns with Bannon about Guo, including but not limited to the sources of the funds he attempts to deploy in the U.S. and his pattern of litigation in the U.S. *Id.*, 134:2-138:11. Bannon did not want to discuss those concerns. *Id.*, 138:9-19.

127.     Further, Guo is somehow able to obtain and publicly disclose party discovery in this case, as shown above in SOF 54 (Gong getting file from Guo) and Ex. QQQ (G News posting screenshots of video depositions from the case, and sharing discovery disclosed only to

47

Eastern Profit). Using that information, Guo has even deployed Bannon to threaten other members of the China Hawk community. After Waller gave his first deposition, Bannon told Waller's superiors at the Center for Security Policy that he (Bannon) had read the transcript, and that Waller should be dismissed from the Committee on the Present Danger: China. Ex. OOOO (Waller Dec.), ¶¶ 1-3.

128.    Meanwhile, Guo attempts to gain credibility by attacking corruption within the CCP, but even when questioned by friends for his own specific knowledge that could be useful to the United States, he has been unable to provide details. Gong Tr., Ex. PP, 180:8-25, 182:15-183:16.

129.    Guo and Eastern Profit never did hire another entity to provide research on corruption, and refuse to explain why they have made no apparent efforts to release the assets they claim were seized. Chunguang Tr., Ex. KK, 91:3-9, 78:17-23; Lianchao Tr., Ex. BB, 237:10-238:6; Wang 2 Tr., Ex. II, 195:21-196:7. The most logical conclusion is that they never intended to actually use Strategic's research to attack the regime and bring the "rule of law" and democracy to China.

## DEFENDANT'S L.R. 56.1(b) RESPONSE TO PLAINTIFF'S STATEMENT OF FACTS

A.    The Parties and Relevant Non-Parties

1.    Through this action, Eastern Profit Corporation Limited ("Eastern") seeks to recover a $1 million deposit (the "Deposit"), plus pre- and post-judgment interest, paid to Strategic Vision US, LLC ("Strategic") pursuant to a contract under which Strategic agreed to provide certain private investigation services to Eastern (the "Research Agreement").

Eastern Profit's characterization of its own theory of damages is not the proper subject of a L.R. Rule 56.1 statement. Eastern's statement, however, serves as a judicial admission that its sole damages theory is to "recover" a $1 million deposit. Eastern never pled a

48

claim for pre- or post-judgment interest, whether under its unjust enrichment, declaratory judgment, contract, or fraud theories.  Dkt. 93 (Second Amended Complaint).  Finally, as set forth above and in Strategic's briefing, the Research Agreement does not call for "private investigation services" under Virginia law.

      2.      Eastern is organized under the laws of Hong Kong.

      <u>Not disputed</u>.

      3.      Eastern has its principal place of business in Hong Kong.

<u>Not disputed</u> that Eastern's corporate filings state that Hong Kong is the location of Eastern's principal place of business, but controverted that Eastern does any business there. In fact, Eastern's only asset—a Hong Kong bank account—is frozen (Chunguang Depo. (formerly "Tr."), Ex. KK, 87:3-88:20; Dkt. 203-2; Eastern's only Hong Kong agent left Eastern long ago (Chunguang Tr., Ex. KK, 71:6-9), and Eastern's only business is in New York, not Hong Kong, as Chunguang has not been there for "several years" and its only existing business is Chunguang's alleged delegation of authority to Yvette Wang, Golden Spring (New York) Limited ("GSNY"), and Guo Wengui ("Guo") to research Chinese officials. (*Id*., 58:14-59:4; 43:21-44:22).

      4.      Guo Wengui ("<u>Mr. Guo</u>") is also known as Miles Kwok.

      <u>Not disputed</u>.

      5.      Mr. Guo was and is an outside advisor to Eastern.

<u>Not disputed</u> that Guo's statements and actions are binding on Eastern, consistent with Eastern's pleading admission: Dkt. 142, p. 2, ¶ 4 ("Eastern authorized Guo to communicate with Strategic Vision on Eastern's behalf concerning the Agreement, Guo's representations to, and interactions with, Strategic Vision concerning the Agreement are

binding upon Eastern, and Eastern has not repudiated any such representations or interactions."). *See also* Strategic's Counterclaims cited by Eastern as the sole support for this statement (Eastern Ex. A, Dkt. 127, pp. 20-21, ¶¶ 3-4, and p. 53, ¶ 108). Eastern cites no record support, however, for its false statement that Guo is a mere "advisor," let alone an "outside" advisor, to Eastern. In fact, Strategic affirmatively alleged that Eastern is "an entity under [Guo]'s actual direction and control and which he directed to become a counter-party to Strategic Vision in the Contract he had negotiated and from which he intended to benefit." Eastern's Ex. A, Dkt. 127, Strategic's Counterclaim, Dkt. 127, ¶ 108.

6.     Mr. Guo acted on behalf of Eastern in connection with the negotiation of the Research Agreement.

Not disputed that Guo acted on behalf of Eastern in negotiating the Research Agreement, but Guo's actions on behalf of Eastern, an entity which he controlled, were ultimately on his own behalf since: Guo gave Eastern the 15 names for research (Wang 1 Tr., Ex. CC, 33:8-14); Guo approved the final contract and gave Wang permission to sign it for Eastern Profit (*Id.*, 61:2-9); and Eastern was to give Guo the research results for Guo's own use, purportedly to attack the CCP (*Id.*, 32:5-35:11, 37:8-38:7).

7.     Yvette Wang ("Ms. Wang") was and is an agent of Eastern Profit.

Not disputed that Wang was authorized to bind Eastern relating to the Research Agreement, but as shown in the sections of Strategic Vision's Counterclaims that Eastern cites as its sole support for this fact, Wang received her authority from, and her actions were actually directed by, Guo: as Strategic pled in the very paragraph cited by Eastern,

"At all times, Wang and Lianchao Han claimed to be acting under the authority and with the permission of Guo." Eastern's Ex. A, Dkt. 127, Strategic's Counterclaim, ¶ 4. Discovery bore this out: Wang admitted that she only came to be involved with the Research Agreement at the "end of December [2017]," just days before the Agreement was signed and long after negotiations had been underway between Guo and Strategic (Wang 1 Tr., Ex. CC, 89:19-90:25); Wang first heard of Eastern from Guo just before traveling to Virginia to finish negotiations (*Id.*, 8:24-11:15, 14:2-25); Guo told Wang that Eastern was the entity he had chosen to sign the Research Agreement (*Id.*); it was Guo who gave Wang approval to sign the Research Agreement (*Id.*, 61:2-9); Guo gave Wang the names to be researched (*Id.*, 33:8-14); Wang admits Guo was the person who was going to use the research (*Id.*, 32:5-35:11, 37:8-38:7); Wang reported back solely to Guo on Strategic's performance (*Id.*, 102:21-103:7); Wang was paid by Golden Spring (New York) (*Id.*), Guo's family office (Coluccio Tr., Ex. OO, 171:2-172:13), which takes direction from Guo (*Id.*, 186:15-19) and is wholly owned by China Golden Spring (*Id.*, 122:15-123:3).  *See also* Ex. NNN (Ex. 3 to Coluccio Tr.).

   8.  Ms. Wang was responsible for overseeing the services that Strategic was to provide to Eastern under the Research Agreement.

<u>Disputed</u> in that the sole source Eastern cites for this allegation is Strategic's Counterclaims (Dkt. 127), and in one of the paragraphs Eastern cites, Strategic pleads that "conversations between Strategic and Guo concerning the purpose, scope, and methods for the Contract were alternatively facilitated by Lianchao [Han] and Wang." *Id.*, p. 25, ¶ 17. As Strategic pled in the immediately prior paragraph, throughout the course of negotiation and performance of the Research Agreement, "Guo represented to

Strategic Vision that Lianchao [Han] and Yvette Wang each had authority to act for and on behalf of Guo at various times." *Id.*, p. 25, ¶ 16. Finally, as Strategic pled in another paragraph cited by Eastern, "[i]n fact, at all times Strategic Vision interacted on the Contract with three individuals. These three were Guo, and two other individuals to whom Guo alternatively gave authority: Wang and another individual identified more fully below, Lianchao Han. At all times, Wang and Lianchao Han claimed to be acting under the authority and with the permission of Guo." *Id.*, p. 21, ¶ 4. *See also* Lianchao Tr., Ex. BB, 95:2-196:14 (by February, "Miles [Guo] put me [Lianchao] back in charge," and Lianchao explained to Strategic that Guo had to be satisfied or he would terminate the contract).

9.     Chunguang Han ("Chunguang") was and is an agent of Eastern.

Not disputed.  Further answering, in the testimony Eastern cites, Chunguang testified he has been an agent for Eastern while living in the United States.  In the other portion of the testimony Eastern cites, Chunguang testified that he resigned as a director after transferring ownership to Guo Mei, who is Guo Wengui's (Miles Kwok's) daughter. Further, as noted in Strategic's Response to SOF 10, below, and in Strategic's Statement of Additional Facts at SOFs 25-32, Strategic disputes that Chunguang actually served as an agent for purposes of entering into any "loan" for ACA's $1 million deposit.

10.     Chunguang was responsible for securing financing that Eastern needed to fund the $1 million Deposit that was to be provided by Eastern to Strategic under the Research Agreement.

This assertion has failed to meet the requirements of Fed. R. Civ. P. 56(c)(1) and the materials cited by Eastern in support of this contention are not admissible in that they

make no reference to the Research Agreement, the deposit, or securing of any financing, and discovery on these topics was not completed.  Fed. R. Civ. P. 56(c)(2).  Eastern successfully blocked discovery into these topics for months, refused to recognize a notice of deposition to produce its own "principal," Chunguang, and tried to keep him testifying (*see* Eastern Letter in Opposition to Strategic's Letter Motion to Compel, Dkt. 129, p. 3, claiming that Strategic should not be able to "pepper [Chunguang] with irrelevant questions concerning…how it got the loan that was used to pay Strategic Vision," which "ha[s] nothing to do with the dispute at issue"). The supposed "creditor," ACA, could not be compelled to provide discovery after its sole director purported to "resign" less than 24 hours before she was served with process, and just after Eastern received notice that an attempt would be made to serve her. Maistrello Tr., Ex. CCC, 57:3-60:11, 61:13-73:19.

11.     Strategic is a limited liability company organized under the laws of Nevada.

Not disputed.

12.     At least from September 1, 2017 and March 13, 2018 (the "Relevant Time Period"), Strategic's principal place of business was in Arlington, Virginia.

Not disputed.

13.     During the Relevant Time Period, French Wallop ("Wallop") was Strategic's Chief Executive Officer and only member.

Not disputed.

14.     Ms. Wallop resides at 1557 North 22nd Street, Arlington, Virginia 22209.

Not disputed.

15.     Among other services, Strategic is a sophisticated company that provides private "investigatory research" to clients within the United States in exchange for monetary compensation.

Eastern improperly includes its own, unsupported characterization of Strategic Vision as a "sophisticated" company.  Its founding and sole member, French Wallop, did not describe the company as such during her testimony.  It has no employees.  Wallop 1 Tr., Ex. FF, 24:1-3.  Uncontroverted that Strategic has engaged in this activity, but immaterial because it does not describe what Strategic Vision agreed to do at Guo's request under *this project,* the Research Agreement. Ex. J, Dkt. 267-1, R. Agreement.  The parties' communications and the Research Agreement, not what Strategic has done in other matters, are what is material in this case. Whether Strategic Vision conducted a "private investigation" within the meaning of Virginia law depends on an application of Virginia law to the facts of this case.

