# Exhibit FF

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

```
 1   UNITED STATES DISTRICT COURT

 2   SOUTHERN DISTRICT OF NEW YORK

 3   ----------------------------------x

 4   EASTERN PROFIT CORPORATION LIMITED,

 5            Plaintiff-Counterclaim Defendant,

 6                                  Case No.

 7       -against-                  18-cv-2185 JGK

 8   STRATEGIC VISION US, LLC,

 9            Defendant-Counterclaim Plaintiff,

10   vs.

11   GUO WENGUI a/k/a, MILES KWOK,

12            Counterclaim Defendant.

13   -----------------------------------x

14

15

16            VIDEOTAPED DEPOSITION

17                   OF

18            FRENCH WALLOP

19          New York, New York

20         Tuesday, February 12, 2019

21

22

23

24

25
```

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 10

1  four years.  And then I was at the Ecole
2  D'Interpretes in Geneva.  And then I came back to
3  Georgetown University and got my linguistic's
4  degree in simultaneous interpreting.
5      Q.    Anything else?
6      A.    I did -- I didn't finish, but I went to
7  SAIS, The School of Advanced International Study,
8  which is part of Johns Hopkins; so it doesn't
9  count as a degree, sadly.
10     Q.    What about your work experience, let's
11 just say the last 20 years or so?
12     A.    Oh, my goodness.
13     Q.    You don't have to say everything.  Just
14 an overview.
15     A.    Well, I've run two companies, and
16 plus -- and I sold them in 2000.  And then in
17 about 2005, I started up my Strategic Vision
18 group.
19     Q.    In 2005, starting Strategic Vision, is
20 that what you've been doing ever since?
21     A.    Yes.
22     Q.    Any other employment that you have or
23 businesses that you're running, other than
24 Strategic Vision?
25     A.    Yes.  I have another company that's

Page 11

1  called Regency Mayfair Worldwide, and that works
2  overseas on projects.
3      Q.    What kind of projects?
4      A.    Family office groups.
5      Q.    What do you mean by that?  What kind of
6  projects do you do for family office groups
7  through this Mayfair company?
8      A.    Investment -- investment advisory.
9      Q.    Okay.  So nothing to do with
10 investigatory research or things of that nature?
11     A.    No.
12     Q.    How do you know Michael Waller, or John
13 Michael Waller?
14     A.    Well, Mike Waller is the way we refer
15 to him, or Dr. Waller.  Gosh, I've known Mike for
16 many, many years.  I would say, certainly,
17 certainly 20.  And our paths have crossed many
18 times in Washington on both international affairs
19 and intelligence groups.
20     Q.    When did Mr. Waller -- well, I'll call
21 him Dr. Waller.
22     A.    Yes, he is Dr. Waller.
23     Q.    He didn't insist on it the last time,
24 but fair enough.  When did you start -- or when
25 did Strategic Vision start working with

Page 12

1  Dr. Waller?
2      A.    I would say in the last year and a
3  half.
4      Q.    And how did that come about?
5      A.    We had an -- I had an introduction by
6  Bill Gertz and Lianchao Han regarding this
7  particular client.  I'm not sure, by the way, how
8  to refer to this client.  We've referred to him
9  as Miles Guo, G-u-o.
10     Q.    Eastern Profit is fine.
11     MR. SCHMIDT:  Well, you know, you refer
12     to him however you think the client is.
13     A.    He has about six names, so I'm not sure
14 what goes into the record.
15     Q.    Whatever you know.
16     A.    We refer to him as Miles Guo.  But I
17 was referred to him by both Bill Gertz, the
18 Washington Times and the Free Beacon, and
19 Lianchao.  And I -- when they approached me,
20 that's when I decided Mike was one of the people
21 I really wanted to work with on this.
22     Q.    But I wanted to ask you.  Have you ever
23 worked with Dr. Waller on any investigatory
24 research before, as you said, you were introduced
25 to Mr. Guo?

Page 13

1      A.    No.  No.
2      Q.    Since you were introduced to Mr. Guo,
3  have you and Dr. Waller worked on any other
4  investigatory research together for another
5  client?  You don't have to name them.
6      A.    I can't name them.
7      Q.    No, I'm saying whether you have or have
8  not provided --
9      A.    Yes.
10     Q.    -- a service to another client?
11     A.    Yes, but -- yes.
12     Q.    Okay.  I didn't ask you to name the
13 client.
14     A.    Don't worry.
15     Q.    And how many other clients have you and
16 Dr. Waller worked on investigatory research for?
17     A.    I can't answer that.
18     Q.    So you're refusing to answer that
19 question?
20     MR. SCHMIDT:  No, no, I don't think
21     that's what she's saying.
22     MR. GRENDI:  Okay.
23     Q.    How many?
24     A.    Four.
25     MR. SCHMIDT:  Approximately?  Okay.

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 14

1        THE WITNESS:  Approximately, yeah.
2        MR. GRENDI:  I'm going to ask that you
3    not try to interrupt.
4        MR. SCHMIDT:  I'm trying to keep you
5    guys moving forward.
6        MR. GRENDI:  I appreciate that, but I'm
7    not trying to --
8        MR. SCHMIDT:  I think you knew what she
9    meant and kind of accused her of refusing to
10   answer.  I don't think that was appropriate,
11   so that's when I had to step in, okay?
12       MR. GRENDI:  I didn't think that that's
13   what I was doing.  I was --
14       MR. SCHMIDT:  Okay.  That's how it was
15   coming across on the record, so I clarified
16   it.
17       MR. GRENDI:  Okay.  Fair enough.
18   Q.    So you and Dr. Waller have worked on
19   approximately five different investigatory
20   research projects with Strategic Vision?
21   A.    Yes.
22   Q.    And none of them preceded your
23   introduction to Mr. Guo?
24   A.    No.
25   Q.    No, they did not precede --

Page 15

1    A.    No.
2    Q.    -- or --
3    A.    They did not.
4    Q.    Prior to working with Dr. Waller, did
5    you work with someone else in terms of
6    investigatory research for Strategic Vision?
7    A.    When?
8    Q.    Before you started working with
9    Dr. Waller, so let's say prior to a year and a
10   half ago.
11   A.    Yes.
12   Q.    And was it just one entity or several
13   entities?
14   A.    I can't remember.
15   Q.    Without going into any detail.  Was
16   that a similar arrangement to your arrangement
17   with Dr. Waller in terms of the provisioning of
18   investigatory research?
19   A.    No.
20   Q.    How was it different?
21   A.    I can't remember.
22   Q.    When did you stop working with someone
23   else on investigatory research prior to working
24   with Dr. Waller?
25   A.    That's an odd question.  I don't know

Page 16

1    how to answer it.
2    Q.    You don't understand the question?
3    A.    No, I don't understand the question.
4    Q.    Okay.  What I'm saying is, when did you
5    stop working with someone else in terms of
6    providing investigatory research?
7    A.    I didn't say I had stopped.
8    Q.    So you work with, concurrently, other
9    individuals who provide investigatory research
10   for Strategic Vision?
11   A.    From time to time.
12   Q.    Okay.  So you don't have an exclusive
13   relationship with Dr. Waller in terms of
14   investigatory research that he provides?
15   A.    No.
16   Q.    Okay.  You said that you founded
17   Strategic Vision in 2005?
18   A.    I think so.  I'd have to look.
19   Q.    Okay.  Was anyone else involved in the
20   company at the time?
21   A.    No.
22   Q.    So it's always been your company?
23   A.    Yes.
24   Q.    And you've never had any other
25   officers?

Page 17

1    A.    No.
2    Q.    Or directors?
3    A.    No.
4    Q.    Or unit holders?
5    A.    No.
6    Q.    Have there been any other principals of
7    Strategic Vision, other than you?
8    A.    No.
9    Q.    So what's your role in Strategic
10   Vision?
11   A.    I run certain advisory clients and work
12   with them as clients, private clients.
13   Q.    Do you have a title, like CEO?
14   A.    Yes, I think it's CEO.
15   Q.    So what services does Strategic Vision
16   provide to its clients?
17   A.    I've already answered that.
18   Q.    I don't think you have.
19   A.    I said advisory services.
20   Q.    What do you mean by advisory services?
21   A.    Advisory client services.
22   Q.    Does that include investigatory
23   research?
24   A.    Yes, in some cases.
25   Q.    What does that investigatory research

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 18

1   involve?
2        A.    Exactly as it says.  Each client is
3   different, isn't it?
4        Q.    Right.  What I'm asking is, what does
5   Strategic Vision's investigatory research
6   services entail?
7        A.    Every client is different.
8   Investigatory services is exactly that, depending
9   upon how you want to define investigations.
10       Q.    How does Strategic Vision provide that
11   service, what does it do?
12       A.    Investigate.
13       Q.    How?
14       A.    The usual ways.
15       Q.    What are the usual ways?
16       A.    I find it's a repetitive question.
17       Q.    I don't care if you find it a
18   repetitive question.  What I'm asking you to do
19   is answer my question.
20             I want to know how Strategic Vision
21   performs investigations?
22       A.    We look everybody up on Facebook.
23       Q.    That's it?
24       A.    Sure.  It's an idiotic question.
25             MR. SCHMIDT:  Don't comment.  Just

Page 19

1        answer the question.
2        Q.    Excuse me, ma'am, I'm just trying to
3   understand things.  And I think -- maybe you
4   don't understand how a deposition works, but I'm
5   just trying to understand basic information.  You
6   might think something is obvious or intuitive,
7   but the record doesn't know that and we don't
8   know that.  So I please ask you to cooperate.
9        A.    Of course.
10       Q.    So other than looking people up on
11   Facebook, how does Strategic Vision perform
12   investigations?
13       A.    We do investigative background work on
14   individuals that other clients are interested in
15   pursuing information on.
16       Q.    So that background work, does that
17   involve surveillance or electronic research; give
18   me a little detail on what it means to
19   investigate someone for background?
20       A.    Precisely.  Just as you said.
21       Q.    Does Strategic Vision do that
22   investigatory research itself?
23       A.    No.
24       Q.    So you never perform any research
25   yourself?

Page 20

1        A.    No.
2        Q.    Who does?
3        A.    Whomever we bring on board to do the
4   investigation.
5        Q.    So Strategic Vision hires independent
6   contractors?
7        A.    Our own team of people that we have
8   worked with off and on through the years, yes.
9        Q.    Do you or Strategic Vision provide any
10   input or edits to any of the reports?  I mean,
11   what does Strategic do in terms of --
12       A.    We review the reports.
13       Q.    Do you ever edit them?
14       A.    I wouldn't say edit them, no.
15       Q.    How does Strategic Vision contribute to
16   the end work product of an investigatory research
17   report?
18       A.    Well, when we get them, we look at them
19   and we read them, depending upon who the teams
20   are, and discuss them, and then produce them.
21   Sometimes they can be verbal, sometimes they can
22   be on flash drives.  It depends what the client
23   needs.
24       Q.    Does Strategic Vision -- well, let me
25   ask you this.  Strike that.

Page 21

1             Do you ever access a network of
2   individuals that you're familiar with to get
3   information for investigatory research?
4        A.    Sometimes.
5        Q.    And just, without naming any names,
6   describe what that entails?
7        A.    Experience.
8        Q.    Right.  Do you speak to individuals in
9   the intelligence community?
10       A.    Yes.
11       Q.    Politicians?
12       A.    Sometimes.
13       Q.    People in the business community?
14       A.    Yes.
15       Q.    And then you take that information and
16   perhaps include that in an investigatory research
17   report, or how does that work?
18       A.    It depends on the client.
19       Q.    Give me an example of a client where
20   you did access that network in order to
21   contribute?
22       A.    I can't do that precisely.
23       Q.    Not with any specificity?
24       A.    Just as I said.  We are very careful
25   about the investigations that we do, they're

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 22

1    private, and if they are what the client has
2    requested, that's what we do.
3         MR. SCHMIDT:  French, maybe you can
4    give a response to these questions just kind
5    of a 30,000-foot level in general of what
6    you do would, different ideas you've done
7    over the years, that might be helpful.
8         THE WITNESS:  Okay.
9         MR. SCHMIDT:  Like types of things
10   you've done to research people, that sort of
11   thing.
12   Q.    Please go ahead.
13        MR. SCHMIDT:  Yeah, go ahead.
14   A.    With what?
15   Q.    What he just asked.
16   A.    Go ahead, ask me the question again.
17   Q.    Can you please give an overview of the
18   types of research investigations that Strategic
19   Vision does and how they do them?
20   A.    We look at individual clients or groups
21   or companies or areas of interest on behalf of
22   our clients, whether it's international, whether
23   it's domestic.
24   Q.    And how many investigations over the
25   years has Strategic Vision handled?

Page 23

1    A.    Oh, my goodness, I have no idea.
2    Q.    Ballpark?
3    A.    I have no idea.
4    Q.    Fifty?
5    A.    No.  I would say probably, maybe 15,
6    20, something like that.
7    Q.    That's since 2005?
8    A.    It's probably more than that, but since
9    2005, yeah.
10   Q.    Okay.  And other than investigatory
11   services, what kind of services does Strategic
12   Vision provide?
13   A.    As I've said earlier, we work with
14   clients on advisory services for family offices.
15   Q.    That's part of Strategic Vision's
16   business?
17   A.    I've already stated that.
18   Q.    You mentioned another entity, that's
19   why I wasn't sure if you'd separated the two
20   entities or you --
21   A.    No, you were very sure.  You didn't --
22   that's not a fair statement.
23        MR. SCHMIDT:  Just answer the question,
24   French.
25        THE WITNESS:  Okay.

Page 24

1    Q.    And Strategic Vision doesn't have any
2    employees?
3    A.    No.
4         MR. GRENDI:  Let's do Exhibit 1 here.
5         (Wallop Exhibit 1, Notice of
6    Deposition, marked for identification.)
7    Q.    Ms. Wallop, do you recognize this
8    document?
9    A.    I'm sure it's in the file.  I don't
10   recognize it particularly.
11   Q.    If you turn to the third page there, do
12   you see that, Attachment A?
13   A.    Yes.
14   Q.    And just generally speaking, do you
15   understand that this is a 30(b)(6) deposition
16   notice?
17   A.    Yes.
18   Q.    And did you review this document prior
19   to today?
20   A.    Actually, I did not.
21   Q.    Did you prepare for this deposition in
22   any way?
23   A.    Of course.
24   Q.    You met with your attorneys?  And I'll
25   just caution you right away, don't tell me

Page 25

1    anything you said to your attorneys or your
2    attorneys said to you.
3    A.    Well, exactly, of course I discussed it
4    with my attorneys.
5    Q.    And did you meet and go over documents
6    in preparation for this deposition?
7         MR. SCHMIDT:  You can say yes or no.
8    A.    Yes.
9    Q.    How long did you do that for?
10   A.    Today, or ever, or?
11   Q.    All in, sure, all together.
12   A.    Sure.  I have no idea what the answer
13   would be.
14        MR. SCHMIDT:  Just do the best you can.
15   A.    Okay.  How about -- for today's
16   deposition?
17   Q.    Yes.
18   A.    Okay.  How about 3 hours, by telephone
19   or something.
20        MR. SCHMIDT:  We had met in person
21   before, you should tell him that.
22   A.    Oh, we had a coffee before, or I had a
23   coffee.
24   Q.    And you prepared with your attorney
25   here, Mr. Schmidt?

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 30

1    A.    Correct.
2    Q.    Does Strategic Vision provide lobbying
3    services?
4    A.    Again, that depends on the client.  We
5    don't do it directly, but we will work with
6    people that are lobbyists.
7    Q.    So sometimes --
8    A.    Sometimes.
9    Q.    -- Strategic Vision provides lobbying
10   services?
11   A.    Sometimes, yes.
12         MR. GRENDI:  This is 3.
13         (Wallop Exhibit 3, Document Bates
14   stamped SVUS000077, marked for
15   identification.)
16   Q.    Ms. Wallop, do you recognize this
17   document?
18   A.    I do.
19   Q.    What is it?
20   A.    It is a preliminary sort of vision for
21   Miles Guo, for our first meeting, I believe, with
22   him, that both Mike Waller, Dr. Waller and I
23   worked on.
24   Q.    So the handwriting on the top right
25   corner, is that your handwriting?

Page 31

1    A.    Yes.
2    Q.    And when did you make that note, if you
3    recall?
4    A.    I'd have to -- to look on my paper
5    calendar.  I don't remember.
6    Q.    You have a paper calendar that you
7    keep?
8    A.    No.  I'd have to look -- I'd have to
9    look.  I remember it was sort of -- there was --
10   there was one meeting in early December, and I
11   don't have that with me.
12   Q.    Ms. Wallop, do you keep a calendar?
13   A.    No, I don't keep anything on -- I keep
14   notes, sticky notes, so.
15   Q.    You don't keep like a Google
16   calendar --
17   A.    No.
18   Q.    -- or electronic calendar?
19   A.    God, no.
20   Q.    You keep paper Post-it notes to track
21   your meetings and schedule?
22   A.    Yes.
23   Q.    How were you introduced to Mr. Guo?
24   A.    Through Bill Gertz and Lianchao Han.
25   Q.    And when did that come about?

