# Exhibit QQ

**Atkinson-Baker, Inc.**
**www.depo.com**

```
 1              UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF NEW YORK

 3      _____

 4      Eastern Profit Corporation, )

 5                  Plaintiff,      )

 6      V.                          )    Civil Action No.

 7      Strategic Vision U.S, LLC,  )    1:18 CV 02185

 8      Defendant.                  )

 9      _____

10

11              C O N F I D E N T I A L

12

13

14          Videotaped Deposition of Bill Gertz

15              Tuesday, October 15, 2019

16

17      ATKINSON-BAKER, INC.
        COURT REPORTERS
18      (800) 288-3376
        www.depo.com
19      Reported by:  Jackie Smith

20

21
```

**Atkinson-Baker, Inc.**
**www.depo.com**

E X H I B I T S

| No. | Description | Page |
|-----|-------------|------|
| 1 | E Mail, 11 11 17 | 11 |
| 2 | News Article | 61 |
| 3 | News Article | 83 |

(EXHIBITS RETAINED)

Page 6

P R O C E E D I N G S

(12:03 a.m.)

THE VIDEOGRAPHER:  I am Jeffrey Elam, your videographer, and I represent Atkinson Baker, Incorporated in Glendale, California.

I am not financially interested in this action, nor am I related or employed of any attorney or any party.  The date is October 15, 2019.  The time is 12:03 p.m.

This deposition is being taking place at Kropf Moseley PLLC, 1100 H Street, Suite 1220, Washington, D.C.  The Case is filed in the United States District Court for the Southern District of New York, Case No. 18 CV 2185(K) excuse me, (JGK), entitled Eastern Profit Corporation, Limited versus Strategic Vision U.S., LLC.

The deponent is Bill Gertz.  This deposition is being taken on behalf of the defendant.  Your court reporter is Jackie Smith from ELSS Executive Reporting.

Counsel will now please introduce

Page 7

themselves.  Counsel, please introduce yourselves

MS. KROPF:  I am Sara Kropf.  I represent the witness.

MS. LUETKEMEYER:  Lucinda Luetkemeyer on behalf of the defendant and counter claimant, Strategic Vision.

MS. CLINE:  Joanna Cline, Pepper Hamilton, on behalf of Eastern Profit.

THE VIDEOGRAPHER:  Will the court reporter please swear in the witness.

(Whereupon, witness was duly sworn.)

BY MS. LUETKEMEYER:

Q.  Good morning, Mr. Gertz.

A.  Good morning.

Q.  We met earlier.  I am Lucinda Luetkemeyer and I represent, Strategic Vision, the defendant in this action.  You are here today for your deposition.

Have you ever been deposed before?

A.  Yes.

Q.  And when was that?

Page 8

A.  Many years ago.

Q.  Do you remember what action it was in?

A.  I don't.

Q.  Okay.  So if you have been deposed before, it's fair to say that you understand what a deposition is?

A.  Yes.

Q.  You take an oath to tell the truth and you understand that's the whole truth to the full extent of your knowledge?

A.  Yes.

Q.  If you answer a question that I ask, I'm going to assume that you understood my question; is that fair?

A.  Okay.

Q.  And if you need clarification or if I speak too quickly, which sometimes I do, please just ask me to rephrase it and I will.

And I will also ask you to please give verbal answers like yes or no instead of um hum or uh

Page 9

3 (Pages 6 to 9)

**Bill Gertz**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

1    huh,  just so it's clear for the court reporter; is
2    that fair?
3         A.   Okay.
4         Q.   Mr. Gertz, I see that your Counsel
5    has provided me with one document that you brought
6    with you today.
7         Do you have a copy of that in front of you?
8         A.   Yes, I do.
9                        - - - -
10   (Exhibit No. 1 marked for identification.)
11                       - - - -
12        Q.   I'm going to go ahead and mark this
13   as Exhibit 1.  And what is this document, Mr. Gertz?
14        A.   It appears to be an e mail from
15   French Wallop.
16        Q.   And that's to you, correct?
17        A.   Yes.
18        Q.   And this e mail is dated November
19   11th of 2017?
20        A.   Yes.
21        Q.   And do you remember what prompted

Page 10

1         Q.   And did you, in fact, use this Signal
2    ap to auto delete the messages that you received?
3         A.   Yes.
4         Q.   Do you how long you had the setting
5    for, one day, ten minutes?
6         A.   No, I don't remember.
7         Q.   Do any of the messages with
8    Ms. Wallop remain on your Signal ap?
9         A.   No.
10        Q.   What about messages with Mr. Waller?
11        A.   No.
12        Q.   Did you ever communicate with
13   Mr. Waller over Signal?
14        A.   I can't remember.
15        Q.   Did you ever use any encrypted
16   message Aps in this matter?
17        A.   No.
18        Q.   Okay.  Did you ever communicate with
19   Mr. Guo via Signal?
20        A.   Yes.
21        Q.   Okay.  And do any of those

Page 12

1    this e mail?
2         A.   I do not.
3         Q.   And how did you discover this e mail?
4         A.   I did a search of my e mail.
5         Q.   And was that in response to the
6    document request that we sent your Counsel?
7         A.   Yes.
8         Q.   And this is the only receptive
9    document you had in response to that request?
10        A.   Yes.
11        Q.   And I see that this e mail is
12   regarding the use of an encrypted messaging ap called
13   Signal, is that correct?
14        A.   Yes.
15        Q.   And after Ms. Wallop sent you this e
16   mail, did you, in fact, communicate with her via
17   Signal?
18        A.   Yes.
19        Q.   And Signal has a functionality where
20   you can delete messages automatically, does it not?
21        A.   Yes.

Page 11

1    communications remain?
2         A.   No.
3         Q.   Okay.  And did you search your
4    standard e mail for communications responsive to the
5    request as well?
6         A.   Yes.
7         Q.   In your normal phone and text
8    messages also?
9         A.   Yes.
10        Q.   And no responsive communications
11   remained?
12        A.   No responsive communications
13   remained.
14        Q.   To your recollection, about how many
15   messages would you say you had over Signal with
16   Ms. Wallop?
17        A.   I don't know.
18        Q.   If you gave your best estimate, would
19   you say under 50?
20        A.   I'd say, yes.
21        Q.   Okay.  And did you use the ap, What's

Page 13

4 (Pages 10 to 13)

**Bill Gertz**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

1    Ap, to communicate with Mr. Guo?
2        A.   No.
3        Q.   Okay.  Did you ever use What's Ap to
4    communicate with Ms. Wallop?
5        A.   No.
6        Q.   And do you have any hard copy
7    documents in your possession related to this matter?
8        A.   No.
9        Q.   Okay.  Any handwritten notes?
10       A.   No.
11       Q.   I don't think I have any more
12   questions about this exhibit now, but we might come
13   back to it later, so feel free to keep it in front of
14   you.  Thank you.
15       Mr. Gertz, how did you prepare for today's
16   deposition?
17       A.   I just, basically, got ready to talk
18   about this case.
19       Q.   And did you meet with anyone to
20   prepare for today's deposition?
21       A.   No.

Page 14

1    the pleadings in this case?
2        A.   No.
3        Q.   So you haven't seen the complaint or
4    the counterclaim?
5        A.   No.
6        Q.   Do you know, generally, what this
7    case is about?
8        A.   Vaguely.
9        Q.   And how do you have knowledge of
10   that?
11       A.   I think it was from some news reports
12   about a contract dispute.
13       Q.   Okay.  And that might have been the
14   news reports from earlier this summer?
15       A.   Yes.
16       Q.   Okay.  And did you show this document
17   that we discussed earlier, Exhibit 1, to anyone other
18   than your attorney before today?
19       A.   No.
20       Q.   Did anyone instruct you not to
21   provide documents responsive to our request?

Page 16

1        Q.   Did you meet with your lawyer?
2        A.   Yes.
3        Q.   Okay.  Did you   I'm not going to
4    ask you about your communications with your lawyer
5    because those are privileged, but did you meet with
6    anyone other than your lawyer to talk about this
7    deposition?
8        A.   No.
9        Q.   Did you speak with Ling Cho Hann
10   (phonetic) about this deposition?
11       A.   No.
12       Q.   Did you speak with Mr. Guo about this
13   deposition?
14       A.   No.
15       Q.   And have you reviewed any other prior
16   depositions taken in this case?
17       A.   No.
18       Q.   Okay.  So you haven't seen French
19   Wallop's deposition, for example?
20       A.   No.
21       Q.   Okay.  Have you ever reviewed any of

Page 15

1        A.   No.
2        Q.   Let's start with going into your
3    background a little bit, your education and your
4    profession.  Can you just tell me a little bit about
5    you, and what you do, and how you arrived to your
6    position today?
7        A.   I am a journalist and author.  I work
8    for The Washington Times, and until recently, The
9    Washington Beacon.  I have written eight books.
10   I have -- I was educated at Washington College in
11   Chester Town, Maryland and also at George Washington
12   University in Washington, D.C.
13       Q.   And do you also occasionally do
14   speaking engagements?
15       A.   Yes.
16       Q.   And how often would you say you do
17   speaking engagements?
18       A.   Maybe once every two to three months.
19       Q.   Is that around the country or mostly
20   around here?
21       A.   It could be locally or it could be

Page 17

5 (Pages 14 to 17)

**Atkinson-Baker, Inc.**
**www.depo.com**

1  around the country.
2      Q.   And do you have a company that
3  arranging those for you or do you have an LLC that you
4  do speaking engagements through?
5      A.   No.
6      Q.   Just available to book you through
7  your website?
8      A.   Yes.
9      Q.   So if someone wanted to book you to
10 do a speech at a college or university, how would they
11 get in touch with you?
12     A.   Probably through phone.
13     Q.   Do you have a book agent?
14     A.   Yes.
15     Q.   And who is your agent?
16     A.   Joseph Valerie.
17     Q.   And what company does he work for?
18     A.   He passed away recently, last year.
19     Q.   Oh, sorry.  Okay.  Do you have anyone
20 new that you work with?
21     A.   No.

1  promotion of radio and television.
2      Q.   And when did your appearances on
3  radio and TV begin?
4      A.   That would probably be around
5  September 3rd, after that.
6      Q.   And are they ongoing, those
7  appearances?
8      A.   Yes.
9      Q.   When is the last one that you had?
10     A.   I think I was on the Adam Carolla
11 Podcast last week.
12     Q.   That must have been interesting.  And
13 you were Fox News last week as well, correct?
14     A.   I think I was on Lou Dobbs, yes.
15     Q.   Okay.  We have talked a little bit
16 about being an author and a journalist.  What's your
17 main focus of writing?
18     A.   I write about defense and national
19 security affairs.
20     Q.   And has that always been the case
21 since you began journalism?

1      Q.   That's who you worked with on your
2  most recent book?
3      A.   Yes.
4      Q.   And tell me about your most recent
5  book?
6      A.   My most recent book is called
7  Deceiving The Sky.
8      Q.   And what's it about?
9      A.   It's about China.  It is
10 basically, in the year 2000, I wrote a book called The
11 China Threat.  And this book was initially, the
12 working title was The China Threat 2.0, to look at all
13 of the various things that have happened related to
14 China since 2000.
15     Q.   And when did Deceiving The Sky come
16 out?
17     A.   It was published in September, early
18 September of this year.
19     Q.   And did you go on a book tour?
20     A.   It's not really a tour in the sense
21 of a tour.  It's more or less a promotional -- a

1      A.   Yes.
2      Q.   And you have written eight books.  We
3  have talked about two of them.
4  Generally, what are the other six about?
5      A.   They are about -- one was about the
6  Clinton Administration's national security policies.
7  One was about arms proliferation.  Another was about
8  the intelligence failures related to 911.  The China
9  Threat was one.  One was called IWar, which was war
10 and peace in the information age.
11     Q.   And since 2017, which is the
12 operative time for this dispute, which entities have
13 paid you money?  We discussed the Free Beacon, The
14 Times.
15     Q.   What other sources of income have you had?
16     A.   In what sense?
17     Q.   Anyone who pays you, that hits your
18 bank account.  So who have your employers been?
19     A.   My employer has been The Washington
20 Times and The Washington Free Beacon.  The most recent
21 book was published by Encounter Books.

**Bill Gertz**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

1    **Q.   And when do you speaking engagements,**
2   **do you receive a fee or honoraria for those?**
3        A.   Sometimes.
4        **Q.   And that's just paid to you directly?**
5        A.   Yes.
6        **Q.   And you receive royalties for your**
7   **books?**
8        A.   Yes.
9        **Q.   And that's through Encounter, the**
10   **publisher?**
11        A.   It will be, yes.  I have not received
12   royalties.
13        **Q.   And wherever you published this book**
14   **with Encounter, what is your contract with them?**
15        A.   In what sense?
16        **Q.   What are the royalties and what are**
17   **the terms of payment?**
18        A.   I don't know all of it, but it's
19   basically after the first number of copies that are
20   sold, you get 15 percent, and after that, a certain
21   number, it's 12 percent, and then I think it's 10

Page 22

1   percent of the sales of the book.
2        **Q.   Do you get more money if the book**
3   **does better in sales, such as like bestseller list or**
4   **anything like that?**
5        A.   No.
6        **Q.   Okay.  And when did you sign the**
7   **contract for the most recent Encounter book deal for**
8   **Deceiving The Sky?**
9        A.   I think it was the August time frame.
10        **Q.   And did you receive a lump many sum**
11   **at the beginning for publishing that book?**
12        A.   No.
13        **Q.   Do you know about when your first**
14   **payment would come in from them?**
15        A.   I'm not sure of the terms, but I
16   think it would be six -- six months or so.
17        **Q.   From publication?**
18        A.   From publication, or maybe a year.
19        **Q.   And based on your prior seven books,**
20   **about how much do you expect to make from your most**
21   **recent book, Deceiving The Sky?**

Page 23

1        A.   It's hard to say.  I couldn't say.  I
2   don't know.
3        **Q.   Well, what's your best guess?**
4        A.   I'd rather not guess.
5        **Q.   Do you think it would be over**
6   **$100,000?**
7        A.   It could be.
8        **Q.   How much did you make on your last**
9   **book?**
10        A.   I made around that amount.
11        **Q.   Okay.  And the six books before that,**
12   **was it about that amount as well?**
13        A.   I really can't remember.
14        **Q.   Is it safe to say possibly in the six**
15   **figures, but that that amount could change, based on**
16   **sales?**
17        A.   I really don't remember.  I really
18   don't have a clear recollection.
19        **Q.   Do you have a contract in writing**
20   **with Encounter for this most recent book deal?**
21        A.   Yes.

Page 24

1        **Q.   And your former agent negotiated that**
2   **for you?**
3        A.   No, he didn't.
4        **Q.   You negotiated that on your own?**
5        A.   Yes.
6        **Q.   Who did you negotiate with at**
7   **Encounter?**
8        A.   Roger Kimble.
9        **Q.   And what's his position?**
10        A.   I believe he is the publisher.
11        **Q.   And was Encounter paid by anyone to**
12   **publish your book?**
13        A.   Not that I know of.
14        **Q.   Okay.  Would they have disclosed that**
15   **to you, do you believe, if they had received payment**
16   **from a third party?**
17        A.   Yes.
18        **Q.   And you said you have worked for both**
19   **The Washington Times and the Free Beacon at the same**
20   **time, is that correct?**
21        A.   Yes.

Page 25

7 (Pages 22 to 25)

**Atkinson-Baker, Inc.**
**www.depo.com**

---

1  **Q.   And when do you speaking engagements,**
2  **do you receive a fee or honoraria for those?**
3      A.   Sometimes.
4  **Q.   And that's just paid to you directly?**
5      A.   Yes.
6  **Q.   And you receive royalties for your**
7  **books?**
8      A.   Yes.
9  **Q.   And that's through Encounter, the**
10 **publisher?**
11     A.   It will be, yes.  I have not received
12 royalties.
13 **Q.   And wherever you published this book**
14 **with Encounter, what is your contract with them?**
15     A.   In what sense?
16 **Q.   What are the royalties and what are**
17 **the terms of payment?**
18     A.   I don't know all of it, but it's
19 basically after the first number of copies that are
20 sold, you get 15 percent, and after that, a certain
21 number, it's 12 percent, and then I think it's 10

Page 22

---

1      A.   It's hard to say.  I couldn't say.  I
2  don't know.
3  **Q.   Well, what's your best guess?**
4      A.   I'd rather not guess.
5  **Q.   Do you think it would be over**
6  **$100,000?**
7      A.   It could be.
8  **Q.   How much did you make on your last**
9  **book?**
10     A.   I made around that amount.
11 **Q.   Okay.  And the six books before that,**
12 **was it about that amount as well?**
13     A.   I really can't remember.
14 **Q.   Is it safe to say possibly in the six**
15 **figures, but that that amount could change, based on**
16 **sales?**
17     A.   I really don't remember.  I really
18 don't have a clear recollection.
19 **Q.   Do you have a contract in writing**
20 **with Encounter for this most recent book deal?**
21     A.   Yes.

