**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **EASTERN PROFIT CORPORATION LIMITED,** | ) | |
| | ) | |
| **Eastern/Counterclaim Defendant,** | ) | |
| | ) | **Case No. 18-cv-2185** |
| **v.** | ) | |
| | ) | |
| **STRATEGIC VISION US, LLC,** | ) | |
| | ) | |
| **Defendant/Counterclaim Eastern.** | ) | |

**DEFENDANT'S CONSOLIDATED (1) REPLY IN SUPPORT OF ITS DKT. 267 L.R. 56.1 STATEMENT SUPPORTING ITS DKT. 265-66 MOTION FOR SUMMARY JUDGMENT; AND (2) RESPONSE TO PLAINTIFF'S DKT. 270 STATEMENT OF ADDITIONAL FACTS IN RESPONSE TO DEFENDANT'S MOTION**

Pursuant to L.R. 56.1(b), Defendant Strategic Vision US, LLC ("Strategic") replies in support of its L.R. 56.1 Statement, Dkt. 267, and responds to the statement of additional facts contained in the Dkt. 270 filing of Plaintiff Eastern Profit Corporation Ltd. ("Eastern").

As to Eastern's statement of additional facts, Eastern has violated L.R. 56.1(b) and, because of this, Strategic herein asks the Court to disregard that portion of Eastern's Dkt. 270. Of a party responding to a statement of facts, L.R. 56.1(b) requires "if necessary, additional paragraphs containing a *separate*, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." (emphasis added) Instead, Eastern perfunctorily wrote (Dkt. 270, p. 47, under the heading "Additional Facts," emphasis added): "*In addition to the facts set out in each of the foregoing responses*, Eastern hereby incorporates each and every factual averment set forth in the Local Rule 56.1 Statement that it submitted in connect[ion] with its Motion for Summary Judgment as if set forth fully and completely herein. *See* Dkt. No. 262." Eastern thus failed to set out its purported additional material facts in the form of individual paragraphs as required by L.R. 56.1(b).

This was especially important for the entirely new facts that appear in some of Eastern's attempts to dispute or otherwise respond to Strategic's facts. "Local Civil Rule 56 [] directs litigants to file statements and counter-statements of material facts about which there is no dispute, and also requires that each factual statement be followed by a citation to admissible evidence, in accordance with Federal Rule 56(e)." *M & T Mortg. Corp. v. White*, 736 F. Supp.2d 538, 553 (E.D. N.Y. 2010) (noting the Court's discretion, despite a failure to follow the local summary judgment rule, to review the record independent of technical errors) *citing Monahan v. New York City Dep't of Corrections,* 214 F.3d 275, 292 (2d Cir.2000).

Recognizing the Court's discretion in the extent to which the local summary judgment rule is enforced, Strategic has addressed Eastern's additional facts in a two-fold approach. First, Strategic has responded to the facts embedded in Eastern's response to Strategic's facts in Strategic's Reply in support of its own facts. When feasible there, Strategic has quoted directly from Eastern's response so that there is no question what Eastern's additional facts are and what Strategic's response is to them. Second and below that, as to Eastern's own 121 SOFs, which Eastern would have the Court treat in their entirety as additional material facts concerning *Strategic*'s Motion for Summary Judgment, Strategic addresses the materiality (or lack thereof) of each fact in relation to Strategic's Motion for Summary Judgment (Dkt. 265-66) and/or establishes why Eastern has failed to adequately prove the fact with admissible record evidence. Strategic's substantive response to Easterns' 121 fact paragraphs is found at Dkt. 273, pp. 48-101. Reference to that submission is incorporated herein and specially noted below when appropriate.

Finally, in the text of the original SOF presented by Strategic, it has indicated each instance when Eastern's response has admitted the fact for purposes of the summary judgment record. In such instance, with few exceptions, Strategic generally does not set out a reply but does include, verbatim, Eastern's

statement of admission.

For the Court's convenience, any evidence cited herein by Strategic (whether or not originally cited in Strategic's Dkt. 267 opening L.R. 56.1 statement) is attached hereto with a newly-assigned exhibit letter/number combination.  Accordingly, the same evidence cited by Strategic will now have different exhibit letters/numbers, but this approach permits the Court to have a single location (i.e. this filing) to access the evidence constituting the record as Strategic has presented it on its Dkt. 266 Motion for Summary Judgment.

<u>STRATEGIC'S REPLY IN SUPPORT OF ITS SOF 1-60</u>

1.   **ALL FACTS ADMITTED**: Strategic Vision US, LLC ("Strategic Vision") is a single-member limited liability company ("LLC") registered and in good standing with the Nevada Secretary of State.  Nev. Sec. of State Bus. Reg. ("S.V. Reg."), Ex. A1 (Ex. A to Dkt. 264, Request for Judicial Notice ("RJN")), ¶ 1; Feb. 12, 2019 F. "Wallop 1 Tr.,"[1] Ex. B1, 8:6-9, 8:25-9:16, 127:4-6.  Strategic Vision is operated by French Wallop, who has had a home in Washington, D.C. for many years.  S.V. Reg., Ex. A1; March 12, 2020 F. Wallop Aff., Ex. C1, ¶¶ 1-2; Dkt. 93, p. 1, ¶ 2; Dkt. 127, p. 1, ¶ 2.  French was married to Senator Malcolm Wallop, who represented Wyoming from 1977 to 1994.  Wallop Aff., Ex. C1, ¶¶ 1-2.

EASTERN'S RESPONSE:  Admitted, except that Strategic Vision's principle place of business is not and never was in Washington. D.C.  Indeed, Ms. Wallop's home and Strategic's principal place of business was in Arlington, Virginia.  Ex. A, Answer at 1 ¶ 2; Ex. B, Strategic's Admissions ¶ 18.

STRATEGIC'S REPLY:  Strategic admits that its principal place of business is Wallop's residence located in Arlington, Virginia and indeed stated in its own SOF 3 that

---

[1]      The former "Depo." is now referred to as "Tr."

"Strategic's principal place of business has always been French's Virginia residence."  There are five miles between Arlington, Virginia and Washington, D.C.  Ex. D1 (https://www.distance-cities.com/search?from=arlington+virginia&to=Washington%2C+District+Of+Columbia%2C+United+States&fromId=&toId=3899&flat=&flon=&tlat=38.9072&tlon=-77.0369&country=)

2.      Her interest in politics, work in international affairs, and decades in Washington allowed French to cultivate extensive relationships in several U.S. presidential administrations, Congress, the Departments of Defense and Energy, and other government agencies.  Dkt. 127, p. 20, ¶¶ 1-2; Dkt. 142, p. 1, ¶ 2; Wallop 1 Tr., Ex. B1, 10:19-11:19, 28:12-20, 28:21-30:1.  This led to consulting work for prominent clients.  Dkt. 93, p. 3, ¶ 14; Jan. 31, 2019 Yvette "Wang 1 Tr.," Ex. E1, 194:20-198:7; Wallop 1 Tr., Ex. B1, 28:12-30:1, 104:16-106:20.  She grew significant connections overseas, consulting for clients in Canada, England, the United Arab Emirates, and Singapore.  *Id*.; Dkt. 127, p. 20, ¶ 2.

EASTERN'S RESPONSE:  Objection.  This fact is not material to any of the issues raised in Strategic's Motion for Summary Judgment motion and should not be deemed admitted.  To the extent an answer is required, denied because Ms. Wallop's alleged relationships do not qualify her to perform the work contemplated by the contract, including the necessity of being licensed to provide such services.  Ex. A, Answer at 14 ¶¶ 88-102 (admitting that Strategic Vision, Ms. Wallop, and Mr. Waller were not licensed to conduct private investigation); Ex. F, Wallop I Tr. at 290:25:-292:2 (same).

STRATEGIC'S REPLY:  Eastern does not dispute Strategic's facts with evidence contradicting them.  Nor does Eastern contend that Strategic's facts have not been fully supported by the evidence cited.  Eastern thus admits the facts for purposes of the summary judgment record.  Eastern's sole challenge is to materiality, not facts.  But Eastern does not truly argue that

Strategic's facts are not material; instead, Eastern simply suggests that Strategic's facts about Wallop's background should be "denied" because Strategic and/or Wallop were supposedly required to be licensed under Virginia's private security law.  But Eastern does not truly argue that Strategic's facts are not material; instead, Eastern simply suggests that Strategic's facts about Wallop's background should be "denied" because Strategic and/or Wallop were supposedly required to be licensed under Virginia's private security law. Eastern's licensing argument, in turn, is really Eastern's Count III claim for a declaratory judgment that Strategic was not licensed under a Virginia private security services statute and therefore that the Research Agreement is void. That argument is the subject of Eastern's entirely separate motion for summary judgment. Whatever its merits (which Strategic disputes in its opposition to Eastern's motion), it has no relevance here, and is certainly not a ground to "deny" Strategic's entirely distinct biographical facts about Wallop's background, which are either true or false, regardless of whether Strategic or Wallop were required to hold a license. Strategic certainly disputes Eastern's opinion that "Ms. Wallop's alleged relationships do not qualify her to perform the work contemplated by the contract, including the necessity of being licensed to provide such services," but the issue is immaterial to SOF 2 and to Strategic's motion.  It is admitted but immaterial that Strategic, Wallop, and Waller were not licensed under the statute.

Eastern's materiality objection should be overruled on an independent ground to the extent it hinges on Eastern's theory that the only relevant qualification is whether Strategic held a "private security" license in Virginia.  As a matter of law, the Virginia licensing requirement applies to the Research Agreement.[2]  The statute regulates private security occupations through the state Criminal Justice Services Board, including alarm respondents, locksmiths, armored car personnel,

---

[2]    Strategic incorporates its discussion of the inapplicability of the Virginia statute found at Dkt. 272, pp. 16-22.

central station dispatchers, and armed security officers, among others, and imposes penalties for those who fail to comply with the statute or Board regulations. *See* Va. Code Ann. § 9.1-138; 9.1-147. It generally regulates activities parallel to, or even in place of, law enforcement *in the State of Virginia*. The only profession that does not deal with physical security is "private investigator," but that work must be obtaining information on crimes or civil wrongs. Va. Code Ann. § 9.1-138.

In contrast, the Research Agreement had a <u>political</u> purpose—Guo Wengui and his network wanted to achieve wholesale regime change *in China* by conducting research over a three year period on subjects that were not disclosed by Eastern to Strategic before the contract was signed. Ex. F1, R. Agreement, Dkt. 267-1, p. 5 ("Duration"); Wallop 1 Tr., Ex. B1, 83:24-84:7, 85:10-86:11, 174:4-8, 175:3-176:18 (subject names were not disclosed until after the contract was signed). Guo testified that the Agreement would allow him to advance his alleged political goals: "<u>Q. Do you want to undermine the current leadership of the People's Republic of China?</u> A. I'm not just trying to undermine the government; I'm trying to eliminate the current government, to -- I'm trying to eliminate the party, Chinese Communist Party, to bring rule of law and freedom to China." Guo 1 Tr., Ex. G1, 33:6-12, 35:12-36:4, 39:9-19 (emphasis added). *See* Waller 1 Tr., Ex. H1, 24:16-25:13 ("He wanted to do battle with the Chinese Communist Party leadership."); 34:5-11 ("Guo had a three-year plan. He wanted a three-year contract to fulfill that plan."). Guo's and Eastern's claims that they would use the research to expose "crimes" against the Chinese people or government were rhetorical references to exposing public corruption rather than a specific plan to use the research in connection with adjudicating specific crimes against particular victims:

> Q.  <u>Do you know why Mr. Guo cares if these individuals are</u>
> <u>committing crimes against the Chinese government?</u>
> MR. GRENDI:  Objection.  You can answer.
> A.  It's a big question, but I love to answer.  And if you follow all
> the media, including New York Times, Washington Post, Wall
> Street Journal, all of this, big media internationally, and his own

> social media, you will have the answer.
> Q.  How about you provide me with your answer?
> A.  Because he spoke out on behalf of a Chinese outrage, common
> people, about the corruption of Chinese certain high official.
> There's no rule of law and democracy in Mainland of China.  And
> Chinese outrage people, they deserve, and they urgently, hungrily
> need that. So he believed what he has been doing until now, since
> two years ago, is for justice and for rule of law, democracy of
> China.

Wang 1 Tr., Ex. E1, 37:8-38:7 (underling added).

In its materiality objection, Eastern cites no case holding that the statute requires a party to

obtain a state license to conduct research into figurative "crimes" or "wrongs" to further political

and public policy goals *in another country*.  Nor has the Virginia legislature endorsed such an

expansive view of what constitutes private investigation in Virginia.  Indeed, over time, the statute

came to list 31 exceptions to the definition of "private investigator." Va. Code Ann. § 9.1-140 (29)

(exemption for reviewing, analyzing digital information and electronic data).

At any rate, this Court need not reach the legal questions surrounding the Virginia statute

here, as that controversy is the focus of an entirely separate motion. Wallop's experience is a

background, historical fact, and her state of licensure neither proves nor disproves those facts.

3.      In 2005, French formed Strategic Vision as a consulting firm for research and

analysis of political intelligence.  Wallop 1 Tr., Ex. B1, 10:10-21, 16:16-17:8, 28:12-30:1; Dkt.

127, p. 20, ¶¶ 1-2; Dkt. 142, p. 1, ¶ 2; S.V. Reg., Ex. A1.  Its clients are typically diplomats or

political figures.  Wallop 1 Tr., Ex. B1, 28:12-30:1, 17:9-21:7; Dkt. 93, p. 3, ¶ 14; Wang 1Tr., Ex.

E1, 194:20-198:7; Dkt. 127, p. 20, ¶ 2.  **ADMITTED**:  Strategic's principal place of business has

always been French's Virginia residence.  Dkt. 127, p. 20, ¶ 1; Dkt. 142, p. 1, ¶ 1; Wallop 1 Tr.,

Ex. B1, 8:25-9:4; S.V. Reg., Ex. A1.  **ADMITTED**:  Strategic has never had employees.  Wallop

1 Tr., Ex. B1, 24:1-3.

EASTERN'S RESPONSE:  As to the first two sentences, objection.  These facts are not material to any of the issues raised in Strategic's Motion for Summary Judgment motion and should not be deemed admitted.  To the extent an answer to the first two sentences is required, denied because Ms. Wallop's alleged relationships do not qualify her to perform the work contemplated by the contract, including the necessity of being licensed to provide such services.  Ex. A, Answer at 14 ¶¶ 88-102 (admitting that Strategic Vision, Ms. Wallop, and Mr. Waller were not licensed to conduct private investigation); Ex. F, Wallop I Tr. at 290:25:-292:2 (same) and 29 (conceding that "investigatory research" is not a core service of Strategic Vision).

As to the third and fourth sentences, admitted.  Eastern further responds, however, that French Wallop's residence, and therefore Strategic's principal place of business, was and is in Arlington, Virginia.  Ex. A, Answer at 1 ¶ 2; Ex. B, Strategic's Admissions ¶ 18.  Eastern further responds that French Wallop was Strategic's only principal/employee.  Ex. B, Answer ¶ 9; Ex. F, Wallop I Tr. at 17:9-14; Ex. G, Wallop II Tr. at 6:4-16; *see also* Ex. F, Wallop I Tr. at 9:1-4.

STRATEGIC'S REPLY:  Eastern objects as immaterial to the first two sentences of SOF 3 but does not dispute these facts with any evidence contradicting them.  Nor does Eastern contend the facts have not been fully supported by the evidence cited.  These facts will be deemed admitted when the Court rejects Eastern's materiality objection. As noted in Strategic's reply on SOF 2, Eastern's materiality objection is illogical to the extent it requires a foray into the applicability of the Virginia private security services statute. Further, even on its own terms, the materiality objection is wrong because the Virginia statute does not apply. Strategic incorporates its additional discussion of the Virginia licensure statute found in its Reply in support of SOF 2 here.

Finally, for emphasis supposedly helpful to its argument that the Virginia licensure statute applies, Eastern restates a fact Strategic already itself stated and thus does not dispute—that it operates out of Wallop's residence in Arlington, Va.  ("Strategic's principal place of business has always been French's Virginia residence.")  Also, an LLC is made up of "members," and may or may not have employees, such that Eastern's statement "French Wallop was Strategic's only principal/employee" is false.  Strategic has never had employees.  Wallop 1 Tr., Ex. B1, 24:1-3. Eastern cites no evidence to contradict this fact.  This, however, is not material to any of the issues raised in Strategic's Motion for Summary Judgment.

4.      **ALL FACTS ADMITTED**:  In about November 2017, Strategic Vision received a new client referral from French's longtime acquaintances Dr. Lianchao Han and William Gertz, both prominent Washington figures.  Wallop 1 Tr., Ex. B1, 11:24-12:21, 89:9-91:1, 31:23-35:7. Dr. Han immigrated to the United States from China, and worked in the U.S. Senate for several years (including for the late Senator Wallop) on matters relating to China.  RJN, Dkt. 264, ¶ 2; Wallop Aff., Ex. C1, ¶¶ 2-3.  After the Tiananmen Square Massacre in 1989, Dr. Han helped found the Independent Federation of Chinese Students and Scholars.  RJN, Dkt. 264, ¶ 2.  William "Bill" Gertz is an investigative reporter and columnist who had already written several articles on Guo and China, the author of several books about national security (during this lawsuit, he wrote a book on Guo and China),, and a national speaker on these topics.  Wallop 1 Tr., Ex. B1, 12:16-21, 33:15-21; Oct. 15, 2019 William "Gertz Tr.," Ex. I1, 17:2-24:21, 25:18-21.

EASTERN'S RESPONSE:  Admitted.  Eastern further responds that Bill Gertz is a former reporter for the Washington Free Beacon and a current reporter for the Washington Times, is a mutual acquaintance of Mr. Guo and Ms. Wallop and Mr. Waller, and was involved in bringing Eastern and Strategic together for the purposes of entering into the Research Agreement.  Ex. J,

Gertz Tr. at 17:2-12, 64:19-76:19, 126:5-8-127:16; Ex. F, Wallop I Tr. at 31:23-34:19; Ex. H, Waller I Tr. at 116:10-117:9, 162:1-163-25.   Eastern responds further that L. Han is a mutual acquaintance of Mr. Guo and Ms. Wallop and Mr. Waller, and he was involved in bringing Eastern and Strategic together to enter into the Research Agreement.   Ex. K, Dep. Tr. L. Han. Tr. at 30:19-34:5, 38:20-14; Ex. F, Wallop I Tr. 34:20-35:1.

5.     **ALL FACTS ADMITTED**: The prospective new client was Guo Wengui (a/k/a Miles Kwok), who Dr. Han and Gertz stated was a wealthy businessman who had moved to the U.S. to escape political persecution in China and who had recently purchased the penthouse at the Sherry-Netherland Hotel in New York City.   Wallop 1 Tr., Ex. B1, 36:18-23, 89:9-91:1, 169:20-170:3; Aug. 2, 2019 "Guo 1 Tr.", Ex. G1, 104:12-105:11, 103:4-23; Nov. 11, 2019 "Chunguang [Han] Tr.," Ex. J1, 5:14-17, 25:19-24, 92:10-93:25.   According to Dr. Han and Gertz, Guo had developed several broad goals involving the Chinese government beneficial to the people of China. Wallop 1 Tr., Ex. B1, 88:3-89:5; Guo 1 Tr., Ex. G1, 45:3-46:16; Aug. 28, 2019 "Lianchao [Han] Tr.," Ex. K1, 53:13-20; Gertz Tr., Ex. I1, 60:16-20, 64:16-65:2, 66:15-67:5, 69:3-8, 69:17-70:1, 128:6-129:6, 131:1-14.   In September 2017, just before being introduced to French Wallop, Guo had filed an application for asylum in the United States.   Guo 1 Tr., Ex. G1, 9:16-21; Lianchao Tr., Ex. K1, 30:11-31:20.

EASTERN'S RESPONSE:  Admitted.

6.     Initially, Guo looked to Strategic Vision for public relations and communications advice regarding his integration into the U.S., such as where to buy residential and business property in Washington, D.C. to achieve a high profile presence there and what personal and business associations to make to advance his goals involving China.   Wallop 1 Tr., Ex. B1, 32:17-

38:4, 41:11-42:11, 43:15-45:25, 87:23-89:5; Gertz Tr., Ex. I1, 137:5-16.  This early, *gratis* advice did not give rise to the claims here.

EASTERN'S RESPONSE:  Denied, except Eastern admits that from the parties' introduction through the signing of the Research Agreement, representatives of Eastern (Mr. Guo and Ms. Wang) conferred with representatives of Strategic (Ms. Wallop and Mr. Waller) regarding a variety of services that Strategic Vison purportedly could provide, including investigatory research.  Ex. F, Wallop I Tr. at 31:23-109:18; Ex. H, Waller I Tr. at 18:8-38:14.  Eastern further responds that L. Han's and Gertz's testimony make clear that it was Strategic Vision that was pitching its services to Mr. Guo, not the other way around.  L. Han Tr. at 39:15-41:13; Gertz Tr. at 130:4-11, 132:23-134:4.

STRATEGIC'S REPLY:     Eastern has not effectively controverted these facts.  Indeed, Eastern does not cite evidence to support its denials and the facts were fully supported by the evidence Strategic cited (Eastern does not dispute that sufficient evidence was cited).  Eastern instead cites testimony from Wallop spanning over 70 pages, which is ineffective to prove any particular fact.  Eastern also cites Waller's testimony but it only provides support to Strategic's facts, including that it was Guo seeking services from Strategic (not the other way around, which Strategic disputes) because Guo "had a big vision of things that he wanted to do."  Waller 1 Tr., Ex. H1, 30:3-11.  At a meeting in December 2017 (Waller 1 Tr., Ex. H1, 21:21-22:7):

> It was a lengthy meeting at his house…
> he told us what he wanted to
> do.· We then said how we could meet that.·

Waller 1 Tr., Ex. H1, 22:22-23:13.

> Q.· · You described he told you what he
> wanted.· What did he tell you he wanted?
> A.· · He wanted to do battle with the Chinese
> Communist Party leadership.

Waller 1 Tr., Ex. H1, 24:16-19.

Q.·· When did you talk to Bill Gertz?
A.·· At about that same time.· Bill Gertz
had asked French Wallop if she could do this
work.· She said she would like to bring me in.

Waller 1 Tr., Ex. H1, 26:9-16 (underlining added).

A.·· Yes.· Guo had a big vision of things
that he wanted to do, and between Mrs. Wallop's
own research and connections and my own, we could
provide all of that or arrange for it to be
provided.

Waller 1 Tr., Ex. H1, 30:3-11 (underlining added).

The testimony Eastern cites from Waller also supports the fact that Guo asked Strategic for advice on real estate purchase and public relations through formation of a non-profit—"[t]here was more that he asked us to do."  Waller 1 Tr., Ex. H1, 30:12-24, 31:12-32:3.  Strategic thus must dispute Eastern's statement "L. Han's and Gertz's testimony make clear that it was Strategic Vision that was pitching its services to Mr. Guo, not the other way around." As Lianchao's testimony described above shows, it was Guo (following Lianchao's concept) who wanted the research from Strategic.  Lianchao Tr., Ex. K1, 126:22-128:9; 137:20-139:20, 46:17-47:9, 138:12-139:15.  Further, Guo asked Strategic for advice on real estate purchase and public relations through formation of a non-profit—"[t]here was more that he asked us to do."  Waller 1 Tr., Ex. H1, 30:12-24, 31:12-32:3.  However, Eastern's mischaracterization of the roles of each side in seeking/offering services is not material to the issues raised in Strategic's Motion for Summary Judgment.

Finally, the parties are mostly in agreement about Eastern's statement "From the parties' introduction through the signing of the Research Agreement, representatives of Eastern (Mr. Guo

and Ms. Wang) conferred with representatives of Strategic (Ms. Wallop and Mr. Waller) regarding a variety of services that Strategic Vision purportedly could provide, including investigatory research." The sole concern is Eastern ignores that <u>Lianchao Han</u> was decidedly integral both in the representation of Eastern during the negotiation of the services that Strategic would provide and the preparation of the Research Agreement. He was not simply an introducing party. In fact, he originated the idea for the research into Chinese political officials that developed into the Research Agreement. Lianchao Tr., Ex. K1, 126:22-128:9; 137:20-139:20. This was to "sustain" Guo's image as a "whistleblower." *Id*., 46:17-47:9. Lianchao told Guo that "once we have solid evidence, we can expose them." *Id*., 138:12-139:15. Lianchao also was involved in the negotiation of the terms of the contract. The extent of Lianchao's involvement, however, is not material to any of the issues raised in Strategic's Motion for Summary Judgment.

7.      Ultimately, Strategic Vision was asked to contribute to Guo's integration efforts by conducting research to expose corruption within the Chinese Communist Party ("CCP"), which Guo would then use to undermine the Chinese regime in China. Guo 1 Tr., Ex. G1, 45:3-46:16; Wallop 1 Tr., Ex. B1, 88:3-89:22; Oct. 30, 2019 Eastern Profit Fed. R. Civ. P. 30(b)(6) "Wang 2 Tr.," Ex. L1, 197:18-208:22, 202:2-204:20, 149:5-150:9. Specifically, research was needed to examine questionable interactions between CCP members and Chinese nationals living in the United States and abroad. *Id.*; Lianchao Tr., Ex. K1, 279:10-14. Although Strategic Vision did not receive any specific names to research until after entering into a contract, Guo believed there was a large number of corrupt CCP officials and that, by exposing them, he could achieve the long-term objective of breaking CCP's control over China, creating a regime change that would turn China from a strategic adversary to a friend of the United States and pave the way for democracy and freedom for the people of China. Guo 1 Tr., Ex. G1, 39:9-19, 45:3-46:16; Wang 2 Tr., Ex.

L1, 49:7-21, 202:2-204:20, 149:5-150:9; Wallop 1 Tr., Ex. B1, 88:3-89:22; Lianchao Tr., Ex. K1, 226:10-18.  Guo claimed that he needed Strategic Vision to advise him on the political weaknesses of CCP members in high government positions.  *Id.*

> EASTERN'S RESPONSE:  Admitted that exposing CCP corruption was Eastern's intention in contracting for the research, but denied that Eastern represented that purpose to Strategic prior to entering into the contract.  Strategic has failed to cite any evidence as required under Local Rule 56.1(d) that Eastern or anyone on behalf of Eastern, including Mr. Guo, represented to Strategic the purpose for which Eastern was planning on using the investigatory research.  In fact, Ms. Wallop admitted that Strategic did not know for what purpose Eastern was proposing to use the investigatory research and thought that Eastern might "run it both ways" (that is, both for and against the CCP), and that Strategic "never [even] discussed what the research would be used for . . . with Mr. Guo or Ms. Wang or Mr. Han."  Ex. ___, Wallop I Tr. at 59:2-61:13.

> STRATEGIC'S <u>REPLY</u>:  Eastern falsely states that Strategic has not supported the fact that Guo and/or others on his behalf conveyed to Strategic that Guo intended to use the research to effect a regime change in China.  Likewise, against the record evidence, Eastern "den[ies] that Eastern represented that purpose to Strategic prior to entering into the contract."  In fact, Strategic cited three sources of evidence proving that Guo and/or others on his behalf conveyed to Strategic that Guo intended to use the research to effect a regime change in China.  First, Strategic cited the testimony of Lianchao Han (Lianchao Tr., Ex. K1, 226:10-18).  Han was Guo's agent for purposes of negotiating the contract.[3]  Eastern admits as such in responding to SOF 4 above:  "Eastern responds further that L. Han is a mutual acquaintance of Mr. Guo and Ms. Wallop and Mr. Waller,

---

[3]       Lianchao Tr., Ex. K1, 28:6-29:3, 30:19-31:3, 33:3-10, 42:8-15, 48:10-52:7, 23:17-25:9, 160:20-162:9, 126:22-128:9; 137:20-139:20.

and he was involved in bringing Eastern and Strategic together to enter into the Research Agreement."  Similarly, in its Answer to Strategic's Counterclaim (Dkt. 127, p. 21, ¶ 4), Eastern alleged admitted that "substantive interactions concerning the Agreement prior to its termination consisted of interactions between French Wallop, J. Michael Waller, Guo Wengui, *Lianchao Han* …"  Dkt. 142, p. 2, ¶ 4 (emphasis added).  Lianchao is thus a material witness on the discussions that Guo and Eastern had with Strategic about the purpose of the Research Agreement.

In SOF 7, Strategic cited Lianchao's testimony (226:10-18) to show that Eastern had represented—to Strategic—Guo's purpose for the contract as being "anti-CCP" and that "[t]he reason we're doing this is to disrupt the regime.":

> Q.  <u>Did Guo represent to Strategic Vision that he was a dissident?</u>
> MR. GAVENMAN:  Objection, form.
> MR. GRENDI:  Objection to form.
> THE WITNESS:  I don't think he specifically said he's a dissident, but I think he made his intention clear to them that <u>he's anti-CCP.  This is the agenda.  The reason we're doing this is to disrupt the regime.</u>

Lianchao Tr., Ex. K1, 226:10-18 (underlining added).

Second, again in SOF 7, Strategic cited Yvette Wang's testimony as Eastern's corporate representative:  Wang 2 Tr., Ex. L1, 149:5-150:9.  When asked how Wang knew the purpose of the research (described by Chunguang Han for Eastern as "trying to disclosure the Chinese corrupted official by investigation") (Wang 2 Tr., Ex. L1, 149:5-14, cited in SOF 7), she testified that she learned the purpose from Guo, Wallop and Waller:  "from Miles and from Wallop, Waller, both," the latter two who "represented themselves, the best research company, professional qualified who can help our research.  *So I got to know about this research from there*."  Wang 2 Tr., Ex. L1, 149:5-150:9 (emphasis added).  In other words, Wallop and Waller discussed with Wang the purpose of the contract.  Finally, Wallop testified that although she did not fully know Guo's purpose for the research, she knew enough that the purpose included an objective against

the CCP: "Guo wanted to use towards his investigation of these individuals. He was going to use it against them, for whatever purpose." Wallop 1 Tr., Ex. B1, 88:3-89:22 (cited above).

Guo himself admitted that he told Strategic, prior to entering the contract, that his purpose was to use its research to fight the CCP:

> Q. Did you tell French Wallop and Mike Waller that you shared those goals?
> A. Yes. Our goal is the same. Overthrow the Chinese Communist Party.
> A. To overthrow the Chinese Communist Party.

Guo 1 Tr., Ex. G1, 31:24-32:6.

> Q. Mr. Guo -- Mr. Guo, how do you intend accomplish the goal that you just described to us? (DIR)
> MR. HARMON: Direct the witness not to answer.
> A: I'm not answering this question.
> BY MR. GREIM:
> Q. Was your work with Strategic Vision intended to accomplish the goal that you just described to us?
> A. Yes.
> Q. Is that what you told French Wallop and Mike Waller?
> A. Yes.
> Q. When did you tell them that?
> A. Between -- I don't recall the exact dates, but it's probably between November 2017 and February 2018, when we signed the contract.

Guo 1 Tr., Ex. G1, 35:12-36:4 (underlining added).

Waller had heard of this objective from Lianchao and Gertz before Waller met Guo in early December 2017. Waller 1 Tr., Ex. H1, 21:16-22:7, 24:16-26:8. Accordingly, Strategic strongly disputes Eastern's statement that Strategic "'never [even] discussed what the research would be used for . . . with Mr. Guo or Ms. Wang or Mr. Han.'" The statement is incorrect. This point, however, is immaterial to Strategic's dispositive motion.

Strategic also must take issue with how Eastern characterizes Wallop's testimony at Wallop 1 Tr., Ex. B1, 59:2-61:13, in an attempt to show that Strategic believed Guo planned to use the research both for and against the CCP. This is disputed, although the parties' differing

perspectives are immaterial to Strategic's Motion for Summary Judgment.  The point should be made, however, that Eastern takes the testimony out of its context, which was what Wallop believed Guo *actually did* with the research (in Wallop's words, "what happened to it"), not what Guo or his agents represented to Strategic prior to the contract *would be* the planned use of the research.  Hence, Wallop testified, past tense, "We have no idea what Yvette did with it.· We have no idea what Guo did with it.· We have no idea what happened to it."  Wallop 1 Tr., Ex. B1, 60:6-11.  Wallop further completely dispels the notion that, had she known Guo intended to use the research for anything supportive of the CCP, Strategic still would have entered the contract:  "[w]e cared very much what it was going to be used for.  We are very adamantly anti-communist…  We are very pro-democracy."  *Id.*, 60:12-20.  Wallop then testified that Strategic understood the research "would be used to fight against the communist party in China."  *Id.*, 21-61:1.

8.      Strategic Vision agreed to consider the project but requested certain conditions.  First, based on Guo's warnings, French was concerned that any association between Strategic Vision and Guo could lead to surveillance by the Chinese government, reprisals, and even physical danger.  Wallop 1 Tr., Ex. B1, 168:4-170:3, 298:15-20; Wallop Aff., Ex. C1, ¶¶ 4-5; Guo 1 Tr., Ex. G1, 45:3-46:16; Lianchao Tr., Ex. K1, 12:9-13:13.  Later, after Strategic Vision began work, Guo claimed that the Chinese Embassy in Washington was surveilling French's residence, writing down the name, in English and Chinese characters, of the person he claimed the Embassy had assigned.  Wallop Aff., Ex. C1, ¶¶ 4-5.

EASTERN'S RESPONSE:  Denied.  The Research Agreement does not contain any of the conditions Strategic claims it does.  *See generally,* Ex. M, Research Agreement.

STRATEGIC'S REPLY:      The facts are fully supported by the evidence that Strategic cites, and Eastern does not contend otherwise.  Nevertheless, Eastern tries to dispute the

facts, but with nothing more than a vague reference to the 5-page Research Agreement. Eastern cites no evidence (or legal principle) holding that a contract must contain a description of each and every circumstance existing at the time it was signed or else the circumstance did not occur. If that were the case, the law would not recognize a claim of fraudulent inducement by silence.

9.      The parties therefore agreed to secrecy measures, such as circuitous payment routes, and later agreed in their written contract "that the Client may direct other entities to pay the Contractor, and that such payments will be deemed satisfactory compensation by the Contractor." Wang 1 Tr., Ex. E1, 11:19-12:11; R. Agreement Ex. F1, (Ex. 2 to Wang Depo 1.), p. 5; Wallop 1 Tr., Ex. B1, 168:4-170:3; Nov. 19, 2019 Strategic Vision Fed. R. Civ. P. 30(b)(6) Tr. ("Waller 2"), Ex. M1, 95:16-25; Wallop Aff., Ex. C1, ¶ 4. For other reasons, as it turned out, no funds ever passed through Eastern's hands. Wang 1 Tr., Ex. E1, 203:11-15.

EASTERN'S RESPONSE: Denied. The Research Agreement does not require Eastern to use a "circuitous payment route"; instead, the provision is permissive and allows Eastern to pay Strategic through other entities, but does not require it to do so— "the Client *may* direct other entities to pay the Contractor, and that such payments ***will be deemed satisfactory compensation*** by the Contractor." Ex. M, Research Agreement at 5.

STRATEGIC'S REPLY:     Eastern does not deny that the parties agreed to secrecy measures, that funds never passed through its own hands to Strategic under the contract, or the existence and correct citation of the cited contract language. Instead, Eastern attempts to argue what the terms of the Research Agreement mean. SOF 9 concerns secrecy measures the parties agreed to independent of the Research Agreement, and simply cites a complementary provision of the Research Agreement. Strategic thus admits Eastern's statement that "The Research Agreement does not require Eastern to use a 'circuitous payment route'; instead, the

provision is permissive and allows Eastern to pay Strategic through other entities, but does not require it to do so—'the Client *may* direct other entities to pay the Contractor, and that such payments *will be deemed satisfactory compensation* by the Contractor.'"  However, Eastern cites no evidence, and does not argue, that the Research Agreement was the parties' complete agreement on the issue of secrecy, or that it somehow supplanted the parties' earlier agreement to use a circuitous payment route. Eastern's attempted controversion of Strategic's evidence by mere citation to the Research Agreement is ineffective.

