# Exhibit B1

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

```
 1   UNITED STATES DISTRICT COURT

 2   SOUTHERN DISTRICT OF NEW YORK

 3   -----------------------------------x

 4   EASTERN PROFIT CORPORATION LIMITED,

 5             Plaintiff-Counterclaim Defendant,

 6                                 Case No.

 7      -against-                  18-cv-2185 JGK

 8   STRATEGIC VISION US, LLC,

 9             Defendant-Counterclaim Plaintiff,

10   vs.

11   GUO WENGUI a/k/a, MILES KWOK,

12             Counterclaim Defendant.

13   -----------------------------------x

14

15

16             VIDEOTAPED DEPOSITION

17                   OF

18             FRENCH WALLOP

19           New York, New York

20         Tuesday, February 12, 2019

21

22

23

24

25
```

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 6

|   | LIST OF EXHIBITS |   |
|---|---|---|
| 1 |  |  |
| 2 | WALLOP         DESCRIPTION | PAGE |
| 3 | Exhibit 19  Strategic Vision's Responses | 262 |
| 4 |             and Objections to |  |
| 5 |             Plaintiff's First Set of |  |
| 6 |             Interrogatories |  |
| 7 | Exhibit 20  Strategic Vision's | 271 |
| 8 |             Supplemental and Amended |  |
| 9 |             Response and Objections to |  |
| 10 |            Plaintiff's First Set of |  |
| 11 |            Interrogatories |  |
| 12 | Exhibit 21  Amended Answer and | 275 |
| 13 |            Counterclaims |  |
| 14 | (Exhibits retained by Counsel.) |  |
| 15 |  |  |
| 16 | (*r) DOCUMENTS REQUESTED: |  |
| 17 |      Page:  118          11 |  |
|    |      Page:  253          22 |  |
| 18 |      Page:  273          6 |  |

Page 7

```
 1        THE VIDEOGRAPHER:  Good morning.  This
 2  is the beginning of media 1 in the matter
 3  deposition of French Wallop, in the matter
 4  of Eastern Profit Corporation Limited versus
 5  Strategic Vision US, LLC.
 6        Today's date is February 12, 2019.  My
 7  name is Jaysun Loushin, I am the
 8  videographer, and the court reporter is
 9  Roberta Caiola.  We are here with Huseby
10  Global Litigation.
11        Counsel, please introduce yourself,
12  after which the court reporter will swear in
13  the witness.  The time on the monitor is
14  9:58.
15        MR. GRENDI:  Good morning.  I'm Zach
16  Grendi.  I'm counsel for Eastern Profit
17  Corporation.  My law firm is Zeichner,
18  Ellman & Krause.
19        MR. SCHMIDT:  Joe Schmidt from Phillips
20  Lytle, on behalf of Strategic Vision as well
21  as the witness, French Wallop.
22        MS. TESKE:  Erin Teske with Hodgson
23  Russ, on behalf of third-party defendant
24  Miles Kwok.
25
```

Page 8

```
 1  FRENCH WALLOP, called as a witness, having been
 2  first duly sworn by a Notary Public of the State
 3  of New York, testifies as follows:
 4  EXAMINATION BY
 5  MR. GRENDI:
 6      Q.    Good morning, Ms. Wallop.  I'm Zach
 7  Grendi, as you just heard, counsel for Eastern
 8  Profit.  I'm just going to be asking you some
 9  questions today.
10            Just for the courtesy of the court
11  reporter and the clarity of the record, I'm just
12  going to ask that, please wait until after I
13  finish asking a question to answer it.  Unlike in
14  normal conversation, in a deposition you need to
15  allow one person to stop talking and the other
16  person to start.
17            Also, shrugs and nods are things that
18  the court reporter can't take down, so I ask that
19  you please answer all questions verbally.  And if
20  you need a break, just let me know, let anyone
21  know, we can take one.  We're going to try to
22  move through this -- these materials as quickly
23  as possible, but breaks are allowed.
24      A.    Thank you.
25      Q.    What's your full legal name?
```

Page 9

```
 1      A.    French Carter Wallop.
 2      Q.    And where do you reside?
 3      A.    1557 North 22nd Street, Arlington,
 4  Virginia 22209.
 5      Q.    And --
 6      A.    And I also have a Wyoming address.
 7      Q.    Do you have a Las Vegas address?
 8      A.    Yes.
 9      Q.    Where is that?
10      A.    It's on Lakes Avenue.  It's -- it's
11  where we use as our agent for the LLC for
12  Strategic Vision.
13      Q.    So that's Strategic Vision's address --
14      A.    Yes.
15      Q.    -- in Las Vegas?
16      A.    Not personal.
17      Q.    Okay.  What's your educational
18  background?
19      Q.    Where would you want to start?
20      Q.    You can start in the beginning, but --
21      A.    Kindergarten?
22      Q.    -- no need to go into great depth.
23  Just an overview, if that's all right.
24            MR. SCHMIDT:  From college up.
25      A.    I went to a school in Switzerland for
```

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 10

1   four years.  And then I was at the Ecole
2   D'Interpretes in Geneva.  And then I came back to
3   Georgetown University and got my linguistic's
4   degree in simultaneous interpreting.
5        Q.    Anything else?
6        A.    I did -- I didn't finish, but I went to
7   SAIS, The School of Advanced International Study,
8   which is part of Johns Hopkins; so it doesn't
9   count as a degree, sadly.
10       Q.    What about your work experience, let's
11  just say the last 20 years or so?
12       A.    Oh, my goodness.
13       Q.    You don't have to say everything.  Just
14  an overview.
15       A.    Well, I've run two companies, and
16  plus -- and I sold them in 2000.  And then in
17  about 2005, I started up my Strategic Vision
18  group.
19       Q.    In 2005, starting Strategic Vision, is
20  that what you've been doing ever since?
21       A.    Yes.
22       Q.    Any other employment that you have or
23  businesses that you're running, other than
24  Strategic Vision?
25       A.    Yes.  I have another company that's

Page 11

1   called Regency Mayfair Worldwide, and that works
2   overseas on projects.
3        Q.    What kind of projects?
4        A.    Family office groups.
5        Q.    What do you mean by that?  What kind of
6   projects do you do for family office groups
7   through this Mayfair company?
8        A.    Investment -- investment advisory.
9        Q.    Okay.  So nothing to do with
10  investigatory research or things of that nature?
11       A.    No.
12       Q.    How do you know Michael Waller, or John
13  Michael Waller?
14       A.    Well, Mike Waller is the way we refer
15  to him, or Dr. Waller.  Gosh, I've known Mike for
16  many, many years.  I would say, certainly,
17  certainly 20.  And our paths have crossed many
18  times in Washington on both international affairs
19  and intelligence groups.
20       Q.    When did Mr. Waller -- well, I'll call
21  him Dr. Waller.
22       A.    Yes, he is Dr. Waller.
23       Q.    He didn't insist on it the last time,
24  but fair enough.  When did you start -- or when
25  did Strategic Vision start working with

Page 12

1   Dr. Waller?
2        A.    I would say in the last year and a
3   half.
4        Q.    And how did that come about?
5        A.    We had an -- I had an introduction by
6   Bill Gertz and Lianchao Han regarding this
7   particular client.  I'm not sure, by the way, how
8   to refer to this client.  We've referred to him
9   as Miles Guo, G-u-o.
10       Q.    Eastern Profit is fine.
11            MR. SCHMIDT:  Well, you know, you refer
12       to him however you think the client is.
13       A.    He has about six names, so I'm not sure
14  what goes into the record.
15       Q.    Whatever you know.
16       A.    We refer to him as Miles Guo.  But I
17  was referred to him by both Bill Gertz, the
18  Washington Times and the Free Beacon, and
19  Lianchao.  And I -- when they approached me,
20  that's when I decided Mike was one of the people
21  I really wanted to work with on this.
22       Q.    But I wanted to ask you.  Have you ever
23  worked with Dr. Waller on any investigatory
24  research before, as you said, you were introduced
25  to Mr. Guo?

Page 13

1        A.    No.  No.
2        Q.    Since you were introduced to Mr. Guo,
3   have you and Dr. Waller worked on any other
4   investigatory research together for another
5   client?  You don't have to name them.
6        A.    I can't name them.
7        Q.    No, I'm saying whether you have or have
8   not provided --
9        A.    Yes.
10       Q.    -- a service to another client?
11       A.    Yes, but -- yes.
12       Q.    Okay.  I didn't ask you to name the
13  client.
14       A.    Don't worry.
15       Q.    And how many other clients have you and
16  Dr. Waller worked on investigatory research for?
17       A.    I can't answer that.
18       Q.    So you're refusing to answer that
19  question?
20            MR. SCHMIDT:  No, no, I don't think
21       that's what she's saying.
22            MR. GRENDI:  Okay.
23       Q.    How many?
24       A.    Four.
25            MR. SCHMIDT:  Approximately?  Okay.

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 14

1      THE WITNESS:  Approximately, yeah.
2      MR. GRENDI:  I'm going to ask that you
3  not try to interrupt.
4      MR. SCHMIDT:  I'm trying to keep you
5  guys moving forward.
6      MR. GRENDI:  I appreciate that, but I'm
7  not trying to --
8      MR. SCHMIDT:  I think you knew what she
9  meant and kind of accused her of refusing to
10  answer.  I don't think that was appropriate,
11  so that's when I had to step in, okay?
12      MR. GRENDI:  I didn't think that that's
13  what I was doing.  I was --
14      MR. SCHMIDT:  Okay.  That's how it was
15  coming across on the record, so I clarified
16  it.
17      MR. GRENDI:  Okay.  Fair enough.
18      Q.   So you and Dr. Waller have worked on
19  approximately five different investigatory
20  research projects with Strategic Vision?
21      A.   Yes.
22      Q.   And none of them preceded your
23  introduction to Mr. Guo?
24      A.   No.
25      Q.   No, they did not precede --

Page 15

1      A.   No.
2      Q.   -- or --
3      A.   They did not.
4      Q.   Prior to working with Dr. Waller, did
5  you work with someone else in terms of
6  investigatory research for Strategic Vision?
7      A.   When?
8      Q.   Before you started working with
9  Dr. Waller, so let's say prior to a year and a
10  half ago.
11      A.   Yes.
12      Q.   And was it just one entity or several
13  entities?
14      A.   I can't remember.
15      Q.   Without going into any detail.  Was
16  that a similar arrangement to your arrangement
17  with Dr. Waller in terms of the provisioning of
18  investigatory research?
19      A.   No.
20      Q.   How was it different?
21      A.   I can't remember.
22      Q.   When did you stop working with someone
23  else on investigatory research prior to working
24  with Dr. Waller?
25      A.   That's an odd question.  I don't know

Page 16

1  how to answer it.
2      Q.   You don't understand the question?
3      A.   No, I don't understand the question.
4      Q.   Okay.  What I'm saying is, when did you
5  stop working with someone else in terms of
6  providing investigatory research?
7      A.   I didn't say I had stopped.
8      Q.   So you work with, concurrently, other
9  individuals who provide investigatory research
10  for Strategic Vision?
11      A.   From time to time.
12      Q.   Okay.  So you don't have an exclusive
13  relationship with Dr. Waller in terms of
14  investigatory research that he provides?
15      A.   No.
16      Q.   Okay.  You said that you founded
17  Strategic Vision in 2005?
18      A.   I think so.  I'd have to look.
19      Q.   Okay.  Was anyone else involved in the
20  company at the time?
21      A.   No.
22      Q.   So it's always been your company?
23      A.   Yes.
24      Q.   And you've never had any other
25  officers?

Page 17

1      A.   No.
2      Q.   Or directors?
3      A.   No.
4      Q.   Or unit holders?
5      A.   No.
6      Q.   Have there been any other principals of
7  Strategic Vision, other than you?
8      A.   No.
9      Q.   So what's your role in Strategic
10  Vision?
11      A.   I run certain advisory clients and work
12  with them as clients, private clients.
13      Q.   Do you have a title, like CEO?
14      A.   Yes, I think it's CEO.
15      Q.   So what services does Strategic Vision
16  provide to its clients?
17      A.   I've already answered that.
18      Q.   I don't think you have.
19      A.   I said advisory services.
20      Q.   What do you mean by advisory services?
21      A.   Advisory client services.
22      Q.   Does that include investigatory
23  research?
24      A.   Yes, in some cases.
25      Q.   What does that investigatory research

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

1  involve?
2      A.    Exactly as it says.  Each client is
3  different, isn't it?
4      Q.    Right.  What I'm asking is, what does
5  Strategic Vision's investigatory research
6  services entail?
7      A.    Every client is different.
8  Investigatory services is exactly that, depending
9  upon how you want to define investigations.
10     Q.    How does Strategic Vision provide that
11  service, what does it do?
12     A.    Investigate.
13     Q.    How?
14     A.    The usual ways.
15     Q.    What are the usual ways?
16     A.    I find it's a repetitive question.
17     Q.    I don't care if you find it a
18  repetitive question.  What I'm asking you to do
19  is answer my question.
20            I want to know how Strategic Vision
21  performs investigations?
22     A.    We look everybody up on Facebook.
23     Q.    That's it?
24     A.    Sure.  It's an idiotic question.
25            MR. SCHMIDT:  Don't comment.  Just

1       answer the question.
2      Q.    Excuse me, ma'am, I'm just trying to
3  understand things.  And I think -- maybe you
4  don't understand how a deposition works, but I'm
5  just trying to understand basic information.  You
6  might think something is obvious or intuitive,
7  but the record doesn't know that and we don't
8  know that.  So I please ask you to cooperate.
9      A.    Of course.
10     Q.    So other than looking people up on
11  Facebook, how does Strategic Vision perform
12  investigations?
13     A.    We do investigative background work on
14  individuals that other clients are interested in
15  pursuing information on.
16     Q.    So that background work, does that
17  involve surveillance or electronic research; give
18  me a little detail on what it means to
19  investigate someone for background?
20     A.    Precisely.  Just as you said.
21     Q.    Does Strategic Vision do that
22  investigatory research itself?
23     A.    No.
24     Q.    So you never perform any research
25  yourself?

1      A.    No.
2      Q.    Who does?
3      A.    Whomever we bring on board to do the
4  investigation.
5      Q.    So Strategic Vision hires independent
6  contractors?
7      A.    Our own team of people that we have
8  worked with off and on through the years, yes.
9      Q.    Do you or Strategic Vision provide any
10  input or edits to any of the reports?  I mean,
11  what does Strategic do in terms of --
12     A.    We review the reports.
13     Q.    Do you ever edit them?
14     A.    I wouldn't say edit them, no.
15     Q.    How does Strategic Vision contribute to
16  the end work product of an investigatory research
17  report?
18     A.    Well, when we get them, we look at them
19  and we read them, depending upon who the teams
20  are, and discuss them, and then produce them.
21  Sometimes they can be verbal, sometimes they can
22  be on flash drives.  It depends what the client
23  needs.
24     Q.    Does Strategic Vision -- well, let me
25  ask you this.  Strike that.

1            Do you ever access a network of
2  individuals that you're familiar with to get
3  information for investigatory research?
4      A.    Sometimes.
5      Q.    And just, without naming any names,
6  describe what that entails?
7      A.    Experience.
8      Q.    Right.  Do you speak to individuals in
9  the intelligence community?
10     A.    Yes.
11     Q.    Politicians?
12     A.    Sometimes.
13     Q.    People in the business community?
14     A.    Yes.
15     Q.    And then you take that information and
16  perhaps include that in an investigatory research
17  report, or how does that work?
18     A.    It depends on the client.
19     Q.    Give me an example of a client where
20  you did access that network in order to
21  contribute?
22     A.    I can't do that precisely.
23     Q.    Not with any specificity?
24     A.    Just as I said.  We are very careful
25  about the investigations that we do, they're

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 22

1   private, and if they are what the client has
2   requested, that's what we do.
3           MR. SCHMIDT:  French, maybe you can
4       give a response to these questions just kind
5       of a 30,000-foot level in general of what
6       you do would, different ideas you've done
7       over the years, that might be helpful.
8           THE WITNESS:  Okay.
9           MR. SCHMIDT:  Like types of things
10      you've done to research people, that sort of
11      thing.
12      Q.    Please go ahead.
13          MR. SCHMIDT:  Yeah, go ahead.
14      A.    With what?
15      Q.    What he just asked.
16      A.    Go ahead, ask me the question again.
17      Q.    Can you please give an overview of the
18  types of research investigations that Strategic
19  Vision does and how they do them?
20      A.    We look at individual clients or groups
21  or companies or areas of interest on behalf of
22  our clients, whether it's international, whether
23  it's domestic.
24      Q.    And how many investigations over the
25  years has Strategic Vision handled?

Page 23

1       A.    Oh, my goodness, I have no idea.
2       Q.    Ballpark?
3       A.    I have no idea.
4       Q.    Fifty?
5       A.    No.  I would say probably, maybe 15,
6   20, something like that.
7       Q.    That's since 2005?
8       A.    It's probably more than that, but since
9   2005, yeah.
10      Q.    Okay.  And other than investigatory
11  services, what kind of services does Strategic
12  Vision provide?
13      A.    As I've said earlier, we work with
14  clients on advisory services for family offices.
15      Q.    That's part of Strategic Vision's
16  business?
17      A.    I've already stated that.
18      Q.    You mentioned another entity, that's
19  why I wasn't sure if you'd separated the two
20  entities or you --
21      A.    No, you were very sure.  You didn't --
22  that's not a fair statement.
23          MR. SCHMIDT:  Just answer the question,
24      French.
25          THE WITNESS:  Okay.

Page 24

1       Q.    And Strategic Vision doesn't have any
2   employees?
3       A.    No.
4           MR. GRENDI:  Let's do Exhibit 1 here.
5           (Wallop Exhibit 1, Notice of
6       Deposition, marked for identification.)
7       Q.    Ms. Wallop, do you recognize this
8   document?
9       A.    I'm sure it's in the file.  I don't
10  recognize it particularly.
11      Q.    If you turn to the third page there, do
12  you see that, Attachment A?
13      A.    Yes.
14      Q.    And just generally speaking, do you
15  understand that this is a 30(b)(6) deposition
16  notice?
17      A.    Yes.
18      Q.    And did you review this document prior
19  to today?
20      A.    Actually, I did not.
21      Q.    Did you prepare for this deposition in
22  any way?
23      A.    Of course.
24      Q.    You met with your attorneys?  And I'll
25  just caution you right away, don't tell me

Page 25

1   anything you said to your attorneys or your
2   attorneys said to you.
3       A.    Well, exactly, of course I discussed it
4   with my attorneys.
5       Q.    And did you meet and go over documents
6   in preparation for this deposition?
7           MR. SCHMIDT:  You can say yes or no.
8       A.    Yes.
9       Q.    How long did you do that for?
10      A.    Today, or ever, or?
11      Q.    All in, sure, all together.
12      A.    Sure.  I have no idea what the answer
13  would be.
14          MR. SCHMIDT:  Just do the best you can.
15      A.    Okay.  How about -- for today's
16  deposition?
17      Q.    Yes.
18      A.    Okay.  How about 3 hours, by telephone
19  or something.
20          MR. SCHMIDT:  We had met in person
21      before, you should tell him that.
22      A.    Oh, we had a coffee before, or I had a
23  coffee.
24      Q.    And you prepared with your attorney
25  here, Mr. Schmidt?

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 26

1   A.   Yes.
2   Q.   Did you go over any documents?
3   A.   No.
4        MR. SCHMIDT:  I think you should tell
5   him that, at the initial meeting we had, we
6   went over the --
7   A.   Oh, well, of course --
8        MR. SCHMIDT:  -- the documents.  That
9   counts as well.  You should --
10        THE WITNESS:  I thought he was talking
11   about the 30 minutes that we met for coffee
12   before we walked across the street.  So,
13   okay.
14        MR. SCHMIDT:  Fill out the record.
15        THE WITNESS:  So, all right.  Yeah, no,
16   obviously.
17   Q.    Let's clean that up, just so I
18   understand.  Did you go over documents in
19   preparation for this deposition?
20   A.   Yes.
21   Q.   Okay.  Let's go to the next document.
22   Just generally speaking, you understand that I'll
23   be asking questions addressed to Strategic
24   Vision.  In response to those, you'll be
25   answering on behalf of Strategic Vision; you

Page 27

1   understand that, right?
2   A.   Correct.
3        MR. GRENDI:  This is Exhibit 2.
4        (Wallop Exhibit 2, Document Bates
5        stamped Eastern 000017, marked for
6        identification.)
7   Q.    Ms. Wallop, I've handed you a document
8   that has the Bates number Eastern 17 in the
9   bottom right-hand corner of the first page, do
10   you see that?
11   A.   Correct.
12   Q.    Just so you -- for the clarity of the
13   record and for your own edification, sometimes
14   I'll be referring to documents by their Bates
15   number, just to be clear, and I just want to make
16   sure you know what a Bates number was.
17   A.   Thank you.
18   Q.   Do you recognize this document?
19   A.   It looks like a LinkedIn document or
20   print-off.
21   Q.   So did you create the content in this
22   document?
23   A.   Yes.
24   Q.   And did you ever give this information
25   to Mr. Guo or Yvette Wang or Michael -- or

Page 28

1   Dr. Waller -- or, I'm sorry, Lianchao Han?
2   A.   It's public.
3   Q.   I understand that.
4   A.   I have no idea whether they saw it or
5   not.
6   Q.   I'm asking whether you personally gave
7   it to them?
8   A.   I have no idea.
9        MR. SCHMIDT:  Do you remember giving it
10   to them?
11        THE WITNESS:  No.
12   Q.   Okay.  And it says here, "over a
13   40-year period, the principal has developed and
14   maintained connections with many U.S.
15   administrations, Congress, DOD, DOE and other
16   agencies."  Do you see that?
17   A.   Correct.
18   Q.   And that's your network of contacts
19   being referred to there?
20   A.   Correct.
21   Q.   And if you look a little further down
22   the page, it mentions strategic research, do you
23   see that?
24   A.   Yes.
25   Q.   Is that investigatory research; I mean,

Page 29

1   what does that mean?
2   A.   It can be.
3   Q.   What about competitive intelligence,
4   that's the last item there?
5   A.   Yes.  What about it?
6   Q.   Is that inclusive of investigatory
7   private research or investigations?
8   A.   In some cases, yes.
9   Q.   Is private investigations a specialty
10   of Strategic Vision or does it really provide a
11   broader suite of services?
12   A.   Broader suite, but it's inclusive of
13   that, if required.
14   Q.   Would you consider investigatory
15   research a core service of Strategic Vision?
16        MR. SCHMIDT:  Objection.  Go ahead.
17   A.   No.
18   Q.   So it's kind of like a side service
19   that Strategic Vision provides?
20        MR. SCHMIDT:  Same objection, but go
21   ahead.
22   A.   It depends on the client's request.
23   Q.   So sometimes it's the general focus of
24   Strategic Vision's service to a client and other
25   times it's not even part of the service?

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 30

1    A.   Correct.

2    Q.   Does Strategic Vision provide lobbying

3  services?

4    A.   Again, that depends on the client.  We

5  don't do it directly, but we will work with

6  people that are lobbyists.

7    Q.   So sometimes --

8    A.   Sometimes.

9    Q.   -- Strategic Vision provides lobbying

10  services?

11    A.   Sometimes, yes.

12        MR. GRENDI:  This is 3.

13        (Wallop Exhibit 3, Document Bates

14    stamped SVUS000077, marked for

15    identification.)

16    Q.   Ms. Wallop, do you recognize this

17  document?

18    A.   I do.

19    Q.   What is it?

20    A.   It is a preliminary sort of vision for

21  Miles Guo, for our first meeting, I believe, with

22  him, that both Mike Waller, Dr. Waller and I

23  worked on.

24    Q.   So the handwriting on the top right

25  corner, is that your handwriting?

Page 31

1    A.   Yes.

2    Q.   And when did you make that note, if you

3  recall?

4    A.   I'd have to -- to look on my paper

5  calendar.  I don't remember.

6    Q.   You have a paper calendar that you

7  keep?

8    A.   No.  I'd have to look -- I'd have to

9  look.  I remember it was sort of -- there was --

10  there was one meeting in early December, and I

11  don't have that with me.

12    Q.   Ms. Wallop, do you keep a calendar?

13    A.   No, I don't keep anything on -- I keep

14  notes, sticky notes, so.

15    Q.   You don't keep like a Google

16  calendar --

17    A.   No.

18    Q.   -- or electronic calendar?

19    A.   God, no.

20    Q.   You keep paper Post-it notes to track

21  your meetings and schedule?

22    A.   Yes.

23    Q.   How were you introduced to Mr. Guo?

24    A.   Through Bill Gertz and Lianchao Han.

25    Q.   And when did that come about?

Page 32

1    A.   I think sometime in late October or

2  early November.

3    Q.   Of what year?

4    A.   2017.

5    Q.   Do you recall if it was Mr. Gertz or

6  Mr. Han that called you, or how did that

7  interaction occur?

8    A.   That's a good question.  I think it was

9  Bill Gertz.  I think he may have called me.

10    Q.   And what did he tell you?

11    A.   He knew that I had been working in the

12  past for Taiwan and had been very active in

13  pro-democracy work, and I think he said at that

14  point he would like to have lunch with me, and,

15  possibly, Lianchao was at that first lunch.  I

16  think that was how it went.

17    Q.   Those were the three people who were

18  present at that lunch?

19    A.   Yes.  The three of us, yes.

20    Q.   And what was discussed there?

21    A.   He discussed Mr. Guo, and that he had

22  met with him, I guess, a number of times, I don't

23  know over what period of time, but that he

24  believed that he was looking for a group that

25  could help change his -- Mr. Guo -- Miles Guo's

Page 33

1  image in America.  He explained a little bit

2  about Miles Guo's issues, and we discussed at the

3  time how perhaps there might be a way of helping

4  him stay in the United States.

5    Q.   What were the issues that you just

6  mentioned?

7    A.   Pro-communist people that were

8  apparently after him.  There were many lawsuits

9  apparently that had been filed against Mr. Guo.

10  We didn't know anything about Mr. Guo, per se,

11  other than some of the media reports.

12        So Lianchao suggested that we meet with

13  him, and I said, well, I will -- I'll think about

14  it and get back to you.

