# Exhibit E1

Page 1

1

2      UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
3      -----------------------------------------x
       EASTERN PROFIT CORPORATION LIMITED,
4
              Plaintiff-Counterclaim Defendant,
5
                      - against -
6
       STRATEGIC VISION US, LLC,
7
              Defendant-Counterclaim Plaintiff,
8
                      - against -
9
       GUO WENGUI a/k/a MILES KWOK,
10
                      Counterclaim Defendant.
11     -----------------------------------------x

12                         340 Madison Avenue
                           New York, New York
13
                           January 31, 2019
14                         9:40 a.m.

15

16

17            EXAMINATION BEFORE TRIAL of YVETTE

18     WANG, a 30(b)(6) Witness on behalf of EASTERN

19     PROFIT CORPORATION LIMITED, the

20     Plaintiff-Counterclaim Defendant herein, taken

21     by the Defendant-Counterclaim Plaintiff,

22     pursuant to Court Order, held at the

23     above-mentioned time and place, before Michelle

24     Lemberger, a Notary Public of the State of New

25     York.

Page 2

1

2  A P P E A R A N C E S:

3

    ZEICHNER ELLMAN & KRAUSE, LLP
4   Attorneys for Plaintiff-Counterclaim Defendant
        35 Mason Street
5       Greenwich, Connecticut 06830
    BY:  ZACHARY GRENDI, ESQ.

6

7

    PHILLIPS LYTLE, LLP
8   Attorneys for Defendant-Counterclaim Plaintiff
        340 Madison Avenue, 17th Floor
9       New York, New York 10173
    BY:  JOSEPH SCHMIT, ESQ.

10

    jschmit@phillipslytle.com

11

    HEATHER KIDERA, ESQ.

12

13

14

    HODGSON RUSS, LLP
15  Attorneys for Counterclaim Defendant
        605 Third Avenue, Suite 2300
16      New York, New York 10158
    BY:  ERIN N. TESKE, ESQ.

17

18

    ALSO PRESENT:

19

        French Wallop

20

        Sophia Xie - Mandarin interpreter
21                 (sitting in)

22              *    *    *    *    *

23

24

25

Page 3

1

2    S T I P U L A T I O N S

3

4        IT IS HEREBY STIPULATED AND AGREED by

5   and between the attorneys for the respective

6   parties herein, that filing, sealing and

7   certification be and the same are hereby

8   waived.

9        IT IS FURTHER STIPULATED AND AGREED

10  that all objections, except as to the form of

11  the question shall be reserved to the time of

12  the trial.

13       IT IS FURTHER STIPULATED AND AGREED

14  that the within deposition may be signed and

15  sworn to before any officer authorized to

16  administer an oath, with the same force and

17  effect as if signed and sworn to before the

18  Court and that a copy of this examination

19  shall be furnished without charge to the

20  attorney representing the witness testifying

21  herein.

22

23

24

25

Page 4

1

2    Y V E T T E   W A N G, having been first duly

3        sworn by a Notary Public of the State

4        of New York, was examined and

5        testified as follows:

6   BY THE REPORTER:

7        Q.  Please state your name for the

8   record.

9        A.  Yvette Wang.

10       Q.  What is your present address?

11       A.  150 East 57th Street, Apartment 22D,

12  New York, New York 10022.

13  EXAMINATION BY

14  MR. SCHMIT:

15       Q.  Good morning.  Could you please

16  state your name for the record?

17       A.  Yvette Wang.

18       Q.  Ms. Wang, my name is Joe Schmit.  We

19  met a moment ago.  I represent defendant and

20  counterclaim plaintiff in this, Strategic

21  Vision U.S. LLC.

22           You're here this morning for your

23  deposition.  Do you recognize that?

24       A.  Yes.

25       Q.  You're here specifically as a

Page 5

1                    Yvette Wang

2   30(b)(6) representative for plaintiff in this

3   action, Eastern Profit Corporation Limited;

4   is that right?

5        A.  Yes.

6        Q.  Has your attorney explained to you

7   what that means, being a 30(b)(6)

8   representative?

9        A.  Yes.

10       Q.  I'm going to ask you a series of

11  questions.  All I ask is that you give me

12  complete and truthful answers; is that all

13  right?

14       A.  Will do.

15       Q.  The most important thing in my book

16  is that you understand the question.

17       A.  Yes.

18       Q.  If at any time you don't understand

19  the question I am asking, just let me know,

20  okay?

21       A.  Yes.

22       Q.  I will do my best to meet your

23  concern.  Okay?

24       A.  Yes, thank you.

25       Q.  There's one thing.  There was a

Page 6

```
1                    Yvette Wang
2    little bit of a miscommunication.  We do have
3    a Mandarin interpreter in the room, but my
4    understanding is you don't need an
5    interpreter?
6        A.  Thank you.
7        Q.  Is that correct?
8        A.  I will try my best, it's correct.
9        Q.  Okay.  If during the morning there
10   comes a time, because for whatever set of
11   reasons you want to change your mind, just
12   let me know.  Okay?
13       A.  Sure, thank you.
14            MR. GRENDI:  Just before we get
15       into it, I just want to put an
16       objection on the record.  I think
17       just for clarity and consistency down
18       the road because I don't want to be
19       interrupting you all the time, but to
20       the extent that you're asking
21       questions that are part of the topics
22       encompassed in the 30(b)(6)
23       attachment, obviously the witness
24       will be answering for the
25       corporation.  To the extent there are
```

Page 7

```
1                    Yvette Wang
2        questions being asked outside of
3        that, the witness will not be
4        answering for the corporation, will
5        be answering based on her own
6        knowledge.  And I may pop in with
7        that every now and then.
8    BY MR. SCHMIT:
9        Q.  Ms. Wang, I'm going to ask you from
10   time to time how you know the answer and just
11   let me know if you've been educated and
12   provided the answer or if it is from your
13   personal knowledge; is that okay?
14       A.  Okay.
15            MR. SCHMIT:  Let's have this
16       marked as Exhibit 1.  If at any time
17       you need a break, just let us know,
18       okay.
19            THE WITNESS:  Sure, thank you.
20            (Whereupon, at this time, the
21       reporter marked the above-mentioned
22       notice of deposition as Wang Exhibit
23       1 for identification.)
24   BY MR. SCHMIT:
25       Q.  Ms. Wang, I'm going to hand you
```

Page 8

```
1                    Yvette Wang
2    what's been marked for your deposition as
3    Exhibit 1.
4        A.  Thank you.
5        Q.  It is Strategic Vision's notice of
6    30(b)(6) deposition to plaintiff.
7            Do you have that in front of you?
8        A.  Yes.
9        Q.  Have you seen it before?
10       A.  Yes, I did.
11       Q.  If you can turn to the last page,
12   those are the list of topics that have been
13   identified.
14            Do you see that?
15       A.  Yes.
16       Q.  Have you reviewed those topics
17   before?
18       A.  Yes.
19       Q.  Are there any topics there that
20   you're not prepared to testify concerning
21   today?
22       A.  No.  All of them, I'm ready to
23   answer the question.
24       Q.  Eastern Profit Corporation Limited,
25   are you familiar with that entity?
```

Page 9

```
1                    Yvette Wang
2        A.  Not too much.
3        Q.  To what extent are you familiar with
4    that entity?
5        A.  No.
6        Q.  You said not too much?
7        A.  Yes.
8        Q.  How are you, if at all, affiliated
9    with Eastern Profit Corporation Limited?
10       A.  I was told this is another party,
11   but I don't know this company at all before
12   this project.
13       Q.  You referred to you were told this
14   is another party.  What do you mean by that?
15       A.  Miles, that is the person who
16   involved in this project as well, and he told
17   me this is another party of the contract.
18       Q.  Miles, who are you referring to?
19       A.  Miles Kwok.
20       Q.  Is he known by any other names?
21       A.  Kwok Ho Wan, I think.
22       Q.  Could you spell that?
23       A.  K-W-O-K, H-O, W-A-N.
24       Q.  How about Guo?
25       A.  Yes.
```

Page 10

Yvette Wang

2     Q.  How do you spell that?

3     A.  G-U-O.

4     Q.  And is that his first name often?

5     A.  Last name, family name.

6     Q.  So sometimes people refer to him as

7  Mr. Guo?

8     A.  Yes.

9     Q.  If I say Mr. Guo, you'll know who

10  I'm referring to?

11     A.  Yes.

12     Q.  If I say Eastern Profit, will you

13  know that I'm referring to Eastern Profit

14  Corporation Limited?

15     A.  Yes.

16     Q.  So is it Mr. Guo who introduced you

17  to Eastern Profit?

18     A.  Yes.

19     Q.  When did that happen?

20     A.  In December 2017.  No, the contract

21  was signed 2018, right before this contract

22  was signed.

23     Q.  I'll represent to you the contract

24  was signed on January 6, 2018; does that

25  sound about right?

Page 11

Yvette Wang

2     A.  2018.  That's right, December 2017.

3     Q.  So shortly before January you would

4  have been introduced to Eastern Profit?

5     A.  Yes.

6     Q.  What did Mr. Guo tell you about

7  Eastern Profit when he introduced you to that

8  company?

9     A.  He told me this is another party of

10  this contract, and then he gave me the name.

11  And that's it.

12     Q.  When you say "another party of the

13  contract," what are you referring to?

14     A.  Another party.  The client of this

15  contract.

16          MR. SCHMIT:  Just so the record

17       is clear, could I have this marked as

18       Exhibit 2?

19          (Whereupon, at this time, the

20       reporter marked the above-mentioned

21       research agreement as Wang Exhibit 2

22       for identification.)

23  BY MR. SCHMIT:

24     Q.  I'm going to hand you what's been

25  marked as Exhibit 2.

Page 12

Yvette Wang

2          Do you recognize that document?

3     A.  Yes.

4     Q.  What is it?

5     A.  It's the contract signed between

6  Eastern Profit and Strategic Vision.

7     Q.  And in your answers up until now,

8  you've been saying the other party to the

9  contract.  You're referring to the contract

10  that I just marked as Exhibit 2?

11     A.  Correct.

12          MR. GRENDI:  Objection to the

13       form.

14          You can answer.

15     Q.  When Mr. Guo introduced you to

16  Eastern Profit, did he hand you the contract?

17     A.  I don't understand what you mean,

18  hand me the contract?

19     Q.  How did he say -- what did he say

20  when you first heard the words Eastern Profit

21  or first heard of the entity?

22     A.  I remember that happened before I

23  went to Virginia to discuss about this

24  contract.  By then I was request to negotiate

25  this contract.  Then I ask who is the client.

Page 13

Yvette Wang

2  Then I had that, this name.

3     Q.  So you were negotiating the contract

4  on behalf of Mr. Guo initially?

5          MR. GRENDI:  Objection of the

6       form.

7          You can answer.

8     A.  I will listen to my lawyer.

9          MR. GRENDI:  I said you can

10       answer.

11     Q.  No, no, you can answer.  Unless he

12  tells you not to answer, you have to answer.

13  Objections are just for the record.

14     A.  Okay.  Correct.

15     Q.  And then at some point Mr. Guo said,

16  The actual entity that's going to enter the

17  contract is Eastern Profit, right?

18     A.  Correct.

19     Q.  So initially, when you were

20  negotiating in Virginia, you were speaking on

21  behalf of Mr. Guo; is that a fair statement?

22          MR. GRENDI:  Objection, you can

23       answer.

24          MS. TESKE:  Objection.

25     A.  Correct.

Page 14

Yvette Wang

2  Q.  And then at some point prior to
3  execution, he said the party we're going to
4  put in the contract is Eastern Profit, right?
5        MR. GRENDI:  Objection.
6        You can answer.
7  A.  I don't remember that.
8  Q.  So what did he finally tell you when
9  he introduced you to Eastern Profit?
10  A.  Because I am a project manager.  I
11  have to have enough information for a
12  project.  So I request the necessary
13  information to finish this contract.  Then he
14  gave me this name.
15  Q.  What information did you request of
16  Mr. Guo in order to finish this project?
17  A.  At least who is the client or who is
18  the vendor.
19  Q.  So when you asked him who the client
20  or the vendor was, he said Eastern Profit; is
21  that fair?
22  A.  Correct.
23  Q.  What did he tell you about Eastern
24  Profit at that time?
25  A.  I don't remember.

Page 15

Yvette Wang

2  Q.  Did you ask anything?
3  A.  No.
4  Q.  Up until that point, had you ever
5  heard of Eastern Profit before?
6  A.  I don't remember I heard about that.
7  Q.  Sitting here today, you think that
8  may have been the first time you ever heard
9  of Eastern Profit?
10  A.  You mean by then?
11        MR. GRENDI:  Objection to the
12        form.
13        You can answer, go ahead.
14  A.  You mean by this time, December
15  2017?
16  Q.  Yes.
17  A.  Yes.
18  Q.  So as far as you can recall, that's
19  the first time you ever heard of Eastern
20  Profit?
21  A.  Correct.
22  Q.  Did Mr. Guo tell you anything about
23  Eastern Profit?
24  A.  I don't remember.
25  Q.  What does Eastern Profit do?

Page 16

Yvette Wang

2        MR. GRENDI:  I'll just remind
3        everyone of the objection as to the
4        topics that the witness has been
5        prepared to testify about, and this
6        outside the topics.  But you can go
7        ahead and answer.
8        MR. SCHMIT:  This is well
9        within the topics, but you stated
10        your objection.
11  Q.  What does Eastern Profit do?
12  A.  I do not know.
13  Q.  Does Eastern Profit have a board of
14  directors?
15  A.  I don't know.
16  Q.  Are you employed by Eastern Profit?
17  A.  No, I'm not.
18  Q.  Are you an officer or director of
19  Eastern Profit?
20  A.  I am not.
21  Q.  Have you ever met anybody or spoken
22  on the phone with anybody who is employed by
23  Eastern Profit?
24  A.  No, I didn't.
25  Q.  Have you ever met anybody or spoken

Page 17

Yvette Wang

2  on the phone with anybody that you understood
3  to be an officer or director of Eastern
4  Profit?
5  A.  No, I didn't.
6  Q.  Since you executed the contract on
7  behalf of Eastern Profit, has anybody told
8  you anything about what Eastern Profit does?
9  A.  You mean business?
10  Q.  Anything.  However you want to
11  characterize it.
12  A.  If I recall a little bit, I'm not
13  sure, Mr. Guo said Eastern Profit is a kind
14  of, like, investment company.  But I didn't
15  ask further what is that.
16  Q.  Do you know where Eastern Profit is
17  based?
18  A.  Hong Kong.
19  Q.  Does it have an office there?
20  A.  I don't know.
21  Q.  Again, do you know if there are any
22  employees in Hong Kong?
23  A.  Eastern Profit employee?
24  Q.  Yes.
25  A.  No, I didn't.

Page 18

Yvette Wang

1
2     Q.  You don't know whether there are or
3  aren't?
4     A.  What is your question, I don't
5  understand?
6     Q.  In Hong Kong, are there any, just to
7  be clear, are there any employees of Eastern
8  Profit in Hong Kong?
9     A.  I didn't request, I didn't research.
10     Q.  When he said it was an investment
11  company, did you ask what type of
12  investments?
13     A.  No, I didn't.
14     Q.  Who are you employed by, Ms. Wang?
15     A.  Golden Spring New York Limited.
16     Q.  What is that company?
17     A.  Family office.
18     Q.  Family office for who?
19     A.  For clients.
20     Q.  I just want to make sure, what's
21  your definition of a family office?
22     A.  Family office, my definition?
23     Q.  Yes.
24     A.  Work for projects come from family
25  and the family's partner, friends,

Page 19

Yvette Wang

1
2  associates.
3     Q.  When you say "family," who are you
4  referring to?
5          MR. GRENDI:  Objection.  Again,
6     I just want to restate my earlier
7     general objection.
8          You can answer.
9          MR. SCHMIT:  What's your
10     earlier general objection?
11          MR. GRENDI:  Outside the scope
12     of the list of items in the
13     attachment to 30(b)(6).
14          MR. SCHMIT:  Golden Spring,
15     just so it is clear, verified the
16     interrogatories in this case.
17          MR. GRENDI:  I understand that.
18     Q.  You can answer.
19          MR. GRENDI:  You can answer.
20     Q.  Whose family?
21     A.  A family come from Mainland of China
22  and Hong Kong.
23     Q.  And what is the name of the family?
24     A.  I cannot disclose that.
25     Q.  Is it Mr. Guo's family?

Page 20

Yvette Wang

1
2     A.  I cannot disclosure that.
3     Q.  Does Mr. Guo review directions at
4  Golden Spring?
5     A.  Sorry?
6     Q.  Does Mr. Guo tell you what to do
7  when you're working on behalf of Golden
8  Spring?
9     A.  No.
10     Q.  Who does?
11     A.  China Golden Spring Group, Hong Kong
12  Limited.
13     Q.  Where are they located?
14     A.  Hong Kong.
15     Q.  Who speaks on behalf of that entity?
16          MR. GRENDI:  Objection, again.
17     We're really getting far afield of
18     what this deposition is supposed to
19     be about.
20          MR. SCHMIT:  You know, I don't
21     think we're getting far afield at
22     all.  But to be perfectly honest, we
23     have a 30(b)(6) witness brought in on
24     behalf of the plaintiff in this case
25     that apparently doesn't know anything

Page 21

Yvette Wang

1
2     about the plaintiff.  And this
3     company that I'm asking about now,
4     verified as attorney in fact the
5     interrogatories on behalf of the
6     plaintiff.
7          MR. GRENDI:  Right.  They're
8     obviously the attorney in fact
9     relationship is disclosed.  So that's
10     clear.  If you want to have a
11     discussion, I think, off the record,
12     maybe we can discuss the problems
13     that you're having here.  But I
14     really want to get this deposition on
15     track as to what this contract was
16     about and how it was negotiated.
17          MR. SCHMIT:  We're getting
18     there, we're getting there.  We are.
19     I just want to make sure we
20     understand who all the entities are.
21  BY MR. SCHMIT:
22     Q.  Are there other employees for Golden
23  Springs New York LTD in New York?
24     A.  Sorry, what is your question?
25     Q.  You work for this entity, Golden

Page 22

```
1                  Yvette Wang
2    Springs, correct?
3         A.  Yes.
4         Q.  Are there other employees?
5              MR. GRENDI:  Objection.  You
6    can answer.
7         A.  In New York?
8         Q.  In New York.
9         A.  I don't answer this.  But because,
10   you know, I try to save everyone's time, so,
11   yes, they do have employees here.
12        Q.  Where is it?  Is there an office?
13        A.  Yes.
14        Q.  Where is the office located?
15        A.  800 Fifth Avenue.
16        Q.  How many employees are there for
17   this entity?
18        A.  12 now, I think, 12.
19        Q.  Does Mr. Guo work for this entity?
20        A.  No.
21        Q.  Why did Golden Springs verify the
22   interrogatories in this case?
23             MR. GRENDI:  Objection.
24             You can answer.
25        A.  I don't understand your question.
```

Page 23

```
1                  Yvette Wang
2         Q.  Why did --
3              MR. SCHMIT:  Let's have this
4         marked as Exhibit 3.
5              (Whereupon, at this time, the
6         reporter marked the above-mentioned
7         responses and objections to
8         interrogatories as Wang Exhibit 3 for
9         identification.)
10   BY MR. SCHMIT:
11        Q.  I'm handing you what's been marked
12   for your deposition as Exhibit 3.
13        A.  Thank you.
14        Q.  Do you recognize that document?
15        A.  Yes.
16        Q.  Turn to the second to last page.  Do
17   you see that, the verification?
18        A.  Yes.
19        Q.  Is that your signature there?
20        A.  Yes.
21        Q.  And it says, Yvette Wang, President,
22   do you see that?
23        A.  Yes.
24        Q.  And then up above it says Golden
25   Spring New York LTD.  I assume your title is
```

Page 24

```
1                  Yvette Wang
2    president with Golden Spring LTD, right?
3         A.  You're right.
4         Q.  Why did you verify the
5    interrogatories in this fashion?
6              MR. GRENDI:  I'm just going to
7         object to the form, and -- well,
8         if -- go ahead and answer if you can.
9         A.  Because I was project manager of
10   this contract (indicating).
11        Q.  And does Golden Spring LTD have any
12   contractual relationships with Eastern
13   Profit?
14        A.  No.
15             MR. GRENDI:  Objection.  I
16        mean, I think that needs to be
17        clarified and I think there's a
18        document that will clarify that.
19             Can we go off the record
20        briefly?
21             MR. SCHMIT:  Yes, sure, why
22        not?
23             MR. GRENDI:  Do you want to
24        step outside?
25             MR. SCHMIT:  You want to talk
```

Page 25

```
1                  Yvette Wang
2    with me?
3              MR. GRENDI:  With you, yes.
4              (Whereupon, a brief recess was
5         taken.)
6              MR. GRENDI:  Just in the
7         interest of clarifying the record, as
8         I think there is just an error there,
9         there is a relationship between
10        Golden Spring and Eastern Profit
11        Corporation, there's a limited power
12        of attorney.  That document, we're
13        happy to produce that to clarify this
14        issue.  But I think the answer that
15        there's no relationship between
16        Eastern Profit and Golden Spring was,
17        obviously, just kind of a mistake
18        made by a witness that's not an
19        attorney.
20             So we will produce that
21        document shortly.  I don't have it on
22        me.
23   BY MR. SCHMIT:
24        Q.  Ms. Wang, have you seen this power
25   of attorney document?
```

Page 26

```
 1                  Yvette Wang
 2      A.  Yes.
 3      Q.  Do you recall who signed it on
 4 behalf of Eastern Profit?
 5      A.  I don't remember that.  It's a long
 6 time ago.  If you have it -- I don't
 7 remember.
 8          MR. GRENDI:  I believe the
 9          document will clarify that.
10          MR. SCHMIT:  Can you help, for
11          the record, and say who executed it?
12          MR. GRENDI:  I know him as
13          Hank.  His full name is -- it's in
14          the interrogatory responses.  Let me
15          see, I want to make sure I get it
16          right for the record.  C-H-U-N-G,
17          U-A-N-G, H-A-N.  That's my
18          recollection.
19 BY MR. SCHMIT:
20      Q.  If you can turn to Exhibit 3, second
21 page, do you see the second interrogatory,
22 number 2?
23      A.  Yes.
24      Q.  It says identify the principals of
25 Eastern.
```

Page 27

```
 1                  Yvette Wang
 2      Do you see that?
 3      A.  Yes.
 4      Q.  And then that's Mr. Han, your
 5 attorney just spelled into the record, right?
 6          MR. GRENDI:  Objection, but,
 7          yes, go ahead.
 8      A.  Yes.
 9      Q.  Is that the only principal of
10 Eastern that you're aware of?
11      A.  From here, yes.
12      Q.  Are you aware of any other
13 principals of Eastern Profit?
14      A.  No.
15      Q.  Have you ever met Mr. Han?
16      A.  We met before.
17      Q.  Where does he reside?
18      A.  Sorry?
19      Q.  Where does he live?  Where does he
20 reside?
21      A.  I don't know.
22      Q.  Where did you meet him?
23      A.  New York.
24      Q.  Do you know if he resides in the
25 States, the United States?
```

Page 28

```
 1                  Yvette Wang
 2      A.  I didn't ask.
 3      Q.  Did he explain to you what his
 4 relationship with Eastern Profit was?
 5      A.  He didn't explain.
 6      Q.  Do you have any idea why he would
 7 execute a power of attorney for Eastern
 8 Profit?
 9      A.  Because we provide service, Golden
10 Spring.
11      Q.  Service to who?
12      A.  Service to the client.
13      Q.  Who is the client?
14      A.  Eastern Profit.
15      Q.  Does Eastern Profit provide Golden
16 Spring with any compensation?
17      A.  Not now, not yet.
18      Q.  When you say "not now," will they at
19 some time in the future or have they at some
20 time in the past?
21          MR. GRENDI:  Objection of form.
22          You can answer.
23      A.  No.
24      Q.  And what did you mean by not now?
25          MR. GRENDI:  Objection.
```

Page 29

```
 1                  Yvette Wang
 2      You can answer.
 3      Q.  You can answer.
 4      A.  Oh.
 5          MR. GRENDI:  You can answer,
 6       I'm sorry.
 7      Q.  Yes.  He's just making an objection
 8 for the record.  It's for him and I to work
 9 out later, if necessary.
10      A.  Okay.  Because Golden Spring didn't
11 sign any contract with Eastern.  So I don't
12 know there is any payment or any, like,
13 payment, yeah.
14      Q.  Does Eastern Profit have a bank
15 account anywhere?
16      A.  I don't know.
17      Q.  Why did Eastern Profit enter into
18 this contract?
19      A.  I don't know.
20      Q.  But Mr. Guo told you Eastern Profit
21 was going to be the client that should be put
22 in the contract, right?
23      A.  Correct.  Mr. Guo said he is the
24 advisor and consultant to Eastern.  So that's
25 why he communicated and told me Eastern
```

Page 30

Yvette Wang

1    should be in this contract.
2        Q.   Did he say what he was advising or
3    consulting Eastern Profit on?
4        A.   He didn't say that clearly, but I
5    remember he mentioned about, like, strategy
6    or some investments, something like that.
7        Q.   Tell me, when did he give this
8    explanation?
9        A.   I don't remember that clearly.
10   Should be in December or January, right
11   before or after this contract signed.
12       Q.   What was the purpose of the
13   contract?
14       A.   Investigation service.
15       Q.   Investigation of what?
16       A.   Information.
17       Q.   What kind of information?
18       A.   Let me review the contract again.
19           (Witness peruses document.)
20       Q.   You can't answer that question
21   without looking at the contract?
22       A.   I can.
23       Q.   I mean, you're welcome to look at
24   it, but what was being investigated pursuant

Page 31

Yvette Wang

1    to the contract?
2        A.   Financial, forensic, historical
3    research, current tracking research, social
4    media research.
5        Q.   Of what?
6        A.   Of what?  I don't understand your
7    question.
8        Q.   I mean, those are general areas, but
9    what's being researched?  Buildings, people,
10   plants, animals?  What's being researched?
11       A.   People.
12       Q.   How were the people identified that
13   were going to be researched?
14           MR. GRENDI:  Objection.  I just
15       want to hop in here.  We may be,
16       obviously, designating portions of
17       this deposition confidential.  I just
18       want to put that on the record,
19       something I should have said at the
20       outset, and obviously applies
21       retroactively to the beginning.
22           Go ahead and answer.
23       A.   The people they are Strategic Vision
24   called them fish, F-I-S-H.

