# Exhibit H1

```
 1   UNITED STATES DISTRICT COURT

 2   SOUTHERN DISTRICT OF NEW YORK

 3   -----------------------------------x

 4   EASTERN PROFIT CORPORATION LIMITED,

 5            Plaintiff-Counterclaim Defendant,

 6                              Case No.

 7     -against-              18-cv-2185

 8   STRATEGIC VISION US, LLC,

 9            Defendant-Counterclaim Plaintiff,

10    vs.

11   GUO WENGUI a/k/a, MILES KWOK,

12            Counterclaim Defendant.

13   -----------------------------------x

14

15

16            VIDEOTAPED DEPOSITION

17                   OF

18            J. MICHAEL WALLER

19            New York, New York

20         Friday, February 8, 2019

21

22

23

24

25
```

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 10

1   that work.
2            MR. SCHMIDT:  Your employer.
3            MR. GRENDI:  Employer, yeah.
4       A.   I do mean principally, principally as
5   my own contractor for myself through my company,
6   through Oceanic Advisors or Liberty Tree
7   Partners.
8       Q.   How do you know French Wallop?
9       A.   I met her about, first about 35 years
10  ago.  I had been a Senate staffer and her husband
11  was a U.S. senator.
12      Q.   Were you a staffer for Ms. Wallop's
13  husband?
14      A.   No.
15      Q.   Did you meet him through your work as a
16  staffer?
17      A.   The senator?
18      Q.   Yes.
19      A.   Yes.
20      Q.   Is that how you met French Wallop?
21      A.   I don't recall.  It could have been at
22  a reception or some other event.
23      Q.   When did you start working with
24  French Wallop in connection with
25  Strategic Vision?

Page 11

1       A.   2016, maybe 2017.
2       Q.   How did that come about?
3       A.   We had talked a lot about doing
4   different business projects.  We had worked
5   together during the Iraq War and the Afghanistan
6   War but never actually did contractual work.  It
7   was just mutual collaboration on work relating to
8   opposing jihadist movements, and then we
9   discussed ways to do business with a variety of
10  prospective clients in 2017.
11      Q.   You're saying 2017 now?
12      A.   2016-2017.  I feel more comfortable
13  saying early 2017.
14      Q.   Okay.  What was the nature of the work
15  you were doing with French Wallop before you
16  started talking about working with Strategic
17  Vision, the Iraq War and Afghanistan War?
18      A.   That was information opposition support
19  for the U.S. Special Operations Forces, or I'll
20  say U.S. Military in general.
21      Q.   So you were both providing that kind of
22  service to the U.S. Military?
23      A.   Yes, independently.  And we had -- when
24  she was working on another project, we had talked
25  about bringing me in, but we didn't.

Page 12

1       Q.   And so when did you do your first
2   project with Strategic Vision and French Wallop?
3            You said you started talking in early
4   2017.  When did you do your first project with
5   Strategic Vision?
6       A.   We had several going on at once at
7   about the same time, so I can't -- either late
8   2016 or early 2017.
9       Q.   So you jumped right in after discussing
10  with Ms. Wallop working together.  She said, "Can
11  you help on a couple of projects?"
12           Is that what happened?
13      A.   Yeah.  It's more of you get together
14  and you talk about ideas, and you brainstorm
15  about what kind of clients are out there or what
16  kind of work should be done or needs to be done,
17  and then where we would properly fit in and what
18  type of teams to build.
19      Q.   And so how many projects have you done
20  with Strategic Vision?
21      A.   None of it's written down, meaning we
22  don't have a contract, so we just work together
23  because we trust each other.  We have probably
24  two right now.
25      Q.   Just historically, how many different

Page 13

1   projects or clients have you serviced with
2   Strategic Vision?
3       A.   Probably two previous.  The ones we're
4   working on now are not yet clients.  We're just
5   working on building them as clients.
6       Q.   So you're not performing any service
7   for just Strategic Vision right now for any of
8   its clients?
9       A.   No.
10      Q.   And you're working on maybe doing two?
11      A.   Yes.
12      Q.   Other than the project that we're going
13  to discuss in this case with Eastern Profit, how
14  many other projects have you done for Strategic
15  Vision?
16      A.   Probably two.
17      Q.   That you actually performed work on?
18      A.   Yeah.
19      Q.   When was that?
20      A.   Let me correct my earlier statement.  I
21  think it was 2016 when I first did work with her.
22      Q.   That's fine.  So there were two other
23  projects that you performed for Strategic
24  Vision --
25      A.   Yes.

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 14

1    Q.    -- other than this one?

2    A.    Yes.

3    Q.    So three total that you've performed

4  work for Strategic Vision?

5    A.    This is the third one, yes.

6    Q.    And without identifying the name of any

7  of the clients or anything like that, what was

8  the substance of that kind of work, the other two

9  projects that you performed?

10    A.    Opposition research and political/

11  policy work, messaging.

12    Q.    What is the opposition research?  Can

13  you break that down a little bit and explain what

14  that means?

15    A.    Yeah, it's common in political

16  campaign-type work, but you can use it for really

17  anything where you want to research who your

18  opposition is, everything you can find out about

19  the opposition and use that for advancing your

20  political or policy purposes.

21    Q.    So was it investigation work?

22    A.    Yes.

23    Q.    What kind of investigation work?  Can

24  you describe it?

25    A.    Computer research, sort of academic

Page 15

1  research, good old-fashioned detective-type work.

2  The same way you would do a background

3  investigation.

4    Q.    And do you do that work personally?

5    A.    I do some of it personally, but I

6  arrange teams where it's beyond my expertise or

7  where the scope is too large.

8    Q.    So sometimes you'll perform the

9  investigatory research yourself if the resources

10  are available?

11    A.    Yes, or if my capabilities are there.

12  If they're beyond my capabilities, I'll hire out

13  the talent.

14    Q.    So you've done that for Strategic

15  Vision?

16    A.    Yes.

17    Q.    What if the research is beyond your

18  capabilities?

19    A.    You hire people who have those

20  capabilities.

21    Q.    You have contacts who can do that kind

22  of research when you can't do it?

23    A.    Yes.

24    Q.    Where is Strategic Vision located?

25    A.    At French Wallop's house.

Page 16

1    Q.    So it doesn't have a storefront or

2  office or anything like that?

3    A.    No.

4    Q.    Do you work in that office when you're

5  working on a project for Strategic Vision?

6    A.    No.  We'll meet at her house to talk,

7  that's all.

8    Q.    Just going back to your career.  How

9  many opposition research projects have you

10  performed in your career?

11    A.    More than a hundred.

12    Q.    Some of those are within the

13  United States?

14    A.    Both in the United States and abroad.

15    Q.    What's the split there, if you can

16  ballpark that?

17    A.    Roughly 50/50 either way.  I couldn't

18  quantify it.

19    Q.    So sometimes the subjects of an

20  investigation are in other countries and

21  sometimes they're in the United States?

22    A.    Yes.

23    Q.    Does French Wallop ever do this kind of

24  investigatory work, opposition research?

25    A.    She does, using different methods.

Page 17

1    Q.    So if you and French Wallop are working

2  on a project?  What's the division of labor?

3  What work would you do and what work would she

4  do?

5    A.    She normally does the networking in the

6  political or diplomatic or intelligence

7  communities through her personal networks.  Her

8  husband was on the Senate Intelligence Committee,

9  so she has connections going back longer than

10  I've known her.  She's maintained all those

11  contacts worldwide, and she's multilingual and

12  she's traveled very extensively.  So she'll use

13  those higher level contacts, and then I'll do the

14  more nuts-and-bolts work.

15    Q.    So in other words, Ms. Wallop might use

16  her network of contacts to get a certain amount

17  of information, investigatory research, and then

18  you might drill down on that data.

19         Is that fair to say?

20    A.    Yeah.  On occasion, yeah.

21    Q.    Let's look at a document here, and

22  we'll mark it as Waller 1.

23         MR. SCHMIDT:  Unless you just want to

24  continue numbering them.

25         MR. GRENDI:  I think I'm just going to

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 18

1  do them by name.  There's going to be some
2  overlap, so I don't want to mix and match.
3  I just want to keep them separate.  I have
4  to be careful not to give you the one that
5  I've marked up, so please bear with me.
6         (Waller Exhibit 1, Research Agreement
7  January 1, 2018, marked for identification.)
8         MS. TESKE:  Sorry, you said this is
9  Waller 1?
10        MR. GRENDI:  Yeah, this is Waller 1.
11    Q.    Mr. Waller, can you please just take a
12  moment to look at this document and let me know
13  when you're done reviewing it.  You don't have to
14  read every word.  Just familiarize yourself with
15  it.
16    A.    Okay.
17    Q.    Mr. Waller, do you recognize this
18  document?
19    A.    I recognize one with a different date
20  that's filled out.
21    Q.    Before today, you don't know if you've
22  ever seen this document?
23    A.    I'm not sure.  There are several
24  versions of it.
25    Q.    Let me ask you about that.  So does

Page 19

1  Strategic Vision have a standard research
2  agreement that it uses for its clients?
3    A.    I don't know.
4    Q.    Have you seen an agreement similar to
5  this in the past?
6    A.    No.  Well, apart from earlier drafts of
7  this one, no.
8    Q.    So you don't know, sitting here today,
9  whether Strategic Vision has a stock agreement
10  that it provides to its clients when there's a
11  project of this nature?
12    A.    I don't know.
13    Q.    So you don't know how long Strategic
14  Vision has used this document?
15    A.    I wrote the draft of this with Guo.
16    Q.    You wrote this document?
17        MR. SCHMIDT:  Just give me a chance to
18    object.
19        THE WITNESS:  Okay.
20        MR. SCHMIDT:  No, go ahead.  You're
21    good.
22    Q.    Did you write the original draft of
23  this research agreement?
24    A.    Not this draft, but I wrote drafts
25  leading up to what appears to be this draft.

Page 20

1  (*r)      MR. GRENDI:  Joe, I think we are going
2    to call for the production of any drafts
3    that weren't already produced.
4         MR. SCHMIDT:  All right.
5    Q.    So do you have those prior drafts in
6  your computer at home?
7    A.    I have one, I think, dated December 29,
8  2017.
9    Q.    Were there any drafts before
10  December 29, 2017?
11    A.    I don't know.  It was with Guo and
12  Lianchao Han and French Wallop, and then later on
13  with only French Wallop and Yvette Wang.
14    Q.    You said before that you worked on the
15  first draft of a document like this, is that
16  right?
17    A.    On initial drafts, but yes.
18    Q.    When did you do that initial draft?
19        MR. SCHMIDT:  Objection.
20        MR. GRENDI:  Is the witness going to
21    answer or are you saying he's not going to
22    answer?
23        MR. SCHMIDT:  It's a form objection.
24    You can answer.
25        THE WITNESS:  When there's an

Page 21

1  objection, am I bound to answer?
2         MR. SCHMIDT:  If I don't instruct you
3    not to answer, you can go ahead and answer.
4         THE WITNESS:  Repeat the question,
5    please.
6         MR. GRENDI:  Can you read it back,
7    please.
8         (Whereupon, the referred to question
9    was read back by the Reporter.)
10    A.    It's hard to say exactly because we
11  were developing the concept, developing the work
12  plan, developing the budgets, and so it would
13  have been depending on what an initial draft is,
14  in November or December of 2017, probably
15  December 2017.
16    Q.    Who did you work with on that draft,
17  the first draft?
18    A.    With Miles Kwok directly, with Lianchao
19  Han as the interpreter and facilitator, and with
20  French Wallop.
21    Q.    Where was that?  That sounds like it
22  was a meeting in person.
23    A.    Yes.  It was at Miles Kwok's residence
24  in New York City.
25    Q.    That was around, you're saying, early

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 22

1  December 2017?
2      A.   Roughly, yeah.  I'd have to go back and
3  check.  I can give you an absolute date.  We went
4  through ideas first, which wouldn't be a draft of
5  the contract, and then we did the draft of the
6  contract.  We did it directly at Kwok's
7  residence.
8      Q.   So did you handwrite it or did someone
9  else handwrite it or was there a computer
10 involved?  Can you just describe the writing
11 process?
12     A.   Yeah, I would have handwritten it
13 because we did not have computers in those
14 meetings.
15     Q.   So you took handwritten notes as to
16 what the provisions of the contract would be?
17     A.   Yes.
18     Q.   Did anyone else take notes like that?
19     A.   I don't recall.
20 (*r)    MR. GRENDI:  We would also call for the
21       production of those notes, Joe.
22     Q.   So please, if you would, describe what
23 was discussed at this meeting where the first
24 draft of the research agreement was memorialized
25 or discussed.

Page 23

1      A.   It was a lengthy meeting at his house.
2  It was split up by a sit-down in his living room
3  and then conversations in his dining room.  And
4  it was developed -- he told us what he wanted to
5  do.  We then said how we could meet that.  We
6  told him some of the things to do may not be
7  legal in the United States to do.  He was fine
8  with that.
9           Then we developed the scope, and then
10 from the scope developed a budget.  And I can't
11 recall specifically if we discussed the budget in
12 that first meeting or subsequently, and I did not
13 save a lot of the notes on purpose.
14     Q.   So you threw away the notes?
15     A.   Yeah.
16     Q.   When did you dispose of the notes?
17     A.   Ordinarily I destroyed my notes on
18 things where they have to be confidential, where
19 there's a high-risk environment, to protect the
20 client and to protect our own people, so I don't
21 remember when I would have done that.  It would
22 have been certainly before any dispute arose.
23     Q.   You mentioned what -- you said Mr. Guo
24 want.  Who are you talking about when you say
25 "Mr. Guo"?

Page 24

1      A.   He uses three names.  Miles Kwok, I
2  suppose, is the name he's using today for his
3  representation here.
4      Q.   Do you also know him as Guo Wengui?
5      A.   Yes.
6      Q.   You said there were three names.
7      A.   There was a third name that contained
8  the name "Guo."  I don't recall the exact part of
9  the name.
10     Q.   This meeting that you say occurred at
11 Mr. Guo's, you say, apartment --
12     A.   Yes, or whatever his unit is called.
13     Q.   -- in December of 2017, was that the
14 first time you had met him?
15     A.   Yes.
16     Q.   You described he told you what he
17 wanted.  What did he tell you he wanted?
18     A.   He wanted to do battle with the Chinese
19 Communist Party leadership.
20     Q.   Can you explain a little bit more about
21 what you thought he meant by that?
22     A.   Yes.  He wanted to exploit divisions
23 within the Communist Party leadership as
24 President Xi was consolidating power.  He wanted
25 to take advantage.  He wanted to exploit

Page 25

1  differences within the regime and within other
2  Chinese billionaires living both inside and
3  outside the People's Republic of China for the
4  purposes of disrupting the Xi government.  He
5  also wanted to expose the family networks of
6  certain of those Communist Party officials,
7  including what he described was their children
8  born out of wedlock who lived under different
9  names with relatives who managed the party
10 leaders' illegally gained funds and a range of
11 things related to that.  The bottom line was it
12 was for disruption of the Chinese Communist Party
13 leadership.
14     Q.   Was this the first time you had heard
15 about that being the supposed goal of this
16 research or request?
17     A.   Before I met him, I was told that he
18 was going to do this, and that's why I took an
19 interest in doing it.
20     Q.   Who told you about that interest?
21     A.   French Wallop told me and Lianchao Han
22 told me and Bill Gertz told me.
23     Q.   Let's just go one at a time.  Who is
24 the first one of those three people to tell you
25 or was it maybe one meeting?

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 26

1    A.    I believe it was French Wallop.
2    Q.    And then subsequent to that, you talked
3  to who about that?
4    A.    To Lianchao Han, L-i-a-n-c-h-a-o.  The
5  second name is H-a-n.
6    Q.    This is all before this December
7  meeting in Mr. Guo's apartment?
8    A.    Yes.
9    Q.    When did you talk to Bill Gertz?
10   A.    At about that same time.  Bill Gertz
11  had asked French Wallop if she could do this
12  work.  She said she would like to bring me in.
13  He thought it would be a great idea, in his
14  words, and Lianchao Han agreed.  And that's when
15  I was brought up to meet -- then I conferred with
16  Lianchao and was brought up to meet Guo.
17   Q.    So Mr. Guo apparently described what he
18  wanted to do, and then you said that Strategic
19  Vision -- let's strike that and start over.
20  Sorry.
21        So Mr. Guo told you what he wanted from
22  you and Ms. Wallop.  What did you tell him back
23  in terms of what Strategic Vision and you
24  yourself could provide as a service?
25   A.    First, I never spoke on behalf of

Page 27

1  Strategic Vision.
2    Q.    Okay.  Who were you speaking on behalf
3  of?
4    A.    On behalf of myself.
5    Q.    So you don't have an employment
6  agreement with Strategic Vision?
7    A.    No.
8    Q.    Did you explain to Mr. Guo and
9  Mr. Lianchao that you did not work for Strategic
10  Vision?
11   A.    Yes.
12   Q.    When was it?  Was that at this meeting
13  that you're talking about now?
14   A.    It was probably at the first meeting
15  with Guo.  I never implied anything that I worked
16  for Strategic Vision.
17   Q.    Did you explicitly say "I don't work
18  for Strategic Vision"?
19   A.    I don't recall if it was quite put that
20  way.  I would let Ms. Wallop answer that because
21  she was speaking for her company.  We presented
22  ourselves as a team, and we were specific that we
23  assemble teams on an as-needed basis to do this
24  type of research because there's no corporate
25  profile.  And that was essential for maintaining

Page 28

1  the client confidentiality and the
2  confidentiality of the work.
3    Q.    So you're saying at the outset here you
4  explained to Mr. Guo and Mr. Lianchao that
5  Strategic Vision and you personally are not
6  working together directly.  That you're, I guess,
7  an independent contractor?
8    A.    Yes, that would be accurate, as an
9  independent contractor.
10   Q.    And you explained that to Mr. Guo and
11  Mr. Lianchao?
12   A.    Yes.
13   Q.    Did they say anything when you
14  explained that?
15   A.    No.
16   Q.    Getting back to my original question,
17  what did you and Strategic Vision, through
18  Ms. Wallop, explain as a possible service that
19  could be provided to Eastern Profit?
20   A.    We could provide this opposition
21  research to Guo.  That we would set up the teams
22  to do the work.  That the work would have to be
23  done both in the United States and outside the
24  United States.  That we were starting up cold.
25  We never implied that we had a corporate entity

Page 29

1  with a staff and resources, that we would be
2  starting this up from scratch as we do with all
3  our projects.  So he was fine with that.
4    Q.    Did you or Ms. Wallop explain what
5  either your capabilities or Ms. Wallop's
6  capabilities were in terms of providing this
7  research?
8        MR. SCHMIDT:  Objection.  Go ahead.
9    Q.    Let me break it down, then.
10        Did you explain what you could provide
11  as a service in connection with this research?
12   A.    Yes.
13   Q.    And what did you explain to the parties
14  present?
15   A.    That I would assemble the research team
16  and supervise the research team.
17   Q.    That's the research team that would
18  perform investigatory research?
19   A.    Yes.
20   Q.    Did Ms. Wallop explain what Strategic
21  Vision could provide in connection with this
22  research?
23   A.    Yes.
24   Q.    What did she say, if you recall?
25   A.    I don't recall exactly.

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 30

1    Q.    What do you recall generally?
2    A.    That she could get the work done.
3    Q.    Were any other services described or
4  offered at this meeting, other than -- let's call
5  it investigatory research or, as you called it,
6  opposition research?
7    A.    Yes.  Guo had a big vision of things
8  that he wanted to do, and between Mrs. Wallop's
9  own research and connections and my own, we could
10 provide all of that or arrange for it to be
11 provided.
12   Q.    What were these other services?
13   A.    Guo was invested in purchasing real
14 estate in Washington, D.C. and in New York City
15 and Westchester County.  Mrs. Wallop had been
16 involved with high-end real estate in the past,
17 so she took that on.
18   Q.    So that was discussed at this meeting?
19   A.    I believe it was at that meeting.  If I
20 remember correctly, Lianchao first raised it with
21 us before we met Guo.
22   Q.    When you say "we," you mean you and
23 Ms. Wallop?
24   A.    Yes.
25   Q.    Now, at the time of this meeting in

Page 31

1  Mr. Guo's apartment, did you understand that
2  there had been prior meetings between either
3  Mr. Guo or Yvette Wang or Lianchao Han and
4  Strategic Vision?
5    A.    And Strategic Vision, no.
6    Q.    What about French Wallop?
7    A.    I don't know.  No, no.
8          MR. SCHMIDT:  No, you don't believe
9      they met before?
10         THE WITNESS:  I don't believe they met
11     before.
12   Q.    So you're not sure if French Wallop had
13 shown Mr. Guo or Yvette Wang real estate in the
14 Washington, D.C. area prior to this meeting?
15   A.    No, that was after the meeting.  There
16 was more that he asked us to do.
17   Q.    Such as?
18   A.    He wanted to set up a foundation, a
19 non-profit foundation for public policy relating
20 to China based in Washington, D.C.  He discussed
21 certain properties he wanted to buy in
22 Washington, D.C. to house that foundation, a
23 prestige property in Georgetown and a property
24 right across from the U.S. Treasury Department
25 overlooking the White House.

Page 32

1          He also wanted to set up a media
2  organization tentatively called Guo Media, and we
3  discussed various aspects of that.
4    Q.    Did Strategic Vision and Mr. Guo ever
5  agree to those other services?  Let's call them
6  non-investigatory services?
7    A.    I don't think it was contractual.  I
8  think it was just verbal.  Because I do know that
9  she took Yvette around to look at certain
10 properties in Washington, D.C.
11   Q.    But to your knowledge, there was never
12 any written agreement between Mr. Guo and
13 Strategic Vision concerning these other services?
14   A.    Not that I know of.
15   Q.    Going back to the terms of the research
16 agreement that you were drafting at this meeting.
17 To the extent you can recall, what were the basic
18 terms that were discussed that you wrote down or
19 remember?
20         MR. SCHMIDT:  Just objection, but go
21     ahead.
22   A.    Okay.  First I'd have to sort out one
23 meeting from the other and then what we discussed
24 before or after the meeting without Guo present,
25 so everything might not be completely accurate.

