# Exhibit A2

Atkinson-Baker, Inc.
www.depo.com

```
1            IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF NEW YORK

3    -------------------------------------x

4    EASTERN PROFIT CORPORATION LIMITED,

5        Plaintiff/Counterclaim Defendant,    Case No.

6        -against-                            18-cv-2185

7    STRATEGIC VISION US, LLC,                (JGK)

8        Defendant/Counterclaim plaintiff.

9    ----------------------------------x

10

11

12

13                   Karin MAISTRELLO

14                   NEW YORK, NEW YORK

15                   AUGUST 23, 2019

16

17

18   ATKINSON-BAKER, INC.

19   (800) 288-3376

20   www.depo.com

21

     REPORTED BY:   KATHLEEN T. KEILTY
22                  C.S.R. NO. 000755

23   FILE NO.:     AD0867C

24

25
```

Page 1

Karin Maistrello
August 23, 2019

August 23, 2019

DIRECTIONS
(Continued)

| NUMBER | QUESTION | PAGE | LINE |
|---|---|---|---|
| 6. | At the end of the conversation, did you tell Mr. Podhaskie that you were going to resign as an ACA director? | 65 | 15 |
| 7. | So my question to you is, did you initiate that conversation or did Mr. Podhaskie? | 67 | 7 |
| 8. | So in the conversation where Daniel said something was going on with ACA, did you come -- did you start that conversation with Podhaskie and come to ask him a question or did Podhaskie come to you? | 68 | 21 |
| 9. | Did he give you advice in this discussion? | 76 | 2 |
| 10. | And I'm not going to ask about legal advice right now. I'm just going to say, during the conversation, did Mr. Podhaskie advise you to do anything? Yes or no. | 78 | 2 |
| 11. | Did you take any actions as a result of your discussion with Mr. Podhaskie? | 78 | 16 |
| 12. | Was the topic of your discussion with Mr. Podhaskie the problems that were happening with ACA? | 98 | 5 |

Page 6

THE VIDEOGRAPHER: My name is Michael Bennett. I am your videographer and I represent Atkinson-Baker, Inc. of Glendale, California. I am a Notary Public in and for the State of New York. I am not financially interested in this action nor am I a relative or employee of any attorney of any of the parties.

The date is August 23rd, 2019. The time is approximately 11:46 a.m. This deposition is taking place at the offices of Bryan Cave Leighton Paisner LLP, located at 1290 Avenue of the Americas, in New York, New York. This is Case No. 18-cv-2185, entitled Eastern Profit Corporation Limited, plaintiff and counterclaim defendant, versus Strategic Vision US, LLC, defendant and counterclaim plaintiff. The deponent is Karin Maistrello. This deposition is being taken on behalf of defendant/counterclaim plaintiff Strategic Vision US, LLC. Your court reporter is Kathleen Keilty with Atkinson-Baker, Inc., and I would ask

Page 7

counsel to please identify themselves.

MR. GREIM: Eddie Greim taking the deposition, from Graves Garrett LLC, representing Plaintiff Strategic Vision.

MS. TESKE: Good morning. Erin Teske, on behalf of the deponent, from Hodgson Russ.

MR. GRENDI: I'm Zach Grendi of Zeichner Ellman & Krause for Plaintiff Eastern Profit.

THE VIDEOGRAPHER: Thank you all very much.

Will the reporter please swear in the witness.

WHEREUPON,

KARIN MAISTRELLO,

having been first duly sworn/affirmed by a Notary Public within and for the State of New York (Kathleen T. Keilty), is examined and testifies as follows:

THE WITNESS: I swear.

EXAMINATION
BY MR. GREIM:

Q. Good morning, Ms. Maistrello.
A. Good morning.

Page 8

Q. Have you been deposed before?
A. No. First time.
Q. Okay. I'll ask you a series of questions about the case. I would just ask that you answer clearly. You know that you can't nod your head. You'll want to speak clearly so it's in the transcript. Do you understand that?
A. Yes, I do.
Q. All right. And if my question is unclear for any reason or you don't understand it, please just let me know and I'll rephrase it or we'll work it out. Okay?
A. Okay.
Q. Could you please state your current residential address.
A. My address is 15-17 Gifford Avenue, Jersey City, New Jersey 07304.
Q. What is your age?
A. Twenty-nine.
Q. And I understand you're an Italian citizen?
A. I am.
Q. In the US on a visa of some kind?
A. Correct.
MR. GREIM: Object to the form and

Page 9

3 (Pages 6 to 9)

Atkinson-Baker, Inc.
www.depo.com

**Page 10**

1  to relevancy.
2  Q.  Tell us about, if you could -- I'm just
3  going to ask you some background questions.  I take
4  it you've got some sort of educational training.
5  Could you just walk us through your, you know, post
6  high school training that you've had.
7  A.  I started at university.  I studied in
8  Rome for three years, interpreting and translation.
9      After that, I moved to China.  I
10 attended Nankai University.  I got my first Master's
11 Degree in Chinese literature and my second Master's
12 Degree in linguistics and applied linguistics.
13 Q.  Okay.  What about after that?  Anything
14 else?
15 A.  As far as studying?
16 Q.  Yes.
17 A.  Nothing else.
18 Q.  Okay.  What was your -- so it sounds
19 you like your last educational degree was from Nankai
20 University?
21 A.  That is correct.
22 Q.  Let's just say starting with from that
23 point forward, could you just tell us your employment
24 history.
25 A.  After moving to the States, I was

**Page 11**

1  employed by Golden Spring New York, and I've been
2  working there since then.
3  Q.  Okay.  Now when was that that you moved
4  to the United States and started working for Golden
5  Spring?
6  A.  I started working for Golden Spring in
7  February 2018.
8  Q.  Is that also when you moved to the
9  United States?
10 A.  I moved slightly earlier.
11 Q.  Did you come here thinking you were
12 going to work for Golden Spring or did you move here
13 and then find Golden Spring as a place to work?
14     MR. GREIM:  Object and direct the
15 witness not to answer.
16     What's the relevance?
17     MR. GREIM:  I am just trying to
18 understand the witness's background.
19 These are typical questions.
20     MS. TESKE:  I've given you some
21 leeway, but none of this is relevant to
22 the case.
23     MR. GREIM:  Okay.
24 Q.  So what languages are you proficient
25 in?

