# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EASTERN PROFIT CORPORATION LIMITED,  )<br>)<br>)<br>Plaintiff/Counterclaim Defendant,  )<br>)<br>v.  )<br>)<br>STRATEGIC VISION US, LLC,  )<br>)<br>Defendant/Counterclaim Plaintiff.  )<br>_____) | Case No. 18-cv-2185 (LJL) |

**DEFENDANT STRATEGIC VISION'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF EASTERN ON ITS COUNT III (DKT. NO. 271)**

This motion attacks Eastern's Count III,[1] which seeks a declaratory judgment that Strategic was supposed to be licensed as a private investigator under Virginia law. Strategic's failure, Eastern says, renders the parties' Agreement illegal; an illegal Agreement means Strategic was unjustly enriched by ACA's $1 million; and as a result, Strategic should send ACA's $1 million to Eastern. This theory fails on the undisputed facts. Virginia requires licenses only if research is targeted for narrow purposes analogous to law enforcement functions, such as investigating crimes or use in court. But Guo Wengui, Eastern's alter ego, said he would use the research for his anti-CCP publicity campaign to oust the regime; his talk of "crimes" against "the Chinese people" was a slogan, not a reference to real crimes, victims, or proceedings; even his top adviser admitted Guo had no idea how he would actually use the material. Virginia does not require groups using researchers for political advocacy to get private security licenses. If there is any doubt, Virginia's heavy presumption against invalidating contracts applies, and even then, Eastern is itself "guilty" under its own theory, as it agreed to share its research with Guo and investor ACA for value. Either because Eastern cannot cancel the Agreement as illegal, or because Eastern conferred no benefit anyway, Eastern's backers cannot use this case to "recover" a windfall in the form of ACA dollars.

I. **Virginia's Supreme Court has not been "clear and certain" that research for overseas political advocacy requires a license or that such contracts can be voided.**

Eastern does not address Virginia's rule that "courts are averse to holding contracts unenforceable on the ground of public policy unless their illegality is clear and certain. Thus, the presumption is against finding contracts void on public policy grounds." *Reading and Language*

---

[1] This reply closes the second of Strategic Vision's two motions for summary judgment against Eastern Profit on Eastern's bid to "recover" $1 million that non-party ACA paid Strategic in early 2018. First, relying on unjust enrichment, Eastern's Count IV seeks restitution of ACA's payment. As Strategic showed in its first motion (Dkt. 265-266 at 28-29), that Count (as well as Eastern's breach of contract and fraud claims, Counts I and II) all fail for many reasons, but at bottom, Eastern simply was not the party that "conferred the benefit" of ACA's $1 million on Strategic. Eastern was penniless from day one. That is enough to defeat all of Eastern's claims. Strategic's second motion, now completely briefed, attacks Eastern's request for a declaratory judgment that the contract was illegal (Count III), which is in turn the sole basis for Eastern's restitution claim (Count IV).

*Learning Center v. Sturgill*, 2016 WL 10880215, at *10 (Va. Cir. Ct. 2016). Ignoring this, Eastern asks this Court to void a contract on an unsettled legal theory never before addressed by the Virginia Supreme Court, where it is unclear the statute even applies. Still, a federal court obligated to decide unsettled matters of state law "must do its best to guess how the state court of last resort would decide the issue." *In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831, 850 (2d Cir. 1992). Here, Virginia's Supreme Court has never reviewed its private security services statute, and an order defining its reach will echo throughout Virginia's policy and advocacy community. As shown below, Virginia's statute does not apply to this overseas political opposition project. Even if it did, the Virginia Supreme Court would not void this contract, awarding Eastern a windfall.

## II. Virginia's licensing statute for private security services does not apply

Strategic was not a "private investigator" that the Virginia Supreme Court would clearly require to have been licensed by the Criminal Justice Services Board. Its Agreement was "for the purpose of providing business research, reporting, documentation, and other consulting services," intended to advance Guo Wengui's alleged political agenda in China (and maybe also Eastern's "plan") and, relatedly, Guo's asylum-driven publicity push.[2] Eastern cites no authority whatsoever suggesting that Virginia has required groups to obtain licenses before researching individuals for international media/political advocacy campaigns. Under the plain text of the statute, this is dispositive. That is because Virginia deliberately chose not to define "private investigator" based on an investigator's methods or activities. Va. Code Ann. § 9.1-138. Rather, it chose a different bright line: a mere policy analyst or political researcher morphs into a "private investigator," subject to licensure (and training and, perhaps, criminal penalties) based on *the purpose of the*

