**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| EASTERN PROFIT CORPORATION LIMITED, | ) ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) ) | Case No. 18-cv-2185 (LJL) |
| v. | ) ) | |
| STRATEGIC VISION US, LLC, | ) ) | |
| Defendant/Counterclaim Plaintiff. | ) ) | |

**DEFENDANT'S CONSOLIDATED (1) REPLY IN SUPPORT OF ITS DKT. 273 L.R. 56.1 STATEMENT SUPPORTING ITS DKT. 271-72 CROSS-MOTION FOR SUMMARY JUDGMENT (SOF 1-32 OF DKT. 273); AND (2) RESPONSE TO PLAINTIFF'S DKT. 279 L.R. 56.1 STATEMENT IN RESPONSE TO DEFENDANT'S CROSS-MOTION**

Pursuant to L.R. 56.1(b), Defendant Strategic Vision US, LLC ("Strategic") replies in support of its L.R. 56.1 Statement, Dkt. 273. That Statement accompanied Strategic's Cross-Motion for Summary Judgment against Eastern Profit's Declaratory Judgment claim, before the Court in Dkt. 271-72.[1] The remainder of this Statement primarily replies <u>only</u> in support of Strategic's Facts 1-32 (from Dkt. 273), which were the only facts Strategic identified as material for purposes of defeating Eastern's Count III.

Facts 1-32 aside, Strategic also herein responds to the statement of additional facts contained in the Dkt. 279 filing of Plaintiff Eastern Profit Corporation Ltd. ("Eastern"). In submitting that statement, Eastern has violated L.R. 56.1(b) and, because of this, Strategic herein asks the Court to disregard that portion of Eastern's Dkt. 279. Of a party responding to a statement of facts, which is what Eastern submitted in Dkt. 279, L.R. 56.1(b) requires "if necessary, additional paragraphs containing a *separate*, short and concise statement of additional material facts as to which it is contended that there exists a

---

[1]    In its Dkt. 273, Strategic indicated that "[t]he facts outlined in Sections (A)-(C) herein, Paragraphs 1-32, support Strategic's Cross-Motion for Summary Judgment." Pursuant to L.R. 56.1(b), Strategic herein replies in support of those facts.

genuine issue to be tried." (emphasis added) Instead of following that mandate, Eastern summarily wrote (Dkt. 279, p. 90, under the heading "Additional Facts," emphasis added): "*In addition to the facts set out in each of the foregoing responses,* Eastern hereby incorporates each and every factual averment set forth in the Local Rule 56.1 Statement that it submitted in connect with its Motion for Summary Judgment as if set forth fully and completely herein, see Dkt. No. 262, as well as each and every response to Strategic's prior Local Rule 56.1 Statement, see Dkt. No. 270." Eastern thus failed to set out its purported additional material facts in the form of individual paragraphs as required by L.R. 56.1(b). More importantly, Eastern attempted to summarily inject into the record <u>on Strategic's Cross-Motion</u> (which again, is limited to Eastern's declaratory judgment claim) two prior sets of factual statements <u>related to other claims not at issue in the Cross-Motion</u>, including affirmative claims by Eastern, the non-movant on the Cross-Motion. "Local Civil Rule 56 [] directs litigants to file statements and counter-statements of material facts about which there is no dispute, and also requires that each factual statement be followed by a citation to admissible evidence, in accordance with Federal Rule 56(e)." *M & T Mortg. Corp. v. White*, 736 F. Supp.2d 538, 553 (E.D. N.Y. 2010) (noting the Court's discretion, despite a failure to follow the local summary judgment rule, to review the record independent of technical errors) *citing Monahan v. New York City Dep't of Corrections,* 214 F.3d 275, 292 (2d Cir.2000). Eastern's tactic was improper.

Strategic thus asks that the Court reject and thereby disregard (1) Eastern's request that the Court consider facts from any prior L.R. 56.1 submission by Eastern seeking dispositive treatment on other claims not before the Court here; and (2) Eastern's request that the Court sift through Eastern's responsive statement in a search for factual assertions that might be considered part of the record on Strategic's Cross-Motion.

Recognizing, however, the Court's discretion in the extent to which the local summary judgment rule is enforced, Strategic has addressed each of Eastern's "additional facts" by showing their lack of materiality to the Cross-Motion.  Significantly, Strategic notes that Eastern relied on a mere nine factual assertions in its legal briefing on the Cross-Motion[2] but would have the Court believe that literally hundreds of other facts or responsive factual assertions, nowhere mentioned in the brief, are somehow essential.

If the Court nevertheless decides to accept Eastern's two-fold requests regarding its fact statement, Strategic reserves the right to timely respond to (1) any facts from any other L.R. 56.1 submission by Eastern; and (2) affirmative factual assertions embedded in Eastern's response to Strategic's facts in a separate, subsequent submission addressing this Cross-Motion.

Finally, for the Court's convenience, any evidence cited herein by Strategic (whether or not originally cited in Strategic's Dkt. 273 opening L.R. 56.1 statement on the Cross-Motion) is attached hereto with a newly-assigned exhibit letter/number combination.  Accordingly, the same evidence cited by Strategic will now have different exhibit letters/numbers compared to Dkt. 273, but this approach permits the Court to have a single location (i.e. this filing) to access the evidence constituting the record as Strategic has presented it on its Dkt. 271-72 Motion for Summary Judgment.

---

[2]      (1) "Ms. Wallop, and Mr. Waller never secured their private investigator licenses in Virginia or elsewhere." (2) "[T]he explicitly stated purpose of the Research Agreement mirrors that language, providing that the research is begin commissioned to "'detect[], stop[], and prevent[] crime or other harm to innocent people.'" (3) "The Research Agreement obligated Strategic to provide Eastern with 'Current Tracking research,' including 'detailed reports on movements of specific subjects by land, air, and sea.'" (4) "The contract also required Strategic to dig up information on the subjects' 'criminal' history, court records, and information regarding their 'extramarital affairs.'" (5) "In paragraph 56 of its Answer, Strategic admits that it contracted in Virginia to provide 'a private investigation' to Eastern under the Research Agreement." (6) "Elsewhere in its Answer, Strategic admitted that it was 'investigative research to be conducted by Strategic Vision pursuant to the Contract.'" (7) "And in paragraph 28 of its Counterclaim, Strategic admitted that it retained private investigators to perform the research called for under the Research Agreement." (8) "[B]oth Ms. Wallop and Mr. Waller repeatedly referred to the services that they were to provide and attempted to provide to Eastern under the Research Agreement as an 'investigation' and that the contractors that Strategic claims to have hired to conduct the research were in fact private 'investigators.'" (9) "Eastern's witnesses testified that Eastern would in fact seek to prosecute the crimes and civil wrongs uncovered by the investigation."

I.      **Strategic's Reply in Support of Facts 1-32 in Support of its Cross-Motion**

    A.  The Research Agreement Was Drafted to Further Guo's Personal Political Goals, Not
       <u>to Assist Any Particular Victim in Adjudicating a Specific Crime or Civil Wrong</u>

    1.      Guo claimed he intended to use Strategic Vision's research for his own publicity

program of attacking senior CCP leadership, thereby pressuring the CCP, leading to its downfall,

and promoting the "rule of law" and "democracy" in China.  Feb. 8, 2019 J. Michael "Waller 1"

Tr., Ex. I2, 24:16-25:13 ("He wanted to do battle with the Chinese Communist Party

leadership."); 34:5-11 ("Guo had a three-year plan. He wanted a three-year contract to fulfill that

plan.").  Guo intended to make political use of Strategic Vision's work:

> <u>Q. What did you intend to do with the</u>
> <u>research that Strategic Vision was going to</u>
> <u>provide?</u>
> MR. HARMON: Object to the form of the
> question.
> MR. GRENDI: Object to form.
> A. The simple reason is, we want to
> eliminate the Chinese Communist Party. We try to
> overthrow the Chinese Communist Party, to bring
> rule of law to China, to let the West know the
> scenes committed by the Chinese Communist Party.

Aug. 2, 2019 "Guo [Wengui] 1" Tr., Ex. J2, 39:9-19 (underling added).

        EASTERN'S RESPONSE:  Objection.  How Eastern or Mr. Guo intended to use the

research is immaterial to any factual or legal issue involved in this case.  To the extent an answer

is required, denied that Mr. Guo intended to make "political use" of the investigatory research

conducted by Strategic Vision or use that research for "his own publicity campaign."  Strategic

has cited no evidence in support of that contention in violation of Local Rule 56.1.  Admitted

that Eastern intended to use the research to obtain information regarding civil and criminal

wrongs by members of the CCP.

STRATEGIC'S REPLY:  Eastern's materiality objection should be overruled and its denial of SOF 1 rejected as contrary to the evidence cited by Strategic (Eastern itself cited no evidence regarding SOF 1).  First, Guo's intention for the contract is legally material—it goes to the heart of Eastern's declaratory judgment claim concerning whether Virginia's private investigator statute applies in this case (it does not).  While Eastern posits that Virginia law looks only to the intention of the "service-provider" to ascertain whether a given contract falls within the statute's coverage,[3] Eastern does not cite any legal authority for the proposition.  Logic would hold that the intended use of the fruits of the contract by the recipient of the fruits bears more heavily on the application of the statute than the activity of the service-provider, which may not even fully know the full extent of the receiving party's plans for the outcome of the contract. In its Cross-Motion, Strategic seeks summary judgment that the Court cannot make the judicial declaration Eastern seeks.

Eastern cites no legal authority prohibiting the Court from considering, for example, evidence of what the Research Agreement's reference to "preventing crime or other harm to innocent people" meant to Eastern and Guo Wengui in the specific context of the declaratory judgment claim, the sole issue raised by the Cross-Motion.  The undisputed evidence is that this phrase was Guo's preferred slogan for his supposed political push, in connection with his asylum application to the United States, to oust the CCP by using the media to publicize the results of the research. (SOF 2-5)  It is also undisputed that neither Guo nor Eastern identified an actual crime, victim (beyond "hundreds of millions" of "Chinese people"), or specific plan to use the research for any case.  (SOF 6)

---

[3]      Dkt. 278, p. 4: "Strategic resorts to arguing that the manner in which Eastern was planning to use the investigative research obtained by Strategic somehow makes Va. Code Ann. § 9.1-139 inapplicable to Strategic."

Second, it is without citing any evidence that Eastern "denie[s] that Mr. Guo intended to make 'political use' of the investigatory research conducted by Strategic Vision or use that research for 'his own publicity campaign.'"  Because it cites no evidence, Eastern's denial apparently relies on its proposition that Strategic did not cite evidence to demonstrate Guo's intentions for the project.  That is false.  In SOF 1, Strategic cited (and quoted) Guo's own testimony, along with the testimony of Strategic's representative Mike Waller, to demonstrate what the stated plan was for the research.  For example, Guo answered the question "[w]hat did you intend to do with the research that Strategic Vision was going to provide" with "to eliminate the Chinese Communist Party," to "overthrow" it, to bring "the rule of law to China," and to publicize "to the West" the "scenes" "committed" by the CCP.  Again, this testimony was both cited and quoted in Strategic's SOF 1.  Finally, Eastern "admits" that it "intended to use the research to obtain information regarding civil and criminal wrongs by members of the CCP," which recognizes the political use that Guo and therefore Eastern intended to put Strategic's research.  In sum, Eastern has not effectively disputed SOF 1 and it should be deemed admitted without qualification.

2.      Guo's advisers suggested he publicize new information about senior CCP officials in order to maintain his publicity campaign. **ADMITTED:** Lianchao Han testified that the idea for research into Chinese political officials was his own. Aug. 28, 2019 Lianchao Han Tr., Ex. K2, 126:22-128:9; 137:20-139:20. **ADMITTED:** Lianchao was at that time already advising Guo on his asylum application (*Id*., 46:17-47:9) and, among other things, on how to remain a resident of the United States. *Id*., 130:14-132:10.  Lianchao also was advising Guo on how to "sustain" his image as a "whistleblower."  *Id*., 46:17-47:9. **ADMITTED:** Before conceiving of Strategic's research project, Lianchao was already advising Guo that, in order to sustain his

momentum of criticism against the CCP, he needed to gather and publish the type of research against "high-ranking government officials" similar to what Lianchao had already performed through two nonprofit "thinktank" entities. *Id*., 43:1-46:2. **ADMITTED:** Lianchao believed that to "continue to disrupt the Communist regime," Guo needed "sustainable, fact-based, evidence-based disclosure of Chinese corruption," and told Guo that "once we have solid evidence, we can expose them." *Id*., 138:12-139:15.

EASTERN'S RESPONSE:  Objection.  How Eastern or Mr. Guo intended to use the research is immaterial to any factual or legal issue involved in this case.  To the extent an answer is required, denied that Mr. Guo's advisers suggested he publicize new information about senior CCP officials "in order to maintain his publicity campaign" and that Lianchao also was advising Guo on how to sustain "his image" as a whistleblower.'"  Strategic has cited no evidence in support of that contention in violation of Local Rule 56.1.  The cited testimony demonstrates that Eastern, Mr. Guo, and L. Han intended to use the research to obtain information regarding civil and criminal wrongs by members of the Chinese Communist Party, not commence some "publicity campaign" or sustain any "image."  Otherwise, admitted.

