KA5KEASC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    EASTERN PROFIT CORPORATION
     LIMITED,
4
                    Plaintiff,
5
              v.                          18 CV 2185 (LJL)
6                                         Telephone Conference
     STRATEGIC VISION US LLC,
7
                    Defendant.
8
     ------------------------------x
9                                         New York, N.Y.
                                          October 5, 2020
10                                        1:00 p.m.

11   Before:

12                      HON. LEWIS J. LIMAN,

13                                        District Judge

14                           APPEARANCES

15   TROUTMAN PEPPER HAMILTON SANDERS LLP
          Attorneys for Plaintiff
16   BY:  JOANNA J. CLINE
          CHRISTOPHER B. CHUFF
17
     GRAVES GARRETT LLC
18        Attorneys for Defendant
     BY:  EDWARD DEAN GREIM
19        JENNIFER A. DONNELLI

20

21

22

23

24

25

KA5KEASC

1            (The Court and all parties appearing telephonically)

2            THE COURT:  Good afternoon.  This is Judge Liman.

3            Who do we have on who will be speaking for Eastern?

4            MS. CLINE:  This is Joanna Cline, your Honor.

5            THE COURT:  Good afternoon, Ms. Cline.

6            And for Strategic?

7            MR. GREIM:  Yes.  You have Eddie Greim, your Honor.

8            THE COURT:  Good afternoon, Mr. Greim.

9            MR. GREIM:  Good afternoon.

10           THE COURT:  The reason for this call is primarily for

11  me to confer with the parties about whether we're going to go

12  to have a jury trial in a couple of weeks.  I want to hear from

13  the parties on that.  I can provide a little bit more

14  information before I hear from you.  That information is the

15  following:

16           As I think I alluded to, the court here is doing a

17  heroic job of trying to make sure that there are juries for

18  cases that are ready for a jury trial, with preference given to

19  criminal cases, and recognizing that there are a limited number

20  of jurors for a variety of reasons.

21           The methodology the court has applied is it's giving

22  preference to the criminal trials, for speedy trial and other

23  reasons, over the civil trials.  We get a date that is

24  available to us, but it is subject to the criminal trials that

25  may be ahead of us, not taking that date, so it's somewhat

KA5KEASC

1   competitive to get a date.  I've had to apply in advance to get

2   a date, but it is subject to criminal trials going first.

3           I've learned a little bit more information that I can

4   give you all.

5           The first is that if we were to get a jury, it would

6   probably be for October 25th, or 26th, or maybe 27th, so, in

7   other words, a couple of days earlier than I had scheduled

8   trial for.

9           The second thing that I have learned is that there are

10  a couple of criminal cases ahead of us in the queue.  I've

11  heard from the judge handling one of those cases, who told me

12  that, as of right now, that case is scheduled to go forward, in

13  which case, I would not have a jury for you all.  The criminal

14  cases, like civil cases, but maybe even more than civil cases,

15  do have a way of pleading.  There are two other criminal cases

16  that are ahead of us.  I've not heard from the judges on those

17  cases.  Those cases may go away, in which case we would have a

18  jury ready to go, say, October 26th or 27th.

19          Unfortunately, I can't give the parties any more

20  certainty than that.  I can tell the parties that if they

21  wanted to try this to the bench, then I could schedule a bench

22  trial, and we could do that remote, if the parties wanted, or

23  try to do that in person.

24          But let me hear from you, Ms. Cline, and then

25  Mr. Greim, about where things stand on your respective ends.

KA5KEASC

1           MS. CLINE:  Yes, your Honor.

2           So, mindful of the Court's admonition at our last

3    conference, the parties did confer, and I think we have

4    agreement on willingness to stipulate to proceed with the bench

5    trial.

6           On behalf of Eastern, though, our proposal would be --

7    let me take a step back.  In our view, the resolution of some

8    of the outstanding MSJs could really focus the case, and, by

9    the same token, we think that if the case were to proceed to a

10   bench trial, because there are disputed issues of material

11   fact, it would make sense, in the interests of judicial

12   economy, to bifurcate the case.  We really think Eastern's

13   declaratory judgment counts regarding whether the contract is

14   void and its related unjust enrichment claim could be held in a

15   pretty tight bench trial.  We think we could get witnesses on

16   and off and probably dispose of that within a day.  And, from

17   our perspective, if Eastern were to win those counts, the case

18   would be over.  So we think it makes sense to sort of look at

19   that narrow issue before delving into the entirety of the case,

20   including Strategic's fraud claim.

