# EXHIBIT A

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EASTERN PROFIT CORPORATION LIMITED | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Case No. 18-CV-2185 (LJL) |
| STRATEGIC VISION US, LLC | ) ) ) |
| Defendant. | ) ) |

## JOINT STATEMENT OF ADMITTED FACTS

**A.     The Parties and Relevant Non-Parties**

1. Eastern Profit Corporation Limited ("Eastern") and Strategic Vision US, LLC ("Strategic") were parties to a written Research Agreement dated January 6, 2018.

2. Eastern is a private company organized under the laws of Hong Kong. Until he sold his interests in Eastern in 2017, Mr. Chunguang Han was the sole director of Eastern. In 2017, Mr. Han transferred ownership to Guo Mei. Guo Mei is Guo Wengui's daughter.

3. Guo Wengui ("Mr. Guo") is also known as Miles Kwok.

4. Mr. Guo was an agent of Eastern for the purposes of negotiating the Research Agreement with Strategic.

5. Mr. Guo acted on behalf of Eastern in connection with the negotiation of the Research Agreement and his representations to Strategic in that role are binding on Eastern.

6. Yvette Wang ("Ms. Wang") was and is an agent of Eastern concerning the negotiation, execution, and performance of the Research Agreement.

7. Strategic is a limited liability company organized under the laws of Nevada.

8. Strategic's principal place of business was and is in Arlington, Virginia. Strategic's principal place of business is in Ms. Wallop's Virginia residence.

9. French Wallop ("Ms. Wallop") was and is Strategic's manager and only member.

10. Ms. Wallop resides in Arlington, Virginia. The Research Agreement was signed at Ms. Wallop's residence.

11. Strategic provides private "investigatory research" to clients within the United States in exchange for monetary compensation.

12. As part of its investigations, Strategic makes investigations into crimes and civil wrongs; the location, disposition, and recovery of stolen property; and the cause(s) of injuries to persons or to property.

13. As part of its investigations, Strategic makes investigations into the identities, habits, conduct, business, occupation, honesty, integrity, credibility, knowledge, trustworthiness, efficiency, loyalty, activity, movement, whereabouts, affiliations, associations, transactions, acts, reputation and character of individuals.

14. As part of Strategic's investigations, Strategic's CEO Ms. Wallop communicates with her network of contacts within the United States government and the United States business community in order to obtain the information concerning the subjects of Strategic's investigations.

15. Since it was founded, Strategic has conducted at least five private investigations for its clients.

16. Strategic has never had employees.

17. J. Michael Waller ("Mr. Waller") is a social and professional acquaintance of Ms. Wallop who has worked with Strategic on a number of projects since 2016 or 2017.

18. Strategic is not and has never been licensed as a private investigator under the laws of Virginia or any other state or jurisdiction within the United States.

19. Ms. Wallop is not and has never been licensed as a private investigator under the laws of Virginia or any other state or jurisdiction within the United States.

20. Mr. Waller is not and has never been licensed as a private investigator under the laws of Virginia or any other state or jurisdiction within the United States.

21. Bill Gertz ("Mr. Gertz") is a former reporter of The Washington Free Beacon and a current reporter of The Washington Times.

22. Mr. Gertz is a mutual acquaintance of Mr. Guo and Ms. Wallop and J. Mr. Waller.

23. Mr. Gertz has written media articles about Mr. Guo and introduced Lianchao Han ("L. Han") to Ms. Wallop and Mr. Waller knowing that L. Han would then introduce Ms. Wallop and Mr. Waller to Mr. Guo.

24. L. Han immigrated to the United States from China, and worked in the U.S. Senate for several years (including for the late Senator Wallop, former husband of Ms. Wallop) on matters relating to China. After the Tiananmen Square Massacre in 1989, Dr. Han helped found the Independent Federation of Chinese Students and Scholars.

25. L. Han introduced Mr. Guo to Ms. Wallop and Mr. Waller in late October or early November of 2017. L. Han described Mr. Guo to Strategic as a wealthy businessman who had moved to the U.S. to escape political persecution in China and who had recently purchased the penthouse at the Sherry-Netherland Hotel in New York City. According to L. Han and Mr.

