# EXHIBIT K

*Atkinson-Baker, Inc.*
www.depo.com

```
1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF NEW YORK

3    --------------------------------------x

4    EASTERN PROFIT CORPORATION LIMITED,

5         Plaintiff/Counterclaim Defendant,     Case No.

6           -against-                           18-cv-2185

7    STRATEGIC VISION US, LLC,                  (JGK)

8         Defendant/Counterclaim plaintiff.

9    ----------------------------------x

10

11

12

13                    Karin MAISTRELLO

14                   NEW YORK, NEW YORK

15                   AUGUST 23, 2019

16

17

18   ATKINSON-BAKER, INC.

19   (800) 288-3376

20   www.depo.com

21
     REPORTED BY:  KATHLEEN T. KEILTY
22                 C.S.R. NO. 000755

23   FILE NO.:    AD0867C

24

25
```

Atkinson-Baker, Inc.
www.depo.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------x

EASTERN PROFIT CORPORATION LIMITED,

Plaintiff/Counterclaim Defendant,     Case No.

-against-                18-cv-2185

STRATEGIC VISION US, LLC,          (JGK)

Defendant/Counterclaim Plaintiff.

---------------------------------------x

August 23, 2019
11:46 a.m.

Deposition of NON-PARTY WITNESS KARIN MAISTRELLO, taken pursuant to Subpoena, dated July 24, 2019, by Attorneys for Defendant/Counterclaim Plaintiff, held at the Offices of Bryan Cave Leighton Paisner, 1290 Avenue of the Americas, New York, New York 10104, before Kathleen T. Keilty, a Certified Shorthand Reporter and Notary Public within and for the State of New York.

Page 2

August 23, 2019

INDEX

| WITNESS | | PAGE |
|---|---|---|
| KARIN MAISTRELLO | | |
| Examination by Mr. Greim | | 8 |

EXHIBITS

| PLAINTIFF'S | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Resignation email | 44 |
| 2 | PDF attachment to Maistrello Exhibit 1 | 44 |
| 3 | Subpoena issued to ACA Capital Group Limited | 55 |
| 4 | Subpoena issued to Karin Maistrello | 55 |
| 5 | "Notice of Change of Company Secretary and Director (Appointment/Cessation,)" Bates Nos. 42-44 | 79 |
| 6 | Document printed off the Hong Kong Corporate Registry database through the ICRIS Cyber Search Centre | 88 |
| 7 | Two-page document titled "Limited Power of Attorney," Eastern 276-77 | 89 |

Page 4

APPEARANCES:

ZEICHNER ELLMAN & KRAUSE, LLP
Attorneys for Plaintiff/Counterclaim Defendant
35 Mason Street.
Greenwich, Connecticut  06830

BY:    ZACHARY B. GRENDI, ESQ.
       zgrendi@zeklaw.com.
       203.489.1233

GRAVES GARRETT LLC
Attorneys for Defendant/Counterclaim Plaintiff
1100 Main Street, Suite 2700
Kansas City, Missouri  64105

BY:    EDWARD D. GREIM, ESQ.
       edgreim@gravesgarrett.com
       816.256.3181

HODGSON RUSS LLP
Attorneys for the Deponent
605 Third Avenue
New York, New York  10158

BY:    ERIN N. TESKE, ESQ.
       eteske@hodgsonruss.com
       646.218.7517

ALSO PRESENT:
Yvette Wang      Golden Spring NY Ltd.
Michael Bennett   Legal Videographer

Page 3

August 23, 2019

INDEX
(Continued)

PRODUCTION REQUESTS

| NUMBER | DESCRIPTION | PAGE | LINE |
|---|---|---|---|
| 1. | Email accepting Ms. Maistrello's resignation from ACA | 45 | 15 |
| 2. | Electronic versions of email and responses with regard to Ms. Maistrello's resignation from ACA | 46 | 11 |

DIRECTIONS

| NUMBER | QUESTION | PAGE | LINE |
|---|---|---|---|
| 1. | Did you come here thinking you were going to work for Golden Spring or did you move here and then find Golden Spring as a place to work? | 11 | 11 |
| 2. | Any entities other than ACA? | 12 | 21 |
| 3. | What did Mr. Podhaskie tell you was going on with ACA? | 62 | 18 |
| 4. | What did Mr. Podhaskie tell you was going on with ACA? | 64 | 6 |
| 5. | Without getting into any legal advice, did Mr. Podhaskie tell you that he had spoken with William Je? | 65 | 8 |

Page 5

2 (Pages 2 to 5)

Karin Maistrello
August 23, 2019

Atkinson-Baker, Inc.
www.depo.com

August 23, 2019

DIRECTIONS
(Continued)

| NUMBER | QUESTION | PAGE | LINE |
|---|---|---|---|
| 6. | At the end of the conversation, did you tell Mr. Podhaskie that you were going to resign as an ACA director? | 65 | 15 |
| 7. | So my question to you is, did you initiate that conversation or did Mr. Podhaskie? | 67 | 7 |
| 8. | So in the conversation where Daniel said something was going on with ACA, did you come -- did you start that conversation with Podhaskie and come to ask him a question or did Podhaskie come to you? | 68 | 21 |
| 9. | Did he give you advice in this discussion? | 76 | 2 |
| 10. | And I'm not going to ask about legal advice right now. I'm just going to say, during the conversation, did Mr. Podhaskie advise you to do anything? Yes or no. | 78 | 2 |
| 11. | Did you take any actions as a result of your discussion with Mr. Podhaskie? | 78 | 16 |
| 12 | Was the topic of your discussion with Mr. Podhaskie the problems that were happening with ACA? | 98 | 5 |

Page 6

THE VIDEOGRAPHER:  My name is                    11:46
Michael Bennett.  I am your videographer
and I represent Atkinson-Baker, Inc. of
Glendale, California.  I am a Notary
Public in and for the State of New York.
I am not financially interested in this
action nor am I a relative or employee of
any attorney of any of the parties.
     The date is August 23rd, 2019.
The time is approximately 11:46 a.m.
This deposition is taking place at the
offices of Bryan Cave Leighton Paisner
LLP, located at 1290 Avenue of the
Americas, in New York, New York.  This is     11:47
Case No. 18-cv-2185, entitled Eastern
Profit Corporation Limited, plaintiff and
counterclaim defendant, versus Strategic
Vision US, LLC, defendant and
counterclaim plaintiff.  The deponent is
Karin Maistrello.  This deposition is
being taken on behalf of
defendant/counterclaim plaintiff
Strategic Vision US, LLC.  Your court
reporter is Kathleen Keilty with
Atkinson-Baker, Inc., and I would ask

Page 7

counsel to please identify themselves.         11:48
     MR. GREIM:  Eddie Greim taking the
deposition, from Graves Garrett LLC,
representing Plaintiff Strategic Vision.
     MS. TESKE:  Good morning.  Erin
Teske, on behalf of the deponent, from
Hodgson Russ.
     MR. GRENDI:  I'm Zach Grendi of
Zeichner Ellman & Krause for Plaintiff
Eastern Profit.
     THE VIDEOGRAPHER:  Thank you all
very much.
     Will the reporter please swear in
the witness.
WHEREUPON,                                      11:48
     KARIN MAISTRELLO,
having been first duly sworn/affirmed
by a Notary Public within and for the
State of New York (Kathleen T. Keilty),
is examined and testifies as follows:
     THE WITNESS:  I swear.
EXAMINATION
BY MR. GREIM:
     Q.    Good morning, Ms. Maistrello.
     A.    Good morning.

Page 8

     Q.    Have you been deposed before?         11:48
     A.    No.  First time.
     Q.    Okay.  I'll ask you a series of
questions about the case.  I would just ask that you
answer clearly.  You know that you can't nod your
head.  You'll want to speak clearly so it's in the
transcript.  Do you understand that?
     A.    Yes, I do.
     Q.    All right.  And if my question is
unclear for any reason or you don't understand it,
please just let me know and I'll rephrase it or we'll
work it out.  Okay?
     A.    Okay.
     Q.    Could you please state your current     11:49
residential address.
     A.    My address is 15-17 Gifford Avenue,
Jersey City, New Jersey 07304.
     Q.    What is your age?
     A.    Twenty-nine.
     Q.    And I understand you're an Italian
citizen?
     A.    I am.
     Q.    In the US on a visa of some kind?
     A.    Correct.
          MR. GREIM:  Object to the form and

Page 9

3 (Pages 6 to 9)

Karin Maistrello
August 23, 2019

Atkinson-Baker, Inc.
www.depo.com

to relevancy.                                            11:49
Q.    Tell us about, if you could -- I'm just
going to ask you some background questions. I take
it you've got some sort of educational training.
Could you just walk us through your, you know, post
high school training that you've had.
A.    I started at university. I studied in
Rome for three years, interpreting and translation.
        After that, I moved to China. I
attended Nankai University. I got my first Master's
Degree in Chinese literature and my second Master's
Degree in linguistics and applied linguistics.
Q.    Okay. What about after that? Anything
else?
A.    As far as studying?                        11:50
Q.    Yes.
A.    Nothing else.
Q.    Okay. What was your -- so it sounds
you like your last educational degree was from Nankai
University?
A.    That is correct.
Q.    Let's just say starting with from that
point forward, could you just tell us your employment
history.
A.    After moving to the States, I was

Page 10

employed by Golden Spring New York, and I've been     11:50
working there since then.
Q.    Okay. Now when was that that you moved
to the United States and started working for Golden
Spring?
A.    I started working for Golden Spring in
February 2018.
Q.    Is that also when you moved to the
United States?
A.    I moved slightly earlier.
Q.    Did you come here thinking you were
going to work for Golden Spring or did you move here
and then find Golden Spring as a place to work?
        MR. GREIM: Object and direct the
witness not to answer.                                11:51
        What's the relevance?
        MR. GREIM: I am just trying to
understand the witness's background.
These are typical questions.
        MS. TESKE: I've given you some
leeway, but none of this is relevant to
the case.
        MR. GREIM: Okay.
Q.    So what languages are you proficient
in?

Page 11

A.    Italian, German, French, English,         11:51
Hungarian, Chinese.
Q.    Okay. Now, let's see, you said that
you've been working for Golden Spring since
February 2018?
A.    That's correct.
Q.    During that time, have you had any
other jobs?
A.    No.
Q.    Have you been the director or officer
of any other entity?
A.    Can I ask you to rephrase?
Q.    Sure.
        Since February of 2018, let's say from    11:52
then to today, have you been a director or officer of
any other entity?
        MS. TESKE: Object to the form.
        You can answer.
A.    I was director of ACA from January 1st
to July 26th of 2019.
Q.    Any entities other than ACA?
        MS. TESKE: Object and direct the
witness not to answer.
        MR. GREIM: All right.
Q.    What were your duties as a director of

Page 12

ACA?                                                  11:53
A.    I was director and I did not have any
specific duty.
Q.    Oh, I forgot to ask you this before.
Have you done any work for hire on the side?
        I asked you about where you've been
employed. I asked you about being an officer or
director. I'm going to go back to the same period.
From February 2018 to today, have you done any other
work on side for hire for any other client.
        MS. TESKE: I am going to direct
the witness it's a yes or no question and
that's it.
A.    No.
Q.    How did you to become a director of      11:54
ACA?
A.    I was asked by William to join ACA and
I gladly accepted.
Q.    Okay. William who?
A.    William Je, spelled J-e.
Q.    Did you know Mr. Je previously?
A.    Yes.
Q.    How did you know him?
A.    I was introduced by William -- to
William by Mrs. Wang as a person of trust, and I met

Page 13

4 (Pages 10 to 13)

Karin Maistrello
August 23, 2019

| | |
|---|---|
| 1    him several times.                                11:54 | 1         (Whereupon, the record is read.)                11:57 |
| 2         Q.    You met him several times before he | 2         MS. TESKE:  Yeah, you can call the |
| 3    offered the directorship to you? | 3    judge. |
| 4         A.    That's correct. | 4         MR. GREIM:  All right.  Let's go |
| 5         Q.    Now, when you said Mrs. Wang or | 5    off the record for a second: |
| 6    Ms. Wang, are you referring to Yvette Wang? | 6         THE VIDEOGRAPHER:  We are off the |
| 7         A.    Yes, I'm referring to her. | 7    record, 11:56 a.m. |
| 8         Q.    The person sitting at this table? | 8         (Whereupon, there is a discussion off |
| 9         A.    Yes. | 9    the record.) |
| 10        Q.    Okay.  When did Ms. Wang introduce you | 10        Whereupon, the following teleconference |
| 11   to Mr. Je? | 11   is held with the Hon. Debra Freeman:) |
| 12        A.    I don't remember. | 12        MR. GREIM:  So, your Honor, this |
| 13        Q.    Let me ask you this way.  If you became | 13   is the issue.  We have just really begun. |
| 14   a director on January 1, 2019, how long before that | 14   I am laying the foundation of |
| 15   had you been introduced to Mr. Je by Ms. Wang?  11:55 | 15   Ms. Maistrello coming on to ACA as a       12:02 |
| 16        A.    I would say several months. | 16   director.  I've asked her if somebody |
| 17        Q.    Maybe here's another way to look at it. | 17   invited her on.  It was William Je.  I've |
| 18   You came to the US or I guess you started with Golden | 18   asked her who introduced her to William |
| 19   Spring in February of 2018.  How long after that time | 19   Je, it was Ms. Yvette Wang, and my |
| 20   did Ms. Wang introduced you to Mr. Je? | 20   question was, you know, who introduced |
| 21        MS. TESKE:  I object.  Asked and | 21   you to Evette Wang or I think it was how |
| 22   answered. | 22   did you meet Evette Wang and we got an |
| 23        If you have a different answer go | 23   instruction not to answer that question. |
| 24   ahead and provide it. | 24   And, your Honor, I'm just trying to lay |
| 25        A.    I really don't remember. | 25   the ground work. |
| Page 14 | Page 16 |
| 1         Q.    How is it that you came to meet          11:55 | 1         Remember, Yvette Wang is the           12:02 |
| 2    Mrs. Wang? | 2    Golden Spring person who is a -- the |
| 3         MS. TESKE:  Object and direct the | 3    attorney in fact for Eastern Profit, and |
| 4    witness not to answer. | 4    so I want to know how is it that |
| 5         MR. GREIM:  On what basis? | 5    Eastern -- an Eastern Profit person has |
| 6         MS. TESKE:  Judge Freeman was very | 6    introduced a director of ACA to ACA. |
| 7    specific about the lines of inquiry that | 7         MS. TESKE:  Your Honor, this is |
| 8    you were entitled to pursue in this | 8    Erin Teske.  Good afternoon.  I apologize |
| 9    deposition, and this is way outside the | 9    for the call.  We spoke for about -- I |
| 10   bounds and I've given you lots of room. | 10   think for about 90 minutes of our |
| 11        MR. GREIM:  Okay.  I'm afraid -- I | 11   conversation yesterday was about Karin |
| 12   hate to do this too early, but these are | 12   Maistrello and the deposition and the |
| 13   just foundational questions to a witness | 13   scope of the documents and testimony |
| 14   being able to explain things about ACA, | 14   requests that were in the subpoena to |
| 15   about ACA's relationship to Eastern       11:56 | 15   Ms. Maistrello, and at the end of that     12:03 |
| 16   Profit.  We know that Ms. Wang is serving | 16   conversation you gave -- your Honor gave |
| 17   as attorney in fact for Eastern Profit. | 17   very explicit instructions that the two |
| 18   If we can't ask this, I don't know -- I | 18   lines of inquiry that were permitted -- |
| 19   don't know really we can ask any | 19   to be permitted at this deposition were |
| 20   questions.  So I'm afraid we're going to | 20   the loan from ACA to Eastern Profit and |
| 21   have to dial up on this question. | 21   the relationship between ACA and Eastern |
| 22        MS. TESKE:  Can you repeat the | 22   Profit.  And I've allowed Mr. Greim to |
| 23   question? | 23   ask a bunch of background questions about |
| 24        MR. GREIM:  I'll just ask the | 24   Ms. Maistrello, including, you know, from |
| 25   reporter to read back the question. | 25   whom she accepted her position at ACA and |
| Page 15 | Page 17 |

Karin Maistrello
August 23, 2019

1  how she met him.  But her personal                    12:03
2  relationship to Ms. Wang is completely
3  irrelevant to anything having to do with
4  this case, and Mr. Greim is on a fishing
5  expedition to learn whatever he can about
6  the associates of Mr. Guo and it is very
7  apparent.
8          MR. GREIM:  Your Honor, I mean,
9  I -- first of all, I don't think there is
10 a -- I see Ms. Wang is in here -- I don't
11 think there is a personal relationship,
12 but I'm trying to -- I mean, I'll have
13 other questions about, you know, who she
14 spoke with while she was at ACA.  I'll
15 want to lay the foundation for her         12:04
16 knowledge of what's going on with ACA,
17 that's not one of the topics, but I have
18 to do that to get to the two and then the
19 third disputed topic that I wrote the
20 letter on yesterday.  So I'm sorry --
21         MS. TESKE:  And that's fine.  I
22 don't object to questions that have to
23 with what Ms. Maistrello did in her role
24 at ACA.  But her relationship to Ms. Wang
25 has nothing to do with that.

Page 18

1          MR. GREIM:  Your Honor, Ms. Wang       12:04
2  is the one who introduced her to ACA.
3          MS. TESKE:  That is so far removed
4  from what is relevant to what she did for
5  ACA and the loan between ACA and Eastern
6  Profit and the relationship between ACA
7  and Eastern Profit.
8          THE COURT:  I'm sorry, the reason
9  it matters who introduced her to ACA is
10 what?
11         MR. GREIM:  Because, your Honor,
12 the person -- we just learned the person
13 who introduced her to ACA is Yvette Wang.
14 She is the person who is alleged to have
15 been acting for Eastern Profit for most    12:05
16 of this case.  So the relationship to ACA
17 and Eastern Profit is directly implicated
18 here.  I mean --
19         THE COURT:  Then why don't you
20 start asking about the relationship
21 between ACA and Eastern Profit?
22         MR. GREIM:  But, your Honor, this
23 is the first question I would ask.  I
24 mean, remember, Eastern Profit only --
25         THE COURT:  Aren't there more

Page 19

1  direct questions about the relationship            12:05
2  with Eastern Profit besides, you know,
3  whether you know Ms. Wang from some other
4  aspect of life?
5          MR. GREIM:  Well, but, your Honor,
6  I don't think it is from some other
7  aspect of life.  I haven't even been able
8  to -- I don't think they are friends from
9  the gym.  I mean, I think that -- I mean,
10 first of all, Mrs. Wang is the CEO of
11 Golden Spring when Ms. Maistrello was
12 working.  She is also the person who
13 acted for Eastern Profit, and if we can't
14 establish that Eastern Profit is making
15 recommendations for the directors of ACA,   12:06
16 which is I think what we're about to
17 get --
18         THE COURT:  What was the exact
19 question that was asked that was objected
20 to?
21         MR. GREIM:  Here, I think we
22 better stop for a second.  We'll give the
23 reporter a pause and I'll see if I can
24 read it to you.
25         THE COURT:  Maybe the reporter can

Page 20

1  read it back.                                       12:06
2          MR. GREIM:  Yeah, can you do that.
3          (Whereupon, the record is read.)
4          THE COURT:  All right.
5          MS. TESKE:  Again, I have no --
6          THE COURT:  Look.  Look, I have
7  another call coming in.  I'm going to say
8  this.  An instruction not to answer is
9  inappropriate unless it is either to
10 protect a privilege or to enforce an
11 order of the court.  I did issue a ruling
12 that there were appropriate subjects into
13 which I would allow inquiry.  My ruling
14 was not meant to be -- oh, hold on one      12:07
15 moment 'cause I need to tell the other
16 people what to do.
17         My ruling was not meant to be so
18 limiting that questions that I'll call
19 background function questions or general
20 connection questions can't be asked.  If
21 this is the person through whom the ties
22 between ACA and Eastern Profit are, then
23 an understanding of what that
24 relationship is between people
25 (construction noise) the relationship

Page 21

6 (Pages 18 to 21)

Karin Maistrello
August 23, 2019

Atkinson-Baker, Inc.
www.depo.com

1    between (construction noise) can be    12:07
2    fleshed out.  I'll allow -- I'm going to
3    allow that question to be answered, but
4    I'm also going to caution Mr. Greim that
5    if this is -- this is not intended, as I
6    said the other day on the phone, to be,
7    you know, whatever the situation or
8    whatever questions come into my head that
9    I think would be a good thing to know
10    gets answered because not every question
11    that comes into your head where you might
12    to know that because you think it's
13    curious and interesting and going to
14    be tied to.  Just keep it focused on the
15    relationship between these entities and    12:08
16    about this loan in question, as I
17    directed the other day.
18       I'm going to be pretty tied up
19    this afternoon with a settlement
20    conference, so it's going to be difficult
21    for me to field calls from you constantly
22    as you go.  Both of you use some, you
23    know, reasonable judgment in formulating
24    questions and objecting to questions in
25    terms of (construction noise) the other

