## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **EASTERN PROFIT CORPORATION LIMITED,** | ) | |
| | ) | |
| | ) | |
| **Eastern/Counterclaim Defendant,** | ) | |
| | ) | **Case No. 18-cv-2185** |
| **v.** | ) | |
| | ) | |
| **STRATEGIC VISION US, LLC,** | ) | |
| | ) | |
| **Defendant/Counterclaim Eastern.** | ) | |
| | ) | |

### DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTIONS *IN LIMINE* (ECF 301)

Dated November 6, 2020

Respectfully submitted,

GRAVES GARRETT LLC

*s/ Edward D. Greim*
Edward D. Greim, #4240172
1100 Main Street, Suite 2700
Kansas City, MO 64105
Telephone: (816) 256-3181
Fax: (816) 256-5958
edgreim@gravesgarrett.com
ATTORNEY FOR
DEFENDANT/COUNTERCLAIM PLAINTIFF

## **TABLE OF CONTENTS**

STANDARD OF REVIEW ................................................................................1

A.  Defendant's Opposition to Motion *In Limine* A (Fact Witness ASOG and
    "Record Protected" Status of Certain Research Subjects) .............................1

    1.  ASOG's Statements are Not Opinion Testimony ...............................2

    2.  ASOG's Explanation – and Others' Testimony About It – Are Not Hearsay ...........3

B.  Defendant's Opposition to Motion *In Limine* B (Newspaper and Print
    Media Exhibits) ........................................................................6

    1.  Eastern's Exhibit List Undermines, and Directly Contradicts,
        its Motion *in Limine* ..........................................................6

    2.  CCP Support of Hong Kong's "Patriotic Groups" is Subject to Judicial Notice ...........6

    3.  The Mutual Support Between the CCP and the CPPCC is Subject
        to Judicial Notice ..............................................................7

    4.  William Je's LinkedIn Profile is Not Hearsay ...................................8

    5.  The Exhibits are Independently Admissible Under FRE 807 ........................9

        a.  *All of the exhibits are necessary to Strategic's fraud claim.* ...........11
        b.  *News Reports of CCP support for "patriotic groups" are especially
            trustworthy* .............................................................11
        c.  *CPPCC's newsletter is especially trustworthy* ...........................12
        d.  *The remaining articles are especially trustworthy* ......................12

C.  Defendant's Opposition to Motion *In Limine* C (Gong and Waller Perspectives on
    Certain Behavior and Actions by Guo Wengui) .........................................13

    1.  The Evidence Cited by Eastern is Fact Testimony, Not Opinions ................14

    2.  If Any is Opinion, it is not based on Specialized Knowledge ..................15

    3.  The Nature of the Bench Trial Eliminates the Concerns of Safeguarded Against
        by Evidence Rules ...............................................................18

    4.  Rule 701 Does Not Bar Admission of Exhibits Evidencing Guo's Connections
        to Mainland China ...............................................................18

D.      Defendant's Opposition to Motion *In Limine* D (Referencing Judge Freeman's Discovery Rulings ............................................................................................... 19

     1.     Evidence of Eastern's Finances and Corporate Existence is Relevant ............... 20

          a.     This Court will Receive Sufficient Facts to Enter Judgment Against Eastern on this Ground. .......................................................... 20

          b.     Eastern's "Relevance" Arguments are Not Persuasive ........................ 22

     2.     Golden Spring's Financial Interactions with ACA are Relevant and Admissible ................................................................................ 24

     3.     Magistrate Judge Freeman Never Ruled the Evidence was "Irrelevant and Therefore Inadmissible." ........................................................ 25

## <u>TABLE OF AUTHORITIES</u>

*Beech Aircraft Corp. v. Rainey*,
    488 U.S. 153, 169, 109 S. Ct. 439, 450, 102 L. Ed. 2d 445 (1988) ..................2, 15

*Bensen v. Am. Ultramar Ltd.*,
    No. 92CIV.4420(KMW)(NRB), 1996 WL 422262 (S.D. N.Y. July 29, 1996) ............2, 3

*Borawick v. Shay*,
    68 F.3d 597, 610 (2d Cir.1995) ..................................................1

*Boykin v. W. Express, Inc.*,
    No. 12CV7428NSRJCM, 2016 WL 8710481, at *6 (S.D.N.Y. Feb. 5, 2016) ..............4

*Celebrity Cruises Inc. v. Essef Corp.*,
    478 F.Supp.2d 440, 447 (S.D.N.Y.2007) ..........................................5

*DeNigris v. New York City Health & Hosps. Corp.*,
    552 Fed.Appx. 3, 6 (2d Cir. 2013) ..............................................4

*Discover Fin. Servs. v. Visa U.S.A. Inc.*,
    No. 04-CV-7844 BSJ DFE, 2008 WL 4560707, at *1 (S.D.N.Y. Oct. 9, 2008) ...........5

*DVL, Inc. v. Niagara Mohawk Power Corp.*,
    490 Fed. Appx. 378 (2d Cir. 2012) .............................................17

*Dynamic Concepts, Inc. v. Tri-State Surgical Supply & Equip. Ltd.*,
    716 F. App'x 5, 11 (2d Cir. 2017) ............................................17

*Hydrolevel Corp. v. Am. Soc'y of Mech. Eng'rs, Inc.*,
    635 F.2d 118, 128 (2d Cir.1980) ...............................................5

*In re GII Industries, Inc.*,
    495 B.R. 209, 211-12 (Bankr. E.D. N.Y. 2010) ..................................1

*Lakah v. UBS AG*,
    996 F. Supp.2d 250, 255 (S.D. N.Y. 2014) ......................................19

*In re Refco, Inc. Securities Litigation*,
    609 F.Supp.2d 304, 306-07 (S.D.N.Y. 2009) .....................................21

*Smith v. City of New York*,
    388 F. Supp. 2d 179, 182 n. 2 (S.D.N.Y. 2005) .................................4

*Sutton v. Massachusetts Mut. Life Ins. Co.*,
    No. 18-CV-1273 (VSB), 2020 WL 5765693 (S.D.N.Y. Sept. 27, 2020) ............14, 15

*United States v. Caldwell,*
    586 F.3d 338, 348 (5th Cir. 2009) ................................................................... 2

*United States v. Cuti,*
    720 F.3d 453, 458 (2d Cir. 2013) ........................................................... *passim*

*United States v. Dupree,*
    706 F.3d 131, 136 (2d Cir. 2013) ................................................................... 4

*United States v. Durham*,
    464 F.3d 976 (9th Cir. 2006) ........................................................................ 16

*United States v. Espino*,
    317 F.3d 788 (8th Cir. 2003) ........................................................................ 16

*United States v. Gagliardi,*
    506 F.3d 140, 151 (2d Cir.2007) ................................................................. 19

*United States v. Garcia,*
    413 F.3d 201, 215 (2d Cir. 2005) ........................................................... 14, 18

*United States v. Garcia*,
    900 F.2d 571, 576 (2d Cir.1990) ................................................................... 4

*United States v. Gotti*,
    457 F. Supp.2d 395, 397 (S.D.N.Y. 2006) ................................................. 4, 5

*United States v. Puzzo,*
    928 F.2d 1356, 1365 (2d Cir.1991) ............................................................... 4

*United States v. Rigas,*
    490 F.3d 208, 225 (2d Cir.2007) ................................................................. 17

*United States v. Roye*,
    No. 3:15-CR-29 (JBA), 2016 WL 4046692, at *2 (D. Conn. July 27, 2016) ........... 16-18

