# EXHIBIT A

**UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| EASTERN PROFIT CORPORATION LIMITED | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. 18-CV-2185 (LJL) |
| STRATEGIC VISION US, LLC | ) ) ) |
| Defendant. | ) ) ) |

## <u>SUR-REPLY IN OPPOSITION TO DEFENDANT'S MOTION *IN LIMINE*</u>

Strategic Vision US, LLC ("Strategic") asserts an affirmative fraud claim based on the premise that its principals are ardently anti-communist and would never do business with anyone who has ties to the Chinese Communist Party ("CCP").  At the same time, Strategic refuses to answer questions about whether its legal bills to pursue that very fraud claim are being paid by CCP-backed individuals or entities.  Strategic cannot have it both ways.

Yet In its Reply in Support of its Motion *In Limine,* Strategic continues its attempt to do just that.  Increasingly more desperate to avoid having to answer under oath whether its litigation funder(s) are backed by affiliates of the CCP—an admission that would gut its fraud claim—Strategic conjures up and then attempts to discredit a new evidentiary theory that Strategic incorrectly attributes to Eastern Profit Corporation Limited ("Eastern").  This new theory, however, is Strategic's, not Eastern's.  The arguments that Strategic puts forth are inapplicable to Eastern's actual evidentiary theories, and they are incorrect in any event.

More specifically, in its Reply, Strategic: (1) speculates that Eastern plans to introduce exhibits relating to the criminal pleas of two individuals to prove that those individuals are funding Strategic's litigation; (2) argues that the Court already has found that the identity of

-1-

its funder(s) (which may well include those two individuals—Strategic won't say) is irrelevant; (3) argues that even if the funders' identity is "conditionally relevant," Eastern will not be able to connect enough dots to get the exhibits into evidence; and (4) argues that even if Eastern can connect the evidentiary dots, Strategic has a First Amendment right not reveal the identity of its funders because doing so would chill litigation funding, and cause "parties like Strategic Vision [to] lose their ability to access the courts and defend themselves."  Reply Brief at 8.

Each of those contentions is wrong.  The question of whether Strategic is being funded, directly or indirectly, by CCP backers goes directly to the heart of the fraud claim, and evidence on that point must come in.

## I.    ARGUMENT

### A.    Eastern Plans to Introduce the Broidy and Davis Documents to Show that the U.S. Government (and Broidy, Davis, and the CCP) Consider Guo Wengui a Dissident.

Eastern intends to introduce the charging documents and plea agreements for Elliott Broidy (PX 62, 71) and Nickie Mali Lum Davis (PX 60, 72), as well as a related press release (PX 61), primarily because the documents are evidence that the U.S. Department of Justice itself considers Guo Wengui—who is referred to in the documents as "PRC National A"—to be a "dissident of the PRC," and thus refers to him as such.  PX 72 at ¶ 13; *see also* PX 61 (referring to Guo as a "PRC Dissident").[1]  Moreover, according to the documents, "the government of the PRC,[2] including PRC Minister A and the President of the PRC, were seeking the removal of [Guo] from the United States back to the PRC."  PX 62 at ¶ 15.  Davis and Broidy were federally indicted for—and recently pleaded guilty to, *inter alia*—agreeing to lobby high-ranking U.S. government

---

[1] Strategic concedes that "PRC National A" is Miles Guo.  Reply at 4.

[2] PRC stands for People's Republic of China.

#111409311 v1

officials on behalf of the CCP to arrange for Guo's removal from the United States and return to China.  *See., e.g.*, PX 60, 71 & 72.  Evidence that the CCP was working to secure the return of Guo to China goes to the fact that the CCP regarded Guo as an adversary, not a supporter, as does evidence that the U.S. Government has expressly classified him as a "dissident."

Eastern had not intended to introduce these exhibits to show that Broidy and/or Davis are paying Strategic's fees.  However, given that Strategic has proactively raised the possibility that Broidy and/or Lum Davis are involved in Strategic's funding, and then **explicitly refused to deny their involvement,** Reply at 4 n.6, Eastern should be entitled to explore the subject at trial through examination of Strategic's witnesses.[3]

### B.  This Court Has Not Ruled that the Issue of Whether Strategic Is Being Funded By CCP Backers Is Irrelevant.

Strategic's characterization of Magistrate Freeman's ruling is inaccurate; she did not rule that the identity of Strategic's funders was irrelevant.  Eastern respectfully refers the Court to the text of her transcript ruling for an accurate representation of her decision.  Dec. 2, 2019 Telephone Conference Tr., at 76 (Attached as Exhibit 1).  As noted in Eastern's Opposition Brief but conspicuously absent from Strategic's Reply, the Court decided that it need not make a definitive relevance ruling at the discovery stage because the parties entered into a stipulation that resolved the discovery dispute.  The fact that Strategic is now apparently walking away from its stipulation—in which it attested "Strategic Vision US, LLC's legal fees in this action are not being paid by any person or entity that is or ever was a member of, associated with, or affiliated with the Chinese Communist Party or the People's Republic of China"—is telling.  Opposition Brief, Ex. A.

---

[3] Eastern does not seek a trial within a trial, as Strategic suggests.  Eastern simply wants to know whether Strategic's fees are being paid, directly or indirectly, by CCP supporters/affiliates.

Our laws allow for litigation funding and alternate fee arrangements, and the fact that Strategic's fees are being paid by someone other than Strategic may not be remarkable standing alone.  In the everyday case, the identity of a litigation funder might be "generally irrelevant" to the parties' claims or defenses.  Reply at 2.  But if the identity of Strategic's funder in this case belies the assertions underlying Strategic's fraud claim and the Stipulation it signed, that fact is undeniably relevant and related evidence is clearly probative and goes to both merits and credibility.  *See* Opposition Brief at 5-6 (citing cases holding that identity of litigation funders is relevant).  Exclusion of any such evidence would prevent Eastern from being able to defend itself against Strategic's claims.

**C.     The Arguments in Strategic's Reply Do Not Refute the Admissibility of Evidence Regarding Strategic's Litigation Funder. [4]**

Strategic's Reply sets forth a Rube Goldberg web of supposed conditional evidentiary inferences regarding the Broidy and Davis exhibits that conflate the issue of whether Guo is a communist with the issue of whether CCP affiliates are directly or indirectly paying Strategic's fees.  Eastern intends to use the Broidy and Davis documents primarily to go to the former issue, whereas Strategic's Motion *in Limine* goes to the latter issue.

Eastern does not subscribe to Strategic's overly complicated theory, which conflates the two issues.  Eastern's evidentiary theory is simple: to succeed on its fraud claim, Strategic must prove (*inter alia*) that Guo is a CCP supporter *and* that Strategic would not associate with supporters of the CCP.  Evidence going to the first issue includes the Broidy/Davis exhibits

---

[4] Strategic's Reply could be read to suggest that Eastern bears the burden of proof.  The "Eastern would need to prove" mantra that Strategic employs in its brief should not obfuscate that it is Eastern, not Strategic, who bears the burden of proof on the affirmative elements of its fraud claim.  Eastern need not prove that Guo is a dissident or that Strategic is now contracting with the very type of people with whom it claims it would not contract. It is Strategic that must prove that Guo is a dissident and that the political affiliation of its business partners is a material fact on which it reasonably relied in entering the contract.  If Eastern has evidence that tends to refute those facts, then it is entitled to present that evidence in defense of Strategic's fraud claim.

(which contain positions on Guo's political affiliation taken by the U.S. Government in official government documents, and admissions under penalty of perjury from criminal defendants regarding their meetings with CCP officials about Guo).  Evidence going to the second issue includes any arrangements by Strategic to have its fees paid by people backed by or affiliated with the CCP.  The two issues might end up being related, but the admissibility of evidence on one issue is not contingent on the admissibility of evidence on the other.[5]  Strategic's suggestion that whether or not the CCP and its allies are successful in deporting Guo is a fact necessary to the admission of this evidence on either issue, Reply at 5, is incorrect.

D.    **Having Used Political Affiliation as a Sword, Strategic Cannot Turn Political Affiliation Into a Shield By Invoking the First Amendment.**

Strategic brought its fraud claim premised entirely on the supposed political affiliation of its principals.  It now seeks to exclude evidence of its principals' political affiliation, hiding behind the First Amendment.  Its argument is ridiculous on several levels.

As a threshold matter, the difficulty in attempting to define the political beliefs of Guo, Strategic, or Wallop and Waller highlights one of the many reasons Strategic's claim should fail on the merits.  One's political beliefs are not black and white facts that can be proven true or false.  Now faced with a challenge to its own political affiliation that it brought upon itself, Strategic apparently is starting to understand this logic.  But Strategic must suffer the consequences of pursuing its claim.  To the extent Strategic's current argument is "we were not okay with communist loyalists in December 2017 but we are ok with them now," Eastern must be able to explore that change of position on a "fact" that Strategic claims is material.

---

[5] Even if Eastern had to lay a foundation in order to get any of its proffered exhibits into evidence, Eastern simply could do so by eliciting foundation testimony from witnesses.  The fact that a foundation must be laid before an exhibit can come in does not preclude a party from attempting to lay that foundation.

Relatedly, Strategic did not employ funders because they "had the courage to come to **Strategic's defense**." Reply at 1. Rather, the evidence that Strategic is hiding may well show that it was the funders who employed Strategic to assist in the **funders' offense**. Notably, before current counsel entered an appearance in this matter, and while Strategic was simply defending Eastern's claims for the return of its $1 million deposit, Strategic's lawyers withdrew for nonpayment of fees. *See* Docket 102. Then suddenly, when current counsel entered its appearance in this case, not only was Strategic able to afford the defense of Eastern's contract claims, but **Strategic for the first time asserted a fraud counterclaim against Eastern based on Guo's political affiliation** and cranked up a scorched earth approach to discovery and litigation. Under such circumstances, the identity of Strategic's funder goes not only to the merits of its fraud claim, but also to the bias of Strategic's witnesses. *See* Opposition at 5-6.

Along the same lines, when it comes to political affiliation, Strategic is the aggressor, not the party in need of defense. Eastern brought this contract case because it paid a $1 million deposit for private investigative services, to people who turned out not to be private investigators, and got nothing in return. **It was Strategic—not Eastern—who then turned this case into a political dispute by bringing a fraud claim based on the theory that political affiliation is a material representation of fact upon which they reasonably relied in entering the contract. Having affirmatively put the political affiliation of its principles at issue, it cannot now claim that is has some First Amendment protection that allows it to hide its own affiliations that belie its claim.** "[W]hen a party puts its confidential communications directly at issue in litigation, any privilege — qualified or not — may be waived." *In re Methyl Tertiary Butyle Ehter ("MTBE") Prods. Liab. Litig.*, 898 F. Supp. 2d. 603, 607 (S.D.N.Y. 2012) (applying the "at issue" doctrine in the context of the deliberative process privilege and noting that the

-6-

doctrine "serves to avoid the 'inherent inequity in permitting [litigants] to use the privilege as a sword rather than a shield,' which is the result whenever litigants are permitted to 'divulge whatever information is favorable to [their] position and assert the privilege to preclude disclosure of detrimental facts'"); *see also HSH Nordbank AG N.Y. Branch v. Swerdlow*, 259 F.R.D. 64, 74 (S.D.N.Y. 2009) (stating that the at issue doctrine prohibits a party from using the attorney-client privilege as both a sword and shield.); *Schiller v. City of New York*, 245 F.R.D. 112, 120 (S.D.N.Y. 2007) (reasoning that because the Second Circuit had found the fairness/at issue doctrine applicable to the normally inviolate attorney-client privilege, that doctrine necessarily applies to the qualified journalist's privilege as well).

## II.   CONCLUSION

For the foregoing reasons and those stated in Eastern's Opposition, Strategic's Motion *In Limine* should be denied.

