**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **EASTERN PROFIT CORPORATION LIMITED,** | ) | |
| | ) | |
| **Plaintiff/Counterclaim Defendant,** | ) | |
| | ) | **Case No. 18-cv-2185 (JGK)** |
| **v.** | ) | |
| | ) | |
| **STRATEGIC VISION US, LLC,** | ) | |
| | ) | |
| **Defendant/Counterclaim Plaintiff.** | ) | |

**STRATEGIC VISION'S SUPPLEMENTAL BRIEF ON VIRGINIA'S**
**PRIVATE SECURITY SERVICES STATUTE**

This brief addresses the following two issues:

1) Does Virginia's private security services statute apply to Strategic Vision in this instance, based on interpretations of similar licensing statutes in other states?

2) Would applying Virginia's private security services statute in this instance run afoul of the United States Constitution?

**I.    Guidance from licensure statutes across the country confirms that Virginia's unique statute does not apply to Strategic Vision in this instance.**

*a.    Virginia's private security services statute is unique.*

A survey of licensure laws from across the nation shows that Virginia's licensing statute

is one-of-a-kind. Under Va. Code Ann. § 9.1-138, a "private investigator" is:

> …any individual who engages in the business of, or accepts employment to make, investigations to obtain information on . . . (i) crimes or civil wrongs (ii) the location, disposition, or recovery of stolen property… or (iv) evidence to be used before any court, board, officer, or investigative committee…

Private investigation licenses are not required in all states.[1] States requiring licenses typically

---

[1] PrivateInvestigatorEDU.org, *Private Investigator License Requirements By State* (2008), https://privateinvestigatoredu.org/license-requirements/ (identifying Alaska, Idaho, Mississippi, South Dakota, and Wyoming as states with no licensing requirements for private investigators).

define "private investigation" to include attempts to obtain information about "crimes or wrongs," although most states limit the "crimes or wrongs" prong to crimes or wrongs *against the state*, and are therefore of little help.[2] In the remaining jurisdictions, as in Virginia, the crimes or wrongs prong is not limited to crimes or wrongs directed at the government.[3] However, these "similar" statutes turn out to be far broader than Virginia's because they include a "catch-all" prong for obtaining information about the identity, habits, conduct, business, occupation, honesty, integrity, etc., of any person. When the dust clears, Connecticut is the only other state employing a definition which (a) includes a "crimes and wrongs" prong not limited to offenses against the state and (b) does not include a "catchall" prong. But even Connecticut's law is broader than Virginia's, as it includes prongs for "conducting surveillance activity" and "conducting background investigations."[4] There is no out-of-state analogue to Virginia's law.

Moreover, opinions reviewing different licensing statutes have generally been decided in different contexts – most had nothing to do with contract law, let alone public policy.[5] Thus, exegeses of other states' statutes carry limited value and should be read with caution.

> b.  *Decisions from courts in other states verify that Virginia's statute does not apply when no investigation activities actually occurred in Virginia.*

While other states' licensing statutes are apples to Virginia's orange, general principles

---

[2] See Tex. Occ. Code Ann. § 1702.104; Or. Rev. Stat. Ann. § 703.401; Tenn. Code Ann. § 62-26-202; 22 Pa. Stat. Ann. § 12; Mo. Ann. Stat. § 324.1100; Mich. Comp. Laws Ann. § 338.822; N.C. Gen. Stat. Ann. § 74C-3; § 1301 Definitions, 23 V.I.C. § 1301; Ky. Rev. Stat. Ann. § 329A.010; N.M. Stat. Ann. § 61-27B-2; Ariz. Rev. Stat. Ann. § 32-2401; Fla. Stat. Ann. § 493.6101(17); Ind. Code Ann. § 25-30-1-2; N.Y. Gen. Bus. Law § 71; Kan. Stat. Ann. § 75-7b01(a); Cal. Bus. & Prof. Code § 7521; Minn. Stat. Ann. § 326.338; Ga. Code Ann. § 43-38-3; 225 Ill. Comp. Stat. Ann. 447/5-10; N.J. Stat. Ann. § 45:19-9.

