L4LPEAS1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

EASTERN PROFIT CORPORATION
LIMITED,

                    Plaintiff,

            v.                          18 CV 2185 (LJL)

STRATEGIC VISION US LLC,

                    Defendant.

------------------------------x
                                        New York, N.Y.
                                        April 21, 2021
                                        9:37 a.m.

Before:

                    HON. LEWIS J. LIMAN,

                                        District Judge

                            APPEARANCES

TROUTMAN PEPPER HAMILTON SANDERS LLP
        Attorneys for Plaintiff
BY:   CHRISTOPHER B. CHUFF
        JOANNA J. CLINE

GRAVES GARRETT LLC
        Attorneys for Defendant
BY:   EDWARD DEAN GREIM
        JENNIFER A. DONNELLI

ALSO PRESENT:

Melissa Francis, Eastern Profit Corporation Limited
J. Michael Waller, Strategic Vision US LLC

UNA WILKINSON, Mandarin Interpreter
LENNY YANG, Check Mandarin Interpreter

JOSHUA KLEIN, Attorney for Mr. Guo
PETRILLO, KLEIN & BOXER, LLP

L4LPEAS1

1           (Trial resumed)

2           THE COURT:  Be seated.  Good morning.  Before we get

3   started with the testimony, a couple of preliminary matters.  I

4   received letters overnight reflecting objections to certain

5   exhibits.  With respect to PX71, the Court will reserve

6   judgment on the objections to the admissibility.

7           With respect to PX67, I don't think that exhibit was

8   actually offered.  It was used, I think, for cross-examination,

9   but I'll check the record.  To the extent it was offered, the

10  Court will reserve decision on whether to receive the exhibit.

11          And with respect to DX56, which is I think the

12  invoice, the Court will receive that as a business record.

13          (Defendant's Exhibit DX56 received in evidence)

14          With that, Ms. Cline, anything before we get started

15  with the testimony?

16          MS. CLINE:  I think there is a little housekeeping

17  with exhibits, too, your Honor.  The parties conferred, per

18  your direction, as to exhibits and tried to eliminate the

19  duplicates so we can provide that in a nicer format for

20  Mr. Fishman.

21          But in the meantime, we also agreed, on the

22  plaintiff's side, we had intended to offer DX32, but neglected

23  to do so.  We're offering it not for the truth of the matter,

24  but just for the fact that it was publicly available on the

25  date shown on the face of the document.  I've conferred with

L4LPEAS1

1    Mr. Greim.  He doesn't object, and then I believe Mr. Greim has

2    some cleanup to do as women.

3              THE COURT:  That will be received.

4              (Defendant's Exhibit DX32 received in evidence)

5              By the way, all of the other exhibits that were

6    offered yesterday, with the exception of the two as to which I

7    indicated I'm going to reserve judgment and which were received

8    for the purposes indicated, subject to a motion to strike, will

9    now be received.

10             One other matter before I hear from Mr. Greim is a

11   reminder to counsel for both parties.  As you are leaving the

12   podium after questioning, please make sure to wipe off the

13   podium, conforming with the district's social distancing Covid

14   restrictions.

15             Mr. Greim?

16             MR. GREIM:  Your Honor, there were two exhibits I

17   neglected to move for entry yesterday.  Those were DX24, power

18   of attorney, and DX68, the rule 26.1 statement of Eastern

19   Profit.  And I conferred with Ms. Cline about both of those.

20   We move for their admission.

21             THE COURT:  Is there any objection to those?

22             MS. CLINE:  No, your Honor.

23             THE COURT:  Those will be received.

24             (Defendant's Exhibits DX24 and DX68 received in

25   evidence)

L4LPEAS1                         Wang - Cross

1            THE COURT:  All right.  Ms. Wang, you're reminded that

2      you are still under oath.  Mr. Greim, you may inquire.

3       YAN PING WANG, Resumed

4      CROSS-EXAMINATION (Resumed)

5      BY MR. GREIM:

6      Q.  Good morning, Ms. Wang.  Now, Eastern Profit is a private

7      company organized under the laws of Hong Kong; isn't that

8      right?

9      A.  Correct.

10     Q.  And until he sold his interest in Eastern in 2017,

11     Mr. Chunguang Han was the sole director of Eastern?

12     A.  I didn't know by then.

13     Q.  Okay.  I'm just asking you today if you know now.  Did you

14     know that until he sold his interest in 2017, Mr. Chunguang Han

15     was the sole director of Eastern?

16     A.  I don't believe so.

17     Q.  You think that's incorrect?

18     A.  I don't know, to be honest.

19     Q.  And in 2017, Mr. Han transferred ownership of Eastern to

20     Guo Mei, correct?

21     A.  Correct.

22     Q.  And Guo Mei is Guo Wengui's daughter?

23     A.  Correct.

24     Q.  Let's pull up DX80.  And I'll tell you, this is a

25     multi-page exhibit.  You'll see in the bottom right-hand corner

L4LPEAS1                        Wang - Cross

you've got -- this was produced to us by you, by Eastern, and
it is a compilation of the corporate filings of Eastern Profit
in Hong Kong.

          If you could scroll through and let's just kind of go
through slowly here.  Can you go to the top again?

          Do you see that this one is from July the 29th of
2015, right?

A.  Correct.

Q.  And the registered office at that time was 49 Bank of China
Tower, No. 1 Garden Road, Hong Kong?

A.  Correct.

Q.  And that's correct, isn't it?

A.  I read from the paper, yes.

Q.  Okay.  Do you have an independent knowledge that that was
the Hong Kong office?

A.  I don't have personal knowledge.

Q.  Okay.  By the way, you were still in Hong Kong in 2015,
weren't you, or not?

A.  You mean July 29th, 2015?

Q.  Yes.

A.  No.  I was in the U.S.

Q.  Okay.  So you came to the U.S., what, a few months before
this, then?

A.  Yes.

Q.  When you were in Hong Kong, did you ever have cause to go

1    to 49F Bank of China Tower?

2    A.   I believe so.

3    Q.   Why were you going there?

4    A.   For business.

5    Q.   Okay.  Very good.  What kind of business?

6    A.   I don't remember clearly.  These towers are a very popular

7    building in the central in Hong Kong.  Everybody knows that.

8    Q.   Sure.  I'm asking you about the ones at 49F at the Bank of

9    China Tower.  What was the reason for your going to 49F at the

10   Bank of China Tower?

11   A.   I believe the China Golden Spring office is there also.

12   Q.   Very good.  Let's scroll down again.  By the way, were you

13   working for China Golden Spring at that time?

14   A.   I was in the U.S. already by then.

15   Q.   So you went back to Hong Kong to go to the China Golden

16   Spring office from time to time?

17   A.   You're asking when?

18   Q.   I'm just asking you, when you went to the China Golden

19   Spring office, were you working for China Golden Spring?

20   A.   You ask of 2017 July, or before that?

21   Q.   Let's go before that.

22   A.   Before that, yes.

23   Q.   Then after July of 2017, why were you going to the China

24   Golden Spring's office in the Bank of China Tower?

25              MS. CLINE:  Objection, relevance.

L4LPEAS1                          Wang – Cross

<div style="line-height:2">

1        THE COURT:  I'll permit it.  Overruled.

2   A.  I came to the U.S. in April 2017.  So after that, I barely

3   went back to Hong Kong.

4   Q.  I understand.  And I'm just asking, when you did go back to

5   Hong Kong, why did you go to 49F at the Bank of China Tower?

6   A.  For business.

7   Q.  Okay.  And was that business to go to the China Golden

8   Spring office?

9   A.  Correct.

10  Q.  Okay.  Let's keep scrolling.  Keep going down to the next

11  report.  Let's actually stop here.

12       Now, you see at this time Han Chunguang --

13       THE COURT:  Can you indicate for the record and for me

14  the page number?

15       MR. GREIM:  Yes, I'm sorry.  So this is stamped --

16  let's go to the very bottom so I can see that -- Eastern 358.

17  This is, again, Exhibit 80.

18  BY MR. GREIM:

19  Q.  And did you see Han Chunguang is listed as the natural

20  person director for Eastern Profit?

21  A.  I read from the paper, yes.

22  Q.  And this is as of July 2017, correct?

23  A.  From the paperwork, yes.

24  Q.  Who knows about Eastern Profit?  Who can tell us about its

25  office and ownership?

</div>

L4LPEAS1                          Wang - Cross

1    A.  I mean, you probably should ask Eastern Profit

2    representative.

3    Q.  Well, you're here.  You've got a power of attorney to

4    represent Eastern Profit for purposes of this case, don't you?

5    A.  Correct.

6    Q.  And you don't know the answer to these questions?

7    A.  It doesn't mean that I should know everything about Eastern

8    Profit.  It depends on what you ask, right?

9    Q.  Okay.  Let's keep scrolling through.  Actually, let's go

10   all the way to the bottom.  Let's go to the very last report.

11   Keep going.  Okay.  Go up a little further.  Okay.  Let's stop

12   here.  No, I'm sorry.  You'll have to go one more.  Go down one

13   page.

14        While we're looking at this, let me ask you, Ms. Wang,

15   other than this, Eastern Profit produce any other accounting or

16   bank records in this case, correct?

17   A.  I did not bring that myself.

18   Q.  Do you know if Eastern Profit has any other bank or

19   accounting records?

20   A.  I'm not quite sure.

21   Q.  Does it have any ledgers in which it keeps track of

22   financial transactions?

23   A.  I don't know about that.

24   Q.  Does it have any kind of income or loss statements?

25   A.  Again, I don't know this detail.

L4LPEAS1                         Wang - Cross

1    Q.  It doesn't have any, does it?

2    A.  I cannot say.  I just represent Eastern Profit on this

3    investigation project as this litigation.  That's it.

4    Q.  Very good.  We've now come to the first page of this last.

5    You know, let's --

6              MR. GREIM:  I'm going to offer DX80.

7              THE COURT:  Any objection as to authenticity or --

8              MS. CLINE:  Not as to authenticity.

9              THE COURT:  It's received subject to motion to strike.

10             (Defendant's Exhibit DX80 received in evidence)

11   BY MR. GREIM:

12   Q.  Actually, we will go to the very last -- second-to-last --

13   oh, we're there.

14             So you'll see that this document, once again, Eastern

15   Profit Corporation Limited, it's a notice of change of address

16   of registered office.  Do you see where the registered office

17   is changed to?

18   A.  From the paperwork, yes.

19   Q.  Okay.  20 South Bay Road, Repulse Bay?

20   A.  From the record, yes.

21   Q.  In Hong Kong, right?

22   A.  Correct.

23   Q.  October 9th, 2019?

24   A.  From the record, yes.

25   Q.  Is that address familiar to you, 20 South Bay Road, No. 20

1    South Bay Road?  Have you ever heard of that before?

2    A.  I don't remember that.

3    Q.  Have you been there?

4    A.  I don't remember that.

5    Q.  Okay.  Let's scroll down to the very last page.

6            Now, you'll see that by this time, as we testified --

7    you mentioned before, the director is Guo Mei, right?

8    A.  From the records, yes.

9    Q.  And it says her residential address is 20 South Bay Road,

10   Majestic View Manor, right?

11           MS. CLINE:  Objection, relevance.  We're talking 2019

12   now.

13           THE COURT:  Overruled.

14   A.  From the paperwork, yes.

15   Q.  Now, was she actually living there at this time?

16           MS. CLINE:  Objection.

17           THE COURT:  Overruled.

18   A.  I don't know.

19   Q.  And you testified yesterday she's living in the U.S. now,

20   right?

21   A.  She lives in the U.S. right now, yes.

22   Q.  And you speak to Guo Mei a lot, right?

23   A.  What do you mean "a lot"?  I don't understand.

24   Q.  Let's play C14.

25           (Video being played)

L4LPEAS1                        Wang - Cross

1           Now, this was your October 30, 2019, deposition,
2    right?
3    A.  Correct.
4    Q.  And you had just been speaking -- you testified at that
5    deposition that you spoke with Guo Mei in between your two
6    depositions, right?
7    A.  We did.
8    Q.  And you said you spoke with her a lot, right?
9    A.  This is what I said in my deposition.
10   Q.  Was that true?  Was that truthful?
11   A.  It is.  It doesn't mean that I'm not telling the truth
12   right now.
13   Q.  No, no.  I'm just asking, is it truthful?
14   A.  Correct.
15   Q.  And the reason you spoke with Guo Mei was to ask her
16   questions about Eastern Profit, correct?
17   A.  Not only about that.
18   Q.  Is that one reason that you spoke with her?
19   A.  Correct.
20   Q.  And again, just to be clear for the record, this was
21   sometime in between January, your first deposition, and October
22   2019, your second deposition, right?
23   A.  Correct.
24   Q.  Now, when you spoke with Guo Mei at that time, had she
25   traveled back to the U.S. or was she living here?

1    A.  I don't know.  I cannot say that.  We talked by phone call.

2    That's it.

3    Q.  Well, you said you met her?

4    A.  Correct, we met.

5    Q.  Okay.  Where did you meet?

6    A.  In our office building.

7    Q.  The Golden --

8    A.  In the lobby.

9    Q.  I'm sorry.  At the Golden Spring New York office?

10   A.  Yes.

11   Q.  And when you asked Guo Mei, she didn't know anything about

12   Strategic, did she?

13   A.  She does not know at all.

14   Q.  And all Guo Mei could tell you was that Eastern assets had

15   been frozen, correct?

16   A.  No.  She ask about the investigation litigation here, asked

17   when we can have this case resolved.

18   Q.  My question is what she told you when you asked her about

19   Eastern Profit, okay?  So what else did she tell you about

20   Eastern Profit?

21   A.  She didn't tell me.

22   Q.  She told you that they have an office in Hong Kong, didn't

23   she?

24   A.  I don't remember that.

25   Q.  Was Eastern still keeping an office in Hong Kong in the

L4LPEAS1                          Wang - Cross

1   summer of 2019, as we were litigating this case?

2   A.  I don't think so.

3   Q.  Eastern has no office in the U.S., does it?

4   A.  Correct.

5   Q.  It has no employees in the U.S.?

6   A.  Correct.

7   Q.  It has no business operations in the U.S.?

8   A.  Correct.

9   Q.  It has no business operations in Hong Kong?

10  A.  You mean when?

11  Q.  Today.

12  A.  I don't think so.  They're frozen.

13  Q.  And it had no business operations in Hong Kong in 2019, did

14  it?

15  A.  I don't know about that.

16  Q.  It had no business operations in Hong Kong in 2017, did it?

17  A.  I have no personal knowledge about that.

18  Q.  Eastern's not registered to do business in New York, is it?

19  A.  I believe so.

20  Q.  Oh, it is registered to do business in New York?

21  A.  Say your question again?

22  Q.  Is Eastern registered to do business in New York?

23  A.  Eastern -- I don't believe Eastern is registered; so it's

24  not registered in New York.

25  Q.  Now, Eastern's bank account was frozen in June 2017,

1    correct?

2    A.  I'm not quite sure about that detail.  I was just told it's

3    frozen, but I didn't know the precise date.

4    Q.  Well, remember I took your deposition in October, and I

5    asked you that same question, didn't I?  Do you recall that?

6    A.  I don't remember that.

7    Q.  Did you testify truthfully at that deposition?

8    A.  I tried my best.

9    Q.  And you swore under oath, right?

10   A.  I did.

11   Q.  Let's play C44.

12          (Video being played)

13          MS. CLINE:  Can we take that image down?

14          MR. GREIM:  Yes, sorry.

15          (Pause)

16   BY MR. GREIM:

17   Q.  Okay.  You'll see on 56, line 7, I asked you:  "Did Eastern

18   have an understanding how it was going to pay back this loan?

19   "A.  By this lawsuit.  That's why Eastern sued to get this one

20   million back, because Eastern's bank account was frozen."

21          Did I read that right so far?

22   A.  Correct.

23   Q.  And by the way, that's correct; that's why Eastern sued?

24   A.  I believe so.

25   Q.  And then I asked:  "It wasn't frozen yet at that time, in

1   the fall of 2018?

2   "A.  Eastern's bank account was frozen around June of 2018,

3   yes."

4              Did I read that right?

5   A.  Correct.

6   Q.  Then I asked you:  "Although, that was after the lawsuit

7   was filed, wasn't it?  The lawsuit was filed in March of 2018,

8   isn't that right?

9   "A.  Oh, yeah.  This is a memory test.  My mistake.  You are

10  confusing me with all these dates back and forward, Eddie.  So

11  correction, Eastern's bank account was frozen.  When is it this

12  contract was signed, SV's contract?"

13             Did I read that correctly so far?

14  A.  Correct.

15  Q.  And then I told you:

16  "Q.  It's dated -- it was signed January 6th, 2018.

17  "A.  January 2018.  Eastern's bank account was frozen in June

18  of 2017.  This is the correct answer."

19             Did I read that correctly?

20  A.  You read that correctly.

21  Q.  That was your testimony, right?

22  A.  Right.

23  Q.  And when Eastern's bank account was frozen, was its office

24  raided?

25  A.  I don't remember that clearly now.

L4LPEAS1                          Wang - Cross

1    Q.  Did it have any employees who were imprisoned or arrested?

2    A.  I don't know about that.

3    Q.  Did the same thing happen to China Golden Spring at the

4    same time as Eastern Profit?

5    A.  I'm not familiar about that.

6    Q.  I'm sorry.  You're not familiar with whether -- so let me

7    ask you.  Are you familiar with whether China Golden Spring's

8    assets in China and Hong Kong have been frozen?

9    A.  Correct.

10   Q.  So they have been frozen, correct?

11   A.  They are frozen.

12   Q.  And is China Golden Spring conducting any operations in

13   Hong Kong right now?

14          MS. CLINE:  Objection, relevance.

15          THE COURT:  What is the relevance of that?

16          MR. GREIM:  Well, your Honor, I'm trying to -- I think

17   these entities are connected.  I think they're basically all

18   the same thing.  I'm trying to get an answer with what's going

19   on with Eastern Profit.

20          THE COURT:  I'll sustain the objection.

21   BY MR. GREIM:

22   Q.  And the amount -- let me ask you this.  Now, your claim in

23   this case is that the High Court of the Hong Kong, Special

24   Administrative Region, is the one that froze the assets of

25   Eastern Profit, correct?

1    A.  By the Chinese government via Hong Kong.

2    Q.  Under the influence of the Chinese government, right?

3    A.  Hong Kong is China.  Chinese communist took Hong Kong

4    completely.  They are the same.

5    Q.  First, I'm going to show you -- hold on.  I'm going to show

6    you a letter written by your counsel to our magistrate judge in

7    this case, Exhibit 126.

8              Just scroll down, if you could.

9              And then you'll see the very last paragraph.  First of

10   all, it's signed by Ms. Cline, correct?  Electronic signature?

11   A.  From the paperwork, yes.

12   Q.  All right.  And then you see Ms. Cline tells Judge Freeman,

13   "The assets of Mr. Guo and Eastern Profit that have been frozen

14   in Hong Kong were frozen not by the CCP or mainland China, but

15   by the High Court of Hong Kong;" do you see that?

16   A.  The High Court of Hong Kong, they are in the Hong Kong, of

17   course, but they are influenced by CCP or mainland China.

18   Technically, my counsel said not by CCP or mainland China is

19   correct.  There's no problem about that.

20   Q.  So you agree with her statement?

21   A.  Correct.

22   Q.  And then she says:  "See Exhibit B."

23             And let's pull up Exhibit B.  This is the order that

24   she attached to her letter.

25             Now, did you agree with Ms. Cline's letter before it

1   went out?  Did you review it?

2   A.  You mean review all the 56 pages?

3   Q.  No, I'm just asking about her letter.

4           MS. CLINE:  Objection, to the extent it calls for

5   privileged conversations.

6           THE COURT:  You're not being asked for your

7   conversation with Ms. Cline.  It's just being asked if you

8   reviewed the letter before it was sent.

9           THE WITNESS:  Yes, your Honor.

10  Q.  And you saw this attach --

11          THE COURT:  I don't know -- you said "yes, your Honor"

12  to me, but I don't think you've answered Mr. Greim's question.

13          MR. GREIM:  Oh, I thought she did.

14  BY MR. GREIM:

15  Q.  Was the answer to my question "yes"?

16  A.  Can you say the question again?  Sorry.

17  Q.  You reviewed Ms. Cline's letter before it was submitted to

18  the Court, correct?

19  A.  I believe my counsel went through the contents with me.

20  Q.  Okay.  Now, let's go to Exhibit B, and you've seen this

21  order before, correct?

22  A.  I don't remember that.

23  Q.  This is the Exhibit B she attached to her letter?

24  A.  Correct.

25  Q.  And you'll see it's from the Hong Kong Special

L4LPEAS1                        Wang - Cross

1  Administrative Region, the High Court, right?

2  A.  From the paperwork, yes.

3  Q.  All right.  And if you scroll down to page 3, you'll see

4  that one of the respondents, whose assets are frozen, is

5  Eastern Profit Corporation Limited, correct?

6  A.  From the paperwork, yes.

7  Q.  And then it's listed here as "respondent 16"?

8  A.  Correct.

9  Q.  Now, let's go to page 14.  Sorry.  Oh, there we go.

10         And you'll see for respondent 16, it lists the assets

11  that are being frozen.  You'll just see that there is a -- it

12  mentions China Minsheng Banking Corporation, Hong Kong branch;

13  do you see that?

14  A.  Correct.

15  Q.  The total amount, it mentions different currencies in

16  there.  The total amount is Hong Kong, 578-some-odd-thousand

17  dollars; do you see that?

18  A.  I did.

19  Q.  Are these the profits of Eastern Profit that were frozen in

20  Hong Kong?

21  A.  From the High Court paperwork, looks like, yes.

22  Q.  When you said you understood the assets were frozen, are

23  these the assets that you understood were frozen?

24  A.  From the paperwork, correct.

25  Q.  Have you seen this order before, before your counsel

L4LPEAS1                        Wang - Cross

1    submitted it?

2    A.   I believe so.

3    Q.   The very first -- let's go back there to the first page.

4    The very first respondent here is who?  Who is that?

5    A.   K-W-O-K, H-O, W-A-N.

6    Q.   Who is that?

7    A.   This is Mr. Guo.

8    Q.   He goes by two names, correct?

9    A.   You mean on this paperwork?

10   Q.   No.  I'm just asking you for your knowledge.  He goes by

11   two names, by at least two names, right?

12   A.   He has his official name and his English name.  Correct.

13   Q.   And underneath here Guo Qiang, is this his son?

14            MS. CLINE:  Objection, relevance.

15            THE COURT:  What is the relevance?

16            MR. GREIM:  Well, your Honor, I'm trying to establish

17   when these assets were frozen because it goes to the

18   credibility of the witness' testimony.

19            THE COURT:  I'll permit limited examination.

20            MR. GREIM:  I'm just about done with this exhibit,

21   your Honor.

22   BY MR. GREIM:

23   Q.   That's his son, correct?

24   A.   Correct.

25   Q.   And then I want to go to the third page -- I'm sorry, the

L4LPEAS1                          Wang – Cross

1    second page, the third respondent.  Qu -- I'm probably not

2    going to say this correctly, but Qu Guo Jiao; do you see that

3    name?

4    A.  I saw it.

5    Q.  Do you know who Qu Guo Jiao is?

6              MS. CLINE:  Objection, relevance.

7              THE COURT:  Overruled.

8    A.  What's your question?

9    Q.  Do you know who she is?

10   A.  I'm not quite sure.

11   Q.  You don't know anyone by that name?

12   A.  I don't remember that.

13   Q.  Okay.  Last question on this document.  Let's go to page 4.

14             THE COURT:  Mr. Greim, is this yet 126?

15             MR. GREIM:  It's actually DX126B.  We broke apart this

16   so that we have three different documents.  126 is the letter

17   itself.  This is 126B.

18             THE COURT:  I don't have 126B, but that's fine.

19             MR. GREIM:  Okay.  Maybe -- I know at some point we

20   adjusted our numbering.

21             THE COURT:  That's fine.  I don't need it.  Ask your

22   question.  I've got it on the screen.

23             MR. GREIM:  Okay.

24   BY MR. GREIM:

25   Q.  Do you see respondent 22 on here is China Golden Spring

L4LPEAS1                          Wang - Cross

1   Group Hong Kong Limited?

2   A.   Correct.

3   Q.   And this is the entity yesterday that you testified you

4   take direction from?

5   A.   Correct.

6   Q.   And then finally, at the very -- second-to-last name, do

7   you see Han Chunguang?

8   A.   Yes, I did.

9   Q.   Now, yesterday you said that Mr. Chunguang came to the

10  United States in, I believe you said, early 2015 with you,

11  correct?

12  A.   I did not say with me.

13  Q.   Okay.  Around the same time as you?

14  A.   I heard it was in early 2015, but I don't know when.

15  Q.   Okay.

16  A.   But he definitely not come together with me.  You're

17  misleading me, sir.

