L4UPEAS1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

EASTERN PROFIT CORPORATION
LIMITED,

                    Plaintiff,

              v.                          18 CV 2185 (LJL)
                                          TRIAL
STRATEGIC VISION US LLC,

                    Defendant.

------------------------------x
                                          New York, N.Y.
                                          April 30, 2021
                                          1:02 p.m.

Before:

                    HON. LEWIS J. LIMAN,

                                          District Judge

               APPEARANCES VIA VIDEOCONFERENCE (ZOOM)

TROUTMAN PEPPER HAMILTON SANDERS LLP
     Attorneys for Plaintiff
BY:  CHRISTOPHER B. CHUFF
     JOANNA J. CLINE

GRAVES GARRETT LLC
     Attorneys for Defendant
BY:  EDWARD DEAN GREIM
     JENNIFER A. DONNELLI

ALSO PRESENT:

Melissa Francis, Eastern Profit Corporation Limited

1              (Trial resumed)

2          (The Court and all parties present via videoconference, Zoom)

3              THE COURT:  Good afternoon.  This is Judge Liman.

4              (Case called)

5              MS. CLINE:  Good afternoon.  This is Joanna Cline,

6      Troutman Pepper, on behalf of Eastern.  With me on the Zoom is

7      my colleague, Chris Chuff, also of Troutman Pepper, and Melissa

8      Francis, who is a corporate rep.

9              THE COURT:  Good afternoon, Ms. Cline.

10             MR. GREIM:  Your Honor, this is Eddie Greim, and with

11     me in the room here is Jennifer Donnelli, counsel for Strategic

12     Vision U.S. LLC, the Graves Garrett law firm.

13             THE COURT:  Good afternoon, Mr. Greim.

14             So we're here today for me to hear closing arguments

15     in the Eastern Profit case.  Before we get started with

16     plaintiff's closing argument, is there anything that either

17     party has to raise with the Court?  Ms. Cline?

18             MS. CLINE:  Not from us, your Honor.

19             THE COURT:  Mr. Greim?

20             MR. GREIM:  Nothing, your Honor.

21             THE COURT:  Okay.  All right.  So I will hear first

22     from you, Ms. Cline.  I think I've given each side one hour,

23     and you may proceed.

24             MS. CLINE:  Thank you.  After four days of trial, the

25     issue before the Court remains the same as those that we

1    identified in our opening.  Was there an enforceable contract?

2    Did the parties perform?  And can Strategic prove each element

3    of fraud by clear and convincing evidence?

4            The resolution of these issues hinges almost entirely

5    on the language of the contract itself, the testimony of

6    Ms. Wallop and Mr. Waller, and the admissions contained in the

7    parties' joint statement of admitted facts and in Strategic's

8    proposed findings of fact.

9            We are mindful of the Court's question posed, I guess

10   it was on Wednesday, regarding the parties' respective

11   performance under the contract; so we'll start with the second

12   of our three issues, the performance of the contract.

13           So turning directly to the Court's question, if there

14   were a question of whether both parties breached the contract,

15   the Court would need to determine whether the breach of one

16   party was excused by a prior material breach by the other

17   party.  And we learn that from a case called *Teachers Insurance*

18   *and Annuity*; 799 F. Supp. 16, Southern District, 1992.

19           The Farnsworth treatise teaches us that if one party

20   is to do work and the other is to pay, the performance of the

21   work is to precede payment.  Farnsworth on Contracts, Section

22   8.12.

23           Here, obviously, Strategic was the party who was going

24   to be doing the work.  Its performance was to precede payment,

25   and its failure to perform was a prior material breach that

excused Eastern's obligation to pay $750,000.

In a moment we'll go into the timing of the performance in detail, but the short story is that both Ms. Wallop and Mr. Waller admit that they didn't provide the required reports, let alone anything remotely useful, by the required dates.  And even if Strategic were entitled to $750,000 in mid-February, as Strategic claims, Strategic would have taken a credit against the deposit they already had received.

By the end of January, it was very clear that the contract had failed, and by February 23rd, Eastern had sent a formal termination notice, which is Defendant's Exhibit 8.

Under the plain language of the contract, the deposit was to be credited to the final one and one-third months of the contract.  Eastern did not breach by failing to pay another 750 on top of the one million that Strategic had already received.

Strategic Vision cannot show a simultaneous breach, but let's assume for a moment that they could.  If the Court were to determine that there were simultaneous breaches by the parties, then the parties would share the responsibility for the contractual breakdown.  And that, too, comes to us from Teachers Annuity case in the Southern District that I cited a moment ago.

And we believe that in a case like this, the way the apportionment works, if there were simultaneous breach, is what

1    the Court contemplated in its summary judgment ruling.  Eastern

2    would be entitled to recover its deposit, less the amount of

3    the reasonable value of services and goods that Strategic can

4    prove it conferred on Eastern.  And that's from the Court's

5    October 5th MSJ ruling, and also in a case called *Silver Air v.*

6    *Aeronautic*, 656 F. Supp. 170 (S.D.N.Y. 1987).

7         The burden of proving up the value of these goods and

8    services is on Strategic.  That comes from *In re:  Lyondell*

9    *Chemical Company*, 585 B.R. 41 (S.D.N.Y. 2018).

10        And here, there is no evidence of any services

11   rendered or any legitimate out-of-pocket costs on the record.

12   There's nothing to show for anything that Waller and Wallop

13   claim to have done, no evidence of any reports or even partial

14   reports, no interview notes even.  No one from Team 1 or Team

15   2, the so-called subcontractors, was here to tell us about

16   their efforts, or about the payments they supposedly received,

17   or the work they supposedly did.

18        There was no returned equipment.  We heard testimony

19   that there was lots of equipment bought.  We don't see any

20   evidence of that.  No receipts for the hundreds of thousands of

21   dollars in start-up equipment that allegedly was bought; just

22   some redacted wire transmissions and bank statements, payments

23   for life insurance, groceries and luxury goods from airport

24   shops.

25        And the damages theory has changed three times since

Ms. Wallop's deposition, including in the middle of the trial itself.  There was nothing substantiating the value they supposedly bestowed upon Eastern and, therefore, they have no basis on which to subtract anything from the $1 million they owed.

Now, let me turn briefly, in summary form, to the other two issues, and then we'll go ahead and proceed and get a little more in detail about the evidence on the record.

So that was Issue No. 1, whether the parties performed.  Let's take a step back and consider whether the contract was even enforceable.  Ms. Wallop's testimony demonstrates that Strategic solicited in and engaged in textbook private investigation services within the Commonwealth of Virginia.  It had no license to do so and, therefore, the research agreement is void, and Eastern is entitled to a return of its deposit.

We agree with the Court that there's not much case law on this statute generally, but the plain language of the statute covered the very conduct at issue here, and there's a Virginia case directly on point, holding that contracts pursuant to which an unlicensed investigative services are void as a matter of law.  That's the *Urban* case that the Court is aware of that we've cited in our papers.

And there's a case in this district, called the *Meyer* case, which I'll cite in a little more detail in a minute, in

which Judge Rakoff held that seeking to uncover information

about one's employment, finances and family life constitutes

private investigation work under the New York statute.

Finally, again, just at a summary level, turning to

the third issue, whether Strategic proved fraud by clear and

convincing evidence.  We'll get to the evidence in a minute,

but very generally speaking, as we previewed in our openings,

the witnesses held deeply passionate, yet divergent, views on

the subject of what makes one a dissident, with each side

accusing the other and its witnesses of CCP allegiance.

But it is Strategic who bears the burden of proof, and

Strategic failed to even establish an ascertainable, coherent

definition of dissident, let alone prove by clear and

convincing evidence that they reasonably relied on material

misrepresentations by Mr. Guo as to his dissident status when

they entered into the research agreement.

Now, Mr. Greim talked in his opening about the three

legs of Strategic's fraud claim, things that supposedly prove

that Mr. Guo was actually a CCP operative.  Those were

Mr. Guo's alleged movement of money, his alleged profession of

allegiance to Xi Jinping, and his alleged attacks on people

claiming to be dissidents.

Almost all of this alleged conduct was known to

Strategic before it entered the contract; so as a threshold

matter, these legs cannot support a fraudulent inducement

1    claim.  But putting that aside, Strategic never actually proved

2    up any of those three things.

3            Eastern and Mr. Guo emphatically deny them, and the

4    evidence, which we'll get to in a minute, does not support

5    them.  And even if they were all true, even if Mr. Guo moved

6    money as Strategic alleges, professed allegiance to President

7    Xi, has been in disputes with some people who are Chinese

8    dissidents, or those people who are pretending to be such,

9    none of those things comes close to showing that Mr. Guo is

10   actually a CCP supporter.

11           Strategic has now had its chance to throw all of its

12   spaghetti up at the wall, but it has not tied together its

13   theory with expert testimony or anything else that links

14   Strategic's allegations to a conclusion that Mr. Guo was not,

15   in fact, a dissident.

16           And, of course, we now know what we didn't know at

17   openings, and what we didn't have a chance to pursue in

18   discovery or on summary judgment, given a stipulation that

19   Strategic had signed suggesting to the contrary.  We now know

20   that Strategic's fees and its fraud counterclaim are being

21   entirely funded by Ciranus, an entity controlled by Elliott

22   Broidy, whose guilty plea agreement specifically included

23   admissions that he was working directly with CCP ministers

24   pursuant to a substantial financial arrangement in an attempt

25   to get Mr. Guo extradited.

1      Entire sections of Mr. Broidy's plea agreement are

2   devoted to this subject.  That's at PX71.  Yet, Ms. Wallop's,

3   Strategic's sole owner, claimed not to know that Broidy had

4   been funding her company's defense and fraud claim.  And

5   Mr. Waller claimed not to have read Mr. Broidy's criminal

6   indictment or guilty plea agreement.

7      In any event, Strategic's fraud claims starts and ends

8   with Mr. Broidy.  It didn't exist before Mr. Broidy began

9   paying their fees, and now it must end because Strategic's

10  willingness to accept money from someone directly tied to the

11  CCP blatantly contradicts their fraud theory.

12      Now, let's break these down, these three issues, in a

13  little more detail.  And if we could share our screen, we can

14  pull up a few cites to the record that may be useful.

15      So, Mr. Chuff, let's go ahead and turn right to page,

16  I guess it's, 4.

17      THE COURT:  After argument, I'm going to want each

18  side to e-mail me the demonstratives that they're using in

19  connection with closing.

20      MS. CLINE:  Understood.  Will do.

21      So let's start first about what did this contract say?

22  Right?  What was Strategic, in the first instance, obligated to

23  do under the agreement?

24      Well, as the Court heard testimony, there were three

25  deliverables to be provided, financial forensic reports,

1    current tracking reports, and social media reports.  That's at

2    the contract itself, as well as in the joint statement of

3    admitted facts at paragraph 36.

4         The deliverables were to be provided by USB drive

5    only.  Oral reports were insufficient.  Citing the joint

6    statement at paragraph 40 and the contract itself, page 3.

7    Importantly, the deliverables were due each week in the first

8    month, at the end of the first month, and then monthly

9    thereafter.  It's in the contract, as well as Mr. Waller's

10   testimony at the cites contained in the demonstrative.

11        And Mr. Waller testified, consistent with the

12   handwritten notes that he had taken, that Strategic knew that

13   Eastern needed quality information quickly, including in the

14   very first month of the contract.  They knew this was time

15   sensitive.  They knew it was important to Eastern to get

16   information, real information, legitimate information, quickly.

17        Let's go to the next slide.

18        So even if we were to assume that the contract started

19   on January 16th, the weekly deliverables were due no later than

20   January 23rd, then again on January 30th, then again on

21   February 6th, then again on February 13.  The first monthly

22   reports were all due on February 16.

23        Next slide, please.

24        But Strategic blew all of these deadlines.  It didn't

25   deliver anything by January 23rd, and that's confirmed by the

1    testimony of Mr. Waller and Ms. Wallop.  They have admitted

2    that no deliverables were provided by January 23rd.

3          In fact, they admitted that they were unable to

4    prepare any of the detailed reports called for under the

5    research agreement, and they did that even pretrial in the

6    joint statement of admitted facts.

7          And if that's not good enough, Lianchao Han, the

8    third-party witness who Ms. Wallop and Dr. Waller trusted and

9    thought was a credible and excellent individual, testified that

10   the information that Strategic provided was junk.

