UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__6/22/2021__
```

------------------------------------------------------------------X
                      :

EASTERN PROFIT CORPORATION LIMITED,    :

                  Plaintiff,    :

                      :         18-cv-2185 (LJL)

    -v-               :

                      :        FINDINGS OF FACT AND

STRATEGIC VISION US LLC,          :        CONCLUSIONS OF LAW

                      :

                 Defendant.    :

                      :

------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Plaintiff Eastern Profit Corporation Limited ("Plaintiff" or "Eastern") brings this action

against Defendant Strategic Vision US LLC ("Defendant" or "Strategic") for breach of contract,

a declaratory judgment, and unjust enrichment.[1]  Strategic asserts counterclaims for breach of

contract and fraudulent inducement.

      An in-person bench trial commenced on April 19, 2021 and concluded on April 23, 2021.

Closing statements were made remotely on April 30, 2021.  This opinion constitutes the Court's

Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52.

      For the reasons that follow, the Court finds for Eastern on its claim seeking a declaratory

judgment that the research agreement at issue is void and unenforceable as a matter of Virginia

law and public policy.

---

[1] Eastern also previously brought a claim for fraudulent misrepresentation, but the parties
stipulated to dismissal with prejudice of that claim.  *See* Dkt. No. 299 ¶ 6.

I.   **FINDINGS OF FACT**

A.   **Relevant Persons**

Eastern is a private limited company registered under the laws of the Hong Kong Special Administrative Region of the People's Republic of China.

Eastern is, in essence, a shell corporation for an individual named Guo Wengui, also known as Mile Kwok ("Guo").  Eastern is not registered to do business in the United States.  It has no office in the United States and no operations in the United States.  It also has no operations in Hong Kong where it is registered.  Its only asset is a bank account in Hong Kong that was frozen by the Hong Kong High Court in 2007 and that now has $80,000 in it.  Prior to 2017, the owner and sole director of Eastern was an individual named Han Changhui ("Han"). In 2017, Han transferred ownership and control to Guo's daughter, Guo Mei, who was a friend of Han's and who is now the owner and sole director of Eastern.

Guo is a former resident of China who now resides in the United States.  He has achieved some notoriety in this country and internationally as he has made claims that are critical of the policies and practices of the Chinese Communist Party ("CCP") while at the same time making statements supportive of individuals within the Chinese government.  He has applied for asylum in the United States.  Guo maintains a family office under the name Golden Spring New York Ltd. ("Golden Spring").

Yvette Wang ("Wang") is an associate of Guo and is the president and director of his company Golden Spring.

Defendant Strategic is a limited liability company registered and in good standing with the Nevada Secretary of State.  Strategic's principal place of business is in Arlington, Virginia.

Among other services, Strategic provides private "investigatory research" to clients within the United States in exchange for monetary compensation.

French Wallop ("Wallop") was and is Strategic's sole manager and only member. Wallop was married to Malcolm Wallop, the U.S. Senator representing Wyoming from 1977 to 1994, who is now deceased. Wallop resides in Arlington, Virginia.

J. Michael Waller ("Waller") is a long-time friend and professional acquaintance of Wallop and is an active member of the community of persons in the United States opposed to the CCP. He holds a Ph.D. in international security affairs from Boston University and has an extensive academic background. In addition to his work with Strategic, he is also currently employed as a senior analyst for strategy at the Center for Security Policy, a think tank based in Washington D.C. Waller has worked with Strategic on a number of projects since 2016 or 2017.

Strategic has never had employees. Nor has Eastern.

**B.**     **The Origins of the Agreement**

The case concerns a research agreement (the "Agreement") dated December 29, 2017 and signed by Strategic and Eastern on January 6, 2018. Wallop signed on behalf of Strategic. Wang signed the name Han on behalf of Eastern.

The Agreement stated that it was "for the purpose of [Strategic] providing business research, reporting, documentation, and other consulting services." The Agreement also reflected Strategic's promise to "conduct high quality original research and prepare reports on subjects chosen at [Eastern's] discretion, for the purpose of detecting, stopping, and preventing crime or other harm to innocent people." PX1.

The Agreement had its origins in meetings among Wallop, Waller, and Guo and persons associated with Guo in late 2017.

Guo was introduced to Wallop and Waller in late October or early November of 2017, by an individual named Linchao Han ("L. Han"). A former reporter for the Washington Free

Beacon and current reporter for the Washington Times named Bill Gertz ("Gertz"), who is a mutual acquaintance of Guo, Wallop, and Waller, was also involved in the introduction.

Both Gertz and L. Han are members of the community of persons in the United States who are opposed to the CCP and self-identify as "China Hawks." L. Han had immigrated to the United States from China and worked in the United States Senate for several years (including for the late Senator Wallop) on matters relating to China. Before he immigrated and after the Tiananmen Square Massacre in 1989, L. Han helped found the Independent Federation of Chinese Students and Scholars. Gertz has opposed the CCP through his writings and books. He met Guo when he interviewed him in June or July 2017 and was asked by Guo to be a director of the Rule of Law Foundation, an organization established by Guo in October 2018 to bring about democratic reform in China.

Wallop and Waller also have been involved in activities dedicated to the overthrow of the CCP.

In late 2017, Gertz approached Wallop and offered to introduce her to L. Han with respect to a project Gertz thought might be of interest to Wallop. L. Han, who is a lawyer, was helping Guo with his application to obtain asylum in the United States. Gertz believed that Wallop could provide strategic communications support to Guo who was engaged in activities to oppose the CCP.

Wallop and Waller met with L. Han and Gertz in late October or early November 2017 at Wallop's home in Virginia. L. Han described Guo to Strategic as a wealthy businessman who had moved to the United States to escape political persecution in China and who had recently purchased the penthouse at the Sherry-Netherland Hotel in Manhattan. According to L. Han and Gertz, Guo had developed several broad goals involving the Chinese government that would be

beneficial to the people of China.  In particular, Gertz described Guo as a dissident who had

broken with the CCP, who was engaged in a whistleblower campaign, and who wanted to devote

his resources to undermining the CCP and causing it to collapse.  L. Han believed that Guo

needed to sustain an image as a "whistleblower" against the CCP.  To be a "whistleblower," L.

Han believed Guo needed to obtain and publish well-researched information against high-

ranking government officials.

Thereafter, Wallop and Waller held several meetings with Guo in late 2017.  Other

meetings were held with Wang and L. Han.  The first meeting, held by Wallop with Guo, was at

Guo's apartment in New York City.  Subsequent meetings, which were held by Wallop and

Waller with L. Han and Wang, were held in Virginia or in Washington, D.C.

Wallop and Waller first met with Guo at his New York apartment on November 21,

2017.  L. Han was also in attendance.  Guo stated that he was on a mission to dismantle the CCP

and described himself as an enemy of the CCP who wanted to use his wealth and influence and

contacts to bring out information to expose the contradictions within the CCP to bring it down.

Wallop presented a document reflecting a "Vision" for Guo "to remain safely in [the

United States] and accomplish his mission back home," i.e., in China.  DX38.  The document

was prepared at the request of L. Han, who Strategic understood to be Guo's emissary but who in

fact acted simply as an intermediary between Strategic and Guo.  *See, e.g.*, Trial Tr. at 57.  The

"Vision" document tracked Wallop's then-understanding of the services Guo desired.  It was

addressed both to his asylum application and to activities intended to help him undermine figures

in the CCP.  It was also addressed to transforming Guo's public image.  The document reflected

the objective for Guo to "transform himself from an apolitical businessman to an international

statesman" and to "build a global moral standing, with a sound philosophical or principled base,

to show a positive vision for his country's future that will unite people who ordinarily would never follow a wealthy businessman" as well as to "bring Mr. G into a new community of leaders and follows to accomplish his objectives."  DX38.

In the "Vision," Strategic proposed to provide services to Guo to change his public image and to build that community.  Strategic stated it would "focus on building those communities [of support] in this country, for the purpose of preventing any chance of [Guo] being forcibly repatriated, and as a base from which to expand publicly."  *Id.*  The services would include helping to change his public image, expanding sources of respect, developing a social engagement presence for Guo with policymakers, media figures, and decisionmakers in Washington D.C., making Guo  a thought-leader and policy leader, and building a foundation to educate people from the United States and China on Guo's ideas.  Among the services promised to Eastern was that Strategic would deploy a secretive and untraceable network of persons supportive of and associated with then-President Donald J. Trump.  Strategic proposed to provide an "aggressive defense" against attacks that were expected to intensify and to develop a network of surrogates who could speak on Guo's behalf without being traced back to him and who would be developed from online networks supportive of President Trump.  Wallop proposed a "three-year effort [with] an experienced team in [Washington D.C.] to advise Mr. G and help him navigate the political and policy terrain, develop strategy, execute programming, and coordinate messaging."  DX38.

At the meeting, Guo stated that he "want[ed] now immediately information" and that the "[f]irst month is critical for quality of information."  Trial Tr. at 383-84.

Those ideas were further developed at a second meeting between Guo, Wallop, and Waller on December 4, 2017.  Trial Tr. at 134.  L. Han and Yang were also at the meeting.  At

this meeting, Wallop presented a three-year timeline for the campaign.  The objectives were stated to be the following: "Remain free in the United States; Become a thought-leader and an international statesman; Change thinking on China and incubate new ideas and strategies; Develop and build self-replicating personal networks; Successfully drive long-term change back home."  DX39.

The proposal had several components, including the establishment of a foundation that would be supportive of Guo's objectives but would be structured so as to avoid the requirement to register with the United States government as an agent of a foreign government or individual. The components included: (1) the creation of "a personal presence in Washington, build friends and allies, make it impossible for US to deport back to China," including the development of "support among Washington influencers and decision-makers" and "support among the president's nationwide grassroots base"; (2) "[d]evelopment of a proper personal presence sufficient to rival the regime," including the purchase of a "Washington residence to show purpose and power, and provide hospitality" (a specific location was mentioned in Georgetown); and (3) the creation of an institutional presence, including through a "Washington-based educational and cultural foundation" that would not have to register under the Foreign Agents Registration Act ("FARA"), 22 U.S.C. § 611 *et seq.*, and through the acquisition of a "[p]hysical office in downtown Washington, D.C."  *Id.*  The three-year timeline concluded: "Implementation of the three-year effort will require an experienced team in Washington to advise Mr. G. and navigate the political and policy terrain, develop strategy, execute programming, and coordinate messaging.  These will all be direct and transparent.  Most can be done through the Foundation, which eliminates any need to register under FARA."  *Id.*

Strategic also proposed that it would marshal the social media network developed by President Trump and would deploy alternative media to support Guo in ways that Strategic was reluctant to put in writing. It noted that Strategic could provide an "'[a]ctive defense' campaign" against those who were expected to "apply intense pressure on the US government to deport Mr. G back to China," including through "aggressive second-tier journalists in alternative media (compartmented from the Foundation)," which "will be described verbally," and by "[o]rchestrat[ing] social media campaigns to promote Mr. G, attack his critics when needed, and generate a groundswell of support among the President's nationwide grassroots base to ensure that Mr. G is never forced to leave the US against his will. This is also compartmented from the Foundation." DX39. Strategic proposed to charge anywhere from $33,000 to $120,000 per month for its services. *Id.*

A subsequent meeting occurred between Wallop, Waller, and L. Han on December 10, 2017. Trial Tr. at 134-35.

Wallop and Waller had a third meeting with Guo on December 11, 2017. *Id.* at 134-36. L. Han was also present at the meeting. *Id.* At that third meeting, the parties' discussions turned to the investigative services Strategic could provide to Guo. *Id.* at 137. Guo stated he was interested in conducting an investigation into members of the CCP with the ultimate objective of helping to overturn the regime. *See, e.g.*, *id.* at 133, 137, 632-38. Strategic described its extensive background in investigation, including its relationships with federal law enforcement and other federal agencies that it could exploit. The investigative services Strategic proposed are described in a PowerPoint prepared by Waller in consultation with L. Han and Wallop entitled, "Time To Get Them: Beginning the psycho-political campaign for China," a portion of which

became the foundation for the Agreement.  PX2.  The PowerPoint described six parts of Phase 1

of the proposed work (the "Plan"):

- Run micro-targeted intelligence collection and analysis;

- Active threat reduction;

- Establish foundation and get it running;

- Network with Russian opposition;

- Acquire appropriate Washington, DC residence; and

- Acquire appropriate Washington, DC foundation offices.

The Plan was discussed at a fourth meeting among Wallop, Waller, Guo, L. Han, and

Yang on or about December 21, 2017.  Trial Tr. at 134-37, 252.

The first part of Phase 1 of the Plan became the foundation for the Agreement.  The goal

was to "[b]uild and operate a secret system for micro-targeted intelligence and collection

analysis."  PX2.  The PowerPoint observed that "[t]his is an extremely sensitive capability that

must be handled with extreme care."  *Id.*  In several bullet points, it describes the "intelligence

and collection analysis."  *Id.*  It would involve ten targets (described as "fish"), who would be

monitored "for several months to understand their habits, patterns, personal and professional

networks, businesses, corruption."  *Id.*  The objectives were to "[k]now what they are going to do

before they do it, so we can anticipate, pre-empt, and disrupt," to obtain "leverage to gain

concessions, protect people, use as political weapon, or as aid in criminal prosecution and asset

recovery," to "[p]rovoke confusion, panic, and infighting within CCP; divide opponents, peel

away potential allies; break the Party's control of corruption information; operate more quickly

than Party can react," to "[e]xpand the capability to go after all desired targets," to "[b]urrow into

commercial and political networks for business purposes," and to "[b]uild an image of

invincibility."  *Id.*  Strategic thus understood that Guo wanted the investigation to uncover

corruption relating to members of the CCP, including crimes committed by members of the CCP, such as the illegal removal of funds from the country.  Trial Tr. at 66.  Other aspects of the Plan included "reduc[ing] political threats to [Guo] and [his] cause" by "aggressive, grassroots, online social media/activist network in the United States," establishing a foundation for Guo, networking with exiled Russian opposition leaders and internal Russian opposition activists, acquiring a Washington, D.C. residence for Guo, and acquiring a Washington, D.C. office for Guo's foundation office.  PX2.

### C. <u>The Negotiation of the Agreement</u>

By mid to late December 2017, the parties were in a position to negotiate the terms of what became the Agreement.  *See, e.g.*, Trial Tr. at 137.  The terms were initially negotiated by Wallop and Waller with Guo and L. Han.  At the final stages, Wang negotiated the terms of the Agreement with Wallop and Waller.

As reflected in the Plan's PowerPoint describing the Plan, it appears that the parties agreed early on that Strategic would obtain information on at least ten targets and that such information would include financial information, tracking information, and information derived from social media.

From the evidence before the Court, the bulk of the negotiations concerned the financial terms of the Agreement.  The parties initially disagreed over those terms.  Strategic wanted to be paid a monthly retainer and to receive a large "evergreen" deposit that it could hold until the last payment was made in light of the large start-up costs that the operation would require.  Guo wanted to pay only on a per report basis.  Eastern was willing to pay a deposit but only if it could be recovered if Strategic failed to provide the deliverables as defined in the Agreement.  Trial Tr. at 268-69.

Strategic expected Wang to sign the Agreement; Wang had become the liaison for Guo by the end of negotiations. *See, e.g.*, Trial Tr. at 139-40. Strategic expected Wang to sign by December 29, 2017, in Virginia, as she had traveled to Washington D.C. the day prior, but the parties still had an ongoing disagreement about the payment terms. Instead, on December 29, 2017, Wallop gave L. Han and Wang a tour of a number of estates and larger properties in Washington D.C. and its environs that were good candidates for Guo to purchase. *Id.* at 139-41.

The negotiations stalled for a few days but on January 5, 2018, Wang sent a text message to Wallop stating that "both L [L. Han] and M [Guo] advised me that we [sic] supposed to meet again." *Id.* at 149; DX16. Negotiations then continued.

Wallop's negotiations with Wang and with Guo, both before and after January 5, focused on the request that Strategic investigate an additional five subjects, as well on the concept of a "waterline" in the "tank, " (i.e., a minimum amount of work that Strategic would need for the work to be worthwhile). As to the former request, Strategic agreed to investigate an additional five subjects but only for the month of January. As to the latter request, Strategic insisted on a minimum payment and a minimum number of subjects in order to commence the investigation but agreed on a scale for the valuation of each report so that if the parties agreed that Strategic would not deliver a particular report for a particular "fish," an equivalent report would be delivered for another fish.

As expressed in the text messages, Strategic would be paid a monthly fee of $750,000 for each of the first three months of the agreement (January, February, and March of 2018) and would investigate 15 subjects for the first month and 10 subjects for each of February and March. The number of subjects and the monthly rate would be adjusted thereafter. The fee structure was further expressed in a January 5, 2018 text message from Wallop to Wang:

The agreement for 3 months is correct.  January we have allowed 15 fish.  10 fish each for Feb and March.  We will determine the subsequent monthly costs obviously by the next numbers of fish in the tank, once we have recapped the previous 3 months.  That has not changed.  We will agree that we will always have 10 fish minimum in the tank which may be adjusted by agreement each month thereafter March 30, 2018 depending on the actual fish count.  We have fish count.  We have discussed this and agreed to this formula from the beginning with your boss—that we remain flexible with his additions.  Naturally if your boss adds or subtracts the number, we shall prorate or add amounts due the following month.  The entire point of the water line in the tank was to keep the costs to a minimum and a planned budget for your boss.  All of this was to give 30 units of reports per month as planned and agreed.  Some months may therefore cost far large amounts than your boss has budgeted, then there will be additional fees per fish, solely becau . . . [the message was cut off].

DX16.  The reference to "boss" was to Guo.

In response, Wang wrote: "Can you please send the contract here? . . . There is of course no impasse here.  I work with several people, M [Guo] is one of them, saying for this project, he is not the only boss."  *Id.*  Wang and Wallop agreed that Wang would sign the contract the next day, January 6, 2015, in person.  Wang wrote: "[T]his contract and all communications from contract signed tomorrow, are exclusively between NY [Guo], you, M [Waller] and me—four of us."  DX17; *see* Trial Tr. at 153-55.