16.     As part of its investigations, Strategic makes investigations into crimes and civil wrongs; the location, disposition, and recovery of stolen property; and the cause(s) of injuries to persons or to property.

Not disputed that Strategic has engaged in this activity, but immaterial because it does not describe what Strategic Vision agreed to do at Guo's request under the Research Agreement. The parties' communications and the Research Agreement, not what Strategic has done in other matters, is what is material in this case. Whether Strategic Vision conducted a "private investigation" within the meaning of Virginia law depends on an application of Virginia law to the facts in this case.

17.     As part of its investigations, Strategic makes investigations into the identities, habits, conduct, business, occupation, honesty, integrity, credibility, knowledge, trustworthiness, efficiency, loyalty, activity, movement, whereabouts, affiliations, associations, transactions, acts, reputation and character of individuals.

> Not disputed that Strategic has engaged in this activity, but immaterial because it does not describe what Strategic Vision agreed to do at Guo's request under the Research Agreement. Ex. J, Dkt. 267-1, R. Agreement.  The parties' communications and the Research Agreement, not what Strategic has done in other matters, is what is material in this case. Whether Strategic Vision conducted a "private investigation" within the meaning of Virginia law depends on an application of Virginia law to the facts in this case.

18.     As part of Strategic's investigations, Strategic's CEO Ms. Wallop communicates with her network of contacts within the United States government and the United States business community in order to obtain the information concerning the subjects of Strategic's investigations.

> Not disputed that Strategic has engaged in this activity, but immaterial because it does not describe what Strategic Vision agreed to do at Guo's request under the Research Agreement. The parties' communications and the Research Agreement, not what Strategic has done in other matters, is what is material in this case. Whether Strategic Vision conducted a "private investigation" within the meaning of Virginia law depends on an application of Virginia law to the facts in this case.

19.     Since it was founded, Strategic has conducted at least five private investigations for its clients.

Not disputed that Strategic has engaged in this activity, but immaterial because it does not describe what Strategic Vision agreed to do at Guo's request under the Research Agreement. The parties' communications and the Research Agreement, not what Strategic has done in other matters, is what is material in this case. Whether Strategic Vision conducted a "private investigation" within the meaning of Virginia law depends on an application of Virginia law to the facts in this case.

20.     Strategic had no employees, other than Ms. Wallop.

Not disputed.

21.     J. Michael Waller ("Waller") is a friend of Ms. Wallop who has partnered with Strategic on a number of investigations since 2016 or 2017.

Not disputed, but further answering, Waller made clear that to the extent his work with Strategic on three matters since 2016-2017 could be called "investigations," they involved "opposition research and political/policy work, messaging." Waller 1 Tr., Ex. Z, 14:6-14:20 ("…[I]t's common in political campaign-type work, but you can use it for really anything where you want to research who your opposition is, everything you can find out about the opposition and use that for advancing your political or policy purposes.").

22.     During the Relevant Time Frame, Strategic was not licensed as a private investigator under the laws of Virginia or any other state or jurisdiction within the United States.

Not disputed, but immaterial because, as discussed in Strategic's Argument, the political opposition work it was hired to do did not require it to be licensed as a private investigator.

23.     During the Relevant Time Frame, Ms. Wallop was not licensed as a private investigator under the laws of Virginia or any other state or jurisdiction within the United States.

> Not disputed, but immaterial because, as discussed in Strategic's Argument, the political opposition work Strategic was hired to do did not require French Wallop to be licensed as a private investigator.

24.     During the Relevant Time Frame, Waller was not licensed as a private investigator under the laws of Virginia or any other state or jurisdiction within the United States.

> Not disputed, but immaterial because, as discussed in Strategic's legal discussion, the political opposition work Waller was hired to do did not require him to be licensed as a private investigator.

25.     Bill Gertz ("Gertz") is a former reporter of The Washington Free Beacon and a current reporter of The Washington Times.

> Not disputed. Further answering, Gertz has covered defense and national security affairs for his entire career (Gertz Tr., Ex. QQ, 20:15-21:1); has written eight books, including two on China, including his most recent book, Deceiving the Sky; and also speaks around the country and appears on national news programs. *Id.*, 7:2-21:10.

26.     Gertz is a mutual acquaintance of Mr. Guo and Ms. Wallop and J. Waller.

> Disputed, in that Gertz is and was more than a mutual acquaintance of Guo, Wallop, and Waller. Gertz developed both a friendship and professional relationship with Guo after having been introduced to him by Sasha Gong between June and July 2017 (Gertz Tr., Ex. QQ, 64:6-65:8; 72:13-73:19). Uncontroverted that Gertz had met Wallop early in 2017 (*Id.*, 26:5-13) and had known and worked with Waller in trying to advocate for

better information capability for the U.S. Government, and viewed their relationship as "occasional friends" (*Id*. 26:14-128:8). Waller and Gertz had known each other for 35 years. Waller 1 Tr., Ex. Z, 16:24-117:9. Waller was working with Gertz and another individual on a separate project as recently as February 2019. *Id*., 63:2-19. Gertz found Wallop to be honest and sincere (Gertz Tr., Ex. QQ, 29:16-20), and found Waller to be honest and sincere (*Id.*, 132:4-10). Later, after learning of this litigation, Gertz asked Guo on more than one occasion not to go through with the lawsuit. *Id*., 89:13-90:16.

27.     Gertz was involved in bringing Eastern and Strategic together for the purposes of entering into the Research Agreement.

<u>Not disputed</u> that Gertz introduced Wallop to Lianchao Han. Gertz Tr, Ex. QQ, 30:4-11. (Gertz may also have introduced Wallop to Yvette Wang (*Id*., 30:4-11), who Gertz knew as an assistant to Guo. (*Id*., 102:14-103:13.) Gertz called Wallop.  Wallop 1 Tr., Ex. FF, 32:5-33:14. Gertz knew nothing about Eastern, Guo had never discussed it with him (Gertz Tr., Ex. QQ, 105:11-106:1), and Gertz never learned of Eastern before hearing of this lawsuit (*Id*., 142:1-3). Gertz introduced Wallop to Lianchao Han because he wanted Han to introduce her to Guo, and so that Wallop could get Guo to "focus his message so that it could be a more effective tool," which would benefit Gertz by giving him "information and news stories."  *Id*., 31:1-132:13. At that meeting, Gertz learned Wallop planned to work with Waller on the project and had no objection. *Id*.

28.     Lianchao Han ("<u>Lianchao</u>") is a mutual acquaintance of Mr. Guo and Ms. Wallop and Waller.

<u>Disputed</u> that Lianchao is a mutual acquaintance of Guo, Wallop, or Waller; while Lianchao was a trusted acquaintance of Wallop and Waller, he was an actual agent

working for Guo. Lianchao was introduced to Guo in late July or early August of 2017 by a longtime friend of Lianchao's who he described as a former "pro-democracy activist," in order to help Guo with his political asylum application, and began to work with Guo on the application. Lianchao Tr., Ex. BB, 30:19-31:3. Based on his work for Guo and Guo's counsel in the fall of 2017, Lianchao refused to testify about factual information he received from Guo about Guo's background. *Id.*, 48:10-52:7. Han maintains a "personal relationship" with Guo and testified he supports what he claims are Guo's political goals. *Id.*, 33:3-10. Han was introduced to all of Guo's family members (his wife, son, and daughter) and other associates such as Tony Blair. *Id.*, 36:7-21. Guo asked Lianchao to work exclusively for him, and Lianchao neither rejected nor accepted the offer. *Id.*, 160:20-162:9. Lianchao also advised Guo on whether "to sue French and Mike." (*Id.*, 23:17-25:9). Lianchao and Wallop knew of each other by reputation but before they were introduced in person, had not actually met. *Id.*, 38:20-39:9; Wallop 1 Tr., Ex. FF, 34:20-35:1 (Wallop and Lianchao had crossed paths in Washington on and off over the years, and Wallop had always known and liked him). Lianchao and Waller had met many years ago (Waller 1 Tr., Ex. Z,16:15-117:9), and had shared the same mentor (Lianchao Tr., Ex. BB, 98:6-199:4).

29.     Lianchao was involved in bringing Eastern and Strategic together for the purposes of entering into the Research Agreement.

Not disputed that Lianchao introduced Wallop and Waller to Guo (Lianchao Tr., Ex. BB, 42:8-15), but Lianchao did not even know of the name of "Eastern Profit" until the lawsuit was filed (*Id.*, 84:6-9). Further, Lianchao acted at Guo's direction at the outset of negotiations, was replaced by Guo for a time by Guo's longtime assistant, Wang, and

59

then replaced Wang at the end of the parties' relationship. (*Id.*, 28:6-29:3; Waller 1 Tr.,

Ex. Z, 28:2-10 (Lianchao as Guo's agent at onset))). Lianchao received a proposal from

Strategic Vision for strategic communications and public relations before his first

meeting, and forwarded it to Guo, and Lianchao testified that the idea for research into

Chinese officials was his own. (Lianchao Tr., Ex. BB, 26:22-128:9; 137:20-139:20).

Lianchao was already advising Guo that he needed to undertake research against "high-

ranking government officials" to sustain his momentum. *Id.*, 43:1-46:2.

B.      The Negotiation of the Research Agreement

30.     In late October or early November, Gertz and Lianchao introduced Mr.

Guo to Ms. Wallop and Waller of Strategic.

Not disputed except that (as set forth in Strategic's response to SOF 27 and 29) Gertz first

introduced Wallop to Lianchao for the purpose of Lianchao's making a further

introduction of Wallop and Waller to Guo. Then, in the first meeting Wallop and Waller

had with Guo, only Lianchao was in attendance. Wallop 1 Tr., Ex. FF, 36:18-37:24.

31.     From the date of that introduction until the Research Agreement was

signed, representatives of Eastern (Mr. Guo and Ms. Wang) conferred with representatives of

Strategic (Ms. Wallop and Waller) to discuss a variety of services that Strategic Vison

purportedly could provide, including investigatory research into certain people who supported

the Chinese Communist Party ("CCP").

Not disputed that from the date of the introduction until the Research Agreement was

signed, Guo and Wang were among those who conferred with Wallop and Waller (as

representatives of Strategic) regarding the work that Strategic would perform for Guo,

and Guo's intended uses of the research Strategic would provide. However, as Eastern's

own citations make clear, Lianchao handled pre-contract negotiations on behalf of Guo

60

until the final week or so before it was signed. *See, e.g.*, Wallop 1 Tr., Ex. FF, 36:18-

44:15 (most communications were with Guo and Lianchao); *Id.*, 73:23-76:13 (when

Wang was in Guo's residence, Guo "often didn't want her in the room" where Wang,

Waller, Lianchao, and Guo were conferring); Waller 1 Tr., Ex. Z, 38:3-14; 52:24-54:7

(agreement was negotiation with Lianchao Han as Guo's agent); 63:5-21 (Wallop and

Waller believed they were negotiating with Guo, and either Lianchao or Wang was

present, but sometimes Guo dismissed Wang because he claimed he did not trust her);

143:6-13 (Wang became the primary point of contact sometime after December 25,

2017); 126:1-134:15 (Lianchao negotiated with Waller through late December, and it was

unclear whether Lianchao or Yvette Wang would sign); 102:2-104:2 (by February 2018,

Wang had told Strategic that Guo had reverted to Lianchao, and wanted all

communication to go through him rather than Wang); *See also* Guo 1 Tr., Ex. AA, 67:9-

68:11 (Lianchao prepared a draft of the Agreement); Wang 1 Tr., Ex. CC, 89:2-91:6)

(discussions about goals of contract involved others, and Wang did not "start to get

involved" until "the end of December"); Lianchao Tr., Ex. BB, 78:22-179:13 (when

Lianchao was negotiating, agreement was reached in principle, and Wang negotiated

details). Wang had only three meetings with Wallop from this time until January 6, 2018

(*Id.*, 56:4-11); Wang first heard of Eastern Profit from Guo, when, before going to

Virginia to meet with Wallop, she asked Guo who the "client" was. *Id.*, 10:16-14:22.