Page 32

1    A.    I think sometime in late October or
2    early November.
3    Q.    Of what year?
4    A.    2017.
5    Q.    Do you recall if it was Mr. Gertz or
6    Mr. Han that called you, or how did that
7    interaction occur?
8    A.    That's a good question.  I think it was
9    Bill Gertz.  I think he may have called me.
10   Q.    And what did he tell you?
11   A.    He knew that I had been working in the
12   past for Taiwan and had been very active in
13   pro-democracy work, and I think he said at that
14   point he would like to have lunch with me, and,
15   possibly, Lianchao was at that first lunch.  I
16   think that was how it went.
17   Q.    Those were the three people who were
18   present at that lunch?
19   A.    Yes.  The three of us, yes.
20   Q.    And what was discussed there?
21   A.    He discussed Mr. Guo, and that he had
22   met with him, I guess, a number of times, I don't
23   know over what period of time, but that he
24   believed that he was looking for a group that
25   could help change his -- Mr. Guo -- Miles Guo's

Page 33

1    image in America.  He explained a little bit
2    about Miles Guo's issues, and we discussed at the
3    time how perhaps there might be a way of helping
4    him stay in the United States.
5    Q.    What were the issues that you just
6    mentioned?
7    A.    Pro-communist people that were
8    apparently after him.  There were many lawsuits
9    apparently that had been filed against Mr. Guo.
10   We didn't know anything about Mr. Guo, per se,
11   other than some of the media reports.
12         So Lianchao suggested that we meet with
13   him, and I said, well, I will -- I'll think about
14   it and get back to you.
15   Q.    And so, you said before that you knew
16   Mr. Gertz from years in politics or what's
17   your --
18   A.    He used to be, he still is, he's still
19   at the Washington Times, and he writes for the
20   Washington Times, and he's now with the
21   Washington -- Washington Times.
22         MR. SCHMIDT:  Times or Post?
23         THE WITNESS:  Washington Times.  Good
24   God, not the Washington Times.
25   Q.    It's a different -- it's a different

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 34

1   outfit.
2        A.    Yeah.  And the -- it's certainly
3   conservative, it was run under the time when
4   Arnaud de Borchgrave was the editor, along with
5   several other close friends, and he's now at the
6   Washington Free Beacon, I think, mostly.
7        Q.    Is that another right of center
8   publication?
9        A.    Um-hum.  I think I would call it a
10  center and conservative.  I wouldn't call it
11  right of center.
12       Q.    I was --
13       A.    I mean, really?
14       Q.    -- asking for your -- I was asking for
15  your understanding of it.
16       A.    Well, you've got my understanding of
17  it.
18       Q.    Thank you.
19       A.    You're welcome.
20       Q.    And how do you know Lianchao Han?
21       A.    Lianchao and I have crossed paths in
22  Washington off and on over the years, maybe
23  because of some of the Taiwan activities in
24  Washington.  But I've always sort of known him
25  and liked him.  I never worked with him.  But

Page 35

1   he's an excellent individual.
2        Q.    Did Strategic Vision pay any referral
3   fees or any other consideration to Mr. Han for
4   introducing Mr. Guo to you?
5        A.    Good Lord, no.
6        Q.    What about Mr. Gertz?
7        A.    Never.
8        Q.    Okay.  And going back to this first
9   meeting document.  Did you present this document
10  to Mr. Guo or was this just you and Mr. Waller's
11  notes?
12       A.    I know that we presented one that was
13  very similar to this, and I think a bit more --
14  it might have been a bit more extensive, but it
15  encapsulated.  We were probably trying to keep it
16  short and concise, but we did -- we did work on
17  this vision based upon what both Mr. Gertz and
18  Lianchao had told us about him and what his sort
19  of ambitions were for remaining in the United
20  States.
21       Q.    So did you and Dr. Waller create this
22  document after your meeting with Mr. Han and
23  Mr. Gertz?
24       A.    Yes.
25       Q.    And how did that collaboration come

Page 36

1   about?
2        A.    Well, I talked -- I mentioned to Bill,
3   I said, one of the people that I like a lot and
4   have worked with on a couple of things, but not
5   monetary, but just ideological, was Dr. Waller,
6   and I'd like to bring Dr. Waller in on this.  And
7   he said, wow, that would be phenomenal.  So, here
8   we are.
9        Q.    And did you speak to Mr. Guo before
10  putting this document together or was this just
11  based on your conversations with Mr. Han and
12  Mr. Gertz?
13       A.    I know that we had a preliminary one,
14  then we met with Mr. Guo, we did something
15  similar to this and gave it to him, I believe,
16  and -- and then we had, obviously, several other
17  meetings after that with Mr. Guo.
18       Q.    So, just speaking about this first
19  meeting.  Where did it occur?
20       A.    With Mr. Guo?
21       Q.    Yes.
22       A.    Okay.  In his apartment at the
23  Sherry-Netherland, his penthouse.
24       Q.    And when was that?
25       A.    I don't have a date on here, so I can't

Page 37

1   tell you.
2        Q.    From your memory.
3        A.    Well, it would have been in December at
4   some point.
5        Q.    December 2017?
6        A.    Yes, sorry.
7        Q.    That's okay.  What occurred at that
8   meeting?  What did you present and what did
9   Mr. Guo say?
10       A.    I believe Lianchao was also there -- I
11  know he was there, and Dr. Waller and I were
12  there, and we discussed his -- that is, Miles
13  Guo's life, his intentions, his questions about
14  investigative work; all of that was part of the
15  conversation.
16            He wanted to be -- he wanted to have a
17  presence in Washington, he wanted to buy real
18  estate in Washington, he wanted to buy a very
19  large bank building in Washington right across
20  from the White House, he wanted to buy a huge
21  house in Washington.  All of these things were
22  part of his sort of image building.
23       Q.    And those were his ideas?
24       A.    Yes.
25       Q.    But you hadn't met with Mr. Guo before

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 38

1  this meeting, right?
2      A.   No.  But the meeting went on for hours
3  and hours and hours.  You're asking what was the
4  content of the meeting.
5      Q.   Yes.
6      A.   Yes, that's what I'm saying.
7      Q.   So was this document written during the
8  meeting or before?
9      A.   I think this one may have been -- may
10  have been before, but -- yes, I think it was
11  before, because it doesn't mention the real
12  estate and so forth that he got into during the
13  meeting.  So this might have been sort of like
14  a -- it is sort of a vision paper, based on a
15  conversation with Mr. -- with Bill Gertz and with
16  Lianchao Han.
17      Q.   What do you recall saying about
18  Strategic Vision's capabilities and background?
19  Actually, let's just start with capabilities.
20          Do you recall presenting about what
21  Strategic Vision could do for Mr. Guo?
22      A.   We were talking ideologically mostly
23  about what could be done to help present his
24  views on communist China, on mainland China.  And
25  so we didn't get into specifics at the very

Page 39

1  beginning.  We just started sort of having an
2  initial conversation about how -- how we felt he
3  could be represented in Washington and how we
4  could show his positive side.
5      Q.   And did you explain what Strategic
6  Vision does or how Strategic Vision could help
7  with that?
8      A.   Probably.
9      Q.   Do you recall what, if anything, you
10  said about that?
11      A.   Not precisely, no.  Generalities.  This
12  was someone we just met, and it is the custom in
13  Asia not to dive into a lot of details unless
14  you're asked.
15      Q.   So did Mr. Lianchao Han or Mr. Guo ask
16  about Strategic Vision's capabilities?
17      A.   Eventually.
18      Q.   But not at this meeting?
19      A.   Not entire -- I don't recall.
20      Q.   Okay.
21      A.   But they could have, but I don't
22  precisely recall.
23      Q.   Was investigatory research discussed in
24  any detail at this first meeting?
25      A.   It could have been.  It could have

Page 40

1  been.
2      Q.   What do you remember about that?
3      A.   I remember that we discussed that Miles
4  Guo said that he had a number of people that he
5  wanted to know more about that were in mainland
6  China, but we didn't have any specifics at that
7  time what he was talking about.
8      Q.   Did Strategic Vision mention that it
9  could provide that information or that it had
10  that capability?
11      A.   I don't recall.  It could have.
12      Q.   Turning to the last page there, SV79.
13  It says, "Mr. G should maintain his statesmanlike
14  status by not engaging in everyday defense or
15  counterattack, and should leave it up to his own
16  surrogates."
17          Do you see that?
18      A.   Where is that?
19      Q.   It's the first sentence of the last
20  paragraph.
21      A.   Oh, the regime, yeah.  Okay.  "Those
22  surrogates will be in journalism, academia,
23  business, policy."  Yes, yes.  Okay.
24      Q.   Do you remember talking about that
25  subject at this meeting?

Page 41

1      A.   Probably.
2      Q.   And what do you remember?
3      A.   I don't remember precisely.  It's over
4  a year ago.
5      Q.   And you don't remember what Mr. Guo
6  said about that, or anybody else?
7      A.   It was a general, initial conversation
8  with somebody that we did not know, and we were
9  asked to produce something that we felt could be
10  a good vision for him to consider, perhaps, yeah.
11          (Wallop Exhibit 4, Document entitled
12      "Three-Year Timeline" Bates stamped
13      SVUS000080, marked for identification.)
14      Q.   Do you recognize what's been marked as
15  Waller 4?
16      A.   Yes.
17      Q.   And what is this document?
18      A.   Wallop.
19      Q.   Oh, sorry, Wallop.  I apologize.  The
20  W. Wallop 4.
21      A.   Yes.
22      Q.   Did you create this document?
23      A.   Yes.  Mike and I did.
24      Q.   When was that?
25      A.   That was at the second meeting with

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 42

1   Miles Guo.
2       Q.    So you remember literally typing and
3   creating this document during the meeting?
4       A.    No.  Prior to the meeting.
5       Q.    Okay.  And when was this second
6   meeting?
7       A.    Again, I'd have to ask Mike.  I think
8   it was -- I know it was in December of 2017.
9       Q.    And who was present?
10      A.    Dr. Waller, Mike Waller, myself,
11  Lianchao, and, obviously, Miles Guo.
12      Q.    What was Lianchao's role in the
13  meeting; was he translating?
14      A.    Yes, mostly.  And explaining, walking
15  through some of the explanations, not only the
16  translation, but, again, we were having a
17  generalized conversation.
18      Q.    And just for the clarity of the record.
19  Mr. Han was translating for Mr. Guo?
20      A.    Yes.  Both ways.
21      Q.    Of course.
22      A.    Mr. Guo speaks very good English, so he
23  doesn't really need an interpreter, but it's
24  better to have one.
25      Q.    Did Mr. Han actually read this whole

Page 43

1   document to Mr. Guo and translate it for him; was
2   that part of the meeting?
3       A.    Yes.  I think we walked through each
4   one of these paragraphs, yes.
5       Q.    And going back to the prior document,
6   Exhibit 3.  Was the same process employed where
7   Mr. Han, to your understanding, was translating
8   the document for Mr. Guo?
9       A.    To my understanding, yes.
10      Q.    But, obviously, you don't speak
11  Mandarin, do you?
12      A.    A little bit.  Not as much as I'd like.
13      Q.    Fair enough.  But you're not fluent?
14      A.    No.
15      Q.    Okay.  And so, to the extent you
16  recall, what occurred at this second meeting?
17      A.    This was a broader timeline based on
18  the first meeting and the first vision paper that
19  we had in our discussion, and this gave sort of a
20  menu, so to speak, a la carte, or menu of ideas
21  as to how we could help Miles Guo, at his
22  request, to set up sort of a strategic plan for
23  him.
24      Q.    So what was his response to the
25  presentation that you made?

Page 44

1       A.    He liked it very much.
2       Q.    Does that include all of the items in
3   this timeline or was he more receptive to some
4   services than others?
5       A.    It was interesting.  He was very keen
6   on having a -- big, a huge, large presence in
7   the way of a residence, and then also purchasing
8   the American Security and Trust building across
9   from the Treasury Department in Washington as an
10  office building for him.  He liked the idea of
11  the Washington-based educational and cultural
12  foundation, which we thought might be a good way
13  of exposing him to or introducing him to
14  Washington and the Hill, and working on a more
15  positive anti-communist role.
16      Q.    And in terms of this real estate
17  portion of it, acquiring what, a residence?
18      A.    Yes.
19      Q.    And also an office building, I guess,
20  for a foundation?
21      A.    Yes.  I just said that.
22      Q.    Yes.  I understand.  And so, is that a
23  service that Strategic Vision typically provides
24  for clients?
25      A.    Yes, sometimes.

Page 45

1       Q.    So Strategic Vision will help people
2   locate properties and acquire them?
3       A.    Correct.
4       Q.    Is that in the D.C. area or nationwide;
5   how does that work?
6       A.    Yes, both.  D.C. area, nationwide,
7   globally, whatever.
8       Q.    And how was that, let's just call it
9   real estate project, followed up on subsequently?
10      A.    Well, actually, Lianchao -- I picked up
11  Lianchao and Yvette at a hotel downtown off M
12  Street, because she wanted to see all of the
13  properties that we had in mind.  I think it must
14  have been obviously -- honestly I can't remember.
15  I think it was -- I think it was after this
16  second meeting, when she came to Washington, and
17  Lianchao lives in Washington, so we picked him
18  up, and I had a brochure, a set of brochures of
19  homes and the office building that we drove
20  around, because there are a lot of cameras in
21  Washington.
22            We put her in the back seat with
23  Lianchao.  I have a Jeep, so those windows happen
24  to have a, whatever it is, sun -- more blacked
25  out windows than the front two seats.

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 54

1    Q.    So this freebie research report, was
2  that research completed, or conducted?
3    A.    It was conducted.  It wasn't completed
4  by any stretch.
5    Q.    Right.  And so what was -- was anything
6  presented back to Mr. Guo or Han or Ms. Wang?
7    A.    Yes.  I believe, yes, we did show --
8  again, Mr. Han, Mr. Guo, Miles Guo, and Mike and
9  myself were privy to whatever Mike had found.
10   Q.    So there was like a third meeting with
11 respect to this --
12   A.    Yes, somewhere.
13   Q.    -- pre-report?
14   A.    Yes.  In December of 2017.
15   Q.    Okay.  And where did that take place,
16 was it in New York?
17   A.    Yes.
18   Q.    What did Strategic Vision present as
19 this free report or free information?
20   A.    They -- I believe they had a -- Mike
21 had a screenshot of a couple of things that he
22 showed Miles Guo.
23   Q.    Was it information about accessing a
24 CITIC Bank account?
25   A.    I believe so, yes.  It wasn't

Page 55

1  accessing.  Please understand, there's a huge
2  difference.
3    Q.    Oh, please.  I want you to explain.
4  What was presented?  That's what I want to
5  understand.
6    A.    Yes.  There's a huge difference between
7  accessing.  It was not accessing.  It was what
8  they call peeking.  It was not invading into the
9  server.
10   Q.    Okay.
11   A.    Okay.
12   Q.    What does peeking mean?  I just want to
13 understand that clearly.
14   A.    To look over the wall.
15         THE WITNESS:  As I see, Yvette has
16    walked into the room.
17         MR. SCHMIDT:  The court reporter will
18    take down the appearance.  That's fine.
19         (Ms. Yvette Wang has joined the
20    deposition.)
21         THE WITNESS:  So, Yvette Wang has just
22    walked into the room.
23   A.    So, the peeking was a screenshot, I
24 believe, and I only saw it for a flash myself, of
25 a CITIC name and maybe an address or something.

Page 56

1  It wasn't very in depth.  I think it might have
2  had some numbers on it, it might have had some
3  account numbers on it or something like that.
4         But it was basically just to show how
5  some things could be retrieved.  We had to be
6  extremely careful.  These things were only
7  retrieved outside of The United States, and if
8  they were -- they were never retrieved inside The
9  United States.
10   Q.    And why was that?
11   A.    Because it's not really a terribly good
12 thing to do.
13   Q.    Is that because it's illegal or --
14   A.    It's probably illegal, yes.  So we
15 would never do anything illegal.
16         MR. SCHMIDT:  In The United States.
17         THE WITNESS:  In The United States.  Or
18    elsewhere, actually.
19   Q.    And did this presentation involve
20 showing that there was money in the bank account
21 or anything of that nature?
22   A.    I don't remember.  I saw it so quickly,
23 I -- because it was really Guo and either Yvette
24 or Lianchao looking at it.  I wasn't looking at
25 it.