Page 24

---

1  percent of the sales of the book.
2  **Q.   Do you get more money if the book**
3  **does better in sales, such as like bestseller list or**
4  **anything like that?**
5      A.   No.
6  **Q.   Okay.  And when did you sign the**
7  **contract for the most recent Encounter book deal for**
8  **Deceiving The Sky?**
9      A.   I think it was the August time frame.
10 **Q.   And did you receive a lump many sum**
11 **at the beginning for publishing that book?**
12     A.   No.
13 **Q.   Do you know about when your first**
14 **payment would come in from them?**
15     A.   I'm not sure of the terms, but I
16 think it would be six -- six months or so.
17 **Q.   From publication?**
18     A.   From publication, or maybe a year.
19 **Q.   And based on your prior seven books,**
20 **about how much do you expect to make from your most**
21 **recent book, Deceiving The Sky?**

Page 23

---

1  **Q.   And your former agent negotiated that**
2  **for you?**
3      A.   No, he didn't.
4  **Q.   You negotiated that on your own?**
5      A.   Yes.
6  **Q.   Who did you negotiate with at**
7  **Encounter?**
8      A.   Roger Kimble.
9  **Q.   And what's his position?**
10     A.   I believe he is the publisher.
11 **Q.   And was Encounter paid by anyone to**
12 **publish your book?**
13     A.   Not that I know of.
14 **Q.   Okay.  Would they have disclosed that**
15 **to you, do you believe, if they had received payment**
16 **from a third party?**
17     A.   Yes.
18 **Q.   And you said you have worked for both**
19 **The Washington Times and the Free Beacon at the same**
20 **time, is that correct?**
21     A.   Yes.

Page 25

---

7 (Pages 22 to 25)

**Bill Gertz**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

1  **Q.   And how long have you worked for each**
2  **publication?**
3      A.   I have been with The Washington Times
4  since 1985, and I was with The Washington Free Beacon
5  from 2012 to 2019.
6      **Q.   And did your roles differ for the two**
7  **publications?**
8      A.   At The Washington Times, I am a
9  national security columnist, and I write a weekly
10 column.
11     **Q.   And at The Free Beacon, you were?**
12     A.   Senior editor, and did writing.
13     **Q.   Okay.  For the entire time, from 2012**
14 **to 2019?**
15     A.   Yes.
16     **Q.   And last Friday, The Free Beacon**
17 **announced that you were no longer affiliated with**
18 **them, correct?**
19     A.   Yes.
20     **Q.   And what led up to that decision and**
21 **announcement?**

Page 26

1      A.   We had a dispute about an editorial
2  matter.
3          MS. CLINE:  Objection, foundation.
4  BY MS. LUETKEMEYER:
5      **Q.   You can answer.  Say that one more**
6  **time.**
7      A.   We had a dispute about editorial.
8      **Q.   What do you mean by "dispute about**
9  **editorial?"**
10     A.   An editorial matter.
11     **Q.   A matter of news reporting?**
12     A.   Yes.
13     **Q.   And who was your dispute with at The**
14 **Free Beacon?**
15     A.   It was with the managers of the Free
16 Beacon.
17     **Q.   So it wasn't with the editor,**
18 **Ms. Johnson?**
19     A.   Yes, it was with Ms. Johnson.
20     **Q.   Anyone else?**
21     A.   Yes.  Michael Goldfarb.

Page 27

1      **Q.   Anyone else?**
2      A.   Aaron Harrison.
3      **Q.   Okay.  And when you say a dispute**
4  **about an editorial matter, what do you mean by that?**
5      A.   We had a disagreement.
6      **Q.   And what was the disagreement?**
7      A.   The disagreement was about my book
8  work.
9      **Q.   And what was the contention that you**
10 **disagreed with?**
11     A.   It was having to do with some outside
12 funding for the book project.
13     **Q.   That you had received?**
14     A.   Yes.
15     **Q.   And what was that outside funding?**
16     A.   If I can explain, it was -- I met Guo
17 Wengui in 2017 and interviewed him.  And I realized he
18 was a tremendous source of information and had a
19 tremendous story that I wanted to do a book about him.
20 And over the months, I sought to see if he would be
21 willing to do a book.  And he initially said that he

Page 28

1  would like to do a book, but then said that he did not
2  want to do a book.
3          I then drafted a proposal for The China
4  Threat 2.0.  And my agent at the time circulated it
5  among a number of publishers, and the publishers
6  turned it down.
7          So, at that point, I went to Guo Wengui and
8  I asked if he would be willing to act as a self
9  publisher.  I was prepared to self publish the book
10 and I was going to ask him to provide a loan for
11 research, and that the loan would be in the form of an
12 advance payment to be paid back with royalties.
13 And I outlined that.  I said that, again, I plan to
14 self publish this, but if I get a publisher, then the
15 royalties that I make from the book would be returned
16 to pay off the loan.  I presented him with these
17 options and he told me that he could not provide the
18 support.
19         I then approached an associate of his named
20 William Je.  And William Je, I had met through Guo,
21 and he was a supporter of my work.  He is a wealthy

Page 29

8 (Pages 26 to 29)

1 financier, and he said that he would agree to give me
2 the loan on the same terms, it would be an advance
3 payment against royalties.
4  Q.  And did you enter into that
5 agreement?
6  A.  Yes.
7  Q.  And was this a written agreement you
8 had with Mr. Je?
9  A.  It was more of an e-mail agreement,
10 yes.
11  Q.  And do you have those e-mails?
12  A.  I have one e-mail.
13  Q.  And what is that one e-mail that you
14 have?
15  A.  It explains that he is transferring
16 the funds, and in exchange, I'm going to abide by the
17 terms that I outlined to you.
18  Q.  And how much money was the agreement?
19  A.  Well, I'd rather not say, but I would
20 say that it was the same amount as the advance on my
21 last book, IWar.

Page 30

1  Q.  Did he suggest that you seek out
2 Mr. Je?
3  A.  I can't remember whether he suggested
4 it or whether I want to Mr. Je on my own.
5  Q.  And how did you first meet Mr. Je?
6  A.  I met Mr. Je at lunch meeting with
7 Mr. Guo.
8  MS. KROPF:  You might want to pause for
9 a second.
10  MS. LUETKEMEYER:  Sure.  We can take a
11 short break.
12  THE VIDEOGRAPHER:  Please stand by.  We
13 are going off the record at 12:22 p.m.
14  (Short Recess).
15  THE VIDEOGRAPHER:  We are back on the
16 record at 12:23 p.m.
17 BY MS. LUETKEMEYER:
18  Q.  We were just discussing Mr. Je.  And
19 I can't recall what your answer was before so I'll
20 just ask you the question again, but how did you first
21 meet Mr. Je?

Page 32

1  Q.  And what was the amount of your
2 advance on your last book, IWar?
3  A.  Well, since it has nothing to do with
4 this litigation, I'd rather not say.
5  Q.  Mr. Gertz, I'm going to ask you the
6 question very plainly, which is, the amount of the
7 loan, as we phrased it, in the financial transaction
8 that was the subject of The Free Beacon's announcement
9 last Friday, how much money was that from Mr. Je?
10  A.  It was $100,000.
11  Q.  And how was that money paid to you?
12  A.  It was sent by wire.
13  Q.  Was that sent to your business bank
14 account or personal bank account?
15  A.  Personal bank account.
16  Q.  And when was that sent?
17  A.  I think it was early April of 2018.
18  Q.  And was Mr. Guo aware of this
19 arrangement?
20  A.  No.  Mr. Guo, I'm not sure, I don't
21 think he was.

Page 31

1  A.  I met Mr. Je at a lunch meeting with
2 Mr. Guo.
3  Q.  Do you remember when that was?
4  A.  I do not.
5  Q.  Was it in 2017?
6  A.  I honestly can't remember.
7  Q.  Do you remember where the lunch was
8 held?
9  A.  It was in Mr. Quo's house in New
10 York.
11  Q.  At the Sherry Netherland?
12  A.  Yes.
13  Q.  Was anyone else present for this
14 lunch?
15  A.  I don't believe so.
16  Q.  And when you -- we'll get back to
17 Mr. Je in a minute, but whenever you received the
18 funding from Mr. Je, was your publisher aware of that?
19  A.  I don't think he was, no.
20  Q.  Is your publisher aware of it now?
21  A.  I don't know.

Page 33

9 (Pages 30 to 33)

**Atkinson-Baker, Inc.**
**www.depo.com**

1    Q.   And when the money came into your
2    account via the wire and you began work, did you by
3    the terms of your agreement, need to provide updates
4    to Mr. Je of your book's progress?
5    A.   No.
6    Q.   And when was he expecting to be
7    repaid?
8    MS. CLINE:  Objection, foundation.
9    THE WITNESS:  The only -- the only
10   repayment was when I got the royalties, that the
11   royalties would go to him.  We arranged that I would
12   that we'd work out the repayment of the royalties when
13   the first royalties came in.
14   BY MS. LUETKEMEYER:
15   Q.   So the agreement that you all had did
16   not have any interest amount or terms, other than that
17   you would work it out later?
18   A.   Correct.
19   Q.   And did you negotiate that $100,000
20   or was that just what he decided to give you?
21   A.   It was based on my last book advance.

Page 34

1    Like I said, I structured it as an advance payment
2    against future royalties for book sales.
3    Q.   So did you receive any other advance
4    for this book then?
5    A.   Yes, from the publisher.
6    Q.   From Encounter?
7    A.   Yes.
8    Q.   And when did you receive that
9    advance?
10   A.   That would have been -- half of it
11   would have been in August, and then the other half
12   would have been in probably the April time frame.
13   Q.   In August, 2018 and April, 2019?
14   A.   Yes.
15   Q.   And I understand these dates are
16   approximate.  Whenever you received that advance from
17   your publisher, Encounter, was Encounter the same
18   publisher that published your prior books?
19   A.   No.
20   Q.   So you found a new publisher?
21   A.   Yes.

Page 35

1    Q.   And when you received that advance
2    from Encounter, how much was that, in two
3    installments?
4    A.   Six thousand total.
5    Q.   Was it divided equally?
6    A.   Half.
7    Q.   So $3,000 in August and $3,000 in
8    April?
9    A.   Yes.
10   Q.   And that was also wired to you?
11   A.   That was a check.
12   Q.   Okay.  And was The Free Beacon aware
13   of that payment?
14   A.   No.
15   Q.   Did they ask about that payment?
16   A.   No.
17   Q.   And The Free Beacon's announcement on
18   Friday which we have discussed referred to the
19   arrangements as a previously undisclosed financial
20   transaction with an individual or affiliate covered in
21   your reporting, is that correct?

Page 36

1    A.   Correct.
2    Q.   And why do you believe that they
3    worded it that way?
4    A.   I don't know.
5    Q.   Was Mr. Je ever covered in your
6    reporting?
7    A.   No.
8    Q.   And was Mr. Je's relationship to
9    Mr. Guo ever covered in your reporting?
10   A.   No.
11   Q.   And is it The Free Beacon's
12   disagreement with you that Mr. Je was the true source
13   of the funds?
14   MS. CLINE:  Objection, foundation.
15   THE WITNESS:  It's not clear in your
16   question.
17   BY MS. LUETKEMEYER:
18   Q.   Did The Free Beacon believe that
19   Mr. Guo was the true source of the funds?
20   MS. CLINE:  Same objection.
21   THE WITNESS:  I don't know.

Page 37

10 (Pages 34 to 37)

**Bill Gertz**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

1    Q.   When Ms. Johnson first raised this
2  issue with you, when did that occur, the first
3  meeting?
4    A.   It was probably two or three weeks
5  ago.
6    Q.   And what was said to you from
7  Ms. Johnson and the other two individuals -- I forget
8  their names?
9    A.   I don't remember, actually, other
10 than that they were unaware of my book project, the
11 financing for my book project.
12   Q.   And how did they first learn of the
13 financing for your book project?
14   A.   Through some discussions.
15   Q.   What discussions?
16      MS. KROPF:  They are privileged, so
17 objection.
18 BY MS. LUETKEMEYER:
19   Q.   And whenever you say there was a
20 disagreement about an editorial matter, why do you say
21 it was an editorial matter?

Page 38

1    Q.   And whose decision, ultimately, was
2  it to let you go from The Free Beacon?
3    A.   I don't know.
4    Q.   Who communicated to you that you were
5  being let go?
6    A.   Michael Goldfarb and Aaron Harrison.
7    Q.   And what are their positions?
8    A.   Chairman and president.
9    Q.   And do you have any e mails or
10 communications with them or Ms. Johnson about this
11 dispute?
12   A.   No.
13   Q.   We talked earlier about your e mail
14 with Mr. Je that memorialized your agreement.
15 Were there any attachments to that agreement, a Word
16 document or a PDF?
17   A.   No.
18   Q.   And leading up to that e mail, how
19 had you and Mr. Je communicated about this
20 arrangement?
21   A.   By phone and by text.

Page 40

1    A.   Because we disagreed on whether there
2  was a conflict of interest.
3    Q.   You believe there was not a conflict
4  of interest?
5    A.   No.
6    Q.   No, you did not believe there was a
7  conflict of interest?
8    A.   No.
9    Q.   What did you believe?
10   A.   I believed that they didn't
11 understand that the money that I received from the
12 book did not come from Guo.
13   Q.   Did they ask you to provide any
14 evidence of the source of the funds?
15   A.   No.
16   Q.   Did you show them the communications
17 you had had with Mr. Je?
18   A.   No.
19   Q.   Did you explain to them the nature of
20 the transaction with Mr. Je?
21   A.   Yes.

Page 39

1    Q.   And was the texting via Signal, or
2  another ap that's encrypted, or was it a text?
3    A.   By Signal.
4    Q.   And do you have any hard copy
5  documents with Mr. Je related to this transaction?
6    A.   No.
7    Q.   Just the bank records showing the
8  wire and that one e mail?
9    A.   No.
10   Q.   Other than those?
11   A.   No.
12   Q.   Did anyone at The Free Beacon ask to
13 see your bank regards regarding the transaction?
14   A.   No.
15   Q.   Did they ask how much money was
16 involved in the arrangement?
17   A.   I can't remember.  No, they didn't.
18   Q.   And has your publisher reached out to
19 you since The Free Beacon announcement on Friday
20 regarding this matter?
21   A.   Yes.

Page 41

11 (Pages 38 to 41)

**Bill Gertz**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

1      Q.   And what have those conversations
2  been?
3      A.   They asked me about my departure from
4  The Free Beacon.
5      Q.   And what did you tell them?
6      A.   I told them that I left because of a
7  dispute over an editorial matter.
8      Q.   Did you inform them of the
9  arrangement with Mr. Je?
10     A.   No.
11     Q.   Have you spoke went Mr. Je since you
12  left The Free Beacon?
13     A.   No.
14     Q.   Have you spoken with him in the last
15  few weeks?
16     A.   I might have had a text conversation
17  with him, yes.
18     Q.   And when did that text conversation
19  occur?
20     A.   Probably three weeks ago.  I can't
21  really recall.

Page 42

1          And it was my impression that he was a
2  supporter of Mr. Guo because he supported the idea of
3  bringing about democratic change in China.
4      Q.   How many times have you met with
5  Mr. Je in person?
6      A.   I don't know.  Probably two or three.
7      Q.   Including that lunch where you first
8  met him?
9      A.   Yes.
10     Q.   And is he someone you speak to
11  regularly on the phone?
12     A.   I wouldn't say regularly.  I speak to
13  him occasionally.
14     Q.   So we spoke earlier about whether he
15  was the subject of your reporting.
16         Would Mr. Je have ever served as a source
17  for you on the record?
18     A.   I can't recall.
19     Q.   Might he have provided background
20  information for you for some of your pieces?
21     A.   No.

Page 44

1      Q.   Was it after the Free Beacon
2  leadership first came to you?
3      A.   I can't recall.
4      Q.   Do you remember what you were
5  discussing with Mr. Je?
6      A.   I don't recall.
7      Q.   When is the last time you spoke with
8  Mr. Je?
9      A.   I don't have a clear recollection of
10  that.
11     Q.   It might have been the text
12  conversation three weeks ago?
13     A.   I can't recall.
14     Q.   And who is William Je?  Let's back up
15  a little bit.  I will ask you that.
16     A.   He is a financier from Hong Kong, and
17  I know -- I think he lives in New York.  I think he
18  has his own company.
19         And like I said, I got to know him through
20  meetings, and he discussed various things about the
21  Chinese communist party that he was opposed to.