10.     In addition, the parties would exchange reports and identification of research subjects only through in-person contact at secure locations, and this would require extensive travel and other time-consuming personal effort by Strategic Vision.  R. Agreement Ex. F1, p. 1; Wang 1 Tr., Ex. E1, 77:18-78:18; Wallop 1 Tr., Ex. B1, 136:13-20; Waller 2 Tr., Ex. M1, 127:4-15; Feb. 8, 2019 Michael "Waller 1 Tr.", Ex. H1, 67:9-68:2.  Guo likewise was expected to refrain from any conduct that would compromise the security of Strategic Vision's work.  Wallop 1 Tr., Ex. B1, 283:11-285:11.  **ADMITTED**:  The parties' contract required "the strictest secrecy[,] not to disclose the existence of the contract, work relating to the contract, sources and methods used to execute the contract and participants in formulating supervising or executing the contract's provisions, to any third party…"  R. Agreement Ex. F1, p. 1.

EASTERN'S RESPONSE:  As to the first and second sentences, denied.  The Research Agreement does not contain any of the measures that Strategic claims that it does in those sentences.  *See generally,* Ex. M, Research Agreement.  Regarding the exchange of reports, the Research Agreement required only that the deliverables be provided "by USB drive only."  *Id.*  In fact, Strategic's course of conduct makes clear that absolute secrecy was never its concern. Ex. F,

Wallop II Tr. at 40:9-41:11 (testifying that she shared flash drives provided by Eastern to her neighbor).    As to the third sentence, admitted.

STRATEGIC'S REPLY:    As with its attempted but ineffective controversion of SOF 9, Eastern here makes a vague reference to the 5-page Research Agreement without establishing, factually, that the parties agreed for each and every agreement governing their interactions to be laid out in writing there or, legally, that the text of the Research Agreement itself is the only available evidence of a circumstance in which it was executed.  Strategic cited evidence fully supporting these facts.  They are admitted, and that does not change if, as it does, Strategic admits Eastern's construction of the Agreement that "Regarding the exchange of reports, the Research Agreement required only that the deliverables be provided 'by USB drive only.'"  The parties' positions are harmonious.

This case has never involved a claim by Eastern that Strategic breached the Agreement by revealing confidential information and it is therefore immaterial and disputed that "In fact, Strategic's course of conduct makes clear that absolute secrecy was never its concern."  Eastern's statement is disputed and based on a single occasion when Wallop viewed the drives with her neighbor in an effort to access them and potentially diagnose malware which immediately activated itself on her computer, in a "nightmare" situation, when she first tried to view them on her own computer; the purpose was not to view or share information that Strategic otherwise kept in confidence under the contract.  Wallop 1 Tr., Ex. B1, 175:7-176:18.  The neighbor was "a friend who kindly was trying to see if there was something the matter with the flash drives."  *Id.* This incident is immaterial to Strategic's motion.

11.    Second, Strategic Vision would engage subcontractors (intelligence analysts in the U.S. and overseas, which Strategic Vision described as a "team" and not its own employees) to

perform the research that Strategic Vision would then incorporate into political advice for Guo. Wallop 1 Tr., Ex. B1, 17:9-21:7, 80:10-24, 82:21-83:23, 79:9-20, 138:17-139:6; Wang 1 Tr., Ex. E1, 179:23-186:20; Waller 1 Tr., Ex. H1, 129:22-130:17, 132:15-133:13.

    EASTERN'S RESPONSE:  Objection.  Strategic has not provided any admissible evidence that such subcontractors were ever retained by Strategic.  To the extent an answer is required, denied.  The Research Agreement does not mention anything about Strategic hiring subcontractors or providing political advice to Mr. Guo.  *See generally,* Ex. M, Research Agreement.

    STRATEGIC'S REPLY:  Eastern purports to challenge the admissibility of the evidence cited by Strategic but provides no particular reason that it is supposedly inadmissible. Strategic cited testimony from its principal, Wallop, that she personally worked on "collecting teams" for the research needed under the contract, including "from the U.K. … from Israel…from the Middle East" and other "networks."  Wallop 1 Tr., Ex. B1, 79:9-20, 80:9-24, 82:21-83:23. Strategic also cited Eastern's own admission that Strategic had described to Wang its plan to use teams to conduct the research. Wang 1 Tr., Ex. E1, 179:23-186:20.  Finally, Strategic cited testimony from Waller about his personal travel overseas to meet with "fresh" members of the subcontractor teams to set up the research project from scratch, all the way down to purchasing computer equipment.  The cited testimony described the cost of this work as $200,000.  Waller 2 Tr., Ex. M1, 129:22-130:17, 132:15-133:13.

    In response to all this evidence, Eastern offers merely a vague reference to the 5-page Research Agreement.  This does not support a challenge to the admissibility of the sworn deposition testimony about the personal activities and experiences of Wallop and Waller on behalf of Strategic.  Nor does the Research Agreement create grounds for Eastern to deny the facts.

Eastern has not established, factually, that the parties agreed for each and every ancillary circumstance to be laid out in writing or else it never happened or, legally, that a contract is the only available evidence of an ancillary circumstance in which it was executed. Strategic cited evidence fully supporting these facts. They are admitted.

Eastern's attempted controversion is ineffective.

12.    Strategic Vision itself would not conduct the research:

Q.    Does Strategic Vision do that investigatory research itself?
A.    No.
Q.    So you never perform any research yourself?
A.    No.
Q.    Who does?
A.    Whomever we bring on board to do the investigation.
Q.    So Strategic Vision hires independent contractors?
A.    Our own team of people that we have worked with off and on through the years, yes.

Wallop 1 Tr., Ex. B1, 19:21-20:8 and 79:9-20, 80:10-24, 82:21-83:23, 153:12-154:24, 130:4-131:13. Notifying this network and organizing its work would take time and advance startup funding. *Id*. and 247:16-18; Waller 1 Tr., Ex. H1, 129:22-130:17, 131:11-133:13.

EASTERN'S RESPONSE: Denied. As to the first sentence, Ms. Wallop and Mr. Waller admitted multiple times that they both conducted investigative activities for Eastern on behalf of Strategic. *See e.g.*, Ex. F, Wallop I Tr. at 17:9-18-12, 21:1-23:6, 51:14-17, 87:7-22, 127:14-128:23, 138:1-16, 151:22-152:13, 153:12-17, 169:5-170:3, 177:5-180:20 (Wallop describing her personal role in the "investigation"), 183:9-18, 257:2-10; Ex. G, Wallop II Tr. at 29:20-30:16, 89:17-93-11, 96:5-101:15; Ex. H, Waller I Tr. at 33:8-34:3, 195:15-17; Ex. I, Waller II Tr. at 57:12-16 ("Q. . . . [S]o Strategic Vision did, in fact, set out to investigate a number of individuals on a list, right? A. Yes.") (emphasis added). For instance, Ms. Wallop testified that she personally tracked two individuals on the Subject List:

Q:  And then go down a few more lines.  There is a debit card purchase on March 13th.  What is the Grace Bay Club & Spa?
A:  That was to investigate -- there were two Chinese individuals we were tracking in the Turks & Caicos.
Q:  So that is an expenditure –
A:  Yes.
Q:  -- of $456 at a spa in Turks & Caicos?
A:  It wasn't a spa, it was a hotel, a night, two nights.
Q:  And your testimony is whom were you investigating?
A:  Two Chinese characters that were on the list.
Q:  And who was with you in Turks & Caicos?
A:  My son was with me, but just we had separate rooms, so --
Q:  But who -- you were there, were you meeting with investigators there?
A:  No, I was investigating on my own.
Q:  Why did you need to be in Turks & Caicos?
A:  Because that's where the two Chinese were those two nights.
Q:  And what did you do to investigate them?
A:  I suppose that when you are tracking somebody you are trying to gather intelligence, and that's what I was doing.
Q:  That's what I am asking you about.  Were you surveilling them?
A:  Yes, to some degree, yes.
Q:  And how did you go about that?
A:  As anybody that does this does, you watch them, you listen, you see what they are talking about, you take photographs of them, you put it back into the basket of information that we filling.

Ex. G, Wallop II Tr. at 97:5-98:22.

As to the second sentence, performance under the Research Agreement was to begin immediately; the parties did not negotiate for and the agreement did not provide for ramp up time.  *See generally* Ex. M, Research Agreement.

STRATEGIC'S REPLY:    With its string citation to testimony, Eastern tries to create the appearance of having sufficient evidence to controvert these facts, but that is simply not the case. None disprove that Strategic used subcontractors.   At most, Wallop's testimony establishes that she conducted in-person physical tracking of two of the research subjects. However, Eastern does not connect that to the "investigatory research" being done by

subcontractor teams under the contract or show that Wallop's work somehow supplanted the teams' research.

The following examines each of Eastern's deposition citations and briefly shows why they are inapposite. This also establishes why Strategic must dispute Eastern's additional statement that "Ms. Wallop and Mr. Waller admitted multiple times that they both conducted investigative activities for Eastern on behalf of Strategic." The statement is not true but also is not relevant to the dispositive issues: Wallop 1 Tr., Ex. B1: 17:9-18-12 (Wallop discusses Strategic's work generally over the years, not specific to the Research Agreement, and explains that "each client is different"); 21:1-23:6 (Wallop discusses Strategic's work generally over the years, not specific to the Research Agreement, and provides an "overview of the types of research investigations that Strategic Vision does"); 51:14-17 (Wallop discusses Strategic's work generally over the years, not specific to the Research Agreement, and states that her description was because "we [Guo and Strategic] were speaking about it in generalities"); 87:7-22 (Wallop discusses Team 1 at 87:15-16); 127:14-128:23 (Wallop discusses the payment structure, not specific activities being done under the contract); 138:1-16 (Wallop describes "layers" of research but not that she was performing them); 151:22-152:13 (Wallop describes the cross-checking or verification being done by the teams); 153:12-17 (same); 169:5-170:3 (Wallop discusses how payment would be made under the contract); 177:5-180:20 (Wallop confirms the use of Team 1 and describes that she and Waller divided "the issues" and "aspects of research" in terms of coordinating their completion; the testimony does not state that Wallop herself performed the investigatory research); 183:9-18 (Wallop discusses but does not define "retrievals"); 257:2-10 (Wallop does not discuss here who prepared the content of the document). Wallop 2 Tr., Ex. G2: 29:20-30:16 (Wallop testifies that "I have a number of people that would have helped me and did help me in pulling information on

Guo": this does not establish that Wallop conducted the same work as the teams but rather the opposite); 89:17-93-11 (Wallop discusses activities after Eastern terminated the Research Agreement, including that she was looking into fraud by Guo); 96:5-101:15 (Wallop describes "surveilling" two subjects while in another country).

––––––––––––––––

Waller 1 Tr., Ex. H1: 33:8-34:3 (Waller describes the project and Guo's demand for secrecy; Waller does not describe how the project would be done; 195:15-17 (Waller discusses Team 1 and Guo's unrealistic expectations for a quick turnaround on the complicated research); Waller 2 Tr., Ex. M1: 57:12-16 (Waller discusses the work being done under the contract and does not contradict his other testimony, cited by Strategic, that the research was being done by the subcontractors).

Eastern's attempted controversion here is, in the end, legally immaterial. Eastern cannot legally establish that the Virginia private security services statute applies in this case.

Strategic's second fact in SOF 12 was wholly within its own experience that "[n]otifying this network and organizing its work would take time and advance startup funding." Strategic did not describe this is a "ramp up" time or assert that the Research Agreement discussed it. It was nevertheless true and supported by the cited evidence. Eastern has not effectively controverted the fact or challenged the evidence.

Strategic admits with qualification that "Performance under the Research Agreement was to begin immediately; the parties did not negotiate for and the agreement did not provide for ramp up time." It is undisputed that the starting date for the Research Agreement was moved back ten days to January 16, 2018 (Dkt. 93, Eastern's Second Amended Complaint, p. 4, ¶ 19), and further, that "Both parties under[stood] that occasional unforeseen challenges may arise that will slow or

block comprehensive research, and that there may be periods in which information is irregular, unavailable, or incomplete." *See* R. Agreement, Ex. F1, Dkt. 267-1, p. 3.  This is immaterial to the issues raised in Strategic's dispositive motion.

13.     Guo would not be allowed to contact the network because Strategic Vision's relationships and approach to the research were confidential and proprietary, and Strategic Vision declined to reveal the names or titles of any team members.  Wallop 1 Tr., Ex. B1, 82:21-83:23, 53:14-25 (French did not even know Mike Waller's contacts and vice versa); Waller 1 Tr., Ex. H1, 129:22-130:14, 74:14-77:1.  Eastern Profit admitted in testimony that Strategic Vision never represented that it had in-house employees or particular categories of associates.  Wang 1 Tr., Ex. E1, 179:23-186:20 (and 184:25-185:3: "Q. Something along those lines but never used the words in-house? A.  I don't remember that.").

EASTERN'S RESPONSE:  Denied.  As to the first sentence, there is no provision within the Research Agreement that prohibited Mr. Guo from contacting the "network" or otherwise knowing the members of Strategic's "team."  *See generally* Ex. M, Research Agreement. As to the second sentence, the record demonstrates that Strategic misrepresented that it had the expertise and qualifications to perform the Research Agreement, including that it was licensed to perform a private investigation.  Dkt. No. 93 ¶¶ 35-39 (summarizing fraud allegations); Ex. O, Deposition Transcript of Guo Wengui dated August 2, 2019 ("Guo I Tr.") at 150:7-151:5 (testifying that Strategic Vision misrepresented its qualifications, including that it was licensed to perform private investigation, and that Eastern relied on those qualification to its detriment); Ex. A, Answer at 14 ¶¶ 88-102 (admitting that Strategic Vision, Ms. Wallop, and Mr. Waller were not licensed to conduct private investigation); Ex. F, Wallop I Tr. at 290:25:-292:2 (same).

STRATEGIC'S REPLY:      Eastern has not effectively challenged the first sentence of Strategic's facts.  That the Research Agreement did not expressly prohibit Guo from contacting the subcontractors does not prove that Guo was actually allowed to contact the subcontractors.  Strategic thus must dispute Eastern's statement that "There is no provision within the Research Agreement that prohibited Mr. Guo from contacting the 'network' or otherwise knowing the members of Strategic's 'team.'"  To the contrary, the Research Agreement called for a "single line communication between" the parties.  R. Agreement, Ex. F1, Dkt. 267-1, p. 1.  Aside from this, a statement that shows the harmony between Strategic's fact and the contractual language, the Agreement is silent; it contains no provision affirmatively giving Guo the right to contact the network or be informed of the identities of subcontractors.  Further, Strategic cited evidence that the parties had agreed on this aspect of their relationship, even if Eastern now impliedly contends that it should have been spelled out in the contract.  Eastern has not established, factually, that the parties agreed for each and every agreement to be laid out in the Research Agreement or, legally, that the text of the Research Agreement is the only available evidence of a circumstance in which it was executed.  Strategic cited evidence fully supporting these facts.  They are admitted.  Even if they were not, the disputed part of the subject is immaterial; the point is that Strategic did indeed use subcontractors, a fact that is not disputed.

Further, Eastern purports to deny the second sentence of Strategic's facts ("Eastern Profit admitted in testimony that Strategic Vision never represented that it had in-house employees or particular categories of associates."). Strategic's assertion was supported by a direct citation to the testimony of Eastern's corporate representative that she did not recall Strategic representing that it had an in-house team of investigators.  Eastern says it challenges this statement, but it fails to point to any other evidence showing that Strategic did in fact make this representation. Instead,

Eastern ignores the testimony of its own representative and simply changes the topic to *other* purported misrepresentations, claiming that "the record demonstrates that Strategic misrepresented that it had the expertise and qualifications to perform the Research Agreement, including that it was licensed to perform a private investigation." This is not true but, regardless, is not a true controversion of SOF 13—whether Strategic is licensed or "qualified" in some sense is a different issue from the issue addressed by SOF 13, namely, whether the project would be staffed by "in house" Strategic employees or outside contractors. Eastern's attempt to change the subject is not a permissible form of contravention, and in the absence of any evidence controverting its own corporate representative's admission, Strategic's fact must be deemed admitted.

Finally, Strategic disputes Eastern's statement that "The record demonstrates that Strategic misrepresented that it had the expertise and qualifications to perform the Research Agreement, including that it was licensed to perform a private investigation."  In reality, the subject is immaterial because Strategic was not required to be licensed as a private security service in Virginia.  The Virginia private security services statute is inapplicable, and Eastern's new "licensure fraud" theory would fail as a matter of law. Strategic has established its qualifications for the type of project called for by the Research Agreement, SOF 2, and these facts are admitted by Eastern because it offered absolutely no evidence in contradiction.

There are several reasons why Eastern has not proven that Strategic misrepresented its abilities.  First, Eastern does not rely on competent evidence. Eastern first cites its own Second Amended Complaint (Dkt. 93) as evidence of Strategic's purported misrepresentations, but Eastern's own pleadings are not evidence. Even if parties *could* cite their own pleadings as evidence on summary judgment, however, this particular pleading fails to actually contain the cited material. Nowhere in Paragraphs 35-39, where Eastern admits it has set forth its fraud claims, does

Eastern allege that Strategic made any representation about its licensure under Virginia law. In reality, Eastern never pled this theory of fraud. Ultimately, its own only proffered evidence in support is an isolated statement by Guo in his deposition that "they told me that, you know, they had all the licenses necessary." Guo 1 Tr., Ex. G1, 150:5-151:5. But apparently Guo never communicated this supposed misrepresentation to Eastern, the party that was supposed to have relied on it. A few minutes later in his deposition, Guo testified as follows: "Q. Did you ever communicate the promises that Strategic Vision made to you, to Eastern Profit?" [Objection to the form] A. No." Guo 1 Tr., Ex. G1, 175:10-23. Guo claimed he did not know whether Eastern Profit ever learned of this purported misrepresentation made to him. *Id*. Thus, even if it were proper for Eastern to belatedly raise this unpled theory of "Virginia licensure" fraud now, in a summary judgment opposition, the only witness who can claim he heard the representation acknowledged that he did not pass it on to Eastern.

14.    **ADMITTED**:  To help set up and monitor the network and prepare its eventual advice to Guo, Strategic Vision would partner with Mike Waller, who was introduced to Guo during contract negotiations.  Wallop 1 Tr., Ex. B1, 35:25-37:22, 11:12-13:1; Gertz Tr., Ex. I1, 131:1-20.   Dr. Waller, a Ph.D. in international security affairs, is an expert in strategic communications, with a focus on intelligence, political warfare, public diplomacy, and terrorism avoidance.  RJN, Dkt. 264, ¶ 4.  **ADMITTED**:  Dr. Waller is not a member or employee of Strategic Vision but was invited to work on the project by French, who he has known professionally for many years.  Wallop 1 Tr., Ex. B1, 11:12-12:9, 24:1-3, 16:12-17:8; Waller 1 Tr., Ex. H1, 10:8-11:25.

EASTERN'S RESPONSE:  Admitted as to the first and third sentences.  As to second sentence, denied.  Strategic has not substantiated Mr. Waller's communications, including

its contention that he is an expert on intelligence.  Ex. A, Answer at 14 ¶¶ 88-102 (admitting that Strategic Vision, Ms. Wallop, and Mr. Waller were not licensed to conduct private investigation); Ex. F, Wallop I Tr. at 290:25:-292:2 (same).

STRATEGIC'S REPLY:    Eastern attempts to challenge information about Waller's educational background and experience in international security affairs (the fact:  "Dr. Waller, a Ph.D. in international security affairs, is an expert in strategic communications, with a focus on intelligence, political warfare, public diplomacy, and terrorism avoidance.") with Eastern's legal argument about whether Virginia's private security statute applies in this case. There is no dispute that Waller holds a Ph.D. in international security affairs or that he has long experience in strategic communications.  Nor should the Court accept the notion that the only qualification required of Waller for this project was whether he was licensed by the State of Virginia for private security services.  The statute is legally inapplicable in this case, and Strategic incorporates herein its discussion above in reference to SOF 2.  Eastern's materiality challenge is ineffective to controvert this second sentence of SOF 14.

15.    Third, given the uncertainties attendant to researching a large group of foreign subjects, Strategic only could approximate the time required to prepare a report on a given person, and could not guarantee a particular result at a particular time. Thus, the contract later allowed for adjustments for "irregular circumstances": "[b]oth parties understand that occasional unforeseen challenges may arise that will slow or block comprehensive research, and that there may be periods in which information is irregular, unavailable, or incomplete.  The Contractor will endeavor to make all research and reports as complete as possible in a timely scheduled manner."  R. Agreement, Ex. F1, p. 3.

EASTERN'S RESPONSE:  As to the first sentence, Eastern denies the sentence as stated and refers to the terms of the Research Agreement itself, in which Strategic agreed to a very specific deliverable schedule.  Eastern further responds that the parties agreed in the Research Agreement that Eastern would not be obligated to pay Strategic unless it successfully provided each deliverable called for in the terms of the Research Agreement; if no deliverables were provided, Eastern had no obligation to pay Strategic under the Research Agreement.  Ex. M, Research Agreement at 1-3; Ex. A, Answer at 2 ¶ 6; Ex. G Wallop II Tr. at 35:5-36:5, 42:15-44:12, 47:6-11, 49:21-50:17 ("Q.  So the pricing was based per unit, correct?  A.  Yes."; "Q. . . . When you were in the meeting talking about this document, the idea was that pricing would be tied to units?  A.  My understanding, that's correct.").

As to the second sentence, admitted that the Research Agreement contains an irregular circumstances clause, but denied that it authorizes any "adjustments" to be made to the contract.  *See generally* Ex. M, Research Agreement.

STRATEGIC'S REPLY:     The parties are in agreement—the Court should consider the undisputed language of the Research Agreement, which documented their understanding that "occasional unforeseen challenges may arise that will slow or block comprehensive research, and that there may be periods in which information is irregular, unavailable, or incomplete.  The Contractor will endeavor to make all research and reports as complete as possible in a timely scheduled manner."  R. Agreement, Ex. F1, p. 3.  By arguing that this provision does not authorize "any adjustments" to the contract, Eastern asks the Court to ignore this provision.  However, "[a]n interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible." *LaSalle Bank Nat'l Ass'n,* 424 F.3d 195, 206 (2nd Cir. 2005) (citation omitted); *accord Lawyers' Fund for*

*Client Prot. of State of N.Y. v. Bank Leumi Trust Co. of N.Y.,* 94 N.Y.2d 398, 404, 706 N.Y.S.2d 66, 727 N.E.2d 563 (2000) (describing this as a "standard principle[] of contract interpretation."). The Court should accept Strategic's fact as supported by the clear contract language—the parties agreed to the possibility of "irregular circumstances." There is no ambiguity caused by these competing contract interpretations. "Parties to a contract may not create an ambiguity merely by urging conflicting interpretations of their agreement." *Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan,* 7 F.3d 1091, 1095 (2d Cir.1993) ("Although the parties dispute the meaning of specific contract clauses, our task is to determine whether such clauses are ambiguous when 'read in the context of the entire agreement.' By examining the entire contract, we safeguard against adopting an interpretation that would render any individual provision superfluous.") (citations omitted). Eastern fails to establish that the "irregular circumstances clause" of the contract did not modify the deliverable schedule. A proper reading of the contract would find that it did—the ""irregular circumstances clause" comes immediately after the "Deliverables" clause. *Id.,* p. 3. Regardless, this is not a true fact controversion; it is a legal question, and these SOF 15 facts are admitted. The interpretation of undisputed contract terms is for the Court. *Serdarevic v. Centex Homes, LLC,* 760 F. Supp.2d 322, 328 (S.D. N.Y. 2010) (citations omitted) ("Under New York law, the initial interpretation of a contract is a matter of law for the court to decide. Where the agreement is unambiguous, a court may not admit extrinsic evidence and interprets the plain language of the agreement as a matter of law."). *See* SOF 46 (Eastern notes in reference to a fact involving the interpretation of a contract that it "Calls for legal conclusion.").

In light of this purely legal issue, Strategic disputes Eastern's construction of the contract as premised on a payment-per-deliverable structure: "Eastern would not be obligated to pay Strategic unless it successfully provided each deliverable called for in the terms of the Research

Agreement; if no deliverables were provided, Eastern had no obligation to pay Strategic under the Research Agreement."  To adopt Eastern's construction would have the Court ignore numerous other provisions that state in plain terms that Strategic was entitled to $750,000 per month regardless of reference to deliverables being provided:  "[i]t is agreed by both Parties that for the first three months of this Agreement … that the payment of $750,000[] USD will be wired per our instructions to our US Bank account." Ex. F1., R. Agreement, p. 4.  Similarly, "[p]ayment is to be made in regular monthly installments of US$750,000, at the end of each month." *Id.*¸ p. 5. Strategic's construction harmonizes all aspects of the contract—the reference to deliverables was a way to track the progress of the project, and the work actually being done because the work was tied to Guo providing names of fish and Strategic providing reports for each subject.  Strategic's compensation was a fixed amount monthly and not dependent on how may deliverables were provided.

16.     Finally, because Strategic Vision would need clear direction from Guo as to the individuals about whom research was needed and any other issues that developed during the project, Guo would be expected to communicate with Strategic Vision as necessary for its work. R. Agreement, Ex. F1, at p. 1.

EASTERN'S RESPONSE:  Denied.  The Research Agreement required Eastern to provide only the "necessary basic information, and desired areas of focus, to [Strategic] to research." *See generally* Ex. M, Research Agreement.  As specified in the Research Agreement, Eastern was to provide this information, not Guo.

STRATEGIC'S REPLY:     This is not a true controversion of the essence of the fact—that the contract called for Eastern to give, as set forth in the SOF, "clear direction from Guo as to the individuals about whom research was needed and any other issues that developed during

the project."  Strategic has already established that Guo spoke for Eastern regarding the contract, as admitted in Eastern's own pleadings.  Dkt. 142, p. 2, ¶ 4 (emphasis added) ("Eastern authorized **Guo** to communicate with Strategic Vision on Eastern's behalf concerning the Agreement, **Guo**'s representations to, and interactions with, Strategic Vision concerning the Agreement are binding upon Eastern, and Eastern has not repudiated any such representations or interactions.").  Even if the scope of what Guo was to provide under the contract was limited to the "necessary basic information, and desired areas of focus," it was still up to Guo to give this to Strategic.  Strategic thus admits "The Research Agreement required Eastern to provide only the 'necessary basic information, and desired areas of focus, to [Strategic] to research.'"  Strategic also admits, with qualification, "As specified in the Research Agreement, Eastern was to provide this information, not Guo."  As a business entity, Eastern could only act through natural person representatives, and Eastern has admitted that Guo spoke for it:  "Eastern authorized Guo to communicate with Strategic Vision on Eastern's behalf concerning the Agreement, Guo's representations to, and interactions with, Strategic Vision concerning the Agreement are binding upon Eastern, and Eastern has not repudiated any such representations or interactions."  Dkt. 142, p. 2, ¶ 4.

17.    After discussing these concerns, Guo pressed ahead with the project, and the parties negotiated the Research Agreement, detailing the services Strategic Vision would provide.  R. Agreement, Ex. F1; Wallop 1 Tr., Ex. B1, 126:3-18; Wallop Aff., Ex. C1, ¶ 4.  Over the course of approximately one month, several drafts of the Agreement were exchanged between Guo and his representatives (in New York) and French and Waller (in Virginia).  Wang 1 Tr., Ex. E1, 59:17-60:4.  **ADMITTED:**  Guo authorized two representatives to speak with Strategic Vision:  Lianchao (who knew both Guo and French) and Wang Yangping, a/k/a Yvette Wang, who French first met

through Guo.  Plt's First Interrog. Resp., Ex. N1, p. 3, No. 5; Wallop 1 Tr., Ex. B1, 199:20-200:9;

Wang 1 Tr., Ex. E1, 59:17-60:4.

EASTERN'S RESPONSE:   As to the first sentence, denied, except that it is

admitted that Eastern, not Guo, and Strategic agreed to proceed with the investigation and that the

parties negotiated and agreed to the Research Agreement to memorialize the terms and conditions

of the parties' arrangement.  *See generally* Ex. M, Research Agreement.

As to the second sentences, denied.   The parties negotiated the agreement in

Virginia (*id.* at 3 ¶ 8; Ex. B, Strategic's Admissions, ¶¶ 20-25), Strategic drafted the agreement in

Virginia (Ex. F, Wallop I Tr. at 108:5-109:18), and the parties signed the agreement in Virginia

(Ex. A, Answer at 2-3, ¶¶ 6-7; *id.* at 28 ¶ 23).

As to the third sentence, admitted.

STRATEGIC'S REPLY:      It is unclear why Eastern designates these statements

as disputed.  As to the first, the project would not have happened unless Guo wanted it to.  Dkt.

142, p. 2, ¶ 4 ("Eastern authorized Guo to communicate with Strategic Vision on Eastern's behalf

concerning the Agreement, Guo's representations to, and interactions with, Strategic Vision

concerning the Agreement are binding upon Eastern, and Eastern has not repudiated any such

representations or interactions.").  *See also* Eastern's SOF, Dkt. 262, p. 2, SOF 6.  Further, and

importantly, Eastern admits the third sentence, which is that it was "Guo," not Eastern, who

authorized Lianchao Han and Yvette Wang to deal with Strategic Vision.  Eastern was the "Client"

under the Agreement.  R. Agreement, Ex. F1, Dkt. 267-1, p. 1.  The parties then negotiated a

contract.  It and its terms are not disputed.  *Id.*

Second, Eastern cannot dispute and does not cite evidence disputing that there were drafts

of the contract and that Eastern's representatives were located in New York when negotiating

them.  Wallop 1 Tr., Ex. B1, 36:18-44:15 (discussing meeting Guo at his New York apartment); 63:5-21 (Wallop and Waller believed they were negotiating with Guo, and either Lianchao or Wang was present, but sometimes Guo dismissed Wang because he claimed he did not trust her); 143:6-13.  Further, some of the negotiations occurred when Wallop and Waller themselves were at Guo's apartment in New York—that is why Wang sometimes referred to Guo as "New York." (Ex. O1 (Wang 1 Tr. Ex. 16, EASTERN-00217-219:  Wang-Wallop January 5, 2018 text exchange, in which Wang says, "So I'm the person to sign this contract tomorrow" and confirms that "NY" [Guo] had instructed her that "this contract and all the communications…are exclusively between NY, you, M [Michael Waller] and me—four of us.").  *See*, for example, Eastern's own SOF 32, Dkt. 262, p. 6 ("One such meeting took place in the middle of December 2017 and was attended by Mr. Guo, Lianchao, Ms. Wallop and Waller."  The evidence of this meeting shows it took place in mid-December 2017 at Guo's apartment in New York City.  Waller 1 Tr., Ex. H1, 230:21-231:22; Wallop 1 Tr., Ex. B1, 32:17-38:4, 41:11-42:11, 43:15-45:25, 87:23-89:5); Waller 1 Tr., Ex. H1, 20:14-23:22 (discussing early December meetings).

In short, no one disputes that the contract was *executed* in Virginia.  *See* SOF 20 ("The Agreement was ultimately signed at French's home in Virginia on January 6, 2018.").  However, it takes two sides to negotiate a bilateral agreement like the Research Agreement and Eastern's representatives were doing their part in New York.  SOF 17 is thus admitted in full.  Eastern's attempted fact dispute is not material because Eastern creates it in an attempt to apply the Virginia private security services statute.  It is inapplicable in this case and on this motion for the reasons discussed herein.

18.    **ALL FACTS ADMITTED:**  During negotiations, the parties agreed to Guo's request that a separate entity, and not Guo himself, would enter into the Agreement with Strategic

Vision.  Wallop 1 Tr., Ex. B1, 299:22-300:8 ("Obviously it's Guo with whom we are dealing. So

Guo equals Eastern, one would presume."); Lianchao Tr., Ex. K1, 185:2-7; Waller 2 Tr., Ex. M1,

95:3-12.  That entity, Eastern Eastern Profit Corporation Limited ("Eastern Profit"), was revealed

by Guo just shortly before the contract was signed.  Wang 1 Tr., Ex. E1, 8:24-11:15, 14:2-25;

Wang 2 Tr., Ex. L1, 162:4-9, 150:10-151:6; Wallop 1 Tr., Ex. B1, 306:6-307:7.  It is a private

limited company registered under the laws of the Hong Kong Special Administrative Region of the

People's Republic of China.  Eastern Profit's C.R. 26.1 Demand, Ex. P1, at p. 2, No. 2, p. 3, Nos. 3-4;

Wang 2 Tr., Ex. L1, 22:10-23:6, 23:25-25:16, 25:24-26:5, 27:8-13, 29:16-18, 29:22-30:5, 76:12-

18.  Eastern Profit has not been registered to do business in the State of New York.  Eastern Profit's C.R.

26.1 Demand, Ex. P1, p. 2, No. 2, p. 3, Nos. 3-4; RJN, Dkt. 264, ¶ 3.

> EASTERN'S RESPONSE:  Admitted, except that the evidence that Strategic cites

makes clear that Ms. Wang revealed that Eastern was the entity that would be the "Client" in the

Research Agreement.

> STRATEGIC'S REPLY:      Given that Wang spoke for Guo regarding the

contract, and that in its response to SOF 17 (third sentence), Eastern admits that it was Guo who

authorized Wang to speak for him, it necessarily follows, and is therefore undisputed, that even

though Wang is the person who "revealed" to Strategic that Eastern would be the counter-

signatory, she was speaking at Guo's direction, which is consistent with the undisputed fact that

Guo insisted another entity sign for him, and it was he who actually chose Eastern to be the

counter-signatory to the contract.  *See* Eastern's SOF, Dkt. 262, p. 7, SOF 40.

19.      In negotiating the Agreement, Strategic Vision dealt with Guo, and only knew of

Guo and the two individuals he had designated to negotiate on his behalf, Lianchao and Wang.

Dkt. 142, p. 2, No. 4; Plt's First Interrog. Rep., Ex. N1, p. 3, No. 6; Wang 2 Tr., Ex. L1, 169:19-

171:7.  At the time, Guo represented that Wang and Lianchao answered to him; in this litigation, Eastern Profit claims that Guo was orally appointed as its agent, and that Wang worked for Eastern Profit because Eastern Profit had orally hired GSNY, an entity controlled Guo's family office, to assist it regarding the Agreement.  POA, Ex. Q1 (Chunguang Ex. 32); Chunguang Tr., Ex. J1, 109:15-110:17, 111:14-112:23; Wang 1 Tr., Ex. E1, 28:6-17; Wang 2 Tr, Ex. L1, 144:19-22, 205:21-206:7, 169:19-171:7.  **ADMITTED:**   At no point has Eastern Profit repudiated any representation made by Guo (himself or through Lianchao and Wang) concerning the Agreement. Dkt. 142, p. 2, ¶ 4 ("Eastern authorized Guo to communicate with Strategic Vision on Eastern's behalf concerning the Agreement, Guo's representations to, and interactions with, Strategic Vision concerning the Agreement are binding upon Eastern, and Eastern has not repudiated any such representations or interactions.").

EASTERN'S RESPONSE:  As to the first sentence, denied except it is admitted that Mr. Guo and Ms. Wang were involved with negotiating the Research Agreement on behalf of Eastern, and that L. Han was involved with introducing Mr. Guo with Ms. Wallop and Mr. Waller. Wang I Tr. at 13:3-14, 51:22 -53:13; Wang II Tr. at 127:25-128:6, 176:10-178:9; L. Han Tr. at 179:2-13; 188:13-17; Ex. F, Wallop I Tr. at 31:23-32:04, 33:15-21, 34:20-35:7; Waller I Tr. 23:23-25:22; *see also* Waller I Tr. at 116:8-117:9.