15    Q.   And so, you said before that you knew

16  Mr. Gertz from years in politics or what's

17  your --

18    A.   He used to be, he still is, he's still

19  at the Washington Times, and he writes for the

20  Washington Times, and he's now with the

21  Washington -- Washington Times.

22        MR. SCHMIDT:  Times or Post?

23        THE WITNESS:  Washington Times.  Good

24    God, not the Washington Times.

25    Q.   It's a different -- it's a different

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
**French Wallop on 02/12/2019**

Page 34

```
1   outfit.
2       A.    Yeah.  And the -- it's certainly
3   conservative, it was run under the time when
4   Arnaud de Borchgrave was the editor, along with
5   several other close friends, and he's now at the
6   Washington Free Beacon, I think, mostly.
7       Q.    Is that another right of center
8   publication?
9       A.    Um-hum.  I think I would call it a
10  center and conservative.  I wouldn't call it
11  right of center.
12      Q.    I was --
13      A.    I mean, really?
14      Q.    -- asking for your -- I was asking for
15  your understanding of it.
16      A.    Well, you've got my understanding of
17  it.
18      Q.    Thank you.
19      A.    You're welcome.
20      Q.    And how do you know Lianchao Han?
21      A.    Lianchao and I have crossed paths in
22  Washington off and on over the years, maybe
23  because of some of the Taiwan activities in
24  Washington.  But I've always sort of known him
25  and liked him.  I never worked with him.  But
```

Page 35

```
1   he's an excellent individual.
2       Q.    Did Strategic Vision pay any referral
3   fees or any other consideration to Mr. Han for
4   introducing Mr. Guo to you?
5       A.    Good Lord, no.
6       Q.    What about Mr. Gertz?
7       A.    Never.
8       Q.    Okay.  And going back to this first
9   meeting document.  Did you present this document
10  to Mr. Guo or was this just you and Mr. Waller's
11  notes?
12      A.    I know that we presented one that was
13  very similar to this, and I think a bit more --
14  it might have been a bit more extensive, but it
15  encapsulated.  We were probably trying to keep it
16  short and concise, but we did -- we did work on
17  this vision based upon what both Mr. Gertz and
18  Lianchao had told us about him and what his sort
19  of ambitions were for remaining in the United
20  States.
21      Q.    So did you and Dr. Waller create this
22  document after your meeting with Mr. Han and
23  Mr. Gertz?
24      A.    Yes.
25      Q.    And how did that collaboration come
```

Page 36

```
1   about?
2       A.    Well, I talked -- I mentioned to Bill,
3   I said, one of the people that I like a lot and
4   have worked with on a couple of things, but not
5   monetary, but just ideological, was Dr. Waller,
6   and I'd like to bring Dr. Waller in on this.  And
7   he said, wow, that would be phenomenal.  So, here
8   we are.
9       Q.    And did you speak to Mr. Guo before
10  putting this document together or was this just
11  based on your conversations with Mr. Han and
12  Mr. Gertz?
13      A.    I know that we had a preliminary one,
14  then we met with Mr. Guo, we did something
15  similar to this and gave it to him, I believe,
16  and -- and then we had, obviously, several other
17  meetings after that with Mr. Guo.
18      Q.    So, just speaking about this first
19  meeting.  Where did it occur?
20      A.    With Mr. Guo?
21      Q.    Yes.
22      A.    Okay.  In his apartment at the
23  Sherry-Netherland, his penthouse.
24      Q.    And when was that?
25      A.    I don't have a date on here, so I can't
```

Page 37

```
1   tell you.
2       Q.    From your memory.
3       A.    Well, it would have been in December at
4   some point.
5       Q.    December 2017?
6       A.    Yes, sorry.
7       Q.    That's okay.  What occurred at that
8   meeting?  What did you present and what did
9   Mr. Guo say?
10      A.    I believe Lianchao was also there -- I
11  know he was there, and Dr. Waller and I were
12  there, and we discussed his -- that is, Miles
13  Guo's life, his intentions, his questions about
14  investigative work; all of that was part of the
15  conversation.
16            He wanted to be -- he wanted to have a
17  presence in Washington, he wanted to buy real
18  estate in Washington, he wanted to buy a very
19  large bank building in Washington right across
20  from the White House, he wanted to buy a huge
21  house in Washington.  All of these things were
22  part of his sort of image building.
23      Q.    And those were his ideas?
24      A.    Yes.
25      Q.    But you hadn't met with Mr. Guo before
```

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 38

1  this meeting, right?
2      A.   No.  But the meeting went on for hours
3  and hours and hours.  You're asking what was the
4  content of the meeting.
5      Q.   Yes.
6      A.   Yes, that's what I'm saying.
7      Q.   So was this document written during the
8  meeting or before?
9      A.   I think this one may have been -- may
10  have been before, but -- yes, I think it was
11  before, because it doesn't mention the real
12  estate and so forth that he got into during the
13  meeting.  So this might have been sort of like
14  a -- it is sort of a vision paper, based on a
15  conversation with Mr. -- with Bill Gertz and with
16  Lianchao Han.
17      Q.   What do you recall saying about
18  Strategic Vision's capabilities and background?
19  Actually, let's just start with capabilities.
20          Do you recall presenting about what
21  Strategic Vision could do for Mr. Guo?
22      A.   We were talking ideologically mostly
23  about what could be done to help present his
24  views on communist China, on mainland China.  And
25  so we didn't get into specifics at the very

Page 39

1  beginning.  We just started sort of having an
2  initial conversation about how -- how we felt he
3  could be represented in Washington and how we
4  could show his positive side.
5      Q.   And did you explain what Strategic
6  Vision does or how Strategic Vision could help
7  with that?
8      A.   Probably.
9      Q.   Do you recall what, if anything, you
10  said about that?
11      A.   Not precisely, no.  Generalities.  This
12  was someone we just met, and it is the custom in
13  Asia not to dive into a lot of details unless
14  you're asked.
15      Q.   So did Mr. Lianchao Han or Mr. Guo ask
16  about Strategic Vision's capabilities?
17      A.   Eventually.
18      Q.   But not at this meeting?
19      A.   Not entire -- I don't recall.
20      Q.   Okay.
21      A.   But they could have, but I don't
22  precisely recall.
23      Q.   Was investigatory research discussed in
24  any detail at this first meeting?
25      A.   It could have been.  It could have

Page 40

1  been.
2      Q.   What do you remember about that?
3      A.   I remember that we discussed that Miles
4  Guo said that he had a number of people that he
5  wanted to know more about that were in mainland
6  China, but we didn't have any specifics at that
7  time what he was talking about.
8      Q.   Did Strategic Vision mention that it
9  could provide that information or that it had
10  that capability?
11      A.   I don't recall.  It could have.
12      Q.   Turning to the last page there, SV79.
13  It says, "Mr. G should maintain his statesmanlike
14  status by not engaging in everyday defense or
15  counterattack, and should leave it up to his own
16  surrogates."
17          Do you see that?
18      A.   Where is that?
19      Q.   It's the first sentence of the last
20  paragraph.
21      A.   Oh, the regime, yeah.  Okay.  "Those
22  surrogates will be in journalism, academia,
23  business, policy."  Yes, yes.  Okay.
24      Q.   Do you remember talking about that
25  subject at this meeting?

Page 41

1      A.   Probably.
2      Q.   And what do you remember?
3      A.   I don't remember precisely.  It's over
4  a year ago.
5      Q.   And you don't remember what Mr. Guo
6  said about that, or anybody else?
7      A.   It was a general, initial conversation
8  with somebody that we did not know, and we were
9  asked to produce something that we felt could be
10  a good vision for him to consider, perhaps, yeah.
11          (Wallop Exhibit 4, Document entitled
12      "Three-Year Timeline" Bates stamped
13      SVUS000080, marked for identification.)
14      Q.   Do you recognize what's been marked as
15  Waller 4?
16      A.   Yes.
17      Q.   And what is this document?
18      A.   Wallop.
19      Q.   Oh, sorry, Wallop.  I apologize.  The
20  W.  Wallop 4.
21      A.   Yes.
22      Q.   Did you create this document?
23      A.   Yes.  Mike and I did.
24      Q.   When was that?
25      A.   That was at the second meeting with

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 42

1   Miles Guo.
2       Q.      So you remember literally typing and
3   creating this document during the meeting?
4       A.      No.  Prior to the meeting.
5       Q.      Okay.  And when was this second
6   meeting?
7       A.      Again, I'd have to ask Mike.  I think
8   it was -- I know it was in December of 2017.
9       Q.      And who was present?
10      A.      Dr. Waller, Mike Waller, myself,
11  Lianchao, and, obviously, Miles Guo.
12      Q.      What was Lianchao's role in the
13  meeting; was he translating?
14      A.      Yes, mostly.  And explaining, walking
15  through some of the explanations, not only the
16  translation, but, again, we were having a
17  generalized conversation.
18      Q.      And just for the clarity of the record.
19  Mr. Han was translating for Mr. Guo?
20      A.      Yes.  Both ways.
21      Q.      Of course.
22      A.      Mr. Guo speaks very good English, so he
23  doesn't really need an interpreter, but it's
24  better to have one.
25      Q.      Did Mr. Han actually read this whole

Page 43

1   document to Mr. Guo and translate it for him; was
2   that part of the meeting?
3       A.      Yes.  I think we walked through each
4   one of these paragraphs, yes.
5       Q.      And going back to the prior document,
6   Exhibit 3.  Was the same process employed where
7   Mr. Han, to your understanding, was translating
8   the document for Mr. Guo?
9       A.      To my understanding, yes.
10      Q.      But, obviously, you don't speak
11  Mandarin, do you?
12      A.      A little bit.  Not as much as I'd like.
13      Q.      Fair enough.  But you're not fluent?
14      A.      No.
15      Q.      Okay.  And so, to the extent you
16  recall, what occurred at this second meeting?
17      A.      This was a broader timeline based on
18  the first meeting and the first vision paper that
19  we had in our discussion, and this gave sort of a
20  menu, so to speak, a la carte, or menu of ideas
21  as to how we could help Miles Guo, at his
22  request, to set up sort of a strategic plan for
23  him.
24      Q.      So what was his response to the
25  presentation that you made?

Page 44

1       A.      He liked it very much.
2       Q.      Does that include all of the items in
3   this timeline or was he more receptive to some
4   services than others?
5       A.      It was interesting.  He was very keen
6   on having a -- a big, a huge, large presence in
7   the way of a residence, and then also purchasing
8   the American Security and Trust building across
9   from the Treasury Department in Washington as an
10  office building for him.  He liked the idea of
11  the Washington-based educational and cultural
12  foundation, which we thought might be a good way
13  of exposing him to or introducing him to
14  Washington and the Hill, and working on a more
15  positive anti-communist role.
16      Q.      And in terms of this real estate
17  portion of it, acquiring what, a residence?
18      A.      Yes.
19      Q.      And also an office building, I guess,
20  for a foundation?
21      A.      Yes.  I just said that.
22      Q.      Yes.  I understand.  And so, is that a
23  service that Strategic Vision typically provides
24  for clients?
25      A.      Yes, sometimes.

Page 45

1       Q.      So Strategic Vision will help people
2   locate properties and acquire them?
3       A.      Correct.
4       Q.      Is that in the D.C. area or nationwide;
5   how does that work?
6       A.      Yes, both.  D.C. area, nationwide,
7   globally, whatever.
8       Q.      And how was that, let's just call it
9   real estate project, followed up on subsequently?
10      A.      Well, actually, Lianchao -- I picked up
11  Lianchao and Yvette at a hotel downtown off M
12  Street, because she wanted to see all of the
13  properties that we had in mind.  I think it must
14  have been obviously -- honestly I can't remember.
15  I think it was -- I think it was after this
16  second meeting, that she came to Washington, and
17  Lianchao lives in Washington, so we picked him
18  up, and I had a brochure, a set of brochures of
19  homes and the office building that we drove
20  around, because there are a lot of cameras in
21  Washington.
22          We put her in the back seat with
23  Lianchao.  I have a Jeep, so those windows happen
24  to have a, whatever it is, sun -- more blacked
25  out windows than the front two seats.

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
**French Wallop on 02/12/2019**

Page 46

1    Q.    Tinted windows?
2    A.    Tinted, yes.  So we drove them around,
3  and I pointed out the homes.  I never made any
4  appointments to see the homes, because the last
5  thing we wanted to do was sort of bring Yvette or
6  anybody else in to see the homes.  We had the
7  brochures that had all of the interiors in the
8  homes, photographs, so she could easily see it.
9          We went around Kalorama, we went around
10 Georgetown, we went into what they call Spring
11 Valley.
12   Q.    And, Ms. Wang, was this the first time
13 you met her?
14   A.    No.  She was also in one of those
15 meetings, probably in the first meeting we had,
16 this one, sorry; whenever the first meeting was
17 with Guo, she was present.
18   Q.    So, I'm sorry, I just want to clarify
19 the record then.  Who was present at the first
20 meeting that you had with Mr. Guo?
21   A.    I think Yvette, Lianchao, Dr. Waller,
22 myself and Miles Guo.
23   Q.    Okay.  And when was this --
24   A.    Walkabout?
25   Q.    Yeah.  Little soldiering through the

Page 47

1  D.C. metro area?
2    A.    It was sometime in December.  It must
3  have been, you know, somewhere from the --
4  somewhere between the 10th and the 20th of
5  December of 2017.
6    Q.    And what did you understand that
7  Ms. Wang and Mr. Guo were doing with that trip?
8  What was their purpose in being there?
9    A.    She wanted to see the brochures that we
10 had, and I think I -- I can't remember, I think I
11 showed the Evermay property to Miles Guo during
12 that second meeting.  I happen to have a copy of
13 it with me.  I had to ask to get copies of the
14 other homes from Washington Fine Properties so
15 that I knew what he wanted as far as large
16 estates or large homes, and he wanted to have a
17 presence, he wanted to be close enough to Capitol
18 Hill.
19   Q.    And just going back.  You didn't show
20 them the interiors of the property because you
21 were concerned about surveillance or --
22   A.    Well, the way it works is, if it's in
23 Washington particularly, if you take an
24 individual in, you have to identify the
25 individual into multi-million-dollar, 10, 20, 30,

Page 48

1  $50 million homes.  You have to give a full
2  background.  I can say -- I can go in and look at
3  it, but when I bring somebody like Yvette, and
4  then I'd have to also identify Lianchao; it was
5  better just to drive around, take a look, decide
6  what sort of looked like something that both
7  Lianchao and Yvette thought might fit his
8  persona, and then go back and go and look at the
9  homes, if that's what he wanted to do.
10   Q.    Did anything come of that --
11   A.    No.
12   Q.    -- process?
13   A.    No.  And we did make a big foray into
14 trying to get the Riggs Bank building, which is
15 something that he wanted -- I'm sorry, excuse me,
16 the American Security and Trust building, which
17 is what he wanted, opposite the Treasury
18 Department.
19   Q.    And what was that effort, if you could
20 just generally describe that?
21   A.    Well, I called three or four people
22 that I think were private owners somehow through
23 a trust, and they told me repeatedly it wasn't
24 for sale.  And then I finally found out that of
25 course it was for sale at the right price.

Page 49

1    Q.    Sure.
2    A.    And we hadn't even gotten down that far
3  down the lane.  So I don't know what the number
4  would have been, but it was substantial, hundreds
5  of millions.
6    Q.    And you were -- so were those the only,
7  we'll call them sellers, you were in contact with
8  in connection with this real estate project?
9    A.    Well, on the office building, yes.
10   Q.    What about with residential properties?
11   A.    Well, with Evermay, I was in touch --
12 the previous owner of Evermay, sadly, who just
13 died in November this year, the previous owner
14 had been a childhood friend since I was 12, and
15 they had recently sold, probably five years prior
16 to this, they had recently sold Evermay to a
17 Japanese couple in the pharmaceutical business.
18         Fast forward, Japanese couple was
19 getting divorced.  Fast forward as well, the
20 previous owners of Evermay had a first right of
21 refusal; should they decide to buy the property
22 back from the Japanese couple, they could, in
23 their contract.
24         So I went to -- his name was Harry
25 Belin.  I went to Harry Belin and talked to him

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 50

1  about Evermay for Miles Guo, because it would
2  have been a perfect, perfect house for Miles.  He
3  could have incorporated his 501(c)(3) in that
4  house, because it was used as a 501(c)(3)
5  foundation by both Harry Belin and the Japanese
6  pharmaceutical couple.
7        Since there was no movement, we didn't
8  go any further on it, because Miles obviously
9  didn't -- I don't know.  I don't know what
10  happened.
11     Q.   You kind of anticipated my next
12  question.  When did this kind of process stop or
13  end?
14     A.   Miles was mostly really, really anxious
15  to move on the investigative side of the famous
16  file that you're aware of.
17     Q.   Sure.
18     A.   So, on the individuals.  I have no
19  idea -- he changes his mind all the time, so I
20  have no idea what his change of heart was on
21  that.
22     Q.   When did -- if you recall, when did the
23  conversation or negotiations pivot to this
24  investigatory research area?
25     A.   Probably during the second meeting.

Page 51

1  Mike has got a much better memory about these
2  things.
3     Q.   Do you recall how that occurred, was it
4  that Strategic Vision presented its investigatory
5  capabilities and Mr. Guo got excited or did he
6  ask about it; what occurred?
7     A.   We were -- again, we were speaking
8  about it in generalities.  It's not something you
9  boast about.  It's not something you discuss in a
10  way that is -- well, it's just not something you
11  boast about.  You can discuss it, you can discuss
12  the activities that can happen, and on a
13  hypothetical basis.
14     Q.   Did there come a time when Strategic
15  Vision offered to provide the sample
16  investigatory research on this --
17     A.   Yes.
18     Q.   -- vein of services?
19     A.   Yes, I believe there was.
20     Q.   When was that?
21     A.   I don't have the date.
22     Q.   Just generally, was it in this
23  December --
24     A.   It was in that December --
25     Q.   -- 2017 time frame?

Page 52

1     A.   That was in that December 2017 time,
2  yes.
3     Q.   What was -- was it research that was
4  offered or did Mr. Guo ask for that?
5     A.   I believe he gave us a name, and I
6  believe that we then had an exploratory peek into
7  what we could find initially.
8     Q.   So what was that exploratory research?
9  What was done by Strategic Vision?
10     A.   It was a -- it was done by our team, or
11  the initial team, before we even had a team, that
12  was contracted by us.  This was sort of a
13  freebie, to take a peek into this individual's
14  name, whatever, background.  And he gave us the
15  name.  I believe it was the number 1 name on the
16  folder that you have.
17     Q.   Is that Anita Suen?
18     A.   Yeah.
19     Q.   And that name was given to someone who
20  has been described by Strategic Vision as the
21  leader of Team 1?  Was that the --
22     A.   What?  I'm sorry, I don't understand
23  that question at all.
24     Q.   Maybe we'll get to it, we can define
25  it.  Let's just put it this way.  Who was that

Page 53

1  information regarding Anita Suen given to to do
2  the research?
3     A.   Mike.
4     Q.   Oh, okay.  Mike Waller?
5     A.   Yes.
6     Q.   Do you know what Mr. Waller did with
7  that information?
8     A.   Not precisely, no.
9     Q.   What understanding at all did you have
10  of what Mr. Waller would do with that
11  information?
12     A.   He was going to explore some of his
13  channels.
14     Q.   Do you know Dr. Waller's what you
15  describe as channels or --
16     A.   No, not all of them, no.
17     Q.   So you don't know all of the --
18     A.   We have channels.  We both have
19  channels.  I have channels, he has channels.
20     Q.   And do you deliberately keep your
21  channels confidential or secret from one another
22  for --
23     A.   Yes.
24     Q.   And why is that?
25     A.   For security.

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

1    Q.    So this freebie research report, was
2  that research completed, or conducted?
3    A.    It was conducted.  It wasn't completed
4  by any stretch.
5    Q.    Right.  And so what was -- was anything
6  presented back to Mr. Guo or Han or Ms. Wang?
7    A.    Yes.  I believe, yes, we did show --
8  again, Mr. Han, Mr. Guo, Miles Guo, and Mike and
9  myself were privy to whatever Mike had found.
10   Q.    So there was like a third meeting with
11 respect to this --
12   A.    Yes, somewhere.
13   Q.    -- pre-report?
14   A.    Yes.  In December of 2017.
15   Q.    Okay.  And where did that take place,
16 was it in New York?
17   A.    Yes.
18   Q.    What did Strategic Vision present as
19 this free report or free information?
20   A.    They -- I believe they had a -- Mike
21 had a screenshot of a couple of things that he
22 showed Miles Guo.
23   Q.    Was it information about accessing a
24 CITIC Bank account?
25   A.    I believe so, yes.  It wasn't

1  accessing.  Please understand, there's a huge
2  difference.
3    Q.    Oh, please.  I want you to explain.
4  What was presented?  That's what I want to
5  understand.
6    A.    Yes.  There's a huge difference between
7  accessing.  It was not accessing.  It was what
8  they call peeking.  It was not invading into the
9  server.
10   Q.    Okay.
11   A.    Okay.
12   Q.    What does peeking mean?  I just want to
13 understand that clearly.
14   A.    To look over the wall.
15        THE WITNESS:  As I see, Yvette has
16   walked into the room.
17        MR. SCHMIDT:  The court reporter will
18   take down the appearance.  That's fine.
19        (Ms. Yvette Wang has joined the
20   deposition.)
21        THE WITNESS:  So, Yvette Wang has just
22   walked into the room.
23   A.    So, the peeking was a screenshot, I
24 believe, and I only saw it for a flash myself, of
25 a CITIC name and maybe an address or something.

1  It wasn't very in depth.  I think it might have
2  had some numbers on it, it might have had some
3  account numbers on it or something like that.
4        But it was basically just to show how
5  some things could be retrieved.  We had to be
6  extremely careful.  These things were only
7  retrieved outside of The United States, and if
8  they were -- they were never retrieved inside The
9  United States.
10   Q.    And why was that?
11   A.    Because it's not really a terribly good
12 thing to do.
13   Q.    Is that because it's illegal or --
14   A.    It's probably illegal, yes.  So we
15 would never do anything illegal.
16        MR. SCHMIDT:  In The United States.
17        THE WITNESS:  In The United States.  Or
18   elsewhere, actually.
19   Q.    And did this presentation involve
20 showing that there was money in the bank account
21 or anything of that nature?
22   A.    I don't remember.  I saw it so quickly,
23 I -- because it was really Guo and either Yvette
24 or Lianchao looking at it.  I wasn't looking at
25 it.

1    Q.    Had you looked at these screenshots or
2  information prior to the meeting?
3    A.    No, I don't believe I did.
4    Q.    Okay.
5    A.    Because, again, we compartmentalize
6  stuff.
7    Q.    So that was Dr. Waller's aspect of this
8  presentation, he handled that?
9    A.    I agree.
10   Q.    Did you tell Eastern or the people
11 present that you had enough information about
12 this person, Ms. Suen, to prove that she had
13 committed crimes?
14   A.    First of all, we had no idea who
15 Eastern was, so I don't know what you mean about
16 Eastern.
17   Q.    I'm obviously talking about Eastern
18 Profit.  Let's just put it this way --
19   A.    Yeah, but we're not here about Eastern
20 Profit, as you understand.  I never heard of
21 Eastern Profit until there was a contract.
22   Q.    Right.  Did you ever tell the people
23 present at this meeting that you had enough
24 information to prove that Ms. Suen had committed
25 crimes?

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 58

1    A.    I don't recall.  Mike would know the
2    answer to that.
3        Q.    Do you recall Mr. Waller talking about
4    crimes or anything like that at this meeting?
5        A.    I wouldn't call them crimes.  I think
6    they were asking for investigative background.
7    Miles Guo wanted to have as much information
8    on -- investigative background on a couple of
9    people, and I think she was the first and only
10   person he actually gave me -- gave us the name
11   about earlier, as a sort of trial.
12       Q.    And you understood that Strategic
13   Vision wouldn't be compensated for this --
14       A.    No.
15       Q.    -- project?
16       A.    Not -- well, we --
17       Q.    And what I mean by project is this
18   little presentation?
19       A.    No.  It was just to show them what we
20   had a certain capacity of being able to do.  It
21   was a limited capacity at that time.
22       Q.    Do you understand why the information
23   was requested, what the goal was?
24       A.    The goal was probably to sort of maybe
25   test some of the work that we could do

Page 59

1    compartmentally.
2        Q.    Let me just be a little more specific
3    then.  Did you understand what the end goal of
4    the research project as a whole was, what the
5    requesters of the information were trying to do?
6        A.    For the entire project?
7        Q.    Yes.  Why did they want this
8    investigatory research?
9        A.    Well, that's a really good question.
10       Q.    That's why I'm asking.  Do you know?
11          MR. SCHMIDT:  If you know or you don't.
12       A.    I don't know.
13       Q.    Okay.  You never discussed what the
14   research would be used for or anything like that
15   with Mr. Guo or Ms. Wang or Mr. Han?
16       A.    No.
17       Q.    Did you think that it was involved with
18   the political conversations you guys had had
19   concerning China, the communist party?
20       A.    Oh, I'm sure it had to do with the
21   communist party.  I mean, Yvette certainly was
22   part of the communist party, and her parents were
23   part of the communist party regime.  So, and she
24   was --
25       Q.    I didn't ask you about that at all.

Page 60

1        A.    But you're asking about the content of
2    the conversation and where it went and who was
3    involved and why --
4        Q.    Um-hum.
5        A.    -- right?
6        Q.    I'm asking whether or not you knew why
7    the research was requested.  That's what I'm
8    trying to understand.
9        A.    We have no idea what Yvette did with
10   it.  We have no idea what Guo did with it.  We
11   have no idea what happened to it.
12       Q.    So Strategic Vision didn't care what
13   the research was going to be used for one way or
14   another?
15       A.    We cared very much what it was going to
16   be used for.  We are very adamantly
17   anti-communist.
18       Q.    I see.
19       A.    We are very pro-democracy.  Both Mike
20   and I are adamantly pro-democracy.
21       Q.    So did you understand that the research
22   would be used to fight against the communist
23   party in China?
24       A.    Correct.  We thought.  We were not sure
25   what they were going to do with it.  Maybe he was

Page 61

1    going to run it both ways.  We don't know.
2        Q.    I'm only asking what you thought.
3        A.    Well, I just gave you my opinion.
4        Q.    Of course.  And so, did you understand
5    that the investigatory research that was
6    collected would ultimately be publicized?
7        A.    Probably, if we ended up with -- I
8    mean, that was up to Guo to decide what he was
9    going to do with it.  We certainly were not going
10   to publish it because we had strict
11   confidentiality agreements, but he didn't,
12   apparently, because he published a number of the
13   slides already on his sites.
14       Q.    Let's just talk about the
15   confidentiality agreement.  What do you mean by
16   that, when you said you had confidentiality
17   agreements?
18       A.    We had -- well, that was later in the
19   agreement itself.
20       Q.    Oh, that's what you're referring to.
21   Okay.
22       A.    Well, you know precisely what I'm
23   referring to.
24          MR. SCHMIDT:  Just answer the
25   questions.