Page 32

Yvette Wang

1        Q.   You use that term as well, correct?
2        A.   Yes.  That is Strategic Vision
3    request me to use.
4        Q.   What did you understand fish to
5    mean?
6        A.   Target people, human beings.
7        Q.   But Strategic Vision wasn't
8    identifying anybody to be researched, that
9    was Eastern Profit, right?
10       A.   Correct.
11       Q.   So who was Eastern Profit
12   identifying to be researched and why?
13       A.   Some individual who are highly
14   corrupted, Chinese people.
15       Q.   Corrupted in whose view?
16           MR. GRENDI:  Objection.
17           You can answer.
18       A.   I don't understand your question.
19       Q.   What do you mean by corrupted?
20       A.   Corrupted, they are Chinese high
21   level official, or some of them they are high
22   level and some of them are official,
23   government official, and their family.  They
24   are suspected to have huge illegal criminal

Page 33

Yvette Wang

1    assets in other country, which they steal
2    from Chinese government and Chinese people.
3        Q.   And when you say "other country,"
4    what are you referring to?
5        A.   Other country means outside of the
6    Mainland of China.
7        Q.   And these people, were they -- are
8    they members of the Communist party?
9        A.   Some of them, they are.
10       Q.   And who identified these people?
11           MR. GRENDI:  Objection.
12           You can answer.
13       A.   Mr. Guo.
14       Q.   And from where did Mr. Guo get his
15   information?
16       A.   I don't know.
17       Q.   You never asked?
18       A.   No.
19       Q.   Did he ever say why certain
20   individuals were being identified?
21       A.   I didn't ask.  But if you want, you
22   can follow his social media.  He talks a lot
23   in there.
24       Q.   About what he's doing and why he's

Page 34

Yvette Wang

1
2  doing it?
3      A.  Yes.
4      Q.  What is your understanding, though,
5  of what he is doing and why he's researching
6  these people?
7          MR. GRENDI:  Objection.
8          You can answer.
9      A.  I don't understand.  What is your
10  question?
11     Q.  Well, what is your understanding?
12     A.  My understanding?
13     Q.  Of why he's investigating these
14  people.
15     A.  Oh, okay.  He needs the information
16  about these people to whistle blow and
17  disclosure their crime.  So Chinese
18  government, and even other countries'
19  authorities, they can take action to this
20  corrupted criminal, Chinese official.
21     Q.  So your understanding was the
22  research would be reported back to China?
23     A.  I don't know that.
24     Q.  How was he going to do what you just
25  said?

Page 35

Yvette Wang

1
2      A.  What is your question?
3      Q.  How was Mr. Guo going to help report
4  or whistle blow on these individuals?
5          MR. GRENDI:  Objection.
6          You can answer.
7      A.  I didn't ask.  And I don't know.
8  But from what he has done on his media, his
9  social media, and he probably, I mean,
10  explained to the public, I don't know, this
11  is all my guess.
12         MS. TESKE:  Can I add my
13         objection to that question?  Thank
14         you.
15     Q.  Who besides you assisted on this
16  project for Mr. Guo?
17         MS. TESKE:  Objection.
18         MR. GRENDI:  Objection.  You
19         can answer.
20     A.  I heard there's a gentleman called
21  Mr. Han Lianchao, H-A-N, L-I-A-N-C-H-A-O.
22     Q.  Did you work with anybody else on
23  this project other than Mr. Guo?
24         MR. GRENDI:  Objection.  You
25         can answer.

Page 36

Yvette Wang

1
2      A.  No.
3      Q.  Was anybody else from Golden Springs
4  involved in this project?
5          MR. GRENDI:  Objection.  You
6          can answer.
7      A.  No.
8      Q.  How did Eastern Profit identify
9  these individuals?
10     A.  I don't know.
11     Q.  You never asked?
12     A.  No.
13     Q.  Mr. Guo never said, This is where we
14  got this list of corrupt people?
15     A.  No.
16     Q.  Is Mr. Guo a member of the Communist
17  Party?
18     A.  No.
19         MR. GRENDI:  Objection.  You
20         can answer.
21         MS. TESKE:  Objection.
22     A.  No.  I'm allowed to answer that.
23     Q.  Are you a member of the Communist
24  Party?
25     A.  I was before.

Page 37

Yvette Wang

1
2      Q.  When did your affiliation with the
3  Communist Party end?
4          MR. GRENDI:  Objection.  You
5          can answer.
6      A.  Five years ago, about.  Five or six,
7  yes.
8      Q.  Do you know why Mr. Guo cares if
9  these individuals are committing crimes
10  against the Chinese government?
11         MR. GRENDI:  Objection.  You
12         can answer.
13     A.  It's a big question, but I love to
14  answer.  And if you follow all the media,
15  including New York Times, Washington Post,
16  Wall Street Journal, all of this, big media
17  internationally, and his own social media,
18  you will have the answer.
19     Q.  How about you provide me with your
20  answer?
21     A.  Because he spoke out on behalf of a
22  Chinese outrage, common people, about the
23  corruption of Chinese certain high official.
24  There's no rule of law and democracy in
25  Mainland of China.  And Chinese outrage

Page 38

Yvette Wang

1          Yvette Wang
2   people, they deserve, and they urgently,
3   hungrily need that.
4          So he believed what he has been
5   doing until now, since two years ago, is for
6   justice and for rule of law, democracy of
7   China.
8       Q.  You keep saying certain high
9   official.  Is there a particular individual
10  you're referring to?
11         MR. GRENDI:  Objection.  I just
12      want to again --
13      A.  I would love to answer.
14      Q.  You could answer.
15         MR. GRENDI:  I wasn't going to
16      say that you can't.  Do we want to
17      put the names of individuals that are
18      going to be potentially more targets
19      of this research contract on the
20      record?
21         MR. SCHMIT:  Well, I just want
22      to make sure.
23      Q.  You're saying one high official, you
24  keep saying, in your answer.  Are you
25  referring -- how about a yes or no?  Are you

Page 39

Yvette Wang

1          Yvette Wang
2   referring to a particular individual?
3          MR. GRENDI:  Objection to the
4      form.
5          You can answer.
6       A.  From New York Times and Washington
7   Post, Wall Street Journal reported about Mr.
8   Guo, I know he whistle blow a lot about
9   Chinese vice president, somehow, yes.  If you
10  read article, you can have answer.
11      Q.  But is that who you were referring
12  to?
13      A.  I don't understand your question.
14      Q.  In your answer, you keep saying
15  singular, high official.
16      A.  Singular?
17      Q.  I just want to make sure.
18      A.  Maybe my English too broken.  I
19  didn't say singular.  What do you mean
20  singular?
21      Q.  As in one person as opposed to many,
22  as opposed to plural?
23      A.  Many, many, yes.
24      Q.  So when you say "high official,"
25  you're referring to the people being

Page 40

Yvette Wang

1          Yvette Wang
2   identified to be investigated, right?
3       A.  Yes.
4          MR. GRENDI:  Objection.  You
5      can answer.
6       Q.  The entity ACA Capital Group
7   Limited, are you familiar with that?
8       A.  I heard this name.
9       Q.  How did you hear this name?
10      A.  From this project.
11      Q.  In what context did the name come
12  up?
13      A.  I don't have that.
14      Q.  Well, how did you hear about it in
15  connection with this project?
16      A.  After that one million was wired to
17  Strategic Vision without contract signed, I
18  heard ACA trying to fix this mistake.  And
19  then this name came to me.
20      Q.  Prior to them wiring a million
21  dollars to Strategic Vision, you had never
22  heard of ACA Capital?
23      A.  No, I didn't.
24      Q.  Do you know why they wired a million
25  dollars to Strategic Vision?

Page 41

Yvette Wang

1          Yvette Wang
2       A.  I don't know, but with this contract
3   that's supposed to be the deposit to this
4   contract.
5       Q.  But why did ACA Capital Limited send
6   the money?
7          MR. GRENDI:  Objection, you can
8      answer.
9       Q.  As opposed to, say, Eastern Profit?
10         MR. GRENDI:  Objection.  You
11      can answer.
12         MR. SCHMIT:  What is the
13      objection on that one?  I'm being
14      pretty liberal about not getting into
15      this debate, but there have been a
16      lot of objections that are
17      questionable, to say the least.
18         MR. GRENDI:  There is a lack of
19      clarity in the form.
20         MR. SCHMIT:  There is?  What is
21      it?  I'd like to meet it.
22         MR. GRENDI:  I mean, I think
23      you're indicating that -- well, you
24      know what --
25         MR. SCHMIT:  I asked why?

Page 42

Yvette Wang

1       MR. GRENDI:  I mean, what, as
2   to --
3       MR. SCHMIT:  It's kind of a
4   standard question.
5       MR. GRENDI:  You want me to
6   explain why your question is a little
7   bit incomplete?  I don't want to --
8       MR. SCHMIT:  No, if there's a
9   form and I can clarify it somehow for
10  you or the witness, I'd like to do
11  so.
12      MR. GRENDI:  Well, I'll allow
13  it to go forward, but I just think
14  it's not necessarily an accurate
15  reflection of what's going on here.
16  But go ahead.
17      MR. SCHMIT:  Can you read the
18  question for the witness?
19  (Whereupon, at this time, the requested
20  portion was read by the reporter.)
21  A.  Why?  Right?
22  Q.  Yes.
23  A.  From my understanding, that was the
24  deposit to this research equipment.  Before

Page 43

Yvette Wang

1   the research equipment was officially signed,
2   and that was a kind of mistake, shouldn't
3   happen.  Because there was even not a
4   contract at all by then.
5   Q.  You mean a contract hasn't been
6   executed at all by then?
7   A.  Signed, executed, correct.
8   Q.  Right.  Because the wire from ACA
9   Capital came a few days before January 6th,
10  right?
11  A.  January 6th, correct.
12  Q.  Which is the day the contract was
13  actually executed, right?
14  A.  You are right.
15  Q.  But I'm going to go back to my
16  question.
17      Why did ACA Capital Limited send
18  money that you're saying is pursuant to a
19  contract that ACA Capital Limited never
20  signed, ever?
21  A.  So you are asking why, right?
22  Q.  Why.
23  A.  I heard there is a loan between
24  Eastern Profit and ACA.

Page 44

Yvette Wang

1   Q.  A loan?
2   A.  Yes.
3   Q.  Who told you about this loan?
4   A.  Both Mr. Guo.  And if I remember
5   correctly, Mr. Han.
6   Q.  What is the loan?
7   A.  I don't know.
8   Q.  But Eastern Profit had loaned money
9   to ACA Capital?
10  A.  Borrow money from ACA Capital.
11  Q.  How much did they borrow?
12  A.  I don't know.
13  Q.  Was the idea that Eastern Profit was
14  going to have to pay this million dollars
15  back to ACA Capital?
16  A.  They called this is a loan,
17  officially there should be a payback, in my
18  understanding.
19  Q.  In other words, at some point ACA
20  Capital is going to want that million dollars
21  back from Eastern Profit?
22  A.  You are right.
23  Q.  Why did ACA Capital agree to provide
24  the funds to Eastern Profit?

Page 45

Yvette Wang

1   A.  There was a loan.
2   Q.  But why did they agree to enter into
3   the loan for this contract?
4   A.  I don't know.
5   Q.  You don't know why they didn't?
6   A.  No.
7   Q.  Is there documentation to support
8   this loan?
9   A.  I requested there should be some
10  documents.
11  Q.  Have you ever seen the documents
12  supporting this loan?
13  A.  I didn't see that.
14  Q.  You did not see it?
15  A.  No.
16      MR. SCHMIT:  Obviously, if
17  there's any documents supporting this
18  loan, we'd ask that they be produced.
19      MR. GRENDI:  Request noted.
20  Q.  What is ACA Capital Limited?
21  A.  I heard it's a fund management
22  company, assets management company, something
23  like that.
24  Q.  Where is it located?

Page 46

Yvette Wang

1
2   A.  I heard it's located in Hong Kong.
3   Q.  Have you ever spoken with anybody
4   from ACA Capital Limited?
5   A.  No.
6   Q.  Does Golden Springs do business with
7   ACA Capital Limited?
8       MR. GRENDI:  Objection.  You
9   can answer.
10  A.  No.
11  Q.  Is Mr. Guo affiliated with ACA
12  Capital Limited at all?
13  A.  I don't know.
14  Q.  Has there been any communications
15  with ACA Capital Limited since this lawsuit
16  began?
17  A.  You mean the communication between
18  who and who?
19  Q.  Eastern Profit and ACA Capital
20  Limited.
21  A.  I don't know.
22  Q.  Nobody has informed you of any?
23  A.  No.
24  Q.  You don't know if ACA Capital has
25  inquired about where the million dollars is

Page 47

Yvette Wang

1
2   or anything along those lines?
3   A.  They didn't tell me, but I heard
4   from Mr. Guo that there was a loan, and they
5   are asking the money back.  But, obviously,
6   that conversation might happen in Hong Kong,
7   which I was not involved.
8   Q.  But Mr. Guo informed you that they
9   are probably asking for the money back?
10  A.  Correct.
11  Q.  Do you know what the terms of the
12  loan were?
13  A.  I don't know.
14  Q.  Are they asking for the money back
15  because the term -- the contract was
16  terminated?
17  A.  Obviously --
18      MR. GRENDI:  Objection of form.
19      You can answer.
20  A.  Obviously, correct.  Because this
21  contract produced nothing.
22  Q.  By the way, is that why ACA Capital
23  Limited is asking for the money back, do you
24  know that?
25      MR. GRENDI:  Objection to the

Page 48

Yvette Wang

1
2   form.
3       You can answer.
4   A.  I don't know.
5   Q.  Does Golden Springs work for any --
6   do any work for any clients unaffiliated with
7   Mr. Guo?
8   A.  I don't understand your question.
9   What is your question?
10  Q.  Are there any clients other than
11  companies that Mr. Guo brings to Golden
12  Springs that Golden Springs does work for?
13      MR. GRENDI:  Objection.  I just
14      want to clarify, which Golden Spring?
15      MR. SCHMIT:  New York Golden
16      Spring, that the witness is an
17      employee of.
18  A.  So you're asking Golden Spring's
19  clients?
20  Q.  Yes.
21  A.  I cannot disclosure that.  But you
22  ask, is there any clients of Golden Spring
23  who was or were introduced by Mr. Guo?
24  Q.  No, that were not.  I mean, are all
25  the clients brought to your Golden Spring by

Page 49

Yvette Wang

1
2   Mr. Guo?
3   A.  Oh, is there any --
4       MR. GRENDI:  Objection.
5   A.  Is there any other client, right?
6   Brought by Mr. Guo to Golden Spring,
7   introduced, you mean, right?
8   Q.  Why don't you answer that question,
9   we'll start there.
10      MR. GRENDI:  Objection.
11  Q.  Just a yes or no.
12      MR. GRENDI:  I don't understand
13      this question.
14      MR. SCHMIT:  She's asking me --
15      she's got a question in mind.  She
16      can answer it and we will get beyond
17      it.
18  A.  Sorry, I don't mean to be rude, but
19  I need to know the question.
20  Q.  Okay.  Your company, Golden Springs
21  does work for clients, right?
22  A.  Correct.
23  Q.  You've referred to Golden Springs as
24  a family office, correct?
25  A.  Correct.

Page 50

Yvette Wang

1           Yvette Wang
2      Q.  Are any of Golden Springs' clients
3   from a source other than Mr. Guo?
4           MR. GRENDI:  Objection.  This
5      has no relevance to this.
6           MR. SCHMIT:  It does.  They
7      signed the interrogatories and we're
8      not getting much information on
9      anything else.  I have to try to work
10     through these issues and find out
11     what's going on here.
12          MR. GRENDI:  You're asking
13     about clients other than the parties
14     that are involved in this action.
15          MR. SCHMIT:  I haven't asked
16     for the identification.
17     Q.  I want to know, is Golden Springs
18  Mr. Guo's family office?
19     A.  No.
20     Q.  Then are there other clients for
21  Golden Springs that are introduced by
22  individuals or come from sources other than
23  Mr. Guo?
24     A.  Yes, we do have.
25     Q.  Now, the family that you work for is

Page 51

Yvette Wang

1           Yvette Wang
2   located in Mainland China?
3      A.  And Hong Kong.
4      Q.  And it is a single family?
5      A.  Not only one family.
6           MR. SCHMIT:  Can I get this
7      marked as Exhibit 4?
8           (Whereupon, at this time, the
9      reporter marked the above-mentioned
10     research agreement as Wang Exhibit 4
11     for identification.)
12  BY MR. SCHMIT:
13     Q.  I'm going to hand you what's been
14  marked as Exhibit 4.  It's entitled research
15  agreement, January 1, 2018.  And it's Eastern
16  1 through Eastern 4.
17     Do you have that in front of you?
18     A.  Yes.
19     Q.  Have you ever seen this document
20  before?
21     A.  Yes.
22     Q.  Who produced -- I mean, not --
23  Eastern indicates you guys produced it in
24  this litigation.  But do you know who drafted
25  or generated this document?

Page 52

Yvette Wang

1           Yvette Wang
2      A.  I heard this was drafted by
3   Strategic Vision.
4      Q.  Now, you heard that; who did you
5   hear that from?
6      A.  Mr. Guo.
7      Q.  Did Mr. Guo hand it to you and say,
8   This is a draft prepared by Strategic Vision?
9      A.  Yes.
10     Q.  What did he say about it, anything
11  in particular?
12     A.  He said he wants me to review and to
13  finish this contract.
14     Q.  And did you do that?
15     A.  Yes.
16     Q.  During the review process, did you
17  have conversations with Mr. Guo?
18     A.  I did.
19     Q.  Generally speaking, what were the
20  tenure of these conversations as you drafted
21  the -- as you filled in and finished the
22  contract?
23     A.  Sorry, can I ask you, what is your
24  question?
25     Q.  Just tell me about the conversations

Page 53

Yvette Wang

1           Yvette Wang
2   you had with Mr. Guo as you filled in and
3   finished the contract.
4      A.  He asked me to review the contract,
5   and he mentioned about, like, the deposit,
6   like price and he explained his request to
7   me, asking me to check whether that is
8   already included in the contract.
9      Q.  Whether the deposit and price were
10  included?
11     A.  The terms, including the deposit,
12  payment, whether they are correct, whether
13  they are included in the contract.
14     Q.  Now, how would you know whether they
15  were correct or not?  Did he tell you what
16  they should be?
17     A.  Yes.
18     Q.  And did you conclude they were
19  correct or were they included in the
20  contract?
21     A.  I reviewed and something was not the
22  same with what he told me.  So I explained to
23  him and he asked me to finish the review and
24  try to revise it.
25     Q.  And what was that issue?

Page 54

Yvette Wang

A. I don't remember that clearly. It's about Strategic Vision called a waterline. Mr. Guo, he doesn't like that. And in his understanding, that should not be a waterline, which is defined by Strategic Vision.

Q. And what was your understanding of what was meant by waterline?

A. Strategic Vision, Ms. Wallop told me and that is a waterline in the tank which can keep the project and team, her team, working and produce the reports. By short term, waterline means money. And Strategic Vision, I mean, Ms. Wallop requested a certain amount of money paid, which maintain her team and her research.

But the argument is, Mr. Guo, he would like to keep, we call it a la carte. Like, I need how many reports, I pay how many reports. If I don't need that amount of reports, and we should not go the waterline. The waterline is a, if I may describe it as a lock-in price or lock-in money, which no matter how many reports the client request,

Page 55

Yvette Wang

and we have to pay that, which in Mr. Guo, his understanding, is not fair and not practical.