Page 33

1          MR. SCHMIDT:  Is the question just what
2      he drafted at that December meeting, the
3      notes he took?  That's the problem with the
4      question.
5          MR. GRENDI:  That's fair.
6          MR. SCHMIDT:  Maybe we can narrow it,
7      take it one bite at a time.
8    Q.    What were the notes that you took, to
9  the extent you recall, regarding this agreement
10 at the meeting at Mr. Guo's apartment that we've
11 been discussing?
12   A.    The general things that he wanted were
13 he wanted to investigate up to 4,000 individuals
14 in China or Chinese nationals living outside
15 China, and he wanted to start with ten.  He
16 described the types of research he wanted done.
17   Q.    Would that include financial forensic
18 research?
19   A.    Yes.
20   Q.    And would it include tracking research?
21   A.    Yes.
22   Q.    How about social media research?
23   A.    Yes.
24   Q.    So if you look at what we marked as
25 Waller 1, do items A, B and C describe the type

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 34

1  of services that Mr. Guo apparently asked for at
2  this meeting?
3       A.    Yes.
4       MR. SCHMIDT:  Objection.
5       Q.    What else was discussed at the meeting,
6  other than the 4,000 individuals starting with
7  ten, and the types of research?
8       A.    Guo had a three-year plan.  He wanted a
9  three-year contract to fulfill that plan.  He had
10  a larger plan of his own of which this was just
11  supposedly a small part.
12      Q.    Anything else you recall?
13      A.    He was extremely conscious of his own
14  personal security.  He expressed fear that he
15  would be murdered.  He expressed concern for his
16  property that was still in China, his overall
17  interest in China.  He expressed concern that
18  under no circumstances should our relationship
19  ever be divulged to anyone.
20            We discussed security measures we would
21  take, which were rather extraordinary because
22  they were meant to avoid detection by the Chinese
23  intelligence services called MSS, which is
24  extremely active in the United States.
25      Q.    That's MMS, you said?

Page 35

1       A.    MSS, Ministry of State Security.
2       Q.    Thanks.  Did Strategic Vision or you
3  offer any terms or conditions to providing this
4  service?
5       A.    In which way?
6       Q.    In other words, you've described what
7  apparently Mr. Guo had requested.  Was there
8  anything that Strategic Vision requested in
9  connection with this service?
10      A.    From him?
11      Q.    Just in connection with providing this
12  investigatory research.  For example, price?
13      A.    Yeah, of course.
14      MR. SCHMIDT:  Do you mean terms that
15      they wanted?
16      MR. GRENDI:  Exactly.
17      MR. SCHMIDT:  Terms of the contract,
18      did you make any requests at that meeting?
19      Sure.  We -- and I don't know if it was
20  at that specific meeting or one subsequent to it,
21  but at the time of working out the contract,
22  let's say sometime in December of 2017.  And some
23  of it was directly with him and some of it was
24  indirectly through Lianchao, and I can't recall
25  necessarily which was which.

Page 36

1            One of the issues was a deposit of $1
2  million to finance the start-up of getting the
3  teams in order and getting all the pieces in
4  place.
5       Q.    Is $1 million the kind of starting
6  negotiating point that Strategic Vision had, or
7  did they demand a different sum?
8       A.    No, we had a larger sum for the work
9  involved, but we needed the funds to start up the
10  teams and to get all the pieces in place.  We
11  were very explicit that we were starting up cold.
12  We requested it first as a signing bonus.  He
13  disagreed.  He objected to that completely, so we
14  agreed on a deposit which would be credited to
15  the last month, roughly month and a third of the
16  contract, so he wouldn't pay us a final payment
17  at the end of year one.  We would just deduct
18  that.  We would just deduct the deposit as our
19  payment.
20      Q.    What about other payment terms?  Were
21  they discussed?
22      A.    Yes.  They were to be, specifically to
23  be circuitous payments so that the Chinese
24  intelligence authorities could not find that he
25  was making payments to any of us.

Page 37

1       Q.    But other than the deposit, was there
2  any other financial consideration discussed for
3  Strategic Vision's services, or your services?
4       A.    Yes.  There was a $750,000-a-month
5  flat-rate payment that was due at the end of the
6  pay period.
7       Q.    And that was discussed at this meeting?
8       A.    At one of those meetings.  I don't
9  recall specifically which.
10      Q.    I just want to go back to this meeting
11  in early December at Mr. Guo's apartment.  Were
12  there any other terms and conditions that
13  Strategic Vision wanted in connection with this
14  research agreement?
15      A.    Financial terms?
16      Q.    Any terms.
17      A.    Yes, we wanted to be paid obviously on
18  time, within five days of the end of the pay
19  period.  We would not issue a formal invoice to
20  avoid having any paperwork or paper trail
21  directly with him.  He would arrange for the
22  payments at the end of the month to be made
23  through a circuitous route for the purpose of
24  avoiding detection by the Chinese authorities.
25            If you want to be more specific, I can

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 38

1  address things more specifically, but offhand I
2  can't think of anything else.
3      Q.   Okay.  And in terms of negotiating
4  these terms for Strategic Vision, were you taking
5  a lead on that or was Ms. Wallop taking the lead
6  on that?
7          MR. SCHMIDT:  Objection.
8      A.   We teamed it.
9      Q.   Did you have --
10     A.   We worked with Lianchao as Guo's agent
11 or representative prior to this to determine the
12 scope.  Then when we met with Guo, he narrowed
13 the scope and then we came to the agreement for
14 750 a month.
15     Q.   What was your financial arrangement
16 with Strategic Vision in connection with this
17 research agreement?
18     A.   That French Wallop and I would split
19 the profits evenly.
20     Q.   Would it be you personally that would
21 split the profits evenly or one of your
22 companies?
23     A.   There were LLCs in my name, so it's
24 effectively me paid to one of my LLCs.
25     Q.   So your understanding through Strategic

Page 39

1  Vision was half of the money that comes in
2  through this research agreement would be paid
3  either to you or one of your LLCs?
4      A.   Half of the profits, yes.
5      Q.   Profits, okay.  So not just revenue.
6  Let's just say if the agreement was a million
7  dollars, you wouldn't get 500,000.  You would get
8  some smaller sum based on either overhead or
9  other costs?
10     A.   That's correct.
11     Q.   How did you plan on accounting for
12 that?
13     A.   Pardon.  There were also expenses paid
14 to one of my LLCs for the purpose of rerouting
15 this through a few channels to avoid detection by
16 the Chinese.
17     Q.   Which LLC was that?
18     A.   That was one that French and I both set
19 up called Georgetown Research LLC.
20     Q.   How much money was sent to Georgetown
21 Research LLC?
22     A.   I have the statements.  I'm guessing
23 $300,000, I'm guessing, but I can provide the
24 statements.
25     Q.   With respect to this agreement to split

Page 40

1  the profits, did you have a written agreement or
2  an oral agreement?
3      A.   Verbal agreement.
4      Q.   So there's no written agreement between
5  you and Ms. Wallop concerning how you or your
6  LLCs would be paid for your services in
7  connection with this research agreement?
8      A.   That's correct.
9      Q.   Other than the $300,000 payment, was
10 there any other payments from Strategic Vision to
11 you or one of your LLCs in connection with this
12 research agreement?
13     A.   Yeah.  I can provide those, the
14 documentation to that effect.
15 (*r)     MR. GRENDI:  Joe, I'm going to ask for
16     the production of Strategic Vision's records
17     with respect to these payments.
18         MR. SCHMIDT:  Okay.  I assume you're
19     going to follow up with a letter or
20     something detailing this, right?
21         MR. GRENDI:  Once we get the
22     transcript, we can do that.
23         MR. SCHMIDT:  Okay.  Because we
24     obviously owe you a letter from the last
25     deposition too.

Page 41

1          MR. GRENDI:  I understand.
2      Q.   You said you have records concerning
3  these transactions?
4      A.   The bank statements, yes.
5      Q.   Just ballpark, all in, do you know
6  about how much money was transferred from
7  Strategic Vision to you or your LLCs in
8  connection with this research agreement?
9      A.   I would say about that $300,000 figure
10 that I was referring to before was probably it,
11 but I would have to check, because the LLCs were
12 also used as a pass-through, by design.
13     Q.   Just in connection with this research
14 agreement, how many different LLCs were used?
15     A.   My own that I control?
16     Q.   Yes.
17     A.   Three.
18     Q.   What are those three?
19     A.   That would be Oceanic Advisors, Liberty
20 Tree Partners, although I don't recall if there
21 was a payment made to Liberty Tree, but that
22 would have been one, and then Georgetown Research
23 which was our joint LLC.
24     Q.   So why were these funds transferred to
25 your LLCs?

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 42

1    A.    So that we could make payments to start
2  team 1 and to cover all related expenses in
3  starting up this project.
4    Q.    So these payments were not for, as you
5  described it earlier, splitting the profits?
6    A.    That was part of the start-up.  We did
7  not deplete the funds.  There were funds left
8  over, but there were all kinds of costs involved
9  to start this up.  So anything involved in
10  starting up this project, we did through this
11  means.
12    Q.    I understand.  Correct me if I'm wrong.
13  The payments that were made to your three LLCs
14  were made in connection with you or your LLCs
15  retaining team 1?
16    A.    Yes.  To building and retaining team 1
17  and all of its equipment and all associated
18  expenses.
19    Q.    Did there come a time when you received
20  payment for splitting the profits?
21    A.    Yes.  I took some of the funds at that
22  same time to pay for my own expenses and my own
23  work, but it was not a splitting of the profits.
24    Q.    Right.  What I'm asking about is not
25  these payments that you just described.  What I'm

Page 43

1  asking about is was there ever another time when
2  you received money from Strategic Vision for
3  splitting the profits from this research
4  agreement?
5    A.    Yeah, during the first month of work.
6    Q.    How much was that payment for?
7    A.    I don't remember.  I have the records.
8    Q.    But you did -- you do recall receiving
9  a payment from Strategic Vision for splitting the
10  profits?
11    A.    To one of the LLCs.
12    Q.    Is that a "yes," though?
13    A.    "Splitting the profits" is the wrong
14  term.  It was for the first months of our own
15  compensation.  One of the issues was we wanted to
16  be paid one month in advance.  Guo objected.  We
17  still had to pay ourselves for that month's work.
18  I'm speaking for myself.  I'm not speaking for
19  Ms. Wallop or Strategic Vision.
20    Q.    I understand.  I just want to make the
21  record clear.  Did there ever come a time when
22  the profits from this research agreement were
23  split between you and Strategic Vision?
24    A.    Yes, but there are still funds left
25  that were not spent.  I don't have access to the

Page 44

1  Strategic Vision account, so I wouldn't know.  I
2  imagine there were some residual things, so the
3  profits were not fully -- to the extent there
4  were profits, they were not fully split.
5         We were cheated out of the first
6  month's work and the second month's work, and
7  then his failure to give 30-days' notice because
8  we were left in limbo.  So as far as we're
9  concerned, there were no profits because Miles
10  Kwok, or Guo cheated us out of our earnings.
11    Q.    So you don't expect to get any money
12  from French Wallop for any profit in connection
13  with this engagement?
14    A.    There's no profit if we were cheated.
15    Q.    I would appreciate it if you would just
16  answer the question directly.  Was there no
17  profit from this engagement for you or Strategic
18  Vision?
19    A.    You have to define "profit."  What were
20  our opportunity costs?  What were our losses from
21  doing work and preparing work for which
22  we were not compensated, or for not taking on
23  other jobs because we were working on Guo's work
24  for which he did not compensate us?  So it's an
25  academic question on what constitutes profit.

Page 45

1    Q.    Let me ask you this.  Do you expect
2  Strategic Vision to send you any payment in the
3  future in connection with, quote-unquote "profit"
4  from this engagement?
5    A.    If Guo pays what he owes yes, I do.  He
6  owes us $2 million in failure to pay and failure
7  to give notice that he was terminating the
8  contract in 30 days.  If and when he pays that,
9  yes, I expect to receive my share of the profit.
10  That's how we operate.
11    Q.    Let's just say the only money that
12  Strategic Vision has is the million dollars.  Is
13  there any profit to split?
14    A.    Not anymore, not with this legal case.
15    Q.    Did you and Strategic Vision ever
16  detail how profit would be defined, in terms of
17  splitting the profits from this engagement?
18    A.    In terms of dividing up the revenues
19  from this engagement, it would be a 50/50 split
20  after expenses.
21    Q.    Expenses, okay.  What expenses would
22  those be?
23    A.    The research teams, any travel, any
24  legal, any contractors, any equipment, any
25  leases, any security measures, anything related

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 46

1   to running the business.
2       Q.    And I guess legal fees --
3       A.    To executing this contract.
4       Q.    I would guess legal fees are apparently
5   a part of that?
6       A.    It's a part of running a business.
7       Q.    I'm asking about what you and --
8       A.    Legal fees are part of running a
9   business, yeah.  They happen to be, yeah.
10          MR. GRENDI:  Let's do number 2.
11          (Waller Exhibit 2, Research Agreement
12      December 29, 2017, marked for
13      identification.)
14      Q.    Mr. Waller, do you recognize this
15  document?
16      A.    Yes.
17      Q.    What is it?
18      A.    This is the research agreement that I
19  was referring to before dated December 29th.
20  It's the signed and initialed agreement between
21  French Wallop and Yvette Wang, who was working as
22  the agent of Miles Kwok, dated January 6, 2018.
23      Q.    So this is different from the draft
24  agreement I had showed you earlier, Exhibit 1?
25      A.    It's not the exact same agreement.

Page 47

1       Q.    So there was subsequent negotiation of
2   this agreement after the first draft that we've
3   showed you was drafted?
4       A.    This draft, this January 1st draft,
5   Exhibit Waller 1 is dated after the signed
6   agreement, Waller Exhibit 2, so I don't know what
7   you mean by "first draft."
8       Q.    But you don't know if Exhibit 1 was
9   drafted before or after the signed agreement?
10      A.    I don't know.  It would appear here you
11  fill in the blanks, and there are several blank
12  areas.  I have not read the text to compare the
13  text, but obviously the December 29th agreement
14  looks more complete than the one that's dated
15  January 1st.
16      Q.    Were you physically present when
17  Exhibit 2 was signed?
18      A.    No.
19      Q.    Were you telephonically involved or
20  telephonically present when this Exhibit 2 was
21  signed?
22      A.    No.  I was not present in any way,
23  shape or form, human or electronic.
24      Q.    Good to know.
25          Just looking at the agreement, the

Page 48

1   research subjects are referred to as "Fish."  Do
2   you see that on -- call it Eastern 7?  It's the
3   third page.
4       A.    Yes.
5       Q.    Where does that term "fish" come from?
6       A.    That was Guo's term.  It's admittedly a
7   very weird term to put in a contract.
8       Q.    You kind of anticipated my follow-up
9   question.  Have you ever done a contract that
10  referred to research subject as "fish"?
11      A.    No.
12      Q.    So this is the first one that you
13  ever --
14      A.    For fish?
15      Q.    Yes.
16      A.    Yes.  I mean, I wasn't going to deliver
17  him flounder as a deliverable, no.
18      Q.    Right.  And the contract refers to
19  "fish in the tank per year."  Do you see that?
20      A.    Yes.
21      Q.    What does the "tank" mean in that
22  context?
23      A.    This was a metaphor that Guo had in our
24  discussions with him about the number of people
25  to be researched at any given time and in the

Page 49

1   three categories outlined in the contract.  So if
2   you had ten individuals and three categories,
3   there would be 30 -- a set of 30.  But on
4   occasion, it would be impossible to research
5   certain of them, so you might only research eight
6   or he might want 12.
7           There would still be the same number of
8   deliverables, though, so it wouldn't be all three
9   items on all of them.  It might be only one or
10  two on some or there might be more people.  So
11  you have a, in his words, a water level in the
12  tank that is constant.
13      Q.    Would that also perhaps be referred to
14  as a "waterline"?  Have you ever heard that term
15  "waterline"?
16      A.    I don't know the difference.
17      Q.    So you and Ms. Wallop had never heard
18  of this kind of jargon in connection with the
19  investigatory research project?
20      A.    Never.  It was very strange.
21      Q.    Did you guys ever talk about how
22  strange you thought that was?
23      A.    Wouldn't you?  Yes.
24      Q.    What was the nature of that
25  conversation between you and Ms. Wallop about

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 50

1 these terms being strange?
2    A.    Any normal person would have a -- you
3 can imagine, if that was his way to quantify the
4 agreement and we put it down, then that was okay.
5 He was the client.  We all understood each other.
6 If you had a, let's say a body of ten names times
7 three issues per -- so that's 30 deliverables --
8 and you couldn't find information on five of
9 them, you go to the next five, but you're really
10 researching 15 people but not on every single
11 category.  So you would have 15 people for, say,
12 an average of two categories per for a total of
13 15, and that's what the fish would be.  Or the
14 subject would be the fish times three.
15    Q.    Let me ask you this, then.  What term
16 would you normally use in a research agreement
17 like this to describe what is referred to here as
18 the "fish" or the "tank" or the "waterline"?
19    A.    I would say "subject" or "individual"
20 or "target," something more...
21    Q.    And in other agreements you used those
22 terms, not fish?
23    A.    Never, no, no.  In my mind I thought it
24 was sort of just a Chinese way of illustrating
25 something and it was a cultural difference, and

Page 51

1 we went along, okay, if you want to call it
2 "fish," we'll call it "fish."
3    Q.    So you or Ms. Wallop didn't object to
4 this terminology?
5    A.    No.  If that's the way he understood
6 it, then that was fine with us.
7    Q.    In your view, is Strategic Vision very
8 experienced in providing the research
9 contemplated by this agreement?
10    A.    I don't know what Strategic Vision has
11 done in the past on this, but in terms of French
12 Wallop being able to deliver on her contacts in
13 the political and policy and diplomatic and
14 intelligence communities, absolutely, yes.  In
15 terms of my capabilities to be brought on as a
16 contractor with Strategic Vision for the
17 remainder of the deliverables, absolutely, yes.
18    Q.    Did you convey that confidence in
19 providing this sort of research to Mr. Guo or
20 Lianchao or Yvette Wang prior to the execution of
21 this agreement?
22    A.    Yes, we explained it explicitly.  In
23 fact, we were so detailed in explaining it, Guo
24 said, "I don't want to know it.  I don't want to
25 know it.  Just go do it."  He got impatient about

Page 52

1 it.  We tried to explain all the methodology to
2 him, and he didn't want to know the methodology.
3 He just wanted the product.
4        MR. GRENDI:  Do you need a break?
5        MR. SCHMIDT:  No.
6    Q.    You said before you've worked on two
7 similar projects with Strategic Vision?
8    A.    Not similar to this, but similar in
9 terms of opposition research or messaging.
10    Q.    So let's drill down on that.  Have you
11 ever performed investigatory research for
12 Strategic Vision that entailed what's described
13 in the research agreement as financial, forensic,
14 historical research?
15    A.    Not for Strategic Vision.  That's why
16 she brought me on board, to perform that type of
17 work.
18    Q.    What about for current tracking
19 research?  The same answer or different?
20    A.    Current tracking, no.  I had not done
21 that.  That's what we got the team members to do.
22    Q.    What about social media research?
23    A.    Yes.
24    Q.    Let's just talk about -- going to
25 Eastern 5 -- the financial, forensic historical

Page 53

1 research.  I'm sorry, the document is Eastern 5
2 on the bottom right corner there.  It's page 1.
3        When I'm referring to either "Eastern"
4 or "Strategic Vision" X number, I'm talking about
5 the Bates number that's in the right-hand corner
6 there, just so you can follow along.
7    A.    Okay.
8    Q.    Do you see financial, forensic
9 historical research there?
10    A.    Yes.
11    Q.    This description of it, was that
12 drafted in conjunction with a conversation you
13 had with plaintiff here?
14    A.    I would say conversations plural and
15 with Lianchao who was acting as his agent.
16    Q.    Who is Lianchao Han?
17    A.    Lianchao Han was a former Chinese
18 foreign ministry official who was a political
19 prisoner in China.  He spent four years doing
20 slave labor in the Gulag there, breaking rocks.
21        He became involved in the democracy
22 movement.  He was a Tiananmen Square student
23 protest organizer.  I first met him about 30
24 years ago.  I did not keep contact with him, but
25 we traveled in the same universe of people, so we

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 54

```
1   had a familiarity with each other and each
2   other's work.
3          He was working with Guo.  Guo was
4   trying to hire him.  He was not, to my knowledge,
5   paid by Guo and did not want to be, but he was
6   acting as Guo's agent to set up this arrangement
7   and to serve as Guo's interpreter.
8      Q.   Does Mr. Guo speak English well?
9      A.   He speaks it well but not fluent.  You
10  can have a conversation with him and he can read
11  it fine, but he cannot -- he would need
12  assistance of an interpreter.
13     Q.   So you've spoken to Mr. Guo in English
14  before?
15     A.   Yes.
16     Q.   But did you have any kind of difficulty
17  understanding what he was saying or struggle with
18  his English?
19     A.   Yeah, he would struggle with his
20  English, and that's why Lianchao or Yvette would
21  be present during the meetings.
22     Q.   So Lianchao and Yvette were
23  interpreters for Mr. Guo, as you understood it?
24     A.   In addition to serving as his agents to
25  work with us.
```