**Page 12**

1  A.  Italian, German, French, English,
2  Hungarian, Chinese.
3  Q.  Okay.  Now, let's see, you said that
4  you've been working for Golden Spring since
5  February 2018?
6  A.  That's correct.
7  Q.  During that time, have you had any
8  other jobs?
9  A.  No.
10 Q.  Have you been the director or officer
11 of any other entity?
12 A.  Can I ask you to rephrase?
13 Q.  Sure.
14     Since February of 2018, let's say from
15 then to today, have you been a director or officer of
16 any other entity?
17     MS. TESKE:  Object to the form.
18     You can answer.
19 A.  I was director of ACA from January 1st
20 to July 26th of 2019.
21 Q.  Any entities other than ACA?
22     MS. TESKE:  Object and direct the
23 witness not to answer.
24     MR. GREIM:  All right.
25 Q.  What were your duties as a director of

**Page 13**

1  ACA?
2  A.  I was director and I did not have any
3  specific duty.
4  Q.  Oh, I forgot to ask you this before.
5  Have you done any work for hire on the side?
6      I asked you about where you've been
7  employed.  I asked you about being an officer or
8  director.  I'm going to go back to the same period.
9  From February 2018 to today, have you done any other
10 work on side for hire for any other client.
11     MS. TESKE:  I am going to direct
12 the witness it's a yes or no question and
13 that's it.
14 A.  No.
15 Q.  How did you to become a director of
16 ACA?
17 A.  I was asked by William to join ACA and
18 I gladly accepted.
19 Q.  Okay.  William who?
20 A.  William Je, spelled J-e.
21 Q.  Did you know Mr. Je previously?
22 A.  Yes.
23 Q.  How did you know him?
24 A.  I was introduced by William -- to
25 William by Mrs. Wang as a person of trust, and I met

Karin Maistrello
August 23, 2019

**Page 14**

```
1   him several times.                              11:54
2       Q.    You met him several times before he
3   offered the directorship to you?
4       A.    That's correct.
5       Q.    Now, when you said Mrs. Wang or
6   Ms. Wang, are you referring to Yvette Wang?
7       A.    Yes, I'm referring to her.
8       Q.    The person sitting at this table?
9       A.    Yes.
10      Q.    Okay.  When did Ms. Wang introduce you
11  to Mr. Je?
12      A.    I don't remember.
13      Q.    Let me ask you this way.  If you became
14  a director on January 1, 2019, how long before that
15  had you been introduced to Mr. Je by Ms. Wang?  11:55
16      A.    I would say several months.
17      Q.    Maybe here's another way to look at it.
18  You came to the US or I guess you started with Golden
19  Spring in February of 2018.  How long after that time
20  did Ms. Wang introduced you to Mr. Je?
21            MS. TESKE:  I object.  Asked and
22  answered.
23            If you have a different answer go
24  ahead and provide it.
25      A.    I really don't remember.
```

**Page 15**

```
1       Q.    How is it that you came to meet      11:55
2   Mrs. Wang?
3             MS. TESKE:  Object and direct the
4   witness not to answer.
5             MR. GREIM:  On what basis?
6             MS. TESKE:  Judge Freeman was very
7   specific about the lines of inquiry that
8   you were entitled to pursue in this
9   deposition, and this is way outside the
10  bounds and I've given you lots of room.
11            MR. GREIM:  Okay.  I'm afraid -- I
12  hate to do this too early, but these are
13  just foundational questions to a witness
14  being able to explain things about ACA,
15  about ACA's relationship to Eastern       11:56
16  Profit.  We know that Ms. Wang is serving
17  as attorney in fact for Eastern Profit.
18  If we can't ask this, I don't know -- I
19  don't know really we can ask any
20  questions.  So I'm afraid we're going to
21  have to dial up on this question.
22            MS. TESKE:  Can you repeat the
23  question?
24            MR. GREIM:  I'll just ask the
25  reporter to read back the question.
```

**Page 16**

```
1             (Whereupon, the record is read.)     11:57
2             MS. TESKE:  Yeah, you can call the
3   judge.
4             MR. GREIM:  All right.  Let's go
5   off the record for a second:
6             THE VIDEOGRAPHER:  We are off the
7   record, 11:56 a.m.
8             (Whereupon, there is a discussion off
9   the record.)
10            Whereupon, the following teleconference
11  is held with the Hon. Debra Freeman:)
12            MR. GREIM:  So, your Honor, this
13  is the issue.  We have just really begun.
14  I am laying the foundation of
15  Ms. Maistrello coming on to ACA as a       12:02
16  director.  I've asked her if somebody
17  invited her on.  It was William Je.  I've
18  asked her who introduced her to William
19  Je, it was Ms. Yvette Wang, and my
20  question was, you know, who introduced
21  you to Evette Wang or I think it was how
22  did you meet Evette Wang and we got an
23  instruction not to answer that question.
24  And, your Honor, I'm just trying to lay
25  the ground work.
```

**Page 17**

```
1             Remember, Yvette Wang is the         12:02
2   Golden Spring person who is a -- the
3   attorney in fact for Eastern Profit, and
4   so I want to know how it is that
5   Eastern -- an Eastern Profit person has
6   introduced a director of ACA to ACA.
7             MS. TESKE:  Your Honor, this is
8   Erin Teske.  Good afternoon.  I apologize
9   for the call.  We spoke for about -- I
10  think for about 90 minutes of our
11  conversation yesterday was about Karin
12  Maistrello and the deposition and the
13  scope of the documents and testimony
14  requests that were in the subpoena to
15  Ms. Maistrello, and at the end of that    12:03
16  conversation you gave -- your Honor gave
17  very explicit instructions that the two
18  lines of inquiry that were permitted --
19  to be permitted at this deposition were
20  the loan from ACA to Eastern Profit and
21  the relationship between ACA and Eastern
22  Profit.  And I've allowed Mr. Greim to
23  ask a bunch of background questions about
24  Ms. Maistrello, including, you know, from
25  whom she accepted her position at ACA and
```