---

[2] Eastern Response to SOF ¶ 7 (Eastern Ex. M, Research Agrmt, p.1); SOF ¶ 1-5 (Guo 1 Tr., Ex. J2, 33:6-12, 35:12-36:4, 39:9-40:6, 45:3-46:16; Waller 1 Tr., Ex. I2, 24:16-25:13; 34:5-11; Lianchao Tr., Ex. K2, 126:22-128:9; 137:20-139:20, 46:17-47:9, 53:13-54:5, 130:14-132:10, 43:1-46:2; Wang 1 Tr., Ex. L2, 37:8-38:7; Dkt. 142, p. 2, ¶ 4.

2

*research*. Under the statute's plain text, it only covers those who make "investigations *to obtain information on* (i) crimes or civil wrongs; (ii) the location, disposition, or recovery of stolen property; (iii) the cause of accidents, fires, damages, or injuries to persons or to property; or (iv) evidence to be used before any court, board, officer, or investigative committee." *Id*. (emphasis added). These four required purposes show why Virginia's legislature grouped "investigators" with armed security guards, alarm dispatchers, and canine handlers: all of these jobs supplement or work with traditional law enforcement and the justice system.

Any other reading of the statute—for example, Eastern's, which apparently asks whether investigators' acts strike the popular imagination in a certain way—is fatally vague and overbroad. "Investigations" occur in a variety of contexts—including in political and media campaigns like this—with no connection whatsoever to the justice system. In these contexts, there is no obvious reason for firearms and other similar training required of the other "security" licensees, yet there is a real danger in requiring pre-approval by the state (i.e., training and a license) for Virginia's galaxy of non-profit and for-profit entities who engage in advocacy and public policy.

Here, Eastern's Response fails to controvert the facts establishing that this Agreement was for a vaguely-conceived advocacy campaign allegedly intended to achieve political change—not (as required under the only potentially relevant parts of the statute) to aid a particular crime or tort victim, or for any particular court or committee. Eastern's representatives stated that since 2017 Guo had been engaged in political endeavors to advance his supposedly anti-CCP agenda.[3] Guo also needed to maintain his status as a "whistleblower" to assist his asylum application.[4] To advance both goals, Guo decided to research individuals tied to top CCP officials through a

---

[3] SOF ¶¶ 1-5 (Guo 1 Tr., Ex. J2, 33:6-12, 35:12-36:4, 39:9-40:6, 45:3-46:16; Waller 1 Tr., Ex. I2, 24:16-25:13; 34:5-11; Lianchao Tr., Ex.K2, 126:22-128:9; 137:20-139:20, 46:17-47:9, 53:13-54:5, 130:14-132:10, 43:1-46:2; Wang 1 Tr., Ex. L2, 37:8-38:7; Dkt. 142 at 2, ¶ 4).
[4] SOF ¶ 2 (Lianchao Tr., Ex. K2, 126:22-128:9; 137:20-139:20, 46:17-47:9, 53:13-54:5, 130:14-132:10, 43:1-46:2).

3

Research Agreement with Strategic.[5] Guo's plan was never defined, but supposedly, the ultimate beneficiary of the research would be "the Chinese people," who would be "rescued" and shown "the truth" about CCP corruption through "the media," triggering Chinese regime change and achieving Guo's purported political goals.[6] According to Eastern, the research would actually be "on behalf of a Chinese outrage, common people…Chinese [] people, they deserve … [rule of law and democracy in Mainland of China];" Lianchao Han, Guo's architect and main contact for the research, admitted Guo didn't have "any idea" how to use it.[7] Guo was not interested in investigating any delineable crime or civil wrong and he was not interested in aiding any particular victim. Rather, Guo sought information to advance his political agenda and put pressure on the CCP. Eastern admits that Guo told Strategic that this was the purpose of the research project.[8]

Eastern cannot overcome these admissions merely because one line in the Agreement refers to "detecting, stopping, and preventing crime or other harm to innocent people."[9] This simply repeats a favorite Guo slogan.[10] Neither Guo nor Eastern could testify to specific victims, crimes, or how "U.S. courts" might be invoked. No other part of the Agreement gives any indication of actual crime victims, crimes, or court proceedings. For example, its very first sentence states that Agreement is "for the purpose of providing business research, reporting, documentation, and other consulting services." The Agreement lays out three subjects which seem no more suited to a criminal case than to a political campaign: (1) financial (business transactions, bank receipts, and