STRATEGIC'S REPLY:  SOF 2 fully survives Eastern's attacks.  First, as discussed more fully above regarding SOF 1, SOF 2 comprises facts material to Strategic's Cross-Motion, namely whether Eastern is entitled to a declaratory judgment that the Research Agreement is void (it is not) because the Agreement allegedly violates a Virginia private investigative services statute (it does not) which, if enforced under Virginia law, should result in a judicial decree voiding the contract (it should not).  Eastern cites no legal authority for the proposition that Virginia law looks only to the intention of the "service-provider" to ascertain whether a given contract falls within the statute's coverage.  SOF 2 shows that Guo intended to use the research

for activities far different than those the statute was designed to ensure were completed by people having a certain level of qualification in order to protect members of the public who needed their services.

Second, Eastern admits most of the facts comprising SOF 2.  The only ones Eastern challenges concern the ultimate use of the research—whether "Guo's advisers suggested he publicize new information about senior CCP officials in order to maintain his publicity campaign" and whether "Lianchao also was advising Guo on how to 'sustain' his image as a 'whistleblower.'"  Both facts were supported by evidence and Eastern cites none in attempting to dispute the Paragraph.  Instead, Eastern admits that Strategic's evidence "demonstrates that Eastern, Mr. Guo, and L. Han intended to use the research to obtain information regarding civil and criminal wrongs by members of the Chinese Communist Party."  But Eastern stops short of admitting that Guo would enjoy a personal benefit in terms of the bolstering of his image as a whistle-blower and dissident.  Strategic, however, proved that the "research to obtain information regarding civil and criminal wrongs by members of the Chinese Communist Party" (what Eastern admits on this point) was not done in a vacuum.  Lianchao was the very person who "talked Miles [Guo] into this.  I discussed with Mike and French to initiate this research project."  Lianchao Tr., Ex. K2, 138:2-8 (cited in SOF 2).  In SOF 2, Strategic cited Lianchao's testimony that the discussions with Strategic included "communication, the P.R. [public relations]" (*Id*., 126:22-127:8) and then later a continuation of Guo's role as a whistleblower of "corrupt officials; once we have solid evidence, we can expose them.  So that's how it started." (*Id*., 139:12-15).  The term "whistleblower" was one Lianchao used directly in his testimony, cited by Strategic in this Paragraph:  "He was already a whistleblower at the time.  My

suggestion was to sustain that whistleblower." (*Id.*, 47:7-9). In sum, Eastern has not effectively disputed SOF 2 and it should be deemed admitted without qualification.

       3.     Guo's and Eastern's claims that they would use the research to expose "crimes" against the Chinese people or government were rhetorical references to exposing public corruption rather than a specific plan to use the research in connection with adjudicating specific crimes against particular victims, as Eastern's corporate representative admitted:

> Q.  Do you know why Mr. Guo cares if these individuals are committing
> crimes against the Chinese government?
> MR. GRENDI:  Objection.  You can answer.
> A.  It's a big question, but I love to answer.  And if you follow all the
> media, including New York Times, Washington Post, Wall Street Journal,
> all of this, big media internationally, and his own social media, you will
> have the answer.
> Q.  How about you provide me with your answer?
> A.  Because he spoke out on behalf of a Chinese outrage, common people,
> about the corruption of Chinese certain high official. There's no rule of
> law and democracy in Mainland of China.  And Chinese outrage people,
> they deserve, and they urgently, hungrily need that. So he believed what
> he has been doing until now, since two years ago, is for justice and for rule
> of law, democracy of China.

Jan. 31, 2019 Yvette "Wang 1" Tr., Ex. L2, 37:8-38:7 (underling added); Lianchao Tr., Ex. K2, 53:13-54:5 (Guo said he wanted to expose the corruption of high-ranking CCP members, but "[h]ow he's going to do it, I don't think he has an idea.").

       EASTERN'S RESPONSE:  Objection.  How Eastern or Mr. Guo intended to use the research is immaterial to any factual or legal issue involved in this case.  To the extent an answer is required, denied.  Strategic has cited no evidence in support of that contention in violation of Local Rule 56.1.  Eastern's witnesses consistently testified that Eastern would in fact seek to prosecute the crimes and civil wrongs uncovered by the investigation. Guo I Tr. at 206:12-208:19 (testifying that he intended to prosecute the crimes and civil wrongs unearthed by the investigation); Wang II Tr. at 203:2-22 (testifying that the investigation was to uncover "crimes"

by "corrupted Chinese official[s]" to bring them to "justice" and cause them to be "sent to jail"); accord Wang I Tr. at 34:4-20 (testifying that Eastern commissioned the research to whistle blow and disclose [the subject's] crime").

STRATEGIC'S REPLY:  Eastern has not effectively disputed this fact.  First, as discussed more fully above regarding SOF 1, SOF 3 is material to Strategic's Cross-Motion because it addresses whether Eastern is entitled to a declaratory judgment that the Research Agreement is void (it is not) because the Agreement allegedly violates a Virginia private investigative services statute (it does not) which, if enforced under Virginia law, should result in a judicial decree voiding the contract (it should not).  Eastern cites no legal authority for the proposition that Virginia law looks only to the intention of the "service-provider" to ascertain whether a given contract falls within the statute's coverage.  SOF 3 shows that Guo intended to use the research for the protection and advancement of an entire population ("the Chinese people"), an activity far different than those the statute was designed to ensure were completed by people having a certain level of qualification in order to protect members of the public who needed their services for personal reasons.

Second, contrary to Eastern's assertion that Strategic did not cite evidence to support SOF 3, the supporting evidence cited there included the testimony of Eastern's designated corporate representative, speaking on a noticed topic, that Guo wanted to use the research "on behalf of a Chinese outrage, common people…Chinese [] people, they deserve … [rule of law and democracy in Mainland of China]."  Wang 1 Tr., Ex. L2, 37:8-38:7 (cited in SOF 3); Ex. M2 (Ex. 1 to Wang 1 Tr., Deposition Notice).  This evidenced the fact that Guo wanted to expose public corruption on behalf of "the Chinese people," as stated in SOF 3.  Strategic also cited the testimony of Lianchao, the individual who conceptualized the idea for the research (Lianchao

Tr., Ex. K2, 138:2-8 (cited in SOF 2), that Guo did not have a specific plan to expose the corrupt activities of individual high-ranking CCP members.

Third, Eastern cites cumulative testimony from Guo and Wang to support its assertion that it "would in fact seek to prosecute the crimes and civil wrongs uncovered by the investigation" but the testimony only underscores Strategic's point: that Guo and his assistants liked to talk using slogans about exposing "crimes," "whistleblowing," "corruption" against the "rule of law" and "Chinese people," but their failure to provide details and frequent references to media shows that they actually had in mind a publicity campaign instead of having targeted any specific victim, crime, or proceeding, as would have been necessary for Strategic to be covered by the Virginia statute. Confirming the testimony cited in Strategic's paragraph and in Eastern's Response, Guo testified that the end-user of the research ultimately would be "the Chinese people" who would be "rescued" and shown "the truth" by "we," meaning "[w]e, as a group" who would bring the evidence to a court through "the media." Guo 1 Tr., Ex. J2 (all cited by Eastern in response to this SOF: 206:14-20, 207:17-21, 208:5-8) ("A. To release them to the media; to release the information to the media."). Guo did not testify that Eastern was an entity with standing to pursue corrupt officials or that the research was actually going to help Eastern itself (if Eastern itself had been the victim of a crime). Rather, he mentioned the media and "we" as a "group" of Chinese citizens. Wang's testimony was not to the contrary. Thus, the testimony Eastern cites only further supports this SOF. Eastern has not effectively disputed SOF 3 and it should be deemed admitted without qualification.

4.      Guo testified that the Strategic Vision research was to advance his alleged political goals: <u>Q. Do you want to undermine the current leadership of the People's Republic of China?</u> A. I'm not just trying to undermine the government; I'm trying to eliminate the current

government, to -- I'm trying to eliminate the party, Chinese Communist Party, to bring rule of

law and freedom to China.  Guo 1 Tr., Ex. J2, 33:6-12 (emphasis added).  Guo further testified:

> Q. Mr. Guo -- Mr. Guo, how do you intend accomplish the goal that you just
> described to us? (DIR)
> MR. HARMON: Direct the witness not to answer.
> A: I'm not answering this question.
> BY MR. GREIM:
> Q. Was your work with Strategic Vision intended to accomplish the goal that you
> just described to us?
> A. Yes.
> Q. Is that what you told French Wallop and Mike Waller?
> A. Yes.
> Q. When did you tell them that?
> A. Between -- I don't recall the exact dates, but it's probably between November
> 2017 and February 2018, when we signed the contract.

Guo 1 Tr., Ex. J2, 35:12-36:4 (underlining added).

EASTERN'S RESPONSE:  Objection.  How Eastern or Mr. Guo intended to use the

research is immaterial to any factual or legal issue involved in this case.  To the extent an answer

is required, denied.  Strategic has cited no evidence in support of the contention that Eastern or

Mr. Guo entered into the Research Agreement to further "political goals" in violation of Local

Rule 56.1.  Eastern's witnesses consistently testified that Eastern would in fact seek to prosecute

the crimes and civil wrongs uncovered by the investigation. Guo I Tr. at 206:12-208:19

(testifying that he intended to prosecute the crimes and civil wrongs unearthed by the

investigation); Wang II Tr. at 203:2-22 (testifying that the investigation was to uncover "crimes"

by "corrupted Chinese official[s]" to bring them to "justice" and cause them to be "sent to jail");

accord Wang I Tr. at 34:4-20 (testifying that Eastern commissioned the research to whistle blow

and disclose [the subject's] crime").

STRATEGIC'S REPLY:  Eastern has not effectively disputed this fact, which included

verbatim, under oath testimony from Guo that Eastern does not claim was mistaken, incomplete,

or otherwise unsupportive.  First, as discussed more fully above regarding SOF 1, SOF 4 is

material to Strategic's Cross-Motion because it addresses whether Eastern is entitled to a

declaratory judgment that the Research Agreement is void (it is not).  Second, contrary to what

now appears to be Eastern's ubiquitous assertion that Strategic did not cite evidence to support

SOF 4, the supporting evidence cited there included testimony from Guo that was correctly

summarized as evidencing "that the Strategic Vision research was to advance his alleged

political goals." (SOF 4, 1st line)

Third, Eastern cites testimony from Guo and Wang to support its assertion that it "would

in fact seek to prosecute the crimes and civil wrongs uncovered by the investigation" but the

testimony only underscores Strategic's point: that Guo and his assistants liked to talk using

slogans about exposing "crimes," "whistleblowing," "corruption" against the "rule of law" and

"Chinese people," but their failure to provide details and frequent references to media shows that

they actually had in mind a publicity campaign instead of having targeted any specific victim,

crime, or proceeding, as would have been necessary for Strategic to be covered by the Virginia

statute.  Confirming the testimony cited in Strategic's paragraph and in Eastern's Response, Guo

testified that the end-user of the research ultimately would be "the Chinese people" who would

be "rescued" and shown "the truth" by "we," meaning "[w]e, as a group" who would bring the

evidence to a court through "the media." Guo 1 Tr., Ex. J2 (all cited by Eastern in response to

this SOF: 206:14-20, 207:17-21, 208:5-8) ("A.  To release them to the media; to release the

information to the media.").  Guo did not testify that Eastern was an entity with standing to

pursue corrupt officials or that the research was actually going to help Eastern itself (if Eastern

itself had been the victim of a crime).  Rather, he mentioned the media and "we" as a "group" of

Chinese citizens.  Wang's testimony was not to the contrary.  Thus, the testimony Eastern cites

only further supports this SOF. Eastern has not effectively disputed SOF 4 and it should be

deemed admitted without qualification.

5.       **ADMITTED:** When pressed for details, Guo claimed that he planned to use

information on the first 15 names to expose "hundreds of billions of dollars" in bank accounts

and "help save millions of people" or "hundreds of millions of people who got falsely persecuted

in China," and/or "rescue tens of millions of people from the prison":

> Q. What did you intend to do with the research that Strategic Vision was going to
> provide?
> MR. HARMON: Object to the form of the question.
> MR. GRENDI: Object to form.
> A. The simple reason is, we want to eliminate the Chinese Communist Party. We try to
> overthrow the Chinese Communist Party, to bring rule of law to China, to let the West
> know the scenes committed by the Chinese Communist Party.
> Q. My question was more specific. What did you intend to do with the research that
> Strategic Vision uncovered regarding the 15 names?
> MR. GRENDI: Object to the form.
> MR. HARMON: Object to the form of the question.
> A. So we're going to send these reports to the U.S. courts so that people who got
> persecuted would know the truth.

Guo 1 Tr., Ex. J2, 39:9-40:6 (underlying added).