21          I'll stop there.  I can tell you that Mr. Greim does

22   not agree, and we can get into the specifics of why I think

23   bifurcation makes sense, but let me just stop there and see if

24   that answers your Honor's question.

25          THE COURT:  It does.  And before I turn to Mr. Greim,

KA5KEASC

1      I can tell you that I'm prepared today, this afternoon, to rule

2      on the outstanding motion for summary judgment, which I will do

3      orally, and I will dictate the decision into the record after I

4      hear from Mr. Greim.  Maybe that would give you all something

5      to discuss further, and maybe it might be beneficial for us to

6      get together one more time.

7              Mr. Greim, let me hear from you.

8              MR. GREIM:  Sure, your Honor.  This all may well be

9      mooted after we hear your decision on this, but our view is

10     that bifurcation probably doesn't make sense.  Really, if you

11     kind of divide the case in half, on the one side, you've got

12     declaratory judgment and unjust enrichment.  The declaratory

13     judgment doesn't really do a whole lot for Eastern Profit

14     unless they also go ahead and get the unjust enrichment, get an

15     order to get a million dollars back that way, but then that

16     raises all the big issues we have on the other side of the

17     case.

18             Likewise, even within declaratory judgment, we've got

19     disputes about the purpose of the agreement, which we believe

20     is the question under the Virginia statute.  We also have an

21     in pari delicto with unclean hands defense, which you did not

22     see on summary judgment.  You saw in pari delicto, you did not

23     see unclean hands, and those are going to bring in most of the

24     fraud evidence.  And so, really, whatever legal theories you

25     use, we're pretty much going to see the same witnesses and the

KA5KEASC

same evidence, it's just there's one way to deal with them, and not really going the contract route and going in equity, and then there's a way to deal with them going at law, by contract and fraud, but it's the same people and the same evidence.

So, I probably already talked too much.  I'm sure all this will be moot in just a few minutes here, but that's why we have a dispute on exactly how a bench trial would go, but I think that's all that makes sense to say right now.

THE COURT:  All right.

Well, let me give you my decision on the outstanding motions for summary judgment, and then we can talk about where we go from there.

I'm not going to hide the punch line.  The punch line is:  I think I've now considered all of the motions for summary judgment, and I'm going to deny each of them finding that they're triable issues of fact.  The parties will warn me whether I've missed a motion for summary judgment, but let me go through that.

The parties present a series of issues for me to decide on a motion for summary judgment.

First, Eastern seeks summary judgment on its claim for declaratory relief that the research agreement was never a valid contract on the theory that it was illegal under the Virginia Private Security Services Statute because Strategic was not licensed to provide private investigation services.

KA5KEASC

1    Strategic makes a cross-motion for summary judgment, arguing

2    that the contract is valid as a matter of law.  Strategic

3    argues that the contract was not for private investigation

4    services as defined in the statute, and that, even if it were,

5    the contract would nonetheless still be valid.

6            I deny both motions.  There are genuine issues of

7    material fact.

8            Virginia law applies to the question of whether the

9    contract can be enforced because the research agreement was

10   negotiated, drafted, signed, and performed in the State of

11   Virginia.  The Virginia Private Security Services Statute

12   states, in relevant part, that, "No person shall engage in the

13   private security services business or solicit private

14   securities business in the Commonwealth without having obtained

15   a license from the department."

16           The statute defines the "private security services

17   business" as "any person engaged in the business of providing,

18   or who undertakes to provide...private investigators...to

19   another person under contract, express or implied."  And I can

20   give you some ellipses as I quoted the statute.

21           A private investigator is defined elsewhere in the

22   statute, in part, as, "any individual who engages in the

23   business of, or accepts employment to make, investigation to

24   obtain information on (i) crimes or civil wrongs."  The statute

25   goes on to state other definitions of private investigator.

KA5KEASC

1          I agree with Strategic that reading the statute as a

2     whole, it is intended to regulate entities engaged in quasi-law

3     enforcement activity.  Eastern points to the language in the

4     research agreement, stating that the purpose of the research

5     conducted by Strategic was to "prevent crime or other harm to

6     innocent people."  It also points to record evidence that goes

7     to show that Strategic, at various times, characterized the

8     activities that it performed for Eastern as investigations and

9     that Strategic surveilled individuals chosen by Eastern by

10    watching them, listening, seeing what they are talking about,

11    and taking photographs of them, activities that are

12    characteristic of law enforcement.