Gertz, Mr. Guo had developed several broad goals involving the Chinese government beneficial to the people of China. In September 2017, just before being introduced to French Wallop, Guo had filed an application for asylum in the United States. At the time, L. Han was advising Guo on his application for asylum in the United States. L. Han believed that Mr. Guo needed to sustain an image as a "whistleblower" against the Chinese Communist Party. To be a "whistleblower," L. Han believed Mr. Guo needed to obtain and publish well-researched information against high-ranking government officials.

B. The Negotiation of the Research Agreement

26. The introduction of Mr. Guo to Ms. Wallop and Mr. Waller occurred at Mr. Guo's penthouse apartment at the Sherry-Netherland Hotel. Ms. Wang was introduced to Ms. Wallop and Mr. Waller by Mr. Guo.

27. From these introductions until the Research Agreement was signed, Mr. Guo, Ms. Wang, L. Han, Ms. Wallop, and Mr. Waller conferred to discuss services that Strategic could cause to be provided, including research into corrupt members of the Chinese government and the Chinese Communist Party ("CCP").

28. The parties then began negotiating the terms of what eventually would become the Research Agreement.

29. The Research Agreement required that Eastern provide a $1 million deposit. On or about January 2, 2018, before the Research Agreement was signed, Strategic received two $500,000 wire transfers from non-party ACA Capital Group Limited ("ACA").

30. Strategic understood that the $1 million payment from ACA was the deposit that the parties had previously discussed in relation to the Research Agreement then under negotiation.

  C. **The Research Agreement**

  31. Eastern and Strategic entered into the Research Agreement on January 6, 2018.

  32. Ms. Wallop signed the Research Agreement on behalf of Strategic in Virginia.

  33. Under the Research Agreement, Strategic was to provide "high quality original research and prepare reports on subjects chosen at [Eastern's] discretion for the purposes of detecting, stopping, and preventing crime or other harm to innocent people."

  34. Under the Research Agreement, Strategic would "provide the deliverables based on the best practices and standards of the industry, comparable to other top firms with similar services," and reports "of very high quality, revealing a true, complete and full profile of the subject."

  35. Under the Agreement: "[Eastern] will provide the necessary basic information, and desired areas of focus, to [Strategic] to research.  [Strategic] will produce complete reports and provide all supporting data as indicated below."

  36. Under the Agreement, Strategic agreed to provide "Financial forensic Historical research," "Current Tracking research," and "Social Media Research."

  37. The Agreement describes Financial forensic Historical research as: "in-depth and detailed reports of existing and historical business and financial transactions, on subjects selected by [Eastern], and relations of the subject as identified by [Eastern].  Business and financial transactions to be researched may include statements, capital sources, inflow and outflow information, bank receipts, financial instruments, financial products, statements of credit, precious metals transfers, commodity transfers, crypto currency exchange, stocks and other equities,

business ownership, real property ownership, trusts, large amounts of spending, specific information to indicate the transaction participants, and other data required by [Eastern]."

38. The Agreement describes Current Tracking research as: "in-depth and detailed reports on movements of specified subjects by land, air, and sea (private and commercial); schedules and itineraries, addresses and lodging, means of transportation, names of carriers, manifests, geolocation, major events and significant contacts the subject involved, video and audio that can be accessed remotely, and other data that may be of relevance to the overall research, such as past travel records that may significant to research."

39. The Agreement describes Social media research as: "in-depth and detailed reports on the social media usage and networks of specified subjects and public figures. Research shall include court records, criminal databases, sex offender and child abuse databases, information on subject's family, extramarital affairs, children born out of wedlock, passports and ID documents, assets, videos and audio, emails, websites, pornography and related media, comments on online media, social media (including Facebook, Twitter, Instagram, Snapchat, Wechat, and other sites as [Eastern] may request), 'dating" or sexual services apps, online classified ads or their equivalents, video or audio recordings, and other media."