Page 22

1    day because if it's not relevant, that's    12:09
2    generally something you can raise later
3    on.  You don't have to -- object at the
4    time, object to the form of the question,
5    instruct if it's privileged or if you are
6    really clear in your own mind that it
7    goes outside of my ruling.
8       I also -- so I'm going to allow
9    the question and I'm going to do it with
10    a caution to try to keep things focused
11    on (inaudible).
12       With respect to the letter that I
13    got which I'm sure is still an open
14    question, still subject to dispute, I saw
15    that there was no statement (construction    12:09
16    noise) are unable to move money in and
17    out of Hong Kong because that
18    (construction noise).  I saw no clear
19    indication that despite a lack of
20    statement by him that would be the case
21    if he were in fact in default, and what I
22    did see was a little bit of the
23    attenuated side, where you say well, this
24    company would have been under close
25    scrutiny, why I'm not sure because it was

Page 23

1    not clearly explained, and if he had    12:10
2    moved money to this company, somebody
3    would have noticed and if somebody would
4    have noticed, then he probably wouldn't
5    have been doing that, and it's a very
6    fudgy thing.
7       The only thing that I saw in there
8    that I thought was an interesting point
9    was that there had been an agreement
10    between the parties not to use Hong Kong
11    banks or Chinese banks based in Hong Kong
12    or something, I'm trying to remember -- I
13    also don't have the letter in front of
14    me -- as part of the contract because    12:11
15    presumably some concerns about that, but    12:11
16    I'm not sure exactly what that translates
17    to, you know, what -- you know, why that
18    would mean that if ACA was helping
19    Mr. Guo move money in and around Hong
20    Kong banks or Chinese controlled banks,
21    why one thing would lead you to think
22    something of the other.  It's still
23    pretty strained to me, but --
24       MS. TESKE:  We will respond to
25    that, and in fact Strategic accepted that

Page 24

1    money from Hong Kong before the contract    12:11
2    was even signed.
3       MR. GREIM:  Well --
4       MS. TESKE:  But this is actually
5    irrelevant.  We will respond and that
6    will be in our letter, but this is
7    actually, I don't think, necessarily
8    relevant for today, 'cause despite that I
9    was going to go ahead -- and this will be
10    more of an issue with respect to the
11    testimony elicited, if any, from Mr. Guo,
12    but I was going to go ahead and let
13    Ms. Maistrello answer some questions
14    about anything she knew about Mr. Guo's
15    funds in ACA.    12:12
16       THE COURT:  Okay.  All right.
17    Maybe you will not need me further.
18       MR. GREIM:  I hope not.  Your
19    Honor, I've got to flight to catch, so I
20    don't want to fool around here.
21       THE COURT:  So stay focused.  Stay
22    focused and try to be -- try to stay
23    focused on Eastern Profit, you know, the
24    payment to Strategic, you know, things
25    that are directly, you know, at issue in

Page 25

7 (Pages 22 to 25)

Karin Maistrello
August 23, 2019

Atkinson-Baker, Inc.
www.depo.com

1    the defense that you're trying to raise          12:12
2    here.
3         MR. GREIM:  And, your Honor, just
4    to be clear, we're going to ask about her
5    resignation as well, the thing that makes
6    ACA not reachable.
7         MS. TESKE:  And I have no
8    objection to this.
9         MR. GREIM:  Okay.
10        THE COURT:  All right, good.
11        MR. GREIM:  All right.
12        THE COURT:  Carry on, then.
13        MR. GREIM:  Thank you.
14        MS. TESKE:  Thank you.
15        MR. GRENDI:  Thank you, your      12:13
16   Honor.
17        THE COURT:  You're welcome.
18        (Whereupon, the teleconference
19   with the Hon. Debra Freeman concludes.)
20        THE VIDEOGRAPHER:  We are back on
21   the record at 12:13 p.m.
22        (Whereupon, the record is read as
23   follows:
24        "Question:  How is it that you came to
25   meet Mrs. Wang?")

                                    Page 26

1         A.   I met her for the first time at a job      12:14
2    interview and that's how we met.
3         Q.   Now, you said you met William Je
4    several times before becoming a director.
5         A.   That's correct.
6         Q.   Did you understand when you were
7    meeting him what his role was with ACA?
8         A.   We never spoke about ACA before.
9         Q.   But I presume that you did speak about
10   ACA when he offered you a directorship; is that
11   right?
12        A.   Briefly.
13        Q.   And was that discussion in person or
14   over the phone?
15        A.   In person.                      12:15
16        Q.   Where did that happen?
17        A.   That happened at our office.
18        Q.   I'm sorry.  Who's office?
19        A.   Golden Spring New York's office.
20        Q.   Your testimony again is that it was
21   several months -- well, actually let me ask you.
22             When -- how long before January 1st,
23   2019 did that discussion happen?
24        MR. GRENDI:  Object to the form.
25        A.   Probably a month before.

                                    Page 27

1         Q.   Tell me what you remember Mr. Je saying      12:16
2    to you about the offer.
3         A.   We didn't speak much.  He just told me
4    that he was interested in some business in the US,
5    and he asked whether I wanted to join.
6         Q.   What did he say the business was?
7         A.   Fund investment.
8         Q.   Now did you have a background in fund
9    investment?
10        A.   I do not.
11        Q.   Did you have any questions for Mr. Je
12   about what this role would entail?
13        A.   No.
14        Q.   Why not?
15        A.   I trusted his judgment.          12:16
16        Q.   Why did you trust his judgment?
17        MS. TESKE:  Object to the form.
18             You can answer.  You can answer.
19        A.   I trust him, therefore, I trust his
20   judgment.
21        Q.   Okay.  I guess let me rephrase it.
22             What is it about him that made you
23   trust his judgement.
24        MS. TESKE:  Object to the form.
25             You can answer.

                                    Page 28

1         A.   He was introduced to me by someone I      12:17
2    trust and that's how it works for me, the person who
3    introduced us trusted him and I got to trust him.
4         Q.   So did you tell him yes on the spot?
5         A.   I did.
6         Q.   Did you ask him what your duties would
7    be?
8         A.   Briefly.
9         Q.   What did he say?
10        A.   Again, he was interested in some
11   business in the US and was asking if I could help
12   find some investors.
13        Q.   Okay.
14        A.   Some --
15        Q.   Go ahead.                       12:17
16        A.   I'm sorry.  Some projects to invest in.
17        Q.   So if I understand correctly, he told
18   you that your duties would be finding projects for
19   ACA to invest in?
20        MS. TESKE:  Object to the form.
21             You can answer.
22        A.   Yes.
23        Q.   Did he say -- did he tell you what
24   sorts of projects ACA invested in?
25        A.   No, he did not.

                                    Page 29

                                    8 (Pages 26 to 29)

Karin Maistrello
August 23, 2019

Atkinson-Baker, Inc.
www.depo.com

| | |
|---|---|
| 1    Q.    So, like, for example, construction    12:18 | 1    Q.    Did he refer you to any attorney to    12:20 |

1    Q.    So, like, for example, construction    12:18
2    projects, renovation projects, did he give you any
3    kind of detail what he meant by projects?
4        A.    Again, no, he did not.
5        Q.    Is ACA a hedge fund?
6        A.    I do not know.
7        Q.    Did Mr. Je tell you who you would be
8    reporting to, if anyone, as a director?
9        A.    No, he didn't.
10       Q.    Did he tell you who else was involved
11   with the company?
12       A.    No, he did not.
13       Q.    Did he tell you if there were any other
14   directors?
15       A.    No, he did not.    12:19
16       Q.    Did he tell you whether he was a
17   director?
18       A.    No, he did not.
19       Q.    Did you have any concerns about working
20   for ACA?
21       A.    No.
22           MS. TESKE:  Object to the form.
23           You can answer.
24       A.    No.
25       Q.    When was the first time you heard of

Page 30

1    Q.    Did he refer you to any attorney to    12:20
2    advise you on that question?
3        A.    No.
4        Q.    Okay.  Let's talk about your time with
5    ACA.  First of all, as director, did you have an
6    office somewhere?
7        A.    No, I did not.
8        Q.    Did ACA have an office in the United
9    States anywhere?
10       A.    I do not know.
11       Q.    Between the time of your appointment
12   and the time that you are saying that you resigned,
13   did you do any work as a director of ACA?
14       A.    No, I didn't.
15       Q.    Did you find any projects for Mr. Je?    12:21
16       A.    No, I didn't.
17       Q.    Did you try to find projects for
18   Mr. Je?
19       A.    No, I didn't.
20       Q.    Did Mr. Je ever ask you why you were
21   not finding projects?
22       A.    No.
23       Q.    Did you ever talk to Mr. Je about your
24   role with ACA after that conversation?
25           MR. GRENDI:  Object to the form.

Page 32

1    ACA?    12:19
2        A.    When he asked me to become director.
3        Q.    Did you do any research to learn more
4    about what ACA was?
5        A.    I did not.
6        Q.    At any time after your discussion with
7    Mr. Je, did you do any research to determine what ACA
8    was?
9        A.    No, I did not.
10       Q.    Did you understand what jurisdiction
11   ACA was registered in?
12           MS. TESKE:  Object to the form of
13       the question.
14           You can answer.
15       A.    I don't answer it -- I'm sorry.  I    12:20
16   didn't understand the question.
17       Q.    Did Mr. Je tell you where ACA was
18   registered?
19       A.    No.
20       Q.    Did he tell you what country or state
21   had jurisdiction over ACA and its directors?
22           MS. TESKE:  Object to the form --
23           MR. GRENDI:  Object to the form.
24           MS. TESKE:  -- of the question.
25       A.    No.

Page 31

1           MS. TESKE:  Object to the form.    12:22
2           You can answer.
3        A.    No.
4        Q.    Let's be clear.  There was an
5    objection.  I'm going to make sure that this is clear
6    for the record.
7           So is it your testimony that after the
8    in-person meeting where Mr. Je offered the
9    directorship to you, you never spoke with Mr. Je
10   again about your work as an ACA director?
11       A.    That's correct.
12       Q.    Okay.  I'm going to broaden the
13   question now.
14           After the discussion with Mr. Je where
15   he made the offer to you, did you ever discuss your    12:22
16   work as an ACA director with any other person?
17       A.    No, I didn't.
18       Q.    Did you ever discuss it with Yvette
19   Wang?
20       A.    I did not.
21       Q.    Were you ever paid for your work as a
22   director?
23       A.    No.
24       Q.    Did you sign any document appointing
25   you as a director?

Page 33

9 (Pages 30 to 33)

Karin Maistrello
August 23, 2019

**Page 34**

```
 1          A.   No.                              12:23
 2          Q.   Well, do you know that you actually
 3   were appointed as a director?
 4          MS. TESKE:  Object to the form of
 5   the question.
 6          You can answer.
 7          A.   Yes.
 8          Q.   How you do know?
 9          A.   I might have answered wrongly the
10   previous question.  Can you rephrase the previous
11   question, please, or reread it?
12          Q.   That's okay.  I'll rephrase it.
13          Did you ever -- I'll just ask you a new
14   question, how about that?
15          Did you ever sign anything accepting an  12:24
16   appointment as a director?
17          A.   Yes, I did.
18          Q.   When did you do that?
19          A.   I don't remember.
20          Q.   Did you keep a copy of that document?
21          A.   I did not.
22          Q.   Do you know whether the thing that you
23   signed was filed with any authority?
24          MS. TESKE:  Object to the form of
25   the question.
```

**Page 35**

```
 1          You can answer if you understand.      12:24
 2          A.   I don't.
 3          Q.   Let me ask you, then, what's your basis
 4   for believing that you were actually appointed as a
 5   director of ACA?
 6          A.   I don't really understand the question.
 7          Q.   So you're testifying today, you've
 8   testified already that you were appointed on
 9   January 1, 2019, as a director of ACA, correct?
10          A.   That's correct.
11          Q.   So why do you believe that you were
12   actually appointed on January 1 or on any other day
13   as a director of ACA?
14          MS. TESKE:  Object to the form.
15          You can answer.                        12:25
16          A.   Because I signed something.
17          Q.   Why do you believe the date was
18   January 1 of 2019?
19          A.   Because I remember it.
20          Q.   You remember signing a document on
21   January 1, 2019?
22          A.   Not signing the document on January 1
23   but being appointed on January 1.
24          Q.   Okay.  When did you sign the document?
25          A.   I don't remember.
```

**Page 36**

```
 1          Q.   Now, when you say you remember being   12:25
 2   appointed on January 1, why do you remember that it
 3   was on that day --
 4          MS. TESKE:  Objection.
 5          Q.   That you were appointed?
 6          MS. TESKE:  Object to the form of
 7   the question.
 8          You can answer the question.
 9          A.   I remember the date, that's all.
10          Q.   Well, did something happen on
11   January 1, 2019 that sticks in your memory?
12          A.   It's --
13          MS. TESKE:  Object to the form of
14   the question.
15          You can answer the question.             12:26
16          A.   It's the first day of the year, so
17   that's why I remember it, probably.
18          Q.   Did someone tell you that that was
19   going to be the effective date of your appointment?
20          A.   I don't remember.
21          Q.   Did the form that you signed say that
22   was the effective date of your appointment?
23          A.   Yes.
24          Q.   When's the last time that you saw that
25   form that you signed?
```

**Page 37**

```
 1          A.   I don't remember.                   12:26
 2          Q.   Did you review it before your testimony
 3   today?
 4          A.   No, I did not.
 5          Q.   Okay.  Other than William Je, did you
 6   ever speak with anyone else at ACA?
 7          A.   No, I didn't.
 8          Q.   Were you aware that ACA had a corporate
 9   secretary?
10          MS. TESKE:  Object to the form.
11          You can answer.
12          A.   No.
13          Q.   Did you ever receive a request in
14   writing from anyone to do something as a director of
15   ACA?                                            12:27
16          A.   No.
17          Q.   Did you ever receive a request verbally
18   from anyone to do something as a director of ACA?
19          A.   No.
20          Q.   Have you ever notarized documents in
21   your capacity as a director of ACA?
22          MS. TESKE:  Object to the form.
23          MR. GRENDI:  Object to the form.
24          MS. TESKE:  You can answer.
25          A.   I don't remember.
```

Karin Maistrello
August 23, 2019

Atkinson-Baker, Inc.
www.depo.com

| | |
|---|---|
| 1    Q.    Is it possible that you did?                    12:28 | 1              MS. TESKE:  Object to the form.         12:30 |
| 2         MS. TESKE:  Object to the form. | 2         You can answer. |
| 3         You can answer. | 3    A.    I don't remember. |
| 4    A.    I really don't remember. | 4    Q.    Was it in the last month? |
| 5    Q.    And I ask that because I understand you | 5    A.    I really don't remember. |
| 6  are a notary, correct? | 6    Q.    Well, we know you spoke with him about |
| 7    A.    That's correct. | 7  a month before January 1, 2019, correct? |
| 8    Q.    I've seen documents that -- well, we've | 8    A.    Yes. |
| 9  all seen documents that you've notarized, right? | 9    Q.    Did you ever speak with him after that |
| 10   A.    That's correct. | 10 time? |
| 11   Q.    And so, my question is, did you do any | 11   A.    When you say speak, you mean over the |
| 12 of that notarization as one of your duties as a | 12 phone or face-to-face? |
| 13 director of ACA? | 13   Q.    Let's start with over the phone.  Have |
| 14   A.    Again, I don't remember. | 14 you spoken with William Je over the phone since the |
| 15   Q.    Did you ever review any sort of a      12:28 | 15 meeting in which he gave you an offer?              12:31 |
| 16 booklet or a guide about what your duties and | 16   A.    No, I have not. |
| 17 responsibilities would be as a director of ACA? | 17   Q.    Did you speak with him in person since |
| 18   A.    No, I did not. | 18 the meeting where he gave you the offer? |
| 19   Q.    Did you ever acquaint yourself with the | 19   A.    I did. |
| 20 Hong Kong law that controls your duties and | 20   Q.    When was that? |
| 21 responsibilities as a director of ACA? | 21   A.    I don't remember. |
| 22        MS. TESKE:  Object to the form. | 22   Q.    Was it after you had become a director? |
| 23        MR. GRENDI:  Object to the form. | 23   A.    Yes. |
| 24        MS. TESKE:  You can answer. | 24   Q.    How long after you became a director? |
| 25   A.    I did not. | 25   A.    I don't remember. |
| Page 38 | Page 40 |

| | |
|---|---|
| 1    Q.    Did you know that Hong Kong law applied   12:29 | 1    Q.    I'm going to try to narrow this down a   12:31 |
| 2  to your duties and responsibilities as a director of | 2  little bit.  This is normal in a deposition, people |
| 3  ACA? | 3  don't remember time, and we'll try a little bit to |
| 4         MS. TESKE:  Object to the form. | 4  jog your memory, but we'll do our best. |
| 5         MR. GRENDI:  Object to the form. | 5         So was the last time or let me ask you |
| 6         MS. TESKE:  You can answer it. | 6  this.  Was the next time you spoke with William Je |
| 7    A.    I did not. | 7  when it was cold weather outside?  Do you remember |
| 8    Q.    Have you ever seen any corporate | 8  being cold? |
| 9  records of ACA other than the document you remember | 9         MS. TESKE:  Object to the form. |
| 10 signing appointing you as director? | 10   A.    I don't remember. |
| 11   A.    I have not. | 11        MS. TESKE:  Sorry.  You can |
| 12   Q.    Have you ever seen a financial | 12 answer. |
| 13 statement of ACA? | 13   Q.    Where was the meeting?  You said you |
| 14   A.    I have not. | 14 spoke with him in person.  Where did you speak with |
| 15   Q.    Do you know whether you have a right to   12:30 | 15 him in person?                                      12:32 |
| 16 vote or that you had a right to vote as a director of | 16   A.    It might have been at our office. |
| 17 ACA? | 17   Q.    And this is at the Golden Spring |
| 18        MS. TESKE:  Object to the form. | 18 office? |
| 19        MR. GRENDI:  Object to the form. | 19   A.    Correct. |
| 20   A.    I don't know. | 20   Q.    Okay.  You said it might have been.  If |
| 21   Q.    Did you ever cast a vote as a director | 21 it wasn't there, where would it have been? |
| 22 of ACA? | 22        MS. TESKE:  Object to the form of |
| 23   A.    I did not. | 23 the question. |
| 24   Q.    When was the last time you spoke with | 24   A.    It was -- it was there, yes. |
| 25 William Je? | 25   Q.    So what do you remember about that |
| Page 39 | Page 41 |

11 (Pages 38 to 41)

Karin Maistrello
August 23, 2019

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|

```
                                    12:32
 1   discussion with Mr. Je?
 2       A.    We didn't have any discussion.  I met
 3   him.  We said hi, we'd greet, how are you, that was
 4   it.
 5       Q.    So there was no discussion about ACA.
 6       A.    Not at all.
 7       Q.    Okay.  Let's go forward from there.
 8   When was the next time that you met Mr. Je in person?
 9       A.    Again, I -- I don't remember.
10       Q.    Was there a next time?
11       A.    I probably met him a couple of times in
12   2019, but I do not remember when.
13       Q.    Okay.  When you met him, any of the
14   times that you met him, did you discuss Eastern
15   Profit?                               12:33
16       A.    No.
17       Q.    Did you discuss this case?
18       A.    No.
19       Q.    Did you discuss Strategic Vision?
20       A.    No.
21       Q.    What did you discuss with him, if you
22   can remember?
23       MS. TESKE:  Object to the form.
24       You can answer.
25       A.    We -- again, we did not discuss

                                        Page 42
```

```
                                    12:35
 1       Q.    Can I please see it?
 2       A.    Absolutely.
 3       MS. TESKE:  Can we take a short
 4   break, go off the record.
 5       MR. GREIM:  Sure.
 6       THE VIDEOGRAPHER:  We are off the
 7   record, 12:34 p.m.
 8       (Whereupon, a recess is taken.)
 9       (Whereupon, Maistrello Exhibit 1,
10   resignation email, is marked for
11   identification, as of this date.)
12       (Whereupon, Maistrello Exhibit 2, PDF
13   attachment to Maistrello Exhibit 1, is marked
14   for identification, as of this date.)
15       THE VIDEOGRAPHER:  We are back on    12:38
16   the record, 12:37 p.m.
17   BY MR. GREIM:
18       Q.    Okay.  Ms. Maistrello, what I've marked
19   here are the documents you gave me, Plaintiff
20   Exhibit 1 and Plaintiff Exhibit  -- I'm sorry,
21   Maistrello Exhibit 1 and Maistrello Exhibit 2.
22       Is Exhibit 1 the email by which you
23   testify you forwarded your resignation to William Je?
24       A.    Yes, it is.
25       Q.    And is Exhibit 2 the PDF attachment to

                                        Page 44
```

```
                                    12:33
 1   anything.  We just greeted each other, how are you,
 2   and that was it.
 3       Q.    Okay.  So far we've been talking about
 4   in-person discussions.  Before we move on, can you
 5   remember any other in-person discussions that you had
 6   with William Je in 2019?
 7       MS. TESKE:  Object to the form.
 8       A.    No.
 9       MS. TESKE:  You can answer.
10       Q.    Okay.  Now we'll move to emails or
11   other written communications or texts, okay?
12       A.    Mm-hmm.
13       Q.    Have you had any emails or texts or
14   other written communications with William Je in 2019?
15       A.    Yes.                          12:34
16       Q.    When?
17       A.    One email on July 26th when I sent my
18   resignation letter.
19       Q.    Did he respond to that email?
20       A.    Yes, he did.
21       Q.    What was his response?
22       A.    He accepted the document.
23       Q.    Did you bring a copy of that with you
24   here today?
25       A.    Yes.

                                        Page 43
```

```
                                    12:39
 1   Exhibit 1.
 2       A.    It is.
 3       Q.    Do you have a copy of them in front of
 4   you still --
 5       A.    Yes.
 6       Q.    -- or you gave me your only copy?
 7       A.    I do.
 8       Q.    Oh, you do.
 9       Now, is it your testimony that Mr. Je
10   responded and said that he accepted it?
11       A.    Yes.
12       Q.    Okay.  Did you bring that email with
13   you?
14       A.    I did not.
15       Q.    Okay.  When did he -- I'd ask you to    12:39
16   produce that afterwards.
17       A.    Mm-hmm.
18       Q.    When did he send that to you?
19       A.    I believe right afterwards.
20       Q.    Did you understand that he was
21   expecting your email?
22       A.    Yes.
23       Q.    How did you understand that he was
24   expecting your email?
25       A.    Before this email, I wrote an email

                                        Page 45
```