*United States v. Rubin/Chambers, Dunhill Ins. Servs.*,
    828 F. Supp.2d 698, 704 (S.D.N.Y. 2011) ............................................... 16, 18

*United States v. Scandifia*,
    390 F.2d 244, 251 n. 8 (2d Cir. 1968) ........................................................... 4

*United States v. Yannotti*,
    541 F.3d 112, 126 (2d Cir. 2008) ........................................................... 16, 18

*Walsh v. Int'l Bhd. of Elec. Workers Local 503*,
No. 14 CV 1677 (VB), 2017 WL 481470, at *4 n. 3 (S.D.N.Y. Feb. 6, 2017) .................5

*Wilder v. World of Boxing LLC*,
220 F. Supp.3d 473, 478 (S.D. N.Y. 2016) ....................................................1, 9

**Rules**

Fed R. Civ. P. 45 ...........................................................................................5

Fed. R. Evid. 201 ..........................................................................................7

Fed. R. Evid. 701 .................................................................................*passim*

Fed. R. Evid. 702 .........................................................................................19

Fed. R. Evid. 801 .................................................................................*passim*

Fed. R. Evid. 802 ..........................................................................................4

Fed. R. Evid. 803 ......................................................................................5, 9

Fed. R. Evid. 807 ..........................................................................................9

**Other Authorities**

31A Am. Jur. 2d § 3 ......................................................................................2

**STANDARD OF REVIEW**

The Second Circuit recognizes a "presumption of admissibility of evidence." *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir.1995). Accordingly, "the movant in a motion *in limine* seeking to exclude evidence has the burden of establishing that the evidence is not admissible for any purpose." *Wilder v. World of Boxing LL*C, 220 F. Supp.3d 473, 478 (S.D. N.Y. 2016). It is a steep burden and one that may have to be met again in the case. "Evidence should be excluded on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds...courts considering a motion *in limine* may reserve judgment until trial, so that the motion is placed in the appropriate factual context." *In re GII Industries, Inc.*, 495 B.R. 209, 211-12 (Bankr. E.D. N.Y. 2010) (references omitted).

### A. Defendant's Opposition to Motion *In Limine* A (Fact Witness ASOG and "Record Protected" Status of Certain Research Subjects)

The Court should deny Eastern's request to exclude evidence about Allied Special Operations Group and the "Records Protected" designation of the initial tranche of research subjects selected by Eastern's purported agent, Guo Wengui. ASOG (a/k/a "Team 2") quickly determined that all fifteen of the initial research subjects selected by Guo were designated by the U.S. government as "Records Protected," meaning that information concerning the subjects' activities was not accessible through traditional, legal means. Strategic was unfamiliar with this designation but came to believe it was a term used by the National Counterterrorism Service. ASOG ceased its research immediately, believing that digging into subjects known to be "Records Protected" could be a criminal activity. This belief was so sincere that ASOG canceled its lucrative business deal with Strategic Vison. ASOG even withdrew an $111,700 invoice. ASOG instead issued an invoice for $5,412.50 which stated, "Client advised all targets are RP by NCS" and "ASOG Termination & Credit issued." The discovery of "Records Protected" status is relevant to

1

both parties' breach of contract claims, and is especially relevant to Strategic Vision's impossibility defense.

### 1. ASOG's Statements are Not Opinion Testimony.

Eastern argues that ASOG's "Records Protected" statements are inadmissible because they "purport to convey an opinion as to what U.S. law provides."[1] However, ASOG's statements were not legal opinions. In fact, they were not opinions at all. While courts in general are rarely decisive on where to draw the line between expert and lay testimony,[2] federal courts error on the side of fact, following *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169, 109 S. Ct. 439, 450, 102 L. Ed. 2d 445 (1988).[3] Applying *Beech Aircraft Corp.*, the Second Circuit resolves the tension between fact and opinion in favor of admission "so long as the witness has personal knowledge." *United States v. Cuti*, 720 F.3d 453, 458 (2d Cir. 2013).[4]

Against this legal backdrop, Eastern cites a single case in support of its "lay legal opinion" argument, *Bensen v. Am. Ultramar Ltd.*, No. 92CIV.4420(KMW)(NRB), 1996 WL 422262 (S.D. N.Y. July 29, 1996). Yet *Bensen* undermines Eastern's position. There, in a corporate divorce, the plaintiff sought to introduce documents prepared by lawyer under the guise of lay testimony. The court noted that it was "faced with a lawyer's opinions about legal issues and asked to analyze the opinions as if the lawyers were not expert in the law…[T]he particular lawyers in question are

---

[1]     For witnesses not testifying as experts, Rule 701 limits testimony in the form of an opinion to opinions that are (1) rationally based on the witness's perception, (2) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (3) not based on scientific, technical, or other specialized knowledge. Fed. R. Evid. 701. In reference to the final criterion, this Court has held that "lay legal conclusions are inadmissible in evidence." *Bensen v. Am. Ultramar Ltd.*, 1996 WL 422262, at *13 (S.D. N.Y. July 29, 1996).

[2] *United States v. Caldwell*, 586 F.3d 338, 348 (5th Cir. 2009).

[3]     Acknowledging that "[a]ll statements in language are statements of opinion, i.e., statements of mental processes or perceptions," the Court concluded it would be "consistent with the Federal Rules' general approach of relaxing the traditional barriers to 'opinion' testimony" to endorse "[a] broad approach to admissibility…[r]ather than requiring that we draw some inevitably arbitrary line between the various shades of fact/opinion." *Id.*

[4] See also 31A American Jurisprudence 2d, Expert and Opinion Evidence § 3 ("Opinion testimony is testimony based on one's belief or idea rather than on direct knowledge of the facts at issue.").

apparently preeminent in their fields and [] they rendered the opinions in their professional capacities." *Id*. at *12. The court recognized that the plaintiff was attempting to "fit a square peg in a round hole" and excluded the evidence.[5]

This case is a far cry from *Bensen* and its analysis of best-in-class attorney legal memos. First, ASOG did not offer an exegesis of statutory language. Mike Waller testified that ASOG provided no statutory cite at all: "Q Did they provide a statutory site [sic] about this restricted persons concept? A No."[6] Second, it is a factual belief that the research subjects had "Records Protected" status, not an "ultimate legal opinion" meant to "tell the finder of fact what result to reach" on the breach of contract issue. ASOG simply conveyed the factual conclusion that the research subjects were marked "Records Protected" in the relevant database and thereby cancelled its work. Like the challenged testimony in *Cuti*, ASOG's statements "fall near the fact end of the fact-opinion spectrum" because the question of whether the relevant records were protected is "factual in nature," because ASOG was "personally familiar" with the designation, and because ASOG possessed "direct knowledge of the facts at issue." *Id*. Third, the statements here were made by a research firm to a client to justify the discontinuing of performance, well before litigation commenced.[7] There is a thumb on the scales of admissibility when it is unclear whether testimony involves fact or opinion. Eastern has not satisfied its burden.

## 2.  ASOG's Explanation–and Others' Testimony About It–Are Not Hearsay.

---

[5]     In doing so, the court provided helpful guidance to distinguish between fact and legal opinion. First, lay testimony does not interpret the meaning of statutory language. *Id*. at *13. Second, lay testimony positing factual conclusions that embrace an "ultimate issue" is admissible under Rule 701, while lay testimony providing "ultimate legal opinions" that "tell the jury what result to reach" or "instruct the jury as to their verdict" is not. *Id*. Finally, lay testimony is inadmissible to the extent it "contains lawyers' legal opinions," the danger being that lay opinions should not be "framed by lawyers who a jury may see as experts instructing them on the law." *Id*.