Dated:  November 18, 2020

Respectfully submitted,

*/s/ Joanna J. Cline*
Francis J. Lawall (Admitted to S.D.N.Y.)
TROUTMAN PEPPER HAMILTON
SANDERS LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103
215.981.4000

Joanna J. Cline (*Pro Hac Vice*)
Christopher B. Chuff (*Pro Hac Vice*)
TROUTMAN PEPPER HAMILTON
SANDERS LLP
1313 North Market Streets, Suite 5100
Wilmington, DE 19801
302.777.6500

#111409311 v1

# EXHIBIT 1

```
                    UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK

In re:                           :
                                      Docket #18cv2185
 EASTERN PROFIT CORPORATION      : 1:18-cv-02185-JGK-DCF
 LIMITED,
                    Plaintiff,   :

   - against -                   :

 STRATEGIC VISION US, LLC, et al., :
                                      New York, New York
                    Defendants.  : December 2, 2019

------------------------------------: TELEPHONE CONFERENCE


                      PROCEEDINGS BEFORE
               THE HONORABLE DEBRA C. FREEMAN,
         UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:          PEPPER HAMILTON LLP
                        BY:  JOANNA CLINE, ESQ.
                             CHRISTOPHER CHUFF, ESQ.
                        1313 Market Street, Suite 5100
                        Wilmington, Delaware 19899


For Defendant -         GRAVES GARRETT, LLC
Strategic Vision        BY:  EDWARD GREIM, ESQ.
US, LLC:                     JENNIFER DONNELLI, ESQ.
                        1100 Main Street, Suite 2700
                        Kansas City, Missouri 64105


For Counter Defendant - HODGSON RUSS LLP
Guo Wengui:             BY:  ERIN TESKE, ESQ.
                             MARK HARMON
                        605 Third Avenue, 23rd Floor
                        New York, New York 10518


Transcription Service: Carole Ludwig, Transcription Services
                       141 East Third Street #3E
                       New York, New York 10009
                       Phone:  (212) 420-0771
                       Email:  Transcription420@aol.com

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.
```

<u>**INDEX**</u>

<u>**E X A M I N A T I O N S**</u>

| <u>**Witness**</u> | <u>**Direct**</u> | <u>**Cross**</u> | <u>**Re-Direct**</u> | <u>**Re-Cross**</u> | <u>**Court**</u> |
|---|---|---|---|---|---|

None

<u>**E X H I B I T S**</u>

| <u>**Exhibit Number**</u> | <u>**Description**</u> | <u>**ID**</u> | <u>**In**</u> | <u>**Voir Dire**</u> |
|---|---|---|---|---|

None

1

                                                                    3

1

2           THE COURT:  Hello, it's Judge Freeman.

3           MR. EDWARD GREIM:  Good morning, Judge, you've got

4   Eddie Greim and Jennifer Donnelli in Missouri here for

5   Strategic Vision, and I've got the other two parties also on

6   the line, I'll let them introduce themselves.

7           MS. JOANNA CLINE:  Good morning, Your Honor,

8   Joanna Cline and Chris Chuff at Pepper Hamilton for

9   Eastern Profit.

10          THE COURT:  Okay.

11          MS. ERIN TESKE:  Good morning, Your Honor, Erin

12  Teske and Mark Harmon here for Mr. Guo, nonparty.

13          THE COURT:  Okay.  Is there anyone else who

14  represented any other nonparties?

15          MR. GREIM:  Your Honor, there's nobody else,

16  I'm the one who put the call together here, so it's

17  just the three of us.

18          THE COURT:  Because there is more than one

19  thing going on now because in this case there always

20  seems to be more than one thing going on. I had had a

21  conference whenever that was with counsel for the

22  party last week, and an issue came up that related to

23  Mr. Guo's deposition so I said I wanted to continue

24  the conference when Mr. Guo's attorney could be on the

25  phone.  But since then I've gotten this correspondence

4

1

2  about a request for a stay and I guess, Ms. Teske, are

3  you representing all of the nonparties who are making

4  that motion?

5        MS. TESKE:  Your Honor, we represent, we've

6  represented nonparties, Golden Spring (New York),

7  Karen Maistrello, Yvette Wang and Myles Kuok or Guo

8  Wengui, all of whom have been affected by extensive

9  nonparty discovery requests and we made that motion on

10  their behalf.

11        THE COURT:  Okay, so first of all, let me work

12  backwards a little bit. It looks to me from Mr.

13  Greim's opposition to the request for a stay that he

14  is actually seeking to do very little more before

15  accepting the close of discovery. It doesn't seem like

16  he's seeking at this point substantial additional

17  nonparty discovery; is that correct, Mr. Greim?

18        MR. GREIM:  Yes, Your Honor, based on our call

19  with you last week, we've got, you know, we're hoping

20  to take the deposition of Mr. Guo on Wednesday and Mr.

21  Bannon on Thursday, and subject to whether we can work

22  out the issues with Google on these, and Twitter on

23  these subpoenas, we're done.  We're not going to go

24  try to find ACA in Hong Kong or do whatever things,

25  we're just, we want to try to get these topics from

```
 1                                                    5
 2  Mr. Guo because that seems to be the most efficient
 3  way to wrap this up.
 4          THE COURT:  So when you're talking, Ms. Teske,
 5  when you're talking about Golden Spring and Ms.
 6  Maistrello, and who am I forgetting, Yvette Wang, it
 7  doesn't seem like anything more is being sought from
 8  them.
 9          MS. TESKE:  Your Honor, my concern is with the
10  subject to (indiscernible) the responses he wants from
11  Mr. Kuok. And there has been, you know, Strategic has
12  a proclivity for making a request on nonparties that
13  are far in excess of any of the scope that they had
14  bene permitted to date. And those, you know, subpoenas
15  to Google, and Twitter, and AT&T, and T-Mobile and the
16  subpoenas that are outstanding are very onerous and
17  harassing of our clients.  He's suggested that if he
18  doesn't get the answers he wants from Mr. Kuok, that
19  he wants another day from Golden Springs and I --
20          THE COURT:  All right, all right, I can
21  address that, let's take it in smaller pieces, okay?
22  The deposition of Mr. Guo is supposed to go forward,
23  I'm not sure why there's been a problem in having it
24  go forward, there is an issue about topics to be
25  covered, which is why I wanted to have counsel for Mr.
```

```
 1                                                       6
 2  Guo on the phone before that deposition to make sure
 3  that everybody is being able to speak on that topic,
 4  be heard on that topic. But I am not envisioning, Mr.
 5  Greim, that if you are not satisfied with Mr. Guo's
 6  responses, that that opens the door to further
 7  depositions.
 8           MR. GREIM:  Nor are we, Your Honor, honestly.
 9  We just, at this point, if Mr. Guo, you know, can't
10  tell us about Golden Spring or says he doesn't know or
11  he's never heard of it, or whatever, at that point we,
12  I mean to me the relief we would get at that point
13  might be something like on summary judgment Golden
14  Spring can't come rolling in with all this information
15  that we, you know, that it never gave us in discovery.
16  But we've got to tie it off at some point and I think
17  that's how we would do it.
18           THE COURT:  I think sooner would be better
19  than later to "tie it off." So, all right, so my view
20  on this is that Mr. Guo's deposition, continued
21  deposition should go forward, this should be the end
22  of it, there should not be another day after this. And
23  then that should not open the door to other
24  depositions from ACA or Golden Spring or anybody else.
25           Mr. Bannon is something that I have heard no
```

7

1

2  squawking about, from his counsel I've had no motion

3  to quash a subpoena, I don't know what's going on with

4  discussions with his counsel, you are not representing

5  him, Ms. Teske, I gather, and so that seems to be

6  something I cannot address today and have no reason to

7  address because I haven't had any appropriate motion

8  practice in front of me should it be needed.

9          MR. GREIM:  Your Honor, the only thing that we

10  seek from you, and it's actually pretty limited,

11  because there's really two pieces. One is, is it even

12  okay to do it on December 5th. The other thing is, I

13  suppose he could still file a motion to quash, but

14  he'd probably file that down in District of DC and

15  then he would raise, you know, whatever substantive

16  issues he has with the subpoena. But I thought that

17  what we might need from you is an okay that December

18  5th is not too late to take it. You're obviously not

19  ruling on whether, on any grounds to quash that he

20  might raise.

21          THE COURT:  Well that's outside the discovery

22  period?

23          MR. GREIM:  Correct, December 5th is outside

24  the discovery period, that period ended on Friday.  He

25  was noticed to appear the previous Friday which I'm

8

1  losing track of the dates, November 22nd.

2         THE COURT:  Well how much notice did you give

3  him?

4         MR. GREIM:  We got word, another one of my

5  trips to the airport we got word that he was not going

6  to appear the following day, and so we're treating it

7  as a no show, there's no motion to quash filed.

8         THE COURT:  How much notice did you give him?

9         MR. GREIM:  He was ultimately served the

10 previous Thursday, so November the 14th.  We've been

11 trying to serve him for a month before that. And so

12 what I told --

13        THE COURT:  I'm sorry, you served him on the

14 14th with a return date for the deposition on the, on

15 what date?

16        MR. GREIM:  November 22nd, Friday, Your Honor.

17        THE COURT:  Well that's, you know, eight days

18 notice, generally, you know, reasonable notice is

19 going to be at least ten for --

20        MR. GREIM:  Sure, Your Honor, and I'd agree,

21 I'd like to have had more notice, what we discussed

22 with counsel was let's get on the phone with the

23 Court, if you want to push it until after the

24 discovery deadline, let's get on the phone and at

9

1
2  least get approval to do that.  And rather than doing
3  that, they emailed and said he would not be appearing,
4  they wanted more time to prep him and so because they
5  earlier mentioned December 5th as an available date,
6  you renoticed it for that date. I'd also tell you that
7  we spoke with his counsel that preceding week, both on
8  Monday and then on Thursday.
9          THE COURT:  Well I'm not going to rule on this
10 based on your representations as to what opposing
11 counsel said. So if, and if there is a motion that's
12 in a different district then I shouldn't be ruling on
13 it in any event. And I'm not going to extend the
14 discovery deadline just based on, you know, what you
15 tell me were your efforts and why it couldn't have
16 been done sooner within the discovery period.
17          So, you know, I'm not going to do what you're
18 asking me to do right now, I'm not going to say
19 discovery is extended to and through December 5th, but
20 that's without prejudice for you to renew that
21 application with, you know, counsel for Mr. Bannon so
22 that I can hear what both sides have to say about the
23 diligent efforts that were made to obtain his
24 testimony before the discovery period and how you were
25 thwarted in your efforts to do so.  And I'm not

10

1

2 persuaded at this point that you were thwarted in you

3 efforts to do so. So, you know, that you served him

4 with sufficient time to make it reasonable, that the

5 subpoena should be enforced, and again, it apparently

6 was in a different district. So that's denied for now.

7 With respect to Mr. Guo, that deposition

8 should go forward but it should not open the door to

9 anything else. And so with respect to depositions,

10 when that's over, the deposition phase of discovery

11 should be no more, that should be it.

12 With respect to the subpoenas that are

13 outstanding, you know, I thought at least certain

14 subpoenas, they were very broad. But again, I'm not

15 sure I actually have a motion to quash or a motion to

16 compel or anything in front of me, and I think last

17 time we spoke, I think you told me it was not in front

18 of me.

19 MR. GREIM:  Your Honor, actually you have a

20 motion from Ms. Teske -- well, let's see, I better let

21 her, what we decided on our last call was that she

22 could contact them and say that it's not necessary to

23 make any production while we work out --

24 THE COURT:  That's correct.  That's right.

25 MR. GREIM:  And here's the thing, Your Honor,

11

1

2   what Google and Twitter ultimately allow will kind of

3   make or break this for us.  we are still in talks with

4   them, we removed the geographic tracking element on

5   these subpoenas and I think we reported that to you

6   last time.

7          THE COURT:  Right, and I remember saying that

8   I didn't understand why you were seeking the

9   information about the IP addresses from which contact

10  had been made because it seemed to me that that was

11  another way to get geographical information.  And you

12  had said, no, no, we're not looking for geographical

13  information.