[3] See La. Stat. Ann. § 37:3503(8)(a); Ohio Rev. Code Ann. § 4749.01; Del. Code Ann. tit. 24, § 1302(17); Iowa Code Ann. § 80A.1.9; W. Va. Code Ann. § 30-18-1.

[4] Conn. Gen. Stat. Ann. § 29-152u (4). The scope of Connecticut's statute seems never to have come up in court.

[5] See e.g., *Ravary v. Reed*, 163 Mich. App. 447, 451, 415 N.W.2d 240, 242 (1987) (dealing with communications privilege); *McKeegan v. Sears, Roebuck & Co.*, No. 68111, 1995 WL 527441, at *4 (Ohio Ct. App. Sept. 7, 1995) (dealing with expert witness testimony); *Pennsylvania Lumbermens Ins. Corp. v. Landmark Elec., Inc.*, No. C.A. 13882, 1993 WL 541644, at *1 (Ohio Ct. App. Dec. 29, 1993) (same); *State v. Watkins*, No. 02C01-9612-CC-00440, 1997 WL 576445 (Tenn. Crim. App. Sept. 17, 1997) (conviction for impersonation of a licensed professional).

of statutory interpretation repeatedly applied by courts around the country show that Virginia's licensing statute is only meant to affect persons performing quasi law enforcement functions within the geographic borders of the Commonwealth.

Private investigation licensure laws are intended only to regulate investigations actually conducted within the state, whether or not that intention is clearly stated. As Judge Easterbrook said in *K–S Pharms., Inc. v. Am. Home Prods. Corp.,* 962 F.2d 728, 730 (7th Cir.1992), it is a basic principle of statutory interpretation "that state statutes should be presumed to govern only conduct within the borders of the enacting state."[6] This principle was applied to private investigator licensing laws in *Landi v. Arkules*, 172 Ariz. 126, 835 P.2d 458 (Ct. App. 1992), which involved an "heir search" conducted by an unlicensed individual. The services of the unlicensed heir hunter were provided pursuant to a contract made in New York, but his search was physically conducted in Arizona (the decedent died there, the heir hunter learned of possible heirs when he was reviewing probate files in Maricopa County, and he located the first three possible heirs in Arizona). Arizona required a private investigation license for heir searches; New York did not. Nevertheless, the heir hunter argued that New York's licensing regime should apply, since the disputed contract for his research services was negotiated and signed there. The Arizona Court of Appeals disagreed: "New York law does not govern the actions of persons conducting a private investigation in Arizona." *Id*. at 134.

*Est. of Wright*, 90 Cal. App. 4th 228, 108 Cal. Rptr. 2d 572 (2001) presents similar facts, and a similar outcome. The question there was whether an unlicensed researcher was subject to California's private security statute. The California Court of Appeals decided that he was not, considering that the researcher merely "searched data bases and made inquiries from Colorado.

---

[6] *IMS Health Inc. v. Ayotte*, 550 F.3d 42, 63 (1st Cir. 2008), abrogated on other grounds by *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 131 S. Ct. 2653, 180 L. Ed. 2d 544 (2011).

He did not perform his search in California[.]" *Id.* at 237.

While cases like *Landi v. Arkules* and *Est. of Wright* are helpful, the proof that Virginia's statute applies only to intra-state investigations is the text of the statute itself, which requires one to "solicit" or "engage in" the private security services business in Virginia. Va. Code. Ann. § 9.1-139A. The contract was signed in Virginia, but the evidence showed no solicitation[7] by Strategic—or if there was, that it was in New York. And "engaging" in that business in Virginia is "providing" or undertaking to provide private investigators there. *Id.*, §9.1-138. But as explained below, no such investigators were provided, or to be provided, in Virginia.