18  Q.   I'm sorry.  I don't intend to do that, Ms. Wang.

19            We're going to pull up DX5.

20            By the way, I move for the admission of 126 and 126B.

21            THE COURT:  Those are received subject to motion to

22  strike.

23            (Defendant's Exhibits 126 and 126B received in

24  evidence)

25  BY MR. GREIM:

L4LPEAS1                        Wang – Cross

1    Q.  Okay.  So this is the cover page of Eastern Corporation's

2    Limited -- Eastern Profit Corporation's responses and objection

3    to Strategic's first set of interrogatories in this case.  Do

4    you recall, have you seen this document before?

5    A.  Correct.

6    Q.  Let's go to the bottom, the signature page.  And once

7    again, you've seen this before?  This is your signature, isn't

8    it?

9    A.  Correct.

10   Q.  Notarized by Karen Maistrello?

11   A.  From the paperwork, yes.

12   Q.  She's a Golden Spring New York employee, isn't she?

13   A.  She is not right now.

14   Q.  But she was at this time, right?

15   A.  Correct.

16   Q.  All right.  Let's look at a few of these responses here.

17   Let's scroll up to -- let's go up a little higher.  Keep going.

18   Keep going.  Okay, let's stop.

19            No. 5.  Each person with knowledge of the agreement,

20   including negotiation of the same, Han Chunguang does not

21   appear on this list, does he?

22   A.  I didn't see his name here.

23   Q.  All right.  And by the way, you swore to these responses in

24   December of 2018, right?  You just saw that?

25   A.  Correct.

1   Q.  So this was about a year after the negotiations, right?

2   A.  Almost.

3   Q.  Almost.  Okay.  Let's keep going.  Scroll to the next page.

4   One more.

5          Okay.  Identify each person with knowledge of the

6   information provided by Eastern to Strategic Vision under the

7   agreement, including the flash drives.  Once again, Han

8   Chunguang is not there, correct?

9   A.  I didn't see his name here.

10  Q.  And you're the one who provided the information and swore

11  to these responses, correct?

12  A.  You're right.

13  Q.  And you satisfied yourself that these were truthful when

14  you answered them, right?

15  A.  You are right.

16  Q.  Okay.  Let's keep going.  Let's go to 12.  I'm going to

17  overlap.

18          Identify each person with knowledge of Eastern's

19  demand for the return of the $1 million deposit.  Do you see in

20  your response any reference to Han Chunguang?

21  A.  I didn't see his name here.

22  Q.  Okay.  Same answer for No. 13, the attempt to reverse the

23  wires.  He's not listed, is he?

24  A.  I didn't see his name here.

25  Q.  Only you and Guo Wengui?

1   A.  Yeah, because only me and Guo Wengui, we stood up.  The

2   rest of the people, they were afraid of being persecuted.

3   That's the whole --

4        MR. GREIM:  I move to strike.  That wasn't my --

5   that's beyond the question.

6        THE COURT:  Overruled.

7        MR. GREIM:  Let's keep going.

8   BY MR. GREIM:

9   Q.  Okay.  No. 16, itemized statement of your alleged damages,

10  and then you say here it's a million dollars, right?  Your

11  damages are the million dollars that was paid as a deposit; is

12  that right?

13  A.  Correct.

14  Q.  Okay.  Then we asked for everybody who knows, who can

15  testify about those damages.  Let's look at No. 17.  No

16  reference to Han Chunguang in the answer to No. 17, is there?

17  A.  I didn't see his name here.

18  Q.  Now, you knew who Han Chunguang was by this time, didn't

19  you?

20  A.  Correct.

21  Q.  In fact, you did give his name in response to another

22  question in these responses, right?

23  A.  Correct.

24  Q.  The question that said who the principal of Eastern, you

25  gave his name as a response, didn't you?

L4LPEAS1                         Wang - Cross

1   A.  Correct.

2   Q.  But you didn't say he had any knowledge of Eastern's $1

3   million in damages?

4   A.  Still a question again, please?

5   Q.  You didn't tell us that Han Chunguang had any knowledge of

6   Eastern's $1 million in damages?

7   A.  I don't remember that.

8   Q.  We just looked at your responses, right?

9   A.  Correct.  This is a public record; so if his name is out

10  there, it's going to be public.  The Chinese Communist will

11  find him.

12  Q.  So did you withhold his name from your sworn response?

13  A.  I didn't mean it.  I'm protecting people's life.

14  Q.  So did you withhold information from your sworn responses

15  in order to protect people's lives in this case?

16  A.  I'm giving my best knowledge and my best memory with

17  protecting people's life in danger.

18          THE COURT:  I want counsel, before we -- why don't we

19  move on to a different subject for the moment.  Because of this

20  subject, Ms. Wang may to want to speak to counsel about this

21  subject before we go further.

22  BY MR. GREIM:

23  Q.  Now, you have testified that Eastern Profit needs a million

24  dollars in this case to -- so they can repay a supposed loan to

25  an entity called ACA, correct?

L4LPEAS1                     Wang - Cross

1   A.  Correct.

2   Q.  And ACA is the entity that actually sent the fundings to

3   Eastern Profit, correct?

4   A.  Correct.

5   Q.  Let's pull up DX21.  No, this is right, 20.  And just

6   scroll through so she can see.

7           So, Ms. Wang, do you recognize this as an exchange you

8   had on Signal with Michael Waller?

9   A.  Correct.

10  Q.  And he's the one who's Pyratz on here?

11  A.  Correct.  He give me his name, yes.

12  Q.  And this happened on January the 30th, right?

13  A.  Correct.

14  Q.  And let's go to the page that's labeled 263, Eastern 263,

15  page 2.  You respond to Dr. Waller and you say:  "He said the

16  biggest problem is that your people didn't even find the door

17  after ten days, not mentioned about entering the door."

18          And you go on.  You were criticizing the deliverable

19  by Strategic Vision, correct?

20  A.  Correct.

21  Q.  Okay.  Now, let's go on to Exhibit 21.  I'm going to show

22  you another -- these are broken up into different exhibits,

23  Ms. Wang.  You'll see another e-mail in this exchange, and

24  again, you are in light gray and he's in dark gray -- or I'm

25  sorry.  He's in light gray; you're in dark gray, right?

1    A.   I'm in the dark gray.

2    Q.   Right.  And so the tail end of his communication is, he's

3    talking about his team, he said:  "They hit all their targets.

4    I trust them."  Do you see that?

5    A.   Correct.

6    Q.   And then you say:  "Yes.  As you know, big budget is ready

7    for this long-term project.  The investors can even pay your

8    team without contract."  Do you see that?

9    A.   I saw that.

10   Q.   Now, were you proposing to start paying Dr. Waller without

11   a contract?

12   A.   No, I did not.

13   Q.   Were you --

14   A.   I was remind him the fact.

15   Q.   You're referring to the fact that ACA wired the million

16   dollars when the contract wasn't signed yet, correct?

17   A.   Correct.

18   Q.   And then you go on and you say:  "But the investors would

19   not continue to spend money on the things they don't need.  For

20   instance, the things of today."  Right?

21   A.   Correct.

22   Q.   And that's what you believed at that time?

23   A.   The investor, they are the people who are purchasing --

24   Q.   My question is, that's what you believed at that time,

25   correct?

1   A.  I don't know what he believed or what.

2   Q.  No.  I'm asking what you believed at that time.  What you

3   wrote is what you believed at that time?

4   A.  What I believe is the investors, they are the people who

5   are persecuted.

6   Q.  I'm not asking --

7             THE COURT:  Ms. Wang, you're instructed to answer the

8   question that you're asked.  You'll have an opportunity, when

9   Ms. Cline examines you, to clarify things if she asks you the

10  question.  But you're directed to answer Mr. Greim's questions.

11            Mr. Greim, ask your question again.

12  Q.  In the first paragraph, where you said "but the investors

13  would not continue to spend money on the things they don't

14  need.  For instance, the things of today," is that what you

15  believed at the time?

16  A.  Correct.

17  Q.  And the next paragraph you say:  "Checked with them.  We

18  have 20 days to update them, two to three times hopefully, with

19  the financial and tracking results agreed in contract.  Even

20  partly, but please be correct."  Is that what you believed at

21  the time?

22  A.  Correct.

23  Q.  And then you say:  "Without above, the investors could not

24  move to second month with us and hard to do future with us, I'm

25  afraid."

1              Did I read that part of the message correctly?

2   A.  You read correctly, sir.

3   Q.  And is that what you believed at the time?

4   A.  Yes.

5   Q.  Now, when was the investors' first monthly payment due?

6   A.  Are you asking about the contract?

7   Q.  Under the contract.

8   A.  What's your question?  Sorry.

9   Q.  When was the investors' first monthly payment due?

10  A.  Due by the client, received the high qualified --

11  high-quality deliverable reports.

12  Q.  Was it due on any particular day?

13  A.  It not go by day.  Go by deliverable report, high

14  quality --

15  Q.  I'm sorry.  Go ahead.

16  A.  High-quality deliverable reports with information with

17  great in the contract.  Payment goes by the deliverable

18  reports.

19  Q.  Your testimony is the payment wasn't due each month, right?

20  A.  The payment was not due by the date.  Due by the reports.

21  Q.  When you say "checked with them," were you referring to

22  Mr. Guo?

23  A.  No, I don't believe so.

24  Q.  Well, when you said "big budget is ready for this long-term

25  project," you heard that information from Mr. Guo, didn't you?

1    A.  Not only from him.

2    Q.  I'm sorry, who else did you learn that from?

3    A.  The people who are persecuted by the Chinese government.

4    Q.  And those are the people who would be receiving the

5    research?

6    A.  They are the people that would like to join the research,

7    potentially, after Strategic Vision deliver the reports.

8    Q.  You agree that big budget is ready for this long-term

9    contract was told to you by Mr. Guo?

10   A.  Not only by him.

11   Q.  You didn't mention these other people before when we asked

12   you the question at your deposition, did you?

13   A.  Say your question again?

14   Q.  Let's just pull it up.  Let's just pull up -- you know, you

15   don't have it.  Let's pull up the first deposition.  Go to page

16   258.  Actually, let's just move on, just move forward.

17            Now, you claim that it was Mr. Guo who arranged the

18   payment from ACA, correct?

19   A.  It was Mr. Guo told me, I believe.

20   Q.  Let's pull up R59.  Actually, we'll go to page 64.  Okay.

21   Let's go to the bottom of 63, 22.  I asked you:  "So is it

22   Eastern Profit's position that -- let me back up.  Is it

23   Eastern Profit's position that you are to handle negotiations

24   or discussions with ACA regarding the million dollar loan?

25   "A.  In my understanding, from the moment I knew the loan, I

1    should help Eastern to handle everything."

2              Did I read that right?

3    A.  Sir, you are off screen.  Which line are you talking?

4    Q.  I'm sorry.  Bottom of 63, start at line 22.  Okay?

5              THE COURT:  Can you enlarge it, maybe highlight what

6    you want the witness to focus on and what you want the Court to

7    focus on?

8              And, Ms. Wang, if you can't see what you're being

9    shown, just let us know you can't see it and counsel will make

10   it larger for you to see.

11   Q.  Okay.  I'm afraid she can't do it because of this, the

12   format.  So I'm just going to go slowly.  I'll tell you the

13   line we're going to start on, okay?

14   A.  Yes.

15   Q.  So we'll try this again.  63, line 22.  This is your first

16   deposition -- or your second deposition.  You're under oath

17   here, correct?

18   A.  Correct.

19   Q.  Okay.  "Okay.  So is it Eastern Profit's position that --

20   let me back up.  Is it Eastern Profit's position that you are

21   to handle negotiations with ACA regarding the million dollar

22   loan?"  Did I read that correctly so far?

23   A.  You read correctly, sir.

24   Q.  Then you said:  "In my understanding, from the moment I

25   knew the loan, I should help Eastern to handle everything."

L4LPEAS1                          Wang - Cross

1          Did I read that correctly?

2     A.  You did it correctly, sir.

3     Q.  And then question on line 7:  "From the first time you

4     learned of the loan, you believed it was your responsibility to

5     handle issues regarding the loan?

6     "A.  Yes."

7          Did I read that right?

8     A.  You did it great.

9     Q.  Okay.  And then:

10    "Q.  And you first learned of the loan sometime in 2018, right?

11    "A.  Yes."

12         Did I read that correctly?

13    A.  Correct.

14    Q.  Okay.  That testimony was truthful?

15    A.  Correct.

16    Q.  Now, you testified to a meeting you had with William Je or

17    William Yu in the fall of 2018, correct?

18    A.  I beg your pardon?

19    Q.  Do you recall having a dinner with William Yu or William Je

20    in the fall of 2018?

21    A.  Correct.

22    Q.  How do you pronounce his name?  How do you -- what do you

23    know William's name to be?

24    A.  William Je.

25    Q.  Okay.  J-e?

L4LPEAS1                          Wang – Cross

1    A.  Correct.

2    Q.  Now, at your second deposition, I think you testified that

3    you only knew William Yu, and you pronounced it Y-u.  Do you

4    recall that?

5    A.  Correct.

6    Q.  Is it the same person, just different way to pronounce the

7    last name?

8    A.  The same person, different pronunciations between Cantonese

9    and Mandarin.

10   Q.  Okay.  Now, ACA asked for repayment of the loan because the

11   Strategic Vision contract produced nothing, correct?

12   A.  I beg your pardon?

13   Q.  ACA asked for repayment of the loan because the Strategic

14   Vision contract produced nothing, correct?

15            MS. CLINE:  Objection, foundation.

16            THE COURT:  Overruled.

17   A.  ACA ask for payback because Eastern Profit borough money

18   from ACA.

19   Q.  Let's pull up R66, and you'll see that you were asked at

20   line 14:

21   "Q.  Are they asking for the money back because the term -- the

22   contract was terminated?

23   "A.  Obviously.  Obviously, correct, because this contract

24   produced nothing."

25            Did I read that correctly?

1    A.   You did it correctly, sir.

2    Q.   ACA and Eastern Profit shared the same goals for the

3    contract; is that right?

4    A.   For this investigation project, correct.

5    Q.   And you testified that William Je was also being prosecuted

6    and persecuted by the CCP, correct?

7    A.   Correct.

8    Q.   And William Je's goal was to take down the CCP?

9    A.   Is that a question?

10   Q.   Yes.

11   A.   Correct, sir.

12   Q.   And so ACA was willing to forgive the loan if the results

13   of the research were effective, correct?

14   A.   It depends on ACA's direction on it.

15   Q.   Right.  But if the results were effective, ACA was willing

16   to forgive the loan?

17   A.   I mean, I guess so, but I cannot talk on behalf of ACA.

18   Q.   But that's what you heard from William Je, correct?

19   A.   I don't remember that, but probably, yes.

20   Q.   William Je wanted to receive the research from the loan --

21   I'm sorry, from the project, correct?

22   A.   I beg your pardon?

23   Q.   William Je wanted to receive the research from the project,

24   correct?

25   A.   He want to receive the one million loan back.

L4LPEAS1                         Wang – Cross

 1   Q.  But he also wanted to receive the research, didn't he?

 2   A.  He didn't mention to me.  I don't remember.

 3   Q.  C23.

 4             (Video being played)

 5             THE COURT:  Let me instruct both counsel that if you

 6   want the Court to focus on deposition testimony, that you

 7   should provide the page and the line and not just play videos;

 8   so that the record reflects what is being shown to the witness.

 9   Otherwise, we just have a big exhibit without any reflection of

10   what's being shown.

11             MR. GREIM:  Right.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1              MR. GREIM:  We will finish the clip, and I will read

2     back.

3              (Video playback)

4     BY MR. GREIM:

5     Q.  That testimony was truthful when you gave it, wasn't it?

6     A.  Correct.

7              MR. GREIM:  What we played was Wang's second

8     deposition, page 4622 to page 4714.

9     BY MR. GREIM:

10    Q.  Mr. Je wanted to be repaid the loan with interest, right?

11    A.  I believe so.

12    Q.  And this loan accrued interest at the rate of $20,000 a

13    month, right?

14    A.  It's a six months' loan, correct.

15    Q.  Well, the loan continued to accrue interest after its

16    maturity, didn't it?

17    A.  I believe so.

18    Q.  And it was compounding monthly, right?

19    A.  What do you mean compound?

20    Q.  Well, after the first month with interest, the $20,000 was

21    added to the principal, right, and then the second month would

22    be 20 percent of the first month's new principal balance; isn't

23    that right?

24    A.  I didn't handle the loan terms by myself.  I don't have

25    personal knowledge about that.

1   Q.  Well, sometime between the time you learned about this loan

2   in 2018 and today, serving as the agent of Eastern Profit in

3   this case, you've never learned what that meant?

4   A.  I learned about this agreement.  It's a six-month loan.

5   Q.  What did Mr. Je tell you?  What does he want?

6   A.  He want the loan to be paid back.

7   Q.  With interest, correct?

8   A.  Correct.

9   Q.  And so by this point, about 30 months of interest would

10  have accrued, correct?

11          Well, let me give you the correct math.

12          By this point, about 28 months of interest would have

13  accrued, correct?

14  A.  If the math is correct, yes.

15  Q.  Two years and four months?

16  A.  Correct.

17  Q.  And so the first interest payment was 20,000, but it

18  increased each month after that, didn't it?

19  A.  If the loan agreement say that, yes.

20  Q.  So, when is the last time you spoke with Mr. Je about

21  wanting repayment on this loan?

22  A.  A month ago.

23  Q.  Okay.  Did he tell you what the total principal plus

24  interest that he's demanding is?

25  A.  I don't remember all the detail.

L4LKEAS2                          Wang - Recross

1    Q.  Has he ever given you anything in writing on the exact

2    amount he's asking for?

3    A.  I don't remember that.

4    Q.  So, all of these discussions about repayment are just

5    happening orally between you and William Je?

6    A.  And in person, also.

7    Q.  In person.  When you spoke to him a month ago, was he

8    within this jurisdiction?

9    A.  Month ago, that was phone call.  In person, that was the

10   testimony I did already.

11   Q.  When is the last time you saw William Je in person?

12   A.  Before pandemic.  2018.

13   Q.  Well, 2018 was well before the pandemic.  It doesn't seem

14   like that now.  Was it just before the pandemic, or was the

15   last time you saw him 2018?

16   A.  I believe I saw him 2019, also, yeah.  I don't remember

17   which date, but it's before the pandemic.

18   Q.  So you have not seen this man since 2019?

19   A.  I didn't see him since the pandemic.

20   Q.  Okay, well, the pandemic started in, what, March -- about a

21   year ago, March of 2020, correct?

22   A.  Correct.

23   Q.  But did you see him just before that?

24   A.  I don't remember clearly.

25   Q.  Did you see him after I deposed you in this case the second

L4LKEAS2                          Wang - Recross

1    time in October of 2019?

2    A.  I don't remember that clearly.

3    Q.  So you spoke on the phone, and your testimony is he didn't

4    give you an exact amount that you had to repay?

5    A.  I don't remember that.

6    Q.  Have you ever asked him to stop charging $20,000 a month

7    interest?

8    A.  I didn't.  I don't remember that.

9    Q.  Well, I'm curious what Eastern Profit thinks it needs to

10   repay Mr. Je.  You just have to pay him back the million

11   dollars, or do you have to pay him back a million dollars plus

12   $20,000 a month compounding monthly since December of 2018,

13   2017?  Which one?

14   A.  I believe, based on the loan agreement, should be all of

15   them, if we win this case.

16   Q.  Has Mr. Je ever told you that?

17   A.  Told me about what, sir?

18   Q.  Let me ask you.  You say "if we win this case."  If you

19   don't win this case, is he going to forgive the loan?

20   A.  That's his take.  I don't know.

21   Q.  Has he said that to you?

22   A.  No, never.  He's asking for payback.

23   Q.  Has he sued you for repayment of the loan balance?

24   A.  Sued me?

25   Q.  I'm sorry.  Has he sued Eastern Profit?

L4LKEAS2                        Wang - Recross

1   A.  I didn't hear about that.

2   Q.  I guess I just want to understand the claim of Eastern

3   Profit here.  Is Eastern Profit seeking a million dollars plus

4   $20,000 a month since December of 2017?

5   A.  Based on the loan agreement, yes.

6   Q.  But it sounds like you don't know whether Mr. Je is

7   actually asking for that much money from you?

8   A.  It's clearly in the loan agreement.  It doesn't need to be

9   in the paperwork.

10  Q.  So if Eastern Profit prevails, it's going to seek $20,000 a

11  month since December of 2017, and ACA is going to walk away

12  with its million dollars back plus $20,000 a month?

13          MS. CLINE:  Objection.  I think Mr. Greim is calling

14  for a legal conclusion and conflating some issues that makes

15  the question confusing.

16          THE COURT:  You should refrain from speaking

17  objections.

18          The objection is overruled.

19          THE WITNESS:  Can you say your question again?

20          MR. GREIM:  I'd like the court reporter to read it

21  back.

22          THE COURT:  Yes, the court reporter may read it back.

23          If counsel wants the court reporter to read back

24  something, the proper way to do it is to ask me if the court

25  reporter would read it back.  The court reporter takes my

L4LKEAS2                         Wang – Recross

1    direction, not your direction.

2            MR. GREIM:  My apologies, your Honor.

3            (Record read)

4            THE WITNESS:  I don't believe ACA will walk away from

5    the principal and interest.  I mean, I still have a little

6    problem to understand the question, but this is what I can tell

7    you.

8    BY MR. GREIM:

9    Q.  Okay.  Well, that's fair, and that was -- as I heard my own

10   question, I used the word "walk away."  I shouldn't have done

11   that.

12           So, if Eastern Profit prevails in this case, it's

13   going to pay the money it receives, your testimony is, back to

14   ACA, correct?

15   A.  Correct.

16   Q.  And so it will pay ACA, ACA will gain the million dollars

17   back plus $20,000 a month since the loan was taken out,

18   correct?

19   A.  Correct.

20   Q.  William Je asked you about the progress of the lawsuit

21   after your first deposition, didn't he?

22   A.  Correct.

23   Q.  Sometime after that first deposition is when you actually

24   saw the loan agreement itself for the first time, right?

25   A.  Correct.

1   Q.  You hadn't even seen the loan document when you testified

2   in January of 2019, right?

3   A.  I believe so.

4   Q.  You were the agent of Eastern Profit, and that was over a

5   year after the loan was taken out, right?

6   A.  I am the agent.  I know the loan agreement.  Doesn't mean I

7   have to see the paperwork.

8   Q.  And you can't -- well, the first time you saw it was in

9   your prior counsel's litigation file, correct?

10  A.  Correct.

11  Q.  And you don't know how Eastern Profit came up with that

12  document, do you?

13  A.  I don't remember that clearly.

14  Q.  Well, not only do you not remember, you just don't know, do

15  you?

16  A.  I don't remember that.

17  Q.  So did you know at one time where the document came from?

18  A.  I don't remember that.

19  Q.  Because Eastern Profit didn't keep a copy of the loan after

20  it was supposedly signed, did they?

21  A.  I don't know that detail.

22  Q.  That's a pretty important document in this case, isn't it?

23  A.  You're right, sir.

24  Q.  Is there anyplace where Eastern Profit keeps its financial

25  records?

L4LKEAS2                        Wang - Recross

1    A.  I don't have personal knowledge about that.

2    Q.  Well, have you heard about it?

3    A.  I don't remember that.

4    Q.  Who might possibly know the answer to that question?

5    A.  I cannot guess, but the principal of Eastern Profit.

6    Q.  That's Mr. Han Chunguang.  He's the one who knows?

7            I guess you say you don't know, correct?

8    A.  I don't know.

9    Q.  How about Guo Mei?

10   A.  I don't know about that.

11   Q.  She's in the U.S., correct?

12   A.  Correct.

13   Q.  You can talk to her anytime?

14   A.  We talk as needed.

15   Q.  You didn't get it from her, did you?

16   A.  I didn't get it by myself.

17   Q.  Let me ask you:  How was the research result from Strategic

18   Vision, had it been what you wanted, how would that have caused

19   Eastern Profit's assets to have been unfrozen?

20   A.  I beg your pardon?

21   Q.  If Strategic Vision had provided the research results that

22   you were looking for, how would that have helped to unfreeze

23   Eastern Profit's assets in its Hong Kong bank account?

24   A.  The successful high quality investigation deliverable

25   reports with the corrupted Chinese governmental officials,

corruption, and their illegal criminal assets proof, evidence,

we potentially will be able to get a chance to report to them

to the authorities and have the criminal Chinese governmental

official arrested, in jail, and hopefully the persecuted

company and individual, they could be rescued and saved.

Q.   Okay.  Now, these corrupt CCP officials, they didn't come

in and take the $80,000 in Eastern Profit's bank account, did

they?

A.   They are the last 1 percent of Chinese Communist Party

member.  They're high-level government official.  They are

manipulating and misusing the country's daily machine to do

this.  They don't need to do that by their own hands, to answer

your question.

Q.   Sure.  And my question is a little bit different.  I

understand what you've said.

     My question, though, is this:  They have not actually

taken the funds out of Eastern Profit's bank account, correct?