11         Next slide, please.

12         So what does the evidence say about what actually was

13   provided?  Like Lianchao Han said, it was on USB drive, and

14   there were actually two that were provided, the first on

15   January 26th and the second on January 30th.  Neither of them

16   was of any use to Eastern.  There's testimony that even

17   Mr. Wallop -- excuse me, even Mr. Waller concedes that the

18   first one was of no use to Eastern Profit.

19         And as to the second one, Mr. Waller conceded that it

20   was not actionable and, instead, contained only 16 lines of

21   potentially usable code, was encrypted, and Strategic never

22   decrypted the code.  Other than these two USB drives, there

23   were no other USB drives delivered.

24         Next slide, please.

25         So again, there's no dispute on the record that they

1    failed to provide any of the deliverables.  And you can look at

2    the various delivery dates, right, whether you look at the

3    first week, whether you look at the day on January 30th when

4    they actually provided the second of the USB drives, weekly

5    deadlines thereafter, or February 16th, which would be the

6    deadline for the first monthly report.  Strategic didn't hit

7    any of those deadlines.

8             Next slide.

9             So the Court may hear from Mr. Greim this concept of

10   irregular circumstances, that there were excuses for

11   Strategic's failure to perform.  Those don't save Strategic

12   here for several reasons.  No. 1, all of the testimony and the

13   concepts underlying the testimony regarding irregular

14   circumstances were hearsay, and that's pretty clear on the

15   record both with respect to Team 1 and Team 2.

16            No. 2, the irregular circumstances were not identified

17   until after Strategic had already blown the deadline.  So it

18   had already missed the first weekly deliverable deadlines that

19   we just discussed, and sometime after that, it came up with

20   this concept of, oh, there were -- you know, there are reasons

21   why we weren't able to do it, based on hearsay.

22            Next slide, please.

23            Finally, the third reason why the irregular

24   circumstances concept isn't here to save Strategic is because

25   Mr. Waller admitted that the irregular circumstances didn't

L4UPEAS1                    Summation - Ms. Cline

1    actually prevent performance of the agreement.  Mr. Waller

2    actually testified that these circumstances didn't ultimately

3    hinder the investigation.

4            As to Team 1?  He testified that the problems

5    presented challenges -- or sorry, that the circumstances

6    presented challenges but not problems.  And as to Team 2, and

7    this concept, sort of double-hearsay-records-protected status,

8    there's no testimony on the record from any -- from any witness

9    with knowledge about what that means.

10           Strategic was unable to come up with a citation to a

11   statute or a Code of Federal Regulations cite defining what

12   records protected means or why it would be -- why it would

13   preclude the investigation of one of the subjects at issue

14   here.  And so Mr. Waller admitted this in his testimony at 368,

15   372 in the transcript.

16           Next slide, please.

17           So we talked about what Strategic was obligated to do.

18   Obviously, we've got to take a look at what Eastern was

19   obligated to do.  No. 1, Eastern was obligated to pay a

20   deposit.  It did so.  The deposit was not as a signing bonus.

21   It was to be credited to work performed during the final one

22   and one-third months of the research agreement.  Mr. Waller

23   admitted as much in his trial testimony at page 196.

24           Importantly, the contract specifically provided that

25   the deposit could be paid by entities other than Eastern

1    Profit.  That's at PX1 at page 5, and Mr. Waller admitted it in

2    his testimony at page 285.

3             So let's say No. 1, Eastern has to pay a deposit.  It

4    did so.  No. 2, Eastern had to provide the names of the

5    subjects to be researched.  It did that as well.  No. 3,

6    Eastern was obliged to pay $300,000 per report, per

7    deliverable.  If no reports were delivered, no payment would be

8    due to Strategic.  That's at the language of the contract

9    itself, as well as Mr. Waller's testimony on pages 193 through

10   195, as well as page 376.

11            The concept of a monthly fee, which I imagine we're

12   going to hear from Mr. Greim about was tied to predictability

13   of workloads, which is what the contract says at page 3.  It

14   was never a concept that absent deliverables, that Strategic

15   would be paid just on a monthly fee regardless of the

16   performance.  That's not what the contract says.

17            So of its three obligations, paying a deposit, paying

18   for information, and being prepared to pay for any

19   deliverables, Eastern was in good shape, complied with its

20   obligations under the agreement.

21            Yes, the deposit came from ACA, but the contract

22   specifically allowed for that.  And Strategic didn't refuse the

23   deposit when they saw that it had come in from ACA.  Ms. Wallop

24   admits that in her testimony.

25            And we know that Eastern provided a list of the names

1    to be investigated, and we know from the testimony of

2    Ms. Wallop, Mr. Waller, as well as Mr. Guo and Ms. Wang, that

3    the names on that, that list of subjects, include high-ranking

4    people within the CCP, as well as their family members.

5            So Eastern performed what it was obliged to perform,

6    but it was excused from further performance on or after, and we

7    would say even as early as January 23rd when Strategic failed

8    to make its first deliverable date under the contract, but

9    certainly no later than -- certainly, Eastern had no obligation

10   to pay any monies after February 16th.

11           Let's go to the next slide.

12           So we mentioned, at the outset, this concept of prior

13   material breach, and we've cited some cases.  And I'm sure the

14   Court is well aware of the concept that a party who commits the

15   first material breach is not entitled to enforce the contract,

16   and that first breach excuses future performance by the other

17   party.  That's in the *Bayer* case, 696 F. App'x 617; the *Tanberg*

18   case, 2009 Westlaw 8705814; the *Burton* case, 487 S.E.2d 200;

19   and the *Countryside Orthopaedics* case, 541 S.E.2d 279.

20           Because Strategic materially breached the agreement

21   first, Eastern was excused from performance.  That's the sort

22   of beginning and end of our position on that.

23           Next slide, please.

24           So the question then becomes:  What are the damages?

25   And as we argued in summary judgment and in pretrial

1    submissions, we believe Eastern's entitled to a restitutionary

2    measure of damages, the return of its one million deposit, plus

3    interest.

4           Why is that so?  Yes, there was a deposit paid by ACA.

5    There's evidence in the record that there was a loan agreement

6    that was authenticated between ACA and Eastern Profit, and the

7    research agreement itself -- the research agreement itself

8    explicitly authorized Eastern to direct others to pay the

9    deposit.  That's at page 5 of the contract.  Ms. Wallop

10   acknowledged it at page 72 through 75 of her testimony, as did

11   Mr. Waller.

12          Strategic knew the deposit came from ACA and didn't

13   refuse or return the money.  That's from Ms. Wallop at page 76.

14   And the loan obligation was confirmed by the fact that

15   Eastern's termination letter -- that's PX8, I believe; maybe

16   it's DX8 -- the termination letter demanded repayment to ACA,

17   not to Eastern.

18          And finally, the loan obligation is confirmed by

19   Eastern's agreement to submit to a Court order requiring any

20   damages that would be awarded to be repaid directly to ACA,

21   rather than to Eastern.

22          Next slide.

23          But, frankly, none of that matters.  The evidence that

24   came in on the loan agreement between ACA and Eastern Profit is

25   irrelevant.  The other side spent much time, much of its trial

L4UPEAS1                        Summation - Ms. Cline

1    time, on the loan agreement and the documentation around it and

2    so forth.  And we expect that we may hear some arguments

3    regarding adverse inferences on that very subject, but it

4    simply doesn't matter.

5            Even if ACA had gifted the money to Eastern, Eastern

6    may still recover damages.  Its hornbook law taken right out of

7    the Restatement of Contracts, section 318.  Regardless of

8    whether the money paid by ACA was a loan or it was a gift, it

9    belonged to Eastern and should be returned.  There's this

10   concept of delegation.  Eastern is entitled to delegate its

11   obligation to ACA, and Strategic, as it agreed in the plain

12   language of the contract, must accept the performance of ACA as

13   if the performance were rendered by Eastern.

14           In addition to the restatement, we cite two cases for

15   that principle, *Memorial Drive Consultants*, 1999 Westlaw

16   354491, and the *Anderson* case, 107 N.Y.S. 916.

17           Next page, please.

18           So that's our measure of damage, the restitutionary

19   measure of $1 million.  And then the next logical question is:

20   Well, does Strategic get a setoff?  Our answer to that is a

21   resounding no.  It conferred no benefit.  So even if we're

22   talking about equitable remedies right, and restitution,

23   there's no benefit conferred here; so Strategic has no argument

24   that it should be entitled to set off part of that million

25   dollars.

L4UPEAS1                    Summation - Ms. Cline

1           It's Strategic's burden to establish the benefit

2    conferred, as we mentioned earlier in the *Lyondell* case, as

3    well as in the Restatement of Contracts, section 374.  If

4    Strategic is unable to put a value on the benefit it conferred,

5    it cannot recover.

6           So let's talk -- next slide, please.

7           Let's talk about what the evidence on record says

8    about what Strategic proved up by way of benefits conferred or

9    costs incurred.  Let's first distinguish between out-of-pocket

10   costs, which we'll get to in a second, and this other concept

11   of personal allocations or payments for time and effort.

12          So we did hear some testimony, although from our

13   perspective it was unclear, with respect to a payment to

14   Ms. Wallop for her time and effort.  And that was a payment, I

15   believe, of $200,000 -- from trial transcript at 117 -- as well

16   as a personal allocation to Mr. Waller for $200,000 as well.

17          There's no support for either one of those payments,

18   and even Strategic isn't contending that those are

19   out-of-pocket expenditures.  There was some -- there's been

20   quite the evolution of the theory as to the payments to

21   Ms. Wallop, which initially was alleged to have been business

22   expenses and now it is just for time and effort.

23          But in any event, I believe Strategic's current

24   position is that that payment was just sort of a blanket

25   payment, and there's no backup at all to support it.  So we

1    would say, right off the bat, those two payments, to Ms. Wallop

2    and Mr. Waller, get excised from any attempt at setoff because

3    they are not out-of-pocket expenses nor are they benefits

4    conferred.

5              Next slide.

6              Now, let's turn to what are the actual out-of-pocket

7    costs being claimed.  There's a claim around this payment to

8    Team 1, but if you sort of peel the onion a bit and look at

9    what the exhibits say and get into the documentary evidence,

10   what the provenance of this payment and what happened to it are

11   entirely unclear.

12             Dr. Waller testified that there was $225,000 that were

13   transferred from Strategic to his LLC, called Georgetown, and

14   that he, in turn, paid it to Team 1, but that's not what DX54,

15   his bank statements, shows.  As the $200,000 of that money,

16   there's no proof in the record as to where it went.  We have no

17   idea if it went to Team 1.  We don't even know who Team 1 is.

18             The remaining $25,000 was transferred, not to Team 1,

19   but to Waller personally, as well as another LLC he owned,

20   called Psyber Solutions.  And all of this comes from DX54,

21   which are the bank records of Georgetown Research, Mr. Waller's

22   LLC.  So this first Team 1 payment, there's simply no evidence

23   in the record to substantiate it.

24             Next slide.

25             Similarly, Mr. -- Dr. Waller testified at trial that

1   there was a $50,000 payment transferred from Strategic Vision

2   to Oceanic, yet another Waller-owned company, and that this

3   amount was paid to settle claims with Team 1, whatever that

4   means.  That testimony was inconsistent with what Strategic had

5   put in its findings of fact, and there's absolutely no

6   documentation to substantiate it.

7           Next slide, please.

8           Then we've also heard about a payment to Team 2.  That

9   was a small payment, in the amount of $5,400, but again, with

10  no evidence of any deliverables received in exchange for that

11  payment and no testimony from Team 2 as to what it was -- what

12  was being paid for there.

13          Relatedly, there's another payment supposedly to a

14  subcontractor called Fletcher.  Ms. Wallop admitted in her

15  testimony, at pages 107 and 108, that there was no contract

16  with Fletcher, that there was no report from Fletcher or

17  deliverable that had ever been provided to Eastern, and that

18  she failed to mitigate.  She didn't, when the contract was

19  terminated, call up Fletcher and ask them to stop working.  In

20  fact, she advertently allowed them to keep working and keep

21  incurring costs, which she's now asking for Eastern Profit to

22  pay.

23          Next slide.

24          Again, a couple more expenses.  There's an allegation

25  about Dr. Waller's personal expenses.  We see no substantiation

1    of those; so that's a zero.