The last-minute negotiations and changes to the terms of the arrangement are reflected in the difference between a draft of the Agreement that Wang was given to negotiate with Wallop and the final Agreement.  *Compare* DX6 (draft)*, with* DX4*, and* PX1 (final).  The draft of the Agreement, which is dated January 1, 2018, was virtually identical to the final Agreement with a few significant exceptions.  The third page of the draft Agreement recited prices of $300,000 annually per subject for each of the three reports Strategic was to prepare: forensic financial reports, tracking reports, and social media reports.  It calculated a total of $3,000,000 per year "for 10 units or deliverables for the first stage . . . or $250,000 per month for 12 months."  DX6.  Each "unit" was a target or fish.  It further provided:

These units or deliverables may be mixed and matched as the Client requests. As one unit is deleted from one fish, an extra fish with the equivalent deliverable is added, as shown in the attached charts. *Such payments will be made following receipt of the agreed-upon number of reports per month.*

DX6 (emphasis added).

The final Agreement similarly required regular monthly installments.  It calculated a total of $9,000,000 per year for 30 units, i.e., 10 subjects each with 3 reports, "or $750,000 per month for 12 months."  DX4; PX1.

The final Agreement, however, contained a significant change in the language.  It provided the same language: "These units or deliverables may be mixed and matched as, the Client requests. As one unit is deleted from one fish, an extra fish with the equivalent deliverable is added, as shown in the attached charts."  DX4; PX1.  But it deleted the following sentence from the draft Agreement: "Such payments will be made following receipt of the agreed-upon number of reports per month."  The change reflected the parties' agreement that Strategic would be paid a flat fee regardless of the number of reports delivered on any particular month.  There might be a variation in the number of reports delivered in a particular month depending, for example, on whether Eastern added a new fish.  On average, however, Strategic would deliver three reports per month on each subject.

In addition, the concept that the obligation to make regular monthly payments would extend only for the first three months of the contract, as reflected in the draft, was replaced by a new concept in the final Agreement that the term of the Agreement would be three years with $9,000,000 due each year, but that the parties would meet "after the March reports and payments [were] made" to "recap the accounting" and that such meeting would take place "prior to moving forward with the next quarter."  DX4; PX1.  Thus, the obligation to make regular monthly payments at a rate of $750,000 per month would continue throughout the term of the

Agreement—and the Agreement was terminable by either side on 30 days' notice—but the parties agreed to assess the value of the relationship and whether the terms should be changed after the three-month period.

In short, the compromise gave Strategic the comfort that, before it began work, it would receive $1 million that it could devote to the establishment of an infrastructure and that Eastern would not be able to terminate the Agreement without 30 days' notice, thus providing Strategic with an additional $750,000. The compromise additionally assured Eastern that it was not irrevocably committing itself to the arrangement for the full three years, and that after three months, the parties would look back to review the quality of the work before deciding how to further proceed under the Agreement or whether changes should be made to it. *See, e.g.*, Trial Tr. at 269-78; PX1 (stating that after the first three months, the parties "will meet to recap the accounting, prior to moving forward with the next quarter" and "that with any change to the numbers above 10 fish in the tank, that [Strategic] will reserve the right to renegotiate [the] financial Agreement").

###    D.    **The Insertion of Eastern into the Agreement**

During negotiations, Guo requested that, to protect his confidentiality and anonymity, he would not sign or be a party to the Agreement but that a separate entity would sign and be a party. Strategic agreed.

Either on the day the Agreement was signed (January 6, 2018) or only shortly before— the witnesses disagree—Eastern's name was first mentioned to Strategic. Strategic did very little, if any, investigation into the identity of Eastern. Wallop simply assumed that it was a shell company associated with Guo and determined that the company was registered in Hong Kong to Guo's daughter but did no other research. *See, e.g.*, Trial Tr. at 285.

Both Wang and Han testified that, prior to Eastern being added as the party to the Agreement, the two had a conversation in which Wang asked Han if Eastern would be interested in commissioning Strategic to conduct research on figures in the CCP and in funding that research and Han agreed. *Id.* at 413-14.[2]  The Court finds that testimony not to be credible. Wang signed interrogatories in connection with this case.  One of the interrogatories asked for Eastern to identify the names of each person with knowledge of the Agreement, including its negotiation.  Wang, who signed on behalf of Eastern, did not include the name Han.  DX5.  The Court finds that the testimony regarding Han was an after-the-fact creation to make it appear that Eastern was an entity, separate from Guo.

The more plausible inference, and the one that the Court draws, is that Guo told Wang to provide the name Eastern to Strategic and to sign Han's name to the Agreement.  If there was any conversation between Wang and Han, it was perfunctory, to confirm the arrangement that Guo had already made and directed.  At the time, Eastern was registered to the same address as Guo's family office in Hong Kong.  It is now registered to an address that is also the residential address of Guo's daughter.  Although at the time Han was the ostensible owner of Eastern, it has now been transferred to Guo's daughter but Han could not testify that he received anything in exchange.  Trial Tr. at 596.  Eastern is a shell for Guo and his family.

The Court draws that conclusion from several facts.  At the time of the supposed conversation, Eastern was essentially a defunct entity.  Although, according to Han, its purpose

---

[2] Wang testified that she met briefly with Han, told him that the investigation firm was very capable and could assist in the investigation of high-level governmental officials from China, and asked Han if he had an interest "to be part of this."  Trial Tr. at 414-15.  She testified that she told him the contract requested a $1 million deposit and that Han said he would figure out how to get the money for the project.  *Id.* at 415.  He later called Wang to say he would take care of the payment and that he was onboard and asked Wang to negotiate the contract.  *Id.*

was to make real estate investments, it had made no such investments.  It had no assets other than the $80,000 frozen in a Hong Kong bank account and it had no operations and no employees. *See, e.g.*, *id.* at 595-96.  Its location was in the offices of Guo's family company in Hong Kong and its sole director was Guo's daughter.  It had no reason to be fund the research and no ability to pay for the research.  There was no evidence that anyone from Eastern read the Agreement or even understood its terms before its name was put on the Agreement.  Guo's daughter did not testify at trial.  Han testified but his testimony was that he called Guo's daughter, told her about the project and that Eastern was going to participate, and that she agreed on the spot and authorized him to take care of it.  *Id.* at 567-69.  He admitted that he was not aware of the name Strategic until after this litigation began, that he never saw the Agreement, and that—aside from the obligation to pay $1 million—he did not understand or know any of the terms of the Agreement.  *Id.* at 603-05.  Han did not even see the Agreement at any time prior to signing, and the first time he saw the Agreement was at his deposition in this case.  Even at trial, he testified that he did not know the content of the Agreement and that he had never read the Agreement from beginning to end.  Moreover, Wang did not tell Han of the obligation and Han did not know of the obligation Eastern supposedly was assuming to pay Strategic $750,000 a month or even of the obligation ultimately reflected in the Agreement that Eastern would pay Strategic $9 million a year for Strategic's services over a three-year period.  *Id.* at 606.

Aside from supposedly arranging for the payment of a $1 million deposit, there is no evidence that Eastern did anything with respect to the Agreement.  It did not make payments to Strategic or provide the names of the persons to be investigated to Strategic (or even know which names were being provided to Strategic).

Finally, the testimony of both witnesses was largely conclusory and when accompanied by details, those details were discredited.  Wang did not provide any details of the supposed conversation with Han; her testimony as a whole was undermined by the repeated examples of the prior inconsistent statements that she made at deposition.  While Han's prior inconsistent statements were less pronounced than Wang's, his testimony was no more convincing.  Finally, no director of Eastern even signed the Agreement; the Agreement was signed by Wang who forged Han's signature.

### E.     The Terms of the Agreement

On January 6, 2018, Eastern and Strategic signed the Agreement.  The Agreement is dated December 29, 2017.  Eastern is identified as the Client and Strategic as the Contractor.

The parties executed the Agreement at Wallop's home in Virginia.  The Agreement was ultimately signed by Wang and Wallop.  Wang signed the Agreement in the name Han after Guo approved its final terms for Eastern, which Wang read him over the phone.

The Agreement is stated to be "for the purpose of providing business research, reporting, documentation, and other consulting services."  PX1.  Under the Agreement, Strategic agreed to "conduct high quality original research and prepare reports on subjects chosen at [Eastern's] discretion for the purposes of detecting, stopping, and preventing crime or other harm to innocent people" and to prepare research and reports on . . . three subject categories: A) Financial forensic Historical research; B) Current Tracking research; and C) Social media research."  *Id.*  Eastern was to provide Strategic "the necessary basic information, and desired areas of focus . . . to research," including the "specified subjects" of the reports, identified in the Agreement as "fish." *Id.*  Strategic was to provide Eastern with "comprehensive confidential reports" on 10 "fish" per year on a timetable set forth in the Agreement.  *Id.*

The "Financial forensic Historical research" was to "consist of, but not be limited to, in-depth and detailed reports of existing and historical business and financial transactions, on subjects selected by [Eastern], and relations of the subject as identified by [Eastern]." *Id.* at 1. Strategic was required to produce a weekly progress report, a preliminary report in the first month of the Agreement, one comprehensive report within three months of the Agreement, and update reports each following month. *Id.* at 2. Under "Deliverables," the Agreement specifies that Strategic was required to produce these reports "as specified above one time per subject, subject to occasional updating throughout the year." *Id.* at 3.

"Current Tracking research" was to "consist of, but not be limited to, in-depth and detailed reports on movements of specified subjects by land, air, and sea (private and commercial); schedules and itineraries, addresses and lodging, means of transportation, names of carriers, manifests, geolocation, major events and significant contacts the subjects involved, videos and audio that can be accessed remotely, and other data that may be of relevance to the overall research, such as past travel records that may [sic] significant to the research." *Id.* at 2. Strategic was required to produce weekly reports in the first month of the Agreement and thereafter research on a monthly basis. *Id.* Under "Deliverables," the Agreement specifies that Strategic was required to produce reports for each subject "monthly or more frequently as [Eastern] directs." *Id.* at 3.

"Social media research" was to "consist of, but not be limited to, in-depth and detailed reports on the social media usage and networks of specified subjects and public figures." *Id.* at 2. Strategic was required to produce research on a weekly basis for the first month of the Agreement and on a monthly basis thereafter. *Id.* Under "Deliverables," the Agreement

specifies that Strategic was also required to produce reports for each subject "monthly or more frequently as [Eastern] directs." *Id.* at 3.

In all, Strategic was to provide deliverables on 10 subjects (or fish) on each of the three topics for a total of 30 reports per year. *Id.* (Confusingly, the monthly and weekly deliverables were also referred to as "reports" but were also considered to be "units.") For the first month of the Agreement (January 2018), Strategic was to provide "comprehensive confidential reports" for up to "15 fish for a total of 30 reports." *Id.* at 4. That figure was to "decrease to 10 fish for a total of 30 reports at the beginning of the second month (February) and for (March) and for the duration of [the Agreement]." *Id.*

The research was to be "based on the best practices and standards of the industry, comparable to other top firms with similar services" and Strategic was obligated to "make most diligent efforts to ensure the served render[ed] are of very high quality, revealing a true, complete and full profile of the subject." *Id.* Strategic guaranteed "that all information provided is genuine." *Id.* at 3.

At the same time, the Agreement also reflected the understanding that "occasional unforeseen challenges may arise that will slow or block comprehensive research, and that there may be periods in which information is irregular, unavailable, or incomplete." *Id.* In such circumstances, Strategic was obligated to "endeavor to make all research and reports as complete was possible in a timely scheduled manner." *Id.*

The Agreement reflected the further understanding that Eastern "may not wish for each of the 10 fish to be the subject of all three reports, and that the number of report work duties [sic] per month will vary." *Id.*

The parties agreed that the identity of the fishes or subject might change: "It is also understood that [Eastern] may find it necessary to remove certain fish from time to time, or [Strategic] may find circumstances do not permit sufficient work to research a given fish." *Id.* When a fish was removed from consideration, "a new fish will be put in its place by [Eastern], keeping the number of fish being monitored at any time at 10." *Id.*

In exchange for Strategic's commitment to conduct the identified research and to deliver the reports, Eastern agreed to pay Strategic a monthly fee calculated on a scale of $300,000 for each of the financial forensic historical research, current tracking research, and social media research on a single "fish" for a total of $900,000 per fish per year for an aggregate of $9,000,000 for the 10 fish (or $750,000 per month) to which Eastern and Strategic were committing.

The actual payment for Strategic's services and reports was "to be made in regular monthly installments of US$750,000, at the end of each month." *Id.* at 5. The parties agreed that "for the first 3 months of th[e] Agreement, January, February and March 2018, . . . the payment of $750,000. USD will be wired per [Strategic's] instructions to [Strategic's] US Bank account." *Id.* at 4. "[A]fter the March reports and payments are made, [] all involved Parties will meet to recap the accounting, prior to moving forward with the next quarter." *Id.* Strategic reserved the "right to renegotiate [the] financial Agreement" "with any change to the numbers above 10 fish in the tank." *Id.*

The parties also agreed that Eastern would pay Strategic "a deposit of US$1,000,000 (one million dollars) upon signing the contract," which would "be credited on a prorated basis to the final 1-1/3 (1.3) months of the contract." *Id.* at 5.

20

The term of the Agreement was three (3) years from the date of signing but the Agreement also provided that "[e]ither party may terminate the contract with 30 days' written notice."  No cause was required.  *Id.*

The Agreement contemplated that Eastern might want additional subjects to be investigated and gave Eastern the right to "direct [Strategic] to conduct other research, not specified in th[e Agreement] for an additional fee."  *Id.* at 4.  It noted that both parties anticipated that the contract "could expand to many more subject of research" and that Eastern had "expressly stated that there could be as many as 4000 such 'fish in the tank.'"  *Id.* at 5.  It provided, "Obviously, negotiations for the far larger range will be agreed upon in writing at a later date."  *Id.*

Several provisions of the Agreement reflected the sensitive nature of the assignment and the parties' desire for confidentiality.  The Agreement begins with the statement:

> Both parties agree that the nature of this contract, and work related to it, is highly confidential.  Both parties are bound by the strictest secrecy not to disclose the existence of the contract, sources and methods used to execute the contract; and participants in formulating, supervising, or executing the contract's provisions, to any third party, except as required under United States law or the laws of the State of Nevada.

PX1.

It includes the agreement that "there will be single line of communication between [Strategic] and [Eastern]" and that "[t]he individuals through which such communication will be made will be identified upon the initiation of this contract."  *Id.* at 1.  "Any and all materials provided by [Eastern] to [Strategic] will be treated with absolute confidentiality and will not be shared by [Strategic] with any other entity."  *Id.*

It also provides that "[Eastern] may direct other entities to pay [Strategic], and that such payments will be deemed satisfactory compensation by [Strategic]."  *Id.* at 4.

All of the deliverables were to be provided "by USB drive only"; oral reports were insufficient. *Id.* at 3.

### F.   ACA Capital Group Limited Provides the Deposit

Even before the signing of the Agreement and as part of the negotiations that ultimately led to the Agreement, Wallop had requested that Eastern provide a $1 million deposit.

The deposit ultimately was provided by an organization called ACA Capital Group Limited ("ACA"). On January 2, 2018, before the Agreement was finalized, ACA sent two $500,000 wire transfers to Strategic that Strategic understood to be the deposit that the parties had previously discussed in relation to the Agreement then under negotiation.

The parties disagree as to the nature of the relationship between ACA and Eastern and the basis upon which ACA funded the security deposit.

Eastern claims that it borrowed the money from ACA. It points to a loan agreement dated December 29, 2017 (the "Loan Agreement") signed by Han on behalf of Eastern and a William Je ("Je") on behalf of ACA. The document has the formalities associated with a true loan agreement. It purports to document a $1 million loan from ACA to Eastern with a 6-month term and an interest rate of 2% compounded monthly "or otherwise mutually agreed by the Lender and the Borrowing in writing from time to time."[3] PX11. The 2% interest is equivalent to $20,000 for the first month. The Loan Agreement reflects that the loan is not collateralized and that ACA would wire transfer the $1 million to a bank designated by Eastern.

Strategic claims that the $1 million reflects an investment by ACA in the research venture launched by Eastern and Strategic and that, in reality, Eastern did not borrow the $1 million from

---

[3] The Court overrules the objection to the authenticity of the Loan Agreement. There is sufficient information before the Court to support its authenticity for the purposes of admissibility (i.e., a factfinder could find it to be authentic). But, as factfinder, the Court finds that the document does not reflect a genuine loan agreement.

ACA and does not owe $1 million to ACA.  It contends that the return of $1 million to Eastern rather than to ACA would represent a windfall to Eastern because Eastern would have no obligation to pay the funds over to ACA.

The Court finds that the $1 million paid from an ACA bank account does not represent a genuine loan from ACA to Eastern.  It reaches that conclusion largely for the reasons identified by Strategic.  First, Eastern's evidence regarding the extension of the loan is wholly implausible. It is based almost entirely on the testimony of Han, the purported representative of Eastern. According to his testimony, Han, who at the time had ceased his role as owner and director of Eastern, called Je, whom he described as a good friend, upon learning of the obligation to pay Strategic $1 million.  Han knew Je as an opponent of the CCP and believed he might be interested in funding anti-CCP research.  Je stated that he was willing to extend the $1 million loan and the parties agreed on a six-month term for the loan and a 2% interest rate.  Han testified that he saw the Loan Agreement for the first time on December 29, 2017 when he met Je at the Palace Hotel in New York to sign the agreement.  The meeting lasted 20 minutes.  Han, who does not read English, did not read the agreement which was in English and which he was supposedly signing on behalf of Eastern; Je just pointed out to him the amount of the loan, the interest rate, and the term.  Han also did not get approval for the loan from Guo's daughter—the ostensible owner of Eastern—and the agreement he was signing on her behalf.  He testified: "I don't need her approval; however, I did report such a matter to her."  Trial Tr. at 598-99.

There was no discussion between Han and Je as to how Eastern would repay the loan. Han stated that he gave the issue some thought but his testimony was not credible.  He testified that Guo's daughter, who was interested in film, would be able through her film investments to operate Eastern to make it profitable and to generate the $1 million (plus interest) necessary to

repay ACA.  *Id.* at 605-06, 610.  As Han put it: "I also believe that after the company transferred to Guo Mei and since she is very good in film, I believe she can operate this company and make it profitable."  *Id.* at 606; *see also id.* at 610 ("Even though at the time that was 80,000 only, we could still be operating and then we could still be investing in film.").  Wang also suggested that the Hong Kong authorities might agree to lift the freeze on the funds based on Strategic's research.  *Id.* at 439-40, 510-11.  The testimony is implausible.  Eastern's assets were limited to $80,000 in a frozen bank account.  Regardless of the skill of Guo's daughter as a film investor (as to which no evidence was introduced), there would have been no way for Eastern to satisfy the terms of the purported loan or to repay even the principal that it presumably owed, much less the interest.  The monies were more in the form of a gift.