Lianchao Han never heard of Eastern until the lawsuit was filed. *Id.*, 84:6-9. Wang, as

Guo's "project manager," knew Guo had identified the subjects for research, but only

knows Guo's reasoning and plans based on Guo's social media posts. Wang 1 Tr., Ex.

CC, 32:12-35:11. Not all the subjects were CCP officials, but Guo intended to use the

information to "whistle blow" on corrupt Chinese officials. *Id*. Guo supposedly cares about this misconduct because he wants to promote democracy and the rule of law in China. *Id*., 37:8-38:7. The urgent need for information by January 26, 2018 was Guo's, but he never told Wang why he needed it so quickly. Wang 1 Tr., Ex. CC, 263:8-268:12; Exs. GG, HH (Wang 1 Tr. Exs. 18 and 21 (Wang text messages showing Guo needed reports for his own purposes).

32.     One such meeting took place in the middle of December 2017 and was attended by Mr. Guo, Lianchao, Ms. Wallop and Waller.

Not disputed that Guo, Lianchao, Wallop and Waller met in mid-December 2017 at Guo's apartment in New York City; however, as Eastern's citation shows, at that point, the discussion included many items that Guo ultimately did not pursue with Wallop and Waller, including Guo's efforts to build his presence through ownership of Washington, D.C.-area real estate and building up an independent media arm. Waller 1 Tr., Ex. Z, 230:21-231:22; Wallop 1 Tr., Ex. FF, 32:17-38:4, 41:11-42:11, 43:15-45:25, 87:23-89:5.

33.     At the meeting described in the preceding paragraph, Ms. Wallop and Waller presented Mr. Guo and Lianchao with a paper document entitled "Time to Get Them: Beginning the Psycho-Political Campaign for China" (hereinafter "Time to Get Them").

Not disputed.

34.     Time to Get Them described Strategic's capabilities concerning "Targeted Intelligence Collection and Analysis."

Not disputed.

35.     Targeted Intelligence Collection and Analysis contemplated that Strategic would "build and operate a secret system for micro-targeted intelligence collection and analysis."

<u>Not disputed</u>.

36.   The parties ultimately decided to proceed with the investigatory research only.

<u>Not disputed</u> that Guo ultimately decided to proceed with only research; but the scope of the research was discussed and negotiated, and Guo made further statements about his plans, at—and after—the meeting at which the "Time to Get Them" document was presented.  *See, e.g.*, Waller 1 Tr., Ex. Z, 46:10-64:24.

37.   The parties then began negotiating the terms of what eventually would become the Research Agreement.

<u>Not disputed</u> that Guo, primarily through Lianchao, but then primarily through Wang after Christmas 2017, negotiated the Research Agreement with Strategic Vision (*see* Response to Fact 31), but Eastern Profit provides no evidence in support of its claim that Guo, Lianchao, Waller, or Wallop "then began" negotiating the Research Agreement— only after the mid-December meeting. Waller's testimony shows that the negotiations, and even initial handwritten drafts, occurred early at the parties' New York City meetings. Waller 1 Tr., Ex. Z, 20:14-23:22 (discussing early December meetings).

38.   A significant portion of the negotiations regarding the terms of the Research Agreement occurred in Virginia.

<u>Not disputed</u> that Wallop met with Wang in Virginia three times (*see* Response SOF 31) and that Wallop communicated with Wang and Lianchao from Virginia, in late December and then on January 2 and January 6, 2018, but before this (as noted above in Strategic's responses to Facts 32 and 37), the majority of the negotiations occurred at Guo's apartment in New York City.

39.     Ms. Wallop and Waller, while located in the Commonwealth of Virginia, communicated with Ms. Wang concerning the activities Strategic was to perform under the Research Agreement.

> Not disputed that Wallop communicated with Wang in late December,  January 2 and January 6, 2018 in Virginia. However, Waller was not present at those meetings, and the sole evidence cited by Eastern are Strategic's admissions are that Waller and Wallop communicated with "Wang via Signal concerning SV's activities to perform under the terms of the Contract," which relates to performance of the Contract, not (as implied by the change of wording in this Fact, to "the activities Strategic *was* to perform") its negotiation.

40.     Ms. Wallop and Waller, while located in the Commonwealth of Virginia, communicated with Ms. Wang concerning the proposed terms of the Research Agreement before it was executed.

> Not disputed as to "at least one" communication made via a Signal message to Ms. Wang, which is the only evidence cited by Eastern.

41.     Ms. Wallop and Waller, while located in the Commonwealth of Virginia, communicated with Ms. Wang concerning the actual terms of the Research Agreement.

> Not disputed as to "at least one" communication made via a Signal message to Ms. Wang, which is the only evidence cited by Eastern.

42.     For instance, from December 2017 through January 6, 2018, Ms. Wallop communicated from the Commonwealth of Virginia to Ms. Wang via Signal messages to negotiate the pricing structure of the contemplated research and the number of individuals to be researched.

<u>Not disputed</u>.

43.     In or around December 2017, Ms. Wallop and Waller prepared the initial draft of the Research Agreement while at Ms. Wallop's home in Virginia.

<u>Disputed</u>; initial drafts were handwritten and were made by Lianchao, Waller, Wallop, and Guo at Guo's apartment in New York City. Waller 1 Tr., Ex. Z, 21:14-22:19. Guo testified for Eastern Profit that Lianchao prepared the first draft. Guo 1 Tr., Ex. AA, 67:9-68:11.

C.     The $1 Million Deposit and ACA Loan

44.     As part of contract negotiations, Ms. Wallop requested that Eastern provide a $1 million Deposit under the Research Agreement.

<u>Not disputed</u>.

45.     On December 29, 2017, to fund the Deposit contemplated by the parties, Eastern borrowed $1 million from ACA Capital Group Limited ("<u>ACA</u>," and the loan from ACA to Eastern, the "<u>ACA Loan</u>").

<u>Disputed</u>. Eastern cites only the testimony of Chunguang, who claimed to have signed a document Eastern says is a loan agreement with ACA for $1 million on Friday, December 29, 2017, the last business day before ACA wired slightly less than that amount to Strategic. This story is not credible and the loan is a sham. First, the purported loan document lists Chunguang as Eastern Profit's "Director," (EASTERN-000278) but Chunguang had long before resigned as a director, having transferred his ownership and directorship of Eastern Profit to Guo Wengui's daughter, Guo Mei, back in June of 2017, just before all of Eastern's assets were seized. Chunguang Tr., Ex. BB, 59:60:8, 70:5-9, 102:2-18 (resignation); 87:3-88:20; Dkt. 203-2 (asset seizure). At his deposition, Chunguang tried to explain this by claiming to have received oral authority from

Eastern's only (and true) director (Guo Mei, the daughter of Guo Wengui) to conduct its business. Chunguang Tr., Ex. BB, 43:11-44:22; 47:11-16; 102:2-104:11. He also claimed to have orally re-delegated this orally-received authority to Wang, allowing her to negotiate the Research Agreement with Strategic, after she approached him to inquire if he knew of any companies that could use research. *Id*., 116:6-117:25. But Wang (and Eastern Profit) had already given binding testimony that Guo simply told Wang that Eastern would be inserted into the Research Agreement shortly before her first trip to Virginia on December 29, 2017, when she asked him who the client would be (Response to Fact 31); Wang had never even heard of Eastern before that time. *Id*. Chunguang is not a credible witness. Other Guo confidants, including Lianchao Han, who negotiated the Research Agreement, easily recognized him as a cook, bodyguard, and errand boy for Guo (Lianchao Tr., Ex. BB, 36:17-37:12; Gong Tr., Ex. PP, 36:9-22; 116:24-118:11). Yet Chunguang refused to provide details on his line of work, place of work, or reason for his presence in Guo's building; he denied ever having worked for Guo, and instead claimed to have begun running his own investment business after having been tutored by Guo, his "mentor" and "idol," in the niceties of art, architecture, and investing. (Chunguang Tr., Ex. KK, 24:20-34:2; 35:17-36:4; 42:7-11). Guo admitted Chunguang is in his building almost every day (in reality, as a personal servant), refused to say why or to know why (Guo 1 Tr., Ex. AA,14:9-117:6; 195:23-197:24), and laughed when asked whether Chunguang attended meetings between Guo and Strategic (*Id*., 58:5-15). Additionally, the timing of the purported "loan" negotiation does not match with the last-minute entry of Eastern Profit into the Research Agreement. The loan was purportedly signed on Friday, December 29, 2017, a date ACA "Chief Executive" William Je (a non-

resident of the U.S. who could not be located for service of a testimonial subpoena)

happened to be in New York City—the last business day before the Tuesday, January 2,

2018 wires were sent. Yet Chunguang testified that even after Wang approached him and

he supposedly agreed to have Eastern enter the agreement (Chunguang Tr., Ex. KK, 39:5-

40:11), a step he says he could only take after he received authority from Guo Mei

(Guo's daughter) to do the project (*Id.*, 72:24-73:13), it required "two or three" in-person

meetings, as well as at least one phone call, before the loan could be signed in-person on

December 29. *Id.*, 133:13-24. Again, Wang's approach to Chunguang was supposedly the

triggering for all of Chunguang's work, but she did not herself learn the identity of

Eastern until just before her December 29 trip to Virginia, and the draft Guo gave her to

review did not even contain Eastern's name. Wang 1 Tr., Ex. CC, 51:6-52:18; Ex. AAAA

(Wang 1 Tr. Ex. 4). There are other indicia that this loan was not a true commercial

transaction. Eastern did not keep any copy of the document after it was signed, and

Chunguang tried to explain by claiming he only intended to tell Eastern's "fiscal

department" (though it had no employees left) about the loan after Eastern's assets were

unfrozen and it could be repaid (Chunguang Tr., Ex. KK, 34:21-136:5). The loan was not

produced before Eastern's first Rule 30(b)(6) deposition, and ten months later, Eastern's

representative, Wang, still could not say where Eastern had obtained the loan document

to produce in the case; she was allowed to say only that she saw it for the first time in

prior litigation counsel's "file." Wang 2 Tr., Ex. II, 97:20-102:8. Chunguang's signature

appears to have been falsely signed on at least two other documents in this case—the

Research Agreement itself (Lianchao Tr., Ex. BB, 222:7-223:8, identifying Chunguang's

name on Research Agreement that was signed by Wang in Wallop's presence in Virginia;

Wang 2 Tr., Ex. II, 141:15-143:5, admitting she did not sign her own name, but denying she signed Chunguang's and claiming she signed "nobody's name"), and a Substitution of Counsel filed in this Court (Chunguang Tr., Ex. KK, 18:9-119:8, Ex. Q (Ex. 33 to Chunguang Tr.))—without his knowledge or agreement. Finally, the purported Loan Agreement bears interest compounded at 2% per month and the $1 million and interest is payable in full in just six months (Chunguang Tr. Ex. 35, EASTERN-000278-80, loan document), even though the Research Agreement's term was for three years (Ex. J to Dkt. 267-1), and it required additional payments of $750,000 per month. *Id*.  Eastern's only way of "repaying" ACA was by Strategic obtaining useful research; that research being skillfully publicized; the publicity somehow leading to regime change in Mainland China; and that regime change rippling through to cause Eastern's frozen bank account to be released. Wang 2 Tr., Ex. II, 49:25-50:10, 53:19-54:3, 56:7-11, 57:5-9, 110:17-112:2; Dkt. 203-2; Chunguang Tr., Ex. KK, 72:24-73:14. But even had all of this happened, Eastern only had the equivalent of roughly $80,000 in its frozen Hong Kong account. *Id*. And William Je, on behalf of ACA, had indicated he might simply "forgive" the loan if the research was successful. Wang 2 Tr., Ex. II, 208:2-16, 46:22-47:14, 44:10-47:14, 197:18-198:6, 202:2-204:20, 73:20-74:8.