Page 57

1    Q.    Had you looked at these screenshots or
2  information prior to the meeting?
3    A.    No, I don't believe I did.
4    Q.    Okay.
5    A.    Because, again, we compartmentalize
6  stuff.
7    Q.    So that was Dr. Waller's aspect of this
8  presentation, he handled that?
9    A.    I agree.
10   Q.    Did you tell Eastern or the people
11 present that you had enough information about
12 this person, Ms. Suen, to prove that she had
13 committed crimes?
14   A.    First of all, we had no idea who
15 Eastern was, so I don't know what you mean about
16 Eastern.
17   Q.    I'm obviously talking about Eastern
18 Profit.  Let's just put it this way --
19   A.    Yeah, but we're not here about Eastern
20 Profit, as you understand.  I never heard of
21 Eastern Profit until there was a contract.
22   Q.    Right.  Did you ever tell the people
23 present at this meeting that you had enough
24 information to prove that Ms. Suen had committed
25 crimes?

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 58

1    A.   I don't recall.  Mike would know the
2  answer to that.
3    Q.   Do you recall Mr. Waller talking about
4  crimes or anything like that at this meeting?
5    A.   I wouldn't call them crimes.  I think
6  they were asking for investigative background.
7  Miles Guo wanted to have as much information
8  on -- investigative background on a couple of
9  people, and I think she was the first and only
10  person he actually gave me -- gave us the name
11  about earlier, as a sort of trial.
12    Q.   And you understood that Strategic
13  Vision wouldn't be compensated for this --
14    A.   No.
15    Q.   -- project?
16    A.   Not -- well, we --
17    Q.   And what I mean by project is this
18  little presentation?
19    A.   No.  It was just to show them what we
20  had a certain capacity of being able to do.  It
21  was a limited capacity at that time.
22    Q.   Do you understand why the information
23  was requested, what the goal was?
24    A.   The goal was probably to sort of maybe
25  test some of the work that we could do

Page 59

1  compartmentally.
2    Q.   Let me just be a little more specific
3  then.  Did you understand what the end goal of
4  the research project as a whole was, what the
5  requesters of the information were trying to do?
6    A.   For the entire project?
7    Q.   Yes.  Why did they want this
8  investigatory research?
9    A.   Well, that's a really good question.
10    Q.   That's why I'm asking.  Do you know?
11    MR. SCHMIDT:  If you know or you don't.
12    A.   I don't know.
13    Q.   Okay.  You never discussed what the
14  research would be used for or anything like that
15  with Mr. Guo or Ms. Wang or Mr. Han?
16    A.   No.
17    Q.   Did you think that it was involved with
18  the political conversations you guys had had
19  concerning China, the communist party?
20    A.   Oh, I'm sure it had to do with the
21  communist party.  I mean, Yvette certainly was
22  part of the communist party, and her parents were
23  part of the communist party regime.  So, and she
24  was --
25    Q.   I didn't ask you about that at all.

Page 60

1    A.   But you're asking about the content of
2  the conversation and where it went and who was
3  involved and why --
4    Q.   Um-hum.
5    A.   -- right?
6    Q.   I'm asking whether or not you knew why
7  the research was requested.  That's what I'm
8  trying to understand.
9    A.   We have no idea what Yvette did with
10  it.  We have no idea what Guo did with it.  We
11  have no idea what happened to it.
12    Q.   So Strategic Vision didn't care what
13  the research was going to be used for one way or
14  another?
15    A.   We cared very much what it was going to
16  be used for.  We are very adamantly
17  anti-communist.
18    Q.   I see.
19    A.   We are very pro-democracy.  Both Mike
20  and I are adamantly pro-democracy.
21    Q.   So did you understand that the research
22  would be used to fight against the communist
23  party in China?
24    A.   Correct.  We thought.  We were not sure
25  what they were going to do with it.  Maybe he was

Page 61

1  going to run it both ways.  We don't know.
2    Q.   I'm only asking what you thought.
3    A.   Well, I just gave you my opinion.
4    Q.   Of course.  And so, did you understand
5  that the investigatory research that was
6  collected would ultimately be publicized?
7    A.   Probably, if we ended up with -- I
8  mean, that was up to Guo to decide what he was
9  going to do with it.  We certainly were not going
10  to publish it because we had strict
11  confidentiality agreements, but he didn't,
12  apparently, because he published a number of the
13  slides already on his sites.
14    Q.   Let's just talk about the
15  confidentiality agreement.  What do you mean by
16  that, when you said you had confidentiality
17  agreements?
18    A.   We had -- well, that was later in the
19  agreement itself.
20    Q.   Oh, that's what you're referring to.
21  Okay.
22    A.   Well, you know precisely what I'm
23  referring to.
24    MR. SCHMIDT:  Just answer the
25  questions.

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 78

1  Q.   Well, I didn't even ask a question.  So
2  I want you to just wait for me to ask, and then
3  you can answer.
4  A.   Go ahead.
5  Q.   Yes, thank you.  So I want to
6  understand what part of the process you would
7  participate in.  What would you do to help in the
8  collection process or accessing of the channels
9  process?
10  A.   Collection and gathering.  It was like
11  hunting and gathering.  We both did it.
12  Q.   And what would you do in connection
13  with this engagement?  What was it that you would
14  do?
15  A.   We would collect --
16  Q.   You.
17  A.   -- through my channels.
18  Q.   Right.
19  A.   Him through his channels.
20  Q.   And what channels did you access in
21  connection with this engagement?
22  MR. SCHMIDT:  Just to -- objection for
23  a second here.  This is a 30(b)(6).
24  THE WITNESS:  I don't understand the
25  question.

Page 79

1  MR. SCHMIDT:  So you're saying you as
2  Strategic Vision, or are you saying you
3  French Wallop?  How do you want to do it?
4  MR. GRENDI:  Let's do Strategic Vision.
5  MR. SCHMIDT:  Yeah.  I mean, that's
6  really the question here.
7  MR. GRENDI:  That's fine.
8  THE WITNESS:  Okay.
9  Q.   What did Strategic Vision do in terms
10  of collection and analysis?
11  A.   That's what we did, we did collection
12  and analysis.
13  Q.   So there's no more specificity --
14  A.   Through our own sources.
15  Q.   -- to it than that?  What does that
16  mean?
17  A.   How do you put a legal case together?
18  You have to start with bits and pieces.  So
19  that's what we were doing.  We were each
20  collecting bits and pieces to make the cases.
21  Q.   Let me ask it this way.  Did you ask
22  people in your network, do you know who Anita
23  Suen is?  What do you know about her?
24  A.   No.
25  Q.   So I'm trying to understand what it is

Page 80

1  you did, Strategic Vision, to collect
2  information?
3  MR. SCHMIDT:  Objection.  She's talked
4  about going out and getting Mike Waller and
5  putting that together --
6  MR. GRENDI:  I'm asking about anything
7  else.
8  MR. SCHMIDT:  Okay, anything else.
9  A.   Collecting teams.  Collecting teams.
10  Q.   Let's do it this way.  Setting aside
11  what Mr. Waller and his team did.  Was there any
12  other teams accessed to provide information in
13  connection with this investigatory research?
14  A.   Yes.
15  Q.   And who were they?
16  A.   There were some from the U.K., there
17  were some from Israel, there were some from the
18  Middle East, there were some from our networks.
19  Q.   And now I'm talking about you
20  personally.
21  A.   Yes.
22  Q.   Are these people that you personally
23  contacted?
24  A.   Yes.
25  Q.   Okay.  That's all I'm trying to

Page 81

1  understand.  Without naming any names, would that
2  involve calling people on the phone or emailing
3  them?
4  A.   Rarely.  It's face-to-face.
5  MR. SCHMIDT:  Just listen to the
6  question.  Don't be distracted by the
7  document for now.
8  Q.   And so, in connection with the research
9  in this matter, how many face-to-face meetings
10  did you have with people in your contacts?  I'm
11  talking about you, Ms. Wallop.
12  MR. SCHMIDT:  Objection.
13  A.   I have no idea.  Many.
14  Q.   You said you rarely do telephone calls.
15  Did you do some in connection with this research
16  agreement?
17  A.   No.
18  Q.   What about internet research, did you
19  do any internet research in connection with this?
20  MR. SCHMIDT:  Objection.  Her
21  personally?
22  Q.   Strategic Vision.  Did Strategic Vision
23  do any internet research in connection with this
24  research?
25  A.   Lightly.  That was not our -- that was

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 82

1   not our way of doing it.
2        Q.    And what about you personally?
3        A.    No.
4        Q.    It says in this document that the first
5   ten targets are identified, do you see that?
6        A.    What page?
7        Q.    387.
8        A.    Yes.
9        Q.    What did you understand that to mean?
10       A.    Well, Guo gave us -- Miles Guo gave us
11  a large packet of names, and, in that -- in the
12  first ten, which they upped it to 15 in the first
13  month, but the first ten targets were identified,
14  and then they changed their mind and asked for 15
15  for the first month.  So that's -- those were his
16  targets.
17       Q.    So these ten targets, are those
18  referred to as fish in the signed research
19  agreement?
20       A.    Correct.
21       Q.    And it says, "monitor the ten targets
22  for several months to understand their habits,
23  patterns, personal and professional networks,
24  businesses and corruption."  Do you see that?
25       A.    Correct.

Page 83

1        Q.    Who would do that work of monitoring?
2        A.    Our team.
3        Q.    And by our team, what encompasses the
4   Strategic Vision team for this research
5   agreement?
6            MR. SCHMIDT:  Objection.  Go ahead.
7        A.    The particular team, we called it Team
8   1, and that's what they were assigned to do.
9        Q.    So Team 1 was assigned the monitoring
10  of the ten targets referred to here?
11       A.    Correct.
12       Q.    Okay.  And do you know the name of
13  anyone on Team 1?
14       A.    No.
15       Q.    Do you know the leader of Team 1, the
16  name of the leader of Team 1?
17       A.    I know his acronym.  I don't know his
18  name, his full name.  This was through Mike.
19       Q.    So you don't know the full name of the
20  leader of Team 1?
21           MR. SCHMIDT:  Yes or no, if you know.
22       Q.    I'm asking a yes or no.
23       A.    No.
24       Q.    So, specifically, do you know when the
25  first ten targets were identified?

Page 84

1        A.    When Guo threw that whole document down
2   on the coffee table in his apartment and he said,
3   these are the people I want investigated, these
4   are -- I said, where did this list come from?
5   And he said, I paid $250 million for this list.
6   I said, wow, okay.  So that's when I knew who the
7   first ten targets were.
8            MR. GRENDI:  Let's do Exhibit 7.
9            (Wallop Exhibit 7, Document entitled
10       "1:  Anita Yiu Suen", marked for
11       identification.)
12       Q.    Do you recognize what's been marked as
13  Wallop 7?
14       A.    Correct, I do.
15       Q.    And is this the document that you just
16  said Mr. Guo threw down on the table?
17       A.    It looks like it.
18       Q.    Okay.  So, to your recollection,
19  Mr. Guo threw a paper copy of this document onto
20  a table at some point during a meeting?
21       A.    No, on -- onto his coffee table in his
22  sun room, yes.
23       Q.    When was that?
24       A.    During the -- probably the second or
25  third meeting we had with him in New York, in

Page 85

1   December of 2017.
2        Q.    So did you keep that paper copy that
3   was thrown on the table?
4        A.    Well, I had this copy, I mean, the copy
5   of the copy.  I mean, the original that he gave
6   us.
7        Q.    I see.  So you retained a paper copy of
8   what's been marked as Wallop 7?
9        A.    That's correct.
10       Q.    And was that -- that was before the
11  contract was signed, right, the research
12  agreement that's the subject of this action?
13       A.    No.  I think we -- I saw the document,
14  but we didn't get the full document because of
15  the famous flash drives that were corrupted --
16       Q.    Right, but --
17       A.    -- by Yvette.
18       Q.    -- I just want to understand what
19  happened to the paper version that was --
20       A.    Oh, I didn't -- he didn't give that to
21  us at the time.  He kept his copy.
22       Q.    You didn't receive --
23       A.    No, no, no --
24       Q.    -- a paper copy from him?
25       A.    -- no, no, no.  He just showed it to

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 86

1  us.
2      Q.    I see.
3      A.    He threw his copy down on the table.
4      Q.    And this was at the second or third
5  meeting?
6      A.    Yeah.
7      Q.    Okay.
8      A.    Yes.
9      Q.    And you did not retain a copy from that
10 meeting?
11     A.    No.
12     Q.    And did you go through the paper copy
13 that was on the table?
14     A.    With him?
15     Q.    Yes.  Or on your own.
16     A.    Well, we glanced at it.  Mike was
17 there.  We glanced at it to try to get an idea as
18 to who it was, what it was.
19     Q.    We'll come back to this.  Going back to
20 Exhibit 6.  On 387, it says, "Document everything
21 as leverage to gain concessions, protect people,
22 use as political weapon, or as aid in criminal
23 prosecution and asset recovery."
24           Do you see that, it's the fourth or
25 fifth bullet down?

Page 87

1      A.    I don't have it.
2      Q.    Oh, I'm sorry.
3      A.    So, what page?
4      Q.    The same one we've been looking at,
5  387.
6      A.    So what would you like to look at?
7      Q.    Where it says, "Document everything as
8  leverage to gain concessions, protect people, use
9  as political weapon, or as aid in criminal
10 prosecution and asset recovery"?
11     A.    Correct.
12     Q.    What is the -- what was that about;
13 what does that mean in terms of the services to
14 be provided?
15     A.    This was what Mike was referring to
16 with regard to the Team 1.
17     Q.    So Team 1 was going to?
18     A.    Take a look at that, yes.
19     Q.    And what kind of leverage was sought?
20     A.    I guess, criminal leverage, depending
21 upon the individuals that we were investigating,
22 per Guo's instructions.
23     Q.    It also says "protect people."  What
24 was -- to your mind, what was the -- what was
25 that about?

Page 88

1      A.    I don't remember.  I don't know
2  precisely.
3      Q.    Okay.  And you don't remember
4  discussing whether -- what the political weapon
5  would be?
6      A.    Well, a political weapon, which is what
7  Guo wanted to use towards his investigation of
8  these individuals.  He was going to use it
9  against them, for whatever purpose.
10     Q.    But you don't know the purpose?
11     A.    Not entirely.
12     Q.    Okay.  A couple of bullets down it
13 says, "Break the Party's control of corrupt
14 information" -- or "corruption information" I
15 should say.  Do you see that?
16     A.    Yes.
17     Q.    What is "the Party's control"?  Which
18 party are we talking about there?
19     A.    Talking about the communist party.
20     Q.    And what control of corruption
21 information does the communist party have?
22     A.    Well, Guo had said that the CCP, or the
23 communist party of China, there was a great deal
24 of corruption within the leadership, and, as a
25 result of that, he wanted to find as much

Page 89

1  corruption as possible, and he wanted us to
2  investigate and retrieve that kind of corruption.
3  In other words, funds that would have been taken
4  out of the country illegally, cash payments, all
5  of these things that were part of that.
6      Q.    I understand.  And so going to the next
7  page, 388.  It says, "Reduce political threats to
8  yourself and your cause."
9            What did you understand is the
10 political threats to whoever yourself or your
11 cause is there?
12     A.    That was to Guo.
13     Q.    Okay.
14     A.    Political threats to Guo and Guo's
15 cause.
16     Q.    And what were those political threats?
17     A.    Well, he said that they were monetary
18 and political, and that many people were after
19 him either for monetary damages or corruption,
20 both by the Chinese officials as well as,
21 perhaps, his own corruption issues.  I don't
22 know.
23     Q.    Did you look into that at all in terms
24 of --
25     A.    This was a preliminary -- this was a

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 90

1  preliminary document that Mike had put together;
2  so, no, we were not under contract to look into
3  it.
4       Q.    Okay.  So you didn't do any work
5  regarding Mr. Guo or his business prior to --
6       A.    The contract?
7       Q.    -- the execution of the contract on or
8  about January 6, 2018?
9       A.    No.
10      Q.    You didn't access your network to
11 determine whether this was someone you wanted to
12 do business with or not?
13      A.    We had Bill Gertz, who was one of the
14 finest intellects on Chinese corruption, and
15 reporters, journalists, and also Lianchao, again,
16 of the highest sterling standards.  When they
17 asked us to look into it, that's what we did.
18 That was looking into putting together a program
19 that would help somebody that we believed at the
20 time was absolutely anti-communist.
21      Q.    I see.  So you relied up -- let me put
22 it this way.  Strategic Vision relied upon the
23 recommendation of Bill Gertz and Lianchao Han in
24 terms of deciding to do business with, or
25 deciding to enter into the research agreement?