Page 43

1      Q.   Did he work with you on the
2  substance, or layout, or formatting of your book?
3      A.   No.
4      Q.   Did he ask you for updates regarding
5  the status of your book after he provided you with the
6  financial assistance?
7      A.   No.
8      Q.   What do you think his interest was in
9  providing you with the $100,000?
10         MS. CLINE:  Objection, foundation.
11         THE WITNESS:  I believe he wanted to
12  support my efforts to bring about exposing the kinds
13  of activities that are being carried out by the
14  Chinese Government, Chinese party.
15  BY MS. LUETKEMEYER:
16     Q.   And did you ever speak with Mr. Guo
17  about Mr. Je's financial assistance?
18     A.   I don't believe I did.  I don't have
19  any recollection of it.
20     Q.   Do you know, did Mr. Guo ask Mr. Je
21  to give you that money?

Page 45

12 (Pages 42 to 45)

**Bill Gertz**
**October 15, 2019**

1       A.   I do not know.

2       Q.   Did you ever speak with anyone else

3   about Mr. Je providing you with the financial

4   assistance?

5       A.   No.

6       Q.   Was your wife aware of it?

7       A.   Yes.

8       Q.   What about Ling Cho Hann?

9       A.   I don't know.

10      Q.   I'm sorry.  You don't know?

11      A.   No, I don't know.

12      Q.   Is it possible that other people were

13   aware of the financial assistance?

14      A.   I don't know.

15      Q.   And following the announcement from

16   The Free Beacon on Friday, have you had any

17   conversations regarding this financial assistance with

18   The Washington Times?

19      A.   Yes.

20      Q.   And what were those conversations?

21      A.   It was in the context of my returning

Page 46

---

1   that have been paid directly or indirectly by Mr. Je?

2       MS. CLINE:  Objection to form,

3   foundation.

4       THE WITNESS:  No.

5   BY MS. LUETKEMEYER:

6       Q.   You are not aware of any other

7   reporters or editors who he made investments in?

8       A.   No.

9       Q.   Do you have any knowledge of any

10   other individuals who have been paid by Mr. Guo?

11      MS. CLINE:  Objection; form, foundation.

12      THE WITNESS:  No.  I would like to

13   explain though that it's my view that the book project

14   had nothing to do with my introduction of French

15   Wallop and Mike Waller to Quo Wengui.

16   BY MS. LUETKEMEYER:

17      Q.   Can you expound on that a little bit?

18      A.   It had nothing to do with it.  There

19   was no relationship between it.

20      Q.   Between the book project and the

21   introduction?

Page 48

---

1   to The Washington Times full time.

2       Q.   And will you be returning to The

3   Washington Times full time?

4       A.   Yes.

5       Q.   And when will that begin?

6       A.   I don't know.

7       Q.   And would that include you continuing

8   to write your column?

9       A.   Yes.

10      Q.   And would you also serve as a

11   reporter and editor?

12      A.   Yes.

13      Q.   Any additional duties you would take

14   on at The Washington Times?

15      A.   No.

16      Q.   Will you receive a pay increase from

17   The Washington Times for returning full time?

18      A.   Yes.

19      Q.   And has that been negotiated yet?

20      A.   No.

21      Q.   Do you have knowledge of any others

Page 47

---

1       A.   Yes, which is the subject of our

2   deposition.

3       Q.   And we'll get to that in a minute.

4   What is the Rule of Law Foundation?

5       A.   In October of 2018, Guo Wengui

6   announced publicly, at a press conference in New York,

7   that he was starting a rule of law organization to

8   bring about democratic reform in China.  And

9   subsequently, the Rule of Law Society was created.

10      Q.   And are you involved with the Rule of

11   Law Foundation?

12      A.   I was asked to be a director, unpaid.

13      Q.   Did you agree to be a director?

14      A.   And I agreed.

15      Q.   And when was that?

16      A.   I can't remember exactly when.  It

17   would have been sometime after October of '18.

18      Q.   And what does your role as a director

19   entail?

20      A.   Well, so far, we have had two

21   telephonic meetings where we have discussed what kind

Page 49

13 (Pages 46 to 49)

**Atkinson-Baker, Inc.**
**www.depo.com**

1  of programs and projects that might be carried out in
2  support of this larger goal of bringing about
3  democracy and rule of law inside of China.
4      Q.  And who are the other directors?
5      A.  I don't -- I'm not sure I can recount
6  them all.  Steve Bannon is the chairman, and there are
7  two or three other people whose names I can't
8  remember.
9      Q.  And is Mr. Guo a director?
10     A.  No.
11     Q.  What is his role?
12     A.  I don't know.  He is not a formal
13  participant of the Rule of Law Society, as far as I
14  know.
15     Q.  Was he involved in the two phone
16  conferences you referenced?
17     A.  No, not that I am aware of.
18     Q.  Have you ever been paid by the Rule
19  of Law Foundation?
20     A.  No.
21     Q.  Do you know of anyone else who, as a

Page 50

1  director, has ever been paid?
2      A.  I don't know.
3      Q.  And what's your understanding of the
4  mission of the organization?
5      A.  As I said, it was outlined in the
6  press conference by Guo Wengui in October where he
7  felt that he wanted to pull resources toward focusing
8  on bringing about rule of law and democracy in China.
9      Q.  And in the last year, what has the
10  organization accomplished?
11     A.  It's in the formative stages, and I
12  think that they have created a -- what they call a
13  whistleblower system whereby people in China can
14  provide tips and information about things that are
15  going on inside the Chinese system that could be used
16  to bring about the rule of law in China.
17     Q.  And was the idea for this
18  organization Mr. Quo's idea?
19     A.  That's what he announced in October
20  of 2018.
21     Q.  And leading up to this announcement

Page 51

1  which we have talked about was the form of a press
2  conference, had you had conversations with him about
3  forming this group?
4      A.  No.
5      Q.  And when did you first hear about the
6  organization being formed?
7      A.  About which organization?
8      Q.  The Rule of Law Foundation.
9      A.  It was after the October thing where
10  he announced that he was moving ahead or having people
11  move ahead with creating the organization.  I don't
12  remember the specific time frame.
13     Q.  And do you believe the organization
14  has long term goals?
15     A.  I'm not clear about what you mean by
16  that.
17     Q.  Do you think it will continue to
18  exist in the future or do you believe it's a short
19  term vehicle for achieving change?
20     A.  I don't know.
21     Q.  And are there any tenants of the

Page 52

1  organization that you disagree with?
2      A.  I'm not sure I know all of their
3  tenants, so I can't answer that.
4      Q.  Are there board members as well as
5  directors?
6      MS. CLINE:  Objection to form.
7      THE WITNESS:  I don't know.
8  BY MS. LUETKEMEYER:
9      Q.  And is Kyle Bass on the Rule of Law
10  Foundation?
11     A.  I believe that there's two entities;
12  one is the Rule of Law Society, and one is the Rule of
13  Law Foundation, and he may be on the Rule of Law
14  Foundation.
15     Q.  And what's the Rule of Law Society?
16     A.  I'm not sure.  I think one is a
17  501(c)(3) and one is a 501(c)(4).  I think the society
18  may be 501(c)(4).
19     Q.  And who is Kyle Bass?
20     A.  He is a financier.
21     Q.  And where does he live?

Page 53

14 (Pages 50 to 53)

**Bill Gertz**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

1     A.   I think he lives in Texas.
2     Q.   And how did he get involved with the
3   Rule of Law Foundation?
4     A.   I don't know.
5     Q.   Have you ever met him in person?
6     A.   No.
7     Q.   Do you know, was he participating in
8   the phone calls that you all had, the phone calls?
9     A.   I don't know.
10     Q.   But you think he might be involved
11   with the Rule of Law Foundation?
12     A.   Yes.
13     Q.   And why do you think that?
14     A.   I think it was announced that he was
15   part of that organization.
16     Q.   Have you ever spoken with him on the
17   phone?
18     A.   No.
19     Q.   Have you ever e mailed with him?
20     A.   No.
21     Q.   Have you ever texted with him?

Page 54

1     A.   No.
2     Q.   Is it safe to say you have never
3   discussed his investments in China with him?
4     A.   Correct.
5     Q.   And to your knowledge as a director
6   of the Rule of Law Foundation, how much financial
7   support money has Mr. Guo provided, indirectly or
8   directly, to the Rule of Law Foundation?
9      MS. CLINE:   Objection; form, foundation.
10      THE WITNESS:   I don't know.
11   BY MS. LUETKEMEYER:
12     Q.   Do you know how much total has been
13   given to the organization?
14     A.   I do not.
15     Q.   So you have not reviewed his
16   operating budget?
17     A.   No.
18     Q.   And do you know how much the Rule of
19   Law Foundation has spent?
20     A.   I do not.
21     Q.   Does the Rule of Law Foundation have

Page 55

1   any employees?
2     A.   I don't know.
3     Q.   Before you had the two phone
4   conferences, did you receive an agenda or written
5   board materials, as the director?
6     A.   I don't recall.  An agenda, what do
7   you mean by that?
8     Q.   Any written communication about what
9   was to be discussed in those two meetings?
10     A.   I can't recall that.
11     Q.   Do you know if the Rule of Law
12   Foundation has spent money given to think tanks?
13     A.   I don't know.
14     Q.   Has the Rule of Law Foundation put on
15   any public events?
16     A.   I don't know the answer to that.
17     Q.   Who is Sasha Gong?
18     A.   Sasha Gong is a former Voice Of
19   America employee.
20     Q.   And how do you know her?
21     A.   I knew her from her reporting, and

Page 56

1   she has known me for a number of years from her
2   reporting and my reporting.
3     Q.   And when is the last time you spoke
4   with Ms. Gong?
5     A.   I can't recall.
6     Q.   Have you spoken with her about this
7   case?
8     A.   No.
9     Q.   Who is Ling Cho Hann?
10     A.   Ling Cho Hann is a human rights
11   activist, a Chinese oriented human rights activist.
12     Q.   When is the last time you spoke with
13   him?
14     A.   I spoke with him on Sunday.
15     Q.   Was it about this case?
16     A.   He had called me and asked me how I
17   was doing, and if I needed any help.
18      And my response was, "I don't need any help.
19   I have a lawyer."
20     Q.   Did you ask Mr. Hann to contact
21   Ms. Wallop and Mr. Waller on your behalf?

Page 57

15 (Pages 54 to 57)

**Bill Gertz**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

| | |
|---|---|
| 1    A.   No. | 1    Q.   Were you aware that he had been |
| 2    Q.   Are you aware that he did so? | 2  deposed in this lawsuit? |
| 3    A.   I don't know. | 3    A.   Yes. |
| 4    Q.   Did he call you after he had spoke | 4    Q.   But you have not reviewed his |
| 5  with them on Sunday? | 5  deposition? |
| 6    A.   No. | 6    A.   No. |
| 7    Q.   Did he speak with you after he spoke | 7    Q.   What's Mr. Ling Cho's relationship |
| 8  with them on Sunday? | 8  with Mr. Guo? |
| 9    A.   No. | 9    MS. CLINE:  Objection, foundation. |
| 10    Q.   So after Mr. Hann called you and | 10    THE WITNESS:  I don't know.  I know that |
| 11  asked if you needed any help, did you send him any | 11  he served as a translator in some of the meetings that |
| 12  communication in writing? | 12  I had with Mr. Guo. |
| 13    A.   No. | 13  BY MS. LUETKEMEYER: |
| 14    Q.   You just told him verbally that you | 14    Q.   And those would have been in 2017? |
| 15  did not need any help? | 15    A.   Probably 2017 and 2018. |
| 16    A.   That's right. | 16    Q.   Let's go back to the very beginning |
| 17    Q.   Do you know why he would call you? | 17  of when you first met Guo Wengui.  When was that, to |
| 18    A.   He's a friend, and I think he was | 18  the best of your recollection? |
| 19  concerned about my situation. | 19    A.   It would have been either June or |
| 20    Q.   And you remain friends? | 20  July of 2017. |
| 21    A.   Yes. | 21    Q.   Okay.  Do you remember writing an |
| Page 58 | Page 60 |

| | |
|---|---|
| 1    Q.   Have you spoken with Mr. Hann about | 1  article for The Free Beacon in May of 2017 about |
| 2  this case, Ling Cho Hann, about this case? | 2  Mr. Guo? |
| 3    A.   No. | 3    A.   I do not. |
| 4    Q.   So when he called you on Sunday | 4    - - - - |
| 5  asking if you need any help, was that needing any help | 5    (Exhibit No. 2 marked for identification.) |
| 6  with respect to your deposition today? | 6    - - - - |
| 7    A.   No. | 7    Q.   Let me mark it so we can talk about |
| 8    Q.   What did he mean by help? | 8  it.  I'm going to hand you, Mr. Gertz, what's been |
| 9    A.   He just wanted to know if he could do | 9  marked as Exhibit No. 2 and I'm going to give a copy |
| 10  anything to help.  He said he felt bad that I was in | 10  to your Counsel as well.  This has a marking. |
| 11  this position that I was in. | 11    Sir, if you can take a minute and look at |
| 12    Q.   And what did you tell him? | 12  that.  It's been marked as Exhibit 2, and the headline |
| 13    A.   I said, "I'm fine.  I have a lawyer. | 13  is, "China Intervenes to Block Businessman From |
| 14  I don't need any help." | 14  Revealing Spying Secrets on VOA." |
| 15    Q.   And did Mr. Hann share with you his | 15    MS. CLINE:  Do you have another copy, by |
| 16  thoughts on this lawsuit? | 16  any chance? |
| 17    A.   No. | 17    MS. LUETKEMEYER:  I'm sorry.  I don't, |
| 18    Q.   Did he tell you that he had been | 18  but I can give you mine in just a second.  I'm sorry. |
| 19  deposed? | 19    Q.   Sir, this article was published on |
| 20    A.   I don't recall.  I don't think that | 20  May 3, 2017.  Do you see that? |
| 21  came up. | 21    A.   Yes. |
| Page 59 | Page 61 |

16 (Pages 58 to 61)

**Bill Gertz**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

| | |
|---|---|

1    Q.   Had you interviewed Mr. Guo before
2  this article?
3        A.   No.
4        Q.   Had you met Mr. Guo before this
5  article?
6        A.   No.
7        Q.   And how soon after this article was
8  written did you meet with Mr. Guo?
9        A.   Like I said, it was in the June or
10  July time frame.
11        Q.   Do you believe this is the first
12  article you wrote about Mr. Guo?
13        A.   I don't know.
14        Q.   It's the earliest I found, so take
15  that for what you will.
16        In this article, Sasha Gong is quoted as a
17  source.  Do you see that in the fourth paragraph?
18        A.   Yes.
19        Q.   What is this article about,
20  Mr. Gertz?
21        A.   It's about an interview that was

Page 62

1    Q.   And these are videos that Mr. Guo
2  would put on the Internet?
3        A.   Yes.
4        Q.   Just available for public viewing?
5        A.   Yes.
6        Q.   Okay.  Did Sasha Gong introduce you
7  to Mr. Guo?
8        A.   Yes.
9        Q.   And when did that occur?
10        A.   It would have been in the June to
11  July time frame, before I did the interview.  I
12  contacted Sasha and said I would like to interview
13  Mr. Guo.
14        Q.   Do you know how Sasha met Mr. Guo?
15        A.   I do not.
16        Q.   And did she agree to make the
17  introduction?
18        A.   Yes.
19        Q.   And when did you first meet him?
20        A.   It was in the June or July time
21  frame.

Page 64

1  curtailed by the Voice Of America, and the suspension
2  of four VOA employees.
3        Q.   Did you interview Sasha Gong for it?
4        A.   Yes.
5        Q.   Will you turn to the third page of
6  this Exhibit 2, please.  It's the paragraph that
7  begins with, additionally.  "Additionally, Guo's wife
8  and daughter currently have been allowed by Chinese
9  authorities to visit him in New York, but are required
10  to return to China for 20 days where they can be used
11  for political leverage against Mr. Guo."
12  Do you see that, Mr. Gertz?
13        A.   At the top there, um hum.
14        Q.   Now, if you didn't interview Mr. Guo
15  for that, do you remember where you learned that
16  information?
17        A.   It was probably Sasha Gong.
18        Q.   Okay.  And then a few paragraphs
19  down, you say, Guo said -- if that was not from an
20  interview from Guo, would that also been from Sasha?
21        A.   It would have been in a recent video.

Page 63

1        Q.   And where did you meet?
2        A.   In New York.
3        Q.   At his apartment?
4        A.   At a restaurant.
5        Q.   And was Ms. Gong present?
6        A.   No.
7        Q.   Who was present for that meeting?
8        A.   An interpreter and Evette Wong.
9        Q.   Do you remember who the interpreter
10  was?
11        A.   Yes.  His name is Wui Chungua
12  (phonetic).
13        Q.   And who was the other third person
14  you said?
15        A.   Evette Wong.
16        Q.   Who is Evette Wong?
17        A.   She, I believe, is an assistant to
18  Mr. Guo.
19        Q.   And who is her employer?
20        MS. CLINE:  Objection, foundation.
21        THE WITNESS:  I don't know.