As to the second sentence, denied to the extent that it says Guo represented that Wang and L. Han answered to him.  Strategic has not cited any evidence in support of that contention as required by Local Rule 56.1(d).  In fact, Ms. Wang and L. Han testified that they did not answer to Guo.  Wang I Tr. at 20:6-14; L. Han at 210:16–211:2.  The second sentence is otherwise admitted.

As to the third sentence, admitted.

STRATEGIC'S REPLY:      Eastern does not effectively controvert any of the three statements.  As to the first, Eastern itself cited evidence that Lianchao negotiated the contract on behalf of Guo:  SOF 31, Dkt. 262, p. 5, n. 31 ("Waller I Tr. at 18:8-38:14," which states that Strategic had "drafts" of the contract "with Guo and Lianchao Han and French Wallop" at 20:9-13).  Thus, Lianchao did more than simply introduce Guo to Strategic, and Eastern has elsewhere admitted that Lianchao and Wang spoke for Guo.  (*See* SOF 4 above, emphasis added, where Eastern states in its response "Eastern responds further that L. Han is a mutual acquaintance of Mr. Guo and Ms. Wallop and Mr. Waller, and he was involved in bringing Eastern and Strategic together *to enter into the Research Agreement*" and SOF 6 above, where Eastern states in its response "representatives of Eastern (Mr. Guo and Ms. Wang) conferred with representatives of Strategic …").

Eastern does not dispute that Strategic also dealt with Guo and Wang in the contract negotiations, and Strategic admits Eastern's statement that "Mr. Guo and Ms. Wang were involved with negotiating the Research Agreement on behalf of Eastern."  However, Eastern cites Wang's testimony at 20:6-14 to purport to establish that Wang did not answer to Guo (Eastern's statement is "Ms. Wang and L. Han testified that they did not answer to Guo."), but Wang's testimony actually relates to whether Guo controls Wang's work for <u>Golden Spring (New York) Limited</u>.  There is no discussion of Eastern itself.  Eastern also cites Lianchao's testimony to try to prove that Lianchao did not report to Guo on the contract negotiations, but it relates to whether Guo would heed Lianchao's advice on political issues—not the other way around (i.e., not whether Lianchao reported to Guo on the contract negotiations here):

> A.   I -- let's see.  In one sense, he won't listen to me, to my advice.  That's the main reason.  We have a political agenda, you know, we both agree to push, and I always gave advice, I think sound advice.  He just wouldn't listen to me. Q.    Is there anyone he does listen to?

Lianchao Tr., Ex. K1, 210:6-12.

Further, Lianchao testified that Wang reported to Guo on the contract negotiations:

Q.    Then at that point, Yvette Wang came in to take over negotiating the details of the contract itself?
MR. GAVENMAN:  Objection.
MR. GRENDI:  Objection.
THE WITNESS:  Yes.
BY MR. GREIM: Q.    Did it -- knowing that Mr. Guo had been concerned about Ms. Wang earlier, did it surprise you that she was brought in to negotiate the contract? MR. GRENDI:  Objection.
MR. GAVENMAN:  Objection.
THE WITNESS:  No.
BY MR. GREIM: Q.    Did it concern you?
A.    No.
Q.    Why not? A.    *Because I know she is with him for, you know, 16 years at the time.  So he trusted her very much.*

179:8-180:5 (emphasis added).

Thus, Eastern's statement that "L. Han was involved with introducing Mr. Guo with Ms. Wallop and Mr. Waller." is incomplete.  Lianchao also negotiated the contract for Eastern.  Eastern itself cited evidence that Lianchao negotiated the contract:  Eastern's SOF 31, Dkt. 262, p. 5 (citing "Waller I Tr. at 18:8-38:14," which states that Strategic had "drafts" of the contract "with Guo and Lianchao Han and French Wallop" at 20:9-13).

Finally, the record contains evidence that Strategic understood Wang was answering to Guo on the contract negotiations:

> Q.· · Let me ask you this.· Do you recall a
> meeting with Ms. Wang where you thought that she
> was proposing major and unreasonable changes?
> A.· · Somewhere in that earlier part of that
> conversation, and that's when we made the changes
> in the edits.· *She then consulted with Guo.· Guo*
> *agreed to them, there might have been something*
> *he disagreed with, and then he disagreed with*
> *her, and then we went back and re-did the edit*
> back to sort of what the original language must

have been in the final copy that she signed, and
he agreed to, on the telephone.

Wallop 1 Tr., Ex. B1, 190:21-191:7 (emphasis added); *Id.*, 306:24-307:4.

20.    **ALL FACTS ADMITTED:**  The Agreement was ultimately signed at French's home in Virginia on January 6, 2018.  R. Agreement, Ex. F1, p. 5; Wallop Aff., Ex. C1, ¶ 4; Wang 1 Tr., Ex. E1, 264:9-12.  Wang claimed authority to sign, admitted she did sign, but claimed she never actually wrote her own signature.  Wang 1 Tr., Ex. E1, 26:24-27:23, 59:17-60:4 (Ex. 2, p. 5, Eastern 9); Wang 2 Tr., Ex. L1, 140:15-144:22, 27:8-13, 147:4-17, 149: 5-14, 145:18-146:8, 148:18-149:14, 154:7-156:13.  Eastern later claimed Chunguang Han had been orally given authority to hire Golden Spring (New York) Limited ("GSNY"), Wang's official employer, by Guo Mei, who is Guo's daughter and the only director, shareholder, or natural person officially associated with Eastern.  Chunguang Tr., Ex. J1, 5:14-17; Wang 2 Tr., Ex. L1, 22:13-23:7, 140:15-144:22, 27:8-13, 147:4-17, 149: 5-14, 145:18-146:8, 148:18-149:14, 154:7-156:13, 166:7-18.  Both Wang and Han were New York residents at all relevant times.  Chunguang Tr., Ex. J1, 13:6-14:2; 17:21-18:3; Wang 1 Tr., Ex. E1, 4:11-12, 26:24-27:23.

EASTERN'S RESPONSE:  Admitted.

21.    Later, after the Research Agreement was executed, this lawsuit was filed, and discovery was underway, **ADMITTED:**  Eastern claimed that two other individuals were involved in the project:  Chunguang Han **[DISPUTED:  an assistant of Guo]** who, in litigation, Eastern has claimed is its "principal") and Guo Mei (Guo's daughter and the sole director, shareholder, or natural person formally associated with Eastern  from June 27, 2017 through today).  Plt's First Interr. Resp., Ex. N1, at p. 2, No. 2 ("Chunguang Han is the principal of Eastern."); Ex. R1 (Chunguang Tr. Ex. 33); Lianchao Tr., Ex. K1, 36:11-38:4; Ex. S1 (Chunguang Tr. Ex. 30), p. 2 (Eastern 401); Wang 2 Tr., Ex. L1, 25:8-28:13, 45:25-47:25, 63:22-64:14, 126:2-17; Chunguang

Tr., Ex. J1, 34:6-17; 38:18-39:15, 106:2-107:24.  **ADMITTED:**  Eastern Profit claims that Guo

Mei orally gave Chunguang Han authority to manage Eastern Profit's affairs, which included his

hiring of Golden Spring (New York) Limited ("GSNY"), Wang's official employer and a wholly-

owned subsidiary of Guo's family office, China Golden Spring (Hong Kong).  Wang 2 Tr., Ex.

L1, 25:5-44:17.  **ADMITTED:**  Eastern Profit claims that, in 2019, both Guo Mei and Chunguang

gave additional verbal authority to Wang in New York that allowed her to represent Eastern

Profit's interests in communicating with a third party regarding payments received by Strategic

Vision under the Agreement, discussed below.  *Id*.  **ADMITTED:**  Both Wang and Han were

residents of New York at all relevant times.  Chunguang Tr., Ex. J1, 13:6-14:2; 17:21-18:3; Wang

1 Tr., Ex. E1, 4:11-12, 26:24-27:23; Wang 2 Tr., Ex. L1, 25:5-44:17.

   EASTERN'S RESPONSE:  As to the first sentence: denied with respect to the

prefatory language that precedes the colon because Strategic could have ascertained Guo Mei's

and C. Han's ownership and prior ownership, respectively, of Eastern before the Research

Agreement was signed simply by accessing Eastern's governance documents, which are publicly-

available, but Strategic chose not to do so, Wallop I Tr. at, 90:4 -91:1; admitted that C. Han is an

agent of Eastern; denied that C. Han is Mr. Guo's assistant, C. Han at 152:6-24; admitted that Guo

Mei is Mr. Guo's daughter and the sole director, shareholder, or natural person formally associated

with Eastern  from June 27, 2017 through today.

   As to the second, third, and fourth sentences, admitted.

   STRATEGIC'S REPLY:  Although Eastern quibbles with the introductory

phrase of the first sentence ("Later, after the Research Agreement was executed, this lawsuit was

filed, and discovery was underway"), Eastern cites no proof that Chunguang Han or Guo Mei were

ever introduced to Strategic during contract negotiations or the short period of performance before

Eastern terminated the contract.  (Eastern admits that it terminated the contract—SOF 45 below)  Instead, in its own SOF 31, Eastern identifies the parties who negotiated the Agreement as Guo and Wang (Dkt. 262, p. 5, ¶ 31), and the evidence bears out that Lianchao also was involved in the negotiations.  *See* Eastern's SOF 32, Dkt. 262, p. 6, ¶ 32 ("One such meeting took place in the middle of December 2017 and was attended by Mr. Guo, Lianchao …").  Eastern merely chastises Strategic for not obtaining governance documents for Eastern until this litigation.  That is not an effective method of controversion and Strategic admits Eastern's statement that "Strategic could have ascertained Guo Mei's and C. Han's ownership and prior ownership, respectively, of Eastern before the Research Agreement was signed simply by accessing Eastern's governance documents, which are publicly-available, but Strategic chose not to do so."

The point is immaterial.  Eastern was not identified until the eve of the contract signing, limiting Strategic's opportunity to conduct research into the entity.  Wang 1 Tr., Ex. E1, 51:6-52:18; Ex. T1 (Wang 1 Tr., Ex. 4).  Further, Eastern cites Wallop I Tr. at 90:4 -91:1 but this testimony concerns Guo, not Eastern or its governance documents, and confirms Strategic's facts—Guo's association with Lianchao and William Gertz (along with Guo's relationship with Steve Bannon) lent Guo the "highest sterling standard."  Wallop 1 Tr., Ex. B1, 90:13-20.  Eastern does not dispute Guo's relationship or interactions with Lianchao, Gertz, or Bannon as described by Strategic.  Regardless, Eastern's citation to Wallop's testimony does not support its assertion.  Ultimately, these quibbles are immaterial to Strategic's SOF 21—there is no dispute that Eastern now relies on the involvement of Chunguang and Guo Mei in explaining the events relating to the Research Agreement, as established by the citations presented in the SOF.  Eastern's other additional fact statements are admitted except for Chunguang's status as an assistant to Guo, but this is not material and does not effectively controvert SOF 21.

22.      Wang signed the Research Agreement only after Guo approved its final terms for Eastern Profit, which Wang read him over the phone line-by-line.  Wang 1 Tr., Ex. E1, 61:2-9.

EASTERN'S RESPONSE: Denied as stated.  Guo I Tr. at 71:7-8, 204:15-25.

STRATEGIC'S REPLY:      There are several reasons why Eastern does not effectively dispute this fact.  First, Eastern cites Guo's testimony but he did not serve as Eastern's corporate representative, and the negotiation and execution of the Research Agreement was a topic in the Fed. R. Civ. P. 30(b)(6) notice to Eastern. Ex. U1 (Ex. 1, Wang 1 Tr., p. 3, No. 1 ("The Research Agreement signed on or about January 6, 2018 between Eastern and Strategic Vision[], including negotiations concerning same.")).  Eastern's corporate representative was Yvette Wang, whose testimony Strategic cited in support of the fact.  Second, Wang testified in relation to Ex. 2 (the Research Agreement) exactly what the fact stated:

> Q.· Was a translation of this document
> ever provided to Mr. Guo?
> A.· I orally translated for him.
> Q.· And he speaks Mandarin?
> A.· Correct.
> Q.· So you read line by line and got his
> okay to the final agreement, right?
> A.· Correct.

Wang 1 Tr., Ex. E1, 61:2-9; F1, Research Agreement, Dkt. 267-1.  Finally, Guo's testimony is either irrelevant or indicates that he simply does not recall.  The first of the two cited portions is irrelevant ("7 A.  I refuse to answer. 8   BY MR. GREIM:").  The second of the two cited portions simply indicates that Guo does not remember:  Q.  Did you talk to Yvette Wang over the phone when she was in Washington to make the final negotiations on the contract? A.  I don't remember. Q.  Did you instruct Yvette Wang to sign the final version of the contract? A.  I don't remember. In sum, SOF 22 is not controverted.

23.     **ADMITTED:**  Of Strategic Vision, the Agreement required "business research, reporting, documentation, and other consulting services" that would be documented in periodic "comprehensive confidential reports" with supporting data provided on a timetable set out in the Agreement.  R. Agreement, Ex. F1, pp. 1, 3; Wang 1 Tr., Ex. E1, 11:19-12:11.  **ADMITTED:** The three areas of analysis (all labeled "research") were "financial forensic historical research; current tracking research; and social media research."   R. Agreement, Ex. F1, pp. 1-2. **DISPUTED:**  Guo represented to Strategic Vision in negotiations, **ADMITTED:**  and the Agreement recited, that **DISPUTED:**  Guo planned to use Strategic Vision's analysis for "detecting, stopping, and preventing crime or other harm" (*Id.*) to the people of China in order to force a regime change that would implement the rule of law and democracy.  Guo 1 Tr., Ex. G1, 45:3-46:16; Wang 1 Tr., Ex. E1, 33:8-14 (Guo identified research subjects), 32:5-35:11, 37:8-38:7.

EASTERN'S RESPONSE: As to the first sentence, admitted that this was one of the many obligations that Strategic undertook in the Research Agreement, and Eastern refers to the Research Agreement for a complete and accurate description of Strategic's obligations under that agreement.  *See generally* Ex. M, Research Agreement.

As to the second sentence, admitted that Strategic was required to provide Eastern with the following three types of "Deliverables": "Financial Forensic Reports" "Current Tracking Reports," and "Social Media Reports," that Strategic was obligated to "provide the deliverables based on the best practices and standards of the industry, comparable to other top firms with similar services," including by delivering reports "of very high quality, revealing the true, complete and full profile of the subject," and that all of the deliverables were to be provided "by USB drive only."  Ex. M, Research Agreement; Ex. A, Answer at 2 ¶ 6.   Eastern refers to the Research

Agreement for a complete and accurate description of Strategic's obligations under that agreement. *See generally* Ex. M, Research Agreement.

As to the third sentence, admitted that the Research Agreement provides that the purpose of Strategic's investigatory research is "detecting, stopping, and preventing crime or other harm." Eastern refers to the Research Agreement for a complete and accurate description of Strategic's obligations under the agreement. *See generally* Ex. M, Research Agreement. The remainder of the third sentence is denied. Strategic has failed to cite any evidence as required under Local Rule 56.1(d) that Eastern or anyone on behalf of Eastern, including Mr. Guo, represented the purpose for which Eastern was planning on using the investigatory research. In fact, Ms. Wallop admitted that Strategic did not know for what purpose Eastern was proposing to use the investigatory research and thought that Eastern might "run it both ways" (that is, both for and against the CCP), and that Strategic "never [even] discussed what the research would be used for . . . with Mr. Guo or Ms. Wang or Mr. Han." Ex. F, Wallop I Tr. at 59:2-61:13.

STRATEGIC'S REPLY: The only thing Eastern tries to challenge is whether there is evidence that Strategic knew Guo's purpose for the research called for by the contract. Evidence exists and Strategic denies Eastern's additional fact that "Ms. Wallop admitted that Strategic did not know for what purpose Eastern was proposing to use the investigatory research and thought that Eastern might 'run it both ways' (that is, both for and against the CCP), and that Strategic 'never [even] discussed what the research would be used for . . . with Mr. Guo or Ms. Wang or Mr. Han.'" As shown above, Eastern mischaracterizes the testimony. Wallop's testimony concerned what she believed Guo *actually did* with the research (in Wallop's words, "what happened to it"), not what Guo or his agents represented to Strategic prior to the contract *would be* the planned use of the research. Hence, Wallop testified, *past tense*, "We have no idea

what Yvette did with it.· We have no idea what Guo did with it.· We have no idea what happened to it."  Wallop 1 Tr., Ex. B1, 60:6-11.  Wallop further dispels the notion that, had she known Guo intended to use the research for anything supportive of the CCP, Strategic still would have entered the contract:  "[w]e cared very much what it was going to be used for.  We are very adamantly anti-communist…  We are very pro-democracy."  *Id.*, 60:12-20.  Wallop then testified that Strategic understood the research "would be used to fight against the communist party in China." *Id.*, 21-61:1.

In an earlier SOF (SOF 7), Strategic established that it knew of Guo's plans for the research from statements by Guo or others on Eastern's behalf. There, Strategic cited the testimony of several witnesses that Guo and/or others on his behalf conveyed to Strategic that Guo intended to use the research to effect a regime change in China, including the testimony of Lianchao (Lianchao Tr., Ex. K1, Dkt. 267, 226:10-18).  And here, in SOF 23, Strategic cited testimony from Guo answering the question "[w]hat was it about the 15 names that led you to believe that Strategic Vision's research would be useful to you in your goal of eliminating the Chinese Communist Party?"  Guo 1 Tr., Ex. G1, 45:3-6.  Guo answered, among other things, "we felt like, if -- with possession of those information, we are able to release those information to the U.S. government to help save millions of peoples who got falsely persecuted in China, even hundreds of millions of people who got persecuted in China."  *Id.*, 45:24-46:5.

Guo then testified that Strategic knew that this was his goal and, purportedly to persuade Eastern to enter the contract, allegedly made a "lying pitch" and "took advantage of our sense of urgency to rescue millions, tens of millions of people, from the prison, and they used those people as bait *to try to get us into sign the contracts*."  Guo 1 Tr., Ex. G1, 46:5-15 (emphasis added).

According to Guo, Strategic full well knew of his plans for the research and purportedly tried to use that knowledge to force a contract.  Thus, Eastern has not effectively disputed any of this SOF.

Again, however, the parties' differing positions on Eastern's additional fact (whether Strategic knew the use Guo planned for the research prior to contracting with his entity) does not create a material dispute of fact.  What is before the Court is Strategic's motion for summary judgment against Eastern on Eastern's own claims for breach of contract, fraud, and unjust enrichment.  Strategic did not seek summary judgment on Strategic's own fraud claim.

24.     Under the Agreement, Strategic Vision would be paid for specific periods of work rather than for its periodic reports.  R. Agreement, Ex. F1, p. 4; Wang 1 Tr., Ex. E1, 56:12-59:16.  Wang had asked for an alternative a la carte, report-for-payment structure, but that was not included in the final Agreement, which instead adopted a "waterline" structure which would pay Strategic Vision a set fee per month.  Wang 1 Tr., Ex. E1, 66:12-67:9.  Strategic Vision was guaranteed a bare minimum of work, from the Agreement's start (January 16, 2018) through a period of three months (April 16, 2018).  R. Agreement, Ex. F1, pp. 3-4.  When that guaranteed period ended, "after the March reports and payments are made, [] all involved Parties will meet to recap the accounting…"  Wang 1 Tr., Ex. E1, 56:22-58:5, R. Agreement, Ex. F1, p. 4; Wallop 1 Tr., Ex. B1, 246:25-247:7.  **ADMITTED:**  The Research Agreement had a term of three years.  R. Agreement, Ex. F1, p. 5.  **ADMITTED:**  Each party had a right to terminate the Agreement on "30 days' written notice."  *Id.*; Ex. V1, Ex. 6 to Wang 1 Tr.; Wang 1 Tr., Ex. E1, 135:18-136:7.

EASTERN'S RESPONSE:  As to the first four sentences, denied. The Research Agreement, as well as Ms. Wallop's own testimony, makes very clear that Eastern was obligated to pay Strategic only if its performed its obligations and provided the "deliverables" called for under the contract. Ex. M, Research Agreement at 1-4 ("The prices for *each deliverable . . .* are

$300,000; "The pricing for *30 units or deliverables* per year remains a constant $9,000,000 per year, or $750,000 per month for 12 months."); Ex. A, Answer at 2 ¶ 6; Ex. G Wallop II Tr. at 35:5-36:5, 42:15-44:12, 47:6-11, 49:21-50:17 ("Q.  So the pricing was based per unit, correct?  A. Yes."; "Q. . . . When you were in the meeting talking about this document, the idea was that pricing would be tied to units?  A.  My understanding, that's correct.").  Strategic also misrepresents Ms. Wang's testimony and the Research Agreement.  As stated in both the cited testimony and the bottom of page 3 of the Research Agreement, the "waterline" concept meant only that Eastern agreed to maintain at least 10 subjects to be investigated for a total of 30 units or deliverables at all times and that if a subject was "removed from consideration" a new subject would "be put in its place."  *See* Ex. M, Research Agreement at 3.  Finally, the Research Agreement does not provide for any "guaranteed" period for the reasons set forth above in this response and because the agreement allowed for termination without cause by providing 30 days' notice.  *See* Ex. M, Research Agreement.

As to the fifth and sixth sentences admitted.

By way of further response, Eastern refers to the Research Agreement for a complete and accurate description of Strategic's obligations under that agreement.  *See generally* Ex. M, Research Agreement.

STRATEGIC'S REPLY:      Eastern disputes how the contract set the framework for Strategic's compensation, Ex. F1, R. Agreement, Dkt. 267-1.  According to Eastern, rather than being paid for specific periods of time, Strategic would be paid only if it produced actual reports, including in the critical first three months of the project.  If Strategic did not produce actual reports in the first three months of the project, it would not be paid.

Each facet of Eastern's legal position on this point is disputed by Strategic but the question ultimately is a legal one for the Court:  (1) "The Research Agreement, as well as Ms. Wallop's own testimony, makes very clear that Eastern was obligated to pay Strategic only if it[] performed its obligations and provided the 'deliverables' called for under the contract."  (2) "As stated in both the cited testimony and the bottom of page 3 of the Research Agreement, the 'waterline' concept meant only that Eastern agreed to maintain at least 10 subjects to be investigated for a total of 30 units or deliverables at all times and that if a subject was 'removed from consideration' a new subject would 'be put in its place.'"  (3) "The Research Agreement does not provide for any 'guaranteed' period for the reasons set forth above in this response and because the agreement allowed for termination without cause by providing 30 days' notice."

These three statements are not fact controversions.  They are legal positions and ask the Court to interpret a contract the existence and terms of which are undisputed.  *Serdarevic v. Centex Homes, LLC*, 760 F. Supp.2d 322, 328 (S.D. N.Y. 2010) (citations omitted).  In asking the Court to adopt its interpretation, Eastern violates several long-standing contract principles.  First, Eastern asks that the contract be interpreted according to one term (i.e. "deliverables") when a contract is to be interpreted according to the entire terms that comprise the document.  *W.W.W. Associates, Inc. v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440 (1990).  "A familiar and eminently sensible proposition of law is that, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms."  *Id.* Second, the complete terms of the contract include a specific provision as to how Strategic would be compensated during "the first 3 months of this Agreement," which are what matter here since Eastern terminated the contract less than two months after it was signed and, with the required termination notice, caused the contract to exist no longer than 90 days.  *See* SOF 45 (Eastern

"admitted that Eastern terminated the Research Agreement on February 23, 2018."); R. Agreement, Ex. F1, pp. 3-4 (Strategic given 30 days after the February 23, 2018 termination to continue its work).

According to the specific provision of the contract, "[i]t is agreed by both Parties that for the first three months of this Agreement … that the payment of $750,000[] USD will be wired per our instructions to our US Bank account." Ex. F1, R. Agreement, p. 4. Similarly, "[p]ayment is to be made in regular monthly installments of US$750,000, at the end of each month." *Id.*¸ p. 5. "An interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible." *LaSalle Bank Nat'l Ass'n,* 424 F.3d 195, 206 (2nd Cir. 2005) (citation omitted). Eastern's proposed interpretation would render meaningless each of the provisions referencing $750,000 per month in compensation to Strategic for the first three months of the project.

Third, courts will interpret a contract in accordance with a specific term like "[i]t is agreed by both Parties that for the first three months of this Agreement … that the payment of $750,000[] USD will be wired per our instructions to our US Bank account" over a more generalized term like "deliverables," which describes reports as the work product expected to be produced by Strategic. The *"ejusdem generis* principle of contract interpretation [] gives precedence to the specific clause [] rather than the general clause []." *Isaacs v. Westchester Wood Works, Inc.*, 278 A.D.2d 184, 185, 718 N.Y.S.2d 338 (2000).

Fourth, "conflicting contract provisions should be harmonized, if reasonably possible, so as not to leave any provision without force and effect" *Isaacs*, 278 A.D.2d at 185 *citing* 22 N.Y. Jur.2d, Contracts, §§ 252–253. The contract language supports Strategic's position, which harmonizes all provisions in the contract. The reference to "deliverables" was a way to track the

progress of the project; Guo provided names of "fish" and Strategic was then responsible for providing reports for each subject.  Thus, the contract stated that "[t]he Client will provide the necessary basic information" while "[t]he Contractor will produce complete reports …" Ex. F1, p. 1.

Fifth, Eastern points to the testimony of Wang and Wallop to contradict Strategic's interpretation of the contract, but "extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." *Intercontinental Planning v. Daystrom, Inc.,* 24 N.Y.2d 372, 379, 300 N.Y.S.2d 817, 248 N.E.2d 576 (1969).  Eastern's citation to outside evidence to contradict the contract's clear payment provisions also is against Eastern's own position elsewhere on the facts, where Eastern repeatedly "refer[s] to the Research Agreement for a complete and accurate description of Strategic's obligations under that agreement."

Next, Eastern disputes that the Research Agreement provides for a "guaranteed" period "because the agreement allowed for termination without cause by providing 30 days' notice." *See* Ex. F1, R. Agreement. To accept Eastern's interpretation would render meaningless the "look back" period provision of the contract ("all involved Parties will meet to recap the accounting [] prior to moving forward with the next quarter").  "An interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible." *LaSalle Bank Nat'l Ass'n,* 424 F.3d 195, 206 (2nd Cir. 2005) (citation omitted).

Finally, it is important to note that although this Court can use summary judgment to resolve the parties' legal dispute regarding the proper interpretation of the Research Agreement, it is unnecessary to do so given the narrow grounds of Strategic's motion for judgment against Eastern on Eastern's own Counts I, II, and IV.

25.     **ALL ADMITTED WITH PURPORTED QUALIFICATIONS:**   Of Eastern

Profit, the Agreement required "the necessary basic information, and desired areas of focus, to the

Contractor to research" and payment for Strategic Vision's services.  R. Agreement, Ex. F1, pp. 1,

3-4.  The payment structure required "for the first 3 months of this Agreement, January, February

and March 2018, [] the payment of $750,000. USD will be wired per our instructions to our US

Bank account."  *Id*., p. 4.   The Agreement also required "a deposit of US $1,000,000 [] upon

signing the contract.  *Id*., p. 5. "The deposit will be credited on a prorated basis to the final 1-1/3

(1.3) months of the contract."  *Id*.

EASTERN'S RESPONSE:  As to the first and second sentences, admitted except

that payment for Strategic's services were only due and owing if Strategic delivered the

deliverables called for under the contract.  *See* Response to ¶ 24.

As to the third and fourth sentences, admitted.  Eastern further responds, however,

that the deposit was not meant to be a signing bonus and that the parties agreed that "[Eastern]

may direct other entities to pay [Strategic], and that such payments will be deemed satisfactory

compensation by [Strategic]."  Ex. M, Research Agreement at 5; Ex. A, Answer at 2 ¶ 6; Ex. A,

Answer at 4 ¶ 17; Ex. I, Waller II Tr. at 91:23-94:6.

By way of further response, Eastern refers to the Research Agreement for a

complete and accurate description of Strategic's obligations under that agreement.  *See generally*

Ex. M, Research Agreement.

STRATEGIC'S REPLY:     Eastern admits the first and second sentences but

tries to qualify the admission by stating additional factual propositions.  Eastern's new "facts"

comprise nothing more than a contract interpretation, and differing contract interpretations do not

create a fact dispute.  Strategic disputes Eastern's statement that "Payment for Strategic's services

were only due and owing if Strategic delivered the deliverables called for under the contract."  But, SOF 25 does not describe the payment structure of the contract and Eastern overreaches here in trying to qualify its admission and create a fact dispute.  Strategic incorporates herein its Reply in support of its SOF 24 above.

Strategic admits Eastern's statement that "The deposit was not meant to be a signing bonus and that the parties agreed that '[Eastern] may direct other entities to pay [Strategic], and that such payments will be deemed satisfactory compensation by [Strategic].'"  This does not effectively qualify Eastern's admission of Strategic's fact about the $1 million initial payment.

Further, regardless of Eastern's characterization, Strategic provided work to Eastern that was not compensated because Eastern never made the required $750,000 payment for January or February 2018 even though required by the contract.  R. Agreement, Ex. F1, Dkt. 267-1, p. 4.  Neither Eastern nor ACA ever made even that first monthly $750,000 payment.  Wang 1 Tr., Ex. E1, 58:6-18.  Eastern admitted nothing in the contract required Strategic to return the $1 million at the end of the contract, nor had Strategic made such a representation to Eastern Profit. *Id*., 198: 8-201:14-21.

26.     **ADMITTED:**  Wang, for Eastern Profit, testified that the deposit was an "evergreen deposit," which "means that one million just stay there as one million.  And they, Strategic Vision is going to issue invoice every month and the client is just to pay the invoice." Wang 1 Tr., Ex. E1, 199:5-200:19.

EASTERN'S RESPONSE: Admitted, except that payment for Strategic's services was only due and owing if Strategic delivered the deliverables called for under the contract and that the deposit was required to be returned if Strategic did not perform its obligations.  *See* Response to ¶ 24.  *See also* Wang I Tr. at 129: 6-12 ("Q.  Now the research agreement called for

a fee of $750,000 a month; is that right?  A.  $750,000, U.S. dollars, based on their weekly reports and general monthly reports.  Without seeing or received the reports, $750,000 U.S. dollars should not be paid.").  Eastern further responds that the deposit was not meant to be a signing bonus and that the parties agreed that "[Eastern] may direct other entities to pay [Strategic], and that such payments will be deemed satisfactory compensation by [Strategic]."  Ex. M, Research Agreement at 5; Ex. A, Answer at 2 ¶ 6; Ex. A, Answer at 4 ¶ 17; Ex. I, Waller II Tr. at 91:23-94:6.  By way of further response, Eastern refers to the Research Agreement for a complete and accurate description of Strategic's obligations under that agreement.  *See generally* Ex. M, Research Agreement.

STRATEGIC'S REPLY:      Eastern admitted this fact, which was taken directly from the testimony of Wang, its corporate representative.  Discussion of the contract was a topic in the corporate representative deposition notice to Eastern.  Ex. U1, Ex. 1, Wang 1 Tr., p. 3, No. 1 ("The Research Agreement signed on or about January 6, 2018 between Eastern and Strategic Vision[], including negotiations concerning same.").  Eastern's attempt to qualify its admission takes the form of an additional statement based on Eastern's interpretation of the contract's payment provisions.  Strategic denies Eastern's contract interpretation:  "Payment for Strategic's services was only due and owing if Strategic delivered the deliverables called for under the contract and that the deposit was required to be returned if Strategic did not perform its obligations."  As shown above, the correct interpretation of the contract would enforce the provisions for monthly payments to Strategic of $750,000.00 not tied to a specific "deliverable."  Strategic incorporates its Reply in Support of SOFs 24-25.  Regardless, it is for the Court to interpret the contract and there is no fact dispute here.  *Serdarevic v. Centex Homes, LLC*, 760 F. Supp.2d 322, 328 (S.D. N.Y. 2010) (citations omitted).

27.     Although unknown to Strategic Vision until discovery in this case, Eastern Profit had no ability to make the $1 million initial payment or pay monthly invoices.  Wang 2 Tr., Ex. L1, 73:20-74:8, 197:18-198:6, 202:2-204:20.  Late in discovery, Eastern Profit claimed its assets were all in Hong Kong and had been frozen there due to influence by the Chinese government and CCP prior to the Research Agreement and showing that those assets were only about $550,000 HK, or roughly $80,000.  *Id.*; RJN, Dkt. 264, ¶ 5; Dkt. 203-2, Oct. 18, 2018, p. 14/27 for Respondent 16 (Dkt. 203, p. 2:  "The assets of Mr. Guo and Eastern Profit that have been frozen in Hong Kong were frozen, not by the CCP or Mainland China, but by *the High Court of Hong Kong*. *See* Exhibit B."  Ex. B (pp. 3, 14, Respondent 16:  H.K. Ct. Order); Chunguang Tr., Ex. J1, 44:17-22, 70:10-72:6, 74:19-75:1, 88:2-89:9, 131:22-132:4, 146:10-24.  Eastern Profit had no expectation that this would change, absent a regime change triggered by the fruits of the Research Agreement.  Wang 2 Tr., Ex. L1, 202:2-203:24.

EASTERN'S RESPONSE: Objection.  Irrelevant and prejudicial.  To the extent a response is required, denied.  As part of contract negotiations, Ms. Wallop requested that Eastern provide a $1 million deposit under the Research Agreement.  Ex. F, Wallop I Tr. at 192:09-194:16.  On December 29, 2017, to fund the deposit contemplated by the parties, Eastern borrowed $1 million from ACA (i.e., the ACA Loan).  Ex. E, C. Han Tr. at 124:14-129:2; Ex. L, ACA Loan Agreement, EASTERN-000278.  On January 2, 2018, as negotiations were wrapping up, but before the parties signed the Research Agreement, Eastern caused the $1 million deposit to be wired to Strategic through ACA.  Id.; Ex. F, Wallop I Tr. at 192:09-194:16.  Strategic received the $1 million.  Ex. A, Answer at 4 ¶ 17; Ex. F, Wallop I Tr. at 192:09-194:16; Ex. H, Waller I Tr. at 157:9-22; Ex. I, Waller II Tr. at 91:14-94:6.  Strategic understood that the $1 million payment from ACA was the deposit that the parties had previously discussed.  Ex. F, Wallop I Tr. 192:09-

194:16; Ex. I, Waller II Tr. at 91:23-94:6.  Strategic has acknowledged that it accepted the $1 million deposit and purported to utilize it to cover the expenses associated with the investigation called for under the Research Agreement.  Ex. A, Answer at 4 ¶ 17; id. at 28 ¶ 23; Ex. F, Wallop I Tr. at 246:16-247:23; Ex. H, Waller I Tr. at 157:9-22; Ex. I, Waller II Tr. at 66:10-16, 93:22-94:6.

STRATEGIC'S REPLY:     Eastern's objections here are misplaced.  The SOF 27 facts are material, and are not objectionable simply because they disfavor Eastern.  As to materiality, the facts are critical to Strategic's summary judgment analysis of Eastern's contract claim, among other aspects of the case.  Summary judgment should issue because Eastern itself conveyed no benefit to Strategic—the payment came from ACA Capital Group, Ltd., not Eastern, even though Eastern contends that the $1 million payment exclusively forms the framework for its contract damages.  *See* Eastern's SOF 1, Dkt. 262 ("Through this action, Eastern Profit [] seeks to recover a $1 million deposit [], plus pre- and post-judgment interest, paid to Strategic Vision US, LLC [] pursuant to a contract under which Strategic agreed to provide certain private investigation services to Eastern []."  *See also* Plt's First Interrog. Resp. (Eastern claims its damages are "$1,000,000 for the $1,000,000 paid to Strategic Vision as a deposit under the Agreement," Ex. N1 (Plt's First Interrog. Resp., p. 16, No. 7)); [all cited by Strategic in Dkt. 267:  Ex. W1 (Wang 1 Tr., Ex. 7); Wang 1 Tr., Ex. E1, 158:6-9, 158:20-159:23, 161:2-17; Dkt. 127, p. 22, ¶ 7; Dkt. 142, p. 3, ¶ 7].