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 62

```
 1      Q.   I really don't.  I'm just trying to
 2  be --
 3           THE WITNESS:  I know, he knows what I'm
 4      referring to.
 5      Q.   I actually don't, so you'll have to
 6  forgive me.  And so, what was the response to
 7  this presentation of the CITIC, as you -- what
 8  did you describe it as, the peering over the
 9  wall?
10      A.   I'm sorry?
11      Q.   What was the response of Mr. Han or
12  Ms. Wang or Mr. Guo to your presentation?
13      A.   I suppose they were interested.  I
14  wasn't -- I wasn't that surprised that something
15  couldn't be brought up off the internet from some
16  of the investigators that Mike would have known
17  about.
18      Q.   So, in other words, you understood that
19  this was what Mike's team or contacts could
20  provide?
21      A.   Yes.
22      Q.   Did you feel that the recipients of
23  this information were impressed by it?
24      A.   I have no idea.
25      Q.   They didn't say anything like, wow,
```

Page 63

```
 1  this is great or --
 2      A.   I have no idea.
 3      Q.   You mean you don't remember or you just
 4  don't --
 5      A.   I have no idea.
 6      Q.   So you know the information was
 7  presented, but you don't recall how it was
 8  received?
 9      A.   I'm sure it was favorable.
10           MR. GRENDI:  Let's take a little break
11      and we'll come back in five or 10 minutes.
12           THE VIDEOGRAPHER:  Going off the record
13      at 11:09.
14           (Whereupon, a short recess was taken.)
15           THE VIDEOGRAPHER:  We're now back on
16      the record at 11:21.
17  BY MR. GRENDI:
18      Q.   Just turning to SVUS84 of that exhibit,
19  that's the Bates number in the bottom right-hand
20  corner.
21      A.   Yes.  Yes, yes, yes.  So 84, okay.  83.
22  84, yes.
23           MR. SCHMIDT:  Final page.
24      Q.   You see where it says, "Total Social
25  Media Awareness," there's a bullet point for
```

Page 64

```
 1  that?
 2      A.   Yes.
 3      Q.   Can you describe what this capability
 4  is?  It says it was originally developed by the
 5  U.S. military.
 6      A.   Yes, this is one of the things that
 7  Mike was aware of.
 8      Q.   Are you aware of it, or you don't know
 9  about this service?
10      A.   I'm aware of it, but he's more
11  experienced with it.
12      Q.   Well, let's -- what do you know about
13  it?
14      A.   Exactly what it says.  I mean, I'm
15  aware of it.  I don't know any more than -- than
16  that.  Mike is the one who is fully aware of it.
17      Q.   I appreciate that Mr. Waller might know
18  more about it than you, but I'm asking what you
19  know.
20      A.   I'm aware of what this paragraph says.
21      Q.   You don't know anything else about this
22  capability or what it is?
23      A.   I'm aware of the social media and text
24  messaging communications in multiple languages.
25      Q.   Okay.  But you don't provide this
```

Page 65

```
 1  service, this isn't something that Strategic
 2  Vision does itself?
 3      A.   Only through our teams do we do this.
 4      Q.   Okay.  Is this service part of
 5  investigatory research or is it separate?
 6      A.   It would probably be part of the full
 7  package.  We were not sure what Miles Guo wanted,
 8  so we tried to create a sort of a menu, as I
 9  mentioned earlier.
10      Q.   So this document contains ideas for
11  Mr. Guo in terms of services that Strategic
12  Vision can provide?
13      A.   Correct.  Strategic Vision and its
14  team.
15           MR. GRENDI:  This is going to be Wallop
16      5.
17           (Wallop Exhibit 5, Handwritten
18      document, marked for identification.)
19      Q.   Looking at Wallop 5, is this your
20  handwriting here?
21      A.   It is.
22      Q.   And who are these individuals listed on
23  this document?
24      A.   Guo asked for some references of
25  individuals in the Middle East, and I wrote them
```

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 70

1     about the fraud beyond --
2          THE WITNESS:  Yes.
3          MR. SCHMIDT:  -- what you read in the
4     media?
5          THE WITNESS:  Yes.
6     Q.    Okay.  And that's from who; how did you
7     hear about that?
8          You can look at me.  I'm asking you the
9     questions.
10    A.    Privileged -- privileged sources.
11    Q.    Okay.  So you're refusing to answer
12    that question based on privilege?
13    A.    Yes.
14    Q.    And what privilege is that?
15         MR. SCHMIDT:  Do you want to go talk
16    about it?
17         THE WITNESS:  Yes.
18         MR. SCHMIDT:  Why don't we go off the
19    record and see what's going on.
20         MR. GRENDI:  I'll tell you what, why
21    don't we just put a pin in it, and keep
22    going.
23         MR. SCHMIDT:  That's fine, too.  Okay,
24    we can do it at a break.
25         MS. TESKE:  Let's take a break for a

Page 71

1     quick second.
2          THE VIDEOGRAPHER:  Off the record at
3     11:29.
4          (Whereupon, a short recess was taken.)
5          THE VIDEOGRAPHER:  Back on the record
6     at 11:35.
7          MR. SCHMIDT:  We just stepped out to
8     discuss if there was any potential privilege
9     issue.  I think it's more of a
10    confidentiality issue.  She had actually
11    already revealed the answer to the question
12    in response to a prior question.  And I
13    think the question when we left was if she
14    knew anything beyond what she had read in
15    the public papers, and the answer was yes.
16    And I think your next question was, what.
17    And I think Ms. French is ready to respond
18    to that.
19    Q.    Go ahead.  How do you know something
20    beyond the public record about Mr. Guo allegedly
21    stealing $3-1/2 billion from the United Arab
22    Emirates?
23    A.    Based on conversations that I had with
24    members of the family with whom he allegedly
25    defrauded them of over $3 billion.

Page 72

1     Q.    And which family is that?
2     A.    The Al Nahyan family.
3     Q.    Is that on this list?  I'm sorry, I
4     have trouble reading your handwriting.
5     A.    Yes, it is.
6     Q.    That's the one, two, three, four --
7     fifth one from the top?
8     A.    Yes.
9     Q.    And what did they say to you about
10    that?
11    A.    When I mentioned his name, they said
12    that, yes, they were fully aware of him and that
13    it was not a pleasant experience.
14    Q.    Why were you talking to the Al Nahyan
15    family about Mr. Guo?
16    A.    Because Mr. Guo, I believe, had been
17    telling me with this document that he knew all of
18    these people, and I was checking on whether he
19    did know any of these people.  And so it came up
20    that he defrauded the UAE and the family of over
21    $3 billion, as you well know.
22    Q.    And you didn't agree to keep your
23    relationship with Mr. Guo confidential when you
24    were speaking with him?
25    A.    That had nothing to do with

Page 73

1     confidentiality.  He was the one that gave me --
2     he asked me for these references.  I wanted to
3     make sure we had a reference on him.  He said
4     that he worked very closely with the UAE, and it
5     turned out, I guess, he did.
6     Q.    When were these conversations you had
7     with the Al Nahyan family?
8     A.    Oh, probably in -- probably about six
9     months after the contract began.
10    Q.    So you were checking references on
11    Mr. Guo after the agreement was over with?
12    A.    Yes.  We had trusted him up until that
13    time.
14    Q.    Sure.
15         MR. SCHMIDT:  Let's not make any
16    commentary.
17         MR. GRENDI:  That's fine.
18    Q.    Let's go with the next exhibit.
19         (Wallop Exhibit 6, Document entitled
20    "Time to Get Them Beginning the
21    Psycho-Political Campaign For China", marked
22    for identification.)
23    Q.    Ms. Wallop, do you recognize this
24    document?
25    A.    Yes, this is one of Mike's documents.

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 74

```
 1     Q.    It's called "Time to Get Them."
 2           Do you know how that title was reached,
 3   created?
 4     A.    Yes, yes.
 5     Q.    How's that?
 6     A.    It came as a result of conversations
 7   with Guo, Lianchao and Mike and myself regarding
 8   the -- regarding the communists working within
 9   The United States, from China DRC, as well as
10   elsewhere.
11     Q.    So in the chronology of meetings we've
12   been talking about, was this document created
13   before the first meeting, the second meeting, the
14   third meeting?  When did it --
15     A.    Oh, it had to have been after the
16   second or third meeting, because there's this
17   photograph of Anita here.
18     Q.    And that's on SVUS387?  If you look at
19   the bottom right-hand corner --
20     A.    Correct.
21     Q.    -- that's where those --
22     A.    Or maybe that's Yvette.  I'm not sure.
23   No, I think it is Anita.
24     Q.    Okay.  Was this a PowerPoint
25   presentation?
```

Page 75

```
 1     A.    Yes.
 2     Q.    And was it presented as a PowerPoint on
 3   a computer or did you print it out?  How was
 4   it --
 5     A.    It might have been on a USB key.
 6     Q.    And did you participate in creating
 7   this document or did Mr. -- Dr. Waller create it
 8   himself?
 9     A.    Dr. Waller did much of it.  I worked
10   with him on some of it; not all of it, but some
11   of it.
12     Q.    So you made edits or --
13     A.    Yes.
14     Q.    And when was this presented to -- well,
15   let's start with striking that.
16           Who was this presented to?
17     A.    Well, this would have been presented to
18   Guo.
19     Q.    Anyone else?
20     A.    And probably Lianchao.  And, obviously,
21   myself.  I can't remember if Yvette was in there
22   or not.  He often didn't want her in the room,
23   so, who knows.
24     Q.    I understand.  But you don't recall
25   specifically who was in the room when this was
```

Page 76

```
 1   presented?
 2     A.    Well, it would have been one of the
 3   four -- I mean all four of us.  It would have
 4   been Lianchao, Guo, myself and Mike.
 5     Q.    Okay.  Do you remember where that --
 6     A.    And possibly Yvette.
 7     Q.    Okay.
 8     A.    I don't remember.
 9     Q.    And do you remember where that was?
10     A.    In his flat, in his apartment at the
11   Sherry-Netherlands.
12     Q.    Okay.
13     A.    All meetings were there with him.
14     Q.    That's helpful.  So you never met with
15   Mr. Guo in Washington, D.C.?
16     A.    No.
17     Q.    Okay.  Let's look at 387.  It says,
18   "build and operate a secret system for
19   micro-targeted intelligence collection and
20   analysis."  Do you see that?
21     A.    Yes.
22     Q.    Is that a service that Strategic Vision
23   would provide or someone else?
24     A.    Through Mike and his teams, and some of
25   my people, yes.
```

Page 77

```
 1     Q.    What do you mean by your people?
 2     A.    Some of my channels, as we discussed
 3   earlier.
 4     Q.    I see.  So in terms of this service,
 5   the game plan was for Dr. Waller to do most of
 6   the research, is that fair to say, through his
 7   channels?
 8     A.    I would say it was equal.
 9     Q.    Okay.
10     A.    It depends.  I mean, it depended on
11   which target we were working with.
12     Q.    So I have some understanding of what
13   Dr. Waller's process and capabilities were from
14   his deposition.  I want to know what -- what it
15   is that you personally would provide as a service
16   in connection with micro-targeted intelligence,
17   collection and analysis?
18     A.    It depended on which target and which
19   channels we both used collectively to bring the
20   information together on individuals or documents.
21     Q.    Right.  And I'm trying to understand
22   what --
23     A.    I don't --
24     Q.    -- process --
25     A.    I can't answer that.
```

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 78

1    Q.    Well, I didn't even ask a question.  So
2   I want you to just wait for me to ask, and then
3   you can answer.
4        A.    Go ahead.
5        Q.    Yes, thank you.  So I want to
6   understand what part of the process you would
7   participate in.  What would you do to help in the
8   collection process or accessing of the channels
9   process?
10       A.    Collection and gathering.  It was like
11  hunting and gathering.  We both did it.
12       Q.    And what would you do in connection
13  with this engagement?  What was it that you would
14  do?
15       A.    We would collect --
16       Q.    You.
17       A.    -- through my channels.
18       Q.    Right.
19       A.    Him through his channels.
20       Q.    And what channels did you access in
21  connection with this engagement?
22            MR. SCHMIDT:  Just to -- objection for
23       a second here.  This is a 30(b)(6).
24            THE WITNESS:  I don't understand the
25       question.

Page 79

1            MR. SCHMIDT:  So you're saying you as
2       Strategic Vision, or are you saying you
3       French Wallop?  How do you want to do it?
4            MR. GRENDI:  Let's do Strategic Vision.
5            MR. SCHMIDT:  Yeah.  I mean, that's
6       really the question here.
7            MR. GRENDI:  That's fine.
8            THE WITNESS:  Okay.
9        Q.    What did Strategic Vision do in terms
10  of collection and analysis?
11       A.    That's what we did, we did collection
12  and analysis.
13       Q.    So there's no more specificity --
14       A.    Through our own sources.
15       Q.    -- to it than that?  What does that
16  mean?
17       A.    How do you put a legal case together?
18  You have to start with bits and pieces.  So
19  that's what we were doing.  We were each
20  collecting bits and pieces to make the cases.
21       Q.    Let me ask it this way.  Did you ask
22  people in your network, do you know who Anita
23  Suen is?  What do you know about her?
24       A.    No.
25       Q.    So I'm trying to understand what it is

Page 80

1   you did, Strategic Vision, to collect
2   information?
3            MR. SCHMIDT:  Objection.  She's talked
4       about going out and getting Mike Waller and
5       putting that together --
6            MR. GRENDI:  I'm asking about anything
7       else.
8            MR. SCHMIDT:  Okay, anything else.
9        A.    Collecting teams.  Collecting teams.
10       Q.    Let's do it this way.  Setting aside
11  what Mr. Waller and his teams did.  Was there any
12  other teams accessed to provide information in
13  connection with this investigatory research?
14       A.    Yes.
15       Q.    And who were they?
16       A.    There were some from the U.K., there
17  were some from Israel, there were some from the
18  Middle East, there were some from our networks.
19       Q.    And now I'm talking about you
20  personally.
21       A.    Yes.
22       Q.    Are these people that you personally
23  contacted?
24       A.    Yes.
25       Q.    Okay.  That's all I'm trying to

Page 81

1   understand.  Without naming any names, would that
2   involve calling people on the phone or emailing
3   them?
4        A.    Rarely.  It's face-to-face.
5            MR. SCHMIDT:  Just listen to the
6       question.  Don't be distracted by the
7       document for now.
8        Q.    And so, in connection with the research
9   in this matter, how many face-to-face meetings
10  did you have with people in your contacts?  I'm
11  talking about you, Ms. Wallop.
12            MR. SCHMIDT:  Objection.
13       A.    I have no idea.  Many.
14       Q.    You said you rarely do telephone calls.
15  Did you do some in connection with this research
16  agreement?
17       A.    No.
18       Q.    What about internet research, did you
19  do any internet research in connection with this?
20            MR. SCHMIDT:  Objection.  Her
21       personally?
22       Q.    Strategic Vision.  Did Strategic Vision
23  do any internet research in connection with this
24  research?
25       A.    Lightly.  That was not our -- that was

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 82

1  not our way of doing it.
2      Q.    And what about you personally?
3      A.    No.
4      Q.    It says in this document that the first
5  ten targets are identified, do you see that?
6      A.    What page?
7      Q.    387.
8      A.    Yes.
9      Q.    What did you understand that to mean?
10     A.    Well, Guo gave us -- Miles Guo gave us
11  a large packet of names, and, in that -- in the
12  first ten, which they upped it to 15 in the first
13  month, but the first ten targets were identified,
14  and then they changed their mind and asked for 15
15  for the first month.  So that's -- those were his
16  targets.
17     Q.    So these ten targets, are those
18  referred to as fish in the signed research
19  agreement?
20     A.    Correct.
21     Q.    And it says, "monitor the ten targets
22  for several months to understand their habits,
23  patterns, personal and professional networks,
24  businesses and corruption."  Do you see that?
25     A.    Correct.

Page 83

1      Q.    Who would do that work of monitoring?
2      A.    Our team.
3      Q.    And by our team, what encompasses the
4  Strategic Vision team for this research
5  agreement?
6          MR. SCHMIDT:  Objection.  Go ahead.
7      A.    The particular team, we called it Team
8  1, and that's what they were assigned to do.
9      Q.    So Team 1 was assigned the monitoring
10  of the ten targets referred to here?
11     A.    Correct.
12     Q.    Okay.  And do you know the name of
13  anyone on Team 1?
14     A.    No.
15     Q.    Do you know the leader of Team 1, the
16  name of the leader of Team 1?
17     A.    I know his acronym.  I don't know his
18  name, his full name.  This was through Mike.
19     Q.    So you don't know the full name of the
20  leader of Team 1?
21         MR. SCHMIDT:  Yes or no, if you know.
22     Q.    I'm asking a yes or no.
23     A.    No.
24     Q.    So, specifically, do you know when the
25  first ten targets were identified?

Page 84

1      A.    When Guo threw that whole document down
2  on the coffee table in his apartment and he said,
3  these are the people I want investigated, these
4  are -- I said, where did this list come from?
5  And he said, I paid $250 million for this list.
6  I said, wow, okay.  So that's when I knew who the
7  first ten targets were.
8          MR. GRENDI:  Let's do Exhibit 7.
9          (Wallop Exhibit 7, Document entitled
10     "1: Anita Yiu Suen", marked for
11     identification.)
12     Q.    Do you recognize what's been marked as
13  Wallop 7?
14     A.    Correct, I do.
15     Q.    And is this the document that you just
16  said Mr. Guo threw down on the table?
17     A.    It looks like it.
18     Q.    Okay.  So, to your recollection,
19  Mr. Guo threw a paper copy of this document onto
20  a table at some point during a meeting?
21     A.    No, on -- onto his coffee table in his
22  sun room, yes.
23         When was that?
24     A.    During the -- probably the second or
25  third meeting we had with him in New York, in

Page 85

1  December of 2017.
2      Q.    So did you keep that paper copy that
3  was thrown on the table?
4      A.    Well, I had this copy, I mean, the copy
5  of the copy.  I mean, the original that he gave
6  us.
7      Q.    I see.  So you retained a paper copy of
8  what's been marked as Wallop 7?
9      A.    That's correct.
10     Q.    And was that -- that was before the
11  contract was signed, right, the research
12  agreement that's the subject of this action?
13     A.    No.  I think we -- I saw the document,
14  but we didn't get the full document because of
15  the famous flash drives that were corrupted --
16     Q.    Right, but --
17     A.    -- by Yvette.
18     Q.    -- I just want to understand what
19  happened to the paper version that was --
20     A.    Oh, I didn't -- he didn't give that to
21  us at the time.  He kept his copy.
22     Q.    You didn't receive --
23     A.    No, no, no --
24     Q.    -- a paper copy from him?
25     A.    -- no, no, no.  He just showed it to

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 86

1   us.
2      Q.   I see.
3      A.   He threw his copy down on the table.
4      Q.   And this was at the second or third
5   meeting?
6      A.   Yeah.
7      Q.   Okay.
8      A.   Yes.
9      Q.   And you did not retain a copy from that
10  meeting?
11     A.   No.
12     Q.   And did you go through the paper copy
13  that was on the table?
14     A.   With him?
15     Q.   Yes.  Or on your own.
16     A.   Well, we glanced at it.  Mike was
17  there.  We glanced at it to try to get an idea as
18  to who it was, what it was.
19     Q.   We'll come back to this.  Going back to
20  Exhibit 6.  On 387, it says, "Document everything
21  as leverage to gain concessions, protect people,
22  use as political weapon, or as aid in criminal
23  prosecution and asset recovery."
24          Do you see that, it's the fourth or
25  fifth bullet down?

Page 87

1      A.   I don't have it.
2      Q.   Oh, I'm sorry.
3      A.   So, what page?
4      Q.   The same one we've been looking at,
5   387.
6      A.   So what would you like to look at?
7      Q.   Where it says, "Document everything as
8   leverage to gain concessions, protect people, use
9   as political weapon, or as aid in criminal
10  prosecution and asset recovery"?
11     A.   Correct.
12     Q.   What is the -- what was that about;
13  what does that mean in terms of the services to
14  be provided?
15     A.   This was what Mike was referring to
16  with regard to the Team 1.
17     Q.   So Team 1 was going to?
18     A.   Take a look at that, yes.
19     Q.   And what kind of leverage was sought?
20     A.   I guess, criminal leverage, depending
21  upon the individuals that we were investigating,
22  per Guo's instructions.
23     Q.   It also says "protect people."  What
24  was -- to your mind, what was the -- what was
25  that about?

Page 88

1      A.   I don't remember.  I don't know
2   precisely.
3      Q.   Okay.  And you don't remember
4   discussing whether -- what the political weapon
5   would be?
6      A.   Well, a political weapon, which is what
7   Guo wanted to use towards his investigation of
8   these individuals.  He was going to use it
9   against them, for whatever purpose.
10     Q.   But you don't know the purpose?
11     A.   Not entirely.
12     Q.   Okay.  A couple of bullets down it
13  says, "Break the Party's control of corrupt
14  information" -- or "corruption information" I
15  should say.  Do you see that?
16     A.   Yes.
17     Q.   What is "the Party's control"?  Which
18  party are we talking about there?
19     A.   Talking about the communist party.
20     Q.   And what control of corruption
21  information does the communist party have?
22     A.   Well, Guo had said that the CCP, or the
23  communist party of China, there was a great deal
24  of corruption within the leadership, and, as a
25  result of that, he wanted to find as much

Page 89

1   corruption as possible, and he wanted us to
2   investigate and retrieve that kind of corruption.
3   In other words, funds that would have been taken
4   out of the country illegally, cash payments, all
5   of these things that were part of that.
6      Q.   I understand.  And so going to the next
7   page, 388.  It says, "Reduce political threats to
8   yourself and your cause."
9          What did you understand is the
10  political threats to whoever yourself or your
11  cause is there?
12     A.   That was to Guo.
13     Q.   Okay.
14     A.   Political threats to Guo and Guo's
15  cause.
16     Q.   And what were those political threats?
17     A.   Well, he said that they were monetary
18  and political, and that many people were after
19  him either for monetary damages or corruption,
20  both by the Chinese officials as well as,
21  perhaps, his own corruption issues.  I don't
22  know.
23     Q.   Did you look into that at all in terms
24  of --
25     A.   This was a preliminary -- this was a

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 90

1  preliminary document that Mike had put together;
2  so, no, we were not under contract to look into
3  it.
4       Q.    Okay.  So you didn't do any work
5  regarding Mr. Guo or his business prior to --
6       A.    The contract?
7       Q.    -- the execution of the contract on or
8  about January 6, 2018?
9       A.    No.
10      Q.    You didn't access your network to
11 determine whether this was someone you wanted to
12 do business with or not?
13      A.    We had Bill Gertz, who was one of the
14 finest intellects on Chinese corruption, and
15 reporters, journalists, and also Lianchao, again,
16 of the highest sterling standards.  When they
17 asked us to look into it, that's what we did.
18 That was looking into putting together a program
19 that would help somebody that we believed at the
20 time was absolutely anti-communist.
21      Q.    I see.  So you relied up -- let me put
22 it this way.  Strategic Vision relied upon the
23 recommendation of Bill Gertz and Lianchao Han in
24 terms of deciding to do business with, or
25 deciding to enter into the research agreement?

Page 91

1       A.    Correct.
2       Q.    Let's just go to SVUS390.
3       A.    Um-hum.
4       Q.    It says, "Network With Russian
5  Opposition and Chinese Expats."  Do you see that?
6       A.    Correct.
7       Q.    Is this a service that you would
8  provide or Mr. Waller would provide?
9       A.    Both of us did.
10      Q.    Okay.  And why was Strategic Vision
11 recommending that Mr. Guo network with Russian
12 opposition and Chinese expats?
13      A.    Well, the photograph that you have
14 here, that's in this is Mikhail Khodorkovsky.
15 Okay?  Mikhail Khodorkovsky is a client of mine,
16 and he is an anti-Putin and pro-democracy leader,
17 opposition leader for Russia; so, therefore, we
18 felt that this might be a good person for Guo to
19 essentially team up with on certain ideological
20 issues.
21      Q.    And how would that synergy or
22 collaboration work?
23      A.    Through me.
24      Q.    Right.  But just a little more
25 specificity.  How would Mr. Guo, or whoever, team

Page 92

1  with Russian opposition and Chinese expats?
2       A.    Through me and certain ideas that we
3  had to combine our ideological belief in
4  democracy.
5       Q.    And -- right.  How would those ideas be
6  executed, what sort of --
7       A.    Through dialogue.
8       Q.    -- activities?
9       A.    Through dialogue.
10      Q.    And you also have links with Chinese
11 people inside Russia?
12      A.    We would have, yes.
13      Q.    That's you and Mr. Waller?
14      A.    Yes.
15      Q.    It says, "for propaganda and
16 organizational purposes."  Do you see that?
17      A.    Yes.
18      Q.    What would be the propaganda and
19 organizational purposes?
20      A.    Media and social media, probably.
21      Q.    So, in other words, messaging of
22 anti-communist, pro-democracy rhetoric?
23      A.    Correct.
24      Q.    Would the Russian opposition group be
25 involved in collecting investigatory research or

Page 93

1  is that a separate group?
2       A.    It would be separate.
3       Q.    Let's go to 394.  It says, "Target
4  Intelligence Capability:  Cost."
5            These costs here, are these prices that
6  Strategic Vision quoted?
7       A.    In a preliminary discussion, yes.
8       Q.    Okay.  So, initially, Strategic Vision
9  was offering $2,805,000 to have two teams monitor
10 one person?
11      A.    Yes.
12      Q.    And what would that monitoring entail,
13 just in terms of the types of surveillance or
14 investigatory work?
15      A.    It was hugely complex, and --
16      MR. SCHMIDT:  Keep going.
17      A.    It was hugely complex, and it had to do
18 with all the investigative tentacles that we
19 could reach within our channels.
20      Q.    So is that the full package of services
21 that Strategic Vision could provide in terms of
22 monitoring, that's like the full suite, call it
23 that?
24      A.    Except that he didn't accept it.
25      Q.    I understand that.  But was this --

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

1    Q.    It says, "sign MOU."  That's a
2  memorandum of understanding?
3    A.    That's correct.
4    Q.    Is that how Strategic Vision normally
5  contracts with its clients?
6    A.    Again, this is a preliminary overview.
7  This was a discussion.  We were discussing it
8  openly in a little meeting that we were having
9  with Mr. Guo.  So this was just sort of a menu of
10  deciding what we would do and how we would
11  perform.
12    Q.    Does Strategic Vision normally sign
13  written agreements with its clients?
14    A.    Yes.
15    Q.    Does Strategic Vision have a standard
16  contract that it uses for its client engagements?
17    A.    No.
18    Q.    So you don't have a stock agreement
19  that you normally use when --
20    A.    No client's the same.
21    Q.    So, prior to signing the research
22  agreement, did you tell Mr. Guo that you had an
23  in-house team of investigators at Strategic
24  Vision?
25    A.    This is a fascinating misnomer.

1    Q.    What -- what term is that that you're
2  calling --
3    A.    No.
4    Q.    -- a misnomer?
5    A.    No.
6          MR. SCHMIDT:  Just answer the question.
7    A.    No.
8          MR. SCHMIDT:  Let him follow -- he'll
9  follow up if he wants to follow up.
10    Q.    Okay.  So Strategic Vision does not
11  have an in-house team of investigators?
12    A.    No.
13    Q.    And you never told Mr. Guo that you had
14  20 employees, did you?
15    A.    I said that we worked with a team of
16  people.  I did not say that we had 20 employees.
17    Q.    Okay.  Did you ever tell him that you
18  had strong teams in Europe and the Middle East?
19    A.    Most likely, yes.
20    Q.    Again, this is all before signing the
21  research agreement, right?
22    A.    Yes.
23    Q.    And did you tell him you had
24  relationships with an Abu Dhabi princess?
25    A.    I said a -- no.