Q. Now, the waterline, is this a reference -- does this have anything to do with the million dollar deposit?

A. No. One million dollar deposit has nothing to do with waterline. Waterline is Ms. Wallop and Strategic Vision requested the client of this contract to pay $750,000 per month, no matter how many reports the client requested or Strategic Vision provided. That money must be paid.

And the explanation and the reason Ms. Wallop explained to me many, many times, hours, said that waterline permit her to keep her team in our country or other district to investigate. And that is her common standard, in her business, and in her called this, industry, which in my understanding is her investigation industry and the business.

And she repeatedly told me that is already very nice and reasonable waterline to Miles Guo, and that is mandatory to this

Page 56

Yvette Wang

project. So we spent hours, hours, hours to negotiate about this waterline.

Q. And the negotiations, what did they lead to? What was the final agreement in your view?

A. We had, I remember, we had totally three meetings. And by the end, compromised.

Q. How did you compromise? Is it reflected in the final agreement?

A. Correct.

Q. Why don't you pull out the final agreement and show me where that compromise is reflected? It's Exhibit 2.

A. So you want me to explain what is compromise?

Q. Well, I asked you whether the compromise -- you said there was a compromise. And I asked you if it was in the final agreement. I believe you said yes?

A. Yes, I said that.

Q. Now you've got the final agreement in front of you and I would like you to point out where it is reflected.

(Witness peruses document.)

Page 57

Yvette Wang

A. Yes, it's on page 4. If you see second paragraph, it is agreed by both parties that for the first three months of this agreement, January, February and March 2018, that the payment of 750,000 U.S. dollars will be wired per our instruction to our U.S. bank account. And after that there is a recap term. What is the recap? Oh, yes. It is also agreed by both parties that after the March reports and the payments are made, that all involved parties will meet to recap the accounting.

Q. What does that mean in your view? What is your understanding of that term?

A. That means in the very beginning, Strategic Vision, I mean, Mrs. Wallop requested $750,000 per month for 12 months. And, obviously, the client, I mean, Mr. Guo, they don't like that, and they didn't agree.

Q. They did or did not agree?

A. They did not. So the compromise here is that recap. Finally, Mrs. Wallop advised or stressed it for the first three months, please pay 750,000 per month. And

Page 58

Yvette Wang

1                    Yvette Wang
2    after the first three months, by the end of
3    March, let's recap. See, so you guys still
4    pay me 750,000 or there's a lower or higher,
5    she called, waterline.
6         Q. So the agreement for the first three
7    months it was going to be 750,000 for
8    January, 750,000 for February and 750,000 for
9    March, right?
10        A. Correct.
11             MR. GRENDI: Objection. You
12        can answer.
13        A. Waterline.
14        Q. Were those amounts ever paid?
15        A. No.
16        Q. That was 750,000 per month, not
17   total, right?
18        A. Correct.
19        Q. How about the -- what is your
20   understanding of the fourth paragraph down?
21   The pricing for 30-year units or deliverables
22   per year remains a constant $9 million per
23   year or 750,000 per month for 12 months?
24        A. You are pointing the correct point.
25   This is Mrs. Wallop called waterline, which

Page 59

1                    Yvette Wang
2    she is able to maintain her investigation
3    team waterlined. And she said that is
4    mandatory. That is if you want this project,
5    you have to pay minimum to keep waterline.
6         Q. In other words, that in part
7    encompassed what it was going to cost
8    Strategic Vision to keep teams out in the
9    field and available in order to do the work
10   for Eastern Profit, right?
11        A. Based on her explanation, she said,
12   yes, that is professional and that is a
13   mandatory request.
14        Q. And that ended up in the final
15   contract?
16        A. Correct.
17        Q. Whose initials are on the bottom
18   right corner of Exhibit 2? There seem to be
19   initials on each page. Whose are those?
20        A. That is mine.
21        Q. So is F.C.W., Ms. Wallop's?
22        A. Yes.
23        Q. And then the other initial is yours?
24        A. Correct.
25        Q. And then on page 5, production

Page 60

1                    Yvette Wang
2    number Eastern 9, that is your signature
3    there, right, on the right-hand side?
4         A. Correct.
5         Q. So that was one issue, the waterline
6    we will call it, that Mr. Guo raised with
7    you.
8             Did he raise any other issues when
9    he saw the draft or the incomplete draft?
10        A. She asked me to check about the
11   deliverable of reports. In my understanding,
12   when she asked me to check, he was already
13   told by Strategic Vision, I mean Mrs. Wallop,
14   how many reports, how frequency the reports
15   will be provided.
16            So Mr. Guo asked me, because he
17   doesn't read English at all. So he ask me to
18   check whether that reports deliverable
19   schedule is included in here as his
20   understanding.
21        Q. Was it?
22        A. Yes. Close, almost.
23        Q. Did you make or request any changes
24   based on what Mr. Guo said?
25        A. I didn't.

Page 61

1                    Yvette Wang
2         Q. Was a translation of this document
3    ever provided to Mr. Guo?
4         A. I orally translated for him.
5         Q. And he speaks Mandarin?
6         A. Correct.
7         Q. So you read line by line and got his
8    okay to the final agreement, right?
9         A. Correct.
10        Q. Okay. What other issues? There is
11   deliverables, waterline; any other issues
12   that Mr. Guo raised with you?
13            MR. GRENDI: Objection of form.
14            You can answer.
15        A. No. That is the main two parts.
16   Yes.
17        Q. What about the deposit? Did he
18   raise any issues with respect to the deposit?
19        A. Oh, you reminded me. Because I
20   remember clearly when I went through this
21   draft with Mr. Guo, I pointed out, I said
22   that one million deposit in advance is a lot.
23   Because I am a project manager, so I feel I
24   should remind him, this is a huge amount of
25   money to pay as a deposit.

Page 62

Yvette Wang

1           And I remember Mr. Guo said,
2  Mrs. Wallop and Mike, they are respectful
3  people.  And I trust them.  They are
4  reliable.  And before they even ask three
5  million as a deposit in this contract, now
6  they reduced by one million, and let's just
7  keep that.  I remember that conversation.
8       Q.  So ultimately you agreed to the
9  million dollar deposit, correct?
10      A.  That's right.  As a project manager,
11 you know, I pointed out my concern, if he
12 insisted then I just let it go.
13      Q.  Did you guys ever discuss any
14 mechanism by which you might be able to get
15 that million dollar deposit back if something
16 wasn't done or things didn't work out under
17 the contract?
18      A.  You mean when I was discussing with
19 Mr. Guo?
20      Q.  Or that you heard of or had been
21 educated about.
22      A.  No, I don't remember that clearly.
23      Q.  Do you remember it at all?
24      A.  No.

Page 63

Yvette Wang

1       Q.  Now, ultimately, you're saying ACA
2  Capital Limited made the million dollar
3  deposit?
4       A.  Correct.
5           MR. GRENDI:  Objection of form.
6           You can answer.
7       Q.  On whose orders did they do that?
8       A.  I'm sorry, what is your question?
9       Q.  On whose orders did they do that?
10 Why did they do that?
11      A.  I was not involved in that
12 instruction communication.  But I guess it's
13 only my guess, between Eastern and ACA.
14      Q.  Eastern and who?
15      A.  ACA Capital.
16      Q.  Who on behalf of Eastern would
17 have --
18           MS. TESKE:  Objection.
19      A.  Obviously, Mr. Han, from the paper.
20      Q.  Do you know that or have you seen
21 anything that would suggest he gave the order
22 to wire the million dollar deposit?
23      A.  No.  I was not involved in that
24 process.

Page 64

Yvette Wang

1       Q.  Did you ever discuss it with Mr.
2  Guo?
3       A.  About what?
4       Q.  The deposit being made.
5       A.  Oh, Mr. Guo send me the receipt, the
6  wire transfer receipt.  And then told me to
7  send a text message to Mrs. Wallop about this
8  one million deposit paid.
9       Q.  And what did -- what was your
10 reaction to getting this receipt, this one
11 million dollar receipt?
12      A.  I was shocked.
13      Q.  Why were you shocked?
14      A.  Because there was even no contract
15 executed and signed.  And the money was
16 already paid.  And in my understanding, this
17 is a huge, huge, mistake.  Accident.
18      Q.  So who did you talk to about that?
19      A.  I texted Mrs. Wallop.
20      Q.  And what did you tell Mrs. Wallop?
21      A.  If you have my Signal message with
22 her, I remember I texted her.  I said, This
23 deposit was already wired to you, even
24 without the contract signed.  And kind of

Page 65

Yvette Wang

1  like shows the seriousness.  And if you would
2  like to continue to do this project, and we
3  will stay -- we will stay with our terms
4  which is our negotiation.  I was very insist,
5  if you do not agree, kindly, please, return
6  the one million deposit back, and sorry for
7  the inconvenience.  You have my Signal
8  message.  I remember that.
9       Q.  And when you say the contract as
10 agreed, in other words, no more changes to
11 the contract, we need to sign it as is; is
12 that fair?
13      A.  Correct.  Sign my version.
14      Q.  Okay.  And, ultimately, when you say
15 your version, the one that was existing at
16 the time the million dollars was paid, right?
17      A.  Correct.
18      Q.  Were any changes requested or made
19 to that contract?
20           MR. GRENDI:  Objection.  You
21      can answer.
22      A.  You mean when?
23      Q.  After the million dollars showed up,
24 did Ms. Wallop or anybody else on behalf of

Page 66

Yvette Wang

1   Strategic Vision request any changes?
2        MR. GRENDI:  Objection.  You
3   can answer.
4        A.   They obviously requested and they
5   did, because the version by that wire
6   transfer was made, my version was different
7   from the final version.  This is from
8   Mrs. Wallop, this version (indicating).
9   There was -- there is some difference in
10  there still.
11       Q.   So changes made after the wire was
12  received?
13       A.   Correct.
14       Q.   What changes were those?
15       A.   That first three months waterline
16  must be paid after that recap.  That is the
17  main change.
18       Q.   That's a change you requested,
19  though, right?
20       A.   No.  That was not a change I
21  requested.  Before that, I request a la
22  carte.  Like how many reports, the client
23  buy, pay how much.  There's no waterline.
24       Q.   When did you have that conversation
25

Page 67

Yvette Wang

1   with Ms. Wallop?
2        A.   The date is -- contract was signed
3   January 6th; that is one week before that
4   date.  It's very end of December, beginning
5   of January.
6        Q.   Any other changes?
7        A.   No.  Mainly that is the most heavily
8   biggest argument.
9        Q.   Had Ms. Wallop told you that's how
10  it had to be prior to the wire being
11  received?
12       MR. GRENDI:  Objection.  You
13  can answer.
14       A.   Sorry, what is your question?
15       Q.   Did this waterline concept, you had
16  discussed it with Ms. Wallop prior to the
17  wire being received or is this a conversation
18  you guys had after ACA Capital sent the
19  money?
20       A.   Oh, the waterline conversation
21  happened from the first second, from the very
22  beginning.  And let me make it precise.  Even
23  before the one million wired, I mean, from
24  the very beginning, when I was discussing
25

Page 68

Yvette Wang

1   with her directly.
2        Q.   And Ms. Wallop said from the
3   beginning that with respect -- there has to
4   be this waterline concept?
5        A.   Correct.
6        Q.   And you conveyed that to Mr. Guo?
7        A.   I post a request and message to Mr.
8   Guo.  I told him this is what they call
9   waterline, they must have.
10       Q.   And when would you have given that
11  message to Mr. Guo?
12       A.   You mean when, right?
13       Q.   When, yes.
14       A.   From my first meeting with
15  Mr. Wallop about this project.
16       Q.   About when was that?
17       A.   Sorry, what is the question?
18       Q.   About when was that?
19       A.   What time, right?
20       Q.   Yes.
21       A.   By the very end of December 2017.  I
22  don't remember that date.
23       Q.   So it was December 2017 Ms. Wallop
24  by then had said, Look, there has to be a
25

Page 69

Yvette Wang

1   waterline.  And you told Mr. Guo this is the
2   position Strategic Vision is taking; is that
3   fair?
4        A.   That is fair.  I remember my first
5   meeting with Ms. Wallop about this project
6   was in the very end of December, in
7   Mrs. Wallop's house in Virginia.  That was
8   our first meeting.  And the waterline problem
9   happened from that moment.
10       Q.   When did you see this final version
11  of the draft, the final agreement for
12  execution?
13       A.   The final version of this contract,
14  the first time I saw was on January 6th, the
15  date which was -- this was signed.
16       Q.   What was your reaction to it?  Who
17  was at that meeting?  Was anybody present?
18       A.   Only Mrs. Wallop and me.
19       Q.   Where did that take place?
20       A.   Ms. Wallop's house, in Virginia
21  home.
22       Q.   And what did you tell Ms. Wallop
23  after you looked at the contract?
24       A.   I remember I went through the
25

Page 70

Yvette Wang

1
2 contract. Then I saw that recap after first
3 three months.
4      Q. And the recap was part of what you
5 had requested, right?
6      A. No.
7      Q. Not at all?
8      A. Not as -- that is not my request at
9 all. That is Ms. Wallop. She stressed it,
10 and she put in the draft. And in my
11 understanding, that was a compromise. Like,
12 okay, now, let's recap by the end of three
13 months about the waterline. At least give a
14 chance to recap, instead of request you must
15 pay for all the 12 months, right? To me,
16 that is a little bit better. So I feel that
17 is a compromise.
18      Q. Before signing it, did you pick up
19 the phone and call anybody?
20      A. I called Mr. Guo.
21      Q. What did you tell Mr. Guo about that
22 agreement?
23      A. I told him, I said, This is still
24 not my contract. Not my version. And I
25 translated to him briefly about the recap,

Page 71

Yvette Wang

1
2 that part.
3      Q. And what did he say?
4      A. He said, you just go ahead to sign
5 it. And we need this project started.
6      Q. Are there any other provisions you
7 went over with Mr. Guo on the phone?
8      A. I emphasized again to him about the
9 report delivery schedule, which is weekly
10 report in the first month, and then there
11 should be a preliminary report for the first
12 month, and then after first month, there
13 should be at least a monthly report every
14 month. And some of the research, the reports
15 will be based on the request from the client.
16 So that's the two main point I emphasized
17 again to him.
18      Q. Why did you emphasize the report
19 issue to Mr. Guo?
20      A. Because that was in the first
21 discussion when I saw this project with Mr.
22 Guo. And -- yeah, that's the two points he
23 really cares about.
24      Q. The report and what it was going to
25 cost?

Page 72

Yvette Wang

1
2      A. Yes.
3      Q. What did he say in regards to the
4 reports?
5      A. You mean --
6      Q. The language, when you told him over
7 the phone, Remember, look, these are the
8 reports, this is when it is going to come in,
9 what was his reaction?
10      A. You mean by 1/6?
11      Q. Yes. As I understand you're having
12 a telephone conversation with him on January
13 6th?
14      A. You're right.
15      Q. What did he say about the reports?
16      A. He said confirmed, okay.
17      Q. The word "report" appears several
18 times in the agreement. What is your
19 understanding of the word report?
20      A. You mean my understanding, personal?
21      Q. Well, why don't we start with yours
22 and if you have reason to think it's
23 different than Eastern, you can let me know.
24      A. In my understanding, the report, as
25 the, I mean, project manager, if I may call

Page 73

Yvette Wang

1
2 myself, a little bit, and the report should
3 be in black and white. It's solid, reliable,
4 and there is value. And I mean, valuable
5 information in the deliverable, which we call
6 the report, and which should be delivered
7 without delay based on the report deliverable
8 schedule of this contract signed to the
9 client. I mean, as a project manager, that
10 is my understanding. First the quality,
11 second the timeline.
12      Quality means you cannot deliver
13 garbage or advertisement or Wikipedia or even
14 Russian language stuff. Because that is not
15 valuable and they are garbage, nonsense.
16      Second, timeline. And you should
17 deliver the report based on the contract
18 signed in here, which agreed by both sides.
19 That is the weekly report, for the first
20 month, and monthly report for the following
21 month, which never happened.
22      Q. What is a progress report, if you
23 look on page 2? What is a progress report?
24      A. Which paragraph are you referring
25 to?

Page 74

Yvette Wang

1
2      Q.   The contractor will produce a
3  progress report.  What is -- compared to a
4  general report, what is a progress report?
5           (Witness peruses document.)
6      A.   Progress reports includes, in my
7  understanding, again, as a project manager,
8  first that should include what is happening.
9  What is the team.  What is your mechanism.
10 And the second mainly that is, I mean, the
11 first part should be like 30 percent or 20
12 percent of the whole progress report.  And
13 the rest of the 80 or 70 percent of progress
14 report, that should be valuable.  Valuable
15 means that, okay, there are information in
16 there, valuable, instead of having zero
17 valuable information and only garbage.
18     Q.   Well, what's a preliminary report as
19 opposed to an overall report, a progress
20 report?
21     A.   The preliminary report, in the first
22 month, in my understanding, that should be a
23 conclusion report or January, big report for
24 the first month.  Why the first month need
25 preliminary report, because that was the

Page 75

Yvette Wang

1
2  beginning of this project.
3           So you may include who is your team,
4  who is your team member, who is your project
5  manager, what is your strategy or what is
6  your mechanism or working.  That's why that
7  happened in the first month.
8           Why there is no preliminary report
9  in the second and third month, the reason is
10 the first month needs all of that
11 information.  Not only the valuable
12 information which they worked, but also their
13 general and detailed information of their
14 investigation team, their work mechanism, at
15 least who is the project manager or how they
16 work.  Fair enough?
17     Q.   What about comprehensive historical
18 research report?  Does that differ any from
19 kind of this overall report concept or
20 progress report or preliminary report?
21     A.   Comprehensive historical research
22 report within three months, in my
23 understanding --
24     Q.   This is your understanding as a
25 project manager?

Page 76

Yvette Wang

1
2      A.   Correct.  I am sorry about that.
3      Q.   That's all right.
4      A.   So comprehensive, within three
5  months, which is a bigger report than the
6  report of first month and the second month
7  and third month.  That should be a kind of
8  like all together, like summarize.  And then
9  they have all the information, I mean,
10 valuable information in there.  They have
11 their whole team reported in here.  And then
12 they may decide, because there is a recap,
13 they may decide by the end of third month,
14 how they will proceed for the next three
15 quarter of that year, that is my
16 understanding.
17     Q.   When you say this is your
18 understanding as a project manager, how did
19 you gain this understanding of these terms?
20     A.   How did I get this?
21     Q.   Yes.
22     A.   From my work experience.
23     Q.   And what kind of work experience was
24 that and for who?
25     A.   For who or from who?

Page 77

Yvette Wang

1
2      Q.   However -- your work experience.
3  You said you gained this from your work
4  experience.  Have you done investigative
5  contracts before?
6      A.   Oh, that is better understanding for
7  me.
8           I'm a project manager and I work for
9  many different projects.  I don't mean
10 investigation project.  For example, I build
11 house, right?  I'm managing like the media
12 project.  This is a common knowledge and
13 common sense as a project manager.
14     Q.   Well, putting aside -- have you ever
15 been a project manager on a, you know,
16 confidential research of individuals?
17     A.   Sorry, can you repeat your question?
18     Q.   Have you ever been a project manager
19 for any contract remotely close to the one we
20 have marked as Exhibit 2?
21          MR. GRENDI:  Objection.  You
22     can answer.
23     A.   I believe this is new to me.  So
24 that's why I was educated, educated by
25 Strategic Vision and Ms. Wallop, saying,

Page 78

Yvette Wang

1     Yvette Wang
2  Yvette, you are new to this kind of industry,
3  I remember that clearly, and she said, we
4  never communicate by e-mail and all the
5  reports and deliverable we must hand over
6  face to face.  No e-mail, no phone call.
7          That's why, for example, like your
8  project, Mike, another associate of Ms.
9  Wallop, will fly himself to other country,
10  including Swiss, Switzerland, or other
11  countries in Asia, to face to face meet their
12  project manager and engineer, to receive
13  their deliverable.
14          So I'm talking about my experience
15  to be educated by a professional people in
16  this so-called industry.  So to answer your
17  question as this kind of project to me is new
18  and fresh, and I was educated a lot.
19     Q.  Did you discuss with either Mr. Guo
20  or Mr. Han what they expected the reports to
21  be prior to execution?
22     A.  They expected the reports or
23  information are valuable.
24     Q.  But did they talk in terms of the
25  form and how they would be delivered,

Page 79

Yvette Wang

1     Yvette Wang
2  anything along those lines?
3     A.  The form?  I don't understand your
4  question.
5     Q.  Flash drive, in person, e-mail; how
6  was it supposed to be delivered based on your
7  conversations with Mr. Guo and Mr. Han?
8     A.  Oh, basically, the first time I was
9  told how the deliverable or report should be
10  transported was, I heard it from Ms. Wallop.
11  And she clearly told me that, no e-mail, no
12  phone call.
13     Q.  No written report?
14     A.  No written report.
15     Q.  No memo, no memorandum?
16          MR. GRENDI:  Objection.
17     Q.  You weren't expecting a memo to be
18  delivered?
19     A.  What do you mean memo?
20     Q.  A written memorandum.
21     A.  Are we talking about the --
22     Q.  The report.
23     A.  Are we talking about the information
24  in a report?  I'm confused by you.
25     Q.  The reports.  We're talking about

Page 80

Yvette Wang

1     Yvette Wang
2  the definition of the report in the
3  agreement.  Did Ms. Wallop ever suggest she
4  was going to write a written report out in
5  any way, shape or form?
6     A.  She said the report should be
7  delivered by flash drive.
8     Q.  By who?
9     A.  Flash drive.  USB key, thumb drive.
10     Q.  And what was your -- did she ever
11  discuss what was going to be on the flash
12  drive or USB key?
13     A.  You mean when?
14     Q.  What.  What was going to be on it?
15     A.  Oh, the report.
16     Q.  Did she ever get into detail of what
17  the form and substance of the report was
18  going to be?
19     A.  I remember she mentioned that will
20  be the valuable information, because she
21  presented herself and her team as the best in
22  this industry.  So she guaranteed again and
23  again the information we will receive, they
24  are valuable and they are in compliance with
25  Mr. Guo's request.

Page 81

Yvette Wang

1     Yvette Wang
2     Q.  Okay.  We will get to the definition
3  of valuable.  But I just want to be clear.
4  Now we're going to deliver flash drives in
5  person for these reports, right?
6     A.  Correct.
7     Q.  Did you have an understanding of
8  what was going to be on the flash drive, not
9  just valuable information, but as far as form
10  or substance, letters, memorandums,
11  handwritten notes?
12     A.  Oh, okay.
13     Q.  Recorded conversations, what was
14  going to be on there?
15     A.  That is very helpful.  In my
16  understanding, based on our discussion about
17  the contract, based on --
18     Q.  In discussion with who, if I can
19  just ask you?
20          MR. GRENDI:  Objection.  You
21     should let the witness answer, and I
22     think it's probably getting difficult
23     for the court reporter to keep up.
24          MR. SCHMIT:  We're doing fine
25     here.