Page 55

```
1      Q.   Just going back to the financial,
2   forensic historical research, has Strategic
3   Vision provided that service in the past?
4      A.   I can't speak for Strategic Vision.
5      Q.   What about for you personally?
6      A.   Yes, as part of another -- as part of
7   other teams.
8      Q.   I just want to talk about the reports
9   referenced on the next page concerning financial,
10  forensic historical research.
11         Do you see the first full paragraph on
12  Eastern 6, "Contractor will produce a progress
13  report"?
14     A.   Yes.
15     Q.   What did you understand a progress
16  report would include or entail?
17     A.   The progress reports were to be on
18  roughly a weekly basis to let him know the
19  progress of how the project was going underway.
20  Initially, the progress reports were simply this
21  is the progress.  We're setting up the team.  We
22  got the funds moved.  We've recruited the right
23  people.  They're in place and so forth.
24         And then the -- so those were the
25  progress reports, and then the, quote, reports to
```

Page 56

```
1   be defined was never intended as a finished
2   analytical essay or bound type of report that one
3   would be accustomed to in a legal or business or
4   an academic environment.  It was simply raw data
5   passed on a USB thumb drive, a flash drive from
6   team 1 through me straight to Guo or his agent.
7          He did not want an analytical product
8   in terms of the short-term reports.
9      Q.   Does this research agreement define
10  what a progress report will have in it?
11         MR. SCHMIDT:  Objection.
12     A.   I mean, it says what it says, a
13  progress report.  I want to know the status.  How
14  are things?  Well, great.  Everybody's recruited.
15  They're in place.  They've begun working.  It
16  takes X number of days to do this, which we told
17  him in advance.  We told him something specific
18  would take six days to do.
19         By day 2, Guo was getting impatient.
20  So we were giving him the reports to let him know
21  how the team was coming together.  And then once
22  the team started digging up information -- it's
23  an extremely time-consuming task.  He knew that,
24  so we gave him the information on the sticks
25  right after he asked for it.
```

Page 57

```
1      Q.   Right.  I just want to understand.  Do
2   you recall a specific discussion with Mr. Guo or
3   Lianchao or Yvette regarding what would be in a
4   progress report prior to the execution of this
5   research agreement?
6      A.   Yeah, the progress report is simply
7   what's the status of the project.
8      Q.   That's not exactly what I asked.
9      A.   It would be a verbal -- it would be a
10  verbal status report and anything on a stick that
11  the researchers came up with in its raw form, not
12  in an analyzed synthesized form.
13     Q.   I think you're missing my question a
14  little bit, so let me just ask it again.
15         Do you recall telling Mr. Guo or
16  Yvette Wang or Mr. Lianchao what you understood
17  would be in a progress report?
18     A.   Yes.
19     Q.   When was that?
20     A.   That was in -- that was before the
21  contract in December, and it was after the
22  contract was signed.
23     Q.   Let's talk about before.  When was it
24  that you -- well, who did you tell about what a
25  progress report would entail before the contract
```

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 58

1   was signed?
2       A.    For the first part of it, for the setup
3   part of it, it was merely to tell him the status
4   of putting the team together.  It's a very
5   complicated task to do.  And because of his own
6   security requirements, which was that everything
7   be delivered on a USB port physically -- a USB
8   drive physically and not done online -- nothing
9   would be done over the internet -- that meant
10  physically traveling to a European country to
11  pick up the drive and then returning to New York
12  to deliver it to Guo or one of his agents.
13      Q.    Mr. Waller, I'm not trying to be
14  difficult here.  I'm trying to understand when
15  you were told -- or when you told, I'm sorry.
16  You said before you told either Mr. Guo or
17  Lianchao or Ms. Yvette Wang about what a weekly
18  progress report included.
19      A.    Right.
20      Q.    And I'm asking you, when did you do
21  that and who did you tell?
22      A.    It would have been in December at some
23  point prior to the contract.
24      Q.    Okay.
25      A.    But it was a casual, it was a casual

Page 59

1   thing.  We're going to give you a progress
2   report.  He was concerned that he was going to
3   get ripped off, so he wanted proof that he wasn't
4   getting ripped off.  So he wanted to know the
5   status of everything as we were putting
6   everything together.  That's fair enough.
7           So if he were to say -- or he did say
8   and through Lianchao and then through Yvette, --
9   although there was a difference between the
10  two -- what's the status of things.  So we would
11  tell him verbally the status of the situation.
12  Then that would get into the second type of
13  report, preliminary report which was on that USB
14  drive.
15      Q.    What did you describe would be in a
16  progress report to Mr. Guo or Lianchao or
17  Ms. Yvette prior to the execution of this
18  agreement?
19      A.    The status of the project as of that
20  day.
21      Q.    That's all?
22      A.    Yeah, very simple.
23      Q.    So you didn't describe it in any kind
24  of detail as to the progress report will have
25  these metrics?

Page 60

1       A.    Oh, no, it was never spelled out.
2       Q.    What about --
3       A.    Now, for a progress report versus
4   reports.  Those are two different things.
5       Q.    I understand.  I was going to ask you
6   next about what the financial, forensic research
7   preliminary report was.
8       A.    The preliminary report was the status
9   of how the research is going, how we set it up,
10  where we're digging, how we're digging, what we
11  were able to find, and what we were able to not
12  find.
13          One of the issues we anticipated -- and
14  it's addressed here in the contract two or three
15  times -- is there will be times where it's
16  impossible to find information or extremely
17  difficult or time-consuming.  It will take weeks
18  or months to find certain information, and this
19  was understood.
20          So we would report back to him.  In the
21  initial stage, we just started up this operation.
22  We don't have the -- there was never an
23  expectation that there would be all the
24  information in hand right away.  He developed
25  that expectation afterward when he was making

Page 61

1   demands.
2       Q.    Let me just hop in.
3           MR. SCHMIDT:  Are you finished?  Just
4       let him finish his answer and then you can
5       follow up.
6           Do you have anything further?
7       A.    Yes, he kept deviating in what he
8   wanted.  He never made it clear to us precisely
9   what he wanted.  He's an erratic personality
10  anyway, so we learned to expect that.
11      Q.    Mr. Waller, I just want you to answer
12  the question I'm asking you.
13      A.    Yes.
14      Q.    I just asked you before what would be
15  in a preliminary report.  That's what I'm trying
16  to get at here.
17      A.    Versus a progress report?
18      Q.    Yes.
19      A.    A preliminary report is simply what did
20  the research team dig up, the raw data that they
21  dug up on the USB port.  That is the, quote,
22  report.  No analytical product, no printed
23  product.  He didn't want paper.
24          A lot of the material was in Mandarin.
25  We did not have a team for that.  That was

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 62

1  stipulated also in the contract.  We ended up
2  needing one.  So it was just the raw data
3  regardless of how much or how little, as we were
4  building it up.
5      Q.    Before the contract was signed, do you
6  recall ever explaining what would be in a
7  preliminary report to Mr. Guo or Lianchao or
8  Yvette Wang?
9      A.    Yes.
10     Q.    When was that?
11     A.    Sometime in December.
12     Q.    And this was you personally?
13     A.    Yeah, yes, yes, because I was
14  supervising team 1.
15     Q.    Was there any disagreement about what a
16  preliminary report should be constituted by
17  between you and Mr. Guo or Waller -- sorry,
18  Mr. Guo, Lianchao or Yvette?
19     A.    Not prior to the contract.
20     Q.    So you didn't have a discussion about
21  what would be in a preliminary report?
22     A.    Yes.  Send what you have.  Send what
23  you come up with.
24     Q.    That was after the execution of the
25  agreement, right?

Page 63

1      A.    No, that was before.  The preliminary
2  report is send us what you found.  For better or
3  for worse, send it.  If it's a little or a lot,
4  send it.
5      Q.    So you and Eastern discussed that?
6      A.    Not Eastern.  With Guo.  I discussed it
7  directly with Guo and/or through Lianchao or
8  Yvette.
9      Q.    I just want to be clear.  You're saying
10  that was before the execution agreement?
11     A.    Yes.
12     Q.    Do you recall where that representation
13  or discussion occurred?
14     A.    That would have been with him directly
15  at his residence, with either -- French Wallop
16  was present whenever I was, and it would have
17  either been with Lianchao and/or Yvette.
18  Sometimes both were in the room.  Sometimes Kwok
19  dismissed Yvette because he didn't trust her.  So
20  on sensitive matters, he kept her out of a lot of
21  these things because he said he didn't trust her.
22     Q.    Mr. Waller, I'm just going to ask
23  again.  Please just answer the question.  You're
24  offering a lot of other information.  I know
25  you're trying to be helpful.

Page 64

1      A.    I am.
2      Q.    I appreciate that.
3      A.    You're trying to pin me down on
4  something I've already answered five times, which
5  is that the report is simply the data that we
6  got, for better or for worse, delivered on a USB
7  drive.  That's it; no more, no less.
8      Q.    What about the comprehensive historical
9  research report within three months?
10     A.    That would be all of the information
11  collected up to that period and collated.
12     Q.    And again, I want to ask about whether
13  you had a discussion about what would be in a
14  comprehensive historical research report prior to
15  the execution of this agreement.
16           Do you recall having that discussion?
17     A.    Yes, that was just delivering him the
18  raw data, but collated.  Let's say, for example,
19  we dig up a lot of information on various of the
20  individuals, but it's not collated.  We simply
21  collate it.  So in our first deliverable to him,
22  we had the electronic files for each of the 15
23  targets, or fish, so we were going to build out
24  from that.
25     Q.    So in your mind, I think you're talking

Page 65

1  about the January 30, 2018 delivery that you made
2  to Yvette Wang at Tracks Bar in New York City?
3      A.    Yes.
4      Q.    And you're saying that data --
5      A.    Repeat that because that would have
6  been the second deliverable.
7      Q.    You're saying that that was a -- what
8  kind of report was that?
9      A.    That was a USB drive with about 60 or
10  80,000 lines of code, of which about 16 lines of
11  code were useful.  I notified them in advance.  I
12  said to them, "No sense in going to Europe just
13  for that because only 16 lines are useful.  Let
14  us work those 16 lines."  They said, "No, we want
15  to have it anyway."  So I went over to Europe,
16  picked it up and brought it back.
17     Q.    In your mind, though, what kind of
18  report was that USB flash drive that you gave to
19  Yvette Wang on or about January 30, 2018?
20     A.    That was a report that we're referring
21  to right here.
22     Q.    Which one?  Is it a progress report?  A
23  preliminary report?  A comprehensive report?  A
24  research report?
25     A.    That would have been a preliminary

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 66

1  report. That would have been one of the weekly
2  reports.
3      Q.   Have you ever provided reports of this
4  nature to other clients in this format of
5  progress report, preliminary report,
6  comprehensive historical research report?
7      A.   Progress reports, of course, yes.
8  Preliminary reports, of course, but in a
9  different way. It was not just raw data. It was
10 more defined. Then the comprehensive historical
11 research report, analogous reports to this type
12 of wording, yes. You can even say comprehensive
13 historical research report, yeah, that would be
14 fine.
15     Q.   So in your mind, is this kind of like a
16 standard industry practice in terms of providing
17 investigatory research?
18     A.   Yes. Now, where it's tailored to the
19 client, you're going to deviate from the
20 standard, like using the word "fish."
21     Q.   What about the current tracking
22 research? You see a little bit lower down there,
23 there's a discussion of producing monthly
24 reports?
25     A.   Yes.

Page 67

1      Q.   Except the first month where there will
2  be weekly reports?
3      A.   Right.
4      Q.   What was your understanding of what the
5  weekly reports would entail?
6      A.   First it would be a status report until
7  we were able to make the deep dives into the
8  research.
9      Q.   What about the monthly reports?
10     A.   That would basically be a compilation
11 of the weekly reports and then anything that was
12 integratable in its raw form, we would submit.
13     Q.   In terms of completing -- let's just
14 start with a weekly report. How would that be
15 completed? In other words, who does the work to
16 put together that report?
17     A.   Team 1. Team 1 did the work because it
18 was simply raw data. There was no analytical
19 product.
20     Q.   What was your role in connection with
21 any weekly reports? What would you do?
22     A.   I was the one you would -- I was the
23 liaison with team 1. I delivered Guo's
24 instructions to team 1. I would get any
25 information back from them, and then I would

Page 68

1  physically go to Europe to pick up the drive and
2  then deliver it back to Guo or his agents.
3      Q.   Would you do any analytical work or
4  analysis of the report itself, or did you just,
5  as you described, just kind of pass it along?
6      A.   I simply acted as a pass-through for
7  delivering that. We had envisioned doing -- in
8  terms of analytical work, if there was to be
9  paper as opposed to electronic information, I
10 would be collecting that and making sense of
11 that, but none of the computer work.
12     Q.   What about the preliminary reports?
13 Would you provide any analysis or use any of your
14 kind of experience in this field to create or
15 edit or do anything with those reports?
16     A.   We had talked about doing that. Guo
17 specifically instructed us not to.
18     Q.   So again, you didn't edit or provide
19 any insight in terms of the data that you were
20 getting from team 1. You just, again, passed it
21 along?
22     A.   Yes. He didn't want it. He just
23 wanted it passed straight to him. Now --
24     Q.   Go ahead.
25     A.   Let me put a caveat on that.

Page 69

1      Q.   Sure.
2      A.   When we found a dead end or we found an
3  issue like bad names, names that were either not
4  real or spelled wrong or seemed to be the same
5  name among one or more different people, or two
6  or more different people, whether it's two people
7  with the same name or one person using two
8  persona, or if we found that some of the
9  information he gave us was false or inaccurate,
10 that's when I would get involved and deliver that
11 to him, as well as whatever information.
12         For example, he gave us copies of
13 passports of certain of the targets that he
14 wanted, and so we checked and found that some of
15 the passports were false. So that was an
16 analytical piece of work that I did or had other
17 team members do apart from this. I delivered
18 that separately, so that's apart from the raw
19 data. We were trying to be as comprehensive as
20 we could for him.
21     Q.   So in other words, in terms of applying
22 your experience and background in this field,
23 that's where you would kind of participate in
24 focusing or refocusing one of these reports?
25     A.   Right. Or if the team had said, we

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 70

1   found a lot of -- we were able to get information
2   on one of the individuals in Kwok's list -- there
3   were, if I recall correctly, about 92 names -- he
4   wanted the top 15 to research.
5           But he did say some of the people
6   further down in this chain might be of
7   importance.  If you find anything, let me know.
8   So we found, yeah, there's one guy, Frank Suen,
9   S-u-e-n, who was a particular -- became a
10  particular object of interest.  So I delivered
11  that news to Kwok, and said, "This is the kind of
12  information they got on him.  How do you want to
13  dig on him?  What else would you like to find?"
14          That was all verbal.  I delivered it.
15  So when you refer to "reports" in quotes, it was
16  verbal.  But in person, either to Kwok directly
17  or to one of his two agents.
18      Q.   So in terms of -- the reports didn't
19  have to be written?
20      A.   Correct.
21      Q.   What about your role in the
22  comprehensive historical research report?  What
23  would you do for one of those reports?  What
24  would you do?
25      A.   First of all, the contract didn't last

Page 71

1   three months for that to be produced.  The way in
2   working with any client is that things will adapt
3   and you find new problems or solutions or needs
4   or discoveries or whatever, opportunities, and
5   you think, how would you like this done.
6           So for the comprehensive historical
7   research report, it would be a summary of the raw
8   stuff that we got based on what the researchers
9   told us, but not a summary of the raw computer
10  data itself because Guo didn't want that
11  analyzed.  Meaning we were able to track targets
12  1, 2, 7, 8, 9 well, and we got this level of work
13  here.  Or we have some leads here, but it's going
14  to take longer than we expected.  Some of these
15  people are impossible to find.  Or this person
16  appears to be a false person.  So that would be a
17  comprehensive report.
18          For the point of doing the actual
19  research for the short-term, we would bring that
20  up if there was trouble right away, which we did.
21  But for a comprehensive one when we're getting a
22  bigger picture of the type of research we're
23  doing and the universe of people being
24  researched, we're finding oh, we might be going
25  after a false target here.  Let's go down after

Page 72

1   this one, or the team went and did on its own.
2           Because it would take at least five
3   days or a week traveling, stopping what they're
4   doing, traveling to a common point in Europe,
5   coming back here, delivering, and then consulting
6   with Guo and his agents, and then going back to
7   deliver the information to team 1.  That takes at
8   least a week just to deliver a message, round
9   trip.
10          So that would be immediate-term
11  reporting, say, weekly or monthly-type, quote,
12  reporting.  The comprehensive one is now we got a
13  big picture of it.  This is what we found.
14      Q.   So you would be, let's say,
15  synthesizing the research for one of these
16  comprehensive reports?
17      A.   Yeah, synthesizing what the team had
18  concluded or told me, but not synthesizing the
19  raw data that the teams came up with, yes.
20      Q.   Got it.  In terms of your relationship
21  with Strategic Vision, who was going to do
22  that -- let's call it -- report synthesis, or
23  that work?
24      A.   Generally me.  But what French Wallop
25  would do was she had her own contacts elsewhere

Page 73

1   throughout the U.S. government and other
2   governments.  So what we did for
3   comprehensiveness of the research and to
4   double-check to make sure that we were on the
5   right path or not, we would consult with members
6   of -- or people associated with intelligence
7   services of the U.S. and other countries.
8       Q.   I see.  So it was kind of two --
9       A.   She can speak more to that.  She had
10  most of those contacts.
11      Q.   It sounds to me like it's two methods
12  of acquiring information?
13      A.   More than two.
14      Q.   Well, let's call it two categories.
15  There is the -- I'll call it Mr. Waller category
16  doing the work that you just described, and then
17  Ms. Wallop would do her category of research
18  using her network of people in politics or
19  government to get information.  Is that fair to
20  say or do I have it wrong?
21      A.   In a law firm, you get defense
22  attorneys and litigators, so you have different
23  people with different skills, but they're in the
24  same general field.
25      Q.   Right.  They're collaborating, but they

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 74

1  kind of do different things?
2      A.    Right.
3      Q.    Got it.
4            MR. GRENDI:  Why don't we take a brief
5  break and come back in five minutes.
6            THE VIDEOGRAPHER:  Off the record at
7  11:28.
8            (Whereupon, a short recess was taken.)
9            THE VIDEOGRAPHER:  Back on the record
10  at 11:37.
11     Q.    Mr. Waller, just to remind you you're
12  still under oath here.
13     A.    Yes.
14     Q.    Have you ever met anyone who works for
15  Strategic Vision, other than Ms. Wallop?
16     A.    No.
17     Q.    Going back to this contract, Waller 2.
18  Can you turn to Eastern 5, which is the first
19  page.  Do you see where it says, "Any and all
20  materials provided by the client to the
21  contractor will be treated with absolute
22  confidentiality and will not be shared by the
23  contractor with any other entity"?
24     A.    Yes.
25     Q.    Do you recall drafting this provision

Page 75

1  into the agreement, or how it got in there?
2      A.    No.
3      Q.    Does Strategic Vision share the
4  information from the client with other entities?
5      A.    Only those who are part of the
6  contract, to execute the contract.
7      Q.    But there were entities other than
8  Eastern Profit and Strategic Vision that receive
9  the materials from the client, which is --
10     A.    The research orders, yes.
11     Q.    So those were other entities.  They're
12  not part of Strategic Vision?
13     A.    They're part of the Strategic Vision
14  team, so they would be included.
15     Q.    They're not actually the same entity as
16  Strategic Vision, legally speaking, right?
17           MR. SCHMIDT:  Objection.
18     Q.    If you know?
19     A.    They're part of the same team.
20     Q.    So in your mind, "team" is what the
21  contractor is defined by in this agreement?
22     A.    Yes.
23     Q.    So it says "Strategic Vision" up top
24  here as the contractor, correct?
25     A.    Yes.  I cannot speak for the signed

Page 76

1  nature of this contract because I am not, I am
2  not part of Strategic Vision.
3      Q.    Right.
4      A.    But having been part of putting the
5  arrangement together, there's a team that's the
6  entity.
7      Q.    So you understood that Strategic Vision
8  U.S. LLC also entailed whoever it is that they
9  subcontracted work to?
10           MR. SCHMIDT:  Objection.
11     A.    Not even Mrs. Wallop knows the
12  identities of many of the people on the team.
13  Not even I know some of them.  That's how tight
14  we kept it.  Guo gave us the research material
15  that, in order to execute the contract, we had to
16  provide to the people doing the research.
17     Q.    But you don't know who those people
18  are, the people doing the research?
19     A.    Not all of them.
20     Q.    Some of them?
21     A.    Some of them, yes.
22     Q.    And who were the people doing the
23  research that you know of?
24     A.    I cannot provide the identities of
25  team 1 for reasons that we explained before.

Page 77

1  Team 2, we --
2      Q.    Hold on.  I just want to maintain that
3  we don't think that that's -- this is a lawyer
4  part -- a legitimate objection.  But in light of
5  the procedural posture of our motion to compel
6  request, I'll allow it.
7            I'm sorry, continue with your answer.
8      A.    Team 2 was a company in Addison, Texas
9  called ASOG.  I believe it is American Special
10  Operations Group, or words to that effect, based
11  in Addison, Texas.  That was team 2.
12     Q.    Sitting here today, you refuse to tell
13  me who's on team 1?
14     A.    I decline to tell you.
15           MR. SCHMIDT:  Objection.  Just be
16  clear, with respect to team 1, do you
17  actually know the members or do you just
18  know the intermediary?
19     A.    I only know the team leader.
20           MR. SCHMIDT:  That's all what I wanted
21  to clarify for the record in case we do a
22  motion to compel later.
23     Q.    You know the leader of who team 1 is?
24     A.    Yes.
25     Q.    But sitting here today, you refuse to

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 78

1  tell me that?
2      A.    Yes.
3      Q.    Why is it that you can't tell me who
4  the leader of team 1 is?
5      A.    Because the leader of team 1 lives in a
6  very high-risk area where there are a lot of very
7  bad actors who can cause physical harm, including
8  the worst kinds of violence you can imagine.
9      Q.    Did you promise the leader of team 1
10  not to disclose his identity?
11     A.    Yes.
12     Q.    Is that a promise that was made in
13  writing or orally?  How was it made?
14     A.    We do everything by handshake as much
15  as we can.  So that was literally a handshake
16  agreement.
17     Q.    That was an agreement between you and
18  the leader of team 1?
19     A.    Yes.
20     Q.    Does Strategic Vision know the name of
21  the leader of team 1?
22           MR. SCHMIDT:  Objection.
23     A.    You would have to ask Strategic Vision.
24     Q.    So you never talked to --
25     A.    I can't pretend to speak for Strategic

Page 79

1  Vision.  I'm not going to be put in that box.
2      Q.    I understand.  What I'm asking you,
3  though, is did you and Ms. Wallop ever talk about
4  who the leader of team 1 was?
5           MR. SCHMIDT:  You can answer whether
6      you had the conversation.
7      A.    Yes.
8      Q.    So she knows the name of the leader of
9  team 1?
10     A.    Yes.
11     Q.    Okay.  Let's go to Eastern 7.  It's the
12  third page of Waller 2.  In the criteria section,
13  do you see where it says, "The contractor
14  guarantees that all information provided is
15  genuine"?
16     A.    Yes.
17     Q.    What does that mean?
18     A.    It means that we're not going to make
19  up fake information in order to try to impress or
20  satisfy the client.  That everything we find is
21  legitimately -- legitimate facts that were
22  legitimately researched.
23     Q.    How do you know if the research is
24  genuine if you're not the one doing it?
25           MR. SCHMIDT:  Objection.