## Page 26

1  the defense that you're trying to raise   12:12
2  here.
3      MR. GREIM: And, your Honor, just
4  to be clear, we're going to ask about her
5  resignation as well, the thing that makes
6  ACA not reachable.
7      MS. TESKE: And I have no
8  objection to this.
9      MR. GREIM: Okay.
10     THE COURT: All right, good.
11     MR. GREIM: All right.
12     THE COURT: Carry on, then.
13     MR. GREIM: Thank you.
14     MS. TESKE: Thank you.
15     MR. GRENDI: Thank you, your   12:13
16  Honor.
17     THE COURT: You're welcome.
18     (Whereupon, the teleconference
19  with the Hon. Debra Freeman concludes.)
20     THE VIDEOGRAPHER: We are back on
21  the record at 12:13 p.m.
22     (Whereupon, the record is read as
23  follows:
24     "Question: How is it that you came to
25  meet Mrs. Wang?")

## Page 27

1      A.   I met her for the first time at a job   12:14
2  interview and that's how we met.
3      Q.   Now, you said you met William Je
4  several times before becoming a director.
5      A.   That's correct.
6      Q.   Did you understand when you were
7  meeting him what his role was with ACA?
8      A.   We never spoke about ACA before.
9      Q.   But I presume that you did speak about
10 ACA when he offered you a directorship; is that
11 right?
12     A.   Briefly.
13     Q.   And was that discussion in person or
14 over the phone?
15     A.   In person.   12:15
16     Q.   Where did that happen?
17     A.   That happened at our office.
18     Q.   I'm sorry. Who's office?
19     A.   Golden Spring New York's office.
20     Q.   Your testimony again is that it was
21 several months -- well, actually let me ask you.
22        When -- how long before January 1st,
23 2019 did that discussion happen?
24     MR. GRENDI: Object to the form.
25     A.   Probably a month before.

## Page 28

1      Q.   Tell me what you remember Mr. Je saying   12:16
2  to you about the offer.
3      A.   We didn't speak much. He just told me
4  that he was interested in some business in the US,
5  and he asked whether I wanted to join.
6      Q.   What did he say the business was?
7      A.   Fund investment.
8      Q.   Now did you have a background in fund
9  investment?
10     A.   I do not.
11     Q.   Did you have any questions for Mr. Je
12 about what this role would entail?
13     A.   No.
14     Q.   Why not?
15     A.   I trusted his judgment.   12:16
16     Q.   Why did you trust his judgment?
17     MS. TESKE: Object to the form.
18     You can answer. You can answer.
19     A.   I trust him, therefore, I trust his
20 judgment.
21     Q.   Okay. I guess let me rephrase it.
22        What is it about him that made you
23 trust his judgement.
24     MS. TESKE: Object to the form.
25     You can answer.

## Page 29

1      A.   He was introduced to me by someone I   12:17
2  trust and that's how it works for me, the person who
3  introduced us trusted him and I got to trust him.
4      Q.   So did you tell him yes on the spot?
5      A.   I did.
6      Q.   Did you ask him what your duties would
7  be?
8      A.   Briefly.
9      Q.   What did he say?
10     A.   Again, he was interested in some
11 business in the US and was asking if I could help
12 find some investors.
13     Q.   Okay.
14     A.   Some --
15     Q.   Go ahead.   12:17
16     A.   I'm sorry. Some projects to invest in.
17     Q.   So if I understand correctly, he told
18 you that your duties would be finding projects for
19 ACA to invest in?
20     MS. TESKE: Object to the form.
21     You can answer.
22     A.   Yes.
23     Q.   Did he say -- did he tell you what
24 sorts of projects ACA invested in?
25     A.   No, he did not.

8 (Pages 26 to 29)

Karin Maistrello
August 23, 2019

**Page 30**

```
1    Q.  So, like, for example, construction          12:18
2  projects, renovation projects, did he give you any
3  kind of detail what he meant by projects?
4    A.  Again, no, he did not.
5    Q.  Is ACA a hedge fund?
6    A.  I do not know.
7    Q.  Did Mr. Je tell you who you would be
8  reporting to, if anyone, as a director?
9    A.  No, he didn't.
10   Q.  Did he tell you who else was involved
11 with the company?
12   A.  No, he did not.
13   Q.  Did he tell you if there were any other
14 directors?
15   A.  No, he did not.                              12:19
16   Q.  Did he tell you whether he was a
17 director?
18   A.  No, he did not.
19   Q.  Did you have any concerns about working
20 for ACA?
21   A.  No.
22       MS. TESKE:  Object to the form.
23       You can answer.
24   A.  No.
25   Q.  When was the first time you heard of
```

**Page 31**

```
1  ACA?                                               12:19
2    A.  When he asked me to become director.
3    Q.  Did you do any research to learn more
4  about what ACA was?
5    A.  I did not.
6    Q.  At any time after your discussion with
7  Mr. Je, did you do any research to determine what ACA
8  was?
9    A.  No, I did not.
10   Q.  Did you understand what jurisdiction
11 ACA was registered in?
12       MS. TESKE:  Object to the form of
13       the question.
14       You can answer.
15   A.  I don't answer it -- I'm sorry.  I          12:20
16 didn't understand the question.
17   Q.  Did Mr. Je tell you where ACA was
18 registered?
19   A.  No.
20   Q.  Did he tell you what country or state
21 had jurisdiction over ACA and its directors?
22       MS. TESKE:  Object to the form --
23       MR. GRENDI:  Object to the form.
24       MS. TESKE:  -- of the question.
25   A.  No.
```

**Page 32**

```
1    Q.  Did he refer you to any attorney to          12:20
2  advise you on that question?
3    A.  No.
4    Q.  Okay.  Let's talk about your time with
5  ACA.  First of all, as director, did you have an
6  office somewhere?
7    A.  No, I did not.
8    Q.  Did ACA have an office in the United
9  States anywhere?
10   A.  I do not know.
11   Q.  Between the time of your appointment
12 and the time that you are saying that you resigned,
13 did you do any work as a director of ACA?
14   A.  No, I didn't.
15   Q.  Did you find any projects for Mr. Je?        12:21
16   A.  No, I didn't.
17   Q.  Did you try to find projects for
18 Mr. Je?
19   A.  No, I didn't.
20   Q.  Did Mr. Je ever ask you why you were
21 not finding projects?
22   A.  No.
23   Q.  Did you ever talk to Mr. Je about your
24 role with ACA after that conversation?
25       MR. GRENDI:  Object to the form.
```