---

[5] SOF ¶ 4 (Guo 1 Tr., Ex. J2, 33:6-12; 35:12-36:4).
[6] SOF ¶¶ 1, 3-4; Strategic's Reply in Support of SOF ¶ 3. (Guo 1 Tr., Ex. J2, 33:6-12, 35:12-36:4, 39:9-40:6, 45:3-46:16; Waller 1 Tr., Ex. I2, 24:16-25:13; 34:5-11; Lianchao Tr., Ex. K2, 126:22-128:9; 137:20-139:20, 46:17-47:9, 53:13-54:5, 130:14-132:10, 43:1-46:2; Wang 1 Tr., Ex. L2, 37:8-38:7; Dkt. 142at 2, ¶ 4).
[7] SOF ¶ 3 (Wang 1 Tr., Ex. L2, 37:8-38:7; Lianchao Tr., Ex. K2, 53:13-54:5 (Architect of the research project admitting Guo claimed to want to use research, but "[h]ow [Guo's] going to do it, I don't think he has an idea.").
[8] SOF ¶ 4 Guo 1 Tr., Ex. J2, 33:6-12; 35:12-36:4
[9] Eastern Response to SOF ¶ 7 (Eastern Ex. M, Research Agmt. at1)
[10] Compare SOF ¶¶1-6 (citations above) and Eastern's Responses to ¶¶ 3-4 (citing Guo I Tr., Ex. J2, 206:12-208:19, Wang II Tr., Ex. U2, at 203:2-22, and Wang I Tr., Ex. L2, 34:4-20: more Guo talking points, but no concrete plans for using the research).

real property ownership); (2) an individual's whereabouts (itineraries, travel, and event attendance); and (3) social media (court records, family information, and pornography usage). The list includes no request for information on an individual's criminal conduct or other civil wrongs.[11]

Eastern now claims it was somehow going to prosecute any crimes or civil wrongs found in the investigation. Dkt. 278 at 2. But a litigant's *post hoc* profession that it might have shared favorable results with some legal authority is a far cry from hiring an investigator with the direction to focus on a concrete crime with an identifiable victim and a conceivable court proceeding—even if facts remain to be found. Otherwise, all researchers are "private investigators": the first of the four statutory prongs (researching a crime or civil wrong) would not only swallow the other three, it would eviscerate the Virginia legislature's effort to limit otherwise vague and overbroad text that reaches everything from journalism to political advocacy—and carries criminal penalties.

Indeed, Eastern never truly addresses the implications of a decision in its favor. A holding that it is "clear and certain" that Virginia's licensing statute applies here will cast into doubt a wide array of contracts involving for-profit and nonprofit policy-advocacy research firms—all of whom must now fear (at the very least) nonpayment from clients who decide to claim they'd meant to share the research with authorities to expose some undefined "crime" against democracy.[12] This cannot be. Perhaps sensing similar dangers, Virginia's legislature enumerated 31 exceptions to its statutory licensing requirements for "private security services"—indicating it did not mean for this

---

[11] Eastern Response to SOF ¶ 7 (Eastern Ex. M, Research Agmt. at 1). Eastern asserts Strategic has repeatedly referred to its own services as "private investigation" or some derivative. There is no reason, however, to assume Strategic's colloquial use of "private investigator" equals Virginia's statutory definition. Nor has Eastern provided evidence that Strategic was indicating it was investigating crime when it previously referred to its services as an "investigation."

[12] Eastern attempts to cast doubt on this outcome but relies on a convoluted reading of the statute. Under Eastern's definition of "private investigator," even a freelance journalist hired to write an article that may ultimately have some bearing on a crime or civil wrong would have to first obtain a license. So, too, an author hired by a publishing company to write a book, or a business consultant hired to evaluate a competing business.

statute to apply broadly. § 9.1-140.[13] Moreover, Eastern completely fails to address Strategic's point that one of Virginia's exceptions to the licensing requirement applies, exempting much of Strategic's research (even under Eastern's reading of the Agreement). Dkt. 272 at 20 (at least one-third of the contractual research is exempt under Va. Code Ann. § 9.1-140(29) (exemption for reviewing, analyzing digital information and electronic data)). This Court should not find Virginia's private security business statute applies to the parties' Research Agreement. Strategic was not a "private investigator" required to be licensed by the Criminal Justice Services Board.