> Q. What was it about the 15 names that led you to believe that Strategic Vision's
> research would be useful to you in your goal of eliminating the Chinese
> Communist Party?
> MR. HARMON: Object to the form of the question.
> MR. GRENDI: Object to form.
> A. So the reason being, some of these names -- first of all, I don't know -- so I
> don't know all the names, but I do know -- I did know some of the names among
> the 15 names. Some names included, for example, the goddaughter of Wang
> Qishan, about -- you know, about her putting aside tens of billions of dollars and
> hundreds of billions of dollars in bank accounts. If we are able to disclose that
> information to the public, that would be great. And, also, they boasted that they
> had information, secret informations, about, you know, a police -- Chinese police
> department intelligence head, intelligence head, about his corruption information.
> So back then, we felt like, if – with possession of those information, we are able
> to release those information to the U.S. government to help save millions of
> peoples who got falsely persecuted in China, even hundreds of millions of people
> who got persecuted in China. And because of this lying pitch, we lost a wonderful
> opportunity to rescue all these millions and tens of millions of people who got

thrown into jail for no reason. So, essentially, these two people, these two individuals, took advantage of our sense of urgency to rescue millions, tens of millions of people, from the prison, and they used those people as bait to try to get us into sign the contracts. And those two people -- those two individuals are really despicable and very low.

Guo 1 Tr., Ex. J2, 45:3-46:16 (underlining added).

EASTERN'S RESPONSE:  Objection.  How Eastern or Mr. Guo intended to use the research is immaterial to any factual or legal issue involved in this case.  To the extent an answer is required, admitted.  Eastern further responds that part of that plan was to prosecute criminal or civil wrongs committed by CCP officials.  Guo I Tr. at 206:12-208:19 (testifying that he intended to prosecute the crimes and civil wrongs unearthed by the investigation); Wang II Tr. at 203:2-22 (testifying that the investigation was to uncover "crimes" by "corrupted Chinese official[s]" to bring them to "justice" and cause them to be "sent to jail"); *accord* Wang I Tr. at 34:4-20 (testifying that Eastern commissioned the research to whistle blow and disclose [the subject's] crime").

STRATEGIC'S REPLY:  The facts in SOF 5, comprised largely of direct quotations of Guo's testimony, are admitted by Eastern (as they must be).  However, Eastern again evades application of the Paragraph by claiming that it is immaterial.  Eastern's objection should be overruled.  SOF 5 is material to Strategic's Cross-Motion because it addresses whether Eastern is entitled to a declaratory judgment that the Research Agreement is void under the Virginia statute (it is not).  SOF 5 highlights why the statute does not apply.  According to Guo (whose representations about the Research Agreement are binding on Eastern, Dkt. 142, p. 2, ¶ 4)[4] the research would affect "millions" or "hundreds of millions" of Chinese people and "hundreds of

---

[4]     Eastern "admits that Eastern authorized Guo to communicate with Strategic Vision on Eastern's behalf concerning the Agreement, that Guo's representations to, and interactions with, Strategic Vision concerning the Agreement are binding upon Eastern, and that Eastern has not repudiated any such representations or interactions."

billions of dollars," a reach far different than that of the statute, which governs occupations such as locksmiths, armored car personnel, central station dispatchers, and armed security officers. Va. Code Ann. § 9.1-138; 9.1-147, 9.1-150. Eastern's additional cited facts are not inconsistent with SOF 2-5 and show that Guo simply used slogans without any plans to target the research to help specific victims of specific crimes in particular courts or proceedings. Eastern's objection to SOF 5 should be overruled.

6.      Guo had no plan to use any of the information to address a specific crime by a specific person in a specific judicial proceeding as opposed to using the information as a weapon against the CCP as a regime. Wang (as Guo's "project manager") knew Guo had identified the subjects for research but, even a year after the contract with Strategic was negotiated, still only knew Guo's reasoning and plans based on Guo's social media posts. Wang 1 Tr., Ex. L2, 32:12-35:11; Lianchao Tr., Ex. K2, 53:13-54:5 (Guo said he wanted to expose the corruption of high-ranking CCP members, but "[h]ow he's going to do it, I don't think he has an idea."). When pressed to provide details, Guo testified:

> Q. What did you expect Strategic Vision's Guo Wengui weekly report to include?
> A. Including corruption of the Chinese Communist Party, their overseas spy network, their money-laundering evidence, as well as evidence regarding them stealing money from the Chinese people.
> Q. Did you expect Strategic Vision to provide you raw data only or analysis of the data?
> MR. GRENDI: Object to the form.
> A. Raw data, only raw data.
> BY MR. GREIM:
> Q. Why?
> A. Because we could use the raw data as evidence when we bring it to the court, a U.S. court.
> Q. Who is going to bring the evidence to a U.S. court?
> A. Of course, people like us, who share the same goal of overthrowing the Chinese Communist Party in the U.S. We, as a group.
> Q. Well, what -- did you discuss this plan with other people?
> A. I don't remember.
> Q. Well, were you planning on sharing the research with anyone else?

A. The U.S. government and the people of China.
<u>Q. How did you plan to share the information with the people of China?</u>
A. To release them to the media; to release the information to the media.
<u>Q. How did you intend to get the information to the U.S. government?</u>
A. Based on the legal procedures of the U.S.
<u>Q. Do you plan to file a lawsuit with the information?</u>
A. To answer your question, the plan is to file a lawsuit.
<u>Q. Who are you going to sue?</u>
A. Whoever commits a crime and we have the evidence.

Guo 1 Tr., Ex. J2, 206:25-208:19 (underlining added).

EASTERN'S RESPONSE:  Objection.  How Eastern or Mr. Guo intended to use the research is immaterial to any factual or legal issue involved in this case.  To the extent an answer is required, denied.  Strategic has cited no evidence in support of that contention in violation of Local Rule 56.1.  Eastern's witnesses consistently testified that Eastern would in fact seek to prosecute the crimes and civil wrongs uncovered by the investigation. Guo I Tr. at 206:12-208:19 (testifying that he intended to prosecute the crimes and civil wrongs unearthed by the investigation); Wang II Tr. at 203:2-22 (testifying that the investigation was to uncover "crimes" by "corrupted Chinese official[s]" to bring them to "justice" and cause them to be "sent to jail"); *accord* Wang I Tr. at 34:4-20 (testifying that Eastern commissioned the research to whistle blow and disclose [the subject's] crime").

STRATEGIC'S REPLY:  Eastern has not effectively disputed SOF 6, which included verbatim, under oath testimony from Guo that Eastern does not claim was mistaken, incomplete, or otherwise unsupportive.  First, as discussed more fully above regarding SOF 1, SOF 6 is material to Strategic's Cross-Motion because it addresses whether Eastern is entitled to a declaratory judgment that the Research Agreement is void (it is not). As SOF 6 demonstrates, the statute does not apply to a contract that served a purpose affecting "millions" or "hundreds of millions" of Chinese people and "hundreds of billions of dollars."  (*See* SOF 5, admitted by

Eastern). The statute instead affects professions that do not affect millions or hundreds of millions of people in the context of one contract—including locksmiths, armored car personnel, central station dispatchers, and armed security officers. The statute does not affect a contract that involves a purely political purpose. SOF 6 demonstrates that the Agreement was not tied to a plan by the end-users to "address a specific crime by a specific person in a specific judicial proceeding." Second, contrary to what now appears to be Eastern's ubiquitous assertion that Strategic did not cite evidence to support SOF 6, the supporting evidence cited there included testimony from Guo that was correctly summarized for the description at the beginning of the Paragraph and then correctly quoted.

Third, Eastern again cites testimony from Guo and Wang to support its assertion that it "would in fact seek to prosecute the crimes and civil wrongs uncovered by the investigation" but the testimony only underscores Strategic's point: that Guo and his assistants liked to talk using slogans about exposing "crimes," "whistleblowing," "corruption" against the "rule of law" and "Chinese people," but their failure to provide details and frequent references to media shows that they actually had in mind a publicity campaign instead of having targeted any specific victim, crime, or proceeding, as would have been necessary for Strategic to be covered by the Virginia statute. Confirming the testimony cited in Strategic's paragraph and in Eastern's Response, Guo testified that the end-user of the research ultimately would be "the Chinese people" who would be "rescued" and shown "the truth" by "we," meaning "[w]e, as a group" who would bring the evidence to a court through "the media." Guo 1 Tr., Ex. J2 (all cited by Eastern in response to this SOF: 206:14-20, 207:17-21, 208:5-8) ("A.  To release them to the media; to release the information to the media."). Guo did not testify that Eastern was an entity with standing to pursue corrupt officials or that the research was actually going to help Eastern itself (if Eastern

itself had been the victim of a crime).  Rather, he mentioned the media and "we" as a "group" of Chinese citizens.  Wang's testimony was not to the contrary.  Thus, the testimony Eastern cites only further supports this SOF. SOF 6 should be deemed admitted without qualification.

7.     During negotiation and performance of the Research Agreement, the only person or entity that Guo or his associates claimed would be using Strategic's research was Guo himself, even if someone else signed the contract opposite Strategic. Waller 1 Tr., Ex. I2, 226:1-253:8.

EASTERN'S RESPONSE:  Objection.  How Eastern or Mr. Guo intended to use the research is immaterial to any factual or legal issue involved in this case.  To the extent an answer is required, denied.  Strategic has cited no evidence in support of that contention in violation of Local Rule 56.1.  In fact, the Research Agreement that Strategic signed made it clear that Eastern was to use the investigatory research provided by Strategic.  Ex. M, Research Agreement at 1-5.

STRATEGIC'S REPLY:  Eastern has not effectively disputed this fact by attempting to make a Guo versus Eastern distinction.  The point of SOF 7 was to tie Guo's plans for the research with the contract itself, a fact that Eastern does not dispute.

SOF 7 should be deemed admitted for several reasons.  First, as discussed more fully above regarding SOF 1, SOF 7 is material to Strategic's Cross-Motion because it addresses whether Eastern is entitled to a declaratory judgment that the Research Agreement is void (it is not).  Through Guo, an entire nation of people would purportedly receive a political benefit from the research Strategic provided under the Agreement, and the contract cannot as a matter of law be subject to the Virginia private security services statute.  Second, Eastern again claims that Strategic did not support the factual assertions in SOF 7, but that again is not the case.  Strategic cited the testimony of Mike Waller, its representative who prepared the "vision" proposal for what Guo wanted to achieve in what later was memorialized as the Research Agreement. Waller

testified that Guo was the recipient of the research and would use it in his personal "campaign" to "topple" the CCP.  Waller 1 Tr., Ex. I2, 227:24-229:4 (cited in SOF 7).

Strategic's SOF 8 provides additional evidence to support SOF 7, including the verbatim quote from Waller's testimony that "It was explicit that they would be all entities controlled by Guo Wengui, <u>that it was his money</u>, and that he would—he may use various vehicles to <u>conceal from the Chinese government the fact that he was making these payments</u>." Waller 2 Tr., Ex. N2, 95:3-12 (underlining added).

Finally, the purpose of SOF 7 was to tie the research to Guo, whether as an individual or as the face of Eastern.  Eastern's attempt at a Guo versus Eastern distinction is misplaced, given that it admitted in a pleading "Eastern authorized Guo to communicate with Strategic Vision on Eastern's behalf concerning the Agreement, that Guo's representations to, and interactions with, Strategic Vision concerning the Agreement are binding upon Eastern, and that Eastern has not repudiated any such representations or interactions."  Dkt. 142, p. 2, ¶ 4.  Eastern does not create a true dispute with SOF 7 in the context of Strategic's Cross-Motion.

8.    As a corollary to this, it was expected that it would be Guo who would pay for Strategic's work. Nov. 19, 2019 J. Michael "Waller 2" Tr., Ex. N2, 95:3-12 (underlining added) ("It was explicit that they would be all entities controlled by Guo Wengui, <u>that it was his money</u>, and that he would—he may use various vehicles to <u>conceal from the Chinese government the fact that he was making these payments</u>."); Lianchao Tr., Ex. K2, 246:6-17.

EASTERN'S RESPONSE:  Objection.  Who was to pay any consideration due and owing under the Research Agreement is immaterial to any factual or legal issue involved in this case.  To the extent an answer is required, denied.  The Research Agreement obligated Eastern to pay Strategic if its properly performed its obligations; there is nothing in the Research

Agreement that implicitly or explicitly states that Mr. Guo would be paying for Strategic's investigatory research.  Ex. M, Research Agreement at 1-5.

STRATEGIC'S REPLY:  The point of SOF 8 was primarily to tie Guo's plans for the research with the contract itself, something Eastern does not dispute.  Whether "Eastern" assumed a payment obligation under the contract, and whether Guo was always going to pay, are not mutually exclusive. In fact, Eastern has already admitted this by elsewhere claiming that it delegated its payment obligation to ACA. *See* Dkt. 279, p. 18, ¶ 23, below, where Eastern states "Admitted that Eastern directed ACA to pay the $1 million deposit on behalf of Eastern, as explicitly allowed under the Research Agreement and pursuant to the ACA Loan Agreement."). So clearly another party can pay Strategic without contradicting the terms of the contract. Since this logically, factually, and legally incorrect position is Eastern's sole argument and evidence for contradicting SOF 8, it is deemed admitted.