13          For its part, Strategic points to the language of the

14    research agreement that it was retained to perform business

15    research, reporting, documentation, and other consulting

16    services, none of which require licensure under the Private

17    Security Services Statute.  That's the argument.

18          It also relies on testimony from Mr. Guo that his

19    objective was a political one to oust the Chinese Communist

20    Party by publicizing information on official corruption, which

21    he viewed as crimes against the Chinese people, democracy, and

22    the rule of law.  According to Strategic, Eastern's focus was

23    not on an actual crime or specific victim or person, but a

24    wholesale political attack on the Chinese regime, and the focus

25    was not on the legal system or law enforcement, per se, but on

KA5KEASC

politics and publicity.

Strategic claims that neither Mr. Guo, nor Eastern ever identified any actual crime or victim of a crime for Strategic to investigate either in the initial talks or in the short period of time that Strategic performed services for Eastern.

The Court cannot grant Eastern's summary judgment motion because the language it focuses on – that the research will be for the purpose of detecting, stopping, and preventing crime or other harm to innocent people – is so broad and general, that it can sweep within it much investigation that had nothing to do with law enforcement or quasi-law enforcement for a crime or civil wrong that has occurred.  Moreover, the specific deliverables also are so general, that, while they might include work that would be done by a private investigator of a crime, they also include work that is done by someone not involved in the investigation of the crime or civil wrong.

On the other hand, the Court also cannot grant Strategic's summary judgment motion because, at the very least, the language in the contract stating that its purpose was to detect and prevent crime and civil wrongs raises an issue of fact as to whether what Strategic was contracted to do was traditional private investigator activity.  That issue will have to await testimony at trial.

Second, Eastern also seeks summary judgment on

KA5KEASC

Strategic's claim that it was fraudulently induced to enter the
research agreement by Eastern's oral misrepresentation about
the purpose for which Eastern requested research.  Strategic
claims, and has pointed to the testimony of Mr. Guo, that
Eastern represented that it was requesting the research because
he, Mr. Guo, opposed the Chinese Communist Party.  In fact,
Strategic alleges Mr. Guo secretly supports the Chinese
Communist Party and wanted the research to assist the Chinese
Communist Party.

      Eastern argues in its summary judgment motion:  First,
that Strategic's failure to conduct any research on Mr. Guo and
its failure to include a representation regarding Mr. Guo's
status in the agreement negate any reasonable reliance as a
matter of law;

      Second, there is no scienter because Mr. Guo had no
reason to lie.  Eastern could have easily found another
investigator if Strategic had refused to do the work for
Eastern;

      Third, the statement that Mr. Guo was a dissident and
opposed to the Chinese Communist Party, wanted to overthrow the
Chinese Communist Party, is not a factual statement capable of
being proven true or false.

      The motion for summary judgment is denied.  The record
contains evidence that Mr. Guo represented that he was an
opponent of the Chinese Communist Party and wanted the research

KA5KEASC

to overthrow the Chinese Communist Party.  It also contains
evidence that Strategic relied on references for Mr. Guo and
investigated to the extent that it checked with persons who it
believed were associated with Mr. Guo to confirm that he was
who he represented to be and that he did want to overthrow the
Chinese Communist Party.

Although the failure to check readily available
information or to ask for a representation in the research
agreement is evidence with respect to whether there is
reasonable reliance.  It is not dispositive, as a matter of
law, on that issue.

There also is evidence of scienter in the form both of
evidence that Mr. Guo knew what he would say was false and that
he had a particular interest in obtaining the services of
Strategic, in part, because he was turned down by another
investigator.

Finally, Eastern cites no authority, and the Court has
found none, that its statement that a person intends to
overthrow the Chinese Communist Party is capable of being
proven true or false.

Third, Strategic cross-moves for summary judgment
plaintiff's claims for breach of contract and undue enrichment.
It argues that the claims that it breached a research services
agreement by failing to return a $1 million deposit and that it
is liable in unjust enrichment for that sum should be

KA5KEASC

dismissed, and it should be granted summary judgment because
the sum of 1 million was paid not by Eastern, but by another
entity.  It also argues that it should be relieved of any
liability by the doctrine of frustration of purpose.

First, with respect to restitution and damages, there
is evidence of the following on the summary judgment record:
To secure Strategic's services under the research agreement,
Eastern agreed to pay a $1 million deposit.  The deposit was to
be used to pay any monies Eastern owed to Strategic with
respect to the final months of contract.  The contract also
provided that any party might be terminated with 30 days'
written notice.  It further provided that Eastern could direct
other entities to pay the deposit.  The deposit was paid by an
entity named ACA Capital Group Limited on Eastern's behalf.
Eastern agreed to repay ACA the $1 million and took on a debt
obligation to it.  ACA had been promised the result of
Strategic's work.  Eastern did not have access to cash at the
time with which it would be able to repay the $1 million or
indeed interest on the loan.