40. The Agreement provides that the deliverables called for under the Agreement were to be delivered to Eastern by USB drive only.

41. The Agreement provides that "[b]oth parties understand that occasional unforeseen challenges may arise that will slow or block comprehensive research, and that there may be periods in which information is irregular, unavailable, or incomplete. The Contractor will endeavor to make all research and reports as complete as possible in a timely scheduled manner."

42. The Agreement provides that "The prices for each deliverable . . . are $300,000" and that "[t]he pricing for 30 units or deliverables per year remains a constant $9,000,000 per year, or $750,000 per month for 12 months."

43. The Agreement states that "[Eastern] will pay [Strategic] a deposit of US$1,000,000 (one million dollars) upon signing the contract."

44. Under the Research Agreement, the $1 million payment would "be credited on a prorated basis to the final 1-1/3 (1.3) months of the contract."

45. The Deposit was not meant to be a signing bonus.

46. The Agreement states that "It is understood that [Eastern] may direct other entities to pay [Strategic], and that such payments will be deemed satisfactory compensation by [Strategic]."

47. The Research Agreement states that the parties could "terminate the contract with 30 days' written notice."

48. Termination was permitted without a showing of cause.

49. Under the Research Agreement, both parties agreed that "the nature of [the] contract, and work related to it, is highly confidential." The Research Agreement states that "both parties are bound by the strictest secrecy not to disclose the existence of the contract, work relating to the contract, sources and methods used to execute the contract . . . ."

D.   **January-February 2018**

50. On or about January 8, 2018, Ms. Wang delivered a list of 15 individuals to Ms. Wallop on a USB key (the "Subject List") to be investigated under the Research Agreement.

51. Many of the individuals on the Subject List were high ranking officials that comprised the key group in control of China's banking system.

52. After receiving the Subject List, Strategic printed a paper copy of the Subject List and began strategizing how to collect information and perform the investigation.

53. Strategic retained or attempted to retain independent contractors to perform research into the 15 individuals identified in the Subject List.

54. Strategic never delivered to Eastern any "financial forensic [h]istorical research" called for under the Research Agreement.

55. Strategic never delivered to Eastern any "current tracking research" called for under the Research Agreement.

56. Strategic never delivered to Eastern any "social media research" called for under the Research Agreement.

57. Strategic "was unable to prepare any detailed reports."

58. On February 23, 2018, Eastern delivered a termination letter under the Research Agreement to Strategic.

59. In the termination letter, Eastern demanded that Strategic return the $1 million deposit by wiring it to ACA.

60. Strategic has not returned the $1 million deposit.

[SIGNATURES TO FOLLOW]

-9-

| | |
|---|---|
| */s/ Joanna J. Cline* | */s/ Edward D. Greim* |
| Francis J. Lawall (Admitted to S.D.N.Y.) | Edward D. Greim (NY Bar ID No. 4240172) |
| TROUTMAN PEPPER HAMILTON SANDERS LLP | Jennifer Donnelli (*Pro Hac Vice*) |
| 3000 Two Logan Square | Lucinda Luetkmeyer (*Pro Hac Vice*) |
| Eighteenth and Arch Streets | 1100 Main Street, Suite 2700 |
| Philadelphia, PA 19103 | Kansas City, MO 64105 |
| Telephone: 215.981.4000 | Telephone: (816) 256-3181 |
| Fax: 215.981.4750 | Fax: (816) 256-5958 |
| | |
| | *Attorneys for Strategic Vision US LLC* |

Joanna J. Cline (*Pro Hac Vice*)
Christopher B. Chuff (*Pro Hac Vice*)
TROUTMAN PEPPER HAMILTON SANDERS LLP
1313 North Market Streets, Suite 5100
Wilmington, DE 19801
Telephone: 302.777.6500
Fax: 302.421.8390

*Attorneys for Eastern Profit Corporation*


SO ORDERED this ___ day of _____ 2020

_____
The Honorable Lewis J. Liman