12 (Pages 42 to 45)

Karin Maistrello
August 23, 2019

Atkinson-Baker, Inc.
www.depo.com

| | |
|---|---|
| 1 saying that I would like to resign, so he was 12:39 | 1 highlighted in plaintiff Exhibit 1. Do you see that? 12:42 |
| 2 definitely expecting it. | 2    A.    I do. |
| 3    Q.    When did you write that email? | 3    Q.    Why is that? |
| 4    A.    On the same day, so July 26th. | 4    A.    'Cause when I did the search in my |
| 5    Q.    Okay.  At what time? | 5 email everything that comes with that "William" gets |
| 6    A.    I don't remember. | 6 highlighted. |
| 7    Q.    Do you have a copy of that email still? | 7    Q.    When you did that search, how many |
| 8    A.    I do. | 8 emails with William Je did you find in your inbox? |
| 9    Q.    I would like to ask that you produce | 9       MS. TESKE:  Object to the form. |
| 10 that. | 10    A.    I don't know. |
| 11       And I'll say it on the record now, | 11    Q.    One or two or more than that? |
| 12 we'll talk about it because this is really something | 12       MS. TESKE:  Object to the form. |
| 13 for me and your counsel, but I would like, if I | 13    A.    I really don't know. |
| 14 could, to have the electronic version of the emails | 14    Q.    Were they all listed together there |
| 15 and responses. 12:40 | 15 when you ran your search? 12:42 |
| 16       MS. TESKE:  Follow up with me, if | 16       MS. TESKE:  Object to the form. |
| 17 you could.  I'm taking notes, but just in | 17    A.    By typing William, all the emails with |
| 18 case, just follow up with me in an email | 18 "William" come up but not necessarily this William. |
| 19 after. | 19    Q.    Who drafted the resignation letter? |
| 20       MR. GREIM:  Very good. | 20    A.    William did. |
| 21    Q.    So when you told Mr. Je, you would like | 21    Q.    Did he send this to you by email? |
| 22 to resign in the prior email that we don't have with | 22    A.    He did. |
| 23 us here today, what was his response? | 23    Q.    Is that your signature?  And I'm |
| 24       MS. TESKE:  Object to the form. | 24 directing you now to Exhibit 2.  Is that your |
| 25       But you can answer. | 25 signature on the line? |
| Page 46 | Page 48 |

| | |
|---|---|
| 1    A.    Okay. 12:41 | 1    A.    Yes, it is. 12:43 |
| 2    Q.    Is that literally what the email said? | 2    Q.    Did you review this document before you |
| 3    A.    I don't remember literally, but that | 3 signed it? |
| 4 was definitely the meaning. | 4    A.    Yes, I did. |
| 5    Q.    Did he tell you that a new director | 5    Q.    Did you make any changes to it? |
| 6 would need to be appointed to fill your place? | 6    A.    I did not. |
| 7    A.    No. | 7    Q.    Do you know whether Mr. Je took any |
| 8       MS. TESKE:  Object to the form. | 8 steps, any further steps to make your resignation |
| 9    Q.    Do you know whether a new director | 9 effective? |
| 10 needs to be appointed to take your place? | 10       MS. TESKE:  Object to the form. |
| 11    A.    No, I don't. | 11       You can answer. |
| 12    Q.    Are you aware of any other directors or | 12    A.    I don't know. |
| 13 officers of ACA who are in the United States? | 13    Q.    Do you know whether he filed this with |
| 14    A.    No, I'm not. | 14 the requisite authorities in Hong Kong? |
| 15    Q.    How often does Mr. Je come to the 12:41 | 15       MS. TESKE:  Object to the form. 12:44 |
| 16 United States? | 16       You can answer. |
| 17       MS. TESKE:  Object to the form. | 17    A.    I don't know. |
| 18       Answer if you know. | 18    Q.    Did -- have you asked Mr. Je if he has |
| 19    A.    I don't know. | 19 taken any steps with your resignation letter? |
| 20    Q.    Your testimony is that you've met him | 20    A.    I have not. |
| 21 in person several times, though, in 2019? | 21    Q.    Do you know whether under either Hong |
| 22    A.    Yes. | 22 Kong law or the bylaws and formation documents of the |
| 23       MS. TESKE:  Object to the form, | 23 company you have effectively resigned -- |
| 24 but go ahead. | 24       MS. TESKE:  Object. |
| 25    Q.    I notice that the name William is | 25    Q.    -- from ACA? |
| Page 47 | Page 49 |

13 (Pages 46 to 49)

Karin Maistrello
August 23, 2019

Atkinson-Baker, Inc.
www.depo.com

| | |
|---|---|
| 1  MS. TESKE:  Object to the form.  12:45 | 1  Yvette Wang?  12:47 |
| 2  A.  I don't know. | 2  A.  I did not. |
| 3  Q.  Has anyone advised you that you have | 3  Q.  Did you discuss any subpoena with |
| 4  actually and effectively resigned as a director of | 4  Yvette Wang? |
| 5  ACA? | 5  A.  I did not. |
| 6  MS. TESKE:  Object to the form. | 6  Q.  How often do you see Yvette Wang? |
| 7  And you can answer yes or no, but | 7  MS. TESKE:  Object to the form of |
| 8  if that -- answer yes or no. | 8  the question.  Object on relevancy |
| 9  A.  No. | 9  grounds. |
| 10  Q.  So do you know whether you are still a | 10  You can answer. |
| 11  director of ACA? | 11  A.  Every day. |
| 12  MS. TESKE:  Object to the form. | 12  Q.  How often do you email with Yvette |
| 13  You can answer. | 13  Wang? |
| 14  A.  Yes. | 14  MS. TESKE:  Object to the form. |
| 15  Q.  Okay, I see.  And your belief is that  12:45 | 15  Object as beyond the scope of Judge  12:48 |
| 16  you are no longer a director of ACA, correct? | 16  Freeman's directives. |
| 17  A.  That's correct. | 17  You can answer. |
| 18  Q.  And what's the basis of that belief? | 18  A.  I don't know. |
| 19  MS. TESKE:  Object to the form. | 19  Q.  Have you ever seen an organizational |
| 20  You can answer. | 20  chart for ACA? |
| 21  A.  My resignation letter. | 21  A.  I have not. |
| 22  Q.  Has anyone told you that this | 22  Q.  Do you know whether Yvette Wang or Guo |
| 23  resignation letter would be sufficient to resign as a | 23  Wengui have any role with ACA? |
| 24  director of ACA? | 24  A.  I do not. |
| 25  A.  Yes. | 25  Q.  Have you ever discussed ACA Yvette |
| Page 50 | Page 52 |

| | |
|---|---|
| 1  Q.  Who told you that?  12:45 | 1  Wang?  12:49 |
| 2  A.  William. | 2  A.  I have not. |
| 3  Q.  When did he tell you that? | 3  Q.  Do you know whether ACA had any parent |
| 4  A.  By drafting the letter. | 4  companies or subsidiaries? |
| 5  Q.  Did he tell you that over the | 5  A.  I don't know. |
| 6  telephone? | 6  Q.  Do you know whether ACA had consulting |
| 7  A.  No. | 7  agreements with any other entity? |
| 8  Q.  Did he tell you that in person? | 8  MS. TESKE:  Object to the form. |
| 9  A.  No. | 9  A.  I don't know. |
| 10  Q.  So it was your assumption that -- I | 10  Q.  Do you know if it had a consulting |
| 11  don't want to put words in your mouth. | 11  agreement with Eastern Profit? |
| 12  Other than by sending the letter, | 12  MS. TESKE:  Object to the form. |
| 13  did William Je make any other statements to you that | 13  You can answer. |
| 14  made you believe that signing the letter would be | 14  A.  I don't know. |
| 15  effective to resign from ACA?  12:46 | 15  Q.  Do you know if it had a consulting  12:50 |
| 16  MS. TESKE:  Object to the form. | 16  agreement with Golden Spring? |
| 17  You can answer. | 17  A.  I don't know. |
| 18  A.  He did not. | 18  Q.  Have you ever heard of Serena Hon? |
| 19  Q.  Did you discuss your resignation from | 19  MS. TESKE:  Object to the form of |
| 20  ACA with any person other than William Je? | 20  the question.  Beyond the scope of Judge |
| 21  A.  I did not. | 21  Freeman's directives. |
| 22  Q.  Did you discuss your resignation from | 22  You can you can answer yes or no. |
| 23  ACA with Yvette Wang? | 23  A.  No. |
| 24  A.  I did not. | 24  Q.  Have you ever heard of an entity called |
| 25  Q.  Did you discuss this deposition with | 25  Eastern Profit? |
| Page 51 | Page 53 |

Karin Maistrello
August 23, 2019

Atkinson-Baker, Inc.
www.depo.com

| | |
|---|---|
| 1    A.   I have not.       12:51 | 1   are a director?       12:54 |

1    A.  I have not.       12:51
2    Q.  So sitting here today, you can't tell
3  us anything about Eastern Profit; is that correct?
4    A.  That's correct.
5    Q.  You don't know what it does?
6    A.  I have no idea.
7    Q.  Did you realize that we're here in the
8  case of Eastern Profit versus Strategic Vision?
9       MS. TESKE:  Object to the form.
10      You can answer.
11    A.  Yes, I did.
12    Q.  So other than hearing that it's in the
13  title of the case, you've never heard of Eastern
14  Profit?
15    A.  I have not.       12:51
16    Q.  Have you ever heard of Strategic
17  Vision?
18    A.  I have not.
19    Q.  And you understand it's in the title of
20  the case that we're here under, correct?
21    A.  That's correct.
22    Q.  So you've never spoken to Yvette Wang
23  about Strategic Vision?
24    A.  No, I have not.
25    Q.  You've never spoken to Yvette Wang

Page 54

1  about Eastern Profit?       12:52
2    A.  No, I have not.
3       (Whereupon, Maistrello Exhibit 3,
4      subpoena issued to ACA Capital Group Limited,
5      is marked for identification, as of this
6      date.)
7       (Whereupon, Maistrello Exhibit 4,
8      subpoena issued to Karin Maistrello, is marked
9      for identification, as of this date.)
10    Q.  I'm going to hand you what we're
11  marking as Exhibits 3 and 4.
12      Please take a look at Exhibit 3.
13    A.  Which one is that?
14       MR. GRENDI:  Which one is that,
15      they look the same.       12:54
16       MR. GREIM:  They're not.  You'll
17      see it's a bit different.
18       MS. TESKE:  Which one is 3?
19       MR. GREIM:  Exhibit 3 is the ACA.
20       MS. TESKE:  Thank you.
21    Q.  So do you see that Exhibit 3 is a
22  subpoena to ACA Capital Group Limited?
23    A.  Mm-hmm, yes.
24    Q.  By the way, is ACA Capital Group
25  Limited the official name of the entity of which you

Page 55

1  are a director?       12:54
2       MS. TESKE:  Object to the form.
3    Q.  Can you please ask it again.
4    Q.  Is ACA Capital Group Limited the
5  official name of the entity of which you are a
6  director?
7       MS. TESKE:  Same objection.
8      You can answer.
9    A.  I am not sure.
10    Q.  So you'll see the first two pages are a
11  notice of subpoena.
12    A.  Mm-hmm.
13    Q.  If you turn to page 3, you'll see the
14  subpoena itself.  Do you see that?
15    A.  I do.       12:55
16       MS. TESKE:  Object to the form.
17      You can answer.
18    Q.  And do you see about a quarter of the
19  way down it says "To"?
20    A.  Yes.
21    Q.  Okay.  And what does it say on that
22  line, could you read that, please?
23    A.  "ACA Capital Group Limited to be served
24  to its director, Karin Maistrello 17 Gifford
25  Apartment 5F, Jersey City, New Jersey, 07304."

Page 56

1    Q.  Is that your address?       12:55
2    A.  It is.
3    Q.  And were you served with this subpoena
4  at that address?
5       MS. TESKE:  Object to the form.
6      You can answer.
7    A.  Yes.
8    Q.  What did you do after you were served
9  with this subpoena?
10       MS. TESKE:  Object if the form.
11      You can answer it.
12    A.  I gave it to our lawyer.
13    Q.  And was that Ms. Teske sitting here
14  next to you?
15    A.  It was not.       12:56
16    Q.  Who was that?
17    A.  Daniel Podhaskie.
18    Q.  When you say "our lawyer," do you mean
19  Golden Spring's lawyer?
20    A.  Golden Spring's lawyer.
21    Q.  Now, don't -- I'm not going to ask you
22  for the content of your discussion.  My only question
23  is, did you ask Mr. Podhaskie for legal advice?
24    A.  I asked him --
25       MS. TESKE:  No.  Whoa, whoa, whoa,

Page 57

15 (Pages 54 to 57)

Karin Maistrello
August 23, 2019

```
 1              whoa.                            12:56
 2                   MR. GRENDI:  Object.  Yes or no, yeah.
 3         Q.    Yes or no.  It's a yes or no answer.
 4                   MS. TESKE:  If you thought you
 5         were seeking legal advice, say yes.  If
 6         not, you can say no.
 7         A.    Then no.
 8         Q.    All right.  Then what did you discuss
 9    with him?
10         A.    I asked him what should I do with
11    these.
12         Q.    And what did he say?
13                   MS. TESKE:  No, no, no, no, no.
14                   MR. GRENDI:  Yeah.
15                   MS. TESKE:  That sounds like --   12:57
16                   MR. GRENDI:  Misunderstanding.
17                   MS. TESKE:  No.  That's sounds
18         like a misunderstanding, so I'm going to
19         direct the witness not to answer.
20                   MR. GREIM:  Okay.
21         Q.    What did you do with these after you
22    showed them to Mr. Podhaskie?
23         A.    Nothing.
24         Q.    I'm sorry.  Did you give them to him or
25    did you keep them?
```

Page 58

```
 1         A.    I gave them to him.            12:57
 2         Q.    Did you keep a copy for yourself?
 3         A.    I did not.
 4         Q.    And just to be clear, let's also take a
 5    look at Exhibit 4.  Do you recognize Exhibit 4?
 6         A.    I do not.
 7         Q.    Okay.  You'll see that under where it
 8    says, "Please take notice," do you see that it says
 9    that "The defendant/counterclaim plaintiff shall
10    cause the attached subpoena directed to nonparty
11    Karin Maistrello to be served after service of this
12    notice."  Do you see that?
13         A.    Yes, I do.
14         Q.    And then if you turn two pages, you see
15    a subpoena?                              12:58
16                   MS. TESKE:  Object to the form.
17         A.    Yes.
18         Q.    And do you see the "To" line?
19         A.    I see it.
20         Q.    Could you read who that's to?
21         A.    "Karin Maistrello, 17 Gifford Avenue,
22    Apartment 5F, Jersey City, New Jersey, 07304."
23         Q.    Is this the subpoena that did you
24    received?
25                   MS. TESKE:  Objection to form.
```

Page 59

```
 1         You can answer.                      12:58
 2         A.    Yes.  I believe so.
 3         Q.    So do you recall receiving two
 4    subpoenas, one for you, Karin Maistrello and the
 5    other for ACA to be served on you?
 6                   MS. TESKE:  Object to the form.
 7         You can answer.
 8         A.    Yes.
 9         Q.    And when you said that you gave them to
10    Mr. Podhaskie.  Did you give him both subpoenas?
11         A.    Yes.
12         Q.    And you didn't keep a copy of either
13    subpoena, correct?
14         A.    Correct.
15         Q.    Did you -- you'll see that on the back   12:59
16    of the one that's addressed to you, this is
17    Exhibit 4, if you look, there's an Exhibit A.  Do you
18    see it lists about eight different document items?
19         A.    Yes.
20         Q.    Did you take any steps to search for
21    these documents?
22                   MS. TESKE:  Object to the form.
23         You can answer.
24         A.    No.
25         Q.    Let me ask you this.  When was the
```

Page 60

```
 1    first time that you saw Exhibits 3 and 4.           01:00
 2                   MS. TESKE:  Object to the form.
 3         A.    I don't know.  To be honest, when I
 4    received this, I didn't read them.
 5         Q.    Did you read them before you gave them
 6    to Mr. Podhaskie?
 7         A.    I did not.
 8         Q.    Had you seen Exhibits 3 and 4 before
 9    the time you were served with process at your house?
10                   MS. TESKE:  Object to the form.
11         You can answer.
12         A.    No.
13         Q.    Why did you choose to resign?
14                   Well, let me strike that.
15                   Why did you resign on July 26th, 2019?   01:01
16         A.    I heard from Daniel that something was
17    going on with ACA, something I --
18                   MS. TESKE:  Whoa, whoa, whoa,
19         whoa, whoa, whoa, whoa, whoa.
20                   MR. GRENDI:  Yeah.
21                   MS. TESKE:  Conversations between
22         you and Daniel are privileged and you are
23         directed not to answer with respect to
24         those conversations.
25                   MR. GREIM:  I would say this, if
```

Page 61

16 (Pages 58 to 61)

Karin Maistrello
August 23, 2019

Page 62

```
1            Mr. Podhaskie is giving legal advice,     01:01
2      it's one thing.  If Mr. Podhaskie is
3      telling her that a subpoena is coming,
4      that is entirely another thing.
5      Q.    So I'm going to ask you --
6            MS. TESKE:  No.  Well -- okay.
7      You --
8            MR. GREIM:  I'll make my record --
9            MS. TESKE:  That's fine.
10           MR. GREIM:  -- and you can listen
11     and you can...
12     Q.    So we'll take this in steps, okay?
13           MS. TESKE:  Don't answer the
14     question.
15     Q.    Did Mr. Podhaskie -- I'm going to ask  01:01
16     you about things that Podhaskie told you, not about
17     advice he gave you, okay?  There's a difference.
18           What did Mr. Podhaskie tell you was
19     going on with ACA?
20           MS. TESKE:  Object to the form of
21     the question.  Direct the witness not to
22     answer.
23           I need -- if you can be really
24     specific in what you're asking.
25           MR. GREIM:  Okay.
```

Page 63

```
1            MS. TESKE:  And she can tell me          01:02
2      and I can decide whether or not that's an
3      attorney-client privileged communication.
4            MR. GREIM:  We'll see.  We'll find
5      a way.
6      Q.    Let's be very careful here, okay.  I
7      don't want you to waive any privilege.
8            When can was the discussion with
9      Mr. Podhaskie that you were starting to tell us
10     about?
11     A.    I don't remember.
12     Q.    Was it on July 26th?
13     A.    I don't remember.
14     Q.    Was it on July 25th?
15     A.    I do not remember.                        01:02
16     Q.    Does Mr. Podhaskie -- did you
17     understand Mr. Podhaskie to be counsel to ACA?
18           MS. TESKE:  Object to the form.
19           You can answer.
20     A.    No.
21     Q.    Did you ever ask Mr. Podhaskie for
22     legal advice relating to ACA?
23           MS. TESKE:  Object to the form.
24           You can answer.
25     A.    No.
```

Page 64

```
1      Q.    Did Mr. Podhaskie ever give you advice  01:03
2      relating to ACA?
3            MS. TESKE:  Object to the form.
4            You can answer.
5      A.    No.
6      Q.    What did Mr. Podhaskie tell you was
7      going on with ACA?
8            MS. TESKE:  Object to the form.
9            Direct you not to answer.
10           I need to know more about the
11     context in which this communication
12     happened before she can answer that
13     question.
14           MR. GREIM:  Okay.  We'll keep
15     going.  We'll see, we'll pick around the      01:03
16     edges here.
17     Q.    Just go slowly, give your counsel a
18     chance to object if she wants to, okay?
19           Did Mr. Podhaskie -- when you spoke
20     with Mr. Podhaskie, was it over the phone or in
21     person?
22           MS. TESKE:  You can answer.
23     A.    In person.
24     Q.    Where did the conversation take place?
25           MS. TESKE:  You can answer.
```

Page 65

```
1      A.    At our office.                           01:04
2      Q.    What time of day was it?
3      A.    I don't remember.
4      Q.    Who else was present?
5      A.    Just the two of us.
6      Q.    Was Yvette Wang present?
7      A.    She was not.
8      Q.    Without getting into any legal
9      advice, did Mr. Podhaskie tell you that he had spoken
10     with William Je?
11           MS. TESKE:  Object to the form of
12     the question and direct the witness not
13     to answer.
14     Q.    Did Mr. Podhaskie -- okay.
15           Let me ask you this.  At the end of     01:05
16     the conversation, did you tell Mr. Podhaskie that you
17     were going to resign as an ACA director?
18           MS. TESKE:  Object to the form of
19     the question and direct the witness not
20     to answer.
21           MR. GREIM:  The problem is that's
22     a yes or no answer.
23           MS. TESKE:  But it's a yes or no
24     answer about what she told her company's
25     lawyer in a conversation where it was
```

17 (Pages 62 to 65)

just the two of them about an issue in 01:05
which she may very well have been seeking
legal advice whether or not, you know,
she understands the scope of that or not,
and she's a Golden Spring employee who
went to the only attorney she knows,
Golden Spring's attorney, to talk about a
legal document and you want to inquire
about those conversations.  And I just
can't give you a lot of leeway there.
        MR. GREIM:  But the problem is,
though, that it's incumbent upon the
attorney -- not every lawyer-client
discussion is protected by the privilege,
and if she's coming to him as the ACA 01:06
director and he's not counsel for ACA --
        MS. TESKE:  It doesn't matter.
        MR. GREIM:  -- it's incumbent upon
him to say I'm counsel for Golden Spring.
But we don't need to do this on the
record.  I understand your objection.
    Q.    Let me ask you this.  Did Mr. Podhaskie
initiate the conversation or did you?
        MS. TESKE:  Object to the form.
        You can answer.