[6]     Waller Depo. II, 107:17-19.

[7]     A guiding concern in *Bensen* and *Cuti*, and of rules regulating lay and expert testimony generally, is that jurors will be unable to distinguish between lay witnesses and experts and parties and their legal counsel. The Court will not mistake ASOG for an expert on the law or be improperly influenced by its statements. Without a jury, improper influence–the overriding concern favoring exclusion in *Bensen*–becomes a nonfactor.

Eastern's second challenge involves the rule against hearsay. Fed. R. Evid. 802 excludes hearsay evidence.[8] Eastern reasons that since ASOG's statements were made outside of court, since Strategic is not calling any member of ASOG to testify, and since ASOG has not been deposed, ASOG's statements regarding "Record Protected" status are "garden-variety inadmissible hearsay." The conclusion, however, ignores the second half of the hearsay definition. It is true that ASOG's statements were made outside of court. But to be hearsay, ASOG's statements must also have been offered to prove the truth of the matter asserted—that the first 15 subjects Guo chose to be researched were records protected. Strategic Vision is not offering ASOG's statements to prove that the research subjects were in fact under "Records Protected" status, or even to prove that such a thing as "Records Protected" status exists. Rather, the proffered testimony and documents are being offered to explain ASOG's state of mind in cancelling the project and the effect that ASOG's statements had on Strategic. "[I]t is well established that statements offered for their effect on the listener are non-hearsay." *United States v. Gotti*, 457 F. Supp.2d 395, 397 (S.D.N.Y. 2006) (citing *Smith v. City of New York,* 388 F. Supp.2d 179, 182 n. 2 (S.D. N.Y.2005) (citing *United States v. Garcia,* 900 F.2d 571, 576 (2d Cir.1990); *see also United States v. Puzzo,* 928 F.2d 1356, 1365 (2d Cir.1991); *DeNigris v. New York City Health & Hosps. Corp.*, 552 Fed.Appx. 3, 6 (2d Cir. 2013) ("[W]here statements are offered to show their effect on a listener's state of mind, they are not hearsay.") (citing *United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013)); *Boykin v. W. Express, Inc.*, No. 12CV7428NSRJCM, 2016 WL 8710481, at *6 (S.D.N.Y. Feb. 5, 2016). "[A] statement offered to show its effect on the hearer is not hearsay." *United States v. Scandifia*, 390 F.2d 244, 251 n. 8 (2d Cir. 1968). Additionally, "[w]here a statement is offered as circumstantial evidence of the declarant's state of mind rather

---

[8] This ban is subject to countervailing federal statutes, exemptions and exceptions laid out in subsequent Federal Rules of Evidence and other rules prescribed by the Supreme Court.

than for the truth of the matter asserted, it is not hearsay." *United States v. Gotti*, 457 F. Supp. 2d 395, 397 (S.D.N.Y. 2006). Even where an out-of-court statement is offered to prove the matter asserted, Rule 803(3) creates an exception to the rule against hearsay for statements "of the declarant's then-existing state of mind (such as motive)." Fed. R. Evid. 803.

In the context of contractual disputes, this Court has admitted out-of-court statements offered as evidence for "why it was reasonable for [a party] to believe further negotiations...would have been futile,"[9] for "the motivation of customers for ceasing to deal with a business,"[10] and "for the limited purpose of offering [a party's] motives for not entering into a deal."[11] None of these statements were hearsay because they were offered to prove the "motive" or "state of mind" of one of the parties to a contract, not to prove the truth of the matter asserted. In the same way, ASOG's statements about "Records Protected" status are being offered to explain ASOG's motive for refusing to collect information on the first fifteen research subjects. ASOG's statements provide circumstantial evidence of its state of mind. The proffered testimony about ASOG's statements also is not hearsay because it is being offered to explain the effect of ASOG's statements on the hearer, Strategic. Whether or not the initial research subjects were in fact covered by "Records Protected" status, ASOG's statements had the effect of Strategic Vision's sudden and unexpected inability to perform its obligations under the Research Agreement, at least with respect to certain research subjects. The rule against hearsay does not apply.[12]

---

[9] *Walsh v. Int'l Bhd. of Elec. Workers Local 503*, No. 14 CV 1677 (VB), 2017 WL 481470, at *4 n. 3 (S.D.N.Y. Feb. 6, 2017).
[10] *See Celebrity Cruises Inc. v. Essef Corp.,* 478 F.Supp.2d 440, 447 (S.D.N.Y.2007); *Hydrolevel Corp. v. Am. Soc'y of Mech. Eng'rs, Inc .,* 635 F.2d 118, 128 (2d Cir.1980)).
[11] *Discover Fin. Servs. v. Visa U.S.A. Inc.*, No. 04-CV-7844 BSJ DFE, 2008 WL 4560707, at *1 (S.D.N.Y. Oct. 9, 2008).
[12]     ASOG's statements would fall under the hearsay exception for business records had Eastern not failed to obtain a records custodian affidavit under Rule 803(6). Those records are part of discovery because ASOG answered a Fed. R. Civ. P. 45 subpoena issued by Eastern for documents indicating that the initial research subjects were "Records Protected"; Eastern's counsel shared these documents with Strategic in September 2019. Since it was

**B. Defendant's Opposition to Motion *In Limine* B (Newspaper and Print Media Exhibits)**

Strategic was fraudulently induced to enter the Research Agreement because Guo Wengui claimed to be a dissident opposed to the CCP, when in fact he supports the CCP and is operating on its behalf against the interests of the United States. One of several lines of evidence tying Guo to the CCP shows that Guo's self-described "money man"–ACA head William Je–holds seats on the Chongqing Chinese People's Political Consultative Conference ("CPPCC") and the Hong Kong Chongqing Friendship Federation ("HKCFF"), both CCP-allied entities. Eastern asks the Court to exclude news articles, newsletters, and social media profiles evincing the close connection between Guo, Je, ACA, and the CCP. Other parts of Strategic's fraud proof concern Guo's past and present ties to the Chinese secret police, his relationship with Steve Bannon, and his campaign against the dissident and China hawk communities. Eastern seeks to exclude this evidence.

**1. Eastern's Exhibit List Undermines, and Directly Contradicts, its Motion *in Limine*.**

Eastern's position is belied by the fact that Eastern itself seeks to admit a dozen news reports (PX Nos. 30, 31, 32, 33, 44, 46, 47, 49, 50, 51, 64, and 65). In fact, one of the exhibits Eastern challenges is the same article found on Eastern's own exhibit list (PX 32=DX34).

**2. CCP Support of Hong Kong's "Patriotic Groups" is Subject to Judicial Notice.**

Pursuant to F.R.E. 201(b), federal courts may judicially notice a fact "that is not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Judicial notice is appropriate where "the facts are matters of common knowledge. *Braun v. United Recovery Sys., LP*, 14 F. Supp. 3d 159, 164 (S.D.N.Y. 2014). The court "must" take judicial notice if a party requests it and the court is supplied with the necessary

---

Eastern itself that compelled production of the ASOG documents, it is disingenuous for Eastern to turn around and challenge the admissibility of those documents because Eastern did not obtain an authentication affidavit.

information. Fed. R. Evid. 201(c)(2). The court may take judicial notice at any stage of the

proceeding. Fed. R. Evid. 201(d). The Court can and should take judicial notice of the fact that

the Chinese Communist Party supports Hong Kong "patriotic groups." It is common knowledge

that China sponsors organizations opposing Hong Kong's independence from the Mainland.