14         MS. TESKE:  Your Honor, it was more than the

15  geographic information, too, I know that's precisely

16  what we picked up on because it seems to be the most

17  offensive component. But we're talking about three

18  years of phone records and billing information, and

19  none of the information that he's asked for is

20  remotely relevant.

21         MR. GREIM:  Your Honor, I mean we've got, we

22  can argue that whatever is out there, I don't think

23  it's a motion --

24         THE COURT:  Wait, wait, wait, we had taken a

25  look at the case law regarding when subpoenas for

1                                                            12

2   phone records and the like are upheld in civil

3   litigations. And generally what we've seen is when

4   there is something that's narrowly tailored to an

5   issue in the case where you really can see that the

6   effort is made to have it narrowly tailored, you know,

7   there's a particular issue about a particular

8   conversation that's at issue, you know, between two

9   parties and there's a dispute about what took place,

10  or when it took place or something like that, you

11  know, and you're looking to have the records to try to

12  confirm one way or another whether that conversation

13  took place on that day in time. Something that is

14  narrow and is clearly geared to something that's

15  disputed or, you know, material to claims or defenses.

16          What you have is extremely broad and it's

17  unclear to me even why you are looking for the

18  information you are looking for. You did not really

19  lay out for me an explanation of relevance of all of

20  these things you're looking for. Now that said, if you

21  are in the process of negotiating, I always encourage

22  negotiation, but if Ms. Teske represents anybody who

23  has standing to object because it's there records and

24  she thinks that it would reveal personal information

25  about them in some manner, you should include her in

13

2   your discussions, and you shouldn't simply negotiate

3   with Google.

4          MR. GREIM:  But, Your Honor, what we want to

5   first do is see whether we can even overcome the

6   issues that Google and others have raised and then our

7   intent frankly was to go back to Ms. Teske and say,

8   well, here's where we are, what do you think about

9   this. I don't know about three-way phone calls on

10  this. I mean I don't know if the Court's suggesting

11  that, but certainly we'd have to come back to Ms.

12  Teske. We're just trying to work with in-house counsel

13  at Google and I get kind of confused here. I think one

14  of them is actually part of Google, I don't know this

15  as well as I should.

16         THE COURT:  Well, look, if I'm going to need

17  to resolve this, and I think what you told me last

18  time was that they were not producing because it was,

19  I've given the direction that they not produce until

20  things were sorted out, until I had ruled, and it was

21  not at that time in front of me to rule, maybe what I

22  was thinking at the time was I didn't have Ms. Teske

23  present. But in any event, I remember thinking that

24  was being tabled.

25         So the fact of the matter is, if there is

14

1

2   going to be a dispute about it, then the party that is

3   seeking the discovery has the burden to show relevance

4   in the first instance and you are going to have to do

5   a lot more than you did to demonstrate why the kinds

6   of records you are seeking are relevant to any claim

7   or defense that's been asserted in this case. Because

8   just to say I want all the phone records because I

9   think, I don't know, if I go through them maybe I'll

10  find something, is not sufficient. You're going to

11  have to explain why these materials that you are

12  seeking are appropriate for production in this case.

13         MR. GREIM:  Your Honor, we recognize that, and

14  we just, frankly, we will do that at the appropriate

15  time if we can get to that stage, and it may be that

16  we don't, but I think we're coming to a conclusion

17  here one way or the other, and we'll be prepared to

18  make our showing to you.

19         THE COURT:  Well I might just cut the whole

20  thing off altogether before you burden Google with

21  ongoing conversations about what can they do and what

22  will they do. Because if it's not something where you

23  can make a showing of relevance in the first instance,

24  why are you even putting them to that burden of having

25  those discussion with you?  Can you give me a basic

1                                                              15

2   explanation as to why you're seeking all of these

3   records from numerous providers, right?  It's

4   LinkedIn, and Google, and YouTube, and AT&T, right,

5   and Verizon maybe, I mean I can't remember exactly but

6   I think there are at least five providers.

7           MR. GREIM:  Your Honor, here's the couple of

8   basic points and they're different for each one. And

9   I'm not the, I don't have my little chart in front of

10  me here but I'll do my best. So for Google and I think

11  YouTube is one of those, it's going to be important.

12  There are some things that are on the internet, videos of

13  Guo, or recordings that Guo says are not his.  And being

14  able to trace those back and show that actually those are

15  his accounts, and we know that one of these channels from

16  the objection letter I think that came from Ms. Teske,

17  they admit that one of those channels is actually Guo's.

18  One of the three that I think we're seeking.

19          THE COURT:  Well then you don't need the

20  information on the one because you have an admission.

21          MR. GREIM:  Well but they don't say which one it

22  is.

23          THE COURT:  All right, well if you have a

24  particular video that you can show has some relevance and

25  you're trying to show this video is on an account that is

16

1

2   controlled by Mr. Guo and you can show that that has some

3   relevance, then I would think you could have a very

4   tailored request for ownership or control or whatever

5   registration information for the particular account for

6   the particular video at the time that that video was

7   uploaded.  But the way you've framed the request is not

8   like that, it's very much broader, if I recall.

9           MR. GREIM:  And then the other piece of this is,

10  I think we'll be able to see that there are, you know, you

11  would not expect lots of phone calls, unprotected phone

12  calls during the time period here from Guo or Golden

13  Spring back to the mainland.

14          THE COURT:  Well then if you're looking for a

15  certain country code or something like that, you're not

16  looking for all phone records, you're looking for calls

17  within a certain timeframe to certain people or certain, a

18  certain part of the world or something at a minimum.

19          MS. TESKE:  Why in the world would that be an

20  expectation that would be relevant to this case?

21          MR. GREIM:  Well, we've heard --

22          MS. TESKE:  He has family in China.

23          MR. GREIM:  Yeah, but we've heard some testimony

24  about what people actually do, what dissidents actually do

25  when they call back to family or associates in China, and

1                                                              17

2   discussions over an open phone line are not one of them.

3   And so --

4           MS. TESKE:  Says who, Eddie?

5           THE COURT:  I'm sorry, I didn't hear, Ms. Teske,

6   what?

7           MS. TESKE:  He said we have testimony to this

8   effect, who is setting the standard here for what a

9   dissident does and doesn't, and why isn't communicating

10  with family or friends that he has in a country in which

11  he grew up and spent his life typical behavior for a

12  person?

13          MR. GREIM:  I will say this testimony comes from

14  a witness that, I mean frankly, Your Honor, this is a

15  separate issue that I wanted to get to on this call

16  later, but we had a witness testify on Tuesday of last

17  week and the only people in the room were myself, my

18  client representative and Ms. Cline for Eastern

19  Profit, there were no other corporate representatives

20  there.  And Mr. Guo knew of the deposition, of course,

21  and then has gone on YouTube, has posted several

22  videos on the internet starting the day afterwards,

23  attacking the witness, discussing what the witness'

24  testimony was and trying to refute it, and making

25  threats against the witness. And frankly, I don't feel

18

1
2  comfortable discussing more about what the witness

3  said on the phone with the Court, not with Guo's

4  counsel on the line.

5           MS. TESKE:  Your Honor, this is the first I'm

6  hearing of any of this and, you know, I obviously

7  cannot, this issue cannot be properly addressed if we

8  can't have a candid conversation on it, so --

9           MR. GREIM:  Well I can represent to the Court

10 that it will be our position, based on witness

11 testimony, that dissidents do not call back on

12 unprotected phone lines. You should not see lots of

13 phone calls back to the mainland.

14          MS. TESKE:  And this is based on one

15 nonparty's opinion?

16          MR. GREIM:  Well I'm going to stop there

17 because I am afraid where this is going to lead.

18          THE COURT:  All right.

19          MR. GREIM:  And I don't want to take --

20          THE COURT:  Okay, everybody stop.  Everybody

21 stop.  Ms. Teske is an officer of the Court, she has

22 ethical obligations, okay.  Saying that you are not

23 comfortable describing the subject of testimony to

24 someone who is an officer of the Court leads to a

25 question of what are you concerned that she would do

1

2 with this information and why would you be concerned

3 that she would do such a thing.  I don't understand

4 that and I'm assuming you are able to have a candid

5 conversation with counsel, but you can do that offline

6 as part of your discussions about this subpoena.

7          All right, now number two, I'm not going to

8 make a determination as to what is or is not

9 appropriate for dissidents to do or what dissidents

10 typically do or do not do or anything of that nature.

11 I have no idea, all right. Parties are developing

12 their claims and are developing their defenses, and

13 they're going to rise and fall on whatever evidence

14 they can put together. Within reason they can have

15 discovery on it, if it starts to get unreasonable I

16 cut it off.   At this point Mr. Greim has indicate din

17 his letter of November 27th, and I quote, "we are in

18 the final lap of discovery."  I accept that, you are

19 in the final lap of discovery, in fact, discovery is

20 closed.  Anything that is left is going to be

21 something that was duly requested, appropriately

22 requested during the discovery periods and has not

23 happened yet through no fault of your own, otherwise

24 discovery is done.

25          So my ruling with respect to Mr. Bannon is I

20

have no persuasive showing at this point as to why

something didn't happen within the discovery period,

and only didn't happen through circumstances outside

your control, that they couldn't have been reasonably

anticipated and that there were diligent efforts made

to accomplish it within the discovery period.  So as

far as I'm concerned, as of now that's out.

Mr. Guo's continued deposition was duly

requested within the period, I've already ruled on it.

I've already said it should go forward, and it should

go forward.  The subpoenas were served within the

discovery period, there was some noise about some of

them that, you know, has not been resolved, I was told

that there are some negotiations going on.

Negotiations are what should happen, but if there's a

nonparty that has expressed a privacy interest and,

therefore, a standing to challenge them, that party,

that nonparty's counsel should be in the loop in

discussions. I don't care how you go about it, I don't

care whether you have two-way conversations, three-way

conversations, I am telling you that the subpoenas, as

drafted, were extremely broad and there is going to

have to be a particularized showing of relevance if I

have to rule on this if you cannot work it out between

21

2  you.

3         I'm going to give you a narrow window of time

4  to try to work it out between and among the interested

5  people and entities. If you can't work it out you'll

6  tell me how close you got and what remains, and I'll

7  rule.  And I will tell you now, Mr. Greim, I am going

8  to rule against you if it's not narrowly tailored to

9  something the subpoenas, as framed, looked extremely

10 broad and overly so.  But Ms. Teske, I'm going to tell

11 you now that I am not going to buy into any party or

12 nonparty's view of what the underlying truth of

13 anything is. I'm not going to be persuaded that this

14 witness is particularly knowledgeable, I'm not going

15 to persuaded this witness is not particularly

16 knowledgeable, if there's a line where I can follow

17 the reasoning and it is an arguable defense, or at

18 least I understand it, I'll allow some leeway in

19 discovery within reason.

20         So if there is some way to focus records on

21 important phone calls that have been identified or

22 something of that nature, I may allow that. If it's

23 something that is just give me all your phone records

24 for all these years, I probably would disallow that.

25 And so you should talk in good faith to see if you can

22

come up with something on these outstanding subpoenas

where there has been a motion duly made in front of me

to see if you can work out your differences, if not,

you put your narrowed differences in front of me.

I'm going to move on to Mr. Guo's deposition

and the issue that we dealt with last week which had

to do with ACA. I had previously ruled that I was not

persuaded, that evidence about whether money could be

moved in or out of Hong Kong was sufficiently relevant

to the claims or defenses, that there was a

sufficient, you know, nexus to defendant's defense in

this case, to make that discovery proportionate to the needs

of the case, and I had said forget it because you are not

going there.