That also appears to be the position of the Virginia Attorney General. See *United States v. Com. of Va.*, 972 F. Supp. 1008 (E.D. Va. 1997). The plaintiff was an investigator with BICS, a company that conducted applicant background checks for the FBI. He filed suit after the Virginia Attorney General wrote the FBI informing it that BICS investigators were subject to state licensing requirements. *Id.* at 1011. The case's core holding was that federal regulation of independent contractors preempted Virginia's licensing statute. But more important here is the position taken by the Virginia Attorney General: that the private security services statute *applied only to BICS investigators who worked in Virginia*. The letter sent from the Department of Criminal Justice Services which catalyzed the lawsuit "advised the FBI that independent contractors who work for the FBI *in Virginia* were subject to its registration and licensing requirements[.]" *Id.* at 1010 (emphasis added). BICS investigators responded by threatening to quit, *or to perform their investigations from other states*.[8] Noting this, the federal district court

---

[7] *Smith v. Commonwealth*, No. 0099-18-1, 2019 WL 2092864, at *4 (Va. Ct. App. May 14, 2019) ("The definition of 'solicit' includes 'to move to action: serve as an urge or incentive to [act]: incite.'")
[8] See *United States v. Com. of Va.*, 139 F.3d 984, 986–87 (4th Cir. 1998) ("BICS investigators have already been deterred from taking new assignments in Virginia."). See also Brief for Appellees, *supra* at15 (Plaintiff Cox said he "would cease working for the FBI *in Virginia* rather than expend the time and money necessary to obtain the registration and/or license") ("Approximately 165 investigators conduct background investigations *in Virginia* through the BICS Program. Of these investigators, approximately 130 both reside in Virginia and do the vast

defined the issue presented as "whether Virginia may impose its statutes and regulations governing private security services on BICS investigators who work exclusively for the FBI *within the boundaries of the Commonwealth*." *Id.* at 1011 (emphasis added).

The Virginia Attorney General's interpretation – that Virginia's licensing statute applies only to persons who gather information while physically present in Virginia – comports with the statute's clearly-articulated purpose "to secure the public safety and welfare against incompetent, unqualified, unscrupulous, or unfit persons engaging in the activities of private security services businesses."[9] The statute's reference to "the public" is a reference to Virginia's own citizens. As a Virginia court said in *LSR Corp. of N. Carolina v. Harrison & Bates, Inc.*, No. LH 760., 1985 WL 306726, at *6 (Va. Cir. Ct. Jan. 2, 1985):

> For the licensing statute to apply, one must have performed one or more of the acts enumerated[.] *These acts must take place in Virginia.* Most courts hold that a . . . licensing statute cannot apply to acts outside of the regulating state, on the theory that the regulating state has no legitimate interest in policing out-of-state acts . . . the statute was designed solely to protect [Virginia] residents." (emphasis added)[10]

See also *Szigeti v. Ohio Dep't of Com.*, 980 F.2d 731 (6th Cir. 1992) (noting a state's "concern of regulating private investigators and their businesses *within the state*") (emphasis added). In other words, Virginia's only interest in applying its licensing statute is to protect Virginians from hiring or being investigated by those who are unqualified.

The Research Agreement was signed at Ms. Wallop's home in Virginia, and partially negotiated in Virginia. But private investigation regulations are triggered by *investigations*, not the original act of contracting, a "relatively insignificant contact." Accord Restatement

---

majority of their work for the FBI in Virginia. Although the remaining investigators live in Maryland or the District of Columbia, they are frequently assigned investigations *in Virginia* because of the high volume of background investigations there.") (emphasis added).

[9] *United States v. Com. of Va.*, 972 F. Supp. 1008, 1010 (E.D. Va. 1997), aff'd, 139 F.3d 984 (4th Cir. 1998) (quoting Va. Code Ann. § 9.1-141).

[10] *LRS* declined to apply a Virginia real estate broker licensing statute where no brokerage activities took place in Virginia, citing and quoting *Corkin v. Elger*, Corp., 106 N.H. 522, 214 A. 2d 740 (1965).