They're frozen, they have not been taken from the account; is

that right?

A.   I believe so.  I don't have the personal knowledge about

that.

Q.   Who knows the answer to that?

A.   I don't know.

Q.   Well, who's watching the shop at Eastern Profit?

A.   I beg your pardon?

L4LKEAS2                          Wang – Recross

1    Q.  I'm sorry, I shouldn't have done that.

2            Who is watching the affairs of Eastern Profit?  Who's

3    in charge?

4    A.  The Eastern Profit principal.

5    Q.  So Han Chunguang is monitoring that account in Hong Kong?

6    A.  I don't have personal knowledge about that.

7    Q.  What's the status of the proceeding in the order that I

8    showed you earlier today in the high court of Hong Kong, do you

9    know?

10   A.  It's a completely political-driven persecuted by the

11   Chinese Government and the Hong Kong special district

12   government.

13   Q.  Is the case still going on right now?

14   A.  I don't have personal knowledge.

15   Q.  Have the assets been unfrozen?

16   A.  I don't have personal knowledge.

17   Q.  Is Eastern Profit doing anything in the case to unfreeze

18   its assets?

19   A.  Like this investigation?  Hire this firm?

20   Q.  Well, anything.

21           Let me ask you a better question.

22           Is Eastern Profit doing anything in Hong Kong right

23   now in the proceeding?  Does it have counsel?

24   A.  I don't have personal knowledge.

25   Q.  Is it making any filings in Hong Kong to try to expose the

1   corruption and unfreeze the assets?

2   A.  I don't have personal knowledge.

3   Q.  Did Eastern Profit hire any lawyers to work with Strategic

4   Vision in Hong Kong, so they could use the research that

5   Strategic was going to find?

6   A.  There's no research result.  Why Strategic -- Eastern

7   Profit should hire law firm in Hong Kong?

8   Q.  So Eastern was waiting to get the Strategic Vision research

9   before hiring counsel in Hong Kong?

10  A.  I don't have personal knowledge, but possible, if there is

11  real deliverable reports delivered.

12  Q.  Now, this loan agreement had a six-month maturity, right?

13  A.  Correct.

14  Q.  It had to be repaid in June of 2018?

15  A.  Say your question again, sorry, sir?

16  Q.  It had to be paid in June of 2018?

17  A.  I don't remember detail, but if the loan agreement say

18  that, yes.

19  Q.  So did Eastern Profit expect that Strategic would deliver

20  the research, and you would be able to prosecute the corrupted

21  officials in time to release the assets to pay back the loan

22  agreement?

23  A.  Correct.

24  Q.  Who came up with this plan for Eastern Profit?

25  A.  Sorry, sir, what's your question?

L4LKEAS2                          Wang - Recross

1   Q.  Who devised this plan for Eastern Profit?

2   A.  The principal of Eastern Profit.

3   Q.  So this was Han Chunguang's plan?

4   A.  I'm not quite sure.  Could be Mei Guo.  Both of them, they

5   were persecuted.  Mei Guo was even in jail in China.

6   Q.  But when you spoke to Mei Guo, she didn't even know about

7   this project, remember?

8   A.  She doesn't know Strategic Vision's name.

9   Q.  I see.

10          So now your testimony is she knew about the project,

11  she just didn't know the name of Strategic Vision?

12  A.  She was not involved in this project.

13  Q.  Okay.  So she didn't know about the project, did she?

14  A.  I cannot talk on behalf of her.

15  Q.  Well, but you did sign interrogatory responses that were

16  supposed to list the names of people who had knowledge, right?

17  A.  Correct.

18  Q.  You didn't list her in those responses, did you?  We just

19  looked at them.

20  A.  Correct.

21  Q.  It was your job to find the people who did have knowledge,

22  wasn't it?

23          MS. CLINE:  Objection.  My understanding was the Court

24  wanted to talk at sidebar about that document.

25          THE COURT:  No, no.  The objection is overruled.

1              THE WITNESS:  Sorry?

2    BY MR. GREIM:

3    Q.  It was your job to find the people with information, so you

4    could report them in that document, wasn't it?

5    A.  Correct.

6    Q.  And Mei Guo was a director of Eastern Profit, right?

7    A.  Correct, but she doesn't need to be involved in the

8    details.

9    Q.  She's the sole director and the owner of all the shares of

10   Eastern Profit, right?

11   A.  Correct.  But she authorized me.

12   Q.  Well, was Eastern Profit doing lots of other activity other

13   than this project?

14   A.  I don't have personal knowledge.

15   Q.  So I think your testimony is that Eastern Profit has no

16   assets it can use at this time, right?

17   A.  They were frozen.

18   Q.  And Golden Spring is not getting paid for all the work it's

19   doing here through your time, correct?

20   A.  Which Golden Spring?

21   Q.  Golden Spring New York.

22   A.  Correct.

23   Q.  Is Golden Spring -- China Golden Spring being paid for your

24   time here?

25              MS. CLINE:  Objection; relevance.

1            THE COURT:  Overruled.

2            THE WITNESS:  No.

3  BY MR. GREIM:

4  Q.  Well, who is paying, then, for the attorneys in this case

5  for Eastern Profit?

6            MS. CLINE:  Objection; relevance.

7            THE COURT:  Yes, what's the relevance?

8            MR. GREIM:  I'm trying to establish, ultimately, who

9  it is that is funding this entire matter.  I'm trying to show

10  that there's not really a loan here, that this is somebody

11  else's money that's paying for everything in this matter.

12            THE COURT:  I think you can ask it more directly if

13  ACA is paying for the defense.  I'll permit that question.

14  BY MR. GREIM:

15  Q.  Is ACA paying for the defense of this case?

16            THE COURT:  Prosecution.

17  Q.  Prosecution of this case?

18  A.  I don't remember that.

19  Q.  Did you know at one time whether it was?

20  A.  It's a three years -- no, I don't remember that.

21  Q.  I think that question wasn't very clear.

22            So, these lawyers are being paid here to be at this

23  trial and to do the work in the case, and then there are

24  lawyers sitting ahead of us who are also being paid, correct?

25  A.  Correct.

L4LKEAS2                          Wang - Recross

1    Q.  And my question is:  Is ACA paying these lawyers that are

2    prosecuting this case for Eastern Profit?

3    A.  No.

4    Q.  Do you know -- I'm not going to ask you to answer it based

5    on the Court's instruction.  Do you know the answer, though, of

6    who is actually paying?

7           MS. CLINE:  Objection; relevance.

8           THE COURT:  I'll permit that question.

9           THE WITNESS:  What's your question, sorry?

10   BY MR. GREIM:

11   Q.  You said it wasn't ACA that was paying the lawyers for

12   Eastern Profit, but do you know who it is?  And don't answer

13   who it is; I just want to know whether you have knowledge of

14   who is paying the lawyers for Eastern Profit.

15   A.  Yes, I do.

16   Q.  Now, you testified that you told Han Chunguang that he

17   needed to come up with a million dollars for the deposit for

18   the research agreement, correct?

19   A.  Correct.

20   Q.  You told him that sometime in late December 2017?

21   A.  Correct.

22   Q.  And you knew the amount of the deposit because by that

23   time, you had taken over the negotiations, correct?

24   A.  Correct.

25   Q.  And you had a copy of the draft agreement, right?

L4LKEAS2                        Wang - Recross

1    A.   Correct.

2    Q.   And that draft agreement specified $750,000 per month would

3    be paid, correct?

4    A.   It's paid by deliverable reports.

5    Q.   Sure, okay.   I understand we have a difference on the

6    theory, but the agreement itself, regardless of what triggers

7    the payment, does say that $750,000 will be paid every month,

8    doesn't it?

9    A.   The payment only be made if there is high quality

10   deliverable reports, investigation reports.

11            THE COURT:   Ms. Wang, would you answer the question.

12   The question just goes to whether you know what the agreement

13   says and whether it says what counsel asked you it said.

14            The court reporter can read back the question.

15            (Record read)

16            THE WITNESS:   I don't believe that's my term.

17            MR. GREIM:   We better pull this up.   Let's pull up

18   DX 4.

19            You know what, let's move on.   We won't go through

20   this.

21   BY MR. GREIM:

22   Q.   Did you tell Han Chunguang that he needed to be making

23   arrangements to pay $750,000 after the first month of the

24   agreement?

25   A.   No.   The investigation was terminated because of a bad

1   quality.

2   Q.  Okay.  Let's go back to the time you asked him to look for

3   a million dollars.  That was in late December 2017, as you just

4   testified, correct?

5   A.  Correct.

6   Q.  Did you tell him that he needed to be thinking about where

7   to find $750,000 for the first month's payment?

8   A.  I don't remember that.

9   Q.  Do you think you might have told him?

10  A.  I didn't recall.

11  Q.  Wouldn't it have been important for Eastern Profit -- you

12  were the project manager.  Wouldn't it have been important for

13  Eastern Profit to make sure it could pay the first three months

14  of the contract, $750,000 each month?

15  A.  Correct.

16  Q.  But you don't remember telling Han Chunguang to do that, do

17  you?

18  A.  Strategic Vision is able to accept the payment from

19  anybody.  I didn't specifically need to tell Eastern Profit to

20  take care of the rest of payments.

21  Q.  Well, Han Chunguang hadn't actually seen the agreement,

22  though, had he?

23  A.  You mean the research agreement?

24  Q.  Right.

25  A.  He did not see that.

1    Q.  So how was he going to know that 30 days in, he may have to

2    pay $750,000?

3    A.  Strategic Vision can be paid by anybody.

4    Q.  Okay.  And so how is Han Chunguang -- but you testified it

5    was Han Chunguang's job to go find a million dollars, right?

6    A.  Correct.

7    Q.  He went and did that, you testified?

8    A.  Correct.

9    Q.  Okay.  And so didn't you need to tell him that he needed to

10   get not just a million dollars, but another 750,000 just 30

11   days out?

12   A.  I didn't mention that to him by then.

13          MR. GREIM:  Your Honor, I'm getting ready to move on

14   to a new topic.  I don't know if this is a good time for --

15          THE COURT:  I think this is a good time for a break.

16   Just give me one moment.

17          (Pause)

18          THE COURT:  Mr. Greim, let me address myself to you,

19   and then I'll address myself to counsel.

20          The line of examination that I cut off was about the

21   signing of documents that were submitted to the Court and

22   whether those documents were not only incorrect, but were

23   signed with the knowledge that they were incorrect.  It raised

24   obvious Fifth Amendment questions, frankly.

25          My question to you, Mr. Greim, is whether you intend

1    to pursue that line.  I'm not going to restrict you from doing

2    so right now; I'm just asking the question, and my question to

3    plaintiff's counsel is whether the witness has a personal

4    lawyer.  But, Mr. Greim, what's your answer?

5              Why don't you think about it during the break.

6              Ms. Cline, why don't you think about it, also, during

7    the break.

8              We're adjourned for ten minutes.  Everybody should be

9    back by, let's call it, 11:15.

10             (Recess)

11             THE COURT:  Mr. Greim, with respect to the question I

12   left you with?

13             MR. GREIM:  Yes.  I actually had sort of a final

14   question to pursue, but I don't -- well, I don't want to say

15   too much, but I do want to pursue it just one step further, and

16   I'll speak slowly, and, hopefully, there will be a chance to do

17   something in that time.

18             THE COURT:  Why don't we put that off.  You'll tell

19   me, after we excuse the witness, what the question will be, and

20   then we'll decide whether we need to recall her, and you can

21   ask other questions.

22             Ms. Cline, does she have a personal counsel?

23             MS. CLINE:  Not on standby, your Honor, but we'd like

24   to look into that.

25             THE COURT:  All right.

1              Do you have other lines of examination, Mr. Greim?

2              MR. GREIM:  I do, I do.

3              THE COURT:  Then we will proceed.

4              Ms. Wang, you're reminded that you are still under

5     oath, and you're obligated to testify truthfully.

6              Mr. Greim, you may proceed.

7              MR. GREIM:  We are going to -- oh, by the way, I

8     wanted to offer before DX 5, which actually was the

9     interrogatory responses.  I failed do that, and I move to admit

10    those now.

11             THE COURT:  Okay.  Those are received subject to a

12    motion to strike.

13             (Defendant's Exhibit 5 received in evidence)

14    BY MR. GREIM:

15    Q.  Ms. Wang, please take a look at this document.  You'll see

16    we used this at your January 2019 -- or prior counsel used this

17    at your January 2019 deposition.

18             MR. GREIM:  Scroll on through, if you would, Becka.

19             THE COURT:  What is the document you're showing the

20    witness?

21             MR. GREIM:  This is DX 6.

22             Keep going.

23    BY MR. GREIM:

24    Q.  You see it's unsigned.  Do you see that, Ms. Wang?

25    A.  Yes, I did.

1    Q.  And it's Bates labeled EASTERN 1 through 4, and I will tell

2    you this was produced -- this is the very first document

3    produced by Eastern to us in this case.

4              Do you recognize this document?

5    A.  Yes.

6    Q.  Is this the draft that Guo Wengui handed to you when he

7    assigned to you to finish the agreement?

8    A.  I remember, yes.

9    Q.  This is, of course, different from the final version, isn't

10   it?

11   A.  Correct.

12   Q.  Let's go to page 3.  I want to direct you to the third from

13   the bottom section that says, "The pricing for ten units."  I

14   want to focus you on this on page 3.  It says, "The pricing for

15   ten units or deliverables for the first stage remains a

16   constant $3 million per year, or $250,000 per month for 12

17   months."

18              Did I read that right so far?

19   A.  Yes.

20   Q.  Now, those weren't the final numbers in the final

21   agreement, were they?

22   A.  I don't remember that clearly.

23   Q.  Well, let me just see if I can help you.

24              Do you recall that the final agreement was $9 million

25   per year, or $750,000 per month?

1    A.   Correct.

2    Q.   Then it says, "These units or deliverables may be mixed and

3    matched as the client requests.  As one unit is deleted from

4    one fish, an extra fish with the equivalent deliverable is

5    added, as shown in the attached charts."

6              Did I read that correctly?

7    A.   You did, yes.

8    Q.   And was that concept retained in the final agreement?

9    A.   I believe so.

10   Q.   And then let's look at the final sentence.  "Such payments

11   will be made following receipt of the agreed-upon number of

12   reports per month."

13             Did I read that correctly?

14   A.   Reports, yes.

15   Q.   Did that statement remain in the final agreement?

16   A.   I don't remember the precise words, but payment go by

17   reports, correct.

18   Q.   Well, that sentence was not kept in the final agreement,

19   was it?

20   A.   I don't remember that precisely.

21   Q.   Well, we don't --

22   A.   We can pull it out.

23   Q.   Let's pull it out.  Let's look at DX 4 and keep this one

24   handy.

25             Let's look at page 4, the middle of the page.  It

L4LKEAS2                          Wang - Recross

1   says, "The pricing for 30 units."  Do you see it says, "The
2   pricing for 30 units or deliverables per year remains a
3   constant $9 million per year, or $750,000 per month for 12
4   months"?
5           Did I read that right?
6   A.  Yes, sir.
7   Q.  And then it goes on and says, "These units or deliverables
8   may be mixed and matched as the client requests."
9           Did I read that right?
10  A.  Correct.
11  Q.  "As one unit is deleted from one fish, an extra fish with
12  the equivalent deliverable is added, as shown in the attached
13  charts."
14          Did I read that part right?
15  A.  Correct.
16  Q.  That last sentence is gone, though, isn't it?
17  A.  That's the reason why I ask you to pull up.
18  Q.  Yes, fair enough.
19          So you don't see it there, do you?
20  A.  Correct.
21  Q.  So let's go back to the last exhibit, back to DX 6.
22          So, the statement that was pulled out from the draft
23  was a statement that, "Such payments will be made following
24  receipt of the agreed-upon number of reports per month,"
25  correct?

1    A.  You read it correctly.

2    Q.  All right.

3            And, by the way, on this draft, Eastern Profit is not

4    yet identified as the signatory, is it?  We can go to the top

5    just to confirm that.

6    A.  Correct.

7    Q.  Now, the parties in this case have given lots of testimony

8    about the negotiations, and I'm going to ask you now a few

9    questions about that.

10           Ms. Wang, do you remember that the final dispute on

11   this contract was over the so-called waterline concept?

12   A.  Waterline fish.  That was the terms Ms. Wallop gave to us.

13   Q.  And do you recall that that was the final dispute that had

14   to be resolved on this contract?

15   A.  It's one of the dispute.

16   Q.  Okay, fine.  Was it one of the final ones that was

17   resolved?

18   A.  Sorry, what's your question?

19   Q.  Was it one of the final disputes that was resolved?

20   A.  Correct.

21   Q.  And Mr. Guo wanted an a la carte payment system, correct?

22   A.  I don't remember that clearly.

23   Q.  He wanted payments, payment per a report?

24   A.  That was my negotiation with Ms. Wallop.

25   Q.  Okay, okay, fair enough.  That's what you wanted.  Is that

1    what Mr. Guo wanted, too?

2    A.   He agreed with me.

3    Q.   And Ms. Wallop wanted a monthly payment or waterline,

4    correct?

5    A.   Correct.

6    Q.   Now, the final agreement, you testified before, was for a

7    three-month mandatory payment with a recap after three months,

8    correct?

9    A.   Correct.

10   Q.   And that was the truth, right?

11   A.   That was said in the contract.

12   Q.   Now, let's explore the waterline concept for a second.

13          Ms. Wallop insisted on mandatory monthly payments in

14   order to keep teams in the field, right?

15   A.   Correct.

16   Q.   And that's what was ultimately agreed to, isn't it?

17   A.   That was need to be approved that they are qualified team.

18   Q.   So the agreement said that the reports had to be approved

19   before payment?

20   A.   I beg your pardon?

21   Q.   The agreement said that the reports had to be approved

22   before payment?

23   A.   The reports has to be reported and reviewed with the

24   clients with high quality of investigation result, then the

25   payment can be made.

1          THE COURT:  Mr. Greim, I think you may have misspoken,

2     but I think the witness said that the teams had to be approved,

3     that they were qualified teams.  You asked about reports having

4     to be approved.

5          MR. GREIM:  Yeah, I wonder if that wasn't -- thank

6     you, your Honor.

7     BY MR. GREIM:

8     Q.  So, Ms. Wang, are you testifying that the teams themselves

9     had to be approved by Eastern Profit as well, not just the

10    reports?

11    A.  The team has to justify their performance by the reports.

12    Q.  I see.

13          So, what was being -- under your testimony, Eastern's

14    belief is that the reports had to be reviewed in order to

15    justify payment?

16    A.  The report has to be presented and reviewed, approved to be

17    qualified, yes.

18    Q.  Okay.  And so your testimony is that Eastern would review

19    the report, and then get back to Strategic and say, approved or

20    not approved, right?

21    A.  Strategic Vision are supposed to present a report to the

22    agents of Eastern Profit, like me, and Mr. Guo will help

23    review, also.

24    Q.  How about Lianchao Han, is he one of the agents?

25    A.  I have no personal knowledge.

1  Q.  Well, have you heard that he's one of the agents?

2  A.  I have no personal knowledge.

3  Q.  Now, I understand you have no personal knowledge.  My

4  question is:  Did you hear from anyone else that Mr. Lianchao

5  Han was one of the people to whom Strategic could report?

6  A.  I didn't recall.

7  Q.  You just don't know either way?

8  A.  Correct.

9  Q.  Now, who, ultimately, then, had to approve the quality of

10 the reports before payment would be released under your

11 understanding?

12 A.  The agents of Eastern Profit, and the person obviously is

13 able to justify and review.

14 Q.  So you said it's Guo Wengui and yourself, for sure, right?

15 Those are two agents, correct?

16 A.  I'm the agent, yes.

17 Q.  Guo Wengui is an agent of Eastern Profit as well, isn't he?

18 A.  I don't know whether he has paperwork, but he is supposed

19 to review, also, because he has the knowledge.

20 Q.  And he was the one who was going to use the research,

21 correct?

22 A.  He is one of them, yes.

23 Q.  So, ultimately, you testified that a compromise was reached

24 between the a la carte system and what Ms. Wallop was asking,

25 the flat fee, correct?

1    A.  We got agreement, yes.

2    Q.  And that compromise was that for the first three months of

3    this agreement, in your understanding — January, February, and

4    March — the payment of 750,000 U.S. dollars would be wired to

5    Strategic's U.S. bank account, and then after that, there would

6    be a recap term; is that right?

7    A.  After qualified report were delivered, yes.

8    Q.  Well, let's pull up -- you testified on this before, didn't

9    you?  You've been asked this question before?

10   A.  Correct.

11   Q.  And you testified truthfully at that time?

12   A.  Yes.

13              MR. GREIM:  Let's play R54, or I guess show it.

14              THE COURT:  Please, the exhibit number, page, and

15   line, and let plaintiff's counsel know, also, what you're going

16   to be showing the witness.

17              MR. GREIM:  Sure.

18              We're going to show Wang's first exhibit -- I'm sorry,

19   first deposition, page 56, 9 to page 58, 18.

20   BY MR. GREIM:

21   Q.  You'll see you were asked --

22              MR. GREIM:  I'm going to go to 56; we're actually

23   going to start at line 4.  It should be in the January 31, 2019

24   deposition.  It should be on page 56.

25              THE COURT:  56, 4 to 58, 15; is that right, counsel?

1          MR. GREIM:  Well, actually -- yes, it will be 56, 4

2     and then, yes, to 58, 18.

3     BY MR. GREIM:

4     Q.  And you will see you were asked at line 4:

5     "Q.  And the negotiations, what did they lead to?  What was the

6     final agreement, in your view?

7     "A.  We had, I remember, we had totally three meetings and, by

8     the end, compromised."

9          Did I read that right so far?

10    A.  Correct.

11    Q.  Answer on line 9:

12    "Q.  How did you compromise?  Is it reflected in the final

13    agreement?

14    "A.  Correct."

15          Line 12:

16    "Q.  Why don't you pull out the final agreement and show me

17    where that compromise is reflected?  It's Exhibit 2.

18    "A.  So you want me to explain what is the compromise?

19    "Q.  Well, I asked you whether the compromise -- you said there

20    was a compromise, and I asked you if it was in the final

21    agreement.  I believe you said yes?

22    "A.  Yes, I said that."

23          Did I get that correctly so far?

24    A.  You read it correctly.

25    Q.  All right.  And then another question was asked:

1    "Q.  Now you've got the final agreement in front of you, and I

2    would like you to point out where it is reflected."

3            And then you see that the court reporter typed in:

4    "Witness peruses document."  That means you looked at it.

5            And then you see now 57, line 2, you say:

6    "A.  Yes, it's on page 4.  If you see second paragraph, it is

7    agreed by both parties that for the first three months of this

8    agreement — January, February, and March 2018 — that the

9    payment of $750,000 will be wired per our instruction to our

10   U.S. bank account, and after that, there is a recap term.

11       "What is the recap?  Oh, yes, it is also agreed by both

12   parties that after the March reports and the payments are made,

13   that all involved parties will meet to recap the accounting."

14           Did I read that right so far?

15   A.  You read it correctly.

16   Q.  When you were answering, you were looking directly at the

17   research agreement, right?

18   A.  Correct.

19   Q.  Question:

20   "Q.  What does that mean, in your view?  What is your

21   understanding of that term?

22   "A.  That means in the very beginning, Strategic Vision, I mean

23   Mrs. Wallop, requested $750,000 per month for 12 months, and

24   obviously the client, I mean Mr. Guo, they don't like that, and

25   they didn't agree.

1    "Q.  They did or did not agree?

2    "A.  They did not.  So the compromise here is that recap.

3    Finally, Mrs. Wallop advised or stressed it for the first three

4    months, please pay $750,000 per month, and after the first

5    three months, by the end of March, let's recap.  See, so you

6    guys still pay me 750,000, or there's a lower or higher, she

7    called, waterline."

8            Did I read that correctly so far?

9    A.  You read it correctly.

10   Q.  And was that truthful when you gave it?

11   A.  I was giving you what I was told by Mrs. Wallop, and then

12   compromise means we finally get agreement.

13   Q.  My only question is were you answering truthfully in this

14   testimony?

15   A.  I always.

16   Q.  So let's go on to line 6:

17   "Q.  So the agreement for the first three months, it was going

18   to be 750,000 for January, 750,000 for February, and 750,000

19   for March, right?

20   "A.  Correct."

21           And then there's an objection from your counsel, and

22   then you say, "Waterline."

23           Did I read that correctly?

24   A.  Correct.

25   Q.  Now, the agreement did require $750,000 per month, didn't

1   it?

2   A.   With deliverable reports, yes.

3   Q.   Let's go on.  Let's look at page 58, line 19:

4   "Q.  How about the -- what is your understanding of the fourth

5   paragraph down, 'The pricing for 30 units or deliverables per

6   year remains a constant $9 million per year, or $750,000 per

7   month for 12 months'"?

8            Did I read that right so far?

9   A.   Correct.

10  Q.   By the way, that's the language we just looked at a second

11  ago, isn't it, when we were comparing the draft agreement with

12  the new agreement?  We just looked at that language, didn't we?