2            And Dr. Waller also testified, I believe for the first

3    time, that there was a legal bill of $15,000 associated with

4    the project for which he was seeking $15,000 in compensation.

5    That's at his transcript at page 361.  Again, that testimony is

6    inconsistent with Georgetown Research bank statement, DX54.

7    And Mr. Waller couldn't recall the name of the law firm he

8    hired, nor did he produce any evidence of the bill, such as an

9    invoice, for example.

10           So if you add all of that up, their claimed

11   out-of-pockets are just north of $300,000, but the ones that

12   they substantiated for real benefits incurred are zero.

13           Next slide.

14           And just to emphasize the point, there's no evidence

15   on the record that Strategic did anything to mitigate.  In

16   fact, the evidence is to the contrary, and the testimony that

17   we heard from Ms. Wallop for the first time, at pages 116 and

18   117 of the transcript, changing this testimony from business

19   expenses to a personal allocation for time and effort, should

20   be rejected as untimely provided.

21           So under -- if the measure of damages is proving up

22   costs incurred or value provided, Strategic has proved none of

23   that.

24           If, instead, the Court were to want to use a proxy to

25   come up with a value for services rendered, it could use the

L4UPEAS1                    Summation - Ms. Cline

1    contract price to measure the restitutionary offset.  But at

2    the most, the Court would need to sort of do a pro rata

3    analysis and cut that off at the date of the first material

4    breach, such that there would be something like two weeks'

5    worth of performance, which Mr. Chuff tells me would amount to

6    just over $338,000.

7              Next slide.

8              And again, sort of ending this conversation about the

9    contract issue and performance issue sort of where we started,

10   with the Court's question about, well, what happens if there's

11   a simultaneous breach?  Again, we think Farnsworth tells us in

12   some circumstances it's impossible for there to be a

13   simultaneous breach, such as, like here, when one party is to

14   do the work and the other party is to pay, the performance of

15   the work is to proceed and there's no simultaneous performance.

16   And again, that's in Farnsworth, as well as in the Restatement

17   of Contract section 234.

18             And as I noted at the outset, even if the parties

19   could perform simultaneously here, Eastern didn't breach.  It

20   didn't fail to pay the $750,000 because Strategic had $1

21   million sitting in its bank account.

22             But notwithstanding that, if the Court, nevertheless,

23   were to find -- next slide -- that the parties had

24   simultaneously breached in mid-February, the parties would

25   simply share the responsibility for the failed performance.

L4UPEAS1                      Summation - Ms. Cline

1   And again, that comes from the *Teachers Annuity* case I cited

2   earlier.  So Eastern would get their return of its deposit.

3   Again, subject to the substantiated restitutionary offset,

4   which, from our perspective, there's nothing substantiated; so

5   Eastern should get back its $1 million.

6            So let's turn next to the second issue, or a second

7   issue, as to whether or not the agreement is even enforceable.

8   And the Court asked for briefing on this, and so our citations

9   will be in that; so I needn't take the Court's time now to read

10  every citation, but we can talk at least briefly about the

11  concepts.

12           Go ahead to the next slide.

13           So the Virginia statute at issue here prohibits

14  anybody from engaging in or soliciting private securities

15  services business in the Commonwealth without having obtained a

16  license.  And what does private security service mean?  Well,

17  it means anybody who engages in the service of providing, or

18  who undertakes to provide, private investigators.

19           And those words are important because your conduct is

20  illegal even if you try to provide these services and failed,

21  which we submit is exactly what happened here.

22           So what we've done in these slides is compare the

23  statutory language to the record.  Right?  So on the left-hand

24  side, we see that the Virginia statute specifically prohibits

25  the solicitation of private investigation.  And what the record

L4UPEAS1                    Summation - Ms. Cline

1   says is that Mr. Waller admits that Strategic retained private

2   investigators.  That's at his testimony at page 198.

3        Next slide, please.

4        So in this one, and I think it's obvious.  So we have

5   on the left-hand side specifics about what private

6   investigation means under the Virginia statute, and then on the

7   right-hand side we compare that against the record.

8        So we see on the left that the Virginia statute

9   defines private investigations include crimes or civil wrongs,

10  finding the location, disposition or recovery of stolen assets,

11  and the causes of accidents, fires, damages or injuries to

12  persons or property.

13       And then if you look on the right-hand side, for each

14  of those first three prongs, at least, there's testimony in the

15  record that's exactly what Strategic was doing.  They were

16  investigating money laundering.  They were investigating

17  recovery and disposition of stolen assets.  They were

18  investigating causes of injuries to persons.

19       Next slide.

20       And mindful of the Court's question, I think on

21  summary judgment, well, okay, but does all of this really add

22  up to traditional private investigator activities?  The Court

23  not wanting to overreach and run the risk of interpreting as

24  illegal conduct that would sweep too broadly, which would sort

25  of be day-to-day conduct that would be swept up in the statute.

L4UPEAS1                       Summation - Ms. Cline

That's not the case here because the kinds of things we're

talking about, again, are textbook private investigator

activity by the admission of Ms. Wallop and Mr. Waller.

        You can see the citations to the record on the

right-hand side of our slides, but we're talking about

investigatory research, sophisticated and extremely sensitive,

targeted intelligence collection analysis, surveillance, good

old-fashioned detective work, extramarital affairs -- next

slide -- hacking, hacking into Chinese government servers,

obtaining evidence of forged U.S. documents, obtaining

information regarding Social Security fraud and tax fraud,

finding the locations of certain offshore companies, obtaining

information regarding bank accounts.

        This is exactly the kind of activity that we would

submit is traditional private investigator activity that should

be subsumed within the statute.

        It was not, by contrast, simple public-image-type

services, nor was it, as Ms. Wallop told us, the type of

research that could just be done at a local library.  It was

much more sophisticated than that.

        Turning briefly to a question the Court posed about

whether there are issues with extraterritoriality or commerce

clause issues if there was some investigatory conduct at issue

outside the commonwealth of Virginia.

        Again, we hit this in our brief, but from our

1    perspective, there's no issue with the commerce clause.  The

2    cases that we found suggested that the commerce clause only

3    comes into play if the conduct at issue takes place, quote,

4    wholly outside of the state at issue, and here, that's just

5    simply not the case.  To the contrary.  Much of the work that

6    Ms. Wallop and Mr. Waller did took place in Virginia.

7            We acknowledge that there's testimony about things

8    that went on in Turks and Caicos and other places, but there

9    were many things that went on in Virginia, certainly sufficient

10   to cover the solicitation at the outset of the contract and the

11   undertaking to provide by finding subcontractors and the like.

12           So again, you can see on our slide, on the right-hand

13   side there, we cite several examples of this.  Strategic

14   operates out of Ms. Wallop's home in Virginia.  The parties

15   negotiated the research agreement in Virginia.  The research

16   agreement provided that the -- sorry.  The research agreement

17   was signed by both parties in Virginia.  Next slide, please.

18   Team 1 picked up the subject list from Ms. Wallop in Virginia.

19   Team 1 delivered the first USB drive to Strategic in Virginia.

20   Ms. Wallop and Mr. Waller met with Team 1 in Virginia.

21   Strategic coordinated its efforts in Virginia.  Mr. Waller and

22   Ms. Wallop met on an almost-daily basis in Virginia.

23           So we submit that -- I mean, from our perspective, the

24   solicitation of the contract alone is enough to fall within the

25   prohibitions of the statute and should render the contract

1   void, but if the Court were to actually reach the analysis of

2   whether or not Strategic engaged in prohibited conduct, we

3   submit the evidence there is overwhelming as well.

4          Next slide.

5          So what happens if, indeed, the Court finds the

6   research agreement to be void as against public policy?  Again,

7   our position is that Strategic must return the $1 million

8   deposit.  In contrast to sort of a restitutionary measure in

9   the context of simultaneous breach or first material breach, if

10  the Court were to find that the research agreement is void as a

11  matter of public policy, Strategic wouldn't get the benefit of

12  even attempting to set off any amounts under the agreement.

13         So where the research agreement is void as against

14  public policy or against the law, that's it.  We get our

15  deposit back, and Strategic doesn't get to reset, to set off

16  even if it claims that there were benefits that it delivered to

17  Eastern.

18         Next slide.

19         Again, the cases that we've mentioned, some of which

20  the Court is familiar with because of our summary judgment

21  briefs, specifically the *Urban* case, which deals with the very

22  statute at issue here.  Although, we agree with the Court,

23  again, it doesn't go into a lot of details about the conduct at

24  issue there.  It clearly stands for the proposition that if the

25  statute is violated, the contract is void.

1            And then by way of analogy, here's a citation to the

2      Judge Rakoff opinion that we mentioned earlier, *Meyer v.*

3      *Kalanick*, 212 F. Supp. 3d 437.  Again, there were egregious

4      facts in that case, and Judge Rakoff was clear about his

5      concern for the conduct that had been alleged there.  But

6      what's important to realize is that the nature of what the

7      unlicensed investigators were doing in that case is exactly

8      what's going on there.

9            And so, as Judge Rakoff put it, if seeking to uncover

10     information regarding a client's litigation adversary has shed

11     light on the adversary's employment, finances, family life, and

12     motivation for bringing a lawsuit does not constitute private

13     investigation work, then the Court does not know what would.

14           We think, by the same reasons, the same conduct would

15     apply here under the Virginia statute.

16           Next slide.

17           Shifting, finally, to our third question, which is the

18     fraud claim.  And again, we have to consider the standard,

19     right?  And it's clear and convincing evidence.  It's not

20     preponderance, and it's not one element of fraud, it's all of

21     them.  And Strategic simply hasn't met the mark here.

22           Let's go to the next slide.

23           So let's talk first about what is this concept of

24     being a dissident, and what does it even mean?  In order to

25     accuse someone of lying about dissident status, Strategic needs

1    to first define what that concept means.  And there's none of

2    that in the record.  There's no standard definition on what it

3    means to be a dissident.  There's no expert testimony on what

4    it means to be a dissident.  So we don't even know what the

5    target is that we're shooting at.  So right there, Strategic's

6    claim falls down.

7              But even if we all were to agree on a definition of

8    dissident, if it could be defined, let's look then about what

9    is Strategic's evidence.  Far from supporting the three legs

10   that Mr. Greim mentioned in his opening, the evidence tells the

11   opposite story.

12             So we heard example, after example, of all of the

13   things that show that Mr. Guo was one of the most outspoken

14   opponents of the Chinese Communist Party in the world.  We

15   heard about his anticorruption campaign, and his campaign to

16   expose CCP members, his very active social media presence, and

17   social media postings, and all of the things he does to expose,

18   educate folks on CCP corruption.  Some of the witnesses

19   referred to it as "the movement."  We have here references to

20   Mr. Guo's testimony at pages 620, 621, 752 through 754, and

21   there were some videos that we showed as well, PX52A and PX70A.

22             We heard lots of testimony on retaliation against

23   Mr. Guo and his family members by the CCP -- that's at page 622

24   of his transcript -- as well as the meeting that he had in his

25   apartment with Liu Yanping, and we heard and saw excerpts of

1      that -- of transcripts of that meeting, both in exhibits and

2      sort of played via video.

3              We heard that the whole point of the research

4      agreement was to investigate CCP members.  The whole idea was

5      to expose corruption, bring those people down.  And even

6      Ms. Wallop and Mr. Waller would testify that the folks under

7      investigation were CCP members or their affiliates or family

8      members, as would Lianchao Han.

9              Next slide.

10             We heard of CCP's cyber and social media attacks on

11     Mr. Guo.  We heard of the Twitter takedown of the accounts

12     attributed to the CCP, which had been sort of aiming at

13     Mr. Guo.  We heard from Ms. Gong about the so-called bot army

14     of social media accounts attacking Mr. Guo that had been set up

15     by the CCP.  We heard about Facebook blocking Mr. Guo's

16     account, and we heard about the cyber attack on Mr. Guo's law

17     firm, the law firm that had been handling his political asylum

18     application.

19             We also heard from Ms. Gong about -- at some length,

20     about the Voice of America interview of Mr. Guo, and how it was

21     cut short due to CCP interference.  We heard from several

22     sources about the Red Notice, issuance of a warrant of sorts

23     for Mr. Guo's arrest by the Chinese government and INTERPOL.