Notably, in its interrogatory responses, Eastern stated that it was Guo who, on behalf of Eastern, ordered the two $500,000 wires totaling $1 million to be sent to Strategic.  DX5.

Strategic also points out that after the Agreement was signed, an additional $750,000—the first monthly payment in January 2018—would have been due in just a few weeks, further adding to Eastern's debt load.  In all, over $27 million would have been due over the three-year term of the Agreement.  Those terms thus had no economic substance for a company with the value of Eastern.

If ACA had loaned the money to Eastern, one would have expected each party to know how much Eastern owed ACA.  But the evidence at trial established that Eastern has not repaid the loan, made any principal payments, or made any interest payments.  At trial, Han was unable to testify as to how much Eastern owed per month in interest on the loan.  Trial Tr. at 607.  According to Han, Eastern's only plan to repay the loan is if it wins the litigation.  *Id.* at 574.  But that is a wholly implausible understanding of the obligations under the loan, which was

reached before there was any litigation and which was made in order for Strategic to perform under the Agreement.

Wang also could not say with confidence what Eastern owed under the loan or what its terms were.  Despite being Eastern's corporate representative—who had claimed authority to act for Eastern even during the negotiation of the Agreement, through performance, and through the litigation itself—Wang had not even seen the purported loan agreement when she first testified at her deposition in January 2019, only later seeing it in the litigation file of her prior counsel.  *Id.* at 508-09.  Although she testified that the counterparty to the loan, Je, had contacted her orally and in person about repayment, that testimony was not credible.  All she remembered was that he said that he wanted the loan to be repaid.  *Id.* at 504-07.  He did not mention what ACA was owed.

There are also irregularities in the loan document and its production. Eastern's agent, Han, is shown to have signed the loan document as "Director," but he was not Eastern's Director at the time.  In addition, Eastern did not keep a copy of the loan document after it was signed. There are no accounting records indicating a loan obligation to ACA.

At the same time, however, the evidence does not support that ACA was an investor in the research project.  ACA did not provide the names of subjects to be investigated, it did not receive any of the results of the research, there is no evidence that it made any arrangements in advance to receive the results of the research, and there is no credible evidence that it made requests after the fact to see the research.  Although there is reference in certain documents to "investors," the Court found convincing Wang's testimony that the reference was to constituents who might use or benefit from the research and not persons who contributed money to fund the Agreement.  The source of the funds sent by ACA is unknown to the Court and was not the

subject of testimony.  But regardless of whether those funds are ultimately traceable to Guo as Strategic suggested or are independent from him, the Court finds that they were a gift on behalf of Eastern (and Guo) and not provided out of any obligation.

G.      **Strategic's Performance Under the Agreement**

The execution of the Agreement imitates a fact pattern imagined by Robert Ludlum and played out in the Pink Panther.  It was shrouded in the secrecy befitting the best spy novels.  It was beset with mishaps befitting of Inspector Clouseau.

Because of security concerns and for fear that any electronic communications would be hacked or be transparent to the CCP, the parties agreed in advance that they would exchange reports and identification of research subjects only by USB drives and through in-person contact at secure locations.

Strategic would coordinate with subcontractors (i.e., intelligence analysts in the U.S. and overseas) to perform the research that Strategic would then incorporate into the reports for Guo. Guo would not be allowed to contact the team/network because Strategic's relationships and approach to the research were proprietary, and Strategic declined to reveal the names or titles of team members.  Pursuant to Guo's instructions and the parties' agreement, instructions to the investigators who would conduct the work, as well as the actual products of the research, could not be transmitted by email but only in-person.

The negotiated start date for the work under the contract was January 16, 2018.  *See, e.g.*, *id.* at 156, 161, 304, 319.  The parties agree that the weekly Financial Forensic Reports, Current Tracking Reports, and Social Media Reports were due no later than January 23, 2018, January 30, 2018, February 6, 2018 and February 13, 2018.  *See also* PX1.  The parties also agree that the first monthly Financial Forensic Reports, Current Tracking Reports, and Social Media Reports were due no later than February 16, 2018.

The parties further agree Strategic ultimately never delivered any "financial forensic [h]istorical research" called for under the Agreement.  Dkt. No. 299-1 ("JSOAF") ¶ 54.  The parties also agree Strategic did not deliver to Eastern any "current tracking research" called for under the Agreement.  *Id.* ¶ 55.  The parties further agree Strategic did not deliver to Eastern any "social media research" called for under the Agreement.  *Id.* ¶ 56.

On or about January 6, 2018—the same day that the Agreement was signed—Wang delivered to Wallop's home in Virginia a set of USB drives containing information for a list of 15 individuals that Eastern wanted investigated under the Agreement (the "Subject List").  Trial Tr. at 156-57; JSOAF ¶ 50.  But when Wallop tried to access the USB drives, she discovered that they were all corrupted.  Surprisingly, Wallop brought the USB drives to a person described as "a neighbor," despite the fact that the Agreement and the information it sought were described as highly secretive.  The "neighbor" tested them and discovered that they did not contain any readable files.  Trial Tr. at 156-57.

On January 8, 2018, Wallop met Wang in New York and obtained three more USB drives.  Fortunately, one of those worked and Wallop was able to download the files for the persons who would be the subject of the investigation.  *Id.* at 76-77, 157-58.  The individuals were virtually all high-ranking CCP members or persons closely related to high-ranking CCP members or their children living in the United States and elsewhere.  PX7.

Wallop and Waller agreed to split the work.  Wallop would focus on domestic investigation.  Waller would focus upon investigation done by investigators overseas.

In early January 2018, Waller travelled to Europe and engaged a 10-person team of computer and data analytic engineers to conduct data mining and research, including research into the "dark web" ("Team 1").  *See, e.g.*, Trial Tr. at 198, 289-92.  Team 1 was led by a person

whom Waller knew.  The operation was shrouded in secrecy.  Waller purchased computers for the team in cash in three separate countries in order to prevent any electronic tracing of the serial numbers of the devices to the purchaser.  He also purchased electronic material in a fourth country for the purposes of camouflaging the actual activity that was taking place.  Information could not even be exchanged by encrypted email or encrypted phone.  *Id.* at 292.  Per the instructions of Guo, information could only be exchanged in person by exchanging USB drives. There was compartmentalization to make sure that if any link in the chain was broken it could not betray the other links in the chain.  Travel was onerous because it would take two or three days to do a round trip to meet in a third location to exchange data.  Before Waller could give the list of the 15 names to Team 1, he had to print out the names from a computer not connected to the internet, scan them, and then place them onto a new encrypted drive to be delivered to Europe.  *Id.* at 304.  Guo had also instructed that Strategic not have Mandarin speakers on Team 1 in case they were spies for the CCP.  L. Han eventually permitted Waller to hire retired European diplomats who spoke with fluent Mandarin who were not of Chinese background.

Waller gave the names to Team 1 in Washington D.C. and traveled to Europe a few days later to obtain a status report and to collect the research that the team had conducted (which was stored on a USB drive).  He received a drive from Team 1 on January 24, 2018 and delivered that material to Wang two days later.  *Id.* at 304-05.

Wallop met with Guo at the end of January 2018.  *Id.* at 162.  At the meeting, Guo stated that he needed the reports by January 26, 2018—10 days after the negotiated start date of the Agreement but three days after the first deadline for the weekly reports.

Strategic delivered a first USB drive to Eastern on January 26, 2018, after Waller's return from Europe.  Strategic has admitted that the information contained on the USB drive delivered

to Eastern on January 26, 2018 was "of no use to Mr. Guo or Eastern because it was nothing more than the researchers' own work to familiarize themselves with the fifteen subjects using open-source information."  *Id.* at 199; DX2 at 35 ¶ 45.  At a meeting with Wang, Waller stated that the drive reflected the work that the team had done to orient itself and that several of the 15 names were misspelled.  Trial Tr. at 307-310, 313-14.  He also stated that the drive contained the location of some offshore companies and the password to a computer server of the Chinese government.  Wang responded with disappointment as to the information, stating that it was not "good enough" and was "all junk."  *Id.* at 314.  In addition, while L. Han expressed the view that Strategic had good leads and should keep working on them,[4] he also relayed that Guo was angry with the information that was delivered under the Agreement and believed that it reflected that Strategic was incompetent and trying to "rip him off."  *Id.* at 320.[5]

Waller traveled to Ireland to receive the second USB drive a few days later and delivered it to Wang in Pennsylvania Station in New York on January 30, 2018.  *Id.* at 199, 327-28.

Wang took the second USB drive to Guo and placed it in the "virgin" laptop that had been left by Strategic from the last meeting.  The two discovered that the drive did not contain useful information.  The information on the drive was limited to raw code that was not actionable by the client but was intended to show that the work was being executed.  *Id.* at 200.  The parties agree that this second USB drive was not "of any use" to Eastern and that it contained

---

[4] L. Han, who did not testify at trial, also testified under oath at deposition that the hard drive that Strategic provided contained only "lots of junk information."  Trial Tr. at 368.  But L. Han was an intermediary between Strategic and Guo and not Guo's agent.  *Id.* at 365.

[5] Waller testified that he did report to Wang or L. Han that Eastern had discovered from sources other than social media that one of the people on Eastern's list was carrying a counterfeit non-Chinese passport of a NATO ally.  Trial Tr. at 320-21.

"incomplete work product . . . in the form of raw research data." *Id.* at 78-79, 199, 200-01, 359, 383; DX2 at 28 ¶ 24.  Among the information on the drive were encrypted email addresses and passwords of communist figures on Guo's list.  Trial Tr. at 329.  Strategic did not deliver any other USB drives to Eastern and Strategic admits it "was unable to prepare any detailed reports." *Id.* at 79, 359.

After the second meeting, and after Wang had conveyed the message in the wake of that meeting that work with Strategic might not be continued for a second month, Waller made arrangements with a new team ("Team 2").  Team 2 was from an obscure organization called the Allied Special Operations Group ("ASOG"), which was purportedly based in Dallas, Texas.  Conspicuously, Strategic offered no evidence regarding the bona fides, qualifications, or legitimacy of this organization.  It would conduct the research using different methodologies from those used by Team 1.  Rather than using data mining and intrusive computer capabilities, ASOG claimed it would work with other commercially available databases and contacts within the federal government to do the research.

Waller testified he met with ASOG in Texas in the first couple of days of February 2018 and presented ASOG with the list of subjects to be investigated, asking the organization to research a selection of those names to see what it could discover using its own methods.  Within a week, ASOG replied to Waller with its results and Waller flew back to Texas to meet with it.  Waller testified that ASOG gave him an oral report at the meeting and permitted him to view— but not take—the research ASOC conducted, which Waller testified included detailed tracking information on the subjects.  *Id.* at 95-96, 344-45.

Waller further testified that he told L. Han at a subsequent meeting that ASOG had told him that it was illegal to obtain this information under federal law given the nature of what was

obtained.[6]  In particular, Waller testified that he stated that he had been told that it would be a federal crime to investigate further the five subjects ASOG had investigated because the National Clandestine Service of the CIA had classified the individuals in a category that ASOG said was called "records protected."  *Id.* at 351-52.  He testified that he was told and conveyed that this classification is intended to protect foreign subjects from database searches for the purpose of protecting their records either because they were subjects of criminal or national security investigations or because they were cooperating with the United States government.  *Id.*  Waller testified L. Han told him that he understood that the information was classified and that he would come up with new names.  Trial Tr. at 352-53.  At the same time, however, ASOG was reluctant to continue work on the assignment without knowing the identity of Strategic's client.  *Id.* at 354. L. Han, however, ultimately did not provide additional names.  *Id.*

The testimony regarding ASOG is of dubious veracity.  As noted, Strategic offered no evidence of the qualifications of ASOG or its competence to do the work that it supposedly performed.  It also offered no evidence that ASOG actually did any work, save for the testimony of Waller that he saw work and an invoice for $104,595 that ASOC reduced to $5,412 supposedly based on a "termination credit."  DX56; Trial Tr. at 345, 350.  There was no evidence offered—from either a fact or expert witness, or in the form of a document or stipulation—that a classification of "records protected" even existed, much less that there was any prohibition on ASOG sharing any work it performed with Strategic or with Eastern.  Waller himself had never heard of the term "records protected" before ASOG mentioned it to him and he does not know of a legal source for it.  Trial Tr. at 369-71.  All that was offered is the

---

[6] Waller testified that he was instructed by Wang on or about January 30, 2018 that he should not contact her in connection with the project anymore and that he should work solely with L. Han. Trial Tr. at 349-50.

testimony of what Waller was told, which was received solely for Waller's state of mind and as background for what he told L. Han, and not for the truth of what was stated.

A few weeks later in February 2018, Wallop and Waller met with L. Han at Wallop's home. *Id.* at 354-56. L. Han told the two to stand down their work.

### H.   Eastern Terminates the Agreement With Strategic

Neither Eastern nor ACA made the first monthly $750,000 payment that was due on February 16, 2018 under the Agreement. Strategic did not deliver any of the monthly reports.

On February 23, 2018, Eastern delivered a letter to Strategic terminating the Agreement. Trial Tr. at 163; DX8; JSOAF ¶ 58.

The letter purported to terminate the Agreement effective immediately and demanded a full and complete refund of the $1 million deposit. After noting that the start date of the Agreement had been delayed from January 6, 2018 to January 16, 2018, the letter listed a number of missteps by Strategic that Eastern claimed constituted a breach of contract and demonstrated that Strategic had fraudulently misrepresented its capabilities. These missteps included the failure to deliver the reports required by the Agreement and the failure to meet the schedule laid out in the Agreement. Eastern demanded that Strategic cease work immediately and return or destroy all materials and information provided by Eastern to Strategic. The letter demanded that the $1 million deposit be returned to ACA at a Singapore address.

Strategic did not return the deposit.

### I.   Guo's Alleged Misrepresentations

Strategic, through Wallop and Waller, claims that Guo misrepresented his identity and his objectives and that they reasonably relied upon his misrepresentations to Strategic's detriment.

Specifically, Guo represented to Wallop and Waller that he was an opponent of the CCP and that he wanted to use the research Strategic would provide to sow discord in that

organization and ultimately to overthrow the CCP and the current regime in China.[7]  Wallop and Waller both testified that they were comfortable entering into an agreement with Guo because they believed that he held the same anti-CCP views that they did and shared their objective of undermining the CCP.  Strategic claims it later learned that Guo was in fact affiliated with the CCP and if it had known that prior to signing the Agreement, it would not have entered into the Agreement.

The Court finds that Wallop and Waller did not rely on Guo's statements that he was anti-CCP, that any such reliance would not have been reasonable given the facts here, and that Strategic has not proved a misrepresentation by Guo.

First, Wallop and Waller's testimony that they relied on Guo's statements was largely conclusory and was undermined by the fact that, despite purportedly being investigators, they did no investigation into Guo's identity or allegiances, much less the identity and allegiances of Eastern, the corporate entity that was later introduced into the transaction.  Guo undoubtedly represented that he was anti-CCP.  He made that point vehemently in his testimony at trial. However, from the evidence, it appears and the Court finds that what attracted Wallop and Waller was the nature of the work: an investigation into alleged corruption by high-ranking members of the CCP, funded by a person who claimed to be a billionaire who would pay them $750,000 per month in order to do that research.  They were less interested in the identity of the funder, Guo, his personal political beliefs, and which faction he sided with in the internecine battles within China.

---

[7] Gertz and L. Han made similar representations about Guo, but they did not do so as Guo's agent and their statements are not attributable to Guo.

Second, any such reliance would have been unreasonable.  According to their testimony, Wallop and Waller largely relied—to the extent they relied on anything—on the testimonials of Gertz and L. Han.  They knew that Gertz and L. Han held similar views to their own views, that Gertz and L. Han had introduced Guo to Strategic, and that if Gertz and L. Han were willing to associate with Guo and to make the introduction, Wallop and Waller simply assumed they should be willing to associate with Guo.

However, much of the information that Strategic now relies upon to suggest that Guo was not genuinely opposed to the current leadership in China was in the public record before the first meetings Wallop and Waller held with Guo and well before the Agreement was signed. Sufficient evidence was available that should have caused Strategic to investigate.  The fact that it did not do any investigation, or ask Guo to make any representations, undermines the reasonableness of any reliance it claims on Guo's statements.  Even before its first meeting with Guo, Strategic had received information that "some suspect that [Guo] may simply represent a faction in an internal leadership struggle."  DX38; *see, e.g.*, Trial Tr. at 58-59, 203.  Waller was also aware of reports that Guo owed his fortune to ties to the CCP and that he maintained close ties to senior CCP leaders after he left China.  Trial Tr. at 203-04, 206.  In the words of Waller, Guo had made it "very public" that he rose up through the CCP and the secret police apparat, Ministry of State Security ("MSS"), with MSS's Deputy Head of Security Ma Jian ("Jian").  *Id.* at 205, 207.

Against this backdrop, it is telling that Strategic did not investigate Guo but rather simply placed blind faith on the fact that Gertz and L. Han vouched for Guo.  *Id.*; *see also id.* at 85-86, 88.  By that time, however, Gertz had written an article dated May 23, 2017, stating Guo has "close ties to senior Chinese Communist Party leaders, including government ministers and

Politburo members" and "access to Ministry of State Security (MSS) operations overseas and in the United States."  DX43.  The article also reported that Guo's wife and daughter were permitted to visit him in the United States but were required to return to China after 20 days where they could be used as political leverage against him—information that Strategic now says is evidence of Guo's relationship with the CCP.  By October 9, 2017, Gertz had publicly written that "Guo said he maintains close ties to supporters within the Chinese government and security system and is able to obtain many internal documents."  DX32.  Also in October 2017, the Wall Street Journal published reports—of which Waller was aware—that Guo had met with four officials from China's MSS in his New York apartment.  DX34.  It is precisely these "close ties," the relationship with the MSS, and the fortune Guo made from the CCP that Strategic now relies on to say that Guo is secretly allied with the CCP.