46.     On January 2, 2018, Eastern caused the $1 million Deposit to be wired to Strategic through ACA.

<u>Disputed</u>. As outlined in the Response to Fact 45 directly above, the money came from ACA and Eastern's loan is a sham. Although Eastern now claims Guo was acting on its behalf, it admits that Guo ordered the wire from ACA to Strategic Vision.  Ex. M (Plt's First Interrog. Resp.), also Dkt. 267-1, p. 2, No. 4.

47.     Strategic received the $1 million.

Not disputed, except that Strategic actually received less than $1 million due to wiring

charges. Wang 1 Tr., Ex. CC, 58:4-159:23, Ex. U, Dkt. 267-1 (Ex. 7 to Wang 1 Tr.)

(Wire confirmation document showing transfer fees.)

48.     Strategic understood that the $1 million payment from ACA was the

Deposit that the parties had previously discussed.

Not disputed that Strategic came to form this belief.

49.     Strategic has acknowledged that it accepted the $1 million deposit and

purported to utilize it to cover the expenses associated with the investigation called for under the

Research Agreement.

Not disputed that Strategic accepted the deposit and began to use it to cover expenses

associated with the Research Agreement.

D.     The Research Agreement

50.     Eastern and Strategic entered into the Research Agreement on January 6,

2018.

Not disputed.

51.     The parties executed the Research Agreement at Ms. Wallop's home in

Virginia.

Not disputed.

52.     Ms. Wallop signed the Research Agreement on behalf of Strategic in

Virginia.

Not disputed.

53.     Per Strategic, the Research Agreement required it to "investigat[e]" certain

individuals chosen by Eastern.

69

<u>Not disputed</u> that, in a pleading response, Strategic Vision accepted Eastern Profit's characterization of the contract to this effect <u>but immaterial</u>. This assertion purports to characterize Strategic Vision's interpretation of the parties' written contract in response to Eastern Profit's own characterization of the contract, all in the context of litigation occurring over a year after the contract was signed. Dkt. 93, p. 10, ¶ 56; Dkt. 127, p. 11, ¶ 56. The assertion is not based on an "interpretation" of the contract prior to or contemporaneous with its entry. The initial interpretation of the Research Agreement, the existence and content of which are undisputed, is a legal question for the Court. "Under New York law, the initial interpretation of a contract is a matter of law for the court to decide." *Serdarevic v. Centex Homes, LLC*, 760 F.Supp.2d 322, 328 (S.D. N.Y. 2010) (citations omitted). By presenting this assertion, Eastern Profit takes the position that the contract is subject to the parties' interpretations. Strategic Vision has established with undisputed record evidence that the individuals to be researched were not just any individuals but members of the CCP. Strategic's SOF 7 above provides: research was needed to examine questionable interactions between CCP members and Chinese nationals living in the United States and abroad. Guo 1 Tr., Ex. AA, 45:3-46:16; Wallop 1 Tr., Ex. FF, 88:3-89:22; Wang 2 Tr., Ex. II, 197:18-208:22, 202:2-204:20, 149:5-150:9; Lianchao Tr., Ex. BB, 279:10-14. Guo believed there was a large number of corrupt CCP officials and that, by exposing them, he could achieve the long-term objective of breaking CCP's control over China, creating a regime change that would turn China from a strategic adversary to a friend of the United States and pave the way for democracy and freedom for the people of China. Guo 1 Tr., Ex. AA, 39:9-19, 45:3-46:16; Wang 2 Tr., Ex. II, 49:7-21, 202:2-204:20, 149:5-150:9; Wallop 1 Tr., Ex. FF, 88:3-89:22; Lianchao

Tr., Ex. BB, 226:10-18.  Guo claimed that he needed Strategic Vision to advise him on the political weaknesses of CCP members in high government positions.  *Id.*

54.      According to the Research Agreement's terms, Strategic was to provide Eastern "high quality original research and prepare reports on subjects chosen at [Eastern's] discretion for the purposes of detecting, stopping, and preventing crime or other harm to innocent people."

Not disputed.  Further answering, Guo made clear that the purpose of the contract was to undermine the CCP.  No particular crime or crime victim was identified within the contract itself, and the only harm identified therein was described as generalized "harm to innocent people."  Ex. J, Dkt. 267-1, R. Agreement, p. 1.

55.      Strategic was obligated to "provide the deliverables based on the best practices and standards of the industry, comparable to other top firms with similar services," including by delivering reports "of very high quality, revealing the true, complete and full profile of the subject."

Not disputed that this assertion sets out verbatim language from the contract.  The contract also contained verbatim language that the "deliverables" comprised "business research, reporting, documentation, and other consulting services."  R. Agreement, Ex. J, Dkt. 267-1, pp. 1, 3; Wang 1 Tr., Ex. CC, 11:19-12:11.  The three areas of analysis (all labeled "research") were "financial forensic historical research; current tracking research; and social media research."  R. Agreement, Ex. J, Dkt. 267-1, pp. 1-2.  Guo represented to Strategic Vision in negotiations, and the Agreement recited on its p. 1, that Guo planned to use Strategic Vision's analysis for "detecting, stopping, and preventing crime or other harm" (*Id.*) to the people of China in order to force a regime change that would

71

implement the rule of law and democracy.  Guo 1 Tr., Ex. AA, 45:3-46:16; Wang 1 Tr.,
Ex. CC, 33:8-14 (Guo identified research subjects), 32:5-35:11, 37:8-38:7.

56.     The Agreement states: "[Eastern] will provide the necessary basic
information, and desired area of focus, to [Strategic] to research.  [Strategic] will produce
complete reports and provide all supporting data as indicated below."

Not disputed.

57.     The three types of research Strategic agreed to perform in the Agreement
were "Financial forensic Historical research, Current Tracking research, and Social Media
Research."

Not disputed.

58.     The Agreement describes Financial forensic Historical research as: "in-
depth and detailed reports of existing and historical business and financial transactions, on
subjects selected by [Eastern], and relations of the subject as identified by [Eastern].  Business
and financial transactions to be researched may include statements, capital sources, inflow and
outflow information, bank receipts, financial instruments, financial products, statements of
credit, precious metals transfers, crypto currency exchange, stocks and other equities, business
ownership, real property ownership, trusts, large amounts of spending, specific information to
indicate the transaction participants, and other data required by [Eastern]."

Not disputed that the quoted material is verbatim from the contract (except for the
omission of the words "commodity transfers" after "precious metals transfers"); however,
the definition of "Financial forensic Historical research" indicated that it would "not be
limited to" the matters described in the assertion.  R. Agreement, Ex. J, Dkt. 267-1, p. 1.

59.     The Agreement describes Current Tracking research as: "in-depth and detailed reports on movements of specified subjects by land, air, and sea (private and commercial); schedules and itineraries, addresses and lodging, means of transportation, names of carriers, manifests, geolocation, major events and significant contacts the subject involved, video and audio that can be accessed remotely, and other data that may be of relevance to the overall research, such as past travel records that may [be] significant to [the] research."

> Not disputed that the quoted material is verbatim from the contract; however, the definition of "Current Tracking research" indicated that it would "not be limited to" the matters described in the assertion.  R. Agreement, Ex. J, Dkt. 267-1, p. 1.

60.     The Agreement describes Social media research as: "in-depth and detailed reports on the social media usage and networks of specified subjects and public figures. Research shall include court records, criminal databases, sex offender and child abuse databases, information on subject's family, extramarital affairs, children born out of wedlock, passports and ID documents, assets, videos and audio, emails, websites, pornography and related media, comments on online media, social media (including Facebook, Twitter, Instagram, Snapchat, Wechat, and other sites as [Eastern] may request), "dating" or sexual services apps, online classified ads or their equivalents, video or audio recordings, and other media."

> Not disputed that the quoted material is verbatim from the contract; however, the definition of "Social media research" indicated that it would "not be limited to" the matters described in the assertion.  R. Agreement, Ex. J, Dkt. 267-1, p. 1.

61.     The Agreement provides that the research called for under the Agreement were to be delivered to Eastern by USB drive only.

Not disputed but, for clarity, the verbatim language of the Agreement is that the

"deliverables" under the contract "will be comprehensive confidential reports" to Eastern

Profit and "shall be by USB drive only."

62.     Strategic was entitled to payment under the Research Agreement only if it

provided the research called for under the Research Agreement; the potential amount owed to

Strategic under the Research Agreement was tied to each deliverable, report, or unit of research

delivered.

Disputed.  In the first instance, Strategic Vision was entitled to payment of $1 million

when Eastern Profit signed the Research Agreement, showing the falsity of Eastern

Profit's assertion that payment was conditioned on Strategic Vision's provision of

research.  Under the Agreement, "[Eastern] will pay [Strategic] a deposit of

US$1,000,000 (one million dollars) upon signing the contract."  R. Agreement, Ex. J,

Dkt. 267-1, p. 5.  This provision had no reference to Eastern Profit's receipt of a

deliverable.  The Agreement contained no provision for return of the $1 million or

compromise of that amount for any reason.  *Id.*  In deposition discovery, Eastern Profit

admitted that nothing in the contract required Strategic to return the $1 million at the end

of the contract, nor had Strategic made such a representation to Eastern Profit.  Wang 1

Tr., Ex. CC, 198:8-201:14-21.  In addition to the $1 million deposit, Eastern Profit was to

pay monthly invoices in a pre-determined amount as compensation for Strategic Vision's

services.  Wang, for Eastern Profit, distinguished the $1 million deposit from the other

fixed "invoice" amounts owed under the contract—the deposit was an "evergreen

deposit," which "means that one million just stay there as one million.  And they,

Strategic Vision *is going to issue invoice every month* and the client is just to pay the

invoice." *Id.*, 199:5-200:19 (emphasis added).  An invoiced amount was not "tied to each

deliverable, report, or unit of research delivered," as Eastern Profit asserts above, but

rather recognized the parties' agreement that a "per deliverable" approach "does not

provide for predictable budgeting or workloads."  R. Agreement, Ex. J, Dkt. 267-1, p. 3.

Wang also testified, for Eastern Profit, that "Strategic Vision requested the client of this

contract to pay $750,000 per month, no matter how many reports the client requested or

Strategic Vision provided":

> Q.· Now, the waterline, is this a
> reference -- does this have anything to do
> with the million dollar deposit?
> A.· No.· One million dollar deposit has
> nothing to do with waterline.· Waterline is
> Ms. Wallop and Strategic Vision requested the
> client of this contract to pay $750,000 per
> month, *no matter how many reports the client*
> *requested or Strategic Vision provided*.· That
> money must be paid.