Page 91

1       A.    Correct.
2       Q.    Let's just go to SVUS390.
3       A.    Um-hum.
4       Q.    It says, "Network With Russian
5  Opposition and Chinese Expats."  Do you see that?
6       A.    Correct.
7       Q.    Is this a service that you would
8  provide or Mr. Waller would provide?
9       A.    Both of us did.
10      Q.    Okay.  And why was Strategic Vision
11 recommending that Mr. Guo network with Russian
12 opposition and Chinese expats?
13      A.    Well, the photograph that you have
14 here, that's in this is Mikhail Khodorkovsky.
15 Okay?  Mikhail Khodorkovsky is a client of mine,
16 and he is an anti-Putin and pro-democracy leader,
17 opposition leader for Russia; so, therefore, we
18 felt that this might be a good person for Guo to
19 essentially team up with on certain ideological
20 issues.
21      Q.    And how would that synergy or
22 collaboration work?
23      A.    Through me.
24      Q.    Right.  But just a little more
25 specificity.  How would Mr. Guo, or whoever, team

Page 92

1  with Russian opposition and Chinese expats?
2       A.    Through me and certain ideas that we
3  had to combine our ideological belief in
4  democracy.
5       Q.    And -- right.  How would those ideas be
6  executed, what sort of --
7       A.    Through dialogue.
8       Q.    -- activities?
9       A.    Through dialogue.
10      Q.    And you also have links with Chinese
11 people inside Russia?
12      A.    We would have, yes.
13      Q.    That's you and Mr. Waller?
14      A.    Yes.
15      Q.    It says, "for propaganda and
16 organizational purposes."  Do you see that?
17      A.    Yes.
18      Q.    What would be the propaganda and
19 organizational purposes?
20      A.    Media and social media, probably.
21      Q.    So, in other words, messaging of
22 anti-communist, pro-democracy rhetoric?
23      A.    Correct.
24      Q.    Would the Russian opposition group be
25 involved in collecting investigatory research or

Page 93

1  is that a separate group?
2       A.    It would be separate.
3       Q.    Let's go to 394.  It says, "Target
4  Intelligence Capability:  Cost."
5            These costs here, are these prices that
6  Strategic Vision quoted?
7       A.    In a preliminary discussion, yes.
8       Q.    Okay.  So, initially, Strategic Vision
9  was offering $2,805,000 to have two teams monitor
10 one person?
11      A.    Yes.
12      Q.    And what would that monitoring entail,
13 just in terms of the types of surveillance or
14 investigatory work?
15      A.    It was hugely complex, and --
16      MR. SCHMIDT:  Keep going.
17      A.    It was hugely complex, and it had to do
18 with all the investigative tentacles that we
19 could reach within our channels.
20      Q.    So is that the full package of services
21 that Strategic Vision could provide in terms of
22 monitoring, that's like the full suite, call it
23 that?
24      A.    Except that he didn't accept it.
25      Q.    I understand that.  But was this --

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 114

1    A.    We just had an agreement of trust
2  between us.
3    Q.    What were the terms of that agreement?
4    A.    Probably 50/50, plus expenses.
5    Q.    And I take it this wasn't a written
6  agreement?
7    A.    No.  We never needed one.
8    Q.    Right.  So when did you and -- well,
9  when did Strategic Vision and Mr. Waller come to
10 this 50/50 split agreement?
11   A.    Well, after we had the agreement
12 finally signed, it had been going off and on, off
13 and on during all of December, we didn't know
14 whether we had an agreement or not.  And then,
15 when Yvette turned up with the first set of flash
16 drives that were corrupted, so then I had come to
17 New York -- we didn't have an agreement, per se.
18 We had a signed agreement.  We had no funds at
19 the time, at the first -- at the tail end of
20 December, when we were still all talking after
21 Christmas.
22         And, finally, the funds turned up --
23 I'm trying to answer your question here.  When
24 the funds turned up in, like, the 2nd or 3rd of
25 January of 2018, we still didn't know whether

Page 115

1  that was even going to work, and then they turned
2  up from somebody we'd never heard of, and so
3  forth and so on.  So we had to sit down and
4  decide what was going to go for the teams that we
5  were going to use and how we were going to
6  allocate the expenses and so forth.
7    Q.    So when -- when was the point in time
8  when Strategic Vision and Mr. Waller decided how
9  they were going to, as you described it, split
10 the -- split it 50/50?
11   A.    Not until sometime in January.
12 Probably the end of January.
13   Q.    So, well after the contract had been
14 signed --
15   A.    Yes.
16   Q.    -- and the --
17   A.    We were trying to figure out what
18 things were going to cost.
19   Q.    You said before that Strategic Vision
20 had sent money to Mr. Waller, or Dr. Waller?
21   A.    When?
22   Q.    I'm asking.  That's what my question
23 is.
24   A.    No.  I mean...
25   Q.    You said there was a wire.  What was

Page 116

1  the wire that was sent?
2    A.    The wire was not sent until the middle
3  of January or so.
4    Q.    Okay.  And was that wire for splitting
5  the profits or for something else?
6    A.    It was for beginning to start paying
7  the team as well as beginning to pay Mike.
8    Q.    Oh, so it was both?
9    A.    Yeah.  There were two wires.  Maybe
10 there were three wires, yeah.
11   Q.    So how much was the wire for the team?
12 And I assume that means Team 1?
13   A.    The preliminary amount for Team 1 was
14 at least 300,000.
15   Q.    And how much of that, if there was a
16 second wire or the same wire, was for Dr. Waller?
17   A.    Then there was a separate wire for
18 about 200 for Dr. Waller.  It could have been
19 250, I have to look.  We haven't done our tax
20 thing yet on it.  But about 250.  And then there
21 was an additional amount for expenses.
22   Q.    How much was that expense amount wire,
23 if you recall?
24   A.    Well, I think -- we're talking about
25 travel, and -- because he had to do a lot of the

Page 117

1  face-to-face collection, and last minute, which
2  costs a lot more; probably between 25 and 50, I
3  can't remember, thousand.
4    Q.    And is that the full extent of the
5  amount of money that's been paid to Dr. Waller in
6  connection with the research agreement that's the
7  subject of this litigation?
8    A.    I think there was a bit more, maybe
9  another 50, and that was based on certain
10 invoices that he had for -- for things that he
11 was -- that we had to pay.
12   Q.    I see.  And so what about -- let's just
13 set aside Dr. Waller.  Were there any other costs
14 that Strategic Vision incurred in connection with
15 this research agreement that didn't go through
16 Dr. Waller or one of his entities?
17   A.    There were -- there was a lot of travel
18 expense for Strategic Vision, face-to-face time
19 with these individuals overseas that I had to do.
20 There was -- there were other entities that were
21 also contracted to retrieve information.
22   Q.    Let's go one at a time, I'm sorry to
23 hop in.  But what were your -- what were
24 Strategic Vision's kind of direct travel
25 expenses?

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 126

```
1              MR. GRENDI:  So another 15 minutes.
2     Let's do Strategic Vision 9.
3              (Wallop Exhibit 9, Research Agreement
4     dated December 29, 2017, marked for
5     identification.)
6     Q.     Ms. Wallop, do you recognize this
7     document?
8     A.     I do.
9     Q.     That's your signature on the last page
10    there?
11    A.     It is.
12    Q.     Were you physically present when this
13    contract was executed?
14    A.     Yes.
15    Q.     And who else was there?
16    A.     Yvette Wang.
17    Q.     Anyone else?
18    A.     No.
19    Q.     Dr. Waller wasn't physically present?
20    A.     No.
21    Q.     Was he on a conference call or
22    telephoned in during the time that this agreement
23    was signed?
24    A.     No.
25    Q.     The agreement references the laws of
```

Page 127

```
1     the state of Nevada in that second paragraph, do
2     you see that?
3     A.     Correct.
4     Q.     Where did that come from?
5     A.     Because Strategic Vision is registered
6     in the state of Nevada.
7     Q.     So you put that in there because that's
8     where Strategic Vision is incorporated?
9     A.     Correct.
10    Q.     And there's some, I'll call it lingo or
11    jargon in this contract about fish, do you recall
12    that?
13    A.     Yes.
14    Q.     Where did the term fish come from?
15    A.     Guo was having a hard time
16    understanding how -- how we would select the --
17    the concept of investigation and the numbers, for
18    instance, per month.  The -- the whole file that
19    he showed us had -- the original file, whatever
20    exhibit that was, in fact, had at least 92 names
21    in it, which was reduced down to 30 names, which
22    was then reduced down to the ten names, but then
23    they switched and wanted to have 15 names in the
24    first month.
25             So, in order to give him an explanation
```

Page 128

```
1     as to how best to visualize, so to speak, the
2     whole concept of this agreement, we used an
3     example of like, it's like fish in a tank.  So if
4     you put the ten fish, or, as it turned out to be,
5     15 fish in the tank, and one of the fish --
6     forgive me -- died, but we didn't want to use the
7     word died, if one of the fish wasn't a useful
8     fish on the information that we were trying to
9     pull, we would take that fish out and put a new
10    fish, meaning a new name, into the tank, and we
11    would run the investigative background on that
12    new fish, as well as the other nine fish.
13             So, that's where the whole concept of
14    the fish tank came from.  He loved it.  He
15    couldn't wait to use it.  It was a big deal to
16    him.  So, fine, we kept talking about fish.  So,
17    for whatever reason, that's why it ended up in
18    this sort of contract agreement.
19             I realize that it's not the usual kind
20    of contract terminology that I would have used,
21    but he loved it, and so we used it, and so he
22    understood it, and that's why we moved forward
23    with it
24    Q.     I just want to know where the concept
25    came from.  Did he start using the term fish or
```

Page 129

```
1     did you; kind of like you saw a fish tank and you
2     said, well, it's just like if you took fish in
3     and out of a tank?
4     A.     Well, we were talking in hypotheticals.
5     He didn't understand how we would have to just
6     take different names out of different sort of
7     collection points --
8     Q.     I see.
9     A.     -- so we just used a really simple
10    analogy of a fish tank.  And you put the ten fish
11    in, as it turned out for the first month 15, and
12    then they -- you know, you pull one out if you
13    found that it wasn't going anywhere; in other
14    words, if it was a dead end.  A lot of these
15    Chinese names used fake names.  That's a whole
16    other thing we can get into.
17    Q.     Sure.  And has Strategic Vision ever
18    used this fish, or fish tank terminology --
19    A.     Never.
20    Q.     -- in connection with --
21             Just let me finish my question.
22    A.     Sorry.
23    Q.     -- with any other client?
24    A.     Never.
25    Q.     I take it from your expression that you
```

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 130

1    found it silly or ridiculous?
2        A.    I did, but it helped him understand the
3    concept.
4        Q.    It says here that, "Any and all
5    materials provided by the client, that's Eastern
6    Profit, to the contractor, that's Strategic
7    Vision, will be treated with absolute
8    confidentiality and will not be shared by the
9    contractor with any other entity."
10           Do you see that in the third paragraph
11   of this research agreement?
12       A.    Yes.
13       Q.    What -- how does that work with
14   Strategic Vision in terms of sharing information
15   with other entities?
16       A.    Well, we had to share it with the
17   teams, in other words, for them to be able to do
18   the research.
19       Q.    Does the contract discuss that at all?
20       A.    It's very clear.  You can't have an
21   agreement -- you can't do the research unless you
22   give it to the teams to do the research, right?
23       Q.    I just asked you if that was in the
24   agreement?
25       A.    Yes.

Page 131

1        Q.    Where?
2        A.    With any other entity.  "Will not be
3    shared by any other entity."  It's not an empty,
4    it was a team.  An entity would be the Washington
5    Post, or you, or a third or fourth party that has
6    nothing to do with this research agreement.
7        Q.    So I just want to understand that.  So
8    then, the contractor referred to in the contract
9    refers to more than just Strategic Vision?
10       A.    Our teams.
11       Q.    Okay.
12       A.    You understand the teams that we had to
13   use.
14       Q.    I'm just trying to understand what the
15   contract says.  Does the contract say anything
16   about teams?
17       A.    Well, if you're in the business, you
18   understand teams are teams, and you have to use a
19   team with a -- as a part of the contract.  He
20   knew perfectly well what that meant.
21       Q.    I just asked you whether the contract
22   said it, that's all.
23       A.    I'm not a lawyer.  It wasn't drawn up
24   by a lawyer.
25       Q.    It says, "The contractor will conduct

Page 132

1    high quality original research and prepare
2    reports on subjects chosen at the client's
3    discretion."
4            Do you see that in that following
5    sentence?
6        A.    Correct, yes.
7        Q.    What original research did Strategic
8    Vision do in connection with this contract?
9        A.    Based upon what we received, we then
10   started diving into pulling information.
11       Q.    When you say we, are you talking about
12   the entity Strategic Vision or other people, like
13   teams?
14       A.    Teams, and Mike and myself.
15       Q.    Was there anyone else that did the
16   research, other than those three entities that
17   you just referred to, yourself, Mr. Waller, or
18   Dr. Waller, and the teams?
19       A.    The groups in -- the individual ones in
20   both Europe and in the U.K.
21       Q.    Is that, you mean Fletcher --
22       A.    Yes.
23       Q.    -- and the other entity that you
24   referred to --
25       A.    Yes.

Page 133

1        Q.    -- I guess, in Switzerland?
2        A.    Yes.
3        Q.    It says, "The contractor will produce
4    complete research reports and provide all
5    supporting data as indicated below."  Do you see
6    that, two or three sentences down?
7        A.    Yes.
8        Q.    So was Strategic Vision going to
9    produce all the reports or were the teams going
10   to create some of them?
11       A.    The teams were going to develop them on
12   the flash drives.  We were not going to do any
13   written reports.
14       Q.    Why wouldn't you do any -- why wouldn't
15   Strategic Vision do any written reports?
16       A.    Because we were trying to keep it as
17   secure as possible.
18       Q.    But you understood that the other
19   teams -- strike that.  Let me start over.
20   Strategic Vision understood that its teams would
21   create written reports?
22           MR. SCHMIDT:  Objection.
23       A.    No.
24       Q.    No?
25       A.    No, it never says anything here about a

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 134

1    written report.
2        Q.    No, I know, I understand that.  I'm
3    trying to understand whether Strategic Vision
4    understood whether its teams or independent
5    contractors would produce written reports?
6        A.    We would not produce written reports,
7    or we had no intention of doing that.  This
8    was -- these were face-to-face meetings,
9    face-to-face information, USB flash drives.
10       Q.    Oh, I understand.
11       A.    It was --
12       Q.    Maybe we're having a semantic --
13       A.    It was Guo's -- sorry.  It was Guo's
14   insistence on the security measure.
15       Q.    I want to clarify something here.  Do
16   you understand written to mean just like
17   something written on a piece of paper as opposed
18   to electronic?
19             MR. SCHMIDT:  That's how I understood
20       it.
21       A.    Yes.
22             MR. SCHMIDT:  That's how the question
23       was.  You went from flash drives to USBs --
24             MR. GRENDI:  No, hold on.  Hold on.
25             MR. SCHMIDT:  -- into written reports.

Page 135

1        So a written report is a written report.  It
2        has a standard connotation.  So you might
3        have to redo this.
4             MR. GRENDI:  Yeah, let's -- let's break
5        it out.  I didn't get it.  I always think of
6        writing as both.
7        Q.    So, including electronic documents, did
8    you understand that written materials would be
9    produced?
10       A.    No.
11       Q.    So you never -- Strategic Vision never
12   contemplated providing any written materials to
13   Eastern Profit?
14       A.    Correct.
15       Q.    So Strategic Vision understood
16   everything would be conveyed orally to the
17   client?
18       A.    Via flash drive.
19       Q.    So flash drive would be allowed.
20   That's -- I'm including a flash drive as a
21   writing.  In other words, if something is typed
22   or handwritten on a piece of paper, that's a
23   writing.  Can we agree on that?
24       A.    No.
25             MR. SCHMIDT:  I'm actually seriously

Page 136

1    confused.  I don't know what you're asking.
2             MR. GRENDI:  All right.  I mean --
3             MR. SCHMIDT:  I think you got to back
4        way up and start this over.
5             MR. GRENDI:  Well, we're getting -- why
6        don't we do lunch.  We'll start over on
7        this.  It's no big deal.
8             THE VIDEOGRAPHER:  Off the record at
9        12:57.
10            (Whereupon, a short recess was taken.)
11            THE VIDEOGRAPHER:  Back on the record
12       at 1:01.
13       Q.    How did Strategic Vision intend to
14   deliver the reports described in this research
15   agreement?
16       A.    Directly to the designated driver, the
17   designated agent for Mr. Guo, who was either
18   going to be Lianchao, then it became Yvette, and
19   then it became Lianchao again.  So we would give
20   it to them or Guo directly on a USB key.
21       Q.    So there would be electronic documents
22   on a USB?
23       A.    Correct.
24       Q.    And would any of those documents be a
25   report in narrative form?

Page 137

1        A.    I never saw them until later, until
2    after all of this started.  I never saw any of
3    the documentation.  Again, compartmentalizing.
4        Q.    Right.  So Strategic Vision never
5    reviewed any of the documents that were delivered
6    to either Lianchao Han or Yvette Wang under this
7    research agreement?
8             MR. SCHMIDT:  Objection.  Go ahead.
9        A.    No.
10       Q.    And I'll just ask about you personally.
11   You personally didn't review any of the documents
12   that were delivered to Lianchao Han or Yvette
13   Wang under this research agreement?
14       A.    No, because of the timing and the
15   logistics.
16       Q.    Okay.  What is financial forensic
17   historical research?
18       A.    What do you mean?
19       Q.    Well, it's described here in -- on
20   Eastern 5, on the first page there?
21       A.    Yes.
22       Q.    Have you used that term before in --
23       A.    Yes.
24       Q.    -- other research agreements?
25       A.    Yes.