Page 65

17 (Pages 62 to 65)

**Bill Gertz**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

BY MS. LUETKEMEYER:

Q.   **And is that the first time you had met her?**

A.   Yes.

Q.   **And you said you met at a restaurant?**

A.   Yes.

Q.   **And how did that meeting go?**

A.   It was an interview.

Q.   **So it was an interview.  Was it on the record?**

A.   Yes.

Q.   **And do you remember about how long it lasted?**

A.   Probably an hour.

Q.   **And what was your first impression of Mr. Guo?**

A.   I was amazed.  I felt that this is a person who is an amazing resource of inside information within the Chinese system.

I felt like he was, in a sense -- in my experience, I have covered intelligence defectors.

Page 66

And I believe that he was like a defector in the sense that he had access to inside information related to the Chinese Government, the Chinese Communist Party, and the Chinese Intelligence Services.

Q.   **And did you believe that he would be a valuable source for you?**

A.   Yes.

Q.   **How long did that meeting last, or interview?**

A.   About an hour.

Q.   **And did you agree to meet again?**

A.   I don't know.  I don't recall.

Q.   **After that first meeting, did you begin to speak with Mr. Guo over the phone?**

A.   After the first meeting, again, because I realized he was a valuable resource, I actually wanted to seek to do a book about him.

Q.   **Already, after that first meeting?**

A.   Yes.

Q.   **Did he provide you with any documents**

Page 67

in that first meeting?

A.   No.

Q.   **And did you make up a proposal to Mr. Guo after the first meeting?**

A.   Not after the first meeting.  I think it might have been several months later.

Q.   **How frequently would you speak with Mr. Guo after that first meeting?**

A.   After the first meeting, it was not frequently, yes.

Q.   **And did he eventually become a source for you, subject of many of your articles and columns?**

MS. CLINE:  Objection.

THE WITNESS:  Occasionally.  I interviewed him occasionally, and he was a source.

BY MS. LUETKEMEYER:

Q.   **Did your opinions of Mr. Guo change over time?**

A.   No.

Q.   **Do you still believe today that same thing you believed whenever you left that first**

Page 68

meeting?

A.   Yes.

Q.   **And if you were to describe Mr. Guo to someone who had never heard of him, how would you describe him?**

A.   A dissident, Chinese millionaire, who is working to bring about democracy and rule of law in China.

Q.   **And what do you think his motivations are?**

MS. CLINE:  Objection, foundation.

THE WITNESS:  I don't know his motivation, other than he has become a defector, former insider, who is now seeking to bring about democratic change.

BY MS. LUETKEMEYER:

Q.   **And when you say bring about democratic change, can you expand on that a little bit, about his goals?**

MS. CLINE:  Objection, foundation.

THE WITNESS:  He believes that the

Page 69

18 (Pages 66 to 69)

**Bill Gertz**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

1  Communist Party of China is the source of the problem
2  of what I regard as the China threat today.
3  BY MS. LUETKEMEYER:
4      Q.   When you say "the China threat," can
5  you explain that to me?
6      A.   That's the title of my 2000 book.  In
7  China, they have something called the China threat
8  theory, which is the Chinese Government and
9  Intelligence Services use to monitor opposition to
10  China's development.
11      So it's a play on the Chinese threat theory.
12  And it is, basically, the national security threats
13  from China which range from military, to political, to
14  intelligence, to economic, to financial.
15      Q.   And do you believe Mr. Guo has value
16  in defeating the China threat?
17      A.   Yes.
18      Q.   In what way?
19      A.   Because he is a former insider and
20  has access, he can provide valuable information that
21  could be used to help expose what I call the China

Page 70

1  threat.
2      Q.   And when you first met Mr. Guo and he
3  told you his story, did you do any independent
4  reporting or verification on what he told you?
5      A.   I did.  As much as I possibly could,
6  I read some of the stories about him in the Chinese
7  press or the press around the world, but there wasn't
8  a lot of information available on him.
9      Q.   Mr. Gertz, do you speak Mandarin?
10      A.   No.
11      Q.   And so when you would meet with
12  Mr. Guo, was there always an interpreter present?
13      A.   Not always, but many times.
14      Q.   Does Mr. Guo speak English?
15      A.   I'd say haltingly.
16      Q.   Was it usually the same interpreter?
17      A.   No.
18      Q.   Who would interpret for him, if you
19  can remember any of their names?  You mentioned one
20  earlier.
21      A.   Evette Wong, Ling Cho Hann were

Page 71

1  interpreters.
2      Q.   So for many of your meetings with
3  Mr. Guo, was Ms. Wong present?
4      A.   I would say occasionally.
5      Q.   Did you ever meet with him one on
6  one, Mr. Guo?
7      A.   Yes.
8      Q.   And where would that occur?
9      A.   In his apartment.
10      Q.   And how frequently would you travel
11  to New York to meet with him?
12      A.   I'd say once every two months.
13      Q.   And would you describe your
14  relationship with Mr. Guo as a professional one?
15      A.   I'd say it was a combination of both
16  a professional, as a source, as well as some
17  friendship.  In the news business, sources can be
18  friends.  It's not unusual.
19      Q.   Would you socialize with him?
20      A.   Would I socialize with him; what do
21  you mean by that?

Page 72

1      Q.   Have you ever spent time with Mr. Guo
2  in a purely social capacity where he is not serving as
3  a source for you?
4      A.   No.
5      Q.   Have you ever been on his yacht?
6      A.   Yes.
7      Q.   How many times?
8      A.   Once.
9      Q.   And you said you have been in his
10  home in New York City?
11      A.   Yes.
12      Q.   Have you ever been in his home, not
13  to work on your book or the reporting, just to spend
14  some time together?
15      A.   Well, like I said, I view him as a
16  valuable source of information.  So there is never a
17  time that I am not with him when I am not looking for
18  some inside information that could be produced as a
19  news story.
20      Q.   Did you help Mr. Guo in his
21  application for asylum?

Page 73

19 (Pages 70 to 73)

**Atkinson-Baker, Inc.**
**www.depo.com**

| | |
|---|---|
| 1     A.   No. | 1   deal with.  And so I am aware of that, and I still |
| 2     Q.   But you are aware of that? | 2   regard him as a valuable resource. |
| 3     A.   Yes. | 3     Q.   Do you believe that Mr. Guo has that |
| 4     Q.   You never advised him on that | 4   kind of baggage? |
| 5   application? | 5     A.   I think all defectors have that |
| 6     A.   No. | 6   baggage, and I would say yes. |
| 7     Q.   You never consulted with him or his | 7     Q.   When you say baggage, what do you |
| 8   lawyers? | 8   mean by that? |
| 9     A.   No. | 9     A.   Whatever personality difficulties or |
| 10     Q.   Has he ever asked you for help | 10   adjustments to dealing with a new society.  He came |
| 11   applying for asylum? | 11   from a different system than is in the United States. |
| 12     A.   No. | 12     Q.   Did you think that Mr. Quo's main |
| 13     Q.   Wherever you would write articles or | 13   goal was to bring down the Chinese Communist Party? |
| 14   columns about Mr. Guo, would you ever show him a draft | 14     A.   Did I believe? |
| 15   before they were published? | 15     Q.   Did you and do you? |
| 16     A.   No. | 16     A.   I do. |
| 17     Q.   Would you ever show him quotes before | 17     Q.   And do you believe he is an opponent |
| 18   they were published, to make sure they were approved | 18   of Chairman Xi? |
| 19   or translated correctly? | 19     A.   Yes. |
| 20     A.   No. | 20     Q.   And have you personally ever heard |
| 21     Q.   And to your knowledge, did Mr. Guo | 21   Mr. Guo give an oath of loyalty to the Chinese |
| Page 74 | Page 76 |

| | |
|---|---|
| 1   read what you wrote about him? | 1   Community Party? |
| 2     A.   Yes. | 2     A.   No. |
| 3     Q.   Did he ever express an opinion about | 3     Q.   Have you ever heard a video of him |
| 4   your writing about him? | 4   doing that? |
| 5     A.   Yes. | 5     A.   No. |
| 6     Q.   And what he did he say? | 6     Q.   Have you ever heard an audio of him |
| 7     A.   If he liked a story, he would send me | 7   doing that? |
| 8   a text that he liked the story. | 8     A.   No. |
| 9     Q.   And if he didn't like the story? | 9     Q.   So it's fair to say you are unaware |
| 10     A.   I didn't hear anything. | 10   of any expressions of loyalty to Chairman Je? |
| 11     Q.   Were you certain that Mr. Guo was a | 11     A.   I would say that at the early stages |
| 12   dissident? | 12   of what he describes as whistle blowing or basically |
| 13     A.   Yes. | 13   exposing things, I believe that perhaps he was |
| 14     Q.   And why is that? | 14   trying to hedge his bets. |
| 15     A.   I have had much experience dealing | 15     I can remember him kind of pulling his |
| 16   with defectors, from covering the intelligence beat. | 16   punches in criticizing Xi Jinping, while at the same |
| 17   And I can tell you that people who defect, as I | 17   time, criticizing what he regarded as large scale |
| 18   consider it, as he does, frequently come with baggage. | 18   corruption, but I never saw it as a kind of a loyalty |
| 19     They have usually had many types of | 19   or fidelity to Xi Jinping. |
| 20   different problems and things.  So often, dealing with | 20     Q.   And what did he tell you about his |
| 21   people from this situation are sometimes difficult to | 21   past? |
| Page 75 | Page 77 |

**Bill Gertz**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

A.   That he has been working to
privately within the system to eventually break with
the regime, and try to bring about democratic change.

Q.   Did he tell you about Tiananmen
Square?

A.   He mentioned that around the time of
Tiananmen, he had some type of an incident related to
a police run in.

Q.   Did you verify whether or not he was
ever arrested in Tiananmen?

A.   I did not.

Q.   And why did Mr. Guo leave China?

MS. CLINE:  Objection, foundation.

THE WITNESS:  I don't know the answer to
that.

BY MS. LUETKEMEYER:

Q.   Did he ever tell you why he left?

A.   No.

Q.   Do you know when he left?

A.   Not exactly.

Q.   Did you ever try to establish when he

Page 78

actually left China?

A.   The only thing I could determine was
that 2015 or 2016, based on news reports.

Q.   That he arrived in America sometime
then?

A.   Yes.

Q.   Do you know if he spent any time in
another country in between?

A.   I don't know.

Q.   Do you believe that Mr. Guo has
broken with the regime definitively?

A.   Yes.

Q.   What do you know about his
relationship with Wang Qishan?

A.   I know that he believes that he has
obtained information about corruption related to Wang
Qishan, and that that was one of his main whistle
blowing activities when he began to go public in the
2017, 2018 time period.

Q.   And what did he represent to you was
their relationship?

Page 79

A.   I never had any sense that he had a
relationship with him.

Q.   And in the course of covering or
getting to know Mr. Guo, did you learn that he had
brought many lawsuits in the United States?

A.   I did.

Q.   And what was the purpose of those
lawsuits?

MS. CLINE:  Objection, foundation.

THE WITNESS:  I don't know.

BY MS. LUETKEMEYER:

Q.   Have you seen the pleadings in any of
those cases?

A.   I did.

Q.   Which ones, do you recall?

A.   I don't recall.

Q.   Do you recall writing an article or a
column about his defamation lawsuit?

A.   I do.

Q.   And do you recall the outcome of that
case?

Page 80

A.   I think he won the case.

Q.   What have you heard from Mr. Guo
about his lawsuits against or on behalf of himself
regarding defamation claims?

A.   It's not something we have discussed.

Q.   So you covered the lawsuits, but he
did not discuss them with you?

A.   I didn't discuss them with him.

Q.   Okay.  So whenever he was successful
in prevailing in that defamation case, did you talk to
him about that court victory?

A.   I do not believe I did.

Q.   You wrote an article about it though?

A.   Yes.  I might have quoted him.  He
may have sent a quote for the story.

Q.   Did you know who the defendants were
in those lawsuits?

A.   I do not.

Q.   Were you aware that they were mostly
dissidents?

A.   Yes.

Page 81

21 (Pages 78 to 81)

**Bill Gertz**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

1    **Q.   Why do you believe that Mr. Guo, if**
2  **he was a dissident, was suing other dissidents?**
3        A.   I don't know.
4        **Q.   Did you ever ask him about it?**
5        A.   No.
6        **Q.   Were you ever given any indication by**
7  **Mr. Guo or anyone else that these cases might have**
8  **been more for show than an actual dispute?**
9        A.   I don't understand that question.
10       **Q.   Did Mr. Guo ever tell you that there**
11 **was additional purpose to the lawsuit besides**
12 **prevailing on defamation law?**
13       A.   I am not aware of anything like that.
14       **Q.   You are not aware of any PR purpose**
15 **to the lawsuits?**
16       A.   No.
17       **Q.   What have you heard from Mr. Guo, if**
18 **anything, about his lawsuits involving Soho, China?**
19       A.   I don't know anything about it.
20       **Q.   Do you know anything about his**
21 **lawsuits involving Sho Shen?**

Page 82

1        A.   No.
2        **Q.   Or its founder, Hui shu Lee?**
3        A.   No.
4        **Q.   Were you ever given any indication by**
5  **Evette Wong or William Je about these lawsuits and**
6  **their purpose?**
7        A.   No.
8        **Q.   Did Mr. Guo talk to you about his**
9  **lawsuits against Chinese state connected companies?**
10       A.   No.
11       **Q.   Were you aware of Mr. Quo's movement**
12 **of money to Hong Kong for investments in Hi Chong**
13 **Securities?**
14       A.   No.
15            - - - -
16       (Exhibit No. 3 marked for identification.)
17            - - - -
18       **Q.   There was an article that you wrote**
19 **that I want to hand to you so that you remember that,**
20 **and I will give a copy to you.  This is an October 25,**
21 **2017 article.  We are going to mark it as Exhibit 3.**

Page 83

1        **Here is a copy and I will give you my copy.**
2  **I will ask you to take a look at the October 25, 2017**
3  **entitled, "Sessions threatens to quit over Chinese**
4  **dissident."**
5        **Do you see that?**
6        A.   Yes.
7        **Q.   And I will represent that the first**
8  **four pages are the article that I want to talk about**
9  **to you.  The last half of this exhibit has to do with**
10 **an unrelated issue.**
11       **On Page 3 of 9, as you can see, they are**
12 **labeled in the upper, right corner of this Exhibit No.**
13 **3, Mr. Gertz, do you see that last paragraph beginning**
14 **with, "The State Department?"**
15       A.   Um hum.
16       **Q.   That paragraph reads that The State**
17 **Department blocked the FBI from arresting two Chinese**
18 **security officials for violating visa rules in meeting**
19 **with Mr. Guo this year."  The Wall Street Journal had**
20 **reported that.  Do you see that?**
21       A.   Yes.

Page 84

1        **Q.   And you report that meeting was part**
2  **of China's efforts to force Mr. Guo to return to**
3  **China, and included threats and intimidation?**
4        A.   Yes.
5        **Q.   When did you first learn about the**
6  **meeting, the visit by Chinese authorities to Mr. Guo?**
7        A.   I don't recall.
8        **Q.   What happened in that incident?**
9        A.   As I recall, what I can say is that
10 China -- and this was in the Wall Street Journal, and
11 I am basing it on that.  The Wall Street Journal
12 reported that Chinese officials showed up to the
13 United States for a meeting on cyber security in
14 Washington.  And at some point, one or both of the
15 officials who were part of the ministry of public
16 security or ministry of state security broke off and
17 went to New York to try to coerce and intimidate Guo
18 into either remaining silent or returning to China.
19       **Q.   Do you know when this occurred?**
20       A.   I do not.
21       **Q.   This article says this year.**

Page 85

22 (Pages 82 to 85)

**Bill Gertz**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

1   A.   It was in the Wall Street Journal
2   article.
3   **Q.   Right.  So, Mr. Gertz, did Guo**
4   **discuss this with you, this visit by the Chinese**
5   **officials?**
6   A.   I believe he did.
7   **Q.   And what did he say?**
8   A.   He explained that they were there to
9   threaten him and his family if he didn't go back to
10  China or if he didn't remain silent.  I can't remember
11  the details.
12  **Q.   And he let them into his home,**
13  **correct?**
14  A.   I believe so.
15  **Q.   They came into the Sherry Netherland**
16  **apartment?**
17  A.   I am not sure.
18  **Q.   Do you know how long the visit**
19  **lasted?**
20  A.   I don't know.
21  **Q.   Do you know if he tried to bargain**

Page 86

1   A.   I have never heard that.
2   **Q.   Have you ever heard a recording of**
3   **him saying that?**
4   A.   No.
5   **Q.   And how would you describe your**
6   **relationship with Mr. Guo today?**
7   A.   Professional and friendly.
8   **Q.   And when is the last time you spoke**
9   **with him?**
10  A.   Probably last month.
11  **Q.   And do you communicate with him over**
12  **text?**
13  A.   Occasionally.
14  **Q.   And sometimes over the phone?**
15  A.   Yes.
16  **Q.   What's your preferred method of**
17  **communication?**
18  A.   Signal.
19  **Q.   Signal.  And when is the last time**
20  **you saw Mr. Guo in person?**
21  A.   It would have been last month.