The facts in support of Strategic's position are not disputed.  The funds came from ACA and, in January 2018, Wang was told by Guo, and then conveyed to Waller, that "big budget is ready for this long-term project" and that the "investors" could pay Waller's team even without a contract. Wang 1 Tr., Ex. E1, 258:5-259:13.  There is nothing other than ACA's $1 million that

Eastern claims for damages.  Each of Strategic's facts was taken from either the sworn testimony of Wang as Eastern's corporate representative, from the testimony of fact witnesses related to Guo, or from Eastern's own fact submissions to the Court during discovery.  (e.g. Dkt. 203-2).  Eastern does not contend that Strategic misquoted any supporting evidence, and Eastern wrongfully states that the facts are denied.

The evidence Eastern cites does not contradict Strategic's facts but addresses other, either ancillary facts or a position that is disputed, namely that there was a true, contemporaneous loan by ACA to Eastern to fund the $1 million initial payment under the Research Agreement.

None of Eastern's citations create a material fact issue.  First, Strategic admits, while noting that this was a provision of the Research Agreement signed by Eastern (Ex. F1, R. Agreement, p. 5), Eastern's statement that: "As part of contract negotiations, Ms. Wallop requested that Eastern provide a $1 million deposit under the Research Agreement."  Second, Strategic disputes the immaterial assertion by Eastern "On December 29, 2017, to fund the deposit contemplated by the parties, Eastern borrowed $1 million from ACA (*i.e.*, the ACA Loan)."  Strategic disputes that this was a true loan, and incorporates herein its SOFs 25, 20, but Strategic also notes that Eastern's claim is an admission that if Eastern obligated itself at all, that occurred on December 29, 2017 (Dkt. 273, pp. 12, 10).  Third, Strategic denies on grounds of false causation Eastern's statement that "On January 2, 2018, as negotiations were wrapping up, but before the parties signed the Research Agreement, Eastern caused the $1 million deposit to be wired to Strategic through ACA."  Strategic admits it received the funds from ACA, but denies that "Eastern caused" the $1 million to be sent.  Importantly, Eastern's citation to Wallop's transcript for this proposition includes not one word about whether Eastern "caused" the wire; instead, the citation only mentions Wallop's interactions with Guo. Fourth, as Strategic itself stated as fact, "Strategic received the $1 million"

and Strategic admits Eastern's statement that "Strategic understood that the $1 million payment from ACA was the deposit that the parties had previously discussed." Fifth, Strategic admits Eastern's statement that "Strategic has acknowledged that it accepted the $1 million deposit and purported to utilize it to cover the expenses associated with the investigation called for under the Research Agreement."

None of the additional facts change the legal analysis supported by the undisputed facts that ACA and not Eastern paid the $1 million that exclusively forms Eastern's damage theory of restitution.

28.     Also unknown to Strategic Vision, Eastern Profit had promised another entity, non-party ACA Capital Group Limited ("ACA"), a private company registered under the laws of the Hong Kong Special Administrative Region of the People's Republic of China, that it would be given the results of Strategic Vision's work. Wang 2 Tr., Ex. L1, 46:22-47:14, 49:25-50:10, 53:19-54:3, 56:7-11, 57:5-9, 110:17-112:2; Wallop 1 Tr., Ex. B1, Dkt. 203-2, Oct. 18, 2018. Eastern claims the $1 million ACA transferred to Strategic on January 2, 2018 was the result of a purported loan between ACA and Eastern only intended to be paid back, with 2% monthly interest, *after* Guo used Strategic's research to trigger regime change in China and (apparently by these means) unfreeze Eastern's Hong Kong bank account. Wang 2 Tr., Ex. L1, 49:25-50:10, 53:19-54:3, 56:7-11, 57:5-9, 110:17-112:2; Dkt. 203-2; Chunguang Tr., Ex. J1, 72:24-73:14. ACA head William Je (a/k/a Yu Jianming)[4] even indicated that ACA might forgive the purported "loan" if the Research Agreement bore fruit:

> A Okay. I didn't discuss that yet, but I heard kind of like William would be happy to contribute this fund into the entire taking down Chinese Communist Party campaign. But I don't have too much details.

---

[4]     It was William Je who was representing ACA's interests in communicating with Eastern Profit about the Research Agreement. Wang 2 Tr., Ex. L1, 57:23-58:19, 53:19-54:3.

Q So had the research been successful, Mr. Yu would have been happy to write off the loan?
Ms. Cline: Objection to form.
Possible.

Wang 2 Tr., Ex. L1, 208:2-16, 46:22-47:14, 44:10-47:14, 197:18-198:6, 202:2-204:20, 73:20-74:8; Plt's Third Interrog. Resp., Ex. X1, p. 3, No. 2.

EASTERN'S RESPONSE: Objection.  Irrelevant, prejudicial, hearsay, and lacks foundation.  To the extent a response is required, denied.  As part of contract negotiations, Ms. Wallop requested that Eastern provide a $1 million deposit under the Research Agreement.  Ex. F, Wallop I Tr. at 192:09-194:16.  On December 29, 2017, to fund the deposit contemplated by the parties, Eastern borrowed $1 million from ACA (*i.e.*, the ACA Loan).  Ex. E, C. Han Tr. at 124:14-129:2; Ex. L, ACA Loan Agreement, EASTERN-000278.  On January 2, 2018, as negotiations were wrapping up, but before the parties signed the Research Agreement, Eastern caused the $1 million deposit to be wired to Strategic through ACA.  *Id.*; Ex. F, Wallop I Tr. at 192:09-194:16.  Strategic received the $1 million.  Ex. A, Answer at 4 ¶ 17; Ex. F, Wallop I Tr. at 192:09-194:16; Ex. H, Waller I Tr. at 157:9-22; Ex. I, Waller II Tr. at 91:14-94:6.  Strategic understood that the $1 million payment from ACA was the deposit that the parties had previously discussed.  Ex. F, Wallop I Tr. 192:09-194:16; Ex. I, Waller II Tr. at 91:23-94:6.  Strategic has acknowledged that it accepted the $1 million deposit and purported to utilize it to cover the expenses associated with the investigation called for under the Research Agreement.  Ex. A, Answer at 4 ¶ 17; *id.* at 28 ¶ 23; Ex. F, Wallop I Tr. at 246:16-247:23; Ex. H, Waller I Tr. at 157:9-22; Ex. I, Waller II Tr. at 66:10-16, 93:22-94:6.

STRATEGIC'S REPLY:      Eastern offers misplaced objections to this SOF 28. First, these facts are legally material, based on admissible evidence (including sworn testimony from Eastern's own corporate representative speaking on noticed topics (Ex. Y1 (Deposition

Notice involved in Eastern's second corporate representative deposition), and not objectionable simply because they disfavor Eastern.   As to materiality, the facts are critical to Strategic's summary judgment analysis of Eastern's contract claim, among other aspects of the case. Summary judgment should issue in favor of Strategic because, per Eastern's own contention (which is the basis of SOF 28), Eastern itself conveyed no benefit to Strategic—the payment came from ACA Capital Group, Ltd., not Eastern, even though Eastern contends that the $1 million payment forms the framework for its contract damages.   *See* Plt's First Interrog. Resp. (Eastern claims its damages are "$1,000,000 for the $1,000,000 paid to Strategic Vision as a deposit under the Agreement," Ex. N1 (Plt's First Interrog. Resp., Ex. M to Dkt. 267-1, p. 16, No. 7)); [all cited by Strategic in Dkt. 267:   Ex. W1 (Wang 1 Tr., Ex. 7); Wang 1 Tr., Ex. E1, 158:6-9, 158:20-159:23, 161:2-17; Dkt. 127, p. 22, ¶ 7; Dkt. 142, p. 3, ¶ 7].   On the undisputed facts, Eastern is not legally entitled to a return of the $1 million initial payment.

Notably, Eastern has not even attempted to dispute any of these facts—that it agreed to share the research with ACA, that ACA is a Hong Kong-registered business entity, that Eastern claims it had a loan with ACA for the contract payment, or that Eastern contends ACA might have forgiven the loan if the research was effective to cause a regime change in China.   Each fact was supported by admissible evidence and Eastern does not back up its foundation objection by discussing any particular piece of evidence.   Eastern does not contend that Strategic misquoted any supporting evidence, and Eastern wrongfully states that the facts are denied.   The evidence Eastern cites does not contradict these facts but addresses other, either ancillary facts or a position that is disputed, namely that there was a true, contemporaneous loan by ACA to Eastern to fund the $1 million initial payment under the Research Agreement.

Unable to effectively object to SOF 28 or show a failure of proof, Eastern tries to offer what it contends are additional facts that somehow change the legal analysis.  They are identical to those in Eastern's response to SOF 27 and Strategic restates here its reply in support of SOF 27.

29.     Neither Guo nor any other Eastern Profit representative disclosed ACA's name to Strategic Vision, disclosed the existence of the "loan," or sought permission from Strategic Vision to allow its strictly confidential work product to be given to a third party for that party's use. Wallop Aff., Ex. C1, ¶¶ 4, 6; R. Agreement, Ex. F1, p. 1 ("Both parties agree that the nature of this contract, and the work related to it, is highly confidential.  Both parties are bound by the strictest secrecy not to disclose … to any third party."); Wang 1. Tr., Ex. E1, 134:19-135:15 ("My understanding is that all the information related to this project or this contract, should be kept confidential").

EASTERN'S RESPONSE: Denied.  ACA wired Strategic $1 million *before* the Research Agreement was even signed.  Ex. A, Answer at 4 ¶ 17; Ex. F, Wallop I Tr. at 192:09-194:16; Ex. H, Waller I Tr. at 157:9-22; Ex. I, Waller II Tr. at 91:14-94:6.   If Strategic was concerned about ACA's involvement, it could have returned the money and called off the agreement; instead, Strategic did not raise any concerns about ACA and accepted the $1 million that ACA sent to Strategic on Eastern's behalf.  Ex. A, Answer at 4 ¶ 17; *id.* at 28 ¶ 23; Ex. F, Wallop I Tr. at 246:16-247:23; Ex. H, Waller I Tr. at 157:9-22; Ex. I, Waller II Tr. at 66:10-16, 93:22-94:6.  In fact, Strategic's course of conduct makes clear that absolute confidentiality was never its concern. Ex. F, Wallop II Tr. at 40:9-41:11 (testifying that she shared flash drives provided by Eastern to her neighbor).

STRATEGIC'S REPLY:     Strategic admits Eastern's statement that "ACA wired Strategic $1 million *before* the Research Agreement was even signed."  (the sum was slightly

less due to wire transaction fees)  However, Eastern improperly takes this statement and asks the Court to impute knowledge to Strategic that Eastern has not proven.  The statement does not give cause for the Court to accept the proposition that, based on Strategic's bank's receipt of wires from ACA (Ex. W1 (Wang 1 Tr., Ex. 7)), Strategic learned of the identity of ACA before the contract was signed, and even further, that Strategic also somehow understood: (1) a "loan" also existed between Eastern and ACA and (2) that ACA was entitled to receive Strategic's research. A true fact dispute is not created by implication, and the SOF 29 facts are admitted by Eastern.

The other facts that Eastern presents as additional information do not create a material dispute and do not change the Strategic's legal position.  Strategic admits with qualification Eastern's statement that "If Strategic was concerned about ACA's involvement, it could have returned the money and called off the agreement; instead, Strategic did not raise any concerns about ACA and accepted the $1 million that ACA sent to Strategic on Eastern's behalf.'" Eastern correctly admits that the Agreement could have been called off even after ACA wired its funds; what Eastern does not even try to establish was that it informed Strategic of all of the relevant surrounding facts. These included the fact that ACA expected to receive Strategic's research. Wang 1 Tr., Ex. E1, 44:1-47:14, 158:6-9, 158:20-159:23, 161:2-17; Ex. W1 Wang 1 Tr. Ex. 7); Dkt. 127, p. 22, ¶ 7; Dkt. 142, p. 3, ¶ 7. ACA may have been willing to write off the purported loan altogether had the research been successful but Eastern still not regained access to its bank accounts. Wang 2 Tr., Ex. L1, 206:24-208:16.  When Eastern terminated the contract, its counsel directed that the $1 million deposit be returned to ACA, not Eastern.  Ex. V1 (Ex. 6 Wang 1 Tr.), p. 1; Wallop 1 Tr., Ex. B1, 241:6-8, 242:19-243:3; Wang 2 Tr., Ex. L1, 211:12-212:15. Regardless, none of this is material to Strategic's Motion for Summary Judgment.

Also not material, and disputed by Strategic, is Eastern's statement that "In fact, Strategic's course of conduct makes clear that absolute confidentiality was never its concern."  Eastern cites a single incident where Wallop asked a neighbor to assist in examining an inoperable flash drive that Eastern had provided.  The neighbor was "a friend who kindly was trying to see if there was something the matter with the flash drives."  Wallop 1 Tr., Ex. B1, 175:7-176:18.

30.     Strategic Vision thus did not know the identity of ACA or its representatives and, when Eastern Profit turned out to have no assets, had no means of recourse against ACA for payment or anything else regarding the Research Agreement.  ACA was to be the ultimate recipient of Strategic Vision's work under the Agreement, even though ACA is not the Eastern and Eastern Profit has not assigned its claims in this case. Ex. P1 (Eastern Profit's C.R. 26.1 Demand), p. 3, No. 4; Wang 2 Tr., Ex. L1, 208:2-16 and 197:18-198:6, 202:2-204:20, 73:20-74:8.  The only authority Eastern Profit has granted anyone regarding the Agreement is a power-of-attorney in favor of Guo's entity, GSNY, not ACA.  Wang 2 Tr., Ex. L1, 205:21-206:7; Ex. Q1 (Chunguang Ex. 32); Chunguang Tr., Ex. J1, 109:15-19, 110:2-17.

EASTERN'S RESPONSE: Objection. Irrelevant.  To the extent an answer is required, denied.  ACA wired Strategic $1 million *before* the Research Agreement was even signed.  Ex. A, Answer at 4 ¶ 17; Ex. F, Wallop I Tr. at 192:09-194:16; Ex. H, Waller I Tr. at 157:9-22; Ex. I, Waller II Tr. at 91:14-94:6.  If Strategic was concerned about ACA's involvement, it could have returned the money and called of the agreement; instead, Strategic did not raise any concerns about ACA and accepted the $1 million that ACA sent to Strategic on Eastern's behalf.  Ex. A, Answer at 4 ¶ 17; *id.* at 28 ¶ 23; Ex. F, Wallop I Tr. at 246:16-247:23; Ex. H, Waller I Tr. at 157:9-22; Ex. I, Waller II Tr. at 66:10-16, 93:22-94:6.   The purpose of the research was to undermine the CCP, not provide it to ACA.  Guo Tr. 1, Ex. F, 39:9-19, 45:3-46:16

STRATEGIC'S REPLY:      Eastern objects to the materiality of the facts but that objection is misplaced.  The legal import of ACA's involvement is relevant to Strategic's defense to, among other aspects of the case, Eastern's contract claim.  Summary judgment should issue against Eastern because it conveyed no benefit to Strategic—the payment came from ACA, not Eastern, even though Eastern contends that the $1 million payment exclusively forms the framework for its own contract damages.  *See* Plt's First Interrog. Resp. (Eastern claims its damages are "$1,000,000 for the $1,000,000 paid to Strategic Vision as a deposit under the Agreement," Ex. N1 (Plt's First Interrog. Resp., Ex. M to Dkt. 267-1, p. 16, No. 7))

To that point, it is telling that Eastern's SOF 1 asserts "Through this action, Eastern Profit Corporation Limited ("Eastern") seeks to recover a $1 million deposit (the "Deposit"), plus pre- and post-judgment interest …"

Strategic admits Eastern's statement that "ACA wired Strategic $1 million *before* the Research Agreement was even signed."  (the sum was slightly less due to wire transaction fees) However, as with SOF 29, Eastern improperly takes this statement and asks the Court to impute knowledge to Strategic that Eastern has not proven.  It is improper to imply that Strategic also somehow understood: (1) a "loan" also existed between Eastern and ACA and (2) that ACA was entitled to receive Strategic's research. A true fact dispute is not created by implication. Moreover, Eastern simply ignored the facts that Strategic had no means of recourse against ACA for payment under the Research Agreement, that Eastern has not assigned its claims in this case, and that the only authority Eastern has granted anyone regarding the Agreement is a power-of-attorney in favor of Guo's entity, GSNY, not ACA.  Eastern simply did not address these facts and they are admitted.  Whether Strategic could have withdrawn after learning all of the relevant facts about ACA is a peripheral point and immaterial to the undisputed facts about ACA's

involvement, which Eastern now admits.

Finally, Strategic admits Eastern's statement that "The purpose of the research was to undermine the CCP," but disputes "not provide it to ACA." This is a mischaracterization of the evidence. ACA was in fact supposed to receive the fruits of the contract (regardless of whether Strategic impliedly "knew" this).

31.     **ALL FACTS ADMITTED:** On or about January 2, 2018, at its bank in Las Vegas, Nevada, Strategic Vision received two successive $500,000 wire transfers. Ex. W1 (Wang 1 Tr., Ex. 7); Wang 1 Tr., Ex. E1, 158:6-9, 158:20-159:23, 161:2-17; Dkt. 127, p. 22, ¶ 7; Dkt. 142, p. 3, ¶ 7. These were from an ACA bank account in Hong Kong. *Id.* Although Strategic Vision did not know of ACA, Strategic Vision assumed the wires had sent at Guo's order under the Agreement, which is what Eastern Profit now contends. Plt's First Interrog. Resp. Ex. N1, p. 2, No. 4 ("Guo Wengui, on behalf of Eastern, ordered wires totaling $1 million to be sent to Strategic Vision on or about December 29, 2017."); Dkt. 93, pp. 3-4, ¶ 17; Wallop Aff., Ex. C1, ¶¶ 6-7. Strategic Vision had agreed with Guo to avoid a direct payment route from Eastern Profit to Strategic Vision (the Agreement provided "that the Client may direct other entities to pay the Contractor, and that such payments will be deemed satisfactory compensation by the Contractor"). R. Agreement, Ex. F1, p. 5. No funds ever passed through Eastern's hands. Wang 1 Tr., Ex. E1, 203:11-15.

EASTERN'S RESPONSE: Admitted, except that the Research Agreement does not require Eastern to "avoid a direct payment route"; instead, the provision is permissive and allows Eastern to pay Strategic through other entities, but does not require it— "the Client *may* direct other entities to pay the Contractor, and that such payments *will be deemed satisfactory compensation* by the Contractor." Ex. M, Research Agreement at 5.

STRATEGIC'S REPLY:      There is no dispute here.  Strategic admits Eastern's statement that "The Research Agreement does not require Eastern to 'avoid a direct payment route'; instead, the provision is permissive and allows Eastern to pay Strategic through other entities, but does not require it—'the Client *may* direct other entities to pay the Contractor, and that such payments *will be deemed satisfactory compensation* by the Contractor.'" Whether the Research Agreement *required* another entity to make payments under the contract is not material. This is particularly the case given that Eastern freely and willingly chose to have a non-party pay the funds that Eastern now claims is the basis of its own damage theory. Finally, whether the payments are "deemed satisfactory compensation" is utterly irrelevant to the question of whether Eastern can properly maintain an action to obtain ACA's $1 million deposit as if those funds had been paid by Eastern.

32.      The wires, however, compromised whatever secrecy this routing might have achieved by **ADMITTED:**  being sent simultaneously from Hong Kong (the very location where Eastern now claims it assets had just been frozen under CCP influence), in the same sizable amounts, and to the same U.S. recipient.  Ex. W1 (Wang 1 Tr., Ex. 7).

EASTERN'S RESPONSE: Admitted that ACA wired the funds to Strategic from Hong Kong, but denied that the Research Agreement prohibited Eastern from wiring any payments called for under the Research Agreement from Hong Kong.  There is no such provision in the Research Agreement; instead, the only relevant provision is permissive and allows Eastern to pay Strategic through other entities, but does not require it— "the Client *may* direct other entities to pay the Contractor, and that such payments *will be deemed satisfactory compensation* by the Contractor."  Ex. M, Research Agreement at 5.

STRATEGIC'S REPLY:   There is no fact dispute here.   Strategic admits Eastern's statement that "The Research Agreement does not require Eastern to 'avoid a direct payment route'; instead, the provision is permissive and allows Eastern to pay Strategic through other entities, but does not require it—'the Client *may* direct other entities to pay the Contractor, and that such payments *will be deemed satisfactory compensation* by the Contractor.'"

Whether the Research Agreement *required* another entity outside Hong Kong to make payments under the contract is not material.   The crux of the facts is admitted: the wires were sent simultaneously from Hong Kong, in the same sizable amounts, and to the same U.S. recipient. Whether the payments are "deemed satisfactory compensation" is utterly irrelevant to the question of whether Eastern can properly maintain an action to obtain ACA's $1 million deposit as if those funds had been paid by Eastern.

33.   **ALL FACTS ADMITTED:**   Discovery later revealed that, several days after sending them, ACA asked its bank to reverse the wires.   Wang 1 Tr., Ex. E1, 107:13-20, 160:2-161:17; Ex. Z1 (Wang 1 Tr., Ex. 8); Plt's First Interrog. Resp. Ex. N1, p. 6, No. 13.   The transfers already having been completed, ACA's request was declined.   *Id.*   ACA did not inform Strategic Vision of this attempt, has never made demand on Strategic Vision for return of the funds, and has never communicated to Strategic Vision about the Research Agreement or any other matter. Wallop Aff., Ex. C1, ¶ 7; Wang 1 Tr., Ex. E1, 161:2-17; Wallop 1 Tr., Ex. B1, 192:20-194:16; Plt's Third Interrog. Resp., Ex. X1, p. 2, No. 1.   Nevertheless, Eastern Profit claims that its damages are "$1,000,000 for the $1,000,000 paid to Strategic Vision as a deposit under the Agreement."   Plt's First Interrog. Resp., Ex. N1, p. 16, No. 7.

EASTERN'S RESPONSE: Admitted.   Eastern responds further as follows:  Eastern directed ACA to reverse the wires because ACA unintentionally wired the $1 million deposit to

Strategic before the Research Agreement was signed.  The deposit was paid by ACA on Eastern's behalf, as explicitly allowed for under the Agreement.  Ex. M, Research Agreement at 5 ("[Eastern] may direct other entities to pay [Strategic], and that such payments will be deemed satisfactory compensation by [Strategic].").  Indeed, as part of contract negotiations, Ms. Wallop requested that Eastern provide a $1 million deposit under the Research Agreement.  Ex. F, Wallop I Tr. at 108:5-109:18, 192:09-194:16.  On December 29, 2017, to fund the deposit contemplated by the parties, Eastern borrowed $1 million from ACA Capital Group Limited.  Ex. E, C. Han Tr. at 124:14-129:2; Ex. L, ACA Loan Agreement, EASTERN-000278.  On January 2, 2018, as negotiations were wrapping up, but before the parties signed the Research Agreement, Eastern caused the $1 million deposit to be wired to Strategic through ACA. *Id.*; Ex. F, Wallop I Tr. at 192:09-194:16.  Strategic received the $1 million.  Ex. A, Answer at 4 ¶ 17; Ex. F, Wallop I Tr. at 192:09-194:16; Ex. H, Waller I Tr. at 157:9-22; Ex. I, Waller II Tr. at 91:14-94:6.  Strategic understood that the $1 million payment from ACA was the deposit that the parties had previously discussed.  Ex. F, Wallop I Tr. 192:09-194:16; Ex. I, Waller II Tr. at 91:23-94:6.  Strategic has acknowledged that it accepted the $1 million deposit and purported to utilize it to cover the expenses associated with the investigation called for under the Research Agreement.  Ex. A, Answer at 4 ¶ 17; id. at 28 ¶ 23; Ex. F, Wallop I Tr. at 246:16-247:23; Ex. H, Waller I Tr. at 157:9-22; Ex. I, Waller II Tr. at 66:10-16, 93:22-94:6.

STRATEGIC'S REPLY:    In an attempt to rehabilitate its damage theory, Eastern offers several additional facts but none create a material fact issue or lessen the strength of Strategic's legal position.  First, Strategic denies Eastern's statement that "Eastern directed ACA to reverse the wires because ACA unintentionally wired the $1 million deposit to Strategic before the Research Agreement was signed."  Eastern cites no evidence in support of this assertion and

the Court need not accept it as bearing on anything.  Second, Strategic admits that the money was received by Strategic under the contract (less wire transaction fees) but disputes that the money was paid "on Eastern's behalf."  Eastern cites no evidence other than the contract itself that "The deposit was paid by ACA on Eastern's behalf, as explicitly allowed for under the Agreement." The contract does not mention ACA, is not signed by ACA, and makes no reference to any particular "other entity" that might make a payment under the contract.  R. Agreement, Ex. F1, p. 5 ("It is understood that the Client may direct other entities to pay the Contractor …").  Nor is there any evidence from ACA.  Eastern simply lacks evidence to make this connection.

Third, *both parties* signed a contract calling for the payment:  "Indeed, as part of contract negotiations, Ms. Wallop requested that Eastern provide a $1 million deposit under the Research Agreement."  Fourth, Eastern cites no evidence for this statement:  "On December 29, 2017, to fund the deposit contemplated by the parties, Eastern borrowed $1 million from ACA Capital Group Limited."  Eastern cites testimony from Chunguang Han (Ex. E, C. Han Tr. at 124:14-129:2).  In the cited testimony, at most, Chunguang testifies that a loan was received "to pay for the investigation company" and that it was for $1 million. (127:5-8, 128:19-23).  There is no testimony that this was the $1 million initial payment under the contract.  Fifth, Strategic denies that "Eastern caused" the wires; the wires came from ACA:  "On January 2, 2018, as negotiations were wrapping up, but before the parties signed the Research Agreement, Eastern caused the $1 million deposit to be wired to Strategic through ACA."  Eastern cites no evidence that it "caused" the wires.

Finally, Strategic admits it "received the $1 million.  Strategic understood that the $1 million payment from ACA was the deposit that the parties had previously discussed.  Strategic has acknowledged that it accepted the $1 million deposit and purported to utilize it to cover the

expenses associated with the investigation called for under the Research Agreement." These facts do not alter any of the analysis.

34.     Attempts to involve ACA in discovery were unsuccessful.  ACA's sole director (Karin Maistrello, a U.S.-based employee of GSNY) accepted hand delivery of a Fed. R. Civ. P. 45 deposition subpoena directed to ACA but then, through counsel she shared with Guo and with his entity, GSNY (Dkt. 213, 4:5-10, Dkt. 195), took the position that the service was ineffective on ACA because she had resigned as a director within 48 hours after Strategic Vision had given the required pre-service notice of intent to Eastern Profit.  Aug. 23, 2019 "Maistrello Tr.," Ex. A2, 27:9-25, 28:1-29:5, 30:1-32:10; Dkt. 177-Exs. C, A.  Maistrello testified that she resigned her directorship after learning from Daniel Podhaskie, counsel GSNY (her employer and Eastern's agent for purposes of this litigation), that she was about to be served with a subpoena in her capacity as an ACA director.  Maistrello Tr., Ex. A2, 55:12-57:20 ("Q. What did you do after you were served with this subpoena? MS. TESKE: Object if the form. You can answer it. A. I gave it to our lawyer. Q. Who was that? A. Daniel Podhaskie.") and Ex. B2 (Maistrello Tr. Ex. 3).

EASTERN'S RESPONSE:  Objection.  Counsel's attempts at discovery are not material facts pertinent to resolution of this matter, including at the summary judgment stage.

STRATEGIC'S REPLY:     Strategic should not be penalized for the absence of any evidence produced by ACA, an entity that Eastern too references in the context of the summary judgment fact record.  For example, Eastern points to ACA as purportedly providing a "loan" to Eastern for the $1 million initial payment under the contract that Eastern contends is its own legally-recoverable damages.  Strategic disputes that there was any loan transaction, but the point is that Eastern itself believes that ACA has a part in the fact record.  Noting the record of ACA's discovery maneuverings (attributable to the individual in-house legal counsel who has attended

depositions of Eastern, GSNY, and Guo, Ex. C2) is important to prevent Eastern from using the fact of no ACA-produced evidence against Strategic on summary judgment.  By standing on its objection without the possibility it would be overruled, Eastern has admitted the facts in SOF 34.

35.     Eastern Profit also opposed discovery into ACA, calling it "entirely collateral to the claims and defenses at issue in this litigation …."  (Dkt. 203, p. 2)  Guo, through the same counsel as GSNY and Maistrello (Dkt. 158, p. 1, opposing discovery into GSNY, Dkt. 195), opposed discovery into ACA, claiming it was "an attempt to harass and provoke" him and that "Strategic should not be entitled to such overreaching discovery from multiple non-parties."  (Dkt. 150, p. 2)  Counsel for ACA never appeared in the case.

EASTERN'S RESPONSE:  Objection.  Counsel's attempts at discovery are not material facts pertinent to resolution of this matter, including at the summary judgment stage.

STRATEGIC'S REPLY:     Strategic should not be penalized for the absence of any evidence produced by ACA, an entity that Eastern too references in the context of the summary judgment fact record.  For example, Eastern points to ACA as purportedly providing a "loan" to Eastern for the $1 million initial payment under the contract that Eastern contends is its own legally-recoverable damages.  Strategic disputes that there was any loan transaction, but the point is that Eastern itself believes that ACA has a part in the fact record.  Noting the record of ACA's discovery maneuverings (attributable to the individual in-house legal counsel who has attended depositions of Eastern, GSNY, and Guo, Ex. C2) is important to prevent Eastern from using the fact of no ACA-produced evidence against Strategic on summary judgment.  By standing on its objection without the possibility it would be overruled, Eastern has admitted the facts in SOF 35.

36.     **ADMITTED:** The Research Agreement was signed January 6, 2018 (Wallop Aff., Ex. C1, ¶ 4) but the effective date was January 16, 2018.  Wang 1 Tr., Ex. E1, 139:4-17; Ex. V1

(Ex. 6 to Wang 1 Tr.), p. 1 ("Eastern agreed to delay the start of the contract by 10 days, from January 6 to January 16."); Dkt. 93, p. 4, ¶ 19.  In early January 2018, Waller travelled to Europe and the Middle East and engaged independent research contractors, including trusted Chinese/English translators and a team lead there.  Wallop 1 Tr., Ex. B1, 115:7-118:10, 82:21-83:23, 130:4-131:13, 71:5-73:4, 74:17-76:6, 77:25-79:23; Waller 1 Tr., Ex. H1, 74:14-77:1, 29:10-19, 41:5-42:18.  This effort cost at least $200,000, done on an expedited basis.  *Id.*; Waller 2 Tr., Ex. M1, 72:4-73:2, 74:10-76:6; Waller 2 Tr. Ex. 104 (Ex. D2).

EASTERN'S RESPONSE: As to the first sentence, admitted.  Eastern further responds that the parties signed the agreement in Virginia (Ex. A, Answer at 2-3, ¶¶ 6-7; id. at 28 ¶ 23).  As to second and third sentences, denied.  Strategic has not provided documentary evidence to support its self-serving testimony.

STRATEGIC'S REPLY:  Eastern contends that the facts in all but the first sentence of SOF 36 have not been supported with "documentary evidence," but this vague complaint is belied by Strategic's multiple citations to sworn testimony and to a billing invoice from Team 1 to Georgetown Research (an LLC of which Mike Waller and French Wallop are members, Waller 2 Tr., Ex. M1, 69:17-25), which evidences the cost of Waller's travel and setting up of Team 1.  Eastern has not effectively controverted any of these facts.  Strategic admits that "The parties signed the agreement in Virginia."

37.   Before the contractors could begin their work, **ADMITTED:** Eastern Profit had to identify the subjects to be researched.  R. Agreement, Ex. F1, p. 1; Wallop 1 Tr., Ex. B1, 83:24-84:7, 85:10-86:11; Waller 2 Tr., Ex. M1, 131:1-132:9, 132:15-133:11.  **DENIED:** Instead, Eastern Profit provided unencrypted (and thus vulnerable) flash drives infected with malware that attacked the computer used to open it.  Wallop 1 Tr., Ex. B1, 174:9-176:18, 198:11-199:1, 200:10-202:2,

207:25-208:13, 114:3-115:6, 85:10-17, 114:8-115:6.  The flash drives were inoperable and Eastern Profit did not fully correct the problem when Wang delivered three more flash drives to Strategic Vision, also unencrypted.  *Id.* **ADMITTED:** One flash drive was working and safe, and it contained 92 names.  *Id.* and 127:14-128:23.  **ADMITTED:**  The number of initial subjects was increased by agreement to 15 from 10.  Waller 2 Tr., Ex. M1, 129:7-17, 82:4-20, Wallop 1 Tr., Ex. B1, 281:19-282:13.

EASTERN'S RESPONSE:   Strategic denies it ever agreed to the hiring of subcontractors.  *See* Ex. M, Research Agreement.  The second and third sentences are also denied. Wang I Tr. at 236-240.  The remainder of the paragraph is admitted.

STRATEGIC'S REPLY:      Eastern does not effectively controvert these facts. While the Research Agreement (the only evidence Eastern cites to support its challenge to the idea that the parties had an understanding on the hiring of contractors) does not reference their use, the contract is not the only evidence of what the parties agreed to regarding this ancillary subject. Eastern has not established, factually, that the parties agreed for each and every ancillary circumstance to be laid out in writing or, legally, that the text of the Research Agreement is the only available evidence of an ancillary circumstance in which it was executed.  Eastern also has not established that Strategic needed Eastern's permission to hire contractors.  Rather, Eastern itself cited evidence (above) in attempting to controvert SOF 12 that proves Strategic hired contractors to conduct the research:  Wallop 1 Tr., Ex. B1, 177:5-180:20 (Wallop confirms the use of Team 1 and describes that she and Waller divided "the issues" and "aspects of research" in terms of coordinating their completion).

To attempt to challenge that Wang delivered corrupted flash drives, Eastern cites Wang's testimony to the effect that Wang and Wallop were able to open "a USB drive" at Wallop's

residence but, later, that Wallop contacted Wang and advised the drive was no longer working. Wang 1 Tr., Ex. E1, 235:22-237:2. There is thus no dispute that a problem occurred with the flash drive, even if Wang did not understand how the problem had happened. Strategic cited evidence fully supporting the SOF 37 facts and they are admitted.

38.   Later, in February, Strategic Vision made arrangements with Allied Special Operations Group ("ASOG"), based in Texas, to research the 15 subjects being examined overseas. Wallop 1 Tr., Ex. B1, 232:7-234:13; Wallop Aff., Ex. C1, ¶ 8; Waller 2 Tr., Ex. M1, 100:16-102:16.

EASTERN'S RESPONSE:  Denied.  There is no admissible evidence of a contract between Strategic and ASOG, or that ASOG performed any work for Strategic.

STRATEGIC'S REPLY:   Eastern's challenge misses the mark.  Strategic did not state that it had a formal arrangement with ASOG, nor has Eastern established that the parties agreed that Strategic could use subcontractors only by way of formal contract.  Eastern challenges the admissibility of the deposition testimony and sworn affidavit statements of representatives for Strategic but does not cite a legal principle, let alone a case discussing federal evidentiary rules, that illustrates why the evidence supposedly is inadmissible.  Both Waller and Wallop testified to personal interactions with representatives of ASOG, and there is documentary evidence in the form of a business record to prove that ASOG was involved and stopped its involvement because of the "Records Protected" designation on the research subjects Eastern chose, all of which Strategic cited in SOF 38.  There is no dispute of the material fact—that ASOG stopped its work, whether Eastern believes evidence showing the *reason* ASOG stopped its work is inadmissible.