1    Q.    What, if anything, did you tell Mr. Guo
2  about an Abu Dhabi princess?
3    A.    A Saudi -- it was not Abu Dhabi, it was
4  Saudi.
5    Q.    Okay.  What did you --
6    A.    To clarify, it's usual we have to
7  clarify.
8    Q.    Sure.  What did you tell Mr. Guo about
9  a Saudi princess?
10    A.    She was my roommate.
11    Q.    That was in college?
12    A.    No, in high school.
13    Q.    And is she a client of Strategic
14  Vision?
15    A.    No.
16    Q.    Okay.  Did you tell Mr. Guo that you
17  had, or that Strategic Vision had relationships
18  with clients in Saudi Arabia?
19    A.    Yes.
20    Q.    And in Iran?
21    A.    Many years ago, in Iran.
22    Q.    What about Turkey?
23    A.    Not a client.  A relationship.
24    Q.    And what about Qatar, did you tell him
25  you had clients in Qatar?

1    A.    I did.  Past tense.  We don't work with
2  terrorists.
3    Q.    Okay.  What about Republican
4  politicians, did you ever tell Mr. Guo that you
5  worked for Republican politicians?
6    A.    Many.
7    Q.    So you told him you had -- that
8  Strategic Vision had worked for --
9          MR. SCHMIDT:  Just focus in on what you
10  told him.
11    A.    Yes.  I did, yes.
12    Q.    So you told Mr. Guo that you had
13  provided services to -- that Strategic Vision had
14  provided services to Republican --
15    A.    Personally.
16    Q.    -- politicians?
17    A.    Personally.  Not Strategic Vision.
18    Q.    Okay.  And what did that entail; that
19  was political campaigns or --
20    A.    Political campaigns.
21    Q.    And I'm going to guess those were
22  Republican --
23    A.    Republican.
24    Q.    -- politicians?
25    A.    Yes, presidential.

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

1    Q.    Which president, or nominee?

2    A.    Beginning -- it's okay, it's on the

3  record.  Beginning with the campaign for

4  President Reagan, President Bush, Dan Quayle,

5  obviously President Trump.

6    Q.    Did you tell Mr. Guo about all of these

7  or some of them?

8    A.    Yes.

9    Q.    Okay.

10    A.    He asked.

11    Q.    Did you tell him that you had influence

12  at the CIA?

13          MR. SCHMIDT:  Objection, but go ahead.

14    A.    I never would have used the word

15  influence.

16    Q.    How would you put it?

17    A.    Channels.

18    Q.    In other words, you have contacts at

19  the CIA?

20    A.    Yes.

21    Q.    And you could get information from them

22  that could be useful to a client from the CIA?

23    A.    No.  That's a trick question.

24    Q.    No, I'm not trying to trick you.  I

25  didn't -- if it came out that way, it wasn't my

1  intent.

2    A.    Yeah, come on.

3    Q.    I'm trying to understand what your

4  channels to the CIA, what their use is?

5    A.    Information sources that are

6  unclassified.

7    Q.    And I would ask you the same question.

8  Did you tell him that you had contacts or

9  channels in the state department?

10    A.    Yes.

11    Q.    Did you ever tell him that you worked

12  for the CIA?

13    A.    Never.

14    Q.    Okay.  Did you ever tell him that

15  Mr. Waller worked for the CIA?

16    A.    Never.

17          MR. GRENDI:  Let's go to 8.

18          (Wallop Exhibit 8, Research Agreement,

19  January 1, 2018, marked for identification.)

20    Q.    This has been marked Wallop 8.  Do you

21  recognize this document at all?

22    A.    This was a draft document to -- to Guo

23  initially.

24    Q.    Who created it?

25    A.    I think Mike and I did.

1    Q.    I'm just trying to --

2    A.    There were a lot of drafts running

3  around at the time, so, and the date is not

4  right.

5    Q.    When did you first start drafting an

6  agreement in connection with this case?

7    A.    When he asked us to, probably in --

8  around the 15th or so of December of 2017, after

9  several meetings.

10    Q.    Were there any other meetings, other

11  than the three we've talked about already, that

12  preceded this drafting?

13    A.    You know, you'd have to ask Mike.  I

14  don't think so, no.

15    Q.    When did you -- when did you do the

16  first draft?  Don't even worry about this

17  document.  I don't know if it is the first draft.

18    A.    When we had the vision documents, those

19  were sort of the beginning of the discussion.

20  This time to get them was also part of the vision

21  document that was on the flash drive, and it was

22  all in the conversation of trying to understand

23  what it was that Guo wanted.

24    Q.    So how did you go about doing the first

25  draft?  Did you and Mike sit down at a computer

1  together, or what was the process?

2    A.    Yes.

3    Q.    Okay.  Where was that, at your home in

4  Virginia?

5    A.    Yes.

6    Q.    And you sat together and --

7    A.    Yes.

8    Q.    -- typed it out or --

9    A.    Sat together and discussed it and...

10    Q.    Did you -- was it handwritten notes

11  that you later had someone transcribe or did

12  you --

13    A.    No.

14    Q.    -- type it on the computer?

15    A.    No.  We just typed it up while we were

16  talking.

17    Q.    And did you do the typing or did he?

18    A.    He did the typing.

19    Q.    Okay.  And did you keep the original

20  draft that you created?

21    A.    I think this was the draft.  I don't

22  know.

23    Q.    Okay.  And do you recall giving Wallop

24  8 to Mr. Guo or Lianchao or Ms. Wang?

25    A.    I'm sure that we gave it to both of

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 114

1    A.    We just had an agreement of trust
2  between us.
3       Q.    What were the terms of that agreement?
4       A.    Probably 50/50, plus expenses.
5       Q.    And I take it this wasn't a written
6  agreement?
7       A.    No.  We never needed one.
8       Q.    Right.  So when did you and -- well,
9  when did Strategic Vision and Mr. Waller come to
10 this 50/50 split agreement?
11      A.    Well, after we had the agreement
12 finally signed, it had been going off and on, off
13 and on during all of December, we didn't know
14 whether we had an agreement or not.  And then,
15 when Yvette turned up with the first set of flash
16 drives that were corrupted, so then I had come to
17 New York -- we didn't have an agreement, per se.
18 We had a signed agreement.  We had no funds at
19 the time, at the first -- at the tail end of
20 December, when we were still all talking after
21 Christmas.
22          And, finally, the funds turned up --
23 I'm trying to answer your question here.  When
24 the funds turned up in, like, the 2nd or 3rd of
25 January of 2018, we still didn't know whether

Page 115

1  that was even going to work, and then they turned
2  up from somebody we'd never heard of, and so
3  forth and so on.  So we had to sit down and
4  decide what was going to go for the teams that we
5  were going to use and how we were going to
6  allocate the expenses and so forth.
7       Q.    So when -- when was the point in time
8  when Strategic Vision and Mr. Waller decided how
9  they were going to, as you described it, split
10 the -- split it 50/50?
11      A.    Not until sometime in January.
12 Probably the end of January.
13      Q.    So, well after the contract had been
14 signed --
15      A.    Yes.
16      Q.    -- and the --
17      A.    We were trying to figure out what
18 things were going to cost.
19      Q.    You said before that Strategic Vision
20 had sent money to Mr. Waller, or Dr. Waller?
21      A.    When?
22      Q.    I'm asking.  That's what my question
23 is.
24      A.    No.  I mean...
25      Q.    You said there was a wire.  What was

Page 116

1  the wire that was sent?
2       A.    The wire was not sent until the middle
3  of January or so.
4       Q.    Okay.  And was that wire for splitting
5  the profits or for something else?
6       A.    It was for beginning to start paying
7  the team as well as beginning to pay Mike.
8       Q.    Oh, so it was both?
9       A.    Yeah.  There were two wires.  Maybe
10 there were three wires, yeah.
11      Q.    So how much was the wire for the team?
12 And I assume that means Team 1?
13      A.    The preliminary amount for Team 1 was
14 at least 300,000.
15      Q.    And how much of that, if there was a
16 second wire or the same wire, was for Dr. Waller?
17      A.    Then there was a separate wire for
18 about 200 for Dr. Waller.  It could have been
19 250, I have to look.  We haven't done our tax
20 thing yet on it.  But about 250.  And then there
21 was an additional amount for expenses.
22      Q.    How much was that expense amount wire,
23 if you recall?
24      A.    Well, I think -- we're talking about
25 travel, and -- because he had to do a lot of

Page 117

1  face-to-face collection, and last minute, which
2  costs a lot more; probably between 25 and 50, I
3  can't remember, thousand.
4       Q.    And is that the full extent of the
5  amount of money that's been paid to Dr. Waller in
6  connection with the research agreement that's the
7  subject of this litigation?
8       A.    I think there was a bit more, maybe
9  another 50, and that was based on certain
10 invoices that he had for -- for things that he
11 was -- that we had to pay.
12      Q.    I see.  And so what about -- let's just
13 set aside Dr. Waller.  Were there any other costs
14 that Strategic Vision incurred in connection with
15 this research agreement that didn't go through
16 Dr. Waller or one of his entities?
17      A.    There were -- there was a lot of travel
18 expense for Strategic Vision, face-to-face time
19 with these individuals overseas that I had to do.
20 There was -- there were other entities that were
21 also contracted to retrieve information.
22      Q.    Let's go one at a time, I'm sorry to
23 hop in.  But what were your -- what were
24 Strategic Vision's kind of direct travel
25 expenses?

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 118

1      A.    Oh, I would say probably at least
2   50,000.
3      Q.    And does Strategic Vision have records
4   and bank statements that would memorialize or
5   otherwise reflect all these payments you're
6   talking about here today?
7      A.    We would be able to give you an idea as
8   to what the costs are, yes.
9      Q.    So those records do exist?
10     A.    The records, the receipts, yes.
11  (*r)    MR. GRENDI:  Joe, obviously we're going
12         to call for the production of those
13         documents, we'll obviously send you a
14         letter, but to put that on the record.
15     Q.    I'm sorry, you were saying after travel
16  expenses, there were other costs as well?
17     A.    Yes.
18     Q.    What were those?
19     A.    The hiring of individuals overseas to
20  retrieve certain information that was only --
21  only in the U.K. or in Switzerland or in the
22  Middle East.
23     Q.    Okay.  And these are -- this is
24  separate from Team 1?
25     A.    Yes.

Page 119

1      Q.    And what was the cost of, let's just
2   say, the team you used to get information out of
3   the U.K.?
4      A.    It was about 20,000 U.S. dollars.
5      Q.    Is that a group called Fletcher?
6      A.    That's correct.
7      Q.    Okay.  What about, you said that maybe
8   a team in Switzerland or somewhere else?
9      A.    Yes.
10     Q.    What was the cost of that other team?
11     A.    I'd have to look.  I can't remember.
12  But it was minimal.  I mean, it wasn't -- it
13  wasn't -- it's like maybe 8, $10,000, something
14  like that.
15     Q.    Right.
16     A.    Some of it had to be done in cash.
17     Q.    How much of it was done in cash?
18     A.    Maybe that amount.
19     Q.    Eight to 10,000?
20     A.    Eight to 10,000, perhaps.  I hate cash.
21     Q.    If you would take a moment, are there
22  any other costs that you can think of that
23  Strategic Vision incurred because of this
24  research agreement?
25     A.    Well, the usual costs, telephone,

Page 120

1   travel, time spent working on this, lots of
2   different meetings with different people to try
3   to collect data.
4      Q.    Did Strategic Vision ever turn away any
5   clients because of this engagement?
6      A.    Yes, we did.
7      Q.    When was that?
8      A.    It was probably in March.
9      Q.    Of what year?
10     A.    I'm sorry.
11     Q.    That's okay.
12     A.    2018.
13     Q.    Sure.  March of 2018.  And why did
14  Strategic Vision turn that client away?
15     A.    Because we were still working on this,
16  we believed.  It could have been February, too.
17  I'd have to ask Mike.
18     Q.    And what's the name of that potential
19  client?
20     A.    I can't tell you.
21     Q.    So you're refusing to tell me that
22  because?
23     A.    I can't tell you.
24     Q.    No, I'm asking why you're not telling
25  me?

Page 121

1      A.    It's confidential.
2         MR. SCHMIDT:  Can you describe in
3      general terms at all or?
4         THE WITNESS:  Obviously, I cannot.
5         MR. SCHMIDT:  Okay.
6         MR. GRENDI:  I mean, obviously, we
7      don't accept that assertion of
8      confidentiality here, and we'll deal with it
9      at a later date.
10     Q.    So why was it that this confidential
11  client couldn't be engaged?
12     A.    We had a lot on our plate.
13     Q.    And how much was this potential client
14  willing to engage Strategic Vision for?
15     A.    We hadn't gotten that far.
16     Q.    So you don't know whether the --
17     A.    No.
18     Q.    -- potential client was going to be a
19  valuable one or not?
20     A.    No, I don't know.  I'd have to -- I'd
21  have to talk to Mike about it.
22     Q.    Was it Mike's client or your client, or
23  Strategic Vision's client I should say?
24     A.    We would have shared the client.
25     Q.    Okay.  And just generally, can you

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 126

1            MR. GRENDI:  So another 15 minutes.
2   Let's do Strategic Vision 9.
3            (Wallop Exhibit 9, Research Agreement
4   dated December 29, 2017, marked for
5   identification.)
6     Q.   Ms. Wallop, do you recognize this
7 document?
8     A.   I do.
9     Q.   That's your signature on the last page
10 there?
11     A.   It is.
12     Q.   Were you physically present when this
13 contract was executed?
14     A.   Yes.
15     Q.   And who else was there?
16     A.   Yvette Wang.
17     Q.   Anyone else?
18     A.   No.
19     Q.   Dr. Waller wasn't physically present?
20     A.   No.
21     Q.   Was he on a conference call or
22 telephoned in during the time that this agreement
23 was signed?
24     A.   No.
25     Q.   The agreement references the laws of

Page 127

1 the state of Nevada in that second paragraph, do
2 you see that?
3     A.   Correct.
4     Q.   Where did that come from?
5     A.   Because Strategic Vision is registered
6 in the state of Nevada.
7     Q.   So you put that in there because that's
8 where Strategic Vision is incorporated?
9     A.   Correct.
10     Q.   And there's some, I'll call it lingo or
11 jargon in this contract about fish, do you recall
12 that?
13     A.   Yes.
14     Q.   Where did the term fish come from?
15     A.   Guo was having a hard time
16 understanding how -- how we would select the --
17 the concept of investigation and the numbers, for
18 instance, per month.  The -- the whole file that
19 he showed us had -- the original file, whatever
20 exhibit that was, in fact, had at least 92 names
21 in it, which was reduced down to 30 names, which
22 was then reduced down to the ten names, but then
23 they switched and wanted to have 15 names in the
24 first month.
25            So, in order to give him an explanation

Page 128

1 as to how best to visualize, so to speak, the
2 whole concept of this agreement, we used an
3 example of like, it's like fish in a tank.  So if
4 you put the ten fish, or, as it turned out to be,
5 15 fish in the tank, and one of the fish --
6 forgive me -- died, but we didn't want to use the
7 word died, if one of the fish wasn't a useful
8 fish on the information that we were trying to
9 pull, we would take that fish out and put a new
10 fish, meaning a new name, into the tank, and we
11 would run the investigative background on that
12 new fish, as well as the other nine fish.
13            So, that's where the whole concept of
14 the fish tank came from.  He loved it.  He
15 couldn't wait to use it.  It was a big deal to
16 him.  So, fine, we kept talking about fish.  So,
17 for whatever reason, that's why it ended up in
18 this sort of contract agreement.
19            I realize that it's not the usual kind
20 of contract terminology that I would have used,
21 but he loved it, and so we used it, and so he
22 understood it, and that's why we moved forward
23 with it
24     Q.   I just want to know where the concept
25 came from.  Did he start using the term fish or

Page 129

1 did you; kind of like you saw a fish tank and you
2 said, well, it's just like if you took fish in
3 and out of a tank?
4     A.   Well, we were talking in hypotheticals.
5 He didn't understand how we would have to just
6 take different names out of different sort of
7 collection points --
8     Q.   I see.
9     A.   -- so we just used a really simple
10 analogy of a fish tank.  And you put the ten fish
11 in, as it turned out for the first month 15, and
12 then they -- you know, you pull one out if you
13 found that it wasn't going anywhere; in other
14 words, if it was a dead end.  A lot of these
15 Chinese names used fake names.  That's a whole
16 other thing we can get into.
17     Q.   Sure.  And has Strategic Vision ever
18 used this fish, or fish tank terminology --
19     A.   Never.
20     Q.   -- in connection with --
21            Just let me finish my question.
22     A.   Sorry.
23     Q.   -- with any other client?
24     A.   Never.
25     Q.   I take it from your expression that you

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 130

1  found it silly or ridiculous?
2      A.    I did, but it helped him understand the
3  concept.
4      Q.    It says here that, "Any and all
5  materials provided by the client, that's Eastern
6  Profit, to the contractor, that's Strategic
7  Vision, will be treated with absolute
8  confidentiality and will not be shared by the
9  contractor with any other entity."
10         Do you see that in the third paragraph
11 of this research agreement?
12     A.    Yes.
13     Q.    What -- how does that work with
14 Strategic Vision in terms of sharing information
15 with other entities?
16     A.    Well, we had to share it with the
17 teams, in other words, for them to be able to do
18 the research.
19     Q.    Does the contract discuss that at all?
20     A.    It's very clear.  You can't have an
21 agreement -- you can't do the research unless you
22 give it to the teams to do the research, right?
23     Q.    I just asked you if that was in the
24 agreement?
25     A.    Yes.

Page 131

1      Q.    Where?
2      A.    With any other entity.  "Will not be
3  shared by any other entity."  It's not an empty,
4  it was a team.  An entity would be the Washington
5  Post, or you, or a third or fourth party that has
6  nothing to do with this research agreement.
7      Q.    So I just want to understand that.  So
8  then, the contractor referred to in the contract
9  refers to more than just Strategic Vision?
10     A.    Our teams.
11     Q.    Okay.
12     A.    You understand the teams that we had to
13 use.
14     Q.    I'm just trying to understand what the
15 contract says.  Does the contract say anything
16 about teams?
17     A.    Well, if you're in the business, you
18 understand teams are teams, and you have to use a
19 team with a -- as a part of the contract.  He
20 knew perfectly well what that meant.
21     Q.    I just asked you whether the contract
22 said it, that's all.
23     A.    I'm not a lawyer.  It wasn't drawn up
24 by a lawyer.
25     Q.    It says, "The contractor will conduct

Page 132

1  high quality original research and prepare
2  reports on subjects chosen at the client's
3  discretion."
4         Do you see that in that following
5  sentence?
6      A.    Correct, yes.
7      Q.    What original research did Strategic
8  Vision do in connection with this contract?
9      A.    Based upon what we received, we then
10 started diving into pulling information.
11     Q.    When you say we, are you talking about
12 the entity Strategic Vision or other people, like
13 teams?
14     A.    Teams, and Mike and myself.
15     Q.    Was there anyone else that did the
16 research, other than those three entities that
17 you just referred to, yourself, Mr. Waller, or
18 Dr. Waller, and the teams?
19     A.    The groups in -- the individual ones in
20 both Europe and in the U.K.
21     Q.    Is that, you mean Fletcher --
22     A.    Yes.
23     Q.    -- and the other entity that you
24 referred to --
25     A.    Yes.

Page 133

1      Q.    -- I guess, in Switzerland?
2      A.    Yes.
3      Q.    It says, "The contractor will produce
4  complete research reports and provide all
5  supporting data as indicated below."  Do you see
6  that, two or three sentences down?
7      A.    Yes.
8      Q.    So was Strategic Vision going to
9  produce all the reports or were the teams going
10 to create some of them?
11     A.    The teams were going to develop them on
12 the flash drives.  We were not going to do any
13 written reports.
14     Q.    Why wouldn't you do any -- why wouldn't
15 Strategic Vision do any written reports?
16     A.    Because we were trying to keep it as
17 secure as possible.
18     Q.    But you understood that the other
19 teams -- strike that.  Let me start over.
20 Strategic Vision understood that its teams would
21 create written reports?
22         MR. SCHMIDT:  Objection.
23     A.    No.
24     Q.    No?
25     A.    No, it never says anything here about a

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 134

1  written report.
2      Q.    No, I know, I understand that.  I'm
3  trying to understand whether Strategic Vision
4  understood whether its teams or independent
5  contractors would produce written reports?
6      A.    We would not produce written reports,
7  or we had no intention of doing that.  This
8  was -- these were face-to-face meetings,
9  face-to-face information, USB flash drives.
10     Q.    Oh, I understand.
11     A.    It was --
12     Q.    Maybe we're having a semantic --
13     A.    It was Guo's -- sorry.  It was Guo's
14  insistence on the security measure.
15     Q.    I want to clarify something here.  Do
16  you understand written to mean just like
17  something written on a piece of paper as opposed
18  to electronic?
19              MR. SCHMIDT:  That's how I understood
20     it.
21     A.    Yes.
22              MR. SCHMIDT:  That's how the question
23     was.  You went from flash drives to USBs --
24              MR. GRENDI:  No, hold on.  Hold on.
25              MR. SCHMIDT:  -- into written reports.

Page 135

1      So a written report is a written report.  It
2      has a standard connotation.  So you might
3      have to redo this.
4              MR. GRENDI:  Yeah, let's -- let's break
5      it out.  I didn't get it.  I always think of
6      writing as both.
7      Q.    So, including electronic documents, did
8  you understand that written materials would be
9  produced?
10     A.    No.
11     Q.    So you never -- Strategic Vision never
12  contemplated providing any written materials to
13  Eastern Profit?
14     A.    Correct.
15     Q.    So Strategic Vision understood
16  everything would be conveyed orally to the
17  client?
18     A.    Via flash drive.
19     Q.    So flash drive would be allowed.
20  That's -- I'm including a flash drive as a
21  writing.  In other words, if something is typed
22  or handwritten on a piece of paper, that's a
23  writing.  Can we agree on that?
24     A.    No.
25              MR. SCHMIDT:  I'm actually seriously

Page 136

1  confused.  I don't know what you're asking.
2              MR. GRENDI:  All right.  I mean --
3              MR. SCHMIDT:  I think you got to back
4      way up and start this over.
5              MR. GRENDI:  Well, we're getting -- why
6      don't we do lunch.  We'll start over on
7      this.  It's no big deal.
8              THE VIDEOGRAPHER:  Off the record at
9      12:57.
10             (Whereupon, a short recess was taken.)
11             THE VIDEOGRAPHER:  Back on the record
12     at 1:01.
13     Q.    How did Strategic Vision intend to
14  deliver the reports described in this research
15  agreement?
16     A.    Directly to the designated driver, the
17  designated agent for Mr. Guo, who was either
18  going to be Lianchao, then it became Yvette, and
19  then it became Lianchao again.  So we would give
20  it to them or Guo directly on a USB key.
21     Q.    So there would be electronic documents
22  on a USB?
23     A.    Correct.
24     Q.    And would any of those documents be a
25  report in narrative form?

Page 137

1      A.    I never saw them until later, until
2  after all of this started.  I never saw any of
3  the documentation.  Again, compartmentalizing.
4      Q.    Right.  So Strategic Vision never
5  reviewed any of the documents that were delivered
6  to either Lianchao Han or Yvette Wang under this
7  research agreement?
8              MR. SCHMIDT:  Objection.  Go ahead.
9      A.    No.
10     Q.    And I'll just ask about you personally.
11  You personally didn't review any of the documents
12  that were delivered to Lianchao Han or Yvette
13  Wang under this research agreement?
14     A.    No, because of the timing and the
15  logistics.
16     Q.    Okay.  What is financial forensic
17  historical research?
18     A.    What do you mean?
19     Q.    Well, it's described here in -- on
20  Eastern 5, on the first page there?
21     A.    Yes.
22     Q.    Have you used that term before in --
23     A.    Yes.
24     Q.    -- other research agreements?
25     A.    Yes.

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 138

```
1       Q.    And are these kind of standard terms or
2    items that would be included in financial
3    forensic historical research?
4       A.    It would be, particularly if you're
5    looking at information you're trying to get in
6    the way of money laundering or cash purchases;
7    for instance, there were cash purchases of
8    houses, cash purchases by these fish.  We were
9    tracking their individual financial spending
10   habits, how they could have a house, how they
11   could have a car, when they only had $2,500 in a
12   credit card limit.
13           I mean, there were multiple layers and
14   levels of investigation that go on into
15   financial, forensic accounting, or research in
16   this case.
17      Q.    This kind of list of different things
18   that could be researched, including statements,
19   capital sources, etc., do you see that list with
20   all those commas there?
21      A.    Yes.
22      Q.    Was that a list that you and Dr. Waller
23   put together in terms of Strategic Vision's
24   capabilities?
25      A.    What we would have been able to have
```

Page 139

```
1    researched -- there are two ways of looking at
2    it.  Stateside, what anybody can do that is into
3    this field.
4       Q.    Right.
5       A.    Versus what you can also do overseas,
6    and they're sort of two different rabbits to.
7       Q.    Does the agreement kind of break out
8    that difference in terms of U.S. versus foreign?
9       A.    Somewhere in here, I think it might
10   have.
11      Q.    Okay.  But just going back to this list
12   of different types of information on Eastern 5.
13   Do you recall you and Dr. Waller putting that
14   list together, or this --
15      A.    Yes, we did.  We talked about it, and
16   he wrote -- wrote it while we collaborated on it.
17      Q.    Do you remember any input from the
18   other side as to what the financial forensic
19   historical research should include?
20      A.    They wanted everything, everything we
21   could get our hands on.
22      Q.    I see.
23      A.    He was particularly -- Guo was
24   particularly insistent that we dive and dive
25   harder, and dive faster, and dive harder, almost
```

Page 140

```
1    to our detriment; we said, it was not legal to do
2    what he wanted to be done, so.
3       Q.    So in terms of the -- you understood
4    that the client wanted everything in terms of
5    financial forensic historical research?
6       A.    That's correct.
7       Q.    And then you kind of put together this
8    list here of everything you could think of that
9    you could access?
10      A.    We put together the list first.
11      Q.    Okay.
12      A.    And then he kept saying he wanted more
13   and more and more and more.
14      Q.    Oh, so do you recall adding, you know,
15   different items to this A tab, forensic
16   historical research, to include more items that
17   he was demanding?
18      A.    No.  He demanded it verbally.
19      Q.    Okay.
20      A.    I think it was around the 26th of
21   January, that, I do remember, where he was
22   insistent; I don't care what it takes, get it,
23   get it.  We said, you have to take your time.
24      Q.    And it talks about on the next page,
25   Eastern 6, progress reports.  It says,
```

Page 141

```
1    "contractor will produce a progress report on" --
2       A.    Where is this?
3       Q.    It's the, I guess, the first full
4    paragraph on Eastern 6.
5       A.    Oh, okay.
6       Q.    What is a progress report?
7       A.    Verbal conversations that we had with
8    him.
9       Q.    What would be in a verbal progress
10   report?
11      A.    Telling him what we were doing and how
12   we were trying to get the teams set up and done
13   in the first month.
14      Q.    Has Strategic Vision bargained for
15   progress reports in other agreements with other
16   clients?
17      A.    I don't understand the question.  Each
18   client is different and each agreement is
19   different, and so the terms are different.
20      Q.    So you've never -- strike that.  Has
21   Strategic Vision ever provided progress reports
22   to other clients in connection with investigatory
23   research?
24      A.    Usually we do it the same way, through
25   USB key or face-to-face.
```

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 142

1    Q.    Has the term progress report been used
2  by Strategic Vision in other contracts it has
3  with its clients?
4    A.    It depends on the terms of the
5  contract.
6    Q.    I'm asking if you recall?
7    A.    I don't recall.
8    Q.    So progress reports are not a standard
9  term that Strategic Vision uses in other research
10 agreements?
11         MR. SCHMIDT:  Objection.
12   A.    Progress reports have different
13 definitions depending upon the security and
14 the -- each individual client's situation.  They
15 are not all the same.
16   Q.    I understand.
17   A.    So they're not all the same.
18   Q.    Okay.
19   A.    A progress report -- if somebody wants
20 a progress report on how their cat is doing, we
21 can do a progress report on how the cat is, or
22 how a house is, or a real estate is.  But this is
23 highly confidential and a secure confidential
24 compartmentalization of information that was
25 vital to him, to Guo.