Page 82

Yvette Wang

2  Q.  Go ahead.
3  A.  Where should I start?
4  Q.  Go ahead.  Do you need it read back
5  here?
6  A.  Based on my discussion with Ms.
7  Wallop, based on my discussion with Mr. Guo,
8  that the report could possibly include, like,
9  financial, like -- because I remember Ms.
10  Wallop described their capability about their
11  technology to the bank system.
12      For example, before a contract
13  signed, she went to New York, met with Mr.
14  Guo, and she described their capability, said
15  they already in a certain bank system.
16      I'm talking about Ms. Wallop, her
17  team.  They were in, entered into a certain
18  bank's system.  And she said her people tried
19  to climb on the wall and they did that, and
20  they saw the bank information in there.  And
21  they are huge money.
22      And then Ms. Wallop even asked Mr.
23  Guo, do you want that money?  Give me your
24  bank account so we can move the money.  And
25  Mr. Guo refused immediately.  So based on my

Page 83

Yvette Wang

2  understanding that the report should include
3  the information or related information about
4  financial, which are not our report, which
5  should be legal, because Mr. Guo told Ms.
6  Wallop clearly, you are doing something
7  illegal.  And I am not stealing money, and I
8  don't need the money.
9  Q.  We will get back to that.  Again, I
10  just want to finish one line of questioning
11  before we go down that road.
12      The report, though, on the flash
13  drive, Excel spread sheets, any
14  representation that you would be supplied
15  with Excel spreadsheets?
16  A.  You mean the final report?
17  Q.  Anything.  Any report.  The flash
18  drive you would receive.  I want to know
19  physically, when you plugged it in and you
20  looked at the screen, what did Eastern Profit
21  understand would pop up?
22  A.  This could be like Excel, like Word,
23  or PDF or video.  Whatever the format.
24  Q.  Was there a specific agreement as to
25  the format of the information?

Page 84

Yvette Wang

2  A.  Agreement of format?  It could be
3  any format, in my understanding.  But the
4  information Eastern requested is illegal and
5  is checkable from resources or database.
6  Q.  You use the term throughout this
7  time --
8      MR. GRENDI:  Why don't we take
9      a break at this time?  I know you're
10      about to ask a question.
11      MR. SCHMIT:  Why don't I just
12      ask and then we will take a break.
13  Q.  You used the term several times the
14  information must be valuable.  What did you
15  mean by that?  What was your understanding of
16  that?
17  A.  Valuable, in my understanding, that
18  should be helpful to the client, as a project
19  manager.
20  Q.  Did you ever discuss -- you keep
21  saying "as a project manager."  I want to get
22  back to that before we break because that's
23  important to this whole line of questioning.
24      Did Mr. Guo ever explain to you what
25  he thought was going to be valuable?

Page 85

Yvette Wang

2  A.  At least they are real.
3  Q.  No, no, did Mr. Guo ever exchange --
4  A.  Yes, he told me.
5  Q.  What did he --
6  A.  They should be real.  They should be
7  real message.
8  Q.  What does "real" mean?  What do you
9  mean by real?
10  A.  Real means that it's true fact, real
11  message.  Instead of -- let me give you
12  another example, maybe that will be helpful.
13  Q.  You answered my question though.
14      Did you ever talk to Ms. Wallop
15  about what Eastern Profit considered was
16  valuable?  Did you ever go, Ms. Wallop, this
17  is what we're looking for, this is what we
18  want?
19  A.  We did.  If you review the contract
20  signed, which is your Exhibit number 2, you
21  can see clearly reports A, B, C, the details.
22  That should be information.
23  Q.  But we already covered that there
24  was no exact agreement as to format, right?
25  A.  Format you mean Excel, Word, PDF,

Page 86

Yvette Wang

1
2  Power Point?
3      Q.  Yes.  What was going to be on the
4  flash drive.
5          MR. GRENDI:  I want to hop in
6      here.  We requested a break, I know
7      you are continuing down this line of
8      questioning and you're obviously
9      entitled to.  But can we have a
10     break, please?
11         MR. SCHMIT:  Sure.  Take a
12     break.
13         THE WITNESS:  Thank you.
14         (Whereupon, a brief recess was
15     taken.)
16 BY MR. SCHMIT:
17     Q.  We were talking before the break,
18  Ms. Wang, about what would be considered,
19  quote unquote, valuable information.
20         Did you ever discuss that with Ms.
21  Wallop or Mike Waller, the other individual
22  you've mentioned?
23     A.  About what?
24     Q.  About what you considered to be
25  valuable or under the contract.

Page 87

Yvette Wang

1
2      A.  The valuable, the first thing they
3  should be truth, they should be true --
4      Q.  No, no, did you discuss it?
5      A.  Discuss it?
6      Q.  Did you discuss your definition of
7  valuable with either Ms. Wallop or Mr.
8  Waller?
9      A.  I didn't.
10     Q.  Do you know of anybody on behalf of
11  Eastern Profit that did?
12     A.  I believe Mr. Guo discussed it with
13  them.
14     Q.  Why do you believe that?
15     A.  Why I believe that?  Because after
16  the discussion, I guess, again, they come up
17  this definition (indicating).  So I read this
18  and I understand --
19     Q.  What are you pointing to?
20     A.  The page one until page two with all
21  the definitions regarding A, B, and C
22  research.
23     Q.  I don't understand what's in the
24  contract, though.  Were you aware of any
25  discussions Mr. Guo had with Ms. Wallop or

Page 88

Yvette Wang

1
2  Mr. Waller about what the definition of what
3  you said is, quote unquote, valuable would
4  be?
5          MR. GRENDI:  Objection.  You
6      can answer.
7      A.  Can you repeat your question?
8          MR. SCHMIT:  Can you read it
9      back?
10     (Whereupon, at this time, the requested
11  portion was read by the reporter.)
12     A.  Sorry, I still -- I don't quite
13  understand your question.  So you're talking
14  about, am I aware Mr. Guo discussed with Ms.
15  Wallop and Mike about the valuable, the
16  definition of valuable?
17     Q.  What he would consider valuable
18  under the contract.
19     A.  I believe I did.
20     Q.  You believe you did with who?
21     A.  Mr. Guo discussed it with them.
22     Q.  Okay.  And why do you believe that?
23     A.  Because Mr. Guo requested their
24  things or they offered their things.  I mean,
25  this is the proof, this is the agreement.

Page 89

Yvette Wang

1
2      Q.  I mean, were you present for any
3  conversations about, you know, Gee, Ms.
4  Wallop, this is what I would consider
5  valuable, this is what I'm looking for?
6      A.  Thank you.  That is more easier for
7  me.  No, I didn't.  And I was absent in the
8  very beginning of this project.  So in the
9  very beginning, which means before I started
10  to be involved in this project, and Mr. Guo
11  and Ms. Wallop and Mike and Mr. Han, you
12  know, Mr. Han Lianchao, we say L.C. in all
13  the correspondence, they discussed about
14  those things, I believe.
15     Q.  Why do you believe that?
16     A.  Because come out with this
17  (indicating).  Otherwise where are they come
18  from?
19     Q.  Are you aware of any specific
20  conversations along those lines, though?
21     A.  I don't understand.  Am I aware of
22  any conversation?
23     Q.  Yes.
24     A.  Yes.
25     Q.  Which ones?  When did they take

Page 90

Yvette Wang

1  place?  Who participated and what was said?
2         MR. GRENDI:  Objection.  You
3     can answer.
4     A.  I will answer that.  That take place
5  in New York.
6     Q.  Okay.
7     A.  And Ms. Wallop and Mike, they came
8  to New York to Mr. Guo, his apartment and did
9  a couple of meetings together with L.C. about
10  this project.
11    Q.  And who is L.C. again?
12    A.  Lianchao.  Han Lianchao.
13    Q.  And do they call in your text
14  messages Mr. Guo, New York, sometimes?
15    A.  Correct, yes.
16    Q.  And when was this meeting?
17    A.  My guess is in November, start from
18  November, something, October or November.
19  Because I start to get involved by the end of
20  December.  So before me, that is my guess.
21  It should have like in December or the
22  beginning or mid of -- no, in November or the
23  beginning or mid of December.  That is my
24  guess.
25

Page 91

Yvette Wang

1     Q.  You weren't at this meeting in
2  New York, though?
3     A.  I didn't attend the meeting about
4  this project with all of them together.  I
5  didn't.
6     Q.  In preparation for today's
7  deposition, did you attempt to educate
8  yourself on what may have occurred at that
9  meeting?
10    A.  No, I didn't.
11    Q.  What have you done in preparation of
12  today's deposition?
13    A.  What I have done?
14    Q.  What have you done to prepare for
15  today's deposition?
16    A.  Oh, I went through the, like the
17  contract, the complaint, some documents which
18  from my lawyer.
19    Q.  Did you go back to any books or
20  records of Eastern Profit to prepare?
21    A.  No.  I didn't.
22    Q.  Are there any books or records for
23  Eastern Profit?  Do they exist?
24    A.  I have no idea.  You should ask
25

Page 92

Yvette Wang

1  them.
2     Q.  Well, you're representing them here
3  today.  You recognize that, right?
4     A.  Yes.
5     Q.  So you, as a representative, are not
6  aware of any books or records that belong to
7  Eastern Profit?
8         MR. GRENDI:  Objection.
9         You can answer.
10    A.  If I may, without offense, I should
11  be defined -- I represent them with limited
12  power of attorney on this project.  So if you
13  ask me the whole history of the records of
14  Eastern, I'm sorry, I cannot help.
15    Q.  No, I'm not -- do they exist?  Do
16  you have any reason to believe they exist?
17    A.  I didn't ask.  I don't know.
18    Q.  What have you done to prepare for
19  today's deposition, other than look at the
20  contract and the complaint?
21    A.  Went through the exhibits, I believe
22  they are there.  And went through some of
23  the -- I didn't went through all of it
24  because I don't have time.  So roughly went

Page 93

Yvette Wang

1  through all these papers.
2     Q.  In other words, you looked at
3  documents that were produced in this
4  litigation?
5     A.  Produced?
6     Q.  Provided.  Like, that are -- that
7  you gave to us or we gave to you in the
8  discovery process.
9     A.  Because that happened almost like
10  one year ago.  So I went through this paper,
11  trying to refresh my memory because I don't
12  remember quite clear some of the things.
13    Q.  In other words, the events at issue
14  happened like a year ago; is that what you're
15  saying?
16    A.  What do you mean?
17    Q.  You said something happened a year
18  ago, so I had to refresh my recollection.
19  What happened a year ago?
20    A.  This project.
21    Q.  That's what I was asking.
22    A.  Yes.  That's why, you know, some
23  dates I don't remember.  It's what you told
24  me, yeah.
25

Page 94

Yvette Wang

2  Q.  Did you meet or speak with anybody
3 in order to educate yourself about Eastern
4 Profit?
5  A.  About Eastern Profit, no.
6  Q.  Did you meet with your attorney to
7 discuss Eastern Profit?
8  A.  No, I didn't.
9  Q.  Did you have any telephone --
10     MR. GRENDI:  Let me pop in.  I
11   think there must be some kind of
12   misunderstanding here.  Because we
13   did meet to prepare for this 30(b)(6)
14   deposition on Tuesday.  I think maybe
15   she's confused about the designee as
16   her attorney.
17  A.  My understanding, you mean discuss,
18 my attorney did ask me -- I don't know.
19     MR. GRENDI:  Hold on, stop,
20   stop.  I just want to be clear, she
21   shouldn't be discussing what I
22   discussed with her.  I am just saying
23   that was preparation for this
24   30(b)(6).
25  Q.  So on Tuesday you met with the

Page 95

Yvette Wang

2 gentleman to your right?
3  A.  Yes.
4  Q.  Was anybody else present?
5  A.  No.  Only me and him.
6  Q.  How long did you meet for?
7  A.  Like two, three hours.  Two hours.
8  Q.  And you reviewed the documents that
9 we have identified?
10  A.  Yes.
11  Q.  Did you speak with Mr. Guo?
12  A.  About what?
13  Q.  About this deposition.  Or Eastern
14 Profit, in preparation for this deposition.
15  A.  I told him my date.
16  Q.  Did you ask him any questions?
17  A.  I didn't yet.  What do you want me
18 to ask?  I ask.
19     MR. GRENDI:  Hold on.  I'm just
20   going to pop in here.  He's just
21   asking questions today, and you can
22   answer them.  You don't need to offer
23   anything.
24  Q.  Other than that you've reviewed some
25 documents, you met with Zachary, have you

Page 96

Yvette Wang

2 spoken with anybody else about today's
3 deposition?
4  A.  My colleagues.  I told them don't
5 call me, because I will be in deposition.
6  Q.  So logistically, logistics?
7  A.  Yes.
8  Q.  But the substance of the deposition
9 or to educate yourself about what Eastern
10 Profit is about, you didn't speak with
11 anybody else?
12  A.  No.
13  Q.  How about Mr. Chung Han, the
14 principal of Eastern?
15  A.  About this deposition?
16  Q.  Yes.
17  A.  No, I didn't.
18  Q.  What is his exact position with
19 Eastern?
20  A.  He's the president of Eastern.  It
21 should be on the paper here.
22  Q.  It just says he's a principal.
23  A.  Okay, the principal of Eastern.
24  Q.  What does that mean?
25  A.  You mean my understanding?

Page 97

Yvette Wang

2  Q.  Yes.
3  A.  Boss.  I don't know.  I don't know
4 his official title.
5  Q.  Is he an officer, director?
6  A.  I don't know.
7  Q.  Do you know what his duties and
8 responsibilities are?
9  A.  I don't know.
10  Q.  How did you know he was a principal?
11  A.  Mr. Guo told me.
12  Q.  If you look at Exhibit 3, would you
13 have personal knowledge of any of these
14 answers?  Maybe you can just point out the
15 ones to which you would have personal
16 knowledge.
17  A.  Personal knowledge about what?
18  Q.  About the answers.  Because you
19 verified these interrogatory responses and
20 I'm just wondering, you know, which ones you
21 knew personally, and if so, I'd like to know
22 how you came up with the information for
23 those responses.
24     MR. GRENDI:  I'm just going to
25   object as compound.  Do you want to

Page 98

Yvette Wang

1          go through them?  I mean, there's
2     quite a few.
3          MR. SCHMIT:  I don't think it's
4     going to take too long.  There's not
5     too many.
6          Q.  Just point out the ones that you had
7     personal knowledge of, that you read the
8     question and you said here's the answer.
9          MR. GRENDI:  I'm objecting
10    again.  The witness will have to read
11    through these and go one by one.
12         MR. SCHMIT:  You're kind of
13    coaching the witness now.
14    Q.  Can you answer the question?
15         MR. GRENDI:  Hold on,
16    objection.  I'm not trying to coach
17    the witness.
18         MR. SCHMIT:  I've asked the
19    question.  She can react accordingly.
20         MR. GRENDI:  You can answer.
21    A.  Then are you asking that we go
22    through all the -- because this is --
23    Q.  I have a question.  Let me ask you
24    one way.  Do you have personal knowledge of

Page 99

Yvette Wang

1     any of the answers?
2          A.  I have to go through.
3          Q.  Okay.  Go through, take your time.
4               (Witness peruses document.)
5          A.  Personal knowledge, okay.
6               (Witness peruses document.)
7          Q.  Okay.  Which one you want to ask?
8          Q.  The question is, just identify which
9     ones you answered based on personal
10    knowledge.
11    A.  Based on my personal knowledge, I
12    signed here that this is based on the best of
13    my personal knowledge.
14    Q.  Okay.  The best of your personal
15    knowledge?
16    A.  Yes.
17    Q.  Which ones?
18    A.  All of them.
19    Q.  So you knew that Mr. Han, prior to
20    seeing these interrogatories, was a principal
21    of Eastern Profit?
22    A.  Which question?
23    Q.  Number two.
24    A.  Correct.  Here, yes, I was told he

Page 100

Yvette Wang

1     was a principal.
2          Q.  So you had to be told that when you
3     saw the question, when you verified it,
4     somebody told you that information, right?
5          A.  That's right.
6          Q.  So you were educated on it.  Is that
7     true with each of these answers?  That's what
8     I'm trying to get at.
9          A.  Correct.
10         MR. GRENDI:  Objection.  But
11    you can answer.
12    Q.  So with each of these answers,
13    somebody had to tell you, with each of these
14    questions somebody had to tell you what the
15    answers were before you could verify it,
16    right?
17         MR. GRENDI:  Objection.  You
18    can answer.
19    A.  Yes.
20    Q.  Now, for example, who told you the
21    answer to number two?
22    A.  Mr. Guo.
23    Q.  How about the answer to number four?
24    A.  Who told me this, right?

Page 101

Yvette Wang

1          Q.  Yes.
2          A.  Mr. Guo.
3          Q.  What is Mr. Guo's relationship with
4     Eastern Profit?
5               MS. TESKE:  Object.
6          A.  I believe I said that before.
7          Q.  Well, tell me again.
8               MR. GRENDI:  Objection.  You
9     can answer.
10    A.  I said he is advisor and consultant
11    to Eastern.
12    Q.  You mentioned a client -- you
13    mentioned the client a couple of times.  Is
14    Eastern Profit a client of New York Golden
15    Springs?
16         MR. GRENDI:  Objection.  You
17    can answer.
18    A.  You asked that question before.
19    Q.  Is it?
20    A.  I said no, there's no official
21    contract.
22    Q.  Is there an unofficial contract?
23    A.  No.
24    Q.  Do you work for anybody other than

Page 102

1                   Yvette Wang
2    New York Golden Springs?
3         A.   No.
4         Q.   Who signs your paychecks when you're
5    paid?
6              MR. GRENDI:  Objection.
7              MR. SCHMIT:  That's a fair
8         question.  I'm not asking amounts.
9         It's a totally fair question.
10        There's no objection to that.
11             MR. GRENDI:  You can answer.
12        Q.   What entity pays you when you look
13   at your paycheck?
14        A.   I refuse to answer, it's too
15   personal.
16             MR. GRENDI:  I'm not
17        instructing the witness to do
18        anything.
19             I said you can answer the
20        question.
21        Q.   I'm not asking the amount.  When you
22   get a paycheck, what entity or individual
23   does it come from?
24        A.   Golden Spring.
25        Q.   When you had to discuss this

Page 103

1                   Yvette Wang
2    project, other than -- I'm not talking about
3    Ms. Wallop or Mr. Waller, did you have
4    conversations with anybody during the
5    negotiations or execution of the agreement,
6    other than Mr. Guo?
7         A.   No.
8              MR. SCHMIT:  If I can have this
9         marked as Exhibit 5.
10             (Whereupon, at this time, the
11        reporter marked the above-mentioned
12        screen shot of text messages as Wang
13        Exhibit 5 for identification.)
14   BY MR. SCHMIT:
15        Q.   I'm going to hand you what's been
16   marked as Exhibit 5.
17        A.   Thank you.
18        Q.   If you could just -- it's a series
19   of screen shots of text messages, SVUS 61
20   through 76.
21             If you could just take a moment and
22   review it and let me know when you're ready
23   to answer any questions.
24             (Witness peruses document.)
25        A.   Okay.  You want me to finish?

Page 104

1                   Yvette Wang
2         Q.   Yes.  If you need more time to
3    review it.
4              (Witness peruses document.)
5         A.   Okay.  Thank you, I'm done.
6         Q.   And just for Lianchao Han, you see
7    his name at the top?
8         A.   Yes.
9         Q.   Who is that again?
10        A.   A gentleman from D.C.
11        Q.   From Washington D.C.?
12        A.   Yes.
13        Q.   Does he work for Mr. Guo?  Does he
14   work for Eastern Profit?  Who does he work
15   for?
16        A.   I don't know he works for.  But he
17   doesn't work for Mr. Guo and Eastern.
18        Q.   He doesn't work for New York Golden
19   Springs?
20        A.   No.
21        Q.   Why is he discussing the contract?
22        A.   I don't know.
23        Q.   He seems to be discussing the
24   contract on behalf of Eastern Profit, right?
25        A.   It seems like, yes.

Page 105

1                   Yvette Wang
2         Q.   You don't know why?
3         A.   I don't know.
4         Q.   You don't know -- what was your
5    understanding of his involvement in the
6    project?
7         A.   Correct.  My understanding, I heard
8    this Mr. Han, he is a friend of Wallop and
9    Mike.  And he, obviously, help translation
10   for Mr. Guo as well.  That is basically what
11   I know.
12        Q.   What is your understanding of the
13   relationship between Mr. Guo and Lianchao
14   Han?
15        A.   To me, it seems like they are
16   friends as well.
17        Q.   Do you know how long Mr. Han has
18   known Mr. Guo?
19        A.   I don't know.
20        Q.   Estimate?
21        A.   Estimate?
22             MS. TESKE:  Object.
23             MR. GRENDI:  Objection.
24        A.   I don't know.
25        Q.   A couple of years, five years, ten

Page 106

Yvette Wang

1  years?
2          MS. TESKE:  Same objection.
3          MR. GRENDI:  Same objection.
4      A.  I don't know.
5      Q.  Do you have any idea?
6      A.  I don't think that long, I mean, my
7  guess.
8      Q.  You've met Mr. Han, right?
9      A.  Yes, I did.
10     Q.  When did you first meet him?
11     A.  In New York.
12     Q.  What time?  When?
13     A.  Late October, November of 2017.
14     Q.  Who introduced you?
15     A.  He was in Mr. Guo's apartment and I
16  went there and Mr. Guo introduced him to me.
17     Q.  What is your understanding of why he
18  was with Mr. Guo that day?
19     A.  My understanding, he's a friend of
20  him, otherwise why at his home, right?
21     Q.  What did Mr. Guo tell you about Mr.
22  Han during the introduction?
23     A.  He said Mr. Han is from Washington
24  D.C.  And he is a real fighter for Chinese
25

Page 107

Yvette Wang

1  rules of law and democracy as well and a very
2  good man.
3      Q.  Do you know, is Mr. Han originally
4  from Washington D.C.?
5      A.  Originally you mean what?
6      Q.  Like where was he born?
7      A.  Oh, he was born in Mainland of
8  China.  He told me.
9      Q.  Did he know Mr. Guo over in China?
10     A.  I don't know.  But I don't believe
11  so.  Looks like not, my guess, again.
12     Q.  Just one more question about the --
13  this has nothing do with this exhibit, but
14  about the million dollars deposit that ACA
15  Capital sent, right, they tried to claw it
16  back, right?
17     A.  To get it back?
18     Q.  Yes.
19     A.  Yes.  Sorry my language.
20     Q.  That's fine.  Who told them that
21  they should try to pull it back?
22     A.  I don't know.
23     Q.  Did you go -- when you found out
24  about the deposit, how did you find out about
25

Page 108

Yvette Wang

1  it?
2      A.  Mr. Guo sent me --
3          MR. GRENDI:  Objection.  You
4      can answer.
5      A.  Mr. Guo sent me the wire receipt,
6  which I told you.
7      Q.  Did you talk with anybody from ACA
8  Capital about it?
9      A.  No, in my memory, no, no.
10     Q.  Did Mr. Guo -- did you tell Mr. Guo,
11  We've got to get this money back, this is
12  crazy?
13     A.  No, I didn't tell him.  I mean, why
14  should I tell him?
15     Q.  Do you know what ACA Capital was
16  told?
17         MR. GRENDI:  Objection.  You
18     can answer.
19     A.  I don't know.  I don't know that.
20     Q.  Do you know if it was specifically
21  told that you have to pull this back because
22  no contract has been signed yet?
23     A.  You mean I was told, right?
24     Q.  No, no.  ACA Capital, they're the
25

Page 109

Yvette Wang

1  ones that were trying to claw the money back?
2      A.  Oh.
3      Q.  Do you know specifically what
4  instruction they were given or why they were
5  doing it?
6      A.  I don't know that part.  I don't
7  know.
8      Q.  Mr. Guo never shared that
9  information with you?
10         MS. TESKE:  Objection.
11         MR. GRENDI:  Objection.
12     Q.  Let's go back to Exhibit 5 here.  If
13  you would turn to production number 65.
14         (Witness peruses document.)
15     Q.  It says at the top, it says, Okay,
16  thanks, I don't think the New York guy is
17  serious.
18         Is it your understanding New York
19  guy is a reference to Mr. Guo?
20     A.  Correct.  That is my understanding,
21  yes.
22     Q.  Okay.  Do you know who this -- who
23  wrote that?
24     A.  I don't know.
25

Page 110

Yvette Wang

1
2      Q.   If that's your answer, that's --
3      A.   I guess, either from Mike or Ms.
4  Wallop.  That is my guess.  Because there's
5  only Lianchao's name here.
6      Q.   Then it says, I have mixed feelings
7  about it, he wants to do it but wants to do
8  it as cheap as possible.
9          Do you see that?
10     A.   Yes.
11     Q.   And then you can see what the
12  response to that.
13          Do you know what these folks are
14  talking about here?
15          MR. GRENDI:  Objection.  You
16      can answer.
17          MS. TESKE:  Same objection.
18     A.   I don't know precisely.  Because
19  this is the conversation between other two
20  people.
21     Q.   Fair enough.
22     A.   But maybe about this project, I'm
23  not sure.
24     Q.   Was there ever any discussion about
25  pricing and Mr. Guo wanting to do it cheaper?