Page 80

1      A.    It's all based on trusting the team.
2      Q.    So you know that team 1 only provides
3  genuine information?
4      A.    They provide -- I know from the team 1
5  leader that all the information they dug up was
6  legitimate information that they did not
7  manufacture or fabricate.  It was just raw data.
8  As to the accuracy of the information they found,
9  that's different.
10          What we mean here by "genuine" is that
11  we did not create false or misleading
12  information.  In fact, we found that we had
13  informed the client of some false information
14  that we discovered.
15     Q.    Just going back to your answer there.
16  So you have a discussion or dialogue with the
17  leader of team 1 about the genuineness or quality
18  of the information that team 1 has found?
19     A.    Yes.
20     Q.    How was that conversation conducted?
21  Was it in person?
22     A.    Yes.
23     Q.    Ever over the phone?
24     A.    Never.
25     Q.    What about via secure text message

Page 81

1  service like Signal?
2      A.    We don't believe in secure text
3  messages, so the answer is no.
4      Q.    Fair enough.
5           So in your mind, Signal is not a secure
6  means of communication?
7      A.    I have no way of knowing, but we don't,
8  we don't -- we have our own methods of
9  communicating, but anything in detail is only
10  done in person.
11     Q.    Do you think a Signal message is more
12  secure than other forms of electronic
13  communication like just email?
14          MR. SCHMIDT:  Objection.
15     A.    Yes, absolutely.
16     Q.    Because you never emailed with Mr. Guo
17  or Lianchao or Yvette Wang concerning this
18  matter, have you?
19     A.    No, it was only by end-to-end
20  encryption that doesn't reside on a server.
21     Q.    Signal does that, is that right?  That
22  application?
23     A.    Yeah.
24     Q.    How do you know the deliverables are
25  provided with the best practice and standards of

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 82

1  the industry?
2      A.    I know.
3      Q.    The contractor is saying that it will
4  provide the deliverables based on the best
5  practices and standards in the industry, right?
6      A.    That's right, yes.
7      Q.    How would Strategic Vision know that?
8      A.    The first best standard is the security
9  part.  We exceed those best standards.  The
10 second part is the actual computer research,
11 which we know from the methods that they're
12 using, which are state-of-the-art methods.
13     Q.    Without divulging who you were working
14 for or when it was, have you ever done the actual
15 research that team 1 was dispatched to do in this
16 case?
17     A.    Not using the same methods.
18     Q.    Similar methods?
19     A.    It takes a certain skill set that I
20 don't have, but I have been present and
21 supervising in person when it was done in other
22 cases.
23     Q.    What skill set is that?
24     A.    Deep dive research.
25     Q.    Go ahead.

Page 83

1      A.    Just like in a law firm where you have
2  the attorney and you have a paralegal.  It
3  doesn't mean the paralegal is incompetent.  It's
4  just the person is not an attorney.  Or you have
5  the partner who might not have passed the bar but
6  owns the firm and can run the firm or manage the
7  firm, right.
8            So you have people with different skill
9  sets, but they all know each other and they all
10 work together, or they all at least trust each
11 other.  And so you have certain of them delegate
12 the work to others to do.
13     Q.    How long have you known the leader of
14 team 1?
15     A.    For about four or five years.
16     Q.    And you've done other work with that
17 individual concerning investigatory research?
18     A.    Yes.
19     Q.    Did you run into any issues with the
20 quality of that work?
21     A.    Never.
22     Q.    Have you ever known the members of any
23 of the teams that are led by the leader of
24 team 1?
25     A.    The individuals that he was

Page 84

1  supervising?
2      Q.    In any event, including in this
3  engagement.  I know you don't know, right?
4      A.    Right.
5      Q.    What about in other engagements?
6            MR. SCHMIDT:  Objection.  That's kind
7      of impossible to answer.
8      A.    On some things you can never know
9  everybody on the team.  It's not possible, if
10 something is outsourced or whatever.  Yeah, there
11 have been other times where I have -- this whole
12 profession involves an unusually high degree of
13 trust that no -- it has to be personal trust, and
14 you learn that by trial and error over a number
15 of years.
16           So you then learn to trust people who
17 do the work for you and produce that work.
18 Sometimes I have been part of the actual teams,
19 but for the sake of protecting the client's
20 identity and the existence of the work, we had
21 worked through cutouts, and that's been similar
22 with other projects.
23     Q.    Let's go to translation issue on
24 Eastern 6.  Starting on the bottom of the page,
25 it says, "When the contractor encounters

Page 85

1  information requiring translation, the contractor
2  will provide electronic copies of the material to
3  the client for the client to evaluate and
4  translate."  Do you see that?
5      A.    Yes.
6      Q.    How would that work?  I take it that
7  you don't speak Mandarin?
8      A.    No.
9      Q.    Does Ms. Wallop speak Mandarin?
10     A.    She understands some.
11     Q.    Can she read it?
12     A.    I don't know.
13     Q.    How did this agreement contemplate the
14 use of translators?
15     A.    We had said from the beginning that
16 we're going to need to have linguists doing the
17 original research.
18     Q.    The members of team 1?
19     A.    Yes.  And Guo said he didn't want that.
20 He would take care of all of the translations.
21 We then raised the issue well, these people are
22 going to dig up raw material in a language they
23 don't speak.
24     Q.    Right.
25     A.    How are they going to evaluate what

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 86

1  they have?  He says, "Just dig up the information
2  and send it to me and let me evaluate it."  So we
3  ended up saying we really need to have people who
4  get the language.  This was, I believe, through
5  Lianchao, who agreed.  So we retained two fluent,
6  say, diplomatic-quality Mandarin language
7  linguists who were not Chinese nationals to be
8  part of that team.
9      Q.    What was the concern about them being
10  Chinese nationals?
11      A.    In case they were agents of the
12  Communist party.  And Guo was pleased with that.
13      Q.    So who were the two individuals that
14  you retained to do this translation work?
15      A.    They were part of team 1.  I don't know
16  their identities.
17      Q.    So team 1 did have Mandarin-speaking
18  and Mandarin-reading members?
19      A.    Yes.  We added them on when we realized
20  we were going to need them.  And I believe
21  Lianchao said, "Yeah, go ahead and get them, as
22  long as they're not Chinese nationals, or don't
23  live in China."
24      Q.    So were you involved in the vetting
25  process for those individuals, or no?

Page 87

1      A.    No.
2      Q.    So did you understand that you weren't
3  really going to be able to read a lot of the data
4  that was part of this research?
5      A.    That was explicit.  A lot of it is just
6  code.
7          MR. GRENDI:  Do we have an issue?
8          THE VIDEOGRAPHER:  Move the mic up.
9          MR. GRENDI:  That's fine.  Just let us
10  know.
11          THE WITNESS:  How is it now?  Is this
12  good?
13          THE VIDEOGRAPHER:  It's just when your
14  hands are there.  I want you to be
15  comfortable.
16          THE WITNESS:  I'm in the hot seat.
17      Q.    Why was it that only USB drives would
18  be used for deliverables?
19      A.    Guo specified that.  He was insistent
20  on it.
21      Q.    Was there any pushback or discussion of
22  using USB drives for transmitting information?
23      A.    No, it made sense.  He didn't want
24  anything distributed electronically or on paper.
25      Q.    Did he explain why?

Page 88

1      A.    Yeah, the Chinese could intercept it.
2      Q.    Paper?
3      A.    No, paper is just too cumbersome.  And
4  you've got the digital forensics within the USB
5  drive so he could gauge what was in there.  But
6  you don't want printouts of computer code.  You
7  want to be able to exploit that code.  You can't
8  do that on paper.
9      Q.    So some of the raw data just in terms
10  of feasibility and practicality had to be
11  electronic?
12      A.    Yes.
13      Q.    In terms of transmitting it?
14      A.    Yes, and in delivering it to him.  He
15  simply specified no paper and nothing
16  electronically transmitted, so that was fair.
17  That was fine.
18      Q.    I want to talk about this irregular
19  circumstances clause.  Do you see that on page
20  Eastern 7?
21      A.    Yes.
22      Q.    Was this concept of irregular
23  circumstances discussed prior to the execution of
24  the agreement?
25      A.    Yes.

Page 89

1      Q.    Who came up with that clause or
2  insisted upon it?
3      A.    I drafted this section of it.
4      Q.    You personally?
5      A.    Yes.
6      Q.    What were you trying to convey when you
7  drafted this section?
8      A.    That there is no even flow of data.
9  That we're going to face challenges as in any
10  research project.  Like any legal case, you can't
11  state your case on the first month.  You have to
12  build the case over a period of time.  And
13  sometimes you're going to run into dead ends.
14  Sometimes you find false information.  Sometimes
15  you'll be spoofed by the other side.
16          There are risks of detection, the
17  countermeasures the other side takes.  There are
18  legal issues.  There are logistical issues given
19  the cumbersome physical nature of delivery of the
20  information by USB drive.  So we're just putting
21  this here that we both understand that it's not
22  all going to be a smooth delivery.
23      Q.    So does irregular circumstance in your
24  mind encompass items, only items that are out of
25  the control of the contractor or researching

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 90

1  party?
2          MR. SCHMIDT:  Objection.
3      Q.    Let me ask that again.  That's fair
4  enough.
5          If Strategic Vision makes a mistake or
6  fails to do its job for any reason, would that be
7  part of irregular circumstances?
8      A.    What do you mean by "failed to do its
9  job"?
10     Q.    Let me try it this way.
11     A.    If you get in an accident on the way to
12 work, are you failing to go to work?
13         MR. SCHMIDT:  Let him rephrase it.  You
14     said you don't understand it.  That's all
15     you have to do.
16     Q.    That's fine.
17         Does irregular circumstances only
18 include, let's just say, outside problems that
19 Strategic Vision would encounter?
20         MR. SCHMIDT:  Objection.  But go ahead
21     to the extent you can.
22     A.    Would you define "outside problem"?
23     Q.    Let's talk about -- you described it
24 earlier, third parties blocking the research or
25 there being dead ends.  Is that the full scope of

Page 91

1  irregular circumstances that you described
2  earlier?
3      A.    No, but it's indicative of an irregular
4  circumstance.
5      Q.    If irregular circumstances occur, does
6  the client still have to pay as though it's
7  getting full research?
8      A.    Yes.  It's right there in the contract.
9      Q.    Where does it say that under irregular
10 circumstances, the client still has to pay the
11 full price?
12     A.    It's right there in the price.  For
13 $750,000 a month, we're going to be doing the
14 following work, understanding that there will be
15 irregular circumstances that may prevent certain
16 of the work from being done at that point in
17 time.  This type of work is impossible to predict
18 when you're going after people who hide their
19 assets, who hide their activity, who operate
20 under false names, who have -- who use rigorous
21 security methods.  Or if there's a legal problem
22 and we discover hey, it's illegal to do this
23 thing that you want us to do, then that's going
24 to be a delay.  We have to figure out the right
25 way to do it.

Page 92

1      Q.    What if irregular circumstances just
2  totally prevented Strategic Vision from providing
3  any research reports?  Would the client still
4  have to pay?
5      A.    That's a hypothetical.  There's a
6  30-day clause to end the contract.
7      Q.    It's a hypothetical, and I'm asking you
8  to please answer the question.
9          What if irregular circumstances just
10 completely prevented Strategic Vision from
11 delivering any work?
12     A.    We go to the client and say it's not
13 possible to do.
14     Q.    And so they wouldn't -- the contract
15 would be over at that point?
16     A.    We would say, hopefully, we can't do it
17 this way.  Do you want to change the parameters?
18 Remember, there were 4,000 names he had, he
19 wanted.  So we can't do it on these 15.  Let's
20 try another group of 15 or it can't be done.
21         And we had suggested on one way to do
22 something, and he didn't want do it that way even
23 though it made sense to do it that way.  So you
24 try to find a way to get the job done, but if
25 ultimately you can't get the job done, then that

Page 93

1  becomes apparent after a lot of back-and-forth
2  with the client, just like any job.
3      Q.    Right, but just to be clear, if
4  irregular circumstances prevent the contractor
5  from delivering any reports, then does the client
6  have to pay anything?
7      A.    If you don't do the work, why should
8  the client pay if you don't do the work, right?
9      Q.    Right.
10     A.    But if you do do the work, then the
11 client pays, but there are going to be irregular
12 circumstances where the product is not going to
13 be what you want at a certain time, so we have to
14 get around that.  Or in the case of starting up,
15 it was explicitly understood from the start that
16 you're not going to get huge amounts of data
17 immediately.  You've gotta get the team to
18 understand the data first, and you gotta build
19 the channels for the data.
20     Q.    So long as Strategic Vision tries to
21 get the data, if irregular circumstances prevent
22 them from delivering any reports, that's good
23 enough.  They should still get paid?
24     A.    Well, no.  Let me give you an example.
25 There was around February -- between January 26th

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 94

1   and February 1st when the client was upset at the
2   way -- things weren't moving fast enough for him.
3   We were directed -- Yvette directed us in writing
4   to find another way of doing it.
5          So she was saying proceed with your
6   work. Just find another way to do it. That's
7   when we brought in team 2.
8       Q.   Okay.
9       A.   So that was an irregular circumstance.
10  Really it wasn't a delay on our part because we
11  were consistent with any research standard. We
12  were doing it as rapidly as humanly and
13  mathematically possible. It's just the client
14  objected because he thought it was a long delay.
15         If you recall in this, we prorated
16  things so that the first two weeks were not at
17  his expense. He agreed. So we had only been in
18  the contract effectively ten days, and he's
19  already objecting that we're not producing
20  monthly reports and everything else.
21      Q.   We'll get to that.
22          MR. SCHMIDT: Let him finish.
23      Q.   Go ahead.
24      A.   Because in order to satisfy him and
25  what he wanted, we offered to go ahead with a

Page 95

1   different team using different methodologies in
2   parallel with team 1, and that's when Yvette
3   instructed us on or about February 1st in a
4   Signal text to go ahead and use the -- start up
5   the other method.
6          So we were still doing the work, and we
7   were still finding a way to give him the
8   deliverables even though going with team 2 was
9   beyond what we had promised. So we were doing
10  extra work for him at this time.
11      Q.   In this contract is Strategic Vision
12  compensated on a per-report basis?
13          MR. SCHMIDT: Objection. Go ahead.
14      A.   It's a flat rate basis. It says "Up to
15  15." It doesn't say 15. It says "Up to 15."
16      Q.   Where are you looking, just so I know?
17      A.   The top of page 8. "The first month,
18  January, of this contract will include up to 15
19  fish for a total of 30 reports and will decrease
20  to ten fish, etc.," for February, for March and
21  for the duration of the contract. So this was
22  explicit. It's not all going to be complete on
23  the first month. Even digging into certain of
24  the names, we're just not going to have it in the
25  first month.

Page 96

1          And when we find that the -- as our
2   team 1 discovered and as Lianchao Han confirmed,
3   at least two and as possibly as many as four of
4   the 15 were not real people.
5       Q.   You're talking about the fish?
6       A.   Yes.
7       Q.   But the contract does say that the
8   comprehensive historical reports are 300,000 per
9   report?
10          MR. SCHMIDT: Objection.
11          MR. GRENDI: It says it on that page,
12  Eastern 8.
13      A.   Per year.
14      Q.   Yeah. And the tracking reports are --
15      A.   Look before that, please. "The flat
16  price structure is as follows." So whether it's
17  a small report or a large report, it's a flat
18  rate structure. And that is an annual number,
19  not a weekly or monthly number.
20      Q.   So in your mind, the report -- strike
21  that.
22          In your mind, the reports are not
23  broken down on a per-report basis cost?
24      A.   Correct.
25      Q.   So there's no charge in this agreement

Page 97

1   for what a weekly report is?
2       A.   That's the whole problem or the whole
3   issue with calling them "fish" and "keeping
4   things up at a water tank level." That was his
5   metaphor for explaining what he wanted at a
6   certain level. We went ahead with that as long
7   as you keep it up at that metaphorical waterline.
8   The actual details of the report are going to
9   vary. That's explicit in here in this contract.
10          We refer to the paragraph right above
11  flat price structure. We refer to each of these
12  as "We will measure each of the 30 reports as,
13  quote, 'report equivalents' in the event that it
14  is necessary to stop work prematurely on one fish
15  and replace it with a second fish. We will then
16  have the partial report on the terminated fish,"
17  etc.
18          So it's explicitly understood in this
19  contract that you're gonna be stop and go and
20  things are going to be incomplete, and then you
21  go on to the next one, but we'll still have that
22  same universe of individuals to be collecting
23  data on.
24      Q.   Just without identifying what you said
25  or who you said it to, did you consult a lawyer

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 98

1   in connection with drafting this agreement?
2       A.    The question answers itself.  No.
3       Q.    Why does it answer itself?
4       A.    It's not legalistic at all.  It's our
5   own wording.  It's more of like an MOU between
6   parties that was executed as a contract.  This is
7   the way we all understand this was going to work.
8   But it was signed as a contract.
9       Q.    What does "MOU" stand for?
10      A.    Memorandum of understanding or
11  statement of work, or whatever other word you
12  want to use.
13      Q.    Just going to Eastern 9, the last page
14  of this document.  Do you see where it says, "It
15  is understood that the client may direct other
16  entities to pay the contractor and that such
17  payments" --
18            (Court reporter interruption.)
19      Q.    -- "will be deemed satisfactory
20  compensation by the contractor."
21            Do you see that?
22      A.    Yes.
23      Q.    Why is this clause in the agreement?
24      A.    To be set up to conceal from the
25  Chinese authorities that Guo was funding this

Page 99

1   research.  So it was explicit that nothing from
2   any of his Hong Kong accounts straight to his
3   Strategic Vision account, but rather through a
4   circuitous route of various places in various
5   countries and various cutouts to conceal these
6   transfers from the Chinese intelligence service.
7       Q.    So it was understood that the client
8   would not directly pay the contractor because of
9   these security concerns?
10      A.    Right.  Well, the client would -- if
11  you think of it as a collaborative versus a legal
12  means, the client authorizes the payment to be
13  paid, or it instructs that the payment be paid,
14  and then it's done through a circuitous route.
15  So we understand that the funds have come on
16  Guo's instruction.  And then we let him know that
17  the funds have been received.  There were no
18  funds that were sent to Strategic Vision after
19  the execution of this contract.
20      Q.    Let me ask you this.  Do you know why
21  Eastern Profit is the client?
22      A.    No, we don't know why it's the client.
23      Q.    Well, how did it get into the contract?
24      A.    How did what get in?
25      Q.    Eastern Profit.

Page 100

1       A.    We never heard of Eastern Profit until
2   the day Yvette said it's gonna be Eastern Profit.
3       Q.    So that was January 6th?
4       A.    No, that was late December.
5       Q.    What did you say in response to Yvette
6   telling you that Eastern Profit was going to be
7   the counterparty to this research agreement?
8       A.    I was not there for the signing.
9       Q.    But this was not the signing?
10      A.    I had not heard of Eastern Profit.
11  There were several days in late December when it
12  was just Yvette and Ms. Wallop talking.
13      Q.    I see.  So you talked to Ms. Wallop
14  about how Eastern Profit got on the agreement?
15      A.    Yes.
16      Q.    But you don't know why yourself?
17      A.    No.  I would presume it's for the
18  reasons stated in the subsequent payments
19  portion, but I don't know that.  Because Eastern
20  Profit never paid us anything, and we never
21  received any money from any Guo entity after
22  execution of the contract.
23      Q.    It says here that "All client payments
24  must be received by the contractor by wire
25  transfer within five business days of invoice."

Page 101

1       A.    Right.
2       Q.    Do you know if Strategic Vision ever
3   sent any invoices to Eastern Profit?
4       A.    It was a verbal invoice.  There were
5   not to be written invoices.
6       Q.    Have you done verbal invoicing before?
7       A.    Yes.
8       Q.    It's a new one for me.  Can you just
9   describe how that works?
10      A.    If you want to keep something
11  untraceable, you don't leave a paper trail.  If
12  you don't leave a paper trail, you don't submit
13  invoices for those purposes, especially if the
14  purpose is to protect the client's identity from
15  one of the most notorious spy agencies in the
16  world who is out to get your client.  So you just
17  say, "Okay, it's the end of the pay date," and
18  then they will send the next one.
19            You're kind of smirking at that.
20      Q.    No, it's a new thing for me.
21      A.    It's normal in our area of work.
22      Q.    That's fine.
23      A.    As long as we comply with the IRS and
24  report our income, then that's fine.  We've done
25  work in other ways to protect our clients and

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 102

1  it's not in writing.
2      Q.    Sure.  Do you know if a verbal invoice
3  was issued in this case?
4      A.    Yes.
5      Q.    When was that?
6      A.    On or about February 16th.
7      Q.    That would have been the first?
8      A.    15th or 16th.  Yes.  It was supposed to
9  be on or about January 31st, but we had agreed on
10 the 26th.  I had offered, with Ms. Wallop's
11 concurrence, to write off the first two weeks of
12 work to satisfy Guo, because he was so agitated.
13 We wanted to keep the contract with him.  So we
14 would not have invoiced until -- we normally
15 would have on January 31st, but we did not until
16 roughly February 15th.
17         And that was to Lianchao Han because by
18 that time, Yvette had instructed us not to
19 communicate with her anymore, or that Guo had
20 said not to communicate with her anymore.
21     Q.    Was it you or Ms. Wallop who, I guess,
22 called Lianchao to verbally invoice?
23     A.    We would only speak in person.
24     Q.    So were you there when the verbal
25 invoice was issued?