**Page 33**

```
1        MS. TESKE:  Object to the form.             12:22
2        You can answer.
3    A.  No.
4    Q.  Let's be clear.  There was an
5  objection.  I'm going to make sure that this is clear
6  for the record.
7        So is it your testimony that after the
8  in-person meeting where Mr. Je offered the
9  directorship to you, you never spoke with Mr. Je
10 again about your work as an ACA director?
11   A.  That's correct.
12   Q.  Okay.  I'm going to broaden the
13 question now.
14       After the discussion with Mr. Je where
15 he made the offer to you, did you ever discuss your  12:22
16 work as an ACA director with any other person?
17   A.  No, I didn't.
18   Q.  Did you ever discuss it with Yvette
19 Wang?
20   A.  I did not.
21   Q.  Were you ever paid for your work as a
22 director?
23   A.  No.
24   Q.  Did you sign any document appointing
25 you as a director?
```

Atkinson-Baker, Inc.
www.depo.com

**Page 46**

```
 1   saying that I would like to resign, so he was        12:39
 2   definitely expecting it.
 3       Q.   When did you write that email?
 4       A.   On the same day, so July 26th.
 5       Q.   Okay.  At what time?
 6       A.   I don't remember.
 7       Q.   Do you have a copy of that email still?
 8       A.   I do.
 9       Q.   I would like to ask that you produce
10   that.
11            And I'll say it on the record now,
12   we'll talk about it because this is really something
13   for me and your counsel, but I would like, if I
14   could, to have the electronic version of the emails
15   and responses.                                        12:40
16            MS. TESKE:  Follow up with me, if
17   you could.  I'm taking notes, but just in
18   case, just follow up with me in an email
19   after.
20            MR. GREIM:  Very good.
21       Q.   So when you told Mr. Je, you would like
22   to resign in the prior email that we don't have with
23   us here today, what was his response?
24            MS. TESKE:  Object to the form.
25            But you can answer.
```

**Page 47**

```
 1       A.   Okay.                                        12:41
 2       Q.   Is that literally what the email said?
 3       A.   I don't remember literally, but that
 4   was definitely the meaning.
 5       Q.   Did he tell you that a new director
 6   would need to be appointed to fill your place?
 7       A.   No.
 8            MS. TESKE:  Object to the form.
 9       Q.   Do you know whether a new director
10   needs to be appointed to take your place?
11       A.   No, I don't.
12       Q.   Are you aware of any other directors or
13   officers of ACA who are in the United States?
14       A.   No, I'm not.
15       Q.   How often does Mr. Je come to the           12:41
16   United States?
17            MS. TESKE:  Object to the form.
18            Answer if you know.
19       A.   I don't know.
20       Q.   Your testimony is that you've met him
21   in person several times, though, in 2019?
22       A.   Yes.
23            MS. TESKE:  Object to the form,
24   but go ahead.
25       Q.   I notice that the name William is
```

**Page 48**

```
 1   highlighted in plaintiff Exhibit 1.  Do you see that? 12:42
 2       A.   I do.
 3       Q.   Why is that?
 4       A.   'Cause when I did the search in my
 5   email everything that comes with that "William" gets
 6   highlighted.
 7       Q.   When you did that search, how many
 8   emails with William Je did you find in your inbox?
 9            MS. TESKE:  Object to the form.
10       A.   I don't know.
11       Q.   One or two or more than that?
12            MS. TESKE:  Object to the form.
13       A.   I really don't know.
14       Q.   Were they all listed together there
15   when you ran your search?                             12:42
16            MS. TESKE:  Object to the form.
17       A.   By typing William, all the emails with
18   "William" come up but not necessarily this William.
19       Q.   Who drafted the resignation letter?
20       A.   William did.
21       Q.   Did he send this to you by email?
22       A.   He did.
23       Q.   Is that your signature?  And I'm
24   directing you now to Exhibit 2.  Is that your
25   signature on the line?
```

**Page 49**

```
 1       A.   Yes, it is.                                  12:43
 2       Q.   Did you review this document before you
 3   signed it?
 4       A.   Yes, I did.
 5       Q.   Did you make any changes to it?
 6       A.   I did not.
 7       Q.   Do you know whether Mr. Je took any
 8   steps, any further steps to make your resignation
 9   effective?
10            MS. TESKE:  Object to the form.
11            You can answer.
12       A.   I don't know.
13       Q.   Do you know whether he filed this with
14   the requisite authorities in Hong Kong?
15            MS. TESKE:  Object to the form.             12:44
16            You can answer.
17       A.   I don't know.
18       Q.   Did -- have you asked Mr. Je if he has
19   taken any steps with your resignation letter?
20       A.   I have not.
21       Q.   Do you know whether under either Hong
22   Kong law or the bylaws and formation documents of the
23   company you have effectively resigned --
24            MS. TESKE:  Object.
25       Q.   -- from ACA?
```

13 (Pages 46 to 49)

Atkinson-Baker, Inc.
www.depo.com

**Page 54**

1  A.  I have not.  12:51
2  Q.  So sitting here today, you can't tell
3  us anything about Eastern Profit; is that correct?
4  A.  That's correct.
5  Q.  You don't know what it does?
6  A.  I have no idea.
7  Q.  Did you realize that we're here in the
8  case of Eastern Profit versus Strategic Vision?
9      MS. TESKE:  Object to the form.
10     You can answer.
11 A.  Yes, I did.
12 Q.  So other than hearing that it's in the
13 title of the case, you've never heard of Eastern
14 Profit?
15 A.  I have not.  12:51
16 Q.  Have you ever heard of Strategic
17 Vision?
18 A.  I have not.
19 Q.  And you understand it's in the title of
20 the case that we're here under, correct?
21 A.  That's correct.
22 Q.  So you've never spoken to Yvette Wang
23 about Strategic Vision?
24 A.  No, I have not.
25 Q.  You've never spoken to Yvette Wang