### III. It is not the "clear and certain" policy of Virginia to criminalize (and therefore void) contracts made in violation of this statute without a showing of willfulness

Even if the Court determines the contract falls under Virginia's private security services statute, Va. Code Ann. § 9.1-139, the Agreement is not void as a matter of law. Importantly, the Virginia Supreme Court has never found a contract void based on a violation of Va. Code Ann. § 9.1-139. Moreover, nowhere in the Virginia private security licensure rules does the legislature indicate that an unlicensed party's contracts are void. Virginia courts are expressly "averse to holding contracts unenforceable on the ground of public policy unless their illegality is clear and certain." *Estes. Exp. Lines, Inc. v. Chopper Exp., Inc*., 273 Va. 358, 364 (Va. 2007).

Under Virginia law, courts must evaluate legislative intent before declaring that violation of a statute renders an offending contract void. *Blick v. Marks, Stokes and Harrison*, 234 Va. 60, 64 (Va. 1987). "The courts should always look to the language of the statute, the subject matter, the wrong it seeks to prevent, and the purpose to be accomplished in its enactment." *Id.* (internal citations omitted). In determining whether the Virginia legislature intended for a statutory violation

---

[13] If the research project was designed to obtain evidence to present to a court, exception 29 would apply (and a license would not be needed), because Strategic's team was acquiring, reviewing, and analyzing digital and computer-based information. Va. Code Ann. § 9.1-140(29). Therefore, should this Court adopt Eastern's interpretation, the entire Agreement could not be voided, since much was expressly exempted under Virginia's licensing statute.

6

to render a contract void, Virginia courts ask whether the legislature imposed criminal penalties for violations of the statute.[14] If the answer is yes, courts conclude that the legislature clearly sought to prohibit such conduct, and they invalidate contracts on the theory that they further criminal activity. Where, as here, the answer is that unlicensed conduct is only *sometimes* criminal, no Virginia case requires a court to void a contract made in violation of the licensing law.

For the first time, Eastern cites an old line of Virginia cases holding the violation of a licensure statute may render contracts void. Dkt. 278 at 6, n. 5. Eastern relies on two primary lines of statutes: those requiring licenses for real estate brokers and for contractors. It then contends these cases require contracts that contravene state "police power" licensing statutes be declared *per se* void. In Eastern's key case, *Massie v. Dudley*, the Virginia Supreme Court voided a real estate contract involving an unlicensed real estate broker, relying on a statute criminalizing unlicensed real estate transactions. 173 Va. 42, 52-53 (Va. 1939).[15] But *Massie* and Eastern's other cases rely on statutes that criminalize *all*, not just some, failures to be licensed.[16] They are therefore inapposite. Here, the private security services statute does not criminalize all violations of the licensing law, only *willful* ones. Va. Code Ann. § 9.1-147(B) (only willful violations of the licensing statute are subject to a penalty and punishable as a Class 1 misdemeanor). In Virginia, the term "willful" only reaches "conduct that must be knowing or intentional, rather than

---

[14] *See, e.g., P.M. Palumbo, Jr., M.D., Inc. v. Bennett*, 242 Va. 248 (Va. 1991) (holding the contract not void because "Code § 13.1–546 does not mention contracts, nor does it contain a penalty within its provisions."); *Blick*, 234 Va. at 64 (refusing to void a contract because the relevant statutory authority did not mention contracts "nor [did] it contain a penalty within its provisions"); *Sellers v. Bles*, 198 Va. 49 (Va. 1956) (holding that "unless what Sellers Brothers contracted to do constitutes a crime under the statutes, their contract is valid.").
[15] Under *Massie*, "where a licensing statute is a police regulation, having for its object the protection of the public, making it unlawful for a person to engage in a business without a license, ***and imposing a penalty for its violation***, a contract made by an unlicensed person is void and unenforceable." *Id.* at 53 (emphasis added).
[16] Eastern's cases involve three statutes: Va. Code 4349(88) (1924); Va. Code Ann. § 54-142 (1950); Va. Code Ann. § 54.1-20 (1982) (statutes attached as Ex. 1 hereto). Under each licensing statute, the Virginia legislature criminalized all violations and, as a result, the courts later voided all contracts in contravention of these statutes.

accidental, and undertaken without justifiable excuse, without ground for believing the conduct is lawful or with a bad purpose." *Correll v. Commonwealth*, 269 Va. 3, 13 (Va. 2005).