Finally, although not material to Strategic's present Cross-Motion, Strategic disputes Eastern's interpretation of the contract to be that "[t]he Research Agreement obligated Eastern to pay Strategic *if it properly performed its obligations*."  This is a legal question that is immaterial here and is, regardless, for the Court to answer.  *Serdarevic v. Centex Homes, LLC*, 760 F. Supp.2d 322, 328 (S.D. N.Y. 2010) (citations omitted) ("Under New York law, the initial interpretation of a contract is a matter of law for the court to decide...").

9.     **ADMITTED:**  After performance had begun in January 2018, Wang was told by Guo, and then conveyed to Waller, that "big budget is ready for this long-term project" and that the "investors" could pay Waller's team even without a contract. Wang 1 Tr., Ex. L2, 258:5-259:13.  At all times, Guo and his associates assumed that some other person or entity rather than Guo would sign the written contract **DISPUTED:**  *as a stand-in for Guo*. Lianchao Tr., Ex. K2,

273:1-5 (In drafting the Research Agreement, for security reasons, there was a concern about Guo being identified as a party.); Ex. O2 (Wang 1 Tr. Ex. 5, SVUS00067-70: Lianchao-Waller Dec. 24-25, 2017 text exchange, in which Lianchao says "I don't know who will sign" and Waller reports that Guo had already proposed and the parties had agreed that Lianchao sign); Ex. P2 (Wang 1 Tr. Ex. 16, EASTERN-00217-219:  Wang-Wallop January 5, 2018 text exchange, in which Wang says, "So I'm the person to sign this contract tomorrow" and confirms that "NY" (that is, Guo) had instructed her that "this contract and all the communications…are exclusively between NY, you, M [Michael Waller] and me—four of us.").

EASTERN'S RESPONSE:  Objection.  Whether Eastern or some other entity signed the Research Agreement "as a stand-in for Guo" and whether Eastern had a "big budget" for the project or "investors" in Eastern is immaterial to any factual or legal issue involved in this case. To the extent an answer is required, denied that Eastern signed the Research Agreement "as a stand-in for Guo."  Strategic has cited no evidence in support of that contention in violation of Local Rule 56.1.  Otherwise, admitted.

STRATEGIC'S REPLY:  Eastern admits the first sentence of SOF 9, which is a material point because it proves the inapplicability of the Virginia statute—this was a "big budget" project, with "investors," that would aim for wholesale political disruption in China to benefit the entire Chinese nation.  This was not a matter governed by the Virginia state private investigator statute.

Eastern disputes the second sentence of SOF 9, an assertion that was of a background nature—to tie Guo's plans for the research with the contract itself, something Eastern does not dispute.  Eastern thus does not create a true dispute here in the context of Strategic's Cross-

Motion on the declaratory judgment claim premised on the Virginia statute.  SOF 9 should be deemed admitted without qualification.

     B.  <u>Eastern had Agreed to Furnish Strategic's Research to Others</u>.

     10.    To the extent Eastern is contending that it operates as a distinct entity outside of Guo's control, Eastern admitted that Guo provided it the initial fifteen subject names for Strategic to research and background information for research.  Feb. 12, 2019 French "Wallop 1" Tr., Ex. Q2, 83:24-84:7, 185:7-186:12, Lianchao Tr., Ex. K2,173:6-174:4. Eastern was to give Guo the research results for Guo's own personal use, purportedly to "whistle blow" and publicly attack the CCP (Wallop 1 Tr., Ex. Q2, 32:5-35:11, 37:8-38:7). These initial names and background information had value: Guo represented to Strategic that he had spent a substantial sum to compile the information associated with each name.  Waller 1 Tr., Ex. I2, 186:11-188:7; Wallop 1 Tr., Ex. Q2, 83:24-84:7, 185:7-186:12, Lianchao Tr., Ex. K2, 173:6-174:4 (Lianchao remembers that Guo claimed to Strategic that he had paid some amount of money to come up with the initial research included with the list of names, but believed Guo may have exaggerated regarding the amount he had spent).

     EASTERN'S RESPONSE:  Objection.  Whether Eastern operates as a distinct entity outside of Guo's control is immaterial to any factual or legal issue involved in this case.  That fact relates solely to Strategic's dismissed alter-ego claim.  To the extent an answer is required, denied.  Strategic has cited no evidence in support of the contention that Eastern did not operate as a distinct entity outside of Mr. Guo's control in violation of Local Rule 56.1.  Strategic has cited no evidence in support of the contention that Eastern was obligated to give Mr. Guo the research results for his own personal use in violation of Local Rule 56.1.  To the contrary, no such obligation exists under the Research Agreement.  Ex. M, Research Agreement at 1-5.

Finally, the fifteen names on the Subject List were identified by Ms. Wang based on information available on the internet.  Wang I Tr. at 194:2-10.

STRATEGIC'S REPLY:  Eastern's objection misconstrues the purpose of SOF 10.  SOF 10 ties Guo's provision of 15 names to his stated intention for the project, namely to gather intelligence on senior CCP officials (beginning with these first 15) for the purpose of exposing their corruption and leading to the wholesale "toppling" of the CCP's political control of China. Waller 1 Tr., Ex. I2, 227:24-229:4 (cited in SOF 7).  SOF 10 supports Strategic's Cross-Motion by showing that the Virginia private investigation statute cannot possibly apply to a formidable endeavor such as this.  SOF 10 is material here as described above and material to other issues before the Court in the context of summary judgment, including Strategic's position that Eastern is not entitled to summary judgment on Strategic's fraud Counterclaim.  As to the declaratory judgment claim, however, the particular degree of Guo's control over Eastern is not material given that Guo's statements about his intentions for using the research called for by the Research Agreement are binding on Eastern.  *See* Eastern's Dkt. 142, p. 2, ¶ 4) (Eastern "admits that Eastern authorized Guo to communicate with Strategic Vision on Eastern's behalf concerning the Agreement, that Guo's representations to, and interactions with, Strategic Vision concerning the Agreement are binding upon Eastern, and that Eastern has not repudiated any such representations or interactions.").

Eastern's alternative denial of SOF 10 as being asserted without evidence ("Strategic has cited no evidence in support of the contention that Eastern was obligated to give Mr. Guo the research results for his own personal use in violation of Local Rule 56.1.") is simply mistaken. Throughout its entire SOF 1-32, Strategic presented by citation and also direct quotation numerous witnesses testifying that Guo intended for the Research Agreement to produce

information critical to his personal endeavor to attack the CCP through publicizing the corrupt

activities of its members. This included testimony from Guo himself and from Lianchao Han,

Guo's asylum adviser who claims to have conceptualized the plan in the first instance.  Eastern

has not (and cannot) deny the existence of this testimony.  Despite this, Eastern cites to the

Research Agreement, but that the contract itself is silent proves nothing.  Eastern cites no

evidentiary support (or legal principle) holding that this contact, or any contract, would be

expected to have explained that Eastern was giving the research to Guo for his use.  Eastern cites

no witness testifying that the Research Agreement was intended to be and was in fact a recitation

of all the matters the parties discussed.  Finally, Eastern cites "Wang I Tr. at 194:2-10" but it

does not relate at all to the subject matter of SOF 10 and is only a partial portion of testimony.[5]

To the extent Eastern is instead relying on Vol. II of Wang's testimony, as the indicated

page and line of Vol. II does relate to the subject of this SOF, such testimony contradicts Wang's

January 2019 under-oath statements.  In her first deposition, eight months before her second

deposition, Wang testified that Guo provided the list of names to Wang, who gave them to

Strategic Vision on his behalf:

> A.· They are the name list.
> Q.· Where did it come from?
> A.· Mr. Guo.
> Q.· Where did Mr. Guo get it?
> A.· I don't know.
> Q.· Did you ever talk to him about it?

---

[5] 2· it afterwards?
·3· A.· He said, No, no, no, no.
·4·Q.· Wasn't it Mr. Guo that asked whether
·5·you could access money from banks of these
·6·people you were identifying?
·7··MS. TESKE:· Object.
·8·A.· What is your question?
·9·Q.· Didn't Mr. Guo ask representatives
10· from Strategic Vision whether they could

Wang 1 Tr., Ex. L2, 194:2-10.

A.· No.

Q.· What did he tell you?· Did he tell
you to do anything with this document?
A.· He said this is about this project.
Q.· And did he instruct you to do
anything with it?
A.· Go to talk, discuss about the
contract, if signed please deliver this to
Strategic Vision.
Q.· And you ended up delivering this to
Strategic Vision?
A.· Correct.

Q.· Did you ever discuss how he gathered
the names or the information?

Wang 1 Tr., Ex. L2, 213:10-17, 215:11-20, 216:19-20.  Eastern appears to be citing later

testimony from Wang where she attempted to contradict her earlier testimony.  This is not an

effective way to create a fact dispute.  SOF 10 is fully admitted.

11.     To the extent Eastern is contending that it operates as a distinct entity outside of

Guo's control, Eastern at all times intended, and the parties agreed, that Guo would receive and

use the research that Strategic would provide, which was a continuation of the work Guo claimed

he already had paid for. Wallop 1 Tr., Ex. Q2, 83:24-84:7, 185:7-186:12, Lianchao Tr., Ex. K2,

173:6-174:4; Waller 1 Tr., Ex. I2, 186:11-188:7; Wang 1 Tr., Ex. L2, 32:5-35:11, 37:8-38:7

(Eastern admits Guo was the person who was going to use the research), 102:21-103:7 (Wang

reported back solely to Guo on Strategic's performance), 263:8-268:12, 37:8-38:7 (Guo

supposedly cares about this misconduct because he wants to promote democracy and the rule of

law in China); Exs. R2 and S2 (Wang 1 Tr. Exs. 18 and 21 (The urgent need for information by

January 26, 2018 was Guo's, but he never told Wang why he needed it so quickly; Wang also

authenticates text messages showing Guo needed reports for his own purposes)); Guo 1 Tr., Ex.

J2, 213:6-214:3 (Wang reported to Guo on Strategic's delivery of a thumb drive, and because it didn't contain the "evidence" he had wanted, agreed with her that Strategic should be sued).

EASTERN'S RESPONSE:  Objection.  Whether Eastern operates as a distinct entity outside of Guo's control is immaterial to any factual or legal issue involved in this case.  That fact relates solely to Strategic's dismissed alter-ego claim.  To the extent an answer is required, denied.  Strategic has cited no evidence in support of the contention that Eastern did not operate as a distinct entity outside of Mr. Guo's control in violation of Local Rule 56.1.  Strategic has cited no evidence in support of the contention that Eastern was obligated to give Mr. Guo the research results for his own personal use in violation of Local Rule 56.1.  To the contrary, no such obligation exists under the Research Agreement.  Ex. M, Research Agreement at 1-5.  Finally, the fifteen names on the Subject List were identified by Ms. Wang based on information available on the internet.  Wang I Tr. at 194:2-10.

STRATEGIC'S REPLY:  Eastern's objection misconstrues the purpose of SOF 11.  Like SOF 10, SOF 11 ties Guo's existing efforts in identifying CCP officials to the Research Agreement here.  Indeed, even before that contract came to exist, Guo had been undertaking steps to gather intelligence on senior CCP officials and had gone so far as hiring another company for that purpose. Thus, Guo's goal never changed even if who he hired did—Guo wanted to spearhead the wholesale "toppling" of the CCP in China. Waller 1 Tr., Ex. I2, 227:24-229:4 (cited in SOF 7).  SOF 11 supports Strategic's Cross-Motion by showing that the Virginia private investigation statute cannot possibly apply to a formidable endeavor such as this.  As to the declaratory judgment claim, however, the particular degree of Guo's control over Eastern is not material.

Eastern's alternative denial of SOF 11 as being asserted without evidence is false. Throughout its entire SOF 1-32, Strategic presented by citation and also direct quotation numerous witnesses testifying that Guo intended for the Research Agreement to produce information critical to his personal endeavor to attack the CCP through publicizing the corrupt activities of its members.  This included testimony from Wang as Eastern's corporate representative, cited numerous times in SOF 11.  Eastern does not deny that Wang so testified or contend that Strategic has taken her testimony out of context.  In SOF 11, Strategic also quoted Guo himself and Lianchao, who conceptualized the plan in the first instance.  Despite this, Eastern cites to the Research Agreement, but that the contract itself is silent proves nothing. Eastern cites no evidentiary support (or legal principle) holding that this contact, or any contract, would be expected to have explained that Eastern was giving the research to Guo for his use. Eastern cites no witness testifying that the Research Agreement was intended to be and was in fact a recitation of all the matters the parties discussed.  Finally, Eastern cites "Wang I Tr. at 194:2-10" but it does not relate at all to the subject matter of SOF 11 (see footnoted testimony above).

12.     To the extent Eastern is contending that it operates as a distinct entity outside of Guo's control, it also had promised to share the information from the Research Agreement with non-party ACA Capital Group Limited ("ACA," the entity that actually paid Strategic the $1 million deposit under the contract, and which Eastern claims "lent" it the $1 million): in a late 2018 dinner meeting, William Je reminded Wang that he had expected information from the Research Agreement regarding corrupted Chinese officials. Wang 1 Tr., Ex. L2, 44:1-47:14, 158:6-9, 158:20-159:23, 161:2-17; Ex. T2, Dkt. 267-1 (Wang 1 Tr. Ex. 7); Dkt. 127, p. 22, ¶ 7;

Dkt. 142, p. 3, ¶ 7. Wang reports to Je on the progress of this case. Oct. 30, 2019 Yvette "Wang 2" Tr., Ex. U2, 224:6-17.