When Eastern terminated the contract before having
incurred 1 million in services, it demanded that the 1 million
be repaid to it, Strategic refused and retained the funds.
Strategic argues that to pay the funds to Eastern, when ACA was
the entity advancing the funds, and Eastern would have no
ability to repay ACA, would confer on Eastern a windfall.

KA5KEASC

1          I find that Strategic's argument for summary judgment

2     is meritless.  There is enough here for Eastern to proceed to

3     trial and claim relief either on a restitution theory or, as

4     Eastern posits in its opposition, on a damages theory.

5          With respect to restitution, Strategic relies

6     primarily on the restatement of contract Section 370, which

7     states, "A party is entitled to restitution...only to the

8     extent that he has conferred a benefit on the other party by

9     way of part performance or reliance."  It argues here the

10    benefit was conferred by ACA and not by Eastern, and Eastern

11    cannot recover restitution.

12         The language of the comment to the restatement and its

13    illustration, and the cases cited by Strategic, do not support

14    its argument.  The comment to the restatement goes on to state

15    that, "A party's restitution interest is his interest in having

16    restored to him any benefit that he had conferred on the other

17    party.  Restitution is, therefore, available to a party only to

18    the extent that he has conferred a benefit on the other

19    party...The benefit must have been conferred by the party

20    claiming restitution.  It is not enough that it was simply

21    derived from the breach."

22         The restatement focuses on the fact that a benefit has

23    been conferred by the nonbreaching party equivalent to that

24    which the nonbreaching party is attempting to have restored in

25    a form of restitution.  It does not focus on the form in which

KA5KEASC

1    the benefit was conferred.  In particular, it does not

2    distinguish, for example, between the circumstances where the

3    nonbreaching party takes on a loan and then having received

4    funds from its creditor, sends those funds to the breaching

5    party, and, on the other hand, the circumstance where the

6    nonbreaching party asks its creditors to send the funds

7    belonging to the debtor directly to the breaching party.

8    Strategic does not dispute that restitution would be

9    appropriate in the first instance, the instance in which the

10   money comes to Strategic through Eastern, but finds its origin

11   in a loan taken out by Eastern.

12           There's no reason in logic or the language of the

13   restatement that Eastern would not be able to obtain

14   restitution in the second instance.  Assuming that the funds

15   being transmitted to -- I'm sorry, let me start again.

16   Assuming that the funds being transmitted to Strategic were the

17   property of Eastern, or could be considered to be in

18   constructive possession of Eastern, the return of funds to

19   Eastern simply puts it back in the position where it was before

20   the breach – where it has borrowed and had possession of

21   1 million from ACA or ownership of the 1 million from ACA.

22           The cases and illustrations in the restatement also

23   are not helpful.  They focus on the fact that there's been some

24   benefit conferred on the breaching party – if there is no

25   benefit, the form of relief you have is damages.

KA5KEASC

1      They also focused on the fact that the benefit that is

2   received is, to some extent, at the expense of the nonbreaching

3   party.  If there is a benefit obtained from the breaching

4   party, not by the nonbreaching party or not from the

5   nonbreaching party, in the performance of the contract, but by

6   the defendant in breaching the contract -- in other words, if

7   the defendant obtains a benefit for breaching the contract, but

8   that benefit is not at the expense of the breaching party --

9   such benefit is not recoverable as restitution.

10      In fact, the principal Second Circuit case relied on

11   by Strategic, *Gerosa v. Savasta & Co*, cuts the other way from

12   its argument.  It states, in part, that to make out a claim for

13   restitution, a plaintiff must show that the defendant "holds

14   funds or property that in good conscience should belong to the

15   plaintiff."  Here, there is sufficient evidence that the

16   1 million paid as a deposit on behalf of Eastern from funds

17   Eastern borrowed from ACA belongs to Eastern and should be

18   returned to Eastern.  In fact, there has been a breach.