Page 66

        A.    I'm not clear about what conversation 01:06
we're talking about.
    Q.    Okay.  You began to tell us a few
minutes ago that you heard from Daniel something was
going on with ACA.  That's the conversation I'm
talking about.
        So my question to you is, did you
initiate that conversation or did Mr. Podhaskie?
        MS. TESKE:  Okay.  Object and
direct the witness not to answer, and I
don't know that if that specific
conversation was a follow-up on a
previous conversation that they had, and
I do not know enough to allow the
witness -- again, we are talking about a 01:07
Golden Spring's employee who went to the
only attorney she knows, her Golden
Spring's attorney, to talk about
something related to a legal case or a
legal document.  I'm not going to allow
the witness --
        MR. GREIM:  Actually, that was not
the witness's testimony, but I will ask
you that now.
    Q.    Did you go to Mr. Podhaskie to ask him

Page 67

about a legal document? 01:07
        MS. TESKE:  She's already
testified that she did.  She already
testified that she brought these
documents to him.  I'm not going to allow
the witness to divulge infor- --
        MR. GREIM:  That was the difficult
conversation.  That's the question.
That's the key.  That's when she handed
him the documents.  This conversation
happened earlier, that's what I'm asking
about.
    Q.    And so my --
        MS. TESKE:  We don't --
    Q.    My question is, in the conversation 01:08
where you said you heard from Daniel something was
going on with ACA -- let me ask you.  That was not
the conversation where you gave him these documents,
was it?
    A.    It was not.
    Q.    So in the conversation where Daniel
said something was going on with ACA, did you come --
did you start that conversation with Podhaskie and
come to ask him a question or did Podhaskie come to
you?

Page 68

        MS. TESKE:  Okay.  Object.  Direct 01:08
the witness not to answer.
        The only way I am going to get
comfortable with the witness answering
these questions is if I know more about
what those conversations entailed, and I
don't -- and that conversation can't
happen on the record.
        MR. GREIM:  Okay.
        MS. TESKE:  I need to step out
with the witness so I can understand the
full scope of what is going on so I
can --
        MR. GREIM:  Okay.  Let's go ahead.
Let's all refresh in our minds.  You know 01:09
what?  Actually we will come back to it.
We'll do that at the end with a bunch of
other stuff.  Okay, let's put a place
mark on this and we'll come back to it.
BY MR. GREIM:
    Q.    But let me come back to my question,
though, because I don't -- I think you began to
answer it talking about this discussion, so now I'm
just going to ask you, why did you decide to resign
as a director of ACA on July 26th?

Page 69

18 (Pages 66 to 69)

Karin Maistrello
August 23, 2019

Atkinson-Baker, Inc.
www.depo.com

1    MS. TESKE:  And I'm going to    01:09
2  caution you not to reveal any
3  communications that you had with
4  Mr. Podhaskie.
5    A.  Can you repeat your question, please.
6    Q.  Why did you decide to resign as an ACA
7  director on July 26th?
8    A.  I did not want to get involved in
9  things that I'm not involved with.
10    Q.  What are those things?
11    A.  To be honest, I don't know.
12    Q.  Is it -- are you referring to this
13  case?
14    A.  I don't know anything about this case.
15  To be honest, I don't even know why I'm here.  The    01:10
16  reason why I worked for this company, why I trust
17  William is because we share a mission.  That's what
18  makes me trust him and that's probably why he trusts
19  me.
20    Anything else, what he does, who he is,
21  his family, I don't know.  I don't care.  We're
22  trying to work to make China a better place and
23  that's all that matters.
24    Q.  Why did you think that resigning from
25  ACA as a director would keep you from getting

Page 70

1  involved in things that you don't want to be involved    01:11
2  in?
3    MS. TESKE:  Object to the form.
4    You can answer.
5    A.  Can you repeat your question, please.
6    MR. GREIM:  I'll have the court
7    reporter do that.
8    (Whereupon, the record is read.)
9    A.  I'm not sure I understand the question.
10    Q.  You told me a few minutes ago that you
11  resigned from ACA because you did not want to get
12  involved in things that you don't want to be involved
13  in.  Do you remember that testimony?
14    MS. TESKE:  Object to the form.
15    You can answer.    01:11
16    A.  Yes.
17    Q.  And so, my question is, why did you
18  think that resigning as a director of ACA would
19  accomplish that goal?
20    MS. TESKE:  Object to the form.
21    You can answer.
22    A.  Let's put it this way.  You are part of
23  a company or you work in a store.  There are things
24  in the store that you don't want to get involved
25  with.  You resign.  You're not part of it any more.

Page 71

1    Q.  What are the things that you don't want    01:12
2  to be involved in?
3    MS. TESKE:  Object to the form.
4    You can answer.
5    A.  I don't know.
6    Q.  But whatever they were, they were
7  serious enough for you to resign from ACA?
8    MS. TESKE:  Object to the form.
9    You can answer.
10    MR. GRENDI:  Object to the form.
11    A.  I don't know.
12    Q.  You just testified a second ago that
13  you trusted Mr. Je because you shared a mission of
14  making China a better place, right?
15    A.  That's correct.    01:13
16    Q.  And is that the mission you thought ACA
17  had?
18    A.  No.  I trust him as a person as I know
19  that he shares the same idea about the Communist
20  Party and how bad they are.  I am not talking about
21  ACA or any other thing.  I was talking specifically
22  about him as a person.
23    Q.  So what is the thing you were trying to
24  keep from getting involved in by resigning as a
25  director?

Page 72

1    MS. TESKE:  Object to the form.    01:13
2    You can answer.
3    A.  I don't know.  I don't know
4  specifically what's going on here with these -- with
5  any company.  I just feel that I don't want to be
6  involved in something that does not belong to me.
7    Q.  What did you learn that made you decide
8  that you did not want to be involved in ACA as of
9  July 26th?
10    MS. TESKE:  Object to the form.
11    You can answer.
12    A.  Really nothing.
13    Q.  Was it something Mr. Podhaskie told
14  you?
15    MS. TESKE:  Object to the form,    01:14
16    and -- object to the form.
17    You can answer without giving away
18  any substance of communications.
19    A.  Yes.
20    Q.  So it's something Mr. Podhaskie told
21  you but you can't tell us what that thing is; is that
22  your testimony today?
23    MS. TESKE:  Because I'm directing
24    her not to.
25    MR. GREIM:  Well, okay.  So you're

Page 73

19 (Pages 70 to 73)

Karin Maistrello
August 23, 2019

Atkinson-Baker, Inc.
www.depo.com

1  directing her not to tell me what the                 01:15
2  thing ACA was involved in that she wanted
3  to get out of.
4        MS. TESKE:  I am directing her not
5  to discuss her communications with Dan
6  Podhaskie with you.
7        MR. GREIM:  Okay.  That's -- okay,
8  fair enough.
9    Q.   I'll ask it this way.  Forget about
10 what Mr. Podhaskie told you.
11        Was the thing that ACA was involved in
12 that you wanted to not be involved in yourself, was
13 it a project of ACA?
14        MS. TESKE:  Object to the form of
15 the question.                                            01:15
16        You can answer.
17   A.   I don't know.
18   Q.   Was it a lawsuit?
19        MS. TESKE:  Object to the form of
20 the question.
21        You can answer.
22   A.   I don't know.
23   Q.   How did it involve ACA?
24        MS. TESKE:  Object to the form.
25        You can answer.

Page 74

1   A.   I don't know.                                     01:16
2   Q.   Why did you think that resigning as a
3  director would spare you from being involved in
4  whatever this thing was?
5        MS. TESKE:  Object to the form.
6        You can answer.
7   A.   I believe I already answered this
8  question.  Meaning, with my resignation, I'm out.
9   Q.   Out of what?
10  A.   ACA.
11  Q.   Did you discuss your conversation with
12 Mr. Podhaskie with any other person were you were
13 done talking with him?  Yes or no for now.
14  A.   No.
15  Q.   Did Mr. Podhaskie tell you he would     01:17
16 discuss your conversation with any other person?  Yes
17 or no for now.
18        MS. TESKE:  Object to the form.
19        You can answer.
20  A.   No.
21  Q.   Do you know whether Mr. Podhaskie
22 discussed your conversation with him with any other
23 person?
24  A.   I do not.
25  Q.   Did Mr. Podhaskie -- I'm not going to

Page 75

1  ask you what it was.  It's just a yes or no question.   01:17
2        Did he give you advice in this
3  discussion?
4        MS. TESKE:  Objection and
5  directing the witness not to answer.
6  We've -- because I'm not going to allow
7  her, no matter what she answers, and she
8  can answer a yes or a no, but no matter
9  what her answer is, she does not
10 understand the scope of the
11 attorney-client privilege.  And I am
12 going to direct her not to discuss
13 communications with Mr. Podhaskie until I
14 am confident that they are not
15 attorney-client privileged                              01:18
16 communications.
17        MR. GREIM:  I think, though, that
18 I need to know whether he gave advice.
19 I'm not asking what it was.  I want to
20 know whether he gave advice, yes or no.
21 And if she says no, it doesn't mean we're
22 going to go all out.  I want to know
23 whether she believes she got advice.
24        You may tell her after you speak
25 with her that, guess what, that was

Page 76

1  actually advice.  I understand that.  I                 01:18
2  want to know her answer before she talks
3  with counsel just on a yes or a no.
4        MS. TESKE:  I will let -- it has
5  no bearing.  I'm not going to let her
6  answer that because it has no bearing.
7  She can not opine on whether or not he
8  gave her legal advice.
9        MR. GREIM:  Well, I'm going to ask --
10        MS. TESKE:  I mean, that's your
11 question.
12        MR. GREIM:  Well, I'm going to ask
13 her whether she believed that she
14 received advice, and it's not going to be
15 binding --                                               01:19
16        MS. TESKE:  But when you say
17 advice, you mean legal advice, and she
18 doesn't understand that.
19        MR. GREIM:  The question -- well
20 wait a minute.
21        MS. TESKE:  That's a legal concept
22 that she doesn't understand.
23        MR. GREIM:  Okay.  I'm just going
24 to make it for the record.  You can
25 object again.

Page 77

20 (Pages 74 to 77)

Karin Maistrello
August 23, 2019

BY MR. GREIM:                                           01:19
        Q.    And I'm not going to ask about legal
advice right now.  I'm just going to say, during the
conversation, did Mr. Podhaskie advise you to do
anything?  Yes or no.
            MS. TESKE:  Hold on a second.
        I am not going to let the witness
    discuss what the substance of her
    communications are with Mr. Podhaskie,
    and although you want to characterize the
    substance, that's the same thing.  That's
    asking her about the substance of her
    conversation.  You just want to
    characterize it.
            MR. GREIM:  Okay.                           01:20
        Q.    Did you take any actions as a result
of your discussion with Mr. Podhaskie?
            MS. TESKE:  Object to the form.
            MR. GRENDI:  Yes.
            MS. TESKE:  You can answer.  No,
    sorry.
        What she did at the direction of
    her counsel --
            MR. GREIM:  That's not my
    question.

                                             Page 78

            MS. TESKE:  It could be, though.            01:20
    You're going to box her into something,
    and you're trying to get -- it's very,
    clear, and I understand why you're doing
    it, but it's very -- but you are trying
    to obtain the substance of
    attorney-client privileged
    communications --
            MR. GREIM:  No.
            MS. TESKE:  -- or communications
    that we haven't determined aren't.  Of
    course you --
            MR. GREIM:  Okay.  We'll come back
    to it.  We've got to move on.
        Q.    Let me see what we're doing here.        01:21
            (Whereupon, Plaintiff's
    Exhibit 5, "Notice of Change of Company
    Secretary and Director
    (Appointment/Cessation)," Bates Nos.
    42-44, marked for identification, as
    of this date.)
            MR. GREIM:  Let's take a short
    break.
            THE VIDEOGRAPHER:  This will
    conclude video No. 1 in the deposition of

                                             Page 79

Karin Maistrello.  We're off the record                01:22
at 1:21 p.m., August 23rd, 2019.
            (Whereupon, a recess is taken.)
            THE VIDEOGRAPHER:  This is the
    beginning of video No. 2 in the
    deposition of Karin Maistrello.  We are
    on the record at 1:31 p.m., August 23rd,
    2019.
BY MR. GREIM:
        Q.    Ms. Maistrello, I've just handed you
what we've marked Exhibit 5.  Have you had a second
to take a look at that?
        A.    Give me one second.
        A.    Sure.
            MR. GREIM:  I'll just say for the          01:33
    record it's three pages.  They have a --
    like a digital Bates label in the bottom
    left-hand corner, 42, 43 and 44, and the
    top reads "Notice of Change of Company
    Secretary and Director," and then in
    parentheses after that
    "Appointment/Cessation."
        Q.    Now, Ms. Maistrello, let me -- maybe
I'll just walk you through this.
            Do you see on page 2 a signature at the

                                             Page 80

bottom of the page?                                    01:33
        A.    I do.
        Q.    Whose signature is that?
            MS. TESKE:  Object to the form of
    the question.
        You can answer.
        A.    That's mine.
        Q.    Okay.  And if you look on the third
page, do you see another signature at the very bottom
under the title "Confirmation"?
        A.    I see it.
        Q.    Okay.  Can you see who signed that?
            MS. TESKE:  Object to the form.
        You can answer.
        A.    Yes.                                      01:34
        Q.    Who?
        A.    William Je.
        Q.    Okay.  And he signed on behalf of what
entity?
            MS. TESKE:  Object to the form.
        Are you asking her to read what's
    written --
            MR. GREIM:  Yes.
            MS. TESKE:  -- on the page?
    'Cause she would not otherwise have --

                                             Page 81

                          21 (Pages 78 to 81)

Karin Maistrello
August 23, 2019

1      MR. GREIM:  Yes.                              01:34
2      MS. TESKE:  -- any understanding.
3  A.    Celestial Tide Limited.
4  Q.    Have you ever heard of that entity
5  before?
6  A.    I have not.
7  Q.    Okay.  Let me ask you, do you recognize
8  this as the document you signed to accept an
9  appointment as a director of ACA?
10  A.    I have to be honest, I don't remember.
11  Q.    Do you agree that your signature
12  appears on the bottom of page 2?
13  A.    I do.
14  Q.    Is it possible -- is it at least
15  possible that you've seen this document before?  01:35
16      MS. TESKE:  Object to the form.
17  A.    Yes.
18  Q.    If you look right above your signature,
19  there's an advisory note.  Do you see that?
20  A.    I do.
21  Q.    And do you say that it says, "All
22  directors of the company are advised to read 'a guide
23  on directors' duties' published by the company's
24  registry and acquaint themselves with the general
25  duties of directors outlined in the guide."

Page 82

1      MS. TESKE:  Object.                          01:35
2  Q.    Do you see that?
3      MS. TESKE:  Object to the form.
4      You can answer.
5  A.    Yes.
6  Q.    Do you recall taking those steps after
7  you signed this document?
8      MS. TESKE:  Object to the form.
9      You can answer.
10  A.    No.
11  Q.    Is the information listed under your
12  name on page 2, was that correct as of January 1,
13  2019?
14      MS. TESKE:  Object to the form.
15      You can answer.                            01:36
16  A.    Yes.
17  Q.    If you could look back on page 1, do
18  you see that there is a name of a director who is
19  resigning at the same time you were coming in?
20      MS. TESKE:  Object to the form.
21      And just for the record, the Exhibit 5 is
22  a document in Chinese that has an English
23  translation, that's what we're working
24  with here.
25      But you can answer the question.

Page 83

1  A.    Oh, can you please repeat the question.    01:36
2  Q.    Do you see on page 1 -- well, first of
3  all, do you see the company name on page one is ACA
4  Capital Group Limited?
5  A.    I see that.
6  Q.    And if you look, then, under 2, it says
7  "Cessation to act as company's secretary/director"?
8  A.    I see that.
9  Q.    And below that, the check mark -- the
10  box for director is checked.  Do you see that?
11  A.    I see that.
12  Q.    And then the name of the person who is
13  ceasing to act as director is printed?
14      MS. TESKE:  Object to the form.
15  Q.    Do you see that?                           01:37
16  A.    Yes.
17  Q.    And what is that name?
18  A.    Can I read it?
19  Q.    Sure.
20  A.    Nil.  Chassot Laurent.
21  Q.    And I'll just point out to you, I know
22  you're just reading off of the form, that's all you
23  are doing here, but the very first line has the word
24  Nil?
25  A.    Yes.

Page 84

1  Q.    Okay.  If you look on page 2, you see      01:37
2  the word "nil" appears in many other boxes?
3  A.    I see that.
4  Q.    Okay.  So does it appear to you that
5  nil just means there's nothing to enter into that
6  field?
7      MS. TESKE:  Object the form.
8      You can answer.
9  A.    Yes.
10  Q.    What is the name in English that you
11  see printed there as the resigning director?
12  A.    Chassot Laurent.
13  Q.    Or might it be Laurent Chassot?
14      MS. TESKE:  Object to the form.
15  A.    Yes.                                       01:38
16  Q.    You see the surname is Chassot?
17  A.    Yes.  In whatever order you prefer.
18  Q.    Have you ever heard that name before?
19  A.    I have not.
20  Q.    Did you realize that as you were coming
21  in as director Laurent Chassot is resigning?
22      MS. TESKE:  Object to the form.
23  A.    Yes.
24  Q.    You did understand that?
25  A.    I can read, yes.

Page 85

22 (Pages 82 to 85)

Karin Maistrello
August 23, 2019

1     Q.    Okay.  Okay, but let me ask you, I'm     01:38
2  going to be clear, did you understand at the time
3  that you signed this document that Laurent Chassot
4  was resigning at the same time you were being
5  appointed as a director?
6          MS. TESKE:  Object to the form.
7          You can answer.
8     A.    I don't remember what happened when I
9  signed, but now that I read it, yes, I can see that.
10     Q.    If you could go to page 3.  And earlier
11  you identified the signature of William Je, correct?
12     A.    Correct.
13     Q.    Do you see he's signing for a company
14  called Celestial Tide Limited and earlier you
15  testified that you had not heard of that entity    01:39
16  before?
17     A.    Yes.
18     Q.    So did you have any understanding that
19  Celestial Tide Limited would be the other director of
20  this entity serving along with you?
21          MS. TESKE:  Objection to the form.
22          MR. GRENDI:  Objection to the
23  form.
24     Q.    At the time you signed this?
25          MS. TESKE:  Same objection.