Additionally, news reports from around the world refer to CCP-backed, anti-independence

organizations as "patriotic groups."[13] Like other courts in the Second Circuit, this Court takes

judicial notice of media reports. *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453

(S.D.N.Y. 2020). *See also Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (explaining that

judicial notice can be used to determine what news reports state); *Accord Staehr v. Hartford*

*Financial Services Group, Inc.*, 547 F.3d 406 (2d Cir. 2008) (affirming district court taking

judicial notice of newspaper articles). Since Eastern has not challenged the authenticity of the

news reports, Strategic has supplied the Court with the necessary information to take judicial

notice. *Hesse,* 463 F. Supp. 3d 453 ("Plaintiffs here do not challenge the authenticity of these

documents, so the Court takes judicial notice of them.").

### 3.   The Mutual Support Between the CCP and the CPPCC is Subject to Judicial Notice.

The Second Circuit has taken judicial notice of newsletters. See *Staehr v. Hartford Fin.*

*Servs. Grp., Inc.*, 547 F.3d 406, 410 (2d Cir. 2008). Courts have also taken judicial notice of

information contained on websites where "the authenticity of the site has not been questioned."

*Fernandez v. Zoni Language Centers, Inc.*, No. 15-CV-6066 (PKC), 2016 WL 2903274, at *3

(S.D.N.Y. May 18, 2016), aff'd, 858 F.3d 45 (2d Cir. 2017). *See also Hotel Employees & Rest.*

*Employees Union, Local 100 of New York, N.Y. & Vicinity, AFL CIO v. City of New York Dep't*

---

[13] See e.g., DX88 (Chinese tabloid); DX89 (*New York Times*); DX90 (op-ed written by CPPCC member); DX94 (news report published by Quartz, an outlet owned by a Japanese business media company); DX95 (Hong Kong newspaper).

*of Parks & Recreation*, 311 F.3d 534, 549 (2d Cir. 2002);  *Ligon v. Doherty*, 208 F. Supp. 2d 384, 386 (E.D.N.Y. 2002). DX87 is a newsletter published to the website of the National Committee of the Chinese People's Political Constative Conference ("CPPCC"). The newsletter announces the release of the "Member list of 13th CPPCC National Committee." 859 of the members were "from the Communist Party of China (CPC)," and all members "had gone through meticulous examinations in terms of their political stance, integrity of character and public image." The newsletter also reported that "the nomination of members had upheld the leadership of the Party, as all members were nominated by Party organizations."

Eastern has not questioned the authenticity of the CPPCC newsletter or the website to which it was published. Strategic has supplied the Court with the necessary information to take judicial notice. DX90 also supports judicial notice of the Communist regime's control of the CPPCC. That exhibit is an op-ed republished in *China Daily News*. The author, who is identified as "a Hong Kong member of the National Committee of the Chinese People's Political Consultative Conference," urges "the patriotic groups who love Hong Kong" to "nip the violence in the bud" and "act in the exact opposite way the [anti-CCP] protesters do." In light of the case law discussed in part A above, and seeing that Eastern has not challenged the authenticity of the op-ed, the Court must take judicial notice that CPPCC members have praised Hong Kong "patriotic groups" while repudiating anti-CCP protesters.

### 4.  William Je's LinkedIn Profile is Not Hearsay.

On his LinkedIn profile, which Strategic can authenticate, ACA head William Je holds himself out as a member of the HKCFF and the CPPCC. Eastern challenges the admission of this evidence under the rule against hearsay. This is even though Eastern's exhibits include the LinkedIn pages of key Strategic witnesses (PX 34-35). Strategic understands that it cannot

introduce William Je's LinkedIn profile to prove the truth of the matter asserted therein–i.e., that William Je is in fact a member of HKCFF and the CPPCC. *See DeLorenzo v. Ricketts & Assocs., Ltd.*, No. 15-CV-2506 (VSB), 2017 WL 4277177, at *7 n.13 (S.D.N.Y. Sept. 25, 2017); *Miami Prod. & Chem. Co. v. Olin Corp.*, 449 F. Supp. 3d 136, 179 (W.D.N.Y. 2020). However, the LinkedIn page is admissible to prove that William Je *holds himself out as* a member of HKCFF and the CPPCC. *See Powers v. Emcon Assocs., Inc.,* No. 14-CV-03006-KMT, 2017 WL 2718476, at *5 (D. Colo. June 23, 2017) ("Plaintiffs contend they did not offer the LinkedIn profiles for the truth of the matter asserted therein, *i.e.* that the two individuals were indeed FMNow employees, but instead that they held themselves out as such. The court agrees."); *Music Group Macao Commercial Offshore Ltd. v. Foote*, No. 14–cv–03078–JSC, 2015 WL 3882448, at *8 (N.D. Cal. June 23, 2015) (admitting the LinkedIn page "insofar as it is Defendant's description of himself as Chief Technology Officer, but not for the truth that Defendant was, in fact, Chief Technology Officer"). Since the LinkedIn page is admissible to show that Willam Je holds himself out as a member of HKCFF and the CPPCC, Eastern has not met its burden of proving that the challenged evidence is "not admissible for any purpose." *Wilder v. World of Boxing LLC*, 220 F. Supp. 3d 473, 478 (S.D.N.Y. 2016).

### 5. The Exhibits are Independently Admissible Under FRE 807.

News reports are hearsay when offered to prove the truth of the facts reported. However, Rule 807[14] creates a "residual" or "catch-all" exception to the hearsay rule for statements that (1) are supported by sufficient guarantees of trustworthiness; and (2) are more probative on the point for which they are offered than any other evidence that the proponent can obtain through reasonable efforts. Fed. R. Evid. 807(a). Applying the residual exception, federal courts admit

---

[14] Previously FRE 803(24).

news reports that would otherwise be barred by the rule against hearsay. *In re Columbia Sec. Litig.*, 155 F.R.D. 466, 474 (S.D.N.Y. 1994). The landmark case is *Dallas County. v. Commercial Union Assurance Co*. Relying on an opinion written by Judge Learned Hand (which in turn relied on Wigmore on Evidence), the Fifth Circuit took the view that newspaper reports are admissible if they are necessary and have circumstantial guaranties of trustworthiness. 286 F.2d 388, 395 (5th Cir. 1961). Necessity "means that unless the hearsay statement is admitted, the facts it brings out may otherwise be lost, either because the person whose assertion is offered may be dead or unavailable, or because the assertion is of such a nature that one could not expect to obtain evidence of the same value from the same person or from other sources." *Id*. at 296. Necessity does not mean "total inaccessibility of firsthand evidence," but rather that "great practical inconvenience would be experienced in making the desired proof." *Id*.