Then we had some changed circumstances. As I

understand it, there was testimony by a, was it a

30(B)(6) witness for Eastern Profit, was that right,

who testified about money in or assets in Hong Kong of

Mr. Guo and, perhaps it's Eastern Profit, I cannot

quite recall, being frozen and --

MS. TESKE:  Sorry, Your Honor, I don't, I just

want to make sure that we're clear because that's not

my understanding. My understanding is that she

testified that's Eastern's money.

```
 1                                                    23
 2              THE COURT:  Eastern Profit's money?
 3              MR. GREIM:  Yes, Your Honor, that's right.
 4   She said that because it's Eastern's dissident's
 5   activities, it's assets were frozen.
 6              THE COURT:  Okay.
 7              MS. TESKE:  Pursuant to a Hong Kong court
 8   order.
 9              THE COURT:  Right, I understand that, that
10   Eastern's, that, no, not pursuant to a Hong Kong court
11   order, that the -- no, but by recollection is of the
12   conference that we had was although there was this
13   Hong Kong court order, the witness testified that the
14   freezing of assets had to do with dissident, someone's
15   dissident status, presumably Mr. Guo. And that it was
16   only going to be freed up, I can't quite remember but
17   it had to do with something beyond this order of the
18   Hong Kong court. The testimony was read to me on the
19   phone in the last conference and it seemed me that
20   Eastern's witness, who Eastern's counsel said had
21   misspoken, but that was the testimony, so I can't take
22   counsel's word for it that the testimony was in error.
23   That Eastern Profit's witness had said that dissident
24   activities can result and did result in money being
25   tied up in Hong Kong. And that --
```

1                                                          24

2              MS. TESKE:  Your Honor, I haven't seen that

3   transcript, so I guess (indiscernible) and I can't

4   respond to that.

5              THE COURT:  Does anybody have it handy?

6              MR. GREIM:  I do, Your Honor.

7              THE COURT:  Can you read that again, because

8   it was that testimony that made me slightly, at least,

9   rethink my prior ruling with respect to the relevance

10  of whether ACA could move money for Eastern or perhaps

11  for Mr. Guo.

12             MR. GREIM:  Your Honor, I would say Ms. Teske

13  was present at the deposition, but let me find it

14  here, I've got it.  I've got it pulled up, I just need

15  to go back to my old letter to get back to the right

16  spot.

17             THE COURT:  In any event, while you're looking

18  for that, based on that testimony, which seemed to me

19  to be a changed circumstance because it seemed to me

20  to be contrary to what had been represented in prior,

21  one or more prior phone conferences about whether

22  money could be freely moved out of Hong Kong

23  regardless of dissident status or involvement with

24  dissidents, I was more inclined to allow some evidence

25  regarding ACA.  But on the other hand, it seemed

25

1

2  likely futile to try to press on compelling ACA to

3  appear for testimony, because I was not persuaded that

4  the service on Ms. Maistrello was adequate service on

5  ACA, I was, it was very unclear how another witness

6  could be compelled to come here to give testimony.  It

7  seemed like it was, you know, as we walked through the

8  various issues it seemed to me that the burdens and

9  the difficulties, practical and otherwise, of trying

10 to compel ACA testimony outweighed going down that

11 path.  But I also thought that some limited questions

12 on that topic could be posed to Mr. Guo even though I

13 had previously said otherwise, and that's why I wanted

14 Mr. Guo's counsel on the phone before that deposition

15 happened.  Because I didn't want that ruling to be

16 sprung on counsel after I had previously in writing

17 said something otherwise.

18          Did you find the testimony?

19          MR. GREIM:  Your Honor, I am sorry, I have not

20 found it yet, I've got an electronic version up here

21 and I'm trying to.

22          MS. TESKE:  Eddie, would you mind just sending

23 me a copy?

24          MR. GREIM:  I'll do that.

25          THE COURT:  Hold on, I had counsel or Eastern

26

1

2   Profit on that last call and you had it at your

3   fingertips, is that the same counsel I have today?

4          MS. CLINE:  Yes, Your Honor, I'm here, I have

5   the transcript in front of me, I'm just not sure that my

6   view of it and Mr. Greim's view are the same.

7          THE COURT:  Well I think you're the one who read

8   it last time.

9          MR. GREIM:  I'm the one who read it last time I

10  think.

11         MR. GREIM:  Yes, I went to the, I cited, I've

12  got a letter for the Court where I cited about four or

13  five places in this transcript and I was trying to find

14  that letter and for some reason it's not saved in our

15  pleadings file.

16         THE COURT:  I'm sorry, so you have many letters

17  to the Court --

18         MR. GREIM:  I know.

19         THE COURT:  And perhaps --

20         MR. GREIM:  Everybody has seen my, I laid out my

21  argument in that, in a reply letter that responded to Ms.

22  Cline's letter on this. And I'm sending the condensed

23  transcript to Ms. Teske, who was there, let's see here, so

24  she can have it in front of her.  Okay, Erin, I sent it to

25  you, I just typed in Strat Vision for the subject line.

27

1
2  Hopefully that is gleaning its way to you if you truly
3  don't have it.
4          MS. TESKE:  Thank you, no, I truly don't have
5  it.
6          MR. GREIM:  Okay, I'm searching for the term
7  mainland, I sent Jennifer back, we may have misfiled this
8  letter that I'm relying on, it may be in our
9  correspondence file.
10         THE COURT:  I'm sorry, do you remember the, I'm
11 looking at my collection of letters from you.  Was it
12 shortly after a deposition, can you place a date?
13         MR. GREIM:  Yes, it would have just been last
14 week, it's a very recent letter, Your Honor.  And I'm
15 just, it will be after the 19th.  I usually have all
16 these printed off sitting in front of me --
17         THE COURT:  Hold on, I'll go onto the docket
18 and I'll pull up correspondence. I'm sorry, the
19 deposition was the 19th?
20         MR. GREIM:  I'm sorry, Jennifer, oh, here it
21 is.  Okay, do you know what docket, it was on the 22nd,
22 November 22nd, so with that information --
23         THE COURT:  Well I have on the 22nd there were
24 four letters filed. There was one from Joanna Cline,
25 there was one from Mr. Greim, there's one, oh, that's

```
 1                                            28
 2   not a letter, that's an order. There is one that's a
 3   response to --
 4          MR. GREIM:  I'm sorry, Your Honor, it was on
 5   the 25th.
 6          THE COURT:  The 25th, okay, I have a motion to
 7   --
 8          MR. GREIM:  Okay, here we go, it's docket
 9   number 206.
10          THE COURT:  Okay.
11          MR. GREIM:  And I've got a, thank you,
12   Jennifer for that.
13          THE COURT:  Do you see, well the one I have is
14   redacted on the docket.
15          MR. GREIM:  I know, I know, but I've got, I
16   will forward it, I will just forward it to -- I can
17   give you the cite.
18          THE COURT:  I just would like you to read the
19   portion of the transcript that you said changed
20   everything. That's all I'm looking for.
21          MR. GREIM:  I know. I know. Sorry. Okay,
22   we'll start with 73.  This is page 73-20 to 74-8.
23   Just getting there here.  Okay, this is the beginning
24   here.  I said, I started to ask, let's start off at
25   line 11, I said "if the contract had not been
```

29

terminated and Strategic Vision had given Eastern

Profit what it wanted, how was it every going to repay

the loan to ACA or even make interest payments?

Answer:  If they're not liars, we were not cheated,

they're professional qualified investigation company,

we're talking about if that is the scenario."  And

then "Question:  How is Eastern Profit going to repay

Strategic or ACA?  Answer:  Which means if this

contract with Strategic Vision, let's say, let's

imagine work out, right, succeed by the end, right,

okay, Eastern Profit has bank account and I heard

there are assets. The bank account was frozen by

Chinese Communist Party in Hong Kong. Eastern believes

that the corrupted CCP are taken down, there are

assets, nobody can take them. So the bank account will

be unfrozen and Eastern Profit will get back to their

normal business."  That's the end of the first answer.

Then I said, "which is what?"  And the answer was, "I

heard again, this is my obtained knowledge, like

investment."  So that's the first one but then there

are more.

         The next place is page 196 --

         MS. TESKE:  That doesn't suggest to me that it

was frozen under any other circumstances than the Hong

30

1

2  Kong order --

3          THE COURT:  If you'll please let Mr. Greim

4  finished reading from the transcript, thank you.

5          MS. TESKE:  Sorry.

6          MR. GREIM:  Okay, page 196-9, "what was

7  Eastern's plan for publicizing and using the

8  information that Strategic Vision as supposed to

9  obtain?  Answer:  Of course to send this criminal

10 person or criminal Chinese Communist Party officials

11 into jail and to, including Eastern Profit, the

12 company, their assets back.  Question:  So Eastern

13 Profit believes that the public outcry resulting from

14 publicity would cause its assets to be unfrozen in

15 Hong Kong?  Answer:  There are some words I don't

16 understand in your sentence?  Archive, what's that,

17 what's your question," and we went back and forth here

18 for a second.

19          So then we went on to page 197,1 "so Eastern

20 Profit's plan was that the public reaction to its

21 publicizing this information would cause its assets to

22 be unfrozen in Hong Kong?  Answer:  Eastern Profit

23 believes to disclosure this corrupted Chinese

24 official, bring the justice to Chinese people and

25 itself also.  We'll be able to help all the Chinese

1

2  people and itself including unfrozen Eastern itself

3  assets and back to normal business which Eastern was

4  conducting before their bank account were frozen."

5          Okay, then there's  more. Let's see, this is

6  page 202.  "Question:  What was Eastern Profit's

7  specific plan to use the research results to unfreeze

8  it's Hong Kong assets?  Ms. Cline:  Objection to form.

9  Mischaracterizes testimony beyond the scope of the

10  agreement regarding the scope of the deposition.  You

11  can answer.  Answer:  I'm happy to tell you. I

12  remember on my name list there are two persons, one is

13  called Meng Kiong Ju (phonetic), he was the head or

14  spearhead of entire China Police Court," it says

15  persecutor, I think she said prosecutor, "almost, most

16  of the law enforcement, he's the head of that, the

17  most powerful person, one of the most powerful person

18  in China.  Question:  And so you hoped -- Answer:  Let

19  me finish." And then I, we finally got her to keep

20  going.  I said, "I thought you were finished with the

21  sentence when a few seconds ticked by, go on ahead.

22  Answer:" now we're on page 203.  "So clearly if

23  Eastern's previous directors, current directors, they

24  were all persecuted by this corrupted Chinese

25  official. So (indiscernible) disclosure of this

32

Chinese official, his legal assets, his crimes, et cetera, to bring the justice to China.  And it should be a natural understanding to Eastern and all the Chinese people who are persecuted by this bad official. If this official is completely removed, sent to jail, and they will be able to get their justice back including, you know the relationship between Hong Kong and Beijing, right, you don't need me to explain that, that will naturally bring justice to Hong Kong for Eastern Profit to release his assets which were illegally frozen.  Question:  In Hong Kong?  Answer: Correct."

And then I went on:  "And this Mr. Meng is a CCT for, I'm sorry, PRC official?  Answer:  He is Chinese Community Party official, yes."  Then we went on and talked about another guy, I said: "So that's one person, you said there was a second person, who was that?  Answer: The second person is Sun Li Juong (phonetic).  Question:  Okay, go ahead.  Answer:  I'm finished."  And then I said, "I'm sorry, that time you were done, okay.  What was the plan with respect to him, how was that going to unfreeze the assets? Answer:  A similar plan.  Question:  Anyone else in your list of 15 names that were going to help unfreeze

33

the Eastern Profit assets in Hong Kong?  Ms. Cline:

Objection to form.  Answer:  Everyone. Question: Okay,

how were ACA assets able to flow out of Hong Kong?

Objection:  Beyond the scope. And then we did not

probe further.

MS. TESKE:  Your Honor, may I be heard on

that?

THE COURT:  Go ahead.

MS. TESKE:  So there's never been, we've never

disputed that there was a Hong Kong order freezing

Eastern's assets.  And nothing that she testified to

suggests that it was frozen pursuant to anything else

and that they were, you know, she's suggesting that

they thought the Chinese government was influencing

the Hong Kong court to impose that order. But that's

never been in dispute and that doesn't change

anything.

MR. GREIM:  Well, Your Honor, I'm sorry, Erin,

are you finished?

THE COURT:  Go ahead.

MS. TESKE:  Yeah, for now.