(Second) of Conflict of Laws § 188(1) (1971) ("the state where performance is to occur has an obvious interest in the question whether this performance would be illegal," while "[s]tanding alone, the place of contracting is a relatively insignificant contact."). All of Strategic Vision's actual investigative activities on this short-lived engagement took place outside of Virginia – Team Two worked out of Texas, Team One operated overseas, and Ms. Wallop's various trips were taken abroad, in England and elsewhere. Further, none of the parties who hired or were investigated by Strategic were Virginians. Eastern is not a Virginia citizen, and each of the "fish" assigned to Strategic are domiciled in different states or countries. The great weight of law suggests that Virginia's licensing statute was not designed for circumstances such as these.

c. *Decisions from courts in other states verify that Virginia's statute is only meant to regulate businesses and individuals performing quasi law enforcement functions.*

Strategic has maintained that licenses are mandated only for researchers performing narrow functions analogous to law enforcement. This is the reason, Strategic has argued, that the Virginia General Assembly grouped private investigators with armed security guards, alarm dispatchers, and canine handlers – jobs which supplement or work with traditional law enforcement and the justice system. Strategic's position is borne out by law from jurisdictions throughout the United States. Perhaps the most striking example is Supreme Court precedent holding that the functions of private investigators are so similar to those of law enforcement officials as to subject evidence gathered by private investigators to the exclusionary rule in criminal law. See *Marsh v. State of Ala.*, 326 U.S. 501, 66 S. Ct. 276, 90 L. Ed. 265 (1946).[11] The parallel relationship between private investigation and law enforcement was also at the core

---

[11] See also *People v. Stormer*, 136 Misc. 2d 184, 186, 518 N.Y.S.2d 351, 352 (Co. Ct. 1987) ("[P]rivate investigators and police are subject to the Fourth Amendment because they are with some regularity engaged in the 'public function' of law enforcement.") (quoting 1 LaFave, Search and Seizure, 1987 ed., Vol. 1, Section 1.8(d), p. 200 (2d ed.)).

of *Employers Ins. of Wausau v. United States*, 815 F. Supp. 255, 259 (N.D. Ill. 1993), a leading

FTCA case. There the Northern District of Illinois held that the term "investigative"

> must be given its normal meaning (akin to that when it is employed in such terms as
> "private investigator"), not just the generic sense that Wausau suggests—that of simply
> looking into [] something . . . [T]he statut[e] . . . was intended to refer to the kinds of
> "investigative" activities that are carried out by law enforcement officers. [12]

The services Strategic Vision promised to provide did not mirror enforcement of the

law. The "wrongs" researched by Strategic were general and political in nature, and the fruits

of the Research Agreement were to be used in the court of public opinion rather than a court of

law. The research had its ultimate use in a media campaign to benefit the Chinese people as a

whole, rather than any identifiable victim, to expose corruption in CCP leadership. Such matters

are of trifling concern to traditional law enforcement officers.[13] Hence, applying Virginia's

licensure statute to Strategic's research would contravene assumptions at the heart of controlling

Fourth Amendment precedent and other federal jurisprudence.

## II.     Applying Virginia's private security services statute in this instance would be unconstitutional.

### a.   *Applying Virginia's statute to activity outside of Virginia would violate the dormant Commerce Clause.*

The positive power to "regulate Commerce . . . among the several states" given to

Congress by Article I, section 8 of the United States Constitution has been interpreted so as to

embody a negative corollary known as the "dormant Commerce Clause."[14] In the Second

---

[12] Relied on by *Murphy v. United States*, 121 F. Supp. 2d 21, 25 (D.D.C. 2000), *aff'd*, 64 F. App'x 250 (D.C. Cir. 2003); *Devine v. United States*, No. CV 118-195, 2020 WL 5441239, at *4 (S.D. Ga. Sept. 10, 2020). See also *In Re Campbell*, 59 V.I. 701, 714 (2013) (noting that many law enforcement functions – including "interviewing witnesses, fact investigation, and fact analysis regarding legal actions or proceedings" – could "potentially be permissibly performed by a law enforcement officer [or a] private investigator").
[13] That the contract contained a strict confidentiality provision preventing the disclosure of information except by Guo and others on his behalf further demonstrates the disparity between law enforcement efforts and the research called for by the Research Agreement.
[14] *VIZIO, Inc. v. Klee*, 886 F.3d 249, 254 (2d Cir. 2018).