13  A.   We did.

14  Q.   And your answer was 24, line 24, page 58:

15  "A.  You were pointing the correct point.  This is Mrs. Wallop

16  called waterline, which she is able to maintain her

17  investigation team waterline, and she said that this is

18  mandatory.  That is if you want this project, you have to pay

19  minimum to keep waterline."

20           Did I read that right?

21  A.   This is what I told -- what I was told.

22  Q.   Did I read that correctly?

23  A.   You did.

24  Q.   Question:

25  "Q.  In other words, that, in part, encompassed what it was

1  going to cost Strategic Vision to keep teams out in the field

2  and available in order to do the work for Eastern Profit,

3  right?"

4          Answer on line 9 now, 9, 11:

5  "A.  Based on her explanation, she said, yes, that is

6  professional, and that is a mandatory request.

7  "Q.  And that ended up in the final contract?

8  "A.  Correct."

9          Did I read that correctly?

10 A.  Correct.

11         THE COURT:  Ms. Wang, were those answers truthful?

12         THE WITNESS:  This is what I was told, your Honor.

13         THE COURT:  Did you testify truthfully in your

14 deposition?

15         THE WITNESS:  Correct.

16 BY MR. GREIM:

17 Q.  We're going to shift gears here a little bit, Ms. Wang, and

18 go back to some of the questions that Eastern's counsel asked

19 you about your background.

20         Now, she asked you about your educational background.

21 Do you recall that?

22 A.  Yes, I do.

23 Q.  Did you give a complete answer of your college and above,

24 your education from college and above?

25 A.  I did not.

1   Q.  Okay.  What did you leave out?

2   A.  I cannot give that information.

3   Q.  Why not?

4   A.  Because all information will become to be public, the

5   Chinese Communists is going to come after me, and my

6   personally, and my family.  I'm protecting my privacy.

7   Q.  Ms. Wang, did you go to the People's Liberation Army

8   Foreign Language Institute at Luoyang?

9   A.  It's ridiculous.  Never.  Never.

10  Q.  Where did you go before you went abroad to Switzerland?

11  A.  I cannot tell you.

12  Q.  Where did you go to school in China?

13  A.  I cannot tell you either.

14  Q.  Where did you get your college degree in China?

15  A.  I cannot tell you.

16  Q.  How is disclosing that information here going to somehow

17  cause CCP retaliation against you or others?

18  A.  I beg your pardon?  What's the question?

19  Q.  I guess I just want to understand how telling us the place

20  where you received your training before you went to

21  Switzerland, how that will cause CCP retaliation against you.

22  A.  I never heard about this.  This is ridiculous.

23  Q.  Well, I'm sorry, maybe I don't understand the reason that

24  you aren't going to tell us the answer.

25              Why are you not telling us where you were trained in

L4LKEAS2                         Wang - Recross

1     China before you went to study international relations abroad?

2     A.  I was never trained by the CCP, period.

3     Q.  What is the place where you went to school?

4     A.  I cannot tell you.

5     Q.  Was it on the Mainland?

6     A.  I cannot tell you.

7     Q.  Where did you grow up?

8              MS. CLINE:  Objection; relevance, your Honor.

9              THE COURT:  You asked about education and her

10    background, so I think it's fair cross-examination.  He's not

11    directing the witness to answer the questions other than to

12    give the answers that she's given.  If there's an application

13    with respect to it by either side, I'll hear counsel after the

14    line of examination is done.

15             You may proceed, Mr. Greim.

16    BY MR. GREIM:

17    Q.  Where did you grow up in China?

18    A.  In Mainland China.

19    Q.  I'm sorry, where?

20    A.  Mainland of China.

21    Q.  And did you get your college education on the Mainland of

22    China?

23    A.  I cannot tell you.

24    Q.  Did you receive training in foreign languages in Mainland

25    China?

1   A.   I cannot tell you.

2   Q.   And the basis is fear of persecution?

3   A.   The basis is to protect the persecution against the --

4   protect my family against persecution, and myself.  All of this

5   answer is going to go to public, period.

6   Q.   But if you were not trained by -- I don't understand how

7   the answer to this question -- and just tell us, tell the

8   Court, how your answer to this question will expose your family

9   to persecution.

10  A.   What's your question?

11  Q.   I'd ask you to tell us why answering where you received

12  your training in China will expose your family to persecution.

13  A.   My family, they were already arrested.  They are still in

14  jail.  If I tell you my school, my college, how you know the

15  Chinese Government is not going to go after my classmates, my

16  professor, my teacher?

17  Q.   Did you receive any intelligence training in China?

18  A.   Never.

19  Q.   Is that the truth?

20  A.   Of course.

21  Q.   As of 2017, you had spent most of the last 16 years working

22  in Hong Kong, correct?

23  A.   You mean 16 years in Hong Kong?

24  Q.   Correct.

25  A.   I cannot tell you.

1   Q.  Well, in 2017, you had been in the United States for about

2   two years, correct?

3   A.  Almost.

4   Q.  And when you came to the U.S., where did you come from,

5   Hong Kong or the Mainland?

6   A.  From Mainland.

7   Q.  And you spent many years working in Hong Kong, did you not?

8   A.  I cannot tell you.

9           THE COURT:  Are you refusing to answer that question?

10          THE WITNESS:  Yes, your Honor, if I can.

11  BY MR. GREIM:

12  Q.  What is the reason you're refusing to answer?

13  A.  Protect my family, my colleague, and people around me.

14  Q.  Well, you've already testified that you worked for China

15  Golden Spring in Hong Kong, correct?

16  A.  Correct.

17  Q.  How many years were you working for China Golden Spring in

18  Hong Kong?

19  A.  A couple of years.

20  Q.  What do you mean, two or three or more like five or ten?

21  A.  Two to three.

22  Q.  Were you working somewhere in Hong Kong before that?

23  A.  I cannot tell you.

24  Q.  I think it's fair to say — tell me if you disagree from

25  your testimony — that your testimony is that the CCP has

1    substantial influence, if not control, over Hong Kong, correct?

2    A.   What's your question?  Sorry?

3    Q.   Well, is it your testimony that the CCP has at least

4    substantial influence over Hong Kong?

5    A.   Correct.

6    Q.   I guess we should probably differentiate because of the

7    recent events.

8              Let's go from -- during the time you were there, did

9    the CCP have substantial influence over Hong Kong?

10   A.   CCP start to have influence from 1997 to Hong Kong.

11   Q.   And is one of the ways in which the CCP exerted its

12   influence in Hong Kong through patriotic groups?

13   A.   Sorry, what's your question?

14   Q.   Is one of the ways in which the CCP exerted its influence

15   in Hong Kong through patriotic groups?

16   A.   I don't understand your question.

17             (Continued on next page)

18

19

20

21

22

23

24

25

L4LPEAS3                        Wang - Cross

1    Q.  Have you -- so have you ever heard of a concept in Hong

2    Kong of groups that are called patriotic groups?

3              MS. CLINE:  Objection, relevance.

4              THE COURT:  Overruled.

5    A.  I don't remember this.

6    Q.  You never heard that term before?

7    A.  I mean, there are so many group in Hong Kong, I do not

8    recall.

9    Q.  How did the CCP assert its influence in Hong Kong after

10   1997, during -- let's just say during the time you were there?

11   How did it assert its influence?

12   A.  For example, CCP change the basic laws of Hong Kong, right?

13   CCP mandatory request all the Hong Kong case to learn Mandarin

14   on top of Cantonese.  There is many way.

15   Q.  Did it do it through private groups?

16   A.  I mean, I am not CCP.  I cannot tell.  What do you mean

17   "private groups"?

18   Q.  Okay.  Well, let's go to that question.  You were CCP for

19   most of your life, you testified, until, you said,

20   January 2017, right?

21   A.  I was misled, and I was requested by CCP, when I was known

22   nothing about CCP, by them.

23   Q.  But you were a member of the CCP until January of 2017,

24   right?  That was your testimony?

25   A.  My testimony is until the beginning of 2015.

L4LPEAS3                          Wang - Cross

1   Q.  I see.  So actually -- so you left the CCP at the beginning

2   of 2015?

3   A.  What do you mean "left"?

4   Q.  Well, I guess I ask you that question.  When did you --

5   when were you no longer a member of the CCP?

6   A.  To recall back from 2015, I left the country.  I never came

7   back, and then from 2017 we started this whistleblowing

8   movement.  We officially go against the CCP.

9   Q.  So is it your testimony that after you joined the

10  whistleblowing movement, you were no longer a member of the

11  CCP?

12  A.  Before I joined.

13  Q.  So you quit the CCP first, then you joined the

14  whistleblowing movement?

15  A.  I quit CCP since I left the country because I never came

16  back again.

17  Q.  And so when did you join the whistleblowing movement?

18  A.  The whistleblowing movement started officially from

19  beginning of 2017.

20  Q.  And you are certain that you were no longer a member of the

21  CCP at that time, right?

22  A.  As for the fact, the facts, correct.

23  Q.  Well, what do you mean by "as for the facts"?  In some

24  sense were you still a member of the CCP?

25  A.  I am not a member of CCP, but to protect my family, who are

1   in jail and arrested, I have to fight and protect them at the

2   same time.

3   Q.  We'll come back to that in a second.  Let me go back to my

4   last line of questioning, though, here.  So you were a member

5   of the CCP while you were in Hong Kong, correct?

6   A.  When I was in Hong Kong, which year?

7   Q.  Well, before you came to the U.S., when you were in Hong

8   Kong, you were a remember of the CCP, right?

9   A.  Before 2015, correct.

10  Q.  And as a member of the CCP in Hong Kong, you weren't aware

11  of any associations, private associations, of people who

12  coordinated with the CCP?

13  A.  Sir, no.  Even I was CCP before, I was very, very inactive.

14  I have no idea what they doing about their party things.

15  That's the thing why I didn't agree, right, completely at all.

16  I don't have that knowledge.

17  Q.  How about the Hong Kong Federation of Youth Groups, have

18  you ever heard of that?

19  A.  Yes.

20  Q.  That's a patriotic group, isn't it?

21  A.  I'm not familiar with this group, but I've heard the name.

22  Q.  And that's a CCP-affiliated group, isn't it?

23  A.  I have no idea.

24  Q.  You don't know either way?

25  A.  I did not involve in the CCP activity from the beginning

1  until end, until I cut off.  I'm not an inactive member.  I

2  don't join their activities.

3  Q.  You were living in Hong Kong, though, correct, while you

4  were working for Chinese Global Spring?

5  A.  I lived in Hong Kong, correct.

6  Q.  And you were just unaware whether the Hong Kong Federation

7  of Youth Groups was pro or anti CCP, just didn't know?

8  A.  Sir, I live in Hong Kong.  It doesn't mean I have to know

9  all of their things.  Especially I am never an active CCP

10  member at all.

11  Q.  How about the Hong Kong Volunteer Corps?  Does that ring a

12  bell?  Have you ever heard of that before?

13  A.  I'm not quite familiar.

14  Q.  Now, Ms. Wang, isn't it true that you were, in fact, still

15  a member of the CCP well into 2017?

16  A.  I beg your pardon?

17  Q.  Isn't it a fact that you were still a member of the CCP

18  well into 2017?

19  A.  I said that to protect my family, and then I have to

20  protect them.  I cannot just like stand in front of a camera

21  and say that I cut off CCP when my family still in jail.  Okay?

22  Which means if I have to say something, then I have to protect

23  my family.  That's the whole reason.  I cannot sit there, in

24  front of a camera and looking at them in the eyes in jail,

25  period.

1   Q.  So you went on Mirror Media in New York, didn't you, in

2   August of 2017 for an interview?

3   A.   Correct.  Right after my husband was arrested and jailed.

4   Q.  And you proclaimed on that that you were part of the

5   whistleblower movement, didn't you?

6   A.   Correct.

7   Q.  But you also said to the host that you were still a CCP

8   member, didn't you?

9   A.   I did.  My husband in jail, and they are connecting with

10  China, that's it.

11  Q.  So saying you were part of the whistleblower movement was

12  okay, and that was not a danger to your husband, right?

13  A.   I hope not, but he had already in jail.

14  Q.  But you had to lie about whether you were a CCP member?

15  A.   I did not lie at all.

16  Q.  So were you a CCP member?

17  A.   I am not.

18  Q.  At the time, in August of 2017, when you gave your

19  interview, were you a CCP member?

20  A.   In effect, I was not.  I was interviewed by a CCP-connected

21  media, which I know that video is going to go to CCP.  What do

22  you want me to say in front of them?  With your husband in

23  jail, you tell me?

24  Q.  You told them that you were a whistleblower in that

25  interview?

1    A.  Correct, I am.

2    Q.  What's the Chinese People's Political Consultative

3    Conference?

4    A.  What's your question?

5    Q.  What is it?

6    A.  What's your question?

7    Q.  What is the Chinese People's Political Consultative

8    Conference?

9    A.  It's a conference.

10   Q.  CPPCC.

11   A.  Yes, it's a conference.

12   Q.  What do they do?

13   A.  From Google and Wikipedia, of course, they organize the

14   committee and manage the country.

15   Q.  And they're appointed by the CCP, aren't they?

16   A.  Correct.

17   Q.  And you would never associate with a member of the CPPCC,

18   would you?

19   A.  Never.  They are the people we investigate.

20   Q.  Right.  They couldn't be a member of the whistleblower

21   movement, could they?

22   A.  I don't have personal knowledge, but it's possible.

23   Q.  You wouldn't take money from them, would you?

24   A.  Me?  Never.  Why?

25   Q.  You wouldn't allow funding for any Eastern Profit's

1   projects to be controlled by a member of the CPPCC, would you?

2   A.  I beg your pardon?

3   Q.  You wouldn't allow funding for any of Eastern Profit's

4   projects to be controlled by a member of the CPPCC, would you?

5   A.  CPPCC member, no.  They will not control this project.

6   Q.  Why not?

7   A.  They're our enemies.  That's it.

8   Q.  How much do you know about William Je?

9   A.  What's your question?

10  Q.  What do you know about William Je?

11  A.  How much, right?  Not too much.

12  Q.  Do you trust him?

13  A.  I trusted him as a CCP fighter also together.

14  Q.  He's the person who released the million dollars to

15  Strategic Vision on behalf of ACA, isn't he?

16  A.  I found out, yes.

17  Q.  Would it shock you to learn that William Je was a member of

18  the CPPCC?

19  A.  What's your question?

20  Q.  Would it shock you to learn that William Je is a member of

21  the CPPCC?

22          MS. CLINE:  Objection, your Honor.  It assumes facts

23  in evidence and lacks foundation.

24          THE COURT:  What's the good-faith belief, counsel?

25          MR. GREIM:  Well, your Honor, it's the LinkedIn page

L4LPEAS3                          Wang – Cross

1   of William Je that's been excluded as an exhibit, but it's

2   findable by anyone.

3          THE COURT:  Thank you.  I'll permit the questions.

4   A.  Mr. Greim, there is 90 million of the CCP member in

5   mainland China.  As I have defined yesterday, 99.9 percent of

6   them, they are common, average workers.  They are people works

7   to support for their life, pay their tax.  They are good

8   people.  So if you are saying, found William Je as a member, or

9   whatever, it doesn't mean that he is CPP.  He is actually

10  across with them.  He is not.  He is fighting against the CCP.

11  That's it.

12         THE COURT:  Would you answer, though, the question

13  that you were asked?

14         Can the court reporter read back the question that

15  starts with "would it shock you"?

16         (Record read back)

17  A.  I'm not.

18  Q.  Why is that not surprising?

19  A.  CCP threatens many people.  Why should it surprise me or

20  shock me?

21  Q.  I'm going to show you the page that we, I'll just tell you,

22  found on the internet.  Okay?  A LinkedIn page.  Now, first of

23  all, there is a little circle with a picture of a man in the

24  upper left-hand corner.

25         THE COURT:  What exhibit are you showing?

1          MR. GREIM:  This is DX49, your Honor.

2          THE COURT:  Not in evidence?

3          MR. GREIM:  Not in evidence, and on a motion in limine

4    it's been excluded.  I just want to make that clear.

5    BY MR. GREIM:

6    Q.  Now, do you recognize the man in that picture?

7    A.  It's very blur, to be honest.  I couldn't.

8    Q.  You've met with William Je many times, haven't you?

9    A.  We met as needed.

10   Q.  He's been to New York to see you here many times?

11   A.  We met as needed.

12   Q.  And you introduced him to people who you care for, don't

13   you?

14   A.  What do you mean I "care for"?

15   Q.  Well, Karin Maistrello was one of your employees at Golden

16   Spring New York, right?

17   A.  She was before.

18   Q.  At the time when you only had about ten or twelve

19   employees?

20   A.  What's your question?

21   Q.  Karen Maistrello was your employee at Golden Spring

22   New York when you only had ten or twelve employees?

23   A.  Close, yes.

24   Q.  And you introduced her to William Je, did you?

25   A.  I did not specifically do that.

1    Q.  Do you deny that you introduced her to William Je?

2    A.  I don't recall.

3    Q.  On one of his meetings to New York?

4    A.  I didn't recall.

5    Q.  You're the reason that she got named as the director of

6    ACA, aren't you?

7    A.  What's your question?

8    Q.  You're the one who introduced her to William Je so that she

9    could get named as a director of ACA, aren't you?

10            MS. CLINE:  Objection, relevance.

11            THE COURT:  Overruled.

12   A.  William came to my office sometime; so who he met, I don't

13   remember.  I was in there or not, but he was in our office

14   before.

15   Q.  So if Karin Maistrello testified that you introduced her to

16   William Je, would you disagree with that, or you just don't

17   remember?

18   A.  Possible.  I don't remember clearly.

19   Q.  All right.  Now, we zoomed in as close -- and you would

20   recognize William Je if he were to walk into this courtroom

21   here, wouldn't you?

22   A.  Correct.

23   Q.  And your testimony is you can't tell if that's him?

24   A.  Sir, it's very blur.  You can see that.

25   Q.  Okay.

L4LPEAS3                          Wang - Cross

1    A.  With the sunglasses on his face or her face.

2    Q.  Let me ask you, do you know whether he was chairman of

3    Equity Capital Markets in Macquarie?

4              MS. CLINE:  Objection, your Honor.  This exhibit has

5    been excluded.

6              THE COURT:  Overruled.  It's being used for

7    cross-examination, not being offered.

8              The question is, do you know or not?

9              THE WITNESS:  I have no personal knowledge.

10   BY MR. GREIM:

11   Q.  Have you ever tried to learn anything about Mr. Je on the

12   internet?  Have you ever looked for his name?

13   A.  No, I didn't.

14   Q.  So how do you -- have you done anything to satisfy yourself

15   that he is friendly to the whistleblower movement and not

16   controlled by the CCP?

17   A.  What's your question?  Sorry.

18   Q.  Have you done anything to satisfy yourself that he is a

19   friend of the whistleblower movement and not controlled by the

20   CCP?

21   A.  He joined this project.  He loan money to Eastern Profits,

22   and I know he has family in Hong Kong being persecuted also.

23   Q.  Did he tell you that?

24   A.  Correct.

25   Q.  When did he tell you this?

L4LPEAS3                        Wang - Cross

1    A.  I can't recall.  Years ago, yeah.

2    Q.  Let's scroll down a little further.  Keep going.  Let's

3    look at his accomplishments or the accomplishments that are

4    listed on this page.  We don't have William Je here.  We

5    haven't asked him if this is his LinkedIn page.

6            Do you see honors and awards?  He has, apparently, an

7    honorary citizenship of Washington State.  Did he ever tell you

8    that?

9            THE COURT:  That question, the objection is sustained.

10   You can ask the question a different way.

11   Q.  Did William Je ever tell you that he was an honorary

12   citizen of Washington State?

13           MS. CLINE:  Objection, calls for hearsay.

14           THE COURT:  Overruled.

15   A.  I don't remember.

16   Q.  Did he ever tell you that he was a -- did he ever tell you

17   that he was in the International Who's Who of Professionals?

18   A.  I don't remember that.

19   Q.  Did he ever tell you about any connections he had to Chung

20   King?

21   A.  Say that again?

22   Q.  Did he ever tell you about any connections he had with

23   Chung King?

24   A.  I couldn't know what name you are talking about.

25   Q.  Well, I'm going to spell it for you.  I'm not a good

L4LPEAS3                          Wang - Cross

1   Chinese speaker.  I'm not one at all.  C-h-o-n-g-q-i-n-g,

2   Chongqing?

3   A.  Never heard of that.

4   Q.  Isn't that a major city in China?

5   A.  Oh, Chongqing you're talking about?

6   Q.  Chongqing, very good.  I hear laughter.  I do my best.

7        Has he ever told you about any connection he has to

8   Chongqing?

9   A.  I don't remember that.

10  Q.  Well, do you not remember it, or do you think it's possible

11  he mentioned it to you?

12  A.  I don't clearly recall.

13  Q.  Did he ever mention being a part of a Hong Kong Chongqing

14  Friendship Association?

15  A.  I don't remember.

16  Q.  Did he ever tell you he was a member of the Chinese

17  People's Political Consultative Conference of Chongqing?

18  A.  I don't remember.

19  Q.  But he might have, you just can't remember?

20  A.  Unlikely.

21  Q.  Oh, unlikely.  Why is that unlikely?

22  A.  Because we barely talk about this.  Not our topics.

23  Q.  You don't talk about his politics with him?

24  A.  Barely, no.

25  Q.  Now, you know that Karin Maistrello was a director of ACA

1   for some time, right?

2   A.   Correct.

3   Q.   And do you recall that she received a subpoena to testify

4   in this case?

5   A.   Correct.

6   Q.   But in between the time that we sent Golden Spring a notice

7   of the subpoena and the time she was served, she resigned; is

8   that right?

9   A.   No, not correct.

10  Q.   Oh, she did not resign?

11  A.   She resigned, but not when Golden Spring receive subpoena.

12  It's not related.

13  Q.   I understand your testimony is just it's a coincidence that

14  she resigned in between the time Golden Spring received notice

15  and the time she was served; is that correct?

16  A.   There's no relation.  She was sick.  She went to hospital.

17  Q.   Okay.  Fair enough.  Fair enough.  So she -- for whatever

18  reason, she resigned?

19  A.   Oh, she resigned in April, May 2020; so that's the time.

20  Q.   So she was still the director of ACA until April of 2020?

21  A.   I'm not in the wire tape.  I have no idea about that.

22  Q.   I'm talking about ACA.

23  A.   Oh, I have no knowledge.  I'm sorry.

24  Q.   And do you know that William Je replaced Karin Maistrello

25  with someone else when she resigned?

L4LPEAS3                          Wang - Cross

1    A.  I don't have personal knowledge.

2    Q.  Let's pull it up, 126A.  Would it concern you if he

3    appointed somebody at ACA, sole natural person director,

4    someone on the mainland?

5    A.  Why I should be concerned?  It's not my business.

6    Q.  I'm going to show you what's been filed by your counsel in

7    this case, a document 203-1.  It's a notice of change of

8    company secretary and director, Karin Maistrello.  Let's go

9    down a little bit.  You'll see it happened on July the 26th,

10   2019.  Do you see that?

11   A.  I do.

12   Q.  And do you recall taking depositions in this case in July

13   and August of 2019?

14   A.  Deposition to who, me?

15   Q.  Various witnesses.  Yes, you and others?

16   A.  I was deposed in January and October of 2019.

17   Q.  Let's just keep going.  Scroll down, please.  You can stop

18   here.

19          And do you see who Karin Maistrello was replaced with,

20   someone named Chen Qiaoling?

21   A.  Yes, I did.

22   Q.  Do you know Chen?

23   A.  Never know.

24   Q.  And Chen is in mainland China, correct?

25   A.  I don't have personal knowledge.

L4LPEAS3                          Wang - Cross

1    Q.  Well, based on this -- I understand that.  Based on this --

2    by the way, this was attached to the letter Joanna Cline, your

3    counsel, filed with the Court that you said you reviewed.  Do

4    you remember?

5    A.  This is a public record, yes.

6    Q.  Okay.  And you'll see Guangxi Province is in the People's

7    Republic of China, correct?

8    A.  Correct.

9    Q.  Do you have any concern at all that the sole director of

10   ACA is now in the People's Republic of China?

11   A.  I don't know this person.  It's not my business.  Why I

12   should be concerned?

13            MR. GREIM:  I'd move to offer Exhibit 126A.

14            THE COURT:  That's received subject to motion to

15   strike.

16            (Defendant's Exhibit 126A received in evidence)

17            THE COURT:  Any further examination?

18            MR. GREIM:  No further, your Honor, other than the one

19   we mentioned.

20            THE COURT:  Okay.  Ms. Cline?

21            Just for the parties' edification, after Ms. Cline is

22   done, we will leave this witness' testimony open for the

23   purpose of the one question and any colloquy that comes out

24   of -- any further questions that comes out of that issue.