24             Next slide.

25             We heard from Ms. Gong, among others, about the

L4UPEAS1                    Summation - Ms. Cline

1    scheduled appearance that Mr. Guo was supposed to have with the

2    Hudson Institute in October of 2017 that was postponed at the

3    behest of the CCP.  That's in Ms. Gong's transcript 796.

4             And we heard a lot about the conspiracy to extradite

5    Mr. Guo.  And specifically, Mr. Broidy, as we've mentioned

6    before, the individual who is paying Strategic's fees in this

7    case, pled guilty for failing to register as an agent of a

8    foreign principal in connection with his efforts, at the

9    request of CCP members or PRC ministers as it says in the

10   papers, to extradite Mr. Guo.

11            The guilty plea contained explicit admissions that he

12   was working with these people, who were prevalent in the CCP,

13   to get Mr. Guo back to China and out of the United States.  And

14   even Mr. Waller admitted that he knew that Broidy was working

15   with China to have Mr. Guo deported.  The Broidy plea agreement

16   is at DX71, and there's some related testimony, Mr. Guo's

17   transcript at page 631 and Mr. Waller at pages 184, as well as

18   392.

19            Next slide.

20            We also heard a lot about the two gentlemen who

21   introduced Mr. Waller and Ms. Wallop to Mr. Guo, William Gertz

22   and Lianchao Han.  And, in fact, it was at the recommendation

23   of Mr. Han and Mr. Gertz that Mr. Waller and Ms. Wallop entered

24   into the agreement.  But they also talked about their ardent

25   belief that Mr. Guo was, in fact, an anti-CCP mouthpiece and

1    all of the hard work he had been doing to expose corruption

2    within the CCP.  We hear that in the transcripts of Mr. Gertz

3    and Mr. Han, in their deposition testimony, as well as

4    admissions from Mr. Waller and Ms. Wallop in the trial

5    testimony.

6            And perhaps the most concrete example of evidence of

7    Mr. Guo's dissident status comes from Sasha Gong, who, of

8    course, testified for Strategic Vision, but who had written a

9    letter to the United States government in support of Mr. Guo's

10   asylum application.

11           If we could just pull that letter up briefly.  This

12   will be DX123.  So let's scroll down to the -- I guess it's the

13   fourth paragraph to see there.  Again, this is Ms. Gong writing

14   to the United States government saying -- sorry, I meant the

15   third paragraph.  My apologies -- saying that prior to the

16   interview she had with him, "Guo Wengui had been using his

17   Twitter account, his own YouTube channel, Facebook accounts,

18   and other media outlets, to expose corruption amongst China's

19   top leaders.  Mr. Guo's whistleblowing content went viral

20   overnight and built a huge following and fan club, both inside

21   and outside China.  Many of his postings have hundreds of

22   thousands of views.  As a veteran journalist, I believe that

23   Mr. Guo has successfully created a 'we media' phenomenon,

24   proliferating do-it-yourself investigative journalism,

25   particularly regarding the Chinese government."

1            Let's turn the page.

2            Ms. Gong goes on to say -- I'm looking now at the

3    second full paragraph on page 2 of Defendant's Exhibit -- well,

4    I guess it's one, two, three, four.  The paragraph reads:  "The

5    VOA interview attracted millions of viewers around the world

6    and was, in my opinion, successful and proper journalism.

7    Following this interview, Mr. Guo continued his own exposé of

8    massive government corruption in China via social media

9    platforms.  As an experienced journalist, I personally verified

10   some of his major stories with independent sources."

11           And then dropping down to the next paragraph:  "As has

12   never been seen before in China, an individual has challenged

13   the legitimacy of the communist rulers in China with so much

14   convincing evidence from inside the government itself.  It is

15   understandable why the Chinese government made such great

16   efforts to silence Mr. Guo."

17           And then finally, on the last page, we have Ms. Gong

18   attesting to the United States government that:  "Mr. Guo is a

19   whistleblower with valor to fight against the most powerful

20   dictatorship in human history."

21           So that speaks to the element of falsity in

22   Strategic's fraud claim, and far from clear and convincing

23   evidence, we would say that the evidence actually supports

24   Mr. Guo's dissident status.

25           Then, turning from the falsity element to the element

1    of reasonable reliance, again -- and the Court has heard some

2    of this in our MSJ papers, and we needn't repeat all of it

3    verbatim here, but as this slide 41 in our demonstrative shows,

4    many of the allegations that form the basis for this whole

5    concept of Strategic's proof that Mr. Guo is actually a CCP

6    operative, the facts that underlie those allegations were

7    publicly available before Strategic entered into the contract.

8            That fact, in and of itself, guts the reasonable

9    reliance element of their claim and renders them unable to

10   prove up their fraud claim by clear and convincing evidence.

11   They knew before they entered the contract that there was

12   people out there who said that Mr. Guo only represented a

13   faction of the CCP.  That's at Wallop's transcript at page 58

14   and 59; Waller at 203.

15           They knew before they entered the contract that

16   Mr. Guo still had ties to CCP leaders.  Wallop at 87 to 81;

17   Waller at 107, as well as 242 to 246.  They knew that the CCP

18   allowed Mr. Guo's wife and daughter to visit him in New York.

19   Wallop's testimony at page 81 through 87.  They knew that Liu

20   Yanping in New York.  Waller's testimony at page 209 to 210.

21   And the video and portions of the transcription of that visit

22   were available online prior to the date on which they entered

23   into the research agreement.  That's seen in DX114.

24           They knew that Mr. Guo had purportedly declared his

25   loyalty to President Xi.  That video, too, was available online

1   prior to the research agreement, DX114.  They knew that Mr. Guo

2   had made his fortune through ties to CCP members, including Ma

3   Jian.  That's at Wallop's transcript at 133, 134; and Waller's

4   transcript at 244 to 246.

5           And they knew of this alleged movement of money from

6   Hong Kong.  Waller's transcript at 284; Wallop's at 73 through

7   75.  Again, even if there is argument later about adverse

8   inferences regarding Mr. Guo's money and movement of money, it

9   doesn't matter because they knew about it before they entered

10  into the contract.

11          Next slide.

12          So what we have here is the inevitable conclusion that

13  Strategic failed to prove reasonable reliance.  They knew all

14  of these facts, or they knew there were at least questions

15  raised by others and they, nevertheless, failed to do any

16  diligence on their own and entered into the contract.

17          They didn't require Eastern to make a written

18  representation that Mr. Guo was anti-CCP, and in fact, they

19  confess, they concede, that they just blindly relied on the

20  recommendation of Mr. Gertz and Lianchao Han.  That's at

21  Ms. Wallop's transcript at page 86 through 88.  And Ms. Wallop

22  admits she thought that at the time the research agreement was

23  signed, that Eastern might "run the research results both ways;

24  that is, for and against the CCP."  That's at her transcript at

25  page 89.

1          Next page, please.

2          And related to all of this is the Court's observation

3    in the motion in limine ruling, when the parties were disputing

4    whether or not the subject -- the payment of Strategic's fees

5    was admissible.  And the Court observed that as Strategic

6    accepted funding from someone associated with the CCP, that

7    fact would make it less likely that the defendant relied on

8    plaintiff's alleged statement that Guo was an opponent of the

9    CCP or that such statements were important to defendant in

10   deciding to enter into the research agreement.

11         Well, it turns out that's exactly what happened.  So

12   beginning with the filing of their counterclaim for fraud,

13   Strategic's fees have been paid by this entity controlled by

14   Elliott Broidy.  And we know, because we looked at his plea

15   agreement, that he admitted that a minister of the PRC asked

16   Broidy to use his influence with high-ranking government

17   officials to advocate for Mr. Guo's removal and return to PRC.

18         We know that Mr. Broidy sought assistance to transmit

19   a memorandum to the Attorney General seeking the removal of

20   Mr. Guo and to arrange a meeting between the Attorney General

21   and PRC Minister A.  And we know --

22         THE COURT:  Ms. Cline, I'm giving you a five-minute

23   warning.

24         MS. CLINE:  Understood.

25         And we know that Mr. Broidy met with PRC Minister A at

1  a hotel in Washington to discuss Broidy's efforts to arrange

2  the meetings with the Department of Justice and the Department

3  of Human Services for PRC Minister A.  All of this comes from,

4  I believe it's PX71.  There's one typo there.  They should all

5  be PX71.

6          So the fact that Strategic's fees are being paid with

7  someone who is working directly with the CCP, obviously,

8  undermines their fraud claim.

9          So what we have, ending with the fraud claim, is that

10 Strategic is unable to prove each of the elements of fraud by

11 clear and convincing evidence.

12         So that's one of our three questions.  Let's go to the

13 second question, whether the contract is void as against public

14 policy or violative of the Virginia statute.  And here, we say

15 absolutely.  Strategic conceded that they engaged in conduct

16 that was textbook private investigation work, such that the --

17 such that they engaged in textbook private investigation work,

18 and they did so without a license.

19         And then so that's question two.  And then finally,

20 with respect to question three, the question about which the

21 Court had us prepare, what's going on with the performance of

22 the parties here.  And we say if they can get around the public

23 policy questions, if there were an enforceable contract,

24 Strategic breached it, and they breached it first, and that, as

25 a result, Eastern's performance is excused.

L4UPEAS1                        Summation - Mr. Greim

1          So we would ask that the Court return $1 million to

2     Eastern Profit, plus interest.  Thank you.

3          THE COURT:  Thank you very much, Ms. Cline.  Very

4     helpful to the Court.

5          Mr. Greim, I'll now hear from you.

6          MR. GREIM:  Your Honor, last week, this Court received

7     colorful and incredible testimony from Yvette Wang and Mr. Guo.

8     The Court also learned from Dr. Waller everything that

9     Strategic was doing and would shortly have -- would have

10    completed on this contract.

11         But what was true at the trial start, I started with

12    in my opening, remains true now.  The end point of every major

13    issue in this case is that Eastern Profit has no damages and

14    cannot establish restitution.

15         Your Honor, it's only argument, although I'll address

16    the other point in a second, is that there is a loan.  That's

17    the only interest that Eastern Profit established in and has

18    argued for in this money.  If the loan is a sham, it has no

19    interest in ACA's money.  It can't get a judgment under a

20    contract theory or under its illegality unjust enrichment

21    theory.  So we'll cover that first your Honor as issue A.

22         We will then address the breach of contract questions

23    and the associated damages issue as issue B, including the

24    issue that you asked us to pay special attention to.

25         THE COURT:  Mr. Greim, let me interrupt you for just

L4UPEAS1                    Summation – Mr. Greim

1    one moment.  I won't count it against you.  I want to ask the

2    court reporters if they need a minute to change the reporters.

3                (Pause)

4                (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              THE COURT:  I'm going to start the clock.

2              MR. GREIM:  I apologize, we had a problem in our

3     building, and I got stuck, your Honor.

4              THE COURT:  Okay.

5              You've got until two minutes after 3:00, 3:02.

6              MR. GREIM:  Thank you.

7              THE COURT:  You may proceed.

8              MR. GREIM:  Your Honor, I think I was going through my

9     overall outline.  We'll cover illegality as issue C, but only

10    in summary fashion because of our issue with the fact that

11    we're already filing a brief, and then, finally, we'll go into

12    fraud as our final issue.

13             Hopefully, we have pulled up the screen here.  Very

14    good.

15             Your Honor, the very first issue is this is

16    essentially a sham loan.  Eastern did not confer any benefit.

17    The applicable section here is Section 370 of the restatement.

18    Restitution only restores a benefit conferred by the plaintiff.

19    As we walked away from summary judgment, the question was:  Is

20    there, in fact, some kind of possessory interest that Eastern

21    Profit has here in the funds that never touched Eastern Profit?

22    In other words, has it established a loan?

23             Now, as we showed in our proposed findings last fall,

24    New York courts will apply five different factors here, and

25    what we've done is we've taken the evidence that came in and

1    grouped them under those five factors.  So the very first two

2    factors go to the economics, and here, your Honor, the very

3    first issue, whether there's collateral or not, this was

4    unsecured, and the entire transaction was utterly unreasonable.

5    Both of those factors cut against there being a loan here.

6    And, again, this is Eastern Profit's burden to show that there

7    was a loan, that it had some interest in this money, some legal

8    interest.