Wallop testified that she did not know what Eastern or Guo were going to do with the research and thought maybe Guo was going to "run it both ways."  Trial Tr. at 89.  Yet neither Wallop nor Waller insisted that Guo or Eastern make any representation about their being anti-CCP or using the research only for anti-CCP purposes.  At trial, Strategic, presumably a sophisticated party, claimed that it did not include a representation in the Agreement because it was concerned about confidentiality.  That explanation was undermined, however, by the evidence that the parties took to keep the Agreement (with its terms) confidential, including that "there's no decrypted electronic copy anywhere."  *Id.* at 386.  The terms of the Agreement themselves were confidential and kept highly confidential.  The parties could have included a representation in the Agreement regarding how the information would be used or about Guo's objectives had Guo's objectives or his allegiances been important to Strategic.  The fact that Strategic did not even suggest that such a representation was ever made is revealing, in that it

shows both that Strategic did not rely on any view regarding Guo's politics or allegiances and that any such reliance was not reasonable.  Waller ultimately admitted that the reason that Strategic did not include a representation—despite the fact that Eastern says it considered Guo's anti-CCP ties to be material—was because of the assumption that one was not needed: "[I]t was just second nature to what we both wanted."  *Id.* at 386-87.

Finally, there also is no clear and convincing evidence as to whether Guo is a supporter or opponent of the CCP.  Guo asserted forcefully at trial that he was an opponent of the CCP.  But other witnesses testified with equal force as to their belief that he was a friend of the CCP.  There is evidence of statements by him that are consistently hostile to the CCP.  But there was also evidence introduced at trial of a conversation that he had with officials of the CCP at his apartment in which he declared his loyalty to Chinese President Xi Jinping and the CCP.  *See, e.g.*, *id.* at 628-32, 716-21, 727-34, 736-50; DX114B.

> The Court credits a portion of the testimony of Waller.  He stated:
> I've worked a lot with communist defectors over the years, actually since I was an undergraduate at George Washington University, and had some of them as professors.  I learned over the years, as well as talking, learning through a lot of people in U.S. intelligence and counter-intelligence, that it's very hard to discern whether someone who has broken with a communist system, whether it's Soviet or Chinese or others, to discern conclusively whether or not they still maintain a loyalty.

Trial Tr. at 204.

Waller went on to state that many defectors and dissidents "still maintain ties because they had families or other connections, and those ties would be valuable if they were indeed dissidents or genuine opponents because they could mine those ties for information that would be useful to the United States, to do damage to their own system."  *Id.* at 204-05.  Thus, Waller

admitted that evidence of a relationship that someone has with people within the CCP on its own is not necessarily indicative of the fact that he or she is a supporter of the CCP.[8]

Strategic's evidence that Guo was a secret supporter of the CCP largely consisted of the testimony of another member of the Chinese dissident community, Sasha Gong ("Gong"); statements by Guo himself; and circumstantial evidence. Guo testified assertively that he was genuinely anti-CCP, and Eastern offered evidence of its own in support of that contention.

Gong is a journalist and dissident. Gong testified that she interviewed Guo several times beginning in April 2017 and continuing through 2018. The interviews were conducted both off the record and live on-air. In the interviews, Guo claimed to Gong, and has also publicly claimed, that he was arrested for his support of the 1989 Tiananmen Square movement. But Guo also told Gong that, after a time in Hong Kong following Tiananmen Square, he came back to mainland China, where he built real estate, made many high-ranking friends, and became one of the major players in China's intelligence community. Gong claims that Guo said he was one of only three people who could visit Hu Jintao, the former general secretary of the CCP (predecessor to President Jinping) without an appointment. He used this access to battle with the former Vice Mayor of Beijing by allying with MSS Deputy Head Jian. Guo told Gong he maintained connections with senior Chinese leaders and that he believed President Jinping was a good leader; Guo's only goal was to target corrupt persons in the CCP. Strategic argued that those statements are consistent with a continuing relationship with the CCP.

Strategic also argued that there is evidence Guo has moved money from Hong Kong or mainland China since he began speaking out as a dissident through ACA and that persons

---

[8] Waller gave similar testimony when asked if Elliott Broidy, who was revealed to be funding Strategic's defense, was associated with the CCP. Trial Tr. at 387-88; *see also id.* at 181

associated with Guo, such as Han and Wang, were comfortable with sending money from Hong Kong or China into the United States and repaying the obligation to ACA by a transfer of funds into China.  It claims that Guo would not have been able to do so without the cooperation of the CCP.

Finally, Strategic argues that Guo has attacked dissidents such as Gong and Bob Fu ("Fu").  Strategic argues that in continuing to attack members of the China Hawk community and dissidents by claiming they are actually controlled by the CCP, Guo continues to turn members of this community against each other.

The evidence is not sufficient to establish that Guo is a supporter of the CCP.

The force of Gong's testimony—that she now believes Guo is a supporter of the CCP based on his associations with certain political leaders, his later harassment of her, and certain pro-CCP statements he is accused of making—is undermined by the fact that even after Guo made the statements to her and after she was aware of his supposed continuing relationships with persons who are members of the CCP, she wrote a letter on his behalf to the United States government supporting Guo's application for asylum and claiming that he was an opponent of the CCP.  In her letter, Gong wrote that Guo had challenged the legitimacy of communist leaders in China, worked Chinese intelligence services, and financed operations investigating overseas corruption by Chinese government officials, all of which made him valuable to the United States government.  *Id.* at 794-98; DX123.

As to Guo's alleged transfers of money and other circumstantial evidence, Strategic's arguments are based on speculation.  It offered no evidence, expert or otherwise, regarding the inferences that can be drawn from the fact that money travelled from Hong Kong or mainland China to the United States supposedly on behalf of Guo.  Indeed, Strategic's presentation was

telling for its failure or apparent inability to offer any expert testimony regarding the inferences to be drawn from Guo's relationships.

As to the attacks on Chinese dissidents, Guo testified that his attacks were only ever in retaliation: "I have never initiated any attack to any Chinese person. Always it was []they who attacked me, then I retaliate." Trial Tr. at 747. "I have never attacked. I was always on the side of retaliation." *Id.* at 748. He added: "I have never initiated any attacks on any person, only under attack under the natural protection do I retaliate. And also, there were millions of people or up to a million people online who were attacking me, and . . . it's not possible that I would retaliate against every one of them either." *Id.* at 748.[9] The evidence shows that Guo is extraordinarily combative, as are other members of the Chinese dissident community. It does not demonstrate on which side of the political battle Guo stands.

Finally, there is evidence to question whether Strategic even believed it was defrauded. Strategic did not assert a counterclaim for fraud when it filed its initial pleadings in this case. Dkt. No. 22. Nor did it in its amended pleadings. Dkt. No. 47. It only asserted such claim after it received litigation funding from an alleged opponent of Guo with an interest in undermining his assertions of hostility to the CCP, a wealthy United States businessperson named Elliott Broidy, whose credibility also is subject to question. *See* Dkt. Nos. 114, 127. Broidy was convicted of federal crimes before he received a presidential pardon in 2020.[10] The evidence

---

[9] When asked about whether he had accused Sasha Gong of being a communist spy, Guo testified: "It was after she called me a spy, then I retaliate." Trial Tr. at 748.

[10] Eastern offered evidence that Broidy himself was a supporter of the CCP as proof that Strategic, which accepted litigation funding from him, did not truly care about the political allegiances of those with whom it did business. *See, e.g.*, Trial Tr. at 181:24-184:17. Some of the evidence was subject to evidentiary challenge. The Court need not resolve those evidentiary challenges because it is satisfied from the testimony of Wallop and Waller that they did not actually or reasonably rely on Guo's representations.

suggests that the claim of fraud was not based on any evidence that Strategic discovered or on any genuine view that Strategic was defrauded but on a recognition that the assertion of a fraud claim would have strategic value in the case or otherwise.

## II.  CONCLUSIONS OF LAW

Eastern brings three claims: a declaratory judgment that the contract is illegal and void as against public policy, breach of contract, and unjust enrichment.  Dkt. No. 93.  Strategic brings two counterclaims for breach of contract and fraudulent misrepresentation.  Dkt. No. 127.

### A.  Eastern's Declaratory Judgment Claim

Each party contends that the other breached the Agreement and that it is entitled to damages.  Before addressing the breach of contract claims, however, the Court must address the argument in Eastern's declaratory judgment claim that the Agreement is void and unenforceable because it violates Virginia's private security services statute and thus Eastern is entitled to a refund of its deposit regardless of whether any party breached the Agreement.  The Court holds that the services contemplated by and performed under the Agreement fall within the conducted prohibited by the statute and that the Agreement is therefore void and unenforceable.  Eastern is entitled to its deposit back.

### 1.  Virginia Private Security Services Statute

Under Virginia law, "a contract made in violation of a statute is void, and there can be no recovery thereon, unless it is apparent from the statute that the legislature did not intend to make the contract void and unenforceable."  *Massie v. Dudley*, 3 S.E.2d 176, 180 (Va. 1939) (holding plaintiffs could not recover under an express contract for a real estate commission where they were not licensed as brokers); *see F. S. Bowen Elec. Co. v. Foley*, 72 S.E.2d 388, 394 (Va. 1952) (violation of statute preventing a contractor from "engaging in business until he has been licensed and registered, and the acts prohibited are termed unlawful and punishment is provided

in the statute for the violation thereof . . . is illegal, not merely invalid") (internal quotation marks and citation omitted).  "[I]mplicit in *Bowen* and *Massie* is that failure to abide by the provisions of a specific statute renders a contract invalid," *Am. Demolition & Design v. Pinkston*, 96 Va. Cir. 142, 2017 WL 11452748, at *8 n.2 (Va. Cir. Ct. Aug. 2, 2017), and "[w]here the Court has declared contracts void under this doctrine the plaintiff has not been able to recover damages otherwise due him," *Beard v. Ragan*, 51 Va. Cir. 229, 2000 WL 33258655, at *3 (Va. Cir. Ct. Jan. 12, 2000).  Under Virginia law, the "policy behind [a] licensing statute and the underlying voidability of contracts for noncompliance" is to "protect the public from inexperienced, unscrupulous, irresponsible, and incompetent contractors . . . [where] [e]nforcement of the contract is denied the unregistered contractor, not because of the nature of the transaction, but as a penalty for failing to comply with the registration statutes."  *Butler v. Creative Design Builders, Inc.*, 24 Va. Cir. 362, 1991 WL 11015277, at *2 (Va. Cir. Ct. Aug. 7, 1991) (quoting *Bacigalupo v. Fleming*, 102 S.E.2d 321, 324 (Va. Ct. App. 1958)).  In essence, it would undermine the policy of the statute for a court to award in damages monies for which a party was not entitled to receive pursuant to law or regulation.

Virginia's "Private Security Services Statute" is a licensing statute that requires persons who perform or contract to provide certain private investigatory work to have a license.  It makes it unlawful for a person to "engage in the private security services business or solicit private security business in the Commonwealth [of Virginia] without having obtained a license from the Department [of Criminal Justice Services]."  Va. Code Ann. § 9.1-139(A).  The statute defines a "private security services business" to mean "any person engaged in the business of providing, or who undertakes to provide . . . private investigators . . . to another person under contract, express or implied."  Va. Code Ann. § 9.1-138.  A "private investigator," in turn, is defined to mean "any

individual who engages in the business of, or accepts employment to make, investigations to

obtain information on (i) crimes or civil wrongs; (ii) the location, disposition, or recovery of

stolen property; (iii) the cause of accidents, fires, damages, or injuries to persons or to property;

or (iv) evidence to be used before any court, board, officer, or investigative committee." *Id.*

 Strategic first argues that it did not violate the Private Security Services Statute by

entering into the Agreement because the work performed under the Agreement does not fall

within the purview of the statute.  Specifically, it argues that Strategic did not provide private

investigators in Virginia: there was no actual investigation in Virginia as Team 1 and ASOG

were located elsewhere and there was no evidence that there was a target in Virginia.

 "[T]he constant endeavor of the courts is to ascertain and give effect to the intention of

the legislature, that intention must be gathered from the words used." *Chase v. DaimlerChrysler

Corp.*, 587 S.E.2d 521, 522 (Va. 2003).  Thus, when interpreting statutes, "we start with the plain

language." *U.S. Dep't of Labor v. N.C. Growers Ass'n*, 377 F.3d 345, 350 (4th Cir. 2004); *see

also Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004) ("It is well established that when the

statute's language is plain, the sole function of the courts . . . is to enforce it according to its

terms.") (internal quotation marks and citation omitted).  "[C]ourts apply the plain language of a

statute unless the terms are ambiguous, or applying the plain language would lead to an absurd

result." *Boynton v. Kilgore*, 623 S.E.2d 922, 925-26 (Va. 2006) (internal citations omitted).

"Ambiguity exists if the text can be 'understood in more than one way or refers to two or more

things simultaneously [or] when the language is difficult to comprehend, is of doubtful import, or

lacks clearness or definiteness.'" *Id.* at 926 n.8 (quoting *Brown v. Lukhard*, 330 S.E.2d 84, 87

(Va. 1985)).  "The phrase 'absurd result' is used 'to describe situations in which the law would

be internally inconsistent or otherwise incapable of operation.'" *Id.* at 926 n.9 (quoting *Cook v.*

*Commonwealth*, 597 S.E.2d 84, 87 (Va. 2004)).  But even "if the literal text of the statute produces a result that is, arguably, somewhat anomalous," the courts "are not simply free to ignore unambiguous language because we can imagine a preferable version."  *Sigmon Coal Co., Inc. v. Apfel*, 226 F.3d 291, 308 (4th Cir. 2000), *aff'd sub nom. Barnhart v. Sigmon Coal Co.*, 534 U.S. 438 (2002).

Under the plain language of the statute, Strategic' conduct can qualify as that of a private security services business not only if it is "engaged in the business of providing" a private investigator but also if it "undertakes to provide" private investigators under contracts.  The focus of the statute is not limited to the actual performance of security services or the actual investigation of crimes or civil wrongs; it also is addressed to the agreement to undertake such services, regardless of whether the services are actually performed by the party to the agreement or by someone with whom that party subcontracts.  *See Ervin B. Davis & Co. v. Dep't of Crim. Just. Servs.*, 49 Va. Cir. 447 (1999), *judgment entered*, No. 160-97, 1999 WL 907550 (Va. Cir. Ct. Sept. 13, 1999) ("[T]he statute makes no reference to a quantity of private security services in which the business must engage before the statute applies.").  The act of "undertaking to provide" is what must occur in Virginia.  The statute does not require that the private investigator, or the information he or she seeks to obtain, must be located in Virginia as well.

That the statute requires a private security services business to be licensed if, while in Virginia, it "undertakes to provide" private investigators is reinforced by the statute's reciprocity provision.  Under Section 9.1-140(10), Virginia exempts from its license requirement "[l]icensed or registered private investigators from other states entering Virginia during an investigation originating in their state of licensure or registration when the other state offers similar reciprocity to private investigators licensed and registered by the Commonwealth."  Va. Code Ann.

§ 9.1-140(10).  The statute anticipates that a private security services business operating in Virginia may require its private investigators, whether acting as employees or independent contractors, to enter other states and so it affords consideration to out-of-state investigators entering Virginia.  That Virginia considers allows out-of-state private investigators to enter Virginia "during an investigation originating in their state of licensure or registration" and gives reciprocity to such out-of-state investigators, suggests that the Virginia legislature was focused at least in part on where the investigation "originates" rather than where the investigation may lead. Indeed, the provision making it unlawful for an unlicensed person to engage in a private security services business in Virginia extends that prohibition to the "undertaking" of such business in Virginia as well.

Setting aside the second question of whether the services that Strategic undertook to provide constitute "private investigation" as defined by the statute, Strategic's conduct manifestly occurred in Virginia.  Strategic operated and continues to operate out of Wallop's home in Virginia.  Trial Tr. at 37.  The Agreement setting forth the services Strategic undertook to provide was executed at Wallop's home in Virginia.  Trial Tr. at 69.  Additionally, much of the work that Strategic did in connection with the Agreement took place in Virginia.  Strategic received the Subject List and the first USB drive from Team 1 in Virginia.  Trial Tr. at 319, 420.

In light of this reading, the Court asked the parties to brief whether, to the extent that the statute could be deemed to regulate commerce outside of its borders, the statute violated the Commerce Clause.  Article I, Section 8, Clause 3 of the United States Constitution empowers Congress to "regulate commerce . . . among the several States."  U.S. Const., Art. I § 8, cl. 3. The Commerce Clause contains a dormant aspect that denies the states "the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce."  *Or. Waste Sys.,*

*Inc. v. Dep't of Env't Quality*, 511 U.S. 93, 98 (1994).  A statute's extraterritorial effect can violate the Commerce Clause when it seeks to regulate commerce that takes place "wholly outside of its borders."  *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 328 (1989).  But the "critical question" is "where the transaction being regulated is consummated" and "in grappling with whether the practical effect of a regulation is to control conduct beyond the boundaries of the State, the circuit courts have focused on the location (or locations) where the contract was formed."  *Berman v. City of New York*, 2012 WL 13041996, at *18 (E.D.N.Y. Oct. 3, 2012); *see also Brown v. Hovatter*, 561 F.3d 357, 365 (4th Cir. 2009) (rejecting plaintiffs' challenge to "the way [the State] authorizes them to do business within the State in a profession regulated by the State" because such "complaints do not involve burdens placed on the interstate movement of goods, materials, or other articles of commerce, and the matters of which they complain—the manner of professional practice in [the State]—are not matters protected by the dormant Commerce Clause").  That is because "there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it."  *Kassel v. Consol. Freightways Corp. of Del.*, 450 U.S. 662, 670 (1981) (quoting *S. Pacific Co. v. Arizona*, 325 U.S. 761, 767 (1945)).

The statute here does not seek to regulate commerce that takes place "wholly outside of its borders."  Virginia has an interest in regulating and licensing not just those who take investigative actions within its borders but also those who in Virginia offer such services to persons in Virginia regardless of where the services are actually performed.  The statute reflects that interest.  It regulates private security services businesses in Virginia where that "private security services business" is defined as engaged in the business of providing, or undertaking to provide, private investigators by implied or express contract.  A "private security services

business" thus is subject to regulation when in Virginia it undertakes to provide private investigators. That reading is also consistent with the purpose of the overall statute, which is to create a local licensing and regulatory scheme. "In the immediate case, Virginia is not attempting to regulate a contract occurring wholly outside the Commonwealth. The contract in question was entered into in the Commonwealth of Virginia . . . [and] [w]hile it may be true that elements of the transaction occurred outside of the Commonwealth of Virginia, this does not necessarily deprive Virginia of its interest in regulating the transaction." *Atl. Mach. & Equip., Inc. v. Tigercat Indus., Inc.*, 427 F. Supp. 2d 657, 666 (E.D. Va. 2006).