Wang 1 Tr., Ex. CC, 55:5-14 (emphasis added).

Therefore, as relevant here, the Agreement required Eastern Profit to make a fixed

monthly $750,000 payment, starting in January 2018 and through March 2018.  R.

Agreement, Ex. J, Dkt. 267-1, p. 5 ("Payment is to be made in regular monthly

installments of US$750,000, at the end of each month").  The parties agreed to a fixed

term of invoiced amounts—"the first 3 months of this Agreement."  R. Agreement, Ex. J,

Dkt. 267-1, p. 4; Wang 1 Tr., Ex. CC, 135:16-141:16; Ex. S, Dkt. 267-1 (Ex. 6 Wang 1

Tr.), p. 1.  Again, this was not "tied to each deliverable, report, or unit of research

delivered," as Eastern Profit asserts above.  Finally, Eastern Profit's citations to the

record are misplaced and in violation of Fed. R. Civ. P. 56(c)(2).  First, Eastern Profit

cites to the Research Agreement generally (pp. 1-5) (and Strategic Vision's pleading

authentication of it) but without quoting any particular contract provision.  Second,

Eastern Profit cites Wallop's testimony in the context of Strategic Vision's Fed. R. Civ.

P. 30(6)(6) deposition on Nov. 19, 2019 but Wallop was not designated for the questions

she was being asked about and the questions had been asked at an earlier occasion,

objections noted on the record (Wallop 2 Tr., Ex. UU, 45:2-46:25).  Wallop's testimony

is not admissible.

63.     The Agreement states that "[Eastern] will pay [Strategic] a deposit of

US$1,000,000 (one million dollars) upon signing the contract."

Not disputed.

64.     The Deposit was to be treated by Strategic as a down payment to be

credited on a prorated basis to fees earned by Strategic during the last one and one-third months

of the Research Agreement.

Disputed.  Under the Research Agreement, the $1 million payment would "be credited on

a prorated basis to the final 1-1/3 (1.3) months of the contract."  The "final 1-1/3 (1.3)

months of the contract" was not defined, either as a special term or in relation to the

"payment term" provision that set forth the $1 million payment.  Although a later,

different provision of the Agreement defined the "duration" of the contract as "in force

for three (3) years from the date of signing," it also allowed any party to "terminate the

contract with 30 days' written notice."  The "payment term" provision does not reference

anything other than "the contract," and Eastern Profit cannot establish that the exclusive

use of the $1 million was to be at the *end* of the third year instead of towards the monies

owed Strategic Vision for the months that it provided services under the Agreement

before Eastern Profit abruptly terminated it effective 30 days after the February 23, 2018

termination (i.e. what turned out to be the last 1 and 1/3 months that the contract actually existed).  Waller 2 Tr., Ex. ZZZ, 92:14-93:21 ("I agree it says the deposit will be credited on a prorated basis to the final one, one-third months[] of the contract.").  Eastern Profit never paid the $750,000 due for January or February 2018.  R. Agreement, Ex. J, Dkt. 267-1, pp. 3-4; Wang 1 Tr., Ex. CC, 58:6-18, 135:16-141:16; Ex. S, Dkt. 267-1 (Ex. 6 Wang 1 Tr.), p. 1; Wallop 1 Tr., Ex. FF, 241:6-8, 242:19-243:3; Wang 2 Tr., Ex. II, 211:12-212:15.

65.    The Deposit was not meant to be a signing bonus.

Not Disputed.  Further answering, Eastern Profit cites Strategic Vision's answer to Paragraph 17 of the SAC but that does not characterize the $1 million payment as a signing bonus.  Strategic Vision's answer also "denies any construction of the Contract that would involve an obligation on the part of Strategic Vision to return the indicated funds to Eastern Profit."  Dkt. 127, p. 4, ¶ 17.

66.    The Agreement states that "It is understood that [Eastern] may direct other entities to pay [Strategic], and that such payments will be deemed satisfactory compensation by [Strategic]."

Not disputed.

67.    The Research Agreement authorized the parties to "terminate the contract with 30 days' written notice."

Not disputed.

68.    Termination was permitted without a showing of cause.

Not disputed.

69.     The termination provision in the Research Agreement allowed for termination without cause so long as 30 day's written notice was provided.

Not disputed.

70.     Strategic did not require Eastern to represent in the Research Agreement that Mr. Guo was a dissident who opposed the CCP.

Not disputed but immaterial.

71.     Strategic did not require Eastern to covenant in the Research Agreement that Eastern would use the investigatory research against the CCP.

Not disputed but immaterial.

72.     Strategic did not conduct diligence into the background of Eastern or Mr. Guo, including into whether Mr. Guo was truly a dissident or opposed the CCP, before signing the Research Agreement.

Disputed.  Whether or not formalized under the description "due diligence," Strategic Vision informed itself of Guo's background and plans for the Research Agreement by communicating with Lianchao and Gertz, longtime Washington, D.C. figures, who approached French Wallop and Michael Waller in the first instance about associating with Guo.  Wallop 1 Tr., Ex. FF, 11:24-12:21, 89:9-91:1, 31:23-35:7.  They vouched for Guo, and Strategic Vision reasonably relied on them to give credibility and authenticity to Guo and his plans.  *Id.*, 12:16-21, 33:15-21; Gertz Tr., Ex. QQ, 17:2-24:21, 25:18-21. Gertz has covered defense and national security affairs for his entire career (*Id.*, 20:15-21:1); has written eight books, including two on China, including his most recent book, Deceiving the Sky; and also speaks around the country and appears on national news programs.  *Id.*, 7:2-21:10.  Eastern believes as such, asserting in SOF 77 below:

"Strategic relied upon the recommendation of Gertz and Lianchao in choosing to enter into the Research Agreement."  Eastern cites similar evidence in SOF 78.

      73.    Ms. Wallop testified that she "never discussed what the research would be used for . . . with Mr. Guo or Ms. Wang or Mr. Han."

<u>Disputed</u> as an incomplete description of Wallop's testimony, which was given in her personal capacity and not as corporate representative of Strategic Vision.  As cited by Eastern Profit in part in SOF 74, Wallop (testifying in her personal capacity) did discuss the planned use of the research by Guo.  In her individual capacity, Wallop was asked, during the time Strategic Vision was meeting with Guo to discuss the project and before the Research Agreement was signed (Wallop 1 Tr., Ex. FF, 54:10-17), whether she understood "what the end goal of the research project as a whole was" (*Id*., 58:22-59:8). Wallop testified:  Q.  So did you understand that the research would be used to fight against the communist party in China?  A.· Correct.· We thought.· We were not sure what they were going to do with it.· Maybe he was going to run it both ways.· We don't know.  I'm only asking what you thought.  A.· Well, I just gave you my opinion.  *Id*., 60:21-61:3.  Wallop also described Strategic Vision's services as providing substance that Guo would use for political and other "leverage" against the CCP:  "Well, Guo had said that the CCP, or the communist party of China, there was a great deal of corruption within the leadership, and, as a·result of that, he wanted to find as much corruption as possible, and he wanted us to investigate and retrieve that kind of corruption.  In other words, funds that would have been taken·out of the country illegally, cash payments, all of these things that were part of that."  *Id*., 88:3-89:22.  Strategic Vision's corporate testimony was that the research done under the contract was to aid in the exposure of

wrongdoing, including in a moral sense, of CCP members.  Waller 2 Tr., Ex. ZZZ, 96:5-97:24.

74.     Ms. Wallop testified that Strategic did not know for what purpose Eastern was proposing to use the investigatory research and thought that Eastern might "run it both ways."

Disputed.  In her individual capacity and not as Strategic Vision, Wallop was asked, during the time Strategic Vision was meeting with Guo to discuss the project and before the Research Agreement was signed (Wallop 1 Tr., Ex. FF, 54:10-17), whether she understood "what the end goal of the research project as a whole was" (*Id.*, 58:22-59:8). Wallop testified:  Q.  So did you understand that the research would be used to fight against the communist party in China?  A.· Correct.· We thought.· We were not sure what they were going to do with it.· Maybe he was going to run it both ways.· We don't know.  I'm only asking what you thought.  A.· Well, I just gave you my opinion.  *Id.*, 60:21-61:3.  In the same testimony, Wallop later described Strategic Vision's services as providing substance that Guo would use for political and other "leverage" against the CCP.  *Id.*, 88:3-89:22.  Strategic Vision's corporate testimony was that the research done under the contract was to aid in the exposure of wrongdoing, including in a moral sense, of CCP members.  Waller 2 Tr., Ex. ZZZ, 96:5-97:24.

75.     Strategic waited until after the Research Agreement was signed to begin investigating Mr. Guo's background.

Disputed.  Strategic Vision was informed by its trusted contacts, Lianchao and Gertz, about Guo before beginning negotiations for the Research Agreement.  Wallop 1 Tr., Ex. FF, 11:24-12:21, 89:9-91:1, 31:23-35:7, 12:16-21, 33:15-21; Gertz Tr., Ex. QQ, 17:2-

24:21, 25:18-21.  Eastern Profit believes as such, asserting in SOF 77 below:  "Strategic

relied upon the recommendation of Gertz and Lianchao in choosing to enter into the

Research Agreement."  Eastern Profit cites similar evidence in SOF 78.  Strategic Vision

also had numerous meetings and conversations with Guo and his designated

representatives in negotiating the contract through which Strategic Vision evaluated more

of Guo's background.  Plt's First Interrog. Resp., Ex. M, Dkt. 267-1, p. 3, No. 5; Wallop

1 Tr., Ex. FF, 199:20-200:9; Wang 1 Tr., Ex. CC, 59:17-60:4.  Further, the testimony

cited by Eastern Profit is not of Strategic Vision's corporate representative and was

limited to the context of a single activity out of several types available to examine Guo's

background—Wallop calling a reference Guo had given her, which was done after the

contract was signed:  "He was the one that gave me - he asked me for these references.· I

wanted to make sure we had a reference on him.· He said that he worked very closely

with the UAE, and it turned out, I guess, he did.  Q.· When were these conversations you

had with the Al Nahyan family?  A.· Oh, probably in -- probably about six months after

the contract began.  Q.· So you were checking references on Mr. Guo after the agreement

was over with? A.·Yes.· We had trusted him up until that time."

   76. Evidence that Strategic is relying upon to show that Mr. Guo

misrepresented his status as a Chinese dissident and opposition to the CCP comes from publicly

available sources, such as news articles (including in the Wall Street Journal) and YouTube

videos, that existed in the public forum before the parties signed the Research Agreement.

   <u>Disputed</u>.  The evidence Strategic Vision is relying on is set forth in *this* submission,

   which Eastern Profit did not have before presenting this blanket assertion.  What Eastern

   Profit cites to are portions of the record as to particular pieces of evidence establishing

Guo's non-dissident status, not all of which predate entry of the Research Agreement.

For example, Strategic Vision testified to a "years long vexatious litigation campaign to

harass Chinese dissidents and democracy activists" that began but had not concluded by

the January 6, 2018 execution of the contract.  Waller 2 Tr., Ex. ZZZ, 34:13 ("it began in

2017").  Strategic Vision also testified to pro-communist statements by Guo occurring

"as recently as September 2019."  *Id*., 36:5-9.