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 138

```
1      Q.   And are these kind of standard terms or
2   items that would be included in financial
3   forensic historical research?
4      A.    It would be, particularly if you're
5   looking at information you're trying to get in
6   the way of money laundering or cash purchases;
7   for instance, there were cash purchases of
8   houses, cash purchases by these fish.  We were
9   tracking their individual financial spending
10  habits, how they could have a house, how they
11  could have a car, when they only had $2,500 in a
12  credit card limit.
13          I mean, there were multiple layers and
14  levels of investigation that go on into
15  financial, forensic accounting, or research in
16  this case.
17     Q.    This kind of list of different things
18  that could be researched, including statements,
19  capital sources, etc., do you see that list with
20  all those commas there?
21     A.   Yes.
22     Q.    Was that a list that you and Dr. Waller
23  put together in terms of Strategic Vision's
24  capabilities?
25     A.    What we would have been able to have
```

Page 139

```
1   researched -- there are two ways of looking at
2   it.  Stateside, what anybody can do that is into
3   this field.
4      Q.   Right.
5      A.    Versus what you can also do overseas,
6   and they're sort of two different rabbits here.
7      Q.    Does the agreement kind of break out
8   that difference in terms of U.S. versus foreign?
9      A.    Somewhere in here, I think it might
10  have.
11     Q.    Okay.  But just going back to this list
12  of different types of information on Eastern 5.
13  Do you recall you and Dr. Waller putting that
14  list together, or this --
15     A.    Yes, we did.  We talked about it, and
16  he wrote -- wrote it while we collaborated on it.
17     Q.    Do you remember any input from the
18  other side as to what the financial forensic
19  historical research should include?
20     A.    They wanted everything, everything we
21  could get our hands on.
22     Q.    I see.
23     A.    He was particularly -- Guo was
24  particularly insistent that we dive and dive
25  harder, and dive faster, and dive harder, almost
```

Page 140

```
1   to our detriment; we said, it was not legal to do
2   what he wanted to be done, so.
3      Q.    So in terms of the -- you understood
4   that the client wanted everything in terms of
5   financial forensic historical research?
6      A.    That's correct.
7      Q.    And then you kind of put together this
8   list here of everything you could think of that
9   you could access?
10     A.    We put together the list first.
11     Q.   Okay.
12     A.    And then he kept saying he wanted more
13  and more and more and more.
14     Q.    Oh, so do you recall adding, you know,
15  different items to this A tab, forensic
16  historical research, to include more items that
17  he was demanding?
18     A.    No.  He demanded it verbally.
19     Q.   Okay.
20     A.    I think it was around the 26th of
21  January, that, I do remember, where he was
22  insistent; I don't care what it takes, get it,
23  get it.  We said, you have to take your time.
24     Q.    And it talks about on the next page,
25  Eastern 6, progress reports.  It says,
```

Page 141

```
1   "contractor will produce a progress report on" --
2      A.    Where is this?
3      Q.    It's the, I guess, the first full
4   paragraph on Eastern 6.
5      A.    Oh, okay.
6      Q.    What is a progress report?
7      A.    Verbal conversations that we had with
8   him.
9      Q.    What would be in a verbal progress
10  report?
11     A.    Telling him what we were doing and how
12  we were trying to get the teams set up and done
13  in the first month.
14     Q.    Has Strategic Vision bargained for
15  progress reports in other agreements with other
16  clients?
17     A.    I don't understand the question.  Each
18  client is different and each agreement is
19  different, and so the terms are different.
20     Q.    So you've never -- strike that.  Has
21  Strategic Vision ever provided progress reports
22  to other clients in connection with investigatory
23  research?
24     A.    Usually we do it the same way, through
25  USB key or face-to-face.
```

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 158

1  tracking, and you have to understand where the
2  pieces fit, or why.
3       Q.    And so just --
4       A.    If you go -- yeah.
5       Q.    On that fifth page, those are your
6  notes about --
7       A.    Yes.
8       Q.    -- Eileen Rodriguez?
9       A.    Yes.
10      Q.    And what does --
11      A.    It's the same Social Security number.
12      Q.    And what's the money down there?  It
13 looks like it says 2,000 and --
14      A.    No, no.  It's 2 million.  2,089,000.
15 That, I believe, was the address where she was
16 living, and it showed, if I recall correctly,
17 again, I can't remember because I don't have it
18 all in front of me, but she had sort of a credit
19 limit of $2,000 on a credit card, the only credit
20 card she had, and then the house that she was
21 living in somehow was bought in cash, but it
22 doesn't show who the owners were of that
23 residence.
24            And then you get all these -- you must
25 have had four or five Social Security numbers

Page 159

1  that were the same Social Security numbers for
2  the same person.
3       Q.    So just going back to my original
4  question, if you recall, how many of the
5  information about the -- well, strike that.
6       A.    There were a lot.  There were at least
7  three or four.
8       Q.    There were 15 fish, right?
9            MR. SCHMIDT:  Let him finish the
10 question.
11      Q.    Yeah, let me just finish the question.
12 Thanks.
13            There were 15 fish, correct?
14      A.    Yes, initially.
15      Q.    And how many of them had information
16 that, in Strategic Vision's knowledge, is false
17 or inaccurate?
18      A.    I would say maybe six or seven.  Maybe
19 more.
20      Q.    And the remainder had, let's call it
21 accurate information?
22      A.    I wouldn't call it accurate.  It had to
23 be double-checked.
24      Q.    Sure.
25      A.    So we found little things that were out

Page 160

1  of whack, like numbers, passport numbers or visa
2  numbers, or this one has an Australian
3  nationality, some of the ones that we were doing
4  in the U.K. had totally different names, but then
5  they actually did match up if you dug deeper.
6       Q.    Okay.  So some of them had -- you had
7  mentioned earlier had -- were completely fake,
8  they weren't --
9       A.    That's right.
10      Q.    -- real people?
11      A.    That's right.
12      Q.    How many of the 15 fish were, in
13 Strategic Vision's opinion or knowledge, fake?
14      A.    I would have to talk to Mike about
15 that, but I think we -- we came up with at least
16 five or six that were fake, or at least had a lot
17 of questions to be asked about them.  The names
18 did not match up with the names on the state
19 department visas or on -- within our channels.
20      Q.    In other words, there obviously was a
21 person who looked like that fish in the --
22      A.    That's right.
23      Q.    -- document?
24      A.    Yes.
25      Q.    But that the names and information

Page 161

1  being provided were for --
2       A.    Were fake.
3       Q.    Were fake?
4       A.    If -- if Guo was telling the truth
5  about saying he paid $250 million for this
6  information, then he totally got, excuse me,
7  screwed.  He got totally screwed.  Because the
8  information in here, just from what we were able
9  to surmise, was rubbish, and that's real -- the
10 real garbage.
11      Q.    Okay.  Let's go back to the research
12 agreement, that's Wallop 9.
13      A.    Yes, let's go.
14      Q.    And we'll -- I do want to check on
15 lunch.  I know it's 1:30 now.  Let me just go see
16 about that.  Let's go off the record for a
17 second.
18      A.    Do you want to finish this?
19      Q.    Well --
20      A.    I'd rather finish this.
21      Q.    Let's keep going, sure.  I'm sure
22 they'll knock when the time comes.
23      A.    I'm sure they will.
24      Q.    Let's talk about irregular
25 circumstances.  Do you see that paragraph?

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 162

1     A.    Yes.
2     Q.    Did you and Mr. Waller draft this
3  section?
4     A.    Dr. Waller, yes, we did.
5     Q.    And what was the intent or purpose
6  behind drafting this section?
7     A.    I wouldn't call it intent.  That's --
8  that's truly not fair.  It was a protective
9  element for life.  You can't always say that it's
10 going to be 100 percent of everything every
11 second of every day.  You cannot.  It's not
12 there, it's not gonna happen.
13           So irregular circumstances by us, and
14 including Guo, said that both parties understand
15 that occasional unforeseen challenges may arise
16 that will slow or block comprehensive research,
17 and that there may be periods in which
18 information is irregular, unavailable or
19 incomplete.
20           Perfect reference are some of these
21 names in here.  The contractor will endeavor to
22 make all research and reports as complete as
23 possible in a timely scheduled manner.  Which
24 does not mean ten days from the beginning of the
25 contract.

Page 163

1     Q.    Has Strategic Vision ever used a clause
2  that's substantially the same or similar to this
3  irregular circumstances clause in other
4  agreements?
5     A.    I'm sure there have been ones that have
6  been similar to it.  I mean, it's not unusual.
7  This is -- this is the form that is taken.
8     Q.    In terms of Strategic Vision's
9  experience in this field, was the research
10 bargained for in this research agreement, did it
11 encounter irregular circumstances or problems
12 from the outset?
13    A.    I would say when we started getting
14 into it, we found that there were irregularities.
15 That's not to say that we couldn't continue
16 digging to find the answer.  But we certainly
17 found irregularities when we were talking to Team
18 2 in Texas about these people.
19    Q.    Right.  So just in terms of, any
20 project has some problems, no investigatory
21 research project just goes off without a hitch,
22 correct?
23    A.    Correct.
24    Q.    So there's always some issues that
25 either slow down the research or make information

Page 164

1  unavailable for a time; is that fair to say?
2     A.    Which Guo understood completely.  At
3  least he said he did.
4     Q.    When did he tell you that?
5     A.    Several times.  I think it was probably
6  the middle of January when we met him, and then
7  on the 26th, even though he was upset we didn't
8  have everything by Chinese New Year, or some kind
9  of new criteria.
10    Q.    Did you understand that the research
11 was needed in a very tight schedule because of
12 the Chinese New Year?
13    A.    No.
14    Q.    When did you come to understand that?
15    A.    Later, when we realized that that
16 seemed to be his issue.
17    Q.    When did you first talk about getting
18 the information by Chinese New Year with Mr. Guo
19 or Yvette Wang --
20    A.    Never.
21    Q.    -- or Lianchao?
22    A.    Never.  Not until much later, I mean,
23 after the fact.
24    Q.    No, that's what I'm trying to find out
25 when --

Page 165

1     A.    Oh.
2     Q.    When that was.
3     A.    After the fact, so sometime in the
4  early part of February, I guess.  I think maybe
5  Lianchao sort of said that to us.
6     Q.    Okay.  But prior to the contract, there
7  was no discussion about --
8     A.    No.
9     Q.    -- Chinese New Year or anything like
10 that?
11    A.    No.
12    Q.    If irregular circumstances arise, does
13 the client have to pay for not receiving any
14 research?
15    A.    Of course.  It's the risk we both take.
16    Q.    And has that occurred in the past with
17 Strategic Vision's clients?
18    A.    Yes.
19    Q.    So even though Strategic Vision is
20 unable to provide, let's just say, any research
21 because of an irregular circumstance, the client
22 still has to pay the full price of the reports?
23    A.    It's our time that it takes to do what
24 we're doing.  We wouldn't find it out, would we,
25 unless we had done the investigation.  So it's

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 174

1    A.   It was supposed to be funded.  The
2  entire contract was supposed to be funded.
3  Apparently, it wasn't.
4    Q.   Let's go back to Exhibit 7.  I think
5  previously you had mentioned that you saw this
6  Exhibit 7 when Mr. Guo put it on a table at a
7  meeting, is that right?
8    A.   I believe this is correct.
9    Q.   And when was the next time you saw this
10  information?
11    A.   When we actually printed it off from
12  the USB key.  After three different attempts of
13  corrupted USB keys from Yvette, we finally were
14  able to print it off ourselves onto a virgin
15  computer.
16    Q.   Okay.  When did -- when was the first
17  time you saw this information after the coffee
18  table viewing?
19    A.   When we printed it off after we got the
20  corrupted USB keys from Yvette.
21    Q.   What date was that?
22    MR. SCHMIDT:  What date?
23    A.   Oh, I'm sorry.  I guess it was about
24  the -- oh, God, about the -- oh, the 8th, the 8th
25  of January it would have been.  It would have

Page 175

1  been Monday, because I had to come up to New York
2  to get it.
3    Q.   So you didn't see the information in
4  Exhibit 7 on January 6, 2018 when it was -- the
5  contract was signed?
6    A.   No.
7    Q.   You didn't view it?
8    A.   I -- it wouldn't open, that was the
9  problem.  That's why I had to come to New York.
10  On the 6th, she gave us three keys, three USB
11  keys.  Two would not open.  The third one would
12  not open on my computer, and so that's when I
13  took it to my neighbor and he was kind enough to
14  put it into his computer, just to see if anything
15  would open.  All it was was complete corrupted
16  file, just nothing but Chinese characters all
17  over the place.  It had no -- nothing like this.
18  So we both starting pulling all of the wires out
19  of his computers and his hard drives and -- yeah,
20  and yanked the flash drive out and everything
21  else.  It was a nightmare.
22    Q.   And who's your neighbor?
23    A.   You have the letter.  His name is
24  Richard Shewell, S-h-e-w-e-l-l.
25    Q.   And What's Mr. Shewell's relationship

Page 176

1  to Strategic Vision?
2    A.   None, other than a friend who kindly
3  was trying to see if there was something the
4  matter with the flash drives, which clearly there
5  were.  So then I came to New York on Monday to
6  meet her, that is Yvette, at the Pierre, in the
7  lobby.  I brought another computer.  She brought
8  three flash drives.  One worked, and that was
9  this, this one; in other words, this file.  The
10  other two were corrupted.
11    I kept them, kept all of the flash
12  drives.  I took the one that was good, I brought
13  it back to Washington and put it into a virgin
14  computer, and then we printed this thing off.  A
15  virgin computer, for the benefit of the court, is
16  one that has no connection to the internet and/or
17  a printer that has any connection to an internet.
18  So it's like a dumb computer.
19    Q.   Does Strategic Vision have any kind of
20  confidentiality arrangement with Richard Shewell?
21    A.   No.
22    Q.   Is Richard Shewell a member of the team
23  or otherwise --
24    A.   No.
25    Q.   Let me just finish the question for the

Page 177

1  record.  Is Richard Shewell part of Strategic
2  Vision's team or teams that provide investigatory
3  research?
4    A.   No.
5    Q.   So once you've accessed this
6  information on January 8th, what did Strategic
7  Vision do next?
8    A.   On January 8th?
9    Q.   Yes.  Now that you have the list of
10  fish.
11    A.   So now that we've printed off this
12  file, then Mike came and we sat down and we
13  started talking about how we were going to --
14  where we could -- which certain things we could
15  put together and enter into our channels for
16  information.  And then we -- then he got in touch
17  with Team 1, that had been sort of sitting on
18  hold, and then -- then there were meetings with
19  Team 1 leader, and we began.
20    Q.   So just this initial process with
21  Dr. Waller, were you parsing to see who was going
22  to do what in terms of the investigation, is that
23  fair?
24    A.   Somewhat, yes.  It's a very complex
25  investigation.  It takes the U.S. side as well as

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 178

1 international side.  We had to divide up the
2 issues.
3       Q.     Were there aspects of the research that
4 he was going to handle and aspects that you were
5 going to handle, or Strategic Vision was going to
6 handle?
7       A.     I would say so, yes.
8       Q.     And what portion of the research was
9 assigned or delegated to Strategic Vision, or you
10 personally?
11      A.     The U.S. side, where we felt that we
12 could pull certain pieces of information legally
13 from U.S. channels, so we had to go through and
14 see who supposedly had a U.S. passport, U.S.
15 visas, or who had, you know, illegitimate
16 children born in the United States.  It was a --
17 it was big.  It was a big issue.
18      Q.     And what portion -- I take it Mr.
19 Waller was going to do the international portion?
20      A.     No, Dr. Waller.
21      Q.     I'm sorry.  I was calling him Mr.
22 Waller the whole last deposition, so correct me,
23 please, feel free.  Dr. Waller.
24             What was Dr. Waller assigned to in
25 terms of this division?

Page 179

1       A.     He was assigned to work with Team 1 to
2 help pull the information with Team 1, because
3 there were a number of things that they had to
4 get into, but they could only do it from an
5 overseas location.
6       Q.     I see.  So none of the U.S.-based
7 investigatory research was handled by Team 1?
8       A.     No.  Well, no.  It was all done -- it
9 was done through the U.S. side.
10      Q.     And that was not Team 1?
11      A.     No, it's never been Team 1.
12      Q.     Got it.  I just want to be clear about
13 it.  The way you're saying no could be
14 interpreted multiple ways, so I just want to be
15 super clear.
16      A.     Not really.
17      Q.     Okay.
18             MR. SCHMIDT:  Just --
19             THE WITNESS:  I know.  It's silly.
20      Q.     You could just -- it's not.  It's a --
21 you have to understand, ma'am, it's a record that
22 we're trying to keep clear for the court, and I
23 just don't want there to be ambiguity.
24      A.     I wouldn't want any ambiguity for the
25 court.