Page 88

1   with them?
2   A.   I don't know.
3   **Q.   Do you know what the objective of the**
4   **visit was?**
5   A.   I do not know.
6   **Q.   Do you know if those men were meeting**
7   **with him regarding the release of held funds?**
8   A.   I do not know.
9   **Q.   Was Mr. Guo concerned about the**
10  **safety of his family after this visit?**
11  A.   I don't know.
12  **Q.   Are you aware of whether Mr. Guo has**
13  **tried to negotiate with security officials for the**
14  **Chinese Government?**
15  A.   I don't know.
16  **Q.   Are you aware of any other meetings**
17  **by Chinese security officials at the Sherry**
18  **Netherland?**
19  A.   I don't know.
20  **Q.   Are you aware of Mr. Guo's statements**
21  **that he has "absolute faith in General Secretary XI?"**

Page 87

1   **Q.   And what was that for?**
2   A.   I met him at his apartment when I was
3   in New York for a book event, book meeting event.
4   **Q.   And how long did that meeting last?**
5   A.   About an hour.
6   **Q.   Was that meeting professional or**
7   **personal in nature?**
8   A.   Both.
9   **Q.   And what did you and Mr. Guo discuss?**
10  A.   Events in Hong Kong mainly.
11  **Q.   Did you discuss this litigation?**
12  A.   No.
13  **Q.   Have you ever discussed this**
14  **litigation with Mr. Guo?**
15  A.   I have.
16  **Q.   And what were the conversations that**
17  **you had with him about it?**
18  A.   At least one occasion, I asked him
19  not to go through with the lawsuit.
20  **Q.   And when was that?**
21  A.   I can't remember exactly when, but it

Page 89

23 (Pages 86 to 89)

**Bill Gertz**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

1  would have been sometime after the lawsuit had become
2  public.
3      **Q.   After it was filed?**
4      A.   I don't know when exactly.
5      **Q.   But it wasn't before the lawsuit was**
6  **filed, it was after the lawsuit was filed?**
7      A.   It was after the word of the lawsuit
8  had become public.
9      **Q.   And when you say you asked him not to**
10 **go through with it, why did you ask him that?**
11     A.   Well, I was at one time friends with
12 Ms. Wallop and Mr. Waller, and I felt that it was best
13 that they would find a way to settle whatever
14 differences they had.
15     **Q.   Did you tell him that?**
16     A.   I just asked him not to sue them.
17     **Q.   He had already sued them though,**
18 **hadn't he?**
19     A.   I don't know.  Like I said, it was
20 after the suit became public.  I didn't know about the
21 details of it.

                                              Page 90

1      **Q.   So you effectively were asking him to**
2  **drop the suit?**
3      A.   I asked him not to sue them.
4      **Q.   And what did he say?**
5      A.   I can't remember, but he didn't say
6  yes or no.  I don't remember what his response was.
7      **Q.   Was this in person?**
8      A.   Yes.
9      **Q.   And who was the translator?**
10     A.   I don't recall.
11     **Q.   Do you know if it was Ling Cho Hann?**
12     A.   I don't remember.
13     **Q.   I won't ask you to speculate.  Since**
14 **that conversation about this litigation, have you had**
15 **other conversations with Mr. Guo about this case?**
16     A.   No.  There may have been two
17 occasions where I asked him not to sue.
18     **Q.   Okay.  What was the other one, do you**
19 **recall?**
20     A.   I can't remember.
21     **Q.   But at least on one occasion?**

                                              Page 91

1      A.   Yes.
2      **Q.   Okay.**
3          **Do you recall ever apologizing to Mr. Guo**
4  **for introducing him to Mr. Waller and Ms. Wallop?**
5      A.   He was very upset about the
6  arrangement between them going bad and expressed that
7  to me.  And I felt bad.  I did apologize and say, yes,
8  I am sorry that things did not work out.
9      **Q.   Do you remember if you characterized**
10 **Ms. Wallop and Mr. Waller in that conversation in any**
11 **particular way?**
12     A.   I don't remember.
13     **Q.   Do you know when that conversation**
14 **occurred?**
15     A.   I do not.
16     **Q.   When you say Mr. Guo was very upset,**
17 **what did he say to you?**
18     A.   I can't recall exactly what he said.
19 I got the impression that he was upset and that he had
20 felt ripped off.
21     **Q.   Did he use those words?**

                                              Page 92

1      A.   No.
2      **Q.   Do you recall the words that he used?**
3      A.   I do not.
4      **Q.   And was this meeting in person as**
5  **well?**
6      A.   Yes.
7      **Q.   Did he seem angry to you?**
8      A.   Not visibly, no.  I just felt that he
9  was upset by it.
10     **Q.   And do you recall who, if anyone, was**
11 **there for that conversation besides the two of you?**
12     A.   I do not.
13     **Q.   Do you recall if that was at his**
14 **apartment?**
15     A.   I can't recall where it was.
16     **Q.   And after you said that you were**
17 **sorry that it happened, what did he say?**
18     A.   I can't remember.
19     **Q.   Did you ever hear back from him that**
20 **he was not going to drop the lawsuit?**
21     A.   No.

                                              Page 93

                              24 (Pages 90 to 93)

**Atkinson-Baker, Inc.**
**www.depo.com**

1      **Q.   And has this lawsuit changed your**
2  **relationship with Mr. Guo?**
3          A.   I don't know.
4      **Q.   Do you notice the difference in how**
5  **the two of you interact?**
6          A.   No.
7      **Q.   He continues to contact you?**
8          A.   He sends me information about the
9  Hong Kong protests occasionally.
10     **Q.   Okay.   And when is the last time**
11 **Mr. Guo was an on the record source in one of your**
12 **articles or columns?**
13         A.   It would have been in July of 2019.
14     **Q.   And your book has some excerpts of**
15 **Mr. Guo,  isn't that correct?**
16         A.   Yes.
17     **Q.   And has he read your book?**
18         A.   I don't know.
19     **Q.   Did you send him the chapters of it**
20 **before it was finished?**
21         A.   No.

Page 94

1      **Q.   Has he seen the sections, to your**
2  **knowledge, that describe him?**
3          A.   Yes.
4      **Q.   Did he see those after it was**
5  **published?**
6          A.   I don't know.
7      **Q.   How do you know that he's seen them?**
8          A.   Has seen what?
9      **Q.   The sections of your book that**
10 **discuss him?**
11         A.   I'm not certain.  I didn't say that I
12 did.  I said I don't know.
13     **Q.   I think I misunderstood.  Did Mr. Guo**
14 **introduce you to any of his associates or friends,**
15 **other than Mr. Je?**
16         A.   I think he may have had some guests,
17 some Chinese guests, at his place, but I can't recall
18 who they may have been.
19         MS. KROPF:  When is a good time for a
20 break?
21         MS. LUETKEMEYER:  We can take one in

Page 95

1  about two minutes.  I am almost done with the
2  questioning.
3      **Q.   Do you know or do you know of Donald**
4  **Chan?**
5          A.   Donald.
6      **Q.   Chan, C-H-A-N?**
7          A.   Chan.  I don't know.
8      **Q.   So we have spoken of William Je, and**
9  **Evette Wong, he introduced you to her, didn't he?**
10         A.   Yes.
11     **Q.   We spoke briefly about what her role**
12 **was.  Do you recall when you first met with Ms. Wong?**
13         A.   When I did the first interview in
14 June or July of 2017.
15     **Q.   At the restaurant?**
16         A.   Yes.
17     **Q.   And did you ever speak with her**
18 **independently outside of Mr. Guo?**
19         A.   I may have, occasionally.
20     **Q.   Did you communicate with her over**
21 **Signal?**

Page 96

1          A.   Yes, I may have, occasionally.
2      **Q.   Was she present in most of your**
3  **meetings with Guo?**
4          A.   No.
5          MS. LUETKEMEYER:  We can take a break
6  here.  Off the record.
7          THE VIDEOGRAPHER:  We are going off the
8  record.  The time is 1:13 p.m.
9          (Short Recess.)
10         THE VIDEOGRAPHER:  We are back on the
11 record at 1:28 p.m.
12         MS. CLINE:  This is Joanna Cline.  I
13 wanted to put on the record that Counsel have agreed
14 that all objections, except as to form, will be
15 reserved until the time of trial.
16         MS. KROPF:  Also, on behalf of
17 Mr. Gertz, we will be designating the whole transcript
18 for now as confidential under the protective order.
19 BY MS. LUETKEMEYER:
20     **Q.   Mr. Gertz, we spoke earlier about the**
21 **Rule of Law Foundation and the Rule of Law Society.**

Page 97

25 (Pages 94 to 97)

**Bill Gertz**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

| | |
|---|---|

1  Do you recall that?
2      A.   Yes.
3      Q.   Remind me again what the difference
4  is between the two?
5      A.   The Rule of Law Society is a
6  501(c)(4) organization and the Rule of Law Foundation
7  is a 501(c)(3).
8      Q.   And which one are you a director on?
9      A.   The 501(c)(4) society.
10     Q.   Okay.  And do you remember the other
11 directors of the 501(c)(4) society?
12     A.   I do not.
13     Q.   And do you all keep minutes of your
14 meetings?
15     A.   I don't know.
16     Q.   Have you ever seen any minutes of
17 meetings?
18     A.   I don't recall.
19     Q.   Do you recall who else was on the two
20 conference call meetings you referenced earlier?
21     A.   I do not recall.

Page 98

1      A.   I think my wife told me.
2      Q.   It was your shared bank account with
3  your wife?
4      A.   Yes.
5      Q.   And what bank is that?
6      A.   Bank of America.
7      Q.   And where does William Je live?
8      A.   I think he lives either in New York,
9  or Hong Kong, or both.
10     Q.   And if we request the banking record
11 that would show that transfer, would you be willing to
12 provide that to us?
13     A.   No.
14     Q.   On what basis?
15     A.   Privacy.
16         MS. KROPF:  It's also not in your
17 deposition -- or in your subpoena.
18         MS. LUETKEMEYER:  Right.  We would have
19 to amend our subpoena for that and talk about it.
20     Q.   Mr. Gertz, you said that you
21 described Mr. Guo as a defector a couple times in this

Page 100

1      Q.   Did Mr. Bannon lead those meetings?
2      A.   I think he was -- yes, he was there.
3      Q.   We spoke at the beginning of the
4  deposition about Mr. William Je.  I just have a few
5  clarifying questions about that.
6          You said that payment to you was made by
7  wire?
8      A.   Yes.
9      Q.   And do you know if that was an ACH
10 transfer?
11     A.   I don't know.
12     Q.   Do you know if it came from a bank in
13 America?
14     A.   I don't know.
15     Q.   And do you have a record of the wire
16 in your banking records?
17     A.   I don't recall.  I don't know.
18     Q.   Have you seen any document?
19     A.   I have not.
20     Q.   How did you learn that the deposit
21 had hit your bank account?

Page 99

1  deposition.  Do you remember that?
2      A.   Yes.
3      Q.   What's the difference between a
4  defector and a dissident?
5      A.   I don't think there is a definition
6  of either one.  A dissident could be a defector.  A
7  defector could be a dissident.  It depends on the
8  circumstances.
9          I would use the term defector in regard to
10 someone who has access to secrets, foreign secrets
11 that would be of value.
12     Q.   In your view, has Mr. Guo always been
13 a defector since you met him?
14     A.   Yes.
15     Q.   Do you recall writing in July of 2017
16 that Mr. Guo was not a defector?
17     A.   No.
18     Q.   And do you believe he is also a
19 dissident?
20     A.   Yes.
21     Q.   So you believe it's possible to be

Page 101

26 (Pages 98 to 101)

**Bill Gertz**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

both a dissident and a defector?

A.  Yes.

Q.   We spoke briefly about the visit by the Chinese officials to Mr. Quo's apartment.

Do you recall that discussion?

A.  Yes.

Q.   Have you listened to the audio or reviewed any video from that meeting?

A.  I don't believe so.

Q.   Are you aware that those recordings exist on the Internet?

A.  I am not certain.  I am not aware of them.

Q.   Before the break, we were discussing a woman named Evette Wong.

Do you remember that?

A.  Yes.

Q.   How many times would you say you have met with Ms. Wong?

A.  Maybe ten.  Not meet with her, but she would be present at a meeting that I was at.

Page 102

Q.   And when you would communicate with her over Signal like we discussed earlier, would other people be on the message or just you and Ms. Wong?

A.  Just me and Ms. Wong.

Q.   And what would you all communicate about?

A.  Usually just about arranging for a meeting with Mr. Guo.

Q.   What was her role with respect to Mr. Guo?

MS. CLINE:  Objection; foundation, form.

THE WITNESS:  I don't really know.  I know her as an assistant to Mr. Guo.

BY MS. LUETKEMEYER:

Q.   Would she help him with scheduling?

A.  I don't know.

Q.   When you said you were in touch with her regarding arranging a meeting with Mr. Guo, correct?

A.  Correct.

Q.   So would you reach out to her if you

Page 103

wanted to meet with him?

A.  Sometimes.

Q.   Would she ever reach out to you if she wanted to meet with you?

A.  I don't recall her doing that.

Q.   How would you normally set up a meeting or an interview with Mr. Guo?

A.  I would send him a text on Signal.

Q.  Just directly to him?

A.  Yes.

Q.   Would he occasionally have other people get back in touch with you?

A.  Yes.

Q.   Who would those people be?

A.  Mainly Evette Wong, or in the past, Ling Cho Hann.

Q.   Do you know what her duties for Mr. Guo involved?

A.  No.

Q.   Do you know anything about her background?

Page 104

A.  I do not.

Q.   Do you know, is she Chinese?

A.  I believe she is Chinese, yes.

Q.   What is Golden Spring?

A.  I don't know.

Q.   You have never heard of an entity, Golden Spring?

A.  I have not.

Q.   Are you familiar with ACA Capital?

A.  I do not know what that is.

Q.   Are you familiar with Eastern Profit?

A.  I think that's the part of this suit here.

Q.   Yes.  It's the plaintiff in this lawsuit.

A.  Yes.

Q.   What do you know about Eastern Profit?

A.  I don't know anything about it.

Q.   Did Mr. Guo ever discuss Eastern Profit with you?

Page 105

27 (Pages 102 to 105)

**Bill Gertz**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

1      A.   No.
2          **Q.   Did he ever discuss any of his**
3  **corporations or affiliated entities with you?**
4      A.   No.
5          **Q.   In the early fall of 2017, do you**
6  **recall an event at the Hudson Institute?**
7      A.   Yes.
8          **Q.   And what was that?**
9      A.   It was to be a speech by Mr. Guo.
10         **Q.   And what was the goal of that event?**
11     A.   He was going to give a speech at one
12  of his first public events.
13         **Q.   And what is the Hudson Institute?**
14     A.   It's a think tank in Washington, D.C.
15         **Q.   And whose idea was the event?**
16     A.   I don't know.
17         **Q.   Did you help organize it?**
18     A.   No.
19         **Q.   How did you first hear about it?**
20     A.   Probably through Ling Cho.
21         **Q.   Were you set to participate in the**

Page 106

1  **event?**
2      A.   I believe I was to be a moderator on
3  a panel of some sort.
4          **Q.   Do you recall who asked you to be a**
5  **moderator?**
6      A.   I think it was Ling Cho.
7          **Q.   And what happened with that event?**
8      A.   It was cancelled.
9          **Q.   Why?**
10     A.   The ostensible reason was that they
11  weren't prepared for it, but it appears from all
12  outside appearances, that it was under pressure from
13  the Chinese Government.
14         **Q.   When you say "outside appearances"**
15  **what leads you to believe that?**
16     A.   Well, there is a report from the U.S.
17  China Commission, a Congressional report, which
18  addressed that issue.  And the report states that the
19  Chinese Government pressured the Hudson Institution as
20  to cancel it by threatening to withhold visas from
21  some of the Hudson scholars.