39.   ASOG determined that the subjects were designated by the U.S. government as "Records Protected"—information concerning the subjects' status and activities was not accessible

through legal means.  Wallop 1 Tr., Ex. B1, 232:7-238:20, 239:16-241:4, 285:12-288:24; Waller 2 Tr., Ex. M1, 100:16-103:25, 105:6-108:21.  The purpose of the designation was to ensure that no one, including the individuals themselves, could learn information that would help them determine they were under investigation.  Waller 2 Tr., Ex. M1, 106:15-107:7.  According to ASOG, trying to research subjects known to be "Records Protected" could be a criminal activity. *Id.*; Waller 2 Tr., Ex. M1, 100:16-102:16, 106:15-108:21.

EASTERN'S RESPONSE:  Objection. Strategic has not provided any admissible evidence in support of this factual averment as required by Local Rule 56.1(d).  Strategic has not cited any admissible evidence demonstrating that certain of the individuals on the Subject List were allegedly designated by the federal government as "records protected," substantiating what the so-called "records protected" designation even means, or why that purported "records protected" designation precludes an investigation into the individuals subject to that designation. Eastern was not able to cite any statutory authority defining the concept of "records protected" or its implications.  Even if Eastern had come up with such substantiation, it is at best a partial excuse—relating only to four or five individuals on the Subject List—for its failed performance; to be sure, Strategic has not cited to any admissible evidence to the contrary.

Instead, Strategic relies solely upon inadmissible hearsay.  In an effort to show that certain of the individuals on the Subject List were "records protected," whatever that might mean, Strategic points to deposition testimony of Ms. Wallop and Mr. Waller , in which they claim that members of a Texas-based investigation group called Allied Special Operations Group ("ASOG") told them that certain individuals on the Subject List were "records protected."  *See* Dkt. No. 266 at 13.  Strategic does not cite to any deposition testimony by the ASOG members (because there is none) or submit an affidavit from those members.  Having failed to obtain discovery from

Strategic's own subcontractors, Strategic cannot now utilize inadmissible hearsay statements attributed to those subcontractors to prove a claim that Eastern somehow frustrated Strategic's performance.

STRATEGIC'S REPLY:      Eastern challenges the admissibility of the deposition testimony of Wallop and Waller and Wallop's sworn affidavit, all of which establish that ASOG informed Strategic that the chosen subjects could not be researched because of the "Records Protected" designation and therefore stopped work.  Strategic also presented a business record (a billing invoice to Strategic, received by Strategic, and paid by Strategic) indicating that work stopped and why.

Whether ASOG was actually correct in naming the research subjects as "Records Protected" or what that designation actually meant for whether the research could be performed is not material—what is material is that ASOG stopped work and cited this to Strategic as the cause. There is thus no dispute of material fact—that ASOG stopped its work—whether Eastern believes evidence showing the *reason* ASOG stopped its work is inadmissible.  The evidence is not being presented for the truth of the matter it assets (i.e., that the research subjects were "Records Protected" and that this meant research could not be performed due to restrictions outside of ASOG's control).  (Fed. R. Evid. 801(c)(2), defining hearsay as a statement "a party offers in evidence to prove the truth of the matter asserted in the statement.").  Instead, the evidence is being presented to show its effect on Strategic, which (as shown below in SOF 44), then reported this circumstance to Lianchao Han, whom Guo had by then placed back in charge of the project. Lianchao and Guo failed to provide new names, frustrating Strategic's performance.

40.      ASOG's conviction was so strong that it withdrew a bill to Strategic Vision for $111,700.  Waller 2 Tr., Ex. M1, 105:6-20, 106:15-108:21; Ex. 105 to Waller 2 Tr., Ex. E2.  ASOG

instead received $5,412 for finding the "Records Protected" designation.  *Id.*; Waller 2 Tr., Ex. M1, 109:12-110:17, 81:15-17.

> EASTERN'S RESPONSE:  Objection.  See Response to ¶ 39.  By way of further response, there is no foundation for any testimony from Strategic Vision as to what ASOG's conviction may have been or why it billed the amounts it allegedly did, and any such testimony would be hearsay in any event.

> STRATEGIC'S REPLY:   Eastern challenges the foundation of the testimony by Wallop and Waller regarding what ASOG indicated to them was the reason it had to stop work—the "Records Protected" designation.  Without citing any evidence, Eastern contends that the withdrawing of a bill for $111,000 in lieu of one for $5,000 does not give the impression that a significant happening caused a significant change in ASOG's plans.  It was not Strategic that withdrew the bill, but ASOG itself and it was ASOG's bill to withdraw.  Strategic received the bill, understood it to be a bill, paid the bill, and there is foundation for introducing the bill as evidence of ASOG's perspective.  There is no fact dispute here.

41.    Strategic Vision did not receive any subject names before entering the Agreement and had no way of anticipating that the third parties conducting the research would encounter this circumstance.  Wallop 1 Tr., Ex. B1, 83:24-84:7, 85:10-86:11, 174:4-8, 175:3-176:18.  Prior to this, Strategic Vision had not heard of the designation.  Wallop Aff., Ex. C1, ¶¶ 8.

> EASTERN'S RESPONSE:  Objection.  See Response to ¶ 39.  To the extent an answer is required, denied.  If Strategic was licensed to provide the services it agreed to provide and had the expertise it claims it has, and if "records protected" stats were a term of art in the private investigation/intelligence field, Strategic would have known about the so-called "records protected" designation.

STRATEGIC'S REPLY:    Eastern attempts a challenge based on an unfounded hypothetical ("*If* Strategic was licensed to provide the services it agreed to provide and had the expertise it claims it has, and *if* 'records protected' stats were a term of art in the private investigation/intelligence field, Strategic would have known about the so-called records protected" designation.'") tied to a legal issue and is, in the end, unsuccessful in showing any controversion of fact.  Eastern offers no evidence to disprove the three facts in SOF 41:  that Strategic did not receive any subject names from Guo or Eastern before entering the Research Agreement, that Strategic did not know to anticipate that its contractor would find that research subjects were "Records Protected," and that the term was unknown to Strategic at the time it entered the contract. Instead, Eastern objects to the facts without specifying any particular reason.  Then, Eastern posits that had Strategic been licensed under the Virginia security services statute, Strategic "would have known" about the designation.  Eastern offers nothing to support this unfounded hypothetical.  In addition, Eastern relies on the statute applying here and, as a matter of law, it does not.  Strategic incorporates herein its Reply in Support of SOF 2 above.

42.    Nevertheless, Guo angrily refused to discuss the "Records Protected" problem when Strategic Vision notified him.  Wallop 1 Tr., Ex. B1, 139:17-140:23, 285:12-288:24, 136:13-20; Waller 2 Tr., Ex. M1, 100:16-102:16.  He then demanded that Strategic Vision turn over all work done by its contractors, despite many protests by Strategic Vision that it was impossible for the researchers to work faster and have final reports ready in a matter of days.  Wallop 1 Tr., Ex. B1, 230:2-232:13, 285:12-288:24, 139:17-140:23; Waller 2 Tr., Ex. M1, 112:11-116:17, 127:24-129:6; Waller 1 Tr., Ex. H1, 56:19-25, 93:20-95:10.  The Agreement did not require, and no party could physically provide, immediate results; what Guo now inexplicably demanded on a rush basis

was contrary to the Agreement.  Wang 1 Tr., Ex. E1, 154:6-23; R. Agreement, Ex. F1; Gertz Tr.,

Ex. I1, 141:4-17.

    EASTERN'S RESPONSE:  Objection. See Response to ¶ 39.  Denied.  The weekly

deliverables called for under the Research Agreement were due by no later than mid-January 2018.

Ex. M, Research Agreement at 1-3.    Strategic did not meet the contractual deadline.    Rather,

Strategic delivered its first USB drive to Eastern pursuant to the Research Agreement on January

26, 2018.  Ex. A Answer at 35 ¶ 45; Ex. H, Waller I Tr. at 201:10-202:13; Ex. G, Wallop II Tr. at

16:12-17; Ex. I, Waller II Tr. at 6:2-8, 112:7-114:10.  That drive did not, however, comply with

the terms of the Research Agreement; indeed, Strategic has admitted that the information contained

on that drive was "of no use to Guo or Eastern Profit because it was nothing more than the

researchers' own work to familiarize themselves with the fifteen subjects using open-source

information."  Answer at A at 35 ¶ 45; Ex. I, Waller II Tr. at 6:2-8, 112:7-114:10.  On January 30,

2018, Strategic delivered a second USB drive to Eastern Profit.  Answer at A at 28 ¶ 24; Ex. G,

Wallop II Tr. at 16:12-17; Ex. H, Waller I Tr. at 211:3-215:16; Ex. I, Waller II Tr. at 115:9-116-

17.  That USB drive, like the first, failed to comply with the terms of the Research Agreement; as

admitted by Strategic, the drive contained "incomplete work product . . . in the form of raw

research data" that was not "of any use" to Eastern.  Ex I, Waller II Tr. at 114:23-115:8.  Strategic

did not deliver any other USB drives to Eastern.    Consequently, Strategic failed to provide to

Eastern any of the required deliverables.  Ex I, Waller II Tr. at 6:2-8, 98:8-114:10; Ex. K, L. Han

Tr. at 160:10-19, 264:9-265:20, 275:15-279:17.    It never delivered any "financial forensic

[h]istorical research" called for under the Research Agreement.  Ex I, Waller II Tr. at 6:2-8, 98:8-

100:3.  It did not deliver to Eastern any "current tracking research" called for under the Research

Agreement.  Ex I, Waller II Tr. at 6:2-8, 100:4-111:20.  It also failed to deliver to Eastern any

"social media research" called for under the Research Agreement.   Ex I, Waller II Tr. at 6:2-8,

112:7-114:10.  In fact, Strategic has admitted that it "was unable to prepare any [of the] detailed

reports" called for under the Research Agreement.   Ex D, Strategic's Responses and Objections

to Eastern's First Interrogatories, Response to Interrogatory No. 8 (emphasis added).  As a result,

on February 23, 2018, Eastern wrote to Strategic terminating the Research Agreement.  Ex A,

Answer at 6 ¶ 28; Ex I, Waller II Tr. at 91:9-13; Ex. N, Termination Letter, EASTERN-000198.

In its letter, Eastern demanded that Strategic return the $1 million deposit.  Ex. A, Answer at 6 ¶

28; Ex. N, Termination Letter, EASTERN-000198.  Strategic has refused to do so.  *Id.*

STRATEGIC'S REPLY:      Despite Eastern's lengthy response, there is no true

fact dispute here as to any of the three statements that comprise SOF 42.  As to the first sentence

("Nevertheless, Guo angrily refused to discuss the 'Records Protected' problem when Strategic

Vision notified him."), Eastern does not admit or deny it.  Strategic's fact is that Guo refused to

discuss the information ASOG had provided, not whether the "Records Protected" designation was

in fact true.  This is not hearsay.  (Fed. R. Evid. 801(c)(2), defining hearsay as a statement "a party

offers in evidence to prove the truth of the matter asserted in the statement.").  Eastern's objection

and incorporation of its Response to SOF 39 are misplaced here.

As to the second sentence ("He then demanded that Strategic Vision turn over all work

done by its contractors, despite many protests by Strategic Vision that it was impossible for the

researchers to work faster and have final reports ready in a matter of days."), Eastern again does

not unequivocally state an "admission" to it but, in fact, Eastern has admitted it by providing

evidence of two thumb drives delivered by Strategic in January 2018 that contained raw data and

then describing that the raw data was not placed into the context of a "report" required by the

Research Agreement.

Eastern goes on to present several facts <u>about those drives</u> but none infringe on Strategic's legal position.  Strategic admits Eastern's statement "Strategic delivered its first USB drive to Eastern pursuant to the Research Agreement on January 26, 2018."  Strategic also partially admits Eastern's statement "That drive did not, however, comply with the terms of the Research Agreement; indeed, Strategic has admitted that the information contained on that drive was 'of no use to Guo or Eastern Profit because it was nothing more than the researchers' own work to familiarize themselves with the fifteen subjects using open-source information.'"  Strategic admits the quoted testimony is on its behalf and that the material could not be used by Guo or Eastern because it was the researchers' initial work, but it denies that this violated the Research Agreement. However, this dispute is not material given the undisputed evidence showing the cause for the premature delivery of the thumb drives (discussed above).  Next, Strategic admits "On January 30, 2018, Strategic delivered a second USB drive to Eastern Profit."  Strategic then partially admits: "That USB drive, like the first, failed to comply with the terms of the Research Agreement; as admitted by Strategic, the drive contained incomplete work product . . . in the form of raw research data' that was not 'of any use' to Eastern."  Strategic admits the quoted testimony is on its behalf and that the material could not be used by Guo or Eastern because it was the researchers' initial work, but it denies that this violated the Research Agreement. This dispute is not material given the undisputed evidence showing the cause for the premature delivery of the thumb drives (discussed above).  Strategic also admits that "Strategic did not deliver any other USB drives to Eastern."

As to the <u>third</u> and final of <u>Strategic</u>'s SOF 42 original sentences ("The Agreement did not require, and no party could physically provide, immediate results; what Guo now inexplicably demanded on a rush basis was contrary to the Agreement."), Eastern again does not stake a clear

position but does not point to any provision of the contract that required immediate results, particularly when there is no disagreement that the contract start date was pushed back by agreement of the parties to the date that, in this response, Eastern claims the first reports were due. *See* SOF 36 (admitted by Eastern).

Eastern offers several other additional statements besides those addressed directly above but none establish a dispute of material fact. First, Strategic disputes that "The weekly deliverables called for under the Research Agreement were due by no later than mid-January 2018. Strategic did not meet the contractual deadline." The parties agree that the contract start date was pushed back to the date that Eastern now claims the first reports were due. *See* SOF 36 (admitted by Eastern). It is thus impossible that by mid-January 2016, Strategic was already "late" in "the weekly deliverables." Second, the following is disputed, as indicated above, including that the contract was terminated by Eastern six weeks after it was entered: "Consequently, Strategic failed to provide to Eastern any of the required deliverables. It never delivered any 'financial forensic [h]istorical research' called for under the Research Agreement. It did not deliver to Eastern any 'current tracking research' called for under the Research Agreement. It also failed to deliver to Eastern any 'social media research' called for under the Research Agreement."

Third, Strategic admits as immaterial to the issues raised in its Motion for Summary Judgment and a happening that was caused by Eastern: "In fact, Strategic has admitted that it 'was unable to prepare any [of the] detailed reports' called for under the Research Agreement." Strategic admits the termination occurred but denies it was justified: "As a result, on February 23, 2018, Eastern wrote to Strategic terminating the Research Agreement." Finally, Strategic admits "In its letter, Eastern demanded that Strategic return the $1 million deposit. Strategic has refused

to do so."  None of these involve a fact dispute or affect Strategic's legal position on Strategic's current motion.

43.     Attempting to keep the project alive, Waller nevertheless made immediate travel plans and flew overseas, met with the research team leader, and returned to New York.  Waller 2 Tr., Ex. M1, 127:24-129:6.  On or about January 26th or 30th, 2018, less than two weeks after Strategic Vision began its work under the Agreement, Waller delivered to Wang an initial tranche of raw data.  Waller 2 Tr., Ex. M1, 112:11-116:17, 127:24-129:6; Wallop 1 Tr., Ex. B1, 243:14-244:4, 285:12-288:24, 136:13-15.  Strategic Vision repeatedly cautioned it would be of no independent use to Guo because it was simply the researchers' own work to familiarize themselves with the initial subjects using open-source information.  Waller 2 Tr., Ex. M1, 112:11-116:17 ("That was their own basic work.  So the only report, in quotes, that we provided as a deliverable was showing how the research team was setting up its methodology to collect this data") and 127:24-129:6.

EASTERN'S RESPONSE:  Eastern has no basis to refute Waller's contention that he flew overseas, met with someone, and returned to New York, but lacks knowledge as to precisely why he did that or the identity of the person he allegedly met (Waller has refused to provide such information, Waller II Tr. at 74-75)  Eastern responds further that Strategic was required under the terms of the Research Agreement to begin providing the deliverables called for under the Research Agreement by no later than mid-January 2018.  Ex. M, Research Agreement at 1-3.  As set forth in the prior response, Strategic failed to meet that deadline.

STRATEGIC'S REPLY:     Eastern does not clearly designate its position on SOF 43 but its response reflects an admission.  As to the first sentence, Eastern states that it "has no basis" to refute the statement, and offers no evidence to contradict Waller's sworn testimony

under cross-examination that he made the trip for the purpose described.  As to the remaining sentences, Eastern quotes their equivalent in its own response to SOF 42 above.  SOF 43 is fully admitted.

Eastern's additional statements do not change this or reflect a material issue.  Strategic disputes that it "was required under the terms of the Research Agreement to begin providing the deliverables called for under the Research Agreement by no later than mid-January 2018."  The parties agreed that the contract start date was pushed back to the date that Eastern now claims the first reports were due.  *See* SOF 36 (admitted by Eastern).  It is thus impossible that Strategic was required to meet this deadline.  Strategic disputes that it "failed to meet that deadline."  It was not the deadline.

44.     Even though Strategic Vision, through Waller, had made extraordinary efforts to accommodate Guo's unreasonable demands under the contract, Eastern Profit would not provide any guidance about the "Records Protected" designation and what it meant for the future of the research on the first 15 subject names.  Waller 2 Tr., Ex. M1, 101:11-103:25, 105:21-107:11.  Nor did Eastern Profit simply move its focus from the initial 15 subject to another 15 within the 92 subject names on the flash drives delivered by Eastern Profit back on January 8, 2018.

EASTERN'S RESPONSE:  Objection. *See* Response to ¶ 39.

STRATEGIC'S REPLY:     Eastern does not controvert any of these facts.  As to the first sentence (which describes Waller's trip overseas in SOF 42), Eastern states that it "has no basis" to refute the existence of Waller's trip and the purpose of it (*see* SOF 43 above).  Eastern also failed to controvert the fact that Guo refused to discuss the "Records Protected" designation—a failure both here and in response to SOF 42 (see SOF 42 Reply).  Eastern also does not refute the final sentence—that Eastern failed to take the next reasonable step—to designate more names

under the contract.  This was Eastern's prerogative:  "The Client will provide the necessary basic information, and desired areas of focus, to the Contractor to research."  R. Agreement, Ex. F1, p. 1.

45.     Although the Agreement provided for a look-back after three months to compare the deliverables with the amounts paid, and **ADMITTED:**  also provided for "'30 days' written notice," **ADMITTED:**  Eastern Profit terminated the Agreement only 5 weeks after the January 16, 2018 start date, claiming it was effective immediately.  R. Agreement, Ex. F1.  **ADMITTED:** Eastern's February 23, 2018, termination letter also demanded "a full and complete refund of the $1 million deposit."  Wang 1 Tr., Ex. E1, 135:16-141:16; Ex. V1 (Ex. 6 Wang 1 Tr.), p. 1; Wallop 1 Tr., Ex. B1, 241:6-8, 242:19-243:3; Wang 2 Tr., Ex. L1, 211:12-212:15.  **DENIED:**  The Agreement contained no provision for return of the monthly fee or deposit if Eastern Profit was dissatisfied with Strategic Vision's work and, in fact, required Eastern Profit to make a monthly $750,000 payment, starting in January.  R. Agreement, Ex. F1.  **ADMITTED:**  Neither Eastern nor ACA ever made even that first monthly $750,000 payment.  Wang 1 Tr., Ex. E1, 58:6-18. **NOT ADDRESSED SO ADMITTED:**  Eastern admitted nothing in the contract required Strategic to return the $1 million at the end of the contract, nor had Strategic made such a representation to Eastern Profit. Wang 1 Tr., Ex. E1, 198:8-201:14-21. **ADMITTED:**  Regardless, Eastern Profit's counsel demanded Strategic "return" the $1 million (*via* wire to ACA, not Eastern).  Ex. V1 (Ex. 6 to Wang 1 Tr.), p. 2 ("Beneficiary Acct. Name:  ACA Capital Group Limited").  **ADMITTED:**  Strategic Vision did not comply.  Dkt. 93, p. 5, ¶ 29.

EASTERN'S RESPONSE:  As to the first sentence:  denied that the Research Agreement provided for any "look-back" period, Ex. M, Research Agreement; admitted that the Research Agreement provided for termination upon 30-days written notice; and admitted that

Eastern terminated the Research Agreement on February 23, 2018, Ex A, Answer at 6 ¶ 28; Ex I, Waller II Tr. at 91:9-13; Ex. N, Termination Letter, EASTERN-000198.

As to the second sentence, admitted.

As to the third sentence, denied. The Research Agreement explicitly states that "[t]he deposit will be credited on a prorated basis to the final 1-1/3 (1.3) months of the contract" and was not meant to be a signing bonus. Ex. M, Research Agreement at 5; Ex. A, Answer at 2 ¶ 6; Ex. A, Answer at 4 ¶ 17; Ex. I, Waller II Tr. at 91:23-94:6. Thus, if Strategic failed to provide the deliverables under the Research Agreement, which it did, the deposit was to be returned to Eastern. Ex. M, Research Agreement at 5; Ex. A, Answer at 2 ¶ 6; Ex. A, Answer at 4 ¶ 17; Ex. I, Waller II Tr. at 91:23-94:6.

As to the fourth sentence, admitted that Eastern did not pay or direct any other entity to pay Strategic any other monies because payment was only required under the Research Agreement if Strategic properly performed its obligations thereunder, which Strategic failed to do. Objection. *See* Response to ¶ 42.

As to the fifth and sixth sentences, admitted.

STRATEGIC'S REPLY: There are only two portions of SOF 45 disputed by Eastern: (a) the Agreement provided for a look-back after three months to compare the deliverables with the amounts paid (first sentence); (b) The Agreement contained no provision for return of the monthly fee or deposit if Eastern Profit was dissatisfied with Strategic Vision's work and, in fact, required Eastern Profit to make a monthly $750,000 payment, starting in January (third sentence). Strategic admits this additional, legal, statement by Eastern: "The Research Agreement explicitly states that '[t]he deposit will be credited on a prorated basis to the final 1-1/3 (1.3) months of the contract' and was not meant to be a signing bonus." But admitting that description

of the contract terms does not contradict (b).  It simply addresses a potential eventuality if Eastern had allowed the contract to come full term.  However, Eastern states "If Strategic failed to provide the deliverables under the Research Agreement, which it did, the deposit was to be returned to Eastern."  The contract simply does not provide this.

As to (a), Eastern cites the contract and characterizes it as not providing "for any 'look-back' period," but the construction of the contract is for the Court and Eastern's construction ignores a provision ("all involved Parties will meet to recap the accounting [] prior to moving forward with the next quarter").  R. Agreement, Ex. F1, p. 4.  "An interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible." *LaSalle Bank Nat'l Ass'n,* 424 F.3d 195, 206 (2nd Cir. 2005) (citation omitted).  As to (b), Eastern does not point to any provision of the contract supporting its challenge to this interpretation of the contract.

Finally, contending that it had a guaranteed period to work under the contract, Strategic disputes Eastern's statement that "Eastern did not pay or direct any other entity to pay Strategic any other monies because payment was only required under the Research Agreement if Strategic properly performed its obligations thereunder, which Strategic failed to do." First, Eastern cites no evidence from some competent witness (or anyone) about why it chose not make any of its regular payments to Strategic. Second, to the extent that Eastern argues that, as a purely legal matter, it now believes it was not required to make any payment under the Research Agreement, then that is a legal assertion based on Eastern's interpretation of the Agreement. As explained above, Strategic disagrees, and that question of interpretation would be for this Court, not for a factfinder. Finally, of course, this Court need not and should not reach any of these issues in granting judgment against Eastern on its breach of contract claim; it need only find that Eastern cannot obtain the $1 million

deposit that it never paid, or, alternatively, that Eastern frustrated Strategic's performance as a matter of law.

46.     The Agreement guaranteed Strategic Vision a period of time to provide its services that ran from the agreed start date of the arrangement (January 16, 2018) (to 30 days after the February 23, 2018 termination, and Eastern's no-notice termination meant that Strategic Vision lost the opportunity to make $1,596,774.25.  R. Agreement, Ex. F1, pp. 3-4, Dkt. 267-1; Wallop 1 Tr., Ex. B1, 246:25-247:7.

| Period | Number of Days | Per Diem | Total |
|---|---|---|---|
| January 16-31 | 15 | $24,193.55 | $362,903.25 |
| February 1-28 | N/A | N/A | $750,000.00 |
| March 1-21 | 20 | $24,193.55 | $483,871.00 |
| | | | $1,596,774.25 |

EASTERN'S RESPONSE:  Objection.  Calls for legal conclusion.  To the extent an answer is required, denied.  As specified in the Research Agreement, Eastern agreed to pay Strategic for each deliverable that Strategic completed in accordance with the terms of the Research Agreement; if no deliverables were provided, Eastern had no obligation to pay Strategic under the Research Agreement.  *See* Response to ¶ 42.

STRATEGIC'S REPLY:     Eastern denies this statement by incorporating its response to SOF 42, which sets forth three sentences, only one of which (the last) mentioned the contract ("The Agreement did not require, and no party could physically provide, immediate results; what Guo now inexplicably demanded on a rush basis was contrary to the Agreement."). The Court should deem SOF 46 admitted.

Eastern again has taken the position that there was no look-back period and, even if there was, this did not guarantee that Strategic would work through that event.  Eastern's interpretation of the contract does not find support in the terms of the instrument, although this is ultimately a legal matter for the Court.  Strategic thus disputes:  "As specified in the Research Agreement,

Eastern agreed to pay Strategic for each deliverable that Strategic completed in accordance with the terms of the Research Agreement; if no deliverables were provided, Eastern had no obligation to pay Strategic under the Research Agreement." Strategic's interpretation that the compensation provisions of the contract did not call for payment-per-deliverable is consistent with governing contract principles. This includes that the Court interprets the contract as an integrated whole (*W.W.W. Associates, Inc. v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440 (1990)) and "[a]n interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible." *LaSalle Bank Nat'l Ass'n,* 424 F.3d 195, 206 (2nd Cir. 2005) (citation omitted). According to the specific provision of the contract, "[i]t is agreed by both Parties that for the first three months of this Agreement … that the payment of $750,000[] USD will be wired per our instructions to our US Bank account." Ex. F1, R. Agreement, p. 4. Similarly, "[p]ayment is to be made in regular monthly installments of US$750,000, at the end of each month." *Id.¸* p. 5. Eastern's proposed interpretation would render meaningless each of the provisions referencing $750,000 per month in compensation to Strategic for the first three months of the project.

Moreover, Wang testified, for Eastern, that "Strategic Vision requested the client of this contract to pay $750,000 per month, no matter how many reports the client requested or Strategic Vision provided":

> Q.· Now, the waterline, is this a
> reference -- does this have anything to do
> with the million dollar deposit?
> A.· No.· One million dollar deposit has
> nothing to do with waterline.· Waterline is
> Ms. Wallop and Strategic Vision requested the
> client of this contract to pay $750,000 per
> month, *no matter how many reports the client
> requested or Strategic Vision provided*.· That
> money must be paid.

Wang 1 Tr., Ex. E1, 55:5-14 (emphasis added).

47.     Not only did Eastern Profit fail to pay these amounts, its February 23, 2018 termination prevented Strategic Vision from performing through the contractually-guaranteed look-back period scheduled for April 16, 2018, resulting in a loss of at least $100,000 in profits for the roughly three-week period between March 21 and April 16.  Wallop Aff., Ex. C1, ¶ 10; Ex. V1 (Ex. 6 to Wang 1 Tr.); R. Agreement, Ex. F1, pp. 3-4.

EASTERN'S RESPONSE:   Denied.   As specified in the Research Agreement, Eastern only agreed to Eastern agreed to pay Strategic for each deliverable that Strategic completed in accordance with the terms of the Research Agreement; if no deliverables were provided, Eastern had no obligation to pay Strategic under the Research Agreement.  *See* Response to ¶ 42.  By way of further response, Eastern has provided no evidence substantiating its claim for $100,000 in lost profits.

STRATEGIC'S REPLY:     The   controversy   here   is   how   the   Research Agreement is interpreted regarding the subject of Strategic's compensation.  Eastern contends that it was a payment-requires-report structure such that if Strategic did not provide a report, it was entitled to no compensation despite the undisputed fact that work was needed in the lead-up to the preparation of a report.  Strategic thus disputes that "As specified in the Research Agreement, Eastern only agreed to Eastern agreed to pay Strategic for each deliverable that Strategic completed in accordance with the terms of the Research Agreement; if no deliverables were provided, Eastern had no obligation to pay Strategic under the Research Agreement."  Strategic contends that compensation was based on time-periods worked, even if the contract set out an internal timetable for what reports could be expected when.

Strategic's interpretation that the compensation provisions of the contract did not call for payment-per-deliverable is supported by several provisions of the contract, "[i]t is agreed by both Parties that for the first three months of this Agreement … that the payment of $750,000[] USD will be wired per our instructions to our US Bank account." Ex. F1, R. Agreement, p. 4.  Similarly, "[p]ayment is to be made in regular monthly installments of US$750,000, at the end of each month." *Id.¸* p. 5.  Wang testified, for Eastern, that "Strategic Vision requested the client of this contract to pay $750,000 per month, no matter how many reports the client requested or Strategic Vision provided":

> Q.· Now, the waterline, is this a
> reference -- does this have anything to do
> with the million dollar deposit?
> A.· No.· One million dollar deposit has
> nothing to do with waterline.· Waterline is
> Ms. Wallop and Strategic Vision requested the
> client of this contract to pay $750,000 per
> month, *no matter how many reports the client
> requested or Strategic Vision provided.·* That
> money must be paid.

Wang 1 Tr., Ex. E1, 55:5-14 (emphasis added).

Eastern's construction should be denied.  It ignores whole portions of the contract, such as that requiring Eastern to pay $750,000 "in regular monthly installments…at the end of each month," the "duration" of the contract being three years, and a look-back period of three months. R. Agreement, Ex. F1, pp. 5 ("Payment terms" and "Duration") and 4 ("It is agreed by both Parties that for the first 3 months of this Agreement…that the payment of $750,000…") and ("all involved Parties will meet to recap the accounting …").  "An interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible." *LaSalle Bank Nat'l Ass'n,* 424 F.3d 195, 206 (2nd Cir. 2005) (citation omitted).

Finally, Strategic cannot accept Eastern's statement that "Eastern has provided no evidence substantiating its claim for $100,000 in lost profits."  Regardless, this motion does not present Strategic's claim for breach of contract damages; it simply asks this Court to grant judgment against Eastern on its own claim that it is entitled to receive ACA's $1 million deposit.

48.    While Eastern's Complaint claims special fraud damages—"los[ing] three months" of investigation time and to need to "find another" investigator (Dkt. 93, ¶ 45)—it was unwilling or unable to testify that it ever undertook such efforts.  Wang 1 Tr., Ex. E1, 155:24-156:4, 157:7-13, 157:18-24.

EASTERN'S RESPONSE:  Denied.  Strategic Vision itself claims that Eastern hired other researchers.  Waller II Tr. at 118:16-119:3.

STRATEGIC'S REPLY:    Eastern does not effectively dispute this fact because it (a) cited Eastern's own pleading, which is not evidence on summary judgment; and (b) was based on Eastern's own testimony, not testimony from Strategic.  Citing the testimony of its corporate representative, SOF 48 states that Eastern "was unwilling or unable to testify that it ever undertook such efforts."  Eastern does not dispute that Wang testified in this manner, and referencing Waller's testimony that Team 1 believed other researchers were looking into the same subjects does not controvert Wang's testimony or the fact as stated.  Wang 1 Tr., Ex. E1, 155:24-156:4, 157:7-13, 157:18-24.  Strategic thus disputes Eastern's statement that "Strategic Vision itself claims that Eastern hired other researchers."

49.    **ADMITTED WITH QUALIFICATION:**  In the end, this three-year contract, intended to advance Guo's purported goal of helping to topple the CCP regime in China to the benefit of the Chinese people, lasted just five weeks.  R. Agreement, Ex. F1, p. 5; Ex. V1 (Ex. 6

to Wang 1 Tr.), p. 1; Guo 1 Tr., Ex. G1, 45:3-46:16; Wallop 1 Tr., Ex. B1, 88:3-89:22; Wang 2 Tr., Ex. L1, 197:18-208:22, 202:2-204:20, 149:5-150:9.

EASTERN'S RESPONSE:   Admitted that Eastern terminated the Research Agreement because Strategic failed to perform its obligations thereunder.  *See* Response to ¶ 42.

STRATEGIC'S REPLY:      Eastern does not adequately address this SOF.  It is based on two things:  (a) Guo's purported goal for the contract, which is undisputed and is now therefore deemed admitted; and (b) the length of time of the Research Agreement, which is undisputed and also deemed admitted.  Eastern should simply have outright admitted this fact without an attempted qualification.

Eastern instead offered an additional statement, which is admitted to the extent that Eastern accurately repeats the cause cited in its counsel's termination letter:  "Eastern terminated the Research Agreement because Strategic failed to perform its obligations thereunder."  Strategic disputes that the stated cause was factually correct.  Strategic's incorporates its responsive statement concerning SOF 39.

50.   **ADMITTED:** Chunguang Han claims to have purchased all of Eastern Profit for $1,000 HK in late 2014.  Chunguang Tr., Ex. J1, 50:17-22, 56:4-14.  He became and remained the sole director of Eastern Profit until he transferred ownership to Guo Mei (Guo Wengui's daughter, Chunguang Tr., Ex. J1, 35:5-12) on June 28, 2017.  *Id*. at 59:5-60:8, 70:5-9, 102:2-18.

EASTERN'S RESPONSE:  Admitted.

51.   **ADMITTED:**  Han claims that during his directorship and while he was in Hong Kong, he trusted a Chinese woman, known only as Natasha Qu (he testified that he never knew her "official" last name or Chinese name), to run whatever it is that Eastern Profit did.  Chunguang

Tr., Ex. J1, 53:20-55:3.  **ADMITTED:** Han did not know who she was working for at the time DISPUTED:  he turned over Eastern's operations to her.  *Id*., 66:21-68:8.

RESPONSE:  As to the first sentence, admitted.  As to the second sentence, denied that C. Han "turned over Eastern's operations" to Natasha Qu.  Rather the cited testimony makes clear that Natasha Qu merely assisted C. Han.  C. Han. Tr. at 67:9-16 ("At the time I was the boss of Eastern Profit, I authorized Natasha to handle a lot of stuff in Hong Kong for me.").

STRATEGIC'S REPLY:      The sole point Eastern tries to dispute is whether Natasha Qu "took over" Eastern's operations or just "assisted" Chunguang.  He testified that Natasha not only was authorized to "handle a lot of stuff," but also that she had broad powers "**to do all the things for me**."  Chunguang Tr., Ex. J1, 53:5-10 (emphasis added). Strategic disputes as immaterial Eastern's statement:  "Natasha Qu merely assisted C. Han."  Chunguang's testimony was that Qu "had broad powers "**to do all the things for me**."  Chunguang Tr., Ex. J1, 53:5-10 (emphasis added).  To the extent Eastern's citation of a supporting statement even qualifies as being in dispute with the broader testimony Chunguang also gave, it is not a material difference, and the Court should treat SOF 51 as fully admitted.

52.      In June of 2017, Eastern Profit's only asset—its Hong Kong bank account—was frozen.  Chunguang Tr., Ex. J1, 87:3-88:20; Dkt. 203-2.  Natasha reported this to Han (*Id*. at 72:3-12), left, and no one replaced her in Hong Kong.  Chunguang Tr., Ex. J1, 71:6-9.

EASTERN'S RESPONSE:  Objection.  Irrelevant, prejudicial.  To the extent an answer is required, denied as the cited testimony makes clear that by that point C. Han sold his interest in Eastern to Guo Mei and was no longer the owner and director of Eastern Profit.

STRATEGIC'S REPLY:      Eastern's objections should be overruled and SOF 52 deemed admitted.  The facts are not irrelevant but go to, among other aspects of the case,

Strategic's overarching defense that Eastern itself did not pay anything to Strategic and in fact could not pay anything under the contract because its assets were frozen. The facts give the history of Eastern and its assets in the context of that and they are not meaningfully disputed.  That the facts are disfavorable to Eastern does not make them prejudicial.