Page 143

1    Q.    What about preliminary reports?
2    A.    There is no terminology on here on
3  preliminary reports, other than face-to-face.
4  That's what we were relying on, was face-to-face.
5    Q.    If you look at the next sentence, it
6  says -- or, actually, the same sentence.  It
7  says, "the contractor will produce a progress
8  report on this financial, forensic research each
9  week in the first month."  Then it says, "one
10 preliminary report in the first month."
11   A.    Which we did.  We exceeded that.
12   Q.    Let me ask you this.  What does a
13 preliminary report include?
14   A.    Verbal report, face-to-face, which is
15 what we were doing when we had the meetings with
16 Guo in his apartment.
17   Q.    I think you're misunderstanding my
18 question.  I'm trying to understand what the
19 contents of a preliminary report would be, as
20 compared to a progress report?
21   A.    It would be a verbal report and
22 updating him on what the circumstances were and
23 what we were gathering and how we were gathering
24 it.  That's a preliminary report.
25   Q.    So there's really no difference between

Page 144

1  a progress report and a preliminary report?
2    A.    I have no idea how to answer that,
3  except that I'm trying to explain to you that it
4  is, in fact, a face-to-face conversation.  It is
5  not in writing.
6    Q.    I understand that.
7    A.    Okay.  So what's the problem on the
8  question?  I don't understand.
9    Q.    I want to understand what the
10 difference is between them.
11   A.    A written report and a verbal report?
12   Q.    Not a written report, no.  Let me ask
13 my question.  It says, a weekly progress
14 report --
15   A.    Yes.
16   Q.    -- and one preliminary report at the
17 end of the first month, or in the first month.
18   A.    All right.
19   Q.    And I want to know if, to Strategic
20 Vision, is there a difference between the
21 contents of a progress report and a preliminary
22 report.  I'm talking about contents, not delivery
23 method.
24   A.    Depending upon how much we've been able
25 to gather, the preliminary report is precisely

Page 145

1  that; that's just the beginning, that's like the
2  first paragraph in a novel.  The next
3  conversation, which is what happened, the next
4  conversation was an update on the material and
5  the information that we had already gathered.  So
6  it was all still verbal, face-to-face.  There is
7  no written report.
8    Q.    And what about a historical research
9  report, one comprehensive historical research
10 report; what were the contents --
11   A.    And that was --
12   Q.    -- whether it's conveyed orally or in
13 writing or electronically, what would the
14 contents of a comprehensive historical research
15 report be?
16   A.    That would have been the findings that
17 would have been coming from our teams, or team in
18 this case, which would have been the USB or flash
19 drive.
20   Q.    And what would typically be in a
21 comprehensive historical research report?  What
22 kind of level of information would be there?
23   A.    Since we were trying to get something
24 within ten days of the contract commencing, and
25 he was adamant about getting something

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 150

1    A.   It was all done with Team 1.  Team 1
2  was doing it.
3    Q.   So Team 1 was assigned the A, B and C
4  described here on Eastern 5 and 6?
5    A.   They were assigned the entire menu.
6  That was their job.  Even though it was separated
7  out, they knew exactly what their mandate was.
8    Q.   And the social media research reports,
9  again, is there any distinction between how
10 they're created and the other reports,
11 conceptually?
12   A.   We didn't have time.  We -- what we
13 were pulling in ten days was remarkable.  Nobody
14 can pull it in ten days.  So you have a
15 three-month contract that you're signed on to,
16 and you believe that you've got three months to
17 pull the entire set of information retrieval
18 that's necessary, and you're given ten days,
19 while somebody's squawking about, oh, my, you
20 know, it -- it's not all there.
21        Well, it can't possibly be all there.
22 Nobody can have it there in ten days.  You can't
23 build a team, collect the beginnings of all of
24 these things, unless you want to be shut down
25 immediately.

Page 151

1    Q.   I just want to be clear, though.  Did
2  Strategic Vision deliver any social media
3  research reports?
4    A.   I'm sure we did, somewhere.
5    Q.   Did you verbally deliver a social media
6  research report to the client?
7    A.   I believe we did.
8    Q.   When would that have been?
9    A.   Sometime during -- between December and
10 January of 2017, '18.  They were verbally,
11 verbally.  And we may have had some
12 documentation.  I can't remember.
13   Q.   And what about current tracking
14 research, how was that conveyed to Ms. Wang or
15 Lianchao Han?
16   A.   Mike did it with the USB key.
17   Q.   And that was on January 30th of 2018?
18   A.   Yes.
19   Q.   Any other time?
20   A.   Yes, there was another USB key earlier,
21 I think.
22   Q.   It says on Eastern 7 that "all
23 deliverables shall be by USB drive only."
24   A.   Correct.
25   Q.   What does deliverables mean in that

Page 152

1  context?
2    A.   All the information we were mandated to
3  investigate.
4    Q.   And why USB only; was that a Strategic
5  Vision concept or Mr. Guo or someone else?
6    A.   It was Guo, as well as our own sense of
7  security on this investigation.  We were
8  investigating, according to Guo, a number of the
9  communist Chinese hierarchy leadership and their
10 children in the United States, and it was --
11 could have been life-threatening for all of us.
12 So it was only on USB key, and, hence, the
13 security issue.
14   Q.   Did Strategic Vision understand that
15 all the fish in Exhibit 7 were living in the U.S.
16 or had property in the U.S.?
17   A.   Some of -- no.  Some of them did and
18 some of them didn't.  I -- you know, you'd have
19 to go through them individually to see which ones
20 have what.
21   Q.   And so is that why Strategic Vision
22 needed a U.S. team, because there was
23 U.S.-located fish?
24   A.   There was U.S.-located information,
25 like fake passport numbers, fake Social Security

Page 153

1  numbers, fake names, Chinese, fake.  A lot of
2  fakes.
3    Q.   In the United States?
4    A.   In the United States.  On the list that
5  Guo gave us.
6    Q.   It says on Eastern 7 that, "the
7  contractor guarantees that all information
8  provided is genuine."  Do you see that?
9    A.   Yes.
10   Q.   It's in the criteria section.
11   A.   Sure.
12   Q.   How does Strategic Vision guarantee
13 that its information is genuine?
14   A.   Based upon the individuals from whom we
15 were retrieving the information, providing of
16 course we were given -- not given fake names and
17 fake passports and fake criteria to investigate.
18   Q.   I just want to understand Strategic
19 Vision's process, though.  How does it normally
20 go about guaranteeing the genuineness of the
21 information being provided to its clients?
22   A.   Because we trust our sources, and our
23 sources do not make up nonsense.
24   Q.   Does Strategic Vision ever do any
25 cross-checking or verification of the information

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 154

1  provided by its sources?
2      A.    That's part of the idea that we had
3  with having Team 1 and Team 2.
4      Q.    That's what you're talking about with
5  the -- how to get them document?
6      A.    Yeah.  It's cross-checking, it's making
7  sure, double verifying the same fact.  You have a
8  birthday over here and you have a birthday over
9  there.  They should be the same birthday.  If
10 they're not, there's something that we need to
11 look at on a secondary basis.
12         If you have a passport number over
13 here, a U.S. passport, a U.S. visa number over
14 here, and it doesn't match what we have within
15 the state department, there's an issue.  So we
16 have to then go down that rabbit hole.
17     Q.    And that's a synthesis or an analysis
18 process that Strategic Vision typically does with
19 the information it's getting from its sources?
20     A.    That's correct.
21     Q.    I see.  And that's how Strategic Vision
22 typically feels comfortable guaranteeing that all
23 the information is genuine?
24     A.    That's correct.
25     Q.    Did Strategic Vision have an

Page 155

1  opportunity to verify that the information being
2  provided was genuine in this instance?
3      A.    Yes and no.
4      Q.    Okay.  How does that work; which part
5  is yes and which part is no?
6      A.    Of course.  Yes, we could verify
7  in many cases that the information was correct,
8  and then, if we found that it was incorrect, we
9  would have to, like, double-check it.
10     Q.    No, I'm asking about what happened in
11 this instance, with this research agreement.  Was
12 Strategic Vision able to determine that the
13 information being provided back to the client was
14 genuine?
15     A.    Yes.
16         MR. SCHMIDT:  Objection, but go ahead.
17     A.    Yes.
18     Q.    How did Strategic Vision do that?
19     A.    Because we compared apples and oranges
20 and made sure that they were one and the same, as
21 far as information that we were turning over
22 based on -- you have to understand, if we're told
23 your name is John Smith, and we're given
24 information on these documents from Guo that your
25 name is John Smith, with a photograph and all of

Page 156

1  your sort of date of birth, and we turn around
2  and we find out really your name is Joe Schmidt,
3  and you were born in a totally different place,
4  then we have to then rejig the entire system that
5  we're working with.
6         That's why it was extremely -- not
7  just -- it wasn't just frustrating, but it was an
8  extremely complex situation that you couldn't
9  just do like you're checking somebody's credit
10 report or Better Business Bureau thing.  You just
11 couldn't.
12     Q.    Well, just going back to Wallop 7.
13     A.    Whatever that is.
14     Q.    You're saying that -- that's the list
15 of fish?
16     A.    Yes.
17     Q.    You could take a look back at it if you
18 want, but I don't think it's necessary.
19     A.    No.  I sort of know these fish by now.
20     Q.    I was going to say, so how many of the
21 fish were -- was Strategic Vision provided with
22 correct information for?
23     A.    Well, I can tell you, you can see some
24 of my notes on here.  Some of these -- for
25 instance, on page 3, you have Anita.

Page 157

1      Q.    Yes.
2      A.    Her real mother is Mingduan Yao.  Her
3  adoptive parents, because that's done a lot in
4  this basket, are Frank Suen, and then -- then
5  the -- the mother -- sorry, the mother is
6  Mingduan Yao, and then the father of the sister,
7  Mingshan -- Mingshan Yao.  These are the real
8  parents of this girl, okay?  But, in certain
9  documentation, it's showing these people
10 are, in fact, her mother and father (indicating).
11 They're not.  They're her adopt -- adoptive
12 parents.
13         Then if you go to here, if you go on to
14 page 4, and it shows 1990 as her, I guess, entry,
15 because I don't have the note on here; 1990 is
16 her -- maybe her entry into the United States
17 visa.  The Social Security number, if I recall
18 correctly, and this is only on recall --
19     Q.    Sure.
20     A.    -- was, in fact -- here we go, on page
21 5, it shows it, had the same Social Security
22 number as a woman named Eileen Rodriguez, at the
23 same address where this woman Anita was living.
24         So then again, this is just one tidbit
25 of one fish, or one person that you have to start

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 158

1  tracking, and you have to understand where the
2  pieces fit, or why.
3      Q.    And so just --
4      A.    If you go -- yeah.
5      Q.    On that fifth page, those are your
6  notes about --
7      A.    Yes.
8      Q.    -- Eileen Rodriguez?
9      A.    Yes.
10     Q.    And what does --
11     A.    It's the same Social Security number.
12     Q.    And what's the money down there?  It
13 looks like it says 2,000 and --
14     A.    No, no.  It's 2 million.  2.089.000.
15 That, I believe, was the address where she was
16 living, and it showed, if I recall correctly,
17 again, I can't remember because I don't have it
18 all in front of me, but she had sort of a credit
19 limit of $2,000 on a credit card, the only credit
20 card she had, and then the house that she was
21 living in somehow was bought in cash, but it
22 doesn't show who the owners were of that
23 residence.
24          And then you get all these -- you must
25 have had four or five Social Security numbers

Page 159

1  that were the same Social Security numbers for
2  the same person.
3      Q.    So just going back to my original
4  question, if you recall, how many of the
5  information about the -- well, strike that.
6      A.    There were a lot.  There were at least
7  three or four.
8      Q.    There were 15 fish, right?
9          MR. SCHMIDT:  Let him finish the
10 question.
11     Q.    Yeah, let me just finish the question.
12 Thanks.
13          There were 15 fish, correct?
14     A.    Yes, initially.
15     Q.    And how many of them had information
16 that, in Strategic Vision's knowledge, is false
17 or inaccurate?
18     A.    I would say maybe six or seven.  Maybe
19 more.
20     Q.    And the remainder had, let's call it
21 accurate information?
22     A.    I wouldn't call it accurate.  It had to
23 be double-checked.
24     Q.    Sure.
25     A.    So we found little things that were out

Page 160

1  of whack, like numbers, passport numbers or visa
2  numbers, or this one has an Australian
3  nationality, some of the ones that we were doing
4  in the U.K. had totally different names, but then
5  they actually did match up if you dug deeper.
6      Q.    Okay.  So some of them had -- you had
7  mentioned earlier had -- were completely fake,
8  they weren't --
9      A.    That's right.
10     Q.    -- real people?
11     A.    That's right.
12     Q.    How many of the 15 fish were, in
13 Strategic Vision's opinion or knowledge, fake?
14     A.    I would have to talk to Mike about
15 that, but I think we -- we came up with at least
16 five or six that were fake, or at least had a lot
17 of questions to be asked about them.  The names
18 did not match up with the names on the state
19 department visas or on -- within our channels.
20     Q.    In other words, there obviously was a
21 person who looked like that fish in the --
22     A.    That's right.
23     Q.    -- document?
24     A.    Yes.
25     Q.    But that the names and information

Page 161

1  being provided were for --
2      A.    Were fake.
3      Q.    Were fake?
4      A.    If -- if Guo was telling the truth
5  about saying he paid $250 million for this
6  information, then he totally got, excuse me,
7  screwed.  He got totally screwed.  Because the
8  information in here, just from what we were able
9  to surmise, was rubbish, and that's real -- the
10 real garbage.
11     Q.    Okay.  Let's go back to the research
12 agreement, that's Wallop 9.
13     A.    Yes, let's go.
14     Q.    And we'll -- I do want to check on
15 lunch.  I know it's 1:30 now.  Let me just go see
16 about that.  Let's go off the record for a
17 second.
18     A.    Do you want to finish this?
19     Q.    Well --
20     A.    I'd rather finish this.
21     Q.    Let's keep going, sure.  I'm sure
22 they'll knock when the time comes.
23     A.    I'm sure they will.
24     Q.    Let's talk about irregular
25 circumstances.  Do you see that paragraph?

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 162

1     A.    Yes.
2     Q.    Did you and Mr. Waller draft this
3  section?
4     A.    Dr. Waller, yes, we did.
5     Q.    And what was the intent or purpose
6  behind drafting this section?
7     A.    I wouldn't call it intent.  That's --
8  that's truly not fair.  It was a protective
9  element for life.  You can't always say that it's
10 going to be 100 percent of everything every
11 second of every day.  You cannot.  It's not
12 there, it's not gonna happen.
13          So irregular circumstances by us, and
14 including Guo, said that both parties understand
15 that occasional unforeseen challenges may arise
16 that will slow or block comprehensive research,
17 and that there may be periods in which
18 information is irregular, unavailable or
19 incomplete.
20          Perfect reference are some of these
21 names in here.  The contractor will endeavor to
22 make all research and reports as complete as
23 possible in a timely scheduled manner.  Which
24 does not mean ten days from the beginning of the
25 contract.

Page 163

1     Q.    Has Strategic Vision ever used a clause
2  that's substantially the same or similar to this
3  irregular circumstances clause in other
4  agreements?
5     A.    I'm sure there have been ones that have
6  been similar to it.  I mean, it's not unusual.
7  This is -- this is the form that is taken.
8     Q.    In terms of Strategic Vision's
9  experience in this field, was the research
10 bargained for in this research agreement, did it
11 encounter irregular circumstances or problems
12 from the outset?
13    A.    I would say when we started getting
14 into it, we found that there were irregularities.
15 That's not to say that we couldn't continue
16 digging to find the answer.  But we certainly
17 found irregularities when we were talking to Team
18 2 in Texas about these people.
19    Q.    Right.  So just in terms of, any
20 project has some problems, no investigatory
21 research project just goes off without a hitch,
22 correct?
23    A.    Correct.
24    Q.    So there's always some issues that
25 either slow down the research or make information

Page 164

1  unavailable for a time; is that fair to say?
2     A.    Which Guo understood completely.  At
3  least he said he did.
4     Q.    When did he tell you that?
5     A.    Several times.  I think it was probably
6  the middle of January when we met him, and then
7  on the 26th, even though he was upset we didn't
8  have everything by Chinese New Year, or some kind
9  of new criteria.
10    Q.    Did you understand that the research
11 was needed in a very tight schedule because of
12 the Chinese New Year?
13    A.    No.
14    Q.    When did you come to understand that?
15    A.    Later, when we realized that that
16 seemed to be his issue.
17    Q.    When did you first talk about getting
18 the information by Chinese New Year with Mr. Guo
19 or Yvette Wang --
20    A.    Never.
21    Q.    -- or Lianchao?
22    A.    Never.  Not until much later, I mean,
23 after the fact.
24    Q.    No, that's what I'm trying to find out
25 when --

Page 165

1     A.    Oh.
2     Q.    When that was.
3     A.    After the fact, so sometime in the
4  early part of February, I guess.  I think maybe
5  Lianchao sort of said that to us.
6     Q.    Okay.  But prior to the contract, there
7  was no discussion about --
8     A.    No.
9     Q.    -- Chinese New Year or anything like
10 that?
11    A.    No.
12    Q.    If irregular circumstances arise, does
13 the client have to pay for not receiving any
14 research?
15    A.    Of course.  It's the risk we both take.
16    Q.    And has that occurred in the past with
17 Strategic Vision's clients?
18    A.    Yes.
19    Q.    So even though Strategic Vision is
20 unable to provide, let's just say, any research
21 because of an irregular circumstance, the client
22 still has to pay the full price of the reports?
23    A.    It's our time that it takes to do what
24 we're doing.  We wouldn't find it out, would we,
25 unless we had done the investigation.  So it's

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 166

1  our time.
2      Q.     But if the compensation is monthly, and
3  time-based, essentially, is there any period
4  where irregular circumstances would result in a
5  pause of the client's obligation to make payment?
6          MR. SCHMIDT:  Objection.  It's been
7      answered, but go ahead.
8      A.     I'd like to ask any law firm.  Give me
9  a break.
10     Q.     Well, I'm asking you the question,
11 though, so, please.
12     A.     Well, you can ask the question, but I'm
13 telling you, it's just like a law firm, we
14 operate in the same way.
15         MR. SCHMIDT:  That's the answer.  You
16     got your answer.
17         MR. GRENDI:  I'm gonna just clean it
18     up.  Thank you.
19     Q.     So, in your mind, or in Strategic
20 Vision's understanding, it's compensated for the
21 time it spends trying to do research, not based
22 upon what's actually delivered?
23         MR. SCHMIDT:  Objection.
24     A.     Yes.
25     Q.     What's the cost of a report under this

Page 167

1  research agreement?
2      A.     Well, you have it here.  It's listed.
3  It's complex, depending upon the menu that he
4  chose to work with.
5      Q.     Are you looking on page -- well,
6  Eastern 8?
7          MR. SCHMIDT:  There's a knocking on the
8      door.
9          THE WITNESS:  Saved by your knock.
10         MR. GRENDI:  Let me see if that's it.
11     We'll go off.  I think it's about time.
12         THE VIDEOGRAPHER:  Off the record at
13     1:42.
14         (Whereupon a luncheon recess was
15     taken.)
16         THE VIDEOGRAPHER:  Back on the record
17     at 2:30.
18     Q.     Good afternoon.  Ms. Wallop, you still
19 understand that you're under oath?
20     A.     Yes.
21     Q.     On this Exhibit Number 9, on page
22 Eastern 9.
23     A.     Just a second.
24     Q.     I think it's right in front of you.
25     A.     Oh, okay.  Number 9, page 9, whatever

Page 168

1  it is.
2      Q.     Yeah, Eastern 9 is the Bates number.
3      A.     Okay, yes.
4      Q.     Do you see where it says, "It is
5  understood that client may direct other entities
6  to pay the contractor"?  It's in the --
7      A.     Yes.
8      Q.     What was the purpose of this clause?
9      A.     Well, it was very simple, but,
10 apparently, Mr. Guo didn't understand how
11 important it was.
12     Q.     Well, why was this clause inserted into
13 the agreement; what was the meaning of it?
14     A.     Because we had told him that, and they
15 had told us that it was coming through a William
16 Wu in London from their account somewhere else in
17 the U.K. or Europe, and we had told them
18 explicitly that it should not come from Hong Kong
19 or an Asian account; and, guess what, it did, and
20 that was because of the mainland Chinese
21 intelligence services then finding out who Guo
22 and his people in Hong Kong were paying for this
23 kind of -- for a contract, let's just put it that
24 way.
25     Q.     So was the purpose of this clause to

Page 169

1  prevent the Chinese communist party from finding
2  out about this relationship?
3      A.     Yes, for our safety and the safety of
4  our -- our contractors or our teams.
5      Q.     Was it ever contemplated that the money
6  would come to an entity other than Strategic
7  Vision, to protect Strategic Vision's identity?
8      A.     Yes.  It was supposed to come from a
9  U.K. account to our account, from -- from him,
10 from Guo, through his money manager in the U.K.,
11 as we understood it.
12     Q.     When was that discussed?
13     A.     It was discussed when -- just before we
14 agreed to the contract, to the terms of the
15 contract, or the agreement.  We shouldn't call it
16 a contract, as it's an agreement.
17     Q.     And how did that issue come up; did you
18 bring it up or was it --
19     A.     Mike and I both raised it.
20     Q.     Okay.  And what was just the substance
21 of that discussion?
22     A.     The security fact that it was dangerous
23 for all of us to be connected with him based upon
24 the investigation that we would be doing, and if
25 that investigation of the mainland Chinese

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 170

1  hierarchy and their families was disclosed as a
2  result of the funding that he was doing to us
3  directly.
4      Q.   Did you ever consider, on the recipient
5  side, using another entity to receive the money,
6  other than Strategic Vision?
7      A.   No.  The agreement was with Strategic
8  Vision.  We had no idea who Eastern was.
9      Q.   Let me ask you about the next sentence
10  there.  It says, "all client payments must be
11  received by the contractor by wire transfer
12  within five business days of invoice," do you see
13  that?
14      A.   Yes.  Somewhere.
15      Q.   It's the last sentence in that
16  paragraph.
17      A.   Yes.
18      Q.   Did Strategic Vision issue any invoices
19  to Eastern?
20      A.   We were -- no.
21      Q.   So there was never a time when
22  Strategic Vision sent an invoice document saying
23  you owe this money to us, to Strategic -- or to
24  Eastern Profit, excuse me?
25      A.   That's when Lianchao was involved, and

Page 171

1  he explicitly told Guo that he did owe the
2  amount.  We never got paid for January, we never
3  got paid for February.  We had the agreement,
4  which outlined the terms.  We gave Guo the first
5  two weeks, essentially, free on our own ticket.
6  So from the 16th to the 26th was ten days that we
7  were into the contract.  So if you've taken it
8  from the 16th of January to the 16th of February,
9  that's when an invoice technically should have
10  gone out to him.  But we believed we were still
11  pulling information, and we wanted to be able to
12  have as much as possible for him, and, in the
13  meantime, he pulled his stunt with the lawsuit on
14  the 23rd.  And I was out of the country, so I
15  didn't know anything about it.
16      Q.   So Strategic Vision never sent Eastern
17  an invoice prior to February 23rd, 2018?
18      A.   We did not, but we should have.  In
19  hindsight, we thought that we were -- we thought
20  that we were being honest.
21      Q.   When was the first time Eastern Profit
22  Corporation was included in this contract, in a
23  draft of it I should say?
24      A.   It was never, until this particular
25  document, to my knowledge.

Page 172

1      Q.   Was that on January 6th, the day it was
2  signed?
3      A.   I think so.
4      Q.   And how did that come up?
5      A.   Yvette said that was who was going to
6  be signing it.
7      Q.   What did you say in response to that,
8  if anything?
9      A.   I asked her, I said, who's Eastern
10  Profit?  She said, Mr. Guo's company, or some
11  such thing.
12      Q.   Then you checked where Eastern Profit
13  Corporation Limited was incorporated?
14      A.   If I recall, when we were in the
15  federal court, you didn't know where --
16      Q.   I'm asking you a question.
17      A.   No, I'm --
18      MR. SCHMIDT:  Just answer --
19      A.   I'm trying to answer it.  I don't know
20  because I couldn't find anything; when we went to
21  sort of look it up, there wasn't anything that we
22  could find in this country.
23      Q.   What I'm asking is, did you look up
24  Eastern Profit Corporation Limited on January 6,
25  2018, did you try to figure out where it was from

Page 173

1  then?
2      A.   No.
3      Q.   Did you know it was domiciled in China?
4      A.   I had no idea.  They certainly didn't
5  reveal that to us, as they should have.
6      Q.   Did you ask them where it was
7  domiciled?
8      A.   Yvette didn't know.
9      Q.   I'm asking if you asked?
10      A.   I asked Yvette.  She didn't know.
11      Q.   When was that?
12      A.   At the signing.  I said, what is this
13  Eastern Profit Corporation?
14      Q.   You asked, what is this Eastern Profit
15  Corporation?
16      A.   Yes.
17      Q.   And what did she say?
18      A.   She said, I don't know, it's something
19  that Mr. Guo has his own -- it's his own company.
20      Q.   And was there any followup to that or
21  was that the end --
22      A.   No.
23      Q.   -- of the discussion?
24      A.   That was the end of the discussion.
25      Q.   Okay.