Page 111

Yvette Wang

1
2          MS. TESKE:  Objection.
3          MR. GRENDI:  Objection.
4      A.   With who?
5      Q.   The project.
6      A.   I have never had that discussion
7  with him.
8      Q.   So to the best of your knowledge,
9  they didn't discuss doing it on the cheap or
10  anything along those lines?
11     A.   I never --
12          MR. GRENDI:  Objection.  You
13      can answer.
14     A.   I never heard cheaper, these words
15  from Mr. Guo's mouth.
16     Q.   Did you hear anything along those
17  lines or something to that effect?
18     A.   Sorry?
19     Q.   Did you hear words other than
20  cheaper, maybe you don't like my word choice.
21     A.   But close to this meaning, right?
22     Q.   Yes.  Conveying that he would like
23  to pay less.
24     A.   No, no, to me.  I didn't hear
25  anything about that.

Page 112

Yvette Wang

1
2      Q.   If you look at 66, that's the
3  production number on the lower right-hand
4  corner.
5          (Witness peruses document.)
6      Q.   I talked with him and he says he
7  wants to do it, but would like to put in a
8  clause in the contract which says if you fail
9  to provide the deliverables as defined in the
10  scope, you should return the deposit.  What
11  do you think?
12          Do you see that?
13     A.   I saw this.
14     Q.   You've seen it before today?
15     A.   Yes.
16     Q.   Where have you seen that statement
17  before?
18     A.   We went through the exhibits.
19     Q.   So on Tuesday you probably saw that?
20     A.   Yes, probably.
21     Q.   What is your understanding of what
22  Mr. Han is saying there?
23          MS. TESKE:  Objection.
24     A.   You mean this message?
25     Q.   Yes.

Page 113

Yvette Wang

1
2          MR. GRENDI:  Objection.
3      A.   Okay.  You're really trying to ask
4  me to guess other people's message.
5      Q.   No, I'm asking, do you have an
6  understanding of what is said there?
7      A.   Fair enough.  Let me read it.
8      Q.   Please read it.
9      A.   It looks like Mr. Han was
10  communicating with Mr. Guo as well about this
11  project, about the deposit, and deliverable
12  in the scope.  That is my understanding,
13  saying, Failed to provide the deliverable as
14  defined in the scope, which agreed by both
15  sides, or agreed by the contract, and the
16  contractor should return the deposit.
17     Q.   Did a clause like this ever end up
18  in the agreement?
19          MR. GRENDI:  Objection.  You
20      can answer.
21     A.   I don't remember this is in the
22  final signed contract.  No.
23     Q.   You don't believe it is?
24     A.   I don't believe that.
25     Q.   Did you ever discuss it with Mr. Guo

Page 114

Yvette Wang

1
2  and Mr. Han, that concept?
3      A.  No, I didn't.
4      Q.  If you can turn to 73.
5      A.  Yes.
6      Q.  It says at the bottom, please call
7  F.  Do you know who F is?
8      A.  I guess it's French Wallop, my
9  guess.
10     Q.  Okay.  That's your understanding.
11         MR. GRENDI:  Objection.
12     Q.  However, it says, Today Y came back
13  with major unreasonable changes as thing we
14  had agreed on in writing on December 12th.
15  Do you see that?
16     A.  Yes.
17     Q.  Who is Y?
18     A.  I guess that's me.
19     Q.  It's around the December 30th
20  timeframe.  Do you recall any changes you had
21  asked for, requested at that time?
22     A.  I don't remember that.  I don't
23  remember, sorry.
24     Q.  You don't remember a conversation
25  about that or any changes at the end of 2017

Page 115

Yvette Wang

1
2  that you agreed or disagreed about?
3      A.  First, I said I don't remember.
4  That doesn't mean I agree or disagree.  I
5  really don't remember.  Because the date, I
6  don't remember what happened.  And then I
7  don't remember like what kind of a
8  conversation I came back.  No, I don't
9  remember that.
10     Q.  Do you recall any conversations you
11  had with Mr. Guo around that time of changes
12  he wanted?
13     A.  I don't remember clearly.
14     Q.  Do you remember just in a general
15  sense?
16     A.  General sense, still about the
17  waterline, because that was the argue, you
18  know, the argue points.  From the beginning
19  throughout the end.
20     Q.  You guys wanted an a la carte pay as
21  the deliverables come in and Strategic Vision
22  wanted this waterline concept?
23     A.  Correct, correct.
24     Q.  And you guys discussed it at length
25  and many phone calls and meetings?

Page 116

Yvette Wang

1
2      A.  I think so.  I believe so.  I
3  believe so.  If there is any, like, main
4  discussion, it's about -- should be about
5  that.
6      Q.  How about the deposit concept?  Does
7  looking at this refresh your recollection
8  about any conversations you had about the
9  deposit?
10     A.  No.  First discussion about the
11  deposit that was -- you remember I said,
12  three meetings and one meeting, that was the
13  conversation about deposit.  And the next one
14  is that wire transfer about that one.
15     Q.  You weren't involved in the
16  conversations about putting a clause in the
17  agreement that you could claw it back if
18  something went bad?
19     A.  No.
20     Q.  Or there is a disagreement?
21     A.  No, I was not involved in that.
22         MR. GRENDI:  Objection.  I just
23     want to advise the witness to let him
24     finish asking the question before you
25     answer.

Page 117

Yvette Wang

1
2         THE WITNESS:  Sure.
3      Q.  Did Eastern Profit do any research
4  on Strategic Vision?
5      A.  I don't know.
6      Q.  You don't know at all?
7      A.  Sorry, please finish your question.
8      Q.  I guess -- so you don't know if
9  Eastern Profit did any research on Strategic
10  Vision or French Wallop or Mike Waller?
11     A.  I don't know.
12     Q.  Did Mr. Guo ever instruct you to
13  look into either of them or the company in
14  general?
15     A.  No.
16     Q.  Did he ever inform you of what he
17  thought, and I'm talking pre execution,
18  inform you of what he knew about French
19  Wallop or Mike Waller or Strategic Vision or
20  anything along those lines?
21     A.  Sorry, what is your question?
22     Q.  Did Mr. Guo ever inform you, prior
23  to execution, what he knew or thought about
24  either Ms. Wallop, Mike Waller or Strategic
25  Vision?

Page 118

Yvette Wang

2  A.  No.  He didn't request me to search
3  about them, no.
4  Q.  Did he ever tell you what he already
5  knew about them?
6  A.  Oh, yes, he did.
7  Q.  What did he say?
8  A.  He said, Ms. Wallop and Mike, they
9  were introduced to him, and they are from
10  Washington D.C.  Kind of like -- I don't
11  remember clearly.  Like they are very
12  experienced and they have a lot of resources
13  and contacts in Washington D.C.  And he heard
14  quite a lot of history about the lady and the
15  gentleman, which the lady and the gentleman
16  told Mr. Guo about.  Like, their experience,
17  like their family, not too private, like
18  their education, like their previous work
19  experience, like their clients, especially
20  some very important clients of Ms. Wallop and
21  Mike.  And the project Ms. Wallop and Mike
22  they have been done, including very
23  significant clients of theirs and their name.
24          Yeah, pretty much like that, like,
25  they mentioned about their clients include

Page 119

Yvette Wang

2  some Russian officials, some middle east,
3  like royal family member official, government
4  people.  And, oh, yeah, Mr. Guo even show me
5  his notebook.  There is one page on there,
6  and with handwriting some name.  And they are
7  written by Ms. Wallop.  And Ms. Wallop told
8  Mr. Guo they are all big clients of hers.
9  Yeah, many about that.
10  Q.  Mr. Guo told you about that?
11  A.  Yes.
12  Q.  And what was your understanding of
13  when Mr. Guo would have learned all that
14  information?
15  A.  You mean when, right?
16  Q.  When, yes.
17  A.  My understanding is in November,
18  December, when Ms. Wallop and Mike, they were
19  introduced to Mr. Guo.  They started to meet,
20  have dinner, lunch together.  That is the
21  time, yes.
22  Q.  And as far as you know, would
23  anybody else, other than Mr. Guo, be present
24  at those dinners?
25  A.  Other people, Han Lianchao, yes, he

Page 120

Yvette Wang

2  presented those dinners and lunch meetings.
3  Q.  Did you ever discuss with Mr. Chao
4  how -- Lianchao what was said at those
5  meetings or if he vetted the information or
6  what he thought about Strategic Vision or
7  French Wallop or Mike Waller?
8          MR. GRENDI:  Objection.  You
9  can answer.
10  A.  I remember Mr. L.C., he described
11  close, similar, like what Mr. Guo described
12  to me about Ms. Wallop and Mike.  Or if
13  something different is that before this
14  project, Mr. Han -- I mean, Lianchao, he
15  brought Ms. Wallop to Mr. Guo, his apartment,
16  tried to sell some real estate property to
17  Mr. Guo.  So that was before this project.
18          And then I remember that was an
19  afternoon and Ms. Wallop brought a brochure,
20  a house called Evermay, E-V-E-R-M-A-Y, that
21  was a house called Evermay.  And she kind of
22  like tried to sell that house to Mr. Guo.
23  Q.  Were you present at this meeting?
24  A.  I was there, yes.
25  Q.  Hadn't Mr. Guo requested information

Page 121

Yvette Wang

2  in real estate?
3  A.  I don't know he requested or not.
4  Q.  She just showed up out of the blue
5  with a brochure and said, How about this?
6  A.  Yes.
7          MR. GRENDI:  Objection.  You
8  can answer.
9  A.  Yes.  That was -- that's why my
10  first knowledge is, I don't know what she is
11  doing for business.
12  Q.  Is that what Mr. Guo said?  How did
13  he describe the encounter?
14  A.  What is your question?
15  Q.  How did Mr. Guo describe the
16  encounter to you?  Did he say that, Hey, I
17  never asked her to do that?
18  A.  I didn't hear that from him.
19  Q.  Did he look at the brochure?
20  A.  Yes, he did.
21  Q.  Was there any comment, Oh, this is
22  the house we talked about or anything along
23  those lines?
24  A.  I don't remember that clearly.
25  Q.  All right, it could be possible,

Page 122

Yvette Wang

1  though, that Mr. Guo requested that
2  information and that's why it was brought to
3  the meeting, right?
4      A.  I don't know what happened before
5  that meeting.  But by that meeting, I saw she
6  was showing her brochure, explain the house
7  condition, like those kind of stuff.
8      Q.  But you have no factual information
9  about why that brochure was brought to the
10  meeting?
11      A.  I have no idea.
12      Q.  Mr. Guo didn't tell you why it was
13  brought there?
14      A.  No.
15      Q.  Did you ask him?
16      A.  Who ask who?
17      Q.  Did you ask Mr. Guo?
18      A.  About that house?
19      Q.  Why the brochure was being discussed
20  at the meeting?
21      A.  No, I didn't.  Because that happens,
22  you know, not something quite special, so why
23  I ask all the details?  No, I didn't.
24      Q.  Were you aware of any trips to the

Page 123

Yvette Wang

1  Washington D.C. area of where Mr. Guo or his
2  representatives were looking for real estate?
3      A.  After that Evermay house was
4  introduced, then Mr. Guo asked me, Oh, you go
5  to have a look at that house.  Then I went to
6  D.C. together with Han Lianchao and together
7  with Ms. Wallop and we tried to visit that
8  Evermay house.
9      Q.  Did you visit any other real estate?
10      A.  Yes.  That is -- was a like four
11  hours about, four hours drive.  And Ms.
12  Wallop drove --
13      Q.  You mean four hours driving around
14  D.C.?
15      A.  Four hours in car.  Because Ms.
16  Wallop did not allow us to, like, quite
17  frequently go out of the car and eat.  And
18  she said, You guys better stay in the car and
19  even put me on the back of the seat.  She
20  said she doesn't want the camera take picture
21  of her and me together.  And we were in a
22  car --
23      Q.  Did you ask her why?
24      A.  She -- I didn't ask.

Page 124

Yvette Wang

1      Q.  No?
2      A.  I didn't ask.  Kind of like she
3  explained, like there's cameras everywhere in
4  D.C., and like the people who looks like
5  common walk on the street, they might be like
6  spies or agent or some other people.  I don't
7  remember clearly, something kind of like
8  that.
9      Q.  What time of year was this?  When
10  was this?
11      A.  December, before this project.  By
12  then I don't even know this project or hear
13  anything about this.
14      Q.  But it's in December of 2017, right?
15      A.  I don't remember the date.
16      Q.  But the year 2017?
17      A.  Oh, yes, that's right.
18      Q.  And you now know that this project
19  had been discussed in meetings in October and
20  November of this year, right?
21          MR. GRENDI:  Objection.  You
22      can answer.
23      A.  Which project?
24      Q.  The project we've been discussing

Page 125

Yvette Wang

1  for three hours now.
2      A.  Okay.  What is the question?
3      Q.  It was discussed among Strategic
4  Vision and Mr. Guo prior to you being
5  introduced to it?
6      A.  No.  Even now I don't know.
7      Q.  You don't know when that project was
8  first raised?
9      A.  I have no idea.  Even now I have no
10  idea.
11      Q.  Did Mr. Guo ever tell you why he was
12  meeting with them?
13      A.  No.
14      Q.  In November and October of 2017?
15      A.  He didn't tell me the reason.
16      Q.  They were there in New York at his
17  apartment having discussions, though, right?
18      A.  A discuss about what?
19      Q.  Anything.  I'm saying a meeting took
20  place.  I just want to firm up that you're
21  aware of meetings in October and November of
22  2017?
23          MR. GRENDI:  Objection.  You
24      can answer.

Page 126

Yvette Wang

1
2     A.  Yes.  Yes, there were -- I heard
3  there were meetings.
4     Q.  You don't know what they were about,
5  though?
6     A.  No.
7     Q.  And then why were you -- why did you
8  go on this trip to D.C. to look at real
9  estate?
10     A.  Because of the Evermay house.
11     Q.  But why look at it?
12     A.  Because Ms. Wallop introduced that
13  to Mr. Guo and Mr. Guo would like me to have
14  a check whether it's worth to buy or purchase
15  or introduce to other people.  Just let me to
16  have a look at that.
17     Q.  Was he looking to relocate to D.C.?
18         MR. GRENDI:  Objection.
19         MS. TESKE:  Same objection.
20         MR. GRENDI:  I mean, I realized
21     that there's an excess here, but
22     where is this going?  This is about
23     real estate.
24         MR. SCHMIT:  I'm exploring her
25     credibility in conversations.  This

Page 127

Yvette Wang

1
2     is well within the 40 yard lines.
3         MR. GRENDI:  Go ahead.
4     A.  I don't know.
5     Q.  You mean, Mr. Guo never told you why
6  you had to go look at this house?
7     A.  No.
8     Q.  Mr. Lianchao never told you why you
9  were in a car for four hours with a woman
10  driving around D.C.?
11     A.  For Evermay, this house.
12     Q.  But why?  You don't know?  I mean,
13  if you don't know, you don't know.
14         MR. GRENDI:  Objection.  I
15     just, if we're having like an
16     understanding issue, let's try to
17     work it out.
18         MR. SCHMIT:  I am, that's why
19     I'm giving her an out.
20         MR. GRENDI:  I think just maybe
21     slow down with your pace here.
22     Because the witness is trying to
23     answer and whatever.  Just go ahead,
24     sorry.
25     Q.  Do you know why you were looking at

Page 128

Yvette Wang

1
2  that house?
3     A.  I don't know.
4     Q.  Did you ever ask, Why are we looking
5  at this house?
6     A.  I didn't.
7     Q.  What did you report back to Mr. Guo
8  about the house and the trip?
9     A.  I told him.  We had about like four
10  hours drive locked in a car, and we were --
11     Q.  You were locked in the car?
12     A.  Description.  We were not allowed to
13  go out of the car, correct, okay?  That's
14  fair enough.  And then Evermay, that house,
15  we were supposed to go to visit that house,
16  but we didn't get access to go inside of
17  there at all.
18         So we were driving around, around
19  and four hours without clear, like objective
20  property, just to look around.  And didn't
21  even enter into any house.  I told him about
22  this.  And then I told him that Evermay house
23  is a neighbor of a very big cemetery.  So the
24  condition from outside, which I was able to
25  view, it's very bad maintained, not very good

Page 129

Yvette Wang

1
2  condition.  Seems like nobody live in there
3  for long time.
4     Q.  And what was Mr. Guo's reaction to
5  that report?
6     A.  He doesn't like cemetery.
7     Q.  So the presence of the cemetery was
8  kind of a show stopper?
9     A.  Show stopper?  What do you mean show
10  stopper?
11     Q.  That would be a deal breaker.  He
12  wouldn't buy the house next to a cemetery?
13         MS. TESKE:  Objection.
14     A.  I don't even know he will buy that
15  or not, to be honest with you.  But I can
16  tell you that is not the house he likes, if I
17  may, because that is a neighbor of a huge
18  cemetery.
19     Q.  Did you ever ask Ms. Wallop why she
20  didn't think it was a good idea for the three
21  of you to be seen together in the D.C. area?
22     A.  I didn't.
23     Q.  Why not?
24     A.  Because that was not polite, right?
25     Q.  Did you ever ask Mr. Guo, Isn't this

Page 130

```
1                 Yvette Wang
2    a little odd?
3        A.  I didn't.  Because it's not polite,
4    to be honest.
5        Q.  You weren't curious at all?
6        A.  Curious about what?
7        Q.  I mean, why do you think -- I mean,
8    curious as to why Ms. Wallop thought you
9    shouldn't be seen together in D.C.?
10       A.  I was, to be honest, curious and
11   surprised after that four hours drive.
12   Because in my understanding, she was going to
13   try to sell that property.  But I went there,
14   at least to have a very, like a check.  She
15   didn't even get me in that house.  And I was
16   in the car for four hours, almost like five
17   hours.  I don't even have --
18       Q.  You guys didn't discuss during this
19   time research at all or the project at all?
20       A.  Which project, the house?
21       Q.  The project you're testifying about
22   here today.
23       A.  No, no.  No word about that.
24   Nothing.
25       Q.  Now that you know the nature of the
```

Page 131

```
1                 Yvette Wang
2    project, does it make sense as to why she
3    didn't want to be seen?
4        A.  Which project, this one?
5        Q.  Yes.
6            MR. GRENDI:  I mean, the
7        defendant is allowed to be here but
8        we don't need commentary.
9        Q.  When I say "project," we know it's
10   getting a little silly.  You know the project
11   I'm talking about.  But I'm just asking you,
12   now that you know the nature of the contract,
13   do you have a better understanding as to why
14   she didn't want any photographs of you guys
15   together?
16       A.  Oh, I probably got your question.
17   That's why Wallop did not allow me and
18   Lianchao, especially me, go out and in the
19   car, because by then, she already know Miles
20   Kwok, who is Miles Kwok.  And then, my guess,
21   again, because she is here, in this room, my
22   guess is she is afraid of like, we are like
23   Miles Kwok's group of people, and we might
24   bring, I don't know some risk or danger to
25   her personally.  That's why she doesn't want
```

Page 132

```
1                 Yvette Wang
2    to be taken photo by chance me and her
3    together.  That is my understanding.
4        Q.  And how did you gain that
5    understanding?
6        A.  Because it's weird.  Like she
7    specifically told me that I gonna put you in
8    the back seat not in front for why reason?
9    By then, you know, even she did explain to
10   me, I will take whatever, you know, the owner
11   of car put me, but she specifically explained
12   that to me, made me feel so weird and
13   surprised by then, right?
14       Q.  Do you understand why she might have
15   thought it was bad, though, not to be viewed
16   with you, given the project that was being
17   discussed?
18           MR. GRENDI:  Objection.  You
19       can answer.
20       A.  Still I have no idea about this
21   project by then.  I just feel it's weird.  It
22   shouldn't be like that serious because I am
23   walking in D.C. and New York every day, I'm
24   in D.C. a lot of time, and in New York many
25   days.  I was never killed, I was never
```

Page 133

```
1                 Yvette Wang
2    assassinated.  And why you're so afraid of be
3    together with me?
4        Q.  Well, wasn't there concern that it
5    would expose the fact that Strategic Vision
6    was being engaged to do research on certain
7    individuals?
8            MS. TESKE:  Object.
9        A.  You're talking about the property
10   project, real estate or this project?
11       Q.  This project, the research project.
12       A.  By then I have no idea about this
13   project.
14       Q.  I know that, ma'am.  We went over
15   that.  You didn't know it when you were
16   sitting in the car, but now looking back
17   don't you think it made sense that there was
18   some concern because Strategic Vision was
19   going to be engaged?
20           MR. GRENDI:  Objection.
21       Q.  Based on what you know now sitting
22   here today?
23       A.  No, I don't believe there is any
24   relationship.  And by then, the four hours
25   drive, I believe her fear is just, okay,
```