Page 103

1      A.    Yeah.  It was more like -- verbal
2  invoice, in quotes, is, "Hey, Lianchao, it's time
3  to pay the first month's 750,000."
4      Q.    Now, did he say anything in response to
5  that?
6      A.    He said "Guo's really upset right now.
7  Let me work with him on it."  But there was never
8  any indication of termination.
9      Q.    Were any other verbal invoices issued?
10     A.    Well, no, because a week later we got
11 served.
12     Q.    So the answer is no?
13     A.    No, because a week later we got served.
14     Q.    You're saying if you hadn't been
15 served, you would have issued the invoice for the
16 next month?
17     A.    We would have still been working with
18 Lianchao had we been paid.  This is to have been
19 paid within five days; that would have been
20 February 20th.  We would have stopped work by
21 then because we did not get paid.  But we did not
22 stop work because Lianchao said he was trying to
23 work it out.
24     Q.    I see.
25     A.    He's speaking as the agent of Guo, so

Page 104

1  we were talking to Guo as far as we were
2  concerned.
3      Q.    Do you know if Lianchao works for
4  Eastern Profit?
5      A.    No.
6      Q.    Do you know one way or another whether
7  he does or does not or you just don't know?
8      A.    He told me Guo has offered to pay him
9  many times, and he was only doing it as a
10 volunteer because he had larger interests in
11 promoting the Chinese democracy movement.
12     Q.    Because of his own political feelings
13 and history?
14     A.    Yeah.  He said Guo was very mercurial,
15 doesn't keep his word and rips off his law firms
16 and clients and customers and fellow investors,
17 and so we should be -- we should be sure to have
18 our money in hand before we continue to work.
19     Q.    When did he tell you that?
20     A.    In December and in January and in
21 February.
22     Q.    Was that an in-person meeting?
23     A.    In person.  And the public record shows
24 that Guo rips off a lot of people.
25     Q.    That is your perception of it?

Page 105

1      A.    No, that's the news reports of it.
2      Q.    How did that come up?  Did Lianchao
3  raise that issue or did you ask him about that?
4      A.    I don't remember.
5         MR. GRENDI:  Why don't we go off the
6  record.
7         THE VIDEOGRAPHER:  Off the record at
8  12:14.
9         (Whereupon, a short recess was taken.)
10        THE VIDEOGRAPHER:  Back on the record
11 at 12:20.
12        MR. GRENDI:  This is Waller 3.
13        (Waller Exhibit 3, Handwritten document
14 Bates stamped Eastern 11, marked for
15 identification.)
16     Q.    Mr. Waller, do you recognize this
17 document?
18     A.    No.
19     Q.    You've never seen it before?
20     A.    No.
21     Q.    Do you recognize the handwriting on the
22 document?
23     A.    It appears to be French Wallop's
24 handwriting.
25     Q.    Do you know her handwriting pretty good

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 106

1  or well?
2      A.    Enough to tell that it appears to be
3  hers.
4      Q.    Do you recognize any of these names?
5      A.    They're mostly Arabic names.
6      Q.    Do you know if any of the individuals
7  on this list of names are clients of
8  Strategic Vision?
9      A.    No, I don't know.
10     Q.    So you've never provided services for
11 any of the individuals listed on this document?
12          MR. SCHMIDT:  Him being personally?
13          MR. GRENDI:  Yes.
14     A.    No.
15     Q.    Okay.  Did you ever talk to Mr. Guo or
16 Lianchao or Yvette Wang about people who are
17 clients of Strategic Vision?
18     A.    Present clients or past clients or
19 prospective clients?
20     Q.    Either.
21     A.    No.  Okay.  Repeat the question, then.
22     Q.    Sure.  Did you ever talk to Mr. Guo,
23 Lianchao or Yvette Wang about people who are
24 clients of Strategic Vision?
25     A.    No.

Page 107

1      Q.    You never told any of those three
2  people, We've done work for X, Y or Z?
3      A.    Yeah, that's why I asked what you mean
4  by "clients," whether it's present, past, or
5  prospective.
6      Q.    Let's go with present or past.
7      A.    No, I wouldn't know Strategic Vision's
8  previous clients.
9      Q.    But you did provide work for -- you
10 described before two clients of Strategic Vision?
11     A.    Yes, but none of them are on this list.
12     Q.    Right, but let me ask you this.  Did
13 you ever tell Mr. Guo, Yvette Wang or Lianchao
14 that you provided work for those two --
15     A.    Yes.
16     Q.    -- entities.  You did.
17          And did you describe the names of those
18 entities to --
19     A.    At least one of them.  I don't recall
20 the exact.
21     Q.    Which name is that?
22     A.    Mikhail Khodorkovsky.
23     Q.    Why don't we help the court reporter
24 out with that one?
25     A.    M-i-k-h-a-i-l.  Forgive me if this is

Page 108

1  not an entirely accurate spelling for the next
2  one.  I believe it's K-o-d-o-r-k-h-o-v-s-k-y.  It
3  might be K-h in the beginning, but I think it's
4  K.  It's K, yeah.
5      Q.    It's for the ease of my own butchering
6  of the Russian language, who is that individual?
7  I'll call him Mr. K?
8      A.    He is a Russian dissident.  He's exiled
9  in London.
10     Q.    You and Strategic Vision have provided
11 investigatory services for that individual?
12     A.    Messaging services.
13     Q.    Message services?
14     A.    Yes.
15     Q.    But not investigation research?
16     A.    I didn't.  I don't know if Strategic
17 Vision did.
18     Q.    Okay.  You said before there was
19 another client that was described to Lianchao,
20 Mr. Guo or Yvette Wang.
21          Do you recall that?
22     A.    I'm not sure.
23     Q.    Without divulging the name of that
24 client, what kind of client was it?
25     A.    I don't know if it was a client in fact

Page 109

1  or just somebody that Strategic Vision had worked
2  with before, so I don't know.  I'm not going to
3  state as a fact that it was a client, so I don't
4  know.
5      Q.    So that was before the contract was
6  signed, those discussions?
7      A.    I don't recall.
8      Q.    Did you ever tell Mr. Guo or Lianchao
9  that you were helping Russian opposition groups?
10     A.    Yes.
11     Q.    When was that?
12     A.    When was I helping them?
13     Q.    No.  When did you tell them that you
14 were helping Russian opposition groups?
15     A.    Certainly before the contract and maybe
16 after the contract.
17     Q.    What did you tell them about that kind
18 of work that you were doing for Russian
19 opposition groups?
20     A.    Starting in -- it was -- how much
21 detail do you want?
22     Q.    You don't have to go crazy.  Just
23 generally.
24     A.    Starting in the late 1980s working with
25 anti-Soviet internal movements to help Ukraine,

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 110

```
1   Latvia, Lithuania, and Estonia secede from the
2   USSR.  And then with Russian internal opposition
3   groups opposed to the Russian -- the Soviet
4   Communist Party.  So they were tied --
5        MR. SCHMIDT:  Slow down.
6        A.    Tied to Boris Yeltsin from, like,
7   roughly '87, '88 up to '93, '94.
8        Q.    What about more recent work with
9   opposition groups and Putin regime?
10       A.    With Mikhail Khodorkovsky, who is one
11  of the lead opposition people against Putin.
12       Q.    So you told Mr. Guo about the services
13  that you provided to Mikhail Khodorkovsky?
14       A.    Not so much the services as opposed to
15  ideas, because one of our ideas was to unite
16  Chinese internal opposition with Russian
17  opposition and help bring -- this was on the
18  messaging part of the ideas, the brainstorming
19  with Guo.  We brainstormed a lot in December and
20  had wide-ranging discussions.  So in this case,
21  it was to work with Russian internal opposition
22  groups to bring things in and out of China over
23  the land border between Russia and China.
24       Q.    Did you tell them that you had
25  connections with the Abu Dhabi princess?
```

Page 111

```
1        A.    I didn't.
2        Q.    Did Ms. Wallop?
3        A.    Probably.
4        Q.    What about connections in Saudi Arabia?
5   Did you tout that as one of the resources that
6   you had?
7        A.    She has Saudi connections.
8        Q.    What about connections in Qatar,
9   Turkey, Iran?  Is that all Ms. Wallop?
10       A.    She has those connections.
11       Q.    So your connections are with the
12  Russian opposition groups?
13       A.    She has connections with them also and
14  with Khodorkovsky.
15       Q.    So you both provide services to these
16  Russian opposition groups?
17       A.    Yes.
18       Q.    Did you ever tell Mr. Guo that you had
19  20 or so projects going at a given time, research
20  projects?
21       A.    At the same time?
22       Q.    Yes.
23       A.    No.
24       Q.    Did Ms. Wallop while you were there
25  tell --
```

Page 112

```
1        A.    Not while I was there.
2        Q.    Did you ever tout connections to the
3   White House prior to the execution of the
4   contract?
5        A.    What do you mean by "tout"?
6        Q.    Like -- I won't say advertise, but just
7   explain in terms of the quality of your services
8   or Strategic Vision's services that you're
9   connected to the White House?
10       A.    Not so much in the services itself.
11  It's that I know people in the White House.
12       Q.    And you told Mr. Guo?
13       A.    Yes.
14       Q.    Did you tell them that you worked for
15  the Trump presidential campaign?
16       A.    No, I did not.  I did not work for the
17  campaign, and I didn't tell them I did.
18       Q.    Did Ms. Wallop?
19       A.    Not that I know of.  I would say I
20  don't know.
21       Q.    That's fine.
22             Did you tell Mr. Guo, Ms. Wang or
23  Lianchao that you worked with the CIA and
24  continue to work with the CIA in the Middle East?
25       A.    No.  I had helped the CIA in the past,
```

Page 113

```
1   but I never said I still work with them.
2        Q.    Do you still work with them?
3        A.    No.
4             MR. GRENDI:  Let's go to Waller 4.
5             (Waller Exhibit 4, Document Bates
6        stamped, marked for identification.)
7        Q.    Do you recognize this document?
8             I gave you the one with my marks on it.
9   Would you mind switching that?
10       A.    Sure.  I should take a look at your
11  marks.
12       Q.    That's okay.  There's nothing that good
13  there.
14       A.    It looks like my LinkedIn page, but I
15  don't see an indication that it's on LinkedIn.
16       Q.    Is this your background information?
17       A.    It appears to be.
18       Q.    Do you remember giving this information
19  to Mr. Guo?
20       A.    No.
21       Q.    Or Lianchao?
22       A.    Maybe Lianchao.
23       Q.    That would have been before this
24  contract was signed?
25       A.    Yes.
```

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 114

1    Q.    What does Georgetown Research do?
2    A.    It's an LLC that I set up with
3  French Wallop in the fall of 2017 to do joint
4  work, and then it became a vehicle for executing
5  this contract.
6    Q.    So Georgetown Research does
7  investigatory work?
8    A.    Yes.
9    Q.    That's in Washington, D.C., right?
10   A.    Yes.
11   Q.    Do you have an office or is that based
12 out of your home?
13   A.    No, it's just an LLC.
14   Q.    So there's no --
15   A.    No staff, no office, no physical
16 address.
17   Q.    And it's just you?
18   A.    Yes.  Pardon, it's French Wallop and me
19 for this LLC.
20        MR. SCHMIDT:  For Georgetown.
21   A.    For Georgetown Research.
22   Q.    So you're both members of that LLC?
23   A.    Yes.
24   Q.    Got it.  Just in your bio it says that
25 you did special projects at Blackwater from 2007

Page 115

1  to 2009?
2    A.    Yes.
3    Q.    Is that company now known as -- I think
4  it's Academi?
5    A.    Academi.  A-c-a-d-e-m-i.  I don't know
6  if it's still by that name or not, but it became
7  that name.
8    Q.    Is this the Blackwater that used to be
9  run by a fellow named Erik Prince?
10        THE WITNESS:  Is this relevant?
11   A.    Yes.
12   Q.    You worked at Blackwater with
13 Erik Prince?
14   A.    Yes.
15   Q.    Did you mention that experience with
16 Blackwater prior to the execution of the contract
17 to Mr. Guo?
18   A.    I don't know.  I don't remember.
19   Q.    Just below that it says "Vice President
20 and American Foreign Policy Council"?
21   A.    Yeah.
22   Q.    Is this the work you were previously
23 describing concerning working with Russian
24 opposition groups?
25   A.    Yes.  It's part of it, yes.

Page 116

1    Q.    But you don't do that work anymore
2  through the American Foreign Policy Council?
3    A.    No.
4    Q.    I guess you're not with that outfit
5  anymore?
6    A.    Correct.
7        MR. GRENDI:  Let's do 5.
8        (Waller Exhibit 5, Signal text message
9        thread, marked for identification.)
10   Q.    Mr. Waller, do you recognize this
11 Signal thread?
12   A.    Let me take a look.  Yes.
13   Q.    Who is this correspondence between?
14   A.    Between Lianchao Han and myself.
15   Q.    I know you mentioned before, but how
16 long do you know Lianchao Han?
17   A.    I first met him in the '80s, but I've
18 then lost contact with him.  I've known him for
19 over 30 years but haven't worked with him closely
20 until this project.
21   Q.    How did you get in touch with him in
22 connection with this project?
23   A.    Through French Wallop.
24   Q.    So French Wallop reintroduced you to
25 Lianchao Han?

Page 117

1    A.    As I, as I understand it from her,
2  Bill Gertz was working with Lianchao Han and Guo,
3  and then Guo said he wanted to do this project
4  that we're discussing now.  Bill Gertz
5  contacted -- Bill Gertz is an intelligence and
6  defense reporter, and I've known him for 35
7  years.  So he talked to French about doing it.
8  She suggested bringing me in, and then through
9  that, I met Lianchao, re-met Lianchao.
10   Q.    So you weren't part of the -- let's
11 call it -- initial introduction of Bill Gertz and
12 Lianchao Han and Mr. Guo?
13   A.    No.
14   Q.    Does Lianchao Han have a relationship
15 with Strategic Vision?  Let's call it a financial
16 relationship.
17   A.    No, not that I know of.
18   Q.    Does he have a financial relationship
19 with you or any of your LLCs?
20   A.    No.
21   Q.    So he doesn't get any referral fees for
22 bringing work to you --
23   A.    No.
24   Q.    -- or Strategic Vision?
25   A.    No.

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 118

1    Q.    And I'll just be super clear, and
2  excuse the lawyer for being a little redundant.
3          Did Lianchao Han receive any
4  compensation for bringing Eastern Profit or
5  Mr. Guo to Strategic Vision?
6    A.    No.
7    Q.    I'll ask the same question for you or
8  your LLCs.  Did you ever pay Lianchao Han for
9  introducing you to Mr. Guo or Eastern Profit?
10   A.    No.
11   Q.    Let's turn to -- this is SVUS62, the
12 second page there.  Between the two text bubbles,
13 there's a lighter one and a darker one.  Which
14 one is you and which one is Lianchao Han?
15   A.    I'm the darker one.
16   Q.    And Lianchao Han is the lighter one?
17   A.    Yes.
18   Q.    Looking at this page, who is the friend
19 you could provide the menu for on December 18th?
20   A.    Guo.
21   Q.    That's Mr. Guo?
22   A.    Yes.
23   Q.    I'm turning to the next page.  This is
24 your message about Trump giving an excellent
25 speech today?

Page 119

1    A.    Yes.
2    Q.    And the response is "Yes, SB talked
3  about it here."  Do you see that?
4    A.    Yes.
5    Q.    Who is SB?
6    A.    I would presume it's Steve Bannon.
7    Q.    In the next message, Lianchao Han asks
8  you about "our friend from Tokyo."
9          Do you see that?
10   A.    Yes.
11   Q.    Who's your friend from Tokyo?
12   A.    He's not referring to my friend.  He's
13 referring to "our" as a generic "our."  It was a
14 Chinese individual from Tokyo whose name, whose
15 real name I never knew.
16   Q.    So not Mr. Guo?
17   A.    No.
18   Q.    This is some other individual?
19   A.    Some other person.
20   Q.    So does Lianchao Han introduce you to
21 other potential clients for the services that you
22 provide?
23   A.    No.
24   Q.    So he didn't ever introduce you to this
25 other Chinese individual?

Page 120

1    A.    He did.  Yeah, he did introduce me to
2  him.
3    Q.    But you didn't end up doing business
4  with him?
5    A.    No.
6    Q.    Turning to 64.  Do you see where it
7  says "New York friend wants to do it but asks for
8  more insurance"?
9    A.    Yes.
10   Q.    Who did you understand the New York
11 friend to be there?
12   A.    Guo.
13   Q.    What do you think Mr. Han meant by
14 "more insurance"?
15   A.    I think he meant assurance.  Assurances
16 that the job could be done.
17   Q.    I see.  So it's kind of just a phonetic
18 mistake in terms of the text message?
19   A.    Or whatever, yeah.
20   Q.    On the next page, do you see where you
21 wrote, "I don't think the New York guy is
22 serious"?
23   A.    Yes.
24   Q.    What did you mean by that?
25   A.    Guo kept waffling on what he wanted,

Page 121

1  and he was saying things that seemed conflicted.
2    Q.    What do you mean by that?
3    A.    He was waffling back and forth on
4  price, on scope, on what he wanted.  He wanted to
5  buy two Rockefeller properties, plus a $25
6  million house in Washington, D.C., and a building
7  across the street from the U.S. Treasury
8  Department with a line of view sight to the
9  White House, and set up all this research at the
10 same time.  It looked like he didn't seem serious
11 to me because he -- he seemed like he was a big
12 thinker, but it wasn't going to be.
13   Q.    So you didn't think that he was really
14 going to follow through with doing any of the
15 work that you guys were discussing at the time?
16   A.    I was apprehensive that he was going to
17 do any work with us.  Oh, and because the prices
18 that he was expecting to pay were nowhere near
19 what things were really going to cost.  That's
20 the next line.
21   Q.    Let me get there myself, if you don't
22 mind.  Lianchao Han's response was, "He wants do
23 it but wants to do it as cheap as possible."
24         Do you see that?
25   A.    Right.

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 122

1    Q.    What do you recall about him wanting to
2  do it for as cheap as possible?
3    A.    Well, you can't blame a businessman for
4  wanting to do something as cheap as possible.
5    Q.    Do you remember prices being discussed?
6    A.    Yeah, prices were discussed, and for
7  the scope that he wanted, it was just simply not
8  possible to do.
9    Q.    What did he propose?
10    A.    I don't recall precisely what it was.
11    Q.    But it was certainly less than whatever
12  ended up being in the contract?
13    A.    Right.
14    Q.    You wrote, "He will fail if he does it
15  on the cheap."  Do you see that?
16    A.    Yes.
17    Q.    Why did you think it would fail if it
18  was done on the cheap?
19    A.    You don't get the top-quality industry
20  standard people.
21    Q.    So in other words, you didn't think
22  that you would be able to hire a team that would
23  be of the sufficient quality to do the research
24  that was being asked for?
25    A.    No, not with the level of

Page 123

1  professionalism and security experience,
2  certainly not.
3    Q.    You don't have any recollection as to
4  what price he had wanted at that time, or asked
5  for at that time?
6    A.    If I remember correctly, he didn't say
7  the price he wanted.  He wanted us to give him a
8  price and then he kept saying no.
9    Q.    I see.  So you had offered some prices
10  and he just said absolutely not?
11    A.    Right.  That's part of the haggling.  I
12  don't recall him giving a price that he was
13  willing to pay, but we settled on the price
14  that's in the contract and adjusted the scope
15  accordingly.
16    Q.    In the same text bubble you wrote,
17  "Let's focus on the other guy."
18         Who's the "other guy"?
19    A.    I am not sure who it was.
20    Q.    Is it the same Chinese individual from
21  Tokyo that was discussed earlier in the thread?
22    A.    I don't know.  It could have been
23  Bannon.  I honestly don't know.
24    Q.    You and Lianchao were talking about
25  doing work for Steve Bannon at that time?

Page 124

1    A.    I know Bannon.
2    Q.    What work were you discussing in this
3  thread about Steve Bannon, other than he made a
4  speech?
5    A.    Steve has a lot of ideas to do a whole
6  lot of things, and one of them was to confront
7  the threat that China poses against the
8  United States.
9    Q.    Did you have a dialogue with
10  Steve Bannon about the research contemplated by
11  this agreement?
12    A.    No.
13    Q.    So you never spoke to Steve Bannon
14  about Mr. Guo or Eastern Profit?
15    A.    No, or anything China related, except
16  maybe the military problem as a policy matter,
17  but nothing to do with Guo or Lianchao.
18    Q.    Turning to the next page.  Do you see
19  where you wrote, "I trust your judgment.  I'm not
20  anxious to dialogue with him further"?
21    A.    Yes.
22    Q.    Who were you talking about there?
23    A.    About Guo.
24    Q.    Why weren't you anxious to keep talking
25  to him?