**Page 55**

1  about Eastern Profit?  12:52
2  A.  No, I have not.
3      (Whereupon, Maistrello Exhibit 3,
4      subpoena issued to ACA Capital Group Limited,
5      is marked for identification, as of this
6      date.)
7      (Whereupon, Maistrello Exhibit 4,
8      subpoena issued to Karin Maistrello, is marked
9      for identification, as of this date.)
10 Q.  I'm going to hand you what we're
11 marking as Exhibits 3 and 4.
12     Please take a look at Exhibit 3.
13 A.  Which one is that?
14     MR. GRENDI:  Which one is that,
15     they look the same.  12:54
16     MR. GREIM:  They're not.  You'll
17     see it's a bit different.
18     MS. TESKE:  Which one is 3?
19     MR. GREIM:  Exhibit 3 is the ACA.
20     MS. TESKE:  Thank you.
21 Q.  So do you see that Exhibit 3 is a
22 subpoena to ACA Capital Group Limited?
23 A.  Mm-hmm, yes.
24 Q.  By the way, is ACA Capital Group
25 Limited the official name of the entity of which you

**Page 56**

1  are a director?  12:54
2      MS. TESKE:  Object to the form.
3  A.  Can you please ask it again.
4  Q.  Is ACA Capital Group Limited the
5  official name of the entity of which you are a
6  director?
7      MS. TESKE:  Same objection.
8      You can answer.
9  A.  I am not sure.
10 Q.  So you'll see the first two pages are a
11 notice of subpoena.
12 A.  Mm-hmm.
13 Q.  If you turn to page 3, you'll see the
14 subpoena itself.  Do you see that?
15 A.  I do.  12:55
16     MS. TESKE:  Object to the form.
17     You can answer.
18 Q.  And do you see about a quarter of the
19 way down it says "To"?
20 A.  Yes.
21 Q.  Okay.  And what does it say on that
22 line, could you read that, please?
23 A.  "ACA Capital Group Limited to be served
24 to its director, Karin Maistrello 17 Gifford
25 Apartment 5F, Jersey City, New Jersey, 07304."

**Page 57**

1  Q.  Is that your address?  12:55
2  A.  It is.
3  Q.  And were you served with this subpoena
4  at that address?
5      MS. TESKE:  Object to the form.
6      You can answer.
7  A.  Yes.
8  Q.  What did you do after you were served
9  with this subpoena?
10     MS. TESKE:  Object if the form.
11     You can answer it.
12 A.  I gave it to our lawyer.
13 Q.  And was that Ms. Teske sitting here
14 next to you?
15 A.  It was not.  12:56
16 Q.  Who was that?
17 A.  Daniel Podhaskie.
18 Q.  When you say "our lawyer," do you mean
19 Golden Spring's lawyer?
20 A.  Golden Spring's lawyer.
21 Q.  Now, don't -- I'm not going to ask you
22 for the content of your discussion.  My only question
23 is, did you ask Mr. Podhaskie for legal advice?
24 A.  I asked him --
25     MS. TESKE:  No.  Whoa, whoa, whoa,

15 (Pages 54 to 57)

Atkinson-Baker, Inc.
www.depo.com

```
 1      whoa.                                    12:56
 2           MR. GRENDI:  Object.  Yes or no, yeah.
 3      Q.   Yes or no.  It's a yes or no answer.
 4           MS. TESKE:  If you thought you
 5      were seeking legal advice, say yes.  If
 6      not, you can say no.
 7      A.   Then no.
 8      Q.   All right.  Then what did you discuss
 9  with him?
10      A.   I asked him what should I do with
11  these.
12      Q.   And what did he say?
13           MS. TESKE:  No, no, no, no, no.
14           MR. GRENDI:  Yeah.
15           MS. TESKE:  That sounds like --     12:57
16           MR. GRENDI:  Misunderstanding.
17           MS. TESKE:  No.  That's sounds
18      like a misunderstanding, so I'm going to
19      direct the witness not to answer.
20           MR. GREIM:  Okay.
21      Q.   What did you do with these after you
22  showed them to Mr. Podhaskie?
23      A.   Nothing.
24      Q.   I'm sorry.  Did you give them to him or
25  did you keep them?
                                                 Page 58
```

```
 1      A.   I gave them to him.                  12:57
 2      Q.   Did you keep a copy for yourself?
 3      A.   I did not.
 4      Q.   And just to be clear, let's also take a
 5  look at Exhibit 4.  Do you recognize Exhibit 4?
 6      A.   I do not.
 7      Q.   Okay.  You'll see that under where it
 8  says, "Please take notice," do you see that it says
 9  that "The defendant/counterclaim plaintiff shall
10  cause the attached subpoena directed to nonparty
11  Karin Maistrello to be served after service of this
12  notice."  Do you see that?
13      A.   Yes, I do.
14      Q.   And then if you turn two pages, you see
15  a subpoena?                                  12:58
16           MS. TESKE:  Object to the form.
17      A.   Yes.
18      Q.   And do you see the "To" line?
19      A.   I see it.
20      Q.   Could you read who that's to?
21      A.   "Karin Maistrello, 17 Gifford Avenue,
22  Apartment 5F, Jersey City, New Jersey, 07304."
23      Q.   Is this the subpoena that did you
24  received?
25           MS. TESKE:  Objection to form.
                                                 Page 59
```

```
 1           You can answer.                      12:58
 2      A.   Yes.  I believe so.
 3      Q.   So do you recall receiving two
 4  subpoenas, one for you, Karin Maistrello and the
 5  other for ACA to be served on you?
 6           MS. TESKE:  Object to the form.
 7           You can answer.
 8      A.   Yes.
 9      Q.   And when you said that you gave them to
10  Mr. Podhaskie.  Did you give him both subpoenas?
11      A.   Yes.
12      Q.   And you didn't keep a copy of either
13  subpoena, correct?
14      A.   Correct.
15      Q.   Did you -- you'll see that on the back  12:59
16  of the one that's addressed to you, this is
17  Exhibit 4, if you look, there's an Exhibit A.  Do you
18  see it lists about eight different document items?
19      A.   Yes.
20      Q.   Did you take any steps to search for
21  these documents?
22           MS. TESKE:  Object to the form.
23           You can answer.
24      A.   No.
25      Q.   Let me ask you this.  When was the
                                                 Page 60
```

```
 1  first time that you saw Exhibits 3 and 4.     01:00
 2           MS. TESKE:  Object to the form.
 3      A.   I don't know.  To be honest, when I
 4  received this, I didn't read them.
 5      Q.   Did you read them before you gave them
 6  to Mr. Podhaskie?
 7      A.   I did not.
 8      Q.   Had you seen Exhibits 3 and 4 before
 9  the time you were served with process at your house?
10           MS. TESKE:  Object to the form.
11           You can answer.
12      A.   No.
13      Q.   Why did you choose to resign?
14           Well, let me strike that.
15           Why did you resign on July 26th, 2019?  01:01
16      A.   I heard from Daniel that something was
17  going on with ACA, something I --
18           MS. TESKE:  Whoa, whoa, whoa,
19      whoa, whoa, whoa, whoa, whoa.
20           MR. GRENDI:  Yeah.
21           MS. TESKE:  Conversations between
22      you and Daniel are privileged and you are
23      directed not to answer with respect to
24      those conversations.
25           MR. GREIM:  I would say this, if
                                                 Page 61
```