Eastern's recitation of the *Massie* rule omits this necessary component of the underlying precedent on voiding police-power licensing contracts: the law must not merely require licenses, it must *criminalize* violations. *Massie* held that its decision to void the contract hinged on the legislature's decision to criminalize violations of the statute: "[t]he imposition of the penalty [by the legislature] emphasizes the illegality" of the conduct, and to the court, indicated the legislature's desire to prohibit such conduct, as "the penalty implies a prohibition even in the absence of prohibitory words in the statute." *Id*. Indeed, while Virginia courts have applied the *Massie* rule to invalidate contracts, they have only done so where the legislature imposed criminal penalties for *every* failure to be licensed, making the unlicensed acts *per se* illegal conduct. *See, e.g., Bacigalupo v. Fleming*, 199 Va. 827 (Va. 1958) (contract was void due to party's failure to obtain a proper contractor license under statute that made it "punishable as a misdemeanor"). That is not this case. The Virginia legislature chose *not* to penalize every failure by private security providers to obtain a license, penalizing instead only *willful* violations.

The legislature's decision in Va. Code. Ann. § 9.1-139 to criminalize some, but not all, conduct that violates the private-security licensing law distinguishes this from Eastern's contractor and real estate licensing cases. *Massie* never answers the question at issue here: what becomes of a contract where one party should have been licensed, but did not willfully fail to obtain the license, meaning the conduct is not criminal? In Virginia, the duty to license depends on the use to which the research will be put; here, if Guo was truthful, he meant to use the research for a public campaign to politically attack the CCP and cause its demise. If this does not clearly place the Agreement outside the statute (and in Section II, Strategic contends it does), it is at the very least

8

true that Strategic had grounds for believing it did not need to ask Virginia for a license before embarking on Guo's campaign. Strategic's actions could not have been "willful," and therefore criminal. *See Correll*, 269 Va. at 13. It is anything but "clear and certain" that the Virginia Supreme Court would extend *Massie* to cover a statutory violation where the legislature excused non-willful conduct from criminal liability, signaling its intent that not every failure to parse a difficult statute renders a contract violative of public policy and supports the harsh remedy of voiding it.

### IV.  Even If The Contract is Void, Eastern Cannot Recover Restitution

Eastern cites no authority for its contention that a void Agreement entitles it to gain the windfall of non-party ACA's $1 million deposit. Strategic has explained at length why Eastern is not entitled to restitution, as Eastern's Hong Kong assets were frozen and it did not confer (and could never have conferred) any benefit on Strategic. Dkt. 266, 9. But restitution is also unavailable under the doctrine of *in pari delicto.* Eastern responds that it is just a recipient, claiming without record citation that it "did not enter into any contract agreeing to provide private investigation services to another person or entity." Dkt. 278 at 10. This ignores the undisputed facts.

The statute Eastern urges this Court to apply covers those who undertake to provide private investigators (those who obtain information on crimes or civil wrongs) to another person *under an express or implied contract*. *See* Va. Code Ann. § 9.1-138. By its own reading, Eastern meets that definition. As Eastern's counter-signatory, Strategic understood that the actual recipients of the research always included Guo.[17] Guo said he would use the research to destabilize the CCP by publicizing the corruption of its officials through the media,[18] claiming again at his deposition that he told Strategic he intended to help the "common people of China" who were in need of being

---

[17] SOF ¶¶ 4, 7, 8 (Guo 1 Tr., Ex. J2, 33:6-12, 35:12-36:4; Waller 1 Tr., Ex. I2, 226:1-253:8; Waller 2 Tr., Ex. N2, 95:3-12; Lianchao Tr., Ex. K2, 246:6-17.)
[18] SOF ¶ 1-2, 4 (see facts cited at footnote 3, supra).

9

"rescued."[19] Guo provided value to Eastern in exchange for Eastern's promise to provide him research, giving starter dossiers on research subjects that allegedly cost him a substantial sum.[20]

Eastern also had an implied contract to provide the research to "investor" and non-party ACA,[21] which was willing to forgive its purported $1 million loan to Eastern had the research been successful.[22] Finally, all administrative work in connection with the contract (supervising it, deciding to enforce it legally, representing Eastern in discovery) has been done by yet another Guo entity which "received" the research—Golden Spring (New York) Limited (GSNY).[23]

Under Eastern's expansive reading of Virginia law, then, Eastern is itself an unlicensed "private security services business" under Va. Code Ann. § 9.1-138, violating § 9.1-139(A). Under this view, Eastern is *in pari delicto*, and Virginia courts will not afford equitable relief where the "objects sought to be achieved" by the plaintiff were also illegal. *Am.-LaFrance & Foamite Indus. v. Arlington Cty.*, 169 Va. 1, 1, 192 S.E. 758 (1937). Whether because it never provided a benefit to Strategic or because it is *in pari delicto*, Eastern is not entitled to restitution.