EASTERN'S RESPONSE: Objection. The purported facts are immaterial to any factual or legal issue involved in this case. To the extent an answer is required, denied. Strategic mischaracterizes the cited testimony and has therefore cited no evidence in support of these contentions in violation of Local Rule 56.1. Eastern is under no obligation to provide ACA with any of the results of Strategic's investigatory research. Ex. L, ACA Loan Agreement, EASTERN-000278.

STRATEGIC'S REPLY: The Court should soundly overrule Eastern's broad objection that SOF 12 does not affect any aspect of the case ("The purported facts are immaterial to any factual or legal issue involved in this case"). One of Strategic's main arguments in its Cross-Motion is under the heading "Even If The Contract is Void, Eastern Cannot Recover Restitution" because the fund Eastern wants as restitution was paid by ACA, not Eastern. *See* Dkt. 272, pp. 22-24/ECF pp. 27-29. There, Strategic argued that "allowing recovery [] would incent sophisticated but unlicensed parties like Guo and Eastern to hire investigators and then reap a windfall…" Dkt. 272, p. 24/ECF p. 29. Clearly, SOF 12 is material to the case and specifically to Strategic's Cross-Motion.

Eastern's factual denial of SOF 12 is without support. Strategic did not misconstrue Wang's testimony or any of the other evidence cited in SOF 12. The various citations (which included the wire transfer receipts themselves, attached again here as Ex. T2 (Ex. 7, Wang 1 Tr.) establish that ACA was the entity that paid Strategic the $1 million deposit under the contract, and which Eastern claims "lent" it the $1 million. Wang's second deposition establishes that she reports to William Je (of ACA) about this case. *See also* Strategic's SOF 28 in support of its

Motion for Summary Judgment ("Also unknown to Strategic Vision, Eastern Profit had promised

another entity, non-party ACA Capital Group Limited ("ACA"), a private company registered

under the laws of the Hong Kong Special Administrative Region of the People's Republic of

China, that it would be given the results of Strategic Vision's work.").[6]  SOF 28 was effectively

admitted by Eastern at Dkt. 270, p. 25, as Eastern did not refute with any evidence the fact that

Eastern intended to share the research under the Research Agreement with ACA.

There is ample evidence in the record to support the fact that ACA was expecting to

receive the research from this project:

> Q. So did he demand repayment of the million dollars from Eastern Profit?
> A You mean in our dinner?
> Q Yes. A He mentioned that.  Kind of a -- he said we are expecting the result, but you are
> cheated.  And the loan agreement, the loan kind of like need to be pay back.
> Q What result did he say he was expecting? MS. CLINE:  Objection to form.
> A Generally they corrupted Chinese official information.
> Q So William Je said he expected that information? MS. CLINE: Objection to form.
> A Correct.

Wang 2 Tr., Ex. U2, 46:22-47:14.

Finally, Eastern's bare citation to the purported Loan Agreement does not create a fact

issue.  Eastern never explains why its agreement to share research with ACA would have to have

been within the purported Loan Agreement; it certainly cites no witness testifying that the

purported Loan Agreement was intended to be and was in fact a recitation of all the matters

Eastern discussed with ACA. In sum, SOF 12 should be deemed fully admitted.

13.     Had the research been successful but Eastern still not regained access to its bank

accounts, Eastern testified that ACA may have been willing to write off the purported loan

altogether. Wang 2 Tr., Ex. U2, 206:24-208:16.

---

[6]     "Wang 2 Tr., Ex.U2, 46:22-47:14, 49:25-50:10, 53:19-54:3, 56:7-11, 57:5-9, 110:17-112:2; Wallop 1 Tr..,
Ex. Q2, Dkt. 203-2, Oct. 18, 2018."

EASTERN'S RESPONSE:  Objection.  Irrelevant.  Immaterial.  Calls for speculation.
To the extent an answer is required, denied.  Strategic mischaracterizes the cited testimony and
has therefore cited no evidence in support of these contentions in violation of Local Rule 56.1.
No such agreement exists, including in the ACA Loan.  Ex. L, ACA Loan Agreement,
EASTERN-000278.

STRATEGIC'S REPLY:  Eastern's objections to SOF 13 are misplaced.  SOF 13 is
material and relevant to a key issue in Strategic's Cross-Motion, namely whether the Court can
grant the declaratory judgment requested by Eastern when it would mean giving a party a
financial windfall in the name of legal restitution.  *See* Dkt. 272, pp. 22-24/ECF pp. 27-29.
Additionally, the cited testimony does not call for speculation but rather represents the
understanding of the debtor about ACA's handling of the purported loan.  Eastern has not
established that Eastern and ACA agreed that the written loan agreement was the exclusive
location of all the loan terms, which is a standardized credit term not included in the ACA-
Eastern document.  Indeed, Wang (for Eastern) had not even seen a written loan document when
she gave her first deposition.  Wang 1 Tr., Ex. L2, 44:24-45:16.

Eastern denies that the parties agreed to possible forgiveness but cites only the purported
loan document as proof, without further explanation or testimony.  Again, Eastern has not
established that Eastern and ACA agreed that the written loan agreement was the exclusive
source of all the loan terms, or that any understanding that ACA would forgive the loan would
have to have been included in the December agreement.  Wang, Eastern's designated
representative, testified to the possibility of forgiveness in certain circumstances.  SOF 13 is
proven without dispute.

14.     Consistent with ACA's possible intention to forgive the loan in exchange for
successful research, Eastern twice testified that ACA told Eastern that *because* Eastern's contract
with Strategic did not yield results, Eastern would have to repay the loan with interest:

> Q. On what basis does Eastern Profit claim that you had authority to deal with
> William Yu regarding the ACA loan at the fall, 2018 meeting?
> A. Eddie, I will repeat my reply for the fourth time for you. I tried to recall every
> inch of the words we said in that dinner to help you in here. Okay? William
> mentioned to me I heard you guys were cheated by liars, <u>which means I will have
> to ask the loan to be paid back with interest</u>. I remember I said yes, sadly, we were
> cheated, and I'm sorry about that. And I agree with you, since you guys have a
> law agreement, the borrower should pay you back, and we are in litigation right
> now trying to get that 1 million U.S. dollars from the liars back. Hopefully we can
> get the justice, and that 1 million U.S. dollars can be returned back to Eastern
> Profits with even any damage. So Eastern, as you said, you told me borrower can
> pay you back.

Wang 2 Tr., Ex. U2, 71:19-72:17 (underlying added).

> Q. Are they asking for the money back because the term—the contract was terminated?
> A. Obviously--
> Mr. GRENDI: Objection of form. You can answer.
> A. Obviously, correct. Because this contract produced nothing.

Wang 1 Tr., Ex. L2, 47:14-21.

EASTERN'S RESPONSE:  Objection.  Irrelevant.  Immaterial.  Calls for speculation.
To the extent an answer is required, denied.  There is no evidence suggesting that anyone from
ACA ever communicated that it would be willing to write off the loan if Strategic performed
under the Research Agreement in violation of Local Rule 56.1.  No such agreement exists,
including in the ACA Loan.  Ex. L, ACA Loan Agreement, EASTERN-000278.

STRATEGIC'S REPLY:  As with SOF 13, Eastern's objections to SOF 14 are
misplaced.  SOF 14 is material and relevant to a key issue in Strategic's Cross-Motion, namely
whether the Court can grant the declaratory judgment requested by Eastern when it would mean
giving a party a financial windfall in the name of legal restitution.  *See* Dkt. 272, pp. 22-24/ECF

pp. 27-29.  Additionally, as shown above for SOF 13, the cited testimony does not call for speculation but rather represents the understanding of the debtor about the parties' dealings surrounding the purported loan.  Wang clearly testified that the loan could be forgiven by ACA if the research was unsuccessful in unfreezing Eastern's assets but otherwise helpful to ACA. Wang 2 Tr., Ex. U2, 206:24-208:16 (cited by Strategic in SOF 13).

Eastern denies that the parties agreed to possible forgiveness but cites only the purported loan document as proof, without further explanation or testimony.  Again, Eastern has not established that Eastern and ACA agreed that the written loan agreement was the exclusive source of all the loan terms, or that any understanding that ACA would forgive the loan would have to have been included in the December agreement.  Wang, Eastern's designated representative, testified to the possibility of forgiveness in certain circumstances.  Eastern has not effectively disputed SOF 14 and it should be deemed admitted.

15.    During performance of the Research Agreement in January 2018, Wang had discussed with Strategic a group of "investors" who were allegedly backing the project in association with Guo. Wang 1 Tr., Ex. L2, 258:5-259:13; Ex. V2 (Wang 1 Tr. Ex. 20). At its deposition, Eastern testified that these "investors" were "the people who are the real fighter for rule of law and democracy in China." Wang 1 Tr., Ex. L2, 258:5-259:13.  In her texts to Strategic, Wang said "the investors would not continue to spend money on the things they don't need, for instance, the things of today [January 26, 2018]. Checked with them, we have 20 days to update them 2-3 times hopefully, with the financial and tracking results agreed in contract… Without the above, the investors could not move to second month with us, and hard to do future with us, I'm afraid." Ex. V2 (Wang 1 Tr. Ex. 20).

EASTERN'S RESPONSE:  Objection.  Irrelevant.  Immaterial.  This Court has already ruled that the identity of Eastern's investors are not relevant to any cause of action or defense in this litigation.

STRATEGIC'S REPLY:  Eastern's objections to SOF 15 are misdirected and the facts should be deemed admitted in full.  The SOF does not focus on the names of the individual investors (the "group" referred to in the documentary evidence cited by Strategic) who allegedly supported Guo's efforts to politically fight the CCP.  Thus, the Magistrate Judge's decision to limit Strategic's ability to compel Eastern to provide those names in discovery was not a decision as to the materiality of SOF 15, and it was certainly not a decision that it was irrelevant *whether* Eastern had investors.  Irrespective whether the name of any individual investor is known, the fact that a group of politically-motivated investors existed is relevant to Strategic's Cross-Motion because it provides support for the idea that the project reflected by the Research Agreement is not covered by the Virginia private investigator statute.   The statute protects individuals who contract for services such as locksmithing, car transportation, and personal security, not for large-scale political projects like here, supported by "groups" of people that are intended to benefit even larger groups of people.  It is relevant for another reason as well: it shows that the ultimate remedy Eastern seeks through a declaratory judgment that the contract is invalid—restitution—is not available here. That is because a party cannot seek restitution where the funds for its performance were actually contributed by investors. Eastern cites no evidence to dispute SOF 15, and it should therefore be deemed admitted.

16.    **ADMITTED:** During its second corporate deposition, ordered by the Court just before the close of discovery after Eastern did not seriously dispute that it had failed to produce a knowledgeable witness at its first deposition (Dkt. 189, p. 5), Eastern (testifying again through

Wang) for the first time claimed that it had also intended to put Strategic's research to its own use. Wang 2 Tr., Ex. U2, 73:8-74:8; 196:9-15; 197:18-198:6; 202:2-204:20; 207:13-208:16.

      EASTERN'S RESPONSE:  Objection.  Strategic's characterizations of discovery taken in this action are immaterial to any factual or legal issue involved in this case.  To the extent an answer is required, those characterizations are denied.  Moreover, how Eastern or Mr. Guo intended to use the research is immaterial to any factual or legal issue involved in this case.  To the extent an answer is required, admitted that Eastern testified that it intended to put Strategic's investigatory research to its own use.

      STRATEGIC'S REPLY:  In SOF 16, Strategic properly explained to the <u>District Court</u> why Eastern gave a second Fed. R. Civ. P. 30(b)(6) deposition during discovery overseen by the Magistrate Judge.  Strategic acknowledges that the discovery context is not the focus of the SOF. However, Strategic disagrees with Eastern's objection that the SOF is immaterial.  To the contrary, SOF 16 answers the question whether the signatory to the contract itself intended to use the research in light of the evidence establishing that the research would be used by Guo, the investor group, and ACA.  (SOFs 10, 12, 15) A business entity, or a series of business entities and groups of people, is unlike the personal individual consumer typically intended to be protected by the Virginia private investigatory statute.  SOF 16 is material and affirmatively admitted by Eastern.

      17.    **ADMITTED:** Specifically, Eastern claimed it wanted to use Strategic's research to unfreeze its only asset, a Hong Kong bank account that it claimed had been frozen by Hong Kong authorities acting under the influence of the CCP. Wang 2 Tr., Ex. U2, 73:8-74:8; 196:9-15; 197:18-198:6; 202:2-204:20; 207:13-208:16; Nov. 11, 2019 "Chunguang [Han]" Tr., Ex. W2, 87:3-88:20; Dkt. 203-2 (Eastern's only asset—a Hong Kong bank account—is frozen).

EASTERN'S RESPONSE:  Objection.  How Eastern or Mr. Guo intended to use the research is immaterial to any factual or legal issue involved in this case.  To the extent an answer is required, denied as stated.  Admitted that unfreezing its Hong Kong bank account was part of Eastern's intended use of Strategic's investigatory research, but as the testimony cited in the foregoing paragraphs of this Local Rule 56.1 statement make clear, the information was to be used to prosecute the crimes and civil wrongs uncovered by the investigation and to undermine CCP leadership.