19      In the alternative, assuming that the $1 million sent

20   to Strategic did not belong to Eastern, there are genuine

21   issues of fact whether Eastern has reliance damages.  Eastern's

22   theory here is that in reliance on Strategic's performance to

23   perform under the contract, Eastern sent the $1 million it

24   otherwise would have had a right to from ACA to Strategic, and

25   that, as a result, is now out $1 million that it must repay

KA5KEASC

1    ACA.

2             I find persuasive Judge Spatt's decision and analysis

3    in the *Nature's Plus* case, 98 F. Supp 3d 600, holding that

4    under New York law, a debt obligation incurred in reliance upon

5    a contract may be recoverable as reliance damages even if the

6    obligation has not been paid in full or in part.  Judge Spatt

7    explained the logic in *Nature's Plus*:  "This rule makes sense

8    as a logical matter.  Even if a nonbreaching party has not paid

9    a debt taken in reliance upon a contract, it has still incurred

10   a legal obligation to do so.  In this respect, the Court does

11   not find that such a rule bestows a double recovery or windfall

12   on the nonbreaching party...the general principle that for

13   purposes of calculating contract damages, the nonbreaching

14   party cannot be placed in a better economic position than it

15   would otherwise have occupied had the breach not occurred is

16   only helpful insofar as it goes.  This is because...the

17   nonbreaching party...incurred a legal obligation to repay in

18   reliance upon the contract."  That's the end of the quote in

19   *Nature's Plus*.

20             The *Nature's Plus* decision was affirmed by the Second

21   Circuit in a summary order that concluded that the plaintiff

22   was entitled to damages with respect to the debt from the third

23   person paying on its behalf because the factfinder could have

24   concluded that the plaintiff remained obligated to repay the

25   loan.  That's 646 F. App'x 25 (2016).

KA5KEASC

1   I do not find persuasive, as a matter of law,

2   Strategic's argument that neither the $1 million, nor the debt

3   Eastern incurred as a result of ACA paying the 1 million on

4   Eastern's behalf can be reliance damages because the debt was

5   incurred on December 29, 2017, while the research agreement was

6   signed on January 6, 2018.

7   The fact, at least on this record, is that Eastern

8   accepted ACA's payment of the 1 million to Strategic as

9   satisfaction of ACA's obligation to lend Eastern the 1 million,

10   and that as a result of ACA paying those funds to Strategic and

11   to Strategic retaining them, Eastern is now out of pocket

12   $1 million that it could have used to retire the principal

13   amount of the loan and that it owes to ACA.  That is sufficient

14   evidence on the damages theory for the case to go forward.

15   Nor is Strategic's argument persuasive at this stage

16   that ACA's payment of the 1 million on Eastern's behalf should

17   be considered to be an investment rather than a legitimate debt

18   as a result of which Eastern itself, as opposed to ACA, would

19   have suffered no damages as a result of Strategic's alleged

20   breach of contract in failing to repay the money.

21   In making this argument, Strategic is essentially

22   asking me to rule that the debt instrument is a sham and

23   conceals the true nature of the economic arrangement.  There is

24   evidence to support that proposition.  There is evidence that

25   Eastern never had the ability to pay even the interest on the

KA5KEASC

loan, that ACA would receive the benefit of the research

agreement and the work that Strategic was going to do, that

Eastern had no real independent existence or substance other

than as a Hong Kong bank account, and that the only way Eastern

could have repaid ACA was as a result of the success of the

venture Strategic had launched.

On the other hand, Eastern argues and presents

evidence that ACA has since demanded repayment of the loan and

that Eastern acknowledges that it remains obligated to repay

the loan, and, thus, the substance of the agreement corresponds

with its form.  That argument clearly presents a substantial

issue at trial.

I note, however, that the fact that the claim for

restitution or, in the alternative for damages, is viable does

not mean that even if there is a breach, Eastern will be

entitled to the full $1 million.  Under the doctrine of

restitution, the $1 million may be reduced by the reasonable

value of the services and goods Strategic conferred on Eastern.

Last, Strategic argues that its performance under the

contract was excused by virtue of the doctrine of frustration

of purpose.  Eastern claims in this case that Strategic failed

to deliver on its contractual promise to research 15 specified

individuals whose names were provided to Strategic by Eastern.

Strategic argues the first 15 subjects that Eastern

gave it to research had records protecting status, meaning that

KA5KEASC

1    the information concerning their status and activity were not

2    accessible to traditional legal means and could not be

3    investigated and that, after being informed of that fact,

4    Eastern failed to give it replacement subjects to research.

5            Eastern has two responses:  Number one, even if

6    Strategic could not research the subjects, it, Eastern, has a

7    right to opt not to provide alternative names, but simply to

8    terminate the agreement and that its right to terminate the

9    agreement was not qualified by or conditioned on an obligation

10   to provide alternative names;

11           And, second, that Strategic has not submitted on the

12   summary judgment record any competent admissible evidence in

13   its ability to conduct the investigation.

14           I need not consider the first argument.  The second

15   argument clearly presents an issue of fact.