Page 86

1          MR. GRENDI:  Same objection.     01:39
2     A.    Can you repeat the question, please.
3     Q.    At the time you signed this document
4  did you have any understanding that Celestial Tide
5  Limited would be serving as the other director of
6  this entity alongside you?
7          MS. TESKE:  Same objection.
8     A.    No.
9     Q.    Did you take any steps to file this
10  document after you signed it?
11     A.    I did not.
12     Q.    Do you know who did?
13          MS. TESKE:  Object to the form.
14     A.    Pardon?
15     Q.    Do you know who did?     01:40
16     A.    I do not.
17     Q.    Did you sign a document like Exhibit 5
18  in connection with your recent purported resignation?
19     A.    I'm not sure I understand the question.
20     Q.    So earlier we looked at Exhibit 1 and
21  Exhibit 2, which were your resignation letter and an
22  email, and my question is, did you also sign a
23  document similar in form to Exhibit 5?
24     A.    No, I did not.
25     Q.    Do you know whether in the official

Page 87

1  records of ACA you are still listed as a director?     01:41
2          MS. TESKE:  Object to the form.
3          You can answer.
4     A.    No, I don't.
5          (Whereupon, Plaintiff's
6  Exhibit 6, document printed off the Hong
7  Kong Corporate Registry database through
8  the ICRIS Cyber Search Centre, is marked
9  for identification, as of this date.)
10     Q.    I'm going to show you what we are
11  marking as Exhibit 6, and I'll represent to you that
12  this is a document we printed off the Hong Kong
13  Corporate Registry database.  It's called ICRIS Cyber
14  Search Centre, and we did it yesterday US time, but
15  actually it was already August 23rd, almost 5:00 GMT     01:42
16  time.
17          Do you see the time stamp in the upper
18  right-hand corner?
19     A.    I do.
20          MS. TESKE:  Object to the form.
21     Q.    Now, do you see that it lists the name
22  of particular directors in the middle of the page?
23     A.    Yes.
24     Q.    And do you see your name there?
25     A.    I do.

Page 88

1     Q.    Did you ever check to see whether your     01:42
2  resignation letter had actually been processed with
3  Hong Kong?
4          MS. TESKE:  Object to the form.
5          You can answer.
6     A.    No.
7     Q.    Do you know if anyone has on your
8  behalf?
9          MS. TESKE:  Object to the form.
10          You can answer.
11     A.    Can you repeat the question, please.
12     Q.    Do you know if anyone has on your
13  behalf checked with Hong Kong to ensure that your
14  registration has become effective?
15     A.    I don't know.     01:43
16          MS. TESKE:  Also the same
17  objection.
18          (Whereupon, Plaintiff's
19  Exhibit 7, two-page document titled
20  "Limited Power of Attorney," Eastern
21  276-77, is marked for identification, as
22  of this date.)
23     Q.    Are you aware of any relationship
24  between ACA and Eastern Profit Corporation?
25     A.    I am not.

Page 89

23 (Pages 86 to 89)

Atkinson-Baker, Inc.
www.depo.com

| | |
|---|---|
| 1    Q.    I'm going to hand you what we're    01:44 | 1    MR. GRENDI:  Yeah.    01:46 |
| 2   marking as Exhibit 7.  And you'll see it's a | 2    Q.    Yes. |
| 3   two-page document, Bates numbered Eastern 276 to 277, | 3    A.    Maybe. |
| 4   titled "Limited Power of Attorney," and then you'll | 4    Q.    Okay. |
| 5   see on that second page there, it looks like you have | 5    Do you know who wrote in the words |
| 6   notarized it.  Am I right? | 6   "Director" and "New York" on this page? |
| 7    A.    You are. | 7    MS. TESKE:  Object to the form. |
| 8    Q.    Do you remember notarizing this | 8    A.    I don't. |
| 9   document? | 9    Q.    Was it you? |
| 10    A.    I don't. | 10    A.    It was not. |
| 11    Q.    Do you notarize many documents every | 11    Q.    Was it Mr. Han? |
| 12   day? | 12    A.    I don't think so. |
| 13    A.    Not every day, but yes. | 13    Q.    I see there's a signature that appears |
| 14    Q.    And do you keep a logbook of each | 14   kind of over your notary stamp.  Is that your |
| 15   notarization you perform?    01:45 | 15   signature again?    01:47 |
| 16    A.    I do. | 16    A.    It is. |
| 17    Q.    And every time you notarize a document, | 17    Q.    Okay.  So if we looked in your notary |
| 18   do you mark it in your log book on that day? | 18   record book, we'd be able to see whether you have an |
| 19    A.    I do. | 19   entry on August 30th of 2018? |
| 20    MS. TESKE:  Object to the form of | 20    A.    Yes. |
| 21   that question. | 21    Q.    So you described Mr. Han for us, but I |
| 22    Q.    You'll see that this document says it | 22   should have asked you before I asked you to begin to |
| 23   was signed by Chunguang Han, did I say that right? | 23   do that is to form some basis for that.  So my |
| 24    A.    Yes. | 24   question to you is, how often do you see Chunguang |
| 25    Q.    Can you tell whose signature is above | 25   Han? |
| Page 90 | Page 92 |

| | |
|---|---|
| 1   Chunguang Han?  Can you read that?    01:45 | 1    A.    Not very often.    01:48 |
| 2    A.    That's -- | 2    Q.    I mean, like once a week, once a month? |
| 3    MS. TESKE:  Object to the form. | 3    A.    Maybe once a week. |
| 4   You can answer. | 4    Q.    And I'll ask you this.  How do you know |
| 5    A.    That's his. | 5   that he is Chunguang Han?  Did somebody originally at |
| 6    Q.    Now, do you know that that is his | 6   the beginning introduce you to him as Chunguang Han? |
| 7   actual signature or are those just the characters | 7    A.    He did. |
| 8   that make up his name? | 8    Q.    Oh, he did, okay. |
| 9    A.    I know it's his. | 9    (Whereupon, there is a discussion |
| 10    Q.    How do you know? | 10   off the record.) |
| 11    A.    Because I never notarize anything | 11    Q.    Now, earlier you said you had not heard |
| 12   without the person being in front of me. | 12   of Eastern Profit.  Do you agree with me that the |
| 13    Q.    Do you know who Chunguang Han is? | 13   statement we just looked at mentions Eastern Profit |
| 14    A.    I do. | 14   many times? |
| 15    Q.    And can you describe him to me?    01:46 | 15    MS. TESKE:  Object to the form.    01:49 |
| 16    A.    In what sense? | 16   You can answer. |
| 17    Q.    Physically. | 17    A.    Can I take a moment to take a look at |
| 18    A.    Pretty tall, short hair, brown eyes, a | 18   the document. |
| 19   hundred -- | 19    Q.    Sure, take a look. |
| 20    Q.    What is his build?  Is he stocky or | 20    A.    Can you please ask your question again? |
| 21   thin or medium? | 21    Q.    Do you see that Eastern Profit appears |
| 22    A.    Medium. | 22   in this document several times? |
| 23    Q.    Is he taller than me? | 23    A.    I do. |
| 24    MS. TESKE:  Object to the form. | 24    Q.    But I guess, I take it that you don't |
| 25    A.    Can I stand? | 25   read these documents before you notarize them; you |
| Page 91 | Page 93 |

24 (Pages 90 to 93)

Karin Maistrello
August 23, 2019

Atkinson-Baker, Inc.
www.depo.com

| | |
|---|---|
| 1 simply take the oath of the person who shows up in 01:50 | 1    A.   I do not. 01:53 |
| 2 front of you, correct? | 2    Q.   Have you been asked by William Je to |
| 3        MS. TESKE:  Object to the form. | 3 assist with bringing on a new director? |
| 4        MR. GRENDI:  Object to the form. | 4        MS. TESKE:  Object to the form. |
| 5    A.   I read the title, I put the date, and I | 5        You can answer. |
| 6 put my stamp. | 6    A.   No. |
| 7    Q.   When you became a director, did anyone | 7    Q.   Did Mr. Je ever express any displeasure |
| 8 make you aware of a loan agreement between ACA and | 8 to you about your performance with ACA? |
| 9 Eastern Profit? | 9    A.   No. |
| 10   A.   No. | 10   Q.   Did any person? |
| 11   Q.   Have you ever heard of such a thing? | 11   A.   No. |
| 12   A.   I have not. | 12   Q.   Are you aware of any ACA wires to any |
| 13   Q.   Did you ever discuss the loan agreement | 13 United States entity? |
| 14 with William Je? | 14        MS. TESKE:  Object to form. |
| 15        MS. TESKE:  Object to the form. 01:51 | 15   A.   I'm not. 01:54 |
| 16   A.   I did not. | 16   Q.   Do you know who at ACA would have |
| 17   Q.   Did you ever discuss it with Han | 17 approved any such wires? |
| 18 Chunguang? | 18        MS. TESKE:  Object to form. |
| 19   A.   I did not. | 19   A.   I don't know. |
| 20   Q.   While you were with ACA, are you aware | 20   Q.   Do you have any understanding as to |
| 21 of any attempts it made to collect on a loan | 21 whether it was your duty or responsibility as the |
| 22 agreement with Eastern Profit? | 22 director of ACA to approve such wires? |
| 23   A.   I was not. | 23   A.   Can you repeat the question, please. |
| 24   Q.   In fact, did you, while you were with | 24   Q.   Do you have any understanding as to |
| 25 ACA, did you ever hear about it extending loans to | 25 whether it was your duty and responsibility as a |
| Page 94 | Page 96 |

| | |
|---|---|
| 1 any entity? 01:52 | 1 director of ACA to approve such wires? 01:55 |
| 2    A.   I did not. | 2    A.   No. |
| 3        MR. GRENDI:  Object to the form. | 3    Q.   Anyone ask you to resign from ACA? |
| 4    Q.   Did you ever hear of any project that | 4    A.   No. |
| 5 ACA had actually undertaken? | 5    Q.   Did anyone advise you to resign from |
| 6    A.   I did not. | 6 ACA? |
| 7    Q.   As you sit here today, do you have any | 7        MS. TESKE:  I'm going to caution |
| 8 certainty that ACA actually undertakes projects? | 8    you against divulging attorney-client |
| 9        MS. TESKE:  Object to the form. | 9    privileged communications, but you may |
| 10   A.   I don't know. | 10   answer the question. |
| 11   Q.   Do you have any certainty that ACA | 11   A.   No. |
| 12 manages funds? | 12   Q.   Did anyone suggest to you that you |
| 13        MS. TESKE:  Object to the form. | 13 should resign from ACA? |
| 14   A.   I don't know. | 14        MS. TESKE:  Same direction.  You |
| 15   Q.   Do you have any information that ACA 01:53 | 15   can answer. 01:56 |
| 16 has attempted to obtain research on individuals in | 16   A.   No. |
| 17 connection with the -- what you said was the shared | 17   Q.   Did it bother you to resign as a |
| 18 mission that you have with William Je? | 18 director of ACA? |
| 19        MS. TESKE:  Object to the form. | 19   A.   No. |
| 20        MR. GRENDI:  Object to the form. | 20   Q.   Why not? |
| 21   A.   I do not. | 21        MS. TESKE:  Object to the form. |
| 22   Q.   Do you recall that ACA ever discussed | 22        You can answer. |
| 23 it? | 23   A.   Why yes?  I don't see why. |
| 24        MS. TESKE:  Object to the form. | 24   Q.   Had you considered resigning from ACA |
| 25        MR. GRENDI:  Object to form. | 25 before July 26th, 2019? |
| Page 95 | Page 97 |

25 (Pages 94 to 97)

Karin Maistrello
August 23, 2019

Atkinson-Baker, Inc.
www.depo.com

| | |
|---|---|
| 1 | A.    No. |
| 2 | Q.    Okay.  I'm not going to ask you what |
| 3 | was said.  I'm going to try this one more time and |
| 4 | then we'll do the thing we discussed before. |
| 5 | Was the topic of your discussion with |
| 6 | Mr. Podhaskie the problems that were happening with |
| 7 | ACA? |
| 8 | MS. TESKE:  Object. |
| 9 | Don't answer. |
| 10 | MR. GREIM:  Okay.  Let's take a |
| 11 | break. |
| 12 | THE VIDEOGRAPHER:  We are off the |
| 13 | record.  The time is 1:57 p.m. |
| 14 | (Whereupon, a recess is taken.) |
| 15 | THE VIDEOGRAPHER:  We are back on |
| 16 | the record.  The time is 2:09 p.m. |
| 17 | BY MR. GREIM: |
| 18 | Q.    Ms. Maistrello, just a few more |
| 19 | questions for you.  I want to return to your |
| 20 | testimony earlier that you resigned from ACA because |
| 21 | you didn't want to be involved in something.  Do you |
| 22 | recall that testimony? |
| 23 | A.    I do. |
| 24 | Q.    And I guess my question to you, I'm |
| 25 | going to ask you one last time because you've said |

01:57 (line 1)
02:10 (line 15)

Page 98

| | |
|---|---|
| 1 | you don't know what that thing is, sitting here |
| 2 | today, have you been able to recall what that thing |
| 3 | is that you did not want to be involved in as a |
| 4 | director of ACA? |
| 5 | MS. TESKE:  Object to the form. |
| 6 | MR. GRENDI:  Objection to the |
| 7 | form. |
| 8 | A.    No. |
| 9 | Q.    Let me ask you this.  Has your |
| 10 | resignation been effective in keeping you from being |
| 11 | involved in that thing that you did not want to be |
| 12 | involved in? |
| 13 | MS. TESKE:  Object to the form. |
| 14 | MR. GRENDI:  Object to the form. |
| 15 | A.    I don't know.  Meaning, I'm here |
| 16 | wasting my time about something I have no idea what |
| 17 | it is about, so I don't know. |
| 18 | Q.    Is being here one of the things you |
| 19 | wanted to not be involved in by resigning? |
| 20 | MS. TESKE:  Object to the form. |
| 21 | A.    I didn't necessarily think about this. |
| 22 | But yeah, if I could have avoided this, why not? |
| 23 | Q.    And in fact, you did avoid being |
| 24 | deposed as an ACA corporate representative, didn't |
| 25 | you? |

02:11 (line 1)
02:11 (line 15)

Page 99

| | |
|---|---|
| 1 | MS. TESKE:  Object to the form. |
| 2 | MR. GRENDI:  Object to the form. |
| 3 | MS. TESKE:  If she knows. |
| 4 | A.    I don't. |
| 5 | Q.    Other than Mr. Podhaskie, is there any |
| 6 | other person that you spoke with before you came to |
| 7 | the conclusion that by resigning as an ACA director, |
| 8 | you might be -- you might avoid being involved in |
| 9 | something you didn't want to be involved in? |
| 10 | MS. TESKE:  Objection to the form. |
| 11 | You can answer. |
| 12 | A.    No. |
| 13 | Q.    You did not speak with Ms. Wang about |
| 14 | whether resigning could keep you from being involved |
| 15 | in something? |
| 16 | MS. TESKE:  Object to the form. |
| 17 | You can answer that. |
| 18 | A.    I did not. |
| 19 | Q.    You did not speak to Mr. Guo about that |
| 20 | topic? |
| 21 | MS. TESKE:  Objection. |
| 22 | A.    I did not. |
| 23 | Q.    Did you speak with Mr. Guo about your |
| 24 | deposition today? |
| 25 | A.    I did not. |

02:12 (line 1)
02:13 (line 15)

Page 100

| | |
|---|---|
| 1 | Q.    Have you reviewed his disposition |
| 2 | transcript in this case? |
| 3 | A.    No. |
| 4 | Q.    Okay.  Did you speak with Ms. Wang |
| 5 | about your deposition today? |
| 6 | A.    I didn't. |
| 7 | Q.    Have you reviewed her deposition |
| 8 | transcript in this case? |
| 9 | A.    No, I haven't. |
| 10 | Q.    And is it your testimony that you have |
| 11 | not had any communication with Mr. Je since his email |
| 12 | back to you regarding your resignation? |
| 13 | MS. TESKE:  Object to the form. |
| 14 | You can answer the question. |
| 15 | A.    That's correct. |
| 16 | Q.    Has anyone communicated with you on |
| 17 | behalf of Mr. Je? |
| 18 | A.    No. |
| 19 | Q.    Have you received any payment from any |
| 20 | person other than your payment as an employee of |
| 21 | Golden Spring? |
| 22 | MR. GRENDI:  Object to the form. |
| 23 | MS. TESKE:  Object to the form. |
| 24 | Sorry.  For what, during what time |
| 25 | period, for any -- |

02:13 (line 1)
02:14 (line 15)

Page 101

26 (Pages 98 to 101)

Karin Maistrello
August 23, 2019

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | MR. GREIM:  In 2019. | 02:14 |
| 2 | MS. TESKE:  Relating to her | |
| 3 | services? | |
| 4 | MR. GREIM:  Relating to personal | |
| 5 | services. | |
| 6 | MS. TESKE:  Personal services? | |
| 7 | MR. GREIM:  Services, any | |
| 8 | services. | |
| 9 | MS. TESKE:  Provided to ACA. | |
| 10 | MR. GREIM:  Well, first provided | |
| 11 | to ACA. | |
| 12 | MS. TESKE:  Maybe rephrase the | |
| 13 | question. | |
| 14 | MR. GREIM:  Yeah, I'm sorry. | |
| 15 | MR. GRENDI:  That's a bad one. | 02:15 |
| 16 | MR. GREIM:  I'm sorry.  I'm | |
| 17 | thinking about -- I'm trying to cut out | |
| 18 | arts and crafts or, you know, artwork or | |
| 19 | something, tangible things. | |
| 20 | Let me go back, okay, and make it | |
| 21 | clear. | |
| 22 | BY MR. GREIM: | |
| 23 | Q.    In 2019, have you received payment for | |
| 24 | any services other than your salary as a director of | |
| 25 | ACA? | |

Page 102

| | | |
|---|---|---|
| 1 | THE WITNESS:  Thank you. | 02:16 |
| 2 | MS. TESKE:  Thank you, | |
| 3 | Ms. Maistrello. | |
| 4 | THE VIDEOGRAPHER:  This will | |
| 5 | conclude Video No. 2 and end the | |
| 6 | deposition of Karin Maistrello.  We are | |
| 7 | off the record at 2:15 p.m., August 23rd, | |
| 8 | 2019. | |
| 9 | (Time noted:  2:15 p.m.) | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Page 104

| | | |
|---|---|---|
| 1 | MS. TESKE:  Object to the form. | 02:15 |
| 2 | You can answer the question. | |
| 3 | Q.    I'm sorry.  Other than your salary as | |
| 4 | an employee of Golden Spring? | |
| 5 | MS. TESKE:  Object to the form. | |
| 6 | But you can answer the question. | |
| 7 | A.    No, I did not. | |
| 8 | MR. GREIM:  Okay.  Well, I want to | |
| 9 | stand on the questions I asked about the | |
| 10 | discussion with Mr. Podhaskie.  I think | |
| 11 | I've asked every possible question that | |
| 12 | can be asked about that question, and I | |
| 13 | want to hold open the deposition for that | |
| 14 | purpose only. | |
| 15 | I will say that for efficiency | 02:15 |
| 16 | sake, if there is a way to get the | |
| 17 | information we need from ACA without | |
| 18 | going into that, then we will try.  We | |
| 19 | will try.  But if we can't, we'll want to | |
| 20 | return to this topic and we'll just raise | |
| 21 | it with the judge.  And so I've got | |
| 22 | nothing else. | |
| 23 | MS. TESKE:  Thank you. | |
| 24 | MR. GRENDI:  Thank you very much. | |
| 25 | MR. GREIM:  Thank you, Ms. Maistrello. | |

Page 103

| | |
|---|---|
| 1 | ACKNOWLEDGMENT |
| 2 | |
| 3 | STATE OF NEW YORK      ) |
| | )  ss.: |
| 4 | COUNTY OF _____  ) |
| 5 | |
| 6 | I, KARIN MAISTRELLO, hereby |
| 7 | certify that I have read the transcript |
| 8 | of my testimony taken under oath, on the |
| 9 | 23rd day of August, 2019; that the |
| 10 | transcript, except as noted in any |
| 11 | attached errata sheet(s), is a true |
| 12 | record of my testimony. |
| 13 | |
| 14 | _____ |
| | KARIN MAISTRELLO |
| 15 | Subscribed and sworn to before me |
| 16 | this ___ day of _____, 20____. |
| 17 | |
| 18 | |
| 19 | _____ |
| 20 | Notary Public |
| 21 | My Commission expires the |
| 22 | ___ day of _____, 20____. |
| 23 | |
| 24 | |
| 25 | |

Page 105

27 (Pages 102 to 105)

Karin Maistrello
August 23, 2019

Atkinson-Baker, Inc.
www.depo.com

1     CERTIFICATE

2

STATE OF NEW YORK  )
3       ) ss.:
COUNTY OF WESTCHESTER )

4

5    I, KATHLEEN T. KEILTY, a Certified
6 Shorthand Reporter and Notary Public within
7 and for the State of New York, do hereby
8 certify:
9    That KARIN MAISTRELLO, the witness whose
10 testimony is hereinbefore set forth, was duly
11 sworn/affirmed by me before testifying and
12 that the foregoing transcript is a true record
13 of said testimony.
14    I further certify that I am not related
15 to any of the parties to this action by blood
16 or marriage, and that I am in no way
17 interested in the outcome of this matter.
18    IN WITNESS WHEREOF, I have hereunto set
19 my hand this 4th day of September, 2019.