*Dallas County* took the position that a news report is trustworthy if it has "the guaranty of the occasion, at which there was no motive for fabrication," *Id*. This Court imposes a higher bar. It was decided in *In re Columbia Sec. Litig.*, 155 F.R.D. 466, 474 (S.D.N.Y. 1994), that "news accounts usually lack the circumstantial guarantees of trustworthiness that Rule 807 requires." A dim view of news reports' trustworthiness was again expressed in *Jacobson v. Deutsche Bank, A.G.* which held that news reports are inadmissible unless proven "especially trustworthy." 206 F. Supp. 2d 590, 595 (S.D.N.Y. 2002), aff'd, 59 F. App'x 430 (2d Cir. 2003).[15] Nevertheless, the offering party can satisfy the more demanding trustworthiness standard in a variety of ways. Federal courts have found news reports "especially trustworthy" where they are corroborated by

---

[15] *Jacobson* presented a very different set of facts. *Jacobson* was a classic case of "he said, he said." One party claimed that a statement had been made; the opposing party (and a witness to the conversation) claimed it hadn't. The Court had nothing to go on but the plaintiff's word, and that was not enough to sustain a claim of defamation at summary judgment. Unlike *Jacobson*, the challenged evidence in this case is corroborated and well-documented. The Court does not have to take Strategic at its word to admit the evidence and, for the most part, Eastern has not challenged the authenticity of the exhibits or the truth of their contents. Strategic encourages the Court to consider these differences in considering Eastern's motion *in limine*.

other independent newspapers,[16] where the declarant has not disputed that he made the reported statements,[17] and where the declarant adopted a reported quotation after publication.[18].

      *a.     All of the exhibits are necessary to Strategic's fraud claim.*

Necessity does not mean "total inaccessibility of firsthand evidence," but rather that "great practical inconvenience would be experienced in making the desired proof." Due to Eastern's obstruction in discovery, Strategic was forced to rely on publicly-available resources for evidence about Guo, ACA, William Je, and related subjects. If Strategic is not permitted to admit the evidence it found in the public record at trial, it will suffer "great practical inconvenience in making the desired proof." It is the task of this Court to balance this necessity in light of other available evidence, against its trustworthiness. *In re Columbia Sec. Litig.*, 155 F.R.D. 466, 475 (S.D.N.Y. 1994).

      *b.     News reports of CCP support for "patriotic groups" are especially trustworthy.*

Regardless of whether the Court chooses to take judicial notice of the fact that that Hong Kong "patriotic groups" are supported by the China's Communist regime, the articles supporting that conclusion[19] are independently admissible under Rule 807. This fact is corroborated by at least eight independent news outlets, from the *New York Times* to the CCP-run *China Daily*. U.s. Courts of Appeals have found adequate "circumstantial guarantees of trustworthiness" requirement met when three independent newspapers corroborated a challenged article's report. *In re Columbia Sec. Litig.*, 155 F.R.D. 466, 475 (S.D.N.Y. 1994) (citing *Larez v. City of Los*

---

[16] *Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991).

[17] *Id*.

[18] *Rivera v. Inc. Vill. of Farmingdale*, 29 F. Supp. 3d 121, 131 (E.D.N.Y. 2013). See also *In re Columbia Sec. Litig.*, 155 F.R.D. 466, 475 (S.D.N.Y. 1994); *Mandal v. City of New York*, 2006 WL 3405005 (S.D.N.Y. 2006) (admitting news report where the reporter took "contemporary notes"); 22 No. 3 Federal Litigator 16 (news reports admissible where the author describes, by affidavit or deposition, the circumstances under which the article was written); *Cody v. Harris,* 2004 WL 1254129 (N.D.Ill. 2004) (admitting news report where the reporter explained the steps taken to ensure accuracy when interviewing sources or incorporating notes into an article).

[19] DX Nos. 87, 88, 89, 90, 93, 94, 95, and 101.

*Angeles,* 946 F.2d 630, 642–43 (9th Cir.1991) and *May v. Cooperman,* 780 F.2d 240, 263 (3d Cir.1985)). Given this level of corroboration, DX Nos. 87, 88, 89, 90, 93, 94, 95, and 101 are admissible under the residual exception.

        c.       *CPPCC's newsletter is especially trustworthy.*

Eastern argues that Strategic's exhibits are hearsay because all news articles are hearsay. This argument has no bearing on DX87, which is a newsletter published by the CPPCC on its website, not a news report. None of the "four classic hearsay dangers" addressed by the *Jacobson* rule–"insincerity, faulty perception, faulty memory, and faulty narration" are present where an assertion is published directly to an organization's website rather than being transmitted to a reporter. *Jacobson*, 206 F. Supp. 2d at 595.

        d.       *The remaining articles are especially trustworthy*.

The remaining exhibits also have circumstantial guarantees of trustworthiness. Page limits prevent an individualized analysis for each exhibit, but the following examples are illustrative of the articles' general applicability. DX32–which discusses Guo's close relationship with Ministry of State Security ("MSS") leader Ma Jian–is especially trustworthy because it was written by Bill Gertz, Guo's friend and patron. Gertz has spent countless hours with Guo, and written an entire book about him. Thus, when reciting the acts about Guo, Gertz was far less likely to suffer from faulty perception, memory, or narration than the average reporter. *See Jacobson,* 206 F. Supp. 2d at 595. Additionally, Gertz had pecuniary incentive to put Guo in a favorable light, making comments that reflect poorly on Guo even more trustworthy. For the same reasons, DX77 (also written by Gertz) is especially trustworthy and admissible under Rule 807. DX77 shows a direct link between Guo and ACA. It reports on a $1 million transfer "sent from HSBC bank in Hong Kong from Guo's company, ACA Capital Group Ltd., to the law firm Williams and Connolly LLP that is now handling the asylum case." DX34 and DX44 report on

the May 2017 meeting between Guo and Liu Yanping, "a top official in charge of discipline at the [MSS]–China's equivalent of the Central Intelligence Agency." These reports have "circumstantial guarantees of trustworthiness" because Guo adopted the relevant portion of the articles during his deposition.[20] See *Rivera v. Inc. Vill. of Farmingdale*, 29 F. Supp. 3d 121, 131 (E.D.N.Y. 2013).

The remainder of the challenged exhibits DX Nos. 41, 72, 73, 74, 92 and 116 report on Guo's relationship with Saraca Media Group, Steve Bannon, the Rule of Law Society, and others, and are amply corroborated by deposition testimony and other evidence in the record. Here again, corroboration ensures that the relevant portions of the articles are sufficiently trustworthy to come in under Rule 807. See *In re Columbia Sec. Litig.*, 155 F.R.D. 466, 475 (S.D.N.Y. 1994) (citing *Larez v. City of Los Angeles,* 946 F.2d 630, 642–43 (9th Cir.1991)).

## C.  Defendant's Opposition to Motion *In Limine* C (Gong and Waller Perspectives on Certain Behavior and Actions by Guo Wengui)

Eastern seeks exclusion of all testimony regarding whether certain actions or inactions of Guo Wengui are inconsistent with being a Chinese dissident who opposes the CCP. This would eliminate large swaths of testimony from Sasha Gong and Mike Waller. Sasha Gong is a prominent Chinese dissident and journalist living in the United States. She introduced Guo Wengui to Dr. Lianchao Han and William Gertz, who later introduced Guo to French Wallop and Strategic. At the time Gong first met Guo, she was director of the Chinese branch of the U.S. Government's Voice of America media operation, which seeks to spread the word about democracy within China through Chinese language broadcasts. Dr. J. Michael Waller is a member of the China Hawk Community with a Ph.D. in international security affairs. Dr. Waller partnered with Strategic to deliver the research called for by the Research Agreement.

---

[20] Guo v. 2 Depo., 282:23-286:23; 288:2-5.

Gong and Waller each testified about Guo's personal history, relationships and conduct since coming to the United States. Gong and Waller also both discussed how Guo's history, relationships, and conduct comport with his alleged dissident status. Guo's personal history, relationships, and conduct are relevant to Strategic's fraud claim, which asserts that Guo induced Strategic to enter the Research Agreement by representing that he was a Chinese dissident intent on fighting against the CCP when in fact he was an ardent and active supporter of the CCP and wanted to advance its cause.