MR. GREIM:  Okay, I mean nor have we said that

the Chinese Communist Party even in China somehow goes

in and freezes assets without using the legal system.

34

1
2  Of course, they always do in China and in Hong Kong.
3  But the point is that we were saying that they are
4  able to influence the legal system in Hong Kong, and
5  the other side says, no, they are not able to do so.
6  But now Eastern Profit says here is why our assets are
7  frozen.  It's because of these corrupt CCP officials.
8  And, in fact, Eastern Profit goes even further and
9  they say we were never even going to be able to repay
10 this loan from ACA unless the research results, you
11 know, yielded pay dirt and we were able to, you know,
12 remove the corrupt officials in China, then we would
13 get our assets unfrozen in Hong Kong.  So it's now
14 gone all the way over to not just the sort of side
15 dispute, if you viewed it that way about whether they
16 can remove things from China, now Eastern Profit says
17 that's the entire reason for the contract, that's the
18 only way Eastern Profit was ever going to be able to
19 pay back ACA. And they go further on that, just to be
20 clear, I didn't cite this information, but they said
21 we're sharing the results of the research with ACA.
22 And by the way, we are dissidents over here, Eastern
23 Profit. So they connected all of the dots at this
24 point and they have now claimed that it's the mainland
25 "corrupt CCP officials" who have caused their assets

1

2   to be frozen in Hong Kong.  And I think that if

3   they've got that power to do this with Eastern Profit

4   and this other long list of Guo entities, why did they

5   leave ACA off and why is that money able to flow

6   freely to all of these other projects?

7          MS. TESKE:  Okay, and so now we've actually

8   come back to how this all started in the first place

9   was because Strategic wanted to show that if ACA's

10  assets weren't frozen and if Guo's weren't then he

11  wasn't a dissident. And that's actually very different

12  than the conversation we're having now --

13         THE COURT:  Wait, wait, wait, wait, I'm sorry,

14  you're talking a little fast for me to follow that.

15         MS. TESKE:  Sorry.

16         THE COURT:  Try that again more slowly.

17         MS. TESKE:  Sure.  So the last time we talked

18  about this and the reason this conversation initially

19  took place is that Strategic argued that Mr. Kuok was

20  not a dissident if he had access to funds in Hong

21  Kong.  And Strategic has never been able to show that

22  that is true.  What it's saying now is that, and it's

23  never been disputed, that the Chinese government has

24  influence over Hong Kong Politics and that Hong Kong

25  did eventually freeze Eastern's assets, and, in fact,

36

1

2  eventually froze Mr. Kuok's, but the fact that they

3  didn't freeze somebody's doesn't suggest that they're

4  not a dissident.

5          THE COURT:  Well Mr. Greim had argued last

6  week that to his understanding, based on various and

7  assorted things, that the theory that he's piecing

8  together, and please correct me if I've got this

9  wrong, Mr. Greim, because my memory may not be quite

10 right, that Mr. Guo would hold himself out as a

11 dissident but that was sort of a public persona, and

12 behind the scenes he was actually not a dissident and

13 was close to the Communist Party in China which

14 understood that he, for whatever useful purposes, was

15 holding himself out as a dissident but they were

16 behind the scenes making sure that he was able to get

17 to money through ACA which was essentially controlled

18 by the Communist Party so that even if his assets were

19 frozen because that's what would happen to a true

20 dissident, the assets would end up frozen in Hong Kong

21 as well as in mainland China, Mr. Guo was still able

22 to move money through ACA because ACA would, that

23 would be the means by which he would still be able to

24 function and get money with the blessing of the

25 Communist Party and with the control of the Communist

37

1

2  Party. Am I remembering that more or less correctly?

3        MR. GREIM:  Yes, Your Honor.

4        THE COURT:  Okay, so the issue was not whether

5  Mr. Guo's assets were frozen because he really was a

6  dissident or for some other reason, the issue had to

7  do with ACA's control and ACA's role here. And the

8  testimony that seemed different from Eastern Profit's

9  representative from a 30(B)(6) witness was that, oh,

10 yes, he can't move money out of Hong Kong, his assets

11 are frozen in Hong Kong, all because of the Chinese

12 government, whereas my prior recollection was that no

13 one had ever said, Mr. Greim had never shown, there

14 was never really an issue about movement of money out

15 of Hong Kong, that the Chinese government didn't control

16 movement of money out of Hong Kong, this was all complete

17 red herring because there had not been any showing that

18 there was any restriction because of the Communist Party

19 on money flowing in and out of Hong Kong.  And therefore,

20 if there was no restriction, what do we care about ACA,

21 there is no restriction to begin with coming from the

22 Community Party. If there is a restriction coming from the

23 Communist Party in China of money moving in and out of

24 Hong Kong if you are a dissident, which is what ACA, I'm

25 sorry, Eastern Profit's witness seemed to signal from that

1                                                              38

2  testimony, then what does it mean if he can still get

3  money through ACA and how do those pieces connect if ACA

4  is, in fact, as Mr. Greim has suggested, controlled by

5  someone who is aligned with the Communist Party.

6          It's a little bit, it's a little bit conspiracy

7  theory-ish, but maybe that is exactly what the theory is,

8  that it is alleged conspiracy between Mr. Guo and the

9  Communist Party in China to have it appear on the surface

10 that he is a dissident and behind the scenes help him get

11 money out through a communist controlled organization. Now

12 I don't know if that's true, not true, but there seemed to

13 be enough there to allow a few questions of Mr. Guo

14 regarding what does he know about the ownership and

15 control of ACA, if anything?  Were his assets, in fact,

16 frozen in Hong Kong, and if so, what is his understanding

17 as to why?  And how did it come to be if his assets were

18 frozen that he was able to move money through ACA if, in

19 fact, he was able to move money through ACA?  Beyond that,

20 I'm not expecting a whole lot.  But I thought that given

21 this change it was worth revisiting my prior ruling where

22 we did not have that testimony informing that prior

23 ruling.

24          MR. HARMON:  Your Honor, this is Mark Harmon,

25 I'm here with Ms. Erin Teske on behalf of the

1

2   nonparties participating in this call.  So the

3   original argument, and I think Ms. Teske was making

4   this point, the original argument that was being made

5   to support the interrogation of witnesses regarding

6   ACA was that Hong Kong, China would never allow a

7   dissident to move money out of China, and the

8   submissions regarding that issue were to the point

9   that the Chinese Government doesn't have the right to

10  freeze assets, itself, in Hong Kong. That in order to

11  freeze assets in Hong Kong, it has to be an order from

12  the government in Hong Kong.  And since there was no

13  order in place against ACA, there was no prohibition

14  on monies moving from ACA out of Hong Kong.

15          So we've moved away from the initial theory

16  that just because it can move money, it must not be a

17  dissident. So the question of whether the timing of

18  the (indiscernible) is somehow material to this broad

19  analysis that Strategic Vision was trying to adopt. So

20  we do know that the Hong Kong government did impose

21  orders freezing the assets of Eastern and we do know that

22  the Hong Kong government did impose orders freezing the

23  assets of Mr. Kuok. So on the basis that Hong Kong froze

24  the assets, do we conclude that the Eastern and Mr. Kuok

25  are indeed dissidents because their assets were frozen,

1                                                                40

2    or do we conclude that the government, that ACA is not a

3    dissident on that basis, or simply that the Hong Kong

4    government hadn't gotten around to freezing ACA's assets?

5                THE COURT:  I think that the answers to those

6    questions might turn on answers to questions about, that

7    Mr. Greim is trying to get at relating to who controls

8    ACA, what exactly is ACA.  Is ACA an independent entity or

9    is it controlled and in the pocket of the Chinese

10   government in China, again, facts about which I have no

11   actual knowledge. But the concept, as I understand it, the

12   concept as I understand it is fairly straightforward even

13   though it seems quite convoluted at first glance. And that

14   is that Mr. Greim has articulated the theory that there is

15   control by the Communist Party in China over assets of

16   dissidents in Hong Kong, by whatever means, directly or

17   indirectly through the courts, by whatever means, if you

18   are a known dissident China will do things to make sure

19   that you cannot move your money, that it will be frozen,

20   including in Hong Kong, a fact that had been

21   challenged earlier by at least plaintiff, and I think

22   also by counsel of Mr. Guo saying that that had not

23   been established. But in any event, the concept is, if

24   you are a dissident, your assets will end up frozen in

25   Hong Kong. So if Mr. Guo is a dissident, his assets

41

will end of frozen in Hong Kong, sort of period, full

stop right there for a moment.

And at first there was a question as to

whether his assets were, in fact, frozen in Hong Kong,

and I was led to believe that they were not, there was

really no issue with getting money in and out of Hong

Kong, even if you're a dissident, and it was just, as

I said, just a red herring because China didn't have

that reach into Hong Kong.

Now if China does have that kind of reach and

if assets are frozen, the Mr. Greim's further theory

is then he should not be able to get money out of Hong

Kong, period, because the Communist Party will insure

that that is so. And then he will not be able to get

money out directly or indirectly through some other

entity because eyes are everywhere and they'll know.

Yet he was allegedly able to, he and Eastern Profit

were able to get money from ACA, which Mr. Greim said

is not surprising because ACA is actually controlled

by the Communist Party and that call signals that

something is up with his dissident status. That you

have appearances and you have reality.

So I don't know if any of that is legitimate,

if any of that is true, if any of that is actually

1                                                              42

2   provable, but it seemed to me that there was enough

3   there from a combination of the information Mr. Greim

4   was putting forward from various and assorted sources,

5   including Eastern Profit's lawyer, not lawyer,

6   witness, sorry, that there was enough, and it was

7   interesting to me that on the last call counsel for

8   Eastern Profit kept saying that he thought the witness

9   had misspoken and it was not correct, but we have

10  testimony from a 30(B)(6) witness who said something

11  and it is what it is, and, you know, we can go from

12  there a little bit.  I thought it was worth allowing

13  Mr. Guo to be asked some questions about the ownership

14  and control of ACA, if he knows, and, you know, some

15  questions about whether he is able to, he and Eastern

16  Profit if he knows, are able to receive money through

17  ACA, coupled with ownership and control of ACA.

18          Now, Mr. Greim, you have in your letter a

19  whole list of topics you want to be able to ask Mr.

20  Guo about, about ACA, but I think the critical one was

21  ownership and control of ACA, if he actually has

22  knowledge about that.

23          MR. GREIM:  That's right, that's really topic

24  number one.

25          THE COURT:  And I think that's what we had

43

1
2 talked about as not only topic number one but as
3 topics, you know, maybe the topic and there may have
4 been, you know, something about movement of money that
5 may have been somewhat related.  But this is not meant
6 to substitute for a deposition of ACA in all regards.
7 You really, as I recall, wanted to try to pin down who
8 controlled ACA, and thought maybe Mr. Guo would know
9 that, and if he doesn't know it, he doesn't know it,
10 if he can't speak to it, he can't speak to it.

11          MR. GREIM:  Right.  Okay, Your Honor, we will
12 keep it to, number one, ownership and control of ACA,
13 and number two, his ability to receive money through
14 ACA.