Circuit, analysis of dormant Commerce Clause issues "treads a well-worn path."[15] A challenged state law is invalid if (a) it discriminates against interstate commerce, or (b) the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits.[16] State laws which have the practical effect of controlling conduct beyond the boundaries of the State ("extraterritorial" conduct) impose an excessive burden.[17] Specifically, the Commerce Clause dictates that no State may force an out-of-state merchant to seek regulatory approval in one State before undertaking a transaction in another.[18] The fact that some nexus to a state exists will not justify regulation of wholly out-of-state transactions.[19]

Courts can and often do invalidate licensing regimes under the dormant Commerce Clause's "extraterritoriality" component.[20] A recent example is *McLemore v. Gumucio*, No. 3:19-CV-00530, 2020 WL 7129023 (M.D. Tenn. Dec. 4, 2020), which involved a challenge to a Tennessee statute making it unlawful for any person to "act as, advertise as, or represent to be an auctioneer without holding a valid license issued by the commission." *Id*. at *1 Online auctioneers brought suit, arguing that the law applied to persons conducting online auctions from outside of Tennessee, and that such application violated the dormant Commerce Clause.

The district court determined that the licensing requirement "by its terms contains no qualifications, no geographical limitations, and no explanation of what it means to act as, advertise as, or represent to be an auctioneer" and agreed that the statute required licensure of any person hosting an online auction accessed in Tennessee. This constituted regulation of

---

[15] *New York Pet Welfare Ass'n, Inc. v. City of New York*, 850 F.3d 79, 89–90 (2d Cir. 2017).
[16] *Id*.
[17] *VIZIO, Inc. v. Klee*, 886 F.3d 249, 255 (2d Cir. 2018) (quoting *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989)).
[18] *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 582 (1986) (citing *Edgar v. MITE Corp.*, 102 S. Ct. 2629, 2640 (1982)).
[19] *Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 615 (9th Cir. 2018).
[20] See *Volkswagen of Am., Inc. v. Smit*, 52 Va. App. 751, 790, 667 S.E.2d 817, 836 (2008) ("The principles set forth in *Healy* and *Brown–Forman Distillers Corp.* are not limited to price-affirmation statutes.").

conduct "occurring wholly outside of Tennessee (*i.e.*, extraterritorial conduct)" and was a *per se* violation of the dormant Commerce Clause. *Id*. at *14.

Virginia's statute would have an unconstitutional effect if applied here. As mentioned above, Strategic's Virginia actions – signing the contract, monitoring progress, and the like – were non-investigative. The "investigative" aspects of Strategic's research – accessing digital records, physical surveillance, social media monitoring, etc. – were all performed elsewhere. Just as the dormant Commerce Clause prevented Tennessee from imposing its licensure regime on extraterritorial auctions in *McLemore*, it prevents Virginia from imposing its licensure regime on extraterritorial investigations here.

    b.  *Applying Virginia's statute to researchers not performing functions similar to those of law enforcement would violate the First, Fifth, and Fourteenth Amendments.*

Overbroad and vague laws are repugnant to the Constitution. A statute is overboard if it prohibits or chills a substantial amount of protected speech.[21] A statute is vague if it fails to provide fair notice of what is prohibited, or is so standardless that it encourages discriminatory enforcement.[22] Overbreadth violates the First Amendment; vagueness the Fourteenth.[23]