25            Thank you, Mr. Greim, for wiping off the podium.

1          MR. GREIM:  Sure.

2          MS. CLINE:  Mr. Chuff, can we bring up, please,

3   Ms. Wang's first deposition in January 2019.

4          THE COURT:  Ms. Cline, you've got to refer to it by

5   the exhibit number.  Give us the page and line number so we can

6   show the witness and opposing counsel.  Thank you.

7          MS. CLINE:  Your Honor, I'm not sure we have exhibit

8   numbers for the deposition, but I can refer to it by date, page

9   and line number.

10          THE COURT:  Okay.

11   REDIRECT EXAMINATION

12   BY MS. CLINE:

13   Q.  So this is Ms. Wang's deposition from January 2018, and

14   I'll be asking her about pages 207 and 208.

15          So, Ms. Wang, you recall Mr. Greim was asking you some

16   questions about the way the pricing works under the research

17   agreement, those questions?

18   A.  Yes, I do.

19   Q.  Okay.  And you remember your deposition being taken, right?

20   A.  Correct.

21   Q.  Okay.  So Mr. Greim asked you some questions that were

22   memorialized earlier in the transcript, but I'm going to ask

23   you to take a look at page 207, and if you could scroll down to

24   line 25.  And actually keep scrolling to the top of page 208,

25   please.

1          So there's a question there that says:  "If Strategic

2     Vision performed as you wanted under the contract and they

3     worked for three months, how much money would they be owed?

4     "A.  Zero because they deliver nothing."

5          Do you see that testimony?

6     A.  Yes, I do.

7     Q.  And was that a truthful answer when you gave it?

8     A.  Correct.

9     Q.  All right.  Mr. Chuff, can we now look at Ms. Wang's second

10    deposition, October 30th, 2019, and let's shift, I think, to

11    page 129.

12         Okay.  So in October a question was asked of you,

13    starting at line 6, at page 129:  "Now, the research agreement

14    called for a fee of $750,000 a month; is that right?

15    "A.  750,000 U.S. dollars based on their weekly reports and

16    general monthly reports.  Without seeing or received the

17    reports, $750,000 U.S. dollars should not be paid."

18         Do you see that testimony?

19    A.  Yes, I do.

20    Q.  Was that truthful when you gave it?

21    A.  Correct.

22    Q.  And, Mr. Chuff, could you pull up DX6, please.

23         Ms. Wang, do you remember Mr. Greim was asking you

24    some questions about a draft research agreement?

25    A.  Yes.

L4LPEAS3                          Wang - Redirect

1   Q.  And, Chris, could you scroll to the top so we can orient

2   the witness?

3           Do you recall he showed you this DX6, which is a draft

4   of the agreement?

5   A.  Correct.

6   Q.  Okay.  And let's take a look at page 3, please.  And

7   specifically, there's a pricing provision here in the draft,

8   where it's being highlighted.  It says:  The prices for each

9   deliverable, A, B and C, are 300,000 each, per subject (per

10  "fish") per year.  Do you see that provision?

11  A.  Yes.

12  Q.  And we can pull up the research agreement, if you'd like,

13  but do you remember whether that price remained in the final

14  contract or that provision remained in the final contract?

15  A.  Correct.

16  Q.  And, Mr. Chuff, can we pull up DX21, please.

17          And, Ms. Wang, do you remember that Mr. Greim was

18  asking you some questions about this text exchange you had with

19  Mr. Waller?

20  A.  Yes.

21  Q.  And can we scroll a little bit, please, to the bottom of

22  the page.

23          And Mr. Greim asked you a number of questions about

24  this text at the bottom of the first page, where you referred

25  to the investors.  Can you tell us what you meant by "the

1   investors" in the context of this text exchange?

2   A.  "The investors" refer to the people who are persecuted by

3   the Chinese government, and I cannot put their name in there

4   because there will be a risk in their life.

5   Q.  By using the word "investors," did you mean to suggest that

6   Eastern Profit wouldn't have to pay the money back?

7           MR. GREIM:  Objection, leading, your Honor.

8           THE COURT:  Overruled.

9   A.  Eastern Profit should pay the money back to ACA.

10  Q.  You testified, I can't now remember if it was yesterday or

11  today, about the negotiations for the research agreement with

12  Mr. Waller and Ms. Wallop.  In the course of those

13  negotiations -- well, let me start again, and I think you said

14  there were a number of meetings in which the research agreement

15  was negotiated?

16  A.  There were several meetings, yes.

17  Q.  Okay.  Over the course of those meetings, did Ms. Wallop or

18  Mr. Waller ever say to you that, from their perspective, it was

19  a material term of a contract that Mr. Guo be a dissident?

20  A.  Sorry?  I beg your pardon?

21  Q.  Yes.  While you were negotiating the contract, did

22  Mr. Waller or Ms. Wallop ever say to you that it was a material

23  term of the contract that Mr. Guo be a dissident?

24  A.  They specifically did not want Mr. Guo's name shown in the

25  contract at all.  So they pointed it out clearly.

1   Q.  Did you and they ever have a discussion about what the term

2   "dissident" means?

3   A.  I don't remember that.

4   Q.  Was there ever a text exchange that memorialized what both

5   parties meant by using the word "dissident"?

6   A.  I believe so.

7   Q.  You think there was -- I'm asking whether you thought there

8   was a text exchange where people were talking about what it

9   means to be a dissident, a definition?

10  A.  No, no.  That one, never.  They specifically asked before

11  some, like a nickname or some like very discretionary name to

12  name people dissident.

13  Q.  When you told Ms. Wallop that Eastern Profit was going to

14  be the counterparty to the contract, did she ask you any

15  questions about that?

16  A.  I told her.  She didn't ask questions about that.

17          MS. CLINE:  Those are all the questions I have, your

18  Honor.

19          THE COURT:  Anything further from the defense?

20          MR. GREIM:  Other than the other point, no, your

21  Honor.

22          THE COURT:  Okay.  So we're not going to conclude

23  Ms. Wang's testimony.  Ms. Wang is going to be excused.

24  Ms. Cline, you're going to consult with Ms. Wang about the

25  issue of obtaining independent separate counsel for her.  It

1    should be obvious the reason why I'm leaving the testimony

2    open.  It's for both for the protection of the parties but also

3    for the protection of the witness.

4           The particular issue that concerns me is the line of

5    questioning that went to the question of whether Ms. Wang

6    knowingly and willfully signed a document that was submitted to

7    the Court that was either incomplete or false and did so

8    knowing that it was either incomplete or false, to protect

9    others.

10          That raises obvious questions and questions that will

11   be obvious to the lawyer with whom she consults.  That is the

12   line of questioning that is being left open, and we'll just

13   return to this issue after she's had a chance to consult.

14   Ms. Cline, you'll keep me updated.

15          MS. CLINE:  Understood.

16          THE COURT:  Who is the next witness?  Ms. Wang, you're

17   excused.  Thank you very much.

18          (Witness excused).

19          MR. CHUFF:  Your Honor, Eastern calls Han Chunguang.

20          THE COURT:  Mr. Chuff, does this witness need an

21   interpreter?

22          MR. CHUFF:  Yes, he does, your Honor.

23          THE COURT:  Okay.  So we'll take a five-minute break

24   just for the interpreter to get set up and for the witness to

25   get set up, and then we'll reconvene at 12:25.

1          (Recess)

2          THE COURT:  Be seated.  Would you please state your

3    name of the witness who you're going to call?

4          MR. CHUFF:  Yes, your Honor.  Han Chunguang.

5          THE COURT:  I'm going to ask my deputy to swear both

6    the interpreter and the witness in a moment.

7          Just a matter with respect to protocol.  I understand,

8    and this is addressed to Mr. Greim, that there is a separate

9    interpreter who is checking the interpretation of the

10   interpreter, who will be sworn; is that correct, Mr. Greim?

11         MR. GREIM:  That is correct, your Honor.

12         THE COURT:  In terms of protocol, I think this is the

13   way I'd like to proceed, subject to you telling me it can't

14   work that way.  I think if there is an objection as to the

15   translation, then that should come from counsel and, you know,

16   maybe the interpreter can indicate to counsel.  Would that work

17   or --

18         MS. DONNELLI:  Yes, your Honor, we think so, but I

19   would ask Mr. Lenny to let me know if you have a concern with

20   what has been translated.  Thank you.

21         MR. YANG:  Raise my hand?

22         THE COURT:  Just raise your hand if you've got a

23   concern, and then you'll relay it to counsel.  We'll take it

24   slowly.  Hopefully there won't be very many, if any, issues.

25   Anything else before we swear the witness and the interpreter?

L4LPEAS3                              Han - Direct

 1     Okay.  Mr. Fishman?

 2                 (Interpreters sworn)

 3      HAN CHUNGUANG,

 4          called as a witness by the Plaintiff,

 5          having been duly sworn, testified as follows:

 6                 THE DEPUTY CLERK:  Thank you, and please be seated and

 7     please just state your full name for the record and spell out

 8     your last name.

 9                 THE DEFENDANT:  My name is Han, and my last name is

10     H-a-n.

11                 THE DEPUTY CLERK:  Thank you.  Please be seated.

12                 THE COURT:  Mr. Han, I would ask you to try to keep

13     your voice loud and speak slowly for the benefit of the

14     interpreters and for my benefit.

15                 THE DEFENDANT:  Yes.

16                 THE COURT:  You may inquire.

17                 MR. CHUFF:  Thank you, your Honor.

18     DIRECT EXAMINATION

19     BY MR. CHUFF:

20     Q.  Good afternoon, Mr. Han.  Other than Han, do you also have

21     a name that you go by?

22     A.  Yes, my Chinese name.

23     Q.  And what is that?

24     A.  Han Chunguang.

25     Q.  Can you spell that, please?

L4LPEAS3                          Han - Direct

1    A.   H-a-n, C-h-u-n-g-u-a-n-g.

2               (Continued on next page)

L4LKEAS4                          Han - Direct

1    BY MR. CHUFF:

2    Q.  Where were you born, Mr. Han?

3    A.  China, Shandong Province.

4    Q.  In what country do you currently live?

5    A.  United States.

6    Q.  When did you move to the United States?

7    A.  May 2017.

8    Q.  Are you a citizen of the United States?

9    A.  No.

10   Q.  Do you have an asylum application pending with the United

11   States Government?

12   A.  Yes.

13   Q.  When was that application submitted?

14   A.  October 2017.

15   Q.  And what is the status of that application?

16   A.  In progress.

17   Q.  Now, Mr. Han, have you ever heard of a company called

18   Eastern Profit Corporation Limited?

19   A.  Yes.

20   Q.  How did you first become involved with Eastern Profit?

21   A.  In 2014, 18th of August, I acquired this company.

22   Q.  So you became the owner of Eastern Profit at that time?

23            THE INTERPRETER:  Counsel, could you repeat?

24   Q.  So you became the owner of Eastern Profit at that time?

25   A.  Yes.  I was this company's director.

1   Q.  And also the owner?

2   A.  Yes.

3   Q.  Did there come a time when you stopped being the owner and

4   director of Eastern Profit?

5   A.  In 2017, June 27th, I transferred this company to Guo Mei.

6   Q.  And who is Guo Mei?

7   A.  Guo Mei is Guo Wengui's daughter.

8   Q.  And what's her relationship to you?

9   A.  We're friends.

10  Q.  Did you have any role with Eastern Profit after you sold it

11  to Guo Mei?

12  A.  I'm this company's agent.

13  Q.  And who authorized you to be Eastern Profit's agent?

14  A.  Guo Mei.

15  Q.  Now, did there come a time where Eastern Profit sought to

16  investigate certain members of the Chinese Communist Party?

17  A.  Yes.

18  Q.  When did you first learn of that potential investigation?

19  A.  It was early December 2017, Yvette called me and told me

20  that there was such an investigative company.

21  Q.  And did she tell you anything else about the opportunity,

22  the investigation?

23          THE INTERPRETER:  Counsel, do you mind to repeat

24  yourself?

25          MR. CHUFF:  Yes, strike that question.

1  BY MR. CHUFF:

2  Q.  Did she tell you anything else about the potential

3  investigation?

4  A.  So she told me that was such a great company who can

5  investigate the CCP's corruption and let the people of China

6  know about the truth, and it would require 1 million-some money

7  to proceed.

8          CHECK INTERPRETER:  The refund.

9          MS. DONNELLI:  Your Honor --

10          CHECK INTERPRETER:  It is refundable.

11          THE INTERPRETER:  Oh.

12  A.  It's refundable.

13  Q.  And how did you respond to Ms. Wang?

14  A.  So, she told me about this project, and she asked me

15  whether I was interested to participate, and I said I was

16  interested to participate.

17  Q.  And after discussing with Yvette, what did you do next?

18  A.  We talked about that at her office, I went to her office,

19  and after we finished the discussion, I called Guo Mei.

20  Q.  So you had a follow-up discussion with Yvette in her office

21  and then called Guo Mei?

22  A.  Well, I called -- it was a phone call first, we had a

23  conversation, and then we had another conversation at the

24  office, and then after that, I called Guo Mei and told Guo Mei

25  about that.

L4LKEAS4                          Han - Direct

1  Q.  What did you discuss with Guo Mei about the potential

2  investigation?

3  A.  So, Yvette told me about this project, and so I said

4  Eastern Profit is going to participate, and because Guo Mei was

5  the director, so I called Guo Mei and then told her about that,

6  and she authorized me to take care of that.  So I called Yvette

7  to tell her that.

8  Q.  What did you tell Yvette after your discussion with Guo

9  Mei?

10  A.  So, I told Yvette that Guo Mei authorized me, and I had the

11  authorization from Guo Mei, and then I also authorize Yvette to

12  take care of this investigation completely.

13  Q.  Now, why did you authorize Ms. Wang to handle the

14  investigation rather than handling it yourself?

15  A.  It's because, first of all, it was Yvette who told me about

16  this project, and she knew about it more, and, also, my English

17  was not so good, and, also, I trust Yvette.

18  Q.  What did you do after authorizing Ms. Wang to handle the

19  investigation?

20  A.  The next, I tried to get hold of William, because I want to

21  borrow $1 million from him, so I called William.

22  Q.  And what's William's full name?

23  A.  William Je.

24  Q.  And who is William Je?

25  A.  He's my good friend.

1   Q.  And how did William respond to your request for a loan?

2              THE INTERPRETER:  Counsel, do you mind if I clarify a

3   point with the witness?  I think I missed something he said.

4              MR. CHUFF:  Your Honor, does she have that permission?

5              THE COURT:  Yes.

6              THE WITNESS:  So I called William.  I told him that

7   there was such a investigative project, and it would require

8   1 million, and I want to borrow money from him.

9   BY MR. CHUFF:

10  Q.  And how did William respond to that request?

11  A.  And so William was interested because he was also anti-CCP,

12  and he said that he would consider it.  And we had two or three

13  phone calls after that, and then at the end, he lent me the

14  money.

15  Q.  Now, on those phone calls, did you discuss the details of

16  the loan?

17  A.  So, yes, we did talk about certain details, such as the

18  loan amount is 1 million, the term will be six months, and

19  monthly interest is 2 percent.

20  Q.  After your phone calls with William, what happened next?

21  A.  So in 2017, December 29th, at Palace Hotel, we signed the

22  loan agreement.

23  Q.  Mr. Han, was anyone else present at that meeting?

24  A.  No.

25  Q.  For how long did you meet with William?

L4LKEAS4                          Han - Direct

1    A.   Twenty minutes.

2    Q.   On whose behalf did you sign the loan agreement?

3    A.   Eastern Profit.

4    Q.   And on whose behalf did William sign?

5    A.   ACA.

6    Q.   Now, let me ask you:  Why would Eastern Profit be willing

7    to incur a $1 million loan to commission this investigation?

8    A.   It is because this investigation can help to disclose the

9    corruption of the CCP, can help the people of China knowing the

10   truth, so Eastern Profit is very willing to participate.

11   Q.   Okay.  Why didn't you just go to a bank or other financial

12   institution for the loan?

13   A.   It's because this project seemed to be rather urgent, and,

14   also, the company account, Eastern Profit's account, was frozen

15   in July 2017, and so to seek a loan from the bank will be quite

16   troublesome.

17              MR. CHUFF:  Could we publish PX 11, please.

18              And, your Honor, with your permission, a copy of PX 11

19   is sitting on the ledge here in front of the witness, and with

20   your permission, may he approach and retrieve it?

21              THE COURT:  Yes.  Is there a witness book for this

22   witness?

23              MR. CHUFF:  I handed up two copies of PX 11.

24              THE COURT:  Good.  I've got that.  Okay.

25

1    BY MR. CHUFF:

2    Q.  Mr. Han, you've just been handed a document marked as

3    PX 11.  Do you recognize this document?

4    A.  Yes.

5    Q.  What is it?

6    A.  It's a loan agreement between Eastern Profit and ACA.

7    Q.  Now, are you able to read English, Mr. Han?

8    A.  A little bit.

9    Q.  And you're still able to recognize this document?

10   A.  Yes.

11   Q.  And how so?  How are you able to recognize this document?

12   A.  So, because when we were talking about this agreement,

13   William pointed out to me the name of his company, my company,

14   the amount, and then also my name.

15   Q.  If you could turn to page 3, please.

16          Mr. Han, does your signature appear on this page?

17   A.  Yes.

18   Q.  And which signature is it, the top one or the bottom one?

19   A.  The top one.

20   Q.  And whose signature is at the bottom of the page?

21   A.  William.

22   Q.  And did you witness William sign this agreement?

23   A.  Yes.

24          MR. CHUFF:  Your Honor, I'd like to offer PX 11 into

25   evidence.

L4LKEAS4                         Han - Direct

```
 1            MS. DONNELLI:  Your Honor, we do object on
 2   admissibility and foundation grounds.  This witness does not
 3   speak or read English well.  He testified at his deposition —
 4   actually, he testified just now — that another witness, another
 5   person, explained the document to him.  This witness can't
 6   authenticate it.  This witness did not keep a copy of the
 7   document, and it was some time before this loan agreement was
 8   ever produced in discovery after Ms. Wang gave her first
 9   30(b)(6) deposition for Eastern Profit.
10            THE COURT:  I'll take the exhibit subject to a motion
11   to strike.  You can obviously cross-examine with respect to it,
12   but I will observe that most of your objections go to weight
13   and not admissibility.
14            But go ahead.
15            (Plaintiff's Exhibit 11 received in evidence)
16   BY MR. CHUFF:
17   Q.  Now, Mr. Han, did the loan agreement require Eastern Profit
18   to share their research results with ACA?
19   A.  No.
20   Q.  Did the loan agreement require Eastern Profit to share the
21   research results with William?
22   A.  No.
23   Q.  Has Eastern repaid the loan?
24   A.  No.
25   Q.  Has Eastern made any principal payments?
```

L4LKEAS4                          Han - Direct

```
 1    A.  No.
 2    Q.  Any interest payments?
 3    A.  No.
 4    Q.  Has the loan agreement been terminated?
 5    A.  No.
 6    Q.  Has ACA demanded repayment of the loan?
 7    A.  Yes.
 8    Q.  And who from ACA has demanded repayment?
 9            THE INTERPRETER:  The witness asked to repeat the
10    interpreting.
11            THE COURT:  You may do so.
12            THE INTERPRETER:  Okay.
13            THE WITNESS:  William.
14    BY MR. CHUFF:
15    Q.  Does Eastern intend to repay the loan?
16    A.  Yes.
17    Q.  How does it intend to do that?
18    A.  So if we win this lawsuit, then we can make the repayment.
19    Q.  Now, sitting here today, are you still an agent of Eastern
20    Profit?
21    A.  Yes.
22    Q.  And is Eastern Profit willing to agree, as part of a court
23    order, that it will repay to ACA any money it is awarded in
24    this litigation?
25            MS. DONNELLI:  Your Honor, we would object to
```

1    foundation of that with this witness.

2              THE COURT:  Overruled.

3              THE WITNESS:  Yes.

4    BY MR. CHUFF:

5    Q.  And is Eastern Profit willing to agree, as part of a court

6    order, that any money awarded to Eastern in this litigation be

7    paid directly to ACA?

8              MS. DONNELLI:  Your Honor, same objection, please.

9              THE COURT:  Overruled.

10             THE WITNESS:  Yes.

11             MR. CHUFF:  Your Honor, no further questions at this

12   time.

13             THE COURT:  Do you want to start your

14   cross-examination, go for about ten minutes?

15             MS. DONNELLI:  Your Honor, we may just do lunch now,

16   is our recommendation.

17             THE COURT:  All right.  It is just before 1:00.  We'll

18   reconvene at 2:00 o'clock.  Everybody should be back in their

19   seats a little bit before 2:00.  My expectation is that today,

20   we'll go a little bit beyond 5:00 p.m. to try to get as much

21   testimony in as we can.

22             MR. CHUFF:  Thank you, your Honor.

23             THE COURT:  Actually, before we break, Mr. Greim,

24   there is one question I want to ask you.

25             You indicated with respect to the last witness, that

L4LKEAS4

there was a question or two that you had open.  I think it would be helpful for me to know what the questions are and what the line of examination is.

MR. GREIM:  Should I tell you right now?

THE COURT:  Yes.

MR. GREIM:  I want to know whether -- it's sort of two points.  I want to know whether she was concerned about disclosing Han Chunguang in the earlier part of the exhibit and whether that didn't already raise the same concerns that she raised for the rest of it.  And I want to ask her again whether she simply misremembered and whether, in fact, she did give truthful statements to the other questions, like whether he had knowledge.

THE COURT:  Very well.

We're adjourned until 2:00 o'clock.  Thank you.

(Luncheon recess)

L4LKEAS4

AFTERNOON SESSION

2:02 PM

(Trial resumed)

THE COURT:  Anything either party has to raise with the Court before we continue with the testimony?  Ms. Cline?

MS. CLINE:  I do have one housekeeping matter, your Honor.  With respect to the exhibits, as to which your Honor mentioned that you would reserve judgment this morning, recognizing that we closed the briefing at midnight last night, we were wondering if your Honor has a timing on the ruling, because if your Honor is disinclined to admit them, then we may seek an alternative means of admission, given that we just learned about all of this on the first day of trial.

THE COURT:  You should seek an alternative -- put together your strongest case for admissibility.  I can't tell you when I will decide, and it may not be until I render a decision, in which case, I may not need to decide admissibility because it may be that the document is not relevant to my decision.

MS. CLINE:  Understood.  Thank you.

THE COURT:  Anything from you, Mr. Greim?

MR. GREIM:  No, your Honor.

THE COURT:  Okay.

Mr. Han, you're reminded that you are still under oath.

L4LKEAS4                         Han - Cross

1           THE WITNESS:  Yes.

2           THE COURT:  Counsel, you may inquire.

3           MS. DONNELLI:  Thank you.

4    CROSS-EXAMINATION

5    BY MS. DONNELLI:

6    Q.  Nice to see you again.

7           Mr. Han, as a former director of a Hong Kong entity,

8    Eastern, you are familiar with what registration documents are,

9    true?

10   A.  Yes.

11          MS. DONNELLI:  Can we please pull up DX 126A.

12   Q.  Mr. Han, you testified that Eastern received a loan from

13   ACA, true?

14   A.  Yes.

15   Q.  Do you see that this is a registration document for ACA

16   Capital Group Limited?

17   A.  I see it.

18   Q.  That is the same entity you testified gave a loan to

19   Eastern, true?

20   A.  Yes.

21   Q.  The title of this document is "Notice of Change of Company

22   Secretary and Director," true?

23   A.  Yes.

24   Q.  If we scroll down to the bottom of the page, we see that

25   the registry received this on August 22nd, 2019, true?

L4LKEAS4                          Han - Cross

1    A.  I see it.

2    Q.  If we turn to the third page of the document, at the top,

3    we see "Appointment of Company Secretary/Director."  Do you see

4    that?

5    A.  Yes.

6            THE COURT:  Excuse me, counsel.  Do you have a copy of

7    126A that you could hand up to the Court?  I've got 126 in the

8    binder you gave me, but no 126A.

9            Thank you.

10           MS. DONNELLI:  I apologize, your Honor.  We intended

11   to have that.

12   BY MS. DONNELLI:

13   Q.  Mr. Han, this document is showing the appointment of a

14   company secretary or director for ACA, true?

15   A.  Well, I don't know, really, things like that, but from what

16   I see here, that is correct.

17   Q.  The name indicated is there in Chinese, Mandarin, true?

18   A.  Yes.

19   Q.  The name is Chen, C-h-e-n; the last name, or the next name,

20   is Q-i-a-o-l-i-n-g, true?

21   A.  Yes.

22   Q.  Below that, we see an address, true?

23   A.  Yes.

24   Q.  We see that's in the People's Republic of China?

25   A.  Yes.

1    Q.  Thank you.

2              Before our lunch break, you testified that Eastern

3    Profit would agree to send any money, any monetary recovery in

4    this case, to ACA, true?

5    A.  Yes.

6    Q.  This means that you're comfortable, then, sending money to

7    a company whose director is in Mainland China?