9           So, the loan agreement, which I won't pull up here to

10   save time, actually says that the lender understands there is

11   no collateral.  Very odd language for a commercial document,

12   but it makes a point that the lender understands there's no

13   collateral.

14          In terms of the ratio of the proceeds, the size of the

15   business, which is the second factor, here, the principal of

16   the loan is infinitely greater than the size of the business.

17   Remember that the assets consisted of this entity of only

18   $80,000 frozen for years in a Hong Kong bank, and the testimony

19   was still frozen.  The other issue here is that there is no

20   evidence of any ongoing business of any kind, no revenue

21   stream, or no planned activities.

22          I won't go through all the points from my opening, but

23   nothing about this transaction makes any economic sense for the

24   lender or for the borrower.

25          The second issue is:  What was the plan for using

1    these loan proceeds?  Now, that's the third issue under the

2    five-part test.  The question is whether the proceeds are for

3    some new activity, which makes them more likely to be an

4    investment, or whether they're for ongoing operations.  Well,

5    what was the evidence here?  Because we asked each witness

6    about this question.

7           Wang doesn't even know who devised this supposed plan

8    for Eastern Profit to use the research.  That was at Wang 514,

9    1 through 5, and we've included pinpoint citations throughout.

10   I'll probably not read those every single time.

11          Second, Eastern expected to receive the research,

12   prosecute the corrupted officials, cause world historical

13   regime change, then get its $80,000 back all within six months.

14   That's from Wang.  But it never even began to hire counsel to

15   use the research that it expected to receive right away.  So

16   there was no person to actually take the research, and do

17   something with it, and execute on this plan.  Wang never asked,

18   and didn't know, how Guo was going to use the research to

19   whistle-blow.  She admitted to that.  And then we took the

20   30(b)(6) of Golden Spring New York, which is actually the agent

21   hired by Guo, that didn't know how to define success under this

22   plan.

23          Han Chunguang has never hired any company to help him

24   unfreeze Eastern Profit's assets.

25          Finally, you might recall this testimony, Han

1    Chunguang claimed Eastern is a mature company, so that Guo

2    Mei's film skills would have been sufficient to take the 80,000

3    after it was unfrozen, invest it in film, and then recover the

4    million dollars, so it could be paid in six months.  So this is

5    an impossible chain of events, and the story just doesn't hold

6    up.

7              The next factor is whether there are records, how does

8    the company itself treat this in its own records.  Well, Han

9    Chunguang said he made no record of the loan at all because he

10   authorized Yvette Wang to do this instead.  But Wang, who was

11   Eastern Profit's agent, can't even say whether the company has

12   any bank or accounting records, ledgers, or income or loss

13   statements.  It doesn't say they don't exist, it doesn't even

14   know whether they do.  This is years into this case.

15             Wang says she became the agent for Eastern after

16   learning of the loan, but still can't say whether and how the

17   interest even compounds.  She finally decided that it might be

18   $20,000 a month since December of 2017.  And then, very

19   significantly, Eastern has received nothing in writing from

20   William Je stating what he expects to be repaid.  There is

21   still no evidence of what the interest is on this and how it

22   computes.

23             Finally -- an additional point, the story of the loan

24   doesn't add up.  If the loan existed, Han and Je should have

25   been disclosed in the December 2018 rog responses, but, your

1   Honor, I think we saw those, we spent a long time on those.

2   Interrogatory 5 asks for everyone with knowledge of the

3   agreement.  And we saw a long list of names in there.  We even

4   saw the attorneys at Foley Hoag at that time for Eastern

5   Profit; they were even listed.  No reference to Han Chunguang,

6   no reference to Guo Mei, no reference to William Je.

7   Interrogatory 16 asks for everyone with knowledge of the

8   million dollars in damages, which Eastern Profit claims it

9   sustained because it took out a loan for that amount.  Han

10  Chunguang was not mentioned, William Je was not mentioned, and,

11  again, Guo Mei was not mentioned.  These people are all central

12  to the loan story that developed during the litigation.  They

13  were never disclosed in these December 2018 interrogatory

14  responses.

15          Now, here's what's important:  In her second

16  deposition, Wang claimed to have met with William Je in the

17  fall of 2018, just a few months before the rog responses were

18  signed, to discuss repayment.  She mentioned that conversation

19  at trial.  But, again, Je was not mentioned in the rog

20  responses, and the meeting was not disclosed at Wang's first

21  deposition, where she seemed unclear even on who William Je

22  was.  Again, it bears all the hallmarks of a story made up

23  during the case.

24          Now, Wang said that those rog responses were truthful

25  when she signed them.  She testified that at trial.  She only

L4UKEAS2                    Summation – Mr. Greim

began to back away from that in my questioning when she

realized the rogs were damning for her theory of the loan.  But

if you go back and look at the transcript, your Honor, she

never actually testified clearly that her responses were wrong.

Those responses should be binding admissions against Eastern

Profit, and the clear import of that is that there was no loan

because there was no Han Chunguang to have knowledge of the

million-dollar loan, there was no William Je, there was no Guo

Mei.  All of that was made up later in the case.  And, finally,

the cherry on the top was the stories that we heard at trial.

         But we don't have to rely only on that.  If we look at

PX 17, which is the power of attorney, which I'm now sharing

here — this was introduced, I think, by the defendants — this

was the power of attorney that even allowed Golden Spring

New York to have, for example, an attorney sitting at counsel

table.  This is the authority that Yvette Wang claimed to be

doing anything in this case, including the research agreement

and then later the loan.  But this was signed, if you look,

August 30, 2018.  So after the case, really only about eight

months after the loan.  But if you look and see what the

authority that was given is, of different topics, it's very

sweeping, but nothing in here references the loan agreement.

Negotiating a contract, executing the contract, the full

enforcement of the rights, very broad language, everything

necessary to do everything in the case; the loan agreement is

L4UKEAS2                    Summation  -  Mr. Greim

never mentioned in this document.  Again, strong evidence that
this has been fabricated during the case.

Five months after this power of attorney was signed in
January 2019, and Wang was disposed, she still claimed not to
be aware that there was a frozen bank account, but that's the
very thing that allegedly necessitated the loan.  Han Chunguang
was often used for documents without his knowledge.  He
testified he signed the power of attorney without reading it.
He said it was given to him by a lawyer and then, "Then I
signed, that's it."  His name was signed at the research
agreement, but he had never seen it and didn't know its terms.

And ACA's only natural person director during January
2019, when ACA was allegedly trying to collect, lived in the
U.S., had never heard of Eastern Profit or Strategic Vision.
That was Karin Maistrello.  Didn't know anything about an
ACA-Eastern Profit tie, didn't know anything about a loan.  Not
everybody got the story from Golden Spring on how they were
supposed to talk about this loan.

No witness could testify where the loan agreement came
from.  Wang is Eastern's agent on the loan, but she didn't
know.  How Eastern came up with a document in this case even at
trial after all this time to prepare, she still couldn't say.
Eastern never kept a copy of the agreement after it was signed.
Eastern doesn't know where or if it keeps financial records.
No person has ever been identified who knows the answer to

1      that.

2            Han Chunguang, in response to a question from the

3      Court, said he never saw the document before he allegedly

4      signed it.  He can't read English, and he says he recognizes it

5      because Je showed him the company names, the amount, and his

6      own name.

7            And then, finally, ACA hid from discovery in this

8      case.  Maistrello was disposed, to be clear, in her personal

9      capacity and not as ACA because she resigned just about a day

10     before she was served.

11           The timing doesn't work.  We talked about that at

12     trial.  If Wang's story and Chunguang Han's stories are true,

13     Chunguang Han learned about the loan too late to be able to

14     have several calls with William Je and sign on December 29th.

15     And then we've got to go back to Wang's first depo.  In that

16     deposition, she said Guo is the one who told her Han was the

17     principal of Eastern Profit, and that wasn't until the rog

18     responses were being drafted in late 2018, a full year later.

19     Wang said she never heard of Eastern Profit before this

20     project, and Guo is the first person who mentioned it to her.

21     And then she testified at her second deposition, going back to

22     her old story, that Guo first told her of Eastern Profit just

23     before she went down to Virginia to sign the contract.  This

24     means that her story and Han Chunguang's story about the loan

25     cannot both be true.  Certainly, Eastern has not established

L4UKEAS2                          Summation - Mr. Greim

1    that there is a legitimate loan here.

2              But there's more, and I'll move to our second point:

3    ACA was an investor among other investors.  Your Honor, Yvette

4    Wang — you saw in the text — discusses talks with non-Guo

5    investors repeatedly at the time of the transaction.  Let's

6    look at the first of those.

7              She says -- in response to Mike Waller, she says:

8    "Remove the worries, but help us to keep the investors on the

9    stage with us."  She's not talking about Guo here.  She's not

10   talking about Han Chunguang or Guo Mei, who don't know anything

11   about this.  She's talking about the person who's funding it.

12   But just in case that isn't clear, let's go later on in the

13   same discussion, in Exhibit 21, where it's even more obvious.

14   She says, "As you know" — telling this to Mr. Waller on the

15   30th of January — "big budget is ready for this long-term

16   project.  The investors can even pay your team without

17   contract."  And when I asked her what that meant, she was very

18   clear that the investors who were paying without the contract

19   was ACA wiring the money.  That's who she's talking about, the

20   investors.

21             And then we go on.  Then she says, "But the investors

22   would not continue to spend money on the things they don't

23   need, for instance, the things of today."  Then she says she

24   even checked with them:  "We have 20 days to update them,

25   hopefully with the results agreed in the contract."  Again,

1    she's talking about the funder here as the investors.  There is

2    no way that that's anybody but ACA and maybe the person who's

3    funding ACA.  That is clearly how Eastern Profit and Golden

4    Spring New York viewed ACA, as an investor.  That's what they

5    were saying at the time.

6         Second, your Honor, ACA actually benefited from, and

7    was involved in, the research agreement.  ACA was getting the

8    research.  Wang testified to that.  She said that her

9    deposition testimony was truthful.  ACA and Eastern Profit

10   shared the same goals for the research project.  When Guo was

11   testifying, he admitted that William Je was one of only a few

12   people involved in negotiating the research agreement itself.

13   So we learned for the first time at trial, from Guo, that

14   William Je was involved with the research agreement.  Obviously

15   did not interface with Wallop and Waller, but he was actually

16   involved in that agreement.  That makes sense if ACA is an

17   investor.

18        And then Wang, quote, probably heard from Je that he

19   would, quote, forgive the loan if the results were successful.

20   That is a contingency, and it makes this an investment.

21        Additionally, Wang admitted that ACA is asking for its

22   money back because the contract produced nothing.  Not because

23   there was a loan, because the contract produced nothing.

24        Additionally, it's obvious that Eastern had no

25   liability or stake here because Wang never even bothered to

1    tell Han Chunguang the financial terms of the agreement and

2    made no efforts to share contract details with him.  She admits

3    it was important for Eastern Profit to make sure it could pay

4    these monthly fees, $750,000 a month for the first three

5    months — she admitted that at trial — but she never told Han

6    Chunguang he needed to find a way to find that money.  She

7    never showed him the agreement, so he could comply with the

8    terms.  And then we also know from Golden Spring's 30(b)(6)

9    deposition that it made no efforts to help Eastern Profit find

10   a way to pay.  And why is that?  Because somebody else was

11   going to do it all along.  It was going to be funded by ACA as

12   an investment.

13          And then, third, we've now heard this new story that,

14   actually, don't worry, it's not a loan, we'll just say it's a

15   gift, and we're okay.  But, first of all, I want to point out

16   the case law that was cited on the PowerPoint, and that is also

17   in the findings of fact and conclusions of law for Eastern, has

18   nothing to do with restitution.  It does not say that a gift --

19   if the loan fails, and it's just a gift, you can get

20   restitution.  That's not at all what those cases say.  They're

21   not on point whatsoever.

22          Remember, the money never went to Eastern Profit.  And

23   what Eastern Profit's witnesses have always said in this case

24   is that, no, there was a deal here, ACA was getting something

25   and Eastern was getting something.  If that's true, this is not

1    a gift.  This is not a gift.  A gift would have been ACA gives

2    the money to Eastern Profit, Eastern Profit then can do

3    whatever it wants to with the money, and decides that it wants

4    to go ahead and use it for the contract.  But the evidence

5    instead was that, no, the money was specifically for this

6    contract.  So there is no evidence whatsoever that it's just a

7    gift.