Strategic argues, second, that the services it undertook to provide did not include investigations of the type enumerated in the statute: "(i) crimes or civil wrongs; (ii) the location, disposition, or recovery of stolen property; (iii) the cause of accidents, fires, damages, or injuries to persons or to property; or (iv) evidence to be used before any court, board, officer, or investigative committee." Va. Code Ann. § 9.1-139(A).

The parties agree that there is little law on this statute. One Virginia state court interpreting the definition of "private investigator" under the statute held that a company fell within the definition of a "private security services business" because it employed "private investigators" to obtain information listed in the statute.[11] In *Ervin B. Davis & Co.*, the court held that the "activities in which the corporation engage[d] as evidenced by the Plaintiff's answers to Defendant's Interrogatories and as described by the company's advertisements, including the web page information submitted . . . comport[ed] with the statutory definition of a

---

[11] *United States v. Commonwealth*, 139 F.3d 984, 986 (4th Cir. 1998), which dealt with the question of whether *Leslie Miller v. Arkansas*, 352 U.S. 187 (1956) precluded the application of the Virginia's licensing and registration requirements to private investigators working solely for the FBI in its Background Investigation Contract Services Program, did not address the question at issue in this case.

private security services business."  1999 WL 33722350, at *2.  The court, however, did not

describe in its opinion what those precise activities were and how they fell into clauses (i)-(iv).

It did note that the company's employees had performed surveillance investigations, but it did

not say what information was so surveilled.[12]  The court ultimately held that the company was

subject to a statutory exception to the licensing requirement due to its status as a claims adjuster.

*See id.*  The case thus does not offer much guidance.  Little guidance is also offered from cases

interpreting similar statutes passed in other states.[13]

"In considering the meaning of particular language in context, '[w]ords in a statute

should be interpreted, if possible, to avoid rendering [other] words superfluous."  *Eley v.*

*Commonwealth*, 826 S.E.2d 321, 324 (Va. App. Ct. 2019) (quoting *Cook v. Commonwealth*, 597

S.E.2d 84 (Va. 2004)).  "It is one of the fundamental rules of construction of statutes that the

intention of the legislature is to be gathered from a view of the whole and every part of the

statute taken and compared together, giving to every word and every part of the statute, if

possible, its due effect and meaning."  *Epps v. Commonwealth*, 626 S.E.2d 912 (Va. App. Ct.

2006) (en banc), *aff'd*, 641 S.E.2d 77 (Va. 2007) (quoting *Posey v. Commonwealth*, 96 S.E. 771

---

[12] It also held that any employees of the company who qualify as private investigators, including its proprietor, would be subject to the registration requirement.  *Ervin B. Davis & Co.*, 1999 WL 33722350, at *2.

[13] Both parties agree that comparable private investigator statutes are of little help in attempting to ascertain the definition of "crimes or civil wrongs."  Strategic submits that most states requiring licenses typically define "private investigation" to include attempts to obtain information about "crimes or civil wrongs" but limit that prong to crimes or wrongs against the state and are therefore of little use.  *See* Dkt. No. 360 at 2 & n.2.  Other states' statutes do not provide such a limitation but have a catch-all prong that defines private investigation more broadly to include information about "the identity, habits, conduct, business, occupation, honestly, integrity, etc. of any person."  *Id.* at 2.  Connecticut's equivalent statute comes closest to matching Virginia's, but the parties have not identified case law on the definition of "crimes or civil wrongs," and the statute contains additional definitional prongs for "conducting surveillance activity" and "conducting background investigations."  *Id.*; *see* Conn. Gen. Stat. Ann. § 29-152u(4).

(Va. 1918)).  Moreover, under the canon of ejusdem generis, "when a particular class of persons or things is enumerated in a statute and general words follow, the general words are to be restricted in their meaning to a sense analogous to the less general, particular words."  *Sainani v. Belmont Glen Homeowners Ass'n, Inc.*, 831 S.E.2d 662, 667 (Va. 2019) (quoting *Martin v. Commonwealth*, 295 S.E.2d 890 (Va. 1982)).

Applying those canons, reading the statute as a whole and interpreting each provision of clauses (i)-(iv) of the statute both individually but also as part of a collective group, the Court concludes that they cover certain of the services Strategic undertook to provide in the Agreement and therefore that Strategic violated the statute by entering into the Agreement.  The Agreement cannot be enforced.

The meaning of the statute can be gleaned from several of its terms.  It addresses only "business" or "employment."  It does not address persons who act as volunteers or do work for themselves and not for others.  Second, the business that is regulated is that of providing "investigations to obtain information"; research that is incidental to some other service is not governed.  A person must be contracted to conduct an "investigation to obtain information." Third, the information must be of a particular type or quality.  As to type, a person is a private investigator if he or she is in the business or accepts employment to make an investigation of three types of information: information regarding "crimes or civil wrong," information regarding "the location, disposition, or recovery of stolen property," and information regarding "the cause of accidents, fires, damages, or injuries to persons or to property."  As to the quality of the information, a person is also a private investigator if he or she conducts an investigation to obtain "evidence to be used for any court, board, officer, or investigative committee."  Clause (iv) thus

addresses an investigation of any subject matter but so long as its objective is to obtain items that would qualify as "evidence."

The Court rejects Strategic's argument that a person can be a private investigator only if he or she is engaged in the process of collecting evidence to be used in some formal proceeding or to prosecute an individual for a specific crime.  That argument runs afoul of the principle that the Court must strive to give meaning to each word in a statute and that state legislatures do not write meaningless or superfluous language.  Clause (iv) is addressed to the collection of "evidence."  It specifically focuses on the collection of information to be used as evidence for a court or an officer, including the collection of evidence to be used in a criminal prosecution. Under the principle of avoiding surplusage, clauses (i)-(iii) must mean something different. They cannot be limited to the collection of evidence for a formal proceeding.  Instead, those provisions by their terms are directed to the subject of the investigation—if a person is to offer investigative services for money, it must be licensed if the investigation is to fall within one of the three categories set forth in clauses (i)- (iii).

The Court also rejects Strategic's argument that for an investigation to be of "crimes or civil wrongs" the investigator must be retained to investigate "some specific prosecutable criminal act, rather than generally wrong or detestable behavior involving no particular victim." Strategic's Proposed Findings of Fact & Conclusions of Law at 38 ¶ 3.  That interpretation makes no sense and would exclude from the statute much activity that is commonly understood to be private or public investigative activity.  It is not an infrequent occurrence that an investigator who sets out on an investigation does not know where it will lead.  He or she may start off with a suspicion that the subject may have engaged in one form of conduct that may implicate any number of different laws (none of which is specified in advance) only to come

across conduct that may violate another law.  There is no reason to think that the Virginia legislature intended to protect the client who starts with a suspicion of specific criminal activity engaged in by the subject and directs the investigator to follow the evidence but deny protection to the putative client who merely starts out with the suspicion that the subject is generally a criminal and asks the investigator to use its know-how to confirm the suspicion.  Strategic does not argue that an investigation that starts out with a broad net would fall outside of the protections of the Virginia statute.  But that is the implication of its argument.  An investigator could opt out of the statute and deprive the client of its protections by the mere expedient of securing an engagement to investigate all crimes, rather than a specific crime.

Strategic's argument that an investigation must concern a "particular victim" is no more persuasive.  The number of criminal statutes, both federal and state, that address "victimless" crimes is legion.[14]  Victimless crimes are generally understood to include crimes of public corruption where the victim is not an identifiable individual but rather the public at large.[15]  Strategic has offered no reason why the Virginia legislature would require a license for the investigation of a crime with an identifiable victim but not for the investigation of a victimless crime.

Once the scope of the statute is properly understood, it is evident that Strategic engaged in a private security services business by undertaking to provide private investigators.  First, the

---

[14] *See, e.g.*, Uniform Crime Reporting Program's National Incident-Based Reporting System (2019) (reporting "crimes against society" as 15.8% of reported offenses in 2019); Matthew K. Suess, *Punishment in the State of Nature: John Locke and Criminal Punishment in the United States of America*, 7 Wash. U. Juris. Rev. 367, 384, 388 (2015) ("[T]he expansion of criminal codes in the United States has led to the widespread prosecution of victimless crime. . . . In line with the states, the majority of federal prisoners are convicted of victimless crimes.")

[15] *See, e.g.*, Mat Tromme, *Waging War Against Corruption in Developing Countries: How Asset Recovery Can Be Compliant with the Rule of Law*, 29 Duke J. Comp. & Int'l L. 165, 218 (2019) ("[C]orruption is often seen as a victimless crime.").

Agreement itself reflects that Strategic was hired to conduct research and prepare reports for "the purpose of detecting, stopping, and preventing crime or other harm to innocent people."  PX1.  It thus was engaged to obtain information through investigators on "crimes or civil wrongs."  It is no matter that the Agreement required Strategic to conduct research for the purpose of "detecting . . . crimes," *id.*, while the statute defines a private investigator as one "who . . . accepts employment to make [] investigations to obtain *information* on . . . crimes or civil wrongs," Va. Code Ann. § 9.1-138 (emphasis added).  The "research" methods Strategic was to deploy are those involved in investigations and the detection of crime is merely the outcome of the enterprise of engaging in the collection of investigation of crime.  It also is no matter that Guo (and Eastern) had ulterior purposes for their detection of criminal activity—to bring down the CCP and to bolster Guo's chances for obtaining asylum.  Persons do not hire private investigators only for public-minded reasons.  They occasionally will do so because a criminal investigation and a criminal conviction will advance their private interests.  Strategic also is not exempted from the coverage of the statute because it undertook to investigate the "crimes" of the ten subjects generically as opposed to specific crimes.  To the contrary, the evidence at trial established that Guo had a suspicion that the subjects whom he asked to be investigated had engaged in corruption and other public wrongs and tasked Strategic with finding information regarding that corruption and those public wrongs.

The conclusion that Strategic engaged in conduct regulated by the Virginia Private Security Services Statute but without the license required by that statute is reinforced by the nature of the "reports" Strategic undertook to deliver and the methods it would use to prepare those reports.  The reports were not limited to the information that could be gleaned from conventional internet searches or reviews of readily available public information such as a

newspaper reporter or a book author might employ.  To prepare the financial reports, Strategic

was to review confidential and not readily accessible information, such as "statements, capital

sources, inflow and outflow information, bank receipts, financial instruments, financial products,

statements of credits, precious metals transfers, commodity transfers, crypto currency exchange,

stocks and other equities, business ownership, real property ownership, trusts, large amounts of

spending, specific information to indicate the transaction participants, and other data required by

[Eastern]."  PX1 at 1-2.  This information is the stuff of private investigatory work, not mere

research.  To prepare the tracking research, Strategic was to engage in the activities that are

engaged in by those who conduct surveillance, including tracking travel, private or commercial,

by land, air, or sea, and obtaining geolocation information and videos and audios that can be

accessed remotely.  *See id.*  To conduct the social media research, Strategic was to review such

other information accessible to private investigators, such as criminal databases, sex offender and

child abuse databases, passports and identification documents, and comments on social media.

*See id.*

        As Strategic admitted, the work thus included hacking into Chinese government servers,

obtaining evidence of forged U.S. documents, obtaining information regarding social security

fraud and tax fraud, finding the location of certain offshore companies, and obtaining

information regarding CCP members' bank accounts.  *See* Trial Tr. at 308, 314-317.  All of this

work was to be done "based on the best practices and standards of the industry, comparable to

other top firms with similar services," i.e., comparable to others engaged in private

investigations—the only conceivable industry with which to compare the services offered by

Strategic.  PX1 at 3.

Thus, Strategic understood that a portion of the services that Guo sought pertained to the investigation of crimes committed by CCP members.  Wallop testified that Guo wanted "to uncover corruption relating to members of the CCP . . . [i]ncluding crimes committed by members of the CCP" and "information about funds stolen by the members of the CCP and taken out of China illegally."  Trial Tr. at 65.  Wallop testified at her deposition that Guo wanted Strategic to "investigate and retrieve" information on the "great deal of corruption within the leadership" of the CCP, such as "funds that would have been taken out of the country illegally, cash payments."  *Id.* at 66.  Guo also sought to obtain "information about location and disposition and recovery of stolen assets," and the "cause of injuries to persons or property."  *Id.* at 40.

The conclusion that Strategic was engaged in the private security services business, as defined by Virginia law, is further supported by the work that Strategic performed after it was engaged.  Wallop admitted that she engaged in surveillance on at least one occasion.  Waller hired private investigators.  Those investigators included Team 1, which engaged in data mining and research, including research into the dark web, and Team 2, or ASOG, which accessed commercially available databases and also contacts within the federal government.  *See supra*.  Waller testified that he told Guo that he and Wallop could do the type of work he requested.  Trial Tr. at 191-92.

Analyzing the definition of  "private investigator" by the company it keeps in the statutory definition of private security services business—which includes persons who fill such quasi law enforcement functions as security officers, personal protection specialists, and electronic security employees—those whom Strategic undertook to employ, and did in fact employ, comfortably fit in.  In Strategic's own words, it was to deploy "an extremely sensitive

capability that must be handled with extreme care." PX2. Strategic's investigators were engaged in the types of activities engaged in by law enforcement.

Strategic argues that its work did not constitute private investigation because Eastern never reported or made an appointment to report any of the results to law enforcement, nor did Eastern contract with another party to do so such research after the Agreement was terminated. Aspects of that argument read as if Strategic is trying to benefit from its own failures. Under Strategic's argument, if a firm is unable to find information on crimes to report to law enforcement, it means it could not have undertaken to find such information and therefore it does not need to be licensed. That argument would require licensure only of good private investigators; those who are unsuccessful would not ever need to be licensed. That result would be plainly inconsistent with the intent of the Virginia legislature and the terms of the statute. More importantly, however, the statute's focus is on an unlicensed business's offer to undertake private security services and not on the actual use by the counterparty of the information that is provided. If a firm as part of its business undertakes to investigate crimes within the meaning of the statute and agrees to do so, it is irrelevant whether the party with whom it contracts ultimately decides to bring the fruits of the investigation to law enforcement or not.

Because Strategic undertook work that fell within the scope of Virginia's Private Security Services Statute, but failed to secure the requisite license therein, the Agreement is void and unenforceable. *See Urban Protective Servs. v. Great Latin Restaurants*, 2007 WL 1660374 (Va. Cir. Ct. Mar. 5, 2007) (noting prior ruling that plaintiff "could not contract to engage in private security services as it was not licensed as required by the Code and that the contract was illegal as a matter of law"); *see also Massie*, 3 S.E.2d at 181; *Bacigalupo*, 102 S.E.2d at 324-25.

Strategic argues that the Agreement cannot be void because Strategic did not commit a "willful" violation of the statute.  It devoted much time at trial to the evidence that Wallop and Waller did not believe a license was necessary and that they had engaged in investigations in the past without obtaining a license, as if by long usage, Strategic would acquire the right to act without being regulated.  It cites to the language in *Massey*, which states that "where a licensing statute is a police regulation, having for its object the protection of the public, making it unlawful for a person to engage in a business without a license, *and imposing a penalty for its violation*, a contract made by an unlicensed person is void and unenforceable."  *Massie*, 3 S.E.2d at 181 (emphasis added).  It argues that Virginia only penalizes "willful" private security licensing violations under Va. Code Ann. § 9.1-147(B), which are knowing or intentional, *see Correll v. Commonwealth*, 607 S.E.2d 119, 124 (Va. 2005), and that because any licensing mistake was not willful, the Agreement cannot be void.  Assuming that Strategic did not knowingly or willfully violate Virginia law, it still is not entitled to retain Eastern's deposit.

Sections 9.1-147–150 provide for penalties in connection with violations of the statute.  Strategic focuses on Section 9.1-147(A), which reads, "It shall be unlawful for any person to: 1. Practice any trade or progression licensed, certified or registered under this article without obtaining the necessary license, certification or registration required by statute or regulation . . . 4. Violate any statute or regulation governing the practice of the private security services businesses or training schools regulated by this article."  Va. Code Ann. § 9.1-147(A).  "Any person who is convicted of willful violation of [this subsection] shall be guilty of a Class 1 misdemeanor."  *Id.* § 9.1-147(B).

But the other sections on penalties—one of which applies here—do not require willful violations.  Section 9.1-148 provides that any person convicted of a violation of its provisions,

without reference to willful violation, shall be guilty of a Class 2 misdemeanor. *Id.* § 9.1-148.
Section 9.1-149 provides that any person convicted of a violation of its provisions, without
reference to willful violation, shall be guilty of a Class 1 misdemeanor. *Id.* § 9.1-149.

Relevant here also is Section 9.1-150, which provides: "Any person required to be
licensed, certified or registered by the Board pursuant to this article who violates any statute or
Board regulation who is not criminally prosecuted is subject to the monetary penalty provided in
this section." *Id.* § 9.1-150.  In other words, if Strategic violated Section 9.1-139(A) by engaging
in the private security services business without the requisite license from the Department of
Criminal Justice Services in Virginia, but did so in a non-willful way, it could be subject to
monetary penalty under Section 9.1-150.  If the violation was willful, Strategic could be subject
to criminal penalties under Section 9.1-147(A).  *Massie*'s holding does not require a willful
violation; the court requires only that the statute impose a penalty for "a violation."  *Massie*, 3
S.E.2d at 181.  It thus does not require that a willful violation be imposed to render a contract by
an unlicensed person void and unenforceable, only that there is some type of penalty.  *See id.*

The Court need not address Strategic's alternative argument that if the Agreement fell
within clause (iv), it also falls within the exemption to clause (iv) under Va. Code Ann.
§ 9.1-140(29), which exempts any individual engaged in "computer or digital forensic services . .
., the acquisition, review, or analysis of digital or computer-based information, in order to obtain
or furnish information for evidentiary purposes or to provide expert testimony before a court."