77.     Strategic relied upon the recommendation of Gertz and Lianchao in

choosing to enter into the Research Agreement.

<u>Not disputed</u>.  Further answering, Strategic Vision informed itself of Guo's background

and plans for the Research Agreement by communicating with Lianchao and Gertz,

longtime Washington, D.C. figures, who approached Wallop and Waller in the first

instance about associating with Guo.  Wallop 1 Tr., Ex. FF, 11:24-12:21, 89:9-91:1, 31:2-

35:7.  They had known Wallop and Waller for many years and vouched for Guo.  *Id*.,

12:16-21, 33:15-21; Gertz Tr., Ex. QQ, 17:2-24:21, 25:18-21.

78.     Ms. Wallop testified as follows:

- Q.  Okay.  So you didn't do any work regarding Mr. Guo or his business prior to . . . the execution of the contract on or about January 6, 2018?

- A.  No.

- Q.  You didn't access your network to determine whether this was someone you wanted to do business with or not?

- A.  We had Bill Gertz, who was one of the finest intellects on Chinese corruption, and reporters, journalists, and also Lianchao, again, of the highest sterling standards.  When they asked us to look into it, that's what we did.  That was looking into putting together a program that would help somebody that we believed at the time was absolutely anti-communist.

- Q.  I see.  So you relied up -- let me put it this way.  Strategic Vision relied upon the recommendation of Bill Gertz and Lianchao Han in terms of deciding to do business with, or deciding to enter into the research agreement?

- A. Correct.

Not disputed and further evidence of the fact of Strategic Vision's reliance on Han and Gertz prior to entering into the Research Agreement and the reasonableness of that reliance.

E.      The Attempted Performance

79.     On or about January 8, 2018, Eastern—through Ms. Wang—delivered a list of 15 individuals to Strategic—through Ms. Wallop—on a USB key (the "Subject List") that Eastern wanted investigated under the Research Agreement.

Disputed.  It was Guo who wanted the individuals examined and provided the list, not Eastern Profit.  Wang testified: "Have you ever seen this document before?  A.· Yes. Q.· What is it?  A.· They are the name list.  Q.· Where did it come from?  A.· Mr. Guo….Q.· What did he tell you?· Did he tell you to do anything with this document?  A.· He said this is about this project.  Q.· And did he instruct you to do anything with it?  A.· Go to talk, discuss about the contract, if signed please deliver this to Strategic Vision. Q.· And you ended up delivering this to Strategic Vision?  A.· Correct."  Wang 1 Tr., Ex. CC, 213:1-13, 214:15-215:17.  Lianchao Han also testified that it was Guo who chose the list of research subjects:  "Q.  Did you discuss with Mr. Guo which names would be good for the project?  A.  No, not at all.  This is entirely his."  Chunguang Tr., Ex. KK, 173:1-3. Further, the initial attempt by Wang to deliver a USB drive containing 92 subjects of research was on January 6, 2018.  Wallop 1 Tr., Ex. FF, 127:14-24, 280:  14-22, 174:9-176:18, 198:11-199:1, 200:10-202:2, 207:25-208:13, 114:3-115:6, 85:10-17, 114:8-

115:6.  The drive was infected with harmful malware, which Wallop discovered when attempting to access it.  *Id*.  Wang then delivered a replacement set of three USB drives on January 8, 2018.  One of the drives was safe and operational.  *Id*.  In taking these actions and making these deliveries, Wang may now claim to have been acting for Eastern Profit, but names were all provided by Guo (and the research was for Guo's benefit).  Guo 1 Tr., Ex. AA, 39:9-19, 45:3-46:16; Wallop 1 Tr., Ex. FF, 88:3-89:22; Wang Tr. 2, Ex. II, 197:18-208:22, 202:2-204:20, 149:5-150:9, 49:7-21; Lianchao Tr., Ex. BB, 226:10-18.

80.     All of the individuals on the Subject List were members of the CCP.

<u>Disputed</u>.  The cited testimony does not support the assertion, in violation of Fed. R. Civ. P. 56(c)(1).

81.     Many of the individuals on the Subject List were high ranking officials that comprised the key group in control of China's banking system.

<u>Not Disputed</u>.

82.     Strategic decided to split the investigation into two parts, with Waller directing the part of the investigation that involved international contacts and Ms. Wallop handling the United States based part of the investigation.

<u>Disputed</u> as to the term "US based" because it implies that Strategic Vision was conducting any of the research under the contract itself.  The testimony Eastern Profit cites (Wallop Tr., Ex. FF, 177:20-178:17, 180:06-180:08) merely shows that Wallop was involved in organizing the research done by independent contractors in the United States. *Id*., 79:9-20, 80:10-24, 82:21-83:23, 153:12-154:24, 130:4-131:13.

83.     The activities that comprised Strategic's investigation occurred in or were directed from Virginia.

Disputed.  Some but not all of the activities involved in Strategic Vision's work under the Research Agreement occurred in Virginia.  Waller travelled <u>overseas</u> to coordinate the creation of Team 1 (Wallop 1 Tr., Ex. FF, 183:19-22, 115:7-118:10, 82:21-83:23, 130:4-131:13, 71:5-73:4, 74:17-76:6, 77:25-79:23; Waller 2 Tr., Ex. ZZZ, 74:14-77:1, 29:10-19, 41:5-42:18) and later to retrieve the work that it had begun (*Id*. 127:24-129:6).  Waller and Wallop communicated with Team 2, based in <u>Texas</u>, regarding the project.  Wallop 1 Tr., Ex. FF, 163:8-18, 232:7-234:13; Wallop Aff., Ex. C, Dkt. 267-1, ¶ 8; Waller 2 Tr., Ex. ZZZ, 100:16-102:16.  Both Waller and Wallop personally travelled to Texas for the meetings with Team 2.  Wallop 2 Tr., Ex. UU, 20:10-13.

84.     Strategic has admitted that it "coordinated its efforts to perform under the [Research Agreement] out of the Commonwealth of Virginia."

Not disputed.

85.     Ms. Wallop performed her portion of the investigation out of her home in Arlington, Virginia.

Disputed.  In violation of Fed. R. Civ. P. 56(c)(1), the cited record does not support the assertion.  The citation merely establishes that Strategic Vision has a principal place of business in Virginia.  Dkt. 93, p. 1, ¶ 2; Dkt. 127, p. 1, ¶ 2.  Wallop's work on the project included communications and involvement in matters occurring in Texas as well as Virginia.  Wallop 1 Tr., Ex. FF, 163:8-18, 232:7-234:13; Wallop 2 Tr., Ex. UU, 20:10-13; Wallop Aff., Ex. C, Dkt. 267-1, ¶ 8; Waller 2 Tr., Ex. ZZZ, 100:16-102:16.  Wallop twice went personally to Texas to meet with Team 2 about the project.  Wallop 2 Tr., Ex.

UU, 20:10-13.  Wallop also met with Lianchao Han and Guo within the first ten days of

the contract—in New York.  Wallop 1 Tr., Ex. FF, 181:7-182:2.

86.     Waller and Ms. Wallop (on behalf of Strategic) met on an "almost daily"

basis to "handle this investigation," at Ms. Wallop's home in Arlington, Virginia.

Not disputed.

87.     Ms. Wallop had in person meetings with, and made phone calls to persons

in Virginia and Washington D.C. to verify and cross check the information provided in the

Subject List.

Disputed to the extent "the information" means the complete subject matter Wallop was

involved with—the record cited by Eastern Profit establishes that only "some" of

Wallop's involvement occurred in Virginia and D.C.  Further, the testimony from Wallop

cited by Eastern Profit does not support the assertion.

88.     Strategic has admitted that Ms. Wallop and Waller met in person at least

five times in Virginia after the Research Agreement was executed to discuss the Research

Agreement.

Not disputed.  The activity being referenced was a "discussion" of the contract.

89.     Strategic has admitted that Ms. Wallop and Waller met in person at least

three times in Virginia after the Research Agreement was executed to discuss the progress of

Strategic's work under the Research Agreement.

Not disputed.

90.     Strategic has admitted that both Ms. Wallop and Waller, while located in

the Commonwealth of Virginia, communicated with Ms. Wang concerning disputes regarding

performance of the Research Agreement.

Not disputed.

91.     After receiving the Subject List, Strategic printed a paper copy of the Subject List and began strategizing how to collect information and perform the investigation.

Not disputed.

92.     Upon receipt of the Subject List, Strategic began verifying and cross checking the information provided in the Subject List.

Not disputed.

93.     After receiving the Subject List, Ms. Wallop (on behalf of Strategic) began searching for legal channels within the United States to see "who supposedly had a U.S. passport, U.S. visas, or who had, you know, illegitimate children born in the United States."

Not disputed.

94.     After receiving the Subject List, Ms. Wallop (on behalf of Strategic) began communicating with numerous individuals in her contact network to verify and cross check the information provided in the Subject List; some of these communications occurred in Virginia and Washington, D.C.

Disputed.  The cited record only establishes that some, not all as indicated in the assertion, of the communications occurred in Virginia or D.C.  The cited deposition testimony provides no identification of where the communications occurred.  This is a failure of proof under Fed. R. Civ. P. 56(c)(1).

95.     After receiving the Subject List, Ms. Wallop (on behalf of Strategic) had in person meetings with, and made phone calls to, persons in Virginia and Washington D.C., to verify and cross check the information provided in the Subject List.

Not disputed.

96.     Ms. Wallop uncovered that some of the names on the Subject List were fake, while other names of the Subject List were correct.

Not disputed.

97.     Ms. Wallop (on behalf of Strategic) took handwritten notes on her print out of the Subject List.

Not disputed.

98.     Ms. Wallop's notes on the Subject List demonstrate that she: 1) verified the identities and relationships of subjects' families; 2) had discovered that one subject was using the same social security number as another person; 3) the nickname of one subject; and 4) the address history of one subject.

Not disputed.

99.     After receipt of the Subject List, Strategic also retained or attempted to retain independent contractors to perform private investigatory research into the 15 individuals identified in the Subject List.

Not disputed that Strategic Vision contracted with independent contractors to perform research into the 15 individuals identified in the Subject List, but controverted that, as a matter of law, this was "private investigatory" research within the meaning of Virginia's statute.  Eastern Profit admits that this is a legal matter for the Court by seeking declaratory relief regarding the subject, alleging that the contract is "illegal and void as against public policy."  Dkt. 93, p. 16.

100.    Throughout January, Ms. Wallop and Waller met with members of one of the investigative teams assembled by Strategic—referred to by Strategic as "Team 1"—on a number of occasions in Ms. Wallop's home in Arlington, Virginia.

<u>Not disputed</u> based on the testimony cited by Eastern.

101.    Ms. Wallop met with the members of Team 1 on January 9, 2018 at her home in Virginia.

<u>Not disputed</u>.

102.    Ms. Wallop met with the members of Team 1 on January 11, 2018 at her home in Virginia.

<u>Not disputed</u>.

103.    Ms. Wallop met with members of Team 1 on January 25, 2018 in Washington D.C.

<u>Not disputed</u>.

104.    Ms. Wallop and Waller also met with the members of the other investigative team—referred to by Strategic as "Team 2—on at least two occasions.

Not disputed and noting that these meetings took place in Texas.  Wallop 2 Tr., Ex. UU, 20:10-13.