Page 180

1       Q.     Of course not.  Right.
2       A.     I want the court to be -- have a very
3 clear reading of what is being asked.
4       Q.     Me, too.
5       A.     Good.
6       Q.     And so then how did you -- were you
7 managing the U.S.-based process personally?
8       A.     Yes.  Um-hum.
9       Q.     So you've got the information on
10 January 8th.  What did you do in terms of that
11 process?  What was --
12      A.     Mike and I, as I said, divided up what
13 needed to be done.  I got in touch with my
14 channels, he got in touch with his channels.
15      Q.     Just without even saying who your
16 channels are or what they do, did you get in
17 touch with several people; how many people did
18 you get in touch with?
19      A.     I have no idea.  There were a number of
20 people.
21      Q.     And did you receive valuable
22 information from those people?
23      A.     Some, I did and some was -- was fake
24 information.  You have to understand that we were
25 given fake names and fake information to either

Page 181

1 send us down rabbit holes for nothing, a waste of
2 time, or we could find legitimately that there
3 were some people that we could actually piece
4 together some of the tracking.  But their names
5 had been changed.  They kept changing their
6 names.
7       Q.     So when did you -- when did you first
8 find out that, in your understanding, some of the
9 names were fake; when did that happen?
10      A.     I would say probably within the
11 first -- probably within the first ten days.  And
12 we discussed that with Lianchao and we discussed
13 it with -- with Guo.
14      Q.     Okay.  How was -- was there a meeting
15 with Lianchao --
16      A.     Yes.
17      Q.     -- and Guo where that was discussed?
18      A.     Yes.
19      Q.     Where was that?
20      A.     In New York, at his apartment.  We
21 never met Guo outside of his apartment.  He never
22 left his apartment.
23      Q.     And when did that meeting occur?
24      A.     I guess it was, as I said, within the
25 ten days from the 8th, 9th, which was like a

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 182

1   Monday or a Tuesday, to about the 15th or so of
2   the month, 16th, something like that.
3        Q.    Was Ms. Wang there?
4        A.    Where?
5        Q.    At that meeting that you've just
6   described.
7        A.    Who knows.  He kept saying he didn't
8   trust her.
9        Q.    I'm asking whether you recall her being
10  present?
11       A.    No, I don't remember, because sometimes
12  she was in there and sometimes Lianchao was
13  there, so I don't remember.  He said he didn't
14  trust her, so a lot of times he sent her out.
15       Q.    In other words, she might have been in
16  the area, in the building that you were meeting
17  in, but he would say, leave the room?
18       A.    Yes.
19       Q.    And you would have the meeting without
20  her?
21       A.    Yes, that happened.
22       Q.    How many times did that --
23       A.    On several occasions.
24       Q.    And were you and Dr. Waller
25  coordinating and checking in on the research

Page 183

1   after this January 8th start date?
2        A.    Oh, yeah.  I mean, obviously, I
3   couldn't -- I could only do from my side what I
4   could do on retrievals.  What he was doing with
5   Team 1 was -- was totally different because it
6   was overseas, and so, therefore, he was
7   coordinating with the person on the overseas
8   retrieval, and I was not a party to that.
9        Q.    Right.  How did you check in with one
10  another?  Would you meet in --
11       A.    Daily.
12       Q.    -- D.C.?
13       A.    No, no, no, he would come to my home.
14  We never did anything on the telephone.
15       Q.    So after -- well, starting on
16  January 8th, you and Dr. Waller were meeting
17  almost daily to handle this investigation?
18       A.    I would say so, yes.
19       Q.    But of course you couldn't communicate
20  with him when he was flying to Europe or things
21  of that nature, correct?
22       A.    No.
23       Q.    Because you wouldn't.  Because, even
24  though you could communicate with him, for
25  security reasons, you would not do that?

Page 184

1        A.    That tended to be the case.  I mean, he
2   might say, I've landed, or he might say, I just
3   finished my meeting, or, I'm on the way back.
4   That's about the limit of it.
5        Q.    And would those be Signal messages or
6   some other communication means?
7        A.    Usually on Signal.
8        Q.    Did you keep your Signal messages with
9   Dr. Waller?
10       A.    I turned over everything I had to --
11  whatever is there to Joe.
12       Q.    Right.  I'm asking --
13       A.    To the law firm.
14       Q.    I'm asking if you -- did you delete
15  Signal messages you had with --
16       A.    Some I have.
17       Q.    -- Dr. Waller?
18       A.    I always do.  Because some I -- I don't
19  keep Sig -- all of my Signal messages.  That
20  means for everybody, not just for Guo.
21       Q.    I understand.  And why is it your
22  practice to delete messages like that?
23       A.    Because that's what it's set up for.
24  That's what Signal does.
25       Q.    Oh, there's like an automatic

Page 185

1   destruction policy?
2        A.    There's an automatic destruction thing,
3   It's 30 minutes or 30 whatever.  An hour.
4        Q.    Okay.  That's one of the features of
5   the application?
6        A.    Yes.
7        Q.    Did you ever ask Mr. Guo or Lianchao or
8   Yvette Wang how they got the information in
9   Exhibit 7?
10       A.    Yes, they told me.
11       Q.    What did they tell you?
12       A.    Guo said, this is the file, he slammed
13  down on the coffee table like that in front of me
14  in his apartment, in his sun room, and said, this
15  is what we need to investigate, these are the
16  people we need to look into, and, here, you can
17  look through the names.  And I said, wow.  He
18  said, I paid $250 million for this.  I said,
19  really.
20       Q.    I take it you didn't believe that
21  price?
22       A.    I found that extraordinary, given just
23  even the preliminary stuff that was on it.
24       Q.    And did he explain to you how the
25  information was obtained by him, other than

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 186

1   obviously paying for it, what means were
2   employed?
3        A.   He bribed people to get it, bribed
4   people to take photographs of passports, I guess.
5   I don't know.
6        Q.   Did he tell you that or is that your
7   assumption?
8        A.   He actually told me that.  I mean, he
9   said that in the meeting.  He said, yeah, I had
10  to bribe people to take pictures of passports.
11  Otherwise, I don't know where the other
12  information came from.
13       Q.   Let's go to the next document.
14            (Wallop Exhibit 10, Signal messages,
15       Bates stamped Eastern-0000201, marked for
16       identification.)
17       Q.   This has been marked Wallop 10.  Do you
18  recognize this Signal thread?
19       A.   Well, it looks like it's from me, and
20  probably to Yvette.
21       Q.   Did you ever exchange Signal messages
22  with Lianchao Han?
23       A.   I'm sure I have.  It may or may not
24  have had anything to do with this, the contract.
25       Q.   So you've worked with Mr. Han on other

Page 187

1   matters or --
2        A.   Well, we're pro-democracy, and he
3   represents a pro-democracy group in Washington;
4   and so, yes, there are issues that are going on
5   about the mainland that had nothing to do with
6   Guo.
7        Q.   Going to Eastern 203.
8        A.   Yes.
9        Q.   Do you see where it says, "yes let's
10  discuss now"?
11       A.   Yes.
12       Q.   And below that there's like a little
13  phone symbol, do you see that?
14       A.   Correct.
15       Q.   Do you recall speaking to Ms. Wang
16  about this agreement on or about December 28th?
17       A.   That would have been correct, because
18  that's when they sort of were changing the terms
19  of the contract from ten fish to 15 fish, and
20  that's what the 15 refers to in her...
21       Q.   And you had a phone conversation about
22  that?
23       A.   Yes, it's right here.  And then I put
24  it in -- or she put it in there, and then you'll
25  see the rest of it.

Page 188

1        Q.   Did you discuss any other terms at that
2   point, or was that just the focus, the number of
3   fish, during the first month?
4        A.   It was the number of fish for the first
5   month.
6        Q.   I'm asking from your memory --
7        A.   Yes.
8        Q.   -- do you recall discussing any other
9   terms of the agreement?
10       A.   No, we didn't change that term.  She
11  knew that, in the second month, it would be ten
12  fish.
13       Q.   And did you redraft or edit the
14  agreement based upon this discussion?
15       A.   Not that I recall, no.
16       Q.   Well, you did put in that there would
17  be 15 fish during the first month instead of
18  the --
19       A.   Yes, because we'd already -- when was
20  this?  This was 12/29.
21       Q.   28.
22       A.   12/28.  And I can't even remember on
23  the contract whether it's -- I don't know if we
24  even defined whether it was 15 in the first month
25  or not, but we went ahead and agreed to the 15;

Page 189

1   so, gave her five fish, basically.
2        Q.   Did you ever give her a copy of the
3   agreement for her to make edits?
4        A.   Yes.
5        Q.   When was that?
6        A.   Because when we talked about it, she
7   was talking to Guo all the time on the telephone,
8   and we made edits.  I remember when she was at
9   the house earlier that -- maybe during this time
10  frame, the 29th, or 28th or something.  "We are
11  looking at your changes and have made a combined
12  document based on our conversation yesterday and
13  our mutual agreement."  This was on the 29th.
14            So we made it at my house, and then we
15  agreed to it, and then I went and printed it off
16  from my printer.
17       Q.   Right.  What I'm asking is, did you --
18  you physically gave her a --
19       A.   Yeah.
20       Q.   -- a paper copy?
21       A.   Yes, we both did.  I mean, we both had
22  the same piece of paper that we were scratching
23  up and redoing.
24       Q.   I wasn't sure of that, that's why I'm
25  asking.  I don't know that.

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 198

1 had to sign it -- she had to come -- she signed
2 it on the 6th.  So she says, "please send the
3 contract here I get the right person to do."  I
4 don't know what that meant.  "There is of course
5 no impasse here.  I work with several people, M
6 is one of them saying for this project he is not
7 only boss."  Well, that was news to us.
8      Q.    I'm just asking about why you didn't
9 send the contract when it was requested there?
10     A.    Because we still didn't have -- oh,
11 dear lord.  We still didn't have the flash
12 drives.  This was the 5th.  We didn't get the
13 proper flash drives with the folder until the
14 8th, Monday the 8th.  So what could we do, except
15 take -- except have her sign the contract.  They
16 had already sent the money, we all had agreed to
17 the terms.  She needed to sign the contract.
18 Then I went to New York to get a flash drive
19 that, God willing, would work, out of the three.
20           And we tried to explain to them that
21 their systems were corrupted.  If she was
22 downloading, or he was downloading the stuff from
23 his own computer, he was getting -- he was being
24 hacked into by the Chinese himself.  Because you
25 can't make this stuff up on the -- on the

Page 199

1 corrupted files.
2      Q.    But before January 6th, you weren't
3 aware of any corruption or hacking issues, were
4 you?
5      A.    Yes, absolutely.
6      Q.    How were you supposedly aware of that?
7      A.    Well, because we had a corrupt -- when
8 we were even sitting there, I think at one point
9 Guo had a USB key and he was putting it into his
10 own computer, and it was acting up, and he took
11 it out and he said, I can't -- I can't do the
12 file here.
13     Q.    When was that?
14     A.    It was before -- this must have been
15 sometime in mid-Jan -- mid-December, whenever we
16 were up there meeting with him, he had an issue
17 with the computer.  And Mike told him, he said,
18 you know, you got -- you got issues here that
19 have nothing to do with us.
20     Q.    You wrote, "As you know, the agreement
21 can only be reviewed and cannot be sent by email
22 for the purpose of absolute security"?
23     A.    Correct.
24     Q.    It says, "Other than New York, L, M and
25 myself and you, we are the only ones privy to

Page 200

1 it."
2      A.    Correct.  And New York was equally
3 adamant about it.  That was Guo.
4      Q.    I was going to say, who's New York?
5      A.    That was Guo.
6      Q.    And L is Lianchao?
7      A.    Yes.
8      Q.    And who's M?
9      A.    Michael, Mike, Dr. Waller.
10     Q.    Turning to Eastern 19.  You wrote,
11 "Thank you.  I will look forward to seeing you
12 tomorrow here.  You can make whatever minor
13 changes here on my laptop and then print off two
14 copies"?
15     A.    Correct.  That meant print off two
16 copies of the agreement.
17     Q.    Right.  What were the changes or issues
18 that you were thinking of at that time?
19     A.    Whatever changes we made that were --
20 she would -- I mean, whatever was made was made,
21 and we agreed to in the document.  I don't
22 remember.  They were minor.
23     Q.    You said, "we've already lost a week"?
24     A.    That's right.
25     Q.    What did you mean by that?

Page 201

1      A.    If we didn't have this, we couldn't
2 start.  If we didn't have the entire file, we
3 couldn't start, could we?  Because we had no
4 information to go on.
5      Q.    Did you understand that time was an
6 important factor?
7           MR. SCHMIDT:  Objection.
8      A.    Of course it was an important factor.
9      Q.    Why was that?
10     A.    Because we were prepared to go, but,
11 due to their corrupt files, we couldn't start
12 until we got the full document that was not
13 corrupted.
14     Q.    Right.  But this is January 5th, right,
15 this email message or Signal message?
16     A.    Yes.
17     Q.    And so I'm just asking, you hadn't
18 seen -- or you hadn't received the files that had
19 any alleged issues with it in terms of --
20     A.    Yes.  She came on the 5th, she put the
21 files in, they didn't work, they were corrupted.
22 I then had to get on the train and come up here
23 on the Monday morning, the 8th, okay, to get the
24 USB file that was clean.  Out of the three, there
25 was only one that was clean.

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 206

1    of Team 1 there were?
2        A.    Because I was told that by Mike.
3    That's all I know.  I don't know who they were, I
4    don't know their names.  I don't know anything
5    about it.  We compartmentalized it.
6        Q.    Right.  So you don't have any -- you
7    played no role in assembling Team 1 or managing
8    its actions?
9        A.    My expertise, young man, is --
10       Q.    I'm not that young, but go on.
11       A.    -- is 45 years of working in
12   specialized areas, and I understand how to
13   assemble the right people to do, God knows, the
14   right job.  And Mike was one of the people who
15   did dispatch and organize Team 1.
16       Q.    Right.  So you weren't involved with
17   managing or assembling --
18       A.    Not on a --
19       Q.    -- Team 1?
20       A.    -- day-to-day because we were
21   compartmentalizing it.
22       Q.    That's fine.  You can -- I'm just
23   asking for an answer.
24       A.    I'm giving you one.
25       Q.    Thank you.

Page 207

1        A.    You're welcome.
2        Q.    What was the issue that -- if we go to
3    Eastern 227, that caused a delay of eight days?
4        A.    Okay, you have to take a calendar out
5    and look at the calendar for January.  It's easy
6    to see.  The 8th, Monday the 8th was when we
7    finally got a decent copy of this, right
8    (indicating)?
9        Q.    Exhibit 7?
10       A.    Yes, Exhibit 7.
11       Q.    Sure.
12       A.    That week, Mike and the person from
13   Team 1 were coordinating how they were going to
14   get the -- the equipment together.  They had to
15   drive to three different countries to get the
16   information -- I mean, to get the equipment, so
17   they wouldn't be tracked.
18             The IP numbers and everything else
19   would not be tracked.  These would be, quote,
20   technically, virgin computers, virgin phones,
21   these would be burner phones.  All of these
22   communications had to be coordinated.  So from
23   the 8th of January to the 16th, I believe, makes
24   eight days.
25       Q.    And that's what I'm trying to

Page 208

1    understand.  What was it between the 8th and the
2    16th that caused a delay?
3        A.    Well, we didn't have the equipment to
4    begin to do what we said we wanted to be able to
5    do because of all of these weirdo delays with the
6    flash drives.
7        Q.    In other words --
8        A.    They were corrupted flash drives,
9    right?
10       Q.    In other words, you didn't have the
11   equipment to do the research on, let's just say,
12   January 1, you had to go and buy it --
13       A.    That's correct.
14       Q.    -- after the agreement was signed?
15       A.    That's correct.  And why would that be?
16       Q.    I'll be asking the questions.
17       A.    I know --
18             MR. SCHMIDT:  Don't ask questions.
19       A.    -- but, I mean, this is absurd.
20             MR. GRENDI:  Why don't we take a little
21   break.
22             THE WITNESS:  Yeah, I think we need a
23   little break.
24             MR. SCHMIDT:  That's fine.
25             THE WITNESS:  You just don't get it.

Page 209

1             THE VIDEOGRAPHER:  Off the record at
2    3:25.
3             (Whereupon, a short recess was taken.)
4             THE VIDEOGRAPHER:  Back on the record
5    at 3:32.
6        Q.    Still on Wallop 10, Bates number
7    Eastern 227.  Do you see where you wrote, "We
8    have some new exotic fish options to discuss
9    too"?
10       A.    Yes.
11       Q.    What did you mean by that?
12       A.    I think Mike and I had come up with
13   some information that would have been interesting
14   for Guo.
15       Q.    Why did you describe it as a fish
16   option?  What does that --
17       A.    I think exotic was the key word there,
18   because it was outside of the parameter.
19       Q.    What do you mean by parameter?  I just
20   want to understand --
21       A.    Outside of the -- the 15 fish.  It was
22   additional information that we thought he might
23   find useful.  It had nothing to do with the 15
24   fish.
25       Q.    What was that information?