Page 107

1          **Q.   Did the Hudson Institute ever decide**
2  **it wasn't comfortable with Guo?**
3      A.   I don't know.
4          **Q.   Were you ever a part of those**
5  **conversations?**
6          MS. CLINE:  Objection to form.
7          THE WITNESS:  No.
8  BY MS. LUETKEMEYER:
9          **Q.   How did you learn that the event was**
10  **cancelled?**
11     A.   I think Ling Cho told me.
12         **Q.   How soon before the event did it get**
13  **cancelled?**
14     A.   A number of hours.
15         **Q.   Do you remember anything about any**
16  **alleged cyber attack?**
17     A.   Yes.  I believe that they were under
18  a cyber attack that they believe came from China as
19  part of the pressure campaign to halt the event.
20         **Q.   The officials of the Hudson Institute**
21  **claimed a cyber attack had occurred?**

Page 108

1      A.   They claimed that they had been
2  attacked by cyber from China.
3          **Q.   Were you invited to that event by Ken**
4  **Weinstein?**
5      A.   No.
6          **Q.   Mr. Hann invited you to that event,**
7  **you said, correct?**
8      A.   Yes.
9          **Q.   And do you remember if you have any**
10  **documents or e mails about that event or the purpose**
11  **of it?**
12     A.   I do not.
13         **Q.   Did you ever hear from anyone or have**
14  **any reason to believe that Hudson might have been**
15  **having second thoughts about hosting the event?**
16     A.   I did not.  I have no idea.
17         **Q.   Do you believe the reason for the**
18  **cancellation as stated by the Hudson Institute?**
19     A.   Could you clarify that?
20         **Q.   Do you believe the stated reason for**
21  **the cancellation, the pressure campaign and the cyber**

Page 109

28 (Pages 106 to 109)

**Bill Gertz**
**October 15, 2019**

1  attack, was the real reason?
2      A.  The question is not clear.
3      Q.  I will rephrase it.  The stated
4  reason for the cancellation, that there had been a
5  cyber attack, do you believe that to be the true
6  reason it was cancelled?
7      A.  I don't believe that was their stated
8  reason for cancelling the event.
9      Q.  What was the stated reason?
10      A.  I believe they issued -- one of their
11  spokesmen told me that there was some other -- there
12  was a lack of preparation for the event.
13      Q.  So you found later that it was a
14  cyber attack or pressure?
15      A.  I'm not sure of the timing.  I can't
16  speculate.
17      Q.  Do you recall writing an article
18  about the think tank cancelling the talk?
19      A.  Yes.
20      Q.  And was the Hudson Institute
21  officials -- were they interviewed for that article?

Page 110

1      A.  The spokesman was quoted, I believe.
2      Q.  And whose idea was it to have the
3  discussion with you and Mr. Guo at the National Press
4  Club just a few days later?
5      A.  I believe it was Ling Cho Hann.
6      Q.  And was that sort of in place of the
7  Hudson Institute's event?
8      A.  Yes.
9      Q.  Did you meet with Mr. Guo the same
10  day as the Hudson Institute event?
11      A.  It may have been the same day or the
12  day after, around that, yes.
13      Q.  So Mr. Ling Cho Hann had the idea to
14  do a National Press Club event, you said?
15      A.  I don't know.
16      Q.  Do you know who organized that event?
17      A.  I do not.
18      Q.  Were you involved in booking and
19  planning that event, inviting the media?
20      A.  No.
21      Q.  You were aware that you are listed as

Page 111

1  a host of that press conference?
2      A.  I do not know.
3      Q.  What was your role during that press
4  conference?
5      A.  I was a moderator for it, and there
6  was a translator, and there was Mr. Guo.
7      Q.  Do you remember who the translator
8  was?
9      A.  I think it may have been Wui Chungua
10  (phonetic).
11      Q.  The same man who was present during
12  your first meeting?
13      A.  Yes, yes.
14      Q.  When you say you moderated, did you
15  come with prepared questions for Mr. Guo?
16      A.  No.
17      Q.  You just asked questions off the
18  cuff?
19      A.  I'm not even sure it was that.  It
20  was more an introducer of that, to make an
21  introductory remark of some sort.

Page 112

1      Q.  Was this his first major public
2  appearance?
3      A.  I don't know if he had done others or
4  not.
5      Q.  And what did you view the purpose of
6  that press conference to be?
7      A.  I think it was so that Mr. Guo could
8  announce his views about the Chinese Communist Party,
9  and what he hoped to do.
10      Q.  Did you believe that event was
11  successful?
12      A.  Yes.
13      Q.  And was it around this time, do you
14  recall, that you introduced Mr. Guo to Steve Bannon?
15      A.  I do not recall the exact time, but
16  it may have been after that, or it may have been
17  around that time.
18      Q.  How did Mr. Guo meet Bannon?
19      A.  I met Steve Bannon after he left the
20  White House.  And he mentioned to me that he was
21  familiar with Mr. Guo, and that  he said he would

Page 113

29 (Pages 110 to 113)

**Atkinson-Baker, Inc.**
**www.depo.com**

1    like to meet him.  And I said, "Okay, I'll ask if he
2    wants to meet you."  And they eventually met at the
3    Hay Adams Hotel.
4        Q.   **How long had you known Mr. Bannon?**
5        A.   I had known him a little bit when he
6    was   before the White House, and a little bit while
7    he was at the White House, but I was not close, but we
8    shared the same views on China.
9        Q.   **Which are what?**
10       A.   That it's a nuclear armed Communist
11   dictatorship that poses a threat to the world.
12       Q.   **And you said Mr. Bannon asked you to**
13   **make an introduction of him to Mr. Guo?**
14       A.   Yes.
15       Q.   **Have he ever met Mr. Guo before, to**
16   **your knowledge?**
17       A.   I don't know.
18       Q.   **Do you know if they had ever spoken**
19   **on the phone?**
20       A.   I don't know.
21       Q.   **So when Mr. Bannon told you he was**

Page 114

1   **interested in meeting Mr. Guo, was this in person?**
2       A.   Yes.
3       Q.   **Where was that?**
4       A.   At his house on Capitol Hill.
5       Q.   **Do you remember about when that would**
6   **be?**
7       A.   I do not.
8       Q.   **Before the Press Club visit in**
9   **October of 2017?**
10      A.   I really can't recall.
11      Q.   **Do you have any documents with**
12   **Mr. Bannon?**
13      A.   No.
14      Q.   **How would you typically communicate**
15   **with Mr. Bannon?**
16      A.   Through text message or phone.
17      Q.   **And when you say text message, would**
18   **that be Signal?**
19      A.   Yes.
20      Q.   **And tell me about that first meeting**
21   **when you introduced Mr. Guo to Mr. Bannon?**

Page 115

1       A.   He came to the Hay Adams Hotel where
2   Guo was staying, and I think we had a lunch meeting
3   after that.
4       Q.   **And who all was present for that**
5   **meeting?**
6       A.   If my memory serves correct, it was
7   Ling Cho Hann and Yang Jain Lie, another dissident,
8   Chinese dissident.
9       Q.   **I don't know how to spell that but**
10   **maybe I can get you to.**
11      A.   Y-A-N-G, J-I-A-N, L-I-E.
12      Q.   **And who is that dissident, what is**
13   **his role?**
14      A.   He is a former imprisoned dissident
15   from China who now has an organization for dissidents,
16   Chinese dissidents.
17      Q.   **And what is this organized called?**
18      A.   I'm not sure.
19      Q.   **Does he live here in Washington?**
20      A.   I think it may be Massachusetts.
21      Q.   **And why was he at the meeting?**

Page 116

1      A.   I don't know.
2      Q.   **Was he there already with Mr. Guo?**
3      A.   He came with Ling Cho, I believe.
4      Q.   **And what was the purpose of that**
5   **first introductory meeting?**
6      A.   Just to meet Steve Bannon, for Guo to
7   meet Steve Bannon, former White House strategist.
8      Q.   **When you first bought up the idea to**
9   **Mr. Guo of him meeting Steve Bannon, what did he say?**
10     A.   He said he'd like to meet him.
11     Q.   **So what was discussed at that first**
12   **meeting?**
13     A.   I don't recall.
14     Q.   **You don't recall anything about it?**
15     A.   I don't recall.  I just have no
16   recollection of what we talked about.
17     Q.   **Did Mr. Bannon ask Mr. Guo questions**
18   **about himself, his background?**
19     A.   I have no recollection of that.
20     Q.   **Do you recall Mr. Guo being**
21   **interested in Mr. Bannon's role at the White House?**

Page 117

30 (Pages 114 to 117)

**Bill Gertz**
**October 15, 2019**

1    A.  No.

2    Q.  Do you recall Mr. Guo bringing up his

3   asylum application?

4    A.  No.

5    Q.  Had Mr. Bannon ever brought up with

6   you the fact that Mr. Guo had a pending application

7   for asylum?

8    A.  I don't know.

9    Q.  Do you recall writing an article

10   about former Attorney General Jeff Sessions

11   threatening to quit over Mr. Guo?

12    A.  I do.

13    Q.  And what were the circumstances

14   surrounding that incident?

15    A.  I don't recall.

16    Q.  Did you ever discuss that incident

17   with Mr. Bannon?

18    A.  No.

19    Q.  Do you recall there being a second

20   meeting when Bannon visited Mr. Guo in New York City?

21    A.  I am not aware of it.  I don't know.

Page 118

1    A.  I do not know.

2    Q.  Have you ever heard of a contract

3   that Mr. Bannon is affiliated with Mr. Guo?

4    A.  I don't know.

5    Q.  What is the relationship between

6   Mr. Bannon and Mr. Guo today?

7    MS. CLINE:  Objection, foundation.

8    THE WITNESS:  I don't know.

9   BY MS. LUETKEMEYER:

10    Q.  Do you know the last time they have

11   spoken?

12    A.  I do not.

13    Q.  And after you introduced the two, did

14   you speak with Mr. Guo about his impressions of

15   Mr. Bannon?

16    A.  I don't recall.

17    Q.  Do you recall speaking with

18   Mr. Bannon about his impressions of Mr. Guo?

19    A.  I do not recall.

20    Q.  What do you think Mr. Guo brought to

21   the table in relation to Mr. Bannon?

Page 120

1    Q.  Were you present for that dinner?

2    A.  I don't know.

3    Q.  Have you ever been to Mr. Quo's home

4   when Mr. Bannon was also in attendance?

5    A.  Yes.  I think there was a lunch

6   meeting after the October, 2018 press conference.

7    Q.  Now, I know about an October, 2017

8   press conference.

9    A.  No.  This was a press conference in

10   2018 announcing the rule of law fund, and we had lunch

11   after at Mr. Quo's house.

12    Q.  Okay.  I am familiar with that one.

13   Thank you.

14    Do you ever recall being at Mr. Quo's house

15   for a dinner with Mr. Bannon?

16    A.  I do not.

17    Q.  Do you know whether Mr. Guo was

18   paying Mr. Bannon?

19    A.  I do not.

20    Q.  Do you recall know whether Mr. Quo's

21   Rule of Law Society pays Mr. Bannon?

Page 119

1    A.  I have no idea.

2    Q.  Why do you think he wanted to meet

3   him?

4    A.  I don't know.

5    Q.  You didn't ever ask him why he wanted

6   you to make the introduction?

7    A.  No.

8    Q.  Do you know if Mr. Bannon ever met

9   with Mr. Guo in the White House?

10    A.  I do not.

11    Q.  You write in your book about

12   Mr. Bannon's trip to Hong Kong and China three weeks

13   after departing the White House in mid September of

14   2017.

15    Do you recall that?

16    A.  Correct.

17    Q.  And what do you know about that trip?

18    A.  I believe that I asked Steve Bannon

19   what he discussed with Wang Qishan.  And he said that

20   he discussed that Wang Quishan was interested in

21   globalism and populism.

Page 121

31 (Pages 118 to 121)

**Atkinson-Baker, Inc.**
**www.depo.com**

| | |
|---|---|
| 1     Q.   Was there some discussion also of | 1     Q.   When you had lunch with Mr. Bannon |

Q.   Was there some discussion also of
economic nationalism during that meeting?
     A.   I don't recall.
     Q.   And what else did Mr. Bannon say
about that meeting?
     A.   I have no other recollection.
     Q.   Do you know how you learned of it?
     A.   I do not.
     Q.   Did you interview him when he
returned?
     A.   I did not.
     Q.   When did you interview him?
     A.   I don't recall.
     Q.   So Mr. Bannon went on the record for
your book though, correct?
     A.   We had discussions.  I don't remember
exactly the form, or place, or when they were.
     Q.   So you don't remember learning about
his trip to China as it was happening?
     A.   No.
     Q.   Are you aware that Mr. Bannon gave a

Page 122

Q.   When you had lunch with Mr. Bannon
and Mr. Guo, do you remember Mr. Bannon discussing his
China visit with Mr. Guo?
     A.   I do not.
     Q.   Do you know who scheduled the meeting
with Wang Qishan and Bannon?
     A.   I do not.
     Q.   Have you ever heard of John Thornton?
     A.   I don't know who he is.
     Q.   You appear to be the first journalist
in June of 2017 to report that Mr. Quo's wife and
daughter were given a 20 day visa to come to the U.S.
that prior month in May, 2017.  Do you recall that
reporting?
     A.   I do not.
     Q.   I think it was in one of our earlier
articles, which I don't want to re mark for you, but
do you recall anything about the visas given to
Mr. Quo's family?
     A.   I do not.
     Q.   Have you ever been told about

Page 124

peace speech in Hong Kong to the state international
security firm?
     A.   Yes.
     Q.   And what do you know about that
speech?
     A.   I don't know anything about it.
     Q.   Do you know who arranged for his
appearance?
     A.   No.
     Q.   Did you ever ask him about it?
     A.   No.
     Q.   Do you know the purpose of his trip?
     A.   No.
     Q.   When he went to China and Hong Kong,
was that before or after you introduced him to
Mr. Guo?
     A.   I do not know.
     Q.   If I represent to you that he
traveled there in September of 2017, does that make in
any more helpful to you?
     A.   I don't have a clear recollection.

Page 123

potential imprisonment or persecution faced by Quo's
family back in China?
     A.   I don't recall any discussion of
that.
     Q.   You don't recall Mr. Guo ever telling
you he was afraid for his family?
     A.   I think he may have said he was
afraid for his family, but other than that, I have no
recollection of any details.
     Q.   Have you ever spoken with any of his
family members?
     A.   I have met his daughter.
     Q.   When was that?
     A.   I don't know.  I don't remember.
     Q.   And where did you meet her?
     A.   At the apartment in New York.
     Q.   Did you speak with her?
     A.   No.  It was just an introduction.
     Q.   Were you aware that Mr. Guo met with
former DHS Secretary Jeh Johnson in May of 2017?
     A.   I don't know.  I don't know anything

Page 125

32 (Pages 122 to 125)

**Bill Gertz**
**October 15, 2019**

1   about that.
2        **Q.   You haven't seen the recording of**
3   **that, there is a video of that?**
4        A.   I have not.
5        **Q.   And when did you first meet French**
6   **Wallop?**
7        A.   It was, January, I believe, January
8   of 2017.
9        **Q.   French Wallop?**
10       A.   Yes.
11       **Q.   Okay.  And that's when you first met**
12  **her in your life?**
13       A.   Yes.
14       **Q.   Okay.  And when did you first meet**
15  **Mr.  Waller, Michael Waller, who is also here?**
16       A.   I have known Mike since, I believe,
17  he used to work at an affiliate publication of The
18  Washington Times many years ago.
19       **Q.   And what was your first impression of**
20  **Ms. Wallop?**
21       A.   Well, she said she knew my former

1   editor, Oner Gaborkoff (phonetic), so I took that as
2   credit to her.
3        **Q.   And how would you describe your**
4   **relationship with Mr. Waller?**
5        A.   We were occasional friends when we
6   worked on a few policy oriented projects based on my
7   book, IWar, which called for reforming U.S. Government
8   information operations.
9        **Q.   What kinds of projects were those?**
10       A.   It was, basically, an idea to bring
11  about a better information capability for the U.S.
12  Government.  Right now, the Voice Of America is poorly
13  run.  We don't have the U.S. information agency that
14  we had during the Cold War.  And so my book, IWar,
15  recommends trying to revitalize some of those
16  functions.
17       **Q.   And how was Mr. Waller to help you in**
18  **that effort?**
19       A.   We sought to collaborate to present
20  these idea to get either Congress or the
21  administration to develop some type of reform

1   programs.
2        **Q.   And do you remember about when that**
3   **was?**
4        A.   I do not, other than sometime between
5   2017 and 2018.
6        **Q.   Did you seek out Mr. Waller's help on**
7   **that effort?**
8        A.   I believe I did.
9        **Q.   And why him?**
10       A.   I believe that he has good skills at
11  doing information.
12       If I may explain, the reason that I tried to
13  contact or put French Wallop in touch with Mr. Guo is
14  that, again, because I saw him as an extremely
15  valuable resource, I also saw him as extremely
16  scattered in his presentation.
17       His presentations would be on video and they
18  would be talking about a wide variety of topics.  And
19  then in the middle of them, he would disclose really
20  valuable information about the inside workings of the
21  Chinese Government and Intelligence Service.  And I

1   felt that he needed a strategic communications person.
2        And because French Wallop had contacted me
3   when she represented a dissident Russian billionaire
4   named Miguel Kortokofski, who I interviewed, she
5   arranged the interview, I felt that she could provide
6   strategic communication support to Guo, Mr. Guo.
7        **Q.   Did you understand Ms. Wallop to be**
8   **credible?**
9        A.   To be credible in what sense?
10       **Q.   A credible person you could recommend**
11  **for Mr. Guo to do business with?**
12       A.   I really didn't know her, I'll be
13  honest to say I really didn't know.  Like I said, I
14  was going on her reputation of having known Oner
15  Gaborkoff.
16       **Q.   Did you find her to be honest in her**
17  **dealings with you?**
18       A.   I guess I would say yes.
19       **Q.   Did you find her to be sincere?**
20       A.   Yes.
21       **Q.   And when did you first learn of the**

1  firm, Strategic Vision?
2      A.  I can't recall, but it would have to
3  have been based on news reports of this matter.
4      Q.  Okay.  So when you introduced Mr. Guo
5  to French and Mike?
6      A.  I didn't.
7      Q.  You didn't introduce them?
8      A.  No.  I introduced them to Ling Cho
9  Hann and Evette Wong, and then they made the
10  introduction to Guo.  My job was simply to make the
11  connection, and then that was it.
12      Q.  Okay.  So when you introduced them to
13  Ling Cho Hann and Ms. Wong, you weren't aware that
14  Ms. Wallop's firm was called Strategic Vision?
15      A.  Correct.
16      Q.  You learned that later, the formal
17  name of the firm?
18      A.  Yes.
19      Q.  Did you learn that once the lawsuit
20  was filed?
21      A.  I can't remember when.