Eastern's attempted denial is that "C. Han sold his interest in Eastern to Guo Mei and was no longer the owner and director of Eastern Profit," which Strategic admits, but Han's official role at the moment of Natasha Qu's report is not the point of the Paragraph.  The point of the Paragraph is that Eastern's asset in Hong Kong was frozen in June 2017 and, secondarily, that Qu left Eastern after this and was not replaced.  Eastern disputes neither fact. It is no reason to "object," and indeed is irrelevant, that Chunguang claims to have just sold his interest and resigned as a director when he received Natasha's report. Eastern's position in this litigation, after all, is that Chunguang retained oral authority to act for Eastern even after he "sold" it to Guo's daughter and resigned. *See* SOF 53 and 54, below, which are admitted by Eastern.

53.    **ADMITTED:**  By about this point, Han was in New York; he says has been there since at least June of 2017.  Chunguang Tr., Ex. J1, 13:6-14:2; 17:21-18:3; Wang 1 Tr., Ex. E1, 26:24-27:23.

EASTERN'S RESPONSE:  Admitted, except the cited testimony also makes clear that by that point C. Han sold his interest in Eastern to Guo Mei and was no longer the owner and director of Eastern Profit.

54.    **ALL FACTS ADMITTED:**  Han claims that, once in New York, he was orally authorized by its new director, Guo Mei (Guo Wengui's daughter), to act as Eastern Profit's agent. Chunguang Tr., Ex. J1, 43:11-44:22; 47:11-16; 102:2-104:11.  Han, in turn, says he orally authorized Wang to handle everything related to an investigation of Chinese officials.  *Id*. at 46:2-

12; 84:22-86:16.  The purpose of that investigation, Han says, was to "expose the Chinese government's corruption and it will give me an opportunity to get my asset back."  *Id*. at 91:24-92:3.  Han gave Wang "full authorization" for the work, understanding that the contract would be in the U.S.  *Id*. at 92:17-24.  Starting in 2017, from New York, Han— still, purportedly, as Eastern Profit's orally-appointed agent—reported back to Guo Mei.  *Id*. at 47:17-48:18.

> EASTERN'S RESPONSE:  Admitted.

55.    Eastern has no remaining Hong Kong business.  Its address had been the 49th Floor of the Bank of China Tower in Hong Kong.  Chunguang Tr., Ex. J1, 58:14-59:4.  Han Chunguang was last there "several years ago."  *Id*.  Eastern Profit's only claimed business anywhere in the world since the asset freeze is in New York: Han's alleged delegation of authority to Yvette Wang, GSNY, and Guo to research Chinese officials.  *Id*. at 43:21-44:22.

> EASTERN'S RESPONSE:  Objection.  Calls for legal conclusion.  To the extent an answer is required, denied.  Strategic has not asserted any facts suggesting that Eastern conducted business in New York.  Strategic claims that Eastern must register to do business in New York because (i) some of the negotiations regarding the Research Agreement occurred in New York, (ii) C. Han signed the ACA Loan Agreement in New York, and (iii) C. Han signed the Power of Attorney authorizing GSNY to handle this litigation for Eastern in New York.  Dkt. No. 266 at 16-18.  These contacts are precisely the type of "casual" or "occasional" interactions that do not constitute doing business in New York, and they certainly do not rise to the level of the "systematic and continuous" activity necessary to be deemed doing business in New York.  That is so, especially when one considers the facts Strategic omitted from its discussion, including (i) the fact that the Research Agreement—a contract between a Hong Kong company (Eastern) and a Nevada limited liability company based in Virginia (Strategic)—was drafted, signed, and

principally negotiated in Virginia, (ii) the fact that the ACA Loan Agreement is between two Hong

Kong companies (Eastern and ACA), governed by Hong Kong law, and contains a Hong Kong

forum-selection clause, and (iii) the fact that the Power of Attorney was entered into with GSNY,

a company that is duly-authorized to operate in New York. Ex. A, Answer at 1-3, 28 ¶¶ 2, 6-8, 23;

Ex. B, Strategic's Admissions, ¶¶ 20-25; Ex. F, Wallop I Tr. at 108:5-109:18; Ex. L, ACA Loan

Agreement, EASTERN-000278; Exhibit O to Strategic's Memorandum (Dkt. No. 266).   In short,

Eastern does not conduct business in New York.

        STRATEGIC'S REPLY:     In the face of four facts by Strategic, Eastern offers

a myriad of additional statements that does not directly refute the facts.  Eastern then labels the

entire subject a "legal conclusion."  SOF 55 is not a legal conclusion—it states facts: (a) Eastern

has no remaining Hong Kong business; (b) Eastern's address had been the 49th Floor of the Bank

of China Tower in Hong Kong; (c) Chunguang, Eastern's supposed agent who reports directly to

its owner and director, was last at Eastern's old Hong Kong office "several years ago."; and (d)

Eastern's only claimed business anywhere in the world since the asset freeze is in New York:

Chunguang's alleged delegation of authority to Yvette Wang, GSNY, and Guo to research

Chinese officials.  These facts are utterly undisputed, and the Court must deem them admitted.

      Eastern intends for its various additional statements to support a legal determination that

Eastern does not do business in New York within the meaning of the corporation registration

statute.  However, none of them change the impact of the material facts regarding the locus of

Eastern's operations being in New York.  Strategic admits "The Research Agreement—a

contract between a Hong Kong company (Eastern) and a Nevada limited liability company based

in Virginia (Strategic)."  Based in Virginia or not, the contract was not "drafted, signed, and

principally negotiated in Virginia."  It takes two sides to negotiate a bilateral agreement like the

Research Agreement and Eastern's representatives were in New York.  Some of the negotiations occurred when Wallop and Waller themselves were at Guo's apartment in New York—that is why Wang sometimes referred to Guo as "New York." (Ex. O1 (Wang 1 Tr. Ex. 16, EASTERN-00217-219:  Wang-Wallop January 5, 2018 text exchange, in which Wang says, "So I'm the person to sign this contract tomorrow" and confirms that "NY" had instructed her that "this contract and all the communications…are exclusively between NY, you, M [Michael Waller] and me—four of us."). *See*, for example, Eastern's own SOF 32, Dkt. 262, p. 6 ("One such meeting took place in the middle of December 2017 and was attended by Mr. Guo, Lianchao, Ms. Wallop and Waller."  The evidence of this meeting shows it took place in mid-December 2017 at Guo's apartment in New York City. Waller 1 Tr., Ex. H1, 230:21-231:22; Wallop 1 Tr., Ex. B1, 32:17-38:4, 41:11-42:11, 43:15-45:25, 87:23-89:5).

Strategic admits that "The ACA Loan Agreement is between two Hong Kong companies (Eastern and ACA), governed by Hong Kong law, and contains a Hong Kong forum-selection clause" and "The Power of Attorney was entered into with GSNY, a company that is duly-authorized to operate in New York." These do not change that the locus of Eastern's operations is in New York.

56.    Han claims to have been compensated for his work for Eastern Profit before he left Hong Kong, and "believe[s] when the company's asset is unfreeze one day, I will receive some compensation" for his work for Eastern Profit in New York.  Chunguang Tr., Ex. J1, 78:17-23.

EASTERN'S RESPONSE:  Denied.  The cited testimony does not support Strategic's contention.  C. Han did not testify that he conducted any business on behalf of Eastern in New York, let alone that he will be paid for any actions he took in New York.  Strategic has

therefore failed to cite any evidence in support of the factual averment in paragraph 56 as required under Local Rule 56.1(d).

STRATEGIC'S REPLY:    Eastern falsely states that the cited testimony does not support the fact when it does.  Chunguang testified: "Q    Did you receive any compensation or payments as an agent of Eastern Profit? A    I believe so.  I believe when the company's asset is unfreeze one day, I will receive some compensation, because this is normal business model where I believe I will receive some compensation one day."  The "work for Eastern Profit in New York" was the work described in SOF 54, which Eastern admitted.  Eastern cites no facts or evidence disputing SOF 56, so it must be deemed admitted.

57.    Han continued to work on Eastern Profit's business in New York after making what he testified was his oral delegation of authority to Wang to use research to recover Eastern Profit's allegedly frozen assets.  In December 2017, Han claims to have met with William Je in New York several times to negotiate and execute a "loan" for $1 million.  Chunguang Tr., Ex. J1, 133:13-134:8.  In 2018, Han conferred with Wang at her office at 800 Fifth Avenue and signed a Power of Authority authorizing the company of which Wang is the CEO, GSNY, to continue to handle the research into Chinese officials, including any related litigation, (*i.e.*, this very case).  *Id.*, 109:12-111:22 and Ex. Q1 (Chunguang Ex. 32).

EASTERN'S RESPONSE:   Denied.   The cited testimony does not support Strategic's contention.  C. Han did not testify that he conducted any business on behalf of Eastern in New York.  Strategic has therefore failed to cite any evidence in support of the factual averment in paragraph 56 as required under Local Rule 56.1(d).  In fact the ACA Loan Agreement referenced in paragraph 56 is a loan agreement between two Hong Kong companies, is governed by "the laws of the Hong Kong Special Administrative Region" and the parties thereunder agreed to submit to

the "non-exclusive jurisdiction of the courts of the Hong Kong Special Administrative Region in relation to any disputes . . . arising out of or in connection with [the ACA Loan Agreement]."

STRATEGIC'S REPLY:      As with SOF 56, Eastern falsely states that the cited testimony does not support SOF 57, but it does, as shown in the chart below.  Strategic herein adds the citation that the "hotel lobby" was in New York (Chunguang Tr., Ex. J1, 127:12-15:  Q  What was the name of the hotel?  A  Palace.  That's right.  Q  Was it here in New York City?  A  Yes.)

| Fact Assertion | Evidence |
| --- | --- |
| Chunguang continued to work on Eastern's business in New York after making his oral delegation of authority to Wang to use research to recover Eastern Profit's allegedly frozen assets.  In December 2017, Han claims to have met with William Je in New York several times to negotiate and execute a "loan" for $1 million. | Q   How many times did you meet with Mr. G in person about this loan agreement? A    I think two or three times. Q   Was that before or after the meeting in the hotel lobby? A    I think before. Mr. G brought this loan agreement with him to meet you in the hotel lobby; correct? A Before this, we talked about a loan over the phone, and then William drafted the document.  At the end, he brought it to the hotel lobby, to which both of us signed. Q    You were the one then who negotiated the terms of the loan on behalf of Eastern Profit; correct? MR. CHUFF: Objection. Mischaracterizes the testimony. A Yes.  William and I talked over the phone about the interest payment of 2 percent and about a half year and stuff like that. |
| In 2018, Chunguang conferred with Wang at her office at 800 Fifth Avenue and signed a Power of Authority authorizing the company of which Wang is the CEO, GSNY, to continue to handle the research into Chinese officials, including any related litigation, (*i.e.*, this very case). | Strategic cited to the Power of Attorney instrument (Ex. Q1, Dkt. 267-1 (Chunguang Tr. Ex. 32), which was discussed in the testimony below<br><br>Q    All right.  The second page, is that your handwritten name above the words Chunguang Han? A Yes. Q    Did you place your handwritten signature there? A  Yes. Q Was this on behalf of Eastern Profit? A Yes. Q  What was the purpose of this document? A This was a Power of Attorney that I gave Yvette the authority to handle the investigation company's matter.  Q  When did |

| | you sign this? A Last year, 2018. Q Who asked you to sign this on behalf of Eastern Profit? A I don't understand your question. MR. CHUFF:  Objection.  Assumes facts. |
| --- | --- |
| | HAN CHUNGUANG A  Yvette told me at the time we were lied to, we were deceased, and we might have to file a lawsuit against the other parties. One day last year Yvette called me saying that she had this document for me to sign to authorize her to handle all these matters.  I said okay.  And then I went to Yvette's, yes, Yvette's office to sign this document.  Q  Where was Yvette's office located? MR. CHUFF:  Objection.  Asked and answered. A    800 Fifth Avenue. Q    So you did not prepare this document yourself? A    No, I did not. Q Why did Guo Mei not sign this document? A Because Guo Mei gave me the authorization to handle the matters, and I gave the authorization to Yvette to handle the matters. And Yvette would report to me. |

Resting wholly on its claim that Strategic failed to cite its statements with evidence (shown above to be false), Eastern cites no facts or evidence disputing SOF 57. Therefore, SOF 57 must be deemed admitted.

This does not change because of the additional statements offered by Eastern.  Strategic admits the document Eastern calls a loan agreement purports to contain the following terms: "The ACA Loan Agreement referenced in paragraph 56 is a loan agreement between two Hong Kong companies, is governed by 'the laws of the Hong Kong Special Administrative Region' and the parties thereunder agreed to submit to the 'non-exclusive jurisdiction of the courts of the Hong Kong Special Administrative Region in relation to any disputes . . . arising out of or in connection with [the ACA Loan Agreement].'"

58.   **ALL FACTS ADMITTED:**  Wang also claims she was responsible for dealing with Eastern Profit's purported New York-executed loan after having first learned of it in 2018 (Wang 2 Tr., Ex. L1, 63:22-64:14); she claims she met with ACA representative William Je in New York in 2018 to discuss Eastern Profit-ACA business.  Wang 2 Tr., Ex. L1, 45:25-47:25. Han met again with Wang at 162 E. 64th Street in New York City, GSNY's current address and also the office of Guo, to discuss the purported "loan" ACA made to Eastern Profit.  Chunguang Tr., Ex. J1, 34:6-17; 38:18-39:15.  Finally, Eastern Profit testified that Guo (who has remained in New York) also served as Eastern Profit's agent in connection with the loan from ACA, and also conferred with Je about the loan.  Wang 2 Tr., Ex. L1, 126:2-17.  Eastern Profit also admits that Guo, again, in New York, acted as its representative in negotiating the contract.  Dkt. 142, p. 2, ¶¶ 3-4; Dkt. 127, pp. 20-21, ¶¶ 3-4.

EASTERN'S RESPONSE:  Admitted.

59.   Continuing into 2019, Eastern Profit continued to operate out of New York.  Wang (Eastern Profit's agent) met with Eastern Profit's sole director, Guo Mei (Guo's daughter), in New York to confer regarding the investigation.  Wang 2 Tr., Ex. L1, 25:8-28:13.

EASTERN'S RESPONSE:  Denied on the basis that Eastern cites no evidence suggesting that Eastern "operates" out of New York.  At all times, Eastern remained a Honk Kong company with its principal place of business in Hong Kong.  Ex. A, Strategic's Answer at 20 ¶ 3; Ex. B, Strategic's Admissions; Ex. C, Eastern Answer to Strategic's Counterclaim at 1 ¶ 3; Ex D, Strategic's Responses and Objections to Eastern's First Interrogatories.

STRATEGIC'S REPLY:   Eastern's circular response is an ineffective controversion of the fact.  The first sentence of SOF 59 is supported by the second sentence, which was supported by the testimony of Eastern's corporate representative that she met "in New York"

at a restaurant with Guo Mei to "ask her what is about Eastern Profit."  Eastern fails to cite any evidence disputing those facts, which must be deemed admitted.  Eastern's only addition is a fact that is admitted by Strategic but not dispositive:  "At all times, Eastern remained a Hon[g] Kong company with its principal place of business in Hong Kong."

60.    In the end, this three-year contract, which Guo claimed he would use to advance his purported goal of toppling the CCP regime in China to the benefit of the Chinese people, was terminated by Eastern after just five weeks. R. Agreement, Ex. F1, p. 5; Ex. V1 (Ex. 6 to Wang 1 Tr.), p. 1; Guo 1 Tr., Ex. G1, 45:3-46:16; Wallop 1 Tr., Ex. B1, 88:3-89:22; Wang 2 Tr., Ex. L1, 197:18-208:22, 202:2-204:20, 149:5-150:9.

EASTERN'S RESPONSE:  Admitted only that Eastern terminated the Research Agreement because Strategic failed to perform its obligations thereunder.  As specified in the Research Agreement, Eastern only agreed to pay Strategic for each deliverable that Strategic completed in accordance with the terms of the Research Agreement; if no deliverables were provided, Eastern had no obligation to pay Strategic under the Research Agreement.  Ex. M, Research Agreement at 1-3; Ex. A, Answer at 2 ¶ 6; Ex. G Wallop II Tr at 35:5-36:5, 42:15-44:12, 47:6-11, 49:21-50:17 ("Q.  So the pricing was based per unit, correct?  A.  Yes."; "Q. . . . When you were in the meeting talking about this document, the idea was that pricing would be tied to units?  A.  My understanding, that's correct.").  As it has admitted, Strategic failed to provide any deliverables.  The weekly deliverables called for under the Research Agreement were due by no later than mid-January 2018.  Ex. M, Research Agreement at 1-3.   Strategic did not meet the contractual deadline.   Rather, Strategic delivered its first USB drive to Eastern pursuant to the Research Agreement on January 26, 2018.  Ex. A Answer at 35 ¶ 45; Ex. H, Waller I Tr. at 201:10-202:13; Ex. G, Wallop II Tr. at 16:12-17; Ex. I, Waller II Tr. at 6:2-8, 112:7-114:10.  That drive

did not, however, comply with the terms of the Research Agreement; indeed, Strategic has admitted that the information contained on that drive was "of no use to Guo or Eastern Profit because it was nothing more than the researchers' own work to familiarize themselves with the fifteen subjects using open-source information." Answer at A at 35 ¶ 45; Ex. I, Waller II Tr. at 6:2-8, 112:7-114:10.   On January 30, 2018, Strategic delivered a second USB drive to Eastern Profit.   Answer at A at 28 ¶ 24; Ex. G, Wallop II Tr. at 16:12-17; Ex. H, Waller I Tr. at 211:3-215:16; Ex. I, Waller II Tr. at 115:9-116-17.   That USB drive, like the first, failed to comply with the terms of the Research Agreement; as admitted by Strategic, the drive contained "incomplete work product . . . in the form of raw research data" that was not "of any use" to Eastern.   Ex I, Waller II Tr. at 114:23-115:8.   Strategic did not deliver any other USB drives to Eastern. Consequently, Strategic failed to provide to Eastern any of the required deliverables.   Ex I, Waller II Tr. at 6:2-8, 98:8-114:10; Ex. K, L. Han Tr. at 160:10-19, 264:9-265:20, 275:15-279:17.   It never delivered any "financial forensic [h]istorical research" called for under the Research Agreement.   Ex I, Waller II Tr. at 6:2-8, 98:8-100:3.   It did not deliver to Eastern any "current tracking research" called for under the Research Agreement.   Ex I, Waller II Tr. at 6:2-8, 100:4-111:20.   It also failed to deliver to Eastern any "social media research" called for under the Research Agreement.   Ex I, Waller II Tr. at 6:2-8, 112:7-114:10.   In fact, Strategic has admitted that it "was unable to prepare any [of the] detailed reports" called for under the Research Agreement.   Ex D, Strategic's Responses and Objections to Eastern's First Interrogatories, Response to Interrogatory No. 8 (emphasis added).   As a result, on February 23, 2018, Eastern wrote to Strategic terminating the Research Agreement.   Ex A, Answer at 6 ¶ 28; Ex I, Waller II Tr. at 91:9-13; Ex. N, Termination Letter, EASTERN-000198.   In its letter, Eastern demanded

that Strategic return the $1 million deposit.  Ex. A, Answer at 6 ¶ 28; Ex. N, Termination Letter, EASTERN-000198.     Strategic has refused to do so.  *Id.*

STRATEGIC'S REPLY:     Eastern does not adequately address this SOF.  It is based on two things:  (a) Guo's purported goal for the contract, which is undisputed; and (b) the length of time of the Research Agreement, which is also undisputed.  Eastern should have outright admitted this fact without an attempted qualification.  It is undisputed.

Eastern's additional statements, which Eastern copies entirely from its response to SOF 42, do not change the analysis. Strategic therefore incorporates herein its entire point-by-point Reply to Eastern's Response to Strategic's SOF 42.

Most of Eastern's disputes involve contract interpretation, a matter of law for this Court, rather than disputes for the factfinder to resolve. If any factual disputes do remain, however, they are immaterial to Strategic's motion, which primarily seeks to dismiss Eastern's contract and unjust enrichment claims because it cannot recover as "damages" the $1 million deposit that came from ACA, not Eastern.

STRATEGIC'S RESPONSE TO EASTERN'S ADDITIONAL FACTS IN DKT. 270

1.     Through this action, Eastern Profit Corporation Limited ("Eastern") seeks to recover a $1 million deposit (the "Deposit"), plus pre- and post-judgment interest, paid to Strategic Vision US, LLC ("Strategic") pursuant to a contract under which Strategic agreed to provide certain private investigation services to Eastern (the "Research Agreement").

STRATEGIC'S RESPONSE:  Eastern's characterization of its damages theory provides material legal support to Strategic's dispositive motion because it proves Strategic's defense— that Eastern is not entitled to restitutionary return of a "Deposit" that Eastern itself never paid. Eastern's characterization is also legally important because it undermines the legal argument

<u>raised for the first time in Eastern's April 6, 2020 submission that its damages theory includes</u>

<u>recovery of alleged "reliance damages."</u>  As recently as this SOF 1, filed on March 16, 2020,

Eastern's damages theory did not seek "reliance damages."  Rather, "Through this action,

Eastern Profit Corporation Limited ("<u>Eastern</u>") seeks to recover a $1 million deposit (the

"<u>Deposit</u>"), plus pre- and post-judgment interest …"  This SOF 1 thus does not reflect a fact

dispute that would preclude summary judgment for Strategic but instead supports dispositive

relief issuing to Strategic.[5]

   2. Eastern is organized under the laws of Hong Kong.

STRATEGIC'S RESPONSE:  <u>Not disputed</u> but <u>immaterial</u> to Strategic's dispositive

motion.

   3. Eastern has its principal place of business in Hong Kong.

STRATEGIC'S RESPONSE:  <u>Not disputed</u> that Eastern's corporate filings state that

Hong Kong is the location of Eastern's principal place of business but <u>immaterial</u> to Strategic's

motion.  Strategic elsewhere established that, even if on paper Eastern is undisputedly registered

in Hong Kong, Eastern does not do any business there. Eastern's only asset—a Hong Kong bank

account—is frozen (Chunguang Tr. (formerly "Depo."), Ex. J1, 87:3-88:20; Dkt. 203-2;

Eastern's only Hong Kong agent left Eastern long ago (Chunguang Tr., Ex. J1, 71:6-9), and

Eastern's only business is in New York, not Hong Kong, as Chunguang has not been there for

"several years" and its only existing business is Chunguang's alleged delegation of authority to

Yvette Wang, Golden Spring (New York) Limited ("GSNY"), and Guo Wengui ("Guo") to

research Chinese officials. (*Id*., 58:14-59:4; 43:21-44:22).

---

[5] The Research Agreement does not call for "private investigation services" under Virginia law.

This relates to Strategic's defense Eastern cannot sue in this forum because it admittedly failed to register with the State of New York as required by New York's corporation law. Eastern does business in New York, its only business, namely the handling of this Research Agreement.

4.      Guo Wengui ("Mr. Guo") is also known as Miles Kwok.

STRATEGIC'S RESPONSE: Not disputed but immaterial to Strategic's motion.

5.      Mr. Guo was and is an outside advisor to Eastern.

STRATEGIC'S RESPONSE: Not disputed that Guo's statements and actions are binding on Eastern, consistent with Eastern's pleading admission,[6] but disputed that Guo's role was limited to being an "advisor" to Eastern.  Regardless, the question is immaterial to Strategic's motion for dispositive relief on Eastern's contract, fraud, and unjust enrichment claims.  None of the several bases on which Strategic moved for relief ultimately depend on Guo's status as an agent versus an "outside advisor" to Eastern because Eastern admitted that Guo's statements and actions are binding on Eastern.

Further responding, Eastern cites no record support for its false statement that Guo is a mere "advisor," let alone an "outside" advisor, to Eastern. In fact, Eastern cited to Strategic's pleading, which affirmatively alleged that Eastern is "an entity under [Guo]'s actual direction and control and which he directed to become a counter-party to Strategic Vision in the Contract he had negotiated and from which he intended to benefit." Eastern's Ex. A, Dkt. 127, Strategic's Counterclaim, Dkt. 127, ¶ 108.

---

[6]      Dkt. 142, p. 2, ¶ 4 ("Eastern authorized Guo to communicate with Strategic Vision on Eastern's behalf concerning the Agreement, Guo's representations to, and interactions with, Strategic Vision concerning the Agreement are binding upon Eastern, and Eastern has not repudiated any such representations or interactions."). *See also* Strategic's Counterclaims cited by Eastern as the sole support for this statement (Eastern Ex. A, Dkt. 127, pp. 20-21, ¶¶ 3-4 and p. 53, ¶ 108).

6.    Mr. Guo acted on behalf of Eastern in connection with the negotiation of the Research Agreement.

STRATEGIC'S RESPONSE: <u>Not disputed</u> that Guo acted on behalf of Eastern in negotiating the Research Agreement.  A dispute regarding Guo's involvement on behalf of Eastern, an entity which he controlled, as being for his own personal interest is <u>immaterial</u> to Strategic's dispositive motion because Eastern admitted that Guo's statements and actions are binding on Eastern.  Guo indeed acted in a manner that was ultimately on his own behalf since: Guo gave Eastern the 15 names for research (Wang 1 Tr., Ex. E1, 33:8-14); Guo approved the final contract and gave Wang permission to sign it for Eastern Profit (*Id*., 61:2-9); and Eastern was to give Guo the research results for Guo's own use, purportedly to attack the CCP (*Id*., 32:5-35:11, 37:8-38:7).

7.    Yvette Wang ("<u>Ms. Wang</u>") was and is an agent of Eastern Profit.

STRATEGIC'S RESPONSE: <u>Not disputed</u> that Wang was authorized to bind Eastern relating to the Research Agreement and material primarily to case background in Strategic's dispositive motion.  Wang ultimately received her authority from, and her actions were actually directed by, Guo: as Strategic pled in the very paragraph cited by Eastern, "At all times, Wang and Lianchao Han claimed to be acting under the authority and with the permission of Guo." Eastern's Ex. A, Dkt. 127, Strategic's Counterclaim, ¶ 4.  In Dkt. 273, pp. 50-51, Strategic cited ample additional proof that Wang received her authority from and reported to Guo's oversight but such is not material here because Eastern does not challenge Wang's actions in the context of the legal arguments Strategic has presented in its dispositive motion.

8.    Ms. Wang was responsible for overseeing the services that Strategic was to provide to Eastern under the Research Agreement.

STRATEGIC'S RESPONSE: <u>Disputed</u> as incomplete because it does not mention Lianchao Han's involvement, but the incompleteness is <u>not material</u> to the principal points of Strategic's dispositive motion.  Eastern's failure to reference Lianchao despite his important involvement is demonstrated in several ways.  First, the sole source Eastern cites for this allegation is Strategic's Counterclaims (Dkt. 127), and in one of the paragraphs Eastern cites, Strategic pleads that "conversations between Strategic and Guo concerning the purpose, scope, and methods for the Contract were alternatively facilitated by Lianchao [Han] and Wang." *Id*., p. 25, ¶ 17. Second, as Strategic pled in the immediately prior paragraph, throughout the course of negotiation and performance of the Research Agreement, "Guo represented to Strategic Vision that Lianchao [Han] and Yvette Wang each had authority to act for and on behalf of Guo at various times." *Id*., p. 25, ¶ 16. Finally, as Strategic pled in another paragraph cited by Eastern, "[i]n fact, at all times Strategic Vision interacted on the Contract with three individuals. These three were Guo, and two other individuals to whom Guo alternatively gave authority: Wang and another individual identified more fully below, Lianchao Han. At all times, Wang and Lianchao Han claimed to be acting under the authority and with the permission of Guo." *Id*., p. 21, ¶ 4. *See also* Lianchao Tr., Ex. K1, 195:2-196:14 (by February, "Miles [Guo] put me [Lianchao] back in charge," and Lianchao explained to Strategic that Guo had to be satisfied or he would terminate the contract).

9.      Chunguang Han ("<u>Chunguang</u>") was and is an agent of Eastern.

STRATEGIC'S RESPONSE: <u>Not disputed</u> for purposes of Strategic's dispositive motion.  Further answering, Chunguang testified he has been an agent for Eastern while living in the United States but, as noted in Strategic's Response to SOF 10 (Dkt. 273, p. 52), and in Strategic's Statement of Additional Facts at SOFs 25-32 (Dkt. 273, pp. 12-16), Strategic disputes

that Chunguang actually served as an agent for purposes of entering into any alleged "loan" for ACA's $1 million "Deposit."

10.    Chunguang was responsible for securing financing that Eastern needed to fund the $1 million Deposit that was to be provided by Eastern to Strategic under the Research Agreement.

STRATEGIC'S RESPONSE: Strategic need not take a position on this assertion because it has failed to meet the requirements of Fed. R. Civ. P. 56(c)(1).  The materials cited by Eastern in support of this contention are not probative in that they make no reference to the Research Agreement, the deposit, or securing of any financing, and discovery on these topics was not completed.  Fed. R. Civ. P. 56(c)(2).  Rather than being completed, Eastern successfully blocked discovery into these topics for months, refused to recognize a notice of deposition to produce its own "principal," Chunguang, and tried to keep him testifying (*see* Eastern Letter in Opposition to Strategic's Letter Motion to Compel, Dkt. 129, p. 3, claiming that Strategic should not be able to "pepper [Chunguang] with irrelevant questions concerning…how it got the loan that was used to pay Strategic Vision," which "ha[s] nothing to do with the dispute at issue"). The supposed "creditor," ACA, could not be compelled to provide discovery after its sole director (living in New Jersey, where she was personally served with a deposition subpoena) purported to "resign" less than 24 hours before she was served with process, and just after Eastern received notice that an attempt would be made to serve her. Maistrello Tr., Ex. A2, 57:3-60:11, 61:13-73:19. Maistrello testified that she resigned her directorship after learning from Daniel Podhaskie, counsel for GSNY (her employer and Eastern's agent for purposes of this litigation), that she was about to be served with a subpoena in her capacity as an ACA director.  Maistrello Tr., Ex. A2, 55:12-57:20 ("Q. What did you do after you were served with this subpoena? MS. TESKE:

Object if the form. You can answer it. A. I gave it to our lawyer. Q. Who was that? A. Daniel

Podhaskie.") and Ex. A2 (Maistrello Depo Ex. 3).

       11.     Strategic is a limited liability company organized under the laws of

Nevada.

STRATEGIC'S RESPONSE: <u>Not disputed</u> but <u>immaterial</u> to Strategic's dispositive

motion.

       12.     At least from September 1, 2017 and March 13, 2018 (the "<u>Relevant Time</u>

<u>Period</u>"), Strategic's principal place of business was in Arlington, Virginia.

STRATEGIC'S RESPONSE: <u>Not disputed</u> but <u>immaterial</u> to Strategic's dispositive

motion.

       13.     During the Relevant Time Period, French Wallop ("<u>Wallop</u>") was

Strategic's Chief Executive Officer and only member.

STRATEGIC'S RESPONSE:  <u>Not disputed</u> but <u>immaterial</u> to Strategic's dispositive

motion.

       14.     Ms. Wallop resides at 1557 North 22nd Street, Arlington, Virginia 22209.

STRATEGIC'S RESPONSE:  <u>Not disputed</u> but immaterial to Strategic's dispositive

motion.

       15.     Among other services, Strategic is a sophisticated company that provides

private "investigatory research" to clients within the United States in exchange for monetary

compensation.

STRATEGIC'S RESPONSE:  As to Plaintiff's characterization of Strategic as a

"sophisticated" company, the statement is <u>immaterial</u>, and is a subjective opinion unsupported by

evidence.  Strategic's founding and sole member, French Wallop, did not describe the company

as "sophisticated" in her testimony.  Wallop 1 Tr., Ex. B1, 24:1-3.  Not disputed that Strategic

has engaged in the activity described in the assertion, but immaterial to Strategic's dispositive

motion.  Further, the statement does not describe what Strategic agreed to do at Guo's request

under *this project,* the Research Agreement. Ex. F1, R. Agreement.  Strategic's Motion for

Summary Judgment concerns only the Research Agreement.  Plaintiff includes this assertion in

support of its own dispositive motion which, in part, seeks relief on its declaratory judgment

claim by arguing that Strategic was legally required to be registered under a Virginia private

security services statute and, since it was not, could not legally enter into the Research

Agreement.  Strategic denies the legal merit to this argument but it is irrelevant to Strategic's

own Motion for Summary Judgment.

      16.    As part of its investigations, Strategic makes investigations into crimes

and civil wrongs; the location, disposition, and recovery of stolen property; and the cause(s) of

injuries to persons or to property.

    STRATEGIC'S RESPONSE: <u>Not disputed</u> that Strategic has engaged in the activity

described in the assertion, but <u>immaterial</u> to Strategic's dispositive motion.  Further, the

statement does not describe what Strategic agreed to do at Guo's request under *this project,* the

Research Agreement. Ex. F1, R. Agreement.  Strategic's Motion for Summary Judgment

concerns only the Research Agreement.  Eastern includes this assertion in support of its own

dispositive motion which, in part, seeks relief on its declaratory judgment claim by arguing that

Strategic was legally required to be registered under a Virginia private security services statute

and, since it was not, could not legally enter into the Research Agreement.  Strategic denies the

legal merit to this argument but it is irrelevant to Strategic's own Motion for Summary

Judgment.

17.     As part of its investigations, Strategic makes investigations into the identities, habits, conduct, business, occupation, honesty, integrity, credibility, knowledge, trustworthiness, efficiency, loyalty, activity, movement, whereabouts, affiliations, associations, transactions, acts, reputation and character of individuals.

STRATEGIC'S RESPONSE: <u>Not disputed</u> that Strategic has engaged in this activity, but wholly <u>immaterial</u> to its Motion for Summary Judgment, which focuses on what Strategic agreed to do at Guo's request *here* under the Research Agreement. Ex. F1, R. Agreement. Eastern cites this to make an argument that is not at issue in Strategic's motion—whether Strategic conducted a "private investigation" within the meaning of a Virginia private security services statute.  That legal question has no influence on the outcome of Strategic's Motion.

18.     As part of Strategic's investigations, Strategic's CEO Ms. Wallop communicates with her network of contacts within the United States government and the United States business community in order to obtain the information concerning the subjects of Strategic's investigations.

STRATEGIC'S RESPONSE: <u>Not disputed</u> that Strategic has engaged in this activity, but <u>immaterial</u> to its Motion for Summary Judgment, which focuses on what Strategic agreed to do at Guo's request *here* under the Research Agreement. Ex. F1, R. Agreement.  Eastern cites this to make an argument that is not at issue in Strategic's motion—whether Strategic conducted a "private investigation" within the meaning of a Virginia private security services statute.  That legal question has no influence on the outcome of Strategic's Motion.

19.     Since it was founded, Strategic has conducted at least five private investigations for its clients.

STRATEGIC'S RESPONSE: <u>Not disputed</u> that Strategic has engaged in this work, but <u>immaterial</u> to its Motion for Summary Judgment *here*, which focuses on what Strategic agreed to do at Guo's request *here* under the Research Agreement. Ex. F1, R. Agreement.  Eastern cites this to make an argument that is not at issue in Strategic's motion—whether Strategic conducted a "private investigation" within the meaning of a Virginia private security services statute.  That legal question has no influence on the outcome of Strategic's Motion.

20.     Strategic had no employees, other than Ms. Wallop.

STRATEGIC'S RESPONSE: <u>Not disputed</u> with qualification that Wallop was a member but not an employee of Strategic.  Wallop 1 Tr., Ex. B1, 24:1-3.  Regardless, this is immaterial to Strategic's Motion.

21.     J. Michael Waller ("<u>Waller</u>") is a friend of Ms. Wallop who has partnered with Strategic on a number of investigations since 2016 or 2017.