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 174

1    A.   It was supposed to be funded.  The
2  entire contract was supposed to be funded.
3  Apparently, it wasn't.
4    Q.   Let's go back to Exhibit 7.  I think
5  previously you had mentioned that you saw this
6  Exhibit 7 when Mr. Guo put it on a table at a
7  meeting, is that right?
8    A.   I believe this is correct.
9    Q.   And when was the next time you saw this
10 information?
11   A.   When we actually printed it off from
12 the USB key.  After three different attempts of
13 corrupted USB keys from Yvette, we finally were
14 able to print it off ourselves onto a virgin
15 computer.
16   Q.   Okay.  When did -- when was the first
17 time you saw this information after the coffee
18 table viewing?
19   A.   When we printed it off after we got the
20 corrupted USB keys from Yvette.
21   Q.   What date was that?
22        MR. SCHMIDT:  What date?
23   A.   Oh, I'm sorry.  I guess it was about
24 the -- oh, God, about the -- oh, the 8th, the 8th
25 of January it would have been.  It would have

Page 175

1  been Monday, because I had to come up to New York
2  to get it.
3    Q.   So you didn't see the information in
4  Exhibit 7 on January 6, 2018 when it was -- the
5  contract was signed?
6    A.   No.
7    Q.   You didn't view it?
8    A.   I -- it wouldn't open, that was the
9  problem.  That's why I had to come to New York.
10 On the 6th, she gave us three keys, three USB
11 keys.  Two would not open.  The third one would
12 not open on my computer, and so that's when I
13 took it to my neighbor and he was kind enough to
14 put it into his computer, just to see if anything
15 would open.  All it was was complete corrupted
16 file, just nothing but Chinese characters all
17 over the place.  It had no -- nothing like this.
18 So we both starting pulling all of the wires out
19 of his computers and his hard drives and -- yeah,
20 and yanked the flash drive out and everything
21 else.  It was a nightmare.
22   Q.   And who's your neighbor?
23   A.   You have the letter.  His name is
24 Richard Shewell, S-h-e-w-e-l-l.
25   Q.   And What's Mr. Shewell's relationship

Page 176

1  to Strategic Vision?
2    A.   None, other than a friend who kindly
3  was trying to see if there was something the
4  matter with the flash drives, which clearly there
5  were.  So then I came to New York on Monday to
6  meet her, that is Yvette, at the Pierre, in the
7  lobby.  I brought another computer.  She brought
8  three flash drives.  One worked, and that was
9  this, this one; in other words, this file.  The
10 other two were corrupted.
11        I kept them, kept all of the flash
12 drives.  I took the one that was good, I brought
13 it back to Washington and put it into a virgin
14 computer, and then we printed this thing off.  A
15 virgin computer, for the benefit of the court, is
16 one that has no connection to the internet and/or
17 a printer that has any connection to an internet.
18 So it's like a dumb computer.
19   Q.   Does Strategic Vision have any kind of
20 confidentiality arrangement with Richard Shewell?
21   A.   No.
22   Q.   Is Richard Shewell a member of the team
23 or otherwise --
24   A.   No.
25   Q.   Let me just finish the question for the

Page 177

1  record.  Is Richard Shewell part of Strategic
2  Vision's team or teams that provide investigatory
3  research?
4    A.   No.
5    Q.   So once you've accessed this
6  information on January 8th, what did Strategic
7  Vision do next?
8    A.   On January 8th?
9    Q.   Yes.  Now that you have the list of
10 fish.
11   A.   So now that we've printed off this
12 file, then Mike came and we sat down and we
13 started talking about how we were going to --
14 where we could -- which certain things we could
15 put together and enter into our channels for
16 information.  And then we -- then he got in touch
17 with Team 1, that had been sort of sitting on
18 hold, and then -- then there were meetings with
19 Team 1 leader, and we began.
20   Q.   So just this initial process with
21 Dr. Waller, were you parsing to see who was going
22 to do what in terms of the investigation, is that
23 fair?
24   A.   Somewhat, yes.  It's a very complex
25 investigation.  It takes the U.S. side as well as

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 178

1    international side.  We had to divide up the
2    issues.
3          Q.    Were there aspects of the research that
4    he was going to handle and aspects that you were
5    going to handle, or Strategic Vision was going to
6    handle?
7          A.    I would say so, yes.
8          Q.    And what portion of the research was
9    assigned or delegated to Strategic Vision, or you
10   personally?
11         A.    The U.S. side, where we felt that we
12   could pull certain pieces of information legally
13   from U.S. channels, so we had to go through and
14   see who supposedly had a U.S. passport, U.S.
15   visas, or who had, you know, illegitimate
16   children born in the United States.  It was a --
17   it was big.  It was a big issue.
18         Q.    And what portion -- I take it Mr.
19   Waller was going to do the international portion?
20         A.    No, Dr. Waller.
21         Q.    I'm sorry.  I was calling him Mr.
22   Waller the whole last deposition, so correct me,
23   please, feel free.  Dr. Waller.
24               What was Dr. Waller assigned to in
25   terms of this division?

Page 179

1          A.    He was assigned to work with Team 1 to
2    help pull the information with Team 1, because
3    there were a number of things that they had to
4    get into, but they could only do it from an
5    overseas location.
6          Q.    I see.  So none of the U.S.-based
7    investigatory research was handled by Team 1?
8          A.    No.  Well, no.  It was all done -- it
9    was done through the U.S. side.
10         Q.    And that was not Team 1?
11         A.    No, it's never been Team 1.
12         Q.    Got it.  I just want to be clear about
13   it.  The way you're saying no could be
14   interpreted multiple ways, so I just want to be
15   super clear.
16         A.    Not really.
17         Q.    Okay.
18               MR. SCHMIDT:  Just --
19               THE WITNESS:  I know.  It's silly.
20         Q.    You could just -- it's not.  It's a --
21   you have to understand, ma'am, it's a record that
22   we're trying to keep clear for the court, and I
23   just don't want there to be ambiguity.
24         A.    I wouldn't want any ambiguity for the
25   court.

Page 180

1          Q.    Of course not.  Right.
2          A.    I want the court to be -- have a very
3    clear reading of what is being asked.
4          Q.    Me, too.
5          A.    Good.
6          Q.    And so then how did you -- were you
7    managing the U.S.-based process personally?
8          A.    Yes.  Um-hum.
9          Q.    So you've got the information on
10   January 8th.  What did you do in terms of that
11   process?  What was --
12         A.    Mike and I, as I said, divided up what
13   needed to be done.  I got in touch with my
14   channels, he got in touch with his channels.
15         Q.    Just without even saying who your
16   channels are or what they do, did you get in
17   touch with several people; how many people did
18   you get in touch with?
19         A.    I have no idea.  There were a number of
20   people.
21         Q.    And did you receive valuable
22   information from those people?
23         A.    Some, I did and some was -- was fake
24   information.  You have to understand that we were
25   given fake names and fake information to either

Page 181

1    send us down rabbit holes for nothing, a waste of
2    time, or we could find legitimately that there
3    were some people that we could actually piece
4    together some of the tracking.  But their names
5    had been changed.  They kept changing their
6    names.
7          Q.    So when did you -- when did you first
8    find out that, in your understanding, some of the
9    names were fake; when did that happen?
10         A.    I would say probably within the
11   first -- probably within the first ten days.  And
12   we discussed that with Lianchao and we discussed
13   it with -- with Guo.
14         Q.    Okay.  How was -- was there a meeting
15   with Lianchao --
16         A.    Yes.
17         Q.    -- and Guo where that was discussed?
18         A.    Yes.
19         Q.    Where was that?
20         A.    In New York, at his apartment.  We
21   never met Guo outside of his apartment.  He never
22   left his apartment.
23         Q.    And when did that meeting occur?
24         A.    I guess it was, as I said, within the
25   ten days from the 8th, 9th, which was like a

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

1   Monday or a Tuesday, to about the 15th or so of
2   the month, 16th, something like that.
3        Q.   Was Ms. Wang there?
4        A.   Where?
5        Q.   At that meeting that you've just
6   described.
7        A.   Who knows.  He kept saying he didn't
8   trust her.
9        Q.   I'm asking whether you recall her being
10  present?
11       A.   No, I don't remember, because sometimes
12  she was in there and sometimes Lianchao was
13  there, so I don't remember.  He said he didn't
14  trust her, so a lot of times he sent her out.
15       Q.   In other words, she might have been in
16  the area, in the building that you were meeting
17  in, but he would say, leave the room?
18       A.   Yes.
19       Q.   And you would have the meeting without
20  her?
21       A.   Yes, that happened.
22       Q.   How many times did that --
23       A.   On several occasions.
24       Q.   And were you and Dr. Waller
25  coordinating and checking in on the research

1   after this January 8th start date?
2        A.   Oh, yeah.  I mean, obviously, I
3   couldn't -- I could only do from my side what I
4   could do on retrievals.  What he was doing with
5   Team 1 was -- was totally different because it
6   was overseas, and so, therefore, he was
7   coordinating with the person on the overseas
8   retrieval, and I was not a party to that.
9        Q.   Right.  How did you check in with one
10  another?  Would you meet in --
11       A.   Daily.
12       Q.   -- D.C.?
13       A.   No, no, no, he would come to my home.
14  We never did anything on the telephone.
15       Q.   So after -- well, starting on
16  January 8th, you and Dr. Waller were meeting
17  almost daily to handle this investigation?
18       A.   I would say so, yes.
19       Q.   But of course you couldn't communicate
20  with him when he was flying to Europe or things
21  of that nature, correct?
22       A.   No.
23       Q.   Because you wouldn't.  Because, even
24  though you could communicate with him, for
25  security reasons, you would not do that?

1        A.   That tended to be the case.  I mean, he
2   might say, I've landed, or he might say, I just
3   finished my meeting, or, I'm on the way back.
4   That's about the limit of it.
5        Q.   And would those be Signal messages or
6   some other communication means?
7        A.   Usually on Signal.
8        Q.   Did you keep your Signal messages with
9   Dr. Waller?
10       A.   I turned over everything I had to --
11  whatever is there to Joe.
12       Q.   Right.  I'm asking --
13       A.   To the law firm.
14       Q.   I'm asking if you -- did you delete
15  Signal messages you had with --
16       A.   Some I have.
17       Q.   -- Dr. Waller?
18       A.   I always do.  Because some I -- I don't
19  keep Sig -- all of my Signal messages.  That
20  means for everybody, not just for Guo.
21       Q.   I understand.  And why is it your
22  practice to delete messages like that?
23       A.   Because that's what it's set up for.
24  That's what Signal does.
25       Q.   Oh, there's like an automatic

1   destruction policy?
2        A.   There's an automatic destruction thing,
3   It's 30 minutes or 30 minutes.  An hour.
4        Q.   Okay.  That's one of the features of
5   the application?
6        A.   Yes.
7        Q.   Did you ever ask Mr. Guo or Lianchao or
8   Yvette Wang how they got the information in
9   Exhibit 7?
10       A.   Yes, they told me.
11       Q.   What did they tell you?
12       A.   Guo said, this is the file, he slammed
13  down on the coffee table like that in front of me
14  in his apartment, in his sun room, and said, this
15  is what we need to investigate, these are the
16  people we need to look into, and, here, you can
17  look through the names.  And I said, wow.  He
18  said, I paid $250 million for this.  I said,
19  really.
20       Q.   I take it you didn't believe that
21  price?
22       A.   I found that extraordinary, given just
23  even the preliminary stuff that was on it.
24       Q.   And did he explain to you how the
25  information was obtained by him, other than

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 186

1   obviously paying for it, what means were
2   employed?
3        A.    He bribed people to get it, bribed
4   people to take photographs of passports, I guess.
5   I don't know.
6        Q.    Did he tell you that or is that your
7   assumption?
8        A.    He actually told me that.  I mean, he
9   said that in the meeting.  He said, yeah, I had
10  to bribe people to take pictures of passports.
11  Otherwise, I don't know where the other
12  information came from.
13       Q.    Let's go to the next document.
14             (Wallop Exhibit 10, Signal messages,
15       Bates stamped Eastern-0000201, marked for
16       identification.)
17       Q.    This has been marked Wallop 10.  Do you
18  recognize this Signal thread?
19       A.    Well, it looks like it's from me, and
20  probably to Yvette.
21       Q.    Did you ever exchange Signal messages
22  with Lianchao Han?
23       A.    I'm sure I have.  It may or may not
24  have had anything to do with this, the contract.
25       Q.    So you've worked with Mr. Han on other

Page 187

1   matters or --
2        A.    Well, we're pro-democracy, and he
3   represents a pro-democracy group in Washington;
4   and so, yes, there are issues that are going on
5   about the mainland that had nothing to do with
6   Guo.
7        Q.    Going to Eastern 203.
8        A.    Yes.
9        Q.    Do you see where it says, "yes let's
10  discuss now"?
11       A.    Yes.
12       Q.    And below that there's like a little
13  phone symbol, do you see that?
14       A.    Correct.
15       Q.    Do you recall speaking to Ms. Wang
16  about this agreement on or about December 28th?
17       A.    That would have been correct, because
18  that's when they sort of were changing the terms
19  of the contract from ten fish to 15 fish, and
20  that's what the 15 refers to in her...
21       Q.    And you had a phone conversation about
22  that?
23       A.    Yes, it's right here.  And then I put
24  it in -- or she put it in there, and then you'll
25  see the rest of it.

Page 188

1        Q.    Did you discuss any other terms at that
2   point, or was that just the focus, the number of
3   fish, during the first month?
4        A.    It was the number of fish for the first
5   month.
6        Q.    I'm asking from your memory --
7        A.    Yes.
8        Q.    -- do you recall discussing any other
9   terms of the agreement?
10       A.    No, we didn't change that term.  She
11  knew that, in the second month, it would be ten
12  fish.
13       Q.    And did you redraft or edit the
14  agreement based upon this discussion?
15       A.    Not that I recall, no.
16       Q.    Well, you did put in that there would
17  be 15 fish during the first month instead of
18  the --
19       A.    Yes, because we'd already -- when was
20  this?  This was 12/29.
21       Q.    28.
22       A.    12/28.  And I can't even remember on
23  the contract whether it's -- I don't know if we
24  even defined whether it was 15 in the first month
25  or not, but we went ahead and agreed to the 15;

Page 189

1   so, gave her five fish, basically.
2        Q.    Did you ever give her a copy of the
3   agreement for her to make edits?
4        A.    Yes.
5        Q.    When was that?
6        A.    Because when we talked about it, she
7   was talking to Guo all the time on the telephone,
8   and we made edits.  I remember when she was at
9   the house earlier that -- maybe during this time
10  frame, the 29th, or 28th or something.  "We are
11  looking at your changes and have made a combined
12  document based on our conversation yesterday and
13  our mutual agreement."  This was on the 29th.
14             So we made it at my house, and then we
15  agreed to it, and then I went and printed it off
16  from my printer.
17       Q.    Right.  What I'm asking is, did you --
18  you physically gave her a --
19       A.    Yeah.
20       Q.    -- a paper copy?
21       A.    Yes, we both did.  I mean, we both had
22  the same piece of paper that we were scratching
23  up and redoing.
24       Q.    I wasn't sure of that, that's why I'm
25  asking.  I don't know that.

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 190

1    So she left with a copy of the draft
2  agreement on or about --
3    A.   I believe so --
4    Q.   -- December 29th?
5    A.   -- yes.  It says here, "most easy
6  edits, no worries."
7    Q.   And that was your comment, correct?
8    A.   Yes.
9    Q.   Why did you think they were mostly easy
10 edits?
11   A.   Well, because she had -- she had made
12 the suggestion on the edits, so I made the
13 agreement to go ahead and make the little
14 changes, whatever they were.
15   Q.   And did you meet with Ms. Wang again on
16 or about December 30th?
17   A.   Honestly, I can't remember the 30th.  I
18 do remember the -- I guess it says -- see, here
19 it's the 5th.  I think it was the 5th that I met
20 her next.
21   Q.   Let me ask you this.  Do you recall a
22 meeting with Ms. Wang where you thought that she
23 was proposing major and unreasonable changes?
24   A.   Somewhere in that earlier part of that
25 conversation, and that's when we made the changes

Page 191

1  in the edits.  She then consulted with Guo.  Guo
2  agreed to them, there might have been something
3  he disagreed with, and then he disagreed with
4  her, and then we went back and re-did the edit
5  back to sort of what the original language must
6  have been in the final copy that she signed, and
7  he agreed to, on the telephone.
8    Q.   Was that on January 6th, on the actual
9  date of the signing?
10   A.   No, it was a little bit earlier.  I
11 think it goes back here to wherever we were
12 talking about mostly easy edits.
13   Q.   Okay.  Was Mr. Guo on the phone when
14 you and Ms. Wang signed the agreement?
15   A.   Yes, I think he was.  I think he was.
16 Because she sat on the sofa with me, and that's
17 where she was talking to somebody, so I -- in
18 Mandarin, so I presume that's who it was.
19   Q.   Okay.  So you didn't know who she was
20 talking to at that point, but --
21   A.   No, but she -- it was clear to me that
22 it was Guo.  She just sort of hung up, she said,
23 okay, fine, we all agree, everything is fine.
24   Q.   But he wasn't on speakerphone, so you
25 didn't hear his voice?

Page 192

1    A.   No.  It was Mandarin, so he was just
2  speaking to his employee, I guess.
3    Q.   But you -- sitting here today, you're
4  not certain that it was him?
5    A.   I could hear his voice, so it sounded
6  like him.
7    Q.   Turning to Eastern 206.
8    A.   Yes.
9    Q.   Do you see this message talking about
10 "unfortunately they could not stop the process
11 technically.  My Boss said he had already
12 contacted you about this fund...we were
13 discussing last week, as I advised you that our
14 people were ready to send you the deposit."  Do
15 you see that?
16   A.   I do.  I was very confused by that.
17   Q.   There's a PDF that was attached to this
18 document, do you see that?
19   A.   Yes.
20   Q.   Do you have any recollection as to what
21 was sent to you on or about January 2nd
22 concerning this deposit?
23   A.   This was, I believe, the copy of the
24 DBS wire.  I'm not sure, but I think it was.
25   Q.   And what was your response to receiving

Page 193

1  the wire?  Because, correct me if I'm wrong, but
2  the contract had not been signed as of
3  January 2nd, 2018, correct?
4    A.   Not by the 2nd, but we had agreed to
5  everything on the terms, even though she had to
6  come back from New York to sign the document; we
7  had agreed by telephone.
8    Q.   Were you surprised to receive the money
9  at that time?
10   A.   Not entirely.  But we -- we -- it came
11 from a source that we didn't know who it was.  It
12 came from ACA Capital or something.  We didn't
13 know who that was.
14   Q.   So how did you find out about that?
15 Did this message prompt you to check your account
16 or was it that you checked your account and said,
17 why is there a million dollars there?  What was
18 the process?
19   A.   It was very simple.  I got this
20 message --
21   Q.   I see.
22   A.   -- I checked the account.  Something
23 from ACA was there.  Said, my boss, meaning Guo,
24 said he had already contacted us about this fund.
25 We never got any contact from Guo.  Never  Never

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 194

1  received a phone call, never received a text,
2  nothing.  So I don't know what she's talking
3  about here.
4         "Our contract won't be changed if there
5  is a chance to work together.  Otherwise please
6  kindly return fund."  These people were like
7  ping-pong balls, okay?  You're just trying to do
8  what they're asking you to do, you get everything
9  in order to do it, and then they fool around with
10  this nonsense.
11      Q.    Did you consider sending the wire back
12  because you didn't have a signed contract or --
13      A.    No, because we already had agreed to
14  this verbally.  Both Guo and herself had agreed
15  to it.  And so she then comes down on the 5th,
16  and signs the thing on the 6th.
17      Q.    And so, going back to the 6th.  Were
18  there any changes made to the agreement at that
19  time?
20      A.    No, none.  The only change was that I
21  accepted the 15 fish instead of the ten, I mean,
22  verbally.  It was a verbal, honorable thing to
23  do.  And then here's my thing saying right what I
24  said on whatever it is, 208, as discussed with
25  the 15 fish.

Page 195

1       Q.    Did you tell Yvette that they shouldn't
2  have sent the wire from where they had?
3       A.    Well, I -- later on I did.  Lianchao
4  told her; like, what were you thinking?
5       Q.    So you had a conversation with Lianchao
6  about the wire --
7       A.    Later.
8       Q.    -- being done properly?
9       A.    Later, later.  Like, two weeks later.
10      Q.    And you understood that Lianchao had
11  conveyed that to --
12      A.    Yes.
13      Q.    -- Ms. Wang?
14      A.    Well, to Guo.  He played those two back
15  and forth.  He played Yvette against Lianchao,
16  Lianchao against Yvette.
17      Q.    Turning to Eastern 208.  It says, "We
18  hope you will have the docs as discussed for the
19  15 fish with you"?
20      A.    That's right.
21      Q.    And so what was -- was that the -- you
22  already understood what that was, that was --
23      A.    That was this.
24      Q.    -- Exhibit 7?
25      A.    Yes.  And that's when she arrived on

Page 196

1  the 5th and she had the bad flash drives, okay?
2  That's when I went to the next door neighbor,
3  just to stick it in to see if it was alive or
4  not.  He didn't see anything, because there was
5  nothing to see, and he couldn't have seen
6  anything even if he had.  So that's exactly what
7  happened.
8       Q.    Turning to Eastern 211.  You wrote,
9  "the agreement for 3 months is correct."  Do you
10  see that at the top of the page?
11      A.    Yes.
12      Q.    What did you mean by that?
13      A.    Because the contract was for three
14  months, was for 90 days.  January, we have
15  allowed 15 fish.  Ten fish each for February and
16  March; for some reason, that's sort of cut off.
17  Oh, here it is, March.  "We will determine the
18  subsequent monthly costs obviously by the next
19  set of numbers of fish in the tank."
20      Q.    So what would happen after 90 days?
21      A.    We were all going to regroup and figure
22  out how much -- how many of the fish had -- were
23  useful information for him and how many fish had
24  been tossed out, and then he was going to be
25  adding more fish.  He said up to 4,000 fish,

Page 197

1  total.
2       Q.    Would it have been possible to do
3  investigations on 4,000 fish?
4       A.    Not all at once, and he knew that.  He
5  agreed that would be ridiculous.  It was supposed
6  to be a three-year contract.
7       Q.    But it was a -- you're saying it was a
8  three-month contract?
9       A.    It was three months, to be done for a
10  year, if you look at the contract itself, and
11  then, after that time, it was a three-year
12  contract.  If you recall, on the last page of the
13  agreement, "duration of this contract shall be
14  enforced for three years from the date of
15  signing."  That's what we had initially planned
16  on.  We certainly had initially planned on the
17  first three months.
18      Q.    On Eastern 213, do you see where it
19  says, "can you please send the contract here?  I
20  get the right person to do.  Thank you"?
21      A.    That was weird.
22      Q.    What did you understand that request to
23  mean?
24      A.    Well, we certainly weren't going to
25  send it through any kind of email thing.  So she

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 198

1  had to sign it -- she had to come -- she signed
2  it on the 6th.  So she says, "please send the
3  contract here I get the right person to do."  I
4  don't know what that meant.  "There is of course
5  no impasse here.  I work with several people, M
6  is one of them saying for this project he is not
7  only boss."  Well, that was news to us.
8      Q.    I'm just asking about why you didn't
9  send the contract when it was requested there?
10     A.    Because we still didn't have -- oh,
11 dear lord.  We still didn't have the flash
12 drives.  This was the 5th.  We didn't get the
13 proper flash drives with the folder until the
14 8th, Monday the 8th.  So what could we do, except
15 take -- except have her sign the contract.  They
16 had already sent the money, we all had agreed to
17 the terms.  She needed to sign the contract.
18 Then I went to New York to get a flash drive
19 that, God willing, would work, out of the three.
20          And we tried to explain to them that
21 their systems were corrupted.  If she was
22 downloading, or he was downloading the stuff from
23 his own computer, he was getting -- he was being
24 hacked into by the Chinese himself.  Because you
25 can't make this stuff up on the -- on the

Page 199

1  corrupted files.
2      Q.    But before January 6th, you weren't
3  aware of any corruption or hacking issues, were
4  you?
5      A.    Yes, absolutely.
6      Q.    How were you supposedly aware of that?
7      A.    Well, because we had a corrupt -- when
8  we were even sitting there, I think at one point
9  Guo had a USB key and he was putting it into his
10 own computer, and it was acting up, and he took
11 it out and he said, I can't -- I can't do the
12 file here.
13     Q.    When was that?
14     A.    It was before -- this must have been
15 sometime in mid-Jan -- mid-December, whenever we
16 were up there meeting with him, he had an issue
17 with the computer.  And Mike told him, he said,
18 you know, you got -- you got issues here that
19 have nothing to do with us.
20     Q.    You wrote, "As you know, the agreement
21 can only be reviewed and cannot be sent by email
22 for the purpose of absolute security"?
23     A.    Correct.
24     Q.    It says, "Other than New York, L, M and
25 myself and you, we are the only ones privy to

Page 200

1  it."
2      A.    Correct.  And New York was equally
3  adamant about it.  That was Guo.
4      Q.    I was going to say, who's New York?
5      A.    That was Guo.
6      Q.    And L is Lianchao?
7      A.    Yes.
8      Q.    And who's M?
9      A.    Michael, Mike, Dr. Waller.
10     Q.    Turning to Eastern 19.  You wrote,
11 "Thank you.  I will look forward to seeing you
12 tomorrow here.  You can make whatever minor
13 changes here on my laptop and then print off two
14 copies"?
15     A.    Correct.  That meant print off two
16 copies of the agreement.
17     Q.    Right.  What were the changes or issues
18 that you were thinking of at that time?
19     A.    Whatever changes we made that were --
20 she would -- I mean, whatever was made was made,
21 and we agreed to in the document.  I don't
22 remember.  They were minor.
23     Q.    You said, "we've already lost a week"?
24     A.    That's right.
25     Q.    What did you mean by that?

Page 201

1      A.    If we didn't have this, we couldn't
2  start.  If we didn't have the entire file, we
3  couldn't start, could we?  Because we had no
4  information to go on.
5      Q.    Did you understand that time was an
6  important factor?
7          MR. SCHMIDT:  Objection.
8      A.    Of course it was an important factor.
9      Q.    Why was that?
10     A.    Because we were prepared to go, but,
11 due to their corrupt files, we couldn't start
12 until we got the full document that was not
13 corrupted.
14     Q.    Right.  But this is January 5th, right,
15 this email message or Signal message?
16     A.    Yes.
17     Q.    And so I'm just asking, you hadn't
18 seen -- or you hadn't received the files that had
19 any alleged issues with it in terms of --
20     A.    Yes.  She came on the 5th, she put the
21 files in, they didn't work, they were corrupted.
22 I then had to get on the train and come up here
23 on the Monday morning, the 8th, okay, to get the
24 USB file that was clean.  Out of the three, there
25 was only one that was clean.