Page 134

Yvette Wang

1       Miles Kwok is the biggest dissident of
2   Chinese government.  And she doesn't want to
3   get together with those group of people.  I
4   mean, Miles Kwok's group of people.  And then
5   I don't think that fear or that experience is
6   related to this project.
7           Let me tell you why.  Because when
8   this project show up in front of me, my first
9   reaction is, okay, what is job of this lady?
10  And later on, with more meetings together
11  with them, I was educated, Ms. Wallop and
12  Mike, they are super very much experienced in
13  investigation and research, which they
14  described themselves in front of me.  And
15  from those meetings, I feel no fear, they
16  have no fear at all to, like, Miles Guo or
17  me.  So it's totally separated.
18      Q.  Why was the agreement, if you look
19  at Exhibit 2, it says here both parties agree
20  that the nature of this contract and work
21  related to it is highly confidential.
22      A.  Yes, I saw this.
23      Q.  What is your understanding of that
24  phrase?
25

Page 135

Yvette Wang

1       A.  Highly confidential, both parties,
2   what is my understanding?  My understanding
3   is that all the information related to this
4   project or this contract, should be kept
5   confidential.
6       Q.  And at whose request was that?
7       A.  I believe, this is my guess, again,
8   because when I have the draft, it's -- if my
9   memory works well, it's already there.  So my
10  guess is, this is a request from both sides.
11      Q.  And do you know why both sides
12  wanted it that way?
13      A.  I don't know, but I feel this is a
14  common sense.
15          MR. SCHMIT:  If I can have this
16      marked as Exhibit 6.
17          (Whereupon, at this time, the
18      reporter marked the above-mentioned
19      three-page letter as Wang Exhibit 6
20      for identification.)
21  BY MR. SCHMIT:
22      Q.  Ms. Wang, I'm going to hand you
23  what's been marked as deposition Exhibit 6.
24      A.  Thank you.
25

Page 136

Yvette Wang

1       Q.  It's a three-page letter, dated
2   February 23rd, 2018.
3           Do you have that in front of you?
4       A.  Yes.
5       Q.  Have you ever seen this before?
6       A.  Yes, I did.
7       Q.  Did you look at it, just a yes or no
8   to this, did you look at it in draft form?
9       A.  I'm sorry, what is your question?
10      Q.  Did you see it in draft form?
11      A.  Draft form meaning?
12      Q.  Prior to being executed.
13      A.  Yes, I did, I did.
14      Q.  Did you provide any input into it?
15      A.  Yes, I did.
16      Q.  Who else would have provided input
17  into this letter?
18      A.  Who else provided information to
19  this, right?
20      Q.  Yes.
21          MR. GRENDI:  Objection.  You
22      can answer.
23      A.  Mr. Guo.
24      Q.  Anybody else?
25

Page 137

Yvette Wang

1       A.  My lawyer.
2       Q.  And just, if -- when you say my
3   lawyer, who are you referring to?
4       A.  Foley Hoag, H-O-A-G, people.
5       Q.  Did they represent Eastern Profit in
6   connection with the negotiation of the
7   agreement as well?
8       A.  One of their partner, they did.
9       Q.  Who was that?
10      A.  Gare, G-A-R-E, Smith.
11      Q.  So Mr. Smith would have looked at
12  the agreement that we've marked as Exhibit 2
13  prior to Eastern Profit executing it?
14          MR. GRENDI:  Objection.  You
15      can answer.
16      A.  Far before this version.  You know
17  what I mean?
18      Q.  No, I don't.
19      A.  Okay.  So the very, very, very
20  beginning, when I first time visited Ms.
21  Wallop to discuss about this contract.
22      Q.  Was there a draft on the table or
23  did you discuss concepts?
24      A.  I asked him to --

Page 138

Yvette Wang

1
2     MR. GRENDI:  Objection, stop,
3  hold on.  I don't want you to
4  reveal --
5     MR. SCHMIT:  Just yes or no,
6  sorry.
7     MR. GRENDI:  I just want to
8  instruct the witness on this.
9     Don't reveal any conversations
10  you had with any lawyers.
11     THE WITNESS:  Okay.
12     MR. GRENDI:  Why don't we just
13  roll that back and you can ask yes or
14  no, please?
15     MR. SCHMIT:  Can you just
16  repeat it?
17  (Whereupon, at this time, the requested
18  portion was read by the reporter.)
19  A.  Yes.
20  Q.  And was Ms. Wallop present for this
21  meeting?
22  A.  No.
23  Q.  Who else -- was anybody else in the
24  room when you discussed this?
25  A.  No.

Page 139

Yvette Wang

1
2  Q.  Was Mr. Guo or anybody on the phone?
3  A.  No.
4  Q.  If you look at -- it's the third
5  paragraph of the letter.  It says, Eastern
6  agreed to delay the start of the contract by
7  ten days from January 6th to January 16th.
8  Do you see that?
9  A.  Yes.
10  Q.  And January 6th is the day the
11  contract was executed, right?
12  A.  Correct.
13  Q.  Is that true?
14  A.  Correct, that was -- that is true.
15  Q.  Why was that done?
16  A.  You mean the delay?
17  Q.  Yes.
18  A.  Oh, that was on January 26th.  The
19  last meeting was Wallop, Mike, Guo and me
20  together at New York.  By that meeting, Mike
21  and Ms. Wallop finally presented their report
22  to Mr. Guo and me, which they already delayed
23  about like three weeks -- three weeks.
24  Q.  I'm sorry, what day was this
25  meeting?

Page 140

Yvette Wang

1
2  A.  January 26th.  And by that meeting,
3  Mike and Ms. Wallop apologized many times to
4  Mr. Guo and me, saying they had internal
5  communication problem, misunderstanding
6  between Mike and their project manager about
7  the report, and about the delay.  So they
8  officially apologized many, many times.
9  Q.  At that meeting?
10  A.  Yes.  And then they offered to Mr.
11  Guo and me, saying that because of our
12  mistake and our internal communication
13  problem with my project manager, and we offer
14  this ten days to you.  So that was the ten
15  days came from.
16  Q.  And simply that would mean less
17  would be due under the contract?
18     MR. GRENDI:  Objection.  You
19  can answer.
20  A.  Sorry, I don't understand.
21  Q.  That would mean less money would be
22  due under the contract, right?
23     MR. GRENDI:  Same objection, go
24  ahead.
25  A.  In my understanding, that means the

Page 141

Yvette Wang

1
2  date we paid.  I mean, the one month we paid
3  should start from January 16th instead of
4  January 6th.
5  Q.  And what was the purpose of this
6  letter that we've marked as Exhibit 6?
7  A.  The purpose was to terminate,
8  officially terminate the contract, and to
9  advise Strategic Vision return the deposit,
10  otherwise Eastern is going to take legal
11  action.
12  Q.  So this was the official termination
13  notice of the agreement, right?
14     MR. GRENDI:  Objection.  You
15  can answer.
16  A.  Correct.
17  Q.  Why did Eastern Profit believe it
18  was entitled to receive the million dollar
19  deposit back?
20     MR. GRENDI:  Objection.  You
21  can answer.
22     MR. SCHMIT:  What could
23  possibly be the objection to that
24  question?
25     MR. GRENDI:  Go ahead.

Page 142

Yvette Wang

1
2     A.  Because Eastern believes or Mr. Guo
3  believes they are cheated and Strategic
4  Vision, they are liar and they did fraud to
5  the client.
6     Q.  Who is the client in that statement?
7        MS. TESKE:  Object.
8     A.  Eastern Profit Corporation Limited,
9  the client in this contract (indicating).
10     Q.  Specifically, why was Eastern Profit
11  terminating this contract, as opposed to
12  trying to work it out or move forward with
13  the agreement?
14     A.  Why?  In my understanding, because
15  after the January 26th meeting, remember,
16  that was the last meeting for four of us get
17  together --
18     Q.  That was January -- give the exact
19  date?
20     A.  January 26th.
21     Q.  January 26, 2018?
22     A.  No.  No, January 26th.
23     Q.  What year?
24     A.  2018.
25     Q.  Okay.  Continue.

Page 143

Yvette Wang

1
2     A.  And from that meeting first,
3  Strategic Vision admitted they made mistake,
4  they apologized, and they delivered nothing
5  and with a delay date.  After that, I
6  believe --
7     Q.  Could I just ask, what do you mean
8  by delay date?
9     A.  You remember in the contract, the
10  first month they should deliver weekly
11  report.  That never ever happened.
12     Q.  And the delay date, is that a
13  reference from January 6th to January 16th?
14     A.  Yes, yes.  Not only that.
15     Q.  What else, go ahead?
16     A.  Because as long as January 6th the
17  contract signed, and they should start to
18  deliver the weekly report.  That never
19  happened.  And then by January 26th, finally,
20  there was a, which I, by the way, I do not
21  have the copy.  They just briefly, very
22  quickly, show us, apologized, and then they
23  took them away.
24     Q.  Have you personally reviewed any of
25  the reports or flash drives that were

Page 144

Yvette Wang

1
2  provided by Strategic Vision to Eastern
3  Profit under the contract?
4     A.  Yes, I did.
5     Q.  Which ones?
6     A.  The one on January 26th.
7     Q.  Any others?
8     A.  The second one and the last one, I
9  don't know that's called report or not.  The
10  so-called 80 gigabyte data.
11     Q.  When was that provided?
12     A.  1/30 or 1/31.  I don't remember that
13  clearly.  You can check that date.
14     Q.  Did you review anything that was
15  provided by Strategic Vision prior to January
16  26th?
17     A.  Nothing.
18     Q.  What is your understanding as to
19  whether anything had been provided under the
20  agreement?
21     A.  Sorry, what is the question?
22     Q.  What is your understanding as to
23  whether anything had been provided under the
24  agreement?
25     A.  Oh, okay.  My understanding, under

Page 145

Yvette Wang

1
2  the agreement, they should provide weekly
3  report in first month, which they didn't.
4     Q.  Did they provide anything, though?
5     A.  Nothing.
6     Q.  Nothing, as far as you know, nothing
7  was given to any representative of Eastern
8  Profit prior to the January 26th meeting?
9     A.  You are 100 percent right.
10     Q.  And what was presented at the
11  January 26th meeting, as far as form or
12  substance?
13     A.  Mike and Ms. Wallop brought a, they
14  called virgin laptop.  It's a Lenovo, I
15  remember.  And they said, their report can
16  only be presented on virgin laptop, never
17  connect with any internet.  So they brought
18  that laptop together with a flash drive,
19  which is encrypted.  There's a keyboard on
20  the flash drive.  So they presented the
21  report with those devices.
22        Do you want to know the content of
23  the report?
24     Q.  Yes.
25     A.  Okay.  So it's all based on my

Page 146

1                    Yvette Wang
2    memory.  So they didn't, by the way, they
3    didn't leave any copy or any copy of that
4    report to us.  So I remember that was about
5    like ten or a dozen -- 10 or 12 pages of a
6    PDF, word -- a PDF file.  But mainly about
7    like the documents which we provided to them.
8    Like, for example, the fish, like they just
9    repeat, like open this file for this fish.
10   But there is nothing in there.  Something
11   like that.  It's really very blurry my
12   memory.
13            Because during that presentation, I
14   remember Mike was sweating a lot, a lot.  And
15   he was very nervous.  And Ms. Wallop and Mike
16   both were repeatedly apologized, saying they
17   have internal communication problem with
18   their project manager.  So by the way, that
19   presentation was conducted by Mike.
20            So I was sitting aside, I don't
21   remember, or standing behind them, just very
22   quickly went through the screen, laptop
23   screen.  So my memory is not that clear.  But
24   basically, there is nothing like valuable.
25       Q.  What did you tell Mike and Ms.

Page 147

1                    Yvette Wang
2    Wallop at that meeting on January 26th?
3        A.  You mean me?
4        Q.  You or Mr. Guo.  Was anybody else
5    there?
6        A.  No, just the four of us.  We told
7    them clearly, we are very extremely
8    disappointed.  And we told them first the
9    seriously delay, the timeline which agreed
10   and signed in the contract, and we gave them
11   enough time, and they didn't even start it.
12   And we are very disappointed, and we cannot
13   accept that at all.
14       Q.  Anything else?
15       A.  And then they keep apologizing and
16   they said they have their team working, which
17   they didn't say who, of course, and where.
18   And they said they will go to meet their
19   project manager in person to pick up their
20   raw material, which is about like 60
21   gigabyte.
22            And then we were extremely
23   disappointed, and we said, whatever you have,
24   just bring that to me.  See whether there is
25   something, again, like garbage today or

Page 148

1                    Yvette Wang
2    something which is meaningful or valuable.
3        Q.  Did you say anything about the
4    contract or payment or termination, anything
5    along those lines?
6        A.  You mean on January 26th?
7        Q.  Yes.
8        A.  No, not yet.
9        Q.  And when you say -- you say project
10   manager, did they ever identify who the
11   project manager was?
12       A.  Who identified?
13       Q.  You've used the term a couple of
14   times their project manage per, their project
15   manager and miscommunication?
16       A.  Yes.
17       Q.  Did Mr. Waller or Ms. Wallop ever
18   say who their project manager was?
19       A.  You mean their project manager?
20       Q.  Yes.
21       A.  No, they didn't.  But it sounds like
22   that project manager resides somewhere not in
23   the U.S., Europe somewhere.
24       Q.  What about, were there any
25   communications between Eastern Profit and

Page 149

1                    Yvette Wang
2    Strategic Vision between the January 26th
3    meeting and the January 31st delivery?
4            MR. GRENDI:  Objection.  You
5        can answer.
6        A.  Between Eastern and Strategic
7    Vision, you mean?
8        Q.  Yes.
9        A.  No, I don't believe so.
10       Q.  So you never communicated with --
11   you or Mr. Guo to your knowledge, never
12   communicated in between those two meetings?
13       A.  Between January 26th to when?
14   January 31st?
15       Q.  January 31st.
16       A.  Why January 31st?
17       Q.  I think that's when you identified
18   the next delivery was made.  Am I right about
19   that?  If I'm wrong --
20       A.  Should be February 6th, after they
21   offer this ten day.  It should be like
22   February somehow.  But we did communicate, I
23   believe.
24       Q.  What was the nature of those
25   communications?

Page 150

Yvette Wang

1        Yvette Wang
2        A.  Who you mean, right?
3        Q.  What was the nature of the
4    communications?
5        A.  The nature of the communication was
6    we basically asked them stop going around,
7    let's talk about the project.  And your fault
8    or your mistake is your problem.  And we have
9    been patient enough and given you enough
10   time.  And we are very disappointed and we
11   are asking whether they are real capable of
12   doing this project or not.
13       Q.  So this was in --
14           MR. GRENDI:  Objection.
15           Actually, not objection, I just want
16           to point out we're over 1 o'clock.  I
17           don't know where this line of
18           questioning, if you want to wrap it
19           up or if you want to break now.
20           MR. SCHMIT:  It's up to you.  I
21           probably have ten more minutes on
22           this topic, but we can break now.
23           THE WITNESS:  I'm with you.
24           Ten more minutes.
25   BY MR. SCHMIT:

Page 151

Yvette Wang

1        Yvette Wang
2        Q.  After January 26th, what was the
3    next deliverable or meeting you had with
4    either Ms. Wallop or Mr. Waller?
5           MR. GRENDI:  Objection.  You
6           can answer.
7        A.  You mean deliverable meeting dates
8    requested based on the contract or which is
9    real --
10       Q.  The next time you saw him.  The next
11   time you met with him or spoke with them to
12   get something from them?
13       A.  That is the so-called 60 or 80
14   gigabyte.  I don't remember that.
15       Q.  How was that delivered?
16       A.  That happened in Penn Station.
17   Track Bar, there's a bar in there.
18       Q.  About when was that?  Was that the
19   January 31st or the February 6th date?
20       A.  I don't remember that.  But you can
21   check from my Signal message.  It should be
22   very end, 30th or 31st of January.  I don't
23   remember, but you can check that from my
24   records.  So that is after the January 26th
25   meeting.  So then Mike and Ms. Wallop said,

Page 152

Yvette Wang

1        Yvette Wang
2    Mike was going to fly to their project
3    manager to meet him face to face and to pick
4    up the flash drive and fly back right away to
5    deliver to us.  And then we give them one
6    more chance.  And --
7        Q.  When did you give them that one more
8    chance?
9        A.  When you mean?
10       Q.  Yes, when.
11       A.  26th.
12       Q.  Okay.  Continue.
13       A.  And then I remember Mike started to
14   text me directly.  Because before that, I
15   only directly Signal text to Ms. Wallop.  So
16   Mike text me, told me where should I go and
17   when.  He said, Union Station, Track Bar.
18   And it's late afternoon, like five or
19   something p.m.  And then I went there.  And
20   that was the date and place he gave me that
21   second flash drive with that like 80 or 60
22   gigabyte things.
23       Q.  Did you personally review that flash
24   drive?
25       A.  You mean in the Union Station?

Page 153

Yvette Wang

1        Yvette Wang
2        Q.  No, at all, ever.
3        A.  I did.
4        Q.  You did?
5        A.  Uh-huh.
6        Q.  Where did you do that?
7        A.  I went back to meet Mr. Guo because
8    he was quite waiting for that.  So I came
9    back from the station.
10       Q.  On the same day?
11       A.  The same day, right away.  Right
12   away.
13       Q.  And you're sure which day was this,
14   you say?
15       A.  I don't remember that date.  Please
16   check, they are there.  And we were together,
17   went through that flash drive.
18       Q.  Had you been given any instructions
19   about what to look for on that flash drive?
20       A.  No.
21       Q.  So Mr. Waller and Ms. Wallop didn't
22   ask you at all, you know, this is what you
23   should look for, this is what's in there?
24       A.  No, they didn't say anything.
25       Q.  Was there anything going on at the

Page 154

Yvette Wang

1  time that Eastern Profit needed that
2  information at that time?
3      A.  I'm sorry, I don't understand your
4  question.
5      Q.  Did Eastern Profit miss anything or
6  breach a contract or not be able to do
7  anything because it didn't have the
8  information on the 26th or whatever the
9  subsequent date is?
10          MR. GRENDI:  Objection.  You
11      can answer.
12      A.  I don't remember clearly.  But I did
13  remember like Mr. Guo, he was waiting for
14  that information for his plan.
15      Q.  Why was he waiting for that
16  information?
17      A.  Why?
18      Q.  Yes.
19      A.  Because he needs that information.
20      Q.  To do what?
21      A.  To do his tech now, Chinese
22  Communist party work.
23          MS. TESKE:  Objection.
24      A.  He has been doing for last two,

Page 155

Yvette Wang

1  three years.
2      Q.  How is he going to use that
3  information in order to do that?
4          MS. TESKE:  Object.
5          MR. GRENDI:  Objection.
6      A.  I don't know.
7      Q.  You never asked?
8      A.  No.
9          MR. SCHMIT:  Why don't we break
10      for lunch now?
11          (Whereupon, a luncheon recess
12      was taken.)
13  BY MR. SCHMIT:
14      Q.  Welcome back, Ms. Wang.
15      A.  Thank you.
16      Q.  Just remember you're still under
17  oath.
18      A.  Yes.
19      Q.  After the termination letter that we
20  looked at a short while ago was sent, what,
21  if anything, did Eastern Profit do to carry
22  on the prong as we've referred to it as?
23      A.  Ask Foley Hoag to follow up.
24      Q.  That's not what I'm asking.  Did the

Page 156

Yvette Wang

1  research continue, did you have somebody else
2  continue to research individuals?
3      A.  I have no idea.  I don't know.
4      Q.  You've not been involved in any
5  research or investigation projects since
6  Foley Hoag sent this letter?
7      A.  Correct.
8      Q.  Do you know who Rich Higgens is?
9      A.  Rich?
10      Q.  Rich Higgens?
11      A.  Sorry, who is this person?
12      Q.  That's the question.  Do you know
13  who that person is, Rich Higgens?
14      A.  Rich Higgens, sounds -- the name is
15  familiar.  Is it the guy with DOJ?  Is that
16  the guy?  No, I don't know.
17      Q.  Who were you thinking of just now?
18      A.  Because there was a newspaper talk,
19  there is a DOJ employee was sued before,
20  maybe I was wrong.  Something similar like
21  that one.
22          MR. GRENDI:  Can you give me a
23      spelling on Higgens?
24          MR. SCHMIT:  H-I-G-G-E-N-S.  It

Page 157

Yvette Wang

1  might be I-N-S, I'm not sure.
2      Q.  You don't recognize that name?  As
3  far as you know, Eastern Profit doesn't work
4  with him?
5      A.  No.
6      Q.  Has Eastern Profit done anything to
7  retain some other firm or individual to do
8  the research it wanted strategic alliance to
9  do -- or Strategic Vision, excuse me?
10      A.  I don't know.
11      Q.  Not to your knowledge?
12      A.  Not with my knowledge.
13      Q.  Do you know who William Yu, Y-U, is?
14      A.  No, I don't know.
15      Q.  You never met anybody by that name?
16      A.  William Yu, no, never.
17      Q.  To your knowledge, is Mr. Guo
18  carrying on the work we've been discussing in
19  any way, shape or form since Strategic Vision
20  was terminated?
21          MR. GRENDI:  Objection.  You
22      can answer.
23      A.  I don't know.
24      Q.  You have not been involved?

Page 158

                    Yvette Wang
1
2      A.   No.
3           MS. TESKE:  Same objection.
4           MR. SCHMIT:  Let's mark this as
5      Exhibit 7.
6           (Whereupon, at this time, the
7      reporter marked the above-mentioned
8      bank document as Wang Exhibit 7 for
9      identification.)
10 BY MR. SCHMIT:
11     Q.   I'm handing you what's been marked
12 for your deposition as Exhibit 7.  Do you
13 have that in front of you?
14     A.   Yes.
15     Q.   It's got the production numbers in
16 the lower right-hand corner of Eastern, a
17 bunch of zeros, 21 through 22.
18          Do you see that?
19     A.   Yes.
20     Q.   Do you recognize this document?
21     A.   Yes.
22     Q.   What is it?
23     A.   It's bank document.
24     Q.   Do you know what it is conveying or
25 signifying?

Page 159

                    Yvette Wang
1
2      A.   This shows a transaction with
3 beneficiary name, Strategic Vision.
4      Q.   Have you ever seen this document
5 before?
6           (Witness peruses document.)
7      A.   Yes, I did.
8      Q.   What is it?
9      A.   Huh?
10     Q.   What is it?
11     A.   It's a bank proof document.
12     Q.   Proving what?
13     A.   Proving looks like a wire transfer
14 to Strategic Vision.  Happened on January 2,
15 2018.
16     Q.   Who is sending the wire?
17     A.   ACA Capital Group Limited.
18     Q.   And do you know why ACA Capital
19 Group Limited is sending a wire to Strategic
20 Vision?
21     A.   From this project, that this should
22 be the deposit.  Because the time match,
23 looks like.
24          MR. SCHMIT:  Can we just have
25      this marked as 8, please.

Page 160

                    Yvette Wang
1
2           (Whereupon, at this time, the
3      reporter marked the above-mentioned
4      corporate telegraphic transfer
5      cancellation amendment request as
6      Wang Exhibit 8 for identification.)
7  BY MR. SCHMIT:
8      Q.   I'm going to hand you what's been
9  marked for your deposition, ma'am, as Exhibit
10 8.
11     A.   Thank you.
12     Q.   Eastern 279 to 280.
13     A.   Yes.
14     Q.   Have you ever seen this before?
15     A.   Yes.
16     Q.   What is it?
17     A.   It's a corporate telegraphic
18 transfer cancellation amendment request.
19     Q.   Who is making the request?
20     A.   Looks like ACA Capital Group
21 Limited.
22     Q.   And, again, do you know why they're
23 making this request?
24     A.   I guess from the date, it looks like
25 they tried to cancel the wire.