Page 125

1    A.    Because he kept coming back with
2  different things that he wanted do which didn't
3  tie into one another, and he didn't seem serious.
4    Q.    Do you have experience with people who
5  ask for your services, but that ultimately you
6  think are really not serious about it?
7    A.    Yeah.  When you're trying to have an
8  serious discussion and he brings out his jacket
9  after jacket of expensive baby alligator skin
10  jackets that were soaked in milk and tailored in
11  Ferrari colors, you think what are we doing here?
12    Q.    When did that occur?
13    A.    Sometime at his home in December.
14    Q.    So you went to a meeting to talk about
15  this contract in December?
16    A.    Yes.
17    Q.    And he instead was showing you clothes?
18    A.    Clothes.  This part was made in Italy
19  and this part in Hong Kong, and a Lego set of the
20  Tower Bridge in London and all kinds of stuff
21  that had nothing to do with anything, and then he
22  was being difficult on the things that we wanted
23  to talk about.  So I said, "I'm not anxious to
24  dialogue with him further."
25    Q.    I got it.

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 126

1          Do you see this message from Lianchao
2  Han on December 24, 2017 starting with "I talked
3  with him"?
4      A.     Um-hum.
5      Q.     What did you understand Lianchao Han to
6  be conveying in this message?
7      A.     Let me read the context.  So your
8  question?
9      Q.     Let me ask it this way.  The message
10 from Lianchao says, "If you fail to provide the
11 deliverables as defined in the scope, you should
12 return the deposit.  What do you think?"
13     A.     Right.
14     Q.     What did you understand that to mean?
15     A.     I spelled it out in the next, in my
16 response.  So we're dialoguing here.  We're not
17 defining things.  So my response explains -- my
18 response would answer your question, my written
19 response here.
20     Q.     Just looking at your response here, you
21 wrote, "That probably won't be possible in the
22 first 30 days because of the start-up work.  I
23 suggest a minimum of 90 days."  Do you see that?
24     A.     Yes.
25     Q.     Did you put anything in the contract

Page 127

1  that memorialized that it wouldn't be possible to
2  do any deliverables in the first 90 days?
3      A.     It's addressed in the contract, yes.
4      Q.     Where is that?
5      A.     Well, let's look.  I'm saying the
6  concerns are addressed in the contract.  It has
7  the -- it is understood that some of the reports
8  were produced on a regular schedule, meaning some
9  were not.  They'll be irregular.  There will
10 be -- then it's followed by the irregular
11 circumstances clause that we discussed.
12         And then there is the 90-day period
13 concerning the comprehensive reports which we
14 already discussed, the progress reports, then the
15 weekly reports, and then the 90-day reports.  So
16 we're setting up the -- this is the discussion
17 toward what ended up in the contract.
18     Q.     At this point, though, you were talking
19 about whether the deliverables meet the scope,
20 right?
21     A.     Yes.
22     Q.     What deliverables do you think would
23 meet the scope?  In other words, what's an
24 acceptable deliverable?
25     A.     He had asked for lots of data right

Page 128

1  away.  I said it's not possible.
2      Q.     That's what you're saying in here?
3  When did you tell him it wasn't possible?
4      A.     The whole time.  And Lianchao agreed
5  with it.  And he would have private meetings in
6  Mandarin with Guo about this.
7      Q.     So you were -- just so we're clear, you
8  were communicating with Mr. Guo through Lianchao?
9      A.     Yes.  Lianchao was explicitly acting as
10 Guo's agent in this correspondence.
11     Q.     And did you ever speak at least via
12 Signal message or other electronic means with
13 Mr. Guo?
14     A.     No.  Pardon me.  Not that I recall.  I
15 don't believe I did, but there might have been in
16 the initial stages.  I would have destroyed that
17 data.
18     Q.     Okay.  Below that it says, "I don't
19 know who will sign."  Do you see that?
20     A.     Yes.
21     Q.     Do you know what Lianchao was talking
22 about there?
23     A.     Who would sign the contract.
24     Q.     Why was that a question?
25     A.     It would have been a security question,

Page 129

1  meaning Guo would have a surrogate who we would
2  understand was signing on his behalf.
3      Q.     Did Strategic Vision think about having
4  a surrogate sign on its behalf for security
5  reasons?
6      A.     You have to ask Strategic Vision.  I
7  can't answer that.
8      Q.     You didn't talk to Ms. Wallop about
9  that?
10     A.     No.  She was going to sign it because
11 it was her company.
12     Q.     Below that it says, "He proposed you
13 and asked us if that would be acceptable to us.
14 All of us agreed, let's keep the agreement."
15         Do you see that?
16     A.     Yes.  Okay, this refreshes my memory.
17 There was a back-and-forth between whether
18 Lianchao or Yvette would be the signer.
19     Q.     And that was on or about December 24th?
20     A.     Yes, and just prior to it.
21     Q.     So there was a meeting before that?
22     A.     There was a back-and-forth with
23 Lianchao this whole time.  It just wasn't all in
24 writing.
25     Q.     Do you mean on the phone or in person?

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 130

```
 1      A.    Never on the phone, always in person.
 2      Q.    So regarding this agreement, you never
 3  spoke to Lianchao on the phone?
 4      A.    Correct.
 5      Q.    What about Ms. Wang?  Did you ever
 6  speak to her on the phone about this agreement?
 7      A.    I think it was only by Signal.  Now,
 8  let me correct myself.  We might have had some
 9  brief talks on Signal audio.
10      Q.    Okay.
11      A.    But I wouldn't have a record of that.
12      Q.    I understand.
13      A.    Yes.  Here he says, "I don't know who
14  will sign," and I said "He," Guo, "proposed you,"
15  Lianchao, and asked -- because there was a
16  question of Yvette doing it, and because Guo told
17  us he didn't trust Yvette, and she's a member of
18  the Communist Party, and her parents are senior
19  people in the Chinese police, that obviously she
20  would be an unreliable person.  I could never
21  figure out why Guo would hire somebody like that,
22  but that's why I did not want her to be involved
23  in the signing of the contract.
24      Q.    When did Mr. Guo tell you that about
25  Yvette?
```

Page 131

```
 1      A.    I heard about it secondhand because I
 2  research my clients.  The judge asked me about my
 3  client and I know what he does for his business,
 4  as well as the people around him.  So I found out
 5  that she was a Communist Party member which Guo
 6  later confirmed at a lunch at his house after the
 7  contract was executed.  And if I recall, Lianchao
 8  said something to that same effect, but I don't
 9  remember if it was before or after the contract
10  was executed.
11      Q.    But even after you knew that or heard
12  that, you still continued to work with Yvette
13  Wang, right?
14      A.    Yes.
15      Q.    Didn't it occur to you that that could
16  be a security risk for this project?
17      A.    Yes, and I told Guo that, and he
18  agreed.
19      Q.    Didn't you feel that that would
20  endanger you or your team leader or your team?
21      A.    Not if it was compartmented.  Not if
22  there was an anonymity, a barrier between Guo and
23  the team that wouldn't endanger them at all.  But
24  even Guo himself made his fortune through the
25  partnership with the number 2 official in the
```

Page 132

```
 1  Chinese secret police, and he still was having
 2  dialogue with the ministry of state security
 3  officials, as he even told us.
 4            So I don't know what his game was.  I
 5  don't know what divisions he was working.  I
 6  presumed he was working on divisions within the
 7  Communist Party.  So if he trusted her after
 8  saying he didn't trust her, then he's the client.
 9  It's his prerogative.
10      Q.    So even though you found information
11  that you thought really may endangered this
12  project, you still went ahead with it?
13            MR. SCHMIDT:  Objection.
14      A.    It didn't endanger the project.
15      Q.    You didn't feel that it did?
16      A.    No.
17      Q.    Let's go to SV69.  Do you see where you
18  wrote --
19      A.    Pardon me, I'm reading.
20      Q.    Go ahead.  Take a little bit of time.
21      A.    Just for the record, SV68 confirms what
22  I just told you.
23      Q.    Please wait for a pending question.
24      A.    69.
25      Q.    Do you see where he wrote -- or I'm
```

Page 133

```
 1  sorry, do you see where you wrote, "If he changes
 2  his mind on you, it indicates to me he doesn't
 3  fully trust you.  Not a good thing"?
 4      A.    Yes.
 5      Q.    What did you mean by that?
 6      A.    If Guo changes his mind on trusting the
 7  person he said he trusted, then that's a bad
 8  sign.
 9      Q.    Do you know why Lianchao didn't end up
10  signing the contract?
11      A.    No.
12      Q.    Do you know if Mr. Guo stopped trusting
13  Lianchao for some reason?
14      A.    I don't know.  He seemed not to trust
15  anybody.  Toward February 1st, as Yvette had
16  noted, Guo had instructed that we only
17  communicate through Lianchao again.  So he
18  regained his trust.  But he never told us to stop
19  talking to Lianchao.
20      Q.    So through the life of the agreement,
21  you continued to communicate with Lianchao?
22      A.    Yes.
23      Q.    Even after Mr. Guo had instructed you
24  that you shouldn't, because in his mind, he
25  didn't want him to be involved in this anymore?
```

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 134

1    A.    He didn't say don't talk to -- Guo did
2  not say don't talk to Lianchao.  He just said
3  Yvette is going to be the principal point of
4  contact.
5    Q.    So you understood that, I guess, let's
6  say, after late December 2017 that there would be
7  two points of contact?
8    A.    Yes.  She would be the primary point of
9  contact on anything major, but because we had the
10  relationship with Lianchao and Lianchao still had
11  Guo's confidence, we would talk to Lianchao about
12  issues coming up with the project and how we
13  might best address them.  Yvette did not seem
14  to -- she was not able to answer those questions
15  for us.
16    Q.    In the response bubble to your last
17  bubble there, it says, "He has sensed my
18  disappointment with him."
19    A.    Yes.
20    Q.    Do you understand what Lianchao was
21  talking about there?
22    A.    That Guo has sensed Lianchao's
23  disappointment with Guo.
24    Q.    Right.  Did you understand what sense
25  of disappointment was being discussed?

Page 135

1    A.    No.  I think Lianchao is very direct
2  and methodical.  Guo is really not.
3    Q.    Why was it that you thought that
4  Lianchao was disappointed with Guo?
5    A.    Because Guo was exaggerating.  Guo was
6  being, again, bringing out his wardrobe to show
7  us, showing us his Lego set.
8    Q.    So Lianchao was at that meeting?
9    A.    Yes.
10    Q.    So after that meeting --
11    A.    Pardon me.  That may have been over the
12  course of two meetings.  I think the Tower Bridge
13  Lego set was at a second meeting.
14    Q.    But to your mind, Lianchao was
15  disappointed with Guo because of how he carried
16  himself at one or both of these meetings at his
17  apartment?
18    A.    Yes, and I believe other things
19  unrelated to our contract.
20    Q.    What were those other things?
21    A.    I don't know.
22    Q.    And Lianchao told you only through this
23  Signal message or did you have a discussion with
24  him about it?
25    A.    We had discussions about it.

Page 136

1    Q.    Can you just briefly describe what was
2  conveyed in those discussions?
3    A.    Similar to what was spelled out here.
4  There was a cause of frustration with Guo keeping
5  focus, Guo keeping a sensible scope of what he
6  wanted to do.  The difference between Guo being
7  unethical in his business practices, which is
8  another reason for a deposit, like a retainer,
9  but it was not a retainer.  Defending Guo when I
10  would say I've done research on him and found
11  that he's been involved in certain alleged
12  nefarious activities, what do you think about it.
13    Q.    So you raised those issues with
14  Lianchao?
15    A.    Yes.
16    Q.    What did he say?
17    A.    He said, "There's a lot there, John.
18  This is a complicated place.  You don't become a
19  billionaire in Communist China by playing by
20  American legal standards."
21    Q.    Let me just ask this.  Why do you think
22  Lianchao was interested at all in what Mr. Guo
23  was doing or trying to do through this contract
24  with Eastern Profit?
25    A.    Because Guo was in the United States

Page 137

1  under a form of sanctuary, he can't go back home
2  or he'll be arrested, so he's in opposition to
3  the Communist Party leadership.  That jived with
4  both Lianchao's and French Wallop's and my own
5  beliefs that the Communist government of China is
6  an evil regime, and if we can help fight it in
7  any way, great.  And if we can make a living
8  doing it, great.  And if we have a defector or a
9  deserter who's come to the United States to put
10  up funds to enable that, then this is a win-win
11  proposition.
12    Q.    So you and French Wallop and Mr. Guo
13  have kind of an ideological common purpose in
14  toppling the Communist regime in China?
15        MR. SCHMIDT:  Objection.  Go ahead.
16    A.    We thought we did.
17    Q.    At the time, let's say, December 2017?
18    A.    Right.  Later we began to suspect that
19  he was either a double agent or some other kind
20  of provocateur, but we could never prove it.
21    Q.    Just looking at the next text bubble,
22  who are Bernie and Judd?
23    A.    I don't remember Bernie.  Let me think
24  of Bernie.  Judd was former Senator Judd Gregg of
25  New Hampshire, G-r-e-g-g.

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 142

1   know anything about computer research.  She would
2   keep saying -- using very oversimplified terms
3   that really made no sense.  "That's garbage.
4   That's garbage."
5          "Well, what do you mean by 'garbage'"?
6   Tell me specifically what's useful and what's
7   not.  She couldn't even say that to us.  She
8   couldn't convey anything necessary to conduct the
9   job.
10      Q.   Let's talk about when are these
11  conversations occurring that you're describing
12  here?  Was this before the contract or after?
13      A.   That was on both.  The judgment of the
14  information was after the contract, but she could
15  not hold a conversation about the types of work
16  involved prior to the contract.
17      Q.   Do you feel that she understood the
18  research agreement?
19      A.   Yes, her English was good enough.
20      Q.   Did she understand what was going to be
21  provided in terms of a service?
22          You're saying she didn't really
23  understand what the work was?
24      A.   Well, for the same reason anybody hires
25  an expert, right?  You depend on the expert to do

Page 143

1   it, but you would at least want to have a
2   conversation about the modalities with that
3   expert, and she didn't -- she wasn't up to having
4   that type of conversation.  Guo was, and she
5   interpreted for Guo.
6       Q.   I see.  Let's go to 72.  And just
7   before we talk about that.
8          When did Lianchao stop being your
9   primary point of contact?
10      A.   As I recall, it was the last few days
11  of December.
12      Q.   Okay.
13      A.   Roughly right after Christmas.
14      Q.   Before, you said he had gotten back
15  involved again later on.
16      A.   Yes.
17      Q.   When was that?
18      A.   When we were instructed to -- well, it
19  was various, because sometimes he would indicate
20  that Guo wanted to convey a message through him
21  verbally and not through Yvette, but in writing
22  it was on February 1st when Yvette instructed me
23  that she would no longer be the point of contact
24  and that I was to communicate only through
25  Lianchao.

Page 144

1       Q.   I see.  When was that again?
2       A.   I believe it was February 1, 2018.
3   It's in a Signal message.
4       Q.   Let's look at SV72.  Do you see where
5   you wrote, "If it is, my main concern is that you
6   remain as the filter to ensure quality control
7   and ensure that we can protect our sources and
8   methods and ensure that New York doesn't release
9   information prematurely and put the entire
10  project and our people in danger."
11      A.   Yes.
12      Q.   "New York" there refers to Mr. Guo?
13      A.   Yes.
14      Q.   Why were you concerned about him
15  releasing information prematurely?
16      A.   Because he would go back and forth on
17  us in terms of long-term research that he would
18  release over time, and therefore not jeopardize
19  the existence of the research itself.  And then
20  because he was so impulsive, he might release
21  information prematurely and then alert people we
22  were watching that we were watching them.
23      Q.   I think you've answered it to an
24  extent.  What would be a premature release of
25  information?

Page 145

1       A.   Let's say he releases information on
2   person X while we are still researching person X.
3   Once you know you're being followed -- once
4   person X knows he or she is being followed,
5   they're going to make it more difficult to put up
6   countermeasures or do whatever to prevent being
7   observed.  So we wanted to make sure that that
8   didn't happen so that we could continue to
9   execute on the project.
10      Q.   Did you understand that ultimately
11  information about the research subjects would be
12  released?
13      A.   Yes.
14      Q.   When did you come to that
15  understanding?
16      A.   That was explicit from the beginning.
17      Q.   Did Strategic Vision and Ms. Wallop
18  understand that too?
19      A.   Yes.
20      Q.   So the collateral damage you're talking
21  about there would be what?
22      A.   The collateral damage would be the
23  existence that we were invading the personal
24  information of senior members of the Chinese
25  Communist Party, the secret police, and their

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 162

1    Did you ever discuss this research
2 assignment with Bill Gertz or William Gertz?
3    A.    Only at the beginning when he was
4 facilitating it.
5    Q.    Can you describe what that discussion
6 was and where that was?
7    A.    I don't recall.
8    Q.    Can you tell me when you talked to
9 Bill Gertz?
10    A.    Probably November, December of 2017.
11 It was pre-contract.
12    Q.    What was the nature of the discussion?
13 What was discussed?
14    A.    I thanked him for putting this
15 together. I asked him if he wanted to be a part
16 of it. He said no.
17    Q.    What do you mean by "be a part of it"?
18    A.    He's an investigative journalist, has
19 been for more than 30, 35 years ever since I've
20 known him, so I wondered if he wanted to be part
21 of it. And since Guo trusted him, he would be an
22 ideal person to have on board.
23    Q.    In terms of an intermediary or someone
24 providing services?
25    A.    Providing services. He has excellent

Page 163

1 contacts in the intelligence community.
2    Q.    I see. That was the only time you ever
3 spoke to Bill Gertz about this matter?
4    A.    Yeah, as far as I can tell. It might
5 have been a casual hey, things are still going.
6 It was nothing in any detail, not in violation of
7 any confidence.
8    Q.    I wasn't saying it was or wasn't. I'm
9 just asking if you spoke to Bill Gertz about this
10 agreement or research agreement after your
11 initial meeting with him that you described from
12 November or December of 2017.
13    A.    I mean, we've been friends for a long
14 time, so more than a how's-it-going-type thing,
15 nothing of substance.
16    Q.    And you're still in touch with
17 Bill Gertz as friends or colleagues?
18    A.    Yeah. I'm working with him and
19 Rich Higgins on another project.
20    Q.    Another investigation project?
21    A.    An information messaging project.
22    Q.    What do you mean by that? Is that a
23 different service than investigatory research?
24    A.    Yeah, it's putting out a message as
25 opposed to investigating.

Page 164

1    Q.    So like social media or print
2 journalism, things like that?
3    A.    Yeah, public diplomacy, just messaging.
4    Q.    Let's go to the next exhibit.
5    MR. GRENDI: Exhibit 6.
6    (Waller Exhibit 6, Document entitled
7    "Anita Yui Suen", marked for
8    identification.)
9    MR. GRENDI: Joe, do you have any
10    objection to me giving this to co-counsel,
11    co-defendant.
12    MR. SCHMIDT: No, that's fine.
13    Q.    Do you recognize this document?
14    A.    Yes.
15    Q.    Generally speaking, what is this?
16    A.    This is the document that Miles Kwok
17 provided for us for the research project. This
18 is his list of targeted names.
19    Q.    Is this the list of fish that when
20 they're describing it?
21    A.    Yes.
22    Q.    When did you first see this document?
23    A.    As I recall, shortly after the contract
24 was executed, or signed. It was shortly after it
25 was signed.