16 (Pages 58 to 61)

Karin Maistrello
August 23, 2019

Atkinson-Baker, Inc.
www.depo.com

## Page 62

```
1       Mr. Podhaskie is giving legal advice,           01:01
2   it's one thing.  If Mr. Podhaskie is
3   telling her that a subpoena is coming,
4   that is entirely another thing.
5   Q.   So I'm going to ask you --
6       MS. TESKE:  No.  Well -- okay.
7   You --
8       MR. GREIM:  I'll make my record --
9       MS. TESKE:  That's fine.
10      MR. GREIM:  -- and you can listen
11  and you can...
12  Q.   So we'll take this in steps, okay?
13      MS. TESKE:  Don't answer the
14  question.
15  Q.   Did Mr. Podhaskie -- I'm going to ask    01:01
16  you about things that Podhaskie told you, not about
17  advice he gave you, okay?  There's a difference.
18      What did Mr. Podhaskie tell you was
19  going on with ACA?
20      MS. TESKE:  Object to the form of
21  the question.  Direct the witness not to
22  answer.
23      I need -- if you can be really
24  specific in what you're asking.
25      MR. GREIM:  Okay.
```

## Page 63

```
1       MS. TESKE:  And she can tell me           01:02
2   and I can decide whether or not that's an
3   attorney-client privileged communication.
4       MR. GREIM:  We'll see.  We'll find
5   a way.
6   Q.   Let's be very careful here, okay.  I
7   don't want you to waive any privilege.
8       When can was the discussion with
9   Mr. Podhaskie that you were starting to tell us
10  about?
11  A.   I don't remember.
12  Q.   Was it on July 26th?
13  A.   I don't remember.
14  Q.   Was it on July 25th?
15  A.   I do not remember.                        01:02
16  Q.   Does Mr. Podhaskie -- did you
17  understand Mr. Podhaskie to be counsel to ACA?
18      MS. TESKE:  Object to the form.
19      You can answer.
20  A.   No.
21  Q.   Did you ever ask Mr. Podhaskie for
22  legal advice relating to ACA?
23      MS. TESKE:  Object to the form.
24      You can answer.
25  A.   No.
```

## Page 64

```
1   Q.   Did Mr. Podhaskie ever give you advice   01:03
2   relating to ACA?
3       MS. TESKE:  Object to the form.
4       You can answer.
5   A.   No.
6   Q.   What did Mr. Podhaskie tell you was
7   going on with ACA?
8       MS. TESKE:  Object to the form.
9       Direct you not to answer.
10      I need to know more about the
11  context in which this communication
12  happened before she can answer that
13  question.
14      MR. GREIM:  Okay.  We'll keep
15  going.  We'll see, we'll pick around the        01:03
16  edges here.
17  Q.   Just go slowly, give your counsel a
18  chance to object if she wants to, okay?
19      Did Mr. Podhaskie -- when you spoke
20  with Mr. Podhaskie, was it over the phone or in
21  person?
22      MS. TESKE:  You can answer.
23  A.   In person.
24  Q.   Where did the conversation take place?
25      MS. TESKE:  You can answer.
```

## Page 65

```
1   A.   At our office.                            01:04
2   Q.   What time of day was it?
3   A.   I don't remember.
4   Q.   Who else was present?
5   A.   Just the two of us.
6   Q.   Was Yvette Wang present?
7   A.   She was not.
8   Q.   Without getting into any legal
9   advice, did Mr. Podhaskie tell you that he had spoken
10  with William Je?
11      MS. TESKE:  Object to the form of
12  the question and direct the witness not
13  to answer.
14  Q.   Did Mr. Podhaskie -- okay.
15      Let me ask you this.  At the end of        01:05
16  the conversation, did you tell Mr. Podhaskie that you
17  were going to resign as an ACA director?
18      MS. TESKE:  Object to the form of
19  the question and direct the witness not
20  to answer.
21      MR. GREIM:  The problem is that's
22  a yes or no answer.
23      MS. TESKE:  But it's a yes or no
24  answer about what she told her company's
25  lawyer in a conversation where it was
```

Karin Maistrello
August 23, 2019

**Page 66**

```
 1      just the two of them about an issue in          01:05
 2      which she may very well have been seeking
 3      legal advice whether or not, you know,
 4      she understands the scope of that or not,
 5      and she's a Golden Spring employee who
 6      went to the only attorney she knows,
 7      Golden Spring's attorney, to talk about a
 8      legal document and you want to inquire
 9      about those conversations.  And I just
10      can't give you a lot of leeway there.
11           MR. GREIM:  But the problem is,
12      though, that it's incumbent upon the
13      attorney -- not every lawyer-client
14      discussion is protected by the privilege,
15      and if she's coming to him as the ACA       01:06
16      director and he's not counsel for ACA --
17           MS. TESKE:  It doesn't matter.
18           MR. GREIM:  -- it's incumbent upon
19      him to say I'm counsel for Golden Spring.
20      But we don't need to do this on the
21      record.  I understand your objection.
22      Q.   Let me ask you this.  Did Mr. Podhaskie
23      initiate the conversation or did you?
24           MS. TESKE:  Object to the form.
25           You can answer.
```