---

[19] SOF ¶ 1, 3-4 (see facts cited at footnote 3, supra).
[20] SOF ¶ 10 (Wallop 1 Tr., Ex. Q2, 83:24-84:7, 185:7-186:12, Lianchao Tr., Ex. K2,173:6-174; Waller 1 Tr., Ex. I2, 186:11-188:7; Wallop 1 Tr., Ex. Q2, 83:24-84:7, 185:7-186:12, Lianchao Tr., Ex. K2, 173:6-174:4); SOF ¶ 11 (Wang, for Eastern Profit, admits Guo is person who is using research, at Wang 1 Tr., Ex. L2, 32:5-35:11, 37:8-38:7; that she reported solely to Guo, 102:21-103:7; and that the urgent need for research on January 28, 2018, was Guo's, Wang 1 Tr. Exs. 18 and 21), ¶ 21 (Wang 2 Tr., Ex. U2, 209:25-210:5; Wallop 1 Tr., Ex. Q2, 83:24-84:7, 185:7-186:12, Lianchao Tr., Ex. K2, 173:6-174:4; Waller 1 Tr., Ex. I2, 186:11-188:7 (first 15 subjects paid for by Guo).
[21] SOF ¶ 9 (Wang 1 Tr., Ex. L2, 258:5-259:13 (investors)); ¶12 (Wang 1 Tr., Ex. L2, 44:1-47:14, 158:6-9, 158:20-159:23, 161:2-17; Ex. T2, Dkt. 267-1 (Wang 1 Tr. Ex. 7); Dkt. 127, at 22, ¶ 7; Dkt. 142 at 3, ¶ 7 (William Je reminded Wang he had expected to receive the research); Wang 2 Tr., Ex. U2, 224:6-17 (Wang reports to Je on case); ¶13 (Wang 2 Tr., Ex. U2, 206:24-208:16 (ACA would write off loan if research successful)); ¶15 (Wang 1 Tr., Ex. L2, 258:5-259:13; Ex. V2 (Wang 1 Tr. Ex. 20); (Wang told Strategic that "investors" were those who "would not continue to spend money on the things they don't need," and would not fund a second month of research without receiving better results)); ¶19 (Wang 1 Tr., Ex. L2, 258:5-259:13; Ex. V2 (Wang 1 Tr. Ex. 20) (Wang admitted that investors had "big budget" and could "pay your team even without contract").
[22] SOF ¶ 13-14. See citations immediately above, and Wang 2 Tr., Ex. U2, 71:19-72:17, Wang 1 Tr., Ex. L2, 47:14-21 (reason ACA demanded "repayment" only because Strategic's work did not yield results).
[23] SOF ¶ 22 (China Golden Spring. Ex. M (Plt's First Interrog. Resp.), also Dkt. 267-1 at 2, No. 4; Wang 1 Tr., Ex. L2, 23:3-29:13 (Eastern's discovery responses signed by Yvette Wang as President of GSNY because it "provide[s] service" to Eastern Profit as its attorney-in-fact); 18:14-20:21 (Wang, Eastern's 30(b)(6) witness, claims GSNY is a "family office" and that she takes direction from China Golden Spring in Hong Kong, but refuses to name the family or individuals involved); Coluccio Tr., Ex. A3, 171:2-172:13 (GSNY is Guo's family office), 186:15-19 (GSNY takes direction from Guo), 122:15-123:3 (GSNY is wholly owned by China Golden Spring).

## CONCLUSION

For the foregoing reasons, Defendant Strategic Vision respectfully requests that this Court grant Strategic's Cross-Motion for judgment against Eastern on Counts III.

Dated May 11, 2020

        Respectfully submitted,

        GRAVES GARRETT LLC

        *s/ Edward D. Greim*
        Edward D. Greim, #4240172
        1100 Main Street, Suite 2700
        Kansas City, MO 64105
        Telephone: (816) 256-3181
        Fax: (816) 256-5958
        edgreim@gravesgarrett.com
        ATTORNEY FOR
        DEFENDANT/COUNTERCLAIMANT

## CERTIFICATE OF SERVICE

This certifies that, on May 11, 2020, the foregoing was served on all counsel of record via the Court's Electronic Case Filing System.

        *s/ Edward D. Greim*
        Attorney for Defendant/Counterclaimant