STRATEGIC'S REPLY:  At any rate, there is no material fact dispute here. Eastern's hope was that after Guo accomplished his political endeavors, the natural result would be the unfreezing of its bank account in Hong Kong.

18.    **ADMITTED:** Eastern claimed it intended to use Strategic's research to criticize CCP leaders, which would then achieve regime change on the Mainland, which Eastern claimed would then cause CCP-influenced Hong Kong authorities to unfreeze Eastern's bank account. Wang 2 Tr., Ex. U2, 73:8-74:8; 196:9-15; 197:18-198:6; 202:2-204:20; 207:13-208:16. Eastern could not explain exactly how this plan would unfold but was confident that its bank account would be unfrozen. *Id*.

EASTERN'S RESPONSE:  Objection.  How Eastern or Mr. Guo intended to use the research is immaterial to any factual or legal issue involved in this case.  To the extent an answer is required, denied as stated.  Admitted that unfreezing its Hong Kong bank account was part of Eastern's intended use of Strategic's investigatory research, but as the testimony cited in the foregoing paragraphs of this Local Rule 56.1 statement make clear, the information was to be used to prosecute the crimes and civil wrongs uncovered by the investigation and to undermine CCP leadership.

STRATEGIC'S REPLY:  The Court should reject Eastern's objection to and attempted qualification of its admission of SOF 18 based on an artificial Guo versus Eastern distinction. As discussed more fully in SOF 17, the use that Guo or Eastern intended for the research provided by the Research Agreement is material to Strategic's Cross-Motion—it bears on the determination of whether the Virginia private investigator statute applies here.

The evidence Strategic has cited proves that the "crimes and civil wrongs" phraseology was Guo's way of describing his, not Eastern's, supposed plan to benefit the Chinese people by exposing to the media the corruption of CCP officials.  Eastern's hope was that after Guo accomplished his political endeavors, the natural result would be the unfreezing of its bank account in Hong Kong.  There is no material fact dispute here.

19.     Wang had told Strategic in January 2018 that "as you know, big budget is ready for this long term project. The investors can even pay your team without contract." Wang 1 Tr., Ex. L2, 258:5-259:13; Ex. V2 (Wang 1 Tr. Ex. 20). But even with the benefit of hindsight, Wang for Eastern answered, "I have no idea" when asked how it had planned to put this budget together. Wang 1 Tr., Ex. L2, 258:21-259:13.

EASTERN'S RESPONSE:  Objection.  Irrelevant.  This Court has already ruled that the identity of Eastern's investors are not relevant to any cause of action or defense in this litigation. To the extent an answer is required, denied.  Strategic mischaracterizes the cited testimony and has therefore cited no evidence in support of these contentions in violation of Local Rule 56.1.

STRATEGIC'S REPLY:  As explained above regarding SOF 15, SOF 19 does not focus on the names of the individual investors who purportedly supported Guo's efforts to politically fight the CCP.  Thus, the Magistrate Judge's decision to limit Strategic's ability to compel Eastern to provide those names in discovery was not a decision on the "merits."  The fact that a

group of investors existed is relevant to Strategic's Cross-Motion for two reasons.  First, it provides support for the idea that the project reflected by the Research Agreement is not covered by the Virginia private investigator statute.  The statute protects individuals who contract for services such as locksmithing, car transportation, and personal security, not for large-scale political projects like here, supported by groups of people that are intended to benefit even larger groups of people.

Second, when cross-examined on her testimony that the investors had a "big budget," Wang for Eastern admitted that the "big budget" was a only a concept untethered to an actual plan to pay the $750,000/month due to Strategic under the contract, which had a term of three years.  Ex. X2, Research Agreement, p. 5 ("Duration" and "Payment terms").

Third, as Strategic has argued in its Cross-Motion, a party cannot seek restitution where the funds for its performance were actually contributed by investors. Wang's open admission that there were investors—undisputed here—puts the final nails in the coffin for Eastern, and confirms that Eastern did not pay under the contract and should not recover under the contract. This is material to that portion of the Cross-Motion objecting to the request by Eastern for an award of restitution of ACA's $1 million deposit.

In short, then, Strategic uses SOF 19 and other evidence to show that the alleged loan transaction between ACA and Eastern cannot create grounds to award Eastern money paid by ACA, even if the Court were to accept the wrong premise that the Virginia statute renders the Research Agreement legally void.

20.    **ADMITTED:** According to Eastern, it had been willing to "borrow" millions of dollars to pay for research to unfreeze an account that held only about $80,000. Wang 2 Tr., Ex. U2, 208:17-22 (Eastern "possibly" intended to keep "borrowing" from ACA for the rest of the

contract because the extent that ACA paid was limited to the contractual deposit); Dkt. 203-2

(the amount frozen in Eastern Profit's Hong Kong bank account was HK $578,399.78, the

equivalent of about USD $80,000); Dkt. 264, ¶ 5. *See also* Ex. Y2

(https://www.bloomberg.com/quote/USDHKD:CUR (published market report showing

historical 5-year exchange rate as between 7.75 and 7.85 HKD to one U.S. dollar)).

      EASTERN'S RESPONSE:  Objection.  How Eastern or Mr. Guo intended to use the

research is immaterial to any factual or legal issue involved in this case.  To the extent an answer

is required, denied as stated.  Admitted that unfreezing its Hong Kong bank account was part of

Eastern's intended use of Strategic's investigatory research, but as the testimony cited in the

foregoing paragraphs of this Local Rule 56.1 statement make clear, the information was to be

used to prosecute the crimes and civil wrongs uncovered by the investigation and to undermine

CCP leadership.

      STRATEGIC'S REPLY:  Like SOF 19, SOF 20 is material to that portion of Strategic's

Cross-Motion on the declaratory judgment claim at issue countering Eastern's request for an

award of restitution based on ACA's $1 million deposit. Eastern did not pay it, and Eastern

should not recover it. In fact, Eastern had no ability to pay the deposit or repay ACA absent an

extraordinary circumstance.  Additionally, the intentions of both contracting parties, not just that

of the service-provider, are material in examining the possible coverage of the Virginia statute.

Eastern has failed to cite any legal authority, a decision from Virginia or otherwise, prohibiting

weight being given to the user's intention for the transaction under consideration.  Thus,

Eastern's relevance objection should be overruled.  At any rate, there is no material dispute here.

      Eastern Did Not and Could Not Have Provided Anything Meaningful of its Own that
      <u>Was of Value to the Research Agreement</u>.

21.     The development of identities and background research on the 15 initial subjects

was provided by Guo at his own cost, and not paid for by Eastern.  Wang 2 Tr., Ex. U2, 209:25-

210:5; Wallop 1 Tr., Ex. Q2, 83:24-84:7, 185:7-186:12, Lianchao Tr., Ex. K2, 173:6-174:4;

Waller 1 Tr., Ex. I2, 186:11-188:7.

EASTERN'S RESPONSE:  Objection.  Who put together the Subject List is immaterial

to any factual or legal issues involved in this case.  To the extent an answer is required, denied.

The fifteen names on the Subject List were identified by Ms. Wang based on information

available on the internet.  Wang I Tr. at 194:2-10.

STRATEGIC'S REPLY:  Both Eastern's objection to and purported denial of SOF 21 are

ineffective.  Guo's financing of the identification of CCP members goes directly to Strategic's

argument that he intended for the Research Agreement to have a political use and create political

benefits, objectives with which the Virginia statute is not concerned and therefore does not

apply.  Eastern cites "Wang I Tr. at 194:2-10," but it does not speak to this subject.  Thus,

Eastern has admitted SOF 21 without qualification.

22.     All of the work involved in negotiating the Research Agreement, monitoring

performance, and prosecuting the lawsuit—even producing documents and serving as a corporate

witness—was performed on behalf of Eastern for free by an entity called Golden Spring New

York (Limited) ("GSNY"), **ADMITTED:**  which in turn takes direction from Guo's family

office, China Golden Spring. Ex. Z2 (Plt's First Interrog. Resp.), also Dkt. 267-1, p. 2, No. 4;

Wang 1 Tr., Ex. L2, 23:3-29:13 (Eastern's interrogatory responses are signed by Yvette Wang as

President of GSNY because GSNY "provide[s] service" to Eastern Profit as its attorney-in-fact);

18:14-20:21 (Wang, Eastern Profit's 30(b)(6) witness, claims GSNY is a "family office" and that

she takes direction from China Golden Spring in Hong Kong, but refuses to name the family or

individuals involved); Nov. 12, 2019 A. "Coluccio Tr.," Ex. A3, 171:2-172:13 (GSNY is Guo's family office), 186:15-19 (GSNY takes direction from Guo), 122:15-123:3 (GSNY is wholly owned by China Golden Spring).

EASTERN'S RESPONSE: Objection. Immaterial. Irrelevant. Denied. Strategic mischaracterizes the cited testimony and has therefore cited no evidence in support of these contentions in violation of Local Rule 56.1. Rather, the record makes clear that the Research Agreement was negotiated and performance of the Research Agreement was monitored by various agents of Eastern. Ex. F, Wallop I Tr. at 31:23-109:18; Ex. H, Waller I Tr. at 18:8-38:14. Admitted, however, that GSNY is wholly owned by China Golden Spring.

STRATEGIC'S REPLY: Eastern's objections to SOF 22 are misplaced. SOF 22 shows that Guo's entity, GSNY, actually rendered all of Eastern's performance under the Research Agreement. This is material to show yet another way in which Eastern failed to confer value under the Research Agreement, further undermining its claim for damages. It also shows that the Research Agreement was a project of Guo's, for his Chinese political objectives, materially distinguishing it from the type of transaction covered by the Virginia statute—a consumer-driven, personal, and direct service like locksmithing, car transportation, and personal protection.

Eastern's denial of SOF 22 is without a basis. Strategic cited supporting testimony from several witnesses and documents themselves and, in response, Eastern does not address them. Eastern instead cites a nearly 100-page section of French Wallop's testimony, which is inconclusive to prove any particular fact, and 20 pages from Waller's testimony. That Lianchao was involved in the preparation of the Research Agreement does not change the truth of the SOF. It should be deemed admitted.

23.    **ADMITTED:**  The only payment that was ever made to Strategic—**DENIED:**  a deposit that was an order of magnitude greater than Eastern's only asset, **ADMITTED:**  a frozen Hong Kong bank account holding only about $80,000, came from an entity called ACA. Wang 1 Tr., Ex. L2, 158:6-9, 158:20-159:23, 161:2-17; Dkt. 127, p. 22, ¶ 7; Dkt. 142, p. 3, ¶ 7; Dkt. 203-2; Dkt. 264, ¶ 5.

EASTERN'S RESPONSE:  Denied as stated.  Admitted that Eastern directed ACA to pay the $1 million deposit on behalf of Eastern, as explicitly allowed under the Research Agreement and pursuant to the ACA Loan Agreement, Ex. E, C. Han Tr. at 124:14-129:2; Ex. L, ACA Loan Agreement, EASTERN-000278; Ex. M, Research Agreement at 1; Ex. A, Answer at 2 ¶ 6, but denied that Eastern's only asset was a frozen Hong Kong bank account holding only $80,000.  Strategic has cited no evidence in support of that contention in violation of Local Rule 56.1.

STRATEGIC'S REPLY:  Eastern attempts to deny a fact (the amount of funds held in the frozen Eastern bank account) represented by its own counsel in an earlier submission to the Court.  As cited by Strategic in SOF 23, Eastern filed Dkt. 203, in which its counsel stated "[t]he assets of Mr. Guo and Eastern Profit that have been frozen in Hong Kong were frozen, not by the CCP or Mainland China, but by the High Court of Hong Kong.  See Exhibit B."  Exhibit B to Dkt. 203 (Dkt. 203-2) indicates that the amount frozen in Eastern Profit's Hong Kong bank account was HK $578,399.78, which is the equivalent of about USD $80,000. *See* Ex. Y2 (https://www.bloomberg.com/quote/USDHKD:CUR (published market report showing historical 5-year exchange rate as between 7.75 and 7.85 HKD to one U.S. dollar).

Eastern's denial is improper and should be rejected.  SOF 23 has been admitted in full.

24.     In negotiations, the parties understood that Guo was funding Strategic's research. Lianchao Tr., Ex. K2, 246:6-17; Ex. Z2 (Plt's First Interrog. Resp.), Dkt. 267-1, p. 2, No. 4; Dkt. 93, pp. 3-4, ¶ 17; Wallop Aff., Ex. B3 (Dkt. 267-1), ¶¶ 6-7. **ADMITTED:**  In the Research Agreement, it was agreed that payment would come from some entity other than the signer. Ex. X2 (Dkt. 267-1), p. 5.  **OBJECTION:**  During performance in January 2018, Wang conveyed to Strategic that "big budget is ready for this long-term project," and that the "investors" could pay Waller's team even without a contract. Wang 1 Tr., Ex. L2, 258:5-259:13.