16           So those are my rulings on the outstanding motion for

17   summary judgment.

18           I'll hear from the parties, but I think what I would

19   like to do is, we've got a trial date.  The trial date I set as

20   a firm trial date, and I'd like to keep it and just do this as

21   a bench trial.  I am open to an application, if the parties

22   think it's more convenient for them and safer for them

23   collectively for the witnesses to do it remotely.  Also, I'm

24   happy to do it in part in the courtroom and in part remotely.

25           Also, with respect to the request that I try certain

KA5KEASC

1    issues first, that is an option that I have, and I think the

2    most orderly way for me to handle that is to give Eastern an

3    opportunity to file a brief with me asking for severance of

4    certain issues for trial and to give Strategic an opportunity

5    to respond.  That way, I can consider the question with some

6    amount of deliberation.

7              But I'll hear from the two of you.  Ms. Cline?

8              MS. CLINE:  Thank you, your Honor.

9              Yes, from Eastern's perspective, we are ready to

10   proceed either in person or via Zoom.  It's safe to say that

11   Mr. Greim will disagree with that.  And the opportunity to

12   brief on the application request sounds good.

13             I guess we also, just as a matter of housekeeping,

14   might need to reset a date for us to submit additional

15   deliverables that go with the pretrial memo that sort of need

16   to pivot and turn those into nonjury trial deliverables as

17   opposed to jury trial deliverables.  So I guess the Court can

18   give us some guidance.

19             The parties are teed up to submit our pretrial memo

20   and all the exhibits today, but I think we want to excise from

21   that all of the jury-related issues.  So I guess if the Court

22   could give us some guidance on whether we should go ahead with

23   that or whether we should regroup in light of today's rulings

24   and get an extension on the dates and the pretrial memo,

25   whatever the Court would like to do is okay with us.

KA5KEASC

1          THE COURT:  Mr. Greim?

2          MR. GREIM:  Your Honor, from Strategic's business

3    perspective, the concern that prompted us to reach out to you

4    the Friday before last is still there.  The problem is not, and

5    really never was, with a jury trial, per se; the problem has

6    been that we have to go and isolate in New York for 14 days

7    before whatever our trial date is.  You might recall, I

8    mentioned the concern trying to watch and see which states

9    appear on the New York quarantine list.

10          I will say, fortunately, Virginia is now off, and so

11   French Wallop is no longer -- as of today, she could come to

12   New York City tomorrow, and there wouldn't be a problem, but I

13   could not.  I would still have to move to New York two weeks in

14   advance and then self-isolate for the 14 days before the trial.

15   And the concern we raise there was, again, not dependent on

16   there being a jury trial.  Perhaps not having a jury trial

17   means that the final part of our -- what may be a rather

18   expensive stay in New York may be a day or two less because it

19   will just move more quickly, but there is still the two weeks

20   of having to live there in isolation.

21          So, that's a hardship.  If that went away, there would

22   be no issue whatsoever.  I mean, everybody's available, and so

23   I understand that a response to that would be let's do this by

24   Zoom or do maybe parts of it by Zoom.  The problem we have

25   there is the witnesses that will be important, there are about

KA5KEASC

probably four or five witnesses that are really important to

hear from in person.  We can check off several of those --

well, actually, every witness would be available in New York.

The problem is, your Honor, that, I mean, having taken the

depositions and defended the depositions of each of those

people, they've all been deposed, a few of them require

translators, and it makes things difficult.  I could not

imagine trying to cross-examine these folks using a translator

and also doing it by Zoom.  I just -- on the one hand, it will

be helpful to have the Court there in some ways, and I'll say

no more than that, but, on the other hand, it just adds another

layer of complication.

          And so there's much we could do by Zoom, but I think

there are about four or five witnesses -- basically,

Mr. Waller, Ms. Wallop, Ms. Wong, Mr. Guo, and Mr. Han

Chunguang -- who really I think the Court should see in person

and the person asking the questions ought to be there, even if

distanced within the courtroom, but they ought to be there with

that witness and whatever translator is being used.

          THE COURT:  I'm sorry.  Which witnesses who you intend

to call need translators?

          MR. GREIM:  Mr. Guo and Mr. Chunguang.