20

21   _____

    KATHLEEN T. KEILTY, C.S.R.
22   License No. 000755

23

24

25

           Page 106

1    ERRATA SHEET
    Page ____ of _____
2

  I, KARIN MAISTRELLO, wish to make the following
3 changes to the foregoing transcript of my testimony
 taken on the 23rd day of August 2019, for the reasons
4 cited below:
5 PG-LN  CHANGE FRM/TO   REASON
6 _____ _____  _____
7 _____ _____  _____
8 _____ _____  _____
9 _____ _____  _____
10 _____ _____  _____
11 _____ _____  _____
12 _____ _____  _____
13 _____ _____  _____
14 _____ _____  _____
15 _____ _____  _____
16 _____ _____  _____
17

18   _____
    KARIN MAISTRELLO
19

20 Subscribed and sworn to before me
21 this _____ day of _____, 20_____.
22

23 _____
   NOTARY PUBLIC
24 My Commission expires the _____ day
25 of _____, 20_____.

           Page 107

28 (Pages 106 to 107)

Karin Maistrello
August 23, 2019

Atkinson-Baker, Inc.
www.depo.com

Page 1

**A**

**a.m** 2:10 7:10 16:7
**able** 15:14 20:7 92:18
99:2
**Absolutely** 44:2
**ACA** 4:13 5:8,11,19,20
5:22 6:6,11,23 12:19
12:21 13:1,16,17
15:14 16:15 17:6,6,20
17:21,25 18:14,16,24
19:2,5,5,6,9,13,16,21
20:15 21:22 24:18
25:15 26:6 27:7,8,10
29:19,24 30:5,20 31:1
31:4,7,11,17,21 32:5,8
32:13,24 33:10,16
35:5,9,13 37:6,8,15,18
37:21 38:13,17,21
39:3,9,13,17,22 42:5
47:13 49:25 50:5,11
50:16,24 51:15,20,23
52:20,23,25 53:3,6
55:4,19,22,24 56:4,23
60:5 61:17 62:19
63:17,22 64:2,7 65:17
66:15,16 67:5 68:17
68:22 69:25 70:6,25
71:11,18 72:7,16,21
73:8 74:2,11,13,23
75:10 82:9 84:3 88:1
89:24 94:8,20,25 95:5
95:8,11,15,22 96:8,12
96:16,22 97:1,3,6,13
97:18,24 98:7,20 99:4
99:24 100:7 102:9,11
102:25 103:17
**ACA's** 15:15
**accept** 82:8
**accepted** 13:18 17:25
24:25 43:22 45:10
**accepting** 5:7 34:15
**accomplish** 7:11
**ACKNOWLEDGMENT**
105:1
**acquaint** 38:19 82:24
**act** 84:7,13
**acted** 20:13
**acting** 19:15
**action** 7:7 106:16
**actions** 6:19 78:16
**actual** 91:7
**AD0867C** 1:23
**address** 9:15,16 57:1,4
**addressed** 60:16
**advice** 5:23 6:14,16
57:23 58:5 62:1,17
63:22 64:1 65:9 66:3
76:2,18,20,23 77:1,8
77:14,17,17 78:3
**advise** 6:17 32:2 78:4
97:5
**advised** 50:3 82:22
**advisory** 82:19
**afraid** 15:11,20
**afternoon** 17:8 22:19
**against-** 1:6 2:6
**age** 9:18
**ago** 67:4 71:10 72:12

**agree** 82:11 93:12
**agreement** 24:9 53:11
53:16 94:8,13,22
**agreements** 53:7
**ahead** 14:24 25:9,12
29:15 47:24 69:14
**alleged** 19:14
**allow** 21:13 22:2,3 23:8
67:14,20 68:5 76:6
**allowed** 17:22
**alongside** 87:6
**Americas** 2:18 7:14
**answer** 9:5 11:15 12:18
12:23 14:23 15:4
16:23 21:8 25:13
28:18,18,25 29:21
30:23 31:14,15 33:2
34:6 35:1,15 36:8,15
37:11,24 38:3,24 39:6
40:2 41:12 42:24 43:9
46:25 47:18 49:11,16
50:7,8,13,20 51:17
52:10,17 53:13,22
54:10 56:8,17 57:6,11
58:3,19 60:1,7,23
61:11,23 62:13,22
63:19,24 64:4,9,12,22
64:25 65:13,20,22,24
66:25 67:10 69:21,23
71:4,15,21 72:4,9 73:2
73:11,17 74:16,21,25
75:6,19 76:5,8,9 77:2
77:6 78:20 81:6,14
83:4,9,15,25 85:8 86:7
88:3 89:5,10 91:4
93:16 96:5 97:10,15
97:22 98:9 100:11,17
101:14 103:2,6
**answered** 14:22 22:3,10
34:9 75:7
**answering** 69:4
**answers** 76:7
**Apartment** 56:25 59:22
**apologize** 17:8
**apparent** 18:7
**appear** 85:4
**APPEARANCES** 3:1
**appears** 82:12 85:2
92:13 93:21
**applied** 10:12 39:1
**appointed** 34:3 35:4,8
35:12,23 36:2,5 47:6
47:10 86:5
**appointing** 33:24 39:10
**appointment** 32:11
34:16 36:19,22 82:9
**Appointment/Cessation**
4:18 79:19 80:22
**appropriate** 21:12
**approve** 96:22 97:1
**approved** 96:17
**approximately** 7:10
**arts** 102:18
**artwork** 102:18
**asked** 13:6,7,17 14:21
16:16,18 20:19 21:20
28:5 31:2 49:18 57:24
58:10 92:22,22 96:2

103:9,11,12
**asking** 19:20 29:11
62:24 68:11 76:19
78:12 81:21
**aspect** 20:4,7
**assist** 96:3
**associates** 18:6
**assumption** 51:10
**Atkinson-Baker** 1:18 7:3
7:25
**attached** 59:10 105:11
**attachment** 4:11 44:13
44:25
**attempted** 95:16
**attempts** 94:21
**attended** 10:10
**attenuated** 23:23
**attorney** 4:23 7:8 15:17
17:3 32:1 66:6,7,13
67:17,18 89:20 90:4
**attorney-client** 63:3
76:11,15 79:7 97:8
**Attorneys** 2:16 3:3,9,15
**August** 1:15 2:10 4:1 5:1
6:1 7:9 80:2,7 88:15
92:19 104:7 105:9
107:3
**authorities** 49:14
**authority** 34:23
**Avenue** 2:18 3:16 7:13
9:16 59:21
**avoid** 99:23 100:8
**avoided** 99:22
**aware** 37:8 47:12 89:23
94:8,20 96:12

**B**

**B** 3:5
**back** 13:8 15:25 21:1
26:20 44:15 60:15
69:16,19,21 79:13
83:17 98:15 101:12
102:20
**background** 10:3 11:18
17:23 21:19 28:8
**bad** 72:20 102:15
**banks** 24:11,11,20,20
**based** 24:11
**basis** 15:5 35:3 50:18
92:23
**Bates** 4:18 79:19 80:17
90:3
**bearing** 77:5,6
**becoming** 27:4
**began** 67:3 69:22
**beginning** 80:5 93:6
**begun** 16:13
**behalf** 7:21 8:6 81:18
89:8,13 101:17
**belief** 50:15,18
**believe** 35:11,17 45:19
51:14 60:2 75:7
**believed** 77:13
**believes** 76:23
**believing** 35:4
**belong** 73:6
**Bennett** 3:22 7:2
**best** 41:4

103:9,11,12

**better** 20:22 70:22 72:14
**beyond** 52:15 53:20
**binding** 77:15
**bit** 23:22 41:2,3 55:17
**blood** 106:15
**book** 90:18 92:18
**booklet** 38:16
**bother** 97:17
**bottom** 80:17 81:1,9
82:12
**bounds** 15:10
**box** 79:2 84:10
**boxes** 85:2
**break** 44:4 79:23 98:11
**Briefly** 27:12 29:8
**bring** 43:23 45:12
**bringing** 96:3
**broaden** 33:12
**brought** 68:4
**brown** 91:18
**Bryan** 2:17 7:12
**build** 91:20
**bunch** 17:23 69:17
**business** 28:4,6 29:11
**bylaws** 49:22

**C**

**C.S.R** 1:22 106:21
**California** 7:4
**call** 16:2 17:9 21:7,18
**called** 53:24 86:14 88:13
**calls** 22:21
**capacity** 37:21
**Capital** 4:13 55:4,22,24
56:4,23 84:4
**care** 70:21
**careful** 63:6
**Carry** 26:12
**case** 1:5 2:5 7:15 9:4
11:22 18:4 19:16
23:20 42:17 46:18
54:8,13,20 67:19
70:13,14 101:2,8
**cast** 39:21
**catch** 25:19
**cause** 21:15 25:8 48:4
59:10 81:25
**caution** 22:4 23:10 70:2
97:7
**Cave** 2:17 7:12
**ceasing** 84:13
**Celestial** 82:3 86:14,19
87:4
**Centre** 4:21 88:8,14
**CEO** 20:10
**certainty** 95:8,11
**CERTIFICATE** 106:1
**Certified** 2:19 106:5
**certify** 105:7 106:8,14
**Cessation** 84:7
**chance** 64:18
**Change** 4:17 79:17
80:19 107:5
**changes** 49:5 107:3
**characterize** 78:10,14
**characters** 91:7
**chart** 52:20
**Chassat** 84:20 85:12,13

**85**:16,21 86:3
**check** 84:9 89:1
**checked** 84:10 89:13
**China** 10:9 70:22 72:14
**Chinese** 10:11 12:2
24:11,20 83:22
**choose** 61:13
**Chunguang** 90:23 91:1
91:13 92:24 93:5,6
94:18
**cited** 107:4
**citizen** 9:21
**City** 3:10 9:17 56:25
59:22
**clear** 23:6,18 26:4 33:4,5
59:4 67:1 79:4 86:2
102:21
**clearly** 9:5,6 24:1
**client** 13:10
**close** 23:24
**cold** 41:7,8
**collect** 94:21
**come** 5:16 6:11,12,13
11:11 22:8 47:15
48:18 68:22,24,24
69:16,19,21 79:13
**comes** 22:11 48:5
**comfortable** 69:4
**coming** 16:15 21:7 62:3
66:15 83:19 85:20
**Commission** 105:21
107:24
**communicated** 101:16
**communication** 63:3
64:11 101:11
**communications** 43:11
43:14 70:3 73:18 74:5
76:13,16 78:9 79:8,10
97:9
**Communist** 72:19
**companies** 53:4
**company** 4:17 23:24
24:2 30:11 49:23
70:16 71:23 73:5
79:17 80:19 82:22
84:3 86:13
**company's** 65:24 82:23
84:7
**completely** 18:2
**concept** 77:21
**concerns** 24:15 30:19
**conclude** 79:25 104:5
**concludes** 26:19
**conclusion** 100:7
**conference** 22:20
**confident** 76:14
**Confirmation** 81:10
**Connecticut** 3:4
**connection** 21:20 87:18
95:17
**considered** 97:24
**constantly** 22:21
**construction** 21:25 22:1
22:25 23:15,18 30:1
**consulting** 53:6,10,15
**content** 57:22
**context** 64:11
**Continued** 5:3 6:2

Atkinson-Baker, Inc.
www.depo.com

Page 2

contract 24:14 25:1
controlled 24:20
controls 38:20
conversation 6:5,8,10
  6:11,17 17:11,16
  32:24 64:24 65:16,25
  66:23 67:1,5,8,12,13
  68:8,10,15,18,21,23
  69:7 75:11,16,22 78:4
  78:13
conversations 61:21,24
  66:9 69:6
copy 34:20 43:23 45:3,6
  46:7 59:2 60:12
corner 80:18 88:18
corporate 4:20 37:8 39:8
  88:7,13 99:24
Corporation 1:4 2:4 7:16
  89:24
correct 9:24 10:21 12:6
  14:4 27:5 33:11 35:9
  35:10 38:6,7,10 40:7
  41:19 50:16,17 54:3,4
  54:20,21 60:13,14
  72:15 83:12 86:11,12
  94:2 101:15
correctly 29:17
counsel 8:1 46:13 63:17
  64:17 66:16,19 77:3
  78:23
counterclaim 7:17,19
country 31:20
COUNTY 105:4 106:3
couple 42:11
course 79:12
court 1:1 2:1 7:23 19:8
  19:19,25 20:18,25
  21:4,6,11 25:16,21
  26:10,12,17 71:6
crafts 102:18
curious 22:13
current 9:14
cut 102:17
Cyber 4:21 88:8,13

---

**D**

D 3:11
Dan 74:5
Daniel 6:10 57:17 61:16
  61:22 67:4 68:16,21
database 4:20 88:7,13
date 7:9 35:17 36:9,19
  36:22 44:11,14 55:6,9
  79:21 88:9 89:22 94:5
dated 2:15
day 22:6,17 23:1 35:12
  36:3,16 46:4 52:11
  65:2 90:12,13,18
  105:9,16,22 106:19
  107:3,21,24
Debra 16:11 26:19
decide 63:2 69:24 70:6
  73:7
default 23:21
defendant 1:5 2:5 3:3
  7:17,18
defendant/counterclaim
  1:8 2:8,16 3:9 7:22

59:9
defense 26:1
definitely 46:2 47:4
degree 10:11,12,19
deponent 3:15 7:19 8:6
deposed 9:1 99:24
deposition 2:14 7:11,20
  8:3 15:9 17:12,19 41:2
  51:25 79:25 80:6
  100:24 101:5,7 103:13
  104:6
describe 91:15
described 92:21
DESCRIPTION 4:8 5:6
despite 23:19 25:8
detail 30:3
determine 31:7
determined 79:11
dial 15:21
difference 62:17
different 14:23 55:17
  60:18
difficult 22:20 68:7
digital 80:17
direct 11:14 12:22 13:11
  15:3 20:1 58:19 62:21
  64:9 65:12,19 67:10
  69:1 76:12
directed 22:17 59:10
  61:23
directing 48:24 73:23
  74:1,4 76:5
direction 78:22 97:14
DIRECTIONS 5:13 6:2
directives 52:16 53:21
directly 19:17 25:25
director 4:17 6:6 12:10
  12:15,19,25 13:2,8,15
  14:14 16:16 17:6 27:4
  30:8,17 31:2 32:5,13
  33:10,16,22,25 34:3
  34:16 35:5,9,13 37:14
  37:18,21 38:13,17,21
  39:2,10,16,21 40:22
  40:24 47:5,9 50:4,11
  50:16,24 56:1,6,24
  65:17 66:16 69:25
  70:7,25 71:18 72:25
  75:3 79:18 80:20 82:9
  83:18 84:10,13 85:11
  85:21 86:5,19 87:5
  88:1 92:6 94:7 96:3,22
  97:1,18 99:4 100:7
  102:24
directors 20:15 30:14
  31:21 47:12 82:22,25
  88:22
directors' 82:23
directorship 14:3 27:10
  33:9
discuss 33:15,18 42:14
  42:17,19,21,25 51:19
  51:22,25 52:3 58:8
  74:5 75:11,16 76:12
  78:8 94:13,17
discussed 52:25 75:22
  95:22 98:4
discussion 6:14,20,22

16:8 27:13,23 31:6
  33:14 42:1,2,5 57:22
  63:8 66:14 69:23 76:3
  78:17 93:9 98:5
  103:10
discussions 43:4,5
displeasure 96:7
disposition 101:1
dispute 23:14
disputed 18:19
DISTRICT 1:1,2 2:1,2
divulge 68:6
divulging 97:8
document 4:20,23 33:24
  34:20 35:20,22,24
  39:9 43:22 49:2 60:18
  66:8 67:20 68:1 82:8
  82:15 83:7,22 86:3
  87:3,10,17,23 88:6,12
  89:19 90:3,9,17,22
  93:18,22
documents 17:13 37:20
  38:8,9 44:19 49:22
  60:21 68:5,10,18
  90:11 93:25
doing 24:5 79:4,15 84:23
drafted 48:19
drafting 51:4
duly 8:17 106:10
duties 12:25 29:6,18
  38:12,16,20 39:2
  82:25
duties' 82:23
duty 13:3 96:21,25

---

**E**

earlier 11:10 68:11 86:10
  86:14 87:20 93:11
  98:20
early 15:12
Eastern 1:4 2:4 4:23
  7:15 8:10 15:15,17
  17:3,5,5,20,21 19:5,7
  19:15,17,21,24 20:2
  20:13,14 21:22 25:23
  42:14 53:11,25 54:3,8
  54:13 55:1 89:20,24
  90:3 93:12,13,21 94:9
  94:22
Eddie 8:2
edges 64:16
edgreim@gravesgarr...
  3:12
educational 10:4,19
EDWARD 3:11
effective 36:19,22 49:9
  51:15 89:14 99:10
effectively 49:23 50:4
efficiency 103:15
eight 60:18
either 21:9 49:21 60:12
electronic 5:9 46:14
elicited 25:11
Ellman 3:3 8:9
email 4:10 5:7,9 43:17
  43:19 44:10,22 45:12
  45:21,24,25,25 46:3,7
  46:18,22 47:2 48:5,21

52:12 87:22 101:11
emails 43:10,13 46:14
  48:8,17
employed 11:1 13:7
employee 7:7 66:5 67:16
  101:20 103:4
employment 10:23
enforce 21:10
English 12:1 83:22
  85:10
ensure 89:13
entail 28:12
entailed 69:6
enter 85:5
entirely 62:4
entities 5:19 12:21 22:15
entitled 7:15 15:8
entity 12:11,16 53:7,24
  55:25 56:5 81:19 82:4
  86:15,20 87:6 95:1
  96:13
entry 92:19
Erin 3:17 8:5 17:8
errata 105:11 107:1
ESQ 3:5,11,17
establish 20:14
eteske@hodgsonruss...
  3:18
Evette 16:21,22
exact 20:18
exactly 24:16
Examination 4:5 8:22
examined 8:20
example 30:1
Exhibit 4:12 44:9,12,13
  44:20,20,21,21,22,25
  45:1 48:1,24 55:3,7,12
  55:19,21 59:5,5 60:17
  60:17 79:17 80:11
  83:21 87:17,20,21,23
  88:6,11 89:19 90:2
Exhibits 4:7 55:11 61:1
  61:8
expecting 45:21,24 46:2
expedition 18:5
expires 105:21 107:24
explain 15:14
explained 24:1
explicit 17:17
express 96:7
extending 94:25
eyes 91:18

---

**F**

face-to-face 40:12
fact 15:17 17:3 23:21
  24:25 94:24 99:23
fair 74:8
family 70:21
far 10:15 19:3 43:3
February 11:7 12:5,14
  13:9 14:19
feel 73:5
field 22:21 85:6
file 1:23 87:9
filed 34:23 49:13
fill 47:6
financial 39:12

financially 7:6
find 5:17 11:13 29:12
  32:15,17 48:8 63:4
finding 29:18 32:21
fine 18:21 62:9
first 8:17 9:2 10:10 18:9
  19:23 20:10 27:1
  30:25 32:5 36:16
  56:10 61:1 84:2,23
  102:10
fishing 18:4
fleshed 22:2
flight 25:19
focused 22:14 23:10
  25:21,22,23
follow 46:16,18
follow-up 67:12
following 16:10 107:2
follows 8:20 26:23
fool 25:20
foregoing 106:12 107:3
Forget 74:9
forgot 13:4
form 9:25 12:17 23:4
  27:24 28:17,24 29:20
  30:22 31:12,22,23
  32:25 33:1 34:4,24
  35:14 36:6,13,21,25
  37:10,22,23 38:2,22
  38:23 39:4,5,18,19
  40:1 41:9,22 42:23
  43:7 46:24 47:8,17,23
  48:9,12,16 49:10,15
  50:1,6,12,19 51:16
  52:7,14 53:8,12,19
  54:9 56:2,16 57:5,10
  59:16,25 60:6,22 61:2
  61:10 62:20 63:18,23
  64:3,8 65:11,18 66:24
  71:3,14,20 72:3,8,10
  73:1,10,15,16 74:14
  74:19,24 75:5,18
  78:18 81:4,13,20
  82:16 83:3,8,14,20
  84:14,22 85:7,14,22
  86:6,21,23 87:13,23
  88:2,20 89:4,9 90:20
  91:3,24 92:7,23 93:15
  94:3,4,15 95:3,9,13,19
  95:20,24,25 96:4,14
  96:18 97:21 99:5,7,13
  99:14,20 100:1,2,10
  100:16 101:13,22,23
  103:1,5
formation 49:22
formulating 22:23
forth 106:10
forward 10:23 42:7
forwarded 44:23
foundation 16:14 18:15
foundational 15:13
Freeman 5:16 16:11
  26:19
Freeman's 52:16 53:21
French 12:1
friends 20:8
FRM/TO 107:5
front 24:13 45:3 91:12

---

Karin Maistrello
August 23, 2019

Atkinson-Baker, Inc.
www.depo.com

94:2
**fudgy** 24:6
**full** 69:12
**function** 21:19
**fund** 28:7,8 30:5
**funds** 25:15 95:12
**further** 25:17 49:8
  106:14