### 1. The Evidence Cited by Eastern is Fact Testimony, Not Opinions.

Rule 701 requires that testimony offered by a lay witness in the form of an opinion be (a) based on the witness's perception, (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge. Fed. R. Evid. 701. *See also United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005). Eastern challenges portions of the Gong and Waller deposition testimony as lay opinion based on subsection (c), "specialized knowledge." According to Eastern, whether Guo's "use of certain terminology, making contact with certain individuals in China, or moving money out of China through other entities is 'dissident activity' is precisely the type of specialized testimony that cannot [be] offered by a lay witness, such as Ms. Gong [or Mr. Waller]."

This argument fails for two reasons. First, the testimony challenged by Eastern as impermissible lay opinion reflects no opinion at all. The challenged statements are all "factual in nature" and were made by "personally familiar" witnesses—the hallmarks of evidence "falling near the fact end of the fact-opinion spectrum." *United States v. Cuti*, 720 F.3d 453, 458 (2d Cir. 2013). A person who is an expert in his or her field can serve as a lay fact witness without the need to qualify the witness. *See Sutton v. Massachusetts Mut. Life Ins. Co.*,No. 18-CV-1273 (VSB),

14

2020 WL 5765693 (S.D. N.Y. Sept. 27, 2020). In *Sutton*—an ADA claim decided only a few months ago in this District—an engineer who had the qualifications of an expert and had provided expert testimony in previous litigation was permitted to testify as a lay fact witness, since he had "firsthand knowledge" of the disputed construction project. *Id.*, at *3. In the same way, Sasha Gong and Mike Waller may testify as lay fact witnesses, even though they could qualify as experts, because they have firsthand knowledge of the facts surrounding Guo. They do not have to be, and are not, called as experts to testify about this personal knowledge.

### 2.  If Any is Opinion, it is Not Based on Specialized Knowledge.

While all the challenged evidence is "factual in nature," a small portion of Gong and Waller's testimony is arguably less clearly factual. For example, when asked whether "in [her] experience with the Chinese government's policing of dissident activities, [it would] be possible for an entity like ACA to transfer money out of Hong Kong under the control of William Je without the approval of the Chinese government," Gong answered that such transfers would only be possible if William Je and ACA were working with the CCP government. Additionally, throughout his deposition, Mike Waller identifies Guo's behavior as "not dissident activity." Testimony answering a hypothetical question is not necessarily opinion testimony. *United States v. Cuti*, 720 F.3d 453, 458 (2d Cir. 2013) (admitting accountants' answer to a hypothetical question as fact testimony). Moreover, as the United States Supreme Court decided in *Beech Aircraft Corp. v. Rainey*, it is "consistent with the Federal Rules' general approach of relaxing the traditional barriers to 'opinion' testimony" to endorse "[a] broad approach to admissibility…[r]ather than [drawing] some inevitably arbitrary line between the various shades of fact/opinion." 488 U.S. 153, 169, 109 S. Ct. 439, 450, 102 L. Ed. 2d 445 (1988).

15

But even if portions of Gong and Waller's testimony are found to be statements of opinion rather than fact, those opinions would still be admissible under Rule 701 because they are not based on the kind of "specialized knowledge" that requires expert qualification. The Second Circuit "has held that as long as opinions do not depend on the sort of specialized *training* that *scientific witnesses or statisticians rely upon when interpreting the results of their own experiments or investigations*, some degree of specific, industry-related knowledge will not disqualify lay opinion testimony." *United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 828 F. Supp.2d 698, 704 (S.D.N.Y. 2011) (emphasis added). This standard was articulated in *United States v. Yannotti*, a criminal case involving a loan shark operation. Acknowledging "Rule 701's requirement that a lay opinion be the product of reasoning processes familiar to the average person in everyday life,"[21] the appellate court concluded, "[w]hile we do not profess that loansharking is an activity about which the average person has knowledge, we find that the opinion [the lay witness] reached from his own loansharking experience derived from a reasoning process familiar to average persons." *Yannotti*, 541 F.3d 112, 126 (2d Cir. 2008).

Applying the *Yannotti* standard, this Court determined that lay witnesses' ability to decode conspiratorial conversations, while "obviously and unavoidably informed by their experience in the financial industry, should not render the subject of their testimony the province of experts." *Rubin/Chambers*, 828 F. Supp.2d at 705. Similarly, federal courts have admitted lay witness opinion testimony about the smell, taste, and weight of illegal drugs. *See United States v. Roye*, No. 3:15-CR-29 (JBA), 2016 WL 4046692, at *2 (D. Conn. July 27, 2016) (citing *United States v. Durham*, 464 F.3d 976 (9th Cir. 2006) and *United States v. Espino*, 317 F.3d 788 (8th Cir. 2003). While the average person may not know the smell or taste or weight of illegal drugs, the drug

---

[21] *Id*. (citing *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005) (citing the Advisory Committee Notes to Federal Rule of Evidence 701)).

users' testimony was based upon reasoning processes common to everyday life and not requiring special training or education. *Id. See also United States v. Rigas,* 490 F.3d 208, 225 (2d Cir.2007).

On the other hand, opinions requiring an understanding of complex "techniques" or "methods" cannot be offered by lay witnesses. *United States v. Roye,* No. 3:15-CR-29 (JBA), 2016 WL 4046692, at *2 (D. Conn. July 27, 2016). For example, lay witness opinions based on "technical knowledge of software design" depend on the sort of specialized training relied on by scientific witnesses and statisticians. *Dynamic Concepts, Inc. v. Tri-State Surgical Supply & Equip. Ltd.*, 716 F. App'x 5, 11 (2d Cir. 2017). "Scientific" training also undergirded the opinion testimony in *DVL, Inc. v. Niagara Mohawk Power Corp.*, 490 Fed. Appx. 378 (2d Cir. 2012), where a lay witness concluded that the flow of water from a manufacturing plant to a construction site would have inevitably caused contamination to migrate to another piece of property. Because knowing the conditions under which chemical contamination of soil can migrate from site to site requires training and education uncommon to the average person, the opinion could not be offered by a lay witness.

Gong and Waller are prominent figures in the China hawk community. They know much more about dissident behavior and CCP activities than the average person. Nevertheless, the "reasoning processes" they use to determine whether certain actions/inactions are consistent with the typical behavior of Chinese dissidents who oppose the CCP do not depend on complex techniques or methods like those used by scientists, engineers, and statisticians. The reasoning behind the Gong and Waller testimony is simple comparison, which requires no special training or education. Average people use this "reasoning process" on a daily basis. Anyone who says "act your age" is using the same reasoning process—comparing a person's behavior to that of a particular type of person.

Circuit precedent also compels admission of the evidence. Like the opinions at issue in *Yannotti*, *Rubin/Chambers*, and the drug cases cited by *United States v. Roye*, any opinion offered by Gong or Waller would be based on years of experience in a particular environment, not technical training or specialized education. The reasoning process used to determine whether someone is acting like a Chinese dissident, if it is scientific at all, is immensely less scientific than the reasoning process needed to explain software design or to determine whether water migration would spread soil contamination from one physical place to another.