15          THE COURT:  Okay, so I think if it's just that
16 and it stays there, I think there's enough here to
17 allow that in discovery and I think that we are, in
18 fact, very close to the end of discovery, all right, I
19 do not intend to extend the deadline. The Steve Bannon
20 thing, you can come back to me if you have more to
21 show about the efforts that were made and with respect
22 to the subpoenas, you are going to be conferring in
23 light of my guidance and seeing if you can resolve
24 these issues. If you can't, you come back to me with
25 something more narrow.

```
 1                                                    44
 2            MR. GREIM:  Your Honor, one other --
 3            MR. HARMON:  Your Honor, this is Mark Harmon,
 4   your explanation of Mr. Greim's theory leads me, and
 5   his subsequent comments, to two questions. Number one,
 6   I hear that the concept is that ACA is actually an
 7   entity controlled by the Chinese Communist Party as a
 8   means for getting money to Mr. Guo. Other than Mr.
 9   Grime's conspiratorial suspicions, can I ask whether
10   he has a good faith belief based upon evidence that he
11   has that supports the notion that ACA is actually an
12   entity through which the Chinese Communist party gets
13   money to Mr. Guo?
14            THE COURT:  Well Mr. Greim did come forward
15   with something on our last call that you were not on,
16   that was at least something along those lines, and
17   again, my memory may fail.  Mr. Greim.
18            MR. GREIM:  Your Honor, I'll go through that
19   again. So what we've been able to find is that, first
20   of all, the person who on paper controls ACA is a man
21   named William Gee (phonetic).  And this information
22   has been produced in party discovery but it's William
23   Gee.  And we've been able to find some information
24   about William Gee's background and his current
25   activities.  So number one, he had been at an entity
```

45

called Macquarie Capital Investment or Advisors, I
don't have all my old notes in front of me here but
I'll do my best, and he purportedly stepped down from
Macquarie, which is a major investment bank and
securities firm out of Australia.  He had been the
head of the Greater China Desk there which was
responsibility for the mainland and Hong Kong.

And so our first point was that someone who is
given that sort of position in a major entity like
Macquarie is not going to be somebody who is a
dissident or who has issues with the regime.  But at
any rate, he allegedly stepped down from that entity
to take control of what was then described as Mr.
Guo's fund which was ACA at I believe the end of 2014.
This is just before Guo came to the US.  However, it
wasn't, it's not clear and there are sources that
indicate he stayed on at Macquarie.

At any rate, one other thing that William Gee
did was he was an economic advisor to many
municipalities on the mainland and he continued in
that role after the time that Guo was claiming to be a
dissident, after the time Guo came to the US and his
assets were being frozen.  And then finally, even
today, he serves on, I'm going to get the initials and

46

1

2   the name probably wrong here, but on the Chong King

3   Hong Kong Patriotic Cooperation Committee and I

4   believe the initials are about five letters, CPBCC or

5   something to that effect.  And that these patriotic

6   committees are not, you know, these are not pro

7   protestors, these are the coalitions of businessmen

8   that China uses to sort of make its wishes known, make

9   its policy wishes known, both in cities within the

10  mainland but also within China.  And so he is openly

11  associated with this patriotic group in Hong Kong

12  which is a Beijing agent in Hong Kong, and he would

13  not, no way would you be a dissident or anything other

14  than directly tied to the PRC and CCP if you are

15  member of one of these committees.  And it's in the

16  open.

17          The other things we pointed to are the fact,

18  to tie back in with Guo, that Eastern Profit, Golden

19  Spring, Hong Kong, China Golden Spring, which controls

20  Golden Spring (New York), your client, and ACA, all

21  shared an office, two different offices in Hong Kong.

22  One was in Guo's actual residence, waterfront

23  residence, the other one was on the 49th floor of the

24  Bank of China Tower in Hong Kong, downtown, which is

25  owned by the Bank of China, state owned entity. And

1

2   Guo specifically warned in one of his broadcasts that

3   the Chinese were trying to use their Bank of China

4   offices outside the mainland as places to conduct

5   espionage and to work out of.  So very bizarre that

6   Eastern Profit, ACA and Golden Spring Hong Kong would

7   all share an office in the Bank of China Tower in Hong

8   Kong. So that's just, that's from my memory but that's

9   part of what we showed.

10          THE COURT:  I believe that I said -- hold on a

11  minute, I believe I said in light of those

12  representations that Mr. Greim should be able to ask

13  Mr. Guo if he knows Mr. Gee and knows anything about

14  him.

15          MR. HARMON:  So my concern is that when you

16  say, Your Honor, that Mr. Guo should answer questions

17  about the control and ownership of ACA, that at the

18  deposition the questioning is going to be consistent

19  with Mr. Greim's past examinations which engage in a

20  far flung review of all of the or attempt to review

21  any financial transaction between ACA and Mr. Guo even

22  unrelated to this case, unrelated to Eastern Profit's.

23          THE COURT:  I'm giving Mr. Greim leave to ask

24  questions about whether Mr. Guo has knowledge or

25  information about who owns or controls ACA.  And if he

48

knows Mr. Gee and knows anything about him.  I'm not,

that doesn't mean, Mr. Greim, you know, you're going

over transactions and the like.  Understood?

MR. GREIM:  Well, Your Honor, the second piece

you'd mentioned before though was whether Guo was able

to receive money through ACA. And we've alleged he

got, you know, a million dollars from ACA just I think

two years ago.

THE COURT:  All right, I don't know what that

paper trail looks like, I don't know on Mr. Guo's

side, I don't know what transactions you're concerned

about or concerned that Mr. Greim might put in front

of the witness. Are you talking about transactions

where Mr. Guo or Eastern Profit received money from

ACA?

MR. GREIM:  Yes, or where he directed money.

So we know he directed $100,000 to a witness in this

matter from ACA.  We know that he directed money to

Strategic Vision from ACA. I don't actually have a

large number, and I bet I'm not going to get a large

number of answers, but if ACA is the one funding Guo's

operation, I want to know about that.

MR. HARMON:  Your Honor, that's exactly my

concern. Mr. Guo has already sat for seven hour

49

depositions and every time that we go back or talk

about giving an arm, the request is for the arm and

the leg. So it should, it should be enough to ask

whether Mr. Guo owns and controls ACA, whether he

knows Mr. Gee and whether or not he was responsible in

any way for the payment by ACA to Strategic Vision in

this case, it's a million dollars. If Mr. Greim's

theory is correct, it's correct on the basis of that

payment. He doesn't need to examine any other

transactions.

        THE COURT:  Hold on.  Did we talk previously

about the length of this continued deposition?

        MR. GREIM:  No, we didn't, other than that I

didn't think I could go for a full day given the

topics that I've got.

        THE COURT:  How long do you anticipate, what's

your best estimate of what you would like to do?

        MR. GREIM:  I'd like to take about four hours,

but I've got an asterisk which is the final issue we

raised about Golden Spring.

        THE COURT:  I'm sorry, what final issue you

raised about Golden Spring?

        MR. GREIM:  Well I was going to get to this

earlier, but you'll see in our November 27th letter we

1                                                          50

2  point out to you that Golden, remember we had to split

3  Golden Spring and Eastern Profit depositions and so

4  Golden Spring ended up producing its witness on a

5  separate date.  We had Court approved topics, the

6  witness they produced was a paralegal who worked for

7  Golden Spring. She had taken one hour of the night

8  before to prepare for it, and we didn't get answers to

9  many, many questions within the Court approved topics.

10 So what I was proposing in my November 27th letter is

11 that let's just have Mr. Guo -- now on the one hand I

12 would like to have Yvette Wang come in because she's

13 the one that has the information. On the other hand,

14 she acts as Guo's assistant and since we've already

15 got Guo coming back can we cut off an extra day,

16 another trip probably, and just have Mr. Guo testify

17 on these missing topics from Golden Spring.

18         MR. HARMON:  I thought we were wrapping things

19 up and that the only thing that was left was

20 discussion with Mr. Guo afterwards, and the other

21 nonparties were not going to be harassed further.  And

22 every time we continue a conversation it grows and

23 grows.

24         THE COURT:  Okay, stop please.  Mr. Guo's

25 deposition, as far as I'm concerned, no more

51

depositions with the, as you put it, Mr. Greim,

asterisk regarding Steve Bannon because I don't know

what to make of that.  Right now it's a no and I'm not

having Ms. Wang back, we're not going there, okay, so

I'm not going to hear about things growing and

growing. The only question I have on the table right

now is length of time for Mr. Guo's deposition because

I think the way to deal with this is not to try to

micromanage the questions on the topics that I'm

allowing, but rather to say he can have this much time

and that will be that.

          MR. GREIM:  Well then, Your Honor, in that

case I've laid out, I'm not, I apologize if this is a

surprise to anyone, but we laid out our objection

regarding Golden Spring in our November 27th letter and

my thought was we would actually save a lot of time by

just trying it with Mr. Guo and having him testify on

topics one, two and three from Golden Spring.

          And so, Your Honor, the reason I mentioned

this in your question about timing was that if I could

cover Golden Spring with Mr. Guo, as well, if I could

cover topics one, two and three from our notice, which

are not objected to with Mr. Guo, then I think I could

do the whole Guo thing in five hours.

52

THE COURT:  What are the topics, in particular?

MR. GREIM:  Okay, topic one was Golden Spring (New York) search for and production of document requests approved by the Court.

THE COURT:  I'm sorry, I'm sorry, you think Mr. Guo is going to be able to answer questions about Golden Spring's search for documents?

MR. GREIM:  Well, Your Honor, we believe that Guo controls Golden Spring and maybe, you know, at best he can tell us what documents they actually have. That's my last, I mean I'm sort of compromising here a bit because I think Yvette Wang does know the answer but I don't want to juggle yet another person. But that's topic one.

Topic two was the ownership, management, governance and structure of Golden Spring between January 1, 2017, and July 1, 2019.  The witness had not information on the duties of Golden Spring's officers or directors, including Yvette Wang and Guo Chong (phonetic), Guo's son and the sole director, including who gives directions to whom.

And then topic three is the last one, and that was Golden Spring (New York)'s dealings with Eastern

53

and Guo between January 1, 2017, and July 1, 2019,
related to negotiation, execution and performance of
the contract at issue. And my July 27th letter has a
long list of questions for the witness who just had an
hour and was a paralegal, didn't know, just did not
know what was going on.  These were topics approved by
the Court and they never changed.

MR. HARMON:  Your Honor, Mr. Guo has sat for a
full day deposition on everything having to do with
his relationship with this case, with Eastern Profit,
with the contract, with dealings with Golden Spring
regarding the contract, all of that's been covered.
To sit him down again for a limited examination on who
the owners of ACA are, if he knows, is he able to move
money without going into the details from ACA, and
questions about Golden Spring should not require five
hours of testimony.  He's got a limited, Mr. Greim
should have a very limited scope and I think that Mr.
Kuok, because he was required to return for three
hours, has got to be more time than necessary if you
are doing a targeted deposition.

MR. GREIM:  But, Your Honor, I think what Mr.
Harmon left out was the Court's prior order which
relates to his discussions with or negotiations with

1                                                          54

2  CCP officials in the six months before the contract

3  was signed --

4           THE COURT:  Right, hold on a second.  Hold on

5  a second.  This business about ACA, which should be

6  very limited, is new and additive to what I had

7  previously said Mr. Guo should come back for a

8  deposition for. This is not supposed to be the only

9  topic, this was, I'm adding, I'm allowing Mr. Greim to

10 add on a few questions about ACA at this deposition

11 where I previously said no on that particular topic.

12 That's all this current ruling is.  The other topics

13 with respect to a transcript of some YouTube video and

14 conversations he's had with people over a certain

15 period of time which I tried to limit and then I

16 backed off of that limitation slightly to say the

17 video could be included, I didn't mean to exclude it

18 when it was, you know, shortly before the period

19 that's justified, I was trying to say six months is a

20 limiting principle, but I bent slightly on that. but

21 all of that was supposed to be part of this continued

22 deposition.

23           So with respect to Golden Spring though and

24 communications with Golden Spring about the contract

25 and all of that, that I don't think is anything where

55

1

2 you had not had an opportunity before to depose Mr.

3 Guo and where he, you know, did not already give

4 testimony.  So I don't understand why you need to go

5 through that as a new topic, that shouldn't be

6 something new, that should have been on the agenda

7 last time.

8          MR. GREIM:  Well, Your Honor, we wanted,

9 obviously we wanted Golden Spring's testimony.  When

10 we, I mean and I can't remember all the instructions

11 not to answer that we had before --

12          THE COURT:  With Mr. Guo?

13          MR. GREIM:  I'm sorry?

14          THE COURT:  You mean with Mr. Guo?

15          MR. GREIM:  Yes, with Mr. Guo.

16          THE COURT:  But were there instructions not to

17 answer about communications with Golden Spring related

18 to the contract?