There is no logical stopping point to Virginia's statute if it applies outside the context of traditional law enforcement activities. Subjecting Strategic to licensing under a "standardless" interpretation of "crimes or civil wrongs" would set dangerous precedent for political candidates conducting research on opponents, business consultants hired to evaluate competitors, and authors or journalists gathering data for books and reports. Virginia's statute would chill a substantial amount of protected speech, fail to provide fair notice of what is prohibited, or both.[24]

---

[21] *United States v. Williams*, 553 U.S. 285, 292, 128 S. Ct. 1830, 1838, 170 L. Ed. 2d 650 (2008).
[22] *Id*. (citing *Hill v. Colorado,* 530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000)).
[23] *Id*.
[24] PI licensing statutes can be unconstitutionally overbroad and/or vague. *See Castillo v. Ingram*, No. 2:14-CV-0332-GMN-PAL, 2015 WL 3559104, at *1 (D. Nev. June 5, 2015); *Gurley v. Missouri Bd. of Priv. Investigator*

c. *If the meaning of Virginia's statute is uncertain, the solution is to invoke the canon of constitutional avoidance.*

"[A] court should opt for an interpretation of state law that would avoid constitutional problems if such an interpretation is not contrary to the intent of the legislature."[25] *IMS Health Inc. v. Ayotte*, 550 F.3d 42 (1st Cir. 2008)[26] is on point. The challenged statute in *IMS* prohibited unwanted transfers of physician prescribing histories for marketing use, but lacked a geographic limitation. On its face, then, the statute "prohibit[ed] the transfer of data from a pharmacy benefits manager located in, say, New York to Verispan, a Delaware firm headquartered in Pennsylvania." *Id.* at 63. To save the statute from the dormant Commerce Clause, the court "read the Prescription Information Law to relate only to activity that takes place domestically." *Id.* It "would make no sense to read the statute to regulate out-of-state transactions when the upshot of doing so would be to annul the statute." *Id.* at 63–64.

Here, too, the doctrine of constitutional avoidance would "illuminate the path out of [the] quandary."[27] Difficult constitutional questions can be avoided by embracing the interpretation that Virginia's licensing statute applies only to researchers performing functions akin to law enforcement while physically present in the Commonwealth.

## CONCLUSION

Because Strategic Vision did not conduct an investigation in Virginia or perform any services paralleling law enforcement, the statute does not apply.

---

*Examiners*, 361 S.W.3d 406 (Mo. 2012); *K-Mart Corp. v. St. Louis Cty.*, 672 S.W.2d 127 (Mo. App. 1984); *Gray v. Dep't of Pub. Safety*, 2021 ME 19.

[25] *Pac. Cap. Bank, N.A. v. Connecticut*, 542 F.3d 341, 354 (2d Cir. 2008).

[26] Abrogated on other grounds by *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011).

[27] *Bourgeois v. Live Nation Ent., Inc.*, 3 F. Supp. 3d 423, 445 n.18 (D. Md. 2014) (court construed a Baltimore anti-ticket-scalping ordinance to apply only to sales occurring within the city in order to avoid defendants' contention "that extraterritorial application of the Ordinances would run afoul of the Constitution's Commerce Clause.").

Dated April 30, 2021

Respectfully submitted,

GRAVES GARRETT LLC

*s/ Edward D. Greim*
Edward D. Greim, #4240172
Jennifer Donnelli (*pro hac vice*)
1100 Main Street, Suite 2700
Kansas City, MO 64105
Telephone: (816) 256-3181
Fax: (816) 256-5958
edgreim@gravesgarrett.com
jdonnelli@gravesgarrett.com
ATTORNEYS FOR
DEFENDANT/COUNTERCLAIM PLAINTIFF

## CERTIFICATE OF SERVICE

This certifies that, on April 30, 2021, the foregoing was served on all counsel of record via the Court's Electronic Case Filing system.

*s/ Edward D. Greim*
Attorney for Defendant/Counterclaim
Plaintiff