8    A.  Well, it's because I borrowed the money from William, so I

9    will return the money to William.

10   Q.  I believe the stipulation was for Eastern to return the

11   money to ACA, true?

12   A.  Yes.

13   Q.  The director that's indicated in the document we just

14   reviewed was in Mainland China, true?

15   A.  Yes.

16   Q.  That's the formal registration document that ACA is telling

17   Hong Kong to reveal its director, true?

18             MR. CHUFF:  Objection; foundation.

19             THE COURT:  Well, she's asking the question.  I assume

20   you've got a good-faith basis for it.  If the witness knows of

21   the authenticity of the document, then the witness can testify

22   to it; if the witness doesn't know, the witness will indicate

23   the witness doesn't know.

24             MS. DONNELLI:  Thank you.

25             THE INTERPRETER:  I'm sorry, do you mind to repeat the

L4LKEAS4                          Han - Cross

1   question?

2             MS. DONNELLI:  Your Honor, could we have our court

3   reporter read back the question, please?

4             THE COURT:  Yes, read back the question.

5             MS. DONNELLI:  Thank you.

6             MR. CHUFF:  Could we just read your ruling to the

7   witness?

8             THE COURT:  No, I don't think so.

9             Instead of having the court reporter read it back, why

10  don't you ask your question again.

11            MS. DONNELLI:  Okay.  Thank you, your Honor.

12            And we would note that this exhibit, 126A, is part of

13  126, which the Court has admitted.  It is correspondence from

14  Ms. Cline to the Court.

15  BY MS. DONNELLI:

16  Q.  Mr. Han, you agree that the document we just looked at is a

17  record of information that ACA has provided to the Hong Kong

18  authority about the identity of its director, true?

19  A.  Well, I don't know about these.  I don't know the internal

20  structure of ACA either.

21  Q.  Thank you.  I'll move on.

22            Mr. Han, you're familiar with Guo Wengui?

23  A.  Yes.

24  Q.  Mr. Guo was your idol and mentor?

25  A.  He is a man that I respect very much.

L4LKEAS4                          Han - Cross

1   Q.  He has taught you many things?

2   A.  Yes.

3   Q.  You have met with Mr. Guo in his penthouse apartment in the

4   Sherry-Netherland Hotel to learn from him?

5   A.  Yes.

6   Q.  That's your place of work, isn't it?

7   A.  No.

8   Q.  Do you know a gentleman named Lianchao Han?

9   A.  I don't have an impression of that.

10  Q.  Are you familiar that Mr. Lianchao Han has assisted Mr. Guo

11  in seeking asylum in the United States?

12  A.  I don't know.

13  Q.  Would it surprise you that Mr. Lianchao Han gave a

14  deposition in this case?

15          THE INTERPRETER:  Gave?

16          MS. DONNELLI:  Gave a deposition in this case?

17  A.  A little bit.

18  Q.  Mr. Lianchao Han was deposed just like you were deposed in

19  this case.  Do you remember that?

20          MR. CHUFF:  Objection, your Honor.

21          THE COURT:  Sustained.  Move on.

22  BY MS. DONNELLI:

23  Q.  Mr. Han, do you run errands for Mr. Guo?

24  A.  If Mr. Guo would have such a need, I would, but then

25  Mr. Guo would not have directed a lot of things either.

L4LKEAS4                          Han - Cross

1    Q.  Are you a cook for Mr. Guo?

2               THE COURT:  Overruled.

3               THE WITNESS:  No.

4    BY MS. DONNELLI:

5    Q.  If you don't work for Mr. Guo, where, then, do you work,

6    Mr. Han?

7    A.  I work for a company of my family.

8    Q.  What is the name of that company?

9    A.  Han's family, Hanjia.

10   Q.  Isn't it true at your deposition that you testified the

11   name of your family company has nothing to do with this case?

12              THE INTERPRETER:  Counsel, do you mind repeating your

13   question?

14   Q.  Isn't it true at your deposition you testified that the

15   name of your family company has nothing to do with this case?

16   A.  Yes.

17   Q.  You also testified that your family trust, your family

18   company, had no involvement with the Eastern Profit, true?

19   A.  Correct.

20   Q.  Where is the office of your family company?

21   A.  In China.

22   Q.  You're testifying that you work here in the United States

23   for a company that's based in China?

24   A.  Well, you are asking me do I have job.  I said I have, and

25   then I'm working for this company, my family's company.  I

1  would be doing things for it.

2  Q.  The family company has no office location in the United

3  States; is that your testimony?

4  A.  That's correct.

5  Q.  Its location is in Mainland China?

6  A.  Yes.

7  Q.  The person to whom you report is in Mainland China?

8  A.  Yes.

9  Q.  What is the name of that person?

10  A.  My family.

11  Q.  What is the name of the person to whom you report in your

12  job?

13  A.  Well, that cousin's name, that cousin is my family.  I

14  don't think that I want to disclose the name of my family here.

15  Q.  Why is it that you can't tell us the name of the person to

16  whom you report in your job?

17        THE COURT:  There's an objection, I think?  What's the

18  objection?

19        MR. CHUFF:  Objection; relevance.

20        THE COURT:  What is the relevance?

21        MS. DONNELLI:  Your Honor, I'm trying to establish

22  this witness' actual employment.

23        THE COURT:  I don't think you need a name for the

24  witness' employment.  The objection is sustained.

25        MS. DONNELLI:  Thank you.

L4LKEAS4                          Han - Cross

1    BY MS. DONNELLI:

2    Q.  Does your family trust have any other employees besides

3    yourself?

4    A.  Just my family and my family.

5    Q.  Where does your family trust obtain the funds to pay you

6    for your work?

7                MR. CHUFF:  Objection; relevance.

8                THE COURT:  Overruled.  But I assume you're going to

9    bring this line of examination to an end soon?

10               MS. DONNELLI:  Yes.  Thank you, your Honor.

11               THE COURT:  It's got marginal relevance.

12               MS. DONNELLI:  Thank you.

13   BY MS. DONNELLI:

14   Q.  What is the nature of the work that you do in the United

15   States for your family in Mainland China?

16   A.  Join in some -- participate in some meeting, and after the

17   meeting, perhaps we can communicate.

18   Q.  I'm not sure you understood the question, Mr. Han.

19               What is the nature of the work?  What do you do here

20   in the United States for your family?  What are your tasks?

21   What are your roles?  What are your jobs?

22               THE COURT:  The objection is sustained, in part,

23   because it's multipart and, in part, because it would be

24   impossible for the interpreter to translate a multipart

25   question.  So why don't you break it apart.

L4LKEAS4                          Han - Cross

1            MS. DONNELLI:  Okay.

2   BY MS. DONNELLI:

3   Q.  Mr. Han, could you describe for us what you do, in general,

4   on a daily basis for your family trust while you're here in the

5   United States?

6   A.  Well, it is my family's company, and so every several

7   weeks, not regular, that we will have phone calls, and if there

8   is something they want me to participate, then we will discuss.

9   Q.  Are you related by family to Guo Wengui?

10  A.  No.

11  Q.  Are you related by family to Yvette Wang?

12  A.  No.

13  Q.  Does your family trust employ Yvette Wang?

14  A.  No.

15  Q.  You've had three years of college, true?

16            THE INTERPRETER:  Sorry?

17  Q.  You had three years of college, true?

18  A.  Well, where I was wasn't really a college.  It was like a

19  college of sport.

20  Q.  We're going to pull up some of your deposition testimony,

21  and in the notebook there, your testimony has been translated

22  into Mandarin, if would you like to follow along.

23  A.  Okay.

24  Q.  We are going to go to page 61.

25            THE COURT:  Counsel, after today's testimony, I would

1   like the parties to confer and to mark the depositions with an

2   exhibit number, and then tomorrow morning, you can give me the

3   exhibit number.

4           Counsel, you'll give us the page number and line

5   number for the parts of the depositions, too, which you're

6   referring the witness.

7           MS. DONNELLI:  Thank you.

8   BY MS. DONNELLI:

9   Q.  We are going to be at page 61.

10  A.  Is that 61, 6-7?

11  Q.  It's going to be page 61, line 17 through page 62, line 7.

12  A.  I don't know how to actually look for it.  I don't know how

13  to find it.

14  Q.  I think, if it's all right, our translator can show you.

15          MS. DONNELLI:  Thank you.

16  Q.  I'm going to start reading at line 17:

17  "Q.  Yes, but specifically to give you the preparation that you

18  needed to be a director of Eastern Profit."

19          That was the question.

20          The answer by you, Mr. Han:  "I went to two-year

21  college.  Secondly, Mr. Guo has been teaching me a lot."

22          And then your answer went on to say, "I formed a

23  three-year college.  Secondly, Mr. Guo has been teaching me a

24  lot.  Thirdly, I love to read books, have educated me a lot.

25  Fourthly, society was also a good teacher that taught me a

L4LKEAS4                          Han - Cross

1    lot."

2              Did I read those words correctly?

3              THE INTERPRETER:  Do you mind to scroll back to 61 for

4    me?

5              Okay, I'm sorry, did I read something wrong?  Ms. Wang

6    and the interpreter, what was I supposed to be reading,

7    counsel?

8              MS. DONNELLI:  Madam Translator, we have the portion

9    translated for our witness, so when I'm reading it into the

10   record, we will not need you to read the question or the answer

11   because it's already been translated for the witness.

12             THE INTERPRETER:  So you don't want me to read --

13             THE COURT:  I'm not so sure that that's right.  Unless

14   the translation has been agreed upon with the plaintiffs, it's

15   not right.

16             MS. DONNELLI:  Okay.  Then it has not been agreed

17   upon.

18             MR. CHUFF:  Yes, objection.  We've never seen it.

19             THE COURT:  So we will need you to translate the

20   portions of the deposition that are being read to the witness.

21             THE INTERPRETER:  Okay.  So, counsel, I should read

22   from line 17 from page 61 to all the way to 62, line 7, right?

23             MS. DONNELLI:  Yes, but you won't need to read any

24   objections or things of that nature.

25             THE INTERPRETER:  The part that Ms. Wang said, the

interpreter said, those, I don't need to read, right?

THE COURT:  That's correct.

MS. DONNELLI:  Correct.

(Pause)

THE WITNESS:  I see that.

BY MS. DONNELLI:

Q.  Did I read the question and the answer correctly?

A.  Yes.

Q.  Did I read your answers correctly?

A.  Well, I do need to clarify somewhat here, because the school structures were quite different from here.  The school that I went to, strictly speaking, it wasn't a college or university.  It was like a school -- institute, a kind of school.

Q.  Mr. Han, did you say the words at your deposition, "I formed a three-year college"?

A.  Yes.

Q.  Thank you.

You were being truthful at your deposition, true?

A.  Yes.

Q.  What was the name of the school in China you attended?

A.  Jinan College.

THE COURT:  Ms. Donnelli, are you going to bring this to a point at some someplace?

MS. DONNELLI:  Yes, your Honor.  We'll move on.

L4LKEAS4                           Han – Cross

1   BY MS. DONNELLI:

2   Q.  Mr. Han, you began having an affiliation with Eastern

3   Profit while you were still living in Hong Kong, true?

4            THE INTERPRETER:  Counsel, do you mind to repeat

5   because the check interpreter just informed me that perhaps it

6   should be called sports academy.

7            MS. DONNELLI:  Thank you.

8   BY MS. DONNELLI:

9   Q.  Mr. Han, you began having an affiliation with Eastern

10  Profit while you were still living in Hong Kong, true?

11  A.  Yes.

12  Q.  You purchased Eastern Profit in 2014?

13  A.  Yes.

14  Q.  You purchased Eastern Profit for 1,000 Hong Kong currency?

15  A.  Yes.

16  Q.  That equates to a few hundred U.S. dollars?

17  A.  Yes.

18  Q.  You purchased Eastern from a friend spelled Z-h-a-o-h-u-i

19  X-u?

20  A.  Yes.

21  Q.  You were around 25 years old when you purchased Eastern

22  Profit?

23  A.  Yes.

24  Q.  You got the money to purchase Eastern Profit from your

25  family fund?

1  A.  Can you repeat the question?  I don't understand this

2  question.

3  Q.  The source of the funds for you to purchase Eastern Profit

4  came from your family fund?

5  A.  Well, it wasn't really my family fund that paid for this --

6  that paid this money.  I brought this money from my own saving.

7  I have saving myself.

8  Q.  We're going to turn to your deposition, page 60.  We're

9  going to read from line 17 to 22:

10  "Q.  Where did the fund come from that Eastern Profit used" --

11  no, skip that.

12          MS. DONNELLI:  Move to strike that.

13          THE COURT:  Motion is granted.

14  Q.  What was the business Eastern Profit was conducting when

15  you took it over?

16  A.  Investment.

17  Q.  What type of investment?

18          THE INTERPRETER:  Counsel, do you mind if I ask the

19  witness to clarify a term?  I didn't hear very clearly about

20  the first word.  Okay?

21  A.  Real estate investment.

22  Q.  Did Eastern Profit purchase any real estate?

23          MR. CHUFF:  Objection; relevance, your Honor.

24          THE COURT:  I share your questions about relevance,

25  but I'll permit it.  Counsel can choose how to use the limited

L4LKEAS4                          Han - Cross

 1  time they've got as they want.

 2              MS. DONNELLI:  Was there a question pending?

 3              THE COURT:  There is one.

 4              The question is:  Did Eastern Profit purchase any real

 5  estate?

 6              THE WITNESS:  We did not find anything suitable.

 7  BY MS. DONNELLI:

 8  Q.  Did Eastern Profit also purchase stocks?

 9  A.  No.

10  Q.  I'd like to turn to your deposition at page 55.

11              THE INTERPRETER:  Do we have it on the screen?

12              MS. DONNELLI:  Okay.  We'll withdraw that.

13  Q.  You were Eastern Profit's sole director, true?

14  A.  Yes.

15  Q.  You were the boss of Eastern?

16  A.  Yes.

17  Q.  When you owned Eastern, you had an agent named Natasha run

18  it for you, true?

19  A.  Yes.

20  Q.  Natasha did everything for you regarding Eastern's

21  business, true?

22  A.  Yes.

23  Q.  Natasha had your full authorization to handle matters for

24  you in Hong Kong, true?

25  A.  Eastern Profit, to handle the matters for Eastern Profit.

L4LKEAS4                         Han - Cross

1  Q.  Thank you.

2          Where was Eastern Profit's office located in

3  Hong Kong?

4  A.  I don't recall clearly.

5  Q.  Was Eastern Profit's office in the Bank of China building?

6  A.  I seriously don't recall very clearly.

7  Q.  But you were at Eastern Profit's office while you were its

8  director, true?

9  A.  Well, at the time, Natasha was in the Bank of China

10  building, so whatever I have -- whatever I want to do, I'll

11  just go to her in Bank of China.

12  Q.  So you did conduct business in the Bank of China building

13  as Eastern Profit, true?

14          THE INTERPRETER:  Counsel, the check interpreter has

15  something he wanted to correct me, perhaps.

16          THE COURT:  You may correct.

17          CHECK INTERPRETER:  I believe the witness mentioned

18  the 49th floor of the Bank of China building.

19          THE WITNESS:  So I would go to -- whenever I want to

20  do that, I would go to find Natasha on the 49th floor in Bank

21  of China building.

22  BY MS. DONNELLI:

23  Q.  Natasha was doing Eastern Profit's business on the 49th

24  floor of the Bank of China building, true?

25  A.  You may say that because I just let Natasha to handle

L4LKEAS4                        Han - Cross

1   Eastern Profit's Hong Kong business herself.

2   Q.  ACA also had a location in the Bank of China building,

3   true?

4   A.  I don't know.

5   Q.  Did you ever meet William Je in the Bank of China building?

6   A.  I don't have recollection of that.

7   Q.  Did Eastern engage in any political activities in

8   Hong Kong?

9   A.  I don't understand your question.

10   Q.  Did Eastern Profit engage in any activities that were of a

11   political nature, having to do with politics?

12   A.  Well, this time Eastern Profit engaged this cheating

13   company investigating the China's Communist Party's corruption,

14   does it count?

15   Q.  So, in your understanding, Eastern was conducting political

16   matters in its investigation through Strategic Vision, true?

17   A.  Well, I don't know, really, much about the specifics.  I

18   only know briefly about the framework, that is, to investigate

19   the government officials in the CCP regarding their corruptions

20   and so to let the people in China know -- learn the truth.

21   Q.  So Strategic was assisting Eastern in something that was

22   political, true?

23           THE COURT:  Sustained.

24           THE WITNESS:  Do you need to repeat that?

25           THE COURT:  The objection is sustained.  You don't

L4LKEAS4                          Han - Cross

1    have to answer the question.

2    BY MS. DONNELLI:

3    Q.   Mr. Han, how much did you --

4              MS. DONNELLI:  Yes?

5              THE INTERPRETER:  Your Honor, do I need to interpret

6    all the objections and things?

7              THE COURT:  I think you should.

8              THE INTERPRETER:  Okay.

9    BY MS. DONNELLI:

10   Q.   Mr. Han, how much did you receive when you sold Eastern to

11   Guo Wengui's daughter?

12   A.   It is handled by Natasha for me, so I don't remember.

13   Q.   You don't have a recollection of how much you received for

14   selling your company?

15   A.   That's correct.

16   Q.   Did Eastern have any assets at the time you sold it to Guo

17   Wengui's daughter?

18   A.   Some.

19   Q.   What were they?

20   A.   When you're talking about assets, what is it, really?

21   Q.   Anything of value that Eastern owned, whether that be money

22   or any other thing of value.

23   A.   Well, there was money in the account of Eastern Profit.

24   Q.   How much was there?

25   A.   It was about 70 to 80 thousand U.S. dollars, but it was

L4LKEAS4                        Han - Cross

1    frozen.

2    Q.   Was there anything else that Eastern Profit owned besides

3    the account with the 70 or 80 thousand U.S. dollars?

4    A.   It has a vehicle.

5    Q.   Anything besides the vehicle?

6    A.   Not to my recollection.

7    Q.   Why did you sell Eastern Profit to Guo Mei, Guo's daughter?

8    A.   Well, it was because Guo Mei wanted to have a company that

9    make film, and so she asked me then, so I transferred the

10   company to her.

11   Q.   Did Guo Mei actually, then, get into the movie business?

12   A.   We did prepare to enter.

13   Q.   Did that actually happen?

14   A.   No, because in July 2017, my account was frozen, so there

15   was no way we can proceed.

16   Q.   So you sold a business with a frozen account to Guo Mei?

17   A.   No.   When I sold the company to Guo Mei, it was June 27th.

18   At the time, the account wasn't frozen.

19   Q.   When was the account frozen?

20   A.   In July.

21   Q.   Why did you resign as director of Eastern Profit?

22   A.   Well, it's because, after all, film is something that Guo

23   Mei is more familiar with, and so I just think that transfer to

24   her, so she can get into it altogether.

25   Q.   Was Eastern Profit the only source for Guo Mei to get

L4LKEAS4                          Han - Cross

1    funding for her film project?

2              MR. CHUFF:  Objection; relevance.

3              THE COURT:  Overruled.

4              THE WITNESS:  Can we repeat the question?

5    BY MS. DONNELLI:

6    Q.  We'll skip it.

7              Was Natasha still working for Eastern when you sold it

8    to Guo Mei?

9    A.  At the time, she was.

10   Q.  Is Natasha still working for Eastern?

11   A.  No, she is not, because you see in the second half of 2017,

12   she just disappeared altogether.

13             I want to clarify one thing:  In the last deposition,

14   I mentioned it was 2018, but it is actually 2017.  This time is

15   accurate.

16   Q.  Do you have any understanding as to why Eastern's assets

17   were frozen?

18   A.  Well, I believe that is a trick played by the Chinese

19   Communist Party.

20   Q.  Your own personal assets were frozen?

21   A.  Yes.

22   Q.  When you sold Eastern Profit, did your association with

23   Eastern Profit end?

24   A.  Well, after I sold the company to Guo Mei, I was the agent

25   for Eastern Profit.

L4LKEAS4                              Han - Cross

1    Q.  Who made you the agent?

2    A.  It was Guo Mei who asked me to be the agent.

3    Q.  Did Guo Mei put anything in writing making you an agent?

4    A.  No.

5    Q.  Where were you living when you became the agent?

6    A.  United States.

7    Q.  Where was Guo Mei living?

8    A.  United States.

9    Q.  What time frame did Guo Mei make you an agent?

10   A.  Well, it was at the time that I sold the company to her,

11   and she said perhaps I can stay on to be the agent, if

12   something is the matter, then she can consult with me.

13   Q.  As agent, could you enter into a contract for Eastern?

14   A.  Yes.

15   Q.  Could you enter into a loan for Eastern?

16   A.  Yes.

17   Q.  Could you hire people for Eastern?

18   A.  Yes.

19   Q.  Did you?

20   A.  Well, there was a loan.  I borrowed money from -- it was

21   the loan to ACA.

22   Q.  Do you consider that to have hired someone?

23   A.  I don't understand.

24   Q.  I ask, Mr. Han, whether you hired anyone as an agent for

25   Eastern?

L4LKEAS4                          Han - Cross

1   A.   No.

2   Q.   Did you have to get approval from Guo Mei to take a loan

3   out with ACA?

4   A.   I don't need her approval; however, I did report such a

5   matter to her.

6   Q.   Did Guo Mei give you authority to pass your authority for

7   Eastern Profit on to anyone else?

8           THE INTERPRETER:  Counsel, do you mind to repeat your

9   question?

10          MS. DONNELLI:  Did Guo Mei's authority to Mr. Han

11  include Mr. Han passing his authority to anyone else for

12  Eastern?

13          THE WITNESS:  Yes.

14  BY MS. DONNELLI:

15  Q.   Did you do that?

16  A.   Well, for the investigative project, then I did authorize

17  Yvette to handle that.

18  Q.   When you were an agent for Eastern, were you paid?

19  A.   No.

20  Q.   Do you expect to be paid in the future?

21  A.   No.

22  Q.   During the time you were agent, did you keep books and

23  records for Eastern?

24  A.   No.

25  Q.   Did Eastern have any liabilities or responsibilities when

L4LKEAS4                          Han - Cross

1   you were an agent for Eastern?

2   A.   There was one loan to ACA.

3   Q.   Did you keep any record of that loan to ACA?

4   A.   It was that borrowing activity.

5   Q.   Did you keep any written --

6         CHECK INTERPRETER:   I think he said the agreement, the

7   loan agreement.

8         THE WITNESS:   Yes, it was a loan agreement.

9   BY MS. DONNELLI:

10  Q.   Did you keep a written record of the loan agreement as you

11  were an agent for Eastern?

12  A.   No.

13  Q.   Why not?

14  A.   Well, for this investigative company, I authorize Yvette to

15  handle that completely, so she was doing that.

16        MS. DONNELLI:   I want to pull up our Exhibit PX 17,

17  which has already been admitted.   This document has been

18  translated, and it's in the notebook.

19        THE COURT:   I don't think I've got PX 17 in the little

20  binder you gave me of exhibits.

21        MS. DONNELLI:   I apologize, your Honor.

22  BY MS. DONNELLI:

23  Q.   What is the title of this document?

24  A.   It's a power of attorney.

25  Q.   What does this document do?

L4LKEAS4                          Han - Cross

1   A.   It's the contract or an agreement between Eastern Profit

2   and these liar company.

3   Q.   If we turn to the bottom of page 2, is that your signature

4   above the typewritten words "Chunguang Han"?

5   A.   Yes.

6   Q.   Did you sign for Eastern Profit?

7   A.   Yes.

8   Q.   Did you sign as director of Eastern Profit?

9   A.   As an agent.

10  Q.   The document says your title is director, correct?

11  A.   When I was -- when I signed this document, I did not look

12  at it, and this handwriting wasn't mine, so I did not write on

13  it.

14  Q.   When you say this handwriting was not yours, what does that

15  mean?

16  A.   The signature on top of my name, that was mine, but then

17  the English, which is below my name, that wasn't mine.  That

18  wasn't my handwriting.

19  Q.   When you signed this document, you were not a director of

20  Eastern Profit, true?

21  A.   That's correct.

22  Q.   You signed this document on August 30, 2018?

23  A.   Yes.

24            (Continued on next page)

25

L4LPEAS5                         HAN – CROSS

1    Q.  You signed it in front of Karin Maistrello?

2    A.  Yes.

3    Q.  Did you give Ms. Maistrello authority to write on the

4    document after you had signed it?

5           THE INTERPRETER:  Do you mind if I clarify for the

6    witness about what he said?  I wasn't exactly sure.

7           THE COURT:  Yes, you may do so.

8    A.  This document was given to me by a lawyer, and then asked

9    me to sign my name on it.  Then I signed.  That's it.

10   Q.  Who was the lawyer for?

11   A.  I don't know.  I don't recall.

12   Q.  Do you agree, this document doesn't mention Guo Mei?

13   A.  That's correct.

14   Q.  It doesn't mention Guo Wengui?

15   A.  That's correct.

16   Q.  Wasn't Guo Wengui also an agent for Eastern Profit?

17   A.  That, I don't know.

18   Q.  I'm going to turn to DX48.  This should be in the notebook

19   translated.