8            Eastern Profit, finally, was not a real thing.  It was

9    not something capable of receiving a gift.  Lianchao Han was

10   the main negotiator for Guo at the beginning and end.  He never

11   even heard of Eastern Profit until this case was filed.  Waller

12   testified that Yvette Wang called Guo the chief or the boss.

13   There were things in the research agreement that Wang didn't

14   want, but Guo insisted should stay in.  That included the

15   amount of the deposit.  Wang only spoke with Guo about what

16   would be valuable.  Guo gave her the initial research packet

17   and told her he'd give it to Strategic if the agreement was

18   signed.  Before getting permission to sign the contract, Wang

19   read it line by line to Guo over the phone.  All the evidence

20   here, your Honor, shows that Guo is the one controlling this

21   transaction.

22           Finally, I don't want to belabor this, but I think the

23   evidence was very clear — the person Eastern claims was the

24   principal never knew anything, Eastern never knew anything.

25   Eastern didn't choose or even see the names of the research

1   subjects.  Wang took her direction, we saw in one of the texts,

2   DX 16, to sign the agreement from Lianchao and Guo.  There's no

3   reference to Han Chunguang told her he'd go sign it.  Han

4   Chunguang testified at trial he didn't even know Guo was an

5   agent of Eastern Profit.  He never saw the research agreement

6   before his deposition, he never heard of Strategic before his

7   deposition, didn't know about the content of the agreement,

8   doesn't know the details of how much the research would cost.

9   When the Court asked him, he didn't know it would cost

10  $9 million a year.  He didn't understand how the interest was

11  going to be computed.  Wang even signed Han's name to the

12  agreement, even though in deposition, she refused to admit it.

13       Golden Spring has the power of attorney under which

14  Yvette Wang claims to act, but it doesn't know whether the POA

15  allowed Yvette to forge Chunguang's signature on the agreement.

16       Han Chunguang never got a report from Yvette when she

17  claimed to have had unsatisfactory results in late January, two

18  weeks in.  We just heard today that that was the material

19  breach.  Han Chunguang was never told that.

20       Guo laughed at his deposition when he was asked

21  whether Han Chunguang attended a meeting with Strategic to

22  discuss the contract.  He laughed.

23       Lianchao Han, who was hardly a friend of Eastern

24  Profit here, he was working with Guo on his asylum application,

25  testified that Han was a servant, bodyguard, cook, ran errands,

1    and booked hotel rooms for Guo.

2              Finally, Eastern seems to have had no existence of any

3    kind, and it's been left now for dead.  It was bought for a few

4    hundred dollars in 2014, no evidence it actually made any

5    investments.  It has no office, employees, or operations in the

6    U.S., Wang testified to that.  Wang tried to learn information

7    in between her depositions about Eastern from Guo Mei in

8    December of 2019, and Guo Mei didn't know anything about

9    Strategic.  Eastern never hired a replacement researcher to

10   unfreeze its assets.  Wang isn't aware that Guo ever pursued

11   this project again.  Wang doesn't know whether Eastern is still

12   doing anything in this Hong Kong court case or making any

13   filings.

14             Your Honor, it's just very clear, this loan agreement

15   was something that was come up with in the litigation.  The

16   burden was on Eastern Profit to prove that it existed, and the

17   reality is that it is out nothing here.  It is out nothing.

18   And we have easily shown that this is a sham loan that made no

19   sense and that has none of the hallmarks of a loan.

20             So now, your Honor, I want to pivot and move to the

21   contract issues.  And I want to address the issues that the

22   Court asked us about.  We agree that material breach is the

23   right way, it's the right rubric here, because, actually, a

24   couple of more detailed questions.  Each party first has to

25   answer:  Was a given breach a material or a partial breach?

L4UKEAS2                    Summation - Mr. Greim

1    That's always the first question in the analysis.  Not whether

2    there was a breach, it's if there was a breach, was it material

3    or partial.  What is a material breach?  It is something that

4    is so -- defects in the performance that are so bad, they must

5    so pervade the whole of the contract, so as to defeat the

6    object the parties intended to accomplish.  It's got to be

7    willful or so substantial and fundamental as to strongly tend

8    to defeat the object of the parties in making the contract.

9         Now, the restatement at Section 241(a), restatement

10   second, gives different factors that are to be considered in

11   deciding whether a given breach is partial or material, and all

12   of those apply here.  We'll talk about those in a second as we

13   go through the timeline.

14        Now, there are certain things that are just material

15   breaches.  So, the failure to tender payment on a contract is a

16   material breach.  The failure to comply with a contract

17   termination clause is a material breach.  We cited authority

18   for you in the demonstrative here.

19        Where a party fails to give proper notice of

20   termination, in fact, the nonbreaching party gets lost profits

21   or expectation damages for that period.  We'll come back to

22   that later.  So that's the first threshold question.

23        The second threshold question is:  If you do have a

24   material breach, what happens afterwards?  And this is a

25   question skipped over by Eastern Profit, but it's actually the

1    key question for this Court because material breaches excuse

2    performance from that time forward on the part of the

3    nonbreaching party.  A partial breach, you can still sue for

4    damages, but you can't stop performance.  That becomes very

5    important here.

6            Now, here's the key point:  The nonbreaching party has

7    to make a choice, they have to make a choice.  They can either

8    choose to continue the contract, and then go on and see what

9    happens, or they can terminate the contract then and sue for

10   breach, and they can get, at that point, restitution damages

11   for a total repudiation of the contract, but they can't do

12   both.  And so if you think there's been a material breach, but

13   then you go on and encourage the other party to keep

14   performing, you may be able to recover whatever damages you can

15   prove flowed from that breach, but you can't go back and say,

16   oh, actually, the contract should have been terminated back

17   with this earlier material breach, that was a prior material

18   breach.  You have to elect.  It's not election of remedies

19   exactly; it's the election that the nonbreaching party with the

20   material breach has to decide to do.  We'll come back to that

21   concept in just a second.

22           Now, let's talk a little bit about the parties' duties

23   here.  Eastern's duties were broader than mere payment.

24   Someone who substantially hinders another party's performance

25   cannot hold the frustrated party in breach of contract.  We'll

1    come to that.  That's our frustration defense.

2            Parties must comply with the duty of good faith and

3    fair dealing, your Honor, and that's related to the frustration

4    concept.

5            Okay.  Now let's turn to this research agreement at

6    PX 1.  Your Honor, payment was not per report.  Instead, it was

7    $750,000 a month.  An unknown number of reports would have been

8    required throughout the year depending on the number of new

9    subjects that were cycled through and depending on whether the

10   different subjects chosen to be researched for each of the

11   targets was also changed.  So there's no way to tie monthly

12   payments to particular reports.

13           Wang actually admitted this in her first deposition,

14   and we went through that testimony on her direct.  You'll

15   recall that she testified that there was a dispute, that Guo

16   wanted a la carte payment, and, instead, Strategic Vision

17   wanted this waterline concept.  And so what Wang testified was

18   that Wallop said it's mandatory to get these monthly payments,

19   so that I can keep my teams in the field, so I can maintain my

20   investigation team.  And Wang was asked and admitted that that

21   is what ended up in the contract.  That's what ended up in the

22   contract.

23           And so the testimony is clear that there was not going

24   to be some sort of each month, let's look and see whether you

25   get reports, and then you get paid for each report.  Remember

1    that, in fact, this was one of the exhibits.  Exhibit 6, this

2    was a draft of the agreement that was not made final.  In fact,

3    this even postdated the Waller notes that were mentioned in the

4    last testimony because Wang testified that this draft agreement

5    is what was given to her by Guo when he said take over the

6    negotiations.  And there was the key sentence that we found

7    that was in this draft and not in the final.  That was that —

8    this is on page 3 of the DX 6 — "Such payments will be made

9    following receipt of the agreed-upon number of reports per

10   month."

11          That is what Guo wanted, that was the a la carte

12   system, and that sentence was stricken and does not appear in

13   the final agreement.

14          Now, to earn this payment, Strategic Vision had to do

15   something.  Its duty was to be working on at all times on 30

16   units.  A unit is a given person and a certain subject matter.

17   It also had to switch out units without additional charges,

18   which could have been pretty onerous had Guo insisted on that.

19   Reporting is the timing and format of information-sharing.  It

20   is not a condition precedent to payment.

21          Now let's move to this issue and address it squarely.

22   The timing and specific content of each report is a term.  Not

23   following that can be a breach of the agreement, but the

24   question is whether each deviation destroyed the fundamental

25   purpose of the agreement, was it material.  And so, on page 3,

L4UKEAS2                          Summation - Mr. Greim

we see -- under deliverables, we see that some reports will be
delivered on as as-needed basis.  There was a definite
timetable, but the timing of reports could be altered.  There
was nothing in there that required each party to assent, it was
something that was going to be flexible.  Financial forensic
reports after the monthly report required only occasional
updating throughout the year.  It didn't even specify exactly
how many had to be done.

          And then, again, there was the irregular circumstances
language.  Both parties understand that occasional unforeseen
challenges may arise that will slow or block comprehensive
research.  There may be periods in which information is
irregular, unavailable, or incomplete.  The contractor will
endeavor to make all research and reports as complete as
possible in a timely scheduled manner.

          Now, they could have not had that provision.  They
could have said time is of the essence; if you don't produce a
report with all the information, you will forfeit that payment.
Payment will be made after inspection and review of each
report.  It could have said something like, you know,
everything must be turned in by January 30th, so we can use it
in this hearing, so that we can use it in this case, must be
shared with counsel, there's a deadline.  None of that is in
the contract.  In fact, the duration, your Honor, of this was
three years.

1          The parties understood that the goal was entire regime

2     change that would take a long time.  They disagreed on how

3     long, but no one believed it was going to happen in a few

4     weeks.

5          By nature, Dr. Waller testified, this was a

6     speculative, progressive process, because "in any deep-dive

7     research program," he said — I'm quoting — "you simply don't

8     know what you're going to find until you find it.  We can't

9     just refund funds just because the information wasn't in that

10    spot.  It's sort of like prospecting for oil, or minerals, or

11    something; you don't know until you find it."  That was at

12    page 269, 2 to 13.

13         Prompt payment was critical, though, for keeping

14    researchers because Strategic was starting from scratch.  For

15    the purposes of this contract, the year begins the day the

16    contract is signed.  That's what it says on page 5.  Payment is

17    to be made in regular monthly installments of $750,000 at the

18    end of each month.  That's the end of that section.  There's no

19    other requirements.

20         And so what happened here?  How did this play out?

21    Were there really simultaneous breaches?  The answer is no.

22         So, everyone agrees the contract started on January

23    the 16th.  Now, Waller testified, Dr. Waller testified, that on

24    January 24th, so now we're one day, one day after the first

25    reports were due, he reported to Lianchao on what Team 1 was

1    finding.  This is not hearsay, this is what he reported to

2    Lianchao.  He reported that three to four names on the initial

3    list of 15 were misspelled, or wrong people, or fake.

4    Replacements were needed; they could not go forward with those

5    names.  He said Team 1 had found various ways to access the

6    Chinese Government database for CITIC.  He said that Team 1 had

7    located offshore companies in Turkey, Cayman Islands, and

8    Caribbean.  Team 1 had identified fraudulent use of a NATO ally

9    passport, and that they were monitoring -- they found that

10   other people were monitoring these same 15 subjects.

11          So, is he providing a drive with information on each

12   of the 15 people, for the subjects that were required?  He's

13   not doing that, but he is reporting on the progress and telling

14   Lianchao Han what's being found.

15          Now, interestingly, Eastern seems to concede right now

16   that this is not a material breach.  They don't say there's a

17   material breach until the 30th; we just heard that in the last

18   presentation.

19          So January 26th, the first thumb drive was delivered.

20   It had the folders for each of the 15 individuals, with

21   information in those folders — it didn't have all the

22   information required — but on the 26th — now this is before the

23   two-week period — information is being given, and actionable

24   information is being given, to Guo.

25          And so what happens here?  Yvette Wang does not tell

1    Strategic Vision, okay, fine, I'll replace those three to four

2    names.  The testimony was, she wouldn't give new names.  The

3    testimony was that she wouldn't give follow-up direction on the

4    new leads that Strategic had given to Eastern.