Va. Code Ann. § 9.1-140(29).  The Court does not rest its conclusion on a finding that the
Agreement sought to obtain information on "evidence to be used before any court, board, officer,
or investigative committee" under clause (iv), but rather on a finding that Strategic undertook to
provide persons to conduct an investigation to obtain information on "crimes" under clause (i).

The Court also rejects Strategic's in pari delicto defense.[16]  Strategic argues that even if the Agreement were void as against public policy, Virginia courts will not afford equitable relief where the "objects sought to be achieved" by the plaintiff were also illegal.  *Am.-LaFrance & Foamite Indus. v. Arlington Cty.*, 192 S.E. 758, 761 (Va. 1937).  It argues that the object of the Agreement was illegal because Eastern intended to share the results of Strategic's investigation with third parties, including ACA and Golden Spring, in exchange for value.

The in pari delicto doctrine provides that where a "the contract is illegal, as involving an immoral purpose, or one for which a punishment is provided, and both parties have knowingly joined therein, they are held to be in pari delicto, and the court will not render aid to relieve either party of the consequences of their acts, but will leave them where it finds them. If the contract is, however, merely invalid, or is based upon a transaction involving no moral turpitude, and is simply contrary to some legal provision relating to the manner, method, or terms of its performance, with no penalty provided other than its invalidity, the court will not require performance of either the express contract or a contract by implication."  *Id.*  "The doctrine of in pari delicto, like the related doctrine of unclean hands, 'prohibits a party from recovering damages arising from misconduct for which the party bears responsibility, bears fault, or which resulted from [ ] [its] wrongdoing."  *Concord Crossroads, LLC v. Human Cap. Res. and Concepts, Inc.*, 2020 WL 9367543, at *11 (E.D. Va. Sept. 2, 2020) (quoting *Ashmore for Wilson v. Dodds*, 262 F. Supp. 3d 341, 353 (D.S.C. 2017)).  It is "based on the principle that a party who consents to and participates in an illegal act may not recover from other participants for the consequences of that act."  *Lee v. Nationwide Mut. Ins. Co.*, 497 S.E.2d 328, 329 (Va. 1998); *see also Stith v. Thorne*, 488 F. Supp. 2d 534, 541 n. 6 (E.D. Va. 2007) ("The doctrine of in pari

---

[16] Strategic also failed to plead this affirmative defense in its Answer.  *See* Dkt. No. 127.

delicto stands for the principle that 'a plaintiff who has participated in the wrongdoing may not

recover the damages resulting from the wrongdoing.'") (quoting Black's Law Dictionary 806

(8th ed. 2004)); *see also In re Bogdan*, 414 F.3d 507, 514 (4th Cir. 2005)).

Virginia's Private Security Services Statute does not penalize a party receiving the

research from a private security services firm for sharing that research for free with a third party.

There is no evidence that Eastern intended to resell the information or that it had contracted to do

so. The Court has found that the contribution by ACA was a gift and not part of a sale. The only

prohibition on sharing the research comes from the Agreement which contains a confidentiality

provision. *See* PX1 ("Both parties agree that the nature of this contract, and work related to it, is

highly confidential."). But even if Eastern had shared the information with ACA or others, that

action would result in a breach of the Agreement and would not be illegal in and of itself. In

short, the wrong here is Strategic offering and agreeing to provide services to Eastern it was not

licensed to provide. It was not Eastern's acceptance of those services.

Finally, the Court rejects Strategic's belated argument that the Virginia Private Security

Statute is unconstitutionally overbroad and vague. The argument is waived.[17] It also is without

merit. A statute is overbroad if it prohibits or chills a substantial amount of protected speech.

"The substantiality of the overbreadth is determined examining the amount of protected speech

affected in relation to the amount of unprotected speech legitimately regulated by the statute."

*Nitke v. Ashcroft*, 253 F. Supp. 2d 587, 606 (S.D.N.Y. 2003). A statute is vague if it "fails to

---

[17] Strategic first made this argument in its post-trial brief, which was also not an issue on which
the Court had asked for post-trial briefing. *See Grand Light & Supply Co. v. Honeywell, Inc.*,
771 F.2d 672, 679-80 (2d Cir. 1985) (district court erred in considering claim raised for first time
in a post-trial brief); *U.S. Bank Nat'l Ass'n as trustee for Registered Holders of CD 2005-CD1
Com. Mortg. Tr., Com. Mortg. Pass-Through Certificates v. 2150 Joshua's Path, LLC*, 2020 WL
5417085, at *10 (E.D.N.Y. July 2, 2020) ("Plaintiff's remaining arguments—raised for the first
time in its post-trial briefs—will not be considered at this juncture.").

'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so

that he may act accordingly.'"  *Id.* at 608 (quoting *Grayned v. City of Rockford*, 408 U.S. 104,

108 (1972)).

Strategic argues that the statute is overbroad and vague because it would regulate other

types of research, without giving notice to the parties conducting the research, including

"political candidates conducting research on opponents, business consultants hired to evaluate

competitors, and authors or journalists gathering data for books and reports."  Dkt. No. 360 at 9.

It cites to *Gurley v. Mo. Bd. of Priv. Investigator Exam's*, 361 S.W.3d 406, 411 (Mo. 2012) in

which a plaintiff challenged a private investigator licensing statute as overbroad because it

reached further than professional private investigators by requiring, as plaintiff argued, "ordinary

citizens to obtain licensure before engaging in all manner of protected First Amendment

activity."  *Id.*  Specifically, the statute made it unlawful for "any person to engage in the private

investigator business in [Missouri] unless such person is licensed as a private investigator" where

"private investigator business" was defined as:

> [T]he furnishing of, making of, or agreeing to make, any investigation for the purpose of
> obtaining information pertaining to:
>   (a) Crimes or wrongs done or threatened against the United States or any state or
>   territory of the United States;
>   (b) The identity, habits, conduct, business, occupation, honesty, integrity, credibility,
>   knowledge, trustworthiness, efficiency, loyalty, activity, movement, whereabouts,
>   affiliations, associations, transactions, acts, reputation, or character of any person;
>   (c) The location, disposition, or recovery of lost or stolen property;
>   (d) Securing evidence to be used before any court, board, officer, or investigating
>   committee;
>   (e) Sale of personal identification to the public; or
>   (f) The cause of responsibility for libel, losses, accident, or damage or injury to
>   persons or property or protection of life or property.

*Id.* at 412.  Plaintiff argued that this statute swept in numerous First Amendment-protected activities,

pointing specifically to subdivision (9)(b), which could include persons who use a social networking

website "to locate a former classmate or to search for a potential romantic partner."  *Id.*

Noting that the "primary rule of statutory interpretation is to ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider the words in their plain and ordinary meaning," the court determined that the term "business" in the definition of "private investigator business" limited the scope of private investigator-related activities listed in the definition and indicated that the statute included within its sweep "only investigations conducted by commercial entities." *Id.* at 413 (quoting *S. Metro. Fire Prot. Dist. v. City of Lee's Summit*, 278 S.W.3d 659, 666 (Mo. 2009)). The court thus held that the statute was not unconstitutionally overbroad because it regulated the activities listed in the statute "only when done as part of a commercial enterprise carried on for profit or as part of a particular occupation habitually engaged in for livelihood or gain" and that " none of the hypothetical unconstitutional applications suggested by [plaintiff] are authorized by the statute when it is so construed." *Id.*

Here too, Virginia's Private Security Services Statute refers to a "private security services business," defining it as "any person engaged in the business of providing, or who undertakes to provide . . . private investigators." Va. Code Ann. § 9.1-138. A private investigator is also defined only in connection with a commercial enterprise. *See id.* (defining a "private investigator" as "any individual who engages in the business of, or accepts employment to make, investigations to obtain information"). Thus, the statute does not cover ordinary citizens doing social media research. Nor, as the Court held above, does the statute address persons who act as volunteers or do work for themselves, thus alleviating Strategic's concern that the statute would require the license of investigations by "authors or journalists gathering data for books and reports" or by political candidates conducting their own research on opponents. Dkt. No. 360 at 9. The statute also clearly does not cover a business consultant who is hired to evaluate a

competitor's business—Strategic's third hypothetical in its parade of horribles—but who is not in the business of investigating the specific information listed under the statute, or if that consultant was not engaged "to obtain information on (i) crimes or civil wrongs; (ii) the location, disposition, or recovery of stolen property; (iii) the cause of accidents, fires, damages, or injuries to persons or to property; or (iv) evidence to be used before any court, board, officer, or investigative committee."  Va. Code Ann. § 9.1-138.  If such information arose during the course of the consultant's work, that research would be "incidental" to the consultant's other work, as the statute's focus is on an unlicensed business's offer to undertake private security services and not on the counterparty's actual use of the information that is provided.  *See supra.*  Indeed, construing the reference to private investigator by the company it keeps in the Virginia Private Security Services Statute, and considering the activities Strategic performed and agreed to perform, what is distinctive about those activities and what qualifies them for regulation is that they constitute conduct, and in particular, conduct that is conventionally engaged in by law enforcement but which Strategic here sold privately for commercial gain.

Strategic's remaining cited cases are either inapposite or do not support its argument.  *See Gray v. Dep't of Pub. Safety*, 248 A.3d 212, 217, 223 (Me. 2021) (rejecting challenge to professional investigator licensing requirement that applicants must have "demonstrated good moral character" because it did not prohibit or constrain speech and because denial of plaintiff's application based on his presentation of false information as fact was "narrowly tailored to serve the significant governmental interest in maintaining standards for licensing professional investigators, who are responsible for researching and reporting on some of the most consequential details of people's lives"); *Castillo v. Ingram*, 2015 WL 3559104, at *1 (D. Nev. June 5, 2015) (not reaching question of whether Nevada statute requiring individuals who work

as private investigators in Nevada be licensed by the state violated the Free Speech Clause because plaintiff lacked injury-in-fact); *K-Mart Corp. v. St. Louis Cty.*, 672 S.W.2d 127, 132-33 (Mo. Ct. App. 1984) (ordinance requiring private investigators to first obtain a private watchman's license from the superintendent of police was not overbroad or vague because the state has power to regulate police power and because the "ordinance conveys a sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices").

### 2.    Relief

Because the Agreement is void, Eastern is entitled to restitution in the amount of $1 million.

A restitution measure of damages "aims to restore the nonbreaching party to as good a position as the one she occupied before the contract was made, without attempting to compensate her for consequential harms." *360Networks Corp. v. Geltzer (In re Asia Glob. Crossing, Ltd.)*, 404 B.R. 335, 341 (S.D.N.Y. 2009); *Daniel v. Wells Fargo Bank, N.A.*, 2013 WL 5723704, at *8 (E.D. Va. Oct. 17, 2013).

Virginia and New York follow the Restatement (Third) of Restitution and Unjust Enrichment to determine whether a party may recover the value of performance rendered in connection with an illegal and consequently void contract. *See, e.g.*, *T. Musgrove Constr. Co., Inc. v. Young*, 840 S.E.2d 337, 342 (Va. 2020); *Mazzei v. Money Store*, 308 F.R.D. 92, 106 (S.D.N.Y. 2015), *aff'd*, 829 F.3d 260 (2d Cir. 2016).

Under Section 32 of the Restatement (Third) of Restitution and Unjust Enrichment:

A person who renders performance under an agreement that is illegal or otherwise unenforceable for reasons of public policy may obtain restitution from the recipient in accordance with the following rules:

> (1) Restitution will be allowed, whether or not necessary to prevent unjust enrichment, if restitution is required by the policy of the underlying prohibition.
>
> (2) Restitution will also be allowed, as necessary to prevent unjust enrichment, if the allowance of restitution will not defeat or frustrate the policy of the underlying prohibition. There is no unjust enrichment if the claimant receives the counterperformance specified by the parties' unenforceable agreement.
>
> (3) Restitution will be denied, notwithstanding the enrichment of the defendant at the claimant's expense, if a claim under subsection (2) is foreclosed by the claimant's inequitable conduct (§ 63).

Restatement (Third) of Restitution and Unjust Enrichment § 32.

Where Section 32(1) applies, the Court need not engage in a traditional unjust enrichment analysis. *Id.* cmt. C. Instead, under Section 32(1), the party that performed under an agreement that is void as against public policy is entitled to recover the value of that performance, without considering whether that party derived any benefit thereunder, where the demands of policy so require. *Id.* § 32(1), Illustration 21. For example, where a client pays for services to a contractor that is not licensed to provide those services, Section 32(1) requires the contractor to return the payments made by the client irrespective of whether it conferred some type of benefit upon the Client. *Id.* Illustration 21 states:

> 21. A pays B $2000 in advance for a series of medical treatments. After two visits to B's office, A learns that B is not licensed to practice medicine. A repudiates the agreement and asks for his money back. A is entitled to recover $2000 from B by the rule of § 32(1). It is irrelevant to A's recovery that he may have derived benefit from B's services.

*Id.*; *see also* Illustration 4; Illustration 18.

Restitution damages can include, for example, the return of a deposit paid under a contract that the defendant has failed to perform. *See In re Asia Glob. Crossing, Ltd.*, 404 B.R. at 342 (stating that restitution damages are particularly appropriate when used to recover a deposit or down payment paid pursuant to a contract that was not performed by the other party);

*Gulati v. Coyne Int'l Enters. Corp.*, 805 F. Supp. 365, 371 (E.D. Va. 1992) (similar); *Busman v. Beeren & Barry Invs., LLC*, 69 Va. Cir. 375, 379 (Va. Cir. Ct. 2005) (similar).

Here, pursuant to Section 32(1) of the Restatement (Third) of Restitution and Unjust Enrichment and consistent with Illustration 21, Eastern is entitled to recover the $1 million deposit it paid to Strategic, and it is irrelevant whether it derived any benefit from Strategic's attempt to perform under the Agreement.

The Agreement authorized Eastern to "direct other entities to pay [Strategic], and that such payments will be deemed satisfactory compensation." PX1 at 5. The $1 million deposit was paid by ACA. As the payor of the $1 million deposit, it may be that ACA has a claim to that restitution amount as against Eastern. However, the fact that ACA was the immediate payor of the monies due from Eastern does not relieve Strategic of its liability to Eastern in this matter. Nor does it permit Strategic to retain the sums. It is sufficient that the payment of the $1 million relieves Strategic of any liability in restitution to either Eastern or ACA. *See* Restatement (Third) of Restitution and Unjust Enrichment § 48 ("If a third person makes a payment to the defendant to which (as between claimant and defendant) the claimant has a better legal or equitable right, the claimant is entitled to restitution from the defendant as necessary to prevent unjust enrichment."); *see also id.* § 64 cmt. c & Illustration 3.

### B.    Remaining Claims

The Court's ruling that the Agreement is void and that Strategic is not entitled to retain the $1 million deposit but must return it to Eastern disposes of this case. The Court nonetheless addresses the parties' remaining claims in the alternative. The Court concludes that even if the Agreement were not in violation of the Virginia Private Security Services Statute, Eastern would be entitled to the return of $250,000 of its deposit.

### 1.      Breach of Contract

Strategic and Eastern each claim that the other materially breached the Agreement. Eastern claims that Strategic breached by failing to provide the weekly reports and monthly reports and thus that it is entitled to return of its deposit on that basis alone. Strategic disputes that it materially breached the agreement and argues that it was Eastern who breached the Agreement by failing to pay the monthly fee as due on February 16, 2019.

The elements of a breach of contract claim under Virginia law are: (1) the existence of a contract; (2) performance or offers by the plaintiff to perform under the contract; (3) the defendant's failure to perform under the contract or breach of the agreement; and (4) actual damage to the plaintiff caused by the breach." *Car Pool LLC v. Hoke*, 2012 WL 4854652, at *3 (E.D. Va. Oct. 11, 2012) (citing *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004)); *see also Dodge v. CDW Gov't, Inc.*, 2009 WL 1605010, at *3 (E.D. Va. June 5, 2009) (stating same). Similarly, under New York law, the elements of a breach of contract claim include: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 188-89 (S.D.N.Y. 2011) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)); *see also Tessler v. NBC Universal, Inc.*, 2009 WL 866834, at *6 (E.D. Va. Mar. 31, 2009), *aff'd sub nom. Tessler v. Nat'l Broad. Co.*, 364 F. App'x 5 (4th Cir. 2010) ("[B]oth New York and Virginia law essentially require the same elements for a legally enforceable contract.").[18]

---

[18] Strategic cites to New York law for the breach of contract claim, while Eastern cites to both New York and Virginia law. "Federal courts sitting in diversity apply state substantive law." *Ellington Credit Fund*, 837 F. Supp. 2d at 179-80 (citing *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996)). The Court has included references to both New York and Virginia law but "[w]here both parties rely upon New York law in their briefs, the Court may assume the parties impliedly consent to the application of New York law." *Fort Prods., Inc v. Men's Med.*

a.      The Parties' Claims

Eastern alleges that Strategic breached by failing to provide quality information in the form of the weekly reports by the Agreement's deadlines and that it is entitled to restitution damages in the amount of the $1 million deposit because Strategic conferred no benefit.  It argues that Strategic was in material breach no later than January 30, 2018 after it failed to timely deliver the first weekly report on January 23 and when it delivered the USB drives with the "useless" information on January 26 and January 30.  Strategic does not deny that it did not provide the report, but rather defends that Eastern substantially hindered its performance and therefore Strategic cannot held it in breach, i.e., it argues frustration of purpose and lack of good faith and fair dealing.  It also argues that to the extent it breached the Agreement, the breaches were not material.  In addition, Strategic argues, Wang and L. Han instructed Strategic to keep working and thus Eastern lost its right to terminate the contract based on the alleged breaches.

Strategic's counterclaim alleges that Eastern first breached the Agreement by failing to pay the $750,000 monthly payment due on February 16, 2018.[19]  It argues Eastern breached the Agreement again when it delivered a termination letter without 30 days' notice.  Eastern responds that Strategic's performance was to precede Eastern's payment of the $750,000 and because there was no performance, it did not breach in its failure to pay.  In addition, Eastern argues that because $1 million was to be credited to work performed on a prorated basis to the final 1 1/3 months of the Agreement, PX1, it did not fail to pay Strategic the $750,000 because Strategic had the $1 million in its account that it could prorate.  If both parties breached, Eastern

_Clinic, LLC_, 2016 WL 797577, at *1 n.1 (S.D.N.Y. Feb. 23, 2016) (citing _Krumme v. WestPoint Stevens, Inc._, 238 F.3d 133, 138 (2d Cir. 2000) ("The parties' briefs assume that New York law controls, and such implied consent . . . is sufficient to establish choice of law.") (internal quotation marks and citations omitted)).