105.    The weekly deliverables called for under the Research Agreement were due by no later than mid-January 2018.

<u>Disputed</u>.  Work under the Research Agreement did not begin until January 16, 2018 by agreement of the parties.  Wang 1 Tr., Ex. CC, 139:4-17; Ex. S, Dkt. 267-1 (Ex. 6 to Wang 1 Tr.), p. 1 ("Eastern agreed to delay the start of the contract by 10 days, from January 6 to January 16."); Dkt. 93, p. 4, ¶ 19.  Under the express terms of the contract, deliverables were to be "produced on a regular schedule" and "others" "on an as-needed basis.  There is no evidence that deliverables were due in mid-January when the work did not begin until January 16, 2018.  The Agreement divided the research contemplated as

falling into three categories.  R. Agreement, Ex. J, Dkt. 267-1.  Financial Forensic

Historical Research was due in the form of a "progress report" "each week in the first

month, one preliminary report in the first month, and one comprehensive [] report within

3 months."  *Id*., p. 2.  Current Tracking Research "on a monthly basis" except for the first

month, where "weekly reports shall be delivered" for a six-month period.  *Id.*  Social

Media Research was "on [a] weekly basis for the first month, and on a monthly basis

thereafter…"  *Id.*

106.    Strategic delivered its first USB drive to Eastern pursuant to the Research

Agreement on January 26, 2018.

<u>Not disputed</u>.

107.    Strategic has admitted that the information contained on the USB drive

delivered to Eastern on January 26, 2018 was "of no use to Mr. Guo or Eastern Profit because it

was nothing more than the researchers' own work to familiarize themselves with the fifteen

subjects using open-source information."

<u>Not disputed</u> that the cited testimony was given but <u>disputed</u> that the statement, taken out

of context, indicates the true fact.  The true fact is that the information delivered was not

in the format of a "deliverable" under the Research Agreement because it was forced to

be provided prematurely based on an unreasonable demand by Guo.  Dkt. 127, p. 6, ¶ 24.

The delivery did show the progress being made by Team 1, which, while not convertible

by Guo into public communications for attacking the CCP, did fulfill Strategic's

obligation to show Guo the progress its team was making.  Waller 2 Tr., Ex. ZZZ,

112:11-116:17 ("That was their own basic work.  So the only report, in quotes, that we

provided as a deliverable was showing how the research team was setting up its

methodology to collect this data") and 127:24-129:6.

108.    On January 30, 2018, Strategic delivered a second USB drive to Eastern

Profit.

Not disputed.

109.    The USB drive delivered to Eastern on January 30, 2018 was not "of any

use" to Eastern.

Not disputed that the cited testimony was given but disputed that the statement, taken out

of context, indicates the true fact.  The true fact is that the information delivered was not

in the format of a "deliverable" under the Research Agreement because it was forced to

be provided prematurely based on an unreasonable demand by Guo.  Dkt. 127, p. 6, ¶ 24.

The delivery did show the progress being made by Team 1, which, while not convertible

by Guo into public communications for attacking the CCP, did fulfill Strategic's

obligation to show Guo the progress its team was making.  Waller 2 Tr., Ex. ZZZ,

112:11-116:17 ("That was their own basic work.  So the only report, in quotes, that we

provided as a deliverable was showing how the research team was setting up its

methodology to collect this data") and 127:24-129:6.

110.    The USB drive delivered to Eastern on January 30, 2018 contained

"incomplete work product . . . in the form of raw research data."[12]

Not disputed.

111.    Strategic did not deliver any other USB drives to Eastern.

---

[12] Answer at A at 28 ¶ 24; Ex. UU, Wallop 2 Tr., 16:12-17; Ex. Z, Waller 1 Tr., 211:3-215:16; Ex. UU, Waller 2 Tr., 115:9-116-17.

<u>Not disputed</u> but immaterial because, after this point, Eastern Profit failed to address the unanticipated situation of research subjects falling under a "records protected" designation that prevented the research.  Guo refused to provide replacement subjects that were not Records Protected.  Waller 2 Tr., Ex. ZZZ, 101:11-103:25, 105:21-107:11.

112.    On February 5, 2018, Ms. Wallop met with Waller and Lianchao regarding the Research Agreement in Ms. Wallop's home in Virginia to discuss the investigation.

<u>Not disputed</u> that Wallop, Waller, and Lianchao met on February 5, 2018, at Wallop's Virginia home to discuss the fact that Strategic Vision's contractors "were finding issues with Guo's fake names and some of Guo's fake information that he had given [Strategic] out of the 15 names that we had," as well as other concerns about "inconsistencies" in the information received from Wang's flash drives and concerns from Team 1, another set of contractors, "that there was a leak within the Guo system."  Wallop 2 Tr., Ex. UU, 20:14-21:25.

113.    Strategic never delivered to Eastern any "financial forensic [h]istorical research" called for under the Research Agreement.

<u>Not disputed but immaterial</u> because Guo, for Eastern Profit, in bad faith prevented and frustrated Strategic Vision's performance.  Strategic Vision found that some of the research subjects were "fake," meaning "false people, false persona," "false identities for the purposes of laundering money."  Waller 1 Tr., Ex. Z, 177:25-179:16.  Strategic Vision's contractor Team 2 discovered that the subjects selected by Guo were designated by the U.S. government as "Records Protected"—information concerning the subjects' status and activities was not accessible through legal means.  Wallop 1 Tr., Ex. FF,

232:7-238:20, 239:16-241:4, 285:12-288:24; Waller 2 Tr., Ex. ZZZ, 100:16-103:25, 105:6-108:21.  The purpose of the designation was to ensure that no one, including the individuals themselves, could learn information that would help them determine they were under investigation.  *Id.*, 106:15-107:7.  According to ASOG, trying to research subjects known to be "Records Protected" could be a criminal activity.  *Id.*, 100:16-102:16, 106:15-108:21.  ASOG's conviction was so strong that it withdrew a bill to Strategic Vision for $111,700.  *Id.*, 105:6-20, 106:15-108:21; Ex. 105 to Waller 2 Tr., Ex. MMMM.  ASOG instead received $5,412 for finding the "Records Protected" designation.  *Id.*; Waller 2 Tr., Ex. ZZZ, 109:12-110:17, 81:15-17.  Strategic Vision did not receive any subject names before entering the Agreement and had no way of anticipating that the third parties conducting the research would encounter this circumstance.  Wallop 1 Tr., Ex. FF, 83:24-84:7, 85:10-86:11, 174:4-8, 175:3-176:18. Prior to this, Strategic Vision had not heard of the designation.  Wallop Aff., Ex. C, Dkt. 267-1, ¶¶ 8.  Nevertheless, Guo refused to discuss the "Records Protected" problem when Strategic Vision notified him.  Wallop 1 Tr., Ex. FF, 139:17-140:23, 285:12-288:24, 136:13-20; Waller 2 Tr., Ex. ZZZ, 100:16-102:16.  He then demanded that Strategic Vision turn over all work done by its contractors, despite many protests by Strategic Vision that it was impossible for the researchers to work faster and have final reports ready in a matter of days.  Wallop 1 Tr., Ex. FF, 230:2-232:13, 285:12-288:24, 139:17-140:23; Waller 2 Tr., Ex. ZZZ, 112:11-116:17, 127:24-129:6; Waller 1 Tr., Ex. Z, 56:19-25, 93:20-95:10.  The Agreement did not require, and no party could physically provide, immediate results; what Guo now inexplicably demanded on a rush basis was contrary to

the Agreement.  Wang 1 Tr., Ex. CC, 154:6-23; R. Agreement, Ex. J, Dkt. 267-1; Gertz

Tr., Ex. QQ, 141:4-17.

114.    Strategic never delivered to Eastern any "current tracking research" called

for under the Research Agreement.

Not disputed but immaterial because Guo, for Eastern Profit, in bad faith prevented and

frustrated Strategic Vision's performance. Strategic Vision found that some of the

research subjects were "fake," meaning "false people, false persona," "false identities for

the purposes of laundering money."  Waller 1 Tr., Ex. Z, 177:25-179:16. Strategic

Vision's contractor Team 2 discovered that the subjects selected by Guo were designated

by the U.S. government as "Records Protected"—information concerning the subjects'

status and activities was not accessible through legal means.  Wallop 1 Tr., Ex. FF,

232:7-238:20, 239:16-241:4, 285:12-288:24; Waller 2 Tr., Ex. ZZZ, 100:16-103:25,

105:6-108:21.  The purpose of the designation was to ensure that no one, including the

individuals themselves, could learn information that would help them determine they

were under investigation.  *Id.*, 106:15-107:7.  According to ASOG, trying to research

subjects known to be "Records Protected" could be a criminal activity.  *Id.*; Waller 2 Tr.,

Ex. ZZZ, 100:16-102:16, 106:15-108:21.  ASOG's conviction was so strong that it

withdrew a bill to Strategic Vision for $111,700.  *Id.*, 105:6-20, 106:15-108:21; Ex. 105

to Waller 2 Tr., Ex. MMMM.  ASOG instead received $5,412 for finding the "Records

Protected" designation.  *Id.*; Waller 2 Tr., Ex. ZZZ, 109:12-110:17, 81:15-17.  Strategic

Vision did not receive any subject names before entering the Agreement and had no way

of anticipating that the third parties conducting the research would encounter this

circumstance.  Wallop 1 Tr., Ex. FF, 83:24-84:7, 85:10-86:11, 174:4-8, 175:3-176:18.

Prior to this, Strategic Vision had not heard of the designation.  Wallop Aff., Ex. C, Dkt. 267-1, ¶¶ 8.  Nevertheless, Guo angrily refused to discuss the "Records Protected" problem when Strategic Vision notified him.  Wallop 1 Tr., Ex. FF, 139:17-140:23, 285:12-288:24, 136:13-20; Waller 2 Tr., Ex. ZZZ, 100:16-102:16.  He then demanded that Strategic Vision turn over all work done by its contractors, despite many protests by Strategic Vision that it was impossible for the researchers to work faster and have final reports ready in a matter of days.  Wallop 1 Tr., Ex. FF, 230:2-232:13, 285:12-288:24, 139:17-140:23; Waller 2 Tr., Ex. ZZZ, 112:11-116:17, 127:24-129:6; Waller 1 Tr., Ex. Z, 56:19-25, 93:20-95:10.  The Agreement did not require, and no party could physically provide, immediate results; what Guo now inexplicably demanded on a rush basis was contrary to the Agreement.  Wang 1 Tr., Ex. CC, 154:6-23; R. Agreement, Ex. J, Dkt. 267-1; Gertz Tr., Ex. QQ, 141:4-17.