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 214

1    A.   Not in depth.
2    Q.   This comment about, we expect to have a
3  fairly full net, was just your assumption?
4    A.   Yes.
5    Q.   And at that time, you didn't know if
6  Team 1 was finding any information or good
7  information, or anything of that nature?
8    A.   We were told that they were finding
9  information.
10   Q.   So, again, how did you get that
11 information if you didn't get it from Dr. Waller?
12   A.   He told me, but I've said to you that I
13 only spoke a little bit to Michael.  I did not
14 know all of the details of that.  He said that he
15 believed he had some good information that was
16 going to make New York, New York, as we called
17 him, happy.
18   Q.   I got it.  Going to Eastern 235.  At
19 the bottom of the page you wrote, "We have to
20 finish shopping and we'll find a very nice
21 present for."  That's all it has there.
22        What did you mean by finish shopping,
23 if you recall?
24   A.   Well, we -- we're -- let's see.  This
25 was ten days into the contract, essentially.  We

Page 215

1  were working through weekends, so we were trying
2  to retrieve information, according to Mike, that
3  was -- that we felt that was going to be very
4  useful for him.  Again, I did not know what those
5  specifics were.
6    Q.   But the reference to shopping is the
7  collection of information?
8    A.   The collection, yes.
9    Q.   And a present would be, what, useful
10 information?
11   A.   Useful information.
12   Q.   And you said, "we'll be there on the
13 25th."  Was that for a meeting that you were
14 planning with Mr. Guo and Lianchao and Yvette?
15   A.   Yeah, it was the 25th or the 26th.  I
16 thought it was the 26th.
17   Q.   If you turn to Eastern 238.
18   A.   Yeah.
19   Q.   You see it says, "okay we'll do lunch
20 for the 26th"?
21   A.   Right.
22   Q.   And is that your recollection, that the
23 meeting was --
24   A.   Yes.
25   Q.   And what -- what happened at that

Page 216

1  meeting, if you recall?
2    A.   We had some information, and I can't
3  remember if Mike had gotten -- I don't think he'd
4  gotten the flash drive at that point, that
5  particular flash drive, but we were giving him a
6  verbal update on certain people within the --
7  within the file, Exhibit 7.
8    Q.   And you said before that you were
9  working around the clock?
10   A.   Yes.  They were.
11   Q.   But you weren't.  You mean the team was
12 or -- I just want to be precise here.
13   A.   Well, I'm human.  I don't work 24/7.
14   Q.   I didn't mean that, obviously.  But you
15 said you'd been working weekends on this; is that
16 fair to say?
17   A.   All of us were working, often.
18 Whenever we found a lead, we'd go after it.
19   Q.   And is that just standard procedure for
20 --
21   A.   Yes.
22   Q.   -- and engagement of this nature?
23   A.   Yes.
24        MR. SCHMIDT:  Just let him finish the
25   question.

Page 217

1        MR. GRENDI:  That's okay.
2    A.   Yes.
3    Q.   And does that schedule ever let up
4  during an engagement or is it just typical for
5  the beginning of an investigatory research
6  project?
7    A.   Well, something that was this intense,
8  where you had an increase -- mentally, you'd
9  already sort of planned out in the contract for
10 ten.  So you get a 33 percent increase.  So you
11 have to sort of shift the -- the process, adjust
12 the process so that you can continue to keep
13 going in.
14        Again, I have to tell you, repeatedly,
15 how many names were fake, how many -- how many
16 bits of information and addresses were fake, how
17 many rabbit holes these guys had to go down to --
18 to prove that there were not -- the information
19 that Guo had been given for $250 million, a lot
20 of it was rubbish.
21   Q.   Just going back to that meeting on the
22 26th of January.  Was any information presented
23 to the client?
24   A.   I think Mike did, yes, verbally.
25 Verbally.  We sat there and listened.

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 230

1    A.    No.
2    Q.    Let's go to Eastern 259.  Do you see
3  where Dr. Waller wrote, "our understanding was
4  that the first 90 days would be for starting up
5  and developing the data"?
6    A.    I see that.
7    Q.    Was that Strategic Vision's
8  understanding as well or just Dr. Waller's?
9    A.    No, it was our mutual understanding
10 between Guo and myself and Lianchao and Mike.
11   Q.    Do you see where it says, "We
12 did not understand that he expected actual data
13 in the first days or weeks"?
14   A.    Correct.
15   Q.    Again, you never talked to Dr. Waller
16 about this exchange after --
17   A.    Not about --
18   Q.    -- it happened on the --
19   A.    -- this exchange, no.
20   Q.    Did you ever discuss the substance of
21 this exchange, or something akin to it, about the
22 expectations of the client?
23   A.    Perhaps later that -- when we were
24 talking about what -- what we had been able to
25 retrieve so far, and how we had -- let me just

Page 231

1  read this.  How Mike had explained very
2  patiently, very calmly, very slowly, whether it
3  was with -- or through Lianchao or through
4  Yvette, how the process works.
5         So, if Guo wanted to speed up and get
6  everything really fast, then all the trap doors,
7  all the doors that we had been able to open
8  quietly, would be slammed shut.  If Guo would
9  just be patient and let us get into where we
10 needed to go quietly, he was going to get an
11 awful lot of information back.
12        The irony is, that had he just relaxed
13 and stayed on top of this, that is Guo, he would
14 have had a huge amount of information three
15 months a year in.  Huge.  We can't fix somebody's
16 perception of how this is done.  He was very
17 impatient.
18   Q.    When did you understand that Mr. Guo
19 was getting impatient?
20   A.    I guess around -- well, certainly on
21 the 26th, when we sort of had our lunch with him,
22 and then -- and then I think possibly through
23 Lianchao; because, as I told you, we never had
24 any direct contact with -- with Guo.  It was
25 always through Lianchao or Yvette.

Page 232

1    Q.    Right.
2    A.    Yvette was taken off the case in, as we
3  understand it, beginning the 1st of February.
4  And then she -- she sent us an email saying she
5  was no longer in it, that only to -- to
6  communicate with Lianchao.
7    Q.    Did Strategic Vision adjust its
8  research approach based upon this request for
9  more immediate results?
10   A.    No.  In fact, we actually increased the
11 pressure on Team 1, and then went and had a
12 long -- several meetings with potential Team 2,
13 and that's another side of it.
14   Q.    Is that a company that goes by the
15 acronym ASOG?
16   A.    Yes.  In Dallas.  Outside of Dallas.
17   Q.    And why was it that ASOG was contacted
18 in connection with this research agreement?
19   A.    Because we had the option of being able
20 to bring in whatever teams we felt were going to
21 be additionally viable, and also on the domestic
22 side of some of the things that we were bumping
23 into, or Mike and his team were bumping into on
24 the international side, which were not pretty.
25        So, we were given the names of the

Page 233

1  fellows who had been with NSA, DIA, whatever,
2  in -- in -- in Dallas, and we went and met with
3  them, and they told us -- they looked at -- we
4  only gave them like a couple of names, we never
5  gave them the whole file.
6         And they looked at it, and then we went
7  back about a week later maybe, it might even have
8  been ten days later, a week later, and they were
9  totally freaked out.  They said, you can't touch
10 any of these people or any of these names.  We
11 said, what are you talking about?
12        That's when they said, these are all
13 RPs.  We will all go to jail if you start fooling
14 around in their files.
15   Q.    So when did you first meet with ASOG,
16 that meeting in Dallas you just described?
17   A.    Yeah, it would have been the beginning
18 of February, I should think.  Again, Mike has the
19 date.
20   Q.    Is there any reason a second team
21 wasn't assembled at the outset of the agreement?
22   A.    We did -- because of the element of
23 retrieval we had to do outside of the United
24 States, because he wanted it so fast and so
25 quickly and intensely, that that was the fastest,

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 234

1  quickest way of getting into certain files had
2  they not all -- had some of them not been fake,
3  then we would have had no -- we wouldn't have
4  gone to the second -- second dimension.
5       Q.    And the decision to go with the second
6  team, was that Strategic Vision's --
7       A.    Mine --
8       Q.    -- decision or Dr. Waller's?
9       A.    Mine and Mike's, yeah.
10      Q.    Jointly?
11      A.    Jointly.
12      Q.    Okay.
13      A.    We both went down twice.
14      Q.    And you said RP.  What does RP mean?
15      A.    Restricted persons.
16      Q.    And in your career in this
17  investigatory field, have you encountered
18  restricted persons before or --
19      A.    Yes and no.  It's had different
20  acronyms.  Sometimes it's PP, protected persons.
21  Sometimes it's RP.  But it means that it is
22  either under a watch list by the U.S. Government
23  or it is a -- or, let's just say a certain agency
24  has tagged these individuals and is watching them
25  themselves.  So we cannot enter into those files

Page 235

1  at all in the U.S.
2       Q.    And these files you're talking about,
3  are these files government files or what kind of
4  files are they?
5       A.    Your Exhibit 7, these names, all of
6  these names.  We can't -- we don't know, because
7  we certainly were not peeking into those
8  government files.
9       Q.    Oh, they're government files you're
10  talking about?
11      A.    Yes.  These are U.S. intelligence
12  files.
13      Q.    I see.  And sometimes those files are
14  accessible, if they're not records protected --
15  or, I'm sorry, restricted persons?
16      A.    It just depends on the jurisdiction of
17  where you're looking into the file.  We would
18  never do anything that would be anti-U.S. law.
19  And he was asking us to continue doing that, Guo
20  was.
21      Q.    But just in terms of these people who
22  you -- ASOG told you were restricted persons.
23  There are some people, obviously, that are not
24  restricted persons, is that fair to say?
25      A.    I have no idea.  Because we didn't give

Page 236

1  them the whole file.  We only gave them like, I
2  don't know, maybe four or five names.
3       Q.    Okay.  But what I'm just trying to
4  understand is --
5       A.    And I --
6       Q.    -- and I know this sounds like a basic
7  question --
8       A.    Right.
9       Q.    -- and I apologize.  But are all people
10  restricted persons in intelligence files or
11  government files?
12      A.    No.
13      Q.    Okay.  So there are certain people --
14      A.    No, no, no, no, no.  These were tagged.
15      Q.    Specially tagged?
16      A.    These were tagged.  And I -- again, you
17  would have to ask Mike.  I don't know if it was
18  the whole file that was tagged or if it was just
19  four or five names they ran through the system.
20      Q.    I see.
21      A.    But they were all tagged; flagged,
22  tagged, whatever you want to call it.
23      Q.    So when did you convey to the client
24  that there was this restricted persons
25  designation on some of the fish?

Page 237

1       A.    We did that through Lianchao.
2       Q.    And when was that?
3       A.    Sometime in the middle of February, I
4  think, by the time we had gotten -- we had been
5  down to -- to Dallas.
6       Q.    And so you went to Dallas with
7  Dr. Waller?
8       A.    Twice.  Twice we went to see him.
9  Twice.  Or see them twice.  The irony was, we
10  then saw this group at a function in Washington,
11  at an intel or security defense function several
12  months later, and they said to us -- they said to
13  us, well, it's really weird, because they already
14  had figured out it was Guo that was the client.
15             We never told them who the client was.
16  So they told -- they -- they said, well, they
17  figured out it was Guo, and they said about a
18  week or so after we had been down there the
19  second time, that Guo had people go down to talk
20  to them.
21             And we never told anybody who they
22  were.  We didn't tell Lianchao who they were.  We
23  didn't tell anyone.  This was just between Mike
24  and me.  So that was very weird.
25      Q.    Do you think that was just a

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 238

1  coincidence or is that --
2       A.    I would find it an extraordinary
3  coincidence.  These guys are so deep-sixed that,
4  just even to physically find them is like
5  difficult.
6       Q.    So deep-sixed, you mean they're
7  inaccessible or --
8       A.    Inaccessible.
9       Q.    -- they keep a low profile?
10      A.    Yeah.  They had a very low profile and
11 they had a very low profile location.
12      Q.    And how is it that you knew about them,
13 ASOG?
14      A.    Through Mike and one of his people.
15      Q.    And so, did there come a time when ASOG
16 said, well, we can't do any research on this
17 because of this --
18      A.    That's right.
19      Q.    -- records protected status?
20      A.    Yes.  That's right.
21      Q.    I understand you're eager to move
22 forward, but, just for the court reporter, just
23 please wait for me to ask the question.
24            Could Strategic Vision still perform
25 some research, though, even though some of the

Page 239

1  individuals were designated as records protected,
2  or restricted persons, I'm sorry?
3       A.    We did not know at that point, and by
4  that time we got some kind of service for a
5  lawsuit.  And our teams, we had to let our teams
6  overseas know on the 23rd of February that they
7  had to stop.
8       Q.    I just want to ask this, though.  Could
9  Team 1 still do its job, even though ASOG found
10 that certain individuals were, as you described,
11 records protected?
12      A.    That's -- that's a question I'd have to
13 leave for a lawyer in the -- in the IC,
14 intelligence community, to answer.  We wouldn't
15 want to do anything that would be illegal.
16      Q.    So you didn't direct Team 1 to stop its
17 work when ASOG gave its report to you that people
18 were records protected?
19      A.    We did.  Mike did.  He did talk to
20 them.  And even though the -- he told them to
21 stop doing anything that looked like it was
22 peeking into something that they shouldn't be
23 looking into.
24            It's one thing to peek into somebody's
25 license, driver's license number, or their --

Page 240

1  their new address, or some sort of preliminary
2  stuff that was being brought up, but if you were
3  getting into deeper stuff, you couldn't touch it.
4  You shouldn't touch it.  And I'm sure he conveyed
5  that to the -- to the Team 1 leader.
6       Q.    So it's your understanding -- Strategic
7  Vision's understanding that Team One's work was
8  curtailed because of the discovery that certain
9  fish were restricted persons or records
10 protected?
11      A.    That's correct.
12      Q.    And that was on or about January 30th,
13 or whereabouts?
14      A.    No, no, no, no, no, no, no.  This was
15 way into the middle, the 15th to the 20th,
16 something in there, of February.
17      Q.    That's when ASOG conveyed to you
18 that --
19      A.    Yes.
20      Q.    -- you were -- okay.
21            So let's just get a clear record then.
22 When did ASOG tell you that certain people
23 were -- certain fish were records protected?
24      A.    At some point in Feb -- in the middle
25 of February 2018.

Page 241

1       Q.    And then is it your understanding that
2  Mike, very shortly thereafter, conveyed this
3  information to Team 1?
4       A.    That's correct.
5            MR. GRENDI:  Let's do Exhibit 13.
6            (Wallop Exhibit 13, Letter dated
7       February 23, 2018, marked for
8       identification.)
9       Q.    Do you recognize this document,
10 Ms. Wallop?
11      A.    Actually, I never saw the letter.  I
12 gather it delivered to -- it says here it was
13 delivered to -- by hand delivery and electronic
14 mail to me, but I was out of the country, and
15 they had, in fact, sent it to the Nevada address.
16      Q.    The Nevada address, is that Strategic
17 Vision's?
18      A.    Strategic Vision's Nevada agent
19 address, yeah.
20      Q.    Does Strategic Vision have an office in
21 Nevada?
22      A.    We have an agent.
23      Q.    Do you have a physical --
24      A.    Yes, it's an address.
25      Q.    -- location that you can --

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 242

1    A.    Yes.  It's on all the documents
2  somewhere.
3    Q.    I'm asking if Strategic Vision has like
4  an office with --
5    A.    No.  It's an agent.  It's an LLC.
6  That's where they set them up.  Like Wyoming.
7    Q.    And what's in Wyoming, I'm sorry?
8    A.    LLCs.  There are a lot of LLCs and
9  corporate trusts and so forth set up in Wyoming,
10  as there are in Nevada.
11    Q.    Those are your corporate trusts and
12  LLCs?
13    A.    No.
14    Q.    I just want to clear it up.
15         You just mean it's a popular state for
16  incorporation?
17    A.    Correct.
18    Q.    Thank you.
19         So when did you first see this letter?
20    A.    Oh, when I probably returned from the
21  Middle East; I think it was probably, I don't
22  know, the first or second week of March.
23    Q.    Were you surprised by the letter?
24    A.    I thought it was idiotic, yes.
25    Q.    Why did you think it was idiotic?

Page 243

1    A.    Because we heard nothing from them.  We
2  were continuing to do the work.  And it was
3  silly.
4    Q.    What work was Strategic Vision doing
5  after January 30th that --
6    A.    All of February.  Or up until the 23rd
7  of February, to be precise.
8    Q.    And were there any meetings with
9  Lianchao Han and Mr. Guo after January 30, 2018?
10    A.    Not with us, no.
11    Q.    With whom, then?
12    A.    With Mike and myself, no.  With
13  Lianchao and Guo, possibly.  I don't know.
14    Q.    Let me ask this then.  Did you or
15  Dr. Waller meet with Lianchao after January 30,
16  2018 concerning this contract?
17    A.    That's a good question.  I doubt it,
18  because I didn't know that there was any issue
19  other than, you know, we were doing our best and
20  pedaling fast.
21    Q.    So Strategic Vision didn't deliver any
22  information to Lianchao, or certainly Yvette,
23  after January 30, 2018?
24    A.    We could have.  I'd have to ask Mike.
25    Q.    You didn't do it personally?