Page 130

1      Q.  Okay.  But as far as you were
2  concerned, you were making an introduction of an
3  individual?
4      A.  Yes.
5      Q.  Or was it two individuals, Mr. Waller
6  also?
7      A.  Well, initially when I met French,
8  she brought Mike in.  And that was her decision, so I
9  had no objection to it.
10      So, again, I was -- my objective was to try
11  and get Mr. Guo to focus his message so that it could
12  be a more effective tool, and that I would benefit
13  from that by getting information and news stories from
14  that.
15      Q.  And you had already known Mr. Waller
16  for years?
17      A.  Yes.
18      Q.  Did her bringing Mr. Waller in give
19  you confidence?
20      A.  I had no objection to it.
21      Q.  Did you know that they were business

Page 131

1  associates?
2      A.  I didn't learn it until the first
3  meeting with French on the subject.
4      Q.  Do you find Mr. Waller to be
5  credible?
6      A.  Yes.
7      Q.  Do you find him to be honest?
8      A.  Yes.
9      Q.  Do you find him to be sincere?
10      A.  Yes.
11      Q.  Do you remember the first time you
12  introduced to Ms. Wallop and Mr. Waller to Ling Cho?
13      A.  I don't not remember the exact day or
14  circumstances.
15      Q.  Do you know if it was an in person
16  meeting?
17      A.  I think it may have been a phone
18  connection given, the connection, and that they would
19  connect them, but I honestly do not remember.
20      Q.  And you have described the purpose of
21  that introduction being for strategic communication

Page 132

1  assistance to Mr. Guo?
2      A.  Yes.  Again, I viewed Mr. Guo as
3  having lots of various resources, but I really felt
4  that what he lacked was someone that could provide him
5  with the ability to project, in a coherent and
6  effective way, his message, which I think is an
7  important message.
8      Q.  And did you tell him that you
9  believed he lacked that ability?
10      A.  I can't recall.  I may have, but I
11  can't recall a specific conversation about that, but I
12  think that was the whole purpose of my contacting
13  French Wallop.
14      Q.  And did he ask you to help him find
15  someone to aid him in communication?
16      A.  No.
17      Q.  Do you remember if you spoke with
18  Mr. Guo before or after you first brought up the idea
19  to Ms. Wallop?
20      A.  I may have raised the question.  I
21  may have told him that I had worked with French Wallop

Page 133

34 (Pages 130 to 133)

1  in the Miguel Kortokofski issue, which was early
2  there, and I said that I felt that if she could do for
3  Miguel Kortokofski what she would do for Mr. Guo, that
4  it would be beneficial to him.
5      Q.   Did you understand that her services
6  would include research?
7      A.   No.
8      Q.   Did Mr. Guo ever discuss with you his
9  goal of hiring someone to conduct research?
10         MS. CLINE:  Objection to form.
11         THE WITNESS:  No.
12  BY MS. LUETKEMEYER:
13      Q.   Did you negotiate any compensation
14  for your introduction?
15      A.   No.  I think, at one point, there was
16  a suggestion that I would get a finder's fee.  And my
17  suggestion was, no, I am not interested in that, but
18  if the collaboration may have involved some important
19  information that could be useful to me as a reporter,
20  that I would be welcome, I would welcome information
21  that would be useful for news reporting.

Page 134

1      Q.   So your arrangement was that the
2  fruits of the labor, if any, would flow to you
3  exclusively as a reporter?
4      A.   No.
5      Q.   Just that you would have access to
6  that information?
7      A.   No.  It was, again, that I felt that
8  if he had all of this valuable information and if it
9  were packaged properly, it could be made public.
10         So that rather than giving an hour and a
11  half video, that he could talk about whatever, his
12  personal food or his exercises, but then he could
13  focus more on the substance of what he wanted to
14  reveal.
15      Q.   So your view is Ms. Wallop and
16  Mr. Waller would help him with information he already
17  had, packaging his story and his information?
18      A.   Correct.
19      Q.   Were you surprised -- would you be
20  surprised to learn that he wanted them to conduct
21  research on third parties?

Page 135

1      A.   Yes.
2      Q.   Was that ever part of your
3  discussions with him?
4      A.   No.
5      Q.   Was that ever part of your
6  discussions with Ms. Wallop?
7      A.   No.
8      Q.   What about with Mr. Waller?
9      A.   No.
10     Q.   Others in this case have testified
11  that Mr. Guo communicated with them using What's Ap.
12  Have you ever spoken with him or communicated with him
13  using What's Ap?
14     A.   No.
15     Q.   You said, previously, it was just
16  Signal?
17     A.   Correct.
18     Q.   Do you recall who it was who
19  suggested you be given a finder's fee for the
20  introduction?
21     A.   It may have been French, but it was

Page 136

1  more of a suggestion rather than a fee.
2  Again, I said that I wasn't interested in any fee, but
3  that I was more interested in getting the message out
4  and getting information.
5      Q.   Do you remember what you told Ling
6  Cho Hann about the purpose of the first meeting with
7  Ms. Wallop and Mr. Waller?
8      A.   To my recollection, it was what I had
9  said, was we have seen from Mr. Guo a very powerful
10  message, but, again, somewhat disjointed in its
11  presentation, and that it was my hope that having a
12  strategic communications professional or
13  professionals, that it would help him to present his
14  information in a much more powerful way.
15     Q.   Did Ling Cho Hann agree?
16     A.   I think he did.
17     Q.   Did he ever mention to you that
18  Mr. Guo needed research help?
19     A.   He did not.
20     Q.   Did Ms. Wong ever mention to you that
21  Mr. Guo was looking for a research firm?

Page 137

35 (Pages 134 to 137)

**Atkinson-Baker, Inc.**
**www.depo.com**

| | |
|---|---|
| 1     A.  No. | 1  progress of those? |
| 2     Q.  **Did you have any concerns introducing** | 2     A.  No. |

A.   No.
Q.   **Did you have any concerns introducing**
Ms. Wallop and Mr. Waller to Mr. Guo?
A.   No.
Q.   **Do you believe that, as originally**
**conceived, the project would be benefiting him**
**personally?**
MS. CLINE:  Objection to form.
THE WITNESS:  What project?
BY MS. LUETKEMEYER:
Q.   **The project of hiring Ms. Wallop and**
**Mr. Waller, do you believe that was to be conveyed to**
**Mr. Guo as a personal benefit?**
A.   I don't know.
Q.   **Did you envision that their efforts**
**would help him obtain asylum?**
A.   I don't know.
Q.   **Do you recall Mr. Guo ever discussing**
**with you if Ms. Wallop could be helpful in him seeking**
**asylum?**
A.   I don't recall.

Page 138

Q.   **Do you recall ever having a**
discussion about Ms. Wallop and Mr. Waller's work
being made public?
A.   I do not.
Q.   **Did you ever see the contract?**
A.   No.
Q.   **When you had meetings with -- first**
of all, let's go back.  Your very first meeting with
Mr. Guo and Ms. Wallop and Mr. Waller, were you all
physically in the same space?
A.   I never met together with Ms. Wallop,
Mr. Waller, and Mr. Guo.
Q.   **Okay.  So you made the introduction**
to Ling Cho Hann and Evette Wong, and then meetings
occurred after that?
A.   Yes.
Q.   **Okay.  Were you ever on any phone**
calls with Mr. Guo, and Ms. Wallop, and Mr. Waller?
A.   No.
Q.   **As he began negotiations and**
discussions with them, did he update you on the

Page 139

progress of those?
A.   No.
Q.   **Did he ever report to you about how**
**the partnership was going?**
A.   No.  I think, at one point, he asked
me if he should do this contract.  And, again, I had
no knowledge about the contract.  I believed that it
was a strategic communications vehicle.
And he asked me if he should do the
contract.  And my response to him was, I would do it
maybe month to month or three months as a trial period
to see how it goes.
Q.   **Did he show it to you when he asked**
**you about it, did he send you a copy of what was**
**proposed?**
A.   No.
Q.   **Did he tell you how much the contract**
**cost?**
A.   I don't believe so.
Q.   **Have you since learned the value of**
**the contract?**

Page 140

A.   Yes.
Q.   **And how did you learn that?**
A.   I can't remember.
Q.   **And what's your understanding of the**
**value of the contract?**
A.   I think it's about a million dollars.
Q.   **And do you understand what the work**
**is to be performed on the contract?**
A.   No.
Q.   **And when you first decided to**
**introduce Ms. Wallop and Mr. Waller to Ling Cho Hann**
**and Ms. Wong, or subsequent introduction to Mr. Guo,**
**was there a time line or deadline in place by Mr. Guo?**
A.   Not that I know of.
Q.   **And you didn't have any deadline in**
**mind, in particular?**
A.   Not   I had no knowledge of that.
Q.   **Was time of the essence?**
MS. CLINE:  Objection to form.
THE WITNESS:  I have no idea.
BY MS. LUETKEMEYER:

Page 141

36 (Pages 138 to 141)

**Bill Gertz**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

1    Q.   You said earlier you hadn't learned
2    of the Eastern Profit until this lawsuit, correct?
3       A.   Correct.
4       Q.   How much do you know about the
5    contract's performance?
6       A.   I don't know anything.
7       Q.   Do you remember ever discussing with
8    Ms. Wallop Ms. Quo's need for research services on
9    third parties?
10      A.   I do not.
11      Q.   Did you ever remember seeing a list
12   of individuals who Mr. Guo wanted specific research
13   and surveillance on?
14      A.   No.
15      Q.   So do you have any knowledge of the
16   contract's performance after the contract was signed?
17      A.   At a certain point, I don't remember
18   when, Mr. Guo came to me with some material.  And it
19   was a printout of some -- what appeared to be data,
20   and I had no idea what it was.
21      And he said that this has been what they had

Page 142

1       Q.   Did you ever ask to see a copy of the
2    contract?
3       A.   No.
4       MS. LUETKEMEYER:  We can take a break to
5    change the tape.
6       THE VIDEOGRAPHER:  We are going off the
7    record.  This is the end of Media Unit No. 1.  The
8    time is 2:06 p.m.
9       (Short Recess.)
10      THE VIDEOGRAPHER:  We are back on the
11   record.  This is the beginning of Media Unit No. 2.
12   The time is 2:20 p.m.
13   BY MS. LUETKEMEYER:
14      Q.   Mr. Gertz, have you ever heard of an
15   entity called ASOG, in Texas?
16      A.   No.
17      Q.   It stands for Allied Special
18   Operations Group?
19      A.   I don't know it.
20      Q.   Have you ever heard of an individual
21   named Adam Craft?

Page 144

1    produced.  And I expressed surprise since I was
2    unaware of this data, whatever research project, and
3    that he showed it to me, and I was like, well, what am
4    I supposed to do with that?  I don't know.
5       Q.   And what did he say about it?
6       A.   He felt that it was not what he
7    wanted.  I mean, I got the impression that he felt
8    that this wasn't what he had expected.
9       Q.   And what did he tell you he expected?
10      A.   He didn't say.
11      Q.   Was he asking you to communicate to
12   Ms. Wallop and Mr. Waller about the material?
13      A.   No.
14      Q.   Just sharing with you what he had
15   received?
16      A.   Yes.
17      Q.   Do you remember when that was?
18      A.   I do not.
19      Q.   Where was that meeting, was that at
20   his apartment?
21      A.   Yes.

Page 143

1       A.   No.
2       Q.   Has Mr. Guo ever asked you to review
3    his paperwork related to his asylum claim?
4       A.   No.
5       Q.   Have you ever seen a draft of it?
6       A.   No.
7       Q.   Whenever we speak earlier in the
8    deposition about Mr. Je, do you know what his company
9    name is?
10      A.   I do not.
11      Q.   And you described him as a financier,
12   do you remember that?
13      A.   A fund manager, financier, financial
14   specialist, is my understanding.
15      Q.   When you say financial specialist,
16   what do you mean?
17      A.   He is wealthy.
18      Q.   Is he an investor?
19      A.   I don't know.
20      Q.   And who is he to Mr. Guo?
21      MS. CLINE:  Objection, foundation.

Page 145

37 (Pages 142 to 145)

**Bill Gertz**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

| | |
|---|---|

THE WITNESS: My understanding is that
they are friends, that they have no formal ties, and
that Mr. Je is a supporter, in a political sense, of
Mr. Guo.
BY MS. LUETKEMEYER:
    Q.  Is Mr. Je also a financial backer of
Mr. Guo?
    A.  Not that I am aware of.
    Q.  Are you aware of him providing
financial assistance to anyone else in the United
States?
    A.  No.
    Q.  Does he provide financial assistance
to the Rule of Law Society?
    A.  I don't know.
    Q.  Do you know the source of his funds
that he paid to you?
    A.  I think it was a sovereign wealth
fund of some sort in the Middle East.
    Q.  Did you ask him about that before he
transferred the money?

Page 146

    A.  My main thing was, yes, where did it
come from.  He said it was a sovereign wealth fund in
the Middle East, I can't remember where, and that it
was completely separate from Mr. Quo's funds.
    Q.  When did you ask him about that?
    A.  Around the time that he made the
loan.
    Q.  Was it before or after he sent the
money?
    A.  I think it was before.
    Q.  And why would you have asked him
about whether or not it was separate from Mr. Guo?
    A.  I was just curious.  He had asked for
the bank transfer information.  It involved an
international transfer.
    Q.  So do you have an understanding that
he put the money into your Bank of America account,
but it came from an international fund?
    A.  As best as I can tell.
    Q.  And what does "sovereign wealth fund"
mean?

Page 147

    A.  I don't know.
    Q.  Did you do any research to see what
it meant?
    A.  No.
    Q.  Did you do any research or vetting of
Mr. Je before you entered into this transaction with
him?
    A.  No.
    Q.  Do you have any idea of how he makes
his money, besides being a financier?
    A.  I don't know.
    Q.  You don't know what countries he
invests in?
    A.  I do not.
    Q.  Do you have any reason to believe
that funding may have come from Saudi Arabia?
    A.  I do not.
    Q.  Did Mr. Guo ever discuss the source
of Mr. Je's wealth with you?
    A.  No.
    Q.  Have you ever visited Mr. Je at his

Page 148

home?
    A.  No.
    Q.  Do you know where all he keeps a
residence?
    A.  I don't.
    Q.  And when is the last time you spoke
with him?
    A.  I can't recall.
    Q.  What's your best guess?
    A.  I can't guess.
    Q.  Sometime this calendar year?
    A.  Yes, probably.  I don't know, the
last six months.
    Q.  Have you spoken with him in the last
few weeks?
    A.  I can't recall.
    Q.  Is he aware of the change in your
status at The Free Beacon?
    A.  Yes.
    Q.  And how did he become aware of that?
    A.  I think I told him.