STRATEGIC'S RESPONSE: <u>Not disputed</u> and <u>immaterial</u> to Strategic's Motion. Further answering, Waller's work involved "opposition research and political/policy work, messaging." Waller 1 Tr., Ex. H1, 14:6-15:20 ("…[I]t's common in political campaign-type work, but you can use it for really anything where you want to research who your opposition is, everything you can find out about the opposition and use that for advancing your political or policy purposes.").

22.     During the Relevant Time Frame, Strategic was not licensed as a private investigator under the laws of Virginia or any other state or jurisdiction within the United States.

STRATEGIC'S RESPONSE: <u>Not disputed</u> but <u>immaterial</u> to Strategic's Motion for Summary Judgment. This assertion relates to a claim that is not addressed there, and reflects a legal position that Strategic disputes—the Virginia private security services statute does not

apply in this case. The political opposition work Strategic was hired to do under the Research Agreement did not require Strategic, Wallop, or Waller to be licensed as private investigators. That question arises in connection with Strategic's Cross-Motion for Summary Judgment on Eastern's declaratory judgment claim, Dkt. 272, and not Dkt. 266.

23.     During the Relevant Time Frame, Ms. Wallop was not licensed as a private investigator under the laws of Virginia or any other state or jurisdiction within the United States.

STRATEGIC'S RESPONSE: Not disputed but immaterial to Strategic's Motion for Summary Judgment. This assertion relates to a claim that is not addressed there, and reflects a legal position that Strategic disputes—the Virginia private security services statute does not apply in this case. The political opposition work Strategic was hired to do under the Research Agreement did not require Strategic, Wallop, or Waller to be licensed as private investigators. That question arises in connection with Strategic's Cross-Motion for Summary Judgment on Eastern's declaratory judgment claim, Dkt. 272, and not Dkt. 266.

24.     During the Relevant Time Frame, Waller was not licensed as a private investigator under the laws of Virginia or any other state or jurisdiction within the United States.

STRATEGIC'S RESPONSE: Not disputed but immaterial to Strategic's Motion for Summary Judgment. This assertion relates to a claim that is not addressed there, and reflects a legal position that Strategic disputes—the Virginia private security services statute does not apply in this case. The political opposition work Strategic was hired to do under the Research Agreement did not require Strategic, Wallop, or Waller to be licensed as private investigators. That question arises in connection with Strategic's Cross-Motion for Summary Judgment on Eastern's declaratory judgment claim, Dkt. 272, and not Dkt. 266.

25.     Bill Gertz ("Gertz") is a former reporter of The Washington Free Beacon and a current reporter of The Washington Times.

STRATEGIC'S RESPONSE: Not disputed.

26.     Gertz is a mutual acquaintance of Mr. Guo and Ms. Wallop and J. Waller.

STRATEGIC'S RESPONSE: Disputed in part as incomplete but the incompleteness does not bear on any issue in Strategic's request for dispositive relief. Gertz is and was more than a mutual acquaintance of Guo but also developed both a friendship and professional relationship with Guo after having been introduced to him by Sasha Gong between June and July 2017 (Gertz Tr., Ex. I1, 64:6-65:8; 72:13-73:19). Not disputed that Gertz had met Wallop early in 2017 (Id., 26:5-13) and had known and worked with Waller in trying to advocate for better information capability for the U.S. Government, and viewed their relationship as "occasional friends" (Id. 26:14-128:8). Waller and Gertz had known each other for 35 years. Waller 1 Tr., Ex. H1, 116:24-117:9. Waller was working with Gertz and another individual on a separate project as recently as February 2019. Id., 63:2-19. Gertz found Wallop to be honest and sincere (Gertz Tr., Ex. I1, 29:16-20), and found Waller to be honest and sincere (Id., 132:4-10). Later, after learning of this litigation, Gertz asked Guo on more than one occasion not to go through with the lawsuit. Id., 89:13-90:16.

27.     Gertz was involved in bringing Eastern and Strategic together for the purposes of entering into the Research Agreement.

STRATEGIC'S RESPONSE: Not disputed to the extent that Gertz introduced Wallop to Lianchao Han. Gertz Tr, Ex. __, 30:4-11. Gertz also called Wallop. Wallop 1 Tr., Ex. B1, 32:5-33:14. Disputed in part because Gertz knew nothing about Eastern (as referenced in SOF 27), Guo had never discussed it with him (Gertz Tr., Ex. I1, 105:11-106:1), and Gertz never learned

of Eastern before hearing of this lawsuit (*Id.*, 142:1-3). Gertz introduced Wallop to Lianchao

Han because he wanted Han to introduce her to Guo, and so that Wallop could get Guo to "focus

his message so that it could be a more effective tool," which would benefit Gertz by giving him

"information and news stories."  *Id.*, 131:1-132:13. At that meeting, Gertz learned Wallop

planned to work with Waller on the project and had no objection. *Id.*

      This subject is immaterial to the principal issues in Strategic's Motion for Summary

Judgment.

      28.    Lianchao Han ("Lianchao") is a mutual acquaintance of Mr. Guo and Ms.

Wallop and Waller.

      STRATEGIC'S RESPONSE:  Not disputed with qualification that the introduction was

made only to Guo, and at that time Eastern was not involved whatsoever.  This, however, is not

material to the principal issues in Strategic's Motion for Summary Judgment.

      Lianchao is more than a mere mutual acquaintance of Guo, Wallop, or Waller; while

Lianchao was a trusted acquaintance of Wallop and Waller, he was an actual agent working for

Guo. Lianchao was introduced to Guo in late July or early August of 2017 by a longtime friend

of Lianchao's who he described as a former "pro-democracy activist," in order to help Guo with

his political asylum application, and began to work with Guo on the application. Lianchao Tr.,

Ex. K1, 30:19-31:3. Lianchao maintains a "personal relationship" with Guo and testified he

supports what he claims are Guo's political goals. *Id.*, 33:3-10. Lianchao and Wallop knew of

each other by reputation but before they were introduced in person, had not actually met. *Id.*,

38:20-39:9; Wallop 1 Tr., Ex. B1, 34:20-35:1 (Wallop and Lianchao had crossed paths in

Washington on and off over the years, and Wallop had always known and liked him). Lianchao

and Waller had met many years ago (Waller 1 Tr., Ex. H1, 116:15-117:9), and had shared the same mentor (Lianchao Tr., Ex. K1, 198:6-199:4).

29.     Lianchao was involved in bringing Eastern and Strategic together for the purposes of entering into the Research Agreement.

STRATEGIC'S RESPONSE:  Not disputed with qualification that "Eastern" was "Guo" when the introduction was made.  This, however, is not material to the principal issues in Strategic's Motion for Summary Judgment.

Lianchao did not even know of the name of "Eastern Profit" until the lawsuit was filed (Lianchao Tr., Ex. K1, 84:6-9). Further, Lianchao acted at Guo's direction at the outset of negotiations, was replaced by Guo for a time by Guo's longtime assistant, Wang, and then replaced Wang at the end of the parties' relationship. (*Id*., 28:6-29:3; Waller 1 Tr., Ex. H1, 28:2-10 (Lianchao as Guo's agent at onset))). Lianchao received a proposal from Strategic for strategic communications and public relations before his first meeting, and forwarded it to Guo, and Lianchao testified that the idea for research into Chinese officials was his own. (Lianchao Tr., Ex. K1, 126:22-128:9; 137:20-139:20). Lianchao was already advising Guo that he needed to undertake research against "high-ranking government officials" to sustain his momentum. *Id*., 43:1-46:2.

30.     In late October or early November, Gertz and Lianchao introduced Mr. Guo to Ms. Wallop and Waller of Strategic.

STRATEGIC'S RESPONSE: Not disputed except that (as set forth in Strategic's response to SOF 27 and 29) Gertz first introduced Wallop to Lianchao for the purpose of Lianchao's making a further introduction of Wallop and Waller to Guo. Then, in the first

meeting Wallop and Waller had with Guo, only Lianchao was in attendance. Wallop 1 Tr., Ex. B1, 36:18-37:24.

This is not material to the principal issues in Strategic's Motion for Summary Judgment.

31.     From the date of that introduction until the Research Agreement was signed, representatives of Eastern (Mr. Guo and Ms. Wang) conferred with representatives of Strategic (Ms. Wallop and Waller) to discuss a variety of services that Strategic Vison purportedly could provide, including investigatory research into certain people who supported the Chinese Communist Party ("CCP").

STRATEGIC'S RESPONSE: <u>Not disputed</u> but incomplete, although the incompleteness (and the undisputed portion of the assertion) is not material to Strategic's Motion for Summary Judgment.

From the date of the introduction until the Research Agreement was signed, Guo and Wang were *among those* who conferred with Wallop and Waller (as representatives of Strategic) regarding the work that Strategic would perform for Guo, and Guo's intended uses of the research Strategic would provide.  As Eastern's own citations make clear, Lianchao handled pre-contract negotiations on behalf of Guo until the final week or so before it was signed. *See, e.g.*, Wallop 1 Tr., Ex. B1, 36:18-44:15 (most communications were with Guo and Lianchao); *Id*., 73:23-76:13 (when Wang was in Guo's residence, Guo "often didn't want her in the room" where Wang, Waller, Lianchao, and Guo were conferring); Waller 1 Tr., Ex. H1, 38:3-14; 52:24-54:7 (agreement was negotiation with Lianchao Han as Guo's agent); 63:5-21 (Wallop and Waller believed they were negotiating with Guo, and either Lianchao or Wang was present, but sometimes Guo dismissed Wang because he claimed he did not trust her); 143:6-13 (Wang became the primary point of contact sometime after December 25, 2017); 126:1-134:15

(Lianchao negotiated with Waller through late December, and it was unclear whether Lianchao or Yvette Wang would sign); 102:2-104:2 (by February 2018, Wang had told Strategic that Guo had reverted to Lianchao, and wanted all communication to go through him rather than Wang); *See also* Guo 1 Tr., Ex. G1, 67:9-68:11 (Lianchao prepared a draft of the Agreement); Wang 1 Tr., Ex. E1, 89:2-91:6) (discussions about goals of contract involved others, and Wang did not "start to get involved" until "the end of December"); Lianchao Tr., Ex. K1, 178:22-179:13 (when Lianchao was negotiating, agreement was reached in principle, and Wang negotiated details).

Wang had only three meetings with Wallop from this time until January 6, 2018 (*Id.*, 56:4-11); Wang first heard of Eastern Profit from Guo, when, before going to Virginia to meet with Wallop, she asked Guo who the "client" was. *Id.*, 10:16-14:22. Lianchao never heard of Eastern until the lawsuit was filed. *Id.*, 84:6-9.

Not all the subjects were CCP officials, but Guo intended to use the information to "whistle blow" on corrupt Chinese officials. Wang 1 Tr., Ex. E1, 32:12-35:11. Guo supposedly cares about this misconduct because he wants to promote democracy and the rule of law in China. *Id.*, 37:8-38:7.

32.     One such meeting took place in the middle of December 2017 and was attended by Mr. Guo, Lianchao, Ms. Wallop and Waller.

STRATEGIC'S RESPONSE: <u>Not disputed</u> that Guo, Lianchao, Wallop and Waller met in mid-December 2017 at Guo's apartment in New York City but immaterial to Strategic's motion.

33.     At the meeting described in the preceding paragraph, Ms. Wallop and Waller presented Mr. Guo and Lianchao with a paper document entitled "Time to Get Them: Beginning the Psycho-Political Campaign for China" (hereinafter "<u>Time to Get Them</u>").

STRATEGIC'S RESPONSE: <u>Not disputed</u> but <u>immaterial</u> to Strategic's motion.

34.    Time to Get Them described Strategic's capabilities concerning "Targeted Intelligence Collection and Analysis."

STRATEGIC'S RESPONSE: <u>Not disputed</u> but <u>immaterial</u> to Strategic's motion.

35.    Targeted Intelligence Collection and Analysis contemplated that Strategic would "build and operate a secret system for micro-targeted intelligence collection and analysis."

STRATEGIC'S RESPONSE: <u>Not disputed</u> but <u>immaterial</u> to Strategic's motion.

36.    The parties ultimately decided to proceed with the investigatory research only.

STRATEGIC'S RESPONSE: Not disputed but immaterial to Strategic's motion.

37.    The parties then began negotiating the terms of what eventually would become the Research Agreement.

STRATEGIC'S RESPONSE:  <u>Not disputed</u> that Guo, primarily through Lianchao, but then primarily through Wang after Christmas 2017, negotiated the Research Agreement with Strategic (*see* Response to SOF 31).  It is <u>immaterial</u> to Strategic's motion, but Eastern provides no evidence in support of its claim that Guo, Lianchao, Waller, or Wallop "then began" negotiating the Research Agreement—only after the mid-December meeting. Waller's testimony shows that the negotiations, and even initial handwritten drafts, occurred early at the parties' New York City meetings. Waller 1 Tr., Ex. H1, 20:14-23:22 (discussing early December meetings).

38.    A significant portion of the negotiations regarding the terms of the Research Agreement occurred in Virginia.

STRATEGIC'S RESPONSE: Not disputed but immaterial to Strategic's motion.  Wallop

met with Wang in Virginia three times (*see* Response SOF 31) and Wallop communicated with

Wang and Lianchao from Virginia, in late December and then on January 2 and January 6, 2018,

but before this (as noted above in Strategic's responses to SOF 32 and 37), the majority of the

negotiations occurred at Guo's apartment in New York City.

This is immaterial because it goes to an issue not raised in Strategic's Motion or

Eastern's Response Brief, namely Plaintiff's legal contention that application of a Virginia

private security services statute results in the Research Agreement being void as against public

policy.  As a matter of law, the Virginia statute does not apply, but the issue has no application in

the Motion for Summary Judgment being addressed here.

39.     Ms. Wallop and Waller, while located in the Commonwealth of Virginia,

communicated with Ms. Wang concerning the activities Strategic was to perform under the

Research Agreement.

STRATEGIC'S RESPONSE: Not disputed but immaterial to Strategic's motion.  Wallop

communicated with Wang in late December,  January 2 and January 6, 2018 in Virginia.

However, Waller was not present at those meetings, and the sole evidence cited by Eastern are

Strategic's admissions are that Waller and Wallop communicated with "Wang via Signal

concerning SV's activities to perform under the terms of the Contract," which relates to

performance of the Contract, not (as implied by the change of wording in this Fact, to "the

activities Strategic *was* to perform") its negotiation.

This is immaterial because it goes to an issue not raised in Strategic's Motion or

Eastern's Response Brief, namely Plaintiff's legal contention that application of a Virginia

private security services statute results in the Research Agreement being void as against public

policy.  As a matter of law, the Virginia statute does not apply, but the issue has no application in the Motion for Summary Judgment being addressed here.

40.     Ms. Wallop and Waller, while located in the Commonwealth of Virginia, communicated with Ms. Wang concerning the proposed terms of the Research Agreement before it was executed.

STRATEGIC'S RESPONSE: Not disputed. Immaterial because it relates to a legal issue not contained in Strategic's motion.

41.     Ms. Wallop and Waller, while located in the Commonwealth of Virginia, communicated with Ms. Wang concerning the actual terms of the Research Agreement.

STRATEGIC'S RESPONSE:  Not disputed. Immaterial because it relates to a legal issue not contained in Strategic's motion.

42.     For instance, from December 2017 through January 6, 2018, Ms. Wallop communicated from the Commonwealth of Virginia to Ms. Wang via Signal messages to negotiate the pricing structure of the contemplated research and the number of individuals to be researched.

STRATEGIC'S RESPONSE: Not disputed. Immaterial because it relates to a legal issue not contained in Strategic's motion.

43.     In or around December 2017, Ms. Wallop and Waller prepared the initial draft of the Research Agreement while at Ms. Wallop's home in Virginia.

STRATEGIC'S RESPONSE: Disputed but wholly immaterial to Strategic's motion, which is based on the existence of the contract, not how initial drafts of it were prepared.  Initial drafts were handwritten and were made by Lianchao, Waller, Wallop, and Guo at Guo's

apartment in New York City. Waller 1 Tr., Ex. H1, 21:14-22:19. Guo testified for Eastern Profit

that Lianchao prepared the first draft. Guo 1 Tr., Ex. G1, 67:9-68:11.

44.      As part of contract negotiations, Ms. Wallop requested that Eastern

provide a $1 million Deposit under the Research Agreement.

STRATEGIC'S RESPONSE:  Not disputed.

45.      On December 29, 2017, to fund the Deposit contemplated by the parties,

Eastern borrowed $1 million from ACA Capital Group Limited ("ACA," and the loan from ACA

to Eastern, the "ACA Loan").

STRATEGIC'S RESPONSE: Disputed because Eastern has not cited probative,

admissible evidence that a "loan" existed. Immaterial to Strategic's legal argument, however,

because Strategic nevertheless addresses Eastern's characterization of the transaction as a loan

and shows why the law still entitles Strategic to summary judgment.

To support this assertion, Eastern cites only the testimony of Chunguang, who claimed to

have signed a document Eastern says is a loan agreement with ACA for $1 million on Friday,

December 29, 2017, the last business day before ACA wired slightly less than that amount to

Strategic after payment of wire transaction fees. Chunguang's story is not credible and the loan

has the earmarks of a sham.

First, the purported loan document lists Chunguang as Eastern Profit's "Director,"

(EASTERN-000278), but he had long before resigned as a director, having transferred his

ownership and directorship of Eastern to Guo Wengui's daughter, Guo Mei, back in June of

2017, just before all of Eastern's assets were seized. Chunguang Tr., Ex. J1, 59:60:8, 70:5-9,

102:2-18 (resignation); 87:3-88:20; Dkt. 203-2 (asset seizure). At his deposition, Chunguang

tried to explain this by claiming to have received oral authority from Eastern's only (and true)

director (Guo Mei, the daughter of Guo Wengui) to conduct its business. Chunguang Tr., Ex. J1, 43:11-44:22; 47:11-16; 102:2-104:11. He also claimed to have orally re-delegated this orally-received authority to Wang, allowing her to negotiate the Research Agreement with Strategic, after she approached him to inquire if he knew of any companies that could use research. *Id*., 116:6-117:25. But Wang (and Eastern) had already given binding testimony that Guo simply told Wang that Eastern would be inserted into the Research Agreement shortly before her first trip to Virginia on December 29, 2017, when she asked him who the client would be (Response to SOF 31); Wang had never even heard of Eastern before that time. *Id*.

Chunguang is not a credible witness. Other Guo confidants, including Lianchao Han, who negotiated the Research Agreement, easily recognized him as a cook, bodyguard, and errand boy for Guo (Lianchao Tr., Ex. K1, 36:17-37:12; Gong Tr., Ex. H2, 36:9-22; 116:24-118:11). Yet Chunguang refused to provide details on his line of work, place of work, or reason for his presence in Guo's building; he denied ever having worked for Guo, and instead claimed to have begun running his own investment business after having been tutored by Guo, his "mentor" and "idol," in the niceties of art, architecture, and investing. (Chunguang Tr., Ex. J1, 24:20-34:2; 35:17-36:4; 42:7-11). Guo admitted Chunguang is in his building almost every day (in reality, as a personal servant), refused to say why or to know why (Guo 1 Tr., Ex. G1, 114:9-117:6; 195:23-197:24), and laughed when asked whether Chunguang attended meetings between Guo and Strategic (*Id*., 58:5-15).

Additionally, the timing of the purported "loan" negotiation does not match with the last-minute entry of Eastern Profit into the Research Agreement. The loan was purportedly signed on Friday, December 29, 2017, a date ACA "Chief Executive" William Je (a non-resident of the U.S. who could not be located for service of a testimonial subpoena) happened to be in New

York City—the last business day before the Tuesday, January 2, 2018 wires were sent. Yet Chunguang testified that even after Wang approached him and he supposedly agreed to have Eastern enter the agreement (Chunguang Tr., Ex. J1, 39:5-40:11), a step he says he could only take after he received authority from Guo Mei (Guo's daughter) to do the project (*Id*., 72:24-73:13), it required "two or three" in-person meetings, as well as at least one phone call, before the loan could be signed in-person on December 29. *Id*., 133:13-24. Again, Wang's approach to Chunguang was supposedly the trigger for all of Chunguang's work, but she did not herself learn the identity of Eastern until just before her December 29 trip to Virginia, and the draft Guo gave her to review did not even contain Eastern's name. Wang 1 Tr., Ex. E1, 51:6-52:18; Ex. T1 (Wang 1 Tr. Ex. 4).

There are other indicia that this loan was not a true commercial transaction. Eastern did not keep any copy of the document after it was signed, and Chunguang tried to explain by claiming he only intended to tell Eastern's "fiscal department" (though it had no employees left) about the loan after Eastern's assets were unfrozen and it could be repaid (Chunguang Tr., Ex. J1, 134:21-136:5). The loan was not produced before Eastern's first Rule 30(b)(6) deposition, and ten months later, Eastern's representative, Wang, still could not say where Eastern had obtained the loan document to produce in the case; she was allowed to say only that she saw it for the first time in prior litigation counsel's "file." Wang 2 Tr., Ex. L1, 97:20-102:8.

Chunguang's signature appears to have been falsely signed on at least two other documents in this case—the <u>Research Agreement</u> itself (Lianchao Tr., Ex. K1, 222:7-223:8, identifying Chunguang's name on Research Agreement that was signed by Wang in Wallop's presence in Virginia; Wang 2 Tr., Ex. L1, 141:15-143:5, admitting she did not sign her own name, but denying she signed Chunguang's and claiming she signed "nobody's name"), and a

Substitution of Counsel filed in this Court (Chunguang Tr., Ex. J1, 118:9-119:8, Ex. R1 (Ex. 33 to Chunguang Tr.))—without his knowledge or agreement.

Finally, the purported Loan Agreement bears interest compounded at 2% per month and the $1 million and interest is payable in full in just six months Ex. F2, (Chunguang Tr. Ex. 35, EASTERN-000278-80, loan document), even though the Research Agreement's term was for three years (Ex. F1), and it required additional payments of $750,000 per month. *Id.*  Eastern's only way of "repaying" ACA was by Strategic obtaining useful research; that research being skillfully publicized; the publicity somehow leading to regime change in Mainland China; and that regime change rippling through to cause Eastern's frozen bank account to be released. Wang 2 Tr., Ex. L1, 49:25-50:10, 53:19-54:3, 56:7-11, 57:5-9, 110:17-112:2; Dkt. 203-2; Chunguang Tr., Ex. J1, 72:24-73:14. But even had all of this happened, Eastern only had the equivalent of roughly $80,000 in its frozen Hong Kong account. *Id*. And William Je, on behalf of ACA, had indicated he might simply "forgive" the loan if the research was successful. Wang 2 Tr., Ex. L1, 208:2-16, 46:22-47:14, 44:10-47:14, 197:18-198:6, 202:2-204:20, 73:20-74:8.

46.     On January 2, 2018, Eastern caused the $1 million Deposit to be wired to Strategic through ACA.

STRATEGIC'S RESPONSE: Disputed because Eastern has not cited probative, admissible evidence that a "loan" existed. Immaterial to Strategic's legal argument, however, because Strategic nevertheless addresses Eastern's characterization of the transaction as a loan and shows why the law still entitles Strategic to summary judgment.

As outlined in the Response to SOF 45, the money came from ACA and Eastern's loan is a sham. Although Eastern now claims Guo was acting on its behalf, it admits that it provided a

discovery response stating that Guo ordered the wire from ACA to Strategic Vision. Ex. N1
(Plt's First Interrog. Resp.), also Dkt. 267-1, p. 2, No. 4.

47.     Strategic received the $1 million.

STRATEGIC'S RESPONSE: Not disputed. Strategic actually received less than $1
million due to wiring charges. Wang 1 Tr., Ex. E1, 158:4-159:23, Ex. W1, Dkt. 267-1 (Ex. 7 to
Wang 1 Tr.) (Wire confirmation document showing transfer fees.)

48.     Strategic understood that the $1 million payment from ACA was the
Deposit that the parties had previously discussed.

STRATEGIC'S RESPONSE: Not disputed that Strategic came to form this belief.

49.     Strategic has acknowledged that it accepted the $1 million deposit and
purported to utilize it to cover the expenses associated with the investigation called for under the
Research Agreement.

STRATEGIC'S RESPONSE: Not disputed that Strategic accepted the deposit and began
to use it to cover expenses associated with the Research Agreement.

50.     Eastern and Strategic entered into the Research Agreement on January 6,
2018.

STRATEGIC'S RESPONSE: Not disputed.

51.     The parties executed the Research Agreement at Ms. Wallop's home in
Virginia.

STRATEGIC'S RESPONSE: Not disputed. As shown above, this is not material to
Strategic's motion. It is merely an attempt by Eastern to show "contact" between this case and
the State of Virginia. That issue is addressed in Dkt. 272, not the motion being addressed here.

52.     Ms. Wallop signed the Research Agreement on behalf of Strategic in Virginia.

STRATEGIC'S RESPONSE: <u>Not disputed</u>. As shown above, this is not material to Strategic's motion.  It is merely an attempt by Plaintiff to show "contact" between this case and the State of Virginia.  That issue is addressed in Dkt. 272, not the motion being addressed here.

53.     Per Strategic, the Research Agreement required it to "investigat[e]" certain individuals chosen by Eastern.

STRATEGIC'S RESPONSE: <u>Not disputed</u> that the term appears in the contract.  In a pleading response, Strategic Vision accepted Eastern's characterization of the contract to this effect but this is <u>immaterial</u> to Strategic's motion.  SOF 53 purports to characterize Strategic Vision's interpretation of the parties' written contract in response to Eastern's own characterization of the contract, all in the context of Eastern's argument that a Virginia private security services statute applies to the contract.  That legal issue is dealt with elsewhere and this SOF has no bearing on Strategic's Motion for Summary Judgment being considered here.

54.     According to the Research Agreement's terms, Strategic was to provide Eastern "high quality original research and prepare reports on subjects chosen at [Eastern's] discretion for the purposes of detecting, stopping, and preventing crime or other harm to innocent people."

STRATEGIC'S RESPONSE: <u>Not disputed</u>.  <u>Immaterial</u> to the summary judgment under consideration here.  Further answering, Guo made clear that the purpose of the contract was to undermine the CCP.  No particular crime or crime victim was identified within the contract itself, and the only harm identified therein was described as generalized "harm to innocent people."  Ex. F1, R. Agreement, p. 1.

55.     Strategic was obligated to "provide the deliverables based on the best practices and standards of the industry, comparable to other top firms with similar services," including by delivering reports "of very high quality, revealing the true, complete and full profile of the subject."

STRATEGIC'S RESPONSE: Not disputed that this assertion sets out verbatim language from the contract but an incomplete statement.  The contract also contained verbatim language that the "deliverables" comprised "business research, reporting, documentation, and other consulting services."  R. Agreement, Ex. F1, pp. 1, 3; Wang 1 Tr., Ex. E1, 11:19-12:11.  The three areas of analysis (all labeled "research") were "financial forensic historical research; current tracking research; and social media research."  R. Agreement, Ex. F1, pp. 1-2.  Guo represented to Strategic Vision in negotiations, and the Agreement recited on its p. 1, that Guo planned to use Strategic Vision's analysis for "detecting, stopping, and preventing crime or other harm" (*Id.*) to the people of China in order to force a regime change that would implement the rule of law and democracy.  Guo 1 Tr., Ex. G1, 45:3-46:16; Wang 1 Tr., Ex. E1, 33:8-14 (Guo identified research subjects), 32:5-35:11, 37:8-38:7.  Other than as it may support Strategic's position that Plaintiff frustrated and interfered with Strategic's performance under the contract, this assertion is immaterial.

56.     The Agreement states: "[Eastern] will provide the necessary basic information, and desired area of focus, to [Strategic] to research.  [Strategic] will produce complete reports and provide all supporting data as indicated below."

STRATEGIC'S RESPONSE: Not disputed.

57.     The three types of research Strategic agreed to perform in the Agreement were "Financial forensic Historical research, Current Tracking research, and Social Media Research."

STRATEGIC'S RESPONSE: <u>Not disputed</u>. Other than as it may support Strategic's position that Plaintiff frustrated and interfered with Strategic's performance under the contract, this assertion is <u>immaterial</u>.

58.     The Agreement describes Financial forensic Historical research as: "in-depth and detailed reports of existing and historical business and financial transactions, on subjects selected by [Eastern], and relations of the subject as identified by [Eastern]. Business and financial transactions to be researched may include statements, capital sources, inflow and outflow information, bank receipts, financial instruments, financial products, statements of credit, precious metals transfers, crypto currency exchange, stocks and other equities, business ownership, real property ownership, trusts, large amounts of spending, specific information to indicate the transaction participants, and other data required by [Eastern]."

STRATEGIC'S RESPONSE: <u>Not disputed</u> that the quoted material is verbatim from the contract (except for the omission of the words "commodity transfers" after "precious metals transfers"); however, the definition of "Financial forensic Historical research" indicated that it would "not be limited to" the matters described in the assertion. R. Agreement, Ex. F1, p. 1.

Other than as it may support Strategic's position that Eastern frustrated and interfered with Strategic's performance under the contract, this assertion is <u>immaterial</u>.

59.     The Agreement describes Current Tracking research as: "in-depth and detailed reports on movements of specified subjects by land, air, and sea (private and commercial); schedules and itineraries, addresses and lodging, means of transportation, names of

carriers, manifests, geolocation, major events and significant contacts the subject involved, video and audio that can be accessed remotely, and other data that may be of relevance to the overall research, such as past travel records that may [be] significant to [the] research."

STRATEGIC'S RESPONSE: Not disputed that the quoted material is verbatim from the contract; however, the definition of "Current Tracking research" indicated that it would "not be limited to" the matters described in the assertion. R. Agreement, Ex. F1, p. 1.

Other than as it may support Strategic's position that Eastern frustrated and interfered with Strategic's performance under the contract, this assertion is immaterial.

60. The Agreement describes Social media research as: "in-depth and detailed reports on the social media usage and networks of specified subjects and public figures. Research shall include court records, criminal databases, sex offender and child abuse databases, information on subject's family, extramarital affairs, children born out of wedlock, passports and ID documents, assets, videos and audio, emails, websites, pornography and related media, comments on online media, social media (including Facebook, Twitter, Instagram, Snapchat, Wechat, and other sites as [Eastern] may request), "dating" or sexual services apps, online classified ads or their equivalents, video or audio recordings, and other media."

STRATEGIC'S RESPONSE: Not disputed that the quoted material is verbatim from the contract; however, the definition of "Social media research" indicated that it would "not be limited to" the matters described in the assertion. R. Agreement, Ex. F1, p. 1.

Other than as it may support Strategic's position that Eastern frustrated and interfered with Strategic's performance under the contract, this assertion is immaterial.

61. The Agreement provides that the research called for under the Agreement were to be delivered to Eastern by USB drive only.

STRATEGIC'S RESPONSE: <u>Not disputed</u> but, for clarity, the verbatim language of the Agreement is that the "deliverables" under the contract "will be comprehensive confidential reports" to Eastern Profit and "shall be by USB drive only." Other than as it may support Strategic's position that Plaintiff frustrated and interfered with Strategic's performance under the contract, this assertion is <u>immaterial</u>.

62.    Strategic was entitled to payment under the Research Agreement only if it provided the research called for under the Research Agreement; the potential amount owed to Strategic under the Research Agreement was tied to each deliverable, report, or unit of research delivered.

STRATEGIC'S RESPONSE: <u>Disputed</u> but this is not directly material to Strategic's motion. The principal issues in that motion do not relate to the compensation structure for Strategic under the contract.

Strategic Vision was entitled to payment of $1 million when Eastern signed the Research Agreement, showing the falsity of Eastern's assertion that payment was conditioned on Strategic Vision's provision of research. Under the Agreement, "[Eastern] will pay [Strategic] a deposit of US$1,000,000 (one million dollars) upon signing the contract." R. Agreement, Ex. F1, p. 5. This provision had no reference to Eastern's receipt of a deliverable. The Agreement contained no provision for return of the $1 million or compromise of that amount for any reason. *Id.* In deposition discovery, Eastern admitted that nothing in the contract required Strategic to return the $1 million at the end of the contract, nor had Strategic made such a representation to Eastern. Wang 1 Tr., Ex. E1, 198:8-201:14-21. In addition to the $1 million deposit, Eastern was to pay monthly invoices in a pre-determined amount as compensation for Strategic Vision's services. Wang, for Eastern, distinguished the $1 million deposit from the other fixed "invoice" amounts

owed under the contract—the deposit was an "evergreen deposit," which "means that one million just stay there as one million.  And they, Strategic Vision *is going to issue invoice every month* and the client is just to pay the invoice."  *Id.*, 199:5-200:19 (emphasis added).  An invoiced amount was not "tied to each deliverable, report, or unit of research delivered," as Eastern asserts above, but rather recognized the parties' agreement that a "per deliverable" approach "does not provide for predictable budgeting or workloads."  R. Agreement, Ex. F1, p. 3.

Wang also testified, for Eastern, that "Strategic Vision requested the client of this contract to pay $750,000 per month, no matter how many reports the client requested or Strategic Vision provided":

> Q.· Now, the waterline, is this a
> reference -- does this have anything to do
> with the million dollar deposit?
> A.· No.· One million dollar deposit has
> nothing to do with waterline.· Waterline is
> Ms. Wallop and Strategic Vision requested the
> client of this contract to pay $750,000 per
> month, *no matter how many reports the client*
> *requested or Strategic Vision provided*.· That
> money must be paid.

Wang 1 Tr., Ex. E1, 55:5-14 (emphasis added).

Therefore, as relevant here, the Agreement required Eastern to make a fixed monthly $750,000 payment, starting in January 2018 and through March 2018.  R. Agreement, Ex. F1, p. 5 ("Payment is to be made in regular monthly installments of US$750,000, at the end of each month").  The parties agreed to a fixed term of invoiced amounts—"the first 3 months of this Agreement."  R. Agreement, Ex. F1, p. 4; Wang 1 Tr., Ex. E1, 135:16-141:16; Ex. V1, Dkt. 267-1 (Ex. 6 Wang 1 Tr.), p. 1.  Again, this was not "tied to each deliverable, report, or unit of research delivered," as Eastern asserts above.  Finally, Eastern's citations to the record are misplaced and in violation of Fed. R. Civ. P. 56(c)(2).  First, Eastern cites to the Research

-135-

Agreement generally (pp. 1-5) (and Strategic Vision's pleading authentication of it) but without quoting any particular contract provision.  Second, Eastern cites Wallop's testimony in the context of Strategic Vision's Fed. R. Civ. P. 30(6)(6) deposition on Nov. 19, 2019 but Wallop was not designated for the questions she was being asked about and the questions had been asked at an earlier occasion, objections noted on the record (Wallop 2 Tr., Ex. G2, 45:2-46:25). Wallop's testimony is not admissible.

63.     The Agreement states that "[Eastern] will pay [Strategic] a deposit of US$1,000,000 (one million dollars) upon signing the contract."

STRATEGIC'S RESPONSE:  Not disputed.

64.     The Deposit was to be treated by Strategic as a down payment to be credited on a prorated basis to fees earned by Strategic during the last one and one-third months of the Research Agreement.

STRATEGIC'S RESPONSE:  Disputed but this is irrelevant to Strategic's motion.  The motion does not directly address compensation matters under the contract.