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 202

1    Q.    I thought --
2    A.    So we couldn't start.
3    Q.    -- the agreement was signed on
4  January 6th, though?
5    A.    Yes, but we couldn't start until we had
6  clean files.  She thought she had clean files,
7  and she didn't have them on the 5th and 6th, did
8  she?
9    Q.    I don't understand how you thought you
10  lost a week, if you hadn't even signed an
11  agreement yet?
12    A.    Because the funds had been sent, right,
13  on the 29th, and let's call it the 2nd that we
14  had received them, and, in fact, they didn't
15  really get into our account until the 4th because
16  of the holiday weekend and so forth.  And then
17  Citibank called to say, are -- is this your --
18  are these -- you expecting this?  I said yes.  So
19  they were fine.  But they were not available --
20  there's something known as a federal reserve,
21  that stops large payments.  Anything over, like,
22  $300,000 gets flagged.  So we had to verify that
23  this was a contract.
24    Q.    Let's go to Eastern 223.  Do you
25  remember Ms. Wang sending you a Signal message

Page 203

1  asking to accommodate two small fish?
2    A.    Two more small fish.  So it would have
3  made 17 fish, okay?  No.  The answer was
4  absolutely no.
5    Q.    Well, let's just go one at a time.
6        MR. SCHMIDT:  Do you remember receiving
7    the message or --
8        THE WITNESS:  Yes.
9        MR. SCHMIDT:  -- or --
10       THE WITNESS:  Yes.
11       MR. SCHMIDT:  Okay.
12    Q.    Okay.  And what was your response?
13    A.    No.  Absolutely no.
14    Q.    And why did you have that firm
15  response?
16    A.    Because we've already given you five
17  extra fish, if you will read my response.
18    Q.    They did have to pay for those 15 fish,
19  though, right?
20    A.    Not really.
21    Q.    Okay.
22    A.    They didn't.  They were five free fish.
23    Q.    And they were entitled to all three
24  reports on those 15 fish?
25    A.    What reports?

Page 204

1    Q.    The financial, forensic research,
2  current tracking and social media?
3    A.    There were not reports, other than
4  flash drive information, which we've already
5  answered that.
6    Q.    Of course we have, yes, but they are
7  referred to as reports in the agreement, so
8  that's why I'm using that term.
9    A.    They're flash drives.
10    Q.    Okay.
11    A.    They're not written.
12    Q.    And the teams that are already
13  dispatched, how many teams were dispatched as of
14  January 9th?
15    A.    Well, One was in the process of
16  being -- Number One was being in the process of
17  being dispatched because it was an overseas
18  person that was -- that Mike had to coordinate
19  with, and we had to get -- we had to get numerous
20  computers and different kinds of phones and
21  burner phones and everything.  It's a huge
22  operation.
23    Q.    Were you involved at all in the
24  logistics of that operation?
25    A.    No.  Mike was.

Page 205

1    Q.    So he was involved in procuring the
2  phones and computers and things of that nature --
3    A.    No.
4    Q.    -- for Team 1?
5    A.    Team 1 did it.
6    Q.    Okay.  What other teams were dispatched
7  as of January 9th, other than Team 1?
8    A.    That was the only "team team" outside
9  of the United States.  I was collecting or I was
10  getting ready to begin to collect information
11  from my own channels, which was not labeled as a
12  team.
13    Q.    Right.  I'm just trying to understand
14  your message on Eastern 224.  At the end it says,
15  "Teams are already dispatched and beginning their
16  trip"?
17    A.    That meant Mike and the person that was
18  hiring the people to manage this particular
19  account.  It wasn't just one person with one
20  computer.  There were at least ten.
21    Q.    Ten individuals.
22    A.    Ten individuals.
23    Q.    On Team 1?
24    A.    On Team 1, at least.
25    Q.    And how did you know how many members

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 206

1  of Team 1 there were?
2      A.    Because I was told that by Mike.
3  That's all I know.  I don't know who they were, I
4  don't know their names.  I don't know anything
5  about it.  We compartmentalized it.
6      Q.    Right.  So you don't have any -- you
7  played no role in assembling Team 1 or managing
8  its actions?
9      A.    My expertise, young man, is --
10     Q.    I'm not that young, but go on.
11     A.    -- is 45 years of working in
12  specialized areas, and I understand how to
13  assemble the right people to do, God knows, the
14  right job.  And Mike was one of the people who
15  did dispatch and organize Team 1.
16     Q.    Right.  So you weren't involved with
17  managing or assembling --
18     A.    Not on a --
19     Q.    -- Team 1?
20     A.    -- day-to-day because we were
21  compartmentalizing it.
22     Q.    That's fine.  You can -- I'm just
23  asking for an answer.
24     A.    I'm giving you one.
25     Q.    Thank you.

Page 207

1      A.    You're welcome.
2      Q.    What was the issue that -- if we go to
3  Eastern 227, that caused a delay of eight days?
4      A.    Okay, you have to take a calendar out
5  and look at the calendar for January.  It's easy
6  to see.  The 8th, Monday the 8th was when we
7  finally got a decent copy of this, right
8  (indicating)?
9      Q.    Exhibit 7?
10     A.    Yes, Exhibit 7.
11     Q.    Sure.
12     A.    That week, Mike and the person from
13  Team 1 were coordinating how they were going to
14  get the -- the equipment together.  They had to
15  drive to three different countries to get the
16  information -- I mean, to get the equipment, so
17  they wouldn't be tracked.
18            The IP numbers and everything else
19  would not be tracked.  These would be, quote,
20  technically, virgin computers, virgin phones,
21  these would be burner phones.  All of these
22  communications had to be coordinated.  So from
23  the 8th of January to the 16th, I believe, makes
24  eight days.
25     Q.    And that's what I'm trying to

Page 208

1  understand.  What was it between the 8th and the
2  16th that caused a delay?
3      A.    Well, we didn't have the equipment to
4  begin to do what we said we wanted to be able to
5  do because of all of these weirdo delays with the
6  flash drives.
7      Q.    In other words --
8      A.    They were corrupted flash drives,
9  right?
10     Q.    In other words, you didn't have the
11  equipment to do the research on, let's just say,
12  January 1, you had to go and buy it --
13     A.    That's correct.
14     Q.    -- after the agreement was signed?
15     A.    That's correct.  And why would that be?
16     Q.    I'll be asking the questions.
17     A.    I know --
18            MR. SCHMIDT:  Don't ask questions.
19     A.    -- but, I mean, this is absurd.
20            MR. GRENDI:  Why don't we take a little
21  break.
22            THE WITNESS:  Yeah, I think we need a
23  little break.
24            MR. SCHMIDT:  That's fine.
25            THE WITNESS:  You just don't get it.

Page 209

1            THE VIDEOGRAPHER:  Off the record at
2  3:25.
3            (Whereupon, a short recess was taken.)
4            THE VIDEOGRAPHER:  Back on the record
5  at 3:32.
6      Q.    Still on Wallop 10, Bates number
7  Eastern 227.  Do you see where you wrote, "We
8  have some new exotic fish options to discuss
9  too"?
10     A.    Yes.
11     Q.    What did you mean by that?
12     A.    I think Mike and I had come up with
13  some information that would have been interesting
14  for Guo.
15     Q.    Why did you describe it as a fish
16  option?  What does that --
17     A.    I think exotic was the key word there,
18  because it was outside of the parameter.
19     Q.    What do you mean by parameter?  I just
20  want to understand --
21     A.    Outside of the -- the 15 fish.  It was
22  additional information that we thought he might
23  find useful.  It had nothing to do with the 15
24  fish.
25     Q.    What was that information?

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 214

1    A.    Not in depth.
2    Q.    This comment about, we expect to have a
3 fairly full net, was just your assumption?
4    A.    Yes.
5    Q.    And at that time, you didn't know if
6 Team 1 was finding any information or good
7 information, or anything of that nature?
8    A.    We were told that they were finding
9 information.
10   Q.    So, again, how did you get that
11 information if you didn't get it from Dr. Waller?
12   A.    He told me, but I've said to you that I
13 only spoke a little bit to Michael.  I did not
14 know all of the details of that.  He said that he
15 believed he had some good information that was
16 going to make New York, New York, as we called
17 him, happy.
18   Q.    I got it.  Going to Eastern 235.  At
19 the bottom of the page you wrote, "We have to
20 finish shopping and we'll find a very nice
21 present for."  That's all it has there.
22         What did you mean by finish shopping,
23 if you recall?
24   A.    Well, we -- we're -- let's see.  This
25 was ten days into the contract, essentially.  We

Page 215

1 were working through weekends, so we were trying
2 to retrieve information, according to Mike, that
3 was -- that we felt that was going to be very
4 useful for him.  Again, I did not know what those
5 specifics were.
6    Q.    But the reference to shopping is the
7 collection of information?
8    A.    The collection, yes.
9    Q.    And a present would be, what, useful
10 information?
11   A.    Useful information.
12   Q.    And you said, "we'll be there on the
13 25th."  Was that for a meeting that you were
14 planning with Mr. Guo and Lianchao and Yvette?
15   A.    Yeah, it was the 25th or the 26th.  I
16 thought it was the 26th.
17   Q.    If you turn to Eastern 238.
18   A.    Yeah.
19   Q.    You see it says, "okay we'll do lunch
20 for the 26th"?
21   A.    Right.
22   Q.    And is that your recollection, that the
23 meeting was --
24   A.    Yes.
25   Q.    And what -- what happened at that

Page 216

1 meeting, if you recall?
2    A.    We had some information, and I can't
3 remember if Mike had gotten -- I don't think he'd
4 gotten the flash drive at that point, that
5 particular flash drive, but we were giving him a
6 verbal update on certain people within the --
7 within the file, Exhibit 7.
8    Q.    And you said before that you were
9 working around the clock?
10   A.    Yes.  They were.
11   Q.    But you weren't.  You mean the team was
12 or -- I just want to be precise here.
13   A.    Well, I'm human.  I don't work 24/7.
14   Q.    I didn't mean that, obviously.  But you
15 said you'd been working weekends on this; is that
16 fair to say?
17   A.    All of us were working, often.
18 Whenever we found a lead, we'd go after it.
19   Q.    And is that just standard procedure for
20 --
21   A.    Yes.
22   Q.    -- and engagement of this nature?
23   A.    Yes.
24         MR. SCHMIDT:  Just let him finish the
25 question.

Page 217

1         MR. GRENDI:  That's okay.
2    A.    Yes.
3    Q.    And does that schedule ever let up
4 during an engagement or is it just typical for
5 the beginning of an investigatory research
6 project?
7    A.    Well, something that was this intense,
8 where you had an increase -- mentally, you'd
9 already sort of planned out in the contract for
10 ten.  So you get a 33 percent increase.  So you
11 have to sort of shift the -- the process, adjust
12 the process so that you can continue to keep
13 going in.
14         Again, I have to tell you, repeatedly,
15 how many names were fake, how many -- how many
16 bits of information and addresses were fake, how
17 many rabbit holes these guys had to go down to --
18 to prove that there were not -- the information
19 that Guo had been given for $250 million, a lot
20 of it was rubbish.
21   Q.    Just going back to that meeting on the
22 26th of January.  Was any information presented
23 to the client?
24   A.    I think Mike did, yes, verbally.
25 Verbally.  We sat there and listened.

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 230

1   A.   No.
2       Q.   Let's go to Eastern 259.  Do you see
3   where Dr. Waller wrote, "our understanding was
4   that the first 90 days would be for starting up
5   and developing the data"?
6       A.   I see that.
7       Q.   Was that Strategic Vision's
8   understanding as well or just Dr. Waller's?
9       A.   No, it was our mutual understanding
10  between Guo and myself and Lianchao and Mike.
11      Q.   Do you see where it says, "We
12  did not understand that he expected actual data
13  in the first days or weeks"?
14      A.   Correct.
15      Q.   Again, you never talked to Dr. Waller
16  about this exchange after --
17      A.   Not about --
18      Q.   -- it happened on the --
19      A.   -- this exchange, no.
20      Q.   Did you ever discuss the substance of
21  this exchange, or something akin to it, about the
22  expectations of the client?
23      A.   Perhaps later that -- when we were
24  talking about what -- what we had been able to
25  retrieve so far, and how we had -- let me just

Page 231

1   read this.  How Mike had explained very
2   patiently, very calmly, very slowly, whether it
3   was with -- or through Lianchao or through
4   Yvette, how the process works.
5       So, if Guo wanted to speed up and get
6   everything really fast, then all the trap doors,
7   all the doors that we had been able to open
8   quietly, would be slammed shut.  If Guo would
9   just be patient and let us get into where we
10  needed to go quietly, he was going to get an
11  awful lot of information back.
12      The irony is, that had he just relaxed
13  and stayed on top of this, that is Guo, he would
14  have had a huge amount of information three
15  months a year in.  Huge.  We can't fix somebody's
16  perception of how this is done.  He was very
17  impatient.
18      Q.   When did you understand that Mr. Guo
19  was getting impatient?
20      A.   I guess around -- well, certainly on
21  the 26th, when we sort of had our lunch with him,
22  and then -- and then I think possibly through
23  Lianchao; because, as I told you, he never had
24  any direct contact with -- with Guo.  It was
25  always through Lianchao or Yvette.

Page 232

1       Q.   Right.
2       A.   Yvette was taken off the case in, as we
3   understand it, beginning the 1st of February.
4   And then she -- she sent us an email saying she
5   was no longer in it, that only to -- to
6   communicate with Lianchao.
7       Q.   Did Strategic Vision adjust its
8   research approach based upon this request for
9   more immediate results?
10      A.   No.  In fact, we actually increased the
11  pressure on Team 1, and then went and had a
12  long -- several meetings with potential Team 2,
13  and that's another side of it.
14      Q.   Is that a company that goes by the
15  acronym ASOG?
16      A.   Yes.  In Dallas.  Outside of Dallas.
17      Q.   And why was it that ASOG was contacted
18  in connection with this research agreement?
19      A.   Because we had the option of being able
20  to bring in whatever teams we felt were going to
21  be additionally viable, and also on the domestic
22  side of some of the things that we were bumping
23  into, or Mike and his team were bumping into on
24  the international side, which were not pretty.
25      So, we were given the names of the

Page 233

1   fellows who had been with NSA, DIA, whatever,
2   in -- in -- in Dallas, and we went and met with
3   them, and they told us -- they looked at -- we
4   only gave them like a couple of names, we never
5   gave them the whole file.
6       And they looked at it, and then we went
7   back about a week later maybe, it might even have
8   been ten days later, a week later, and they were
9   totally freaked out.  They said, you can't touch
10  any of these people or any of these names.  We
11  said, what are you talking about?
12      That's when they said, these are all
13  RPs.  We will all go to jail if you start fooling
14  around in their files.
15      Q.   So when did you first meet with ASOG,
16  that meeting in Dallas you just described?
17      A.   Yeah, it would have been the beginning
18  of February, I should think.  Again, Mike has the
19  date.
20      Q.   Is there any reason a second team
21  wasn't assembled at the outset of the agreement?
22      A.   We did -- because of the element of
23  retrieval we had to do outside of the United
24  States, because he wanted it so fast and so
25  quickly and intensely, that that was the fastest,

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 234

```
 1  quickest way of getting into certain files had
 2  they not all -- had some of them not been fake,
 3  then we would have had no -- we wouldn't have
 4  gone to the second -- second dimension.
 5       Q.    And the decision to go with the second
 6  team, was that Strategic Vision's --
 7       A.    Mine --
 8       Q.    -- decision or Dr. Waller's?
 9       A.    Mine and Mike's, yeah.
10       Q.    Jointly?
11       A.    Jointly.
12       Q.    Okay.
13       A.    We both went down twice.
14       Q.    And you said RP.  What does RP mean?
15       A.    Restricted persons.
16       Q.    And in your career in this
17  investigatory field, have you encountered
18  restricted persons before or --
19       A.    Yes and no.  It's had different
20  acronyms.  Sometimes it's PP, protected persons.
21  Sometimes it's RP.  But it means that it is
22  either under a watch list by the U.S. Government
23  or it is a -- or, let's just say a certain agency
24  has tagged these individuals and is watching them
25  themselves.  So we cannot enter into those files
```

Page 235

```
 1  at all in the U.S.
 2       Q.    And these files you're talking about,
 3  are these files government files or what kind of
 4  files are they?
 5       A.    Your Exhibit 7, these names, all of
 6  these names.  We can't -- we don't know, because
 7  we certainly were not peeking into those
 8  government files.
 9       Q.    Oh, they're government files you're
10  talking about?
11       A.    Yes.  These are U.S. intelligence
12  files.
13       Q.    I see.  And sometimes those files are
14  accessible, if they're not records protected --
15  or, I'm sorry, restricted persons?
16       A.    It just depends on the jurisdiction of
17  where you're looking into the file.  We would
18  never do anything that would be anti-U.S. law.
19  And he was asking us to continue doing that, Guo
20  was.
21       Q.    But just in terms of these people who
22  you -- ASOG told you were restricted persons.
23  There are some people, obviously, that are not
24  restricted persons, is that fair to say?
25       A.    I have no idea.  Because we didn't give
```

Page 236

```
 1  them the whole file.  We only gave them like, I
 2  don't know, maybe four or five names.
 3       Q.    Okay.  But what I'm just trying to
 4  understand is --
 5       A.    And I --
 6       Q.    -- and I know this sounds like a basic
 7  question --
 8       A.    Right.
 9       Q.    -- and I apologize.  But are all people
10  restricted persons in intelligence files or
11  government files?
12       A.    No.
13       Q.    Okay.  So there are certain people --
14       A.    No, no, no, no, no.  These were tagged.
15       Q.    Specially tagged?
16       A.    These were tagged.  And I -- again, you
17  would have to ask Mike.  I don't know if it was
18  the whole file that was tagged or if it was just
19  four or five names they ran through the system.
20       Q.    I see.
21       A.    But they were all tagged; flagged,
22  tagged, whatever you want to call it.
23       Q.    So when did you convey to the client
24  that there was this restricted persons
25  designation on some of the fish?
```

Page 237

```
 1       A.    We did that through Lianchao.
 2       Q.    And when was that?
 3       A.    Sometime in the middle of February, I
 4  think, by the time we had gotten -- we had been
 5  down to -- to Dallas.
 6       Q.    And so you went to Dallas with
 7  Dr. Waller?
 8       A.    Twice.  Twice we went to see him.
 9  Twice.  Or see them twice.  The irony was, we
10  then saw this group at a function in Washington,
11  at an intel or security defense function several
12  months later, and they said to us -- they said to
13  us, well, it's really weird, because they already
14  had figured out it was Guo that was the client.
15            We never told them who the client was.
16  So they told -- they -- they said, well, they
17  figured out it was Guo, and they said about a
18  week or so after we had been down there the
19  second time, that Guo had people go down to talk
20  to them.
21            And we never told anybody who they
22  were.  We didn't tell Lianchao who they were.  We
23  didn't tell anyone.  This was just between Mike
24  and me.  So that was very weird.
25       Q.    Do you think that was just a
```

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 238

1  coincidence or is that --
2      A.    I would find it an extraordinary
3  coincidence.  These guys are so deep-sixed that,
4  just even to physically find them is like
5  difficult.
6      Q.    So deep-sixed, you mean they're
7  inaccessible or --
8      A.    Inaccessible.
9      Q.    -- they keep a low profile?
10     A.    Yeah.  They had a very low profile and
11 they had a very low profile location.
12     Q.    And how is it that you knew about them,
13 ASOG?
14     A.    Through Mike and one of his people.
15     Q.    And so, did there come a time when ASOG
16 said, well, we can't do any research on this
17 because of this --
18     A.    That's right.
19     Q.    -- records protected status?
20     A.    Yes.  That's right.
21     Q.    I understand you're eager to move
22 forward, but, just for the court reporter, just
23 please wait for me to ask the question.
24            Could Strategic Vision still perform
25 some research, though, even though some of the

Page 239

1  individuals were designated as records protected,
2  or restricted persons, I'm sorry?
3      A.    We did not know at that point, and by
4  that time we got some kind of service for a
5  lawsuit.  And our teams, we had to let our teams
6  overseas know on the 23rd of February that they
7  had to stop.
8      Q.    I just want to ask this, though.  Could
9  Team 1 still do its job, even though ASOG found
10 that certain individuals were, as you described,
11 records protected?
12     A.    That's -- that's a question I'd have to
13 leave for a lawyer in the -- in the IC,
14 intelligence community, to answer.  We wouldn't
15 want to do anything that would be illegal.
16     Q.    So you didn't direct Team 1 to stop its
17 work when ASOG gave its report to you that people
18 were records protected?
19     A.    We did.  Mike did.  He did talk to
20 them.  And even though the -- he told them to
21 stop doing anything that looked like it was
22 peeking into something that they shouldn't be
23 looking into.
24            It's one thing to peek into somebody's
25 license, driver's license number, or their --

Page 240

1  their new address, or some sort of preliminary
2  stuff that was being brought up, but if you were
3  getting into deeper stuff, you couldn't touch it.
4  You shouldn't touch it.  And I'm sure he conveyed
5  that to the -- to the Team 1 leader.
6      Q.    So it's your understanding -- Strategic
7  Vision's understanding that Team One's work was
8  curtailed because of the discovery that certain
9  fish were restricted persons or records
10 protected?
11     A.    That's correct.
12     Q.    And that was on or about January 30th,
13 or whereabouts?
14     A.    No, no, no, no, no, no, no.  This was
15 way into the middle, the 15th to the 20th,
16 something in there, of February.
17     Q.    That's when ASOG conveyed to you
18 that --
19     A.    Yes.
20     Q.    -- you were -- okay.
21            So let's just get a clear record then.
22 When did ASOG tell you that certain people
23 were -- certain fish were records protected?
24     A.    At some point in Feb -- in the middle
25 of February 2018.

Page 241

1      Q.    And then is it your understanding that
2  Mike, very shortly thereafter, conveyed this
3  information to Team 1?
4      A.    That's correct.
5            MR. GRENDI:  Let's do Exhibit 13.
6            (Wallop Exhibit 13, Letter dated
7      February 23, 2018, marked for
8      identification.)
9      Q.    Do you recognize this document,
10 Ms. Wallop?
11     A.    Actually, I never saw the letter.  I
12 gather it is delivered to -- it says here it was
13 delivered to -- by hand delivery and electronic
14 mail to me, but I was out of the country, and
15 they had, in fact, sent it to the Nevada address.
16     Q.    The Nevada address, is that Strategic
17 Vision's?
18     A.    Strategic Vision's Nevada agent
19 address, yeah.
20     Q.    Does Strategic Vision have an office in
21 Nevada?
22     A.    We have an agent.
23     Q.    Do you have a physical --
24     A.    Yes, it's an address.
25     Q.    -- location that you can --

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 242

1    A.    Yes.  It's on all the documents
2  somewhere.
3       Q.    I'm asking if Strategic Vision has like
4  an office with --
5       A.    No.  It's an agent.  It's an LLC.
6  That's where they set them up.  Like Wyoming.
7       Q.    And what's in Wyoming, I'm sorry?
8       A.    LLCs.  There are a lot of LLCs and
9  corporate trusts and so forth set up in Wyoming,
10  as there are in Nevada.
11      Q.    Those are your corporate trusts and
12  LLCs?
13      A.    No.
14      Q.    I just want to clear it up.
15            You just mean it's a popular state for
16  incorporation?
17      A.    Correct.
18      Q.    Thank you.
19            So when did you first see this letter?
20      A.    Oh, when I probably returned from the
21  Middle East; I think it was probably, I don't
22  know, the first or second week of March.
23      Q.    Were you surprised by the letter?
24      A.    I thought it was idiotic, yes.
25      Q.    Why did you think it was idiotic?

Page 243

1       A.    Because we heard nothing from them.  We
2  were continuing to do the work.  And it was
3  silly.
4       Q.    What work was Strategic Vision doing
5  after January 30th that --
6       A.    All of February.  Or up until the 23rd
7  of February, to be precise.
8       Q.    And were there any meetings with
9  Lianchao Han and Mr. Guo after January 30, 2018?
10      A.    Not with us, no.
11      Q.    With whom, then?
12      A.    With Mike and myself, no.  With
13  Lianchao and Guo, possibly.  I don't know.
14      Q.    Let me ask this then.  Did you or
15  Dr. Waller meet with Lianchao after January 30,
16  2018 concerning this contract?
17      A.    That's a good question.  I doubt it,
18  because I didn't know that there was any issue
19  other than you, know, we were doing our best and
20  pedaling fast.
21      Q.    So Strategic Vision didn't deliver any
22  information to Lianchao, or certainly Yvette,
23  after January 30, 2018?
24      A.    We could have.  I'd have to ask Mike.
25      Q.    You didn't do it personally?

Page 244

1       A.    I personally did not, no.
2       Q.    Do you know if Dr. Waller did that
3  or --
4       A.    Well, he did on the 30th, obviously.
5       Q.    Right.  I'm talking about after the
6  30th.
7       A.    Okay.  Well, I don't know.  I don't
8  know.
9       Q.    Okay.  It says, "Eastern agreed to
10  delay the start of the contract by ten days from
11  January 6th to January 16th."  Do you see that on
12  the first page, Eastern 198?
13      A.    Yes.
14      Q.    Is that the ten-day grace period or
15  accommodation that you were talking about --
16      A.    Correct.
17      Q.    -- regarding the January --
18      A.    Yes.
19      Q.    -- 26, 2018 meeting?
20      A.    Yes.
21      Q.    Thank you.
22            Did Strategic Vision attempt to contact
23  Mr. Guo or Lianchao or Ms. Wang after receipt of
24  this letter?
25      A.    Well, Yvette had been taken off the

Page 245

1  case.  She was forbidden, apparently, to have
2  anything to do with it.  So the only two people
3  that would have been contactable would have been
4  Lianchao and I'm sure that -- again, I'm not sure
5  of the dates, but I'm sure -- and Lianchao
6  travels, too, so I'm not sure where he was in
7  February, but I'm sure that both Mike and I must
8  have had some conversation with him in February,
9  after this.
10      Q.    But you don't remember that, sitting
11  here today, what that conversation was like?
12      A.    No.  Well, I mean, we were very
13  surprised and very unhappy, and we'd been working
14  hard to -- to do what Guo wanted, so...
15      Q.    And did Lianchao say anything back to
16  you, or what was discussed?
17      A.    I think he said that, you know, Guo
18  gets upset all the time about a lot of things,
19  and so maybe we -- he could smooth it over and
20  calm him down and so forth.  And then we just, I
21  think, hoped that that would happen, and it
22  didn't.  So then the -- this thing was done, so
23  we just stopped.
24      Q.    You mean this lawsuit?
25      A.    Yes.