Page 161

                    Yvette Wang
1
2      Q.   To your knowledge, did anybody from
3  Eastern Profit or anyone for that matter,
4  tell Strategic Vision, Hey, we're going to
5  try to cancel the wire we sent?
6      A.   I have no knowledge about that.
7      Q.   You didn't do it?
8      A.   No, I didn't.
9      Q.   And again, you weren't involved in
10 any conversations regarding why the wire was
11 canceled?
12     A.   I'm sorry, what is the question?
13     Q.   You weren't involved in any
14 conversations concerning why the wire was
15 canceled; is that a correct statement?
16     A.   I was not involved in any
17 conversation of that.
18     Q.   And looking at this doesn't refresh
19 your recollection of anything?
20     A.   No, no.
21          MR. SCHMIT:  Mark this as 9,
22      please.
23          (Whereupon, at this time, the
24      reporter marked the above-mentioned
25      e-mail chain as Wang Exhibit 9 for

Page 178

Yvette Wang

1
2  Guo.  I told him, this is still not my
3  contract, but I can see there's recap here,
4  right, this is new, and then what do you want
5  me to do.  And then he said, Then just sign
6  it.  Then I sign it.
7      Q.  Just yes or no to this.  Was
8  Mr. Smith involved at this stage of the
9  proceedings, Gare Smith who you identified
10 earlier?
11     A.  I know Gare Smith; you mean
12 preceding these proceeding?
13     Q.  No.  During these negotiations
14 you're talking?
15     A.  With Ms. Wallop, right?
16     Q.  Was Gare Smith?
17     A.  Yes.
18     Q.  Was he involved in any of these
19 meetings or looking at the drafts or helping
20 you out in any fashion?
21     A.  No.
22     Q.  When was the last time you would
23 have spoken or conferred with him?
24     A.  I don't remember that clearly.
25 Sometime late December.  I don't remember

Page 179

Yvette Wang

1
2  that clearly.
3      Q.  But at some point he looked at a
4  draft and you discussed it with him?  Don't
5  tell me what you discussed.
6      A.  Yes.
7      Q.  If you could just look at the
8  fraudulent misrepresentation count there.
9  Page 6.
10     (Witness peruses document.)
11     A.  Yes.
12     Q.  It says there, if you look at
13 paragraph 32, Prior to entering into the
14 contract representatives for Strategic Vision
15 made the following representations to
16 Eastern.
17     Do you see that?
18     A.  Yes.
19     Q.  Who were the representatives of
20 Strategic Vision referring to?
21     A.  Ms. French Wallop and Mr. J. Michael
22 Waller.
23     Q.  Now, you know, it says, A, Strategic
24 Vision had a highly skilled in-house team of
25 investigators ready to conduct the detailed

Page 180

Yvette Wang

1
2  research Eastern required during a short
3  timeframe.
4      Do you see that?
5      A.  Yes.
6      Q.  When did they -- is that a
7  representation that was made to you?
8      A.  Made to me?
9      Q.  Yes.
10     A.  I don't understand the question.
11 Made to me with what?
12     Q.  Did somebody say that to you?
13     A.  Yes.
14     Q.  Who said that?
15     A.  Strategic Vision.
16     Q.  Who is Strategic Vision?
17     A.  Ms. French Wallop and Mr. J. Michael
18 Waller.
19     Q.  Who said those words, though; who
20 made those representations to you?
21     A.  Both of them.
22     Q.  On separate occasions, at the same
23 time?
24     A.  At the same time.  At the same time.
25     Q.  When was that made?

Page 181

Yvette Wang

1
2      A.  Well, a couple of times.
3      Q.  When was the first time that
4  representation was made?
5      A.  I remember the first time should
6  be -- first time which I was there is like
7  mid December, something like that, almost
8  every, each meeting about this project, and
9  the Strategic Vision that two person, and
10 they always repeatedly, repeatedly tell or
11 told Mr. Guo and me, they are this, very
12 capable, very experienced.
13     Q.  The best?
14     A.  Yes.  The best in the industry.
15     Q.  Specifically, with respect to, A,
16 highly skilled in-house team of
17 investigators.
18     Do you see that?
19     A.  Yes.
20     Q.  What words did they use to convey
21 that?
22     A.  What words?  They said they have
23 project manager, they have different team in
24 different kind of, like, country, and they
25 have quite a lot of significant clients who

Page 182

Yvette Wang

1    they served and they named them as a
2    reference.  But they refused to tell us,
3    like, what position in their team, like those
4    kind of details.
5        Q.  So they identified clients for you?
6        A.  Yes.
7        Q.  Who were the clients they
8    identified?
9        A.  Some Russian official, Middle
10   Eastern royal family people.  I believe you
11   have the names.  Handwriting by Ms. Wallop,
12   yeah.
13       Q.  Did you attempt to contact them or
14   verify those stories at all?
15       A.  No, I didn't, personally, I didn't.
16       Q.  Did Mr. Guo?
17       A.  I don't know.
18       Q.  Did anybody else, as far as you
19   know?
20       A.  No idea.
21       Q.  Did you and Mr. Guo or anybody else
22   ever talk about these clients and the work
23   Strategic Vision had done for them or
24   anything along those lines?

Page 183

Yvette Wang

1        A.  Personally, I didn't.
2        Q.  Did you ever ask Mr. Waller or Ms.
3    Wallop, you know, more about their team or
4    how they would do it or what they wanted to
5    do?
6        A.  We mentioned, we asked, yes.
7        Q.  What did they say?
8        A.  They refused to tell too much
9    details.  They just say they are very
10   capable.  And they use for the clients, and
11   they are experienced, but I don't know who
12   they are or where are they.
13       Q.  But they told you they weren't going
14   to tell you, right?  I mean, you asked and
15   they said, We're not going to reveal that
16   information?
17           MR. GRENDI:  Objection.  You
18       can answer.
19       A.  We did not ask the name.  And they
20   didn't disclosure too much details.
21       Q.  Did you ask them for more detail?
22       A.  I don't remember that.  I don't
23   remember that part.
24       Q.  Did they specifically say in-house?

Page 184

Yvette Wang

1    When you use the term in-house, is that a
2    word that came out of Ms. Wallop's or Mr.
3    Waller's mouth?
4        A.  I believe this is described their
5    project manager.
6        Q.  It says here, they said highly
7    skilled in-house team.  I'm just wondering,
8    did they ever actually use the term in-house?
9    Did you ever discuss with them what they
10   meant by in-house?
11       A.  The in-house means their people.
12   They always called them our people.
13       Q.  So they said -- that's what I'm
14   trying to get.  I want to know what they
15   said.  Did they say our people?
16       A.  Yes.  So in my understanding, okay,
17   your people, it's your team.  And it should
18   be in-house, not you --
19       Q.  Well, did they ever say in-house,
20   though?  That's the question.
21       A.  They said my people, our people.
22       Q.  Our people, my people?
23       A.  Yes.
24       Q.  Something along those lines but

Page 185

Yvette Wang

1    never used the words in-house?
2        A.  I don't remember that.
3        Q.  How about, B, why don't you read
4    that to yourself.
5            (Witness peruses document.)
6        A.  Yes.
7        Q.  Did a representation about former
8    intelligence officers, was that ever
9    discussed in your presence?
10       A.  You mean, is there any formal
11   intelligence officer shows in front of me?
12       Q.  No, no.  You had discussions, I
13   assume, it says Strategic Vision here in the
14   complaint.  This is the complaint filed by
15   Eastern Profit.
16       A.  Oh, okay.
17       Q.  Did somebody from Strategic Vision
18   ever specifically say they had a former
19   intelligence officer or anything like that?
20       A.  Yes, they did.
21       Q.  And when would those representations
22   have been made?
23       A.  Many times.  Almost every -- each of
24   the meetings about this project.

Page 186

Yvette Wang

1      Yvette Wang
2      Q.  Did you ask them what they meant by
3  that?
4      A.  What is your question?
5      Q.  Did you ask them what they meant by
6  a former intelligence officer?
7      A.  What does that mean?
8      Q.  Did you ask them what they meant
9  when they said former intelligence officer?
10     A.  We ask, like who they are, what did
11 they work for, like for previous -- like
12 their employer or their experience.  And
13 basically we didn't ask too much, but we did
14 ask.  Mainly they, I mean, Ms. Wallop and
15 Mike, they voluntarily kept talking with us.
16 Keep introducing us many, many times.  And
17 even I can feel clearly by the end of some
18 meeting, we start to lose our patience, like,
19 let's stop education, let's talk about the
20 contract and project.
21     Q.  So at a certain point you got sick
22 of hearing about their capabilities and what
23 they can do?
24     A.  What is the question?
25     MR. GRENDI:  Objection.

Page 187

Yvette Wang

1      Yvette Wang
2      Q.  At a certain point you got tired of
3  hearing about their capabilities and what
4  they can do?
5      A.  Yes.  Because they are repeating so
6  many, many times.
7      Q.  And you just said, Let's get to the
8  contract and let's negotiate it?
9      A.  No.  We said, Let's just see what we
10 can do together, not specifically which
11 contract or which investigation.
12     Q.  At the end of the day, was it really
13 important to you whether there was a former
14 intelligence officer involved or not?
15     A.  That is their team.  And we have no
16 control about that team.
17     Q.  What did you -- the capabilities of
18 conducting sophisticated financial tracking,
19 do you remember many conversations about
20 that?
21     A.  Yes.
22     Q.  What was said about that?
23     A.  Like they said they are capable of
24 climb the wall and watch the thing right
25 there.  Like, sounds like they are breaking

Page 188

Yvette Wang

1  something.
2      Q.  Breaking something?
3      A.  They described that.  Yes.
4      Q.  When you look at sophisticated
5  financial tracking, what would your
6  expectation be?
7      A.  Legal.
8      Q.  Legal versus nonlegal?
9      A.  Yes.  Because what they said to us
10 is not legal.  It's common sense, we don't
11 need that.
12     Q.  What did they say to you?
13     A.  They said climb the wall and see the
14 assets.  So in our understanding, it's not
15 legal.
16     Q.  So at that point you didn't really
17 rely on that, in fact, you told them, We
18 don't want that; is that a stair statement?
19     MR. GRENDI:  Objection.
20     Objection.
21     You can answer.
22     A.  What is your question?
23     Q.  At that point, when you heard that
24 from Ms. Wallop or Mr. Waller, you said, No,

Page 189

Yvette Wang

1      Yvette Wang
2  we don't want that?
3      A.  Correct, correct.
4      Q.  You don't have to do that, right?
5      A.  Correct.
6      MR. GRENDI:  Objection.  I'm
7  just going to advise you to please
8  not raise your voice at the witness.
9  I think -- I know you're trying to
10 get information.
11     MR. SCHMIT:  I'm not raising my
12 voice at all.  I think the record
13 will reflect --
14     MR. GRENDI:  Well, I think --
15     MR. SCHMIT:  It's been going a
16 little clearer now that we're getting
17 a better understanding, but I don't
18 think I've been raising my voice at
19 all.
20     THE WITNESS:  By the way, I
21 don't like people have their cell
22 phone in front of me like this.  It
23 just makes me uncomfortable.  So that
24 will slow down my answer to you.  I'm
25 just trying to help here.

Page 194

Yvette Wang

1    it afterwards?
2        A.  He said, No, no, no, no.
3        Q.  Wasn't it Mr. Guo that asked whether
4    you could access money from banks of these
5    people you were identifying?
6            MS. TESKE:  Object.
7        A.  What is your question?
8        Q.  Didn't Mr. Guo ask representatives
9    from Strategic Vision whether they could
10   access money from the bank accounts of the
11   people that were being identified by Eastern
12   Profit?
13           MS. TESKE:  Object.
14           MR. GRENDI:  Same objection.
15       A.  I don't remember that.
16       Q.  You don't remember that happening at
17   all?
18       A.  No.
19       Q.  Let's go on to page 7.  C there,
20   they had represented other sophisticated
21   clients in the past, including Republican
22   politicians, a Middle Eastern prince, and a
23   leader of the Russian Opposition Party.  Do
24   you see that?

Page 195

Yvette Wang

1        A.  Yes.
2        Q.  And that -- when was that
3    representation made?
4        A.  I forget the time.  In one of the
5    meetings about this project.
6        Q.  And did you follow up with any of
7    these individuals to even verify that they
8    were clients?
9        A.  Follow up?  You mean?
10       Q.  Call them, e-mail them, text them?
11       A.  I didn't.
12       Q.  Did anybody at your direction?
13       A.  From me, I didn't.
14       Q.  Do you know of it being done at all?
15       A.  I have no idea.
16       Q.  Do you have any reason to believe
17   that this is not a true statement, that they
18   represented sophisticated clients in the
19   past?  What about that --
20       A.  Personally, I believe that is true.
21       Q.  You do believe that is a true
22   statement?
23       A.  Yes.
24       Q.  Okay.

Page 196

Yvette Wang

1        A.  Because otherwise why why Ms. Wallop
2    handwrite all the client's name?  I mean,
3    some of the very important client's name in
4    Miles Guo's handbook -- notebook.
5        Q.  You have no reason to believe that
6    it wasn't true, right?
7            MR. GRENDI:  Objection.  You
8        can answer.
9        A.  Personally, I believe it's true.
10       Q.  And do you believe some of those
11   clients might have included Republican
12   politicians?
13       A.  I don't know about that.
14       Q.  Do you have any reason to believe
15   they didn't?
16       A.  I have no knowledge about that.
17       Q.  Do you know whether Ms. Wallop is a
18   Republican or a Democrat?
19       A.  It's not my business.  I never know
20   about that.
21       Q.  How about Middle Eastern princes?
22       A.  Yes.
23       Q.  Any reason to think the clients in
24   the past didn't include a Middle Eastern

Page 197

Yvette Wang

1    prince?
2        A.  It should be on the handwriting,
3    some of them.
4        Q.  You believed it to be true?
5        A.  I believe the handwriting, it's
6    true.
7        Q.  And do you have any reason to
8    believe that what was written on that sheet
9    of paper, napkin whatever you're describing
10   wasn't true?
11       A.  Which paper?
12       Q.  Wherever the prince's name was
13   written down.  My question is, do you have
14   any reason to believe that that prince was
15   not a former client of Strategic Vision or
16   Ms. Wallop or Mr. Waller?
17       A.  After I saw Ms. Wallop, her
18   handwriting on Mr. Guo's notebook, I believe
19   they are true.
20       Q.  And a leader of the Russian
21   Opposition Party, do you have any reason to
22   believe that Strategic Vision didn't
23   represent a leader of the Russian Opposition
24   Party?

Page 198

Yvette Wang

1
2    A.   Same answer.
3    Q.   You believed them to be true?
4    A.   Yes.
5    Q.   Have you discovered anything since
6  then to in any way make you question that?
7    A.   Same answer like before, no.
8    Q.   Paragraph 34, it says here,
9  Strategic Vision also told Eastern that
10  Eastern's one million dollar deposit would be
11  used as a deposit against the last payments
12  owed by Eastern at the end of the contract.
13  Paragraph, upon information and belief
14  Strategic Vision also knew this statement to
15  be false.
16        Why was that statement false?
17    A.   I don't understand this statement.
18  Can you please help me?
19    Q.   It's Eastern Profit's complaint.
20  That's the one million dollar deposit under
21  the agreement.
22    A.   That's right, this is drafted by
23  lawyer.  English is not my first language,
24  sorry about that.  I'm trying to understand.
25    Q.   Was that representation ever made to

Page 199

Yvette Wang

1
2  you?
3        (Witness peruses document.)
4    A.   From the contract side --
5    Q.   So you're referring back to the
6  contract that's been marked.  What exhibit is
7  that for the record?
8    A.   Your Exhibit number 2.
9    Q.   Okay.
10    A.   Page number 5.  The client will pay
11  the contractor a deposit of U.S. dollar one
12  million upon signing the contract.  The
13  deposit will be credited on a prorated basis
14  to the final one to one-third month of the
15  contract.
16        In my understanding, this one
17  million should not be used against the last
18  payment.
19    Q.   Should not be used?
20    A.   Correct.
21    Q.   What should have happened with the
22  one million dollar deposit upon --
23    A.   This is, in my understanding, an
24  evergreen deposit, which means that one
25  million just stay there as one million.  And

Page 200

Yvette Wang

1
2  they, Strategic Vision is going to issue
3  invoice every month and the client is just to
4  pay the invoice.
5    Q.   So it would stand out there, and the
6  client, you would still owe the monthly fees?
7        MR. GRENDI:  Objection.  You
8      could answer.
9    Q.   That's what evergreen means, right?
10    A.   Correct, yes.
11    Q.   In other words, to give you an
12  example, you paid a million dollars and you
13  get that bill for $750,000.  If the million
14  dollars is an evergreen deposit, or in our
15  business a retainer, you still have to pay
16  that $750,000, right?
17    A.   That is evergreen, you are right.
18  Pay month by month and this deposit stay
19  there.
20    Q.   What happens to that evergreen
21  deposit at the end of the contract?
22    A.   They didn't say clearly in the
23  contract, which means Strategic Vision should
24  return that deposit after this project is
25  terminated.

Page 201

Yvette Wang

1
2    Q.   Well, it says here, the deposit will
3  be credited on a prorated basis to the final
4  one and one-third months of the contract.  Do
5  you see that?
6    A.   Yes.
7    Q.   What is your understanding of that?
8    A.   Can I say, I don't understand what
9  is prorated basis?  I don't understand this.
10    Q.   You don't know what prorated -- you
11  don't have a view as to what prorated basis
12  means?
13    A.   I'm not quite familiar with that.
14    Q.   What language of this contract would
15  say that Strategic Vision should just return
16  the million dollars at the end of the
17  contract?
18    A.   They didn't clearly say that
19  sentence in the contract.
20    Q.   It's not in there, right?
21    A.   Correct.
22    Q.   When was the final day of the
23  contract?
24        MR. GRENDI:  Objection.  You
25      can answer.

Page 202

Yvette Wang

1
2      A.  Final day?
3      Q.  You sent a letter on February 23rd,
4  but if you look at the last sentence, I'll
5  just point it out to you, it discusses 30
6  days written notice.
7          Do you see that?
8      A.  Yes.
9      Q.  So what's the final day of the
10  contract?
11          MR. GRENDI:  Just objection.  I
12      think the letter speaks for itself,
13      but she can answer.
14      A.  This is really a mathematic
15  question.
16      Q.  Okay.
17      A.  I mean, anyone can calculate.
18      Q.  Calculate from when, what numbers?
19      A.  From the letter.
20      Q.  Okay.
21      A.  From the letter of Foley Hoag.  And
22  we, based on the contract, gave them 30 days
23  notice time.
24      Q.  Beginning on February 23rd?
25          MR. GRENDI:  Same objection.

Page 203

Yvette Wang

1
2      A.  Why February 23rd?
3      Q.  Isn't that the date of the letter?
4      A.  That's right.
5      Q.  What does the contract say?
6      A.  One month notice time.
7      Q.  So it would be one month after
8  February 23rd, correct?
9      A.  Yes.
10          MR. GRENDI:  Objection.
11      Q.  Did -- and I think you answered this
12  this morning, I just want to make sure.  Did
13  Eastern Profit pay, other than the deposit,
14  did they pay any money to Strategic Vision?
15      A.  No.
16          MR. GRENDI:  Let's just -- can
17      we take a break for two minutes?
18          MR. SCHMIT:  Sure.
19          (Whereupon, a brief recess was
20      taken.)
21  BY MR. SCHMIT:
22      Q.  We're back on the record.
23      A.  Yes.
24      Q.  We were talking how the million
25  dollar deposit would be used, paragraph 34 of

Page 204

Yvette Wang

1
2  the complaint.  And you were comparing it to
3  the language in the contract marked as
4  Exhibit 2.
5          Now, I think in the end you had just
6  said that other than the million dollar
7  deposit, Eastern Profit had made no other
8  payments to Strategic Vision; is that
9  correct?
10      A.  Correct.
11      Q.  So under those circumstances, let's
12  just assume for a second you guys had no
13  complaints, but had given a termination
14  notice.  How would that million dollar
15  deposit be used?
16          MR. GRENDI:  Objection.
17      Q.  In other words, the contract went
18  fine, and you just decided to terminate it
19  for reasons unrelated, and we've got that
20  million dollar deposit.  What are we supposed
21  to do with it?
22          MR. GRENDI:  Objection.  You
23      can answer.
24      A.  You mean, what is our expectation to
25  Strategic Vision about that one million,

Page 205

Yvette Wang

1
2  right?
3      Q.  Yes.
4      A.  They should return.
5      Q.  Even if the contract -- if the
6  contract had been performed and you had made
7  no other payments for the three-month period,
8  they would just return the million dollars?
9      A.  Correct.
10      Q.  What is that based on?  What
11  language of the contract is that based on?
12      A.  Because that one million was wired
13  and hit Strategic Vision's account without a
14  contract signed.  This is a financial or
15  understanding mistake.  Even with the
16  contract signed, that million should be
17  returned back and after the contract signed
18  and wired again.  That is a professional
19  proper financial procedure.
20      Q.  Did anybody ever ask, until this
21  lawsuit or, excuse me, until the Foley Hoag
22  letter for the million dollars to be
23  returned?
24      A.  Yes, we did.
25      Q.  You asked them?  When did you ask?

Page 210

Yvette Wang

1
2    Strategic Vision is owed 750,000 times three,
3    we've agreed, right?
4        A.  Go ahead.
5        Q.  We've agreed, so far --
6        A.  This is said in the contract, the
7    words in the contract.
8        Q.  Yes, exactly.  They're owed that
9    money, but the only money that's been given
10   to them by Eastern Profit is the million
11   dollar deposit.  Under that scenario, what
12   should we do with the million dollar deposit?
13       A.  Should be refunded.
14       Q.  Why?
15       A.  Because there is no performance in
16   here at all.
17       Q.  No, we're assuming performance was
18   okay.  It's a hypothetical.  Are you familiar
19   with that term?
20       A.  No.
21       Q.  Okay.  We're just setting up -- I'm
22   eliminating, for the sake of argument, the
23   whole point of this question is you agree
24   with performance.  You think Strategic Vision
25   did a great job, I know you didn't, okay.  I

Page 211

Yvette Wang

1
2    know you don't.  But let's assume that they
3    did a great job, they worked for three
4    months.  All they were paid was a million
5    dollar deposit.  In other words, even though
6    they did great work, you didn't pay them for
7    the three months, you didn't pay the 750,000
8    or the 750,000 for February, the 750,000 for
9    the part of March.  Okay?  Are you with me so
10   far?
11       A.  Kind of.
12       Q.  Okay.  What should happen at that
13   point with the million dollar deposit?
14       A.  Back to your Exhibit number 2.
15       Q.  Okay.
16       A.  Yes, right here, your Exhibit number
17   2, page number 5.  The deposit will be
18   credited on a prorated basis to the final one
19   to one-third month of the contract.  They can
20   use the deposit.
21       Q.  To pay what's owed?
22       A.  This is said in the contract.  If I
23   may --
24            MR. GRENDI:  Hold on, wait for
25       questions.