Page 165

1    Q.    Does January 8th or 9th sound right?
2    A.    Approximately.
3    Q.    How did you receive it?
4    A.    On a USB drive that Yvette had provided
5 to French Wallop.
6    Q.    So you received the USB drive with the
7 information in Exhibit 6 from French Wallop,
8 then?
9    A.    Yes.
10    Q.    Who had gotten the information from
11 Yvette Wang?
12    A.    Yvette had handed -- she had given
13 us -- or she had given French, rather, USB drives
14 that were corrupted. So French had to go up to
15 New York to get uncorrupted versions of the drive
16 and then bring it down. That's what was on this.
17 This document was on that drive.
18    Q.    Right. So did you see this document
19 from the initial drive that was given to
20 French Wallop on January 6th or from, as you just
21 mentioned, drives that were given subsequently?
22    A.    As I recall, I did not see anything in
23 the corrupted drives. This was the non-corrupted
24 drive a few days later.
25    Q.    Okay. Do you recall when the

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 174

1    Q.    Did there come a time when he just
2    said, do it by brute force.  I don't care what it
3    takes.  Just access that account?
4    A.    Not on that one particularly, but on
5    another one, that's when we told him it was
6    illegal and he got angry.
7    Q.    So Strategic Vision never accessed
8    Anita Suen's CITIC account?
9    A.    No.  If I recall correctly, it was that
10   team 1 reported they went back to access it, and
11   there were other people trying to access that
12   same account.  Guo had said to us on two
13   occasions that he had three or four other teams.
14         Team 1 raised a red flag for me.  Then
15   when I met with the team 1 leader, he explained
16   it.  He said they stopped the activity because
17   they did not want to damage anything that Guo's
18   other teams might be doing.
19   Q.    Where was that meeting with the team 1
20   leader?
21   A.    In Europe.
22   Q.    In which part?
23   A.    It would be in Ireland.  No, pardon me.
24   That one was in the United States.
25   Q.    The team 1 leader was in the

Page 175

1    United States, and you met with him here?
2    A.    Yes, on that occasion.
3    Q.    How many times did you meet with the
4    team 1 leader?
5    A.    I may have to amend this statement
6    later when I see the written transcript because
7    I'm not exactly sure of certain dates.
8         MR. SCHMIDT:  Just do the best you can.
9    Don't speculate.
10        MR. GRENDI:  Yeah, sure.
11   Q.    How many times did you meet with the
12   team 1 leader in connection with this engagement?
13   A.    Maybe eight or ten times.
14   Q.    And some of those meetings were in the
15   United States?
16   A.    Yes.
17   Q.    And some of them were in Ireland?
18   A.    Ireland and Germany.
19   Q.    Anywhere else?
20   A.    No.
21   Q.    So when did those meetings begin?
22   A.    The U.S. ones or the foreign ones?
23   Q.    The first one, wherever it was?
24   A.    The U.S. ones were to arrange the
25   parameters of the -- set the parameters of what

Page 176

1    the job would be.  The European ones -- that was
2    before the contract.  The European ones were to
3    have him deliver the, quote, reports on the USB
4    drives after the contract was signed.
5    Q.    So those are the only two categories of
6    reasons to meet?
7    A.    Was to coordinate the scope of the
8    work, the nature of the work, the verification
9    that the work was being done, and then the work
10   product.
11   Q.    Just going back to this Exhibit 6.
12   What did you do with this information once you
13   got it?
14   A.    I gave it to team 1.
15   Q.    Where was that?
16   A.    That was by USB drive that I handed to
17   team 1 in Washington, D.C. or Arlington,
18   Virginia.
19   Q.    And then did you understand that team 1
20   was going to fly off to Europe to use the data?
21   A.    Yes, immediately.
22   Q.    What date was that?
23   A.    Within 24 hours of receiving the USB
24   drive.
25   Q.    So on or around January 9th,

Page 177

1    January 10th?
2    A.    Roughly.  It was very rapid.
3    Q.    Was the leader of team 1 like on
4    standby, kind of waiting to get the information
5    in the United States --
6    A.    Yes.
7    Q.    -- so that he could --
8    A.    Pardon me.  I didn't mean to intrude.
9         MR. SCHMIDT:  Let him finish the
10   question even if you know where it's going.
11        THE WITNESS:  Okay.
12   Q.    Looking at this document.  Did you
13   review it after receiving it to verify the
14   contents?
15   A.    Yes.  We printed it out to be able to
16   look at it, write it up, make sure we understood
17   what was in it, what things meant, what certain
18   of the relations were, and then to -- and what
19   certain of the documentation was that was
20   displayed in them.
21   Q.    So when you first reviewed it, did you
22   have any reason to think the information included
23   was inaccurate or wrong?
24   A.    No.
25   Q.    You kind of indicated earlier that you

**EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC**
**J. Michael Waller on 02/08/2019**

Page 178

```
1   thought some of the information was wrong.  Can
2   you please -- you don't have to say their names,
3   but just point to the numbered individuals where
4   you think that applies?
5        A.    I can't point to them off the top of my
6   head, but there were two data points here.  First
7   was from team 1 that said that they were -- they
8   found two and possibly three that were wrong.
9   And then Lianchao said that three and possibly
10  four were wrong.
11       Q.    So one of the issues you encountered
12  you're saying is that the information provided
13  was what, inaccurate?  Or what did the leader of
14  team 1 tell you?
15       A.    The leader of team 1 said that at least
16  one of the names was misspelled in Mandarin, and
17  since there were various transliterations of the
18  names in English, they needed the accurate
19  transliteration.  Then they suspected that others
20  were simply false people, false persona.
21       Q.    What do you mean by that?  That they
22  were not real people or they were fake documents?
23  What does that mean?
24       A.    Team 1 suspected that they were not
25  real people.  They were false identities for the
```

Page 179

```
1   purposes of laundering money or committing other
2   illegal activity.
3        Q.    In other words, if I remember from the
4   "Shawshank Redemption," it's a fake person.
5   Someone who doesn't even exist?
6        A.    Yeah, that's the way we understood it.
7        Q.    Were there any other issues with the
8   list of fish here?
9        A.    For team 1?
10       Q.    Yeah.
11       A.    We found that some of the documents
12  that are displayed here were themselves false.
13       Q.    What do you mean by that?  That they
14  were forgeries?
15       A.    Yes.  The Canadian passport of one of
16  the individuals was a forgery.
17       Q.    Anything else you can remember about
18  what you've described as fake documents?
19       A.    Not from team 1.  From team 2 we found
20  some more American passports that were forgeries.
21       Q.    Let's describe that.  Team 2 -- who ran
22  team 2?
23       A.    That was the ASOG, A-S-O-G, in Texas.
24       Q.    When did you give this information to
25  ASOG?
```

Page 180

```
1        A.    In the first week in February, right
2   after Yvette instructed us to find a different
3   means of getting data.
4        Q.    So what did they report to you was a
5   problem with the list of fish?
6        A.    They said there were many problems with
7   this list of fish.  First, that there were
8   several passports that were false, and they
9   suspected they had been forged from a Chinese
10  infiltration of a passport office in Texas.
11       They found -- the most important thing
12  they found was that all of the main 15 names had
13  been designated by federal authorities as records
14  protected, and that it was a crime to try to get
15  their records, because these individuals were
16  somehow either the subject of an active U.S.
17  criminal or counterintelligence investigation or
18  were Chinese nationals collaborating with the
19  U.S. authorities.
20       Q.    Okay.  So what does "records protected"
21  mean to you?
22       A.    The way we were told by the research
23  team was -- and by others when we looked at it, I
24  had not heard the term before -- that any records
25  pertaining -- any official records pertaining to
```

Page 181

```
1   those individuals were protected by the
2   U.S. government.  Meaning you could not go to,
3   say, the state of California contact to get their
4   driver's license number.  That would be a crime.
5        Q.    How would a person know that it was a
6   crime?
7        A.    You don't know unless you know whose
8   record is protected.
9        Q.    Right.
10       A.    We didn't know, so we had no idea.  So
11  we related this to Guo, hey, this is a crime to
12  do it.  Let's figure out something else or get
13  another list of fish.
14       Q.    I want to go back there.  You're saying
15  that these people have information that's in the
16  public domain that you could otherwise, if they
17  weren't records-protected, access?
18       A.    Or they're in the semipublic domain.
19       Q.    Okay.  Something that a regular
20  investigator could find if they use databases or
21  other sources to get that information?
22       A.    Right.  Some of these are protected,
23  meaning they're not officially accessible, but if
24  you have a contact in the system, you can ask
25  them and they'll run a check for you.  So you
```

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 186

1   Europe, how did you monitor the research process,
2   if at all?
3       A.   I would meet with the team 1 leader
4   approximately every week during the beginning of
5   the contract.
6       Q.   Let's see if you remember.  What was
7   the first monitoring meeting you had with the
8   team 1 leader after the contract was signed?
9       A.   It was between January 17th and
10  January 20th, if I recall correct.
11      Q.   Just going back to this information in
12  Exhibit 6.  Was this more information than you
13  normally get when you start an investigation
14  project?
15      A.   This was very specific, and Guo
16  explained the meaning of it.  It was more in the
17  sense that Guo said he paid a quarter of a
18  billion dollars for this file that we have here
19  as Waller 6.  He paid $250 million, so he said.
20      Q.   Did you believe that statement?
21      A.   No.
22      Q.   You think maybe there was a translation
23  issue there?
24      A.   No, there was not.  I said, "Billion or
25  million?"  I couldn't believe it.  Guo insisted.

Page 187

1   Lianchao later said, "He likes to exaggerate."
2       Q.   The information in here includes dates
3   of birth --
4       A.   Right.
5       Q.   -- ID numbers, locations, passport
6   numbers, is that right?
7       A.   Yes.
8       Q.   Is that more information than Strategic
9   Vision or you usually start with when you begin
10  an investigation?
11      A.   I can't speak for Strategic Vision, but
12  speaking personally it depends on the case.  It
13  depends on the nature of the information that we
14  get.  Sometimes it's even more specific.
15      Q.   Is this sort of information helpful in
16  terms of jump-starting or accelerating an
17  investigation?
18           MR. SCHMIDT:  Objection.
19      A.   You can't start an investigation
20  without a starting point.  This was the starting
21  point.
22      Q.   I'm saying have you ever started an
23  investigation just with someone's name?
24      A.   You need more than just a name,
25  generally.

Page 188

1       Q.   What's kind of the bare minimum
2   starting point?
3       A.   Place of work or residence, nationality
4   even.
5       Q.   So there's more than that kind of
6   information in here, right?
7       A.   Yes.
8       Q.   But it's not the most information you
9   were ever given?
10      A.   Oh, no, I've had far more detailed
11  information.
12      Q.   Did you get any more information about
13  how Eastern Profit or Mr. Guo acquired this list
14  of names and information?
15      A.   Guo told us that he had it done
16  himself.  He commissioned it all himself through
17  years of work through other research companies
18  worldwide.
19      Q.   So peers or competitors of Strategic
20  Vision or yourself?
21      A.   Yeah, yeah.  But also my suspicion was
22  that he also got this information from the
23  Communist Chinese secret police because of the
24  nature of how some of it is so specific in China;
25  like passports, for example.

Page 189

1       Q.   Regarding the research, what was your
2   understanding of why Eastern and Mr. Guo or
3   whoever wanted this information?
4       A.   He wanted it to tear apart the Chinese
5   Communist Party leadership.
6       Q.   So was it your understanding that, once
7   he got the research information from Strategic
8   Vision or you, that he would then publicize or
9   otherwise disseminate that information?
10      A.   Yes.
11      Q.   I just want to look at Strategic Vision
12  175.
13           MR. SCHMIDT:  You have to look at the
14  lower right-hand corner.
15      A.   Okay.
16      Q.   It looks like there was a Post-it note
17  on this document.  Do you see that?
18      A.   Yes.
19      Q.   Whose handwriting is on that Post-it
20  note?
21      A.   It looks like French Wallop's
22  handwriting.
23      Q.   That's not your handwriting?
24      A.   No.  I have not seen this before.  I
25  have not seen the Post-it note before.

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 210

1    Q.    I understand.  Did you tell them that
2  you were going to fly to Europe to get the next
3  tranche of information?
4    A.    Yes.
5    Q.    And did you?
6    A.    Yes.
7    Q.    When was that?
8    A.    Within a couple of days.  I think it
9  was the 29th.
10   Q.    That you flew to Europe?
11   A.    Yes.
12   Q.    And then did you fly right back?
13   A.    Yes, the same day.
14   Q.    What country was that?
15   A.    I went to Ireland first, and then while
16  in Ireland, I booked a flight to Germany just so
17  that I would not have a preexisting flight to
18  Germany, to Frankfurt.  I met the contact in
19  Frankfurt.
20   Q.    Oh, i see.  So you flew to Ireland, and
21  then you booked a flight to Germany to meet the
22  leader of team 1?
23   A.    Yes.
24   Q.    That travel plan that you just
25  described is to avoid people knowing your

Page 211

1  itinerary?
2    A.    Right.
3    Q.    So then you met the leader of team 1 in
4  Germany on or about the 29th?
5    A.    I think it was the 30th.
6    Q.    Then you flew right back to the
7  United States?
8    A.    Yes.
9    Q.    What did you do next?
10   A.    Then I delivered the material to Yvette
11  at Penn Station.
12   Q.    Was that at Tracks Bar?
13   A.    Sounds right.
14   Q.    That was about 80 gigabytes of data or
15  thereabouts?
16   A.    Yes.
17   Q.    Did you even have a chance to review
18  that information?
19   A.    It was code.  I was told in advance
20  what it was.  Team 1 said it's only 80 gigs of
21  data of which 16 lines of code are important.  I
22  told this to Yvette before traveling.  She said,
23  "I don't care.  Bring it back anyway."
24   Q.    Just describe the meeting where you
25  handed the 80 gigabytes of data to Yvette.

Page 212

1    A.    I came in from Newark Airport by rail
2  to Penn Station, met her at that restaurant with
3  her male companion.  She and I sat next to each
4  other.  I used a virgin computer, meaning one
5  that had never been on the internet or had never
6  been used for anything besides my drives, and
7  scrolled through the information with her on the
8  screen.
9    Q.    This was in like the booth of the
10  restaurant?
11   A.    Yes.
12   Q.    What did you explain to her as you were
13  doing that?
14   A.    I said, "This is just as we reported.
15  There are 16 useful lines of code in here."
16       MR. GRENDI:  Let's do Exhibit 7.
17       (Waller Exhibit 7, Background Report on
18  Qing Yao, marked for identification.)
19   Q.    Just looking at the first page, do you
20  recognize this document?
21   A.    No.
22   Q.    Do you know whether or not this
23  information was in the 80 gigabytes of data?
24   A.    No.
25   Q.    And you never reviewed this report?

Page 213

1    A.    I'm not familiar with this report.  You
2  just said, "Look at the first page."
3    Q.    If you want to take a look through for
4  more to see if you know it, go ahead.
5    A.    I don't recognize this document.
6    Q.    So you don't know who created it?
7    A.    No.
8    Q.    Going back to that 80-gigabyte drive.
9  Did you on your flight back have a chance to
10  review it or look at any of the data?
11   A.    No.
12   Q.    Is that because you didn't have a
13  laptop with you?
14   A.    You don't -- computers on planes are
15  not secure.
16   Q.    And you didn't have any time in Germany
17  before your flight home to look at the data?
18   A.    No.  The team 1 leader explained to me
19  what the data contained.  If it's 80 gigabytes of
20  code and only 16 lines are useful, you only need
21  to know what's on those 16 lines.  Those 16 lines
22  were the email addresses and encrypted passwords
23  of several people on Guo's target list.
24   Q.    So the team had been able to obtain the
25  email address and passwords for some of the

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 214

1  members or some of the individuals listed in the
2  Exhibit 6?
3      A.   Yes.  The encrypted passwords, not the
4  passwords themselves.
5      Q.   What is the difference?
6      A.   It shows -- the encrypted password
7  shows the characters that aren't the characters
8  of the password.  So it's so-and-so@yahoo.com and
9  then a series of characters that are the
10 encrypted password.
11     Q.   What use is that information from an
12 investigation perspective?
13     A.   It gives you the email address and the
14 fact that there is a password that's decryptable.
15 It's within the code.  It's just a question of
16 mathematically decrypting it.
17     Q.   I see.  So the information provided
18 could show that there is a path to getting the
19 password of the individual fish?
20     A.   Yes.
21     Q.   And that through that, other
22 information could come?
23     A.   Yes.
24          MR. GRENDI:  Let's do 8.
25          (Waller Exhibit 8, Letter dated

Page 215

1       February 23, 2018, marked for
2       identification.)
3      Q.   Mr. Waller, do you recognize this
4  letter?
5      A.   Yes.
6      Q.   Just going back to the 80-gigabyte
7  drive we were talking about earlier.  Did you
8  give that information to Ms. Wallop before giving
9  it to Mrs. Wang?
10     A.   No.
11     Q.   So she never saw that information on
12 January 29th or January 30th?
13     A.   No.
14     Q.   Did there come a time when you reviewed
15 that information with Ms. Wallop?
16     A.   No.
17     Q.   Just turning back to 8 here.  When did
18 you first see this letter?
19     A.   On February 23, 2018.
20     Q.   How did you get it?
21     A.   I got it in a Signal text message from
22 Yvette.
23     Q.   Were you surprised by this letter?
24     A.   Yes.
25     Q.   Why is that?

Page 216

1      A.   Because we were working with Lianchao
2  to execute the contract and had not been in
3  contact at all with Yvette since February 1st
4  when she told us not to communicate with her, but
5  to communicate only with Lianchao.  So we had no
6  idea that anything representing a lawsuit was
7  ever under consideration.
8      Q.   After you started communicating
9  exclusively with Lianchao about this contract,
10 what other reports did you deliver?
11     A.   There was a third electronic thumb
12 drive and then verbal communication with
13 Lianchao.  By this time, Lianchao was saying that
14 Guo was very dissatisfied and for us to not
15 worry.  He's working on it.
16     Q.   I just want to understand the last
17 thing you said there.  Not to worry and you're
18 working on it, who are you talking about there?
19     A.   Lianchao said, "Guo is dissatisfied,
20 but no worries.  I'm working with him on it."  I,
21 Lianchao, am working with Guo on it.
22     Q.   What did the third USB drive that you
23 delivered contain?
24     A.   It contained more data, more extensive
25 data.

Page 217

1      Q.   How did you deliver that?
2      A.   By hand.
3      Q.   To whom?
4      A.   To Lianchao.
5      Q.   Did you ever discuss that third
6  delivery with Mr. Guo or anyone from Eastern?
7      A.   No, because Lianchao was Guo's agent
8  and our sole interlocutor.
9      Q.   At that time?
10     A.   Right.  Varying back and forth with
11 Yvette.  But per Yvette's February 1st
12 instruction she said New York -- or whatever
13 euphemism she used -- now wants you to talk only
14 to a euphemism for Lianchao.  That's in the
15 February 1st Signal communication.
16     Q.   So what was the response to this third
17 delivery you're describing?
18     A.   He just accepted it and said he would
19 relay it.
20     Q.   Did you get any feedback?
21     A.   No.
22     Q.   About when was that?
23     A.   I'm guessing roughly February 10th.
24     Q.   Were there any reports that you
25 delivered after February 10th?

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 226

1        MR. GRENDI:  Let's go to 9.
2        (Waller Exhibit 9, Document Bates
3    stamped SVUS000077, marked for
4    identification.)
5    Q.    Do you recognize this document?
6    A.    Yes.
7    Q.    Looking at that top right-hand corner,
8    there's some handwriting there.  Do you see that?
9    A.    Yes.
10   Q.    Is that your handwriting or someone
11   else's?
12   A.    No, it's someone else's.
13   Q.    Is it French's handwriting?
14   A.    It appears to be.
15   Q.    Did you draft this document?
16   A.    Yes.
17   Q.    Did you draft it alone or did you work
18   with French on it?
19   A.    I worked with French and Lianchao.
20   Q.    When was the first meeting with Guo?
21   A.    I want to say December 9th.  I'm not
22   certain.  I have the train receipt that would
23   mark that date.
24   Q.    Was Bill Gertz at that meeting?
25   A.    No.

Page 227

1    Q.    So who was there?
2    A.    It was French, Lianchao, Guo, and
3    myself.
4    Q.    Had you prepared this document in
5    advance of that meeting?
6    A.    Yes.
7    Q.    Where did you get the ideas for this
8    "Vision," as it's titled?
9    A.    Through my career of fighting
10   totalitarian dictatorships and helping defectors
11   or others to come up and be a spokesman for the
12   opposition.
13   Q.    Why did you think "Mr. G," as it's
14   titled in this document, would be interested in
15   this suite of services?
16   A.    This was based on our conversations
17   with Lianchao.
18   Q.    I see.  So had Lianchao described to
19   you what Mr. Guo was trying to do?
20   A.    Yes.
21   Q.    Based on those conversations, you
22   created this "Vision" document?
23   A.    Yes.
24   Q.    Is this sort of a Strategic Vision
25   playbook for waging a campaign to topple a, as

Page 228

1    you described it, "totalitarian regime"?
2    A.    It's not a Strategic Vision one; it's
3    my own.
4    Q.    It's your own?
5    A.    -yes.  And not a playbook; it was
6    designed custom to present to Guo.
7    Q.    So this is based on your analysis and
8    experience?
9    A.    Yeah.
10   Q.    This document?
11   A.    Yes.
12   Q.    What was Mrs. French's involvement with
13   creating this document, if any?
14   A.    Mrs. Wallop, she was part of the
15   discussions leading up to part of the
16   brainstorming with Lianchao to get the ideas
17   together to draw up this plan.
18   Q.    Were these your ideas as to what
19   Mr. Guo should do or did he tell you this is what
20   he wanted to do?
21   A.    He didn't tell us anything at that
22   time.  It was Lianchao who did.  So I combined
23   what he wanted with what I thought would best
24   suit his goals.
25   Q.    Did you give the document to Mr. Guo or

Page 229

1    Lianchao?
2    A.    Yes, to both of them.
3    Q.    You handed them a paper document?
4    A.    Yes.
5    Q.    But Mr. Guo didn't engage with
6    Strategic Vision or you to provide these
7    services, right?
8    A.    Not in a contractual way.
9    Q.    Let me ask you this.  Is there another
10   agreement between Mr. Guo -- strike that.
11       Did Strategic Vision and Mr. Guo come
12   to an agreement concerning the services in this
13   document?
14   A.    No, he decided just to go with the
15   opposition research.
16   Q.    So everything else in here was kind of
17   scrapped?
18   A.    Yes.
19   Q.    Do you know why Mr. Guo didn't engage
20   with Strategic Vision on these other items?
21   A.    No.
22       MR. GRENDI:  Let's do 10.
23       (Waller Exhibit 10, Document Bates
24   stamped SVUS80, marked for identification.)
25   Q.    Do you recognize this document?

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 230

1    A.    Yes.
2         Q.    This is the first document.  It's Bates
3    stamped SV80.
4              Did you draft this document as well?
5    A.    Yes.
6         Q.    What was this document drafted for?
7    A.    This was a follow onto the previous
8    document, Waller 9, after we met with -- after
9    the first meeting with Guo.  So we then took
10   what -- our takeaways from our discussion with
11   him for further ones with Lianchao, and then I
12   wrote this three-year timeline to show Guo on our
13   second meeting.
14        Q.    And when was that second meeting?
15   A.    Mid-December.
16        Q.    That was, again, with you, French,
17   Lianchao and Mr. Guo?
18   A.    Yes, at his residence.
19        Q.    In New York?
20   A.    Yes.
21        Q.    What was discussed at that meeting?
22   A.    All of these issues were, including
23   everything stated here and a proposal for him to
24   get the domain .China, so that he could build a
25   global media presence that the Chinese government

Page 231

1    couldn't interfere with.
2         Q.    How long was that meeting?
3    A.    Three or four hours.
4         Q.    What was the feedback you got from
5    this -- I take it it was a presentation based on
6    this document?
7    A.    Yes, we discussed this document.  Each
8    of us had a copy of it.  He had a copy of it.  We
9    discussed the whole thing.  He was going along
10   with it in English.  Then we discussed -- what
11   came out of this, he wanted to go ahead and
12   explore the real estate.  He did not engage so
13   much on the media part.  He was interested in
14   buying property.
15        Q.    Where would that property be?
16   A.    That was the Evermay mansion in
17   Georgetown.  That was the property across the
18   Treasury Department building in Washington, D.C.
19   We talked about him buying the Newseum,
20   N-e-w-s-e-u-m building in downtown Washington,
21   D.C., and the Rockefeller properties in New York
22   City and outside New York.
23        Q.    Did you participate in showing these
24   properties to Mr. Guo?
25   A.    No.