**Page 67**

```
 1      A.   I'm not clear about what conversation     01:06
 2      we're talking about.
 3      Q.   Okay.  You began to tell us a few
 4      minutes ago that you heard from Daniel something was
 5      going on with ACA.  That's the conversation I'm
 6      talking about.
 7           So my question to you is, did you
 8      initiate that conversation or did Mr. Podhaskie?
 9           MS. TESKE:  Okay.  Object and
10      direct the witness not to answer, and I
11      don't know that if that specific
12      conversation was a follow-up on a
13      previous conversation that they had, and
14      I do not know enough to allow the
15      witness -- again, we are talking about a    01:07
16      Golden Spring's employee who went to the
17      only attorney she knows, her Golden
18      Spring's attorney, to talk about
19      something related to a legal case or a
20      legal document.  I'm not going to allow
21      the witness --
22           MR. GREIM:  Actually, that was not
23      the witness's testimony, but I will ask
24      you that now.
25      Q.   Did you go to Mr. Podhaskie to ask him
```

**Page 68**

```
 1      about a legal document?                       01:07
 2           MS. TESKE:  She's already
 3      testified that she did.  She already
 4      testified that she brought these
 5      documents to him.  I'm not going to allow
 6      the witness to divulge infor- --
 7           MR. GREIM:  That was the difficult
 8      conversation.  That's the question.
 9      That's the key.  That's when she handed
10      him the documents.  This conversation
11      happened earlier, that's what I'm asking
12      about.
13      Q.   And so my --
14           MS. TESKE:  We don't --
15      Q.   My question is, in the conversation    01:08
16      where you said you heard from Daniel something was
17      going on with ACA -- let me ask you.  That was not
18      the conversation where you gave him these documents,
19      was it?
20      A.   It was not.
21      Q.   So in the conversation where Daniel
22      said something was going on with ACA, did you come --
23      did you start that conversation with Podhaskie and
24      come to ask him a question or did Podhaskie come to
25      you?
```

**Page 69**

```
 1           MS. TESKE:  Okay.  Object.  Direct      01:08
 2      the witness not to answer.
 3           The only way I am going to get
 4      comfortable with the witness answering
 5      these questions is if I know more about
 6      what those conversations entailed, and I
 7      don't -- and that conversation can't
 8      happen on the record.
 9           MR. GREIM:  Okay.
10           MS. TESKE:  I need to step out
11      with the witness so I can understand the
12      full scope of what is going on so I
13      can --
14           MR. GREIM:  Okay.  Let's go ahead.
15      Let's all refresh in our minds.  You know  01:09
16      what?  Actually we will come back to it.
17      We'll do that at the end with a bunch of
18      other stuff.  Okay, let's put a place
19      mark on this and we'll come back to it.
20      BY MR. GREIM:
21      Q.   But let me come back to my question,
22      though, because I don't -- I think you began to
23      answer it talking about this discussion, so now I'm
24      just going to ask you, why did you decide to resign
25      as a director of ACA on July 26th?
```

18 (Pages 66 to 69)

Atkinson-Baker, Inc.
www.depo.com

**Page 70**

```
1         MS. TESKE:  And I'm going to                    01:09
2    caution you not to reveal any
3    communications that you had with
4    Mr. Podhaskie.
5         A.   Can you repeat your question, please.
6         Q.   Why did you decide to resign as an ACA
7    director on July 26th?
8         A.   I did not want to get involved in
9    things that I'm not involved with.
10        Q.   What are those things?
11        A.   To be honest, I don't know.
12        Q.   Is it -- are you referring to this
13   case?
14        A.   I don't know anything about this case.
15   To be honest, I don't even know why I'm here.  The   01:10
16   reason why I worked for this company, why I trust
17   William is because we share a mission.  That's what
18   makes me trust him and that's probably why he trusts
19   me.
20             Anything else, what he does, who he is,
21   his family, I don't know.  I don't care.  We're
22   trying to work to make China a better place and
23   that's all that matters.
24        Q.   Why did you think that resigning from
25   ACA as a director would keep you from getting
```

**Page 71**

```
1    involved in things that you don't want to be involved  01:11
2    in?
3         MS. TESKE:  Object to the form.
4         You can answer.
5         A.   Can you repeat your question, please.
6         MR. GREIM:  I'll have the court
7    reporter do that.
8         (Whereupon, the record is read.)
9         A.   I'm not sure I understand the question.
10        Q.   You told me a few minutes ago that you
11   resigned from ACA because you did not want to get
12   involved in things that you don't want to be involved
13   in.  Do you remember that testimony?
14        MS. TESKE:  Object to the form.
15        You can answer.                                   01:11
16        A.   Yes.
17        Q.   And so, my question is, why did you
18   think that resigning as a director of ACA would
19   accomplish that goal?
20        MS. TESKE:  Object to the form.
21        You can answer.
22        A.   Let's put it this way.  You are part of
23   a company or you work in a store.  There are things
24   in the store that you don't want to get involved
25   with.  You resign.  You're not part of it any more.
```

**Page 72**

```
1         Q.   What are the things that you don't want   01:12
2    to be involved in?
3         MS. TESKE:  Object to the form.
4         You can answer.
5         A.   I don't know.
6         Q.   But whatever they were, they were
7    serious enough for you to resign from ACA?
8         MS. TESKE:  Object to the form.
9         You can answer.
10        MR. GRENDI:  Object to the form.
11        A.   I don't know.
12        Q.   You just testified a second ago that
13   you trusted Mr. Je because you shared a mission of
14   making China a better place, right?
15        A.   That's correct.                           01:13
16        Q.   And is that the mission you thought ACA
17   had?
18        A.   No.  I trust him as a person as I know
19   that he shares the same idea about the Communist
20   Party and how bad they are.  I am not talking about
21   ACA or any other thing.  I was talking specifically
22   about him as a person.
23        Q.   So what is the thing you were trying to
24   keep from getting involved in by resigning as a
25   director?
```