EASTERN'S RESPONSE:  As to the first sentence, denied.  Strategic mischaracterizes the record and has therefore cited no evidence in support of these contentions in violation of Local Rule 56.1  As to the second sentence, admitted.  As to the third sentence, objection. Irrelevant.  Immaterial.  This Court has already ruled that the identity of Eastern's investors are not relevant to any cause of action or defense in this litigation.

STRATEGIC'S REPLY:  Eastern's challenges to SOF 24 are ineffective.  Contrary to Eastern's assertion, Strategic cited ample evidence to support the first sentence, including testimony from Lianchao, the person who conceptualized the project that became the Research Agreement,[7] that "I tried to put two sides together, *have Miles to pay for this*, dig up something that we can use to expose the Communist regime's corruption so that it advances."  Lianchao Tr., Ex. K2, 246:10-14 (emphasis added).  Lianchao's testimony was not "mischaracterized."  As to the third sentence, Eastern does not and cannot challenge that its designated representative (Wang) testified to these quoted statements.  In addition, Eastern's materiality objections should be overruled.  As shown above with SOF 15, the fact that a group of investors existed regarding the Research Agreement is relevant to Strategic's Cross-Motion because it provides support for

---

[7]     Lianchao Tr., Ex. K2, 126:22-128:9; 137:20-139:20, 46:17-47:9.

the idea that the project reflected by the contract is not covered by the Virginia private investigator statute. It also fatally undermines Eastern's restitution claim, since, as Strategic showed on its Cross-Motion, a party cannot claim restitution for contract costs provided by a third-party investor.

25.     During the litigation, Eastern for the first time claimed that **ADMITTED:** it had in fact paid Strategic itself by virtue of having received a loan from another entity, ACA, that exactly matched ACA's payment of a deposit to Strategic. Wang 2 Tr., Ex. U2, 49:25-50:10, 53:19-54:3, 56:7-11, 57:5-9, 110:17-112:2; Dkt. 203-2; Chunguang Tr., Ex. W2, 72:24-73:14.

EASTERN'S RESPONSE: Objection. Strategic's characterizations of the positions taken in this litigation are immaterial to any factual or legal issue involved in this case. To the extent an answer is required, those characterizations are denied. As to the remainder, denied as stated. Admitted that Eastern directed ACA to pay the $1 million deposit on behalf of Eastern, as explicitly allowed under the Research Agreement and pursuant to the ACA Loan Agreement, Ex. E, C. Han Tr. at 124:14-129:2; Ex. L, ACA Loan Agreement, EASTERN-000278; Ex. M, Research Agreement at 1; Ex. A, Answer at 2 ¶ 6, but denied as to Strategic's characterization of Eastern's claims during this litigation. Strategic has cited no evidence in support of that contention in violation of Local Rule 56.1.

STRATEGIC'S REPLY: Eastern makes no true dispute as to the facts here. Eastern simply rejects the context Strategic has given for them. Eastern admits that "ACA [paid] the $1 million deposit on behalf of Eastern." It is immaterial when in discovery this was established.

26.     There is reason to doubt that a loan was truly made, beginning with irregularities in the loan document itself. The man who signed the loan for Eastern, purportedly (on the signature line) as a "Director," was not in fact its director. Chunguang Tr., Ex. W2, 59:9-60:8,

70:5-9, 102:2-18 (discussing resignation); Ex. C3 (Chunguang Tr. Ex. 35, EASTERN-000278-80, loan document). Chunguang had long before resigned as a director, having transferred Eastern to Guo Wengui's daughter, Guo Mei, back in June of 2017, just before all of Eastern's assets were seized. Chunguang Tr., Ex. W2, 59:60:8, 70:5-9, 102:2-18 (resignation), 87:3-88:20; Dkt. 203-2 (asset seizure). The real director at the time of the purported loan, Eastern's sole director, was Guo Mei, Guo Wengui's daughter. *Id*. Chunguang admitted Guo Mei had purchased Eastern from him six months before the Research Agreement was negotiated, but testified that Guo's daughter had made the purchase in order to go into the movie business, and had orally asked him to be Eastern's agent. Chunguang Tr., Ex. W2, 101:17-105:3 (date of sale June 27, 2017), Ex. X2 (Dkt. 267-1), p. 5 (Agreement signed January 6, 2018); Wallop Aff., Ex. B3 (Dkt. 267-1), ¶ 4; Wang 1 Tr., Ex. L2, 264:9-12.

EASTERN'S RESPONSE: Objection. Immaterial. Irrelevant. As to the first sentence, denied. The loan agreement is a valid and enforceable contract that has been authenticated by Chunguang Hang. Ex. E, C. Han Tr. at 124:14-129:2; Ex. L, ACA Loan Agreement, EASTERN-000278. As to the remainder, admitted.

STRATEGIC'S REPLY: Eastern responds to SOF 26 with one objection and one factual challenge to a sentence (the first). Neither are effective. The subject of SOF 26 is material to the declaratory judgment. It shows that Eastern was not providing anything of value to the arrangement, such that Eastern should not be successful in requesting an award of restitution of ACA's $1 million deposit. Eastern did not pay it and should not recover it. Strategic uses SOF 19 and other evidence to show that the alleged loan transaction between ACA and Eastern cannot create grounds to award Eastern money paid by ACA, even if the Court were to accept the wrong premise that the Virginia statute renders the Research Agreement legally void. The first sentence

of SOF 26 was a conclusory statement that does not bear on the facts otherwise admitted by

Eastern in the remainder of the Paragraph.

27.    Other Guo confidants, including Lianchao Han, who negotiated the Research

Agreement, easily recognized Chunguang as a cook, bodyguard, and errand boy for Guo.

Lianchao Tr., Ex. K2, 36:17-37:12; Nov. 26, 2019 Sasha "Gong Tr.," Ex. D3, 36:9-22; 116:24-

118:11.  Lianchao testified that Chunguang was usually in Guo's New York apartment when he

visited Guo. Lianchao Tr., Ex. K2, 266:12-277:4. Yet, Chunguang refused to provide details on

his line of work, place of work, or reason for his presence in Guo's building; he denied ever

having worked for Guo and instead claimed to have begun running his own investment business

after having been tutored by Guo, his "mentor" and "idol," in the niceties of art, architecture, and

investing. (Chunguang Tr., Ex. W2, 24:20-34:2; 35:17-36:4; 42:7-11). Guo admitted Chunguang

is in his building almost every day, but refused to say why or to know why (Guo 1 Tr., Ex. J2,

114:9-117:6; 195:23-197:24), and laughed when asked whether Chunguang attended meetings

between Guo and Strategic (*Id*., 158:5-15). Of course, he did not. *See* Eastern's Rule 56.01

Statement, Dkt. 262, and Strategic's Responses to same, below, SOF 30-32.

EASTERN'S RESPONSE:  Objection.  The alleged facts are immaterial to any legal or

factual issue involved in this case.  To the extent an answer is required, denied.  Strategic

mischaracterizes the cited testimony and has therefore cited no evidence in support of these

contentions in violation of Local Rule 56.1.  Chunguang Han was not Mr. Guo's cook,

bodyguard, or errand boy.  C. Han Tr. at 152.  The loan agreement is a valid and enforceable

contract that has been authenticated by Chunguang Han.  Ex. E, C. Han Tr. at 124:14-129:2; Ex.

L, ACA Loan Agreement, EASTERN-000278.

STRATEGIC'S REPLY:  Eastern's response to SOF 27 consists primarily of objections that are misplaced.  SOF 27 presents material facts on the alleged loan transaction between ACA and Eastern that Eastern claims supports its entitlement to restitution of the $1 million paid by ACA to Strategic.  Regardless of whether the Court agrees with Eastern's incorrect legal proposition that the Virginia statute applies, Eastern is not entitled to restitution of someone else's money.  Eastern's declaratory judgment claim should be dismissed on Strategic's Cross-Motion.

Factually, Strategic did not misquote Lianchao's testimony or attempt to attribute it to some other witness.  Lianchao's testimony was correctly cited.  It is also a correct statement to identify the deposition questions that Chunguang, who purportedly signed the loan agreement on behalf of Eastern, refused to answer.  Eastern has not identified a factual dispute here in SOF 27 and it should be deemed fully admitted.

28.    Additionally, the timing of the purported "loan" negotiation does not match with the last-minute insertion of Eastern as the signatory to the Research Agreement. The loan was purportedly signed on Friday, December 29, 2017, a date ACA "Chief Executive" William Je (a non-resident of the U.S. who could not be found to testify as a witness) happened to be in New York City—the last business day before the Tuesday, January 2, 2018 wires were sent from ACA to Strategic. Ex. T2 (Dkt. 267-1) (Wang 1 Tr. Ex. 7); Wang 1 Tr., Ex. L2, 158:6-9, 158:20-159:23, 161:2-17; Dkt. 127, p. 22, ¶ 7; Dkt. 142, p. 3, ¶ 7.  Yet, Chunguang testified that even after Yvette Wang approached him and he supposedly agreed to have Eastern sign the Research Agreement (Chunguang Tr., Ex. W2, 39:5-40:11), a step he says he could only take after he received authority from Guo Mei (Guo's daughter) to do the project (*Id*., 72:24-73:13), it required "two or three" in-person meetings, as well as at least one phone call, before the loan

could be signed in-person on December 29. *Id*., 133:13-24. Again, Wang's approaching Chunguang is what supposedly triggered all of Chunguang's work in this regard, but she did not herself learn the identity of Eastern until just before her first, December 29, 2017 trip out of town to Virginia, and the draft Guo gave her to review did not even contain Eastern's name. Wang 1 Tr., Ex. L2, 51:6-52:18; Ex. E3 (Wang 1 Tr. Ex. 4).

EASTERN'S RESPONSE:  Objection.  Immaterial. Irrelevant.  To the extent an answer is required, denied.  Strategic mischaracterizes the record and has therefore cited no evidence in support of these contentions in violation of Local Rule 56.1.  Yvette Wang learned that Eastern was going to be the entity that would sign the Research Agreement well before her trip to Virginia to discuss the contract with Strategic and in plenty of time to allow Chunguang Han to meet with William Je of ACA to sign the ACA Loan Agreement.  Wang I Tr. at 1-12.  The loan agreement is a valid and enforceable contract that has been authenticated by Chunguang Hang. Ex. E, C. Han Tr. at 124:14-129:2; Ex. L, ACA Loan Agreement, EASTERN-000278.

STRATEGIC'S REPLY:  Eastern's objections and factual challenge should be disregarded.  SOF 28 presents material facts that bear on the alleged loan transaction between ACA and Eastern that Eastern claims supports its entitlement to restitution of the $1 million paid by ACA to Strategic.  Regardless of whether the Court agrees with Eastern's incorrect legal proposition that the Virginia statute applies, Eastern is not entitled to restitution of someone else's money.

Eastern's factual response is meaningless.  For the most part, Eastern ignores the individual sentences that comprise the SOF and therefore has admitted the facts they contain. Eastern purports to challenge when Wang learned of Eastern's involvement as signatory to the Research Agreement but only does so by indiscriminately citing 12 pages of testimony, which is

inconclusive to prove any individual fact.  Finally, Eastern states that the loan agreement is valid and enforceable, which is a legal conclusion for the Court.  SOF 28 should be deemed fully admitted.

29.    Eastern did not keep any copy of the loan agreement after it was signed, and Chunguang tried to explain by claiming he only intended to tell Eastern's "fiscal department" (though it had no employees left) about the loan at some future point after Eastern's assets were unfrozen and the loan could be repaid (Chunguang Tr., Ex. W2, 134:21-136:5). The loan was not produced before Eastern's first Rule 30(b)(6) deposition on Jan. 31, 2019 and, ten months later, Eastern's corporate representative (Wang) still could not say <u>where</u> Eastern had obtained the loan document to produce in the case; she was allowed to say only that she saw it for the first time in prior litigation counsel's "file." Wang 2 Tr., Ex. U2, 97:20-102:8.

EASTERN'S RESPONSE:  Objection.  Immaterial.  Irrelevant. These alleged facts have no bearing on any issue involved in this case.  To the extent, an answer is required, denied. Strategic mischaracterizes the record and has therefore cited no evidence in support of these contentions in violation of Local Rule 56.1.  The loan agreement is a valid and enforceable contract that has been authenticated by Chunguang Hang.  Ex. E, C. Han Tr. at 124:14-129:2; Ex. L, ACA Loan Agreement, EASTERN-000278.

STRATEGIC'S REPLY:  As with SOF 28, Eastern's objections and factual challenge to SOF 29 should be disregarded. The several facts contained there are all supported by the evidence Strategic cited, and SOF 29 relates to an issue in the pending Cross-Motion:  the alleged loan transaction between ACA and Eastern that Eastern claims supports its entitlement to restitution of the $1 million paid by ACA to Strategic.  Regardless of whether the Court agrees with Eastern's incorrect legal proposition that the Virginia statute applies, Eastern is not entitled

to restitution of someone else's money and the Cross-Motion should be granted. Factually, Eastern purports to deny SOF 29 but the only evidence it cites (to prove the loan agreement is "valid and enforceable") does not relate to the facts in the Paragraph. Further, it is a legal conclusion. SOF 29's facts should be deemed fully admitted.