          One issue -- it has been helpful, your Honor.  Thank

you for the summary judgment decision.  It's apparent that one

thing we're going to get into is the ACA-Eastern profit

KA5KEASC

| | |
|---|---|
| 1 | relationship, and Han Chunguang is sort of one of the key |
| 2 | witnesses on that question.  He's the one who allegedly signed |
| 3 | the loan document, and unless we can track down Mr. William Je, |
| 4 | he will be the only witness we will be able to hear from on |
| 5 | that, but he also requires a translator. |
| 6 | THE COURT:  Ms. Cline, tell me what your position is. |
| 7 | I'd like to give you a trial; I'd like to give you a trial |
| 8 | quickly.  I am concerned that there's not consent on both |
| 9 | sides. |
| 10 | I'm also, frankly, concerned, Mr. Greim, that by -- |
| 11 | your arguments are ones that might make it difficult for me to |
| 12 | give Eastern a trial anytime soon.  Actually, maybe I'll direct |
| 13 | the question to you. |
| 14 | MR. GREIM:  Sure. |
| 15 | THE COURT:  Because I do have an option of going |
| 16 | forward and saying, listen, quarantine, and I don't have any |
| 17 | certainty as to when, nor do you, as to when travel |
| 18 | restrictions will be lifted.  The prognosis that we have is |
| 19 | that the fall and the winter may be worse than what has been. |
| 20 | You're the defendant in this case, the plaintiff wants to |
| 21 | prosecute the case, and why shouldn't I put you to the choice |
| 22 | of either coming here and doing it in court with Mr. Guo or |
| 23 | doing it remotely?  People have done cross-examinations by |
| 24 | Skype remotely. |
| 25 | MR. GREIM:  Your Honor, I'm afraid -- I understand it. |

KA5KEASC

1    I don't like the fact that we're in this unique position here,

2    but we are a counterclaim -- I think our rights are equal here

3    to Eastern Profit's.  I know they're the plaintiff.  If they

4    want to push ahead, I mean, just to be clear, we do, too.  It's

5    the quarantine is the problem.  So I feel like I've got a child

6    reading the Odyssey right now, and I feel like we've got Scylla

7    and Charybdis on either side of us here, with, one, ineffective

8    examination, and I think I've got a duty to my client not to --

9    we've specifically discussed this issue about trying to do

10   things through the computer or on Zoom, given the experience

11   everyone had in the depositions, and I don't think I can do an

12   effective job representing my client that way.

13          At the same time, it is an extreme hardship, and it

14   will impact our ability to prepare if we are in isolation for

15   those 14 days before the trial.  And I am bitterly -- I don't

16   know, I regret the fact that we are the ones -- it only impacts

17   us, and so we find ourselves in the position of having to raise

18   this to the Court, and that we can't do it together, because I

19   think our opposing counsel don't have the same quarantine

20   issues.

21          But I can't let the issue of the quarantine affect our

22   representation of the client.  I can't let it affect their

23   substantive rights here.  I don't think it's fair for us to do

24   so.  I recognize the power of the Court to control the case,

25   and the docket, and all those things, I recognize everyone's

KA5KEASC

1    desire to get this case moving, but it can't come at the

2    expense of effective representation and advocacy, and that's

3    why I have to do this, your Honor.  I have to register this

4    objection.  I hate the idea that we would have to wait longer,

5    but I think we'd have to wait until the restrictions are

6    lifted, and then we can all come and get it done.

7          THE COURT:  Here's what I think I'm going to do:

8    Ms. Cline, I'm not going to force you to answer on the spot.

9    You're going to be briefing one issue in front of me, which is

10   the issue of severance.  What I'd like to do is I'm going to

11   give you all a little bit more time on the pretrial order, a

12   day or two, just to reflect that this is going to proceed as a

13   bench trial.  I'm going to keep the date you've got for the

14   trial for now.

15         Ms. Cline, you're going to brief the issues severance

16   and whether I've got the power, and should exercise it, to have

17   this case go forward either remotely or if you want to make the

18   argument in person, although I don't find that argument all

19   that attractive, but you can convince me.

20         And, Mr. Greim, you'll respond to that.  I think

21   that's the most orderly way to handle it.

22         Does that make sense to you, Ms. Cline?

23         MS. CLINE:  It does.

24         THE COURT:  How much time do you think you'll need to

25   redo the papers to strip out the jury stuff?