---
**G**
---

**Garrett** 3:9 8:3
**general** 21:19 82:24
**generally** 23:2
**German** 12:1
**getting** 5:23 65:8 70:25
  72:24
**Gifford** 9:16 56:24 59:21
**give** 6:14 20:22 30:2
  58:24 60:10 64:1,17
  66:10 76:2 80:13
**given** 11:20 15:10
**giving** 62:1 73:17
**gladly** 13:18
**Glendale** 7:4
**GMT** 88:15
**go** 13:8 14:23 16:4 22:22
  25:9,12 29:15 42:7
  44:4 47:24 64:17
  67:25 69:14 76:22
  86:10 102:20
**goal** 71:19
**goes** 23:7
**going** 5:16,20,22 6:6,10
  6:15,16 10:3 11:12
  13:8,11 15:20 18:16
  21:7 22:2,4,13,18,20
  23:8,9 25:9,12 26:4
  33:5,12 36:19 41:1
  55:10 57:21 58:18
  61:17 62:5,15,19 64:7
  64:15 65:17 67:5,20
  68:5,17,22 69:3,12,24
  70:1 73:4 75:25 76:6
  76:12,22 77:5,9,12,14
  77:23 78:2,3,7 79:2
  86:2 88:10 90:1 97:7
  98:2,3,25 103:18
**Golden** 3:21 5:16,17
  11:1,4,6,12,13 12:4
  14:18 17:2 20:11
  27:19 41:17 53:16
  57:19,20 66:5,7,19
  67:16,17 101:21 103:4
**good** 8:5,24,25 17:8 22:9
  26:10 46:20
**Graves** 3:9 8:3
**Greenwich** 3:4
**greet** 42:3
**greeted** 43:1
**Greim** 3:11 4:5 8:2,2,23
  9:25 11:14,17,23
  12:24 15:5,11,24 16:4
  16:12 17:22 18:4,8
  19:1,11,22 20:5,21
  21:2 22:4 25:3,18 26:3
  26:9,11,13 44:5,17
  46:20 55:16,19 58:20
  61:25 62:8,10,25 63:4

64:14 65:21 66:11,18
67:22 68:7 69:9,14,20
71:6 73:25 74:7 76:17
77:9,12,19,23 78:1,15
78:24 79:9,13,22 80:9
80:15 81:23 82:1
98:10,17 102:1,4,7,10
102:14,16,22 103:8,25
**Grendi** 3:5 8:8,8 26:15
27:24 31:23 32:25
37:23 38:23 39:5,19
55:14 58:2,14,16
61:20 72:10 78:19
86:22 87:1 92:1 94:4
95:3,20,25 99:6,14
100:2 101:22 102:15
103:24
**ground** 16:25
**grounds** 52:9
**Group** 4:14 55:4,22,24
56:4,23 84:4
**guess** 14:18 28:21 76:25
93:24 98:24
**guide** 38:16 82:22,25
**Guo** 18:6 24:19 25:11
52:22 100:19,23
**Guo's** 25:14
**gym** 20:9

---
**H**
---

**hair** 91:18
**Han** 90:23 91:1,13 92:11
92:21,25 93:5,6 94:17
**hand** 55:10 90:1 106:19
**handed** 68:9 80:10
**happen** 27:16,23 36:10
69:8
**happened** 27:17 64:12
68:11 86:8
**happening** 6:23 98:6
**hate** 15:12
**head** 9:6 22:8,11
**hear** 94:25 95:4
**heard** 30:25 53:18,24
54:13,16 61:16 67:4
68:16 82:4 85:18
86:15 93:11 94:11
**hearing** 54:12
**hedge** 30:5
**held** 2:17 16:11
**help** 29:11
**helping** 24:18
**hereinbefore** 106:10
**hereunto** 106:18
**hi** 42:3
**high** 10:6
**highlighted** 48:1,6
**hire** 13:5,10
**history** 10:24
**Hodgson** 3:15 8:7
**hold** 21:14 78:6 103:13
**Hon** 16:11 26:19 53:18
**honest** 61:3 70:11,15
82:10
**Hong** 4:20 23:17 24:10
24:11,19 25:1 38:20
39:1 49:14,21 88:6,12
89:3,13

**Honor** 16:12,24 17:7,16
18:8 19:1,11,22 20:5
25:19 26:3,16
**hope** 25:18
**house** 61:9
**hundred** 91:19
**Hungarian** 12:2

---
**I**
---

**ICRIS** 4:21 88:8,13
**idea** 54:6 72:19 99:16
**identification** 44:11,14
55:5,9 79:20 88:9
89:21
**identified** 86:11
**identify** 8:1
**implicated** 19:17
**in-person** 33:8 43:4,5
**inappropriate** 21:9
**inaudible** 23:11
**inbox** 48:8
**including** 17:24
**incumbent** 66:12,18
**INDEX** 4:2 5:2
**indication** 23:19
**individuals** 95:16
**infor-** 68:6
**information** 83:11 95:15
103:17
**initiate** 6:8 66:23 67:8
**inquire** 66:8
**inquiry** 15:7 17:18 21:13
**instruct** 23:5
**instruction** 16:23 21:8
**instructions** 17:17
**intended** 22:5
**interested** 7:6 28:4
29:10 106:17
**interesting** 22:13 24:8
**interpreting** 10:8
**interview** 27:2
**introduce** 14:10 93:6
**introduced** 13:24 14:15
14:20 16:18,20 17:6
19:2,9,13 29:1,3
**invest** 29:16,19
**invested** 29:24
**investment** 28:7,9
**investors** 29:12
**invited** 16:17
**involve** 74:23
**involved** 30:10 70:8,9
71:1,1,12,12,24 72:2
72:24 73:6,8 74:2,11
74:12 75:3 98:21 99:3
99:11,12,19 100:8,9
100:14
**irrelevant** 18:3 25:5
**issue** 16:13 21:11 25:10
25:25 66:1
**issued** 4:13,15 55:4,8
**Italian** 92:0 12:1
**items** 60:18

---
**J**
---

**J-e** 13:20
**January** 12:19 14:14
27:22 35:9,12,18,21

35:22,23 36:2,11 40:7
83:12
**Je** 5:24 13:20,21 14:11
14:15,20 16:17,19
27:3 28:1,11 30:7 31:7
31:17 32:15,18,20,23
33:8,9,14 37:5 39:25
40:14 41:6 42:1,8 43:6
43:14 44:23 45:9
46:21 47:15 48:8 49:7
49:18 51:13,20 65:10
72:13 81:17 86:11
94:14 95:18 96:2,7
101:11,17
**Jersey** 9:17,17 56:25,25
59:22,22
**JGK** 1:7 2:7
**job** 27:1
**jobs** 12:8
**jog** 41:4
**join** 13:17 28:5
**judge** 15:6 16:3 52:15
53:20 103:21
**judgement** 28:23
**judgment** 22:23 28:15
28:16,20
**July** 2:15 12:20 43:17
46:4 61:15 63:12,14
69:25 70:7 73:9 97:25
**jurisdiction** 31:10,21

---
**K**
---

**Kansas** 3:10
**Karin** 1:13 2:14 4:4,15
7:20 8:16 17:11 55:8
56:24 59:11,21 60:4
80:1,6 104:6 105:6,14
106:9 107:2,18
**Kathleen** 1:21 2:19 7:24
8:19 106:5,21
**keep** 22:14 23:10 34:20
58:25 59:2 60:12
64:14 70:21 72:24
90:14 100:14
**keeping** 99:10
**Keilty** 1:21 2:19 7:24
8:19 106:5,21
**key** 68:9
**kind** 9:23 30:3 92:14
**knew** 25:14
**know** 9:5,11 10:5 13:21
13:23 15:16,18,19
16:20 17:4,24 18:13
20:2,3 22:7,9,12,23
24:17,17 25:23,24,25
30:6 32:10 34:2,8,22
39:1,15,20 40:6 47:9
47:18,19 48:10,13
49:7,12,13,17,21 50:2
50:10 52:18,22 53:3,5
53:6,9,10,14,15,17
54:5 61:3 64:10 66:3
67:11,14 69:5,15
70:11,14,15,21 72:5
72:11,18 73:3,3 74:17
74:22 75:1,21 76:18
76:20,22 77:2 84:21
87:12,15,25 89:7,12

89:15 91:6,9,10,13
92:5 93:4 95:10,14
96:16,19 99:1,15,17
102:18
**knowledge** 18:16
**knows** 66:6 67:17 100:3
**Kong** 4:20 23:17 24:10
24:11,20 25:1 38:20
39:1 49:14,22 88:7,12
89:3,13
**Krause** 3:3 8:9

---
**L**
---

**label** 80:17
**lack** 23:19
**languages** 11:24
**Laurent** 84:20 85:12,13
85:21 86:3
**law** 38:20 39:1 49:22
**lawsuit** 74:18
**lawyer** 57:12,18,19,20
65:25
**lawyer-client** 66:13
**lay** 16:24 18:15
**laying** 16:14
**lead** 24:21
**learn** 18:5 31:3 73:7
**learned** 19:12
**leeway** 11:21 66:10
**left-hand** 80:18
**legal** 3:22 5:23 6:16
57:23 58:5 62:1 63:22
65:8 66:3,8 67:19,20
68:1 77:8,17,21 78:2
**Leighton** 2:17 7:12
**let's** 10:22 12:3,14 16:4
32:4 33:4 40:13 42:7
59:4 63:6 69:14,15,18
71:22 79:22 98:10
**letter** 18:20 23:12 24:13
25:6 43:18 48:19
49:19 50:21,23 51:4
51:12,14 87:21 89:2
**License** 106:22
**life** 20:4,7
**Limited** 2:14 4:14,23
7:16 55:4,22,25 56:4
56:23 82:3 84:4 86:14
86:19 87:5 89:20 90:4
**limiting** 21:18
**line** 5:6,14 6:3 48:25
56:22 59:18 84:23
**lines** 15:7 17:18
**linguistics** 10:12,12
**listed** 48:14 83:11 88:1
**listen** 62:10
**lists** 60:18 88:21
**literally** 47:2,3
**literature** 10:11
**little** 23:22 41:2,3
**LLC** 1:7 2:7 3:9 7:18,23
8:3
**LLP** 3:3,15 7:13
**loan** 17:20 19:5 22:16
94:8,13,21
**loans** 94:25
**located** 7:13
**log** 90:18

---

Karin Maistrello
August 23, 2019

Atkinson-Baker, Inc.
www.depo.com

logbook 90:14
long 14:14,19 27:22
40:24
longer 50:16
look 14:17 21:6,6 55:12
55:15 59:5 60:17
80:12 81:8 82:18
83:17 84:6 85:1 93:17
93:19
looked 87:20 92:17
93:13
looks 90:5
lot 66:10
lots 15:10

**M**

Main 3:10
Maistrello 1:13 2:15 4:4
4:11,15 7:20 8:16,24
16:15 17:12,15,24
18:23 20:11 25:13
44:9,12,13,18,21,21
55:3,7,8 56:24 59:11
59:21 60:4 80:1,6,10
80:23 98:18 103:25
104:3,6 105:6,14
106:9 107:2,18
Maistrello's 5:8,10
making 20:14 72:14
manages 95:12
mark 69:19 84:9 90:18
marked 44:10,13,18 55:5
55:8 79:20 80:11 88:8
89:21
marking 55:11 88:11
90:2
marriage 106:16
Mason 3:4
Master's 10:10,11
matter 66:17 76:7,8
106:17
matters 19:9 70:23
mean 18:8,12 19:18,24
20:9,9 24:18 40:11
57:18 76:21 77:10,17
93:2
meaning 47:4 75:8 99:15
means 85:5
meant 21:14,17 30:3
medium 91:21,22
meet 15:1 16:22 26:25
meeting 27:7 33:8 40:15
40:18 41:13
memory 36:11 41:4
mentions 93:13
met 13:25 14:2 18:1 27:1
27:2,3 42:2,8,11,13,14
47:20
Michael 3:22 7:2
middle 88:22
mind 23:6
minds 69:15
mine 81:7
minute 77:20
minutes 17:10 67:4
71:10
mission 70:17 72:13,16
95:18

Missouri 3:10
misunderstanding
58:16,18
Mm-hmm 43:12 45:17
55:23 56:12
moment 21:15 93:17
money 23:16 24:2,19
25:1
month 27:25 40:4,7 93:2
months 14:16 27:21
morning 8:5,24,25
mouth 51:11
move 5:17 11:12 23:16
24:19 43:4,10 79:14
moved 10:9 11:3,8,10
24:2
moving 10:25

**N**

N 3:17
name 7:1 47:25 55:25
56:5 83:12,18 84:3,12
84:17 85:10,18 88:21
88:24 91:8
Nankai 10:10,19
narrow 41:1
necessarily 25:7 48:18
99:21
need 21:15 25:17 47:6
62:23 64:10 66:20
69:10 76:18 103:17
needs 47:10
never 27:8 33:9 54:13,22
54:25 91:11
new 1:2,14,14 2:2,18,18
2:21 3:16,16 7:5,14,14
8:19 9:17 11:1 27:19
34:13 47:5,9 56:25
59:22 92:6 96:3 105:3
106:2,7
nil 84:20,24 85:2,5
nod 9:5
noise 21:25 22:1,25
23:16,18
NON-PARTY 2:14
nonparty 59:10
normal 41:2
Nos 4:18 79:19
notarization 38:12 90:15
notarize 90:11,17 91:11
93:25
notarized 37:20 38:9
90:6
notarizing 90:8
notary 2:20 7:4 8:18 38:6
92:14,17 105:19 106:6
107:23
note 82:19
noted 104:9 105:10
notes 46:17
notice 4:17 47:25 56:11
59:8,12 79:17 80:19
noticed 24:3,4
NUMBER 5:6,14 6:3
numbered 90:3
NY 3:21

**O**

oath 94:1 105:8
object 9:25 11:14 12:17
12:22 14:21 15:3
18:22 23:3,4 27:24
28:17,24 29:20 30:22
31:12,22,23 32:25
33:1 34:4,24 35:14
36:6,13 37:10,22,23
38:2,22,23 39:4,5,18
39:19 40:1 41:9,22
42:23 43:7 46:24 47:8
47:17,23 48:9,12,16
49:10,15,24 50:1,6,12
50:19 51:16 52:7,8,14
52:15 53:8,12,19 54:9
56:2,16 57:5,10 58:2
59:16 60:6,22 61:2,10
62:20 63:18,23 64:3,8
64:18 65:11,18 66:24
67:9 69:1 71:3,14,20
72:3,8,10 73:1,10,15
73:16 74:14,19,24
75:5,18 77:25 78:18
81:4,13,20 82:16 83:1
83:3,8,14,20 84:14
85:7,14,22 86:6 87:13
88:2,20 89:4,9 90:20
91:3,24 92:7 93:15
94:3,4,15 95:3,9,13,19
95:20,24,25 96:4,14
96:18 97:21 98:8 99:5
99:13,14,20 100:1,2
100:16 101:13,22,23
103:1,5
objected 20:19
objecting 22:24
objection 26:8 33:5 36:4
56:7 59:25 66:21 76:4
86:21,22,25 87:1,7
89:17 99:6 100:10,21
obtain 79:6 95:16
offer 28:2 33:15 40:15
40:18
offered 14:3 27:10 33:8
office 27:17,18,19 32:6,8
41:16,18 65:1
officer 12:10,15 13:7
officers 47:13
offices 2:17 7:12
official 55:25 56:5 87:25
oh 13:4 21:14 45:8 84:1
93:8
okay 9:3,12,13 10:13,18
11:3,23 12:3 13:19
14:10 15:11 25:16
26:9 28:21 29:13 32:4
33:12 34:12 35:24
37:5 41:20 42:7,13
43:3,10,11 44:18
45:12,15 46:5 47:1
50:15 56:21 58:20
59:7 62:6,12,17,25
63:6 64:14,18 65:14
67:3,9 69:1,9,14,18
73:25 74:7,7 77:23
78:15 79:13 81:8,12
81:18 82:7 85:1,4 86:1
86:1 92:4,17 93:8 98:2

98:10 101:4 102:20
103:8
once 93:2,2,3
open 23:13 103:13
opine 77:7
order 21:11 85:17
organizational 52:19
originally 93:5
outcome 106:17
outlined 82:25
outside 15:9 23:7 41:7

**P**

p.m 26:21 44:7,16 80:2,7
98:13,16 104:7,9
page 4:3,8 5:6,14 6:3
56:13 80:25 81:1,9,24
82:12 83:12,17 84:2,3
85:1 86:10 88:22 90:5
92:6 107:1
pages 56:10 59:14 80:16
paid 33:21
Paisner 2:18 7:12
Pardon 87:14
parent 53:3
parentheses 80:21
part 24:14 71:22,25
particular 88:22
parties 7:8 24:10 106:15
Party 72:20
pause 20:23
payment 25:24 101:19
101:20 102:23
PDF 4:11 44:12,25
people 21:16,24 41:2
perform 90:15
performance 96:8
period 13:8 101:25
permitted 17:18,19
person 13:25 14:8 17:2
17:5 19:12,12,14
20:12 21:21 27:13,15
29:2 33:16 40:17
41:14,15 42:8 47:21
51:8,20 64:21,23
72:18,22 75:12,16,23
84:12 91:12 94:1
96:10 100:6 101:20
personal 18:1,11 102:4
102:6
PG-LN 107:5
phone 22:6 27:14 40:12
40:13,14 64:20
Physically 91:17
pick 64:15
place 5:17 7:11 11:13
47:6,10 64:24 69:18
70:22 72:14
plaintiff 1:8 2:8,17 3:9
7:16,19,22 8:4,9 44:19
44:20 48:1 59:9
Plaintiff's 4:8 79:16 88:5
89:18
Plaintiff/Counterclaim
1:5 2:5 3:3
please 8:1,13 9:11,14
34:11 44:1 55:12 56:3
56:22 59:8 70:5 71:5

84:1 87:2 89:11 93:20
96:23
Podhaskie 5:20,21,24
6:5,9,12,12,17,20,22
57:17,23 58:22 60:10
61:6 62:1,2,15,16,18
63:9,16,17,21 64:1,6
64:19,20 65:9,14,16
66:22 67:8,25 68:23
68:24 70:4 73:13,20
74:6,10 75:12,15,21
75:25 76:13 78:4,9,17
98:6 100:5 103:10
point 10:23 24:8 84:21
position 17:25
possible 38:1 82:14,15
103:11
post 10:5
Power 4:23 89:20 90:4
prefer 85:17
present 3:20 65:4,6
presumably 24:15
presume 27:9
pretty 22:18 24:23 91:18
previous 34:10,10 67:13
previously 13:21
printed 4:20 84:13 85:11
88:6,12
prior 46:22
privilege 21:10 63:7
66:14 76:11
privileged 23:5 61:22
63:3 76:15 79:7 97:9
probably 24:4 27:25
36:17 42:11 70:18
problem 65:21 66:11
problems 6:22 98:6
process 61:9
processed 89:2
produce 45:16 46:9
PRODUCTION 5:5
proficient 11:24
Profit 1:4 2:4 7:16 8:10
15:16,17 17:3,5,20,22
19:6,7,15,17,21,24
20:2,13,14 21:22
25:23 42:15 53:11,25
54:3,8,14 55:1 89:24
93:12,13,21 94:9,22
project 74:13 95:4
projects 29:16,18,24
30:2,2,3 32:15,17,21
95:8
protect 21:10
protected 66:14
provide 14:24
provided 102:9,10
Public 2:20 7:5 8:18
105:19 106:6 107:23
published 82:23
purported 87:18
purpose 103:14
pursuant 2:15
pursue 15:8
put 51:11 69:18 71:22
94:5,6

**Q**

Atkinson-Baker, Inc.
www.depo.com

quarter 56:18
question 5:14 6:3,7,12
  9:9 13:12 15:21,23,25
  16:20,23 19:23 20:19
  22:3,10,16 23:4,9,14
  26:24 31:13,16,24
  32:2 33:13 34:5,10,11
  34:14,25 35:6 36:7,8
  36:14,15 38:11 41:23
  52:8 53:20 57:22
  62:14,21 64:13 65:12
  65:19 67:7 68:8,15,24
  69:21 70:5 71:5,9,17
  74:15,20 75:8 76:1
  77:11,19 78:25 81:5
  83:25 84:1 87:2,19,22
  89:11 90:21 92:24
  93:20 96:23 97:10
  98:24 101:14 102:13
  103:2,6,11,12
questions 9:4 10:3
  11:19 15:13,20 17:23
  18:13,22 20:1 21:18
  21:19,20 22:8,24,24
  25:13 28:11 69:5
  98:19 103:9