In sum, even if Gong and Waller's testimony includes opinions, and even if those opinions rely upon industry-specific background knowledge, the opinions are still admissible under Rule 701. *Rubin/Chambers*, 828 F. Supp.2d at 705 (S.D. N.Y. 2011). To hold otherwise would "overextend the concept of specialized knowledge." *Id*.

### 3. The Nature of the Bench Trial Eliminates the Concerns Safeguarded Against by Evidence Rules.

As correctly pointed out in Eastern's motion *in limine*, "[t]he purpose of [FRE 701(c)] is to prevent a party from conflating expert and lay opinion testimony, thereby conferring an aura of expertise on a witness." *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005). The danger with lay opinion testimony is that the *jury* will mistake lay witnesses for experts and ascribe too much weight to their testimony. *Rubin/Chambers*, 828 F. Supp. 2d at 705 (S.D.N.Y. 2011). That danger simply does not exist in a bench trial.

### 4. Rule 701 Does Not Bar Admission of Exhibits Evidencing Guo's Connections to Mainland China.

Almost in passing, Eastern contends that the Court should exclude dozens of exhibits demonstrating Guo's extensive and ongoing relationships with Mainland China.[22] Without

---

[22] Eastern asks the Court to exclude DX Nos. 30-31, 33, 35-37, 51-52, 67, 70, 76, 78, 79, 81, 83-90, 92-114.

authority, Eastern argues "[f]or any of these documents to be even remotely relevant, Strategic

would need an expert witness who meets the requirements of Rule 702 to testify regarding

whether such contacts with Mainland China are inconsistent with being a Chinese dissident who

opposes the CCP...Because [] there is no witness that can . . . testify about the purported

implications of these documents, [they] must [] be excluded." Eastern seems to say that the

relevance of a piece of evidence cannot be established unless a testifying expert draws

conclusions from that evidence. Eastern cites no legal basis for this farfetched proposition, and

there is none. Strategic does not need an expert witness to establish the relevance of its

exhibits.[23] The exhibits should be admitted.

### D. Defendant's Opposition to Motion *In Limine* D (Referencing Discovery Rulings)

Eastern challenges the admissibility of certain of Strategic's deposition designations by

claiming Magistrate Deborah Freeman "already deemed" this evidence "to be irrelevant and

therefore inadmissible." Eastern is wrong for two reasons: (1) evidence that Eastern is a financial

and operational shell, incapable of having sustained $1 million in damage, is central to Strategic's

defense; and (2) Magistrate Judge Freeman made no ruling regarding admissibility because it was

beyond the scope of her referral.

As this Court has now seen in the summary judgment briefing and the parties' proposed

Findings of Fact and Conclusions of Law ("FOF/COL"), the evidence sought to be excluded is

potentially dispositive. If Eastern had few assets and no ability to repay a purported loan from a

closely-allied entity (ACA), then under applicable law, Eastern's alleged loan with ACA was a

---

[23] Eastern also suggests that, without an expert witness, Strategic Vision cannot lay a foundation for the exhibits. But documents can be authenticated without expert witnesses, or any witnesses, for that matter. "The bar for authentication of evidence is not particularly high . . . Generally a document is properly authenticated if a reasonable juror could find in favor of authenticity." *Lakah v. UBS AG*, 996 F. Supp.2d 250, 255 (S.D.N.Y. 2014) (citing *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir.2007)).

sham. In that case, Eastern gave no value, vitiating its damages claims. Golden Spring's ties to ACA only make this showing more compelling because they explain how the shell operated within Guo's network. Golden Spring is the means by which Guo ran Eastern and his other entities, and ACA turns out to have funded much of that work (including in litigation activity here). Eastern's own evidence that purports to establish the bona fides of its loan actually involves the relationship between ACA's William Je and Golden Spring's president, Yvette Wang.

    1.   **Evidence of Eastern's Finances and Corporate Existence is Relevant.**

This Court will have to hear and consider evidence of Eastern's basic non-existence. The facts will show that it was financially non-existent, with less than $80,000 sitting in a frozen Hong Kong account. It was operationally non-existent, with no identifiable line of business, no employees or operations anywhere, and no revenue. It was a shelf company, a true cutout: its activities were all through Guo or his family office, Golden Spring (New York), drawing on ACA for any necessary funding. If this is true, then the "loan agreement" (which Eastern produced late in the case to rescue its claim that ACA's $1 million payment was really Eastern's money) was a sham. There was no "loan," and ACA's payment was its own third-party payment or, at best, its own investment. Without having made a payment, Eastern cannot recover damages relying on theories (restitution and reliance) that specifically require the $1 million to have been Eastern's.

    a.   **This Court will Receive Sufficient Facts to Enter Judgment Against Eastern on this Ground.** In negotiations for the Research Agreement, Strategic Vision dealt only with Guo, and only knew of Guo and the two individuals he had designated to negotiate on his behalf, Dr. Lianchao Han and Wang. Eastern was not revealed until shortly before the contract was signed, and it was Guo who introduced it. Wang, who placed the Eastern signature on the Agreement,

testified that she did not know Eastern would be the signatory until shortly before signing the contract. Wang had never even heard of Eastern before. Operationally, there was no "Eastern."

Eastern cannot show (as it must) that ACA's $1 million payment was really Eastern's payment under a purported ACA-Eastern loan agreement. This "loan" transaction, if it actually existed, was a sham. *See In re Refco, Inc. Securities Litigation*, 609 F.Supp.2d 304, 306-07 (S.D.N.Y. 2009). "As a result of these transfers [to hide bad debt through sham loans made to a related entity], RGHI owed hundreds of millions of dollars to Refco, *but RGHI had no liquid assets and no operational functions and thus it had no conceivable means of repaying the 'loans*.'" *Id.* (describing this as "sham loan") (emphasis added); *see also Jockmus v. U.S.*, 335 F.2d 23, 29 (2d Cir. 1964). The document Eastern presented as the loan agreement indicated that the transaction bore interest at 2% per month (therefore, starting at $20,000 per month), compounding monthly.[24] It was repayable in full, with interest, in just six months, in late June 2018. The amount in Eastern's frozen Hong Kong bank account was transparently insufficient to support the extension of $1 million in credit. In fact, even if Eastern paid only the interest, it was insufficient to sustain even the first four months of payments.

Moreover, even if the $80,000 had been $80 million, under Eastern's alleged plan, it would not have been available anytime soon. Eastern's plan was to have the research yield such damaging information that, when published, it would affect public opinion to such an extent that the CCP would be overthrown. This would then cause Hong Kong to unfreeze Eastern's funds. However, the Research Agreement did not contemplate anything like such rapid-fire action. Instead, it contemplated a three-year term and the potential of over 4,000 research subjects. Neither ACA nor Eastern could reasonably have expected repayment of the $1 million or the

---

[24]     ECF 273-13.

accumulated interest anytime close to the 6-month maturity in late June 2018. And after June 2018, the loan's onerous monthly-compounding interest would place Eastern into a progressively deeper hole, exceeding the principal amount even before the end of the Research Agreement's term.

The breadth of the transaction between Strategic and Eastern also indicates there was little possibility ACA's initial $1 million would ever be repaid. An additional $750,000—the first monthly payment, for January—would have been due in just a few weeks, further adding to Eastern's debt load and showing the relevance of Eastern's finances and corporate structure. Over $27 million would have been due over the three-year term of the contract. Strategic incorporates herein FOF/COL 33, 56, 44-45, 56.