19          MR. GREIM:  Your Honor, my recollection, and

20 I've got to go back through, is that there is a

21 mixture of, he was able to give some testimony but,

22 for example, when we asked, you know, what Yvette

23 Wang's role was with Golden Spring, the answer was he

24 wasn't sure but I think he said she was too pretty to

25 be in charge. And there was some, he dodged the

1                                                          56

2  question --

3         THE COURT:  Well look, no, I'm not revisiting

4  rulings wholesale, okay, I already ruled with respect

5  to a continuation of Mr. Guo's deposition, yes, he

6  should come back and here are the particular topics

7  and they were fairly narrow.  The only thing that I am

8  now doing is I am opening that window a slight bit

9  more to include some questions about ACA's ownership

10 and control and his ability to move money through ACA

11 from Hong Kong.  That's it, that's all that I am doing

12 on that front.  With respect to Golden Spring's

13 witness not being able to answer questions, if they're

14 already the types of areas that would have been

15 covered in your prior deposition of Guo, then they

16 were covered in your prior deposition of Guo. And the

17 rules say you get seven hours and I'm not making an

18 exception to have you go back over old ground, right,

19 you can have the topics that I previously said. If

20 there is a particular topic for Golden Spring where

21 you did not get adequate testimony and you want to

22 move to have somebody come back and answer, you're

23 going to have to show that it was relevant, that it

24 was approved by the Court if it was put before me

25 before, or else it was not disputed by the parties or

57

1
2  by Golden Spring's counsel, that there was a complete

3  refusal or failure to answer these questions and that

4  they're, you know, totally different from questions

5  you would have envisioned before asking Mr. Guo.  And

6  you would have had no reason to ask him at his prior

7  deposition and, you know, it couldn't have been

8  anticipated before to put them before Mr. Guo and now,

9  you know, you're really stuck and in a bind and have

10 nowhere else to turn.

11         I'm not inclined to have another Golden Spring

12 witness back. Maybe if there's a concrete question

13 that could be written, you know, or an answer could be

14 provided in writing, you could say to Golden Spring's

15 counsel, you know, here's the concrete question where

16 the witness didn't have knowledge, can you please

17 provide us a sworn answer from somebody.  And deal

18 with it that way, and counsel for Golden Spring take a

19 fair look at the transcript, if you produced a witness

20 who supposedly had knowledge on certain topics who

21 didn't have knowledge on the topics, then see if you

22 can make it right by, you know, by providing answers

23 to particular questions that were posed where the

24 person should have had knowledge and didn't. But this

25 is not a wholesale revisiting of Mr. Guo's continued

58

1
2  deposition, it's already a continuation.

3        MR. GREIM:  Okay, fair enough, Your Honor, we

4  thought, I mean frankly I thought this would be faster

5  to do it this way, but we will, we laid out in our

6  letter where we think Golden Spring fell short. I was

7  somewhat abbreviated there, I just wanted to get it

8  out to you and --

9        THE COURT:  Look, you're going to have to show

10  me on any particular Golden Spring Question that was

11  asked, one, it's a question that's calling for

12  relevant information, two, it was either approved by

13  the Court, agreed by the parties or, you know, if it

14  was never the subject of discussion but it's within

15  one of the topics, there's a good reason why it's fair

16  game. That the question really wasn't answered,

17  couldn't be answered by this witness, you've got to

18  show a good faith conference with counsel to try to

19  work out that issue. I just, I don't think Mr. Guo is

20  necessarily the way to go about this.

21        MR. GREIM:  Okay.  Okay, Your Honor, we'll

22  take it back, we will --

23        THE COURT:  I expect you to be at the end of

24  discovery. I do not want the dribs and drabs to, you

25  know, the trickle of things to turn into another

59

1  stream of all kinds of things coming down the pike. I

2  don't expect five letters per day on the docket, I

3  don't expect, you know, new deposition requests, I

4  don't expect, you know, more subpoena activity than

5  has already been put in front of me, right, you've got

6  to hold yourself to it, when you say you're at the

7  end, it's got to be at the end.

8

9         MR. GREIM:  Your Honor, I mean, look, we

10  wanted to be done two months ago, and we are

11  frustrated on the Golden Spring front because we had

12  this witness who came in and, frankly, didn't know

13  much, and I didn't expect --

14         THE COURT:  All right, well counsel for Golden

15  Spring, you know, confer in good faith about that, you

16  know what the topics were, if the witness was not

17  prepared to testify on certain topics where the

18  witness was supposed to testify, see what you can do

19  to make that right assuming, you know, it's focused,

20  it's narrow, it can be dealt with with a relatively

21  straightforward answer and see if you can work that

22  out. I'm not going to stay discovery as to nonparties,

23  I don't see that there is that much left and I think

24  you just need to get to the end of it. I don't want

25  anything left over should there be a denial of a

60

motion.

All right, and there is one more issue out there that I'm aware of which has to do with the request for who is paying defendant's fees, where I know I've gotten some more briefing, is that fully briefed now?

MR. GREIM:  We think it is, we're ready to argue it.

MR. HARMON:  Your Honor, before we move onto that stuff, could we be shown some (indiscernible) --

THE COURT:  I'm sorry, could we what?

MR. HARMON:  I am aware that Mr. Greim is going to be allowed to question about meetings that Mr. Kuok had with representatives of the Chinese government, but even considering that topic and the limited topics that you permitted Mr. Greim to add on and considering that he's already been subjected to a seven hour deposition, a targeted deposition of the continued deposition of Mr. Guo should not take more than three hours and I think there should be time limitation.

MR. GREIM:  Your Honor, I would simply say it takes a very long time, this is a witness where we have a translator and occasionally we have it checked

61

1
2 by a check translator.  If you look, for example, at
3 the seven hour deposition that we took before, and
4 again, I will say much of that was blocked, you will
5 see that it doesn't take up that many pages because of
6 the time that it takes to have the translator
7 translate my question, the answer, and then any of the
8 objections or instructions not to answer.  And so I,
9 with a different witness I actually might agree it
10 would take less than that time but I know what it's
11 like with this witness and I just know that it's going
12 to end up happening.

13          THE COURT:  What time are you starting the
14 deposition in the morning?

15          MR. GREIM:  I think ten o'clock, Your Honor.

16          MR. HARMON:  Your Honor, that is another
17 problem, I have alternate dates to provide, but Mr.
18 Guo is not available tomorrow.

19          THE COURT:  I expect him to be deposed
20 tomorrow, why is he not available?  I've had it with
21 Mr. Guo being directed to appear and then finding to
22 that he's just not, he just can't do it, because he's
23 been directed to do it.  Where is he going to be
24 tomorrow?

25          MR. HARMON:  I don't have the, I'm sorry, it's

1                                                              62

2   Wednesday, I don't have the details on where he is

3   going to be.

4           THE COURT:  Why is he not available?  Tell him

5   I expect him to appear, let's move on.  Four hours,

6   four hours total I expect him to appear.

7           With respect to the issue -- first of all,

8   other than the issue of who is paying defendant's

9   counsel's bills, is there any other issue that remains

10  outstanding for me at the moment other than things

11  we've talked about already?

12          MR. GREIM:  Your Honor, I was going to raise,

13  we kind of moved quickly from Bannon but it sounds to

14  me like I need to get his counsel on the phone with

15  you for permission to appear on the 5th.

16          THE COURT:  Well I am not -- okay, with

17  respect to Mr. Bannon let me see if I can clarify.

18  All right, an application to compel Mr. Bannon to

19  appear, if you are making such an application, is

20  denied.  As far as I'm concerned, it's outside of the

21  discovery period, I've had no showing of diligence and

22  why it was impossible to make this happen during the

23  discovery period assuming he really is a witness with

24  relevant knowledge for information. So right now it's

25  just denied. It's denied without prejudice to renew

63

upon an appropriate showing. And part of the reason

that I'm not persuaded is because I suspect there are

two sides to the story of the efforts that were made

to secure his testimony, how much notice was given,

when the discussions started, when you could have

subpoenaed him for the first time, you know, whether

he was dodging service or not, and so on. And I'm just

not going to simply take your word for it. So it's

denied without prejudice and if you can make a better

showing as to, you know, what has happened, I will

allow Mr. Bannon's counsel to be heard on the topic.

And so you should alert Mr. Bannon's counsel that if

you are going to renew the application and he wishes

to be heard, I will hear him or her as the case may

be. If he or she does not wish to be heard and you

have a full application about all of the efforts that

were made with the timing, here's the subpoena, here's

when it was served, here's when we tried to serve it,

here's the effort we made to serve it, here's the

conversation we had, here's how he made it so

difficult, and we couldn't possibly have done it on

reasonable notice within the discovery period and I'm

persuaded, and Mr. Bannon's counsel has been given an

opportunity to be heard and doesn't wish to be heard,

1                                                              64

2 then I'll decide it on a renewed application based on

3 what you tell me alone, as long as it's clear that

4 he's been given the opportunity, her or she, and does not

5 wish to take me up on it.

6          Now if an application is made in another

7 district to quash a subpoena, it's in another district,

8 and so be it.

9          MR. GREIM:  Okay.

10          THE COURT:  For that matter, take a look at the

11 rules regarding applications to enforce subpoenas which

12 are usually enforceable only by contempt, and whether that

13 needs to be made in the district where the subpoena was

14 served also. Because if, in fact --

15          MR. GREIM:  Your Honor, I guess my point, it's

16 not clear to me, I don't have a motion to quash, it's

17 not clear to me that there is one coming but it sounds

18 like what you're telling us is the ball is in our

19 court truly to, well, first of all --

20          THE COURT:  What I'm saying is you've asked me

21 for one thing right now and that is to extend the

22 discovery period for the purpose of this deposition

23 and the answer is no. I will not do that absent a

24 better showing as to why the discovery period should

25 be extended.  If you want to do that I'm going to give

1

2   Mr. Bannon's counsel an opportunity to be heard on the

3   topic of whether the discovery period should be extended

4   to allow for this deposition. It may be that substantive

5   argument regarding whether the deposition should happen or

6   not is not going to be made in this district.

7           MR. GREIM:  Right.  Okay, very good, we'll march

8   ahead on that and I think that's all the clarification we

9   need.

10          THE COURT:  Is there any other issue out there

11  that I have not at least touched on besides the, who's

12  paying the bills?  No?  I don't think we need nonparties'

13  counsel for that, is that right?

14          MS. TESKE:  No, I think we're signing off now,

15  thank you, Your Honor.

16          THE COURT:  Okay.  So feel free to drop off

17  the call, assuming that doesn't affect our conference

18  call. All right, so on that topic, who do we now have

19  on the call, do we just have counsel for the parties?

20          MR. GREIM:  Yes, Mr. Greim and Ms. Donnelli

21  for Strategic Vision.

22          MR. CHUFF:  And this is Chris Chuff from

23  Pepper Hamilton for Eastern Profit.

24          THE COURT:  Okay.  So this is a somewhat

25  unusual request, then again, there have been lots of

66

1   somewhat unusual requests in this case, who wants to

2   be heard first?

3           MR. CHUFF:  So Your Honor, we think that this

4   request, we believe that this is really a contract

5   claim.  Eastern Profit is seeking a million dollars --

6           THE COURT:  Wait, who is speaking here?

7           MR. CHUFF:  I'm sorry, this is Chris Chuff

8   from Pepper Hamilton.

9           THE COURT:  Okay.

10          MR. CHUFF:  And so we view this as a contract

11  claim.  Eastern Profit is seeking the return of a

12  million dollar deposit under the contract, Strategic

13  Vision is seeking roughly $1.5 million dollars under

14  the contract. It's (indiscernible) claim for which the

15  claimed damages are less than $500,000, is a complete

16  sideshow, but curiously all of Strategic Vision's

17  discovery efforts are focused there.  And we need to

18  be able to defend ourselves if Strategic Vision is

19  going to continue to probe into this area. So what's

20  what our motion to compel is intended to do.