20   A.  Yes.

21   Q.  What is the title of this document?

22   A.  A substitution of counsel.

23   Q.  Is that your signature at the bottom?

24   A.  That signature I authorized Yvette sign it.

25   Q.  But you did not, yourself, sign this document?

L4LPEAS5                          HAN - CROSS

1    A.  That's correct.

2    Q.  When did you authorize Yvette Wang to sign this document

3    for you?

4    A.  Well, when we were supposed to have this partnership with

5    this company, I authorized Yvette so that she can sign on

6    documents.

7    Q.  Was that put in writing?

8    A.  Verbally.

9    Q.  I'm sorry?

10   A.  Verbally.

11   Q.  It was verbal?

12   A.  Yes.

13   Q.  I want to talk now about the research agreement.  We can

14   pull it up.  It's been admitted as PX1.

15   A.  Yes, I see it.

16   Q.  Thank you.  The title of this document is Research

17   Agreement, true?

18   A.  Yes.

19   Q.  The first time you saw the research agreement was at your

20   deposition, true?

21   A.  Yes.

22   Q.  You had never seen the research agreement before that

23   deposition in November of 2019, true?

24   A.  That's correct.

25   Q.  You had never heard of Strategic Vision before your

L4LPEAS5                          HAN - CROSS

1   deposition, true?

2   A.  That's correct.

3   Q.  What was the purpose of the research agreement?

4           THE INTERPRETER:  Counsel, do you mind if I clarify

5   with him?

6   A.  Yvette told me that it was a fantastic company, very good;

7   that they can investigate the corruption of the Chinese

8   Communist Party so we can tell people the truth of them.  So

9   she asked me whether I would be interested, and I said that,

10  yes, I'd probably be interested to participate.

11  Q.  What was the end purpose of the agreement?  What was it to

12  achieve?

13  A.  I don't know about the content of this agreement.

14  Q.  What was the purpose?  What was the objective of the

15  agreement?

16  A.  Well, it was because -- you see, Yvette told me that there

17  was this great company that can investigate the CCP's

18  corruption, so that people can learn the truth about them, and

19  whether I would be interested.  And since Eastern Profit is

20  also a victim and the account was frozen, so I was interested

21  to participate.

22  Q.  Did you hire any company to help you unfreeze Eastern's

23  account?

24  A.  No.

25  Q.  You testified earlier today that the deposit under this

L4LPEAS5                          HAN - CROSS

1    research agreement was refundable.  Can you point out to us

2    where in this agreement the deposit is refundable --

3            THE COURT:  I've got it, absolutely.  I have a

4    different question.

5            Mr. Han, did you ever read the research agreement from

6    beginning to end?

7            THE WITNESS:  No.

8            MS. DONNELLI:  Thank you.

9            THE COURT:  Do you still want that question?  I think

10   it's pointless.

11           MS. DONNELLI:  Okay.  Thank you.  We'll move on.

12   BY MS. DONNELLI:

13   Q.  Mr. Han, you first met William Je in Hong Kong, true?

14   A.  Yes.

15   Q.  Did you make any plans besides the loan that you described,

16   of $1 million, for Eastern to finish paying under the research

17   agreement?

18   A.  Well, Eastern Profit at the moment it was frozen; however,

19   before it was frozen, it was a normal company that was

20   operating.  So we could have done investments and to make the

21   payment.

22   Q.  What leads you to think that Eastern could have made an

23   investment that would have been sufficient to cover the cost of

24   the research agreement?

25   A.  Well, first of all, Eastern Profit is a mature company, and

L4LPEAS5                          HAN - CROSS

1   I also believe that after the company transferred to Guo Mei

2   and since she is very good in film, I believe she can operate

3   this company and make it profitable.

4   Q.   How much was the research under the research agreement

5   going to cost Eastern?

6   A.   Well, I don't really know about the details, but when

7   Yvette was telling me, she told me that the project would

8   require a million; so I borrow a million from William.

9   Q.   Did Ms. Wang tell you the research agreement would require

10  $750,000 in the first month?

11  A.   No.

12  Q.   As agent for Eastern, did you take it upon yourself to

13  determine how much this research agreement would cost and how

14  much -- or how it would be paid?

15  A.   Well, because for this investigative project involves

16  something so complicated and they're all in English, so I just

17  authorized -- I completely authorized Yvette to handle that for

18  me.  And so since she is anti-CCP, I completely have faith in

19  her.

20          THE COURT:  Let me ask one other question, Mr. Han.

21  Were you aware that the research agreement required Eastern to

22  pay $9 million a year?

23          THE WITNESS:  I don't know.

24  BY MS. DONNELLI:

25  Q.   What was the interest on the loan that you, on behalf of

1   Eastern, you say took out from ACA?

2   A.   Monthly, two percent.

3   Q.   How much does that equal per month in dollars?

4   A.   I don't know the calculation on that.

5   Q.   When you decided to go to William Je for a loan, why is it

6   that you believed he would be interested in that loan?

7   A.   It's because we are all people who are anti-Chinese

8   Communist Party; so I believe that he definitely would be

9   interested.

10  Q.   Today you testified that you spoke with Mr. Je about this

11  loan on the phone; do you recall that testimony?

12  A.   Yes.

13  Q.   Isn't it true that you actually met Mr. Je to negotiate

14  this loan?

15  A.   We discussed that over the phone, and then we signed the

16  agreement in person.

17  Q.   Did you only meet Mr. Je one time to sign the loan in

18  person?

19  A.   Yes.

20  Q.   I'm going to turn to your deposition at page 133.  I'm

21  going to start with line 13.

22  A.   Yes, I see that.

23  Q.

24  "Q.   How many times did you meet with Mr. Je in person about

25  this loan agreement?

1    "A.  I think two or three times."

2              Did I read the question and answer correctly?

3    A.  Yes.

4    Q.  And then if we read line 16:  "Was that before or after the

5    meeting in the hotel lobby?

6    "A.  I think before."

7              Did I read the question and answer correctly?

8    A.  Yes.

9    Q.  Your answers were truthful when you gave them at your

10   deposition, true?

11   A.  Well, it was an accident because during the deposition, I

12   was rather confused.  I was led by counsel round and round; so

13   I made this answer.

14   Q.  So your answer was not truthful at the deposition?

15   A.  Well, I can make clarification with this information here.

16   Q.  I'm sorry?

17   A.  Clarification for the information here.

18   Q.  You agree, at your deposition, you said those words, true?

19   You said those words at your deposition, true?

20   A.  Yes.

21   Q.  At the deposition, on that page we've read from, you don't

22   see yourself telling me that you're confused by the question,

23   true?

24   A.  That's correct.

25   Q.  You don't see that you asked me for an opportunity to

1   complete or alter your answer, true?

2   A.  That's correct.

3   Q.  William Je is not often in New York City, is he?

4           MR. CHUFF:  Objection, foundation.

5           THE COURT:  Overruled.

6   A.  I don't know.

7   Q.  You would agree that it was fortuitous that you happened to

8   be able to meet with Mr. Je two or three times regarding the

9   loan, true?

10  A.  Well, I just tried.  I don't quite understand what you mean

11  because we were talking about the details about this loan over

12  the phone.

13  Q.  Mr. Han, how many months did Eastern have to repay the

14  loan?

15          THE INTERPRETER:  How many?

16          MS. DONNELLI:  Months.

17  A.  The sooner the better.

18  Q.  How many months did Eastern Profit have, under the loan

19  agreement, to repay the loan?

20  A.  Six months.

21  Q.  Six months during a time when Eastern asset's are frozen,

22  true?

23  A.  That's correct.

24  Q.  Are Eastern's assets still frozen today?

25  A.  Yes.

L4LPEAS5                        HAN - CROSS

1    Q.  Why did you agree for Eastern to have to repay a loan in

2    six months when its assets were frozen?

3    A.  Well, because at the time that Yvette told me about this

4    investigation, I thought it was great.  That was such a great

5    company, and I thought that maybe that was also a means to help

6    to defrost the company's accounts.  And so that was what I was

7    thinking in mind at the time; so after we defrost the company

8    account, that we can get into more investments, and then we can

9    repay the loan.

10   Q.  When the account was unfrozen, it had 80,000 U.S. dollars,

11   true?

12   A.  Even though at the time that was 80,000 only, we could

13   still be operating and then we could still be investing in

14   film.

15           THE COURT:  Can I see counsel for a moment up at

16   sidebar, with the court reporter.

17           (Continued on next page)

18

19

20

21

22

23

24

25

L4LPEAS5                         HAN - CROSS

1              (At the side bar)

2              THE COURT:  I don't want to cut you off, but I'm

3    sensitive to the limited time we've got.  And questions

4    about -- repeated questions to the effect that the account was

5    frozen or asking the witness where language appears in an

6    agreement that the witness hasn't read may not be the most

7    efficient use of your time.

8              And as I indicated before, while I may entertain an

9    application to extend the time of this trial for good cause, I

10   am going to consider in that application how the time has been

11   used.  So I thought at least fair warning to you.

12             MS. DONNELLI:  Thank you.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2    BY MS. DONNELLI:

3    Q.  Did Mr. Je ask you how Eastern was going to pay back the

4    loan?

5    A.  Let me clarify.  It's not Mr. Je, it's William.

6    Q.  William Je is the same as William Ju, J-u, true?

7    A.  Well, I don't know whether they are the same person, but

8    the William I know is William Yu, and his last name is Yu.

9    Q.  Did you receive a copy of the loan agreement?

10   A.  What agreement, sorry?

11   Q.  The loan agreement.

12   A.  It was on December 29, 2017, we signed the agreement in

13   Palace Hotel.

14             THE INTERPRETER:  Interpreter making a correction.

15   Plaza Hotel.

16   Q.  But you didn't keep a copy of the loan agreement, true?

17   A.  That's correct.

18   Q.  Thank you.

19             THE COURT:  Mr. Han, do you have PX11 in front of you?

20             THE WITNESS:  Yes.

21             THE COURT:  Are you saying that you saw this document

22   on December 29th at the Plaza Hotel?

23             THE WITNESS:  Yes.

24             THE COURT:  Did you see this document at any time

25   before December 29th?

L4LPEAS5                          HAN - CROSS

1          THE WITNESS:  No.

2          MS. DONNELLI:  Your Honor, just to follow up on that.

3    BY MS. DONNELLI:

4    Q.  Mr. Han, I'd like to direct you to your deposition.  We're

5    looking at page 135 -- excuse me, 134, line 21:

6    "Q.  Did you keep a copy of this loan agreement after you

7    signed it that day in the hotel lobby with Mr. Je?

8    "A.  No."

9    A.  That's correct.

10   Q.  Did I read the words as your answer correctly?

11   A.  Yes.

12   Q.  Those were true words when you gave them at the deposition?

13   A.  Yes.

14         MS. DONNELLI:  Thank you.  No further questions.

15         THE COURT:  Any reexamination?

16         MR. CHUFF:  No, your Honor.

17         THE COURT:  Why don't you clean the podium.

18         Mr. Han, you're excused.  Thank you very much.

19         (Witness excused)

20         THE COURT:  Who is the next witness?

21         MS. CLINE:  The plaintiff calls Guo Wengui.

22         THE COURT:  Why don't we bring him in.  I take it he's

23   also going to need the interpreter?

24         MS. CLINE:  He's going to need an interpreter, and I

25   think there will be some housekeeping around his own counsel,

1      who is present.

2                  THE COURT:  While we're getting the jury box and the

3      witness stand ready, is this the witness who there is a

4      potential issue of invoking the Fifth Amendment?

5                  MS. CLINE:  It is, your Honor.

6                  THE COURT:  And I take it that still is a live issue?

7                  MS. CLINE:  It is.

8                  THE COURT:  Is counsel for the witness present in the

9      courtroom?

10                 MS. CLINE:  I don't see him, but I believe he's in the

11     vestibule.  May I leave a copy of the exhibit on the bar?

12                 THE COURT:  Yes, please.  And while you're at it, are

13     there exhibits, plaintiff's exhibits for Mr. Guo and defense

14     exhibits for Mr. Guo?

15                 MR. CHUFF:  Yes, your Honor.  I handed up two binders.

16                 THE COURT:  I've got them.  Thank you.

17                 MR. KLEIN:  Your Honor?  Josh Klein.  How are you?

18                 THE COURT:  Good afternoon.

19                 MR. KLEIN:  Can I be heard for a moment?

20                 THE COURT:  Yes.

21                 MR. KLEIN:  I'm here as Mr. Guo's counsel.  My

22     understanding is, depending on the line of questioning today,

23     Mr. Guo may want to avail himself of certain constitutional

24     protections and rights, and I was wondering whether the Court

25     would allow me to stand or sit somewhere in the courtroom such

L4LPEAS5                         HAN - CROSS

1    that I can advise Mr. Guo when he's on the stand?

2              THE COURT:  I had anticipated, Mr. Klein, that that

3    would be your request.  I haven't discussed it with the parties

4    or with my courtroom deputy.

5              Let me first ask the parties whether there is any

6    objection.  We'll seat the witness, and then while we're doing

7    that, I'm going to confer with my deputy about the logistics

8    for that, but let's take first things first.

9              Ms. Cline, any objection?

10             MS. CLINE:  No, your Honor.

11             THE COURT:  Mr. Greim?

12             MR. GREIM:  No, your Honor.

13             THE COURT:  Okay.

14             MR. KLEIN:  And, your Honor, just one other question.

15   Just in terms of just facilitating things logistically, to the

16   extent that if the Court is amenable to what I suggested, one

17   option would be for me to simply indicate when he's invoking;

18   alternatively, I can confer with him briefly and he can

19   indicate.  If we can do that?

20             THE COURT:  I think the better practice would be for

21   him to invoke.  It can be under advice.

22             MR. KLEIN:  Understood.

23             THE COURT:  But he should be the one to.

24             MR. KLEIN:  Understood.

25             THE COURT:  Mr. Guo, you may have a seat in the

1   witness seat in the jury box.

2          THE WITNESS:  (In English)  Yes, your Honor.  Oh,

3   here?

4          THE COURT:  Mr. Klein, we will be able to arrange for

5   you to sit in the jury box.  My suggestion is we have to comply

6   with the court's social distancing rules, would be for you to

7   have a pad or something with you so that you can communicate

8   that way with your client, unless there is some other

9   suggestion that you've got.

10         MR. KLEIN:  I'm not sure, because of the language

11  issues, whether I'm going to be able to communicate in writing

12  with him.

13         THE COURT:  Right.  We're going to take a ten-minute

14  break while we figure out the logistics now.  It's 3:35.  We'll

15  reconvene at 3:45.

16         MR. KLEIN:  Thank you, your Honor.

17         (Recess)

18         THE COURT:  Be seated.  Mr. Klein, I understand that

19  you've worked out with my courtroom deputy a means for you to

20  communicate with Mr. Guo and provide advice to him while, at

21  the same time, observing the Court's social distancing rules;

22  is that right?  And can you describe that to me?

23         MR. KLEIN:  Yes, your Honor.  With the assistance of

24  the court interpreter, I will communicate to Mr. Guo advice, to

25  the extent I need to, and my understanding is that will be

1    private, that the interpreter would be just facilitating my

2    ability to privately communicate with Mr. Guo.

3            And to the extent that communication results in an

4    assertion of rights, Mr. Guo will then vocally assert his

5    rights.

6            THE COURT:  You may be seated, Mr. Klein.

7            Any objection from the plaintiff?

8            MS. CLINE:  None from plaintiffs.

9            THE COURT:  From defendant?

10           MR. GREIM:  None, your Honor.

11           THE COURT:  That's acceptable to me.  I mean, my main

12   interest is in making sure that the witness is able to get

13   advice from counsel.  And then also, secondarily, it's

14   important that we observe the court's social distancing rules

15   and that I'm able to get the testimony that the witness is

16   willing to provide.

17           If at any time, Mr. Klein, the mechanism of

18   communication doesn't work and you need to consult with Mr. Guo

19   in person, we'll take a break and I'll make arrangements for

20   that.

21           MR. KLEIN:  Yes.

22           THE COURT:  I will also, in a moment, ask the

23   interpreter to convey to Mr. Guo in Chinese exactly what I've

24   just said to you, which is that if he wants to confer with you,

25   beyond just the signaling, he can request an opportunity to do

L4LPEAS5                          Kwok - Direct

1    so, and I'll honor that request.

2              MR. KLEIN:  Much appreciated, your Honor.

3              THE WITNESS:  (In English)  Yes, your Honor.

4              THE COURT:  So let me just ask you directly, Mr. Guo.

5    Has the court interpreter explained to you that if you want to

6    consult with Mr. Klein at any time, all you have to do is tell

7    me that, and we will take a break and I will give him an

8    opportunity to do so and you an opportunity?

9              THE WITNESS:  (In English)  Yes, your Honor.

10             THE DEFENDANT:  Yes, your Honor.

11             THE COURT:  All right.  Mr. Fishman, would you please

12   swear the witness.

13    KWOK HO WAN,

14        called as a witness by the Plaintiff,

15        having been duly sworn, testified as follows:

16             THE DEPUTY CLERK:  Will you please state your full

17   name for the record and spell it out, please.

18             THE WITNESS:  So K-w-o-k, H-o, W-a-n, Kwok Ho Wang.

19             THE DEPUTY CLERK:  Thank you.  Please be seated.

20             THE WITNESS:  (In English)  Thank you.

21             THE COURT:  Counsel, you may inquire.

22   DIRECT EXAMINATION

23   BY MS. CLINE:

24   Q.  Good afternoon, Mr. Guo.  Do you support the Chinese

25   Communist Party?

L4LPEAS5                          Kwok - Direct

A.   (In English)  No.

          (Through Interpreter)  No.

Q.   Do you consider yourself to be a Chinese dissident?

A.   (In English)  Yes.

          (Through Interpreter)  Yes.

          THE INTERPRETER:  Counsel, do you mind if I ask the
witness to speak in Chinese, or shall I just repeat what he
says?

          THE COURT:  Sorry.  Do I refer to you as Mr. Kwok or
Mr. Guo?

          THE WITNESS:  It's the same, your Honor.  It's the
same name.  It's just the pronunciation in Hong Kong or the
pronunciation from China.

          THE COURT:  Mr. Guo, if you answer the questions in
English, which obviously makes life easier for everybody, I'm
not going to ask the interpreter to translate it.  The answer
will stand in English.  If you need the assistance of the
interpreter to give your best answers, then you should answer
in Chinese and use the interpreter, and the interpreter will
translate for you.  I'm indifferent.

          THE WITNESS:  So can I choose it?  Some of the things
that I can say in "yes" or "no" I can say by myself.  I can say
"yes" or "no"; so I think it is to save the Court time, but if
there is something that I can't say in "yes" and "no," I'm
certain that I will use the interpreter.

1          THE COURT:  That's fine.  Counsel, you may proceed.

2          MS. CLINE:  Your Honor, may we have the last question

3   and answer, just to make sure we're on the same track here?

4          THE COURT:  Would the court reporter read back the

5   last question and answer.

6          (Record read)

7          THE COURT:  You may inquire.

8          MS. CLINE:  Okay.

9   BY MS. CLINE:

10  Q.   What does it mean to you to be a dissident?

11  A.   Well, anyone who disagrees with communist party; that

12  believe that they have committed, for example, genocide and the

13  killing of the Christians, Catholics, the other religious

14  people; and anyone that don't agree with one party ruling, that

15  has no freedom of religion, those are the dissidents.

16  Q.   In the role of being a dissident, do you work to expose

17  corruption within the Chinese Communist Party?

18  A.   Yes.

19  Q.   Can you please describe your efforts to expose corruption?

20  A.   Well, since 2017, I started to be a whistleblower, and I

21  talked about the Chinese company HMA.  And this company's

22  assets increased 20 times, to the extent of like trillions of

23  dollars, and that is because the Vice Chairman of China, Wang

24  Qishan; so I disclosed that.

25          And so since 2017 to present time, I have disclosed

L4LPEAS5                          Kwok – Direct

the incidents that shows the corporate from the officials of

China, the corruption they involved, and the overseas assets,

the assets in Hong Kong.  There were over thousands of these

corporate that involve -- there were thousands of corporations

that they were involved in my whistleblowers campaign, and I

have already disclosed 2,900 and more of such with videos.  So

that is what I did from 2017 to present time.

Q.  Do you use any social media platforms in the course of

exposing CCP corruption?

A.  (In English)  Yes.

          (Through Interpreter)  Yes.

Q.  Can you briefly describe what those were or are?

A.  YouTube and Twitter and Live Stream and GTV, and Instagram,

around these.

Q.  In 2017 and 2018, how frequently were you posting regarding

CCP corruption on social media?

A.  Every day.

          (Continued on next page)

L4LKEAS6                           Guo - Direct

BY MS. CLINE:

Q.  After you started your CCP expose program, did you experience anything that made you believe that the CCP was retaliating against you?

A.  Yes.

Q.  Did anything bad happen to your family in the 2017-2018 time frame?

A.  Yes.

Q.  What was that?

A.  Well, they have arrested 270 of my colleagues and then, also, 18 family members, including my wife, my daughter, my brother, my sister-in-law, et cetera.  Altogether, 18 family members.

Q.  Were you personally ever threatened with arrest?

A.  Yes, many.

Q.  Describe any occasions in 2017 in which you were threatened with arrest.

A.  Well, since 2017, 2nd of February, I started to be the whistleblower, Chinese Communist Party using all different channels to communicate with me and threaten to kidnap or arrest me and my family.

        Well, for example, the Ministry of Security, the minister, Liu Yanping, had come to meet me twice in London. During those occasions, he threatened to -- and also using some of the offices in the U.K. to shadow -- to follow me and to

1    threaten me.  And also other incidents prior to the VOA

2    incident happened on the 19th of April, they often using the

3    threat of killing or arrest my family, so that I can stop

4    broadcasting whistleblowing.

5            CHECK INTERPRETER:  I believe the witness mentioned

6    vice minister, vice minister.

7            THE INTERPRETER:  Okay.  Vice Minister Liu Yanping.

8            THE WITNESS:  And, also, including just hours before a

9    VOA live broadcasting, which was supposed to be three hours,

10   they had also sent out a red notice to arrest -- to arrest me

11   and also arrest my colleague and family, and also confiscate my

12   family asset of the amount of, like, tens of billions of

13   dollars.  And also during that time, when they were making the

14   arrest, they beat my colleagues, and some of them were even

15   beaten to be disabled, very much injured.  So many incidents

16   like that, I cannot even tell you.

17           And I can also tell you one incident, so that you can

18   understand the enormity of their threat to me.  For example, in

19   early April, and that is before I suppose to be having the

20   broadcast with VOA on the 19th of April, it was around that in

21   April 13, they had actually -- the Chinese Communist Party and

22   the public security officers, they came to my home, and then

23   standing with guns in front of my mother and my father -- my

24   father, at the time, was already in bed, bedridden, and my

25   mother was also in wheelchair, and they were in their eighties,

1   and they were carrying gun, standing in front of them, and make

2   my mother to call me, and then during that phone call, they

3   told me to stop the broadcasting, so, otherwise, they're going

4   to do whatever to my parents.

5          And so such incidents, there were many.

6          THE INTERPRETER:  Let me consult.

7          (Pause)

8          THE WITNESS:  And if I don't stop, they would arrest

9   my parents again.

10          And, also, since that incident, my mother was so

11   scared, that she cried all the time, and then she was crying so

12   much, that she's blind.  And, also, a year after that, and then

13   she had a heart attack or then she passed away.

14          And, also, that during that time, in March and April,

15   that kind of time, the Communist Party had asked me -- had

16   actually threatened me to tell me to write all this kind of

17   letters and other cooperation.  Many, many incidents, I cannot

18   even tell you how many, just so that I can stop the

19   broadcasting.

20          And then, also, that I want to report to the judge

21   here that you see, my brother, my sister-in-law, and my nephew,

22   and my niece, they were in Dalian, you know, that they were

23   being put in the court, appearing in court 11 times, and to be

24   tried, and then they put into prison, to have a prison sentence

25   from three to five years.

1           And then, of course, such incident was so many, that I
2      don't think that I can even finish it within several hours.  So
3      I don't really want to waste the Court's time, but I want to
4      tell you one last thing.  That is, that during that time, that
5      Elliott Broidy and Jho Low, and then they were here trying to
6      lobby and have me deported back into China.
7           And then during that kind of time, concurrently
8      happening in Kaifeng City and Dalian City in China, they also
9      arrest my -- the fourth time, arrest my colleagues and my
10     families, and then they were being beaten and also seized my
11     assets amounted to $13.1 billion.  And all these are
12     information anyone can find in a public domain.
13              THE COURT:  Mr. Greim?
14              MR. GREIM:  Yes, your Honor.  I just -- I wanted to
15     object that it called for a narrative, and it came in in such a
16     way, that we have no way of sorting out the personal knowledge
17     from the hearsay.  It all kind of came in in dribbles.  I just
18     object to calling for a narrative and hearsay.
19              THE COURT:  Well, I'm not going to strike the
20     testimony, but be more careful in terms of your questions.
21              And, Mr. Guo, let me instruct you that you should just
22     answer the questions that are asked of you, and we want to know
23     what you know of your personal knowledge.  Okay?
24              Counsel, you may inquire.
25              MR. KLEIN:  Your Honor, may I confer briefly?