5             On the 30th, the second thumb drive was given, and

6    this is when Eastern said there was a material breach.  It had

7    all this code, and some of the code was email addresses and

8    passwords for the people they were monitoring, the CCP members.

9    It was going to take six more days to decrypt them.  Again, the

10   question was:  Is this a material breach?  Well, did Yvette

11   Wang tell Mr. Waller to quit working, that you have materially

12   breached, we're allowed to terminate the contract and sue you

13   for restitution?  No.  She said to keep working after this.

14   And by this time, they're laboring with three to four of the

15   names that aren't even valid.

16            Now, Strategic begins to hire other people.  They go

17   to ASOG on the 1st and 2nd of February, and then they make a

18   report back to Lianchao Han, who the testimony was that he

19   became the main point of contact for Guo again at this time,

20   about what ASOG had found.  And Waller testified that ASOG had

21   found that the 15 names were records-protected; in other words,

22   you couldn't use government databases, it wasn't lawful to use

23   government databases to, get tracking information for these

24   individuals.

25            Now, what Waller did ask Lianchao Han for was new

1     names:  ASOG can get this done for us, we can add them to Team
2     1.
3              So he asked Lianchao:  Give us new names, tell us
4     which of the other names scattered throughout the research
5     material you want us to shift over to, and we'll just move with
6     those, we'll use names that are not records-protected.  But the
7     testimony again was that Eastern Profit would not tell
8     Strategic Vision what new names it should use; it just said
9     this is rubbish.  And, again, three to four of the names were
10    false, in the first place.
11             So Strategic is still trying to work during this
12    period.  No one has told Strategic that they have materially
13    breached and to quit work.  The first thing that happens, the
14    first time somebody materially breaches, is the nonpayment on
15    February the 15th.  And that was a critical lack of payment
16    because, unlike Strategic not delivering each category of
17    report for the subjects up to this time, that had nothing to do
18    with whether Eastern would be able to pay Strategic, but
19    Strategic not being paid meant that it could not keep using
20    Team 1.  And so this is the first breach that actually kept
21    Strategic from being able to perform at all.  It could not use
22    Team 1 after this date.
23             So this, your Honor, is really the first material
24    breach.  And then Lianchao says:  Just wait, let me try to work
25    it out.  Waller testifies to that.

L4UKEAS2                      Summation - Mr. Greim

1           And the very next thing that happens is Eastern

2    delivers a termination letter and demands return of the million

3    dollars.  And so that is its own breach because under the

4    contract, a termination required 30 days' notice.  Well, it

5    didn't give 30 days' notice.

6           So, your Honor, I think there was enough testimony

7    from Dr. Waller establishing that they were getting close.

8    They weren't meeting the exact timelines, but in a three-year

9    contract, can you really say that missing the first few weekly

10   reports, at the very beginning of this three-year contract,

11   completely destroyed the purpose of this?  That would only be

12   true if Guo had some special undisclosed need for the research

13   on January 30th, more of which we'll come back to, but no party

14   testified that there was some specific court case — because now

15   we hear it was going to be given to the DOJ or FBI — there was

16   nothing about the need to use that on January 30th, didn't hear

17   a shred of evidence about it.

18          So what happens when the first material breach is

19   actually from Eastern Profit?  The answer is that Strategic is

20   entitled to the $750,000 that would have been due on the 15th.

21   There was another week of performance before the termination,

22   so it's entitled to a quarter of that $750,000, which is

23   $187,000.  And then it's entitled to its lost profits, its

24   expectation damages, for that 30-day period.  And there's case

25   law, your Honor, we've cited in our demonstrative that lays out

1    that this was the damages that you're entitled to.

2              So if you add these numbers up, you get to

3    $1.687 million, but that's credited for the money that

4    Strategic would have had to spend but didn't have to spend for

5    the second month.  That's the $200,000 monthly fee to Team 1,

6    that's the $200,000 to Dr. Waller for his efforts that he was

7    paid for January — he would have to have been paid that for the

8    second month — and the $200,000 that Ms. Wallop would have had

9    to have been paid for the next month as well.  So that's not

10   money that's added on; it's actually subtracted out of the

11   contract price for that 30-day period.

12             So if you add these together, the total contract

13   damages are $1,087,000, but, finally, on top of all of that,

14   you've got to subtract off the million dollars as a credit that

15   was received by Strategic Vision.  So the ultimate contract

16   damages here, your Honor, are $87,000 if there was a first

17   breach.

18             Now, to save time, I'm going to move to our fraud

19   damages.  Most of the damages evidence that you heard, your

20   Honor, are expenditures made in reliance on the contract.  The

21   testimony did not change -- there was a charge that Dr. Waller

22   or Ms. Wallop had changed what they said they were testifying

23   to.  That's simply not correct.  I'll just run through what the

24   different wires were for and what the money was for, for Waller

25   and Wallop.

L4UKEAS2                    Summation - Mr. Greim

1          $200,000 went to Team 1, $25,000 went to Team 1, and

2    $200,000 went to Waller for his own work on the project, all on

3    the 18th, 11,000 went to Waller for his AmEx travel expenses,

4    $5410 went to ASOG for its work, and then $200,000 went to

5    Wallop for her work on the project.  That $691,000 was all

6    incurred within about the first month, and in our demonstrative

7    we've laid out the exhibits in which you can find each one of

8    those things.

9          Next, in the next period, you see there were $5300 in

10   additional AmEx expenses from Dr. Waller, $17,686 for a legal

11   opinion, and then $50,000 for Team 1 for Oceanic Advisors.  And

12   so their fraud damages don't equal a million dollars, your

13   Honor; if the Court were going to award a million dollars to

14   Eastern, this amount would have to be reduced, would have to be

15   subtracted.

16         I'm doing my best to move quickly.  We had prepared

17   these with the thought that we may have to read all of this

18   into the record.  I'm going to do my best to use my remaining

19   time here and walk through the rest of our points here.

20         Your Honor, the Virginia statute has different subject

21   matters that have to be being investigated for this to be an

22   illegal contract.  But the problem is this:  The most the

23   testimony established was that Guo hoped to prove money

24   laundering by CCP members.  As we'll see in a little bit, Guo

25   never identified how a U.S. court was going to somehow have

1    jurisdiction over some issue involving CCP officials and CCP

2    assets.  He was asked that directly.  He wasn't able to provide

3    an answer to the Court.

4           If this is really for crimes or civil wrongs, or to be

5    used in a court or to recover stolen property, we ought to be

6    able to specify what that is, and at no point was there any

7    evidence that that existed.

8           I want to now go to the Virginia law of illegality,

9    which layers on top of the statute itself.  Virginia has a

10   presumption against finding contracts void unless the

11   illegality is clear and certain.  So that's the standard we

12   have here.

13          And then there's more.  Where the basis for illegality

14   is a licensing statute, failure to get a license, the statute

15   has to impose a penalty for that violation, for the violation

16   of the licensing statute to actually mean the contract is

17   illegal.

18          And then, finally, on this specific statute, the only

19   penalty is for willful violations — for willful violations —

20   and so it should be a willful violation of the Virginia

21   licensing statute, if anything, that would cause this to be an

22   illegal contract.

23          THE COURT:  Mr. Greim, you should assume you're going

24   to have to read everything from every slide you want me to

25   take.  I'm not going to permit slides that you haven't read

1    from.

2              MR. GREIM:  Okay, very good, your Honor.  I'll do my

3    best.

4              The evidence showed that there was no actual

5    investigation done in Virginia.  They merely met with Team 1

6    there to give the names and get the results.  They met with

7    Lianchao and Gertz there but not with Yvette, on the

8    investigation issues.  That was actually in D.C., the one time

9    she came down.

10             There was no evidence that there was any single

11   subject in Virginia, and there was no evidence that actual

12   investigation was done from Wallop's home in Virginia.  We'll

13   have more on that in our brief.

14             We've already covered how the research agreement does

15   not suggest it's tied to any specific crime, asset or

16   proceeding.  If it had been, that would have been something to

17   put in the agreement, and it might well have played into the

18   deadlines, but there was none of that.

19             There was also no evidence of Eastern or Guo ever

20   hiring anyone to be able to obtain this information and use it.

21             Strategic's understanding was that this was a

22   long-term media play to trigger intra-CCP discord and undermine

23   the regime.

24             At the center of the whole plan was the media.  This

25   was to be a dual outreach to Chinese people in China and

1   supporters in the U.S., and the target was very large, the

2   entire CCP.

3              Now — we'll come to this later — Guo's May 2017

4   recording suggests he actually wanted to give the research to

5   the party's disciplinary committee in order to gain leverage on

6   Wang Qishan.  That, of course, was never disclosed, and the

7   first we heard of that was in the recordings we played.

8              Finally, Dr. Waller and Ms. Wallop both said that had

9   anyone said this is for a specific crime or civil wrong or

10  certain property we're trying to recover, had anyone ever said

11  that, they would not have taken on the project.  And they

12  averred, both Dr. Waller and Ms. Wallop, that none of that had

13  ever been identified to them, and, again, had it been so, they

14  would have backed away from this.

15             Finally, any violation was not willful.  Waller has

16  never had someone ask him for a license, never considered

17  getting one.  The issue of licensure was never discussed

18  between the parties.

19             Strategic does provide consulting services in many

20  areas, but where it uncovers crimes and civil wrongs, it does

21  that on an international basis and not domestically.  This is

22  similar to work already done by think tanks in Northern

23  Virginia.  In fact, Lianchao Han testified at his deposition

24  that he works for something called the Kleptocracy Center at

25  the Hudson Institute, which researches nonpublic information on

1     high-level Chinese officials.  This is the kind of work that's

2     always done by think tanks.

3            Finally, computer analysis was the core of this

4     contract.  As we'll show in our briefing, there is an exception

5     for that computer analysis.

6            I'm going to quickly move now, your Honor, to adverse

7     inferences.  I think we established the four points of those

8     but I'll run through those.  I think I have to make my showing

9     during my 60 minutes, so I'll do that.

10           Factor one:  Guo is loyal to Eastern.  He said he

11     wanted it to win, he hasn't raised the privilege to hurt

12     Eastern, and he testified for them voluntarily.

13           Second, they're not separate for purposes of control,

14     and this is the only other contested of the four points.  Guo's

15     young daughter, Guo Mei, is Eastern's sole director and knows

16     nothing about Strategic or this case.  Guo's servant, or chef,

17     Han Chunguang, was named as Eastern's principal.  Several

18     witnesses testified that that's the kind of work he does for

19     Guo; they witnessed it.

20           Guo's assistant, Wang, is the president of Golden

21     Spring, Eastern's attorney in fact for this case.  Waller

22     testified that Wang called Guo "chief" and "boss."  She

23     admitted that she's a president and director of what she called

24     Guo's family office, Golden Spring New York.  Golden Spring

25     New York testified that it's a family office of Guo.  As Golden

1   Spring New York president, Wang reports to China Golden Spring;

2   his owner is Guo's son, Guo Qiang.

3           Finally, in Guo's declaration, Exhibit 51, Guo admits

4   that China Golden Spring is also his family office and pays him

5   money for his work relating to China.  We'll cover that briefly

6   in our fraud section here.

7           Guo took the Fifth on the question of whether he

8   controls Golden Spring New York and Eastern Profit's conduct of

9   this litigation.  He admits that Golden Spring New York's,

10  quote, internal lawyer, Daniel Podhaskie, gives him legal

11  advice on this case and says their communications are

12  privileged.

13          He confers with Podhaskie about information he passes

14  on and Ms. Cline, Eastern's counsel, who serves under the

15  direction of Golden Spring New York.  In other words, your

16  Honor, there's ample evidence here of control and loyalty, and

17  we think that Guo's statements here and his invocation of the

18  Fifth Amendment should be attributed to Eastern Profit.

19          I'm going to finally now go to the facts that cover

20  our fraud and our unclean hands defense to the extent Eastern

21  is seeking unjust enrichment.

22          First of all, Guo is no dissident, and he actually

23  meant to use this research for leverage against Wang's faction.

24  I talked about my three legs.  I actually have four, and I will

25  just run through those here.

L4UKEAS2                       Summation - Mr. Greim

1              First, he kept financial ties to China after claiming

2       his dissident status meant he couldn't move money.  And there

3       are several points of fact on this.  The main one, though, is

4       just an adverse inference.  At 643, 16 to 22, Guo claimed he

5       has taken no money from China or Hong Kong -- I'm sorry, he

6       took the Fifth on the question of whether he claims he has

7       taken no money from China or Hong Kong since speaking out.  Of

8       course, there is much other evidence of Guo making this

9       assertion, but that alone, that adverse inference alone,

10      establishes this prong.