[19] The Court rejects Strategic's argument that Eastern breached the contract by having ACA pay the $1 million deposit.  _See supra_.

argues it would still get its $1 million deposit less any substantiated benefit conferred by Strategic, which it claims was zero or at most, $338,709.68 for the 14 days of work performed by Strategic prior to its breach.

The Court concludes that Strategic did not materially breach the Agreement by delivering the "useless" USB drives or failing to deliver the weekly reports, but that it did breach by failing to deliver the first monthly report on February 16, 2018 in accordance with the Agreement. Eastern also breached by failing to pay the $750,000 monthly fee on February 16, 2018. There is thus a simultaneous breach. As a result, Eastern was within its rights in terminating the Agreement shortly after February 16 and Strategic is not entitled to performance or damages from Eastern. Eastern also is not entitled to performance or damages from Strategic.

### b. Eastern's Claim

Eastern argues that Strategic breached the Agreement by failing to deliver the progress report on the financial forensic research each week in the first month of the Agreement, weekly current tracking reports each week during that first month, and social media research each week during the first month. The parties agree Strategic never delivered any financial forensic historical research, current tracking research, or social media research called for under the Agreement. JSOAF ¶¶ 54-56. The two USB drives that Strategic delivered were useless: the first contained only the researchers' own work to familiarize themselves with the subjects based on open source information while the second was unreadable raw material delivered from a subcontractor who refused to provide the actual information. Strategic also never provided any monthly reports. Eastern argues that Strategic breached the Agreement. Strategic claims that any breaches were immaterial or were caused by Eastern who frustrated its performance.

The Court begins, as always, with the Agreement. *See, e.g.*, *Kelly v. Ammado Internet Servs., Ltd.*, 2012 WL 4829341, at *3 (E.D. Va. Oct. 10, 2012) ("To interpret a contract's terms,

Virginia courts 'consider the words of [the] contract within the four corners of the instrument itself.'") (quoting *Mathews v. PHH Mortg. Corp.*, 724 S.E.2d 196, 201 (Va. 2012)).  The Agreement is not a model of clarity.  Each side presents powerful arguments.  The Court concludes that the failure to deliver the weekly reports or research during the first month was not a material breach.

"A material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract."  *Horton v. Horton*, 487 S.E.2d 200, 204 (Va. 1997); *see VFS Fin., Inc. v. Falcon Fifty LLC*, 17 F. Supp. 3d 372, 379-80 (S.D.N.Y. 2014) ("A breach is material if it "go[es] to the root of the agreement between the parties [and] is so substantial that it defeats the object of the parties in making the contract.").

In some senses, the Agreement here is akin to an installment contract.  Strategic was to conduct research on three topic areas with respect to ten individuals designated by Eastern and to deliver the fruits of that research in the form of periodic reports: (i) weekly and then a preliminary report in the first month for financial forensic historical research, (ii) weekly and then monthly in the case of current tracking research, and (iii) weekly and then monthly for social media research.  "[T]he most effective way" for Eastern to have made clear that the failure to deliver each of the specified reports each week during the first month would have been to say that time was of the essence in the Agreement.  *ADC Orange, Inc. v. Coyote Acres, Inc.*, 857 N.E.2d 513, 516 (N.Y. 2006).  For example, where a party has failed to make payment in a contract for the purchase of real estate, "whether [a] [party]'s late installment payment constitutes a material breach depends on whether time [i]s of the essence with respect to that payment."  *Id.* (contract for purchase of real property).  Whatever its expressed desires in the

Agreement or during contract negotiation, Eastern here did not insist on a provision that time would be of the essence.  It thus cannot avail itself of that doctrine.

The absence of an explicit "time is of the essence" provision is not dispositive, however, of Eastern's claim.  It just requires the exercise of judicial interpretation.  Although "[t]ime is generally of the essence where a definite time of performance is specified in a contract," that is not so where "circumstances indicate a contrary intent."  *Burgess Steel Prod. Corp. v. Mod. Telecomms., Inc.*, 613 N.Y.S.2d 158, 159 (1st Dep't 1994).  "The mere designation of a date upon which a thing is to be performed does not alone bring about [the] result [that time is of the essence]."  *Ring 57 Corp. v. Litt,* 280 N.Y.S.2d 330, 332 (2d Dep't 1967).  "What constitutes a reasonable time for performance depends upon the facts and circumstances of the particular case."  *Zev v. Merman*, 533 N.E.2d 669, 669 (N.Y. 1988).  Indeed, courts have held that "[i]n the absence of a provision that time was of the essence, the plaintiff was required to communicate unequivocal notice that tardy payments would not be accepted."  *Cmty. Nat. Bank & Tr. Co. of N.Y. v. Joseph*, 504 N.Y.S.2d 185, 185 (2d Dep't 1986).

Reviewing the Agreement as a whole, the Court concludes that the requirement that Eastern deliver reports on all three subjects for the 15 fish in each week of the first month was not a material term of the Agreement and that the failure to deliver those weekly reports did not defeat an essential purpose of the Agreement.  The Court starts with the fact that the Agreement was intended to create a long-term relationship between the parties.  Eastern retained Strategic to conduct research over a three-year period terminable only on 30 days' notice.  Although the Agreement gave Eastern the right to "remove certain fish from time to time," it was not necessarily the case that Eastern would choose to do so or that Strategic would find "circumstances do not permit sufficient work to research a given fish."  PX1 at 3.  The

Agreement contemplated that Strategic might continue its research on a given subject throughout the entire three-year period. *See, e.g.*, *id.* at 2 (noting that, for current tracking research, Eastern could direct more frequent reporting "for up to a six-month period"). In these circumstances, it is impossible to say that the failure to deliver research on one or more or even all of the subjects in the first couple of weeks of the Agreement would frustrate or defeat the purpose of the Agreement as a whole.

That conclusion is reinforced by numerous other provisions of the Agreement. In the first instance, the timing of the weekly reports and the form which they were to take are stated in the Agreement in somewhat vague terms, hardly the unequivocal and definitive language one would expect if time were of the essence for each of the reports. The financial forensic research was to be in the form of "a progress report . . . each week in the first month," with no specific date set for delivery or specific content required. *Id.* The language with respect to the weekly current tracking research and social media research similarly is general: it refers to "research" not reports and provides for that research to be delivered weekly without setting a date certain. *See id.* It stands in contrast to the more definitive language with respect to the monthly reports— a "preliminary report" on financial forensic historical research in the first month, *id.*; "Current Tracking reports for each subject . . . produced monthly," *id.* at 3; and "Social media reports . . . produced monthly," *id.* Indeed, the weekly reports are not even singled out as "Deliverables." *See id.*

Moreover, Eastern did not give Strategic the final list of subjects to research and was not required to do so until the Agreement was signed, one week before the first weekly reports were due. *See id.* at 1. It thus could not have been within the reasonable contemplation of the parties that Strategic would have been required to deliver actionable information as to each and every

one of the subjects in the first couple of weeks of the Agreement.  Strategic did not even know

for certain who the subjects were and whether they would be able to be researched.  Indeed, the

Agreement itself recognized that the "circumstances [might] not permit sufficient work to

research a given fish."  *Id.* at 3.

Furthermore, Strategic was not even required to continue the research for five of the

original 15 subjects designated by Eastern beyond the first month, and Eastern would not be

entitled to reports on those subjects in the ensuing months.  Strategic was required to research 15

subjects in the first month.  It was required to research only ten subjects in each of the following

months.  At the time the Agreement commenced, the parties did not know which, if any, of the

15 initial subjects would form the group of ten subjects for the rest of the research.  It is

inconceivable that the failure to deliver information in the first couple of weeks for a subject as

to whom research might not continue beyond those first couple of weeks would defeat the

purpose of the Agreement.

Finally, after Eastern still had not received the fourth weekly report due by February 13,

2018, it did not warn Strategic that it was late on its payments, in breach of the Agreement, or

otherwise indicate that "time was of the essence" in the Agreement.  Even if the Agreement

could be considered a time of the essence contract, "a party, by acquiescence or failure to pursue

rights diligently under a time of the essence provision, eliminates or waives the provision as a

term or implied term of the contract."  *Lockheed Martin Transp. Sec. Sols. v. MTA Cap. Constr.

Co.*, 2014 WL 12560686, at *22 (S.D.N.Y. Sept. 16, 2014) (collecting cases); *see Atateks

Foreign Trade Ltd. v. Priv. Label Sourcing, LLC*, 2009 WL 1803458, at *21 (S.D.N.Y. June 23,

2009), *aff'd*, 402 F. App'x 623 (2d Cir. 2010) ("[I]t is improper for a party who has waived its

right to timely performance to attempt suddenly to cancel the contract without first notifying its

counterparty that time is of the essence and re-setting the time for performance within a reasonable time by clear, distinct, and unequivocal notice.") (internal quotation marks and citation omitted); *see also Ring 57 Corp.*, 280 N.Y.S.2d at 332 ("[A]cquiescence in [a] series of delays" waives default).

For those reasons, the Court concludes that the failure to deliver the research or the weekly reports for the first month of the Agreement did not constitute a material breach.

The Court reaches a different conclusion with respect to the monthly reports: the preliminary financial forensic research reports due in the first month and the current tracking and social media reports whose production monthly was listed as a deliverable. The failure to produce those monthly reports was material. The monthly reports play an important role within the context of the Agreement. It was on the basis of the monthly reports that Eastern was to dictate the work to be done by Strategic. The Agreement provided that it was "understood that [Eastern] may not wish for each of the 10 fish to be the subject of all three reports, and that the number of report work duties per month [would] vary." PX1 at 3. That was particularly so with respect to the first month—the reports for which would dictate which ten of the 15 subjects would become the focus of the future reports. Without those reports, Eastern would have no means by which to determine who Strategic should focus on in the ensuing months. And, without a basis to determine who Strategic should investigate, an essential purpose of the Agreement would be defeated.

The monthly reports for the first month also play an important part in the accounting provision of the Agreement. That provision, it will be recalled, reflected that after the "March reports and payments [were] made, . . . all involved Parties will meet to recap the accounting, prior to moving forward with the next quarter." *Id.* at 4. There might be an increase the number

of "fish" thereafter. *Id.*  The parties might also decide to renegotiate the terms of their

agreement.  It was to be at that March meeting that the parties were to discuss whether they

found "the proper information requested on target A and any of the couple of categories under

target A," and where "this ma[d]e sense or should [they] stop and move on to a different target

with a different parameter, and was this working properly."  Trial Tr. at 274.  It is the only

provision for a recap set in the Agreement, and that provision for a recap was an essential

provision of the Agreement.  It was the basis for the compromise between Strategic, which

wanted a monthly retainer regardless of results, and Eastern, which wanted to pay by result.  But,

in order for that accounting mechanism to function properly, it could not be based solely on the

results of one month's reporting—even the most recent month.  The parties would need to have

some trajectory and to understand whether the results for a particular month reflected an increase

in what had been found and might suggest additional work to be done, or instead reflected that

after exhaustive work a dead-end had been reached.  Strategic's failure to deliver monthly

reports thus frustrated an essential provision of the Agreement.

### c.   Strategic's Counterclaim

Strategic's counterclaim alleges that Eastern first breached the Agreement by failing to

pay the $750,000 monthly payment due on February 16, which it argues, was required under the

Agreement regardless of the deliverables and which it needed to fund Team 1's research.[20]  It

also argues Eastern breached the Agreement again when it delivered a termination letter without

30 days' notice.  As shown below, it does not follow from the fact that Strategic failed to deliver

the monthly reports that Eastern was privileged to withhold the $750,000 payment.  Analyzing

the facts and the law, the correct result is that Eastern still owes Strategic the $750,000 and its

---

[20] The Court rejects Strategic's argument that Eastern breached the contract by having ACA pay
the $1 million deposit.  *See supra.*

breach will be satisfied by allowing Strategic to withhold that sum from the money it is holding as a deposit.  At the same time, however, Strategic's breach did entitle Eastern to declare that it would cease performing under the Agreement and not pay the next $750,000 installment.

The Court rejects Eastern's interpretation that it was obligated to pay Strategic only upon the delivery of a report and thus that it had no obligation to pay Strategic the $750,000 in mid-February.

Eastern's argument is based on the section of the Agreement headed "Prices."  That section states in pertinent part: "The prices for each deliverable "A," "B," and "C" are $300,000 each per subject per year, for a total of $900,000 per fish per year." PX1 at 3.  It further states that the pricing for the first month "will include up to 15 fish for a total of 30 reports and will decrease to 10 fish for a total of 30 reports at the beginning of the second month (February) and for (March) [sic] and for the duration of this contract."  *Id.* at 4.  It contains a paragraph that states:

> (A) Comprehensive historical reports: $300,000 per report (or report-equivalent) per year.
>
> (B) Tracking reports: $300,000 per report (or report-equivalent) per year.
>
> (C) Social media reports: $300,000 per report (or report-equivalent) per year.

*Id.*

The "Prices" section, however, also states that the "solution [of prices per report] does not provide for predictable budgeting or workloads," "[t]o ensure the maximum workload for predictability of the agreed price, [Strategic] will measure the deliverables as 30 units per year (10 fish x 3 reports [A+B+C] each = 30 jobs/reports at any given time)," and "[t]he pricing for 30 units or deliverables per year remains a constant $9,000,000 per ear, or $750,000 per month for 12 months."  *Id.* at 3-4.

The parties disagree as to the import of this language.  Eastern argues that it reflects an agreement by the parties that Eastern would pay $300,000 per report only when the reports were delivered.  Strategic responds that the language sets forth the methodology by which the $750,000 per month and $9,000,000 was derived.  The Court concludes that Strategic has the better of the argument.

First, the Court is obliged to give meaning and effect to all of the provisions of the Agreement and to avoid rendering any provision surplusage or meaningless.  *See Goodman v. Resol. Tr. Corp.*, 7 F.3d 1123, 1127 (4th Cir. 1993) ("Contract terms must be construed to give meaning and effect to every part of the contract, rather than leave a portion of the contract meaningless or reduced to mere surplusage."); *Fifth Third Bank, N.A. v. Int'l Bus. Machs. Corp.*, 2021 WL 508727, at *9 (W.D. Va. Feb. 11, 2021) ("[N]o word or clause in a contract will be treated as meaningless if a reasonable meaning can be given to it, and parties are presumed not to have included needless words in the contract.") (quoting *TM Delmarva Power, L.L.C. v. NCP of Va., L.L.C.*, 557 S.E.2d 199, 200 (Va. 2002)); *Berry v. Klinger*, 300 S.E.2d 792, 796 (Va. 1983) ("The court must give effect to all of the language of a contract if its parts can be read together without conflict.").  The Agreement states, in several places, that Eastern is obligated to pay Strategic a monthly fee of $750,000 for Strategic's agreement to the terms of the contract.  That language is unambiguous:  "Payment is to be made in regular monthly installments of US$750,000, at the end of each month."  PX1 at 5.

Second, Strategic's interpretation is the best way to construe the Agreement as a whole to satisfy the purposes of the parties.  *See First Am. Bank of Va. v. J.S.C. Concrete Const., Inc.*, 523 S.E.2d 496, 501 (Va. 2000) ("[T]he court will not treat any word or clause as meaningless if any reasonable interpretation consistent with the other portions of the contract can be ascribed to

it."). As Strategic points out, the Agreement contemplated that there would be circumstances where it would not deliver, or be able to deliver, three reports a month. With respect to financial forensic reports, Strategic's obligation was only to produce "update reports" on a monthly basis after the three-month marker. Most importantly, as Strategic highlights, Eastern had the unfettered discretion to substitute subjects over the term of the Agreement: if it deemed it necessary to remove one subject, it had the right to designate an additional subject to be investigated and thus "the number of report work duties per month will vary." PX1 at 3. The substitution of one subject for another would result in delay in reporting and increased costs for Strategic. But Strategic was willing to accept those increased costs and the discretion that the Agreement gave Eastern over the timing of reports because Eastern would pay a flat monthly fee in exchange for Strategic's agreement to provide the agreed number of reports or report equivalents over the course of the year.

Third, reflecting the fact that Strategic's obligation was measured on an annual and not a monthly basis, the very language to which Eastern points reflects the price per deliverable "per year." There is no price per deliverable per month. Thus, Eastern's own reading of the Agreement, applied literally, would lead to a result that not even Eastern urges—that (notwithstanding the language regarding $750,000 per month), Eastern's only obligation was to pay "$900,000 per fish per year." *Id.*

Contrary to Eastern's argument, Strategic's interpretation does give effect and meaning to each provision of the Agreement. Given the flexibility the Agreement accorded Eastern to request the reports and to the timing of their delivery, as well as with respect to the subjects to be investigated, there was a need to set forth a methodology showing the correspondence between reports owed and money to be paid. In the absence of such a provision, there would be no ready

method to determine whether Eastern received all the reports it was owed in a circumstance

where, for example, it had substituted subjects and mixed and matched reports.  The language to

which Eastern points provided such a method.  Eastern's failure to pay $750,000 by its due date

was a material breach of the Agreement.  *See, e.g.*, *Tandberg, Inc. v. Advanced Media Design,*

*Inc.*, 2009 WL 4067717, at *4 (E.D. Va. Nov. 23, 2009) ("[It] is well-settled that failure to make

timely payment constitutes a material breach.") (collecting cases).

Finally, Eastern's argument that Strategic was to deliver quality reports in the first weeks

and that if it did not do so, Eastern would have the right both to declare a material breach and to

obtain the return of its deposit is, in essence if not in form, an attempt to achieve through

contrived contract interpretation the very right to make payment contingent on the delivery of

reports and to deprive Strategic of the value of the deposit that it attempted but failed to achieve

through contract negotiation.  During contract negotiation, Eastern argued that the payments

should be due based on deliverables and that if the reports were not of the quality Eastern

expected, it would be able to obtain the return of its deposit.  Strategic objected to those requests

and insisted that it needed the security of a regular monthly payment, a $1 million evergreen

deposit, and one-month notice before the contract could be terminated.  Those provisions were

needed before Strategic embarked on the venture and made the investments necessary to

establish a research network, without knowing in advance whether it would be able to

successfully research any or all of the subjects.  The Agreement permitted Eastern to terminate at

any time and for any reason, but that termination would not be effective for one month—

ensuring that Strategic would be able to recoup through the deposit the investment it made to

begin the research.  Eastern's argument would essentially reverse those provisions and frustrate

the expressed intent of the parties at the time of contracting.  If accepted, it would permit Eastern

to condition payment on the quality of the reports and to recoup its deposit, notwithstanding the 30-day notice provision.