115.    Strategic never delivered to Eastern any "social media research" called for under the Research Agreement.

Not disputed but immaterial because Guo, for Eastern Profit, in bad faith prevented and frustrated Strategic Vision's performance.  Strategic Vision found that some of the research subjects were "fake," meaning "false people, false persona," "false identities for the purposes of laundering money."  Waller 1 Tr., Ex. Z, 177:25-179:16.  Strategic Vision's contractor Team 2 discovered that the subjects selected by Guo were designated by the U.S. government as "Records Protected"—information concerning the subjects' status and activities was not accessible through legal means.  Wallop 1 Tr., Ex. FF, 232:7-238:20, 239:16-241:4, 285:12-288:24; Waller 2 Tr., Ex. ZZZ, 100:16-103:25, 105:6-108:21.  The purpose of the designation was to ensure that no one, including the

individuals themselves, could learn information that would help them determine they were under investigation. *Id*., 106:15-107:7. According to ASOG, trying to research subjects known to be "Records Protected" could be a criminal activity. *Id.*, 100:16-102:16, 106:15-108:21. ASOG's conviction was so strong that it withdrew a bill to Strategic Vision for $111,700. *Id*., 105:6-20, 106:15-108:21; Ex. 105 to Waller 2 Tr., Ex. MMMM. ASOG instead received $5,412 for finding the "Records Protected" designation. *Id.*; Waller 2 Tr., Ex. ZZZ, 109:12-110:17, 81:15-17. Strategic Vision did not receive any subject names before entering the Agreement and had no way of anticipating that the third parties conducting the research would encounter this circumstance. Wallop 1 Tr., Ex. FF, 83:24-84:7, 85:10-86:11, 174:4-8, 175:3-176:18. Prior to this, Strategic Vision had not heard of the designation. Wallop Aff., Ex. C, Dkt. 267-1, ¶¶ 8. Nevertheless, Guo angrily refused to discuss the "Records Protected" problem when Strategic Vision notified him. Wallop 1 Tr., Ex. FF, 139:17-140:23, 285:12-288:24, 136:13-20; Waller 2 Tr., Ex. ZZZ, 100:16-102:16. He then demanded that Strategic Vision turn over all work done by its contractors, despite many protests by Strategic Vision that it was impossible for the researchers to work faster and have final reports ready in a matter of days. Wallop 1 Tr., Ex. FF, 230:2-232:13, 285:12-288:24, 139:17-140:23; Waller 2 Tr., Ex. ZZZ, 112:11-116:17, 127:24-129:6; Waller 1 Tr., Ex. Z, 56:19-25, 93:20-95:10. The Agreement did not require, and no party could physically provide, immediate results; what Guo now inexplicably demanded on a rush basis was contrary to the Agreement. Wang 1 Tr., Ex. CC, 154:6-23; R. Agreement, Ex. J, Dkt. 267-1; Gertz Tr., Ex. QQ, 141:4-17.

 116. Strategic has admitted that it "was unable to prepare any detailed reports."

<u>Not disputed but immaterial</u> because Guo prevented Strategic Vision's performance.
Strategic Vision found that some of the research subjects were "fake," meaning "false
people, false persona," "false identities for the purposes of laundering money."  Waller 1
Tr., Ex. Z, 177:25-179:16.  Strategic Vision's contractor Team 2 discovered that the
subjects selected by Guo were designated by the U.S. government as "Records
Protected"—information concerning the subjects' status and activities was not accessible
through legal means.  Wallop 1 Tr., Ex. FF, 232:7-238:20, 239:16-241:4, 285:12-288:24;
Waller 2 Tr., Ex. ZZZ, 100:16-103:25, 105:6-108:21.  The purpose of the designation
was to ensure that no one, including the individuals themselves, could learn information
that would help them determine they were under investigation.  *Id.*, 106:15-107:7.
According to ASOG, trying to research subjects known to be "Records Protected" could
be a criminal activity.  *Id.*, 100:16-102:16, 106:15-108:21.  ASOG's conviction was so
strong that it withdrew a bill to Strategic Vision for $111,700.  *Id.*, 105:6-20, 106:15-
108:21; Ex. 105 to Waller 2 Tr., Ex. MMMM.  ASOG instead received $5,412 for
finding the "Records Protected" designation.  *Id.*; Waller 2 Tr., Ex. ZZZ, 109:12-110:17,
81:15-17.  Strategic Vision did not receive any subject names before entering the
Agreement and had no way of anticipating that the third parties conducting the research
would encounter this circumstance.  Wallop 1 Tr., Ex. FF, 83:24-84:7, 85:10-86:11,
174:4-8, 175:3-176:18.  Prior to this, Strategic Vision had not heard of the designation.
Wallop Aff., Ex. C, Dkt. 267-1, ¶¶ 8.  Nevertheless, Guo angrily refused to discuss the
"Records Protected" problem when Strategic Vision notified him.  Wallop 1 Tr., Ex. FF,
139:17-140:23, 285:12-288:24, 136:13-20; Waller 2 Tr., Ex. ZZZ, 100:16-102:16.  He
then demanded that Strategic Vision turn over all work done by its contractors, despite

many protests by Strategic Vision that it was impossible for the researchers to work faster and have final reports ready in a matter of days.  Wallop 1 Tr., Ex. FF, 230:2-232:13, 285:12-288:24, 139:17-140:23; Waller 2 Tr., Ex. ZZZ, 112:11-116:17, 127:24-129:6; Waller 1 Tr., Ex. Z, 56:19-25, 93:20-95:10.  The Agreement did not require, and no party could physically provide, immediate results; what Guo now inexplicably demanded on a rush basis was contrary to the Agreement.  Wang 1 Tr., Ex. CC, 154:6-23; R. Agreement, Ex. J, Dkt. 267-1; Gertz Tr., Ex. QQ, 141:4-17.

117.    On February 23, 2018, Eastern wrote to Strategic terminating the Research Agreement.

Not disputed that Eastern Profit's then-attorney, Foley Hoag, wrote to Strategic Vision on February 23, 2018, and in that letter purported to terminate the Research Agreement without notice.  Wang 1 Tr., Ex. CC, 135:16-141:16; Ex. S, Dkt. 267-1 (Ex. 6 Wang 1 Tr.), p. 1; Wallop 1 Tr., Ex. FF, 241:6-8, 242:19-243:3; Wang Tr. 2, Ex. II, 211:12-212:15.  Disputed to the extent Eastern Profit claims the letter was effective not only to terminate the Research Agreement, but to terminate it effective immediately, as of February 23, 2018.  The Research Agreement did not allow such a termination.  R. Agreement, Ex. J, Dkt. 267-1, p. 5 ("Duration") ("Either party may terminate the contract with 30 days' written notice.").

118.    In the termination letter, Eastern demanded that Strategic return the $1 million deposit.

Not disputed.

119.    Strategic has refused to return the $1 million deposit.

<u>Not disputed</u> that Strategic has not complied with Eastern Profit's demand that it pay $1 million to it or to ACA, although the evidence cited by Eastern Profit refers only to Eastern Profit's demand that Strategic Vision pay $1 million, not to Strategic Vision's actions or the basis for them.

120.    Ms. Wallop and Waller met with Lianchao on February 25, 2018 in Ms. Wallop's home in Virginia to discuss, among other things, Eastern's termination of the Research Agreement.

<u>Disputed</u>.  As the French Wallop deposition transcript cited by Eastern shows, rather than discussing Eastern Profit's letter purporting to terminate the Research Agreement, "Mike and Lianchao and I were trying to figure out how to handle Guo, because of the fact that we were delivering information and nothing seemed to satisfy him."  Wallop 2 Tr., Ex. UU, 31:23-32:5.

121.    Since termination, ACA has demanded repayment of the ACA Loan, and Eastern acknowledges that it remains obligated to repay the ACA Loan.

<u>Disputed</u> and in violation of Fed. R. Civ. P. 56(c) because Eastern Profit cites evidence that was not subject to cross-examination and therefore should be inadmissible.  Strategic Vision was impeded in discovery from obtaining information about ACA from anyone but Eastern Profit or Chunguang Han, shown above to lack credibility.  ACA itself was kept outside of the discovery process through obstructionist maneuverings by Eastern Profit, Guo, and GSNY.  ACA's sole director (Karin Maistrello, a U.S.-based employee of GSNY) accepted hand delivery of a Fed. R. Civ. P. 45 deposition subpoena directed to ACA but then, through counsel she shared with Guo and GSNY (Dkt. 213, 4:5-10, Dkt. 195), took the position that the service was ineffective on ACA because she had resigned as a director within

48 hours after Strategic Vision had given the required pre-service notice of intent to Eastern

Profit.  Maistrello Tr., Ex. CCC, 27:9-25, 28:1-29:5, 30:1-32:10; Ex. TTTT, Ex. 6 to

Maistrello Tr.; Dkt. 177-Exs. 3, 1.  Maistrello testified that she resigned her directorship

after learning from Daniel Podhaskie, legal counsel GSNY (her employer and Eastern

Profit's agent for purposes of this litigation), that she was about to be served with a

subpoena in her capacity as an ACA director.  Maistrello Tr., Ex. CCC, 55:12-57:20 ("Q.

What did you do after you were served with this subpoena? MS. TESKE: Object if the

form. You can answer it. A. I gave it to our lawyer. Q. Who was that? A. Daniel

Podhaskie.") and Ex. X (Maistrello Depo Ex. 3).  Eastern Profit also opposed discovery into

ACA, calling it "entirely collateral to the claims and defenses at issue in this litigation …."

(Dkt. 203, p. 2)  Guo, through the same counsel as GSNY and Maistrello (Dkt. 158, p. 1,

opposing discovery into GSNY, Dkt. 195), opposed discovery into ACA, claiming it was

"an attempt to harass and provoke" him and that "Strategic should not be entitled to such

overreaching discovery from multiple non-parties."  (Dkt. 150, p. 2)  ACA never

appeared in the case and provided no discovery whatsoever.  Moreover, according to

Eastern Profit, ACA indicated it may forgive the purported loan to Eastern Profit under

certain circumstances, thus creating uncertainty at a minimum that the loan is actually

being enforced.  ACA head William Je (a/k/a Yu Jianming, as well as Je Kin Ming)[13]

informed Wang that ACA might forgive the purported "loan" if the Research Agreement

bore fruit:

> A  Okay. I didn't discuss that yet, but I heard kind of like William would be happy
> to contribute this fund into the entire taking down Chinese Communist Party
> campaign. But I don't have too much details.

---

[13]      It was William Je who was representing ACA's interests in communicating with Eastern Profit about the
Research Agreement.  Wang 2 Tr., Ex. II, 57:23-58:19, 53:19-54:3.

Q So had the research been successful, Mr. Yu would have been happy to write off the loan?
Ms. Cline: Objection to form.
Possible.

Wang 2 Tr., Ex. II, 208:2-16, 46:22-47:14, 44:10-47:14, 197:18-198:6, 202:2-204:20, 73:20-74:8; Ex. M, Dkt. 267-1, Plt's Third Interrog. Resp., p. 3, No. 2.  Finally, Eastern Profit has no means to repay the alleged loan from ACA.  Eastern Profit's assets are frozen and, even if unfrozen, amount to a fraction of the $1 million allegedly extended by ACA.  RJN, Dkt. 264, ¶ 5; Dkt. 203-2, Oct. 18, 2018, p. 14/27 for Respondent 16 (Dkt. 203, p. 2:  "The assets of Mr. Guo and Eastern Profit that have been frozen in Hong Kong were frozen, not by the CCP or Mainland China, but by *the High Court of Hong Kong*. *See* Exhibit B."  Ex. B (pp. 3, 14, Respondent 16:  H.K. Ct. Order); Chunguang Tr., Ex. KK, 44:17-22, 70:10-72:6, 74:19-75:1, 88:2-89:9, 131:22-132:4, 146:10-24.


Dated April 6, 2020

Respectfully submitted,

GRAVES GARRETT LLC

*s/ Edward D. Greim*
Edward D. Greim, #4240172
1100 Main Street, Suite 2700
Kansas City, MO 64105
Telephone: (816) 256-3181
Fax: (816) 256-5958
edgreim@gravesgarrett.com
ATTORNEYS FOR
DEFENDANT/COUNTERCLAIM PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

This certifies that, on April 6, 2020, the foregoing was served on all counsel of record via the Court's Electronic Case Filing System.

<u>*s/ Edward D. Greim*</u>
Attorneys for Defendant/Counterclaim Plaintiff