Page 244

1    A.    I personally did not, no.
2    Q.    Do you know if Dr. Waller did that
3  or --
4    A.    Well, he did on the 30th, obviously.
5    Q.    Right.  I'm talking about after the
6  30th.
7    A.    Okay.  Well, I don't know.  I don't
8  know.
9    Q.    Okay.  It says, "Eastern agreed to
10  delay the start of the contract by ten days from
11  January 6th to January 16th."  Do you see that on
12  the first page, Eastern 198?
13    A.    Yes.
14    Q.    Is that the ten-day grace period or
15  accommodation that you were talking about --
16    A.    Correct.
17    Q.    -- regarding the January --
18    A.    Yes.
19    Q.    -- 26, 2018 meeting?
20    A.    Yes.
21    Q.    Thank you.
22         Did Strategic Vision attempt to contact
23  Mr. Guo or Lianchao or Ms. Wang after receipt of
24  this letter?
25    A.    Well, Yvette had been taken off the

Page 245

1  case.  She was forbidden, apparently, to have
2  anything to do with it.  So the only two people
3  that would have been contactable would have been
4  Lianchao and I'm sure that -- again, I'm not sure
5  of the dates, but I'm sure -- and Lianchao
6  travels, too, so I'm not sure where he was in
7  February, but I'm sure that both Mike and I must
8  have had some conversation with him in February,
9  after this.
10    Q.    But you don't remember that, sitting
11  here today, what that conversation was like?
12    A.    No.  Well, I mean, we were very
13  surprised and very unhappy, and we'd been working
14  hard to -- to do what Guo wanted, so...
15    Q.    And did Lianchao say anything back to
16  you, or what was discussed?
17    A.    I think he said that, you know, Guo
18  gets upset all the time about a lot of things,
19  and so maybe we -- he could smooth it over and
20  calm him down and so forth.  And then we just, I
21  think, hoped that that would happen, and it
22  didn't.  So then the -- this thing was done, so
23  we just stopped.
24    Q.    You mean this lawsuit?
25    A.    Yes.

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 278

1  activities recruiting, vetting, engaging and
2  marshaling the initial efforts of the various
3  investigators and analysts in The United States,
4  Europe and the Middle East."  Do you see that?
5      A.    I do.
6      Q.    Did Eastern ever engage any analysts in
7  the Middle East?
8      A.    Eastern?
9      Q.    Oh, I'm sorry, Strategic Vision.  Did
10 Strategic Vision ever engage any analysts in the
11 Middle East?
12     A.    It could have, and I wouldn't know.  It
13 could have been done through Team 1.
14     Q.    Wasn't Team 1 located in Europe?
15     A.    They were, but they could have -- they
16 all have links.
17     Q.    Okay.  Let me ask you this then.  So is
18 it your understanding that Team 1 could farm out
19 its responsibilities to other teams to help it
20 get information?
21     A.    It was all part of the team.
22     Q.    Right.  What I'm asking is, did Team 1
23 have subteams?
24     A.    No.  They would have had teams that --
25 well, if you call them subteams, they weren't.

Page 279

1  They were part of the original team.  And if they
2  used people in the Middle East or Europe or
3  wherever -- you know, the dark web has no
4  geographical location, so it could have been
5  anywhere that they were -- they were challenging
6  each other to find what they needed to find.
7  That's how it works.
8      Q.    But you understood Team 1 was located
9  in Europe, correct?
10     A.    Yes.
11     Q.    And Team 2 wasn't -- well, Team 2 was
12 ASOG, correct?
13     A.    Correct.
14     Q.    And Team 2 is located in The United
15 States?
16     A.    Correct.
17     Q.    And ASOG wasn't contacted until what
18 time?
19     A.    I answered that before.
20     Q.    Was that about February, middle --
21     A.    The beginning of February, and then
22 beginning to the 5th -- I don't know, 5th of
23 February.  I have to go back and look.
24     Q.    And what was the recruiting process?
25     A.    Mike and I were using our channels.

Page 280

1      Q.    And what vetting was done to select
2  the -- well, what vetting was done to select Team
3  1?
4      A.    Experience.
5      Q.    So just Dr. Waller's experience with
6  Team 1?
7      A.    Yes.
8      Q.    Let's look at paragraph 62.  Paragraph
9  62 says that, "Mr. Guo provided to Strategic
10 Vision a list of 92 potential subjects with no
11 prioritization."  Do you see that in the middle
12 of the paragraph there?
13     A.    I do.
14     Q.    And what list was that that had just 92
15 non-prioritized names?
16     A.    Exhibit 7.
17     Q.    So you didn't understand that there was
18 any priority to the 15 names that are in very
19 large font with numbers next to them?
20         MR. SCHMIDT:  Objection.  Go ahead.
21     A.    No, I would not -- I would not agree
22 with that.  We numbered them as to priority.
23     Q.    Well, you received the document with
24 the numbers next to -- let's just say, if you
25 look at the first page?

Page 281

1      A.    Yes.
2      Q.    It says Anita Suen --
3      A.    Yeah.
4      Q.    -- and it has a big 1 next to it?
5      A.    Yes.
6      Q.    It also has the types of reports, does
7  it not?
8      A.    Correct.
9      Q.    Did you not understand that that meant
10 that Anita Suen would be one of the fish?
11     A.    She was the first fish.
12     Q.    Right.
13     A.    She was the most important fish for
14 him.
15     Q.    Right.
16     A.    So the first, more or less, 15 in here
17 were the first -- were the first 15 fish that he
18 was talking about.
19     Q.    And there happens to be exactly 15
20 names with a number next to it and the number of
21 reports that were requested, and the types of
22 reports?
23     A.    Pretty much, yes.  You'd have to count
24 the names of the fish, yeah.  If you can see --
25 so you can't go by the page number, in other

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 282

1    words. You have to go by the subject. See,
2    like, here is the second fish (indicating).
3        Q.    Right.
4        A.    So the second fish is on page 11.
5        Q.    Right.
6        A.    Okay. So you -- you'd have to go -- so
7    these 15 fish are in here at least -- at least 15
8    fish in here.
9        Q.    And you understood that those were
10   the -- or Strategic Vision understood that those
11   were the 15 fish that the research was supposed
12   to start on, correct?
13       A.    Yes.
14             MR. SCHMIDT: Objection.
15       Q.    Do you still have the virgin laptop
16   that's described in paragraph 63?
17       A.    Yes.
18       Q.    And do you just have a ton of these
19   virgin laptops lying around, because of your --
20   Strategic Vision's work?
21       A.    On this specific issue, we had two
22   domestic ones, ones here, and then a battery of
23   ones overseas.
24       Q.    Could Strategic Vision get those
25   laptops if they request -- it requested them from

Page 283

1    Team 1?
2        A.    Never. They've been destroyed. They
3    were destroyed on purpose, because we would
4    destroy them every week so that there was no
5    tracing to the IP number.
6        Q.    So it's Strategic Vision's practice to
7    regularly destroy these laptops for security
8    purposes?
9        A.    Those particular ones, yes. We did not
10   destroy the two that we had.
11       Q.    Paragraph 66, it says, "at the time the
12   agreement was negotiated with Mr. Guo, Strategic
13   Vision and Mr. Guo expressly agreed that they
14   would not meet in person again." Do you see
15   that?
16       A.    Yes.
17       Q.    Was that maintained or followed?
18       A.    He kept insisting on wanting to meet
19   us, and we kept trying to explain to him that
20   every time we went in and out, we were being
21   photographed. We didn't like that. We did not
22   want to be identified with his programs.
23       Q.    And, by photographed, do you mean going
24   in and out of his apartment building?
25       A.    Yes.

Page 284

1        Q.    Who did you understand was doing that
2    surveillance, you mean the building security or
3    the --
4        A.    Oh, any number of people could easily
5    do the -- the security. Mike's face is very
6    recognizable, people who knew who Mike was;
7    anybody in the Chinese communist party would have
8    made us, so...
9        Q.    I see. But Strategic Vision did meet
10   with Mr. Guo repeatedly after the contract was
11   signed?
12       A.    We tried not to.
13             MR. SCHMIDT: Objection.
14             THE WITNESS: Oh, sorry.
15             MR. SCHMIDT: It's okay.
16       A.    We tried not to. We explained to him
17   after about maybe the fourth time that we just
18   couldn't do that anymore, it was just really
19   dangerous for him and dangerous for us.
20       Q.    Just so we're clear. The last time you
21   personally met with Mr. Guo was -- was that
22   January 30th?
23       A.    That was the 26th. No, it was the 26th
24   of January, because the 30th was when Mike met
25   with Yvette at Union Station.

Page 285

1        Q.    Got it.
2        A.    Or Penn Station.
3        Q.    When did Mr. Guo summon you to his
4    yacht in Florida?
5        A.    That must have been sometime -- it
6    might have been at the 26th meeting, January 26,
7    2017 -- 2018.
8        Q.    But I take it that yacht meeting never
9    happened?
10       A.    No. We refused to go. It was not
11   safe.
12       Q.    Let's go to paragraph 68. It says
13   "Strategic Vision learned that most of the
14   individuals so identified by Eastern have been
15   designated by the U.S. Department of State under
16   the Obama administration as records protected
17   persons, meaning that information concerning
18   their status and activities was not subject to
19   disclosure under any circumstance." Do you see
20   that?
21       A.    That's correct.
22       Q.    And did that in any way hinder Team
23   One's efforts, the records protected persons
24   designation?
25       A.    Actually, the curious thing is here, we

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 286

1  did not alert Eastern, we alerted Guo and we
2  alerted Lianchao, and -- and I believe that
3  Yvette was alerted -- no, I don't think -- Yvette
4  may not have been alerted because that was -- by
5  that time, it was in February.
6      Q.   It says most of the individuals.  Is
7  that most of the fish?
8      A.   Yes.
9      Q.   Is it fair to say that ASOG only looked
10  into five individuals on the list?
11     A.   I don't know how many they looked into.
12  Again, you would have to ask Mike.  They could
13  have looked into all of them.  I honestly don't
14  remember.
15     Q.   Let's look at paragraph 70.
16     A.   70?
17     Q.   7-0, yeah.
18     A.   Okay.
19     Q.   It says, "Strategic Vision verbally
20  reported to Mr. Guo and Eastern that Strategic
21  Vision could not within the limits of U.S. law
22  obtain the information sought by Eastern on its
23  initial list of subjects and that Strategic
24  Vision's work would be refocused upon others on
25  Eastern's list."

Page 287

1          Do you remember when you told
2  Mr. Guo --
3      A.   That must have --
4      Q.   -- this information?
5      A.   That must have been through Lianchao.
6  And you keep using the word Eastern.  It would
7  have been --
8      Q.   I was just reading the complaint.
9      A.   Yeah, but it's -- it's not Eastern.
10  It's Guo.  And I think it would have been -- that
11  would have been at the -- that would have been at
12  the -- at the January 26th lunch.
13     Q.   It says, "As a result, Mr. Guo became
14  enraged"?
15     A.   Yes.  He was -- I thought he was going
16  to jump on the table.
17     Q.   "And irrationally insisted that
18  Strategic Vision immediately deliver its work
19  product"?
20     A.   That's correct.  And continue to dive
21  into illegal areas.  And we said, we can't do
22  that.  That's when Mike apologized and said,
23  we're really sorry, but, you know, there are
24  certain things we can do, and we'll get, but
25  there are other things we can't do, and we --

Page 288

1  you'll be in bigger trouble than we will.
2  They'll send you back to China.
3      Q.   Going to paragraph 71.  It says:
4          "In the face of Eastern's insistence,
5  however, Strategic Vision hand-delivered its raw
6  data to Mr. Guo and Eastern on January 26, 2018,
7  with the caveat that it would be of no use to
8  Eastern until Strategic Vision had an opportunity
9  to analyze it and produce a formal report"?
10     A.   Yes, that's correct.  And formal report
11  would have meant, not just sort of a -- a file
12  that had been encrypted, but it also needed to
13  have Chinese translation, as I understood it, and
14  also needed to have -- and also needed -- there
15  are certain lines of code.
16         Look, I'm not a code expert, but there
17  are lines of code that people have to go through
18  and actually sort of translate into a language,
19  and he kept -- and it takes time to actually
20  translate that code.  You can't just stick it
21  into a machine and expect it to happen.
22         So we gave him the raw code, I believe,
23  on both the 26th and the 31st, or the 31st of
24  January, those two different USB keys.
25     Q.   Then it says, "until Strategic Vision

Page 289

1  had an opportunity to analyze it and produce a
2  formal report."  How would that work?
3      A.   Well, we needed to be able to take that
4  USB key back to the Team 1 to have them go
5  through and -- and configure however it was
6  supposed to be done.  And that was not -- that
7  was not my area, that was Mike's area, and Mike
8  can explain that really succinctly to you.
9      Q.   Paragraph 74.  There's a reference to a
10  wire reversal?
11     A.   Yes.
12     Q.   How did that attempted wire reversal
13  come to your attention?
14     A.   That was wild.  I got a call, like,
15  about the -- I have to see, I think it was around
16  the 12th or the 16th or something like that of
17  January 2018, and -- from Citibank wire
18  department saying that there'd been a request to
19  have 499,000 and some change reversed back to the
20  sender.  And I said, well, what are you talking
21  about?  She said, well, we've gotten a request.
22         So then I called one of my private
23  bankers at Citibank and I said, can this be done?
24  I've never heard of such a thing.  He said,
25  absolutely not, it can never be done.  Once the

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 306

1  understanding at that time that Yvette was on the
2  telephone with Mr. Guo.
3          Did you ask Yvette to ask Mr. Guo if he
4  would personally sign the contract?
5      A.   No.
6      Q.   And how long was that meeting at which
7  you found out that Eastern would be signing, and
8  you and Yvette signed the contract?
9      A.   I have no idea.  It was during that
10  moment when she had the paperwork and we made the
11  changes, we agreed to the changes, she signed,
12  and then I signed, and it had Eastern on the top.
13  That's all I know.
14     Q.   All in all, two hours?
15     A.   Maybe.  Let's call it two hours, to
16  make you happy.
17     Q.   No, not -- I want the truth.  No answer
18  is going to make me happy.
19     A.   Two hours is fine with me.
20     Q.   I just want the truth.
21     A.   Two hours is fine.
22     Q.   Two hours?
23     A.   Sure.
24     Q.   And your understanding is that this
25  contract was the culmination of the conversations

Page 307

1  that you had had with Mr. Guo about the
2  investigative services that Strategic was going
3  to provide?
4      A.   He hired us, not Yvette.
5      Q.   So this contract was the culmination of
6  those conversations?
7      A.   Yes.
8          MS. TESKE:  Okay.  I have nothing
9  further.
10         MR. SCHMIDT:  I have no questions.
11  Thank you.
12         THE WITNESS:  Cheers.
13         MR. SCHMIDT:  Let him go off the
14  record.
15         THE VIDEOGRAPHER:  This concludes
16  today's deposition.  The time is 5:57.
17
18         (Whereupon, the within proceedings
19  concluded at 5:57 p.m., on the
20  12th day of February, 2019.)
21
22         *       *       *       *       *
23
24
25

Page 308

1          D E C L A R A T I O N
2
3      I hereby certify that having been first
4  duly sworn to testify to the truth, I gave the
5  above testimony.
6
7      I FURTHER CERTIFY that the foregoing
8  transcript is a true and correct transcript of
9  the testimony given by me at the time and place
10  specified hereinbefore.
11
12
13         _____
14              FRENCH WALLOP
15
16
17
18  Subscribed and sworn to before me
19
20  this _____ day of _____ 20___.
21
22
23  _____
24      NOTARY PUBLIC
25

Page 309

1                   ERRATA SHEET
2
3  NAME OF CASE:  EASTERN PROFIT v STRATEGIC
4  DATE OF DEPOSITION:  Tuesday, February 12, 2019
5  NAME OF WITNESS:  FRENCH WALLOP
6  PAGE LINE   FROM                TO

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 310

```
 1                REPORTER'S CERTIFICATE
 2
 3   STATE OF NEW YORK  )
 4                          ) ss.
 5   COUNTY OF NEW YORK )
 6
 7          I, ROBERTA CAIOLA, a Shorthand Reporter
 8   and Notary Public within and for the State of New
 9   York, do hereby certify:
10          That FRENCH WALLOP, the witness whose
11   deposition is hereinbefore set forth, was duly
12   sworn by me and that such deposition is a true
13   record of the testimony given by such witness.
14          I further certify that I am not related
15   to any of the parties to this action by blood or
16   marriage and that I am in no way interested in
17   the outcome of this matter.
18          In witness whereof, I have hereunto set
19   my hand on this date, February 21, 2019.
20
21          Roberta Caiola
22          _____
23                ROBERTA CAIOLA
24
25
```