Page 149

38 (Pages 146 to 149)

**Bill Gertz**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

| | |
|---|---|
| 1    Q.   So that would have had to be in the | 1    A.   Yes. |
| 2  last few weeks? | 2    Q.   And what did he say? |
| 3    A.   Yes. | 3    A.   I can't recall.  I don't remember how |
| 4    Q.   Was that over the phone? | 4  he responded. |
| 5    A.   Yes. | 5    Q.   This is in the last few weeks though, |
| 6    Q.   And how did that conversation begin? | 6  right? |
| 7    A.   Just that I was moving on from the | 7    A.   Yes. |
| 8  Free Beacon. | 8    Q.   And you don't remember what he said |
| 9    Q.   Was he ever contacted by The Free | 9  to you? |
| 10  Beacon? | 10    A.   No. |
| 11    A.   No. | 11    Q.   Did he express surprise that you were |
| 12    Q.   Was he ever contacted by anyone else? | 12  being asked to leave because of his interaction with |
| 13    A.   I don't know. | 13  you? |
| 14    Q.   And last Friday, there was an article | 14    A.   I think he said to me, again, that |
| 15  on Buzz Week published about your departure from The | 15  this was unfair because the money did not come from |
| 16  Free Beacon. | 16  Mr. Guo. |
| 17    Did you see that article? | 17    Q.   Did he offer to contact your editors |
| 18    A.   I saw it. | 18  for you? |
| 19    Q.   And did speak with the reporter, | 19    A.   I don't think so, no. |
| 20  Ms. Gray, for that article? | 20    Q.   Did you ask him to do that? |
| 21    A.   No. | 21    A.   No. |
| Page 150 | Page 152 |

| | |
|---|---|
| 1    Q.   Did you see the quote in that article | 1    Q.   Did you ask him to send a letter? |
| 2  from Mr. Quo's Counsel? | 2    A.   No. |
| 3    A.   I did not. | 3    Q.   Did you ask him to provide proof that |
| 4    Q.   You are not aware that that article | 4  the money did not come from Mr. Guo? |
| 5  was updated with a quote from Mr. Guo? | 5    A.   No. |
| 6    A.   I didn't see it. | 6    Q.   And why not? |
| 7    Q.   Was Mr. Je contacted for that | 7    A.   Like I said, I was ready to move on |
| 8  article? | 8  from The Free Beacon. |
| 9    A.   I don't know. | 9    Q.   How long did your conversation with |
| 10    Q.   When you spoke with Mr. Je about the | 10  Mr. Je last? |
| 11  change in your employment at The Free Beacon, what did | 11    A.   Very brief, five minutes. |
| 12  you tell him? | 12    Q.   Did he ask you if there was anything |
| 13    A.   That I was moving on. | 13  he could do to help you? |
| 14    Q.   And what was the reason for that? | 14    A.   No. |
| 15    A.   That we had a dispute over an | 15    Q.   Did he express any indication that he |
| 16  editorial matter. | 16  would want his money back? |
| 17    Q.   Why did you contact him? | 17    A.   No.  I just indicated to him that |
| 18    A.   Just to let him know that I was | 18  when I get the royalties, that I would continue to |
| 19  moving on, and that was the reason. | 19  work out the payment to him. |
| 20    Q.   And that his funding to you was the | 20    Q.   Have you made any payments to him so |
| 21  basis for you moving on? | 21  far? |
| Page 151 | Page 153 |

39 (Pages 150 to 153)

**Bill Gertz**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

| | |
|---|---|
| 1    A.   No. | 1   repay all of the money to Mr. Je? |
| 2    Q.   You expect royalties to come within | 2    A.   Very confident. |
| 3   six months of publishing the book? | 3    Q.   When do you think that will occur? |
| 4    A.   Six months to a year. | 4    A.   I can't say. |
| 5    Q.   And based on your agreement with him, | 5    Q.   If you do not make $100,000 from your |
| 6   will you be paying him any interest? | 6   book royalties, would you and your wife pay Mr. Je |
| 7    A.   No. | 7   back from your own funds? |
| 8    Q.   Did he ever suggest that you pay him | 8    A.   That would be a discussion we'd have, |
| 9   interest? | 9   if that were to come up. |
| 10    A.   No. | 10    Q.   Did you and Mr. Je ever discuss the |
| 11    Q.   Do you expect the royalties from your | 11   possibility that your royalties might not exceed his |
| 12   book to exceed the amount of the financial support he | 12   loan? |
| 13   gave you? | 13    A.   No. |
| 14    A.   I hope it will. | 14    Q.   Has Mr. Je contacted you since you |
| 15    Q.   Has this incident impacted your | 15   last spoke to him, in the last few weeks? |
| 16   promotional and book tour? | 16    A.   No. |
| 17    A.   Not so far. | 17    Q.   Do you have any written communication |
| 18    Q.   You have had no appearances | 18   with Mr. Je? |
| 19   cancelled? | 19    A.   No. |
| 20    A.   No. | 20    Q.   Just the e mail you referenced |
| 21    Q.   Have you appeared on any TV or radio | 21   earlier regarding the terms of this agreement? |
| Page 154 | Page 156 |

| | |
|---|---|
| 1   shows since the Friday announcement by The Free | 1    A.   That was in the April time frame, |
| 2   Beacon? | 2   April, yes, 2018. |
| 3    A.   I have not. | 3    Q.   And that's the only communication |
| 4    Q.   Have you cancelled any interviews on | 4   that you have had with him? |
| 5   your own because of it? | 5    A.   Correct. |
| 6    A.   No. | 6    Q.   Did your editors at The Free Beacon |
| 7    Q.   Do you have any upcoming meetings or | 7   see that communication? |
| 8   signings in the next few weeks? | 8    A.   No. |
| 9    A.   I haven't looked at the calendar, but | 9    Q.   Did they ask you for it? |
| 10   I probably do. | 10    A.   No. |
| 11    Q.   Did Mr. Je ask you if book sales | 11    Q.   Why did you choose not to show that |
| 12   would be impacted by your departure from The Free | 12   to them? |
| 13   Beacon? | 13    A.   They weren't interested in hearing or |
| 14    A.   No. | 14   seeing about anything. |
| 15    Q.   Did he express any concern about your | 15    Q.   Why do they believe Mr. Je was |
| 16   ability to pay him back? | 16   connected to Mr. Guo? |
| 17    A.   No. | 17        MS. CLINE:  Objection, foundation. |
| 18    Q.   Did he ask you for a specific date | 18        THE WITNESS:  I don't know. |
| 19   that the money must be repaid? | 19   BY MS. LUETKEMEYER: |
| 20    A.   No. | 20    Q.   Do you know how they found out Mr. Je |
| 21    Q.   How confident are you that you can | 21   was the source of the funding? |
| Page 155 | Page 157 |

**Bill Gertz**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

1      A.   I guess it would have been Friday
2  the Friday, or two or three Fridays ago.
3      Q.   Any idea why they waited to announce
4  it until this Friday?
5      A.   I do not know.
6      Q.   Did they tell you they were going to
7  make a public statement on their website?
8      A.   Yes.
9      Q.   Did you have any input into what that
10 statement said?
11     A.   No.
12     Q.   Did you object to it?
13     A.   No.
14     Q.   Did they give you an advance copy of
15 what it would say?
16     A.   Yes.
17     Q.   And that was over e mail?
18     A.   Um hum.
19     Q.   Did you speak with Mr. Guo about this
20 incident with The Free Beacon?
21     A.   I did not.

Page 162

1      Q.   Did you ever give him permission to
2  publish or talk about you on Guo Media?
3      A.   I'm sorry?
4      Q.   Did you speak with Mr. Guo about him
5  using your name on Guo Media; did he ever ask for
6  permission to do so?
7      A.   No.
8      Q.   Are you aware that you have ever been
9  mentioned on Guo Media?
10     A.   I don't know.
11     Q.   How often do you, if ever, tune in to
12 Guo Media and look at the videos?
13     A.   Occasionally, if there is a video
14 that has been translated into English, if someone
15 tweets out or something.
16     Q.   Occasionally, they will have
17 subtitles at the bottom in English?
18     A.   Yes.
19     Q.   Did you ever appear with Guo on one
20 of his videos?
21     A.   No.

Page 164

1      Q.   Do you know if he is aware of it?
2      A.   I do not.
3      Q.   Did The Free Beacon editors ask you
4  for your bank records?
5      A.   No.
6      Q.   Are you familiar with Guo Media?
7      A.   Yes.
8      Q.   And what is it?
9      A.   I believe it's the platform that
10 Mr. Guo uses for his presentations, and talks, and
11 speeches.
12     Q.   Like on You Tube, and things like
13 that?
14     A.   I believe it's a website.
15     Q.   Okay.  And what's the purpose of it?
16         MS. CLINE:  Objection, foundation.
17         THE WITNESS:  It's a place for him to
18 give speeches and talks.
19 BY MS. LUETKEMEYER:
20     Q.   To get his message out?
21     A.   Yes.

Page 163

1      Q.   Did he ever ask you to?
2      A.   No.
3      Q.   Are you familiar are Ming Jing Media,
4  Mirror Media?
5      A.   I think it is a dissident Chinese
6  publication in New York, but I am not certain.
7      Q.   Do you know of any PR firms or social
8  media firms Mr. Guo has hired?
9      A.   I do not.
10     Q.   Do you know of any PR firms or social
11 media firms that the Rule of Law Foundation has hired?
12     A.   I do not.
13     Q.   What about the Rule of Law Society?
14     A.   I don't know.
15     Q.   Have you ever heard of the firm BLJ
16 Worldwide, a firm known as Brown, Lloyd, and James?
17     A.   I have not.
18     Q.   Has Mr. Guo ever talked to you about
19 his media plan?
20     A.   No.
21     Q.   Do you know of any other research

Page 165

42 (Pages 162 to 165)

**Bill Gertz**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

| | |
|---|---|
| 1 | to you? |
| 2 | A.   Yes. |
| 3 | Q.   You said there have been two Rule of |
| 4 | Law Society phone conferences, correct, that you can |
| 5 | recall? |
| 6 | A.   Yes. |
| 7 | Q.   And you said there were maybe two or |
| 8 | three other people on those calls beside you and |
| 9 | Mr. Bannon? |
| 10 | A.   Yes. |
| 11 | Q.   How long did those calls |
| 12 | approximately last? |
| 13 | A.   Maybe 20 minutes. |
| 14 | Q.   Do you recall who did the bulk of the |
| 15 | talking? |
| 16 | A.   I do not. |
| 17 | Q.   And is there an e mail chain or a |
| 18 | list serve where you can all communicate with one |
| 19 | another? |
| 20 | A.   I don't recall how the communication |
| 21 | is.  It might be an e mail.  It might be a text.  I |

Page 170

| | |
|---|---|
| 1 | Q.   Do you know if those are American |
| 2 | citizens? |
| 3 | A.   Yes.  Yes, I mean   I'm trying to |
| 4 | remember.  I honestly can't recall and I don't want to |
| 5 | speculate. |
| 6 | Q.   Do you recall if they are men or |
| 7 | women? |
| 8 | A.   I think they are women. |
| 9 | Q.   Do you know if one of them is named |
| 10 | Karen Mitchello? |
| 11 | A.   Yes. |
| 12 | Q.   Do you know, is Evette Wong one of |
| 13 | them? |
| 14 | A.   No. |
| 15 | Q.   Have you ever met Karen Mitchello in |
| 16 | person? |
| 17 | A.   Yes. |
| 18 | Q.   And Who is Karen Mitchello? |
| 19 | A.   I believe she is an assistant to |
| 20 | someone in Guo Media perhaps. |
| 21 | Q.   And where did you meet her? |

Page 172

| | |
|---|---|
| 1 | don't know. |
| 2 | Q.   You just receive a call in number and |
| 3 | you call it? |
| 4 | A.   Yes. |
| 5 | Q.   And you don't have any inclination of |
| 6 | the other two members of that society? |
| 7 | A.   I don't. |
| 8 | Q.   You were on the phone with them |
| 9 | twice? |
| 10 | A.   It would have been twice, it would |
| 11 | have been once. |
| 12 | Q.   Was Kyle Bass one of the other |
| 13 | members of that society? |
| 14 | A.   No. |
| 15 | Q.   He is a member of the foundation, to |
| 16 | your knowledge? |
| 17 | A.   I believe it's the foundation. |
| 18 | Q.   Okay.  But the society has two |
| 19 | unnamed members you can't recall, you and Mr. Bannon, |
| 20 | correct? |
| 21 | A.   Yes. |

Page 171

| | |
|---|---|
| 1 | A.   I met her at the Rule of Law Building |
| 2 | in New York.  They have a building for the Rule of Law |
| 3 | Society meetings. |
| 4 | Q.   And so the meetings are at a |
| 5 | building, but they are on the phone? |
| 6 | A.   Well, they are held there for people |
| 7 | that are there, or they are on the phone.  That's how |
| 8 | they do it.  So people that are in the building are |
| 9 | there, and people who call in. |
| 10 | Q.   Did you call in or were you present |
| 11 | at the building? |
| 12 | A.   I think I called in.  I can't really |
| 13 | remember.  I remember being in the building, but I |
| 14 | don't remember being in for a meeting.  It's just not |
| 15 | clear to me. |
| 16 | Q.   When you were in the building, that's |
| 17 | when you met Karen Mitchello? |
| 18 | A.   Yes. |
| 19 | Q.   Do you know whether she is also |
| 20 | involved in Mr. Quo's other businesses? |
| 21 | MS. CLINE:  Objection to form. |

Page 173

44 (Pages 170 to 173)

**Bill Gertz**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

| | |
|---|---|
| 1 in this case? | 1    Q.   Did you contact Mr. Hann in the last |
| 2        A.   No. | 2 week and ask him to reach out to Mr. Waller and |
| 3        Q.   Have you had a conversation with | 3 Ms. Wallop about this deposition? |
| 4 Mr. Je about paying for your lawyer in this case? | 4        A.   No. |
| 5        A.   No. | 5        Q.   Would you be surprised to know that |
| 6        Q.   Do you know what year Mr. Guo was | 6 he says that he talked to you about it on Sunday? |
| 7 born? | 7        A.   He called me on Sunday and asked me |
| 8        A.   I do not. | 8 if I needed help.  And I said I don't need help, I had |
| 9        Q.   Are you aware there is some dispute | 9 a lawyer. |
| 10 about his actual birth date? | 10        Q.   Did he tell you he would be |
| 11        A.   I am not aware. | 11 communicating with Mr. Waller and Ms. Wallop about it? |
| 12        Q.   Have you ever talked to him about his | 12        A.   No. |
| 13 early years in China? | 13        Q.   So it would be surprising for you to |
| 14        A.   No. | 14 hear about that? |
| 15        Q.   You spoke very briefly about you | 15        MS. CLINE:  Objection to form. |
| 16 meeting Mr. Quo's daughter? | 16        Q.   Have you ever heard of Celestial |
| 17        A.   Yes. | 17 Holdings? |
| 18        Q.   Where does she live? | 18        A.   No. |
| 19        A.   I don't know. | 19        Q.   Just one second.  Did you review the |
| 20        Q.   Did you speak with her when you met | 20 subpoena for documents that we sent you before this |
| 21 her at his house? | 21 deposition? |
| Page 178 | Page 180 |
| 1        A.   Just an introduction. | 1        A.   Yes. |
| 2        Q.   Did Mr. Guo ever provide you with any | 2        Q.   And how did you conduct a search for |
| 3 other documents that Strategic Vision, Ms. Wallop, or | 3 responsive documents? |
| 4 Mr. Waller have produced to him? | 4        A.   I searched for e mail and text |
| 5        A.   No. | 5 messages. |
| 6        Q.   Just that one packet that we | 6        Q.   And the e mail from Ms. Wallop that |
| 7 discussed? | 7 you produced is the only e mail you had? |
| 8        A.   Which packet?  He didn't give it to | 8        A.   Yes. |
| 9 me.  He showed it to me. | 9        MS. KROPF:  The only e mail he has |
| 10        Q.   Did he ever show you any other | 10 responsive to the request that we negotiated out of |
| 11 documents? | 11 the five categories. |
| 12        A.   No. | 12        MS. LUETKEMEYER:  Correct.  In the |
| 13        Q.   So he showed it to you, then he took | 13 revised letter that we sent, yes. |
| 14 it back? | 14        Q.   Have you discussed today's deposition |
| 15        A.   He showed it in front of me, yes. | 15 with anyone else besides your Counsel and the people |
| 16        Q.   Did you ever discuss those documents | 16 that we discussed at the beginning of the meeting? |
| 17 with anyone else? | 17        A.   No. |
| 18        A.   No. | 18        Q.   About how much have you been paid in |
| 19        Q.   Did you ever use them in your | 19 speaking fees or honoraria since 2017? |
| 20 reporting? | 20        A.   I have no idea. |
| 21        A.   No. | 21        Q.   Can you estimate? |
| Page 179 | Page 181 |

46 (Pages 178 to 181)

**Bill Gertz**
**October 15, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

1    THE VIDEOGRAPHER:  We are going off the
2    record at 2:53 p.m., and this concludes today's
3    testimony of Bill Gertz.  The total number of media
4    units used was two.
5         (The deposition concluded at 2:53 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

Page 186

1    CERTIFICATION OF NOTARY
2         I, Jackie Smith, the officer before whom the
3    foregoing deposition was taken, do hereby certify that
4    witness whose testimony appears in the foregoing
5    deposition was duly sworn by me; that the testimony of
6    said witness was taken by me stenographically and
7    thereafter reduced to typewriting; that said
8    deposition is a true record of the testimony given by
9    said witness; that I am neither counsel for, related
10   to, or employed by any of the parties to the action in
11   which this deposition is taken; and further, that I am
12   not a relative or employee of any attorney  employed
13   by the parties thereto, nor financially or otherwise
14   interested in the outcome of the action.
15         _____
16         Jackie Smith
17         Notary Public
18   My Commission Expires: 3-30-2020
19
20
21

Page 187

48 (Pages 186 to 187)

**Bill Gertz**
**October 15, 2019**