Under the Research Agreement, the $1 million payment would "be credited on a prorated basis to the final 1-1/3 (1.3) months of the contract."  The "final 1-1/3 (1.3) months of the contract" was not defined, either as a special term or in relation to the "payment term" provision that set forth the $1 million payment.  Although a later, different provision of the Agreement defined the "duration" of the contract as "in force for three (3) years from the date of signing," it also allowed any party to "terminate the contract with 30 days' written notice."  The "payment term" provision does not reference anything other than "the contract," and Eastern cannot establish that the exclusive use of the $1 million was to be at the *end* of the third year instead of towards the monies owed Strategic Vision for the months that it provided services under the

Agreement before Eastern abruptly terminated it effective 30 days after the February 23, 2018

termination (i.e. what turned out to be the last 1 and 1/3 months that the contract actually

existed).  Waller 2 Tr., Ex. M1, 92:14-93:21 ("I agree it says the deposit will be credited on a

prorated basis to the final one, one-third months[] of the contract.").  Eastern never paid the

$750,000 due for January or February 2018.  R. Agreement, Ex. F1, pp. 3-4; Wang 1 Tr., Ex. E1,

58:6-18, 135:16-141:16; Ex. V1 (Ex. 6 Wang 1 Tr.), p. 1; Wallop 1 Tr., Ex. B1, 241:6-8, 242:19-

243:3; Wang 2 Tr., Ex. L1, 211:12-212:15.

65.     The Deposit was not meant to be a signing bonus.

STRATEGIC'S RESPONSE:  Not Disputed.[7]

66.     The Agreement states that "It is understood that [Eastern] may direct other

entities to pay [Strategic], and that such payments will be deemed satisfactory compensation by

[Strategic]."

STRATEGIC'S RESPONSE: Not disputed.

67.     The Research Agreement authorized the parties to "terminate the contract

with 30 days' written notice."

STRATEGIC'S RESPONSE: Not disputed.

68.     Termination was permitted without a showing of cause.

STRATEGIC'S RESPONSE: Not disputed.

69.     The termination provision in the Research Agreement allowed for

termination without cause so long as 30 day's written notice was provided.

STRATEGIC'S RESPONSE: Not disputed.

---

[7]     Further answering, Eastern cites Strategic Vision's answer to Paragraph 17 of the SAC but that does not characterize the $1 million payment as a signing bonus.  Strategic Vision's answer also "denies any construction of the Contract that would involve an obligation on the part of Strategic Vision to return the indicated funds to Eastern Profit."  Dkt. 127, p. 4, ¶ 17.

70.     Strategic did not require Eastern to represent in the Research Agreement that Mr. Guo was a dissident who opposed the CCP.

STRATEGIC'S RESPONSE: <u>Not disputed</u> but <u>immaterial</u>.  Guo's dissident status is relevant but not in the current motion.

71.     Strategic did not require Eastern to covenant in the Research Agreement that Eastern would use the investigatory research against the CCP.

STRATEGIC'S RESPONSE: <u>Not disputed</u> but <u>immaterial</u>.  Guo's dissident status is relevant but not in the current motion.

72.     Strategic did not conduct diligence into the background of Eastern or Mr. Guo, including into whether Mr. Guo was truly a dissident or opposed the CCP, before signing the Research Agreement.

STRATEGIC'S RESPONSE:  <u>Disputed</u> but <u>immaterial</u>.  Guo's dissident status, and when Strategic learned the truth of it, are relevant but not in the current motion.

Whether or not formalized under the description "due diligence," Strategic Vision informed itself of Guo's background and plans for the Research Agreement by communicating with Lianchao and Gertz, longtime Washington, D.C. figures, who approached Wallop and Waller in the first instance about associating with Guo.  Wallop 1 Tr., Ex. B1, 11:24-12:21, 89:9-91:1, 31:23-35:7.  They vouched for Guo, and Strategic Vision reasonably relied on them to give credibility and authenticity to Guo and his plans.  *Id.*, 12:16-21, 33:15-21; Gertz Tr., Ex. I1, 17:2-24:21, 25:18-21.  Gertz has covered defense and national security affairs for his entire career (*Id.*, 20:15-21:1); has written eight books, including two on China, including his most recent book, Deceiving the Sky; and also speaks around the country and appears on national news programs.  *Id.*, 7:2-21:10.  Eastern believes as such, asserting in SOF 77 below: "Strategic

relied upon the recommendation of Gertz and Lianchao in choosing to enter into the Research

Agreement."  Eastern cites similar evidence in SOF 78.

> 73.    Ms. Wallop testified that she "never discussed what the research would be
> used for . . . with Mr. Guo or Ms. Wang or Mr. Han."

STRATEGIC'S RESPONSE:  Disputed but immaterial.  Guo's dissident status, and

when Strategic learned the truth of it, are relevant but not in the current motion.

Eastern relies on an incomplete description of Wallop's testimony, which was given in

her personal capacity and not as corporate representative of Strategic Vision.  As cited by

Eastern in part in SOF 74, Wallop (testifying in her personal capacity) did discuss the planned

use of the research by Guo.  In her individual capacity, Wallop was asked, during the time

Strategic Vision was meeting with Guo to discuss the project and before the Research Agreement

was signed (Wallop 1 Tr., Ex. B1, 54:10-17), whether she understood "what the end goal of the

research project as a whole was" (Id., 58:22-59:8).  Wallop testified:  Q. So did you understand

that the research would be used to fight against the communist party in China?  A.· Correct.· We

thought.· We were not sure what they were going to do with it.· Maybe he was going to run it

both ways.· We don't know.  I'm only asking what you thought.  A.· Well, I just gave you my

opinion.  Id., 60:21-61:3.  Wallop also described Strategic Vision's services as providing

substance that Guo would use for political and other "leverage" against the CCP:  "Well, Guo

had said that the CCP, or the communist party of China, there was a great deal of corruption

within the leadership, and, as a·result of that, he wanted to find as much corruption as possible,

and he wanted us to investigate and retrieve that kind of corruption.  In other words, funds that

would have been taken·out of the country illegally, cash payments, all of these things that were

part of that."  Id., 88:3-89:22.  Strategic Vision's corporate testimony was that the research done

under the contract was to aid in the exposure of wrongdoing, including in a moral sense, of CCP members.  Waller 2 Tr., Ex. M1, 96:5-97:24.

74.    Ms. Wallop testified that Strategic did not know for what purpose Eastern was proposing to use the investigatory research and thought that Eastern might "run it both ways."

STRATEGIC'S RESPONSE:  Disputed but immaterial.  Guo's dissident status, how the research would allegedly help foster it, and when Strategic learned the truth, are relevant but not in the current motion.

The context of Wallop's testimony cited here is what she believed Guo *actually did* with the research (in Wallop's words, "what happened to it"), not what Guo or his agents represented to Strategic prior to the contract *would be* the planned use of the research.  Hence, Wallop testified, past tense, "We have no idea what Yvette did with it.· We have no idea what Guo did with it.· We have no idea what happened to it."  Wallop 1 Tr., Ex. B1, 60:6-11.  Wallop further completely dispels the notion that, had she known Guo intended to use the research for anything supportive of the CCP, Strategic still would have entered the contract:  "[w]e cared very much what it was going to be used for.  We are very adamantly anti-communist… We are very pro-democracy."  *Id.*, 60:12-20.  Wallop then testified that Strategic understood the research "would be used to fight against the communist party in China."  *Id.*, 21-61:1.

Moreover, in her individual capacity and not as Strategic Vision, Wallop was asked, during the time Strategic Vision was meeting with Guo to discuss the project and before the Research Agreement was signed (Wallop 1 Tr., Ex. B1, 54:10-17), whether she understood "what the end goal of the research project as a whole was" (*Id.*, 58:22-59:8).  Wallop testified:

Q.  So did you understand that the research would be used to fight against the communist party

in China?· A.· Correct.· We thought.· We were not sure what they were going to do with it.· Maybe he was going to run it both ways.· We don't know.  I'm only asking what you thought. A.· Well, I just gave you my opinion.  *Id*., 60:21-61:3.  In the same testimony, Wallop later described Strategic Vision's services as providing substance that Guo would use for political and other "leverage" against the CCP.  *Id*., 88:3-89:22.  Strategic Vision's corporate testimony was that the research done under the contract was to aid in the exposure of wrongdoing, including in a moral sense, of CCP members.  Waller 2 Tr., Ex. M1, 96:5-97:24.

75.     Strategic waited until after the Research Agreement was signed to begin investigating Mr. Guo's background.

STRATEGIC'S RESPONSE:  Disputed but immaterial.  Guo's dissident status, and when Strategic learned the truth of it, are relevant but not in the current motion.

Strategic Vision was informed by its trusted contacts, Lianchao and Gertz, about Guo before beginning negotiations for the Research Agreement.  Wallop 1 Tr., Ex. B1, 11:24-12:21, 89:9-91:1, 31:23-35:7, 12:16-21, 33:15-21; Gertz Tr., Ex. I1, 17:2-24:21, 25:18-21.  Eastern believes as such, asserting in SOF 77 below:  "Strategic relied upon the recommendation of Gertz and Lianchao in choosing to enter into the Research Agreement."  Eastern cites similar evidence in SOF 78.  Strategic Vision also had numerous meetings and conversations with Guo and his designated representatives in negotiating the contract through which Strategic Vision evaluated more of Guo's background.  Ex. N1, Plt's First Interrog. Resp., Ex. M, Dkt. 267-1, p. 3, No. 5; Wallop 1 Tr., Ex. B1, 199:20-200:9; Wang 1 Tr., Ex. E1, 59:17-60:4.  Further, the testimony cited by Eastern is not of Strategic Vision's corporate representative and was limited to the context of a single activity out of several types available to examine Guo's background— Wallop calling a reference Guo had given her, which was done after the contract was signed:

"He was the one that gave me - he asked me for these references.· I wanted to make sure we had a reference on him.· He said that he worked very closely with the UAE, and it turned out, I guess, he did.  Q.· When were these conversations you had with the Al Nahyan family?  A.· Oh, probably in -- probably about six months after the contract began.  Q.· So you were checking references on Mr. Guo after the agreement was over with? A.·Yes.· We had trusted him up until that time."

76.     Evidence that Strategic is relying upon to show that Mr. Guo misrepresented his status as a Chinese dissident and opposition to the CCP comes from publicly available sources, such as news articles (including in the Wall Street Journal) and YouTube videos, that existed in the public forum before the parties signed the Research Agreement.

STRATEGIC'S RESPONSE: Disputed but immaterial.  Guo's dissident status, and when Strategic learned the truth of it, are relevant but not in the current motion.

The evidence Strategic Vision is relying on is set forth in *its motion here*, Dkt. 266, which Eastern did not have before presenting this blanket assertion.  What Eastern cites to are portions of the record as to particular pieces of evidence establishing Guo's non-dissident status, not all of which predate entry of the Research Agreement.

77.     Strategic relied upon the recommendation of Gertz and Lianchao in choosing to enter into the Research Agreement.

STRATEGIC'S RESPONSE:  Not disputed.  Also not material to this summary judgment review.

78.     Ms. Wallop testified as follows:

- Q.  Okay.  So you didn't do any work regarding Mr. Guo or his business prior to . . . the execution of the contract on or about January 6, 2018?
- A.  No.

-142-

- Q.  You didn't access your network to determine whether this was someone you wanted to do business with or not?
- A.  We had Bill Gertz, who was one of the finest intellects on Chinese corruption, and reporters, journalists, and also Lianchao, again, of the highest sterling standards.  When they asked us to look into it, that's what we did.  That was looking into putting together a program that would help somebody that we believed at the time was absolutely anti-communist.
- Q.  I see.  So you relied up -- let me put it this way.  Strategic Vision relied upon the recommendation of Bill Gertz and Lianchao Han in terms of deciding to do business with, or deciding to enter into the research agreement?
- A. Correct.

STRATEGIC'S RESPONSE:  Not disputed. Also not material to this summary judgment review.

79.     On or about January 8, 2018, Eastern—through Ms. Wang—delivered a list of 15 individuals to Strategic—through Ms. Wallop—on a USB key (the "Subject List") that Eastern wanted investigated under the Research Agreement.

STRATEGIC'S RESPONSE:  Disputed but not material to this summary judgment review. It was *Guo* who wanted the individuals examined and provided the list, not Eastern Profit.  Wang testified: "Have you ever seen this document before?  A.· Yes.  Q.· What is it? A.· They are the name list.  Q.· Where did it come from?  A.· Mr. Guo….Q.· What did he tell you?· Did he tell you to do anything with this document?  A.· He said this is about this project. Q.· And did he instruct you to do anything with it?  A.· Go to talk, discuss about the contract, if signed please deliver this to Strategic Vision.  Q.· And you ended up delivering this to Strategic Vision?  A.· Correct."  Wang 1 Tr., Ex. E1, 213:1-13, 214:15-215:17.  Lianchao Han also testified that it was Guo who chose the list of research subjects:  "Q.  Did you discuss with Mr. Guo which names would be good for the project?  A.  No, not at all.  This is entirely his." Lianchao Tr., Ex. K1, 173:1-3.

Further, the initial attempt by Wang to deliver a USB drive containing 92 subjects of research was on <u>January 6, 2018</u>.  Wallop 1 Tr., Ex. B1, 127:14-24, 280:  14-22, 174:9-176:18, 198:11-199:1, 200:10-202:2, 207:25-208:13, 114:3-115:6, 85:10-17, 114:8-115:6.  The drive was infected with harmful malware, which Wallop discovered when attempting to access it.  *Id.*  Wang then delivered a replacement set of three USB drives on January 8, 2018.  One of the drives was safe and operational.  *Id.*  In taking these actions and making these deliveries, Wang may now claim to have been acting for Eastern Profit, but names were all provided by Guo (and the research was for Guo's benefit).  Guo 1 Tr., Ex. G1, 39:9-19, 45:3-46:16; Wallop 1 Tr., Ex. B1, 88:3-89:22; Wang 2 Tr., Ex. L1, 197:18-208:22, 202:2-204:20, 149:5-150:9, 49:7-21; Lianchao Tr., Ex. K1, 226:10-18.

80.     All of the individuals on the Subject List were members of the CCP.

STRATEGIC'S RESPONSE: <u>Disputed</u>.  The cited testimony does not support the assertion, in violation of Fed. R. Civ. P. 56(c)(1).  This is <u>not material</u> to Strategic's motion.

81.     Many of the individuals on the Subject List were high ranking officials that comprised the key group in control of China's banking system.

STRATEGIC'S RESPONSE: <u>Not Disputed</u>.  This is <u>not material</u> to Strategic's motion.

82-104:[8]  STRATEGIC'S RESPONSE:  Each of these assertions relates to details about when and where Strategic Vision or its agents performed certain acts under the Research Agreement. Eastern relied on these facts for purposes of its own argument (under Eastern's Count III) that Virginia's licensing statute purportedly applied, that Strategic failed to be licensed under it, and that Eastern was entitled to a declaratory judgment that Strategic had violated the statute; that the Research Agreement was against Virginia public policy; and that the Research

---

[8]     The full text of Eastern's SOFs 82-104 can be found at Dkt. 262, pp. 15-18.

Agreement was therefore void. However, with limited exceptions addressed immediately below, none of these allegations have any bearing on Strategic's own Motion for Summary Judgment, Dkt. 266, on Eastern's Counts I (breach of contract); II (fraudulent inducement); and IV (unjust enrichment).

Strategic advances two independent grounds for summary judgment against Eastern on its contract claim: first, that Eastern cannot show it sustained compensable money damages; and two, that Eastern is precluded from a contract recovery because it frustrated Strategic's performance when it failed to supply replacement subjects after Strategic reported that the first 15 subjects were "Records Protected." Of marginal relevance on this second prong of Strategic's contract motion—frustration—are the following paragraphs.

96.     Ms. Wallop uncovered that some of the names on the Subject List were fake, while other names of the Subject List were correct.

STRATEGIC'S RESPONSE:  This was not disputed by Strategic in response to Eastern's motion. On Strategic's own dispositive motion on Eastern's contract claim based on frustration, it is an admission by Eastern showing that before its further performance was frustrated, Strategic was making progress on the list of names and had already determined that some of the names were fake and would need to be replaced.

98.     Ms. Wallop's notes on the Subject List demonstrate that she: 1) verified the identities and relationships of subjects' families; 2) had discovered that one subject was using the same social security number as another person; 3) the nickname of one subject; and 4) the address history of one subject.

STRATEGIC'S RESPONSE:  This was not disputed by Strategic in response to Eastern's motion. On Strategic's own dispositive motion regarding Eastern's contract claim based on

frustration, it is an admission by Eastern showing that before its further performance was frustrated, Strategic was making progress on the list of names.

99.     After receipt of the Subject List, Strategic also retained or attempted to retain independent contractors to perform private investigatory research into the 15 individuals identified in the Subject List.

STRATEGIC'S RESPONSE:  In response to Eastern's motion, Strategic Vision <u>did not dispute</u> that it arranged with independent contractors to perform research into the 15 individuals identified in the Subject List, but controverted that, as a matter of law, this was "private investigatory" research within the meaning of Virginia's private security services statute. Strategic pointed out that Eastern admitted this is a legal matter for the Court when Eastern sought declaratory relief regarding the subject, alleging that the contract is "illegal and void as against public policy."  Second Amended Complaint, Dkt. 93, p. 16. On Strategic's own dispositive motion regarding Eastern's contract claim based on frustration, it is an admission by Eastern showing that Strategic had retained or attempted to retain independent contractors to do the work and thereby was fulfilling Strategic's responsibilities under the contract.

100.    Throughout January, Ms. Wallop and Waller met with members of one of the investigative teams assembled by Strategic—referred to by Strategic as "Team 1"—on a number of occasions in Ms. Wallop's home in Arlington, Virginia.

STRATEGIC'S RESPONSE:  This was <u>undisputed</u> by Strategic on Eastern's motion. On Strategic's own dispositive motion regarding Eastern's contract claim based on frustration, it is an admission by Eastern that Strategic had assembled independent teams and had begun to work with them before Strategic's performance under the contract was frustrated.

100-104.[9]  STRATEGIC'S RESPONSE:  These paragraphs pertain to meetings between Strategic Vision and Team 1 in January, and between Strategic Vision and Team 2 on two other occasions. They were undisputed by Strategic on Eastern's motion. On Strategic's own dispositive motion Eastern's contract claim based on frustration, they are admissions by Eastern that Strategic had assembled independent teams and had begun to work with them during the first two to three weeks of the Agreement before Strategic's performance under the contract was frustrated.

105.    The weekly deliverables called for under the Research Agreement were due by no later than mid-January 2018.

STRATEGIC'S RESPONSE:  <u>On Eastern's motion, this was disputed by Strategic</u> for the following reason: Work under the Research Agreement did not begin until January 16, 2018 by agreement of the parties.  Wang 1 Tr., Ex. E1, 139:4-17; Ex. V1 (Ex. 6 to Wang 1 Tr.), p. 1 ("Eastern agreed to delay the start of the contract by 10 days, from January 6 to January 16."); Dkt. 93, p. 4, ¶ 19.  Under the express terms of the contract, deliverables were to be "produced on a regular schedule" and "others" "on an as-needed basis.  There is no evidence that deliverables were due in mid-January when the work did not begin until January 16, 2018.  The Agreement divided the research contemplated as falling into three categories.  R. Agreement, Ex. F1.  Financial Forensic Historical Research was due in the form of a "progress report" "each week in the first month, one preliminary report in the first month, and one comprehensive [] report within 3 months."  *Id.*, p. 2.  Current Tracking Research "on a monthly basis" except for the first month, where "weekly reports shall be delivered" for a six-month period.  *Id.*  Social

---

9    The full text of Eastern's SOFs 82-104 can be found at Dkt. 262, p. 18.

-147-

Media Research was "on [a] weekly basis for the first month, and on a monthly basis thereafter…" *Id.*

On Strategic's dispositive motion on Eastern's Counts I (contract), II (fraud), and IV (unjust enrichment), this is immaterial. If any relevance could be found, it would be marginal and limited to Strategic's independent ground for dismissing Eastern's contract claim based on Eastern's frustration of performance. As shown above, there is no genuine factual dispute that the start of the Research Agreement was pushed back to January 16, and this date marks the beginning of performance. As Strategic showed in its initial motion papers at SOF 36, Strategic began to perform for the next two weeks until it learned the 15 subjects were "Records Protected." It informed Lianchao Han (acting for Guo) of this fact, and Guo's failure to identify new subjects frustrated Strategic's performance. *See* SOF 44.

106.    Strategic delivered its first USB drive to Eastern pursuant to the Research Agreement on January 26, 2018.

STRATEGIC'S RESPONSE:  On Eastern's motion, this was not disputed by Strategic. This fact is not relevant on Strategic's own dispositive motion, except that for purposes of Strategic's frustration of performance argument, it is marginally relevant to lay out the timeline of the parties' performance and dispute.

107.    Strategic has admitted that the information contained on the USB drive delivered to Eastern on January 26, 2018 was "of no use to Mr. Guo or Eastern Profit because it was nothing more than the researchers' own work to familiarize themselves with the fifteen subjects using open-source information."

STRATEGIC'S RESPONSE:  On Eastern's motion, Strategic did not dispute that the cited testimony was given but disputed that the statement, taken out of context, indicates the true

fact.  The true fact is that the information delivered was not in the format of a "deliverable"

under the Research Agreement because it was forced to be provided prematurely based on an

unreasonable demand by Guo.  Dkt. 127, p. 6, ¶ 24.  The delivery did show the progress being

made by Team 1 which, while not convertible by Guo into public communications for attacking

the CCP, did fulfill Strategic's obligation to show Guo the progress its team was making.  Waller

2 Tr., Ex. M1, 112:11-116:17 ("That was their own basic work.  So the only report, in quotes,

that we provided as a deliverable was showing how the research team was setting up its

methodology to collect this data") and 127:24-129:6.

    This fact is not relevant on Strategic's motion for summary judgment, except that for

purposes of Strategic's frustration of performance argument, it is marginally relevant to lay out

the timeline of the parties' performance and dispute.

    108.    On January 30, 2018, Strategic delivered a second USB drive to Eastern Profit.

    STRATEGIC'S RESPONSE:  On Eastern's motion, this was not disputed. This fact is

not relevant on Strategic's motion for summary judgment, except that for purposes of Strategic's

frustration of performance argument, it is marginally relevant to lay out the timeline of the

parties' performance and dispute.

    109.    The USB drive delivered to Eastern on January 30, 2018 was not "of any use" to

Eastern.

    STRATEGIC'S RESPONSE:  On Eastern's motion, Strategic did not dispute that the

cited testimony was given but disputed that the statement, taken out of context, indicates the true

fact.  The true fact is that the information delivered was not in the format of a "deliverable"

under the Research Agreement because it was forced to be provided prematurely based on an

unreasonable demand by Guo.  Dkt. 127, p. 6, ¶ 24.  The delivery did show the progress being

made by Team 1, which, while not convertible by Guo into public communications for attacking the CCP, did fulfill Strategic's obligation to show Guo the progress its team was making.  Waller 2 Tr., Ex. M1, 112:11-116:17 ("That was their own basic work.  So the only report, in quotes, that we provided as a deliverable was showing how the research team was setting up its methodology to collect this data") and 127:24-129:6.

This fact is not relevant on Strategic's motion for summary judgment, except that for purposes of Strategic's frustration of performance argument, it is marginally relevant to lay out the timeline of the parties' performance and dispute.

110.    The USB drive delivered to Eastern on January 30, 2018 contained "incomplete work product . . . in the form of raw research data."

STRATEGIC'S RESPONSE:  On Eastern's motion, this was not disputed. This fact is not relevant on Strategic's motion for summary judgment, except that for purposes of Strategic's frustration of performance argument, it is marginally relevant to lay out the timeline of the parties' performance and dispute.

111.    Strategic did not deliver any other USB drives to Eastern.

STRATEGIC'S RESPONSE:  On Eastern's motion, this was not disputed, but Strategic asserted it was immaterial because, after this point, Eastern failed to address the unanticipated situation of research subjects falling under a "records protected" designation that prevented the research.  Guo refused to provide replacement subjects that were not Records Protected.  SOF 44; Waller 2 Tr., Ex. M1, 101:11-103:25, 105:21-107:11.

On Strategic's motion, this fact is only relevant to Strategic's "frustration" argument, an independent ground for granting summary judgment against Eastern on its contract (Count I) claim. Strategic believes the undisputed facts show that Eastern frustrated Strategic's

performance, entitling Strategic to summary judgment against Eastern on Eastern's claim for breach of contract. *See* SOF 39-44.

112.    On February 5, 2018, Ms. Wallop met with Waller and Lianchao regarding the Research Agreement in Ms. Wallop's home in Virginia to discuss the investigation.

STRATEGIC'S RESPONSE:  On Eastern's motion, Strategic did not dispute that Wallop, Waller, and Lianchao met on February 5, 2018, at Wallop's Virginia residence to discuss the fact that Strategic Vision's contractors "were finding issues with Guo's fake names and some of Guo's fake information that he had given [Strategic] out of the 15 names that we had," as well as other concerns about "inconsistencies" in the information received from Wang's flash drives and concerns from Team 1, another set of contractors, "that there was a leak within the Guo system."  Wallop 2 Tr., Ex. G2, 20:14-21:25.

On Strategic's motion, this fact is only relevant to Strategic's "frustration" argument, an independent ground for granting summary judgment against Eastern on its contract (Count I) claim. Strategic believes the undisputed facts show that Eastern frustrated Strategic's performance, entitling Strategic to summary judgment against Eastern on its claim for breach of contract. *See* SOF 39-44.

113.    Strategic never delivered to Eastern any "financial forensic [h]istorical research" called for under the Research Agreement.

STRATEGIC'S RESPONSE:  On Eastern's motion, this fact was not disputed but Strategic argued it was immaterial because Guo, for Eastern, in bad faith prevented and frustrated Strategic Vision's performance.  Strategic found that some of the research subjects were "fake," meaning "false people, false persona," "false identities for the purposes of laundering money."  Waller 1 Tr., Ex. H1, 177:25-179:16.  Strategic's contractor Team 2

discovered that the subjects selected by Guo were designated by the U.S. government as "Records Protected"—information concerning the subjects' status and activities was not accessible through legal means.  Wallop 1 Tr., Ex. B1, 232:7-238:20, 239:16-241:4, 285:12-288:24; Waller 2 Tr., Ex. M1, 100:16-103:25, 105:6-108:21.  The purpose of the designation was to ensure that no one, including the individuals themselves, could learn information that would help them determine they were under investigation.  Waller 2 Tr., Ex. M1, 106:15-107:7.  According to ASOG, trying to research subjects known to be "Records Protected" could be a criminal activity.  *Id.*, 100:16-102:16, 106:15-108:21.  ASOG's conviction was so strong that it withdrew a bill to Strategic Vision for $111,700.  Waller 2 Tr., Ex. M1, 105:6-20, 106:15-108:21; Ex. 105 to Waller 2 Tr., Ex. E2.  ASOG instead received $5,412 for finding the "Records Protected" designation.  *Id.*; Waller 2 Tr., Ex. M1, 109:12-110:17, 81:15-17.  Strategic did not receive any subject names before entering the Agreement and had no way of anticipating that the third parties conducting the research would encounter this circumstance.  Wallop 1 Tr., Ex. B1, 83:24-84:7, 85:10-86:11, 174:4-8, 175:3-176:18.  Prior to this, Strategic had not heard of the designation.  Wallop Aff., Ex. C1, Dkt. 267-1, ¶¶ 8.  Nevertheless, Guo refused to discuss the "Records Protected" problem when Strategic Vision notified him.  Wallop 1 Tr., Ex. B1, 139:17-140:23, 285:12-288:24, 136:13-20; Waller 2 Tr., Ex. M1, 100:16-102:16.  He then demanded that Strategic turn over all work done by its contractors, despite many protests by Strategic that it was impossible for the researchers to work faster and have final reports ready in a matter of days.  Wallop 1 Tr., Ex. B1, 230:2-232:13, 285:12-288:24, 139:17-140:23; Waller 2 Tr., Ex. M1, 112:11-116:17, 127:24-129:6; Waller 1 Tr., Ex. H1, 56:19-25, 93:20-95:10.  The Agreement did not require, and no party could physically provide, immediate results; what Guo now

inexplicably demanded on a rush basis was contrary to the Agreement.  Wang 1 Tr., Ex. E1, 154:6-23; R. Agreement, Ex. F1; Gertz Tr., Ex. I1, 141:4-17.

On Strategic's motion, this fact is only relevant to Strategic's "frustration" argument, an independent ground for granting summary judgment against Eastern on its contract (Count I) claim. Strategic believes the undisputed facts show that Eastern frustrated Strategic's performance, entitling Strategic to summary judgment against Eastern on Eastern's claim for breach of contract. *See* SOF 39-44.

114.    Strategic never delivered to Eastern any "current tracking research" called for under the Research Agreement.

STRATEGIC'S RESPONSE:  On Eastern's motion, this fact was not disputed but Strategic argued it was immaterial for the same reasons, and citing the same evidence, cited in its response to Paragraph 113.

On Strategic's motion, this fact is only relevant to Strategic's "frustration" argument, an independent ground for granting summary judgment against Eastern on its contract (Count I) claim. Strategic believes the undisputed facts show that Eastern frustrated Strategic's performance, entitling Strategic to summary judgment against Eastern on Eastern's claim for breach of contract. *See* SOF 39-44.

115.    Strategic never delivered to Eastern any "social media research" called for under the Research Agreement.

STRATEGIC'S RESPONSE:  On Eastern's motion, this fact was not disputed but Strategic argued it was immaterial for the same reasons, and citing the same evidence, cited in its response to Paragraph 113.

On Strategic's motion, this fact is only relevant to Strategic's "frustration" argument, an independent ground for granting summary judgment against Eastern on its contract (Count I) claim. Strategic believes the undisputed facts show that Eastern frustrated Strategic's performance, entitling Strategic to summary judgment against Eastern on Eastern's claim for breach of contract. *See* SOF 39-44.

116.   Strategic has admitted that it "was unable to prepare any detailed reports."

STRATEGIC'S RESPONSE:  On Eastern's motion, this fact was not disputed but Strategic argued it was immaterial for the same reasons, and citing the same evidence, cited in its response to Paragraph 113.

On Strategic's motion, this fact is only relevant to Strategic's "frustration" argument, an independent ground for granting summary judgment against Eastern on its contract (Count I) claim. Strategic believes the undisputed facts show that Eastern frustrated Strategic's performance, entitling Strategic to summary judgment against Eastern on Eastern's claim for breach of contract. *See* SOF 39-44.

117.   On February 23, 2018, Eastern wrote to Strategic terminating the Research Agreement.

STRATEGIC'S RESPONSE:  On Eastern's motion, Strategic did not dispute that Eastern's then-attorney, Foley Hoag, wrote to Strategic on February 23, 2018, and in that letter purported to terminate the Research Agreement without notice.  Wang 1 Tr., Ex. E1, 135:16-141:16; Ex. V1 (Ex. 6 Wang 1 Tr.), p. 1; Wallop 1 Tr., Ex. B1, 241:6-8, 242:19-243:3; Wang 2 Tr., Ex. L1, 211:12-212:15.  Strategic disputed this allegation to the extent Eastern claims the letter was effective not only to terminate the Research Agreement, but to terminate it effective immediately, as of February 23, 2018.  The Research Agreement did not allow such a

termination.  R. Agreement, Ex. F1, p. 5 ("Duration") ("Either party may terminate the contract with 30 days' written notice.").

On Strategic's motion, any dispute regarding this fact is immaterial.

118.    In the termination letter, Eastern demanded that Strategic return the $1 million deposit.

STRATEGIC'S RESPONSE:  On Eastern's motion, Strategic did not dispute this fact, and it is immaterial here, on Strategic's motion except that the return was to be to ACA, not Eastern, further proving that ACA was an investor or contributor on the project and Eastern did not have compensable damages.

119.    Strategic has refused to return the $1 million deposit.

STRATEGIC'S RESPONSE:  On Eastern's motion, Strategic did not dispute that it has not complied with Eastern's demand that it pay $1 million to it or to ACA, although the evidence cited by Eastern refers only to Eastern's demand that Strategic pay $1 million, not to Strategic Vision's actions or the basis for them.

On Strategic's motion, this fact is not material.

120.    Ms. Wallop and Waller met with Lianchao on February 25, 2018 in Ms. Wallop's home in Virginia to discuss, among other things, Eastern's termination of the Research Agreement.

STRATEGIC'S RESPONSE:  On Eastern's motion, Strategic did dispute this fact.  As the Wallop deposition transcript cited by Eastern shows, rather than discussing Eastern's letter purporting to terminate the Research Agreement, "Mike and Lianchao and I were trying to figure out how to handle Guo, because of the fact that we were delivering information and nothing seemed to satisfy him."  Wallop 2 Tr., Ex. G2, 31:23-32:5.

<u>On Strategic's motion, this fact is not material</u>.

121.    Since termination, ACA has demanded repayment of the ACA Loan, and Eastern acknowledges that it remains obligated to repay the ACA Loan.

STRATEGIC'S RESPONSE:  <u>On Eastern's own motion</u>, Strategic disputed this fact, cited substantial contrary evidence (Dkt. 273, pp. 99-101, which is incorporated here by reference) and argued the citation was in violation of Fed. R. Civ. P. 56(c) because what Eastern was citing was not subject to cross-examination and therefore should be inadmissible. ACA's statements to Eastern claiming that ACA wanted repayment on the purported loan, cited for the purpose of showing the loan is real, valid, and had not been forgiven at the time of the statement, are hearsay statements that are inherently unreliable when being reported by Eastern itself. For purposes of Strategic's own dispositive motion, however, these facts, even if they were true, are immaterial. The first independent ground of Strategic's motion is that Eastern cannot show it is entitled to restitutionary return of a deposit that Eastern itself never paid, and never could have paid; nor can Eastern recover ACA's $1 million payment under a reliance theory, as Eastern incurred the purported obligation well before the Research Agreement between Eastern and Strategic was signed. As Strategic has shown above, at SOF 27, and as Eastern failed to effectively controvert in its response, Eastern's only asset was a frozen Hong Kong bank account holding less than $80,000. Even if Eastern's purported plan to publicize Strategic's research (at $9 million per year, or $27 million over three years) had triggered regime change in China, Eastern could never have repaid even the interest on what it now characterizes as a "Loan." (The purported interest was 2% per month, compounded monthly, with the full $1 million due and payable in 6 months.) SOF 28. Further, Eastern admits it entered that Loan before—not after—entering into the Research Agreement. SOF 27-28; Ex. F2, Chunguang Tr. Ex. 35, EASTERN-

000278-80, loan document). This means that, as a matter of law, neither the costs of the Loan nor

the principal are recoverable under Eastern's brand-new "reliance" theory. Accordingly,

Eastern's claims that ACA believes its payment to Strategic was a "loan" to Eastern, and that

Eastern agrees, misses the real issue: that in every way, this was a third-party payment from

ACA to Strategic. ACA in fact did pay Strategic and Eastern itself characterized this as a

"contribution" or, in a legal sense, an investment:

> A Okay. I didn't discuss that yet, but I heard kind of like William would be happy
> to contribute this fund into the entire taking down Chinese Communist Party
> campaign. But I don't have too much details.
> Q So had the research been successful, Mr. Yu would have been happy to write
> off the loan?
> Ms. Cline: Objection to form.
> Possible.

Wang 2 Tr., Ex. L1, 208:2-16, 46:22-47:14, 44:10-47:14, 197:18-198:6, 202:2-204:20, 73:20-

74:8; Ex. X1, Dkt. 267-1, Plt's Third Interrog. Resp., p. 3, No. 2.  Eastern never had a chance of

paying ACA even its supposed "interest" obligations, let alone the principal.


Dated April 27, 2020

                              Respectfully submitted,

                              GRAVES GARRETT LLC

                              _s/ Edward D. Greim_
                              Edward D. Greim, #4240172
                              1100 Main Street, Suite 2700
                              Kansas City, MO 64105
                              Telephone: (816) 256-3181
                              Fax: (816) 256-5958
                              edgreim@gravesgarrett.com
                              ATTORNEY FOR
                              DEFENDANT/COUNTERCLAIMANT

## <u>CERTIFICATE OF SERVICE</u>

This certifies that, on April 27, 2020, the foregoing was served on all counsel of record via the Court's Electronic Case Filing System.

*s/ Edward D. Greim*
Attorney for Defendant/Counterclaimant