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 246

1    Q.   When did you instruct Mike, or anyone
2  else involved with the Strategic Vision team, to
3  just stop work on this project?
4    A.   After the 23rd of February.
5    Q.   You don't remember the exact date?
6    A.   No.  We had things in the hopper that
7  were being produced, but they -- we bought them,
8  so we had to pay for them, so when we got the
9  information, then we could produce it, but...
10   Q.   And did Dr. Waller fly to Europe to
11 tell the leader of Team 1 to stop work, or how
12 did that happen?
13   A.   I'm not sure.  You would have to ask
14 him how he did that.  He may have met with him
15 overseas.
16   Q.   Okay.  In connection with splitting the
17 profits from this engagement with Dr. Waller, do
18 you owe him money, or does Strategic Vision owe
19 him money I should say?
20   A.   First of all, there weren't profits.
21   Q.   Earlier we discussed your arrangement
22 with Dr. Waller to split the proceeds of this
23 engagement, correct?
24   A.   That's correct.
25   Q.   And has that splitting occurred, is

Page 247

1  what I should ask?
2    A.   Yes, because our time was valuable for
3  those two months, plus the people that we had
4  already contracted to pay for the research and so
5  forth.  We expected to have a three-month
6  contract at the very least, which were the terms
7  of the agreement, so...
8    Q.   And what I'm asking is, did you at some
9  point send Dr. Waller a wire or write him a check
10 for his half of this engagement?
11   A.   I already answered yes.
12   Q.   And that was -- was that $250,000 that
13 you referred to earlier?
14   A.   Yes.  More or less.  Plus expenses,
15 travel expenses and other expenses.
16   Q.   And there was another wire for about
17 $300,000 for Team 1, right?
18   A.   Yes, at least.
19   Q.   Okay.  So as far as you and Dr. Waller
20 are concerned, there's nothing left to split,
21 that's already been --
22   A.   Oh, that baby -- that train's long left
23 the station.
24        MR. GRENDI:  Let's go to 14.
25        (Wallop Exhibit 14, Document Bates

Page 248

1  stamped SVUS000040 and SVUS000041, marked
2  for identification.)
3    Q.   Just take a moment to take a look at
4  these two documents, SVUS40 and 41.
5    A.   Correct.
6    Q.   Do you recognize these documents?
7    A.   Yes, I do.
8    Q.   What are they?
9    A.   I think these were done by the -- I
10 can't remember if these were done by the ASOG
11 guys.  I think they were done by the ASOG guys,
12 because of the socials.  And they were -- Xi
13 Ping -- Xi Jinping, who is the premier of China,
14 and then his number 2, the next vice president of
15 the communist party in China.
16        And this is a -- this is a -- sort of a
17 geo -- geologic -- I mean, how would I put it?
18 It's sort of a graph of the connections between
19 certain families that were in the original
20 document that we were investigating.  So this was
21 like a -- not a flow chart; this was like a
22 genealogical -- I don't know what you want to
23 call it -- chart.
24   Q.   A family tree, is that what it is?
25   A.   It's sort of a family tree, yeah.  But

Page 249

1  it shows the relationships of many of these
2  people that were in our original document from
3  Guo.
4    Q.   Did you give this document to the
5  client?
6    A.   To the client?
7    Q.   Yeah, did you deliver this family tree?
8    A.   This is when we were told they were
9  RPs.
10   Q.   So you got this information on or about
11 February 15th?
12   A.   Yes.  Again, I would have to -- yes.
13   Q.   But you didn't give it to Lianchao?
14   A.   We never gave it to him.  We told
15 Lianchao.
16   Q.   What this family tree or --
17   A.   Yes.
18   Q.   -- chart includes?
19   A.   We told them that they were all RPs,
20 that the names that we had were RPs that we had
21 given in.  And, again, Mike would remember how
22 many of these we gave.
23   Q.   And just turning to the second page --
24   A.   Okay.
25   Q.   -- SVUS41?

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 254

1    (Wallop Exhibit 16, Invoice from Allied
2    Special Operations Group, Bates stamped
3    SVUS000262, marked for identification.)
4        MR. SCHMIDT:  After this document, why
5    don't we take a two-minute break?
6        MR. GRENDI:  Yeah, sure.
7    Q.    So do you recognize this document, this
8    invoice from Allied Special Operations Group?
9    A.    Correct, ASOG.
10   Q.    And why was the invoice reduced from
11   over $100,000 to $5,000?
12   A.    Because they couldn't touch the -- they
13   couldn't go into the files that they had -- that
14   they had with the names; they could have gone to
15   prison, all right?  So they refunded us -- or
16   refunded is the wrong word.  I wish they had
17   refunded, but, no, they sent us a bill -- in
18   other words, so that you can see what this sort
19   of thing actually cost, this is what these things
20   cost, and this was only for a few names, and this
21   is only for one week.  So they -- you know, we
22   bit and screamed and hollered, and so they ended
23   up sending us the -- the bill for the 5,000.
24   5,412.50.
25   Q.    So, originally, ASOG was trying to get

Page 255

1    $105,000 from --
2    A.    It was 111,000.
3    Q.    Oh, I'm sorry.  Did I miss -- I thought
4    I -- no, that's fair.  Yeah, 111.
5    A.    $111,700.  That's what these people
6    charge.  Not these people, but the industry
7    charges.
8    Q.    And Strategic Vision kind of fought
9    back on that and said, well, you didn't really do
10   the work, so?
11   A.    No, we did not do that.
12   Q.    How did you negotiate with them over
13   the total amount owed?
14   A.    We explained to -- I mean, they
15   explained to us that they would have gone ahead
16   and done it and billed us for the 111,000,
17   without question.  Until they bumped into the
18   RPs.  When they bumped into the RPs, they said,
19   we can't do it.  You know, as American citizens,
20   neither can you.  So we didn't.
21   Q.    And because of that, they -- ASOG
22   determined that they should reduce the invoice to
23   just $5,000?
24   A.    They did.
25   Q.    I'm just confused, because you said you

Page 256

1    screamed and hollered, and that's why --
2    A.    Well, yeah, because normally we
3    understand -- look, again, a little bit in the IC
4    is that -- that, when you get into certain
5    records' protected arenas you cannot, you cannot
6    invade that space.
7        So while they were sniffing around the
8    edges of each one of these files, we said, you
9    know, between us, we can't touch it, so there
10   should be no bill.  So then that's when they sent
11   the $5,000 bill.
12   Q.    Because they had spent some time trying
13   to do this?
14   A.    They'd spent a week.  And the time --
15   the timing thing is there, the time -- whatever
16   it is.  Our rate, hours worked.  And those are
17   the initials of the people that worked there.
18       MR. GRENDI:  We can take that break
19   now, if you like.
20       THE VIDEOGRAPHER:  Off the record at
21   4:41.
22       (Whereupon, a short recess was taken.)
23       THE VIDEOGRAPHER:  Back on the record
24   at 4:48.
25       MR. GRENDI:  Let's do Exhibit 17 here.

Page 257

1    This will be Wallop 17.
2        (Wallop Exhibit 17, Document Bates
3    stamped SVUS000272 to SVUS000277, marked for
4    identification.)
5    Q.    Do you recognize this document,
6    Ms. Wallop?
7    A.    I do.
8    Q.    What is this?
9    A.    This was an investigation background on
10   a couple of people that are on the list.
11   Q.    Are they one of the 15 fish or are they
12   tertiary or --
13   A.    That's a good question.  I honestly
14   can't remember.  But they were of great interest
15   to -- I think they were part of the 15 fish.
16   They were a great interest to Guo.
17   Q.    And just going back to ASOG.  Has
18   Strategic Vision ever worked with ASOG before?
19   A.    I haven't, but I've worked on the IC
20   with a couple of people that have been involved
21   with ASOG.
22   Q.    And IC, does that mean intelligence
23   community?
24   A.    Yes.
25   Q.    And how did you work with members of

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 278

1  activities recruiting, vetting, engaging and
2  marshaling the initial efforts of the various
3  investigators and analysts in The United States,
4  Europe and the Middle East."  Do you see that?
5      A.    I do.
6      Q.    Did Eastern ever engage any analysts in
7  the Middle East?
8      A.    Eastern?
9      Q.    Oh, I'm sorry, Strategic Vision.  Did
10  Strategic Vision ever engage any analysts in the
11  Middle East?
12     A.    It could have, and I wouldn't know.  It
13  could have been done through Team 1.
14     Q.    Wasn't Team 1 located in Europe?
15     A.    They were, but they could have -- they
16  all have links.
17     Q.    Okay.  Let me ask you this then.  So is
18  it your understanding that Team 1 could farm out
19  its responsibilities to other teams to help it
20  get information?
21     A.    It was all part of the team.
22     Q.    Right.  What I'm asking is, did Team 1
23  have subteams?
24     A.    No.  They would have had teams that --
25  well, if you call them subteams, they weren't.

Page 279

1  They were part of the original team.  And if they
2  used people in the Middle East or Europe or
3  wherever -- you know, the dark web has no
4  geographical location, so it could have been
5  anywhere that they were -- they were challenging
6  each other to find what they needed to find.
7  That's how it works.
8      Q.    But you understood Team 1 was located
9  in Europe, correct?
10     A.    Yes.
11     Q.    And Team 2 wasn't -- well, Team 2 was
12  ASOG, correct?
13     A.    Correct.
14     Q.    And Team 2 is located in The United
15  States?
16     A.    Correct.
17     Q.    And ASOG wasn't contacted until what
18  time?
19     A.    I answered that before.
20     Q.    Was that about February, middle --
21     A.    The beginning of February, and then
22  beginning to the 5th -- I don't know, 5th of
23  February.  I have to go back and look.
24     Q.    And what was the recruiting process?
25     A.    Mike and I were using our channels.

Page 280

1      Q.    And what vetting was done to select
2  the -- well, what vetting was done to select Team
3  1?
4      A.    Experience.
5      Q.    So just Dr. Waller's experience with
6  Team 1?
7      A.    Yes.
8      Q.    Let's look at paragraph 62.  Paragraph
9  62 says that, "Mr. Guo provided to Strategic
10  Vision a list of 92 potential subjects with no
11  prioritization."  Do you see that in the middle
12  of the paragraph there?
13     A.    I do.
14     Q.    And what list was that that had just 92
15  non-prioritized names?
16     A.    Exhibit 7.
17     Q.    So you didn't understand that there was
18  any priority to the 15 names that are in very
19  large font with numbers next to them?
20         MR. SCHMIDT:  Objection.  Go ahead.
21     A.    No, I would not -- I would not agree
22  with that.  We numbered them as to priority.
23     Q.    Well, you received the document with
24  the numbers next to -- let's just say, if you
25  look at the first page?

Page 281

1      A.    Yes.
2      Q.    It says Anita Suen --
3      A.    Yeah.
4      Q.    -- and it has a big 1 next to it?
5      A.    Yes.
6      Q.    It also has the types of reports, does
7  it not?
8      A.    Correct.
9      Q.    Did you not understand that that meant
10  that Anita Suen would be one of the fish?
11     A.    She was the first fish.
12     Q.    Right.
13     A.    She was the most important fish for
14  him.
15     Q.    Right.
16     A.    So the first, more or less, 15 in here
17  were the first -- were the first 15 fish that he
18  was talking about.
19     Q.    And there happens to be exactly 15
20  names with a number next to it and the number of
21  reports that were requested, and the types of
22  reports?
23     A.    Pretty much, yes.  You'd have to count
24  the names of the fish, yeah.  If you can see --
25  so you can't go by the page number, in other

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 282

1   words.  You have to go by the subject.  See,
2   like, here is the second fish (indicating).
3       Q.    Right.
4       A.    So the second fish is on page 11.
5       Q.    Right.
6       A.    Okay.  So you -- you'd have to go -- so
7   these 15 fish are in here at least -- at least 15
8   fish in here.
9       Q.    And you understood that those were
10  the -- or Strategic Vision understood that those
11  were the 15 fish that the research was supposed
12  to start on, correct?
13      A.    Yes.
14            MR. SCHMIDT:  Objection.
15      Q.    Do you still have the virgin laptop
16  that's described in paragraph 63?
17      A.    Yes.
18      Q.    And do you just have a ton of these
19  virgin laptops lying around, because of your --
20  Strategic Vision's work?
21      A.    On this specific issue, we had two
22  domestic ones, ones here, and then a battery of
23  ones overseas.
24      Q.    Could Strategic Vision get those
25  laptops if they request -- it requested them from

Page 283

1   Team 1?
2       A.    Never.  They've been destroyed.  They
3   were destroyed on purpose, because we would
4   destroy them every week so that there was no
5   tracing to the IP number.
6       Q.    So it's Strategic Vision's practice to
7   regularly destroy these laptops for security
8   purposes?
9       A.    Those particular ones, yes.  We did not
10  destroy the two that we had.
11      Q.    Paragraph 66, it says, "at the time the
12  agreement was negotiated with Mr. Guo, Strategic
13  Vision and Mr. Guo expressly agreed that they
14  would not meet in person again."  Do you see
15  that?
16      A.    Yes.
17      Q.    Was that maintained or followed?
18      A.    He kept insisting on wanting to meet
19  us, and we kept trying to explain to him that
20  every time we went in and out, we were being
21  photographed.  We didn't like that.  We did not
22  want to be identified with his programs.
23      Q.    And, by photographed, do you mean going
24  in and out of his apartment building?
25      A.    Yes.

Page 284

1       Q.    Who did you understand was doing that
2   surveillance, you mean the building security or
3   the --
4       A.    Oh, any number of people could easily
5   do the -- the security.  Mike's face is very
6   recognizable, people who knew who Mike was;
7   anybody in the Chinese communist party would have
8   made us, so...
9       Q.    I see.  But Strategic Vision did meet
10  with Mr. Guo repeatedly after the contract was
11  signed?
12      A.    We tried not to.
13            MR. SCHMIDT:  Objection.
14            THE WITNESS:  Oh, sorry.
15            MR. SCHMIDT:  It's okay.
16      A.    We tried not to.  We explained to him
17  after about maybe the fourth time that we just
18  couldn't do that anymore, it was just really
19  dangerous for him and dangerous for us.
20      Q.    Just so we're clear.  The last time you
21  personally met with Mr. Guo was -- was that
22  January 30th?
23      A.    That was the 26th.  No, it was the 26th
24  of January, because the 30th was when Mike met
25  with Yvette at Union Station.

Page 285

1       Q.    Got it.
2       A.    Or Penn Station.
3       Q.    When did Mr. Guo summon you to his
4   yacht in Florida?
5       A.    That must have been sometime -- it
6   might have been at the 26th meeting, January 26,
7   2017 -- 2018.
8       Q.    But I take it that yacht meeting never
9   happened?
10      A.    No.  We refused to go.  It was not
11  safe.
12      Q.    Let's go to paragraph 68.  It says
13  "Strategic Vision learned that most of the
14  individuals so identified by Eastern have been
15  designated by the U.S. Department of State under
16  the Obama administration as records protected
17  persons, meaning that information concerning
18  their status and activities was not subject to
19  disclosure under any circumstance."  Do you see
20  that?
21      A.    That's correct.
22      Q.    And did that in any way hinder Team
23  One's efforts, the records protected persons
24  designation?
25      A.    Actually, the curious thing is here, we

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 286

1    did not alert Eastern, we alerted Guo and we
2    alerted Lianchao, and -- and I believe that
3    Yvette was alerted -- no, I don't think -- Yvette
4    may not have been alerted because that was -- by
5    that time, it was in February.
6        Q.    It says most of the individuals.  Is
7    that most of the fish?
8        A.    Yes.
9        Q.    Is it fair to say that ASOG only looked
10   into five individuals on the list?
11       A.    I don't know how many they looked into.
12   Again, you would have to ask Mike.  They could
13   have looked into all of them.  I honestly don't
14   remember.
15       Q.    Let's look at paragraph 70.
16       A.    70?
17       Q.    7-0, yeah.
18       A.    Okay.
19       Q.    It says, "Strategic Vision verbally
20   reported to Mr. Guo and Eastern that Strategic
21   Vision could not within the limits of U.S. law
22   obtain the information sought by Eastern on its
23   initial list of subjects and that Strategic
24   Vision's work would be refocused upon others on
25   Eastern's list."

Page 287

1              Do you remember when you told
2    Mr. Guo --
3        A.    That must have --
4        Q.    -- this information?
5        A.    That must have been through Lianchao.
6    And you keep using the word Eastern.  It would
7    have been --
8        Q.    I was just reading the complaint.
9        A.    Yeah, but it's -- it's not Eastern.
10   It's Guo.  And I think it would have been -- that
11   would have been at the -- that would have been at
12   the -- at the January 26th lunch.
13       Q.    It says, "As a result, Mr. Guo became
14   enraged"?
15       A.    Yes.  He was -- I thought he was going
16   to jump on the table.
17       Q.    "And irrationally insisted that
18   Strategic Vision immediately deliver its work
19   product"?
20       A.    That's correct.  And continue to dive
21   into illegal areas.  And we said, we can't do
22   that.  That's when Mike apologized and said,
23   we're really sorry, but, you know, there are
24   certain things we can do, and we'll get, but
25   there are other things we can't do, and we --

Page 288

1    you'll be in bigger trouble than we will.
2    They'll send you back to China.
3        Q.    Going to paragraph 71.  It says:
4              "In the face of Eastern's insistence,
5    however, Strategic Vision hand-delivered its raw
6    data to Mr. Guo and Eastern on January 26, 2018,
7    with the caveat that it would be of no use to
8    Eastern until Strategic Vision had an opportunity
9    to analyze it and produce a formal report"?
10       A.    Yes, that's correct.  And formal report
11   would have meant, not just sort of a -- a file
12   that had been encrypted, but it also needed to
13   have Chinese translation, as I understood it, and
14   also needed to have -- and also needed -- there
15   are certain lines of code.
16             Look, I'm not a code expert, but there
17   are lines of code that people have to go through
18   and actually sort of translate into a language,
19   and he kept -- and it takes time to actually
20   translate that code.  You can't just stick it
21   into a machine and expect it to happen.
22             So we gave him the raw code, I believe,
23   on both the 26th and the 31st, or the 31st of
24   January, those two different USB keys.
25       Q.    Then it says, "until Strategic Vision

Page 289

1    had an opportunity to analyze it and produce a
2    formal report."  How would that work?
3        A.    Well, we needed to be able to take that
4    USB key back to the Team 1 to have them go
5    through and -- and configure however it was
6    supposed to be done.  And that was not -- that
7    was not my area, that was Mike's area, and Mike
8    can explain that really succinctly to you.
9        Q.    Paragraph 74.  There's a reference to a
10   wire reversal?
11       A.    Yes.
12       Q.    How did that attempted wire reversal
13   come to your attention?
14       A.    That was wild.  I got a call, like,
15   about the -- I have to see, I think it was around
16   the 12th or the 16th or something like that of
17   January 2018, and -- from Citibank wire
18   department saying that there'd been a request to
19   have 499,000 and some change reversed back to the
20   sender.  And I said, well, what are you talking
21   about?  She said, well, we've gotten a request.
22             So then I called one of my private
23   bankers at Citibank and I said, can this be done?
24   I've never heard of such a thing.  He said,
25   absolutely not, it can never be done.  Once the

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 298

1  in for the protection of the parties, is that a
2  fair statement?
3      A.   That's a fair statement.
4      Q.   And you, being Strategic, took some
5  steps to maintain the identity of the parties, to
6  keep the identity of the parties secret, is that
7  fair?
8      A.   That's correct.
9      Q.   And is it -- is it one of Strategic's
10  business goals to protect the identities of its
11  clients, generally speaking?
12      A.   Yes, because it's generally a private
13  agreement or an arrangement between my clients
14  and myself.
15      Q.   And was this agreement different in
16  that regard in any way from your other clients;
17  was there a heightened degree of security or a
18  sense of keeping things -- keeping the names of
19  the parties confidential?
20      A.   Absolutely --
21      MR. SCHMIDT:  Objection.  But go ahead.
22      THE WITNESS:  Sorry.
23      MR. SCHMIDT:  No, that's fine.
24      A.   Absolutely.
25      Q.   When you learned that Eastern would be

Page 299

1  signing the contract on January 6th, the date
2  that you and Yvette executed the contract, did
3  you speak to Mr. Guo at any point thereafter,
4  prior to signing the contract but after learning
5  that Eastern would be the signatory?
6      A.   Gosh, I -- well, let me see.  So she
7  signed it on the -- the 6th of January.  Then we
8  saw him subsequently during January.  So I never
9  had any direct contact with him, it was only
10  through Yvette or Lianchao.  So I'm not sure if
11  that answers your question.
12      Q.   After finding out that Eastern would be
13  the counterparty to the contract --
14      A.   Right.
15      Q.   -- that's the subject of this
16  litigation, did you talk to Mr. Guo about also
17  signing the contract?
18      A.   He represented Eastern, and in all of
19  our conversations he was the only party with whom
20  I negotiated, and Mike negotiated the discussion
21  and the contract.
22      Q.   So after finding out that Eastern, not
23  Mr. Guo, would be the counterparty to the
24  contract, did you talk to Mr. Guo about also
25  signing the contract?

Page 300

1      A.   He represented -- Guo represented that
2  he was, in fact, the person that was going to
3  fund this.  So I presumed, when Yvette's sitting
4  next to me and having conversations with him,
5  along with -- along with all of the conversations
6  that we'd had in his apartment, that obviously
7  it's Guo with whom we are dealing.  So Guo equals
8  Eastern, one would presume.  Just saying.
9      Q.   Did you do any independent research to
10  determine whether or not that was -- that Guo
11  equaled Eastern?
12      A.   It's -- it's so redundant, but, no, we
13  didn't, because he said he was going to fund it,
14  whatever it was, and we did not know the name of
15  the entity that he was going to use.
16      Q.   When did he first tell you that it
17  would be an entity and not himself personally
18  that would be the counterparty to the contract?
19      A.   Because he said that he had accounts
20  everywhere and that it would probably be through
21  the U.K. office of William Wu or William Yu, or
22  whatever his name was, that was the -- his
23  financial person.
24      Q.   And when did you find that out; when
25  was the first time?

Page 301

1      A.   When did I find it out?  I mean, we
2  were discussing the payment process and how that
3  would work after looking at the -- we had the
4  vision paper, we had the -- the Word
5  presentation, we had done another sort of vision
6  paper; all of these were in different discussions
7  with him moving forward.
8      He then said, when we got to sort of
9  the third or fourth discussion of all of this,
10  that he wanted to fund it, and he explained that
11  he paid $250 million for that, and that he wanted
12  very much to make sure that, if this was done,
13  that we would have a long-term contract for at
14  least three years, and for possibly up to 4,000,
15  quote, fish, and he said that he would fund it,
16  so we presumed he would fund it.  We didn't know
17  whether he was Eastern or, as I say, the Mickey
18  Mouse Club.  We didn't know.  He never told us
19  who it was going to be.
20      Q.   But prior to signing the contract --
21      A.   Right.
22      Q.   -- you never asked Mr. Guo to sign it
23  himself?
24      A.   No, because he wouldn't.
25      Q.   Did you ever ask him?

EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC
French Wallop on 02/12/2019

Page 306

1  understanding at that time that Yvette was on the
2  telephone with Mr. Guo.
3          Did you ask Yvette to ask Mr. Guo if he
4  would personally sign the contract?
5      A.   No.
6      Q.   And how long was that meeting at which
7  you found out that Eastern would be signing, and
8  you and Yvette signed the contract?
9      A.   I have no idea.  It was during that
10  moment when she had the paperwork and we made the
11  changes, we agreed to the changes, she signed,
12  and then I signed, and it had Eastern on the top.
13  That's all I know.
14     Q.   All in all, two hours?
15     A.   Maybe.  Let's call it two hours, to
16  make you happy.
17     Q.   No, not -- I want the truth.  No answer
18  is going to make me happy.
19     A.   Two hours is fine with me.
20     Q.   I just want the truth.
21     A.   Two hours is fine.
22     Q.   Two hours?
23     A.   Sure.
24     Q.   And your understanding is that this
25  contract was the culmination of the conversations

Page 307

1  that you had had with Mr. Guo about the
2  investigative services that Strategic was going
3  to provide?
4      A.   He hired us, not Yvette.
5      Q.   So this contract was the culmination of
6  those conversations?
7      A.   Yes.
8          MS. TESKE:  Okay.  I have nothing
9  further.
10         MR. SCHMIDT:  I have no questions.
11  Thank you.
12         THE WITNESS:  Cheers.
13         MR. SCHMIDT:  Let him go off the
14  record.
15         THE VIDEOGRAPHER:  This concludes
16  today's deposition.  The time is 5:57.
17
18         (Whereupon, the within proceedings
19  concluded at 5:57 p.m., on the
20  12th day of February, 2019.)
21
22          *       *       *       *       *
23
24
25

Page 308

1          D E C L A R A T I O N
2
3      I hereby certify that having been first
4  duly sworn to testify to the truth, I gave the
5  above testimony.
6
7      I FURTHER CERTIFY that the foregoing
8  transcript is a true and correct transcript of
9  the testimony given by me at the time and place
10  specified hereinbefore.
11
12
13         _____
14            FRENCH WALLOP
15
16
17
18  Subscribed and sworn to before me
19
20  this _____ day of _____ 20___.
21
22
23  _____
24     NOTARY PUBLIC
25

Page 309

1                  ERRATA SHEET
2
3  NAME OF CASE:  EASTERN PROFIT v STRATEGIC
4  DATE OF DEPOSITION:  Tuesday, February 12, 2019
5  NAME OF WITNESS:  FRENCH WALLOP
6  PAGE LINE   FROM                   TO
7
8  ____|_____|_____|_____
9  ____|_____|_____|_____
10 ____|_____|_____|_____
11 ____|_____|_____|_____
12 ____|_____|_____|_____
13 ____|_____|_____|_____
14 ____|_____|_____|_____
15 ____|_____|_____|_____
16 ____|_____|_____|_____
17 ____|_____|_____|_____
18 ____|_____|_____|_____
19 ____|_____|_____|_____
20 ____|_____|_____|_____
21 ____|_____|_____|_____
22 ____|_____|_____|_____
23 ____|_____|_____|_____
24
25

**EASTERN PROFIT CORP LIMITED vs STRATEGIC VISION US, LLC**
French Wallop on 02/12/2019

Page 310

```
 1              REPORTER'S CERTIFICATE

 2

 3  STATE OF NEW YORK  )

 4                         ) ss.

 5  COUNTY OF NEW YORK )

 6

 7          I, ROBERTA CAIOLA, a Shorthand Reporter

 8  and Notary Public within and for the State of New

 9  York, do hereby certify:

10          That FRENCH WALLOP, the witness whose

11  deposition is hereinbefore set forth, was duly

12  sworn by me and that such deposition is a true

13  record of the testimony given by such witness.

14          I further certify that I am not related

15  to any of the parties to this action by blood or

16  marriage and that I am in no way interested in

17  the outcome of this matter.

18          In witness whereof, I have hereunto set

19  my hand on this date, February 21, 2019.

20

21          [signature]

22          _____

23              ROBERTA CAIOLA

24

25
```