Page 212

Yvette Wang

1
2            MR. SCHMIT:  Off the record for
3    a second.
4            MR. GRENDI:  Sure.
5            (Discussion held off the
6       record.)
7        Q.  I'm going to hand you, Ms. Wang, an
8    exhibit -- excuse me, we're not going to mark
9    it as an exhibit but it has production
10   numbers SVUS 000171 through 000259.
11           MR. GRENDI:  Wait, can we go
12      off the record again?  I'm sorry.
13           MR. SCHMIT:  Okay.
14           (Discussion held off the
15      record.)
16           MR. SCHMIT:  Okay, let's mark
17      it as an exhibit.
18           (Whereupon, at this time, the
19      reporter marked the above-mentioned
20      name list as Wang Exhibit 12 for
21      identification.)
22   BY MR. SCHMIT:
23       Q.  I'm going to hand you what has been
24   marked as Exhibit 12 for your deposition.
25       A.  Thank you.

Page 213

Yvette Wang

1
2        Q.  Just flip through it and let me know
3    when you're finished.  It has production
4    numbers SVUS 000171 through 000259.  And
5    that's marked confidential and should remain
6    confidential.
7            Have you ever seen this document
8    before?
9        A.  Yes.
10       Q.  What is it?
11       A.  They are the name list.
12       Q.  Where did it come from?
13       A.  Mr. Guo.
14       Q.  Where did Mr. Guo get it?
15       A.  I don't know.
16       Q.  Did you ever talk to him about it?
17       A.  No.
18           MS. TESKE:  I object to this
19      whole line of questioning.  Because I
20      haven't seen the document, and I also
21      don't think I can read the document.
22           MR. GRENDI:  Well, if you
23      want --
24           MS. TESKE:  To the extent it
25      concerns my client and I haven't had

Page 214

```
 1                   Yvette Wang
 2        a chance to review it, I object to
 3        this line of questioning.  This is
 4        not my client so I'm not going to
 5        direct her not to answer, but I would
 6        like to put my objection on the
 7        record.
 8   BY MR. SCHMIT:
 9        Q.  Whose handwriting -- if you can look
10   at page 5, 175 production number, page 5 in
11   handwriting, whose handwriting is that?
12        A.  I don't know.
13        Q.  Same question for 177, page 7.
14        A.  I don't know.
15        Q.  Did Mr. Guo ever tell you where he
16   got this list or this packet?
17             MR. GRENDI:  Objection.  You
18        can answer.
19        A.  No.
20        Q.  Did you ever ask?
21        A.  No.
22        Q.  When did you see it before?
23        A.  I don't remember that clearly.  It
24   should be December 2017.
25        Q.  At some point during the month of
```

Page 215

```
 1                   Yvette Wang
 2   December of 2017?
 3        A.  Correct.
 4        Q.  Who was -- was it just you and
 5   Mr. Guo?
 6        A.  Correct.
 7        Q.  Ms. Wallop and Mr. Waller weren't at
 8   that meeting?
 9        A.  No.
10        Q.  What did he tell you?  Did he tell
11   you to do anything with this document?
12        A.  He said this is about this project.
13        Q.  And did he instruct you to do
14   anything with it?
15        A.  Go to talk, discuss about the
16   contract, if signed please deliver this to
17   Strategic Vision.
18        Q.  And you ended up delivering this to
19   Strategic Vision?
20        A.  Correct.
21        Q.  Did you ever hear Mr. Guo say that
22   he had paid $250 million for this document,
23   and the information within it?
24        A.  Can you repeat?
25             MS. TESKE:  Object.
```

Page 216

```
 1                   Yvette Wang
 2        Q.  Did you ever hear Mr. Guo tell
 3   anybody that he had paid $250 million for the
 4   information in this document?
 5        A.  I didn't hear that from myself, by
 6   myself.
 7        Q.  Did you ever hear anybody else say
 8   that or --
 9        A.  I don't remember.
10        Q.  It doesn't sound familiar at all?
11        A.  No.
12        Q.  You never heard him represent that
13   to Ms. Wallop or Mr. Waller?
14        A.  I don't remember that.
15        Q.  Remember as in it didn't happen or
16   you're not sure one way or another?
17        A.  I just don't remember whether that
18   happened or not.  No memory about that.
19        Q.  Did you ever discuss how he gathered
20   the names or the information?
21        A.  No.
22             MR. SCHMIT:  Mark this as 13.
23             (Whereupon, at this time, the
24        reporter marked the above-mentioned
25        background report as Wang Exhibit 13
```

Page 217

```
 1                   Yvette Wang
 2        for identification.)
 3   BY MR. SCHMIT:
 4        Q.  I will hand you what was marked as
 5   Exhibit 13.
 6             (Witness peruses document.)
 7        Q.  It is a background report with the
 8   production number Eastern 144 through 195.
 9        A.  Yes.
10        Q.  Can you just let me know when you're
11   finished reviewing?
12        A.  Yes, you can go ahead.
13        Q.  Have you ever seen this before?
14        A.  Yes.
15        Q.  What is it?
16        A.  This is the one file in the 80
17   gigabyte.
18        Q.  So about -- we're not sure what day
19   you received the 80 gigabyte, though, right?
20        A.  You remember Penn Station, Track
21   Bar?  That's the date I received the 80
22   gigabyte.
23        Q.  Is this a report Strategic Vision
24   had within the 80 gigabytes?
25        A.  Correct.
```

Page 234

Yvette Wang

1
2  was dark.  I told her I will have to take a
3  train, go back to New York.  Because I have
4  my schedule on Monday.  And that day was a
5  Saturday.
6           So she offered -- first she tried to
7  persuade me to stay one more day, which is
8  Sunday, to continue to discuss and finish
9  this contract.  And she offered to drive me
10 to my hotel.  That was the drive there.  And
11 because of the four hours that drive, so this
12 was my second time in her car.  I
13 automatically came to the back seat instead
14 of the front seat.  So this text message
15 referring this.  Because I am a guest, I have
16 to respect the owner's habit to always put me
17 in the back.
18           MR. SCHMIT:  Mark this as 17,
19      please.
20           (Whereupon, at this time, the
21      reporter marked the above-mentioned
22      screen shot of text messages as Wang
23      Exhibit 17 for identification.)
24 BY MR. SCHMIT:
25      Q.  Here is Exhibit 17.

Page 235

Yvette Wang

1
2      A.  Thank you.
3      Q.  I've handed you what has been marked
4  as Exhibit 17.  It is Eastern 220 through
5  222.
6           Do you have that in front of you?
7      A.  Yes.
8      Q.  Just let me know when you're
9  finished.
10          (Witness peruses document.)
11     A.  Okay, finished.
12     Q.  Do you recall this exchange?
13     A.  Yes.
14     Q.  Who is speaking in the first page?
15 Is that you or Ms. French?
16     A.  French.
17     Q.  What is she referring to?  This
18 should be very concerning for your team as
19 the item is full of issues.
20     A.  You mean the whole, this message
21 refer?
22     Q.  Well, the part I just read to you.
23 I mean, you can read as much as you want.
24 But towards the bottom it says, This should
25 be very concerning to your team as the item

Page 236

Yvette Wang

1
2  was full of issues.
3      A.  The whole message here refers to the
4  USB flash drive.  This message was January
5  8th.  On January 6th, we sign a contract.
6  Right after sign a contract, I gave her a USB
7  drive with the information of your Exhibit
8  number 12.  And she took the USB, plugged it
9  in her Mac, and click the USB and click this
10 PDF file, and open that.  And me and her, we
11 went through every -- each of the page of
12 this (indicating).
13          During this process, I never touch
14 any of her devices.  And then we went through
15 from bottom, top to bottom, bottom to top,
16 like a couple of minutes.  I explained to
17 her, and she scrolled up, down, and she
18 admitted she received your number Exhibit 12,
19 PDF file with no problem at all.
20          And then after that, I left, I went
21 back to New York.  And before this Exhibit
22 number 17 message, on page 220, and Ms.
23 Wallop called me.  She said she could not
24 open the flash drive again.  I have no idea
25 what happened with her device, with her

Page 237

Yvette Wang

1
2  conduction of her computer.
3          So she requested to have more copy
4  of your Exhibit number 12 file.  So I told
5  her, I am so busy here.  I have no time to
6  take a train or flight to you.  So she
7  offered to come to me to New York City.  So
8  this is the message happened on your Exhibit
9  17, about this.
10     Q.  So when you went first met, I guess,
11 on January 6th, you were able to open the
12 flash drive.  And on whose computer was that?
13     A.  Ms. Wallop's computer, yes, we were
14 able to open, go through a couple of times.
15 And there's no issue, no problem at all.
16     Q.  And did you ever collect the flash
17 drive back?
18     A.  The one --
19     Q.  Yes.  After Ms. Wallop said, Hey,
20 I'm having trouble with this, something is
21 wrong.  What did she say is wrong with it?
22     A.  What is your question?
23     Q.  What did she say was wrong with the
24 flash drive?
25     A.  She said she couldn't open.  And she

Page 258

Yvette Wang

1     those lines?
2          MS. TESKE:  Objection.
3     A.  I don't remember.  I don't remember.
4     Q.  Back to Exhibit 20.
5     A.  Yes.  I am there.
6     Q.  It says, As you know, big budget is
7  ready for this long-term project.  Investors
8  can even pay your team without contract.
9  What does that mean?
10    A.  The first sentence, big budget is
11 ready for this long-term project, which I was
12 told by Mr. Guo.  In my understanding, the
13 dissidents of Chinese government who are the
14 real fighters for Chinese democracy and rule
15 of law, they are a group of people in my
16 understanding, so that is referring to that.
17 The investor can even pay your team without
18 contract, this refers to the one million,
19 which we just discussed about that.
20    Q.  Who were the investors?
21    A.  The people, this is my definition,
22 the people who are the real fighter for rule
23 of law and democracy of China.
24    Q.  Are they shareholders of Eastern

Page 259

Yvette Wang

1     Profit?
2     A.  I don't know.
3     Q.  Do they invest into ACA Capital
4  Limited?
5     A.  I don't know.
6     Q.  Does investor have anything
7  whatsoever to do with actually putting money
8  towards the project?
9     A.  I have no knowledge about this.
10    Q.  How is Eastern going to put this
11 budget together?
12    A.  I have no idea.
13    Q.  I mean, you testified earlier, as
14 far as you know, Eastern Profit didn't have
15 bank accounts; is that right?
16         MR. GRENDI:  Objection.
17    A.  You mean have or did not have?
18    Q.  Does Eastern Profit have a bank
19 account of any kind?
20    A.  I don't know.
21    Q.  Does Eastern Profit have investments
22 of any kind?
23    A.  No idea.
24    Q.  Does Eastern Profit have a budget --

Page 260

Yvette Wang

1  excuse me, a brokerage account with anybody?
2     A.  No idea at all.
3     Q.  Does Eastern Profit have clients or
4  customers?
5     A.  I have no knowledge about this.
6     Q.  How does Eastern Profit make money,
7  if it does?
8          MR. GRENDI:  Objection.  You
9       can answer.
10    A.  I heard this is an investment
11 company, that's it.
12    Q.  Who did you hear that from?
13    A.  Mr. Guo.
14    Q.  What did he say regarding
15 investments?
16    A.  This is an investment company.
17    Q.  Eastern Profit?
18    A.  Yes.
19    Q.  Well, who conducts the investments
20 and how do they conduct their business?
21 Where are they investing?  Tell me about it.
22    A.  He didn't say.
23    Q.  He just said that it's an investing
24 company?

Page 261

Yvette Wang

1     A.  Correct.
2     Q.  Did they have a portfolio they were
3  managing?
4     A.  I have no idea.  I didn't check.  Iu
5  have no idea.
6     Q.  And you didn't speak with Mr. Guo
7  about today's deposition at all in order to
8  prepare; is that right?
9     A.  I told him.
10    Q.  No, but did you speak to him and
11 say, What can you tell me about Eastern
12 Profit, I'm being deposed as their
13 representative, anything along those lines?
14    A.  No, not in that detail.  I didn't
15 even see him.
16    Q.  What did you say to him on the
17 phone -- did you speak with him on the phone?
18    A.  I mentioned to him a couple of days
19 ago, I have this deposition.
20    Q.  What was his reaction?
21         MS. TESKE:  Object.
22    A.  He said okay.
23    Q.  Did you explain to him you were
24 testifying as a representative of Eastern

Page 262

Yvette Wang

1
2  Profit?
3       A.  I didn't go that detail.
4       Q.  Did he seem to know anything about
5  the deposition, that it was occurring or
6  otherwise?
7            MS. TESKE:  Objection.
8            MR. GRENDI:  Objection.
9       A.  I didn't -- no.
10      Q.  Does Eastern Profit have any assets
11  whatsoever as far as you know?
12      A.  No idea.
13      Q.  Does it have a relationship with a
14  bank?  Does it have any loans or anything
15  like that?
16           MR. GRENDI:  Objection.  You
17      can answer.
18      A.  No idea about their loan with bank.
19           MR. SCHMIT:  Why don't we take
20      five minutes?
21           MR. GRENDI:  I was just going
22      to say that.
23           (Whereupon, a brief recess was
24      taken.)
25           MR. SCHMIT:  Mark this as

Page 263

Yvette Wang

1
2       Exhibit 21.
3            (Whereupon, at this time, the
4       reporter marked the above-mentioned
5       screen shot of text messages as Wang
6       Exhibit 21 for identification.)
7  BY MR. SCHMIT:
8       Q.  I'm going to hand you what's been
9  marked as Exhibit 21.
10      A.  Thank you.
11      Q.  It is a two-page text message, 259
12  through 260.  Do you have that in front of
13  you?
14      A.  Yes.
15      Q.  If you can just read the message and
16  let me know when you're finished.
17           (Witness peruses document.)
18      A.  Yes, I finished.
19      Q.  Did you receive this text message?
20      A.  Yes.
21      Q.  Did you ever discuss these issues
22  with Mr. Waller?
23      A.  I believe no.
24      Q.  Did you ever discuss them with Mr.
25  Guo?

Page 264

Yvette Wang

1
2       A.  I mentioned this message to him.
3       Q.  And what was his reaction?
4       A.  He said they are making excuse and
5  it doesn't make any sense.
6       Q.  Why did he think it didn't make any
7  sense?
8            MS. TESKE:  Object.
9       A.  I believe the two pages here, the
10  main spirit or the main contact with never
11  included in the contract, which is signed on
12  January 6th.
13      Q.  I'm sorry, what's not included?
14      A.  The content of here.
15      Q.  Did Mr. Guo ever discuss that based
16  on his experience this isn't how it worked or
17  Mr. Waller had it all wrong?
18      A.  He didn't mention that to me.
19      Q.  In this context, was Mr. Guo getting
20  more and more agitated?
21      A.  What do you mean agitated?
22      Q.  Angry, frustrated.
23           MS. TESKE:  Object.
24      A.  Oh, yes.
25      Q.  And in this time, did he ever say

Page 265

Yvette Wang

1
2  why he needed this information so
3  immediately?
4            MR. GRENDI:  Objection.
5       A.  No, he didn't mention that.  He said
6  that before already.
7       Q.  He said what before?
8            (Witness peruses document.)
9       Q.  Are you looking for a particular
10  message?
11      A.  Yes.  There was a timeline in my
12  text message.  On your Exhibit number 18,
13  page 233, conveyed to him, this is my
14  message, on January 16, to French Wallop, I
15  said, Convey to him, he advised that if you
16  could make it he needs to see the report
17  before January 25th.  And he has some plan
18  from January 6th, which will need your input.
19      Q.  But did he ever tell -- as far as
20  you know, did he ever tell you, let's start
21  there, what the plan was?  That was the
22  question.
23           MR. GRENDI:  Objection.  We've
24      been over this a couple of times now,
25      but go ahead.

Page 266

Yvette Wang

1
2    A.  I believe I replied to you, sir, at
3  least twice.
4    Q.  That's fine.
5    A.  And I don't know the plan details.
6    Q.  Do you have any sense of why there
7  was this need for immediacy?
8    A.  Immediacy, you mean immediately?
9    Q.  Yes.
10    A.  I don't think it's immediately.
11    Q.  Was time of the essence or do you
12  have any idea what was going to happen?
13         MR. GRENDI:  Objection.  I
14     just -- I'd recommend just using some
15     phrases that are perhaps a little
16     more straightforward.  I want to make
17     sure the witness clearly understands
18     and can answer correctly, that's all.
19     Go ahead.
20    A.  What is your question?
21    Q.  You're the 30(b)(6) witness for
22  Eastern Profit?
23    A.  I am.
24    Q.  And you've educated yourself for
25  today's deposition.  Looking back, you have

Page 267

Yvette Wang

1
2  no idea what the plan was you've said or why
3  this information was needed; is that a fair
4  statement?
5         MR. GRENDI:  Objection.  You
6     can answer.
7    A.  I can tell you which I was told by
8  Mr. Guo.  His plan is his whistle blowing and
9  disclosure corrupted Chinese official, and to
10  bring the justice and bring the truth to the
11  public.  That is his plan, and --
12    Q.  Go ahead, were you done?
13    A.  I'm done.
14    Q.  Has he been unable to do that, has
15  he missed a milestone or some sort of
16  deadline that has in any way hurt his plans?
17         MS. TESKE:  Objection.
18         MR. GRENDI:  Objection.
19    A.  Yes.  You are right.  Sounds to me,
20  he had his deadline, timeline to wait for
21  this information.
22    Q.  And going back, though, has it in
23  some way, has Eastern Profit, let's put it
24  that way, been hurt, because it didn't have
25  information expected on January 26th or

Page 268

Yvette Wang

1
2  January 31st?
3    A.  What is your question?
4    Q.  Has Eastern Profit been damaged at
5  all because it didn't have the information it
6  wanted on January 26th or January 31st?
7    A.  Okay.  I'm glad I asked you.
8    Q.  Go ahead.
9    A.  I believe I replied before, but I
10  will reply again.  The damage to Eastern
11  Profit should be based on Eastern Profit
12  calculation, which for now, I don't know.
13    Q.  So you can't, sitting here today,
14  identify any damages that Eastern Profit has
15  suffered?
16         MR. GRENDI:  Objection.  It's
17     not how the witness testified
18     earlier, but go ahead.
19    Q.  Then tell me all you know about the
20  damages that Eastern Profit has suffered.
21    A.  I will.  So far, for now, and I can
22  see that is a loan, need to pay back.  Legal
23  fee, logistics, all the related fees, right?
24  But I believe this is not all their damage.
25    Q.  Is there -- is there a particular

Page 269

Yvette Wang

1
2  clause in the contract that would entitle you
3  to legal fees?  Do you know anything about
4  that?
5    A.  Which contract?  Which clause?
6    Q.  Any one that would entitle Eastern
7  Profit to damages, including legal fees?
8         MS. TESKE:  Objection.
9         MR. GRENDI:  Objection.
10    A.  I didn't see any contract except
11  this one.
12    Q.  Okay.  What clause in that contract,
13  the contract we're discussing today, would
14  entitle you to legal fees?
15         MR. GRENDI:  Objection.
16     You can answer.
17    A.  There's no clause in this contract,
18  I believe.
19    Q.  Okay.  I mean, go ahead, if you can
20  point it out.  I would like to have you point
21  it out.
22         (Witness peruses document.)
23    A.  I believe in this contract, it
24  didn't say anything about legal fees.
25    Q.  And with respect to the loan, just

Page 278

1
2                I N D E X
3   EXAMINATION BY                    PAGE
4   Mr. Schmit                         4
5
           E X H I B I T S
6
7
     WANG         DESCRIPTION          PAGE
8
      1      Notice of deposition        7
9
      2      Research agreement         11
10
      3      Responses and objections
11           to interrogatories        23
12    4      Research agreement        51
13    5      Screen shot of text messages  103
14    6      Three-page letter        135
15    7      Bank document            158
16    8      Corporate telegraphic transfer
             cancellation amendment
17           request                  160
18    9      E-mail chain             161
19   10      Handwritten document     164
20   11      Complaint                167
21   12      Name list                212
22   13      Background report        216
23   14      Background report        219
24   15      Screen shot of text messages  224
25   16      Screen shot of text messages  230

Page 279

1
2
           (Exhibits cont.)
3
4
     WANG         DESCRIPTION          PAGE
5
     17      Screen shot of text messages   234
6
     18      Screen shot of text messages   240
7
     19      Screen shot of text messages   244
8
     20      Screen shot of text messages   254
9
     21      Screen shot of text messages   263
10
     22      Screen shot of text messages   272
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 280

1
2   DOCUMENTS AND/OR
    INFORMATION REQUESTED          PAGE LINE
3
     Documents supporting loan       45   17
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 281

1
2                C E R T I F I C A T E
3       I, MICHELLE LEMBERGER, a shorthand
4   reporter and Notary Public within and for
5   the State of New York, do hereby certify:
6       That the witness(es) whose testimony
7   is hereinbefore set forth was duly sworn by
8   me, and the foregoing transcript is a true
9   record of the testimony given by such
10  witness(es).
11      I further certify that I am not
12  related to any of the parties to this
13  action by blood or marriage, and that I am
14  in no way interested in the outcome
15  of this matter.
16
17
18
19
20             MICHELLE LEMBERGER
21
22
23
24
25

Page 282

1
2          DEPOSITION ERRATA SHEET
3   Case Caption:  Eastern Profit Corp v.
4   Strategic Vision LLP
5
6       DECLARATION UNDER PENALTY OF PERJURY
7          I declare under penalty of perjury
8   that I have read the entire transcript of my
9   Deposition taken in the captioned matter or
10  the same has been read to me, and the same is
11  true and accurate, save and except for changes
12  and/or corrections, if any, as indicated by me
13  on the DEPOSITION ERRATA SHEET hereof, with
14  the understanding that I offer these changes
15  as if still under oath.
16
17         _____
18         YVETTE WANG
19
20  Subscribed and sworn to on the _____ day of
21  _____, 2019, before me,
22  _____
23  Notary Public,
24  in and for the State of _____
25

Page 283

1
2          DEPOSITION ERRATA SHEET
3   Page No. _____ Line No. _____ Change to: _____
4   _____
5   Reason for change: _____
6   Page No. _____ Line No. _____ Change to: _____
7   _____
8   Reason for change: _____
9   Page No. _____ Line No. _____ Change to: _____
10  _____
11  Reason for change: _____
12  Page No. _____ Line No. _____ Change to: _____
13  _____
14  Reason for change: _____
15  Page No. _____ Line No. _____ Change to: _____
16  _____
17  Reason for change: _____
18  Page No. _____ Line No. _____ Change to: _____
19  _____
20  Reason for change: _____
21  Page No. _____ Line No. _____ Change to: _____
22  _____
23  Reason for change: _____
24  SIGNATURE:_____DATE:_____
25         YVETTE WANG