Page 232

1         Q.    Do you know who did?
2    A.    French did to Yvette.
3         Q.    I see.  When was that, if you know?
4    A.    Late December.  I believe it was late
5    December.  It was obviously subsequent to this
6    meeting.
7         Q.    So this was the first time there was a
8    discussion about purchasing a Washington property
9    in connection with building this Washington
10   presence?
11   A.    No, that came up at the first meeting.
12   This is the takeaway from the first meeting, this
13   document 10 and the presentation of the follow-on
14   proposal for the second meeting.
15        Q.    And it has cost estimates, things of
16   that nature?
17   A.    Yes.
18        Q.    Did you ever give a gift to Mr. Guo?
19   A.    Maybe a token gift.  I don't remember.
20        Q.    You don't recall trying to give Mr. Guo
21   a gift?
22   A.    No, I don't remember.  It was something
23   very minor, but I don't recall.
24        Q.    Do you customarily give gifts to
25   clients or potential clients?

Page 233

1    A.    It depends on the nature of the client
2    or the interest of the client.
3         Q.    So sometimes?
4    A.    A bottle of wine or something small
5    scale, yeah.
6         Q.    Okay.
7              MR. GRENDI:  Let's do 11.
8              (Waller Exhibit 11, Document entitled
9         "Time to Get Them Beginning the
10        Psycho-Political Campaign For China," Bates
11        stamped SV385 to SV402, marked for
12        identification.)
13             MR. GRENDI:  I think there's a little
14        bit of a copying issue here.  We can come
15        back to it if we need to.  It should be
16        SV385 to SV402.
17        Q.    Mr. Waller, do you recognize this
18   document?
19   A.    Yes.
20        Q.    What is it?
21   A.    It is a PowerPoint presentation to Guo
22   elaborating on the discussions that we had had
23   and showing a game plan that we were recommending
24   for him.
25        Q.    So is this created subsequently to the

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 234

1  previous two documents you were just showed?
2       A.    I believe I created it at the same time
3  with this.
4       Q.    That would be Exhibit 10?
5       A.    Yes, for the second meeting.
6       Q.    Did you present it at the second
7  meeting on like a computer?
8       A.    No.  He didn't allow computer
9  presentations.  It was just by hand.
10      Q.    So you printed this out?
11      A.    Yes, in a color paper copy.
12      Q.    So that was at that same second meeting
13  you described earlier?
14      A.    I believe so.
15      Q.    Turning to 387.  It says, "Build and
16  operate a secret system for micro-targeted
17  intelligence collection and analysis."
18           Do you see that?
19      A.    Yes.
20      Q.    What does that mean?
21      A.    That was the project about which this
22  whole suit is about.
23      Q.    That's a description of the research
24  that was memorialized in the research agreement?
25      A.    Yes.

Page 235

1       Q.    It says, "The first ten targets are
2  identified."
3       A.    Yes.
4       Q.    What does that mean?
5       A.    He told us that he had ten targets he
6  wanted us to look at, and then gave us the name
7  of one to test earlier.
8       Q.    Who was that?
9       A.    That was Anita Suen.
10      Q.    Is that actually a picture of her on
11  the right?
12      A.    Yes.
13      Q.    And that test, was that test
14  demonstration before or after this meeting?
15      A.    I think it was before.
16      Q.    I see.  With respect to --
17      A.    Yes.  It was before because he provided
18  this picture for the presentation that we used.
19      Q.    What about the other nine targets?  Had
20  those been identified?
21      A.    I don't recall.  I think he hadn't
22  chosen which ones he wanted to prioritize, but I
23  don't recall.
24      Q.    You mentioned before that there were
25  like 92 non-prioritized names?

Page 236

1       A.    Yes.
2       Q.    Is that correct?
3       A.    Yes.
4       Q.    Where are you getting that list of 92
5  from?
6       A.    From Exhibit 6.
7       Q.    Which part of that?
8       A.    Throughout the entire document you have
9  the main person, the numbered individual in large
10  letters, and then all the people associated with
11  that individual on these trees, and that's a
12  total of 92.
13      Q.    I see.  So if you counted up all the
14  individuals referenced in Exhibit 6, it's 92?
15      A.    Yes.
16      Q.    Exhibit 92 also -- excuse me --
17  Exhibit 6 also has 15 different named
18  individuals, correct?
19      A.    Yes.
20      Q.    And under those individuals' names
21  there's also the two reports that are requested,
22  two or three reports?
23      A.    Back on Exhibit 6?
24      Q.    Yes.
25      A.    Yes.

Page 237

1       Q.    Sitting here today, are you telling me
2  that you didn't understand that the 15 numbered
3  names were the 15 fish being identified?
4       A.    Yes, but we didn't get this until after
5  the contract.  Really, this is three weeks before
6  we received this.
7       Q.    Right, but when did you receive a list
8  of 92 names?
9       A.    The day we received Exhibit 6.
10      Q.    Right, but you're indicating that you
11  didn't understand that they were prioritized in
12  any way.
13      A.    No, we understood fully that they were
14  prioritized.  But he also said you'll also find
15  people in here -- if you find data on some of
16  these other individuals, dig it out and let me
17  see it because they might replace one of the 15.
18      Q.    Right.  But in conducting the initial
19  research, you understood that the 15 fish were
20  the 15 names with numbers next to them on
21  Exhibit 6, right?
22      A.    Yes.
23      Q.    Going back to Exhibit 11.  It says,
24  "Document everything as leverage to gain
25  concessions, protect people, use as political

weapon or as aid in criminal prosecution and asset recovery."
What do you mean by that?
A. Those were memorializing Guo's -- the end results that he wanted from this information.
Q. What did you understand that to be?
A. He said he had family still in China who he wanted to get released. He said he had assets still in China that he wanted to -- that had been confiscated that he wanted to recover, and others that he wanted to prevent being confiscated.
Q. It also says "as aid in criminal prosecution and asset recovery."
A. Yes.
Q. What does that mean in this context?
A. The asset recovery part, I just mentioned.
Q. Oh, for recovery of his own assets?
A. Of his own stolen assets.
Q. I see. Not the assets of others?
A. No.
Q. Continue.
A. And then for criminal prosecution of anybody of a criminal nature who is on the list.

Q. Criminal prosecution where?
A. It was never specified. It could be London. It could be United States. He didn't mean China.
Correction. Also in China because he had reasons for some of them who could be prosecuted in China with the information that he had.
Q. In the next, I guess, little arrow or bullet, it says, "Break the party's control of corruption information." What does that mean?
A. The party keeps its control. The Chinese Communist Party keeps its control by -- it's sort of a symbiosis between the super rich who got rich off the party, and then the knowledge of their corrupt activities that the party and the secret police have.
Q. What does the "break the party's control of corrupt information" mean?
A. If you make the information public that certain pillars of the Chinese government are involved in corruption, right now it's only the secret police that has that information or the Chinese authorities who have that information, and they're using it for purposes of political

control, to blackmail people to stay in line. His desire was to break that monopoly and get it out there so that everybody would know.
Q. I understand. And it says, "Burrow into commercial and political networks for business purposes." What does that mean?
A. Yes. He had some business applications that he wanted to use this information for in China or Hong Kong.
Q. Let's go to 388. It says, "Aggressive grassroots online social media/activist network in the United States, to mobilize key support base."
A. Yes.
Q. What does that mean?
A. He had political threats to himself through Americans who were tied in with the Chinese government, who were putting pressure on him to be deported back to China. So we wanted to reduce the effectiveness of that political pressure by organizing other groups that would be rallying to say this guy is leading the opposition to China. Don't deport him back to Beijing.
Q. What is this network? Is it other

companies or individuals? Who's in the network?
A. Main political activist networks and online activists.
Q. How many different entities are in that network? Ballpark?
A. It's really hard to say because there are networks of networks, so they're not necessarily cohesive. It's really impossible to say.
Q. These are all American-based entities?
A. North American, U.S. and Canada.
Q. Below that it says, "Primarily the loose coalition that got Trump elected and to which Trump communicates through his Tweets."
A. Yes.
Q. What does that mean?
A. That's the online "MAGA" network of supporters of Trump who hate the Chinese government.
Q. How did they get Trump elected? I'm just trying to understand that comment.
A. They were credited with doing the -- Trump was running his campaign not through out of his pocket so much as saying outrageous things and using social media to get other people to

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 242

1 echo everything he said. So we would want to use
2 that network, and that was credited with getting
3 him elected.
4     Q.    So this isn't a group of Russian
5 hackers that got Trump elected?
6     A.    No, no.
7     Q.    It also says, "Citizen-journalists who
8 break news, expose opponents, attack opponents,
9 discredit critics"?
10    A.    Right.
11    Q.    So that's a different part of this
12 network?
13    A.    Yes.
14    Q.    How would you access that network?
15    A.    I know them.
16    Q.    So you can get these journalists to
17 write positive things about Mr. Guo or attack the
18 communists?
19    A.    Or attack the people who wanted to get
20 him deported and say this person is doing it, but
21 this person also has money and is invested in
22 Chinese companies. And there might be other
23 reasons that the Chinese regime uses to leverage
24 Americans to do their work for them, do their
25 work for it.

Page 243

1     Q.    So the previous group, that loose
2 coalition, is kind of just the broad MAGA group?
3     A.    Younger activists.
4     Q.    The second group is journalists for
5 hire essentially?
6     A.    Not really for hire so much as people
7 who want a good story.
8     Q.    I see. Then it says, "Effective in
9 getting the President's attention and influencing
10 policy." What does that mean?
11    A.    Well, the President is known for
12 following Twitter quite closely, and so he has
13 certain -- he follows a very small amount of
14 people, and he watches a certain network that's
15 in this building, so it's a question of getting
16 things on Fox and on Twitter.
17    Q.    I see. And that gets the President's
18 eye on Mr. Guo in a positive light?
19    A.    Yes.
20    Q.    To prevent him from being deported?
21    A.    Yes.
22    Q.    Then it says, "Coordinate with the
23 above allied journalists in the U.S. and abroad
24 to remain on the information offensive."
25    A.    Yes.

Page 244

1     Q.    What do you mean by "information
2 offensive" there in italics?
3     A.    Yes. Get off the defensive. Change
4 his image from an eccentric, exiled
5 billionaire -- who can have sympathy for somebody
6 like that, right? -- to somebody who is trying to
7 do the right thing and bring democracy to China.
8     Q.    So this is kind of like a PR campaign
9 in a way that's being proposed?
10    A.    Yes.
11    Q.    Let's go to 390. Who is the gentleman
12 pictured on the top right there?
13    A.    That is Mikhail Khodorkovsky.
14    Q.    That's the individual you mentioned
15 earlier today?
16    A.    Yes. He's the Russian political
17 opposition leader who's exiled in London.
18    Q.    There's also a map here that's of the
19 Eurasian area with little numbers and
20 bull's-eyes. Do you see that?
21    A.    Yes.
22    Q.    What do those little markers or
23 bull's-eyes represent? There's numbers next to
24 them.
25    A.    Yes. Those are locations in Russian

Page 245

1 where organized anti-Putin protests had just
2 taken place.
3     Q.    Let's just look at the one that's in
4 the Archangel region near Finland, the top left.
5 It says 100 to 150. Do you see that?
6     A.    Yes.
7     Q.    What does that mean?
8     A.    That means that 100 to 150 people took
9 to the streets on that given day in that
10 nationwide-organized protests against Putin.
11    Q.    When was that protest?
12    A.    There were a few. I don't recall.
13    Q.    It says below that, "Team with exiled
14 Russian opposition leaders and internal Russian
15 opposition activists."
16    A.    Yes.
17    Q.    What is the concept behind that idea?
18    A.    In this case it's a vision to transform
19 the whole Eurasian region into democratic
20 societies in Russia and China, and to use the
21 synergies of the China centric people with those
22 of the Russia centric people and have them work
23 together.
24    Q.    In other words, they're both oppressed
25 by horrible dictatorships. They might as well be

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 246

1  on the same side?
2      A.    Right.
3      Q.    It says, "Link with Chinese people
4  inside of Russia including cross-border traders
5  for propaganda and organizational purposes."
6      A.    Yes.
7      Q.    What does that mean?
8      A.    There's a large Chinese population of
9  both permanent, semipermanent, and migratory
10  inside Russia, especially in central Russia and
11  the Russian Far East, and along the border area
12  illustrated on this chart on page 390.
13          The idea is you work with those
14  traders, Chinese traders who are in Russia, which
15  is freer than China in this regard, to have them
16  bring back pro-Guo, anti-regime material back
17  into China as part of their trading roots, and
18  the authorities don't bother them.
19          So this is just a new way -- as opposed
20  to flying into Beijing where you're going to get
21  caught.  You just do it through the trading
22  networks of Chinese nationals into Russia.
23      Q.    The idea would be to exploit the
24  commercial connection between China and Russia to
25  get information into China that's pro-Guo, so to

Page 247

1  speak?
2      A.    Or that suits what he wants to achieve,
3  yes.
4      Q.    Because it's typically difficult to
5  get -- let's call it -- controversial information
6  into China?
7      A.    Right.
8      Q.    Let's go to 394.  It says here for
9  single individual, regular monitoring with two
10  competitive teams, $2,805,000 per year, all costs
11  included.  Do you see that?
12      A.    Yes.
13      Q.    Was that like an initial price that was
14  quoted to Mr. Guo and Eastern?
15      A.    Yes.  Not Eastern, Mr. Guo.
16      Q.    It says above for one, but with one
17  team only $2,380,000.
18      A.    Yes.
19      Q.    Again, that was just an initial quote?
20      A.    Yes.
21      Q.    It says at the bottom, "This enterprise
22  can easily become a profit-making venture."
23      A.    Yes.
24      Q.    How is that?
25      A.    Mr. Guo is a man who likes to make a

Page 248

1  profit.  He had -- he's got his asset recovery
2  here.  He's getting leverage over bad actors in
3  China.  He can make a lot of money off this.  So
4  it's not simply a philanthropic or political
5  operation.  It could become advantageous to him
6  as a businessman.
7      Q.    In terms of recovering his own money?
8      A.    Yeah.
9      Q.    Is there any other way that it would
10  be?
11      A.    He spelled out some specific ways.
12  They were his ideas, not ours.  They were
13  itemized earlier in this exhibit.
14      Q.    Is that concerning exposing corruption
15  in China?
16      A.    Yes.
17      Q.    Let's go to 395.  It says, "U.S.-based
18  online army, same group as those who helped win
19  Trump election."  What does that mean?
20      A.    That was the online activists who I
21  referred to earlier.
22      Q.    It's the same group.  This is just a
23  kind of recitation of that?
24      A.    Yes.
25      Q.    It says, "Attack tactics include

Page 249

1  breaking news, creation & deployment of memes
2  (memetic warfare), defending friends, trolling
3  opponents, exposing and isolating opponents in
4  policy and media, swarming opponents."
5          Are these tactics that are issued to
6  this U.S.-based online army?
7      A.    That's what they practice already, so
8  we would hire them to carry them out.
9      Q.    In hiring them, you would just pay them
10  as you described earlier with anonymous hackers?
11      A.    No.  It's people who want to write
12  about it, want to develop those memes, want to
13  make a living doing this rather than have their
14  day job working at Walmart.
15      Q.    How are they paid, though?  I just want
16  to understand how they would make money.
17      A.    They would be paid either by check or
18  by cash through a series of LLCs.
19      Q.    I see.  Is it Strategic Vision that has
20  the connections to this online army or is it you
21  personally?
22      A.    Me personally.
23      Q.    Okay.  Just how would that normally
24  work?  You would contact one of these groups
25  online and send them a check if they agreed to

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 250

1 promote the content that you wanted?
2     A.    Yeah, or I know them personally.
3     Q.    How big is this online army that you're
4 able to access?
5     A.    It's 50 principal people with millions
6 of followers who add the volume and the mass to
7 the messages, so the re-tweeting and re-liking
8 and all that other stuff.
9     Q.    So what?  They, like, employ people who
10 have Twitter accounts to promote this content
11 or --
12    A.    Yes.
13    Q.    -- how does it work?
14    A.    Yeah, somebody is on Twitter, has a
15 certain following, has a certain stature in
16 whatever audience that you're looking at, and
17 then you pay them to do this type of work as part
18 of whatever else they're doing.
19    Q.    Do they typically disclose that they're
20 being paid to tweet about this subject?
21    A.    Some of them do.
22    Q.    But not all of them?
23    A.    I doubt it.
24    Q.    Let's go to 397.  I see here that
25 Hudson Institute and Atlas Foundation are

Page 251

1 circled?
2     A.    Um-hum.
3     Q.    Why is that?
4     A.    Because they are the smaller
5 foundations that are effective, despite their
6 small size.
7     Q.    I see.  So was this $11 million or so
8 price point being kind of promoted as you should
9 run an institution like these two?
10    A.    Yes.  It was in response to his request
11 for how much he was even thinking of pouring more
12 in.  And I said, "Pour too much in and people
13 aren't going to take it seriously."
14    Q.    In other words, it's counterproductive
15 to have an over-funded institution?
16    A.    It can be.
17    Q.    That's because people just think that
18 it's a mouthpiece for someone or?
19    A.    Oh, they know it's a mouthpiece anyway.
20 It's just an 800-pound gorilla as opposed to
21 somebody else who fits in with, you know, with
22 everyone else.
23    Q.    Let's go to 398.  It says, "Russia
24 Networking:  Cost."  "We will facilitate, but not
25 manage or coordinate networking with Russian

Page 252

1 opponent leaders and group.  Costs depends on
2 your discussions with them."
3         I'm trying to understand that.  What
4 does that mean?
5     A.    We had offered to introduce Guo to
6 Khodorkovsky and others.
7     Q.    So does this have anything do with the
8 actual research?  So it's not a Russian network
9 that would perform the investigatory research
10 that you would request for an agreement like
11 this?
12    A.    No.
13    Q.    There are these examples of Russia
14 beyond Putin, China beyond communism.
15        Do you see that?
16    A.    Yeah.
17    Q.    What are you talking about there?  What
18 is that?
19    A.    Well, the "Russian beyond Putin" refers
20 to Khodorkovsky's plan to envision a Russia
21 beyond Putin, because so many people sort of
22 believed that Putin is forever.  And there's
23 going to be an end to it, so the question is how
24 will there be an end to Putin's regime and then
25 what's going to replace it.

Page 253

1         So we had that vision.  Let's stop
2 obsessing about Putin and think about post-Putin
3 Russia.  The same as China.  Nearly everyone
4 seems to think that the Chinese Communist Party
5 is forever.  Our vision is to have a finite limit
6 to the party rule, and so think of the People's
7 Republic of China beyond the Chinese Communist
8 Party.
9     Q.    I understand.  Please turn to 401.  It
10 says, "Global electronic intelligence gathering
11 and synthesis capability through social media
12 monitoring."
13    A.    Yes.
14    Q.    Is that the investigatory research kind
15 of work?
16    A.    That's part of what we had proposed,
17 but we did not do this.
18    Q.    This is a different service?
19    A.    Yes.
20    Q.    How is this different?  I just want to
21 understand.  What's the distinction between this
22 global electronic intelligence gathering and what
23 the research agreement contemplated?
24    A.    This particular line item is to
25 collect, harvest data by electronic means through

EASTERN PROFIT CORPORATION LIMITED vs STRATEGIC VISION US, LLC
J. Michael Waller on 02/08/2019

Page 290

```
1           THE VIDEOGRAPHER:  This concludes
2   today's deposition of Mr. Waller.  The time
3   is 5:35.  We are off the record.
4
5
6           (Whereupon, the within proceedings
7   concluded at 5:35 p.m., on the 8th day of
8   February, 2019.)
9
10          *       *       *       *       *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 292

```
1                   ERRATA SHEET
2
3   NAME OF CASE:  EASTERN PROFIT v STRATEGIC
4   DATE OF DEPOSITION:  Friday, February 8, 2019
5   NAME OF WITNESS:  J. MICHAEL WALLER
6   PAGE  LINE   FROM                TO
7
8   ____|_____|_____|_____
9   ____|_____|_____|_____
10  ____|_____|_____|_____
11  ____|_____|_____|_____
12  ____|_____|_____|_____
13  ____|_____|_____|_____
14  ____|_____|_____|_____
15  ____|_____|_____|_____
16  ____|_____|_____|_____
17  ____|_____|_____|_____
18  ____|_____|_____|_____
19  ____|_____|_____|_____
20  ____|_____|_____|_____
21  ____|_____|_____|_____
22  ____|_____|_____|_____
23  ____|_____|_____|_____
24
25
```

Page 291

```
1               D E C L A R A T I O N
2
3           I hereby certify that having been first
4   duly sworn to testify to the truth, I gave the
5   above testimony.
6
7           I FURTHER CERTIFY that the foregoing
8   transcript is a true and correct transcript of
9   the testimony given by me at the time and place
10  specified hereinbefore.
11
12
13          _____
14                   J. MICHAEL WALLER
15
16
17
18  Subscribed and sworn to before me
19
20  this _____ day of _____ 20___.
21
22
23  _____
24      NOTARY PUBLIC
25
```

Page 293

```
1                   REPORTER'S CERTIFICATE
2
3   STATE OF NEW YORK  )
4                      ) ss.
5   COUNTY OF NEW YORK )
6
7           I, ROBERTA CAIOLA, a Shorthand Reporter
8   and Notary Public within and for the State of New
9   York, do hereby certify:
10          That J. MICHAEL WALLER, the witness
11  whose deposition is hereinbefore set forth, was
12  duly sworn by me and that such deposition is a
13  true record of the testimony given by such
14  witness.
15          I further certify that I am not related
16  to any of the parties to this action by blood or
17  marriage and that I am in no way interested in
18  the outcome of this matter.
19          In witness whereof, I have hereunto set
20  my hand on this date, February 15, 2019.
21
22          ROBERTA CAIOLA
23
24
25
```