**Page 73**

```
1         MS. TESKE:  Object to the form.               01:13
2         You can answer.
3         A.   I don't know.  I don't know
4    specifically what's going on here with these -- with
5    any company.  I just feel that I don't want to be
6    involved in something that does not belong to me.
7         Q.   What did you learn that made you decide
8    that you did not want to be involved in ACA as of
9    July 26th?
10        MS. TESKE:  Object to the form.
11        You can answer.
12        A.   Really nothing.
13        Q.   Was it something Mr. Podhaskie told
14   you?
15        MS. TESKE:  Object to the form,               01:14
16   and -- object to the form.
17        You can answer without giving away
18   any substance of communications.
19        A.   Yes.
20        Q.   So it's something Mr. Podhaskie told
21   you but you can't tell us what that thing is; is that
22   your testimony today?
23        MS. TESKE:  Because I'm directing
24   her not to.
25        MR. GREIM:  Well, okay.  So you're
```

19 (Pages 70 to 73)

```
 1          MR. GREIM:  In 2019.                           02:14
 2          MS. TESKE:  Relating to her
 3  services?
 4          MR. GREIM:  Relating to personal
 5  services.
 6          MS. TESKE:  Personal services?
 7          MR. GREIM:  Services, any
 8  services.
 9          MS. TESKE:  Provided to ACA.
10          MR. GREIM:  Well, first provided
11  to ACA.
12          MS. TESKE:  Maybe rephrase the
13  question.
14          MR. GREIM:  Yeah, I'm sorry.
15          MR. GRENDI:  That's a bad one.    02:15
16          MR. GREIM:  I'm sorry.  I'm
17  thinking about -- I'm trying to cut out
18  arts and crafts or, you know, artwork or
19  something, tangible things.
20          Let me go back, okay, and make it
21  clear.
22  BY MR. GREIM:
23     Q.   In 2019, have you received payment for
24  any services other than your salary as a director of
25  ACA?
```

Page 102

```
 1          MS. TESKE:  Object to the form.    02:15
 2          You can answer the question.
 3     Q.   I'm sorry.  Other than your salary as
 4  an employee of Golden Spring?
 5          MS. TESKE:  Object to the form.
 6          But you can answer the question.
 7     A.   No, I did not.
 8          MR. GREIM:  Okay.  Well, I want to
 9  stand on the questions I asked about the
10  discussion with Mr. Podhaskie.  I think
11  I've asked every possible question that
12  can be asked about that question, and I
13  want to hold open the deposition for that
14  purpose only.
15          I will say that for efficiency       02:15
16  sake, if there is a way to get the
17  information we need from ACA without
18  going into that, then we will try.  We
19  will try.  But if we can't, we'll want to
20  return to this topic and we'll just raise
21  it with the judge.  And so I've got
22  nothing else.
23          MS. TESKE:  Thank you.
24          MR. GRENDI:  Thank you very much.
25          MR. GREIM:  Thank you, Ms. Maistrello.
```

Page 103

```
 1          THE WITNESS:  Thank you.             02:16
 2          MS. TESKE:  Thank you,
 3  Ms. Maistrello.
 4          THE VIDEOGRAPHER:  This will
 5  conclude Video No. 2 and end the
 6  deposition of Karin Maistrello.  We are
 7  off the record at 2:15 p.m., August 23rd,
 8  2019.
 9          (Time noted:  2:15 p.m.)
```

Page 104

```
 1                ACKNOWLEDGMENT
 2
 3   STATE OF NEW YORK     )
                           )   ss.:
 4   COUNTY OF _____ )
 5
 6        I, KARIN MAISTRELLO, hereby
 7   certify that I have read the transcript
 8   of my testimony taken under oath, on the
 9   23rd day of August, 2019; that the
10   transcript, except as noted in any
11   attached errata sheet(s), is a true
12   record of my testimony.
13
                 _____
14                KARIN MAISTRELLO
15   Subscribed and sworn to before me
16   this ___ day of _____, 20____.
17
18
19   _____
                  Notary Public
20
21   My Commission expires the
22   ___ day of _____, 20____.
```

Page 105

27 (Pages 102 to 105)

Karin Maistrello
August 23, 2019

```
 1              CERTIFICATE
 2
   STATE OF NEW YORK    )
 3                      ) ss.:
   COUNTY OF WESTCHESTER )
 4
 5        I, KATHLEEN T. KEILTY, a Certified
 6   Shorthand Reporter and Notary Public within
 7   and for the State of New York, do hereby
 8   certify:
 9        That KARIN MAISTRELLO, the witness whose
10   testimony is hereinbefore set forth, was duly
11   sworn/affirmed by me before testifying and
12   that the foregoing transcript is a true record
13   of said testimony.
14        I further certify that I am not related
15   to any of the parties to this action by blood
16   or marriage, and that I am in no way
17   interested in the outcome of this matter.
18        IN WITNESS WHEREOF, I have hereunto set
19   my hand this 4th day of September, 2019.
20
21        _____
          KATHLEEN T. KEILTY, C.S.R.
22        License No. 000755
23
24
25
```

Page 106

```
 1              ERRATA SHEET
               Page ___ of ____
 2
        I, KARIN MAISTRELLO, wish to make the following
 3   changes to the foregoing transcript of my testimony
     taken on the 23rd day of August 2019, for the reasons
 4   cited below:
 5   PG-LN    CHANGE FRM/TO      REASON
 6   ____    _____     _____
 7   ____    _____     _____
 8   ____    _____     _____
 9   ____    _____     _____
10   ____    _____     _____
11   ____    _____     _____
12   ____    _____     _____
13   ____    _____     _____
14   ____    _____     _____
15   ____    _____     _____
16   ____    _____     _____
17
              _____
18              KARIN MAISTRELLO
19
20   Subscribed and sworn to before me
21   this ____ day of _____, 20____.
22
      _____
23        NOTARY PUBLIC
24   My Commission expires the ____ day
25   of _____, 20_____.
```

Page 107

28 (Pages 106 to 107)

Karin Maistrello
August 23, 2019