30.     Chunguang's signature appears to have been falsely signed on at least two other documents involved in this case—the <u>Research Agreement</u> itself (Lianchao Tr., Ex. K2, 222:7-223:8, identifying Chunguang's name on Research Agreement that was signed by Wang in French Wallop's presence in Virginia (Wang 2 Tr., Ex. U2, 141:15-143:5, admitting she did not sign her own name, but denying she signed Chunguang's and claiming she signed "nobody's name"), and a <u>Substitution of Counsel</u> filed in this Court (Chunguang Tr., Ex. W2,118:9-119:8; Ex. F3 (Dkt. 267-1) (Ex. 33 to Chunguang Tr.)—without his knowledge or agreement.

EASTERN'S RESPONSE: Objection. Immaterial. Irrelevant. These alleged facts have no bearing on any issue involved in this case. To the extent, an answer is required, denied. Strategic mischaracterizes the record and has therefore cited no evidence in support of these contentions in violation of Local Rule 56.1. The loan agreement is a valid and enforceable contract that has been authenticated by Chunguang Hang. Ex. E, C. Han Tr. at 124:14-129:2; Ex. L, ACA Loan Agreement, EASTERN-000278.

STRATEGIC'S REPLY: The two facts contained in SOF 30 are supported by the deposition testimony Strategic cited. They relate to whether Eastern is entitled to restitution of someone else's money based on a loan agreement that lacks any indicia of truth. Regardless of whether the Court agrees with Eastern's incorrect legal proposition that the Virginia statute applies, and even if the loan agreement is a true transaction, which it is not as shown in SOF 30, Eastern is not entitled to restitution of someone else's money. Factually, Eastern cannot deny the

evidence cited, and it was not mischaracterized.  Eastern cites a legal conclusion, which misses the subject of SOF 30 entirely.

31.     **ADMITTED:**  Additionally, the purported loan covered only the $1 million deposit on a contract that required payments of $750,000 per month beginning January 2018. Ex. X2 (Dkt. 267-1), p. 5. **DENIED:**  Eastern had made no arrangements to borrow any of the other payments (Wang 2 Tr., Ex. U2, 208:17-22) and had "no idea" how it would fund the rest of the Agreement (Wang 1 Tr., Ex. L2, 258:21-259:13, 262:10-18), which had a term of three years. Ex. X2 (Dkt. 267-1), p. 5 ("Duration").  **ADMITTED:**  The purported loan bore interest at 2% per month, compounding monthly.  Ex. C3 (Chunguang Tr. Ex. 35).  **ADMITTED:**  It was repayable in full, with interest, in just six months.  *Id.* **DENIED:** Yet Eastern had committed itself to a Research Agreement that would take three years to complete Ex. X2 (Dkt. 267-1), p. 5 ("Duration")), and Eastern's only plan for generating cash was for Strategic to find damaging research on CCP leaders; for Guo or someone else to effectively publicize the research; for regime change in China to occur; and for this regime change to cause Hong Kong authorities to unfreeze Eastern's account. Wang 2 Tr., Ex. U2, 73:8-74:8; 196:9-15; 197:18-198:6; 202:2-204:20; 207:13-208:16; Chunguang Tr., Ex. W2, 87:3-88:20. **DENIED:** That account, however, held only about $80,000, just a fraction of the deposit and nothing for the contractually-required payment for a single month of work. Dkt. 203-2 (Eastern's only asset—a Hong Kong bank account—is frozen); Dkt. 264, ¶ 5.

EASTERN'S RESPONSE:  Objection.  Immaterial.  Irrelevant. These alleged facts have no bearing on any factual or legal issue involved in this case.  To the extent an answer is required, Eastern responds as follows.  As to the first sentence, admitted.  As to the second sentence, denied.  Strategic mischaracterizes the record and has therefore cited no evidence in

support of these contentions in violation of Local Rule 56.1.  As to the third and fourth

sentences, admitted.  As to the fifth and sixth sentences, denied.  Strategic mischaracterizes the

record and has therefore cited no evidence in support of these contentions in violation of Local

Rule 56.1.  The loan agreement is a valid and enforceable contract that has been authenticated by

Chunguang Hang.  Ex. E, C. Han Tr. at 124:14-129:2; Ex. L, ACA Loan Agreement,

EASTERN-000278.

STRATEGIC'S REPLY:  The facts in SOF 31 are material because they relate to whether

Eastern is entitled to restitution of someone else's money based on a loan agreement that lacks

any indicia of truth.  Regardless of whether the Court agrees with Eastern's incorrect legal

proposition that the Virginia statute applies, and even if the loan agreement is a true transaction,

which it is not as shown in SOF 31, Eastern is not entitled to restitution of someone else's

money.

Eastern attempts to dispute the second sentence of the Paragraph, which is based on the

testimony of its own representative that Eastern had "no idea" how it would fund the rest of the

Research Agreement.  However, Eastern does not contend that the witness was misquoted and

fails to present any competing evidence.  The same infirmities affect Eastern's response to the

fifth and sixth sentences.  Eastern's reference to a legal conclusion about the enforceability of the

loan agreement as between Eastern and ACA is factually meaningless.  SOF 31 should be

deemed admitted in full.

32.     Despite the fact that the loan had been due for payment in full on June 29, 2018

per its terms (Ex. C3, Chunguang Tr. Ex. 35), Eastern testified it had had no contact with ACA

about repayment as of the date its initial deposition was taken on January 31, 2019, almost a year

after Eastern had sued Strategic. Wang 1 Tr., Ex. L2, 45:8-46:23. Indeed, Eastern's corporate

witness, the so-called "project manager," claimed she had never seen a loan document and had never spoken with anyone from ACA. *Id*. Only after Strategic questioned the genuineness of the loan in this litigation did Eastern use its second corporate deposition on Oct. 30, 2019 to claim that William Je, the chief executive of ACA, had begun to "chase" Chunguang in New York City to collect. Wang 2 Tr., Ex. U2, 35:2-39:8. These meetings supposedly took place in the late summer of 2019. *Id*. Eastern's corporate representative also claimed to remember that in the fall of 2018, William Je (on behalf of ACA) had met her for dinner at a New York City restaurant to discuss the Research Agreement and loan. *Id*., 44:1-47:14.

EASTERN'S RESPONSE:  Objection.  Immaterial.  Irrelevant. These alleged facts have no bearing on any issue involved in this case.  To the extent, an answer is required, denied. Strategic mischaracterizes the record and has therefore cited no evidence in support of these contentions in violation of Local Rule 56.1.  The loan agreement is a valid and enforceable contract that has been authenticated by Chunguang Hang.  Ex. E, C. Han Tr. at 124:14-129:2; Ex. L, ACA Loan Agreement, EASTERN-000278.

STRATEGIC'S REPLY:  The facts in SOF 32 are material because they show that the loan agreement Eastern relies on to support its restitution request is factually untrue.  Regardless of whether the Court agrees with Eastern's incorrect legal proposition that the Virginia statute applies, Eastern is not entitled to restitution because it cannot prove why the subject fund belongs to it.

Eastern attempts to factually dispute SOF 32 with a legal conclusion about the enforceability of the loan agreement as between Eastern and ACA, but that is ineffective.  SOF 32 should be deemed admitted in full.

STRATEGIC'S RESPONSE TO THE "ADDITIONAL FACTS" EASTERN
PURPORTS TO INCLUDE WITHIN THE RECORD ON STRATEGIC'S CROSS MOTION
<u>FOR SUMMARY JUDGMENT</u>

As requested by Strategic at the beginning of this submission, the summary judgment record on its Cross-Motion should not include the over 100 additional facts Eastern attempts to incorporate by reference from its own Statement of Facts in Support of its Dkt. 260-61 Motion for Summary Judgment (Eastern's SOF is Dkt. 262).  These 100 additional facts, and Eastern's Motion for Summary Judgment, cover different claims, involving different factual and legal issues, than what is before the Court here.  To the extent Eastern's prior affirmative Local Rule 56.1 statement contains any relevant facts, they have been answered by Strategic in Dkt. 273. Eastern's prior briefing on the declaratory judgment claim (Dkt. 261) comprised only five pages of its briefing and, again, that briefing went largely to other claims.

In addition, the Court should deny Eastern's sweeping directive (Dkt. 279, p. 90) that the Court and Strategic pick through and try to understand the relevance of factual responses that Eastern has made so far in the various summary judgment briefs to locate "new" facts that Eastern may have asserted in responding to Strategic's facts.  Neither the Court nor Strategic should have to guess what factual point Eastern thinks may be embedded in a response to facts supporting summary judgment on claims other than the declaratory judgment claim.

Indeed, Strategic and this Court can use a much easier means of identifying the facts Eastern believes are relevant in responding to Strategic's cross-motion: simply reviewing Eastern's response brief, which contains its legal argument. Under Local Rule 56.1, Eastern's response brief is supposed to cite and discuss the materiality of any facts (not just some of the facts) Eastern claims support its opposition to Strategic's Cross-Motion for Summary Judgment on Eastern's declaratory judgment claim. In that response brief, Eastern makes a grand total of 9

factual assertions. Strategic already addressed each of those 9 assertions in its Dkt. 273 in responding to Eastern's Dkt. 262 L.R. 56.1 statement. Eastern did not pull any of those factual assertions from the other statements of facts it made in response to other motions in this case.

Nonetheless, in case there were any doubt as to their immateriality on the current motion, Strategic addresses below Eastern's response to Facts 33-129. In its original Rule 56.1 Statement of Facts (Dkt. 273), Strategic already made clear that only Facts 1-32 were directed to Strategic's Cross-Motion for Summary Judgment Eastern's Declaratory Judgment Claim; Strategic's Additional Facts 33-129 were merely part of Strategic's opposition to Eastern's Motion for Summary Judgment on Strategic's counterclaim for fraud.  Eastern's response to Facts 33-129 underscores that critical fact disputes exist precluding summary judgment for Eastern on Strategic's fraud claim.  However, those facts are wholly immaterial to Eastern's  declaratory judgment claim (and, therefore, to Strategic's Motion for Summary Judgment against that claim). The following summary responses are grouped using the same headings Strategic included in its original Statement of Additional Facts:

It was Reasonable for Strategic to Rely on Guo's Statements—They Came After Guo <u>was Introduced by Trustworthy Sources</u>.  (SOF 33-42)

Eastern attempted to dispute a fair number of the facts in this section, and objected to most all of them, but the subject matter they discuss is important to a full analysis of Strategic's fraud claim.  Even if non-essential aspects of the facts are disputed (i.e., whether Guo arranged for Lianchao or Gertz to introduce him to Strategic or they accomplished that on their own initiative—SOF 33), the gist of the facts (i.e., Guo was introduced to Strategic) is undisputed and establishes the events that developed into in-person meetings between Guo and Strategic that led to the Research Agreement.  Guo was given credibility and trust because of his association with Lianchao, William Gertz, and Steve Bannon.

The facts are immaterial to whether the Virginia private investigation services statute applies to that contract and, if so, it should be voided as against public policy.  At most, they lend indirect support to the undisputed fact that the purpose of the contract was to publicize corruption in the CCP and thereby advance Guo's goal of having a regime change in China.

Guo Had Reason to Need Strategic's Services Because He Had No Other Avenue.  (SOF 43-46)

Eastern attempted to dispute a fair number of the facts in this section, and objected to most all of them, but the facts are material to the fraud analysis because they show a motive for Guo to use Strategic (he was no longer working with an earlier company after having developed the large collection of research subjects).  "The requisite strong inference as to fraudulent intent may be established by factual allegations which show whether Defendants had both motive and opportunity to commit fraud or which constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Siben v. American Airlines, Inc.*, 913 F. Supp. 271, 278 (S.D.N.Y. 1996) (*citing Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989).

The facts are immaterial to whether the Virginia private investigation services statute applies to that contract and, if so, it should be voided as against public policy.

Guo Made False Statements About his Opposition to the CCP and Desire to Use Strategic's Work to Undermine the CCP and Bring About Regime Change.  (SOF 47-48)

These two facts (which go to a key element of Strategic's fraud claim) are strongly denied by Eastern, clear indication that fact disputes preclude summary judgment on Strategic's fraud claim.  They are immaterial to the declaratory judgment claim.

Guo's Representations Were False.  (SOF 49-129)

Not surprisingly, Eastern attempts to dispute a large portion of these facts, which reflect subjects critical to Strategic's fraud claim, which requires proof of falsity.  They are immaterial to the declaratory judgment claim.

Dated May 11, 2020

                                            Respectfully submitted,

                                            GRAVES GARRETT LLC

                                            *s/ Edward D. Greim*
                                            Edward D. Greim, #4240172
                                            1100 Main Street, Suite 2700
                                            Kansas City, MO 64105
                                            Telephone: (816) 256-3181
                                            Fax: (816) 256-5958
                                            edgreim@gravesgarrett.com
                                            ATTORNEY FOR
                                            DEFENDANT/COUNTERCLAIMANT

## CERTIFICATE OF SERVICE

        This certifies that, on May 11, 2020, the foregoing was served on all counsel of record via the Court's Electronic Case Filing System.

                                            *s/ Edward D. Greim*
                                            Attorney for Defendant/Counterclaimant