KA5KEASC

<table>
<tr><td>1</td><td>MS. CLINE:  So, your Honor, from our perspective, the</td></tr>
<tr><td>2</td><td>stripping out isn't the problem.  It's -- I think the one</td></tr>
<tr><td>3</td><td>undertaking that we've got to think about of it is your</td></tr>
<tr><td>4</td><td>procedures require findings and conclusions be submitted with</td></tr>
<tr><td>5</td><td>the pretrial for a bench trial, and we haven't done that yet.</td></tr>
<tr><td>6</td><td>So I think even today, the parties could probably pivot and</td></tr>
<tr><td>7</td><td>submit the rest of the pretrial motion, we just need a little</td></tr>
<tr><td>8</td><td>more time on the findings and conclusions.</td></tr>
<tr><td>9</td><td>THE COURT:  Does October 15th give you enough -- I'm</td></tr>
<tr><td>10</td><td>sorry, October 16th give you enough time?</td></tr>
<tr><td>11</td><td>MS. CLINE:  Yes, for us, your Honor.</td></tr>
<tr><td>12</td><td>THE COURT:  And, Mr. Greim, does that give you enough</td></tr>
<tr><td>13</td><td>time?</td></tr>
<tr><td>14</td><td>MR. GREIM:  Yes, it does, your Honor.</td></tr>
<tr><td>15</td><td>THE COURT:  Okay.</td></tr>
<tr><td>16</td><td>So I am going to amend my order to make a joint</td></tr>
<tr><td>17</td><td>pretrial order due October 16th.  It will also reflect that on</td></tr>
<tr><td>18</td><td>both sides -- I want to confirm this.  Ms. Cline, you are</td></tr>
<tr><td>19</td><td>waiving the right to a jury trial?</td></tr>
<tr><td>20</td><td>MS. CLINE:  That's correct, we are.</td></tr>
<tr><td>21</td><td>THE COURT:  And, Mr. Greim, you're also waiving the</td></tr>
<tr><td>22</td><td>right to a jury trial?</td></tr>
<tr><td>23</td><td>MR. GREIM:  We are, your Honor.</td></tr>
<tr><td>24</td><td>THE COURT:  Then with respect to the briefing of</td></tr>
<tr><td>25</td><td>severance and whether I can try this case remotely or try it in</td></tr>
</table>

KA5KEASC

1  person, Ms. Cline, how much time do you want for your papers

2  with respect to that?

3          MS. CLINE:  Oh, how about 48 hours?

4          THE COURT:  So that gives you October 7 at 5:00 p.m.

5          And, Mr. Greim, you'll respond on October 9th at

6  5:00 p.m.

7          MR. GREIM:  Yes, your Honor, that works.

8          THE COURT:  Good.

9          Is there anything else that would be useful to discuss

10  right now?

11          MS. CLINE:  Not from our perspective.  Thank you, your

12  Honor.

13          THE COURT:  Mr. Greim?

14          MR. GREIM:  I don't think so, your Honor.

15          Just to lay it out clearly, I think if we do have to

16  go forward on November 2nd, and we make this filing on the 9th,

17  I've lost track of my dates, but I think -- I believe it would

18  be the following week that we would need to move out there, but

19  we'll be prepared to do it, but we're going to beg you not to

20  do it.

21          THE COURT:  Actually, let me ask the question.  My

22  calendar is open enough.  Ms. Cline, if I move the trial to

23  November 9th, would that work for you?

24          MS. CLINE:  I'm just checking.  One second, please.

25          Yes, I think we can make that work.

KA5KEASC

```
 1              Mr. Chuff, is that okay with you?

 2              MR. CHUFF:  Yes, that's fine with me.

 3              THE COURT:  And, Mr. Greim, I know that you are not

 4    going to say it works for you in terms of coming to New York,

 5    but do you have any immovable trial obstacles or other things

 6    that will conflict with November 9th?

 7              MR. GREIM:  No, your Honor.  We've kind of been

 8    keeping the fall open for just this matter, so we are good that

 9    next week if we had to go.

10              THE COURT:  Okay.  I'll adjourn the trial to

11    November 9th.  It also, obviously, takes care of another issue,

12    which is that I had not focused on the fact that I scheduled

13    the first day of the trial for the day before Election Day.  So

14    that will ensure that at least what we call Election Day is

15    over.

16              All right.  And I will undoubtedly have a conference

17    after I receive the papers from you all, but I want to look at

18    the papers first before I decide how quickly I want to talk to

19    you.

20              All right.  Ms. Cline, anything else?

21              MS. CLINE:  Nothing further.  Thank you.

22              THE COURT:  Mr. Greim?

23              MR. GREIM:  Nothing more, your Honor.

24              THE COURT:  Okay.  Thank you, all.  Have a good

25    afternoon, stay safe, and stay healthy.  And, Mr. Greim, I hope
```

KA5KEASC

1     for all parties' sakes, that the restrictions are lifted.

2              MR. GREIM:  Thank you, your Honor.  Thank you very

3     much.

4              THE COURT:  Okay.  Thank you.  Bye-bye.

5                            * * *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25