**R**

raise 23:2 26:1 103:20
ran 48:15
reachable 26:6
read 15:25 16:1 20:24
  21:1,3 26:22 56:22
  59:20 61:4,5 71:8
  81:21 82:22 84:18
  85:25 86:9 91:1 93:25
  94:5 105:7
reading 84:22
reads 80:19
realize 54:7 85:20
really 14:25 15:19 16:13
  23:6 35:6 38:4 40:5
  46:12 48:13 62:23
  73:12
reason 9:10 19:8 70:16
  107:5
reasonable 22:23
reasons 107:3
recall 60:3 83:6 95:22
  98:22 99:2
receive 37:13,17
received 59:24 61:4
  77:14 101:19 102:23
receiving 60:3
recess 44:8 80:3 98:14
recognize 59:5 82:7
recommendations 20:15
record 16:1,5,7,9 21:3
  26:21,22 33:6 44:4,7
  44:16 46:11 62:8
  66:21 69:8 71:8 77:24
  80:1,7,16 83:21 92:18
  93:10 98:13,16 104:7
  105:12 106:12
records 39:9 88:1
refer 32:1
referring 14:6,7 70:12
refresh 69:15

regard 5:10
regarding 101:12
registered 31:11,18
registration 89:14
registry 4:20 82:24 88:7
  88:13
related 67:19 106:14
relating 63:22 64:2
  102:2,4
relationship 15:15 17:21
  18:2,11,24 19:6,16,20
  20:1 21:24,25 22:15
  89:23
relative 7:7
relevance 11:16
relevancy 10:1 52:8
relevant 11:21 19:4 23:1
  25:8
remember 14:12,25 17:1
  19:24 24:12 28:1
  34:19 35:19,20,25
  36:1,2,9,17,20 37:1,25
  38:4,14 39:9 40:3,5,21
  40:25 41:3,7,10,25
  42:9,12,22 43:5 46:6
  47:3 63:11,13,15 65:3
  71:13 82:10 86:8 90:8
removed 19:3
renovation 30:2
repeat 15:22 70:5 71:5
  84:1 87:2 89:11 96:23
rephrase 9:11 12:12
  28:21 34:10,12 102:12
REPORTED 1:21
reporter 2:20 7:24 8:13
  15:25 20:23,25 71:7
  106:6
reporting 30:8
represent 7:3 88:11
representative 99:24
representing 8:4
request 37:13,17
requests 5:5 17:14
requisite 49:14
reread 34:11
research 31:3,7 95:16
residential 9:15
resign 6:6 46:1,22 50:23
  51:15 61:13,15 65:17
  69:24 70:6 71:25 72:7
  97:3,5,13,17
resignation 4:10 5:8,10
  26:5 43:18 44:10,23
  48:19 49:8,19 50:21
  50:23 51:19,22 75:8
  87:18,21 89:2 99:10
  101:12
resigned 32:12 49:23
  50:4 71:11 98:20
resigning 70:24 71:18
  72:24 75:2 83:19
  85:11,21 86:4 97:24
  99:19 100:7,14
respect 23:12 25:10
  61:23
respond 24:24 25:5
  43:19
responded 45:10

response 43:21 46:23
responses 5:10 46:15
responsibilities 38:17
  38:21 39:2
responsibility 96:21,25
result 6:20 78:16
return 98:19 103:20
reveal 70:2
review 37:2 38:15 49:2
reviewed 101:1,7
right 6:16 9:9 12:24 16:4
  21:4 25:16 26:10,11
  27:11 38:9 39:15,16
  45:19 58:8 72:14 78:3
  82:18 90:6,23
right-hand 88:18
role 18:23 27:7 28:12
  32:24 52:23
Rome 10:8
room 15:10
ruling 21:11,13,17 23:7
Russ 3:15 8:7

**S**

sake 103:16
salary 102:24 103:3
saw 23:14,18 24:7 36:24
  61:1
saying 28:1 32:12 46:1
says 56:19 59:8,8 76:21
  82:21 84:6 90:22
school 10:6
scope 17:13 52:15 53:20
  66:4 69:12 70:10
scrutiny 23:25
search 4:21 48:4,7,15
  60:20 88:8,14
second 10:11 16:5 20:22
  72:12 78:6 80:11,13
  90:5
secretary 4:17 37:9
  79:18 80:20
secretary/director 84:7
see 12:3 18:10 20:23
  23:22 44:1 48:1 50:15
  52:6 55:17,21 56:10
  56:13,14,18 59:7,8,12
  59:14,18,19 60:15,18
  63:4 64:15 79:15
  80:25 81:9,11,12
  82:19 83:2,18 84:2,3,5
  84:8,10,11,15 85:1,3
  85:11,16 86:9,13
  88:17,21,24 89:1 90:2
  90:5,22 92:13,18,24
  93:21 97:23
seeking 58:5 66:2
seen 38:8,9 39:8,12
  52:19 61:8 82:15
send 45:18 48:21
sending 51:12
sense 91:16
sent 43:17
September 106:19
Serena 53:18
series 9:3
serious 72:7
served 56:23 57:3,8

59:11 60:5 61:9
service 59:11
services 102:3,5,6,7,8
  102:24
serving 15:16 86:20 87:5
set 106:10,18
settlement 22:19
share 70:17
shared 72:13 95:17
shares 72:19
SHEET 107:1
sheet(s) 105:11
short 44:3 79:22 91:18
Shorthand 2:20 106:6
show 88:10
showed 58:22
shows 94:1
side 13:5,10 23:23
sign 33:24 34:15 35:24
  87:17,22
signature 48:23,25
  80:25 81:3,9 82:11,18
  86:11 90:25 91:7
  92:13,15
signed 25:2 34:23 35:16
  36:21,25 49:3 81:12
  81:18 82:8 83:7 86:3,9
  86:24 87:3,10 90:23
signing 35:20,22 39:10
  51:14 86:13
similar 87:23
simply 94:1
sit 95:7
sitting 14:8 54:2 57:13
  99:1
situation 22:7
slightly 11:10
slowly 64:17
somebody 16:16 24:2,3
  93:5
sorry 18:20 19:8 27:18
  29:16 31:15 41:11
  44:20 58:24 78:21
  101:24 102:14,16
  103:3
sort 10:4 38:15
sorts 29:24
sounds 10:18 58:15,17
SOUTHERN 1:2 2:2
spare 75:3
speak 9:6 27:9 28:3 37:6
  40:9,11,17 41:14
  76:24 100:13,19,23
  101:4
specific 13:3 15:7 62:24
  67:11
specifically 72:21 73:4
spelled 13:20
spoke 17:9 18:14 27:8
  33:9 39:24 40:6 41:6
  41:14 64:19 100:6
spoken 5:24 40:14 54:22
  54:25 65:9
spot 29:4
Spring 3:21 5:16,17 11:1
  11:5,6,12,13 12:4
  14:19 17:2 20:11
  27:19 41:17 53:16

66:5,19 101:21 103:4
Spring's 57:19,20 66:7
  67:16,18
ss 105:3 106:3
stamp 88:17 92:14 94:6
stand 91:25 103:9
start 6:11 19:20 40:13
  68:23
started 10:7 11:4,6
  14:18
starting 10:22 63:9
state 2:21 7:5 8:19 9:14
  31:20 105:3 106:2,7
statement 23:15,20
  39:13 93:13
statements 51:13
States 1:1 2:1 10:25 11:4
  11:9 32:9 47:13,16
  96:13
stay 25:21,21,22
step 69:10
steps 49:8,8,19 60:20
  62:12 83:6 87:9
sticks 36:11
stocky 91:20
stop 20:22
store 71:23,24
strained 24:23
Strategic 1:7 2:7 7:17,23
  8:4 24:25 25:24 42:19
  54:8,16,23
Street 3:4,10
strike 61:14
studied 10:1
studying 10:15
stuff 69:18
subject 23:14
subjects 21:12
subpoena 2:15 4:13,15
  17:14 52:3 55:4,8,22
  56:11,14 57:3,9 59:10
  59:15,23 60:13 62:3
subpoenas 60:4,10
Subscribed 105:15
  107:20
subsidiaries 53:4
substance 73:18 78:8,11
  78:12 79:6
sufficient 50:23
suggest 97:12
Suite 3:10
sure 12:13 23:13,25
  24:16 33:5 44:5 56:9
  71:9 80:14 84:19
  87:19 93:19
surname 85:16
swear 8:13,21
sworn 105:15 107:20
sworn/affirmed 8:17
  106:11

**T**

T 1:21 2:19 8:19 106:5
  106:21
table 14:8
take 6:19 10:3 44:3
  47:10 55:12 59:4,8
  60:20 62:12 64:24

Atkinson-Baker, Inc.
www.depo.com

78:16 79:22 80:12
87:9 93:17,17,19,24
94:1 98:10
**taken** 2:15 7:21 44:8
49:19 80:3 98:14
105:8 107:3
**talk** 32:4,23 46:12 66:7
67:18
**talking** 43:3 67:2,6,15
69:23 72:20,21 75:13
**talks** 77:2
**tall** 91:18
**taller** 91:23
**tangible** 102:19
**teleconference** 16:10
26:18
**telephone** 51:6
**tell** 5:20,21,24 6:5 10:2
10:23 21:15 28:1 29:4
29:23 30:7,10,13,16
31:17,20 36:18 47:5
51:3,5,8 54:2 62:18
63:1,9 64:6 65:9,16
67:3 73:21 74:1 75:15
76:24 90:25
**telling** 62:3
**terms** 22:25
**Teske** 3:17 8:5,6 11:20
12:17,22 13:11 14:21
15:3,6,22 16:2 17:7,8
18:21 19:3 21:5 24:24
25:4 26:7,14 28:17,24
29:20 30:22 31:12,22
31:24 33:1 34:4,24
35:14 36:4,6,13 37:10
37:22,24 38:2,22,24
39:4,6,18 40:1 41:9,11
41:22 42:23 43:7,9
44:3 46:16,24 47:8,17
47:23 48:9,12,16
49:10,15,24 50:1,6,12
50:19 51:16 52:7,14
53:8,12,19 54:9 55:18
55:20 56:2,7,16 57:5
57:10,13,25 58:4,13
58:15,17 59:16,25
60:6,22 61:2,10,18,21
62:6,9,13,20 63:1,18
63:23 64:3,8,22,25
65:11,18,23 66:17,24
67:9 68:2,14 69:1,10
70:1 71:3,14,20 72:3,8
73:1,10,15,23 74:4,14
74:19,24 75:5,18 76:4
77:4,10,16,21 78:6,18
78:20 79:1,10 81:4,13
81:20,24 82:2,16 83:1
83:3,8,14,20 84:14
85:7,14,22 86:6,21,25
87:7,13 88:2,20 89:4,9
89:16 90:20 91:3,24
92:7 93:15 94:3,15
95:9,13,19,24 96:4,14
96:18 97:7,14,21 98:8
99:5,13,20 100:1,3,10
100:16,21 101:13,23
102:2,6,9,12 103:1,5
103:23 104:2

**testified** 35:8 68:3,4
72:12 86:15
**testifies** 8:20
**testify** 44:23
**testifying** 35:7 106:11
**testimony** 17:13 25:11
27:20 33:7 37:2 45:9
47:20 67:23 71:13
73:22 98:20,22 101:10
105:8,12 106:10,13
107:3
**texts** 43:11,13
**Thank** 8:11 26:13,14,15
55:20 103:23,24,25
104:1,2
**thin** 91:21
**thing** 22:9 24:6,7,21 26:5
34:22 62:2,4 72:21,23
73:21 74:2,11 75:4
78:11 94:11 98:4 99:1
99:2,11
**things** 15:14 23:10 25:24
62:16 70:9,10 71:1,12
71:23 72:1 99:18
102:19
**think** 16:21 17:10 18:9
18:11 20:6,8,9,16,21
22:9,12 24:21 25:7
69:22 70:24 71:18
75:2 76:17 92:12
99:21 103:10
**thinking** 5:15 11:11
102:17
**third** 3:16 18:19 81:8
**thought** 24:8 58:4 72:16
**three** 10:8 80:16
**Tide** 82:3 86:14,19 87:4
**tied** 22:14,18
**ties** 21:21
**time** 7:10 9:2 12:7 14:19
23:4 27:1 30:25 31:6
32:4,11,12 36:24
39:24 40:10 41:3,5,6
42:8,10 46:5 61:1,9
65:2 83:19 86:2,4,24
87:3 88:14,16,17
90:17 98:3,13,16,25
99:16 101:24 104:9
**times** 14:1,2 27:4 42:11
42:14 47:21 93:14,22
**title** 54:13,19 81:10 94:5
**titled** 4:23 89:19 90:4
**today** 12:15 13:9 25:8
35:7 37:3 43:24 46:23
54:2 73:22 95:7 99:2
100:24 101:5
**told** 28:3 29:17 46:21
50:22 51:1 62:16
65:24 71:10 73:13,20
74:10
**top** 80:19
**topic** 6:21 18:19 98:5
100:20 103:20
**topics** 18:17
**training** 10:4,6
**transcript** 9:7 101:2,8
105:7,10 106:12 107:3
**translates** 24:16

**translation** 10:8 83:23
**true** 105:11 106:12
**trust** 13:25 28:16,19,19
28:23 29:2,3 70:16,18
72:18
**trusted** 28:15 29:3 72:13
**trusts** 70:18
**try** 23:10 25:22,22 32:17
41:1,3 98:3 103:18,19
**trying** 11:17 16:24 18:12
24:12 26:1 70:22
72:23 79:3,5 102:17
**turn** 56:13 59:14
**Twenty-nine** 9:19
**two** 17:17 18:18 48:11
56:10 59:14 60:3 65:5
66:1
**two-page** 4:23 89:19
90:3
**typical** 11:19
**typing** 48:17

---

**U**

**unable** 23:16
**unclear** 9:10
**understand** 9:7,10,20
11:18 27:6 29:17
31:10,16 35:1,6 38:5
45:20,23 54:19 63:17
66:21 69:11 71:9
76:10 77:1,18,22 79:4
85:24 86:2 87:19
**understanding** 21:23
82:2 86:18 87:4 96:20
96:24
**understands** 66:4
**undertaken** 95:5
**undertakes** 95:8
**United** 1:1 2:1 11:4,9
32:8 47:13,16 96:13
**university** 10:7,10,20
**upper** 88:17
**use** 22:22 24:10

---

**V**

**verbally** 37:17
**version** 46:14
**versions** 5:9
**versus** 7:17 54:8
**video** 79:25 80:5 104:5
**videographer** 3:22 7:1,2
8:11 16:6 26:20 44:6
44:15 79:24 80:4
98:12,15 104:4
**visa** 9:23
**Vision** 1:7 2:7 7:18,23
8:4 42:19 54:8,17,23
**vote** 39:16,16,21

---

**W**

**wait** 77:20
**waive** 63:7
**walk** 10:5 80:24
**Wang** 3:21 13:25 14:5,6
14:6,10,15,20 15:2,16
16:19,21,22 17:1 18:2
18:10,24 19:1,13 20:3

20:10 26:25 33:19
51:23 52:1,4,6,13,22
53:1 54:22,25 65:6
100:13 101:4
**want** 9:6 17:4 18:15
25:20 51:11 63:7 66:8
70:8 71:1,11,12,24
72:1 73:5,8 76:19,22
77:2 78:10,13 98:19
98:21 99:3,11 100:9
103:8,13,19
**wanted** 28:5 74:2,12
99:19
**wants** 64:18
**wasn't** 41:21
**wasting** 99:16
**way** 14:13,17 15:9 55:24
56:19 63:5 69:3 71:22
74:9 103:16 106:16
**we'll** 9:11 20:22 41:3,4
43:10 46:12 62:12
63:4,4 64:14,15,15
69:17,19 79:13 98:4
103:19,20
**we're** 15:20 20:16 26:4
54:7,20 55:10 67:2
70:21 76:21 79:15
80:1 83:23 90:1
**we've** 38:8 43:3 76:6
79:14 80:11
**weather** 41:7
**week** 93:2,3
**welcome** 26:17
**Wengui** 52:23
**WESTCHESTER** 106:3
**When's** 36:24
**WHEREOF** 106:18
**whoa** 57:25,25,25 58:1
61:18,18,18,19,19,19
61:19,19
**William** 5:24 13:17,19,20
13:24,25 16:17,18
27:3 37:3 39:25 40:14
41:6 43:6,14 44:23
47:25 48:5,8,17,18,18
48:20 51:2,13,20
65:10 70:17 81:17
86:11 94:14 95:18
96:2
**wires** 96:12,17,22 97:1
**wish** 107:2
**witness** 2:14 4:3 8:14,21
11:15 12:23 13:12
15:4,13 58:19 62:21
65:12,19 67:10,15,21
68:6 69:2,4,11 76:5
78:7 104:1 106:9,18
**witness's** 11:18 67:23
**word** 84:23 85:2
**words** 51:11 92:5
**work** 5:16,18 9:12 11:12
11:13 13:5,10 16:25
32:13 33:10,16,21
70:22 71:23
**worked** 70:16
**working** 11:2,4,6 12:4
20:12 30:19 83:23

**works** 29:2
**wouldn't** 24:4
**write** 46:3
**writing** 37:14
**written** 43:11,14 81:22
**wrongly** 34:9
**wrote** 18:19 45:25 92:5
**www.depo.com** 1:20

---

**X**

**x** 1:3,9 2:3,9

---

**Y**

**yeah** 16:2 21:2 58:2,14
61:20 92:1 99:22
102:14
**year** 36:16
**years** 10:8
**yesterday** 17:11 18:20
88:14
**York** 1:2,14,14 2:2,18,19
2:21 3:16,16 7:5,14,14
8:19 11:1 92:6 105:3
106:2,7
**York's** 27:19
**Yvette** 3:21 14:6 16:19
17:1 19:13 33:18
51:23 52:1,4,6,12,22
52:25 54:22,25 65:6

---

**Z**

**Zach** 8:8
**ZACHARY** 3:5
**Zeichner** 3:3 8:9
**zgrendi@zeklaw.com**
3:6

---

**0**

**000755** 1:22 106:22
**06830** 3:4
**07304** 9:17 56:25 59:22

---

**1**

**1** 4:10,12 5:7,15 14:14
35:9,12,18,21,22,23
36:2,11 40:7 44:9,13
44:20,21,22 45:1 48:1
79:25 83:12,17 84:2
87:20
**1:21** 80:2
**1:31** 80:7
**1:57** 98:13
**10** 6:15
**10104** 2:19
**10158** 3:16
**11** 5:9,15,15 6:19
**11:46** 2:10 7:10
**11:56** 16:7
**1100** 3:10
**12** 5:19 6:21
**12:13** 26:21
**12:34** 44:7
**12:37** 44:16
**1290** 2:18 7:13
**15** 5:7 6:4
**15-17** 9:16
**16** 6:19

Karin Maistrello
August 23, 2019

Atkinson-Baker, Inc.
www.depo.com

**17** 56:24 59:21
**18** 5:20
**18-cv-2185** 1:6 2:6 7:15
**1st** 12:19 27:22

---
**2**
---

**2** 4:11 5:9,19 6:14,15
    44:12,21,25 48:24
    80:5,25 82:12 83:12
    84:6 85:1 87:21 104:5
**2:09** 98:16
**2:15** 104:7,9
**20** 105:16,22 107:21,25
**2018** 11:7 12:5,14 13:9
    14:19 92:19
**2019** 1:15 2:10,16 4:1
    5:1 6:1 7:9 12:20
    14:14 27:23 35:9,18
    35:21 36:11 40:7
    42:12 43:6,14 47:21
    61:15 80:2,8 83:13
    97:25 102:1,23 104:8
    105:9 106:19 107:3
**203.489.1233** 3:6
**21** 5:19 6:10
**23** 1:15 2:10 4:1 5:1 6:1
**23rd** 7:9 80:2,7 88:15
    104:7 105:9 107:3
**24** 2:16
**25th** 63:14
**26th** 12:20 43:17 46:4
    61:15 63:12 69:25
    70:7 73:9 97:25
**2700** 3:10
**276** 90:3
**276-77** 4:23 89:21
**277** 90:3
**288-3376** 1:19

---
**3**
---

**3** 4:13 5:20 55:3,11,12
    55:18,19,21 56:13
    61:1,8 86:10
**30th** 92:19
**35** 3:4

---
**4**
---

**4** 4:15 5:21 55:7,11 59:5
    59:5 60:17 61:1,8
**42** 80:18
**42-44** 4:18 79:20
**43** 80:18
**44** 4:10,11 80:18
**45** 5:7
**46** 5:9
**4th** 106:19

---
**5**
---

**5** 4:17 5:23 6:21 79:17
    80:11 83:21 87:17,23
**5:00** 88:15
**55** 4:13,15
**5F** 56:25 59:22

---
**6**
---

**6** 4:20 5:21 6:4 88:6,11
**605** 3:16

**62** 5:20
**64** 5:21
**64105** 3:10
**646.218.7517** 3:18
**65** 5:23 6:4
**67** 6:7
**68** 6:10

---
**7**
---

**7** 4:23 6:7,7 89:19 90:2
**76** 6:14
**78** 6:15,19
**79** 4:17

---
**8**
---

**8** 4:5 5:23 6:10
**800** 1:19
**816.256.3181** 3:12
**88** 4:20
**89** 4:23

---
**9**
---

**9** 6:14
**90** 17:10
**98** 6:21

Karin Maistrello
August 23, 2019