Rather than a *bona fide* loan, the Eastern-ACA transaction represented an investment in the research project. Although not known to Strategic Vision during contract negotiations, Eastern had promised ACA that it would be given the results of Strategic Vision's work. Guo and Eastern intended ACA to be an ultimate recipient of Strategic's work under the Agreement. With ACA's involvement, Eastern did not provide anything to the Agreement; it could only pass the research to Guo and ACA, who provided the manpower, names of the subjects to be researched, and funding for the research.

**b. Eastern's "Relevance" Arguments are Not Persuasive.**

In seeking *in limine* relief, Eastern begs the ultimate question in this case (ironically, highlighting its importance) because Eastern mischaracterizes its termination of the Research Agreement as including a "demand[] [for] repayment of the $1 million deposit that *it* put down in connection with the signing of the contract" and that Strategic has "refused to *return*" the fund (ECF 302, p. 5) (emphasis added). Of course, as a matter of undisputed fact, Eastern did not "put

down" any money on the Agreement. The $1 million was "put down" by ACA, not Eastern. Whether ACA's payment can be recharacterized as Eastern's *own* payment due to the existence of a *bona fide* loan is the question the parties are disputing and will turn to the evidence to prove—it is not the starting point

Eastern disagrees, but miscasts the parties' merits dispute as one of relevance. To build its argument, Eastern relies on a form of "straw man" argument. It ignores the entire argument set forth immediately above—Strategic's real argument—and falsely suggests that Strategic intends to use Eastern's "non-existence" to prove other points at trial that were actually resolved long ago in this case. Specifically, Eastern pretends that the relevance is about (i) whether Guo is an agent of Eastern, or (ii) about whether Guo can be held liable as the alter ego of Eastern. On the first point, Eastern admitted that Guo was its agent. But Eastern's defensive admission does not magically cut off proof showing even more—that Guo was both agent and principal, since Eastern was his shell. Additionally, Strategic chose not to re-plead its alter ego theory as a count against Guo when current counsel filed its First Amended Complaint, but that hardly means that evidence of Eastern's financial and operational non-existence is irrelevant and inadmissible on other claims and defenses.

Finally, Judge Freeman conditioned her discovery decision (ECF 189, pp. 2-3) about Eastern's finances as dependent on Strategic showing of legal relevance *at that time*. Although Judge Freeman was skeptical at the time of her decision,[25] Strategic continued to develop the facts and its theory over the ensuing months. Strategic was aided in no small part by Eastern's own decision, weeks after Judge Freeman's discovery ruling, to present evidence to the Court about its own penury. Critically, Eastern informed Judge Freeman that "[t]he assets of Mr. Guo and Eastern

---

[25]     ECF 189, p. 4: "The Court has expressed its skepticism of this legal theory, and Defendant has cited no authority to support its position on the point, despite having had several opportunities to do so."

Profit that have been frozen in Hong Kong were frozen, not by the CCP or Mainland China, but by the High Court of Hong Kong. See Exhibit B." (ECF 203, p. 2) Eastern's Ex. B (Dkt. 203-2, p. 3 "Respondent 16" and p. 14 "Respondent 16") showed the amount frozen in its Hong Kong bank account was HK $578,399.78, the equivalent of about USD $80,000. Eastern submitted the document as part of a brief seeking to block discovery into its relationship with ACA (ECF 203, p.1), but ironically, that very effort finally laid bare its status as a lifeless shell that cannot sustain its own damages because Guo's network operates it (GSNY) and funds it (ACA).[26] Strategic ultimately presented this, as well as its other hard-fought evidence, summarized above, on summary judgment. *See* ECF 266, p. 35. The Court declined to grant judgment under Rule 56, but as Strategic has proposed in its findings of fact and conclusions of law, it has ample legal and factual basis to rely on these facts and find against Eastern.

2.   **Golden Spring's Financial Interactions with ACA are Relevant and Admissible.**

The ACA-Golden Spring relationship is important in this case. ACA, not Eastern, provided the deposit that funded the Research Agreement. And as Eastern admitted, it was to turn over the research to ACA, which had indicated it might "forgive" the "loan" if the research yielded good results. ACA was one of two key entities that were to fund and use the research for which Eastern

---

[26]      Eastern's reliance on another Judge Freeman ruling suffers from the same defect, as that ruling was also limited and was overtaken by the course of discovery. Judge Freeman ruled in the context of Eastern's Fed. R. Civ. P. 30(b)(6) deposition that "the reported 2017 transfer of Plaintiff" was not relevant. But that order (ECF 189, pp. 2-3) related only to Eastern's deposition and none other (as shown by Judge Freeman's related ruling that, for example, the identities of Golden Spring's employees was not a proper subject for Eastern's corporate representative but would be for Golden Spring's corporate representative (ECF 189, p. 3 n. 1)) and did not make a finding of admissibility for trial purposes. A significant portion of Strategic's evidence regarding Eastern's corporate structure came from the Chunguang Han deposition—the testimony of the person whose name appears as the counter-signature on the Research Agreement, who signed Golden Spring's Power-of-Attorney on behalf of Eastern, who signed the purported "loan agreement" between Eastern and ACA, and who is declared to have signed a Substitution of Counsel for Eastern in this case. To preclude Chunguang's description of when and why he sold Eastern to Guo's daughter and how her directorship at the time he signed or purportedly signed these documents affects their credibility would be prejudicial to Strategic.

a mere pass-through recipient. The other key entity was Golden Spring (New York) Limited, which answered to China Golden Spring, Guo's family office. Wang was the President of Golden Spring (New York) and said she took directions from China Golden Spring. In that capacity, she executed a "Power of Attorney" *in the midst of his litigation* which purported to retroactively appoint Golden Spring (and therefore, Ms. Wang herself) as an Eastern's agent in all of her and Golden Springs' prior dealings. Thus, everything that actually happened on Eastern's side of the contract—from conceiving the project, to its funding, to its execution, to performance, and even to running this litigation—was accomplished either by ACA, Guo, or Golden Spring. The ACA-Golden Spring relationship touches on almost every issue in the case. To take the alleged Eastern-ACA loan as an example: except for the alleged signing of the loan agreement (if Chunguang Han is to be believed), all of ACA's dealings with Eastern were through Golden Spring President Yvette Wang.

3. **Magistrate Judge Freeman Never Ruled the Evidence was "Irrelevant and Therefore Inadmissible."**

As a threshold matter, Eastern's uses careful wording equating "irrelevant" as meaning "inadmissible," insinuating that Magistrate Freeman did something Judge Koeltl's referral order (ECF 128) did not give her authority to do—make a merits decision about the admissibility of evidence. To the contrary, the referral authorized Judge Freeman to conduct matters of a general pretrial "*non-dispositive*" nature, and those obviously included consideration of relevance and proportionality in the context of Rule 26, but Judge Freeman issued no dispositive ruling as to the admissibility of any particular piece of evidence, including deposition testimony that had not yet occurred. (ECF 128, p. 1; ECF 189)

Dated November 6, 2020

Respectfully submitted,

GRAVES GARRETT LLC

*s/ Edward D. Greim*
Edward D. Greim, #4240172
1100 Main Street, Suite 2700
Kansas City, MO 64105
Telephone: (816) 256-3181
Fax: (816) 256-5958
edgreim@gravesgarrett.com
ATTORNEY FOR
DEFENDANT/COUNTERCLAIMANT


## CERTIFICATE OF SERVICE

This certifies that, on November 6, 2020, the foregoing was served on all counsel of

record via the Court's Electronic Case Filing System.


*s/ Edward D. Greim*
Attorney for Defendant/Counterclaim