21          As part of Strategic Vision's star claim,

22  Strategic Vision is claiming that contrary to Mr.

23  Guo's representations that he is a Chinese dissident

24  and opposes the Chinese Communist Party, Mr. Guo is

1                                                              67

2   actually affiliated with the Chinese Communist Party

3   and that Strategic Vision would have never entered

4   into the contract with Eastern had it known that to be

5   the case.  Now if an affiliate of the Chinese

6   Communist Party is paying Strategic Vision's

7   litigation bills, then Strategic Vision's star claim

8   falls apart. That fact would show that the Chinese

9   Communist Party views Mr. Guo as an opponent, not an

10  ally, and therefore corroborating the truthfulness of

11  his alleged representation that he opposes the CCP.

12  And it also shows that Strategic Vision is willing to

13  associate with affiliates of the CCP, contrary to its

14  claim that it's not. And so it goes to two direct

15  elements of Strategic Visions fraud counterclaim of

16  the falsity of Mr. Guo's alleged statements that he's

17  a dissident and opposes the CCP and the reliance

18  elements, because it refutes Strategic Vision's

19  allegation that it would never associate with the

20  Chinese Communist Party.

21          THE COURT:  And what is the basis for your

22  belief or reasonable suspicion here that the bills are

23  being paid by the Chinese Communist Party in some

24  manner or someone affiliated with it?

25          MR. CHUFF:  So the first and foremost is

1                                                          68
2   during our meet and confer regarding this motion to
3   compel, I asked opposing counsel to stipulate that
4   their bills are not being paid by an affiliate of the
5   Chinese Communist Party and they refused.
6          THE COURT:  Okay, a refusal to stipulate is
7   not evidence that something is true.
8          MR. CHUFF:  Right, no, agreed.  But it is
9   circumstantial --
10          THE COURT:  But what led you to make the
11   application in the first place, what led you to ask
12   for the stipulation in the first place?
13          MR. CHUFF:  Right, right, so two things.
14   First, Strategic Vision's prior two sets of lawyers
15   withdrew because Strategic Vision could not pay their
16   legal bills.  Then all of a sudden in June, 2017,
17   Graves Garrett enters its appearance (indiscernible)
18   and stuff like that and is apparently being paid. And
19   so, first of all, we know that someone with the
20   financial wherewithal has decided to pay Strategic
21   Vision's bill.
22          But second, and more importantly, we believe
23   that person is Bruno Wu who is a registered foreign
24   agent of the Chinese Communist Party and we know that
25   because he had to file a registration statement

1

2   pursuant to the Foreign Agents Registration Act of

3   1938 evidencing that fact.

4        THE COURT:  I'm sorry, and what makes you

5   think he's the one paying the bills?

6        MR. CHUFF:  Right, I'm sorry, I'm getting

7   there now.  So Bruno Wu sued Mr. Guo in New York State

8   Court for defamation in March, 2018.  In that case,

9   Bruno Wu was represented by the law firm Arkin

10  Solbakken.  Fast forward to August, 2019, Mr. Guo sues

11  Strategic Vision and others (indiscernible) for

12  defamation in New York State Court.  And in that case

13  Strategic Vision was, we think not coincidentally,

14  represented by the same law firm as Bruno Wu, Arkin

15  Solbakken.  And so it's all of these things that give

16  us we think a good faith basis to believe that

17  Strategic Vision's legal bills are being paid by

18  someone affiliated with the CCP, particularly Bruno

19  Wu.

20        THE COURT:  I'm sorry, this person was an

21  adversary of Mr. Guo in some other litigation?

22        MR. CHUFF:  Right, Bruno Wu sued Mr. Guo in

23  New York State Court for defamation in March, 2018,

24  and in that case he's represented by the law firm

25  Arkin Solbakken.

1                                                              70

2          THE COURT:  What was the defamation claim

3  about, just out of curiosity?

4          MR. CHUFF:  You know, I actually don't have

5  the details in front of me, Your Honor, and I wasn't,

6  I'm not prepared to I guess get into the details of

7  it.

8          THE COURT:  Okay, so because somehow Strategic

9  Vision seems to have suddenly found money to pay

10  counsel, your assumption is that the way that they

11  found money to pay counsel is from this person who has

12  been an adversary of Mr. Guo because there's a

13  coincidence with respect to law firms.  And because

14  this person is a registered foreign agent you draw

15  from that that this person is, that, I'm sorry, that

16  it must be that strategic vision is being paid by a

17  Chinese communist party agent?

18          MR. CHUFF:  That's right, Your Honor. And

19  again, if we're applying the goose and gander

20  approach, I mean the defendant has been given some

21  latitude to (indiscernible) things that we think are

22  completely unproportional and have nothing to do with

23  this case, and we think that this is much closer, much

24  more closely tied to elements of a claim than anything

25  that they're pursuing.

71

1

2          THE COURT:  So you just want to know, you

3     don't want to see all the bills or anything, you just

4     want to know is this particular person funding the

5     defense?

6          MR. CHUFF:  We want a name, Your Honor, we

7     want just a name, that's it.

8          THE COURT:  You just want to know if this

9     person who you think is funding the defense, you want

10    to know if he is, in fact, funding the defense?

11         MR. CHUFF:  Right, exactly. Now if some other

12    affiliate of the CCP is funding the defense, we'd want

13    to know that, too, but just the name, name or names.

14         THE COURT:  All right, so let me hear from Mr.

15    Greim on this because I will say that I've spent a

16    long time sort of winding my way through your various

17    potentially supportable conspiracy theories, just

18    because something is a conspiracy theory doesn't

19    necessarily mean it's wrong, if there is, in fact, a

20    conspiracy, but trying to work my way through the

21    various ins and outs of why you should be suspicious

22    of a certain person because of affiliations and so on

23    and so forth, and it is true that the argument was

24    made by Strategic Vision that had you but known that

25    Mr. Guo was not a dissident but, in fact, was in

72

1

2  league with the CCP, Communist Party in China, you

3  would never have entered into the contract, would

4  never have, you know, sullied the entity's reputation

5  through that association, and so on. So why is this

6  not just as discoverable as the sorts of things that

7  you've been looking for?

8          MR. GREIM:  Your Honor, a couple of things,

9  I'll answer that question but I've got to, as soon as

10  I answer that I want to come back to these two prongs

11  that Mr. Chuff gave here. Because I think one of them

12  we may just have a misunderstanding between the

13  parties, because I hit mute and quickly conferred with

14  my co-counsel to make sure I wasn't missing something.

15  Btu let me answer your first question here.

16          THE COURT:  I don't know what you're talking

17  about, do you want to explain?

18          MR. GREIM:  Yeah, okay, I'm sorry, I'll start

19  with that.  So first of all, we don't believe that

20  during any meet and confer we refused to stipulate

21  that we're not being paid by the Chinese Communist

22  Party or some affiliate thereof. We can add in Bruno

23  Wu or some affiliate of him. We absolutely would

24  stipulate to that.  We somewhat, I guess I would say,

25  resent a little bit that we would need to, but we

73

 1

 2  would.  And as an officer of the court, I mean I'll

 3  say it right now that, and I think I've said that in

 4  our letter response, as well, we are not being paid by

 5  this Bruno Wu or any other affiliate or pass through

 6  or, you know, friend of a friend of Bruno Wu, however

 7  you want to call it. We're not being paid by any of

 8  those individuals or entities, or associations.  And

 9  we're not being paid by the Chinese Communist Party or

10  some friend of the CCP that they set up to make

11  payments, however you want to define it, we are not.

12  And I frankly did not recognize that that was a point

13  that could have avoided this entire thing because

14  we're absolutely not.

15          And I would also say on this other point

16  regarding this firm Arkin S Solbakken, I actually

17  have, I will say I have personal knowledge of how it

18  is that they were slotted in to represent my client in

19  this other defamation claim that Mr. Guo filed against

20  Strategic Vision and actually me, individually. I'm

21  actually a defendant in that case.  And it does appear

22  that this firm also represents Bruno Wu. I don't think

23  it's a conflict for them to be doing that.  But

24  absolutely, I mean I have knowledge about how they

25  were retained and it has nothing to do with Bruno Wu.

1                                                           74

2   So I'll make those representations for what they're

3   worth.

4            But to go back to the relevance issue, as

5   well, this is a very, what we are trying to do on our

6   side is we are showing what Guo was actually doing at

7   the time of the contract, you know, immediately before

8   and immediately afterwards. We can show the genesis of

9   this ACA fund, we can trace the whole thing through.

10  We've got a lot of factual backing for that. Whether

11  you agree with our conclusion or not we have many,

12  many data points out there and did before we even

13  filed the counterclaim.

14           What they're trying to say is that it's our

15  conduct in the litigation that's probative, and that

16  is a very different thing.  They're trying to take our

17  conduct here and the fact that we're fighting hard,

18  trying to finally pull all this together as a coherent

19  claim and they're saying that really that is the thing

20  that makes this suspicious. And by the way, if you're

21  being paid now, you must be okay with the communists,

22  you must not have much of a problem with them, and

23  then we can extrapolate back in time to what you would

24  have been willing to do when you negotiated with Mr.

25  Guo.

1

2          But of course, and I'm going to be very

3   careful about how I say this, but there are several

4   extra bridges to jump here, to cross, when you try to

5   draw conclusions about what somebody does once they've

6   actually been sued. Not just in this litigation but

7   have been sued for defamation. I mean it does not, in

8   other words, what a party is willing to do now that

9   they are on the line in this case, that everything is

10  on the line, does not translate back to what they are

11  willing to do when they entered into the contract.

12          THE COURT:  But, wait a minute.  Maybe we

13  don't need to go to points B, C and D if you can reach

14  a resolution of this with point A.  Maybe there is

15  some willingness to stipulate and maybe in light of

16  the willingness to stipulate the motion can be

17  withdrawn.  What say you on plaintiff's side?

18          MR. CHUFF:  Yes, Your Honor, so if they're

19  willing to stipulate that they're not currently being

20  paid by anyone associated with the Chinese Communist

21  Party, associated, affiliated, and also that they do

22  not have a fee arrangement to be paid by anyone

23  affiliated or associated with the Chinese Communist

24  Party and we do think that this resolves the issue.

25          THE COURT:  Hold on, Mr. Greim, do you think

76

1
2  you can work out a stipulation along those lines?

3          MR. GREIM:  Yes, in those exact words or

4  something similar we will make out a stipulation, and

5  I mean if it's good enough I will accept the words he

6  just used.

7          MR. CHUFF:  We'll give it some thought but I

8  assume that (indiscernible).

9          THE COURT:  All right, so I'm going to

10  consider this a nonissue because you are going to work

11  it out by stipulation.  You know, I will say on points

12  B, C and D, even though we don't need to get there,

13  that I think it went to the question of reputational

14  harm.  If there was a claim for that. I think that was

15  where I was seeing the potential relevance.  For us to

16  be seen as doing something involving the Communist

17  Party would hurt our business.  But I don't really

18  think I need to dwell on that or give it further

19  analysis.

20          All right, I think we are going to be

21  adjourned.  And as far as I'm concerned, you get the

22  four hours for Mr. Guo, you're going to have further

23  talk about the pending subpoenas to see if you can

24  work them out, if not you're going to come back to me

25  with something more narrow, and I think that's going

```
 1                                                      77
 2   to be that unless you end up making a persuasive
 3   argument that discovery should be reopened for Mr.
 4   Bannon's deposition, assuming that it's not quashed by
 5   another district.  All right?
 6             MR. GREIM:  Thank you, Your Honor.
 7             THE COURT:  Okay, take care, everybody.
 8             MR. CHUFF:  Thanks, Your Honor.
 9                  (Whereupon the matter is adjourned.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

78

C E R T I F I C A T E

          I, Carole Ludwig, certify that the foregoing

transcript of proceedings in the United States District

Court, Southern District of New York, Eastern Profit

Corporation Limited versus Strategic Vision US, LLC, et al.,

Docket #18cv2185, was prepared using PC-based transcription

software and is a true and accurate record of the

proceedings.


Signature_____

                    Carole Ludwig

Date:  December 6, 2019