1              THE COURT:  Yes.

2              Do you need the assistance of the interpreter?

3              MR. KLEIN:  I do, your Honor.

4              THE COURT:  Okay.  The interpreter may assist.

5              (Pause)

6              MR. KLEIN:  Thank you, your Honor.

7              THE WITNESS:  Thank you, your Honor.

8              THE COURT:  Mr. Klein, did you have your consultation?

9              MR. KLEIN:  Yes, your Honor.

10             THE COURT:  Very well.

11             You may inquire, counsel.

12   BY MS. CLINE:

13   Q.  Mr. Guo, you mentioned the VOA interview.  Does that mean

14   Voice of America?

15   A.  Yes.

16   Q.  Describe what you personally experienced on the day you

17   were supposed to have the VOA interview.

18             THE COURT:  Let me caution you to keep your answer

19   short.  Counsel can ask follow-up questions if need be.

20             THE WITNESS:  Yes, your Honor.

21             Well, because at the time, the Chinese people yearned

22   to learn about the freedom and rule of law, and through the

23   VOA, Voice of America, it was the beacon for Chinese people.

24             So in April, they invited me to have an interview, and

25   that happened, the incident of April 19, 2017, and it was a

1    three hours' interview.

2    BY MS. CLINE:

3    Q.  Did the interview end up being three hours?

4    A.  No.

5    Q.  What happened?

6    A.  So because it was influenced by the embassy of China and

7    also the foreign minister, they even sort of disconnected the

8    cable for the recording, so the interview at the end was not

9    even an hour long.

10   Q.  At some point after the day of that interview, did a

11   minister of the Chinese -- the People's Republic of China come

12   to visit you in New York?

13   A.  Yes.

14   Q.  Who was that?

15   A.  It was Liu Yanping, who was the minister of security, the

16   intelligence perhaps, and also being the secretary, as well,

17   and altogether, there are four people.

18   Q.  Are you aware of any transcriptions or recordings of a

19   portion of that meeting that day?

20   A.  There was recording, audio recording, and also video.

21          MS. CLINE:  Your Honor, may I ask the witness to

22   access a hard copy of an exhibit?  And this will be

23   Exhibit DX 114.

24          THE COURT:  Yes.

25          MS. CLINE:  Just for way of reference, I'm going to

1   direct the witness' attention to the page that's Bates labeled

2   SVUS001362, and on the witness' copy, I put an orange sticker,

3   so he could find it.

4          THE COURT:  Counsel, is it DX 114?

5          MS. CLINE:  Yes, your Honor.

6          THE COURT:  For some reason, that's not in the binders

7   that I've been provided.  Maybe your colleague has another

8   copy.

9          MR. CHUFF:  Is it the last tab, your Honor?

10         THE COURT:  Oh, it is the last tab.  I've got it.

11  Thank you.

12         MS. CLINE:  Are we all on page 1362?

13         THE WITNESS:  Yes.

14  BY MS. CLINE:

15  Q.  Now, prior to your testimony today, Mr. Guo, were you able

16  to review this transcription?

17  A.  Yes.

18  Q.  Is it an accurate transcription of the conversation that

19  you had with Mr. Liu?

20  A.  Yes.

21  Q.  If you could please turn the page to 1363, the next page.

22  I'll direct your attention to the -- let's see.  There's a

23  designation on the left-hand side that says 2:30?

24  A.  Yes.

25  Q.  I'm going to read the transcription in English there.  It

1    says -- first of all, next to the 2:30, there are the initials

2    LYP.  Do you see those?

3    A.  Yes.

4    Q.  Do you understand what they stand for?

5    A.  Yes.

6    Q.  What is it?

7    A.  This is our legal document.  Does it mean that?

8    Q.  Well, my understanding is that the transcription reflects a

9    conversation between -- back-and-forth between Mr. Liu and then

10   you.  Is that your understanding?

11   A.  Yes.  And LYP, that stands for Liu Yanping, right?

12   Q.  Okay.  And then at the bottom, you'll see GWG?

13   A.  So, yes, it is an acronym for my -- the English spelling of

14   my Chinese name.

15   Q.  Okay.  So let's go back up to the column with the 2:30.  I

16   will read it into the record in English.  It says, "This is the

17   premise.  I think personally that I am appointed by the country

18   to carry out this duty and resolve the issue.  My goal is to

19   seek a solution to the problems.  Don't trust others, and don't

20   listen to them.  First, I promise to ensure your safety,

21   including your family's safety."

22          And then I'll continue:  "Do you get me?  This, same

23   thing, let's clarify these issues at the legal and judicial

24   level and then resolve them.  Do you get it?  Solve them and

25   put them to an end.  Certainly you can rest assured that your

L4LKEAS6                          Guo - Direct

1   personal and family safety will be well protected."

2   A.  Yes.

3   Q.  Did he say those things to you?

4   A.  Yes.

5           MS. CLINE:  Your Honor, I would offer DX 114, but only

6   the portion that relates to video 8.

7           THE COURT:  Okay.  That's received subject to motion

8   to strike.

9           Any issues on authenticity for that?

10          MR. GREIM:  No, none on authenticity.

11          (Defendant's Exhibit 114 received in evidence)

12  BY MS. CLINE:

13  Q.  Mr. Guo, how did you feel after he said those things to

14  you?

15  A.  Well, you see, at the time, my family were all detained,

16  arrested, so when I heard what he said, I felt I was very

17  scared, very frightened.  I could not even describe it.  You

18  see, particularly that when I was really -- when I understand

19  what that really mean in the Chinese cruel -- the cruel

20  legality in China, when they say they can protect your family,

21  that means that they can kill them all.

22  Q.  Did you feel pressured as a result of that conversation to

23  take any actions to protect your family?

24  A.  Of course.  I was so very afraid.

25  Q.  After that meeting, did you ever sign a document which you

1   pledged allegiance to Chairman Xi?

2   A.  Well, in fact, even before that, in March.  And I started

3   to have this discussion with him all the way to August.  In

4   between this time, I must have signed four to five documents --

5   of such documents.

6   Q.  Why would you agree to say that if you're really a

7   dissident?

8   A.  Well, I don't really have a choice.  I make those

9   statements under duress.

10          You see, those were documents already written,

11  presented to me at the time that my wife, my daughter, were --

12  they were arrested.  And, also, that it was a condition that

13  they would release my wife, and my daughter, and my colleagues.

14          But the thing is that it had never caused me to waver

15  from any of the anti-CCP objectives and the purpose of that.

16  It never caused me to waver any of that.  In fact, the result,

17  you can actually see from my action.

18  Q.  Subsequent to this meeting, did you become aware of an

19  effort to extradite you back to China?

20  A.  Well, at the time of the meeting, Liu Yanping had already

21  explicitly state claims that they have the assistance of the

22  largest PR firm, that is Elliott Broidy, and then also backed

23  by the president or military, the purpose to extradite me back

24  into China.

25          So that is why I need to compromise.

1     MR. GREIM:  Your Honor, again, I can't always hear

2   this until we're all done, but I object to hearsay about what

3   Liu Yanping told him.

4     THE COURT:  I'm not receiving it for the truth, but I

5   will receive it for the witness' state of mind and for the fact

6   that he says it was said to him, but not for the truth.

7     THE WITNESS:  Can I tell you something, your Honor?

8     THE COURT:  No, you cannot.  The way these proceedings

9   work is you're going to answer the questions of counsel, and if

10   you've got a question about the proceedings where you need to

11   consult with your personal counsel, you can do so.

12     THE WITNESS:  But I want to say something to my

13   counsel, Mr. Klein.

14     THE COURT:  Are you asking for advice as to whether to

15   invoke a privilege?

16     THE WITNESS:  No.  I just want to clarify that

17   whatever I said just now, they were my personal experience.

18   There is not one thing that was hearsay.

19     THE COURT:  Okay.  So, listen, if you've got questions

20   for Mr. Klein that are not of a privilege nature, we're going

21   to break a little bit after 5:00 o'clock, you can talk to

22   Mr. Klein about them then, but the way it works is that you

23   answer counsel's question, and then if there are further

24   opportunities for questions, you'll answer the additional

25   questions.

L4LKEAS6                          Guo - Direct

1          You may proceed.

2          THE WITNESS:  Yes, your Honor.

3     BY MS. CLINE:

4     Q.  During the 2017-2018 time period, was your personal data

5     ever subject to a cyber attack?

6     A.  Yes.

7     Q.  Can you describe that very briefly?

8          MR. GREIM:  Your Honor, I'm sorry, I just want to

9     object here because I want to make sure that there's a

10    foundation -- I'm sorry, I withdraw it.  I'll have to wait and

11    hear what he says.

12         THE WITNESS:  Well, at the time, the Wi-Fi at my home,

13    my cell phone, and also that the Wi-Fi of wherever I go, they

14    were hacked, and controlled, and impacted by these hackers.

15    And, also, at the time that my YouTube and Twitters, they were

16    hacked, also.  In fact, I was the person who was being hacked

17    the most in the world.

18    Q.  Was there ever a law firm who represented you who was the

19    victim of a cyber attack?

20    A.  Yes.

21    Q.  Do you recall the name of the law firm?

22    A.  I use English — maybe it's not accurately pronounced —

23    Clark Hill in Washington, D.C. is the law firm representing --

24    it's an immigration law firm.

25    Q.  Is it Clark Hill?

1    A.  Yes.

2    Q.  Are they representing you in connection with your -- were

3    they representing you in connection with your asylum

4    application?

5    A.  Yes.

6    Q.  Now, I'd like to shift gears a little bit and talk about

7    the research agreement that's at issue in this lawsuit.

8    A.  Yes.

9    Q.  Did the research agreement that's at issue in this case fit

10   into your CCP expose program?

11   A.  Yes.

12   Q.  Very briefly, describe how.

13   A.  Well, it was like I said before, at the beginning of 2017,

14   I had started this expose campaign against HNA under Vice

15   President of China, Wang Qishan.  And he and his family's asset

16   in overseas and the asset of Agent A, those were illegal asset,

17   those campaign.

18          And then so the asset was amounted to -- such illegal

19   asset was amounted to like trillions.

20   Q.  And how were you first introduced to Ms. Wallop and

21   Mr. Waller?

22   A.  It was in around December 2017, I was introduced to them by

23   Mr. Han Chunguang and Mr. Bill Gertz, although I don't recall

24   the accurate time.

25   Q.  What did you and they discuss in your initial meetings?

1  A.  Well, you see that my English wasn't good, so at the time

2  that -- I did not say a lot, it was mainly Mr. Han Chunguang,

3  and he was a supporter of ours, and, also, he supported the

4  anti-CCP's corruption.  So mainly he talked more, and he knew a

5  lot anyway.

6         So for my mind -- at the time, the take of mind was to

7  have a great launch, and then -- so I only said that we wanted

8  to investigate legally all those asset of, like, HNA and Wang

9  Qishan.

10 Q.  And did Mr. Waller and Ms. Wallop describe their

11 qualifications to conduct an investigation?

12 A.  Yes.

13 Q.  And did you ultimately decide that they were qualified to

14 be hired to do an investigation?

15 A.  Well, they claimed that they had connection with the

16 defense department, CIA, FBI, princes in the Middle East, and

17 they also claimed that they had hundreds of employees, the

18 largest investigative business.  So, of course, I believe in

19 them.

20 Q.  What were you hoping to do with the information that you

21 thought they would find?

22 A.  Well, so that we can try and just -- try them with justice,

23 just like what we're doing today in the United States, of those

24 corrupted parties.

25 Q.  Were you the person who was the lead on negotiating the

1    specific details of the contract?

2    A.  No.

3    Q.  Did you negotiate the pricing or the terms of the payment

4    arrangements?

5    A.  No.

6              THE COURT:  May I ask a question?

7              Mr. Guo, when you say that you were going to try them

8    with justice, just like what we're doing today in the United

9    States, where did you expect the information you were going to

10   uncover would lead to charges, which courts?

11             THE WITNESS:  Of course, it is in the United States,

12   your Honor.  We will report them to the Department of Justice,

13   to the FBI, so that they can make investigation, so that those

14   illegal asset investment that are conducted by Agent A.  And,

15   also, of course, because how they amass these asset, the victim

16   will be the Chinese people, as well, so that we will report

17   them to the court, as well, to help those people that have been

18   victims.

19             Well, in fact, that we have always been in

20   connection -- have been in contact with the FBI, and then we

21   have always reported informations to the FBI.  That is why that

22   when Liu Yanping and his entourage came -- when they came to

23   New York, they were stopped by the Homeland Security officers,

24   and, also -- in May, and, also, all of their electronics were

25   taken away from them.

1          THE COURT:  You may inquire.

2     BY MS. CLINE:

3     Q.  Do you know who did negotiate the agreement?

4     A.  Well, it would be William Je and Wang Yan Ping, and also

5     some of the anti-CCP people, Han Lianchao.

6     Q.  Okay.  I'm asking -- I know there are a couple of

7     agreements in this case.  I'm asking just about the research

8     agreement with Strategic Vision.

9          Do you know who was in charge of negotiating that?

10    A.  Han Chunguang, Wang Yan Ping, and William.

11    Q.  Do you understand that there was also -- there's a loan

12    agreement that was executed in connection with the research

13    agreement?

14    A.  Yes.

15    Q.  And who was in charge of negotiating -- or who was involved

16    in the loan agreement, if you know?

17    A.  For the loan agreement, mainly it would be William --

18    they -- they were doing the negotiation.

19    Q.  Were you involved in identifying the targets of the

20    investigation, the people to be investigated?

21    A.  My involvement was limited to only providing the names of

22    Wang Qishan and several name of his family.  I didn't do -- I

23    didn't have any other involvement.

24    Q.  You may have explained this already, but could you just

25    briefly tell us who Wang Qishan is?

1    A.   He's the Vice President of China, and he's also the

2    permanent Vice President of China after the change of

3    constitution, and he is also the chairman of the central

4    disciplinary committee, and he's also the chairman of the

5    number one corporate that is Agent A, who has amassed so much

6    of the asset -- of 20 times of the asset.  So he's that person.

7    So that, in fact, the Agent A, their asset expand 20 times per

8    day, that kind of a speed.

9         And then, also, that, you know, there was a fund they

10   owed in New York that has the asset of like hundred million

11   dollar that was owned by Agent A as well.  That is the reason

12   that why I want to investigate them, the New York.

13   Q.   Did you ever meet with Ms. Wallop and Mr. Waller to discuss

14   the results of their research efforts?

15   A.   Yes.

16   Q.   What happened at that meeting?

17   A.   Well, you see, those two people, they were very busy about

18   drinking the red wine, and also boasting about their past

19   glory, and talking about how much they know about the Middle

20   East royalty, the princes, and how much they were working with

21   the CIA, the defense department, and helping the presidents and

22   supporting them.  So, really, 99 percent, they were talking.  I

23   was really listening, not talking much.

24   Q.   Did there come a time in which they showed you some

25   information that was contained on a thumb drive that they put

L4LKEAS6                          Guo - Direct

1    into a computer?

2    A.  Yes.

3    Q.  And what was your reaction when you saw what was on the

4    thumb drive?

5    A.  Well, I thought they were completely rubbish because those

6    were the information contained -- you can find in Google, and,

7    in fact, they were information that I have done in my

8    whistleblowing campaign.

9    Q.  After that meeting, did they -- was there another time

10   where they presented additional data to you?

11   A.  Seemed to be like several USB drive.

12   Q.  Did any of those USB drives contain any information that

13   was useful to your campaign to expose corruption?

14   A.  Nothing, really.  And they -- in fact, every time they

15   would communicate with Yan Ping and told her that, you know,

16   this information would have code and encrypted, cannot be open.

17   Q.  Did the work that Ms. Wallop and Mr. Waller had done meet

18   your expectations in any way?

19   A.  No.  Completely it was a deception.

20   Q.  Even though Mr. Waller and Ms. Wallop weren't able to

21   provide you useful information, did you continue on with your

22   expose program?

23   A.  Yes.

24   Q.  From 2017 until now, have you ever wavered in your

25   opposition to the CCP?

1    A.  Well, you know, from 2017 to now, we have continued to

2    expose the CCP, and telling the truth about the virus, and

3    telling the truth about how they have, like, victimized the

4    children in Hong Kong, and how we became the number one enemy

5    of CCP, how much that they have hacked us in such a great

6    number, that we were number one, and continued to threaten us.

7    That, in fact, is the proof of our work and that we have done

8    to the CCP.

9            MS. CLINE:  No further questions, your Honor.

10           THE COURT:  Mr. Greim, are you going to do the cross?

11           MR. GREIM:  Yes, your Honor.

12           THE COURT:  Let's start with five or ten minutes, and

13   we'll take a break for the day.

14           MR. GREIM:  Sure.

15           MS. CLINE:  Mr. Fishman --

16           THE COURT:  Would you clean off the podium.

17           (Pause)

18           THE COURT:  You may inquire.

19   CROSS-EXAMINATION

20   BY MR. GREIM:

21   Q.  Mr. Guo, you've testified consistently that you began your

22   whistleblowing campaign in 2017, correct?

23   A.  Yes.

24   Q.  But 2017 is not when you came to the United States, is it?

25   A.  I don't know what you mean.  I did come to the United

L4LKEAS6                          Kwok - Cross

1  States in 2017, but, in fact, I had been to the United States

2  even before that.

3            (Continued on next page)

1    Q.   Did there come a time when you claim to have fled China?

2    A.   (In English)  Yes.

3              (Through Interpreter)  Yes.

4    Q.   In what year?

5    A.   2014.

6    Q.   At the end of 2014?

7    A.   December.

8    Q.   Now, Mr. Guo, isn't it a fact that you were detained in

9    China and then released in January of 2015?

10   A.   Absolutely rubbish.  In fact, I was in London in

11   January 2015, but it was Elliott Broidy, those people, who said

12   that my family were arrested.

13             MR. GREIM:  Motion to strike.  I don't understand what

14   the last part has to do with my question.

15             THE COURT:  Overruled.

16   Q.   Mr. Guo, you currently have Hong Kong citizenship; is that

17   right?

18             THE INTERPRETER:  I'm sorry, counsel, what did you

19   say, Hong Kong what?

20   Q.   Citizenship.

21   A.   (In English)  Yes.

22             (Through Interpreter)  Yes.

23   Q.   And a Hong Kong passport?

24   A.   (In English)  Yes.

25             (Through Interpreter)  Yes.

1  Q.  In what countries do you hold citizenship?

2  A.  At this moment, I have citizenship of Hong Kong only.

3  Q.  And so between December 2014, when you say you left China,

4  and early 2017, where were you?

5  A.  In the UK, in the United States, in Europe and Japan and I

6  also have been to UAE in the Middle East.

7  Q.  Now, you bought an apartment in the Sherry Netherland Hotel

8  in March of 2015, correct?

9          MS. CLINE:  Objection to form.

10          THE COURT:  Overruled.

11  A.  So I'm asserting the Fifth Amendment not to answer this

12  question.

13  Q.  Mr. Guo, let me -- I don't want to ask a lot of questions

14  that provoke that issue, and I'm going to try to steer clear as

15  I learn what those might be.

16          Let me ask you, is it true that you have not moved a

17  penny out of Hong Kong or the mainland since you began

18  whistleblowing?

19  A.  So I'm invoking the Fifth Amendment.

20  Q.  Mr. Guo, you've had an attorney say substantially those

21  words on your behalf to the Wall Street Journal?

22  A.  I'm invoking the Fifth Amendment.

23  Q.  Why did you not begin whistleblowing until January of

24  2017 -- or I'm sorry.  Let me withdraw that.  I'm just going to

25  withdraw the question.

1          Why did you not begin whistleblowing until February of

2     2017?

3     A.   Well, you see, in January 2015, the Chinese CCP, they

4     arrested my family, and they continue these kinds of arrests to

5     2016, and they threatened to expatriate me to China.   In fact,

6     starting from January 2015, Bruno Wu, Elliott Broidy, Jho Low,

7     and they called me directly threatening me that they're going

8     to arrest all my family.

9          And so this situation continued, and so I tried to do

10    my best to have my family released.   So in February 2nd, 2017,

11    that's the next day my daughter was released, I started the

12    whistleblowing campaign.

13    Q.   Mr. Guo, is it your sworn testimony here, under oath, that

14    starting in January of 2015, Jho Low, Elliott Broidy and Bruno

15    Wu began to personally contact you and threaten you?

16    A.   Calling me personally was Bruno Wu.   In fact, that Bruno Wu

17    had called me many times even before that and when he called me

18    and told me over the phone personally that Elliott Broidy, who

19    has the biggest political power influence in the United States,

20    and Jho Low, who is the head of the intelligence overseas, he

21    told me that.

22         So Bruno Wu, he's actually a registered person in the

23    intelligence for China overseas, and so he is the same as Liu

24    Yanping and the words that they were telling were the same.

25    Q.   Mr. Guo --

L4LPEAS7                          Kwok - Cross

1              THE INTERPRETER:  I'm sorry, counsel.

2       A.  And that Liu Yanping was Bruno Wu's leader.

3              THE COURT:  So, Mr. Guo, the question to you was a

4       simple question, it was whether, starting in January 2015, Jho

5       Low, Elliott Broidy and Bruno Wu began to personally contact

6       you and threaten you.  I think you can just simply, next time,

7       answer that question and not give us a speech.

8              THE WITNESS:  (In English)  Yes, your Honor.  Sorry.

9       A.  (Through Interpreter)  Yes.

10      Q.  Mr. Guo, did you listen to the court proceedings yesterday?

11      A.  No.

12      Q.  Did you listen to them the day before?

13      A.  No.

14      Q.  Has anyone discussed with you the testimony and the

15      evidence presented in this courtroom on Monday or Tuesday of

16      this week?

17      A.  No.

18             THE COURT:  Mr. Greim, when you come to a convenient

19      breaking point, we'll break for the day.  Now is a good time.

20             MR. GREIM:  This is as good a time as any.  I'm okay.

21             THE COURT:  All right.  We'll break for the day.  We

22      will reconvene tomorrow morning at 9:30.

23             Mr. Guo, you're going to be excused.  I need to have a

24      minute with the lawyers.  I'll expect you and your counsel a

25      couple of minutes before 9:30.  Make sure you're ready to go

L4LPEAS7                          Kwok – Cross

1    promptly at 9:30.

2           THE WITNESS:  (In English)  Thank you, your Honor.

3    Thank you.

4           (Witness temporarily excused)

5           THE COURT:  Counsel, stay here for just a minute.

6           Mr. Greim, is there any further word with respect to

7    Sasha Gong, the last witness?

8           MR. GREIM:  She came to New York anyway, and she's

9    here.  She will be able to testify.

10          THE COURT:  Very well.  Good.  And I expect that

11   tomorrow, by the end of the day, after the testimony of Sasha

12   Gong, we'll discuss the testimony of Yvette Wang and the open

13   questions with respect to Yvette Wang.  So counsel should be

14   prepared to address that with me.

15          Anything else from plaintiff before we break for the

16   day?

17          MS. CLINE:  No, your Honor.

18          THE COURT:  Anything else from defendant?

19          MR. GREIM:  No, your Honor.

20          THE COURT:  Okay.  Have a good evening, everybody.

21          (Adjourned to April 22, 2021, at 9:30 a.m.)

22

23

24

25

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                              Page

 3    YAN PING WANG

 4   Cross By Mr. Greim . . . . . . . . . . . . . 470

 5   Redirect By Ms. Cline  . . . . . . . . . . . 557

 6    HAN CHUNGUANG

 7   Direct By Mr. Chuff  . . . . . . . . . . . . 564

 8   Cross By Ms. Donnelli  . . . . . . . . . . . 578

 9    KWOK HO WAN

10   Direct By Ms. Cline  . . . . . . . . . . . . 618

11   Cross By Mr. Greim . . . . . . . . . . . . . 640

12                      PLAINTIFF EXHIBITS

13   Exhibit No.                               Received

14    11   . . . . . . . . . . . . . . . . . . . 573

15                      DEFENDANT EXHIBITS

16   Exhibit No.                               Received

17    DX56   . . . . . . . . . . . . . . . . . . 468

18    DX32   . . . . . . . . . . . . . . . . . . 469

19    DX24 and DX68  . . . . . . . . . . . . . . 469

20    DX80   . . . . . . . . . . . . . . . . . . 475

21    126 and 126B . . . . . . . . . . . . . . . 488

22    5  . . . . . . . . . . . . . . . . . . . . 522

23    126A   . . . . . . . . . . . . . . . . . . 556

24    114  . . . . . . . . . . . . . . . . . . . 630

25
```