11              But, second, he did get money-- from Hong Kong for

12      even Mainland work during his whistleblower phase.  We've got

13      adverse inferences on those points, where he was asked that

14      question, but we should look at Exhibit 51 here, where Guo

15      swore in another case — and this was accepted as evidence —

16      that during the relevant time, China Golden Spring Hong Kong

17      Group, Hong Kong company owned and operated by my family,

18      entered into a cutting agreement with, sure enough, ACA.  China

19      Golden Spring was hired, he says, because of his reputation in

20      the Asian business community, and because I had the ability to

21      make introductions to numerous business executives in China and

22      Hong Kong.

23              Between January 2017 and February 2018, when ACA

24      terminated the agreement, China Golden Spring was paid about

25      $7.1 million by ACA.  This is during the very period that's

1    relevant here.  But here's the kicker:  He says, as a result of

2    that, he himself received distributions in excess of $500,000

3    from China Golden Spring.  Now, how could that be when even the

4    freeze order shows that China Golden Spring's bank accounts

5    were frozen at this time?  But, nonetheless, Guo says he's able

6    to get it out, and he's relying on this to establish damages in

7    another matter.  So something doesn't add up.  Guo's able to

8    get money from China when he wants everyone to think that he

9    can't do it.

10         Next, who's he getting it from?  Guo and Wang both

11   claim to trust William Je as an anti-CCP dissident, and that we

12   should get an adverse inference from the question:  And he

13   sends money to places where you ask him to do so, doesn't he?

14   Lianchao Han that Je manages Guo's assets.  Gong testified that

15   Guo called Je his money man.  William Je already has many

16   Mainland contacts.  Guo testified to that.  Wang claims that

17   CPPCC is appointed by the CCP and, quote, are our enemies.  But

18   then she claimed not to be shocked that she would be a member

19   and began to backtrack, claiming that she never really talks

20   politics with William Je.

21         Here is the most interesting point of Guo's testimony,

22   your Honor.  Guo was simply asked about whether he knew about

23   Je's Chongqing ties.  That was the only question.  But in

24   response Guo raised the issue of the CPPCC.  He is the one who

25   said that.  Unless he was listening into the trial, he would

1    not have heard about the CPPCC being an issue in this case.

2    He's the one who raised it when I asked him about Chongqing,

3    and he said that Je might have told him he was a member.  That

4    is a critical admission.  That should be a big deal when the

5    CPPCC is an enemy.

6            So then, when I finally asked Guo, aren't you

7    concerned that William Je being your money -- about William Je

8    being your money man if he's associated with the CCP -- and I

9    think the inference we should get from that is that Je is his

10   money man, he is associated with the CPPCC, and Guo is not

11   concerned about it.

12           The second leg of our showing here is that Guo claimed

13   to have come to the U.S. to serve as an intelligence source for

14   the U.S., but he never actually met with the FBI or CIA to

15   provide useful evidence.  He worked for, and with, MSS

16   beforehand, Gong testified, and he had continuing contacts with

17   them after coming to the U.S., and he claimed to have access to

18   their info.  He claims he had access, quote, at any time to

19   high-level CCP information in the U.S.  In trial, he claimed he

20   had always reported information to the FBI.

21           But in his first deposition, he admitted not meeting

22   or giving information to the FBI or CIA.  He claimed at trial

23   he had testified this way because of FBI orders.  But, your

24   Honor, that's simply not credible.  The point is, Guo claims to

25   be this intelligence asset to the U.S. and to be doing that

1    while he's over here, but he admitted in his first deposition

2    he was not doing it.

3          Next, let's go to his own statements.  His April 2017

4    video — this is DX 37, DX 114B at page 1314-1315 — Lianchao

5    authenticated his voice, and then Guo waffled in response to

6    the Court's question, saying, I can't identify whether it was

7    my voice or not.  But we all heard Guo's voice on his own

8    recordings and we heard him in the open courtroom.  I think

9    everybody listening had to know that that was Guo's voice and

10   that that's the way he talks.  You can also rely on the

11   Lianchao authentication.

12         Referring to an interview, he said, it's time to

13   finish this guy, they're against our country, against our

14   government and against our party, referring to Xi Nuo, who, he

15   said, holds the, quote, so-called asylum papers.  He said, they

16   attack our CCP leaders, they deserve to die.  At trial, he

17   admitted to having a long-running feud with Nuo.  Then he said:

18   After I return to China, let's have a drink together, I must

19   make some contributions and establish merit first and then go

20   back, I will send messages.

21         Now, I asked him, in his May meeting, May 2017

22   meeting, whether he was focusing really on his assets.  He took

23   the Fifth.  That should be an adverse inference against Eastern

24   Profit.

25         Contrary to his claim on his direct examination, his

L4UKEAS2                    Summation - Mr. Greim

1   family was already safe by the time of this meeting, and Guo

2   even suggested — we heard at page 732, 12 to 23 — that they

3   keep his son in custody.

4           Guo was very willing to support the CCP, and, instead,

5   he really wanted to clip the Wang Qishan faction heading into

6   the 19th National Congress --

7           THE COURT:  Mr. Greim, five-minute warning.

8           MR. GREIM:  This is at pages 727 to 728, 729, 731, and

9   732.  I asked him a capstone question:  Your ultimate concern

10  was whether Wang Qishan and his faction retain power?

11          His answer:  Yes, because — and this is his quote —

12  they were the corruption.

13          So, he wants to give evidence on the Wang corruption,

14  as he said, to the party's central committee.  Then, when I

15  asked him, he said this is, quote, related to the Strategic

16  Vision project.

17          Now, at DX 41 — this is a Wall Street Journal article

18  in response to this case — Golden Spring New York's counsel,

19  Podhaskie, identified in that article as Guo's counsel — you

20  can take him as Golden Spring's New York's counsel too — told

21  The Wall Street Journal that Guo's goal was to, quote, get rid

22  of the radical cadre inside the Communist party.  That's not

23  the kind of language he used with Strategic Vision.

24          Finally, let's go to the very last video, which was DX

25  37, DX 76A is the authentication, DX 114B, 1320 to 1330 is the

1    translation, and then DX 35 is the translation of the letter

2    that actually was shown on the screen.  Lianchao Han

3    authenticated that video as being Guo even if Mirror Media did

4    not also authenticate it as its own record of its own

5    interview.

6          Guo said to the Court:  I went to Mirror and showed

7    them this is the letter.

8          Now, he said he signed it under duress because his

9    family was under arrest, but DX 114B includes no such

10   statement.  His family was safe by then.  We can look all

11   throughout 116 -- I'm sorry, 114B.  There's not a word in there

12   about duress.

13         Guo admits he signed a letter stating he didn't cross

14   the red line, claims he never explained what it meant.  But if

15   you look in there, page 1322 to 23, he explains it means he

16   didn't, quote, leak the national intelligence (unintelligible).

17   Guo mentions contributions to Xi's Chinese dream, at 1328, and

18   he repeats several phrases from the letter, saying, I did this

19   from the heart.  He could not say he disclosed (unintelligible)

20   to the U.S. in his days-later asylum application.  That

21   evidence is damning.

22         Finally, the evidence was that he attacked dissidents

23   to show his, quote, merits in the U.S. to support a reentry

24   into China.  He doesn't deny attacking dissidents online and

25   says his response is that they attacked him first.

1        There was evidence of online attacks from Gong -- on

2   Gong, on Bob Fu and Chen Guangcheng, and Sasha Gong explained

3   who those individuals were.  She said this made her more

4   hesitant to speak out against Guo.

5        Your Honor, Sasha Gong, you saw her letter supporting

6   Guo's asylum application in early 2018, but she was also asked:

7   Would you still have submitted this letter today, knowing what

8   you know?  Her answer was she would not submit the letter

9   today.

10       Obviously, she said earlier, Guo did not have many

11  attacks on dissidents in 2017 but that over time this ramped

12  up.

13       So, the final question here, your Honor, is:  What's

14  going on?  What's going on in this case?

15       It looks like Guo wanted to use Strategic Vision's

16  research to go after Wang Qishan.  That's what he's talking

17  about in the recordings leading up to this contract.  Why is it

18  that Guo suddenly needed research in January?  Why did he

19  abruptly need this and claim he needed to have actual items

20  right at that moment?  Why did that come up in January?  It's

21  because he was hoping to use this to help ease his entry back

22  to China.  His attack on dissidents are simply an effort to, as

23  he said, gain merit before he returns.

24       Your Honor, in conclusion, with a normal real

25  counterparty, this contract would have been performed, and

L4UKEAS2                     Summation - Mr. Greim

1    Strategic Vision was on the cusp of fruitful research from Team

2    1 and ASOG.  Given what we now know about Guo and his likely

3    intended use of the research in late 2017, it is better for

4    everyone that the contract terminated early.

5              The right resolution in this case is to sustain

6    Strategic's breach of contract claim for $87,000, but even if

7    the Court is not inclined to take that step, Eastern is a fake

8    company that sustained no loss.  Either way, Guo's harassment

9    of Strategic Vision, Dr. Waller, and Ms. Wallop should end now.

10             One thing I want to cover, since I have about a minute

11   left — I know this is out of order but I was worried I was

12   running out of time — I want to just make sure I cover the

13   other fraud elements.  There was reasonable and actual

14   reliance.  Strategic relied on Guo's representations about

15   himself and his goals for the research and believed he was a

16   dissident who, quote, wanted to bring the whole party down.

17   That is the definition of dissident that mattered, and that's

18   what the testimony was.  He called himself number one enemy of

19   the CCP.

20             The testimony was that Han and Gertz were trusted

21   friends.  Strategic understood that they, too, wanted to defeat

22   the CCP.  Even Lianchao, working on the 2017 Guo asylum

23   application, had never seen those key videos from April or

24   August 2017 but he authenticated them.

25             Materiality:  Waller showed he had no reason to

L4UKEAS2

1  believe the third-party funder was a CCP member, affiliate, or

2  associate.  He himself questioned Broidy about what Broidy had

3  done, before deciding what to do here, and Waller said that

4  that comported with his own research into Guo that he was doing

5  from the time of the lawsuit.

6          Finally, we heard that Guo was not finding other

7  people to do this research.  His earlier teams had quit, and he

8  had spent a massive amount of money for this research, so he

9  needed Strategic Vision to come in.  He was hoping that they

10  were going to be able to give him the goods on Wang Qishan, not

11  to bring down the CCP but to help himself.  He wasn't able to

12  do so.  That was the fraud.

13          The end result here, your Honor, should be judgment

14  for Strategic Vision in this case.

15          THE COURT:  Thank you very much, Mr. Greim, and thank

16  you also to you, Ms. Cline.  The Court will take this under

17  advisement.

18          I would ask each party to email me the demonstratives

19  that you used.  You do not need to send me, and I don't want

20  you to send me, by email additional copies of the exhibits that

21  you have used in argument today.

22          Before we break, Ms. Cline, is there anything for the

23  Court?

24          MS. CLINE:  Nothing from us, your Honor.

25          THE COURT:  Mr. Greim, is there anything for the

L4UKEAS2

1    Court?

2              MR. GREIM:  Nothing, except how would you like to

3    receive these?  By email?

4              THE COURT:  Yes, please.

5              All right.  Have a good weekend, everybody.  Thank you

6    for excellent arguments and an excellent presentation on both

7    sides.

8              Let me also say one thing that I should have said at

9    the beginning, and I think my deputy did say it but it's worth

10   repeating in light of the experience from last week:  Nobody

11   who was listening in on this call should have recorded it,

12   nobody should retransmit it.  It is a violation of my orders to

13   retransmit or to record the court proceedings, and I've

14   informed everybody who has listened in — and it's part of the

15   record — that I have asked the marshals to look into the prior

16   occasions where the proceedings have been rebroadcast.

17             With that, I want to thank the court reporter.  We are

18   adjourned.  I'll take it under advisement.  Have a great

19   weekend, everybody.

20             MR. GREIM:  Thank you.

21             MS. CLINE:  Thank you, your Honor.

22             (Adjourned)

23

24

25