Strategic brings a second, separate claim based on Eastern's failure to provide the proper termination notice under the Agreement, which provides that "[e]ither party may terminate the contract with 30 days' written notice." PX1. Eastern submitted a letter on February 23, 2018 stating that it was terminating the contract and made no payments thereafter. The Agreement indicates that termination would be effective only 30 days after notice of termination. However, when a party materially breaches a contract, the other party is relieved of its future obligations. *See New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 117 (2d Cir. 2006) ("When a party has breached a contract, that breach may excuse the nonbreaching party from further performance if the breach is 'material.'"). Given Strategic's material breach, Eastern was permitted to terminate the Agreement without giving 30 days' notice, and this basis for the counterclaim thus fails.

### d.    Relief

The evidence establishes that Strategic and Eastern both materially breached the Agreement and did so at the same time. Strategic breached by failing to deliver the monthly report on February 16, 2018. Eastern breached when it failed to pay the $750,000 installment on February 16, 2018.

It is black letter law that, upon a material breach of contract, the non-breaching party may elect to cease performance and seek damages. *See, e.g.*, *Lovink v. Guilford Mills, Inc.*, 878 F.2d 584, 586 (2d Cir. 1989) ("A total breach justifies termination of the contract and damages for complete failure of performance."); *The Est. of Mantle v. Rothgeb*, 2007 WL 4548127, at *10 (S.D.N.Y. Nov. 6, 2007) ("If plaintiff did materially breach the Agreement, defendants would have been entitled to terminate the contract and sue for damages."). Absent circumstances not

78

applicable here, a party who fails to perform cannot itself seek damages.  *See Optima Media Grp. Ltd. v. Bloomberg L.P.*, 2021 WL 1941878, at *8 (S.D.N.Y. May 14, 2021) ("In order to recover for breach of contract, a party must first show it substantially performed under that contract"); *Car Pool*, 2012 WL 4854652, at *3 (requiring plaintiff's adequate performance of the contract to state a claim).  It follows that, upon Strategic's failure to deliver the monthly reports, Eastern had the right to send the termination notice and direct Strategic not to perform any further activities for Eastern.  Eastern is not liable for any portion of the $750,000 payment that would have been due in mid-March for services performed from mid-February on, after Eastern validly terminated the Agreement.  It also follows that upon Eastern's failure to pay the $750,000 in consideration of the retention of Strategic from mid-January to mid-February, Strategic was no longer required to engage in investigative services for Eastern.  Eastern's beach gave it the right at that time to immediately elect to stop working for Eastern and not to incur any additional expenses on its behalf.

It does not follow that either of Eastern or Strategic is entitled to contract damages. Eastern has not identified any damages it suffered by failing to receive the first monthly reports. In addition, by failing to tender payment and materially breaching the Agreement, Eastern is not entitled to damages.  At the same time, Strategic too is not entitled to recover damages for Eastern's breach of contract.  Had Strategic performed and delivered the monthly reports (regardless of their quality), it would have been entitled to damages for Eastern's premature termination of the Agreement in the amount of at least $750,000—representing the payment it would have been owed for the 30-day period it was entitled to payment after Eastern served a notice of termination (and which was due on February 16).  But it did not perform on February 16, and thus it cannot complain that it did not receive the $750,000.

79

Where "each party breached an obligation due and owing under the contract . . . neither party is entitled to damages from the other." *Buffardi v. Parillo*, 563 N.Y.S.2d 948, 950 (3d Dep't 1990) (finding "no merit in each party's claim that he was relieved from the obligation to perform by the other party's failure to perform" because "[n]either party engaged in the type of conduct that frustrated or prevented the other party from performing, and since both conditions were to be fulfilled in a reasonable time, neither party was justified in waiting for the other party to perform first") (internal citation omitted).

A different conclusion follows with respect to whether Eastern is entitled to recover the full $1 million deposit it paid Strategic at the beginning of the Agreement.  It is not entitled to do so on a breach of contract theory.  Eastern does not dispute that the parties had agreed that the $1 million deposit could be credited by Strategic against the final 1 and 1/3 months of the Agreement.  *See* PX1 at 5.  As described above, that agreement was critical to Strategic's agreement to perform investigative services—had Eastern not agreed to provide an advance against its obligations and had it not further agreed that Strategic could retain that sum for as long as the Agreement was in effect, up to a maximum of 1 and 1/3 months, Strategic would not have invested in the infrastructure necessary to carry out the Agreement.  The Agreement here was in effect for one month, from January 16, 2018 to February 16, 2018.  It follows that, had Strategic  not violated the Virginia Private Security Services Statute, Strategic would have been entitled to retain that portion of the $1 million that it earned while the Agreement was in effect, or $750,000.  That amount and Strategic's right to retain it are not contingent upon Strategic's

*delivery* of reports—that is the precise contractual provision Eastern demanded but was not able to obtain during contract negotiations. [21]

Eastern is entitled to restitution in the amount of $250,000 on a breach of contract theory. That represents the $1 million deposit Eastern paid less the $750,000 amount that Strategic is owed and entitled to keep under the Agreement. "[I]f a party justifiably refuses to perform on the ground that his remaining duties of performance have been discharged by the other party's breach, the party in breach is entitled to restitution for any benefit that he has conferred by way of part performance or reliance in excess of the loss that he has caused by his own breach." Restatement (Second) of Contracts § 374 (1981); *see also New Windsor*, 442 F.3d at 118 ("[A] plaintiff whose breach was not willful and deliberate may, in some instances, recover so much as his efforts have actually benefited the non-breaching party."). Even if Eastern breached the Agreement by failing to pay the $750,000 due on February 16, it is still entitled to restitution for the benefit it conferred on Strategic, which is equal to the amount in excess of the $750,000 that Strategic is owed, i.e., $250,000. However, that sum is subsumed within the $1 million Eastern is entitled to recover on its claim based on the Virginia Private Security Services Statute.

## 2. Eastern's Unjust Enrichment Claim

Eastern also bring a claim for unjust enrichment. That claim does not provide any relief for Eastern.

The elements of unjust enrichment are: "(1) a benefit conferred on the defendant by the plaintiff; (2) knowledge on the part of the defendant of the conferring of the benefit; and (3) acceptance or retention of the benefit by the defendant in circumstances that render it inequitable for the defendant to retain the benefit without paying for its value." *The Christian Broad.*

---

[21] That the $750,000 is not contingent on Strategic's delivery of services distinguishes Eastern's reliance on Restatement (Second) of Contracts § 234 cmt. e, f.

*Network, Inc. v. Busch*, 2006 WL 2850624, at *7-8 (E.D. Va. Oct. 3, 2006) (collecting cases); *see Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011) (same).

"Where the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded." *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 274 (N.Y. 2009) (plaintiff could not use unjust enrichment claim to recover fee paid because it arose from services governed by engagement letter).   The parties do not dispute that the Agreement is enforceable and that payment of the $1 million deposit was required by the Agreement.   Regardless of whether its breach of contract claim succeeds, Eastern cannot recover for the $1 million under an unjust enrichment claim.  *See UETA Latinamerica, Inc. v. Zafir*, 10 N.Y.S.3d 566, 568 (2d Dep't 2015) (claim for unjust enrichment "only applies in the absence of an express agreement, and is not really a contract at all, but rather an equitable obligation imposed in order to prevent a party's unjust enrichment"); *The Christian Broad. Network*, 2006 WL 2850624, at *8 ("Unjust enrichment claims arise 'when there is no contractual relationship.'") (quoting *Aerotek, Inc. v. Tyonek Native Corp.*, 2005 WL 3372872, at *3 (E.D. Va. Dec. 8, 2005)); *see also Bazak Int'l Corp. v. Tarrant Apparel Grp.*, 347 F. Supp. 2d 1, 4 (S.D.N.Y. 2004) ("If a valid, enforceable contract existed between the parties, then [plaintiff] cannot recover under a theory of unjust enrichment. However, if no valid contract was in place regarding the sale of the goods, [plaintiff] has failed to state a claim for relief under the theory of unjust enrichment because, absent a contract, the benefit that [defendant] garnered from selling the merchandise was not at [plaintiff]'s expense.").

### 3.      Strategic's Fraud Counterclaim

Strategic argues that Eastern cannot recover the $1 million deposit because it was paid by ACA and because it was the victim of fraud by Guo and Eastern.  The Court rejects these arguments.

Under Virginia law, the elements of actual fraud are: "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled."  *Winn v. Aleda Constr. Co.*, 315 S.E.2d 193, 195 (Va. 1984).  The burden of proof applicable to fraud under Virginia law is "clear and convincing evidence," which is "higher than a mere preponderance."  *Sweely Holdings, LLC v. SunTrust Bank*, 820 S.E.2d 596, 604 (Va. 2018); *see Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614 (4th Cir. 1999).

 Similarly, under New York law, "a claim of fraudulent inducement requires proof (1) that the defendants made a representation, (2) as to a material fact, (3) which was false, (4) and known to be false by the defendants, (5) that the representation was made for the purpose of inducing the other party to rely upon it, (6) that the other party rightfully did so rely, (7) in ignorance of its falsity, (8) to his injury."  *Internet L. Libr., Inc. v. Southridge Cap. Mgmt., LLC*, 2005 WL 3370542, at *5 (S.D.N.Y. Dec. 12, 2005), *aff'd sub nom. ITIS Holdings Inc. v. Southridge Cap. Mgmt. LLC*, 329 F. App'x 299 (2d Cir. 2009).  "Each element of [a] fraud claim must be shown by clear and convincing evidence, at the summary judgment stage as well as at trial."  *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 219 (S.D.N.Y. 2007), *aff'd*, 354 F. App'x 496 (2d Cir. 2009)

To prevail on a fraud claim under both Virginia and New York law, a plaintiff must establish that the defendant made a false statement.  Strategic here failed to do so.  Strategic's claim is based on the notion that, at the time Guo requested Strategic to perform investigative

services for Eastern, Guo falsely represented that he was anti-CCP and that he would use the research obtained by Strategic for the purposes of sowing discord in the CCP and eventually overthrowing it.  Thus, to prove its case, Strategic would have had to show either that Guo was a proponent of the CCP or at best indifferent to the CCP, or that Guo did not intend to use the research for the stated purposes.

The evidence did not establish Strategic's claim.  Although there is evidence that Guo has made statements in favor of the CCP and of some conduct that would suggest that he is not hostile to the Chinese government (or at least not to all parts of it), Guo also testified to being an opponent of the CCP and to an intent to use the Strategic research in a manner hostile to the Chinese government.  There is also evidence that Guo made statements consistent with a person who is hostile to the CCP.  The evidence at trial does not permit the Court to decide whether Guo is, in fact, a dissident or a double agent.  In the absence of a definitive or at least clear answer to that question, Strategic has not satisfied its burden of providing a false statement.  Others will have to determine who the true Guo is.

The evidence before the Court also does not establish that Strategic reasonably or actually relied on Guo's representations about his political allegiances and the purposes for which he sought the research.

"In assessing the reasonableness of a plaintiff's alleged reliance, [the Court] considers the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them."  *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 118 (S.D.N.Y. 2009) (quoting *Glidepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435, 459 (S.D.N.Y. 2007)).  "In applying the test of reasonableness, the court must determine whether the plaintiff availed itself of the means

available to it given its size and sophistication." *Ambac Assur. Corp. v. Countrywide Home Loans, Inc.*, 2016 WL 7374210, at *12 (N.Y. Sup. Ct. Dec. 19, 2016) (internal quotation marks and citation omitted).  "Factors to be considered in making this determination may include the particular parties' prior course of dealing, the roles of other participants in the transaction, the time and expense of the investigation, the feasibility of practical[ity] of the plaintiff's performance of a particular type of investigation before entering into the transaction, the foreseeable risk to the plaintiff of failing to undertake the investigation, and responsible industry custom." *Id.* (internal quotation marks and citation omitted).

Before reasonably relying on a representation regarding information material to participation in a significant transaction, a sophisticated party "has a duty to conduct an independent appraisal of the risk it is assuming and a duty to investigate the nature of its business transactions." *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 58 F. Supp. 2d 228, 259 (S.D.N.Y. 1999); *see id.* (noting that they "cannot be heard to complain when they fail to make diligent inquiries").  "Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, . . . courts are particularly disinclined to entertain claims of justifiable reliance." *Crigger v. Fahnestock & Co., Inc.*, 443 F.3d 230, 235 (2d Cir. 2006).  "[I]f false representations are made regarding matters of fact, and the means of knowledge are at hand and equally available to both parties, and the party, instead of resorting to them, sees fit to trust himself in the hands of one whose interest is to mislead him, the law, in general, will leave him where he has been placed by his own imprudent confidence." *Persaud Cos., Inc. v. IBCS Grp., Inc.*, 425 F. App'x 223, 226 (4th Cir. 2011) (quoting *Costello v. Larsen*, 29 S.E.2d 856, 858 (1944).  "Succinctly put, a party will not be heard to complain that he has been defrauded when it is his own evident lack of due care which is responsible for his

predicament." *Rodas v. Manitaras*, 552 N.Y.S.2d 618, 620 (1st Dep't 1990); *accord Crigger*, 443 F.3d at 235; *see also Hitachi Credit*, 166 F.3d at 629 ("A plaintiff cannot claim that its reliance was reasonable and justified when it makes a partial inquiry, with full opportunity of complete investigation, and elects to act upon the knowledge obtained from the partial inquiry.").

Similarly, to establish actual reliance in a fraud action under New York law, "the plaintiff must show a belief in the truth of the representation and a change of position in reliance on that belief." *Hecht v. Components Int'l, Inc.*, 867 N.Y.S.2d 889, 895 (Sup. Ct. 2008) (citing *CBS Inc. v. Ziff-Davis Pub. Co.*, 553 N.E.2d 997, 1000 (N.Y. 1990)).  Put another way, the plaintiff must show that the "defendant's misrepresentation induced plaintiff to engage in the transaction in question[.]" *Laub v. Faessel*, 745 N.Y.S.2d 534, 536 (1st Dep't 2002).  Actual reliance requires proof "that 'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.'" *Basis PAC-Rim Opportunity Fund (Master) v. TCW Asset Mgmt. Co.*, 48 N.Y.S.3d 654, 656 (1st Dep't 2017) (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005)).

Strategic is and holds itself out to be a sophisticated entity.  Its business includes the investigation of people, including their backgrounds and their financial relationships. Information was available to it that called Guo's political allegiances and objectives into question.  Gertz had written an article on May 23, 2017, prior to the Agreement, that described Guo's "close ties to senior Chinese Communist Party leaders, including government ministers and Politburo members," indicated Guo had "access to Ministry of State security operations overseas and in the United States," and noted that "Guo's wife and daughter currently have been allowed by Chinese authorities to visit him in New York but are required to return to China after 20 days, where they can be used for political leverage against Guo."  Trial Tr. at 82; DX 43.

Wallop denied seeing this article, despite Strategic's focus on "research and analysis of political intelligence," her 30-year relationship with Gertz, and the fact that Gertz introduced her to Guo. *See, e.g.*, Trial Tr. at 34; *see also id.* at 55-56.  In another article, dated October 9, 2017, Gertz had noted that "Guo said he maintains close ties to supporters within the Chinese government and security system."  Trial Tr. at 84-85; DX32.  It was therefore a matter of public knowledge that Guo had provided funds to security forces in China and maintained relationships with high-level members of the CCP.  If Wallop and Waller were concerned that such relationships were consistent with support of the CCP or at least ambivalence towards it, they could have investigated or inquired further.  Instead they did not.  *See, e.g.*, *PNC Bank, Nat'l Ass'n v. Dominion Energy Mgmt., Inc.*, 2018 WL 1768061, at *11 (E.D. Va. Apr. 12, 2018) ("Examples of unreasonable reliance include 'where a party had information that would excite the suspicions of a reasonably prudent person' or 'where one relies upon an oral statement that is contrary to a written statement in his possession.'") (citation omitted).

If Guo's allegiances and the purpose for which Eastern commissioned the research had been important to Strategic, as it testified, it could have protected itself.  It could, for example, have asked for a representation of Guo's loyalties, or at least a recital in a whereas clause in the Agreement.  It need not necessarily have feared that including such a representation or recital would have undermined the purpose of the Agreement and the parties' mutual desire for confidentiality.  Representations are included in the most confidential of agreements.  Moreover, the parties already went to extensive lengths to preserve confidentiality, including by having a confidentiality provision in the Agreement, by using "virgin laptops" to transfer the research data, and by making sure no non-encrypted electronic versions of the Agreement were available.

Moreover, although Strategic argued that Guo did not want references to himself in the Agreement, Strategic need not have acceded to that request.

Indeed, the structure of the Agreement and the deliverables Strategic was obligated to provide to Eastern are themselves inconsistent with the notion of reasonable reliance. The Agreement gave Eastern (and Guo) alone the power to dictate Strategic's research agenda. Strategic did not have input into the subjects of investigation or a veto over them. The Agreement provides that Eastern "will provide the necessary basis information, and desired areas of focus, to [Strategic] to research." PX1. It also provided that Eastern could "direct [Strategic] to conduct other research, not specified in this agreement, for a fee." *Id.* Eastern had the right to select fish. If Eastern had demanded that Strategic research an opponent of the CCP, the Agreement would have required Strategic to do so. Strategic's only option not to investigate a subject was if "circumstances do not permit sufficient work to research a given fish." *Id.*

## CONCLUSION

For the reasons explained above, the Court concludes that Eastern prevails on its claim for a declaratory judgment that the Agreement is unenforceable and void, and Eastern is entitled to restitution in the amount of the $1 million Strategic was never entitled to collect from Eastern. The Court has reviewed the remaining arguments and defenses, which fail.

The parties are directed to meet and confer regarding a proposed form of judgment and to file with the Court a joint stipulation or judgment by June 29, 2021.


SO ORDERED.

Dated: June 22, 2021
        New York, New York

_____
            LEWIS J. LIMAN
        United States District Judge